# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf
of all others similarly situated,

               Plaintiffs,

     v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

              Defendant.

Case No. 2:23-CV-02848 (SJB) (SLT)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

I.    LEGAL AND FACTUAL BACKGROUND ........................................................ 1

    A.    Procedural History ................................................................................ 1

    B.    Factual Background ............................................................................... 2

        1.    Plaintiffs' Work as Investigators ............................................. 2

        2.    GEICO's Overtime Practices .................................................... 4

        3.    GEICO's Practices of Restricting Overtime Pressured Investigators to Work Off the Clock ...................................... 5

        4.    GEICO Carefully Budgeted Overtime and Subjected Overtime Approval to Strict Constraints ...................................... 6

        5.    GEICO's Performance Metrics Penalized Investigators for Working More Hours, While Simultaneously Pressuring them to Do So ............................................................ 8

        6.    Similar Performance Ratings Pressured Supervisors and the Region 2 Manager to Increase Workload While Limiting Hours........................................................ 10

        7.    GEICO Regularly Did Not Pay Investigators for All Hours Worked .................................................... 12

        8.    Investigators' Work Was Tracked and Timestamped in GEICO's Databases ...................................... 13

        9.    GEICO Supervisors Knew Investigators Worked Off the Clock ........................................................ 14

II.    ARGUMENT ...................................................................................... 15

III.    Legal Standard .................................................................................. 15

IV.    The Employer's Responsibility to Manage Overtime........................................... 15

V.    The New York Class Meets the Requirements of Rule 23(a) ................................ 16

    A.    The Class is So Numerous that Joinder is Impracticable.......................... 16

    B.    The Class Shares Common Questions of Law and Fact ........................... 16

    C.    Plaintiffs' Claims Are Typical of the Class .............................................. 19

    D.    Plaintiffs and Counsel Will Adequately Represent the Class .................. 20

VI.    Plaintiffs' Claims Meet the Requirements of Rule 23(b)(3) ................................ 22

    A.    Predominance is Met........................................................................... 22

i

        B.    The Superiority Requirement is Met.......................................................... 24

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Allegra v. Luxottica Retail N. Am.*,
  341 F.R.D. 373 (E.D.N.Y. 2022) .......................................................................... 15

*Alleyne v. Time Moving & Storage Inc.*,
  264 F.R.D. 41 (E.D.N.Y. 2010) ............................................................................ 19

*Barrows v. Becerra*,
  24 F. 4th 116 (2d Cir. 2022) ................................................................................. 19

*Belfiore v. P&G*,
  311 F.R.D. 29 (E.D.N.Y. 2015) ............................................................................ 15

*Brito v. Marina's Bakery Corp.*,
  No. 19 Civ. 828, 2022 U.S. Dist. LEXIS 53351 (E.D.N.Y. Mar. 24, 2022) .......................... 24

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010) ................................................................................. 20

*Calderon v. GEICO Gen. Ins. Co.*,
  809 F.3d 111 (4th Cir. 2015) .................................................................................. 4

*Catholic Health Care W. v. U.S. Foodserv.*,
  729 F.3d 108 (2d Cir. 2013) ................................................................................. 25

*Clarkson v. Alaska Airlines Inc.*,
  No. 19 Civ. 0005, 2020 U.S. Dist. LEXIS 138838 (E.D. Wash. Aug. 4, 2020) ..................... 25

*Diaz v. N.Y. Paving Inc.*,
  No. 18 Civ. 4910, 2023 U.S. Dist. LEXIS 57143 (S.D.N.Y. Mar. 31, 2023) ........................ 25

*Espinoza v. 953 Assocs. LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) ........................................................................... 19

*Hasemann v. Gerber Prod. Co.*,
  331 F.R.D. 239 (E.D.N.Y. 2019) ........................................................................... 15

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ............................................................................... 19

*Lawrence v. NYC Med. Prac., P.C.*,
  No. 18 Civ. 8649, 2024 U.S. Dist. LEXIS 14339 (S.D.N.Y. Jan. 26, 2024) ........................ 18

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F. 3d 242 (2d Cir. 2011)..................................................................................... 20

*Long v. HSBC USA Inc.*,
    No. 14 Civ. 6233, 2015 U.S. Dist. LEXIS 122655 (S.D.N.Y. Sept. 11, 2015) ....................... 25

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)...................................................................................... 19

*Martinenko v. 212 Steakhouse, Inc.*,
    No. 22 Civ. 518, 2023 U.S. Dist. LEXIS 64562 (S.D.N.Y. Apr. 12, 2023)............................. 22

*Martinez v. Ayken, Inc.*,
    No. 13 Civ. 7411, 2016 U.S. Dist. LEXIS 25556 (E.D.N.Y. Feb. 29, 2016) .......................... 17

*McDonagh v. Gov't Emps. Ins.*,
    No. 17 Civ. 391 (D. Md.) ........................................................................................... 4

*Mendez v. MCSS Rest. Corp.*,
    No. 16 Civ. 2746, 2019 U.S. Dist. LEXIS 103032 (E.D.N.Y. June 14, 2019)........................ 16

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)............................................................................... 15, 25

*Noble v. 93 Univ. Pl. Corp.*,
    224 F.R.D. 330 (S.D.N.Y. 2004).................................................................................. 18

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023) ........................................................................... 20

*Perez v. Allstate Ins. Co.*,
    No. 11 Civ. 1812, 2014 U.S. Dist. 130214 (E.D.N.Y. Sept. 16, 2014)............................ 21, 23

*Pichardo v. Carmine's Broadway Feast, Inc*,
    No. 15 Civ. 13065, 2016 U.S. Dist. LEXIS 78276 (S.D.N.Y. June 13, 2016) ....................... 19

*Pineda v. Skinner Servs., Inc.*,
    No. 16 Civ. 12217, 2019 U.S. Dist. LEXIS 133178 (D. Mass. Aug. 8, 2019)....................... 18

*Poplawski v. Metroplex on the Atlantic, LLC*,
    No. 11 Civ. 3765, 2012 U.S. Dist. LEXIS 46408 (E.D.N.Y. Apr. 2, 2012)............................ 20

*Pub. Emps. Retirement Sys. Mississippi v. Merrill Lynch & Co.*,
    227 F.R.D. 97 (S.D.N.Y. 2011)................................................................................... 22

*Ramirez v. Riverbay Corp.*,
    39 F. Supp. 3d 354 (S.D.N.Y. 2014) ........................................................................ 16

*Rivera v. Harvest Bakery Inc.*,
    312 F.R.D. 254 (E.D.N.Y. 2016) ............................................................................. 24

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ..................................................................................... 23

*Romero v. La Revise Assocs., L.L.C.*,
    58 F. Supp. 3d 411 (S.D.N.Y. 2014) ........................................................................ 23

*Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234 (2d Cir. 2011) ..................................................................................... 16

*Scott v. Chipotle Mexican Grill, Inc.*,
    954 F.3d 502 (2d Cir. 2020) ..................................................................................... 22

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ...................................................................................... 17, 22, 24

*In re Vale S.A. Sec. Litig.*,
    No. 19 Civ. 526, 2022 U.S. Dist. LEXIS 6433 (E.D.N.Y. Jan. 11, 2022) ............... 22

*Vetter v. GEICO Gen. Ins. Co.*,
    No. 13 Civ. 642 (D. Md.) ........................................................................................... 4

*In re Visa Check/Mastermoney Antitrust Litig. v. United States*,
    280 F.3d 124 (2d Cir. 2001) ..................................................................................... 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................................... 15, 16-17

*Willix v. Healthfirst, Inc.*,
    No. 07 Civ. 1143, 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec. 3, 2009) .......... 21

*Winfield v. Citibank, N.A.*,
    843 F. Supp. 2d 397 (S.D.N.Y. 2012) ..................................................................... 19

*Wood v. Mike Bloomberg 2020, Inc.*,
    746 F. Supp. 3d 185 ................................................................................................. 21

*Zivkovic v. Laura Christy LLC*,
    329 F.R.D. 61 (S.D.N.Y. 2018) .......................................................................... 20, 23

**FEDERAL RULES**

Fed. R. Civ. P. 23 (a) ................................................................................................. 16

Fed. R. Civ. P. 23 (b)(3) ........................................................................................ 22, 24

Fed. R. Civ. P. 23 (g)(1)(A) ....................................................................................... 21

**FEDERAL REGULATIONS**

Title 29 C.F.R. § 785.11 ............................................................................................ 15

Title 29 C.F.R. § 785.13 ............................................................................................ 15

**INTRODUCTION**

It is illegal for an employer to fail to pay overtime to employees who work more than 40 hours in a week.  To prove liability, the New York Labor Law ("NYLL") does not require a plaintiff to show a deliberate directive, plan, or policy.  It requires only that the employer knew or should have known that the work was performed.  Here, GEICO created a robust system of incentives and disincentives that punished Special Investigators[1] for reporting long hours, while encouraging their supervisors and managers to overload them with work.  The predictable outcome was that Investigators worked overtime without explicitly reporting that fact to GEICO. GEICO should have known better.  That common contention, and the effect of GEICO's management practices, are the "glue" that holds this class action together.

Plaintiffs seek to represent a class of Investigators who worked for GEICO in New York State (under a single Manager) and were subject to the same employment practices they challenge here, and who, like Plaintiffs, were not paid for all overtime hours worked over 40 hours each workweek (the "Class").

## I.    LEGAL AND FACTUAL BACKGROUND

### A.    Procedural History

On April 17, 2023, Plaintiffs filed a nationwide Class and Collective Action Complaint. Docket Entry ("DE") 1.  Plaintiffs filed a Motion for Court-Authorized Notice Pursuant to 29

---

[1]    "Special Investigator" or "Investigator" is an overarching title that includes Plaintiffs' job titles and those of other employees with substantially similar job duties.  Notwithstanding changes in job titles over time, "Special Investigator" is used herein to refer to employees in the following positions (and similarly situated job titles, however variously titled) who performed similar investigative work and were subject to the same overtime practices:  Senior Field Security Investigator, Lead Security Investigator, Major Case SIU Investigator, Field Medical Fraud Investigator, Field Major Case SIU Investigator, Senior Outside Security Investigator, Internal Major Case SIU Investigator, Senior Internal Security Investigator, Internal Security Investigator, and Claims Security Investigator.

U.S.C. § 216(b) ("216(b) Motion"), DE 39, which was denied without prejudice and with leave to renew after the Court resolved GEICO's then-pending Motion to Dismiss. DE 43. Plaintiffs filed an Amended Complaint revising the scope of this case to New York Investigators, which mooted GEICO's Motion to Dismiss. DE 52. Plaintiffs then filed a Renewed 216(b) Motion on April 15, 2024, which is still pending. DE 62.

The Parties have engaged in extensive discovery, but it has been limited by the Court's case management order, which does not permit full discovery until the Court rules on Plaintiffs' 216(b) Motion. *See* Apr. 16, 2024 Min. Order. Plaintiffs responded to detailed Court Interrogatories with declaration testimony from 32 Investigators who opted into this matter,[2] and GEICO produced time and payroll records and policy documents. In Phase One discovery, the Parties have taken one Rule 30(b)(6) deposition, one Manager deposition, one Supervisor deposition, seven Named Plaintiff depositions, and eight Opt-In Plaintiff depositions. The Parties anticipate additional discovery during Phases Two (which begins after the Court rules on Plaintiffs' 216(b) Motion) and Three (damages discovery). *See id.*

### B. Factual Background

#### 1. *Plaintiffs' Work as Investigators*

Investigators worked remotely, either from their homes or in the field, or from a GEICO office, in GEICO's Special Investigations Unit ("SIU"), from April 17, 2017 to the present (Class Period). All Class Members here were assigned to GEICO's regional office in Melville, NY, which GEICO designated "Region 2" before 2023.[3] Investigators work on small teams with

---

[2]     Four opt-in plaintiffs have since withdrawn from this action and refiled their claims in the District of Maryland to avoid losing time to briefing on this Court's jurisdiction. *See* DE 49. One additional opt-in plaintiff has withdrawn from this action. *See* DE 72.

[3]     DE 56-1 (Barden 216(b) Decl.) ¶ 1; DE 56-2 (Brady 216(b) Decl.) ¶ 1; Declaration of Michael J. Scimone ("Scimone Decl."), Ex. 1 (Brust Dep.) 149:21-22; DE 56-4 (Caniglia, Jr. 216(b) Decl.) ¶ 1; DE 56-5 (Caniglia, Sr. 216(b) Decl.) ¶1; Ex. 2 (Costanzo Dep.) 20:23-25; DE

seven to ten others,[4] who report to SIU Supervisors, who report to a single SIU Manager.[5] Investigators regularly speak with Supervisors about their cases and workloads during team meetings and one-on-one calls.[6] Supervisors hold semi-monthly meetings with Investigators to discuss their performance.[7] Supervisors regularly correspond and meet with the Manager about their Investigators' workloads, performance, and other concerns.[8]

Investigators' primary job duties are to investigate cases of suspected insurance fraud. They must, among other things, review case files; run background checks; examine billing reports; drive to medical facilities, accident scenes, and/or theft sites; gather evidence; interview

---

56-7 (DiNiso 216(b) Decl.) ¶ 1; Ex. 3 (K. Fischer Dep.) 28:9-14; Ex. 4 (M. Fischer Dep.) 89:2-8; DE 56-10 (Geraci 216(b) Decl.) ¶ 1; DE 56-11 (Giambalvo 216(b) Decl.) ¶ 1; DE 56-12 (Gillen 216(b) Decl.) ¶ 1; Ex. 5 (Grey Dep.) 49:24-50:5; Ex. 6 (Jones Dep.) 51:17-23; Ex. 7 (King Dep.) 178:17-24; DE 56-16 (Mangan 216(b) Decl.) ¶ 1; DE 56-17 (McManus 216(b) Decl.) ¶ 1; Ex. 8 (Moeser Dep.) 33:2-6; Ex. 9 (Muñoz Dep.) 53:18-20; DE 56-20 (Neenan 216(b) Decl.) ¶ 1; DE 56-21 (O'Sullivan 216(b) Decl.) ¶ 1; Ex. 10 (Pia Dep.) 36:14-17; DE 56-23 (Reed 216(b) Decl.) ¶ 1; DE 56-24 (Teatum 216(b) Decl.) ¶ 1; DE 56-24 (Wendling 216(b) Decl.) ¶ 1; *see also* Ex. 11 (30(b)(6) Dep.). Unless otherwise noted, all exhibits are attached to the Scimone Declaration.

[4]    Ex. 12 (Newport Dep.) 52:2-3 (Manager describing teams as having approximately 7-12 Investigators); Ex. 9 (Muñoz Dep.) 98:1-13 (Investigator describing teams as having approximately 7-10 Investigators).

[5]    Ex. 11 (30(b)(6) Dep.) 82:24-83:3 (discussing reporting structure). GEICO's corporate structure changed in 2023, but Investigators and Supervisors in New York still report to one Manager.

[6]    Ex. 13 (Cassagne Dep.) 50:16-51:8 (as Supervisor, he spoke with his supervisees "[s]ometimes daily, sometimes weekly, depending on the need," by phone or during weekly meetings); *see also e.g.*, Ex. 1 (Brust Dep.) 254:21-256:-4 (Investigator had monthly team meetings with Cassagne and weekly one-on-one meetings with Supervisor Toni D'Agata during which he complained about his high caseload and working overtime to meet his case requirements).

[7]    Ex. 14 (SIU Field Supervisor Expectations 2020) at G007935 (Expectations requiring supervisors to "[s]pend the major portion of each day coaching and working with [Special Investigators] and listing monthly ride, call, and case review meetings); Ex. 13 (Cassagne Dep.) 39:5-8 (Supervisor noting that the purpose of the "monthly case review" is to make sure cases are "spread evenly throughout the month to the associates").

[8]    Ex. 12 (Newport Dep.) 50:24-51:9 (Manager met regularly with supervisors, and had "an open-door policy with . . . supervisors"); Ex. 13 (Cassagne Dep.) 26:17-27:19 (Supervisor and other supervisors met with their Manager approximately once a year to discuss an overall business plan, including "staffing or cases").

witnesses and law enforcement; confirm police reports; canvass and surveil scenes; conduct examinations under oath; and write and submit reports about their findings.[9]  These duties and the prescribed procedures for them are outlined in SIU Operations Manuals.[10]

### 2. *GEICO's Overtime Practices*

GEICO has a history of overtime noncompliance.  In litigation that ran from 2010 to 2016, Investigators successfully challenged GEICO's practice of misclassifying them as exempt from overtime.  *See Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015) (affirming summary judgment in favor of Investigators; administrative exemption did not apply). Following *Calderon*, GEICO reclassified Investigators as salaried nonexempt.[11]  Investigators continued to challenge GEICO's overtime practices.  *See Vetter v. GEICO Gen. Ins. Co.*, No. 13 Civ. 642 (D. Md.) (matter pending during *Calderon* that settled in 2018); *McDonagh v. Gov't Emps. Ins.*, No. 17 Civ. 391 (D. Md.) (matter brought after *Calderon;* settled in 2018). Following *Calderon*, *Vetter*, and *McDonagh*, GEICO changed its practices again around January

---

[9]    *See* Ex. 15 (Senior Field Security Investigator Job Description) at G006749; Ex. 16 (Lead Security Investigator Job Description) at G006754; Ex. 17 (Internal Major Case SIU Investigator Job Description) at G006756; Ex. 18 (Senior Internal Security Investigator Job Description) at G007697; Ex. 19 (Major Case SIU Investigator Job Description) at G007700; Ex. 20 (Internal Security Investigator Job Description) at G007705; Ex. 21 (Field Major Case SIU Investigator Job Description) at G007709; Ex. 22 (Claims Security Investigator Job Description) at G007711; *see also* Ex. 1 (Brust Dep.) 49:20-50:8; Ex. 8 (Moeser Dep.) 33:11-14; Ex. 10 (Pia Dep.) 37:25-39:3; Ex. 3 (K. Fischer Dep.) 32:4-33:20; Ex. 6 (Jones Dep.) 48:3-13, 51:8-16; Ex. 23 (Mangan Dep.) 30:9-23; Ex. 2 (Costanzo Dep.) 158:21-166:1; Ex. 7 (King Dep.) 42:22-43:12; Ex. 4 (M. Fischer Dep.) 60:12-62:9; Ex. 9 (Muñoz Dep.) 52:22-53:8, 70:19-80:10; Ex. 24 (O'Sullivan Dep.) 29:16-22; Ex. 25 (Reed Dep.) 31:14-37-9; Ex. 26 (Barden Dep.) 26:9-15, 28:16-21, 166:7-15, 175:15-20.

[10]    *See e.g.*, Ex. 27(2017 SIU Operations Manual) at G010748-92.

[11]    Ex. 28 (FLSA Communications to Associates) at G009145 (describing payment for hours worked after 38.75 hours as "premium payment" to be paid at a fluctuating workweek rate effective November 26, 2016).

2020.[12]  GEICO now pays Investigators overtime at 1.5x their hourly rate for *recorded* time over 40 hours in a workweek – which is not all the time they work.[13]

### 3. *GEICO's Practices of Restricting Overtime Pressured Investigators to Work Off the Clock.*

GEICO imposed tight controls on overtime pay that encouraged Investigators to consistently underreport their time to keep their jobs.  GEICO requires that all requests for overtime pay receive prior management approval.[14]  Investigators must demonstrate a "business need" (an ambiguous concept)[15] for approval to work beyond their scheduled 7.75 hours per day.[16]  These policies create an expectation that Investigators "discuss[] with [their] supervisor to determine if the extra time was needed," during which the supervisor may approve or deny the request.[17]

---

[12]    Ex. 29 (Hourly Rate Excel) at G009143 (client rates of pay with note stating that "SIU Investigators were paid by salary until January 4, 2020").

[13]    Ex. 30 (May 2023 HR Handbook) at G000054 ("A nonexempt associate is paid overtime pay (time and one-half the hourly rate of pay.")).

[14]    Ex. 31 (November 2017 HR Handbook) at G000041 ¶ 5 (discussing premium pay and stating that "[w]ork time beyond 38.75 hours in a week is not allowed without prior management approval."); Ex. 30 (May 2023 HR Handbook) at G000054 ("A nonexempt associate must receive permission in advance to work more than their regular work hours.  Failure to do so may result in disciplinary action, up to and including termination of employment.").

[15]    Ex. 11 (30(b)(6) Dep.) 257:13-258:4 (circular explanation of "business need" and stating that the manager determined it); Ex. 12 (Newport Dep.) 241:9-20 (describing overtime that meets business need as work discussed with a supervisor before approval); Ex. 13 (Cassagne Dep.) 186:23-187:8 ("If you need to do something regarding your case . . . that was a business need which was – needed to be done within the guidelines of the company, then it would be approved . . . .").

[16]    Ex. 32 (AD & SIU Talking Points) at G010294 (document including FAQ about 2020 reclassification and stating overtime was "available according to business need").

[17]    Ex. 12 (Newport Dep.) 257:2-3; *see also id.* 239:5-17 (Manager: "If time was needed or you thought time was needed, you would contact your supervisor, have a discussion, maybe pursue alternate solutions . . . ."); Ex. 1 (Brust Dep.) 140:20-21 (Investigator stating general policy was "to ask your supervisor for overtime before you did it.").

Investigators' unpredictable field work made prior approval impractical.  Accordingly, Supervisors required them to email *after* working overtime for approval.[18]  Supervisors required these emails, often sent late in the evening, to outline the tasks Investigators completed, the times the tasks were completed, and the amount of overtime requested.[19]  Constance Mangan described this as "onerous," because she "had to contact [her] supervisor; had to request permission to submit for overtime; had to cite a specific case or cases that [she] would require the overtime for, and then had to specify the number of hours [she] anticipated needing to complete that task on that day that would require overtime."[20]  If she underestimated the overtime needed, she "was not permitted to correct it."[21]  Supervisors often denied overtime requests.[22]

### 4.    *GEICO Carefully Budgeted Overtime and Subjected Overtime Approval to Strict Constraints.*

Supervisors did not have unlimited discretion to approve overtime.  Region 2 had an overtime budget.[23]  Outside of the "one-off" situations described above, where an Investigator

---

[18]    Ex. 13 (Cassagne Dep.) 198:7-199:2 (Supervisor generally did not approve overtime in advance; "if an investigator was in the field and he was coming to the end of his day and he had to finish up an interview or if he had to do something at a police station or the interview – whatever, or the EUO ran over and he was running past his time, then he would contact me at the end of the day and say 'I had to work two hours today to finish what I needed to do on this case.' I would have him send me the information, I would say, "Fine, put it on your timesheet, and I would approve it."), *id*. 199:20-25 (similar).

[19]    *See, e.g.*, Ex. 33 (Keith Fischer Nov. 30, 2016 email to Cassagne) at G011492 (sent at 11:44 PM, noting cases worked, time spent on cases (from 6:30 AM to 7 PM), requesting 4 hours overtime); Ex. 34 (Brust June 3, 2020 email to Cassagne) at G012079 (sent at 10:56 PM noting cases worked, requesting 3 hours overtime); Ex. 35 (Caniglia, Jr. December 15, 2016 email to Cassagne) at G011543 (sent at 1:43 AM noting cases worked, time spent on cases (from 7 AM to 8:30 PM), requesting 2 hours overtime).

[20]    Ex. 23 (Mangan Dep.) 106:16-22.

[21]    *Id.*106:23-24.

[22]    Ex. 1 (Brust Dep.) 253:23-254:14 (describing "sporadic" frequency of approval); Ex. 6 (Jones Dep.) 139:3-5 ("there were times where overtime was approved, and whenever I asked, it was never being approved.").

[23]    Ex. 36 (William Newport June 25, 2018 email) at G010847 (noting SIU budget); Ex. 37 (2018 SIU Reforecast Excel) at G010846 (in SIU tab, Region "experienced [an] increase[d] case load but [had] recently shifted who works it to less OT in the field.").

6

had specific tasks to complete, even the Region's Manager did not have "unlimited discretion."[24] Manager William Newport testified that, "[i]f it was going to be almost like a regular, a lot of work . . . I would need to review it and submit it or discuss it with the appropriate parties at GEICO to see if it would be acceptable."[25]

This second-level approval process occasionally led to limited periods when GEICO allowed overtime for special circumstances, like catastrophe projects,[26] that fell outside Investigators' regular caseload. This "pre-authorized" overtime was tightly regulated.[27] In 2018, Newport submitted an "OT approval form" to GEICO Vice President Rick Hoagland, who ultimately authorized a one-week overtime "campaign" allowing Investigators to work an additional ten hours for one week to resolve an unexpected excess of cases – but on the condition that the time spent would be rigorously tracked, and the effects of the work documented, with continued approval contingent on the results.[28] A similar "campaign" occurred in June 2020.[29] These limited periods of pre-authorized overtime were the exception that proves the rule: overtime was strictly controlled, not routinely allowed.

---

[24]    Ex. 12 (Newport Dep.) 255:9-23.
[25]    *Id.* 255:14-20.
[26]    Ex. 31 (November 2017 Associate Handbook) at G000040 (discussing Catastrophe Pay policy); Ex. 3 (K. Fischer Dep.) 119:10-22 (describing pre-approved overtime work during catastrophe and working approximately 12-hour days).
[27]    *See, e.g.*, Ex. 38 (Special Pay Program Acknowledgement (Exempt) Form) at G011552.
[28]    Ex. 39 (November 23, 2018 email from Rick Hoagland to Newport) at G010848; Ex. 40 (Cassagne November 26, 2018 email to Investigators) at G011553 ("There are a large amount of social media cases pending in SIU. Currently there are 650 cases that need to be handled.").
[29]    Ex. 41 (June 2020 Cassagne Emails to Supervisors and Investigators) at G011584-85.

5.    *GEICO's Performance Metrics Penalized Investigators for Working More Hours, While Simultaneously Pressuring them to Do So.*

GEICO imposed strict performance metrics on Investigators, with severe consequences for scoring poorly.  All metrics rated Investigators on a 1-5 scale.[30]  Investigators who were rated less than a 3.0 were ineligible for an annual salary increase and put on a performance improvement plan.[31]  The metrics were weighted differently over the years, but taken together, they penalized Investigators for working more hours while increasing their workload in ways that made it impossible to limit those hours.

One key metric, (Adjusted) Productivity, was calculated as a ratio that divided the number of cases an Investigator closed by the number of work hours reported for the month.[32]  The effect of this, which GEICO managers emphasized to Investigators, was that reporting additional work hours "would reflect negatively on our ratings"[33] – in other words, "if you

---

[30]    *See* Ex. 42 (November 2017 Associate Handbook – Employment Contents) at G000172 (outlining 1-5 scale for appraisals); Ex. 43 (July 2023 Associate Handbook) at G000210 (same). *See, e.g.*, Ex. 44 (Reed 2017 Performance Appraisal) at G006014-18; Ex. 45 (Brady 2018 Performance Appraisal) at G005991-92; Ex. 46 (Grey 2019 Performance Appraisal) at G006119-29; Ex. 47 (McManus 2020 Performance Appraisal) at G006449-56; Ex. 48 (Grey 2021 Performance Appraisal) at G006152; Ex. 49 (Muñoz 2022 Performance Appraisal) at G006202.

[31]    Ex. 42 (November 2017 Associate Handbook – Employment Contents) at G000170 (performance appraisals are "a primary factor in determining his/her salary within the salary pay range.").  In 2023, this language was softened to say that a 3.0 rating means an Investigator "is not eligible for a merit increase and *may* be placed on a Warning.  An associate's performance that continues to be rated less than Good (3.0) will be subject to further corrective action, up to and including termination of employment." Ex. 43 (July 2023 Associate Handbook) at G000210. *See also* Ex. 26 (Barden Dep.) 167:19-24 ("I was contacted at one point by Mr. Janik who told me that I didn't actually meet criteria for a raise at that particular time during the year, and it was due to my performance evaluation.").

[32]    Ex. 50 (SIU Case Investigations Instructions) at G017297 ("The number of cases closed . . . per 155 hours worked.  155 hours worked is roughly the average number of hours worked by an associate in one month's time.").  The "Implied Adjusted Factor," which had different levels and weights throughout the Class Period, weighted different cases depending on the expected amount of work, to compare Investigators working on different cases.  *Id.*

[33]    Ex. 8 (Moeser Dep.) 104:5-8.

8

submit overtime you are gonna be docked" or "judged on more hours worked."[34]  For example,

"if you put in for 20 hours overtime in a given month, well, now you are rated on . . . 175 hours

instead of 155 hours, which would negatively reflect on your rating . . . ."[35]

     The other metrics made Investigators' work either more time-consuming or more

deadline-driven.  To score File Quality, GEICO randomly audited cases and assigned a quality

score based on various factors.[36]  These required great attention to detail to avoid being

downgraded for how a report was worded.[37]  Other metrics, such as Case Life, measured how

quickly Investigators resolved cases.[38]  And some more granular, task-specific requirements

required Investigators to "touch" a case within a few days at certain points in the investigation.[39]

Plaintiff Keith Fischer explained:

---

[34]    *Id.* 106:14-16.

[35]    *Id.*106:16-22.

[36]    Ex. 51 (Costanzo 2021 Performance Appraisal) at G006624 (describing File Quality metric: "Must meet case report quality guidelines.  Measured as percent of files satisfactory. Includes regional and CHO audit results."); Ex. 6 (Jones Dep.) 96:4-13 (describing File Quality audit factors including whether evidence was uploaded properly (i.e., whether it could be opened or viewed properly in the system), whether a recorded interview was taken, whether the proper opening or closing was used, whether a case report was properly uploaded to the case management system); Ex. 8 (Moeser Dep.) 181:13-182:12 (describing File Quality factors, including how reports were worded).

[37]    Ex. 8 (Moeser Dep.) 181:24-182-6 ("But they would down grade you because you didn't use the right wording.  You know, if you went to interview somebody and, you know, you decided later on that you didn't need to interview somebody but you didn't document that properly, they would downgrade you for that.").

[38]    Ex. 52 (SIU Core Metrics Report Card Excel) at G007938 (Notes tab with formulas for metrics, including Average Case Life, calculated as: (Closed Date – Case Assigned Date) / (Number of Closed Cases)).

[39]    Ex. 3 (K. Fischer Dep.) 72:24-73:6 (he had to "touch" a case on "[t]he 3rd day, the 8th day, . . . the 15th day, the 21st day, and then closure within I believe 28 days"), *id.* 74:12-17 (social media cases had to be touched the day they were received); Ex. 1 (Brust Dep.) 172:16-17 ("You had to touch the case, meaning review the case every five days."); Ex. 23 (Mangan Dep.) 171:17-21 ("I know that they used to tell you you had to touch a case – the initial receipt of the case has to be acknowledged . . . ."), *id.* ("You have to touch it in some way.  You reach out; you verify a date; you do an additional computer check, whatever you think might be required for the case."); Ex. 25 (Reed Dep.) 108:19-24 ("You had to . . . touch the case almost every day to see if

On a Friday before 3 o'clock if I got let's say five cases during the day, I had to touch them before . . . 10 o'clock at night. So I had to do something on it to touch them to get into them and show that I had gotten the case, that I knew about the case, and I had spoken to somebody or done something on the case.[40]

GEICO Supervisors ensured that these metrics were constantly on Investigators' minds. They forwarded "report cards" to Investigators every month showing their ratings.[41] And GEICO ranked Investigators against each other,[42] forcing relative low scorers into the lowest quartile, which placed them at risk of adverse job consequences.[43]

### 6. *Similar Performance Ratings Pressured Supervisors and the Region 2 Manager to Increase Workload While Limiting Hours.*

The same pressures that drove Investigators to work unreported hours applied to their Supervisors and to the Manager of Region 2. Supervisors were evaluated on the same metrics as Investigators, but aggregated for their team.[44] Thus, if a team of Investigators reported longer

---

[40]  there were any updates. That also included going back into the claim file to see if there was any updates in the claim file that the examiner failed to notify you of."), *id.* 159:12-15 ("I know that you had to touch the case at least every four days."); Ex. 6 (Jones Dep.) 283:22-23.

[40]  Ex. 3 (K. Fischer Dep.) 73:17-74:9 (guidelines became more stringent; in 2014 or 2015, he "had to touch a case within three days. If we got it on a Friday, you had to touch it on a Monday. At the end, to give you a perspective on it, you had to touch it the same day. You had to touch it within five hours. So we lost that two days.").

[41]  *See, e.g.*, Ex. 53 (October 20, 2021 email from Supervisor Chester Janik to Investigator Grey) at G012429-30 (regarding September score card, including notes that Grey "failed three cases on audit" and that he "did a good job on raising up the Activity number from last month of 89 to 159").

[42]  Ex. 42 (November 2017 Associate Handbook – Employment Contents) at G000170 (Investigators "are rated (performance rating) and then ranked against other associates in their department"); Ex. 12 (Newport Dep.) 155:21-23 (Manager: core metrics were "a way to evaluate [Investigators'] performance compared to their peers.").

[43]  Ex. 25 (Reed Dep.) 78:22-79:6 (discussing difficultly keeping up with cases and that it was often a choice between (1) letting "cases linger where you're going to be put on a coaching plan, or you're going to be put into the fourth quartile, or you're going to be losing money at the end of the year because your rating and your report card was bad" and (2) working "on your own to get those cases caught up and get those cases done").

[44]  For 2017, Supervisor Goals included "Independent Audit Results" (40% weight) and "Composite Score of Team" (60% weight). Ex. 54 (Cassagne 2017 Performance Appraisal) at G010539-42 (noting total cases assigned and overall team rating, and Manager Michael DeGrocco noting overall team rating improvement and ranking compared to other Region 2

work hours and suffered lower productivity scores as a result, their supervisors were similarly

impacted.  GEICO compared Supervisors' teams against each other in Performance Appraisals.[45]

Manager metrics were similarly aggregated and compared on a region-vs.-region basis,

with the addition of one more metric: New Cases Assigned.[46]  This measured the volume of work

handled by the entire Region.[47]  Managers could adjust the cases assigned to their Region by

requesting changes to an algorithm that identified potential fraud markers.[48]  GEICO ensured

that these scores were front-of-mind for Managers; Louis Pia's supervisor, Gerard Cassagne,

reported that Region 2 SIU Manager William Newport "got his butt handed to him" during a

management meeting for having lower caseload numbers than other managers.[49]  Soon

afterwards, the number of cases flowing into Region 2 increased.[50]

Investigators' caseloads rose steadily over the years.  Investigators discussed their

increasing caseloads in team meetings and during phone calls with their supervisors.[51]

Caseloads increased dramatically after March 2020.[52]  Supervisors knew people had trouble

---

Supervisors).  From 2018 on, Supervisor Goals changed to Quality, Productivity, Case Life, and
Effectiveness, which more explicitly tied Supervisor metrics to Investigators' metrics.  *Compare*
Ex. 55 (Cassagne 2018 Performance Appraisal) at G010601 (including Quality, Productivity, and
Case Life), *with* Ex. 56 (2019 Metrics PowerPoint) at G007966 (noting 2018-19 Supervisor
Metrics as Productivity, Quality, Case Life, and Effectiveness).

[45]    Ex. 54 (Cassagne 2017 Performance Appraisal) at G010541 (Manager Newport noting
that, "Overall, his team ranked 1st in case life, 2nd in productivity and 4th in quality.").

[46]    Ex. 56 (2019 Metrics PowerPoint) at G007969.

[47]    Ex. 12 (Newport Dep.) 73:7-16 (explaining "NCA" means New Cases Assigned), *id.*
98:4-6 ("[T]he new cases assigned would have been the ones that passed through the referral
process.").

[48]    Ex. 12 (Newport Dep.) 77:18-24.

[49]    Ex. 10 (Pia Dep.) 219:12-20.

[50]    *Id.* 220:13-16 ("There was an increase in cases and – and it was for the whole unit, not
just a specific team or . . . investigator.").

[51]    *See, e.g.*, Ex. 57 (Supervisor D'Agtata Coaching Log for Investigator Wendling) at
G016093-98 (caseload worsened shortly after COVID began).

[52]    Ex. 13 (Cassagne Dep.) 93:10-12 ("So this was COVID time.  So they definitely had an
increase in caseload.").

keeping up during this stressful and disorienting time but were only able to move around a case or two – which did not truly alleviate Investigators' problems.[53]

### 7. GEICO Regularly Did Not Pay Investigators for All Hours Worked.

The predictable effect of these systems, and the culture they created, was that Investigators routinely did not report hours worked above 38.75 hours per week (or 7.75 hours per day, Monday through Friday),[54] entering 38.75 hours on their timesheets each week.[55] Across a sample of 25 Investigators from June 2017 through November 2023, only 1% of hours logged were overtime hours.[56] The other 99% of entries show precisely 7.75 hours per day.

---

[53]    Ex. 57 (Supervisor D'Agtata Coaching Log for Investigator Wendling) at G016097 (week ending May 8, 2020, noting "team meeting about the increase of assignments and [that] some teams are getting more cases than others"), *id.* (week ending May 15, 2020, Wendling said he was overwhelmed by the number of cases he received).

[54]    Ex. 23 (Mangan Dep.) 109:23-24 ("My understanding was that overtime was discouraged."), *id.* 150:20-24 ("Well it was specifically Toni D'Agata and Dara who pointed out to me that putting in overtime hours would be detrimental to me. So that's certainly a discouragement to me.").

[55]    DE 56-1 (Barden 216(b) Decl.) ¶¶ 8-9, 11; DE 56-2, Ex. B (Brady 216(b) Decl.) ¶¶ 8-11; DE 56-3, Ex. C (Brust 216(b) Decl.) ¶¶ 7-10; DE 56-4, Ex. D (Caniglia, Jr. 216(b) Decl.) ¶¶ 7-12; DE 56-5, Ex. E (Caniglia, Sr. 216(b) Decl.) ¶¶ 7-9, 11; Costanzo Dep. 231:14-18, 231:25-232:9; DE 56-7, Ex. G (DiNiso 216(b) Decl.) ¶¶ 6-9; K. Fischer Dep. 120:9-121:21; DE 56-9, Ex. I (M. Fischer 216(b) Decl.) ¶¶ 6-8; DE 56-10, Ex. J (Geraci 216(b) Decl.) ¶¶ 7-8, 11; DE 56-11, Ex. K (Giambalvo 216(b) Decl.) ¶¶ 6-7; DE 56-12, Ex. L (Gillen 216(b) Decl.) ¶ 7; DE 56-13, Ex. M (Grey 216(b) Decl.) ¶¶ 7-10; Jones Dep. 146:23-151:12; DE 56-15, Ex. O (King 216(b) Decl.) ¶¶ 8-10; DE 56-16, Ex. P (Mangan 216(b) Decl.) ¶¶ 9-10; DE 56-17, Ex. Q (McManus 216(b) Decl.) ¶¶ 6-7; DE 56-18, Ex. R (Moeser 216(b) Decl.) ¶¶ 8-10; DE 56-19, Ex. S (Muñoz 216(b) Decl.) ¶¶ 6-10; DE 56-20 Ex. T (Neenan 216(b) Decl.) ¶¶ 8-9; DE 56-21, Ex. U (O'Sullivan 216(b) Decl.) ¶¶ 8-9; DE 56-22, Ex. V (Pia 216(b) Decl.) ¶¶ 8-11; DE 56-23, Ex. W (Reed 216(b) Decl.) ¶¶ 8-10; DE 56-24, Ex. X (Teatum 216(b) Decl.) ¶¶ 6-10; DE 56-25, Ex. Y (Wendling 216(b) Decl.) ¶¶ 8-9.

[56]    *See* Ex. 58 (June 2017 – July 2023 Time Records) at G004003; Ex. 59 (July 2023 – November 2023 Time Records) at G004148.

Plaintiffs testified that it became routine to underreport work hours because of the strict controls GEICO exercised,[57] because Supervisors told them not to report overtime,[58] because their performance metrics penalized them for reporting more hours,[59] and because Supervisors told them "there's no approved overtime."[60] Even when there were processes in place to request approval, they were so burdensome as to deter Investigators from using them.[61]

### 8. *Investigators' Work Was Tracked and Timestamped in GEICO's Databases.*

GEICO's payroll systems are not the only source of data about Investigators' work. GEICO assigns cases through its database SICM ("Special Investigation Case Management"), where Investigators submit casework.[62] SICM records the date and time when a Special Investigator is assigned a new case.[63] Special Investigators "mark down every task that they

---

[57] Ex. 23 (Mangan Dep.) 109:7-110:8 ("We never submitted for overtime when I worked for Kevin Moynihan. I don't even recall overtime being an option when I worked for Kevin Moynihan . . . . overtime was discouraged, and to go back and try to get an additional hour approved on top of the two hours I had already requested, I didn't feel confident that it would be approved, and I also did not really want to have to go through another process of submitting a request for an approval and specifying a case for another hour of overtime, especially when my [] supervisors were saying we shouldn't be doing it.").

[58] Ex. 8 (Moeser Dep.) 131:15-132:16 (Supervisor Neyland told him that "they, and I don't know who 'they' are, said that you are not supposed to report overtime" for time spent completing reports of field activities).

[59] Ex. 60 (Caniglia, Jr. Dep.) 235:23-236:16 ("If I could work five cases in 38.75 and then the next week I got ten cases, I could only put 38.75 hours in. So if I did ten cases in 38.7 hours, if I put more work in, which I did, I could be negatively impacted on my core metrics. Q. If you were to put in ten additional hours and you log those in the system, is what you're saying that your productivity number would be negatively affected because you are taking 48.75 hours to close those cases now? A. Yes, that's correct, Counsel.").

[60] Ex. 6 (Jones Dep.) 139:2-3 ("And it was said that, you know, there's no approved overtime right now.").

[61] Ex. 23 (Mangan Dep.) 106:7-108:3 (overtime approval process was onerous because she "was so crunched for time, and we were all so pressed for time, it seemed like even the smallest thing was just another layer, another thing, another procedure that we had to go through in order to get this [work] done.")

[62] Ex. 11 (30(b)(6) Dep.) 188:15-17.

[63] Ex. 13 (Cassagne Dep.) 235:12-15.

take" in SICM,[64] and these entries are timestamped.[65]  This information was visible to GEICO Supervisors.[66]  Investigators reported their tasks by typing notes into SICM or clicking checkboxes.[67]  After an investigation, when Investigators "close out" of a case,  SICM timestamps this action.[68]  After Investigators complete their work, SICM tracks their activity metrics, including Productivity,[69] Case Life,[70] and File Quality.[71]

**9.    *GEICO Supervisors Knew Investigators Worked Off the Clock.***

SICM time stamps were not the only way GEICO Supervisors were made aware of the unreported hours that Special Investigators were working.  As noted above, requests for overtime, when made, were frequently sent late in the evening.[72]  And Plaintiffs informed GEICO management, over and over again, that they were working unpaid hours.[73]

---

[64]    Ex. 11 (30(b)(6) Dep.) 262:20-21.

[65]    *Id.* 262:23-24.

[66]    Ex. 13 (Cassagne Dep.) 240:10-15 (SICM includes information about various aspects of Investigators' work, including related case law, events, and EUOs).

[67]    Ex. 13 (Cassagne Dep.) 241:14-23.

[68]    Ex. 11 (30(b)(6) Dep.) 267:15-18.

[69]    *Id.* 197:2-6 (SICM tracks productivity).

[70]    Ex. 11 (30(b)(6) Dep.) 198:10-12 (SICM is the only database that tracks case life); Ex. 13 (Cassagne Dep.) 235:16-20 (case life is based on the timestamp of when a case is assigned).

[71]    Ex. 11 (30(b)(6) Dep.) 197:21-198:5 (GEICO uses SICM and an internal database called Guardian to track file quality audits.)  GEICO also tracks mileage and money spent on gas through Wheels, a fleet management company through which Special Investigators' cars are issued and managed.  Cassagne Dep. 244:20-246:22.

[72]    *See supra* note 19.

[73]    Ex. 26 (Barden Dep.) 101:15-103:16; Ex. 1 (Brust Dep.) 111:9-115:2; Ex. 60 (Caniglia, Jr. Dep.) 77:1-83:11; Ex. 2 (Costanzo Dep.) 50:13-22, 51:4-23; Ex. 5 (Grey Dep.) 256:18-256:22, 257:1-257:17; Ex. 6 (Jones Dep.) 122:4-123:18; Ex. 4 (K. Fischer Dep.) 87:24-89:3, 99:20-100:10; Ex. 7 (King Dep.) 113:16-114:25, 115:1-116:18; Ex. 23 (Mangan Dep.) 104:20-106:6, 110:9-111:4; Ex. 8 (Moeser Dep.) 95:20-99:21; Ex. 9 (Muñoz Dep.) 143:1-144:17; Ex. 24 (O'Sullivan Dep.) 67:8-69:15; Ex. 10 (Pia Dep.) 70:4-71:19; Ex. 25 (Reed Dep.) 70:18-71:11, 72:8-73:3.

## II.    Argument

Plaintiffs seek to certify a class of current and former Investigators in Region 2 from April 17, 2017, through the date of judgment in this action, who worked more than 40 hours per workweek but were not paid for all hours.

## III.    Legal Standard

Class actions provide a single forum for similar claims, and afford an indispensable mechanism for conserving judicial resources. *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006). Plaintiffs may proceed on behalf of a class if the requirements of Federal Rule 23(a) are met, along with one of the prongs of Rule 23(b). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345-46 (2011). "Rule 23 should be construed '*liberal[ly]* rather than restrictive[ly.]'" *Belfiore v. P&G*, 311 F.R.D. 29, 60 (E.D.N.Y. 2015) (cleaned up; emphasis and alteration in the original). In the Second Circuit, the "general preference" is "*granting* rather than denying class certification." *Id.*; *see also Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 254 (E.D.N.Y. 2019) (same); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 392 (E.D.N.Y. 2022) ("[I]f there is to an error made, let it be in favor and not against the maintenance of the class action . . . ") (citation omitted).

## IV.    The Employer's Responsibility to Manage Overtime

The law places responsibility on *employers* to ensure that time worked is paid. Even where an employer does not ask an employee to work overtime, it is the employer's job to ensure that "the work is not performed if it does not want it to be performed" – it "cannot sit back and accept the benefits without compensating for them," and "[t]he mere promulgation of a rule against such work is not enough" – it must be enforced in practice. 29 C.F.R. § 785.13. Work must be paid when "the employer knows *or has reason to believe* that [an employee] is continuing to work and the time is working time." 29 C.F.R. § 785.11 (emphasis added). The

NYLL, which "incorporates the overtime requirements of the FLSA," requires the same

showing: that the plaintiff "performed work for which he was not properly compensated, and that

the employer had actual or constructive knowledge of that work." *Ramirez v. Riverbay Corp.*, 39

F. Supp. 3d 354, 363 (S.D.N.Y. 2014) (cleaned up).

## V.    The New York Class Meets the Requirements of Rule 23(a).

Class certification is appropriate if: "(1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class;

and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a); *see also Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d

234, 251 (2d Cir. 2011).  Plaintiffs meet all four requirements.

### A.    The Class is So Numerous that Joinder is Impracticable.

The Class here satisfies numerosity.  Although Rule 23(a) does not require a specific

minimum number of class members, "[n]umerosity is presumed at a level of 40 members."

*Mendez v. MCSS Rest. Corp.*, No. 16 Civ. 2746, 2019 U.S. Dist. LEXIS 103032, at *20

(E.D.N.Y. June 14, 2019) (cleaned up).  GEICO's records show that in 2020, Region 2 SIU had

at least 100 Investigators.[74]  GEICO has yet to produce complete personnel data from April 2017

to the present, which would likely show additional class members.

### B.    The Class Shares Common Questions of Law and Fact.

The common factual circumstances in which the Class worked – while reporting to a

single Manager with control over their workload and performance management – satisfy

commonality.  Commonality is met if the class's claims "depend upon a common contention"

---

[74]    Ex. 61 (Overview of SIU Case Investigations) at G011963.

that is "of such a nature that it is capable of class wide resolution." *Dukes*, 564 U.S. at 350; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (a "common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.") (cleaned up). "In other words, the relevant inquiry is whether a classwide proceeding is capable of 'generat[ing] common *answers* apt to drive the resolution of the litigation.'" *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015) (quoting *Dukes* at 350); *see also Martinez v. Ayken, Inc.*, No. 13 Civ. 7411, 2016 U.S. Dist. LEXIS 25556, at *29 (E.D.N.Y. Feb. 29, 2016) (commonality met where "both Plaintiffs and the prospective class 'were subject to the same general employment scheme' based upon 'the same course of events and legal theory'") (cleaned up).

The resolution of this case will be driven by common questions of law and fact: (i) whether GEICO failed to pay Investigators in Region 2 for all hours worked; (ii) whether GEICO failed to accurately record all hours worked by Investigators; and (iii) whether GEICO knew, or should have known, that Investigators were working off the clock. The answers to all these questions are amenable to common proof at trial.

As shown above, the relevant facts about GEICO's employment practices were common to all Class Members: they all experienced GEICO's practices of restricting overtime, were all subject to the same overtime approval process and performance metrics, and their escalating workload was controlled by a handful of Supervisors reporting to a single Manager who was incentivized to increase it. *Supra* Section II(B)(3)-(6). Every Investigator who has testified worked an ever-increasing number of cases per month to avoid being fired, and was deterred by GEICO's practices from logging more than 38.75 hours per week. Variations in their work, such as whether each Investigator spent more time on the road or at a desk, or the types of cases they

17

investigated, primarily affect damages. *See Noble v. 93 Univ. Pl. Corp.*, 224 F.R.D. 330, 343 (S.D.N.Y. 2004) (even where "there are some differences among employees," such as "responsibilities, hours worked, and salaries," if "[a]ll potential class members are alleged to have been harmed by a common practice" i.e., "defendant's failure to adequately compensate employees for overtime hours," commonality is met).

These common circumstances will give rise to common answers to the legal questions. As explained in Section III(D)(1) below, whether GEICO underpaid Investigators and failed to record their time can be shown using aggregate proof based on GEICO's SICM data that tracked their activities. And the question of whether GEICO knew or should have known of this off-the-clock work is a common question because it concerns whether the company was on notice that a pattern existed and whether it adequately "exercise[d] its control [to] see that [unpaid] work is not performed." 29 CFR § 785.13.

GEICO's overtime practices did not vary. Neither did the overtime approval process that applied to every Special Investigator who lived or worked in New York during the Class Period, or the performance metrics each Investigator was subject to. Whether GEICO paid Investigators for all hours worked and whether GEICO knew or should have known that Investigators were working off the clock are issues of fact that are central to this case and "[th]ere is no reason to think that the resolution of th[ese] inquir[ies] will vary between class members." *Pineda v. Skinner Servs., Inc.*, No 16 Civ. 12217, 2019 U.S. Dist. LEXIS 133178, at *17 (D. Mass. Aug. 8, 2019). Courts in this Circuit routinely find commonality where plaintiffs suffer a common harm due to an employer's failure to pay overtime. *See e.g., Lawrence v. NYC Med. Prac., P.C.*, No. 18 Civ. 8649, 2024 U.S. Dist. LEXIS 14339, at *19 (S.D.N.Y. Jan. 26, 2024) ("Plaintiffs have established multiple issues common to the class[, including] . . . that they frequently worked off

18

the clock, and that Defendants manipulated timekeeping equipment and required them to verify

false time records."); *Pichardo v. Carmine's Broadway Feast, Inc* ., No. 15 Civ. 130658, 2016

U.S. Dist. LEXIS 78276, at *18 (S.D.N.Y. June 13, 2016) (finding commonality where the

employer's compensation policy "denied class members of their overtime wages."); *Espinoza v.*

*953 Assocs. LLC*, 280 F.R.D. 113, 127 (S.D.N.Y. 2011) (finding commonality in off-the-clock

case where "[d]efendants' practice and policy regarding . . . altering clock-in and clock-out times

had a common impact on class members"); *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D.

41, 49 (E.D.N.Y. 2010) ("[A]ll putative class members were allegedly harmed by a common

practice – [defendant]'s indiscriminate 'no overtime, period' policy – and that their grievances

relate to this universal practice implicate common questions of law and fact.").  Even an

"unofficial policy of discouraging reporting of [] overtime" is sufficient to satisfy commonality.

*Jimenez v. Allstate Ins.* Co., 765 F.3d 1161, 1165-66 (9th Cir. 2014); *see also Winfield v.*

*Citibank, N.A.*, 843 F. Supp. 2d 397, 408 (S.D.N.Y. 2012) ("[T]he existence of a formal policy of

requiring overtime pay should not immunize the defendant where the plaintiffs have presented

evidence that this policy was commonly violated in practice.").

## C.    Plaintiffs' Claims Are Typical of the Class.

The named Plaintiffs' claims are typical of the Class's claims.  Fed. R. Civ. P. 23(a)(3).

Typicality is satisfied "when each member's claim arises from the same course of events, and

each class member makes similar legal arguments to prove the defendant's liability."  *Barrows v.*

*Becerra*, 24 F. 4th 116, 131 (2d Cir. 2022); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d

Cir. 1997) (internal quotations omitted) (finding typicality where class members' claims "arise[]

from the same course of events, and each class member [must] make [] similar legal arguments

to prove defendant's liability." (quoting *In Re Drexel Burnham Lambert*, 960 F.2d 372, 291 (2d

Cr. 1997)).  In practice, typicality and commonality "tend to merge into one another, so that

19

similar considerations animate analysis of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol*, 126 F.3d at 376). "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 441 (S.D.N.Y. 2023) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 155 (S.D.N.Y. 2002)).

Plaintiffs' claims are typical because they arise from the same events as the Class's claims: GEICO's restrictive overtime approval practices, draconian performance metrics that punished long work hours, and the ever-increasing work GEICO piled on Class Members year after year. Plaintiffs will make similar legal arguments to prove liability: that the NYLL requires the GEICO to take affirmative steps to avoid unpaid work, and that after years of overtime litigation and consistent complaints from Investigators, GEICO knew or should have known that off-the-clock work was rampant in Region 2. *See Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 69 (S.D.N.Y. 2018) ("[T]ypicality, like commonality, has been found where plaintiff's claims arise from the same unlawful practices or legal theories."); *see also Poplawski v. Metroplex on the Atlantic, LLC*, No. 11 Civ. 3765, 2012 U.S. Dist. LEXIS 46408, at *20 (E.D.N.Y. Apr. 2, 2012) ("The [typicality] requirement is 'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'") (quoting *In re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir. 1982)). For purposes of Rule 23(a)(3), Plaintiffs' claims are typical of the Class.

### D.    Plaintiffs and Counsel Will Adequately Represent the Class.

A proposed class representative is adequate if he or she has "an interest in vigorously pursuing the claims of the class" while having "no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F. 3d 242, 249 (2d Cir. 2011) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

Plaintiffs' interests are aligned with the Class because they were subject to, and injured by, the same policies and practices.  And, if successful, Plaintiffs will be entitled to the same measure of damages as members of the Proposed Class – unpaid wages for time worked off-the-clock. Further, Plaintiffs understand their obligations as class representatives, have undertaken steps to fulfill them, and will continue to do so.  Scimone Decl. ¶ 10.  To date, Plaintiffs have participated in written discovery, including by answering interrogatories, providing documents responsive to Defendant's requests for production of documents, and sitting for full-day depositions that in some cases required significant travel.  *Id.* ¶ 11.

Plaintiffs' counsel also meet the requirements for Class Counsel under Rule 23(g).  Rule 23(g) requires the Court to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs' counsel successfully avoided GEICO's motion to dismiss, have conducted robust class certification discovery, including Manager and Supervisor depositions and a Rule 30(b)(6) deposition, and defended 15 depositions of Plaintiffs and Opt-In Plaintiffs.  Scimone Decl. ¶ 13; *see also supra* Section II(A).  Plaintiffs' counsel have extensive experience litigating employment class actions and have been appointed class counsel by courts in this District.  Scimone Decl. ¶ 12; Ex. 63 (Kessler Decl.) ¶¶ 5-10; *see, e.g.*, *Wood v. Mike Bloomberg 2020, Inc.*, 746 F. Supp. 3d 185, at 198 (S.D.N.Y. 2024); *Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812, 2014 U.S. Dist. 130214, at *69 (E.D.N.Y. Sept. 16, 2014); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2009 U.S. Dist. LEXIS 114818, at *9-10 (E.D.N.Y. Dec. 3, 2009). Plaintiffs' Counsel are prepared to commit the resources to litigate this matter on behalf of the Class.  Scimone Decl. ¶ 14; Ex. 63 (Kessler Decl.) ¶ 11.

VI.     **Plaintiffs' Claims Meet the Requirements of Rule 23(b)(3).**

Plaintiffs seek to certify the Class under Rule 23(b)(3), which is proper for class actions seeking monetary damages if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The Class satisfies predominance and superiority.

A.     **Predominance is Met.**

The substantial common legal questions in this case, which can be proven through evidence common to all Class Members in Region 2, will far outweigh any individual questions of liability; and damages can be proven on a common basis through a model based on GEICO's own data, as explained below.  Rule 23(b)(3) predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453.  "A court examining predominance must assess (1) 'the elements of the claims and defenses to be litigated,' (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief,' and (3) 'whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues.'" *Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 502, 512 (2d Cir. 2020) (quoting *Johnson v. Nextel Commc'ns Inc*., 780 F.3d 128, 138 (2d Cir. 2015)).  "Predominance does not require a plaintiff to show that there are no individual issues." *Martinenko v. 212 Steakhouse, Inc.*, No. 22 Civ. 518, 2023 U.S. Dist. LEXIS 64562, at *24 (S.D.N.Y. Apr. 12, 2023) (citing *Pub. Emps. Retirement Sys. Mississippi v. Merrill Lynch & Co.*, 227 F.R.D. 97, 111 (S.D.N.Y. 2011)).  Predominance is a "low bar."  *See In re Vale S.A. Sec. Litig*., No. 19 Civ. 526, 2022 U.S. Dist. LEXIS 6433, at *66 (E.D.N.Y. Jan. 11, 2022).

Plaintiffs satisfy predominance because all Class Members were subject to the same policies and practices, and because GEICO should have known these practices would pressure the Class to work off the clock. *See Zivkovic*, 329 F.R.D. at 75 ("Where plaintiffs' claims arise from a common policy and rely on a common legal theory, the predominance requirement is satisfied . . ."); *see also In re Visa Check/Mastermoney Antitrust Litig. v. United States*, 280 F.3d 124, 139 (2d Cir. 2001) (Sotomayor, J.) (for predominance, courts focus on whether questions of liability are common). Every aspect of GEICO's conduct – requiring Investigators to log 7.75 hours per day, increasing the number of cases assigned despite complaints about workload, using a battery of performance metrics that put increasing pressure on Investigators to work beyond 38.75 hours per week to avoid negative consequences[75] – were common to the Class and can be shown through common proof. A jury will be able to decide from these common facts whether GEICO should have known of their results.

The more challenging aspect of this case will be proving damages, but it is "well-established" that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Variations in damages do not defeat predominance. *See In re Visa Check*, 280 F.3d at 141 ("There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action."); *Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812, 2014 U.S. Dist. LEXIS 130214, at *61 (E.D.N.Y. Sept. 16, 2014) ("[G]iven the common issues concerning defendant's liability…the individualized nature of damages, without more, does not defeat the predominance element."); *Romero v. La Revise Assocs.*, L.L.C., 58 F. Supp. 3d 411, 419 (S.D.N.Y. 2014) ("[T]he need for individualized determinations of . . .

---

[75]    *Supra* Section II(B)(3)-(5), (7), (9).

23

damages does not, without more, preclude certification of a class under Rule 23(b)(3)." (quoting *In re Indus. Diamonds Antitrust Litig*., 167 F.R.D. 374, 382 (S.D.N.Y. 1996))).

In a wage and hour case like this one, the plaintiffs' burden is to establish a "just and reasonable inference" about the amount and extent of unpaid work. *Tyson Foods*, 577 U.S. at 456-57; *Brito v. Marina's Bakery Corp*., No. 19 Civ. 828, 2022 U.S. Dist. LEXIS 53351, *45-46 (E.D.N.Y. Mar. 24, 2022) (applying same standard to NYLL claims). Here, GEICO's data tracked and time-stamped Investigators' work, including the cases assigned each month, the investigative activities conducted, and other events. Ex. 62 (O'Neil Decl.) ¶¶ 3-4. These data, combined with Plaintiffs' testimony about their unrecorded hours, will be more than sufficient to establish a "just and reasonable inference" about Plaintiffs' damages. *See id.* ¶¶ 5-15.

### B.    The Superiority Requirement is Met.

A class action here would be superior to the alternative, which would be for each Investigator to bring their own individual lawsuit. To determine whether "a class action is superior to other available methods for the fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), courts consider: (1) the class members' interests in individually controlling separate litigations, (2) the nature and extent of litigation already begun by or against class members, (3) the desirability of concentrating the litigation of the claims, and (4) the manageability of the case as a class action. *Id.* All four factors favor certification here.

Plaintiffs are unaware of any Class Members who have expressed interest in or have begun individual wage litigation against GEICO for the Class Period. A class action is desirable here because it will provide relief to all Class Members without the costs of individualized litigation. The ability to pool resources is particularly important here where each worker's individual damages would be overwhelmed by the cost of litigating the claims against a well-resourced defendant. *See Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 277 (E.D.N.Y. 2016);

*see also Catholic Health Care W. v. U.S. Foodserv.*, 729 F.3d 108, 130 (2d Cir. 2013) (class actions "facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery"); *Long v. HSBC USA Inc.*, No. 14 Civ. 6233, 2015 U.S. Dist. LEXIS 122655, at \*22 (S.D.N.Y. Sept. 11, 2015) (same).

Separate actions arising from the same operative facts would pose a significant burden on the courts.  Concentrating litigation in this forum is desirable "given the extent of Defendants' business in this state and the number of class members who reside in this district." *Clarkson v. Alaska Airlines Inc.*, No. 19 Civ. 0005, 2020 U.S. Dist. LEXIS138838, at \*18 (E.D. Wash. Aug. 4, 2020).  GEICO's Region 2 office is based in New York and a significant number of Class Members are based in this District, making it a convenient and appropriate forum.

Finally, regarding manageability, as described above in Section III(C)(2), Plaintiffs' claims all arise from the same operative facts, which are common and can be presented in one proceeding.  *See In re Nassau*, 461 F.3d at 228 (the class action device is appropriate where "many nearly identical litigations can be adjudicated in unison"); *Diaz v. N.Y. Paving Inc.*, No. 18 Civ. 4910, 2023 U.S. Dist. LEXIS 57143, at \*12 (S.D.N.Y. Mar. 31, 2023) (superiority satisfied in action involving off-the-clock claims).  Liability will be based on common evidence, including corporate documents, manager testimony, and GEICO data.  Accordingly, a class action is superior.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the Proposed Class pursuant to Rule 23(a) and 23(b)(3), designate Plaintiffs as Class Representatives, and appoint Outten & Golden LLP and Kessler Matura P.C. as Class Counsel pursuant to Rule 23(g).

Respectfully submitted,

Dated: March 12, 2025          By:   */s/ Michael J. Scimone*

Michael J. Scimone
Sabine Jean
Jarron D. McAllister
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: 212-245-1000
Fax: 646-509-2060
mscimone@outtengolden.com
sjean@outtengolden.com
jmcallister@outtengoldne.com

Troy L. Kessler
Garrett Kaske
**KESSLER MATURA P.C.**
534 Broadhollow Road, Suite 275
Melville, NY 11747
Telephone: 631-499-9100
Facsimile: 800-451-0874
tkessler@kesslermatura.com
gkaske@kesslermatura.com

*Attorneys for Plaintiffs and the Putative Class and Collective*