# Exhibit 12

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf of
all others similarly situated,

                Plaintiffs, Docket No.
                            23CIV.02848
                            (GRB)(ARL)

    -against-

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a
GEICO,

                Defendant.

----------------------------------------x

                Zoom Deposition
                New York

                January 13, 2025
                9:26 a.m.


                CONFIDENTIAL


      Examination Before Trial of WILLIAM

NEWPORT, pursuant to Notice, before Deirdre

Plevritis, a Notary Public of the State of New

York.



```
                                             Page 50
 1                          50
 2      A    It would have been to prepare
 3  for the changes forthcoming.
 4      Q    So was this looking ahead to
 5  the reorganization that eventually
 6  happens in 2024?
 7      A    It would have been the
 8  reorganization and the changes in our
 9  business practice.  It would have
10  happened in 20 -- I want to say it was
11  2023, going into 2024.
12      Q    What were the changes in the
13  business practice that happened in or
14  about that time?
15      A    That is when we went from
16  saying region 2 and region 8, as you
17  referenced to put it in prospective where
18  it wasn't necessarily region 2 and region
19  8.  It would have been larger areas and
20  more encompassing.  That is when my
21  responsibilities shifted towards
22  analytics.  That was part of that
23  business change.
24      Q    Again, now, in the 2018 to
25  2023 timeframe, did you have regular,
```

```
                                             Page 51
 1                          51
 2  meaning, like, standing meetings with the
 3  supervisors who reported to you?
 4      A    It varied over time.  There
 5  were times that we would have formal
 6  meetings.  There were times I was always
 7  available for the supervisors, but over
 8  that time it was always an open door
 9  policy with the sups, supervisors.
10      Q    Did you work physically in
11  the Long Island office?
12      A    Yes, I did.
13      Q    Did your supervisors also
14  work in the Long Island office or did
15  that vary?
16      A    That varied.
17      Q    Approximately, how many
18  worked in the office?
19      A    It depended on the timeframe.
20  That number would have fluctuated even
21  during that '18 to '23 timeframe.
22      Q    Do you recall how many worked
23  outside the office?
24      A    That also, depending on that
25  five-year stretch would have changed.
```

```
                                             Page 52
 1                          52
 2      Q    Without breaking down between
 3  who was in the office and out of the
 4  office, can you -- do you recall what the
 5  general range was of the total number of
 6  supervisors between 2018 and 2023, low
 7  end and high end?
 8      A    So from '18 to '19, it would
 9  have been more while I had the medical
10  major case units before it went to
11  Courtney, so I will give you the answer
12  from say '19 to '23, I believe that is
13  most likely what you are looking for.
14      Q    Sure.
15      A    Probably somewhere between at
16  any given time seven to 12, would be my
17  best guess, maybe, a little lighter than
18  12, at most times lighter than 12, maybe,
19  seven to 10.  I am just trying to go
20  through all of the people that came
21  through.
22      Q    In 2019, approximately how
23  many supervisors went over to
24  Courtney Wolff's team?
25      A    I want to say three.  I don't
```

```
                                             Page 53
 1                          53
 2  recall the exact number off the top of my
 3  head.  Three people popped up.
 4      Q    What do you -- do you have an
 5  understanding of what this case is about?
 6      A    Yes, I do.
 7      Q    What is your understanding of
 8  what this case is about?
 9      A    The understanding, I guess
10  the contention is the unpaid overtime and
11  the workload, as I understand it.
12      Q    I note that is correct as far
13  as, I will represent and put a little bit
14  more color on it that this is -- the
15  allegations in this case are that
16  investigators working in New York worked
17  on unpaid time off the clock.
18           If I use the term "off the
19  clock," do you have a general
20  understanding of what I mean by that
21  term?
22      A    Sure.
23      Q    Okay.  When did you first
24  learn that this lawsuit was happening?
25      A    It was some time ago.  I
```



Page 70

```
 1                    70
 2   other years besides 2022?
 3        A    Yes, this looks to be
 4   something that we would have created and
 5   provided over different periods of time.
 6   Sure.  It looks familiar.  The format,
 7   the format, the labeling, all of that
 8   appears to be familiar.  In terms of
 9   exactly what is in it, I don't recall.
10        Q    Did you produce a similarly
11   or did you create a similarly formatted
12   document for each of the years going back
13   to 2018 that you worked in SIU through
14   '22?
15        A    I don't remember.  We would
16   produce different information for
17   different reasons.  I don't know if this
18   was one new to '22 or duplicated or what.
19        Q    Was this the last document of
20   this type that you created before you
21   moved into the analytics manager
22   position?
23        A    I don't recall.  I'm not
24   sure.  I don't know.
25        Q    Where did you generally save
```

Page 71

```
 1                    71
 2   these documents when you created them?
 3        A    Over time it would have
 4   changed.  I don't remember if it was in a
 5   share drive, emailed, saved locally or
 6   sent to planning.  I don't remember.  It
 7   probably varied over time with what was
 8   accessible and the planning process and
 9   who we needed to furnish it to.  There
10   wasn't an exact central location.
11        Q    When you were searching for
12   documents for this case, did you provide
13   this document to Counsel?
14             MR. TSONIS:  Objection to
15        form.  Foundation.
16             You can answer.
17             THE WITNESS:  You said I can
18        or can't answer, Greg?
19             MR. TSONIS:  You can.
20        A    I don't remember if this one
21   was part of it or not.
22        Q    I am going to direct -- most
23   of my questions will be about the first
24   few pages of this document.  I am going
25   to direct your attention to the third
```

Page 72

```
 1                    72
 2   paragraph on the first page of Exhibit 2.
 3             You can just read -- go ahead
 4   and read that paragraph to yourself just
 5   to familiarize yourself with it and let
 6   me know when you are finished.
 7        A    Okay.
 8        Q    I am going to ask you about a
 9   couple of the terms here.
10             What does "loss report
11   volume" mean?
12        A    That would be the first
13   notice of losses over a defined period of
14   time.
15        Q    So is that then when an
16   insured first reports to GEICO that they
17   have incurred a loss which may lead to
18   them making an insurance claim?
19        A    Yes.
20        Q    And that is different from
21   cases assigned; I take it?
22        A    Yes.
23        Q    What is the difference
24   between those two numbers?
25        A    The number of loss reports
```

Page 73

```
 1                    73
 2   from a GEICO insured would always be
 3   larger than the cases assigned.  SIU
 4   would work a -- SIU would review a
 5   portion of the loss reports over that
 6   given time period.
 7        Q    The term "NCA" that you used
 8   in this paragraph, what does that mean?
 9        A    That would relate to the new
10   cases assigned for SIU.
11        Q    So when there is a reference
12   here to the NCA percent, is that the
13   percentage of loss reports that were
14   assigned to SIU?
15        A    Yes, so, yep, it would be
16   your new cases assigned.  It is a
17   calculation with overall loss reports and
18   the number of cases established.
19        Q    There is a reference to the
20   automated referral process.  What is
21   that?
22        A    That is an algorithm used to
23   identify questionable red flags for
24   review by SIU.
25        Q    I assume -- I take it that
```

19 (Pages 70 to 73)



MAGNA LEGAL SERVICES

```
                                    Page 74
 1                    74
 2    was something that's done through some
 3    sort of automated process?
 4        A    Yes, those would be sent to
 5    us.
 6        Q    It says here that claims home
 7    office SIU is working on expanding the
 8    automated referral process as of this
 9    time in 2022.  Was that process expanded?
10        A    I don't remember.  They --
11    there were lots of changes over time with
12    that process.  I don't remember the exact
13    changes.
14        Q    Do you recall how they were
15    working to expand it in 2022?
16        A    I don't remember what exactly
17    they were looking to expand in 2022,
18    specifically.
19        Q    When we see references to
20    "home office," is that GEICO as a whole,
21    meaning the offices over the various
22    regions?
23        A    The claims home office team
24    would have been -- we had claims home
25    office SIU and that is what that would be
```

```
                                    Page 75
 1                    75
 2    referencing.
 3        Q    And that is the office that
 4    had responsibility for GEICO as a whole?
 5             MR. TSONIS:  Objection to
 6        form.  Foundation.
 7             You can answer.
 8        A    They would -- they would help
 9    coordinate the different regions and
10    different processes.  That was their
11    role.  They would provide guidance over a
12    period of time.
13        Q    Do you have an understanding
14    of why home office was working to expand
15    the automated referral process?
16        A    I don't want to speak for
17    them.  I mean overall, not specific to
18    this, any time we were going to attempt
19    to identify further fraud, we -- we would
20    want to if there was a way to identify
21    cases that had questionable activity.  I
22    don't remember why exactly they wanted to
23    expand it at that moment though, no.
24        Q    Looking at the last sentence
25    here.  Was the outcome of expanding the
```

```
                                    Page 76
 1                    76
 2    referral process expected to increase the
 3    number of cases that came into SIU?
 4             MR. TSONIS:  Object to form.
 5        Foundation.
 6             You can answer.
 7        A    It appears based on the
 8    document, yes, the intention was to get
 9    us more cases.
10        Q    In the next paragraph there
11    is a reference to WELM.  Please take a
12    look at that.  My question will be what
13    WELM is?
14             MR. TSONIS:  Michael, while
15        he is reviewing that, I will just
16        place a standing, I guess, maybe, a
17        request that given the sensitive
18        nature and certainly internal and
19        propriety business processes and
20        tools that the witness has
21        knowledge of and may testify to, we
22        will designate the entire
23        transcript as confidential and then
24        once the transcript has been
25        finalized we can more precisely
```

```
                                    Page 77
 1                    77
 2        identify the portions which we will
 3        keep confidential; if that is okay?
 4             MR. SCIMONE:  Understood.
 5             MR. TSONIS:  Thank you.
 6        A    I have read the paragraph.
 7        Q    What is "WELM"?
 8        A    WELM would have been that
 9    automated system of referrals we
10    discussed just previously in the prior
11    paragraph.
12        Q    Do you know what "WELM"
13    stands for?
14        A    I don't.
15        Q    There is a reference here to
16    lowering our WELM cut score.  What does
17    that mean?
18        A    It is an algorithm.  There
19    is -- I am not privy to all the inner
20    workings and characteristics, but if you,
21    depending on how those algorithms and the
22    characteristics reviewed, you were able
23    to adjust the score you would like to see
24    a referral on.  So the lower the score
25    would get you, I guess if you were lower
```



```
                                    Page 154
 1                    154
 2      we can come back at -- how long do
 3      you need?  1:30.  That's a little
 4      bit long.  Sorry.  1:15?
 5           MR. TSONIS:  Yeah, let's --
 6      1:15, 1:20, and then we will be
 7      back.
 8           THE VIDEOGRAPHER:  Off the
 9      record.  12:39.
10           (A recess was taken.)
11           THE VIDEOGRAPHER:  On the
12      record, 1:20.
13      EXAMINATION BY
14      MR. SCIMONE:
15           Q    Mr. Newport, welcome back
16      after lunch.  You understand that you are
17      still under oath?
18           A    Yes, sir.
19           Q    Did you discuss your
20      testimony with anyone during the lunch
21      break?
22           A    No, not directly, no.  I
23      spoke to Greg briefly, but not about the
24      testimony.  Nothing else.
25           Q    Okay.  Mr. Newport, are you
```

```
                                    Page 155
 1                    155
 2      familiar with the term "core metrics" as
 3      that term is used at GEICO?
 4           A    Yes, yes, I am.
 5           Q    Can you define how GEICO uses
 6      that term?
 7           A    Um, it would be like a group
 8      of metrics to calculate a rating for an
 9      associate or any position really, I mean
10      a GEICO associate in general, not
11      specific to SIU or a position.  Most
12      positions at some point or another had
13      core metrics.
14           Q    Is that a rating that is used
15      for performance management purposes?
16           A    Yes, it could be.
17           Q    Is that the way core metrics
18      are used at GEICO?
19           A    For performance management,
20      it was a way to -- I don't know what you
21      mean by "performance management."  It was
22      a way to evaluate associates' performance
23      compared to their peers or compared to a
24      goal package, so sure.
25           Q    That is what is meant by
```

```
                                    Page 156
 1                    156
 2      performance management.
 3           A    Okay.
 4           Q    Okay.  Did you have a role in
 5      deciding what the core metrics would be
 6      for investigators in your region?
 7           A    Yes, depending on the year it
 8      might have varied, but sure, setting the
 9      goals was part of it.
10           Q    And so can you describe what
11      your role would be?  Let me ask a
12      specific question because you mentioned,
13      I think you said a level.  I am not sure
14      if that was the terminology you used.
15           Was your decision about sort
16      of what the level would be for the goal
17      or was it more general than that?
18           A    Depending on the timeframe,
19      it varied.  So core metrics discussions
20      on any given year would start with some
21      guidance perhaps from claims home office
22      and then discussion on several variables,
23      and then you would create the metrics
24      from that there.  It would be somewhat of
25      a collaborative discussion mostly between
```

```
                                    Page 157
 1                    157
 2      the region, claims home office and, you
 3      know, my superiors, to determine what the
 4      right levels might be or the goals, in
 5      general.
 6           Q    And did, as the outcome of
 7      that process, were the same core metrics
 8      used across regions or different ones?
 9           A    It varied.  Even within
10      regions you had multiple sets of goals.
11      I am not familiar with what the other
12      regions would have instituted and how
13      many goal packages they would have had.
14           Q    I want to draw a distinction
15      here in the question I am asking between
16      sort of two different determinations.
17      One is what the metric would be.  So, for
18      example, we want to measure productivity
19      as to what the specific goal would be.
20           So, for example, we want
21      productivity to be at sort of this level
22      or above to be rated a five, as an
23      example.
24           So with that distinction, in
25      terms of selecting which core metrics to
```



Page 238

```
 1                      238
 2   like a distribution list for SIU
 3   managers.  You would have been on that
 4   list in this time in 2020, correct?
 5        A    I should have been.  Sure.
 6        Q    And as you are reading this
 7   and as it is refreshing your
 8   recollection, it is correct to say that
 9   this reflected a change in how overtime
10   was paid to nonexempt employees?
11            MR. TSONIS:  Object to form.
12            You can answer.
13        A    Yeah, it appears that is what
14   is outlined in Shane's message.
15        Q    The method of payment
16   changed, correct?
17        A    I would have to -- let's see.
18   Yeah, it appears there was a change in
19   their compensation.
20        Q    And right about the middle of
21   Shane Wheelers communication it says:
22            "As before, the same rules
23   will apply to the use of overtime."
24            First bullet point:  "(Use of
25   overtime must be approved by management
```

Page 239

```
 1                      239
 2   in parenthesis, not including minimal
 3   time needed to complete a task for a
 4   customer.)"  Closed paren.
 5            What was your understanding
 6   of the statement of use of overtime must
 7   be approved by management?
 8        A    The way that I would have
 9   understood it at that time is there is
10   not necessarily a pre-approved overtime.
11   If time was needed or you thought time
12   was needed, you would contact your
13   supervisor, have a discussion, maybe
14   pursue alternate solutions, like you
15   demonstrated earlier, maybe closing
16   someone.  That is how I would have
17   interpreted it.
18        Q    That discussion with the
19   manager that you are describing, am I
20   correct, your understanding is that the
21   process is that someone should be
22   speaking to a manager before they work
23   overtime?
24        A    Yes, for the most part,
25   except, you know, if they got caught in
```

Page 240

```
 1                      240
 2   traffic coming home, maybe as an example,
 3   but in terms of if they needed or they
 4   felt there was an extenuating
 5   circumstance, they would organize with
 6   their supervisor or communicate with
 7   their supervisor.
 8        Q    And this note in parenthesis
 9   about minimal time needed to complete a
10   task for a customer, as I understand it,
11   investigators, most of the time at least
12   do not communicate directly with
13   customers; tell me if I wrong about that?
14        A    I don't know about most of
15   the time.  I mean part of their job is
16   actually communicating with the
17   customers.
18        Q    Okay.  So my question really
19   is how does this statement apply, if at
20   all, to the work done by investigators?
21   So in other words, there seems to be some
22   recognition there may be minimal time
23   where someone doesn't have time to get an
24   approval from a supervisor or doesn't
25   need to or something like that, are there
```

Page 241

```
 1                      241
 2   categories like that for SIU?
 3        A    I would say something of the
 4   effect of if they got caught in traffic,
 5   perhaps, or you know, a recorded
 6   interview went wrong would be an example,
 7   perhaps.
 8        Q    The second bullet point is:
 9   "Overtime will be evaluated and approved
10   based on business needs."  So what is
11   your understanding of what that means?
12        A    It would be evaluating --
13   exactly how it reads.  It would be in
14   order to have pre-approved overtime,
15   probably have to have some information
16   and discuss it, and same for me as it
17   would be for an investigator before we
18   approved overtime, we would evaluate it
19   and discuss it with whoever needed to
20   approve it.
21            MR. SCIMONE:  We will mark it
22       as Exhibit 15, the document Bates
23       stamped 11859 through 11862.
24            (Document Bates stamped 11859
25       through 11862 referred to received
```



Page 254

```
                       254
 1
 2   to work outside of their normal hours."
 3            Do you have an understanding
 4   of what acceptable overtime means?
 5       A    I am just pulling back up.  I
 6   am not certain as it is written here what
 7   that definition would be.
 8       Q    Based on your experience as a
 9   manager, do you have an understanding of
10   what acceptable overtime means?
11            MR. TSONIS:  Object to form.
12            Foundation.
13            You can answer.
14       A    It would be an example of
15   some of the items we went over earlier.
16   If they -- if they called and they needed
17   a couple of hours, it would be reviewed
18   on a case-by-case basis.  We would look
19   for alternatives.  We would in some cases
20   approve it as needed if they were stuck
21   on a call.  Those would be on a
22   case-by-case basis in any opinion to be
23   defined as acceptable reasons.
24       Q    And you would approve it to
25   the extent that you had permission to
```

Page 255

```
                       255
 1
 2   approve that kind of overtime; is that
 3   fair to say?
 4       A    If it made sense, sure.  I
 5   don't remember the specific scenarios or
 6   associates, but yes, there was -- if it
 7   all lined up and that was the best course
 8   of action, they could do it.
 9       Q    Did you have unlimited
10   discretion to approve overtime?
11            MR. TSONIS:  Object to form.
12            You can answer.
13       A    In terms of unlimited
14   discretion, no, I don't believe that.  If
15   it was going to be almost like a regular,
16   a lot of work, you might consider it as a
17   pre-approved basis.  I would need to
18   review it and submit it or discuss it
19   with the appropriate parties at GEICO to
20   see if it would be acceptable.  On
21   one-off scenarios for a little bit here
22   and there, I had -- there were situations
23   that were within my control.
24       Q    Let me see if I understand
25   this correctly.  I think I do, but I want
```

Page 256

```
                       256
 1
 2   to make sure I am getting an accurate
 3   understanding of your testimony.
 4       A    Sure.
 5       Q    There were one-off
 6   situations.  You gave the example of
 7   someone being stuck on a call, for
 8   example, where you had discretion to
 9   approve that; correct so far?
10       A    That would -- chances are
11   that would be within my authority.  I
12   would -- chances are that was handled at
13   a supervisor level.  The cases that are
14   here and there, this happened, okay, you
15   know, no problem.
16       Q    But in general, putting aside
17   those one-off situations, the rule is
18   that people would need to ask for
19   pre-approval?  In other words,
20   investigators would need to ask for
21   pre-approval from a manager before
22   working overtime.  That was the general
23   rule, correct?
24            MR. TSONIS:  Object to form.
25       A    Yes, there should be a
```

Page 257

```
                       257
 1
 2   discussion with the supervisor to
 3   determine if the extra time was needed.
 4       Q    And whether or not the
 5   supervisor would approve it?
 6       A    Sure.
 7       Q    And that is the scenario
 8   where you say your discretion was not
 9   unlimited?
10            MR. TSONIS:  Object to form.
11            Misstates testimony.
12            You can answer.
13       A    Yeah, I would say if it was
14   happening on a regular pattern, or there
15   was a broader need for pre-approved
16   overtime for a group of people.  I
17   probably would need -- I would need
18   approval in terms of someone contacting
19   their supervisor saying they needed a
20   couple of hours.  I wouldn't say that was
21   unlimited, but if there was a pattern
22   that was consistently needed, we would
23   want to look at what other options are
24   there for this associate for us to work
25   with him.
```



```
                                  Page 338
 1                      338
 2     4   Excel file Bates labeled    94
 3         G10837
 4     5   Document Bates stamped     113
 5         G12112
 6     6   Document Bates stamped     118
 7         10798
 8     7   Document Bates stamped     133
 9         G10868 running through
10         G10871
11     8   Document Bates stamped     160
12         G10797
13     9   Document Bates stamped     168
14         G12116 running through
15         12134
16    10   Document Bates stamped     173
17         G10914
18    11   Document Bates stamped     192
19         G11778 through 11798
20    12   Document Bates stamped     197
21         10856 running through
22         10866
23    13   Document Bates stamped     224
24         7938
25    14   Document Bates stamped     235
```

```
                                  Page 339
 1                      339
 2         12059 through 12060
 3    15   Document Bates stamped     241
 4         11859 through 11862
 5    16   Document Bates stamped     262
 6         G12062
 7    17   Document Bates stamp 12091  264
 8         running through 12092
 9    18   Document Bates stamped     269
10         G10848 through 10851
11    19   PDF Bates stamped G10847   279
12    20   Excel file Bates stamped   279
13         G10846
14    21   Document Bates stamped     286
15         G12086 through 12087
16    22   Document Bates number      292
17         G12152 running through
18         12153
19    23   Document Bates stamped     294
20         G12065 through 12066
21    24   Document Bates stamped     297
22         12064
23    25   Document Bates stamp 12325  299
24         through 12326
25    26   Document Bates stamped     309
```

```
                                  Page 340
 1                      340
 2         G5838
 3    27   Document Bates stamped     314
 4         G4003
```

```
                                  Page 341
 1                      341
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK  )
 4                       ) ss.:
 5    COUNTY OF NASSAU   )
 6          I, Deirdre Plevritis, a
 7    Notary Public within and for the
 8    State of New York, do hereby certify:
 9          That WILLIAM NEWPORT, the
10    witness whose deposition is
11    hereinbefore set forth, was duly
12    sworn by me and that such
13    deposition is a true record of the
14    testimony given by such witness.
15          I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage; and that I
18    am in no way interested in the outcome
19    of this matter.
20          IN WITNESS WHEREOF, I have
21    hereunto set my hand this 16th day
22    of January, 2025.
23               Deirdre Plevritis
                 ----------------------
24               DEIRDRE PLEVRITIS
25
```

