# EXHIBIT 1

1

2           IN THE UNITED STATES DISTRICT COURT

3           FOR THE EASTERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - )

5   KEITH FISCHER, MICHAEL O'SULLIVAN,)

6   JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

7   BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

8   CHARISE JONES, individually and   ) (GRB) (ARL)

9   on behalf of all others similarly )

10  situated,                         )

11                    Plaintiffs,     )

12      - v -                         )

13  GOVERNMENT EMPLOYEES INSURANCE    )

14  COMPANY d/b/a GEICO,              )

15                    Defendant.      )

16  - - - - - - - - - - - - - - - - - - )

17

18      VIDEOTAPED DEPOSITION OF CHARISE JONES

19

20

21

22

23  Reported by:

24  Kim M. Brantley

25  Job No: J11541510



```
 1                        CHARISE JONES

 2                  Monday, August 12, 2024

 3                     Time:  9:53 a.m.

 4        Videotaped deposition of CHARISE JONES, held

 5   at Duane Morris, LLP, 1540 Broadway, 14th Floor,

 6   New York, New York, before Kim M. Brantley, Court

 7   Reporter and Notary Public of the State of New

 8   York.

 9

10   APPEARANCES:

11   On behalf of the Plaintiffs:

12        OUTTEN & GOLDEN, LLP

13        1225 New York Avenue NW - Suite 1200B

14        Washington, DC, 20007

15        (202) 847-4400

16        Email: sjean@outtengolden.com

17        BY:  SABINE JEAN, ESQUIRE

18

19

20

21

22

23

24

25
```



```
 1                    CHARISE JONES
 2   APPEARANCES CONTINUED:
 3   On behalf of the Defendant GEICO:
 4        DUANE MORRIS, LLP
 5        1540 Broadway - 14th Floor
 6        New York, New York 10036
 7        (312) 499-0198 (Ms. Alberty)
 8        Email:  gsslotnick@duanemorris.com
 9        BY:  GREGORY SLOTNICK, ESQUIRE
10
11   Also on behalf of the Defendant GEICO:
12        DUANE MORRIS, LLP
13        190 South LaSalle Street - Suite 3700
14        Chicago, Illinois 60603
15        (312) 499-0198
16        Email: tealberty@duanemorris.com
17   BY:  TIFFANY ALBERTY, ESQUIRE
18             (Appearing via Zoom)
19
20   ALSO PRESENT:
21        SILVIO FACCHIN, Legal Video Specialist
22        Esquire Deposition Solutions
23
24
25
```



```
 1                    CHARISE JONES
 2       P R O C E E D I N G S
 3          THE LEGAL VIDEO SPECIALIST:  This is
 4    the media labeled number one in the video
 5    recorded deposition of Charise Jones in the
 6    matter of Keith Fischer, et al. versus
 7    Government Employee Insurance Company, doing
 8    business as GEICO.
 9          This deposition is being taken in New
10    York City, New York on August 12, 2024.  My
11    name is Silvio Facchin, I am a certified
12    legal video specialist; the court reporter is
13    Kim Brantley, and we're both representing
14    Esquire Deposition Solutions.
15          We are now going on the record.  The
16    time is 9:53 a.m.
17          Counsel will state their appearances
18    for the record.
19          MR. SLOTNICK:  Good morning.  Greg
20    Slotnick of Dwayne Morris for defendant
21    GEICO.
22          MS. JEAN:  Sabine Jean, Otten & Golden,
23    for plaintiff -- for named plaintiff Charise
24    Jones.
25          THE LEGAL VIDEO SPECIALIST:  Will the
```



| 1 | CHARISE JONES |
| 2 | court reporter please swear in the witness. |
| 3 | Whereupon, |
| 4 | CHARISE JONES |
| 5 | called as a witness by counsel for Defendant, and |
| 6 | after having been first duly sworn, was examined |
| 7 | and testified as follows: |
| 8 | EXAMINATION BY COUNSEL FOR DEFENDANT |
| 9 | BY MR. SLOTNICK: |
| 10 | Q.   Good morning, Ms. Jones. |
| 11 | A.   Hi. |
| 12 | Q.   Can you please state and spell your |
| 13 | name for the record. |
| 14 | A.   Charise, C-h-a-r-i-s-e, Jones, |
| 15 | J-o-n-e-s. |
| 16 | Q.   Thank you.  And what is your current |
| 17 | address? |
| 18 | A.   5567 Redleaf Rose Drive, Myrtle Beach, |
| 19 | South Carolina, 29579. |
| 20 | Q.   Have you been deposed before? |
| 21 | A.   Yes. |
| 22 | Q.   So you probably know some of what I'm |
| 23 | about to say.  So again my name is Greg Slotnick. |
| 24 | I'll be taking your deposition today.  I'll be |
| 25 | asking you a series of questions.  Your job is to |



```
1                    CHARISE JONES
2        Q.   And when -- strike that.
3             What years were you working in that
4   role?
5        A.   The field one?
6        Q.   Yes.
7        A.   2016 to 2000- -- or 2015, I'm sorry, to
8   2022, 2023, in that area.
9        Q.   And who was your supervisor in that
10  role?
11       A.   In -- before 2016 it was Dara Campbell,
12  and then like midway of 2016 it was April Neyland.
13       Q.   Do you know why that changed at the
14  time?
15       A.   I went from medical to auto, and then
16  they were not really separating it any longer.  It
17  wasn't, you know, going to be like auto or
18  medical.  They were just -- everybody was going to
19  handle everything.  And then we had some
20  supervisors leave, so they just switched around
21  everybody.
22       Q.   Do you recall which supervisors left?
23       A.   Rich Kilgallon left.  There was another
24  one.  Again another one had passed away,
25  Mazziotti.  And I think that's the only ones I
```



```
 1                    CHARISE JONES

 2       Q.   What else did they indicate?

 3       A.   Based on your job title, that's what it

 4   meant.

 5       Q.   Were there different job duties for

 6   different levels?

 7       A.   Yes.

 8       Q.   What were some of the differences

 9   between say level sixty-five and level sixty-four?

10       A.   Sixty-five is someone that actually had

11   a full caseload of working the case and going out

12   or having a -- you know, working at a desk or, you

13   know, doing a full investigation.

14       Q.   And what was a -- a sixty-four?

15       A.   Sixty-four would be like intake where

16   they would just assign the cases.

17       Q.   Were sixty-fours inside investigators?

18       A.   Yes.

19       Q.   Were any field investigators level

20   sixty-four?

21       A.   No.

22       Q.   And what is the difference between

23   level sixty-five and level sixty-six?

24       A.   Sixty-six were lead workers.

25       Q.   And what is a "lead worker"?
```



1                    CHARISE JONES

2         A.    Someone that would like take over let's

3    say if the supervisor is out, or the supervisor

4    wasn't unavailable, or if they had questions, or

5    they would take on more work or do something extra

6    where they would get compensated for that.

7         Q.    Do you know how the levels were

8    assigned?

9         A.    I don't know how they were assigned.

10   It's just whoever applied for them.

11        Q.    Were they posted as separate job,

12   like -- strike that.

13             Could you see if a particular job

14   posting was at a particular level?

15        A.    Yes.

16        Q.    And which levels have you worked in in

17   SIU?

18        A.    In SIU, sixty-five and sixty-six.

19        Q.    Do you recall when you were a level

20   sixty-five, what time frame?

21        A.    I was a sixty-five up until 2023.

22        Q.    And what happened in 2023?

23        A.    I applied for an SIU trainer's job.

24        Q.    And was that a level sixty-six job?

25        A.    Yes.



```
 1                    CHARISE JONES

 2        A.   No, total.

 3        Q.   Okay.  Is that standard practice for

 4   new investigators to ride along with more seasoned

 5   investigators?

 6        A.   Yes.

 7        Q.   Do you know if that's still the

 8   practice?

 9        A.   Now I have no idea.

10        Q.   Got it.

11             And what were your work hours in that

12   role?

13        A.   There were no set hours.

14             You know, again when my children were

15   littler and going to school, it was, you know, I

16   tried to do like 6:00 or 7:00 o'clock in the

17   morning.  When they got a little older, I did

18   like, you know, maybe 7:00, 7:30.

19        Q.   That was your start time, correct?

20        A.   Correct.

21        Q.   And you decided when to start each day?

22        A.   Correct.

23        Q.   And when did you usually finish?

24        A.   It would depend on my workload and what

25   I was doing.
```



1                      CHARISE JONES

2         Q.    Approximately?

3         A.    I tried to stay within, you know, 4:00,

4    4:30, you know, 5:00, you know.

5         Q.    And was that the case throughout your

6    time in that role?

7         A.    For the most part, yes.  I mean, if I

8    needed to change my hours specifically, I would

9    tell my supervisor.

10        Q.    And who was your supervisor during that

11   time?

12        A.    April Neyland.

13        Q.    Was she your only supervisor during

14   that time?

15        A.    Yes.

16        Q.    Did April ever say that you could not

17   change your hours during that time?

18        A.    Work -- you know, changing in the

19   beginning, she said kind of make it the same, you

20   know, unless -- if I had, you know, something

21   going on, or the kids were sick, or whatever the

22   case may be, or I needed to take off, or change

23   it.

24              But she said, as long as I stayed

25   within 7:00 to 7:30, there was no issue to tell



```
 1                    CHARISE JONES

 2   her.

 3        Q.   And how much of that time would you say

 4   you allocated to working in the field?

 5        A.   Again it would depend on, you know,

 6   where I was going.  Obviously certain places took

 7   longer to get to than others, so there was really

 8   no allocating.  It would depend on the traffic.

 9        Q.   Were you going into the field every

10   day?

11        A.   I tried to do my field work three days

12   a week, and then the other two days is -- was, you

13   know, typing up my reports, or doing anything that

14   I needed to do where I wasn't going to go out.

15        Q.   Did you generally stick to three days

16   in the field, two days at home?

17        A.   Generally.

18        Q.   And just to confirm, those two days

19   were at your home as opposed to in the office,

20   correct?

21        A.   Correct.

22        Q.   In this role did you ever work in the

23   office itself?

24        A.   No.  I just came in from meetings, or

25   they had car inspections, or whatever.
```



1                    CHARISE JONES

2    home.

3         Q.   Did that change post COVID -- and when

4    I say "COVID," I'm going to use March 2020 as a

5    starting point.

6         A.   Yeah, then all of us worked from home.

7         Q.   How frequently did you speak with April

8    in that role?

9         A.   Quite frequently.

10        Q.   Could you approximate that?

11        A.   You know, at least once or twice a

12   week.

13        Q.   Were those scheduled meetings, or were

14   they fluid conversations?

15        A.   Some were scheduled, and some was, you

16   know, a message, "Hey, I need to speak to you."

17        Q.   What types of issues did you need to

18   speak with April about?

19        A.   Closing a case, or a question on the

20   case, asking her opinion on something.

21        Q.   Anything else?

22        A.   No.

23        Q.   So did you generally perform your case

24   work by yourself?

25        A.   Yes.



CHARISE JONES

1

2     Q.   Do you know if other people that April

3  supervised used flex time more often than you did?

4     A.   I have no knowledge to that.

5     Q.   Do you know if flex time is a

6  supervisor-by-supervisor policy, or if it's a

7  general SIU policy?

8     A.   It's a supervisor by supervisor.

9     Q.   Do you know of supervisors who did not

10  allow their investigators to use flex time?

11     A.   No, I do not.

12     Q.   And you mentioned that you were working

13  both auto and medical type of claims.

14         Is that right?

15     A.   Correct.

16     Q.   Do you recall how those would be

17  assigned to you?

18     A.   Again they would be like a queue.

19  Somebody would assign them based on, you know, how

20  the next person would be up, or if there was

21  somebody, you know, not catching cases, because

22  they were going to be off, or they were out sick,

23  or for whatever reason.  So they'd just assign

24  them.

25     Q.   And when you say "catching cases," is



```
 1                    CHARISE JONES
 2        A.   The eyes.
 3        Q.   Did you take any other extended periods
 4   of leave from 2017 to present?
 5        A.   No.
 6             (Employee handbook was marked
 7        Deposition Jones Exhibit 2, for
 8        identification.)
 9             THE WITNESS:  Do I give this back to
10        you?
11             MR. SLOTNICK:  You can just put it to
12        the side.
13   BY MR. SLOTNICK:
14        Q.   So Ms. Jones, I've just given you
15   what's been marked Exhibit 2.  This is a document
16   titled "Compensation Contents From the GEICO
17   Community Services Associate Handbook."
18             Are you familiar with this document?
19        A.   Yes.
20        Q.   Did you receive this document during
21   your employment with GEICO?
22        A.   I don't recall when I received this.
23        Q.   But do you recall receiving it?
24        A.   Physically receiving it, no.  Was it
25   told to me where to locate it?  Yes.
```



```
 1                    CHARISE JONES

 2        Q.   Do you recall who told you where to

 3   locate it?

 4        A.   It was on training information that you

 5   have on the computer every now and then, and it'll

 6   tell you where things can be located on the

 7   computer.

 8        Q.   And did you in fact review this policy?

 9        A.   I can honestly say I didn't.  I did not

10   review it.

11        Q.   Why didn't you review it?

12        A.   At the time it -- you know, I've been

13   there so long, I didn't think I needed to review

14   it -- view it again.

15        Q.   You had an understanding of what the

16   policy was beforehand.  Is that what you're

17   saying?

18        A.   Yes.

19        Q.   Do you know if the policies changed

20   over time?

21        A.   I do not know.

22        Q.   Did you regularly receive employee

23   handbooks throughout your GEICO employment?

24        A.   Again receive them, no, but told where

25   they were, or once a year we had a signed -- sign
```



```
1                    CHARISE JONES
2    it on the computer, but nothing physically given.
3         Q.   Do you recall what you signed each
4    year?
5         A.   It was just an employee handbook
6    saying -- especially because we had the company
7    car, you know, what the dos and don'ts about it,
8    not to share everything, leaving your computer
9    unlocked, just general stuff that you had to sign.
10        Q.   And when you say general things you
11   needed to sign, are you referring to general GEICO
12   policies?
13        A.   Correct.
14        Q.   And how were you able to access the
15   policies?
16        A.   It's something called Workday.  You
17   could go into it, or on the -- there's a -- just a
18   site that has all the handbooks and stuff that you
19   could visually see.
20        Q.   Did you --
21        A.   -- and refer to, I'm sorry.
22        Q.   Do you recall the name of the site?
23        A.   The Workday site is -- it was just
24   Workday, and the other one at the time it was
25   under the "region two".
```



```
1                    CHARISE JONES

2           I don't know if they -- it was -- it's

3     just like a site now where everyone can go in and

4     just look at the handbook.  I don't know what the

5     name of it is, though.

6          Q.   So if we turn to page G000039.

7               THE WITNESS:  Can you just give me a

8          tissue, I'm sorry.

9               Sorry, what page?

10    BY MR. SLOTNICK:

11         Q.   G000039, at the bottom right.

12         A.   Okay.

13         Q.   So if you look in the middle of the

14    page, the paragraph that starts with "all

15    nonexempt associates".  Do you see that?

16         A.   Yes.

17         Q.   So it says, "All nonexempt associates

18    are required to accurately record their hours

19    worked and absences taken.

20               "All exempt associates are required to

21    accurately -- accurately record their absences

22    taken.

23               "A nonexempt associate who feels he/she

24    did not receive pay for all his/her hours worked,

25    and an exempt or salaried nonexempt associate who
```



1                    CHARISE JONES

2      feels his/her pay incorrectly reflects a deduction

3      for an absence should contact his/her supervisor,

4      local human resources manager, or corporate

5      resources" -- or sorry, "corporate human

6      resources.

7             Did I read that correctly?

8      A.   Yes.

9      Q.   And were you a nonexempt employee from

10     at least 2017 through March 2022?

11     A.   Yes.

12     Q.   Do you know what "nonexempt" means?

13     A.   Exempt versus nonexempt is one is

14     salaried and one is hourly.

15     Q.   And as a nonexempt associate, would you

16     agree that you were required to follow this policy

17     of GEICO?

18            MS. JEAN:  Objection.

19            THE WITNESS:  Yes.

20     BY MR. SLOTNICK:

21     Q.   And was it your understanding that you

22     were required to accurately record your hours

23     worked while working at GEICO?

24     A.   Yes.

25     Q.   And that if you had any issues



```
 1                      CHARISE JONES
 2        Q.   Do you recall whether your position was
 3   eligible for overtime?
 4        A.   I was under the impression it was.
 5        Q.   Why were you under the impression it
 6   was?
 7        A.   If I'm working, and I'm putting in the
 8   hours, I should be paid for it.  And based on what
 9   I'm reading and what they're saying is, if I'm
10   working, then I should be paid for it.
11        Q.   Do you know if you were eligible for
12   overtime in your trainer role?
13        A.   Yes, I was -- I mean, again I was under
14   the same impression that if I'm working, anything
15   over my time, or if it bled into more time, yes.
16        Q.   Do you know if you're eligible for
17   overtime in your current role as an auditor?
18        A.   Yes, I am.
19        Q.   So you were required to accurately
20   record your hours worked as an investigator.
21             Is that correct?
22        A.   Correct.
23        Q.   And did GEICO policy require you to
24   accurately record your hours worked as a trainer?
25        A.   Yes.
```



```
 1                   CHARISE JONES

 2       Q.   And as an auditor?

 3       A.   Yes.

 4            (Training history log was marked

 5       Deposition Jones Exhibit 3, for

 6       identification.)

 7   BY MR. SLOTNICK:

 8       Q.   Ms. Jones, have you seen what's in

 9   front of you and has been marked as Exhibit 3 with

10   Bates number G004285?

11       A.   I have not seen it, no.

12       Q.   Are you familiar with the trainings

13   that you completed throughout your employment at

14   GEICO?

15       A.   Yes.

16       Q.   And taking a look through this

17   document, does it refresh your recollection with

18   respect to trainings that you completed while

19   working at GEICO?

20       A.   Yes, it is.

21       Q.   Do you believe that this is an accurate

22   listing of your trainings completed at GEICO?

23            MS. JEAN:  Objection.

24            THE WITNESS:  I would say -- I mean,

25       without checking to see if I actually -- you
```



1                    CHARISE JONES

2        Q.   And first I should ask, did you always

3   get paid for all of the time that you entered into

4   GEICO's timekeeping system?

5              MS. JEAN:   Objection.

6              THE WITNESS:   Whatever I entered I got

7        paid for, yes.

8   BY MR. SLOTNICK:

9        Q.   So paragraph seven, it -- it reads, "My

10  supervisor told me that if I was going to work

11  over 38.75 hours per week I needed to speak with

12  her and state why I needed to work additional

13  hours, because my supervisor was required to

14  pre-approve those hours.

15            "I recall asking my supervisor for one

16  or two extra hours for one week, but my supervisor

17  would not approve the overtime pay and said

18  instead I could work one to two fewer hours the

19  following week.  However, because of my workload I

20  was not able to take a few hours off the next

21  week.

22            "Accordingly I only entered 7.75 hours

23  per day, five days a week, regardless of how many

24  hours I actually worked."

25            Did I read that accurately?



1                       CHARISE JONES

2        Q.   And when you submit -- strike that.

3             When did you submit the report that

4   you're referring to here?

5        A.   She wanted it submitted the next day

6   for the manager to approve it.

7        Q.   And who was the manager?

8        A.   Bill Newport.

9        Q.   How did you submit it?

10       A.   I sent an email.

11       Q.   Who did you send the email to?

12       A.   Her, April.

13       Q.   Was anyone copied on that email?

14       A.   No.

15       Q.   And were your overtime hours for that

16  week approved?

17       A.   Yes.

18       Q.   So why did you -- why do you believe

19  that that dissuaded you from future requests to be

20  paid above 38.75 hours per work week?

21       A.   Because it -- the way it was -- the way

22  she reprimanded me on putting it in, saying that

23  there was nobody to approve it, and "You can't

24  just work the overtime," and she wanted to know

25  why I didn't ask somebody, and I proceeded to let



```
 1                   CHARISE JONES
 2   her know that nobody was there.  All the
 3   supervisors were out for the day.  The manager was
 4   out.  And I said, "I worked it, so I put it in."
 5            And then she told me that in order for
 6   me to get approved for it, I had to write down
 7   every single case that I worked, what I did, the
 8   time I did it, and why I needed to work that
 9   amount of hours overtime.
10            And I -- it was just time consuming.
11   That took more time out of my day during my work,
12   of which she made it a big deal to do it, and then
13   after it was approved, it was like no big deal.
14   "Okay, it's approved.  No problem."
15       Q.   And you submitted only 1.5 five
16   hours --
17       A.   Mm-hmm.
18       Q.   Is that correct?
19       A.   Correct.  And that's what persuaded me,
20   because at that point I was just like, just forget
21   the time, then.  Don't pay me for that 1.5 if
22   you're going to make me go through hoops for it.
23       Q.   But did you -- strike that.
24            Is it your testimony that you actually
25   worked more than 1.5 hours that week?
```



CHARISE JONES                                      August 12, 2024
FISCHER V. GEICO                                                201

```
 1                    CHARISE JONES
 2        Q.   So those are the meetings that you had
 3   with the other investigators?
 4        A.   The meetings and just like the
 5   one-on-one that I speak to Maria on a daily basis,
 6   that she's told me -- currently she's still being
 7   told that, you know, you cannot put in overtime.
 8   There's no -- there's no overtime, like you just
 9   can't work it.
10        Q.   Who is Maria's supervisor?
11        A.   Araynay (phon) is her first name, and
12   it starts with an N her last name.  I don't know
13   how to pronounce it.  It's Nievo or (phon) -- I
14   don't know how to pronounce her last name.
15        Q.   Do you know how to spell it?
16        A.   No, I don't want to guess.
17        Q.   Where does Maria work currently?
18        A.   She's remote.
19        Q.   From which location?
20        A.   The Melville office.
21        Q.   And is she a field investigator?
22        A.   Yes.
23        Q.   Do you know of any investigators
24   outside of Long Island who were eligible for
25   overtime?
```



                          CHARISE JONES

1

2       A.   No.

3       Q.   Do you know if investigators in Buffalo

4    are eligible for overtime?

5       A.   I do not.

6       Q.   Do you know if investigators in regions

7    other than region two were eligible for overtime?

8       A.   I do not.

9       Q.   Do you know whether any SIU

10   investigator employees other than field

11   investigators were eligible for overtime?

12      A.   I do not know.

13      Q.   Do you know whether any SIU

14   investigator employees in positions other than

15   field investigators were paid overtime?

16           MS. JEAN:   Objection.

17           THE WITNESS:   Other than SIU?

18   BY MR. SLOTNICK:

19      Q.   Other than SIU field investigators.

20      A.   I don't know.

21      Q.   Do you know if lead security

22   investigators were eligible for overtime?

23      A.   That I don't know.

24      Q.   Do you know if lead security

25   investigators were ever denied overtime?



1                      CHARISE JONES

2          A.   No, I do not.

3          Q.   Do you know if lead security

4    investigators were paid overtime?

5          A.   I was never told that they were or they

6    didn't.

7          Q.   So you don't know?

8          A.   No.

9          Q.   Do you know if claim security

10   investigators were eligible for overtime?

11         A.   Claims -- not SIU, correct?

12         Q.   In SIU.

13         A.   Oh.  I don't know.

14         Q.   Is that a job title you're familiar

15   with?

16         A.   "Claims SIU"?  No.

17         Q.   Are you familiar with a job title of

18   field major case SIU investigators?

19         A.   Yes.

20         Q.   Were they eligible for overtime?

21         A.   I don't know.

22         Q.   Do you know if they were denied

23   overtime?

24         A.   I don't know.

25         Q.   Do you know if they were paid overtime?



```
 1                      CHARISE JONES
 2        A.   I don't know.
 3        Q.   Have you heard the term "field medical
 4   fraud investigators"?
 5        A.   Yes.
 6        Q.   Do you know if they were eligible for
 7   overtime?
 8        A.   I don't know.
 9        Q.   Do you know if they were denied
10   overtime?
11        A.   I don't know.
12        Q.   Do you know if they were paid overtime?
13        A.   I don't know.
14        Q.   Have you heard the job title "internal
15   major case SIU investigator"?
16        A.   Yes.
17        Q.   Do you know if they were eligible for
18   overtime?
19        A.   I don't know.
20        Q.   Do you know if they were denied
21   overtime?
22        A.   I don't know.
23        Q.   Paid overtime?
24        A.   I don't know.
25        Q.   Have you ever heard the -- the term
```



```
 1                    CHARISE JONES
 2    "internal security investigator"?
 3        A.   Some of these terms seemed -- seem like
 4    they're interchangeable, but I've heard these
 5    terms, but again they're usually field or desk,
 6    but they're all -- the specific things that you're
 7    saying is either field or desk.
 8              So, yes, I've heard the term, but I
 9    don't know specifically, you know -- it was either
10    field or a desk person.
11        Q.   Okay.  Do you know if desk people, as
12    you refer to them, were eligible for overtime?
13        A.   I -- I don't know if they were
14    eligible.
15        Q.   Do you know if desk investigators were
16    ever denied overtime?
17        A.   I don't know.
18        Q.   Do you know if they were ever paid
19    overtime?
20        A.   No, I don't know.
21        Q.   Okay.  If you look back at your
22    declaration.  So this should be Exhibit 5.
23        A.   Okay.
24        Q.   And if you go to paragraph fourteen.
25        A.   Okay.
```



CHARISE JONES                                    August 12, 2024
FISCHER V. GEICO                                            223

```
 1                  CHARISE JONES
 2   investigators worked outside of your region were
 3   similar to those that you did?
 4         A.   Yes, they did.  They were similar.
 5         Q.   How do you know they were similar?
 6         A.   If I saw -- if I -- again some of the
 7   policies were either rated for like Florida or a
 8   different state, and then the accident happened in
 9   New York, and then in our system we could see if
10   there were any prior claims, and when you see
11   that, you could see if an investigator actually
12   did a prior investigation, and it did come time
13   where you would -- it would be from another
14   region.  And so I would look at that and see what
15   that prior case was, and you could see their entry
16   notes and see what they did to see if the new case
17   had anything to do with the old case.
18         Q.   So you had access to any investigative
19   files of any SIU investigators in any region?
20         A.   Yes.
21         Q.   Do you know if those investigators were
22   able to use flex time policies?
23         A.   That I do not know.
24         Q.   Do you know what their regular working
25   schedules were?
```



```
 1                    CHARISE JONES

 2       A.   At the other regions?

 3       Q.   Yeah.

 4       A.   I do not know.

 5       Q.   Do you know if they worked overtime?

 6       A.   I don't.  I don't know.

 7       Q.   Do you know if they were subject to the

 8  same performance metrics that you were?

 9       A.   I don't know.

10       Q.   Did you ever personally observe the

11  work of any investigators outside of region two?

12       A.   Other than looking at it on the

13  computer?  No.

14            MR. SLOTNICK:  Quick break?

15            THE LEGAL VIDEO SPECIALIST:  We're now

16       going off the record.  The time is 2:47 p.m.

17            (Recess taken.)

18            THE LEGAL VIDEO SPECIALIST:  We are

19       back on the record.  The time is 2:56 p.m.

20       This is the beginning of the media labeled

21       number four.

22            (Second Amended Complaint was marked

23       Deposition Jones Exhibit 7, for

24

25       identification.)
```



1       CHARISE JONES

2       Q.   Do you know what that stands for?

3       A.   Special investigation something

4  management.  I don't know a hundred percent.  Case

5  management -- special investigation case

6  management.

7       Q.   And have supervisors always been

8  required to review and approve the case reports

9  after investigators submit them?

10       A.   Not a ways (phon).  If you were a lead

11  person at grade sixty-six, you can approve them

12  without a supervisor.  You would just let them go.

13  And they did change that in 2022 where nobody's

14  cases -- I wouldn't say "nobody," because I don't

15  know a hundred percent, but unless you're on some

16  type of let's say warning, or you're not meeting

17  expectations, they're -- you're just -- they're

18  all just going through.  No -- no supervisors need

19  to be reviewing them.

20       You could be new to the investigations,

21  or just started, or you just did this role, so

22  those ones are being held back for the supervisor

23  to review.

24       But if you're anything else than a

25  sixty-six, or a lead person, or whatever, if



1                    CHARISE JONES

2    they -- they're all going through.

3          Q.   And that's across the board in the SIU

4    now?

5          A.   Yes.

6          Q.   You know that for a fact?

7          A.   Yeah.

8          Q.   When -- and I'm sorry, when did that

9    change?

10         A.   That was just recently in -- when this

11   big change happened in 2020 -- the end of '21,

12   '22, when they changed this regions, no more

13   regions, it's all under one company, everybody's

14   cases were just released.  Nobody -- no

15   supervisors had to review them.

16         Q.   Do you know the period of time in which

17   the policy was that lead investigators can release

18   their own cases?

19         A.   I do not.

20         Q.   Do you know if that was in effect in

21   2016?

22         A.   I do not know.  I do not know.

23         Q.   Do you know how they actually go

24   about -- strike that.

25              Do you know how supervisors actually go



1

2

3

4

5                        CHARISE JONES

6

7        MS. JEAN:  She will read and sign the

8

9    transcript.  And on the record we do request

10

11   a one-day transcript.

12

13        THE LEGAL VIDEO SPECIALIST:  We are now

14

15   going off the record.  The time is 4:27 p.m.

16

17   This is the end of media number five

18

19   concluding this video recorded deposition.

20

21        (Whereupon at 4:27 p.m. the videotaped

22

23   deposition of Charise Jones concluded.)



```
 1              CHARISE JONES
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6           I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9           That CHARISE JONES, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13           I further certify that I am not related
14   Toni of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17           IN WITNESS WHEREOF, I have hereunto set
18   my hand this 13th day of August, 2024.
19
20              Kim M. Brantley
                _____
21              Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

