# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     -----------------------------------X
 3   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 4   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
 5   of all others similarly situated,

 6             Plaintiffs,

 7                                Case No.:
                                  2:23 Civ. 2848
 8                                (GRB) (ARL)
          -against-
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY D/B/A GEICO,

11             Defendants.
     -----------------------------------X
12

13
     DEPOSITION of MARGARET A. FISCHER
14

15        December 19, 2024

16

17        New York, New York

18

19

20

21

22   Reported By:

23   Marina Dubson

24   Job #: J12144278

25
```



1

2
                    DATE: December 19, 2024
3
                    TIME: 10:00 a.m.
4

5

6            DEPOSITION of MARGARET A. FISCHER, an

7    opt-in Plaintiff herein, taken by the

8    Defendant, pursuant to Federal Rules of

9    Civil Procedure, and Notice, held at the

10   Duane Morris LLP, 1540 Broadway, 14th

11   Floor, New York, New York 10036, at the

12   above-mentioned date and time, before

13   MARINA DUBSON, a Notary Public of the State

14   of New York.

15

16

17

18

19

20

21

22

23

24

25



MARGARET A. FISCHER                                    December 19, 2024
FISCHER V. GEICO                                                          3

```
 1   APPEARANCES:

 2

 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6       Sjean@outtengolden.com

 7       ZARKA DSOUZA, ESQ.
         Zdesouza@outtengolden.com
 8

 9

10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG TSONIS, ESQ.
13   Gtsonis@duanemorris.com

14

15   Gil Peretz, Shereck Video, videographer,
16

17

18

19

20

21

22

23

24

25
```



1          IT IS HEREBY STIPULATED AND AGREED,

2    by and between the attorneys for the

3    respective parties, as follows:

4

5    THAT all objections, except as to the form

6    of the questions, shall be reserved to the

7    time of the trial;

8

9    THAT the within examination may be signed

10   and sworn to before any Notary Public with

11   the same force and effect as if signed and

12   sworn to before the Court;

13

14   THAT filing of the original transcript of

15   the examination is waived.

16

17

18

19

20

21

22

23

24

25



1        M. A. Fischer

2        THE REPORTER:  Are you ordering

3    a copy of this transcript?

4        MS. JEAN:  Yes, copy.

5        MR. TSONIS:  Regular turnaround

6    final, no rough.

7                    XXXX

8        THE VIDEOGRAPHER:  Good

9    morning.  We are on the record, and

10   the time now is 10:12 a.m.

11       Today's date is December 19,

12   2024.

13       This is media one in the video

14   deposition of Ms. Margaret Fischer --

15   one second -- Margaret Fischer, in

16   the matter of Government Employee

17   Insurance Company -- I'm sorry.

18       In the matter of Keith Fischer

19   versus Government Employee Insurance

20   Company, index number 2:23 Civ. 2848

21   (GRB) (ARL).

22       My name is Gil Peretz.  I am

23   the legal videographer with Shereck

24   Video in association with Esquire.

25       Today we're at the offices of



1              M. A. Fischer

2    Duane Morris, LLC, located at 1540

3    Broadway on the 14th floor in New

4    York City, New York.

5         Would counsel please identify

6    yourself and state whom they

7    represent.

8         MS. DSOUZA:  This is Zarka

9    Dsouza from Outten & Golden on behalf

10   of plaintiffs.

11        Joining me today is my

12   colleague, Sabine Jean, also from

13   Outten & Golden, also representing

14   the plaintiffs.

15        MR. TSONIS:  Gregory Tsonis

16   from Duane Morris, LLC, on behalf of

17   defendant Geico.

18        THE VIDEOGRAPHER:  Thank you.

19        The court reporter with us

20   today is Marina Dubson with Esquire.

21        Will the court reporter please

22   swear in the witness.

23        (Whereupon, the witness was

24   sworn in by the Court Reporter.)

25                XXXX



```
 1              M. A. Fischer
 2   M A R G A R E T  A.  F I S C H E R,
 3        called as a witness, having been
 4        first duly sworn by a Notary Public
 5        of the State of New York, was
 6        examined and testified as follows:
 7   EXAMINATION
 8   BY MR. TSONIS:
 9        Q.    Good morning, Ms. Fischer.
10        A.    Good morning.
11        Q.    Can you please state and spell
12   your name for the record.
13        A.    It's Margaret, M-A-R-G-A-R-E-T,
14   Fischer, F-I-S-C-H-E-R.
15        Q.    All right.  And have you ever
16   gone by any other names?
17        A.    Peggy.
18        Q.    Peggy.  Any other last names?
19        A.    My maiden name is Meehan,
20   M-E-E-H-A-N.
21        Q.    And, Ms. Fischer, what's your
22   current address?
23        A.    49 Constable Lane in Levittown,
24   New York.
25        Q.    So, my name -- as I introduced
```



```
 1                    M. A. Fischer
 2   office, correct?
 3        A.    Yes.
 4        Q.    With the exception of a period
 5   of time post COVID where employees worked
 6   from home?
 7        A.    Yes.
 8        Q.    Okay.  When you transitioned
 9   back from working home to the office, were
10   you five days a week in the office?
11        A.    I did not return to the office.
12   I retired.
13        Q.    You retired.
14              And you never actually went
15   back to the office at that point?
16        A.    Correct.
17        Q.    Understood.  Prior to that
18   point -- well, strike that.
19              What was your job title at
20   Geico before you retired?
21        A.    Inside medical investigator.
22        Q.    Okay.  Did that job title
23   change at some point?  Were you something
24   else, and you became an inside medical
25   investigator?
```



```
 1              M. A. Fischer

 2       A.    It was a -- I believe the

 3  titles did change.  It was just medical

 4  investigator.

 5       Q.    Were you ever something known

 6  as, like, a major case investigator?

 7       A.    Well, that's the same thing.

 8  It was always a major case investigator.

 9       Q.    Okay.  It was major case

10  because all the medical investigations

11  qualify as major case investigations; is

12  that right?

13            MS. DSOUZA:  Objection.

14       A.    No.

15  BY MR. TSONIS:

16       Q.    Back up for a second.

17            What's the difference, I guess,

18  between a field or desk investigator and a

19  medical -- inside medical investigator?

20       A.    I can answer what I did.  I

21  can't tell you what other people's jobs

22  included.  But my job, I investigated

23  medical providers and facilities.

24       Q.    Were there others that would

25  qualify as major case but didn't have the
```



1              M. A. Fischer

2        Q.    So, for example, investigation

3    of a body shop that's facilitating

4    fraudulent claims?

5        A.    Right.  Yes.

6        Q.    All right.  So, is it fair to

7    characterize the inside and outside

8    investigators that you referenced as

9    generally investigating individual claims?

10            MS. DSOUZA:  Objection.

11       A.    I'm sorry.  Repeat that.

12   BY MR. TSONIS:

13       Q.    Yeah.  Do inside or outside

14   investigators, to your understanding,

15   investigate typically, like, a single

16   claim?

17       A.    Yes, some do.

18       Q.    All right.  And as a major case

19   investigator or inside medical

20   investigator, was it your understanding

21   that you were doing investigations at the

22   entity level as opposed to the individual

23   claim level?

24       A.    Yes.

25       Q.    You were investigating, in your



```
1                    M. A. Fischer
2    job, claims that had already been paid,
3    right?
4         A.    Correct.
5         Q.    All right.  Other
6    investigators, like inside and outside
7    investigators, are typically investigating
8    pending claims, right?
9         A.    Yes.
10        Q.    How would cases get assigned to
11   you as an inside medical investigator?
12        A.    The supervisor would assign
13   them.
14        Q.    Who was your supervisor before
15   you retired?
16        A.    Kristen Slack.
17        Q.    Do you remember who the manager
18   was?
19        A.    Courtney Wolfe.
20        Q.    How long was Courtney Wolfe
21   your manager?
22        A.    I believe -- my best estimate
23   was that she started in 2018, I think.
24        Q.    Prior to Courtney Wolfe, who
25   was your manager?
```



 1           M. A. Fischer

 2             MS. DSOUZA:  I'd just like

 3       to -- Counsel, could you just wait

 4       for the witness to complete her

 5       answer before you ask the next

 6       question?

 7             MR. TSONIS:  Sure.

 8  BY MR. TSONIS:

 9       Q.    I think you said that you would

10  be assigned cases by your supervisor; is

11  that right?

12       A.    Correct.

13       Q.    Approximately how many cases

14  would you be assigned in a month?

15       A.    I believe four.

16       Q.    Four cases per month?

17       A.    I believe so.

18       Q.    All right.  And what kinds of

19  things would you have to do to investigate

20  those cases?

21       A.    I would have to run background

22  searches.  I would have to run data

23  searches, review billing, review public

24  records, review previous cases through our

25  case system.  I would assign clinic



```
 1                  M. A. Fischer
 2    period of time.  They weren't once-and-done
 3    quick cases.
 4         Q.    Sure.
 5         A.    Yeah.
 6         Q.    So, in terms of, you know, the
 7    time it takes to close one of your cases
 8    versus cases handled by either field or
 9    desk investigators, your cases would take
10    substantially longer?
11         A.    Months.
12         Q.    There were some that even
13    lasted years?
14         A.    There could be, yeah.
15         Q.    Okay.  So, I guess, knowing
16    that you referenced having to update, you
17    know, a case every 15 days; is that right?
18         A.    Yes.
19         Q.    All right.  Besides that 15-day
20    requirement, was there any other, you know,
21    timeline you had to meet in terms of
22    entries you had to make in SICM?
23         A.    In the beginning of a case when
24    you opened it, there were -- there was
25    standards of things that needed to be
```



```
 1                    M. A. Fischer
 2   typical schedule that you worked?
 3        A.    Yes.  I worked 9:00 to 5:30 in
 4   the later years.
 5        Q.    When you say "the later years,"
 6   was that your schedule from 2016 to the
 7   time you retired?
 8        A.    Yes.
 9        Q.    You typically worked Monday
10   through Friday?
11        A.    Yes.
12        Q.    You received breaks during that
13   9:00 to 5:30 period?
14        A.    Yes.
15        Q.    And did you also receive a meal
16   period?
17        A.    It was unpaid.
18        Q.    That was going to be my next
19   question.
20        A.    Yes.
21        Q.    So, is it your understanding
22   you were compensated for a meal period --
23   or excuse me.  Strike that.
24             Is it your understanding you
25   were compensated for the break period, but
```



```
 1                      M. A. Fischer
 2    the meal period was uncompensated?
 3         A.    Correct.
 4         Q.    All right.  How long was the
 5    meal period?
 6         A.    45 minutes.
 7         Q.    All right.  So, not great at
 8    math, but doing an eight-and-a-half-hour
 9    shift with a 45-minute lunch leaves you
10    with seven and three-quarters hours?
11         A.    7.75, correct.
12         Q.    Were there times that you would
13    be scheduled to work more than 7.75 hours?
14         A.    No.
15         Q.    Did you have the ability to
16    flex your time?
17         A.    No.
18         Q.    Like, for example, field
19    investigators at times need to, you know,
20    adjust their schedule based on what's going
21    on in the field, right?
22         A.    (No verbal response.)
23         Q.    Did you ever need to do that?
24         A.    If I needed, I would take time.
25    You would take personal time or --
```



```
 1                  M. A. Fischer
 2        Q.    Okay.  Were you always -- since
 3   2016, were you paid on an hourly basis when
 4   you worked for Geico?
 5        A.    Yes.
 6        Q.    All right.  Were you paid time
 7   and a half for all hours you worked over
 8   40?
 9        A.    I didn't receive any overtime
10   pay, I don't believe.
11        Q.    I guess, was it your
12   understanding, if you know, that you would
13   have received overtime pay at a time and a
14   half had you worked over 40 hours and
15   entered it into Workday?
16        A.    Yes.
17        Q.    All right.  If you flip to the
18   next page, page 2 of your declaration, in
19   paragraph 7 you say:  My regular schedule
20   for Geico was 9:00 a.m. to 5:30 p.m.  I
21   also worked approximately two to 2.5 hours
22   each week in addition to that.
23             So, I'll pause there.
24             What was the work that you were
25   doing for those two to 2.5 hours?
```



```
 1                  M. A. Fischer
 2         A.    As the day would come to an
 3    end, I would see what needed to still be
 4    accomplished in that day to fulfill my
 5    diary, and I would be catching up, making
 6    sure that everything was -- that I had to
 7    accomplish in that day was done.
 8         Q.    Okay.
 9         A.    To the best of my ability.
10         Q.    And, I guess, is that things
11    that are -- that you had to do to complete
12    a diary entry that day?
13         A.    Some of it was, yes.
14         Q.    Okay.  So, I guess, you know,
15    if it's due the next day or the day
16    after -- well, step back for a moment.
17              You said the diary sort of
18    entries were every 15 days you had to
19    submit, right?
20         A.    Right.
21         Q.    Is that 15 business days or 15
22    real-time days?
23         A.    I think it was 15 business
24    days.
25         Q.    Okay.  So, essentially, three
```



```
 1                   M. A. Fischer
 2    half hours a week.
 3         Q.    Okay.  And that includes the
 4    meal period?
 5         A.    Yes.
 6         Q.    All right.  So, we say in
 7    paragraph eight is when, essentially, COVID
 8    started, right?
 9         A.    Yes.
10         Q.    And you write here in the
11    second full sentence:  I was specifically
12    assigned to work on cases of medical fraud,
13    and Geico kept my caseload steady.  So,
14    during this period, my overtime hours
15    slightly decreased.
16              Let me pause there for a
17    second.
18              You were always assigned to
19    work on cases of medical fraud during this
20    time period, right?
21         A.    Correct.
22         Q.    The 2016 to retirement time
23    period?
24              And you're saying Geico kept
25    your caseload steady, right?
```



```
1              M. A. Fischer

2         A.    To the COVID time and then they

3    stopped.  We weren't getting new cases.

4         Q.    So, when you say, Geico kept my

5    caseload steady, is what you mean, I was

6    not being assigned new cases?

7         A.    Correct.

8         Q.    Okay.  So, without any new

9    cases being assigned, you were still

10   working overtime, you're saying?

11        A.    Yes.

12        Q.    And that was just from the

13   existing caseload you had?

14        A.    That was also because every day

15   I had to be on at 9:00 a.m.  I had to build

16   my station every morning.  I had to set up

17   my computers, my monitors, my -- get

18   everything set online, ready to go.  I had

19   to be -- 9:00 o'clock, I had to be up and

20   running every morning, so that was time

21   before.  And at the end of my shift, I had

22   to break everything down and -- and also I

23   was working on stuff.  There was stuff I

24   would work extra on.

25        Q.    So, if I'm understanding
```



                      M. A. Fischer

     A.    No.

     Q.    Okay.  So, this time off would
need to be accounted for in determining the
total number of hours that you worked in
any given workweek?

     A.    Correct.

     Q.    Okay.  Okay.  You can set that
aside.

     A.    Does this give a balance of my
sick time when I left the company?

     Q.    I do not know.

     A.    And also, I see in here that
the course that I took was the FCLS.  That
was the --

     Q.    Okay.  Thank you.

     A.    You're welcome.

          MR. TSONIS:  I'm going to hand
     you what's going to be marked as
     Exhibit 3.

          (Defendant's Exhibit 3, human
     resources associate handbook, was
     marked for identification as of this
     date by the Reporter.)

BY MR. TSONIS:



```
 1                  M. A. Fischer

 2        Q.    Ms. Fischer, have you had a

 3   chance to look at this document?

 4        A.    Yes, I flipped through it.

 5        Q.    All right.  Have you seen this

 6   document before?

 7        A.    I believe so, yes.

 8        Q.    All right.  What is this

 9   document?

10        A.    It's a human resources

11   associate handbook.

12        Q.    All right.  And does it look to

13   be, I guess, just a portion of the

14   associate handbook?

15        A.    Seems that way, yeah.

16        Q.    All right.  The portion related

17   to compensation?

18        A.    Okay.  Yes.

19        Q.    Is this something, the

20   associate handbook, that you had to review

21   on an annual basis and certify?

22        A.    I believe so.

23        Q.    All right.  Did you certify

24   that every year?

25        A.    Sure, yeah.  Absolutely.
```



 1                    M. A. Fischer

 2        Q.    And by certify, I guess, were

 3   you certifying that you had read and

 4   understood what those policies were?

 5        A.    Yes.

 6        Q.    All right.  Now, if you turn to

 7   the page Bates stamped G000033 -- I

 8   apologize.  I directed you to the wrong

 9   page.

10             So, the page ending in 39, if

11   you look at the large header about

12   two-thirds of the way down, do you see it

13   says:  Hourly nonexempt associates?

14        A.    Yes.

15        Q.    All right.  Is it your

16   understanding you were an hourly nonexempt

17   associate?

18        A.    Yes.

19        Q.    Do you see this, the language

20   after the header, that says:  An hourly

21   nonexempt associate is paid overtime pay,

22   parenthesis, time and one half of the

23   hourly rate of pay, close parenthesis, for

24   all hours actually worked in excess of 40

25   in the workweek.  Any absence taken is not



```
 1                M. A. Fischer
 2   included as hours actually worked and does
 3   not count towards the 40-hour threshold
 4   that must be exceeded to receive overtime
 5   pay.
 6                Do you see -- did I read that
 7   right?
 8        A.    Yes.
 9        Q.    All right.  So, you understood
10   that, as an hourly nonexempt associate,
11   Geico's policy was that you would be paid
12   for all hours actually worked in excess of
13   40 in a workweek?
14                MS. DSOUZA:  Objection.
15        A.    Say it again.
16   BY MR. TSONIS:
17        Q.    Yeah.  You understood as an
18   hourly nonexempt associate that you would
19   be paid overtime for all hours that you
20   actually worked in excess of 40 in a
21   workweek?
22                MS. DSOUZA:  Objection.
23        A.    That's what's stated, yes.
24   BY MR. TSONIS:
25        Q.    Okay.  The next paragraph
```



MARGARET A. FISCHER                                    December 19, 2024
FISCHER V. GEICO                                                    171

```
 1                    M. A. Fischer
 2   continues:  An hourly nonexempt associate
 3   must receive permission in advance to work
 4   more than his or her regular work hours.
 5             Did I read that right?
 6        A.    Yes.
 7        Q.    All right.  Did you understand
 8   that you had to request permission in
 9   advance to work more than your regular work
10   hours?
11        A.    Yes.
12        Q.    Okay.  The following sentence
13   says:  The associate's timesheet must show
14   the exact day, parentheses, S, the hours
15   are worked.  Job training that is required
16   or compulsory staff meetings before and
17   after regular work hours are considered
18   hours worked for purposes of overtime pay
19   for hourly nonexempt associates.
20             I'll pause there.
21             Did you understand your
22   timesheet had to show the exact days that
23   your hours were worked?
24        A.    Yes.
25        Q.    Okay.  Now, if we move up above
```



```
 1                 M. A. Fischer

 2    the header, do you see the last paragraph

 3    above the header that says, hourly

 4    nonexempt associates?  Begins with, all?

 5        A.    Yes.

 6        Q.    All right.  And that sentence

 7    says:  All nonexempt associates are

 8    required to accurately record their hours

 9    worked and absences taken.

10             Did I read that right?

11        A.    Yes.

12        Q.    All right.  Did you understand

13    as a nonexempt associate you were required

14    to accurately record your hours worked?

15             MS. DSOUZA:  Objection.

16        A.    Yes.

17    BY MR. TSONIS:

18        Q.    The next sentence deals with

19    exempt associates.

20             You were not an exempt

21    associate, right?

22        A.    Yes.

23        Q.    Sorry.

24             Is that correct?

25        A.    Yes.
```



                         M. A. Fischer

1

2       Q.      Thank you.

3               It then continues in the third

4    sentence:   A nonexempt associate who feels

5    he/she did not receive pay for all his/her

6    hours worked and an exempt or salaried

7    nonexempt associate who feels his/her pay

8    incorrectly reflects a deduction for an

9    absence should contact his or her

10   supervisor, local human resources manager,

11   or corporate human resources.

12              Did I read that right?

13      A.      Yes.

14      Q.      All right.  Did you understand

15   that, if you had -- if you felt you didn't

16   receive pay for all the hours that you

17   worked, that you could contact your

18   supervisor, local human resources manager,

19   or corporate human resources?

20      A.      Yes.

21      Q.      All right.  Did you also

22   understand as a Geico associate that Geico

23   maintains a Berkshire Hathaway ethics line?

24      A.      Yes.

25      Q.      What's the purpose of the



1               M. A. Fischer

2    Berkshire Hathaway ethics line?

3         A.    I believe it was to report any

4    kind of problem that you had.

5         Q.    All right.  Would that include

6    a problem of not being compensated for all

7    time worked?

8         A.    It could be, yeah.

9         Q.    Okay.  Did you ever try to call

10   the Berkshire Hathaway line?

11        A.    No.

12        Q.    You would be able to call the

13   line if you wanted to, though, right?

14        A.    Correct.

15        Q.    Did you ever try to call

16   corporate human resources?

17        A.    No.

18        Q.    And I'll preface this.  I'm

19   talking about being compensated for time

20   that you're alleging that you worked.

21             Okay?

22             Did you ever try to contact

23   Geico corporate human resources?

24        A.    No.

25        Q.    Did you ever try to contact



```
 1                    M. A. Fischer
 2   Geico local human resources manager?
 3        A.    No.
 4        Q.    You had the ability to contact
 5   Geico's corporate human resources, right?
 6        A.    Yes.
 7        Q.    You had the ability to contact
 8   Geico's local human resources manager?
 9        A.    Yes.
10        Q.    It also says you could contact
11   your supervisor, correct?
12        A.    Yes.
13        Q.    Did you ever contact your
14   supervisor?
15        A.    We discussed overtime in
16   meetings just in passing, like, everybody
17   knew every -- you know, when we were
18   working.
19        Q.    Okay.  Let's be more specific
20   about that.
21              Which supervisor are you
22   talking about?
23        A.    I don't know.  Maybe Danielle.
24   I don't know.  But in general, when you
25   would have a group meeting, you know, it
```



```
 1                  M. A. Fischer
 2    would -- you know, people were working
 3    more.  There was a lot of work to be done.
 4         Q.    Would you participate in
 5    meetings only with major case or with other
 6    job titles within SIU?
 7         A.    Mainly with major case.
 8         Q.    How many meetings would you
 9    have?
10         A.    Maybe one a month.
11         Q.    Was everybody present in those
12    meetings, meaning field, major case, and
13    inside major case?
14         A.    No, just my unit.
15         Q.    Did everybody in your unit --
16    well, strike that.
17              I think you said earlier, at a
18    certain point they hired 12 new people, and
19    there was a total of about 18?
20         A.    Yes.
21         Q.    Did those 18 people report to
22    the same supervisor?
23         A.    Two supervisors.
24         Q.    Who was the other supervisor?
25         A.    Katherine -- what's
```



1              M. A. Fischer
2    Katherine's -- Cavallo and Kristin Slack.
3         Q.    Okay.  So, you would be a part
4    of meetings that happened with your peers
5    that reported to Kristin Slack?
6         A.    Yes.
7         Q.    Would you be a part of meetings
8    for your peers that reported to Kristen
9    Cavallo [sic?
10        A.    Katherine.
11        Q.    Katherine Cavallo.  Apologies.
12        A.    Yes, they would put us -- at
13   that point, I believe that it was all
14   together.
15        Q.    Okay.  So, that was, I guess --
16   my question was:  Would the two teams have
17   separate meetings?  Or would it be one big
18   group meeting?
19        A.    One big group meeting when it
20   was two teams, I believe, best I can
21   remember.  It wasn't that long.
22        Q.    That happened approximately
23   once a month -- once a month, you said?
24        A.    I would think so, yeah.
25        Q.    Where did they take place?



1              M. A. Fischer

2         A.    In one of the conference rooms,

3    I believe, to the best that I can remember.

4         Q.    Okay.  Would people that were

5    assigned out of the New Jersey office

6    participate?

7         A.    No.

8         Q.    What would typically be

9    discussed in these meetings?

10        A.    Any changes that were going on,

11   trends that were happening, expectations,

12   any updates, any news, things like that.

13        Q.    Would individual investigators,

14   like, present during this meeting?  So, I

15   guess was it interactive amongst the whole

16   group?  Or was it more of a download from

17   the supervisors?

18        A.    It would -- the supervisor

19   would lead, and then people would add if

20   they're asked for questions.

21        Q.    Would the SIU manager

22   participate in these meetings?

23        A.    Once in a while.

24        Q.    If you had to estimate, how

25   frequently?



```
 1                   M. A. Fischer

 2         A.    Every few months.

 3         Q.    Okay.  During these meetings,

 4    were there ever concerns about unpaid

 5    overtime being raised?

 6         A.    No.

 7         Q.    No investigator you ever heard

 8    raised a concern to a supervisor about

 9    unpaid overtime?

10         A.    Not about unpaid overtime.

11         Q.    Am I understanding correctly

12    that some people raised concerns about

13    having to work overtime?

14         A.    That we did work overtime.

15         Q.    Okay.  What was the concern

16    that you raised or that others raised?

17         A.    There was a lot of work that

18    had to be done.  It takes time to keep

19    current.

20         Q.    Okay.  So, was the issue --

21    well, strike that.

22               Was it you that raised that

23    issue or others?

24         A.    Say it again.

25         Q.    Was it you that brought that up
```



1              M. A. Fischer

2    and raised that issue?  Or was it others?

3         A.    No.  It would just be as part

4    of a discussion.

5         Q.    So, there would be a discussion

6    about workload generally is what I'm

7    understanding?

8         A.    Workload, yes.

9         Q.    Okay.  So, you and other

10   investigators would have discussions with

11   the supervisor about your workload

12   generally?

13        A.    Yes.

14        Q.    Okay.  During the course of

15   those discussions, you didn't inform your

16   supervisor that you were working overtime

17   and not logging it into Workday; is that

18   correct?

19        A.    Correct.

20             MS. DSOUZA:  Objection.

21   BY MR. TSONIS:

22        Q.    And during those discussions,

23   your supervisor didn't instruct you to work

24   overtime and not log it into Workday,

25   correct?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
181

1                    M. A. Fischer

2          A.     Correct.

3          Q.     Did you ever raise -- strike

4     that.

5                    Separate from the meetings, did

6     you ever inform any of your supervisors

7     that you were working hours beyond your

8     scheduled hours but not entering them into

9     Workday?

10         A.     Yes.

11         Q.     Who did you inform?

12         A.     Danielle Perdomo.

13         Q.     When did you inform Danielle

14    Perdomo?

15         A.     I don't know.  She was aware.

16         Q.     What's your best estimate as to

17    when?

18         A.     I don't have one.  I would send

19    an e-mail.  She would see the timestamp on

20    the e-mail.  She would know I'm still in

21    the office.

22         Q.     Okay.  Let me clarify.  I'm not

23    talking about if you believe she could

24    infer that you were working past your

25    scheduled start time.



```
 1                      M. A. Fischer

 2              Does that make sense?

 3      A.     No.

 4      Q.     That doesn't make sense?

 5      A.     No.  Say it again.

 6      Q.     Sure.

 7              So, I think what you just said

 8   is she could, from an e-mail that you sent

 9   to her, determine that that e-mail was sent

10   after your scheduled end time; is that

11   right?

12      A.     Yes.

13      Q.     All right.  And I understand

14   and you've testified about some of the

15   timestamp stuff earlier, right?

16      A.     Right.

17      Q.     Okay.  I guess my question is a

18   little different.

19              Did you actually ever inform

20   your supervisor, either orally or in

21   writing, that you were working additional

22   hours beyond your scheduled hours but not

23   logging it into Workday?

24      A.     No.

25      Q.     All right.  Did your supervisor
```



```
 1                M. A. Fischer
 2   ever instruct you, either orally or in
 3   writing, that you needed to work hours
 4   beyond what you were scheduled but not log
 5   it into Workday?
 6        A.    No.
 7        Q.    Okay.  Now, going back to your
 8   earlier point, you've stated that your
 9   supervisor could see e-mails that were time
10   stamped beyond the end of your scheduled
11   shift; is that right?
12        A.    Correct.
13        Q.    All right.  Were those e-mails
14   like the diaries in SICM that we were
15   discussing?
16        A.    In addition to diaries in SICM,
17   there would be timestamps on e-mails that
18   would be sent during that time.
19        Q.    Okay.  So, I just want to make
20   sure that I have your testimony accurately.
21             At times, you would send
22   e-mails to your supervisor beyond the end
23   of your scheduled shift?
24        A.    Yes.
25        Q.    Okay.  Did you ever work longer
```



```
 1                    M. A. Fischer
 2   get back in.
 3        Q.    I didn't realize the Woodbury
 4   office was that large.
 5        A.    It's very large.  It was very
 6   large.
 7        Q.    I asked you a series of
 8   questions a short while ago, if you ever,
 9   you know, either orally or in any kind of
10   written correspondence, informed your
11   supervisor you were working beyond your
12   scheduled shift, right?
13        A.    Correct.
14        Q.    I'll ask you the same series of
15   questions about your manager.
16              Did you ever inform your
17   manager orally or in writing that you were
18   working beyond your scheduled shift-end
19   time?
20        A.    No.
21        Q.    Did you ever inform your
22   manager -- or excuse me.  Strike that.
23              Did your manager ever inform
24   you, either orally or in writing, that you
25   needed to work beyond the end of your
```



1          M. A. Fischer

2    scheduled shift time and not record it in

3    Workday?

4         A.    No.

5         Q.    Did you ever raise any

6    complaints, either orally or in writing, to

7    your manager about working additional hours

8    than those scheduled but not being

9    compensated for them?

10        A.    No.

11        Q.    Did your manager ever instruct

12   you to work more than the hours you were

13   scheduled but not log those hours in

14   Workday?

15        A.    No.

16        Q.    Thank you.

17              Would e-mails that you sent

18   after the end of your shift go to your

19   manager?

20        A.    Not unless she was CC'd on it.

21        Q.    Was it typical that she would

22   be CC'd on it?

23        A.    No.

24        Q.    Okay.  Besides timestamps on

25   e-mails, is there any other way that you



```
 1                   M. A. Fischer
 2         A.    A lot.
 3         Q.    Okay.  As a major case
 4    investigator, we said that your caseload
 5    did not increase, right?
 6         A.    Correct.
 7         Q.    In fact, your caseload
 8    decreased because you weren't assigned new
 9    cases?
10         A.    Correct.
11         Q.    Okay.  If you continue on in
12    that paragraph, bottom of page 5 going onto
13    page 6, it says:  As a result, to keep up
14    with his escalating workload and Geico's
15    demanding performance metrics, Fischer
16    typically began working at approximately
17    6:00 a.m. and finished his work for the day
18    at approximately 11:00 p.m., accounting for
19    some gaps in his workday for meals and
20    other self-care from March 2020 through
21    April 2020 -- plaintiff Fischer worked
22    between approximately 60 and 75 hours per
23    week in most full workweeks, i.e., weeks
24    with no days lost to holidays or other time
25    off.
```



```
 1                      M. A. Fischer

 2              THE VIDEOGRAPHER:   This

 3       concludes the video deposition of

 4       Ms. Margaret Fischer.   The time now

 5       is approximately 4:48 p.m.   We are

 6       off the record.   Thank you, everyone.

 7              (Whereupon, at 4:50 P.M., the

 8       Examination of this Witness was

 9       concluded.)

10

11              _____

12                     MARGARET. A FISCHER

13

14    Subscribed and sworn to before me

15    this _____ day of _____ 20____.

16    _____

17       NOTARY PUBLIC

18

19

20

21

22

23

24

25
```



```
 1                      M. A. Fischer

 2                  C E R T I F I C A T E

 3

 4   STATE OF NEW YORK        )
                              :
 5   COUNTY OF RICHMOND       )

 6

 7          I, MARINA DUBSON, a Notary Public for

 8   and within the STATE OF NEW YORK, do hereby

 9   certify:

10          That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14          I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19          IN WITNESS WHEREOF, I have hereunto

20   set my hand this 19th day of December 2024.

21

22

23          _____
                    MARINA DUBSON
24

25
```

