# EXHIBIT 3

1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF NEW YORK
3   ------------------------------------x

4   KEITH FISCHER, MICHAEL O'SULLIVAN,
    JOHN MOESER, LOUIS PIA, THOMAS
5   BARDEN, CONSTANCE MANGAN, and
    CHARISE JONES, Individually and on
6   behalf of all others similarly
    situated,

7
                                Plaintiffs,
8
                    -against-              Case No.
9                                          2:23 Civ. 2848
    GOVERNMENT EMPLOYEES INSURANCE         (GRB)(ARL)
10  COMPANY d/b/a GEICO,

11                              Defendant.

12  ------------------------------------x

13                      August 28, 2024
                        10:06 a.m.
14

15  ***This Transcript Contains a Confidential Section***

16

17          Videotaped Deposition of KEITH FISCHER,

18  taken by Defendant, pursuant to Notice and Agreement,

19  held at 1540 Broadway, New York, New York, before

20  Joseph R. Danyo, a Shorthand Reporter and Notary

21  Public within and for the State of New York.

22

23

24

25



```
 1

 2   A P P E A R A N C E S :

 3        OUTTEN & GOLDEN LLP
          Attorneys for Plaintiffs
 4            1225 New York Avenue, N.W.
              Suite 1200B
 5            Washington, D.C. 20005

 6        By:   ZARKA SHABIR DSOUZA, ESQ.
                HANNAH COLE-CHU, ESQ.
 7

 8
          DUANE MORRIS LLP
 9        Attorneys for Defendant
              190 South LaSalle Street
10            Suite 3700
              Chicago, Illinois 60603
11
          By:   TIFFANY ALBERTY, ESQ.
12

13

14   Also Present:

15        ADRIENNE CHEMMEL, Videographer

16                    ~oOo~

17

18

19

20

21

22

23

24

25
```



1              Fischer

2         THE VIDEOGRAPHER:  Good morning.  We

3    are now on the record.  The time is 10:06

4    a.m. on August 28, 2024.  This begins the

5    video deposition of Keith Fischer taken in        10:06

6    the matter of Keith Fischer versus

7    Government Employees Insurance Company

8    filed in the United States District Court

9    for the Eastern District of New York, the

10   case number of which is 2:23 Civ.                 10:07

11   2848(GRB)(ARL).

12         My name is Adrienne Chemmel.  I am

13   your videographer today.  The court

14   reporter is Joe Danyo.  We are

15   representing Esquire Deposition Solutions.        10:07

16        Will everyone present please identify

17   themselves and state whom you represent,

18   after which the witness will be sworn in.

19         MS. DSOUZA:  Zarka Shabir Dsouza from

20   Outten & Golden for the Plaintiffs.               10:08

21         MS. ALBERTY:  Tiffany Alberty of

22   Duane Morris on behalf of the Defendant

23   GEICO.

24         THE VIDEOGRAPHER:  Will the court

25   reporter please swear in the witness, and         10:08



| | Fischer |
|---|---|
| 1 | |
| 2 | then, Counsel, you may proceed. |
| 3 | K E I T H   F I S C H E R, having been first |
| 4 | duly sworn by Joseph R. Danyo, a Notary Public, |
| 5 | was called as a witness and testified as follows:    10:08 |
| 6 | EXAMINATION BY MS. ALBERTY: |
| 7 | Q.   Can you please state and spell your |
| 8 | first and last name. |
| 9 | A.   Keith, K-e-i-t-h, Fischer, |
| 10 | F-i-s-c-h-e-r.                                        10:08 |
| 11 | MS. ALBERTY:  Let the record reflect |
| 12 | that this is the discovery deposition of |
| 13 | Mr. Keith Fischer taken pursuant to notice |
| 14 | and by agreement of the parties.  Today's |
| 15 | deposition will be taken in accordance        10:08 |
| 16 | with all applicable rules. |
| 17 | Q.   Mr. Fischer, I know I introduced |
| 18 | myself off the record, and I just stated my name |
| 19 | for the record, but I'm Tiffany Alberty.  I'm |
| 20 | counsel for GEICO, the Defendant in this case.       10:08 |
| 21 | I'm going to be asking you a series |
| 22 | of questions about your background, your |
| 23 | experience at GEICO.  Before we get started, have |
| 24 | you been deposed before? |
| 25 | A.   Deposed, I mean as far as grand jury,    10:09 |



1                        Fischer

2   2016.  I'm not sure if I really had any

3   catastrophes after 2016, to the best of my

4   recollection.  There could have been, but from

5   what I remember it was prior to that.            10:42

6        Q.   So then let's circle back.  As an SIU

7   investigator, were you assigned to a specific

8   level?

9        A.   When I first started at GEICO, I was

10  a grade 65, and that was in 1999, and in 2004     10:42

11  five years later I was promoted to grade 66.  I

12  believe I was one of four investigators promoted

13  to that.

14       Q.   Okay, and tell me what's the

15  difference between a 65 and a 66, to your         10:42

16  recollection?

17       A.   66, in accordance with the regular

18  day-to-day investigations, I was also asked as a

19  66 to train all the new investigators that came

20  on board.  I was asked to do ride-alongs with     10:43

21  inside staff or counsel depending on the

22  supervisor's requests.  I was probably given

23  between four and six more cases a month being at

24  that level.  I had to take on more serious cases

25  to do things out of the ordinary that some people 10:43



```
 1                    Fischer
 2     wouldn't have to do.  It usually came at the
 3     request of my supervisor Jerry Cassagne.
 4          Q.   What were the duties and
 5     responsibilities for a level 65?                10:43
 6          A.   To handle cases given to us by the
 7     inside staff, anything from bodily injuries to
 8     theft claims to social media to visiting
 9     attorneys with pictures and letters requesting
10     that they drop cases.  They were called operation  10:44
11     challenges.  Typing.  Every day doing
12     face-to-face interviews, coordinating with the
13     National Insurance Crime Bureau, police
14     personnel.  I also had a significant arson
15     contingent of investigators that I had to deal    10:44
16     with because I dealt with thefts and fires as far
17     as GEICO was concerned.  I have an arson
18     background.
19          Q.   With?
20          A.   The Levittown Fire Department.          10:44
21          Q.   With the duties that you just
22     outlined as a level 65, would a level 66 have to
23     take on those duties in conjunction then with the
24     training that you previously spoke about?
25          A.   Yes.                                    10:45
```



1                          Fischer

2          Q.    And then what about social media?

3          A.    Yeah.   That was maybe 5 percent, and

4    then we were given the other 5 percent was policy

5    claims.   Usually checking on people's vehicles          10:47

6    where they lived, rate evading, things like that.

7          Q.    In 2000, and I want to focus in 2016

8    were you assigned to a specific team?

9          A.    Yes.   I was assigned to my

10   supervisor, Jerry Cassagne.   I was assigned to          10:47

11   the theft team.

12         Q.    Who was comprised of that team at

13   that time?

14         A.    Myself, John Gillane, Vito, I've got

15   the wrong last name.   Vito, and what's her name?        10:47

16   Maria Munoz.

17         Q.    From 2016 onward until your

18   retirement, were you always assigned to Jerry's

19   team as the theft team?

20         A.    It did change.   To the best of my           10:48

21   recollection, I did primarily theft claims.

22   There were times that I was asked, if I can

23   expand my answer, as time went on, in the theft

24   team, there became times where the staged

25   accident team was cut off at a certain time.             10:48



                              Fischer

1

2              In other words, they would be given

3    only 20 cases, because they were what GEICO had

4    deemed level 1 cases, because there were usually

5    3 and 4 occupants in the car, which meant a          10:48

6    larger number of examinations under oath.

7              Usually about the 18th or 19th or

8    20th of the month, that particular team would

9    reach their maximum amount of cases that they

10   could receive, which was laid down or supplied to    10:48

11   us by supervisors, and, at that point, I would

12   take on staged accident losses, because those

13   particular five, six, seven investigators were

14   now cut off from staged accidents.

15             So, in addition to my theft claims, I      10:49

16   was also asked to do staged and caused losses.

17        Q.   Okay.  Was that something that only

18   uniquely applied to you, if you know?

19        A.   No.  There was a few of us.  Not just

20   myself.  I wasn't singled out, but a lot of us       10:49

21   had to take on additional work from other teams

22   even though we were assigned to the theft team.

23        Q.   For those who were on your theft

24   team, do you know, say, for example, if John,

25   Vito or Maria had to then take on staged            10:49



```
 1                    Fischer
 2   accidents to assist with that department?
 3             MS. DSOUZA:  Objection.
 4        Q.   You can answer.
 5        A.   Did they have to take those claims        10:50
 6   on?
 7        Q.   Yes.
 8        A.   Is that what you're asking?
 9        Q.   To your knowledge.
10        A.   Yes.                                      10:50
11        Q.   I think from your testimony, as I
12   understand it, you did not work in the office.
13   Is that right?
14        A.   That's right.
15        Q.   Did you ever have an inside role?        10:50
16             MS. DSOUZA:  Objection.
17        A.   No.
18        Q.   In your position from 2016 until your
19   retirement, did you have a set schedule, meaning
20   I worked Monday through Friday 9 to 5?             10:50
21        A.   No.
22        Q.   Did you have flex time?
23        A.   We were, I guess that's what it was
24   called.  Yes.  You could start and stop depending
25   on your schedule, depending on your examinations    10:50
```



```
 1                        Fischer
 2   under oath or your investigations.  If you had to
 3   go out to Brooklyn, New York for an examination
 4   under oath and you had to leave at 5 o'clock in
 5   the morning to beat traffic to get there by 7 or      10:51
 6   7:30, so obviously by the time you got home at
 7   2 or 3 o'clock in the afternoon you would
 8   actually start your typing at 2 or 3 o'clock in
 9   the afternoon, but my day actually would start at
10   5 o'clock in the morning.                             10:51
11           So, if that's what you mean, I wasn't
12   assigned to my computer at any given time.  No.
13       Q.   Did anyone ever tell you how to flex
14   your time, meaning you should be in the car from
15   5 to 7 and then do your examinations under oath      10:51
16   in the morning versus being able to do it at
17   night or at a convenient time for the person
18   you're interviewing?
19       A.   No.
20       Q.   As an SIU investigator, were you able      10:51
21   to make the determination of what each case
22   needed in order to investigate for that specific
23   theft-related incident?
24       A.   I was given procedures to follow as
25   to what was necessary to be completed and             10:52
```



KEITH FISCHER  Confidential                                     August 28, 2024
Keith Fischer, et al. vs GEICO                                           43

```
 1                        Fischer
 2         Q.   After you conducted then I believe
 3   you stated your initial report, after looking at
 4   the claim screen, getting the policy, reading the
 5   notes, speaking to the theft examiner, getting        10:59
 6   the background check, getting a police report,
 7   researching the news, taking recorded statements,
 8   interviews, EUOs, from there, did you make the
 9   determination of what else you needed in order to
10   complete your investigation?                          10:59
11         A.   Yes.
12         Q.   Did anybody tell you what steps you
13   needed to take after you conducted your initial
14   report?
15         A.   No.  Can I just clarify.  That's          11:00
16   limited to what -- those are just some of the
17   things that I was required to do.  I may have
18   left some out like conducting parking tickets on
19   the vehicle after it was stolen or before it was
20   stolen to see its location.  We also got plate       11:00
21   readers towards the end.  As you know, EZ-Pass
22   and things like that, we were required to go into
23   there to see if the car had gone through any
24   tolls.
25              We also touched base, I believe, I        11:00
```



```
 1                       Fischer

 2    double-insured case, in other words, if car 1 and

 3    car 2 weren't both from GEICO, I had to reach out

 4    to the adverse carrier, Allstate, Farmers, State

 5    Farm, Progressive, and talk to them as they were       11:05

 6    the other vehicle and speak to their SIU as to

 7    any concerns they may have with their vehicle, if

 8    that was a concern.

 9              I reviewed the police accident

10    report, and it was the same as a theft.  I would       11:05

11    then do my report, and I would go out to the

12    field and do my investigation and/or conduct

13    EUOs.

14         Q.    Similar to the theft claims, once you

15    did your initial review of what we just talked         11:05

16    about, the claim screens, policy, notes, you

17    spoke to the staged loss examiner, background

18    check, police reports, conducting interviews,

19    from there, did you also make the determination

20    of what you needed to conduct in order to then         11:05

21    render your final determination in a staged loss

22    claim?

23         A.    Yes.

24         Q.    Is it fair to say then for both the

25    theft and the staged loss matters that you were        11:06
```



```
 1                         Fischer
 2    handling that you did have to analyze and look
 3    specifically to those claims to see what else
 4    they needed in order for you to render your
 5    determination?                                    11:06
 6         A.   Yes.
 7         Q.   For your final determination, was
 8    that wholly your responsibility in saying yes, I
 9    believe there's fraud, or no, I don't believe
10    there's fraud?                                    11:06
11         A.   Yes.
12         Q.   Did anyone ever tell you you needed
13    to change your opinion as to your ultimate
14    determination?
15         A.   No, not that I recall.                  11:06
16         Q.   In 2016 up until your retirement in
17    2020, did you investigate arsons?
18         A.   I did receive a lot of the car fires,
19    car thefts.  Myself and John Gillane were given I
20    would say the majority of those because of our    11:07
21    arson background.
22         Q.   Within arson specifically, you said
23    there's a theft team.  Was there an arson team?
24         A.   No.
25         Q.   But there was a staged loss team,       11:07
```



```
 1                      Fischer
 2   my investigation, and, just to clarify, that
 3   could have been multiple examiners.  It could
 4   have been the PIP.  It could have been the bodily
 5   injury claim, and it could also be an AD          11:21
 6   adjuster.  Whoever was assigned at the top of
 7   that claims file on the claim screen I would have
 8   to touch base with each and every one of those as
 9   to my findings during my investigation and as
10   well as submit a report to them.  My entire       11:21
11   report, whether it be, you know, three pages or
12   20 pages.
13          Q.   How long or short were your typical
14   reports?
15          A.   Depending on the type of case, you    11:22
16   know, a staged accident and maybe a theft could
17   be anywhere from five pages up to, you know,
18   maybe ten pages, 12 pages.  Each claim was
19   different.  It depended on the extent of the
20   investigation.  You know, if someone was hurt or  11:22
21   someone was arrested, if someone, there was a
22   fire and someone was killed, those kind of things
23   were obviously, there's more to my report, but
24   the more detailed the investigation obviously the
25   bigger the report.                                11:22
```



```
 1                    Fischer

 2        Q.   How long would it take for you to

 3   investigate a theft case?

 4        A.   I mean I can't put a time on it, but

 5   I mean the simplest theft could be no less than    11:22

 6   five hours and could go as far as 25 to 30 hours

 7   depending on examinations under oath.  Just the

 8   basic theft claim that was closed the first day,

 9   whether I got the claim in the morning and by the

10   afternoon the car was recovered and the insured    11:23

11   just parked it on the other side of the mall and

12   just made a mistake on the door that he or she

13   went out, it would still take me at least four to

14   five to six hours just to do, open and close my

15   investigation.                                      11:23

16        Q.   What about for staged loss?  How long

17   would that take you on the short to long?

18        A.   Again, it all depends on the number

19   of passengers.  Some had two, some had five.

20   Some had six, sometimes you got a van full of      11:23

21   nine, so it depended, but on the short side, I

22   mean maybe, if you didn't have to conduct

23   examinations under oath, maybe ten hour, eight to

24   ten hours just on a background checks and things

25   like that.  On someone where we had to do          11:24
```



```
1                         Fischer

2     hours.  If it was four or five, maybe 20 hours.

3     I mean to the best of my recollection.  It could

4     have gone more.

5          Q.   Can some cases require EUOs and some        11:25

6     don't?

7          A.   Yes.

8          Q.   What about recorded statements?

9          A.   You were required to take a recorded

10    statement probably on just about all of your, at      11:25

11    least on my theft cases, not so much, obviously

12    not on medical fraud or staged and caused losses

13    because they were represented by an attorney.

14           Because of theft, most of them didn't

15    have an attorney, so I would conduct a recorded       11:26

16    statement prior to determination, whether an EUO

17    or further investigation was necessary.

18         Q.   How long would it take to investigate

19    a social media claim?

20         A.   It could be as little as, again, the        11:26

21    number of claimants.  To the best of my

22    recollection, I mean, if I had one claimant,

23    three or four hours.  If I found something right

24    away, maybe two to three hours, but most of them

25    are three hours, four hours.  Multiple claimants,     11:26
```



```
 1                       Fischer
 2    maybe 10 max.
 3           Q.   How long would it take to investigate
 4    an auto body fraud case?
 5           A.   Again, depending on the severity and    11:27
 6    how many cars were involved, again, it was
 7    usually enhanced damages that we were concerned
 8    with at body shops.  It was the same types of
 9    damage.  So to review multiple auto damage
10    adjusters' pictures and estimates of fraud, I     11:27
11    mean their estimates of damages, I'm sorry, if I
12    I was given a particular body shop and there was
13    15 cars of concern, that could be a minimum of
14    ten hours.  If it was more cars, it could be 20
15    or 30 with also a lot of street time and a lot of  11:27
16    surveillance.
17           Q.   Did you ever have theft cases that
18    you can open and close the same day?
19           A.   Yes.
20           Q.   Did you have med fraud cases that you   11:27
21    could open and close the same day?
22           A.   Not to my recollection, no.
23           Q.   Did you have social media cases that
24    you could open and close the same day?
25           A.   Yes.                                    11:28
```



```
 1                      Fischer
 2    your workload heavier aside from what we talked
 3    about where somebody was going out on leave or
 4    holiday?
 5           A.   As a grade 66, did you ask how many    11:57
 6    more cases I would get?
 7           Q.   No.  Were there other factors that
 8    made your workload heavier at times outside of
 9    what we talked about for people taking leave or
10    holiday?                                           11:57
11           A.   Yeah.  I was responsible as a grade
12    66 to train all the new hires.  I would spend
13    from three to six weeks with each one of them.
14    They would come to my house in the morning, and
15    they would leave 4 or 5 o'clock.  They would go    11:57
16    out and do EUOs with me.  I would train them how
17    to do EUOs.  You know, I would introduce them to
18    my contacts out in law enforcement and at NICB.
19                 Weather was a big factor.  Come the
20    winter, sometimes EUOs got canceled because of     11:57
21    snow.  Things like that.  I'm sure there are many
22    other factors, but at this point those are the
23    ones that come to mind.
24           Q.   As a level 66, do you know who else
25    in region 2 who was assigned to let's say the      11:58
```



```
 1                          Fischer

 2           A.   George McMannus was also in the

 3      staged/caused loss the last two or three years.

 4      So his caseload stopped at 20.  I mean it could

 5      have gone to 30, but for the most part they were      11:59

 6      cut off.

 7           Q.   I apologize if you stated this

 8      before.  I just can't recall.  When cases were

 9      provided to you for individuals who went out on

10      leave and we'll say a short leave, not a full        12:00

11      FMLA 3 months or vacation, when they would return

12      from either leave or vacation, would those cases

13      that you oversaw go back to those individuals?

14           A.   Yes.

15           Q.   The cases that you handled versus the      12:00

16      ones that George and Mark handled would have

17      differed because you were assigned to theft and

18      they were assigned to staged loss.  Is that

19      right?

20           A.   Yes.  Can I just clarify that I said       12:00

21      20, and it could have been 24 or 26.  I don't

22      remember the exact number, because I wasn't in

23      the team, but it was somewhere in the 20s as far

24      as the number of cases prior to them being cut

25      off.                                                 12:01
```



```
1                        Fischer
2    through my -- Jerry Cassagne, I gave everything
3    to my immediate supervisor Jerry Cassagne, who
4    then passed it on to human resources, and it was
5    approved.                                              12:05
6         Q.   Outside of this leave in May to June
7    2020, did you take any other extended leave
8    outside of protected leave or a sabbatical?
9         A.   From '16 to 2020?
10        Q.   Yes.                                         12:05
11        A.   No.
12             (Fischer Exhibit 2, Document Bates
13             stamped G000028 through 43, was so marked
14             for identification, as of this date.)
15        Q.   So what has been placed in front of         12:06
16   you has been marked as Exhibit 2.  Mr. Fischer,
17   if you just want to take a look at what the
18   document is, you don't have to read it
19   necessarily in totality for substance, because
20   I'm going to direct your attention to one page,       12:06
21   but just let me know whenever you're ready.
22        A.   Yeah.  This is the human resources
23   handbook.
24        Q.   Have you seen this document before?
25        A.   Yes.                                         12:06
```



```
 1                    Fischer

 2          Q.   Do you recall receiving this handbook

 3   during your employment with GEICO?

 4          A.   Yes, I believe so.

 5          Q.   So let's look at page G000038.  So at      12:07

 6   the bottom of the page it says "Overtime

 7   Eligibility."  Actually it extends over to page

 8   39.  So, if you want to flip there, that's where

 9   the substance of the policy is.  The middle of

10   the page starts with "All non-exempt associates."  12:07

11   Do you see that paragraph?

12          A.   Which one?

13          Q.   It starts with "All non-exempt

14   associates."  Do you see that paragraph in the

15   middle?                                              12:07

16          A.   Oh.  All exempt.  All non-exempt?

17          Q.   Yes.

18          A.   Yes.

19          Q.   Okay.  It states, "All non-exempt

20   associates are required to accurately record       12:07

21   their hours worked and absences taken."

22               You were a non-exempt employee,

23   correct?

24          A.   Yes.

25          Q.   And so this part of the policy would     12:08
```



```
 1                        Fischer

 2    have applied to you, correct?

 3            A.    Yes.

 4            Q.    And you understood that as a

 5    non-exempt employee, you're required to          12:08

 6    accurately record your hours worked and then any

 7    absences taken, right?

 8            A.    Yes.

 9            Q.    It goes on to state, it's actually

10    the third sentence in that paragraph, "A          12:08

11    non-exempt associate who feels he/she did not

12    receive pay for all his/her hours worked and an

13    exempt or salaried nonexempt associate who feels

14    his/her pay incorrectly reflects a deduction for

15    an absence should contact his/her supervisor,     12:08

16    local human resources manager or corporate human

17    resources."  Did I read that correctly?

18            A.    Yes.

19            Q.    Is it fair to say that as a

20    non-exempt employee, if you felt that there was   12:09

21    an issue regarding your pay for your hours

22    worked, that you should contact your supervisor,

23    local or corporate HR?

24            A.    Yes, which I did.

25                  (Fischer Exhibit 3, Document Bates   12:09
```



```
 1                        Fischer

 2            stamped G004265 and attachment, was so

 3            marked for identification, as of this

 4            date.)

 5            Q.   Mr. Fischer, what has been marked in    12:10

 6       front of you is Exhibit 3.  It has been marked

 7       G004265.  That's the top page.  The remaining

 8       pages are actually a printout of an excel

 9       spreadsheet.  That's why you see the topic lines,

10       and it is chronologic.                            12:10

11                 Do you recall intermittently

12       throughout your employment with GEICO being

13       trained on any revisions to GEICO's policies and

14       procedures as it applied to your position as a

15       lead security investigator local 66?              12:11

16            A.   To the best of my recollection, I

17       can't say for sure.  I mean I would have to look

18       this over.  The courses that I took.

19            Q.   As you're looking at the Learning

20       Record, which is the most left column?            12:11

21            A.   Yes.

22            Q.   And it identifies, for example, the

23       associate handbook, the recreational vehicle

24       training course, the code of conduct, time and

25       labor absence request, do these topics sound      12:11
```



```
 1                    Fischer
 2   familiar to you?
 3           A.   Yes.  Absolutely.
 4           Q.   As to your participation in the
 5   learning courses where it then has a completion     12:12
 6   status, a record date, and a record grade, do you
 7   have any reason to dispute the specific dates,
 8   the policies or your pass/fail rate regarding any
 9   of the trainings you participated in for GEICO's
10   policies throughout your tenure?                     12:12
11           A.   No.
12           Q.   Was it your understanding from 2016
13   and until your retirement that you were required
14   to follow the overtime policy as we discussed in
15   Exhibit 2?                                           12:12
16           A.   Just could you repeat that?
17           Q.   Sure.  Is it your understanding that
18   from 2016 until your retirement that you were
19   required to follow the overtime policy that we
20   looked at in Exhibit 2?                              12:13
21           A.   In Exhibit 2.  Yes, but, if I can
22   clarify that this was the policy set by GEICO,
23   but the practice did not follow the policy.
24           Q.   Okay.
25           A.   Just something I just want to add.      12:13
```



```
1                         Fischer

2          Q.   You said that Jerry told you to the

3    effect that you could work off the clock.  Is

4    that your testimony?

5               MS. DSOUZA:  Objection.              12:14

6          A.   We were given -- I'll answer the

7    question.  As far as Jerry is concerned, Jerry

8    knew, if not weekly, at least biweekly, that I

9    was working overtime each and every day and

10   weekends to maintain my caseload.               12:15

11         Q.   Did Jerry ever tell you to work off

12   the clock?

13              MS. DSOUZA:  Objection.

14         A.   No.  Let's clarify.  Jerry did say to

15   me numerous times you have to do what you have to   12:15

16   do to complete your work, and that's the

17   understanding I had with Jerry for over 15 years

18   or 20 years that I worked for him.

19         Q.   But to the extent that he told you

20   you need to get what you need to get done off the   12:15

21   clock, did he say anything to that degree?

22              MS. DSOUZA:  Objection.

23         A.   Not in those exact words, but it was,

24   if you have to work overtime to get your caseload

25   to where it has to be so that it's not             12:16
```



```
 1                      Fischer

 2    unreasonable and not sustainable, that I could do

 3    that without any repercussions from GEICO.

 4         Q.   Did you have communication with Bill

 5    Newport?                                              12:16

 6         A.   Yes, once or twice a year, yes.

 7         Q.   Did you ever report to Bill Newport

 8    that you felt in theory that Jerry had said get

 9    what you need to get done, and you took it as I

10    don't have to log my hours?                           12:16

11              MS. DSOUZA:  Objection.

12         A.   Would you repeat that.  I'm sorry.

13         Q.   Sure.  Did you ever go to Bill

14    Newport with your concerns that it was your

15    interpretation of what Jerry said, which is you    12:16

16    got to get it done when you can get it done to

17    imply you should not log your hours?

18              MS. DSOUZA:  Objection.

19         A.   I did have a conversation with Bill

20    Newport at a meeting that didn't go very well        12:17

21    when I asked him in front of six or seven other

22    investigators, my exact words were who is

23    watching the store?  Do you know what's going out

24    in the field, and do you know what we do each and

25    every day as your investigators?                     12:17
```



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                            119

```
 1                        Fischer
 2   overtime with which somebody said denied?
 3          A.   I never put in for any other
 4   requests.  I can only speak for myself.
 5          Q.   And as to then getting approved to        12:55
 6   enter in your OT, which you did then enter in
 7   your OT, were you paid for that overtime, to your
 8   recollection?
 9          A.   Yes.
10          Q.   Have you ever put in more than 7.75        12:55
11   hours for a day with which you didn't seek
12   pre-approval?
13          A.   Only during catastrophes.
14          Q.   What does that process look like?
15          A.   I answer to an SIU supervisor, Dale,      12:55
16   I forget his last name.  He was from that region
17   in Colorado and/or Houston.  He actually traveled
18   with me on both, and at that point he would say
19   that we worked a 12-hour day.  I'm going to give
20   you two hours travel in the morning.  I am going      12:56
21   to give you two to three-hour reporting time at
22   night when you go back to your hotel room.
23          Q.   Okay, and so then you would just
24   enter your hours after you both agreed to
25   whatever that hour was in the Workday system, and     12:56
```



1                    Fischer

2    think of is I know Maria Munoz and Jeff Lewonka

3    both took the overtime.

4         Q.   How do you know that?

5         A.   Because I spoke to them.  They wanted          02:42

6    more overtime.  I remember receiving an e-mail

7    from Jeff that, if I wasn't taking the overtime,

8    because I was Jeff's 66.  He worked in my team,

9    and I said no, that you'd have to ask Jerry to

10   work.  You know, whoever investigators didn't        02:43

11   want to work the overtime, Jeff could work that

12   additional overtime with more cases.

13        Q.   Do you know if they were paid for the

14   overtime they worked?

15        A.   Yes.                                        02:43

16        Q.   How do you know that?

17        A.   I mean in speaking to Jeff I know

18   that he was paid, and he was happy that he was

19   finally making overtime.  I remember having a

20   conversation with him.                               02:43

21        Q.   Under this set of circumstances then

22   you did have the opportunity to decline working

23   overtime at GEICO, right?

24        A.   Yes.  I was out sick or FMLA leave.

25        Q.   Okay.  Transitioning to the next page      02:43



```
 1                      Fischer
 2     '20.
 3          Q.   To your knowledge, was timing the
 4     only metric GEICO used to evaluate your
 5     performance?                                         02:48
 6          A.   No.  It was the number of cases that
 7     you caught, the number of EUOs that you
 8     conducted, the time that you touched each case.
 9     There was productivity.  There was case
10     management.  There was initial case assessment.     02:48
11     There was probably five or six things on your
12     evaluation that you had to meet, and you were
13     graded on each one.  Each one was given a 30, 40,
14     50 or 20 percent on how much it affected your
15     report card.                                         02:48
16          So I was a case manager.  I think it
17     was 40 percent.  Productivity was 20 percent.  It
18     was things to that nature that changed.
19          Q.   Was file quality part of the
20     performance metric?                                  02:49
21          A.   Yes.
22          Q.   Based on paragraph 14, you
23     specifically itemized for theft, "there were
24     certain criteria on which I was evaluated in
25     addition to general criteria."                       02:49
```



KEITH FISCHER  Confidential                                   August 28, 2024
Keith Fischer, et al. vs GEICO                                          175

```
 1                    Fischer
 2            So theft then would have its own
 3    specific metrics?
 4         A.   Yes.
 5         Q.   Did staged loss have its own specific    02:49
 6    metrics?
 7         A.   Yes.
 8         Q.   Did med fraud have its own specific
 9    criteria?
10         A.   I don't remember.                        02:49
11         Q.   Did body shop have its own specific
12    criteria?
13         A.   I don't know if the body case existed
14    in 2020.  That was kind of phased out.
15         Q.   Do you know if PIP had its own           02:49
16    special criteria along with jump-in claims,
17    because you said it falls under the same?
18         A.   Yeah.  Those were rated different
19    too.
20         Q.   Do you know if arson had different       02:50
21    metrics?
22         A.   That was all handled under theft.
23         Q.   Do you know if social media had its
24    own criteria?
25         A.   I don't believe so.                      02:50
```



```
 1                    Fischer
 2   types of claims, whether that's for theft, staged
 3   loss, med fraud, rate evasions, those all would
 4   have different duties that were required to
 5   investigate the claims?                                03:29
 6        A.   There was different investigative
 7   steps for each one of those.  Yes.
 8        Q.   As it applies to the other teams, do
 9   you know if they had flex time?
10             MS. DSOUZA:  Objection.                       03:29
11        A.   I don't know.  I would think so.
12        Q.   And, as it applies to the other teams
13   as well as the folks on the inside, do you know
14   if they worked overtime?
15             MS. DSOUZA:  Objection.                       03:29
16        A.   I don't know.
17        Q.   If they did work overtime, do you
18   know if they were ever paid for it?
19        A.   I don't know.
20        Q.   Did you personally see other special    03:30
21   investigators in your region doing their work?
22        A.   No, unless it was one of my cases,
23   unless I was going on vacation, and they did part
24   of my case, no, I wouldn't look at any of their
25   cases.                                                 03:30
```



1                          Fischer

2          Q.   For any other special investigators

3     in your region, did you have access to their

4     claim files?

5          A.   Yes.                                        03:30

6          Q.   Did you review them in your custom

7     and practice?

8          A.   No.  The only time that I reviewed

9     other cases, you could go into someone else's

10    case and put their name in and put dates.  So, if   03:30

11    I wanted to look at six months worth of cases,

12    the only time I would do that was with the

13    blessing of Jerry Cassagne because of my

14    trainees.

15          At the beginning, when I would train        03:30

16    them and I would do reports, I would send them a

17    few of my cases to look at just to see how to

18    write the report.  So there were times where they

19    would send me their case, how they wrote it up,

20    and say is this good?  Did I miss something?         03:31

21    That's when I would review their cases.  Yes.

22          Q.   Outside of in more of that training

23    and shadowing component, were you looking at any

24    of the other SIU claim files?

25          A.   Other than the trainees, no.             03:31



```
 1                     Fischer
 2          Q.   Did you ever have access to any of
 3     the special investigators' Workday to see what
 4     they were logging for their hours?
 5          A.   No.                                      03:31
 6          Q.   For other special investigators in
 7     your region, did you ever work together on the
 8     same case?  Kind of like counsel is right now
 9     they're working together on the same case.
10          A.   Yeah, if there was a pattern, I might   03:31
11     catch, let's say there's a string of thefts, or
12     it really took place, as far as I remember, I had
13     a body case where it was the same shop, and maybe
14     two of us went out to the field and we worked
15     together on it, but we would do one report.  We   03:31
16     wouldn't generate two reports.  It would be one
17     report.
18          Q.   Outside of the body style cases, do
19     you recall doing anything like that on theft,
20     arson, staged loss, PIP or jump-ins?              03:32
21          A.   No, not that I recall.
22          Q.   Did you ever work or communicate with
23     any special investigators outside of your region?
24          A.   Oh, yes.  Regularly.  We called it
25     assist cases.  We would get a case from region    03:32
```



```
 1                    Fischer
 2    I do remember picking the brain of other
 3    investigators just to see what they had to do.
 4    Especially upstate the other team that worked for
 5    Chad up in the Buffalo area.  I got to pick their     03:34
 6    brain a lot, because I spoke to them quite often,
 7    but there were times that you would speak to New
 8    Jersey, Connecticut, you know, and are you
 9    required to do these steps too, you know, and
10    most of the time it was pretty much the same in      03:34
11    most regions.
12              There were a few things that were
13    different, and they were set by the managers, but
14    that had to do, you know, if you get someplace
15    like Maine and you've got New York, it's            03:34
16    completely different.  We outnumbered them
17    probably ten to one.
18         Q.   Do you know what the other categories
19    of special investigators outside of your region
20    were?                                               03:34
21         A.   No.  Other than just region 2, I
22    really didn't get, if I met them in catastrophes
23    and things like that, some guys were assigned to
24    different teams like we were.  They may have had
25    different teams unlike New York, but that's         03:34
```



```
 1                      Fischer
 2    because that's before that was going on, hail.
 3    They had a hail team.  You know, things like
 4    that.
 5           Q.   Do you know what type of claims each      03:35
 6    category of special investigator outside of your
 7    region worked on?
 8                MS. DSOUZA:  Objection.
 9           A.   Could you just repeat that.  I'm
10    sorry.                                                03:35
11           Q.   Sure.  Do you know what type of
12    claims that each special investigator outside of
13    your region worked on?
14                MS. DSOUZA:  Objection.
15           A.   No.                                       03:35
16           Q.   As far as outside your region, do you
17    have any knowledge whether those special
18    investigators had flex time?
19           A.   I couldn't tell you.  No.
20           Q.   For outside of your region do you         03:35
21    know if those special investigators worked
22    overtime?
23                MS. DSOUZA:  Objection.
24           A.   I don't know.
25           Q.   Would you know if they were subject       03:35
```



```
 1                    Fischer
 2    '20.
 3         Q.   You're going to have to break that
 4    down for me, because you lost me on the numbers.
 5         A.   Richie Kilgen had nine or ten.  Jerry     04:48
 6    Cassagne had 8.  Dara had 8, and Toni D'Agata had
 7    7 or 8.  So there was about 32 to 35 of us
 8    between the four supervisors.
 9         Q.   And those are all special
10    investigators that are in the field?               04:48
11         A.   Correct.
12         Q.   What about special investigators who
13    are in office?
14         A.   That was an additional 25 to 30
15    inside.  They weren't handled by those             04:48
16    supervisors.  They had other supervisors inside.
17         Q.   Do you know the day-to-day work for
18    the inside supervisors?
19              MS. DSOUZA:  Objection.
20         A.   No.                                       04:48
21         Q.   Do you know the workloads for the
22    investigators on the inside?
23         A.   No.
24         Q.   Do you know the workloads for field
25    major case SIU investigators?                       04:48
```



```
 1                        Fischer
 2           A.    No.
 3           Q.    Do you know if the field major case
 4    SIU investigators' work varied?
 5                 MS. DSOUZA:   Objection.           04:49
 6           A.    To the best of my knowledge, it did
 7    vary.
 8           Q.    Do you know how the field major case
 9    SIU investigators' job duties are different from
10    yours?                                          04:49
11                 MS. DSOUZA:   Objection.
12           A.    No.
13           Q.    Do you know how claims security
14    investigators' job duties varied from yours?
15                 MS. DSOUZA:   Objection.           04:49
16           A.    No.
17           Q.    Do you know what the claims security
18    investigators' workloads were like from 2016 to
19    present?
20                 MS. DSOUZA:   Objection.           04:49
21           A.    No.
22           Q.    For medical fraud investigators, do
23    you know how their job duties differed from
24    yours?
25                 MS. DSOUZA:   Objection.           04:50
```



```
 1                        Fischer
 2        A.   No.
 3        Q.   Do you know what their workloads were
 4   like from 2016 to present?
 5        A.   No.                                        04:50
 6        Q.   Do you know if their caseloads
 7   varied?
 8             MS. DSOUZA:   Objection.
 9        A.   No.
10        Q.   For the internal security               04:50
11   investigators, do you know how their job duties
12   differed from yours?
13             MS. DSOUZA:   Objection.
14        A.   No.
15        Q.   Do you know if there was a difference    04:50
16   between field major case SIUs and major case SIU
17   investigators?
18        A.   No.
19        Q.   Do you know if there's a difference
20   between internal major case SIU investigators and  04:50
21   major case SIU investigators?
22             MS. DSOUZA:   Objection.
23        A.   No.
24        Q.   Do you know how any of those titles
25   would be tiered from level 65 to 66?               04:51
```



```
 1                      Fischer
 2            MS. ALBERTY:  Objection.
 3       A.   Yes.
 4            MS. DSOUZA:  I think that is it.
 5            MS. ALBERTY:  I don't have any              05:33
 6       further questions.  Thank you.
 7            MS. DSOUZA:  Thank you.
 8            THE VIDEOGRAPHER:  This marks the end
 9       of the deposition.  We are going off the
10       record at 5:33 p.m.                             05:34
11            (Time noted:  5:33 p.m.)
12                         _____
13
14  Subscribed and sworn to
15  before me this____day of_____, 2024.
16  _____
17
18
19
20
21
22
23
24
25
```



1

2                    C E R T I F I C A T I O N

3

4              I, JOSEPH R. DANYO, a Shorthand Reporter

5     and Notary Public, within and for the State of New

6     York, do hereby certify:

7              That I reported the proceedings in the

8     within entitled matter, and that the within transcript

9     is a true record of such proceedings.

10             I further certify that I am not related, by

11    blood or marriage, to any of the parties in this

12    matter and that I am in no way interested in the

13    outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto set my

15    hand this 2nd day of September, 2024.

16

17    _____

18             JOSEPH R. DANYO

19             STATE OF NEW YORK

20             My Commission Expires 2/20/2027

21

22

23

24

25

