# EXHIBIT 5

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE EASTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - )

5    KEITH FISCHER, MICHAEL O'SULLIVAN,)

6    JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

7    BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

8    CHARISE JONES, individually and   ) (GRB) (ARL)

9    on behalf of all others similarly )

10   situated,                         )

11                   Plaintiffs,       )

12        - v -                        )

13   GOVERNMENT EMPLOYEES INSURANCE    )

14   COMPANY d/b/a GEICO,              )

15                   Defendant.        )

16   - - - - - - - - - - - - - - - - - )

17

18        VIDEOTAPED DEPOSITION OF CONSTANCE MANGAN

19

20

21

22

23   Reported by:

24   Kim M. Brantley

25   Job No: J11541509



```
 1                    CONSTANCE MANGAN

 2                 Thursday, August 9, 2024

 3                 Time: 9:35 a.m.

 4        Videotaped deposition of CONSTANCE MANGAN,

 5   held at Duane Morris, LLP, 1540 Broadway, 14th

 6   Floor, New York, New York, before Kim M. Brantley,

 7   Court Reporter and Notary Public of the State of

 8   New York.

 9

10   APPEARANCES:

11   On behalf of the Plaintiffs:

12        OUTTEN & GOLDEN, LLP

13        1225 New York Avenue NW - Suite 1200B

14        Washington, DC, 20007

15        (202) 847-4400

16        Email: hcolechu@outtengolden.com

17        BY:  HANNAH COLE-CHU, ESQUIRE

18

19

20

21

22

23

24

25
```



```
 1                    CONSTANCE MANGAN

 2   APPEARANCES CONTINUED:

 3   On behalf of the Defendant GEICO:

 4        DUANE MORRIS, LLP

 5        190 South LaSalle Street - Suite 3700

 6        Chicago, Illinois 60603

 7        (312) 499-0198

 8        Email: tealberty@duanemorris.com

 9   BY:  TIFFANY ALBERTY, ESQUIRE

10

11   Also On behalf of the Defendant GEICO:

12        DUANE MORRIS, LLP

13        1540 Broadway - 14th Floor

14        New York, New York 10036

15        (212) 471-1856

16        Email:  gsslotnick@duanemorris.com

17        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)

18

19   ALSO PRESENT:

20        SILVIO FACCHIN, Legal Video Specialist

21        Esquire Deposition Solutions

22

23

24

25
```



```
 1                     CONSTANCE MANGAN
 2              P  R  O  C  E  E  D  I  N  G  S
 3                  THE LEGAL VIDEO SPECIALIST:  This is
 4      the media labeled number one in the video recorded
 5      deposition of Constance Mangan in the matter of
 6      Keith Fischer, et al., versus Government Employee
 7      Insurance Company, doing business as GEICO.
 8                  This deposition is being taken in New
 9      York City, New York, on August 9th, 2024.  My name
10      is Silvio Facchin.  I am a certified legal video
11      specialist; the court reporter is Kim Brantley,
12      and we are both representing Esquire Deposition
13      Solutions.
14                  We are now going on the record.  The
15      time is 9:35 a.m.
16                  Counsel will state their appearances
17      for the record.
18              MS. COLE-CHU:  Hannah Cole-Chu for the
19          plaintiffs and the witness, Connie Mangan.
20              MS. ALBERTY:  Tiffany Alberty and
21          Gregory Slotnick on behalf of the defendants,
22          GEICO.
23              THE LEGAL VIDEO SPECIALIST:  And will
24          the court reporter please swear in the
25          witness.
```



```
 1                      CONSTANCE MANGAN
 2   Whereupon,
 3                      CONSTANCE MANGAN
 4   called as a witness by counsel for Defendant, and
 5   after having been first duly sworn, was examined
 6   and testified as follows:
 7          EXAMINATION BY COUNSEL FOR DEFENDANT
 8                  BY MS. ALBERTY:
 9       Q.   Can you please state your name and
10   spell it for the court reporter?
11       A.   Sure.  Constance Mangan,
12   C-o-n-s-t-a-n-c-e, last name Mangan, M-a-n-g-a-n.
13           MS. ALBERTY:  Let the record reflect
14   that this is the discovery deposition of Constance
15   Mangan taken pursuant to notice and by agreement
16   of the parties.  Today's deposition will be taken
17   in accordance with all applicable rules.
18           Excuse me.  It's an early morning.
19           THE WITNESS:  That's a tough one.
20   BY MS. ALBERTY:
21       Q.   I know I previously introduced myself
22   on the record and then before we began, but my
23   name's Tiffany Alberty.  I'm counsel for GEICO.
24   Today I'm going to be asking you a series of
25   questions about your experience at GEICO.
```



1                    CONSTANCE MANGAN

2    could receive a case anywhere in the counties or

3    the city.

4         Q.   And which -- I guess which counties in

5    which cities?

6         A.   Oh, okay.  So Nassau and Suffolk

7    County.  Because we were more of like a

8    metropolitan area team.  There's also I believe an

9    upstate team.  So anywhere in the five boroughs,

10   or Nassau and Suffolk County.

11        Q.   Okay.  So you wouldn't take anything

12   for example up in Albany?

13        A.   Oh, no.  I mean Yonkers once in a blue

14   moon, which is pretty close to the Bronx.

15        Q.   Mm-hmm.

16        A.   But nothing that far upstate.

17        Q.   And nothing outside of the state?

18        A.   No case assignments outside of the

19   state, no.

20        Q.   And you don't remember in time when

21   that transition happened where you took the

22   Nassau, Suffolk County, and then the five

23   boroughs?

24        A.   I don't.

25        Q.   What office were you assigned to?



```
 1              CONSTANCE MANGAN
 2   You could spend a great deal of time in the field,
 3   or you could spend a lot of time typing at your
 4   computer, so...
 5        Q.   So within your position did you send
 6   emails?
 7        A.   Yes.
 8        Q.   And you evaluated various claims?
 9        A.   I don't know if I would use the word
10   "evaluated," but we certainly reviewed claims,
11   gathered evidence in claims.  We didn't make claim
12   determinations.
13        Q.   But you would make the determination
14   whether there was fraud or not found?
15        A.   Correct.
16        Q.   I believe you said that gather police
17   reports, do interviews, gather statements, run
18   background checks, review files, conduct
19   surveillance...
20             For all those tasks would the case
21   dictate how much time you would allocate to those
22   tasks?
23        A.   I guess I would say that each case in
24   an investigation in my opinion is different, and
25   so every case could take you in a different
```



1                    CONSTANCE MANGAN

2        might say, "Come on in," and they show you

3        their equipment, and you meet some of the

4        doctors and the personnel.

5            So you might in your mind say, well

6        this will probably be about an hour or two

7        hours, but you could also have a four- or

8        five- or six-hour day.

9    BY MS. ALBERTY:

10       Q.   Were -- were your hours varied?

11       A.   No.

12       Q.   What were your hours you worked?

13       A.   My hours were consistently beginning

14   between 7:00 a.m. and 9:00 a.m. -- So it varied

15   only in that very limited sense -- and then

16   finishing anywhere between say 3:00 to 5:00.

17           Those were the scheduled hours, not the

18   actual hours that I worked.

19       Q.   Were you -- strike that.

20           Who was your supervisor?  And again I

21   want to focus between the 2016 to 20/2010 (sic)

22   time frame.

23       A.   Okay, I'm going to go backwards,

24   because that would be easier.  Brian Portnoy was

25   the supervisor I had when I retired.  I don't know



1                    CONSTANCE MANGAN

2    exactly when he became my supervisor, but before

3    him I had Toni D'Agata as a supervisor, and Dara

4    Vetri Campbell as a supervisor.  And if you're

5    going to go back probably earlier than say 2016 or

6    2017, then I had -- April Neyland I had as a

7    supervisor, but very briefly, and Kevin Moynihan

8    was my supervisor when I started, and he was my

9    supervisor for quite a while.  Also Tony

10   Mazziotti.  I'll spell it for you, it's

11   M-a-z-z-i-o-t-t-i.

12        Q.   Do you believe you had April Neyland as

13   your supervisor in 2016 or forward to 2020?

14        A.   I really couldn't say.

15        Q.   When you tendered your retirement, who

16   did you give your notice to?

17        A.   Brian Portnoy was my immediate

18   supervisor.

19        Q.   Do you know how many SIUs he managed?

20             MS. COLE-CHU:  Objection to form.

21             THE WITNESS:  I'm not sure what

22        question you're asking me.  You're asking me

23        how many people he managed in a team?

24   BY MS. ALBERTY:

25        Q.   Yep, to your knowledge.



```
 1                        CONSTANCE MANGAN

 2        A.    I was never assigned to work inside the

 3   Woodbury office, but that was our home base.  That

 4   was where we had meetings.  That was where you'd

 5   go if you needed supplies that you couldn't order,

 6   when you had to replace your computer, or replace

 7   your car, or go see an examiner face to face from

 8   time to time, but never actually assigned to be in

 9   the office.

10        Q.    Okay, so no inside role in the office?

11        A.    Right.  We were always remote.

12        Q.    Did you have any flex time?

13        A.    What do you mean --

14              MS. COLE-CHU:  Objection to form.

15              THE WITNESS:  -- by flex time?

16   BY MS. ALBERTY:

17        Q.    Sure.  I know you said in your custom

18   and practice you would work between starting 7:00

19   a.m., 9:00 a.m. start time, and then end between

20   3:00 to 5:00 p.m.

21              Did you have the opportunity to say

22   work in the evenings, or work early mornings

23   and --

24        A.    No.

25        Q.    -- carve out your own schedule?
```



```
 1                    CONSTANCE MANGAN
 2         A.   No.  That was the amount of
 3    flexibility.  You could start at 7:00 a.m., or you
 4    could start by 9:00 a.m.
 5         Q.   So you never had --
 6         A.   No weekends.
 7         Q.   Okay.
 8         A.   No nights, not as part of your
 9    schedule.  And we had to submit our time --
10    initially it was monthly, and then weekly, and
11    then we had to submit our time every single day.
12         Q.   So you never had the opportunity to use
13    flex time?
14         A.   I still don't know what you mean by
15    "use flex time."  I'm sorry.
16         Q.   Just to work whenever you can to get
17    your hours done.
18         A.   When we first started as investigators,
19    when I first began in around 2004 and years
20    subsequent to that, we had a much more flexible
21    schedule.  Because it was required that we would
22    sometimes meet with a person at night, or on a
23    Sunday, and that way -- so then if you had to
24    start at 12:00 and work until 8:00 o'clock,
25    because you were meeting somebody when they
```



```
1                    CONSTANCE MANGAN

2    they were so backed up, they told us don't even

3    ask for a court date less than three our four

4    weeks in the future.

5         Q.   So it seems that for med cases the

6    shortest amount of time would have been a month.

7    Then to more of the standard in your investigative

8    scope of three to four months was the length of

9    those type of claims.

10            Is that right?

11       A.   The -- the medical fraud claims?

12       Q.   Yes.

13       A.   It wasn't the -- always the average.  I

14   would say it takes at least a month, or it did in

15   my cases, that I found it most of the time it took

16   at least a month to get the statements that are

17   required to close a -- a medical fraud case.

18            A -- a staged accident case can also

19   take many months, because that's another case

20   where your typical staged accident is four or five

21   occupants in a car; everybody is represented by

22   attorneys, often different attorneys; everybody is

23   receiving medical treatment.  So those cases can

24   also go on for months and months.

25       Q.   Okay.
```



CONSTANCE MANGAN                                                August 09, 2024
FISCHER V. GEICO                                                             62

```
1                      CONSTANCE MANGAN

2         A.   EUOs.

3         Q.   EUOs.

4         A.   Examination under oath.  Yeah, because

5    we love acronyms.  It's just one of those things.

6         Q.   Were you doing EUOs for doctors,

7    medical specialists, things like that as well?

8         A.    I did not.  Other people did within the

9    SIU, but I did not.

10        Q.   Okay.  Would you consider yourself a

11   subject matter expert in the field of medical

12   insurance investigations?

13             MS. COLE-CHU:  Objection to form.

14             THE WITNESS:  I would say that I became

15        very proficient at it.

16   BY MS. ALBERTY:

17        Q.   What about for auto insurance fraud?

18        A.   Yes, very proficient at it.

19        Q.   To your knowledge, do you know if other

20   senior security investigators had the same

21   workload as you for the medical fraud claims?

22        A.   Yes.

23        Q.   How do you know that?

24        A.   Well, I -- I spoke to other

25   investigators that were in the medical fraud team,
```



```
 1                    CONSTANCE MANGAN

 2    conducted for the year?

 3         A.   Yes, actually it's required that you

 4    review it, and I believe, if I'm correct, that we

 5    had to sign it.

 6         Q.   What would typically be included in

 7    that performance evaluation?

 8         A.   So, to the best of my recollection,

 9    because it has been a while, that would be case

10    life, quality of your cases, the amount of

11    training that you had, the number of cases

12    assigned.

13              Those are the ones that come to mind.

14         Q.   Would it include the number of cases

15    closed in that year?

16         A.   I believe it could.

17         Q.   How many cases would you say you closed

18    a month?

19         A.   That changed frequently.  The goal

20    would be to try to close as many as possible, but

21    just it was not always possible.  And since it was

22    such a rolling caseload, it's hard for me to give

23    you an answer to that question, because I really

24    am not certain.

25         Q.   Would you be able to close one case a
```



```
 1                      CONSTANCE MANGAN

 2    month?

 3         A.   Well, hopefully, yes.  That would be

 4    great.

 5         Q.   Okay?

 6         A.   Yeah.

 7         Q.   Five cases, ten cases a month?

 8         A.   Potentially; depends.

 9         Q.   When you would effectively close a

10    case, what did that look like?

11              MS. COLE-CHU:  Objection to form.

12              THE WITNESS:  Yeah, I'm not sure I can

13         answer that.  I'm not sure what you mean.

14         What do you mean, "What did it look like?"

15    BY MS. ALBERTY:

16         Q.   Sure.  Meaning did you have to submit a

17    final report, who did it go to, were you making

18    determinations whether there was fraud, there

19    wasn't fraud?

20         A.   Okay, so I was making determinations as

21    far as whether or not I discovered any fraud as a

22    result of my investigation for sure, whether

23    billing was excessive or improper.

24              I had to submit a written report

25    through the case reporting system, and once you
```



```
 1                    CONSTANCE MANGAN

 2              Do you see that paragraph?

 3      A.   Yes.

 4      Q.   Okay.  So it says, "All nonexempt

 5  associates are required to accurately record their

 6  hours worked and absences taken."

 7              And you were a nonexempt employee from

 8  2016 to 2020, correct?

 9      A.   Yes, I was.

10      Q.   And so this part of the policy would

11  apply to you, correct?

12      A.   Yes.

13      Q.   And that you were required to follow

14  the policy to accurately record your hours worked

15  and absences taken?

16      A.   That is what it says.

17      Q.   Was it your understanding that you had

18  to follow the policy?

19      A.   Could I just read the whole thing for

20  one second?

21      Q.   Sure, take your time.

22      A.   Okay.  Thank you.

23              (Witness reviews document.)

24      A.   Okay.  Well, yeah, and it does say here

25  that, "When you feel that your pay incorrectly
```



```
 1                       CONSTANCE MANGAN

 2    an unofficial meeting, we would certainly see

 3    them, like I said, at an examination under oath.

 4         Q.   Were there any official standing

 5    meetings to have conversations with your

 6    supervisor?

 7         A.   Oh, yeah.  We had official meetings as

 8    well.

 9         Q.   When did those occur in -- in time?

10    And I'm not saying date --

11         A.   Yeah.

12         Q.   -- I'm just saying more on a regular

13    basis, such as a quarterly, biannual, annual?

14         A.   Well, obviously during the pandemic,

15    that changed everything, so we really weren't

16    having in-person meetings at that time.

17              But, I -- I don't believe I can answer

18    that with any real accuracy.  So I'm not certain

19    how often we had meetings with our supervisors.

20         Q.   Did you always get paid for the time

21    you entered into what you believe was the Workday

22    timekeeping system?

23         A.   I got paid for the hours I submitted,

24    yes.

25         Q.   I want to look at your declaration.
```



1          CONSTANCE MANGAN

2          THE WITNESS:  Yeah, I'm going to have

3     to ask you to repeat that question again.

4  BY MS. ALBERTY:

5     Q.   Sure.

6     A.   I got a little lost in there.

7     Q.   That's okay.

8          I think you said any time you would

9  bring up the amount of time it would take for you

10 to do your job and exceed then the 38.75 hours,

11 that your supervisors would then bring up the

12 discussion of overtime?

13    A.   That's not correct.  If I testified to

14 that, then that's not correct.

15         It's -- we would constantly have

16 conversations about working hours in excess of the

17 7.75 per day.  There was a time when overtime was

18 offered, and there were times when we had

19 conversations about that offered overtime.

20    Q.   Okay, so GEICO offered overtime.  Did

21 you enter your overtime hours?

22         MS. COLE-CHU:  Objection to form.

23         THE WITNESS:  I can recall submitting

24    overtime hours on very few occasions.

25



```
1                    CONSTANCE MANGAN

2    BY MS. ALBERTY:

3         Q.   When you submitted your overtime hours,

4    were you paid for that overtime?

5         A.   To the best of my recollection I was

6    paid for the overtime I submitted, yes.

7         Q.   Okay, number twelve of your

8    declaration, which is going to be page three and

9    four, states "The process for requesting overtime

10   approval was onerous and deterred me from

11   reporting overtime I worked."

12        A.   I see that.

13        Q.   In -- in what way do you mean that it

14   was "onerous"?

15        A.   To me it felt onerous due to the fact

16   that I had to contact my supervisor; I had to

17   request permission to submit for overtime; I had

18   to cite a specific case or cases that I would

19   require the overtime for, and then I had to

20   specify the number of hours I anticipated needing

21   to complete that task on that day that would

22   require overtime.

23             Now, if I underestimated, I was not

24   permitted to correct it.  So if I said, "I'm going

25   to need two more hours" because, I'm guessing, it
```



```
 1                        CONSTANCE MANGAN
 2    supervisor thought that was necessary.
 3         Q.   Did you intentionally not report time
 4    you spent on work even when GEICO approved your
 5    overtime?
 6         A.   I did not report all of the time that I
 7    spent on work at the direction of my supervisors.
 8         Q.   But every time you requested more time
 9    it was granted?
10         A.   On the very few occasions -- which I
11    believe probably less than a dozen times in all of
12    those years -- on those few occasions where I
13    submitted for overtime, to the best of my
14    recollection, I was paid for that.
15         Q.   Under paragraph twelve it states, "And
16    GEICO's performance evaluation system would give
17    me a low rating because it measured my ratio of
18    cases worked to hours and flagged that I should
19    have more cases assigned.
20              "Because I did not want even more cases
21    assigned, this deterred me from submitting my
22    overtime hours worked for approval."
23              What was the tiering process of ratio
24    of cases to hours worked?
25              MS. COLE-CHU:  Objection to form.
```



```
 1                        CONSTANCE MANGAN

 2              THE WITNESS:  I don't understand that

 3         question.

 4   BY MS. ALBERTY:

 5         Q.   Well, it's stating that "it measured my

 6   ratio of cases to hours worked."

 7              What -- what's that process?

 8              MS. COLE-CHU:  Objection.

 9   BY MS. ALBERTY:

10         Q.   What are the metrics for the ratio of

11   cases to hours worked?

12              MS. COLE-CHU:  Objection to form.

13              THE WITNESS:  That -- that statement

14         refers to conversations I had with my

15         supervisors.

16              Again, I specifically recall this

17         discussion with my supervisor, Toni D'Agata,

18         and also with Dara Campbell that that was the

19         way that that calculation was made.

20   BY MS. ALBERTY:

21         Q.   So -- so I understand that you're

22   telling me someone told you this.

23         A.   Yes.

24         Q.   But I'm trying to get down to it

25   granularly, which is what is the ratio?  What are
```



CONSTANCE MANGAN                                    August 09, 2024
FISCHER V. GEICO                                                123

```
 1                      CONSTANCE MANGAN
 2    the actual numbers of cases that would then be
 3    allocated to the number of hours?
 4            So say, for example, ten cases needed
 5    to have thirty hours.  What is it granularly on
 6    the ratio scale, if you know?
 7        A.   I do not know.
 8        Q.   Then further in the sentence it says,
 9    "And flagged that I should have more cases
10    assigned."
11            So then going back to the ratio, which
12    is if you exceeded forty hours and now say you're
13    working fifty hours, that additional ten hours,
14    how many new cases would be assigned per that ten
15    additional hours that exceeded the forty-hour
16    week?
17            MS. COLE-CHU:  Objection to form.
18            THE WITNESS:  I understand --
19    BY MS. ALBERTY:
20        Q.   Yeah, granularly, if you know.
21        A.   I understand the question you're
22    asking.  I do not have an answer for you.  I do
23    not know.
24        Q.   And I might be looking at this
25    literally.
```



1                   CONSTANCE MANGAN

2         A.   We haven't been in touch, no.

3              Sometimes when you retire you stay in

4    touch with people, and sometimes you don't.  An

5    occasional like, "Oh, let's get together some day

6    and see each other," but that would be the extent

7    of it.

8         Q.   In regard to Tony, do you know if Tony

9    ever submitted overtime and was denied?

10        A.   You're saying Tony Geraci or Toni

11   D'Agata?

12        Q.   Sorry, Geraci.

13        A.   Well, there's so many -- I don't know

14   that he submitted for specifically, but I know it

15   was the same issue, that we were not to put in for

16   overtime; that we were to record our hours as

17   38.75 per week, 7.75 a day.

18        Q.   So --

19        A.   Whether he was specifically denied

20   anything at any point, that I'm not certain of.

21        Q.   Do you know if George McManus had

22   submitted overtime and was denied?

23        A.   I do not know independently if he was

24   or not.

25        Q.   Did he tell you?



1                          CONSTANCE MANGAN

2          A.   I know he worked overtime.  I don't

3    remember if he ever told me that he was denied

4    overtime.

5          Q.   Do you know if Mike Sullivan submitted

6    for overtime and was denied?

7          A.   I do not know if he was denied.

8          Q.   Do you know if Charise Jones submitted

9    for overtime and was denied?

10         A.   I do not know if she was denied.

11         Q.   Do you know if Louis Pia submitted

12   overtime and was denied?

13         A.   I do not know if he was denied.

14         Q.   And do you know if John Moeser

15   submitted overtime and was denied?

16         A.   I do not know if he was denied.

17         Q.   Do you know if any of these people that

18   you commiserated with over the overtime ever went

19   to human resources?

20         A.   Not to my knowledge, but I don't know

21   for sure.

22         Q.   Okay.  Let's go to actually paragraph

23   ten.  It states, "GEICO set a regular schedule of

24   me starting anywhere between 7:00 to 9:00 a.m.

25   and ended between 3:00 to 5:00 p.m., but I



```
 1                        CONSTANCE MANGAN
 2   BY MS. ALBERTY:
 3        Q.   Correct?
 4        A.   Well, assuming that I wasn't on
 5   vacation that week, which I have no independent
 6   recollection of, if I was working, I was working
 7   overtime.  That's the only way I could really
 8   state it.
 9        Q.   In 2020 did you ever get COVID?
10        A.   No.
11        Q.   Did you have limitations based upon
12   COVID restrictions in which you could not do your
13   job?
14        A.   To some degree, yes.
15        Q.   And in what way?
16        A.   Field work, field visits.
17        Q.   Okay, so in March up and until your
18   retirement in May of 2020 -- say we'll say for the
19   two months -- you were not able to conduct
20   in-field investigations, correct?
21        A.   We were requested to do them, but then
22   we were told that it was not mandatory but
23   optional.
24             I opted not to go out and interact with
25   the public during that time period.
```



1          CONSTANCE MANGAN

2      Q.   Since you were then working remote, did

3  the time for you to work -- which was that 7:00

4  a.m./9:00 a.m. to the 3:00 p.m./5:00 p.m. --

5  flexibility change because of COVID?

6      A.   Still the hours were always in that

7  ballpark, somewhere between 7:00 or 8:00 a.m.

8  mostly for me, not usually 9:00 a.m., until, yes,

9  the three -- between 3:00 and 5:00, if we want to

10 just cover all of it.

11     Q.   Okay.

12     A.   Yes.

13     Q.   And then you were not canvassing scenes

14 or going out and seeing anything at that time?

15     A.   Right.

16     Q.   And I take it you weren't interviewing

17 people?

18     A.   Well, the only format for interviewing

19 anybody as far as our claimant was through an

20 examination under oath, and those had been -- once

21 the suspension of -- well, like the city came down

22 with, and of course the state came down with it

23 eventually, the federal government came down with

24 this nobody but necessary, vital workers.  So that

25 stopped.  And I had no other format to do those



```
 1                        CONSTANCE MANGAN
 2          Q.   Did they say specifically that it would
 3     be "detrimental" if you put in those hours, even
 4     though you were working those hours?
 5          A.   Is the question whether or not they
 6     used the word "detrimental" in a conversation?
 7               (Ms. Alberty nods head in the
 8     affirmative.)
 9          A.   I don't remember if they did or not.
10          Q.   Did you tell Bill Newport that you were
11     working fifty to sixty hours a week, that you were
12     not logging your overtime hours?
13          A.   I don't recall ever having a
14     conversation like that with them.
15          Q.   Did you tell anyone in HR?
16          A.   I did not speak to HR, no.
17          Q.   Was there any -- was there anyone that
18     worked over Bill that you would speak with?
19          A.   No.
20          Q.   Did you ever put in writing -- whether
21     to the SIUs, to the supervisors, to Bill -- that
22     you were working fifty to sixty hours a week on
23     average?
24          A.   Not to my recollection.
25          Q.   As to what weeks or how much overtime
```



```
 1                    CONSTANCE MANGAN

 2    was requested by your other SIUs, you were not

 3    involved in approving any overtime hours for your

 4    colleagues, correct?

 5         A.   That's correct.

 6         Q.   Did anyone -- strike that.

 7              Did any of the SIUs come to you and

 8    tell you more on a number amount, similar to what

 9    you state in your declaration of fifty to sixty

10    hours?

11              Did any of your SIUs tell you, "Hey,

12    I'm working seventy hours typically in a week"?

13              MS. COLE-CHU:  Objection to form.

14              THE WITNESS:  To the best of my

15         recollection I can recall some people saying

16         they worked longer than I was working, which

17         I -- I found upsetting.  I'm not sure exactly

18         who.  Maybe Lou Pia, but I -- I -- I believe

19         that's the case.  I would not say a hundred

20         percent for sure.

21    BY MS. ALBERTY:

22         Q.   Would that have been in person? on the

23    phone? email?

24         A.   When I saw Lou Pia, it was always in

25    person.  I don't know that we spoke on the phone
```



CONSTANCE MANGAN                              August 09, 2024
FISCHER V. GEICO                                          153

```
 1                    CONSTANCE MANGAN
 2   much at all.
 3        Q.   Do you know whether any employees
 4   outside of the Woodbury office were approved to
 5   work more than the 38.75 hours in a week?
 6        A.   If they were approved to work?  I don't
 7   know.
 8        Q.   Do you know if Lou was approved for any
 9   overtime hours?
10        A.   I don't know what hours he was approved
11   for.
12        Q.   So were you eligible for overtime?
13             MS. COLE-CHU:  Objection.
14             THE WITNESS:  Overtime had been offered
15         at one point, but in a -- to my understanding
16         in a very limited capacity.
17   BY MS. ALBERTY:
18        Q.   And I apologize if you previously
19   testified to this...
20             Do you know when in time overtime was
21   allowed and approved?
22        A.   Yeah, that a good question.  I wouldn't
23   be able to answer that.  I'm not sure.
24        Q.   Do you know whether other senior
25   security investigators were eligible for overtime?
```



```
 1                  CONSTANCE MANGAN

 2    investigators outside of Long Island and the

 3    boroughs.  Do you know if they were eligible for

 4    overtime?

 5         A.   Well, again I don't know the specifics

 6    of their eligibility, but I know many of them were

 7    also working hours in excess of their scheduled

 8    7.75 per day.

 9         Q.   Do you know whether SIU investigators

10    other than field security investigators were

11    eligible for overtime?

12              MS. COLE-CHU:  Objection.

13              THE WITNESS:  I don't know their

14         eligibility status.

15    BY MS. ALBERTY:

16         Q.   Do you know if they were paid for

17    overtime?

18         A.   I don't know what they were paid for or

19    not paid for, but I know they were working a lot.

20         Q.   Do you know if lead security

21    investigators were eligible for overtime?

22              MS. COLE-CHU:  Objection.

23              THE WITNESS:  I don't know their

24         eligibility status, but I know Keith Fischer

25         was a lead, and he had expressed to me that
```



```
1                    CONSTANCE MANGAN

2         he also was working hours in excess of his

3         7.75 every day, and that we were not putting

4         in for overtime.

5    BY MS. ALBERTY:

6         Q.   Do you know if Keith Fischer was denied

7    overtime?

8         A.   I don't know.

9         Q.   Do you know if lead security

10   investigators were denied overtime?

11        A.   Not to my recollection.  I don't know.

12        Q.   Do you know if lead security

13   investigators were paid overtime?

14        A.   I don't know.

15        Q.   Do you know if claim security

16   investigators were paid overtime?

17        A.   I'm not sure what you mean by "claim

18   security investigators."  I mean, that title, I

19   don't know that title.

20        Q.   Do you know if that was a title for any

21   employee at GEICO during 2016 to 2020?

22        A.   It's not a title that sounds familiar

23   to me.  "Claims security investigator"?

24             (Ms. Alberty nods head in the

25   affirmative.)
```



1                        CONSTANCE MANGAN

2    treatment for example.

3              And then as far as that case going on

4    to the next level, I don't know how much

5    involvement he would have had or not had in

6    something beyond that.

7         Q.   For auto-related claims, did every

8    single one have a medical component?

9         A.   A lot of them did, but I know because a

10   theft case wouldn't have any medical component to

11   it, as an example.

12        Q.   Would an arson have a medical component

13   to it, if it was just property damage?

14        A.   Yeah, my experience with arson as it

15   relates to automobile fraud is that the arsons

16   that were generally investigated, to the best of

17   my knowledge, was a -- a vehicle, and generally an

18   unoccupied vehicle.

19        Q.   What did you understand to be the

20   categories of special investigators outside of

21   your region?

22             MS. COLE-CHU:  Objection to form.

23             THE WITNESS:  I'm not sure what you

24        mean by that.

25   BY MS. ALBERTY:



1             CONSTANCE MANGAN

2       Q.   So, outside of the areas that you

3   covered --

4       A.   Okay.

5       Q.   -- which should have been Nassau and

6   Suffolk County and the five boroughs --

7       A.   Yes, right.

8       Q.   What did you understand the categories

9   of special investigators who would not be within

10  those areas but around the rest of the State of

11  New York?

12      A.   I'm not certain what their categories

13  were.

14      Q.   Do you know what type of claims they

15  handled?

16      A.   As far as I know the same claims as

17  everyone else: Auto-related accidents, staged

18  accidents, or fraud -- exaggerated injuries.  I

19  imagine just -- I guess what the other associated.

20           But they would handle a theft if theft

21  was up in Albany, that would be their case.

22      Q.   But do you know?

23      A.   I don't know if they had specific

24  sections like we did in our metropolitan region.

25  I don't know that answer.



1          CONSTANCE MANGAN

2     records of my schedule.

3  BY MS. ALBERTY:

4     Q.    To paragraph fifty-five, from December

5  of 2016 to March 2020 GEICO assigned Mangan work

6  that required her to spend extensive but highly

7  variable hours both at home and in the field to

8  investigate cases assigned to her.

9          "In full work weeks, i.e. weeks in

10  which Mangan worked at least five days without

11  loss to a holiday or other time off, these

12  assignments required her to work, approximately

13  fifty to sixty hours per week.

14          "Specifically Plaintiff Mangan recalls

15  working between approximately between forty-five

16  and fifty hours in the week of September 23rd,

17  2019."

18          I believe we fleshed this out.  I just

19  want to double check.

20          The type of work that you did during

21  December of 2016 to March of 2020 were med fraud

22  claims, right?

23     A.    That is right.

24     Q.    How if at all did that differ -- strike

25  that.



```
 1                      CONSTANCE MANGAN

 2   answers I received from my supervisors, and the

 3   communications from my supervisors.

 4            I know that this was a widespread issue

 5   and that, to my knowledge, a large group of

 6   investigators experienced the same problems and

 7   issues that I experienced and complained about the

 8   same things that I was complaining about.

 9            So that much I can say, but I don't

10   feel comfortable saying I could answer one

11   particular person's day-to-day activities.  That

12   would be hard for me to do.

13       Q.   Do you know the workloads for field

14   major case SIU investigators from 2016 to present?

15            MS. COLE-CHU:  Objection to form.

16            THE WITNESS:  I do not.

17   BY MS. ALBERTY:

18       Q.   Do you know if the workloads of field

19   major case SIU investigators from 2016 to present

20   varied?

21            MS. COLE-CHU:  Objection to form.

22            THE WITNESS:  Could you say that again?

23   BY MS. ALBERTY:

24       Q.   Sure.  Do you know if the workloads for

25   field major case SIU investigators from 2016 to
```



1                    CONSTANCE MANGAN

2   present varied?

3            MS. COLE-CHU:  Same objection.

4            THE WITNESS:  Yeah, I -- I don't

5        believe I can answer that question.

6   BY MS. ALBERTY:

7        Q.   Do you know the job duties for a major

8   field case SIU investigators?

9        A.   When you say a "major field case SIU

10  investigator," I'm not sure who you're referring

11  to.

12       Q.   So fair to say you don't know what the

13  job duties would be of that title?

14       A.   Yeah, I don't know specifically their

15  job duties of that title.

16       Q.   As it applies to senior internal

17  security investigators, do you know what those job

18  duties were?

19       A.   I know some of their job duties, and I

20  know I personally relied on them for computer work

21  and help, especially early on.

22            They're often a liaison for cases to

23  say a bigger case that would be forthcoming, a

24  litigation.  So there might be an internal

25  investigator who was assigned to help put together



```
1                    CONSTANCE MANGAN

2    BY MS. ALBERTY:

3         Q.   Do you know --

4         A.   Those are some of their

5    responsibilities.  I don't know all of their

6    responsibilities.

7         Q.   Do you know what their work loads were?

8              MS. COLE-CHU:  Objection to form.

9              THE WITNESS:  I don't have specific

10        numbers, or I don't think I'm able to answer

11        that question.

12   BY MS. ALBERTY:

13        Q.   Do you know if their workloads varied?

14        A.   My answer would probably be the same.

15   I'm not certain.

16        Q.   Do you know what the job duties were

17   for senior field security investigators?

18        A.   Well, I'm a senior field investigator,

19   so I know what my job duties were.  I know what

20   job duties were for a number of the other

21   investigators.

22             So when you say "senior investigator,"

23   "senior field investigator," to me those are

24   essentially the same.  Most of the people that I

25   worked with in my job, we were considered field
```



```
 1                    CONSTANCE MANGAN

 2          THE LEGAL VIDEO SPECIALIST:  We are now

 3     going off the record.  The time is 4:00 p.m.

 4     This is the end of the media labeled number

 5     five, concluding this video recorded

 6     deposition.

 7          (Whereupon at 4:00 p.m. the videotaped

 8     deposition of Constance Mangan concluded.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    CONSTANCE MANGAN

2              C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                          : Ss.

5   COUNTY OF NEW YORK     )

6              I, Kim M. Brantley, Shorthand

7   Reporter, and Notary Public within and for the

8   State of New York, do hereby certify:

9              That CONSTANCE MANGAN, the witness

10  whose deposition is hereinbefore set forth, was

11  duly sworn by me and that such deposition is a

12  true record of the testimony given by the witness.

13             I further certify that I am not related

14  to any of the parties to this action by blood or

15  marriage, and that I am in no way interested in

16  the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18  my hand this 14th day of August, 2024.

19

20             _____
               Kim M. Brantley

21                 Kim M. Brantley

22

23

24  My Commission expires May 31, 2026.

25

