# EXHIBIT 6

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF NEW YORK
   ------------------------------------X
3  KEITH FISCHER, MICHAEL O'SULLIVAN,
   JOHN MOESER, LOUIS PIA, THOMAS
4  BARDEN, CONSTANCE MANGAN, and
   CHARISE JONES, individually and on behalf
5  of all others similarly situated,

6            Plaintiffs,

7                          Case No.:
                           2:23 Civ. 2848
8                          (GRB)(ARL)
          -against-
9
   GOVERNMENT EMPLOYEES INSURANCE
10 COMPANY d/b/a GEICO,

11           Defendants.
   ------------------------------------X
12

13

14
   DEPOSITION OF
15

16           DANIEL JOSEPH KING

17
          Tuesday, January 7th, 2025
18
          Garden City, Long Island, New York
19

20

21 Reported By:

22
   Marina Dubson
23

24 Job #: J12200285

25



DANIEL J. KING                                                    January 07, 2025
Fischer v Government Employees Ins.                                             2

1

2

3

4
                    DATE: January 7th, 2025
5
                    TIME: 10:00 a.m.
6

7

8          DEPOSITION of DANIEL JOSEPH KING, an

9    opt-in Plaintiff herein, taken by the

10   Defendant, pursuant to Federal Rules of

11   Civil Procedure, and Notice, held at

12   Esquire Deposition Solutions, 1225 Franklin

13   Avenue, Suite 325, Garden City, New York

14   11530, at the above-mentioned date and

15   time, before MARINA DUBSON, a Notary Public

16   of the State of New York.

17

18

19

20

21

22

23

24

25



1  | APPEARANCES:

2  |

3  | OUTTEN & GOLDEN, LLP
   | Attorney for Plaintiffs
4  | 685 Third Avenue, 25th Floor,
   | New York, New York 10017
5  | (212) 245-1000
   | BY: SABINE JEAN, ESQ.
6  |     Sjean@outtengolden.com

7  |     JARRON MCALLISTER, ESQ.
   |     Jmcallister@outtengolden.com
8  |

9  |

10 | DUANE MORRIS, LLP
   | Attorney for Defendant
11 | 1540 Broadway, 14th Floor,
   | New York, New York 10036
12 | (212)471-1856
   | BY: GREG SLOTNICK, ESQ.
13 | Gsslotnick@duanemorris.com

14 |

15 |
   | Sam Shereck, Shereck Video, videographer
16 | Sshereck1@gmail.com

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                              4

```
 1          IT IS HEREBY STIPULATED AND AGREED,

 2   by and between the attorneys for the

 3   respective parties, as follows:

 4

 5   THAT all objections, except as to the form

 6   of the questions, shall be reserved to the

 7   time of the trial;

 8

 9   THAT the within examination may be signed

10   and sworn to before any Notary Public with

11   the same force and effect as if signed and

12   sworn to before the Court;

13

14   THAT filing of the original transcript of

15   the examination is waived.

16

17

18

19

20

21

22

23

24

25
```



```
 1                D. King
 2        THE REPORTER:  Please confirm
 3   your orders?
 4        MR. SLOTNICK: 5-day expedite
 5   final.
 6        MS. JEAN:  Copy, regular
 7   turnaround.
 8                XXXX
 9        THE VIDEOGRAPHER:  We're on the
10   record.  The time is 10:10 a.m.
11   Today's date is Tuesday, January 7,
12   2025.  This is the video deposition
13   of Daniel King in the matter of
14   Fischer et al. v. Government
15   Employees Insurance Company d/b/a
16   GEICO, case number 23CIV2848 in the
17   United States District Court for the
18   Eastern District of New York.
19        My name is Sam Shereck, legal
20   videographer with Shereck Video in
21   association with Esquire.  Today, we
22   are at the offices of Esquire located
23   at 1225 Franklin Avenue, Garden City,
24   New York.  Will counsels please voice
25   identify yourselves and state who you
```



```
 1                      D. King

 2        represent?

 3             MS. JEAN:  Good morning.  This

 4        is Sabine Jean for plaintiffs.  I'm

 5        Sabine Jean of Outten & Golden, and

 6        with me is my colleague,

 7        Jarron McAllister.

 8             MR. SLOTNICK:  Good morning.

 9        My name is Greg Slotnick.  I am from

10        the law firm of Duane Morris, LLP,

11        representing defendant GEICO in this

12        case.

13             THE VIDEOGRAPHER:  And the

14        court reporter is Marina Dubson with

15        Esquire.  Please swear in the

16        witness.

17             (Whereupon, the witness was

18        sworn in by the Court Reporter.)

19   EXAMINATION

20   BY MR. SLOTNICK:

21        Q.   Good morning, Mr. King.

22        A.   Good morning.

23        Q.   Could you please state and

24   spell your name for the record?

25        A.   Sure.  Daniel King, K-I-N-G.
```



```
 1                       D. King
 2    assume.
 3         Q.    So, from approximately 2005 to
 4    2013, somewhere in that range?
 5         A.    Yes.
 6         Q.    And you mentioned that you then
 7    worked as an auto fraud investigator?
 8         A.    Correct.
 9         Q.    And what were your job
10    responsibilities in that role?
11         A.    In that, it went from car theft
12    to hit-and-runs to, as well, what they call
13    jump-ins.  People who claim to be in a car
14    accident but were never in the car or bus
15    or something.  Motor vehicle, parking
16    losses, flood damage.
17         Q.    Okay.  And what years were you
18    in that role for?
19         A.    I was there from, I think you
20    had said 2013 till I left, since I retired.
21         Q.    And did GEICO have different
22    regions to which employees reported?
23         A.    Yes, but it changed at times.
24         Q.    Do you recall how it changed
25    over time?
```



```
 1                         D. King
 2        A.    I may have been assigned court
 3   cases that were assigned to me in Brooklyn
 4   and Queens.  Another time, it may be Long
 5   Island and in the Bronx.
 6        Q.    Did you always perform your
 7   work in New York State, though?
 8        A.    Yes.
 9        Q.    And did you ever perform work
10   in New York north of the city?
11        A.    Not past -- yes, once or twice.
12   Maybe just Westchester, if I had to go look
13   for somebody.
14        Q.    But predominantly, most of your
15   work was focused in the New York City area
16   and Long Island?
17        A.    Yes.
18        Q.    And did you always work in
19   New York at GEICO?
20        A.    Yes.
21        Q.    Do you know if GEICO was still
22   using regions when you left GEICO in 2022?
23        A.    Not for -- I wasn't.  Let's put
24   it that way.  I wasn't assigned regions.  I
25   was assigned to wherever they wanted me to
```



```
 1                    D. King
 2   of.
 3        Q.    And from the period of 2016
 4   until the end of your GEICO employment in
 5   2022, did you have a set schedule?
 6        A.    Yes.
 7        Q.    Do you recall what your set
 8   schedule was?
 9        A.    Monday through Friday, 8:00
10   a.m. to, I think it was like 4:30, I
11   believe.
12        Q.    Did that ever change during
13   that time?
14        A.    No.
15        Q.    Did you need to have that
16   schedule approved by your supervisor or is
17   it something that you set by yourself?
18        A.    That was something that we were
19   told, that that's our hours.
20        Q.    And that's something that
21   Dara Campbell told you?
22        A.    I think it was -- it was from
23   the -- from the upper echelons, the upper
24   bosses, like Mike DeGrocco.  I think that
25   was his name.  He was a manager.
```



DANIEL J. KING                                                January 07, 2025
Fischer v Government Employees Ins.                                        68

```
 1                    D. King
 2       Q.    And just to jump back, you
 3  mentioned a canvass.
 4             Can you describe what that
 5  means?
 6       A.    If somebody said that their car
 7  was parked out front and it got hit, we
 8  have no witness, no proof.  I may go knock
 9  on people's doors.  I ask them if they have
10  any Ring cameras or any other type, or see
11  if there's like maybe a police camera on a
12  pole nearby.
13       Q.    Did you have to perform a scene
14  canvass on all of your cases, or was that
15  depending on the facts?
16       A.    It -- it depended on the case.
17       Q.    Do you recall like what
18  percentage of the cases required a scene
19  canvass?
20       A.    Probably 50 percent.
21       Q.    You mentioned previously you
22  always had a company car with GEICO; is
23  that right?
24       A.    Correct.
25       Q.    And how far did you typically
```



```
 1                      D. King

 2    drive to investigate your cases?

 3         A.    All the way up to Westchester

 4    and all the way south to Staten Island, and

 5    all the way east to -- maybe went for about

 6    -- Smithtown or Commack.

 7         Q.    And how much time did you spend

 8    in the field in a day when you would go

 9    into the field?

10         A.    Every day was different.

11         Q.    And you mentioned earlier that

12    the number of claims that you handled per

13    week fluctuated; is that correct?

14         A.    No.  Over time, yes.  But then

15    it would be a continuous -- could be

16    several months and it's X amount per week,

17    five cases a day, 15 cases a week.

18         Q.    Were those set -- were they --

19    were they completely set by GEICO, or did

20    it depend on when you were assigned cases?

21    Like was it the same every single week for

22    a set period of time, or did it depend sort

23    of on the week?

24         A.    For the most part, it was set

25    by GEICO.  If -- during summer months or
```



```
 1                        D. King

 2        Q.    And when you say during that

 3   time, what do you mean?

 4        A.    During the last couple of years

 5   of my -- my time at GEICO.

 6              (Clarified by the Court

 7         Reporter.)

 8        A.    When I was employed at GEICO.

 9        Q.    Do you know if Scott Brady --

10   strike that.

11              What did Keith Fischer say

12   about his workload?

13        A.    That it wasn't as -- it wasn't

14   as much as mine.

15        Q.    Do you recall when he said that

16   to you?

17        A.    No.

18        Q.    Any other details from that

19   conversation?

20        A.    I -- it was either him or

21   George who said, wow, you guys are getting

22   killed, meaning Steve and I.

23        Q.    Do you recall any other details

24   of your discussions about your workload

25   with Keith or George or Scott?
```



DANIEL J. KING                                              January 07, 2025
Fischer v Government Employees Ins.                                      80

```
 1                       D. King
 2       A.    George had told me that, again,
 3  he couldn't believe how many cases that we
 4  were catching or being assigned, if you
 5  want to --
 6       Q.    Did he say how many cases he
 7  had at the time?
 8       A.    He didn't say the number, but
 9  he -- he said his workload was not as heavy
10  as ours.
11       Q.    Do you recall any other
12  conversations with anyone other than Keith,
13  Scott or George about workloads?
14       A.    No.
15       Q.    And did those conversations
16  take place in person or over the phone?
17       A.    In person.
18       Q.    Do you know about the workloads
19  of any other investigators other than the
20  individuals we mentioned?
21       A.    No.
22             (Defendant's Exhibit 2, GEICO
23        employee handbook, was marked for
24        identification as of this date by the
25        Reporter.)
```



```
 1                    D. King
 2   BY MR. SLOTNICK:
 3        Q.   Mr. King, you've been handed
 4   what's been marked as Defendant's
 5   Exhibit 2.
 6             Are you familiar with this
 7   document?
 8        A.   Honestly, no.  I've seen it,
 9   but I never really read it.
10        Q.   But you recall receiving this
11   document?
12        A.   No, I don't recall receiving
13   it.
14        Q.   Yeah, if you could just let me
15   finish the question first.  I know it's --
16   it's not the easiest thing.
17             Do you recall receiving
18   handbooks while you first worked at GEICO?
19        A.   When I was first hired, yes.
20        Q.   And do you recall ever
21   receiving any updates to handbooks at
22   GEICO?
23        A.   No.
24        Q.   Do you have any reason to
25   believe that you did not receive access to
```



```
 1                      D. King
 2    updated handbooks at GEICO?
 3         A.    I believe -- my knowledge --
 4    that these were changed and updated and all
 5    put on the computer.  So, I don't recall
 6    receiving individual -- this packet like
 7    this.  I may or may not have gotten an
 8    e-mail saying updates made to whatever
 9    on -- you know, online, but I don't recall
10    going online and looking at it.
11         Q.    Do you recall whether you had
12    access to the GEICO employee handbook while
13    you were employed there?
14         A.    Yes.
15         Q.    And did you have access?
16         A.    Yes.
17         Q.    But you don't recall ever
18    actually looking at it; is that correct?
19         A.    I did probably look at it for
20    vacation time to see how many -- how much
21    vacation time I was going to, you know, get
22    like every year or what they call
23    floating -- floating holidays, how to use
24    them, things of that nature.  I'm sorry.
25    And one other time, I did look on it
```



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                           83

```
 1                    D. King
 2    because I was going out sick, long-term
 3    sick.  So, I looked it up for that, too.
 4         Q.    If you could turn to the page
 5    that's marked G000039 on the bottom right.
 6         A.    Okay.
 7         Q.    And in the paragraph that
 8    starts, all nonexempt associates, right in
 9    the middle of the page, do you see that
10    paragraph?
11         A.    Yes.
12         Q.    And it says, all nonexempt
13    associates are required to accurately
14    record their hours worked and absences
15    taken.  All exempt associates are required
16    to accurately record their absences taken.
17    A nonexempt associate who feels he or she
18    did not receive pay for all his/her hours
19    worked and an exempt or salaried nonexempt
20    associate who feels his/her pay incorrectly
21    reflects a deduction for an absence should
22    contact his/her supervisor, local human
23    resources manager or corporate human
24    resources.
25              Did I read that paragraph
```



1                        D. King

2    increase each year at GEICO?

3          A.    Yes.

4          Q.    Did you always receive that?

5          A.    No.

6          Q.    Do you recall how many years

7    you did not receive that from 2016 to 2022?

8          A.    I would say the last two or

9    three years.

10         Q.    And are you referring to the

11   COVID time period, from 2020 to 2022?

12         A.    Yes.

13         Q.    Do you know whether any other

14   GEICO investigators were paid hourly wages?

15         A.    I don't know about anybody but

16   myself with this.

17         Q.    And how did you record your

18   time worked at GEICO?

19         A.    We had to do a timesheet once a

20   week online.

21         Q.    And did you always record your

22   time accurately?

23         A.    Yes.

24         Q.    Did you submit that timesheet

25   to your supervisor for approval?



```
 1                    D. King
 2       A.    Yes.
 3       Q.    Did that process ever change?
 4       A.    I don't think in the beginning
 5   when I was hired.  I don't recall it was --
 6   it may not have been done online.
 7       Q.    Do you recall a time period
 8   where there was a physical timesheet that
 9   you were submitting?
10       A.    I don't recall.
11       Q.    But at some point between 2016
12   and 2022, you started submitting your time
13   online each week?
14       A.    Yes.
15       Q.    And can you walk me through the
16   process of how you would actually submit
17   your time into GEICO systems?
18       A.    I don't know if I am going to
19   recall correctly because -- but you would
20   go onto -- it was an app timesheet, I
21   believe.  You would put in the hours that
22   you worked for each day or if you were off.
23   I don't know if it had a total or not.  And
24   then you would submit it to your supervisor
25   to be reviewed.
```



```
 1                      D. King
 2        Q.    Do you recall whether your
 3   submitted time was always approved?
 4        A.    That I recall, yes.
 5        Q.    Did you have any issues with
 6   respect to time that you submitted that was
 7   not correctly paid?
 8        A.    Not that I recall.
 9        Q.    And do you recall the name of
10   the app that you used to submit your time?
11        A.    I don't.
12        Q.    Was it potentially called
13   Workday?
14        A.    Yes.
15        Q.    Do you remember if you used
16   Workday as the only app to submit your time
17   online or was there previously another
18   application?
19        A.    I don't recall.
20        Q.    Did you certify the accuracy of
21   the time that you recorded when you
22   submitted it?
23        A.    I don't understand what you
24   mean by that.
25        Q.    Were you required to confirm
```



```
 1                        D. King
 2    that the time entry you were submitting was
 3    accurate when --
 4         A.    I believe so.
 5         Q.    Did you always have to do that
 6    before you submitted your time?
 7         A.    Yes.
 8              (Defendant's Exhibit 4,
 9          Declaration of Daniel King, was
10          marked for identification as of this
11          date by the Reporter.)
12    BY MR. SLOTNICK:
13         Q.    Mr. King, you've been handed
14    what's been marked Defendant's Exhibit 4.
15              Have you seen this document
16    before?
17         A.    Yes.
18         Q.    And did you help prepare this
19    document?
20         A.    I'd have to look it over and
21    see if there's anything from me on this.
22         Q.    Yeah.  Please take a minute to
23    review it.  I should have said that at the
24    outset.
25         A.    Yes, I did.
```



```
 1                    D. King
 2   average?
 3        A.    Correct.
 4        Q.    And what time period is that in
 5   reference to?
 6        A.    That is from, I guess, COVID,
 7   when we were -- you know, after COVID, then
 8   we went -- were back to full, you know,
 9   going out and doing everything.  You know,
10   not just staying at home until I resigned.
11        Q.    And when you say back to full,
12   what do you mean by that?
13        A.    Well, before we were -- because
14   of COVID, we weren't allowed to go out and
15   do investigations.  Everything had to be
16   over the phone, everything had to be --
17   EUOs had to be done over the phone.
18        Q.    So, during COVID, you were not
19   allowed to work in the field; is that
20   correct?
21        A.    Correct.
22        Q.    And do you remember how long
23   that was the case for?
24        A.    A year maybe, or a year and a
25   half.  I -- I don't particularly recall.
```



```
 1                        D. King
 2        Q.    And how did the fact that you
 3   could not go into the field impact your
 4   workload during that time?
 5        A.    Some of it, it -- it helped.
 6   We weren't catching as many cases as we
 7   were prior or after COVID.  People weren't
 8   out driving, people, weren't, you know,
 9   committing fraud, I guess, during that
10   time.
11        Q.    Okay.  So, was the volume of
12   cases lower during that time?
13        A.    I believe it was.
14             MS. JEAN:  Apologies.  For
15          clarification, when you say that
16          time, can you state the time, if
17          possible, please?
18   BY MR. SLOTNICK:
19        Q.    During the time period we were
20   just testifying about in terms of
21   March 2020 to when you were allowed to go
22   back out in the field, that's -- that's the
23   time period.
24             MS. JEAN:  Because I was
25          still -- thank you.
```



```
 1                     D. King
 2   paid for that extra time after dinner,
 3   correct?
 4        A.    She didn't just say me.  She
 5   said they're not going to pay you guys
 6   after that, you know.  They're not going to
 7   pay more than 7.75.
 8        Q.    And what exactly did she say to
 9   you about that?
10        A.    I can't give you a quote.  I
11   can't.  I don't --
12        Q.    Was that one conversation or
13   was that a number of conversations about
14   that topic specifically?
15        A.    I've probably had several
16   conversations about that.  Not so much as
17   far as overtime, it was more about how many
18   hours working just to get the job done --
19              (Clarified by the Court
20         Reporter.)
21        A.    It would take to complete the
22   job, how many extra hours a day.
23        Q.    Did Dara Campbell ever
24   encourage you to work extra hours off the
25   clock?
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                                  117

```
 1                      D. King
 2        A.    No.
 3        Q.    Did she ever suggest you work
 4   extra hours off the clock?
 5        A.    Not to my recollection.
 6        Q.    And you had also mentioned
 7   Bill Newport, SIU manager, correct?
 8        A.    Correct.
 9        Q.    Can you describe what he told
10   you about working those extra hours?
11        A.    He never told me anything
12   specifically.  I didn't really have many
13   conversations with him.  I -- I don't think
14   I have ever had a one-on-one with him.
15        Q.    Have you ever met Bill Newport?
16        A.    Yes.
17        Q.    Did you meet him in person?
18        A.    Yes.
19        Q.    So, who was Bill Newport
20   talking to when you learned of this?
21        A.    The -- the supervisors.  I'm
22   sorry.  The supervisors.
23        Q.    So, this is -- strike that.
24              Are you saying that this is
25   something Dara said that Bill said?
```



```
 1                    D. King
 2       A.    Yes.
 3       Q.    Understood.  So, did Bill ever
 4   directly tell you that?
 5       A.    No.
 6       Q.    Or any -- have any discussions
 7   with you about your hours worked?
 8       A.    No.
 9       Q.    And what's your basis for the
10   estimation that you worked 50 hours a week
11   on average in paragraph nine?
12       A.    My basis, that I would work
13   from 8 to 5.  After dinner, I would go back
14   up, log on to my computer again and spend
15   another two, two and a half hours
16   attempting to make my TIP.
17       Q.    And are you testifying that you
18   did this every single day?
19       A.    I would say yes, I did.  Yes.
20       Q.    During what time period?
21       A.    During post-COVID until I left.
22       Q.    Did you ever work additional
23   hours before COVID?
24       A.    At times.  At times.  But not
25   to the extent that I was the last two years
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                            119

```
 1                    D. King
 2   or three years.
 3        Q.   What do you mean by at times,
 4   like how often?
 5        A.   If for some reason I got stuck
 6   in traffic from coming back from doing an
 7   EUO, but I had to get this in, you know, by
 8   tonight at midnight, I would work the hours
 9   to get -- to get the report in.
10        Q.   Did you ever make any requests
11   with respect to those additional hours for
12   overtime pay?
13        A.   No.
14        Q.   Why not?
15        A.   Well, because it was known that
16   they were not paying us overtime.  So, I'm
17   not sure why I would even -- why ask?
18        Q.   Did you ever receive overtime
19   pay while you worked at GEICO?
20        A.   I testified earlier that I did
21   when I was -- they had those extra cases,
22   the social media cases.  Yes, I was paid
23   overtime.
24        Q.   I think you testified to the
25   social media cases and the Superstorm Sandy
```



```
 1                        D. King
 2     cases, correct?
 3          A.    I wasn't paid for Superstorm
 4     Sandy.  I -- you asked if anything was
 5     available to anybody.
 6          Q.    Right.  Other than the social
 7     media cases though, did you ever put in a
 8     request for overtime pay?
 9          A.    No.
10               MR. SLOTNICK:  Off the record.
11               THE VIDEOGRAPHER:  All right.
12          Off the record at 12:29.
13               (Whereupon, an off-the-record
14          discussion was held.)
15               (Whereupon, a short break was
16          taken at this time.)
17               THE VIDEOGRAPHER:  Okay.  Back
18          on the record at 1:26.
19     BY MR. SLOTNICK:
20          Q.    Mr. King, before we broke, we
21     were reviewing your declaration?
22          A.    Yes.
23          Q.    So, if you could turn to
24     paragraph ten on page three in -- in
25     Exhibit 4.
```



```
 1                    D. King
 2   paragraph?
 3        A.    Just regular investigators.
 4        Q.    Can you identify who you're
 5   talking about by name?
 6        A.    Well, anybody who was an
 7   investigator that was working for
 8   Dara Campbell at that time.
 9        Q.    Were you present for those
10   discussions?
11        A.    No.
12        Q.    And what do you mean by
13   frequently reiterated?
14        A.    When I would complain about
15   that, that I'm having trouble keeping up
16   with the work --
17              (Clarified by the Court
18         Reporter.)
19        A.    When I would speak to her about
20   me having trouble keeping up with my
21   caseload and saying that, you know, there's
22   not enough hours in the day for me, and
23   basically had said I am going to get
24   divorced soon because my wife was
25   complaining I'm never around even though I
```



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                          140

```
 1                         D. King
 2    work from home.
 3              She basically said we're all --
 4    she did say, but I can't quote, we're all
 5    in the same boat and you got to do the best
 6    you can.
 7         Q.    Did she say anything else on
 8    that front?
 9         A.    Not that I recall.
10         Q.    Do you know if any other
11    investigators complained to Dara Campbell
12    about not being able to keep up with the
13    workload like you did?
14         A.    Honestly, I don't know.
15         Q.    Did working from home during
16    the time period you couldn't go into the
17    field after March 2020, did that give you
18    any more flexibility in terms of how and
19    when you could investigate your cases?
20         A.    No.  It -- it kind of hindered
21    it because we couldn't go out.
22         Q.    Were you still required to go
23    into the field and take pictures and scene
24    canvass?
25         A.    Not in the beginning, no.
```



```
 1                         D. King
 2    was all the same, numbers-wise.
 3         Q.    Do you remember if that was an
 4    application that you used to take a look at
 5    the workloads?
 6         A.    I think it's called SICM.
 7         Q.    And did you use SICM throughout
 8    2016 through 2022 at GEICO?
 9         A.    Yes.
10         Q.    And again, I know you mentioned
11    you took a look at your team.
12               Who specifically do you
13    remember looking at?
14         A.    Dux, Steve Stemmler, Anthony.
15    I can't think of Anthony's last name.  It
16    starts with a D.  Just glance quick to see
17    what the numbers were.
18         Q.    Did those records also reflect
19    the number of hours each of those
20    investigators worked?
21         A.    No.  It was just caseload,
22    cases open, cases closed.
23         Q.    Did you have access to any of
24    those investigator's hours worked through
25    SICM or elsewhere?
```



```
 1                      D. King
 2        A.    The hours?  SICM never showed
 3   hours and -- and you couldn't look at
 4   people's pay or hours worked.
 5              (Clarified by the Court
 6         Reporter.)
 7        A.    SICM didn't show work hours.
 8   And the other application where we put our
 9   timesheets in, we weren't -- you didn't
10   have access to look at other people's pay
11   or hours.
12        Q.    And earlier, you had mentioned
13   assists on certain cases.
14              Do you recall that testimony?
15        A.    Yeah.  Yes.
16        Q.    How did assists play into your
17   case numbers?  Like were you receiving
18   credit for assists?
19        A.    No.  That was an issue.
20        Q.    Did you receive any type of
21   impact on your cases as a result of taking
22   assists?
23        A.    No.
24        Q.    Do you know how assists were
25   delegated?
```



```
 1                     D. King

 2           THE VIDEOGRAPHER:  Okay.  We're

 3      off the record at 3:54, and that

 4      concludes the deposition.

 5           (Whereupon, at 3:55 P.M., the

 6      Examination of this Witness was

 7      concluded.)

 8

 9
                _____
10                   DANIEL KING

11

12 Subscribed and sworn to before me

13 this _____ day of _____ 20___.

14
   _____
15      NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25
```



DANIEL J. KING                                                    January 07, 2025
Fischer v Government Employees Ins.                                            224

```
 1                      D. King

 2              C E R T I F I C A T E

 3

 4   STATE OF NEW YORK       )
                             :
 5   COUNTY OF RICHMOND      )

 6

 7        I, MARINA DUBSON, a Notary Public for

 8   and within the State of New York, do hereby

 9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 7th day of January 2025.

21

22

23   _____
               MARINA DUBSON
24

25
```

