# EXHIBIT 7

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
 4   - - - - - - - - - - - - - - - - - )
 5   KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6   JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:
 7   BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848
 8   CHARISE JONES, individually and   ) (GRB) (ARL)
 9   on behalf of all others similarly )
10   situated,                         )
11                   Plaintiffs,       )
12      - v -                          )
13   GOVERNMENT EMPLOYEES INSURANCE    )
14   COMPANY d/b/a GEICO,              )
15                   Defendant.        )
16   - - - - - - - - - - - - - - - - - )
17
18       VIDEOTAPED DEPOSITION OF THOMAS BARDEN
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J11541508
```



```
 1                    THOMAS BARDEN

 2                Thursday, August 8, 2024

 3                Time: 9:59 a.m.

 4         Videotaped deposition of THOMAS BARDEN, held

 5    at Duane Morris, LLP, 1540 Broadway, 14th Floor,

 6    New York, New York, before Kim M. Brantley, Court

 7    Reporter and Notary Public of the State of New

 8    York.

 9

10    APPEARANCES:

11    On behalf of the Plaintiffs:

12         OUTTEN & GOLDEN, LLP

13         1225 New York Avenue NW - Suite 1200B

14         Washington, DC, 20007

15         (202) 847-4400

16         Email: hcolechu@outtengolden.com

17                zdsouza@outtengolden.com

18         BY:  HANNAH COLE-CHU, ESQUIRE

19               ZARKA SHABIR DSOUZA, ESQUIRE

20

21

22

23

24

25
```



 1                    THOMAS BARDEN

 2   APPEARANCES CONTINUED:

 3   On behalf of the Defendant GEICO:

 4        DUANE MORRIS, LLP

 5        190 South LaSalle Street - Suite 3700

 6        Chicago, Illinois 60603

 7        (312) 499-0198

 8        Email: tealberty@duanemorris.com

 9   BY:  TIFFANY ALBERTY, ESQUIRE

10

11   Also On behalf of the Defendant GEICO:

12        DUANE MORRIS, LLP

13        1540 Broadway - 14th Floor

14        New York, New York 10036

15        (212) 471-1856

16        Email:  gsslotnick@duanemorris.com

17        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)

18

19   ALSO PRESENT:

20        SILVIO FACCHIN, Legal Video Specialist

21        Esquire Deposition Solutions

22

23

24

25



```
 1              THOMAS BARDEN
 2         P R O C E E D I N G S
 3              THE LEGAL VIDEO SPECIALIST:  This is
 4    the media labeled number one in the video recorded
 5    deposition of Thomas Barden in the matter of Keith
 6    Fischer, et al., versus Government Employee
 7    Insurance Company, doing business as GEICO.
 8              This deposition is being taken in New
 9    York City, New York, on August 8th, 2024.  My name
10    is Silvio Facchin.  I am a certified legal video
11    specialist; the court reporter is Kim Brantley,
12    and we're both representing Esquire Deposition
13    Solutions.
14              We are now going on the record.  The
15    time is 10:00 a.m.
16              Counsel will state their appearances
17    for the record.
18         MS. COLE-CHU:  For the plaintiffs,
19         Hannah Cole-Chu, from Outten & Golden, and
20         with me is Zarka DSouza from Outten & Golden
21         as well.
22         MS. ALBERTY:  And Tiffany Alberty, on
23         behalf of GEICO, along with Gregory Slotnick.
24              THE LEGAL VIDEO SPECIALIST:  Will the
25         court reporter please swear in the witness.
```



```
 1                     THOMAS BARDEN

 2                     THOMAS BARDEN

 3   called as a witness by Counsel for the Defendant,

 4   and, after having been first duly sworn by the

 5   Notary Public, was examined and testified as

 6   follows:

 7          EXAMINATION BY COUNSEL FOR DEFENDANT:

 8                   BY MS. ALBERTY:

 9        Q.   Can you please state your name and

10   spell it for the court reporter.

11        A.   It's Thomas Barden, T-h-o-m-a-s,

12   Barden, B-a-r-d-e-n.

13            MS. ALBERTY:  Let the record reflect

14        that this is the discovery deposition of Mr.

15        Thomas Barden taken pursuant to notice and by

16        agreement of the parties.  Today's deposition

17        will be taken in accordance with all

18        applicable rules.

19   BY MS. ALBERTY:

20        Q.   Mr. Barden, I know that I introduced

21   myself off the record.  I will just make another

22   introduction.  My name is Tiffany Alberty.  I

23   represent GEICO in this matter that's been filed.

24            Would you prefer me to call you Thomas,

25   Tom, Mr. Barden?
```



1                    THOMAS BARDEN

2        A.   Yes.

3        Q.   Okay, so we're going to circle back to

4   your employment with GEICO.

5             When you first started as a security

6   field investigator, what region or area were you

7   working in --

8             MS. COLE-CHU:   Objection.

9             THE WITNESS:   I was assigned to the

10       Albany area.

11   BY MS. ALBERTY:

12       Q.   Did that encompass any additional

13   counties or cities?

14       A.   It was an area south of Albany, all the

15   way to the Canadian border basically, and from the

16   Massachusetts state line to west, to right around

17   Utica, just east of Utica, New York.

18       Q.   Was there, for example, a mild radius

19   that you covered, fifty mile, a hundred mile?

20       A.   It was well over a hundred mile radius,

21   from what I can guess.

22       Q.   To your knowledge, did GEICO have

23   different geographic regions to which employees

24   were assigned?

25       A.   Yes.



1                    THOMAS BARDEN

2       Q.   Fair to say because you were a level

3  sixty-five, that's the only knowledge that you

4  have about that position is within that level

5  base, correct?

6            MS. COLE-CHU:  Objection.

7            THE WITNESS:  Yes.

8  BY MS. ALBERTY:

9       Q.   As a senior field investigator, what

10  were your hours?

11            MS. COLE-CHU:  Objection.

12            THE WITNESS:  Hours were basically

13       eight hours a day.

14  BY MS. ALBERTY:

15       Q.   Were they set times?

16       A.   When I was hired, I was told that our

17  hours were flexible so that we could adjust to

18  whatever is required during the day regarding

19  in-person interviews, scene canvasses, EUOs that

20  had to be done, things likes that, so that we

21  could adjust our schedule according to that.

22       Q.   Did you say EUOs?

23       A.   Examinations under oath.

24       Q.   Okay, thank you.

25       A.   Sorry.



```
 1                    THOMAS BARDEN

 2        Q.   No, that's okay.

 3        A.   Sorry.

 4        Q.   So in your position everything that you

 5   just outlined are some of the additional duties

 6   and responsibilities that you had in order to

 7   investigate auto fraud, correct?

 8        A.   Yes.

 9        Q.   Did your hours change from that flex

10   time throughout your employment with GEICO?

11             MS. COLE-CHU:   Objection.

12             THE WITNESS:   The hours were extended.

13   BY MS. ALBERTY:

14        Q.   Okay, and in what capacity?

15        A.   With increased caseload, it was -- it

16   demanded more hours to complete cases,

17   investigative steps.

18        Q.   Were you still allocated that flex time

19   we talked about?

20        A.   It was still -- it was basically up to

21   us when we got that work done, when we put in that

22   eight hours.

23        Q.   When you first started, who was your

24   supervisor?

25        A.   Chester Janik, Chet Janik.
```



```
 1                    THOMAS BARDEN

 2              MS. COLE-CHU:  Objection.

 3              THE WITNESS:  No.

 4  BY MS. ALBERTY:

 5       Q.   Have you ever had a desk role at the

 6  Woodbury office?

 7              MS. COLE-CHU:  Objection.

 8              THE WITNESS:  No.

 9  BY MS. ALBERTY:

10       Q.   Did anyone tell you how to arrange your

11  flex time?

12       A.   No.

13       Q.   Were you free to complete your work at

14  any time that was convenient for you?

15              MS. COLE-CHU:  Objection.

16              THE WITNESS:  It wasn't out of

17         convenience.  It was more when the job

18         dictated when I needed to work.

19  BY MS. ALBERTY:

20       Q.   Aside from the auto fraud cases we

21  spoke about, did you have any other cases you

22  would work on?

23       A.   Occasionally we would be assigned

24  medical, like injury cases.

25       Q.   Almost like personal injury cases?
```



1                    THOMAS BARDEN

2        Q.   And once you would be assigned the

3   case, what were your next steps then thereafter?

4        A.   We would adopt the case and then start

5   our investigation.

6        Q.   I believe in your declaration you

7   indicated that you would investigate insurance

8   fraud, but it seems to me now that it's much

9   narrow than that.  It was just auto insurance

10  fraud.

11            Is that correct?

12            MS. COLE-CHU:  Objection.

13            THE WITNESS:  Most of our cases were

14       auto damage.  On occasion we would be

15       assigned for auto injury.

16  BY MS. ALBERTY:

17       Q.   But you weren't involved, for example,

18  like in property insurance fraud, as in

19  homeowner's?

20       A.   Homeowners?  No.

21       Q.   Were you involved in any cases related

22  to arson or theft?

23       A.   There were arson auto cases, yes; auto

24  theft, yes.

25       Q.   For the auto fraud cases that you



```
 1               THOMAS BARDEN

 2    investigated, how long did it take you to complete

 3    your investigations?

 4         A.   That depended on the complicated nature

 5    of the claim.

 6         Q.   Sure.  Could you give maybe a range?

 7         A.    I really couldn't.  I mean, sometimes

 8    it took hours; sometimes it took days; sometimes

 9    it took weeks; depended on how complicated the

10    case was, what the claim was, how long it took us

11    to get information.

12              We requested police reports that

13    sometimes were not available.  Contacting

14    claimants was difficult at times.

15         Q.   Aside from gathering police reports,

16    contacting claimants, conducting witness

17    interviews, and going on scene, is there anything

18    else that you would do to investigate these auto

19    insurance fraud cases?

20         A.   We did background investigations on all

21    of the parties involved, social media

22    investigations, examinations under oath as I

23    mentioned before, scene canvasses, if I didn't

24    mention that, interviewing police agencies,

25    reviewing police accident reports and depositions,
```



THOMAS BARDEN                                          August 08, 2024
Keith Fischer, et al. vs GEICO                                      42

```
1                    THOMAS BARDEN
2    four hours in the field a day?
3        A.   It was hard to say.
4        Q.   After COVID, or when COVID started in
5    March of 2020, how much time did you spend in the
6    field?
7        A.   None.
8        Q.   All the way up until you left in
9    December of 2020, was there any time that you went
10   back to going into the field?
11           MS. COLE-CHU:  Objection.
12           THE WITNESS:  December of 2022.
13   BY MS. ALBERTY:
14       Q.   Sorry, that's what I meant, of 2022.  I
15   apologize.
16       A.   That's okay.
17           Yes, around November of 2021 we were
18   allowed to go back in the field for certain scene
19   canvasses, anything that didn't have contact with
20   people basically was the first step of returning
21   back to the field.
22       Q.   For the tasks that you mentioned --
23   which is background checks, gathering police
24   reports, contacting claimants, doing special media
25   investigations, examinations under oath, scene
```



                              THOMAS BARDEN

1

2    canvassing -- for those tasks, did you have to do

3    that for every single one of your cases?

4          A.    I would say the majority of those, yes.

5                The claim or the case that we took

6    would dictate exactly what we needed to do, but

7    those were a lot of the tools or some of the tools

8    that we used during our investigation.

9                Each claim was different.  Each case

10   was different.

11         Q.    Was that up to you to make that

12   determination?

13               MS. COLE-CHU:  Objection.

14               THE WITNESS:  It was.

15   BY MS. ALBERTY:

16         Q.    When did you first get assigned to your

17   own cases outside of shadowing?

18         A.    January 20, 2020, so after my first

19   three months basically.

20         Q.    And how many claims did you handle per

21   week?

22               MS. COLE-CHU:  Objection.

23               THE WITNESS:  I got roughly eight cases

24      a week.

25   BY MS. ALBERTY:



```
1                    THOMAS BARDEN

2         This is the beginning of the media labeled

3         number two.

4              MS. ALBERTY:  All right.  So we're

5         going to go into Exhibit Number 2.

6              (Employee handbook was marked

7         Deposition Barden Exhibit 2, for

8         identification.)

9    BY MS. ALBERTY:

10        Q.   All right, Tom, if you just want to

11   take a -- a peak through.  You don't have to read

12   it verbatim, substantively.  We're only going to

13   look at one section.

14             So just let me know whenever you're

15   ready.

16        A.   Okay.

17             (Witness reviews document.)

18             MS. ALBERTY:  Okay, are you ready, Kim?

19             THE COURT REPORTER:  Yes.

20             THE WITNESS:  Yes.

21   BY MS. ALBERTY:

22        Q.   All right.  So what I marked and handed

23   to you is G000028 through G00043.

24             You received this handbook during your

25   employment with GEICO, right?
```



```
 1                    THOMAS BARDEN

 2            MS. COLE-CHU:  Objection.

 3            THE WITNESS:  I don't know if I

 4       received this one.

 5  BY MS. ALBERTY:

 6       Q.   Okay --

 7       A.   I received one.  I received "a"

 8  handbook, yes.

 9       Q.   Okay, was that at the beginning of your

10  employment during your orientation, as you

11  remember?

12       A.   Yes.

13       Q.   I really just want to focus on page

14  00038.  At the very bottom of that page it says

15  "Overtime Eligibility," and then if you actually

16  flip then to the next page at 39, it has the

17  substantive policy itself.

18            So, down towards the middle of the page

19  it states, "All nonexempt associates are required

20  to accurately record their hours worked and

21  absences taken."

22            Do you see that?

23       A.   Yes.

24       Q.   And you were a nonexempt employee,

25  correct?
```



```
 1                      THOMAS BARDEN
 2              MS. COLE-CHU:  Objection.
 3              THE WITNESS:  Correct.
 4   BY MS. ALBERTY:
 5       Q.   Okay, and then, not the immediate
 6   sentence then after, but the next sentence states,
 7   "A nonexempt associate who feels he/she did not
 8   receive pay for all his/her hours worked and an
 9   exempt or salaried nonexempt associate who feels
10   his/her pay incorrectly reflects the deduction for
11   an absence should contact his/her supervisor,
12   local human resource manager, or corporate human
13   resources."
14              Did I read that correctly?
15       A.   Yes.
16       Q.   Okay.  You'd agree that you were
17   required to follow this policy as a nonexempt
18   employee of GEICO?
19              MS. COLE-CHU:  Objection.
20              THE WITNESS:  It was put out there as a
21        requirement, which...
22   BY MS. ALBERTY:
23       Q.   Was it the expectation that as an
24   employee of GEICO that you were to follow the
25   policies as outlined for your specific position?
```



```
 1                    THOMAS BARDEN
 2            MS. COLE-CHU:  Objection.
 3            THE WITNESS:  I would say it was their
 4       expectation, yes.
 5   BY MS. ALBERTY:
 6       Q.   Was it your understanding that you
 7   needed to adequately record your hours?
 8       A.   Yes.
 9       Q.   If there was any issue regarding your
10   hours and pay, was it your understanding that you
11   could contact a supervisor, local HR, or corporate
12   HR?
13       A.   It was my understanding that I would
14   bring it to the attention of my supervisor.
15       Q.   Was HR an accessibility point for you
16   in your position?
17            MS. COLE-CHU:  Objection.
18            THE WITNESS:  As far as I knew, yes.
19   BY MS. ALBERTY:
20       Q.   I think you said you recalled getting
21   the employee handbook at orientation.
22            Do you recall ever getting subsequent
23   trainings for the policies and procedures of GEICO
24   as it would apply to your position?
25            MS. COLE-CHU:  Objection.
```



```
 1                    THOMAS BARDEN

 2            THE WITNESS:  I don't recall.

 3            MS. ALBERTY:  Let's do this.  It's

 4       three.

 5            You can set that to the side, Tom.

 6            (Training history log was marked

 7       Deposition Barden Exhibit 3, for

 8       identification.)

 9  BY MS. ALBERTY:

10       Q.   All right.  So, what's been handed to

11  you has been marked as Exhibit 3.  This is

12  actually a training history log.  It's four pages

13  that is Bates G004287 through -- that's it, and

14  then its got the three pages then thereafter.

15            Okay.  So looking at page number one,

16  row seven, it states that, "In this together was

17  completed October 22nd, 2019."

18            Do you see that?

19            MS. COLE-CHU:  Objection.  Which row?

20            MS. ALBERTY:  Row seven, if you're

21       counting the top row, which is the -- my

22       apologies.

23  BY MS. ALBERTY:

24       Q.   Do you see that, Tom?

25       A.   You're talking the very first one that
```



```
 1                          THOMAS BARDEN
 2    "Says Historical Tracking Under Learning Record
 3    Type"?
 4         Q.    Yes.
 5         A.    That row across?
 6         Q.    Yep, that row across.
 7         A.    Yes.
 8         Q.    Okay.  Do you recall this training?
 9         A.    No.
10         Q.    Do you have any reason to dispute that
11    you completed this training and you passed it?
12         A.    No.
13         Q.    And below it is going to be the
14    policies and acknowledgments from 2019, which
15    would have been completed around October 25, 2019,
16    sort of been at the beginning of your employment.
17              Is this consistent with what you
18    remember in obtaining the policies and procedures
19    around the time you started?
20              MS. COLE-CHU:  Objection.
21              THE WITNESS:  I don't recall what
22         happened at that time.
23    BY MS. ALBERTY:
24         Q.    Do you have any reason to dispute that
25    you received, completed, and passed the policies
```



```
 1                    THOMAS BARDEN

 2   and procedures when you first started your

 3   employment?

 4              MS. COLE-CHU:  Objection.

 5              THE WITNESS:  No.

 6   BY MS. ALBERTY:

 7      Q.   When you first started at GEICO, do you

 8   remember what type of HRIS software was being

 9   used, so human resource information software that

10   was being used at that time?

11      A.   No.

12      Q.   Do you remember any transitionary

13   software that was used then thereafter to help

14   with logging in your hours, information, things

15   like that?

16              MS. COLE-CHU:  Objection.

17              THE WITNESS:  No, I don't recall.

18   BY MS. ALBERTY:

19      Q.   If we go to page two -- and it's

20   actually easier if I just indicate the date and

21   then we go across that line -- but on March 11th,

22   2020 it indicates here that you received the

23   policies and acknowledgments for 2020 and which

24   you completed it.

25              Do you recall that?
```



```
 1                    THOMAS BARDEN

 2        A.    You're on what page?  What was the

 3   date?

 4        Q.    Sure.  May 11th, 2020.

 5        A.    Oh, May 11th, okay.

 6              (Witness peruses the document.)

 7        A.    Okay, and the question, I'm sorry?

 8        Q.    Sure.  Do you recall receiving the 2020

 9   policies and completing that enrollment?

10        A.    No.

11        Q.    Do you have any reason to disagree that

12   you would have received it and completed it?

13              MS. COLE-CHU:  Objection.

14              THE WITNESS:  No.

15   BY MS. ALBERTY:

16        Q.    Then transitioning to -- actually,

17   strike that.

18              Looking back at the May 11th, 2020,

19   would you have any idea why it doesn't indicate

20   that you passed?

21        A.    I have no idea.

22        Q.    All right.  If we go a few rows down

23   then to November 6th, 2020, do you recall

24   receiving training about claims code of conduct?

25        A.    No.
```



```
1                    THOMAS BARDEN

2        Q.   Do you have any reason to disagree that

3   you would have completed that training as well as

4   it applied to the claims code of conduct of GEICO?

5             MS. COLE-CHU:   Objection.

6             THE WITNESS:   No.

7   BY MS. ALBERTY:

8        Q.   Then two lines down, on April 27th,

9   2021, do you see where it indicates you received

10  and completed the 2021 policies and

11  acknowledgments?

12       A.   Yes.

13       Q.   Do you recall this?

14       A.   No.

15       Q.   Do you have any reason to disagree that

16  you would have received and completed the policies

17  from 2021?

18            MS. COLE-CHU:   Objection.

19            THE WITNESS:   No.

20  BY MS. ALBERTY:

21       Q.   And then if we go to the very last

22  page, at the top it indicates policies and

23  acknowledgments for 2022 that would have occurred

24  on September 8th of 2022.

25            Do you recall this training?
```



```
1                      THOMAS BARDEN

2        A.    Okay.

3        Q.    -- at that time, correct?

4        A.    Correct.

5        Q.    And you weren't meeting people in

6   person at that time, correct?

7        A.    Correct.

8        Q.    And you weren't doing interviews or

9   declarations under oath, correct?

10       A.    We were doing everything by phone

11  remotely.  We did the same work, we did it

12  remotely.

13       Q.    In your capacity as a field

14  investigator, did you have the ability to close

15  files?

16       A.    To close the cases?

17       Q.    Yes.

18       A.    Yes.

19       Q.    How frequent would you close cases?

20       A.    I tried to close cases every day when I

21  was -- whenever I was finished with them.

22       Q.    Did you need authority from any of your

23  supervisors or managers in order to close a case?

24       A.    They were reviewed, and if it was not

25  acceptable to close the case at that time, it
```



THOMAS BARDEN                                    August 08, 2024
Keith Fischer, et al. vs GEICO                              85

```
 1                    THOMAS BARDEN

 2   restrictions on gathering, traveling, all that.

 3        Q.   Do you recall how long that occurred

 4   for?

 5        A.   I don't recall.

 6        Q.   Did you have to try to -- sorry I

 7   didn't mean to interrupt you.

 8        A.   No, go ahead.

 9        Q.   Did you have to try to stay abreast of

10   what was going on in the county in order for you

11   to do your job?

12        A.   For me to do my job?

13        Q.   Yes.

14        A.   I don't believe so.

15        Q.   Do you know whether any other employees

16   asked for approval to work more than 38.75 hours

17   in a week?

18        A.   I don't know.

19        Q.   Do you know whether any employees

20   outside of the Albany area were approved to work

21   more than 38.75 hours in a week?

22             MS. COLE-CHU:  Objection.

23             THE WITNESS:  We were all told that any

24        overtime was not going to be approved after a

25        certain date.
```



1                    THOMAS BARDEN

2        A.   Yes.

3        Q.   Transitioning to number eleven on page

4    three of the declaration," From May of 2020 to

5    August of 2020 GEICO permitted me to submit

6    overtime hours for approval but required me to

7    document for reasons of overtime, case

8    information, and specific tasks that I needed to

9    do on each case."

10           How did you learn that you couldn't put

11   your overtime hours?

12           MS. COLE-CHU:  Objection.

13           THE WITNESS:  How did I learn that I

14       was not allowed to?

15   BY MS. ALBERTY:

16       Q.   No, that you could.

17       A.   I talked with my supervisor that

18   basically told me, "If you're working extra hours,

19   put in for it.  Document it."

20       Q.   Were there specific hard and fast lines

21   of what you needed to input for your overtime

22   hours?

23       A.   Like the reasons?

24       Q.   Yes.

25       A.   I don't know if there were certain



```
1                    THOMAS BARDEN

2        time, yes.

3    BY MS. ALBERTY:

4        Q.   And you were paid for that certain

5    period of time --

6               MS. COLE-CHU:  Objection.

7    BY MS. ALBERTY:

8        Q.   -- for overtime, right?

9               MS. COLE-CHU:  Objection.

10              THE WITNESS:  Yes.

11   BY MS. ALBERTY:

12       Q.   Do you know if other senior field

13   security investigators were eligible for overtime?

14              MS. COLE-CHU:  Objection.

15              THE WITNESS:  I don't know.  I don't

16       know.

17   BY MS. ALBERTY:

18       Q.   Do you know if other senior field

19   security investigators were eligible for overtime

20   who were outside of your assigned outfit?

21              MS. COLE-CHU:  Objection.

22              THE WITNESS:  I don't know.

23   BY MS. ALBERTY:

24       Q.   Do you know whether SIU investigators

25   other than senior field security investigators
```



```
 1                    THOMAS BARDEN
 2   were eligible for overtime?
 3            MS. COLE-CHU:  Objection.
 4            THE WITNESS:  I don't know.
 5   BY MS. ALBERTY:
 6        Q.   Do you know if those SIU investigators
 7   were actually paid overtime?
 8        A.   I don't know.
 9        Q.   Do you know if lead security
10   investigators were eligible for overtime?
11        A.   I don't know.
12        Q.   Do you know if lead security
13   investigators were denied overtime?
14        A.   I do not know.
15        Q.   Do you know if they were paid for
16   overtime?
17        A.   I do not know.
18        Q.   Do you know what -- if claim security
19   investigators were eligible for overtime?
20            MS. COLE-CHU:  Objection.
21            THE WITNESS:  I do not know.
22   BY MS. ALBERTY:
23        Q.   Did you ever speak to anybody who was a
24   claim security investigator?
25        A.   I'm not even sure what that title is,
```



```
1                    THOMAS BARDEN

2    so, no.

3         Q.   Do you know if claim security

4    investigators were denied overtime?

5         A.   I don't know.

6         Q.   Do you know if claim security

7    investigators were actually paid overtime?

8         A.   I don't know.

9         Q.   Do you know if field major case SIU

10   investigators were eligible for overtime?

11            MS. COLE-CHU:  Objection.

12            THE WITNESS:  No, don't know.

13   BY MS. ALBERTY:

14        Q.   Do you know if field major case SIU

15   investigators were denied overtime?

16        A.   I don't know, no; do not know.

17        Q.   Do you know if field major case SIU

18   investigators were paid overtime?

19        A.   Do not know.

20        Q.   Do you know if field medical fraud

21   investigators were eligible for overtime?

22            MS. COLE-CHU:  Objection.

23            THE WITNESS:  No, I do not know.

24   BY MS. ALBERTY:

25        Q.   Sorry, I wasn't sure if you said no or
```



1                    THOMAS BARDEN

2     I don't know.

3          A.   No, I don't know.

4          Q.   Thank you.  Do you know if field

5     medical fraud investigators were denied overtime?

6          A.   Do not know.

7          Q.   Do you know if field medical fraud

8     investigators were paid overtime?

9          A.   Do not know.

10         Q.   Do you know if internal major case SIU

11    investigators were eligible for overtime?

12              MS. COLE-CHU:  Objection.

13              THE WITNESS:  Do not know.

14    BY MS. ALBERTY:

15         Q.   Do you know if internal major case SIU

16    investigators were denied overtime?

17         A.   I do not know.

18         Q.   Do you know if internal major case SIU

19    investigators were paid overtime?

20         A.   I do not know.

21         Q.   Do you know if internal security

22    investigators were eligible for overtime?

23         A.   I do not know.

24              MS. COLE-CHU:  Objection.

25    BY MS. ALBERTY:



```
 1                      THOMAS BARDEN

 2        Q.   Do you know if internal security

 3   investigators were denied overtime?

 4        A.   I do not know.

 5        Q.   Do you know if internal security

 6   investigators were paid overtime?

 7        A.   I do not know.

 8        Q.   And then do you know if major case SIU

 9   investigators were eligible for overtime?

10             MS. COLE-CHU:  Objection.

11             THE WITNESS:  Do not know.

12   BY MS. ALBERTY:

13        Q.   Do you know if major SIU investigators

14   were denied overtime?

15        A.   Do not know.

16        Q.   And do you know if major case SIU

17   investigators were paid overtime?

18        A.   Do not know.

19        Q.   Do you know how many titles were

20   considered nonexempt in your Woodbury office when

21   you worked for GEICO?

22        A.   I have no idea.

23        Q.   Do you feel like in your position you

24   were really siloed to the seven to ten people that

25   you previously talked -- that we previously talked
```



```
1                       THOMAS BARDEN

2         A.    I don't know.

3         Q.    And what did Marie do for you?

4         A.    Basically just the initial background

5    investigation of -- of the initial claimant in the

6    case.

7         Q.    Did you ever meet Marie in person?

8         A.    No.

9         Q.    Did you speak to her?

10        A.    I spoke to her on the phone

11   occasionally.

12        Q.    Did she ever indicate to you that this

13   was a temporary pilot program?

14        A.    I don't think so.

15        Q.    So ultimately Marie came in, and she

16   was helping you with your duties in running

17   background checks and the initial steps for your

18   cases.

19              Is that right?

20        A.    Correct.

21        Q.    And then these were tasks that you

22   typically did in your custom and practice as a

23   field security investigator?

24              MS. COLE-CHU:   Objection.

25              THE WITNESS:   Yes.
```



```
1                  THOMAS BARDEN
2    there was a unit in the New York City area that
3    did auto theft.  And I'm just going off of my
4    recollection.  Staged -- staged fraud, I know
5    there was -- there was a unit down here that did
6    that also.  But again, upstate, we didn't have
7    that luxury, I guess.
8         Q.  Do you know, as to those other
9    categories, those other units, what types of cases
10   they specifically worked on?  If they make a
11   general medical claims, if they were more narrow
12   than that?
13        A.  I don't know.
14        Q.  As to those other units, do you have
15   any idea what their duties and responsibilities
16   were?
17            MS. COLE-CHU:  Objection.
18            THE WITNESS:  Not other than
19        investigating insurance fraud.  That's what
20        we all did.
21   BY MS. ALBERTY:
22        Q.  Do you know if those other units had
23   the same flex time that your department had?
24        A.  I don't know.
25        Q.  Do you know if those other units had
```



1                    THOMAS BARDEN

2    overtime opportunities?

3                MS. COLE-CHU:  Objection.

4                THE WITNESS:  I don't know.

5    BY MS. ALBERTY:

6         Q.   Did you personally see or observe the

7    other special investigators in your region doing

8    their work?

9                MS. COLE-CHU:  Objection.

10                THE WITNESS:  No.

11   BY MS. ALBERTY:

12        Q.   Were you ever assigned like two persons

13   to one case?

14        A.    I don't believe so, no; not to my

15   recollection, no.

16        Q.   Did you have any access to the other

17   special investigator's claim files?

18        A.   No.

19                MS. COLE-CHU:  Objection.

20   BY MS. ALBERTY:

21        Q.   Did you have the option in Workday to

22   access any of the time records that would show

23   workloads for the other special investigators?

24                MS. COLE-CHU:  Objection.

25                THE WITNESS:  No.



```
 1                    THOMAS BARDEN
 2    classified employees who worked as special
 3    investigators in New York during the time period
 4    from three years prior to filing the complaint
 5    until the resolution of this action?
 6              MS. COLE-CHU:  Objection.
 7              THE WITNESS:  Yes.
 8    BY MS. ALBERTY:
 9         Q.   Why do you feel like you're a
10    representative of the collective members and class
11    members?
12              MS. COLE-CHU:  Objection.
13              THE WITNESS:  Why do I feel like I'm a
14         representative?
15    BY MS. ALBERTY:
16         Q.   Yes.
17         A.   Because I did the same job they did.
18         Q.   As to all the plaintiffs identified on
19    the caption -- so Keith Fischer, do you know what
20    his title was?
21         A.   I don't recall, no.
22         Q.   Michael O'Sullivan; did you know what
23    his title was?
24         A.   No.
25         Q.   John Moeser; did you know his title?
```



 1                      THOMAS BARDEN

 2        A.   No, I don't recall.

 3        Q.   Louis Pia, do you know what his title

 4   was?

 5        A.   I don't recall, no.

 6        Q.   Constance Mangan; do you know what her

 7   title was?

 8        A.   No.

 9        Q.   Cherise Jones, did you know her title?

10        A.   I'm not sure what her title was when

11   she filed this, no.

12        Q.   Ashley Alvarez, did you know what her

13   title was?

14        A.   No.

15        Q.   Do you know how many people are special

16   investigators within the time consideration that

17   you worked at GEICO?

18             MS. COLE-CHU:  Objection.

19             THE WITNESS:  No.

20   BY MS. ALBERTY:

21        Q.   Fair to say then you do not know the

22   day-to-day work for those other special

23   investigators?

24             MS. COLE-CHU:  Objection.

25             THE WITNESS:  Other than the fact they



1                    THOMAS BARDEN

2          investigated fraud, just like I did, I don't

3          know what anybody's day-to-day action is.

4

5     BY MS. ALBERTY:

6          Q.   You'd agree that various levels that we

7     talked about at the beginning of your

8     deposition -- so you as a level sixty-five, you

9     know what your day-to-day responsibilities are,

10    correct?

11         A.   Yes.

12         Q.   For a level sixty-six, a level

13    seventy-eight, a level forty-two, do you know what

14    those day-to-day requirements are of their

15    position?

16              MS. COLE-CHU:   Objection.

17              THE WITNESS:   No.

18    BY MS. ALBERTY:

19         Q.   Do you know what the work loads for the

20    field major case SIU investigators from 2016 to

21    present was?

22         A.   No idea.

23         Q.   Do you know if the work loads of the

24    field major case SIU investigators from 2016 to

25    present varied?



1                    THOMAS BARDEN

2        Q.    But again in the three plus years you

3   worked at GEICO, you don't remember any time when

4   this denial of a raise occurred?

5        A.    Yeah, I'm not sure exactly what the

6   dates were.

7             MS. ALBERTY:  Okay, I don't have any

8        further questions.

9             THE COURT REPORTER:  Is there read and

10        sign in this?  Will he read and sign?

11             MS. COLE-CHU:  Yes, please.

12             THE LEGAL VIDEO SPECIALIST:  All right.

13        We are now going off the record.  The time is

14        4:16 p.m.  This is the end of the media

15        labeled number six concluding this video

16        deposition.

17             (Whereupon at 4:16 p.m. the deposition

18   of Thomas Barden concluded.)

19

20

21

22

23

24

25



1                      THOMAS BARDEN

2                  C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                          : Ss.

5    COUNTY OF NEW YORK    )

6              I, Kim M. Brantley, Shorthand

7    Reporter, and Notary Public within and for the

8    State of New York, do hereby certify:

9              That THOMAS BARDEN, the witness whose

10   deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true

12   record of the testimony given by the witness.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in

16   the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of August, 2024.

19

20             _____

21                  Kim M. Brantley

22

23

24   My Commission expires May 31, 2026.

25

