# EXHIBIT 8

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
 4   - - - - - - - - - - - - - - - - - )
 5   KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6   JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:
 7   BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848
 8   CHARISE JONES, individually and   ) (GRB) (ARL)
 9   on behalf of all others similarly )
10   situated,                         )
11                    Plaintiffs,      )
12       - v -                         )
13   GOVERNMENT EMPLOYEES INSURANCE    )
14   COMPANY d/b/a GEICO,              )
15                    Defendant.       )
16   - - - - - - - - - - - - - - - - - )
17
18        REMOTE VIDEOTAPED DEPOSITION OF MICHAEL REED
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J12200420
```



```
 1                    MICHAEL REED

 2                Wednesday, January 8, 2025

 3

 4        Remote videotaped deposition of MICHAEL REED,

 5   held via Zoom, before Kim M. Brantley, Court

 6   Reporter and Notary Public of the State of New

 7   York.

 8

 9   APPEARANCES:

10   On behalf of the Plaintiffs:

11        OUTTEN & GOLDEN, LLP

12        685 Third Avenue - 25th Floor

13        New York, NY, 10017

14        (212) 245-1000

15        Email: jmcallister@outtengolden.com

16               sjean@outtengolden.com

17        BY:  JARRON D. MCALLISTER, ESQUIRE

18             SABINE JEAN, ESQUIRE

19

20

21

22

23

24

25
```



```
 1                    MICHAEL REED

 2   APPEARANCES CONTINUED:

 3   On behalf of the Defendant GEICO:

 4         DUANE MORRIS, LLP

 5         190 South LaSalle Street - Suite 3700

 6         Chicago, Illinois 60603

 7         (312) 499-0198

 8         Email: tealberty@duanemorris.com

 9   BY:  TIFFANY ALBERTY, ESQUIRE

10

11   ALSO PRESENT:

12         ROBERT PACHECO, Legal Video Specialist

13         Esquire Deposition Solutions

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    MICHAEL REED

2            P R O C E E D I N G S

3               THE LEGAL VIDEO SPECIALIST:  We are now

4     on the video record.  Today's date is January the

5     8th, 2025.  The time is 10:03 a.m., Eastern

6     Standard Time.  This begins the videoconference

7     deposition of Mr. Michael Reed in the matter of --

8     in the matter of Keith Fischer, et al., Plaintiff,

9     vs. Government Employees Insurance Company, doing

10    business as GEICO, Defendant, to be heard in the

11    United States District Court for the Eastern

12    District of New York, case number 2232848.

13               My name is Robert Pacheco.  I am the

14    remote videographer.  Your court reporter today is

15    going to be Miss Kim Brantley, both representing

16    Esquire Deposition Solutions.

17               Would counsel please introduce

18    yourselves and your affiliation, and the witness

19    will be sworn in.

20               MR. MCALLISTER:  Good morning.  My name

21         is Jarron McAllister.  I'm an attorney at

22         Outten & Golden, and I'm here with my

23         colleague, Sabine Jean.

24               MS. ALBERTY:  And Tiffany Alberty on

25         behalf of the defendant, GEICO.



```
 1                      MICHAEL REED
 2   Whereupon,
 3                      MICHAEL REED
 4   called as a witness by counsel for Defendant, and
 5   after having been first duly sworn, was examined
 6   and testified as follows:
 7            EXAMINATION BY COUNSEL FOR DEFENDANT:
 8                  BY MS. ALBERTY:
 9       Q.   Mr. Reed, can you please state and
10   spell your name for the court reporter.
11       A.   Sure.  First name is Michael,
12   M-i-c-h-a-e-l, with a middle initial of N, and the
13   last name is Reed, R-e-e-d.
14            MS. ALBERTY:  Let the record reflect
15            that this is the discovery deposition of Mr.
16            Michael N. Reed, taken pursuant to notice and
17            by agreement of the parties.  Today's
18            deposition will be taken in accordance with
19            all applicable rules.
20   BY MR. ALBERTY:
21       Q.   Mr. Reed, I know that we went through
22   you some preliminary things where you had seen me,
23   but my name is Tiffany Alberty.  I represent the
24   defendants GEICO in this matter.  Today I'm going
25   to be taking your deposition and asking you a
```



```
 1                   MICHAEL REED
 2   "nontraditional" I'm talking Uber Eats, any type
 3   of side gigs, side hustle, anything like that.
 4        A.   I do not do any of those jobs, and I a
 5   not working anywhere either off the books or off
 6   the record.
 7        Q.   Okay.  When you started in 2005, all
 8   the way up and until 2023, what were the titles
 9   that you held at GEICO?
10        A.   I was a senior security investigator,
11   or an a SIU investigator would be the common term.
12   That was the only position that I held.
13        Q.   Okay, so for -- and I'm forward now.
14            So that entire time from 2005 to 2023
15   you always had the same title, which was senior
16   security investigator, correct?
17        A.   Correct.  That's correct.
18        Q.   From 2005 to 2023, was there a specific
19   geographic region that you were assigned to?
20        A.   Yes.  I worked western New York, which
21   would be the Buffalo area.  I covered seven
22   western -- seven counties out of western New York.
23            To give you geographical, I guess
24   easier would be from Lake Ontario to the
25   Pennsylvania border, from Lake Erie and Buffalo as
```



                    MICHAEL REED

1   either the New York State Department of Insurance

2   Fraud Bureau, which is now known as something

3   different, or I would refer any of those cases or

4   claims over to NICB, the National Insurance Crime

5   Bureau, and there may be further investigation

6   through the fraud bureau with New York State or

7   with NICB.

8        Q.   With -- and thank you.  That was a

9   mouthful.

10           With regard to the claims examiner with

11  your initial step of formulating your plan of

12  action, did the claims examiner ever tell you what

13  to do?

14       A.   The claims examiner did not tell me how

15  to run my investigation, no.

16           They would -- they would possibly

17  suggest, or they may have a specific concern, but

18  my investigation was primarily my investigation.

19       Q.   With regard to making a decision as to

20  if you found a basis for insurance fraud or you

21  did not, was that a determination you made?

22       A.    I would give them the determination

23  that I felt -- or once again that determination of

24  whether or not that claim was moved forward or



```
 1                    MICHAEL REED
 2   paid was determined by the claims examiner in the
 3   RLA, or what's known as a regional liability
 4   adjustor.  They were the ones that made that
 5   determination.
 6        Q.   And I guess in theory would you then
 7   make your recommendation, and then the claims
 8   examiner would render the decision?
 9        A.   Yeah, the decision was that I did not
10   handle that part of the claim, no.
11        Q.   What were your scheduled weekly hours
12   again from that 2016 to 2023 time frame?
13        A.   7:00 a.m. to 3:30 p.m., or 8:00 to 4:30
14   p.m.
15        Q.   Did you have a preferred schedule,
16   meaning the 7:00 a.m. or the 8:00 a.m.?
17        A.   The preferred was the 7:00 a.m. to
18   3:30.
19        Q.   Between that time frame in 2016 to
20   2023, did that schedule change at all, meaning the
21   7:00 a.m. time or the 8:00 a.m. time?
22        A.   By -- I did not change that frame.
23   That was my preferred time.
24        Q.   From 2016 to your resignation, do you
25   recall who your supervisor was?
```



```
 1                      MICHAEL REED

 2        A.   I started out working for a gentleman

 3   by the name of Anthony or Tony Mazziotti.  He was

 4   my direct supervisor; then I worked or Chester or

 5   Chet Janik, and when I left the company I was

 6   working for Toni D'Agata.

 7        Q.   And from 2016 to 2023, who was your

 8   manager?

 9        A.   There was a Michael DeGrocco and a

10   William Newport were the last two managers that I

11   had.  Prior to that it might have been Sharyl

12   Derenthal, but once again I don't recall the

13   exact -- I know the last two.

14        Q.   Did you ever work in the office?

15        A.   No, I did not.

16        Q.   And did you ever have an inside role,

17   or were you predominantly in the field?

18        A.   It was all field.

19        Q.   So it's fair to say you did not have a

20   desk role?

21        A.   No, I did not.  I -- I'm all the way

22   over in Buffalo.  In region two, I was -- I was

23   down in Long Island.

24        Q.   Did you have flex time?

25        A.   They called it "flex time," yes.
```



1                    MICHAEL REED

2        Q.   Okay.  And what, to your recollection,

3   what did that mean?

4        A.   That meant that you could flex your

5   hours if needed, however that flex was never --

6   never applicable to what we did.

7        Q.   What do you mean by that?

8        A.   It means that at 7:00 a.m., I was

9   receiving cases right off the bat at 7:00 o'clock

10  or prior to 7:00 a.m.  In those cases I had to get

11  up, get on the computer, and get working on all of

12  those cases.  There was no flexibility on their

13  end.  The cases continued to come in all day.

14            So I still had to work 7:00 a.m. to

15  3:00 p.m., 3:30, but yet continue to work

16  afterwards to catch up on all the cases that I

17  received during the day.

18       Q.   Did anyone tell you how to arrange your

19  flex time?

20       A.   No.

21       Q.   Were you -- strike that.

22            Did you have the flexibility to work

23  before 7:00 a.m.?

24       A.   Did I have the flexibility?

25       Q.   Yes.



```
 1                    MICHAEL REED
 2        A.   7:00 a.m. was what they considered my
 3   start time, but if needed to do extra case work, I
 4   would work before 7:00 a.m., yes.
 5        Q.   From 2016 to 2023 were you assigned to
 6   a specific I want to say type of claim or team to
 7   investigate claims?
 8        A.   No, I was not.  No, I was not.
 9        Q.   And what I mean by "team," do you
10   understand that there were various types of teams
11   within the New York region that others were
12   involved in?  Excuse me.
13        A.   Yes, I know there were teams, but being
14   one of only two field investigators, often the
15   area that I was at I was handling all types of
16   claims.  I was not part of any team.
17        Q.   Who was the other person that was
18   working with you in the field at that time?
19        A.   Mike Grey was out here also.
20        Q.   For the intake where you would receive
21   cases, was there a specific intake person that was
22   assigned to you?
23        A.   No.  There was just intake for region
24   two, and you would receive a case for whoever was
25   working the intake desk that day.
```



```
 1                      MICHAEL REED
 2    and run, property, staged theft, rate evasion,
 3    PIP, arson, underwriting, did all of those types
 4    of cases require running background checks?
 5         A.   Yes.
 6         Q.   Did all of those cases require
 7    examining provider fill-in reports?
 8         A.   Not all of them, no.
 9         Q.   Did all of those types of cases require
10    a medical assessment within the scope of personal
11    injury?
12         A.   In regards to personal injury, yes, but
13    the other cases, no.
14         Q.   With regard to all the cases we --
15    excuse me.
16              With regard to all of the claims we
17    spoke about, did they require visiting the
18    accident or theft scene?
19         A.   There was scene canvasses involved in
20    numerous -- numerous of those cases, yes.
21         Q.   Which ones did not require a scene
22    investigation?
23         A.   Which ones did not require a scene
24    investigation?  It's hard to determine, because
25    every case could be different.
```



```
 1                        MICHAEL REED

 2           I mean, a PIP case may require a scene

 3   investigation on one but not on another.

 4       Q.   Did this kind of go back then to one of

 5   the duties and responsibilities that you spoke

 6   about, which is to formulate a plan of action

 7   dependent upon the type of claim and issues

 8   asserted by the examiner and yourself?

 9       A.   Yeah.  It depended upon the type of

10   claim, the type of incident, whether or not a

11   scene canvas was conducted.

12           Every -- every case was different

13   because there was different circumstances.  And

14   sometimes there was no scene that we knew of, or

15   they could not provide us with a specific address.

16       Q.   Did all of these types of claims

17   require obtaining police reports?

18       A.   Not all of them, no.

19       Q.   Did all of these types of claims

20   require conducting EUOs?

21       A.   No, not all of them.

22       Q.   For all of these types of claims, did

23   the reports have any type of page length

24   requirement when you would submit your findings?

25       A.   Page -- what do you --
```



1              MICHAEL REED

2      Q.   Sure.  So, I'll give you an example.

3      A.   Okay.

4      Q.   If you had an arson matter that was

5   assigned to you to do your report of findings, you

6   were required to do three pages for your

7   findings --

8      A.   No.

9      Q.   -- to that degree.

10     A.   The -- my investigation could be one

11  page to fifteen pages, depending upon the

12  information that I discovered.  And those are just

13  round -- I mean, that's just numbers I'm throwing

14  out.  I'm not specific to one or fifteen.

15     Q.   How long would it take to investigate

16  any of these types of claims we just spoke about?

17     A.   How long?

18     Q.   Yes.

19     A.   Each case was different.

20     Q.   Could some take twenty-four hours?

21     A.   Some could take twenty-four hours, and

22  some could take several days.

23     Q.   Did you ever have investigations that

24  would last longer than say for example six months?

25     A.   If EUOs were required, yes, that's



```
 1                    MICHAEL REED
 2   quite possible.
 3        Q.   Did you have matters with which
 4   attorneys, counsel, was involved?
 5        A.   Yes.
 6        Q.   And with investigations that would last
 7   we'll say six months, was that common or rare?
 8        A.   It -- once again, it's hard to say.
 9             A case could take longer if you had a
10   personal injury claim, or a possible jump-in on an
11   insured vehicle where you had four people or five
12   people in a vehicle that you needed to interview,
13   and they were all represented by counsel.  So you
14   have maybe five different attorneys.  So five
15   different attorneys needing to schedule five
16   different statements for five different attorneys
17   in five different attorneys' office, after those
18   statements are conducted, if there's any questions
19   or any concerns, then all of those may have to go
20   to five different EUOs.  Five different EUOs are
21   conducted and, as you know, there's two chances
22   for each person for an EUO.  So, if you have five
23   persons, they don't show up for the first EUO,
24   then you have to reschedule a second EUO.
25             So, it's quite possible that some of
```



```
1                      MICHAEL REED
2             When -- when Chet retired, we were
3    split up, so I don't know if they were assigned to
4    D'Agata's team or not.  John was already gone well
5    before that, and I don't know if Michael was or
6    not.
7         Q.   Did you ever work with Tom Barton?
8         A.   I know the name, but I did not work
9    with -- I mean, we were all in the -- in the SIU,
10   but I -- I don't know -- I did not specifically
11   work with him.  I know who he is.  I know the
12   name.
13        Q.   Do you know if individuals working in
14   other SIU investigator positions such as a claim
15   security investigator would have the same workload
16   as you?
17        A.   That I do not know.  I don't know what
18   downstate or what that area worked case wise.
19        Q.   And do you know what varying titles
20   there would have been downstate in comparison to
21   what you guys handled upstate?
22        A.   What do you mean by "job titles"?  With
23   the teams and stuff?
24        Q.   Titles for the various roles within
25   SIU.  So such as a field major case investigator
```



```
 1                    MICHAEL REED

 2    versus a field medical fraud investigator.

 3         A.   Yeah, they -- I -- I don't -- I'm not

 4    familiar what they had going on downstate.

 5              We were, I don't want to say completely

 6    removed, but we had our own area up here that we

 7    worked, and it was different than downstate.

 8              Downstate has different issues and

 9    different cases that they would work, and they

10    would have different teams and so forth.  But I

11    was not privy to any of that.  I didn't -- wasn't

12    part of it, and I didn't really get involved in

13    that.

14         Q.   Did you ever work as a lead security

15    investigator?

16         A.   As a lead?  No.  I was always a

17    sixty-five.

18         Q.   Was there anybody up north that you

19    worked with that was a lead from -- again I want

20    to focus on that 2016 to 2023 timeframe?

21         A.   There was no lead in our little corner.

22    And I'm not sure, but I think that Craig Costanzo

23    may have been a lead, but he was out of Syracuse.

24         Q.   Okay.  So I'm going to share my screen

25    with you again.  So what's in front of you has
```



```
 1                    MICHAEL REED

 2       Q.   Okay.  Do you recall when you

 3  started -- of course this would have been a really

 4  long time ago, 2005 -- that you received an

 5  Associate Handbook?

 6       A.   I did receive an Associate Handbook,

 7  yes.

 8       Q.   And do you remember when, throughout

 9  your tenure with GEICO, if there was any type of

10  annual review or training of the Associate

11  Handbook or modifications with which you would

12  have been made aware of to the handbook?

13       A.   Not that I recall, no.

14       Q.   So I'm going to go to G000039.  Here we

15  go.  Is this -- Michael, real quick, is this okay

16  zoom wise, or do you want me to zoom in more?

17       A.   No, I -- I have my glasses on.  I can

18  see what we got here.

19       Q.   Okay.  So for the focus here -- I'm

20  just going to scroll down just a little bit, so

21  we're split screen.  So that means also G000040.

22  So we have -- I'm trying to just read this into

23  the record appropriately, which is going to be

24  that it is elongated into the "Salaried Nonexempt

25  Associates" paragraph.
```



 1                     MICHAEL REED

 2       A.   No.  We -- you -- we were working our

 3   cases.  We were working the extra hours.

 4            I don't know how you want to phrase

 5   that, but that's all I can tell you is that under

 6   the -- the attitude, if you would, that we were

 7   working and everything that we had to do within

 8   that time frame, I'm sure that that's what the

 9   policy says.  But the reality, the work needed to

10   be done.

11       Q.   In this paragraph it does indicate that

12   you could go to HR.  Was HR an accessibility point

13   for you in your position?

14       A.   It -- you could go to HR.  That's

15   correct.

16       Q.   But you never went to HR, correct?

17       A.   No, I did not.

18       Q.   I think you had stated you don't recall

19   specifically getting trainings as to various

20   policies that you saw for GEICO throughout your

21   tenure.  However, in this case there's been

22   documents that have been exchanged by GEICO to

23   your counsel to evidence various trainings that

24   you participated in, acknowledged, and authorized.

25            Have you reviewed any of the documents



```
 1              MICHAEL REED
 2   for various policies that related back to 2006.
 3              We have records here, and I'll go
 4   through it with you just to read it into the
 5   record, but, for example, the associate handbook
 6   and policy as it's applicable to the claims here,
 7   so that would start in 2016.  So, on page five we
 8   have a "Michael Reed Policies and Acknowledgement,
 9   2016 Historical Tracker" that would have been been
10   (sic) seen, completed, and passed on May 26th of
11   2016.
12              With regard to this historical tracking
13   log, the dates with which you reviewed the
14   policies, completed, and passed, do you have any
15   reason to dispute the accuracy of the historical
16   tracking log for your trainings while you were
17   with GEICO?
18        A.   From what I'm looking at, I can't
19   dispute that, no.
20        Q.   Did you understand that you were
21   required to report to anyone within GEICO if any
22   managers or your supervisors were telling you to
23   work off the clock?
24        A.   They were not telling us to work off
25   the clock.
```



1              MICHAEL REED

2    concludes today's videotaped deposition.  The

3    time is 2:57 p.m.  Going off the record now.

4         (Whereupon at 2:57 p.m. the videotaped

5    deposition of Michael Reed concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                              : Ss.

5    COUNTY OF NEW YORK    )

6              I, Kim M. Brantley, Shorthand

7    Reporter, and Notary Public within and for the

8    State of New York, do hereby certify:

9              That MICHAEL REED, the witness whose

10   deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true

12   record of the testimony given by the witness.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in

16   the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 20th day of January, 2025.

19

20                    _____

21                    Kim M. Brantley

22

23

24   My Commission expires May 31, 2026.

25
```

