# EXHIBIT 9

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ------------------------------------X
 3   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 4   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
 5   of all others similarly situated,

 6            Plaintiffs,

 7                            Case No.:
                              2:23 Civ. 2848
 8                            (GRB)(ARL)
          -against-
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY d/b/a GEICO,

11            Defendants.
     ------------------------------------X
12

13

14   DEPOSITION OF

15

16            MARIA MUNOZ

17

18            Tuesday, December 17th, 2024

18            New York, New York

19

20

21   Reported By:

22

     Marina Dubson

23

24   Job #: J12144279

25
```



1

2

3

4

            DATE: December 17th, 2024

5

            TIME: 10:00 a.m.

6

7

8       DEPOSITION of MARIA MUNOZ, an opt-in

9   Plaintiff herein, taken by the Defendant,

10  pursuant to Federal Rules of Civil

11  Procedure, and Notice, held at Duane

12  Morris, LLP, 1540 Broadway, 14th Floor,

13  New York, New York 10036, at the

14  above-mentioned date and time, before

15  MARINA DUBSON, a Notary Public of the State

16  of New York.

17

18

19

20

21

22

23

24

25



```
 1   APPEARANCES:

 2

 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6       Sjean@outtengolden.com

 7       JARRON MCALLISTER, ESQ.
         Jmcallister@outtengolden.com
 8

 9

10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG SLOTNICK, ESQ.
13   Gsslotnick@duanemorris.com

14

15
     Gil Peretz, Shereck Video, videographer
16

17

18

19

20

21

22

23

24

25
```



1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25



```
 1              M. Munoz
 2         THE REPORTER:  Please confirm
 3    your orders?
 4         MR. SLOTNICK:  Rough draft and
 5    5-day expedite final.
 6         MS. JEAN:  Copy, regular
 7    turnaround.
 8              XXXX
 9         THE VIDEOGRAPHER:  Good
10    morning.  We're on the record, and
11    the time now is 10:07 a.m.  Today's
12    date is December 17, 2024.
13         This is media one in the video
14    deposition of Ms. Maria Munoz in the
15    matter of Keith Fischer versus
16    Government Employee Insurance
17    Company.
18         The index number is 2:23 Civ.
19    2848(GRB) (ARL).
20         My name is Gil Peretz.  I am
21    the legal videographer with Shereck
22    Video in association with Esquire.
23         Today, we're at the office of
24    Duane Morris LLP located at 1540
25    Broadway on the 14th floor in New
```



1            M. Munoz

2    York City.

3        Would counsel please identify

4    themselves and state whom they

5    represent?

6        MS. JEAN:  Good morning.  This

7    is Sabine Jean from Outten & Golden

8    on behalf of plaintiffs and opt-in

9    plaintiffs.  Along with me is my

10   colleague, Jarron McAllister, also

11   from Outten & Golden.

12       MR. SLOTNICK:  Good morning.

13   My name is Greg Slotnick.  I am an

14   attorney with Duane Morris, LLP,

15   representing the defendant, Geico, in

16   this case.

17       THE VIDEOGRAPHER:  Thank you.

18   The court reporter with us today is

19   Marina Douglas [sic] with Esquire --

20       (Clarified by the Court

21   Reporter.)

22       THE VIDEOGRAPHER:  Dubson, my

23   apology, with Esquire.

24       Would the court reporter please

25   swear in the witness?



```
 1                   M. Munoz
 2              (Whereupon, the witness was
 3          sworn in by the Court Reporter.)
 4
 5   M A R I A   M U N O Z,
 6          after having first been duly sworn by
 7          a Notary Public of the State of New
 8          York, was examined and testified as
 9          follows:
10   EXAMINATION
11   BY MR. SLOTNICK:
12          Q.    Good morning, Ms. Munoz.
13          A.    Good morning.
14          Q.    Could you please state and
15   spell your name for the record?
16          A.    Maria Munoz, M-A-R-I-A,
17   M-U-N-O-Z.
18          Q.    And what is your current
19   address?
20          A.    207 Central Park Road,
21   Plainview, New York 11803.
22          Q.    Thank you, Ms. Munoz.  And
23   before we get started, I introduced myself,
24   I am going to introduce myself again for
25   the record.  So, my name is Greg Slotnick.
```



```
 1                    M. Munoz
 2       Q.    Do you recall when this took
 3   place?
 4       A.    No.
 5       Q.    You also mentioned
 6   communicating about the lawsuit with
 7   Scott Brady; is that correct?
 8       A.    Yes.
 9       Q.    And when did you talk to Scott
10   about the case?
11       A.    I don't know the timeframe.
12       Q.    What was the substance of that
13   conversation?
14       A.    The same as with Charise, if he
15   had ever heard about this.  And I provided
16   him with the information to contact the
17   attorneys if he wanted.
18       Q.    Did he ask for the contact
19   information?
20       A.    I don't recall how that went.
21       Q.    Did Charise ask for it?
22       A.    I don't recall.
23       Q.    And is -- strike that.
24             What is Scott Brady's position?
25       A.    Senior field investigator.
```



MARIA MUNOZ                                        December 17, 2024
FISCHER, et al. -against- GEICO                                  24

```
 1                    M. Munoz
 2        Q.    Is he currently a Geico
 3   employee?
 4        A.    Yes.
 5        Q.    Do you work with him personally
 6   right now?
 7        A.    Not physically, but yes, we're
 8   on the same team.
 9        Q.    And what team is that?
10        A.    Our supervisor is
11   Arineh Nazari, A-R-I-N-E-H, N-A-Z-Z-A-R-I
12   [sic].
13        Q.    Thank you for spelling that.
14              And then you also mentioned an
15   Al Brust; is that right?
16        A.    Yes.
17        Q.    And who is Al Brust?
18        A.    He was a co-worker of mine.
19        Q.    So, no longer a current Geico
20   employee?
21        A.    No.
22        Q.    And what position did Al work
23   in?
24        A.    Senior field investigator.
25        Q.    And what was the substance of
```



 1                          M. Munoz

 2          A.     A field investigator.

 3          Q.     Did you apply for that role?

 4          A.     Yes.

 5          Q.     Do you prefer working in the

 6    field to working at a desk?

 7                 MS. JEAN:  Objection.

 8                 THE WITNESS:  Yes.

 9    BY MR. SLOTNICK:

10          Q.     And why is that?

11                 MS. JEAN:  Objection.

12                 THE WITNESS:  I like something

13           different every day.

14    BY MR. SLOTNICK:

15          Q.     And who was your supervisor

16    when you first joined the SIU?

17          A.     Dara Campbell, I believe.

18    Dara, D-A-R-A.

19          Q.     And who was your manager at the

20    time?

21          A.     That would be Michael DeGrocco.

22          Q.     And what did the field

23    investigator SIU role generally entail in

24    terms of your job duties?

25          A.     I would be assigned cases, and



```
 1                        M. Munoz
 2        A.    Not often.
 3        Q.    Could you approximate what you
 4   mean by that?
 5        A.    I would only be in the office
 6   if I was called for a meeting or if there
 7   was some kind of function going off -- on
 8   in the office.
 9        Q.    Is it correct that your
10   day-to-day would be in the field?
11        A.    Field or at home, yes.
12        Q.    What percentage of the time
13   would you approximate you were in the field
14   versus working at home?
15        A.    It varies.
16        Q.    What is the variation based on?
17        A.    The caseload, what type of case
18   I got, the traffic.
19        Q.    Did you ever have a desk-based
20   investigator role in SIU?
21        A.    Not primarily, no.
22        Q.    Do those exist in SIU?
23        A.    Yes.
24        Q.    And did you have a set schedule
25   when you started working in SIU?
```



```
 1                      M. Munoz
 2         A.    Yes.
 3         Q.    What was your set schedule?
 4         A.    It would have been either 8:00
 5    to 4:30, but then I know at some point I
 6    changed it to 7:00 to 3:30.
 7         Q.    And to change it, did you have
 8    to request approval from your supervisor?
 9         A.    I don't remember.
10         Q.    Do you know what flex time is
11    at Geico?
12         A.    Yes.
13         Q.    And what is flex time?
14         A.    The way that it was told to me
15    is if you needed to work at a not regularly
16    scheduled time, you could back that time
17    out at a later or earlier time.
18         Q.    So, when you say back that time
19    out, what -- what do you mean by that?
20         A.    So, if I worked an additional
21    two hours one day, then I was expected to
22    back that time out the next day or by the
23    end of the pay week.
24         Q.    And would that be in order to
25    add up to the 38.75 per week?
```



```
 1                     M. Munoz

 2        A.    Correct.

 3        Q.    Did you have to seek approval

 4   to back the time out or change the time in

 5   subsequent days?

 6        A.    I don't know if it was

 7   necessarily approval.  It was -- but I

 8   always advised if I was going to do it.

 9        Q.    You would give advance notice

10   of that?

11        A.    Correct.

12        Q.    Do you recall approximately how

13   many times you used flex time?

14        A.    In my career at Geico or in

15   SIU?

16        Q.    In SIU.

17        A.    From like start to today?

18        Q.    I guess how often would you use

19   it approximately?

20        A.    Not very often.

21        Q.    Was it ever denied when you

22   requested it?

23        A.    Not to my knowledge.  The only

24   time it would have been is if it was to do

25   with the pay weeks because you had to do it
```



```
 1                      M. Munoz
 2        A.    It was sometime, I believe, in
 3   2023.  So, she became my supervisor -- 2023
 4   or 2024.
 5        Q.    Okay.  Fairly recently?
 6        A.    Correct.
 7        Q.    In the time that you've worked
 8   in SIU, has your job changed in any way?
 9        A.    In regard to my
10   responsibilities or --
11        Q.    In regard to your job title.
12        A.    Title?  No.
13        Q.    What about with respect to your
14   job responsibilities?
15        A.    When I --
16   responsibilities-wise, I have not changed.
17   There was one point where I was on what's
18   called the theft team, T-H-E-F-T.  So, I
19   only specialized in stolen vehicles, but
20   that was just for a small period of time.
21        Q.    Do you recall when you were a
22   member of the theft team?
23        A.    I know it was in 2020.  I just
24   don't remember when it started and when it
25   exactly ended.
```



1                        M. Munoz

2          A.    Yeah, I don't remember.

3          Q.    And did your supervisor change

4    when you were on that specialty team?

5          A.    No.  I don't -- I don't believe

6    it did, no.

7          Q.    Do you remember who your

8    supervisor was on that team?

9          A.    Gerry Cassagne.

10         Q.    Do you know if Gerry also

11   supervised the other members of that team?

12         A.    Yes, he would have.

13         Q.    And do you believe he was the

14   only supervisor that was responsible for

15   supervising the theft team?

16         A.    I mean, I think they kind of

17   worked all together.  But he was the

18   supervisor to the four people that I told

19   you about, me included.

20         Q.    And this is more back to the

21   general time in SIU.

22               How far did you usually drive

23   to investigate a given claim?

24         A.    It varies.

25         Q.    How does it vary?



```
 1                        M. Munoz
 2          A.     Based on the location.
 3          Q.     What is the farthest you've
 4    ever driven to investigate a claim?
 5          A.     In my tenure of SIU?
 6          Q.     Yeah.
 7          A.     Mileage or hours?
 8          Q.     Either one.
 9          A.     Because it makes a difference.
10    So, I've gone -- I mean, I've gone up to
11    well over anywhere between 60 to 120 miles
12    one way, I would say.
13          Q.     And what's the shortest
14    distance you've driven for a claim
15    investigation?
16          A.     I had one down the block from
17    my home.
18          Q.     So, it varies drastically?
19          A.     Yes.
20          Q.     Is there any pattern or
21    practice to how far you're driving for a
22    given claim?
23          A.     No.
24          Q.     It's just based on the scene of
25    where the accident takes place or where --
```



```
 1                      M. Munoz
 2         A.     Okay.
 3         Q.     Do you recognize that document?
 4         A.     I can't say that I've ever seen
 5    it.  I don't remember it in this way.
 6         Q.     Do you recall receiving
 7    handbooks from Geico during your employment
 8    at Geico?
 9         A.     Yes.
10         Q.     And is this document a human
11    resources associate handbook, compensation
12    contents, from Geico?
13         A.     That's what it states, yes.
14         Q.     Okay.  So, if you can turn to
15    page G000039.  And if you look in the
16    middle of the page, there's a paragraph
17    that starts all nonexempt associates.
18                Do you see that?
19         A.     Yes.
20         Q.     It says all nonexempt
21    associates are required to accurately
22    record their hours worked and all absences
23    taken.  All exempt associates are required
24    to accurately record their absences taken.
25    Nonexempt associates --
```



```
 1                    M. Munoz
 2              (Clarified by the Court
 3          Reporter.)
 4       Q.    The paragraph that says, all
 5   nonexempt associates are required to
 6   accurately record their hours worked and
 7   absences taken.  All exempt associates are
 8   required to accurately record their
 9   absences taken.
10              A nonexempt associate who feels
11   he/she did not receive pay for all of
12   his/her hours worked, an exempt or salaried
13   nonexempt associate who feels his/her pay
14   incorrectly reflects a deduction for an
15   absence should contact his/her supervisor,
16   local human resources manager or corporate
17   human resources.
18              Did I read that accurately?
19       A.    Yes.
20       Q.    Do you recall getting training
21   on this policy?
22       A.    Yes.
23       Q.    What do you recall about
24   receiving training on the policy?
25       A.    Just to record our time or
```



```
 1                    M. Munoz
 2    input our time that was worked.
 3        Q.    Did you understand this policy
 4    to be applicable to your employment at
 5    Geico?
 6        A.    Yes.
 7        Q.    Did you understand from this
 8    policy that Geico required you to
 9    accurately record all of your hours worked?
10        A.    Based on what it says.
11        Q.    Is that a yes?
12        A.    Yes.
13        Q.    It's on the same page
14    underneath the section that says hourly
15    nonexempt associates, there's a paragraph
16    that starts, an hourly nonexempt associate.
17            Do you see that?
18        A.    Well, there's two paragraphs
19    there that start that.
20        Q.    The first one.
21        A.    Okay.
22        Q.    So, it says, an hourly
23    nonexempt associate is paid overtime pay,
24    time and one half the hourly rate of pay,
25    for all hours actually worked in excess of
```



```
 1                      M. Munoz
 2    40 in the workweek.
 3              Did I read that accurately?
 4         A.   Yes.
 5         Q.   Did you get training on this
 6    policy?
 7         A.   Yes.
 8         Q.   Did you understand this policy
 9    to be applicable to your employment?
10         A.   Yes.
11         Q.   Did you understand from this
12    policy that Geico paid overtime for all
13    hours actually worked above 40 in a
14    workweek?
15              MS. JEAN:  Objection.
16              THE WITNESS:  So, it might
17         state that, but that's not how it
18         went.
19    BY MR. SLOTNICK:
20         Q.   Did you understand that was
21    Geico's policy?
22         A.   As written here?
23         Q.   Yes.
24         A.   Yes.
25              MR. SLOTNICK:  I am just going
```



```
 1                      M. Munoz
 2           to introduce Exhibit 3.
 3                  (Defendant's Exhibit 3, human
 4           resources associate handbook, was
 5           marked for identification as of this
 6           date by the Reporter.)
 7    BY MR. SLOTNICK:
 8           Q.    Ms. Munoz, I've handed you
 9    what's been marked Defendant's Exhibit 3.
10                  Do you recognize this document?
11           A.    So, I don't recognize it as the
12    way it is here when I've seen it.  I
13    believe I've seen it online.  So, it just
14    kind of looks a little different, but I
15    have seen the human resources associate
16    handbook.
17           Q.    Understood.  Thank you for
18    clarifying.
19                  So, you've not seen it printed
20    out in this format, you're saying?
21           A.    Not that I recall.
22           Q.    But you've accessed it online?
23           A.    I believe so, yes.
24           Q.    And would that be through
25    Geico's internal online capabilities?
```



                            M. Munoz

1

2        A.    When we have to do like a

3   course, let's say, every year saying that

4   we reviewed it.  Maybe in the beginning

5   when I first started SIU, they may have

6   given it to me in this form actually, now

7   that I remember, but I don't remember

8   actually looking at it in this form.

9        Q.    You said when you take a course

10  for a yearly review.

11             What -- what do you mean by

12  that?

13       A.    Not a review.  Like we have to

14  acknowledge yearly like policies and

15  acknowledgements, or maybe go over the

16  handbook.

17       Q.    And you do that on a yearly

18  basis at Geico?

19       A.    I believe it's yearly.

20       Q.    So, if we turn to the page that

21  is marked G000195 on the bottom right-hand

22  corner, do you see the language that starts

23  in bold, nonexempt associates are never

24  allowed to work off the clock?

25       A.    Yes.



```
1                       M. Munoz

2          A.    Yes.

3          Q.    Has that always been the case

4    during your time in SIU?

5          A.    To submit our time?

6          Q.    Yes.

7          A.    Yes.

8          Q.    Whether that was Workday or

9    another program, that's -- that's the

10   method of being paid at Geico; is that

11   right?

12         A.    Yes.

13         Q.    Did you always certify the

14   accuracy of the time that you recorded when

15   you submitted it for payroll purposes?

16              MS. JEAN:  Objection.

17              THE WITNESS:  I know currently,

18        it tells you are you certifying it,

19         but I can't recall in years past.  I

20         don't remember.

21   BY MR. SLOTNICK:

22         Q.    Do you know when that started?

23         A.    I don't.

24         Q.    Do you submit the time that you

25   work to your supervisor for approval, or do
```



```
 1                    M. Munoz

 2        Q.    If we turn to paragraph six on

 3   page 2 of your declaration, do you see in

 4   bold in the middle of the page, it says my

 5   schedule and unpaid wages and overtime?

 6        A.    Yes.

 7        Q.    And in paragraph six, you say,

 8   my supervisor told me that I could only

 9   report up to 38.75 hours per week or

10   7.75 hours a day, five days a week, in the

11   timekeeping program.  Accordingly, I only

12   entered 7.75 hours per day, five days a

13   week, regardless of how many hours I

14   actually worked.

15             Do you recall writing that into

16   your declaration?

17        A.    I recall advising my attorneys

18   about that, yes.

19        Q.    And when did your supervisor

20   tell you that?

21        A.    That is prior to the

22   reorganization of SIU.  That is how it was.

23   You were just told you input 7.75 per day

24   regardless of your time, unless you flexed,

25   but then that would show accordingly.  So,
```



```
 1                    M. Munoz
 2   maybe I had a 9.75, but then it would be a
 3   5.75 on another day.
 4        Q.    And which supervisor actually
 5   told you that?
 6        A.    Well, they all -- they all told
 7   us that, meaning Dara.  That's how I was
 8   trained, under Dara.  April, Gerry and
 9   Tony.  Currently, it's not like that.
10        Q.    But when you say it was like
11   that -- so, let's focus on that time
12   period.
13             So, you say each of Dara,
14   April, Gerry and Tony all told you that
15   that was the policy in place?
16        A.    I don't know -- I know it was
17   told from the beginning.  So, it would be
18   under Dara to April, because everybody
19   recorded time or asked you to submit it
20   differently.  There were different ways I
21   did it.
22             Some you would enter per day,
23   submit.  Some you would enter in the
24   beginning of the week, some you would enter
25   in the end of the week and then submit by
```



```
 1                    M. Munoz

 2    the end of the week.

 3         Q.    Can you describe the time

 4    periods that were applicable to each of

 5    those ways you just described entering

 6    time?

 7         A.    38.75 per week.

 8         Q.    Right.  But you mentioned

 9    different methods of how you submitted

10    time.  You just said sometimes you would

11    put in daily amounts sometimes at the

12    front -- you would front load it.

13              What specifically was the

14    practice during each period of time in SIU?

15         A.    Well, I don't remember how Dara

16    wanted it.  April, to the best of my

17    knowledge, wanted it daily.  And Gerry,

18    just get it done by the end of the week.  I

19    don't remember with Tony how it was either.

20         Q.    Was that practice different

21    between your different supervisors?

22         A.    Yes.

23         Q.    And you said that that changed

24    at some point in time, the 7.75 hours per

25    day?
```



```
 1                    M. Munoz
 2   utilizing that time and working on the
 3   weekends to catch myself up.  It's very
 4   overwhelming when you're scrolling.
 5        Q.    I mean, how often would --
 6   would you be scrolling?
 7        A.    That would happen -- since
 8   2023, it doesn't happen really as often.
 9   Prior to that, I -- I -- I mean, I can't
10   give an exact amount, but there were
11   multiple times, a lot of times within a
12   year, that I would be scrolling.
13        Q.    And so scrolling would be --
14   just trying to figure this out.  Scrolling
15   would mean cases from before the 25 most
16   recent pending ones that you had in your --
17        A.    So, they're all your open
18   cases.  So, any cases that I need to work
19   would be in that pending because once
20   they're closed, they're gone.  They leave
21   there.
22        Q.    Do you have the authority to
23   close cases by yourself?
24        A.    Currently, yes.
25        Q.    When did that practice start?
```



```
 1                      M. Munoz
 2          A.    I believe it was somewhere in
 3    between Gerry and Tony as my supervisor.
 4    I'm not sure of the year.
 5          Q.    Do you have specific criteria
 6    that have to be met in order to close out a
 7    case by yourself?
 8          A.    Well, yes, you're supposed to.
 9    There are specific things you need to do.
10    But when you close it yourself, you just
11    submit.  So, it will close whether you did
12    them all or not.
13          Q.    And then your understanding
14    would be that that might be looked at by
15    the audit team --
16          A.    Correct.  Then -- right.
17    Before the audit team, your supervisors
18    used to approve your cases.  So, either a
19    supervisor might see it or the audit team.
20    So, you don't -- best practice, you don't
21    want to close it without doing everything
22    correctly.
23          Q.    So, before that policy changed
24    and you were allowed to close your own
25    cases, you either had audit or a supervisor
```



```
 1                        M. Munoz
 2      look at cases that you submitted for
 3      closure?
 4           A.     Correct.
 5           Q.     Do you know if other
 6      investigators had that same practice
 7      applied to them, to their own cases?
 8           A.     When -- yes.  Yes.
 9           Q.     That would apply to all field
10      investigators in Region 2?
11           A.     So, the only time somebody
12      would be different, it would be expected
13      when I had -- when I -- when my cases were
14      being approved by a supervisor.  To my
15      knowledge, all the field investigators were
16      being approved by a supervisor.
17                  I remember at some point lead
18      investigators used to be able to approve
19      their cases on their own, but I can't speak
20      of that because I wasn't a lead.  And then
21      when they took away the supervisors
22      approving it, we got this period of -- of
23      self-approval, and then you got random
24      audits, right.
25                  So, you just -- that was before
```



1                    M. Munoz

2    at that point.

3         Q.    And was that due to the field

4    or remote nature of your job?  Is that why

5    you didn't see them all the time?

6         A.    Correct.

7         Q.    Do you remember how often you

8    would speak to them on the phone, your

9    supervisors?

10        A.    I mean, I could go literally

11   weeks without talking to anyone.  Get your

12   job done and nobody really bothered you,

13   you know.

14        Q.    Okay.  And when we talked about

15   the catastrophe pay and specific dedicated

16   overtime drives, did you always accept

17   those overtime hours that were offered to

18   you?

19        A.    To my knowledge, I always -- I

20   always worked overtime when offered.

21        Q.    And those were entirely

22   voluntary overtime hours, correct?

23        A.    Yes.  I don't believe any of it

24   was mandatory.  Especially -- I know the

25   cat -- oh, yeah, I know cat was not



```
 1                    M. Munoz
 2    some point that I -- oh, I usually clock on
 3    at 6:00, 6:30, to at least April and Gerry.
 4    We're not talking about the -- that time
 5    period you just said last, right?  We're
 6    talking in general now?
 7         Q.    General, yes.
 8         A.    Yep.  But I don't -- I don't do
 9    that anymore, so --
10         Q.    And when is the last time that
11    you did that?
12         A.    I don't remember the exact
13    time.  Well, it would be -- well, I
14    shouldn't say I don't ever do it, because
15    now if I do clock in at 6:00, then I am
16    done at 2:30.
17              I do have that ability to do
18    that, but I am not -- I will work up to
19    39.99 hours and I am fine.  Nobody says
20    anything to me because it's not considered
21    overtime.  So, that's how I work now, or
22    since we've had to check in and check
23    out -- clock out.
24         Q.    And do you submit for those
25    39.99 hours for payment?
```



```
 1                    M. Munoz
 2        A.    At minimum, it's 38.75.  At
 3   maximum, it's 39.99999.  As long as it
 4   doesn't go over 40.  So, I -- I am all in
 5   between.
 6        Q.    Are you still working your
 7   general set schedule from 7:00 a.m. to
 8   3:30?
 9        A.    That is my general schedule.
10   But that's -- if you looked at my Workday
11   submissions the last few months, this whole
12   year, I have been working almost over eight
13   hours Monday through Thursday.  And then by
14   the time Friday comes, I only have like
15   whatever's left of the 38 to 39 hours and
16   then I have to clock off.
17            And then that's when I've asked
18   for, if needed, additional time to work.
19   Because I am willing to work, but they, you
20   know, don't want me to, so I stop.
21   Computer goes off.  Phone's on the charger.
22   I don't do anything after the hours.  I
23   don't pick up calls.
24        Q.    And those requests you just
25   mentioned, those were the requests you
```



```
 1                    M. Munoz
 2            THE WITNESS:  Currently as per
 3         when this was signed.  This was --
 4         shows here, what, November of 2023;
 5         is that correct?  Right?  So, I
 6         don't -- I do not work over when I am
 7         submitting in my time currently, no.
 8   BY MR. SLOTNICK:
 9         Q.   Did anyone ever talk to you
10   about accurately entering your time worked
11   on the Geico timekeeping system as part of
12   this change that occurred?
13            MS. JEAN:  Objection.
14            THE WITNESS:  There were just
15         e-mails since the change that have
16         been sent that I've never seen before
17         saying -- number one, an e-mail that
18         said something -- I'm summarizing --
19         if you need overtime, ask your
20         supervisor and they'll let you know.
21            If you work overtime without it
22         getting approved, then you need to
23         let them know immediately.  And it
24         may have said 24 hours or 48.  I
25         don't remember if it gave a specific
```



```
 1              M. Munoz
 2   timeframe.  Because it's funny --
 3        (Clarified by the Court
 4   Reporter.)
 5        THE WITNESS:  That e-mail -- 24
 6   to 48 hours, you need to let them
 7   know.
 8        I went to go find that e-mail.
 9   I had saved it in my archive, and
10   it's gone.  I can't find it.  But
11   that e-mail was sent sometime this
12   year in regard to overtime.
13        So, when I saw that, that's why
14   I asked after.  Because it said if
15   you need it, ask.  I needed it or I
16   thought I needed it.  I wanted it,
17   you know, to get more work done.  And
18   I didn't get it approved.
19        After that e-mail came out, a
20   secondary e-mail came out which made
21   me go back to look at the first one,
22   and I couldn't find it.  And that
23   said -- kind of reiterated, like yes.
24        So, it was said again if you
25   need overtime, please make sure you
```



1                    M. Munoz

2          ask your supervisor.  Not saying that

3          you could do it, just saying like

4          make sure you get approval first.

5                And then the secondary was if

6          you do it but didn't get approval,

7          make sure you let us know.  So,

8          that -- that's recent.  That's as of

9          this year.  And I -- I don't even

10         remember the question.

11    BY MR. SLOTNICK:

12         Q.    Do you recall who sent you that

13    e-mail, the -- either one of those two

14    e-mails you just testified about?

15         A.    That would be Rene Cubas, and

16    Scott Goss sent the secondary one.

17         Q.    Who is Scott Goss?

18         A.    He's part of management, like

19    above Rene.  I don't know.  Everything is

20    just structured so different now.

21         Q.    And did you ever receive any

22    similar e-mails prior to these two that you

23    just testified about that talk about asking

24    for overtime or working overtime?

25         A.    I do not recollect ever prior



```
 1                      M. Munoz
 2   to that getting anything in my tenure in
 3   SIU.
 4        Q.    Did you ever send any e-mails
 5   relating to requests to work overtime in
 6   your tenure at SIU?
 7        A.    I don't recall actually doing
 8   it.  Besides recently, I don't remember if
 9   it was an e-mail and/or a Webex message.
10   It's -- one way, it's in written form of
11   where I asked Arineh for my concerns of
12   getting the work done, let's say, before a
13   vacation was coming or a holiday, and I
14   knew.
15              So, case life is a goal now.
16   So, it's very important to get your work
17   done within the timeframe, and sometimes
18   it's really hard to do that.
19        Q.    When you say case life is a
20   goal now, was it always a goal?
21        A.    It was, on and off, a goal
22   through my tenure in SIU.
23        Q.    Do you recall when it was on
24   versus when it was off?
25        A.    I don't, besides now.
```



```
 1                   M. Munoz

 2        A.    Most of the complaints were in

 3   regard to the workload but then would lead

 4   to hours worked, because in order to get

 5   the work done, you just had to work more

 6   than what was expected of you.

 7        Q.    Do you currently feel that in

 8   order to get the work done, you have to

 9   work more than what's expected of you?

10        A.    Well, currently, I don't.  So,

11   my case life might be a little higher

12   than -- I mean, I think I am about average

13   right now.  But currently, no.  It feels, I

14   mean, a little different.  It's just they

15   still don't have it all together.  They're

16   trying.

17        Q.    Did any manager or supervisor

18   at Geico ever directly tell you that you

19   should work off the clock?

20        A.    No.  I -- I don't believe so.

21        Q.    Did any manager or supervisor

22   at Geico ever directly tell you you should

23   not accurately record all of your hours

24   worked?

25        A.    I don't recall.
```



 1                     M. Munoz

 2          could put that in writing, we'll

 3          address it.

 4               MS. JEAN:  Yes, we will.

 5               MR. SLOTNICK:  Nothing further.

 6               THE VIDEOGRAPHER:  This

 7          concludes the video deposition of

 8          Ms. Maria Munoz.  The time is

 9          approximately 5:06 p.m.  We're off

10          the record.  Thank you very much,

11          everyone.

12               (Whereupon, at 5:10 P.M., the

13          Examination of this Witness was

14          concluded.)

15

16

17          _____
                   MARIA MUNOZ

18

19     Subscribed and sworn to before me

20     this _____ day of _____ 20____.

21

22     _____
            NOTARY PUBLIC

23

24

25



MARIA MUNOZ                                        December 17, 2024
FISCHER, et al. -against- GEICO                                282

```
1                        M. Munoz

2                C E R T I F I C A T E

3

4   STATE OF NEW YORK        )
                             :
5   COUNTY OF RICHMOND       )

6

7        I, MARINA DUBSON, a Notary Public for

8   and within the State of New York, do hereby

9   certify:

10       That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19       IN WITNESS WHEREOF, I have hereunto

20  set my hand this 17th day of December 2024.

21

22

23              _____
                        MARINA DUBSON
24

25
```

