# EXHIBIT 10

```
 1

 2
                  UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
        -----------------------------
 4   KEITH FISCHER, MICHAEL
     O'SULLIVAN, JOHN MOESER, LOUIS
 5   PIA, THOMAS BARDEN, CONSTANCE
     MANGAN, and CHARISE JONES,
 6   Individually and on behalf of
     All others similarly situated,
 7
                    Plaintiffs,
 8
              vs.        No. 2:23 Civ. 2848(GRB)(ARL)
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY d/b/a GEICO,

11                  Defendant.
     -----------------------------
12

13

14

15      VIDEOTAPED DEPOSITION OF MICHAEL O'SULLIVAN

16                  New York, New York

17              Monday, August 26, 2024

18

19

20

21

22   Reported by:
     Yaffa Kaplan
23   JOB NO. 11574176

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1
 2                   August 26, 2024
 3                   10:00 a.m.
 4
 5        Deposition of MICHAEL O'SULLIVAN,
 6   held at the offices of Esquire Deposition
 7   Solutions, 1225 Franklin Avenue, Garden
 8   City, New York, pursuant to Replace, before
 9   Yaffa Kaplan, a Notary Public of the State
10   of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    3

```
 1
 2    A P P E A R A N C E S:
 3
 4         OUTTEN & GOLDEN LLP
 5         Attorneys for Plaintiffs
 6              685 Third Avenue, 25th Floor
 7              New York, New York 10017
 8         BY:   SABINE JEAN, ESQ.
 9
10         DUANE MORRIS LLP
11         Attorneys for Defendant
12              190 South LaSalle Street, Suite 3700
13              Chicago, Illinois 60603
14         BY:   TIFFANY E. ALBERTY, ESQ.
15
16    ALSO PRESENT:
17         JOSEPH BARLETTA - Videographer
18
19
20
21
22
23
24
25
```



MICHAEL O'SULLIVAN                                              August 26, 2024
Keith Fischer, et al. vs GEICO                                              4

1

2          IT IS HEREBY STIPULATED AND AGREED,

3    by and between counsel for the respective

4    parties hereto, that the filing, sealing and

5    certification of the within deposition shall

6    be and the same are hereby waived;

7          IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form

9    of the question, shall be reserved to the

10   time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be signed

13   before any Notary Public with the same force

14   and effect as if signed and sworn to before

15   the Court.

16

17

18

19

20

21

22

23

24

25



1

2          THE VIDEOGRAPHER:  We are on the record,

3     and the time now is approximately 10:00 a.m.

4     Today's date is August 26, 2024.

5          This is the video deposition of Michael

6     O'Sullivan in the matter of Keith Fischer et

7     al v. Government Employees Insurance Company.

8     Index number 2:203cv02848 (GRB)(ARL) in the

9     United States District Court, Eastern District

10    of New York.

11         My name is Joseph Barletta, legal

12    videographer with Shereck Video in association

13    with Esquire.  Today we are at the office of

14    Esquire Deposition Solutions located at

15    1225 Franklin, Avenue, Garden City, New York.

16         Will counsels please voice identify

17    yourselves and state whom you represent.

18         MS. JEAN:  Sabine Jean from Outten &

19    Golden, representing plaintiffs.

20         MS. ALBERTY:  Tiffany Alberty on behalf

21    of defendants with Duane Morris.

22         THE VIDEOGRAPHER:  Thank you.  The court

23    reporter is Yaffa Kaplan with Esquire.

24         Please swear in the witness.

25 M I C H A E L   O ' S U L L I V A N , called as a



```
 1                     M. O'Sullivan
 2   witness, having been duly sworn by a Notary Public,
 3   was examined and testified as follows:
 4   EXAMINATION BY
 5   MS. ALBERTY:
 6        Q.    What is your name and address?
 7        A.    Michael O'Sullivan, 205 Elsie Avenue,
 8   Merrick, New York 11566.
 9        Q.    Good morning, Mr. O'Sullivan.
10        A.    Good morning.
11        Q.    I know I previously introduced myself
12   off the record and then I also introduced myself
13   on, but my name is Tiffany Alberty.  I represent
14   GEICO in this matter.
15             Today I am going to be asking you a
16   series of questions about you, your background,
17   your time and experience at GEICO.
18             Have you ever been deposed before?
19        A.    No.
20        Q.    And then let the record reflect that
21   this deposition is taken pursuant to notice and
22   also agreement by the parties.
23             What I am going to do is I am just going
24   to go through some ground rules for us to cover at
25   the very beginning, so you familiarize yourself
```



```
 1                      M. O'Sullivan

 2    interview.

 3        Q.    I am not surprised.

 4        A.    But you had to ask.

 5        Q.    So let's talk about for the med-fraud

 6    claims.  How long -- strike that.

 7             For the med-fraud claims, what is the

 8    range to -- how short to how long for those type of

 9    claims would it take to investigate?

10        A.    On a good case, they could be opened and

11    closed within a month.  On a case where you are

12    dealing with claimants that won't make themselves

13    available for interviews or attorneys who keep

14    rescheduling the interviews, then go on for five or

15    six months.

16        Q.    For PIP cases, what was that life span

17    of a case?

18        A.    Again, it could be a month, or you know,

19    I mean, there was always pressure to get the cases

20    closed.

21             But a lot of times, you know, when you

22    are dealing with attorneys, it -- just don't make

23    it easy.  So they reschedule you once or twice, I

24    guess, hoping that you go away.  But just have to

25    continue requesting the interviews.
```



```
 1                        M. O'Sullivan
 2        Q.     Touching cases.
 3        A.     I mean, I would be assigned up to 20
 4   cases a month.  And you know, if I had to get to
 5   them, I don't know how many per week or per day,
 6   but how often I would get into them.
 7        Q.     For the assigned.  Let's just go with
 8   the 20 cases per month that you were getting
 9   assigned.
10             How many cases of those were you closing
11   a month?
12        A.     I don't recall what the closure was.  I
13   mean, you can close ten in one month and 20 in the
14   next.  It depends on how quick, you know, you are
15   getting interviews.  Again, it's out -- out of my
16   control.  It was out of my control.
17        Q.     Fair to say then it fluctuated on how
18   many cases you could close a month?
19        A.     Yes.
20        Q.     Would it fluctuate on how many cases
21   were assigned to you a month?
22        A.     Well, the case was self-assigned.  And
23   you know, I forget what the number was when I
24   retired, but you made it your best effort to assign
25   yourself the cases.
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    67

```
 1                      M. O'Sullivan

 2    referencing to in paragraph number 5?

 3         A.    I don't know.

 4         Q.    As far as when you said management would

 5    have provided you this information, as to whom in

 6    management?  Do you know?

 7         A.    I don't know.

 8         Q.    Let's flip to Page Number 3 of your

 9    declaration under paragraph 8.

10              So it states, "I only entered 7.75

11    working hours per day, five days a week, regardless

12    of how many hours I actually worked.  I only

13    entered this amount of time because I understood,

14    based on conversations with my supervisor, that

15    GEICO would not authorize overtime pay, 'just for

16    typing.'  Meaning, writing my case reports as

17    required -- as required by my job."

18              Which supervisor are you referring to in

19    paragraph number 8?

20         A.    Brian Portnoy.

21         Q.    As to paragraph number 8 for our other

22    supervisors that I believe you testified to, Dara

23    Campbell and Toni D'Agata, do you recall them

24    saying anything to this degree?

25         A.    No.
```



```
 1                        M. O'Sullivan

 2    receiving overtime pay, and for each person

 3    describe all the facts and information supporting

 4    your claim, and all the ways in which you gained

 5    such facts and information."

 6              Your response states, that at least in

 7    relevant part, aside from the objection, "That the

 8    individuals you saw, other special investigators

 9    who worked many overtime hours off the clock each

10    week without receiving overtime pay includes

11    individuals identified in paragraph 17 of your

12    declaration."

13              And then your response to interrogatory

14    number 10.

15              If we look at interrogatory number 10,

16    the only person that you referenced then is Dan

17    King.

18              As it regards Dan King, is your

19    knowledge based off just what he told you?

20        A.   Knowledge of what?

21        Q.   As it -- as it applies to the topic for

22    interrogatory number 12.

23              So overtime, that you saw other special

24    investigators who worked many overtime hours off

25    the clock each week without receiving pay, was that
```



```
1                    M. O'Sullivan
2    knowledge that you had personally because you
3    watched him not work on the clock, or is that
4    something he told you?
5         A.   I would say that he was on -- on a
6    computer, and Dan would call me with questions for
7    different -- in different situations.
8         Q.   When you say that you would see him on
9    the computer, how did that happen?
10        A.   There was -- I forget -- forget what the
11   program was, but -- but it would list people I --
12   that were signed on with a green dot.  I forgot the
13   name.  I don't know if it's part of Outlook or --
14   or what system it was.
15        Q.   As indicated, if somebody was online and
16   you can see their green dot, how do you know that
17   he was not logging his hours?
18        A.   I wouldn't know that.
19        Q.   Did you ever review Dan King's entered
20   Workday hours?
21             MS. JEAN:  Objection.
22        A.   No.
23        Q.   So then aside from Dan King, going back
24   to Exhibit Number 4, looking at paragraph 17, this
25   is going to be the last page.
```



```
 1                      M. O'Sullivan

 2             And sorry, I am kind of looking at

 3    both -- both exhibits just based upon your answer.

 4             So then for 17, you state, "I worked

 5    with approximately four to other six other special

 6    investigators in my medical team; including Dan

 7    King, Pat Ormberger, Eric David and Brad Waltman."

 8             We already spoke about Dan King.

 9             As it applies to then Pat Ormberger, how

10    do you know he was working overtime hours off the

11    clock without receiving overtime pay?

12        A.    Well, Pat is a female.  It's short for

13    Patricia.

14        Q.    Sorry.

15        A.    Don't offend me.

16             I wouldn't know what hours she was

17    working.

18        Q.    Then transitioning to Eric David from

19    number 17.  How would you know that Eric David was

20    working many overtime hours off the clock each week

21    without receiving overtime pay?

22        A.    Multiple conversations.  When we meet up

23    at -- at deposition locations.

24        Q.    And as far as the knowledge that you

25    have that Eric David was working many overtime
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                   80

```
 1                      M. O'Sullivan
 2    hours off the clock each week without receiving
 3    overtime pay, was that something he had told you?
 4    Or you had personal knowledge?
 5         A.    He had told me.
 6         Q.    Then for Brad Waltman.  How did you know
 7    he was working many overtime hours off the clock
 8    each week without receiving overtime pay?
 9         A.    I would receive -- well, Waltman -- I
10    didn't train him, but he -- I guess he shadowed me
11    when he first got hired.  And he would call me to
12    discuss different scenarios or situations.  And a
13    lot of times, it would be later -- late afternoon
14    or early evening, which would indicate he was
15    probably still working.
16         Q.    But do you know if him working in the
17    late afternoon was still on his flextime or if that
18    was overtime?
19         A.    I wouldn't know that.
20         Q.    Do you know if Dan King ever entered --
21    strike that.
22               Do you know if Dan King ever requested
23    overtime hours?
24               MS. JEAN:  Objection.
25         A.    I don't know if he ever did.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    M. O'Sullivan
 2    Because I actually had surgery, like, I think weeks
 3    before COVID, which like, right in under the -- so.
 4         Q.    Okay.  All right, no problem.
 5              Starting in March of 2020, and if you
 6    just came back from leave, were you performing all
 7    of your work remotely because of the pandemic?
 8         A.    Yes.
 9         Q.    So fair to say you weren't going out in
10    the field to do in-person investigations or on-site
11    visits to clinics?
12         A.    For the most part, yes.
13         Q.    You were conducting investigations over
14    the phone then because you couldn't go in person?
15         A.    We were doing phone -- I was doing phone
16    interviews when possible.
17              When I say when possible, because at
18    some point, you know, I couldn't get through to
19    attorney's offices.  You know, being -- everything
20    shut down, so it was a struggle to get the
21    interview -- interviews in.
22              Some of the cases, if I recall
23    correctly, we made one or two attempts to contact
24    the claimant directly, and then we closed them out
25    just so they weren't going to be lingering for an
```



MICHAEL O'SULLIVAN                                          August 26, 2024
Keith Fischer, et al. vs GEICO                                           96

```
 1                    M. O'Sullivan
 2    extended period of time.
 3         Q.    Do you recall, because of these
 4    limitations, you were closing out cases faster?
 5         A.    I want to say yes, but I am not
 6    100 percent sure.  I kind of -- I kind of remember
 7    we were -- we were processing the cases.
 8              And like I said, the ones where we
 9    couldn't get interviews or couldn't get through to
10    the attorneys, I think we were going to close them
11    out and open up new cases to try and keep the
12    investigations moving.
13         Q.    During COVID, did working from home
14    100 percent instead of working for the field give
15    you more flexibility in your investigation process?
16         A.    Flexibility in what sense?  Give me an
17    idea what you are looking at, as far as what.
18         Q.    I mean, you are not driving now, so you
19    may have more time to allocate doing reports or
20    whatever was necessary that you could do in a
21    remote capacity for all your cases.
22         A.    Yes, I believe that's fair to say.
23         Q.    During March of 2020, was it still your
24    older son and your wife who were residing with you?
25              MS. JEAN:  Objection.
```



```
 1                      M. O'Sullivan

 2      Q.    All right.  Took a quick lunch.

 3            I believe before we were taking a break

 4   we were discussing about COVID.

 5            Was there anything related to COVID, and

 6   we will say from March of 2020 up until the end of

 7   the year, into 2021, that that set of circumstances

 8   due to COVID, the lock downs, county, state,

 9   governor orders, that affected your ability to do

10   your job?

11            MS. JEAN:  Objection.

12      A.    Not necessarily, no.

13      Q.    Do you have knowledge as to whether any

14   other GEICO employee asked for approval to work

15   more than the 38.75 hours in a week?

16      A.    No.

17      Q.    All the individuals that you worked with

18   on your team, and the ones specifically that you

19   identified in paragraph 17, so that would have been

20   Daniel King, Pat Ormberger, Eric David and Brad

21   Waltman, were all those individuals assigned to

22   working the southern half, we will say, of

23   New York?  To your knowledge?

24      A.    To my knowledge, yes.

25      Q.    As far as anybody on the med team, was
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    99

```
 1                      M. O'Sullivan
 2      anybody assigned up north to Albany, Syracuse or
 3      Buffalo area?
 4           A.    I don't think on our team.  I think our
 5      team was all lower portion of the region.
 6           Q.    Do you have any knowledge whether any
 7      other employees were approved to work more than the
 8      38.75 hours in a week?
 9           A.    I have no knowledge to that.
10           Q.    So from 2016 to '22, you could have
11      asked for overtime by and through your supervisors;
12      correct?
13                 MS. JEAN:  Objection.
14           A.    Yes.
15           Q.    Do you have any knowledge as to whether
16      any other senior security investigators were
17      eligible for overtime?
18           A.    No.
19           Q.    Do you know whether SIU investigators,
20      other than those who worked in the med team, were
21      eligible for overtime?
22           A.    I have no knowledge of that.
23           Q.    Do you know whether any other SIU
24      investigators who worked outside of the med team
25      were paid overtime?
```



```
 1                    M. O'Sullivan

 2       Q.    Do you recall if it was male or female?

 3       A.    May have been Charise Jones.  Might have

 4   been a female, Charise Jones.  I believe it was

 5   probably Jones.

 6       Q.    Then looking at 19 -- just kidding, 18.

 7             It states, "I also know that other

 8   special investigators worked many overtime hours

 9   off the clock each week without receiving overtime

10   pay."

11             As to other special investigators

12   reference in paragraph 18, who are you referring

13   to?

14       A.    It could be a variety of investigators.

15             You know, if we would be at a deposition

16   location, you know, just in conversation, guys

17   would be complaining about working extra hours to

18   get cases done.

19       Q.    As to the complaints for extra hours, do

20   you know if any of them asked for overtime hours

21   and they were denied them?

22       A.    I don't know that.

23       Q.    As to all these other special

24   investigators who worked overtime hours off the

25   clock without them receiving pay, do you know if
```



```
 1                  M. O'Sullivan
 2    coaching plan.
 3         Any written policy described in
 4    performance evaluation metrics and/or a number
 5    scale.
 6         Any documents involve describing
 7    caseload metrics, including time frames for
 8    case assignments.
 9         Any documents describing productivity
10    metrics.
11         Any monthly report cards issued by your
12    supervisors for Michael O'Sullivan.
13         Any documents for metrics that would
14    require a coaching plan.
15         And any documents referencing
16    time-in-progress compliance or TIP compliance,
17    and any metrics associated with that.
18         MS. ALBERTY:  Okay.
19         THE VIDEOGRAPHER:  I am going to sign us
20    off.
21         This concludes the video deposition of
22    Michael O'Sullivan.  The time now is
23    approximately 3:21 p.m.
24         We are off the record.
25         (Time noted: 3:21 p.m.)
```



```
1                    M. O'Sullivan
2              C E R T I F I C A T E
3   STATE OF NEW YORK       )
4                           : ss.
5   COUNTY OF QUEENS        )
6
7           I, YAFFA KAPLAN, a Notary Public
8       within and for the State of New York, do
9       hereby certify:
10          That MICHAEL O'SULLIVAN, the witness
11      whose deposition is hereinbefore set forth,
12      was duly sworn by me and that such
13      deposition is a true record of the
14      testimony given by the witness.
15          I further certify that I am not
16      related to any of the parties to this
17      action by blood or marriage, and that I am
18      in no way interested in the outcome of this
19      matter.
20          IN WITNESS WHEREOF, I have hereunto
21      set my hand this 3rd day of September,
22      2024.
23
24                   YAFFA KAPLAN
25
```

