# EXHIBIT 11

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF NEW YORK
2
    KEITH FISCHER, MICHAEL        )
3   O'SULLIVAN, JOHN MOESER,      )
    LOUIS PIA, THOMAS BARDEN,     )
4   CONSTANCE MANGAN, and         )
    CHARISE JONES,                )
5   individually and on behalf    )
    of all others similarly       )
6   situated,                     )
                                  )
7            Plaintiffs,          )   Case No:
                                  )   2:23-Civ. 2848
8       -vs-                      )   (GRB)(ARL)
                                  )
9   GOVERNMENT EMPLOYEES          )
    INSURANCE COMPANY d/b/a       )
10  GEICO,                        )
                                  )
11            Defendant.          )

12        The videotaped videoconference deposition of

13  LOUIS CANIGLIA, JR., called for examination, taken

14  pursuant to the Federal Rules of Civil Procedure of

15  the United States District Courts pertaining to the

16  taking of depositions, taken remotely before ALICE

17  M. SCHWINGER, CSR NO. 84-2913, a Certified

18  Shorthand Reporter of the State of Illinois, on the

19  17th day of January, A.D. 2025, commencing at 10:00

20  a.m. Central Standard Time.

21

22

23

24



LOUIS CANIGLIA, JR.                                          January 17, 2025
KEITH FISCHER, et al. vs GEICO                                              2

```
1   APPEARANCES:

2        OUTTEN & GOLDEN, LLP,

3        (685 Third Avenue, 25th Floor,

4        New York, New York 212/245-1000,

5        516/788-7159), by:

6        MR. JARRON D. McALLISTER,

7             appeared on behalf of the Plaintiffs;

8

9        DUANE MORRIS LLP,

10       (190 South LaSalle Street, Suite 3700,

11       Chicago, Illinois 60603,

12       312/499-6700), by:

13       MR. GREGORY TSONIS,

14            appeared on behalf of the Defendant;

15

16

17

18

19

20

21

22   REPORTED BY:  ALICE M. SCHWINGER, CSR

23              CSR No. 84-2913.

24
```



1        THE VIDEOGRAPHER:  We are now on the record.          10:01:54
2    The time is 10:00 a.m. Central Time on January 17,        10:01:55
3    2025.  This begins the videoconference deposition         10:01:59
4    of Louis Caniglia, Jr., taken in the matter of            10:02:03
5    Keith Fischer, et al., v. Government Employees             10:02:07
6    Insurance Company.  This case is filed in the             10:02:11
7    United States District Court, Eastern District of         10:02:14
8    New York, Case No. 2:23 CIV 2848.                         10:02:16
9            My name is Brent Jordan.  I'm your                10:02:23
10   remote videographer today.  The court reporter is         10:02:26
11   Alice Schwinger.  We are representing Esquire             10:02:29
12   Deposition Solutions.                                     10:02:31
13           Will counsel present please identify             10:02:32
14   yourself and state whom you represent.                    10:02:34
15       MR. McALLISTER:  Jarron McAllister for                10:02:36
16   plaintiffs from Outten and Golden representing            10:02:39
17   Mr. Caniglia in this deposition today.                    10:02:42
18       MR. TSONIS:  Greg Tsonis from Duane Morris,           10:02:45
19   LLP, representing defendant GEICO.                        10:02:48
20       THE COURT REPORTER:  My name is Alice                 10:02:51
21   Schwinger, Illinois Certified Shorthand Reporter.
22   This deposition is being held via videoconferencing
23   equipment.  The witness and reporter are not in the
24   same room.  The witness will be sworn in remotely



 1   pursuant to agreement of all parties.  The parties

 2   stipulate that the testimony is being given as if

 3   the witness was sworn in person.                    10:03:23

 4                    (WHEREUPON, the witness was duly

 5                    sworn.)

 6                    LOUIS CANIGLIA, JR.,

 7   called as a witness herein, having been first duly

 8   sworn, was examined and testified as follows:

 9                    EXAMINATION

10   BY MR. TSONIS:

11        Q.    Good morning, Mr. Caniglia.             10:03:24

12        A.    Hello.                                   10:03:26

13        Q.    Can you please state and spell your name  10:03:27

14   for the record?                                     10:03:29

15        A.    Yeah, my name is Louis Caniglia.  That's  10:03:29

16   L-o-u-i-s, last name is Caniglia, C-a-n-i-g-l-i-a.  10:03:33

17        Q.    All right.  What's your current address?  10:03:42

18        A.    10 Berry Court, Congers, that's          10:03:43

19   C-o-n-g-e-r-s, New York 10920.                      10:03:49

20        Q.    Thank you.  And, Mr. Caniglia, as I      10:03:52

21   said, my name is Greg Tsonis.  I'm a lawyer for     10:03:55

22   GEICO, and I'll be taking your deposition today.    10:03:58

23            Have you ever been deposed before?         10:04:02

24        A.    No.                                      10:04:03



| | |
|---|---|
| 1 | BY THE WITNESS: | 10:44:50 |
| 2 |    A.   That's not what I said. | 10:44:50 |
| 3 | BY MR. TSONIS: | 10:44:51 |
| 4 |    Q.   Okay.  So I guess I'm just asking to try | 10:44:51 |
| 5 | to distinguish from the subsequent workday process. | 10:44:53 |
| 6 | There was a time where you would enter in a number | 10:44:57 |
| 7 | of hours for a workday.  Setting aside your | 10:44:59 |
| 8 | contention of whether those hours were authorized | 10:45:02 |
| 9 | by management, you would enter in a total number of | 10:45:05 |
| 10 | hours for any given workday; right? | 10:45:07 |
| 11 |    MR. McALLISTER:  Objection. | 10:45:10 |
| 12 | BY THE WITNESS: | 10:45:11 |
| 13 |    A.   We were told to put 7.75 hours a week -- | 10:45:11 |
| 14 | a day in, sorry, 7.75 hours a day in, and that's | 10:45:16 |
| 15 | it, no matter how much time you worked.  Now, | 10:45:21 |
| 16 | sometimes GEICO did allow us to put overtime in, in | 10:45:24 |
| 17 | Workday.  It was a brief period, but then I did -- | 10:45:29 |
| 18 | I would enter additional hours because I was | 10:45:33 |
| 19 | allowed, I guess you could say, without getting any | 10:45:38 |
| 20 | type of disciplinary action against me. | 10:45:41 |
| 21 |       But I'm going to say that 7.75 hours was | 10:45:43 |
| 22 | the number that we were instructed to put in daily, | 10:45:49 |
| 23 | no matter how much work we put in. | 10:46:00 |
| 24 | | 10:46:00 |



LOUIS CANIGLIA, JR.                                     January 17, 2025
KEITH FISCHER, et al. vs GEICO                                        53

```
 1        Q.    So I'm not asking about any specific    10:54:23
 2   day.  I'm just asking were there times where you   10:54:28
 3   worked more than 7.75 hours in a day, and that's -- 10:54:31
 4        A.    Yes.                                     10:54:35
 5        Q.    -- and recorded more than 7.75 hours in  10:54:35
 6   a day?                                              10:54:38
 7        A.    Again, I -- yes.  I would have to say    10:54:39
 8   yes.  I can't recall, though, the specific days,    10:54:44
 9   but possibly, yes.                                  10:54:48
10        Q.    Okay.  When that would occur, what was   10:54:50
11   the process that you would follow?  Would you have  10:54:52
12   to, for example, notify anyone that you were going  10:54:56
13   to work more than 7.75 hours?                       10:54:58
14        A.    Yeah, my supervisor.                     10:55:01
15        Q.    Okay.  And how would you notify your     10:55:02
16   supervisor?                                         10:55:05
17        A.    E-mail.                                  10:55:05
18        Q.    What would you say in an e-mail to your  10:55:06
19   supervisor?                                         10:55:10
20        A.    I need some extra hours to work.  I'm -- 10:55:10
21   you know, I'm going to be working extra hours.  Can 10:55:17
22   you approve overtime?                               10:55:19
23        Q.    And what would your supervisor respond,  10:55:21
24   typically?                                          10:55:25
```



1    A.    It would usually be, in sum and            10:55:26

2  substance, a negative for payment, but didn't say   10:55:30

3  don't work.                                          10:55:35

4    Q.    But they didn't say work the hours          10:55:36

5  anyway?                                              10:55:40

6    A.    They didn't say don't work.                 10:55:41

7    Q.    Right.  I understand your testimony.        10:55:43

8  I'm just clarifying.  They didn't tell you to work   10:55:46

9  the hours anyway; right?                             10:55:48

10    MR. McALLISTER:  Objection.                       10:55:50

11  BY THE WITNESS:                                      10:55:51

12    A.    No, they didn't tell me to work and        10:55:51

13  you're not getting paid, no, they didn't say that.   10:55:55

14  BY MR. TSONIS:                                        10:55:58

15    Q.    Did any of your supervisors in your time   10:55:58

16  in SIU at GEICO ever instruct you to work off the    10:56:01

17  clock?                                               10:56:05

18    A.    No.                                         10:56:06

19    Q.    When you first joined SIU, were you --      10:56:09

20  after your training was completed, were you working  10:56:18

21  remotely from your home?                             10:56:21

22    A.    Yes.                                        10:56:22

23    Q.    And did that, I guess, continue the        10:56:22

24  entire time that you worked for GEICO in SIU?        10:56:25



| | | |
|---|---|---|
| 1 | THE WITNESS:  Okay. | 11:08:03 |
| 2 | MR. TSONIS:  But we can go off the record. | 11:08:04 |
| 3 | Jarron, do you want to come back at, call it 12:15 | 11:08:06 |
| 4 | your time? | 11:08:09 |
| 5 | MR. McALLISTER:  Yep.  Sounds great. | 11:08:10 |
| 6 | MR. TSONIS:  All right. | 11:08:13 |
| 7 | THE VIDEOGRAPHER:  Off the record at 11:06 | 11:08:14 |
| 8 | a.m. | 11:08:16 |
| 9 | (WHEREUPON, a short break was | 11:08:16 |
| 10 | taken.) | 11:17:29 |
| 11 | THE VIDEOGRAPHER:  We are back on the record | 11:17:29 |
| 12 | at 11:15 a.m. | 11:17:34 |
| 13 | BY MR. TSONIS: | 11:17:35 |
| 14 | Q.    All right.  Mr. Caniglia, were you | 11:17:37 |
| 15 | familiar when you worked for GEICO with what's | 11:17:40 |
| 16 | known as the GEICO associate handbook? | 11:17:42 |
| 17 | A.    Yes. | 11:17:45 |
| 18 | Q.    All right.  What was the GEICO associate | 11:17:46 |
| 19 | handbook? | 11:17:48 |
| 20 | A.    It was a -- I believe it was like the | 11:17:49 |
| 21 | GEICO policy on what the company values were, | 11:17:54 |
| 22 | expectations, things of that nature. | 11:17:58 |
| 23 | Q.    Was it your understanding that GEICO | 11:18:02 |
| 24 | maintained its policies in the associate handbook? | 11:18:04 |



| | | |
|---|---|---|
| 1 | MR. McALLISTER:  Objection. | 11:18:07 |
| 2 | BY THE WITNESS: | 11:18:08 |
| 3 | A.    My understanding, yes. | 11:18:08 |
| 4 | BY MR. TSONIS: | 11:18:09 |
| 5 | Q.    And was -- when you started with GEICO, | 11:18:09 |
| 6 | was that associate handbook provided to you? | 11:18:12 |
| 7 | A.    Yes. | 11:18:14 |
| 8 | Q.    I'm going to -- so in terms of exhibits | 11:18:16 |
| 9 | today, what I think will work best, I'm going to | 11:18:21 |
| 10 | drop a document in the chat -- | 11:18:24 |
| 11 | A.    Okay. | 11:18:24 |
| 12 | Q.    -- right now, and once you click on it | 11:18:26 |
| 13 | in the chat, it will ask you to download it and | 11:18:29 |
| 14 | save it somewhere.  Once it downloads, if you click | 11:18:32 |
| 15 | it again in the chat, it should open it.  So let me | 11:18:35 |
| 16 | know when you've done that, if you've got it open. | 11:18:37 |
| 17 | A.    Okay.  So I can download this; correct? | 11:18:41 |
| 18 | Q.    Yes.  It's just a PDF file. | 11:18:42 |
| 19 | A.    Okay.  I think I have it up.  It says | 11:19:02 |
| 20 | Compensation Contents? | 11:19:04 |
| 21 | Q.    Yes.  And for the record, so this will | 11:19:06 |
| 22 | be marked as Exhibit 1, and it's the document | 11:19:06 |
| 23 | bearing the Bates label G000028 through 0043. | 11:19:09 |
| 24 | | |



```
 1                      (WHEREUPON, a certain document was         11:19:09
 2                      marked Caniglia Deposition Exhibit
 3                      No. 1, for identification, as of
 4                      January 17, 2025.)                         11:19:17
 5    BY MR. TSONIS:                                               11:19:17
 6         Q.    Mr. Caniglia, so when I say "Bates               11:19:21
 7    numbers," and I'll probably refer to it, if you see         11:19:23
 8    in the lower right-hand corner, do you see there's          11:19:25
 9    a letter G and then followed by a series of                 11:19:28
10    numbers?                                                    11:19:30
11         A.    Would you like me to read them?  Yes, I          11:19:30
12    see that.                                                   11:19:32
13         Q.    No, you don't have to read them.  I'm            11:19:32
14    just orienting.  So as I -- I'll refer to, you              11:19:36
15    know, the document ending in, for example, this             11:19:37
16    first page is 0028, and so if I direct you to              11:19:39
17    another page using those numbers, that's the number        11:19:42
18    set that I'm referencing.  Okay?                            11:19:46
19         A.    Okay.                                            11:19:47
20         Q.    So does this document look familiar to          11:19:48
21    you, Mr. Caniglia?                                          11:19:50
22         A.    Yes.  I mean, I was handed a paper               11:19:51
23    document, but yeah, I would say this is similar,            11:19:55
24    yes.                                                        11:19:57
```



1    Q.    That's fair.  And do you see at the          11:19:57

2    bottom of the page, the first page on the left, it 11:19:59

3    shows Human Resources Associate Handbook?          11:20:03

4    A.    It says 11/17 Human Resources Associate      11:20:06

5    Handbook, yes.                                     11:20:11

6    Q.    And was it your understanding that GEICO     11:20:11

7    periodically updated its associate handbook?       11:20:13

8    A.    It's possible.  I -- I don't know if I       11:20:16

9    received updated handbooks.  I might have.  But    11:20:21

10   it's possible, yeah, that they changed -- yes, it's 11:20:24

11   possible, yes.                                     11:20:28

12   Q.    And generally the numbers that you           11:20:28

13   noted, 11/17, you know, does that indicate to you  11:20:31

14   that this -- this handbook is -- was updated       11:20:34

15   approximately November of 2017?                    11:20:37

16   A.    Well, it would probably have had to.  I      11:20:39

17   mean, I was employed with GEICO in 2011, so if this 11:20:41

18   is dated 2017, then, yes, this was an update.      11:20:45

19   Q.    Yeah, I guess I'm just saying typically      11:20:48

20   when you saw sort of a date in the lower left-hand  11:20:50

21   side, was that kind of indicating when the last    11:20:53

22   time the handbook was updated?                     11:20:54

23   A.    Yeah, I would say that's -- I mean,          11:20:56

24   reasonably, yeah.  Yes.                            11:21:00



1    Q.    And periodically, maybe annually, did        11:21:01

2    GEICO have you sort of acknowledge that you had     11:21:04

3    received and reviewed the associate handbook?       11:21:06

4    A.    Yes, possible -- yes, possibly, yes.          11:21:09

5    Q.    Okay.  And if GEICO required you to           11:21:12

6    acknowledge that you read and reviewed the          11:21:14

7    associate handbook, you completed those            11:21:16

8    acknowledgements?                                   11:21:19

9    A.    I would say yes, I -- yes.                    11:21:20

10   Q.    If you turn to the page ending in 0038,       11:21:23

11   so ten pages in.                                    11:21:31

12   A.    All right.  Give me -- give me a second       11:21:44

13   here.  All right.  Was it 38, you said?             11:21:45

14   Q.    Yes.                                          11:21:49

15   A.    Okay.  36, 37, 38.  Okay.                     11:21:49

16   Q.    You see at the bottom, there's a large       11:21:51

17   heading that says Overtime Eligibility?            11:21:55

18   A.    Yes.                                          11:22:02

19   Q.    All right.  Now, if you turn to the next      11:22:02

20   page, the one ending in 0039.                      11:22:04

21   A.    Yes, I'm on it.                               11:22:09

22   Q.    Do you see at the top it says the            11:22:10

23   workweek is 12:01 a.m. Saturday to 12:00 on Friday? 11:22:11

24   A.    Yes.                                          11:22:16



LOUIS CANIGLIA, JR.                                          January 17, 2025
KEITH FISCHER, et al. vs GEICO                                            76

```
 1        A.    Okay.  All nonexempt associates are        11:26:16
 2   required -- is that --                                11:26:19
 3        Q.    Yes.                                        11:26:21
 4        A.    Okay.                                       11:26:21
 5        Q.    So that paragraph starts and says:  All    11:26:22
 6   nonexempt associates are required to accurately       11:26:24
 7   record their hours worked and absences taken.         11:26:27
 8             Do you see that?                             11:26:29
 9        A.    Yes.                                        11:26:30
10        Q.    All right.  So GEICO's policy was that     11:26:31
11   all nonexempt associates were required to             11:26:34
12   accurately record their hours worked?                 11:26:36
13        A.    That's what it says, yes.                  11:26:38
14        Q.    Okay.  And if you skip the second          11:26:41
15   sentence that deals with exempt associates, the       11:26:45
16   third sentence says:  A nonexempt associate who       11:26:47
17   feels he or she did not receive pay for all of his    11:26:50
18   or her hours worked and an exempt or salaried         11:26:53
19   nonexempt associate who feels his or her pay          11:26:56
20   incorrectly reflects a deduction for an absence       11:26:58
21   should contact his or her supervisor, local human     11:27:00
22   resources manager, or corporate human resources.      11:27:03
23             Do you see that?                             11:27:06
24        A.    Reading it with you, yes.                  11:27:07
```



```
1       A.    No, I -- no.                              11:42:21

2       Q.    Okay.                                     11:42:21

3       A.    I'm going to assume my supervisor.        11:42:26

4   That's an assumption, though.  I'm going to assume  11:42:29

5   my supervisor.                                      11:42:31

6       Q.    And when your supervisor -- so I guess    11:42:32

7   when you submit it, are you certifying that it's,   11:42:34

8   like, you know, accurate, accurately reflects the   11:42:36

9   time that you worked?                               11:42:39

10      MR. McALLISTER:  Objection.                     11:42:39

11  BY THE WITNESS:                                     11:42:40

12      A.    No.                                        11:42:40

13  BY MR. TSONIS:                                      11:42:42

14      Q.    It's your testimony that it's not a       11:42:42

15  certification each week when you submit in Workday?  11:42:44

16      MR. McALLISTER:  Objection.                     11:42:47

17  BY THE WITNESS:                                     11:42:48

18      A.    A certification of what I was allotted    11:42:48

19  to do during that time period.                      11:42:52

20  BY MR. TSONIS:                                      11:42:55

21      Q.    Is that what the certification that you   11:42:55

22  have to acknowledge each week says, this certifies  11:42:58

23  that you have entered what you were allotted to     11:43:01

24  work, or does it say that you --                    11:43:03
```



```
 1        A.    Yes.                                    11:43:03

 2                  (WHEREUPON, there was a brief       11:43:03

 3              interruption.)                          11:43:03

 4        THE COURT REPORTER:  Hold on.  Hold on.       11:43:11

 5        MR. McALLISTER:  Lou, if you can just let him 11:43:11

 6   finish the question before you answer.            11:43:12

 7        THE WITNESS:  I'm sorry.                       11:43:15

 8                  (Record read.)                      11:43:15

 9        MR. TSONIS:  I'll finish my question.         11:43:15

10   BY MR. TSONIS:                                     11:43:28

11        Q.    Does it say that you certify that the   11:43:28

12   hours that you entered are accurate and reflect the 11:43:32

13   time worked?                                       11:43:35

14        MR. McALLISTER:  Objection.                   11:43:35

15   BY THE WITNESS:                                    11:43:37

16        A.    Answer it as a yes-or-no question.  I   11:43:37

17   believe it does say that, but that doesn't mean    11:43:42

18   that I felt accurate about doing that.  I mean, I  11:43:45

19   did have to keep my job and pay my mortgage, so I  11:43:49

20   clicked yes.                                       11:43:53

21   BY MR. TSONIS:                                     11:43:54

22        Q.    Okay.  And, Mr. Caniglia, you have      11:43:54

23   already said a number of things, and you will have 11:43:57

24   plenty of opportunity to explain your -- I just -- 11:44:00
```



LOUIS CANIGLIA, JR.                                    January 17, 2025
KEITH FISCHER, et al. vs GEICO                                    103

```
 1        A.    Yes.                                    11:54:55
 2        Q.    And Gerry Cassagne, you know, starts off  11:54:56
 3   thanking people for submitting their time sheets,   11:55:01
 4   and then in the second paragraph says:  If you      11:55:03
 5   still have to submit, please do so by tomorrow.     11:55:06
 6   If you plan on working any overtime today or        11:55:09
 7   tomorrow, you must enter it into this time sheet.   11:55:11
 8   After I approve the time sheet, and the hours are   11:55:14
 9   not correct, I must put in a special correction     11:55:17
10   through HR to adjust it.                            11:55:20
11        Do you see that?                               11:55:22
12        A.    I do.                                    11:55:22
13        Q.    All right.  And in the third paragraph,  11:55:23
14   he writes:  If you get stuck working overtime after 11:55:23
15   you submitted your sheet, contact me immediately so 11:55:26
16   I can make the correction before I approve it and   11:55:29
17   send it in.  Right?                                 11:55:31
18        A.    Yes.                                     11:55:32
19        Q.    All right.  So here, in December of '16, 11:55:33
20   Gerry Cassagne is instructing you to enter in       11:55:36
21   overtime into your time sheet; right?               11:55:39
22        A.    Yeah, I would agree with that, yes.      11:55:41
23        Q.    Okay.  He's instructing everyone, in     11:55:45
24   fact, that reports to him that any overtime work    11:55:49
```



800.211.DEPO (3376)
EsquireSolutions.com

LOUIS CANIGLIA, JR.                                    January 17, 2025
KEITH FISCHER, et al. vs GEICO                                      104

| | | |
|---|---|---|
| 1 | has to be entered into their time sheet? | 11:55:51 |
| 2 | A.    I don't know if that's a question, but | 11:55:53 |
| 3 | I'll agree with your statement, yes. | 11:55:57 |
| 4 | Q.    Okay.  And, in fact, I guess he's | 11:55:58 |
| 5 | saying -- he's saying that if -- if you work | 11:56:01 |
| 6 | overtime after you submitted your sheets, to let | 11:56:04 |
| 7 | him know so he can get you paid for it; right? | 11:56:07 |
| 8 | A.    Yes.  He sent an e-mail out for that, | 11:56:12 |
| 9 | yes. | 11:56:16 |
| 10 | Q.    You can close this document out too. | 11:56:16 |
| 11 | A.    Okay. | 11:56:20 |
| 12 | Q.    I'm dropping another document in the | 11:56:21 |
| 13 | chat. | 11:56:31 |
| 14 | A.    Okay. | 11:56:32 |
| 15 | (WHEREUPON, a certain document was | 11:56:32 |
| 16 | marked Caniglia Deposition Exhibit | |
| 17 | No. 5, for identification, as of | |
| 18 | January 17, 2025.) | 11:56:32 |
| 19 | BY MR. TSONIS: | 11:56:32 |
| 20 | Q.    It's going to be marked as Exhibit 5, | 11:56:33 |
| 21 | and for the court reporter, Exhibit 5 for the | 11:56:34 |
| 22 | record is a document bearing the Bates label | 11:56:38 |
| 23 | G012903. | 11:56:43 |
| 24 | A.    Can I just ask, who is -- Gregory, | 11:56:45 |



```
 1   need to do this -- and then there's a list of, you        11:58:33
 2   know, several bullet points; right?                       11:58:36
 3        A.   Yes.                                             11:58:38
 4        Q.   Now, some of these are just logistically        11:58:38
 5   how, you know, which buttons you click to actually        11:58:42
 6   enter your time; right?                                   11:58:45
 7        A.   Yes.                                             11:58:46
 8        Q.   Do you see the one, it is -- one, two,          11:58:47
 9   three, four, five, six, seven -- eight bullet             11:58:53
10   points down that starts with the word Enter?             11:58:54
11        A.   Yes.                                             11:58:56
12        Q.   All right.  That bullet point says:            11:58:56
13   Enter the 7.75 hours for the day (for whatever           11:58:58
14   hours you work for that day.)                             11:59:03
15             Do you see that?                                11:59:06
16        A.   Yes.                                             11:59:07
17        Q.   All right.  So Gerry Cassagne's                11:59:07
18   instructions to his investigators were to enter          11:59:08
19   7.75 or whatever you worked for that day; right?         11:59:13
20        A.   My interpretation of that, and I know          11:59:18
21   I'm -- I know it's a yes-or-no question, but to me,      11:59:21
22   that's enter 7.75 hours, yes, for whatever --           11:59:25
23   whatever hours you worked today, you're only            11:59:30
24   getting 7.75 hours.                                      11:59:32
```



 1        Q.    You interpret this bullet point to limit          11:59:34

 2    an investigator to only entering 7.75 hours?                11:59:36

 3        A.    That's my interpretation, yes.                    11:59:40

 4        MR. McALLISTER:  Objection.                             11:59:42

 5    BY MR. TSONIS:                                              11:59:42

 6        Q.    And what's that interpretation based on?          11:59:42

 7        A.    This statement.                                   11:59:44

 8        Q.    So why would he write the parenthetical           11:59:46

 9    if he was only telling people to write 7.75 hours?          11:59:50

10        MR. McALLISTER:  Objection.                             11:59:53

11    BY THE WITNESS:                                             11:59:54

12        A.    Because he said whatever hours you                11:59:54

13    worked for that day.                                        11:59:55

14    BY MR. TSONIS:                                              11:59:56

15        Q.    Wouldn't that include hours in excess of          11:59:56

16    7.75?                                                       11:59:58

17        A.    Not my interpretation of it, no.                  12:00:00

18        Q.    What's the basis for not interpreting             12:00:03

19    that to include hours over 7.75?                            12:00:07

20        A.    Because he put enter 7.75 hours for the           12:00:11

21    day or whatever hours you worked for that day.              12:00:14

22        Q.    Didn't we just look at two prior                  12:00:20

23    communications from Gerry Cassagne where he's               12:00:23

24    talking about entering in overtime?                         12:00:26



800.211.DEPO (3376)
EsquireSolutions.com

1    A.    We did.                                      12:00:27

2    Q.    And so you don't think this is              12:00:28

3  consistent with that communication?                 12:00:29

4    A.    No.                                          12:00:31

5    Q.    Did you understand that you could enter      12:00:33

6  more than 7.75 hours for the day -- for any workday  12:00:38

7  during this time period?                             12:00:41

8    A.    I did.                                        12:00:42

9    Q.    Did you frequently enter more than 7.75      12:00:43

10  hours?                                               12:00:46

11    MR. McALLISTER:  Objection.                        12:00:46

12  BY THE WITNESS:                                      12:00:47

13    A.    Not frequently, no.  When I was allowed      12:00:47

14  to by supervisors, I did.  But, again, it says       12:00:49

15  enter 7.75 hours a day or whatever hours you worked  12:00:57

16  for that day.                                        12:01:01

17  BY MR. TSONIS:                                       12:01:02

18    Q.    And you don't read this e-mail as 7.75       12:01:02

19  being the default, but Gerry Cassagne instructing    12:01:07

20  you to enter whatever hours you worked for the       12:01:10

21  workday?                                             12:01:12

22    MR. McALLISTER:  Objection.                        12:01:12

23  BY THE WITNESS:                                      12:01:13

24    A.    I don't see him saying that I could add      12:01:13



```
 1  ten hours in this bullet.  Do you, Counsel?          12:01:15

 2  BY MR. TSONIS:                                        12:01:18

 3      Q.    But you do see him saying to enter          12:01:18

 4  whatever hours you worked for that day; right?        12:01:21

 5      A.    I do see that, yes.                         12:01:23

 6      Q.    Okay.  Now, you can close out of this.      12:01:24

 7      A.    Okay.                                        12:01:30

 8      Q.    I'm going to drop what's going to be        12:01:30

 9  marked as Exhibit 6 into the chat.                    12:01:39

10                (WHEREUPON, a certain document was      12:01:39

11                 marked Caniglia Deposition Exhibit

12                 No. 6, for identification, as of

13                 January 17, 2025.)                     12:02:00

14  BY MR. TSONIS:                                        12:02:00

15      Q.    Sending now, you should be able to          12:02:01

16  download it.                                          12:02:02

17      A.    Okay.                                        12:02:03

18      Q.    And for the record, this is a               12:02:04

19  compilation exhibit that has several different        12:02:06

20  documents in it bearing -- but it bears the Bates     12:02:10

21  label starting in G011538 and 539, 543, 493, 516,     12:02:13

22  613, 409, 537, 836, 535, 534, 502, 501, 500, 486,     12:02:23

23  488, 489, 418, 461, 459, 455, 456, and that's it.     12:02:34

24  Sorry, just had to get that on the record.            12:02:42
```



1    BY THE WITNESS:                                          12:33:39

2         A.    I don't know.                                 12:33:39

3    BY MR. TSONIS:                                           12:33:40

4         Q.    So you don't know one way or the other        12:33:40

5    whether you're entitled to overtime?                    12:33:44

6         A.    Well, I'm not going to answer that            12:33:45

7    question, with all due respect.  I mean, I'm            12:33:47

8    answering it by saying that I don't know.               12:33:49

9    That's --                                               12:33:52

10        MR. McALLISTER:  You can answer the question.       12:33:53

11   If the answer is I don't know, then that's totally      12:33:54

12   fine.  But, yeah.  And it can be simple as that.        12:33:57

13   BY MR. TSONIS:                                           12:34:01

14        Q.    Okay.  I guess in your understanding,         12:34:01

15   you just don't know if you're entitled to overtime      12:34:04

16   if you didn't actually work more than 40 hours          12:34:07

17   in --                                                   12:34:10

18        A.    That's correct.                               12:34:10

19        Q.    Okay.  You write in paragraph 10 of your     12:34:11

20   declaration that starting in March 2020, the            12:34:20

21   COVID-19 pandemic halted field operations, so all       12:34:23

22   of your work was done remotely until approximately      12:34:27

23   November 2021?                                          12:34:29

24        A.    Yes.                                          12:34:31



1    Q.    All right.  When you say your work was    12:34:33

2  done remotely, I guess, is it more accurate to say    12:34:35

3  that you were no longer working in the field,    12:34:39

4  initially?    12:34:41

5    MR. McALLISTER:  Objection.    12:34:41

6  BY THE WITNESS:    12:34:42

7    A.    I was working from my house, so I --    12:34:42

8  again, you're asking me a yes-or-no question that's    12:34:48

9  really, like --    12:34:50

10  BY MR. TSONIS:    12:34:52

11    Q.    Right.  But prior to the COVID pandemic,    12:34:52

12  you would sometimes work from your home, but you'd    12:34:55

13  also be out in the field; right?    12:34:57

14    A.    Yeah.  Yes.    12:34:58

15    Q.    You'd be doing EUOs in person.  You    12:35:00

16  might be doing scene canvasses.  You might be going    12:35:04

17  to get a police report.  You might be doing --    12:35:04

18    MR. McALLISTER:  Objection.    12:35:04

19  BY MR. TSONIS:    12:35:04

20    Q.    -- a number of things; right?    12:35:07

21    A.    Yes.    12:35:08

22    Q.    All right.  And when COVID -- the COVID    12:35:09

23  pandemic hit March 2020, GEICO instructed all field    12:35:12

24  investigators that no fieldwork would be conducted    12:35:15



 1  anymore; right?                                    12:35:18

 2      A.    Yes.                                      12:35:19

 3      Q.    Right.  So you worked exclusively out of 12:35:20

 4  your home?                                         12:35:24

 5      MR. McALLISTER:  Objection.                    12:35:24

 6  BY THE WITNESS:                                    12:35:24

 7      A.    Yes.                                      12:35:24

 8  BY MR. TSONIS:                                     12:35:25

 9      Q.    For a period of time, and then I         12:35:25

10  understand that certain activities, you know, might 12:35:28

11  have been permitted for fieldwork; for example, a  12:35:31

12  scene canvass if nobody else was present?          12:35:33

13      A.    Yes.                                      12:35:36

14      Q.    Okay.  And some things like EUOs,         12:35:36

15  examinations under oath, it took a little while,   12:35:40

16  but eventually GEICO set up a virtual process for  12:35:43

17  that to happen?                                    12:35:47

18      A.    Yes.                                      12:35:48

19      Q.    All right.  And virtual EUOs, you know,  12:35:48

20  were the only way to do EUOs for a while; right?   12:35:51

21      A.    Yes.  I -- no, but yeah.  I mean, we     12:35:54

22  still do --                                        12:36:00

23      Q.    Virtual EUOs were the only permissible   12:36:01

24  methods that GEICO allowed for a period of time to 12:36:03



1   do EUOs?                                              12:36:06

2        A.    Okay.  Yes.                                12:36:08

3        Q.    All right.  And then eventually, you       12:36:09

4   know, in-person EUOs were permitted under certain     12:36:11

5   circumstances?                                        12:36:15

6        A.    Yeah.  Okay.  Yes.                         12:36:16

7        Q.    But even since COVID, GEICO has            12:36:19

8   continued to use virtual EUOs where it makes sense;   12:36:24

9   right?                                                12:36:27

10       A.    I -- again, I haven't worked with GEICO    12:36:27

11  for a year, so -- but I would say they -- they        12:36:30

12  probable -- from when I left, yes, I would assume     12:36:32

13  that they're still doing that method.                 12:36:35

14       Q.    Now, once COVID hit and you were working   12:36:38

15  exclusively in your home -- well, let me back up      12:36:42

16  for a second.                                         12:36:44

17            So you said, I think earlier, about a       12:36:45

18  60-mile radius from your house was your sort of       12:36:47

19  general geographic area?                              12:36:50

20       A.    Yeah.  That's fair to say, yes.            12:36:52

21       Q.    All right.  I know it's tough and every    12:36:55

22  day is a little bit different, but typically if you   12:36:57

23  were out in the field, how much time would you        12:36:59

24  spend driving to and from, you know, your house?      12:37:01



1      A.    Like from my house to -- it depends.          12:37:03

2    Typically is an interesting word to use, but          12:37:12

3    fieldwork could -- prior to the -- are you talking    12:37:16

4    prior to the pandemic?                                12:37:20

5      Q.    Yes.                                           12:37:21

6      A.    Could be fieldwork maybe --                    12:37:22

7    approximately one hour a day to four hours a day,     12:37:26

8    if I could -- it really depends on the day.           12:37:29

9      Q.    Generally, would you try to group as          12:37:34

10   many field activities as possible on the same day    12:37:38

11   so you could sort of go from point A --               12:37:41

12     A.    Yeah, but --                                  12:37:41

13     Q.    Hold on.  Hold on.                            12:37:42

14          -- from point A to B to C, you know, for       12:37:44

15   example, and back home to maximize your time in the  12:37:46

16   field?                                                12:37:49

17     MR. McALLISTER:  Objection.                         12:37:49

18   BY THE WITNESS:                                       12:37:50

19     A.    I'm not going to be inefficient.  I'm         12:37:50

20   going to try to make my time as most efficient as    12:37:55

21   possible.  So I would plan my day accordingly.        12:37:58

22   BY MR. TSONIS:                                        12:38:02

23     Q.    All right.  I think I've heard others         12:38:02

24   say that they would try to sort of start at the      12:38:06



 1  pretty far drive one way in New York.                    12:39:16
 2       A.    It is.  I agree with you.                      12:39:18
 3       Q.    Okay.  Once COVID hit, though, and you         12:39:20
 4  weren't in the field, you know, that time you --          12:39:27
 5  there's no longer any time in the car; right?             12:39:29
 6       A.    For a brief period, I believe it was           12:39:31
 7  like for the -- yeah, for a brief period of time,         12:39:35
 8  yes, I'd agree with that, yeah.                           12:39:38
 9       Q.    Was it a brief period of time?  I mean,        12:39:40
10  in your declaration, you write that normal field         12:39:43
11  operations didn't come back until November of 2021.      12:39:45
12       MR. McALLISTER:  Objection.                          12:39:49
13  BY THE WITNESS:                                           12:39:50
14       A.    Yeah.  Yes.                                    12:39:50
15  BY MR. TSONIS:                                            12:39:51
16       Q.    All right.  So from about March 2020 to       12:39:51
17  November 2021, you were -- well, for a period of          12:39:55
18  time, you were definitely not in the field at all;       12:39:58
19  right?                                                    12:40:01
20       A.    I wouldn't say at all.  I mean, during        12:40:01
21  that particular time period, I might have went out,      12:40:03
22  like you said prior, to do canvasses and things          12:40:06
23  like that, maybe pick up the police reports; but         12:40:08
24  for the most part, the job in general changed to         12:40:11



1    primarily a working-at-home job, in terms of they          12:40:14

2    didn't -- like, again, GEICO probably didn't want          12:40:21

3    you to go out and get sick.  At that particular            12:40:25

4    time, it was very -- it was uncertain.  People were        12:40:28

5    dying.  It was all over the news.  So I can                12:40:30

6    understand GEICO's position on that.                       12:40:32

7           So I'd say for that yearish, give or                12:40:34

8    take, field operations, normal field operations           12:40:39

9    were not the same prior to the pandemic.                   12:40:44

10   Q.    Right.  And I guess I'm just saying                  12:40:47

11   immediately after COVID, you know, the amount of          12:40:50

12   time in the field was like zero percent; right?            12:40:52

13   MR. McALLISTER:  Objection.                                12:40:55

14   BY THE WITNESS:                                            12:40:56

15   A.    In the beginning, I would say -- I mean,            12:40:56

16   from what I can recall, I could be wrong again, but        12:41:00

17   no, I don't recall being in the field that much            12:41:06

18   during the pandemic, in the initial part of the            12:41:09

19   pandemic.  Again, pandemic, I don't know the dates         12:41:12

20   of when it officially lasted, but definitely the           12:41:15

21   beginning part, no.                                        12:41:19

22   BY MR. TSONIS:                                             12:41:20

23   Q.    Okay.  And so you write in your                      12:41:20

24   declaration here that -- in the next sentence in           12:41:23



| | | |
|---|---|---|
| 1 | paragraph 10 that GEICO increased your caseload | 12:41:26 |
| 2 | significantly after March 2020; right? | 12:41:28 |
| 3 | A.    Yes. | 12:41:31 |
| 4 | Q.    And you write that your overtime hours | 12:41:31 |
| 5 | increased as a result to about 50 hours a week on | 12:41:34 |
| 6 | average? | 12:41:37 |
| 7 | A.    That's what I wrote, yes. | 12:41:38 |
| 8 | Q.    Okay.  So I guess part of the increase | 12:41:39 |
| 9 | in your caseload was the result of basically | 12:41:44 |
| 10 | eliminating the windshield time as a field | 12:41:47 |
| 11 | investigator; right? | 12:41:50 |
| 12 | MR. McALLISTER:  Objection. | 12:41:51 |
| 13 | BY THE WITNESS: | 12:41:52 |
| 14 | A.    That could be an explanation of why, | 12:41:52 |
| 15 | yes. | 12:41:55 |
| 16 | BY MR. TSONIS: | 12:41:55 |
| 17 | Q.    All right.  Well, I guess, if you | 12:41:55 |
| 18 | remove, you know, one to four hours of a day that | 12:41:57 |
| 19 | you would have otherwise been in the field, that's | 12:42:00 |
| 20 | time you could otherwise spend working on cases; | 12:42:02 |
| 21 | right? | 12:42:04 |
| 22 | MR. McALLISTER:  Objection. | 12:42:05 |
| 23 | BY THE WITNESS: | 12:42:05 |
| 24 | A.    Counsel, I mean, I'm going -- I'm going | 12:42:05 |



 1  and sign the transcript?  We have to ask.              16:11:34

 2       MR. McALLISTER:  Oh, sure.                         16:11:34

 3       THE COURT REPORTER:  Okay.                         16:11:34

 4       MR. TSONIS:  And we'll do --                       16:11:36

 5       THE VIDEOGRAPHER:  Thank you.  This will           16:11:36

 6  conclude today's videoconference deposition of         16:11:40

 7  Louis Caniglia, Jr., taken on January 17, 2025, at      16:11:42

 8  4:10 p.m. Central Time.                                 16:11:48

 9       THE COURT REPORTER:  So I did get -- it's          16:11:48

10  five-day delivery for you, Counsel.  I did get          16:11:48

11  that.                                                   16:11:48

12           And Counsel, you said you wanted a copy?       16:12:01

13       MR. TSONIS:  Electronic transcript, yeah,          16:12:01

14  that's fine.                                            16:12:01

15       THE COURT REPORTER:  Mr. McAllister, copy?         16:12:05

16       MR. McALLISTER:  Yes.                              16:12:05

17       THE COURT REPORTER:  Okay.  All right.

18               (WHEREUPON, the deposition concluded

19                at 4:12 p.m.)

20

21

22

23

24



 1  STATE OF ILLINOIS    )

 2                       )  SS:

 3  COUNTY OF DUPAGE     )

 4          I, ALICE M. SCHWINGER, CSR No. 84-2913,

 5  a Certified Shorthand Reporter of the State of

 6  Illinois, do hereby certify:

 7          That previous to the commencement of the

 8  examination of the witness, the witness was duly

 9  sworn to testify the whole truth concerning the

10  matters herein;

11          That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony

15  given and the proceedings had;

16          That the said deposition was taken

17  before me at the time and place specified;

18          That I am not a relative or employee or

19  attorney or counsel, nor a relative or employee of

20  such attorney or counsel for any of the parties

21  hereto, nor interested directly or indirectly in

22  the outcome of this action.

23          IN WITNESS WHEREOF, I do hereunto set my

24  hand at Woodridge, Illinois, this 21st day of



1    January, A.D. 2025.

2

3

4

5

6              Certified Shorthand Reporter

7

8

9    ALICE M. SCHWINGER, CSR No. 84-2913

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

