# EXHIBIT 14

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF NEW YORK

3      KEITH FISCHER, MICHAEL          )
       O'SULLIVAN, JOHN MOESER, LOUIS  )
4      PIA, THOMAS BARDEN, CONSTANCE   )
       MANGAN, and CHARISE JONES,      )
5      individually and on behalf of all )
       others similarly situated,      )
6                                       )
                Plaintiffs,             )
7                                       ) No. 2:23-cv-2848
          -v-                           )
8                                       )
       GOVERNMENT EMPLOYEES INSURANCE   )
9      COMPANY d/b/a GEICO,             )
                                        )
10               Defendant.             )

11

12             Wednesday, January 15, 2025

13         Oral videoconference deposition of ALBERT

14   BRUST, held pursuant to Notice via Zoom with all

15   parties participating remotely, commencing at

16   9:00 a.m. Central Time, on the above date, before

17   Andrew R. Pitts, Certified Shorthand Reporter.

18

19

20

21

22

23   Andrew R. Pitts, CSR, RPR
     License No.:  084-4575
24   Esquire Deposition Solutions

25



```
 1   REMOTE APPEARANCES:

 2   On behalf of the Plaintiffs:

 3   OUTTEN & GOLDEN, LLP
     685 Third Avenue - 25th Floor
 4   New York, New York  10017
     (347) 390-2121
 5   Email: jmcallister@outtengolden.com
     BY:  JARRON D. McALLISTER, ESQUIRE
 6

 7   On behalf of the Defendant GEICO:

 8   DUANE MORRIS, LLP
     190 South LaSalle Street - Suite 3700
 9   Chicago, Illinois  60603-3433
     (312) 499-6779
10   Email:  gtsonis@duanemorris.com
     BY:  GREGORY TSONIS, ESQUIRE
11

12

13   ALSO PRESENT:

14       BRENT JORDAN, CLVS, Legal Videographer.

15

16

17

18

19

20

21

22

23

24

25
```



```
1                      I N D E X

2    ALBERT BRUST                          EXAMINATION

3        BY MR. TSONIS                      5, 286
         BY MR. McALLISTER                 278
4

5                    E X H I B I T S

6    BRUST           DESCRIPTION                    PAGE

7    Exhibit 1       Compensation Contents,         104
                     G000028-43
8

9    Exhibit 2       E-mails, G011080-81            148

10   Exhibit 3       E-mails, G011431-432           151

11   Exhibit 4       E-mails, G011598-599           155

12   Exhibit 5       E-mails, G017819-820           161

13   Exhibit 6       7/19/20 e-mail, G017819        163

14   Exhibit 7       E-mails, G012091-92            164

15   Exhibit 8       Performance appraisal,         206
                     G006735-745
16

17   Exhibit 9       Workday profile, G005126-163   218
                     (CONFIDENTIAL)
18

19   Exhibit 10      Associate of the Month         236
                     nomination, G015733-737
20

21   Exhibit 11      Opt-In Plaintiff Responses     244

22   Exhibit 12      Human Resource Associate       261
                     Handbook, G000191-235
23

24

25
```



```
 1              (Whereupon, the following proceedings were
 2              taken via videoconference.)
 3              THE VIDEOGRAPHER:  Okay.  We are now on the
 4    record.  The time is 9:02 a.m. Central Time on
 5    January 15th, 2025.  This begins the videoconference
 6    deposition of Albert Brust taken in the matter of
 7    Keith Fischer, et al., v. Government Employees
 8    Insurance Company, d/b/a Geico.  This case is filed in
 9    the United States District Court for the Eastern
10    District of New York, Case No. 2:23-CIV-2848.
11              My name is Brent Jordan.  I am the
12    certified legal videographer for the day.  The court
13    reporter is Andrew Pitts.  We are representing Esquire
14    Deposition Solutions.
15              Will Counsel present please identify
16    yourself and state whom you represent.
17              MR. McALLISTER:  Good morning.  I am Jarron
18    McAllister, and I am an attorney from Outten & Golden
19    and I am representing Mr. Brust today.
20              MR. TSONIS:  Gregory Tsonis with Duane
21    Morris, LLP, representing the Defendant Geico.
22              COURT REPORTER:  Okay.  Mr. Brust --
23              THE WITNESS:  Yeah, Al Brust.  I was an
24    employee of Geico.  I no longer am.
25              COURT REPORTER:  Great.  Okay.  Sir, please
```



1    raise your right hand to be sworn in.

2              (Whereupon, the witness was

3              administered an oath.)

4              COURT REPORTER:  Okay.  Thank you.  Sworn.

5    You may lower your hand.  I'll mute myself, and

6    Counsel you may proceed.

7              MR. McALLISTER:  Thank you.

8                    ALBERT BRUST,

9    called as a witness herein, having been first

10   administered an oath, was examined and testified

11   remotely via videoconference as follows:

12                    EXAMINATION

13   BY MR. TSONIS:

14        Q.    Good morning, Mr. Brust.

15        A.    Good morning.

16        Q.    As you probably heard, my name is Greg

17   Tsonis.  I'm an attorney that represents Geico in this

18   lawsuit.

19              Before you kick off, can you please just

20   state and spell your name for the record.

21        A.    It's Brust, B as in boy, R-U-S-T.

22        Q.    All right.  And your first name --

23        A.    First name is Albert, A-L-B-E-R-T.

24        Q.    Perfect.  And what's your current address?

25        A.    62 Brandy Avenue, Holbrook, New York,



1   keep the assignments, I guess, roughly equal?

2           MR. McALLISTER:  Objection.

3   BY THE WITNESS:

4       A.    Yeah, the -- the goal was to keep the

5   assignments equal, yes.

6   BY MR. TSONIS:

7       Q.    Were there times where you would not be

8   part of the rotation to receive assign- -- or to get

9   assigned cases?

10      A.    Yes.

11      Q.    When would those times occur?

12      A.    Depending.  Sometimes you would catch a

13  case that required a lot more back -- you know, more

14  background checks or the field work would be

15  time-consuming.

16          An example is if I would have to go to

17  Staten Island.  For me, that commute, hour and a half

18  to two hours, and then, you know, it could be three to

19  four hours just driving.  So the supervisors would

20  recognize that and, you know, possibly take you off

21  the catching that day, or instead of catching four

22  cases, maybe you'll catch three or two.

23      Q.    Okay.  So based on your existing workload,

24  I guess one tool that supervisors would use would be

25  adjusting whether you would receive new case



```
 1   assignments or -- on any given day?
 2              MR. McALLISTER:  Objection.
 3   BY THE WITNESS:
 4        A.   Yes.
 5   BY MR. TSONIS:
 6        Q.   All right.  And maybe if they didn't close
 7   you out completely, they might reduce the number of
 8   cases that you would be assigned on a given day?
 9              MR. McALLISTER:  Objection.
10   BY THE WITNESS:
11        A.   Yes.
12   BY MR. TSONIS:
13        Q.   Okay.  Who was it that was actually
14   assigning the cases to the investigators like
15   yourself?
16              MR. McALLISTER:  Objection.
17   BY THE WITNESS:
18        A.   The only name I recall is Theresa Bishop.
19   I -- I -- I guess she would review the referrals, and
20   then -- I got a lot from her.  I don't know if I was,
21   like, assigned to her, like my team, or it's -- but
22   I just -- she's the only person I remember because,
23   again, I only met her once or twice, and the other
24   people I never met, so I just don't remember their
25   names.
```



```
 1   BY THE WITNESS:
 2        A.    Yes.
 3   BY MR. TSONIS:
 4        Q.    Sorry, what was that?
 5        A.    Yes.
 6        Q.    Okay.  And if you were working from home,
 7   would you similarly have flexibility as to when you
 8   would start your day?
 9             MR. McALLISTER:  Objection.
10   BY THE WITNESS:
11        A.    There was flexibility, but you had to --
12   you always had to show a reason, you know.  You -- you
13   couldn't just sign in at 7:00 just because you felt
14   like it.
15   BY MR. TSONIS:
16        Q.    But did you have a scheduled start time?
17   For example, when, you know, in -- after the COVID
18   changes occurred and you were working from home, you
19   were working from home each day, right?
20        A.    Right.
21        Q.    Did you have a scheduled start time?
22        A.    I don't recall a scheduled start time.  The
23   general time was -- which was spoken was 8:00, but
24   again, if there were appointments or if you needed to
25   work, you thought you were going to have to work
```



1    later, they would recommend that you would start

2    later.  If you needed to be somewhere early in the

3    morning, they were okay with you signing in at, like,

4    7:00.  So if I -- if I wanted to be in Staten Island,

5    I would have to start a little bit earlier just

6    because of the commute.

7        Q.    Right.  And if you started a little earlier

8    or you started a little later, you didn't need to,

9    like, get approval from your supervisor, right?

10       A.    No, you didn't have to get approval, but

11   you did -- you did make them aware if it was -- if

12   it -- if the start time -- I mean, I don't -- I never

13   started at 6:00, you know, but like I said, my -- my

14   start time was between 7:30 and 8:00, so I never had

15   to reach out and get approval because it was within,

16   you know, I guess, their normal expectancy of where

17   you should be as far as starting.

18       Q.    Right.  And using that example, I guess, if

19   you're schedule to start at 7:30, you could choose, if

20   you wanted to, to start at 7:45 that day, right?

21       A.    Right.  It's sometimes, yeah, you -- you

22   didn't have to start on the hour or the half hour.  It

23   could be an even unexpected start time where, you

24   know, I could be sipping a cup of coffee and the, you

25   know, phone rings, and it's somebody that I've been



1      Q.    Okay.  So, Mr. Brust, I'm going to mark the

2  document that I'm -- that you've downloaded and you're

3  looking at now as Exhibit 1.

4           MR. TSONIS:  And for the record, it bears

5  the Bates label of G000028 through G000043.

6  BY MR. TSONIS:

7      Q.    Have you seen this document before?

8      A.    Yes.

9      Q.    And what is the document?

10     A.    This document outlines, you know, the

11  compensation given to us by Geico, you know, pay,

12  time, salary, and how we're --

13     Q.    And do you see this --

14     A.    Yeah.

15     Q.    On the bottom on the left-hand side, do you

16  see the words Human Resources Associate Handbook?

17     A.    Yes.

18     Q.    As a Geico employee, were you aware that

19  Geico maintained an associate handbook?

20     A.    Yes.

21     Q.    And you understood that that associate

22  handbook contained Geico's policies with respect to

23  various parts of your employment?

24     A.    Yes.

25     Q.    All right.  And one of those portions was



1  compensation?

2      A.   Yes.

3      Q.   All right.  And Geico's policies with

4  respect to timekeeping, for example, would also be

5  included in its associate handbook?

6      A.   Yes.

7      Q.   Did you receive an associate handbook when

8  you started working with Geico?

9      A.   I did.

10      Q.   All right.  And when you received the

11  handbook, did you read it?

12      A.   Yes.

13      Q.   All right.  And Geico requires its

14  employees to sign an acknowledgement stating that they

15  read -- read and understood the policies in the

16  associate handbook, right?

17      A.   Yes.

18      Q.   All right.  And did you complete an

19  acknowledgement certifying that you read and

20  understood the policies in Geico's handbook?

21      A.   Yes.

22      Q.   If you turn to the page -- and so before

23  you do that, do the see on the bottom left-hand corner

24  this next to the words Human Resources Associate

25  Handbook, it says 11/17?



1        A.    Yes.

2        Q.    All right.  Does this -- does that indicate

3   to you that this handbook was the version that was in

4   effect in approximately November of 2017?

5        A.    Yes.

6        Q.    And recognizing that predates the start of

7   your employment with Geico, is it your understanding

8   that Geico would periodically update its associate

9   handle book?

10        A.    Yes.

11        Q.    All right.  And typically when it updates

12   an associate handbook, does it include the date on

13   which the handbook was updated in that location?

14        A.    Yes.

15        Q.    All right.  Now, if you turn to the page

16   that ends -- so that letter G and series of numbers,

17   the page that ends with 0038.

18        A.    38?

19        Q.    Let me know when you're there.

20        A.    Okay.

21        Q.    Do you see at the bottom of that page in

22   the bold letters there, there's a heading that says

23   Overtime Eligibility?

24        A.    Yes.

25        Q.    All right.  And if you turn to the next



1  getting flood claims from" -- you know, whatever,

2  whatever hurricane it is, and you -- "you can handle

3  this on overtime."

4         So we would do our regular work, and then

5  you volunteered.  So the overtime that we were getting

6  was not even to work on our own cases; it was to work

7  on these additional claims through catastrophe.

8      Q.   All right.  Is what you're referencing cat

9  pay?

10     A.   Correct.  Correct.

11     Q.   All right.  And setting cat pay aside, were

12 there periods of time where overtime was authorized

13 when you worked at SIU?

14     A.   Yes.

15     Q.   When was that?

16     A.   I don't remember, but I -- it didn't last

17 very long.  I'm going to say it lasted, you know,

18 maybe a month or two, and then maybe it popped up

19 again.  For whatever reason, they said, you know,

20 there's some overtime, but it was very rare.

21     Q.   Okay.  And we'll get to those periods of

22 time in a moment here, but when you would have these

23 conversations with Gerry Cassagne, would Gerry

24 Cassagne explore alternative ways to help you catch

25 up, for example, stop you from catching cases?



1      A.   He would stop us from catching cases, but

2  that would be, you know, one day a month, if that.

3      Q.   Well, if you reached a certain number of

4  cases assigned during the course of a month, wouldn't

5  Gerry Cassagne have the ability to stop you from

6  catching cases for the remainder of that month?

7           MR. McALLISTER:  Objection.

8  BY THE WITNESS:

9      A.   Yes.

10  BY MR. TSONIS:

11     Q.   Okay.  And similarly, he might be able to

12  shift workload to, for example, taking one or more of

13  your cases and giving them to another investigator?

14           MR. McALLISTER:  Objection.

15  BY THE WITNESS:

16     A.   He would never take cases from me.  He

17  would just take me off the catching for the day, which

18  would, in turn, result in the other investigators

19  catching more cases.

20  BY MR. TSONIS:

21     Q.   Right.  But you didn't have an

22  understanding at any given time of how many cases each

23  investigator was assigned?

24     A.   I never paid attention.  There was a way to

25  look it up, but I never paid attention to who caught



1  BY THE WITNESS:

2       A.    That's correct.

3  BY MR. TSONIS:

4       Q.    Okay.  If you, for example, you know, got

5  stuck in traffic or had an EUO that ran long, and you

6  worked two extra hours on Monday, one option would be

7  cutting two hours from a different shift, right?

8       A.    That, that wasn't really exposed to until,

9  like, the end of my -- I didn't hear about that until,

10 like, maybe my last few months.  I forget what they

11 called it, but, like, you could if you worked, like

12 I said, an extra two hours, you could end -- on

13 Thursday, you could work two hours less on Friday.

14           But it wasn't about the -- you know, you

15 didn't -- you -- even if you did work an extra two

16 hours, you wouldn't want to work less than hours on a

17 Friday because you had too much work, you know.  It's

18 just -- it was all about time, you know.

19           It -- and, again, you know, have I worked

20 extra in -- no, I wouldn't take two hours less because

21 that actually hurts me in a way because I still have

22 work to do.

23      Q.    Right.  But you had an understanding, or is

24 your understanding of the concept that, you know, if

25 you work two hours more one day, you can cut two hours



1   from a subsequent shift, like flexing your time?

2        A.    That's what it's called, flex time.  Yeah,

3   so flex time, I didn't become aware of that until

4   probably -- it was probably maybe -- maybe my last

5   year in Geico, and I was working two hours every --

6   extra every day, so that means I would have off every

7   Friday if I -- if I did that, you know?

8           So I didn't really pay attention to the

9   flex time.  It didn't -- it didn't work for me because

10  I'm working extra so I could do the work.  I'm not --

11  I wasn't working extra so I could take a day off.

12       Q.    Okay.  And going back to the conversation

13  with your supervisors, Toni D'Agata and Gerry

14  Cassagne, you never told them how many hours extra

15  you're working that you're claiming now, right?

16          MR. McALLISTER:  Objection.

17  BY THE WITNESS:

18       A.    I have told Gerry that I do about two hours

19  every day and on the weekends I would do about two

20  hours on Saturday, two hours on Friday.  You know, it

21  was between four to five hours on the weekend.  He

22  knew.  I definitely told him.

23  BY MR. TSONIS:

24       Q.    All right.  So you're claiming that you

25  told Gerry Cassagne specifically how much time you





ALBERT BRUST                                        January 15, 2025
KEITH FISCHER v GEICO                                          235

1    chart of the days that you would have requested to

2    have taken off your Workday?

3         A.    Yes.

4         Q.    All right.  And some of these are, like,

5    vacation time, some are floating holidays, some are

6    care time?

7         A.    Yes.

8         Q.    Is care time sick days?

9         A.    Yes.

10        Q.    And if you scroll a little further, you see

11   there are some sick entries.

12              Is it your understanding that at some point

13   in, you know, 2021, 2022, Geico switched from calling

14   sick time "sick time" and started calling it "care

15   time"?

16        A.    Yes.

17        Q.    All right.  And if you lastly go to the

18   page that ends in 5158.

19        A.    Okay.

20        Q.    The very first row, do you see the document

21   listed there is Acknowledgement of Receipt of Policies

22   and Availability of Handbooks?

23        A.    Yes.

24        Q.    All right.  And it shows that you signed

25   this acknowledgement, if you look to the right, the



1   second-to-last column on, approximately on or about

2   September 17, 2019, at 1:17 p.m.?

3       A.    Yes.

4       Q.    All right.  And you -- you certified that

5   by clicking submit, you acknowledge that you received

6   and familiarized yourself with the policies found in

7   the associate handbook?

8       A.    Yes.

9       Q.    All right.  And you agree to abide by

10  Geico's terms, requirements, and conditions as

11  expressed in the employee handbook?

12      A.    Yes.

13      Q.    And you understood that violating any of

14  the policies in the associate handbook might result in

15  disciplinary action up to and including termination of

16  employment?

17      A.    Yes.

18      Q.    All right.  Thank you.  You can set that

19  aside.  I'm going to mark another document as an

20  exhibit.  oh, I apologize.  I don't know what I just

21  did.  I think I tried to take a screen shot.

22          (Whereupon, Brust Exhibit 10 was presented.)

23  BY MR. TSONIS:

24      Q.    I just posted it to the chat.  I believe

25  this should be Exhibit 10.  Let me know when you have



```
 1                    COURT REPORTER:  I think this is 12.

 2                    MR. McALLISTER:  We're on Exhibit 12.

 3                    MR. TSONIS:  This will be marked as

 4    Exhibit 12.  For the record, it's the Bates --

 5    document Bates stamped G000191 to 235.

 6                    (Whereupon, Brust Exhibit 12 was presented.)

 7    BY MR. TSONIS:

 8         Q.    Do you see this document, Mr. Brust?

 9         A.    I have it pulled up.

10         Q.    All right.  And do you recognize this

11    document?

12         A.    Yes.

13         Q.    And what document -- what is this document?

14         A.    This is a -- the human resource associate

15    handbook.

16         Q.    Okay.  So do you see -- do you recognize

17    this is another version of the associate handbook?

18         A.    Yes.

19         Q.    All right.  And similarly, if you look at

20    the bottom left, do you see that there's a date that

21    says 7/23?

22         A.    Yes.

23         Q.    Do you recognize this is a version that

24    would have been implemented on or about July of 2023?

25         A.    Yes.
```



ALBERT BRUST                                              January 15, 2025
KEITH FISCHER v GEICO                                                  262

 1        Q.    All right.  If you flip to the page that
 2    ends in 195.
 3        A.    Okay.
 4        Q.    And you see that there's a section with --
 5    the big heading that says Classifications of
 6    Associates?
 7        A.    Yes.
 8        Q.    And do you see underneath that there's a
 9    Non-Exempt Associates, a subheading?
10        A.    Yes.
11        Q.    And then if you look at the second
12    paragraph that starts with the bolded line, do you see
13    that it says, "Non-exempt associates are never allowed
14    to work," quote, "off the clock," closed quotes?
15        A.    Yes.
16        Q.    So you understood that Geico's policy is
17    that non-exempt associates are never allowed to work
18    off the clock?
19        A.    Yes.
20        Q.    All right.  And you understood that working
21    off the clock violates company policy and could result
22    in disciplinary action up to and including termination
23    of employment?
24        A.    Yes.
25        Q.    All right.  And then if you look forward,



1    you understood that associates also must not work

2    during an off-duty meal or rest period?

3        A.    Yes.

4        Q.    All right.  So if you look at that page

5    that ends in 196, the last paragraph there in the

6    section we've been looking at says, "No officer,

7    manager, or supervisor may require, encourage, or

8    suggest that a non-exempt associate work off the

9    clock.  Any associate who works off the clock or

10   believes they are being asked to work without

11   recording time or being properly compensated for time

12   worked must immediately contact associate relations or

13   the Berkshire Hathaway ethics hotline about the

14   matter."

15            Do you see that?

16       A.    Yes.

17       Q.    Just to -- to be clear, you've never

18   contacted the associate relations or Berkshire

19   Hathaway ethics hotline about a supervisor requiring

20   or encouraging or suggesting that you work off the

21   clock?

22       A.    No.

23       Q.    All right.  And you never similarly

24   contacted the -- either of those, the associate

25   relations or the Berkshire Hathaway ethics hotline



1   anything for the record?

2           COURT REPORTER:  Just to confirm orders for

3   the transcript.

4           MR. TSONIS:  We'll do an electronic

5   transcript only.

6           THE VIDEOGRAPHER:  Okay.  Thank you.  This

7   will conclude today's videoconference deposition of

8   Albert Brust taken on January 15th, 2025, at 4:44 p.m.

9   Central Time.

10          (Whereupon, the proceedings concluded.)

11            FURTHER DEPONENT SAITH NOT

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1   STATE OF ILLINOIS      )
                           ) SS:
2   COUNTY OF C O O K      )

3

4        I, ANDREW R. PITTS, C.S.R. within and for the

5   County of Cook and State of Illinois, do hereby

6   certify that heretofore, to wit, on Friday the 15th

7   day of January, 2025, personally appeared before me

8   via videoconference, ALBERT BRUST, in a cause now

9   pending and undetermined in the United States District

10  Court, For the Eastern District of New York, wherein

11  KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS

12  PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE

13  JONES, individually and on behalf of all others

14  similarly situated are the Plaintiffs, and GOVERNMENT

15  EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the

16  Defendant.

17       I further certify that the said witness was

18  first duly sworn to testify to the truth, the whole

19  truth and nothing but the truth in the cause

20  aforesaid; that the testimony then given by said

21  witness was reported stenographically by me in the

22  presence of the said witness remotely via

23  videoconference, and afterwards reduced to typewriting

24  by Computer-Aided Transcription, and the foregoing is

25  a true and correct transcript of the remote
```



1  videoconference testimony so given by said witness as

2  aforesaid.

3        I further certify that the signature to the

4  foregoing deposition was reserved by counsel for the

5  Deponent.  I further certify that the taking of this

6  deposition was pursuant to Notice, and that there were

7  present via videoconference at the deposition the

8  attorneys hereinbefore mentioned.

9        I further certify that I am not counsel for nor

10  in any way related to the parties to this suit, nor am

11  I in any way interested in the outcome thereof.

12        IN TESTIMONY WHEREOF:  I have hereunto set my

13  hand and affixed my seal this 22nd day of January,

14  2025.

15  *Andrew R. Pitts*

16  _____

17  ANDREW R. PITTS, CSR, RPR

18  CSR, COOK COUNTY, ILLINOIS

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com