# EXHIBIT 15

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3           FOR THE EASTERN DISTRICT OF NEW YORK

 4

 5   KEITH FISCHER, MICHAEL O'SULLIVAN, )
     JOHN MOESER, LOUIS PIA, THOMAS    )
 6   BARDEN, CONSTANCE MANGAN, and     )
     CHARISE JONES, individually and on )
 7   behalf of all others similarly     )
     situated,                          )
 8                                       )
                    Plaintiffs,          ) Case No.
 9                                       ) 2:23 Civ. 2848
                vs.                      ) (GRB)(ARL)
10                                       )
     GOVERNMENT EMPLOYEES INSURANCE      )
11   COMPANY d/b/a GEICO,                )
                                         )
12                  Defendant.           )
     ------------------------------------)

13

14

15

16        * CONTAINS CONFIDENTIAL PORTIONS *

17

18      VIDEOTAPED DEPOSITION OF JOHN E. MOESER

19               Garden City, New York

20              Friday, August 2, 2024

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. J11541506
```



1

2

3

4                    August 2, 2024

5                    11:04 a.m.

6

7

8            Videotaped Deposition of JOHN E.

9    MOESER, held at the offices of Esquire

10   Deposition Solutions, 1225 Franklin Avenue,

11   Garden City, New York, before Kristin Koch, a

12   Registered Professional Reporter, Registered

13   Merit Reporter, Certified Realtime Reporter

14   and Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25



1

2  A P P E A R A N C E S:

3

4      OUTTEN & GOLDEN LLP

5      Attorneys for Plaintiffs

6          685 Third Avenue

7          New York, New York 10017

8      BY:   MICHAEL J. SCIMONE, ESQ.

9          SABINE JEAN, ESQ.

10

11

12     DUANE MORRIS LLP

13     Attorneys for Defendant

14         1540 Broadway

15         New York, New York 10036

16     BY:   MARIA CACERES-BONEAU, ESQ.

17         GREGORY SLOTNICK, ESQ.

18         - and -

19         190 South LaSalle Street

20         Chicago, Illinois 60603

21     BY:   TIFFANY E. ALBERTY, ESQ. (Via Zoom)

22

23  ALSO PRESENT:

24  JONATHAN JUAREZ, Videographer

25  SAMANTHA JACOBSON, GEICO (Via Zoom)



```
 1                    J. Moeser

 2         THE VIDEOGRAPHER:  We are now on the

 3    record.  My name is Jonathan Juarez.  I am a

 4    legal videographer for Esquire.

 5         Today's date is August 2nd, 2024, and

 6    the time is 11:04 a.m.  This deposition is

 7    taking place at 1225 Franklin Avenue,

 8    Garden City, New York, in the matter of

 9    Keith Fischer versus Government Employees

10    Insurance Company.  The deponent is John

11    Moeser.

12         Counsel, please, identify yourselves

13    for the record.

14         MS. CACERES-BONEAU:  Maria

15    Caceres-Boneau on behalf of GEICO.

16         MR. SLOTNICK:  Greg Slotnick on behalf

17    of GEICO as well.

18         MR. SCIMONE:  Michael Scimone with

19    Outten & Golden on behalf of plaintiffs.

20         MS. JEAN:  Sabine Jean, Outten &

21    Golden, on behalf of plaintiffs.

22         THE VIDEOGRAPHER:  The court reporter

23    is Kristin Koch and will now swear in the

24    witness.

25              *     *     *
```



```
 1                       J. Moeser
 2    J O H N   E.   M O E S E R,
 3          called as a witness, having been duly sworn
 4          by a Notary Public, was examined and
 5          testified as follows:
 6    EXAMINATION BY
 7    MS. CACERES-BONEAU:
 8          Q.    Could you state and spell your name for
 9    the record.
10          A.    John Moeser, M-O-E-S-E-R.
11          Q.    And what is your current address?
12          A.    18 Red Maple Road, Ridge, New York.
13          Q.    My name is Maria Caceres-Boneau and I
14    will be taking your deposition today.  I will be
15    asking a series of questions and what you will do
16    today is provide truthful responses to the
17    questions.  My questions and your answers will be
18    recorded by the court reporter and obviously by
19    the videographer as well.  Because the court
20    reporter is recording us, it's important that we
21    answer verbally and rather than with uh-huhs and
22    uh-uhs, like yes, no, verbally.  Do you understand
23    that?
24          A.    Yes.
25          Q.    Great.  Also, because the court
```



```
 1                       J. Moeser
 2   figures, but some people were saying that they
 3   were catching well over 50, 60 cases a month.
 4              MR. SCIMONE:  We have been going for
 5        about an hour and a half.  Can we take a
 6        break?
 7              MS. CACERES-BONEAU:  Yeah, sure.  It's
 8        a good time.
 9              THE VIDEOGRAPHER:  The time right now
10        is 12:35 p.m. and we are off the record.
11              (Lunch recess was taken from 12:35 to
12        1:25.)
13              THE VIDEOGRAPHER:  The time right now
14        is 1:25 p.m. and we are back on the record.
15   CONTINUED EXAMINATION BY
16   MS. CACERES-BONEAU:
17        Q.    Thank you.  So when you were employed
18   at GEICO, did you receive any employee handbooks?
19        A.    I believe when I first started, yes.
20        Q.    And do you recall whether the employee
21   handbook had any discussions about your
22   compensation?
23        A.    You mean as far as my salary was
24   concerned?
25        Q.    Anything related to how your
```



                            J. Moeser

1    compensation would be determined.

2         A.    I don't know if it did or not.

3         Q.    Did it have anything related to

4    recording your hours worked?

5         A.    I don't know if the handbook had it,

6    no.

7         Q.    So you said you received a handbook

8    when you were hired.  Did you receive a handbook

9    every year after that?

10        A.    A handbook?  No.

11        Q.    Did you receive any company policies

12   related to documenting your hours worked?

13        A.    There may have been some e-mails that

14   were given out or maybe during a meeting or

15   something, but I don't recall them.

16        Q.    Did you have any -- let me rephrase

17   this.

18        Did you have an annual policies and

19   acknowledgment training?

20        A.    Yes.  Well, no, it wasn't training.  It

21   was the form that you gave out -- well, I guess it

22   was training, because you had to review certain

23   things online or -- and you would sign off on it,

24   yeah.



```
 1                        J. Moeser
 2        Q.    And would they test your knowledge on
 3   some of the things that they would train you on?
 4        A.    What do you mean "test your knowledge"?
 5        Q.    Did they have any kind of questions and
 6   answers?  Or let me rephrase it.
 7              Were there any times that you were
 8   required to answer a prompt during this training?
 9        A.    Yes, there were videos that we reviewed
10   with questions on it, yeah.
11        Q.    And those questions were related to the
12   content of the videos?
13        A.    The ones I can remember, yeah.
14        Q.    Do you remember whether or not any of
15   that content was related to how to record your
16   hours?
17        A.    I don't remember any of those.
18        Q.    Do you recall whether or not this --
19   was this training -- was this training on Workday?
20        A.    I don't -- I don't know if it was on
21   Workday, no.  I think it was something separate.
22        Q.    Okay.  And --
23        A.    Oh, wait, I think you had to -- I think
24   you had to submit it through Workday or something.
25        Q.    Okay.  And do you recall acknowledging
```



 1                          J. Moeser

 2   "all exempt associates," so that does not apply to

 3   you; right?  So we move on to the --

 4        A.    Well, at one time I was considered an

 5   exempt employee.

 6        Q.    From -- but not at GEICO?

 7        A.    Yes, at GEICO.

 8        Q.    What period was that when you were

 9   considered an exempt employee?

10        A.    I think they changed my status after

11   the results of the second lawsuit that came

12   through.  I don't know the exact date, but I know

13   we got changed from exempt to non-exempt.

14        Q.    And during the course of this since

15   2016, you were considered exempt?

16              MR. SCIMONE:  Objection.

17        A.    I think I was considered non-exempt.

18        Q.    Non-exempt.  Okay.  So from 2016 until

19   your last day at GEICO, you were a non-exempt

20   employee, is that what you believe to be correct?

21        A.    What I believe, yes.

22        Q.    Okay.  So the third sentence says:  A

23   nonexempt associate who feels he/she did not

24   receive pay for all his or her hours worked and an

25   exempt or salaried nonexempt associate who feels



```
 1                         J. Moeser
 2    his or her pay incorrectly reflects a deduction
 3    for an absence should contact his or her
 4    supervisor, local human resources manager or
 5    corporate human resources.
 6             Do you see that there?
 7        A.    Yes.
 8        Q.    And since you were a non-exempt
 9    employee, you were eligible for overtime; right?
10        A.    Yes.
11        Q.    Now, you were required to accurately
12    record your hours; right?
13             MR. SCIMONE:  Objection.
14        A.    Yes.
15        Q.    Did you get training on this policy?
16        A.    Not that I can recall.
17             MS. CACERES-BONEAU:  This we are going
18        to mark as Exhibit 5.
19             (Moeser Exhibit 5, Document Produced
20        Natively, spreadsheet Bates stamped G004289,
21        marked for identification.)
22        Q.    Okay.  So this here is a training
23    history log.
24        A.    Uh-huh.
25        Q.    And flipping the first page -- one,
```



```
 1                        J. Moeser
 2   wanted you to follow.
 3        Q.    Would that include recording your hours
 4   accurately?
 5             MR. SCIMONE:   Objection.
 6        A.    Again, I don't -- I don't remember that
 7   being part of any of these courses that I took.
 8        Q.    Did you -- let's move to the next row.
 9   It says it's a training on January 6, 2017,
10   related to SIU Investigative Expectations
11   E-Learning Course.  Do you recall that training?
12        A.    No.  That's --
13        Q.    It also indicates that you passed it;
14   correct?
15        A.    Yes.
16        Q.    The next training that I'm looking at
17   is the following row.  It was completed on April
18   5th, 2017, 2017 Policies & Acknowledgments.  Do
19   you recall this training?
20        A.    Not the particulars of it, no.
21        Q.    It indicates here that you passed;
22   correct?
23        A.    Yes.
24        Q.    Do you recall taking Policies &
25   Acknowledgments trainings, though, even if it's
```



```
 1                        J. Moeser
 2    not just a specific one?
 3         A.    Like I stated, I -- I took them once a
 4    year, I believe.
 5         Q.    Okay.  And moving on to -- the next one
 6    is -- it was a training that was completed on June
 7    6, 2017.
 8         A.    Okay.
 9         Q.    And it says Workday Worker Self Service
10    eLearning.  Do you recall this training?
11         A.    I don't recall the contents of the
12    training.
13         Q.    What was Workday used for?
14         A.    Workday was the program that they
15    started to report your hours worked, vacation
16    time, you could track your sick time history.  I
17    don't know what else it was used for.  That's all
18    I used it for.
19         Q.    And how do you use Workday?
20         A.    You mean when you log in?
21         Q.    Yes.
22         A.    You would log in and it had various
23    boxes that you could, you know, enter figures
24    into.
25         Q.    And the figures are the time that you
```



```
 1                       J. Moeser
 2    worked?
 3         A.    Would be the hours that I worked, yeah.
 4         Q.    I am going to scroll -- move down three
 5    more rows --
 6         A.    Okay.
 7         Q.    -- to a training that was completed on
 8    November 24, 2017.
 9         A.    Claims Code of Conduct.  Okay.
10         Q.    Claims Code of Conduct E-Learning
11    Course, do you see that?
12         A.    Yes.
13         Q.    Do you recall this training?
14         A.    Again, I don't recall the contents of
15    this training.
16         Q.    Then if we move on to the next page,
17    the very top row there is a training that was
18    completed on April 24th, 2018.
19         A.    Right.
20         Q.    And this one is for the 2018 Policies &
21    Acknowledgments.  Do you see that there?
22         A.    Yes.
23         Q.    And it says that you passed this
24    training; right?
25         A.    Yes.
```



```
 1                        J. Moeser
 2        Q.    And pardon the repetitiveness, but do
 3   you recall this training, taking this training?
 4        A.    Well, it's obvious I took the training,
 5   but I don't recall the contents of it.
 6        Q.    Let me go down to -- if you continue
 7   down, there is a 2019 Policies & Acknowledgments
 8   training that was completed on May 9th, 2019.  Do
 9   you see that?
10        A.    Okay.  Right, policies &
11   Acknowledgments.  Okay.
12        Q.    Yes.  And this training here, it says
13   that you also passed this training; right?
14        A.    Yes.
15        Q.    Do you have any reason to believe that
16   you didn't pass it?
17        A.    No.
18        Q.    I am going to the last page.
19        A.    Okay.
20        Q.    We have on this -- the first row it
21   says Welcome to Workday Learning at GEICO.
22        A.    Right.
23        Q.    And you see that; right?  It says the
24   training was completed on May 4th, 2020.  Do you
25   see that?
```



```
 1                      J. Moeser

 2      A.    Yes.

 3      Q.    Did you always get paid for that time

 4   that you entered in Workday?

 5      A.    Yes.

 6      Q.    Let's look at the declaration.  There

 7   is paragraph numbers on the left side.  And let's

 8   move to paragraph number 8, which is -- starts on

 9   the second page.

10      A.    Uh-huh.

11      Q.    If you read paragraph 8, it states:  "I

12   only entered 7.75 hours per day, regardless of how

13   many hours I actually worked.  I did not enter

14   more hours into the timekeeping system as my

15   supervisor said doing so would affect my rating,

16   giving me a poor evaluation and negatively

17   effecting my potential for an annual pay

18   increase."

19            What supervisors told you that?

20      A.    The supervisors that I mentioned

21   before.

22      Q.    So who were they?

23      A.    It would have been April Neyland, it

24   would have been Rich Kiligin, it would have been

25   Tony Mazzotti.  I guess I don't know if that was
```



                          J. Moeser

1
2    you were receiving?

3         A.    Because we were told, okay, when I mean

4    "we," I mean other investigators during meetings,

5    that since we are working from home, that due to,

6    like you said before, no windshield time, that you

7    should be able to handle more cases being assigned

8    to you.

9         Q.    Now, during COVID there was -- I mean,

10   in New York we were shut down, right, that's why

11   you were working from home.

12        A.    Uh-huh.

13        Q.    Now, weren't there less cars out on the

14   road during COVID?

15        A.    I couldn't tell you.

16        Q.    Do you know whether any other employees

17   asked for approval to work more than 38.7 hours in

18   a week?

19        A.    I wouldn't know that, no.

20        Q.    Do you know -- sorry.  Do you know

21   whether any employees outside of Long Island were

22   ever approved to work more than 38.7 hours in a

23   week?

24        A.    What do you mean by --

25        Q.    Do you want me to repeat it?



                              J. Moeser

1

2        A.    What do you mean by outside Long

3    Island?  Did they live outside Long Island or

4    were they working outside Long Island?  I don't --

5        Q.    So do you know whether any employees

6    who were working outside of the five boroughs and

7    Long Island that were ever approved to work more

8    than 38.75 hours in a week?

9        A.    Do you mean the people who worked in

10   the upstate team?

11       Q.    Sure, yes.

12       A.    Because that's who it would be.

13       Q.    Okay, yes.

14       A.    I don't know what they submitted for

15   overtime.

16       Q.    Okay.  I am going to call them the

17   upstate team.  That's what you call them?

18       A.    Well, that's how they -- the upstate

19   team and the Downstate team, so...

20       Q.    Thank you.  Do you know whether any

21   employees outside of your region were ever

22   approved to work more than 38.75 hours?

23       A.    I wouldn't know that.

24       Q.    Now, we established earlier that you

25   were eligible for overtime as a non-exempt



```
 1                      J. Moeser
 2   know, someplace like an EUO center or something,
 3   but I wouldn't take my laptop to do scene
 4   canvasses in Brooklyn or something, no.
 5        Q.    So when you would be in a scene
 6   canvass, did you carry a notebook of some sort
 7   where you would note?
 8        A.    Oh, you mean to document what I did?
 9        Q.    Yes.
10        A.    I -- a lot of times what I would do is
11   that I -- I would print out the cover sheet of the
12   referral.  A lot of people didn't do that.  I did.
13   And I would use just like a single piece of paper
14   and just write notes on it, and then when the case
15   was over with, I would destroy that.  They didn't
16   want you to keep records.
17        Q.    You referred -- let me look here.  In
18   the -- so in the Complaint there is a reference to
19   special investigators.  Do you know what titles
20   special investigators means or what titles
21   would -- what job titles would be encompassed
22   within the special investigators?
23        A.    It's my understanding that's what we
24   all were, special investigators.
25        Q.    So that's senior field investigators
```



JOHN E. MOESER  Confidential                    August 02, 2024
Keith Fischer, et al. vs GEICO                            188

```
 1                    J. Moeser
 2   and which other titles?
 3        A.    I guess it was anybody who was assigned
 4   to the SIU, Special Investigations Unit.
 5        Q.    Do you know if you were all working the
 6   same types of claims?  Actually, do you know if
 7   you were all working the same types of referrals?
 8        A.    No, we weren't.  Like I explained
 9   before, we had different teams that would handle
10   different referrals.  But prior to being split up
11   in specialty teams, there was a time that we used
12   to handle all different referrals, everybody, you
13   know.
14        Q.    Do you know if internal security
15   investigators were permitted to flex their time?
16        A.    I wouldn't know that.
17        Q.    Do you know if field medical fraud
18   investigators were permitted to flex their time?
19        A.    If they were -- again, in their medical
20   team I know some of them that worked there and
21   they had the same status as I did, but I don't
22   know if there were other people in the medical,
23   because they came in later on when they split the
24   unit, and I really didn't know a lot of them.  I
25   don't know what their title was as far as inside
```



```
 1                    J. Moeser
 2  or field, so I don't know how their pay went as
 3  far as flex time or flexible hours or anything
 4  else, but some of the people that worked there
 5  used to be in the auto team, so they were still
 6  categorized the same way I was.
 7       Q.    Do you know if any major case SIU
 8  investigators were permitted to flex their time?
 9       A.    I don't know, no.
10       Q.    Do you know if lead security
11  investigators were permitted to flex their time?
12       A.    I -- I don't know if they were inside
13  if they were permitted to flex or have flexible
14  hours.
15       Q.    Did you personally see other
16  investigators in your region doing work?
17       A.    What do you mean "doing work"?
18       Q.    Did you personally see them
19  investigating cases?
20       A.    Yeah.  Yeah.  I mean, I would run into
21  them from time to time.
22       Q.    Did you all ever work on cases
23  together?
24       A.    They wouldn't have a case that I was
25  assigned.  They may have a sister case or similar
```



```
 1                        J. Moeser
 2   underwriting claims or something to that effect,
 3   but...
 4        Q.    Do you know if investigators outside of
 5   Region 2 were able to flex their time?
 6        A.    Again, if they were field
 7   investigators, I'm assuming that if it's for one
 8   region it's for all regions, I mean, GEICO's
 9   policies.  I mean, it's a very large company.  I'm
10   assuming that they just -- each region field
11   investigators were deemed the same as me.  I don't
12   know.
13        Q.    Do you know if investigators outside of
14   Region 2 worked overtime?
15        A.    I wouldn't know that.
16        Q.    Do you know if investigators outside of
17   Region 2 had the same performance metrics as you?
18        A.    I believe they -- the reason -- some of
19   the reasons why they changed the metric system was
20   to get all the regions on the same page or be
21   rated the same way, but I don't know if that was
22   true or not.  I don't know if they could do it
23   that way.  Because they handled different cases
24   than we did, you know, some of them.  So I don't
25   know how they rated them in other regions, but I
```



 1                    J. Moeser

 2  know the goal was to put everybody on the same

 3  page, and I don't know if it worked or not.  I

 4  don't think it did.  So I don't know how they got

 5  rated.

 6        Q.    Did you have access to the referral

 7  files of investigators outside of Region 2?

 8        A.    I could look up their cases, yes.

 9        Q.    Could you -- how would you know that it

10  was -- they were outside of Region 2?

11        A.    They would -- by the area where they

12  were assigned.  I mean, when you -- when I

13  searched the name, it would pop up like my area,

14  and I believe -- at one time my area was

15  Nassau/Suffolk and then it got changed to another

16  where Rich Kiligin was there.  It wasn't upstate,

17  but it was another region that they -- another

18  area in the region that they had me with, but you

19  would find out that, okay, I am contacting you and

20  you are from California, well, then that's region

21  so and so.  You know, I don't know the areas or

22  the regions or anything, but it would pop up what

23  area that you were working in.

24        Q.    Could you look up a name of an

25  investigator and see what their workload was that



```
 1                          J. Moeser

 2          produced in the case.

 3                  MS. CACERES-BONEAU:  Okay.

 4                  THE VIDEOGRAPHER:  The time right now

 5          is 6:35 p.m. and we are off the record.

 6                  (Time noted:  6:35 p.m.)

 7

 8

 9                       ---------------------

10                       JOHN E. MOESER

11

12

13   Subscribed and sworn to before me

14   this       day of               2024.

15

16   ----------------------------------------

17

18

19

20

21

22

23

24

25
```



1

2                  C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                         ) ss.:

6    COUNTY OF NASSAU     )

7

8            I, KRISTIN KOCH, a Notary Public

9        within and for the State of New York, do

10       hereby certify:

11           That JOHN E. MOESER, the witness

12       whose deposition is hereinbefore set forth,

13       was duly sworn by me and that such

14       deposition is a true record of the

15       testimony given by such witness.

16           I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage; and that I am

19       in no way interested in the outcome of this

20       matter.

21           IN WITNESS WHEREOF, I have hereunto

22       set my hand this 8th day of August, 2024.

23

24       _____

25           KRISTIN KOCH, RPR, RMR, CRR

