# EXHIBIT 16

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,
and CHARISE JONES, individually and on behalf of
all others similarly situated,

                      Plaintiffs,


      -against-            Case No.:
                          23-Civ-02848(GRB)(ARL)


GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a
GEICO,

                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -x

                December 13, 2024
                9:31 a.m.


EXAMINATION BEFORE TRIAL of GERRY CASSAGNE, a
Non-Party Witness herein, taken by the
Plaintiffs, held via Zoom, pursuant to Subpoena,
taken before DANIELLE DEYOUNG, a Shorthand
Reporter and Notary Public in and for the State
of New York.

            MAGNA LEGAL SERVICES
              (866) 624-6221



Page 2

```
2   A P P E A R A N C E S:
3
4           OUTTEN & GOLDEN LLP
               Attorneys for Plaintiffs
5            685 Third Avenue, 25th Floor
             New York, New York 10017
6
7           BY: HANNAH COLE-CHU, ESQ.
8
9           DUANE MORRIS LLP
               Attorneys for Defendant
10           190 South LaSalle Street, Suite 3700
                Chicago, Illinois 60603
11
12          BY: GREGORY TSONIS, ESQ.
13
14
15  ALSO PRESENT:
16  JARRON McALLISTER, OUTTEN & GOLDEN LLP
17
18
19
20
21
22
23
24
25
```



```
                                                           Page 3
 2                   S T I P U L A T I O N S
 3
 4              IT IS HEREBY STIPULATED AND AGREED, by
 5   and among counsel for the respective parties
 6   hereto, that the filing, sealing and
 7   certification of the within deposition shall be
 8   and the same are hereby waived;
 9              IT IS FURTHER STIPULATED AND AGREED that
10   all objections, except as to form of the
11   question, shall be reserved to the time of the
12   trial;
13              IT IS FURTHER STIPULATED AND AGREED that
14   the within deposition may be signed before any
15   Notary Public with the same force and effect as
16   if signed and sworn to before the Court.
17
18                       *      *      *
19
20
21
22
23
24
25
```



                                                              Page 4
 1                      G. CASSAGNE
 2     G E R R Y  C A S S A G N E, after having first
 3     been duly sworn by a Notary Public of the State
 4     of New York, was examined and testified as
 5     follows:
 6              THE COURT REPORTER:  State your
 7          name for the record, please.
 8              THE WITNESS:  Gerry Cassagne.
 9              THE COURT REPORTER:  State your
10          address for the record, please.
11              THE WITNESS:  35 Jasmine Lane,
12          Kings Park, New York 11754.
13     EXAMINATION BY
14     MS. COLE-CHU:
15          Q     Good morning, Mr. Cassagne.
16          A     Good morning.
17          Q     My name is Hannah Cole-Chu.
18     I'm an attorney representing the
19     Plaintiffs in this lawsuit.  With me is
20     Jarron McAllister, who also represents
21     the Plaintiffs.
22              For the record, can you please
23     state and spell your name.
24          A     Gerry Cassagne, G-E-R-R-Y,
25     Cassagne, C-A-S-S-A-G-N-E.



```
 1                G. CASSAGNE
 2      foundation, calls for speculation.
 3                    You can answer.
 4           A      It could be any, but this is
 5      also for AD, which is the auto damage
 6      people.  So this is for both -- this is
 7      for a couple of different units.  So this
 8      is not specific to SIU.
 9           Q      So is your answer, then,
10      you're not sure who "management" refers
11      to?
12               MR. TSONIS:  Objection, form,
13          mischaracterizes testimony.
14           A      Management, I believe, would
15      be supervisors and managers and above.
16           Q      Looking down farther under the
17      FAQ, the third bullet point, and the sub
18      point underneath that specifically reads:
19                    "Overtime has always been
20      available based on business need."  What
21      do you understand business need to mean
22      here?
23           A      If you need to do something
24      regarding your case -- or in this case, I
25      would assume AD do something, that was a
```



```
 1                  G. CASSAGNE
 2    business need which was -- needed to be
 3    done within the guidelines of the
 4    company, then it would be approved
 5    because it had to be done to handle
 6    either the investigation or the case
 7    correctly, to make sure things were done
 8    according to protocols.
 9          Q     Is it true, then, that if
10    there was not a business need, overtime
11    was not available?
12          MR. TSONIS:  Objection to form.
13                You can answer.
14          A     No.  Overtime was available if
15    the investigator explained to me why he
16    needed to do it on that specific case, it
17    would be approved.
18          Q     Did you have discretion to
19    approve overtime however you saw fit as a
20    supervisor?
21          A     I did not have the ability to
22    say -- like those ten hours a week thing,
23    it was preapproved ten hours a week per
24    investigator.  I was able to tell my
25    investigators that if you are working on
```



Page 189

1       G. CASSAGNE
2    progressive disciplinary process referred
3    to here?
4         A      I don't know anything about
5    that.  What we were told is if the
6    investigator worked the overtime, they
7    would get paid for it; they would just
8    have to send me documentation for why
9    they needed it on that specific case and
10   it would be approved.
11        Q      Do you know if supervisors
12   were subject to discipline if they had an
13   investigator working off the clock?
14        A      I was not.  I don't know
15   anything about it.
16        Q      Was the expectation generally
17   that investigators should complete their
18   work within the regular 38.75 hour work
19   week?
20        A      The investigators were --
21               Can you ask that again?
22        Q      Was it GEICO's expectation
23   that investigators should complete their
24   work within the regular 38.75 hour work
25   week?



Page 190

```
 1                    G. CASSAGNE
 2         MR. TSONIS:  Objection to form.
 3                   You can answer.
 4       A     The expectation was that they
 5   were supposed to handle their work within
 6   that time period, but if they needed the
 7   overtime to work on a specific case, they
 8   would let me know and I would approve it.
 9       Q     You've testified already that
10   you heard concerns from your
11   investigators, at least at one point,
12   regarding caseload.  I believe we were
13   talking about the June 2020 period when
14   caseload was high.
15              Were there other times during
16   the period that we are talking about,
17   from 2016 to the end of your time with
18   GEICO, where investigators raised
19   concerns about their workload being high?
20         MR. TSONIS:  Objection to form.
21                   You can answer.
22       A     I don't know specific dates
23   and times, but yes, I had complaints
24   about caseload -- not regularly, but I
25   did have complaints about caseload
```



Page 207

1              G. CASSAGNE
2    working off the clock?
3         A    No.
4         Q    Why not?
5         A    If he was working off the
6    clock, he would have had to tell me and
7    say, I had to work extra hours these
8    days, and I would have to approve so he
9    would get overtime.
10        Q    So you weren't aware of any
11   investigators working more than 38.75
12   hours a week off the clock?
13        A    No.  If they did so, they
14   would have to notify me for the approval
15   for overtime.
16        Q    So there's no instance where
17   an investigator worked more than 38.75
18   hours a week off the clock, you found out
19   about it, raised it with them, fixed it,
20   disciplined them, whatever needed to
21   happen?
22        A    No.
23        Q    Was there ever any instance
24   where you had concerns that off-the-clock
25   work might be happening and so you



Page 208

```
 1                    G. CASSAGNE
 2    investigated it?
 3         A      No.
 4         Q      In this e-mail, Lou Caniglia
 5    says:  "Most of the referrals I am
 6    receiving are not fraud cases."  What was
 7    your reaction to reading that?
 8         A      What he was talking about
 9    there was the referrals that were coming
10    in from that -- I believe from that
11    automated system, which spit out the
12    possible fraud cases based on the
13    parameters put into the computer.
14                So a lot of those -- not a lot
15    of them, but sometimes those cases would
16    come out and it may have thought that
17    there was a fraud indicator in there,
18    that ended up not being so, but it would
19    be looked at based on the referral from
20    the system.  Then the investigator would
21    have to investigate it, find out that
22    there wasn't, and then he would be able
23    to close the case at that point.
24         Q      Are you referring to VELM?
25         A      Yeah, it was VELM -- I believe
```



MAGNA LEGAL SERVICES

1                   G. CASSAGNE
2        A     This is an e-mail I sent to
3     the SIU supervisors.
4        Q     Under Topic 3, it says -- this
5     is just an excerpt of what it says.
6              Actually, let me step back.
7     The subject line of this e-mail is
8     "Meeting Agenda."  Do you know what
9     meeting this agenda pertains to?
10       A     This was probably a staff
11    meeting that we had coming up and this
12    was a meeting notice that we would have
13    used.
14       Q     So is the agenda content that
15    you plan on communicating to your
16    investigators?
17       A     Yes.
18       Q     All right.
19             Let's go back down to Topic
20    Number 3, which is called
21    Caseload/Overtime, and it says:  "Work
22    day is 7.75 hours.  If you work more than
23    7.75, overtime must be put in."
24             My question is:  What does
25    "overtime must be put in" mean?



Page 215

|   |   |
|---|---|
| 1 | G. CASSAGNE |
| 2 | A     If there was a situation, I |
| 3 | explained in the past, where you told me |
| 4 | you worked two hours extra on whatever |
| 5 | day, you have to put on your timesheet |
| 6 | that you didn't work 7.75, that you |
| 7 | worked 9.75.  So they had to put the |
| 8 | overtime in their timesheet before it was |
| 9 | sent to me for approval. |
| 10 | Q     I believe that we talked today |
| 11 | about timesheets -- your investigators |
| 12 | needing to submit timesheets before the |
| 13 | work week is done, correct? |
| 14 | A     There was the one incident |
| 15 | where if it came in on a Friday -- they |
| 16 | put them in every week, but then I had to |
| 17 | approve it every two weeks.  So at the |
| 18 | end of the second week on a Friday after |
| 19 | 1:00 p.m., if they were going to work |
| 20 | extra, that's when we had to do that |
| 21 | extra work for that overtime. |
| 22 | Q     So did the meeting that this |
| 23 | agenda is for actually happen? |
| 24 | A     I don't remember if it |
| 25 | happened.  I would guess it did, but... |



```
 1                    G. CASSAGNE
 2        Q     Do you remember -- so I am
 3   interested in you clarifying what "put
 4   in" means here in number three.  I just
 5   want to --
 6        A     Enter it into your timesheet.
 7   Enter the two hours or whatever overtime
 8   you did on that specific day into your
 9   timesheet.
10        Q     Topic 3 continues:  "Caseload
11   is not going down."
12              Next sentence:  "We cannot ask
13   for additional staff if we are handling
14   current caseload without overtime."
15              Had the investigators
16   attending these meetings expressed
17   concerns about caseload?
18         MR. TSONIS:  Form.
19              You can answer.
20        A     Yes.
21        Q     And why was that being
22   discussed in the context of overtime?
23         MR. TSONIS:  Objection, form,
24     calls for speculation.
25              You can answer.
```



Page 278

```
 1                    G. CASSAGNE
 2      Does the number of cases assigned to an
 3      investigator determine how much work is
 4      required for those cases?
 5           A     No.
 6              MR. TSONIS:  No further
 7      questions.  Thank you, Gerry.
 8              MS. COLE-CHU:  I don't have
 9      anything further.
10              MR. TSONIS:  We will reserve to
11      read and sign.
12                        (Whereupon, the
13                        examination of GERRY
14                        CASSAGNE was concluded at
15                        4:54 p.m.)
16
17                   _____
18                   GERRY CASSAGNE
19
20
21   Subscribed and sworn to
22   before me on this_____ day
23   of _____, _____.
24
     _____
25   Notary Public
```



Page 281

1        G. CASSAGNE
2        C E R T I F I C A T E
3
4        I, DANIELLE DeYOUNG, a Shorthand Reporter
5   and Notary Public of the State of New York, do
6   hereby certify:
7   That the WITNESS whose examination is
8   hereinbefore set forth, was duly sworn, and
9   that such examination is a true record of the
10  testimony given by such WITNESS.
11  I further certify that I am not related to any
12  of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15
16
17
18
19        _____
                *Danielle DeYoung*
20        DANIELLE DeYOUNG
21
22
23
24
25

