# Exhibit 1

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF NEW YORK
 3   KEITH FISCHER, MICHAEL           )
     O'SULLIVAN, JOHN MOESER, LOUIS   )
 4   PIA, THOMAS BARDEN, CONSTANCE    )
     MANGAN, and CHARISE JONES,       )
 5   individually and on behalf of all)
     others similarly situated,       )
 6                                    )
              Plaintiffs,             )
 7                                    ) No. 2:23-cv-2848
       -v-                            )
 8                                    )
     GOVERNMENT EMPLOYEES INSURANCE   )
 9   COMPANY d/b/a GEICO,             )
                                      )
10            Defendant.              )
11
12         Wednesday, January 15, 2025
13      Oral videoconference deposition of ALBERT
14   BRUST, held pursuant to Notice via Zoom with all
15   parties participating remotely, commencing at
16   9:00 a.m. Central Time, on the above date, before
17   Andrew R. Pitts, Certified Shorthand Reporter.
18
19
20
21
22
23   Andrew R. Pitts, CSR, RPR
     License No.: 084-4575
24   Esquire Deposition Solutions
25
```

## Page 2

```
 1   REMOTE APPEARANCES:
 2   On behalf of the Plaintiffs:
 3   OUTTEN & GOLDEN, LLP
     685 Third Avenue - 25th Floor
 4   New York, New York  10017
     (347) 390-2121
 5   Email: jmcallister@outtengolden.com
     BY:   JARRON D. McALLISTER, ESQUIRE
 6
 7   On behalf of the Defendant GEICO:
 8   DUANE MORRIS, LLP
     190 South LaSalle Street - Suite 3700
 9   Chicago, Illinois  60603-3433
     (312) 499-6779
10   Email: gtsonis@duanemorris.com
     BY:   GREGORY TSONIS, ESQUIRE
11
12
13   ALSO PRESENT:
14      BRENT JORDAN, CLVS, Legal Videographer.
15
```

## Page 3

```
 1                I N D E X
 2   ALBERT BRUST                    EXAMINATION
 3      BY MR. TSONIS                  5, 286
        BY MR. McALLISTER               278
 4
 5             E X H I B I T S
 6   BRUST       DESCRIPTION                  PAGE
 7   Exhibit 1   Compensation Contents,        104
                 G000028-43
 8
 9   Exhibit 2   E-mails, G011080-81           148
10   Exhibit 3   E-mails, G011431-432          151
11   Exhibit 4   E-mails, G011598-599          155
12   Exhibit 5   E-mails, G017819-820          161
13   Exhibit 6   7/19/20 e-mail, G017819       163
14   Exhibit 7   E-mails, G012091-92           164
15   Exhibit 8   Performance appraisal,        206
                 G006735-745
16
17   Exhibit 9   Workday profile, G005126-163  218
                 (CONFIDENTIAL)
18
19   Exhibit 10  Associate of the Month        236
                 nomination, G015733-737
20
21   Exhibit 11  Opt-In Plaintiff Responses    244
22   Exhibit 12  Human Resource Associate      261
                 Handbook, G000191-235
23
24
25
```

## Page 4

```
 1       (Whereupon, the following proceedings were
 2        taken via videoconference.)
 3       THE VIDEOGRAPHER:  Okay.  We are now on the
 4   record.  The time is 9:02 a.m. Central Time on
 5   January 15th, 2025.  This begins the videoconference
 6   deposition of Albert Brust taken in the matter of
 7   Keith Fischer, et al., v. Government Employees
 8   Insurance Company, d/b/a Geico.  This case is filed in
 9   the United States District Court for the Eastern
10   District of New York, Case No. 2:23-CIV-2848.
11       My name is Brent Jordan.  I am the
12   certified legal videographer for the day.  The court
13   reporter is Andrew Pitts.  We are representing Esquire
14   Deposition Solutions.
15       Will Counsel present please identify
16   yourself and state whom you represent.
17       MR. McALLISTER:  Good morning.  I am Jarron
18   McAllister, and I am an attorney from Outten & Golden
19   and I am representing Mr. Brust today.
20       MR. TSONIS:  Gregory Tsonis with Duane
21   Morris, LLP, representing the Defendant Geico.
22       COURT REPORTER:  Okay.  Mr. Brust --
23       THE WITNESS:  Yeah, Al Brust.  I was an
24   employee of Geico.  I no longer am.
25       COURT REPORTER:  Great.  Okay.  Sir, please
```



Page 45

1 Geico. About a week or two later, we just had a
2 little get-together, like a -- like a going away
3 party, whatever you want to call it, but --
4  Q.  Sure.
5  A.  And that was it.
6  Q.  Okay. Since that time --
7  A.  That -- I'm sorry?
8  Q.  Since that time, have you talked with her
9 at all?
10  A.  I don't recall. No, I don't believe
11 I have.
12  Q.  Okay. Let me turn now to some basic
13 biographical questions.
14   Are you married, Mr. Brust?
15  A.  Yes.
16  Q.  How long have you been married?
17  A.  Approximately 26 years.
18  Q.  And earlier, I know you gave your home
19 address on the record. How long have you lived there?
20  A.  Since 1999.
21  Q.  Okay. Do you have like a dedicated office
22 in your home?
23  A.  Yes.
24  Q.  All right. And that -- when you worked for
25 Geico and you worked from home, is that where you

Page 46

1 worked from?
2  A.  Yes.
3  Q.  Do you have children?
4  A.  Yes.
5  Q.  How many children?
6  A.  Two.
7  Q.  Approximately how old are they?
8  A.  24 and 22.
9  Q.  Okay. I think, given your history as a
10 police officer, this will be very brief, but have you
11 ever been charged with a crime?
12   MR. McALLISTER: Objection.
13 BY THE WITNESS:
14  A.  No.
15 BY MR. TSONIS:
16  Q.  Have you ever been arrested or convicted of
17 a felony?
18   MR. McALLISTER: Objection.
19 BY THE WITNESS:
20  A.  No.
21 BY MR. TSONIS:
22  Q.  Have you ever been arrested for or charged
23 with a crime of dishonesty?
24   MR. McALLISTER: Objection.
25

Page 47

1 BY THE WITNESS:
2  A.  No.
3 BY MR. TSONIS:
4  Q.  Where did you go to high school?
5  A.  Levittown Division, which is in Nassau
6 County, Long Island.
7  Q.  When did you graduate?
8  A.  1989.
9  Q.  And did you pursue additional education
10 after high school?
11  A.  Yes.
12  Q.  Where did you go to school?
13  A.  I went to New York Institute of Technology,
14 which is in Old Westbury, in Nassau County.
15  Q.  Did you receive a degree from there?
16  A.  Yes.
17  Q.  What was your degree in?
18  A.  I have a political science degree, a B.S.
19 in political science.
20  Q.  Okay. And what year did you graduate?
21  A.  1993.
22  Q.  After that, did -- have you achieved any
23 other degrees or certifications or licenses?
24  A.  No.
25   MR. TSONIS: Why don't we take a quick

Page 48

1 break -- I just -- I'm out of coffee -- before
2 I launch into a new session, if that's okay.
3   THE WITNESS: Yeah.
4   MR. McALLISTER: Okay. What time do you
5 want to come back?
6   MR. TSONIS: 11:00, that's fine with me,
7 seven minutes. Is that okay?
8   MR. McALLISTER: So it's going to be 11:05.
9   MR. TSONIS: Oh, sorry. Well, I mean, five
10 to ten minutes. I mean --
11   MR. McALLISTER: Yeah.
12   MR. TSONIS: -- I'll be back sooner than
13 that, but that's fine.
14   MR. McALLISTER: Yeah, yeah.
15   THE VIDEOGRAPHER: And we'll go off the
16 record at 9:54 a.m.
17   (Whereupon, a break was taken.)
18   THE VIDEOGRAPHER: We are back on the
19 record at 10:06 a.m.
20 BY MR. TSONIS:
21  Q.  All right. Mr. Brust, you understand that
22 you're still under oath?
23  A.  Yes.
24  Q.  Now, earlier, I think you referenced you
25 began to work for Geico in September of 2019?



Page 49

1  A. Yes.
2  Q. What was your job title when you began
3  working with Geico?
4  A. Senior field security investigator.
5  Q. Did that job title change at some point?
6  A. I don't believe so, no.
7  Q. Okay. Did your job responsibilities
8  generally change?
9  A. I mean, in the beginning, I handled, you
10 know, a variety of different types of fraud claims,
11 and then approximately about a year or two into
12 working with Geico, I was assigned -- I was
13 investigating thefts, thefts like vehicle thefts. So
14 I was part of the theft team.
15 Q. Okay. And we'll -- we'll get to, I guess
16 the -- the breakout of how things were organized in
17 your office.
18      But I guess just from a general standpoint,
19 how would you describe your job security -- or your
20 job duties and responsibilities as a senior field
21 security investigator?
22 A. I would be assigned cases that were
23 referred by another associate, whether it came from
24 claims or the auto damages adjuster, and we would
25 investigate what their concerns are.

Page 50

1       And it could be a variety of, you know, the
2  damage to the car does not fit the facts of the loss,
3  or it could be something as simple as, you know, it
4  was a change in policy, you know, day before the claim
5  was filed, you know. You know, and I would do
6  examination under oaths, and, you know, all this, all
7  my findings were typewritten into a case file folder
8  and submitted when completed.
9  Q. Do you have an understanding as to whether
10 there's a difference between a senior field security
11 investigator and a field security investigator?
12 A. I didn't -- I don't know if there's a
13 difference, so I'm not aware of that.
14 Q. All right. You were hired on as a senior
15 field security investigator; is that right?
16 A. That's correct.
17 Q. Okay. Were there other field security
18 investigators that you worked with?
19 A. I believe we all had the same title.
20 Q. What geographic area did you have?
21 A. I covered Nassau County, Suffolk County,
22 Long Island, and the five boroughs. That would be it.
23 So --
24 Q. Were there -- were there other individuals
25 with the same job title that had the same geographic

Page 51

1  area?
2  A. All the investigators that were assigned to
3  Woodbury, we -- from my understanding, we all covered
4  the same area.
5  Q. Okay. Some of those other investigators,
6  though, handled different types of cases typically;
7  would that be right?
8  A. Right.
9      MR. McALLISTER: Objection.
10 BY MR. TSONIS:
11 Q. Okay. So I think you referenced earlier
12 you were on the theft team?
13 A. That's correct.
14 Q. All right. Is it your understanding that
15 investigators that were assigned to the Woodbury and
16 later the Melville office were organized, I guess, by,
17 you know, different teams, for example, a coverage
18 team, right?
19     MR. McALLISTER: Objection.
20 BY THE WITNESS:
21 A. Yes.
22 BY MR. TSONIS:
23 Q. A staged team?
24 A. Yes.
25     MR. McALLISTER: Objection.

Page 52

1  BY MR. TSONIS:
2  Q. There was the theft team that you were a
3  part of, right?
4  A. That's correct.
5  Q. And then there was a fourth team; wasn't
6  there?
7      MR. McALLISTER: Objection.
8  BY THE WITNESS:
9  A. A fourth team?
10 BY MR. TSONIS:
11 Q. Was there a fourth team?
12 A. Staged, theft -- I don't recall if there
13 was a fourth team.
14 Q. Okay. I guess the types of cases that
15 people on the staged team investigated differed from
16 the types of cases that you investigated?
17 A. Yes.
18 Q. All right. Does the way that those cases
19 are investigated differ too? For example, you know,
20 do theft cases require more examinations under oath
21 than, you know, coverage cases?
22 A. I don't know if -- I'm not really sure if
23 that's a fair comment. I -- I never really monitored
24 or discussed -- you know, I did not do staged, so I --
25 and I rarely dealt with the staged people. I really



Page 109

1 the last paragraph above that that starts, "All
2 non-exempt associates"; do you see that?
3   A.   Yeah, I see that.
4   Q.   Okay.  And the first sentence reads, "All
5 non-exempt associates are required to accurately
6 record their hours worked and absences taken."
7       Did I read that right?
8   A.   Yes.
9   Q.   All right.  Now, as a non-exempt associate,
10 you understood that you were required to accurately
11 record your hours worked?
12   A.   Yes.
13   Q.   All right.  And you, as a non-exempt
14 associate, you were also required to accurately record
15 any absences taken?
16   A.   Yes.
17   Q.   All right.  And the second sentence deals
18 with all exempt associates are required to accurately
19 record their absences taken"; do you see that?
20   A.   Yes.
21   Q.   Now, the following sentence after that
22 says, "A non-exempt associate who feels he/she did not
23 receive pay for all his/her hours worked, and an
24 exempt or salaried non-exempt associate who feels his
25 or her pay incorrectly reflects a deduction for an

Page 110

1 absence should contact his/her supervisor, local human
2 resources manager, or corporate human resources."
3       Do you see that?
4   A.   Yes.
5   Q.   All right.  Now, as a non-exempt associate,
6 did you ever contact your supervisor and explain that
7 you believed that you didn't receive pay for all the
8 hours that you worked?
9   A.   I have contacted -- no, so what's the --
10 can you repeat the question?
11   Q.   Yeah.  As a non-exempt associate, did you
12 ever contact your supervisor and inform him or her
13 that your pay did not reflect the hours that you
14 worked?
15   A.   I have.  If I worked past the -- you know,
16 the eight hours and I felt I was entitled, I would
17 ask, but I was told there is no overtime.
18   Q.   All right.  Mr. Brust, I'm -- I'm asking
19 you a very specific question.
20   A.   Right.
21   Q.   Did you ever contact your supervisor and
22 inform him or her that you didn't receive pay for all
23 of the hours you worked?
24   A.   Yes.
25   Q.   When did you contact your supervisor?

Page 111

1   A.   I don't -- I can't recall the specific
2 date, but I have discussed with my supervisor that
3 because of the workload, I'm working through lunch,
4 I'm working after hours, I'm working on the weekends.
5   Q.   Which supervisor or supervisors did you
6 make that report to?
7   A.   Gerry Cassagne, and towards the end of my
8 time with Geico, I was supervised by Toni D'Agata.
9   Q.   Let's focus on Mr. Cassagne for a second.
10       When did you inform Mr. Cassagne of what
11 you just testified to, that you were working
12 additional hours?
13   A.   Specific date and time, I'm not going to be
14 able to give you that, but it was, you know, over a
15 period of time where, you know, I would discuss with
16 Gerry that to get my work done, I'm working past the
17 eight hours, and could we get overtime.  And he told
18 me he will bring it up at the next meeting with Bill.
19 And then every meeting, it was the same answer, that
20 he can't authorize the overtime.
21   Q.   How many instances are you saying that you
22 informed Mr. Cassagne of that?
23   A.   I can't -- I mean, it was over a course of
24 years it was discussed .  It was -- it was a constant,
25 you know, constantly brought up, and again, Gerry

Page 112

1 would say, "Do the best you can."
2   Q.   Right.  I want to be clear, Mr. Brust.
3       When you're talking about conversations
4 with Jerry Cassagne --
5   A.   Right.
6   Q.   -- are you talking about general
7 discussions about workload?
8   A.   No, I'm talking about it -- I specifically
9 discussed overtime with Gerry Cassagne on numerous
10 occasions, and I don't particularly know -- you know,
11 I couldn't even tell you if it was -- you know, it
12 could have been two times in a month, it may not be
13 that month, it maybe could be two days in a row, three
14 days in a row.  It depends, you know, if the timing of
15 it is right or -- you know, or, you know, it's just it
16 was brought up on a -- I would say on a regular basis.
17   Q.   Okay.  So your testimony is that you would
18 have discussions with Gerry Cassagne on a regular
19 basis regarding the availability of overtime; is
20 that --
21   A.   Correct.
22   Q.   Okay.  And what would you say specifically
23 in those conversations with Mr. Cassagne?
24   A.   I would ask, "Are we allowed to put in for
25 overtime?"  And he, in return, would say, "Don't do



Page 113

1 anything," something to that, "let me speak to Bill."
2 And then he would get back to me and say, "There is no
3 overtime."
4    Q.  So when you would say -- or ask
5 Mr. Cassagne if overtime was available, what
6 specifically would Gerry Cassagne say to you?
7    A.  He would say, "Spoke to Bill and he said
8 there's a" -- he's -- he'll ask for it. And, you
9 know, shortly after, we'd get the answer that no
10 overtime.
11    Q.  So when you would bring this concern to
12 Mr. Cassagne, you would only request overtime for the
13 work that you currently had?
14      MR. McALLISTER: Objection.
15 BY THE WITNESS:
16    A.  I would request it, you know, especially
17 when I was falling behind. I would say, "I need to
18 catch up. Could I get overtime," you know, this day
19 or that day. And he said, "The last I spoke to Bill,
20 there's no overtime."
21      And the other -- there were times, you
22 know, and it wasn't because I asked, again, it was
23 most likely it was because there was like a hurricane
24 or some type of flooding where we would get an e-mail
25 saying, you know, "Starting this date, you will be

Page 114

1 getting flood claims from" -- you know, whatever,
2 whatever hurricane it is, and you -- "you can handle
3 this on overtime."
4      So we would do our regular work, and then
5 you volunteered. So the overtime that we were getting
6 was not even to work on our own cases; it was to work
7 on these additional claims through catastrophe.
8    Q.  All right. Is what you're referencing cat
9 pay?
10    A.  Correct. Correct.
11    Q.  All right. And setting cat pay aside, were
12 there periods of time where overtime was authorized
13 when you worked at SIU?
14    A.  Yes.
15    Q.  When was that?
16    A.  I don't remember, but I -- it didn't last
17 very long. I'm going to say it lasted, you know,
18 maybe a month or two, and then maybe it popped up
19 again. For whatever reason, they said, you know,
20 there's some overtime, but it was very rare.
21    Q.  Okay. And we'll get to those periods of
22 time in a moment here, but when you would have these
23 conversations with Gerry Cassagne, would Gerry
24 Cassagne explore alternative ways to help you catch
25 up, for example, stop you from catching cases?

Page 115

1    A.  He would stop us from catching cases, but
2 that would be, you know, one day a month, if that.
3    Q.  Well, if you reached a certain number of
4 cases assigned during the course of a month, wouldn't
5 Gerry Cassagne have the ability to stop you from
6 catching cases for the remainder of that month?
7      MR. McALLISTER: Objection.
8 BY THE WITNESS:
9    A.  Yes.
10 BY MR. TSONIS:
11    Q.  Okay. And similarly, he might be able to
12 shift workload to, for example, taking one or more of
13 your cases and giving them to another investigator?
14      MR. McALLISTER: Objection.
15 BY THE WITNESS:
16    A.  He would never take cases from me. He
17 would just take me off the catching for the day, which
18 would, in turn, result in the other investigators
19 catching more cases.
20 BY MR. TSONIS:
21    Q.  Right. But you didn't have an
22 understanding at any given time of how many cases each
23 investigator was assigned?
24    A.  I never paid attention. There was a way to
25 look it up, but I never paid attention to who caught

Page 116

1 what.
2    Q.  All right. Being that you were relatively
3 new to Geico, it might be that Gerry Cassagne was
4 advising ow ways that you could be more productive
5 too, right?
6      MR. McALLISTER: Objection.
7 BY THE WITNESS:
8    A.  I wouldn't say he advised us. He just --
9 you know, he just said, "Do the best you can." You
10 know, like, we knew what we had to do, and it had to
11 be done, you know. It was all part of the metrics.
12 So there was no -- there was cutting corners. You had
13 to handle, you know, the cases.
14      THE WITNESS: I'm sorry, I -- could I just
15 let my dog out?
16      MR. TSONIS: Okay.
17      THE WITNESS: You know, I'm at home.
18 I apologize. Okay. I'm sorry.
19 BY MR. TSONIS:
20    Q.  Okay. I believe earlier, you testified
21 that some investigators just, you know, worked faster
22 than others, right?
23      MR. McALLISTER: Objection.
24 BY THE WITNESS:
25    A.  Yeah, everyone, every investigator has



Page 137

1  Q.  When did you have that conversation with
2  Toni D'Agata?
3  A.  I don't have any record of that. I don't
4  have specific dates, but, I mean, Toni was my
5  supervisor for maybe the last six months of my time
6  with Geico, so, you know -- or around that time, you
7  know, when I left Geico, towards the end, that --
8  Q.  How many times did you have that kind of
9  conversation with Toni D'Agata?
10  A.  I would -- it wasn't many with her. Again,
11  it was just she wasn't a supervisor very long, but,
12  you know, I -- I do recall in the -- my initial
13  conversation and her taking, you know, over as my
14  supervisor, we discussed it, and I was -- and she was
15  well aware of our complaints.
16      And, again, I -- you know, I've dealt
17  with supers -- you know, I've had supervisors my
18  entire life. Once they know, they don't want to hear
19  it over and over and over. You know, it was known.
20      I did mention it, I would say, you know,
21  approximately about, you know, anywhere between five
22  to ten times in the six months that we just need
23  overtime. We need overtime or work on your own time.
24  Q.  What do you mean by or work on your own
25  time?

Page 138

1  A.  Again, for me to get the job done, and
2  again, your metrics, again, there's always the -- if
3  your metrics aren't to their standards, and again, if
4  they determine it's at the bottom quartile, there's
5  always that risk of getting laid off or not getting
6  raises.
7      So if other people -- and, again, it really
8  has nothing to do with what other people are doing,
9  you know. I did it because I felt it was the right
10  thing to do. Again, as far as me being an
11  investigator, you know, a retired detective, I took a
12  lot of pride in my investigations. I didn't like to
13  do shoddy work, and I -- you know, I did what was
14  necessary. And if I worked on my own time, and in the
15  police department, I mean, we had a cap on overtime,
16  you know. You worked on your own time sometimes, you
17  know. You did the job.
18  Q.  Do you have an understanding as to whether
19  overtime was ever approved for any investigator?
20      MR. McALLISTER: Objection.
21  BY THE WITNESS:
22  A.  Overtime, I do recall overtime being
23  approved, and I was -- I was very happy. I was -- you
24  know, I was like, "Finally," but it only lasted, like,
25  two weeks. You know? It came and went really fast.

Page 139

1  And then there was another time it started again, and
2  that, I think, lasted like maybe three days. It was
3  even less and besides the cat overtime, but that was
4  for cat cases. So now we were catching cat cases and
5  our regular cases, but the overtime was only for the
6  cat cases.
7  BY MR. TSONIS:
8  Q.  Right. So let me distinguish for a second.
9      There was a period of time, I think you're
10  testifying, where overtime hours were pre-approved for
11  investigators to use?
12  A.  Yes.
13  Q.  For example, in or around June of 2020, was
14  there a period of time where every investigator was
15  authorized to use up to ten hours of overtime per
16  workweek?
17      MR. McALLISTER: Objection.
18  BY THE WITNESS:
19  A.  I don't have anything to, you know, refresh
20  my recollection as to that. You know, did -- you
21  know, you're referring to June, so I'm going to assume
22  that you have something that -- that -- in that time
23  frame, but I do recall we had, like, ten -- we could
24  do ten hours a week. I do recall that.
25

Page 140

1  BY MR. TSONIS:
2  Q.  All right. Excuse me. And similarly, do
3  you recall a period in July of 2020 where you -- it
4  was communicated that you could work up to ten hours
5  of overtime per workweek?
6      MR. McALLISTER: Objection.
7  BY THE WITNESS:
8  A.  I do -- I do recall another time, if it was
9  July, I don't -- I don't recall what month it was, but
10  I do recall, I stated before you made those comments
11  before June, July, I do recall it was like two
12  separate times, you know, that we were all authorized,
13  but it was not very long.
14  BY MR. TSONIS:
15  Q.  Okay. Prior to or setting aside that --
16  that preauthorized overtime, was it your understanding
17  that as an investigator, you could request overtime
18  and needed to have overtime approved before you could
19  work it?
20  A.  You were advised to ask your supervisor for
21  overtime before you did it.
22  Q.  Okay. So you understood that the policy
23  was if you felt there was a business need for overtime
24  that you could request it from your supervisor?
25      MR. McALLISTER: Objection.



Page 141

1  BY THE WITNESS:
2     A.  That's correct.
3  BY MR. TSONIS:
4     Q.  Okay.  If you, for example, you know, got
5  stuck in traffic or had an EUO that ran long, and you
6  worked two extra hours on Monday, one option would be
7  cutting two hours from a different shift, right?
8     A.  That, that wasn't really exposed to until,
9  like, the end of my -- I didn't hear about that until,
10  like, maybe my last few months.  I forget what they
11  called it, but, like, you could if you worked, like
12  I said, an extra two hours, you could end -- on
13  Thursday, you could work two hours less on Friday.
14        But it wasn't about the -- you know, you
15  didn't -- you -- even if you did work an extra two
16  hours, you wouldn't want to work less than hours on a
17  Friday because you had too much work, you know.  It's
18  just -- it was all about time, you know.
19        It -- and, again, you know, have I worked
20  extra in -- no, I wouldn't take two hours less because
21  that actually hurts me in a way because I still have
22  work to do.
23     Q.  Right.  But you had an understanding, or is
24  your understanding of the concept that, you know, if
25  you work two hours more one day, you can cut two hours

Page 142

1  from a subsequent shift, like flexing your time?
2     A.  That's what it's called, flex time.  Yeah,
3  so flex time, I didn't become aware of that until
4  probably -- it was probably maybe -- maybe my last
5  year in Geico, and I was working two hours every --
6  extra every day, so that means I would have off every
7  Friday if I -- if I did that, you know?
8        So I didn't really pay attention to the
9  flex time.  It didn't -- it didn't work for me because
10  I'm working extra so I could do the work.  I'm not --
11  I wasn't working extra so I could take a day off.
12     Q.  Okay.  And going back to the conversation
13  with your supervisors, Toni D'Agata and Gerry
14  Cassagne, you never told them how many hours extra
15  you're working that you're claiming now, right?
16        MR. McALLISTER:  Objection.
17  BY THE WITNESS:
18     A.  I have told Gerry that I do about two hours
19  every day and on the weekends I would do about two
20  hours on Saturday, two hours on Friday.  You know, it
21  was between four to five hours on the weekend.  He
22  knew.  I definitely told him.
23  BY MR. TSONIS:
24     Q.  All right.  So you're claiming that you
25  told Gerry Cassagne specifically how much time you

Page 143

1  were working and not putting into Workday?
2        MR. McALLISTER:  Objection.
3  BY THE WITNESS:
4     A.  Yes.  Yes.
5  BY MR. TSONIS:
6     Q.  And was that time that you're just
7  referencing the amount of time that you spent
8  consistent throughout your time at Geico?
9        MR. McALLISTER:  Objection.
10  BY THE WITNESS:
11     A.  I will say that it was not every weekend,
12  but I would say most of my weekends were spent working
13  at some point.
14  BY MR. TSONIS:
15     Q.  Do you have an understanding of how much
16  time any other investigator spent working on any given
17  workweek?
18        MR. McALLISTER:  Objection.
19  BY THE WITNESS:
20     A.  I did not have a conversation where
21  I specifically spoke about time, but I was aware that
22  all investigators were at some point -- and, again,
23  not every weekend, but have worked on the -- on the
24  weekends.
25

Page 144

1  BY MR. TSONIS:
2     Q.  All right.  You're making pretty broad
3  statement that all investigators are working on the
4  weekend.
5        So who do you mean by all investigators?
6     A.  You know, I don't remember all of them, but
7  I -- like I said, did they work every day weekend?
8  But I know for a fact, and I know you're going to say
9  it's broad, but there wasn't too many of us, and we've
10  had the conversation many times that unless you work
11  on the weekends, you're not going to -- you're not
12  going to be able to keep up.
13        Again, I don't know how much they did, but
14  without a doubt -- and I know, like, it's, you know,
15  nobody -- when you're testifying, they don't like
16  absolutes, but they worked weekends.
17        Did they work as much as me or more or
18  less?  I don't -- I don't know.  I didn't keep track,
19  but it was a -- it was a complaint from all of us, and
20  I'd be surprised if an investigator said they never
21  worked on the weekend.
22     Q.  When you say all, who are you referencing?
23     A.  So I would say Maria Munoz, Ted Wendling,
24  Steve Stemmler, Keith Fischer.  Who else?  Kevin Dux.
25  Tiffany Cummings.  I'm trying to think of who else



Page 145

1 worked there. I guess I don't remember the rest of
2 the investigators. I'm sorry.
3    Q. So it's your testimony that every single
4 one of those individuals informed you that they were
5 working on the weekend and the number of -- and the
6 amount of time they spent working?
7       MR. McALLISTER: Objection.
8 BY THE WITNESS:
9    A. The people I just mentioned, at some point
10 we did have conversation that we -- we were working
11 weekends, and it's ridiculous, without -- definitely.
12 I mean, I know, again, the absolutes, but I recall
13 having conversations with -- in groups, individually,
14 each individually. You know, and it became a joke.
15 "What did you do this weekend?" Geico. What else?"
16 You know, "What else do I do? Geico." You know?
17 BY MR. TSONIS:
18    Q. Do you have any personal knowledge of
19 conversations those individuals had with their
20 supervisors?
21       MR. McALLISTER: Objection.
22 BY THE WITNESS:
23    A. No.
24 BY MR. TSONIS:
25    Q. Okay. So you have no personal knowledge of

Page 146

1 any conversation that those investigators had with
2 their supervisors at any given time?
3       MR. McALLISTER: Objection.
4 BY MR. TSONIS:
5    Q. Is that correct?
6    A. I don't have -- you know, I -- I guess I'd
7 have to even say yeah because we've been in meetings
8 where it's been brought up. So, you know,
9 individually, I don't know what they say, you know, on
10 their one-on-one meetings, but I've been in meetings
11 in Melville where that was the hot topic. So, again,
12 I don't recall who was present that day, who was
13 absent that day, but it wasn't just one meeting.
14     So can I say everybody? No, but we've had
15 meetings, and, you know, the majority of us were
16 always present. So, again, I can't recall, but that
17 was the hot topic at the meetings.
18     I don't know if there's records of
19 meetings. I don't know if -- you know, if they
20 kept -- you know, if the -- notes from meetings, you
21 know, I have no idea, but it was some of those
22 meetings were pretty heated, you know. So --
23 BY MR. TSONIS:
24    Q. The individuals that you're referencing,
25 are those all field investigators?

Page 147

1    A. Yes.
2    Q. Do you have any personal knowledge as to
3 the hours worked by desk investigators?
4       MR. McALLISTER: Objection.
5 BY THE WITNESS:
6    A. I -- I didn't know any of them personally.
7 BY MR. TSONIS:
8    Q. Do you have any personal knowledge
9 regarding the hours worked by investigators that
10 worked major case?
11       MR. McALLISTER: Objection.
12 BY THE WITNESS:
13    A. No.
14 BY MR. TSONIS:
15    Q. Are all the investigators that you named on
16 the theft specialty team?
17       MR. McALLISTER: Objection.
18 BY THE WITNESS:
19    A. No.
20 BY MR. TSONIS:
21    Q. Which ones aren't?
22    A. Maria Munoz.
23    Q. What team did she work on?
24    A. The theft team. We were the only two,
25 I think we were the only two theft investigators.

Page 148

1       MR. TSONIS: Okay. Why don't we go to
2 lunch.
3       MR. McALLISTER: Sure.
4       THE WITNESS: Okay.
5       MR. TSONIS: Do you want to come back at --
6       THE VIDEOGRAPHER: Okay. We'll go off the
7 record at 12:12 p.m.
8     (Whereupon, a luncheon break was taken.)
9       THE VIDEOGRAPHER: We're back on the record
10 at 1:07 p.m.
11 BY MR. TSONIS:
12    Q. All right. Mr. Brust, do you realize your
13 still under oath?
14    A. Yes, I'm aware.
15    Q. Okay. I'm going to drop in the chat here
16 what I'm going to introduce as Exhibit 2.
17     (Whereupon, Brust Exhibit 2 was presented.)
18 BY MR. TSONIS:
19    Q. If you can download it and open it.
20    A. Okay.
21    Q. In the bottom right-hand corner, you should
22 see a stamp, which --
23    A. Yeah, well, I opened it up, and it appears
24 to be an e-mail.
25       MR. TSONIS: Okay. And for the record, it



Page 149
1 is an e-mail bearing Bates label G011080 to 011081.
2 BY MR. TSONIS:
3   Q.  So as part of your employment with Geico,
4 you had a Geico e-mail address, right, Mr. Brust?
5   A.  Yes.
6   Q.  What was that e-mail address, if you
7 remember?
8   A.  abrust@geico.com.
9   Q.  Okay.  And if you scroll down to the second
10 page sort of, this chain is, obviously, at the top are
11 the most recent e-mails and at the bottom is the --
12 the older e-mails.
13      Do you see an e-mail from Gerry Cassagne
14 that's sent Tuesday, December 17th, at 12:57 p.m.?
15   A.  Yes.
16   Q.  All right.  And on the To line in that
17 e-mail, there's a distribution list, it looks like,
18 that's says R2 Gerry Cassagne Section; do you see
19 that?
20   A.  Yes.
21   Q.  All right.  Were you part of region 2?
22   A.  Yes, I was.
23   Q.  All right.  And you would have received an
24 e-mail that was sent to this distribution list, right?
25   A.  That's correct.

Page 150
1   Q.  Okay.  And so you see that the -- the title
2 of the e-mail is called Overtime Change?
3   A.  Yes.
4   Q.  All right.  I want to draw your attention
5 to, I guess, the second paragraph there.
6      More specifically, in the second line, do
7 you see the sentence that says, that begins with the
8 word "All" at the end?
9   A.  Yes.
10   Q.  All right.  That says sentence says, "All
11 overtime must be approved in advance, so make sure to
12 obtain approval before it is submitted in Workday."
13      Do you see that?
14   A.  Yes, I do.
15   Q.  And the following sentence says, "In
16 addition, we will still offer flexibility within the
17 same week if you work extra hours and would like comp
18 time instead," right?
19   A.  Yes.
20   Q.  Okay.  And this was an e-mail that Gerry
21 Cassagne sent to you and other investigators that
22 reported to him?
23   A.  Yes.
24   Q.  All right.  So Gerry Cassagne was informing
25 you and others that overtime had to be approved in

Page 151
1 advance?
2   A.  Yes.
3   Q.  And Gerry Cassagne was informing you and
4 others as of this date that you had the flexibility
5 within the same week to use comp time if you work
6 extra hours?
7   A.  Yes.
8   Q.  Okay.  And this would have been about
9 approximately three months after you started, right?
10   A.  Yes.
11   Q.  Okay.  You could set this aside.  Thank
12 you.
13   A.  Okay.
14   Q.  I'm going to send you another exhibit, what
15 I'm going to mark as Exhibit 2.  If you could download
16 that and open it, Mr. Brust.
17      (Whereupon, Brust Exhibit 3 was presented.)
18 BY MR. TSONIS:
19   Q.  Let me know when you are ready.
20   A.  I am ready.
21      MR. TSONIS:  All right.  For the record,
22 this is another e-mail chain bearing the Bates label
23 G011431 to 432.
24 BY MR. TSONIS:
25   Q.  If you scroll again to the second page, do

Page 152
1 you see an e-mail, the initial e-mail in this chain is
2 sent from you to Gerry Cassagne sent June 5th, 2020?
3   A.  Yes.
4   Q.  And you write to Mr. Cassagne, "Good
5 morning.  Overtime starts after a 40 hour work week.
6 So, does that mean to hit 10 hours overtime a week,
7 I need to work 11.25 hours more a week?"
8      Did I read that right?
9   A.  Yes.
10   Q.  All right.  And Gerry Cassagne, if you go
11 to the first page at the bottom, replies, "No, it's
12 just that the first 1.25 is paid at regular time.
13 That is just the rules."  Right?
14   A.  Let me refer to -- where -- where are we
15 now?
16   Q.  At the bottom of the first page of the
17 e-mail.
18   A.  Yeah, I see it.  I see it, yeah.  "No, it's
19 just the first 1.25 is paid at regular time.  That's
20 just the rules."
21   Q.  Okay.  And then you reply to that e-mail at
22 9:22 a.m.  Do you see that right above?
23   A.  Yes.
24   Q.  All right.  And you reply to that e-mail,
25 "Thanks.  I am doing ok, but I will never refuse



Page 169

1  BY MR. TSONIS:
2      Q.   Yeah.  I mean, for example, I might show
3  present right now, but if I walk away from my computer
4  for ten minutes until it goes to away, it looks like
5  I'm working to you, right?
6      A.   Correct.
7      Q.   Okay.  And similarly, when you see someone
8  is logged in or online, you don't know whether they're
9  actually working any extra hours rather than just
10  flexing their time, right?
11          MR. McALLISTER:  Objection.
12  BY THE WITNESS:
13      A.   If somebody's online, you're correct, in --
14  in that particular moment, could I say from sitting at
15  my desk whether they are working a day for a day or is
16  it if there are working on their own time or if
17  they're working on overtime?  No, I cannot tell.
18  I'm -- I know from conversation.
19          So if some -- if I was told by an
20  investigator, "I worked last night," I would say,
21  "Yeah, I saw you on the computer."  That's the only
22  time I would be able to confirm it.
23  BY MR. TSONIS:
24      Q.   Okay.  But even if an investigator told
25  you, "I worked last night," you wouldn't necessarily

Page 170

1  know without more explanation whether that person was
2  flexing their time or working above normal hours,
3  right?
4          MR. McALLISTER:  Objection.
5  BY THE WITNESS:
6      A.   I was unaware -- I didn't know what flex
7  time was until the very end, so I don't think --
8  again, I can't really -- I'll just say I'll leave it
9  at that.  I -- I didn't know much about flex time
10  because -- and when I did, it doesn't help me because
11  I'm working the same hours.  I'm just changing the
12  dates.
13  BY MR. TSONIS:
14      Q.   I guess just to be clear, my point is if
15  someone tells you, "Yeah, I worked the weekend," you
16  don't know if that person was flexing their hours or
17  working additional hours, right?
18          MR. McALLISTER:  Objection.
19  BY THE WITNESS:
20      A.   Sometimes I would know because they would
21  mention that, "This is" -- you know, "This is
22  nonsense.  I'm tired on working on my own time."  We
23  didn't get a -- you -- you wouldn't -- I am not aware
24  of anyone getting overtime on the weekends.
25

Page 171

1  BY MR. TSONIS:
2      Q.   Are you aware of what overtime was approved
3  to any other investigator?
4          MR. McALLISTER:  Objection.
5  BY THE WITNESS:
6      A.   No, I don't -- you know, I wouldn't get
7  that e-mail, so I wouldn't know, you know.  You know,
8  I didn't -- you know, no, I didn't know when they did
9  overtime, and they -- except for a few times, you
10  know, that there -- you know, I knew when there was
11  overtime, and if there was no overtime and it wasn't
12  authorized and you were, you know, on at 10:00 at
13  night, either you're doing flex time or you're on your
14  own time.  Those are the only two choices if there's
15  no overtime.
16  BY MR. TSONIS:
17      Q.   Right.  But sitting at your computer, you
18  don't know which of those it would be, right?
19          MR. McALLISTER:  Objection.
20  BY THE WITNESS:
21      A.   Correct.
22  BY MR. TSONIS:
23      Q.   Okay.  And you don't have any specific
24  knowledge for any specific workweek of the actual
25  hours worked for any other investigator?

Page 172

1          MR. McALLISTER:  Objection.
2  BY THE WITNESS:
3      A.   No.
4  BY MR. TSONIS:
5      Q.   All right.  You can close this document.
6          Earlier, you mention -- you referenced your
7  metrics with respect to your job; do you recall that?
8      A.   Yes.
9      Q.   What metrics are you referencing?
10      A.   I'm trying to recall.  There were time
11  frames you had, I think it was three days to have your
12  background checks completed.  You had, I think it was
13  like a -- you know, again, also within three or two to
14  three days that you had to make an attempt or
15  interview the policyholder.
16          You had to touch the case, meaning, review
17  the case every five days.  If you did a background
18  check, if you did a TLO or a license plate check, that
19  had to be uploaded into the case folder; if not, it
20  could cause you to -- you know, you can get a
21  downgrade, and if -- you know, if you missed enough,
22  you could fail the -- you know, the audit.  You had a
23  case life, and I don't remember exactly, I think it
24  was around 13 days they wanted the case closed.
25          Obviously, if you did a recorded interview,



Page 173
1  it needed to be uploaded. And there was certain
2  wording that you had to use for your opening when the
3  case -- your case opening. You had a -- would also
4  TIP the case; in other words, you had to, once the
5  case was assigned, you had a -- you know, a timeframe
6  to when you put your first note in there that you, you
7  know, basically acknowledge that you received the case
8  and that you reviewed the claim.
9      What else was there? You know, there
10 was -- you know, and besides the metrics, again, it
11 was, you know, if you uploaded a TLO search, and there
12 was a Social Security number that wasn't redacted,
13 you -- you know, it could be -- it would be a
14 downgrade.
15     So the metrics, it was a broad -- you know,
16 it was broad. It had to do with case handling and --
17 and basically protocols, like, all in one. It had to
18 do with timing and kind of like the rules, like do
19 this, do that, you know. So I was just -- there's a
20 lot of stuff I don't -- so that's kind of what
21 I remember.
22    Q.   Okay. As a an associate at Geico, were you
23 assigned a performance rating, if you recall, on an
24 annual basis?
25    A.   Yes.

Page 174
1    Q.   All right. And does that performance
2  rating typically score you somewhere between a 1 and
3  a 5?
4    A.   Yes.
5    Q.   Okay. Some of the things that you talked
6  about here, are those portions of what would be
7  considered quality as a performance metric?
8    A.   Right, the metric, the -- the review from
9  1 to 5 was based on the metrics, and then there was
10 certain amount of, like -- I believe the supervisors
11 had like a discretionary, you know, number. I guess
12 they could add a point or take a point away.
13     Certain things didn't fit within the
14 metrics, certain cases, they were kind of like
15 assignments outside your typical assignments that came
16 from intake, you know.
17     And an example would be there -- I don't
18 know if you're in New York, but in New York City in
19 Brooklyn, they have a thing called dollar vans. You
20 know, like -- you know, I did a whole case on that.
21 You know, because of that and the results of that,
22 I got additional -- like, I got a prior review, you
23 know, because it was considered, you know, a -- you
24 know, I don't want to say above and beyond, but extra
25 work outside my typical case assignments.

Page 175
1      So yeah, it's -- the 1 to 5 is your -- you
2  know, based on metrics and anything additional that
3  your supervisor would find that you basically had
4  additional value.
5      You know, like -- and I was also trained as
6  an event -- you know, I did the event data recorders,
7  the EDR. There was only a few of us. So that also
8  afforded me maybe like a half a point because I had an
9  extra, extra training as opposed to somebody else, you
10 know.
11    Q.   Okay. And were those EDR activities that
12 you did, is that something that you would have to do
13 for other people's cases?
14    A.   Yes.
15    Q.   Okay. Did you volunteer to do the
16 electronic data recording downloads?
17    A.   To -- well, the training came out, and
18 I was asked by Gerry Cassagne to go to the training
19 and if I would be willing to, you know, do -- do the
20 EDR downloads. And, you know, I don't -- I don't turn
21 any training down, so I said yes. I think it's a --
22 you know, it's a good thing to do.
23     And, you know, I got trained, and I was
24 responsible of doing the event data recorders for my
25 cases and anyone else that needed it, then I would --

Page 176
1 it would be referred to me as an assist case.
2    Q.   Okay. When you first started with Geico,
3  do you have an understanding of how case life was
4  measured?
5    A.   Yes, I was told that there is a case life.
6 Yes.
7    Q.   Okay. Did you understand that case life
8  was one of the metrics against which your performance
9  was measured?
10    A.   I don't -- I don't know if it was part of
11 how they measured our review, but it was monitored, it
12 was on the spreadsheet, and if -- I don't remember the
13 number. I think it was like 13 days, but if you are
14 anywhere like 17, 18, it would be highlighted, and it
15 would be reviewed and basically what you'd be told
16 is if possible, close it.
17    Q.   Okay. So case life was a -- to the best of
18 your recollection, a metric against which your
19 performance was assessed?
20    A.   Well, I'm not -- again, I'm not 100 percent
21 sure that if it was -- it -- if it was -- it was a
22 metric, but I don't know if -- I don't remember. I'm
23 kind of feeling like it was more the case life fell
24 more on the manager, and that was kind of like his
25 metric. So if our case life was bad, it actually



Page 249

1  you to work overtime to keep up; is that right?
2     A.   Yes.
3     Q.   And then you estimate from November 21
4  through February 2023 that you were again working
5  about 50 hours a week on average?
6     A.   Yes.
7     Q.   Okay. And then paragraph 11 sort of recaps
8  the information in the preceding paragraphs and then
9  states after that parentheses that you see in the
10 middle, it says, "In sum, for the periods described
11 above, my best estimate is that I am owed
12 approximately $137,743.59 in base wages."
13       You see that?
14    A.   Yes.
15    Q.   And that this amount -- the following
16 sentence says that that amount does not include
17 liquidated damages, which add another $137,734.53 in
18 damages?
19    A.   Yes.
20    Q.   And then it says it also doesn't include
21 amounts encompassing fees, costs, or interest?
22    A.   Correct.
23    Q.   So, I guess, is it accurate to say that as
24 part of your -- you joining this lawsuit, you are
25 seeking at least $275,000 from Geico?

Page 250

1       MR. McALLISTER:  Objection.
2  BY THE WITNESS:
3     A.   Yes.
4  BY MR. TSONIS:
5     Q.   That's what you believe that you should be
6  paid, $275,000?
7       MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9     A.   That, I did not do the math on this when
10 I conferred with counsel. This is what was presented
11 to me, and again, that's why they're hired, you know.
12 That's -- you know -- you know, I retained them for
13 them to determine what I'm owed.
14 BY MR. TSONIS:
15    Q.   Does $275,000 exceed the wages that you've
16 earned for the time that you entered into Workday?
17       MR. McALLISTER:  Objection.
18 BY THE WITNESS:
19    A.   Again, that -- that's -- I mean, I would
20 think that's a -- you know, to be answered by counsel.
21 I mean, I don't know the value of, you know, in a
22 suit, you know, liquidated damages, how they even come
23 up with that number, but, you know, when I reviewed it
24 and discussed it with counsel, that was what they
25 were -- were they felt was a fair estimate.

Page 251

1  BY MR. TSONIS:
2     Q.   Right. And I recognized you -- you've
3  testified you didn't do the math and you're not
4  familiar with the concept of liquidated damages.
5       I'm asking you as a party to this lawsuit,
6  you are suing Geico, do you feel like you are owed
7  $275,000 at least?
8       MR. McALLISTER:  Objection.
9  BY THE WITNESS:
10    A.   Yes.
11 BY MR. TSONIS:
12    Q.   Okay. Will you direct your attention to
13 paragraph 12.
14    A.   Okay.
15    Q.   Do you see that it states that Geico
16 required you to seek approval from your supervisor to
17 submit any hours above 38.75?
18    A.   Yes.
19    Q.   And then it talks about Gerry Cassagne, and
20 you're -- you're saying that he reiterated to you that
21 hours above 38.75 would not be approved?
22    A.   Yes.
23    Q.   And then you write, "At various times, my
24 supervisor approved a limited amount of extra hours to
25 allow me to catch up on work. This was limited to

Page 252

1  about an hour or two extra hours a week."
2       Do you see that?
3     A.   Yes.
4     Q.   All right. But earlier, we looked at
5  periods of time in June and July where you could work
6  up to ten hours of overtime a week, right?
7     A.   Yes.
8     Q.   All right. And, in fact, there was an
9  e-mail that said hey we have extra unused overtime if
10 you want to work even more than that?
11    A.   That's correct.
12    Q.   Okay. So this statement is inaccurate?
13       MR. McALLISTER:  Objection.
14 BY THE WITNESS:
15    A.   No, it's accurate. I just didn't recall
16 the other times.
17 BY MR. TSONIS:
18    Q.   Well, it says this was limited to about an
19 hour or two extra hours a week?
20    A.   Yes.
21    Q.   That's not accurate, though, right?
22       MR. McALLISTER:  Objection.
23 BY THE WITNESS:
24    A.   It's -- it's -- it was more than that, but
25 when I stated that, I didn't recall those, the --



Page 253

1 I think it was June-July, you know, e-mails.
2 BY MR. TSONIS:
3    Q.   Right. I'm -- I guess knowing what we
4 discussed today, you would agree that this statement
5 is no longer accurate, to the best of your
6 recollection?
7        MR. McALLISTER:  Objection.
8 BY THE WITNESS:
9    A.   I wouldn't say it's not accurate because we
10 were limited overtime, and it -- it was -- that's
11 accurate. It was like an hour or two, but when the --
12 let's say the gates were open for the ten hours, there
13 wasn't, like, an official e-mail.
14        So, you know, there were times where Gerry
15 said, you know, "I could give you a couple hours a
16 week just to catch up." So it wasn't like an official
17 e-mail. So that's what I recall at that time when
18 I made that statement.
19 BY MR. TSONIS:
20    Q.   Okay. So this statement is referencing
21 something other than the pre-approved overtime that
22 was offered in June and July of 2020?
23    A.   Right, but this was very limited. This,
24 this didn't happen very often.
25    Q.   Okay. How frequently was it that Gerry

Page 254

1 Cassagne would tell you that he could give you an
2 extra hour or two to catch up?
3    A.   Very limited. I mean, it would -- it
4 wasn't even every month, you know, and if it was, it
5 wouldn't -- it wouldn't be more than probably five
6 hours to the month. So, again, I don't recall, but it
7 was not often, you know. It was not every month.
8        It could be I could go a couple months no
9 overtime, I could have two months in a row with this
10 amount of overtime, you know, I could go five months
11 without overtime. So it was very sporadic, and it all
12 depended on, again, my case load if I was falling
13 behind. So, again, I can't really answer, you know,
14 you know, exactly how many times.
15    Q.   Okay. But there were some times where
16 Gerry Cassagne offered you extra hours in a workweek,
17 one or two extra hours?
18    A.   Yes.
19    Q.   Okay. So if you skip down to paragraph 14,
20 do you see where it says, "In or around the end of
21 2021 and on a few occasions in 2022, I complained
22 verbally to my supervisor, Mr. Cassagne, during our
23 monthly team meetings. I told him about the volume of
24 work we were being assigned and the number of unpaid
25 hours I and my colleagues were working as a result.

Page 255

1 His response to these complaints was that he was not
2 permitted to improve this overtime work."
3        Did I read that right?
4    A.   I -- what paragraph was that?
5    Q.   Paragraph 14.
6    A.   "In or around" -- yes, okay, and, "I told
7 him about the volume of work" -- right, and on certain
8 times, he did not authorize the overtime.
9    Q.   Okay. But this paragraph describes the
10 discussions that you referenced earlier today that you
11 had with Mr. Cassagne?
12    A.   Yes.
13    Q.   Okay. And so this paragraph is an accurate
14 summary of the discussions that you had with Gerry
15 Cassagne about working off the clock?
16        MR. McALLISTER:  Objection.
17 BY THE WITNESS:
18    A.   Yes.
19 BY MR. TSONIS:
20    Q.   Okay. Paragraph 15 similarly says that
21 throughout your time working with Toni D'Agata, "She
22 held weekly one-on-one meetings with special
23 investigators." And during these meetings, I verbally
24 expressed your dis- -- you verbally expressed your
25 displeasure of working overtime without pay and that

Page 256

1 Ms. D'Agata, though sympathetic to your concerns, told
2 you she was not authorized to approve you "overtime
3 that I was working," or you were working?
4    A.   That's accurate.
5    Q.   Okay. Are these -- is this the discussions
6 you were referencing with Ms. D'Agata earlier?
7        MR. McALLISTER:  Objection.
8 BY THE WITNESS:
9    A.   Yes.
10 BY MR. TSONIS:
11    Q.   Okay. Apart from what's written here, did
12 you have any other discussions with Ms. D'Agata?
13        MR. McALLISTER:  Objection.
14 BY THE WITNESS:
15    A.   Regarding overtime?
16 BY MR. TSONIS:
17    Q.   Yes.
18    A.   It wasn't -- I didn't discuss it every
19 one-on-one meeting, but it was -- it was definitely
20 discussed on different occasions.
21    Q.   Okay. So let me just clarify.
22        Did you ever have team meetings where
23 multiple investigators were present with Ms. D'Agata
24 where this came up?
25    A.   I don't recall that.



Page 257

1  Q.  Okay.  So the only communication which
2  you -- you're claiming to have raised this with
3  Ms. D'Agata were on one-on-one meetings with her?
4  A.  Yeah, I only recall one on one.  I do not
5  recall bringing this up on a team meeting.
6  Q.  Okay.  And do you see here there's no
7  mention of Ms. Greenman?
8  A.  Yes.
9  Q.  All right.  So earlier today, if
10  I understood your testimony correctly, you referenced
11  a conversation with Ms. Greenman; is that right?
12  A.  Yes.
13  Q.  Regarding overtime, I mean?
14  A.  Yes.
15  Q.  All right.  Here, though, you don't note
16  any conversation with Ms. Greenman?
17  A.  No.
18  Q.  Okay.  Did you approve your own cases, or
19  did Gerry Cassagne approve your cases?
20  A.  What do you mean, like approve?  Like, when
21  I was finished with the investigation, did he sign off
22  on it?
23  Q.  Yes.
24  A.  Oh, no.  Gerry Cassagne, I submitted them
25  for approval.

Page 258

1  Q.  And he would go in and review and approve
2  them?
3  A.  Yes.
4  Q.  Okay.  Were you aware that there were other
5  investigators that did not need Gerry Cassagne to
6  approve their cases?
7      MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9  A.  No.
10  BY MR. TSONIS:
11  Q.  Were you aware of any investigators who did
12  not require a supervisor to approve their cases?
13      MR. McALLISTER:  Objection.
14  BY THE WITNESS:
15  A.  When Gerry Cassagne was around, I would say
16  I'm not aware of that, but after Gerry Cassagne left,
17  there was self-approval where we did sign off on our
18  cases.
19  BY MR. TSONIS:
20  Q.  When did that self-approval process start?
21  A.  Right before Gerry left, or he might have
22  already left, but it was right around that time, and
23  it turned -- once -- once region 2 was taken away and
24  they restructured, it was around that time.
25  Q.  So Gerry Cassagne -- without pulling it up

Page 259

1  again, I'll represent to you that the date, that the
2  Managed To date for Gerry Cassagne with regard to
3  supervising you ends on April 26, 2023.
4      So what's your best estimate as to when
5  self-approval would have started?
6  A.  I think a more accurate reference would be
7  when region 2 was dismantled and we became -- the
8  oversight came from, I guess, corporate down in
9  Maryland, so whenever that change occurred.
10  Q.  Okay.
11  A.  And I don't -- I don't recall when it was.
12  It was -- it was -- the self-approval for me was maybe
13  approximately six, seven months.  It wasn't --
14  I didn't do it very long.
15  Q.  Okay.  When the Workday system that
16  required you to sort of, you know, check in and check
17  out on a daily basis using your phone was rolled out,
18  was there any training or anything that accompanied
19  that?
20  A.  I wouldn't call it training.  It was, you
21  know, a brief discussion on what was needed to be
22  done, and I think, again, most of it was
23  self-explanatory.
24  Q.  Did you, like, go into a Woodbury office or
25  a Melville office, or did you have like a Zoom session

Page 260

1  that walked through how you would do it?
2  A.  I don't recall that.
3  Q.  Was there any communication that came along
4  with that new system or new process?
5  A.  The only communication was during team
6  meeting that, you know, this is how it needs to be
7  done, and that's -- that's the only thing I really
8  recall.  I don't recall any type of pamphlet, manual,
9  or, you know, training video.
10     We were just basically told that we got to
11  enter our hours, and when we're off the clock, sign
12  out, and when we go back in, sign in, make sure at the
13  end of the day you do the e-mail if that was required,
14  and that was really it.
15  Q.  All right.  I'll drop one more document
16  into the chat here.  Actually, you know what,
17  I dropped it into the chat earlier by accident.  If
18  you scroll to the top, at the top of the chat, the
19  very first document that states Geico Associated
20  Handbook.
21  A.  It's -- I got it, yeah.
22  Q.  Yeah.  It's the one that, for the record,
23  this --
24      MR. TSONIS:  Court Reporter, what exhibit
25  are we on, or Jarrod, if you know?



Page 297

```
 1   DEPOSITION ERRATA PAGE
 2     Page No.____ Line No. _____ Change to:_____
 3   _____
 4   Reason for change:_____
 5     Page No.____ Line No. _____ Change to:_____
 6   _____
 7   Reason for change:_____
 8     Page No.____ Line No. _____ Change to:_____
 9   _____
10   Reason for change:_____
11     Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14     Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17     Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20     Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24                ALBERT BRUST
25
```

Page 298

```
 1   DEPOSITION ERRATA PAGE
 2     Page No.____ Line No. _____ Change to:_____
 3   _____
 4   Reason for change: _____
 5     Page No.____ Line No. _____ Change to:_____
 6   _____
 7   Reason for change:_____
 8     Page No.____ Line No. _____ Change to:_____
 9   _____
10   Reason for change:_____
11     Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14     Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17     Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20     Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25                ALBERT BRUST
```

Page 299

```
 1   STATE OF ILLINOIS   )
                         ) SS:
 2   COUNTY OF C O O K   )
 3
 4        I, ANDREW R. PITTS, C.S.R. within and for the
 5   County of Cook and State of Illinois, do hereby
 6   certify that heretofore, to wit, on Friday the 15th
 7   day of January, 2025, personally appeared before me
 8   via videoconference, ALBERT BRUST, in a cause now
 9   pending and undetermined in the United States District
10   Court, For the Eastern District of New York, wherein
11   KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS
12   PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE
13   JONES, individually and on behalf of all others
14   similarly situated are the Plaintiffs, and GOVERNMENT
15   EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the
16   Defendant.
17        I further certify that the said witness was
18   first duly sworn to testify to the truth, the whole
19   truth and nothing but the truth in the cause
20   aforesaid; that the testimony then given by said
21   witness was reported stenographically by me in the
22   presence of the said witness remotely via
23   videoconference, and afterwards reduced to typewriting
24   by Computer-Aided Transcription, and the foregoing is
25   a true and correct transcript of the remote
```

Page 300

```
 1   videoconference testimony so given by said witness as
 2   aforesaid.
 3        I further certify that the signature to the
 4   foregoing deposition was reserved by counsel for the
 5   Deponent.  I further certify that the taking of this
 6   deposition was pursuant to Notice, and that there were
 7   present via videoconference at the deposition the
 8   attorneys hereinbefore mentioned.
 9        I further certify that I am not counsel for nor
10   in any way related to the parties to this suit, nor am
11   I in any way interested in the outcome thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto set my
13   hand and affixed my seal this 22nd day of January,
14   2025.
15
16   
     _____
17   ANDREW R. PITTS, CSR, RPR
18   CSR, COOK COUNTY, ILLINOIS
```