# Exhibit 2

### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF NEW YORK
 3   KEITH FISCHER, MICHAEL        )
     O'SULLIVAN, JOHN MOESER, LOUIS)
 4   PIA, THOMAS BARDEN, CONSTANCE )
     MANGAN, and CHARISE JONES,    )
 5   individually and on behalf of all )
     others similarly situated,    )
 6                                 )
             Plaintiffs,           )
 7                                 ) No. 2:23-cv-2848
         -v-                       )
 8                                 )
     GOVERNMENT EMPLOYEES INSURANCE)
 9   COMPANY d/b/a GEICO,          )
                                   )
10            Defendant.           )
11
12          Friday, January 10, 2025
13       Oral videoconference deposition of CRAIG
14   COSTANZO, held pursuant to Notice via Zoom with all
15   parties participating remotely, commencing at
16   10:00 a.m. Central Time, on the above date, before
17   Andrew R. Pitts, Certified Shorthand Reporter.
18
19
20
21
22
23
24   Andrew R. Pitts, CSR, RPR
     License No.:  084-4575
25   Esquire Deposition Solutions
```

### Page 2

```
 1   REMOTE APPEARANCES:
 2   On behalf of the Plaintiffs:
 3   OUTTEN & GOLDEN, LLP
     685 Third Avenue - 25th Floor
 4   New York, New York  10017
     (347) 390-2121
 5   Email: zdsouza@outtengolden.com
            sjean@outtengolden.com
 6   BY:  ZARKA SHABIR DSOUZA, ESQUIRE
          SABINE JEAN, ESQUIRE
 7
 8   On behalf of the Defendant GEICO:
 9   DUANE MORRIS, LLP
     190 South LaSalle Street - Suite 3700
10   Chicago, Illinois  60603-3433
     (312) 499-6779
11   Email:  gtsonis@duanemorris.com
     BY:  GREGORY TSONIS, ESQUIRE
12
13
14   ALSO PRESENT:
15      MEGAN SCZYGELSKI, Legal Videographer.
```

### Page 3

```
 1                I N D E X
 2   CRAIG COSTANZO                     EXAMINATION
 3       BY MR. TSONIS                       5
 4
 5              E X H I B I T S
 6   COSTANZO     DESCRIPTION                PAGE
 7   Exhibit 1    Workday profile for Craig
                  Costanzo, G004533-4588      separate
 8                (confidential)              transcript
 9
10   Exhibit 2    Geico HR Associate Handbook, 147
                  Compensation Contents,
11                G000028-43
12   Exhibit 3    2017 Geico Performance Guide & 166
                  Appraisal for Craig Costanzo,
13                G006638-6642
14   Exhibit 4    2019 Geico Performance       183
                  Appraisal for Craig Costanzo,
15                G006591-6603
16   Exhibit 5    2020 Geico Performance       193
                  Appraisal for Craig Costanzo,
17                G006581-6590
18   Exhibit 6    MAP 2 2021 (second half of   206
                  year) Performance Appraisal,
19                Craig Costanzo, G006623-6626
20   Exhibit 7    MAP 2 2022 (second half of   223
                  year) Performance Appraisal,
21                Craig Costanzo, G006621-6622
22   Exhibit 8    Answers to Interrogatories   229
23   Exhibit 9    Geico Human Resources        250
                  Associate Handbook,
24                G000191-235
25
```

### Page 4

```
 1       (Whereupon, the following proceedings were
 2        taken via videoconference.)
 3       THE VIDEOGRAPHER:  Good morning.  I am now
 4   started the recording, and we are now on the record.
 5   The time is 10:01 a.m. Central on Friday,
 6   January 10th, 2025.  This begins the videoconference
 7   deposition of Craig Costanzo taken in the matter of
 8   Keith Fischer, et al., versus Government Employees
 9   Insurance Company doing business as Geico filed in the
10   United States District Court for the Eastern District
11   of New York, Case No. 23-cv-2848.
12       My name is Megan Sczygelski.  I'm your
13   remote videographer today.  The court reporter is
14   Andrew Pitts.  We are representing Esquire Deposition
15   Solutions.
16       Will everyone present please identify
17   themselves and state who you represent, after which
18   the court reporter will swear in the witness.
19       MS. DSOUZA:  Hi.  This is Zarka DSouza from
20   the law firm Outten & Golden on behalf of the
21   Plaintiffs.
22       MR. TSONIS:  Gregory Tsonis on behalf of
23   Defendant Geico, from Duane Morris LLP.
24       MS. JEAN:  Sabine Jean from Outten & Golden
25   on behalf of the Plaintiffs.
```



Page 17

1  Q. Okay. Any other types of documents that
2  you reviewed that you recall?
3  A. I believe a brief look at the employee
4  handbook.
5  Q. The Geico associate handbook?
6  A. Yes.
7  Q. All right. Which portion of the Geico
8  associate handbook do you recall reviewing?
9  A. With regards to HR and report -- making
10 certain reports.
11 Q. How to report things to human resources?
12 A. Yes.
13 Q. Okay. Any other portions of the handbook?
14 A. I don't remember any other.
15 Q. All right. Any other types of documents
16 that you recall reviewing?
17 A. I don't remember any others.
18 Q. Okay. As part of this lawsuit, did you
19 ever produce documents that you have to your lawyers?
20 A. Yes, I did.
21 Q. Okay. And what types of documents did you
22 produce?
23 A. Performance appraisals, some memos,
24 I believe the handbooks. I just packaged up
25 everything I had.

Page 18

1  Q. Got it. And were those documents stored,
2  like, in a file cabinet or a file folder or somewhere
3  specific in your home?
4  A. My desk basically.
5  Q. Got it. So you have like a Geico file on
6  your desk?
7  A. It -- basically my desk is my Geico office.
8  Q. Fair enough. Okay.
9  A. It was -- it was drawers on my desk and --
10 Q. Okay. Aside from the documents that you
11 have provided to your lawyers, do you have other
12 documents that are relevant to this case?
13 A. No, I don't believe I do.
14 Q. Okay. What do you understand this case to
15 be about?
16 A. It's regarding a period of time when Geico
17 was requiring us to do excessive amounts of work that
18 couldn't possibly be done during the typical
19 eight-hour day and that it was forcing us to have to
20 work additional hours.
21 Q. What period of time was that?
22 A. I would say there's occasionally some, you
23 know, starting probably, I don't know, two or three or
24 four years once I started working here, but my primary
25 concern was -- started during the COVID period when it

Page 19

1  just -- everything changed.
2  Q. Okay. And, you know, COVID I understand in
3  a lot of ways is sort of a delineating line. So
4  let's -- let's talk about that.
5     I guess, pre-COVID, I think you said you
6  started in 2014, right?
7  A. Correct.
8  Q. And now I think you said, you know, two or
9  three or four years after you started is when --
10 I don't want to put words in your mouth, but when, you
11 know, you started to experience some of this increase
12 in case load?
13 A. Correct.
14 Q. Okay. And I guess from that time period to
15 COVID, what is, I guess, the -- the essence of -- of
16 your claims here in this lawsuit?
17 A. Well, when I was hired, they explained what
18 the case load would be and that they had based it on
19 studies, how much work could reasonably be done, and
20 then they just started increasing it seemed like every
21 year additional case load with no explanation on how
22 we were supposed to get it accomplished.
23 Q. Okay. When you say they, who are you
24 referring to?
25 A. I would say SIU management.

Page 20

1  Q. Okay. So --
2  A. Because they set the goal packages.
3  Q. When you began working for Geico, were you
4  located out of -- well, strike that.
5     When you began working for Geico, what was
6  your job title?
7  A. Senior field investigator, I believe, or
8  senior security investigator.
9  Q. So as a -- does the title, job title
10 outside security investigator sound familiar?
11 A. Yes.
12 Q. All right. And is it your understanding
13 that an outside position within the context that we're
14 talking about refers to a field position?
15 A. Correct.
16 Q. All right. And so you worked out in the
17 field, and you didn't on a day-to-day basis have to go
18 into the office to do your work, right.
19 A. That's correct.
20 Q. All right. But in Geico's system, you were
21 assigned to a specific office, right?
22 A. Yes.
23 Q. Were you assigned out of the what was then
24 the Woodbury office?
25 A. That was my understanding, yes.



Page 21

1  Q.  Okay.  Normally on a day-to-day basis,
2  though, you would work either from your home or out in
3  the field or some combination of the two, right?
4  A.  That's correct.
5  Q.  Okay.  As an out- -- when you were an
6  outside investigator during this time period when you
7  started, who was the SIU manager of the Woodbury
8  office?
9  A.  I can't remember his name.
10  Q.  Was it Mike DeGrocco?
11  A.  Yes, it was.
12  Q.  Okay.  And do you recall when Mike DeGrocco
13  stopped being the SIU manager for the Woodbury office?
14  A.  No, I -- I couldn't.  I don't remember the
15  dates.
16  Q.  All right.  That's okay.  Again, we'll be
17  talking about things that happened several years ago,
18  so understandable that you don't recall exact dates,
19  but to the extent you can give me your best
20  recollection, that's all I'm asking for.
21      After Mike DeGrocco, who took over as the
22  SIU manager of the Woodbury office?
23  A.  Bill Newport.
24  Q.  Okay.  How long did Bill Newport serve as
25  SIU manager of the Woodbury office?

Page 22

1  A.  I think I answered to him until they put me
2  under Renee.
3  Q.  Do you know Renee's last name?
4  A.  It's my current manager, and I'm drawing a
5  blank on his last name.
6  Q.  That's okay.  And we'll -- this isn't a
7  memory test, but there are some documents that I think
8  will probably refresh your recollection --
9  A.  Yes.
10  Q.  -- help you.  So I'm not -- not trying to
11  get you to just wrack your brain for no reason.  I'm
12  just trying to get a certainly general sense of -- of
13  the timeline.
14      When you started in 2014, do you recall who
15  your supervisor was?
16  A.  Chet Janik.
17  Q.  All right.  And did Chet, Chet Janik,
18  continue being your supervisor until he retired?
19  A.  That's correct.
20  Q.  Do you recall approximately when Chet
21  retired?
22  A.  I don't want to guess.  I don't remember.
23  I'm -- '22, '23 something.  I don't -- I'm not --
24  I don't remember for sure.
25  Q.  Okay.  So in any event, I mean, going back

Page 23

1  to the sort of pre-COVID time period that we're
2  talking about here, throughout that time period, you
3  had two SIU managers:  We said Bill Newport or prior
4  to Mike DeGrocco?
5  A.  That's correct.
6  Q.  All right.  And you had one supervisor,
7  Chet Janik?
8  A.  That's correct.
9  Q.  All right.  So when you referenced earlier
10  that they told you certain things, who were you
11  referring to?
12  A.  Generally it would be either Chet Janik or
13  mostly Bill Newport was during the time frame that the
14  major changes took place.
15  Q.  Okay.  And, again, we're talking about the
16  pre-COVID time period here, so prior to call it
17  February or March of 2020, right?
18  A.  Okay.  And that would -- I mean, it was
19  mostly through Chet Janik and the establishment of the
20  different goal packages.
21  Q.  So on a yearly basis in your job, you were
22  assessed on various criteria; is that right?
23  A.  Correct.
24  Q.  All right.  And in the time period that
25  we're talking about here generally, do you recall what

Page 24

1  those criteria were?
2  A.  Well, it changed, but it was bioquality,
3  productivity, case life at some point.  I feel like
4  I'm missing one.  Sorry.
5  Q.  No, that's okay.  So when you referenced
6  earlier that they changed, I guess do you mean that in
7  this time period -- well, strike that.
8      So recognizing you started in 2014, do you
9  have an understanding as to, I guess, you know, how
10  far back the claims that you're making in this lawsuit
11  go?
12  A.  I believe it goes back into 2016.
13  Q.  Okay.  So while I might ask you about 2014
14  or 2015 at some point, typically we're talking about,
15  I guess, you know, the start of the claims that you're
16  asserting in this lawsuit right now until the sort of
17  pre-COVID time period, right?
18  A.  Okay.
19  Q.  So in that time period, is it accurate to
20  say that the categories on which you were rated, which
21  I think you said were case life, quality, and
22  productivity, didn't change, but that the metrics
23  against which you might have been measured in any
24  given year did change?
25  A.  Yes.



Page 49

1   A.   I think so.
2   Q.   Okay.  Your supervisor, I guess, doesn't
3   know on a day-to-day basis what hours you're working,
4   right?
5   A.   Not unless we happen to -- I mean, that's
6   probably correct.  Unless we talked about it, there
7   was a -- we were able to start at different times for
8   a period and then they kind of set it, set our start
9   times.
10  Q.   Okay.  As a field investigator, though, you
11  would have the ability generally to flex your schedule
12  as needed?
13       MS. DSOUZA:  Objection.
14       You can answer, Craig.
15  BY THE WITNESS:
16  A.   To some extent.  See, it's -- it kind of
17  got difficult because, as they started implementing
18  these TIP times, they started -- you know, they kind
19  of locked you into a schedule because they were
20  sending you cases that you had to make TIPs relatively
21  quickly after you got the case.  So you were kind of
22  locked into a -- the schedule, not necessarily set,
23  but you had to kind of be there during the day time to
24  manage those TIPs.
25

Page 50

1   BY MR. TSONIS:
2   Q.   What was the time period within which you
3   had to do those activities, the TIP activities?
4   A.   Well, some of it -- and, again, it changed
5   so much, but at one point, it was like you're supposed
6   to be doing something with it, like, in a couple of
7   hours.  It -- it got very confusing because it was
8   within a couple hours, but then they'd say it's an
9   overall add all the numbers together kind of thing,
10  and then they'd average it out.  So it was kind of
11  confusing.
12  Q.   Okay.  And we'll talk more about that.
13       Did you ever notify your supervisor that
14  you were working overtime but not documenting it in
15  Geico's timekeeping system?
16  A.   I wouldn't say that I said it exactly like
17  that.  I -- I believe it was more of an "I have to
18  stay, I have to work past the times to try to meet
19  these requirements" and that I felt it was not
20  possible to meet these requirements once they started
21  giving us the huge volume of cases.  There was no way
22  to do it within the eight-hour day.
23  Q.   Okay.  But you never specifically told your
24  supervisor that you were working time periods but not
25  logging them in Geico's timekeeping system?

Page 51

1   A.   I never specifically told him that I was
2   not logging time into the system, no, I didn't say
3   that, I don't believe.
4   Q.   Okay.  Similarly, you never told any SIU
5   manager that you were working but not entering certain
6   periods of time working into the company's timekeeping
7   system?
8   A.   I believe I made it clear that there was no
9   way to do this unless I put extra time in.  I didn't
10  specifically say I'm not putting it into the
11  timekeeping, but I believe I made it clear to them was
12  that the only way there was working was because we
13  were putting in extra time.
14  Q.   Who did you make that report to?
15  A.   Bill Newport.
16  Q.   When did you make that -- when did you have
17  that conversation?
18  A.   I mean, I couldn't tell you specifically
19  when.  I just felt that, you know, the message was
20  getting crossed that this isn't working.  You're
21  giving us way too many cases to have the expectation
22  that we're able to do this in eight hours, and the
23  only way we can get this done is to put extra time in.
24  Q.   Right, but none of your cases -- well,
25  strike that.

Page 52

1       In terms of investigative activities,
2   there's only a very small number of things that have
3   to happen, you know, shortly after a case is assigned,
4   right?
5       MS. DSOUZA:  Objection.
6       You can answer.
7   BY THE WITNESS:
8   A.   It's -- well, there's -- there's time
9   quickly, and then there's number of days to get
10  certain things entered.  And, again, back at that --
11  during some of that same time frame in the COVID area
12  there, this was, you know, activities, and they were
13  grading us on activities.
14       And we had discussions, "Well, then don't
15  do -- if you can't get it done, then don't do all the
16  activities on every case."  And we were saying -- I
17  said to them, "Well, if I don't do the activities, I
18  get downgraded."  So I'm doing activities that don't
19  need to be done, taking up time that I don't have, to
20  try to meet the requirements to get the -- you know,
21  so I don't downgraded.
22  BY MR. TSONIS:
23  Q.   Right?
24  A.   So, I mean --
25  Q.   But the activities were measured on a



Page 154

1   A.   Yes, it was.
2   Q.   And those policies are the policies that
3   are contained in the associate handbook?
4   A.   Yes, it is.
5   Q.   All right.  Now, I'm happy to show it to
6   you if you'd like, but would you agree that each year
7   you were required to acknowledge and agree to follow
8   Geico's policies, that you did so?
9   A.   I agree with that, yes.
10  Q.   Okay.  And that includes the overtime
11  eligibility policy that we just reviewed?
12  A.   Yes.
13  Q.   Okay.  Just one moment.  I'll show you
14  Exhibit 1 again, just to look at another page that
15  I think will help guide us in our next discussion
16  here.  This is going back to Exhibit 1.  This is the
17  page that's ending in 4585.
18       Do you see here there's a Performance
19  Review section, and it's still your Workday profile?
20  A.   Yes.
21  Q.   All right.  And, now, this lists
22  essentially each review year starting from the
23  beginning of your employment with Geico to essentially
24  the most recent, not including the 2024 calendar year
25  for which there -- the performance review process

Page 155

1   hasn't been completed, it lists every other year that
2   you've worked for Geico here, right?
3   A.   Yes.
4   Q.   All right.  And starting in 2014, it shows
5   that for that initial, your first year with Geico,
6   which -- when did we say you started with Geico, when
7   in 2014?
8   A.   August 4th.
9   Q.   Okay.  So even though this shows a
10  January 12th of 2014, you -- you actually only worked
11  for Geico for, like, four months there, right?
12  A.   Correct.
13  Q.   In the 2014 calendar year?
14  A.   Correct.
15  Q.   All right.  And in that year, you received
16  a 3.8 manager rating, right?
17  A.   Yes.
18  Q.   Then moving forwards very quickly here,
19  2015, it was a 4.6?
20  A.   Yes.
21  Q.   2016, a 4.5?
22  A.   Yes.
23  Q.   In 2017, you got a 4.8?
24  A.   Yes.
25  Q.   In 2018, you received a 5?

Page 156

1   A.   Yes.
2   Q.   2019, a 4.4?
3   A.   Yes.
4   Q.   And 2020, a 5?
5   A.   Yes.
6   Q.   And 2021 is when I believe Geico instituted
7   a semi-annual review process, right?
8   A.   I believe so.
9   Q.   Okay.  So for the first half of 2021, you
10  received a 4.8?
11  A.   Yes.
12  Q.   And in the second half of 2021, a 4.7?
13  A.   Yes.
14  Q.   And then for 2022, it looks like there was
15  some sort of interim review for the first three months
16  of the year?
17  A.   Yeah, I -- I don't remember --
18  Q.   Do you recall what that was?
19  A.   Nope, I don't remember.
20  Q.   Okay.  Oh, in that review for the first
21  three months of 2022, you received a 4.8, right?
22  A.   Yes.
23  Q.   And in 2022, now going to the standard
24  semi-annual review process, for the first half, you
25  received a 4.6?

Page 157

1   A.   Yes.
2   Q.   And then the second half of 2022, you
3   received a rating of 5?
4   A.   Yes.
5   Q.   And then in 2023, it shows you as a 4.3; do
6   you see that?
7   A.   Yes.  Yep.
8   Q.   All right.  Well, for the first half,
9   excuse me, of 2023.
10       And then there's a total year 2023 rating
11  it shows?
12  A.   Yes.
13  Q.   Do you see that?
14       Is it your understanding you received a
15  first half of the year 2023 rating and then one that
16  encompassed the entire year?  I guess I'm just trying
17  to figure out if this is --
18  A.   I -- I -- I don't know.  I've lost track on
19  how we're even doing business anymore.
20       MS. DSOUZA:  And I have to -- I'd just like
21  to remind the witness to let counsel complete his
22  question and before -- before you answer, just so we
23  have a clean record.
24       MR. TSONIS:  Thank you.  And I'm sure the
25  court reporter thanks you for that too.  Sorry.



Page 158

1  BY MR. TSONIS:
2  Q.  So, Mr. Costanzo, I guess from 2014
3  through, you know, midway through 2023, every rating
4  that you received was essentially, you know, at least
5  some point above a 4 to a 5 even, right?
6  A.  Yes.
7  Q.  All right.  So you were exceeding
8  expectations in -- for -- in terms of your performance
9  rating in each of the years from 2016 through 2023, at
10  least through June 30th?
11  A.  Yes.
12  Q.  Okay.  Were you a lead security
13  investigator the entire time?
14  A.  No, I had started -- I got promoted at a
15  certain point.
16  Q.  Do you remember when that was?
17  A.  Not offhand, I don't.
18  Q.  What was the change in job duties for when
19  you were -- well, what was your position before versus
20  what was it after?
21  A.  Well, it was -- really, the job is
22  basically the same.  At some point prior to getting
23  the lead investigator, I was assigned to be the
24  training officer.  So I trained the new investigators,
25  and I was assigned the duties of doing the event data

Page 159

1  recorders.
2     So then they approached me about becoming a
3  lead investigator since that was what the job, my
4  understanding was, to do the training and do the event
5  data recorders, so they ended up promoting me to that.
6  Q.  Okay.  And when did you become -- was it
7  training officer or --
8  A.  It's just they started using me to do the
9  training.  There was no title or anything; it's just
10  as we were getting new people, he used me to train
11  them.
12  Q.  When you say he used you to train them, do
13  you mean Bill Newport or Chet --
14  A.  Chet, Chet Janik.
15  Q.  All right.  So you would train other field
16  investigators?
17  A.  Yes, well, in our -- in our team.
18  Q.  The -- yes, I appreciate the clarification.
19     So you would train other field
20  investigators that worked for Chet Janik?
21  A.  Yes.
22  Q.  Okay.  When did that start?
23  A.  I don't know the dates.  I -- I'd train the
24  next person and the next couple -- or the next couple
25  of people.  I don't know the dates.

Page 160

1  Q.  Just approximately, I guess, when did you
2  begin training other investigators?  Regardless of
3  formal job title, I just mean like when did you start
4  training people?
5  A.  I -- I don't know the dates.  It was
6  before -- like I said, it was before I became a lead
7  investigator, but I trained Brian Crozier, Barry
8  Reifen (phonetic), Tom Bardon, so I think -- I believe
9  it was those three, but I -- I don't know the dates.
10  Q.  Okay.  Was it pre-COVID, post-COVID?
11  A.  Yes, pre-COVID.
12  Q.  Pre-COVID, okay.
13     And post-COVID, have you trained anyone?
14  A.  No.
15  Q.  There have been new people that have been
16  hired though, right?
17  A.  Not -- not in our -- our area, not in our
18  team.
19  Q.  Not in your geographic area or upstate New
20  York?
21  A.  Right.
22  Q.  There have been other investigators that
23  have been hired for, like, New York City, for example?
24  A.  Possibly, but I wasn't involved in that.
25  Q.  Okay.  So you've only trained people --

Page 161

1  well, strike that.
2     You don't necessarily train, like, every
3  new field investigator, only certain people that are
4  geographically close to you?
5  A.  Yeah, only the people that were in Chet
6  Janek's group.
7  Q.  Okay.  What did the training entail?
8  A.  I -- they could come to my office, and we
9  would learn how to use SICM, how to conduct the
10  investigations, how to meet the -- the audit criteria,
11  how the interviews are supposed to take place, how to
12  do the recordings.
13     You know, Brian Crozier was a little
14  different because he was transferring in from damage
15  adjusters, so he knew the Geico stuff.  I just had to
16  teach him the SICM stuff and -- and the requirements
17  for that.  So it depended, but --
18  Q.  Would they go out into the field with you?
19  A.  Yes.
20  Q.  All right.  And when you say they would
21  come to your office, like, would they literally come
22  over to your house?
23  A.  Yep.
24  Q.  Okay.  Some of these individuals, it sounds
25  like, like Brian, already worked for Geico, and so you



Page 162

1  needed to teach them more about the, you know, SIU
2  tech and the investigative side; is that fair?
3      A.   That's correct.
4      Q.   And some people, like yourself, were maybe
5  former law enforcement who are pretty well versed in
6  investigation or investigative tactics, but not
7  necessarily on the Geico ways of doing things?
8      A.   Correct.
9      Q.   Right.  In terms of the using systems,
10 I think you mentioned system.  Were there -- oh, it's
11 SICM, excuse me, S-I-C-M for the court reporter.
12 Would there be other systems that you talked to them
13 about?
14     A.   Yes.
15     Q.   Which ones?
16     A.   We would do TLO for background searches;
17 ISO, which is through NICB for claims searches;
18 there's a DRN, which is vehicle citing searches; teach
19 them how we do the social media searches.  There's
20 Carfax to do the vehicle histories.  There's different
21 things within Geico to how to do license plate
22 searches.  I'm sure I'm missing some stuff, but
23 there's different systems that we -- we need to get
24 into to do certain searches.
25     Q.   Okay.  And generally, I guess, you would be

Page 163

1  teaching them, like, what the expectations are, how to
2  do the job of field investigator?
3      A.   Yes.
4      Q.   Okay.  In terms of schedule and the ability
5  to change your schedules, would you talk to them about
6  that?
7      A.   I think so.  I believe we talked some of
8  that, yes.
9      Q.   Okay.  And, I guess, would you tell them
10 that they had, you know, the ability to set their own
11 sort of schedule for any given day of what they were
12 going to do and when they would start their day?
13     A.   I -- I guess I would tell them how I did
14 things.  I mean, really, that's more of a supervisor's
15 telling them what they can do and can't do.  I didn't
16 get into it a lot.  I think it was kind of work that
17 out with the supervisor what your general schedule
18 would be or when you're making changes.
19     Q.   Okay.  And similarly, particularly if it's
20 not someone that came from Geico, you'd cover time
21 entry with them and how to enter their time?
22     A.   Yes.
23     Q.   All right.  And I take it you did that
24 for -- was it Marty ^Reifen you said?
25     A.   Yeah, I think that's how it was -- yes.

Page 164

1      Q.   Okay.  And Tom Darden, I think you said?
2      A.   Bardon.
3      Q.   Bardon, excuse me.  I can't read my own
4  handwriting.  Bardon?
5      A.   It's -- yeah.
6      Q.   So what would you instruct them regarding
7  the entry of their time in Workday?
8      A.   7.75.  I mean, that's what you put in for
9  your -- each work day.
10     Q.   Did you ever instruct them that they had to
11 enter in only the time that they actually worked?
12     A.   No.  I mean, we put in 7.75 unless --
13 I mean, unless you were getting paid overtime, then
14 you would put in the overtime, but --
15     Q.   Sure.  Did you ever tell any of those
16 individuals that you worked additional hours but
17 didn't log it into Workday?
18     A.   I never had that conversation with them.
19     Q.   Okay.  Did you ever explain to them, "Hey,
20 you know, the workload, sometimes you can't keep up,"
21 and instruct them in any way?
22     A.   I don't remember that conversation, but
23 I -- I -- if I did, I think I would have just said,
24 you know, "If there's issues, you got to go to your
25 supervisor and talk to them."

Page 165

1      Q.   Did you train them that if they needed
2  overtime, if there was a business reason for it, they
3  could request it from their supervisor?
4      A.   No, because I don't think that that was
5  necessarily the deal.  It depends on when they were
6  getting trained for what the rules were.
7      Q.   Well, we're talking about the pre-COVID
8  time period, it sounds like?
9      A.   Yeah.  I mean, under Chet, I guess it's --
10 you pretty much have to talk to Chet about it if
11 there's issues where it's going to be more time, then
12 just talk to him and work it out.  I didn't want to
13 speak for him.
14     Q.   Right.  But you told them that if they had
15 any issue that required them to work additional hours
16 that they could make that request and discuss it with
17 their supervisor?
18     A.   Yes, I -- I think I -- I think I would have
19 said something to that effect, yes.
20     Q.   Okay.  You didn't instruct them that they
21 could enter time into Workday -- or excuse me.  Strike
22 that.
23          You didn't instruct them that they could
24 work additional hours, but they shouldn't enter it
25 into Workday?



Page 166

1  A.  No, I did not.
2  Q.  Okay.  I want to look for a moment -- I'm
3  going to stop sharing this.  I will mark -- look at
4  what's going to be marked as Exhibit 3.
5      (Whereupon, Costanzo Exhibit 3 was
6       presented.)
7      MR. TSONIS:  I'll share my screen.
8  BY MR. TSONIS:
9  Q.  Have you seen this document before,
10  Mr. Costanzo?
11  A.  Yes, I believe I have.
12  Q.  What is this document?
13  A.  This is our performance appraisal forms.
14  Q.  Okay.  And this is the performance of --
15  your performance guide and appraisal form for the
16  rating period January 1, 2017 to December 31st, 2017?
17  A.  Yes.
18  Q.  Okay.  And that's your name written on
19  here, right?
20  A.  Yes.
21  Q.  And it shows your supervisor as Mr. Janik?
22  A.  Yes.
23  Q.  Now, this is the sort of 1 through 5 rating
24  period that we were -- or rating scale, excuse me,
25  that we talked about earlier, right?

Page 167

1  A.  Yes.
2  Q.  All right.  And there's a -- under the
3  fully trained associate scale sort of a 5 is someone
4  that consistently exceeds all standards and goals?
5  A.  Yes.
6  Q.  A 4 is someone that consistently meets and
7  often exceeds standards or goals?
8  A.  Yes.
9  Q.  And then a 3 is someone that consistently
10  meets standards or goals?
11  A.  Yes.
12  Q.  All right.  So if you look at the second
13  page -- and, again, this is a document that's Bates
14  stamped G006638 going down to 6642, but I want to look
15  at the second page first.
16     Now, it shows Section 1 is Goal Setting; do
17  you see this?
18  A.  Yes.
19  Q.  And this shows Performance Goals, and then
20  there's three different parts here that are listed; do
21  you see that?
22  A.  Yes.
23  Q.  Now, the first is Average Case Life, right?
24  A.  Yes.
25  Q.  And in parentheses, it says "non EUO

Page 168

1  cases"; do you see that?
2  A.  Yes.
3  Q.  It was your understanding that any case
4  that required an examination under oath would
5  automatically be excluded from a calculation of
6  average case life?
7  A.  Yes.
8  Q.  All right.  And that was done because of
9  the unpredictability of when or whether a policyholder
10  would actually appear for an examination under oath?
11  A.  I believe so.
12  Q.  Okay.  Now, the weight for this metric was
13  20 percent?
14  A.  Yes.
15  Q.  Right.  So -- and, again, I'm skipping
16  ahead a little bit, but there's a 40 percent weight
17  for productivity and a 40 percent weight for quality
18  and a 20 percent weight for average case life, right?
19  A.  Yes.
20  Q.  All right.  So your -- you understood that
21  your performance was being weighted or assessed, you
22  know, with those weights, that productivity was 40 out
23  of -- 40 points out of 100, let's say, right?
24  A.  Yes.
25  Q.  All right.  So the average case life, to be

Page 169

1  a 5, your average case life would have to be below a
2  7.0, it shows?
3  A.  Yes.
4  Q.  And 7.0 is a number of days that a case is
5  open?
6  A.  Yes.
7  Q.  All right.  And then similarly, and we
8  don't have to go through all the ranges, but it shows
9  different ranges for days for a 4, 3, 2, and a 1,
10  right?
11  A.  Yes.
12  Q.  And if your average case life was above 19
13  days, then you would be rated a 1?
14  A.  Yes.
15  Q.  Similarly, under Quality, right, there's
16  a -- in addition to the weight, there's sort of a
17  metrics here, like a 5 is above a 96.1, right?
18  A.  Yes.
19  Q.  So we talked earlier, there's sort of an
20  assessment of any case that is subject to an audit
21  that is made, and then audit -- like a score is
22  generate for how many of the things that you needed to
23  do you did correctly, right?
24  A.  Yes.
25  Q.  All right.  So this is kind of like a --



Page 262

1  correct transcript of the remote videoconference
2  testimony so given by said witness as aforesaid.
3       I further certify that the signature to the
4  foregoing deposition was reserved by counsel for the
5  Deponent.  I further certify that the taking of this
6  deposition was pursuant to Notice, and that there were
7  present via videoconference at the deposition the
8  attorneys hereinbefore mentioned.
9       I further certify that I am not counsel for nor
10 in any way related to the parties to this suit, nor am
11 I in any way interested in the outcome thereof.
12      IN TESTIMONY WHEREOF:  I have hereunto set my
13 hand and affixed my seal this 14th day of January,
14 2025.
15
16 *Andrew R. Pitts*
17 ANDREW R. PITTS, CSR, RPR
18 CSR, COOK COUNTY, ILLINOIS

