# Exhibit 3

```
                                                    Page 1
 1
 2   IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
 3   ----------------------------------x
 4   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 5   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, Individually and on
 6   behalf of all others similarly
     situated,
 7
                    Plaintiffs,
 8
         -against-              Case No.
 9                              2:23 Civ. 2848
     GOVERNMENT EMPLOYEES INSURANCE   (GRB)(ARL)
10   COMPANY d/b/a GEICO,
11                Defendant.
12   ----------------------------------x
13                August 28, 2024
                  10:06 a.m.
14
15   ***This Transcript Contains a Confidential Section***
16
17       Videotaped Deposition of KEITH FISCHER,
18   taken by Defendant, pursuant to Notice and Agreement,
19   held at 1540 Broadway, New York, New York, before
20   Joseph R. Danyo, a Shorthand Reporter and Notary
21   Public within and for the State of New York.
22
23
24
25
```

```
                                                    Page 2
 1
 2   A P P E A R A N C E S :
 3      OUTTEN & GOLDEN LLP
        Attorneys for Plaintiffs
 4         1225 New York Avenue, N.W.
           Suite 1200B
 5         Washington, D.C. 20005
 6      By:   ZARKA SHABIR DSOUZA, ESQ.
              HANNAH COLE-CHU, ESQ.
 7
 8
        DUANE MORRIS LLP
 9      Attorneys for Defendant
           190 South LaSalle Street
10         Suite 3700
           Chicago, Illinois 60603
11
        By:   TIFFANY ALBERTY, ESQ.
12
13
14   Also Present:
15      ADRIENNE CHEMMEL, Videographer
16             ~oOo~
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 3
 1        Fischer
 2        THE VIDEOGRAPHER:  Good morning.  We
 3   are now on the record.  The time is 10:06
 4   a.m. on August 28, 2024.  This begins the
 5   video deposition of Keith Fischer taken in
 6   the matter of Keith Fischer versus
 7   Government Employees Insurance Company
 8   filed in the United States District Court
 9   for the Eastern District of New York, the
10   case number of which is 2:23 Civ.
11   2848(GRB)(ARL).
12        My name is Adrienne Chemmel.  I am
13   your videographer today.  The court
14   reporter is Joe Danyo.  We are
15   representing Esquire Deposition Solutions.
16        Will everyone present please identify
17   themselves and state whom you represent,
18   after which the witness will be sworn in.
19        MS. DSOUZA:  Zarka Shabir Dsouza from
20   Outten & Golden for the Plaintiffs.
21        MS. ALBERTY:  Tiffany Alberty of
22   Duane Morris on behalf of the Defendant
23   GEICO.
24        THE VIDEOGRAPHER:  Will the court
25   reporter please swear in the witness, and
```

```
                                                    Page 4
 1        Fischer
 2   then, Counsel, you may proceed.
 3   K E I T H   F I S C H E R, having been first
 4   duly sworn by Joseph R. Danyo, a Notary Public,
 5   was called as a witness and testified as follows:
 6   EXAMINATION BY MS. ALBERTY:
 7        Q.  Can you please state and spell your
 8   first and last name.
 9        A.  Keith, K-e-i-t-h, Fischer,
10   F-i-s-c-h-e-r.
11        MS. ALBERTY:  Let the record reflect
12        that this is the discovery deposition of
13        Mr. Keith Fischer taken pursuant to notice
14        and by agreement of the parties.  Today's
15        deposition will be taken in accordance
16        with all applicable rules.
17        Q.  Mr. Fischer, I know I introduced
18   myself off the record, and I just stated my name
19   for the record, but I'm Tiffany Alberty.  I'm
20   counsel for GEICO, the Defendant in this case.
21        I'm going to be asking you a series
22   of questions about your background, your
23   experience at GEICO.  Before we get started, have
24   you been deposed before?
25        A.  Deposed, I mean as far as grand jury,
```



Page 25

1      Fischer
2  claims.
3      Q.  Would this have been for everything
4  of personal property including residential?
5      A.  No.  I did mostly vehicle.  Just
6  about all vehicle.
7      Q.  Then did you resign, or were you
8  terminated from Allstate?
9      A.  I resigned in good standing at
10  Allstate and joined GEICO Insurance May 10th,
11  1999.
12      Q.  Why did you leave Allstate?
13      A.  Better, a little bit more as far as
14  salary, but the freedom to do what I felt I did
15  best was go out into the street and talk to
16  people and interview people.
17      Q.  Okay.  So from 1999 until what day
18  did you work for GEICO?
19      A.  From May 10, 1999 to I believe it
20  was, I believe today is my anniversary, my
21  four-year anniversary.  My last vacation day was
22  today, but I actually probably didn't retire
23  until November 1st was my actual day of 2000.
24      Q.  2000 or 2020?
25      A.  I'm sorry.  2020.

Page 26

1      Fischer
2      Q.  Okay.  No problem.  I just wanted to
3  double-check.
4      A.  Yeah.  That would have been 21 and a
5  half years.
6      Q.  Okay, and we'll get more into the
7  substance of your experience at GEICO, but, when
8  you retired in November of 2020, did you assume
9  any other employment then thereafter?
10      A.  No.
11      Q.  Have you worked since let's say
12  November of 2020 any type of odd jobs, part-time,
13  1099, independent contractor status?
14      A.  No.
15      Q.  So your wife, did she retire as well?
16      A.  Yes.  She retired about a month after
17  I did.
18      Q.  Okay, and since her retirement, to
19  your knowledge, has she worked?
20      A.  No.
21      Q.  What is your source of income now, if
22  any?
23      A.  I have my New York City Police
24  pension, I have Social Security, and I have a
25  401(k).

Page 27

1      Fischer
2      Q.  Your Social Security that you're
3  getting, is that under Social Security Disability
4  Insurance?
5      A.  Yes, it is.
6      Q.  And how long have you been under SSDI
7  for?
8      A.  I'm going to say 2022.  Two years.
9  About two years.
10      Q.  I'm going to jog your memory here.
11  Let's go back to 1999.
12      A.  Okay.
13      Q.  When you first started at GEICO, do
14  you remember what your title was?
15      A.  SIU investigator, to the best of my
16  recollection.
17      Q.  Were you always full time?
18      A.  Yes.
19      Q.  What type of investigations did you
20  conduct when you first started at GEICO in 1999?
21      A.  To the best of my recollection, I
22  handled just about everything that was given to
23  us.  I didn't have a specific category or claim
24  that I would handle whatever was given to us by
25  the inside staff, would give us our cases.  In

Page 28

1      Fischer
2  our mailbox we would come and pick them up and
3  whatever it was asked we were asked to do.
4      Q.  So for GEICO they have quite a few
5  different lines of insurance.  Were you handling
6  every aspect, meaning commercial, residential,
7  property, cyber?
8      A.  Property.
9      Q.  When you first started in 1999, were
10  you assigned to a region?
11      A.  Region 2.
12      Q.  Did you work in region 2 for your
13  entire tenure?
14      A.  Yes.
15      Q.  When you started in 1999, were you
16  assigned to a geographic location?
17      A.  To the best of my recollection, we
18  were given the five boroughs of New York City,
19  Nassau and Suffolk.
20      Q.  Did that geographic area ever expand
21  during your tenure?
22      A.  I was asked to travel upstate several
23  times up to Syracuse, Binghamton, Rochester, that
24  area, to handle some cases.  Yes.
25      Q.  How frequent would you say you were



Page 29

1            Fischer
2  handling let's say cases up north?
3       A.  I did for about six months.  I was
4  under a different supervisor who was assigned up
5  there, and I had agreed to travel up there one or
6  two days a week and conduct cases up there.  They
7  were short on staff.
8       Q.  Do you remember when in time that
9  would have occurred?
10      A.  Probably after 2006, 2005, somewhere
11  in there maybe.
12      Q.  Okay.
13      A.  I believe Cheryl Darenthal was the
14  supervisor at the time.  So that might have been
15  2008, '09, '10, to the best of my recollection.
16      Q.  Okay.  Focusing on the claims in this
17  case, it's my understanding that it would have
18  started at the end of 2016 into then when you
19  retired.  Does that sound right to you?
20      A.  Could you repeat the question.
21      Q.  Sure.  As far as the claims and the
22  time period, because you've worked for GEICO for
23  so long, it's my understanding that the claims
24  would have occurred at the end of 2016 all the
25  way through to when you retired.  Does that sound

Page 30

1            Fischer
2  right?
3       A.  Yes.
4       Q.  So I will try my best to
5  differentiate if we're going back in time to when
6  you first started at GEICO, but really the focus
7  will be around that time consideration of 2016 up
8  until your retirement.  Okay?
9       A.  Okay.
10      Q.  So, for that specific time frame,
11  2016 until your retirement, fair to say that the
12  cases that you handled would have been in the
13  five boroughs, Suffolk and Nassau County?
14      A.  That's correct.
15      Q.  Did you handle any type of claims
16  outside of the State of New York between that
17  time frame?
18      A.  Yes, I did.  I was asked to go, I was
19  assigned to the catastrophe team, and I did
20  travel to Houston, Texas, and Denver, Colorado
21  twice I believe to handle hail claims in Denver
22  and flood claims in Houston, Texas.
23      Q.  Do you remember when in time that
24  would have been?
25      A.  That might have been just prior to

Page 31

1            Fischer
2  2016.  I'm not sure if I really had any
3  catastrophes after 2016, to the best of my
4  recollection.  There could have been, but from
5  what I remember it was prior to that.
6       Q.  So then let's circle back.  As an SIU
7  investigator, were you assigned to a specific
8  level?
9       A.  When I first started at GEICO, I was
10  a grade 65, and that was in 1999, and in 2004
11  five years later I was promoted to grade 66.  I
12  believe I was one of four investigators promoted
13  to that.
14      Q.  Okay, and tell me what's the
15  difference between a 65 and a 66, to your
16  recollection?
17      A.  66, in accordance with the regular
18  day-to-day investigations, I was also asked as a
19  66 to train all the new investigators that came
20  on board.  I was asked to do ride-alongs with
21  inside staff or counsel depending on the
22  supervisor's requests.  I was probably given
23  between four and six more cases a month being at
24  that level.  I had to take on more serious cases
25  to do things out of the ordinary that some people

Page 32

1            Fischer
2  wouldn't have to do.  It usually came at the
3  request of my supervisor Jerry Cassagne.
4       Q.  What were the duties and
5  responsibilities for a level 65?
6       A.  To handle cases given to us by the
7  inside staff, anything from bodily injuries to
8  theft claims to social media to visiting
9  attorneys with pictures and letters requesting
10  that they drop cases.  They were called operation
11  challenges.  Typing.  Every day doing
12  face-to-face interviews, coordinating with the
13  National Insurance Crime Bureau, police
14  personnel.  I also had a significant arson
15  contingent of investigators that I had to deal
16  with because I dealt with thefts and fires as far
17  as GEICO was concerned.  I have an arson
18  background.
19      Q.  With?
20      A.  The Levittown Fire Department.
21      Q.  With the duties that you just
22  outlined as a level 65, would a level 66 have to
23  take on those duties in conjunction then with the
24  training that you previously spoke about?
25      A.  Yes.



Page 33

1         Fischer
2     Q.  You also stated as a 66 you would be
3  assigned four to six more cases a month, and
4  would that have been under the same scope of
5  cases that you just spoke about?
6     A.  Yes.
7     Q.  Which would have been social, auto,
8  operation challenges?
9     A.  I would like to clarify my answer.
10  As time went on, I thought we were back in the
11  early 2000's, as time went on, I became more of
12  the theft coordinator, but in addition to my
13  theft investigations, I also handled staged
14  accidents, caused accidents, social media.  Being
15  a 66, I was expected to handle bigger cases, more
16  pattern cases I guess you could say, rings,
17  things of that nature as a 66.
18     Q.  In 2016 until your retirement, what
19  percentage of theft cases would you say you were
20  handling?
21     A.  Probably 70 percent of my claims were
22  theft.
23     Q.  Then what percentage were you
24  handling staged accidents?
25     A.  About 20 percent.

Page 34

1         Fischer
2     Q.  And then what about social media?
3     A.  Yeah.  That was maybe 5 percent, and
4  then we were given the other 5 percent was policy
5  claims.  Usually checking on people's vehicles
6  where they lived, rate evading, things like that.
7     Q.  In 2000, and I want to focus in 2016
8  were you assigned to a specific team?
9     A.  Yes.  I was assigned to my
10  supervisor, Jerry Cassagne.  I was assigned to
11  the theft team.
12     Q.  Who was comprised of that team at
13  that time?
14     A.  Myself, John Gillane, Vito, I've got
15  the wrong last name.  Vito, and what's her name?
16  Maria Munoz.
17     Q.  From 2016 onward until your
18  retirement, were you always assigned to Jerry's
19  team as the theft team?
20     A.  It did change.  To the best of my
21  recollection, I did primarily theft claims.
22  There were times that I was asked, if I can
23  expand my answer, as time went on, in the theft
24  team, there became times where the staged
25  accident team was cut off at a certain time.

Page 35

1         Fischer
2     In other words, they would be given
3  only 20 cases, because they were what GEICO had
4  deemed level 1 cases, because there were usually
5  3 and 4 occupants in the car, which meant a
6  larger number of examinations under oath.
7     Usually about the 18th or 19th or
8  20th of the month, that particular team would
9  reach their maximum amount of cases that they
10  could receive, which was laid down or supplied to
11  us by supervisors, and, at that point, I would
12  take on staged accident losses, because those
13  particular five, six, seven investigators were
14  now cut off from staged accidents.
15     So, in addition to my theft claims, I
16  was also asked to do staged and caused losses.
17     Q.  Okay.  Was that something that only
18  uniquely applied to you, if you know?
19     A.  No.  There was a few of us.  Not just
20  myself.  I wasn't singled out, but a lot of us
21  had to take on additional work from other teams
22  even though we were assigned to the theft team.
23     Q.  For those who were on your theft
24  team, do you know, say, for example, if John,
25  Vito or Maria had to then take on staged

Page 36

1         Fischer
2  accidents to assist with that department?
3         MS. DSOUZA:  Objection.
4     Q.  You can answer.
5     A.  Did they have to take those claims
6  on?
7     Q.  Yes.
8     A.  Is that what you're asking?
9     Q.  To your knowledge.
10     A.  Yes.
11     Q.  I think from your testimony, as I
12  understand it, you did not work in the office.
13  Is that right?
14     A.  That's right.
15     Q.  Did you ever have an inside role?
16         MS. DSOUZA:  Objection.
17     A.  No.
18     Q.  In your position from 2016 until your
19  retirement, did you have a set schedule, meaning
20  I worked Monday through Friday 9 to 5?
21     A.  No.
22     Q.  Did you have flex time?
23     A.  We were, I guess that's what it was
24  called.  Yes.  You could start and stop depending
25  on your schedule, depending on your examinations



**Page 69**

1      Fischer
2          THE VIDEOGRAPHER: We are back on the
3      record at 11:46 a.m.
4  BY MS. ALBERTY:
5      Q.  Okay. So, before we took a break, we
6  were talking about the different types of claims
7  that you would investigate. For any of the
8  claims that you investigated for the five
9  boroughs, Suffolk and Nassau County, how far
10 would you drive, meaning mileage, max?
11     A.  An estimate, I mean I would do, to be
12 fair, I mean between 500 to 1200 miles a month.
13 I had to fill out a monthly mileage record.
14 Obviously during COVID there was no mileage, but
15 from '16 to '20, it depended on where my cases
16 were located, whether Staten Island, Brooklyn or
17 the Bronx or how many EUOs I did.
18         So I would say the minimum 4 to 500 a
19 month and some months a thousand to 1200 a month.
20     Q.  I apologize. My question was not
21 great. Regarding, how do I want to articulate
22 this, regarding how far you would drive, meaning
23 hours. Clearly you're not driving 500 miles in
24 one day.
25     A.  No.

**Page 70**

1      Fischer
2      Q.  So, in a day, what was, you know, the
3  time that you spent in the car obviously not
4  considering COVID times?
5      A.  Some days as many as five to six
6  hours and some days two hours. It depended on
7  the number of EUOs that I had or where my cases
8  were located. I lived pretty much centrally
9  located in Nassau. So I was 30 miles from the
10 city, and I was 30 to 40 miles from Suffolk.
11     Q.  I think you said, for the claims that
12 you handled up north, you're just unsure when in
13 time that would have occurred?
14     A.  It was prior to this 2016. I'm
15 almost positive.
16     Q.  Okay. Prior to COVID, how many
17 claims would you handle a week in, again, sorry,
18 the 2016 to 2020 time frame?
19     A.  I'm going, approximately between 30
20 to 60 a month. It depended on the year. As time
21 went on and we lost investigators, obviously the
22 cases grew because there was less personnel.
23     Q.  And that 30 to 60 cases per month
24 range, did that fluctuate?
25     A.  Yes.

**Page 71**

1      Fischer
2      Q.  Were some weeks busier than others?
3      A.  Yes.
4      Q.  Were there certain times of the year
5  that were busier than others?
6      A.  Not to my recollection. Everything
7  was, there was no certain time of the year.
8  Busier? I will say the summer was busy because
9  people were on vacation. So, yes, that was quite
10 busy. We handled up to 60 or 70 cases depending
11 on I think there was five to seven people were
12 allowed to go on vacation at any given time. So
13 that meant that you had to take those 2 to 300
14 cases and divide them up.
15     Q.  If somebody went out, say, for
16 example, on short-term leave, say one week or was
17 out on a holiday, would you step in only for that
18 week to handle whatever was necessary for that
19 case, or would you then assume the entirety of
20 the case and work it from the very beginning to
21 the end?
22     A.  I would work it from the beginning to
23 the end. It was now my case. Are you talking
24 about if they had existing claims prior to going
25 on vacation? Their cases?

**Page 72**

1      Fischer
2      Q.  Yes.
3      A.  Yes, there would be times where we
4  would have to conduct examinations under oath or
5  go out and do some steps depending on who you
6  worked with. In the theft team there was only
7  four or five of us. So in SIU you were given two
8  or three days prior to your vacation to catch up
9  on your cases. Then you would go away for a week
10 say, and then you would come back, and you were
11 given another day.
12         So there was about ten days there
13 that, not only did you have to do your 60 or 70
14 cases, but you had to go in and touch the cases
15 of other examiners or if they asked you to maybe
16 do some examinations under oath that were
17 scheduled, you would do it for them and/or maybe,
18 if you were out in Queens, you would do a canvass
19 or interview one of their insureds, because they
20 had to make entries into their case certain
21 dates. We were given guidelines to touch our
22 cases so many days a month.
23     Q.  Do you know how many times you had to
24 touch a case a month if it was in theft?
25     A.  I had to touch it at least, to the



Page 73

1  Fischer
2  best of my recollection, four or five times a
3  month.  The 3rd day, the 8th day, I believe the
4  15th day, the 21st day and then closure usually
5  within I believe 28 days.  Something to that
6  effect.
7      Q.  Did you say you had to close the case
8  within 28 days?
9      A.  No, no, you could have a case open
10 for three or four months, but we were given a set
11 of guidelines that we had to not only make these
12 entries, but the quicker that we closed the claim
13 the better your rating.
14     Q.  For example, social media, was there
15 a requirement to touch the case a specific amount
16 of times per month?
17     A.  From 16 to 20 guidelines and
18 procedures changed numerous times.  Each year,
19 just to give you an example, a theft claim when I
20 first started, maybe let's say '14 or '15, you
21 had to touch a case within three days.  If we got
22 it on a Friday, you had to touch it on a Monday.
23 At the end, to give you a perspective on it, you
24 had to touch it the same day.  You had to touch
25 it within five hours.  So we lost that two days.

Page 74

1  Fischer
2      On a Friday before 3 o'clock if I got
3  let's say five cases during the day, I had to
4  touch them before 10 o'clock, 8 o'clock,
5  10 o'clock at night.  So I had to do something on
6  it to touch them to get into them and show that I
7  had gotten the case, that I knew about the case,
8  and I had spoken to somebody or done something on
9  the case.
10     Q.  And was this regarding social media
11 cases or theft cases?
12     A.  I'm sorry, I was using theft as an
13 example.  Social media, there was procedures that
14 you had to follow.  You had to touch it the day
15 that you got it.  In 2019, 2020, it could even
16 have been '18, you had to touch the case the day
17 you got it.  You were expected to close that
18 social media usually within three to five days I
19 would say, and sometimes you'd go longer, but
20 that's usually when you were required to complete
21 it and submit it.
22     Q.  For these guidelines that you stated
23 changed every year, was that set forth by GEICO?
24     A.  Yes.
25     Q.  How was that communicated to you?

Page 75

1  Fischer
2      A.  Through our supervisors and through
3  our quarterly meetings with management.  Our
4  manager, Mike DeGrocco or at the time 2016 to
5  '20, Bill Newport.
6      Q.  To your knowledge, would individual
7  teams only receive the guidelines for the types
8  of cases that they would see?
9      A.  I can't speak for anybody else.  I
10 can say, for me, I had a booklet of all of the
11 procedures.  They would come out regularly in
12 e-mails.  Usually in December they would come
13 out, and this is what's going to change for the
14 following year.  Sometimes it would come out
15 twice a year, sometimes three.  Depending on the
16 upper management, they would change the
17 procedures and rules as to what you had to do on
18 each particular case.
19     Q.  So, as it applies then to the theft
20 cases that you said you had to touch between four
21 to five times a month, that number in theory
22 would have changed per year based off your
23 testimony, is that right?
24     A.  That's correct.
25     Q.  Were there other factors that made

Page 76

1  Fischer
2  your workload heavier aside from what we talked
3  about where somebody was going out on leave or
4  holiday?
5      A.  As a grade 66, did you ask how many
6  more cases I would get?
7      Q.  No.  Were there other factors that
8  made your workload heavier at times outside of
9  what we talked about for people taking leave or
10 holiday?
11     A.  Yeah.  I was responsible as a grade
12 66 to train all the new hires.  I would spend
13 from three to six weeks with each one of them.
14 They would come to my house in the morning, and
15 they would leave 4 or 5 o'clock.  They would go
16 out and do EUOs with me.  I would train them how
17 to do EUOs.  You know, I would introduce them to
18 my contacts out in law enforcement and at NICB.
19     Weather was a big factor.  Come the
20 winter, sometimes EUOs got canceled because of
21 snow.  Things like that.  I'm sure there are many
22 other factors, but at this point those are the
23 ones that come to mind.
24     Q.  As a level 66, do you know who else
25 in region 2 who was assigned to let's say the



Page 117

1  Fischer
2  I went to. I would plot in my days. 7 a.m. to
3  10 o'clock at night, 11 o'clock at night, and
4  they would self-generate 16 hours to 18 hours for
5  the day. I do -- I can only remember twice where
6  I actually did it on my timesheet while working
7  in region 2 in the SIU. Two or three times. I
8  don't want to say. It could have been more than
9  that, you know. It wasn't less than that.
10      Q.  I think I'm losing you just a little
11  bit. So are you saying there's two different
12  systems with which you put in your overtime
13  hours, one specifically only for cat cases and
14  one specifically only related to theft cases?
15      A.  Oh, no. It's the same system. I'm
16  sorry.
17      Q.  Okay, and for, when you would go in
18  and adjust your time, I think you had indicated
19  that you would adjust it to 16 hours if you
20  needed to.
21      A.  Let's say ten. I know one day I put
22  in for 10.75, and I got 43 hours. I got 41.75
23  instead of 38.75. I put in for three hours and
24  ten minutes I think one day.
25      Q.  Okay, and, when that was submitted

Page 118

1  Fischer
2  through Workday when you closed out for the two
3  weeks in your custom and practice, then it was
4  approved, is that right?
5      A.  I had to pre-approve it with Jerry
6  who had to pre-approve it with Bill.
7      Q.  What did the pre-approval process
8  look like before you would go in and then adjust
9  the numbers in the Workday system?
10      A.  It would send Jerry an e-mail stating
11  that on August 28th, 2024 I went out to Brooklyn,
12  New York, where I secured a high-end vehicle,
13  waited for police to arrive at 2 o'clock in the
14  morning. I waited until 5 o'clock. I am
15  respectfully requesting overtime in the amount of
16  three hours.
17      Q.  And then you would send an e-mail.
18  Would you get correspondence back saying
19  approved?
20      A.  Yes.
21      Q.  Or denied?
22      A.  It would be back -- that one time I
23  got it back from Jerry that it was approved.
24      Q.  Did you ever, to your recollection,
25  receive any e-mail back after you requested

Page 119

1  Fischer
2  overtime with which somebody said denied?
3      A.  I never put in for any other
4  requests. I can only speak for myself.
5      Q.  And as to then getting approved to
6  enter in your OT, which you did then enter in
7  your OT, were you paid for that overtime, to your
8  recollection?
9      A.  Yes.
10      Q.  Have you ever put in more than 7.75
11  hours for a day with which you didn't seek
12  pre-approval?
13      A.  Only during catastrophes.
14      Q.  What does that process look like?
15      A.  I answer to an SIU supervisor, Dale,
16  I forget his last name. He was from that region
17  in Colorado and/or Houston. He actually traveled
18  with me on both, and at that point he would say
19  that we worked a 12-hour day. I'm going to give
20  you two hours travel in the morning. I am going
21  to give you two to three-hour reporting time at
22  night when you go back to your hotel room.
23      Q.  Okay, and so then you would just
24  enter your hours after you both agreed to
25  whatever that hour was in the Workday system, and

Page 120

1  Fischer
2  then would you get paid then that corrected
3  amount?
4          MS. DSOUZA:  Objection.
5      A.  To the best of my recollection, I did
6  go through the Workday system to put in my
7  overtime to the best of my -- I'm almost positive
8  it went through. Did I get paid? Yes.
9      Q.  Transitioning to number 9, it states,
10  "From 2016 to approximately March 2020, I worked
11  about ten to 12 hours a day Monday through Friday
12  and eight hours on many weekends. I estimate
13  working a total of 50 to 65 hours a week on
14  average during this time period."
15          On what do you base these estimates?
16      A.  My caseload and the knowledge that I
17  did this each and every day. My day started
18  early in the morning, and it went to late at
19  night. I was fortunate enough that my wife was
20  an investigator and knew the pressures and the
21  stress at GEICO. She worked there herself. So
22  after dinner I would go back on the computer, and
23  I would, because now it was downtime. I knew I
24  wasn't receiving cases after 4 or 5 o'clock, and
25  for that 3 or 4 hours I could type in peace and



### Page 273

```
 1           Fischer
 2     MS. ALBERTY:  Objection.
 3  A.   Yes.
 4     MS. DSOUZA:  I think that is it.
 5     MS. ALBERTY:  I don't have any
 6  further questions.  Thank you.
 7     MS. DSOUZA:  Thank you.
 8     THE VIDEOGRAPHER:  This marks the end
 9  of the deposition.  We are going off the
10  record at 5:33 p.m.
11     (Time noted:  5:33 p.m.)
12           _____
13
14  Subscribed and sworn to
15  before me this____day of_____, 2024.
16  _____
```

### Page 274

```
 1
 2          C E R T I F I C A T I O N
 3
 4     I, JOSEPH R. DANYO, a Shorthand Reporter
 5  and Notary Public, within and for the State of New
 6  York, do hereby certify:
 7     That I reported the proceedings in the
 8  within entitled matter, and that the within transcript
 9  is a true record of such proceedings.
10     I further certify that I am not related, by
11  blood or marriage, to any of the parties in this
12  matter and that I am in no way interested in the
13  outcome of this matter.
14     IN WITNESS WHEREOF, I have hereunto set my
15  hand this 2nd day of September, 2024.
16
17            _____
18              JOSEPH R. DANYO
19              STATE OF NEW YORK
20         My Commission Expires 2/20/2027
```

### Page 275

```
              I N D E X
Witness          Examination by       Page
KEITH FISCHER    Ms. Alberty            4
                 Ms. Dsouza           269

              E X H I B I T S
Fischer                                  Page
Exhibit 1  Revised Notice of Deposition of   12
           Keith Fischer
Exhibit 2  Document Bates stamped G000028    82
           through 43
Exhibit 3  Document Bates stamped G004265    84
           and attachment
Exhibit 4  Plaintiff Keith Fischer's        109
           Responses to the Court's
           Interrogatories and Declaration
           of Keith Fischer
Exhibit 5  Second Amended Collective and    219
           Class Action Complaint
Exhibit 6  Document Bates stamped           222
           P00000490 through 494
Exhibit 7  Document Bates stamped 00000078  230
           through 064
Exhibit 8  Document Bates stamped           240
           P00000077
Exhibit 9  Plaintiff Keith Fischer's        260
           Responses and Objections to
           Defendant's First Set of
           Interrogatories
                  ~oOo~
```

### Page 276

```
            DEPOSITION ERRATA SHEET
Our Assignment No. 11658332
Case Caption: Keith Fischer v GEICO

        DECLARATION UNDER PENALTY OF PERJURY
   I declare under penalty of perjury that I have
read the entire transcript of my deposition taken in
the above-captioned matter or the same has been read
to me, and the same is true and accurate, save and
except for changes and/or corrections, if any, as
indicated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer these
changes as if still under oath.
      Signed on the _____day of_____
2024.
                  _____
                        KEITH FISCHER
Subscribed and sworn to on the_____day of
_____, 2024 before me.

_____
Notary Public in and for the State of New York.
```



800.211.DEPO (3376)
EsquireSolutions.com