# Exhibit 4

```
                                        Page 1
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------X
 3   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 4   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
 5   of all others similarly situated,
 6           Plaintiffs,
 7                           Case No.:
                             2:23 Civ. 2848
 8                              (GRB) (ARL)
          -against-
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY D/B/A GEICO,
11           Defendants.
     ----------------------------------X
12
13
     DEPOSITION of MARGARET A. FISCHER
14
15
             December 19, 2024
16
17       New York, New York
18
19
20
21
22   Reported By:
23   Marina Dubson
24   Job #: J12144278
25
```

```
                                        Page 2
 1
 2
             DATE: December 19, 2024
 3
             TIME: 10:00 a.m.
 4
 5
 6       DEPOSITION of MARGARET A. FISCHER, an
 7   opt-in Plaintiff herein, taken by the
 8   Defendant, pursuant to Federal Rules of
 9   Civil Procedure, and Notice, held at the
10   Duane Morris LLP, 1540 Broadway, 14th
11   Floor, New York, New York 10036, at the
12   above-mentioned date and time, before
13   MARINA DUBSON, a Notary Public of the State
14   of New York.
```

```
                                        Page 3
 1   APPEARANCES:
 2
 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6      Sjean@outtengolden.com
 7      ZARKA DSOUZA, ESQ.
        Zdesouza@outtengolden.com
 8
 9
10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG TSONIS, ESQ.
13   Gtsonis@duanemorris.com
14
15
     Gil Peretz, Shereck Video, videographer,
16
```

```
                                        Page 4
 1       IT IS HEREBY STIPULATED AND AGREED,
 2   by and between the attorneys for the
 3   respective parties, as follows:
 4
 5   THAT all objections, except as to the form
 6   of the questions, shall be reserved to the
 7   time of the trial;
 8
 9   THAT the within examination may be signed
10   and sworn to before any Notary Public with
11   the same force and effect as if signed and
12   sworn to before the Court;
13
14   THAT filing of the original transcript of
15   the examination is waived.
```



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
57–60

Page 57

1   M. A. Fischer
2  your phone looking for?
3      A.   Anything relative to overtime.
4      Q.   And, I guess, is that the
5  criteria that you were using as far as
6  something that you might need to provide if
7  it was relevant or relative to overtime?
8           MS. DSOUZA:  Objection.
9      A.   Yes.
10 BY MR. TSONIS:
11     Q.   Okay.  Besides your phone and
12 your, you know, physical files in your
13 home, any other places that you searched?
14     A.   No.
15     Q.   Did you find any documents that
16 you provided to counsel?
17     A.   No.
18     Q.   Did you ever have, I guess,
19 paper files in your home?
20     A.   No.
21     Q.   All right.  Now, we haven't
22 gotten to your specific jobs you held at
23 Geico, but you worked in SIU, right?
24     A.   Yes.
25     Q.   And you said you worked in the

Page 58

1          M. A. Fischer
2  office, correct?
3      A.   Yes.
4      Q.   With the exception of a period
5  of time post COVID where employees worked
6  from home?
7      A.   Yes.
8      Q.   Okay.  When you transitioned
9  back from working home to the office, were
10 you five days a week in the office?
11     A.   I did not return to the office.
12 I retired.
13     Q.   You retired.
14          And you never actually went
15 back to the office at that point?
16     A.   Correct.
17     Q.   Understood.  Prior to that
18 point -- well, strike that.
19          What was your job title at
20 Geico before you retired?
21     A.   Inside medical investigator.
22     Q.   Okay.  Did that job title
23 change at some point?  Were you something
24 else, and you became an inside medical
25 investigator?

Page 59

1          M. A. Fischer
2      A.   It was a -- I believe the
3  titles did change.  It was just medical
4  investigator.
5      Q.   Were you ever something known
6  as, like, a major case investigator?
7      A.   Well, that's the same thing.
8  It was always a major case investigator.
9      Q.   Okay.  It was major case
10 because all the medical investigations
11 qualify as major case investigations; is
12 that right?
13          MS. DSOUZA:  Objection.
14     A.   No.
15 BY MR. TSONIS:
16     Q.   Back up for a second.
17          What's the difference, I guess,
18 between a field or desk investigator and a
19 medical -- inside medical investigator?
20     A.   I can answer what I did.  I
21 can't tell you what other people's jobs
22 included.  But my job, I investigated
23 medical providers and facilities.
24     Q.   Were there others that would
25 qualify as major case but didn't have the

Page 60

1          M. A. Fischer
2  specific job title of -- strike that.  I
3  misspoke.
4          Is it fair to characterize
5  major case as a sort of subgroup within
6  SIU?
7      A.   Rephrase that.
8      Q.   I'll ask a general question.
9          How -- what was the
10 organizational structure of the Melville or
11 Woodbury SIU office?
12     A.   It was -- when I left, there
13 were two -- it was divided into two
14 managements.  It was medical team -- there
15 was medical and there was other.
16          There were outside
17 investigators.  There were inside
18 investigators.  People did social media
19 searches.  People did small investigations,
20 nothing -- and then we had medical
21 investigations, major medical
22 investigations.
23     Q.   Were there other major
24 investigations that weren't medical?
25     A.   I'm not--



Page 61

1        M. A. Fischer
2    Q.  So, for example, investigation
3  of a body shop that's facilitating
4  fraudulent claims?
5    A.  Right.  Yes.
6    Q.  All right.  So, is it fair to
7  characterize the inside and outside
8  investigators that you referenced as
9  generally investigating individual claims?
10       MS. DSOUZA:  Objection.
11    A.  I'm sorry.  Repeat that.
12  BY MR. TSONIS:
13    Q.  Yeah.  Do inside or outside
14  investigators, to your understanding,
15  investigate typically, like, a single
16  claim?
17    A.  Yes, some do.
18    Q.  All right.  And as a major case
19  investigator or inside medical
20  investigator, was it your understanding
21  that you were doing investigations at the
22  entity level as opposed to the individual
23  claim level?
24    A.  Yes.
25    Q.  You were investigating, in your

Page 62

1        M. A. Fischer
2  job, claims that had already been paid,
3  right?
4    A.  Correct.
5    Q.  All right.  Other
6  investigators, like inside and outside
7  investigators, are typically investigating
8  pending claims, right?
9    A.  Yes.
10    Q.  How would cases get assigned to
11  you as an inside medical investigator?
12    A.  The supervisor would assign
13  them.
14    Q.  Who was your supervisor before
15  you retired?
16    A.  Kristen Slack.
17    Q.  Do you remember who the manager
18  was?
19    A.  Courtney Wolfe.
20    Q.  How long was Courtney Wolfe
21  your manager?
22    A.  I believe -- my best estimate
23  was that she started in 2018, I think.
24    Q.  Prior to Courtney Wolfe, who
25  was your manager?

Page 63

1        M. A. Fischer
2    A.  Bill Newport.
3    Q.  And when did Bill Newport start
4  being your manager?
5    A.  I don't remember.
6    Q.  Did he get to the Woodbury or
7  Melville office at around the same time as
8  Courtney?
9    A.  I don't understand.
10    Q.  So, was Courtney always located
11  in the Melville office?
12    A.  I believe so.
13    Q.  All right.  At some point, it
14  sounds like, if you started to -- reporting
15  to her in 2018, something changed, right?
16  Either she came to the office, or the
17  structure changed, right?
18    A.  She came from a different
19  department in Woodbury, yes.
20    Q.  Okay.  Do you remember who your
21  manager was before Bill Newport?
22    A.  I believe Mike DeGrocco.
23    Q.  To the best of your
24  recollection -- and I realize it was a long
25  time ago -- who was your supervisor in

Page 64

1        M. A. Fischer
2  2016?
3    A.  2016, I believe Danielle
4  Perdomo.
5    Q.  And how long was she your
6  supervisor for?
7    A.  I couldn't say exactly, but I
8  would estimate around two years.
9    Q.  Who was your supervisor after
10  that?
11    A.  Kristin Slack.
12    Q.  Was there anyone in the middle?
13    A.  No.
14    Q.  Okay.
15    A.  Danielle had previously been my
16  supervisor once before also.  There was
17  somebody before Danielle.
18    Q.  Okay.  To the best of your
19  recollection, was Mike DeGrocco your
20  manager or the manager of the Woodbury
21  office in 2016?
22    A.  No.
23    Q.  Who was?
24    A.  I don't believe he was.  I
25  believe it was Bill Newport.  I'm not sure.



Page 85

1       M. A. Fischer
2   A.  I started doing medical -- I
3 was always doing medical investigations.
4   Q.  Oh, okay.
5   A.  Yes.
6   Q.  Would you ever do, I guess,
7 some of the more traditional investigations
8 of individual claims or no?
9   A.  No.
10   Q.  No?  So, from day one you were
11 doing medical investigations?
12   A.  Yes.
13   Q.  Okay.  What did you do before
14 you started working at Geico?  Like, did
15 you have a background in this sort of
16 investigative work?
17   A.  I have a bachelor's degree in
18 criminal justice from St. John's
19 University.
20   Q.  Okay.
21   A.  I worked for Hertz Rent-a-Car
22 in the security administrative position.  I
23 worked for another leasing company for a
24 few years doing billing.  And then I was
25 home for a number of years with my

Page 86

1       M. A. Fischer
2 children.
3   Q.  Got it.  Okay.
4       I was just curious if you
5 had -- I know it sounds like there's a fair
6 amount of former law enforcement that work
7 in the special investigations unit.
8   A.  Yes.
9   Q.  Your husband included, right?
10   A.  Yes, sir.
11   Q.  Yeah.  The third sentence here
12 says you worked from Geico's Woodbury, now
13 Melville, office in Nassau County,
14 New York, and in the field until about
15 March 2020 when you worked remotely in your
16 home, right?
17   A.  Yes.
18   Q.  Now, we talked a little bit
19 about how you would occasionally go out
20 into the field.
21       Does this refer to that?
22   A.  In the beginning, we were out
23 in the field maybe once a week, more often;
24 and then as it changed -- the job changed
25 over the years how things were done.

Page 87

1       M. A. Fischer
2   Q.  Got it.  And then I think you
3 said it was right around that 2016 or 2017
4 time period where you sort of permanently
5 were working in the office?
6   A.  I believe so in that -- it
7 seems that time period, yes.
8   Q.  Okay.  From this entire time,
9 January 2010 to November 2020, it sounds
10 like your formal job title may have
11 changed; is that right?
12   A.  Yes.
13   Q.  Did your job responsibilities
14 change?
15   A.  Yes, in that we were not
16 required to go into the field as often.
17   Q.  All right.  Aside from not
18 having to go out into the field one day a
19 week, did your job responsibilities change
20 in any other way?
21   A.  No.
22   Q.  Okay.  Did you ever work out
23 of -- well, strike that.
24       You're aware that there was
25 another office located in the State of New

Page 88

1       M. A. Fischer
2 York?
3   A.  Yes.
4   Q.  All right.  And where was that?
5   A.  Buffalo.
6   Q.  All right.  Did you ever work
7 out of the Buffalo office?
8   A.  No.
9   Q.  You seem very happy about that.
10   A.  Yes.
11   Q.  Why is that?
12   A.  It's very cold in Buffalo.
13 It's a lot of snow.  It was very far away.
14   Q.  Did you ever interact with
15 investigators that worked out of the
16 Buffalo office?
17   A.  No.
18   Q.  Okay.  Do you have
19 understanding of, like, what kind of work
20 the Buffalo office did, the SIU department
21 in the Buffalo office?
22   A.  Not -- it's -- I would assume
23 it was the same that we did, but I'm not --
24 I'm not -- I don't know exactly what
25 they --



Page 89

1          M. A. Fischer
2      Q.   Okay.  Did you have a specific
3   geographic area for which you investigated
4   claims or cases?
5      A.   Region 2 in New York.
6      Q.   So, Woodbury is or was Region
7   2, right?
8      A.   Right.  Right.
9      Q.   Were the actual claims or cases
10  that you were investigating located in the
11  State of New York?
12     A.   And some in New Jersey.
13     Q.   Okay.  So, some of your cases
14  concerned, like, New Jersey medical
15  providers?
16     A.   Yes.
17     Q.   Okay.  When you had field
18  investigations that needed to be done for
19  those New Jersey cases, who would get
20  assigned that work?
21     A.   I only had a very few, and I
22  don't remember who did them.  It would be
23  probably a field investigator from our
24  office.
25     Q.   All right.  I guess, do you

Page 90

1          M. A. Fischer
2   know if it was a field investigator out of
3   Woodbury or if it was a field investigator
4   assigned out of the Buffalo office?
5      A.   No.  It might have been out of
6   the New Jersey office.
7      Q.   There was a separate New Jersey
8   office there?
9      A.   There was also a region that
10  covered New Jersey.  There was an office in
11  New Jersey.
12     Q.   Okay.
13     A.   Now that I think of it.
14     Q.   Got it.
15          Did you interact with the
16  individuals that were located in New
17  Jersey?
18     A.   Just if they did an
19  investigation for me.
20     Q.   Okay.  How big was this office
21  in New Jersey?
22     A.   I do not know.
23     Q.   Okay.  Did you ever go there?
24     A.   No.
25     Q.   Okay.  In paragraph 3, you say:

Page 91

1          M. A. Fischer
2   As a special investigator, my main job
3   duties were to investigate claims of
4   suspected medical fraud.  Geico assigns
5   cases of suspected medical fraud to special
6   investigators who are responsible for
7   documenting evidence of fraud.
8          I'll pause there for a second.
9   You talked about some of the activities
10  that you would do to investigate it.  Let's
11  talk about the actual documentation,
12  though.
13         Where would you document the
14  things that you were doing on cases?
15     A.   In our online case file, which
16  was called SICM.
17     Q.   All right.  So, you would use
18  the SICM system to document your
19  activities?
20     A.   My findings.
21     Q.   Not your activities?
22     A.   My activities would be noted in
23  the report, yes.
24     Q.   I guess on a day-to-day basis,
25  right, if you're reviewing billing records

Page 92

1          M. A. Fischer
2   or things like that that you were talking
3   about, where would you document those?
4      A.   In SICM, in the reflected case.
5      Q.   Okay.
6      A.   Yes.
7      Q.   I guess, do you have an
8   understanding as to whether the way you
9   documented cases in SICM differed or was
10  the same than other investigators, either
11  field or desk?
12         MS. DSOUZA:  Objection.
13     A.   I am not aware of how other
14  investigators document.
15  BY MR. TSONIS:
16     Q.   All right.  Would you enter
17  your, I guess, activities sort of in a
18  separate line in SICM?  Or did they all go
19  in the same entry and you would just update
20  it?
21     A.   It would be in a note, a
22  separate note for each activity.  There
23  could be many on one day, and there could
24  be one on a day.
25     Q.   There could be none on a day?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
97–100

Page 97

1           M. A. Fischer
2   saved on -- some initial steps you take
3   with every case?
4       A.   Yes.
5       Q.   All right.  And then after
6   that, is it accurate to say that it kind of
7   depends on where the investigation takes
8   you?
9       A.   Yes.  And the supervisor can
10  also direct you, you know, you need to do
11  this; this needs to get done by the next
12  15 days, certain things that come up if
13  they find something.
14      Q.   Okay.  If you were doing an
15  investigative activity and 15 days later
16  you were still working on it, could you
17  satisfy that requirement by simply going
18  into SICM and saying still investigating
19  whatever that issue was?
20      A.   No.
21      Q.   Why not?
22      A.   Because you have to show a
23  substantial activity on that case to keep
24  that case moving.  You can't just have a
25  case sit.

Page 98

1           M. A. Fischer
2       Q.   Right.  But if, I guess, the
3   substantial activity that you're working
4   on, you know, wasn't completed in 15 days,
5   what would happen?
6       A.   You would write what you had
7   completed.
8       Q.   Okay.  Prior to COVID, how many
9   new cases were you assigned typically in a
10  month?
11      A.   Well, we said four.
12      Q.   Okay.  So, you would have four
13  cases that you were assigned.  I think you
14  said it would take sometimes months to
15  close cases.
16      A.   Yeah.
17      Q.   How many cases would you
18  typically close in a given month?
19      A.   Every month would be different.
20  I would say on average, maybe three.
21      Q.   Okay.  You were a Geico
22  associate for a long time.  I'm sure you
23  know that there are certain metrics against
24  which associates are rated, right?
25      A.   Yes.

Page 99

1           M. A. Fischer
2       Q.   For the purposes of their
3   performance review?
4       A.   Yes.
5       Q.   And what are those metrics?
6       A.   They are audits, the -- our
7   cases were audited by other supervisors,
8   how -- your timeline and your cases, your
9   diary, if everything was up to date, you
10  know, your performance, if, you know, you
11  were there, you weren't there, things like
12  that.
13      Q.   All right.  Is the audit metric
14  that you're referring to what Geico calls
15  quality?
16      A.   I'm sorry?
17      Q.   Is the -- is the metric that
18  you're referring to regarding having to do
19  documentation correctly, what Geico refers
20  to as a quality metric?
21      A.   I'm not sure.  I've never heard
22  that, I don't think.
23      Q.   Okay.  But you referenced
24  audits being done by other supervisors of
25  your files?

Page 100

1           M. A. Fischer
2       A.   Yes.
3       Q.   All right.  And they assessed
4   your files for, essentially, you know,
5   doing the activities and documenting them
6   the right way?
7       A.   Correct.
8       Q.   All right.  Besides that sort
9   of, you know, metric, did you have other
10  specific metrics that you were held to?
11      A.   (No verbal response.)
12      Q.   For example, your performance
13  wasn't assessed against the number of days
14  it took to close a case, right?
15      A.   Not on our cases.
16      Q.   Not on major case?
17      A.   No.
18      Q.   Or inside medical?
19      A.   Right.
20      Q.   All right.  And similarly, you
21  weren't rated in terms of productivity on
22  how many cases you closed per month?
23      A.   No.
24      Q.   No, that's not right?  Or, no,
25  you weren't?



Page 101

1      M. A. Fischer
2   A.  No, we weren't.
3   Q.  Okay.  Do you have an
4  understanding as to whether field or desk
5  investigators are assessed in how many
6  cases they close per month?
7      MS. DSOUZA:  Objection.
8   A.  I do.
9   Q.  All right.  And is your
10 understanding that that was a performance
11 metric that applied to them?
12  A.  Yes.
13  Q.  All right.  Similarly, do you
14 have an understanding as to whether field
15 and desk investigators had a metric called
16 time to close that they were assessed with?
17  A.  No.
18  Q.  You have no understanding that
19 field or desk investigators, in part, had a
20 metric monthly as to how many days their
21 cases were open?
22  A.  Yes.
23  Q.  All right.  You understood
24 that, for those investigators, you received
25 a better score if your cases were open less

Page 102

1      M. A. Fischer
2  time and a worse score if your cases were
3  open for a significant amount of time?
4   A.  Yes.
5   Q.  All right.  And -- but that
6  worked differently, we said, for inside
7  medical, like yourself, investigators?
8   A.  Correct.
9   Q.  Would you receive performance
10 ratings each year?
11  A.  Yes.
12  Q.  All right.  Do you have a
13 general sense of where you shook out in
14 terms of your performance on a year-to-year
15 basis?
16  A.  I was always in the top four or
17 five percent.
18  Q.  Okay.  And just for clarity,
19 I'm sure you recall.  Do you have -- do you
20 understand that Geico rates all its
21 associates from a yearly review standpoint
22 on a one-to-five scale?
23  A.  Yes.
24  Q.  Do you agree that three, using
25 Geico's scale, is satisfactory?

Page 103

1      M. A. Fischer
2   A.  Not personally.
3   Q.  Got it.  Because you didn't
4  receive a three, you got fours or fives?
5   A.  Well, I worked hard.
6   Q.  All right.  Well, you
7  understand that a four or five rating is
8  above average or a very good rating at
9  Geico, right?
10  A.  Yes.
11  Q.  All right.  And an associate
12 that receives a rating of a two or a one is
13 someone that isn't meeting expectations?
14  A.  Is what?
15     I'm sorry.
16  Q.  Someone that isn't meeting
17 expectations?
18  A.  Yes.
19  Q.  All right.  Did you ever
20 receive a one or a two?
21  A.  No.
22  Q.  Okay.  Did the ratings --
23 strike that.
24     Aside from quality, do you
25 recall any other metrics that were involved

Page 104

1      M. A. Fischer
2  in your performance reviews?
3   A.  Not that I can recall.  It's
4  been a while.
5   Q.  Besides SICM what other
6  systems, Geico systems, did you use on a
7  regular basis?
8   A.  Outlook for e-mail.  Workday
9  for time management.  I had access to
10 billing.
11  Q.  When you say "billing," is that
12 the Atlas database?
13  A.  Yes.  And we had Background.
14 We had a background services that we ran.
15  Q.  That's fair.
16     So, there was a number of, I
17 guess, third-party providers, we'll call
18 them, that you could run different checks
19 on, right?
20  A.  Yes.
21  Q.  All right.  And you had
22 credentials and access and would use those
23 kinds of systems?
24  A.  Yes.
25  Q.  All right.  Did you have a



```
                                Page 297
 1              M. A. Fischer
 2          E X H I B I T S
 3
 4  DEFENDANT EXHIBITS
 5
 6  EXHIBIT   EXHIBIT                    PAGE
 7  NUMBER    DESCRIPTION
 8  1         interrogatories            79
 9  2         Workday profile            153
10  3         human resources            167
11            associate handbook
12  4         Excel spreadsheet          200
13  5         2017 self-appraisal        213
14  6         Excel spreadsheet          227
15  7         the operative complaint    233
16  8         interrogatories            258
17  9         e-mail chain               270
18
19
20       (*Exhibits attached to transcript.)
21
22            (Cont'd next page.)
23
24
25
```

```
                                Page 298
 1              M. A. Fischer
 2              I N D E X
 3
 4  EXAMINATION BY                       PAGE
 5  MR. TSONIS                           7, 287
 6  MS. DSOUZA                           282
 7
 8
 9     INFORMATION AND/OR DOCUMENTS REQUESTED
10  INFORMATION AND/OR DOCUMENTS        PAGE
11  BY MR. TSONIS:
12  1. Request to preserve notes        42
13  2. Request for notes                43
14  BY MS. DSOUZA:
15  3. Request for e-mails              292
16  4. Request for swipe card activity  293
17     as well as SICM data
18  5. Request for yearly goals         293
19
20
21         QUESTIONS MARKED FOR RULINGS
22  PAGE LINE QUESTION
23  (None)
24
25
```

```
                                Page 299
 1              M. A. Fischer
 2          C E R T I F I C A T E
 3
 4  STATE OF NEW YORK      )
                           :
 5  COUNTY OF RICHMOND     )
 6
 7      I, MARINA DUBSON, a Notary Public for
 8  and within the STATE OF NEW YORK, do hereby
 9  certify:
10      That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 19th day of December 2024.
21
22
23      _____
                MARINA DUBSON
24
25
```

```
                                Page 300
 1           ERRATA SHEET
 2  WITNESS NAME: MARGARET. A FISCHER
 3  PAGE  LINE(s)      CHANGE        REASON
 4  ____|_____|  _____|_____
 5  ____|_____|  _____|_____
 6  ____|_____|  _____|_____
 7  ____|_____|  _____|_____
 8  ____|_____|  _____|_____
 9  ____|_____|  _____|_____
10  ____|_____|  _____|_____
11  ____|_____|  _____|_____
12  ____|_____|  _____|_____
13  ____|_____|  _____|_____
14  ____|_____|  _____|_____
15  ____|_____|  _____|_____
16  ____|_____|  _____|_____
17  ____|_____|  _____|_____
18  ____|_____|  _____|_____
19  ____|_____|  _____|_____
20  ____|_____|  _____|_____
21
22  ---------------------
    MARGARET. A FISCHER
23
    SUBSCRIBED AND SWORN BEFORE ME
24  THIS ____ DAY OF _____, 20___.
25  _____  _____
    (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

