# Exhibit 5

Page 1

1
2           IN THE UNITED STATES DISTRICT COURT
3            FOR THE EASTERN DISTRICT OF NEW YORK
4    - - - - - - - - - - - - - - - - - )
5    KEITH FISCHER, MICHAEL O'SULLIVAN,)
6    JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:
7    BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848
8    CHARISE JONES, individually and   ) (GRB) (ARL)
9    on behalf of all others similarly )
10   situated,                         )
11                  Plaintiffs,        )
12      - v -                          )
13   GOVERNMENT EMPLOYEES INSURANCE    )
14   COMPANY d/b/a GEICO,              )
15                  Defendant.         )
16   - - - - - - - - - - - - - - - - - )
17
18       REMOTE VIDEOTAPED DEPOSITION OF MICHAEL GREY
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J12254485

Page 2

1                     MICHAEL GREY
2            Wednesday, January 22, 2025
3            Time: 10:02 a.m.
4      Remote videotaped deposition of MICHAEL GREY,
5    held via Zoom, before Kim M. Brantley, Court
6    Reporter and Notary Public of the State of New
7    York.
8
9    APPEARANCES:
10   On behalf of the Plaintiffs:
11       OUTTEN & GOLDEN, LLP
12       685 Third Avenue, 25th Floor
13       New York NY 10017
14       (202) 847-4400
15       Email: sjean@outtengolden.com
16       BY:   SABINE JEAN, ESQUIRE
17
18   On behalf of the Defendant GEICO:
19       DUANE MORRIS, LLP
20       190 South LaSalle Street - Suite 3700
21       Chicago, Illinois 60603
22       (312) 499-6779
23       Email: gtsonis@duanemorris.com
24   BY:  GREGORY TSONIS, ESQUIRE
25

Page 3

1                     MICHAEL GREY
2    APPEARANCES CONTINUED:
3    ALSO PRESENT:
4        BRENT JORDAN, Legal Video Specialist
5        Esquire Deposition Solutions

Page 4

1        MICHAEL GREY
2        P R O C E E D I N G
3        THE LEGAL VIDEO SPECIALIST:  We are now
4    on the record.  The time is 10:02 Eastern
5    time on January 22nd, 2025.  This begins the
6    video conference deposition of Michael Grey,
7    taken in the matter of Keith Fischer, et al.,
8    v. Government Employees Insurance Company.
9    This case is filed in the United States
10   District Court, Eastern District of New York,
11   Case No. 223-civ-2848.
12       My name is Brent Jordan.  I'm your
13   remote videographer for today.  The court
14   reporter is Kim Brantley.  We are
15   representing Esquire Deposition Solutions.
16       Will counsel present please identify
17   yourself and state whom you represent.
18       MS. JEAN:  This is Sabine Jean from
19   Outten & Golden, representing plaintiffs and
20   opt-in plaintiffs.
21       MR. TSONIS:  Craig Tsonis, from Duane
22   Morris, LLP, representing defendant GEICO.



Page 45

1  MICHAEL GREY
2  based off of Woodbury and HMOs that were in the
3  New York City area, and meanwhile in the Buffalo
4  office they had HMOs, and that had to do with the
5  Buffalo area.  And GEICO changed our pay scale
6  from a Woodbury scale to the Buffalo scale, which
7  was lower.  And then I said, "Well, if that's the
8  case, then we should be able to get the benefits
9  that they're getting in the Buffalo office."
10      They struck me down a couple times, and
11  then in due time, I'm proud to say, that we were
12  all able to get independent help, including
13  adjustors, and SIU investigators, et cetera,
14  basically showing the precedent -- it set the
15  precedent that I would mention things that should
16  be handled, and it would take two or three times
17  before they would come to the realization, and I
18  had to go farther up the chain for this stuff to
19  happen; very similar to the -- the whistleblower
20  stuff.
21      I also went into the Buffalo office
22      in -- in meeting with -- for the United Way
23      they would have us come in I think yearly for
24      them to give us a presentation on the United
25      Way.

Page 46

1  MICHAEL GREY
2  BY MR. TSONIS:
3      Q.  Approximately what year was the
4  benefits-related change that you were referencing?
5      A.  So I don't know the exact dates, but
6  I'm going to -- if -- approximately -- the Buffalo
7  office probably opened around 2008, 2009,
8  something of that nature.  And then soon after
9  GEICO decided, "Well, if we have a Buffalo pay
10 rate, and Mike Grey, you live in the Buffalo area,
11 you're going to get a ten percent cut in your pay
12 because you don't live in Woodbury, so we're not
13 going to base you off of the pay at Woodbury.
14 We're going to base you -- the pay in Buffalo."
15      So, I would guess within two years of
16 that Buffalo office opening, I met with somebody.
17 Her name is -- was Angela Rinelli.  She has since
18 gone on to -- I would say she's a vice president
19 of some sort, probably in the top ten of GEICO
20 chain right now, and she was in human resources at
21 the time, and she told me, no, that wasn't going
22 to happen.
23      I went back a second time.  She said,
24 "No, that's not going to happen."
25      I then went above her and, sure enough,

Page 47

1  MICHAEL GREY
2  we were able to get all those benefits.
3      And so I am proud to say that it
4  probably took care of twenty-five to fifty
5  representatives in both auto damage and SIU that
6  were able to take advantage of those benefits that
7  GEICO wasn't going to provide for them.
8      Q.  You never -- while you were at SIU, you
9  never worked out of the Buffalo office, though,
10 right?
11     A.  Correct.
12     Q.  You were never a part of region eight,
13 to your knowledge?
14     A.  I don't believe so.
15         Again, I'm not sure what was going on
16 at the very end.  My supervisor was out of Boston,
17 which is part of region eight.  I don't think that
18 they have region eight any more.  I -- I don't
19 really know.  It -- it was a lot of confusion and
20 changes going on.
21     Q.  That's a fair point.
22         So, is it your recollection that at
23 some point GEICO changed from a
24 geographically-based sort of organizational
25 structure to a more, you know,

Page 48

1  MICHAEL GREY
2  vertically-integrated function structure?
3     A.  Yes.
4         MS. JEAN:  Objection.
5  BY MR. TSONIS:
6     Q.  Okay.  Do you recall approximately when
7  that change took place?
8     A.  Only because 2023, spring 2023, that
9  would be my guess.
10    Q.  I appreciate that.
11        So prior to, you know, that change, did
12 you ever work out of the Buffalo office?
13    A.  No.
14    Q.  You've referenced at some point meeting
15 the head of region eight.  Do you recall when that
16 was?
17    A.  His name was Doug, I believe, and I was
18 with SIU.  Before COVID -- 2016, 2017, 2018,
19 something in that nature.
20    Q.  When you say the head of region eight,
21 do you mean like the regional vice president or
22 the SIU manager in region eight?
23    A.  I believe he was the regional vice
24 president.
25    Q.  Okay.



Page 49

1  MICHAEL GREY
2  A. So he ran the region. That's --
3  that's -- I believe that's who we met with.
4  Q. Okay. What did you discuss with that
5  regional vice president, or that individual?
6  A. I think he just wanted to get an idea
7  of what we were doing, things in the area. I
8  believe that they -- again, this is a belief; I
9  don't know -- I think that they were looking at
10 options. Again, we're in Buffalo, yet we're
11 considered employees of Woodbury, but we're
12 getting paid at the Buffalo rate, and we're
13 getting Buffalo benefits. Is -- is there some
14 sort of line that they're going to draw in Albany
15 that we all might be a part of this?
16     So I think he was asking for that, and
17 he just wanted also, get a feel for SIU. Because
18 the SIU for region eight would have been in New
19 England. That's what region eight handled. So
20 for him to actually sit down with somebody, he'd
21 have to go to New England and New Jersey and sit
22 down with people, and instead he could sit down
23 with us.
24  Q. So region two -- which is based out of
25 Woodbury, later Melville -- is it your

Page 50

1  MICHAEL GREY
2  understanding that region two investigated claims
3  within the State of New York?
4  A. Yeah, I was a member of region two, an
5  employee out of Woodbury. It had no association
6  really with region eight, other than -- so if I
7  went to region eight and I had gave my ID, I
8  wouldn't be able to get in. I'd have to go
9  through security and discuss everything, et
10 cetera. I was not -- I had no access to region
11 eight, even though I lived in Buffalo.
12  Q. While you worked for GEICO, did you
13 always investigate claims within the State of New
14 York, or did you investigate claims, you know,
15 outside of New York, for example, in New England?
16  A. Yeah, for the most part I would say for
17 six years it was -- I shouldn't say that.
18 Definitely before COVID.
19     So before COVID, before the pandemic,
20 it was strictly within an hour and a half, like
21 maybe once in a blue moon Syracuse that I would go
22 to. I'd handle down to Pennsylvania, maybe even a
23 claim that -- a case that the person lived in
24 Pennsylvania but they worked in New York, very
25 once in a blue moon I might go into Pennsylvania,

Page 51

1  MICHAEL GREY
2  but it would -- handle that, and then to the east
3  side of Rochester, maybe half between Rochester
4  and Syracuse. I don't know if you're familiar
5  with New York State at all, but...
6     But an hour and a half -- I think they
7  had a two-hour driving window form, or a mileage
8  form. So that's what we handled.
9     Then when the pandemic hit, it changed
10 to still trying to get most of them in our area,
11 but I picked up a lot of stuff that would be
12 downstate New York, et cetera.
13     And then, when the whole regional
14 changed that we were talking about, where it was
15 no longer region, it was more so of apartments, I
16 had cases all the way to the west coast,
17 Washington, California, Arizona, whatever, State
18 of Washington, I mean, and then all the way up
19 down, up and down the -- I mean, I -- I don't
20 there was any state that I was not allowed to have
21 a case in at that point.
22  Q. Okay. So after that change, the
23 geographic I guess location of like the claims you
24 were investigating sort of expanded. It could be
25 it sounds like anywhere nationally?

Page 52

1  MICHAEL GREY
2  A. Correct.
3  Q. Okay. What was your title when you
4  first came into SIU?
5  A. I believe I was considered a senior
6  field investigator.
7  Q. And that was in 2015?
8  A. Correct.
9  Q. At some point did your title change?
10 A. Yes. In December of 2023 I became a
11 desk investigator. GEICO took away my car and my
12 phone and had me just working in front of a
13 computer all day rather than going in the field.
14  Q. Got it.
15     When you say "desk investigator," I
16 guess was the job title like senior internal
17 security investigator?
18  A. Possibly. Sorry, I don't know. I
19 just -- they termed us field and desk.
20     You might be right that that was the
21 title. I never got a card or anything that showed
22 what my title is because it never went out on the
23 road.
24  Q. Did the types of cases that you
25 investigated as a desk investigator differ from



Page 253

1               MICHAEL GREY  
2   A.  Yes.  
3   Q.  Okay.  Do you agree that it was  
4 unprofessional?  
5      MS. JEAN:  Objection.  
6      THE WITNESS:  I think that I worked for  
7   this company for twenty-one years, and if I  
8   was unprofessional, I wouldn't have lasted  
9   this long.  
10      I think basically what was going on is  
11   that I touched a nerve; they didn't  
12   appreciate it, and they made subtle changes  
13   in order to get through with, but there's  
14   no -- after my discussions with the State of  
15   New York, I'm pretty certain that they were  
16   breaking regulations, and directors knew it,  
17   and that's why directors changed, and other  
18   people took over.  
19 BY MR. TSONIS:  
20   Q.  Turning back to this performance  
21 appraisal --  
22   A.  Mm-hmm.  
23   Q.  You write -- we don't need to rehash  
24 it, but you write in the beginning about  
25 "turnover" for lack of a better word at various

Page 254

1               MICHAEL GREY  
2 levels?  
3   A.  Yes.  
4   Q.  You write, "Despite these obstacles, I  
5 was able to successfully handle the workload and  
6 produce adequately for the provision"?  
7   A.  Yes.  
8   Q.  Right?  And overall, in terms of your  
9 rating here, it looks like you're rated a three,  
10 meet expectations?  
11   A.  Yeah, I don't know where the point  
12 sixes or any of that went from before.  Maybe  
13 that's in the bottom.  I don't know.  
14   Q.  Yeah, I mean it -- (undecipherable) it  
15 just shows a three, "Meets Expectations."  
16   A.  Right.  Again, this particular  
17 appraisal -- yes, it just says "Meets  
18 Expectations."  
19   Q.  Okay.  I think you testified at length  
20 here about various complaints that you've raised  
21 to your supervisor or management at GEICO, right?  
22   A.  Yes.  
23   Q.  In any of those formal complaints did  
24 you document any complaint regarding unpaid  
25 overtime?

Page 255

1               MICHAEL GREY  
2   A.  Possibly.  I don't -- I don't know.  I  
3 don't know.  
4   Q.  You can't think of a single area where  
5 you've actually documented that you've worked time  
6 but were not paid for it?  
7      MS. JEAN:  Objection.  
8      THE WITNESS:  I made comments to Chet,  
9   numerous comments to Chet.  I -- I stopped  
10   with Andrew.  
11 BY MR. TSONIS:  
12   Q.  I'm -- my question's a little bit  
13 different.  I understand your prior testimony.  
14      In any of the complaints that you  
15 raised regarding GEICO's failure allegedly to  
16 comply with the law by not complying with New York  
17 insurance regulations, did you raise any complaint  
18 and document it that GEICO was not following  
19 federal or state wage and hour laws?  
20   A.  No.  That was not part of my complaint.  
21 It was strictly right or wrong in how we were  
22 treating customers.  It was not personal.  
23   Q.  Okay.  But as part of this lawsuit,  
24 you're alleging that GEICO failed to comply with  
25 both federal and New York State wage and hour

Page 256

1               MICHAEL GREY  
2 laws, right?  
3   A.  Oh, I'm sorry.  Say that again.  
4   Q.  As part of this lawsuit, you are  
5 alleging that GEICO failed to comply with federal  
6 and New York State wage and hour laws, right?  
7   A.  I believe so, yes.  
8   Q.  All right.  In none of your performance  
9 appraisals that we looked at do you ever address  
10 or discuss allegedly unpaid over time?  
11   A.  Correct.  
12   Q.  Right?  And sitting here today, you  
13 can't think of a single document in which you had  
14 actually notified anyone in writing of overtime  
15 that you claim to have worked but you were not  
16 paid for.  
17      Isn't that right?  
18      MS. JEAN:  Objection.  
19      THE WITNESS:  I think it was implied  
20   with Chet.  I -- I didn't address it anymore  
21   with anyone else after that for fear of  
22   losing my job.  
23 BY MR. TSONIS:  
24   Q.  I think you mentioned -- so, to be  
25 clear, you never mentioned to Toni D'Agata that



Page 257

1    MICHAEL GREY
2  you were working time off the clock but not being
3  compensated -- compensated for it?
4     A.  Yeah, I didn't -- I didn't have very
5  much of a relationship with Toni and didn't
6  discuss much with her at all, correct.
7     Q.  Okay.  And did you ever discuss working
8  off the clock with Mr. Gelderman and not being
9  paid for it?
10    A.  I explained to Mr. Gelderman that I
11  would not take extra cases because that would -- I
12  was no longer going to pay -- I'm sorry, that I
13  was no longer going to work overtime and not get
14  paid.  That I definitely did speak to him about.
15    Q.  Isn't it true that Mr. Gelderman in
16  writing coached you that you were not permitted to
17  work off the clock?
18       MS. JEAN:  Objection.
19       THE WITNESS:  Mr. Gelderman, after
20    being my supervisor for several months,
21    explained to me that my interpretation was
22    flex time was incorrect.
23  BY MR. TSONIS:
24    Q.  Was your interpretation of flex time
25  that you could work time but not enter it into

Page 258

1    MICHAEL GREY
2  Workday?
3    A.  No, it was -- he was questioning why I
4  was working at 7:00 o'clock at night or something
5  to that effect, and I explained to him that I
6  thought that that was flex time, and he said "No,
7  that would have to be approved overtime."
8       MR. TSONIS:  I'm going to drop in the
9    chat what's going to be I believe Exhibit 19.
10      And for the record Exhibit 19 is a document
11    Bates stamped G017971 to 972.
12      (Email chain Bates stamped G17971 to
13    972 was marked Deposition Grey Exhibit 19,
14    for identification.)
15  BY MR. TSONIS:
16    Q.  And there is a top email, Mr. Grey, but
17  I want to focus your attention first on this email
18  from Mr. Gelderman.
19      Do you see this email?
20    A.  I see an email dated July 31st, 2023.
21    Q.  All right.  And this is from your
22  supervisor at the time, Mr. Andrew Gelderman?
23    A.  Yes.
24    Q.  And it's to you copying Patricia Wupio,
25  who would have been the SIU manager at that time?

Page 259

1    MICHAEL GREY
2    A.  Yes.
3    Q.  And the subject is "July 30th Working
4  Hours"?
5    A.  Yes.
6    Q.  And Mr. Gelderman writes, "This email
7  is a follow-up to our discussion this morning.
8  Please read the full email and acknowledge you've
9  received/understood it.
10      "Yesterday you had logged on to work on
11  current cases in your pending.  However this was
12  outside of the normal time GEICO has approved.
13      "As discussed, approval by GEICO
14  management is needed to work additional time
15  outside of your hours.
16      "I have noticed that time has not been
17  entered for yesterday at this time.  Please make
18  any adjustments needed to reflect the hours
19  worked.
20      "I can submit this for you if you have
21  trouble doing so.  Please see the excerpt from the
22  GEICO handbook at the end of this email.
23      "Future violations of this GEICO policy
24  can lead to further disciplinary actions up to and
25  including termination."

Page 260

1    MICHAEL GREY
2      Did I read that right?
3    A.  That's what it says.
4    Q.  All right.  So, in this email Mr.
5  Gelderman is instructing you that the time that
6  you spend working, even if outside your normal
7  hours, has to be entered into Workday, right?
8    A.  It has to be approved.
9    Q.  It says, "I have noticed that time has
10  not been entered for yesterday at this time.
11      "Please make any adjustments needed to
12  reflect the hours worked," right?
13    A.  I state that -- the sentiment is
14  outside the normal time GEICO has approved.
15    Q.  Well, it doesn't say "Approval by GEICO
16  management is needed to work anytime outside of
17  the scheduled hours."  He says "needed to work
18  additional time outside of your hours," right?
19    A.  Yes.
20    Q.  Okay.  So for that additional time,
21  he's telling you that you need to make adjustments
22  in Workday to reflect the hours worked, right?
23    A.  Yes.
24    Q.  And then he includes GEICO's policy
25  contained in the Associate Handbook below, right?



```
                                                      Page 293
 1                      MICHAEL GREY
 2             C E R T I F I C A T E
 3  STATE OF NEW YORK    )
 4                       : Ss.
 5  COUNTY OF NEW YORK   )
 6          I, Kim M. Brantley, Shorthand
 7  Reporter, and Notary Public within and for the
 8  State of New York, do hereby certify:
 9          That MICHAEL GREY, the witness whose
10  deposition is hereinbefore set forth, was duly
11  sworn by me and that such deposition is a true
12  record of the testimony given by the witness.
13          I further certify that I am not related
14  to any of the parties to this action by blood or
15  marriage, and that I am in no way interested in
16  the outcome of this matter.
17          IN WITNESS WHEREOF, I have hereunto set
18  my hand this 2nd day of February, 2025.
19
20          _____Kim M. Brantley_____
21                Kim M. Brantley
22
23
24  My Commission expires May 31, 2026.
25
```

