# Exhibit 6

CHARISE JONES  
FISCHER V. GEICO

August 12, 2024  
1–4

### Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3           FOR THE EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - )
 5    KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6    JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:
 7    BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848
 8    CHARISE JONES, individually and   ) (GRB) (ARL)
 9    on behalf of all others similarly )
10    situated,                         )
11                   Plaintiffs,        )
12       - v -                          )
13    GOVERNMENT EMPLOYEES INSURANCE    )
14    COMPANY d/b/a GEICO,              )
15                   Defendant.         )
16    - - - - - - - - - - - - - - - - - )
17
18       VIDEOTAPED DEPOSITION OF CHARISE JONES
19
20
21
22
23    Reported by:
24    Kim M. Brantley
25    Job No: J11541510
```

### Page 2

```
 1                      CHARISE JONES
 2               Monday, August 12, 2024
 3               Time:  9:53 a.m.
 4        Videotaped deposition of CHARISE JONES, held
 5    at Duane Morris, LLP, 1540 Broadway, 14th Floor,
 6    New York, New York, before Kim M. Brantley, Court
 7    Reporter and Notary Public of the State of New
 8    York.
 9
10    APPEARANCES:
11    On behalf of the Plaintiffs:
12         OUTTEN & GOLDEN, LLP
13         1225 New York Avenue NW - Suite 1200B
14         Washington, DC, 20007
15         (202) 847-4400
16         Email: sjean@outtengolden.com
17    BY:  SABINE JEAN, ESQUIRE
```

### Page 3

```
 1                      CHARISE JONES
 2    APPEARANCES CONTINUED:
 3    On behalf of the Defendant GEICO:
 4         DUANE MORRIS, LLP
 5         1540 Broadway - 14th Floor
 6         New York, New York 10036
 7         (312) 499-0198 (Ms. Alberty)
 8         Email:  gsslotnick@duanemorris.com
 9         BY:  GREGORY SLOTNICK, ESQUIRE
10
11    Also on behalf of the Defendant GEICO:
12         DUANE MORRIS, LLP
13         190 South LaSalle Street - Suite 3700
14         Chicago, Illinois 60603
15         (312) 499-0198
16         Email: tealberty@duanemorris.com
17    BY:  TIFFANY ALBERTY, ESQUIRE
18             (Appearing via Zoom)
19
20    ALSO PRESENT:
21         SILVIO FACCHIN, Legal Video Specialist
22         Esquire Deposition Solutions
```

### Page 4

```
 1         CHARISE JONES
 2     P R O C E E D I N G S
 3        THE LEGAL VIDEO SPECIALIST:  This is
 4   the media labeled number one in the video
 5   recorded deposition of Charise Jones in the
 6   matter of Keith Fischer, et al. versus
 7   Government Employee Insurance Company, doing
 8   business as GEICO.
 9        This deposition is being taken in New
10   York City, New York on August 12, 2024.  My
11   name is Silvio Facchin, I am a certified
12   legal video specialist; the court reporter is
13   Kim Brantley, and we're both representing
14   Esquire Deposition Solutions.
15        We are now going on the record.  The
16   time is 9:53 a.m.
17        Counsel will state their appearances
18   for the record.
19        MR. SLOTNICK:  Good morning.  Greg
20   Slotnick of Dwayne Morris for defendant
21   GEICO.
22        MS. JEAN:  Sabine Jean, Otten & Golden,
23   for plaintiff -- for named plaintiff Charise
24   Jones.
25        THE LEGAL VIDEO SPECIALIST:  Will the
```



Page 45

1  CHARISE JONES
2  Q. What types of claims were you working
3  on in that role?
4  A. Auto claims.
5  Q. And that is different than the medical
6  claims that you were working on previously,
7  correct?
8  A. Well, the auto encompassed any injuries
9  as well. So it was just anything having to do
10 with auto, whether they were injured or not.
11 Q. Okay. And what was your next position
12 with GEICO?
13 A. After that I worked in -- they did away
14 with that job. They actually closed it or removed
15 it. They didn't -- I don't know what they called
16 it, but they stopped that job, and then I went
17 inside and worked in -- I don't know the name of
18 the department. It was also in claims. It was --
19 I don't recall the name of the job it was, but I
20 went from outside to inside.
21 Q. In the claims department itself?
22 A. Yes.
23 Q. Do you know why they got rid of that
24 job?
25 A. They were cutting down on the cars and

Page 46

1  CHARISE JONES
2  just trying to -- you know, I don't know their
3  actual reasoning for doing it, but they did.
4  Q. And so then you began working inside
5  you said?
6  A. Correct.
7  Q. And that is similar to the previous
8  roles where you were working out of the New York
9  office.
10    Is that right?
11 A. Correct.
12 Q. This was still in the claims
13 department?
14 A. Correct.
15 Q. How long did you work in that position
16 for?
17 A. That wasn't that long, and that was
18 another department that they closed down.
19 Q. The department inside the claims
20 department?
21 A. Yes. It was -- it was separate, but I
22 just don't know the name of it, and they closed
23 down that department all together.
24 Q. And what happened to your employment at
25 that point?

Page 47

1  CHARISE JONES
2  A. Then I went to claims. It was called
3  hybrid where I handled PIP and liability claims.
4  Q. What does "PIP" mean?
5  A. Personal injury protection.
6  Q. What is personal injury protection?
7  A. That's the no-fault part of it,
8  medical, when they had an injury.
9  Q. Is that a New York-specific procedure?
10 A. Yes.
11 Q. And how long were you in that role for?
12 A. That I was in for maybe two years.
13 Q. Do you recall what years you worked in
14 that role?
15 A. I do not.
16 Q. Do you know if it was within the last
17 ten years that you were in that role?
18 A. No. No, it was ten years -- it was
19 more than ten years.
20 Q. More than ten years ago?
21 A. Yeah.
22 Q. Okay. And what was the next position
23 you worked in at GEICO?
24 A. Then I went back to SIU.
25 Q. Did you apply to go back to SIU?

Page 48

1  CHARISE JONES
2  A. Yes.
3  Q. And what position did you work in when
4  you went back to SIU?
5  A. That was a desk job, and it was solely
6  medical again.
7  Q. Were you working out of the Woodbury
8  office?
9  A. Yes.
10 Q. When you say "solely medical," what do
11 you mean?
12 A. It didn't have to do with any damages
13 on cars. It had to do with just injuries.
14 Q. Who was your supervisor in that role?
15 A. April Neyland.
16 Q. Was this the first time you worked with
17 April Neyland?
18 A. No.
19 Q. When had you worked with her
20 previously?
21 A. When -- when I was in the PIP, personal
22 injury protection, and the liability, she was also
23 my supervisor there.
24    And I apologize, when I went to SIU,
25 the supervisor there was not April, because she



Page 49

1  CHARISE JONES
2  was not there yet.  I forget who -- I don't know
3  who -- who I had when I first went there.
4      Q.   When you first went to SIU?
5      A.   Back again, yes.
6      Q.   Got it, okay.  Do you recall how long
7  you worked in that position for?
8      A.   That position maybe four years.
9      Q.   Do you remember the years that you
10 worked in that role?
11     A.   I do not.
12     Q.    And so what was the title that you were
13 working as?
14     A.   I do not recall.
15     Q.   But this was the first time that you
16 had returned to the SIU, right?
17     A.   Correct.
18     Q.   And did you apply to return to SIU?
19     A.   Yes.  I remember the supervisor's name.
20     Q.   What was the supervisor's name?
21     A.   Sharyl Derenthal.
22     Q.   Could you spell that if you're able?
23     A.   S-h-e-r-y-l, and Derenthal, I would
24 butcher it.  I have no idea.
25     Q.   Okay.  Fair enough.

Page 50

1  CHARISE JONES
2      And was she the supervisor or the
3  manager?
4      A.   She was the supervisor.
5      Q.   Do you recall who the manager was?
6      A.   She did become the manager, but at that
7  time I don't know who the manager was.
8      Q.   And sorry, when I say supervisor and
9  manager, do you understand what I mean --
10     A.   Yes.
11     Q.   -- in those different terms?
12     A.   Yes.
13     Q.   And what is the different between a
14 supervisor and a manager at GEICO?
15     A.   I directly would report to my
16 supervisor, and then the supervisor would report
17 to the manager.
18     Q.   Got it.  Fair enough.
19     Has that always been the reporting
20 structure at GEICO as far as you know?
21     A.   Yes.
22     Q.   Was that the same in SIU and in the
23 claims department?
24     A.   Yes.
25     Q.   And what was your next position at

Page 51

1  CHARISE JONES
2  GEICO?
3      A.   I then applied for the field SIU.
4      Q.   Do you recall when that was?
5      A.   No, I do not.
6      Q.   Do you remember what the actual job
7  title of the position was?
8      A.   It was called field SIU investigator.
9      Q.   And were you accepted to work in that
10 role?
11     A.   Yes.
12     Q.   What did that role entail, generally?
13     A.   That was again going out and either
14 taking photos of vehicles, or trying to get
15 statements from people.
16     That was really it.
17     Q.   And what was your geographic region
18 with respect to that role?
19     A.   Again it was just all New York.
20     Q.   Did you go into other states at all?
21     A.   Rarely.
22     Q.   Was that part of a region within GEICO?
23     A.   Where I worked it was region two.
24     Q.   Do you know what region two
25 encompassed?

Page 52

1  CHARISE JONES
2      A.   Region two was the New York office.
3      Q.   And did region two only investigate New
4  York-specific claims?
5      A.   No.
6      Q.   What other claims did region two
7  investigate?
8      A.   We did Connecticut, Pennsylvania
9  sometimes, depending on where it fell, like where
10 the geographical location was in Pennsylvania.
11     Q.   And in terms of where a case would
12 fall, as you say, how is that determined?  Is that
13 just the location of the incident?
14     A.   Correct, where it -- where it happened,
15 we'd put in the ZIP code, and we would map it out.
16     Q.   Okay.  And did GEICO have different
17 geographic regions --
18     A.   Yes.
19     Q.   -- in the SIU?
20     A.   Yes.
21     Q.   Do you recall how many there were?
22     A.   I do not.
23     Q.   Did you ever work in any region other
24 than region two?
25     A.   No.



Page 93

1  CHARISE JONES
2  was just a brief time.
3    Q.  And then what happened to your job
4  position at that time?
5    A.  They asked me if I preferred auditor or
6  trainer, and I basically said whatever would keep
7  my job, and they just said that everyone was going
8  to be auditors, that there -- there was no need
9  for trainers any more.  They were doing like --
10 almost like self-training like.  They were just
11 going to implement like, you know, a way to
12 self-teach yourself.
13   Q.  And so when you say "auditor," is that
14 your current job role?
15   A.  Correct.
16   Q.  And when did you start working in that
17 role?
18   A.  We were told we were auditors I think
19 like the end of 2023, but we started, you know,
20 actually auditing in this -- beginning of this
21 year.
22   Q.  And when you say "auditing," what do
23 you mean?
24   A.  Now I -- all the investigators that do
25 a case, when they go ahead and conduct their cases

Page 94

1  CHARISE JONES
2  and they close it, I go in and I look at their
3  case and make sure that they completed everything
4  the way they should have.
5    Q.  So the auditor role is different than
6  investigator, correct?
7    A.  Correct.
8    Q.  And when you were -- to back -- strike
9  that.
10      To go back to when you were a trainer,
11 did you have any supervisory responsibilities in
12 that role?
13   A.  No.
14   Q.  When you worked as a trainer, did you
15 participate in providing information for
16 performance evaluations to any other employees?
17   A.  To any other employees?  No.
18   Q.  And in your role as an auditor, do you
19 have any supervisory responsibilities?
20   A.  No.
21   Q.  Have you ever in this role?
22   A.  No.
23   Q.  Have you provided any information for
24 performance evaluations for other SIU employees in
25 your role as an auditor?

Page 95

1  CHARISE JONES
2    A.  If they -- if -- if the audit came back
3  negatively, and they -- because it's a scoring --
4  if it's scoring, that information is used for
5  performance, but not my me.  It's whoever the
6  supervisor is.
7    Q.  And when you say "scoring," could you
8  describe what you mean by that?
9    A.  You start off at a hundred percent, and
10 then there's categories for, you know, everything
11 that we look into as far as what they did, and
12 then each category has a scoring on it.
13      Depending on what they, you know, miss,
14 or they missed, you know, they could -- it'd go
15 from a hundred down to, you know, whatever the
16 point system was.
17   Q.  Do you know what the point system is?
18   A.  Yes.  It's like certain categories are,
19 you know, fifteen percent, then you have
20 categories that are ten percent, you know, five
21 percent -- not percent, points, I'm sorry, fifteen
22 points, ten points -- ten points, three points,
23 one point, depending on where it fell.
24   Q.  Can you give me some examples of these
25 categories?

Page 96

1  CHARISE JONES
2    A.  Investigative quality is fifteen
3  points...
4        If they did not upload the evidence
5  properly, whether we couldn't open it or we
6  couldn't view it, that would be three points...
7        If they took a recorded interview, and
8  they didn't use the proper opening and closing,
9  that's seven points...
10       You know, they have to upload their
11 report to the case management.  They have to
12 upload it to the claims department, so they could
13 view it.  That's one point, if they don't do it.
14   Q.  In your positions at GEICO, were you
15 ever disciplined in any capacity?
16   A.  I'm sure I was.  I just don't recall,
17 like what specific -- I mean, nothing to the point
18 where it was something I would remember.
19   Q.  Do you know if there was any written
20 disciplinary record at any point for your
21 employment?
22   A.  Currently I'm on a coaching plan.
23   Q.  What does that entail?
24   A.  They -- my percentage is ninety-six
25 percent -- ninety-six point something, and I'm off



Page 97

1      CHARISE JONES
2  by a point.
3          So because I'm not at that ninety-six
4  point seven percent, they put me on a plan that I
5  have to work to get to that point.
6      Q.   Can you just give me a general
7  description of what you mean by "ninety-six
8  percent"?
9      A.   Currently there's eight auditors.
10  Prior to that there was six auditors.  So within
11  the six auditors, it ranged from ninety-eight to
12  ninety-six percent.  So there is -- being that
13  there was only a couple of us, the margins were
14  very tight, and they said that ninety-seven --
15  96.7 percent was what the average should be, and I
16  was at 96.4.
17          So because I wasn't at the right
18  percentage, they put me on this coaching plan.
19      Q.   Who is your current supervisor?
20      A.   Douglas Koontz, K-o-o-n-t-z.
21      Q.   And how long has he been your
22  supervisor for?
23      A.   About five -- four or five months.
24      Q.   Who was your supervisor before Douglas?
25      A.   Sarah Greenman, G-r-e-e-n-m-a-n.

Page 98

1      CHARISE JONES
2      Q.   And how long was Sarah your supervisor
3  for?
4      A.   About three or four months; not that
5  long.
6      Q.   Was she -- was -- strike that.
7          Was Sarah your first supervisor as an
8  auditor?
9      A.   When I first got the auditor's
10  position, there was no supervisor.  It was just
11  reporting directly to the manager.
12      Q.   Who was the manager?
13      A.   Gerry Marlon, M-a-r-l-o-n.
14      Q.   And so after the period of time when
15  there was no supervisor in the auditor role for
16  you, was Sarah your first supervisor in that role?
17      A.   Yes.
18      Q.   So you reported to Sarah and Douglas as
19  an auditor?
20      A.   Correct.
21      Q.   Okay.  And just to confirm, is Douglas
22  your current supervisor?
23      A.   Yes.
24      Q.   And then as a trainer, who were your
25  supervisors?

Page 99

1      CHARISE JONES
2      A.   Just April Neyland, and then -- Sarah
3  Greenman was the one who approached me and said
4  which would I prefer, auditor or trainer.
5      Q.   Did you prefer your job as a trainer to
6  your job as an investigator?
7      A.   Yes.
8      Q.   Why is that?
9      A.   Wait, you said did I prefer trainer?
10  Yes.  The answer is yes, I wanted to be a trainer.
11      Q.   Yes.
12      A.   Because the -- it wasn't as stressful
13  as far as meeting all the expectations of an
14  investigator.
15      Q.   When you say "expectations of an
16  investigator," what do you mean?
17      A.   All the things that comes along with
18  your investigation: Time frames, how many cases,
19  your performance.
20          It was just -- you know, it was just a
21  lot to make sure you maintained, where as a
22  trainer I kind of could, you know -- it was easier
23  for me to make my own schedule as a trainer on who
24  I was going to, you know, talk to, send out
25  invites for, you know, specific training.

Page 100

1      CHARISE JONES
2          It was just a lot -- a lot less stress.
3      Q.   Did you speak with any other trainers
4  before you took the position?
5      A.   No.
6      Q.   During your employment with GEICO from
7  2017 to present, did you take any FMLA or
8  disability leave?
9      A.   Yes.
10      Q.   And when was that?
11      A.   I don't know the time, but it was two
12  specific times.
13          Well, I had eye surgery, and I was out
14  for I think a week or two, and I had breast
15  reduction that I was out for a short period of
16  time.
17      Q.   And when you say short period of time,
18  is that a number of days?  weeks?
19      A.   Yeah -- it wasn't -- no more than a
20  week.
21      Q.   Do you recall when those leaves took
22  place?
23      A.   One I know is around 2018, and the
24  other one I don't recall.
25      Q.   Which one was in 2018?



Page 121

1    CHARISE JONES
2  work done in the amount of time they're giving us.
3    Q.  Which other coworkers are you referring
4  to?
5    A.  Other ones when I would be at
6  examinations under oath at other places.
7       So depending on who was there, it could
8  have been, you know, Keith Fischer, Scott Brady.
9  Other people I talked to knowing that they were on
10 when I was on late would be Jeff Lewonka.
11      That's I can recall off the top of my
12 head.
13   Q.  Who is Jeff Lewonka?
14   A.  He was another coworker.
15   Q.  And what position did he work in?
16   A.  Same thing as the investigator.
17   Q.  Do you recall when you had those
18 discussions with Keith Fischer, Scott Brady, and
19 Jeff Lewonka?
20   A.  Just over the course of working as an
21 investigator.
22   Q.  How often did you have those
23 conversations?
24   A.  You know, whenever I would meet up with
25 them, see them at other places, and if I saw them

Page 122

1    CHARISE JONES
2  online after, you know, like late hours, while I
3  was working.
4    Q.  And you said that you made a complaint
5  to April Neyland.  Is that right?
6    A.  Correct.
7    Q.  How many times did you complain to her
8  about off-the-clock work?
9    A.  A handful of times.
10   Q.  Could you approximate what you mean by
11 "a handful"?
12   A.  Maybe four to five times.
13   Q.  And do you recall when you made those
14 complaints to her?
15   A.  It was over the course of, you know,
16 her -- me being reporting to her.  So it was over
17 the course of a year or so, two years, you know,
18 depending on -- I don't know the time frame, but
19 it was, you know, whenever it came up, she was the
20 one I would discuss it with.
21   Q.  When you say whenever "it" came up,
22 what are you referring to?
23   A.  Whenever I had the -- wherever --
24 whenever I had to do the overtime, or when it was
25 coming towards the end of the week, and I wasn't

Page 123

1    CHARISE JONES
2  able to finish up what I had, or the day -- you
3  know, I was just -- so much windshield time, and I
4  just couldn't finish my work.
5    Q.  And when you say you couldn't finish
6  your work, what do you mean by that?
7    A.  Again we had like certain time frames
8  to finish it, certain time frames that things had
9  to be submitted by, and knowing that my shift was
10 over based on the number of hours I've already
11 worked, I knew that this report had to be in by
12 the end of that day, and I would just have to do
13 it, otherwise it would, you know, be held against
14 me for not doing it.
15   Q.  And your testimony is that that
16 happened on four to five occasions?
17   A.  Talking to her about the overtime?
18   Q.  Correct.
19   A.  Yes.
20   Q.  And from April 2017 to the present,
21 have you been paid hourly?
22   A.  I believe it changed at some point.  I
23 just don't know when.
24   Q.  Do you recall how it changed?
25   A.  I don't know how it changed.

Page 124

1    CHARISE JONES
2    Q.  Do you recall when it changed
3  approximately?
4    A.  I do not.
5    Q.  But you do understand the difference
6  between hourly and salary?
7    A.  Yes.
8    Q.  What's your understanding of that
9  difference?
10   A.  You're -- you're paid hourly, meaning
11 each hour you work you're paid, or you're just
12 paid a flat fee of -- you know your grade is a
13 sixty-five, you make X amount, and that's what
14 your pay is, no matter how much you work.
15   Q.  Do you recall your rates of pay?
16   A.  Oh, no.  I do not.
17   Q.  Did your rates of pay generally
18 increase throughout your employment?
19   A.  Yes.
20   Q.  Did you ever make a -- a bonus or
21 commission?
22   A.  I don't know.  I mean, I had
23 profit-sharing, so I don't know if that's called a
24 bonus or a commission.  It was my own money.
25   Q.  Okay, and what do you mean by profit



Page 137
1            CHARISE JONES
2     Q.   And first I should ask, did you always
3  get paid for all of the time that you entered into
4  GEICO's timekeeping system?
5           MS. JEAN:  Objection.
6           THE WITNESS:  Whatever I entered I got
7     paid for, yes.
8  BY MR. SLOTNICK:
9     Q.   So paragraph seven, it -- it reads, "My
10 supervisor told me that if I was going to work
11 over 38.75 hours per week I needed to speak with
12 her and state why I needed to work additional
13 hours, because my supervisor was required to
14 pre-approve those hours.
15          "I recall asking my supervisor for one
16 or two extra hours for one week, but my supervisor
17 would not approve the overtime pay and said
18 instead I could work one to two fewer hours the
19 following week.  However, because of my workload I
20 was not able to take a few hours off the next
21 week.
22          "Accordingly I only entered 7.75 hours
23 per day, five days a week, regardless of how many
24 hours I actually worked."
25          Did I read that accurately?

Page 138
1            CHARISE JONES
2     A.   Yes.
3     Q.   And was 38.75 the number of weekly
4  hours you were expected to work as an investigator
5  at GEICO?
6     A.   Yes.
7     Q.   Was that always the case while you were
8  an investigator?
9     A.   Yes.
10    Q.   Which supervisor told you that?
11    A.   April Neyland.
12    Q.   And when did that conversation take
13 place?
14    A.   I don't know specifically.  Again it
15 was a couple of times that I did ask her.
16    Q.   So you asked her more than just this
17 one occasion?
18    A.   Yes.
19    Q.   And can you give me the details of each
20 of those occasions?
21    A.   Again, based on us having to do things
22 at a specific time frame, I said that I needed
23 more time, and I needed to work more on a specific
24 day, or more that I could not take time off on the
25 next day, because I was still getting work the

Page 139
1            CHARISE JONES
2  next day.  And it was said that, you know, there's
3  no approved overtime right now.  But, you know,
4  there were times where overtime was approved, and
5  whenever I asked, it was never being approved.
6     Q.   And can you detail those occasions when
7  you did ask for approval?
8     A.   I don't know what you mean by "detail."
9     Q.   Can you give me the dates when you
10 asked for approval?
11    A.   I don't know the dates.
12    Q.   Approximately?
13    A.   I don't know.  I truly don't know.
14    Q.   Were those those four to five occasions
15 that you mentioned earlier?
16    A.   It -- it -- it could have been those
17 times, but it was more on the times that I was
18 working that I needed the time off -- the time to
19 work, meaning that, you know, I was running into a
20 week where I saw that it was going to be more than
21 my 38.75, or it was going to be within the
22 two-week period that we get paid, and I couldn't
23 take off the time, and I was unfamiliar with when
24 the pay period ended and started, and there were
25 times where it was coming towards the end of the

Page 140
1            CHARISE JONES
2  week, and she would tell me, "Listen, this is the
3  end of the pay period.  If you don't take it off,
4  you can't do it next week, because now it's the
5  next pay period."
6           And I was like, "Oh, I didn't even
7  realize that."
8     Q.   So to turn back to your paragraph
9  seven, do you recall where that conversation took
10 place?
11    A.   It would either be via Zoom or phone.
12 I don't recall which one it was.
13    Q.   And again, do you recall when that
14 conversation took place?
15    A.   I do not.
16    Q.   Approximate, in the last few years?
17    A.   It was definitely within the last --
18 like right before I became trainer, like within
19 that time, right around that time before I -- you
20 know, because I was working first of all two jobs,
21 and it was like right around that time.
22    Q.   Was anyone else on that Zoom or phone
23 call with you?
24    A.   No.
25    Q.   It was just you and April?



Page 281

1   CHARISE JONES
2   A.  I would ask if there were any cases
3   that needed -- that weren't assigned yet, if they
4   needed any -- anything that I could just go out
5   on, like assist cases, where I could go out and
6   do -- it's called an EDR, which is event data
7   recorder, where I'd go in and plug in and get
8   information from a car.  Those were one set only
9   certain investigators were able to do, and because
10  I had that box to do that (indicating), I would
11  get those cases.
12      Q.  When you say "box," what do you mean?
13      A.  It's an event data recorder box.
14      Q.  Earlier you testified about being an
15  SIU trainer.  Do you recall that?
16      A.  Yes.
17      Q.  And you stated that you started the
18  position about in or around 2023.  I believe you
19  said, "I don't know.  Maybe 2023."
20      Do you recall that?
21      MR. SLOTNICK:  Objection.
22      THE WITNESS:  Yes.
23  BY MS. JEAN:
24      Q.  Looking at the documents in front of
25  you as well as the documents that you had

Page 282

1   CHARISE JONES
2   introduced on the record, particularly exhibits --
3   Exhibit 5, that includes your declaration?
4       A.  Yes.
5       Q.  If you turn to page four, paragraph
6   ten.
7       A.  Yes.
8       Q.  It says --
9       A.  Okay.
10      Q.  It says, "In approximately February or
11  March 2022 prior to my promotion to being a
12  trainer."
13      Do you see that?
14      A.  Yes.
15      Q.  Actually, sorry.  Back up.
16      If you go back to page one of that
17  document, in paragraph one, on the middle of that
18  paragraph, it says, "Before becoming a trainer as
19  a special investigator from 2016 until my
20  promotion in approximately March 2022" -- do you
21  see that sentence?
22      A.  Yes.
23      Q.  Does that refresh your recollection of
24  when you became a trainer in SIU?
25      A.  Yes.

Page 283

1   CHARISE JONES
2       Q.  When did you become a trainer in SIU?
3       A.  March of 2022.
4       Q.  Okay.  I'm done with that document.
5   Thank you.
6       You gave testimony regarding the change
7   in the number of days to close a case.
8   Specifically you stated that at some point GEICO
9   went from thirty days to close a case to
10  approximately ten days to close a case.
11      Do you recall your testimony?
12      MR. SLOTNICK:  Objection.
13      THE WITNESS:  Yes.
14  BY MS. JEAN:
15      Q.  Do you recall, when did that change
16  take place?
17      A.  That was recent.  I don't know the
18  exact time.  And it wasn't closing a case.  It was
19  being in the case.  So within thirty days you had
20  to either close it or be in it.
21      Q.  What does "being in it" mean?
22      A.  Meaning you have to touch it, either
23  review it, make a note, entry, something.
24      Q.  And when you say "recently," does that
25  mean in the past two years or longer?

Page 284

1   CHARISE JONES
2       A.  No, definitely within the past year.
3       Q.  And this was in relation to a case
4   going red.  Do you recall that testimony?
5       A.  Yes.
6       Q.  You stated that it would be a few days
7   before the thirty days, when it was thirty days, a
8   case would turn orange before it would go red.
9       Do you recall that?
10      A.  I do.
11      Q.  Going to the change, the recent change
12  within the past year of a case having to be in a
13  case in ten days, do you know when a case would
14  turn orange?
15      A.  It was the same.  It would be like
16  two -- two or three days prior to the ten days, it
17  would turn orange, and then on the tenth day it
18  would turn red.
19      Q.  Do you know if there were any
20  consequences for a case turning red?
21      A.  Only the fact that currently you have
22  to put in a ten-day report on the file.
23      Q.  What does that mean, "a ten-day
24  report"?
25      A.  Meaning you have to summarize what has



Page 297

```
 1              CHARISE JONES
 2            I N D E X
 3   DEPOSITION OF CHARISE JONES
 4   EXAMINATION BY:                    PAGE:
 5      Mr. Slotnick                    5, 292
 6      Ms. Jean                        275
 7
 8
 9         INDEX OF DEPOSITION EXHIBITS:
10   JONES EXHIBITS:                    PAGE:
11   Jones Exhibit 1. Notice of Deposition    11
12   Jones Exhibit 2. Employee handbook       101
13   Jones Exhibit 3. Training history log    109
14   Jones Exhibit 4. Employment Contents
15   From the GEICO Human Resources Associate
16   Handbook                                 115
17   Jones Exhibit 5. Charise Jones Declaration  134
18
19   Jones Exhibit 6. Answers to Interrogatories 176
20
21   Jones Exhibit 7. Second Amended Collective
22
23   and Class Action Complaint               224
24
25     (Exhibits attached to original transcript.
```

Page 298

```
 1              CHARISE JONES
 2      ERRATA SHEET FOR THE TRANSCRIPT OF:
     Case Name: Keith Fischer, et al. vs. GEICO
 3   Dep. Date: August 12, 2024
     Deponent:  Charise Jones
 4
               CORRECTIONS:
 5   Pg.  Ln.  Now Reads   Should Read   Reason
     ___  ___  _____   _____   _____
 6   ___  ___  _____   _____   _____
 7   ___  ___  _____   _____   _____
 8   ___  ___  _____   _____   _____
 9   ___  ___  _____   _____   _____
10   ___  ___  _____   _____   _____
11   ___  ___  _____   _____   _____
12   ___  ___  _____   _____   _____
13   ___  ___  _____   _____   _____
14   ___  ___  _____   _____   _____
15   ___  ___  _____   _____   _____
16   ___  ___  _____   _____   _____
17            _____
                     Signature of Deponent
18
19   SUBSCRIBED AND SWORN BEFORE ME
20   THIS____DAY OF_____, 2024
21
22   _____
23      (Notary Public)
24
25   MY COMMISSION EXPIRES: _____
```

Page 299

```
 1              CHARISE JONES
 2         ACKNOWLEDGEMENT OF WITNESS
 3      I, CHARISE JONES, do hereby acknowledge
 4   that I have read and examined the foregoing
 5   testimony, and the same is a true, correct and
 6   complete transcription of the testimony given by
 7   me, and any corrections appear on the attached
 8   Errata sheet signed by me.
 9   _____  _____
10      (DATE)              (SIGNATURE)
```

Page 300

```
 1              CHARISE JONES
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6        I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9        That CHARISE JONES, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13        I further certify that I am not related
14   Toni of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto set
18   my hand this 13th day of August, 2024.
19
20        _____
                    Kim M. Brantley
21        Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

