# Exhibit 7

## Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    ----------------------------------X
 3  KEITH FISCHER, MICHAEL O'SULLIVAN,
    JOHN MOESER, LOUIS PIA, THOMAS
 4  BARDEN, CONSTANCE MANGAN, and
    CHARISE JONES, individually and on behalf
 5  of all others similarly situated,
 6          Plaintiffs,
 7                              Case No.:
                                2:23 Civ. 2848
 8                              (GRB)(ARL)
        -against-
 9
    GOVERNMENT EMPLOYEES INSURANCE
10  COMPANY d/b/a GEICO,
11          Defendants.
    ----------------------------------X
12
13
14
    DEPOSITION OF
15
16          DANIEL JOSEPH KING
17
            Tuesday, January 7th, 2025
18
            Garden City, Long Island, New York
19
20
21  Reported By:
22
    Marina Dubson
23
24  Job #: J12200285
25
```

## Page 2

```
 1
 2
 3
 4
                DATE: January 7th, 2025
 5
                TIME: 10:00 a.m.
 6
 7
 8      DEPOSITION of DANIEL JOSEPH KING, an
 9  opt-in Plaintiff herein, taken by the
10  Defendant, pursuant to Federal Rules of
11  Civil Procedure, and Notice, held at
12  Esquire Deposition Solutions, 1225 Franklin
13  Avenue, Suite 325, Garden City, New York
14  11530, at the above-mentioned date and
15  time, before MARINA DUBSON, a Notary Public
16  of the State of New York.
```

## Page 3

```
 1  APPEARANCES:
 2
 3  OUTTEN & GOLDEN, LLP
    Attorney for Plaintiffs
 4  685 Third Avenue, 25th Floor,
    New York, New York 10017
 5  (212) 245-1000
    BY: SABINE JEAN, ESQ.
 6     Sjean@outtengolden.com
 7     JARRON MCALLISTER, ESQ.
       Jmcallister@outtengolden.com
 8
 9
10  DUANE MORRIS, LLP
    Attorney for Defendant
11  1540 Broadway, 14th Floor,
    New York, New York 10036
12  (212)471-1856
    BY: GREG SLOTNICK, ESQ.
13  Gsslotnick@duanemorris.com
14
15
    Sam Shereck, Shereck Video, videographer
16  Sshereck1@gmail.com
```

## Page 4

```
 1      IT IS HEREBY STIPULATED AND AGREED,
 2  by and between the attorneys for the
 3  respective parties, as follows:
 4
 5  THAT all objections, except as to the form
 6  of the questions, shall be reserved to the
 7  time of the trial;
 8
 9  THAT the within examination may be signed
10  and sworn to before any Notary Public with
11  the same force and effect as if signed and
12  sworn to before the Court;
13
14  THAT filing of the original transcript of
15  the examination is waived.
```



Page 41

1             D. King
2     Q.   And how long were you there
3  for?
4     A.   Six months.
5     Q.   What was your next position?
6     A.   I worked for a private security
7  firm.
8     Q.   What was the name of the firm?
9     A.   Elite Security.
10    Q.   And what were your job
11 responsibilities there?
12    A.   Did corporate security for the
13 Golden Globes, Waldorf Astoria events, the
14 Plaza, stuff at -- I can't think of the
15 name of the place.  Right near Times
16 Square.  Now, it's changed so many times, I
17 forget.  It was a small venue there.  I
18 used to do a lot of different things for
19 ABC and CNN.
20    Q.   How long were you in that
21 position for?
22    A.   Up until I got hired for GEICO.
23    Q.   And when were you hired for
24 GEICO?
25    A.   August 2005.

Page 42

1             D. King
2     Q.   And what role were you hired
3  into at GEICO?
4     A.   As an investigator.
5     Q.   And was that the only role that
6  you held at GEICO?
7     A.   Yes.  I was first hired as a
8  medical fraud investigator, and then after
9  several years, I switched over to the
10 auto -- auto fraud investigator.
11    Q.   Did you switch over
12 voluntarily?
13    A.   No.
14    Q.   How did it come about that you
15 made that switch?
16    A.   They needed people.  Just -- it
17 was a management decision.
18    Q.   And just to jump back to -- you
19 said you started as a medical fraud
20 investigator?
21    A.   Yes.
22    Q.   Can you describe what your job
23 duties were in that role?
24    A.   Yeah, it was investigating
25 people who were in car accidents.  And then

Page 43

1             D. King
2  after the accident, they were treating at
3  certain medical facilities that maybe
4  popped up as being unscrupulous.
5         And then also we investigated
6  durable medical equipment that's given to
7  these individuals to see if they ever used
8  them, they know how to use them.  A lot of
9  EUOs were conducted.  Clinic inspections,
10 going into medical facilities, making sure
11 that they had the material and the
12 equipment that they -- they're billing for.
13    Q.   And was that role located in
14 New York?
15    A.   Yes.
16    Q.   Was it a field-based role or a
17 desk-based role?
18    A.   It was field based.  Sorry.
19    Q.   Did you have a GEICO company
20 car?
21    A.   Yes, I did.
22    Q.   And how long were you in the
23 medical fraud investigator role for?
24    A.   About eight years, I would
25 think.  I am guessing.  Well, I -- I

Page 44

1             D. King
2  assume.
3     Q.   So, from approximately 2005 to
4  2013, somewhere in that range?
5     A.   Yes.
6     Q.   And you mentioned that you then
7  worked as an auto fraud investigator?
8     A.   Correct.
9     Q.   And what were your job
10 responsibilities in that role?
11    A.   In that, it went from car theft
12 to hit-and-runs to, as well, what they call
13 jump-ins.  People who claim to be in a car
14 accident but were never in the car or bus
15 or something.  Motor vehicle, parking
16 losses, flood damage.
17    Q.   Okay.  And what years were you
18 in that role for?
19    A.   I was there from, I think you
20 had said 2013 till I left, since I retired.
21    Q.   And did GEICO have different
22 regions to which employees reported?
23    A.   Yes, but it changed at times.
24    Q.   Do you recall how it changed
25 over time?



Page 109

1  D. King
2  today, there were certain steps that you
3  had to take and have them submitted within
4  the 24 hours to make your TIP.
5     Q.   What specific steps are you
6  talking about?
7     A.   You had to do an opening
8  statement about the case, why you were
9  assigned, what you were assigned about.
10  You had to do background -- initial
11  background checks on all the people
12  involved.
13         And there was another -- there
14  was another like basic same step that you
15  had to put in, basically saying what --
16  what other further steps of investigations
17  you were going to do.
18     Q.   Do you know if that TIP
19  requirement was in place throughout 2016 to
20  2022?
21     A.   Yes.
22     Q.   It was?
23     A.   Yes.
24     Q.   And back to your discussion
25  with Dara, I guess the first discussion,

Page 110

1  D. King
2  was anyone else on that call?
3     A.   No.
4     Q.   Do you have any written records
5  of that discussion with Dara?
6     A.   No, I don't.
7     Q.   Do you have any written records
8  of that second discussion you had with
9  Dara?
10     A.   No, I don't.
11     Q.   Did you ever put in a formal
12  request to transfer off her team?
13     A.   No, I did not.
14     Q.   If you look at paragraph nine
15  on the next page, you say, on my regular --
16     A.   Oh, paragraph nine?
17     Q.   Yeah, paragraph nine, page
18  three at the very top.
19     A.   Got you.
20     Q.   You say, my regular schedule
21  for GEICO was 8:00 a.m. to 4:30 p.m. with a
22  half-hour lunch. I often worked until
23  5:00 p.m., and then I continued working
24  after dinner each day for an additional two
25  hours. I worked about 50 hours a week on

Page 111

1  D. King
2  average?
3     A.   Correct.
4     Q.   And what time period is that in
5  reference to?
6     A.   That is from, I guess, COVID,
7  when we were -- you know, after COVID, then
8  we went -- were back to full, you know,
9  going out and doing everything. You know,
10  not just staying at home until I resigned.
11     Q.   And when you say back to full,
12  what do you mean by that?
13     A.   Well, before we were -- because
14  of COVID, we weren't allowed to go out and
15  do investigations. Everything had to be
16  over the phone, everything had to be --
17  EUOs had to be done over the phone.
18     Q.   So, during COVID, you were not
19  allowed to work in the field; is that
20  correct?
21     A.   Correct.
22     Q.   And do you remember how long
23  that was the case for?
24     A.   A year maybe, or a year and a
25  half. I -- I don't particularly recall.

Page 112

1  D. King
2     Q.   And how did the fact that you
3  could not go into the field impact your
4  workload during that time?
5     A.   Some of it, it -- it helped.
6  We weren't catching as many cases as we
7  were prior or after COVID. People weren't
8  out driving, people, weren't, you know,
9  committing fraud, I guess, during that
10  time.
11     Q.   Okay. So, was the volume of
12  cases lower during that time?
13     A.   I believe it was.
14         MS. JEAN:  Apologies. For
15     clarification, when you say that
16     time, can you state the time, if
17     possible, please?
18  BY MR. SLOTNICK:
19     Q.   During the time period we were
20  just testifying about in terms of
21  March 2020 to when you were allowed to go
22  back out in the field, that's -- that's the
23  time period.
24         MS. JEAN:  Because I was
25     still -- thank you.



Page 113

1         D. King
2   BY MR. SLOTNICK:
3       Q.   So, is it your allegation that
4   you worked an additional two hours after
5   dinner every single day?
6       A.   At least, yes.
7       Q.   And what is that estimate based
8   on?
9       A.   Based on the time that I spent
10  at my desk, I would go down and have
11  dinner.  My wife would get home around
12  5:00.  We'd have dinner, and then I would
13  go up and work for another two, two and a
14  half hours, just trying to -- to take care
15  of my TIP.
16      Q.   Would you record that time?
17      A.   There's an unofficial recording
18  if you -- if GEICO really wants to look.
19      Q.   What do you mean by that?
20      A.   Well, when I submit my cases or
21  I submit my cases to be reviewed for TIP,
22  or e-mails when my bosses are responding to
23  me or talking to me which were after hours.
24      Q.   But when I -- just to go back
25  to whether you submitted for that time, I

Page 114

1         D. King
2   mean on the Workday app, did you actually
3   put in for these additional hours you claim
4   to have worked?
5       A.   No, because I was told not to.
6       Q.   Who told you not to?
7       A.   Dara Campbell.  And it was said
8   that they're not paying you overtime.
9       Q.   Who said that?
10      A.   Dara said that.  There was a
11  guy -- the guy, Bill, the manager.
12      Q.   Bill was another SIU manager
13  that you had?
14      A.   Yeah, Bill.  I can't think of
15  his last name.  Oh, Newport.  Bill Newport.
16      Q.   And back to Dara.  So, when did
17  she tell you that specifically?
18      A.   I don't exactly recall.
19      Q.   Do you remember when she said
20  that to you?
21      A.   I know it was in the evening on
22  a phone call, but I don't remember the date
23  or -- I mean, this is all way before any
24  lawsuit was put in.  So --
25      Q.   Do you have any written

Page 115

1         D. King
2   correspondence of that discussion with
3   Dara?
4       A.   No, I do not.
5       Q.   And what exactly did Dara say
6   to you on the phone in that call?
7       A.   I can't quote exactly what she
8   said.
9       Q.   The sum and substance?
10      A.   Okay.  So, we discussed a
11  couple of things.  Which one are you
12  referring to?
13      Q.   I just want to know sort of
14  what Dara told you on that phone call with
15  respect to not putting in for your time
16  worked as you are testifying to.
17      A.   Okay.  Because I spoke about --
18  I spoke to her about getting transferred.
19  That was one phone call.
20      Q.   Right.
21      A.   And then he was talking about
22  one when I was saying I had trouble keeping
23  up.  Is that what you're talking about?
24      Q.   You just testified with respect
25  to Dara telling you that you would not be

Page 116

1         D. King
2   paid for that extra time after dinner,
3   correct?
4       A.   She didn't just say me.  She
5   said they're not going to pay you guys
6   after that, you know.  They're not going to
7   pay more than 7.75.
8       Q.   And what exactly did she say to
9   you about that?
10      A.   I can't give you a quote.  I
11  can't.  I don't --
12      Q.   Was that one conversation or
13  was that a number of conversations about
14  that topic specifically?
15      A.   I've probably had several
16  conversations about that.  Not so much as
17  far as overtime, it was more about how many
18  hours working just to get the job done --
19           (Clarified by the Court
20       Reporter.)
21      A.   It would take to complete the
22  job, how many extra hours a day.
23      Q.   Did Dara Campbell ever
24  encourage you to work extra hours off the
25  clock?

Page 117

1  D. King
2  A. No.
3  Q. Did she ever suggest you work
4  extra hours off the clock?
5  A. Not to my recollection.
6  Q. And you had also mentioned
7  Bill Newport, SIU manager, correct?
8  A. Correct.
9  Q. Can you describe what he told
10 you about working those extra hours?
11  A. He never told me anything
12 specifically. I didn't really have many
13 conversations with him. I -- I don't think
14 I have ever had a one-on-one with him.
15  Q. Have you ever met Bill Newport?
16  A. Yes.
17  Q. Did you meet him in person?
18  A. Yes.
19  Q. So, who was Bill Newport
20 talking to when you learned of this?
21  A. The -- the supervisors. I'm
22 sorry. The supervisors.
23  Q. So, this is -- strike that.
24      Are you saying that this is
25 something Dara said that Bill said?

Page 118

1  D. King
2  A. Yes.
3  Q. Understood. So, did Bill ever
4  directly tell you that?
5  A. No.
6  Q. Or any -- have any discussions
7  with you about your hours worked?
8  A. No.
9  Q. And what's your basis for the
10 estimation that you worked 50 hours a week
11 on average in paragraph nine?
12  A. My basis, that I would work
13 from 8 to 5. After dinner, I would go back
14 up, log on to my computer again and spend
15 another two, two and a half hours
16 attempting to make my TIP.
17  Q. And are you testifying that you
18 did this every single day?
19  A. I would say yes, I did. Yes.
20  Q. During what time period?
21  A. During post-COVID until I left.
22  Q. Did you ever work additional
23 hours before COVID?
24  A. At times. At times. But not
25 to the extent that I was the last two years

Page 119

1  D. King
2  or three years.
3  Q. What do you mean by at times,
4  like how often?
5  A. If for some reason I got stuck
6  in traffic from coming back from doing an
7  EUO, but I had to get this in, you know, by
8  tonight at midnight, I would work the hours
9  to get -- to get the report in.
10  Q. Did you ever make any requests
11 with respect to those additional hours for
12 overtime pay?
13  A. No.
14  Q. Why not?
15  A. Well, because it was known that
16 they were not paying us overtime. So, I'm
17 not sure why I would even -- why ask?
18  Q. Did you ever receive overtime
19 pay while you worked at GEICO?
20  A. I testified earlier that I did
21 when I was -- they had those extra cases,
22 the social media cases. Yes, I was paid
23 overtime.
24  Q. I think you testified to the
25 social media cases and the Superstorm Sandy

Page 120

1  D. King
2  cases, correct?
3  A. I wasn't paid for Superstorm
4  Sandy. I -- you asked if anything was
5  available to anybody.
6  Q. Right. Other than the social
7  media cases though, did you ever put in a
8  request for overtime pay?
9  A. No.
10    MR. SLOTNICK: Off the record.
11    THE VIDEOGRAPHER: All right.
12  Off the record at 12:29.
13    (Whereupon, an off-the-record
14  discussion was held.)
15    (Whereupon, a short break was
16  taken at this time.)
17    THE VIDEOGRAPHER: Okay. Back
18  on the record at 1:26.
19 BY MR. SLOTNICK:
20  Q. Mr. King, before we broke, we
21 were reviewing your declaration?
22  A. Yes.
23  Q. So, if you could turn to
24 paragraph ten on page three in -- in
25 Exhibit 4.



Page 177

1           D. King
2      running shopping and everything. I
3      was basically working that whole
4      time, except for 20 minutes here or
5      there.
6  BY MR. SLOTNICK:
7      Q.   Did you have rest breaks or
8  other breaks during each workday?
9      A.   I may have.  If I had to get up
10 and go to the bathroom, I went to the
11 bathroom.  If the doorbell rang, if I was
12 home, I open the doorbell [sic].  But, I
13 mean, I always went back to work.
14     Q.   Did you sign out for those
15 breaks?
16     A.   No.  There was no -- we didn't
17 have to sign out for those.
18     Q.   Okay.  Were there any breaks
19 that you did have to sign out for?
20     A.   No.
21     Q.   Did you take a lunch break
22 every day?
23     A.   Sometimes I did.  I ate at my
24 desk a lot of times.
25     Q.   Do you recall if you signed out

Page 178

1           D. King
2  for those breaks?
3      A.   No, because most times, I was
4  still working while I was eating.
5      Q.   So, you did not sign out for
6  meal breaks?
7          MS. JEAN:  Objection.
8          THE WITNESS:  No.
9  BY MR. SLOTNICK:
10     Q.   If you look at interrogatory
11 number four on page five, it says, describe
12 each job title that you held during the
13 relative period, including start and end
14 dates of each title held.  And for each job
15 title, describe each job duty that you
16 performed.
17         And in the second paragraph,
18 plaintiff states during the relevant
19 period, he recalls working for GEICO as a
20 senior fraud investigator in SIU from
21 approximately 2016 to May 2022 in GEICO's
22 Woodbury, now Melville, office.
23         Do you see that testimony?
24     A.   Yes.
25     Q.   And was senior fraud

Page 179

1           D. King
2  investigator your official title at GEICO?
3      A.   There was two forms.  I don't
4  know if -- honestly, I don't recall.  I was
5  either fraud investigator, it said on my
6  business card senior fraud investigator,
7  but then there was one that got paid more
8  money than I did.  And that was based on
9  merit.
10     Q.   What do you mean one got paid
11 more than you?
12     A.   The senior one was making more
13 money than a regular investigator.  I don't
14 know if the one that says senior fraud is
15 the above title or -- like Keith Fischer.
16 All right.  So, he was like a senior one.
17 He was making more money than me.
18 George McManus, same thing.
19 Michael O'Sullivan, no.  Steve Stemmler, at
20 the time, no.
21     Q.   So, you said Keith Fischer and
22 George McManus were in roles that were
23 making more money than you?
24     A.   Same job, more money.
25     Q.   Was it the same job title that

Page 180

1           D. King
2  you had?
3      A.   That's what I don't recall, if
4  theirs is senior fraud --
5         (Clarified by the Court
6         Reporter.)
7      A.   I don't recall exactly what
8  their title was.
9      Q.   And you said Michael O'Sullivan
10 and Steve Stemmler --
11     A.   At the time.
12     Q.   Let me finish my question.
13     A.   Sorry.
14     Q.   No.  You're okay.
15         At the time, Mike O'Sullivan
16 and Steve Stemmler were in the same role as
17 you --
18     A.   Yes.
19     Q.   -- is that correct?
20     A.   Yes.
21     Q.   Do you recall what their
22 official job title was?
23     A.   No.  Let me see if I have a
24 card.
25         MS. JEAN:  You're not allowed



Page 221

 1      D. King
 2      THE VIDEOGRAPHER:  Okay.  We're
 3  off the record at 3:54, and that
 4  concludes the deposition.
 5      (Whereupon, at 3:55 P.M., the
 6  Examination of this Witness was
 7  concluded.)
 8
 9
        _____
10           DANIEL KING
11
12  Subscribed and sworn to before me
13  this _____ day of _____ 20___.
14
    _____
15      NOTARY PUBLIC

Page 222

 1      D. King
 2           E X H I B I T S
 3
 4  DEFENDANT EXHIBITS
 5
 6  EXHIBIT     EXHIBIT                PAGE
 7  NUMBER      DESCRIPTION
 8  Exhibit 1   the complaint          18
 9  Exhibit 2   GEICO employee handbook 80
10  Exhibit 3   training log           92
11  Exhibit 4   Declaration of Daniel  98
12              King
13  Exhibit 5   interrogatories        173
14  Exhibit 6   second amended collective 189
15              and class action complaint
16  Exhibit 7   e-mail                 190
17  Exhibit 8   e-mail                 193
18  Exhibit 9   e-mail                 194
19  Exhibit 10  e-mail                 197
20
21
22      (*Exhibits attached to transcript.)
23
24          (Cont'd next page.)
25

Page 223

 1      D. King
 2           I N D E X
 3
 4  EXAMINATION BY                    PAGE
 5  MR. SLOTNICK                      6
 6  MS. JEAN                          212
 7
 8   INFORMATION AND/OR DOCUMENTS REQUESTED
 9  INFORMATION AND/OR DOCUMENTS      PAGE
10  1. Request for SICM entries       219
11  2. Request for metrics            220
12  3. Request for expectations for   220
13     case investigation tasks
14
15
16      QUESTIONS MARKED FOR RULINGS
17  PAGE LINE QUESTION
18  (None)

Page 224

 1      D. King
 2          C E R T I F I C A T E
 3
 4  STATE OF NEW YORK    )
                          : 
 5  COUNTY OF RICHMOND   )
 6
 7      I, MARINA DUBSON, a Notary Public for
 8  and within the State of New York, do hereby
 9  certify:
10      That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 7th day of January 2025.
21
22
23              _____
                      MARINA DUBSON
24
25

