# Exhibit 8

### Page 1

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
 4
 5   KEITH FISCHER, MICHAEL O'SULLIVAN, )
     JOHN MOESER, LOUIS PIA, THOMAS     )
 6   BARDEN, CONSTANCE MANGAN, and      )
     CHARISE JONES, individually and on )
 7   behalf of all others similarly     )
     situated,                          )
 8                                      )
              Plaintiffs,               ) Case No.
 9                                      ) 2:23 Civ. 2848
          vs.                           ) (GRB)(ARL)
10                                      )
     GOVERNMENT EMPLOYEES INSURANCE     )
11   COMPANY d/b/a GEICO,               )
                                        )
12            Defendant.                )
     -----------------------------------)
13
14
15
16         * CONTAINS CONFIDENTIAL PORTIONS *
17
18      VIDEOTAPED DEPOSITION OF JOHN E. MOESER
19               Garden City, New York
20               Friday, August 2, 2024
21
22
23   Reported by:
24   KRISTIN KOCH, RPR, RMR, CRR
25   JOB NO. J11541506
```

### Page 2

```
 1
 2
 3
 4              August 2, 2024
 5              11:04 a.m.
 6
 7
 8      Videotaped Deposition of JOHN E.
 9   MOESER, held at the offices of Esquire
10   Deposition Solutions, 1225 Franklin Avenue,
11   Garden City, New York, before Kristin Koch, a
12   Registered Professional Reporter, Registered
13   Merit Reporter, Certified Realtime Reporter
14   and Notary Public of the State of New York.
15
```

### Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4      OUTTEN & GOLDEN LLP
 5      Attorneys for Plaintiffs
 6          685 Third Avenue
 7          New York, New York 10017
 8      BY:   MICHAEL J. SCIMONE, ESQ.
 9            SABINE JEAN, ESQ.
10
11
12      DUANE MORRIS LLP
13      Attorneys for Defendant
14          1540 Broadway
15          New York, New York 10036
16      BY:   MARIA CACERES-BONEAU, ESQ.
17            GREGORY SLOTNICK, ESQ.
18            - and -
19          190 South LaSalle Street
20          Chicago, Illinois 60603
21      BY:   TIFFANY E. ALBERTY, ESQ. (Via Zoom)
22
23   ALSO PRESENT:
24   JONATHAN JUAREZ, Videographer
25   SAMANTHA JACOBSON, GEICO (Via Zoom)
```

### Page 4

```
 1        J. Moeser
 2        THE VIDEOGRAPHER:  We are now on the
 3   record.  My name is Jonathan Juarez.  I am a
 4   legal videographer for Esquire.
 5        Today's date is August 2nd, 2024, and
 6   the time is 11:04 a.m.  This deposition is
 7   taking place at 1225 Franklin Avenue,
 8   Garden City, New York, in the matter of
 9   Keith Fischer versus Government Employees
10   Insurance Company.  The deponent is John
11   Moeser.
12        Counsel, please, identify yourselves
13   for the record.
14        MS. CACERES-BONEAU:  Maria
15   Caceres-Boneau on behalf of GEICO.
16        MR. SLOTNICK:  Greg Slotnick on behalf
17   of GEICO as well.
18        MR. SCIMONE:  Michael Scimone with
19   Outten & Golden on behalf of plaintiffs.
20        MS. JEAN:  Sabine Jean, Outten &
21   Golden, on behalf of plaintiffs.
22        THE VIDEOGRAPHER:  The court reporter
23   is Kristin Koch and will now swear in the
24   witness.
25         *   *   *
```



Page 29

1  J. Moeser
2  A. I believe it was a swimming pool
3  company that I started working for and then --
4  yeah, swimming pool company.
5  Q. And after that?
6  A. After that I decided to start a
7  business installing swimming pools, which didn't
8  last, and then when I discontinued that I got --
9  worked for Trans America Airlines at J -- Kennedy
10 Airport.
11 Q. What were you doing there?
12 A. I was a ramp agent.
13 Q. And then -- do you recall around what
14 years that was?
15 A. Maybe 1980.
16 Q. Okay. And then after working there,
17 where did you go next?
18 A. I was working at my friend's bar for a
19 brief time, he had a bar in West Babylon, and then
20 I went to the Police Department.
21 Q. What year was it that you started at
22 the Police Department?
23 A. January of '82, 1982.
24 Q. And you worked there through what year
25 did you mention earlier?

Page 30

1  J. Moeser
2  A. February of 2002.
3  Q. So '82 through 2002. And what did you
4  do with the Police Department?
5  A. Started out as a patrolman, worked in
6  various commands, got into the detective bureau
7  and became a detective, moved up the rank in
8  detective, and then retired.
9  Q. What Police Department was this?
10 A. New York City.
11 Q. And following, I guess, January 2002,
12 what did you do next, where did you go work?
13 A. I had taken some time off and then I
14 started working for a private investigations firm
15 that were actually handling insurance work, and
16 then I stopped doing that and decided to start a
17 private investigations firm. We did that for
18 about a year and a half. We then broke up the
19 firm and I got the job with Safeco Insurance, and
20 then from there I went to GEICO insurance.
21 Q. And what years were you working for
22 Safeco Insurance?
23 A. I believe it was sometime in 2003, I
24 think.
25 Q. Do you recall when you stopped working

Page 31

1  J. Moeser
2  there?
3  A. It was about a month before I got the
4  job with GEICO, which was in October 2003, so it
5  would have been either August or September.
6  Q. Okay. And then you mentioned you
7  started working at GEICO in October 2003; is that
8  right?
9  A. No. Two thousand -- I'm sorry. Did I
10 say -- it's 2006 I started with GEICO.
11 Q. Okay. 2006. So then Safeco, you were
12 with Safeco from approximately 2003 through August
13 of 2006?
14 A. I worked for Safeco for about two
15 years. I don't know the exact time when I
16 started, but I know I worked with him for around
17 two years.
18 Q. Okay. And then you started at GEICO
19 October of 2006?
20 A. I believe it was October 3rd, yeah.
21 Q. Okay. And then your last day with
22 GEICO was what?
23 A. April 30th, 2021.
24 Q. Are you currently employed?
25 A. No.

Page 32

1  J. Moeser
2  Q. So have you been retired since you left
3  GEICO?
4  A. Well, I'm not working, no.
5  Q. Do you do any part-time work?
6  A. No.
7  Q. What is the source of your income?
8     MR. SCIMONE: Objection.
9  A. Pension. I'm sorry. Pension and my
10 Social Security.
11 Q. What titles did you hold at GEICO
12 starting from the very beginning?
13 A. I was considered a senior field
14 investigator.
15 Q. And that's the role that you were hired
16 for?
17 A. Yes.
18 Q. And when you left GEICO, is that the
19 role that you still had?
20 A. Yes.
21 Q. Did GEICO have different geographic
22 regions to which employees were assigned?
23 A. Throughout the country or --
24 Q. Yes.
25 A. Yes.



Page 33
1            J. Moeser
2    Q.   What region were you in?
3    A.   Region 2.
4    Q.   And was that the region you were in
5  throughout the duration with GEICO?
6    A.   Yes.
7    Q.   Now, you described yourself as a senior
8  field investigator; right?
9    A.   That's the title that they gave me,
10  yes.
11    Q.   What were your duties and
12  responsibilities as a senior field investigator?
13    A.   To investigate claims that had
14  suspicions for allegations of fraud.
15    Q.   Was there ever a time that the title
16  may have been a little different where maybe it
17  was senior outside security investigator instead
18  of senior field security investigator?
19    A.   It could have been, yes, because I was
20  a field investigator, so that's -- I believe what
21  you are saying is that that was considered outside
22  compared to the inside investigators, yeah.
23    Q.   Okay.  And so the requirements of the
24  position are the same, they are outside?
25         MR. SCIMONE:  Objection.

Page 34
1            J. Moeser
2    Q.   Between.  Sorry.  I am going to
3  rephrase that.
4         Senior field security investigator and
5  a senior outside security investigator would have
6  the same -- be the same role?
7    A.   I am not familiar with the first term
8  that you said, but if they were field
9  investigators, yes.
10    Q.   Okay.  And the first term is the senior
11  outside -- senior outside security investigator is
12  the one that you are not familiar with the term;
13  right?
14    A.   Not really, no.  No.
15    Q.   And the term that you are familiar with
16  is senior field security investigator; right?
17    A.   Yes.
18    Q.   Okay.  So you said you investigated
19  potential fraudulent activity; correct?
20    A.   Suspicion of fraudulent activity, yes.
21    Q.   What -- what were your hours?
22    A.   Well, that's -- I don't know how to
23  define that, because when I first started, my
24  hours were different than when I left.
25    Q.   What were your -- did you have a set

Page 35
1            J. Moeser
2  time that you would start your day?
3         MR. SCIMONE:  Objection.
4    A.   A set time?  I normally would start
5  around 8 a.m., but, you know, we also had what
6  they called flexible hours.
7    Q.   What does flexible hours mean?
8    A.   It means that you could start your day
9  at a different time or -- start your day at a
10  different time.
11    Q.   So if you start your day at a different
12  time, then do you end your day at a different
13  time?
14    A.   You would, yes.
15    Q.   Who was your supervisor?
16    A.   I had -- during my tenure there, I had
17  many supervisors, so...
18    Q.   Let's go with 2016 through 2021, do you
19  recall who your supervisor was during those years?
20    A.   I know my last supervisor was April
21  Neyland, but I also worked for Rich Kiligin.  I
22  don't know if he retired prior or after that time.
23    Q.   Okay.  So prior to April Neyland you
24  worked for Rich Kiligin; is that correct?
25    A.   Kiligin, yes.

Page 36
1            J. Moeser
2    Q.   Kiligin?
3    A.   Yeah.
4    Q.   And who was the manager?
5    A.   During 2016?
6    Q.   Yes.
7    A.   I don't know when Mike DeGrocco left,
8  but my last manager was Bill Newport.
9    Q.   And prior to Bill Newport, who was it?
10    A.   Mike DeGrocco.
11    Q.   Okay.  Did you ever work in an office
12  while you were at GEICO?
13    A.   You mean at the Woodbury office or --
14    Q.   Yes.
15    A.   No.  I mean, occasionally I went there
16  for meetings and different training sessions, but
17  I didn't have like a desk there.
18    Q.   Okay.  Did you ever have an inside role
19  as an investigator?
20    A.   No.
21    Q.   Did you ever have a desk role as an
22  investigator?
23    A.   Well, you mean as a desk investigator?
24    Q.   Correct.
25    A.   No.



Page 93

1     J. Moeser
2     A.  February 4th, 2020.  I mean, I'm sorry,
3  May 4th, 2020, correct?
4     Q.  Yes.
5     A.  Okay.
6     Q.  Do you recall the contents of that
7  training?
8     A.  No.  I could just assume it had
9  something to do with Workday.
10    Q.  Okay.
11    A.  Oh, my God, I failed it.
12    Q.  And then the next row is 2020
13 Policies & Acknowledgments training.  Do you see
14 that?
15    A.  Yes.
16    Q.  And do you recall the contents of that
17 training?
18    A.  No, not the -- no.
19    Q.  Okay.  The second to the last row says
20 SIU Knowledge Test 2020.  That was completed on
21 December 18, 2020.  Do you see that?
22    A.  Yes.
23    Q.  And do you recall that test?
24    A.  No.
25    Q.  And the last row there is the 2021

Page 94

1     J. Moeser
2  Policies & Acknowledgments training.  Do you
3  recall that training?
4     A.  Not the contents of it, no.
5     Q.  And it says that you completed it;
6  correct?
7     A.  Yes.  It doesn't say pass, though.
8     Q.  Now, based on the policy that we read
9  out of the handbook that was marked as Exhibit 4,
10 so we are back to this here, based on that policy,
11 do you understand that you were required to
12 accurately record your hours worked?
13       MR. SCIMONE:  Objection.
14    A.  Yes.
15    Q.  Did you understand that managers and
16 supervisors were not allowed to tell you to work
17 off the clock?
18       MR. SCIMONE:  Objection.
19    A.  Did I understand -- say that again,
20 please.  That managers and supervisors --
21    Q.  Did you understand that managers and
22 supervisors were not allowed to tell you to work
23 off the clock?
24    A.  They were not allowed to tell me that?
25 No.

Page 95

1     J. Moeser
2     Q.  Did you know that you were required to
3  report any off-the-clock work that you performed
4  to a supervisor?
5        MR. SCIMONE:  Objection.
6     A.  Was I required to report off-the-clock
7  work?
8     Q.  Yes.
9     A.  Well, yeah.  Yeah.
10    Q.  Did you understand that if you felt
11 that you were not being paid for all of your hours
12 worked, that you should contact your supervisor?
13       MR. SCIMONE:  Objection.
14    A.  Yes.
15    Q.  Did you understand that you could also
16 contact human resources if you -- if you felt you
17 did not receive all of the hours you worked?
18       MR. SCIMONE:  Objection.
19    A.  Yes.
20    Q.  Did you ever make such a report with
21 your supervisor?
22       MR. SCIMONE:  Objection.
23    A.  Regarding?
24    Q.  That you -- okay.  Did you ever make a
25 report with your supervisor that you did not

Page 96

1     J. Moeser
2  receive pay for all of the hours you worked?
3     A.  Yes.
4     Q.  Who was that supervisor?
5     A.  It would have been several of them.
6  There would have been April Neyland, Rich Kiligin,
7  my manager, Bill Newport, another supervisor Tony
8  Mazzotti.
9     Q.  Okay.  Let's go through -- and did you
10 ever report that you felt like you did not receive
11 pay for all of your hours worked to human
12 resources?
13    A.  After 2016?
14    Q.  Correct, yes.
15    A.  No.
16    Q.  Now, you mentioned April Neyland, Rich
17 Kiligin, Bill Newport and Tony Mazzotti as
18 individuals to whom you reported.  Were all of
19 these after -- 2016 or after?
20    A.  I don't know the time frame with Tony
21 Mazzotti, but I know the other three would have
22 been.
23    Q.  Let's start with Bill Newport.  What
24 did you report to Bill Newport?
25    A.  That I, along with everybody else that



Page 97

1            J. Moeser
2  I knew of, were working more hours than what they
3  were documenting.
4      Q.   Who are the "everybody else"?
5      A.   Everybody else within the SIU teams.
6      Q.   Can you be more specific about that?
7      A.   It was people who were attending
8  meetings who were field investigators at the time
9  that were making their concerns about getting more
10 cases assigned to them and not -- and working more
11 hours than what they were documenting.
12     Q.   Were -- when you discussed this with
13 Bill Newport, was this in a group setting or was
14 it one on one?
15     A.   It was what they called a skip-level
16 meeting and there were other investigators with
17 me.
18     Q.   What is -- what is a skip-level
19 meeting?
20     A.   It's a meeting directly with your
21 manager and you skip over the supervisor.  The
22 supervisor is not present.
23     Q.   How many people attend a skip-level
24 meeting?
25     A.   It could have been an individual, it

Page 98

1            J. Moeser
2  could be in a team.  At that particular time it
3  was members that were in the team that I was
4  working in.
5      Q.   What team was that?
6      A.   I don't remember which team that was.
7  That was -- could have been in the enhanced damage
8  team or the staged -- I don't recall what team I
9  was in.
10     Q.   So when you made this complaint to Bill
11 Newport, it was -- let me rephrase that.
12          So when you discussed this with Bill
13 Newport, it was at a skip meeting involving either
14 the staged loss referral team or the enhanced
15 damage referral team; is that right?
16     A.   Was I making a complaint about the team
17 or --
18     Q.   No.  When you -- when you discussed the
19 hours that you were working, was -- that was
20 during a skip-level meeting that involved either
21 the staged loss referral team or the enhanced
22 damage referral team; is that right?
23     A.   What do you mean by involved?  I was in
24 the team at the time, on one of those teams.
25     Q.   Okay.  So the skip-level meeting had

Page 99

1            J. Moeser
2  people outside of the team that you were involved
3  in as well?
4          MR. SCIMONE:  Objection.
5      A.   It could have been, yes.
6      Q.   So I guess to rephrase it, was it just
7  Bill Newport and the staged loss referral team in
8  the skip meeting?
9      A.   I don't recall.  I know there was
10 several other individuals in this meeting with me.
11 What teams they were in, I don't know.  They could
12 have been in the enhanced damage team or -- I
13 don't believe they were in the staged loss team,
14 but I could be wrong, but there was maybe two or
15 three other investigators in this meeting with me
16 and I don't know what team he -- what other teams
17 they were in.  I don't -- I don't know if they
18 were all under April's supervision, because not
19 only did she supervise people in the staged loss
20 team, but she supervised people in other teams, so
21 I don't -- I don't know what teams they were in.
22     Q.   How many people did April supervise?
23     A.   It varied.  I mean, it could have been
24 anywhere from eight to ten.  She -- you know,
25 during some certain periods she was also

Page 100

1            J. Moeser
2  supervising inside staff people, I believe, along
3  with field team people.
4      Q.   And do you recall the names of the
5  people that were in this meeting with Bill Newport
6  and you?
7      A.   No, I don't -- I believe one of them
8  may have been a Mike Lazos, but I don't recall the
9  other people.
10     Q.   Was it -- what did you tell Bill
11 Newport?
12     A.   I told him that not only myself, but it
13 seems to be that most people are working more
14 hours than what they are submitting, which is
15 reflected on their evaluations, and I felt it was
16 unfair that, you know, with the amount of work
17 that you were giving us that we were forced to
18 work more hours than what they are documenting,
19 and I told him that there is no secret to this, I
20 mean, you could very easily look this up, and I
21 told him, I said, just look at their case
22 reporting system.  Everything is time stamped.
23 And I said this is -- this is well-known amongst
24 everybody in meetings that we had, everybody
25 within the field.  So, you know, I felt that I was



Page 101

1           J. Moeser
2  being fairly judged by the hours that I was
3  submitting and not being compensated for it, and I
4  felt that I had to work these hours in order to
5  keep -- meet standards with their evaluation
6  system.
7       Q.   Now, you worked a flex schedule; right?
8       A.   Yes.
9       Q.   So looking at a time stamp doesn't
10 accurately reflect the hours that you worked in a
11 day, though?
12           MR. SCIMONE:  Objection.
13      A.   Yes, it does.
14      Q.   But you were able to complete tasks
15 when you felt like it; right?
16           MR. SCIMONE:  Objection.
17      A.   What do you mean when I felt like it?
18      Q.   Because you had flexible time.  Were
19 you able to complete tasks at different times of
20 the day?
21      A.   I did complete tasks within different
22 times of the day, but that doesn't mean I took any
23 breaks during or I started later.  Even if I
24 started at 7:30 or 8:00 in the morning, there were
25 times that I worked until 7 or 8:00 at night

Page 102

1           J. Moeser
2  continually.
3       Q.   Were there times that you started after
4  8 in the morning?
5       A.   Occasionally.  I don't recall
6  particular dates or anything, but there may have
7  been times that I started after 8.
8       Q.   Do you recall starting after 9?
9       A.   I don't recall that, no.  No.
10      Q.   So you mentioned this meeting with Bill
11 Newport.  Was there any other time that you had a
12 discussion with Bill Newport about this issue?
13      A.   Personal with him?
14      Q.   Just with Bill Newport.  It could be in
15 another group or it could be personally.
16      A.   No, there --
17      Q.   My question is was there any other
18 discussion that you had with Bill Newport on a
19 separate occasion?
20      A.   Yes, both in a group and individual.
21      Q.   So tell me about the individual.
22      A.   Well, as Bill became our manager, he
23 wasn't familiar with what SIU investigators did,
24 this is what he expressed, and that he wanted to
25 do ride-alongs with field investigators to get a

Page 103

1           J. Moeser
2  feel for what they do, and on some of those
3  ride-alongs that we did this subject would come up
4  as far as the amount of cases that we are being
5  assigned, the increase on them and the amount of
6  hours it takes to do these cases, which obviously
7  if you are giving me more work to do within a time
8  period, one of two things are gonna happen:  I'm
9  either gonna work more, or it's gonna reflect on
10 my quality of my investigation.
11      Q.   How many times did you have these --
12 this type of one-on-one conversation with Bill
13 Newport about this?
14      A.   I don't recall how many times.  I mean,
15 I think we did several ride-alongs together and I
16 don't know if we discussed this on every
17 ride-along, but I think I probably had, you know,
18 maybe four, maybe five ride-alongs with him, maybe
19 three, in that area.
20      Q.   And what was Bill Newport's response to
21 you?
22      A.   Not much.  They were gonna look into it
23 and basically changed the subject.
24      Q.   Did he tell you that you needed to
25 report all your hours you worked?

Page 104

1           J. Moeser
2       A.   I don't remember in the individual
3  meetings, but it was -- I believe -- I don't know
4  if Bill mentioned that, but in group meetings that
5  was mentioned, and we were also told that it would
6  reflect negatively on our ratings because of the
7  amount of cases that they felt that you should
8  handle within a certain period of time -- within a
9  month's time.
10      Q.   But you were told in the meeting that
11 you needed to report your time accurately; right?
12           MR. SCIMONE:  Objection.
13      A.   I don't recall that, no.
14           MS. CACERES-BONEAU:  Can we read
15      back -- can we move back up the testimony
16      from a sentence before, the prior response to
17      the prior question.
18      Q.   So the prior question I asked was:  Did
19 he tell you that you needed to report all of your
20 hours worked.
21           And then your response was:  I don't
22 remember in the individual meetings, but it was --
23 I believe -- I don't know if Bill mentioned that,
24 but in group meetings that was mentioned.
25           So again, I said did he tell you that



Page 105

1     J. Moeser
2  you needed to report all of your hours worked, and
3  your response was:  I don't remember in the
4  individual meetings, but it was -- I believe -- I
5  don't know if Bill mentioned that, but in group
6  meetings.  So are you changing that testimony
7  then?
8      A.  No.  I mean, what was discussed in
9  group meetings was that it would negatively
10 reflect on your evaluation based on the hours that
11 you were working in a given month compared to the
12 cases that they were assigning you, and it was
13 voiced by not only myself, but several other
14 members in these meetings that we are working way
15 past the time frame and not submitting them.  Now,
16 at that point the meeting subject -- the meeting
17 changed and we got off that subject, so I don't
18 know if that's what -- there is a misunderstanding
19 here, but I don't ever, you know, remember that
20 conversation with him.
21     Q.  So you don't remember Bill Newport ever
22 telling you that you needed to accurately enter
23 your time?
24     A.  He may have, yes, but I don't remember
25 it, though.

Page 106

1     J. Moeser
2      Q.  Okay.  But you said something about it
3  negatively affecting your ratings.  What do you
4  mean by that?
5      A.  Meaning that from what -- how it was
6  explained to me is that you are based on the
7  amount of hours worked in a month, which was, I
8  believe, 155 hours.  Now, they felt that you
9  should be able to handle X amount of cases within
10 that time frame, and they never explained to us
11 how they came up with that ratio, however, when
12 you increased the cases over periods of time,
13 well, what was told to us is that if you submit
14 for overtime, you are gonna be docked -- well, not
15 docked, but you are gonna be judged on more hours
16 worked.  So for an example, if you put in for 20
17 hours of overtime in a given month, well, now you
18 are rated on 170 hours, 175 hours instead of 155
19 hours, which would negatively reflect on your
20 rating in that part of your rating, because you
21 are doing in their eyes the same amount of work in
22 more hours.
23     Q.  Do you know of anyone whose rating was
24 negatively affected that way?
25     A.  Oh, I don't -- I couldn't -- I don't --

Page 107

1     J. Moeser
2  no, I don't know.
3      Q.  So you mentioned Bill Newport.  You
4  mentioned there being -- you mentioned one
5  meeting, but you said there was more than --
6  sorry.  With respect to Bill Newport, you had
7  one-on-one conversations, but you also had how
8  many group meetings where you all discussed your
9  hours worked?
10     A.  I don't -- I don't know the number of
11 group meetings we had, but we would have periodic
12 training sessions, meetings, and the subject would
13 come up often and either would be non-addressed by
14 supervisors attending this meeting, or they would
15 just tell us that this is something that we are
16 looking into as far as the amount of cases that
17 you are getting, and basically other times we were
18 told they can't control the amount of cases that
19 we are being assigned, because a lot of this is
20 coming from home office that wanted to increase
21 the ratio of how many cases get assigned to SIU in
22 a given week or time frame.
23     Q.  And you mentioned Rich Kiligin.
24     A.  Kiligin, correct.
25     Q.  And was he one of your supervisors?

Page 108

1     J. Moeser
2      A.  For a time, yes.
3      Q.  Was he a supervisor from -- at any time
4  period between 2016 and your last day of
5  employment?
6      A.  Yes.
7      Q.  And when you -- what did you discuss
8  with Rich Kiligin?
9      A.  Other than standard training sessions
10 that he would hold, again, the amount of cases
11 that were being assigned, the increased amount of
12 cases being assigned, and that, you know, people
13 are working more hours than what they are
14 documenting.
15     Q.  When you say the number of cases that
16 were being assigned, you said that -- earlier you
17 represented that you had about 13 to 17 cases when
18 you left GEICO?
19     A.  That was in the staged loss team.
20     Q.  And what was Rich Kiligin's response?
21     A.  Not much.  Got off the subject very
22 quickly and basically said there is nothing he
23 could do and that, you know, I guess we would
24 discuss this at another time, and I felt that that
25 meant like at general meetings.



Page 129
1           J. Moeser
2     A.   Yeah, it would just be people in
3   Region 2.
4     Q.   Do you recall who attended, the names
5   of special investigators who attended these
6   meetings?
7     A.   I don't recall all of them.  I mean,
8   there could have been anywhere from 30 to 40
9   investigators attending this.  It depended on
10  their schedules and stuff.  But again, I know that
11  there was roll call taken and this was all
12  scheduled previous because people had to make
13  arrangements in their schedules to attend this
14  meeting, so there would be e-mails generated back
15  and forth that we are having an SIU meeting on
16  this particular date at this location.  So how
17  many people actually showed up, it could have been
18  anywhere from, like I said here, 35 to 40
19  investigators.  As far as the names of all of
20  them, I couldn't tell you all the names.  I know
21  generally that, you know, people listed in this
22  Complaint were there, along with other people.
23    Q.   And a team meeting, where would that be
24  held?
25    A.   Well, if it was during the time -- the

Page 130
1           J. Moeser
2   same session as a group meeting, then we would
3   have just split up into different teams in the
4   same room and it would be a meeting going on with
5   just the supervisor and their team.  If it was --
6   if the supervisor decided to have a team meeting,
7   it could be at a location where she wanted or he
8   wanted, it could be in the Woodbury office, it
9   could be in the Melville office or it could be in
10  the Bronx location when I was working for Rich.
11    Q.   I am going to go back to Exhibit 6 and
12  we are going to look at your Declaration of John
13  Moeser that's Exhibit 6.  It says in paragraph 12,
14  which is on page 4 --
15    A.   Okay.
16    Q.   Tell me when you have completed reading
17  the paragraph.
18         (Document review.)
19    A.   Okay.
20    Q.   So it starts with:  "GEICO required me
21  to seek approval from my supervisor to submit any
22  hours worked above 38.75."
23         How do you form the basis for saying
24  that it was a requirement?
25         MR. SCIMONE:  Objection.

Page 131
1           J. Moeser
2     A.   How do I form a basis on it?  Just from
3   general knowledge that, you know, if I was --
4   wanted to submit for overtime, that if I did
5   submit for overtime, that I would get a call from
6   her or correspondence from her asking me what the
7   overtime was submitted for, and I would have to
8   explain it to her.
9     Q.   So any time you worked above 38.75
10  hours, you requested approval from your
11  supervisor?
12         MR. SCIMONE:  Objection.
13    A.   I didn't request it.  She would get
14  that sent to her in Workday.
15    Q.   Okay.  And it states:  "April
16  Neyland" -- second sentence -- "my supervisor,
17  frequently reiterated to me and other Special
18  Investigators that hours above 38.75 to complete
19  regular case work would not be approved."
20    A.   Uh-huh.
21    Q.   When did she -- when did this
22  conversation take place?
23    A.   Again, I don't know specific dates, but
24  there were times that I did speak to her over the
25  phone and she had told me that submitting overtime

Page 132
1           J. Moeser
2   for regular work on a case, and I tried to have
3   her define what regular work meant, and then it
4   turned into, well, administrative work, and I went
5   from there and said what do you mean by
6   administrative work.  She said work that basically
7   you are doing on a case that doesn't involve any
8   type of Examinations Under Oath or any type of,
9   you know -- in other words, just for case
10  reporting, what I was told was that they, and I
11  don't know who "they" are, said that you are not
12  supposed to report overtime for that type of work,
13  and it was kind of cloudy when I asked her to
14  explain it, but again, that's how it was explained
15  to me and, you know, we kind of got off the
16  subject kind of quickly.
17    Q.   You mentioned Examinations Under Oath.
18  Could you work over 38.75 hours if you were
19  conducting an Examination Under Oath?
20    A.   Well, I don't know how that would come
21  about, unless there was travel time involved, you
22  know, because the Examination Under Oaths were
23  normally done prior to 5:00, for me, prior to 5:00
24  at night, so I don't know how that -- now, I had
25  to do summaries of them and also work on



Page 133
1          J. Moeser
2  additional cases that I got assigned that day when
3  I returned back to my home office.
4     Q.   So if you knew you were starting -- if
5  you knew you were going to have an Examination
6  Under Oath that ended at 5:00, then would you
7  start your day later?
8     A.   No.  No.
9          MR. SCIMONE:  I think this might be a
10     good time for a bathroom break.  We have been
11     going about a little over an hour and a half
12     since lunch.
13         MS. CACERES-BONEAU:  Okay.
14         MR. SCIMONE:  Is that okay?
15         MS. CACERES-BONEAU:  Yes, that's fine.
16         THE VIDEOGRAPHER:  The time right now
17     is 2:52 p.m. and we are off the record.
18         (Recess was taken from 2:52 to 3:06.)
19         THE VIDEOGRAPHER:  The time right now
20     is 3:06 p.m. and we are back on the record.
21  BY MS. CACERES-BONEAU:
22     Q.   Hi, Mr. Moeser.  I am looking back at
23  what we have marked as Exhibit 6, which is a
24  Declaration of John Moeser.  It's the last
25  document we were looking at, and we had left off

Page 134
1          J. Moeser
2  on page 4 and we had formerly been discussing
3  paragraph 12.  Now we are going to look at
4  paragraph 13.  You can let me know when you have
5  finished reading that paragraph.
6          (Document review.)
7     A.   Okay.
8     Q.   Okay.  So you reference an e-mail in
9  here.  When did that e-mail exchange take place?
10    A.   I don't know the date of it, but it
11  would have been after I had submitted for overtime
12  at one point.
13    Q.   And you mentioned a supervisor.  Which
14  supervisor was this e-mail exchange with?
15    A.   That would have been April Neyland.
16    Q.   Was anyone else copied on the e-mail
17  exchange?
18    A.   I don't believe so, no.  No.
19    Q.   When did you submit this report?
20    A.   Which report?  The overtime report?
21    Q.   Well, it says here: "She instructed me
22  to submit a list of reasons for why these hours
23  should have been approved.  I completed the report
24  as requested, and my overtime hours approved, but
25  I was again discouraged from reporting them."

Page 135
1          J. Moeser
2     A.   The report that I am referring to there
3  is the -- I guess the e-mail that I sent her with
4  the list of cases that I was submitting the
5  overtime for.
6     Q.   And you state here your hours were
7  approved, your overtime -- sorry -- your overtime
8  hours were approved after submitting this report?
9     A.   Yes.
10    Q.   Why did you believe they were -- you
11  were discouraged from reporting them if your hours
12  were approved?
13    A.   Because that's what she told me after
14  when I had the phone conversation with her, that
15  you don't submit overtime for office work.
16    Q.   What is office work?
17    A.   Well, I think you are gonna need to ask
18  her that, because that's exactly what I asked, and
19  office work, from what I assumed, was just report
20  writing or doing database work or not exactly
21  going out into the field, and, you know, there was
22  times that -- and I believe -- I don't know if
23  this was the time that we were working after
24  COVID, so everything was in house, so to say, so I
25  didn't know what you meant by office work, you

Page 136
1          J. Moeser
2  know, or administrative work as I heard also.
3     Q.   You said this was after COVID and
4  everything was in house.  So when did you send --
5  when do you think this took place?
6     A.   I don't know if this particular time
7  took place after COVID, but again, when COVID
8  occurred and we were restricted into doing office
9  work, we were doing our EUOs over the telephone,
10 so is that considered office work or -- it was
11 never really explained as far as since there was
12 no travel time involved at that point, what do you
13 consider office work or administrative work
14 compared to when we were in the field.  Now, this
15 particular time, I don't know if this was during
16 COVID or before COVID.
17    Q.   Did you complain to anyone that you
18 felt discouraged from reporting overtime?
19    A.   Anyone as far as management or anyone
20 in general?
21    Q.   It can be anyone in general.
22    A.   Oh, yeah.  I mean, we talked about it
23 amongst ourselves a lot.
24    Q.   Who -- who is "we"?
25    A.   Well, again, I mean, there would have



Page 177

1           J. Moeser
2      A.   Yes.
3      Q.   And you say in paragraph 14 that -- the
4  second sentence you state:  "These performance
5  metrics and ratings changed constantly, but to the
6  best of my recollection GEICO generally evaluated
7  me based on how many hours it took me to complete
8  a case task, how often I made an entry in a case
9  report, how many days I took to close a case, and
10 how many cases I completed within a month."
11          Were these the only metrics that were
12 used to evaluate your performance at GEICO?
13     A.   No.  There were others.
14     Q.   What were the others?
15     A.   There were the other -- the amount of
16 cases I'm being assigned, the quality of my case,
17 whether or not it was a face-to-face -- and what I
18 mean by face-to-face, in-person contact with
19 somebody, or whether -- and that would be
20 considered a level 1.  Level 2 would mean that you
21 didn't do any field work on the case.  That one
22 used to also go into your metrics.  Not -- not so
23 much the type of case that you had, but whether or
24 not you got an impact on the case, and that was
25 very difficult with staged loss cases, because you

Page 178

1           J. Moeser
2  may take an impact on it.  That doesn't mean it's
3  gonna impact the claim.
4           When I was in the property damage or
5  the enhanced damage team, metrics were also
6  applied as far as if I took an impact, in other
7  words, if I had a positive -- positive findings
8  for the claims examiners to make a determination
9  on or the auto damage adjuster, they would
10 consider that an impact, and there was a whole
11 category of what you can take positive impacts on.
12     Q.   You answered my next question, which
13 was going to be what is an impact, so I appreciate
14 it.
15     A.   It's -- it's -- they had a list of
16 everything -- you could take an impact for an
17 underwriting referral.  In other words, during the
18 course if I found out that you didn't live at this
19 certain location and I was submitted an
20 underwriting referral that I would submit to
21 underwriting through my -- I think it was my --  my
22 SICM system, my case reporting SICM.  I would
23 get -- sorry.  I would get a credit for that
24 impact and you were judged on that.  So, you know,
25 they made it almost like your goal is to get a lot

Page 179

1           J. Moeser
2  of impacts on a case, however, a lot of cases
3  never warranted impacts, and not that you would be
4  downgraded, but you wouldn't get a positive or a
5  higher rating on that case.
6      Q.  And when you have an impact, you
7  mentioned it was being able to help make a
8  determination on the fraud?
9      A.  No, it would be help to make a
10 determination on how the claims examiner or the
11 management wanted to handle -- make a decision as
12 far as the claim concerned.
13     Q.   And what would be an example where
14 there isn't an impact?
15     A.   If I didn't have any really what they
16 considered positive findings.  It could be -- I
17 would have to see the categories again that they
18 printed out that they had that I could tell you
19 what would be a neg- -- or no impact.  For
20 instance, if you were doing a case where you were
21 a newly insured person with GEICO and you had a
22 vehicle that was not new, a used vehicle, and you
23 would put that on your policy without collision
24 damage, and then two days before you put collision
25 on your car, two days before you had an accident

Page 180

1           J. Moeser
2  you put collision on your car, so obviously the
3  suspicion is that you added collision after you
4  had the accident.  So there could be a time when
5  you produced records to me that verified that.
6  You either had let's say a CARCO report done or
7  you had photos of the car or something to that
8  effect.  Well, then basically that wouldn't impact
9  the claim any, so I wouldn't take an impact on
10 that.  And then they had impacts, like I stated
11 before, where they let you do underwriting
12 referrals, but then they changed that, and it got
13 more complicated to take an impact for an
14 underwriting referral.  You had to make a
15 significant impact on an underwriting decision.
16 How would I know that?  I don't work in
17 underwriting.  So you would make the referral and
18 there was subcategories of it that you could or
19 could not take an impact on.  And it got kind of
20 complicated there, you know, in -- in the last few
21 years, and this was all dictated by people from
22 our home office and stuff like that.
23     Q.   When you say your home office --
24     A.   GEICO's home office.
25     Q.   Do you mean nationwide or do you mean



Page 181

1         J. Moeser
2  just Region 2?
3     A.   No, nationwide.
4     Q.   As far as you mentioned the impact, how
5  about were you -- did you have event data recorder
6  equipment?
7     A.   Not me, no.  Other investigators did.
8     Q.   Was file quality part of your
9  performance metrics?
10    A.   File quality?  Yes.
11    Q.   How about audit results?
12    A.   I believe so, yes.  Yeah.
13    Q.   What did they look for in an audit?
14    A.   Again, that changed.  There -- there
15 was a booklet that they gave you, and I remember
16 this, it had to be 7 or 8 pages big, of all the
17 downgrades that they would consider on an audit or
18 the positive that they would do on an audit, and
19 they could downgrade you for something as simple
20 as, you know, the wording that you used.  That's
21 how ridiculous it got.  I mean, you know, and it's
22 all semantics as far as, you know, you know, I
23 went there or I traveled there.  Well, what
24 difference does it make?  You went there.  But
25 they would downgrade you because you didn't use

Page 182

1         J. Moeser
2  the right wording.  You know, if you went to
3  interview somebody and, you know, you decided
4  later on that you didn't need to interview
5  somebody but you didn't document that properly,
6  they would downgrade you for that, or, you know,
7  if your investigation was, I guess, in their eyes
8  good, they would give you a rating on it.  I don't
9  know how they actually came up with that
10 calculation, but it was never really explained
11 thoroughly to not me or anybody else that I
12 remember asking the questions about that.
13    Q.   Did you -- were there specific time
14 limits on tasks that you had to complete?
15    A.   Yeah.
16    Q.   Can you give me some examples?
17    A.   Time limits would be case life.  There
18 was times that I -- yeah, I mean, my cases at that
19 time were judged on case life.  And I believe
20 right before I left, I don't know if it was a few
21 months before I left, they changed the system
22 again and they did away with the case life on a
23 case and they got -- and they actually got into a
24 whole other thing as far as how they evaluate
25 individuals, it was done on a semi-annual basis

Page 183

1         J. Moeser
2  instead of an annual basis, but I remember them
3  doing away with case life, but that was shortly
4  before I left.
5     Q.   Was there a record system where you
6  would enter every task that you completed for a
7  case?
8     A.   A record system?  Yeah.  That was
9  called the SICM system.
10    Q.   And did it record every task that you
11 did for every part of your investigation?
12    A.   Yes, every time I entered into it.
13 That was our case reporting system.
14    Q.   What would you enter into it?
15    A.   Basically everything I did, you know,
16 from the start, from the case assessment all the
17 way down to my closing summary.
18    Q.   Did you enter that contemporaneously as
19 you were -- as you were completing those tasks?
20    A.   Yes.
21    Q.   So when you would go for, say, a scene
22 canvass, you would immediately enter that note or
23 whatever it was that you -- how -- explain to me
24 how you would enter that scene canvass onto SICM.
25    A.   Well, I don't know what you mean by

Page 184

1         J. Moeser
2  immediately, because you couldn't do it while you
3  were in the field unless you sat there with your
4  laptop, which I don't know too many people are
5  gonna do that, but how I did it and other people
6  may have done it differently, but SICM, which was
7  the -- I think it was an acronym for the Special
8  Investigations Case Management system, you could
9  open up a field and actually type in what you were
10 doing there, but the print was so small and didn't
11 have a spell check and I decided not to do that,
12 so I would open up my own Word program and I would
13 keep that case running, and when I came back from
14 like your example from doing a canvass, I would
15 come back to my home office and type it into the
16 Word program and then copy and paste it into the
17 SICM, because you could alter -- not alter, but
18 you could edit a Word program a lot easier than in
19 SICM.
20    Q.   And did you enter that into SICM on the
21 same day or could you enter it on the next day?
22    A.   Yeah, you could enter it in the next
23 day, but it would be time stamped for that day.
24 So then -- one -- I'm glad you brought that --
25 another downgrade was that when they looked into



Page 277

```
 1           J. Moeser
 2   produced in the case.
 3        MS. CACERES-BONEAU:  Okay.
 4        THE VIDEOGRAPHER:  The time right now
 5   is 6:35 p.m. and we are off the record.
 6        (Time noted:  6:35 p.m.)
 7
 8
 9           --------------------
10           JOHN E. MOESER
11
12
13   Subscribed and sworn to before me
14   this      day of            2024.
15
16   -----------------------------------
```

Page 278

```
 1
 2           C E R T I F I C A T E
 3
 4   STATE OF NEW YORK   )
 5                       ) ss.:
 6   COUNTY OF NASSAU    )
 7
 8        I, KRISTIN KOCH, a Notary Public
 9   within and for the State of New York, do
10   hereby certify:
11        That JOHN E. MOESER, the witness
12   whose deposition is hereinbefore set forth,
13   was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of this
20   matter.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 8th day of August, 2024.
23
24            
25             KRISTIN KOCH, RPR, RMR, CRR
```

Page 279

```
 1
 2   --------------------I N D E X--------------------
 3
     WITNESS            EXAMINATION BY             PAGE
 4
 5   JOHN E. MOESER    MS. CACERES-BONEAU   5, 258, 274
 6                     MR. SCIMONE               236, 273
 7
     --------------------EXHIBITS--------------------
 8
 9   MOESER                                  PAGE  LINE
10
     Exhibit 1
11   Letter dated November 17, 2016, Bates
     stamped P00000502......................14    4
12
     Exhibit 2
13   Letter dated March 12, 2018, Bates
     stamped P00000416 through P00000420....14    22
14
     Exhibit 3
15   Revised Amended Notice of Deposition
     of John Moeser.........................16    8
16
     Exhibit 4
17   Human Resources Associate Handbook,
     Bates stamped G000028 through G000043..79    8
18
     Exhibit 5
19   Document Produced Natively,
     spreadsheet Bates stamped G004289......83   19
20
     Exhibit 6
21   Plaintiff John Moeser's Responses to
     the Court's Interrogatories and
22   Declaration of John Moeser.............111   24
23   Exhibit 7
     Plaintiff John Moeser's Responses and
24   Objections to Defendant's First Set
     of Interrogatories.....................116   25
25
```

Page 280

```
 1
 2   --------------------EXHIBITS--------------------
 3
     MOESER                                  PAGE  LINE
 4
 5   Exhibit 8
     Second Amended Collective and Class
 6   Action Complaint.......................195   14
 7
     --------------------REQUESTS--------------------
 8
 9   Page 276  Videos of the policy review and
               acknowledgment trainings
10
               Calendar entries reflecting skip-level
11             meetings
12             Any records that Bill Newport may have
               made of skip-level meetings at which
13             the topics of hours and workload were
               discussed
14
               Documents and policies reflecting
15             performance metrics including a seven-
               to eight-page booklet of audits and
16             what kinds of things would result in
               negative audit ratings
17
               With respect to Exhibit 5, the
18             underlying documents or data giving
               rise to these time stamp entries
```