# Exhibit 9

### Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------X
 3   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 4   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
 5   of all others similarly situated,
 6            Plaintiffs,
 7                              Case No.:
                                2:23 Civ. 2848
 8                              (GRB)(ARL)
          -against-
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY d/b/a GEICO,
11            Defendants.
     ------------------------------------X
12
13
14
     DEPOSITION OF
15
16            MARIA MUNOZ
17
              Tuesday, December 17th, 2024
18
              New York, New York
19
20
21   Reported By:
22
     Marina Dubson
23
24   Job #: J12144279
25
```

### Page 2

```
 1
 2
 3
 4
              DATE: December 17th, 2024
 5
              TIME: 10:00 a.m.
 6
 7
 8        DEPOSITION of MARIA MUNOZ, an opt-in
 9   Plaintiff herein, taken by the Defendant,
10   pursuant to Federal Rules of Civil
11   Procedure, and Notice, held at Duane
12   Morris, LLP, 1540 Broadway, 14th Floor,
13   New York, New York 10036, at the
14   above-mentioned date and time, before
15   MARINA DUBSON, a Notary Public of the State
16   of New York.
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1   APPEARANCES:
 2
 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6       Sjean@outtengolden.com
 7       JARRON MCALLISTER, ESQ.
         Jmcallister@outtengolden.com
 8
 9
10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG SLOTNICK, ESQ.
13   Gsslotnick@duanemorris.com
14
15
     Gil Peretz, Shereck Video, videographer
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1        IT IS HEREBY STIPULATED AND AGREED,
 2   by and between the attorneys for the
 3   respective parties, as follows:
 4
 5   THAT all objections, except as to the form
 6   of the questions, shall be reserved to the
 7   time of the trial;
 8
 9   THAT the within examination may be signed
10   and sworn to before any Notary Public with
11   the same force and effect as if signed and
12   sworn to before the Court;
13
14   THAT filing of the original transcript of
15   the examination is waived.
16
17
18
19
20
21
22
23
24
25
```



Page 49

1        M. Munoz
2   attorneys and attempt to settle the bodily
3   injury claims with the attorneys.
4   Sometimes they were direct with people, but
5   over 90 percent of the time, there were
6   attorneys involved.
7       Q.   And what was your next position
8   with Geico?
9       A.   Then I went to the continuing
10  unit, which is CU.
11      Q.   And what is the continuing
12  unit?
13      A.   The highest level of claims.
14      Q.   What do you mean by highest
15  level of claims?
16      A.   Those cases were also bodily
17  injury claims for claimants with attorneys,
18  but it would be higher policy limits and
19  more extensive injuries.
20      Q.   Were there thresholds that
21  would move cases into the CU?
22      A.   Yes.
23      Q.   Okay.  Do you recall what those
24  were?
25      A.   I -- no.  Offhand, I don't.

Page 50

1        M. Munoz
2       Q.   And did the day-to-day job
3   duties differ significantly from your job
4   as TA2?
5       A.   Not significantly.
6       Q.   How did they differ?
7       A.   Well, first off, when I was in
8   TA2 and CU, I handled Upstate New York
9   claims.  They also had a separate
10  department.  So, when I came into CU,
11  you're expected to go to court when these
12  cases would go to court.  So, they would
13  send me Upstate to go settle the claims or
14  attempt to settle claims.
15      Q.   Got it.  And was that a mostly
16  field-based role or was that a desk --
17      A.   No, predominantly desk.
18      Q.   So, were you doing the actual
19  investigations in that role?
20      A.   No.
21      Q.   It was mostly focused on
22  negotiations with the attorneys and the
23  injured; is that right?
24      A.   Correct.
25      Q.   And when you say Upstate New

Page 51

1        M. Munoz
2   York, what general geographic area do you
3   mean?
4       A.   I remember Buffalo, Rochester,
5   that area.
6       Q.   Do you recall if you generally
7   took the company car up there or did you go
8   by some other method?
9       A.   No, they flew me.
10      Q.   Did you still have a company
11  car at that time?
12      A.   No.
13      Q.   So, for the office-based roles,
14  you no longer had a company car; is that
15  right?
16      A.   Correct.
17      Q.   And after the CU position, what
18  role did you work in at Geico?
19      A.   I got the job in SIU.
20      Q.   And I believe you said earlier
21  that that was in 2015; is that right?
22      A.   Correct.
23      Q.   And when you say the job, could
24  you give me details of what the actual
25  title was when you first started in SIU?

Page 52

1        M. Munoz
2       A.   A field investigator.
3       Q.   Did you apply for that role?
4       A.   Yes.
5       Q.   Do you prefer working in the
6   field to working at a desk?
7            MS. JEAN:  Objection.
8            THE WITNESS:  Yes.
9   BY MR. SLOTNICK:
10      Q.   And why is that?
11           MS. JEAN:  Objection.
12           THE WITNESS:  I like something
13       different every day.
14  BY MR. SLOTNICK:
15      Q.   And who was your supervisor
16  when you first joined the SIU?
17      A.   Dara Campbell, I believe.
18  Dara, D-A-R-A.
19      Q.   And who was your manager at the
20  time?
21      A.   That would be Michael DeGrocco.
22      Q.   And what did the field
23  investigator SIU role generally entail in
24  terms of your job duties?
25      A.   I would be assigned cases, and



Page 53

1             M. Munoz
2   I was to investigate them for aspects of
3   fraud.
4        Q.    And what type of cases were you
5   assigned at the time?
6        A.    Would have been auto damage,
7   like something with the vehicles, or it
8   could have been injury cases.
9        Q.    Do you recall how the SIU was
10  organized at that time?
11       A.    In what regard?
12       Q.    Were there regions in the SIU
13  at the time?
14       A.    Well, there was regions within
15  the company.
16       Q.    So, companywide regions?
17       A.    Correct.
18       Q.    Do you recall what region you
19  were in?
20       A.    Region 2.
21       Q.    And what geographic area did
22  Region 2 encompass?
23       A.    New York.
24       Q.    Anywhere else?
25       A.    We might have also handled

Page 54

1             M. Munoz
2   other states, but I don't recall.  It was
3   predominantly New York.
4        Q.    Did you ever work in any other
5   region?
6        A.    Not -- in a -- no.
7        Q.    Is Geico SIU currently
8   organized into regions?
9        A.    No.
10       Q.    When did that change, if you
11  recall?
12       A.    I believe sometime at the end
13  of 2022 or in 2023.
14       Q.    Do you know why that change
15  occurred?
16       A.    I don't know exactly why, no.
17       Q.    And so in 2015, you worked as a
18  field investigator, correct?
19       A.    For the SIU department?
20       Q.    Yes.
21       A.    Yes.
22       Q.    And what were the -- do you
23  know if there were any requirements for
24  that position?
25       A.    Education background.  There

Page 55

1             M. Munoz
2   were others.  I just don't remember what
3   they were.
4        Q.    And what do you mean by
5   background?
6        A.    Well, I meant the background of
7   your education.  So, I had a criminal
8   justice degree, so I know that checked off
9   a box for me.
10       Q.    And do you recall what your
11  scheduled weekly work hours were when you
12  first started?
13       A.    It was 38.75 hours per week.
14       Q.    And you said that your
15  supervisor was Dara Campbell; is that
16  right?
17       A.    Correct.
18       Q.    And in your role as a field
19  investigator in SIU, did you ever work in
20  an office?
21       A.    At any point?
22       Q.    Yes.
23       A.    Yes.
24       Q.    How often did you work in the
25  office?

Page 56

1             M. Munoz
2        A.    Not often.
3        Q.    Could you approximate what you
4   mean by that?
5        A.    I would only be in the office
6   if I was called for a meeting or if there
7   was some kind of function going off -- on
8   in the office.
9        Q.    Is it correct that your
10  day-to-day would be in the field?
11       A.    Field or at home, yes.
12       Q.    What percentage of the time
13  would you approximate you were in the field
14  versus working at home?
15       A.    It varies.
16       Q.    What is the variation based on?
17       A.    The caseload, what type of case
18  I got, the traffic.
19       Q.    Did you ever have a desk-based
20  investigator role in SIU?
21       A.    Not primarily, no.
22       Q.    Do those exist in SIU?
23       A.    Yes.
24       Q.    And did you have a set schedule
25  when you started working in SIU?

Page 69

1  M. Munoz
2  would have been told, okay, if you do that
3  on Saturday, you have to make up the time
4  within a time period to make it for the
5  workweek, if that makes sense.
6       Q.   And that's within the same
7  workweek or pay period practice that we
8  talked about earlier?
9       A.   Correct.
10      Q.   Do you remember if any of your
11 supervisors actually told you that, that
12 that was the policy?
13      A.   Again, the one that I remember
14 speaking about it at some point was
15 April Neyland.  Yeah.  Sorry.
16      Q.   Do you remember how many times
17 you spoke with April about flex time?
18      A.   No.
19      Q.   Did April allow flex time?
20      A.   Yes.
21      Q.   Did you ever request flex time
22 with any of your other supervisors that
23 we've talked about?
24      A.   Possibly.
25      Q.   Do you recall if they also

Page 70

1  M. Munoz
2  allowed you to use flex time?
3       A.   Yes.
4       Q.   Yes, as in they did allow it?
5       A.   Yes.
6       Q.   Were you assigned specific
7  types of claims to investigate when you
8  were not working on the theft team in
9  New York?
10      A.   Yes.
11      Q.   And what types of claims were
12 you assigned?
13      A.   I would work any and all of the
14 claims assigned to me so they could deal
15 with the vehicles, like auto damage, body
16 shops, injury claims.
17      Q.   Can you describe what you mean
18 by body shop claims?
19      A.   So, sometimes an investigation
20 would lead to possibly -- or suspicion of
21 the body shop maybe enhancing damage on
22 a -- on a vehicle that was brought in
23 there.  That could be an example of a shop
24 case.
25      Q.   Those are called shop cases?

Page 71

1  M. Munoz
2       A.   Between us investigators, yes.
3       Q.   And when you say vehicle cases,
4  what did you mean by that?
5       A.   Anything relating to the
6  property damage, collision damage.
7  Anything relating to the vehicle and an
8  accident.
9       Q.   And what was your role in
10 investigating these cases?  Like could you
11 walk me through what your day-to-day
12 responsibilities were?
13      A.   I would check my e-mails,
14 that's how you would find your assignments,
15 which would also come into a separate SIU
16 system called SICM, S-I-C-M.  So, you would
17 look over your -- your e-mails.  I would
18 look over my e-mails, look over the cases I
19 received.
20           Then at that point, I could
21 also -- I would run backgrounds, review
22 over the claim file itself because that's a
23 different system, which at this point is
24 called ATLAS, A-T-L-A-S.
25           I would review SICM for any

Page 72

1  M. Munoz
2  prior SIU cases relating to the policy,
3  review over the policy itself.  And after
4  my backgrounds and reviews were done, I
5  would determine what field work would be
6  needed.
7       Q.   And what were the different
8  types of field work that you would perform?
9       A.   From when I started SIU up till
10 today?
11      Q.   Yes.
12      A.   I go to precincts still
13 sometimes to obtain police reports or
14 attempt to, to speak to police officers
15 and/or detectives.  I go to accident scenes
16 to look for video footage, camera footage
17 or witnesses.  I knock on doors of people's
18 houses or businesses to get that footage.
19           Sometimes I'm -- I will take
20 statements in person from people.
21 Sometimes I look for stolen vehicles.  I
22 also am able to perform what's called an
23 event data recorder, EDR for short, on
24 vehicles, which pulls crash data.  Go to
25 body shops.  And I might have forgot some



Page 73
1          M. Munoz
2   other things I do, but that's the gist.
3     Q.   And have you performed all of
4   those job duties throughout your time at
5   SIU?
6     A.   Not the whole time.
7     Q.   When you say not the whole
8   time, what do you mean by that?
9     A.   Well, the one thing that sticks
10  out is the EDR.  I just became certified or
11  trained in that within past year or two,
12  maybe more.  I'm not sure on the exact
13  date.  But that wasn't my whole -- I -- I
14  wasn't doing that the whole time.
15    Q.   Is that something that you
16  voluntarily decided to -- to learn or was
17  that a requirement for your job?
18    A.   When I first got it, I was
19  strongly advised to do it.  And so I did.
20    Q.   What do you mean by strongly
21  advised?
22    A.   I was just told, we have this
23  opportunity of a machine and the training,
24  I think you should take it.  That's pretty
25  much it.

Page 74
1          M. Munoz
2     Q.   And who told you that?
3     A.   Gerry Cassagne.
4     Q.   And was this while Gerry was
5   still a Geico employee or had he left
6   already?
7     A.   Yes, he was a Geico employee.
8     Q.   And what exactly does checking
9   an EDR involve?  Like are you physically
10  going to the car itself to --
11    A.   Yes.
12    Q.   Okay.  Can you describe just
13  generally what that means?
14    A.   So, I have to speak to the
15  owner of the vehicle, which you need to get
16  the owner's permission to do so.  So, I
17  speak to them, I explain what it is, what I
18  am attempting to pull from the vehicle.  I
19  send them an authorization, they sign it.
20       Then I will either go meet them
21  at their home, their job or the vehicle at
22  the body shop, wherever the car is.  And
23  then I -- there's two machines.  There's a
24  CAN Plus, C-A-N, P-L-U-S, and a CDR, which
25  is crash data retrieval, C-D-R, 900.

Page 75
1          M. Munoz
2        So, dependent upon which
3   machine the vehicle takes, I use that.  I
4   plug into the OBD, which I don't know that
5   acronym, something diagnostic underneath
6   the steering wheel.  Plug it in, put it
7   onto my computer, and then it pulls the VIN
8   and pulls all the crash data.  And then I
9   get a report.
10    Q.   Approximately how long does the
11  EDR process take on a given car?
12    A.   Well, on average, I tell people
13  it will take five to ten minutes.  There
14  have been circumstances where it's taken 30
15  to 40.
16    Q.   What circumstances lead to EDRs
17  taking longer?
18    A.   Some, just computer
19  malfunctions.  Doesn't connect, I have to
20  reboot my computer, start it again.
21  Sometimes the software needs to be updated
22  or reprogrammed.  It's a lot of trial and
23  error, which I've learned sometimes the car
24  has to be on, sometimes it has to be off.
25  Sometimes it has to be on auxiliary.

Page 76
1          M. Munoz
2     Q.   And would you say that most
3   field investigators are EDR trained?
4     A.   At this point?
5     Q.   Yes.
6     A.   The New York field
7   investigators are.
8     Q.   And when you say New York field
9   investigators, are you saying that all of
10  them are trained in it?
11    A.   The -- yes.  The -- the ones --
12  my co-workers currently now that are field
13  investigators are all trained in the EDR.
14    Q.   Do you know if desk
15  investigators are trained in EDR?
16    A.   They are not.
17    Q.   And just to jump back to the
18  types of claims that you're investigating,
19  we're talking about vehicles, body shop
20  cases, injury cases.
21       How did you receive those
22  assignments?  So, you mentioned that they
23  would be in an e-mail form or SICM; is that
24  right?
25    A.   Well, both.



Page 77

1    M. Munoz
2    Q.   Okay.  So, would you -- is --
3    is there a method to assigning cases to
4    investigators in SIU?
5    A.   At this point, now we have a
6    team that's called risk, and they figure
7    out what cases.  I don't know their
8    process.  We used to have certain people
9    that that was their only job when we were a
10   region, like Region 2, and they used to
11   hand out -- like send out the cases.
12   Q.   Do you know how long the risk
13   team has been in place?
14   A.   Approximately a year.
15   Q.   And so prior to the last year
16   around, you were assigned cases by
17   individuals who would distribute cases to
18   investigators; is that correct?
19   A.   Yes.
20   Q.   Do you know what they would use
21   to make those determinations for
22   distribution?
23   A.   I don't.
24   Q.   Do you know who those
25   individuals were that distributed cases to

Page 78

1    M. Munoz
2    you?
3    A.   I don't remember their names.
4    Q.   Do you remember what their job
5    title was?
6    A.   It's like on the tip of my
7    tongue.  I don't.  I'm sorry.
8    Q.   And how long did it take you to
9    investigate a given fraud claim?
10   A.   I mean, it varies.
11   Q.   What does it vary based on?
12   A.   It depends what type of case it
13   was, if it needed an Examination Under
14   Oath, also known as an EUO.
15   Q.   Does it vary based on anything
16   else?
17   A.   I mean, yeah.  There -- there
18   could be other circumstances.  Sometimes
19   things come up in the investigation.  Maybe
20   you want to meet with somebody and take a
21   statement from them, but their schedule
22   doesn't allow you to meet with them when
23   you want to.
24   Q.   And when you say investigation
25   or -- strike that.

Page 79

1    M. Munoz
2    When you say Examination Under
3    Oath, is that something that you've been
4    doing since the beginning in SIU?
5    A.   Yes.
6    Q.   Did you do that when you were
7    on the theft specialty team as well?
8    A.   Yes.
9    Q.   What does an EUO generally
10   mean?
11   A.   It's an Examination Under Oath.
12   So, the person that I request to come in
13   gives a statement under oath, kind of like
14   today's settings, with a court reporter.
15   They used to be in person, but now we do
16   them via Zoom unless the need is to do it
17   in person.
18   Q.   When did you start conducting
19   them via Zoom?
20   A.   In 2020.  And Zoom isn't the
21   actual platform, we use Webex.
22   Q.   Videoconference?
23   A.   Yes.
24   Q.   Okay.
25   A.   I am not a fan.  So, that's why

Page 80

1    M. Munoz
2    it just doesn't...
3    Q.   Why are you not a fan?
4    A.   I like in-person statements
5    better.  I think that you get a better
6    response.
7    Q.   And you said that you still
8    perform some EUOs in person based on the
9    case circumstances?
10   A.   Correct.
11   Q.   Approximately what percent are
12   done in person versus by web conference
13   currently?
14   A.   Currently, the percentage, I
15   mean, less than -- for me, less than ten
16   percent.
17   Q.   And before 2020, did you take
18   any EUOs by web conference or they were all
19   in person?
20   A.   All in person.
21   Q.   Do you know if that was a
22   change that came about based on COVID-19?
23   A.   It was.
24   Q.   Okay.  In terms of the --
25   jumping back to the New York theft



Page 81

1                M. Munoz
2    specialty team, do you recall who was a
3    part of that team with you?
4       A.   Joe Krattinger,
5    K-R-A-T-T-I-N-G-E-R, Al Brust.  And this --
6    hold on one second.  He quit, this guy.  I
7    can't remember his name.  I could see his
8    face.  Ted Wendling.  I'm not really sure
9    how to spell his name.  I think it was just
10   the four of us.  There might have been
11   someone else, but that's who I remember.
12      Q.   And did those members change
13   over time, or was that the group throughout
14   the time you worked on the New York theft
15   team?
16      A.   I believe we were just the one
17   group.
18      Q.   And did you only receive theft
19   cases while on that team?
20      A.   I don't want to say only
21   because there's a possibility I got others,
22   but that was my main role.
23      Q.   Can you describe generally what
24   the theft team encompassed, like what theft
25   cases were?

Page 82

1                M. Munoz
2       A.   Uh-huh.  So, we handled any
3    reports with the suspicion of fraud on a
4    stolen vehicle if an insured reported their
5    vehicle was stolen.
6       Q.   So, it was a vehicle-based
7    team, correct?
8       A.   Correct.
9       Q.   And what was different about
10   working on the theft team compared to what
11   you were doing previously?
12      A.   Well, it was predominantly
13   every day, I knew what kind of cases I was
14   getting.  I had made many contacts with the
15   police departments during that time period
16   because I had to deal with the police a
17   lot.  The Examinations Under Oath lessened.
18      Q.   Do you know why that was the
19   case?
20      A.   Well, because most of my EUOs
21   prior to that time were for injury cases,
22   and I wasn't handling those.
23      Q.   Do you know what the goals
24   were -- of the specialty theft team were,
25   if any?

Page 83

1                M. Munoz
2       A.   The exact goals, no.
3       Q.   The general goals?
4       A.   The goals changed so much, I
5    don't remember what they were at that time.
6       Q.   What do you mean that the goals
7    changed so much?
8       A.   Every year, it changes.  Like
9    what our metrics are, what the goals are.
10      Q.   What do you mean by metrics?
11      A.   Metrics is how they rate us on
12   our report cards.
13      Q.   And when you say report cards,
14   could you describe what you mean?
15      A.   So, basically like when you're
16   in school and you get a grade, it's kind of
17   your grading within the department.  And
18   then your grade at the end of the year will
19   be how your merit increase would be.  It
20   would be -- coincide with each other.
21      Q.   And did you have specific
22   performance metrics that applied to you
23   while you were on the New York theft team?
24      A.   I am sure I did, yes.
25      Q.   Do you remember what they were?

Page 84

1                M. Munoz
2       A.   No.
3       Q.   Do you know what your current
4    performance metrics are?
5       A.   Yes.
6       Q.   What are they?
7       A.   I am rated on my file audits,
8    case life and productivity.
9       Q.   Can you describe what you mean
10   by file audits?
11      A.   So, we have an audit team who
12   audits the SIU department.  And I don't
13   know the number, it's based on your hours
14   worked per month of how many audits you
15   get.  So, it's a grade for your case.  They
16   take a case, and they grade it.
17      Q.   Do you know what they grade it
18   based on?
19      A.   Oh, yeah.  There -- I mean,
20   there's many different things.  I mean, it
21   goes from the investigative quality up
22   until did you upload a document that was
23   supposed to be uploaded.  I mean, there's
24   many other factors.
25      Q.   And you mentioned case life.



Page 97

1    M. Munoz
2  would say that there was somewhere between
3  25 to 40 field investigators handling the
4  same territory we're handling now.
5    Q.   Were they all reporting to the
6  same supervisor that you were?
7    A.   That one specific, no.
8    Q.   Do you know how many different
9  supervisors those 25 to 40 people reported
10 to?
11   A.   I -- when I started, I know
12 there was Dara Campbell, Tony D'Agata,
13 Gerry Cassagne. There was another guy, I
14 think his name was Rich. Not really sure.
15 I never reported to him. And there were
16 others -- oh, Rich Killigan. Killigan was
17 his last name. And I would say anywhere
18 from my start, there was five to maybe
19 seven SIU supervisors.
20   Q.   Do you know approximately how
21 many people each of those supervisors
22 supervised?
23   A.   I'd say there was seven --
24 there could be seven to ten people on a
25 team possibly at any given time.

Page 98

1    M. Munoz
2    Q.   And were those individuals all
3  field investigators?
4    A.   I believe so, at that time.
5    Q.   And when you say at that time,
6  what time period are you referring to?
7    A.   From when I started SIU.
8    Q.   Up through what time
9  approximately?
10   A.   Until 2022, '23.
11   Q.   So, these teams stayed in place
12 through COVID; is that correct?
13   A.   Yes.
14   Q.   So, we were talking about how
15 many claims you would handle per week, and
16 you mentioned that it varied and it -- and
17 that it fluctuated; is that correct?
18   A.   Correct.
19   Q.   So, were some weeks busier than
20 other weeks?
21   A.   Yes.
22   Q.   What would that depend on?
23   A.   Volume of claims coming in.
24 Staffing issues could be a reason.
25   Q.   Anything else?

Page 99

1    M. Munoz
2    A.   That's the most I can think of
3  right now.
4    Q.   Were there certain times of the
5  year that were busier than other times of
6  the year?
7    A.   Yes.
8    Q.   What times of the year were
9  busiest?
10   A.   I would say the summer was
11 always a busy time. To me, that would be
12 the busiest time.
13   Q.   So, summer would be the busiest
14 period? What would be the less busy times
15 of a year?
16   A.   Usually around holidays.
17   Q.   Do you know why that would be
18 the case?
19   A.   Well, I know by claims volume.
20 So, let's say at the time of the holidays
21 or like the week of, it's not really that
22 busy. But then once people would report
23 the claims after, because maybe I am
24 assuming they think that we were closed or
25 something, then it would get busier.

Page 100

1    M. Munoz
2         Or people in claims might have
3  been off, and now they come back, and now
4  they need to -- they send a referral to get
5  it assigned to SIU or something like that.
6    Q.   Is that the usual process of
7  how claims come into SIU, through the
8  claims department?
9    A.   Yes. A claim -- well, the
10 usual process, yes. So, claims may find
11 something and send a referral, and then
12 the referral -- referral comes through and
13 then it gets assigned.
14   Q.   How else do you receive claim
15 files in SIU?
16   A.   Sometimes I get phone calls
17 from police contacts, and they'll tell me
18 that I may want to look at this claim.
19 Sometimes -- I'm trying to think. That's
20 pretty much -- oh, no.
21        There's a database, like a
22 system -- I don't know if I am using the
23 right word -- that they use also which kind
24 of gives the claim a score value in regard
25 to whether they think it should be assigned



Page 141

1      M. Munoz
2  detail the conversations that you had with
3  Dara when she told you you needed to input
4  38.75 hours only per workweek?
5      A.  I can't because I don't
6  remember it.
7      Q.  Can you describe those
8  conversations with April?
9      A.  I don't remember specific
10 conversations.
11     Q.  What about with Gerry?
12     A.  In regard to the inputting, the
13 7.75 per day, I don't remember an exact
14 conversation.
15     Q.  Do you recall any exact
16 conversations with Tony about that?
17     A.  No.
18     Q.  Were any of these conversations
19 in written form, either through text or
20 e-mail?
21     A.  Not that I can recall.
22     Q.  Were they over the phone?
23     A.  I don't remember how we would
24 have spoke about it.
25     Q.  Do you remember if anyone else

Page 142

1      M. Munoz
2  was there when you had these conversations?
3      A.  I don't recall.
4      Q.  Do you recall what your
5  response was when you received those
6  instructions from your supervisors?
7      A.  I just inputted the time as I
8  was told, which was 7.75 per day, 38.75,
9  right, for the week.
10     Q.  Did you challenge that
11 instruction in any way?
12     A.  Well, we voiced concerns,
13 meaning me and my co-workers, in regard to
14 that we weren't necessarily working those
15 hours.
16     Q.  When did you voice those
17 concerns?
18     A.  Team meetings sometimes we
19 would have with certain supervisors.
20 Sometimes we would have a meeting every few
21 months with the manager also where we all
22 got together, it would be brought up.  And
23 those -- yeah, those would be the times.
24     Q.  Were any of those
25 communications that you just talked about

Page 143

1      M. Munoz
2  in written form?
3      A.  I'm sure there's something in
4  writing.  Now, I have, at this point, put
5  in writing like I -- I asked for overtime,
6  at least a minimum of four times this year,
7  and I was told no.
8      Q.  Who did you ask for overtime
9  this year?
10     A.  Arineh Nazari.
11     Q.  Do you recall when you sent
12 those communications?
13     A.  Within approximately the last
14 six months.
15     Q.  Were you asking for the
16 authority to work future overtime in those
17 conversations?
18     A.  I was asking for either that
19 day or that week.
20     Q.  Do you recall why Arineh told
21 you that you cannot work that overtime?
22     A.  The first time, she told me it
23 was a taboo subject.  Second, third, maybe
24 it was just do the best you can, just get
25 it done.  And I believe -- I don't know,

Page 144

1      M. Munoz
2  because I didn't see the communication nor
3  hear it -- she asked management the last
4  time and was told that it wasn't, you know,
5  approved.  Just do the best -- like get it
6  done, get your work done.
7      Q.  So, after receiving her
8  responses, did you still go ahead and work
9  overtime?
10     A.  No.
11     Q.  And when you say management,
12 she reached out to management, who are you
13 talking about?
14     A.  I -- I -- it's an assumption
15 because I don't know.  But I -- I think she
16 would have asked Rene Cubas, who is my
17 manager.
18     Q.  And how long has Rene been your
19 manager for?
20     A.  Probably since '23 -- 2023.
21     Q.  So, your -- just to go back in
22 time a little bit, your original manager
23 when you first started at SIU was
24 Michael DeGrocco, correct?
25     A.  Correct.



Page 145

1              M. Munoz
2      Q.   Was there anyone in that role
3   between Michael DeGrocco and Bill Newport?
4      A.   No.  I believe it was
5   Mike DeGrocco, Bill Newport and then it
6   would become Rene in my tenure with SIU.
7      Q.   And I just want to go back.
8           So, you talked about voicing
9   concerns in team meetings with team
10  supervisors, correct?
11     A.   The supervisors would be
12  present, yes.
13     Q.   Do you recall any other details
14  about when those meetings took place or who
15  was there?
16     A.   Team meetings would be with
17  your section.  And my section, you know,
18  changed sometimes, so I -- I couldn't say
19  who exactly was there.  And then sometimes,
20  we would have full meetings with all of
21  SIU, supervisors and -- and management
22  present.
23     Q.   When you say your section, what
24  do you mean by that?
25     A.   So, a section would be who --

Page 146

1              M. Munoz
2   so if I reported to Gerry, it was whoever
3   was under Gerry.  That is my section.
4      Q.   Do you remember how many of the
5   full SIU meetings there were where these
6   complaints were raised?
7      A.   I don't remember the exact
8   number.  Maybe, on average, they held them
9   twice a year.
10     Q.   And can you describe the
11  substance of what concerns were being
12  talked about in these meetings?
13     A.   Well, they would start off in
14  regard to how we were doing, let's say, as
15  a department.  And then when it came time
16  to voice concerns or questions, certain
17  investigators would voice their concerns
18  and say that we had too much work, we
19  couldn't get it done and we needed more
20  time to complete it or more people to do
21  the job.
22     Q.   Which investigators are you
23  referring to?
24     A.   I don't -- one instance that
25  stands in my mind is a guy named

Page 147

1              M. Munoz
2   Mark Giambalvo.  He definitely was a
3   loudmouth, definitely voiced his opinion.
4      Q.   Do you recall what position
5   Mark worked in?
6      A.   Same as I, field investigator.
7      Q.   And do you remember the
8   substance of what he said?
9      A.   Not in totality, no.
10     Q.   Do you remember the gist of
11  what he said in these meetings?
12     A.   That we had too much work and
13  that it couldn't get done in the timeframe.
14     Q.   Do you recall what the response
15  was?
16     A.   Sometimes it was, okay, we'll
17  look into it, we'll see if we can hire
18  someone, do the best you can, we know you
19  guys are overworked.
20     Q.   And who were the individuals
21  who were actually giving these responses
22  in --
23     A.   It would be management such as
24  either Mike DeGrocco or Bill Newport.
25  These kind of things did not happen under

Page 148

1              M. Munoz
2   Rene.
3      Q.   When you say these kind of
4   things, what do you mean?
5      A.   Well, these kind of discussions
6   in regard to the workload.  I mean, I've
7   only met with Rene two times.  So, he
8   doesn't live in New York.
9      Q.   Do you know where he lives?
10     A.   Florida.
11     Q.   So, is it fair to say that you
12  no longer directly report to someone who is
13  in New York?
14          MS. JEAN:  Objection.
15          THE WITNESS:  My supervisor is
16     in New York, but my manager is in
17     Florida.
18  BY MR. SLOTNICK:
19     Q.   And this is in the current
20  organization of SIU?
21     A.   Correct.
22     Q.   If we look at paragraph seven
23  of Exhibit 5, it says, my regular schedule
24  for Geico is 7:00 a.m. to 3:30 p.m.  I also
25  work approximately 1.5 hours each day in



```
                                              Page 281
 1              M. Munoz
 2         I N D E X
 3
 4  EXAMINATION BY                          PAGE
 5  MR. SLOTNICK                            7, 275
 6  MS. JEAN                                265
 7
 8    INFORMATION AND/OR DOCUMENTS REQUESTED
 9  INFORMATION AND/OR DOCUMENTS      PAGE
10  BY MR. SLOTNICK:
11  1. Request for witness's notes    217
12  2. Request for text messages      265
13  BY MS. JEAN:
14  3. Request for documents          277-78
15
16
17      QUESTIONS MARKED FOR RULINGS
18  PAGE LINE QUESTION
19  (None)
20
21
22
23
24
25
```

```
                                              Page 282
 1              M. Munoz
 2         C E R T I F I C A T E
 3
 4  STATE OF NEW YORK     )
                          :
 5  COUNTY OF RICHMOND    )
 6
 7       I, MARINA DUBSON, a Notary Public for
 8  and within the State of New York, do hereby
 9  certify:
10       That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14       I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 17th day of December 2024.
21
22
23         _____
                  MARINA DUBSON
24
25
```



```
                                              Page 283
 1            ERRATA SHEET
 2  WITNESS NAME: MARIA MUNOZ
 3  PAGE   LINE (s)       CHANGE        REASON
 4  ____|_____| _____| _____
 5  ____|_____| _____| _____
 6  ____|_____| _____| _____
 7  ____|_____| _____| _____
 8  ____|_____| _____| _____
 9  ____|_____| _____| _____
10  ____|_____| _____| _____
11  ____|_____| _____| _____
12  ____|_____| _____| _____
13  ____|_____| _____| _____
14  ____|_____| _____| _____
15  ____|_____| _____| _____
16  ____|_____| _____| _____
17  ____|_____| _____| _____
18  ____|_____| _____| _____
19  ____|_____| _____| _____
20  ____|_____| _____| _____
21
22  ---------------------
    MARIA MUNOZ
23
    SUBSCRIBED AND SWORN BEFORE ME
24  THIS ____ DAY OF _____, 20__.
    _____  _____
25  (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```