# Exhibit 13

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -x
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,
and CHARISE JONES, individually and on behalf of
all others similarly situated,

                              Plaintiffs,


         -against-              Case No.:
                           23-Civ-02848(GRB)(ARL)




GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a

GEICO,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - -x

                       December 13, 2024
                       9:31 a.m.



EXAMINATION BEFORE TRIAL of GERRY CASSAGNE, a

Non-Party Witness herein, taken by the

Plaintiffs, held via Zoom, pursuant to Subpoena,

taken before DANIELLE DEYOUNG, a Shorthand

Reporter and Notary Public in and for the State

of New York.


              MAGNA LEGAL SERVICES
                 (866) 624-6221
```



Page 26

1      G. CASSAGNE
2      Q    Do the essential functions one
3   through ten describe your job duties as a
4   field supervisor?
5      A    Yes.
6      Q    I am going to ask you about
7   number eight, which reads:
8          "Prepares business plans,
9   staffing, projections and budgets,
10  requisitions, supplies and materials
11  necessary for sufficient operation,
12  reviews, plans and budgets periodically
13  to achieve cost reduction where
14  possible."
15         Did I read that correctly?
16     A    Yes.
17     Q    What does business plans refer
18  to, if you know?
19     A    As a field supervisor I did
20  not prepare business plans, requisitions.
21  We met with our manager to come up with a
22  business plan usually on a yearly basis,
23  but the business plan was written by the
24  manager and prepared by the manager and
25  sent in by the manager.  We just were

Page 27

1      G. CASSAGNE
2   there meeting with them to go over things
3   that he could put into the business plan.
4      Q    What went into the business
5   plan?
6      A    I can't tell you.  I wasn't
7   privy to everything that goes into that
8   business plan.
9      Q    Do you recall meeting with
10  your manager to discuss a business plan?
11     A    Yes.
12     Q    How many times?
13     A    Once yearly -- or a couple
14  times yearly we would have planned
15  meetings to go over different things
16  that, as a field supervisor, we would be
17  able to help and say this is what's going
18  on and whether it's staffing or cases or
19  whatever.  That's the input that we had.
20     Q    Do you remember any other
21  conversations that you had at any of
22  those other meetings?
23     A    They were a long time ago.
24  There was like, again, yearly meetings,
25  so lots of conversations.

Page 28

1      G. CASSAGNE
2      Q    Do you remember any
3   conversations that you had with your
4   manager at any of these planning meetings
5   concerning staffing?
6      A    Yes.
7      Q    How would those conversations
8   go?
9          MR. TSONIS:  I am going to
10      object.  What time period are you
11      talking about?
12         MS. COLE-CHU:  I didn't hear the
13      objection.
14         MR. TSONIS:  What time period are
15      you talking about?
16  BY MS. COLE-CHU:
17     Q    The time period of this case,
18  Gerry, is July 22, 2016 through the
19  present.  I understand that you left in
20  April 2023.  So the focus of my questions
21  are going to be on that time period, from
22  July 2016 through April 2023.  Going
23  forward, that will be the focus of my
24  questions.  Does that make sense?
25     A    Yes.

Page 29

1      G. CASSAGNE
2      Q    So of the planning meetings
3   that you recall attending during that
4   time period, I'm curious as to what you
5   recall about the conversations related to
6   staffing that you had with your manager.
7   Can you tell me about those?
8      A    It was related to whether
9   staffing needed to be increased or
10  staffing was good, but again, that's
11  decisions made by the manager and above.
12     Q    You ultimately did not have
13  any control over that?
14     A    No, I did not.
15     Q    What would lead you to a
16  recommendation that staffing be increased
17  or not increased?
18     A    People retiring, people
19  leaving the company.  If we thought the
20  teams were getting low and we needed more
21  staffing, it would be regarding -- you
22  know, can we bring in a couple extra guys
23  or whatever to handle cases.  Depending
24  on caseload, depending on, like I said,
25  retirement and people getting

Page 38

```
 1                G. CASSAGNE
 2        A    Yes.
 3        Q    Does this document reflect
 4   what you understood to be GEICO's
 5   expectations of you as an SIU supervisor?
 6        A    Yes.
 7        Q    I would like to direct you to
 8   2E towards the bottom of page one, Case
 9   Reviews.  You gave some testimony today
10   already about reviewing cases and my
11   question is --
12             Well, first off, I will read
13   it for the record.  It says:
14             "Case Reviews:  Meet monthly
15   case review and SPR expectations spread
16   evenly throughout the month to benefit
17   the associates."
18             Did I read that correctly?
19        A    Yes.
20        Q    What does it mean to "meet
21   monthly case review and SPR
22   expectations"?
23        A    I believe this was us
24   reviewing cases --
25             "Spread evenly throughout the
```

Page 39

```
 1                G. CASSAGNE
 2   month to benefit the associate" --
 3             "Meet monthly case review and"
 4   --
 5             I believe it was us monitoring
 6   the cases to make sure they were spread
 7   evenly throughout the month to the
 8   associates.
 9        Q    Does that mean that the cases
10   were assigned in a staggered fashion to
11   investigators?
12             MR. TSONIS:  Objection,
13        foundation, calls for speculation.
14        It's the language.
15   BY MS. COLE-CHU:
16        Q    If you understand, Gerry, you
17   can go ahead and answer.
18        A    Cases were assigned to
19   investigators in a rotation basis, but
20   they were assigned specifically regarding
21   the cases they were assigned to or the
22   team they were assigned to.  So some
23   investigators would get a certain amount
24   of cases, regarding the team they were
25   in, and other investigators would get
```

Page 40

```
 1                G. CASSAGNE
 2   other cases, regarding the team they were
 3   in.
 4        Q    And is that what 2E is talking
 5   about?
 6             MR. TSONIS:  Objection,
 7        foundation, calls for speculation.
 8   BY MS. COLE-CHU:
 9        Q    You can go ahead and answer,
10   Gerry, if you understand my question.
11        A    I'm guessing that's what it
12   is, but it's a little bit broad.
13        Q    What are SPR expectations?
14        A    I believe that's the -- I
15   don't even know what SPR means.
16   Performance review, I guess -- yeah, a
17   performance review, so to make sure that
18   they were meeting their performance
19   review expectations.
20        Q    Are the expectations outlined
21   in this document consistent, roughly,
22   from year to year during the time period
23   we are talking about, from 2016 to 2023
24   when you left the company?
25             MR. TSONIS:  Objection, form,
```

Page 41

```
 1                G. CASSAGNE
 2        foundation, calls for speculation.
 3             You can answer if you
 4        know.
 5        A    The expectations on certain
 6   things stayed the same but on other
 7   things changed, obviously, within time,
 8   whether it's caseload, whether it was
 9   case procedures or there were case
10   protocols, different things got added on,
11   different things were taken out.
12        Q    Exhibit 1 was a job
13   description and this Exhibit 2 was a
14   document reflecting supervisor
15   expectations.  Were you involved in the
16   creation of either of those documents?
17        A    Was I involved in the creation
18   of this document, you're asking me?
19        Q    Either of these documents,
20   Exhibit 1 or Exhibit 2?
21        A    No.
22        Q    Were you involved in training
23   special investigators?
24        A    Yes.
25        Q    Were you involved in reviewing
```

MAGNA
LEGAL SERVICES

Page 50

G. CASSAGNE
Q How often was it needed, in your recollection?
A After my review of what the investigator had or if the investigator needed an emergency, I would be on a case-by-case basis.
Q Was it a frequent occurrence?
MR. TSONIS: Objection to form. You can answer.
A No.
Q If you were dealing with one of these situations that we are discussing now, otherwise the case assignments -- strike that.
How often did you communicate with your investigators that you supervised?
A Sometimes daily, sometimes weekly, depending on the need.
Q Did you regularly communicate with investigators?
A Yes.
Q How did you communicate with them?

Page 51

G. CASSAGNE
A Either by phone or by -- however I needed to. Meetings.
Q How often did you have meetings?
A I tried to have weekly meetings or if not, then I would have them when necessary.
MR. TSONIS: Off the record.
(Whereupon, a recess took place at 10:30 a.m. and ended at 10:41 a.m.)
BY MS. COLE-CHU:
Q Gerry, before the break we were talking about meetings that you had with your investigators, and I believe you testified that you tried to have meetings weekly. Why was it important to meet weekly with your investigators?
A To update them on any new procedures, update them on any new types of cases that may be coming out, update them on any type of new fraud trends that we had, stuff like that.
Q What does fraud trends mean?

Page 52

G. CASSAGNE
A If we identified any type of new fraudulent type of case, you know, if the bad guys are doing something with staging accidents or doing something with body shop fraud or something like that. So we try to keep them updated on all type of fraud trends.
Q Would you say you had a good relationship with your investigators?
A I hope I did.
Q Did you want your investigators to feel comfortable approaching you with questions?
A Absolutely, yes.
Q Did you want them to feel comfortable approaching you with any concerns that they had?
A Yes.
Q Did they approach you with questions and concerns, you know, in the course of their work?
A I believe they did, yes.
Q Would you consider the investigators that you worked with to be

Page 53

G. CASSAGNE
hardworking?
A Yes.
Q And reliable?
A Yes.
Q Would you consider them trustworthy investigators?
A Yes.
MS. COLE-CHU: I am going to introduce Exhibit 3.
(Whereupon, Exhibit 3 was marked for identification.)
MS. COLE-CHU: Let me know when you have it in front of you. It's a longer document; it's 30 pages. So take a look through it. I am going to direct you to a specific section, but take your time going through it and let me know when you've done that.
I will note for the record this is document Bates number is G000161. It's titled: Employment Contents.

Page 90

```
 1                G. CASSAGNE
 2       Q    Immediately underneath
 3   "Fraud," just to confirm, that refers to
 4   productivity?
 5       A    Yes.
 6       Q    And audits refer to the audits
 7   we've been discussing, three a month that
 8   you had to perform?
 9       A    Yes.
10       Q    And in this review, was your
11   investigators performance weighted in
12   your performance again like in prior
13   years?
14       A    Yes.
15       Q    So like in prior years, your
16   job performance was determined by your
17   investigators performance?
18       A    Yes.
19         MS. COLE-CHU:  Okay.
20              Next is Exhibit 7.  That
21         should be appearing in the chat.
22         This is G010623.
23              (Whereupon, Exhibit 7 was
24              marked for
25              identification.)
```

Page 91

```
 1                G. CASSAGNE
 2   BY MS. COLE-CHU:
 3       Q    Before you look at that,
 4   Gerry, I actually just have one question
 5   on the last document.  I didn't ask you
 6   this.
 7            Exhibit 6, the document we
 8   were just talking about, is that your
 9   2019 performance evaluation?
10       A    Yes.
11       Q    Okay.  Thank you.
12            Now go ahead and look at the
13   new document and let me know when you are
14   ready for me to ask you some questions
15   about it.
16       A    Got it.  Thank you.
17       Q    Again, this is Exhibit 7,
18   G010623.
19            Gerry, is this your 2020
20   performance appraisal?
21       A    Yes.
22       Q    Who completed this appraisal?
23       A    Bill Newport.
24       Q    I am going to ask you a few
25   questions about this paragraph on the
```

Page 92

```
 1                G. CASSAGNE
 2   first page.  Do you want a second to
 3   review it or are you ready for me to ask
 4   you some questions about it?
 5       A    Just give me a second to read
 6   it.
 7            (Perusing).
 8            Okay.
 9       Q    The first sentence reads:
10            "Gerry managed a diverse team
11   of field investigators that experienced
12   an increase in workload and a change in
13   how they complete their work."
14            Is it true, in your
15   experience, that in 2020 you experienced
16   an increase in workload?
17       A    I believe so, yes.
18       Q    And let me ask more
19   specifically.  Is it true that your
20   investigators experienced an increase in
21   workload in 2020?
22         MR. TSONIS:  Objection, form,
23         foundation.
24   BY MS. COLE-CHU:
25       Q    You can go ahead and answer,
```

Page 93

```
 1                G. CASSAGNE
 2   Gerry.
 3       A    Yes.
 4       Q    Can you tell me about that
 5   increase in workload, whatever you
 6   remember about it, when did it happen?
 7       A    I don't remember exactly.
 8   This is COVID time.
 9       Q    Yes.  COVID hit March 2020.
10       A    Right.  So this was COVID
11   time.  So they definitely had an increase
12   in caseload, but there were other factors
13   built into that where the field work was
14   taken away from them.  So there was no
15   field work being done.  So windshield
16   time was not included in that.
17       Q    Couple questions.  I believe
18   you said there was an increase in
19   workload around COVID.  What do you
20   attribute that to, if you know?  Why was
21   there an increase in workload around this
22   time?
23       A    I don't know specifically.  I
24   mean, it could be changing the volume of
25   claims coming in, there could have been a
```

Page 186

```
 1                G. CASSAGNE
 2      foundation, calls for speculation.
 3            You can answer.
 4      A    It could be any, but this is
 5   also for AD, which is the auto damage
 6   people.  So this is for both -- this is
 7   for a couple of different units.  So this
 8   is not specific to SIU.
 9      Q    So is your answer, then,
10   you're not sure who "management" refers
11   to?
12            MR. TSONIS:  Objection, form,
13      mischaracterizes testimony.
14      A    Management, I believe, would
15   be supervisors and managers and above.
16      Q    Looking down farther under the
17   FAQ, the third bullet point, and the sub
18   point underneath that specifically reads:
19            "Overtime has always been
20   available based on business need."  What
21   do you understand business need to mean
22   here?
23      A    If you need to do something
24   regarding your case -- or in this case, I
25   would assume AD do something, that was a
```

Page 187

```
 1                G. CASSAGNE
 2   business need which was -- needed to be
 3   done within the guidelines of the
 4   company, then it would be approved
 5   because it had to be done to handle
 6   either the investigation or the case
 7   correctly, to make sure things were done
 8   according to protocols.
 9      Q    Is it true, then, that if
10   there was not a business need, overtime
11   was not available?
12            MR. TSONIS:  Objection to form.
13            You can answer.
14      A    No.  Overtime was available if
15   the investigator explained to me why he
16   needed to do it on that specific case, it
17   would be approved.
18      Q    Did you have discretion to
19   approve overtime however you saw fit as a
20   supervisor?
21      A    I did not have the ability to
22   say -- like those ten hours a week thing,
23   it was preapproved ten hours a week per
24   investigator.  I was able to tell my
25   investigators that if you are working on
```

Page 188

```
 1                G. CASSAGNE
 2   a case and you run over your time and you
 3   deem it necessary, you would just have to
 4   send me the reason why and I would
 5   approve it, based on the investigator's
 6   information he sent to me on that
 7   specific case.
 8            MR. TSONIS:  Now may be a good
 9      time for a five-minute break,
10      whenever you're ready.
11            MS. COLE-CHU:  Sure.  I just have
12      a few more questions on this one and
13      then we can take a break.
14            Gerry, is that okay?
15            THE WITNESS:  That's fine.  Thank
16      you.
17   BY MS. COLE-CHU:
18      Q    Going back up to the top of
19   the page, there's a bullet point that
20   reads:  "Management must pay overtime
21   worked, even if the additional hours were
22   not authorized and follow the company's
23   progressive disciplinary process if
24   overtime work was not approved."
25            What can you tell me about the
```

Page 189

```
 1                G. CASSAGNE
 2   progressive disciplinary process referred
 3   to here?
 4      A    I don't know anything about
 5   that.  What we were told is if the
 6   investigator worked the overtime, they
 7   would get paid for it; they would just
 8   have to send me documentation for why
 9   they needed it on that specific case and
10   it would be approved.
11      Q    Do you know if supervisors
12   were subject to discipline if they had an
13   investigator working off the clock?
14      A    I was not.  I don't know
15   anything about it.
16      Q    Was the expectation generally
17   that investigators should complete their
18   work within the regular 38.75 hour work
19   week?
20      A    The investigators were --
21            Can you ask that again?
22      Q    Was it GEICO's expectation
23   that investigators should complete their
24   work within the regular 38.75 hour work
25   week?
```

MAGNA LEGAL SERVICES

Page 198

G. CASSAGNE

unless it was a special situation, like the ten hours per week example that we've been talking about?

MR. TSONIS: Same objection.

You can answer.

A  I did not have the ability to preapprove overtime ahead of time. It would have to be told to me that it was needed on that specific case at that specific time, yes.

Q  And what do you mean, "at that specific time"?

A  Well, if an investigator was in the field and he was coming to the end of his day and he had to finish up an interview or if he had to do something at a police station or the interview -- whatever, or the EUO ran over and he was running past his time, then he would contact me at the end of the day and say I had to work two hours today to finish what I needed to do on this case.

I would have him send me the information, I would say, fine, put it on

Page 199

G. CASSAGNE

your timesheet, and I would approve it.

Q  So it sounds like it had to be on a day-by-day basis, that you would approve overtime?

MR. TSONIS: Objection, form, mischaracterizes testimony.

You can answer.

A  Yes, it was pretty much on a day-to-day basis. Yes.

Q  And it was also in situations where the overtime had already been worked because -- you know, the example that you gave, they, you know, got stuck in the city maybe and worked two hours later, they let you know and then you permitted them to record the overtime?

MR. TSONIS: Objection, form.

You can answer.

A  Yeah. Either -- sometimes I found out after the fact or sometimes they contacted me and said, I am on my way to this location, I have to finish this up, I am going to be stuck here for two hours, and I would say okay.

Page 200

G. CASSAGNE

Q  So what I understand you to be saying is if your investigators are telling you that they cannot perform all of the work within a 38.75 hour week and they need preapproval for overtime in order to complete their casework, you did not have the authority to grant that approval?

MR. TSONIS: Objection, form, mischaracterizes testimony, incomplete hypothetical.

You can answer.

A  I can approve overtime on a case-by-case basis when needed.

Q  My question was a yes or no question, and I believe in giving your answer, it's a no, but I can ask it again --

MS. COLE-CHU: Or Danielle, do you mind reading back the question that I asked?

(Whereupon, the requested testimony was read back by the reporter.)

Page 201

G. CASSAGNE

MR. TSONIS: Objection, form, mischaracterizes testimony, incomplete hypothetical, asked and answered.

You can answer.

A  I did not have the ability or authority to preauthorize overtime, correct.

Q  Who did have that authority?

A  My assumption would be Bill Newport or above -- or the manager at the time.

MR. TSONIS: Off the record.

(Whereupon, a discussion was held off the record.)

MS. COLE-CHU: Exhibit 24 awaits. This is document Bates number G011603.

(Whereupon, Exhibit 24 was marked for identification.)

THE WITNESS: Got it.

BY MS. COLE-CHU:

Q  Do you recognize this



Page 234

```
 1              G. CASSAGNE
 2   to work overtime and they went ahead and
 3   worked it, then that would become a
 4   disciplinary action situation, and then
 5   you would have to pay them for that work
 6   time that they did and then deal with the
 7   disciplinary action after that.
 8       Q    What was the disciplinary
 9   action, if you know?
10       A    I don't know.  I've never had
11   to deal with it.
12       Q    Let's go back to Exhibit 23;
13   that was the Lou Pia deposition
14   transcript.
15       A    Okay.  Go ahead.
16       Q    Are you familiar with Siccum?
17       A    Yes.
18       Q    Do supervisors use Siccum when
19   managing caseload for investigators they
20   supervise?
21       A    Siccum was the case management
22   system reporting system.
23       Q    Did you use Siccum to -- when
24   you were supervising your investigators?
25       A    Yes.
```

Page 235

```
 1              G. CASSAGNE
 2       Q    How did you use it when you
 3   were supervising your investigators?
 4       A    You were able to review any
 5   case, that's where you did your
 6   approvals.  You were able to see any of
 7   the case pendings.  You were able to read
 8   any of the notes entered in any case.  So
 9   anything regarding that case
10   specifically, you were able to go in,
11   read it, prove it, close it, review it.
12       Q    Does Siccum record the date
13   and time that a case is assigned to an
14   investigator?
15       A    I believe it does, yes.
16       Q    And is that the timestamp
17   that's used to measure case life?
18       A    I believe when a case is
19   assigned, that's when the time starts for
20   case life, yes.
21       Q    We talked today about the
22   system of assigning point values to
23   cases.  Do you recall that conversation?
24       A    Yes.
25       Q    It was some cases had higher
```

Page 236

```
 1              G. CASSAGNE
 2   point values than others?
 3       A    Yes.
 4       Q    Does Siccum regard the point
 5   values?
 6       A    It's based on the level at
 7   closing.  So if it was a -- like we said,
 8   it was a level one, you got one point for
 9   it.  You got a level two because there
10   was no field work -- I forgot -- it was a
11   .75, and then the other cases, the
12   computer check cases or social media were
13   .375, I believe.
14            Don't quote me on those
15   numbers.  I think that's the way it
16   worked.  So it was at the point when you
17   closed the case, that's how they were
18   recorded.
19       Q    If we were to go into Siccum,
20   would we see what the levels were for the
21   case at closing?
22       A    Yes.
23       Q    And then would we also see the
24   point value associated with that level?
25       A    No.  It just had the level --
```

Page 237

```
 1              G. CASSAGNE
 2   when it was assigned, it was given a
 3   level, but the supervisors and the
 4   investigator had the ability to change
 5   that level based on their closing,
 6   because it was assigned as a level one
 7   field and if they didn't do a field work
 8   on it, they could change that to a level
 9   two -- or it had to be changed to a level
10   two.  So the investigator could either do
11   that or the supervisor could do that.
12       Q    Did those changes have to be
13   justified?
14       A    No, just based on the
15   investigation.
16       Q    Was checking that part of the
17   audit to make sure any change was
18   appropriate?
19       A    Yes.  Case level was, I
20   believe, part of one of the audit
21   guidelines, and it was also part of our
22   job to make sure that the right level
23   closing was there, so they got the right
24   amount responsible for that case, level
25   one, two or three.
```



```
                                              Page 238
 1              G. CASSAGNE
 2       Q    Does Siccum record the date
 3   and time a case was closed?
 4       A    Yes.
 5       Q    Is that the other end of the
 6   case life metric?  Is that the timestamp
 7   that's used to measure case life?
 8       A    Yes.
 9       Q    And after an investigator
10   closes a case, what does that look like
11   in Siccum?  How do you know a case is
12   closed?
13       A    It just says the report was
14   submitted and then you would have to go
15   in, read the case, and then make sure
16   that it was closed right.  Then once I
17   approved it, it would show up as closed.
18            There was some levels of cases
19   that were automatically closed out
20   supervisor approval.  That was done on
21   some of the lower level cases, they were
22   closed automatically; that was just a
23   system set up.
24       Q    Does that field that we are
25   talking about that says submitted or
```

```
                                              Page 239
 1              G. CASSAGNE
 2   closed, does that field have a name?
 3       A    It would just say case -- it
 4   would just say report submitted, you
 5   would open up the report, read the
 6   report, then I would hit approve.  Then
 7   when you went back in, in the line where
 8   it said submitted, it would now say
 9   closed.  Does that answer your question?
10       Q    I'm wondering if it's like
11   under -- like are those drop-down options
12   or I'm wondering --
13       A    When a supervisor approves it,
14   he hits an approval button and then that
15   turns it into a -- if it's closed.  Now
16   if it's a pending case, where it's not
17   closed but he's just sending in the
18   report that needs to be sent in during
19   that timeframe, you know, entering a
20   report --
21            Let's say he's just updating a
22   report, it would still say report
23   submitted.  Then I would see it and then
24   once I hit approve, it would not
25   automatically go to closing, there was a
```

```
                                              Page 240
 1              G. CASSAGNE
 2   check box that had to be checked to say
 3   closed and once that check box was
 4   closed, then that made the case closed.
 5   But entering reports stayed as open.
 6       Q    When you're looking -- if you
 7   recall, I know it's been a few years.
 8   When you're looking at a case file in
 9   Siccum, what fields do you see?
10       A    Well, there were tabs.  So
11   there were tabs for case law, there were
12   tabs for events, there was tabs for EUOs.
13   So you would open up each tab and then a
14   note would be put in there regarding that
15   specific event.  So then an EUO note
16   would be in there or a --
17            You know, so whatever tab you
18   hit, you had to document specific -- to
19   that specific tab.
20       Q    Is there like a status field?
21       A    Regarding what?
22       Q    Associated with the case.  So
23   like if you pull up a case -- I don't
24   know what it would say -- open --
25       A    Yeah, it would say pending
```

```
                                              Page 241
 1              G. CASSAGNE
 2   or -- whether it would say report
 3   submitted, it would say closed, that was
 4   really the only status that it showed at
 5   that point.
 6       Q    So we've talked over the
 7   course of the whole day about
 8   investigative steps that investigators
 9   are expected to take on a given case, and
10   my understanding -- and what I would like
11   for you to confirm -- is that all of
12   those steps are recorded in Siccum?
13       A    Correct.
14       Q    Are they typed notes or are
15   there check boxes or drop-down menus?
16       A    Some are check boxes, some are
17   both, some you have to put another note
18   in it or an explanation.  So each tab had
19   a specific way of documenting it.  So
20   each tab had some check boxes on it and
21   then a note or no check boxes in it and
22   just a note.  So it was different per
23   tab.
24       Q    Do you know if that for typed
25   notes, there's a field in Siccum that
```



Page 278

```
 1                G. CASSAGNE
 2   Does the number of cases assigned to an
 3   investigator determine how much work is
 4   required for those cases?
 5       A    No.
 6          MR. TSONIS:  No further
 7   questions.  Thank you, Gerry.
 8          MS. COLE-CHU:  I don't have
 9   anything further.
10          MR. TSONIS:  We will reserve to
11   read and sign.
12             (Whereupon, the
13              examination of GERRY
14              CASSAGNE was concluded at
15              4:54 p.m.)
16
17       _____
18            GERRY CASSAGNE
19
20
21   Subscribed and sworn to
22   before me on this_____ day
23   of _____, _____.
24
25   _____
     Notary Public
```

Page 279

```
 1                G. CASSAGNE
 2                I N D E X
 3
 4
 5   WITNESS        EXAMINATION BY      PAGE
 6   GERRY CASSAGNE   Ms. Cole-Chu        4
 7
 8
 9   EXHIBITS      DESCRIPTION         PAGE
10   Exhibit 1     Bates number G006751   24
11   Exhibit 2     Bates number G007935   35
12   Exhibit 3     Bates number G000161   53
13   Exhibit 4     Bates number G010539   78
14   Exhibit 5     Bates number G010601   86
15   Exhibit 6     Bates number G010593   88
16   Exhibit 7     Bates number G010623   91
17   Exhibit 8     Bates number G010619  106
18   Exhibit 9     Bates number G010614  115
19   Exhibit 10    Bates number G010617  117
20   Exhibit 11    Bates number G010611  124
21   Exhibit 12    Bates number G007960  131
22   Exhibit 13    Bates number G007975  141
23   Exhibit 14    Bates number G010811  144
24   Exhibit 15    Bates number G011437  155
25   Exhibit 16    Bates number G011519  160
```

Page 280

```
 1                G. CASSAGNE
 2                I N D E X(Cont'd)
 3
 4
 5   EXHIBITS      DESCRIPTION         PAGE
 6   Exhibit 17    Bates number G012055  163
 7   Exhibit 18    Bates number G011584  169
 8   Exhibit 19    Bates number G011553  177
 9   Exhibit 20    Bates number G011542  181
10   Exhibit 21    Bates number G010294  183
11   Exhibit 22    Louis Pia 216(b)      191
                   Declaration
12
     Exhibit 23    Louis Pia Deposition  194
13                 Excerpts 1 (76, 99-104)
14   Exhibit 24    Bates number G011603  201
15   Exhibit 25    Bates number G011859  213
16   Exhibit 26    Louis Pia Deposition  248
                   Testimony Excerpts 2
17                 (73-74)
18   Exhibit 27    Compilation exhibit   259
```

Page 281

```
 1                G. CASSAGNE
 2                C E R T I F I C A T E
 3
 4       I, DANIELLE DeYOUNG, a Shorthand Reporter
 5   and Notary Public of the State of New York, do
 6   hereby certify:
 7   That the WITNESS whose examination is
 8   hereinbefore set forth, was duly sworn, and
 9   that such examination is a true record of the
10   testimony given by such WITNESS.
11   I further certify that I am not related to any
12   of the parties to this action by blood or
13   marriage; and that I am in no way interested in
14   the outcome of this matter.
15
16
17
18
19       _____
20            DANIELLE DeYOUNG
21
```

