Case 2:23-cv-02848-SJB-ST     Document 98-25     Filed 06/11/25     Page 1 of 9 PageID #: 3035

# Exhibit 23

### Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3         FOR THE EASTERN DISTRICT OF NEW YORK
 4   - - - - - - - - - - - - - - - - - )
 5   KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6   JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:
 7   BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848
 8   CHARISE JONES, individually and   ) (GRB) (ARL)
 9   on behalf of all others similarly )
10   situated,                         )
11                  Plaintiffs,        )
12        - v -                        )
13   GOVERNMENT EMPLOYEES INSURANCE    )
14   COMPANY d/b/a GEICO,              )
15                  Defendant.         )
16   - - - - - - - - - - - - - - - - - )
17
18        VIDEOTAPED DEPOSITION OF CONSTANCE MANGAN
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J11541509
```

### Page 2

```
 1                   CONSTANCE MANGAN
 2             Thursday, August 9, 2024
 3             Time: 9:35 a.m.
 4        Videotaped deposition of CONSTANCE MANGAN,
 5   held at Duane Morris, LLP, 1540 Broadway, 14th
 6   Floor, New York, New York, before Kim M. Brantley,
 7   Court Reporter and Notary Public of the State of
 8   New York.
 9
10   APPEARANCES:
11   On behalf of the Plaintiffs:
12        OUTTEN & GOLDEN, LLP
13        1225 New York Avenue NW - Suite 1200B
14        Washington, DC, 20007
15        (202) 847-4400
16        Email: hcolechu@outtengolden.com
17        BY:   HANNAH COLE-CHU, ESQUIRE
18
19
20
21
22
23
24
25
```

### Page 3

```
 1                   CONSTANCE MANGAN
 2   APPEARANCES CONTINUED:
 3   On behalf of the Defendant GEICO:
 4        DUANE MORRIS, LLP
 5        190 South LaSalle Street - Suite 3700
 6        Chicago, Illinois 60603
 7        (312) 499-0198
 8        Email: tealberty@duanemorris.com
 9   BY:  TIFFANY ALBERTY, ESQUIRE
10
11   Also On behalf of the Defendant GEICO:
12        DUANE MORRIS, LLP
13        1540 Broadway - 14th Floor
14        New York, New York 10036
15        (212) 471-1856
16        Email:  gsslotnick@duanemorris.com
17        BY:   GREGORY SLOTNICK, ESQUIRE (Via Zoom)
18
19   ALSO PRESENT:
20        SILVIO FACCHIN, Legal Video Specialist
21        Esquire Deposition Solutions
22
23
24
25
```

### Page 4

```
 1            CONSTANCE MANGAN
 2        P R O C E E D I N G S
 3        THE LEGAL VIDEO SPECIALIST:  This is
 4   the media labeled number one in the video recorded
 5   deposition of Constance Mangan in the matter of
 6   Keith Fischer, et al., versus Government Employee
 7   Insurance Company, doing business as GEICO.
 8        This deposition is being taken in New
 9   York City, New York, on August 9th, 2024.  My name
10   is Silvio Facchin.  I am a certified legal video
11   specialist; the court reporter is Kim Brantley,
12   and we are both representing Esquire Deposition
13   Solutions.
14        We are now going on the record.  The
15   time is 9:35 a.m.
16        Counsel will state their appearances
17   for the record.
18        MS. COLE-CHU:  Hannah Cole-Chu for the
19   plaintiffs and the witness, Connie Mangan.
20        MS. ALBERTY:  Tiffany Alberty and
21   Gregory Slotnick on behalf of the defendants,
22   GEICO.
23        THE LEGAL VIDEO SPECIALIST:  And will
24   the court reporter please swear in the
25   witness.
```



Page 29

1  CONSTANCE MANGAN
2  A. Woodbury.
3  Q. Do you know what other offices there
4  are in New York?
5  A. Well, there is an office upstate, but I
6  don't exactly know where, and then the Woodbury
7  office covers pretty much everything. That's the
8  main office, to the best of my knowledge. Even
9  the upstate people had to report to Woodbury.
10  Q. I think you described yourself as a
11  special investigator. Is that right?
12  A. I am --
13  MS. COLE-CHU: Objection.
14  THE WITNESS: -- a senior investigator.
15  Sorry, Hannah.
16  BY MS. ALBERTY:
17  Q. That's okay.
18  A. -- in the special investigations unit.
19  Q. Were you any specific level?
20  A. Yes.
21  Q. What level?
22  A. Level sixty-five.
23  Q. Since you were with GEICO for a very
24  long time --
25  A. Yeah.

Page 30

1  CONSTANCE MANGAN
2  Q. -- did your levels ever change?
3  A. No.
4  Q. So throughout your entire tenure you
5  were a level sixty-five senior special
6  investigator?
7  A. Level sixty-five senior investigator,
8  special investigations unit.
9  Q. What were your duties and
10  responsibilities?
11  A. To investigate fraud or suspected
12  fraud; to gather evidence of fraud; to interview
13  claimants; to review files; to conduct background
14  checks and other computer inquiries; to take
15  statements; to sometimes conduct our surveillance;
16  to do clinic inspections and clinic visits; to
17  visit pharmacies; to visit police precincts
18  regarding police reports; to conduct examinations
19  under oath; to prepare reports, and to submit
20  reports; to speak with other units within GEICO
21  such as the PIP unit, which is the personal injury
22  protection unit; or the theft unit; or the auto
23  damage, auto body unit.
24  Q. Did you supervise anybody?
25  A. No. I'm bossy, but not the supervisor.

Page 31

1  CONSTANCE MANGAN
2  Q. Did you shadow anyone -- and I want to
3  narrow more on the time frame just because you
4  were with GEICO for so long. So really the focus
5  is going to be 2016 to 2020.
6  A. Okay.
7  Q. Did you ever shadow any employees?
8  A. Shadow? I -- I'm not sure I understand
9  what you mean by "shadow".
10  Q. Sure. As to oversee but not
11  necessarily supervise.
12  A. No. I did have an intern go out with
13  me -- I think two interns potentially, just they
14  shadowed me. So they went with me to see what the
15  job was like and what the responsibilities were,
16  but I did not shadow anyone else that I can
17  remember.
18  Q. Other than the interns that shadowed
19  you, did you have any other employees that
20  shadowed you during that four-year time period?
21  A. I don't really remember. I'm not --
22  I'm not sure.
23  Q. To your knowledge was there a
24  difference between a senior field security
25  investigator and a senior outside security

Page 32

1  CONSTANCE MANGAN
2  investigator?
3  MS. COLE-CHU: Objection to form.
4  THE WITNESS: I -- the term, the first
5  term you said, was that senior security field
6  investigator?
7  BY MS. ALBERTY:
8  Q. Yep.
9  A. I'm not familiar with that title, but
10  field investigators was what we were also referred
11  to as.
12  Q. What about senior outside security
13  investigators?
14  A. Well, we were senior investigators, so
15  assigned to the field.
16  Q. Were there other senior investigators
17  that were assigned to a different unit than the
18  one that you worked on?
19  A. Yes, there were -- I'm sorry. Well,
20  I -- I want to correct myself because I know there
21  were other investigators assigned to what we call
22  inside staff, but if their title was senior
23  investigator, I cannot say that with certainty.
24  I'm not sure what their title was exactly. It may
25  be senior investigator.



Page 101
1    CONSTANCE MANGAN
2    Let's take a peak at page --
3    A.  Sure.
4    Q.  -- three, and then number nine.
5    A.  Did you say number nine?
6    Q.  Yep.
7    A.  Oh, okay.  Thank you.
8    Q.  So number nine states, "My supervisor
9  told me I could work up to -- only up to 38.75
10  hours per week, even though I had frequent
11  conversations with my supervisors that it was not
12  possible to complete our work within these hours.
13       "Accordingly, I enter only 7.75 hours
14  per day, five days a week, regardless of how many
15  hours I actually worked."
16       As to the consistency in -- your
17  declaration that states "further conversations
18  with my supervisors," can you tell me at any time
19  when that occurred?
20    A.  I'm sorry, could you ask me that
21  question again?
22    Q.  Sure.  And I -- I'm looking at the
23  first sentence of declaration number nine where it
24  says "frequent conversations with my supervisors,"
25  where you were saying you couldn't complete your

Page 102
1    CONSTANCE MANGAN
2  work within these hours.
3    A.  Right.
4    Q.  Can you tell me when those
5  conversations occurred with your supervisors?
6    A.  Well, frequently we had those
7  conversations, and we had conversations outside of
8  actual official meetings.  We had conversations on
9  the phone, or conversations via email from time to
10  time.
11       So, frequent, I -- I can't really nail
12  that down I don't think to anything much more
13  specific than that.
14    Q.  And I believe from what you testified
15  to where the conversations took place would have
16  been in person, on the phone, or via email.
17       Is that right?
18    A.  Yes, that would be accurate.
19    Q.  When you had these conversations within
20  any mode of communication, was there anyone else
21  who would have been present to hear your
22  complaints, other than you and your supervisors?
23    A.  Well, for any non -- any conversation
24  not in person, it would be impossible for me to
25  answer that for anyone other than myself.

Page 103
1    CONSTANCE MANGAN
2       So for myself, I would say that I was
3  alone during those conversations.
4    Q.  Did you ever record any of these
5  conversations?
6    A.  No, I did not.
7    Q.  Under -- same page --
8    A.  Okay.
9    Q.  -- on number eleven, you state, "GEICO
10  required me to seek approval from my supervisor to
11  submit any hours worked above 38.75."
12       Which supervisor told you that?
13    A.  If I had to name a specific supervisor,
14  I can recall having that conversation with Brian
15  Portnoy, with Toni D'Agata, and I believe Dara
16  Campbell, I believe, to the best of my
17  recollection.
18    Q.  Do you recall when they had told you
19  this?
20    A.  Any time I brought up the amount of
21  hours I was actually working to complete my cases,
22  and we discussed the possibility of being paid
23  overtime for it.  So that would be when we would
24  have those conversations.  Not specific dates.  I
25  don't know.

Page 104
1    CONSTANCE MANGAN
2    Q.  Would this be consistent with -- strike
3  that.
4       Where did these conversations take
5  place?
6    A.  The -- the same as I previously
7  testified.  I believe -- I can't think of anything
8  outside of either a telephone call, or an email
9  conversation, or an in-person conversation.
10    Q.  Would it be true then it was just the
11  two of you having those conversations, nobody else
12  would be involved?
13       MS. COLE-CHU:  Objection to form.
14       THE WITNESS:  Yeah, I can only answer
15    again for myself, because I'm in my home on
16    my computer.
17       Whether or not my supervisor was alone
18    or in the presence of anybody else, I don't
19    know.  I couldn't answer that.
20  BY MS. ALBERTY:
21    Q.  So any time that you had complaints
22  that you had to exceed then the 38.75 hours in a
23  work week, Brian, Toni, Dara would then talk to
24  you about entering in overtime, correct?
25       MS. COLE-CHU:  Objection to form.



Page 105

1  CONSTANCE MANGAN
2      THE WITNESS:  Yeah, I'm going to have
3   to ask you to repeat that question again.
4  BY MS. ALBERTY:
5      Q.  Sure.
6      A.  I got a little lost in there.
7      Q.  That's okay.
8          I think you said any time you would
9  bring up the amount of time it would take for you
10 to do your job and exceed then the 38.75 hours,
11 that your supervisors would then bring up the
12 discussion of overtime?
13     A.  That's not correct.  If I testified to
14 that, then that's not correct.
15         It's -- we would constantly have
16 conversations about working hours in excess of the
17 7.75 per day.  There was a time when overtime was
18 offered, and there were times when we had
19 conversations about that offered overtime.
20     Q.  Okay, so GEICO offered overtime.  Did
21 you enter your overtime hours?
22     MS. COLE-CHU:  Objection to form.
23     THE WITNESS:  I can recall submitting
24 overtime hours on very few occasions.
25

Page 106

1  CONSTANCE MANGAN
2  BY MS. ALBERTY:
3      Q.  When you submitted your overtime hours,
4  were you paid for that overtime?
5      A.  To the best of my recollection I was
6  paid for the overtime I submitted, yes.
7      Q.  Okay, number twelve of your
8  declaration, which is going to be page three and
9  four, states "The process for requesting overtime
10 approval was onerous and deterred me from
11 reporting overtime I worked."
12     A.  I see that.
13     Q.  In -- in what way do you mean that it
14 was "onerous"?
15     A.  To me it felt onerous due to the fact
16 that I had to contact my supervisor; I had to
17 request permission to submit for overtime; I had
18 to cite a specific case or cases that I would
19 require the overtime for, and then I had to
20 specify the number of hours I anticipated needing
21 to complete that task on that day that would
22 require overtime.
23         Now, if I underestimated, I was not
24 permitted to correct it.  So if I said, "I'm going
25 to need two more hours" because, I'm guessing, it

Page 107

1  CONSTANCE MANGAN
2  could potentially be approved, and then I could
3  get two hours.
4          But the supervisors consistently told
5  us we only work 7.75 hours a day, we only work
6  38.75 hours a week, in spite of the fact that I
7  was working overtime on a regular basis every
8  week.
9      Q.  Okay.
10     A.  Okay.
11     Q.  But you -- you were already in contact
12 with your supervisors.  So contacting your
13 supervisors wasn't anything that was abnormal.
14 You were already doing that, right?
15     MS. COLE-CHU:  Objection to form.
16     THE WITNESS:  To me it's an additional
17 procedure that took time, and because I was
18 so crunched for time, and we were all so
19 pressed for time, it seemed like even the
20 smallest thing was just another layer,
21 another thing, another procedure that we had
22 to go through in order to get this process
23 done.
24         So, because of the circumstances I
25 already felt that I was in, to add another

Page 108

1  CONSTANCE MANGAN
2      thing to that was onerous and -- and to -- to
3      me excessive.
4  BY MS. ALBERTY:
5      Q.  When you made the request, how would
6  you do it?
7      MS. COLE-CHU:  Objection to form.
8      THE WITNESS:  So the request for
9      overtime, to the best of my recollection, was
10     via email to my direct supervisor.
11 BY MS. ALBERTY:
12     Q.  When you made the request for overtime,
13 was it always approved?
14     A.  To the best of my recollection, I would
15 say yes, but I made, as I said, very few requests.
16 BY MS. ALBERTY:
17     Q.  Do you recall specifically who you made
18 the request through?  And what I mean by that is
19 not just the general supervisors, like a named
20 person.
21     A.  Well, the supervisors that I had, which
22 would have been Brian Portnoy, or Toni D'Agata, or
23 Dara Campbell, going back to Kevin Moynihan, but
24 that's again possibly before 2016, so.
25     Q.  So as far as the process of emailing



Page 109
1                CONSTANCE MANGAN
2   your supervisor saying to him, "I'm going to need
3   X amount of overtime hours for these cases this
4   week," that was something that you were doing
5   while you were under the supervision of Kevin as
6   well?
7      A.   We never submitted for overtime when I
8   worked for Kevin Moynihan.  I don't even recall
9   overtime being an option when I worked for Kevin
10  Moynihan.
11         The subject of ever submitting overtime
12  came up sometime later, but I don't know when.  I
13  could not even tell you a year, because I just
14  don't recall.
15     Q.   Did you ever have the time that you
16  underestimated the amount of overtime that you
17  needed and had to go back and ask for more time?
18     A.   I never went back to ask for more time,
19  but I would sometimes work more than what I had
20  submitted for.
21     Q.   Why wouldn't you go back and ask for
22  more time?
23     A.   My understanding was that overtime was
24  discouraged, and to go back and try to get an
25  additional hour approved on top of the two hours I

Page 110
1                CONSTANCE MANGAN
2   had already requested, I didn't feel confident
3   that it would be approved, and I also did not
4   really want to have to go through another process
5   of submitting a request for an approval and
6   specifying a case for another hour of overtime,
7   especially when my -- my supervisors were saying
8   we shouldn't be doing it.
9      Q.   What do you mean -- excuse me, what do
10  you mean that you felt your overtime requests were
11  discouraged?
12     A.   Because our -- as I have stated and I
13  would tell my supervisors, there is no way I can
14  complete my investigations, my reports, within the
15  time frame of 7.75 hours a day; that in order to
16  complete my work I had to work in excess of those
17  hours on a regular basis.
18         And the response that I received from
19  my supervisors -- and that would be all of the
20  supervisors that I have named so far -- was that
21  Don't do overtime.  Work 38.75; work 7.75."
22         My response would be, "But I have to,
23  because it affects my performance evaluation.  It
24  affects my case rating.  There's no way that I can
25  do -- finish these cases if I don't work more than

Page 111
1                CONSTANCE MANGAN
2   my normally scheduled hours."
3         And they would say, "We understand, but
4   there's nothing we can do about it."
5      Q.   But you had the ability, though, to
6   still request overtime?
7      A.   The problem to my understanding with
8   requesting overtime was that affected my ability
9   to -- not my ability, I apologize.  It affected my
10  qualification to be assigned more cases.  So,
11  while I was already feeling extremely
12  overwhelmed -- I can recall having this
13  conversation with Toni D'Agata especially, not on
14  a particular date, but I can remember having this
15  conversation with her, that -- and I -- I believe
16  Dara as well -- that if you submitted say in a
17  week that you worked fifty hours, that would then
18  trigger the assignment of more cases to you,
19  because you are now available on more hours.
20         So, I'm doing the overtime to complete
21  the cases I already have -- and I'm failing to do
22  that a lot of the time -- and now if I submit all
23  of my actual overtime hours, all of the hours that
24  I was working, say fifty hours, that would then
25  trigger the assignment of additional cases adding

Page 112
1                CONSTANCE MANGAN
2   to my caseload.  And the supervisors didn't want
3   us to do that.  They knew he had an unmanageable
4   and unreasonable caseload, and they constantly
5   told me and -- and everybody -- not everybody, but
6   most the people that I spoke with and worked with
7   that I knew and had conversations with, that we
8   were limited to a 7.75-hour day, in spite of the
9   fact that we were all complaining and all saying
10  that we're all working way past that.
11         There was -- just seemed to be no
12  avenue to satisfy that problem.
13     Q.   With regard to supervisors saying
14  "Don't do overtime" -- I think that's what the
15  phrase you had stated --
16     A.   Yeah.
17     Q.   Was that ever in any type of GEICO
18  policy?
19         MS. COLE-CHU:  Objection to form.
20         THE WITNESS:  My recollection of those
21  conversations were specifically telephone
22  conversations, in-person conversations,
23  predominantly.
24  BY MS. ALBERTY:
25     Q.   Do you ever recall seeing that in an



Page 149

1    CONSTANCE MANGAN
2    A.  Specifically that's harder to answer,
3   but I know that I had discussions like that with
4   Tony Geraci, and with Dave Jones, George McManus,
5   Mark Giambalvo.
6        I mean, if I have to specifically name
7   a person or persons, I know for sure I would
8   have -- I -- not would have.  I know for sure I
9   had conversations with them about working extra
10  hours every week and not submitting overtime for
11  it.
12   Q.  Do you remember what their response
13  was?
14   A.  They were doing the same thing.
15   Q.  Was that their response?
16   A.  Yeah, there was head nodding and, "Yes,
17  that's -- we're all doing that."  Or "I worked
18  until 10:00 o'clock the other night," or "I turned
19  my computer on on the weekend."
20        It was -- that was the kind of response
21  that a we were sharing.
22   Q.  With management did you ever tell them
23  that you were working fifty to sixty hours a week
24  and that you weren't putting in your overtime for
25  those hours?

Page 150

1    CONSTANCE MANGAN
2    A.  You mean to Bill Newport specifically?
3    Q.  To your supervisors.
4    A.  My supervisors?  Absolutely.  They knew
5   how many hours I was working.  I told them I was
6   working overtime every day, yeah.
7    Q.  And you told them that --
8    A.  And they knew I wasn't putting in
9   overtime, because they would have had to approve
10  it.
11   Q.  Right, so when you told them that you
12  weren't putting in for overtime, but you were
13  working the fifty to sixty hours over --
14   A.  Right.
15   Q.  -- what would they say?
16   A.  They would say, "We know, but there's
17  nothing we can do about it."
18   Q.  Did they encourage you to put in your
19  overtime hours?
20   A.  Well, it was specifically Toni D'Agata
21  and Dara who pointed out to me that putting in
22  overtime hours would be detrimental to me.
23        So that's certainly a discouragement to
24  me, and also it seemed to be the same answer was
25  "Do 38.75 per week, 7.75 per day."

Page 151

1    CONSTANCE MANGAN
2    Q.  Did they say specifically that it would
3   be "detrimental" if you put in those hours, even
4   though you were working those hours?
5    A.  Is the question whether or not they
6   used the word "detrimental" in a conversation?
7        (Ms. Alberty nods head in the
8   affirmative.)
9    A.  I don't remember if they did or not.
10   Q.  Did you tell Bill Newport that you were
11  working fifty to sixty hours a week, that you were
12  not logging your overtime hours?
13   A.  I don't recall ever having a
14  conversation like that with them.
15   Q.  Did you tell anyone in HR?
16   A.  I did not speak to HR, no.
17   Q.  Was there any -- was there anyone that
18  worked over Bill that you would speak with?
19   A.  No.
20   Q.  Did you ever put in writing -- whether
21  to the SIUs, to the supervisors, to Bill -- that
22  you were working fifty to sixty hours a week on
23  average?
24   A.  Not to my recollection.
25   Q.  As to what weeks or how much overtime

Page 152

1    CONSTANCE MANGAN
2   was requested by your other SIUs, you were not
3   involved in approving any overtime hours for your
4   colleagues, correct?
5    A.  That's correct.
6    Q.  Did anyone -- strike that.
7        Did any of the SIUs come to you and
8   tell you more on a number amount, similar to what
9   you state in your declaration of fifty to sixty
10  hours?
11       Did any of your SIUs tell you, "Hey,
12  I'm working seventy hours typically in a week"?
13       MS. COLE-CHU:  Objection to form.
14       THE WITNESS:  To the best of my
15    recollection I can recall some people saying
16    they worked longer than I was working, which
17    I -- I found upsetting.  I'm not sure exactly
18    who.  Maybe Lou Pia, but I -- I -- I believe
19    that's the case.  I would not say a hundred
20    percent for sure.
21  BY MS. ALBERTY:
22   Q.  Would that have been in person? on the
23  phone? email?
24   A.  When I saw Lou Pia, it was always in
25  person.  I don't know that we spoke on the phone



Page 169

1  CONSTANCE MANGAN
2  BY MS. ALBERTY:
3  Q. Aside from a possible email, which I
4  think you said maybe was an email, or maybe it was
5  told to you, do you recall if it was anything that
6  was a policy that was generated from GEICO?
7     MS. COLE-CHU: Objection to form.
8     THE WITNESS: Like I guess when you ask
9   me that question I -- I -- the only thing I
10  could think of is that they are the
11  representatives of GEICO. They're my
12  supervisors. So they are representatives of
13  GEICO. So if they're telling me that that's
14  what I have to do, I am assuming that that's
15  the policy, or that that's coming from
16  somewhere else.
17     That's the way I -- I see it.
18  BY MS. ALBERTY:
19  Q. Sure, and -- and I understand that.
20     In the form -- so, say Exhibit Number
21  2. That's a policy; it's written out; it tells
22  you what the overtime eligibility is; things of
23  that nature...
24     Was there anything that was in a formal
25  document that you recall seeing that line-itemed

Page 170

1  CONSTANCE MANGAN
2  all the tasks that you needed to do for your cases
3  with the allocation of the time consideration for
4  each task?
5  A. I am not certain that there is a
6  document that says that, but I'm not certain that
7  there isn't. There might be.
8  Q. You just don't remember as you sit here
9  today?
10  A. I don't. I'm sorry.
11  Q. I know you stated that you personally
12  didn't keep any records regarding your time each
13  day that you worked, but did you keep any type of
14  daily diary, weekly diary, monthly diary of how
15  much work or tasks you completed each day, week,
16  or month?
17     MS. COLE-CHU: Objection to form.
18     THE WITNESS: Yeah, I don't have any
19   diaries. I didn't keep any diaries.
20  BY MS. ALBERTY:
21  Q. The hours it took to complete a task,
22  that would vary depending on the task and the
23  year, right?
24     MS. COLE-CHU: Objection to form.
25     THE WITNESS: What do you mean the

Page 171

1  CONSTANCE MANGAN
2   "year"?
3  BY MS. ALBERTY:
4  Q. You had said at sometime you recall a
5  task changing from forty-eight to twenty-four
6  hours. You couldn't tell me what year that was or
7  when it changed.
8     (Witness nods head in the affirmative.)
9  Q. So in theory some of these tasks
10  changed throughout the years, from what I'm
11  gathering from your testimony?
12  A. Right. Yeah, I would not be able to
13  tell you specifically when those changes occurred.
14  Q. Okay. Were you required to make an
15  entry in a case daily?
16  A. I have to think a minute.
17     I know that they used to tell you you
18  had to touch a case -- the initial receipt of the
19  case that has to be acknowledged, and then I think
20  there was -- there was definitely some sort of
21  time structure for -- and then in three days, in
22  so many days, and I don't remember exactly the
23  specifics. But there was definitely a structure
24  to that where this has to -- you have to -- you
25  can't just like sit on a case.

Page 172

1  CONSTANCE MANGAN
2     If in two weeks you have a statement
3  scheduled, that doesn't mean you do nothing on
4  that case for two weeks. You have to touch it in
5  some way. You reach out; you verify a date; you
6  do an additional computer check, whatever you
7  think might be required for the case.
8     So there was -- there had to be input
9  on cases on a regular, ongoing basis.
10  Q. Was it on a daily basis? That's the
11  question.
12  A. From my recollection and my experience,
13  I don't remember having to make a daily entry on
14  cases.
15  Q. In your declaration it states that,
16  "There was an evaluation on how many days I took
17  to close a case."
18     Walk me through that.
19  A. So there is a -- sort of a scale or a
20  metric for a case rating based on case life.
21     So, case life is the time that the case
22  is in your queue and assigned to you to the time
23  that you close it and submit it to go back to the
24  supervisor.
25     So a case life with less days is a much



Page 285

```
 1              CONSTANCE MANGAN
 2                 I N D E X
 3   DEPOSITION OF CONSTANCE MANGAN
 4   EXAMINATION BY:                    PAGE:
 5       Ms. Alberty                    5, 282
 6       Ms. Cole-Chu                   275
 7
 8         INDEX OF DEPOSITION EXHIBITS:
 9   MANGAN EXHIBITS:                   PAGE:
10   Mangan Exhibit 1. Notice of Deposition  12
11   Mangan Exhibit 2. GEICO's Associate
12   Handbook                           76
13   Mangan Exhibit 3. Training history log  79
14   Mangan Exhibit 4. Interrogatories and
15   declaration                        96
16   Mangan Exhibit 5. Answers to
17   Interrogatories                    207
18   Mangan Exhibit 6. Second Amended
19   Collective and Class Action Complaint  207
20
21      (Exhibits attached to original transcript.)
22
23
24
25
```

Page 286

```
 1              CONSTANCE MANGAN
 2        ERRATA SHEET FOR THE TRANSCRIPT OF:
     Case Name: Keith Fischer, et al. vs. GEICO
 3   Dep. Date: August 9, 2024
     Deponent:  Constance Mangan
 4
                 CORRECTIONS:
 5   Pg.  Ln.  Now Reads   Should Read   Reason
     ___  ___  _____  _____   _____
 6   ___  ___  _____  _____   _____
 7   ___  ___  _____  _____   _____
 8   ___  ___  _____  _____   _____
 9   ___  ___  _____  _____   _____
10   ___  ___  _____  _____   _____
11   ___  ___  _____  _____   _____
12   ___  ___  _____  _____   _____
13   ___  ___  _____  _____   _____
14   ___  ___  _____  _____   _____
15   ___  ___  _____  _____   _____
16   ___  ___  _____  _____   _____
17                        _____
                          Signature of Deponent
18
     SUBSCRIBED AND SWORN BEFORE ME
19   THIS____DAY OF_____, 2024
20   _____
           (Notary Public)
21
     MY COMMISSION EXPIRES: _____
22
23
24
25
```

Page 287

```
 1              CONSTANCE MANGAN
 2         ACKNOWLEDGEMENT OF WITNESS
 3      I, CONSTANCE MANGAN, do hereby acknowledge
 4   that I have read and examined the foregoing
 5   testimony, and the same is a true, correct and
 6   complete transcription of the testimony given by
 7   me, and any corrections appear on the attached
 8   Errata sheet signed by me.
 9   _____   _____
10      (DATE)               (SIGNATURE)
```

Page 288

```
 1              CONSTANCE MANGAN
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6         I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9         That CONSTANCE MANGAN, the witness
10   whose deposition is hereinbefore set forth, was
11   duly sworn by me and that such deposition is a
12   true record of the testimony given by the witness.
13         I further certify that I am not related
14   to any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17         IN WITNESS WHEREOF, I have hereunto set
18   my hand this 14th day of August, 2024.
19
20            _Kim M. Brantley_
21              Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

