# Exhibit 24

## Page 1

```
 1
 2
            UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NEW YORK
 3    -----------------------------
 4  KEITH FISCHER, MICHAEL
    O'SULLIVAN, JOHN MOESER, LOUIS
 5  PIA, THOMAS BARDEN, CONSTANCE
    MANGAN, and CHARISE JONES,
 6  Individually and on behalf of
    All others similarly situated,
 7
              Plaintiffs,
 8
          vs.      No. 2:23 Civ. 2848(GRB)(ARL)
 9
    GOVERNMENT EMPLOYEES INSURANCE
10  COMPANY d/b/a GEICO,
11            Defendant.
    -----------------------------
12
13
14
15    VIDEOTAPED DEPOSITION OF MICHAEL O'SULLIVAN
16              New York, New York
17            Monday, August 26, 2024
18
19
20
21
22  Reported by:
    Yaffa Kaplan
23  JOB NO. 11574176
24
25
```

## Page 2

```
 1
 2              August 26, 2024
 3              10:00 a.m.
 4
 5        Deposition of MICHAEL O'SULLIVAN,
 6  held at the offices of Esquire Deposition
 7  Solutions, 1225 Franklin Avenue, Garden
 8  City, New York, pursuant to Replace, before
 9  Yaffa Kaplan, a Notary Public of the State
10  of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2  A P P E A R A N C E S:
 3
 4        OUTTEN & GOLDEN LLP
 5        Attorneys for Plaintiffs
 6              685 Third Avenue, 25th Floor
 7              New York, New York 10017
 8        BY:   SABINE JEAN, ESQ.
 9
10        DUANE MORRIS LLP
11        Attorneys for Defendant
12              190 South LaSalle Street, Suite 3700
13              Chicago, Illinois 60603
14        BY:   TIFFANY E. ALBERTY, ESQ.
15
16  ALSO PRESENT:
17        JOSEPH BARLETTA - Videographer
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3  by and between counsel for the respective
 4  parties hereto, that the filing, sealing and
 5  certification of the within deposition shall
 6  be and the same are hereby waived;
 7        IT IS FURTHER STIPULATED AND AGREED
 8  that all objections, except as to the form
 9  of the question, shall be reserved to the
10  time of the trial;
11        IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be signed
13  before any Notary Public with the same force
14  and effect as if signed and sworn to before
15  the Court.
16
17
18
19
20
21
22
23
24
25
```



Page 29

1          M. O'Sullivan
2    Q.   Yes.
3    A.   I believe I was 65.
4    Q.   At any time from when you started, all
5  the way until you retired in May of '22, did your
6  level ever change?
7    A.   No.
8    Q.   Do you know what the other levels would
9  have been?
10    A.   I believe a lead security -- senior
11  security lead investigator, is a level 66.
12    Q.   Do you know if there is any other
13  levels?  Like level 80 is so-and-so or level 30 is
14  so-and-so?
15    A.   Not that I know of, no.
16    Q.   What were your duties and
17  responsibilities as a senior security investigator?
18    A.   I was hired by GEICO to be on the
19  medical team.
20    Q.   What does that mean?
21    A.   I did medical fraud investigations, for
22  the most part.
23    Q.   Were you on the medical fraud team for
24  your entire tenure?
25    A.   Yes.  I say yes, but there was a short

Page 30

1          M. O'Sullivan
2  period where they tried to integrate everybody into
3  doing everything, but it -- I don't think it worked
4  out the way they wanted it.
5       So we ended up going back to, you know,
6  what we call the car guys and medical guys.  So I
7  went back to the medical side.
8    Q.   Do you remember when that integration
9  occurred?
10    A.   I have no recollection time-frame-wise.
11    Q.   When you say the car guys versus the
12  medical guys, what is the car guys?
13    A.   Car guys do investigations.  Auto
14  accidents.  I guess auto damage, auto-body fraud.
15    Q.   Did you ever have a title as senior
16  field security investigator?
17    A.   I'm sorry, repeat that.
18    Q.   Sure.  Did you ever have the title,
19  senior field security investigator?
20    A.   I believe the title was always senior
21  security investigator.
22       I don't recall them ever being -- I
23  mean, you were considered the field investigator,
24  but you -- I believe if you look in the directory,
25  company directory, I was a senior security

Page 31

1          M. O'Sullivan
2  investigator.
3    Q.   Do you recall if there was any
4  difference in title between being a senior field
5  security investigator or a senior outside security
6  investigator?
7    A.   I would believe that's the same title.
8    Q.   Throughout your tenure at GEICO, did you
9  ever supervise any employees?
10    A.   No.
11    Q.   Were there any requirements for your
12  position as a senior security investigator?
13    A.   Not that I recall.  Not that I know of,
14  I should say.
15    Q.   When you first started at GEICO, what
16  were your hours?
17    A.   Basically you worked seven hours, 7.75.
18  But it was an eight-and-a-half hour day.
19    Q.   Did you have specific hours where you
20  had to clock in, clock out?
21    A.   No.
22    Q.   So for that 7.75 in the day, can you
23  allocate the hours to whatever would work that day
24  for you?
25    A.   Yes.

Page 32

1          M. O'Sullivan
2    Q.   Was that considered flextime?
3    A.   Yes.
4    Q.   Did you have that flextime ability
5  throughout your entire tenure at GEICO?
6    A.   Yes.
7    Q.   So focusing merely on that role, the
8  2016 until your retirement time frame, who was your
9  supervisor?
10    A.   I had several supervisors.  In the '16
11  to '22 time frame, I believe I had Dara Campbell,
12  Toni D'Agata and Brian Portnoy.
13    Q.   Do you recall if all three of those
14  individuals were your supervisors at the same time?
15    A.   I'm sorry, if what?
16    Q.   Sure.  So with Dara Campbell, Toni
17  D'Agata and Brian Portnoy; were all three of those
18  individuals your supervisors at the same time?
19    A.   Oh, no.  No.  It's when they realign
20  teams, you would be shifted to a different
21  supervisor.
22    Q.   Do you know when that phase out and
23  transition would have occurred with the
24  supervisors?
25    A.   I don't recall.



Page 65

M. O'Sullivan

1
2    So it states, "Since" -- sorry, I will
3    wait 'till you get there.
4        It states, "Since January 2020, GEICO
5    classified me and other special investigators as
6    nonexempt employees who were eligible for overtime
7    pay at one-and-one-half times my regular rate if I
8    worked over 40 hours a week."
9        Do you recall what the one-and-one-half
10   times rate would have been at that time?
11   A.   No.
12   Q.   "That said, prior to January 2020, GEICO
13   classified me and other special investigators as
14   nonexempt employees eligible for overtime pay, but
15   they used a different method of payment.  My
16   understanding of this payment method called
17   'premium pay' was that it was less than my regular
18   rate."
19       What was the premium pay amount, if you
20   know?
21   A.   No.
22   Q.   Where was that -- this -- where does
23   this information come from?
24       Meaning, the change and the payment
25   method type now called premium pay?

Page 66

M. O'Sullivan

1
2    A.   I guess it came from management.  I
3    don't --
4    Q.   Do you know as you sit here today,
5    though?  Like, who told you any of this
6    information?
7    A.   No.  I don't recall actually who
8    furnished me with that information.
9    Q.   And I am just trying to understand to do
10   a reflection, which is the premium pay versus the
11   one-and-one-half times regular rate.
12       Do you have any idea what that
13   dollar-amount difference would have been?
14   A.   I recall the premium pay was actually
15   less than regular pay.  It wasn't even
16   straight-time pay.  It was less than regular pay.
17   Q.   But do you remember what that amount
18   was?
19   A.   No, I don't.
20   Q.   Was the premium rate ever indicated on
21   your pay slips?
22   A.   I don't -- I don't know.  I don't recall
23   how it was indicated on the pay stub.
24   Q.   Do you recall seeing any type of written
25   policy regarding the premium pay that you are

Page 67

M. O'Sullivan

1
2    referencing in paragraph number 5?
3    A.   I don't know.
4    Q.   As far as when you said management would
5    have provided you this information, as to whom in
6    management?  Do you know?
7    A.   I don't know.
8    Q.   Let's flip to Page Number 3 of your
9    declaration under paragraph 8.
10       So it states, "I only entered 7.75
11   working hours per day, five days a week, regardless
12   of how many hours I actually worked.  I only
13   entered this amount of time because I understood,
14   based on conversations with my supervisor, that
15   GEICO would not authorize overtime pay, 'just for
16   typing.'  Meaning, writing my case reports as
17   required -- as required by my job."
18       Which supervisor are you referring to in
19   paragraph number 8?
20   A.   Brian Portnoy.
21   Q.   As to paragraph number 8 for our other
22   supervisors that I believe you testified to, Dara
23   Campbell and Toni D'Agata, do you recall them
24   saying anything to this degree?
25   A.   No.

Page 68

M. O'Sullivan

1
2    Q.   When did the conversation with Brian
3    Portnoy take place about, "just for typing"?
4    A.   I don't recall a time frame.
5    Q.   Do you remember if this was over the
6    phone, via text, e-mail?
7    A.   I believe it was over the phone.
8    Q.   To your knowledge, was anyone else
9    present for this conversation?
10   A.   No.
11   Q.   Did you have any custom and practice
12   that you would record any conversations with
13   supervisors or other employees of GEICO?
14   A.   No.
15   Q.   Was this a one-time occurrence?
16   A.   Basically, yes.
17   Q.   Was there anything else substantively
18   from this conversation that you recall outside of
19   the specifically, just for typing?
20   A.   No.
21   Q.   Was the reference for just for typing
22   only allocated to the case reports that you would
23   do?
24   A.   Yes.
25   Q.   And I just want to make sure we are



Page 69

1          M. O'Sullivan
2  talking about the same thing for case reports.
3          Were those the same things where you
4  made a determination of fraud or not fraud?
5      A.   Basically summarize the investigation,
6  yes.
7      Q.   Would some case summaries be short?
8      A.   Most of them were in detail, if the
9  interview went forward.  The only ones that would
10 be shorter is if the interview never went forward
11 and deemed the claimant noncooperative.
12     Q.   In a range, so I have an idea, how many
13 pages would your case summaries fluctuate?  1 to
14 50?  10?
15     A.   1 to 4, 1 to 5.
16          (O'Sullivan Exhibit 5, Answers to
17      interrogatories, marked for identification, as
18      of this date.)
19     Q.   So what's been placed in front of you
20 has been marked as Exhibit Number 5.  This is a
21 different set of answers to interrogatories which
22 GEICO propounded upon you.
23          Feel free to take a look and then just
24 let me know when you are ready.  And similar to the
25 declaration, we will look at things specifically,

Page 70

1          M. O'Sullivan
2  but just to familiarize yourself with the document.
3      A.   Okay.
4      Q.   Have you seen this before?
5      A.   Yes.
6      Q.   All right.  And I think similar to
7  Exhibit Number 4, go to the last page, Page 17.
8  There is a verification page where it looks like
9  there is an electronic signature that's dated for
10 July 29, 2024.
11          Is that your electronic signature?
12     A.   Yes.
13     Q.   And similar to your custom and practice
14 before, would you review the responses to the
15 interrogatories to ensure the correctness before
16 you signed the verification page?
17     A.   I did review them, yes.
18     Q.   Let's look at interrogatory number 3.
19 That's going to be on Page 4, and then the
20 responses on 4 and 5.
21          The interrogatory states, "Describe in
22 detail any oral or written policies or procedures
23 that you contend dictated the day-to-day activities
24 that you performed during your employment with
25 GEICO during the relevant period."

Page 71

1          M. O'Sullivan
2          Your response says, in relevant parts,
3  "That plaintiff further responds, that at least on
4  one occasion he called his supervisor, Brian
5  Portnoy, requesting overtime due to case write-ups
6  he had to complete.  And his supervisor responded
7  that he can't approve overtime just for typing."
8          Is this the same conversation we were
9  discussing in paragraph 8 of your declaration?
10     A.   Yes.
11     Q.   And again, you recall this was a phone
12 conversation, but you don't know when in time it
13 was?
14     A.   I don't recall the time frame.
15     Q.   Walk me through the overtime process as
16 you recall it to be.
17     A.   As far as what?  The policy, if we were
18 going to ask for overtime?
19     Q.   Yes.
20     A.   If we were going to have to do overtime,
21 you had to get supervisor approval.
22     Q.   Was this always the policy, at least
23 from 2016 to '22?
24     A.   I believe so, yes.
25     Q.   So during that time period, say you

Page 72

1          M. O'Sullivan
2  needed to work more time for your cases, you would
3  reach out either to, at that time; Dara Campbell,
4  Toni D'Agata or Brian Portnoy?
5      A.   Actually, really didn't reach out to
6  them for overtime.  We just -- because it didn't
7  seem like the company was going to pay overtime for
8  typing, so I just typed my cases as required or as
9  needed to get the cases submitted timely.
10     Q.   Did you ever request OT through those
11 supervisors?
12     A.   Did I ever request what?
13     Q.   Did you ever request overtime through
14 those supervisors?
15     A.   I don't recall with Campbell or D'Agata.
16 Like I said, the one time with Portnoy, it was; he
17 can't authorize overtime for typing.
18          It was asked once.  And once I realized
19 it wasn't going to happen, I just did my typing as
20 necessary.
21     Q.   Did you report that conversation that
22 you had with Brian Portnoy to anyone else?
23     A.   Not that I recall.
24     Q.   I apologize if I am repeating myself.
25          To your knowledge, do you recall ever



Page 177

1         M. O'Sullivan
2         MS. ALBERTY:  Objection.
3    A.   Yes.
4         MS. JEAN:  Those are all my questions.
5         MS. ALBERTY:  Just a quick follow up.
6    EXAMINATION BY
7    MS. ALBERTY:
8    Q.   On the monthly report card, was your
9    manager ever issuing those?
10   A.   No, it was done by my immediate
11   supervisor.
12        MS. ALBERTY:  Okay.  I don't have any
13   other questions.
14   RQ      MS. JEAN:  I have a few things I want to
15   state on the record in terms of follow up, and
16   we will follow up in writing as well.
17        We would like to request documents
18   regarding underlying training documents from
19   Exhibit 3.
20        Documents listing and/or describing
21   performance metrics and eligibility standards
22   and conditions to receive annual raises.
23        Documents regarding performance
24   evaluations of plaintiff Michael O'Sullivan
25   with any metrics listed, including any

Page 178

1         M. O'Sullivan
2    coaching plan.
3         Any written policy described in
4    performance evaluation metrics and/or a number
5    scale.
6         Any documents involve describing
7    caseload metrics, including time frames for
8    case assignments.
9         Any documents describing productivity
10   metrics.
11        Any monthly report cards issued by your
12   supervisors for Michael O'Sullivan.
13        Any documents for metrics that would
14   require a coaching plan.
15        And any documents referencing
16   time-in-progress compliance or TIP compliance,
17   and any metrics associated with that.
18        MS. ALBERTY:  Okay.
19        THE VIDEOGRAPHER:  I am going to sign us
20   off.
21        This concludes the video deposition of
22   Michael O'Sullivan.  The time now is
23   approximately 3:21 p.m.
24        We are off the record.
25        (Time noted: 3:21 p.m.)

Page 179

1              M. O'Sullivan
2    _____.
3    MICHAEL O'SULLIVAN
4
5    Subscribed and sworn to before me
6    this ____ day of _____, 2024.
7
8    _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1              M. O'Sullivan
2         C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                        : ss.
5    COUNTY OF QUEENS     )
6
7         I, YAFFA KAPLAN, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10        That MICHAEL O'SULLIVAN, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by the witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I am
18   in no way interested in the outcome of this
19   matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 3rd day of September,
22   2024.
23
24              
                YAFFA KAPLAN
25