# Exhibit 25

Page 1

```
1
2            IN THE UNITED STATES DISTRICT COURT
3           FOR THE EASTERN DISTRICT OF NEW YORK
4    - - - - - - - - - - - - - - - - - - )
5    KEITH FISCHER, MICHAEL O'SULLIVAN, )
6    JOHN MOESER, LOUIS PIA, THOMAS     ) Case No.:
7    BARDEN, CONSTANCE MANGAN, and      ) 2:23 Civ. 2848
8    CHARISE JONES, individually and    ) (GRB) (ARL)
9    on behalf of all others similarly )
10   situated,                          )
11                    Plaintiffs,       )
12        - v -                         )
13   GOVERNMENT EMPLOYEES INSURANCE     )
14   COMPANY d/b/a GEICO,               )
15                    Defendant.        )
16   - - - - - - - - - - - - - - - - - - )
17
18         REMOTE VIDEOTAPED DEPOSITION OF MICHAEL REED
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J12200420
```

Page 2

```
1                       MICHAEL REED
2               Wednesday, January 8, 2025
3
4        Remote videotaped deposition of MICHAEL REED,
5    held via Zoom, before Kim M. Brantley, Court
6    Reporter and Notary Public of the State of New
7    York.
8
9    APPEARANCES:
10   On behalf of the Plaintiffs:
11        OUTTEN & GOLDEN, LLP
12        685 Third Avenue - 25th Floor
13        New York, NY, 10017
14        (212) 245-1000
15        Email: jmcallister@outtengolden.com
16               sjean@outtengolden.com
17   BY:  JARRON D. MCALLISTER, ESQUIRE
18        SABINE JEAN, ESQUIRE
19
20
21
22
23
24
25
```

Page 3

```
1                       MICHAEL REED
2    APPEARANCES CONTINUED:
3    On behalf of the Defendant GEICO:
4        DUANE MORRIS, LLP
5        190 South LaSalle Street - Suite 3700
6        Chicago, Illinois 60603
7        (312) 499-0198
8        Email: tealberty@duanemorris.com
9    BY:  TIFFANY ALBERTY, ESQUIRE
10
11   ALSO PRESENT:
12        ROBERT PACHECO, Legal Video Specialist
13        Esquire Deposition Solutions
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       MICHAEL REED
2       P R O C E E D I N G S
3       THE LEGAL VIDEO SPECIALIST:  We are now
4    on the video record.  Today's date is January the
5    8th, 2025.  The time is 10:03 a.m., Eastern
6    Standard Time.  This begins the videoconference
7    deposition of Mr. Michael Reed in the matter of --
8    in the matter of Keith Fischer, et al., Plaintiff,
9    vs. Government Employees Insurance Company, doing
10   business as GEICO, Defendant, to be heard in the
11   United States District Court for the Eastern
12   District of New York, case number 2232848.
13       My name is Robert Pacheco.  I am the
14   remote videographer.  Your court reporter today is
15   going to be Miss Kim Brantley, both representing
16   Esquire Deposition Solutions.
17       Would counsel please introduce
18   yourselves and your affiliation, and the witness
19   will be sworn in.
20       MR. MCALLISTER:  Good morning.  My name
21   is Jarron McAllister.  I'm an attorney at
22   Outten & Golden, and I'm here with my
23   colleague, Sabine Jean.
24       MS. ALBERTY:  And Tiffany Alberty on
25   behalf of the defendant, GEICO.
```



Page 29

1          MICHAEL REED
2   stress related, I was taking extra time off
3   because of the amount of work and what was going
4   on with the company, itself.  I was a --
5   sixty-three years old at that time, and I decided
6   it was time just to retire or resign from the
7   company.
8          Q.   Going back to one of the answers that
9   you provided, FMLA, were you on FMLA up and until
10  you provided your notice and then retired?
11         A.   Just for the prior -- for the last --
12  the last month of my employment with GEICO.  That
13  was it.
14              And that FMLA was filed because I had
15  taken what they deemed my maximum number of six
16  days for the year, which was ten, and I was taking
17  some extra sick time, so I was required to become
18  FMLA, as they phrased it, so I could use my sick
19  time when I wasn't feeling well.
20         Q.   Okay.  When -- strike that.
21              From 2016 to your retirement, from your
22  recollection how many times did you apply for FMLA
23  with GEICO?
24         A.   That was the only time.
25         Q.   And when you had applied for FMLA with

Page 30

1          MICHAEL REED
2   GEICO, was everything approved?
3          A.   Yes.
4          Q.   Were you assigned to a specific person
5   to assist you with your FMLA processing?
6          A.   It was through the human resources with
7   GEICO.  I don't recall the name of the human
8   resource person that I spoke with.
9          Q.   Okay.  And there were no issues
10  whatsoever with your FMLA processing and granting.
11              Is that right?
12         A.   Not at all, not at all.
13              MR. MCALLISTER:  Objection.
14  BY MS. ALBERTY:
15         Q.   While you were with GEICO -- and let's
16  say the entirety, 2005 to 2023 -- did you ever
17  hold the title senior payment recovery examiner?
18         A.   No.
19         Q.   With your title specifically you
20  indicated you were a senior security investigator.
21              Do you know about if that was a senior
22  outside security investigator, or a senior field
23  security investigator?
24         A.   The exact title I don't know.  I was a
25  field investigator, though.

Page 31

1          MICHAEL REED
2          Q.   There's different levels of special
3   investigators.  Do you recall the level that you
4   were?
5          A.   I was a sixty-five.
6          Q.   Have you ever been a sixty-six?
7          A.   No.
8          Q.   And throughout your tenure from 2005 to
9   2023, were you always a level sixty-five?
10         A.   Yes, I was.
11         Q.   What were your duties and
12  responsibilities as a senior field security
13  investigator?
14         A.   My responsibilities were to receive
15  cases from intake.  I would receive the case, and
16  I would go ahead and work the case to its
17  entirety, and then file the end of the case and
18  the findings of the claims examiner.
19              Would you like me to go through each
20  step of when I received the case, or just?
21         Q.   Sure.  What we'll do is we'll break
22  that apart.
23              So I think you provided three different
24  prongs, which is received the case for intake,
25  work the case to entirety, and then findings to

Page 32

1          MICHAEL REED
2   the claims examiner.
3          So, once you would receive the case for
4   intake, what were some of the other
5   responsibilities and duties that you had?
6          A.   Okay, when I received the case from
7   intake via email, I would go ahead and go into the
8   claim itself with the claim number.  That case
9   would come through the -- through email.  I would
10  then go into the SICM, or the case file management
11  with GEICO, look at the concerns that the intake
12  had posted, take that claim number, go into the
13  claim, itself.  I would review the claim in its
14  entirety.  I would document the persons involved
15  in that claim, and I would go ahead and start at
16  that point also formulating a Word document for
17  the case, itself...
18         All of the persons involved in that
19  came I would go ahead and enter into SICM
20  individually, into the person's tab with all of
21  their information.  I would take all of those
22  persons and again also put them into the SICM
23  document...
24         I would formulate a plan of action at
25  that time as to what the specific concerns were of



Page 33

1          MICHAEL REED
2   the examiner, and how I was going to approach or
3   investigate that case.
4          I would contact the examiner to find
5   out again from the examiner, either by email or by
6   phone, find out what their specific concerns were
7   in regards to the claim and what their suspicions
8   were in regards to any insurance fraud...
9          Once I formulated all of that, I would
10  then do background investigations, personal
11  background investigations on each person involved
12  in the claim, any witnesses in the claim,
13  occupants, passengers, drivers, so forth.  All of
14  those background investigations were done...
15         I would then do a background
16  investigation on the vehicles involved; background
17  investigations or prior insurance claims again on
18  all of those persons involved through NICB, or
19  what's known as ISO...
20         I would run all of those persons and
21  vehicles through ISO; document all of that
22  information in my Word document, document all that
23  information into SICM.  It all had to be
24  summarized and placed into different categories
25  into the SICM report...

Page 34

1          MICHAEL REED
2          At that point I would determine
3   interviews that needed to be conducted and who
4   needed to be interviewed, whether it was in person
5   or by phone.  I would start scheduling those
6   interviews with those persons, once again either
7   by phone or in person...
8          I would go ahead and determine if there
9   was any witnesses that needed to be found or tried
10  to be contacted...
11         I would do a scene canvas of where the
12  incident occurred if possible...
13         I would go ahead and see if there was
14  any police reports or law enforcement reports in
15  regards to the claim, itself...
16         If that police report or law
17  enforcement report was not in the claim file,
18  which it very seldom was, I would then go ahead
19  and go to or contact that law enforcement agency
20  and obtain a copy of that police report or
21  incident report, whatever it would be, in regards
22  to the claim or the incident; conduct the
23  interviews with all the persons involved;
24  summarize all of those statements; speak again
25  throughout the claim and throughout my

Page 35

1          MICHAEL REED
2   investigation with the claims examiner to keep
3   them updated on what progress was being, you know,
4   done...
5          Along with all -- entering all of this
6   in the SICM, I was also -- had a Word document
7   that the Word document was basically my case file
8   in regards to the claim, to keep that Word
9   document updated with all of the information, and
10  all of that information at the end of the
11  investigation was discussed with the claims
12  examiner...
13         The claims examiner would determine
14  whether or not there was enough information at
15  that point.  There was also cases where we decided
16  at that point that examination under oath, or
17  EUOs, were needed to be conducted of any parties
18  involved, and if EUOs were needed or conducted, I
19  would go ahead and schedule those and conduct
20  those EUOs...
21         Again, after the EUOs, summarize all of
22  them, contact the claims examiner, and go ahead
23  and conclude my investigation based on the
24  information that I had...
25         If any referrals were required to

Page 36

1          MICHAEL REED
2   either the New York State Department of Insurance
3   Fraud Bureau, which is now known as something
4   different, or I would refer any of those cases or
5   claims over to NICB, the National Insurance Crime
6   Bureau, and there may be further investigation
7   through the fraud bureau with New York State or
8   with NICB.
9     Q.   With -- and thank you.  That was a
10  mouthful.
11         With regard to the claims examiner with
12  your initial step of formulating your plan of
13  action, did the claims examiner ever tell you what
14  to do?
15    A.   The claims examiner did not tell me how
16  to run my investigation, no.
17         They would -- they would possibly
18  suggest, or they may have a specific concern, but
19  my investigation was primarily my investigation.
20    Q.   With regard to making a decision as to
21  if you found a basis for insurance fraud or you
22  did not, was that a determination you made?
23    A.   I would give them the determination
24  that I felt -- or once again that determination of
25  whether or not that claim was moved forward or



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
37–40

Page 37

1           MICHAEL REED
2   paid was determined by the claims examiner in the
3   RLA, or what's known as a regional liability
4   adjustor.  They were the ones that made that
5   determination.
6       Q.   And I guess in theory would you then
7   make your recommendation, and then the claims
8   examiner would render the decision?
9       A.   Yeah, the decision was that I did not
10  handle that part of the claim, no.
11      Q.   What were your scheduled weekly hours
12  again from that 2016 to 2023 time frame?
13      A.   7:00 a.m. to 3:30 p.m., or 8:00 to 4:30
14  p.m.
15      Q.   Did you have a preferred schedule,
16  meaning the 7:00 a.m. or the 8:00 a.m.?
17      A.   The preferred was the 7:00 a.m. to
18  3:30.
19      Q.   Between that time frame in 2016 to
20  2023, did that schedule change at all, meaning the
21  7:00 a.m. time or the 8:00 a.m. time?
22      A.   By -- I did not change that frame.
23  That was my preferred time.
24      Q.   From 2016 to your resignation, do you
25  recall who your supervisor was?

Page 38

1           MICHAEL REED
2       A.   I started out working for a gentleman
3   by the name of Anthony or Tony Mazziotti.  He was
4   my direct supervisor; then I worked or Chester or
5   Chet Janik, and when I left the company I was
6   working for Toni D'Agata.
7       Q.   And from 2016 to 2023, who was your
8   manager?
9       A.   There was a Michael DeGrocco and a
10  William Newport were the last two managers that I
11  had.  Prior to that it might have been Sharyl
12  Derenthal, but once again I don't recall the
13  exact -- I know the last two.
14      Q.   Did you ever work in the office?
15      A.   No, I did not.
16      Q.   And did you ever have an inside role,
17  or were you predominantly in the field?
18      A.   It was all field.
19      Q.   So it's fair to say you did not have a
20  desk role?
21      A.   No, I did not.  I -- I'm all the way
22  over in Buffalo.  In region two, I was -- I was
23  down in Long Island.
24      Q.   Did you have flex time?
25      A.   They called it "flex time," yes.

Page 39

1           MICHAEL REED
2       Q.   Okay.  And what, to your recollection,
3   what did that mean?
4       A.   That meant that you could flex your
5   hours if needed, however that flex was never --
6   never applicable to what we did.
7       Q.   What do you mean by that?
8       A.   It means that at 7:00 a.m., I was
9   receiving cases right off the bat at 7:00 o'clock
10  or prior to 7:00 a.m.  In those cases I had to get
11  up, get on the computer, and get working on all of
12  those cases.  There was no flexibility on their
13  end.  The cases continued to come in all day.
14          So I still had to work 7:00 a.m. to
15  3:00 p.m., 3:30, but yet continue to work
16  afterwards to catch up on all the cases that I
17  received during the day.
18      Q.   Did anyone tell you how to arrange your
19  flex time?
20      A.   No.
21      Q.   Were you -- strike that.
22          Did you have the flexibility to work
23  before 7:00 a.m.?
24      A.   Did I have the flexibility?
25      Q.   Yes.

Page 40

1           MICHAEL REED
2       A.   7:00 a.m. was what they considered my
3   start time, but if needed to do extra case work, I
4   would work before 7:00 a.m., yes.
5       Q.   From 2016 to 2023 were you assigned to
6   a specific I want to say type of claim or team to
7   investigate claims?
8       A.   No, I was not.  No, I was not.
9       Q.   And what I mean by "team," do you
10  understand that there were various types of teams
11  within the New York region that others were
12  involved in?  Excuse me.
13      A.   Yes, I know there were teams, but being
14  one of only two field investigators, often the
15  area that I was at I was handling all types of
16  claims.  I was not part of any team.
17      Q.   Who was the other person that was
18  working with you in the field at that time?
19      A.   Mike Grey was out here also.
20      Q.   For the intake where you would receive
21  cases, was there a specific intake person that was
22  assigned to you?
23      A.   No.  There was just intake for region
24  two, and you would receive a case for whoever was
25  working the intake desk that day.



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
77–80

Page 77

1               MICHAEL REED
2  of GEICO that you were to follow the policies
3  outlined in your specific position such as here
4  forthwith the requirement to accurately record
5  your hours?
6      A.  I'm sorry.  What was your question?
7      Q.  Sure.  So, was it the expectation as a
8  GEICO employee, you were to follow the policies
9  outlined in the associate handbook such as the
10  ones to accurately record your hours?
11      A.  The expectation for that?  There is an
12  expectation, but the reality is you still have to
13  get your work done.  So.
14          With the amount of work that was coming
15  in, that was not feasible.  We had to work the
16  hours because the case life, the overload, and the
17  log, and the amount of cases.
18      Q.  Was it your understanding that you
19  needed to adequately record your hours?
20      A.  The 38.75 was recorded, but there was
21  hours, many hours after that that were worked
22  because of the amount of cases and the case life
23  that we were under the microscope for, with your
24  supervisor looking through your cases, wanting to
25  know why the cases weren't closed, and those cases

Page 78

1               MICHAEL REED
2  had to be worked.
3      Q.  But was it your understanding that you
4  needed to record your hours accurately?
5      A.  The 38.75 was what was recorded.
6  That's correct.  The extra hours, that was not --
7  if you want to use the frame -- up for discussion
8  with the supervisor.  There was no overtime, but
9  the amount of cases you had, there was no way that
10  you could not get that work done within that
11  timeframe.
12          Their -- their -- their thought was
13  three hours to set up a case.  That would include
14  the backgrounds, all of the setting up of the Word
15  document, and all of that information through
16  SICM.  The initial of getting the case, that's
17  before any statements, interview, anything done,
18  was three hours.
19          So, at eighteen cases per week -- you
20  could do you the math -- you're already over
21  38.75.
22          So, the question is, do you want to
23  just stick to that and let your cases linger where
24  you're going to be put on a coaching plan, or
25  you're going to be put into the fourth quartile,

Page 79

1               MICHAEL REED
2  or you're going to be losing money at the end of
3  the year because your rating and your report card
4  was bad, or are you going to work on your own to
5  get those cases caught up and get those cases
6  done?  And that's --
7      Q.  You --
8      A.  -- that's what was done.
9      Q.  You said that "they," "they said three
10  hours."  Who is "they"?
11      A.  That was a GEICO -- one of their -- and
12  I -- once again, I can't produce the document, but
13  that was what the -- the thought was of GEICO that
14  that should take you two to three hours to set up
15  your initial case.
16      Q.  As far as when you say "they," you
17  indicate GEICO.  Is that right?
18      A.  That's correct.  GEICO and -- which
19  would have been the SIU directors, the SIU
20  management.
21      Q.  Was that ever written in a policy that
22  you recall seeing?
23      A.  I don't remember seeing it in a policy,
24  but then I didn't see all of the SIU management
25  policies.

Page 80

1               MICHAEL REED
2      Q.  Was there an intranet with which you
3  can receive all of your GEICO policies as it was
4  applicable to you as a special outside
5  investigator?
6      A.  You could go into the GEICO website.
7  That's correct, for employees.
8      Q.  Okay.  So you had the accessibility to
9  see the various policies that were implemented for
10  your position and your role, right?
11      A.  Yes.
12      Q.  With regard to the policy that's in
13  front of you where it states, "All nonexempt
14  associates are required to accurately report their
15  hours worked," do you see any carveout there for a
16  differentiation of the standard 38.75 for
17  overtime?
18      A.  And what exactly do you mean by that?
19      Q.  Sure.  So I believe your testimony was
20  that you were to accurately record our 38.75 and
21  not OT, but there is nowhere in this policy that
22  it carves out those specific limitations as you
23  just stated, right?
24      A.  To work overtime?
25      Q.  Yes.



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
105–108

Page 105

1           MICHAEL REED
2  because it was just not -- it was not something we
3  do, and it was frowned upon to put any overtime
4  in.
5         So we just continued to work and do the
6  hours, and do the cases that needed to be done,
7  and the hours that they needed to be done.
8     Q.   Is it fair to say that in paragraph
9  eight these are more general statements because
10  it's only based off your experience and you don't
11  know what other people were inputting either
12  overtime or what their pay increases were or
13  their -- their evaluation processes?
14     A.   Yeah, I have no knowledge of any other
15  investigator except myself.
16     Q.   I'm going to go to number nine
17  paragraph.
18         Did you need -- sorry, did you need a
19  second, Michael, or you're okay?
20     A.   No, I'm good.
21     Q.   Okay.  Okay, so number nine, it says,
22  "My regular schedule for GEICO was either 8:00
23  a.m. to 4:30 p.m., or 7:00 a.m. to 3:30 p.m."
24         "I received case assignments as early
25  as 7:00 to ensure I was able to meet activity

Page 106

1           MICHAEL REED
2  metrics for my cases.
3         "I had to interact with these
4  assignments early in the morning.  I regularly
5  worked approximately two additional hours each day
6  in order to address case files I received on the
7  road maintaining the case life for my other cases
8  and to meet guidelines set by GEICO.
9         "I regularly did hot take a lunch
10  break.  I worked about 52.5 hours per week on
11  average."
12         I believe I read that correct.  Is that
13  right?
14     A.   You did read it correct, yes.
15     Q.   Okay.  With regard to number nine, what
16  time period is this in reference to?
17     A.   Years wise?
18     Q.   Yes.
19     A.   That would be probably at least 2015,
20  2016 until I left.
21     Q.   Okay.  And I think you said in your
22  custom and practice you would typically work that
23  7:00 a.m. to 3:30 p.m. timeframe?
24     A.   Correct.
25     Q.   How often do you allege you worked

Page 107

1           MICHAEL REED
2  through your lunch breaks on average every week?
3     A.   There was no lunch break.  There was no
4  specific lunch break.
5     Q.   I want to circle back real quick.
6         When we were talking about weekly
7  report cards, monthly report cards, end-of-year
8  evaluation, all on a rating scale of one to five,
9  in -- in assessing what the breakdown would be --
10  for example, the number of cases worked as you
11  state would be a number included on your
12  end-of-year evaluation, and that would dictate the
13  line of the one to five -- what were the actual
14  number of cases that would fall into the
15  one-to-five category?
16     A.   When -- when I left, excuse me, to get
17  a five you had to have worked at least twenty-five
18  to thirty cases per week --
19     Q.   And when you say "worked," is that --
20     A.   Excuse me, twenty-five to thirty per
21  month.
22     Q.   Sorry --
23     A.   It's okay.
24     Q.   -- to interrupt you.
25     A.   No worries.

Page 108

1           MICHAEL REED
2     Q.   When you say to work twenty-five to
3  thirty cases per week or per month, is that
4  meaning a touch point on the case?
5     A.   You had to go into your case every --
6  minimum was every four days or five days you had
7  to be in those cases or you had to be in the case
8  every day.
9         Everything had a timeframe to it.
10  Backgrounds -- once you got the case, you had
11  twenty-four hours to set up the case.  Background
12  investigations had to be done with a certain other
13  time frame.  You had to contract the insured
14  within another time frame.  You had to contact the
15  examiner with another time frame.  All of the --
16  and all of the entries into SICM had different
17  time frames attached to them.
18         So you had to keep up on your cases.
19  You had to currently work your cases, naturally
20  touch the case almost every day just to see if
21  there were any updates.  That also included going
22  back into the claim file to see if there was any
23  updates in the claim file that the examiner failed
24  to notify you of.
25     Q.   Would that time frame be conditional



Page 157

MICHAEL REED

2  there was time frames attached to all of
3  them.
4  BY MS. ALBERTY:
5      Q.   And as far as the time frame itself,
6  what then was that for the initial setup?
7      A.   Twenty-four hours for the initial
8  setup, the backgrounds; twenty-four hours to
9  contact the examiner; background investigations...
10 all of that was within the twenty-four hours, and
11 it all had to be conducted, and then there was
12 time frames after that for contacting others; it
13 would be the witnesses and so forth.
14      But all of that was involved in your
15 case, and if you did not meet those timelines,
16 your case would fail.  And if your case failed,
17 obviously that would go about against your report
18 card and of course against your evaluation,
19 because you had a case that failed.
20     Q.   So the -- so again the question was the
21 time consideration.  So, you said twenty-four, and
22 then I can't tell if you said it was an additional
23 twenty-four hours, and then you said another time
24 consideration.
25      What is the actual time consideration

Page 158

MICHAEL REED

2  in order to keep you between the first and third
3  place ranking?
4      A.   Each item that you entered into SICM
5  had a time frame attached to it: Twenty-four hours
6  to set up your additional case, do your
7  backgrounds; then you had an additional
8  twenty-four hours for time -- from the time -- and
9  I'm just going off from what I can recall, because
10 it's been a while -- to contact the insured; you
11 had to contact the claims examiner within
12 twenty-four hours; you had to have all of your
13 initial plan of action and your report all done
14 into SICM under that plan of action and all of
15 those items added, most of within the first
16 twenty-four hours of receiving that case.
17     Q.   Okay, so you said twenty-four plus
18 twenty-four.  So again, is it twenty-four and
19 forty-eight hours, or is it twenty-four only?
20     A.   Twenty-four.  I'm sorry I confused you.
21     Q.   That's okay.
22      And is it your testimony that the
23 twenty-four allocation of time is what would keep
24 you in the first to third rating?
25     MR. MCALLISTER:  Objection.

Page 159

MICHAEL REED

2      THE WITNESS:  There was -- there was
3  items -- there was other items that would
4  keep you in that first to third rating, but
5  time frame, time and process, case life, case
6  closure, all of that is what you had to
7  maintain with those cases to stay out of that
8  dreaded fourth quartile.
9  BY MS. ALBERTY:
10     Q.   Were you required to make a daily entry
11 in each one of your cases?
12     A.   I'm trying to recall.  I know that you
13 had to touch the case at least every four days.  I
14 believe it was four or five days that you had to
15 at least go into the case every four or five days.
16      Now that would be sometimes if you --
17 you got your initial case, you got everything done
18 on say Monday, and everything was completed, but
19 you talked to the attorney, and the attorney's not
20 available until the following week, you had to
21 just note within that first week that you reviewed
22 the claim file and that you reviewed the case.
23 But in the case it would say that your interview
24 was set for the following week with the attorney.
25      So there was some variables on that

Page 160

MICHAEL REED

2  time frame, because not all witnesses are
3  available within twenty-four hours or within a
4  couple days, and especially with attorneys, and if
5  you have four or five cases, you've already got
6  people scheduled for interviews when you're
7  getting those additional cases, so it's all pushed
8  out.
9      Q.   So then it appears that you have to
10 touch the case every four to five days to keep you
11 in good standing?
12      Does that sound right?
13     A.   That would be correct.
14     Q.   All right.  And how many days were you
15 provided to close a case to stay in good standing,
16 so that one to third rating?
17     A.   You had to maintain a constant flow of
18 the case to close it out.  That's what they looked
19 at.  The case could not sit for days while you did
20 nothing in it before you closed it out.
21      Certain cases, obviously they felt that
22 cases could be closed quicker than other cases.
23 So a theft case may take longer than just to
24 verify the date of loss or pick up a police
25 report, but a PIP case or a bodily injury claim



Page 201

```
 1                MICHAEL REED
 2          ACKNOWLEDGEMENT OF WITNESS
 3       I, MICHAEL REED, do hereby acknowledge
 4   that I have read and examined the foregoing
 5   testimony, and the same is a true, correct and
 6   complete transcription of the testimony given by
 7   me, and any corrections appear on the attached
 8   Errata sheet signed by me.
 9   _____   _____
10      (DATE)             (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 202

```
 1
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6            I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9            That MICHAEL REED, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13            I further certify that I am not related
14   to any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17            IN WITNESS WHEREOF, I have hereunto set
18   my hand this 20th day of January, 2025.
19
20                   Kim M. Brantley
21            Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

