# Exhibit 26

**Page 1**

```
 1                                              
 2          IN THE UNITED STATES DISTRICT COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
 4   - - - - - - - - - - - - - - - - - )
 5   KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6   JOHN MOESER, LOUIS PIA, THOMAS     ) Case No.:
 7   BARDEN, CONSTANCE MANGAN, and      ) 2:23 Civ. 2848
 8   CHARISE JONES, individually and    ) (GRB) (ARL)
 9   on behalf of all others similarly  )
10   situated,                          )
11               Plaintiffs,            )
12        - v -                         )
13   GOVERNMENT EMPLOYEES INSURANCE     )
14   COMPANY d/b/a GEICO,               )
15               Defendant.             )
16   - - - - - - - - - - - - - - - - - )
17
18        VIDEOTAPED DEPOSITION OF THOMAS BARDEN
19
20
21
22
23   Reported by:
24   Kim M. Brantley
25   Job No: J11541508
```

**Page 2**

```
 1                    THOMAS BARDEN
 2              Thursday, August 8, 2024
 3              Time: 9:59 a.m.
 4        Videotaped deposition of THOMAS BARDEN, held
 5   at Duane Morris, LLP, 1540 Broadway, 14th Floor,
 6   New York, New York, before Kim M. Brantley, Court
 7   Reporter and Notary Public of the State of New
 8   York.
 9
10   APPEARANCES:
11   On behalf of the Plaintiffs:
12        OUTTEN & GOLDEN, LLP
13        1225 New York Avenue NW - Suite 1200B
14        Washington, DC, 20007
15        (202) 847-4400
16        Email: hcolechu@outtengolden.com
17               zdsouza@outtengolden.com
18        BY:  HANNAH COLE-CHU, ESQUIRE
19             ZARKA SHABIR DSOUZA, ESQUIRE
20
21
22
23
24
25
```

**Page 3**

```
 1                    THOMAS BARDEN
 2   APPEARANCES CONTINUED:
 3   On behalf of the Defendant GEICO:
 4        DUANE MORRIS, LLP
 5        190 South LaSalle Street - Suite 3700
 6        Chicago, Illinois 60603
 7        (312) 499-0198
 8        Email: tealberty@duanemorris.com
 9   BY:  TIFFANY ALBERTY, ESQUIRE
10
11   Also On behalf of the Defendant GEICO:
12        DUANE MORRIS, LLP
13        1540 Broadway - 14th Floor
14        New York, New York 10036
15        (212) 471-1856
16        Email:  gsslotnick@duanemorris.com
17        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)
18
19   ALSO PRESENT:
20        SILVIO FACCHIN, Legal Video Specialist
21        Esquire Deposition Solutions
22
23
24
25
```

**Page 4**

```
 1        THOMAS BARDEN
 2        P R O C E E D I N G S
 3        THE LEGAL VIDEO SPECIALIST:  This is
 4   the media labeled number one in the video recorded
 5   deposition of Thomas Barden in the matter of Keith
 6   Fischer, et al., versus Government Employee
 7   Insurance Company, doing business as GEICO.
 8        This deposition is being taken in New
 9   York City, New York, on August 8th, 2024.  My name
10   is Silvio Facchin.  I am a certified legal video
11   specialist; the court reporter is Kim Brantley,
12   and we're both representing Esquire Deposition
13   Solutions.
14        We are now going on the record.  The
15   time is 10:00 a.m.
16        Counsel will state their appearances
17   for the record.
18        MS. COLE-CHU:  For the plaintiffs,
19   Hannah Cole-Chu, from Outten & Golden, and
20   with me is Zarka DSouza from Outten & Golden
21   as well.
22        MS. ALBERTY:  And Tiffany Alberty, on
23   behalf of GEICO, along with Gregory Slotnick.
24        THE LEGAL VIDEO SPECIALIST:  Will the
25   court reporter please swear in the witness.
```



Page 25

1  THOMAS BARDEN
2  Q. When you resigned in December, were you
3  still within that Albany territory?
4  A. Yes.
5  Q. During your time with GEICO, did you
6  ever transition out of the Albany territory?
7  A. No.
8  Q. I believe in the complaint, in your
9  declaration you described yourself as a special
10  investigator. Is that the same as the field
11  investigator position that we just spoke about?
12  A. I believe field investigator is
13  encompassed within all special investigators.
14  Q. Would there be other titles then that
15  you would anticipate or presume that are special
16  investigators along with your field investigator
17  position?
18      MS. COLE-CHU: Objection.
19      THE WITNESS: I would assume that there
20    are other titles that people were given.
21  BY MS. ALBERTY:
22  Q. Do you know what those other titles
23  would have been?
24  A. I'm not sure what they would have been.
25  Q. Okay. I believe you indicated a level

Page 26

1  THOMAS BARDEN
2  sixty-five special investigator. What does that
3  mean?
4  A. Basically the level I was assigned to.
5  I'm not sure what that level indicates.
6  Q. Okay. Were you ever any other level
7  while you were with GEICO?
8  A. No.
9  Q. As the -- as the field investigator,
10  what were your duties and responsibilities?
11  A. We were --
12      MS. COLE-CHU: Objection. Sorry.
13      THE WITNESS: We were assigned auto
14    fraud investigative cases. So our job was to
15    investigate the fraud that was indicated.
16  BY MS. ALBERTY:
17  Q. And that would have been within that
18  Albany territory that you told me about?
19  A. Yes.
20  Q. Did you supervise anyone?
21  A. No.
22  Q. Did anyone shadow you?
23  A. No.
24  Q. When you first started, did you shadow
25  anyone?

Page 27

1  THOMAS BARDEN
2  A. Yes.
3  Q. And who was that?
4  A. Craig Costanzo.
5  Q. How long did that occur for?
6  A. Three to four months.
7  Q. So if my math serves me right, then
8  that would have been between September of 2019 to
9  about end of December of 2019 into January of 2020
10  that you would have shadowed Craig Costanza (sic)?
11  A. Yes.
12  Q. What were the requirements for your
13  position?
14      MS. COLE-CHU: Objection.
15      THE WITNESS: Requirements? As far as?
16  BY MS. ALBERTY:
17  Q. You know, if there was any type of
18  education requirements --
19  A. Oh.
20  Q. -- any experience requirements.
21  A. I'm not sure what their requirements
22  were.
23  Q. Do you know if there was a level
24  sixty-six field investigator role at GEICO?
25  A. I don't know.

Page 28

1  THOMAS BARDEN
2  Q. Fair to say because you were a level
3  sixty-five, that's the only knowledge that you
4  have about that position is within that level
5  base, correct?
6      MS. COLE-CHU: Objection.
7      THE WITNESS: Yes.
8  BY MS. ALBERTY:
9  Q. As a senior field investigator, what
10  were your hours?
11      MS. COLE-CHU: Objection.
12      THE WITNESS: Hours were basically
13    eight hours a day.
14  BY MS. ALBERTY:
15  Q. Were they set times?
16  A. When I was hired, I was told that our
17  hours were flexible so that we could adjust to
18  whatever is required during the day regarding
19  in-person interviews, scene canvasses, EUOs that
20  had to be done, things likes that, so that we
21  could adjust our schedule according to that.
22  Q. Did you say EUOs?
23  A. Examinations under oath.
24  Q. Okay, thank you.
25  A. Sorry.



Page 101

1   THOMAS BARDEN
2
3   BY MS. ALBERTY:
4       Q.   Fair to say then you're assuming that
5   from July or August of 2020 up and until December
6   of '22 that you exceeded your forty-hour work week
7   between fifteen to twenty hours, right?
8           MS. COLE-CHU:  Objection.
9           THE WITNESS:  I'm not assuming.  I know
10      I did.
11  BY MS. ALBERTY:
12      Q.   But you didn't itemize it?
13      A.   I did not write it down and itemize
14  every minute, no.
15      Q.   Did you tell anyone that you were
16  working approximately fifty-five to sixty hours a
17  week during that time, and by this time I'm
18  talking around the July time period?
19      A.   We had meetings with supervisors and
20  discussed the time that we were actually putting
21  into cases, and how much time we were spending
22  working off the clock, yes.
23      Q.   How -- it's hard, because we're working
24  in a few different time periods, right?
25           So, for -- let's start COVID 2020,

Page 102

1   THOMAS BARDEN
2   March --
3       A.   Mm-hmm.
4       Q.   How frequent were meetings occurring?
5       A.   I believe he -- meaning Mr. Janik --
6   tried to have a complete team meeting with
7   everyone quarterly.  So every two to three months,
8   he would travel, we would meet.  This is prior
9   to -- obviously prior to March.  After that it
10  would be either Zoom, or a conference call, or
11  things like that.  He would try to do it that way.
12      Q.   Sure, but still under that time
13  condition of quarterly, regardless of the forum?
14      A.   I -- I believe, from what I understand,
15  that was his schedule to do that.  That was his
16  requirement to do that, yes.
17      Q.   Do you recall any of these quarterly
18  meetings being in person?
19      A.   Not -- at that time, once we were
20  allowed to meet again, yes, then we had meetings
21  in person again.
22      Q.   Do you remember when that occurred in
23  time?
24      A.   I don't remember the dates.
25           They -- I remember traveling to

Page 103

1   THOMAS BARDEN
2   Syracuse, Weedsport, which is the other side of
3   Syracuse, having in-person meetings with Mr. Janik
4   and other team members at that time.
5       Q.   To the best of your recollection do you
6   remember if that happened in '21 or '22?
7       A.   I don't remember when we were opened
8   back up to do that.
9            Like I said, it went -- you know, the
10  opening of COVID went in steps, as everybody
11  knows.  We were allowed to go out on the road and
12  do scene canvasses, but not allowed to meet with
13  people.  Once we were allowed to meet with people
14  again, then we started having meetings again.
15  So -- and I'm not sure what that time frame is, to
16  be honest with you.
17      Q.   All right, transitioning to number
18  nine, you state, "GEICO returned to limited field
19  operations in or about the November 2021 time
20  frame."
21           What does that mean?  What does
22  "limited field operations" mean?
23      A.   Just -- just, like I just said, we were
24  allowed to do scene canvasses, you know, things
25  that didn't take interaction with public

Page 104

1   THOMAS BARDEN
2   basically.
3            We weren't -- we still weren't allowed
4   to do interviews in person with claimants, things
5   like that, but we were allowed to at least go on
6   the road and do scene canvasses.
7            I think we were allowed to go to
8   certain police agencies that were allowed --
9   allowing us to come there, pick up police reports,
10  and that depended on the areas, things like that,
11  so.
12      Q.   Did you ever go back to the one hundred
13  percent of being able to do your position like it
14  was in 2020, January 2020?
15      A.   It did expand as we went through.  We
16  were allowed to meet with -- with claimants and
17  interview them in person again.  So I am guessing,
18  yeah, probably.
19           I never went back to meeting them in
20  their homes.  I always met them at a remote
21  location, but -- and I think most everybody else
22  did that same thing.  But, yeah, it eventually got
23  back to where we were meeting people in person,
24  doing in-person interviews.
25           We never went back as far as when I



Page 165

1  THOMAS BARDEN
2  accurately and correctly?
3      MS. COLE-CHU:  Objection.
4      THE WITNESS:  Yes.
5  BY MS. ALBERTY:
6    Q.  Do you know what would happen once you
7  had reported it, where it went then thereafter?
8    A.  It's -- far as I know it stayed within
9  that system.
10    Q.  Do you know if anybody would review it?
11    A.  Yes.
12    Q.  And who was that?
13    A.  Mr. Janik.
14    Q.  Anyone else, to your knowledge?
15      MS. COLE-CHU:  Objection.
16      THE WITNESS:  Not that I know of.
17  BY MS. ALBERTY:
18    Q.  Did you keep any separate personal
19  system that helped maintain your task list for
20  your cases, outside of the GEICO software we just
21  talked about?
22    A.  Not that I recall, no.
23    Q.  Other than this GEICO software, was
24  there any other records that you created in any
25  other capacities, so whether that was in Microsoft

Page 166

1  THOMAS BARDEN
2  Word, Power Point.
3      I don't know how software efficient you
4  are, but anything else that would keep records of
5  how much work you completed each day?
6    A.  Not that I recall, no.
7    Q.  And case reports, were those a part of
8  your job duties?
9    A.  Yes.
10    Q.  And these various task items such as
11  witness interviews, canvassing a scene, obtaining
12  a police report, were those a part of your duties
13  and responsibilities, insuring completing your
14  auto theft cases?
15    A.  Yes.
16    Q.  Do you know how long GEICO would give
17  you to investigate a case?
18      MS. COLE-CHU:  Objection.
19      THE WITNESS:  I'm not -- I don't
20    recall.
21  BY MS. ALBERTY:
22    Q.  Was one of the things in the
23  performance metrics for number twelve you indicate
24  it's "how many days I took to close out a case."
25      So as you sit here today, you don't

Page 167

1  THOMAS BARDEN
2  recall how many days GEICO would give you as a
3  field investigator to investigate a claim?
4    A.  Yeah, I don't recall at this point.
5  No.
6    Q.  Okay, let's turn to number thirteen.
7  It says, "GEICO's performance metrics and ratings
8  determined whether I was entitled to an annual
9  raise.
10      "If I failed to meet them they could
11  also lead to disciplinary action such as being put
12  on a coaching plan that will eventually lead to
13  termination."
14      What's your basis for believing that
15  disciplinary action at GEICO was based on the
16  performance metrics that you line itemized in
17  number twelve?
18      MS. COLE-CHU:  Objection.
19      THE WITNESS:  Well, because I was -- I
20    was contacted at one point by Mr. Janik who
21    told me that I didn't actually meet criteria
22    for a raise at that particular time during
23    the year, and it was due to my performance
24    evaluation.
25  BY MS. ALBERTY:

Page 168

1  THOMAS BARDEN
2    Q.  When you were ineligible for a raise,
3  did he, for example, specifically say, "Hey, on
4  the Smith matter I notice you didn't go out and
5  canvas the scene.  So because you didn't hit that
6  performance metric for that case, this is one of
7  the reasons why you're ineligible for a raise"?
8      MS. COLE-CHU:  Objection.
9  BY MS. ALBERTY:
10    Q.  Was it ever that specific?
11    A.  I don't believe it was conveyed in that
12  specific content.
13    Q.  Do you recall if there was any type of
14  written policy that stated that the metrics were
15  linked to discipline?
16    A.  Well, I know I got put on, excuse me,
17  on a coaching plan because of poor performance.  I
18  don't recall at this time if it was directly
19  related to a performance rating, or if it was just
20  simply an overall -- you know, like a specific
21  performance rating period is what I mean, or if it
22  was just kind of an ongoing supervisory notation
23  or they noticed happening.
24    Q.  When you were put on your coaching, was
25  it specifically itemized that, for example, you



Page 173

1    THOMAS BARDEN
2  investigator employee to complete certain tasks on
3  new cases such as conducting background checks and
4  other initial steps for a case.
5       "This gave me time to catch up on my
6  existing cases and close them more quickly,
7  although I was working the same number of hours,
8  but to the best of my knowledge GEICO did not
9  ultimately continue this program for special
10 investigators."
11      What is your basis for believing that
12 GEICO implemented a pilot program like this?
13   A.   That's what was told to me by Bill
14 Newport and Chet Janik.
15   Q.   Was this during the initial phone call
16 when you were placed on the coaching plan?
17   A.   I believe it was right around that
18 time.  It happened at sometime after that.  It
19 wasn't like something that happened immediately.
20   Q.   Paragraph fourteen seems to indicate
21 that the pilot program was discontinued.
22      What's your basis for believing that?
23   A.   From what I understand that was -- when
24 I left that was when that program ended.  That was
25 what I understood when I left.  Because I asked

Page 174

1    THOMAS BARDEN
2  Chet Janik when I left if they were going to
3  continue that, and he said no, that was it.
4    Q.   When did this conversation occur?
5    A.   With my supervisor?
6    Q.   Yeah.
7    A.   When I had decided to leave the
8  company.
9    Q.   Was there -- I'm trying to think in
10 time.  So it's December of '22 is when you quit.
11      Was it the same time you tendered your
12 resignation?  Was it a separate conversation after
13 that?
14   A.   I don't know if it was contiguous when
15 I told him I was leaving.  It may have been after
16 that.  I'm -- I'm not sure when that happened.
17   Q.   Who was --
18   A.   -- or when I asked him about that.
19   Q.   Who was the person that was assigned to
20 you?
21      MS. COLE-CHU:  Objection.
22      THE WITNESS:  I believe her name was
23   Marie, I believe.
24 BY MS. ALBERTY:
25   Q.   Do you know what her title was?

Page 175

1    THOMAS BARDEN
2    A.   I don't know.
3    Q.   And what did Marie do for you?
4    A.   Basically just the initial background
5  investigation of -- of the initial claimant in the
6  case.
7    Q.   Did you ever meet Marie in person?
8    A.   No.
9    Q.   Did you speak to her?
10   A.   I spoke to her on the phone
11 occasionally.
12   Q.   Did she ever indicate to you that this
13 was a temporary pilot program?
14   A.   I don't think so.
15   Q.   So ultimately Marie came in, and she
16 was helping you with your duties in running
17 background checks and the initial steps for your
18 cases.
19      Is that right?
20   A.   Correct.
21   Q.   And then these were tasks that you
22 typically did in your custom and practice as a
23 field security investigator?
24      MS. COLE-CHU:  Objection.
25      THE WITNESS:  Yes.

Page 176

1    THOMAS BARDEN
2  BY MS. ALBERTY:
3    Q.   How long was Maria assigned to you?
4    A.   I don't recall.
5    Q.   Was she still working with you in
6  December when you left?
7    A.   She was still there.  I don't recall if
8  she was still doing that with my cases when I
9  resigned.
10   Q.   If the coaching took place, and it was
11 only supposed to last two or three months, and it
12 took place in the spring or the summer of '22, it
13 then in theory would have been phased out by the
14 fall?
15      Did you ever have a subsequent
16 conversation with Bill or with Chet that now
17 you've been removed off the coaching plan?
18   A.   I don't recall if I did or not.  I
19 don't recall that conversation, if it happened.
20   Q.   Is it your understanding that you were
21 still then on this coaching plan until the end of
22 your employment?
23   A.   No, I don't believe so.
24   Q.   So you --
25   A.   I just don't recall the conversation



Page 237

```
 1                    THOMAS BARDEN
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6            I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9            That THOMAS BARDEN, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13            I further certify that I am not related
14   to any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17            IN WITNESS WHEREOF, I have hereunto set
18   my hand this 11th day of August, 2024.
19
20            _____
21                  Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

