# Exhibit 60

### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NEW YORK
 2
     KEITH FISCHER, MICHAEL        )
 3   O'SULLIVAN, JOHN MOESER,      )
     LOUIS PIA, THOMAS BARDEN,     )
 4   CONSTANCE MANGAN, and         )
     CHARISE JONES,                )
 5   individually and on behalf    )
     of all others similarly       )
 6   situated,                     )
                                   )
 7            Plaintiffs,          )  Case No:
                                   )  2:23-Civ. 2848
 8       -vs-                      )  (GRB)(ARL)
                                   )
 9   GOVERNMENT EMPLOYEES          )
     INSURANCE COMPANY d/b/a       )
10   GEICO,                        )
                                   )
11            Defendant.           )
12       The videotaped videoconference deposition of
13   LOUIS CANIGLIA, JR., called for examination, taken
14   pursuant to the Federal Rules of Civil Procedure of
15   the United States District Courts pertaining to the
16   taking of depositions, taken remotely before ALICE
17   M. SCHWINGER, CSR NO. 84-2913, a Certified
18   Shorthand Reporter of the State of Illinois, on the
19   17th day of January, A.D. 2025, commencing at 10:00
20   a.m. Central Standard Time.
21
22
23
24
```

### Page 2

```
 1   APPEARANCES:
 2        OUTTEN & GOLDEN, LLP,
 3        (685 Third Avenue, 25th Floor,
 4        New York, New York 212/245-1000,
 5        516/788-7159), by:
 6        MR. JARRON D. McALLISTER,
 7            appeared on behalf of the Plaintiffs;
 8
 9        DUANE MORRIS LLP,
10        (190 South LaSalle Street, Suite 3700,
11        Chicago, Illinois 60603,
12        312/499-6700), by:
13        MR. GREGORY TSONIS,
14            appeared on behalf of the Defendant;
15
16
17
18
19
20
21
22   REPORTED BY:  ALICE M. SCHWINGER, CSR
23                 CSR No. 84-2913.
24
```

### Page 3

```
 1        THE VIDEOGRAPHER:  We are now on the record.
 2   The time is 10:00 a.m. Central Time on January 17,
 3   2025.  This begins the videoconference deposition
 4   of Louis Caniglia, Jr., taken in the matter of
 5   Keith Fischer, et al., v. Government Employees
 6   Insurance Company.  This case is filed in the
 7   United States District Court, Eastern District of
 8   New York, Case No. 2:23 CIV 2848.
 9        My name is Brent Jordan.  I'm your
10   remote videographer today.  The court reporter is
11   Alice Schwinger.  We are representing Esquire
12   Deposition Solutions.
13        Will counsel present please identify
14   yourself and state whom you represent.
15        MR. McALLISTER:  Jarron McAllister for
16   plaintiffs from Outten and Golden representing
17   Mr. Caniglia in this deposition today.
18        MR. TSONIS:  Greg Tsonis from Duane Morris,
19   LLP, representing defendant GEICO.
20        THE COURT REPORTER:  My name is Alice
21   Schwinger, Illinois Certified Shorthand Reporter.
22   This deposition is being held via videoconferencing
23   equipment.  The witness and reporter are not in the
24   same room.  The witness will be sworn in remotely
```

### Page 4

```
 1   pursuant to agreement of all parties.  The parties
 2   stipulate that the testimony is being given as if
 3   the witness was sworn in person.
 4           (WHEREUPON, the witness was duly
 5            sworn.)
 6           LOUIS CANIGLIA, JR.,
 7   called as a witness herein, having been first duly
 8   sworn, was examined and testified as follows:
 9              EXAMINATION
10   BY MR. TSONIS:
11     Q.  Good morning, Mr. Caniglia.
12     A.  Hello.
13     Q.  Can you please state and spell your name
14   for the record?
15     A.  Yeah, my name is Louis Caniglia.  That's
16   L-o-u-i-s, last name is Caniglia, C-a-n-i-g-l-i-a.
17     Q.  All right.  What's your current address?
18     A.  10 Berry Court, Congers, that's
19   C-o-n-g-e-r-s, New York 10920.
20     Q.  Thank you.  And, Mr. Caniglia, as I
21   said, my name is Greg Tsonis.  I'm a lawyer for
22   GEICO, and I'll be taking your deposition today.
23        Have you ever been deposed before?
24     A.  No.
```



Page 77

1  Q.  Okay. Did you ever contact your
2  supervisor to report that you felt that you didn't
3  receive pay for all the hours you worked?
4  A.  Yes.
5  Q.  When did you do that?
6  A.  I really wish I could give you, like,
7  exact dates. I just -- I can't. I mean, it
8  happened -- it happened frequently, but I don't
9  know the exact dates.
10  Q.  When you say "it happened frequently,"
11  what is the "it" you're referring to?
12  A.  Requests for overtime payment.
13  Frequently, again, is not like every day, but it's
14  a culmination. So you're working -- you're working
15  the job and you're doing the work, and then after,
16  like, two weeks, you're putting ten hours a week in
17  overtime, like, then an e-mail like, look, I've
18  been working this, can I get some overtime kind of
19  thing, or a phone call, you know.
20  Q.  Okay. So just so I'm clear, the
21  conversations that you're talking about, are
22  they -- they're either via e-mail or over the
23  phone?
24  A.  I would say yes, that's correct, yes.

Page 78

1  Q.  Okay. And when you would have those
2  conversations, it sounds like part of that either
3  e-mail or conversation would be requesting
4  overtime?
5  A.  Yes.
6  Q.  All right. And those conversations,
7  though, didn't say I feel like my pay doesn't -- my
8  paycheck that I received doesn't reflect the hours
9  that I actually worked, right, as we were looking
10  at in the handbook?
11  A.  I don't --
12  MR. McALLISTER: Objection.
13  BY THE WITNESS:
14  A.  I don't know. Can you rephrase that,
15  Counsel? I think you're summarizing my statements
16  a little bit.
17  BY MR. TSONIS:
18  Q.  Right. I guess I'm trying to get
19  specifically as to an understanding as to what you
20  would say. You wouldn't say I worked, you know, 50
21  hours last week, and my paycheck does not reflect
22  that; right?
23  MR. McALLISTER: Objection.
24

Page 79

1  BY THE WITNESS:
2  A.  I don't -- if I can recall back to my
3  conversations with my supervisors, it's possible
4  that I -- I could have said something like that,
5  like I worked 20 hours overtime and my pay -- my
6  paycheck doesn't reflect that. It's possible.
7  BY MR. TSONIS:
8  Q.  But you don't recall --
9  A.  Yes.
10  Q.  You don't recall any conversation like
11  that?
12  A.  Do I recall any -- I just said that,
13  it's definitely possible that I said that to my
14  supervisors, and it fell on deaf ears.
15  Q.  So you're saying it's possible, but do
16  you recall any specific conversation like that?
17  A.  A specific date and time, no; but, yes,
18  I've definitely expressed my overtime to my
19  supervisors over the phone, and I wasn't
20  compensated for it.
21  Q.  Okay. So when you say --
22  A.  I don't know how far up that goes up the
23  line after the supervisor, if the manager or the
24  vice president or -- again, I can't attest to any

Page 80

1  of that, but I can only attest to what I told my
2  supervisor.
3  Q.  That's what I'm trying to figure out.
4  What are you claiming you specifically told your
5  supervisor?
6  A.  That I worked on cases over the 7.75
7  time period, and why is it not reflected in my
8  paycheck?
9  Q.  Did you use those precise words?
10  A.  It's possible, yeah, I might have used
11  those words, yes.
12  Q.  Okay. You're saying it's possible, I
13  guess. Do you have a recollection, or are you just
14  saying it's possible?
15  A.  I'm saying it's possible.
16  Q.  So you don't specifically recall what
17  words you might have used?
18  A.  It was a long time ago. No, I don't. I
19  don't have the conversation recorded. I'm not
20  trying to be difficult. I understand where
21  you're -- I get it. I just -- I can say that I've
22  asked for overtime during that time frame. I don't
23  know exactly what I said, though. I can't recall
24  exactly what I said.



Page 81
1  Q.  Okay.  So in those conversations, you'd
2  ask for overtime, but you don't recall specifically
3  what you said?
4  A.  No, I'd ask for overtime, and, again, I
5  don't recall exactly what I said because it was so
6  long ago.
7  Q.  Okay.  And which supervisors did you
8  have those conversations with?
9  A.  Gerry Cassagne, Toni D'Agata.
10  Q.  Any others?
11  A.  I might have had a conversation with
12  Theresa Bishop, but again, I don't know exactly the
13  time frame or what I said.
14  Q.  Okay.
15  A.  In terms of -- I know what I said, but I
16  don't -- I don't understand -- the best way to
17  answer the question is I don't exactly know what I
18  said at that particular time because it was so long
19  ago.  That's the best way I can put it.
20  Q.  Okay.  So Gerry Cassagne was your
21  supervisor throughout the time period of 2016 to
22  some point of 2021; is that right?
23  A.  I think that's right, yes.
24  Q.  All right.  Within that time period,

Page 82
1  that's a period -- that's a multi-year time period,
2  are there specific times within that multi-year
3  time period that you had these conversations with
4  Gerry Cassagne?
5  A.  I can't -- I can't again say the
6  specific times, but there were time periods that I
7  did have conversations with Gerry Cassagne, yes,
8  regarding overtime.
9  Q.  Were there some years where you didn't
10  have those conversations?
11  A.  Not that I recall.  I mean, I'm going to
12  say no to that.
13  Q.  And when you would have those
14  conversations with Gerry Cassagne, what would his
15  response be?
16  A.  Gerry's responses would be it's not --
17  overtime is not approved sometimes.  Again, it's
18  difficult to say every conversation.  Sometimes
19  overtime was approved, premium time was approved,
20  or you can't put in for overtime or you can't put
21  in for premium time.  So it's -- I understand where
22  your question is going, and I get it.  It's very
23  difficult to answer that question.  Can you be more
24  specific?

Page 83
1  Q.  Well, I guess, you're the one claiming
2  that you had conversations with Gerry Cassagne, so
3  I'm just trying to get your understanding and your
4  recollection of what his response would be.
5  A.  I mean, he was my supervisor for five
6  years.  I can't recall five years' worth of
7  conversations with the gentleman.  I mean, can you
8  recall five years of conversations with people?  I
9  mean, it's -- I'm -- again, I'm not trying to be
10  difficult.  I think I answered it the best I can,
11  so...
12  Q.  Okay.  I'm going to switch gears, but I
13  just want to close the loop on a couple of things.
14  Did you ever --
15  A.  Okay.
16  Q.  -- report to your -- as it says in the
17  associate handbook, you know, it identifies local
18  human resources manager and corporate human
19  resources.  Did you ever report to your local human
20  resources manager that your -- you didn't receive
21  pay for all the hours that you actually worked?
22  A.  I'm sorry.  Am I supposed to be
23  scrolling through something, like, to look --
24  Q.  No, you don't have to look at the

Page 84
1  document for reference.  I'm just asking you a
2  basic factual question.
3  A.  Okay.
4  Q.  Did you ever report to your local human
5  resources manager that you did not receive pay for
6  all the hours you actually worked?
7  A.  I'm going to say no.
8  Q.  All right.  Did you ever --
9  A.  Yes, no.  Sorry.
10  Q.  Did you ever report to corporate human
11  resources that you -- you did not receive pay for
12  all the hours you actually worked?
13  A.  I didn't even know we could do that, but
14  no.
15  Q.  Okay.  Were you aware that GEICO
16  maintains like a Berkshire Hathaway ethics hotline?
17  A.  Yes.
18  Q.  Did you ever report to the Berkshire
19  Hathaway ethics hotline that you did not receive
20  pay for all hours that you actually worked?
21  A.  I did not.
22  Q.  Okay.  So I'm going to drop another
23  exhibit into the chat here.  You should be getting
24  it now.  This is going to be marked as Exhibit 2,



Page 233

1  MR. McALLISTER: Objection.
2  BY THE WITNESS:
3     A.   I would disagree with that.
4  BY MR. TSONIS:
5     Q.   You don't think working additional hours
6  helped improve your metrics?
7     MR. McALLISTER: Objection.
8  BY THE WITNESS:
9     A.   I think that working the core metric
10 hours or working extra hours decreased my core
11 metric performance because if you do the math in
12 terms of hours worked versus cases closed, if you
13 increase the hours worked, it will decrease your
14 productivity.  So I was trying to be more
15 product -- I was, like, honestly trying to be more
16 productive, but it just didn't work out.
17        And I also wanted to keep the
18 investigation process as transparent.  And in a
19 way, I know investigations take a long time,
20 sometimes, but other times when you get something
21 across your desk and it's someone's insurance
22 claim, which they have a contract with GEICO, it
23 was like, okay, there's not really fraud here.  It
24 came across.  I don't know how it came across.

Page 234

1  Again, I can't attest to how it did, but I'm not --
2  I'm not going to waste somebody's time or -- you
3  know, if there's no fraud there, I'm not going to
4  investigate it as thoroughly as I would if I do
5  find fraud indicators early.  I don't know.
6  That --
7  BY MR. TSONIS:
8     Q.   Well, let me go back to what you said in
9  the beginning, though.  You said --
10    A.   Sure.
11    Q.   -- you disagree because working --
12 because you're rated from a productivity standpoint
13 on how many hours you're also spending to close
14 those cases.  Is that -- did I misstate your
15 testimony?
16    A.   How many hours am I working.  So what I
17 said was that if I -- if you -- if you closed
18 five -- let me just try to -- if you close five --
19 just say you hypothetically get five cases in a
20 week and you work 48 hours to close those five
21 cases, and then next week you get five case and it
22 only takes you 37.75, the first week that I said,
23 you would be rated less no matter what just because
24 of the number, it took you longer to work those

Page 235

1  cases.
2     Q.   Okay.  So using your analogy --
3     A.   Sure.
4     Q.   -- that would only be true if you were
5  actually entering the additional time into Workday;
6  right?
7     MR. McALLISTER: Objection.
8  BY THE WITNESS:
9     A.   No.
10 BY MR. TSONIS:
11    Q.   How would the productivity metric that's
12 assessed take into account time that you claim you
13 worked but didn't enter into the company's
14 timekeeping software?
15    A.   That's a great question.  I mean, I
16 think that's a question for GEICO management to --
17    Q.   Well, do you have any basis for thinking
18 that it was accounted for in your productivity
19 metrics?
20    A.   It was.  It was negatively accounted for
21 in terms of I was less productive for doing more
22 work.
23    Q.   How was it negatively productive --
24 negatively affecting your productivity when those

Page 236

1  hours weren't documented anywhere, according to
2  you?
3     A.   Because in the core metrics, at the end
4  of the year, if I took more time than 38.75 hours
5  to complete -- we'll use -- I'll use an example of
6  five cases.  If I could work five cases in 38.75
7  and then the next week I got ten cases, I could
8  only put 38.75 hours in.  So if I did ten cases in
9  38.7 hours, if I put more work in, which I did, I
10 could be negatively impacted on my core metrics.
11    Q.   If you were to put in ten additional
12 hours and you log those in the system, is what
13 you're saying that your productivity number would
14 be negatively affected because you are taking 48.75
15 hours to close those cases now?
16    A.   Yes, that's correct, Counsel.
17    Q.   Okay.  Now, I guess what I'm saying is
18 if you don't enter those hours and in GEICO's
19 system it looks like you're only working 38.75
20 hours to close, don't you get the benefit of the
21 increased productivity number?
22    MR. McALLISTER: Objection.
23 BY THE WITNESS:
24    A.   Maxed out at 5, and then have to deal



Page 273

1  STATE OF ILLINOIS    )
2                       ) SS:
3  COUNTY OF DUPAGE     )
4          I, ALICE M. SCHWINGER, CSR No. 84-2913,
5  a Certified Shorthand Reporter of the State of
6  Illinois, do hereby certify:
7          That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10 matters herein;
11         That the foregoing deposition transcript
12 was reported stenographically by me, was thereafter
13 reduced to typewriting under my personal direction
14 and constitutes a true record of the testimony
15 given and the proceedings had;
16         That the said deposition was taken
17 before me at the time and place specified;
18         That I am not a relative or employee or
19 attorney or counsel, nor a relative or employee of
20 such attorney or counsel for any of the parties
21 hereto, nor interested directly or indirectly in
22 the outcome of this action.
23         IN WITNESS WHEREOF, I do hereunto set my
24 hand at Woodridge, Illinois, this 21st day of

Page 274

1  January, A.D. 2025.
2
3
4                  
5
6                  Certified Shorthand Reporter
7
8
9  ALICE M. SCHWINGER, CSR No. 84-2913

Page 275

1              I N D E X
2  EXAMINATION                              PAGE
3  LOUIS CANIGLIA, JR.,
4  EXAMINATION                                 4
5  BY MR. TSONIS:
6
7              E X H I B I T S
8  Exhibit No. 1                              69
9  Exhibit No. 2                              85
10 Exhibit No. 3                              98
11 Exhibit No. 4                             102
12 Exhibit No. 5                             104
13 Exhibit No. 6                             110
14 Exhibit No. 7                             214
15 Exhibit No. 8                             224
16 Exhibit No. 9                             243
17 Exhibit No. 10                            245
18 Exhibit No. 11                            246
19 Exhibit No. 12                            249
20 Exhibit No. 13                            253

Page 276

1       DEPOSITION ERRATA SHEET
2  Our Assignment No. J12275709
3  Case Caption:  Fischer, et al
4  vs.  Government Employees Insurance Company
5      DECLARATION UNDER PENALTY OF PERJURY
6      I declare under penalty of perjury
7  that I have read the entire transcript of
8  my deposition taken in the captioned matter
9  or the same has been read to me, and
10 the same is true and accurate, save and
11 except for changes and/or corrections, if
12 any, as indicated by me on the deposition
13 errata sheet hereof, with the understanding
14 that I offer these changes as if still under
15 oath.
16      Signed on the _____ day of
17 _____, 2025.
18
19 _____
20      Louis Caniglia, Jr.