# Exhibit 62

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br> v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,<br><br>       Defendant. | No. 23 Civ. 02848 (GRB) (ARL)<br><br>**DECLARATION OF CATHERINE O'NEIL IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Catherine O'Neil, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I was retained by Plaintiffs' Counsel as an expert in the above-captioned matter. I make this declaration upon personal knowledge and would so testify if called as a witness in this case.

2. I am a Data Scientist and the Founder and CEO of O'Neil Risk Consulting and Algorithmic Auditing, Inc. ("ORCAA"), an algorithmic auditing company. I received my undergraduate degree in Mathematics from the University of California, Berkeley in 1994 and my Ph.D. in Mathematics from Harvard University in 1999. Prior to ORCAA, I taught Mathematics at Massachusetts Institute of Technology and Columbia College and worked in finance for 4 years as a quantitative analyst and risk researcher. I have published frequently over the past 25 years, including most recently *The Shame Machine: Who Profits in the New Age of Humiliation*, *Weapons of Math Destruction: How Big Data Increases Inequality and Threatens*

*Democracy*, and *Doing Data Science: Straight Talk from the Front Line*. I was also a Bloomberg Opinion columnist until 2022. A copy of my CV is attached hereto.

3. I have reviewed multiple documents that were produced by GEICO, as well as deposition testimony from this case. These sources include an excel spreadsheet bates stamped G010798 that refers to data collected by GEICO's Special Investigation Case Management (SICM) system, among other databases ("the SICM report"), a document bates stamped G010914 that contains a data dictionary for the SICM report, and the deposition transcript of William Newport, former SIU Manager. I also interviewed three former Special Investigators who are Plaintiffs or Opt-In Plaintiffs in this case.

4. The SICM report contains data showing new cases assigned, closed cases, pending cases, case impact ratio, productivity ratio, investigative events, and various performance metrics from January to August 2022. The data was categorized by investigator, supervisor, team, and month.

5. These data, together with testimony from Special Investigators, can be used to assess damages for all class members. With a full dataset covering 2017 through 2024, which I understand can be produced at later stages of the discovery process, I would be able to establish a baseline for the number of hours associated with the typical caseloads assigned to Special Investigators, and to track fluctuations in that workload over time to identify weeks when the work assigned was inconsistent with the hours reported in GEICO's timekeeping system.

**Establishing a Baseline for the Time Costs of Investigative Work**

6. Although the exact details of my anticipated report are subject to a review of evidence that will be produced later in the case, my expected approach would be as follows.

2

First, I would seek to establish a baseline by correlating the case and task assignments in the SICM dataset with the number of hours that Plaintiffs testified to.

7. The idea of the baseline analysis is to establish an estimate of the time costs of various specific kinds of work done by Special Investigators, which can be measured in different ways, such as (a) closing a case; (b) investigating a feature; (c) "impacting" a feature; (d) closing a case of a certain level/type; (e) achieving a certain "disposition type" in closing a case; or (f) performing certain "investigative activities". The SICM dataset will show how many of each kind of event were completed by a given Special Investigator in a given month.

8. These measures of workload would then need to be compared with Plaintiffs' testimony about how many hours they were actually working in that month. To corroborate the Plaintiffs' recollections, I would also review time stamp entries in SICM, emails, and other objective data to assess the accuracy of Plaintiffs' reports about typical start and end times.

9. I would then use this data to estimate how long each type of task took each Plaintiff, using a mathematical technique called a "linear regression." For example, the counts of various investigative activities completed by a given Plaintiff in a given month, along with their stated (and corroborated) hours for that month, would be one "data point" in such a regression. Considering many such data points across many Plaintiffs, the regression will estimate the average time cost (in hours) for each kind of investigative activity. This average will be useful to estimate how much work each Plaintiff did, even if the actual length of time for a given task varies slightly depending on the details.

10. Importantly, this baseline should allow me to track the relative amount of work assigned to Special Investigators throughout the relevant time period.

3

**Assessing Damages**

11. Once a baseline analysis has been conducted, the general approach to calculating damages for Special Investigators in a given month is to (1) impute the time they worked that month by applying our "baseline" regression results to the reported components of their work, and (2) compare that to the hours they reported to GEICO for that month. To do this, I would need payroll data showing hours reported and absences taken for 2017 through 2024, similar to partial records for the Plaintiffs and Opt-ins that GEICO has already produced.

12. To assess damages for Special Investigators in a given month, I would apply the regression equation to the data showing cases and tasks completed each month to get an estimate of true hours worked. Then I would subtract the Investigator's reported hours (e.g. 38.75) to get their estimated unreported hours for the month. Finally, I would multiply this by the appropriate hourly pay rate to get an estimate of damages due for the month.

13. To ensure greater accuracy, I would aim to use the different measurements of work to arrive at multiple ways of estimating workload. For example, "cases closed" would provide one measure of workload, while "investigative activities," "disposition type," or "features impacted" would offer others. Ultimately, I might take the average across the various workload estimates. Since the different ways of measuring work are related but distinct, this multi-measurement approach would provide robustness to changes over time in the frequency or time required for certain kinds of work. By comparing how the different measurements of work evolve, I could also gain insight into whether the overall mix of tasks and cases actually constitutes "more work," accounting for changes in the work process over time.

14. It may be necessary to conduct more than one such analysis to account for different kinds of cases and/or teams (e.g. desk versus field investigators), as different cases

presumably called for a different mix of case activities. The overall approach and methodology, however, would be the same for each group.

15. Each of the above analyses will give us a way to estimate Class Members' workloads despite fluctuations over time. Based on Special Investigators' testimony, one would expect to see that Class Members' workload generally increased from 2017 to the present, even when accounting for variations in the work process, type of cases handled, or supervisor, while reported hours of work stayed flat. If the analysis described here shows that measures of workload grow consistently while hours are flat, that would strongly support an inference that the number of hours reported in the workweek are an undercount of actual time worked. At a basic level, if we see that the workload doubled, we would expect the hours to double as well; and if GEICO's payroll does not reflect that expanded time, then one could infer the amount of unpaid hours based on the analysis described above.

The foregoing is true and correct to the best of my knowledge and belief.

Dated: March 12, 2025
Cambridge, MA

_____
Catherine O'Neil

Catherine H. O'Neil, Ph.D.
27 Ware Street
Cambridge, MA 02138

(617)780-1051
cathy.oneil@gmail.com

• Algorithmic auditor, CEO and founder of ORCAA (orcaarisk.com)
• Author of NYT best-selling book *Weapons of Math Destruction*
• Author of *The Shame Machine* and *Doing Data Science*
• TED Speaker
• Entrepreneur. Experience working with setting a vision while managing teams of developers and data scientists or instructors and teaching assistants while conferring autonomy, clear expectations, and continual feedback and growth.
• Advocate for women and underrepresented groups in mathematics and STEM.

**Positions Held**

• **O'Neil Risk Consulting and Algorithmic Auditing, Inc., Founder and CEO** (September 2016 – present)
I started a consulting company that helps companies and organizations manage and audit their algorithmic risks, including fairness, bias, and legal compliance.

• **Writer** (2014 – present) Author of *The Shame Machine: who profits in the new age of humiliation*, *Weapons of Math Destruction: how big data increases inequality and threatens democracy*, and *Doing Data Science: straight talk from the front line*. All three focus on cultural ramifications of big data models, advice to modelers, and related policy goals.

• **Columnist, Bloomberg Opinion** (2017 – 2022)

• **Regular weekly guest, Slate Money podcast** (2014 – 2017)

• **Data science consultant** (2015 – present)
Consumer Fraud data analysis for the Illinois Attorney General's Office.

• **Program Director, the Lede Program: Introduction to Data Practices, Columbia Graduate School of Journalism** (2014 – 2014)

• **Senior Data Scientist, Johnson Research Labs** (2013 – 2014)

• **Lead Data Scientist, Intent Media** (2011 – 2012)

• **Methodology Researcher, Riskmetrics** (2009 - 2011)

• **Quantitative Analyst, D.E. Shaw & Co** (2007 - 2009)

• **Assistant Professor, Barnard College Mathematics Department** (2005 - 2007)

• **Senior Postdoctoral Research Associate, M.I.T. Mathematics Department** (2003 - 2005)

• **C.L.E. Moore Instructor, M.I.T. Mathematics Department** (1999 - 2003)

**Publications**

- With Sargeant, Holli and Appel, Jacob, "Explainable Fairness in Regulatory Algorithmic Auditing", published in West Virginia Law Review, Volume 127, No. 1, pp. 79-133. Available at http://dx.doi.org/10.2139/ssrn.4756637
- "The Shame Machine," published by Random House 2022.
- with Hanna Gunn, "Near Term AI". *Ethics of Artificial Intelligence.* S. Matthew Liao (Ed.), Oxford University Press. Forthcoming.
- "Weapons of Math Destruction: how big data increases inequality and threatens democracy," published by Random House September 2016.
- "On Being a Data Skeptic," an essay published as an e-book by O'Reilly Media in October 2013.
- with Rachel Schutt, "Doing Data Science," published by O'Reilly Media in October 2013.
- "Measuring CDS Value-at-Risk", preprint available.
- with Gilles Zumbach, "Using Relative Returns to Accommodate Fat-Tailed Innovations in Processes and Option Pricing," accepted for publication by Quantitative Finance, preprint available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1488062
- "A View on the Transition from Academics to Finance," Notices of the American Mathematical Society, Volume 55 Number 6, (2008) 700-702.
- "Sampling Spaces and Arithmetic Dimension," appearing in "Number Theory, Analysis, and Geometry" in honor of Serge Lang, edited by Goldfeld, D.; Jorgenson, J.; Jones, P.; Ramakrishnan, D.; Ribet, K.; Tate, J. (Eds.) 2012, published by Springer
- with J. Cremona, T. Fisher, D. Simon, and M. Stoll, "3-descent on an Elliptic Curve, III: Algorithm," to appear in Mathematics of Computation.
- with J. Cremona, T. Fisher, D. Simon, and M. Stoll, "3-descent on an Elliptic Curve, II: Geometry," J. reine angew. Math. 632 (2009) 63-84.
- with J. Cremona, T. Fisher, D. Simon, and M. Stoll, "3-descent on an Elliptic Curve, I: Algebra," J. reine angew. Math. 615 (2008) 121-155.
- "Models of Some Genus One Curves with Applications to Descent," Journal of Number Theory, Vol. 112 (2005), No. 2, 369-385.
- "The Period-Index Problem for Elliptic Curves," Journal of Number Theory, Vol. 95, No. 2, Aug 2002, pp. 329-339.
- "Jacobians of genus one curves," Math. Res. Lett. 8 (2001), no. 1-2, 125-140.
- "Jacobians of Curves of Genus One," Harvard Ph.D. Thesis, Spring 1999.
- "Connectivity of n-tuple vertex graphs," Journal of Combinatorics, Information and System Sciences, 20 (1995) 153-159.

**Education**

- Ph.D. Mathematics, Harvard University, graduated May 1999
- B.S. Mathematics, University of California, Berkeley, graduated May 1994

**Other**

- TED Speaker, "The Era of Blind Faith in Big Data Must End". 2017.