**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated, <br><br>          Plaintiffs, <br><br>   v. <br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO, <br><br>          Defendant. | Case No. 2:23-CV-02848 <br><br>District Judge Sanket J. Bulsara <br><br>Magistrate Judge Steven L. Tiscione |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'**
<u>**MOTION FOR CLASS CERTIFICATION**</u>

Gerald L. Maatman, Jr.
(*gmaatman@duanemorris.com*)
Jennifer A. Riley
(*jariley@duanemorris.com*)
Gregory Tsonis
(*gtsonis@duanemorris.com*)
Gregory S. Slotnick
(*gsslotnick@duanemorris.com*)

**DUANE MORRIS LLP**
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000

**ATTORNEYS FOR DEFENDANT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

    A.    THE SPECIAL INVESTIGATIONS UNIT ("SIU") IS BROAD AND VARIED . 2
    B.    INVESTIGATORS DID NOT REPORT TO A "SINGLE MANAGER"............... 5
    C.    ROBUST POLICIES AND TRAINING REQUIRED INVESTIGATORS TO RECORD ALL HOURS WORKED ................................................. 6

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ..................................................................................................... 8

I.    PLAINTIFFS' PROPOSED CLASS INCLUDES UNINJURED CLASS MEMBERS WHO LACK STANDING ................................................................. 8

II.    PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEIR PROPOSED CLASS SATISFIES COMMONALITY ................................................................. 10

    A.    Plaintiffs' Assertions Concerning Lawful Policies Do Not Meet Their Burden ... 13
    B.    Courts Have Rejected Plaintiffs' Theory Of Commonality Because It Is Not Susceptible To Common Proof ................................................... 15

        1.    Putative Class Members Testified That They Did Not Work Off The Clock ........................................................................ 15
        2.    Supervisors Did Not Direct Putative Class Members To Work Off The Clock ........................................................................ 16
        3.    Putative Class Members Worked And Recorded Varying Amounts Of Overtime ..................................................................... 17
        4.    Supervisors Developed Varied Practices Regarding Advance Approval Of Overtime Work .............................................................. 17
        5.    Performance Metrics Applicable to Putative Class Members Varied Substantially ...................................................................... 19
        6.    Plaintiffs' Claimed Bases of Actual or Constructive Knowledge Are Not Susceptible to Common Proof ........................................... 20
        7.    SICM Entries Are Not Common Proof of Off-the-Clock Work .............. 23

    C.    Plaintiffs' Cases Are Distinguishable and Do Not Support a Finding of Commonality Here ............................................................... 24

III.    PLAINTIFFS FAIL TO DEMONSTRATE THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUALIZED ISSUES .................................... 25

    A.    Individualized Issues Overwhelm Any Common Factors ..................... 25

B.      Plaintiffs Lack a Reliable Class-Wide Method For Determining Liability And Damages, As Required .......................................................................................... 28

IV.    PLAINTIFFS CANNOT SATISFY TYPICALITY because THEY LACK KNOWLEDGE AS TO OTHERS' CIRCUMSTANCES ................................................... 29

CONCLUSION ............................................................................................................ 31

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41 (E.D.N.Y. 2010) .................................25

*In Re Bank of Am.*, 286 F.R.D. 572 (D. Kan. 2012) .......................................................23

*Benitez v. Valentino U.S.A., Inc.*, 2025 U.S. Dist. LEXIS 30503 (S.D.N.Y. 2025) .....................14

*Bondi v. New Rochelle Hotel Assocs.*, 2018 U.S. Dist. LEXIS 209005 (S.D.N.Y. 2018)............14

*Bowerman v. Field Asset Servs., Inc.*, 2022 WL 2433971 (9th Cir. 2022)..................................29

*Brady v. Top Ships Inc.*, 324 F. Supp. 3d 335 (E.D.N.Y. 2018)..................................................30

*Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344 (W.D.N.Y. 2011) ..................................................15

*Calvo v. City of New York*, 2017 WL 4231431 (S.D.N.Y. 2017)....................................................9

*Campbell v. City of New York*, 2021 U.S. Dist. LEXIS 40933 (S.D.N.Y. 2021) ...................21, 30

*Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999), *overruled on other grounds by In Re IPO*, 471 F.3d 24 (2d Cir. 2006) ................................................................30

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................ 8, 26, 28-29

*Cuevas v Citizens Fin. Group, Inc.*, 526 F. App'x 19 (2d Cir. 2013)............................................8

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006).................................................9, 29

*DeSilva v. N. Shore-Long Island Jewish Health Sytem*, 27 F. Supp. 3d 313 (E.D.N.Y. 2014) ................................................................................................................................27

*In Re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992) ....................................30

*Edwards v. City of New York*, 2012 U.S. Dist. LEXIS 68055 (S.D.N.Y. 2012) ..........................21

*Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. 2009)..................................24

*Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229 (E.D.N.Y. 2013) ...............................26

*Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113 (S.D.N.Y. 2011)..................................................25

*Fernandez v Wells Fargo Bank, N.A.*, 2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) ..............................................................................................13, 15, 23, 26

*Gordon v. Kaleida Health*, 2014 WL 1279170 (W.D.N.Y. 2014) ................................................15

*Gregory v. Stewart's Shops Corp.*, 2016 U.S. Dist. LEXIS 89576 (N.D.N.Y. 2016) ..................................................................................................................14, 16

*Hinojos v. Home Depot, Inc.*, 2006 WL 3712944 (D. Nev. 2006) ...............................................24

*Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014)................................15, 21

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) .......................................................24

*Lanqing Lin v. Everyday Beauty Amore Inc.,* 2019 WL 3037072 (E.D.N.Y. 2019) ...................30

*Lawrence v. NYC Med. Prac., P.C.*, 2024 U.S. Dist. LEXIS 14339 (S.D.N.Y. 2024).................25

*Li v. NY Capri Nails & Spa Inc.*, 2024 WL 708775 (S.D.N.Y. 2024)..........................................30

*Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58 (2d Cir. 2021) ...............................8

*Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83 (E.D.N.Y. 2015)...................................................31

*Marin v. Apple-Metro, Inc.*, 2017 U.S. Dist. LEXIS 165568 (E.D.N.Y. 2017) ...........................10

*Mendez v. U.S. Nonwovens Corp.*, 314 F.R.D. 30 (E.D.N.Y. 2016) .............................................12

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)......................................................................8

*Ni v HSBC Bank USA, N.A.*, 2025 U.S. Dist. LEXIS 13138 (S.D.N.Y. 2025)............................14

*Noonan v. Indiana Gaming Co.*, 217 F.R.D. 392 (E.D. Ky. 2003) ..............................................31

*Opperman v. Path, Inc.*, 2016 WL 3844326 (N.D. Cal. 2016).....................................................29

*Pichardo v. Carmine's Broadway Feast, Inc.*, 2016 WL 4379421 (S.D.N.Y. 2016)...................25

*Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516 (C.D. Cal. 2011) ............................................23

*Reid v. A-Plus Care HHC Inc*, 2024 U.S. Dist. LEXIS 240930 (S.D.N.Y. 2024) .......................26

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ..........................................................26

*Romero v. H.B. Auto. Grp., Inc.*, 2012 WL 1514810 (S.D.N.Y. 2012)...........................12, 15, 28

*Ruffo v. Adidas Am. Inc.*, 2016 WL 4581344 (S.D.N.Y. 2016).....................................................9

*Ruiz v. Citibank, N.A.*, 2015 WL 4629444 (S.D.N.Y. 2015), *aff'd*, 687 F. App'x 39 (2d Cir. 2017) ........................................................................................................ 10, 13-14

*Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279 (S.D.N.Y. 2015)........................................... 12-14, 22

*Singh v. City of New York*, 418 F. Supp. 2d 390 (S.D.N.Y. 2005) ...............................................14

*Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54 (E.D.N.Y. 2014) ...............................................................................................................10

*Sykes v. Mel S. Harris & Assocs., Inc.*, 780 F.3d 70 (2d Cir. 2015) ................................9

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ....................................................8-9

*In Re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ...........28

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................*Passim*

*White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012) ...................21

*Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397 (S.D.N.Y. 2012) ...............................24

*Zivali v. AT&T Mobility LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011).............................14

*Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61 (S.D.N.Y. 2018) ..................................28

**Federal Statutes**

29 U.S.C. § 216(b) ..........................................................................................................24

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................*Passim*

Fed. R. Civ. P. 23(a) .......................................................................................................26

Fed. R. Civ. P. 23(a)(2) ...................................................................................................11

Fed. R. Civ. P. 23(a)(3) ...................................................................................................30

Fed. R. Civ. P. 23(b)(3)..............................................................................................26, 28

**Regulations**

29 C.F.R. § 785.13 ..........................................................................................................13

**Non-Periodical Publications**

https://www.geico.com/ about/corporate/at-a-glance/ ........................................................2

## INTRODUCTION

The Court should deny Plaintiffs' motion to certify a class of so-called "Special Investigators" pursuing off the clock claims for alleged unpaid wages. Plaintiffs have not demonstrated (and cannot) that their claims have any bearing on the claims of putative class members, as Rule 23 requires. GEICO maintains robust policies requiring all investigators to record all hours worked. Plaintiffs' contention otherwise — that GEICO's lawful use of basic performance criteria, coupled with a purported desire to limit overtime worked, led to investigators' failure to accurately record their work time — fails to satisfy their burden. Plaintiffs have not and cannot show significant evidence of a common plan or scheme to subvert GEICO's policies. As a result, the Court cannot resolve Plaintiffs' claims in one stroke through consideration of common evidence.

*First,* Plaintiffs have not and cannot show that all putative class members suffered injury. At least six putative class members testified they did not work overtime, have never been pressured to work "off the clock," and that, to the contrary, they recorded and were paid for all hours worked. The inclusion of uninjured class members dooms Plaintiffs' motion, and Plaintiffs have not and cannot modify their proposed definition to exclude them.

*Second*, Plaintiffs have not demonstrated that the answer to any common question can resolve the claims of putative class members in one stroke. GEICO's policies overtly required putative class members to record all hours worked, and Plaintiffs fail to provide any significant proof of a *de facto* policy to the contrary. Without common proof of an unlawful policy, a class-wide proceeding will not generate common answers apt to drive resolution of the litigation. As a result, Plaintiffs fail to meet their burden of showing commonality.

*Third,* Plaintiffs have not demonstrated that any common question predominates over the myriad individual inquiries upon which their claims depend. Adjudicating this case will require

1

individualized mini-trials about what putative class members were told by supervisors, whether they recorded their work hours, and whether their supervisors and managers had actual or constructive knowledge of alleged off the clock work, among other inquiries, rendering class certification inappropriate.  As the Second Circuit has recognized, "where, as here, off-the-clock work is at issue, courts are disinclined to find the predominance requirement satisfied."

*Fourth*, Plaintiffs fail to meet the typicality requirement because they lack knowledge as to whether other investigators requested overtime, worked uncompensated overtime, or were denied overtime.  Further, they lack personal knowledge regarding other putative class members' experiences, particularly as to individuals that did not work in the same job titles or who worked for other supervisors.

*Fifth*, Plaintiffs lack any reliable method of measuring alleged uncompensated work time on a class-wide basis.  Plaintiffs' expert concedes uninjured class members who did not work off-the-clock are not excludable from her model, and the model relies on "hand-tuning" adjustments that would overcompensate some individuals while undercompensating others.  Plaintiffs offer an insufficient expert model with a flawed methodology.

For these reasons, discussed fully below, Plaintiffs' attempt to certify a class necessarily fails under Rule 23.

### FACTUAL BACKGROUND

**A.     THE SPECIAL INVESTIGATIONS UNIT ("SIU") IS BROAD AND VARIED**

GEICO provides various types of insurance coverage to customers in all 50 states.  *See* https://www.geico.com/_about/corporate/at-a-glance/ (last accessed May 12, 2025).  GEICO maintains various offices, including in Buffalo, New York and Melville, New York.  Until 2023, the Buffalo office was part of "Region 8," and the Melville office was part of "Region 2."  (ECF No. 62-37, Fogarty Decl. ¶¶ 13-15.)

The Special Investigations Unit ("SIU") is a unit within GEICO comprised of investigators and others devoted to investigating potential insurance fraud. Though Plaintiffs lump together individuals with varied job together as "Special Investigators"[1] the types of investigators and types of fraud they investigate vary widely. (*Id*. ¶¶ 9-29; (Mot. at 1 n.1.)

Individuals in these various jobs perform different duties. (*See, e.g.*, Ex. 1, Jones Dep. 59:5-60:7.) "Major case" investigators, for instance work only complex "major case" investigations targeting entities rather than individuals. (Ex. 52, Wolfe Decl. ¶ 12; Ex. 2, M. Fischer Dep. 61:13-62:9.) Lead Investigators, by contrast, train new investigators, conduct ride-alongs, and work particularly complex cases. (Ex. 3, K. Fischer Dep. 31:14-32:3, 76:7-18; Ex. 4, Pia Dep. 35:25-36:2, 38:11-39:3.) "Outside" investigators work in the field and remotely from their homes, while "inside" investigators worked exclusively from their computers in the Melville office, pre-COVID, and now work either in office or in hybrid roles. (Ex. 3, K. Fischer Dep. 36:11-17; Ex. 5, Mangan Dep. 28:11-12; 46:1-11; Ex. 4, Pia Dep. 43:5-19; Ex. 6, King Dep. 44:3-45:20; Ex. 2, M. Fischer Dep. 58:19-59:14; 65:13-17; Ex. 7, Barden Dep. 24:5-10; Ex. 8, Reed Dep. 27:18-22.) Some investigators have assistants to conduct tasks like customer contact and background checks, while others did not. (Ex. 7, Barden Dep. 175:15-25; Ex. 6. King Dep. 168:12-23.)

Most (but not all) Plaintiffs assigned to the Melville office were assigned to specific teams between 2018 and 2022, where they exclusively investigated specific types of fraud, such as medical fraud, staged losses, or auto body fraud. (Ex. 3, K. Fischer Dep. 32:1-3, 78:15-20; Ex. 9, Munoz Dep. 64:7-25; Ex. 5, Mangan Dep. 213:20-23; Ex. 2, M. Fischer Dep. 58:19-59:14; 65:13-

---

[1] GEICO does not concede any such group exists by using Plaintiffs' term "Special Investigators."

1; Ex. 4, Pia Dep. 53:20-54:19, 138:24-139:18; Ex. 7, Barden Dep. 36:20-24; Ex. 8, Reed Dep. 40:5-16.)  Plaintiffs who covered upstate New York, by contrast, were never divided into teams and had different case volumes.  (Ex. 8, Reed Dep. 59:22-60:13.)

Different investigations require different investigative actions and, thus, different numbers of hours to complete.  (Ex. 8, Reed Dep. 36:11-37:5, 44:6-45:12, 46:4-14; Ex. 3, K. Fischer Dep. 60:14-20; Ex. 5, Mangan Dep. 35:16-22.)  Investigators determine what tasks (such as background checks, scene surveillance, document requests, witness interviews, examinations under oath ("EUOs"), additional police reporting) are necessary to conduct an investigation and whether an investigation is concluded and a case should be closed.  (Ex. 3, K. Fischer Dep. 43:1-15, 47:14-23, 48:7-11, 63:5-7; Ex. 5, Mangan Dep. 35:13-16, 62:6-9, 71:17-72:8; Ex. 7, Barden Dep. 42:22-43:14, 80:13-21; Ex. 10, O'Sullivan Dep. 44:10-19.)

Some types of investigations can be assigned and closed within "ten minutes" or 24 hours (Ex. 3, K. Fischer Dep. 64:17-19; Ex. 4, Pia Dep. 57:21-58:12), while others take "one month minimum" or "one to six months."  (Ex. 5, Mangan Dep. 55:5-24; Ex. 10, O'Sullivan Dep. 41:5-15; *see* Ex. 8, Reed Dep. 46:15-47:8 (1 day to 6 months); Ex. 7, Barden Dep. 38:25-39:11 ("hours," "days," or "weeks" to close auto fraud cases).)  There is no way to determine in advance how many hours each investigation will require.  (Ex. 3, K. Fischer Dep. 61:2-15 (admitting that he "can't put a time on" time to close).)

Each investigator reports to an SIU supervisor, with investigators on the same "team" commonly assigned to the same supervisor.  (Ex. 3, K. Fischer Dep. 32:1-3; Ex. 4, Pia Dep. 48:8-49:6; Ex. 5, Mangan Dep. 38:20-39:1.)  For instance, field investigators outside of metro New York, such as Barden and Reed, reported to Chet Janik.  (Ex. 7, Barden Dep. 29:24-25; Ex. 8, Reed Dep. 38:2-6.)  By contrast, Jones reported to Dara Campbell and April Neyland.  (Ex. 1, Jones

Dep. 53:2-21; Ex. 9, Munoz Dep. 23:23-24:12; 52:15-18.)   Between two to ten investigators reported to each supervisor in New York.  (Ex. 53, Newport Decl. ¶¶ 7-11; Ex. 54, Neyland Decl. ¶ 3.)  Some "field" checked in with their supervisor multiple times each week, while others went weeks without checking in.  (Ex. 9, Munoz Dep. 164:3-13; Ex. 1, Jones Dep. 70:7-22.)

The schedules that Plaintiffs worked varied.  Many "field" investigators were able to "flex" their time, meaning adjust their schedules to the needs of their workload (such as to avoid or account for traffic), while others were required to complete their work within a fixed schedule. (Ex. 3, K. Fischer Dep. 36:18-37:19; Ex. 7, Barden Dep. 28:15-21; Ex. 8, Reed Dep. 38:25-39:5; Ex. 1, Jones Dep. 66:10-68:2; Ex. 9, Munoz Dep. 56:24-58:20; Ex. 5, Mangan Dep. 38:10-13; Ex. 4, Pia Dep. 52:5-11; Ex. 6, King Dep. 53:3-19; Ex. 2, M. Fischer Dep. 105:1-11, 106:15-17; Ex. 64, Portnoy Decl. ¶ 14.)  Many "field" investigators utilized flex time to manage their schedules and workloads due to significant "windshield time" (*i.e.*, drive time) that occupied portions of their workdays, except from March 2020 to November 2021, when the COVID-19 pandemic required many to work from home and to forego time-consuming tasks like scene surveillance, police department visits, and in-person statements and EUOs.  (Ex. 4, Pia Dep. 61:18-62:12; Ex. 9, Munoz Dep. 91:20-92:23; Ex. 6, King Dep. 68:25-69:10, Ex. 11, Caniglia Jr. Dep. 143:19-145:7, 146:21-147:8, 149:3-151:15; Ex. 5, Mangan Dep. 140:11-16, 144:13-15; Ex. 7, Barden Dep. 42:4-11.)  This change provided Plaintiffs more time to complete other case tasks and investigations. (Ex. 10, O'Sullivan Dep. 95:5-96:22; Ex. 6, King Dep. 111:18-112:13.)

## B.    INVESTIGATORS DID NOT REPORT TO A "SINGLE MANAGER"

Contrary to Plaintiffs' repeated assertion that all "Special Investigators" reported to supervisors who reported a "single Manager" in SIU (Mot. at 1, 16-17), SIU investigators reported up to a variety of Managers during the relevant timeframe.  From April 2017 to mid-2018, Region 2 SIU investigators reported up to SIU Manager Mike DeGrocco and began reporting to Bill

Newport when he became SIU Manager for Region 2 in 2018.  (Ex. 53, Newport Decl. ¶ 3; Ex. 12, Costanzo Dep. 21:5-23.)

Beginning in early 2019, "Special Investigators" who worked "major cases" concerning medical providers – including those with job titles of Major Case SIU Investigator, Field Major Case SIU Investigator, and Internal Major Case SIU Investigator – reported to SIU Manager Courtney Wolfe.  (Ex. 13, Newport Dep. 39:2-41:5; Ex. 52, Wolfe Decl. ¶¶ 6, 8.)  Between early 2019 and 2023, approximately 18% to 20% of the investigators in "Region 2" reported to supervisors who reported to Wolfe and not to Newport.  (Ex. 53, Newport Decl. ¶¶ 10-11, 16; Ex. 52, Wolfe Decl. ¶¶ 10-11.)

GEICO's elimination of the geography-based "Region" structure in 2023 led to additional changes.  With the dissolution of the prior "Region" structure, certain Plaintiffs, such as Craig Costanzo, and putative class members in upstate New York began reporting to supervisors in former Region 8 based in Buffalo, New York, who reported to a different manager, Patricia Woupio.  (Ex. 55, Gelderman Decl. ¶¶ 9-10.)  Investigators who worked in former Region 2 reported to supervisors who reported to Renee Cubas, while the medical "major case" investigators continued to report to supervisors who reported to Wolfe.  (*Id*. ¶ 6.; Ex. 63, Slack Decl. ¶¶ 6-7; Ex. 62, Greenman Decl. ¶ 5.)  Major case investigators who did *not* work medical provider cases but who worked in New York, however, reported up to an entirely different Manager.  (Ex. 52, Wolfe Decl. ¶ 15.)  Thus, during the relevant time-period, putative class members reported to at least six different Managers, including to as many as four different Managers at any given time.

## C.    ROBUST POLICIES AND TRAINING REQUIRED INVESTIGATORS TO RECORD ALL HOURS WORKED

At all relevant times, GEICO maintained robust policies and training applicable to "Special Investigators" that required accurate recording of all their time worked, including any overtime.

6

Although GEICO utilized the timekeeping software Workday since 2017, the mechanisms by which they recorded their time varied by investigator and by time-period. "Special Investigators" entered their total hours worked each day into Workday but, beginning in February 2023, some "Special Investigators," but not others, started using a Workday application on their mobile phones to record their start, stop, and meal period times to the minute. (Ex. 4, Pia Dep. 93:21-95:7; Ex. 9, Munoz Dep. 137:19-139:22, 178:10-179:32; Ex. 18, Grey Dep. 180:15-181:9.) When submitting time for any pay period, all GEICO associates are required to certify that their time entries are accurate and account for all their hours worked, including overtime. (Ex. 6, King Dep. 97:20-98:7; Ex. 11, Caniglia Jr. Dep. 91:14-92:20.)

GEICO's timekeeping policies appear in its Employee Handbook, which states that associates must record all hours worked and that "**[n]on-exempt associates are never allowed to work 'off the clock.'**" (Ex. 20, G000195-196; Ex. 21, G000039 (emphasis in original).) Prior versions of the Handbook similarly prohibited off-the-clock work. (*Id.*) The Handbooks explain that employees "must not work during an off-duty meal or rest break" and that "[n]o officer, manager, or supervisor may require, encourage, or suggest that a non-exempt associate work off the clock." (*Id.*) If any associate works off the clock "or believes [he or she is] being asked to work without reporting time or being properly compensated for time worked," the employee "must immediately contact Associate Relations or the Berkshire Hathaway ethics hotline." (*Id.*)

GEICO regularly trains non-exempt employees and their supervisors to ensure compliance. Accordingly, Plaintiffs and putative class members admitted they knew they are responsible for accurately entering their own hours into Workday, that they are not permitted to work off the clock, and that their supervisors are prohibited from requesting or requiring that they perform work off the clock. (Ex. 3, K. Fischer Dep. 82:12-84:8; Ex. 14, Brust Dep. 105:4-107:14, 235:20-17,

261:16-263:3; Ex. 12, Costanzo Dep. 150:4-14, 153:1-154:12, 250:8-251:22; Ex. 7, Barden Dep. 61:23-62:18; Ex. 15, Moeser Dep. 82:22-83:14; Ex. 2, M. Fischer Dep. 167:21-174:14.)

## LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule" by showing, by a preponderance of the evidence, each of the Rule 23 requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011); *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). To ensure that a class representative truly may stand in the shoes of the absent class members, a court may certify a class only after conducting a "rigorous analysis" of the evidence and finding Rule 23's requirements satisfied. *Comcast*, 569 U.S. at 33; *Wal-Mart*, 564 U.S. at 350-51; *Cuevas v Citizens Fin. Group, Inc.*, 526 F. App'x 19, 21-22 (2d Cir. 2013). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 338 U.S. at 349-50.

## ARGUMENT

## I. PLAINTIFFS' PROPOSED CLASS INCLUDES UNINJURED CLASS MEMBERS WHO LACK STANDING

Plaintiffs cannot certify the class they propose because it indisputably encompasses individuals who did not suffer injury and, therefore, lack Article III standing. Further, Plaintiffs cannot limit the proposed class to those who allegedly worked unpaid overtime, as that would lead to an impermissible fail-safe definition.

It is well settled that an individual who did not suffer an injury cannot recover damages. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 63 (2d Cir. 2021) (applying *TransUnion* and excluding uninjured

class members). The Second Circuit, accordingly, has made clear that, to certify a class, "plaintiffs must show that they can prove, through common evidence, that all class members were injured by the alleged [conduct]." *Sykes v. Mel S. Harris & Assocs., Inc.*, 780 F.3d 70, 82 (2d Cir. 2015). Ultimately, "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *Calvo v. City of New York*, 2017 WL 4231431, at *3 (S.D.N.Y. 2017) ("[I]n this Circuit, a class cannot be certified if any person captured within that definition lacks Article III standing.").

The class that Plaintiffs propose undisputedly contains multiple individuals who did not suffer any injury. Putative class members to date have testified that, although they worked as "Special Investigators" during the relevant time frame, they did not work "off the clock" and, therefore, did not suffer any injury. (Ex. 56, McDermott Decl. ¶¶ 14-17; Ex. 57, Koenig Decl. ¶¶ 22-24; Ex. 58, Sheppard Decl. ¶¶ 31-34; Ex. 59, Butler Decl. ¶¶ 20-22; Ex. 60, Bishop Decl. ¶¶ 27-29; Ex. 61, Carbonaro Decl. ¶¶ 21-24.) That alone requires denial of Plaintiffs' motion.

Plaintiffs cannot save their motion by contending the proposed class contains only a tolerable, *de minimis* number of uninjured class members. In *Denney,* the Second Circuit made clear that there is no *de minimis* exception in this Circuit and that Plaintiffs' class "must . . . be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264; *see Ruffo v. Adidas Am. Inc*., 2016 WL 4581344, at *3 (S.D.N.Y. 2016) (denying class certification in part because 0.7% defect rate "seriously undermines the proposition that every person . . . experienced harm due to the alleged defect").

Plaintiffs likewise cannot redefine their proposed class to include only those "who worked more than 40 hours per workweek but were not paid for all hours" (Mot. at 15) because it would constitute an impermissible fail-safe class. "A fail-safe class is one whose definition shields the

putative class members from receiving an adverse judgment . . . In other words, in a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Marin v. Apple-Metro, Inc.*, 2017 U.S. Dist. LEXIS 165568 at *133 (E.D.N.Y. 2017). Courts reject "fail-safe" classes because they do not bind absent class members who, by virtue of failing to prevail on the merits, are defined out of the class and not bound by the ruling. *See Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014).

Even if Plaintiffs' definition did not create fail-safe class, which it does, it fails because membership would depend on resolution of multiple individual issues for each proposed class member, including whether he or she (i) worked more than 40 hours in each workweek after April 17, 2017, and (ii) did not receive wages for some or all hours worked over 40. (Mot. at 15.) Thus, the proposed class definition "would require an adjudication of the merits of each individual's claim to determine whether [the individual is] within the class, squandering whatever efficiency gains might be had from mass litigation." *Ruiz v. Citibank, N.A.*, 2015 WL 4629444, at *7 (S.D.N.Y. 2015), *aff'd*, 687 F. App'x 39 (2d Cir. 2017). Courts routinely decline to certify such improperly defined classes. *See Marin*, 2017 U.S. Dist. LEXIS 165568 at *133 (recommending against certification where proposed subclasses' membership relied upon prevailing on NYLL claims); *Spread Enterprises, Inc.*, 298 F.R.D. at 69 (denying class certification where class definition included customers "charged excessive fees" and turned on assessment of liability).

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEIR PROPOSED CLASS SATISFIES COMMONALITY

Plaintiffs have not met the commonality requirement in Rule 23(a)(2). While Plaintiffs claim, contrary to GEICO's policies requiring investigators to record all hours worked, that GEICO supposedly created conditions that allowed otherwise, Plaintiffs fail to provide any

significant proof that any such *de facto* policy existed and pervaded SIU.  This failure also dooms their motion.

Rule 23(a)(2) requires a plaintiff seeking class certification to demonstrate "questions of law or fact common to the class."  *Wal-Mart,* 564 U.S. at 350-51.  Commonality "does not mean merely that [class members] have all suffered a violation of the same provision of law."  *Id.* at 350.  Rather, to satisfy commonality, a plaintiff must demonstrate a common question that is "of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

In *Wal-Mart*, for example, plaintiffs claimed the company discriminated against employees based on their sex by denying them equal pay or promotions through refusal to cabin managers' discretion, which led to a "corporate culture" permitting bias against women.  The U.S. Supreme Court reversed the Ninth Circuit's affirmance of class certification due to plaintiffs' failure to demonstrate commonality, explaining that "[a]ny competently crafted class complaint literally raises common 'questions' but "[r]eciting these questions is not sufficient to obtain class certification."  *Id*. at 349.  Plaintiffs must show putative class members' claims "can productively be litigated at once."  *Id.*  "[B]ridging the gap" between an individual's claim and company policy of discrimination required "significant proof" that Wal-Mart "operated under a general policy of discrimination" which, the Court determined, was "entirely absent."  *Id.*  Instead, the evidence showed a "policy" of allowing discretion by local supervisors, "just the opposite of a uniform employment practice that would provide the commonality needed for a class action."  *Id.*

Courts in the Second Circuit apply the same rules where plaintiffs assert claims for supposed "off the clock" work.  In *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (S.D.N.Y.

2015), plaintiffs sought to certify a class of employees that worked "off the clock."  Despite evidence of individual violations, Citibank's formal, companywide policies were "entirely legal and appropriate" and that plaintiffs provided "no evidence of a common plan or scheme to subvert these policies." *Id.* at 295.  The court explained that a class-wide determination of liability required demonstrating that appropriate policies "reliably translated themselves into inappropriate managerial behavior across the width and breadth of the class," but it found no such evidence.  *Id.* Putative class members were paid overtime in at least some pay periods, with wide variation between them, suggesting "the effects of Citibank's purported 'no overtime' policy were far from uniform," did not evidence common direction or a common mode of exercising discretion, and, ultimately, did not demonstrate common questions susceptible to class-wide proof.  *Id.; see Mendez v. U.S. Nonwovens Corp.*, 314 F.R.D. 30, 44 (E.D.N.Y. 2016) (requiring "'significant proof' that managers and supervisors uniformly exercised their discretion to deny class members compensation for their work" contrary to lawful policies, and finding such evidence lacking).

Similarly, here, Plaintiffs' suggestion of purported "common questions" regarding "whether GEICO failed to pay Investigators in Region 2 for all hours worked" or "whether GEICO failed to accurately record all hours worked by Investigators" miss the mark. *Romero v. H.B. Auto. Grp., Inc.*, 2012 WL 1514810, at *18 (S.D.N.Y. 2012) ("After *Dukes,* though, the fact that Plaintiff came up with a list of common questions is no longer sufficient.").  GEICO maintained lawful policies that required investigators to accurately record all time worked and prohibited off-the-clock work.  (Ex. 20, G000195; Ex. 21, G000039.)  Plaintiffs lack any proof, let alone significant proof, that, GEICO maintained a *de facto* policy or practice of failing to pay for all hours worked that extends across the putative class, contrary to its established, lawful policies.

12

A.    **Plaintiffs' Assertions Concerning Lawful Policies Do Not Meet Their Burden**

Unable to show an unlawful policy pervading the work of investigators across SIU, Plaintiffs contend that "all experienced GEICO's practices of restricting overtime, were all subject to the same overtime approval process and performance metrics, and their escalating workload was controlled by a handful of Supervisors reporting to a single Manager who was incentivized to increase it." (Mot. at 17.) Such purportedly "common" issues are far from uniform.

First, questions identifying lawful practices must drive resolution of the litigation. In *Ruiz*, the court concluded that policies such as "setting production targets" and "avoid unnecessary overtime" are "perfectly acceptable" practices. 93 F. Supp. 3d at 289-90. But common questions like ""[d]id Citibank have a national sales quota formula" or "[d]id Citibank attempt to reduce overtime hours" are "easily susceptible to class-wide proof" but "are not apt to drive the resolution of the litigation." *Id.*; *see Wal-Mart*, 564 U.S. at 355 (noting that policy of delegating significant discretion to managers over pay is "a very common and presumptively reasonable way of doing business"); *Fernandez*, 2013 WL 4540521, at *7 (arranging employees' work schedules to reduce overtime did not show "a policy to require uncompensated overtime"); 29 C.F.R. § 785.13 (requiring management "to exercise its control and see that the work is not performed if it does not want it to be performed.").

Similarly, here, Plaintiffs cannot demonstrate commonality by pointing to "perfectly acceptable" policies such as utilizing performance metrics or restricting overtime. Plaintiffs' claims depend upon demonstrating that, irrespective of GEICO's lawful policies, putative class members performed compensable work they failed to report but supervisors knew about. *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (noting that plaintiff must show "how much of that time was spent with the employer's actual or constructive knowledge"); *Zivali v. AT&T Mobility LLC*, 784 F. Supp. 2d 456, 467-68 (S.D.N.Y. 2011) (decertifying collective action

13

in part because whether each manager knew of alleged off-the-clock work required individualized determinations).

Second, where a company maintains valid policies, "it is to be presumed that 'most managers' operate in accordance with the law, rather than in violation of it." *Ruiz*, 93 F. Supp. 3d at 291 (citing *Dukes*, 564 U.S. at 355). Thus, plaintiffs are tasked with showing "the *de facto* practices and policies of which they complain are sufficiently uniform and pervasive as to warrant class treatment." *Gregory v. Stewart's Shops Corp.,* 2016 U.S. Dist. LEXIS 89576, at *41 (N.D.N.Y. 2016). Though in *Ruiz* plaintiffs amassed "not-insignificant anecdotal evidence" suggesting "certain branch managers applied improper pressure" and "certain personal bankers felt pressured to work off the clock," the court found such anecdotal evidence deficient "in both scale and uniformity" to show unlawful conduct that permeated the putative class. 93 F. Supp. 3d at 291-92; *Bondi v. New Rochelle Hotel Assocs.*, 2018 U.S. Dist. LEXIS 209005, at *47-51 (S.D.N.Y. 2018) (same). Likewise, in *Benitez v. Valentino U.S.A., Inc.*, 2025 U.S. Dist. LEXIS 30503, at *17 (S.D.N.Y. 2025), the anecdotal evidence presented did not document "consistent and widespread deviations from Defendant's formal policy of paying employees for all time worked," thus plaintiffs failed to prove the practices at issue "were sufficiently uniform and pervasive as to warrant class treatment." *Ni v HSBC Bank USA, N.A.*, 2025 U.S. Dist. LEXIS 13138, at *23 (S.D.N.Y. 2025) (rejecting commonality theory that defendant "pressured" plaintiffs not to record overtime hours because it "necessarily involves the individual decisions and actions of hundreds of putative class members and managers to violate written timekeeping policies on which they were trained").

14

**B.      Courts Have Rejected Plaintiffs' Theory Of Commonality Because It Is Not Susceptible To Common Proof**

Multiple courts squarely reject Plaintiffs' theory of commonality.  Plaintiffs contend they were forced to work-off the clock due to GEICO's policy of "limiting available overtime while also delegating 'onerous' responsibilities that could not be met in a [38.75]-hour workweek." *Fernandez*, 2013 WL 4540521, at *2; Mot. at 1.  Courts in this jurisdiction routinely conclude that, where a defendant maintains a policy prohibiting work off-the-clock, a plaintiff cannot show commonality where resolution of who worked off-the-clock, for how long, and whether the supervisor knew about such work require individualized inquiries. *See, e.g., Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 51-52 (W.D.N.Y. 2014) (denying certification due to lack of commonality because "NYLL liability will come down to whether, on a department specific basis, a particular supervisor did not follow CHS' directive"); *Gordon v. Kaleida Health*, 2014 WL 1279170, at *22-25 (W.D.N.Y. 2014) (declining class certification in off-the-clock case lacking commonality); *Romero*, 2012 WL 1514810, at *18 (commonality lacking because "whether putative class members worked overtime, and whether Defendants failed to pay overtime … in violation of the NYLL [] are important considerations in this case.  But 'they are not common one[s]'"); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347-48 (W.D.N.Y. 2011) (denying class and conditional certification in off-the-clock case despite allegations that limited number of hours allocated to store).

Multiple such individualized circumstances are present here.

**1.      *Putative Class Members Testified They Did Not Work Off The Clock***

Contrary to Plaintiffs' allegations, multiple "Special Investigators" testified that: (1) they were not pressured by their supervisors or Managers to not report overtime, even if they did not receive advance approval to work that overtime; and (2) they accurately reported all work time,

including any overtime.  (Ex. 56, McDermott Decl. ¶¶ 14-17; Ex. 57, Koenig Decl. ¶¶ 22-24; Ex. 58, Sheppard Decl. ¶¶ 31-34; Ex. 59, Butler Decl. ¶¶ 20-22; Ex. 60, Bishop Decl. ¶¶ 27-29; Ex. 61, Carbonaro Decl. ¶¶ 21-24.)  Given such testimony, Plaintiffs cannot establish that "the *de facto* practices and policies of which they complain are sufficiently uniform and pervasive as to warrant class treatment."  *Gregory v. Stewart's Shops Corp.,* 2016 U.S. Dist. LEXIS 89576, at *41 (N.D.N.Y. 2016) (employee declarations "assert[ing] that the deviations from defendant's express wage and hour policies did not occur at the stores where they worked" refuted commonality).

### 2.      *Supervisors Did Not Direct Putative Class Members To Work Off The Clock*

Despite claiming routine "off the clock" work, Plaintiffs admit no supervisor or Manager instructed them to work "off the clock."  (Ex. 3 K. Fischer Dep. 88:11-14; Ex. 8, Reed Dep. 81:20-25; Ex. 9, Munoz Dep. 199:15-20; Ex. 6, King Dep. 116:23-117:5; Ex. 13, Newport Dep. 334:18-335:5; Ex. 2, M. Fischer Dep. 122:6-10; 180:22-181:2; 182:15-183:6; Ex. 11, Caniglia Jr. Dep. 53:1-54:14.)   To the contrary, multiple managers and supervisors repeatedly communicated GEICO's policy against off-the-clock work.  Chester Janik expressly told investigators: "If you're working extra hours, put in for it.  Document it."  (Ex. 22, G012464; Ex. 23, G015179; Ex. 24, G012482; Ex. 7, Barden Dep. 107:17-19; *see* Ex. 9, Munoz Dep. 185:9-188:3 ("[I]f you need overtime, ask your supervisor."); Ex. 22, G12464-65.)   Supervisor Jerry Cassagne repeatedly informed his direct reports that overtime should be entered into Workday, as did supervisors Toni D'Agata, Dara Campbell, and Rich Kilgen.  (Ex. 16, Cassagne Dep. 189:22-190:8, 207:10-208:3, 214:19-216:9; Ex. 11, Caniglia Jr. Dep. 44:4-20, 103:19-104:3, 107:17-110:5; Ex. 14, Brust Dep: 164:15-18; Ex. 25, G012010; Ex. 26, G012903; Ex. 27, G011080; Ex. 50, G011860; Ex. 28, G011586.)  SIU Manager Bill Newport reinforced GEICO's policy against off-the-clock work to his supervisors. (Ex. 53, Newport Decl. ¶ 7; Ex. 29, G016068 (directing Janik, "if [Plaintiff

Constanzo's] working over the 8 hours please make sure he is putting in his time"); Ex. 30, G012062.)  When supervisor Andrew Gelderman became aware that Plaintiff Grey worked outside of his normal hours but had not entered time into Workday, he ensured Grey was paid for the time and counseled him that off-the-clock work was expressly forbidden by GEICO's policies.  (Ex. 31, G021788.)

### 3.    *Putative Class Members Worked And Recorded Varying Amounts Of Overtime*

Multiple Plaintiffs recorded and were paid for varying amounts of overtime.  (Ex. 5, Mangan Dep. 105:19-106:6, 153:20-23; Ex. 1, Jones Dep. 148:15-149:14; Ex. 4, Pia Dep. 129:17-131:24; Ex. 6, King Dep. 118:22-120:9; Ex. 13, Newport Dep. 326:2-11.)  Plaintiff Keith Fischer recorded overtime on at least six occasions in 2017, and Plaintiff Caniglia Jr. did the same in 8 workweeks in 2018.  (Ex. 32, Fischer OT Emails; Ex. 33, Caniglia Jr. OT Approvals.)  Plaintiff Grey recorded and was paid overtime for 14 workweeks in an eight-month period in 2019.  (Ex. 18, Grey Dep. 161:9-169:3, 172:9-14.).  Multiple Plaintiffs recorded and were paid for various amounts of overtime from 2020 to present as well.  (ECF No. 62-37, Fogarty Decl. ¶ 31; Exs. 34-40, Pay Excerpts for Brust, Jones, King, Teatum, Pia, Wending, and Grey.)  Plaintiffs Grey and Munoz both admitted that they ceased working unreported overtime in 2023, when GEICO switched to a mobile timekeeping system, and Plaintiff Costanzo did the same in 2022 or 2023 when he began seeing a report that compared his performance metrics to others.  (Ex. 9, Munoz Dep. 178:10-179:32; Ex. 18, Grey Dep. 180:15-181:9; Ex. 12, Costanzo Dep. 253:4-254:6.)

### 4.    *Supervisors Developed Varied Practices Regarding Advance Approval Of Overtime Work*

GEICO empowered supervisors to approve overtime work in their discretion based on "business need."  (Ex. 17, 30(b)(6) Dep. 257:13-258:4; Ex. 13, Newport Dep. 241:9-20; *see* Ex. 16, Cassagne Dep. 186:23-187:8 ("If you need to do something regarding your case . . . that was a

business need which was – needed to be done within the guidelines of the company, then it would be approved").)  Plaintiffs have not demonstrated that overtime requests and approvals were subject to "any common mode of exercising discretion" that can be proven with common evidence. (Mot. at 5.)

The practices supervisors established for overtime requests varied substantially from supervisor to supervisor.  Some supervisors, such as Jerry Cassagne, allowed an email after overtime was worked providing details of what cases and activities required overtime and the amount of overtime worked.  (Ex. 32, Fischer OT Emails.)  Other supervisors, like Chet Janik, similarly allowed investigators to inform him of overtime after it had been worked but asked for less detail, requiring only that the investigator put on Outlook calendar the case number(s) requiring overtime and total overtime hours worked.  (Ex. 41, G012001; G012004; G012010; G012042; G012062; G012076; G012091; G012453; G012464; G012482; G015179.) Still other supervisors, like Toni D'Agata, required that her investigators obtain approval prior to working overtime and communicated that expectation to her investigators.  (Ex. 42, G011379.)   Thus, whether and to what extent the practices of 12 to 16 SIU supervisors at any given time for requesting overtime (Ex. 53, Newport Decl. ¶ 11) allegedly "were so burdensome as to deter Investigators from using them" (Mot. at 13) is not susceptible to common proof.

Supervisors' decision-making process in granting advance approval for overtime varied broadly.  In many instances, supervisors approved Plaintiffs' advance requests to work overtime. (Ex. 13, Newport Dep. 253:22-254:23; Ex. 53, Newport Decl. ¶ 11.)  Some supervisors utilized alternative tactics, like temporarily stopping assignment of new cases to the investigator or transferring an investigator's cases to others, to avoid any need for overtime work.  (Ex. 43, G012550; Ex. 44, G011932; Ex. 14, Brust Dep. 65:23-66:11, 114:21-115:9; Ex. 13, Newport Dep.

250:6-252:20.)  Other supervisors directed "flex" scheduling for field investigators to adjust their schedules by working more hours on one day and fewer hours on another day during the same workweek to eliminate any need for overtime work.  (Ex. 14, Brust Dep. 141:23-142:11.)  Some supervisors permitted Plaintiffs to flex time to change their work hours within a workweek as they saw fit, while others did not allow flex time without approval, even for field investigators.  (Ex. 14, Brust Dep. 75:21-76:17, 141:4-142:11; Ex. 12, Costanzo Dep. 136:8-16; Ex. 45, G012091; Ex. 5, Mangan Dep. 38:10-18, 46:21-47:11; Ex. 4, Pia Dep. 51:23-52:21; Ex. 1, Jones Dep. 77:5-8 (flex time is a "supervisor by supervisor policy")).)

### 5.    *Performance Metrics Applicable to Putative Class Members Varied Substantially*

Plaintiffs assert "draconian performance metrics" required them to work unrecorded overtime (Mot. at 20), but the performance metrics applicable to Plaintiffs and putative class members varied substantially over time depending on job titles and duties.  (Ex. 3, K. Fischer Dep. 174:25-175:22.)

Some investigators were assessed on metrics including case life (how long a case has been open), productivity (number of cases closed), and quality (audit scores measuring compliance with certain documentation and investigative procedures).  (Ex. 46, G010856; Ex. 13, Newport Dep. 157:14-159:3.)  The actual metrics applicable to other investigators, however, differed depending on the "team" to which they were assigned, reflecting the fact certain investigators worked cases that were less complex and easier to close.  (Ex. 13, Newport Dep. 101:14-102:2, 148:8-149:5; Ex. 47, G010797.)  Plaintiff Mangan, as a medical fraud investigator, for example, had different performance metrics and evaluations than Plaintiff Keith Fischer had as a Lead Investigator on the theft team.  (Ex. 5, Mangan Dep. 121:15-123:23; Ex. 3, K. Fischer Dep. 174:25-175:22.)  Field investigators' metrics excluded cases requiring an EUO from case life, (Ex. 48, G006603; Ex. 12,

Costanzo Dep. 184:12-185:14; Ex. 49, G010804), while desk investigators' metrics assigned a lower weight to closed cases to account for drive time needed for field investigators to close cases. (Ex. 17, 30(b)(6) Dep. 137:16-138:23.)  Major case investigators like Plaintiff Fischer differed entirely and were never rated on case life, as major case investigations could last months or even years, and were not assessed on productivity given complexity and duration of major cases (Ex. 2, M. Fischer Dep. 65:13-16, 94:6-18, 123:17-24, 137:18-138:7; 243:3-10.)  Plaintiff Fischer received only 4 new cases per month, and simply had to ensure she recorded a "diary" update once every 15 business days.  (*Id*.)

Multiple "Special Investigators" testified they never felt undue pressure to meet their performance metrics, which included manageable goals.  (Ex. 56, McDermott Decl. ¶¶ 14-16; Ex. 57, Koenig Decl. ¶¶ 18-20; Ex. 58, Sheppard Decl. ¶¶ 18-22, 33; Ex. 59, Butler Decl. ¶¶ 9-16, 18; Ex. 60, Bishop Decl. ¶¶ 20-23, 27; Ex. 61, Carbonaro Decl. ¶¶ 9-10, 16-18.)  Plaintiffs' claims that "performance metrics penalized them for reporting more hours" or "the performance metrics each Investigator was subject to" allegedly "did not vary," are unsupported in the record and ignore vast material differences among putative class members.  (Mot. at 18.)

**6.      *Plaintiffs' Claimed Bases of Actual or Constructive Knowledge Are Not Susceptible to Common Proof***

Similarly, Plaintiffs' claim GEICO supposedly had actual or constructive knowledge of unpaid overtime is not susceptible to common proof.  (Mot. at 17.)  "The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working <u>and</u> not reporting his time.'"  *Hinterberger*, 299 F.R.D. 22, 37 (W.D.N.Y. 2014) (citing *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 875 (6th Cir. 2012).)  The test is what GEICO "should have known, not what 'it could have known.'"  *Id*. at 39.  "If an employer sets up a sufficient, working system for employees to request and receive overtime pay, and an employee inexplicably declines

to utilize that system, the employer should not be expected to have knowledge that the employee is not being paid." *Campbell v. City of New York*, 2021 U.S. Dist. LEXIS 40933, at \*22 (S.D.N.Y. 2021).

Plaintiffs' unilateral choice not to submit some overtime in Workday does not impute uniform knowledge to GEICO regarding uncompensated off-the-clock overtime. *See Edwards v. City of New York*, 2012 U.S. Dist. LEXIS 68055, at \*10-11 (S.D.N.Y. 2012) ("The plaintiffs were familiar with and utilized the defendant's system for tracking and compensating overtime," therefore that "[s]ome plaintiffs may on occasion have chosen not to submit overtime slips for minutes of overtime worked . . . is insufficient to impute knowledge to the defendant that the plaintiffs were performing uncompensated overtime work.").

Plaintiffs testified they received GEICO's lawful written policies requiring all SIU investigators to record and enter all time worked accurately, received annual training on those lawful timekeeping policies, and were paid for all time entered in GEICO's timekeeping system. (Ex. 3, K. Fischer Dep. 85:5-86:23, 119:5-9; Ex. 4, Pia Dep. 78:23-79:10, 81:19-85:11; 98:6-9; Ex. 5, Mangan Dep. 100:20-24; Ex. 15, Moeser Dep. 75:17-19, 76:19-77:13, 89:16-92:17, 115:3-5; Ex. 7, Barden Dep. 59:22-60:23, 63:10-67:19; Ex. 12, Costanzo Dep. 153:20-154:12, 250:8-251:22; Ex. 6, King Dep. 81:17-83:3; Ex. 14, Brust Dep. 105:1-106:21, 235:20-236:17; Ex. 8, Reed Dep. 62:2-7, 83:3-19; Ex. 11, Caniglia Jr. Dep. 67:14:-68:3, 69:1-71:9, 76:5-24; Ex. 2, M. Fischer Dep. 167:21-174:14; Ex. 1, Jones Dep. 101:6-104:5, 137:2-7; Ex. 9, Munoz Dep. 118:6-120:12, 121:11-123:19.) Numerous Plaintiffs requested and were paid for overtime hours, despite their contentions otherwise, *see supra* § II.A.3, thus they were familiar with and repeatedly used GEICO's lawful system for entering time and receiving overtime compensation.

21

Plaintiffs' testimony regarding the bases of supervisors' knowledge varied substantially. Plaintiff Pia, for example, claimed he informed his supervisor he was working off-the-clock "every day." (Ex. 4, Pia Dep. 185:7-186:16.)  Plaintiff Peggy Fischer, however, conceded she never made any verbal or written complaint of off-the-clock work or overtime to her supervisors, manager, or Human Resources, and claims only constructive knowledge based on time-stamped emails and SICM entries after the end of her scheduled shift.  (Ex. 2, M. Fischer Dep. 173:14-183:18, 186:14-187:15.)  Other Plaintiffs contend they raised "workload" generally to supervisors, but not off-the-clock work.  (Ex. 6, King Dep. 79:9-80:10, 139:12-140:9.)  Some Plaintiffs contend their supervisors "understood" they were working off-the-clock, while others do not. (Ex. 3, K. Fischer Dep. 88:11-89:3; Ex. 10, O'Sullivan Dep. 67:8-25.)

In sum, Plaintiffs' evidence regarding supervisors' alleged knowledge of off-the-clock based in alleged complaints or GEICO's timekeeping system cannot establish commonality.  This is necessarily so because "even if th[e] number of anecdotal accounts were sufficiently large to confidently be extrapolated to the class as a whole, the contradictions and heterogeneity within the group suggest the lack of a common answer." *Ruiz*, 93 F. Supp. 3d 279, 291-92.  Thus, even if Plaintiffs raise common questions as to actual or constructive knowledge, the evidence cannot provide the "common answers" that Rule 23 requires.  *See, e.g., Fernandez*, 2013 WL 4540521, at *10 ("Plaintiffs' evidence on off-the-clock work consists of individualized and particular incidents, the characterizations of which are often qualified.  As a result, they have failed to come forward with evidence that defendants enforced a common policy concerning denial of overtime pay.").

### 7.    *SICM Entries Are Not Common Proof of Off-the-Clock Work*

Plaintiffs' claim that supervisors were "aware of the unreported hours that Special Investigators were working" from time-stamped entries in the SICM system used to document case work is legally untenable.  (Mot. at 13-14.)

Numerous courts have held that such records do not satisfy plaintiff's burden to offer common proof under Rule 23.  *See*, *e.g.*, *In Re Bank of Am*., 286 F.R.D. 572, at 585-86, 588 (D. Kan. 2012) (denying class certification where expert analysis comparing computer records of bank employees' transactions with time records was insufficient "common evidence" of off-the-clock work); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 534-36 (C.D. Cal. 2011) (holding computer logs were not common evidence establishing off-the-clock work due to individualized inquiries any denying certification).

SICM entries cannot serve as common proof of alleged off-the-clock work.  While investigators document case activities in SICM, no individual SICM entry describes the hours that went into completing that activity.  (Ex. 6, King Dep. 167:23-168:11 ("SICM didn't show work hours.").)  Plaintiff Keith Fischer, in fact, estimated that 75% of an investigator's work happens outside of SICM.  (Ex. 51, O'Neil Notes.)  Investigators' ability to flex their schedules without prior approval prevents a supervisor from obtaining knowledge because they cannot know, for example, if a 5:00 pm SICM entry resulted from a commonly flexed shift or unreported, off-the-clock overtime.  Further, supervisors' oversight of investigations in SICM varied, with some investigators empowered to close cases without supervisor approval.  (Ex. 1, Jones Dep. 243:7-244:2 (lead investigators "can approve [cases] without a supervisor.") Ex. 4, Pia Dep. 170:13-25 (needed supervisory approval); Ex. 7, Barden Dep. 80:13-21; Ex. 9, Munoz Dep. 151:22-153:4.)

Even if SICM records established working time for a single investigator, (which they do not), they would not establish anything for anyone else. These reports are the opposite of common proof. Thus, Plaintiffs fail to demonstrate commonality.[2]

### C.    Plaintiffs' Cases Are Distinguishable and Do Not Support a Finding of Commonality

Plaintiffs' precedent supporting commonality is either inapplicable or distinguishable, and their claim that an unofficial policy of discouraging reporting of overtime can satisfy commonality misses the mark. (Mot. at 19.) Plaintiffs cite *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 408 (S.D.N.Y. 2012), but *Winfield* was an FLSA collective action under 29 U.S.C. § 216(b), not a Rule 23 class action (a substantially lower threshold). *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014), a Ninth Circuit decision, is distinguishable because putative class members there kept no time records; rather, the local office manager could file a timekeeping "exception" to the default 8-hour workday. *Id.* at 1165-66. By contrast, here, Plaintiffs always remained responsible for accurately entering their hours into GEICO's timekeeping system. (Ex. 20, G000195; Ex. 21 at G000039; Ex. 5, Mangan Dep. 78:7-16; Ex. 1, Jones Dep. 105:21-24, 108:19-109:3; Ex. 9, Munoz Dep. 133:13-23; Ex. 6, King Dep. 95:17-96:6; Ex. 13, Newport Dep. 311:11-12.)

Plaintiffs are likewise incorrect that courts in the Second Circuit "routinely find commonality where plaintiffs suffer a common harm due to an employer's failure to pay overtime." (Mot. at 18-19.) Those cases are much more limited in scope than Plaintiffs broadly

---

[2] Likewise, the fact that other lawsuits have been filed against GEICO is not sufficient to warrant certification. *See, e.g., Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *3 n. 4 (S.D.N.Y. 2009) (denying certification where the plaintiff cited six other lawsuits against Sprint with similar off-the-clock allegations as "these citations do not add to the showing required here for certification"); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3 (D. Nev. 2006) (denying conditional certification despite "three actions from other districts where a few Home Depot employees have alleged that they worked off the clock or that they had their time improperly reduced" because such "complaints do not suggest a common nationwide practice").

assert.  For example, in *Lawrence v. NYC Med. Prac., P.C.*, 2024 U.S. Dist. LEXIS 14339, at *19 (S.D.N.Y. 2024), the court agreed with defendant that certain common issues did not predominate and "corrected" the originally-certified class to exclude certain employees.  Similarly, in *Pichardo v. Carmine's Broadway Feast, Inc.*, 2016 WL 4379421 (S.D.N.Y. 2016), the court found commonality because defendants submitted only incomplete payroll records and 8 identical employee declarations as evidence.  *Id.* at *2.  In contrast, GEICO provides extensive citations to Plaintiffs' time and pay records, testimony, and contemporaneous emails to demonstrate their highly individualized circumstances and lack of common proof.  *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 127 (S.D.N.Y. 2011), also demonstrates commonality issues with multiple managers and supervisors, as the court modified the proposed class to exclude employees that worked at one of two relevant restaurants.  Finally, *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 49 (E.D.N.Y. 2010), assessed commonality in approval of a class action settlement — not class certification — and is inapposite.  Plaintiffs' authority supporting commonality falls short and they otherwise fail to meet their burden.

## III.    PLAINTIFFS FAIL TO DEMONSTRATE THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUALIZED ISSUES

### A.    Individualized Issues Overwhelm Any Common Factors

Plaintiffs have not and cannot meet the Rule 23(b)(3) requirement of showing that common issues predominate.  Even if Plaintiffs showed a common issue (they did not), necessary individualized inquiries overwhelm any common issue.

To certify a Rule 23(b)(3) class, Plaintiffs must prove by a preponderance of the evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  "Rule 23(b)(3)'s

predominance criterion is even more demanding than Rule 23(a)," requiring a "close look" at "whether common questions predominate over individual ones." *Comcast,* 569 U.S. at 34; *Reid v. A-Plus Care HHC Inc*, 2024 U.S. Dist. LEXIS 240930, at *9 (S.D.N.Y. 2024).

In an off-the-clock wage case alleging managers restricted overtime, "[w]ithout meaningful evidence of a New York-wide policy," predominance is not met where "determination of liability turns on a highly individualized, employee-by-employee analysis of what they were told by management and how any time-recording practices were applied." *Fernandez*, 2013 WL 4540521, at *14. As the Second Circuit recognizes, "where, as here, off-the-clock work is at issue, courts are disinclined to find the predominance requirement satisfied." *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (collecting cases); *Fernandez*, 2013 WL 4540521, at *14 (disparate practices and individualized circumstances precluded predominance); *Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. 2013) (no predominance where "each class member would have to come forward and establish how many hours he or she worked and how much he or she was paid.").

Here, individualized circumstances overwhelm any common factors. Investigators reported to various supervisors, who reported to various managers, and supervisors exercised discretion in highly varied ways. *See supra* at Background § B; § II.A.2. Courts recognize the application of discretion is quintessentially an individualized issue. *DeSilva v. N. Shore-Long Island Jewish Health Sytem*, 27 F. Supp. 3d 313, 329 (E.D.N.Y. 2014) (no predominance where "official policies, consistent with the law, provide that all overtime worked should be compensated," such that "plaintiffs' claims hinge on whether a [ ] manager correctly used his or her *discretion* to approve overtime worked"). As *DeSilva* recognized, "even assuming a manager improperly disapproved payment for time that was actually worked for [defendant]'s benefit, while

26

that violation may beget a claim for an individual employee, it does not support class treatment." *Id*.

This case would necessarily require highly individualized mini-trials for each class member. For each individual, the Court would need to determine whether the investigator worked overtime, and, if so, whether they recorded and were paid for that overtime during any particular workweek; whether GEICO had actual or constructive knowledge of alleged unrecorded overtime, including complaints to a supervisor or whether the claim relies on theories of constructive knowledge such as time-stamped SICM entries; which of different performance metrics applied and whether any supervisor used those metrics to "pressure" investigators to work "off-the-clock"; and whether an investigator was instructed not to work off-the-clock, but nonetheless did so; among others. *See supra* § II.A.

GEICO would be entitled to present individualized arguments specific to individual putative class members based on efforts investigate and remediate any off-the-clock work of which it became aware. For example, when Plaintiff Thomas Barden suggested he would work off-the-clock to catch up on workload, Supervisor Chet Janik reminded him "I don't want anyone working over their 7.75 hours, without putting in for overtime." (Ex. 24, G012482.) Other supervisors similarly worked to ensure their reports were compensated for all such time. (*Id*.; Ex. 44, G011932; Ex. 31, G021788.) Any similar instructions to putative class members are individualized issues demonstrating a lack of predominance.

The myriad individualized inquiries required to establish Plaintiffs' claims, and GEICO's defenses, preclude a finding of predominance notwithstanding Plaintiffs' citations. As with commonality, the *Romero* court found predominance in the settlement context, not the merits. *Romero*, 58 F. Supp. 3d at 414. Uniform compensation and tipping policies were challenged in

*Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61 (S.D.N.Y. 2018), not a *de facto* policy allegedly applied by dozens of supervisors contradicting a written policy. *Id*. at 70. And, in *In Re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124 (2d Cir. 2001), a price-fixing antitrust case, the Second Circuit confirmed the finding of predominance based on expert's establishment of uniform "class-wide injury" resulting from overpayment that avoided analysis of individualized questions. *Id*. at 137. Establishing Defendant's liability here necessarily requires analysis of individualized issues.

**B.    Plaintiffs Lack a Reliable Class-Wide Method For Determining Liability And Damages, As Required**

Plaintiffs cannot demonstrate predominance for another, fundamental reason: they cannot demonstrate a reliable method for measuring class-wide damages for purposes of Rule 23(b)(3).

Plaintiffs bear the burden of demonstrating the Court can measure damages associated with the alleged violation on a class-wide basis. *Comcast Corp.*, 569 U.S. at 34. As the Supreme Court explained "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Id.* at 38. If a model does not measure "only those damages attributable to that theory" it cannot possibly establish that damages are susceptible of measurement across the entire class. *Id.* at 35; *see Bowerman v. Field Asset Servs., Inc.*, 2022 WL 2433971, at *8 (9th Cir. 2022) (reversing certification where plaintiffs "cannot show that the whole class suffered damages traceable to the[] alleged [wrong]" and cannot "present[] a method of calculating damages that is not excessively difficult").

Plaintiffs have not met their burden of showing their model can measure damages associated with allegedly unpaid overtime hours on class-wide basis. First, Plaintiffs' theoretical damages model fails the standards of *Daubert* because it is unreliable and speculative. In proposing a linear regression model to model time purportedly worked, O'Neil fails to first

28

establish the data she proposes to analyze has a meaningful correlation to the number of hours worked. (Ex. 65, Thompson Decl. ¶¶ 17-41.)

Second, Plaintiffs' model provides no method for determining off-the-clock work by putative class members. O'Neil purports to utilize Plaintiffs' self-reported and biased estimated hours to create a "baseline" of "average hours" which she would then "hand tune" for every individual. (*Id*. ¶¶ 9-16; Ex. 19, O'Neil Dep. 168:9-21; 189:17-191:17.) Plaintiffs' model would overcompensate some individuals and undercompensate others, making class certification inappropriate. *See Opperman v. Path, Inc*., 2016 WL 3844326, at *14-15 (N.D. Cal. 2016) (denying certification due to overcompensation and under compensation).

Third, O'Neil concedes the model cannot exclude persons who did not work any unpaid overtime hours. (*See* Ex. 19, O'Neil Dep. 160:24-161:12, 162:15-163:19) (admitting plaintiffs' theoretical model would not exclude uninjured class members); *see also* Ex. 65, Thompson Decl. ¶¶ 42-56.) The inability to exclude uninjured class members –who suffered no injury and thus lack standing – constitutes independent grounds for denial of class certification. *See Denney*, 443 F.3d at 264; *Bowerman*, 2022 WL 2433971, at *9 (reversing certification where fact of injury "would implicate highly individualized inquiries on whether that particular class member ever [suffered the alleged wrong]").

## IV.  PLAINTIFFS CANNOT SATISFY TYPICALITY BECAUSE THEY LACK KNOWLEDGE OF OTHERS' CIRCUMSTANCES

Plaintiffs separately fail to establish typicality. Rule 23 requires "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is met where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brady v. Top Ships Inc.*, 324 F. Supp. 3d 335, 350 (E.D.N.Y. 2018) (quoting *In*

*Re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).  Plaintiffs must show "the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999), *overruled on other grounds by In Re IPO*, 471 F.3d 24, 42 (2d Cir. 2006).

Plaintiffs fail to establish typicality.  First, courts routinely find plaintiffs lacking personal knowledge of putative class members' overtime claims cannot satisfy typicality.  *See Li v. NY Capri Nails & Spa Inc.*, 2024 WL 708775, at *10-11 (S.D.N.Y. 2024) (finding no typicality for NYLL overtime claims where named plaintiff lacked knowledge of alleged overtime hours of absent class members); *Lanqing Lin v. Everyday Beauty Amore Inc.,* 2019 WL 3037072, at *3-4 (E.D.N.Y. 2019) (rejecting speculation that "all employees were paid the same" and finding no commonality or typicality); *see also Campbell*, 2021 U.S. Dist. LEXIS 40933, at *22 (S.D.N.Y. 2021).  Plaintiffs here confirmed they lack any knowledge of whether other investigators requested overtime, worked uncompensated overtime, or were denied overtime.  (Ex. 3, K. Fischer Dep. 194:8-196:5; Ex. 10, O'Sullivan Dep. 77:13-80:19, 98:13-16, 99:6-9, 128:6-22); Ex. 15, Moeser Dep. 161:16-162:23; Ex. 4, Pia Dep. 72:7-24, 128:25-129:16; Ex. 7, Barden Dep. 85:15-18, 183:8-184:4; Ex. 5, Mangan Dep. 128:8-129:16; 151:25-152:5; 155:9-156:14; Ex. 1, Jones Dep. 201:23-205:20.)

Second, material dissimilarities amongst the named Plaintiffs' claims prevents typicality.  *See, Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 100 (E.D.N.Y. 2015) (typicality lacking where plaintiff's claim "does not arise from the same course of events" as others); *Noonan v. Indiana Gaming Co.*, 217 F.R.D. 392, 397 (E.D. Ky. 2003) (factual differences between various class members destroyed typicality).  Plaintiffs lack personal knowledge regarding work experiences of

30

other Investigators, particularly those in different job titles or with different supervisors. (Ex. 3, K. Fischer Dep. 198:18-199:19, 252:17-254:23; Ex. 15, Moeser Dep. 187:17-189:14, 193:16-194:5; Ex. 4, Pia Dep. 49:7-50:11; Ex. 7, Barden Dep. 152:18-156:25, 213:18-214:19, 215:19-25; Ex. 5, Mangan Dep. 200:19-201:25, 259:13-260:15, 262:5-15; Ex. 1, Jones Dep. 223:18-224:13.)

## **CONCLUSION**

For the foregoing reasons, Defendant requests the Court deny Plaintiffs' Motion.


**Dated:  May 12, 2025**                                  Respectfully submitted,

                                                          GOVERNMENT EMPLOYEES
                                                          INSURANCE COMPANY d/b/a GEICO


                                                          By: /s/ *Gerald L. Maatman, Jr.*
                                                                One of its Attorneys

Gerald L. Maatman, Jr.
(*gmaatman@duanemorris.com*)
Jennifer A. Riley
(*jariley@duanemorris.com*)
Gregory Tsonis
(*gtsonis@duanemorris.com*)
Gregory S. Slotnick
(*gsslotnick@duanemorris.com*)

**DUANE MORRIS LLP**
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000


**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that he caused a copy of the foregoing to be served upon the following counsel of record by electronic mail, this DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, on the 12th day of May 2025:

**OUTTEN & GOLDEN LLP**
Michael J. Scimone
Jarron D. McAllister
Sabine Jean
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: 212-245-1000
Facsimile: 646-509-2060
mscimone@outtengolden.com
jmcallister@outtengolden.com
sjean@outtengolden.com

**OUTTEN & GOLDEN LLP**
Ryan C. Cowdin
1225 New York Avenue NW
Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4409
Facsimile: (202) 847-4410
rcowdin@outtengolden.com

**KESSLER MATURA P.C.**
Garrett Kaske
Troy L. Kessler
534 Broadhollow Road, Suite 275
Melville, New York 11747
Telephone: (631) 499-9100
Facsimile: (631) 499-9120
gkaske@kesslermatura.com
tkesler@kesslermatura.com

*/s/ Gerald L. Maatman, Jr.*
Gerald L. Maatman, Jr.