# EXHIBIT 19

```
 1
 2            UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NEW YORK
 3   --------------------------------
     KEITH FISCHER, MICHAEL
 4   O'SULLIVAN, JOHN MOESER,
     LOUIS PIA, THOMAS BARDEN,
 5   CONSTANCE MANGAN, and CHARISE
     JONES, individually and on
 6   Behalf of all others similarly
     Situated,
 7
                    Plaintiffs,
 8
              vs.              No. 23 Civ. 02848
 9                                 (GRB) (ARL)

10   GOVERNMENT EMPLOYEES INSURANCE
     COMPANY d/b/a GEICO,
11
                    Defendant.
12   --------------------------------

13

14

15       VIDEOTAPED DEPOSITION OF CATHERINE O'NEIL

16                 New York, New York

17              Thursday, April 24, 2025

18

19

20

21

22

23   Reported by:
     Yaffa Kaplan
24   JOB NO. 12744863

25
```


800.211.DEPO (3376)
EsquireSolutions.com

```
 1
 2                    April 24, 2025
 3                    9:40 a.m.
 4
 5         Videotaped Deposition of CATHERINE
 6    O'NEIL, held at the offices of Duane
 7    Morris, 1540 Broadway, New York, New York,
 8    pursuant to Notice, before Yaffa Kaplan, a
 9    Notary Public of the State of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2    A P P E A R A N C E S:
 3
 4        OUTTEN & GOLDEN LLP
 5        Attorneys for Plaintiffs
 6             685 Third Avenue, 25th Floor
 7             New York, New York 10017
 8        BY:   MICHAEL SCIMONE, ESQ.
 9              ZARKA DSOUZA, ESQ.
10
11        DUANE MORRIS LLP
12        Attorneys for Defendant
13             190 South LaSalle Street, Suite 3700
14             Chicago, Illinois 60603
15        BY:   GREGORY TSONIS, ESQ.
16              JUSTIN DONOHO, ESQ.,
17                               (Via videoconference)
18
19    ALSO PRESENT:
20        RICHARD MORALES - Videographer
21
22
23
24
25
```



```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3   by and between counsel for the respective
 4   parties hereto, that the filing, sealing and
 5   certification of the within deposition shall
 6   be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form
 9   of the question, shall be reserved to the
10   time of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed
13   before any Notary Public with the same force
14   and effect as if signed and sworn to before
15   the Court.
16
17
18
19
20
21
22
23
24
25
```



                            C. O'Neil

1              THE VIDEOGRAPHER:  Good morning, we are
2       now on the record.  The time is 9:40 a.m.,
3       Eastern time on April 24, 2025.
4              This begins Media Number 1 to the
5       videotaped deposition of Catherine O'Neil,
6       taken in the matter of Keith Fischer versus
7       Government Employees Insurance Company.
8              My name is Richard Morales, I am your
9       videographer today; the court reporter is
10      Yaffa Kaplan.  We are representing Esquire
11      Deposition Solutions.
12             Counsel will you please introduce
13      yourselves and affiliations, and the witness
14      will be sworn.
15             MR. SCIMONE:  Michael Scimone with
16      Outten & Golden, representing the plaintiff.
17             MS. DSOUZA:  Zarka Dsouza with Outten &
18      Golden, also representing the plaintiffs.
19             MR. TSONIS:  Gregory Tsonis on behalf of
20      Government Employees Insurance Company,
21      defendant.
22             MR. DONOHO:  Hi, this is Justin Donoho,
23      also on behalf of GEICO.
24   C A T H E R I N E    O ' N E I L , called as a



```
 1                        C. O'Neil
 2   witness, having been duly sworn by a Notary Public,
 3   was examined and testified as follows:
 4   EXAMINATION BY
 5   MR. TSONIS:
 6        Q.    What is your name and address?
 7        A.    Catherine O'Neil, 27 Ware Street,
 8   Cambridge, Massachusetts 02138.
 9              THE VIDEOGRAPHER:  You may proceed.
10        Q.    Good morning, Ms. O'Neil.
11        A.    Good morning.
12        Q.    My name is Greg Tsonis.  I am an
13   attorney for the defendant in this lawsuit,
14   Government Employees Insurance Company.  I will be
15   taking your deposition today.  Okay?
16        A.    Yes.
17        Q.    Just -- there will be, I am sure, a
18   number of acronyms today.  But do you know if I say
19   GEICO, I am referring to the defendant in this
20   lawsuit?
21        A.    Yes, I do.
22        Q.    And you understand that in this lawsuit
23   a group of plaintiffs are suing GEICO for
24   violations of both Federal Law, the Fair Labor
25   Standards Act, and New York State law?
```



```
 1                        C. O'Neil
 2   will say, let's say -- let's say I estimate that
 3   each case takes about seven hours, but it actually
 4   only takes you six hours because you are so
 5   efficient, and you get 22 cases done instead of 20.
 6   Then I would estimate that time as 22 times
 7   seven hours, instead of 22 times six hours.  So you
 8   get more overtime.
 9             So you get rewarded for being more
10   efficient; relative to someone who did it in seven
11   hours per case, and therefore had only 20 cases
12   done.
13        Q.   Sure.  So -- if I am also less
14   efficient.  So explain to me how, in your model,
15   the slacker; right?  That's not as efficient,
16   doesn't get attributed; right?
17             Someone that's less than average but is
18   assigned the average number of hours, isn't it true
19   that it would overstate the hours worked for that
20   person?
21        A.   No.  No, because -- well, tell me
22   exactly what you mean by slacker and I will tell
23   you what's going to happen for them.
24        Q.   So let's say -- using the simplest
25   method you have, your average says investigators
```



```
 1                    C. O'Neil
 2   close ten cases per month.  Right?  And so --
 3        A.    Correct.
 4        Q.    -- and to close that ten cases, we
 5   assign a value of, you know, four hours per case?
 6        A.    Okay.
 7        Q.    If I close 20 cases, but I can actually
 8   do them faster, it doesn't take me four hours, your
 9   model is assigning me 80 hours of work in a week
10   where I didn't work 80 hours if I did them faster.
11   Right?
12        A.    That's right.
13        Q.    If it takes me only two hours?
14        A.    That's one of the reasons we don't just
15   do the dumbest one.  We say, what kind of cases did
16   you do.
17        Q.    Right.  We are not talking about other
18   regressions at the moment.
19        A.    But -- yes.
20        Q.    In this basic one --
21        A.    Yes.
22        Q.    -- if I am more efficient because I
23   close more cases, but I did it, in actuality as an
24   individual, in less time or half the time than the
25   average person would do; right?
```



```
 1                      C. O'Neil
 2           In your model, I am assigned more hours
 3   work than what I, in actuality, did.  Right?
 4        A.   That's right.
 5             MR. SCIMONE:  Just remember slow the
 6        pace down a little bit for the -- for the
 7        court reporter.  Sorry.
 8        Q.   Conversely, if it took me more time, if
 9   instead of four hours a case, it was actually
10   taking me six but I am only getting assigned four
11   now under your model.  So I am under -- I have --
12   the hours assigned to me in your model are -- under
13   represent what I actually worked.  Right?
14        A.   Yes.
15        Q.   So just to be clear:  In your model,
16   it's your testimony that if you are, I guess, the
17   prototypical, the composite-average investigator,
18   that the model would accurately model the time that
19   you spent.
20             Is that your contention?
21        A.   Yes.
22        Q.   If I am an investigator though --
23        A.   I apologize for interrupting, but can I
24   just revise what I just said?
25             If you are the average worker, like, and
```



```
 1                          C. O'Neil
 2   it's the average week; right?  Even the average
 3   worker would have variations one week to the next,
 4   or one month to the next, because just -- cases all
 5   close in the same month or something.  There is
 6   going to be some natural variation.
 7        Q.    Sure.  But there might not be a natural
 8   variation.  For example, if I am -- if I am really
 9   efficient because I am good at what I do, or I have
10   been doing it for a long time, I am going to be
11   consistently better than average.  Right?  I am
12   going to be consistently, month over month, more
13   efficient.
14        A.    That is possible.
15        Q.    So in your model, I am consistently
16   overassigned the number of work hours in your model
17   than what I actually worked in that scenario.
18   Right?
19        A.    Yes.
20        Q.    It doesn't balance out.  Because I am
21   not, for example, varying above and below; I am
22   consistently on one side of --
23        A.    That's right.
24        Q.    And the same would be true, excuse me,
25   of the converse.
```



```
 1                        C. O'Neil
 2   allocated damages in your model wouldn't be
 3   accurate because they don't meet the average?
 4        A.    It's also possible that he was slower
 5   for certain things, but faster for other things.  I
 6   don't know that either.
 7             But yes, you are right.  That would be a
 8   drag on him.
 9        Q.    Right.  And because you are not --
10   because you are applying the average, you are
11   essentially combining the population that we have
12   talked about, the sample data that you would like;
13   200 people into one, you know, composite
14   investigator.  Is that right?
15        A.    That's exactly right.
16        Q.    And you use that composite investigator
17   to the data for the actual investigators, and you
18   basically are assigning, based on the work that
19   they completed, how much time the average
20   investigator would have taken to do this work?
21        A.    That's right.
22             So here is another -- sorry to interrupt
23   you, but there is another scenario.  Which is that
24   somebody takes two weeks of holiday in one month.
25   So they get half the normal amount of work, but
```



```
 1                      C. O'Neil
 2   coefficient for the EUO-type of activity that would
 3   be like, This takes four hours.  It's a heavy lift.
 4            And that -- that's great.  Because that
 5   would mean that going back and through the other
 6   people for the other weeks, every time somebody got
 7   a EUO, they would be rewarded with a four-hour
 8   imputed time.
 9       Q.   So -- okay.  So do you have, I guess,
10   any understanding of how many cases did or did not
11   require EUOs that, for example, a field
12   investigator would have?
13       A.   No.
14       Q.   Do you have an understanding of the
15   changes in the EUO process over time?
16       A.   No.
17       Q.   Do you have an understanding of how
18   technologically the process by which EUOs were
19   conducted changed?
20       A.   This might refer to the fact that during
21   COVID some things were done over Zoom.
22            So, yes.  So one of the things that
23   occurs -- occurs to me, and one of the plans I had
24   for this model, is that -- that there are certain
25   things that might have been special in a special
```



```
 1                       C. O'Neil
 2   situation like COVID.
 3              So if -- during that era, we could hand
 4   tune the coefficient.  If it didn't take four hours
 5   on average because they didn't have to drive to see
 6   a person, like, you could just move it down.
 7              And we would have to use testimony for
 8   that purpose, to hand tune it from four hours to
 9   two hours, or whatever it is.  I am just saying
10   numbers.  But it would require an actual
11   investigation.
12              But that's one of the benefits of having
13   that model that separates things out by -- by
14   activity type.
15              And also, that's the kind of thing --
16   remember when we were talking about how the
17   different models would give us slightly different
18   answers?  That's an explanation for why different
19   models would give us different answers.  Because
20   one of them will be sensitive to this, and one of
21   them won't.
22              So we will be like, Oh, wait.  Is this
23   during COVID?  It is.  Okay.  So let's believe this
24   one in this time period.
25              So we want to be as accurate as
```



```
 1                        C. O'Neil
 2   possible.  And different -- the fact that we have
 3   four different ways of looking at it means we could
 4   be more accurate.
 5        Q.    I want to follow up.  And I recognize
 6   you wouldn't know what an exact amount might look
 7   like --
 8        A.    Yes.
 9        Q.    -- but you talked about hand tuning that
10   time period based on testimony.
11        A.    Yes.
12        Q.    Explain to me what you mean by using
13   testimony to hand tune?
14        A.    I would try to figure out the delta
15   between how much time does it take to do an EUO
16   when you drive there, and how much time does it
17   take to do an EUO when you do it on Zoom.
18        Q.    When you say using testimony, are you
19   proposing that you would just ask plaintiffs?
20        A.    Yes.
21        Q.    How much time did it used to take you,
22   and how much time it would take you after that
23   change?
24        A.    Well, I wouldn't ask; the lawyers would.
25        Q.    Fair enough.
```



```
 1                    C. O'Neil
 2   in terms of the transcript turnaround time, so
 3   I think they placed an order with you.
 4           THE VIDEOGRAPHER:  The time is 3:44 p.m.
 5   We are off the record.
 6           (Time noted: 3:44 p.m.)
 7   _____.
 8   CATHERINE O'NEIL
 9
10   Subscribed and sworn to before me
11   this ___ day of _____, 2025.
12
13   _____
```



800.211.DEPO (3376)  
*EsquireSolutions.com*

```
1                       C. O'Neil
2                  C E R T I F I C A T E
3    STATE OF NEW YORK     )
4                          : ss.
5    COUNTY OF QUEENS      )
6
7           I, YAFFA KAPLAN, a Notary Public
8      within and for the State of New York, do
9      hereby certify:
10          That CATHERINE O'NEIL, the witness
11     whose deposition is hereinbefore set forth,
12     was duly sworn by me and that such
13     deposition is a true record of the
14     testimony given by the witness.
15          I further certify that I am not
16     related to any of the parties to this
17     action by blood or marriage, and that I am
18     in no way interested in the outcome of this
19     matter.
20          IN WITNESS WHEREOF, I have hereunto
21     set my hand this 28th day of April, 2025.
22
                               _____
23
24                             YAFFA KAPLAN
25
```

