**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY,<br><br>       Defendant. | Case No. 2:23-CV-02848<br><br>District Judge Sanket J. Bulsara<br><br>Magistrate Judge Steven Tiscione |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF CATHERINE O'NEIL**

Respectfully submitted,

Gerald L. Maatman, Jr.
(gmaatman@duanemorris.com)
Jennifer A. Riley
(jariley@duanemorris.com)
Gregory Tsonis
(gtsonis@duanemorris.com)
Justin Donoho
(jrdonoho@duanemorris.com)
Gregory S. Slotnick
(gsslotnick@duanemorris.com)
DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000

**ATTORNEYS FOR DEFENDANT**

## TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY ...................................................................1

II.     PROCEDURAL BACKGROUND.......................................................................3

III.    SUMMARY OF OPINIONS ...............................................................................4

    A.    O'Neil's "Step One": Attempting To Establish A "Baseline" Linear
        Regression Model To Estimate Average Time to Complete Cases And
        Tasks .................................................................................................... 4

    B.    O'Neil's Step Two: Applying The Linear Regression Model To Each
        Putative Class Member To Attempt To Estimate "True" Time Worked............... 7

    C.    O'Neil's Step Three: Subtracting Recorded Hours from "True" Hours................. 8

IV.     LEGAL STANDARD...........................................................................................8

V.      ARGUMENT .......................................................................................................9

    A.    The Court Should Exclude O'Neil's Testimony Because She Does Not
        Base Her Opinions On Sufficient Facts Or Data ..................................... 9

    B.    O'Neil's Opinions Are Not The Product Of Reliable Principles And
        Methods................................................................................................ 13

        1.    The Court Must Exclude O'Neil's Damages Model Because It Relies
            On Biased And Unreliable Inputs ............................................. 13

        2.    The Court Must Exclude O'Neil's Testimony Because She Relies On
            Cherry-Picked Inputs That Are Not Random Or Representative ............ 17

        3.    The Court Must Exclude O'Neil Because She Fails To Test Her
            Opinions Or Quantify Error Rates ........................................... 20

    C.    O'Neil Has Not Reliably Applied Her Principles And Methods To The
        Facts Of The Case ................................................................................ 22

        1.    SICM Data Does Not Reflect Time Worked And O'Neil's Proposed
            Use Would Result In Overcompensating Putative Class Members.......... 22

        2.    O'Neil's Methodology Cannot Estimate Hours Worked By Portions Of
            The Putative Class Such As Major Case Investigators........................... 25

    D.    The Court Should Exclude O'Neil's Opinions As Irrelevant And
        Unhelpful To Class Certification ......................................................... 26

VI.     CONCLUSION..................................................................................................29

i

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ....................................13

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999) .............................................................26

*Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015) .........................................................12

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ....................................................................1, 28

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...............................1, 13, 19

*In re Diet Drugs, No. MDL 1203*, 2001 WL 454586 (E.D. Pa. 2001).........................................20

*E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370 (S.D.N.Y. 2010) ....................................14, 17, 20

*Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*, 693 F. Supp. 3d 335 (E.D.N.Y. 2023) .............................................................................................................................9

*Farmer v. DirectSat USA, LLC*, 2013 WL 1195651 (N.D. Ill. 2013)....................................20, 25

*Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365 (S.D.N.Y. 2014).........................................17

*Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130 (D. Or. 2002) ................................20

*Gonzales v. Harley-Davidson Motor Co. Grp.*, 2005 U.S. Dist. LEXIS 51304 (D. Ariz. 2005) ..........................................................................................................................20

*Hartman v. EBSCO Indus., Inc.*, 2013 WL 5460296 (N.D. Ind. 2013).......................................20

*Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)....................25

*Hurt v. Com. Energy, Inc.*, 2015 WL 410703 (N.D. Ohio 2015) ........................................... 18-19

*Jerue v. Drummond Co., Inc.*, 2023 WL 6610603 (M.D. Fla. 2023) ...........................................28

*Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015).............................10

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688 (S.D.N.Y. 2007) .........17

*Kim v. Benihana, Inc.*, 2024 WL 3550390 (C.D. Cal. 2024)......................................................25

*Lamarr-Arruz v. CVS Pharmacy, Inc.*, 2017 WL 4277188 (S.D.N.Y. 2017)..............................22

*Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719 (E.D.N.Y. 2016)......................................10

*Maurizio v. Goldsmith*, 2002 WL 535146 (S.D.N.Y. 2002)..................................................10, 12

*Med. Depot, Inc. v. Med Way US, Inc.*, 2024 WL 1835374 (E.D.N.Y. 2024)................................9

*In re Mirena (II)*, 341 F. Supp. 3d at 241, 242 ................................................17

*In re Mirena IUD*, 169 F. Supp. 3d at 449, 456................................................18

*Pogil v. KPMG L.L.P.*, 2024 WL 1208909 (S.D.N.Y. 2024) ........................................10

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014)...........22

*In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................23, 26

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991 (S.D.N.Y. 2003) ................................................................................14, 17

*Santiago v. Fischer*, 2020 WL 9816014 (E.D.N.Y. 2020) ........................................25

*Sorto-Romero v. Delta Int'l Mach. Corp.*, 2007 WL 2816191 (E.D.N.Y. 2007) ........................10

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976 (S.D.N.Y. 2001)..................14

*Toomey v. MillerCoors LLC*, 86 F. Supp. 3d 202 (E.D.N.Y. 2015) ..................................10

*United States v. Williams*, 506 F.3d 160-61 (2d Cir. 2007)........................................13

*Valente v. Textron, Inc.*, 931 F. Supp. 2d 409 (E.D.N.Y. 2013)..................................20

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005)........................26

*Young v. Brand Scaffold Servs., LLC*, 2009 WL 4674053 (E.D. Tex. 2009) ..............................10

*Zaremba v. Gen. Motors Corp.*, 360 F.3d 355 (2d Cir. 2004)..................................9-10

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ........................................9

**Rules**

Fed. R. Evid. 702 ........................................................................*Passim*

Fed. R. Evid. 702(b)........................................................................9, 17

Fed. R. Evid. 702(c)........................................................................13, 22

Fed. R. Evid. 702(d)........................................................................22

Rule 23 ........................................................................28

## I.    INTRODUCTION AND SUMMARY

The Court should exclude the testimony of Plaintiffs' proposed expert, Catherine O'Neil, the sole evidence on which Plaintiffs rely to satisfy their burden to show that the Court could calculate damages on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). O'Neil's opinion that she can estimate the "actual number" of hours that Plaintiffs and putative class members worked using one or more linear regression models is unreliable and based on a flawed methodology and, therefore, inadmissible.   O'Neil's opinions represent a mere "thought experiment" because she has not performed any analysis to demonstrate the viability of her proposed model, despite having data available to do so.  Plaintiffs cannot show by a preponderance of the evidence that O'Neil's proposed opinions meet the requirements of the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), subsequent precedent applying *Daubert*, or Federal Rule of Evidence 702 for various reasons.

First, O'Neil's testimony is inadmissible because she does not base her opinions on sufficient facts and data.  As O'Neil concedes, her model is "completely theoretical."  O'Neil has not analyzed any of the data slated for use in her model, has not built the model she proposes, and has reviewed only a negligible amount of the information produced in this case.

Second, O'Neil's testimony is inadmissible because O'Neil's theoretical model is not the product of reliable principles and methods.  O'Neil bases her model on Plaintiffs' self-reported hours, which the record confirms are unreliable and severely biased, though O'Neil fails to control for such factors.  Next, O'Neil limits her "baseline" to only Plaintiffs and fails to utilize any random or representative sample, introducing selection bias that she again fails to control for. Finally, O'Neil's analysis lacks any reportable or testable margin of error, and O'Neil does not have any prediction of her proposed model's error margin and has not tested her model to discern the magnitude of its errors in estimating putative class members' damages.  Expressing error

margins is standard in any linear regression model, and O'Neil possessed the data to perform those calculations yet failed to do so.

Third, O'Neil's opinions should be excluded because Plaintiffs cannot demonstrate that her proposed model reflects a reliable application of scientific principles and methods to the facts of the case. O'Neil provides no reasoned basis for her opinion that available data can be used to calculate hours worked by any individual. Further, O'Neil provides no support for her decision to base her model only on the testimony and data for five to 20 Plaintiffs and lacks any basis for assuming such information would apply to all putative class members. Finally, O'Neil conceded that her model will not work for a portion of the putative class members, such as for Plaintiff Peggy Fischer and other major case investigators. O'Neil concedes that her proposed model will significantly overstate or understate the estimated damages for putative class members who deviate significantly with respect to variables O'Neil's model does not attempt to and cannot control for, such as worker efficiency, commute distances, traffic, weather, home office setups, and "all kinds" of other independent variables.

Fourth, O'Neil's opinions will not help the trier of fact understand the evidence or determine a fact in issue, rendering them unhelpful and irrelevant. The fact in issue for which Plaintiffs offer O'Neil's opinions is whether Plaintiffs can establish "the amount and extent of unpaid work" for all putative class members with "common evidence." (ECF No. 98-1, at 22, 24.) The answer to that question is no because it would require myriad individualized inquiries. While O'Neil attempts to fix a few (but not most) of the reasons for exclusion in various ways, each curing method she proposes would require individualized testimony or evidence for each putative class member and "hand tuning" following "limitless" individualized testimony by Plaintiffs. That

2

defeats the point of her testimony and renders O'Neil's opinions irrelevant and unhelpful to the class certification inquiry.

For each of these independent reasons, this Court should exclude O'Neil's opinions in full.

## II.    PROCEDURAL BACKGROUND

On March 12, 2025, Plaintiffs submitted their motion for class certification accompanied by the Declaration of Catherine O'Neil.  (**Exhibit A**, O'Neil Decl.)  On April 24, 2025, Defendant deposed O'Neil regarding the opinions set forth in the O'Neil Declaration.  Defendant included a declaration from Matthew R. Thompson addressing the inadequacies of O'Neil's methodology and purported model with its Response.  (**Exhibit B**, Thompson Decl.)  With their Reply, Plaintiffs submitted a supplemental Declaration of Catherine O'Neil.  (**Exhibit C**, O'Neil Reply Decl.)

In forming the opinions set forth in her initial declaration, O'Neil considered only the following three documents: (1) an Excel spreadsheet produced by GEICO reflecting data collected by GEICO's Special Investigation Case Management ("SICM") system,[1] which O'Neil refers to as the "SICM Report," bates-stamped G010798; (2) a SICM "data dictionary"; and (3) the deposition transcript of former SIU Manager William Newport.  (O'Neil Decl. ¶ 3; **Exhibit D**, Deposition Transcript of Catherine O'Neil ("O'Neil Dep.") at 20:7-21:16.)  O'Neil also collectively interviewed Plaintiffs Keith Fischer, Margaret "Peggy" Fischer, and Michael Reed, and subsequently produced the notes from that conversation.  (O'Neil Decl. ¶ 3; **Exhibit E**, 7/17/24 O'Neil Meeting Notes, P00001668-1670.)

---

[1] The SICM Report is not a time record.  It reflects, for certain investigators, the numbers of certain activities completed over a month, such as the number of cases assigned, the number of cases closed, and the number of examinations under oath completed, for example.

O'Neil did not consider:  (i) any other available SICM data; (ii) 18 other deposition transcripts, including all 16 transcripts of Plaintiffs' depositions; (iii) 38 declarations, including 29 declarations submitted by Plaintiffs and 9 declarations submitted by Defendant; (iv) 56 sets of interrogatory answers, including all 55 sets of interrogatory answers submitted by Plaintiffs; or (v) more than 4,800 produced documents totaling over 21,000 pages.

O'Neil's second declaration states that she "relied on" "the hours estimates of 24 GEICO investigators" who submitted declarations in this matter.  (O'Neil Reply Decl. ¶ 1.)  It also states that O'Neil is "not concerned with the potential for 'biased' hours estimates" because while "people might estimate more hours than they actually worked," her model "does not rely on testimony alone."  (*Id*. ¶ 14.)

## III.    SUMMARY OF OPINIONS

Plaintiffs retained O'Neil to "describe a model that would measure [putative class members' alleged] lost wages."  (O'Neil Dep. at 32:10.)  According to O'Neil, "[t]hat's the gist of it."  (*Id.* at 32:7.)  O'Neil opines that she could perform her proposed "measure[ment]" in three steps:  (1) averaging Plaintiffs' self-reported hours (as described in their self-interested interrogatory responses), and preparing a regression analysis of that data against information reflecting Plaintiffs' case-related activities, to assign an amount of time to each type of case-related activity; (2) applying the assigned time-per-activity amounts to the case-related activity data for some putative class members (many putative class members do not track such activity), to reverse-engineer their purported "actual time" spent working; and (3) subtracting the hours each person recorded in GEICO's timekeeping system from the purportedly "actual" hours worked.

### A.    O'Neil's "Step One":  Attempting To Establish A "Baseline" Linear Regression Model To Estimate Average Time to Complete Cases And Tasks

O'Neil opines that her first step would involve establishing a "baseline" by using a linear regression analysis to compare Plaintiffs' estimated hours with certain categories of activities reflected in the SICM Report.  The linear regression model O'Neil proposes is simply a "thought experiment."  (O'Neil Dep. at 15:3.)  She "ha[s] not taken any steps to actually create that model, based on data that's available" or to test that model.  (*Id.* at 16:12-15.)  Similarly, she "ha[s]n't taken the data that is available to [her] and run any analysis on it."  (*Id.* at 49:5-8.)  Further, O'Neil has never attempted to model the time to do anything as an output of a linear regression in the past.  (*Id.* at 80:17-81:4.)  This would be her first time.  (*Id.*)  According to O'Neil, "[t]his is all completely theoretical."  (*Id.* at 70:16.)

Step 1(a) would be to obtain the number of hours that Plaintiffs testified they worked during the relevant period, including alleged off-the-clock hours.  (O'Neil Decl. ¶ 6.)  O'Neil reviewed Plaintiffs' 2023 responses to interrogatories, which contain Plaintiffs' untested assertions regarding the number of hours they allege they worked during the relevant period, and did not actually review Plaintiffs' testimony regarding their estimated hours.  (O'Neil Dep. at 21:10-16; 55:14-56:16; O'Neil Reply Decl. ¶ 1.)  O'Neil conceded that such estimations are subject to "error" given:  (a) that they consist of "estimat[ed] hours that they worked several years ago"; and (b) there is "a potential bias" associated with Plaintiffs' "self-reporting," possibly resulting in an "overreport" of the number of hours worked.  (*Id.* at 36:21-37:20.)  Despite the admitted incorrectness and bias, O'Neil labels those estimates the "ground truth" of the time Plaintiffs "actually work[ed]" any month.  (O'Neil Dep. at 37:25-38:5, 42:10-12, 43:7-21, 44:7-11, 83:18-21, 106:14-22.)

In Step 1(b), O'Neil then would average certain Plaintiffs' hours estimates and compare that average against information reflected in in the SICM Report to attempt to create a "baseline"

model.  (O'Neil Decl. ¶ 6; O'Neil Dep. at 44:17-45:7, 54:20-55:4.)  O'Neil would look at "specific kinds of work done by Special Investigators" and which are tallied in the SICM Report on a monthly basis, such as:

(a) closing a case;

(b) investigating a feature;

(c) "impacting" a feature;

(d) closing a case of a certain level/type;

(e) achieving a certain "disposition type" in closing a case; or

(f) performing certain "investigative activities."

(O'Neil Decl. ¶ 7.)  Although the information in the SICM Report only indicates that certain activities took place (*e.g.*, a certain number of cases were closed over the month), it does not show when such activity occurred or how much time each activity took.  O'Neil nevertheless opines that she can use it to create her "baseline" model.  According to O'Neil, she would:  (1) prepare one or more linear regression models to measure average time to perform activities  listed in (a) – (f) above (*id.* ¶¶ 6-10); and (2) use the linear regression models to "estimate the average time cost (in hours) for each kind of investigative activity."  (*Id.* ¶ 9.)  In other words, although SICM does not contain any information regarding the amount of time spent on any given activity, O'Neal would use Plaintiffs' self-reported hours and the activity information contained in Plaintiffs' SICM Report to quantify the time they spent to "close a case" or to perform other activities tallied in SICM, and then apply those "time costs" to other putative class members to purportedly derive their "actual time worked" over the course of a month.  (*Id.* ¶¶ 12-15; O'Neil Dep. at 81:23-82:6.)  While O'Neil would to "corroborate" Plaintiffs' estimated hours through SICM or email timestamps, she admitted that "it would be very difficult for me to – to reassure myself that

6

[Plaintiffs' contentions] are accurate." (O'Neil Decl. ¶ 8; O'Neil Dep. at 63:7-70:16, 106:23-107:17.) And while record evidence may "cut against" the truth of Plaintiffs' claimed hours and "whether these claimed hours are actually being worked," O'Neil proposes no methodology or adjustments to account for contradictory evidence because she's "not assessing the accuracy of the reported hours." (*Id.* at 111:9-10, 202:2-9.)

In O'Neil's words, the time estimates that her model uses would have "lots and lots of padding" built in to account for time spent on "a huge number of pieces of work" that are not tallied in SICM. Such activities include for example, driving a vehicle, trainings, coaching sessions with supervisors, attending office meetings, shadowing others to learn their cases, and booting up and shutting down computers. (*Id.* at 101:7-24, 103:23-104:11, 124:15-128:4, 154:24-155:24.) This "padding" "will be incorporated into [each measurement of time to complete a case or task assignment] on an average basis." (*Id.* at 127:21-23.)

### B.    O'Neil's Step Two:  Applying The Linear Regression Model To Each Putative Class Member To Attempt To Estimate "True" Time Worked For That Putative Class Member

In Step two of O'Neil's proposed analysis, for a given month, she would apply the time costs derived for each category of activity to the information tallied in SICM for to certain putative class members "to get an estimate of true hours worked." (O'Neil Decl. ¶¶ 11-12; O'Neil Dep. at 37:25-38:18, 44:12-15, 46:7-8, 152:12-153:23.)  O'Neil concedes several shortcomings this approach.

First, estimated damages would be unmodeled for any putative class member who did not enter activities in SICM on a daily or more frequent basis. (*Id.* at 120:25-121:6, 122:4-123:3.) O'Neil posits this would be "a different type of model" requiring "different types of data," though she "do[es]n't have any understanding that such data exists" and could not create it without such data. (*Id.* at 137:11-139:15, 140:18-22.)

Second, O'Neil's proposed model and its application depends on only "slight" variation across putative class members in the time it takes to complete any variable being measured (such as cases closed, disposition, etc.)  (O'Neil Decl. ¶ 9; O'Neil Dep. at 178:12-16.)  The "reliability of the regression" she proposes "is contingent on how much variation there might be within the group."  (O'Neil Dep. at 91:18-22; *see* 96:18-21 (similar).)  Thus, any significant variation among putative class members with respect to any of these categories being measured would introduce error into O'Neil's proposed model and its application.  (*Id.* at 173:23-174:3.)

Third, the magnitude of error expected in the output of O'Neil's proposed model remains unknown.  While magnitude of error is "a standard output of multilinear regression," O'Neil has not calculated and cannot offer any estimate regarding the magnitude of error to this Court.  (O'Neil Decl.; O'Neil Dep. at 180:9-18.)  Thus, her opinion deviates from standard practices in data science.  Further, O'Neil has not tested her proposed model for accuracy and concedes that her model cannot possibly be tested for accuracy.  (O'Neil Dep. at 199:13-24.)  There is no way for her model to capture or confirm the actual number of hours an individual worked in a workweek.  (*Id.*)

**C.    O'Neil's Step Three: Subtracting Recorded Hours from "True" Hours**

Step three of O'Neil's analysis is to subtract a putative class member's reported hours for the month from the supposed "true hours" derived from her regression analysis to get the "estimated unreported hours for the month."  (*Id.*)

**IV.    LEGAL STANDARD**

A court must exclude an expert's opinion under Federal Rule of Evidence 702 unless the proponent shows "that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.  Exclusion is warranted if the proponent fails to prove any one of Rule 702's requirements "by a preponderance of the evidence." *Med. Depot, Inc. v. Med Way US, Inc.*, 2024 WL 1835374, at *2 (E.D.N.Y. 2024).

## V.    ARGUMENT

The Court should exclude O'Neil's testimony because she does not base her testimony on sufficient facts or data, her opinions are not the result of reliable principles and methods, her opinions do not reflect a reliable application of scientific principles to the facts of this case, and her opinions are not helpful to the class certification inquiry.

### A.    The Court Should Exclude O'Neil's Testimony Because She Does Not Base Her Opinions On Sufficient Facts Or Data

The Court should exclude O'Neil's testimony because O'Neil does not base her opinions on sufficient facts or data.  O'Neil ignored multiple relevant sources of data and information, including the data she claims allows her to create her proposed regression analysis, and failed to use them to prepare or test her opinions.

O'Neil's opinions must be "based on sufficient facts or data." Fed. R. Evid. 702(b).  "Expert opinions based on insufficient facts or data, or on unsupported suppositions [are] not acceptable.  Anecdotal evidence and 'generalized assumptions' are inadequate bases for an expert report." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (internal citations omitted).  Courts routinely exclude damages opinions that lack sufficient data or evidence and that instead rely on "conjecture" or "hypothetical" models. *See Zaremba*, 360 F.3d at 357, 360 (affirming exclusion of damages opinion consisting of "unsupported conjecture" based on a "hypothetical alternative design" that "had not been examined or tested"); *Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*, 693 F. Supp. 3d 335, 355 (E.D.N.Y. 2023) (excluding opinion where

proffered expert "provided no explanation rooted in any facts or data within the record or otherwise"); *Toomey v. MillerCoors LLC*, 86 F. Supp. 3d 202, 207 (E.D.N.Y. 2015) (excluding opinion that was "simply too speculative" and "not based on any facts or evidence in the record"); *Pogil v. KPMG L.L.P.*, 2024 WL 1208909, at *14 (S.D.N.Y. 2024) (granting motion to exclude damages opinion based on "assumptions" that were "hypothetical" and "ungrounded in the record"); *Maurizio v. Goldsmith*, 2002 WL 535146, at *5 (S.D.N.Y. 2002) (excluding opinion because expert "offers no facts or data supporting his proposed testimony"); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 181 (N.D. Cal. 2015) (excluding opinion proffering hypothetical regression model "without any showing that the data is available"); *Young v. Brand Scaffold Servs., LLC*, 2009 WL 4674053, at *4 (E.D. Tex. 2009) (excluding damages opinion where proffered expert "did not use any facts or data").

Further, an expert's failure to test assumptions with available data runs afoul of Rule 702 and renders expert testimony unreliable and, therefore, requires exclusion. *See, e.g., Sorto-Romero v. Delta Int'l Mach. Corp.*, 2007 WL 2816191, at *7-9 (E.D.N.Y. 2007) (granting motion to exclude expert opinion and stating "[i]n analyzing the reliability of an expert's testimony, the 'key question' is 'whether it can be (and has been) tested'"); *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 737 (E.D.N.Y. 2016) (excluding opinion where expert "admitted that neither prior to nor during the investigation of this case did he perform any tests" regarding the proposed methodology); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (affirming exclusion where expert "did not perform any test" to support opinion and "offer[ed] no tests, models, [or] calculations" supporting opinion, noting that "[n]umerous courts" exclude expert opinions where the expert did not create "models or administer tests").

Here, O'Neil relies on assumptions and hypotheticals that she did not test against the data. According to O'Neil, her opinions are a "thought experiment" (O'Neil Dep. at 15:3) and "completely theoretical." (*Id*. at 70:16.)  She has not prepared or used the model she contends she could build in this matter, and, in fact, she has *never* prepared or used a linear regression model to estimate the time spent performing activities.  (*Id*. at 80:17-81:4.)  Retained by Plaintiffs' counsel, O'Neil claims she "could" build such a model but has not done so in this case because she "do[esn't] have the data."  (*Id.* at 66:17-18.)  While O'Neil unquestionably does not possess *all* data for *all* putative class members for the applicable limitations period, the spreadsheet that O'Neil relies upon to opine that she *could* build the model she proposes contains *actual data*, for a subset of Plaintiffs and putative class members, that O'Neil asserts "can be used to assess damages."  (O'Neil Decl. ¶ 5; *see id*. ¶ 3 (relying on SICM Report.)  Thus, O'Neil  possesses complete data, from a multiple-month period, which she could have used to attempt to substantiate her proffered opinions for some of the Plaintiffs and putative class members.

The SICM Report on which O'Neil relies contains various categories of data, for seven complete months, for 34 Plaintiffs and putative class members.  The columns in the report specify interviews conducted per month, including whether the interviews were face-to-face, over the phone, or recorded; how many cases required an Examination Under Oath ("EUO"); whether an EUO took place; whether a medical file review occurred; number of scene canvases done; the disposition of closed cases in each month; various case types such as "field" (cases requiring field investigative work), "desk" (investigated from an office), or social media (reviewing online social media profiles as part of a claim.  (Ex. F.)  Though unwritten in her declaration, O'Neil explained "an idea" to "corroborate Plaintiffs' recollections" as to hours allegedly worked by referencing quartile rankings of each investigator for productivity, which the SICM Report reflects.  (O'Neil

Dep. at 61:16-63:6; Ex. F.)  The SICM Report also provides data showing "new cases assigned," "closed cases," "case impact ratio," "productivity ratio," "investigative events," and "various performance metrics" that O'Neil contends she can use to model the time required to do each category of data (like close a case) for the time period encompassing January to August 2022.[2]

Despite possessing and reviewing 238 months of data for varied individuals, and precisely the same data that O'Neil contends she would utilize to build her model, O'Neil conducted *no* analysis of this data to support her opinions.  When asked if she "ever looked at that data and actually tried to create the model [she] contend[s] is possible in [her] declaration," O'Neil responded:  "I haven't done it on a computer.  I have done it in my head.  I thought about it quite thoroughly."  (O'Neil Dep. at 15:15-20.)  When pressed if she did "a linear regression in her head to model the data," O'Neil responded "I know how to do a linear regression.  It's very familiar to me, so I imagined doing it."  (*Id*. at 15:23-16:6.)  Ultimately, O'Neil conceded that she "ha[s] not taken any steps to actually create that model, based on data that's available."  (*Id*. at 16:12-15.)

In sum, O'Neil failed to construct any version of her damages model, even though she possessed the very data that she contends she would rely upon to do so – *i.e.*, both the SICM Report and Plaintiffs' estimated hours – for the period encompassing January 2022 through July 2022 for Plaintiffs and putative class members.  She limited the extent of her work to a "thought experiment" rather than actual analysis grounded in available data.  In so doing, she failed to test her opinions and "avoid[ed] presenting any data or information upon which opposing counsel and the jury can utilize to test the correctness of [her] conclusion."  *Maurizio*, 2002 WL 535146, at *5 (granting motion to exclude damages opinion); *see Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144

---

[2] As the SICM Report was a contemporaneous report apparently compiled in August 2022, the August data reflects mid-month performance.  The SICM Report reflects reporting that is no longer utilized by GEICO.

(M.D. Pa. 2015) (excluding damages opinion, stating, "the expert must conduct some sort of independent investigation or verification to ensure that the data he or she plans to use is both accurate and helpful to the court). *Daubert* and Rule 702 demand more.

### B. O'Neil's Opinions Are Not The Product Of Reliable Principles And Methods

Plaintiffs cannot meet their burden to show that O'Neil's opinions "are the product of reliable principles and methods." Fed. R. Evid. 702(c). To be admissible, "it is critical that an expert's analysis be reliable at every step," and "any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation omitted). *Daubert* described the applicable factors regarding reliability, including (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Plaintiffs cannot meet these factors because O'Neil's model has not been and cannot be tested, has not been subject to peer review, has no known or potential rate of error, incorporates no standards or controls, and has not gained general acceptance in the relevant scientific community.

### 1. The Court Must Exclude O'Neil's Damages Model Because It Relies On Biased And Unreliable Inputs

The Court must exclude O'Neil's proposed damages model because it depends on Plaintiffs' self-interested, biased testimony. Such inputs are not scientifically valid and reliable measures of Plaintiffs' purported work hours, and O'Neil does not verify their accuracy or take steps to control for their partiality. "[A]ny expert should be aware that a party and counsel in a

13

litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entertainment, Inc. v. William Morris Agency, Inc*., 2003 WL 22124991, at *3 (S.D.N.Y. 2003)

For an expert's opinion to be reliable, the data upon which the expert relies also must be reliable, thus it is incumbent upon experts to verify the accuracy of the information that they utilize. *See E.E.O.C. v. Bloomberg L.P*., 2010 WL 3466370, at *14 (S.D.N.Y. 2010) ("Relying solely on the information fed to [the expert] by the [expert's client] without independently verifying whether the information is representative undermines the reliability of his analysis."). Expert testimony is unreliable where assumptions are based upon "conclusory statements of the expert's client, rather than on the expert's independent evaluation." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc*., 2001 WL 1602976, at *4-5 (S.D.N.Y. 2001); *Rowe*, 2003 WL 22124991 at *9.

The starting point and foundation of O'Neil's purported damages model is the estimated hours worked as supplied by Plaintiffs. O'Neil confirmed at her deposition that she needs to "be able to trust that this number is true," that it is an "important number" in her analysis, and that the number "establish[es] the ground truth, [] how much they actually worked." (O'Neil Dep. at 51:2-25.) O'Neil contends that though a single individual's testimony would do, based on the distribution of answers, she may need five to 20 Plaintiffs' testimony regarding actual hours purportedly worked to build her model. (O'Neil Dep. at 37:25-38:5, 42:10-12, 43:7-21, 44:7-11, 83:18-21, 106:14-22.) "[A] the end of the day," O'Neil "would average them all to say, the average is this." (*Id*. at 53:13-14.)

Plaintiffs' estimated hours are key to every step in O'Neil's proposed damages model. Using that "ground truth," O'Neil plans to use monthly information concerning Plaintiffs' tasks to "establish an estimate of time costs of various specific kinds of work done by special

investigators." (O'Neil Decl. ¶ 9.) Using those calculated "time costs," O'Neil contends that she can "figure out the difference between how much [Plaintiffs] actually worked and how much they stated they worked on their time sheets." (O'Neil Dep. at 41:3-20.) That, O'Neil contends, would calculate the amount of "stolen time" and "wage theft" from Plaintiffs. (*Id*. at 41:4-7, 45:5-17.)

Despite the estimated hours' importance to her model, O'Neil took no steps to address the bias inherent in Plaintiffs' estimates. Although she recognized that "there is a potential bias that could be involved in the self-reporting of hours worked" by the plaintiffs in a lawsuit, who "may be incentivized to overreport the number of hours that they claim to have worked," O'Neil admitted that her model does not account for that bias. (O'Neil Dep. at 37:4-20.) As Defendant's expert confirmed, O'Neil's methodology fails to account or control for this bias, rendering it unreliable. Indeed, O'Neil's failure to control for bias contradicts the methodological best practices described in her own published works. (Thompson Decl. ¶¶ 8-11.)

Prior to submitting her initial opinions, O'Neil failed to obtain any information regarding the hours Plaintiffs contend they worked. (O'Neil Dep. at 55:14-56:16.) In her Reply Declaration, O'Neil asserts that she "relied on" the "hours estimates of 24 GEICO investigators [who] submitted declarations in this matter," referencing the declarations of the Named and Opt-In Plaintiffs containing, in part, their estimates of hours worked. (Reply Decl. ¶ 1.) In other words, even after questioning regarding bias at her deposition, O'Neil chose to continue blindly accepting biased hours estimates set forth in Plaintiffs' cookie-cutter declarations as the foundation of her model.

The record confirms that Plaintiffs' self-reported hours are infected with substantial error and bias. A cursory comparison of Plaintiffs' hours estimates against their deposition testimony would have confirmed the unreliability of Plaintiffs' self-reported hours estimates. For example,

Plaintiff Costanzo stated under oath that "from November 2021 to November 2023" he "worked about 42 to 45 hours a week." (Costanzo Decl. ¶ 17.) Yet when questioned on this statement during his deposition, Costanzo confirmed the inaccuracy of this claim, admitting that he ceased working overtime when he saw a report comparing his performance to others' performance. (Costanzo Dep. at 253:4-254:6.) Similarly, despite claiming in her declaration that she worked "46 to 48 hours per week" from "November 2021 to the present," Plaintiff Munoz admitted in her deposition that she ceased working overtime in 2023, when GEICO instituted a new mobile timekeeping system. (Munoz Decl. ¶ 10; ECF No. 98-76, Munoz Dep. at 78-79, 185.)

These are not isolated examples of erroneous and biased allegations. Plaintiff Keith Fischer alleged that he "only entered 7.75 working hours per day, five days a week, regardless of how many hours [he] actually worked" (ECF No. 56-8 ¶ 8), but timekeeping records show that he requested to work overtime and recorded overtime on at least six occasions in 2017. (ECF No. 98-99.) Plaintiff Caniglia similarly declared that he was never permitted to enter more than 38.75 hours per week and, therefore, consistently worked unrecorded overtime. (ECF No. 56-4, Caniglia Decl. ¶¶ 14, 16, 18.) Yet, at his deposition, he confirmed that, between 2016 and 2018, his supervisor permitted him to work and record more than 38.75 hours per week so long as he documented the business need in an email. (**Exhibit G**, Caniglia Dep. at 138:4-14.) Plaintiff Grey alleged that in nearly all workweeks between 2016 and 2023, he was permitted to record and was paid for only 38.75 hours. (ECF No. 56-13, Grey Decl. ¶ 11.) Faced with his time records at his deposition, however, Grey admitted that he was permitted and instructed to record overtime in 2016 and 2017, and that he recorded overtime for 14 workweeks over an eight-month period in 2019. (**Exhibit H**, Grey Dep. at 154:17-155:8, 161:9-169:3, 172:9-14.) Multiple other Plaintiffs

likewise recorded overtime from 2020 to the present, despite similar assertions.  (ECF No. 62-37, Fogarty Decl. ¶ 31.)

Despite the above inconsistencies, O'Neil blindly accepted Plaintiffs' allegations, did not review their deposition testimony or time records, and did not test the reliability of their allegations or control for their bias in any way.  On that basis alone, O'Neil's testimony must be excluded as unreliable.  *See Rowe*, 2003 WL 22124991 at *3 (finding data upon which expert relied insufficient because it would "be biased"); *Bloomberg L.P.*, 2010 WL 3466370 at *17 (excluding expert testimony and stating that "[t]o ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology").

### 2.    The Court Must Exclude O'Neil's Testimony Because She Relies On Cherry-Picked Inputs That Are Not Random Or Representative

O'Neil's testimony is inadmissible because her methodology in creating a purported "baseline" for the time associated with particular tasks does not rely on any sufficiently large, random, or representative sample of the putative class, contrary to established practice, but instead relies exclusively on Plaintiffs' estimations of their purported hours worked.  Her methodology is infected with selection bias, which requires its exclusion.  *See* Fed. R. Evid. 702(b).

The court must exclude an expert's opinion where an expert considers only biased information, selectively defines the universe of relevant evidence, or fails to verify whether information or data is representative.  *See Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 380-81 (S.D.N.Y. 2014); *Bloomberg L.P.*, 2010 WL 3466370 at *14 (excluding expert testimony that "simply assumed the validity of the allegations" and "rel[ied] solely on the information fed to him…without independently verifying whether the information is representative").  "Opinions that assume a conclusion and reverse-engineer[] a theory to fit that conclusion are, similarly, inadmissible."  *In re Mirena (II),* 341 F. Supp. 3d 213, 241-42 (S.D.N.Y. 2018) (citations and

quotations omitted); *see, e.g.*, *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *12-13 (S.D.N.Y. 2007) (excluding damages expert reports and testimony because calculations were based on a data "so flawed that its probative value is substantially outweighed by its potential for unfair prejudice"); *Hurt v. Com. Energy, Inc.*, 2015 WL 410703, at *4-7 (N.D. Ohio 2015) (excluding damages report based on unreliable data that was not representative and did not follow generally accepted methodology, such as accounting for possible biases); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 449, 456 (S.D.N.Y. 2016) (excluding expert testimony that "discusse[s] only the evidence that [she] believed would advance the plaintiffs' position") (alterations in original).

In *Hurt*, for instance, an expert sought to calculate damages by relying upon a survey seeking "how many hours per day and how many days per week [plaintiffs] spent [working] for defendants," among other information, distributed to the plaintiffs by plaintiffs' counsel. *Hurt*, 2015 WL 410703 at *3, *5-8. Using the results, the expert estimated the median numbers of hours and days worked, estimated damages owed to each person, and extrapolated the results to other class members. *Id*. The court excluded the expert's testimony due in part to plaintiffs' self-reported hours, noting "the risks of faulty memory and insincere responses (i.e., giving untrue answers to produce some favorable results)" and the expert's failure to account for those biases. *Id*. at *4-5 (noting the "enhanced likelihood that the respondents would inflate the hours they worked in order to increase the damages they would recover"). The court next expressed concern regarding the selection of plaintiffs, noting that "ill-will toward Defendants [would] make [some respondents] particularly eager to give 'insincere responses.'" *Id*. at *5. "[H]igher or lower damages on average" by survey respondents, the court noted, "would have biased the [total damages] results." *Id*. Thus, the court excluded the expert's testimony as unreliable.

The information on which O'Neil purports to rely is not representative of the putative class. First, to establish the "ground truth of actual work time" to establish a baseline, O'Neil exclusively incorporates only *Plaintiffs'* self-reported hours. (O'Neil Decl. ¶ 6 ("I would seek to establish a baseline by correlating the case and task assignments in the SICM dataset with the number of hours that Plaintiffs testified to."); *see* O'Neil Dep. at 35:24-36:9, 38:8-18, 43:7-11; O'Neil Reply Decl. ¶ 1 (citing exclusively the declarations of Named and Opt-In Plaintiffs).) Plaintiffs, however, are only *some* of the putative class members who submitted estimates of hours worked, and O'Neil does not verify that they are representative.

Second, O'Neil selectively disregards other members of the putative class and ignores their testimony. For example, six putative class members provided testimony that they generally worked only their 38.75 scheduled hours each week, with limited exceptions. (ECF Nos. 98-123, McDermott Decl. ¶¶ 14-17; 98-124, Koenig Decl. ¶¶ 22-24; 98-125, Sheppard Decl. ¶¶ 31-34; 98-126, Butler Decl. ¶¶ 20-22; 98-127, Bishop Decl. ¶¶ 27-29; 98-128, Carbonaro Decl. ¶¶ 21-24.) In the rare circumstances those putative class members worked more than 38.75 hours, they entered that time into GEICO's timekeeping system and were paid for all time worked. (*Id*.) Those six putative class members' estimates declared that they generally worked no overtime and did not need to work overtime to complete their work. (*Id*.) O'Neil's proposed methodology to establish her "baseline" inexplicably omits these individuals' estimates entirely, without explanation.

O'Neil's exclusive reliance on Plaintiffs' estimated hours constitutes impermissible selection bias. She ignores contrary evidence to maximize Plaintiffs' claimed damages, and omits available hours estimates from non-plaintiffs, reflecting the type of bias warranting exclusion under *Daubert* and Federal Rule of Evidence 702. Because O'Neil's methodology may "inflate the hours [plaintiffs] worked in order to increase the damages they would recover," she cannot

demonstrate that her baseline sample is representative of the putative class or reliable. *Hurt*, 2015 WL 410703, at *5; *Bloomberg L.P.*, 2010 WL 3466370, at *14 (finding exclusion appropriate where expert made "no effort to ensure that the materials he reviewed were representative").

### 3. The Court Must Exclude O'Neil's Testimony Because She Fails To Test Her Model Or Quantify Error Rates

Even if O'Neil's decision to design a model around biased, unreliable data and a non-representative sample did not warrant exclusion (and it does), her failure to even attempt to calculate the "known or potential rate of error" of her model requires the Court to disregard her testimony. *Daubert*, 509 U.S. at 593-94.

Courts routinely exclude expert testimony where an expert fails to test and quantify error rates or confidence intervals. *See Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 425 (E.D.N.Y. 2013) (excluding opinion because expert's "model is not reliable because its error rate is unknown and cannot be determined"); *Farmer v. DirectSat USA, LLC*, 2013 WL 1195651, at *6 (N.D. Ill. 2013) (excluding opinion extrapolating off-the-clock hours calculated for seven plaintiffs to estimate damages for 493 putative class members because "[the expert] runs no tests, calculates no confidence intervals, and provides no margins of error"); *Gonzales v. Harley-Davidson Motor Co. Grp.*, 2005 U.S. Dist. LEXIS 51304, at *19-20 (D. Ariz. 2005) (excluding expert's methodology as unreliable because there was no known error rate or confidence interval); *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1138 (D. Or. 2002) (excluding expert testimony where there was no known margin of error); *In re Diet Drugs,* 2001 WL 454586, at *13 (E.D. Pa. 2001) (excluding expert opinion because "error rate" was "unknown" and "untestable"); *Hartman v. EBSCO Indus., Inc.*, 2013 WL 5460296, at *9 (N.D. Ind. 2013) (granting motion to exclude expert opinion because "[t]he potential error rate is unknown").

Calculating the rate of error of Plaintiffs' self-reported hours was possible. O'Neil confirmed that by using no more than 20 Plaintiffs' testimony as to alleged off-the-clock hours, she could "get a good estimate of the average amount of hours that the plaintiffs worked per week in the baseline time period." (O'Neil Dep. at 60:13-61:4.) If she had at least ten data points, she could "calculate the mean, the average" and "would be able to draw error bars" that she believed would be "pretty tight." (*Id*.)

O'Neil, however, did not conduct any such analysis. (O'Neil Dep at 16:12-20.) When asked at her deposition whether she even asked Plaintiffs' counsel for documents reflecting the number of hours Plaintiffs contend they worked, Plaintiffs' counsel instructed O'Neil not to answer. (*Id*. at 55:23-56:11.) Only following her deposition did O'Neil review and "rel[y] on" the Named and Opt-In Plaintiffs' Declarations. (Reply Decl. ¶ 1.) Despite now having at least 24 individuals' data points, O'Neil's Reply Declaration lacks any calculation of Plaintiffs' average hours or associated "error bars" for the foundational input of her analysis. (*Id*.) O'Neil similarly fails to create any baseline using the SICM Report data, or calculate any analysis of upper and lower bounds of error associated with her "time cost" estimates, to assess the accuracy of her model, despite acknowledging such calculations should be "part of [her] methodology." (O'Neil Dep. at 179:8-180:18.) And, as O'Neil recognized, significant variation in the coefficients that she seeks to analyze through a linear regression would render her model unreliable, making an assessment of error rates critical. (O'Neil Dep. at 175:25-177:12, 178:12-22.) In other words, if the time to close a case conduct an EUO varied significantly across cases or across putative class members, the magnitude of potential error in the average work time attributed to each task would increase exponentially. (*Id*.) O'Neil performed no analysis to determine the scale of potential

21

error in her model, despite confirming that error rate calculations are standard data science practice. (O'Neil Dep. at 180:9-18.)

O'Neil's failure to quantify an error rate – either as to Plaintiffs' self-reported hours or any other portion of her model – renders her model and her opinions unreliable and provides an additional basis for exclusion under Fed. R. Evid. 702(c).

**C.    O'Neil Has Not Reliably Applied Her Principles And Methods To The Facts Of The Case**

Plaintiffs cannot meet their burden to show that O'Neil's opinions and her proposed model "reflect a reliable application of the principles and methods to the facts of the case," and exclusion is warranted for two reasons.  Federal Rule of Evidence 702(d).

**1.    SICM Does Not Reflect Time Worked, And O'Neil's Proposed Use Would Overcompensate Certain Putative Class Members**

The Court should exclude O'Neil's testimony because she does not (and cannot) show that her methodology has any reliable application to the facts of this case.  After unreliably estimating task times, as discussed above, O'Neil uses SICM data regarding tasks performed to estimate total hours worked.  But O'Neil has not tested and does not demonstrate any reliable connection between tasks identified in SICM and time spent on those tasks, let alone any connection between tasks identified in SICM and total hours worked.  As explained by Defendant's expert, "[i]f the time required to complete a given factor varies substantially from case to case, activity to activity, and/or investigator to investigator, there may be no relationship, or no relationship that can be reliably measured, between time and the factor identified in the SICM data."  (Thompson Decl. ¶ 24.)  Further, "[g]iven the variable nature of cases and activities that may be associated with time worked there is no reason to assume a 'tight' relationship exists."  (*Id.* ¶ 27.)

An expert's failure to account for major variables in her analysis warrants exclusion.  *See Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014)

(granting motion to exclude regression opinion because regression model omitted accounting for "major" variable); *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 2017 WL 4277188, at *10 (S.D.N.Y. 2017) (excluding data analysis as unreliable where proffered expert "failed to analyze the effect of potential confounding variables"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1274 (S.D. Cal. 2010) (excluding opinion based on regression model due to "the omission of key independent variables" that were "quantifiable" because omission resulted in study "so incomplete that it is inadmissible as irrelevant and unreliable").

Variation among the putative class members in the time it takes to perform tasks would significantly overstate damages for certain individuals.  (O'Neil Dep. at 92:6-92:17, 95:3-8, 100:12-104:4, 159:13-168:15, 197:3-17.)    Specifically, O'Neil's model would "overstate" damages for a putative class member who, compared with "the composite-average investigator": (a) performed case and task assignments more efficiently; (b) improved efficiency at a greater rate over time; (c) had below-average commute distances; (d) experienced more ideal traffic and/or weather conditions during commutes; and/or (e) experienced above-average efficiencies with respect to "all kinds of independent variables" including "variables that couldn't really be captured by SICM or any other data."  (*Id.*)  O'Neil does nothing to test or control for these variables.

Many such variables are evident throughout the record that O'Neil failed to review.  For example, O'Neil's model would overstate damages for any putative class member who experienced above-average efficiencies in (f) canvassing scenes, (g) conducting EUOs, (h) conducting surveillance, (i) investigating bodily injury, and (j) investigating property damages (k) reviewing police reports, (l) testing water in flood cases, (m) examining vehicles, (n) visiting fire marshals, (o) visiting police departments, (p) investigating prior claims, (q) investigating stolen cars, (r) investigating any crime committed with the vehicle, (s) investigating broadcast news

reports, (t) investigating EZ-Pass data, (u) investigating neighbors where a theft occurred about potential cameras, and (v) writing reports, to name only some of limitless examples.  (**Exhibit I**, Reed Dep. at 28, 45-47; **Exhibit J**, K. Fischer Dep. at 38-43, 47, 52, 60, 64, 66, 79-80, 141.)  While SICM data may indicate that an activity took place, O'Neil does not and cannot derive from SICM the *amount* of time that such activity required (Thompson Decl. ¶¶ 15-16), and she does nothing to account or control for the substantial variation in the amount of time required by different putative class members to perform such activities for different cases of differing complexity at different times. (Thompson Decl. ¶ 27).

Plaintiffs' statements confirm the inability of SICM data to calculate time worked.  During O'Neil's pre-declaration interview of three Plaintiffs, Keith Fischer confirmed that "75% of work time was outside SICM," meaning that he worked within SICM during only 25% of his time spent working.  (Ex. D.)  Plaintiff Reed admitted that he misrepresented data in SICM by overstating the number of activities he performed.  (*Id*.)  Specifically, Reed informed O'Neil that "because [he] was ex-PD, [he] could get 15 police reports in 2min in a single trip.  [He] could stretch this out to more hours on SICM, saying [he] made a few trips." (*Id*.)  In other words, Reed would log several entries in SICM, suggesting that he performed multiple activities, even though he performed all tasks in a single trip.  Due to his multiple SICM entries, O'Neil's model would assign him substantially more time for picking up police reports than he actually worked.  Despite being informed of the limitations of SICM data, O'Neil failed to account for these major variables affecting the accuracy of her model.

Finally, O'Neil's opinion that over- or under-compensation in any month for non-SICM activities would "come out in the wash" is unfounded.  (O'Neil Dep. at 132:17-133:13.)  O'Neil simply assumes, without evidence, that an individual would not be *consistently* above-average or

24

below-average over the duration of his or her employment, resulting in over- or under-compensation. (*Id.* at 163:7-23.) Absent any analysis, O'Neil's opinion that such variation would result in an evening, or "wash," must be excluded. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (striking expert's speculative opinion that cited no record evidence).

### 2. O'Neil's Methodology Cannot Estimate Hours Worked By Portions Of The Putative Class, Such As Major Case Investigators

O'Neil's model has no application to those putative class members who worked as major case investigators, a material portion of the putative class, and, therefore, it cannot possibly be used to measure any purported damages of such putative class members.

Courts exclude expert opinions based on unsupported assumptions, including unsupported assumptions regarding similarity that fail to account for variation among the putative class. *See Santiago v. Fischer*, 2020 WL 9816014, at *2, *5 (E.D.N.Y. 2020) (granting motion to exclude damages opinion as unreliable because it resulted in "estimate" for plaintiff based on "statistical[] average" of others besides plaintiff); *Kim v. Benihana, Inc.*, 2024 WL 3550390, at *5 (C.D. Cal. 2024) (excluding unreliable opinion because it applied regression model based on data from other restaurants to the defendant restaurant in "conclusory" fashion based on an "unsupported assumption" that all restaurants were "identical" in relevant respects); *Farmer*, 2013 WL 1195651, at *6 (excluding expert opinion regarding off-the-clock hours for putative class due to "no analysis" confirming "the experiences of the seven technicians whose depositions he was provided are representative of the other 493 technicians' experiences").

Here, O'Neil assumed uniformity across the putative class and failed to account for material differences among positions. The jobs of major case investigators, like Plaintiff Peggy Fischer, the only Named or Opt-In Plaintiff who worked as a major case investigator, differ

drastically from the jobs of other investigators.  Fischer and other major case investigators, for instance, were not rated on how long a case was open as their investigations could last months or even years, and they were not assessed on productivity (the number of cases closed per month), given the complexity and duration of major cases.  (ECF No. 98-69, M. Fischer Dep. at 65:13-16, 94:6-18, 123:17-24, 137:18-138:7, 243:3-10.)  Similarly, while Plaintiffs generally assert that their workloads continuously increased to unmanageable levels, peaking in summer 2020, Plaintiff Fischer received only 4 new cases per month on average, and none after March 2020.  (*Id*.)  Major case investigators like Fischer did not make daily SICM entries, only completing a "diary" update once every 15 business days, vastly limiting data on which O'Neil could rely for her model.  (*Id*.)

In using up to 20 Plaintiffs' information to estimate damages for at least 200 putative class members, O'Neil assumes, without support, that the testimonial and SICM data on which she based her model is sufficiently similar across the putative class such that damages can be reliably estimated from the same averages.  Lacking any support for that assumption, the Court should exclude her testimony.

### D.    The Court Should Exclude O'Neil's Opinions As Irrelevant And Unhelpful To Class Certification

The many reasons above warranting exclusion of O'Neil's opinions as unreliable, such as bias, render them unhelpful and irrelevant also.

Where an expert's opinion is unreliable, it fails to provide probative value.  *See*, *e.g*., *In re REMEC*, 702 F. Supp. 2d at 1274 (excluding "unreliable and unhelpful" expert testimony); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (affirming exclusion of regression found "not probative because it omitted the major variables" that were "too significant not to be accounted for in the regression analysis in this case"); *In re Wireless Tel. Servs. Antitrust Litig.*,

385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) (excluding "a regression analysis [that] fail[ed] to incorporate major independent variables" noting "such analysis may be excluded as irrelevant").

O'Neil does not propose any method to cure the irremediable reliability problems presented by Plaintiffs' recall bias, Plaintiffs' self-interested reporting bias, putative class members' misrepresentations in SICM, attribution of time spent doing work unlogged in SICM to SICM-logged work, and the untestability of her model. O'Neil's proposals to adjust her model to cure reliability issues would result in individualized inquiries that render her model unhelpful and irrelevant. First, with respect to lack of sufficient similarity in experiences between Plaintiffs used to prepare the model and putative class members, O'Neil proposes to either (a) train the model with the individualized testimony and SICM data of all putative class members (O'Neil Dep. at 46:19-48:21, 173:23-177:12); or (b) create individualized models for putative class members for whom her proposed model would not work, if necessary data is available. (*Id.* at 137:11-139:15, 140:18-22, 182:19-183:6, 237:25-238:12.)

Second, with respect her model's failure to correct for major variables, O'Neil proposes to perform individualized "hand tuning," including seeking individualized testimony from Plaintiffs to determine their "estimates" of how their experiences per month varied from the average investigator's experience that month. (*Id.* at 189:17-191:24, 215:15-224:20, 227:21-228:24, 230:4-235:24, 241:6-242:18). O'Neil's "model is essentially reliant on the plaintiffs to fill in gaps for things that have changed" due to the "limitless" ways "a work environment might change for a large group of people over a period of multiple years." (*Id.* at 217:17-218:8.) Her Reply Declaration attempts to walk back her testimony, stating only that she would hand-tune the "parameter which serves as an estimate of hours for a specific task for all employees" based on "changes in work process, such as during COVID." (Reply Decl. ¶ 15.) O'Neil's purported

solution, however, would require individualized assessments and/or models in order to "fill in gaps for things that have changed" and attempt to provide an accurate damages model that satisfies *Daubert*'s and Rule 702's requirements.  (*Id*.)

The necessity of individualized analysis in either circumstance is aptly demonstrated by Plaintiff Peggy Fischer.  From March 2020 until her retirement, Fischer alleges working 40.75 hours per week – or two additional hours – but only revealed at her deposition that her estimates of off-the-clock work included 10-15 minutes setting up and 10-15 minutes taking down her workstation each day on her dining room table, which she contends is compensable.  (**Exhibit K**, P. Fischer Dep. at 147:15-149:10.)  In a five-day workweek, all of Fischer's alleged off-the-clock "work" may have been encompassed by these activities, none of which would be captured in SICM or common to other putative class members.  O'Neil's adjustment of coefficients would not apply here and, in the absence of individualized hand-tuning or modeling, O'Neil cannot accurately model Fischer's claimed damages.

A model that requires analysis into the individual circumstances of each putative class member cannot calculate damages on a class-wide basis and satisfy Plaintiffs' obligation under Rule 23 and applicable precedent.  *See Comcast*, 569 U.S. at 33.  The individualized inquiries O'Neil would need to perform to cure such inaccuracies would predominate over any remaining purported "common evidence" used by her model to establish "the amount and extent of unpaid work" for all putative class members.  (ECF No. 98-1 at 22, 24.)  Accordingly, O'Neil's opinions should be excluded as unhelpful to the trier of fact.  *See Jerue v. Drummond Co., Inc.*, 2023 WL 6610603, at *9 (M.D. Fla. 2023) (excluding regression model assessing class-wide impact "that can then be applied individually to [each putative class member]'" as "unhelpful" because "that method would create individual inquiries which would predominate over class wide inquiries").

## VI.    CONCLUSION

For the foregoing reasons, GEICO respectfully requests that the Court exclude the testimony and opinions offered by Catherine O'Neil.

**Dated: July 23, 2025**

Respectfully submitted,

Gerald L. Maatman, Jr.
(gmaatman@duanemorris.com)
Jennifer A. Riley
(jariley@duanemorris.com)
Gregory Tsonis
(gtsonis@duanemorris.com)
Justin Donoho
(jrdonoho@duanemorris.com)
Gregory S. Slotnick
(gsslotnick@duanemorris.com)
DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000

**ATTORNEYS FOR DEFENDANT**

## **CERTIFICATE OF SERVICE**

I, Gerald L. Maatman, Jr., hereby certify that on July 23, 2025, I caused a true and correct copy of the foregoing to be served on counsel of record via email.

/s/ *Gerald L. Maatman, Jr.*
Gerald L. Maatman, Jr.