# EXHIBIT B

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,<br><br>Defendant. | Case No. 2:23-CV-02848 (SJB) (SLT) |

## DECLARATION OF MATTHEW R. THOMPSON

I, Matthew R. Thompson, based on my personal knowledge and pursuant to 28 U.S.C. § 1746, declare as follows:

1.  At the request of counsel for Government Employees Insurance Company d/b/a GEICO ("GEICO"), I was asked to review the declaration of Catherine O'Neil submitted by Plaintiffs in support of their motion for class certification, along with deposition testimony, case filings, and data for the named and opt-in plaintiffs, to assess whether her proposed methodology could accurately and reliably estimate potential individual damages on a class-wide basis.  The following sections outline my background and qualifications and present my assessment of Dr. O'Neil's declaration.

2.  I am a labor economist and statistician, and the Vice President and Practice Leader of the Labor and Employment group at Charles River Associates ("CRA"), a global consulting firm whose services include performing economic and statistical analyses in connection with litigation and other consulting matters. My education includes a Ph.D. in Economics from the University of North Carolina at Chapel Hill. Prior to joining CRA, I was a principal at ERS Group, a firm specializing in economic research and statistical analysis.

3.  I have nearly 30 years' experience analyzing large volumes of workforce data and have provided expert witness testimony in federal and state cases. I am experienced in the statistical analysis of employment practices, employment outcomes, and the computation of economic loss estimates in employment matters, including federal and state wage and hour claims. In that capacity, I routinely work with company-specific human resources information systems ("HRIS"), timekeeping, and employer payroll data. Using these types of data, I am regularly retained to examine whether the underlying data support allegations raised in Equal Employment Opportunity (EEOC, Title VII and ADA) matters, Office of Federal Contract Compliance Program (OFCCP) investigations, Fair Labor Standards Act (FLSA) and state wage and hour litigation matters, as well as estimate potential economic losses.

4.  A copy of my current CV and recent testimony is attached to this report as Exhibit A. My billing rate is $750 per hour and the staff working with me on this report bill between $300 and $700 per hour. This declaration is based on the information available to me as of May 12, 2025. Should additional information become available it may be necessary to supplement or amend this declaration. At trial I may rely upon documents that have been produced or testimony that has been given in this matter. In addition, I may prepare demonstrative exhibits for use in trial.

5.  In preparing this declaration I relied upon the documents and data attached in Exhibit B.

## Dr. O'Neil's proposed methodology

6.  I was asked by counsel to review the Declaration of Catherine O'Neil in Support of Plaintiffs' Motion for Class Certification and provide my opinion regarding the feasibility and reliability of her proposed methodology for calculating individual damages for all putative class members. Dr. O'Neil's declaration and deposition testimony outline her proposed methodology for estimating potential exposure, including the following steps:

    - Collect self-reported hours worked from Plaintiff testimony for a "baseline" analysis;

    - Use these self-reported hours to estimate the average time associated with "typical caseloads" recorded in the SICM data in the "baseline" through linear regression;

    - Apply the average time for each case or activity based on her baseline estimates to all other putative class members and time periods for which self-reported hours were not collected to "impute" the monthly amount of time "worked" to complete the observed cases and activities for the putative class members; and

    - Calculate the difference between the "imputed" time and the time reported in payroll to estimate any potential exposure for the putative class members.

7.  Under appropriate conditions, regression analyses are used by labor economists and other empirical researchers to estimate the relationship between outcomes of interest (*e.g.,* compensation) and factors related to that outcome (*e.g.,* experience, productivity). However, regression analyses have limitations that impact their use as an effective means of providing reliable estimates that researchers need to consider when performing these analyses and interpreting their results. Regression analyses are not a "panacea," as Dr. O'Neil herself notes:

    > *Because of the sanitizing effect of mathematical modeling, we often interpret the results of data analysis as "objective" when it's of course only as objective as the underlying process and relies in opaque and complex ways on the chosen proxies. The result is a putatively strong, objective measure that is actually neither strong nor objective.* (O'Neil, Cathy. 2013. *On Being a Data Skeptic*. Sebastopol, California: O'Reilly Media, Inc, p.6.)

8.  It is almost always possible to use data to run a linear regression, but the ability to run a linear regression says nothing about the accuracy or reliability of the output of that regression. A regression will provide meaningful and reliable insight only if (1) the data on which they are based are sufficient, accurate, and reliable and (2) the outcome being analyzed is theoretically and systematically related to the data collected. Dr. O'Neil hasn't provided a method for sufficiently, accurately, or reliably collecting estimates of hours worked or demonstrated that the factors she proposes to use to estimate hours are systematically related to the time required to close a case or complete a recorded activity. As outlined below, each of her steps introduce error and variability that would result in unreliable estimates of individual hours worked on a class-wide basis. Any potential individual exposure estimate would also be unreliable and is unlikely to quantify an individual plaintiff's damages within an acceptable margin of error.

## Dr. O'Neil does not provide a method for obtaining reliable "hours worked" data

9.  Dr. O'Neil's proposed methodology relies on having accurate measures of hours worked for an unspecified sample of data that include any purported time that was not included in the hours employees contemporaneously reported to GEICO for payment. These additional "off-the-clock" hours were not captured contemporaneously in any data source or, as I understand, independently maintained by any plaintiff in alternative data or records but are central to her methodology. In other words, her proposed methodology is to use a sample of hours worked in order to estimate hours worked for every putative class member and time period, but she has not specified a method of collecting accurate hours worked for any sample of data. Instead, she proposes using testimony from a subset of plaintiffs to obtain this critical information, on which her proposed methodology is based:

    *Q. So I guess what role then, in that analysis that you just described, does plaintiff's testimony about how many hours they claim to have worked play?*

    *A. The role that the testimony plays is to understand in the most recent time period, where they have the best memory. Or could be a different baseline. If for example, we go really far back before 2010 -- which would be great if we had even more data -- but during a certain period, we are trying to establish the ground truth, and how much they actually worked. So that's what the testimony is for. Is establishing the ground truth of; what did you actually work on average in that time period, subtract it from -- so that we can subtract it from the stated timesheet work, and figure out the discrepancy there.* (O'Neil deposition, 41:21 – 42:15)

10. Dr. O'Neil herself acknowledges that collecting data from individual plaintiffs is subject to error and reporting bias, particularly when providing those estimates over an extended period. However, she provides no method for collecting this information that is designed to limit the error or potential bias inherent in self-reported hours. Failing to account for the error and reporting bias will render her analyses unreliable. Dr. O'Neil herself has published work that states this explicitly:

    *Nerds: acknowledge the inevitable gaming. Make plans for it. Make your model gaming-aware and make sure proxies are cross-checked. For example, a model that is high impact and widely used, relies on proxies, and is highly transparent is going to be gamed. It's not enough to show that it worked on test data before it was implemented—it has to work in the situation where the people being judged by the model are aware of how it works.* (O'Neil, Cathy. 2013. *On Being a Data Skeptic.* Sebastopol, California: O'Reilly Media, Inc, p. 11.)

11. In this instance, Dr. O'Neil's own words imply that if plaintiffs are asked to estimate their hours, knowing that those hours will be used to calculate their own damages associated with this case, there is incentive for them to "game" the model in their favor. She also states as much in her deposition testimony:

    *Q.  So you would agree with me that someone estimating of number of hours that they worked on a week-to-week basis could be subject to error?*

    *A. Yes.*

    *Q. Particularly if they are estimating hours that they worked several years ago?*

    *A. Yes.*

    *Q.  And you also agree with me that as plaintiffs in a lawsuit, people that filed a lawsuit, that there is a potential bias that could be involved in the self-reporting of number of hours worked?*

    *MR. SCIMONE: Objection.*

    *A. Yes.*

    *Q.  Does your model account for that bias?*

    *A. No.*

*Q. And by bias, I think you understand what I mean; someone in a lawsuit may be incentivized to overreport the number of hours that they claim to have worked.*

*A. I understand.*

*Q. You would agree that's a possibility?*

*MR. SCIMONE: Objection.*

*A. Yes.* (O'Neil deposition, 36:21 – 37:20)

12. A review of the declarations provided by Plaintiffs and Opt-ins demonstrate an additional issue with Dr. O'Neil's proposed collection of data on the actual time worked. When asked to provide information on hours worked, respondents typically provided a range attributable to a given period. For example, Louis Pia reported working between 55 and 60 hours per week from December 2021 through December 2022. (Declaration of Louis Pia, ¶12)  It is unclear from this response which weeks during that period Mr. Pia worked 55 hours and which weeks he worked something other than 55 hours, nor does his testimony indicate whether he ever worked hours outside of the 55 – 60 hour range. As a result, the best measure one has from that response is an average of weekly work hours that does not distinguish between weeks or months that do vary in recorded activity. As a result of using average hours worked instead of a more accurate measure for any given week, Dr. O'Neil is adding error to the "outcome" variable (hours worked) on which she proposes estimating her linear regression. Statistically speaking, this will increase the error rate associated with any estimates she makes on the time necessary to complete any given case or task, making them less reliable than standard linear regression coefficients are when they are based on actual data. The statistical approach that Dr. O'Neil proposes using average number of hours per week cannot reliably differentiate the amount of time necessary to complete any given task.

13. For example, if Dr. O'Neil assumes Louis Pia works his reported average of 57.5 hours per week for every week during this period, then regresses this on his actual monthly cases closed for the months of January through August 2022, she will assume that his efficiency varies such that he completed anywhere between 22 and 46 cases per week in the same amount of time. (See Table 1 below.) It may be the case that Mr. Pia worked 55-hour weeks (or even shorter) during the month in which he closed 22 cases and 60-hour weeks (or even longer) during the month in which he closed 46 cases. Alternately, it may be the case that Mr. Pia worked 60-hour weeks (or even longer) during the month in which he closed 22 cases and 55-hour weeks (or even shorter) during the month in which he closed 46 cases. Either way, Dr. O'Neil's regression will poorly measure any true correlation (assuming one exists) between hours worked and cases closed, as she purports to do. Rather than allow the data to inform the relationship (or lack of a relationship), in instances such as this where her model differs from the testimony of putative class members she would "hand tune" the model to match the testimony. (O'Neil deposition 189:17 – 192:5) Effectively, Dr. O'Neil suggests that she will adjust her model to match the testimony of putative class members.

Table 1: Louis Pia's average reported weekly hours and actual cases closed, January – August 2022

| Activity Month | Self-Reported Weekly Hours | Closed Cases |
|---|---|---|
| 2022-01 | 57.5 | 28 |
| 2022-02 | 57.5 | 22 |
| 2022-03 | 57.5 | 39 |
| 2022-04 | 57.5 | 29 |
| 2022-05 | 57.5 | 35 |
| 2022-06 | 57.5 | 46 |
| 2022-07 | 57.5 | 27 |
| 2022-08 | 57.5 | 37 |

14.    The same issue presents itself with the alternative data categories that Dr. O'Neil proposes she can utilize to run her model.  There is no evidence suggesting that the types of cases, activities, or features which she identifies are susceptible to a regression that can provide accurate and reliable time estimates for those events.  And, once again, Dr. O'Neil proposes to "hand tune" her model to account for differences between her model and the testimony provided by putative class members, as well as individual circumstances of which she becomes aware.

## Time stamp data does not accurately reflect total time worked

15.    Dr. O'Neil states that "to corroborate the Plaintiffs' recollections, I would also review time stamp entries in SICM, emails and other objective data to assess the accuracy of Plaintiffs' reports about typical start and end times." (O'Neil declaration, ¶8) Her use of timestamp data to corroborate work assumes that the timestamp data in the systems regularly used by the putative class members are capable of identifying and measuring accurately *when* putative class members begin and end compensable work throughout each day. Moreover, in order to accurately estimate work hours, this data must also include the ability to capture and measure the length of non-compensable breaks throughout the workday, which it does not. Any patterns in the SICM timestamp data entries (*e.g.*, the theoretical patterns described by Dr. O'Neil in her deposition testimony, 63:9 – 24) provide no information on when the work that is being documented was completed or whether it was completed off-the-clock. Because the data does not tell you when work was completed, any observed patterns in SICM timestamps would require individual investigation to understand if there was any underlying pattern in the work process.

16.    Timestamp data only indicates when a person executed a command in a system. It provides no information about what was done leading up to or following the execution of that command. Dr. O'Neil herself admits that there is no reason to believe that the SICM data will reflect the amount of time that a task or activity takes. (O'Neil deposition, 100:18 – 22) Even one of the plaintiffs that Dr. O'Neil interviewed (according to her notes) stated that 75 percent of his work occurs outside of the SICM system. (O'Neil plaintiff interview notes, Bates No. P00001670) Thus, in order to accurately estimate work hours, this data must also include the ability to capture and measure the beginning and end of compensable work and the length of non-compensable breaks throughout the workday. The data on which Dr. O'Neil presupposes she could rely upon to validate the self-reported time does not appear to exist.

## Limitations of the available data

17. When gathering data, particularly sample data, it is important to understand the limitations of such data, specifically in situations where the researcher would like to draw general conclusions about experiences (*e.g.*, time spent working) of some set of workers or time periods that are not included in the data collected. Dr. O'Neil testified that while she would prefer more data her method could be used with information on as little as one person:

   *Q. Well, we talked about 200 people's worth of data. Do you similarly need, you know, 200 estimates of how much time was spent working off the clock?*

   *A. No.*

   *Q. So what number of people would you need?*

   *MR. SCIMONE: Objection. Go ahead.*

   *A. I mean, I could make do with one person.*

   *Q. So it's your testimony that if you had solely Keith Fischer's estimate and the number of hours of off-of-the-clock time that he worked, you could apply that to 199 other members of a putative class?*

   *A. I mean, I would be statistically more comfortable if I had more. If I had five people or ten people. As always, I want more.* (O'Neil deposition, 50:10 – 25)

18. She further states the number of people necessary for her method to generate reliable estimates is a "legal" question rather than a "math" question. (O'Neil deposition, 52:5 – 16) However, these issues are precisely questions that empirical researchers must address to determine the reliability of their analyses and whether the sample is sufficient to represent the broader population to which she would like to examine, putting them squarely in the purview of an expert in statistical sampling.

19. When assessing the appropriate sample, one needs to consider whether those who are sampled are sufficiently representative of the non-sampled population, and whether the policies, procedures, and work in the "baseline" period from which the sample is drawn are consistent with the policies, procedures, and work in the non-sampled periods. Dr. O'Neil has not provided any information regarding how she will determine whether her "baseline" analyses would be appropriate across different "strata" of investigators. For example, whether the model would be appropriate for investigators holding different positions; investigating different types of cases; performing different types of tasks; having different skills, specialties, or abilities; working in distinct geographic environments, such as urban or rural areas; or working during different periods of time within the liability period. If the sampled population (*i.e.*, those for whom work hours were collected) is different than the non-sampled population, the "baseline" estimates cannot be used to reliably estimate hours worked. Furthermore, the more the population differs across multiple dimensions or strata, the less reliable any estimate will be of any given individual's exposure.

20. As outlined below there appears to be substantial variation in the work that individual investigators perform, changes in processes over the liability period, and individual performance and experience that would require substantially more data than Dr. O'Neil suggests is needed to reliably estimate potential unpaid work hours for any given individual putative class member in this matter. Without addressing differences across individuals and the work that they perform, Dr. O'Neil cannot provide a reliable estimate of hours worked for each putative class or collective member. As such, her proposed methodology cannot reliably estimate individual exposure on a class-wide basis. At best, the method proposed by Dr. O'Neil would represent the self-reported average experience of the sampled "baseline" respondents during the specific periods their responses cover. Dr. O'Neil has not provided sufficient information nor a method to evaluate whether those purported experiences are typical of any other putative class member.

## Limitations of regression analysis

21. Regression analysis is mathematically designed to provide insight into the average impact of different factors on an outcome, or to report trends over time or across individuals. As long as the regression analysis satisfies certain criteria, it can then be used to predict, forecast, or estimate the outcomes for any given set of inputs. However, the predictions of a model are only as good as the model itself. To judge a regression model's quality, statisticians perform tests and test hypotheses based on some common factors, which includes (but is not necessarily limited to) asking the following questions:

   - Is there sufficient correlation between my model's input (*e.g.*, cases or activities) and my model's outcome of interest (*e.g.*, hours worked)?

   - Have I correctly controlled for everything that is correlated with the outcome of interest (*i.e.*, Am I missing something important)?

   - How much of the variation in my outcome variable is explained by my model?

22. If the statistician finds the answer to any one of these to be lacking, then they have reason to believe that their model is incorrect or biased at best and even more unreliable or useless at worst. In Dr. O'Neil's own words:

   *A thoughtful user of data knows that not everything they want to understand is measurable, that not all proxies are reasonable, and that some models have unintended and negative consequences. While it's often true that doing something is better than doing nothing, it's also dangerously easy to assume you've got the perfect answer when at best you have a noisy approximation.* (O'Neil, Cathy. 2013. *On Being a Data Skeptic*. Sebastopol, California: O'Reilly Media, Inc, p.2.)

23. As I describe below, Dr. O'Neil provides no evidence that the data and model that she proposes to use to estimate alleged damages for the plaintiffs in this case satisfy any of the tests that are generally accepted by practitioners in the field for validating a model's usefulness. Further, she has not proposed any professionally accepted methodology or tests that she would perform on her model to ensure that its outcomes are reasonable or meaningful.

SICM data does not reflect hours worked

24. For a regression analysis to provide meaningful results the factors that Dr. O'Neil identifies in the Special Investigation Case Management (SICM) data: "(a) closing a case; (b) investigating a feature; (c) "impacting" a feature; (d) closing a case of a certain level/type; (e) achieving a certain "disposition type" in closing a case; or (f) performing certain "investigative activities"" (O'Neil declaration, ¶7), need to be theoretically and systematically related to the amount of time it takes to complete the case or activity. If the time required to complete a given factor varies substantially from case to case, activity to activity, and/or investigator to investigator, there may be no relationship, or no relationship that can be reliably measured, between time and the factor identified in the SICM data. If there is no correlation or insufficient correlation between these factors and time worked, then they cannot be used to reliably predict the time required to complete a set of cases and activities as Dr. O'Neil proposes to do.

25. Statisticians would generally assess the impact of each factor or group of related factors in their models by measuring their "statistical significance," which translates into a "confidence interval" around the weights given to each factor included in the model. Dr. O'Neil discusses this in her deposition, stating:

> To be clear: I -- I would be able – I would be able to say, Here is my best guess as to -- for each person in the spreadsheet, here is my best estimate for the number of unpaid hours of work. Here is the lower bound, here is the upper bound. (O'Neil deposition, 180:22 – 181:3)

26. Dr. O'Neil does not state what she will do if her confidence interval implies that there may be no relationship between the factors she includes in the model and her outcome of interest, time worked. For example, she has not demonstrated that there is a "tight" relationship between number of cases closed and time worked either across or within individual investigators, and the available data suggest this may not be the case. It is my understanding that there is no "typical" case, and no two cases are the same or necessarily require the same amount of investigative effort or time. Jennifer Fogarty testified to this in her deposition:

> Q. How would an SIU supervisor help an investigator determine what needs to be done for an investigation?
>
> A. It would depend on the case. I couldn't speak to anything specifically. Every investigation is like a snowflake. There are no two alike. (Fogarty deposition, 71:11-16)

27. Given the variable nature of cases and activities that may be associated with *time worked* there is no reason to assume a "tight" relationship exists. The measures in the SICM data are numeric and do not capture any of the qualitative differences in cases or activities. They record the number of times something occurred in the month (*e.g.*, the number of cases closed, or activities performed) but none of the relative attributes of an investigation (*e.g.*, the complexity of the investigation or the length of time it takes that investigator or even an average investigator to complete). As such, simply using these numeric data in a regression to find their average impact on hours worked neglects the wide variability of the work that each investigation may encompass. Dr. O'Neil acknowledges this limitation in her deposition testimony, using driving time as an example:

> Q. Sure. I guess even the same activity being done, the time it takes to do it, might vary drastically depends on, for example, how much drive time it required. Right?
>
> A. Absolutely. (O'Neil deposition, 102:10 – 14)

28. In fact, the SICM data show that even a single individual reporting the same or substantially similar hours each month may have considerable variation in the number of cases closed in a month. Figure 1 below includes a black line (representing cases closed) and a blue bar (representing hours purportedly worked) for each of the 13 plaintiffs for which both SICM data and declarations were provided. The blue bar represents the average monthly hours each plaintiff reported as having worked in his or her declaration during the period for which SICM data is available, accounting for recorded leave. The average reported monthly hours ranged from approximately 166 hours (Michael R Gray) to approximately 237 hours (Evan G Teatum) as shown on the bottom scale of the graph. As noted above, the average weekly hours do not vary during the period, while the monthly hours vary only by the number of workdays in a month.

29. The black line overlaying the average hours is the range of the number of cases that were reported as being closed in a month over the 8-month period the data cover (January through August 2022), with the red mark identifying the median number of cases per month. There is considerable variation in the monthly number of cases closed both across and within individuals. For example, over this period there were between 13 and 47 cases closed in a month. This variation could reflect timing of cases (*e.g.,* cases opened at the end of a prior month), complexity, case type, or unobserved individual-specific characteristics, but do not necessarily relate directly to the amount of time worked.  The chart also demonstrates that there is considerable within-investigator variation in the number of cases closed with very little variation in the number of hours worked. For example, Joseph Costanza reports an average of 194 hours per month while the number of cases closed ranged from 16 to 47.

**Figure 1: Average monthly hours worked and cases closed, January – August 2022**



30. The existence of a statistically significant relationship between the observed measures in the SICM data and hours worked is central to and necessary for Dr. O'Neil's proposed methodology to reliably estimate individual exposure on a class-wide basis. She has not demonstrated that a measurable, systematic relationship between any of the metrics recorded in the SICM data and the number of hours worked exists, despite having access to a sample of the data to validate whether such a relationship exists. Given the individual and case specific nature of each investigator's work there may be no class-wide relationship between work and these measures. Absent a relationship, Dr. O'Neil has no foundation for using linear regression to predict hours or calculate potential damages. Furthermore, she has provided no alternative method of calculating individual specific damages if her model cannot be reliably estimated.

### Individual-specific characteristics impact hours worked

31. Figure 1 above also demonstrates the fact that investigators are not identical, as evidenced by the differences across people in both average number of reported hours (the blue bar) and median monthly cases closed (the red dash). Some investigators appear from these data to complete more cases in the reported time worked than others. For example, Joe Costanza and Ted Wendling each close a median of 37 cases per month. Furthermore, Joe Costanza completes his 37 cases in an average of 194 reported hours per month, while Ted Wendling completes his 37 cases in an average of 226 reported hours per month. This suggests that, at the median and average, Joe Costanza is approximately 16 percent more efficient than Ted Wendling, using their own self-reported data. However, this may not be a fair or accurate conclusion to draw from the data. For example, even if individuals are working the same type of investigations, they may have different processes, approaches, or experiences. Jennifer Fogarty testified to the individual nature of investigations and investigators in her deposition:

> Q. What would be required to close a case in less than one day?
>
> A. The investigator took enough steps to decide if it was suspected fraud or a valid claim. It's up to the investigator to determine what they have to do to either validate or confirm fraud. They are fact-finders. (Fogarty deposition, 196:8 – 14)

32. Furthermore, different employees commonly bring different skill sets to a job. For example, one employee may be more efficient than another, or may have different training or qualifications that allow them to perform different or more complex tasks or investigations than another. Labor economists call the set of skills and abilities that an employee brings to the job their "human capital." Under labor economic theory, employees are paid for their skills and abilities based on their productive value to the employer. For example, an employee who is twice as fast at producing "widgets" than another can be expected to be paid twice as much in wages for the same amount of time as a slower employee, all else equal, although many other factors may also contribute to an employee's compensation. Similarly, an employee who is capable of producing "premium widgets" may be paid more than an employee who is only capable of producing "standard widgets." Wages will also differ when the duties and responsibilities of individual employees vary. Thus, wages (in a competitive labor market) tend to reflect the different skills, abilities, and responsibilities of different employees. (See, *e.g.*, Becker, Gary S. 1993. *Human Capital: A Theoretical and Empirical Analysis with Special Reference to Education, 3rd Edition*. Chicago: University of Chicago Press.)

33. Figure 2 below shows the most recent rate of pay that each of the plaintiffs appearing in the SICM data reported in their declarations, inflated to 2023 dollars, when necessary, assuming 3 percent wage inflation per year. All of these plaintiffs were working as special investigators in 2022, yet their pay rates differ substantially from $33.33 to $56.00 per hour. Labor economic theory would suggest that an employee making $33.33 per hour is performing substantially different work than an employee making $56.00 per hour. This is further evidence that employees differ on an individual level that are likely unrelated to the metrics observed in the SICM data and could only be captured or modeled through an individualized review of each plaintiff.

**Figure 2: Most recent rate of pay in 2023 dollars**



34. Dr. O'Neil has not indicated how she would address potentially substantial variation in the effort required to close an investigation, even those of the same type and reaching the same disposition. She did testify on how she would address difference in employee efficiency in her "baseline" period:

> *Well, I thought about, you know, your correct observations about somebody who is consistently more efficient would get overpaid for the hours they worked. And it is possible to adjust for that. An individual level in baseline, if someone consistently does -- remember the sanity check? Where as one of the things you want to make sure about this model once you built it is that on average, people are actually working 55 hours a week or whatever that number is. But maybe some guys are working -- imputed working 58 hours a week, so they are a little bit more efficient during the baseline. So it is possible to have individualized adjustment factors for efficient people and inefficient people.* (O'Neil deposition, 222:17 – 223:9)

35. This "hand tuning" approach that Dr. O'Neil proposes to address variation among putative class members is not possible without collecting individualized, self-reported hours worked *for each individual putative class member, i.e.*, an individualized review of each putative class member, in order to determine each person-specific adjustment factor. Another way to say this is that her proposed model lacks a crucial, missing piece of information associated with hours worked – in this case, for example, individual efficiency. If Dr. O'Neil were to collect this data and perform this adjustment, it effectively aligns the hours estimated by the model to the self-reported hours given by the putative class or collective member. In other words, she proposes to run a regression only to adjust any regression-driven predictions back to match the self-reported hours.

36. Further, the month-to-month variation in SICM measures within a single plaintiff cannot be explained by individual efficiency alone, for example, since an individual will appear to be "efficient" in some months and "inefficient" in others. Variation in working conditions (*e.g.*, commute distances, case processes, *etc.*) and case complexity are likely drivers of this variation. To "hand tune" the model as she proposes, Dr. O'Neil would require individual-specific information at the monthly level.

### There is evidence that the nature of the work investigators performed changed over time

37. In her declaration, Dr. O'Neil suggests that the nature of the work investigators perform may have changed over time, and that she can perform robustness checks across the different types of productivity measures to check for these changes over time:

> *"Since the different ways of measuring work are related but distinct, this multi-measurement approach would provide robustness to changes over time in the frequency or time required for certain kinds of work. By comparing how the different measurements of work evolve, I could also gain insight into whether the overall mix of tasks and cases actually constitutes 'more work', accounting for changes in the work process over time."* (O'Neil declaration, ¶13)

38. What Dr. O'Neil does not acknowledge is that *the actual measures themselves are also changing over time*. This implies that it would be impossible to model all time periods the same way or to use the same measures across different time periods to validate her model. For example, even in the relatively short period of SICM data provided to me, I observe that the classification of the cases changes between the first two months of data (January 2022 – February 2022), in which cases are classified by categories numbered 1 through 7, and the last five months of data (April 2022 – August 2022), in which cases are classified by categories numbered P8 through P18. (There appears to be some overlap between the categories in March 2022, suggesting that the classification system changed sometime during that month.) Furthermore, the SICM data dictionary itself suggests that changes have occurred over time to the reporting and metric calculations, beginning with the phrase, "July 2023 Changes in green." (Bates No. G010914)

39. These changes to the way GEICO chose to measure investigator productivity over time likely reflect actual changes in the nature of the work that investigators were doing over time. Bill Newport testified to the changing nature of the work over time in his deposition:

> *It would depend on the timeframe, Michael. I know you had said from '18 to '23, but we were in very different pockets of work. For 2020, for example, there was a definite difference in the types of cases that we may receive. There were changes in the amount of time that may be required in the field. At any given time, there was a change in how physical EUOs versus virtual EUOs. There was – so any one of these reasons or changes would be part of the discussion that we would have as a unit as it relates to any workload or volume concerns.* (Newport deposition, 303:10 – 24)

40.  Dr. O'Neil has provided no guidance on how her model would address changes in the data collection process over time, or how her model would address systematic policy changes that may render baseline estimates irrelevant to other periods.  For example, activities or case types recorded in her baseline may not exist in data prior to or after the period covered in the baseline, and *vice versa*. Thus, the estimated impact of a particular case or activity has no relevance outside of the baseline period analyzed. As a result, Dr. O'Neil would need to obtain information from each period where GEICO had either a different operating procedure, recorded different information, and/or changed the recording process. Given the evidence that there are changes happening over time in what the measures represent (or even if they exist), she would need to obtain information from putative class members throughout the liability period. Dr. O'Neil has proposed no methodology for collecting the necessary information that could be reliably used to estimate individual damages on a class-wide basis. Further, she suggests that she could base her model on just one person. (O'Neil deposition, 50:17) Without information sufficient to model individual differences and differences across time (both within and across time), Dr. O'Neil's proposed model lacks crucial information without which it cannot produce meaningful, predictive estimates of time worked.

41.  Dr. O'Neil has provided no evidence that the data and model she proposes using to estimate alleged damages for the plaintiffs in this case will satisfy any of the tests that are generally accepted by practitioners in the field for validating a model's usefulness and reliability. She has not demonstrated that there is a systematic, precise, and meaningful relationship between the data measures provided in the SICM data and time worked. Given the variability and unique features of each case or activity it is unlikely that relationship, which is required to conduct a meaningful and reliable linear regression model, exists. Evidence of individual-specific efficiency and changes in both the type and process related to the work of investigators across different time periods suggest that there is essential information missing from Dr. O'Neil's proposed regression model that is correlated with time worked, and she has not suggested any viable way of addressing this missing information. Further, she has not proposed any professionally accepted methodology or tests that she would perform on her model to ensure that its outcomes are reasonable, meaningful, or reliable. As a result, Dr. O'Neil's proposed model is unlikely to have reliable predictive power for estimating damages for individual putative class members, or on a class-wide basis.

## Hours worked and the non-linear nature of overtime calculations

42.  Plaintiffs allege that they are not permitted to record more than 7.75 hours per day or 38.75 hours per week. However, the submitted time records show that this is not the case for all plaintiffs. While many of the weeks show 38.75 hours, particularly prior to the change in time recording systems, there are others where the plaintiffs recorded more or fewer hours. It is unclear in these weeks why an individual would not have reported the alleged "off-the-clock" time. Dr. O'Neil does not address the recorded hours worked or how they relate to her proposed model. Instead, she assumes the presence of unpaid off-the-clock time. Furthermore, Dr. O'Neil does not provide a method to reconcile her monthly calculations with the legally required weekly calculation of overtime. Given the variability of recorded hours, how Dr. O'Neil chooses to allocate her proposed monthly estimates across weeks will affect the calculation of any potential unpaid overtime.

### Review of hours recorded in the timekeeping data

43. Plaintiffs allege that they are generally only allowed to record 7.75 hours per day worked and 38.75 hours per week worked, outside of individual requests on a one-off basis to work overtime. (Complaint, ¶108) My analysis of the timekeeping data provided show that there is considerable variation both across individuals and over time in both the percent of weeks with exactly 38.75 hours paid and the percent of weeks with at least some overtime (*i.e.*, over 40 hours) paid. For example, Figure 3 below shows the percent of workweeks in the timekeeping data with exactly 38.75 hours of work recorded, excluding any weeks in which the employee took paid time off, sick time, or holiday time and Figure 4 below shows the percent of workweeks with over 40 hours of work recorded. Each employee in the data has four bars representing four periods of time: before May 2020, May through August of 2020, September 2020 through December 2022, and January 2023 through the end of the data.

44. Based on my review of the materials available to me, these four periods appear to have distinct differences in the way time was recorded or in the frequency with which overtime was allegedly approved. Specifically, the complaint in this matter states: "GEICO supervisors did not approve overtime, except for a brief period starting between approximately May and August of 2020, when they offered to pay overtime to Special Investigators who took on additional cases, on top of their already-high workload." (Complaint, ¶24) This suggests that a different pattern in overtime hours may be observed during the May through August 2020 period compared to those directly preceding and following that period.

45. Furthermore, the timekeeping system appears to have changed in 2023, leading to substantive changes in the way hours were recorded for payment. Prior to 2023, most timekeeping data records provided to me do not contain timestamps indicating the times employees began and ended work at the beginning or end of their shifts, or during their meal periods. Beginning in 2023, almost all timekeeping data records provided to me do contain such timestamps. As a result, the timekeeping data no longer reflect a pattern of days reflecting exactly 7.75 hours of recorded work or weeks reflecting exactly 38.75 hours of recorded work.

46. The figures below illustrate several sources of variation in the hours actually recorded and paid to the special investigators included in the timekeeping data during the class period:

- **Differences across time periods.** As can be seen in Figure 3 below, the periods "before May 2020" and "September 2020 through December 2022" are the most likely to have weeks with exactly 38.75 hours recorded. However, even during these periods some individuals record fewer than 38.75 hours and more than 40 hours in some weeks and the percent recording exactly 38.75 hours differs by individual plaintiff. Similarly, Figure 4 below shows that the period "May 2020 through August 2020" is the most likely to have weeks with over 40 hours, but there are also occurrences of weeks with over 40 hours during the periods "before May 2020" and "January 2023 and forward." The different patterns across time periods in the timekeeping data suggest that an investigator present only before May 2020 is likely to have had a different experience than an investigator present only after January 2023.

- **Differences across individuals.** Figure 3 and Figure 4 also show considerable variation in the percent of weeks across plaintiffs. For example, Figure 4 shows that 14 plaintiffs worked over 40 hours in more than half of the weeks in the "May 2020 through August 2020" period. At the same time, Figure 3 shows that 6 plaintiffs worked exactly 38.75 hours in all of the weeks in the same period. This type of variation is unsurprising, given the individual-level differences that potentially drive time worked, described in paragraphs 32 through 36 above.

47. Given these differences in recorded hours worked and paid, it is clear that not all plaintiffs faced similar rules, situations, or individual experiences for the entire class period. Furthermore, without performing an individual review of a putative class member's circumstances, it is not possible to predict how well any given sample of special investigators would represent a larger class such that reliable damage estimates could be made on the basis of out-of-sample prediction.

**Figure 3: Percent of weeks with exactly 38.75 hours of work recorded**



**Figure 4: Percent of weeks with over 40 hours of work recorded**

## Overtime hours are calculated at the weekly level

48. The New York Labor Law and Fair Labor Standards Act require non-exempt workers to be paid overtime premiums for all hours in excess of 40 in a week. What is not clear, is whether Dr. O'Neil understands the way that overtime hours and damages are calculated. Instead of weekly damage calculations, she has proposed a rough methodology for estimating monthly hours on the basis of monthly productivity measures:

> *"To assess damages for Special Investigators in a given month, I would apply the regression aquation to the data showing cases and tasks completed each month to get an estimate of true hours worked. Then I would subtract the Investigator's reported hours (e.g. 38.75) to get their*

*estimated unreported hours for the month. Finally, I would multiply this by the appropriate hourly pay rate to get an estimate of damages due for the month."* (O'Neil declaration, ¶12)

49. This description glosses over the complexity of calculating alleged damages, and alleged overtime damages in particular, in two ways. First, Dr. O'Neil has not explained how she will apportion the hours she estimates for a given month back to the weekly level. Not only are workweeks distinct from months such that they do not always fall cleanly into one month or another (*i.e.*, a week can start in one month and end in another), but individuals often work differential hours across the 4 – 5 weeks that fall within any given month. Furthermore, the differential hours across weeks account for even greater variation in dollars owed to a non-exempt employee than the variation in hours itself, given the non-linearity of the additional overtime premiums (0.5x the regular rate of pay) that apply only to hours in excess of 40. This is further complicated by the existence of non-worked vacation, sick, and holiday hours that presumably account for at least some periods of time (and thus workweeks) in which there would be fewer hours worked than the average full workweek for any given plaintiff. Essentially, Dr. O'Neil has neglected to describe a methodology in which she accounts for this non-negligible complication, which will impact potential class or collective members differentially depending on the number of hours they worked off-the-clock, on average, that occur after the 40th hour of the week (as opposed to before the 40th hour) and depending on the amount of paid days off the individual plaintiff takes and the pattern with which they use that time off (*e.g.*, entire weeks at a time as opposed to a day every week or two). Without a clear methodology for how Dr. O'Neil plans to account for these differences across plaintiffs, her proposed methodology will smooth differences across potential class or collective members so as to systematically underestimate damages for some plaintiffs while systematically overestimating damages for other plaintiffs.

50. Second, Dr. O'Neil has described the way that she will treat any weeks in which her hours estimate is higher than the hours recorded by any given plaintiff in the data (*i.e., the weeks in which she estimates off-the-clock damages*), but has neglected to describe the way she will approach weeks in which her hours estimate is lower than the hours recorded by the plaintiff in the timekeeping data (*i.e., weeks in which her estimates imply that plaintiffs have been paid for more hours than they worked*). Given the substantial variability both across months within an individual and more generally across individuals that I described above in the data for the sample plaintiffs, it is highly likely that Dr. O'Neil's model will estimate hours worked both above and below the actual recorded timekeeping hours across all of the weeks in the data, even if she is estimating weekly hours that are, on average, higher than those actually recorded in timekeeping. For example, if a putative class member reported an average of 42 hours of work per week and was paid for 38.75 hours in two weeks, it could still be the case that Dr. O'Neil's estimate is 46 hours of work in one week and 38 hours of work in the second week, suggesting that in one week this particular putative class member worked 7.25 hours off-the-clock while in the second week they were paid for 0.75 hours of work not performed. The way any weeks that estimate fewer hours than paid would be treated for the purpose of Dr. O'Neil's methodology is unaddressed in her declarations but has major implications on: (1) bias in her class-wide damage calculation; and (2) cross-putative class member bias in her damage calculations.

51. If, for example, Dr. O'Neil decides to assume no damages occurred during weeks with hours estimates lower than recorded hours while assuming all estimated damages occurred during weeks with hours estimates higher than recorded hours, she will be systematically biasing her class-wide damages upward, in favor of the putative class over the defendant. If instead she assumes that her model is incorrect and that under-estimates in some weeks should offset over-estimates in other weeks, then she must recognize that the non-linear nature of overtime premium damages means that any "manual adjustments" she makes at this point in her analysis add a further source of error to her already error-ridden estimates.

52.  Further, if she uses a model based on sample data from a subset of putative class members rather than modeling each putative class member separately, she introduces cross-putative class member bias into her damage calculations.

53.  For example, suppose that class-wide average productivity implies 4 hours of work per case according to Dr. O'Neil's regression model, but putative class member A is particularly efficient and takes only 2 hours of work per case, while putative class member B is particularly inefficient and takes 6 hours of work to perform the exact same type of case. The class-wide model that Dr. O'Neil proposes using would treat these two putative class members the same way. Suppose also that both employees completed 12 cases of the same type in a week. To the extent Dr. O'Neil does not propose collecting information on every putative class member so as to allow her to "hand tune" her model separately for each individual, she may estimate that both class members worked 48 hours in that week (12 cases x 4 hours per case), and each should have been paid for 40 hours of straight-time and 8 hours of overtime.

54.  Because I know the actual average productivity of putative class members A and B, I know that a better estimate of putative class member A's time worked in that week would be 24 hours (12 cases x 2 hours), and I know that a better estimate of putative class member B's time worked in that week would be 72 hours (12 cases x 6 hours). In this case, putative class member A was owed 24 hours of straight-time and no overtime, while putative class member B was owed 40 hours of straight-time and 32 hours of overtime for that week.

55.  By using a class-wide model despite significant individual variation, in this scenario Dr. O'Neil would have severely over-calculated the estimated work hours for putative class member A and severely under-calculated the estimated work hours for putative class member B. While this is a stark example, it serves to illustrate the point that using a regression model, which is mathematically designed to estimate an average, "best-fit" formula for describing an entire group (*e.g.*, the putative class), will often do a poor job of predicting the outcome of a particular individual or observation (*e.g.*, week) when there is sizeable variation across individuals in the group.

56.  Using such a model to estimate alleged damages for a group of substantially different putative class members without controlling for their individual levels of efficiency (and other substantial factors), will necessarily over-estimate alleged damages for some putative class members while under-estimating alleged damages for other putative class members, resulting in inequities in any final back-payments to these putative class members, should the Court find in their favor.

Pursuant to 29 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2025                                        Matthew R. Thompson

**Exhibit A – CV**



## Matthew R. Thompson
Vice President

PhD, Economics
University of North Carolina at
Chapel Hill

BA, Economics
Central College

Matthew Thompson, Vice President, is Practice Leader of CRA's Labor and Employment practice. Dr. Thompson specializes in empirical research, applying statistical techniques to the analysis of various issues including firm level employment decisions, government contracting programs, and the impact of proposed regulatory and legislative changes. In these endeavors Dr. Thompson assists clients with the collection, analysis, and production of various electronic and hard copy data sources. He also provides economic loss estimates for single plaintiff and class action cases and assists clients with the development of processes that proactively monitor employment decisions. Dr. Thompson works with attorneys and human resource professionals in analyzing issues concerning Title VII, Age Discrimination in Employment Act (ADEA), Fair Labor Standards Act (FLSA), and Office of Federal Contract Compliance Programs (OFCCP) audits. He has provided expert witness testimony in state and federal cases. In addition to his sole authored work, Dr. Thompson has teamed with leading academic researchers to provide in-depth policy related research. Dr. Thompson has presented employment discrimination issues to attorneys and human resource professionals at seminars on the use of statistics in employment litigation, and has been an invited speaker at North Shore Labor Counsel, New England Legal Foundation, Atlanta Bar Association, Jacksonville Industry Liaison Group, Big Bend SHRM, Professional Liability Underwriting Society, and Jacksonville SHRM events.

## Professional history

2007–Present    *Vice President*, Charles River Associates

1997–2007    *Principal/Research Economist,* ERS Group

Define and develop economic and statistical analyses of employment practices, such as compensation, promotion and termination, tailored to specific client needs and data requirements. Facilitate the identification, collection and organization of the data required for the analysis of the employment issue being examined. Create proactive methods for analyzing and reviewing proposed employment actions. Estimate potential economic losses associated with employment discrimination claims, wage and hour violations, and personal injury and wrongful death for individuals or classes of individuals. Lead a team of employees including PhD economists, programmers and research assistants.

2003–2005    *Adjunct Professor,* College of Social Science, Florida State University

1994–1997    *Instructor,* Department of Economics, University of North Carolina at Chapel Hill

Charles River Associates

| 1994–1997 | *Research Assistant,* Department of Economics and Carolina Population Center, University of North Carolina at Chapel Hill |
|---|---|
| | Assisted in the estimation and statistical analysis of various projects using Census, National Medical Expenditure Survey (NMES), and Industry datasets. |

## Publications and research papers

"Understanding Employment Data Used for EEO Disparity Analyses." *Adverse Impact Analysis: Understanding Data, Statistics, and Risk*, Morris, Scott and Eric Dunleavy (Editors), Routledge Taylor & Francis Group, New York and London (2017).

"The Effect of Living Wage Laws on Low-wage Workers and Low-income Families: What do we know now?" With David Neumark and Leslie Koyle. *IZA Journal of Labor Policy*, 1:11 (2012).

"Estimating the Economic Impacts of Living Wage Mandates Using Ex Ante Simulations, Longitudinal Estimates, and New Public and Administrative Data: Evidence for New York City." With David Neumark, Francesco Brindisi, Leslie Koyle, and Clayton Reck. NBER Working Paper Series (Working Paper 18055), May 2012.

"The Economic Impacts on New York City of the Proposed Living Wage Mandate." With Marsha Courchane, David Neumark, Timothy Riddiough, and Anthony Yezer. New York City Economic Development Corporation, 2011.

"Report on Gainful Employment." With Jonathan Guryan. Career College Association, April 2, 2010.

"Compensation Strategies in the Era of the Lilly Ledbetter Fair Pay Act." With David Lamoreaux. *Newsletter of the American Health Lawyers Association*, May 2009.

"The Lilly Ledbetter Fair Pay Act and Compensation Strategies." With David Lamoreaux. *Profiles in Diversity Journal*, March/April 2009.

"Companies Need to Take Heed of New Fair Pay Act." With Kenneth Bello and Jennifer Belli, Bello Black & Welsh LLP and David Lamoreaux, Charles River Associates. *New England In-house*, March 2009.

"Public Housing: A Hard Habit to Break? The Participation and Labor Supply Decisions of Public Housing Participants." PhD Dissertation, Department of Economics, University of North Carolina at Chapel Hill, 1997.

## Presentations and professional meetings

"Reading the Tea Leaves – Trends in Compensation Related Issues," Panelist, North Shore Labor Counsel Meeting, Deerfield, IL, November 13, 2019.

"Lifecycle of a Pay Equity Audit," Moderator, First Chair Equal Pay Summit, Chicago, IL, October 22, 2019.

"Immigration and EEO-Affirmative Action Developments," Panelist, NYU Labor and Employment Law, 71st Annual Conference on Labor, New York, NY, June 8, 2018.

"Pay Equity, Immigration and "Reverse Preemption" Developments," Panelist, NYU Labor and Employment Law, 71st Annual Conference on Labor, New York, NY, June 7, 2018.

"Recent Developments in Pay Equity and Practical Considerations in Self-Analysis," NELI Briefing with Felicia Davis, March 2018.

"Analyzing the Outcome of Your Compensation Philosophy", Invited Speaker, 2017 HR Tallahassee Conference and Expo, Tallahassee, FL, June 14, 2017.

"Who Knew Compensation Could Be So Complicated?" Panelist, PLUS Management & PL Symposium, Chicago, IL, April 5, 2017.

"How to Enhance Your Diversity & Inclusion Efforts through the Use of Metrics." Invited Speaker, Jacksonville SHRM, Jacksonville, FL, March 30, 2017.

"Developments Affecting Employers: Gender Wage Gap and 401(k)/403(b) Litigation."  Moderator, CRA New York Seminar Series, New York, NY, February 7, 2017.

"How to Enhance Your Diversity & Inclusion Efforts through the Use of Metrics." Invited Speaker, Big Bend SHRM, Tallahassee, FL, October 12, 2016.

"Statistical Analysis in Employment Selection Matters."  Invited Speaker, North Shore Labor Counsel Meeting, Deerfield, IL, May 20, 2015.

"Managing Employment Litigation in a Volatile Economy."  Invited Speaker, New England Legal Foundation Board Meeting, Boston, MA, June 2, 2010.

"EEO-1 Revisions and Information Technology Challenges."  Invited Speaker, Jacksonville Industry Liaison Group, Jacksonville, FL, May 15, 2006.

"The Role of an Economist in Litigation."  Invited Speaker, Florida State University Master's of Economics Seminar, Tallahassee, FL, February 23, 2006.

 "Use, Misuse and Abuse of Experts and Their Testimony."  Invited Speaker, Atlanta Bar Association Continuing Legal Education, Atlanta, GA, March 19, 2004.

"Commonly Used Statistical Techniques."  ERS Group's seminar on Employment Discrimination: Economic and Statistical Evidence. Spring 2002, Fall 2003, and Fall 2004.

"Advanced Statistical Techniques: Compensation Analysis."  ERS Group's seminar on Employment Discrimination: Economic and Statistical Evidence. Fall 2002.

## Professional memberships

- American Economic Association

- American Bar Association

Charles River Associates

## Litigation related reports and declarations

_Robert Dixon and Kelly Porreca, et al. v. Greater Delaware Valley Society of Transplant Surgeons d/b/a Gift of Life Donor Program;_ October Term 2020, Case No. 001532, Philadelphia County Court of Common Pleas, Commerce Court.

_Rebecca Cartee-Haring and Dawn Marinello v. Central Bucks School District;_ Nos. 2:20-cv-01995-MMB and 2:21-cv-05587-MMV, United States District Court, Eastern District of Pennsylvania.

_Cecil Thomas et al. v. TXX Services, Inc. et al. (Cushi Cunningham – Cushi's World);_ No. 2:13-cv-2789, United States District Court, Eastern District of New York.

_Kerryann Cook v. McGivney, Kluger, Clark & Intoccia, P.C., and Charles M. McGivney, Jr.;_ No.01-20-0015-4494, American Arbitration Association.

_Jared Le Feuvre v. Enterprise Rent-A-Car Canada Company;_ CV-20-00647858-00CP, Ontario Superior Court of Justice.

_Penelope Pajak, v. Wal-Mart Stores East, L.P., a Foreign Limited Partnership;_ No.: 6:19-cv-1144-ORL-40DCI, United States District Court, Middle District of Florida, Orlando Division.

_Terrence McCollum, v. Utz Quality Foods, LLC;_ No.: 1:19-cv-587, United States District Court, Middle District of North Carolina, Greensboro Division.

_Aaron Essner, v. Howmedica Osteonics Corp. (d/b/a Stryker Corporation) and Colleen Riley;_ No.: BER-L-3805-18, Superior Court of New Jersey, Bergen County-Law Division.

## Oral testimony

_Kerryann Cook v. McGivney, Kluger, Clark & Intoccia, P.C., and Charles M. McGivney, Jr.;_ No.01-20-0015-4494, American Arbitration Association.

Deposition testimony in _Kennedy Donohue, et al. v. AMN Services, LLC;_ No.: 37-201400012605-CU-OE-CTL, Superior Court of California, County of San Diego.

Cross Examination testimony in Jared Le Feuvre v. Enterprise Rent-A-Car Canada Company; CV-20-00647858-00CP, Ontario Superior Court of Justice.

Hearing testimony in _Starbucks Corporation, Employer and Workers United, Petitioner;_ Case No. 19-RC-289815, 289816, 289817, 290060, and 290145, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in _Starbucks Corporation, Employer and Workers United, Petitioner;_ Case No. 31-RC-289988, Proceedings before the National Labor Relations Board, Region 19, Los Angeles, California.

Hearing testimony in _Starbucks Corporation, Employer and Workers United, Petitioner;_ Case No. 04-RC-289708, 289746, 290056, and 290064, Proceedings before the National Labor Relations Board, Region 04, Philadelphia, Pennsylvania.

Charles River Associates

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-289455, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-289458, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 13-RC-288995, Proceedings before the National Labor Relations Board, Region 13, Chicago, Illinois.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 13-RC-288328, Proceedings before the National Labor Relations Board, Region 13, Chicago, Illinois.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 28-RC-289033, Proceedings before the National Labor Relations Board, Region 28, Phoenix, Arizona.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-288594, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-287954, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 03-RC-285929, Proceedings before the National Labor Relations Board, Region 3, Buffalo, New York.

Deposition testimony in *Penelope Pajak, v. Wal-Mart Stores East, L.P., a Foreign Limited Partnership;* No.: 6:19-cv-1144-ORL-40DCI, United States District Court, Middle District of Florida,

## Exhibit B – Materials Relied Upon

- Second Amended Collective and Class Action Complaint in the matter of *Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan, and Charise Jones, individually and on behalf of all others similarly situated, Plaintiffs, v. Government Employees Insurance Company d/b/a GEICO, Defendant*;

- Declaration of Catherine O'Neil in Support of Plaintiffs' Motion for Class Certification;

- Time records for selected plaintiffs:

    o G004003_Confidential
    o G004148_Confidential
    o G004150_Confidential
    o G004151_Confidential
    o G005975
    o G006169
    o G006235
    o G006316
    o G006412
    o G006580
    o G006719
    o G007713_Confidential
    o G008036_Confidential
    o G008190_Confidential
    o G008647_Confidential
    o G008704_Confidential
    o G009061
    o G009228_Confidential
    o G009399_Confidential
    o G009553_Confidential
    o G009594_Confidential
    o G009638_Confidential
    o G009639_Confidential
    o G009814_Confidential
    o G009883_Confidential
    o G009898_Confidential
    o G010017_Confidential
    o G010100_Confidential
    o G010219_Confidential

- Plaintiffs' Court-Ordered Responses:

    o Opt-In Plaintiff Albert Brust's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Anthony Geraci's Responses to the Court's Interrogatories;
    o Plaintiff Ashley Alvarez's Responses to the Court's Interrogatories;
    o Plaintiff Charise Jones's Responses to the Court's Interrogatories;
    o Plaintiff Constance Mangan's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Craig Costanzo's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Daniel King's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Danielle Ennis's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Evan Teatum's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff George McManus's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff John Gillen's Responses to the Court's Interrogatories;
    o Plaintiff John Moeser's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Joseph Costanza's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Joseph Neenan's Responses to the Court's Interrogatories;
    o Opt-In Plaintiff Kathleen Austin's Responses to the Court's Interrogatories;

- o   Plaintiff Keith Fischer's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Louis Caniglia, Jr.'s Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Louis Caniglia, Sr.'s Responses to the Court's Interrogatories;
- o   Plaintiff Louis Pia's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Margaret Fischer's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Maria Munoz's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Mark Giambalvo's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Mark Sowell's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Michael Grey's Responses to the Court's Interrogatories;
- o   Plaintiff Michael O'Sullivan's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Michael Reed's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Scott Brady's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Ted Wendling's Responses to the Court's Interrogatories;
- o   Plaintiff Thomas Barden's Responses to the Court's Interrogatories;
- o   Opt-In Plaintiff Vito DiNiso's Responses to the Court's Interrogatories

- Deposition transcript of Catherine O'Neil dated April 24, 2025;

- Deposition transcript of Jennifer Fogarty dated October 25, 2024;

- Deposition transcript of William Newport dated January 13, 2025;

- Plaintiff interview notes produced by Catherine O'Neil (Bates Nos. P00001668 – P00001670); and

- 2023.07.27 SICM Data Dictionary – G010914 (Bates Nos. G010914 – G010922).