# EXHIBIT D

1

2                    UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NEW YORK
3    ------------------------------
     KEITH FISCHER, MICHAEL
4    O'SULLIVAN, JOHN MOESER,
     LOUIS PIA, THOMAS BARDEN,
5    CONSTANCE MANGAN, and CHARISE
     JONES, individually and on
6    Behalf of all others similarly
     Situated,
7
                     Plaintiffs,
8
            vs.                      No. 23 Civ. 02848
9                                        (GRB) (ARL)

10   GOVERNMENT EMPLOYEES INSURANCE
     COMPANY d/b/a GEICO,
11
                     Defendant.
12   ------------------------------

13

14

15        VIDEOTAPED DEPOSITION OF CATHERINE O'NEIL

16                  New York, New York

17              Thursday, April 24, 2025

18

19

20

21

22

23   Reported by:
     Yaffa Kaplan
24   JOB NO. 12744863

25



1

2                        April 24, 2025

3                        9:40 a.m.

4

5        Videotaped Deposition of CATHERINE

6   O'NEIL, held at the offices of Duane

7   Morris, 1540 Broadway, New York, New York,

8   pursuant to Notice, before Yaffa Kaplan, a

9   Notary Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



CATHERINE ONEIL                                         April 24, 2025
FISCHER vs GEICO                                                    3

```
 1
 2    A P P E A R A N C E S:
 3
 4         OUTTEN & GOLDEN LLP
 5         Attorneys for Plaintiffs
 6              685 Third Avenue, 25th Floor
 7              New York, New York 10017
 8         BY:   MICHAEL SCIMONE, ESQ.
 9              ZARKA DSOUZA, ESQ.
10
11         DUANE MORRIS LLP
12         Attorneys for Defendant
13              190 South LaSalle Street, Suite 3700
14              Chicago, Illinois 60603
15         BY:   GREGORY TSONIS, ESQ.
16              JUSTIN DONOHO, ESQ.,
17                        (Via videoconference)
18
19    ALSO PRESENT:
20         RICHARD MORALES - Videographer
21
22
23
24
25
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    4

1

2          IT IS HEREBY STIPULATED AND AGREED,

3    by and between counsel for the respective

4    parties hereto, that the filing, sealing and

5    certification of the within deposition shall

6    be and the same are hereby waived;

7          IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form

9    of the question, shall be reserved to the

10   time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be signed

13   before any Notary Public with the same force

14   and effect as if signed and sworn to before

15   the Court.

16

17

18

19

20

21

22

23

24

25



 1                          C. O'Neil

 2          THE VIDEOGRAPHER:  Good morning, we are

 3     now on the record.  The time is 9:40 a.m.,

 4     Eastern time on April 24, 2025.

 5          This begins Media Number 1 to the

 6     videotaped deposition of Catherine O'Neil,

 7     taken in the matter of Keith Fischer versus

 8     Government Employees Insurance Company.

 9          My name is Richard Morales, I am your

10     videographer today; the court reporter is

11     Yaffa Kaplan.  We are representing Esquire

12     Deposition Solutions.

13          Counsel will you please introduce

14     yourselves and affiliations, and the witness

15     will be sworn.

16          MR. SCIMONE:  Michael Scimone with

17     Outten & Golden, representing the plaintiff.

18          MS. DSOUZA:  Zarka Dsouza with Outten &

19     Golden, also representing the plaintiffs.

20          MR. TSONIS:  Gregory Tsonis on behalf of

21     Government Employees Insurance Company,

22     defendant.

23          MR. DONOHO:  Hi, this is Justin Donoho,

24     also on behalf of GEICO.

25     C A T H E R I N E   O ' N E I L , called as a



| 1 | C. O'Neil |
|---|---|

```
 1                        C. O'Neil
 2    witness, having been duly sworn by a Notary Public,
 3    was examined and testified as follows:
 4    EXAMINATION BY
 5    MR. TSONIS:
 6         Q.    What is your name and address?
 7         A.    Catherine O'Neil, 27 Ware Street,
 8    Cambridge, Massachusetts 02138.
 9               THE VIDEOGRAPHER:  You may proceed.
10         Q.    Good morning, Ms. O'Neil.
11         A.    Good morning.
12         Q.    My name is Greg Tsonis.  I am an
13    attorney for the defendant in this lawsuit,
14    Government Employees Insurance Company.  I will be
15    taking your deposition today.  Okay?
16         A.    Yes.
17         Q.    Just -- there will be, I am sure, a
18    number of acronyms today.  But do you know if I say
19    GEICO, I am referring to the defendant in this
20    lawsuit?
21         A.    Yes, I do.
22         Q.    And you understand that in this lawsuit
23    a group of plaintiffs are suing GEICO for
24    violations of both Federal Law, the Fair Labor
25    Standards Act, and New York State law?
```



                         C. O'Neil

1

2      A.    I didn't know those are the two laws,

3    but yes.

4      Q.    So today I will be asking you a series

5    of questions.  Your job is just to provide truthful

6    answers to my questions.

7            There is a court reporter here today

8    that will be taking down my questions and your

9    answers.

10           Does that make sense?

11     A.    Yes, it does.

12     Q.    Have you been deposed before?

13     A.    Yes, I have.

14     Q.    So this will be familiar to you, but

15   because the court reporter is writing everything

16   down, it's important that you answer each question

17   verbally.  So things like uh-huhs or uh-uhs, or

18   nods or shakes of the head don't really translate

19   well in terms of words on the page.

20           Does that make sense?

21     A.    Yes, it does.

22     Q.    Also so we have a clean record, please

23   wait for me to finish my question before you start

24   your answer.  And similarly, I will wait for you to

25   finish your answer before I start my next question.



                              C. O'Neil

Okay?

        A.    Yes.

        Q.    You understand that you are answering
questions here today under oath, which means you
are giving testimony as if you would in the court
of law.

        A.    Yes, I do.

        Q.    And do you agree to answer each of my
questions truthfully and completely today?

        A.    Yes, I do.

        Q.    Can we agree if you don't understand a
question or it may very well happen I don't phrase
a question or frame it correctly, that you will
see -- ask me to restate my question?

        A.    Yes, I will.

        Q.    Can we agree if you do answer my
question that you understood my question?

        A.    Yes.

        Q.    Your attorney may make objections to my
questions as we go through the process.  Those
objections are just for the record.  You must
answer each of my questions unless your attorney
instructs you not to answer.  Okay?

        A.    Yes.



                              C. O'Neil

1

2        Q.    If you need a break at any time for any

3    reason, just let me know.  The only thing I would

4    ask if there is a question pending that you answer

5    the question before we go on break.  Okay?

6        A.    Yes.

7        Q.    Are you taking any medication or drugs

8    of any kind that would interfere with your ability

9    to provide truthful testimony here today?

10       A.    No.

11       Q.    Do you have any kind of medical

12   condition or any other issues that may interfere

13   with your ability to give truthful testimony?

14       A.    No.

15             MR. TSONIS:  I am going to hand you

16       what's going to be marked as Exhibit 1.

17             (Exhibit 1, Subpoena, marked for

18       identification, as of this date.)

19       Q.    Ms. O'Neil, have you seen the document

20   that's marked as Exhibit 1 before?

21       A.    I don't think so.

22       Q.    Do you know what this document is?

23       A.    Well, I am reading it.

24             It says it's a subpoena.

25       Q.    Right.  So I will represent to you that



```
 1                         C. O'Neil

 2    this is a subpoena that is for your appearance and

 3    ultimately testimony here today.  As you see, the

 4    notice date, and time and place.

 5                 If you flip four pages in, do you see a

 6    page that's titled, Rider to subpoena?

 7         A.    Yes.

 8         Q.    Have you ever seen this portion of the

 9    document before?

10         A.    I don't think so.

11         Q.    Do you understand that as part of the

12    subpoena here today, that the subpoena required

13    both your appearance for deposition testimony, but

14    also requested that you produce documents in

15    connection with the subpoena?

16         A.    Yes.

17         Q.    And what documents do you understand

18    that you are required to produce?

19         A.    The notes that my colleague, Jake, and I

20    took when we were talking to a couple of

21    plaintiffs.

22                 Three, maybe four of the plaintiffs.

23    Three.

24         Q.    Any other documents that you understand

25    were encompassed by the subpoena?
```



1                     C. O'Neil

2              MR. SCIMONE:  Objection.

3              Go ahead.

4         A.    No.

5         Q.    If you flip to the next page, actually

6    Page 3 of the subpoena, just want to specifically

7    talk about Request Number 2 at the top.

8              It states, "All documents, data,

9    materials or information that you reviewed,

10   considered, or relied upon in forming the opinions

11   expressed in your declaration, including but not

12   limited to."

13             And there is a number of subpoints

14   there.

15             Do you see that?

16        A.    Yes.

17        Q.    When it references your declaration, you

18   submitted a declaration in support of plaintiff's

19   motion for class certification in connection with

20   this litigation.  Right?

21        A.    Yes.

22        Q.    Have you submitted any other

23   declarations?

24        A.    No.

25        Q.    So looking at those four subcategories



```
 1                           C. O'Neil

 2    of identified documents, did you do anything to

 3    locate any of those documents?

 4         A.    My colleague, Jake, was talking to

 5    Michael about exactly --

 6                 MR. SCIMONE:  I will caution you not to

 7             reveal anything that was discussed between you

 8             and your team or the attorneys in the case.

 9             That's privileged or work-product information,

10             so please don't disclose the content of

11             anything we discussed.

12                 MR. TSONIS:  To be clear:  I am not

13             trying to pry into any privileged

14             conversation, but what was discussed is not

15             what I am asking.  I asked a very precise

16             question, so I appreciate the clarification.

17         Q.    What steps did you take or did your

18    colleague Jake take, that you know of, to identify

19    which of these documents exist and collect them?

20         A.    A conversation about what the request

21    meant, a request for documents from you guys.

22                 There was a request for documents and we

23    were trying to clarify exactly what that meant, and

24    we decided that it meant the notes that we had

25    taken.
```



                         C. O'Neil

1

2        MR. SCIMONE:  And again, if that was a

3   conversation involving counsel, please don't

4   discuss any further the content of that

5   conversation.

6        I think at this point I am going to

7   object to questions.

8        We are getting real deep into privileged

9   and work-product grounds.  We did object to

10  most of these document request -- requests on

11  those grounds, so we are in some privileged

12  territory.

13       That's the objection for the record.

14       MR. TSONIS:  Right.  I am not trying to

15  get into privileged information or the

16  substance of any conversation between counsel

17  and the witness.  I am asking the witness what

18  steps were taken to identify what document --

19  documents existed.  I don't think that's

20  privileged in any way.

21       MR. SCIMONE:  Well, but at a certain

22  point, the extent -- there was a determination

23  made by counsel that certain documents were

24  privileged or were work product, and we are

25  getting into the steps that were taken.



                              C. O'Neil

1
2           We are inevitably getting close to
3       conversations between counsel and the expert
4       witness, so that's the territory we are in.
5           MR. TSONIS:  Okay.  Noted the objection.
6       Some follow-up questions though.
7       Q.    Are you aware of any data sets,
8   spreadsheets or statistical analyses that have not
9   been produced to defendant's counsel, GEICO's
10  counsel, in this case?
11      A.    No.
12      Q.    Are you aware of any notes, drafts,
13  outlines, or working papers that you or your
14  colleagues have created that have not been produced
15  to GEICO in this litigation?
16      A.    To be honest, I am not a lawyer and I
17  don't know what exactly has been produced.  So I
18  don't know the complete list of things that have
19  been produced to you.
20      Q.    That's fair.
21          Have you conducted any analysis of any
22  data as part of this litigation?
23      A.    What's it called; that I wrote that you
24  have.
25      Q.    The declaration?



                              C. O'Neil

2       A.    The declaration, thank you.

3             The declaration is a thought experiment
4   that I produced for them.  It's a thought
5   experiment; we had this data, here is what I would
6   do with it.

7       Q.    So one of -- and we will talk at length,
8   I am sure, about your declaration, but one of the
9   things that you reference in your declaration is a
10  spreadsheet that contains data for January through
11  August of 2022.  Right?

12      A.    That sounds right.

13      Q.    Have you done any analysis of that data?

14      A.    No.

15      Q.    Have you ever looked at that data and
16  actually tried to create the model that you contend
17  is possible in your declaration?

18      A.    I haven't done it on a computer.  I have
19  done it in my head.  I thought about it quite
20  thoroughly.

21            But have I done any number crunching on
22  a computer?  I have not.

23      Q.    So I guess:  Have you done a linear
24  regression in your head to model the data?

25      A.    It depends on what you mean by doing a



```
 1                        C. O'Neil
 2   linear regression in your head.
 3            I know how to do a linear regression.
 4   It's very familiar to me, so I imagined doing it.
 5            If that's the same as doing it, that's a
 6   different question.
 7        Q.    Just to be precise.  So you thought
 8   about it.  So in theory, you considered --
 9   considered whether it would be possible to build
10   your model?
11        A.    Yes.
12        Q.    But you have not taken any steps to
13   actually create that model, based on data that's
14   available.  Right?
15        A.    Correct.
16        Q.    Besides that one spreadsheet, you
17   haven't taken any steps to create that model from
18   any other data that's available to plaintiff or
19   plaintiff's counsel?
20        A.    That's correct.
21        Q.    Have you requested any other data?
22        A.    I don't know what that means.  That's a
23   lawyerly term.
24            MR. SCIMONE:  And I will again object.
25            To the extent the question requires you
```



```
 1                          C. O'Neil

 2        to disclose any conversations you had with us,

 3        please don't relay that information.

 4        Q.    Again, to be clear; that's a ground rule

 5   for the entire deposition.  I am not asking for the

 6   substance of any conversations you had with the

 7   lawyers for plaintiff in this case.  Okay?

 8             I guess I am asking a different

 9   question, which is:  Have you ever requested any

10   data from plaintiff or plaintiff's counsel that you

11   were not provided?

12   DI        MR. SCIMONE:  Again, I would say:  Yes,

13        please don't answer that question.  I mean,

14        it's work product.  It's conversation with

15        counsel.

16        Q.    Are there any sources of data that you

17   wish you had available to you before you submitted

18   your declaration?

19        A.    I am a data scientist.  I always wish I

20   had all the data.

21        Q.    But are there specific sources of data

22   that you would have liked before you wrote a

23   declaration?

24        A.    No.  I was happy with what I had.

25        Q.    What do you understand that this lawsuit
```



                              C. O'Neil

 1
 2   is about?
 3         A.    It's a question of whether some
 4   investigators were shortchanged in terms of the
 5   hours they worked in pay.  So it's a wage-theft
 6   investigation.
 7         Q.    Okay.  And when you say wage theft, what
 8   do you mean exactly?
 9         A.    I mean, that's just a term.  I am not a
10   lawyer, so I am not going to try to define it.
11               But it means that they feel that they
12   didn't get paid enough for the work they did.
13         Q.    By didn't get paid enough, are you
14   saying their wages weren't high enough or?
15         A.    My understanding is that they were
16   putting down a certain number of hours per week;
17   not because that's the actual number of hours they
18   worked.  They actually worked more than that.  But
19   because they were -- that was the situation.
20               For them.  At work.
21               So they had unreliable numbers on a
22   monthly basis.  And they were being underpaid
23   because their actual hours were higher.  That's
24   what they are claiming.
25         Q.    Your understanding is that plaintiffs



                            C. O'Neil

1

2   were reporting a certain number of hours to GEICO

3   on a weekly basis.  But in actuality, were working

4   a different number of hours?

5        A.    Yes.

6        Q.    Shift gears for a second.

7              What did you do to prepare for this

8   deposition specifically?

9              And again, at the outset, I don't want

10  to know about the content of any conversations with

11  counsel.

12       A.    Besides building that report?  What's it

13  called again?  Sorry.

14       Q.    Declaration?

15       A.    The declaration.  I wrote the

16  declaration.

17             And then in order to get prepared for

18  this deposition, I reread it and prepared for,

19  like, the kinds of questions you might ask me.

20       Q.    Did you meet with your attorneys?

21       A.    Yes.  We met yesterday.

22       Q.    Okay.  No substance of any

23  conversations.  To be clear.

24             You met yesterday.  Who did you meet

25  with?



```
 1                          C. O'Neil

 2        A.     Michael and Zarka.

 3        Q.     In person?

 4        A.     Yes.

 5        Q.     Approximately how long was that meeting?

 6        A.     Two hours.

 7        Q.     Did you review any documents?

 8        A.     Yes.

 9        Q.     Did those documents refresh your

10   recollection?

11        A.     Yes.

12        Q.     So what documents did you review?

13        A.     The declaration.

14               The notes.  The notes I had taken in my

15   interview with the plaintiffs.

16        Q.     So just to clarify:  You produced to

17   plaintiff's counsel, and subsequently produced to

18   GEICO, a set of notes from an interview that you

19   conducted with plaintiffs in this litigation.

20   Specifically Keith Fischer, Michael Gray, and

21   Margaret Fischer?

22        A.     I think Mike Reed was there too.

23        Q.     Mike Reed.  If I said Gray, I apologize.

24   I think Mike Reed.

25        A.     That's correct.
```



```
 1                         C. O'Neil

 2             And also the data dictionary and the

 3      spreadsheet.  Those are the four documents.

 4         Q.    Okay.  No other documents besides those

 5      four?

 6         A.    There might have been other documents

 7      there, but we didn't review them.

 8         Q.    Did you review any deposition testimony?

 9         A.    No.

10         Q.    Did you review any declarations

11      submitted by any plaintiffs?

12         A.    Mine.

13         Q.    Just yours?

14         A.    Yes.

15         Q.    But any plaintiffs in this litigation --

16         A.    No.

17         Q.    Just for the court reporter's sake,

18      please wait for me to finish even though you know

19      where I am going with the question.  It will just

20      make for a clean record.

21             Did you draft any notes in preparation

22      for this deposition?

23         A.    No.

24         Q.    Did you discuss this deposition with

25      anyone other than your attorneys?
```



1                          C. O'Neil

2       A.    No.

3       Q.    I think you referenced someone named

4    Jake that you worked with?

5       A.    Yes.

6       Q.    Who is Jake?

7       A.    My colleague.

8       Q.    What is his last name?

9       A.    Appel.

10      Q.    Can you spell that?

11      A.    A-P-P-E-L.

12            Oh, so I should say; I certainly talked

13   to him yesterday before the prep about -- because

14   -- about -- about the deposition.

15      Q.    Does Jake work for O'Neil Risk

16   Consulting Algorithmic Auditing Inc.?

17      A.    Yes, he does.

18      Q.    What is his job title?

19      A.    Chief strategist.

20      Q.    What is your job title?

21      A.    CEO.

22      Q.    Did Jake participate in the drafting of

23   your declaration?

24      A.    Yes.

25      Q.    What role did he have?



CATHERINE ONEIL                                             April 24, 2025
FISCHER vs GEICO                                                        23

```
 1                        C. O'Neil

 2      A.    He edited it after I wrote it.

 3      Q.    So you wrote an initial draft?

 4      A.    Yes, I did.

 5      Q.    And then you sent it to Jake?

 6      A.    Yes.

 7      Q.    And he edited that draft?

 8      A.    Yes.

 9      Q.    Did he send it back to you?

10      A.    Yes.

11      Q.    Did you edit it further after Jake

12   did --

13      A.    Yes.  Sorry.

14      Q.    I am sure this will be a constant

15   struggle all day.  I appreciate it.

16            After you edited it for the first time,

17   did you send it back to Jake?

18      A.    I don't remember.  But we work very

19   closely together, so it's possible that we went

20   through a few rounds of it, yes.

21      Q.    What was your purpose in sending it to

22   Jake for editing?

23            MR. SCIMONE:  I will caution you not to

24        reveal the content of any drafts or changes

25        that were made in the editing process, as
```



```
 1                        C. O'Neil
 2        drafts are specifically protected as work
 3        product in Rule 26.
 4        A.     Can you repeat the question?
 5        Q.     Sure.  What was your purpose in sending
 6   the draft to Jake for editing?
 7        A.     I wanted him to check my thinking.
 8               I wanted him to make sure I didn't have
 9   any typos or misspelling or bad statements.
10               I also wanted him to format it because
11   there was a certain type of formatting required and
12   he is very good at that.
13        Q.     Did Jake have any substantive input into
14   the declaration?
15   DI        MR. SCIMONE:  I would ask you not to
16        answer that question.
17               Again, drafts of declarations or
18        testimony by an expert are work product.
19               MR. TSONIS:  So two points on that one:
20        I asked if he had substantive input, not what
21        he edited in a draft.  So I don't think a
22        privilege objection would apply.
23               And I guess we should clarify this at
24        the outset.  My understanding of plaintiff's
25        objections to the subpoena is that you have
```



```
 1                      C. O'Neil
 2         taken the position that this is not a report
 3         covered by Rule 26, but now you are objecting
 4         on the basis of Rule 26.
 5                 So which is it.
 6                 MR. SCIMONE:  Drafts of information
 7         provided by counsel by an expert witness are
 8         work product.
 9                 You can answer the question about
10         whether or not there was any substantive
11         input, as long as you don't reveal the content
12         of any substance.
13         A.    No.
14         Q.    At any point, did Jake have substantive
15    input into the content of the declaration?
16                 Again; not asking about specific changes
17    that were made.
18         A.    No.
19         Q.    Is Jake typically the person that you
20    would send an expert report or a declaration, or
21    something similar, for formatting and punctuation
22    and proofreading?
23         A.    Yes.
24         Q.    How long has Jake worked with your
25    company, O'Neil Risk Consulting?
```



```
 1                          C. O'Neil

 2        A.    Six years.

 3        Q.    How long has the company been in

 4   existence?

 5        A.    Nine years almost.

 6        Q.    We referenced and we will look at a set

 7   of notes that were created during an interview with

 8   a group of plaintiffs.

 9              Whose notes were those?

10        A.    Those were ORCAA's notes.  Jake took

11   them.

12        Q.    Who was the person you referenced?

13        A.    Jake.

14        Q.    Oh, those are -- you are referring to an

15   acronym for your company?

16        A.    Oh, sorry.  ORCAA, that's my company's

17   name.

18        Q.    Understood.  Sorry, I thought that was a

19   person for a second.

20              So you said those are ORCAA's notes,

21   Jake took them.

22              Just so I am clear:  Did you have a set

23   of notes that you were taking?

24        A.    No, I didn't.

25        Q.    So Jake was taking those notes?
```



```
 1                          C. O'Neil
 2        A.    The way we usually conduct interviews is
 3   one of us takes notes while the other one speaks.
 4   And I was speaking for the most part, and that --
 5   so he was taking notes.
 6        Q.    Are there draft versions of those notes?
 7   Were they cleaned up, in other words, into a final
 8   form?
 9        A.    No.
10        Q.    So in real time, they were typed exactly
11   as they exist today?
12        A.    Correct.
13        Q.    You said you spoke with Jake in
14   preparation for your deposition today.  How long
15   did you speak with him?
16        A.    All together, he was working on this for
17   a half an hour.  But it was like; when I landed,
18   talked to him for five minutes, and then when I got
19   in the cab, I talked to him for another ten
20   minutes.  So 15 minutes all together.
21        Q.    And that was over the phone it sounds
22   like.  Was anybody else present in the
23   conservation?
24        A.    No.
25        Q.    Did you work with anyone else at, I will
```



```
 1                      C. O'Neil
 2   use your acronym, ORCAA, in the creation of your
 3   declaration?
 4        A.    No.
 5        Q.    What are Jake's job responsibilities as
 6   a chief strategist?
 7        A.    He does a lot of -- of the writing.
 8   This was an exception, because I did the writing
 9   here.
10             He helps develop products.
11             He works on the website.
12             And he is basically my right-hand man
13   for all our work.
14        Q.    When you say he develops products, what
15   do you mean?
16        A.    Well, we found out, for example, about a
17   regulation that healthcare companies have to do
18   with respect to AI governance.
19             So he developed a product which is now
20   on our website.  Like, we can help you do this AI
21   governance.  Please reach out to us.
22             MR. TSONIS:  I am going to hand you
23        what's going to be marked as Exhibit 2.
24             (Exhibit 2, Declaration and curriculum
25        vitae, marked for identification, as of this
```



```
                          C. O'Neil

 1

 2      date.)

 3      Q.    All right.  Ms. O'Neil, flipping past

 4   the first page which says Exhibit 62.  We will be

 5   referring to this as Exhibit 2 during the course of

 6   the day, but turning to the second page here.

 7            Have you seen this document before?

 8      A.    Yes, I have.

 9      Q.    What is this document?

10      A.    This is my declaration.  And also has my

11   resume attached to it.

12      Q.    So this is the declaration that you

13   submitted in support of plaintiff's motion for

14   class certification in this case?

15      A.    That's correct.

16      Q.    And as you noted, appended to the back

17   of your declaration is a copy of your curriculum

18   vitae.  Right?

19      A.    Correct.

20      Q.    Is this CV up to date?

21      A.    It is.  It is up to date.  I looked at

22   it this morning.

23            So I have a copy of this.  Yes, I was

24   just checking the latest publication, but yes.

25      Q.    Does this declaration -- well, what are
```



```
 1                         C. O'Neil
 2   your opinions in this case?
 3        A.    Can you tell me what that means?  An
 4   opinion; it's a lawyerly term that I don't
 5   understand.  Sorry.
 6        Q.    That's okay.  And I apologize for almost
 7   interrupting you.
 8              So do you understand that you have been
 9   retained as an expert witness in this case?
10   Potentially?
11        A.    Yes, I do.
12        Q.    And as an expert, you would be
13   formulating certain opinions on which you would be
14   opining and providing testimony.
15              Do you understand that?
16        A.    Yes.
17        Q.    And generally speaking, those opinions
18   that an expert submits are contained in a document,
19   typically a report that may take the form of a
20   declaration as well.
21              Does that make sense?
22        A.    Yes.
23        Q.    So you submitted this declaration in
24   your capacity as a retained expert for plaintiffs;
25   correct?
```



                            C. O'Neil

1

2          A.     I did.

3          Q.     In fact, in the very first sentence of

4    paragraph 1, you say, "I was retained by

5    plaintiff's counsel as an expert in the above

6    captioned matter."  Right?

7          A.     That's right.

8          Q.     So this declaration contains all the

9    opinions that you have in this matter.  Right?

10                MR. SCIMONE:  Objection.

11         A.     I -- now I know what you mean by

12   opinion.  So, yes.

13         Q.     Sitting here today, you don't have any

14   other opinions in this case that are not submitted

15   as part of this declaration.  Right?

16         A.     Now I am a little bit worried that I

17   don't really know what an opinion is, but I am

18   going to say -- I am going to say, Yes, that's

19   right.

20         Q.     So what are the opinions that you are

21   issuing as an expert in this case that are

22   contained in this declaration?

23                MR. SCIMONE:  Objection.  Go ahead.

24         A.     In this -- in this declaration, I am --

25   I am describing a model that I could build if I



```
 1                       C. O'Neil
 2   were given a certain amount of data.  I could build
 3   this model to measure the lost wages of the
 4   plaintiffs.
 5        Q.    Okay.  Any other opinions that you have
 6   in -- as part of this declaration?
 7        A.    That's the gist of it.  I mean, the --
 8   it's a relatively expansive model, so there are
 9   details.  But the only real point of this is to
10   describe a model that would measure lost wages.
11        Q.    Okay.
12        A.    Given certain data.
13        Q.    Okay.  Let's flip to paragraph 5, prior
14   to that.
15             And you don't need to look through, but
16   you referenced various data sources.
17             And in paragraph 5, you say, "These
18   data, together with testimony from special
19   investigators, can be used to assess damages for
20   all class members.  With a full dataset covering
21   2017 through 2024, which I understand can be
22   produced at later stages of the discovery process,
23   I would be able to establish a baseline for the
24   number of hours associated with the typical
25   caseloads assigned to special investigators, and to
```



1                        C. O'Neil

2     track fluctuations in that workload over time to

3     identify weeks when the work assigned was

4     inconsistent with the hours reported in GEICO's

5     timekeeping system."

6              Did I read that right?

7        A.    Yes.

8        Q.    Is that one of your opinions in this

9     matter?

10       A.    This is the point of this declaration.

11    So, yes.

12       Q.    And breaking down this, you know, higher

13    level opinion, I guess there is -- it's your

14    opinion that you would be able to establish a

15    baseline for the time costs of investigator work.

16    Right?

17       A.    What do you mean by "time costs"?

18       Q.    I think that's a phrase that you use in

19    your declaration.  Right?

20       A.    I would be able to establish a baseline

21    for the number of hours they worked, they

22    overworked, and how it fluctuated, and measure the

23    overall number of hours they weren't paid.  If

24    that's what you mean by time cost then, yes.  If

25    that's -- you know.



```
 1                         C. O'Neil
 2        Q.    Well, if you look at the heading right
 3   above paragraph 6, you say, "Establishing a
 4   baseline for the time costs of investigative work."
 5             Right?
 6        A.    Okay.  Yes.
 7        Q.    So what did you mean by that phrase?
 8        A.    I meant I was -- established a period of
 9   time where we know how much time they actually
10   worked, and we could compare that to the amount of
11   time they stated in their -- in their weekly time
12   sheets, what they worked.  And understand the
13   differences.
14        Q.    Okay.  When you say, "A full dataset
15   covering 2017 through 2024," what would a full
16   dataset look like?
17        A.    It would have an entry for all the
18   plaintiffs for every month that they worked in that
19   period, for all of the columns that the spreadsheet
20   has.
21        Q.    So -- and if we look -- I am not trying
22   to not guide you.
23             In paragraph 3, you reference, you know,
24   multiple documents.  But if you look at the second
25   sentence, it says, "These sources include an Excel
```



                              C. O'Neil

1

2    sheet Bates-stamped G010798 that refers to data

3    collected by GEICO's special investigation case

4    management or SICM system, among other documents

5    that are listed there."  Right?

6         A.    Yes.

7         Q.    And in paragraph 4, you say, "The SICM

8    report contains data showing new cases assigned,

9    closed cases, pending cases, case impact ratio,

10   productivity ratio, investigative events and

11   various performance metrics from January to August

12   2022.  The data was categorized by investigator,

13   supervisor team and month."  Right?

14        A.    Yes.

15        Q.    So when you say a full dataset, are you

16   referring to data in that format from 2017 through

17   2024?

18        A.    Yes, I am.

19        Q.    You also say that you would need --

20   "That data, that together with testimony from

21   special investigators, can be used to assess

22   damages for all class members."  Right?

23        A.    Yes.

24        Q.    Why would you need the testimony from

25   special investigators?



C. O'Neil

2   A.    I would want to establish that baseline

3   that I mentioned to figure out what the true number

4   of hours worked was, so that I could figure out the

5   discrepancy.

6   Q.    So when you say true number of hours

7   worked, I guess you are referencing to what

8   plaintiffs allege that they worked?

9   A.    Correct.

10  Q.    In your model that you describe here in

11  your declaration, do you take any steps to

12  corroborate the numbers that plaintiffs claim to

13  have worked on a week-to-week basis?

14        The number of hours, I should say.

15  A.    In this model, I don't, but I could

16  separately do that.  For sure.  There is lots of

17  opportunities.  I guess -- guess -- I guess even

18  here, I describe it as, other objective measures

19  that would corroborate this model.

20        So yes, I refer to that.

21  Q.    So you would agree with me that someone

22  estimating of number of hours that they worked on a

23  week-to-week basis could be subject to error?

24  A.    Yes.

25  Q.    Particularly if they are estimating



```
 1                        C. O'Neil

 2    hours that they worked several years ago?

 3         A.    Yes.

 4         Q.    And you also agree with me that as

 5    plaintiffs in a lawsuit, people that filed a

 6    lawsuit, that there is a potential bias that could

 7    be involved in the self-reporting of number of

 8    hours worked?

 9              MR. SCIMONE:  Objection.

10         A.    Yes.

11         Q.    Does your model account for that bias?

12         A.    No.

13         Q.    And by bias, I think you understand what

14    I mean; someone in a lawsuit may be incentivized to

15    overreport the number of hours that they claim to

16    have worked.

17         A.    I understand.

18         Q.    You would agree that's a possibility?

19              MR. SCIMONE:  Objection.

20         A.    Yes.

21         Q.    Would you need to look at the testimony

22    for every single special investigator to come up

23    with this baseline?

24         A.    No.

25         Q.    How many special investigator's
```



```
 1                          C. O'Neil

 2   testimony would you need to look at?

 3        A.    It would probably depend on how

 4   consistent they were.  But if I heard consistent

 5   answers; ten or 20, maybe five.  I don't know.

 6             That's a lawyerly question, to be

 7   honest.  It's not really a math question.

 8        Q.    So, well, it's kind of a math question.

 9   Right?  I guess -- let's look at it from a math

10   perspective.

11             So you are opining that you can come up

12   with a baseline number of hours that the plaintiffs

13   contend to have worked.  Right?

14        A.    Yes.

15        Q.    Is that baseline number of hours one

16   specific number that would apply to each putative

17   class member?

18        A.    Yes.

19        Q.    So you weren't actually looking at the

20   number of hours that certain plaintiffs reported

21   working?

22        A.    That's right.  My mathematical

23   assumption is that that number is -- is not -- yes.

24   It's not consistent with -- yes.

25        Q.    Well, if you look at paragraph 8 in your
```



```
 1                      C. O'Neil
 2   declaration, in the paragraph above that, you talk
 3   about what you referred to as an objective
 4   measurement of a baseline analysis.  Which we will
 5   discuss later.
 6           But it's essentially using data to
 7   measure how much time certain things take.  Right?
 8       A.    Not only to see how much time certain
 9   things take.  That is one thing I would do, yes.
10       Q.    Well, you say that the, "Idea of a
11   baseline analysis is to establish an estimate of
12   the time costs of various specific kinds of work
13   done by special investigators."
14           Right?  In paragraph 7?
15       A.    Yes.
16       Q.    And then in paragraph 8, you say that,
17   "Those measures of workload would need to be
18   compared with plaintiff's testimony about how many
19   hours they were actually working in that month."
20       A.    Yes, I do.
21       Q.    And you say, "To corroborate the
22   plaintiff's recollections, I would also review time
23   stamp entries in SICM, e-mails, and other objective
24   data to assess the accuracy of plaintiff's report
25   of typical start- and end-time times."  Right?
```



                          C. O'Neil

1

2       A.    Yes, I do say that.

3       Q.    And ultimately; your model proposes to

4  take the time that plaintiffs report to have

5  actually worked, subtract the time that your

6  analysis says that the work should have taken or

7  did take, and then the difference is the unreported

8  additional work time.  Right?

9            MR. SCIMONE:  Objection.

10      A.    Can you ask that question again, and be

11  more precise about what they said they worked?

12           Do you mean what they wrote down what

13  they worked in the SICM, or what they told us they

14  worked in testimony?  There is two things I said.

15      Q.    That's a good clarification, and I

16  appreciate that.  So I will clarify.

17           So your model seeks to take the number

18  of hours that plaintiffs are now contending in

19  their testimony, or otherwise, about how many hours

20  they actually worked in a month.  And your model

21  tries to subtract out what the analysis shows you

22  know they actually worked, or that the work took,

23  to come up with the difference between what they

24  reported versus how much time the work actually

25  took.  Right?



```
 1                        C. O'Neil
 2        A.    No.  That's not what my model does.
 3        Q.    Okay.  So how does your model --
 4        A.    My model takes the difference between
 5   what they actually worked and what their time
 6   sheets said they worked.  That's the stolen time,
 7   if you will, of -- in the baseline period.
 8             And then it also figures out the
 9   fluctuations of their workload over time, so that
10   it can do the same thing in other time periods.
11             It can also, in other time periods,
12   figure out the difference between how much they
13   actually worked and how much they stated they
14   worked on their time sheets.
15             So we are looking for, sort of, the
16   workload fluctuated over time.  We know how much
17   they worked during baseline.
18             The question is:  How much overworking
19   did they do in other time periods?
20             So that's what my model is measuring.
21        Q.    So I guess what role then, in that
22   analysis that you just described, does plaintiff's
23   testimony about how many hours they claim to have
24   worked play?
25        A.    The role that the testimony plays is to
```



```
 1                         C. O'Neil
 2    understand in the most recent time period, where
 3    they have the best memory.
 4              Or could be a different baseline.
 5              If for example, we go really far back
 6    before 2010 -- which would be great if we had even
 7    more data -- but during a certain period, we are
 8    trying to establish the ground truth, and how much
 9    they actually worked.
10              So that's what the testimony is for.  Is
11    establishing the ground truth of; what did you
12    actually work on average in that time period,
13    subtract it from -- so that we can subtract it from
14    the stated timesheet work, and figure out the
15    discrepancy there.
16         Q.   Okay.  So if your model looks at, you
17    know, uses an analysis to come up with the amount
18    of time that plaintiffs, you know, actually worked.
19    Right?  Your model, your analysis, using data
20    sources, is meant to do that?
21         A.   It's -- yes.
22         Q.   And from that, I think you said you
23    would subtract out the number of hours reported in
24    GEICO's timekeeping system?
25         A.   That's right.
```



```
 1                        C. O'Neil
 2        Q.    And you have a delta.  And that delta
 3   represents what plaintiffs -- or you would say, is
 4   unrecorded work time that wasn't compensated.
 5   Right?
 6        A.    Exactly.
 7        Q.    So in the analysis that I just laid out,
 8   where does the role of plaintiff's testimony fit
 9   in?
10        A.    Establishing that ground truth of actual
11   work time in the baseline period.
12        Q.    So the plaintiff's testimony of the
13   number of hours they actually spent working is
14   designed to inform how much time these tasks took
15   to actually do in your model?
16        A.    I mean, certainly, that's also true.
17   That's how much time it took them to do the tasks
18   that they did.
19              But really, it's a simple question.  The
20   simple question is:  How much, on average, did you
21   work in this -- in the baseline time period?
22        Q.    Right.  But in the, like, baseline
23   period, you are describing -- in order for you to
24   try and break down and do what you talked about in
25   paragraph 7, which is an estimate of time costs of
```



```
1                         C. O'Neil
2     various specific kinds of work, you need to have a
3     numerator.  Right?  Of the total number of hours
4     that they allege they spent working doing that
5     work.  Right?
6          A.    Yes.
7          Q.    So even this baseline that you are
8     referencing as a starting point incorporates the
9     number of hours that plaintiffs contend that they
10    worked off the clock?
11         A.    Starting point is that.  Yes.
12         Q.    I think you said that you would
13    ultimately come up with one number that applies to
14    all special investigators in the putative class; is
15    that right?
16         A.    That's right.
17         Q.    So to be clear, you would look at some
18    number of special investigators' testimony to get a
19    sense of how many hours they were working in
20    various time periods; is that correct?
21         A.    Well, in the baseline time period.
22         Q.    In the baseline time period?
23         A.    Yes.
24         Q.    Is that right?
25         A.    Yes, that's correct.
```



```
 1                            C. O'Neil
 2        Q.    And then from that various testimony,
 3   you would create -- is it an average?
 4        A.    Average what?
 5        Q.    Average number of hours worked for
 6   different time periods?
 7        A.    I mean, I could measure the average.
 8              I could also -- what I was imagining
 9   doing, because I was imagining it being a
10   measurement of a particular person's wage theft, is
11   looking at their hours on a -- on a monthly basis
12   because that's how the spreadsheet data looks.  And
13   saying, given your workload for this month and your
14   stated hours, this is my estimate of how many hours
15   you actually worked.
16              So it would be individualized in that
17   sense.
18        Q.    Okay.  So your model could create an
19   individualized analysis, for example, for Keith
20   Fischer?
21        A.    If he is one of the plaintiffs, yes.
22        Q.    Yes.  And he is one of the plaintiffs.
23              Similarly, he is one of the people you
24   spoke with -- similarly, like, you know, Michael
25   Reed; you could create an individualized model for
```



                          C. O'Neil

 1

 2   him?

 3        A.    Yes.

 4        Q.    And the model that you proposed, I

 5   guess, does require that you look on an individual

 6   basis at various plaintiffs.  Right?

 7        A.    The model I propose is trained on

 8   individual data, because that's what the

 9   spreadsheet data is.  So monthly information per

10   plaintiff for those many years.

11             But I could use that model, once it's

12   been built, to do this individualized measurement

13   of wage theft.

14        Q.    Okay.  So if I am understanding

15   correctly:  You would -- to use your terminology,

16   train the model using individual plaintiffs to come

17   up with the baseline?

18        A.    Yes.

19        Q.    How many plaintiffs would you need to

20   reliably train your model?

21        A.    It was not just a question of how many

22   people are involved, but how many months of data I

23   have for them.  And I would say if I had 200 people

24   followed, then I would need a year or two of data.

25        Q.    So where -- let's start first with the



```
 1                          C. O'Neil

 2    number 200.  Where does the, if I had 200 people,

 3    come from?

 4         A.    I asked how many plaintiffs are in the

 5    class, and I think I heard that number.

 6         Q.    So your understanding in writing this

 7    declaration is that it's 200?

 8         A.    Yes.

 9         Q.    Approximately?

10         A.    Approximately.

11         Q.    Class members.

12               And from 200, you said you would need

13    how much data?

14         A.    One or two years.

15         Q.    So 12 to 24 months of data for all 200

16    people?

17         A.    Yes.

18         Q.    And if you didn't have 12 to 24 months

19    of data for 200 people, fair to say that you

20    wouldn't be able to reliably train the model and

21    apply the methodology that you state in your

22    declaration?

23         A.    It's hard to tell exactly how much I

24    need without seeing the data.  It just -- I --

25    because I don't know how consistent it is.
```



```
 1                          C. O'Neil

 2              Some data is easier to train than

 3      others.  It depends on the statistical signal

 4      within the data.  I expect this to be very

 5      well-behaved data, actually.

 6              So it could maybe make do with less than

 7      that.  But I would prefer to have more -- more than

 8      less -- to make a good statistical model with good

 9      estimates.

10         Q.   Understanding the preference is always

11      for more data, and I think I understand why, I

12      guess I am trying to get a sense for this.  If that

13      data wasn't available, there would be a potential

14      issue with the reliability of the baseline analysis

15      that you are talking about.  Right?

16         A.   Yes.

17         Q.   And if you didn't have a sample of 200

18      individuals representing 12 to 24 months, similarly

19      the model that you are proposing to create wouldn't

20      necessarily be reliable; is that right?

21         A.   That's right.

22         Q.   Do you have any understanding as to

23      whether that data is available for a 12- to

24      24-month period?

25         A.   I don't.
```



                                C. O'Neil

1

2        Q.    Do you have an understanding as to

3    whether that data is available for 200 people?

4        A.    I don't.

5        Q.    As we said earlier, you haven't taken

6    the data that is available to you and run any

7    analysis on it.  Right?

8        A.    Right.

9        Q.    Do you have any understanding of how

10   many individuals are encompassed in the spreadsheet

11   produced and Bates-labelled G010798, that you

12   reviewed prior to your deposition?

13       A.    I don't remember.  I know it's at least

14   a handful, but not more than a dozen.

15       Q.    You don't think there is more than 12

16   people's data reflected in that spreadsheet.

17       A.    To be honest, I wasn't looking.  I

18   wasn't counting it.  I wasn't doing an analysis.

19            I was looking at the type of data it

20   was.  I was more interested in the columns than the

21   rows, once I understood that the rows corresponded

22   to people's monthly work.

23       Q.    So you talked about what a full dataset

24   would look like for the basis of this analysis.

25   But you say in paragraph 5, that "That data,



                              C. O'Neil
    1

    2   together with testimony from special

    3   investigators."

    4            So I want to focus on the testimony

    5   piece for a second.  What does a full dataset of

    6   testimony look like?

    7        A.    I mean, I think that's a lawyerly

    8   question, but I would say for my -- for my

    9   purposes, I just want a number.

   10        Q.    Well, we talked about 200 people's worth

   11   of data.  Do you similarly need, you know, 200

   12   estimates of how much time was spent working off

   13   the clock?

   14        A.    No.

   15        Q.    So what number of people would you need?

   16            MR. SCIMONE:  Objection.  Go ahead.

   17        A.    I mean, I could make do with one person.

   18        Q.    So it's your testimony that if you had

   19   solely Keith Fischer's estimate and the number of

   20   hours of off-of-the-clock time that he worked, you

   21   could apply that to 199 other members of a putative

   22   class?

   23        A.    I mean, I would be statistically more

   24   comfortable if I had more.  If I had five people or

   25   ten people.  As always, I want more.



                              C. O'Neil

1

2          I want to -- I want to be able to trust

3   that this number is true.  It's a good

4   approximation.

5          Q.    As a mathematician, you understand that

6   the sample that you use has to be reliable.  Right?

7          A.    Yes.

8          Q.    Do you think a sample of one would be

9   reliable?

10         A.    Depends on their memory.  But I mean, I

11  would prefer more than one.

12         Q.    I guess I am asking a slightly different

13  question.

14              In the group of 200, as a mathematician,

15  would you feel comfortable building a model around

16  a sample of one?

17         A.    You have to understand that I am not

18  doing that.  Like, the overall model is using a lot

19  of data.

20              This putative model that we haven't

21  built yet, and this number that we are getting from

22  the plaintiff's testimony, is just a single

23  baseline number.

24              So I am really just looking at what

25  number -- it is an important number, I grant you



C. O'Neil

1

2   that.  So because it's an important number, I would

3   like to have more than -- more than one person

4   testifying to it.

5        Q.    That's what I am trying to figure out.

6   Is; what is the sample that's necessary for you to,

7   you know, feel comfortable, to use your word, with

8   your model and its reliability?

9        A.    To be honest with you, I don't think

10  that's really a math question.  It -- it's a

11  question of like, maybe legal precedent, like how

12  many people need to testify about how much work

13  they actually did.  How many hours they actually

14  worked before that number is accepted.

15          I don't know what the legal precedent

16  for that is.

17       Q.    I am not asking you to opine --

18       A.    I will just say -- sorry.

19       Q.    You are okay.

20       A.    As a statistician, I would want to hear

21  a few, like three.  And if they were consistent, I

22  would be, oh, this seems to be converging to

23  something consistent.  If they were inconsistent, I

24  would be like, I would like to hear more.

25       Q.    Sure.  But as a statistician, you



                              C. O'Neil

1

2    recognize that there are certain requirements that

3    you have to consider and ensure before you can

4    conclude that data from a limited sample can

5    reliably be extrapolated to the whole.  Right?

6        A.    So when you are a statistician, you

7    usually have something called a distribution you

8    are working with.  So like it could be a normal

9    distribution, a bell curve.  You know.

10            So if you are talking about like the IQ

11   of the average person, then the bell curve is

12   really wide.  You wouldn't find out just one

13   person's IQ and say everybody has that IQ.  You

14   would have to actually ask a bunch of people to get

15   the averages to be a hundred.  Right?

16            But that's because you know the

17   distribution is a bell curve, and you know there is

18   people with 80; there is people with 120.  On

19   average, it's 100.

20            I don't know what the distribution is

21   here for the number of hours worked, so I don't

22   know how much it varies.  Right?  So I would be --

23   that's one of the kind of things I would be

24   interested in knowing.

25            Yes, it would be better to have more



```
 1                          C. O'Neil
 2    than one, so I could get a sense of consistency.
 3              If -- in other words, if -- just like --
 4    let's go back to the IQ thing.  And I said I met
 5    somebody and they said, My IQ is 100.  And I might
 6    just want to walk away, saying everybody has an IQ
 7    of 100.  But if the next person came along and
 8    said, I have an IQ of 80, and then the third person
 9    came along and said, I have an IQ of 120; I would
10    be like, wow, these are really different.  Let's
11    get a few more until we figure out the distribution
12    a little bit.
13              And then at the end of the day, I would
14    average them all to say, The average is this.
15              So that's what I would probably suggest.
16    If I knew nothing else for this plaintiff's
17    testimony, is ask three or four and see if there is
18    wild variation.  If there is; ask way more.
19              But I don't -- yes.
20        Q.    What would you consider mild variation
21    in the context here of after-hours work?
22        A.    Three to four hours.
23        Q.    So if the hours started to converge
24    within three or four of each other, you would feel
25    like you had enough testimony establishing that
```



                           C. O'Neil

1

2   that was the baseline number of hours?

3        A.    Yes.  And I would take the average of

4   the answers that we got.

5        Q.    You interviewed three individuals before

6   you drafted this declaration.  Right?

7        A.    Might have been more than three.  But I

8   did, yes, I interviewed some plaintiffs.

9        Q.    In fact you say in paragraph 3, in the

10  last sentence, that you interviewed three former

11  special investigators who are plaintiffs or opt-in

12  plaintiffs in this case.  Right?

13       A.    Okay.  Yes.

14       Q.    Did you look at or did those individuals

15  report to you what their average number of hours

16  that they contend they worked off the clock are?

17       A.    When I interviewed them -- the answer is

18  no.

19             When I interviewed them, which was like

20  a long time ago, I didn't have this model

21  developed.  So this was not the question I had at

22  the top of my mind.

23       Q.    Did you ever ask plaintiff's counsel if

24  any documents reflect the number of hours a

25  plaintiff or opt-in plaintiffs contends that they



                          C. O'Neil

1

2    worked?

3    DI         MR. SCIMONE:  Objection.

4              Please don't answer that question as to

5         your conversations with counsel.

6              MR. TSONIS:  I didn't ask for the

7         substance of conversations.  I asked her if

8         they -- she requested the kind of data.

9              MR. SCIMONE:  That is the substance of

10        the conversation.  Please don't answer the

11        question as stated.

12        Q.   Would you have liked to have received

13   data on the number of hours that plaintiffs or

14   opt-in plaintiffs in this case contend that they

15   worked off the clock for various time periods?

16        A.   Certainly would make my analysis easier.

17        Q.   With that data, you would be able to

18   actually provide some sort of estimate as to the

19   variance between plaintiff's reported hours and

20   actual work.  Isn't that right?

21        A.   The discrepancy; yes.

22        Q.   I will use that word.

23             So the discrepancy, as you said earlier,

24   started to converge within three or four hours.

25   That may be an indication that you reached a point



                            C. O'Neil

2   that -- you used that, to apply to a larger group?

3        A.    Yes.

4        Q.    If it showed a variance greater than

5   that, you would need more data?

6        A.    Can I -- I don't agree with that

7   statement, quite.

8              What I meant to say is; that if there

9   was a large variance, I would -- it's not that I --

10  well, okay.

11             Yes, I would need more data to be sure

12  of the average.

13       Q.    And I guess to be clear:  You know, part

14  of your model -- I understand, you know, a model

15  can be built with one person's hours as sort of

16  that baseline.  Right?

17       A.    Yes.

18       Q.    If you were to do that, that model

19  wouldn't necessarily be reliable.  Right?  When

20  extrapolated to everyone else?

21       A.    That's right.

22       Q.    So part of your model -- your work as an

23  expert, is not only creating a model, but creating

24  one that's actually reliable.

25             Would you agree with that?



```
1                         C. O'Neil

2        A.    That's right.

3        Q.    Your model that you lay out here, in

4   theory, you haven't actually established that it

5   can reliably assess the damage of class members.

6   Right?

7        A.    It depends on the data that I received.

8        Q.    And if you don't have some of that data

9   that we discussed that you would need, for example,

10  then your model may not reliably assess class

11  member's damages?

12       A.    For example, yes.

13       Q.    Another scenario could be that you need

14  to essentially get data from every class member to

15  build a reliable model.  Right?

16             MR. SCIMONE:  Objection.

17       A.    I don't think I would need that.

18       Q.    It's possible you would need a majority

19  of the class members' data to build a reliable

20  model if there was substantial variance?

21             MR. SCIMONE:  Objection.

22       A.    No.

23       Q.    It's not possible?

24             MR. SCIMONE:  Objection.

25       A.    It's very, very unlikely.
```



                          C. O'Neil

1

2      Q.    Okay.  What's the outer limit of the

3   amount of -- assuming a group of 200 individuals,

4   as you did, the highest that you anticipate you

5   would need in terms of individual's data?

6             MR. SCIMONE:  Objection.

7      A.    20.

8      Q.    So 10 percent of the group, you feel you

9   can reliably extrapolate that number to everyone?

10     A.    Yes.

11     Q.    Why 10 percent?

12     A.    It's not that it's 10 percent; it's that

13  it's 20.  20 is a lot of people.

14             And these numbers that they are going to

15  be giving me is not unlimited in size.  It's a very

16  tight range that would be believable.  You know

17  they didn't work more than 120 hours a week.  So

18  it's -- it's a range already.  It's sort of

19  sandwiched between 40 and 120.  And so I already

20  know something about the distribution.

21             And I don't think they are going to be

22  all up there; 100.  I don't think they are going to

23  be all over the place either.  So I am guessing

24  they are going to be in the range of 45 to 60.

25             And once you get to that point, you are



```
 1                         C. O'Neil
 2    like, well, you just don't need that many data
 3    points between 45 and 60 before you can take an --
 4    an average and believe in it.
 5         Q.    When you said 45 and 60 just now, are
 6    those just hypothetical numbers or are those --
 7         A.    I am talking about hours -- I am talking
 8    about hours per week of working.
 9              So they are not hypothetical.  They are,
10    like, practical.  Like, there is a practical range
11    that I expect the answer to be in.  Nobody is going
12    to say, I worked a thousand hours a week.
13         Q.    Sure.  So without knowing the
14    distribution, to your point, it's capped in
15    practical terms by the -- a number of hours in a
16    week, let's say.  Without knowing the distribution
17    though, how could you definitely say that you need
18    no more than 20 individuals?
19         A.    Because I would want to get a good
20    estimate of the average amount of hours that the
21    plaintiffs worked per week in the baseline time
22    period.  And given the constraints of these
23    numbers, I think probably less than 20 would give
24    me, like, confidence.
25              I would draw -- I would calculate the
```



                             C. O'Neil

2    mean, the average, and then I would be able to draw

3    error bars.  Because I had ten data points and I

4    think the error bars would be pretty tight.

5              I mean, in fact, if they were tight

6    after the ten -- ten plaintiffs came, I would say

7    we don't need to talk to more plaintiffs.  And I

8    would even be able to say I have a lower bound and

9    an upper bound on this stuff too; I don't just have

10   an estimate of the wage theft.  I have an lower

11   bound and upper bound, depending on this error bar.

12        Q.    Would the 20 that you are talking about

13   as an hourly need to be randomly selected?

14        A.    That would be great if they were

15   representative, yes.

16        Q.    Is it necessary for the reliability of

17   the model that they be randomly selected?

18        A.    No.  And there is also a way to check

19   the representativity.

20        Q.    What do you mean by that?

21        A.    Well, one of the things that they told

22   me in the interview was that they were all given

23   like report cards, and they were very closely

24   tracked for their productivity.  So we could check

25   where they were in that -- in that.



                          C. O'Neil

2         Because I know they got punished if they

3    were in the bottom quarter, quartile.  So they were

4    like -- if they were sort of in the middle of the

5    pack and they were like -- go back to the, like,

6    scenario where you had ten plaintiffs, and they had

7    consistent numbers, and they were all sort of --

8    they were represented -- they were sort of in the

9    middle of the pack, or not -- or centered around

10   the center of the pack is a better way saying

11   that -- you can draw them in the distribution of

12   report cards scoring.  Then that would be an

13   argument for the representativity.

14        Q.    Is that what you propose to do in your

15   model?

16        A.    That's an idea I had.

17        Q.    Is that listed anywhere in your

18   declaration?

19        A.    No.  But I did talk about looking at

20   other data for objective correlation of -- yes, you

21   actually asked me about it.

22          And you had asked me like in

23   paragraph 8; to corroborate the plaintiff's

24   recollections, I would also review other objective

25   data.



                            C. O'Neil

1

2       Q.    So when you write "other objective

3    data," you just referenced individuals ranging --

4    or quartile ranging on a month-to-month basis.

5    Right?

6       A.    Yes.

7       Q.    What other data were you referencing

8    when you wrote, other objective data?

9       A.    One of the things I understood was that

10   they -- they worked on the weekends, and then

11   sometimes on Monday, they would put in a lot of

12   reports.

13          So if I had time stamps for the SICM

14   system, I could see how those report entries got

15   bunched up together.  And so on a Monday; they

16   would have maybe more entries bunched up.  And then

17   on Tuesday, Wednesday, Thursday, Friday; they would

18   have it more spaced out.

19          So this would be useful in two ways.

20   First the spaced-outedness, which would sort of

21   indicate how long each case took, which would be a

22   corroboration on the time that it took to do a

23   certain thing.  And then it would also corroborate

24   that they had to work on weekends.

25       Q.    What within similar SICM would



                          C. O'Neil

1

2    corroborate whether a plaintiff had to work

3    weekends or not?

4         A.    If there was bunching up of the time

5    stamps on a Monday morning for entries.

6         Q.    So your testimony is:  If I have a

7    number of -- more time-stamped entries on SICM on a

8    Monday than I do the rest of the week, that

9    indicates weekend work?

10        A.    It certainly indicates it.

11              Not a proof; it's evidence.

12        Q.    My follow-up question:  Does it

13   establish that weekend work was done?

14              MR. SCIMONE:  Objection.

15        A.    That's a lawyerly question and I don't

16   know what "establish" is.

17              It's not a proof; it's evidence.  But

18   it's something I could possibly use to corroborate

19   stuff.

20        Q.    Would the use of SICM data bunching on

21   Mondays, for example, be used to indicate or to

22   establish, you know, evidence that weekend work was

23   done?  Which in turn, establishes evidence that

24   off-the-clock work was done?

25              Is that what you are saying?



                            C. O'Neil

     A.    Yes.

     Q.    So you are sort of using that data to
build one assumption on another to confirm
off-the-clock work?

           MR. SCIMONE:  Objection.

     A.    I mean, all statistical models just end
up being evidence.  Nothing is a proof.  Right?

           So what you want to do, and I even
talked about that explicitly here, is have more
than one model.  And hopefully, they say the same
basic story, but from a different angle.  Because
you know, you want evidence from this angle,
evidence from that angle.  You want them all to be
saying the same story.

           So that's what I mean by corroborative
objective data.  So to build yet another way of
thinking about it.

           But if it says largely the same story,
another possibility is, I guess, the SICM data --
like, imagine if I get SICM data time stamps and I
didn't see any of that bunching up on Monday.
That's another possibility.  And I would be like,
oh, so maybe they didn't work on the weekends and
then put everything in on Monday morning.



```
 1                          C. O'Neil
 2        Q.    Isn't it another possibility if you saw
 3   bunching on Monday morning, that they just didn't
 4   feel like doing it on Friday?
 5        A.    Yes.  But I could look for evidence that
 6   they didn't do stuff on Friday.
 7               So if they did consistency --
 8   consistently worked, like, inputting things Monday,
 9   Tuesday, Wednesday, Thursday, Friday; or Tuesday,
10   Wednesday, Thursday, Friday.  And then on Mondays,
11   they had three times as much as any other day when
12   they were consistent on other days; that would look
13   a little bit more like they were working on the
14   weekend than that they slacked off on Friday,
15   because they didn't slack off on Friday.
16               I mean, that's just a theoretical thing.
17               My point is though:  I don't have the
18   data.  And if I did, I could try to understand how
19   a narrative was being produced with the data.
20        Q.    Your understanding is entries made by
21   investigators don't actually describe how much time
22   an act or a task took.  Right?
23        A.    They don't directly describe that.
24               But if you see consistent four-hour
25   differences during a Tuesday, like you see they put
```



```
 1                      C. O'Neil

 2   something in at 10:00 a.m., and then put something

 3   in at 2:00 p.m., like you see four-hour gaps, then

 4   you start to think, oh, it takes them about two

 5   hours for them to do something.

 6             That's the kind of analysis that all of

 7   this is based on.

 8        Q.   I guess my question is a little bit

 9   different.  The time entries or the time-stamped

10   entries in SICM don't actually establish,

11   themselves, how much time it takes someone to do a

12   specific task.  Right?

13        A.   I would say they give evidence for that,

14   but they don't prove it.

15        Q.   Well, you are assuming -- I guess in the

16   example you just gave a short while ago, that an

17   investigator's, sort of, normal work product is

18   that:  I do a task, and then I immediately log it

19   into SICM.  Right?

20        A.   Well, they certainly described a kind of

21   pretty -- pretty close surveillance system, that

22   they -- they said it would go red if they were

23   considered late, so they were working under time

24   pressure.  So I do think that's a natural

25   assumption that they would -- they would, as soon
```



                              C. O'Neil

1   as they were done with the task, they put it in

2   SICM to get it under the time pressure -- to get it

3   in before the deadline.

4       Q.    Is it your understanding that -- well,

5   strike that.

6           The time or the color change that you

7   talked about before, it goes red, do you have an

8   understanding what that time frame was?

9       A.    No.

10      Q.    So if it was a ten-day time frame, for

11  example, they could have a case pending without an

12  update for ten days.  Under that assumption, they

13  wouldn't necessarily have to go into SICM

14  immediately after they completed a task; right?

15      A.    Of course not, if it's ten days.  Right?

16  But --

17      Q.    You can finish.

18      A.    Yes.

19      Q.    In that circumstance, given the amount

20  of time of that -- given the assessment that they

21  were on -- or the change to red that you

22  referenced, if there was a longer window of time,

23  that necessarily means that SICM time-stamped

24  entries are less reliable as a predictor of what



                         C. O'Neil

1

2    tasks were done and how much time they took.

3    Right?

4              MR. SCIMONE:  Objection.

5         A.    I am just -- I would like to argue that

6    the SICM time-stamp entry would be pretty useful.

7              For example, the data we have in the

8    spreadsheet are basically counts of cases closed or

9    types of cases closed.  We don't know what time

10   they did it, but we know the event happened.

11             And that's already a way of thinking

12   about their work.  Their workweek consisted of this

13   many cases closed, these types of cases closed.

14             And I think it's probably equally valid

15   to stay -- say their workweek consisted of them

16   preparing and then entering things into the SICM

17   database.

18             So even just the count of how much SICM

19   entries they have in a given day would be useful.

20   The time stamp would be even more precise.

21        Q.    And in what way would the time stamp be

22   more precise?

23        A.    Well, for example, let's go back to the

24   Monday morning scenario where they -- because they

25   also mentioned that they worked on their entries in



```
 1                        C. O'Neil
 2   a separate document, and then copied and pasted it
 3   into SICM.
 4              If we saw that they had on the
 5   Tuesday -- the Tuesday example was they put
 6   something at 10:00 a.m. on Tuesday, and then did
 7   something at 2:00 p.m. on Tuesday.  It's not a
 8   proof that the second thing they did took four
 9   hours, but it's an indication.
10              But if on Monday, they had an input at
11   9:00 a.m., another input at 9:15, and another input
12   at 9:30; that sounds like they are copying and
13   pasting from work they did over the weekend.
14              So it's:  More information, it would
15   give you a more precise type of story.
16              This is all completely theoretical.
17              MR. SCIMONE:  Just -- we have been going
18       for I think a little more than an hour and a
19       half.
20              At some point soon, I think, can we take
21       a break?
22              MR. TSONIS:  I am fine.  We can take a
23       break now.
24              THE VIDEOGRAPHER:  The time is
25       10:53 a.m.  We are going off the record.
```



```
 1                        C. O'Neil

 2              (Recess taken.)

 3              THE VIDEOGRAPHER:  The time is

 4      11:07 a.m.  We are back on the record.

 5       Q.    Let's switch gears a little bit and talk

 6      about your CV and kind of your past experience

 7      here.

 8              So you said that you have been deposed

 9      before; right?

10       A.    That's right.

11       Q.    How many times have you been deposed

12      before as an expert in a litigation?

13       A.    Once.

14       Q.    What was that case about?

15       A.    The California AG Office hired me to

16      help them try to make the case that a certain

17      effective APR calculation was reasonable to ask

18      businesses to do.  In particular businesses.

19              So there was a person -- the company

20      they were dealing with, I am not sure who sued who

21      or how that works, but the company was claiming

22      this was like a hardship to have to calculate this

23      effective APR on their products, which is a

24      business-to-business loan product.  And so the AG

25      wanted me to make the case that it was actually not
```



                          C. O'Neil

1
2    hard at all to do.

3        Q.    And APR, I think you referenced annual

4    percentage rate?

5        A.    Yes.  Interest -- effective interest

6    rate.

7        Q.    Prior to your deposition, did you issue

8    a report that contained your opinions?

9        A.    Yes, I did.

10       Q.    And you were deposed in that matter;

11   right?

12       A.    Yes.

13       Q.    Did you ultimately testify at trial?

14       A.    No.

15       Q.    Do you remember the name of that case?

16       A.    No.

17       Q.    Do you remember the resolution?  How the

18   case ended up?

19       A.    No not exactly.

20       Q.    Generally, do you?

21       A.    I think -- I think the -- California

22   might have amended the requirement.

23       Q.    Were any portion of your opinions

24   excluded in connection with that matter?

25       A.    Can you say what that means?



                          C. O'Neil

1

2      Q.    Sure.  So sometimes one side, like the

3  side that you are not on, will say, you know, there

4  is something wrong with your opinions, or they are

5  not reliable, you are not qualified to give them.

6           Something along those lines.

7      A.    Oh.  No.

8      Q.    Besides that one proceeding, have you

9  ever authored a report as -- as a retained expert

10  in other litigation?

11      A.    Yes.

12      Q.    How many times?

13      A.    I think just once.

14      Q.    One time other than the California case

15  you discussed; is that right?

16      A.    Yes.

17           I mean, to be clear:  I have been

18  retained as an expert a bunch of times.  But in

19  terms of actually writing a report that got read by

20  a judge; I think it only happened once.

21           Other than this -- the deposition case.

22      Q.    Before we go to the new case.  The

23  California case, approximately what year was that

24  that you were deposed?

25      A.    I think it was 2024.



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                      74

```
 1                        C. O'Neil

 2        Q.    Now, this other case that you authored a

 3   report.

 4        A.    Yes.

 5        Q.    Was it a report, you know, similar to

 6   the declaration that you submitted here in this

 7   litigation?  Or was it something more detailed or

 8   in a different format?

 9        A.    It was just more detailed, because it

10   was describing an analysis that I actually ran with

11   real data.

12        Q.    What was the subject matter of your

13   opinions and your analysis in that matter?

14        A.    It was about a payday loan company in

15   Illinois with a nonoptional insurance product for

16   the loan itself.  And so I remember one of the

17   things -- I don't remember that well because it was

18   2014 or something along those lines, but one of the

19   sections was evidence that this insurance product

20   wasn't actually used for insurance purposes; it was

21   effectively just a surcharge.

22             And then another section of the report

23   was demonstrating that it made an effective APR

24   more than 500 percent on average for the borrowers,

25   where the usury rate in Illinois was 36 percent or
```



                              C. O'Neil

1

2    32 percent.

3        Q.    I presume from the substance of your

4    opinions you were retained as an expert by the

5    borrowers, by the plaintiffs, and not from the

6    payday loan company?

7        A.    It was an AG Consumer Fraud Division.

8        Q.    So the attorney general of the state of

9    Illinois retained you as an expert in that matter?

10       A.    Yes.

11       Q.    Do you remember the name of the matter?

12       A.    I think it might have been All Lenders.

13   Something like that.  I could find it.

14       Q.    And you testified that was about, the

15   best of your recollection, 2014?

16       A.    Yes.

17       Q.    Besides those two matters, you have not

18   authored any expert reports for any other

19   litigation or arbitration or any sort of, you know,

20   similar proceeding.  Is that right?

21       A.    That's right.

22       Q.    You said you have been retained as an

23   expert a number of times.  Do you have a sense for

24   approximately how many times you have been retained

25   as an expert?



```
 1                        C. O'Neil

 2        A.     Maybe a dozen.

 3        Q.     Do those dozen include the attorney

 4   generals for California and Illinois?

 5        A.     Yes.

 6        Q.     Are you typically, I guess, retained by,

 7   you know, state entities?  Or is it something --

 8   you are retained by private plaintiffs or

 9   defendants?

10        A.     Well, I have been obviously working with

11   Outten & Golden.

12               And on another case as well, I was

13   working with them.

14               MR. SCIMONE:  Please don't disclose

15          anything you have worked on with us in other

16          litigation.  Okay?

17        A.     Okay.

18               And yes, other state AGs and another

19   state regulatory agency.

20        Q.     Have you ever been retained by a

21   defendant in litigation?

22        A.     No.

23        Q.     You are also retained, I think you

24   mentioned, by the same plaintiff's counsel that's

25   in this litigation for a separate matter titled
```



```
1                          C. O'Neil

2    Alvarez vs GEICO; is that right?

3         A.    Can you repeat the question?

4         Q.    Yes.  Have you been retained by this

5    same plaintiff's counsel that's here with you today

6    in connection with a different matter captioned

7    Alvarez vs GEICO?

8               MR. SCIMONE:  I am going to object to

9         the question.

10        A.    I don't know.

11        Q.    That's fine.

12              So looking at your CV here, I see you

13   have authored some different books and

14   publications; is that right?

15        A.    Yes.

16        Q.    So it says you are an author of a book,

17   Weapons of Math Destruction.

18        A.    Yes.

19        Q.    Did you write that book?

20        A.    Yes.

21        Q.    Was anyone a co-author with you or was

22   it just you?

23        A.    I am the only author.

24        Q.    Obviously I suspect the things that you

25   write in your book, you think are reliable and
```



```
 1                        C. O'Neil
 2    accurate in terms of statistics and mathematics?
 3         A.    Yes.
 4         Q.    Similarly, I think Doing Data Science is
 5    another book that you have written.  Right?
 6         A.    Yes.
 7         Q.    Did you have a co-author with that book?
 8         A.    I did.
 9         Q.    Who was your co-author?
10         A.    Rachel Schutt.
11         Q.    What role did you play, as opposed to
12    your co-author?
13         A.    I wrote it all.
14         Q.    You wrote it all?
15         A.    Yes.  We are still not friends.
16         Q.    Sounds like you had a falling out?
17         A.    We did, yes.
18         Q.    Was it over the book?
19         A.    Yes.
20         Q.    Given that you wrote it all, similarly I
21    suspect you would say that Doing Data Science is a
22    very reliable source that is accurate in terms of
23    content with respect to mathematics, statistical
24    analysis and the like?
25         A.    Yes.
```



1                          C. O'Neil

2        Q.     The Shame Machine is a different book

3    that you published?

4        A.     Yes.

5        Q.     Does that deal with mathematics?

6        A.     No.

7        Q.     So none of the work that you have done

8    as a retained expert concerns, I guess, what you

9    are trying to do here in this litigation?  You

10   know, analyzing and creating a model that can

11   assess claimed off-the-clock work by plaintiffs in

12   a litigation.  Right?

13       A.     That's correct.

14       Q.     You haven't been retained as an expert

15   in any sort of wage-and-hour litigation in the

16   past; is that right?

17       A.     That's right.

18       Q.     In your private practice, you have never

19   done the kind of analysis that you set forth that

20   you contend that you could do in your declaration.

21   Right?

22       A.     Private practice makes it sound like I

23   am a lawyer.  But I am not a lawyer.

24       Q.     I didn't mean to imply that you were a

25   lawyer.  I apologize if there was any offense.



C. O'Neil

2    A.    Not offended.

3    Q.    I am being a little self-deprecating.

4         I guess I mean:  In your background in

5    ORCAA, or prior to ORCAA, you have never done or

6    created a model that you are setting forth in your

7    declaration.  Right?

8    A.    That's wrong, actually.

9         I worked very close to here at a hedge

10   fund for a couple of years, DE Shaw, and that's all

11   we did is linear -- multilinear regressions.

12   That's how we tried to predict the futures market.

13        So this methodology is very standard,

14   and it's something I did professionally.

15   Q.    I am not questioning that linear

16   regression is a tool of mathematics.

17        I guess I am questioning:  Have you ever

18   used linear regression to try to capture the time

19   costs of various acts, like you set forth in your

20   declaration, to create that kind of model?

21   A.    I have never used it for this intended

22   purpose.

23   Q.    So I guess to be clear:  You have done

24   models concerning -- that incorporate the concept

25   of linear regressions, but you have never done them



```
 1                    C. O'Neil

 2   to try to capture the time costs that you are, as

 3   set forth, in your declaration?

 4        A.    Exactly.

 5        Q.    Linear regressions are, you would agree,

 6   a very basic tool in statistical analysis.  Right?

 7        A.    Yes.

 8        Q.    In fact, linear regressions are used by

 9   many different people for many different purposes.

10   Right?

11        A.    Yes.

12        Q.    If you go back to what has been marked

13   as Exhibit 2, I guess I want to orient you again

14   towards -- starting at Page 2, really moving onto

15   Page 3.  That section that's titled, Establishing a

16   Baseline For the Time Costs of Investigative Work.

17        A.    Yes.

18        Q.    So this baseline for the time costs,

19   this is what we were just discussing.  Right?  You

20   are using linear regression to create that

21   baseline?

22        A.    Yes.

23        Q.    Here in your declaration, I guess, would

24   it be fair to say paragraphs, sort of, 6 through 10

25   are about establishing that linear regression?
```



```
 1                          C. O'Neil
 2         A.    Yes.
 3         Q.    Paragraphs 11 through 15, which have the
 4    title of Assessing Damages, are more about using
 5    the linear regression.  Right?
 6         A.    That's exactly right.
 7         Q.    So you propose that any linear
 8    regression that you would establish would apply to
 9    multiple investigators, you said.  Right?
10         A.    That's right.
11         Q.    You are not opining that you would seek
12    to establish a linear regression for each
13    individual investigator?
14         A.    That's right.
15         Q.    So you used the word "correlating" in
16    your declaration.  I am trying to find the exact --
17    oh, it's at the top of Page 3.
18               You write, "First, I would seek to
19    establish a baseline by correlating the case and
20    task assignments in the SICM dataset with the
21    number of hours that plaintiffs testified to."
22    Right?
23         A.    Yes.
24         Q.    What do you mean by correlating?
25         A.    Overall, that sentence is meant to give
```



                            C. O'Neil

 1

 2    a high-level description of what we talked about a

 3    little bit earlier.

 4                Which is to say; with this many cases of

 5    this type, or this many tasks of this type, you

 6    have a stated hour -- monthly hours of this.  But

 7    we actually know that you worked more than that by

 8    your testimony, so we are going to -- we are going

 9    to build -- build the model that tries to infer the

10    amount of time each of those cases took, or each of

11    those tasks took, given the actual number of hours

12    you worked and not the stated number of hours you

13    worked.

14        Q.    When you say, stated number of hours you

15    worked, the numbers entered into GEICO's

16    timekeeping system?

17        A.    Yes.

18        Q.    When you say actual hours, you are

19    referring to the number of hours that plaintiffs

20    contend that they worked?

21        A.    That's right.

22                I'm sorry to bother you, but this light

23    is like glaring.

24                MR. TSONIS:  We can go off the record.

25        I think it's automated to pull those shades



```
 1                        C. O'Neil
 2      down.
 3              THE VIDEOGRAPHER:  The time is
 4      11:23 a.m.  We are going off the record.
 5              (Discussion off the record.)
 6              THE VIDEOGRAPHER:  The time is
 7      11:24 a.m.  We are back on the record.
 8      Q.    But in the field of mathematics, I guess
 9      the term correlation refers to measuring the
10      strength of the relationship between two numerical
11      variables.  Right?
12      A.    Yes.  This is not a statistical
13      correlation that I am describing.  This is a sort
14      of mundane use of the word correlate, which means
15      to make a connection.
16      Q.    So you are not using the word correlate
17      in your declaration here in the statistical or
18      mathematical sense?
19      A.    Correct.
20      Q.    In fact, I guess you couldn't
21      mathematically correlate these different variables.
22      Right?  The time spent, for example, on a task or a
23      case versus the hours worked?
24      A.    You could.  It would probably not be
25      very meaningful.
```



                              C. O'Neil

1

2       Q.    Okay.  Similarly, you know, even

3  taking -- not taking into account numerical values;

4  right?  You have nonnumerical things like closing a

5  case.  Right?  That's a nonnumerical value or

6  variable.

7       A.    Well, closing a case is nonnumerical.

8  But usually what we do is count the number of cases

9  closed, so we turn them into numerical variables.

10      Q.    Okay.  In paragraph 7 of your

11  declaration, you say, "The idea of the baseline

12  analysis is to establish an estimate of the time

13  costs of various specific kinds of work done by

14  special investigators, which can be measured in

15  different ways."

16            And then there is a number of listed

17  parts there from (a) to (f).

18            Do you see that?

19      A.    Yes.

20      Q.    So when you say various specific kinds

21  of work that could be measured in different ways,

22  such as -- I mean, you are referring to what's

23  listed in (a) through (f), and not something else

24  for example.  Is that right?

25      A.    Yes.



                            C. O'Neil

1

2      Q.    You are not aware of other kinds of work

3   that you could analyze that's not listed in

4   paragraph 7, in other words?

5      A.    I am not aware off the top of my head.

6      Q.    Is various specific kinds of work, as

7   used in paragraph 7, different than your use of

8   case and task assignments in paragraph 6?

9           It's at the top of Page 3 still.  Just

10  the end of paragraph 6.

11     A.    Oh, sorry.  That's the -- yes.  No,

12  that's -- that sentence is describing the same

13  idea.  Just being more precise in paragraph 7.

14     Q.    Okay.  I just want to make sure I

15  understand if they mean different things or it's

16  just different ways of identifying the same thing

17  that you are referring to.

18     A.    Just different ways of identifying the

19  same thing.

20          And I am a little more granular in

21  paragraph 7.  Right?  I am not just talking about

22  the number of cases.  Which would be (a), closing a

23  case would be counting the cases closed, but maybe

24  instead (d), closing a case of a certain type.  So

25  that's more granular.



                              C. O'Neil

        Like looking at not just how many

overall cases; but how many of these types of

cases, how many of these types of cases.  And that,

that's a different kind of analysis.

        Q.    So each specific kind of work here in

the regression that you are proposing is

essentially an independent variable.  Right?

        A.    Well, these should be understood; (a),

(b), (c), (d), (e), and (f) should be understood as

different possible linear regressions.  Actually,

these are all possible linear regressions I could

run.

        Q.    Okay.  So in your declaration, are you

proposing to run different linear regressions?  Or

a linear regression?

        A.    I am proposing -- I believe by the time

I get to paragraph -- when I am talking in

paragraph 13, for example, I mention four different

ones I would like to run.  But they are all

basically the same ideas as what you see in

paragraph 7, but I am proposing in this plan to do

more than one type.

            As I said before, like, you would want

to develop the story of how the workload varied in



                            C. O'Neil

 1
 2    the overall time period of the data by first
 3    saying -- establishing that for the baseline in
 4    terms of; here is the stupidest way of doing it,
 5    the number of cases you closed this week or this
 6    month.  Just to count.  That's the stupidest one.
 7    It's very, very basic.
 8                How many cases did you close?  Oh, I
 9    closed 25 this month.  Okay.  It takes this many
10    hours to close 25.
11                That's the data that would be coming in
12    for that data point, for that model, for that
13    training.
14                And at the end of the day, you would
15    basically be measuring the average number of cases
16    it took somebody to -- in this many hours.  It
17    would not give you very much information.
18                It would just essentially say:  Once you
19    train that model on all the data in the baseline
20    period, you just get the average number of cases
21    for a full month's worth of work.
22                But if you did it instead with the type
23    of case; then somebody would say, I did, you know,
24    I did 25 cases overall; but they were broken up
25    into 15 of these, 5 of these, 2 of these and 3 of



                        C. O'Neil

1

2    these in this month.  And in the next month, I did

3    55, but they were totally different breakdown of

4    the cases.  And it was, like, actually 50 of the

5    first type, and then 5, and then 0, and then 0.

6           And when you have a bunch of data like

7    that, you are able to infer that this type of case

8    takes less time than that type of case, because of

9    the breakdown.  So that's more information.  And

10   it's important to get more information.

11          Well, anyway, it's just one way of

12   thinking how work, like caseloads, really varied

13   over time.  Right?

14          So you would have, you know, in this

15   era; you had a case load of 60 per week.  Well, it

16   matters what kind of cases they were because we

17   learned in the baseline linear regression, that

18   these are much easier than those.  So if it's 60 of

19   the easy ones, that sounds pretty reasonable.  But

20   if it's 60 of the hard ones, that sounds like a

21   lot.

22          So the kind of analysis we do in the

23   baseline, at a more granular level, allows us to

24   understand the other time periods more -- more

25   like -- more precisely.



1                          C. O'Neil

2          Q.    Do you have an understanding as to

3    whether GEICO accounted for the different types of

4    cases, in the amount of time it would take to

5    investigate them, when it was assessing

6    investigators' productivity?

7          A.    Yes.  Yes, there were -- there were --

8    like, I think this is part of the report card

9    stuff, or might -- I don't remember exactly.  But I

10   know that there productivity points of some type

11   being, you know, awarded to different types of

12   cases.  So there was some sense that like, this was

13   harder work than this, and this was less work than

14   this.

15         Q.    Do you have an understanding of what --

16   why or how GEICO apportioned those metrics that you

17   are talking about?

18         A.    No.  That would be great to know.

19         Q.    Do you have an understanding of why

20   field cases, meaning cases that required fieldwork,

21   an investigator that actually goes out into the

22   field, versus inside or desk cases that an

23   investigator can work on a computer, would be

24   assigned different weights?

25         A.    Oh, yes, absolutely.  Yes, I mean, there



```
 1                         C. O'Neil
 2   are some things that clearly take more work.
 3              And so you know, the overall point of
 4   doing this linear regression is that the math will
 5   tell us that answer.
 6              Another way of doing it would be like to
 7   interview people.  Like:  How much work did this
 8   take versus that?  Is that easier or harder?  By
 9   how much?  And we can get estimates from the people
10   themselves.
11              Or we can do the linear regression.  And
12   the linear regression will infer that this,
13   actually this type of case, the field
14   investigation, actually takes twice as long as this
15   other type of case.
16              So that's actually the point of the
17   linear regression, is to figure that out.
18       Q.    The reliability of the regression that
19   you are talking about though is contingent on how
20   much variation there might be within the group in
21   terms of how much time it takes.  Right?
22       A.    Absolutely.
23       Q.    The more variation that exists, the less
24   reliable it would be?
25       A.    I mean, it's still going to be a
```



```
                            C. O'Neil
 1
 2     reliable estimate of the average.
 3         Q.    You used the word reliable in the
 4     statement you just made.
 5               What do you mean?
 6         A.    One of the things I mean is that just as
 7     often as you are overestimating; you are
 8     underestimating.  Like it evens out.  Because you
 9     are taking -- that's what the linear regression
10     does, is it takes an estimate in the center.  So
11     it's, in some sense, the best guess.
12     Mathematically speaking.
13         Q.    But the best guess, to your point, might
14     overstate the amount of time that certain
15     individuals worked using the model.  Right?
16         A.    Yes, at times.  But it would also
17     underestimate it at other times.
18         Q.    But I guess I am saying:  When you come
19     up with your baseline by applying it to everyone,
20     it's going to overstate the number of hours that
21     certain individuals worked.  Right?
22         A.    That makes it sound like there is a bias
23     in the overall estimate.
24               But the point is that there is no bias.
25     It might not be precise.  So sometimes it will
```



                            C. O'Neil

2    overestimate; sometimes it will underestimate.  But

3    it's not going to be biased.

4        Q.    I guess I am not asking about bias.  I

5    am just asking:  That for certain class members

6    that you would apply this model to, it would

7    overstate the number of hours that they worked?

8        A.    Well, I would say for certain months, it

9    would overstate it.  For other months, it would

10   understate it.

11            So depending on how many months we are

12   estimating it for them, it would probably mostly

13   get a pretty good -- I mean, that's one of the

14   statistical laws.  That you have a lot of -- that

15   the average overall, if you have enough, it's the

16   law of large numbers that it will be very close to

17   the true answer if you have a bunch of different

18   estimates that is unbiased.

19            So in this case, if it -- if it were

20   just one month of wage theft that we are trying to

21   measure, yes, it would probably be either an

22   overestimate or an underestimate.  But if you are

23   talking about years of work, like it would be very

24   close to an appropriate estimate.

25       Q.    But when you are talking about the law



                          C. O'Neil

1
2    of large numbers or doing these kind of analysis,
3    you would need a substantial amount of data to
4    prevent what you are talking about; right?
5         A.    Definitely the more the better.
6         Q.    You would need a substantial amount of
7    data; right?
8         A.    Yes.
9         Q.    It would similarly taking -- not just
10   looking at one person and their various months, it
11   would on the whole, overstate the number of alleged
12   off-the-clock hours for certain individuals, and
13   could understate the alleged off-the-clock hours
14   for other individuals.  Right?
15        A.    It's going to give you an actual number.
16              You know, so it could give you a number
17   like 188 hours of unpaid work.  Overall.  And it's
18   not going to be exactly-exactly right.  It could
19   have been 186 instead of 188.  So that would be an
20   overstatement, but it would be pretty small.
21              So I agree with you that it would never
22   be exactly right.  It would actually be really hard
23   to even imagine what it would look like for it to
24   be exactly right.  But statistically speaking, it
25   would be a very, very good estimate if we have



                          C. O'Neil

 1
 2   enough data.
 3       Q.    I guess what I am trying to clarify is
 4   that when you are doing a model like this, it's
 5   going to overstate for some individuals potentially
 6   the number of off-the-clock hours, and it's going
 7   to understate for other individuals.  Right?
 8       A.    Yes.
 9       Q.    And again, that would -- you can't use
10   an average, I guess, to reliably extrapolate the
11   number of hours for every single person.  Right?
12       A.    To be clear:  It's not entirely precise.
13   And yes, that so -- so it means it will be slightly
14   inaccurate for everyone.  But it will be unbiased
15   and a very good estimate.
16       Q.    If you had enough data?
17       A.    Yes.
18       Q.    So to use a silly example.  If you put,
19   you know, me in a room with Jeff Bezos, you know we
20   are each worth billions because if we take the
21   average of our net worth.  Right?
22       A.    That's right.
23       Q.    That would not be a reliable indicator
24   of my net worth.  I will represent to you that I am
25   not worth billions.  Right?



C. O'Neil

1

2    A.    That's right.  And so that's actually a

3    great counterexample to what the situation is here.

4    Because these guys are actually much more

5    comparable to each other than you and Jeff Bezos in

6    terms of their wealth.

7    Q.    But Jeff Bezos's wealth could be

8    objectively verified.  Whereas in your model, you

9    are using plaintiff's own subjective opinions of

10   what they worked.  Right?  As a starting point?

11        MR. SCIMONE:  Objection.

12   Q.    You can answer.

13   A.    I mean, I am using that to help me

14   establish the baseline, yes.

15   Q.    And the baseline is used to ultimately

16   assess the damages for all class members?

17   A.    That's right.

18   Q.    I think we said earlier the variation

19   among the various class members makes the linear

20   regression less reliable.  Right?

21   A.    Yes.

22   Q.    Do you have a sense for how much the

23   alleged off-the-clock work by investigators varied?

24   A.    No.

25   Q.    Well, you interviewed three of them;



                              C. O'Neil

2   right?

3        A.    Yes.

4        Q.    And your report says that you read, in

5   paragraph 3, deposition testimony from this case.

6   Right?

7        A.    Yes.

8        Q.    Whose deposition testimony did you read?

9        A.    I forget his name, unfortunately.

10       Q.    Is it William Newport?

11       A.    I don't -- I just don't remember.  I am

12   so sorry.

13       Q.    No, that's okay.

14       A.    But it wasn't a plaintiff.

15       Q.    This wasn't a pop quiz.

16            I guess you say that you read deposition

17   testimony, generally, in paragraph 3.  And then you

18   later on say in a list, and the deposition

19   transcript of William Newport, former SIU manager.

20       A.    Oh, great.  Yes.

21       Q.    I just want to be clear:  Did you read

22   any other deposition testimony?

23       A.    No.  And to be clear:  When I

24   interviewed the plaintiffs, and I might have

25   mentioned this earlier, like, my goal was to



```
 1                         C. O'Neil

 2   understand what kind of systems and technology they

 3   were using that would give me data around this in

 4   general.

 5              I didn't even know about the

 6   spreadsheets at that point.  I didn't have this

 7   plan at all.

 8              MR. TSONIS:  Let's mark this as

 9       Exhibit 3.

10              (Exhibit 3, Interview notes, marked for

11       identification, as of this date.)

12       Q.    Ms. O'Neil, you have been handed

13   Exhibit 3.  Which is, for the record, is a document

14   produced by plaintiffs in this litigation, bearing

15   the Bates stamp P1688 to 1670.

16              Have you ever seen this document before,

17   Ms. O'Neil?

18       A.    Yes.

19       Q.    What is this document?

20       A.    These are the notes that we took when we

21   spoke to the plaintiffs.

22       Q.    I think you said we in your sentence

23   refers to you and Jake?

24       A.    Jake Appel, yes.

25       Q.    Besides this one interview, have you had
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                     99

```
 1                          C. O'Neil
 2    any other -- and I don't want to know the
 3    substance, but have you had any conversations with
 4    Keith Fischer, Peggy Fischer or Michael Reed?
 5         A.    No.
 6         Q.    Did you review any documents before
 7    interviewing these individuals?
 8         A.    No.
 9         Q.    Had you ever read the complaint?
10         A.    No, I don't think I had.
11         Q.    So it looks like here, Jake typed up in
12    front of each of these bullets, kind of who the
13    speaker was for these random -- for these questions
14    and answers.  Right?
15         A.    Yes.
16         Q.    Any reason to think what's written here
17    is inaccurate?
18         A.    No.
19         Q.    Is this a fair and accurate
20    representation, to the best of your knowledge, of
21    the conversation you had with these three
22    individuals?
23         A.    Yes.
24         Q.    This was information that you used and
25    considered before you drafted and submitted your
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    100

                            C. O'Neil

2  declaration?

3       A.    Yes.

4       Q.    It shows in the first bullet point here,

5  "Describe SICM's system, how and when you use it."

6            It says, "This is how we get our

7  cases -- or got our cases, excuse me.  How we

8  document our notes and close the case.  Everything

9  goes through SICM."

10           Do you see that?

11      A.    Yes.

12      Q.    Earlier we talked about time stamps with

13 SICM entries.  But just to be clear, the content of

14 any SICM entry doesn't indicate how long that

15 activity took.  Right?

16      A.    I don't know.  I have never seen any

17 SICM data, but I believe you.

18      Q.    Do you have any reason to think that the

19 content of any SICM entry does, in fact, reflect

20 the amount of time that a task or an activity

21 takes?

22      A.    No.

23      Q.    So if you go four bullet points down.

24 Mike refers to Mike Reed or Michael Reed.  Right?

25      A.    Yes.



1                          C. O'Neil

2        Q.    And it says, "I worked around Buffalo.

3   Covered seven large counties.  Lots of driving.

4   Not unusual to have three- or four-hour round trip,

5   excluding interview of insured."  Right?

6        A.    Yes.

7        Q.    So the time that an investigator might

8   spend driving in a vehicle, that's not time

9   represented in SICM.  Right?

10       A.    I guess not.

11       Q.    I presume you expect that field

12  investigators are typically assigned cases that

13  require fieldwork?

14       A.    Right.

15       Q.    So time not spent in SICM, you know,

16  might be time that they are spending on the road.

17  Right?

18       A.    Oh, for sure.

19       Q.    And it might also mean that they are

20  doing a number of other things.

21            Just -- I guess the ultimate conclusion

22  that you draw is that they weren't submitting

23  something in SICM at that time.  Right?

24       A.    That's right.

25       Q.    So if you are a field investigator, for



                          C. O'Neil

 1

 2   example like Michael Reed, who said he covers seven

 3   large counties, you also had -- did you have an

 4   understanding that there were field investigators

 5   that worked in New York City, for example?

 6        A.    Yes, I think one of them mentioned Long

 7   Island.  But yes, I -- I did get that impression

 8   that they weren't all in Buffalo.  For example,

 9   they weren't all Upstate.

10        Q.    Sure.  I guess even the same activity

11   being done, the time it takes to do it, might vary

12   drastically depends on, for example, how much drive

13   time it required.  Right?

14        A.    Absolutely.

15        Q.    Even within drive time, there could be

16   variables that couldn't really be captured by SICM

17   or any other data.  Right?

18        A.    Say that again, please.

19        Q.    Sure.  Even with respect to drive time

20   for field investigators, there could be variables

21   that affect what that drive time is that are

22   outside of SICM or other captured data source.

23   Right?

24        A.    Of course.

25        Q.    So weather, for example.



                          C. O'Neil

1

2        A.    Traffic.

3        Q.    And there is all kinds of independent

4   variables that might affect how much time it took

5   to do those tasks.  Right?

6        A.    Sure, absolutely.

7        Q.    Some of those might affect certain

8   investigators.  For example, ones that worked in

9   more rural geographic areas more heavily compared

10  to others that are in more urban areas, for

11  example.

12       A.    Yes.

13       Q.    Have you ever considered, I guess, the

14  reliability of information that people put into

15  SICM?

16            MR. SCIMONE:  Objection.

17       A.    I haven't actually thought about that

18  because I never have gotten any SICM data.

19       Q.    Do you have any reason to suspect SICM

20  data or time-stamp data might not actually reflect

21  the work that's being done?

22       A.    I don't have any reason to believe that.

23       Q.    There is another kind of work that

24  special investigators do that wouldn't be captured

25  in SICM at all.  Right?



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    104

                              C. O'Neil

1

2        A.     Yes.  They mentioned side requests.

3   Somebody did here, I forget who.  But helping

4   somebody with an RV problem.

5        Q.     Okay.  And what was your understanding

6   as to that, that issue?

7        A.     Well, actually I don't know if it -- I

8   don't know about SICM, because I have never seen

9   the data by -- in SICM, so I don't know if that was

10  captured by the SICM system.  But I noticed it

11  wasn't captured in the spreadsheet that I was

12  working with to formulate my linear regression.

13       Q.     If you skip to the last page of the

14  exhibit before you, before that last paragraph, the

15  last main bullet.  Where it says, "Keith.  There

16  was also extra curricular work."

17            Do you see that, the last set of bullet

18  points?

19       A.     Sorry, which one?

20            Oh, yes.  This one.

21       Q.     So really, I want to point your

22  attention right above that.  The subbullet point.

23            It says, "Keith.  75 percent of work

24  time was outside SICM."

25       A.     Yes.



```
 1                        C. O'Neil

 2        Q.    Than just 25 percent in SICM?

 3        A.    Right.

 4        Q.    So the fact that you are proposing to

 5   use SICM time-stamp entries as part of a regression

 6   analysis is necessarily, I guess, in a way

 7   undermined by the fact that, at least according to

 8   Keith Fischer here, he said there was 75 percent of

 9   his work time was outside that SICM.  Right?

10        A.    I didn't actually propose to use SICM

11   time stamps in a linear regression.

12              I was proposing to use -- I mean, if I

13   had access to the time stamps just to understand,

14   like, things like the bunching up of entries on

15   Monday morning.  That's not a linear regression;

16   that's more like a graphic.

17              So kind of like a histogram.  When do

18   people use SICM?  When do they, you know, upload

19   their final reports?  That would not be a linear

20   regression.

21              And it's -- and it's not even in my --

22   sorry to interrupt you -- it's not even in

23   Exhibit 2.  It's not in the declaration.  It's

24   just -- it was just an idea I had for how to

25   corroborate the stuff I am learning through the
```



```
 1                        C. O'Neil
 2   linear regression plan.
 3        Q.    Well.  You write in part in paragraph 8
 4   in Exhibit 2 -- and you don't need to go back to
 5   it, I will read it to you.
 6             "To corroborate the plaintiff's
 7   recollections, I would also review time-stamp
 8   entries in SICM."
 9             And you also list e-mails and other
10   object -- objective data to assess the accuracy of
11   plaintiff's report about start and end times.
12             Right?  Is that right?
13        A.    Yes.
14        Q.    So your model starts with figuring out
15   the number of hours that plaintiffs, you know,
16   allege that they worked off the clock.  Right?
17        A.    Yes.  During the baseline period.
18        Q.    During the baseline period.
19             And to do that, in part, you say Step 1
20   is:  What are the numbers that plaintiffs say they
21   worked?  Right?
22        A.    Yes.
23        Q.    And then you say in your declaration
24   here, that you would corroborate those metrics.
25   Right?
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    107

```
 1                        C. O'Neil

 2        A.    Yes, I would corroborate.  Yes.

 3        Q.    You would need to ensure that they are

 4   being actually accurate before you could use them

 5   in a model.  Right?

 6        A.    Well, actually it would be very

 7   difficult for me to -- to reassure myself that they

 8   are accurate.  I would do more things, like -- to

 9   be clear, I am not claiming I can prove that they

10   are not lying or that they are lying.

11              I am suggesting that you could

12   corroborate the overall testimony that -- and

13   understanding of how they worked by looking at

14   things, like bunching up of entries on Monday.

15   Like, it's not a direct check on the number of

16   hours they claim to be working per week during the

17   baseline period.

18        Q.    But your declaration here says, I can

19   assess the damages.

20        A.    Yes.

21        Q.    Of all of these class members.  Right?

22        A.    Right.

23        Q.    Damages are in the form of money paid

24   ultimately by GEICO for, you know, not paying

25   alleged overtime.
```



                            C. O'Neil

 1
 2              You understand that's what the damages
 3       in this case refer to.  Right?
 4              A.    Yes.
 5              Q.    So in order to calculate how much money
 6       GEICO allegedly owes, you need to establish a
 7       reliable method of calculating what each individual
 8       is owed.  You would agree with that?
 9              A.    Yes.
10              Q.    So Step 1 of your methodology is
11       figuring out the quote/unquote, Actual -- I think
12       you said, Actual hours that plaintiff works.
13              Meaning what they are now claiming they
14       worked during that time period?
15              A.    During the baseline time period, yes.
16              Q.    But if a plaintiff told you, I worked
17       100 hours every single week without exception, is
18       that something that you would automatically plug
19       into your model?  Or would you try to corroborate
20       and establish the accuracy of that number?
21              A.    Well, we talked about this earlier.
22              But I think we would want to have quite
23       a few plaintiffs say independently how much they
24       worked and look for consistency, and then get to
25       the point of where we had a good estimate of that



                              C. O'Neil

1

2    number.

3              We would probably take the average of

4    the different plaintiff's numbers.  And that would

5    be a important number, you are right about that, in

6    assessing the damages.

7         Q.    Right.  And that number, in part, you

8    say in this declaration that you would,

9    "Corroborate those numbers of what they report to

10   be working by reviewing things like time-stamp

11   entries in SICM, e-mails, and other objective data

12   to assess the accuracy of plaintiff's reports about

13   typical start and end times."

14        A.    Yes.  Yes.

15        Q.    You wrote in your declaration that you

16   would need to ensure the accuracy of that

17   information.  Right?

18              MR. SCIMONE:  Objection.

19        A.    Just to be clear:  Ensuring makes it

20   sound like I am proving something.  And I want to

21   establish yet another -- yet another way of

22   building evidence that their overall story is

23   trustworthy.

24        Q.    Sure.

25        A.    So that's why I am thinking if I am a



                          C. O'Neil

2   judge, for example, and I am seeing their testimony

3   that they worked whatever, 55 hours a week, and

4   it's -- some of them say 52, some of them say 57,

5   some of them say 55; that sounds pretty consistent.

6            Or whatever it is.  I don't know what it

7   is because I didn't ask them.

8            I used that number to do damages.

9            They also have testified that they

10  worked on weekends and put it in.  That's a good

11  explanation for how they got those extra hours of

12  work, because they are already working 40 hours

13  during the week.  Then they worked another 15 hours

14  on the weekend, say.

15           Then you look for evidence of that if

16  you have the time-stamped data.  So if I have also

17  a picture for the judge of how like more often --

18  how many more entries happened on Monday, than on

19  Tuesday, Wednesday, Thursday, or Friday.  That

20  would be another part of that story.

21           That's what I mean by other objective

22  data that would corroborate.  The overall story.

23       Q.   I appreciate that clarification.  I

24  guess my question is a little bit different.

25           As part of your model before you could



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                            111

```
 1                      C. O'Neil
 2   actually use it to contend that "X" amount of
 3   dollars are owed --
 4        A.   Yes.
 5        Q.   You would need to make sure that you
 6   could assess the accuracy of plaintiff's reported
 7   hours.  Right?
 8             MR. SCIMONE:  Objection.
 9        A.   No, I'm not assessing the accuracy of
10   the reported hours.  I am --
11        Q.   You write in your declaration --
12             MR. SCIMONE:  Excuse me, Counsel.  She
13        was in the middle of speaking.
14             You can finish your answer.
15        Q.   You can finish.
16        A.   I am trying to corroborate their overall
17   story with other ways of thinking about the data.
18             And yes, like I -- so I will just
19   restate:  That if they are claiming that they
20   worked more than 40 hours a week, and they claim
21   they worked on the weekend, then a way of
22   corroborating that would be to have time-stamped
23   data for SICM.
24        Q.   So in order to corroborate the
25   plaintiff's recollection of claimed work hours, you
```



```
 1                       C. O'Neil
 2    would need to review data to assess the accuracy of
 3    their report of typical start and end times?
 4               MR. SCIMONE:  Objection.
 5        A.    I would like to be able to do that.  It
 6    would be great to have that data.
 7               I could still do this analysis without
 8    that.
 9        Q.    But in paragraph 8 you write that
10    precise sentence almost.  "To corroborate
11    plaintiff's recollections, I would also review
12    time-stamp entries in SICM, e-mails, and other
13    objective data to assess the accuracy of
14    plaintiff's reports about typical start and end
15    times."
16               So is it your testimony now that you
17    don't need to do what you put in your declaration?
18               MR. SCIMONE:  Objection.
19        A.    My testimony now is that I would love to
20    do that.  I would do that if I had the data.  And I
21    could do this analysis with the spreadsheet data
22    alone.
23               It would always -- sorry -- it would
24    always be better to be able to corroborate it on
25    top of the analysis, to corroborate it further with
```



                         C. O'Neil

1

2    more data.

3        Q.    You can do the analysis, but you would

4    not have corroborated or assessed the accuracy of

5    the numbers that plaintiffs are reporting they

6    worked in that scenario.  Right?

7        A.    That's right.

8        Q.    I would like to direct you to page --

9    second page, Bates stamp 1669.

10       A.    Yes.

11       Q.    Do you see the bullet point halfway

12   through, that says, "Cathy.  How about during

13   COVID"?

14       A.    Yes.

15       Q.    So you asked these investigators about

16   workload and other work circumstances during the

17   COVID time-frame period, call it roughly

18   February/March of 2020, beginning then.

19       A.    Yes.

20       Q.    If you skip down two bullet points.

21             Do you see it says, "Cathy.  How many

22   hours to do the paperwork (not the work) for a

23   single case."

24             Do you see that?

25       A.    Yes.  Yes, yes.



```
 1                         C. O'Neil

 2        Q.    I'm sorry, I directed you to the wrong

 3   part.

 4             Stay on that bullet point, "Cathy.  How

 5   about during COVID"?

 6        A.    Okay.

 7        Q.    Now the last subbullet point here.  Do

 8   you see Mike?  And it starts with, "Candidly."

 9        A.    Yes.

10        Q.    It says, "Because I was ex-PD -- meaning

11   Police Department -- I could get 15 police reports

12   in two minutes in a single trip.  I could stretch

13   this out to more hours on SICM, saying I made a few

14   trips."

15             Do you see this?

16        A.    Yes, I do.

17        Q.    So Michael Reed informed you that at

18   times though, he could get a number of police

19   report -- reports in a short amount of time; he

20   would enter in multiple trips in SICM?

21        A.    Yes.

22             MR. SCIMONE:  Objection.

23        Q.    You would agree that this is evidence

24   that's available to you that indicates that SICM

25   time entries are not then necessarily reflective of
```



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                  115

```
 1                        C. O'Neil

 2     the work that was actually performed by special

 3     investigators?

 4               MR. SCIMONE:  Objection.

 5          A.   Yes.  Well, this is -- I don't really

 6     know what he means to say, stretch this out to --

 7     to more hours.

 8               I don't know how SICM accepts data.  And

 9     I think earlier, like you actually implied, that

10     they didn't have hours information in there.

11               But I just don't know because I don't

12     have access to SICM.  I never seen SICM.

13          Q.   Do you need access to SICM to see him

14     say in your colleague's notes, I could get 15

15     police reports in two minutes in a single trip?

16               And then at the end he says, I made a

17     few trips.

18               One trip versus a few?

19          A.   Yes.  Well, so there is an ambiguity in

20     this sentence.

21               Is he claiming that he made a few trips,

22     or is he claiming he spent more hours?  Those are

23     different things.  Because one of them measures an

24     activity which is a trip, and one of them measures

25     an hour measurement.  I don't know how he entered
```



CATHERINE ONEIL                                      April 24, 2025
FISCHER vs GEICO                                                116

```
 1                       C. O'Neil
 2   it.  I don't know SICM.
 3           But I do know the spreadsheet, and the
 4   spreadsheet doesn't have hours.  And so I don't --
 5   it does have activities.
 6           I mean, I am not answering -- I am
 7   answering a different question now, but it's just
 8   too ambiguous for me to understand precisely what
 9   he meant by that.
10       Q.   Did you ask him any follow-up questions?
11       A.   No.  Because that would have been in the
12   notes.
13       Q.   But this could be read to imply that
14   Michael Reed is entering into SICM multiple trips,
15   when in fact he was only taking one to get police
16   reports?
17       A.   Yes, I think that's right.  But we just
18   don't know exactly what it meant, to enter it in
19   multiple.
20       Q.   Sure.  It also can be read -- the
21   phrase, stretch this out to more hours on SICM, as
22   Mike Reed entering in activities, you know, one
23   trip to a police station as multiple trips that
24   took longer periods of time.
25       A.   Sure.
```



                               C. O'Neil

 1

 2      Q.     And if multiple investigators were doing

 3   what Mike Reed is talking about doing here, that

 4   would ultimately affect the reliability of your

 5   model.  Correct?

 6             MR. SCIMONE:  Objection.

 7      A.     Of my model?

 8      Q.     Yes.

 9      A.     No, not --

10      Q.     You don't think entering multiple

11   entries into SICM of events that didn't occur would

12   affect the reliability of your model?

13      A.     They did occur.  He got 15 police

14   reports.

15             So all those police reports were events

16   that happened.  And that's what I am measuring.

17             And to be clear:  If it was efficient,

18   my model would pick up that it didn't take very

19   long.

20      Q.     How would your model pick up that it

21   didn't take very long?

22      A.     Because my model looked at how many

23   events happened this week for this guy.  And

24   presumably filing a police report for a given case

25   counts as an event, so 15 would show up.



CATHERINE ONEIL                                                  April 24, 2025
FISCHER vs GEICO                                                          118

```
 1                      C. O'Neil

 2              And so it would figure out; if this

 3   happened a lot, presumably this guy, at least, did

 4   it.  And he was ex-PD and he claims other people

 5   are ex-PD too; probably they all did it.  That

 6   would actually come out in the wash in my model

 7   because everyone was doing it.  It would be

 8   consistent.

 9              And over time, my model would infer

10   because of how often it happened and how efficient

11   it was, that this stuff doesn't take very long;

12   police reports.  It would actually -- in other

13   words, it would actually pick it up.  It would pick

14   up that police reports are efficient.

15       Q.    What if they weren't efficient?  What if

16   Michael Reed, because he was an ex-police

17   department -- police officer, he could get this,

18   but other investigators couldn't.

19       A.    I mean, I am guessing he was -- it was a

20   standard approach, because he mentioned in the

21   beginning that they were all ex-PD.

22              I also being expect that if he was

23   super -- superefficient, compared to the other ones

24   because of this particular approach or other

25   similar things, that -- that we would figure it out
```



1                        C. O'Neil

2      if it was in his report card.

3              So that's one of the reasons -- going

4      back to corroborative objective data that I would

5      love to have, is to see, like, where did this guy

6      score in terms of the report cards?

7              If you ask ten people how many hours you

8      worked in the baseline, and we found out that they

9      were all super, super performers in the report

10     card, then that wouldn't be representative.  And

11     that would be more of a concern for me for my

12     analysis.

13     Q.   So if an investigator didn't have any

14     activities that they had to log into SICM, that

15     would prohibit, I guess, or make it more difficult

16     for you to model their time costs for the various

17     activities.  Right?

18     A.   Just to be clear:  I want to clarify

19     that my analysis is not based on SICM data as a

20     whole.  It's based on just the spreadsheet I saw.

21     Q.   Sure.  So you are saying:  I can take

22     that spreadsheet and the data in that spreadsheet,

23     and I can, using those data points, create a model

24     that allocates the amount of time spent on each of

25     these, I guess, is it what -- is it the things in



```
1              C. O'Neil

2    7(a); closing a case, investigating a feature,

3    impacting a feature, et cetera?

4         A.   Yes.  So there would be different models

5    saying, you know, it takes about this much time to

6    close this type of case versus that type of case.

7    It takes this much amount of time to do this kind

8    of investigative task versus this kind of

9    investigative task.  Et cetera.

10             So there are four different ways of

11   thinking about it.

12        Q.   Sure.  Okay.  If there were

13   investigators that would not have the kind of data

14   that's reflected in the spreadsheet that you are

15   referencing -- that you identify in your

16   declaration, you wouldn't be able to model those

17   time costs for those investigators.  Right?

18        A.   That's right.

19        Q.   Do you have an understanding as to

20   whether some investigators have that data?

21        A.   My -- my entire declaration was

22   stipulated on the assumption that I am looking for

23   wage theft of people who are in the spreadsheet who

24   have this data.

25        Q.   So if there were individuals that were
```



                              C. O'Neil

1
2   not entering, you know, activities and data on a
3   daily or, you know, multiple-times-a-day basis, you
4   wouldn't be able to model the time costs for their
5   work activities?
6        A.    Yes, that's right.
7              If I didn't trust from their data from
8   the spreadsheet; I wouldn't be able to trust the
9   outcome of that model.
10       Q.    Did Peggy Fischer -- I see here much of
11  your notes here are Keith Fischer and Michael Reed.
12  And at the very end, there seems to be some -- some
13  input from Peggy.
14             If you flip to the third page.
15       A.    Yes.
16       Q.    Do you have an understanding of what
17  Peggy's -- how Peggy's workload differed from that
18  of potentially, you know, Keith or Mike Reed?
19       A.    They definitely are different, and it's
20  because of the nature of the work is different.
21             And then we also has something called
22  diary points, which I don't have it in my
23  spreadsheet.
24       Q.    So she notes in here, "You could have a
25  lot of outside work that becomes just a small SICM



```
1                          C. O'Neil
2     entry."  Right?
3          A.    That's right.
4          Q.    Do you have an understanding as to
5     whether someone in Peggy Fischer's job title
6     regularly used SICM?
7          A.    She definitely mentioned using SICM.
8          Q.    Do you have an understanding of the
9     frequency of that use, though?
10         A.    Well, she mentioned herself.  You could
11    read -- you could spend two hours going on the
12    Internet, and then write four sentences in SICM.
13              So it seemed to me, based on from what
14    she was saying, that she uses SICM to do all of her
15    reporting, is how she, like, proves that she
16    finished a project.  She, like, put something into
17    SICM.
18         Q.    Do you have an understanding as to
19    whether Peggy Fischer does or does not use SICM on
20    any sort of daily basis?
21         A.    My impression was she did use it on a
22    daily basis.
23         Q.    Would it surprise you if I told you that
24    she testified that she doesn't consistently use
25    SICM?
```



1                          C. O'Neil

2              MR. SCIMONE:  Objection.

3         A.    Yes.

4         Q.    If, for example, Peggy Fischer was only

5    entering information into SICM two weeks at a time,

6    that would make it difficult for you to model the

7    time costs of her time -- of her work time.  Right?

8         A.    Just to be clear:  Once again, I am not

9    -- my analysis isn't based on the SICM; it's based

10   on the spreadsheet.  You know --

11        Q.    Sure.  So -- I don't mean to interrupt,

12   I apologize.

13              Do you have an understanding of what

14   generates the data in the spreadsheet?

15        A.    No.

16        Q.    So you don't even know where that data

17   comes from?

18        A.    I really don't.

19        Q.    Would it surprise you to learn that it

20   comes from SICM?

21        A.    No.

22        Q.    So I will represent to you that when an

23   investigator uses SICM, there is a preform text

24   field, but there is also drop-down boxes that

25   indicate what was being done.  Right?



```
 1                          C. O'Neil

 2              I believe you read the SICM manual as

 3    one of the individual materials that you referenced

 4    in your declaration.  Right?

 5         A.    No.

 6         Q.    I think you say you read a data

 7    dictionary for the SICM report?

 8         A.    Yes.

 9         Q.    That didn't give you any understanding

10    as to how the SICM system kind of operates?

11         A.    No, not really.  I mean, I be -- I don't

12    know the SICM, so I don't know.

13              But I didn't know that that was about

14    SICM.

15         Q.    Okay.  There is a lot of noncasework

16    that an investigator could do that's not captured

17    in any database.  Right?

18         A.    Yes.

19         Q.    So earlier, you referenced, you know,

20    Keith Fischer talking about EDRs or things like

21    that.  Electronic data recorders.

22         A.    Yes, that sounds vaguely familiar.

23         Q.    So -- well, we will set Keith Fischer

24    aside.

25              If an investigator is doing a training,
```



1                          C. O'Neil

2   that's not something that's going to be captured as

3   a date point.  Right?

4        A.    That's right.

5        Q.    Your spreadsheet that you are

6   referencing --

7        A.    That's right.

8        Q.    -- if they are getting a coaching

9   session with their supervisor and they are on the

10  phone for 30 minutes, that's not going to be

11  captured in the spreadsheet.  Right?

12       A.    Yes.

13       Q.    If they are attending a meeting at the

14  office, that's not going to be captured in a

15  spreadsheet.  Right?

16       A.    Right.

17       Q.    If they are shadowing somebody else and

18  just learning their cases, that's not going to be

19  captured in a spreadsheet.  Right?

20       A.    That's right.

21       Q.    In fact, there is a huge number of

22  pieces of work that may not be captured at all in

23  your spreadsheet.  Right?

24            MR. SCIMONE:  Objection.

25       A.    That's right.



                              C. O'Neil

     Q.    So your model wouldn't necessarily
account for any of the work that's done because
it's not reflected as data points in the
spreadsheet.  Right?

     A.    Well, it does account for it in a larger
sense.  It -- you could think of that as padding,
but you could also think of the written work that
they have to do in the spell checking and all that.

           Like, that's not directly measured but
it happens consistently, so it's in there.  It's in
there in terms of their hours.  It's in there in
terms of their work that they did in between the
events that we actually are capturing, like the
cases closed and the investigations done.

           So there is lots and lots of padding, I
agree.  And driving is some padding as well.

           You know, the way the linear regression
works is that it -- it simplifies a description of
your month's work by saying, Yes, lots of things
happened this month.  Maybe you got trained, maybe
you trained other people.  But what we are looking
at is this month through the prism of just the
types of cases you closed.

           So -- and then the end result after



                              C. O'Neil

 1
 2   training the model, is the average number of hours
 3   it took you to close this type of case versus this
 4   type of case, this type of case versus that type of
 5   case.
 6             But yes, those hours will pad -- be
 7   padded with the other stuff that's happening in
 8   your life on average.  The other stuff happening at
 9   work on average.
10             So the training, you know, there is
11   probably like three minutes of that
12   three-and-a-half hours that it took you to do that.
13   Three minutes of that refers to; on average, you
14   are actually in training for three minutes.  You
15   could think about it that way.
16             That the hours because -- because we
17   have simplified our perspective for just the sake
18   of this linear regression, and just think about the
19   types of cases you have closed, or just think about
20   the types of investigations you have closed, you
21   have done, you have completed.  Then that kind of
22   stuff that is un- -- that it's blind to, will be
23   incorporated into that on an average basis.
24        Q.   But training hours, for example, aren't
25   going to pad the time spent on cases.  Right?



```
 1                        C. O'Neil
 2      A.    Sure.  Every -- everything that's not a
 3  case closed will be padding when you do that kind
 4  of regression.
 5      Q.    So when you say "padding," what you
 6  mean, I think and in layman's terms, that it will
 7  overstate the amount of time that is required or
 8  that was spent on doing that task?
 9            MR. SCIMONE:  Objection.
10      Q.    Right?
11      A.    I don't think over- -- overstate makes
12  it sounds like you are -- you know, you shouldn't
13  have gotten paid that much --
14      Q.    I don't mean to interrupt.
15      A.    What I am saying is that you are doing
16  your job, things happen, you end up closing this
17  many cases.
18            That's just -- do the dumbest one again,
19  which is:  How many cases do you close?  Don't care
20  about what type of case.
21            You know, a lot of things went into
22  that, and part of it was training.
23            And like the answer -- the answer you
24  are getting is, like on average, I can get about 15
25  cases closed a month.
```



```
 1                      C. O'Neil

 2              And that, of course, incorporates the

 3    fact that:  I have to do training.  I have to talk

 4    to my boss.  You know, I have to go driving.  I

 5    have to get gas.

 6              That's not an overstatement.  That's how

 7    many cases you end up getting done with all the

 8    other stuff you also have to do.

 9              I don't recognize that as an

10    overstatement.

11       Q.    As a mathematical point when you create

12    a time cost on the time it takes to close a case,

13    that time is encompassing, necessarily encompasses

14    anything that's not captured by the data.  Right?

15       A.    Yes.

16       Q.    So if I work 40 hours in a workweek and

17    I spend ten of it doing training or doing other

18    stuff, if I wanted to calculate the amount of time

19    it actually takes to close the number of cases that

20    I closed -- to work them, I would divide 30 by the

21    number of cases that I closed.  Right?

22              MR. SCIMONE:  Objection.

23       A.    That's not the analysis I am doing, no.

24       Q.    We can get back to your model in a

25    second.
```



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                  130

```
 1                           C. O'Neil
 2              I just want to establish that if I work
 3   in one workweek 40 hours, but ten of those are
 4   spent doing other stuff, and I only really work on
 5   my cases 30 hours.  Right?
 6              In that one workweek, and I close five
 7   cases.  On average then, it would take me six hours
 8   to close a case.  Right?
 9        A.    That's the layman's way of thinking
10   about it.  That's not the way linear regression
11   would think about that.
12        Q.    I understand that.
13        A.    A linear regression would say:  If you
14   close five cases per week -- let's say this is
15   happening every week, every single week.  Ten hours
16   was training, 30 hours was working on cases.  And
17   you are like, this is my real work.  That stuff is
18   just training.  You are going to think of it as
19   taking six hours per case.
20              But the linear regression is going to
21   say, well, 40 hours and five cases; it takes eight
22   hours.  It's not an overstatement because what you
23   are doing is dumbing down your productivity into:
24   I only care about cases.
25              So that's what linear regressions do.
```



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                   131

```
 1                        C. O'Neil
 2   They dumb it down to some kind of toy version that
 3   is, by nature, super-simplified.
 4              But just divvy up your time into these
 5   things, and it's just divvy up your time into
 6   cases.  How much time does a case take; that's
 7   going to be eight hours, not six hours.
 8        Q.    But in that scenario?
 9        A.    Yes.
10        Q.    You specified:  If I do ten hours of
11   training consistently.
12        A.    Yes.
13        Q.    But if I don't do ten hours of training
14   consistently, it's going to overstate the amount of
15   time I spend working in workweeks, and I didn't do
16   training.  Right?
17        A.    It's going to come out in the wash,
18   actually.  It's going to come out in the wash.
19              Like, if you sometimes do training and
20   sometimes don't do training.  In the training
21   period of the model, then it's going to -- in the
22   weeks that you do the training, it's going to look
23   like it takes you eight hours per case.  In the
24   weeks you don't do the training, you are going to
25   get more cases done.
```



```
 1                        C. O'Neil

 2              It's really six hours.  Right?  When you

 3    don't have training.  If you do it -- if you do

 4    it -- sometimes you have training, sometimes you

 5    don't; then the linear regression is going to sort

 6    of get the number in between six and eight, which

 7    is like seven-something.  Right?  That actually

 8    reflects how often you have training.

 9              That's what linear regressions do.

10    They -- like, they estimate the -- their estimate

11    is -- is blind to the training.  It's going to

12    take, sort of, the average of your perceived number

13    of hours it takes you for the case.  Perceived in

14    the sense of; like it doesn't know about the

15    training, doesn't see the training.  So it thinks

16    you are a little bit slower this week.

17         Q.    But using your model, your reasoning

18    that you just laid out --

19         A.    Yes.

20         Q.    -- people that close more cases, would

21    be allocated more, sort of, padding with respect to

22    training in that scenario than they actually did.

23    Right?

24         A.    No.  As I just said, this will track the

25    amount of -- the proportion of the weeks that you
```



```
 1                       C. O'Neil
 2   do training.  And it will change the amount of time
 3   it allocates for a case, based on the actual
 4   situation.  So you are not going to get more or
 5   less.  It's going to be -- it's going to accurately
 6   track how often it takes you to do a case.
 7   Including the training.
 8        Q.    When you say more accurately track, I
 9   think what you mean is:  It will be over in some
10   weeks, under in others.
11             But in your terminology, it will come
12   out in the wash?
13        A.    It will come out in the wash.
14        Q.    If you look at a long enough time frame,
15   it will balance out; is that right?
16        A.    Exactly right.  And that's why I want
17   more data.
18        Q.    If you don't look at a long enough time
19   frame, look at an isolated snapshot like a month or
20   two months, it may not balance out.  Right?
21        A.    That's right.
22        Q.    Similarly we talked about training, but
23   any work time that's not encompassed by the data
24   that's reflected in the spreadsheet would simply
25   be, you know, fall under the same sort of
```



                        C. O'Neil

 1

 2   parameters and have the same result.  Right?

 3       A.    Absolutely.

 4       Q.    So going back to Peggy Fischer.  I think

 5   we mentioned if she is only going into SICM and

 6   making an update once every two weeks, that's not

 7   going to provide you the same data points as what

 8   you saw in the spreadsheet.  Right?

 9       A.    It really depends on what she is putting

10   in in the two weeks.  Like if what -- if she --

11   what if she is saying, In the last, like, last

12   week, I got this many activities done of this type.

13            If she is filling up her time sheet in a

14   way that still apportions it to a week, the right

15   week or even the right month -- actually, yes, this

16   is -- the granularity on my spreadsheet data is a

17   month.

18            So presuming that she does it at least

19   once a month, I think would -- would still work.

20       Q.    If she has one entry that just

21   identifies the stuff she has been doing over the

22   last two weeks, do you think that's sufficient data

23   for you to allocate precisely what she was doing in

24   that one-month period?

25       A.    Well, just to say, the spreadsheet is a



                          C. O'Neil

1

2    monthly data point.  So all I know is this month

3    you got this many cases closed of this type of

4    each.

5            If she could give me that information

6    for the month, then if she does it every two weeks,

7    that would be twice a month.  That would be enough.

8        Q.    Do you have an understanding of how many

9    cases Peggy Fischer, people with her job title,

10   were assigned?

11       A.    No.

12       Q.    Mike Reed here, I think, cites at one

13   point that he got in May of 2020 70 cases.

14            Do you see that?

15       A.    Yes.

16       Q.    And in Page 1 here, Mike Reed also talks

17   about, you know, the number of cases assigned used

18   to be 10 to 12.

19            I am looking about three-quarters of the

20   way down the page.

21       A.    Yes.

22       Q.    And then 15 to 20, and now it's 25 to

23   30.

24            Do you see that?

25       A.    Yes.



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                              136

```
 1                      C. O'Neil
 2      Q.    And then the sub-bullet point says, "In
 3   May of 2020, I got 70 cases; average case is
 4   30 hours."
 5      A.    Right.
 6      Q.    Do you see that?
 7      A.    By the way, this conversation here, I
 8   remembered when I got the spreadsheet.
 9            And I am like, Oh, this is great.  We
10   are going to figure out in the base period like
11   what types of cases take longer or shorter.
12   Because what I would like to say is, wow, we went
13   from ten cases a month to 70 cases per month.  That
14   sounds like you got seven times more work.  Right?
15            But what if the type of cases he got
16   were actually easier when he got 70?
17            So that's why I wanted to break it down
18   more granularly.
19      Q.    So the quantity of cases assigned to
20   investigators isn't necessarily reflective of the
21   amount of the work that they are doing.  Right?
22      A.    Right.  You would want to know more
23   information.
24      Q.    To use your point; you can get more of
25   an easier type of cases and your volume of cases
```



1                              C. O'Neil

2     wouldn't necessarily reflect that you actually

3     worked more hours.  Right?

4          A.    That's right.

5          Q.    So in this circumstance; right?  Mike

6     Reed is saying, I got 70.

7                And I think you were saying, It would be

8     great to be able to see the data of what kinds of

9     cases and things like that.  Is that accurate?

10         A.    That's right.

11         Q.    Do you have an understanding of what

12    type of investigator Peggy Fischer was?

13         A.    She was a desk investigator.

14         Q.    Anything more than that?

15         A.    I didn't really talk to her more than

16    that, because the men were talking so much.

17         Q.    Did you have an understanding of what

18    "major case" is in GEICO-speak?

19         A.    Major case?  No.

20         Q.    So I will represent to you that people

21    like Keith Fischer and Michael Reed investigate

22    claims, whereas people who work as major-case

23    investigators investigate fraud and entity level.

24         A.    What do you mean by entity level?

25         Q.    I mean, they may be investigating



```
 1                        C. O'Neil
 2    hundreds of claims because they are investigating
 3    an entity that is potentially involved in fraud.
 4    For example, a doctor's office that is a mill for
 5    an insurance scam.
 6         A.    Go it.
 7         Q.    So would it surprise you to learn that
 8    Peggy Fischer said she was assigned, on average,
 9    four cases a month prior to COVID?
10         A.    Doesn't surprise me.  I didn't talk to
11    her very long.
12         Q.    Would it surprise you to know that
13    major-case investigators, like Peggy Fischer, has
14    never been assessed on productivity?  Meaning; the
15    metrics in the spreadsheet regarding activities and
16    the like?
17         A.    No, it wouldn't surprise me.  I mean, it
18    sounds to me like they have a very different job.
19         Q.    And because they have a different job,
20    you wouldn't be able to use this sort of regression
21    analysis if you didn't have that data.  Right?  You
22    wouldn't be able to create it.
23         A.    I have no idea what the data is that
24    GEICO collects around Peggy's work.
25              The -- I don't want to say I couldn't
```



```
1                          C. O'Neil
2      come up with a model.  I am pretty good at coming
3      up with models.  But now it sounds to me like it
4      would be a different type of model.
5                  I mean, maybe the methodology would be
6      the same, but it would be different types of data.
7          Q.    If you had that sort of data available
8      that you are talking about --
9          A.    Right, but I don't even know what's
10     collected.  I'm sorry.
11         Q.    That's okay, I apologize as well.  We
12     both quick talkers.
13                 You don't have any understanding that
14     any such data exists.  Right?
15         A.    Correct.
16         Q.    Would it surprise you to learn that
17     Peggy Fischer said she was assigned zero new cases
18     between COVID's start in February or March of 2020
19     to her retirement at the end of the 2020?
20         A.    No.
21         Q.    Why wouldn't it surprise you, given what
22     your notes reflect here in terms of case
23     assignments reflected by, or as told by, Mike Reed
24     and Keith Fischer?
25         A.    I just -- just because I am a human
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    140

```
 1                         C. O'Neil
 2   being and I know that during COVID things changed.
 3        Q.    When you wrote your declaration, were
 4   you envisioning investigators that get assigned
 5   zero cases for a multimonth period?
 6        A.    Certainly not.  That would not be
 7   helpful.
 8        Q.    That would mean --
 9        A.    Sorry to interrupt.
10             I mean, just to be clear, like, for all
11   I know, she had different units of work that were
12   considered productive.  They weren't called cases,
13   they were called, like, mini investigations.  Maybe
14   she had something like that.  I don't know.
15             But I -- certainly if all of her
16   productivity measures were zero, that would not be
17   useful.  I could not work with that.
18        Q.    You wouldn't be able to create the model
19   that's outlined in your declaration if somebody
20   didn't have the data points around investigative
21   activities and the like.  Right?
22        A.    Correct.
23        Q.    Similarly, you wouldn't be able to
24   create a model if, for example, people like Peggy
25   Fischer might work a case for months or years;
```



                              C. O'Neil

 1
 2   right?

 3        A.    Well, I don't know about that.  Like,

 4   she did mention diary -- diary points.  That sounds

 5   like something I could work with.

 6        Q.    Having -- do you have any understanding

 7   of what diary points are?

 8        A.    No, but they are points so they are

 9   numerical.  And they are -- like evidently, you are

10   going to get more points if you to do more.  You

11   know, it just -- it's just that simple.

12             So you could figure out whether, you

13   know, she has been more and more -- like, I don't

14   even know what diary points are.

15             But I am just stipulating:  If it turns

16   out she is expected to do 70 diary points now but

17   she used to do 10 diary points, then it sounds like

18   more work.

19        Q.    Is it fair to say you are interpreting

20   the word point, by nature, as a mathematician?

21        A.    Yes, absolutely.

22        Q.    Is it also entirely possible she means a

23   point in time she had to complete a diary entry?

24        A.    Oh, yes.  Look at that.  Internal

25   deadlines.



                            C. O'Neil

 1

 2            You are right.

 3       Q.    Okay.

 4       A.    I think that's a better interpretation.

 5       Q.    Right.  So do you have an understanding

 6  as to the metrics that investigators are assessed

 7  against at GEICO?

 8       A.    Something about that was described in

 9  the data dictionary.

10       Q.    So generally at a high level, you would

11  have -- is it your understanding that you have a

12  metric called case life, a metric called

13  productivity, and a metric called quality?

14       A.    Yes.

15       Q.    I am not trying to imply that those are

16  static across time, but generally speaking, those

17  are three types of categories.

18            And I will even represent to you that

19  the productivity assessment changed over time that

20  applied to people that are part of this lawsuit.

21  Okay?

22       A.    Okay.

23       Q.    In 2022 specifically, this investigative

24  activities metric was something that was utilized

25  by GEICO as reflected in certain documents, and as



```
 1                        C. O'Neil
 2   reflected in some data it appears that that's
 3   contained in the spreadsheet that you looked at.
 4            Are you with me so far?  You know, I am
 5   not asking a question; I am laying a groundwork.
 6        A.   Yes.  State that last part again.
 7        Q.   Productivity as a metric has been
 8   assessed in different ways.  I will represent to
 9   you not as gospel, but I think it's accurate to say
10   it's been assessed in different ways by GEICO, over
11   time by GEICO.
12        A.   Right.
13        Q.   One of those ways for a period of time
14   is the type of data that I think you see reflected
15   in terms of tracking the number of investigative
16   activities that were done in a monthly period, for
17   example.
18            Does that make sense?
19        A.   Yes.
20        Q.   If there were periods of time where that
21   data didn't exist, and productivity was simply the
22   number of cases that were closed; that would make
23   the linear regressions that you are talking about
24   here, the multiple ones, it would make some of them
25   possible.  Right?
```



                          C. O'Neil

1

2       A.     That's right.

3       Q.     And similarly, you talked about, sort

4    of, cases closed as being kind of the dumbest one.

5              If that was the only data that you had

6    for a multiyear period, it would affect the

7    reliability of assessing damages over that time

8    period; right?  Using your model?

9       A.     Are you saying that they didn't even say

10   the different types of cases?  Just number of

11   cases?

12      Q.     Yes.  If you didn't have the types --

13   well, if you didn't have -- you may have types of

14   cases in this hypothetical, in this situation that

15   we are talking about.

16             If types of cases, like desk or field or

17   social media or the like, but you don't have all

18   the individual activities that were being done;

19   that would affect the reliability, the accuracy of

20   the regression model.  Right?

21      A.     It wouldn't change the -- that one

22   regression that is just done by cases, the length

23   of what type of case you close and how many; that

24   would be exactly the same.

25             But my goal was in making -- in



```
 1                        C. O'Neil
 2   suggesting four regressions is having four
 3   different ways of coming at it and making sure we
 4   are consistent.  So we would have one fewer of
 5   those four things, but the first one would be the
 6   same thing.
 7        Q.   Sure.  So if -- you know, we talked
 8   about closing a case.  Right?  That's one?
 9        A.   Yes.
10        Q.   Investigating a specific feature is, you
11   know, some type of (b) that you list here in
12   paragraph 7.  Right?
13        A.   Yes.
14        Q.   If you couldn't do that, if that data
15   didn't exist, you wouldn't be capable of doing a
16   linear regression.  Right?
17        A.   Right.
18        Q.   And similarly impacting a feature is
19   number (c).
20        A.   Yes.
21        Q.   What is a feature, to your
22   understanding?
23        A.   I forget, to be honest.
24        Q.   So sitting here today, you don't know
25   what a feature is as used in your declaration?
```



```
 1                         C. O'Neil
 2       A.     I think it had to do with whether GEICO
 3  got money back, like things changed in terms of
 4  like the actual policy.  Or whether, like, it
 5  was -- I think it was a financially impact
 6  measurement.
 7              And the reason why I wanted to do the --
 8  do a regression with that is because it sounded to
 9  me like higher impact activities were probably more
10  work for the investigator, so I wanted to give them
11  credit for working harder and getting that impact
12  accomplished.
13              Which I think somebody mentioned, maybe
14  here, that they -- that it was incentivized.  They
15  were incentivized to have that impact.  So
16  presumably that means it was more work for them, so
17  they should be given credit for that.
18              That's what the linear regression would
19  do.  It would infer that this high-impact activity
20  actually took more time.
21       Q.     So you write here in paragraph 7, one of
22  the subparts, "He is achieving a certain
23  disposition-type in closing a case."
24              Is that what you are referring to?
25       A.     That's slightly different.  That's sort
```



```
 1                      C. O'Neil
 2  of saying, like, whether it was denied or whether
 3  it was paid, or like the different kinds of
 4  outcomes of the claims.
 5            Which is also -- but the same idea
 6  holds -- applies, which is, like, you know, it
 7  takes more work to do certain types of -- it
 8  probably takes more work to get something paid,
 9  because you have to do an assessment or something,
10  than it takes to do -- just to dismiss something.
11            Now that I am talking about it, I feel
12  like maybe the impact was that they had -- they
13  noticed something else when they were visiting
14  someone.  They noticed, you know, that the car was
15  supposed to be parked in the garage, but it wasn't
16  parked in the garage.  There was some kind of extra
17  work involved in certain types of impact.
18            So it's just -- it's -- that's the lens
19  I wanted to use.  The third lens was like, well,
20  maybe, you know, it -- the cases went up, but maybe
21  they were easier in some way.
22            And I wanted to check, well, are they
23  easier?  Are they measured in various ways?  Are
24  they actually just as hard as the old cases were?
25            MR. SCIMONE:  Counsel, it's 12:35.  It
```



```
 1                       C. O'Neil
 2        seems like we are going to go for a while.
 3        What do you want to do about lunch?
 4             MR. TSONIS:  We can go off the record
 5        and take lunch.  That's fine.
 6             THE VIDEOGRAPHER:  The time is 1:34 p.m.
 7        We are going off the record.
 8             (Recess taken.)
 9             THE VIDEOGRAPHER:  The time is 1:27 p.m.
10        We are back on the record.
11        Q.    You understand you are still under oath;
12   right?
13        A.    Yes.
14        Q.    So I would like to talk a little bit
15   more about the regressions, the linear regression
16   that you have testified here.
17             So we talked a fair amount, sort of
18   setting up and how to establish the baseline for
19   the linear regressions.  Right?
20             Let's talk about applying it.  So in
21   paragraph 9 of your declaration, Exhibit 2, you
22   talk about using the data to estimate how long each
23   type of task took each plaintiff using a linear
24   regression.  Right?
25        A.    Yes.
```



```
 1                        C. O'Neil
 2        Q.    And, you know, we have looked at
 3   paragraph 7 that has (a) through (f), the various
 4   ways.  And I think you said those would all be
 5   different linear regressions that you could
 6   theoretically do.
 7        A.    Yes.
 8        Q.    And you would -- what would be the
 9   process by which you combine those linear
10   regressions to come up with an average?
11        A.    Okay.  There is two different types of
12   average, which is why I am pausing.  Just to make
13   sure I understand the question.
14             So the average -- the way I would
15   combine the -- the regressions, I think I talk
16   about in a different paragraph than paragraph 9.
17             The average I am talking about in
18   paragraph 9 is trying to explain what the
19   regression is doing.  And this -- so which average
20   do you want to talk about?  Paragraph 9 average?
21        Q.    Let's talk about paragraph 9 first.
22        A.    Okay.  So that's what I was saying
23   earlier.  In just the example where it's just the
24   number of cases closed per week; it took on average
25   this many hours.  The coefficient of the regression
```



                          C. O'Neil

1   will tell you how many -- like how -- the weight of

2   that.  So that -- the weight there would be 8 if it

3   was eight hours per case.  It would be 6 if it was

4   six hours per case.  If you remember that previous

5   conversation.

6            If you broke it out into the type of

7   case you closed, then the coefficients of those --

8   like, there is four types of -- of types of cases:

9   Type 1, type 2, type 3, type 4.  Then you have four

10  coefficients.  And each of them would refer to the

11  number of hours that it inferred those cases take.

12           So that's -- that's the average.  An

13  average amount of time Case 1 takes is the

14  coefficient of that variable, that first variable.

15  The average amount of time that case -- type 2 case

16  takes is the coefficient of the second variable.

17  And so on.

18           Look; can I say it another way?

19      Q.   Sure.

20      A.   Let's imagine you are -- that month you

21  work 200 hours.  I am just saying that just to make

22  it a round number.

23           And you are like, how did you spend this

24  time?  How did you spend this time, your 200 hours?



```
 1                          C. O'Neil
 2    How are we going to allocate the 200 hours to this
 3    lens, i.e. cases, types of cases closed?
 4              Let's say you did, like, you did five
 5    cases of Type 1, five cases of Type 2, four cases
 6    of Type 3, and three cases of Type 4.
 7              If you want to sort of add up the hours,
 8    well, each of these five Type 1 cases took me six
 9    hours; so it's 6 times five hours for Type 1 cases.
10    So 6 is the coefficient; five is the number you did
11    that week or month.  And then your 30 is the total
12    hours allocated to Type 1's-type cases.
13              And similarly for the other four types
14    of cases.
15              So that's why you have -- the
16    coefficients are the hours, and then you are
17    multiplying by the number of cases that you did.
18    Like that.  And that gives you the total amount of
19    time in the 200 -- all together 200 that you spent
20    on Type 1 cases and so on.
21              So at the end of the day, you are
22    seeing -- so anyway.
23              The average is, again, the coefficient
24    refers to the average amount of time spent on that
25    type of thing.
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    152

```
 1                        C. O'Neil
 2        Q.    Okay.  And the average that you are
 3   talking about is an average used to create the
 4   baseline.  Right?
 5        A.    How the baseline comes in.
 6              So the -- sorry.  Are you talking about
 7   the baseline regression?  Or the baseline number of
 8   hours that the plaintiffs testified that they
 9   worked?
10        Q.    The baseline regression now.
11        A.    Regression, yes.  Yes.
12        Q.    So for example, you know, flipping to
13   paragraph 11 here, the heading, Assessing Damages.
14              You say, "Once a baseline analysis has
15   been conducted."
16              And that's what you were just
17   describing.
18        A.    Yup.
19        Q.    "The general approach to calculating
20   damages for special investigators in a given month
21   is to:  1, impute the time they worked that month
22   by applying our baseline regression results to the
23   reported components of their work."
24        A.    Yes.
25        Q.    "And 2, compare that to the hours they
```



CATHERINE ONEIL                                         April 24, 2025
FISCHER vs GEICO                                                    153

```
 1                        C. O'Neil
 2   reported to GEICO for that month."  Right?
 3        A.    Yes.
 4        Q.    So set aside number 2 for a moment.
 5             When you talk about the reported
 6   components of their work, this is the spreadsheet
 7   data that you are talking about.  Right?
 8        A.    Yes.
 9        Q.    And would you apply this baseline
10   analysis on a special investigator by special
11   investigator-case basis to assess damages?
12        A.    Yes.
13        Q.    So you wouldn't apply it across any
14   groups.  You would apply the results of the
15   baseline analysis to an individual person?
16        A.    Yes.  And for a couple of reasons.
17             One is that they did different stuff.
18   And the other one is that they worked for different
19   months.
20             Like, we are not going to give this guy
21   like, backpay on a month he didn't even work, or he
22   wasn't even at GEICO.  So we could only possibly
23   apply it to when he was actually working.
24        Q.    I guess to use basic examples; closed
25   cases, which we have talked about as maybe the
```



```
1                        C. O'Neil
2    simplest one.  If you have a value or a coefficient
3    of "X" number of hours to close, you know, a case
4    generally, or if you looked at the types of cases
5    like field or desk or social media cases, you would
6    have different values; correct?
7              You would apply, you know, what Joe
8    Smith, investigator or Keith Fischer, investigator,
9    you know, did in terms of cases closed.  Or those
10   types of cases in one particular month, for one
11   particular year, to come up with the time worked
12   for that month.
13        A.    Yes.
14        Q.    Okay.  And the coefficient would be an
15   average that you would create from -- and that's
16   the dataset set we talked about; around
17   12 to 24 months and 200 people?
18        A.    Yes.
19        Q.    That dataset, if you had it, you are
20   claiming creates the averages, or sort of
21   coefficient, that you could apply to any individual
22   special investigator.  Right?
23        A.    Yes.
24        Q.    And prior to going on lunch too, we
25   talked about various tasks or, you know, work
```



```
 1                     C. O'Neil
 2   activities that investigators might do that don't
 3   show up in the dataset.  Correct?
 4       A.    Yes.
 5       Q.    So we talked about things -- I think we
 6   talked about traffic driving and weather driving
 7   and trainings, for example.
 8       A.    That's right.
 9       Q.    And we also mentioned times spent at
10   meetings unrelated to cases.  Right?
11       A.    Yes.
12       Q.    The time that it takes, for example, for
13   someone to boot up their computer, shut down their
14   computer.  That's not time captured in the data.
15   Right?
16       A.    That's right.
17       Q.    Time spent talking to their supervisors,
18   whether it's, for example, on just a check-in on
19   how work is going.
20       A.    That's right.
21       Q.    Time spent talking to a supervisor as
22   part of a daily coaching plan wouldn't be time
23   captured in the data.  Right?
24       A.    That's right.
25       Q.    Even in your notes here, your interview,
```



                        C. O'Neil
1
2    you talked -- there was reference to the time spent
3    trying to put together a request for overtime.
4    That wouldn't be captured in the data.  Right?
5        A.    That's right.  Only the things that that
6    I have as columns in my spreadsheet can even
7    possibly be part of this analysis.
8            On the other hand, you should also
9    realize that there is a reason that GEICO collected
10   this information.  It was the way they measured
11   productivity.  It's what they cared about.  So it
12   also stands to reason; it's what the workers cared
13   about.  They were incentivized to, like, have good
14   numbers.
15           So it was kind of a mutual agreement
16   that this is how their time was being measured.
17   That your productivity was being measured by how
18   many of these activity and cases that they actually
19   accomplished.
20       Q.   So I guess I am -- strike that.
21           So are you saying that because GEICO
22   measured these sorts of activities, or has data at
23   least for some period of time as to these
24   activities, that it valued them or it found them
25   important?



                            C. O'Neil

 1

 2      A.    Yes, and yes.  And that's also how the

 3   report cards were built.  Right?  And that's how,

 4   yes, they were punished or rewarded, as I

 5   understand it.

 6            I am just saying:  It stands to reason

 7   that that's a way of measuring your ability to do

 8   your job.  Like, nobody is being measured by their

 9   ability to turn their computer on.

10      Q.    Sure.  I guess you are presupposing here

11   though that there is actually some sort of negative

12   consequence that would follow if somebody wasn't,

13   you know, meeting a performance metrics or

14   something like that.  Right?

15      A.    Yes.

16      Q.    The data would also show, for example,

17   if somebody was consistently ranked in the lower

18   quartile, but they were not, in fact, subject to

19   any discipline.  Right?

20      A.    Well, if -- to be honest, I don't know

21   if the data that you have includes information

22   about discipline.

23      Q.    Well, we have data on people's

24   performance reviews on an annual or semiannual

25   basis.  That might be something that could confirm



| | |
|---|---|
| 1 | C. O'Neil |
| 2 | that; correct? |
| 3 | A.    Yes. |
| 4 | Q.    So it's entirely possible that there are |
| 5 | some investigators that were perfectly fine with, |
| 6 | for example, not trying to achieve a 4 or 5, the |
| 7 | top rating scale, but maximizing their results? |
| 8 | MR. SCIMONE:  Objection. |
| 9 | Q.    You can answer. |
| 10 | A.    As far as I know, yes. |
| 11 | Q.    Sure.  And there might be people that |
| 12 | might have decided they were not going to work over |
| 13 | their scheduled hours, and they were only going to |
| 14 | adhere to their scheduled work hours. |
| 15 | Right?  That's possible? |
| 16 | MR. SCIMONE:  Objection. |
| 17 | A.    That's possible. |
| 18 | Q.    And in your model, by analyzing data for |
| 19 | 200 individuals, applying that model, the average |
| 20 | would then assign overtime or additional hours |
| 21 | worked to that individual who didn't actually work |
| 22 | beyond their scheduled hours.  Right? |
| 23 | A.    Well, if you think about it, if those |
| 24 | people worked less and they accomplished less, my |
| 25 | model would actually give them less credit. |



                            C. O'Neil

2          Let's say the average person who was

3    striving for a 4, 5, or good score, productivity

4    score, got like 20 cases done per month.  And these

5    slackers got five cases done per month.

6          If you follow the math, I would not be

7    assigning them overtime for that.  I would be

8    assigning that five -- you only got done five, and

9    that should have only taken you -- if they are

10   seven hours each; 35 hours.  So you didn't get

11   underpaid.

12       Q.    Sure.  So let's take a slightly revised

13   version of this hypothetical.  Let's say I am much

14   more efficient than average at closing my cases.

15       A.    Okay.

16       Q.    Under the model that you have set forth

17   here in your declaration, I am actually penalized.

18   Right?

19          Because I am closing more cases, but I

20   am above average, so I am faster at closing them.

21   I close more cases than average.  Right?

22       A.    Okay.

23       Q.    So in that model, do I get more credit?

24   Are my hours overstated?  Or understated?

25       A.    In that model, you get more, like, I



                              C. O'Neil

1

2   will say, let's say -- let's say I estimate that

3   each case takes about seven hours, but it actually

4   only takes you six hours because you are so

5   efficient, and you get 22 cases done instead of 20.

6   Then I would estimate that time as 22 times

7   seven hours, instead of 22 times six hours.  So you

8   get more overtime.

9            So you get rewarded for being more

10  efficient; relative to someone who did it in seven

11  hours per case, and therefore had only 20 cases

12  done.

13       Q.   Sure.  So -- if I am also less

14  efficient.  So explain to me how, in your model,

15  the slacker; right?  That's not as efficient,

16  doesn't get attributed; right?

17           Someone that's less than average but is

18  assigned the average number of hours, isn't it true

19  that it would overstate the hours worked for that

20  person?

21       A.   No.  No, because -- well, tell me

22  exactly what you mean by slacker and I will tell

23  you what's going to happen for them.

24       Q.   So let's say -- using the simplest

25  method you have, your average says investigators



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                                161

```
 1                         C. O'Neil
 2    close ten cases per month.  Right?  And so --
 3         A.    Correct.
 4         Q.    -- and to close that ten cases, we
 5    assign a value of, you know, four hours per case?
 6         A.    Okay.
 7         Q.    If I close 20 cases, but I can actually
 8    do them faster, it doesn't take me four hours, your
 9    model is assigning me 80 hours of work in a week
10    where I didn't work 80 hours if I did them faster.
11    Right?
12         A.    That's right.
13         Q.    If it takes me only two hours?
14         A.    That's one of the reasons we don't just
15    do the dumbest one.  We say, what kind of cases did
16    you do.
17         Q.    Right.  We are not talking about other
18    regressions at the moment.
19         A.    But -- yes.
20         Q.    In this basic one --
21         A.    Yes.
22         Q.    -- if I am more efficient because I
23    close more cases, but I did it, in actuality as an
24    individual, in less time or half the time than the
25    average person would do; right?
```



                        C. O'Neil

1                       In your model, I am assigned more hours

2  work than what I, in actuality, did.  Right?

3       A.    That's right.

4                 MR. SCIMONE:  Just remember slow the

5            pace down a little bit for the -- for the

6            court reporter.  Sorry.

7       Q.    Conversely, if it took me more time, if

8  instead of four hours a case, it was actually

9  taking me six but I am only getting assigned four

10 now under your model.  So I am under -- I have --

11 the hours assigned to me in your model are -- under

12 represent what I actually worked.  Right?

13      A.    Yes.

14      Q.    So just to be clear:  In your model,

15 it's your testimony that if you are, I guess, the

16 prototypical, the composite-average investigator,

17 that the model would accurately model the time that

18 you spent.

19                Is that your contention?

20      A.    Yes.

21      Q.    If I am an investigator though --

22      A.    I apologize for interrupting, but can I

23 just revise what I just said?

24                If you are the average worker, like, and



```
 1                      C. O'Neil
 2   it's the average week; right?  Even the average
 3   worker would have variations one week to the next,
 4   or one month to the next, because just -- cases all
 5   close in the same month or something.  There is
 6   going to be some natural variation.
 7        Q.    Sure.  But there might not be a natural
 8   variation.  For example, if I am -- if I am really
 9   efficient because I am good at what I do, or I have
10   been doing it for a long time, I am going to be
11   consistently better than average.  Right?  I am
12   going to be consistently, month over month, more
13   efficient.
14        A.    That is possible.
15        Q.    So in your model, I am consistently
16   overassigned the number of work hours in your model
17   than what I actually worked in that scenario.
18   Right?
19        A.    Yes.
20        Q.    It doesn't balance out.  Because I am
21   not, for example, varying above and below; I am
22   consistently on one side of --
23        A.    That's right.
24        Q.    And the same would be true, excuse me,
25   of the converse.
```



CATHERINE ONEIL                                                April 24, 2025
FISCHER vs GEICO                                                          164

```
 1                         C. O'Neil

 2              If I am always slower, then I am

 3   overrepresented in terms of damages in your model.

 4   Right?

 5        A.    No.  Underrepresented.

 6        Q.    If I am slower?

 7        A.    If you are slower.

 8        Q.    Then I am getting more credit than what

 9   I otherwise --

10        A.    No, you are getting less.

11              If you are efficient; you get more.  If

12   you are inefficient; you get less.

13        Q.    Excuse me.  Okay.  Right.  If I am

14   superefficient, I am getting assigned more hours.

15   If I am really slow, I am getting assigned less

16   hours?

17        A.    That's right.

18        Q.    From a damages standpoint though, the

19   model wouldn't accurately reflect the number of

20   hours I actually worked?

21        A.    That's right.  It's an estimate.

22        Q.    So we talked -- right, paragraph 7.  We

23   don't need to refer back to it.

24              But there, you have the different

25   regressions that you would do investigating a
```



```
 1                          C. O'Neil
 2   feature, for example?
 3        A.    Yes.
 4        Q.    So similarly, right, you are doing a
 5   similar linear regression to assess, to build your
 6   model in this way and to apply it?
 7        A.    Yes.
 8        Q.    So if I investigated way more features;
 9   right?  In SICM, if I have more of that activity
10   but I didn't spend as much time, because I am
11   really efficient, it would overrepresent my claimed
12   hours in your model.  Right?
13        A.    Yes.
14        Q.    And similarly; if I was really slow and
15   had less features, then that would underrepresent
16   my time?
17        A.    That's right.
18        Q.    Would that be true for the remainder
19   impacting a feature?  For example, if I was far
20   more efficient at impacting a feature that we would
21   see the same results; where if I was significantly
22   above or below the average, that it wouldn't
23   accurately represent my time worked?
24        A.    Yes.  If you were consistently more
25   efficient in every type of task.
```



CATHERINE ONEIL                                            April 24, 2025
FISCHER vs GEICO                                                      166

```
 1                        C. O'Neil

 2            Like, you had a little 15 percent boost

 3    of efficiency above -- like above the average, then

 4    yes, you would be giving you -- it would impute

 5    more hours.  Oh, like, oh, look at how much work

 6    you did.  You must have worked a lot this week, and

 7    you only stated 39.75 hours.  Or whatever.

 8            So you would get a lot of back pay for

 9    that month, yes.

10       Q.    And closing cases of a certain level of

11    time, we talked about field cases versus desk cases

12    for example.  Right?

13       A.    Yes.

14       Q.    So in field cases, we talked a lot about

15    efficiency.  But let's say, for example, I have a

16    much shorter commute on average for my field cases

17    than the typical, you know, than other field

18    investigators.

19            In that sense, I am -- the hours that

20    are spent closing these specific types of cases are

21    being overallocated to me.  Right?

22            MR. SCIMONE:  Objection.

23       A.    I don't know the extent to which a

24    commute really matters here.  Because it seems to

25    be as there is a lot of more driving, there is also
```



```
 1                         C. O'Neil
 2    driving to police stations, there is also driving
 3    to the scene.  There is a lot of other things
 4    happening.  So I am not sure how much that actually
 5    matters.
 6              But I get your point.  Like sometimes,
 7    just coincidentally, it -- some tasks are easier
 8    for people.
 9        Q.    I mean, just beyond coincidence, I think
10    we said Mike Reed, who you interviewed, said he
11    worked in Buffalo.  He covers seven large counties,
12    lots of driving, not unusual to have a three- or
13    four-hour round trip, excluding interview of the
14    insured.  Right?
15        A.    Yes.
16        Q.    So if three or four hours, because he
17    has an expansive geographic area, is larger than
18    normal commute time.  Right?  That would impact the
19    number of cases that he can close.  Right?
20        A.    Yes, that's right.  That's if that
21    statement is correct.  But I don't know that that's
22    true.
23        Q.    You don't know one way or the other?
24        A.    I don't know one way or the other.
25        Q.    But if that were true, then again, his
```



                         C. O'Neil

1
2    allocated damages in your model wouldn't be
3    accurate because they don't meet the average?
4         A.    It's also possible that he was slower
5    for certain things, but faster for other things.  I
6    don't know that either.
7              But yes, you are right.  That would be a
8    drag on him.
9         Q.    Right.  And because you are not --
10   because you are applying the average, you are
11   essentially combining the population that we have
12   talked about, the sample data that you would like;
13   200 people into one, you know, composite
14   investigator.  Is that right?
15        A.    That's exactly right.
16        Q.    And you use that composite investigator
17   to the data for the actual investigators, and you
18   basically are assigning, based on the work that
19   they completed, how much time the average
20   investigator would have taken to do this work?
21        A.    That's right.
22              So here is another -- sorry to interrupt
23   you, but there is another scenario.  Which is that
24   somebody takes two weeks of holiday in one month.
25   So they get half the normal amount of work, but



```
 1                    C. O'Neil

 2   they also only stayed -- half of their work, you

 3   know.

 4            So in that case, my model also still

 5   says, Oh, you got this much work; we impute this

 6   much hours.  It's still more than what you wrote

 7   down in the time sheet, because you only wrote down

 8   two weeks worth of time in the time sheet.  So we

 9   are still going to get back pay for that.

10            So it's flexible to things like vacation

11   time.

12       Q.   So your model accounts for vacation

13   time.  And I think that's why you said you would

14   want the, sort of, time records or attendance

15   records.  Right?

16       A.   Yes.

17       Q.   I am curious.  So the data that you are

18   analyzing here is monthly.  Right?

19       A.   Yes.

20       Q.   Are GEICO investigators paid monthly?

21       A.   I don't know.

22       Q.   Do you have an understanding of what the

23   GEICO workweek was for any of these individuals?

24       A.   No.  Well, I mean, I know that they were

25   asked to state their hours as less than 40.
```



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                  170

```
 1                        C. O'Neil
 2       Q.    You know that's what plaintiffs are
 3   saying.  They are saying --
 4       A.    Yes.
 5       Q.    -- the claims in this litigation?
 6             I guess my question is:  Is it your
 7   understanding that GEICO's pay periods are a period
 8   of two weeks?
 9       A.    I am not thinking about that.  It
10   doesn't matter to my analysis.
11             All that matters to me is that I need to
12   compute the number of hours that they weren't paid.
13       Q.    I understand.
14             So because you are looking at it monthly
15   though, you are trying to assess the numbers that
16   they weren't paid for in a different given month?
17       A.    Yes.
18       Q.    You are not allocating the numbers of
19   unpaid hours in a particular workweek?
20       A.    That's right.
21       Q.    I think we said, and I apologize if I
22   already asked this.  You know, the next one,
23   number 7, is sort of achieving a certain
24   disposition-type in closing a case; is that right?
25       A.    Okay, yes.
```



C. O'Neil

1

2        Q.    I think you referenced before lunch that

3   it's your understanding having sort of a particular

4   disposition or being able to recover, you know,

5   have an impact, recover funds, whatever the case

6   may be, might require more investigative work or

7   that was valued more.

8        A.    That's right.

9        Q.    What's your basis for that?  Is it just

10  your assumption that activities that result in, you

11  know, a tangible monetary value would require more

12  time, or would be incentivized to pursue?

13       A.    Yes, it is.  Well, I will say I am an

14  expert in data and why people collect data.  And so

15  just the very fact that those are put in different

16  categories has -- raises my eyebrows.

17            Like, there is a reason GEICO is keeping

18  track of these as separate.  And I am going to

19  assume that it has something to do with:  They are

20  considered a really different type.  And so -- so

21  that's the first thing that made me pay attention

22  to it.

23            And then when I thought through it, of

24  course, I am not an expert investigator, but again,

25  it just stands to reason that some things take more



CATHERINE ONEIL                                         April 24, 2025
FISCHER vs GEICO                                                   172

```
 1                         C. O'Neil
 2   effort to do, because it's a longer process.
 3        Q.    Is it your assumption, I guess --
 4   presupposing that an investigator knows early on or
 5   at the outset of an investigation what the
 6   disposition could or would be?
 7        A.    Say that again.
 8        Q.    Sure.  If I am an investigator and I am
 9   assigned a case, I guess, how is it that I know
10   that at the end I am going end up have a
11   disposition that is, you know, total denial or a
12   partial denial that saves GEICO money?
13             Can I even know that at the outset?
14        A.    I don't assume that you know that at the
15   outset.
16        Q.    I guess when I am doing various
17   activities or tasks, whatever you want to call it,
18   you would think -- just referenced that they might
19   be incentivized or they might have an emphasis
20   placed on them.  But that's not possible if the
21   investigator don't know about them at the outset of
22   an investigation.  Right?
23        A.    Sure, it is.  I mean -- what I mean to
24   say is:  The guy, some investigator, gets a case on
25   Monday.  They don't know what's going to happen.
```



                         C. O'Neil

1

2    So they do the first step.  And they say, Oh, this

3    is going to be one of those cases where I have to

4    do the second step.  And they do the second step.

5    And they say, Oh, this is one of those cases that

6    actually requires a third step.

7              And I want to give them credit for that.

8    In my model -- I want my model to certain discern

9    the difference between a three-step investigation

10   versus a one-step investigation.  They didn't know

11   that going in, but they know that at the end, and

12   it took them three days instead of one day.

13        Q.    As we are talking about the variability

14   here of individuals as your model is applied, one

15   concept that we haven't really talked about is sort

16   of the magnitude of that variability.  Right?

17             So if -- do you recall earlier, we

18   talked about a distribution of hours worked.  And I

19   think you were talking about that it's, you know,

20   you know at the outset; it's in some defined rate

21   range.  Right?

22        A.    Yes.

23        Q.    Would significant variation in the

24   distribution in any of these metrics that you

25   propose doing a regression or linear regression on



CATHERINE ONEIL                                                April 24, 2025
FISCHER vs GEICO                                                        174

```
 1                          C. O'Neil
 2   affect the magnitude of the error?
 3        A.    Yes.
 4        Q.    So for example, a social media case
 5   might be closed in an hour, whereas a major case
 6   might take a year to close.
 7              Does that make sense?
 8        A.    Well, you are talking about a variation
 9   in time, I see.  Yes.  Yes.
10        Q.    So we are back in a world where we are
11   talking about, you know, 7(a); closing a case,
12   where we are looking at the most basic form.
13              That sort of extreme variability would
14   lead to pretty extreme error rates in that
15   regression analysis.  Right?  Or could, I should
16   say.
17        A.    Yes, it could.
18        Q.    So someone like Peggy Fischer.  Let's
19   say she closed one case.  Right?  She is not nearly
20   getting the credit.  Right?
21              Because the average case closed,
22   quote/unquote, is significantly less than the year
23   it took her.  Right?
24        A.    Yes.  And that's why I would be
25   surprised to find out that GEICO doesn't somehow
```



```
 1                        C. O'Neil

 2    classify desk investigator cases in some way that

 3    would distinguish between one-hour social media

 4    case and one-year case.

 5              I am sure that -- well, I am not sure.

 6    But people who want to keep track of these kind of

 7    things probably would distinguish between these

 8    types of cases somehow.  That's what -- how the

 9    data is formulated.

10        Q.    Sure.  And as I am sure you saw in your

11    spreadsheet -- and I am not contending that people

12    who were classified as inside or desk investigators

13    were all major-case investigators or had no product

14    metrics.

15              But I think you mentioned earlier;

16    right?  If somebody doesn't -- they don't have this

17    dataset, then the application of an average

18    investigator to their, you know -- you can't apply

19    your model to them because you don't have your data

20    points.  Right?

21        A.    I would -- it's a very open question.

22              I would -- you know, if I don't have

23    data; I can't do an analysis.  I will say that.

24        Q.    That's fair.

25              And if you have very limited data, then
```

                         C. O'Neil

 1    it also would be fair to say that the magnitude of

 2    the error in any analysis you could do would be

 3    substantial?

 4        A.    For sure.

 5        Q.    And ultimately, that analysis wouldn't

 6    be a reliable way to measure that person's

 7    off-the-clock work?

 8        A.    I would need a lot of data.

 9            If the underlying data is extremely

10    variable, like you said, like if you are counting

11    the number of days it took to do, if it's extremely

12    variable, then I would need a lot of data to even

13    get a good average.  So, yes.

14        Q.    Sure.  And similarly -- right?  When we

15    talk about, Hey, closing cases of a certain type,

16    like if there is a substantial variation between

17    the amount of time it takes to close a social media

18    case, or field cases, or desk cases; that variation

19    is going to increase the magnitude of the error in

20    your analysis.  Right?

21        A.    Yes.

22        Q.    And if it's a substantial variation,

23    that error would be significant, such that it would

24    not lead to an accurate result, an accurate



CATHERINE ONEIL                                                     April 24, 2025
FISCHER vs GEICO                                                            177

```
 1                      C. O'Neil
 2    measurement, of people's alleged off-the-clock
 3    work.  Right?
 4         A.    Yes.
 5         Q.    And the same general concept would be
 6    true for your proposed regression analyses in 7(b),
 7    (c), (d), (e) and (f).  Right?  A magnitude of an
 8    error in any of the underlying data -- or extreme
 9    variability, I should say -- in the underlying data
10    could lead to an error of significant magnitude
11    such that it would make the results inaccurate.
12         A.    Yes.  But I want to point out that the
13    amount of variability that you just described, with
14    social media taking one hour and another
15    investigation takes more than a year, is much, much
16    bigger variation that I saw in that spreadsheet.
17              That spreadsheet had nothing like that
18    kind of variability.
19         Q.    Do you know what type of investigations
20    were included, or what was included in that type of
21    spreadsheet?
22         A.    I think they were field investigators.
23         Q.    Were they only field investigators?
24         A.    I believe so.
25              MR. SCIMONE:  Objection.
```



1              C. O'Neil

2        Q.    Ultimately in paragraph 9, in the last

3   sentence, you say, "The average will be useful to

4   estimate how much work each plaintiff did, even if

5   the actual length for a given task varies slightly.

6   Depending on the details."  Right?

7        A.    Yes.

8        Q.    And that's a different way of sort of

9   discussing the concepts that we have just been

10  talking about.  Right?

11       A.    Yes.

12       Q.    Slight variation, I think is your

13  contention, wouldn't make your model inaccurate;

14  but that substantial variation, significance

15  variations would.  Right?

16       A.    Yes.  And I also made the point earlier

17  that in a given week, it just might so happen that

18  the number of cases you closed is smaller than --

19  than your work actually represents, but the next

20  week it might make up for it.  So things might be a

21  little bit bunchy.  But over time, many months, it

22  would be much more accurate.

23       Q.    Do you recall earlier when we were

24  talking about coming up with the baseline of

25  reported hours from a sample of individuals, you



```
 1                        C. O'Neil
 2   talked about error bars?
 3        A.    Yes.
 4        Q.    Yes?  What would the acceptable error
 5   threshold be in your model?
 6        A.    Actually, I think that's really a legal
 7   question.  I don't know.  Offhand.
 8        Q.    As a mathematical standpoint, what error
 9   percentage would you be comfortable putting forth
10   in that model and calling the results accurate?
11        A.    Well, to be clear:  If I am saying lower
12   bounds and upper bounds; then that's a way of
13   measuring.  That's a way of stating the accuracy.
14   I don't have to say anything more than that.
15            I would say, This is my best estimate.
16   And this is my lower bound, this is my upper bound.
17   And that's the final word about accuracy, if you
18   have those lower bound and upper bound.
19            And I think it would be a legal question
20   whether that was acceptable to have that range.
21        Q.    So do you have an idea, as a
22   mathematician and as an retained expert, what your
23   goal would be in terms of an upper and lower bound?
24        A.    Well, I mean, at the very least; lower
25   bound -- for my notion of a lower bound, would be
```



```
1                        C. O'Neil
2    that the lower -- that the lower bound isn't below
3    zero.  If I am trying to estimate number of hours
4    that went unpaid, I wouldn't want the upper bars to
5    include zero.  I would want them to be tightly
6    coupled around this actual estimate.
7              Now, what tight means, is what I am
8    saying, is like a legal question.
9         Q.   Okay.  So you don't talk about potential
10   error in your declaration.  Right?
11        A.   No.  But it's a standard output of
12   multilinear regression.  It's part of the
13   methodology.
14        Q.   Okay.  But as part of that methodology,
15   despite it being part of that methodology, it's not
16   something you describe as being part of your
17   declaration?
18        A.   Correct.
19        Q.   And you don't, sitting here today, have
20   an opinion on what acceptable levels of error would
21   be for you before you would submit your model?
22        A.   To be clear:  I -- I would be able -- I
23   would be able to say, Here is my best guess as
24   to -- for each person in the spreadsheet, here is
25   my best estimate for the number of unpaid hours of
```



```
 1                         C. O'Neil
 2   work.  Here is the lower bound, here is the upper
 3   bound.
 4             It's not about being comfortable.  I
 5   would be able to do -- I would be very comfortable
 6   with that.
 7        Q.    You would agree that a linear regression
 8   typically models two things:  Trends and variation.
 9   Right?
10        A.    Okay.  Yes.
11        Q.    You agree with that?
12        A.    It's a very -- it's -- it's a -- a vague
13   way to describe it, but yes.  I do agree with that.
14        Q.    The linear regression that you are
15   proposing would model the trend.  Right?
16        A.    Yes.  And the trend here would be
17   essentially the average amount of time allocated to
18   these different activities.  And the variation
19   would be the kind of thing that we are just talking
20   about, the error bars.
21        Q.    Right.  And ultimately, you would use
22   the data points and try to draw a line that creates
23   the best fit to those data points.
24        A.    In this case, it's a multivariable
25   regression, so it's not the line; it's like a
```



```
 1                       C. O'Neil
 2    hyperplane.  But it's geometrically similar to a
 3    line.
 4              The line is if you have a plane and you
 5    have a bunch of points on the line; you are trying
 6    to make a line.  But here, it is not a plane; it's
 7    like a four-dimensional space.  So you are trying
 8    to fit the best hyperplane.
 9         Q.   Do you have any criteria in terms of how
10    you determine the best fit in this model?
11         A.   Yes.  This is -- it's the standard way.
12    That is what linear regression is, is like a method
13    to find the best-fit type of thing.
14         Q.   Got it.  Your opinions, sitting here
15    today, is that a linear regression would be a good,
16    sort of, starting point for modelling damages in
17    this case.
18         A.   Yes.
19         Q.   As you dig in, when you are actually
20    trying to apply a linear regression, is it possible
21    that you could discover that a linear regression is
22    unreliable for modelling damages in this case?
23         A.   No.
24         Q.   You don't believe that it's possible?
25         A.   No.
```



CATHERINE ONEIL                                              April 24, 2025
FISCHER vs GEICO                                                        183

```
 1                            C. O'Neil

 2        Q.    Even if you found extreme variability in

 3   the underlying data like we discussed?

 4        A.    I don't think that's plausible.  I mean,

 5   the answer is yes, if I found extreme variability,

 6   then it could be the wrong approach.

 7              But I don't think it's plausible that I

 8   would find extreme variability.  Extreme

 9   variability would like -- like somebody working

10   10,000 hours in a week, or someone closing a

11   thousand cases in a week.  And I don't think that's

12   plausible.

13        Q.    Part of what you would need to do to

14   determine whether this is, in fact, a reliable

15   model for assessing damages in this case, you would

16   need to take certain steps to do that.  Right?

17        A.    Yes.  They are called exploratory data

18   analysis.

19        Q.    What do you mean by exploratory data

20   analysis?

21        A.    It's a way of sort of eyeballing.

22   Drawing pictures and eyeballing the data to make

23   sure it doesn't have extreme variability.

24              Like building histograms to make sure

25   it's -- the number of hours claimed, like written
```



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                              184

                           C. O'Neil

1

2    down in the time sheet is, in fact, never bigger

3    than 40.  Or never bigger than 120.  Or never

4    bigger than a number of hours in a week or a month,

5    so that the numbers look plausible.

6         Q.    Okay.  Once you built your model, I

7    mean, you addressed the question of confidence in

8    the model.  Right?

9         A.    Yes.

10        Q.    And you would add in modelling

11   assumptions about the errors?

12        A.    Those aren't assumptions.  Those are

13   inferred by the data itself.

14        Q.    What are inferred by the data itself?

15        A.    The variation of the data, the variance

16   of the data.  Like the variability of the data is

17   used to compute the error bars around the

18   coefficients in the model.

19        Q.    And after you did that, you would add in

20   more predictors.  Right?  If you could?

21        A.    Like what?

22        Q.    If that data was available to you, isn't

23   that how you how you ensure that a linear

24   regression is a reliable model for assessing

25   damages?



                              C. O'Neil

1

2       A.    I think I need you to re- -- like start

3   the question again, because I am not sure where we

4   are.

5            What -- like, what variables do we have

6   right now in our hypothetical model?

7       Q.    I mean, I am just talking about the

8   dataset that we do have.  Right?  And the variables

9   that we have been talking about; whether that's the

10  variables in the types of cases, the activities,

11  the nondata work, I guess I will call it.  The

12  activities that people would do that wouldn't be

13  captured by the data in any of the work.

14           All of these are variables.  Right?

15      A.    Potentially.  But that's not what I

16  model -- that's not what my plan is.

17           My plan is to build four regressions

18  using these different lenses of productivity, and

19  then use all four -- this is the other average we

20  were talking about, like we mentioned very

21  briefly -- and then sort of seeing how consistent

22  with these models.

23           So each one of these models, I could do

24  what I told you about.  For each of these models

25  for each person, I could calculate the number of



                              C. O'Neil

 1

 2    hours that that model thinks they overworked, and

 3    past what they stated they worked.

 4             One of them might say, Oh, you know I

 5    could do that for all people in a period of time.

 6    And one of models might say, Oh, people understated

 7    their hours by a factor of 0.75.  And the other --

 8    another model might say, Actually they understated

 9    it on average by a factor of 0.95.

10             And then I would say, Okay, well, what's

11    closer to the truth?  I would want to look at why

12    these two different models are giving me two

13    different answers.  I would want to investigate

14    that, because they are supposed to be answering the

15    same question.  That's why I am doing four of them.

16             So they are all trying to answer the

17    same question, but from different perspectives.  If

18    they all say a similar factor, then I am going to

19    be believing it really, really well.

20        Q.    If they say materially different

21    factors?

22        A.    Then I am going to want to understand

23    why.

24        Q.    Then it -- it wouldn't be reliable in

25    terms of assigning damages?



```
 1                        C. O'Neil
 2        A.    Right.  I would want -- I would want to
 3   true them up before believing any one of them.  So
 4   it is a process.
 5        Q.    We have talked about a number of
 6   variables.  One we haven't talked about is -- do
 7   you know what Examinations Under Oath are?
 8        A.    I mean, just from TV.
 9        Q.    Fair enough.
10        A.    Isn't this one of them.
11        Q.    I think this technically would qualify.
12              Do you know what examinations under oath
13   are for investigators?
14        A.    Oh, no, I don't.
15        Q.    And I will represent to you that there
16   are certain circumstances in which investigators
17   have to ask questions of a policyholder that are
18   conducted under oath.
19        A.    Okay.
20        Q.    Do you have an understanding of how a
21   case's -- how the involvement of an EUO in any
22   investigation that was done in a case that an
23   investigator had, how that affected the data?
24        A.    Say that sentence again.
25        Q.    Yes.  Do you have an understanding of
```



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                              188

```
 1                         C. O'Neil
 2    basically the impact of whether a case required an
 3    EUO or not, what impact that had in terms of the
 4    data in the spreadsheet that we have been talking
 5    about?
 6         A.    Oh, but now that you say EUO I remember
 7    them mentioning that in the interview.
 8              So that's a great example of something
 9    that definitely takes time, and would qualify for
10    being -- that's probably one of the activities, in
11    fact.
12              So, sorry I am not -- I am just spinning
13    a little bit.
14         Q.    Sure.
15         A.    Ask the question one more time now that
16    I know what an EUO is.
17         Q.    Sure.  Do you have an understanding of
18    whether or not a case requiring an EUO, how that
19    would affect the underlying data in the spreadsheet
20    we have been talking about?
21         A.    Okay.  So if it's an activity, then it
22    would fall under that particular regression I want
23    to run that says, how many activities of each type
24    did you do?
25              And then I would have this, like,
```



                            C. O'Neil

 1
 2   coefficient for the EUO-type of activity that would
 3   be like, This takes four hours.  It's a heavy lift.
 4           And that -- that's great.  Because that
 5   would mean that going back and through the other
 6   people for the other weeks, every time somebody got
 7   a EUO, they would be rewarded with a four-hour
 8   imputed time.
 9       Q.    So -- okay.  So do you have, I guess,
10   any understanding of how many cases did or did not
11   require EUOs that, for example, a field
12   investigator would have?
13       A.    No.
14       Q.    Do you have an understanding of the
15   changes in the EUO process over time?
16       A.    No.
17       Q.    Do you have an understanding of how
18   technologically the process by which EUOs were
19   conducted changed?
20       A.    This might refer to the fact that during
21   COVID some things were done over Zoom.
22           So, yes.  So one of the things that
23   occurs -- occurs to me, and one of the plans I had
24   for this model, is that -- that there are certain
25   things that might have been special in a special



                          C. O'Neil

2   situation like COVID.

3            So if -- during that era, we could hand

4   tune the coefficient.  If it didn't take four hours

5   on average because they didn't have to drive to see

6   a person, like, you could just move it down.

7            And we would have to use testimony for

8   that purpose, to hand tune it from four hours to

9   two hours, or whatever it is.  I am just saying

10  numbers.  But it would require an actual

11  investigation.

12           But that's one of the benefits of having

13  that model that separates things out by -- by

14  activity type.

15           And also, that's the kind of thing --

16  remember when we were talking about how the

17  different models would give us slightly different

18  answers?  That's an explanation for why different

19  models would give us different answers.  Because

20  one of them will be sensitive to this, and one of

21  them won't.

22           So we will be like, Oh, wait.  Is this

23  during COVID?  It is.  Okay.  So let's believe this

24  one in this time period.

25           So we want to be as accurate as



1                         C. O'Neil

2    possible.  And different -- the fact that we have

3    four different ways of looking at it means we could

4    be more accurate.

5         Q.    I want to follow up.  And I recognize

6    you wouldn't know what an exact amount might look

7    like --

8         A.    Yes.

9         Q.    -- but you talked about hand tuning that

10   time period based on testimony.

11        A.    Yes.

12        Q.    Explain to me what you mean by using

13   testimony to hand tune?

14        A.    I would try to figure out the delta

15   between how much time does it take to do an EUO

16   when you drive there, and how much time does it

17   take to do an EUO when you do it on Zoom.

18        Q.    When you say using testimony, are you

19   proposing that you would just ask plaintiffs?

20        A.    Yes.

21        Q.    How much time did it used to take you,

22   and how much time it would take you after that

23   change?

24        A.    Well, I wouldn't ask; the lawyers would.

25        Q.    Fair enough.





CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                   192

```
 1                         C. O'Neil
 2      A.    But that would be my best guess as to
 3 how to do it.  I mean, I would be happy to do it
 4 another way.
 5           I want to find out how to tune it.
 6      Q.    Are you aware that the length of time it
 7 might take to actually conduct an EUO would vary on
 8 a number of different factors?
 9           For example, if the witness doesn't show
10 up; do you have an understanding of what has to
11 happen next?
12      A.    No.
13      Q.    Do you have an understanding of as to,
14 whether by law, GEICO is required to provide the
15 deponent a number of opportunities to show up
16 before they could pursue additional action?
17      A.    No, I don't know those rules.
18      Q.    Do you know whether some investigators
19 decide to wait, you know, ten minutes?  Or some
20 might wait two hours for an EUO?
21           Do you have an understanding as to the
22 underlying variation?
23      A.    No, all I know is that they are counted.
24           But just to be clear:  All the things
25 you just said are similar to what we were talking
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    193

```
 1                       C. O'Neil
 2   about before, with like training or meetings.  Like
 3   all these models are blind to it.
 4             But at the same time, they are, you
 5   know, in some sense incorporated into the overall
 6   time management, like the time that these things
 7   take to do.
 8        Q.    Would it impact your analysis if EUOs
 9   while, you know, constituting potentially an
10   activity or some sort of SICM entry associated with
11   them, were not actually utilized to measure the
12   productivity of any investigator?
13        A.    I -- I don't know about that.  I don't
14   know exactly how productivity is measured.  But I
15   do know, like, if it's an activity that takes a lot
16   of time and it's being kept track off; that I could
17   use that data.
18        Q.    All right.  But part of what you talked
19   about is investigators incentivizing or
20   prioritizing certain activities or tasks because of
21   the way they were rated.  Right?
22        A.    Yes.
23        Q.    So if they were not rated, if any case
24   that involved an EUO was excluded from the metrics
25   against which they were assessed, that would be
```



CATHERINE ONEIL                                             April 24, 2025
FISCHER vs GEICO                                                      194

```
 1                         C. O'Neil
 2   important to know.  Right?
 3        A.    It could be.
 4        Q.    It --
 5        A.    Yes.
 6        Q.    -- it would have an impact, a material,
 7   potential impact, on the amount of time spent on
 8   those activities.  Right?
 9        A.    Yes, it could.  It could, yes.
10        Q.    And whether those metrics are part of or
11   not part of the metrics against which an
12   investigator might be assessed, isn't contained in
13   the spreadsheet data that we have been talking
14   about.  Right?
15        A.    That's right.
16              I mean, there is also the natural human
17   fact that people don't like, actually like wasting
18   their time.  So it doesn't make that much sense for
19   me for someone to do something that just wastes
20   time.  They probably want to do it efficiently.
21        Q.    Okay.  So --
22        A.    At the end the day, like these models
23   are supposed to be estimating how much time
24   something actually took.  You know.  You know, with
25   the caveat that meetings and trainings are somehow
```

CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                              195

                          C. O'Neil

1
2    embedded into these measurements as well, because
3    they just happen sometimes.
4              But you know, if the EUO took many, many
5    hours to do, like, they are not doing that for fun.
6    They are doing it because it's part of their job.
7         Q.    I guess I -- we can move on.  I don't
8    think it's necessary.  I am not appreciating maybe
9    the material distinction there that you are trying
10   to draw.
11        A.    Sorry.
12        Q.    No, that's okay.  I don't want to go
13   down a rabbit hole.  Trying to be as efficient as
14   possible, so it's okay.
15             But I guess generally, whether it's EUOs
16   or it's police reports, for example, the length and
17   complexity of a police report will necessarily, you
18   know, vary the amount of time that it takes to
19   review and, you know, do the activity.  Right?
20        A.    Are you saying that that activity,
21   getting a police report, has variability?
22        Q.    Not getting, although getting as well.
23   I was talking about actually reviewing and you
24   know, doing the investigating as to the content of
25   it, for example.



                              C. O'Neil

1

2       A.    I think all -- I think all of the

3   activities probably have variability, yes.  But at

4   the same time, they are categorized the way they

5   are for a reason.

6       Q.    Right.  And your model or the regression

7   analysis that you are proposing or analyses,

8   wouldn't account for changes in an individual

9   investigator's productivity over time, for example?

10      A.    Depending on how long of a, you know --

11  you know, if they got more productive and less

12  productive, and more productive and less

13  productive, it would even out.  Right?  As I was

14  saying earlier.

15      Q.    But similarly, just as an

16  investigator -- as they get more experience, they

17  get more and more productive and more efficient;

18  that would introduce you know, substantial error

19  potentially, when applied to that individual?

20      A.    It would certainly change their numbers

21  according to my model, yes.

22      Q.    It would change their numbers.  But it

23  wouldn't accurately reflect the number of hours

24  that they actually worked if you were to do an

25  individual analysis.  Right?



```
 1                        C. O'Neil
 2       A.    It depends on the situation exactly.
 3             But to your earlier point:  A person who
 4   is extra efficient is going to be overrewarded by
 5   my model, than someone who is inefficient will be
 6   underrewarded for the hours they actually worked.
 7             So if that's the same person in
 8   different eras; it could even out, it could not.
 9       Q.    Okay.  Similarly, your model wouldn't
10   account for differences across individual -- like
11   different individual investigator's productivity.
12   So one person is going up, one person is going
13   down, but your model is applying an average?
14       A.    Right.
15       Q.    It wouldn't account for that?
16       A.    Right.
17       Q.    It also wouldn't account for changes,
18   let's say, to the nature of the individual
19   investigator's work over time.
20             So let's say, for example, someone is
21   experienced and they start getting the real hard
22   and more complex cases.
23             Are you following?
24       A.    Well, I am following.  But if those more
25   complex cases were categorized differently, in the
```



                              C. O'Neil

 1
 2   categorization that I have, then I would be able to
 3   keep tabs on that.
 4        Q.    That's fair.  If they weren't
 5   categorized differently though --
 6        A.    Right.
 7        Q.    -- the model wouldn't capture those type
 8   of changes to the nature of their work.
 9        A.    That's right.
10        Q.    Are there any variables that you would
11   exclude from your regression model?
12        A.    There is a lot of variables I didn't
13   choose to use.  Is that what you mean?
14        Q.    In part, I guess.
15              Yes.  Is there a data, a piece of data
16   or variable that is available to you that you
17   choose to exclude, based on how you instruct --
18   constructed your model?
19        A.    Well, sure.  Like, the ratios are not as
20   useful to me as the raw numbers.
21        Q.    In terms of things like productivity,
22   you are talking about?
23        A.    There is a lot of different ratios in
24   that spreadsheet.  And I was like, I want the
25   numbers; I don't want the ratios.



                             C. O'Neil

1

2          Q.    Okay.  Let's talk very slightly about

3     testing.

4                How can you test your model to ensure

5     its accuracy?

6          A.    Well, once I trained it in the baseline,

7     I could do -- I could ask my model, like, What is

8     the average imputed number of hours for people

9     during baseline?

10               And I better come up with the number I

11    started with.

12         Q.    But I guess I will ask it slightly

13    differently.  There is no way for your model to

14    actually capture, to confirm that your model

15    captures the actual number of hours that an

16    individual worked in a workweek?

17         A.    Right.  It's an estimate.

18         Q.    Okay.  So -- and it doesn't capture

19    that, but it's not possible for it to actually --

20    for you to test it, to confirm that for this

21    individual in this workweek, they worked this many

22    hours, and the model comes up with that many hours

23    as well.  Is that right?

24         A.    That's right.

25         Q.    Are you aware of any periods of time



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                     200

                              C. O'Neil

1
2    where that is possible?

3         A.    I mean, the sanity check, as we say it

4    in the business, is, you know, you started with an

5    assumption that -- let's say during baseline, they

6    claim to have been actually working 55 hours a week

7    on average.  So impute everybody's time during that

8    time period, and make sure it averages out to 55

9    hours a week.  That's -- that's like the most basic

10   check that you are getting the right basic kind of

11   number.

12        Q.    If there was a -- sorry, did you?

13              If there was a period of time in which

14   overtime was permitted by GEICO, you would agree

15   that if investigators are working those hours, that

16   they would be incentivized to actually get paid for

17   them by GEICO.  Right?

18        A.    Sure.

19        Q.    So if there was a period of time in

20   which you had this data for that investigators are

21   claiming to work for in excess of 40 hours a week,

22   you know, whether that's 50 or 60 or 70 hours a

23   week, you would expect the data to show reported

24   hours greater than what they normally would work if

25   overtime were permitted.  Right?



```
 1                        C. O'Neil

 2         A.    Yes.

 3         Q.    If it didn't show that, you would agree

 4    that it's unlikely those investigators were

 5    actually working those hours.  Right?

 6         A.    Well, it's certainly -- my estimate

 7    would not show that.  Yes.

 8         Q.    Beyond your estimate, if I am allowed to

 9    put in for overtime but I didn't put in for

10    overtime, and I am now saying I was working

11    overtime; that doesn't logically make sense.

12    Right?

13               If I am able to be paid for it, I would

14    put in for it.

15               MR. SCIMONE:  Objection.

16         A.    You know, I don't think it's really a

17    math question because it's about the politics of

18    situation of asking your boss for overtime.  Even

19    if you are technically allowed, it may be a bad

20    situation with your boss and they are not going to

21    want to say yes.

22         Q.    But it's also possible you don't have to

23    ask your boss.

24         A.    It is possible.  I just don't know the

25    situation.
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    202

```
 1                           C. O'Neil

 2        Q.    As a data point, we talked earlier about

 3   corroborating the baseline.  Right?

 4        A.    Yes.

 5        Q.    That would be a point of corroboration

 6   that would either confirm or cut against whether

 7   these claimed hours are actually being worked.

 8   Correct?

 9        A.    Yes.

10              MR. SCIMONE:  Do you have a sense of how

11         much longer we are going to go?

12              We are about 2:30.

13              MR. TSONIS:  Tell you what.  Why don't

14         we go on break.

15              THE VIDEOGRAPHER:  The time is 2:26 p.m.

16         We are going off the record.

17              (Recess taken.)

18              THE VIDEOGRAPHER:  The time is 2:43 p.m.

19         We are back on the record.

20        Q.    I want to talk about Exhibit 2 a little

21   bit more, your declaration.  A couple of areas that

22   we haven't discussed yet.  The first is in

23   paragraph 13.

24              So we talked about the various

25   regressions that you proposed.  After the first
```



```
 1                    C. O'Neil
 2   full sentence, which addresses that point, you see
 3   it says, "Ultimately, I might take the average
 4   across the various workload estimates."
 5        A.    Yes.
 6        Q.    As we have been discussing today, you
 7   seem to be talking a lot more definitively about
 8   using your discretion to come up with a number that
 9   you would apply with your model, but here you
10   write, you might.
11        A.    Yes.
12        Q.    Is it something that's a potential
13   option, or something that you would actually do, is
14   combining different regressions?
15             In other words; might you take only
16   single regression and apply that?  Or will you take
17   multiple and combine them?
18        A.    The answer is:  I could go either way,
19   and I would have justification in any case.  Like,
20   I would choose it for a reason.
21             So remember when we talked about
22   social -- was it EUOs -- being on Zoom.  And we
23   were like, Okay, in that case, we can hand
24   adjust -- hand tune, like, the number of hours
25   presumed to imputed to take for an EUO during
```



                          C. O'Neil

1

2    COVID.  And that case, I would possibly actually

3    have an argument for trusting that hand-adjusted

4    regression more than the other regressions which

5    are blind to that change.

6              Whereas outside of COVID, I might say,

7    Well, they are all a little bit different, but they

8    are all giving me basically the same story.  I

9    don't have a reason to believe this model more than

10   that model, so I am going to take the average.

11        Q.    Okay.  So would it be accurate, I guess,

12   or more accurate to say; there are certain limited

13   time periods for which you may take a single -- or

14   apply a single regression?

15        A.    Yes.

16        Q.    But otherwise, you would be applying

17   multiple regression?

18        A.    I would say the average answer, yes.

19        Q.    Okay.

20        A.    I mean, my go-to is to take the average

21   because it -- it's like four different opinions;

22   you want to average them.  That's the statistical

23   thing to do.

24              But in a certain situation for a certain

25   time period, for example, you might actually have



```
 1                      C. O'Neil
 2    good reason to believe one over the other, and then
 3    you would go there.
 4               But I would justify it all.
 5         Q.    Okay.  In paragraph 15, you talk about,
 6    you know, ultimately that these analyses are a way
 7    to estimate workloads despite fluctuations over
 8    time.  You write that in the first sentence.
 9    Right?
10         A.    Yes.
11         Q.    And you say, "Based on" -- in the second
12    sentence.  "Based on special investigators'
13    testimony, one would expect to see that class
14    members' workload generally increased from 2017 to
15    the present, even when accounting for variations in
16    the work process, type of cases handled, or
17    supervisor, while reported hours of work stayed
18    flat."
19         A.    Yes.
20         Q.    So what specifically in special
21    investigators' testimony leads you to expect that
22    the workload would generally increase from 2017 to
23    the present?
24         A.    I mean, just the conversation we had.
25    You know, it may -- you know, if you got more
```



```
 1                    C. O'Neil
 2   than -- like, when I started, I got ten to 12
 3   cases.  Then it was 15 to 20.  Then I got 70 cases
 4   in 2020, so there was like this increase.
 5             But by year --
 6      Q.    Right.  But you know, this sentence that
 7   we just read doesn't say 2017 to 2020.
 8      A.    You are right.
 9      Q.    It says 2017 to the present.
10      A.    You are right.
11             Actually, what I would love is the data
12   from 2010 or even before 2010, because -- because
13   Keith said things were good until 2010.  Well, I
14   would love to have data from before 2010 because
15   that would be another sort of touchstone of ground
16   truth.
17             You know, you would have -- it sounds
18   like to me, like I could actually believe the
19   stated time before 2010.  That would be another way
20   of sort of checking.  But yeah --
21      Q.    I didn't mean to cut you off.  I
22   apologize.
23             I was going to say:  Do you think that,
24   you know, it's likely that there had been
25   significant changes, both in terms of technological
```



```
 1                          C. O'Neil
 2   process from 2010 to 2025 that would make that
 3   comparison during that time period sort of an
 4   apples to oranges comparison?  In layperson's
 5   terms?
 6        A.    Absolutely, there would be changes.  But
 7   on the other hand, I can adjust for changes if I
 8   understand them.
 9        Q.    Well, let's talk about that because you
10   continue here, after that sentence, you say, "If
11   the analysis here, described here, shows that
12   measures of workload grow consistently while hours
13   are flat, that would strongly support an inference
14   that the number of hours reported in the workweek
15   are an undercount of actual time worked.  At a
16   basic level, if we see that the workload doubled,
17   we would expect the hours to double as well.  And
18   if GEICO's payroll does not reflect that expanded
19   time, then one could infer the amount of unpaid
20   hours based on the analysis described above. "
21        A.    Right.
22        Q.    So let's talk for a second about that
23   second sentence.
24              "On a basic level, if we see that the
25   workload doubled, we would expect the hours to
```



```
 1                          C. O'Neil
 2     double as well."
 3             Right?  So let's talk about the COVID
 4     time frame, for example.  You recall throughout the
 5     course of the day that we talked about field
 6     investigators and part of their work time being --
 7     driving from their home out to the field, and then
 8     ultimately back home again.  Right?
 9        A.    Yes.
10        Q.    And you understand, at least for certain
11     people like Michael Reed, for example, that
12     constituted a significant portion of their workday?
13        A.    Well.  He did tell me it took a long
14     time when he did it.  I don't know if it happened
15     every day, but yes, it did take three to four hours
16     sometimes he said.
17        Q.    And similarly, I know you are not a
18     New York resident.
19        A.    I used to be.
20        Q.    But you can imagine in traffic, it could
21     take many hours to drive from one part of New York
22     City to another part of New York City.  Right?
23        A.    Absolutely.
24        Q.    So given that drive time, there is at
25     least potentially a significant amount of the time,
```



CATHERINE ONEIL                                                  April 24, 2025
FISCHER vs GEICO                                                          209

                              C. O'Neil

1

2    the work time that was spent, you know, in the

3    preCOVID time period, do you have an understanding

4    of how COVID affected the investigator's presence

5    in the field in March of 2020?  For example?

6         A.    I don't have a, like, intricate

7    understanding.  This is something I would want to

8    have, I would want to learn more.

9         Q.    If you learn that GEICO prohibited its

10   field investigators in going out into the field in

11   almost all circumstances, that would lead to a

12   significant amount of time on a daily basis that

13   investigators would in our -- not be in a vehicle

14   driving.  Right?

15        A.    Yes.

16        Q.    And would you expect that that time

17   would be filled by additional workload; right?

18        A.    Yes.

19        Q.    So in such a circumstance, for example,

20   the statement, That if the workload doubled, that

21   we would expect the hours to double as well, would

22   not actually be the truth.  Or would not actually

23   be accurate.  Right?

24        A.    Yes.  And that's -- I mean, to be clear,

25   like that was, I said, at a basic level.



```
 1                        C. O'Neil

 2              So maybe I should have said, All other

 3    things being equal.  But I meant to sort of say at

 4    a high level, you know, in general, intuitively, if

 5    the workload doubles, your hours might double.

 6    Right?

 7              But you are absolutely right.  A

 8    workload could look like it's doubling, but the

 9    type of work and the conditions of work changed, so

10    it's not actually doubling.  Absolutely.  And

11    that's why I am doing all this, but -- because I

12    want to get it right.

13        Q.    Even the sentence before, you say, If

14    the analysis shows that the measure of workload

15    grows consistently while hours are flat, that would

16    strongly support an inference that there is an

17    undercount of the actual time worked that is being

18    reported.

19              But in the circumstance we describe,

20    that wouldn't necessarily be the case.  An increase

21    of workload would be a substantial portion of the

22    field investigator's time no longer occupied by

23    driving a vehicle.  Right?

24        A.    To be clear:  In that sentence, I am

25    using workload to take into account the fact that
```



                         C. O'Neil

 1
 2     the type of work might be changing.
 3              I don't want to quibble about this, but
 4     what I meant by workload, because, again, we are
 5     measuring in four different ways, we are trying to
 6     get it right, so we really mean the number of
 7     hours; not the number of cases.  Right?  The
 8     cases --
 9              MR. SCIMONE:  Please let her finish.
10         Q.    You can finish.
11         A.    So what I mean when I say workload
12     there, because the measures of workload, it's
13     supposed to imply like this carefully constructed
14     thing where we actually auto tuned to COVID, and we
15     are actually trying to measure the workload in four
16     different ways and trying to get it right.
17              If that's growing consistently and the
18     hours are flat, then that's evidence that there is
19     work that wasn't paid for.
20              And I think that's an accurate
21     statement.
22         Q.    In this sentence, you used the terms
23     workload, hours reported, and actual time worked.
24         A.    Yes.
25         Q.    And those are three distinct concepts in



CATHERINE ONEIL                                              April 24, 2025
FISCHER vs GEICO                                                        212

```
 1                    C. O'Neil
 2   this sentence.
 3            And it sounds like -- like now, correct
 4   me if I am wrong, you are saying workload really
 5   meant actual time worked?
 6        A.   Maybe if I could suggest imputed --
 7   imputed hours.  So those are really different,
 8   these are three different notions.
 9            So when I say measures of workload, I
10   mean our measures of workload.  The ones we are
11   imputing the numbers of hours worked in four
12   different ways.  So they are -- they are statistics
13   we are coming up with, whereas the true number of
14   hours worked is something that happened, but we
15   can't really measure directly.  And then the stated
16   number of hours worked are in the time sheets.
17            Those are three different things.
18        Q.   Okay.  So I guess I am trying to
19   understand.  When you say workload, you know,
20   workload is growing while hours are flat.  And you
21   mean reported hours.  Right?
22        A.   Yes.
23        Q.   So workload is growing.  And by workload
24   you mean, you know, I -- I am just trying to get an
25   understanding of what you mean.
```



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                              213

```
 1                          C. O'Neil
 2              I guess the way I interpreted it when I
 3    read this, is that you were referring to
 4    paragraph 7.  The specific kinds of work done by
 5    special investigators could be measured in
 6    different ways.  Which is that (a) through (f) that
 7    we talked about at length today.
 8        A.    Right.  So it could be measured in
 9    different ways, and we are going to measure it in
10    four ways and going to be careful about it.
11              And once we have measured it, it's going
12    to be in terms of hours.
13        Q.    So when you say measure it four ways,
14    what are the four ways that you are referencing the
15    four -- the four regressions?
16        A.    Right.
17        Q.    But which specific regressions?
18              Because I see number 7 here, we have
19    (a), (b), (c), (d), (e), (f).  There is six.
20        A.    Yeah, yeah in 13, cases closed,
21    investigative activities -- I really -- I should
22    have said by type.
23              Investigative activities, disposition
24    type or features impacted.
25              So those are the four regressions.
```



```
 1                         C. O'Neil

 2              There are six in paragraph 7, but two of

 3    them are dumber, less granular.

 4              One of the first, very first one, is

 5    just the number of cases closed; the number of

 6    features investigated.  We could do those two, but

 7    they are not as granular and therefore not as

 8    useful to us.  So I discarded them for like the

 9    actual plan for paragraph 13.

10              I'm sorry if that was confusing.

11         Q.    It's not.

12              So if I understood your testimony, now

13    you are saying cases closed and investigating a

14    feature would not be regressions that you would

15    run?  The other four that are listed in

16    paragraph 7?

17         A.    That's right.  The cases closed would

18    just be an average.  It would just be a single

19    number.  The answer would be a single number.

20    Right?  It would be a pretty dumb regression.  So

21    we wouldn't do it.

22         Q.    I guess I am confused.  In paragraph 13,

23    you talk about multiple ways of investigating

24    workload, the different measurements.  And you say,

25    For example, cases closed.
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    215

```
 1                          C. O'Neil
 2        A.    Yes.   I should have said, Cases closed
 3   by type.
 4        Q.    Okay.   So this paragraph 13, in that for
 5   example sentence, should say, Cases closed by type?
 6        A.    Yes.
 7        Q.    Okay.   So you also, I guess, want to add
 8   I suspect to paragraph 7, that just because
 9   measuring -- measuring closing a case and
10   investigating a feature can be done, that they
11   wouldn't be useful in this case?
12        A.    Yes, fair enough.   They wouldn't be
13   useless, but they wouldn't be as useful as the more
14   granular ones.
15        Q.    So going back though to this sentence
16   that we looked at in paragraph 15, around, you
17   know, workload growing while hours being flat
18   strongly supports an undercount of actual time
19   worked.
20             So we talked about things like no
21   fieldwork.   Right?   You would agree though that
22   workload or the measures of workload could grow,
23   but technological advancements could not
24   necessarily lead to an undercount of actual time
25   worked.   Right?
```



                              C. O'Neil

 1

 2      A.    So -- yes.  There was an -- I can't

 3   remember when I learned this.  Was it during the

 4   interview with these people?  I don't remember.

 5            But I heard at some point that they did

 6   social media checks, but then they got a service to

 7   help them do social media checks, so it got more

 8   efficient.

 9      Q.    Sure.  So that's a good example.

10      A.    That's a great example.  So that would

11   be a hand-tuned parameter.

12            Sorry to interrupt.

13      Q.    That's okay.  So something like EUOs

14   being done via Zoom could make the process more

15   efficient.  Right?

16      A.    Yes.

17      Q.    Similarly, a vendor being utilized to do

18   a certain number or type of social media

19   investigations would also be something that leads

20   to more, you know, efficient process, and

21   ultimately not an increase in the number of hours

22   that investigators worked.  Right?

23      A.    Correct.

24      Q.    When -- you talked at length about hand

25   tuning this.  And I know earlier you testified, you



C. O'Neil

1
2    know, you would use the plaintiff's testimony or
3    the special investigator's testimony.
4              Is your model essentially reliant on the
5    plaintiffs in this case just telling you their best
6    recollection of what was going on in these time
7    periods?
8         A.    Well, no.  I mean, it's just reliant on
9    getting a good factor for that particular hand
10   tuning.
11             So something GEICO probably has.  GEICO
12   probably said, you know, Before we did this, it
13   took our investigators three hours on average, but
14   after we use this vendor, it's a half an hour.
15             I would love to hear that.  Then I would
16   use that factor of 6 to hand tune my coefficient.
17        Q.    Sure.  But I guess, you know, I am
18   thinking through the most limitless ways.  Right?
19   That a work environment might change for a large
20   group of people over a period of multiple years.
21   Right?
22        A.    Yes.
23        Q.    So the vendor point that you noted just
24   now, you know, you recall that someone had
25   mentioned it.  Right?



1                           C. O'Neil

2              I guess I am trying to explore what

3     happens if someone doesn't mention it, or someone

4     doesn't remember the time period that it took

5     place?  Like, your model is essentially reliant on

6     the plaintiffs to fill in gaps for things that have

7     changed.  I mean; is that accurate?

8         A.    That's accurate.

9              But I would point out that if I forgot

10    to put in an adjustment for the social media thing,

11    then they would be underpaid for that.

12             If we had a baseline that is recent,

13    where it would -- at the moment where it's

14    efficient, then I would be underpaying them in my

15    model for the previous era, where it was less

16    efficient.  Right?  So it doesn't always go their

17    way.

18             If we forget -- in fact, in general,

19    things get more efficient.  So if we forget to do

20    stuff, it's actually to the detriment of the

21    plaintiffs.  Typically.

22        Q.    And your reasoning for saying that is

23    because things tend to get more efficient?

24        A.    Yes.

25        Q.    But there are various inefficiencies



```
 1                      C. O'Neil
 2    that this is already introduced into a work force.
 3    Right?
 4              For example, if GEICO, you know,
 5    completely reorganized SIU leadership and the
 6    organizational structure of that part of the
 7    business, that would have a negative impact on
 8    efficiency.  Right?
 9         A.    I would hope not.
10         Q.    You don't think a corporate
11    reorganization with communication changes,
12    shuffling of job responsibilities and changes would
13    potentially introduce inefficiencies?
14         A.    For some period; maybe, yes.
15         Q.    And if I am an investigator and I have
16    got a new supervisor, you know, starting next week,
17    and that supervisor wants things done differently,
18    that's going to introduce inefficiencies.  Right?
19         A.    But that happens during baseline too.
20    So anything that happens during baseline is already
21    sort of baked into the model.  Including reorgs.
22         Q.    Right.  But if I had more supervisory
23    changes or more changes that introduce
24    inefficiencies, then that would have, again, just
25    similar to what we talked about before on that
```



CATHERINE ONEIL                                              April 24, 2025
FISCHER vs GEICO                                                        220

```
 1                        C. O'Neil
 2    average, and so it would impact and overstate the
 3    number of hours that I allegedly worked.  Right?
 4         A.    Yes.
 5         Q.    Okay.  But ultimately, this statement
 6    that at a basic level, workload doubles, we would
 7    expect hours to double as well, you are not
 8    expecting that that is what the -- or excuse me.
 9              It's not your opinion that the data
10    shows that.  Right?
11         A.    No.  I don't know what the data is going
12    to show.
13         Q.    Is this sentence, at a basic level, you
14    know, is that an opinion that you are offering
15    here?  Or is that just context in your declaration?
16         A.    That's context.
17         Q.    Okay.  But it's very possible that we
18    would see, you know, an increase in workload, but
19    not a commensurate increase in the number of hours,
20    given potential changes in the amount of time spent
21    in the field, technological changes, process
22    improvement and the like.  Right?
23         A.    Well, now you are using the term of art
24    that I am trying to define.  The work -- the
25    measure in workload is our estimates of the number
```



                              C. O'Neil

2   of hours.

3          So if we see a number -- our measurement

4   of the number of hours going up and the stated

5   hours staying flat; then I do think that implies

6   unpaid hours.  More unpaid hours.  I think --

7      Q.    But it could also --

8          MR. SCIMONE:  Please let the witness

9      finish.  Go ahead.

10     A.    I think what you meant to say is like

11  the stated number of cases going up, which is a raw

12  number; that's not what I call work-measured

13  workload.  It's just a raw number.

14          The number of cases, the number of cases

15  go up, and the hours stay flat; anything could be

16  happening.  COVID could be happening and people are

17  just more efficient because of new regime.

18          So I don't want to put words in your

19  mouth, but I think that's what you are implying.

20          And I agree with that estimate.

21     Q.    Nor do I want to put words in your

22  mouth.  But even if you can see an increase or

23  change in case type, that doesn't imply an increase

24  in hours worked.

25          If for example, social media cases go



```
 1                      C. O'Neil
 2   up, but the process, you know -- or field cases
 3   could, excuse me, go up, close -- in the amount
 4   closed.  But that's because you are no longer
 5   spending, you know, three to four hours -- if you
 6   are Mike Reed, driving to and from various parts of
 7   Buffalo.  Right?
 8        A.    Yes.
 9        Q.    So it would vary, essentially, for each
10   individual person, depending on their
11   circumstances.  If they had those changes, it would
12   have impacted those changes.  Right?
13        A.    Yes.
14        Q.    Besides what we talked about today, are
15   there any other changes that you would like to make
16   to your declaration?
17        A.    Well, I thought about, you know, your
18   correct observations about somebody who is
19   consistently more efficient would get overpaid for
20   the hours they worked.  And it is possible to
21   adjust for that.
22              An individual level in baseline, if
23   someone consistently does -- remember the sanity
24   check?  Where as one of the things you want to make
25   sure about this model once you built it is that on
```



```
 1                      C. O'Neil
 2   average, people are actually working 55 hours a
 3   week or whatever that number is.  But maybe some
 4   guys are working -- imputed working 58 hours a
 5   week, so they are a little bit more efficient
 6   during the baseline.
 7           So it is possible to have individualized
 8   adjustment factors for efficient people and
 9   inefficient people.
10      Q.    And to do those adjustments, would you
11   need to review your model and the data, sort of on
12   a person-by-person basis?
13      A.    No, no, no.  It's a formula that would
14   work for everybody.  It would -- like everyone
15   would get the same formula for the -- this would
16   just be part of the calculation of damages.
17           Not -- it wouldn't change the model; it
18   would just be like an extra little factor in the
19   calculation for damages.
20      Q.    What do you mean, one extra little
21   factor for the calculation of damages?
22      A.    So the damages calculation would be what
23   I just -- what I said already, times an
24   individualized efficiency number.  Which could be
25   like 0.15, if somebody is 15 percent more efficient
```



CATHERINE ONEIL                                    April 24, 2025
FISCHER vs GEICO                                            224

```
1                      C. O'Neil
2    during baseline than the average.  Or 0.85 is
3    somebody is 85 percent as efficient as the average
4    in baseline.
5         Q.    Right.  So I guess my question is:  To
6    determine if they are 0.15 or 0.85, you would need
7    to be looking at that individual's data and their
8    data and the spreadsheet, for example, to determine
9    whether or not they are more or less efficient.
10   Right?
11        A.    Yes.  But I am -- that's what I am doing
12   already for the damages calculation.
13        Q.    Right.  But you would have to identify
14   those individuals by looking at their data before
15   you could apply any kind of adjustment.  Right?
16        A.    Yes.
17        Q.    So you could only identify those
18   individuals by looking at their individualized
19   data.  Right?
20        A.    Yes.
21        Q.    So aside from that side piece, are there
22   any other revisions that you propose to make to
23   your declaration?
24        A.    No.
25             MR. TSONIS:  All right.  I have no
```



                              C. O'Neil

 1

 2       further questions at this time.  Thank you.

 3              MR. SCIMONE:  Let's go off the record.

 4              THE VIDEOGRAPHER:  The time is

 5       3:08 p.m..  We are going off the record.

 6              (Recess taken.)

 7              THE VIDEOGRAPHER:  The time is

 8       3:15 p.m..  We are back on the record.

 9   EXAMINATION BY

10   MR. SCIMONE:

11       Q.    All right.  Ms. O'Neil, I just have a

12   few questions to clarify some of your testimony

13   today.

14              First of all, if you could just look at

15   Exhibit 2, your declaration, and turn to

16   paragraph 6.

17              Before we look at that, I will just ask:

18   You have said a couple of times today that there

19   are different ways you could build the model you

20   have described here; is that right?

21       A.    Yes.

22       Q.    And you say in paragraph 6 here, that

23   "The details of my anticipated report are subject

24   to a review of evidence."

25              Is it fair to say then that essentially



CATHERINE ONEIL                                     April 24, 2025
FISCHER vs GEICO                                              226

```
 1                        C. O'Neil
 2   what you are saying is:  You could iterate, based
 3   on what you learned about the facts of the case,
 4   data, or other information that might arise,
 5   including some of the hypotheticals that counsel
 6   posed to you today?
 7            MR. TSONIS:  Objection to form.
 8       A.   Absolutely.  I mean, all -- all
 9   modelling is iterative, actually.
10       Q.   So you have talked a little bit about
11   different lenses.  A couple of times you used that
12   term.
13            Can you just explain what you mean by
14   that?
15       A.   Yes.  When I referred to the four
16   different linear regressions I want to run,
17   there -- I think of them as:  How do I allocate
18   time in sort of the toy universe?  There are four
19   different, sort of, toy universes I have been
20   referring to them at different directions, at
21   getting at the workload measurements.
22            And one of them is like, let's look at
23   it as time allocated to cases by type of case.  And
24   another one is time allocated to investigations by
25   type of investigation.  And so on.
```



CATHERINE ONEIL                                       April 24, 2025
FISCHER vs GEICO                                              227

```
 1                        C. O'Neil
 2              So it's the lens.  When I say "lens," I
 3    mean like investigation type, case type,
 4    disposition type.  Those are the lenses.
 5         Q.    Is it more accurate to have more lenses
 6    to look at the data, rather than fewer?
 7         A.    I think it gives you a fuller story.  It
 8    allows you to do the tuning I was referring to.
 9              And when it's appropriate, it allows you
10    to look for explanations.  If there is
11    discrepancies and the models are telling you
12    different things, you can say why, and then you can
13    go back and look for more descriptions, or more,
14    you know, more information.  Whether that's
15    plaintiff's testimony, or asking GEICO for more
16    data, or even figuring it out in some third-party
17    way.
18              I mean, the way I think about data
19    science in general is that it's quantifying what is
20    already known by experts.
21              And so I am just -- I am not an expert
22    in this domain of investigation, but I am -- I will
23    be seeing quantifications of things.  And so I want
24    to -- I want to, as I said a bunch of times, I want
25    to see them in four different ways.  So that if
```



```
 1                        C. O'Neil
 2   there is inconsistencies, I can go to the experts
 3   and say, Can you try to explain this inconsistency
 4   to me.
 5        Q.    And the experts you are talking about
 6   here; the subject matter experts who know about the
 7   job?
 8        A.    Yes.
 9              MR. TSONIS:  Objection to form.
10        A.    Whether it's the investigators
11   themselves or GEICO.
12        Q.    Okay.  So let's talk about a couple of
13   the variables that have come up today.  One that we
14   have talked about a little bit is the difference
15   between field investigators, or desk investigators,
16   or major case investigators, or some other
17   category.
18              Do you have an idea of how you would
19   handle the potential differences between those
20   groups, so that you are not just looking at sort of
21   all of them -- well, how would you handle the
22   differences between those groups?
23        A.    It's hard for me to say, without knowing
24   more about the data.
25              I know it seems that I know a lot more
```



1                          C. O'Neil

2    about the field investigator data and how they were

3    tracked by management, and it was a really useful

4    way for me to build these different models.  I

5    would have to know a lot more about how the desk

6    investigators were tracked by the managers at

7    GEICO, but I -- presuming they are being tracked or

8    they have been tracked, I think I can probably

9    develop a similar type of model with a similar

10   methodology.

11        Q.    So similar methodology, but potentially

12   a different model for a different category?

13              MR. TSONIS:  Objection, form.

14        A.    Potentially.  Potentially a different

15   model.

16              But the idea, again, would be to try to

17   measure their workload over time and compare it to

18   some baseline, and then try to extrapolate the

19   differences.

20        Q.    Another example of a significant

21   variable that came up today was COVID.  Obviously

22   things were different during COVID than they were

23   either before or after.

24              And so we talked about how you would --

25   although you said in your declaration that if



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    230

```
 1                         C. O'Neil
 2   workload doubled, you would expect hours to double;
 3   it's probably more complex than that.
 4              So as to COVID, you would want to get a
 5   better handle on the information.
 6              Do you recall that testimony?  Better
 7   handle on what caused things to vary?
 8              Do you recall that?
 9        A.    Yes.
10              MR. TSONIS:  Objection to form.
11        Q.    Did I state -- summarize that
12   accurately?
13        A.    Well, let me put it this way:  Around
14   COVID, I would want to learn quite a bit more about
15   how the processes changed.  So, and I would
16   hopefully be able to autochange the model to adjust
17   for it.
18        Q.    Do you remember the hypothetical counsel
19   posed where if during COVID, people were not
20   allowed to go into the field at all, that would
21   eliminate all drive time?
22        A.    Yes.
23        Q.    I would like to direct you to Exhibit 3,
24   the interview notes.  And on the first page, if you
25   just look -- these are five bullet points up, it's
```



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                  231

```
 1                      C. O'Neil
 2    the sub-bullet.  And this is under some notes about
 3    Mike Reed.  And it's the part that begins in
 4    May 2020.
 5              First of all:  May 2020 would have been
 6    during the COVID lockdown period.
 7         A.   Sorry, is this on Page 1?
 8         Q.   Yes.
 9         A.   Yes, I see it.
10         Q.   So May 2020, we are talking about the
11    COVID lockdown time?
12         A.   Yes.
13         Q.   Just -- he says here, "In May 2020, I
14    got 70 cases.  Average case is three hours
15    including set up, plan of action, et cetera.  That
16    three hours does not include extra work like
17    chasing people."
18              How does that affect your thinking how
19    you look at COVID time?  If at all?
20         A.   Well, I mean, it might have actually
21    been harder in certain ways to get the attention of
22    people during COVID, because everybody was going
23    through trauma and probably didn't answer their
24    phone to investigators from GEICO.
25              I know I was hiding and drinking a lot
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                    232

```
 1                        C. O'Neil
 2   of wine.
 3        Q.    Fair enough.
 4             If you look just above that, where he is
 5   talking about what his sort of typical case load
 6   was.
 7             He says when he started, you got ten to
 8   12 cases per month.  And then he says later on, it
 9   was 15 to 20 cases a month to get a report card 5.
10   Now it's 25 to 30.
11             And then it's right after that he says,
12   in COVID, during COVID, during May of 2020 he got
13   70 cases.
14        A.    Yes.
15        Q.    Does that give you a little bit more
16   sort of background for what might have been
17   happening with the three-hour time and how that --
18        A.    Yes.
19             MR. TSONIS:  Objection to form.
20             You can answer.
21        A.    Well, it -- it's specific enough that I
22   could -- I could estimate how many -- how much work
23   he was assigned in May 2020 because he is telling
24   me how many cases he got.  He is telling me a
25   baseline of how much it took -- how much time it
```



```
 1                        C. O'Neil
 2   took.  And then he is saying, plus waiting around
 3   for people to call me back or answer their phone.
 4   Or whatever.
 5        Q.    So in this last part, before the May
 6   2020 comment where he said that now it's 25 to 30.
 7   Let's suppose hypothetically that's the average
 8   case load before COVID and --
 9        A.    Right.
10        Q.    -- and then in May of 2020, that goes up
11   to 70 cases.
12        A.    Right.
13        Q.    You would have drive time eliminated, if
14   he is not going out into the field.
15              On the other hand, he is also saying
16   each of those cases requires three hours of set-up
17   time.
18        A.    Right.
19        Q.    Does that refresh your recollection what
20   was going on in this interview?
21        A.    For sure.  I mean, what -- it occurs to
22   me is just looking at these numbers, is that the
23   number of cases being assigned preCOVID went sky
24   high during COVID, and then came back down?
25        Q.    So can you think -- sorry, go ahead.
```



1                           C. O'Neil

2              Is there anything that occurs to you how

3    you would tune your model based on that

4    information?

5              MR. TSONIS:  Objection to form.

6         A.    Well, I mean.

7              MR. TSONIS:  Go ahead.

8         A.    It -- I think what is clear from this

9    context is that GEICO was giving out lots of cases

10   during COVID and expecting them to be super easy

11   because there was less driving.

12             But they weren't taking into account --

13   at least this is how he is thinking about it, I

14   think, they weren't taking into account that there

15   is a lot of other things that happened as well as

16   the driving.  There is also the setting up, the

17   plan of action.  There is a lot of writing.  And so

18   the 70 cases was way too much.

19        Q.    So when we talk about establishing

20   baseline truth and then using that to extrapolate

21   using your model, would it help if you had

22   estimates of hours from the people who testified

23   during COVID, and not during COVID?

24             So for example, if they gave different

25   estimates of hours for those two time periods,



                                C. O'Neil

 1

 2    would that help you get to a more accurate model

 3    that accounts for changes between those two time

 4    periods?

 5          A.    Absolutely, yes.  I mean, and there is

 6    two ways of going about that.

 7                We could ask them, During COVID -- well,

 8    how much did you work on average?  How many hours a

 9    week?

10                Or we could say, What was the difference

11    between this activity postCOVID and this activity

12    during COVID?

13                And we could do that for each activity.

14                But, you know -- or we could do all of

15    that and then see if we get kind of the same

16    adjustment for COVID, which would be my preferred

17    way of doing it.

18                Again, so that's a great example of how

19    data science is just quantifying expert

20    information.  They are the experts.  They lived

21    through this.  They know.

22                And -- but they probably aren't very

23    precise.  So they would give us these numbers and

24    they would be estimates.

25          Q.    Earlier in the day, counsel posed a



1                              C. O'Neil

2     hypothetical where he said, you know, you might

3     have a case that takes one hour to close and you

4     might have a different kind of case that takes one

5     year to close.

6               And in your declaration, you have said,

7     you know, it's probably more accurate to say that

8     you would want to look at cases closed by type.

9               Can you just explain a little bit more?

10    Are we talking about different regressions or

11    different ways of tuning the regression?

12              I am not quite clear how that works in

13    the model.

14         A.    That's one of the lenses.  So, it's

15    trying to get at the fact that we said a bunch of

16    times today, where you are like, well, the cases

17    went up but the types of cases got easier, so maybe

18    it wasn't actually more work.

19              That's just a hypothetical.

20              So -- so you want to know not just the

21    number of cases, but the types of cases.

22              And so that's why when we do the linear

23    regression at a granular level by types of case,

24    then you get a stronger idea of which types of

25    cases are harder and which are easier.  On average.



1              C. O'Neil

2       Q.    So does that mean you would do it like

3  one regression for major cases, one regression for

4  social media cases, and one for other kinds for

5  example?  Or something else?

6       A.    No, it's one regression where you are --

7  you are asking:  This month, how many of these

8  case -- of social media cases do you have?  How

9  many of these cases do you have?  How many of these

10 cases?  How many -- and we know the total number of

11 hours.

12            See, the thing is, if we had more

13 granular data, we wouldn't even have to do that.

14 If we had the data that said, I did three social

15 media cases, and all together took me nine hours.

16 And separately, I had three field investigations

17 that took me 25 hours.  Then we wouldn't have to do

18 this, because then we would be like, Oh, it takes

19 nine hours to do three cases.  That's easy.  It's

20 three hours a piece.

21            We don't have that.

22            That's why we use the regression, so we

23 do an accounting as each of the types you did, and

24 the total hours you did.

25       Q.    If you have a category of cases, like



                           C. O'Neil

1  major cases that often took a great deal of time,

2  counsel suggested a year, for example, would you

3  want to treat that in a different way because you

4  have month-by-month data; but you have -- but you

5  wouldn't be closing a number of those cases

6  presumably in a single month.  Right?  It would be

7  a case that crossed multiple months.  So would the

8  same model work for that?  Or would you want to do

9  something different?

10      A.    I definitely would do something

11  different.  But to be honest, I wouldn't be able to

12  do it out of thin air.  I would have to rely on

13  GEICO having actually thought through this, by

14  which I think they have because they care about

15  tracking their employees, and they will have

16  developed a system of deciding whether you are

17  making process on those big cases.

18            And so I don't know what it's called.  I

19  thought maybe it was called diary points, but it's

20  not.

21            But it could be the number of diary

22  points.  It could be like a measurement of how

23  much, you know, how often did you make progress on

24  this case.



```
 1                      C. O'Neil
 2           So what -- how did they define progress?
 3    I don't know.
 4           But you know -- so if they define
 5    progress in some way, and you were seen making
 6    progress on this case in January, February, but
 7    then nothing in March, and then comes back in July
 8    and August, like there would be some way of
 9    measuring your progress because that's what
10    companies do.  They measure the progress of their
11    employees with data.
12       Q.    And a couple of times today we have
13    referred to time entries in SICM.  I believe in
14    your declaration you referred to time stamps.
15           Do you have a -- so in paragraph 8 for
16    example, you say, "I would refer to time-stamped
17    entries in SICM."
18           Do those two terms sort of mean
19    different things to you?
20       A.    They are very different, yes.
21       Q.    Can you explain the difference?
22       A.    A time stamp is a metadata.
23           So if I send you an e-mail, if you look
24    at the header, the full header, it will tell you
25    the time stamp, like when I send the e-mail.  Or
```



```
 1                        C. O'Neil

 2    when it was delivered actually, because now you

 3    could have, like, delay the delivery of it.

 4              That's a time stamp.  It's literally

 5    just stamping; it's almost like a postage stamp.

 6              Whereas -- what was the other phrase?

 7       Q.    Time entries, I think.

 8       A.    Right.  Time entries.  Makes me think

 9    it's like that guy Mike Reed saying, like, I had,

10    you know, I did -- I posted more hours of driving.

11              But I really couldn't tell what he

12    really meant.  But that's it.  It's more -- it

13    gives the sense that he is describing his hours

14    doing something.

15              That's an explicit -- an explicit

16    typed-in number from an employee.

17       Q.    And based on your conversations with

18    investigators, do you have an understanding of

19    whether time stamps exist in SICM?

20       A.    Every computer has time stamps.  It's an

21    automated feature of computers.

22       Q.    When we talk about sort of ways that a

23    case extending over the course of, say a year,

24    might have been measured, one thing you could

25    potentially look at is time stamps that showed when
```



 1                        C. O'Neil

 2   the investigators touched SICM?

 3        A.    Absolutely, yes.

 4        Q.    All right.  And I think last question I

 5   have.

 6             Near the end of the day, there were a

 7   couple of questions about looking at individualized

 8   data.  And just to clarify that:  As I am

 9   envisioning your model, and tell me if I am wrong,

10   it will look essentially at the end of the day like

11   a spreadsheet.  The output will look like a

12   spreadsheet where each investigator will have an

13   imputed number of hours associated with a given

14   time period.

15             Am I envisioning that more or less

16   correctly?

17             MR. TSONIS:  Objection to form.

18        A.    Okay.  So there is two parts of it.

19   There is the output of the model, and then there is

20   what we do with that output to get the measurement

21   of the loss, the lost wages.

22             So I will just start with the

23   spreadsheet we have.  There is -- the rows are per

24   person per month of work.  Let's imagine adding a

25   column to that spreadsheet, where we have the



CATHERINE ONEIL                                            April 24, 2025
FISCHER vs GEICO                                                      242

```
 1                         C. O'Neil
 2    output of the model.  The output of the model is
 3    going to be imputed time to do the amount of work
 4    we saw happening on that month for that person.  So
 5    that's going to be like 54.  It's an hour, it's a
 6    measurement of hours.
 7              We already have the column next to it,
 8    that's the stated amount of hours on the time
 9    sheet.  And then we are going to create a new
10    column, like an Excel spreadsheet, which is the
11    difference between those two things, and that's the
12    number of hours that were unpaid.  That's the
13    estimate of the number of hours that were unpaid
14    for that month.
15              Now, if I am going to be -- I also
16    mentioned the possibility of having an
17    individualized efficiency number.  That could be a
18    third -- another column.
19              And then you could multiply those two
20    numbers to get an adjust -- a normalized number of
21    missing hours.  In some sense, you would just want
22    to add those up for the person for all the months
23    that person was in the system to get the total
24    number of hours they were underpaid.
25              But their salary might actually have
```



                        C. O'Neil

 1
 2   changed during that time.  So probably a better way
 3   of doing it is another column, which says, what was
 4   their salary at that -- on that month, because that
 5   might change over time.
 6            And then you would have another column,
 7   which is the multiplication of the number of hours
 8   normalized that they missed being paid, times the
 9   salary they had at that time.  And then you have --
10   that's the amount of money they lost out of that
11   month.
12            Then finally, you would add that all up
13   for that person, for all their months that they
14   exist in the spreadsheet, to get the total amount
15   of money that they missed out of.
16            You might even adjust that for
17   inflation.
18       Q.   So just to summarize.  When we are
19   talking, when you talk about individualized data
20   and looking at individualized data, we are really
21   talking about individual data points within a
22   single model?
23            MR. TSONIS:  Objection to form.
24       A.   I guess that's right.
25            MR. SCIMONE:  Okay.  I have no further



CATHERINE ONEIL                                        April 24, 2025
FISCHER vs GEICO                                                  244

```
 1                        C. O'Neil

 2        questions.

 3   EXAMINATION BY

 4   MR. TSONIS:

 5        Q.    Just to follow up on this last point you

 6   were talking about.

 7              So this spreadsheet, this model as you

 8   described it, the output it assesses, the lost

 9   wages that you referenced.  Right?

10        A.    Yes.

11        Q.    So because you are assessing an average

12   number of hours, that would apply to everyone.

13   That spreadsheet will have the same number for

14   every single person going down the spreadsheet.

15   Right?

16              MR. SCIMONE:  Objection.

17        A.    No.

18        Q.    How is it not if you are using an

19   average that would apply across the place -- the

20   putative class?

21        A.    Pause -- sorry to interrupt.

22              I am using that -- let's say it's 55.

23   Let's say we have that the average person claimed

24   that they had 55 hours, not 40 -- 40 hours, okay.

25              Then I am using that number 55.  You are
```



                              C. O'Neil

1

2    right.

3              And I am going to make sure, as I

4    mentioned a couple of times, after I build this

5    model that the average during baseline, the average

6    amount for the week is 55.

7              But an individual might be calculated to

8    have done 58 or 52 hours that week.  But I am doing

9    the actual damages, the thing I just described.

10        Q.    Is this coefficient an additional

11   coefficient that you might apply to individuals?

12        A.    I could do that or could not do that.

13   That's an option.

14              But my point is that it's not true that

15   everyone will be assumed to have worked 55 hours

16   for every week during baseline.  I think that's

17   what you asked.  It's not true that everybody will

18   be like 55, 55, 55.  That's not true.

19              What will be true is that when I have

20   imputed -- when I figured out that column that is

21   the output of my model during baseline, it will

22   average out to 55.  That's what I -- that's the

23   standardization I am doing.

24              So it's not going to add -- average out

25   to 39.75; it's going to average to out to 55.  But



                              C. O'Neil

  2   there will be variation among people.

  3        Q.    I didn't mean to interrupt.  I am just

  4   trying to understand.

  5              Where would that variation in class come

  6   from?

  7        A.    Because some people did more work than

  8   other people.  They did different types of work.

  9              And we already figured out that what we

 10   did with training, the model during baseline, that

 11   some work takes longer and some work takes less

 12   time.

 13        Q.    Okay.  So that's going.

 14              And then you could apply this sort of

 15   individual factor that you referenced to

 16   individuals.  Right?

 17        A.    I could.

 18              And after doing that, if I did that,

 19   then each person's average during baseline would be

 20   55.  Right?  But that doesn't mean on a given month

 21   it would be 55.

 22        Q.    Okay.  So over the time period, it would

 23   average for everyone to that hypothetical 55 number

 24   you are talking about?

 25        A.    Right.  So if I didn't use those little



1                         C. O'Neil

2    extra factors; then it would just average, for all

3    people, for all the months, baseline to 55.

4        Q.    So once you do that, you have to apply

5    those individualized factors to get the numbers to

6    vary according to each individual person?

7        A.    Oh, now I am confused.  I'm sorry.

8        Q.    That's okay.  So you referenced, I

9    think, correct me, that if you looked across the

10   entire time period for each person, it would

11   average out to the 55, you know, hypothetical

12   number that you are talking about.  Right?

13       A.    If we used those efficiency factors.

14       Q.    Okay.

15       A.    If we used the -- let me say it in one

16   sentence.

17            If we used the efficiency factors as I

18   described, then per person in baseline their

19   numbers would average out to 55.  If we didn't use

20   those factors, then as a whole group in baseline

21   over that entire time, it would average out to 55.

22       Q.    Okay.  And these individual

23   adjustments -- so you know, you recall your counsel

24   here asked you a short while ago about Mike Reed's

25   statement in the interview here.  That, you know,



```
 1                        C. O'Neil
 2   May 2020, the number of cases he was assigned and
 3   the average case time that it takes.
 4        A.    Yes.
 5        Q.    So I think you said, you know, something
 6   like, hopefully we will be able to auto tune the
 7   model.
 8        A.    Yes.
 9        Q.    Is that right?
10              So explain to me:  Is it just, Oh, look,
11   there is a data point where this guy is saying in
12   this time frame, here is an average.  So I am going
13   to incorporate it into my model.
14        A.    No.
15        Q.    So why would you use an auto-tuned model
16   for this circumstance for what's listed here?
17        A.    Well, I would -- okay.  I would want --
18   I wouldn't conduct this conversation.
19              And to be clear:  I don't have skin in
20   the game as to how we come up with this factor for
21   auto tuning.
22              But one possibility would be that the
23   plaintiffs would be interviewed to -- to estimate
24   how much difference there was in doing a particular
25   activity during COVID versus not during COVID.
```



```
 1                        C. O'Neil

 2              And again, we would do that same kind

 3   of -- it would be the same kind of thing.  We would

 4   ask ten people, you know, the same ideas, that we

 5   get various answers, and we average them to have an

 6   auto tuning factor.

 7              Or we would ask GEICO, because they

 8   probably kept track of it.  Like, do you have a

 9   measurement of how much more efficient your

10   investigators got for this type of activity during

11   COVID?

12              They might know.

13       Q.    So again, I think we talked about this

14   earlier today, but if there is substantial

15   variations in the answers that the people are being

16   asked to provide, you would need to ask more people

17   to figure out, you know, a relative range where

18   that transaction is not so varied.

19              Would that be accurate?

20       A.    Yes, that would be.  I don't think there

21   is going to be that much variation in these

22   particular questions though.  It's pretty small --

23   what's the word?  Window of answers that we are

24   looking for.

25       Q.    But you haven't seen all of the data, or
```



                              C. O'Neil

1

2    you haven't asked a significant -- or any other

3    people besides these three.  Right?

4         A.    Right.  That's right.

5         Q.    So you don't know that for a fact.  You

6    are just assuming.

7         A.    No, but I -- I know that it's a small

8    window of possible, plausible answers.  So I --

9    it's just not going to be a wildly variant thing.

10             The only wildly varying thing I heard

11   today is the one hour versus one year.  That's a

12   factor of 40 times 365.  Right?  That's really big.

13             But it's nothing like that.  Like, if I

14   say on average, it took -- according to my model,

15   on average it took EOUs like four hours to do.  How

16   much time did it take during COVID?  I am going to

17   get an answer that's between one and three.

18             It's a much smaller window.

19        Q.    Sure.  Another disparity; right?  Is

20   Peggy Fischer testified that she wasn't assigned

21   any new cases once COVID started.  Mike Reed is

22   saying he got 70 cases in May of 2020.

23             You would agree there is a relative

24   difference; between 0 and 70 is another pretty wide

25   disparate range?



CATHERINE ONEIL                                         April 24, 2025
FISCHER vs GEICO                                                    251

```
 1                         C. O'Neil
 2        A.    Well, they are different types of
 3   investigators, so I would treat them separately.
 4              So they are not -- they are not -- yes,
 5   I wouldn't agree that they are -- that's not a
 6   single statistic; that is wildly variant.
 7        Q.    Sure, but you also recognized, I think,
 8   about -- when your counsel asked you about someone
 9   like Peggy Fischer and the cases that they worked,
10   I think you said something like, you know, you
11   suspect that there is a metric that GEICO has to be
12   able to gauge that individual's progress in their
13   cases.
14              Did I summarize that accurately?
15        A.    Yes.
16        Q.    What if it's just human judgment?  What
17   if they have a boss that checks in with them that
18   says, How is the case going?  What have you done in
19   the last few weeks?
20              That's it.
21        A.    And the boss doesn't write anything
22   down?
23        Q.    Yes.
24        A.    And then I would not be able to run a
25   model.
```



CATHERINE ONEIL                                             April 24, 2025
FISCHER vs GEICO                                                      252

```
 1                        C. O'Neil
 2        Q.    So if there is no data that could assess
 3   the productivity in the same way as the spreadsheet
 4   that you have seen, then that, then that's -- you
 5   wouldn't be able to do that.  Right?
 6        A.    Yes.
 7        Q.    Okay.
 8             MR. SCIMONE:  Are we still in the scope
 9        of redirect here?
10             MR. TSONIS:  I think we are.
11             MR. SCIMONE:  Okay.
12             MR. TSONIS:  I don't think I have any
13        further questions.  All right.
14             MR. SCIMONE:  Thank you.  We are done.
15             THE VIDEOGRAPHER:  The time is 3:44 p.m.
16             I'm sorry.  First, Counsel, we are going
17        to take the video orders real quick on the
18        record.
19             Does anybody have standing orders?
20             MR. TSONIS:  I don't think we have
21        standing orders.
22             MR. SCIMONE:  I don't think we do, but
23        yes, we are going to order.
24             Standard video delivery and sync.
25             MR. TSONIS:  I think we placed an order
```



```
 1                        C. O'Neil

 2        in terms of the transcript turnaround time, so

 3        I think they placed an order with you.

 4               THE VIDEOGRAPHER:   The time is 3:44 p.m.

 5        We are off the record.

 6               (Time noted: 3:44 p.m.)

 7        _____.

 8        CATHERINE O'NEIL

 9

10   Subscribed and sworn to before me

11   this ____ day of _____, 2025.

12

13   _____

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                      C. O'Neil

 2                 C E R T I F I C A T E

 3   STATE OF NEW YORK    )

 4                        : ss.

 5   COUNTY OF QUEENS     )

 6

 7           I, YAFFA KAPLAN, a Notary Public

 8       within and for the State of New York, do

 9       hereby certify:

10           That CATHERINE O'NEIL, the witness

11       whose deposition is hereinbefore set forth,

12       was duly sworn by me and that such

13       deposition is a true record of the

14       testimony given by the witness.

15           I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I am

18       in no way interested in the outcome of this

19       matter.

20           IN WITNESS WHEREOF, I have hereunto

21       set my hand this 28th day of April, 2025.

22
                         _____
23

24                       YAFFA KAPLAN

25
```



1

2      ----------------- I N D E X ---------------

3    WITNESS                    EXAMINATION BY          PAGE

4    Catherine O'Neil      Mr. Tsonis            6, 244

5                          Mr. Scimone                225

6

7      ----------- INFORMATION REQUESTS -----------

8    DIRECTIONS: 17, 24, 56

9    RULINGS:

10   TO BE FURNISHED:

11   REQUESTS:

12   MOTIONS:

13     ----------------- EXHIBITS -----------------

14    EXHIBIT                                    FOR ID.

15   Exhibit 1  Subpoena                          9

16   Exhibit 2  Declaration and curriculum vitae  28

17   Exhibit 3  Interview notes                   98

18

19

20

21

22

23

24

25



CATHERINE ONEIL                                             April 24, 2025
FISCHER vs GEICO                                                       256

1

2                    DEPOSITION ERRATA SHEET

3    Our Assignment No. 12744863

4    CASE NAME: Fischer vs. GEICO

5

6      DECLARATION UNDER PENALTY OF PERJURY

7        I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same has been read to me, and

11   the same is true and accurate, same and

12   except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding

15   that I offer these changes as if still under

16   oath.

17   _____

18            Catherine O'Neil

19   Subscribed and sworn to on the _____ day of

20   _____, 2025 before me,

21   _____

22   Notary Public,

23   in and for the State of _____

24

25



```
 1

 2                    DEPOSITION ERRATA SHEET

 3    Page No._____Line No.____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No.____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No.____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No.____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No.____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No.____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No.____Change to:_____

22    _____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25                    Catherine O'Neil
```



CATHERINE ONEIL                                          April 24, 2025
FISCHER vs GEICO                                                     258

1
2                    DEPOSITION ERRATA SHEET
3    Page No._____Line No.____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No.____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No.____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No.____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No.____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No.____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No.____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25                   Catherine O'Neil

