# Exhibit 1

## Page 1

```
 2         UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF NEW YORK
 3   -----------------------------
     KEITH FISCHER, MICHAEL
 4   O'SULLIVAN, JOHN MOESER,
     LOUIS PIA, THOMAS BARDEN,
 5   CONSTANCE MANGAN, and CHARISE
     JONES, individually and on
 6   Behalf of all others similarly
     Situated,
 7
               Plaintiffs,
 8
          vs.              No. 23 Civ. 02848
 9                              (GRB) (ARL)
10   GOVERNMENT EMPLOYEES INSURANCE
     COMPANY d/b/a GEICO,
11
               Defendant.
12   -----------------------------
13
14
15      VIDEOTAPED DEPOSITION OF CATHERINE O'NEIL
16              New York, New York
17           Thursday, April 24, 2025
18
19
20
21
22
23   Reported by:
     Yaffa Kaplan
24   JOB NO. 12744863
25
```

## Page 2

```
 2                April 24, 2025
 3                 9:40 a.m.
 4
 5        Videotaped Deposition of CATHERINE
 6   O'NEIL, held at the offices of Duane
 7   Morris, 1540 Broadway, New York, New York,
 8   pursuant to Notice, before Yaffa Kaplan, a
 9   Notary Public of the State of New York.
```

## Page 3

```
 2   A P P E A R A N C E S:
 3
 4        OUTTEN & GOLDEN LLP
 5        Attorneys for Plaintiffs
 6             685 Third Avenue, 25th Floor
 7             New York, New York 10017
 8        BY:   MICHAEL SCIMONE, ESQ.
 9              ZARKA DSOUZA, ESQ.
10
11        DUANE MORRIS LLP
12        Attorneys for Defendant
13             190 South LaSalle Street, Suite 3700
14             Chicago, Illinois 60603
15        BY:   GREGORY TSONIS, ESQ.
16              JUSTIN DONOHO, ESQ.,
17                    (Via videoconference)
18
19   ALSO PRESENT:
20        RICHARD MORALES - Videographer
```

## Page 4

```
 2        IT IS HEREBY STIPULATED AND AGREED,
 3   by and between counsel for the respective
 4   parties hereto, that the filing, sealing and
 5   certification of the within deposition shall
 6   be and the same are hereby waived;
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form
 9   of the question, shall be reserved to the
10   time of the trial;
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed
13   before any Notary Public with the same force
14   and effect as if signed and sworn to before
15   the Court.
```



Page 93

1            C. O'Neil
2  overestimate; sometimes it will underestimate.  But
3  it's not going to be biased.
4      Q.   I guess I am not asking about bias.  I
5  am just asking:  That for certain class members
6  that you would apply this model to, it would
7  overstate the number of hours that they worked?
8      A.   Well, I would say for certain months, it
9  would overstate it.  For other months, it would
10 understate it.
11          So depending on how many months we are
12 estimating it for them, it would probably mostly
13 get a pretty good -- I mean, that's one of the
14 statistical laws.  That you have a lot of -- that
15 the average overall, if you have enough, it's the
16 law of large numbers that it will be very close to
17 the true answer if you have a bunch of different
18 estimates that is unbiased.
19          So in this case, if it -- if it were
20 just one month of wage theft that we are trying to
21 measure, yes, it would probably be either an
22 overestimate or an underestimate.  But if you are
23 talking about years of work, like it would be very
24 close to an appropriate estimate.
25     Q.   But when you are talking about the law

Page 94

1            C. O'Neil
2  of large numbers or doing these kind of analysis,
3  you would need a substantial amount of data to
4  prevent what you are talking about; right?
5      A.   Definitely the more the better.
6      Q.   You would need a substantial amount of
7  data; right?
8      A.   Yes.
9      Q.   It would similarly taking -- not just
10 looking at one person and their various months, it
11 would on the whole, overstate the number of alleged
12 off-the-clock hours for certain individuals, and
13 could understate the alleged off-the-clock hours
14 for other individuals.  Right?
15     A.   It's going to give you an actual number.
16         You know, so it could give you a number
17 like 188 hours of unpaid work.  Overall.  And it's
18 not going to be exactly-exactly right.  It could
19 have been 186 instead of 188.  So that would be an
20 overstatement, but it would be pretty small.
21         So I agree with you that it would never
22 be exactly right.  It would actually be really hard
23 to even imagine what it would look like for it to
24 be exactly right.  But statistically speaking, it
25 would be a very, very good estimate if we have

Page 95

1            C. O'Neil
2  enough data.
3      Q.   I guess what I am trying to clarify is
4  that when you are doing a model like this, it's
5  going to overstate for some individuals potentially
6  the number of off-the-clock hours, and it's going
7  to understate for other individuals.  Right?
8      A.   Yes.
9      Q.   And again, that would -- you can't use
10 an average, I guess, to reliably extrapolate the
11 number of hours for every single person.  Right?
12     A.   To be clear:  It's not entirely precise.
13 And yes, that so -- so it means it will be slightly
14 inaccurate for everyone.  But it will be unbiased
15 and a very good estimate.
16     Q.   If you had enough data?
17     A.   Yes.
18     Q.   So to use a silly example.  If you put,
19 you know, me in a room with Jeff Bezos, you know we
20 are each worth billions because if we take the
21 average of our net worth.  Right?
22     A.   That's right.
23     Q.   That would not be a reliable indicator
24 of my net worth.  I will represent to you that I am
25 not worth billions.  Right?

Page 96

1            C. O'Neil
2      A.   That's right.  And so that's actually a
3  great counterexample to what the situation is here.
4  Because these guys are actually much more
5  comparable to each other than you and Jeff Bezos in
6  terms of their wealth.
7      Q.   But Jeff Bezos's wealth could be
8  objectively verified.  Whereas in your model, you
9  are using plaintiff's own subjective opinions of
10 what they worked.  Right?  As a starting point?
11         MR. SCIMONE:  Objection.
12     Q.   You can answer.
13     A.   I mean, I am using that to help me
14 establish the baseline, yes.
15     Q.   And the baseline is used to ultimately
16 assess the damages for all class members?
17     A.   That's right.
18     Q.   I think we said earlier the variation
19 among the various class members makes the linear
20 regression less reliable.  Right?
21     A.   Yes.
22     Q.   Do you have a sense for how much the
23 alleged off-the-clock work by investigators varied?
24     A.   No.
25     Q.   Well, you interviewed three of them;



Page 169

```
 1           C. O'Neil
 2  they also only stayed -- half of their work, you
 3  know.
 4         So in that case, my model also still
 5  says, Oh, you got this much work; we impute this
 6  much hours.  It's still more than what you wrote
 7  down in the time sheet, because you only wrote down
 8  two weeks worth of time in the time sheet.  So we
 9  are still going to get back pay for that.
10         So it's flexible to things like vacation
11  time.
12     Q.   So your model accounts for vacation
13  time.  And I think that's why you said you would
14  want the, sort of, time records or attendance
15  records.  Right?
16     A.   Yes.
17     Q.   I am curious.  So the data that you are
18  analyzing here is monthly.  Right?
19     A.   Yes.
20     Q.   Are GEICO investigators paid monthly?
21     A.   I don't know.
22     Q.   Do you have an understanding of what the
23  GEICO workweek was for any of these individuals?
24     A.   No.  Well, I mean, I know that they were
25  asked to state their hours as less than 40.
```

Page 170

```
 1           C. O'Neil
 2     Q.   You know that's what plaintiffs are
 3  saying.  They are saying --
 4     A.   Yes.
 5     Q.   -- the claims in this litigation?
 6         I guess my question is:  Is it your
 7  understanding that GEICO's pay periods are a period
 8  of two weeks?
 9     A.   I am not thinking about that.  It
10  doesn't matter to my analysis.
11         All that matters to me is that I need to
12  compute the number of hours that they weren't paid.
13     Q.   I understand.
14         So because you are looking at it monthly
15  though, you are trying to assess the numbers that
16  they weren't paid for in a different given month?
17     A.   Yes.
18     Q.   You are not allocating the numbers of
19  unpaid hours in a particular workweek?
20     A.   That's right.
21     Q.   I think we said, and I apologize if I
22  already asked this.  You know, the next one,
23  number 7, is sort of achieving a certain
24  disposition-type in closing a case; is that right?
25     A.   Okay, yes.
```

Page 171

```
 1           C. O'Neil
 2     Q.   I think you referenced before lunch that
 3  it's your understanding having sort of a particular
 4  disposition or being able to recover, you know,
 5  have an impact, recover funds, whatever the case
 6  may be, might require more investigative work or
 7  that was valued more.
 8     A.   That's right.
 9     Q.   What's your basis for that?  Is it just
10  your assumption that activities that result in, you
11  know, a tangible monetary value would require more
12  time, or would be incentivized to pursue?
13     A.   Yes, it is.  Well, I will say I am an
14  expert in data and why people collect data.  And so
15  just the very fact that those are put in different
16  categories has -- raises my eyebrows.
17         Like, there is a reason GEICO is keeping
18  track of these as separate.  And I am going to
19  assume that it has something to do with:  They are
20  considered a really different type.  And so -- so
21  that's the first thing that made me pay attention
22  to it.
23         And then when I thought through it, of
24  course, I am not an expert investigator, but again,
25  it just stands to reason that some things take more
```

Page 172

```
 1           C. O'Neil
 2  effort to do, because it's a longer process.
 3     Q.   Is it your assumption, I guess --
 4  presupposing that an investigator knows early on or
 5  at the outset of an investigation what the
 6  disposition could or would be?
 7     A.   Say that again.
 8     Q.   Sure.  If I am an investigator and I am
 9  assigned a case, I guess, how is it that I know
10  that at the end I am going end up have a
11  disposition that is, you know, total denial or a
12  partial denial that saves GEICO money?
13         Can I even know that at the outset?
14     A.   I don't assume that you know that at the
15  outset.
16     Q.   I guess when I am doing various
17  activities or tasks, whatever you want to call it,
18  you would think -- just referenced that they might
19  be incentivized or they might have an emphasis
20  placed on them.  But that's not possible if the
21  investigator don't know about them at the outset of
22  an investigation.  Right?
23     A.   Sure, it is.  I mean -- what I mean to
24  say is:  The guy, some investigator, gets a case on
25  Monday.  They don't know what's going to happen.
```



Page 173

1  C. O'Neil
2  So they do the first step. And they say, Oh, this
3  is going to be one of those cases where I have to
4  do the second step. And they do the second step.
5  And they say, Oh, this is one of those cases that
6  actually requires a third step.
7      And I want to give them credit for that.
8  In my model -- I want my model to certain discern
9  the difference between a three-step investigation
10 versus a one-step investigation. They didn't know
11 that going in, but they know that at the end, and
12 it took them three days instead of one day.
13     Q.  As we are talking about the variability
14 here of individuals as your model is applied, one
15 concept that we haven't really talked about is sort
16 of the magnitude of that variability. Right?
17     So if -- do you recall earlier, we
18 talked about a distribution of hours worked. And I
19 think you were talking about that it's, you know,
20 you know at the outset; it's in some defined rate
21 range. Right?
22     A.  Yes.
23     Q.  Would significant variation in the
24 distribution in any of these metrics that you
25 propose doing a regression or linear regression on

Page 174

1  C. O'Neil
2  affect the magnitude of the error?
3      A.  Yes.
4      Q.  So for example, a social media case
5  might be closed in an hour, whereas a major case
6  might take a year to close.
7      Does that make sense?
8      A.  Well, you are talking about a variation
9  in time, I see. Yes. Yes.
10     Q.  So we are back in a world where we are
11 talking about, you know, 7(a); closing a case,
12 where we are looking at the most basic form.
13     That sort of extreme variability would
14 lead to pretty extreme error rates in that
15 regression analysis. Right? Or could, I should
16 say.
17     A.  Yes, it could.
18     Q.  So someone like Peggy Fischer. Let's
19 say she closed one case. Right? She is not nearly
20 getting the credit. Right?
21     Because the average case closed,
22 quote/unquote, is significantly less than the year
23 it took her. Right?
24     A.  Yes. And that's why I would be
25 surprised to find out that GEICO doesn't somehow

Page 175

1  C. O'Neil
2  classify desk investigator cases in some way that
3  would distinguish between one-hour social media
4  case and one-year case.
5      I am sure that -- well, I am not sure.
6  But people who want to keep track of these kind of
7  things probably would distinguish between these
8  types of cases somehow. That's what -- how the
9  data is formulated.
10     Q.  Sure. And as I am sure you saw in your
11 spreadsheet -- and I am not contending that people
12 who were classified as inside or desk investigators
13 were all major-case investigators or had no product
14 metrics.
15     But I think you mentioned earlier;
16 right? If somebody doesn't -- they don't have this
17 dataset, then the application of an average
18 investigator to their, you know -- you can't apply
19 your model to them because you don't have your data
20 points. Right?
21     A.  I would -- it's a very open question.
22     I would -- you know, if I don't have
23 data; I can't do an analysis. I will say that.
24     Q.  That's fair.
25     And if you have very limited data, then

Page 176

1  C. O'Neil
2  it also would be fair to say that the magnitude of
3  the error in any analysis you could do would be
4  substantial?
5      A.  For sure.
6      Q.  And ultimately, that analysis wouldn't
7  be a reliable way to measure that person's
8  off-the-clock work?
9      A.  I would need a lot of data.
10     If the underlying data is extremely
11 variable, like you said, like if you are counting
12 the number of days it took to do, if it's extremely
13 variable, then I would need a lot of data to even
14 get a good average. So, yes.
15     Q.  Sure. And similarly -- right? When we
16 talk about, Hey, closing cases of a certain type,
17 like if there is a substantial variation between
18 the amount of time it takes to close a social media
19 case, or field cases, or desk cases; that variation
20 is going to increase the magnitude of the error in
21 your analysis. Right?
22     A.  Yes.
23     Q.  And if it's a substantial variation,
24 that error would be significant, such that it would
25 not lead to an accurate result, an accurate



Page 177

1  C. O'Neil
2  measurement, of people's alleged off-the-clock
3  work. Right?
4  A.  Yes.
5  Q.  And the same general concept would be
6  true for your proposed regression analyses in 7(b),
7  (c), (d), (e) and (f). Right? A magnitude of an
8  error in any of the underlying data -- or extreme
9  variability, I should say -- in the underlying data
10 could lead to an error of significant magnitude
11 such that it would make the results inaccurate.
12  A.  Yes. But I want to point out that the
13 amount of variability that you just described, with
14 social media taking one hour and another
15 investigation takes more than a year, is much, much
16 bigger variation that I saw in that spreadsheet.
17       That spreadsheet had nothing like that
18 kind of variability.
19  Q.  Do you know what type of investigations
20 were included, or what was included in that type of
21 spreadsheet?
22  A.  I think they were field investigators.
23  Q.  Were they only field investigators?
24  A.  I believe so.
25       MR. SCIMONE: Objection.

Page 178

1  C. O'Neil
2  Q.  Ultimately in paragraph 9, in the last
3  sentence, you say, "The average will be useful to
4  estimate how much work each plaintiff did, even if
5  the actual length for a given task varies slightly.
6  Depending on the details."  Right?
7  A.  Yes.
8  Q.  And that's a different way of sort of
9  discussing the concepts that we have just been
10 talking about.  Right?
11  A.  Yes.
12  Q.  Slight variation, I think is your
13 contention, wouldn't make your model inaccurate;
14 but that substantial variation, significance
15 variations would.  Right?
16  A.  Yes. And I also made the point earlier
17 that in a given week, it just might so happen that
18 the number of cases you closed is smaller than --
19 than your work actually represents, but the next
20 week it might make up for it. So things might be a
21 little bit bunchy. But over time, many months, it
22 would be much more accurate.
23  Q.  Do you recall earlier when we were
24 talking about coming up with the baseline of
25 reported hours from a sample of individuals, you

Page 179

1  C. O'Neil
2  talked about error bars?
3  A.  Yes.
4  Q.  Yes? What would the acceptable error
5  threshold be in your model?
6  A.  Actually, I think that's really a legal
7  question. I don't know. Offhand.
8  Q.  As a mathematical standpoint, what error
9  percentage would you be comfortable putting forth
10 in that model and calling the results accurate?
11  A.  Well, to be clear: If I am saying lower
12 bounds and upper bounds; then that's a way of
13 measuring. That's a way of stating the accuracy.
14 I don't have to say anything more than that.
15       I would say, This is my best estimate.
16 And this is my lower bound, this is my upper bound.
17 And that's the final word about accuracy, if you
18 have those lower bound and upper bound.
19       And I think it would be a legal question
20 whether that was acceptable to have that range.
21  Q.  So do you have an idea, as a
22 mathematician and as an retained expert, what your
23 goal would be in terms of an upper and lower bound?
24  A.  Well, I mean, at the very least; lower
25 bound -- for my notion of a lower bound, would be

Page 180

1  C. O'Neil
2  that the lower -- that the lower bound isn't below
3  zero. If I am trying to estimate number of hours
4  that went unpaid, I wouldn't want the upper bars to
5  include zero. I would want them to be tightly
6  coupled around this actual estimate.
7       Now, what tight means, is what I am
8  saying, is like a legal question.
9   Q.  Okay. So you don't talk about potential
10 error in your declaration. Right?
11  A.  No. But it's a standard output of
12 multilinear regression. It's part of the
13 methodology.
14  Q.  Okay. But as part of that methodology,
15 despite it being part of that methodology, it's not
16 something you describe as being part of your
17 declaration?
18  A.  Correct.
19  Q.  And you don't, sitting here today, have
20 an opinion on what acceptable levels of error would
21 be for you before you would submit your model?
22  A.  To be clear: I -- I would be able -- I
23 would be able to say, Here is my best guess as
24 to -- for each person in the spreadsheet, here is
25 my best estimate for the number of unpaid hours of



Page 181

1            C. O'Neil
2   work.  Here is the lower bound, here is the upper
3   bound.
4        It's not about being comfortable.  I
5   would be able to do -- I would be very comfortable
6   with that.
7     Q.    You would agree that a linear regression
8   typically models two things:  Trends and variation.
9   Right?
10    A.    Okay.  Yes.
11    Q.    You agree with that?
12    A.    It's a very -- it's -- it's a -- a vague
13  way to describe it, but yes.  I do agree with that.
14    Q.    The linear regression that you are
15  proposing would model the trend.  Right?
16    A.    Yes.  And the trend here would be
17  essentially the average amount of time allocated to
18  these different activities.  And the variation
19  would be the kind of thing that we are just talking
20  about, the error bars.
21    Q.    Right.  And ultimately, you would use
22  the data points and try to draw a line that creates
23  the best fit to those data points.
24    A.    In this case, it's a multivariable
25  regression, so it's not the line; it's like a

Page 182

1            C. O'Neil
2   hyperplane.  But it's geometrically similar to a
3   line.
4        The line is if you have a plane and you
5   have a bunch of points on the line; you are trying
6   to make a line.  But here, it is not a plane; it's
7   like a four-dimensional space.  So you are trying
8   to fit the best hyperplane.
9     Q.    Do you have any criteria in terms of how
10  you determine the best fit in this model?
11    A.    Yes.  This is -- it's the standard way.
12  That is what linear regression is, is like a method
13  to find the best-fit type of thing.
14    Q.    Got it.  Your opinions, sitting here
15  today, is that a linear regression would be a good,
16  sort of, starting point for modelling damages in
17  this case.
18    A.    Yes.
19    Q.    As you dig in, when you are actually
20  trying to apply a linear regression, is it possible
21  that you could discover that a linear regression is
22  unreliable for modelling damages in this case?
23    A.    No.
24    Q.    You don't believe that it's possible?
25    A.    No.

Page 183

1            C. O'Neil
2     Q.    Even if you found extreme variability in
3   the underlying data like we discussed?
4     A.    I don't think that's plausible.  I mean,
5   the answer is yes, if I found extreme variability,
6   then it could be the wrong approach.
7        But I don't think it's plausible that I
8   would find extreme variability.  Extreme
9   variability would like -- like somebody working
10  10,000 hours in a week, or someone closing a
11  thousand cases in a week.  And I don't think that's
12  plausible.
13    Q.    Part of what you would need to do to
14  determine whether this is, in fact, a reliable
15  model for assessing damages in this case, you would
16  need to take certain steps to do that.  Right?
17    A.    Yes.  They are called exploratory data
18  analysis.
19    Q.    What do you mean by exploratory data
20  analysis?
21    A.    It's a way of sort of eyeballing.
22  Drawing pictures and eyeballing the data to make
23  sure it doesn't have extreme variability.
24       Like building histograms to make sure
25  it's -- the number of hours claimed, like written

Page 184

1            C. O'Neil
2   down in the time sheet is, in fact, never bigger
3   than 40.  Or never bigger than 120.  Or never
4   bigger than a number of hours in a week or a month,
5   so that the numbers look plausible.
6     Q.    Okay.  Once you built your model, I
7   mean, you addressed the question of confidence in
8   the model.  Right?
9     A.    Yes.
10    Q.    And you would add in modelling
11  assumptions about the errors?
12    A.    Those aren't assumptions.  Those are
13  inferred by the data itself.
14    Q.    What are inferred by the data itself?
15    A.    The variation of the data, the variance
16  of the data.  Like the variability of the data is
17  used to compute the error bars around the
18  coefficients in the model.
19    Q.    And after you did that, you would add in
20  more predictors.  Right?  If you could?
21    A.    Like what?
22    Q.    If that data was available to you, isn't
23  that how you how you ensure that a linear
24  regression is a reliable model for assessing
25  damages?



Page 185

 1   C. O'Neil
 2   A.   I think I need you to re- -- like start
 3   the question again, because I am not sure where we
 4   are.
 5         What -- like, what variables do we have
 6   right now in our hypothetical model?
 7   Q.   I mean, I am just talking about the
 8   dataset that we do have.  Right?  And the variables
 9   that we have been talking about; whether that's the
10   variables in the types of cases, the activities,
11   the nondata work, I guess I will call it.  The
12   activities that people would do that wouldn't be
13   captured by the data in any of the work.
14         All of these are variables.  Right?
15   A.   Potentially.  But that's not what I
16   model -- that's not what my plan is.
17         My plan is to build four regressions
18   using these different lenses of productivity, and
19   then use all four -- this is the other average we
20   were talking about, like we mentioned very
21   briefly -- and then sort of seeing how consistent
22   with these models.
23         So each one of these models, I could do
24   what I told you about.  For each of these models
25   for each person, I could calculate the number of

Page 186

 1   C. O'Neil
 2   hours that that model thinks they overworked, and
 3   past what they stated they worked.
 4         One of them might say, Oh, you know I
 5   could do that for all people in a period of time.
 6   And one of models might say, Oh, people understated
 7   their hours by a factor of 0.75.  And the other --
 8   another model might say, Actually they understated
 9   it on average by a factor of 0.95.
10         And then I would say, Okay, well, what's
11   closer to the truth?  I would want to look at why
12   these two different models are giving me two
13   different answers.  I would want to investigate
14   that, because they are supposed to be answering the
15   same question.  That's why I am doing four of them.
16         So they are all trying to answer the
17   same question, but from different perspectives.  If
18   they all say a similar factor, then I am going to
19   be believing it really, really well.
20   Q.   If they say materially different
21   factors?
22   A.   Then I am going to want to understand
23   why.
24   Q.   Then it -- it wouldn't be reliable in
25   terms of assigning damages?

Page 187

 1   C. O'Neil
 2   A.   Right.  I would want -- I would want to
 3   true them up before believing any one of them.  So
 4   it is a process.
 5   Q.   We have talked about a number of
 6   variables.  One we haven't talked about is -- do
 7   you know what Examinations Under Oath are?
 8   A.   I mean, just from TV.
 9   Q.   Fair enough.
10   A.   Isn't this one of them.
11   Q.   I think this technically would qualify.
12         Do you know what examinations under oath
13   are for investigators?
14   A.   Oh, no, I don't.
15   Q.   And I will represent to you that there
16   are certain circumstances in which investigators
17   have to ask questions of a policyholder that are
18   conducted under oath.
19   A.   Okay.
20   Q.   Do you have an understanding of how a
21   case's -- how the involvement of an EUO in any
22   investigation that was done in a case that an
23   investigator had, how that affected the data?
24   A.   Say that sentence again.
25   Q.   Yes.  Do you have an understanding of

Page 188

 1   C. O'Neil
 2   basically the impact of whether a case required an
 3   EUO or not, what impact that had in terms of the
 4   data in the spreadsheet that we have been talking
 5   about?
 6   A.   Oh, but now that you say EUO I remember
 7   them mentioning that in the interview.
 8         So that's a great example of something
 9   that definitely takes time, and would qualify for
10   being -- that's probably one of the activities, in
11   fact.
12         So, sorry I am not -- I am just spinning
13   a little bit.
14   Q.   Sure.
15   A.   Ask the question one more time now that
16   I know what an EUO is.
17   Q.   Sure.  Do you have an understanding of
18   whether or not a case requiring an EUO, how that
19   would affect the underlying data in the spreadsheet
20   we have been talking about?
21   A.   Okay.  So if it's an activity, then it
22   would fall under that particular regression I want
23   to run that says, how many activities of each type
24   did you do?
25         And then I would have this, like,



Page 197

1  C. O'Neil
2  A.  It depends on the situation exactly.
3      But to your earlier point:  A person who
4  is extra efficient is going to be overrewarded by
5  my model, than someone who is inefficient will be
6  underrewarded for the hours they actually worked.
7      So if that's the same person in
8  different eras; it could even out, it could not.
9  Q.  Okay.  Similarly, your model wouldn't
10 account for differences across individual -- like
11 different individual investigator's productivity.
12 So one person is going up, one person is going
13 down, but your model is applying an average?
14 A.  Right.
15 Q.  It wouldn't account for that?
16 A.  Right.
17 Q.  It also wouldn't account for changes,
18 let's say, to the nature of the individual
19 investigator's work over time.
20     So let's say, for example, someone is
21 experienced and they start getting the real hard
22 and more complex cases.
23     Are you following?
24 A.  Well, I am following.  But if those more
25 complex cases were categorized differently, in the

Page 198

1  C. O'Neil
2  categorization that I have, then I would be able to
3  keep tabs on that.
4  Q.  That's fair.  If they weren't
5  categorized differently though --
6  A.  Right.
7  Q.  -- the model wouldn't capture those type
8  of changes to the nature of their work.
9  A.  That's right.
10 Q.  Are there any variables that you would
11 exclude from your regression model?
12 A.  There is a lot of variables I didn't
13 choose to use.  Is that what you mean?
14 Q.  In part, I guess.
15     Yes.  Is there a data, a piece of data
16 or variable that is available to you that you
17 choose to exclude, based on how you instruct --
18 constructed your model?
19 A.  Well, sure.  Like, the ratios are not as
20 useful to me as the raw numbers.
21 Q.  In terms of things like productivity,
22 you are talking about?
23 A.  There is a lot of different ratios in
24 that spreadsheet.  And I was like, I want the
25 numbers; I don't want the ratios.

Page 199

1  C. O'Neil
2  Q.  Okay.  Let's talk very slightly about
3  testing.
4      How can you test your model to ensure
5  its accuracy?
6  A.  Well, once I trained it in the baseline,
7  I could do -- I could ask my model, like, What is
8  the average imputed number of hours for people
9  during baseline?
10     And I better come up with the number I
11 started with.
12 Q.  But I guess I will ask it slightly
13 differently.  There is no way for your model to
14 actually capture, to confirm that your model
15 captures the actual number of hours that an
16 individual worked in a workweek?
17 A.  Right.  It's an estimate.
18 Q.  Okay.  So -- and it doesn't capture
19 that, but it's not possible for it to actually --
20 for you to test it, to confirm that for this
21 individual in this workweek, they worked this many
22 hours, and the model comes up with that many hours
23 as well.  Is that right?
24 A.  That's right.
25 Q.  Are you aware of any periods of time

Page 200

1  C. O'Neil
2  where that is possible?
3  A.  I mean, the sanity check, as we say it
4  in the business, is, you know, you started with an
5  assumption that -- let's say during baseline, they
6  claim to have been actually working 55 hours a week
7  on average.  So impute everybody's time during that
8  time period, and make sure it averages out to 55
9  hours a week.  That's -- that's like the most basic
10 check that you are getting the right basic kind of
11 number.
12 Q.  If there was a -- sorry, did you?
13     If there was a period of time in which
14 overtime was permitted by GEICO, you would agree
15 that if investigators are working those hours, that
16 they would be incentivized to actually get paid for
17 them by GEICO.  Right?
18 A.  Sure.
19 Q.  So if there was a period of time in
20 which you had this data for that investigators are
21 claiming to work for in excess of 40 hours a week,
22 you know, whether that's 50 or 60 or 70 hours a
23 week, you would expect the data to show reported
24 hours greater than what they normally would work if
25 overtime were permitted.  Right?



```
                                    Page 257
 1
 2                DEPOSITION ERRATA SHEET
 3    Page No._____Line No.____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No.____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No.____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No.____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No.____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No.____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No.____Change to:_____
22    _____
23    Reason for change:_____
24    SIGNATURE:_____DATE:_____
25              Catherine O'Neil
```

```
                                    Page 258
 1
 2                DEPOSITION ERRATA SHEET
 3    Page No._____Line No.____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No.____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No.____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No.____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No.____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No.____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No.____Change to:_____
22    _____
23    Reason for change:_____
24    SIGNATURE:_____DATE:_____
25              Catherine O'Neil
```

