# EXHIBIT J

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
3    ------------------------------------x

4    KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
5    BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, Individually and on
6    behalf of all others similarly
     situated,
7
                          Plaintiffs,
8
                  -against-              Case No.
9                                        2:23 Civ. 2848
     GOVERNMENT EMPLOYEES INSURANCE      (GRB)(ARL)
10   COMPANY d/b/a GEICO,

11                        Defendant.

12   ------------------------------------x

13                    August 28, 2024
                      10:06 a.m.
14

15   ***This Transcript Contains a Confidential Section***

16

17         Videotaped Deposition of KEITH FISCHER,

18   taken by Defendant, pursuant to Notice and Agreement,

19   held at 1540 Broadway, New York, New York, before

20   Joseph R. Danyo, a Shorthand Reporter and Notary

21   Public within and for the State of New York.

22

23

24

25



```
 1

 2   A P P E A R A N C E S :

 3        OUTTEN & GOLDEN LLP
          Attorneys for Plaintiffs
 4            1225 New York Avenue, N.W.
              Suite 1200B
 5            Washington, D.C. 20005

 6        By:  ZARKA SHABIR DSOUZA, ESQ.
               HANNAH COLE-CHU, ESQ.
 7

 8
          DUANE MORRIS LLP
 9        Attorneys for Defendant
              190 South LaSalle Street
10            Suite 3700
              Chicago, Illinois 60603
11
          By:  TIFFANY ALBERTY, ESQ.
12

13

14   Also Present:

15        ADRIENNE CHEMMEL, Videographer

16                   ~oOo~

17

18

19

20

21

22

23

24

25
```



1                    Fischer

2          THE VIDEOGRAPHER:  Good morning.  We

3     are now on the record.  The time is 10:06

4     a.m. on August 28, 2024.  This begins the

5     video deposition of Keith Fischer taken in          10:06

6     the matter of Keith Fischer versus

7     Government Employees Insurance Company

8     filed in the United States District Court

9     for the Eastern District of New York, the

10    case number of which is 2:23 Civ.                    10:07

11    2848(GRB)(ARL).

12          My name is Adrienne Chemmel.  I am

13    your videographer today.  The court

14    reporter is Joe Danyo.  We are

15    representing Esquire Deposition Solutions.           10:07

16          Will everyone present please identify

17    themselves and state whom you represent,

18    after which the witness will be sworn in.

19          MS. DSOUZA:  Zarka Shabir Dsouza from

20    Outten & Golden for the Plaintiffs.                  10:08

21          MS. ALBERTY:  Tiffany Alberty of

22    Duane Morris on behalf of the Defendant

23    GEICO.

24          THE VIDEOGRAPHER:  Will the court

25    reporter please swear in the witness, and            10:08



```
 1                         Fischer
 2         then, Counsel, you may proceed.
 3   K E I T H    F I S C H E R, having been first
 4   duly sworn by Joseph R. Danyo, a Notary Public,
 5   was called as a witness and testified as follows:    10:08
 6   EXAMINATION BY MS. ALBERTY:
 7         Q.   Can you please state and spell your
 8   first and last name.
 9         A.   Keith, K-e-i-t-h, Fischer,
10   F-i-s-c-h-e-r.                                        10:08
11              MS. ALBERTY:  Let the record reflect
12         that this is the discovery deposition of
13         Mr. Keith Fischer taken pursuant to notice
14         and by agreement of the parties.  Today's
15         deposition will be taken in accordance          10:08
16         with all applicable rules.
17         Q.   Mr. Fischer, I know I introduced
18   myself off the record, and I just stated my name
19   for the record, but I'm Tiffany Alberty.  I'm
20   counsel for GEICO, the Defendant in this case.        10:08
21              I'm going to be asking you a series
22   of questions about your background, your
23   experience at GEICO.  Before we get started, have
24   you been deposed before?
25         A.   Deposed, I mean as far as grand jury,      10:09
```



```
 1                      Fischer
 2   conducted during each investigation.  I was given
 3   a set of I guess you could say rules or
 4   procedures to follow, how to conduct each type of
 5   investigation, whether it be a caused accident or      10:52
 6   a theft accident, and I had to meet those.  I had
 7   to do those particular procedures in order to
 8   receive a passing grade on my investigation.
 9        Q.   What were those itemized procedures
10   to take the case, and we'll focus first on theft.      10:52
11        A.   On a theft case, upon receiving it,
12   you were asked to read the claim screens, the
13   policy, the notes from the claims examiner or the
14   theft examiner.
15             After doing that, they would then           10:53
16   call the theft examiner, and you had received, I
17   received a notice that I received the claim.  I
18   would open it up, and it would tell me a little
19   about the claim, the e-mail, as to why I got the
20   case.  So I had some idea.                             10:53
21             So I would dig into the policy, into
22   the policy screens, into the insured, how long
23   they had the policy, how many prior claims they
24   had, things like that.
25             At that point, I would call the theft        10:53
```



```
1                     Fischer

2    examiner, and I would confer with him or her

3    mostly.  Females, I believe nine of the ten were

4    females, and we would confer with that particular

5    theft case what her concerns were as far as the        10:54

6    fraud was.

7         Q.   Okay.  After the theft examiner would

8    articulate to you what her or his concerns were,

9    what procedures as set forth from what you were

10   saying did you have to conduct then thereafter?        10:54

11        A.   I would have to go into my

12   investigative steps.  I would have to initialize

13   my report and say that I received this theft case

14   as a concern from examiner Jane Smith who feels

15   that let's say the insured has had a prior fire        10:54

16   theft or a prior fire or a prior theft claim and

17   has some concerns as to this claim.

18             I would go in, and I would then do a

19   background check on the insured, NICB, sometimes

20   clear, and look at his insurance background into       10:55

21   the claim.  I would then look to see if there was

22   a police report or an accident report depending

23   on the theft.

24             Each and every theft claim was

25   different, whether it was the car was stolen or        10:55
```



```
 1                    Fischer
 2   was the car involved in an accident and then
 3   reported stolen, was there a fire, was there a
 4   crime committed with it.  I would try to look up
 5   Fox News, maybe Channel 2, Channel 7, to see if      10:55
 6   there was any news on this particular claim that
 7   reached that level, let's say, fire, maybe
 8   someone was killed or someone was hurt, and then
 9   I would usually after doing my background checks
10   I would start a basic report just that I had        10:56
11   received the case this date.  These are the
12   examiner's concerns, and these are the steps that
13   I'm going to take to identify if there is any
14   fraud.
15           Usually I will interview the insured.       10:56
16   I will conduct a recorded statement.  I will
17   conduct an examination under oath if needed.  I
18   will confer with law enforcement.  I will confer
19   with any other law enforcement, whether it be a
20   fire marshal or other adverse carrier such as       10:56
21   Progressive, Allstate, Farmers, things like that,
22   to see if they had any prior claims with him, if
23   that came up in their history, and I would
24   usually do my report usually within the same day
25   depending on when I got it.                         10:57
```



```
 1                   Fischer
 2            So it would be about two, two and a
 3    half hours from the time I got it to the time
 4    that I was satisfied that I had done my report,
 5    my initial case report on the claim.              10:57
 6        Q.   For each theft claim, did GEICO
 7    require you to conduct a background check?
 8        A.   Yes.
 9        Q.   For each theft claim, did GEICO
10    require you to obtain a police report?           10:57
11        A.   Not in each case.  Depending on
12    the -- each claim was different.  So it depended
13    on whether the car was recovered right away,
14    whether the insured already had the report.  It
15    all depended on what -- by the time I received   10:57
16    the theft claim, it was usually a day or two or
17    three days, maybe four days old, so some of those
18    documents were already secured by the theft
19    examiner, so I didn't have to, but in most cases
20    I did have to secure that report.                10:58
21        Q.   For conducting research through news
22    channels, was that a required procedure by GEICO
23    for theft cases?
24        A.   Yes.
25        Q.   For procedures set forth for theft      10:58
```



```
 1                     Fischer

 2   cases, were you required to interview the

 3   policyholder?

 4          A.   Yes.

 5          Q.   Were you required to take recorded     10:58

 6   statements?

 7          A.   Yes.

 8          Q.   Were you required to conduct EUOs?

 9          A.   Yes.

10          Q.   Were you required to talk to the       10:58

11   police or fire department?

12          A.   Yes.

13          Q.   Where was that list of procedures to

14   follow generated?

15          A.   It came from home office and           10:58

16   through -- given to, I believe it came out of

17   Chevy Chase.  The eight or nine regions of SIU

18   answered to a gentleman named Steve Ruzienbeck

19   and Michael College, so most of the -- who were

20   both prior Maryland state troopers.  They were    10:59

21   hired by GEICO, and we answered, our region, the

22   8 SIU regions or ten SIU regions answered to

23   those particular individuals.  They laid the

24   foundation and the procedures down to all SIU

25   investigators.                                     10:59
```



```
 1                       Fischer

 2       Q.   After you conducted then I believe

 3   you stated your initial report, after looking at

 4   the claim screen, getting the policy, reading the

 5   notes, speaking to the theft examiner, getting          10:59

 6   the background check, getting a police report,

 7   researching the news, taking recorded statements,

 8   interviews, EUOs, from there, did you make the

 9   determination of what else you needed in order to

10   complete your investigation?                            10:59

11       A.   Yes.

12       Q.   Did anybody tell you what steps you

13   needed to take after you conducted your initial

14   report?

15       A.   No.  Can I just clarify.  That's           11:00

16   limited to what -- those are just some of the

17   things that I was required to do.  I may have

18   left some out like conducting parking tickets on

19   the vehicle after it was stolen or before it was

20   stolen to see its location.  We also got plate         11:00

21   readers towards the end.  As you know, EZ-Pass

22   and things like that, we were required to go into

23   there to see if the car had gone through any

24   tolls.

25            We also touched base, I believe, I           11:00
```



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                              47

```
 1                      Fischer
 2    double-insured case, in other words, if car 1 and
 3    car 2 weren't both from GEICO, I had to reach out
 4    to the adverse carrier, Allstate, Farmers, State
 5    Farm, Progressive, and talk to them as they were        11:05
 6    the other vehicle and speak to their SIU as to
 7    any concerns they may have with their vehicle, if
 8    that was a concern.
 9              I reviewed the police accident
10    report, and it was the same as a theft.  I would        11:05
11    then do my report, and I would go out to the
12    field and do my investigation and/or conduct
13    EUOs.
14         Q.   Similar to the theft claims, once you
15    did your initial review of what we just talked          11:05
16    about, the claim screens, policy, notes, you
17    spoke to the staged loss examiner, background
18    check, police reports, conducting interviews,
19    from there, did you also make the determination
20    of what you needed to conduct in order to then          11:05
21    render your final determination in a staged loss
22    claim?
23         A.   Yes.
24         Q.   Is it fair to say then for both the
25    theft and the staged loss matters that you were         11:06
```



                            Fischer

1
2    given cases.

3               When I had the flood cases out in
4    Houston, I spent a few days, I think I did about
5    500 cars a day where I would test the water, salt    11:11
6    or freshwater inside a car.  I would look the car
7    over.  I would inspect the car to see if there
8    was any fraud concerns.  I actually did it at I
9    believe the Texas stadium where the Texans played
10   as the cars were towed in.                          11:12

11        Q.   With the cat cases, though, for that
12   two to three weeks and when we were talking about
13   Houston and Colorado, that would have been either
14   right before or right at the very beginning of
15   2016, correct?                                       11:12

16        A.   Yes, I believe so.  I don't know when
17   the Houston floods were.  That was the last set
18   of catastrophes that I went to.  I want to say
19   that I did hail 60 or 70 cases in a matter of two
20   weeks, and I did take some home with me back to     11:12
21   New York, back to region 2, which I had to work
22   on to their fruition at the end of the claim.
23   Also do my regular cases.

24               So I was still responsible for those
25   cases even when I got back to New York and back     11:12



```
 1                    Fischer
 2   my investigation, and, just to clarify, that
 3   could have been multiple examiners.  It could
 4   have been the PIP.  It could have been the bodily
 5   injury claim, and it could also be an AD          11:21
 6   adjuster.  Whoever was assigned at the top of
 7   that claims file on the claim screen I would have
 8   to touch base with each and every one of those as
 9   to my findings during my investigation and as
10   well as submit a report to them.  My entire       11:21
11   report, whether it be, you know, three pages or
12   20 pages.
13            Q.   How long or short were your typical
14   reports?
15            A.   Depending on the type of case, you  11:22
16   know, a staged accident and maybe a theft could
17   be anywhere from five pages up to, you know,
18   maybe ten pages, 12 pages.  Each claim was
19   different.  It depended on the extent of the
20   investigation.  You know, if someone was hurt or  11:22
21   someone was arrested, if someone, there was a
22   fire and someone was killed, those kind of things
23   were obviously, there's more to my report, but
24   the more detailed the investigation obviously the
25   bigger the report.                                11:22
```



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                              64

```
 1                    Fischer
 2   maybe 10 max.
 3        Q.   How long would it take to investigate
 4   an auto body fraud case?
 5        A.   Again, depending on the severity and      11:27
 6   how many cars were involved, again, it was
 7   usually enhanced damages that we were concerned
 8   with at body shops.  It was the same types of
 9   damage.  So to review multiple auto damage
10   adjusters' pictures and estimates of fraud, I       11:27
11   mean their estimates of damages, I'm sorry, if I
12   I was given a particular body shop and there was
13   15 cars of concern, that could be a minimum of
14   ten hours.  If it was more cars, it could be 20
15   or 30 with also a lot of street time and a lot of   11:27
16   surveillance.
17        Q.   Did you ever have theft cases that
18   you can open and close the same day?
19        A.   Yes.
20        Q.   Did you have med fraud cases that you      11:27
21   could open and close the same day?
22        A.   Not to my recollection, no.
23        Q.   Did you have social media cases that
24   you could open and close the same day?
25        A.   Yes.                                       11:28
```



                              Fischer

1

2    persons that were inside the residence.

3         Q.   For arson cases, how long did it take

4    you to investigate those types of claims?

5         A.   Those are more of my heavier cases.     11:29

6    So I mean those could go from a minimum of 15

7    hours all the way up to maybe 30, dependent on

8    from beginning to end and how much time I put

9    into them.  It depended on how many times I had

10   to go to the fire marshal's office.  How many     11:29

11   times I had to go to the New York City Police

12   Department, Nassau.

13             I also had a very big following out

14   in Suffolk County, and those were long drives.

15   So I could be, it all depended on the location,   11:30

16   which borough that it was in it depended on.

17             So I would say a minimum of, you

18   know, 15 to 20 hours all the way up to 30 or 40,

19   depending on the severity of the arson.  The

20   fire.  I shouldn't say arson.  The fire.  It       11:30

21   depended if it damaged the home.  Did it hurt

22   anybody?  Did it damage the car?  Did the police

23   have more to this?  You know, as time went on,

24   from 2016 to 2020, surveillance cameras became

25   more pronounced.  They were out in the street.     11:30



```
 1                        Fischer
 2           Q.   As a lead security investigator, I
 3    believe you said you were assigned four to six
 4    additional cases a month.  Correct?
 5           A.   Um-hum.  One to two cases a week.        12:01
 6           Q.   Do you know for those who would have
 7    been 65s in your theft team if they would have a
 8    lower workload than you since they didn't have to
 9    have those additional assignments?
10           MS. DSOUZA:  Objection.                       12:01
11           A.   I can't speak for anybody else as far
12    as their workload.  I really didn't deal with it.
13    I mean they may have caught a few less cases.
14    Five, eight different, you know, small cases than
15    me.  That was really about the same.                 12:02
16           Q.   Do you know how their workloads
17    differed?
18           A.   Each case was different, so it all
19    depended on the severity of the type of theft.
20    Where it occurred.  How far you had to drive.        12:02
21    How many people were involved.  Was it just the
22    insured.  Was it a family.  How many witnesses
23    they had.  It all depended on there were so many
24    different criteria as to the claim that you had
25    to speak to.  The more people that the insured     12:02
```



                              Fischer

 2   brought in to the theft claim as far as

 3   witnesses, you know, how did he get home, who was

 4   he with prior to, who picked him up after the car

 5   was stolen, who did he call, who did he tell          12:02

 6   about the theft.

 7            So sometimes you have to interview

 8   five or six other people other than just the

 9   insured.  So it all depended on the insured's

10   version of the chain of events.                       12:03

11        Q.   From 2016 until 2020, were you ever

12   disciplined in your capacity as a lead security

13   investigator?

14        A.   No.

15        Q.   Did you ever issue out any                  12:03

16   disciplinary action?

17        A.   No.

18        Q.   Do you have any knowledge as to

19   GEICO's disciplinary tiering process?

20        A.   No.  The only thing I can speak to is       12:03

21   summonses.  They did, as you know, Queens County

22   and the five boroughs did change the speed limit

23   as to I think down to 25 miles an hour.  GEICO

24   did inform us that, if we were to receive more

25   than three summonses, moving summonses, red light     12:04



```
 1                    Fischer
 2        Q.   You're stating that GEICO assigned
 3   remote cases with fewer points.  What was a
 4   regular theft case worth?  What was a remote
 5   theft case worth on this point-based system that    02:06
 6   you're stating?
 7        A.   They were worth the same as far as,
 8   you know, I mean, if it was a high-level case, I
 9   don't know if there was actually any, they graded
10   it at all.  It was just you were told you want to   02:06
11   catch more.
12        Q.   Okay, but as far as the point system
13   and the matrix for the point system, you can't
14   sit here today and tell me what that point system
15   was?                                                02:06
16        A.   No, I can't.
17        Q.   Why do you believe that GEICO assumed
18   remote work took less time than in-person field
19   work?
20        A.   Why it took more or less?                 02:07
21        Q.   Less time than in-person field work.
22        A.   Oh, well, I didn't have to travel,
23   windshield time from Brooklyn to Queens, Brooklyn
24   to Manhattan.  I couldn't go out and do canvasses
25   of neighbors and things like that.  Things that I   02:07
```



```
 1                       Fischer
 2            MS. ALBERTY:  Objection.
 3       A.   Yes.
 4            MS. DSOUZA:  I think that is it.
 5            MS. ALBERTY:  I don't have any          05:33
 6       further questions.  Thank you.
 7            MS. DSOUZA:  Thank you.
 8            THE VIDEOGRAPHER:  This marks the end
 9       of the deposition.  We are going off the
10       record at 5:33 p.m.                         05:34
11            (Time noted:  5:33 p.m.)
12                         _____
13
14  Subscribed and sworn to
15  before me this____day of_____, 2024.
16  _____
17
18
19
20
21
22
23
24
25
```



1

2                    C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 2nd day of September, 2024.

16

17   _____

18           JOSEPH R. DANYO

19   STATE OF NEW YORK

20   My Commission Expires 2/20/2027

21

22

23

24

25

