**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated, | Case No. 2:23-CV-02848 |
| Plaintiffs, | District Judge Sanket J. Bulsara |
| v. | Magistrate Judge Steven L. Tiscione |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO, | |
| Defendant. | |

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Government Employees Insurance Company ("Defendant" or "GEICO"), pursuant to Local Civil Rule 56.1, hereby submits the following Statement of Undisputed Facts and Supporting Evidence in support of its Motion for Summary Judgment on the claims of Named Plaintiffs Keith Fischer ("K. Fischer"), Michael O'Sullivan ("O'Sullivan"), John Moeser ("Moeser"), Louis Pia ("Pia"), Thomas Barden ("Barden"), Constance Mangan ("Mangan"), and Charise Jones ("Jones"); and Opt-In Plaintiffs Louis Caniglia, Jr. ("Caniglia, Jr."), Michael Grey ("Grey"), Daniel King ("King"), Margaret Fischer ("M. Fischer"), Craig Costanzo ("Costanzo"), Ted Wendling ("Wendling"), Maria Munoz ("Munoz") and Albert Brust ("Brust") (collectively, "Plaintiffs").

## STATEMENT OF UNDISPUTED FACTS

**I.      The Parties**

1.      GEICO is in the business of providing insurance and operates in the state of New York.  (Docket Entry ("DE") No. 53, GEICO's Answer to Plaintiffs' Second Amended Collective and Class Action Complaint ("Answer"), ¶¶ 1, 106.)

2.      Plaintiffs are current and former GEICO employees in GEICO's Special Investigations Unit ("SIU").  (DE No. 53, Answer at ¶¶ 2, 9, 19, 28, 36, 44, 52, 59, 70.)

**II.     GEICO's Timekeeping Policies**

3.      The SIU is a unit within GEICO comprised of different types of investigators and other workers primarily devoted to investigating different kinds of insurance fraud.  (Ex. 1, J. Fogarty 2024 Decl., ¶¶ 9-29.)[1]

4.      For each investigation, the SIU investigator determined what tasks (such as background checks, scene surveillance, document requests, witness interviews, examinations under oath ("EUOs"), or additional police reporting) were necessary, conducted those tasks, and determined when to close a case.  (Ex. 2, K. Fischer Dep. 43:1-15; 47:14-23; 48:7-11; 63:5-7; Ex. 3, Mangan Dep. 35:13-16; 62:6-9; 71:17-72:8; Ex. 4, Barden Dep. 42:22-43:14; 80:13-21; Ex. 4, O'Sullivan Dep. 44:10-19.)

5.      GEICO associates are responsible for ensuring that all time worked is entered in GEICO's timekeeping system, including overtime.  (Ex. 6, Emails (G012464-65); Ex. 7, Emails (G015179); Ex. 8, Emails (G012482); Ex. 9, GEICO 2017 HR Associate Handbook Excerpts

---

[1] Plaintiffs in this litigation have used the term "Special Investigators" to refer to all investigative employees (sometimes referred to as "associates") in the SIU.  GEICO opposes Plaintiffs' overbroad, blanket characterization, as each investigative position within the SIU was a different position within SIU throughout the relevant period.

(G000039); Ex. 10, GEICO 2023 HR Associate Handbook Excerpts (G000195-196); Ex. 4, Barden Dep. 107:17-19; Ex. 84, Newport Dep. 311:2-12; 312:3-19; 325:2-6; 334:18-335:7.)

6.      GEICO's timekeeping policies appear in its Employee Handbook.  At all relevant times, the Handbook provided that GEICO associates must record all hours worked (Exs. 9, 10), and explicitly states that **"[n]on-exempt associates are never allowed to work 'off the clock.'"** (Ex. 10.)  If any associate works off the clock "or believes [he or she is] being asked to work without reporting time or being properly compensated for time worked," the employee "**must** immediately contact Associate Relations."  (*Id*. (emphasis added)).

7.      While a supervisor would "approve" an employee's timesheet, supervisor's review of timesheets is to ensure time has been entered for each day, and that any vacation, sick, or holiday hours have been keyed appropriately to ensure proper compensation.  (Ex. 84, Newport Dep. 324:8-19.)

8.      With respect to their time entries, Plaintiffs would "just put it in Workday and they get paid."  (Ex. 11, Emails (G012010); Ex. 12, Emails (G012903); Ex. 13, Emails (G011080); Ex. 14, Emails (G011859-61); Ex. 15, Emails (G011586), Ex. 82, Emails (G011540).)

9.      Plaintiffs entered notes on their cases into the Special Investigations Case Management ("SICM") application, and while SICM entries are time-stamped, SICM entries do not show the amount of time it took to complete each case task.  (Ex. 2, K. Fischer Dep. 91:22-25; Ex. 16, SICM Manual (P00000879-906 at 899).)

10.     SICM is not a timekeeping system.   (Ex. 2, K. Fischer Dep. 91:22-25; Ex. 16 (at 899.)

11.     SIU "field" investigators worked outside of a GEICO office and worked "flex" schedules, whereby they could adjust shift start and end times and how many hours they worked

each day.  (Ex. 2, K. Fischer Dep. 36:18-37:19; Ex. 4, Barden Dep. 28:15-21; Ex. 3, Mangan Dep. 38:10-13; Ex. 17, Pia Dep. 52:12-21; Ex. 18, Portnoy Decl. ¶ 14; Ex. 19, Greenman Decl. ¶¶ 8, 10-12.)

12.     Plaintiffs recorded the time that they worked in GEICO's timekeeping software via a computer; beginning in or around 2023, some investigators were able to record their time using a mobile application. (Ex. 17, Pia Dep. 93:21-95:7; Ex. 20, Munoz Dep. 139:23-140:18.)

13.     Upon submission of their hours, GEICO associates, including Plaintiffs, certified that their time entries accurately reflected all of their hours worked, including overtime. (Ex. 21, King Dep. 97:20-98:7; Ex. 22, Caniglia, Jr. Dep. 91:14-92:20.)

### III.    Facts Specific To Each Plaintiff

#### a.   Thomas Barden

14.     Barden worked for GEICO as a Level 65 senior field investigator in the SIU from September 2019 to December 2022.  He investigated auto injury and auto insurance fraud within the Albany, New York region.  (Ex. 4, Barden Dep. 20:18-23; 22:10-19; 25:8-13; 25:25-26:5; 28:12-21; 38:6-15.)

15.     Chet Janik was Barden's supervisor for most of Barden's employment, and Gerard Cassagne was Barden's supervisor for Barden's last few weeks of his employment.  (*Id.* 23-30:12.)

16.     Barden worked "basically eight hours a day," but the "hours were flexible" in that he could determine which hours he worked each day.  (*Id.* 28:12-21; 36:10-18.)

17.     The time for Barden to complete investigations could range from hours to weeks because "[e]ach case was different."  (*Id*. 38:25-39:11; 43:9-10; 44:4-8.)

18.     Janik instructed Barden in 2020, "if you're working extra hours, put in for it. Document it," and specifically told his team "I don't[] want anyone working over their 7.75 hours, without putting in for overtime." (*Id.* 107:3-19; Ex. 8 G012483.)

19.     Barden did not recall working overtime before March 2020, and he was paid for all overtime that he recorded from March 2020 through July 2020. (*Id*. 77:11-16; 98:24-99:8; 151:22-152:10; 196:19-22; Ex. 23, Barden Resp. to Court Interrogatories, Barden Decl. ¶ 11.)

20.     Barden alleges that he worked 55 to 60 hours per week between August 2020 through December 2022, though he does not have any records confirming his hours beyond what he recorded in GEICO's timekeeping software. (Ex. 4, Barden Dep. 99:16-101:14.)

21.     Barden believed that the efficiency with which he closed cases factored into this performance evaluation such that not logging overtime hours would result in merit-based pay increases. (*Id*. 158:21-159:9; 227:14-228:5.)

22.     Barden recorded more than 40 hours in 7 workweeks between September 30, 2019 and December 9, 2022, which is 4.55% of all workweeks during that time and 5.15% of workweeks in which Barden worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 28-29.)

### b.  Albert Brust

23.     Brust worked as a Senior Field Security Investigator from September 2019 through February 2024 where he handled a variety of fraud and theft claims for Nassau County, Suffolk County, Long Island, and the five boroughs area of New York. (Ex. 25, Brust Dep. 48:24-49:14; 50:20-23; 33:20-23.)

24.     Brust alleges that he worked approximately 50-60 hours per week. (*Id*. 246:9-17; 247:11-248:1; 249:3-6; Ex. 26, Brust Resp. to Court Interrogatories, Brust. Decl. ¶¶ 8, 9.)

25.     Brust had "flextime" with which he could schedule his workday based on the needs of his cases, and there were no requirements as to how frequently he had to be in the field or when he needed to start his day.  (Ex. 25, Brust Dep. 55:2-16; 75:21-76:17; 77:3-15; 167:7-11.)  When working on a case, all activity in the files would be time stamped according to the time that it was completed.  (*Id*. 126:1-11; 169:7-18.)

26.     Before COVID, Brust was getting assigned two to three cases a day and traveling often for investigations, but after COVID hit, Brust was receiving five to six cases a day but no longer spent time driving to investigate the different claims in person.  (*Id*. 63:10-18; 91:11-18.)

27.     Throughout his GEICO career, Brust regularly requested, recorded, and was paid for overtime hours.  (Ex. 25, Brust Dep. 114:11-14; 138:18-139:12; 154:6-12; Ex. 27, Brust Pay Records (G000504-508, G000577-584, G000586-587, G000589-591, G000593-594).)

28.     Neither Brust's manager Bill Newport, nor any other SIU Manager ever told him not to record hours that he worked.  (Ex. 26, Brust Dep. 223:7-10.)  In fact, Brust was reminded by his manager Gerard Cassagne to put in his timesheet and "[d]on't forget to put in any overtime if worked." (Ex. 15, Emails (G011586).)

29.     Similarly, Brust never told his supervisor that he was working hours that he did not record in GEICO's timekeeping system and, at one point, reported that he was "not able to, you know, conduct a proper investigation with, you know, just the, you know, standard week." (Ex. 25, Brust Dep. 129:20-24; 221:18-24.)

30.     Brust had told his supervisor Cassagne that he would work while watching hockey games, but never stated to anyone that he was working off the clock.  (*Id*. 130:13-22; 131:25-132:13.)

6

31.     Brust did not make any comments regarding his alleged unpaid off the clock work during his performance evaluations.  (*Id*. 217:4-218:4; 218:6-10.)

32.     Brust received several merit-based pay increases and attributes them to working off the clock: "working the extra hours definitely helped with me satisfying the metrics."  (*Id*. 181:23-182:3; 183:12-19; 185:18-23; 188:19-189:21, 217:11-13.)

33.     Brust recorded more than 40 hours in 22 workweeks between September 16, 2019 and February 2, 2024, which is 9.95% of all workweeks during that time and 10.53% of workweeks in which Brust worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 24-25.)

   **c.  Louis Caniglia, Jr.**

34.     Louis Caniglia, Jr. worked in GEICO's SIU as a senior field security investigator from 2015 to late 2023, based in the New York and Long Island area.  (Ex. 22, Caniglia, Jr. Dep. 26:13-28:1; 55:8-18; 207:4-18.)

35.     Caniglia, Jr. primarily investigated theft cases and sometimes assisted on major case investigations, reporting over the years to different supervisors including Gerard Cassagne, Toni D'Agata, Richard Aniolowski and Theresa Bishop.  (*Id*. 26:13-28:1; 205:13-207:18.)

36.     Caniglia, Jr. estimated that he worked 43 to 50 hours per week from 2016 through 2023.  (Ex. 28, Caniglia, Jr. Resp. to Court Interrogatories, Caniglia, Jr. Decl. ¶ 13.)

37.     Caniglia, Jr. did not work a set work schedule and could use flex time, as his supervisors did not monitor or supervise his day-to-day case tasks.  (Ex. 22, Caniglia, Jr. Dep. 194:5-19; 200:16-201:5; 264:22-266:7.)

38.     Caniglia, Jr.'s case assignments fluctuated monthly, and he had the ability to decline or remove cases if he made the request to his supervisor.  (*Id.* 209:9-19; 213:9-13.)

39.    Caniglia, Jr. received annual training on GEICO's written policies requiring him to accurately record all time that he worked.  (*Id*. 68:5-7; 69:20-24; 91:14-92:20.)

40.    Caniglia, Jr. understood based on supervisor directives that if he worked overtime, he had to document it, including a November 25, 2016 email from his supervisor Gerard Cassagne to Caniglia, Jr. specifically stating "[i]f you work overtime, you must be able to document your time worked," and "**Bottom line**- continue to work the way you were working. If you determine that you need to work overtime on any specific day, you can work the overtime and you will get paid for it. You have to document your overtime hours and be able to verify why it was needed. Your supervisor will also be responsible to verify your overtime."  (Ex. 29, G. Cassagne Dep. 180:16-181:4; 260:14-261:1; Ex. 30, Emails (P00000077).)

41.    On December 8, 2016, Cassagne told Caniglia, Jr. that if he was working overtime, he "must enter it" into his timesheet and that if he was "stuck working overtime" after the timesheets were submitted, to contact him immediately to correct the error.  (Ex. 22, Caniglia, Jr. Dep. 53:10-53:22; 64:4-9; 96:5-8; 103:19-104:3; Ex. 31, Emails (G011548).)

42.    Caniglia, Jr. admitted that he knew the process to request overtime, by contacting his supervisor, and identifying which case he needed overtime and why.  (Ex. 22, Caniglia, Jr. Dep. 53:10-22; 64:4-9; 96:5-8; Ex. 84, Newport Dep. 240:18-241:20; Ex. 32, Caniglia, Jr. OT Emails (G011375-76;  G011385;  G011409;  G011418;  G011455-56;  G011459;  G011461; G011486;  G011488-89;  G011493;  G011500-02;  G011516;  G011535;  G011537;  G011538-39; G011543-45;  G011613;  G011836;  G013543); Ex. 29, Cassagne Dep. 180:16-181:4;  187:9-17; 260:14-261:1.)

43.    Caniglia Jr. told his supervisors "I am requesting overtime", his supervisors approved his overtime requests, and Caniglia Jr. was paid for all overtime that he recorded.  (Ex.

22, Caniglia, Jr. Dep. 112:1-116:5; 117:13-20; 126:1-132:20; 243:16-246:9; Ex. 33, Caniglia, Jr. Pay Records (G002230, G002234, G002241, G002243-46, G002306-10, G002379-89, G002391-92, G002394-96, G008548-52);   Ex. 32, Caniglia, Jr. OT Emails (G011421-11423; G11375 (emailing "I am requesting overtime.")).)

44.     None of Caniglia, Jr.'s supervisors told him to work off the clock (Ex. 22, Caniglia, Jr. Dep. 54:7-18) or that he could not receive overtime pay.  (*Id.* 165:8-19.)

45.     Sometime during his tenure, Caniglia, Jr. started to use the Workday application on his cell phone.  (*Id.* 42:10-14; 51:1-14.)

46.     Caniglia, Jr. never told his managers or Human Resources ("HR") that he was working time beyond what he recorded or that his pay did not reflect the hours that he worked. (*Id.* 78:18-79:20; 84:4-7; 167:1-8.)

47.     Because Caniglia, Jr. handled a variety of cases, he admitted that the productivity metric was different per type of case and team assignment.  (*Id.* 208:4-7.)

48.     Caniglia, Jr. thought that closing cases in less time would positively impact his merit salary raise that he received every year.  (*Id.* 242:14-243:6; 229:13-15.)

49.     Caniglia Jr. recorded more than 40 hours in 32 workweeks between April 17, 2017 and December 21, 2023, which is 9.97% of all workweeks during that time and 11.07% of workweeks in which Caniglia Jr. worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 20-21.)

### d.  Craig Costanzo

50.     Costanzo was a senior field security investigator with GEICO SIU from approximately 2014 to 2019 and has been a lead security investigator since approximately August 2019, at most times based in upstate New York.  (Ex. 34, Costanzo Resp. to Court Interrogatories,

Costanzo Decl. ¶¶ 1-2; Ex. 35, Costanzo Dep. 16:1-6; 20:3-8; 94:16-23; 107:6-10; 127:13-128:20; 186:2-9.)

51.    Costanzo's supervisors were Chet Janik from approximately 2014 to 2022, Dara Campbell from November 2022 to June 30, 2023, Andrew Gelderman from July 1, 2023 to March 18, 2024, and Sarah Greenman from March 19, 2024 to present.  (*Id.* 22:14-24; 74:20-75:22.)

52.    Costanzo alleges that he worked approximately 43 hours per week before March 2020, approximately 48 hours per week but as much as 55 hours per week from March 2020 to November 2021, and approximately 42 to 45 hours from November 2021 to the present.  (Ex. 34, Costanzo Resp. to Court Interrogatories, Costanzo Decl. ¶¶ 10-13.)

53.    Costanzo's estimates include approximately 3 hours of commuting per day during periods in which he worked in the field.  (Ex. 35, Costanzo Dep. 101:16-23.)

54.    Costanzo testified "[t]hat's possible" when directly asked if his alleged extra hour worked per day on top of his scheduled work hours was spent commuting from the field back to his home, and that no one instructed him to work an extra hour per day.  (*Id.* 87:10-25; 232:25-233:24; 234:8-23.)

55.    Costanzo's supervisor Chet Janik did typically approve Costanzo's overtime requests.  (*Id.* 45:20-47:16.)

56.    Costanzo knew that GEICO policy required him to document all the time he worked into GEICO's timekeeping system and Costanzo admitted that "if [Costanzo] worked overtime, [he] knew that [he was] supposed to document that" in GEICO's timekeeping system.  (*Id.* 48:12-20.)

57.    Costanzo's supervisor did not know on a day-to-day basis what hours he was working.  (*Id.* 49:2-9.)

58.    Costanzo never told his supervisor that he worked any time that he did not record into GEICO's timekeeping software, and he was "not sure how they would have known that" he was working any time that he did not record.  (*Id*. 45:20-47; 50:12-51:3; 232:25-233:24.)

59.    Costanzo had authority to change the status of his investigations to "closed" in SICM without supervisor approval.  (*Id*. 211:1-212:5.)

60.    Costanzo stopped working off the clock at some point in 2022 or 2023.  (*Id*. 243:17-244:21; 252:18-254:6.)

61.    Costanzo received overtime pay for overtime hours recorded in GEICO's timekeeping system.  (Ex. 36, Costanzo Pay Records (G001030-1031; G001034; G001036-1039; G001045; G001047; G001050-1051; G001053-1054; G001057-1059; G001061-1068; G001074; G001082; G001084-1085; G001087-1092; G001094; G001096-1098; G001100-1102; G001111-1113; G001186; G001192; G008980; G008982-8983; G008985-8990; G008992; G008994-8995; G008998-9000; G009009-9011; G010102; G010104-5; G010107-12; G010114; G010116-18; G010120-22; G010131-33).)

62.    Costanzo believed that Janik and Newport knew that he was working more hours than he was entering into Workday because "they had access to that SICM to see when we're in and when we're out and that they would know we were doing work and doing entries after hours." (Ex. 34, Costanzo Dep. 142:12-144:24.)

63.    Costanzo never complained to GEICO's local HR, corporate HR, or any supervisor that he did not receive pay for all hours worked.  (*Id*. 151:13-24; 152:5-10.)

64.    Costanzo recorded more than 40 hours in 59 workweeks between April 17, 2017 and September 6, 2024, which is 15.49% of all workweeks during that time and 17.05% of workweeks in which Costanzo worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 22-23.)

### e. Keith Fischer

65.    K. Fischer was employed as a Grade 65 GEICO SIU Investigator from 1999 to 2004 and as a Grade 66 GEICO SIU Lead Investigator from 2004 to 2020 based in New York City and Long Island.  (DE No. 53, Answer at ¶ 9; Ex. 2, K. Fischer Dep. 25:17-25; 27:13-16; 28:12-19; 31:6-13.)

66.    From 2016 to 2020, K. Fischer primarily investigated theft cases, reported to supervisor Gerard ("Gerry") Cassagne, and did not work a set work schedule, but rather, he determined what tasks were needed for a given investigation and used flex time to complete them. As a Lead Investigator, he also trained incoming SIU investigators.  (*Id.* 31:17-20; 33:2-6; 33:18-22; 34:9-11; 36:11-37:19; 43:12-15.)

67.    K. Fischer spent different amounts of time on each case.  For example, K. Fischer closed some cases the same day that he received them, and he closed some cases in a matter of months.  (*Id.* 64:17-19, 23-25; 66:3-67:6; 73:7-13; 79:16-80:10; 125:24-126:6.)

68.    K. Fischer received GEICO's written policies requiring him to record and enter all time worked accurately, received annual training on those timekeeping policies, and was paid for all time that he entered in GEICO's timekeeping system.  (*Id*. 85:5-86:23; 107:9-20; 119:5-9.)

69.    Neither K. Fischer's supervisor (Cassagne) nor his manager (Newport) told him to work without recording his time, meaning work "off the clock."  (*Id*. 88:2-89:3; 99:4-11.) Cassagne allegedly told K. Fischer that how he completed his work was up to him and that "you have to do what you have to do to complete your work."  (*Id*. 87:3-10; 88:2-18.)

70.    On November 25, 2016, Cassagne sent K. Fischer an email stating, "[i]f you work overtime, you must be able to document your time worked," and "**Bottom line**- continue to work the way you were working. If you determine that you need to work overtime on any specific day,

you can work the overtime and you will get paid for it. You have to document your overtime hours and be able to verify why it was needed. Your supervisor will also be responsible to verify your overtime." (*Id.* 241:4-12; Ex. 30, Email (P00000077).)

71.     K. Fischer controlled how many hours he entered into GEICO's time keeping software, and he generally recorded working 7.75 hours per day, Monday through Friday. (Ex. 2, K. Fischer Dep. 106:15-23; 111:10-112:14.)

72.     GEICO paid K. Fischer for all time that he recorded in GEICO's timekeeping system. (*Id.* 106:15-23; 111:10-112:14.)

73.     K. Fischer estimated that he worked 50 to 65 hours per week from 2016 through March 2020. (Ex. 37, K. Fischer Resp. to Court Interrogatories, K. Fischer Decl. ¶ 9.)

74.     K. Fischer described the schedule of a day of work as follows: he left his house at 5:00 am, arrived at an interview location at 7:00 am, "sleep in your car" or reviewed the file until 9:00 am, conducted an interview until approximately 2:00 pm, and arrived home at 4:00 pm. According to K. Fischer, the day he described included 11 hours of work. (Ex. 2, K. Fischer Dep. 242:21-243:24.)

75.     K. Fischer routinely included his commute toward his total hours worked. (Ex. 38, K. Fischer OT Emails (G011487 (6:45 am left my residence . . . 3 EUO's . . . from 10AM to 12PM; drove home/arrived 1:45PM); G011491 ("7:15AM left residence; 10:00AM-1:00PM conducted 3 EUO's; 1:00PM left [Brooklyn], 2:30PM arrived home"); G011492 (6:30AM to 7PM; Left my house at 7AM; I did a EUO . . . at 11AM")).) At least once, K. Fischer included a seven hour stretch of time that he spent "on and off typing cases…" (Ex. 38, K. Fischer OT Emails (G011498).)

76.     K. Fischer understood how to request overtime because from 2016 to 2020, K. Fischer recorded and was paid for overtime, including on at least six occasions in 2017.  (Ex. 39, K. Fischer Pay Records (G002123; G002125-2127; G002136-2137; G002144); Ex. 38, K. Fischer OT Emails (G011487; G011492; G011518; G011521; G011515; G011497; G011498; G011496; G011536); Ex. 2, K. Fischer Dep. 116:3-7; 152:8-11; Ex, 29, G. Cassagne, 180:16-181:4; 187:9-17; 189:5-10; 260:14-261:1.)

77.     K. Fischer believed that if he recorded overtime, he would receive lower scores on his monthly "report card" and that he "needed the rating of 4 or 5 to get a better raise and better compensation through [his] profit share."  (Ex. 2, K. Fischer Dep. 99:16-18.)

78.     GEICO never capped the number of hours that K. Fischer could work on a given case.  (*Id*. 189:8-190:21.)

79.     K. Fischer never told Cassagne, Newport, or HR about any occasion in which he worked more hours than he recorded because, as he explained, "You don't report them. You just, you sit, and you take it.  That's just the way we did things."  (*Id.* 97:5-16; 98:20-25.)

80.     K. Fischer does not know if any other investigators requested overtime, were denied overtime, or worked uncompensated overtime, did not personally see other investigators performing their work, did not look at the SIU claim files of any other investigators other than for training purposes, and he could not see what hours other investigators entered in GEICO's timekeeping system.  (*Id*. 194:8-196:5.)

81.     K. Fischer generally recalled that coworkers informed him that they were working long hours and their caseload was difficult, but he did not relay the report to anyone else at GEICO or suggest that the reporting coworker inform a supervisor or HR.  (*Id*. 206:2-207:18.)

14

82.    K. Fischer once asked Newport "…who's watching the store here? Do you know what we do? Is anybody telling you what we do? Do you read our reports? Do you read the things that we do? Do you look at our monthly reports? Do you look at our mileage reports? Do you look at our reports to Jerry [Cassagne]? Do you look at our report cards?"  (*Id*. 89:13-92:8.)

83.    K. Fischer never recorded the total amount of hours or overtime that he worked outside of GEICO's timekeeping system.  (*Id*. 234:6-235:5.)

84.    According to K. Fischer, SICM time-stamped entries do not show hours worked and he would type of case task summaries in Microsoft Word and submit them as SICM entries at a later time.  (*Id*. 247:18-22; Ex. 81, C. O'Neil Interview Notes.)

85.    K. Fischer participated in prior litigation captioned as the *Calderon* and *Vedder* matters against GEICO alleging unpaid wages and received around $99,300 total as a result.  (*Id*. 9:9-11:18.)

86.    K. Fischer recorded more than 40 hours in 6 workweeks between April 17, 2017 and August 27, 2020, which is 3.61% of all workweeks during that time and 4.26% of workweeks in which K. Fischer worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 32-33.)

**f.  Margaret Fischer**

87.    M. Fischer worked as a GEICO SIU investigator from approximately January 2010 to September 2020, and she retired in November 2020.  Beginning in 2016, M. Fischer predominantly worked in GEICO's Long Island office as an inside medical major case investigator.  (Ex. 40, M. Fischer Dep. 58:17-59:8; 82:4-83:10; 87:2-7; 68:25-69:8; Ex. 41, M. Fischer Resp. to Court Interrogatories, M. Fischer Decl. ¶ 1.)

88.     M. Fischer's supervisors were Danielle Perdomo from approximately 2016 to 2018 and then Kristen Slack until she retired.  (Ex. 40, M. Fischer Dep. 62:14-64:13; Ex. 41, M. Fischer Resp. to Court Interrogatories, M. Fischer Decl. ¶ 2.)

89.     M. Fischer generally worked a set schedule from 9:00 am to 5:30 pm.  (Ex. 40, M. Fischer Dep. 104:25-105:17.), and alleges that she worked around 41.5 to 42 hours per week from December 2016 to March 2020 and around 40.75 hours per week from March 2020 to September 2020.  (*Id*. 147:12-25.)

90.     M. Fischer's time estimates included each day approximately 10 to 15 minutes to set up her workstation at her dining room table and 10 to 15 minutes to take it down, which she alleges was necessary to eat dinner at her table.  (*Id.* 138:25-139:18; 142:5-23.)  She did not inform her supervisor about the time spent organizing her workstation.  (*Id.* 141:13-142:12; 144:2-24; 148:17-149:10.)

91.     M. Fischer's supervisor assigned her approximately four cases per month.  (*Id.* 65:9-17.)  M. Fischer's caseload decreased upon the onset of COVID in March 2020 because she was not assigned new cases.  (*Id.* 242:15-243:10.)

92.     M. Fischer's cases were complex and could take months or even years to close.  (*Id.* 94:6-14; Ex. 42, Sheppard Decl. ¶ 18.)  She typically closed around three (3) cases per month, though every month was different.  (Ex. 40, M. Fischer Dep. 98:17-20.)

93.     M. Fischer was required to request permission from her supervisor to work more than her regular work hours and her timesheet had to show the dates and number of hours that she worked, including any overtime.  (*Id*. 34:13-35:5; 171:7-24; 172:6-16.)

94.     M. Fischer rarely requested overtime because "[i]t has been the trend in [GEICO] that people just worked to get their work done for the day" and she "didn't feel that it would be approved." (*Id*. 190:16-192:4; 193:21-194:16.)

95.     No supervisor or manager instructed M. Fischer not to report overtime, and GEICO paid her for all hours that she entered into GEICO's timekeeping system. (*Id*. 129:6-19; 182:7-183:6; 186:7-187:15; 236:19-23; Ex. 43, M. Fischer Pay Records (G002657).)

96.     M. Fischer did not enter case notes into SICM every day and was only required to create a "diary" log in SICM every 15 business days. (Ex. 40, M. Fischer Dep. 92:7-93:24; 94:15-18; 97:5-98:7; 123:10-124:4.)

97.     M. Fischer's performance evaluations depended on the quality of her investigations. (*Id*. 100:12-102:8; Ex. 44, Bishop Decl. ¶ 21.)

98.     M. Fischer's performance was not evaluated for "Productivity," meaning the number of cases closed in a month, or "Case Life," meaning how long her investigations remained open. (Ex. 40, M. Fischer Dep. 100:12-102:8; Ex. 44, Bishop Decl. ¶ 21; Ex. 43, Sheppard Decl. ¶ 22.)

99.     M. Fischer believes her supervisor tracked the number of hours that she worked through the time stamps on her case notes and e-mails, and her building swipe in and out times, though none of her supervisors told her or suggested that they did so. (Ex. 40, M. Fischer Dep. 130:2-18; 132:25-133:4; 134:7-25; 291:14-292:3.)

100.    M. Fischer never complained to her supervisor, manager, or HR regarding her hours or her pay, nor does she recall coworkers making such complaints. (*Id*. 173:14-175:9; 179:3-181:2.)

101.    M. Fischer recorded more than 40 hours in 2 workweeks between April 17, 2017 and September 18, 2020, which is 1.14% of all workweeks during that time and 1.27% of workweeks in which Fischer worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 6-7.)

### g.  Michael Grey

102.    Grey worked as a senior field security investigator with GEICO SIU from 2003 to August 2024.  He worked in the field or from home before 2016 until December 2023, when he transitioned to a 100% in-person desk investigator role.  Grey worked out of Buffalo, New York and would cover the northern territory of New York.  (Ex. 45, Grey Dep. 11:2; 37:24-25; 52:3-23.)

103.    Grey reported at different times to Chat Janik, Toni D'Agata and Andrew Gelderman.  (*Id*. 69:1-71:25; Ex. 46, Grey Resp. to Court Interrogatories, Grey Decl. ¶ 2; Ex. 47, Gelderman Decl. ¶ 9.)

104.    During Grey's employment, he took two extended periods of time off due to medical issues in 2019 and 2021.  (Ex. 45, Grey Dep. 87:22-88:16; 279:21-280:11.)

105.    Grey did not work a set schedule and could use flex time, and asserts he worked approximately 45 to 50 hours per week.  (*Id.* 110:1-4; 119:3-11; 123:12-18; 124:4-11; 125:11-25; 262:23-263:9; Ex. 46, Grey Resp. to Court Interrogatories, Grey Decl. ¶ 11.)

106.    Grey received GEICO's written policies requiring him to accurately record all time that he worked, and he received annual training on those policies.  (*Id*. 134:12-135:5; 138:24-139:13.)

107.    On April 19, 2018, Grey's supervisor emailed his team stating, "you are aware that you are eligible for overtime pay, per the guidelines. If you are working beyond 7.75 hours in a day, you should be putting in for the overtime pay."  (*Id*. 100:20-101:6; 106:5-18; Ex. 6.)

108.    Grey requested overtime from his supervisor Chet Janik on multiple occasions. (Ex. 48, Grey OT Emails (G012453-54; G012457-58; G012461; G017971-72).)  GEICO paid Grey for overtime that he properly recorded in the timekeeping system.  (Ex. 45, Grey Dep. 110:1-4; 119:3-11; 125:11-25; 213:2-14; Ex. 49, Grey Pay Records (G003189-97; G003200-3202; G003208; G003210; G003214; G003219-23; G004025-26; G004028-30; G004032-33; G004036; G004038; G008279-87; G008290-92; G008298-8300; G008304; G008309-13); Ex. 50, Grey's 2019 Annual Performance Appraisal (G006119-6129).)

109.    When Gelderman supervised Grey, Gelderman told him, "to always enter all of [his] time worked so that [he] could be properly compensated for such time – including the occasions the required overtime hours worked over 40 in a given week."  (Ex. 47, Gelderman Decl. ¶¶ 9, 18).

110.    Grey became a desk investigator and did not work overtime after February 2023. (Ex. 45, Grey Dep. 181:4-9.)

111.    Janik never told Grey to work off the clock.   (*Id*. 150:16-152:2; 273:5-9.)

112.    Grey never contacted his supervisor, manager or HR to complain that he did not receive pay for all the hours he worked.  (*Id*. 139:25-140:21; 192:9-12; 256:24-257:6.)

113.    Grey recorded more than 40 hours in 39 workweeks between April 17, 2017 and August 1, 2024, which is 11.08% of all workweeks during that time and 12.23% of workweeks in which Grey worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 4-5.)

### h.  Charise Jones

114.    Jones has worked at GEICO since 1986.  Jones worked in the SIU as a Level 65 investigator from approximately 2016 to 2022, as a SIU Trainer from mid-2022 to late-2023, and

since late-2023 as an SIU Auditor.  (Ex. 51, Jones Dep. 30:10-16; 60:19-25; 92:22-93:2; 93:13-94:7.)

115.    From mid-2022 to late-2023, Jones worked as a SIU trainer, which was an exempt position for which she was paid on an annual salary.  (*Id.* 89:19-90:8; 92:22-93:2; Ex. 1, Fogarty 2024 Decl. ¶ 8; Ex. 80, SIU Trainer Job Description).

116.    Jones alleges that she worked 51 to 58 hours per week between April 2017 and March 2022.  (Ex. 52, Jones Resp. to Court Interrogatories, Jones Decl. ¶ 13.)

117.    Jones once complained to her supervisor that she "wasn't able to finish up what I had" due to "so much windshield time," which is how she referred to her estimated four to six hours of commute time per day, and she described days where she "put[] in almost [her] entire day of [her] 7.75 in the car."  (Ex. 51, Jones Dep. 122:21-123:4; 151:18-152:8; Ex. 52, Jones Decl. ¶ 8.)

118.    Jones understood that GEICO policy required her to accurately record her hours worked but she "never report[ed] working more than 7.75 hours per day.  (*Id.* 105:21-24; 108:19-109:3; 160:12-14.)

119.    SIU Manager Bill Newport, when discussing hiring needs, cautioned SIU associates not to work off the clock because doing so would "not be beneficial for the people that are only working the 38.75 [hours], because you'll have the numbers skewed."  (*Id.* 172:6-173:9.)

120.    Jones closed investigations in between one hour and several weeks.  (*Id.* 78:7-22.)

121.    Jones had flex time with which she could adjust her schedule as needed.  (*Id.* 76:7-15.)

122.    April Neyland, Jones's supervisor, instructed Jones that if she worked late on one

day, then she should use flex time to "try to take it off before the next pay period."  (*Id*. 161:23-

162:11.)

123.    Neyland further instructed Jones that "if [she] was going to work over 38.75 hours

per week [she] needed to speak with [Neyland] … and state why [she] needed to work additional

hours."  (Ex. 52, Jones Decl. ¶ 7.)

124.    Jones sometimes requested overtime hours that her supervisor "approved… no

problem", and GEICO paid her for the overtime that she recorded.  (Ex. 51, Jones Dep. 148:15-

17; 149:10-14; Ex. 53, Jones Pay Records (G000767, G000792, G000799, G000801, G000806,

G000810, G000823, G000827, G000829, G000832, G000837, G000848, G000849, G000850,

G000851, and G000896).)

125.    Jones described the process for requesting overtime as a "hassle" and too "time

consuming."  (Ex. 51, Jones Dep. 148:18-149:14, 150:14-19.)

126.    Jones never reported working off the clock to a supervisor or to HR and postulates

that timestamps on her entries in SICM notified GEICO of her hours.  (*Id.* 153:12-22; 156:7-15,

190:13-25.)

127.    Newport at one point asked Jones's team "how [they] were doing, how the

workflow was, if [they] needed anything," and Jones did not raise any concerns about pay or

working time.  (*Id.* 72:20-73:15.)

128.    Jones recorded more than 40 hours in 21 workweeks between April 17, 2017 and

March 25, 2022, which is 8.4% of all workweeks during that time and 9.77% of workweeks in

which Jones worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 30-31.)

### i. Daniel King

129. King worked as a senior field security investigator with GEICO SIU from approximately 2005 to May 2022. He was based out of the Woodbury area in New York and focused on auto fraud. (Ex. 21, King Dep. 41:20-44:20; 53:7-14; 57:2-4; 62:19-21; 162:20-163:2; Ex. 54, King Resp. to Court Interrogatories, King Decl. ¶ 1).

130. From 2016 until his resignation, King reported at different times to Toni D'Agata and Dara Campbell. (Ex. 21, King Dep. 49:24-50:13; 51:16-24; 171:17-22.)

131. King alleges that from 2016 to May 2022, he worked between 50 to 52 hours per week. (Ex. 54, King Decl. ¶ 11.)

132. King contends he did not have flex time and worked a set schedule of Monday through Friday, from approximately 8:00 am to 4:30 pm. (Ex. 21, King Dep. 144:15-145:2.)

133. King received and was annually trained on GEICO's written policies requiring him to accurately record and submit all his worktime. (*Id.* 83:7-84:10; 85:13-18; Ex. 55, King Training Records (G004268).)

134. King requested overtime from D'Agata. (Ex. 56, King OT Emails (G011213; G011215).)

135. On December 30, 2019, King again followed GEICO's overtime request process by emailing his supervisor D'Agata indicating the cases he needed four hours of overtime on. (Ex. 56, King OT Emails (G011750).)

136. King requested overtime on several occasions. (Ex. 56, King OT Emails G011213; G011215; G011750.)

137. GEICO paid King for any overtime requested and recorded in GEICO's timekeeping system. (Ex. 21, King Dep. 191:23-200:15; Ex. 56, King OT Emails (G011868;

G011931; G012063; G012158; G012227; G012235; G012240); Ex. 57, Pay Records (G010030-35; G010038; G010048-51; G010064; G001203; G001205; G001207-1214; G001225-1226; G001228; G001230; G001233; G001235; G001242; G001249; G001265-1270; G001273; G001283-1286; G001299).)

138.    King alleges that Dara Campbell told him that he can "only ente[r] 7.75 hours per day regardless of how many hours worked," but could not recall when this conversation occurred, nor in what context.  (Ex. 21, King Dep. 105:23-106:16.)

139.    No supervisor ever instructed King to work off the clock.  (*Id*. 116:23-117:5; 128:24-129:3; 137:9-25.)

140.    King was on FMLA leave from February 2020 to August 2020.  (*Id.* 128:7-15; 142:15-23.)

141.    King never complained to a supervisor or to HR that he was not paid for all of the hours he worked until he alluded to same when he tendered his resignation in May 2022.  (Ex. 21, King Dep. 90:24-91:10; Ex. 58, King Resignation (G005838).)

142.    King recorded more than 40 hours in 37 workweeks between April 17, 2017 and May 13, 2022, which is 15.61% of all workweeks during that time and 17.96% of workweeks in which King worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 14-15.)

### j.    Constance Mangan

143.    Mangan worked for GEICO as a Level 65 Senior Investigator from April 2004 until July 1, 2020.  (Ex. 3, Mangan Dep. 25:11-20; 30:4-8.)

144.    Mangan was trained on GEICO's employee handbook policies and understood that GEICO prohibited employees from working off the clock.  (*Id*. 84:1-20.)

145.    Mangan alleges that she worked "around 50 to 60 hours a week on average" between late 2016 and May 2020.  (*Id.* 129:22-130:11; Ex. 59, Mangan Resp. to Court Interrogatories, Mangan Decl. ¶ 10.)

146.    Mangan's estimate is based "on a week in September that [she] could more specifically recall working the over time [sic].  But [she doesn't] have any document to reflect that…."  (Ex. 3, Mangan Dep. 134:4-6; 133:23-134:8.)

147.    Mangan recalls "sometimes" informing her supervisors that she was working until 7:30 pm, 8:00 pm, or 9:00 pm at night and claims unnamed supervisors at unspecified times told her "Don't do overtime. Work 38.75; work 7.75."  (*Id.* 110:21-24; 147:24-148:2.)

148.    Mangan knew how to request overtime because she submitted several requests for overtime, which were approved, and she admitted that when she did request the overtime, it was always approved.  (*Id.* 105:20-24; 106:3-6; 108:12-15; Ex. 60, Mangan Pay Records (G00967); Ex. 61, Mangan OT Emails (G11615; G11617; G11639; G11645; G11666; G11667; G11679; G11683; G11685; G11741; G11746).)

149.    Mangan believes that her supervisors knew she was working more hours than what she recorded based on timestamps on her SICM entries and emails.  (*Id.* 130:12-133:5.)

150.    Mangan sometimes declined to record overtime hours because she thought "it affects [her] performance evaluation" and to ensure that she met GEICO's performance metrics for employees in her position.  (*Id.* 110:9-112:12.)  Mangan cannot remember a specific date where a supervisor told her not to submit overtime.  (*Id.* 109:11-14; 111:5-19.)

151.    Mangan received annual raises throughout her employment with GEICO.  (*Id.* 93:15-18.)

152.    Mangan was an opt-in plaintiff in *Vedder v. GEICO* and received approximately $11,000 in a settlement in that matter for unpaid wages.  (*Id*. 9:9-11:25; Ex. 59, Mangan Decl. ¶ 6.)

153.    Mangan recorded more than 40 hours in 2 workweeks between April 18, 2017 and May 29, 2020, which is 1.28% of all workweeks during that time and 1.43% of workweeks in which Mangan worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 12-13.)

### k.  John Moeser

154.    Moeser worked in the GEICO SIU as a senior field security investigator from October 2006 to April 2021, based in the New York City and Long Island region.  From 2016 onward, Moeser focused on staged loss and theft cases, and his supervisors at different times were Rich Kilgin or April Neyland.  (Ex. 62, Moeser Dep. 31:18-23; 35:18-25; 38:9-39:5; 44:4-11; 64:19-65:2.)

155.    Moeser alleges that he worked approximately 52.5 hours per week from December 2016 to March 2020 and approximately 55 hours per week from March 2020 to April 2021.  (*Id.* 139:14-23; Ex. 63, Moeser Resp. to Court Interrogatories, Moeser Decl. ¶¶ 10-11.)

156.    Moeser's case load fluctuated week to week and month to month, all cases required different tasks, and the time to complete cases "varied" from a few hours to a few months.  (Ex. 62, Moeser Dep. 50:5-22; 54:24-55:20; 59:11-15; 67:10-19; 270:18-272:10.)

157.    Moeser did not have specific hours he had to clock in and clock out but had the ability to work "flexible hours" and worked in the field as part of former Region 2 throughout his GEICO tenure.  (*Id.* 34:25-35:14; 101:7-102:1.)

158.    Beginning in approximately March 2020, Moeser had more time to complete his tasks because he was no longer working in the field.  (*Id.* 153:10-18; 157:9-22.)

159.    Moeser did not enter case notes into SICM in real time, such that the time stamps on his SICM entries do not show which day or at what time the task was completed.  (*Id.* 184:20-185:19; 246:18-23.)

160.    GEICO trained Moeser on its policy requiring employees to accurately record of all of the time that they worked, and Moeser understood that GEICO required him to log all of his hours.  (*Id.* 83:8-14.)

161.    Moeser knew that he could ask his supervisor to preapprove overtime by identifying which case he was working on and what tasks he needed to complete.  (*Id.* 134:21-135:9; 198:14-17.)

162.    Moeser frequently recorded overtime in GEICO's timekeeping system, and GEICO paid him overtime rates for any overtime hours recorded.  (*Id.* 111:12-21; 115:3-5; 141:13-20; 138:2-5; 138:18-22; 198:14-17; 202:19-24; Ex. 64, Moeser Pay Records (G001790; G001811; G001871; G001873; G008736; G008738; G009858; G009860).)

163.    Moeser admits he knew that he could bring any concerns about pay issues to his supervisor, local, or corporate GEICO HR, but he never reported anything to HR.  (*Id*. 95:10-19; 96:9-15.)

164.    Moeser believed that if he recorded overtime, he would have lower performance ratings, which determined whether he was eligible for a raise, but the metrics were never the same, changed intermittently throughout the year and was not the only variable for a raise.  (Ex. 63, Moeser Decl. ¶ 14; Ex. 62, Moeser Dep. 175:10-177:13.)

165.    Moeser participated in two prior litigations captioned as the *Calderon* and *Vedder* matters against GEICO alleging unpaid wages and received roughly $74,000 as a result.  (*Id*. 12:4-15:16.)

166.    Moeser recorded more than 40 hours in 6 workweeks between April 17, 2017 and April 30, 2021, which is 2.97% of all workweeks during that time and 3.30% of workweeks in which Moeser worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 16-17.)

### l.    Maria Munoz

167.    Munoz has worked at GEICO in a variety of jobs since 1999, all based out of the Long Island GEICO location.  (Ex. 20, Munoz Dep. 45:10-16.)

168.    In 2015, Munoz started her job as a field investigator in the SIU where she investigated auto damage claims for "aspects of fraud" for Region 2, which handled New York state.  (*Id*. 51:17-22; 52:22-8; 53:18-23.)  For a brief period of time in 2020, Munoz was assigned as a member of the specialized theft team.  (*Id*. 64:13-25.)

169.    Munoz alleges that she worked approximately 46 to 48 hours per week from July 2016 through March 2020, 48 to 52 hours per week from March 2020 to November 2021, and 46 to 48 hours per week from November 2021 to present.  (*Id*. 157:22-158:4; 171:14-23; Ex. 65, Munoz Resp. to Court Interrogatories, Munoz Decl. ¶ 10.)

170.    During her time at GEICO, and on an annual basis, GEICO trained Munoz to record all time that she worked, and she understood that GEICO required her to "record our time or input our time that was worked."  (Ex. 20, Munoz Dep. 119:20-120:6; 123:9-19.)

171.    Munoz's supervisors at different times were Dara Campbell, April Neyland, Gerard Cassagne, Toni D'Agata, Sarah Greenman, and her current supervisor Arineh Nazari, and her manager at different times were Mike DeGrocco, Bill Newport, and her current manager Rene Cubas.  (*Id*. 52:15-21; 59:21-62:16; 144:18-145:6.)

172.    Due to the remote nature of her job, Munoz would "go literally weeks without talking to anyone," including without talking to any of her supervisors.  (*Id*. 164:3-13.)  Munoz

also had authority to close out her cases by herself without waiting for supervisor approval, so she worked primarily independently.  (*Id*. 151:22-24; 154:13-15.)

173.    Munoz's volume of claims varied drastically: the summer months were the busiest by volume and the winter holidays were "not really that busy."  (*Id*. 99:4-22.)

174.    Munoz's time spent working depended on "traffic."  The sites that she investigated could be "well over anywhere between 60 to 120 miles one way."  (*Id*. 55:10-13; 56:9-18; 92:3-17.)

175.    While Munoz was scheduled into a particular shift, she was able to take advantage of GEICO's flex time which she could use if she "needed to work at a not regularly scheduled time, [she] could back that time out at a later or earlier time."  (*Id*. 57:13-17.)  Munoz had the ability to flex her time as long as it was within the same pay period but did not use flex time very often, and no one at GEICO told her how to arrange her flex time when she did use it.  (*Id*. 58:12-59:3; 68:22-69:5.)

176.    None of Munoz's supervisors instructed her to work off the clock.  (Ex. 20, Munoz Dep. 161:18-162:12).  Munoz asked her supervisor Nazari for overtime to complete her work but after being denied the overtime, Munoz did not work the overtime hours when they were not approved.  (*Id*. 136:19-24; 137:19-140:18; 143:15-144:10.)  Rather, Munoz input up to 39.99999 hours into Workday, all of which was paid,  (i*d*. 178:10-179:5; 136:19-24), and she testified that if she is not getting paid, "I stop.  Computer goes off.  Phone's on the charger.  I don't do anything after the hours.  I don't pick up calls."  (*Id*. 179:17-23; 199:7-16.)

177.    Although Munoz asked supervisor Gerard Cassagne about overtime and told him, "work can't get done, that we have too much work," Cassagne "never said that you can work overtime."  (*Id.* 161:18-162:15.)

178.    Munoz received a merit-based pay increase based on her performance every year. (*Id.* 130:21-131:7.)

179.    Munoz recorded more than 40 hours in 33 workweeks between April 17, 2017 and September 9, 2024, which is 8.8% of all workweeks during that time and 10.15% of workweeks in which Munoz worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 34-35.)

### m.  Michael O'Sullivan

180.    O'Sullivan worked for GEICO from 2003 to 2022 as a senior field security investigator in the SIU where he focused on medical fraud investigations in the New York City and Long Island regions.  (Ex. 5, O'Sullivan Dep. 24:8-10, 15-21; 25:8-25; 26:19-25; 29:16-22; 43:13-21.)  Between 2016 and 2022, O'Sullivan reported at different times to SIU supervisors Dara Campbell, Toni D'Agata, and Brian Portnoy.  (*Id.* 32:7-12.)

181.    O'Sullivan alleges that he generally worked from 8:30 am to 6:00 pm, approximately 47.5 to 50 hours per week.  (*Id.* 89:8-23; Ex. 66, O'Sullivan Resp. to Court Interrogatories, O'Sullivan Decl. ¶ 10.)

182.    With the onset of the COVID-19 pandemic in approximately March 2020, O'Sullivan had more time to complete his tasks because he was no longer working in the field. (Ex. 5, O'Sullivan Dep. 96:13-22.)

183.    O'Sullivan determined what investigative steps were necessary to investigate each of his medical fraud claims.  O'Sullivan closed varying numbers of cases per month, and he could decline taking additional cases as his schedule required.  (*Id.* 41:7-15; 44:17-19; 45:22-46:6; 105:20-24.)

184.    O'Sullivan had flextime and could adjust his schedule as needed.  (*Id.* 31:15-32:6; 34:19-35:22; 36:8-13; 89:8-12.)

185.    GEICO trained O'Sullivan on its policy requiring employees to accurately record of all their time worked, and O'Sullivan understood that he was required to log all of the hours that he worked in GEICO's timekeeping system and that managers and supervisors were not allowed to and did not tell him to work off the clock.  (*Id.* 53:15-19; 54:20-55:13; 57:8-12; 59:9-25.)

186.    On August 26, 2019, Portnoy reminded O'Sullivan to "please make sure you are keying any additional hours worked into workday.  This is in reference to overtime."   (Ex. 67, Emails (G019913)).

187.    No GEICO SIU supervisor or manager ever told O'Sullivan to work off the clock.  (Ex. 5, O'Sullivan Dep. 59:14-60:4.)

188.    O'Sullivan "absolutely" believed there was an open-door policy with his supervisors where he could come to them with any information or concerns and that he could bring concerns about pay issues to his supervisor or to GEICO's local or corporate HR representatives, but he never did.  (*Id.* 55:9-13; 60:2-4; 92:24-93:8; 157:19-23.)

189.    On a weekly basis, O'Sullivan entered his hours into GEICO's timekeeping software and certified that his hours were correct.  (*Id.* 57:8-58:9; 62:9-63:4; 175:8-176:12.)

190.    O'Sullivan recorded overtime hours in GEICO's time keeping system on several occasions, and GEICO always paid O'Sullivan at the overtime rates for the hours that he recorded. (*Id.* 73:5-11;  83:8-11;  85:25-86:4;  Ex. 68,  O'Sullivan Pay Records (G009339; G019960; G003296; G003299-3302; G003304-3305; G003307; G003310; G003318; G003355; G008217); Ex. 69, O'Sullivan OT Emails (G011669; G011673; G011680; G011684; G011686; G011688; G011697-11701; G011705-11712; G011721-11722; G011727; G011740)).)

191.    O'Sullivan maintains that Portnoy once commented to him that GEICO would not authorize overtime pay "just for typing," so O'Sullivan never requested overtime thereafter based on his belief that approval for overtime pay "wasn't going to happen." (Ex. 5, O'Sullivan Dep. 67:8-25; 71:15-73:17.)

192.    O'Sullivan believed that if he recorded overtime, he would have lower performance ratings, which determined whether he was eligible for a raise. (Ex. 66, O'Sullivan Resp. to Court Interrogatories, O'Sullivan Decl. ¶ 14.)

193.    O'Sullivan has no knowledge as to whether any other GEICO employees asked for approval to work more than 38.75 hours in a week or whether any other GEICO employees were approved to work more than 38.75 hours in a week. (Ex. 5, O'Sullivan Dep. 77:13-80:19; 98:13-16; 99:6-9; 128:6-22.)

194.    O'Sullivan participated in the *Calderon* matter against GEICO alleging unpaid wages and received around $70,000 as a result. (*Id*. 10:22-13:6.)

195.    O'Sullivan recorded more than 40 hours in 13 workweeks between April 17, 2017 and April 22, 2022, which is 5.24% of all workweeks during that time and 5.80% of workweeks in which O'Sullivan worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 10-11.)

**n.  Louis Pia**

196.    Pia worked as an SIU Investigator from 2003 until 2017 and as Lead SIU Investigator from 2017 until November 2022 when he retired. (Ex. 17, Pia Dep. 37:15-38:17; 25:17-20.)

197.    Pia alleges from late 2016 to approximately March 2020, he worked an average of 55 hours per week, from March 2020 to November 2021 he worked approximately 65 hours per

week, and from December 2021 to December 2022 he worked approximately 55-60 hours per week. (*Id*. 109:15-110:2; Ex. 70, Pia Resp. to Court Interrogatories, Pia Decl. ¶ 9).

198.    Pia's estimated number of hours worked is "based on what [he] can recall" because he has no records tracking his allegedly unpaid off-the-clock work. (Ex. 17, Pia Dep. 109:15-111:25; 125:23-127:9; 186:13-16; 190:25-191:15.)

199.    Pia used a company car to drive to different locations to investigate cases. Pia generally worked in the field between approximately 7:00 am until 2:30 pm. (*Id.* 43:10-24; 61:18-64:5.)

200.    Pia included the time spent driving in his time , explaining that for "most of my cases in the Bronx and Brooklyn," "I would leave my house at approximately 7:00 o'clock, and I wouldn't get to the Bronx -- which was right down the block from Yankee Stadium -- until about 8:20, 8:30. Now, you throw in a little rain and snow, and you can add on a half hour to 45 minutes to that." (*Id*. 60:17-64:5.)

201.    Pia at one point said to his supervisor Gerry Cassagne, "I don't care how good your -- an investigator you are, 70 cases -- nobody can do 70 cases," and suspects Cassagne "was well aware that [Pia was] working over and above the 38.75." (*Id*. 101:2-8; 110:8; 127:23-128:8.)

202.    Pia was trained on and understood GEICO's policy forbidding off-the-clock work. (*Id*. 78:23-85:22; 86:20-87:16.) This was reiterated by his supervisor, who instructed him "You also must put the hours into workday as overtime … The overtime is there to be USED. USE IT IF YOU NEED IT." (Ex. 72, Pia OT Emails (G011574-75; G011581-85).)

203.    Pia recorded overtime hours numerous times, and GEICO paid him for all overtime hours that he recorded. (*Id*. 129:17-131:24; Ex. 71, Pia Pay Records (G002505; G002510;

G002511; G002518; G002522; G002524; G002573; G002583; G002584; G002585; G002586; G002587); Ex. 72, Pia OT Emails (G011574-75; G011581-85).)

204.    Pia sometimes did not record overtime because he believed it would improve his performance metrics and thereby avoid losing a potential raise, being placed on a performance plan, or being terminated.  (Ex. 17, Pia Dep. 47:11-17; 68:9-18; 105:16-107:6.)

205.    Pia did not make any written complaints about unpaid overtime hours worked to his supervisor, nor did he ever go to GEICO HR with complaints about unpaid overtime because he believed "that would be career suicide."  (*Id*. 128:9-15.)

206.    Pia received a raise every year.  (*Id*. 162:15-163:21.)

207.    Pia recorded more than 40 hours in 16 workweeks between April 17, 2017 and November 30, 2022, which is 5.71% of all workweeks during that time and 6.35% of workweeks in which Pia worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 8-9.)

### o.  Michael Reed

208.    Reed worked as a Senior Field Investigator in the SIU division from 2005 through 2023, covering seven counties in Western New York.  (Ex. 73, Reed Dep. 27:7-22; 28:3-5; 30:21-25).  During that time, Reed regularly worked from 7:00 am to 3:30 pm.  (*Id*. 38:24-39:20.)

209.    Reed investigated a variety of claims including "theft, theft and fire of a vehicle, personal injury, date of loss, suspected jump-ins, hit and runs…", underwriting, and body shops.  (*Id.* 41:8-13; 41:18-20; 42:7-10).

210.    As an investigator in the field, Reed was responsible for driving to investigate his claims and drove "an hour and a half, an hour and forty-five minutes one way" depending on the weather and the time of year.  (*Id*. 51:6-20.)

211.    GEICO paid Reed for all of his hours worked, and Reed never brought concerns to any supervisor regarding his pay.  (*Id.* 63:19-64:15; 66:19-67:2).

212.    Reed contends that Janik at some point told Reed that "there was no overtime," but no supervisors or managers within the SIU ever told Reed to work off the clock.  (*Id.* 72:17-21; 83:20-25; 179:11-25.)

213.    Reed's belief that GEICO did not permit overtime was "an assumption," and he testified that he never requested overtime because he believed "that was something that was not done."  (*Id.* 67:3-7; 181:8-20; 188:2-5).

214.    Reed alleges that he "worked" an extra two hours every day from 2016 until his resignation in 2023 based on "[t]he hours that [he] would be on the road traveling back and forth to statements," which could be as much as "between an hour and a half, an hour and forty-five minutes one way."  Reed claims he never requested overtime, but collected overtime through 2017, until he stopped recording overtime hours.  (*Id.* 51:6-20; 112:17-113:24; 119:4-9; 124:6-10; Ex. 74, Reed Pay Records (G003422, G003427, G004144-45, G004147, G008107-9, G008112-16, G008118-24, G008130-31).)

215.    During Reed's employment with GEICO, he received yearly pay increases that were "based upon performance."  (Ex. 73, Reed Dep. 103:12-104:5).  Case life was "not something towards the end of my career that we were based – that we were scored on."  (*Id.* 110:7-18).

216.    Reed recorded more than 40 hours in no workweeks between April 17, 2017 and March 24, 2023.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 18-19.)

**p.  Ted Wendling**

217.    Wendling worked as a senior field security investigator with GEICO SIU from September 2019 to November 2023 in a remote capacity and assigned to GEICO's office in Nassau

County, New York.  (Ex. 75, Wendling Resp. to Court Interrogatories, Wendling Decl. ¶ 1; Ex. 76, Workday Profile (G004780-81).)

218.    Wendling's immediate supervisors were Toni D'Agata from September 2019 through October 2023 and subsequently Sarah Greenman in November 2023.  (Ex. 75, Wendling Resp. to Court Interrogatories, Wendling Decl. ¶ 2.)

219.    Before February 2023, Wendling submitted his timesheet on a weekly basis, and alleges that he worked approximately 57.625 hours per week, some of which was not recorded in GEICO's timekeeping system.  (*Id*. ¶¶ 7-10.)

220.    After February 2023, Wendling began punching in and out daily using Workday and worked approximately 38.75 hours a week.  (*Id*. ¶¶ 7-9.)

221.    Wendling "regularly performed work for GEICO that [he] did not report in the company's timekeeping system," but Wendling never complained about overtime to anyone at GEICO.  (*Id*. ¶¶ 13-14.)

222.    Wendling was subject to performance coaching by his supervisor D'Agata in or around May 2020, and D'Agata documented that "[Wendling] said he had a hard time keeping up this week – he had 3 telephone EUOs and received 4 cases a day is hard to manage.  I explained if needed, and he works extra – put in for the time worked. I will review his case load as well." (Ex. 77, Wendling Performance Review (G016093-98).)

223.    GEICO paid Wendling for overtime hours he recorded in GEICO's timekeeping system.  (Ex. 78, Wendling Pay Records (G003740-41; G003744; G003748; G003751).)

224.    Wendling failed to appear for his noticed deposition despite GEICO noticing Wendling's deposition on three separate occasions.  (Ex. 79, Wendling Dep. 7:5-9:4.)

225.    Wendling recorded more than 40 hours in 6 workweeks between September 16, 2019 and November 20, 2023, which is 2.76% of all workweeks during that time and 3.02% of workweeks in which Wendling worked 4 days or more.  (Ex. 24, Fogarty 2025 Decl. ¶¶ 26-27.)