Exhibit 2

1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF NEW YORK
3   -----------------------------------x

4   KEITH FISCHER, MICHAEL O'SULLIVAN,
    JOHN MOESER, LOUIS PIA, THOMAS
5   BARDEN, CONSTANCE MANGAN, and
    CHARISE JONES, Individually and on
6   behalf of all others similarly
    situated,
7
                        Plaintiffs,
8
                -against-                Case No.
9                                        2:23 Civ. 2848
    GOVERNMENT EMPLOYEES INSURANCE       (GRB)(ARL)
10  COMPANY d/b/a GEICO,

11                      Defendant.

12  -----------------------------------x

13                     August 28, 2024
                       10:06 a.m.
14

15  ***This Transcript Contains a Confidential Section***

16

17       Videotaped Deposition of KEITH FISCHER,

18  taken by Defendant, pursuant to Notice and Agreement,

19  held at 1540 Broadway, New York, New York, before

20  Joseph R. Danyo, a Shorthand Reporter and Notary

21  Public within and for the State of New York.

22

23

24

25



```
 1

 2   A P P E A R A N C E S :

 3        OUTTEN & GOLDEN LLP
          Attorneys for Plaintiffs
 4            1225 New York Avenue, N.W.
              Suite 1200B
 5            Washington, D.C. 20005

 6        By:   ZARKA SHABIR DSOUZA, ESQ.
                HANNAH COLE-CHU, ESQ.
 7


 8
          DUANE MORRIS LLP
 9        Attorneys for Defendant
              190 South LaSalle Street
10            Suite 3700
              Chicago, Illinois 60603
11
          By:   TIFFANY ALBERTY, ESQ.
12


13

14   Also Present:

15        ADRIENNE CHEMMEL, Videographer

16                   ~oOo~

17

18

19

20

21

22

23

24

25
```



```
 1              Fischer
 2        THE VIDEOGRAPHER:  Good morning.  We
 3   are now on the record.  The time is 10:06
 4   a.m. on August 28, 2024.  This begins the
 5   video deposition of Keith Fischer taken in      10:06
 6   the matter of Keith Fischer versus
 7   Government Employees Insurance Company
 8   filed in the United States District Court
 9   for the Eastern District of New York, the
10   case number of which is 2:23 Civ.              10:07
11   2848(GRB)(ARL).
12         My name is Adrienne Chemmel.  I am
13   your videographer today.  The court
14   reporter is Joe Danyo.  We are
15   representing Esquire Deposition Solutions.     10:07
16        Will everyone present please identify
17   themselves and state whom you represent,
18   after which the witness will be sworn in.
19        MS. DSOUZA:  Zarka Shabir Dsouza from
20   Outten & Golden for the Plaintiffs.            10:08
21        MS. ALBERTY:  Tiffany Alberty of
22   Duane Morris on behalf of the Defendant
23   GEICO.
24        THE VIDEOGRAPHER:  Will the court
25   reporter please swear in the witness, and      10:08
```



                            Fischer

2        then, Counsel, you may proceed.

3    K E I T H    F I S C H E R, having been first

4    duly sworn by Joseph R. Danyo, a Notary Public,

5    was called as a witness and testified as follows:    10:08

6    EXAMINATION BY MS. ALBERTY:

7         Q.   Can you please state and spell your

8    first and last name.

9         A.   Keith, K-e-i-t-h, Fischer,

10   F-i-s-c-h-e-r.                                        10:08

11            MS. ALBERTY:  Let the record reflect

12        that this is the discovery deposition of

13        Mr. Keith Fischer taken pursuant to notice

14        and by agreement of the parties.  Today's

15        deposition will be taken in accordance         10:08

16        with all applicable rules.

17        Q.   Mr. Fischer, I know I introduced

18   myself off the record, and I just stated my name

19   for the record, but I'm Tiffany Alberty.  I'm

20   counsel for GEICO, the Defendant in this case.       10:08

21            I'm going to be asking you a series

22   of questions about your background, your

23   experience at GEICO.  Before we get started, have

24   you been deposed before?

25        A.   Deposed, I mean as far as grand jury,      10:09



```
 1                        Fischer

 2          Q.   Have you ever been a named plaintiff

 3    in any other lawsuit?

 4          A.   I had my 9/11 case heard.  I was

 5    present during 9/11 where I did dig several days,        10:13

 6    and after attending several medicals over the

 7    last 23 years, I did secure counsel, and I did

 8    receive a settlement from 9/11.

 9          Q.   Okay.  Other than for the 9/11 case,

10    can you think of any other case that you've been        10:13

11    a plaintiff of, aside from the one we're here for

12    today.

13          A.   The other two GEICO cases that were

14    2016, I believe, and 2018, to the best of my

15    recollection.                                           10:14

16          Q.   Have you ever been a defendant to a

17    lawsuit?

18          A.   Not that I recall.  Not during my

19    employment with GEICO.

20          Q.   Okay.  In regards to the two other          10:14

21    cases for GEICO, do you recall one of the names

22    being Calderon?

23          A.   Yes.

24          Q.   Did you have to provide answers to

25    discovery or deposition testimony?                      10:14
```



```
 1                        Fischer
 2           A.   No, I did not.
 3           Q.   How did you come to be involved in
 4      the Calderon matter?
 5           A.   I believe that came out of Florida,      10:14
 6      and it was a class action lawsuit that we were
 7      contacted by other members of SIU that that was
 8      ongoing, and I guess that they also were seeking
 9      our support in joining that lawsuit.
10           Q.   Do you know who was the lead counsel    10:15
11      on the Calderon matter for the Plaintiffs?
12           A.   It came out of -- I do.  It slips
13      right now.  It was Kaster & Associates.
14           Q.   Do you know who was the primary
15      plaintiff leading that lawsuit?                   10:15
16           A.   No, I don't.
17           Q.   Then let's transition to the Vedder
18      case.  Does that sound familiar for the other
19      GEICO matter?
20           A.   I've seen the name, but, yeah, I mean   10:15
21      I saw the name, but I couldn't be positive as to
22      who the counsel was.
23           Q.   Okay.  Do you recall who was the lead
24      plaintiff taking the first role in that case?
25           A.   I believe it was Calderon was the one   10:15
```



```
 1                    Fischer

 2   who started it.  I don't think he came out of

 3   Florida or California.  That's the only name that

 4   I'm aware of.

 5         Q.   For either the Calderon or the Vedder      10:16

 6   matter, did you receive any money as a result of

 7   those cases?

 8         A.   Yes, I did.

 9         Q.   Do you recall how much you received

10   from each case?                                       10:16

11         A.   I received ██████ in the 2016

12   settlement, and I received ██████ in the second,

13   which was probably 2018, for a total of about

14   ██████ something.

15         Q.   And what was the money allocated for,      10:16

16   to your knowledge?

17         A.   Working unpaid overtime and interest

18   on the overtime.

19         Q.   Have you ever filed any

20   administrative charge or claim against any person     10:16

21   or entity?

22         A.   No.  Not to my recollection.

23         Q.   Have we discussed all of the lawsuits

24   with which you've been involved personally?

25         A.   Yes.                                       10:17
```



                          Fischer

 1
 2   claims.
 3         Q.   Would this have been for everything
 4   of personal property including residential?
 5         A.   No.  I did mostly vehicle.  Just        10:33
 6   about all vehicle.
 7         Q.   Then did you resign, or were you
 8   terminated from Allstate?
 9         A.   I resigned in good standing at
10   Allstate and joined GEICO Insurance May 10th,      10:34
11   1999.
12         Q.   Why did you leave Allstate?
13         A.   Better, a little bit more as far as
14   salary, but the freedom to do what I felt I did
15   best was go out into the street and talk to        10:34
16   people and interview people.
17         Q.   Okay.  So from 1999 until what day
18   did you work for GEICO?
19         A.   From May 10, 1999 to I believe it
20   was, I believe today is my anniversary, my         10:34
21   four-year anniversary.  My last vacation day was
22   today, but I actually probably didn't retire
23   until November 1st was my actual day of 2000.
24         Q.   2000 or 2020?
25         A.   I'm sorry.  2020.                        10:35



```
 1                      Fischer
 2           Q.   Your Social Security that you're
 3   getting, is that under Social Security Disability
 4   Insurance?
 5           A.   Yes, it is.                          10:36
 6           Q.   And how long have you been under SSDI
 7   for?
 8           A.   I'm going to say 2022.  Two years.
 9   About two years.
10           Q.   I'm going to jog your memory here.    10:37
11   Let's go back to 1999.
12           A.   Okay.
13           Q.   When you first started at GEICO, do
14   you remember what your title was?
15           A.   SIU investigator, to the best of my   10:37
16   recollection.
17           Q.   Were you always full time?
18           A.   Yes.
19           Q.   What type of investigations did you
20   conduct when you first started at GEICO in 1999?   10:37
21           A.   To the best of my recollection, I
22   handled just about everything that was given to
23   us.  I didn't have a specific category or claim
24   that I would handle whatever was given to us by
25   the inside staff, would give us our cases.  In     10:37
```



```
 1                    Fischer
 2   our mailbox we would come and pick them up and
 3   whatever it was asked we were asked to do.
 4        Q.   So for GEICO they have quite a few
 5   different lines of insurance.  Were you handling          10:38
 6   every aspect, meaning commercial, residential,
 7   property, cyber?
 8        A.   Property.
 9        Q.   When you first started in 1999, were
10   you assigned to a region?                                 10:38
11        A.   Region 2.
12        Q.   Did you work in region 2 for your
13   entire tenure?
14        A.   Yes.
15        Q.   When you started in 1999, were you           10:38
16   assigned to a geographic location?
17        A.   To the best of my recollection, we
18   were given the five boroughs of New York City,
19   Nassau and Suffolk.
20        Q.   Did that geographic area ever expand       10:39
21   during your tenure?
22        A.   I was asked to travel upstate several
23   times up to Syracuse, Binghamton, Rochester, that
24   area, to handle some cases.  Yes.
25        Q.   How frequent would you say you were        10:39
```



```
1                      Fischer

2     2016.  I'm not sure if I really had any

3     catastrophes after 2016, to the best of my

4     recollection.  There could have been, but from

5     what I remember it was prior to that.              10:42

6          Q.   So then let's circle back.  As an SIU

7     investigator, were you assigned to a specific

8     level?

9          A.   When I first started at GEICO, I was

10    a grade 65, and that was in 1999, and in 2004      10:42

11    five years later I was promoted to grade 66.  I

12    believe I was one of four investigators promoted

13    to that.

14         Q.   Okay, and tell me what's the

15    difference between a 65 and a 66, to your          10:42

16    recollection?

17         A.   66, in accordance with the regular

18    day-to-day investigations, I was also asked as a

19    66 to train all the new investigators that came

20    on board.  I was asked to do ride-alongs with      10:43

21    inside staff or counsel depending on the

22    supervisor's requests.  I was probably given

23    between four and six more cases a month being at

24    that level.  I had to take on more serious cases

25    to do things out of the ordinary that some people  10:43
```



```
 1                       Fischer

 2         Q.   You also stated as a 66 you would be

 3    assigned four to six more cases a month, and

 4    would that have been under the same scope of

 5    cases that you just spoke about?                      10:45

 6         A.   Yes.

 7         Q.   Which would have been social, auto,

 8    operation challenges?

 9         A.   I would like to clarify my answer.

10    As time went on, I thought we were back in the        10:45

11    early 2000's, as time went on, I became more of

12    the theft coordinator, but in addition to my

13    theft investigations, I also handled staged

14    accidents, caused accidents, social media.  Being

15    a 66, I was expected to handle bigger cases, more     10:46

16    pattern cases I guess you could say, rings,

17    things of that nature as a 66.

18         Q.   In 2016 until your retirement, what

19    percentage of theft cases would you say you were

20    handling?                                             10:46

21         A.   Probably 70 percent of my claims were

22    theft.

23         Q.   Then what percentage were you

24    handling staged accidents?

25         A.   About 20 percent.                           10:46
```



| | |
|---|---|
| 1 | Fischer |
| 2 | Q.   And then what about social media? |
| 3 | A.   Yeah.  That was maybe 5 percent, and |
| 4 | then we were given the other 5 percent was policy |
| 5 | claims.  Usually checking on people's vehicles |
| 6 | where they lived, rate evading, things like that. |
| 7 | Q.   In 2000, and I want to focus in 2016 |
| 8 | were you assigned to a specific team? |
| 9 | A.   Yes.  I was assigned to my |
| 10 | supervisor, Jerry Cassagne.  I was assigned to |
| 11 | the theft team. |
| 12 | Q.   Who was comprised of that team at |
| 13 | that time? |
| 14 | A.   Myself, John Gillane, Vito, I've got |
| 15 | the wrong last name.  Vito, and what's her name? |
| 16 | Maria Munoz. |
| 17 | Q.   From 2016 onward until your |
| 18 | retirement, were you always assigned to Jerry's |
| 19 | team as the theft team? |
| 20 | A.   It did change.  To the best of my |
| 21 | recollection, I did primarily theft claims. |
| 22 | There were times that I was asked, if I can |
| 23 | expand my answer, as time went on, in the theft |
| 24 | team, there became times where the staged |
| 25 | accident team was cut off at a certain time. |

10:47
10:47
10:47
10:48
10:48



```
 1                        Fischer
 2    accidents to assist with that department?
 3              MS. DSOUZA:  Objection.
 4         Q.   You can answer.
 5         A.   Did they have to take those claims      10:50
 6    on?
 7         Q.   Yes.
 8         A.   Is that what you're asking?
 9         Q.   To your knowledge.
10         A.   Yes.                                    10:50
11         Q.   I think from your testimony, as I
12    understand it, you did not work in the office.
13    Is that right?
14         A.   That's right.
15         Q.   Did you ever have an inside role?       10:50
16              MS. DSOUZA:  Objection.
17         A.   No.
18         Q.   In your position from 2016 until your
19    retirement, did you have a set schedule, meaning
20    I worked Monday through Friday 9 to 5?            10:50
21         A.   No.
22         Q.   Did you have flex time?
23         A.   We were, I guess that's what it was
24    called.  Yes.  You could start and stop depending
25    on your schedule, depending on your examinations  10:50
```



                              Fischer

1

2   under oath or your investigations.  If you had to

3   go out to Brooklyn, New York for an examination

4   under oath and you had to leave at 5 o'clock in

5   the morning to beat traffic to get there by 7 or          10:51

6   7:30, so obviously by the time you got home at

7   2 or 3 o'clock in the afternoon you would

8   actually start your typing at 2 or 3 o'clock in

9   the afternoon, but my day actually would start at

10  5 o'clock in the morning.                                  10:51

11          So, if that's what you mean, I wasn't

12  assigned to my computer at any given time.  No.

13      Q.   Did anyone ever tell you how to flex

14  your time, meaning you should be in the car from

15  5 to 7 and then do your examinations under oath          10:51

16  in the morning versus being able to do it at

17  night or at a convenient time for the person

18  you're interviewing?

19      A.   No.

20      Q.   As an SIU investigator, were you able          10:51

21  to make the determination of what each case

22  needed in order to investigate for that specific

23  theft-related incident?

24      A.   I was given procedures to follow as

25  to what was necessary to be completed and                10:52



```
 1                          Fischer
 2         Q.    After you conducted then I believe
 3   you stated your initial report, after looking at
 4   the claim screen, getting the policy, reading the
 5   notes, speaking to the theft examiner, getting          10:59
 6   the background check, getting a police report,
 7   researching the news, taking recorded statements,
 8   interviews, EUOs, from there, did you make the
 9   determination of what else you needed in order to
10   complete your investigation?                            10:59
11         A.    Yes.
12         Q.    Did anybody tell you what steps you
13   needed to take after you conducted your initial
14   report?
15         A.    No.  Can I just clarify.  That's           11:00
16   limited to what -- those are just some of the
17   things that I was required to do.  I may have
18   left some out like ███████████████████████
19   ████████████████████████████████████████
20   ████████████████████████████████████            11:00
21   ████████████████████████████████████
22   ████████████████████████████████████████
23   ███████████████████████████████████
24   ██████
25                We also touched base, I believe, I         11:00
```



```
 1                      Fischer
 2    double-insured case, in other words, if car 1 and
 3    car 2 weren't both from GEICO, I had to reach out
 4    to the adverse carrier, Allstate, Farmers, State
 5    Farm, Progressive, and talk to them as they were      11:05
 6    the other vehicle and speak to their SIU as to
 7    any concerns they may have with their vehicle, if
 8    that was a concern.
 9              I reviewed the police accident
10    report, and it was the same as a theft.  I would     11:05
11    then do my report, and I would go out to the
12    field and do my investigation and/or conduct
13    EUOs.
14         Q.   Similar to the theft claims, once you
15    did your initial review of what we just talked       11:05
16    about, the claim screens, policy, notes, you
17    spoke to the staged loss examiner, background
18    check, police reports, conducting interviews,
19    from there, did you also make the determination
20    of what you needed to conduct in order to then       11:05
21    render your final determination in a staged loss
22    claim?
23         A.   Yes.
24         Q.   Is it fair to say then for both the
25    theft and the staged loss matters that you were      11:06
```



```
 1                    Fischer
 2   handling that you did have to analyze and look
 3   specifically to those claims to see what else
 4   they needed in order for you to render your
 5   determination?                                    11:06
 6        A.   Yes.
 7        Q.   For your final determination, was
 8   that wholly your responsibility in saying yes, I
 9   believe there's fraud, or no, I don't believe
10   there's fraud?                                     11:06
11        A.   Yes.
12        Q.   Did anyone ever tell you you needed
13   to change your opinion as to your ultimate
14   determination?
15        A.   No, not that I recall.                  11:06
16        Q.   In 2016 up until your retirement in
17   2020, did you investigate arsons?
18        A.   I did receive a lot of the car fires,
19   car thefts.  Myself and John Gillane were given I
20   would say the majority of those because of our    11:07
21   arson background.
22        Q.   Within arson specifically, you said
23   there's a theft team.  Was there an arson team?
24        A.   No.
25        Q.   But there was a staged loss team,       11:07
```



```
 1                      Fischer
 2   hours.  If it was four or five, maybe 20 hours.
 3   I mean to the best of my recollection.  It could
 4   have gone more.
 5          Q.   Can some cases require EUOs and some      11:25
 6   don't?
 7          A.   Yes.
 8          Q.   What about recorded statements?
 9          A.   ████████████████████████████████
10   ████████████████████████████████████████████    11:25
11   ███████████████████████████████████████████
12   ████████████████████████████████████████████
13   ████████████████████████████████████████
14          ████████████████████████████████████████
15   ███████████████████████████████████████████     11:26
16   ████████████████████████████████████████████
17   ██████████████████████████████████
18          Q.   How long would it take to investigate
19   a social media claim?
20          A.   It could be as little as, again, the    11:26
21   number of claimants.  To the best of my
22   recollection, I mean, if I had one claimant,
23   three or four hours.  If I found something right
24   away, maybe two to three hours, but most of them
25   are three hours, four hours.  Multiple claimants,  11:26
```



```
1                    Fischer
2     maybe 10 max.
3          Q.   How long would it take to investigate
4     an auto body fraud case?
5          A.   Again, depending on the severity and       11:27
6     how many cars were involved, again, it was
7     usually enhanced damages that we were concerned
8     with at body shops.  It was the same types of
9     damage.  So to review multiple auto damage
10    adjusters' pictures and estimates of fraud, I       11:27
11    mean their estimates of damages, I'm sorry, if I
12    I was given a particular body shop and there was
13    15 cars of concern, that could be a minimum of
14    ten hours.  If it was more cars, it could be 20
15    or 30 with also a lot of street time and a lot of  11:27
16    surveillance.
17         Q.   Did you ever have theft cases that
18    you can open and close the same day?
19         A.   Yes.
20         Q.   Did you have med fraud cases that you      11:27
21    could open and close the same day?
22         A.   Not to my recollection, no.
23         Q.   Did you have social media cases that
24    you could open and close the same day?
25         A.   Yes.                                       11:28
```



                            Fischer

2   persons that were inside the residence.

3         Q.   For arson cases, how long did it take

4   you to investigate those types of claims?

5         A.   Those are more of my heavier cases.            11:29

6   So I mean those could go from a minimum of 15

7   hours all the way up to maybe 30, dependent on

8   from beginning to end and how much time I put

9   into them.  It depended on how many times I had

10  to go to the fire marshal's office.  How many     11:29

11  times I had to go to the New York City Police

12  Department, Nassau.

13             I also had a very big following out

14  in Suffolk County, and those were long drives.

15  So I could be, it all depended on the location,   11:30

16  which borough that it was in it depended on.

17             So I would say a minimum of, you

18  know, 15 to 20 hours all the way up to 30 or 40,

19  depending on the severity of the arson.  The

20  fire.  I shouldn't say arson.  The fire.  It       11:30

21  depended if it damaged the home.  Did it hurt

22  anybody?  Did it damage the car?  Did the police

23  have more to this?  You know, as time went on,

24  from 2016 to 2020, surveillance cameras became

25  more pronounced.  They were out in the street.     11:30



1              Fischer

2  We had plate readers.  We had things that helped

3  us significantly.

4          So those are the kind of things.  It

5  was more work, but it was more work that helped          11:30

6  you identify what happened in the case.

7      Q.   I don't think we actually talked

8  about this.  Did you handle jump-in claims?

9      A.   Yes.

10      Q.   What are those?                                   11:31

11      A.   ███████████████████████████

12  ██████████████████████████████████████

13  ██████████████████████████████████████

14  ███████████████████████████████████████

15  ██████████████████████████████████                        11:31

16  ████████████████████████████████████

17  ███████████████████████████████████████

18  ██████████████████████████████████████

19  ██████████████████████████████████████

20  ███████████████████████████████████████                   11:31

21  ██████████████████████████████

22  ██████████████████████████████████████

23  ██████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████                      11:31



                            Fischer

2  best of my recollection, four or five times a

3  month.  The 3rd day, the 8th day, I believe the

4  15th day, the 21st day and then closure usually

5  within I believe 28 days.  Something to that                    11:53

6  effect.

7        Q.   Did you say you had to close the case

8  within 28 days?

9        A.   No, no, you could have a case open

10  for three or four months, but we were given a set    11:53

11  of guidelines that we had to not only make these

12  entries, but the quicker that we closed the claim

13  the better your rating.

14        Q.   For example, social media, was there

15  a requirement to touch the case a specific amount    11:53

16  of times per month?

17        A.   From 16 to 20 guidelines and

18  procedures changed numerous times.  Each year,

19  just to give you an example, a theft claim when I

20  first started, maybe let's say '14 or '15, you      11:54

21  had to touch a case within three days.  If we got

22  it on a Friday, you had to touch it on a Monday.

23  At the end, to give you a perspective on it, you

24  had to touch it the same day.  You had to touch

25  it within five hours.  So we lost that two days.     11:54



```
 1                    Fischer
 2        Q.   As a lead security investigator, I
 3   believe you said you were assigned four to six
 4   additional cases a month.  Correct?
 5        A.   Um-hum.  One to two cases a week.        12:01
 6        Q.   Do you know for those who would have
 7   been 65s in your theft team if they would have a
 8   lower workload than you since they didn't have to
 9   have those additional assignments?
10        MS. DSOUZA:  Objection.                       12:01
11        A.   I can't speak for anybody else as far
12   as their workload.  I really didn't deal with it.
13   I mean they may have caught a few less cases.
14   Five, eight different, you know, small cases than
15   me.  That was really about the same.              12:02
16        Q.   Do you know how their workloads
17   differed?
18        A.   Each case was different, so it all
19   depended on the severity of the type of theft.
20   Where it occurred.  How far you had to drive.      12:02
21   How many people were involved.  Was it just the
22   insured.  Was it a family.  How many witnesses
23   they had.  It all depended on there were so many
24   different criteria as to the claim that you had
25   to speak to.  The more people that the insured     12:02
```



```
 1                      Fischer

 2   brought in to the theft claim as far as

 3   witnesses, you know, how did he get home, who was

 4   he with prior to, who picked him up after the car

 5   was stolen, who did he call, who did he tell         12:02

 6   about the theft.

 7             So sometimes you have to interview

 8   five or six other people other than just the

 9   insured.  So it all depended on the insured's

10   version of the chain of events.                      12:03

11        Q.   From 2016 until 2020, were you ever

12   disciplined in your capacity as a lead security

13   investigator?

14        A.   No.

15        Q.   Did you ever issue out any                 12:03

16   disciplinary action?

17        A.   No.

18        Q.   Do you have any knowledge as to

19   GEICO's disciplinary tiering process?

20        A.   No.  The only thing I can speak to is      12:03

21   summonses.  They did, as you know, Queens County

22   and the five boroughs did change the speed limit

23   as to I think down to 25 miles an hour.  GEICO

24   did inform us that, if we were to receive more

25   than three summonses, moving summonses, red light    12:04
```



|    |                                                              |       |
|----|--------------------------------------------------------------|-------|
| 1  | Fischer                                                      |       |
| 2  | stamped G004265 and attachment, was so                       |       |
| 3  | marked for identification, as of this                        |       |
| 4  | date.)                                                       |       |
| 5  | Q.   Mr. Fischer, what has been marked in                    | 12:10 |
| 6  | front of you is Exhibit 3.  It has been marked               |       |
| 7  | G004265.  That's the top page.  The remaining                |       |
| 8  | pages are actually a printout of an excel                    |       |
| 9  | spreadsheet.  That's why you see the topic lines,            |       |
| 10 | and it is chronologic.                                       | 12:10 |
| 11 | Do you recall intermittently                                 |       |
| 12 | throughout your employment with GEICO being                  |       |
| 13 | trained on any revisions to GEICO's policies and            |       |
| 14 | procedures as it applied to your position as a              |       |
| 15 | lead security investigator local 66?                         | 12:11 |
| 16 | A.   To the best of my recollection, I                       |       |
| 17 | can't say for sure.  I mean I would have to look            |       |
| 18 | this over.  The courses that I took.                         |       |
| 19 | Q.   As you're looking at the Learning                       |       |
| 20 | Record, which is the most left column?                       | 12:11 |
| 21 | A.   Yes.                                                     |       |
| 22 | Q.   And it identifies, for example, the                     |       |
| 23 | associate handbook, the recreational vehicle                 |       |
| 24 | training course, the code of conduct, time and             |       |
| 25 | labor absence request, do these topics sound               | 12:11 |



| | Fischer |
|---|---|
| 1 | |
| 2 | familiar to you? |
| 3 | A.   Yes.  Absolutely. |
| 4 | Q.   As to your participation in the |
| 5 | learning courses where it then has a completion       12:12 |
| 6 | status, a record date, and a record grade, do you |
| 7 | have any reason to dispute the specific dates, |
| 8 | the policies or your pass/fail rate regarding any |
| 9 | of the trainings you participated in for GEICO's |
| 10 | policies throughout your tenure?                      12:12 |
| 11 | A.   No. |
| 12 | Q.   Was it your understanding from 2016 |
| 13 | and until your retirement that you were required |
| 14 | to follow the overtime policy as we discussed in |
| 15 | Exhibit 2?                                            12:12 |
| 16 | A.   Just could you repeat that? |
| 17 | Q.   Sure.  Is it your understanding that |
| 18 | from 2016 until your retirement that you were |
| 19 | required to follow the overtime policy that we |
| 20 | looked at in Exhibit 2?                               12:13 |
| 21 | A.   In Exhibit 2.  Yes, but, if I can |
| 22 | clarify that this was the policy set by GEICO, |
| 23 | but the practice did not follow the policy. |
| 24 | Q.   Okay. |
| 25 | A.   Just something I just want to add.    12:13 |



```
 1                    Fischer
 2    That's all.
 3         Q.   Is it fair to say, at least from the
 4    policy that's set forth in front of you, that
 5    working off the clock was not allowed by GEICO?      12:13
 6              MS. DSOUZA:  Objection.
 7         A.   There was no contention that it was
 8    ever not allowed.  I mean I was told several
 9    times by my immediate supervisor Jerry Cassagne
10    that what I did after hours was up to me.  They      12:13
11    never turned off our computers as they did
12    recently to the new investigators.
13              There was no lunches.  There was no
14    breaks.  What I did in my time, I was my own
15    person, my own man, and I did whatever I had to      12:14
16    do to make sure that I completed my cases
17    following the procedures that GEICO set forth in
18    each investigation.
19         Q.   But in looking at Exhibit 2, does it
20    indicate anywhere that you can work off the          12:14
21    clock?
22         A.   That I can work off the clock?  Does
23    it say here?  No, it does not.
24              MS. DSOUZA:  Objection.
25         A.   That you gave me.                           12:14
```



1                        Fischer

2        Q.   You said that Jerry told you to the

3   effect that you could work off the clock.  Is

4   that your testimony?

5             MS. DSOUZA:  Objection.                    12:14

6        A.   We were given -- I'll answer the

7   question.  As far as Jerry is concerned, Jerry

8   knew, if not weekly, at least biweekly, that I

9   was working overtime each and every day and

10  weekends to maintain my caseload.               12:15

11       Q.   Did Jerry ever tell you to work off

12  the clock?

13            MS. DSOUZA:  Objection.

14       A.   No.  Let's clarify.  Jerry did say to

15  me numerous times you have to do what you have to   12:15

16  do to complete your work, and that's the

17  understanding I had with Jerry for over 15 years

18  or 20 years that I worked for him.

19       Q.   But to the extent that he told you

20  you need to get what you need to get done off the   12:15

21  clock, did he say anything to that degree?

22            MS. DSOUZA:  Objection.

23       A.   Not in those exact words, but it was,

24  if you have to work overtime to get your caseload

25  to where it has to be so that it's not            12:16



```
 1                    Fischer

 2   unreasonable and not sustainable, that I could do

 3   that without any repercussions from GEICO.

 4        Q.   Did you have communication with Bill

 5   Newport?                                              12:16

 6        A.   Yes, once or twice a year, yes.

 7        Q.   Did you ever report to Bill Newport

 8   that you felt in theory that Jerry had said get

 9   what you need to get done, and you took it as I

10   don't have to log my hours?                           12:16

11             MS. DSOUZA:  Objection.

12        A.   Would you repeat that.  I'm sorry.

13        Q.   Sure.  Did you ever go to Bill

14   Newport with your concerns that it was your

15   interpretation of what Jerry said, which is you     12:16

16   got to get it done when you can get it done to

17   imply you should not log your hours?

18             MS. DSOUZA:  Objection.

19        A.   I did have a conversation with Bill

20   Newport at a meeting that didn't go very well        12:17

21   when I asked him in front of six or seven other

22   investigators, my exact words were who is

23   watching the store?  Do you know what's going out

24   in the field, and do you know what we do each and

25   every day as your investigators?                     12:17
```



```
 1                    Fischer
 2          And that was in the presence of at
 3   least six or seven other investigators.
 4          Q.   Did you say are you watching the
 5   store?                                            12:17
 6          A.   I said who is watching -- my exact
 7   words were who's watching the store here?  He is
 8   the manager of the SIU.  There were two managers.
 9   I don't know the medical side.  I forget her
10   name, but Bill was the property side, staged      12:17
11   loss.  He was the medical and PIP team, auto
12   team.  He was responsible for the nonmedical
13   investigators, and at a yearly meeting, which we
14   usually, sometimes it was semiannually, sometimes
15   it was annually, towards the end it became        12:18
16   annually, because the meetings got out of hand
17   and so disgruntled from the investigators that I
18   kind of led the meeting off by asking Bill, I
19   said, who's watching the store here?  Do you know
20   what we do?  Is anybody telling you what we do?   12:18
21   Do you read our reports?  Do you read the things
22   that we do?  Do you look at our monthly reports?
23   Do you look at our mileage reports?  Do you look
24   at our reports to Jerry?  Do you look at our
25   report cards?                                     12:18
```



```
 1                        Fischer

 2            We've brought numerous concerns to

 3    Jerry and Toni D'Agata and Dara at quarterly

 4    meetings, semiannual meetings, and they got less

 5    as time went on because they didn't want to hear        12:19

 6    our gripes I guess you could say, our complaints

 7    about the overtime that we were doing, and it

 8    just so happened that Bill was present in the

 9    beginning, but towards the end he refused to

10    come.                                                   12:19

11            Q.    When did this meeting occur?

12            A.    The last, I'm going to say '19, '20,

13    '21.  They were very, very, not hostile.  They

14    were very angry investigators that the amount of

15    work that we were doing to get through each week        12:19

16    and the stress and the unsustainable goals that

17    we were given and the caseload, and all we wanted

18    him was to reduce it, to review it for us.  Bill,

19    please look at it and read what we do, just go

20    through one examiner, through one investigator,         12:19

21    and look at the steps that we have to do.

22                Everything is time-stamped at GEICO,

23    so they know when I'm working on a weekend.  They

24    know when I'm working at night, what time.  They

25    know my keystrokes.  So they have that.                 12:19
```



1                       Fischer

2               I said, please, just take one of us

3       and look at the amount of time that we are giving

4       you to meet your criteria that you've set in

5       front of every one of us, and we didn't want to          12:20

6       do -- I mean after a while we kind of backed off,

7       because it was, you know, it was falling on deaf

8       ears is really what it was doing.

9               Q.   For this specific meeting that you're

10      talking about where it was in front of six or            12:20

11      eight investigators where you were asking him

12      about the store, I'm just trying to again

13      delineate when in time this meeting was?

14              A.   I'm going to say 2020.  I retired in

15      2020.  I'm mixing up the years.  I'm going to say         12:20

16      2019.

17              Q.   And who else was in attendance?

18              A.   It was a closed door meeting in his

19      office.  John Gillane, George McMannus, Lou Pia.

20      Did I say Mark?  Mark Giabalvo, George McMannus,          12:21

21      Lou Pia, Kevin.  I forget Kevin's last name.

22      John Gillane.  I believe Vito.  I know at least

23      four of them were there.  There was definitely

24      seven or eight, but those are the people that I

25      remember.                                                 12:21



```
 1                    Fischer
 2   he said, you know, I had to follow, because not
 3   only were we friends, but we were co-workers.  I
 4   respected Jerry.
 5        Q.   And circling back on the policy           12:26
 6   itself and taking what you've testified to which
 7   is you brought concerns to Jerry and to Bill, did
 8   you ever take your concerns to local HR?
 9        A.   No.  We didn't do things like that.
10   We just, whether it's my police background, my     12:26
11   law enforcement background, being, you know, a
12   fireman, you don't do that to your supervisors.
13   You don't report them.  You just, you sit, and
14   you take it.  That's just the way we did things.
15   That's the way I was taught.  That's the way I      12:27
16   was brought up.
17        Q.   Is it fair then to say you didn't go
18   to corporate HR either to report these issues?
19        A.   When I finally went out, when I
20   retired in 2020, Kiana Brown, I did it was like     12:27
21   an exit statement, and being that I was 22, I was
22   only 59 years old, I had planned on working
23   another four years, she asked me, do you have any
24   concerns, it was like an exit statement, my
25   indication was that we're working so much           12:27
```



```
 1                        Fischer
 2   overtime and there's so much stress on the job
 3   that it is making me retire because I felt I was
 4   going to get sick.  I retired four years early.
 5   I wanted to work until I was 62 or 63.              12:28
 6         Q.   Do you know if they opened any type
 7   of investigation when you reported this to Kiana?
 8         A.   I don't know what she took down.  She
 9   asked me to give an exit statement which I did.
10   My feelings, I didn't have any grudges against     12:28
11   the company or the people I worked with.  My
12   grudges were the overtime and the amount of
13   stress and overtime that I had to work to get
14   through each and every work week 46 to 47 weeks a
15   year other than my vacation.                        12:28
16              I know that I told Kiana Brown, you
17   know, that was my exit statement.  It was pretty
18   lengthy.  It was probably two or three minutes
19   long as to why I was leaving.
20         Q.   Why didn't you report -- strike that.    12:28
21   Do you agree that you were required to report to
22   HR during your tenure if your managers were
23   telling you to work overtime, but not log your
24   hours?
25         A.   Was I required?  It's in the policy.     12:29
```



```
 1                    Fischer
 2    It's written.  The policy says that.  The
 3    practice at GEICO was not to do that.
 4         Q.   And why was it your understanding
 5    that it was the practice at GEICO for you not to      12:29
 6    go to HR to report that it was your understanding
 7    that Bill and Jerry were effectively telling you
 8    to work off the clock?
 9              MS. DSOUZA:  Objection.
10         A.   Let me clarify.  I don't want to say       12:29
11    that Bill told me to work off the clock.  He
12    turned his head to it.  He didn't have a lot to
13    say after that meeting, but Jerry told me, if not
14    weekly, biweekly, monthly, twice to three times a
15    month that I had to -- he couldn't stop us from      12:30
16    working overtime to complete our cases.  I needed
17    the rating of 4 or 5 to get a better raise and
18    better compensation through my profit share.
19              Bill on numerous occasions more than
20    five, less than ten, was told about the overtime    12:30
21    at open meetings, which probably held between 40
22    and 60 investigators.  He was present at those
23    meetings.  He heard what went on.  He heard it
24    from his immediate supervisors, Dara, Toni and
25    Jerry, that we were working an astronomical          12:31
```



```
 1                    Fischer
 2   Your ten hours of overtime then you were only
 3   getting paid 18 to $19 for that ten hours of
 4   overtime?
 5          A.   180.  Correct.  18 times 10.  So if      12:39
 6   that's what -- are you saying 20 hours or ten
 7   hours?  Did you say 20 hours?
 8          Q.   Ten hours.
 9          A.   So it would be $180 additional.
10          Q.   Okay.                                    12:39
11          A.   So I should be making 600, but I was
12   getting let's say $180 to $200.  I was getting a
13   third of what I should have been getting to do
14   overtime.
15          Q.   For your standard hours that you         12:39
16   worked, not overtime, standard hours, did you
17   have to record your time?
18          A.   Yes.
19          Q.   How did you record your time?
20          A.   Once every two weeks usually on a        12:39
21   Wednesday or Thursday I would go in, and I would
22   put my 775 Monday through Friday for the two
23   weeks.
24          Q.   And you said this was your practice
25   on Wednesday to log two weeks' worth of time,       12:40
```



```
 1                    Fischer
 2   correct?
 3         A.   Yeah.  If the pay period ended on
 4   let's say the Friday, usually you did it on
 5   Wednesday or Thursday.  Jerry would send out a      12:40
 6   reminder, please put your time in and your time
 7   sheet so that you'll get paid two weeks from now
 8   or a week from now.
 9         Q.   How did you enter your time?  Like in
10   what system?                                        12:40
11         A.   Right on my computer, my GEICO
12   computer.
13         Q.   Do you remember what the software
14   was?
15         A.   God, no, I'm sorry.  I don't.           12:40
16         Q.   Okay.  Does Workday sound familiar?
17         A.   Yes, that's true.  Yes, that is.
18         Q.   Do you know if you had to verify your
19   time once you entered it?
20         A.   Yes, I believe I did.                   12:40
21         Q.   Did you receive any bonuses or
22   commissions?
23         A.   From '16 to '20?
24         Q.   Yes.
25         A.   Other than profit-sharing?  No.        12:40
```



1                      Fischer

2         Q.   Let's go to number 7 for your

3    declaration, page 3.

4         A.   That starts the Vetter settlement?

5         Q.   Yes.  Number 7, the second sentence,      12:45

6    it says, "The timekeeping system auto-filled my

7    hours for each day to be 7.75."  Walk me through

8    that real quick.

9         A.   Just repeat that.  I'm sorry.

10        Q.   Sure.  I'm looking at the last           12:45

11   sentence of number 7, "The timekeeping system

12   auto-filled my hours each day to be 7.75."

13        A.   That's correct.  Yes.

14        Q.   So I guess walk me through that, so I

15   understand.  Obviously I don't have the software   12:45

16   in front of me, so I don't know what it looks

17   like.

18        A.   As you click on, say, Monday through

19   Friday, as you clicked on the date, it would say

20   hours worked, and, as soon as you clicked on it,   12:45

21   it would say 7.75, and you could just touch each

22   day.  It was a rather quick process to fill in

23   the ten days and then submit it.

24        Q.   Okay.  Did you have the capacity,

25   even though, if the numbers auto-populated, so     12:46



```
 1                    Fischer

 2   7.75 auto-populates.  Did you have the capacity

 3   to change that number?

 4        A.   With the supervisor's approval, yes.

 5        Q.   Okay.  So you could fluctuate that          12:46

 6   time, meaning more time or less time.  It's not

 7   required that, even though it auto-populates to

 8   7.75, that it's locked into that number?

 9        A.   Correct.  Yes.

10        Q.   With that filling process of the 7.75       12:46

11   and you would do that in two-week increments,

12   once you submitted for that time, did you always

13   get paid for that time?

14        A.   Yes.

15        Q.   Okay.  Transitioning to number 8, it        12:47

16   states, "Throughout my tenure, my supervisors

17   told me that I could only report up to 38.75

18   hours per week or 7.75 hours a day, five days a

19   week, in the timekeeping program."

20             Which supervisor told you that?             12:47

21        A.   My immediate supervisor, Jerry

22   Cassagne.

23        Q.   And when did this occur?

24        A.   Throughout my tenure.  Well, we'll

25   talk about 2016 through 2020.  Jerry would send a     12:47
```



```
 1                      Fischer
 2          Q.   Yes.
 3          A.   There might have been a few times
 4   where I put in for -- I do remember putting in
 5   for three hours once.  I do remember putting in         12:51
 6   for five hours once, maybe once or twice a year.
 7   It just wasn't worth the headache, and I forget
 8   the circumstances.  It might have been, I know I
 9   was rear-ended one day in my company car.  I
10   recovered some stolen cars where I had to stay          12:52
11   late at night.  I recovered them.  It took a long
12   time for the police to come.  I did a plate
13   reader search, and I found a car at 2 o'clock in
14   the morning.  I went out there and I sat until
15   the police came.  It was a very high-end car.  So       12:52
16   80 to $100,000.
17               I went out there, and I sat there and
18   waited for the police to arrive, and those are
19   the kind of things that just it was part of
20   your -- do I have proof of that?  I believe so,         12:52
21   but I can't swear to it that that was the case.
22          Q.   When you had a request for overtime,
23   what did that process look like?
24          A.   You would go in, and you would change
25   your -- I can speak through the catastrophes that       12:52
```



```
 1                     Fischer
 2   overtime with which somebody said denied?
 3          A.   I never put in for any other
 4   requests.  I can only speak for myself.
 5          Q.   And as to then getting approved to      12:55
 6   enter in your OT, which you did then enter in
 7   your OT, were you paid for that overtime, to your
 8   recollection?
 9          A.   Yes.
10          Q.   Have you ever put in more than 7.75     12:55
11   hours for a day with which you didn't seek
12   pre-approval?
13          A.   Only during catastrophes.
14          Q.   What does that process look like?
15          A.   I answer to an SIU supervisor, Dale,    12:55
16   I forget his last name.  He was from that region
17   in Colorado and/or Houston.  He actually traveled
18   with me on both, and at that point he would say
19   that we worked a 12-hour day.  I'm going to give
20   you two hours travel in the morning.  I am going   12:56
21   to give you two to three-hour reporting time at
22   night when you go back to your hotel room.
23          Q.   Okay, and so then you would just
24   enter your hours after you both agreed to
25   whatever that hour was in the Workday system, and  12:56
```



```
 1                      Fischer
 2   number of cases doesn't necessarily equate
 3   directly to a specific number of hours?
 4             MS. DSOUZA:  Objection.
 5        A.   It all comes down to the type of     01:03
 6   case.  Again, I can only speak for myself.  Each
 7   theft is completely different from, you know,
 8   each case, dependent on the number of claimants,
 9   the number of insured, how many witnesses he had,
10   how many EUOs, were they no-showed, or they       01:03
11   didn't show up, or sometimes they would no-show
12   for two, and they would ask for a third, and
13   legal would say okay, yeah, let's give them a
14   third.
15             So there was a lot of prolonged         01:03
16   investigations that sometimes you held a case
17   three or four months, and let's not forget that
18   you had to document that case every three, eight,
19   15, 21, 28 days.  If I have a case open three
20   months, I had to document it 15 times, you know.  01:04
21        Q.   Mr. Fischer, I need you to just focus
22   on the question that I'm asking.
23        A.   Okay.  I'm sorry.  Sure.
24        Q.   Okay.  Is it fair to say because you
25   stated that every case, you just said it,         01:04
```



| 1 | Fischer |
|---|---------|

 2    required a different number of hours because all

 3    the cases were different, so the number of cases

 4    did not necessarily equate to a specific number

 5    of hours?                                              01:04

 6         A.   Yes.

 7              MS. DSOUZA:  Objection.

 8         Q.   Because you didn't log your

 9    additional overtime hours, is it fair to say that

10    the number that you have indicated in paragraph     01:05

11    9, ten to 12 hours a day, estimating 50 to 65

12    hours a week, is an assumption?

13              MS. DSOUZA:  Objection.

14         A.   Each week was different.  There were

15    weeks that maybe I worked depending on whether I     01:05

16    took a day off or whether I had vacation coming

17    up, whether I had, you know, EUOs.  To me, the

18    best estimate, as far as I'm concerned is that I

19    was working ten to 12 hours every day five days a

20    week, and then I was doing an additional 4 to        01:05

21    eight hours on Saturdays and Sundays.

22         Q.   Then this would have been an

23    assumption, because you can't break down, for

24    example, March 5th, 2018, which would have been a

25    Monday to then March 11th, which is a Sunday,        01:06



```
 1                    Fischer
 2    two cards a month with 20 on each side.  I was
 3    now going through three and three and a half
 4    cards.
 5           Q.   Did you get rid of those documents      02:21
 6    before or after you joined the lawsuit?
 7           A.   That was way before.
 8           Q.   You were eligible for overtime,
 9    right?
10           MS. DSOUZA:  Objection.                      02:22
11           A.   Yes.
12           Q.   Do you know if other lead security
13    investigators were eligible for overtime?
14           MS. DSOUZA:  Objection.
15           A.   To the best of my recollection,         02:22
16    everyone in July and August of 2020, because I
17    was still there until November, everyone was
18    offered ten hours a week, and, if someone else
19    didn't take it, then you could take that person's
20    ten hours, if that's what it came to to keep up     02:22
21    with the increase in the caseload.
22           Q.   Okay.  So the question was do you
23    know whether other lead security investigators
24    were eligible for overtime?
25           MS. DSOUZA:  Objection.                      02:22
```



```
 1                         Fischer
 2    and every day is on there as to EUOs, the day
 3    that I conducted it, the day I requested it, the
 4    day I conducted it, or the day I was present for
 5    a no show was in there each and every day.           03:08
 6              Q.   But do all cases need EUOs?
 7              A.   No.
 8              Q.   Going back to your declaration, and
 9    I'm wrapping up, Counsel, where it is stated, "If
10    I reported working more hours, I understood that    03:08
11    would negatively affect my performance ratings,"
12    did somebody at GEICO tell you this?
13              MS. DSOUZA:  Objection.
14              A.   Yes.  It was Jerry Cassagne at our
15    meetings stated -- actually all three supervisors   03:08
16    would sit in front of the room and say, look,
17    you're going to work 38.75.  If you are going to
18    put in for overtime and you get paid for overtime
19    ten hours a week or five hours a week, whatever
20    it was, so at the end of the month you had 20 or    03:08
21    40 hours overtime, you were affected because you
22    had more time to complete cases where someone who
23    didn't take the overtime, I didn't have that, I
24    had to complete them within 38.75.  I had a
25    better rating.                                       03:09
```



KEITH FISCHER  Confidential                          August 28, 2024
Keith Fischer, et al. vs GEICO                            190

```
 1                        Fischer
 2        Q.   Were you ever capped on the hours per
 3   case?  So you got a brand new theft case.  Were
 4   you capped on 30 hours per case?
 5        A.   No.                                          03:09
 6        Q.   Is that fair to say for any of your
 7   cases?
 8        A.   Yes.
 9        Q.   Social media, PIP, cat, you were
10   never capped by the hours you can allocate to     03:09
11   that case?
12        A.   Correct.
13        Q.   And then you stated for the meetings
14   there were two other individuals there.  Who were
15   those people?  Your supervisors you said.         03:09
16        A.   As far as the overtime?  Is that what
17   you're talking about?
18        Q.   Going back to paragraph 14, yes, that
19   we just talked about.
20        A.   That was Jerry Cassagne, Toni D'Agata   03:09
21   and Dara Campbell.
22             THE VIDEOGRAPHER:  We are going off
23        the record at 3:09 p.m.
24             (Recess taken)
25             THE VIDEOGRAPHER:  We are back on the    03:24
```



```
 1                          Fischer
 2    types of claims, whether that's for theft, staged
 3    loss, med fraud, rate evasions, those all would
 4    have different duties that were required to
 5    investigate the claims?                              03:29
 6          A.   There was different investigative
 7    steps for each one of those.  Yes.
 8          Q.   As it applies to the other teams, do
 9    you know if they had flex time?
10               MS. DSOUZA:  Objection.                   03:29
11          A.   I don't know.  I would think so.
12          Q.   And, as it applies to the other teams
13    as well as the folks on the inside, do you know
14    if they worked overtime?
15               MS. DSOUZA:  Objection.                   03:29
16          A.   I don't know.
17          Q.   If they did work overtime, do you
18    know if they were ever paid for it?
19          A.   I don't know.
20          Q.   Did you personally see other special   03:30
21    investigators in your region doing their work?
22          A.   No, unless it was one of my cases,
23    unless I was going on vacation, and they did part
24    of my case, no, I wouldn't look at any of their
25    cases.                                               03:30
```



```
 1                      Fischer
 2        Q.   For any other special investigators
 3   in your region, did you have access to their
 4   claim files?
 5        A.   Yes.                                    03:30
 6        Q.   Did you review them in your custom
 7   and practice?
 8        A.   No.  The only time that I reviewed
 9   other cases, you could go into someone else's
10   case and put their name in and put dates.  So, if  03:30
11   I wanted to look at six months worth of cases,
12   the only time I would do that was with the
13   blessing of Jerry Cassagne because of my
14   trainees.
15            At the beginning, when I would train     03:30
16   them and I would do reports, I would send them a
17   few of my cases to look at just to see how to
18   write the report.  So there were times where they
19   would send me their case, how they wrote it up,
20   and say is this good?  Did I miss something?      03:31
21   That's when I would review their cases.  Yes.
22        Q.   Outside of in more of that training
23   and shadowing component, were you looking at any
24   of the other SIU claim files?
25        A.   Other than the trainees, no.            03:31
```



```
 1                    Fischer
 2         Q.   Did you ever have access to any of
 3    the special investigators' Workday to see what
 4    they were logging for their hours?
 5         A.   No.                                       03:31
 6         Q.   For other special investigators in
 7    your region, did you ever work together on the
 8    same case?  Kind of like counsel is right now
 9    they're working together on the same case.
10         A.   Yeah, if there was a pattern, I might     03:31
11    catch, let's say there's a string of thefts, or
12    it really took place, as far as I remember, I had
13    a body case where it was the same shop, and maybe
14    two of us went out to the field and we worked
15    together on it, but we would do one report.  We    03:31
16    wouldn't generate two reports.  It would be one
17    report.
18         Q.   Outside of the body style cases, do
19    you recall doing anything like that on theft,
20    arson, staged loss, PIP or jump-ins?                03:32
21         A.   No, not that I recall.
22         Q.   Did you ever work or communicate with
23    any special investigators outside of your region?
24         A.   Oh, yes.  Regularly.  We called it
25    assist cases.  We would get a case from region      03:32
```



                              Fischer

1

2        Q.   When you say, "I also know that other

3   special investigators worked many overtime hours

4   off the clock each week without receiving pay,"

5   is this information based off what other special        03:43

6   investigators told you, or you have personal

7   knowledge as to observing that they worked

8   overtime and then failed to report their

9   overtime?

10       A.   This was the meetings, our meetings,           03:44

11  each one of our meetings, whether they were

12  quarterly or semiannual, it depended on

13  supervisor meetings or manager meetings, the

14  first topic of discussion, whether it be our

15  annual Christmas get-together or our other four         03:44

16  or five meetings with management or just -- that

17  was the first topic that came up was overtime and

18  the caseload every single meeting.  They were, we

19  would talk, if we had a two-hour meeting, I would

20  say the first half hour until the bosses shut it        03:44

21  down and said it's over, I'm not going to answer

22  any other questions, or we're not going to

23  discuss it.  It happened every single meeting for

24  probably ten years.

25       Q.   Well, again, the question was, as to           03:44



1              Fischer

2    your personal knowledge, is that just based upon

3    what was told to you during these meetings?

4         A.   Yes.

5         Q.   Do you recall any employees                      03:45

6    specifically saying the number of overtime hours

7    they were working without reporting them?

8         A.   No.

9         Q.   When you heard people say at these

10   meetings that they were working long hours and         03:45

11   their caseload was difficult and they were not

12   getting paid, did you report this to anyone in

13   corporate at GEICO?

14        A.   No.

15        Q.   Did you make any recommendation to         03:45

16   the other individuals that they should report it

17   to corporate?

18        A.   No.

19        Q.   On your declaration page 5, paragraph

20   17, it states, "I attended a Christmas luncheon        03:45

21   in or around 2018 where Richie Lenihan, another

22   special investigator, raised concerns to GEICO

23   manager Mike DeGrocco about our escalating

24   workload and the lack of authorized overtime

25   hours."                                                  03:46



```
1                    Fischer

2    tender anything over to your counsel?

3         A.   Absolutely.

4              MS. ALBERTY:  And I will follow up

5         with you.                                    04:22

6         Q.   I don't want to go through these line

7    by line.  That is not my intent here today.  More

8    so my question regarding these is anywhere in

9    your custom and practice of writing down daily

10   tasks whatever they may be, did you ever indicate  04:22

11   either the total amount of hours you worked that

12   day or the total amount of overtime with which

13   you exceeded the 7.75 hours that you typically

14   should have worked in SIU?

15        A.   No, I did not.                           04:23

16        Q.   Fair to say that's not something you

17   would have done in your custom and practice?

18        A.   I didn't have any reason to, because

19   no one was asking for my overtime.  I didn't set

20   out back in 2010.  I did it so that I would make   04:23

21   my life easy when I did my yearly and monthly

22   reports.

23             The only reason that I did this and

24   obviously to organize my month so that, if I knew

25   I was going to Brooklyn on Tuesday, you know, I    04:23
```



```
 1                        Fischer
 2   wouldn't have to go on Thursday.  I would try and
 3   do three in Brooklyn.  You know, it was more to
 4   help me coordinate my weekly and daily activities
 5   out on the street and help me with my reports.      04:23
 6        Q.   Okay.  Can you flip to P41.
 7        A.   Yes.
 8        Q.   Sorry.  I probably should have also
 9   indicated this specific number within the packet
10   of P41.  It has been a long day.  So, within the    04:24
11   packet of P41, can you flip to P57, please.  My
12   apologies.
13        A.   Page 57?
14        Q.   Yes.
15        A.   Okay.  Yes.  I see it now.  I'm           04:24
16   sorry.  Yes.  Okay.  I'm here.
17        Q.   Alright.  Looking at September 2017,
18   Sunday to Wednesday, the 3rd through the 6th,
19   there's numbers that are then circled.  So we
20   have a 7 without a circle dash 13 on the 3rd, and   04:25
21   then on the 4th it has a 13 in a circle.  On the
22   5th, it has 8 in a circle.  On the 6th, it has a
23   6 in a circle.  Do you have any idea what these
24   numbers reflect?
25        A.   Can I just see the page you're           04:25
```



```
                         Fischer
 1
 2   Jerry?
 3         A.   Yes.
 4         Q.   In this e-mail it specifically states
 5   that starting November 2016 that "If you work          04:33
 6   overtime, you must be able to document your time
 7   worked."  Do you see that?
 8         A.   Yes.
 9         Q.   Was that your understanding that, if
10   you worked overtime, that you have to document         04:34
11   it?
12         A.   Yes.
13         Q.   It also indicates that your travel
14   time is considered working hours.  You would
15   agree with that?                                       04:34
16         A.   That my travel time is work-related?
17         Q.   Yes.
18         A.   Yes.
19         Q.   It also states, "If you determine
20   that you need to work overtime on any specific         04:34
21   day, you can work overtime and you will get paid
22   for it."
23              So you understood based off your
24   direct supervisor's explicit instructions that,
25   if you need to work overtime, you can work             04:34
```



```
 1                         Fischer
 2    overtime, and you will get paid for it, correct?
 3              MS. DSOUZA:  Objection.
 4         A.   Correct.
 5         Q.   It also states that you have to            04:34
 6    document your overtime hours and be able to
 7    verify why it was needed, and you see that,
 8    correct?
 9         A.   Yes.
10         Q.   So you understood that your               04:35
11    responsibility was to document your overtime and
12    verify why you needed the overtime, correct?
13              MS. DSOUZA:  Objection.
14         A.   Yes.  This was the policy, but it was
15    not the practice of GEICO.                          04:35
16         Q.   This is a direct e-mail, an explicit
17    e-mail from your supervisor Jerry in November
18    2016?
19         A.   Yes.
20         Q.   Did you ever respond to this e-mail?      04:35
21         A.   I don't recall, but I did try to
22    submit overtime, and I was turned down, and I
23    gave up after about two to three months.
24         Q.   But do you remember in time when you
25    requested overtime?                                 04:35
```



1                          Fischer

2          A.    It was shortly after this I believe

3    back at the start of January that I tried for

4    several times, but I was shot down only because

5    it didn't meet the criteria, or the allocation of        04:36

6    overtime wouldn't go to what I used it for.

7               So, although I had windshield hours

8    some days of going from Levittown, New York to

9    Brooklyn is 35 miles, and you leave at 5 in the

10   morning, and you get there at 7.  You sleep in           04:36

11   your car or you review your file until 9 until

12   when you walk down the block, you do that so you

13   don't have to fight traffic, or you're trying to

14   get there reasonably on time like today.

15              Instead of taking three or four               04:36

16   hours, I would do it in two hours by leaving at

17   5, review my case, you know, maybe take a nap

18   prior to walking down to the EUO and then going

19   down to the EUO, getting back in my car at

20   2 o'clock, driving home in another two hours of         04:36

21   traffic, I already spent 11 hours, and that was

22   not part of the overtime.  That did not fit the

23   criteria of putting in for overtime.  It had to

24   be -- windshield time didn't count.  Typing on

25   weekends didn't count.                                  04:37



```
 1                        Fischer
 2   or I would make a phone call.  I would have to go
 3   out to the police department maybe.  I tried to
 4   do my fuel work all in one day and then come home
 5   at night.  So, if you saw me in the morning, go          04:41
 6   onto my computer for an hour or two, and then I'm
 7   gone for five or six hours.  You know, could I
 8   have been out at a Met game or a Yankee?
 9   Absolutely, but I know that I was out conducting
10   EUOs, because I kept these records to show where         04:41
11   I was during the day when I was not typing, and
12   then you'll see me come back to the computer
13   after dinnertime and work another four or five
14   hours, and I can't tell you how many times my
15   wife said get off the computer.  My kids would           04:42
16   tell me get off the computer.  Stop.  You're
17   driving yourself crazy.
18        Q.   Is it fair to say, though, that the
19   time stamps would not necessarily be indicative
20   of evidencing overtime hours?                            04:42
21             MS. DSOUZA:  Objection.
22        A.   Yes.
23        Q.   So the complaint that we looked at,
24   Exhibit 5, was filed as a collective action.  Do
25   you know what that means?                                04:42
```



```
 1                      Fischer

 2          MS. ALBERTY:  Objection.

 3      A.   Yes.

 4          MS. DSOUZA:  I think that is it.

 5          MS. ALBERTY:  I don't have any          05:33

 6      further questions.  Thank you.

 7          MS. DSOUZA:  Thank you.

 8          THE VIDEOGRAPHER:  This marks the end

 9      of the deposition.  We are going off the

10      record at 5:33 p.m.                          05:34

11          (Time noted:  5:33 p.m.)

12                          _____

13

14  Subscribed and sworn to

15  before me this____day of_____, 2024.

16  _____

17

18

19

20

21

22

23

24

25
```



1

2                    C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 2nd day of September, 2024.

16

17   _____

18                    JOSEPH R. DANYO

19           STATE OF NEW YORK

20           My Commission Expires 2/20/2027

21

22

23

24

25

