# Exhibit 3

1

2            IN THE UNITED STATES DISTRICT COURT

3            FOR THE EASTERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - )

5     KEITH FISCHER, MICHAEL O'SULLIVAN,)

6     JOHN MOESER, LOUIS PIA, THOMAS     ) Case No.:

7     BARDEN, CONSTANCE MANGAN, and      ) 2:23 Civ. 2848

8     CHARISE JONES, individually and    ) (GRB) (ARL)

9     on behalf of all others similarly )

10    situated,                          )

11                    Plaintiffs,        )

12       - v -                           )

13    GOVERNMENT EMPLOYEES INSURANCE      )

14    COMPANY d/b/a GEICO,               )

15                    Defendant.         )

16    - - - - - - - - - - - - - - - - - )

17

18        VIDEOTAPED DEPOSITION OF CONSTANCE MANGAN

19

20

21

22

23    Reported by:

24    Kim M. Brantley

25    Job No: J11541509



1              CONSTANCE MANGAN

2          Thursday, August 9, 2024

3          Time: 9:35 a.m.

4      Videotaped deposition of CONSTANCE MANGAN,

5  held at Duane Morris, LLP, 1540 Broadway, 14th

6  Floor, New York, New York, before Kim M. Brantley,

7  Court Reporter and Notary Public of the State of

8  New York.

9

10  APPEARANCES:

11  On behalf of the Plaintiffs:

12      OUTTEN & GOLDEN, LLP

13      1225 New York Avenue NW - Suite 1200B

14      Washington, DC, 20007

15      (202) 847-4400

16      Email: hcolechu@outtengolden.com

17      BY:  HANNAH COLE-CHU, ESQUIRE

18

19

20

21

22

23

24

25



```
1                    CONSTANCE MANGAN

2    APPEARANCES CONTINUED:

3    On behalf of the Defendant GEICO:

4         DUANE MORRIS, LLP

5         190 South LaSalle Street - Suite 3700

6         Chicago, Illinois 60603

7         (312) 499-0198

8         Email: tealberty@duanemorris.com

9    BY:  TIFFANY ALBERTY, ESQUIRE

10

11   Also On behalf of the Defendant GEICO:

12        DUANE MORRIS, LLP

13        1540 Broadway - 14th Floor

14        New York, New York 10036

15        (212) 471-1856

16        Email:  gsslotnick@duanemorris.com

17        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)

18

19   ALSO PRESENT:

20        SILVIO FACCHIN, Legal Video Specialist

21        Esquire Deposition Solutions

22

23

24

25
```



1                      CONSTANCE MANGAN

2              P  R  O  C  E  E  D  I  N  G  S

3                 THE LEGAL VIDEO SPECIALIST:  This is

4    the media labeled number one in the video recorded

5    deposition of Constance Mangan in the matter of

6    Keith Fischer, et al., versus Government Employee

7    Insurance Company, doing business as GEICO.

8                 This deposition is being taken in New

9    York City, New York, on August 9th, 2024.  My name

10   is Silvio Facchin.  I am a certified legal video

11   specialist; the court reporter is Kim Brantley,

12   and we are both representing Esquire Deposition

13   Solutions.

14                 We are now going on the record.  The

15   time is 9:35 a.m.

16                 Counsel will state their appearances

17   for the record.

18             MS. COLE-CHU:  Hannah Cole-Chu for the

19         plaintiffs and the witness, Connie Mangan.

20             MS. ALBERTY:  Tiffany Alberty and

21         Gregory Slotnick on behalf of the defendants,

22         GEICO.

23             THE LEGAL VIDEO SPECIALIST:  And will

24         the court reporter please swear in the

25         witness.



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    CONSTANCE MANGAN
 2   Whereupon,
 3                    CONSTANCE MANGAN
 4   called as a witness by counsel for Defendant, and
 5   after having been first duly sworn, was examined
 6   and testified as follows:
 7           EXAMINATION BY COUNSEL FOR DEFENDANT
 8                 BY MS. ALBERTY:
 9       Q.   Can you please state your name and
10   spell it for the court reporter?
11       A.   Sure.  Constance Mangan,
12   C-o-n-s-t-a-n-c-e, last name Mangan, M-a-n-g-a-n.
13           MS. ALBERTY:  Let the record reflect
14   that this is the discovery deposition of Constance
15   Mangan taken pursuant to notice and by agreement
16   of the parties.  Today's deposition will be taken
17   in accordance with all applicable rules.
18           Excuse me.  It's an early morning.
19           THE WITNESS:  That's a tough one.
20   BY MS. ALBERTY:
21       Q.   I know I previously introduced myself
22   on the record and then before we began, but my
23   name's Tiffany Alberty.  I'm counsel for GEICO.
24   Today I'm going to be asking you a series of
25   questions about your experience at GEICO.
```



1                    CONSTANCE MANGAN

2         Q.   And you don't have any documentation

3    that's in front of you, correct?

4         A.   Correct.

5         Q.   And you don't have any recording

6    devices on you, other than what Silvio has set up

7    today?

8         A.   I do not.

9         Q.   Okay.  All right.  Have you ever been a

10   party to a lawsuit other than this one?

11        A.   Yes.

12        Q.   Okay, talk to me about that a little

13   bit.

14        A.   That was a prior lawsuit against GEICO,

15   the allegation being that GEICO was not

16   compensating employees for overtime and hours

17   worked in excess of their regularly scheduled

18   hours.

19             I remember Vedder versus GEICO was the

20   name of the suit.

21        Q.   Okay.  Other than that, have you had

22   any other legal proceedings?

23        A.   Regarding?

24        Q.   Outside of the Vedder and this one

25   today.



CONSTANCE MANGAN

 1
 2    GEICO in the special investigations unit were
 3    involved in it, and they told me about it.
 4         Q.    Okay.  Did you opt into that --
 5         A.    That I opted into.
 6         Q.    Do you remember when?
 7         A.    I do not.
 8         Q.    And in what way other than opting into
 9    the lawsuit did you participate in the lawsuit?
10         A.    Oh, I provided information to the
11    attorneys who were representing us in that suit.
12         Q.    Okay.  Did you have to provide any type
13    of declaration statement for that lawsuit?
14         A.    I don't remember.
15         Q.    Do you remember if you had to provide
16    any answers to discovery in that lawsuit?
17         A.    I don't remember.
18         Q.    Okay.  Did that lawsuit settle?
19         A.    Yes.
20         Q.    Do you recall how much money you
21    received as a result of that case?
22         A.    I believe it was approximately ████.
23         Q.    Okay.  And to your knowledge was that
24    regarding wages?
25         A.    Yes, unpaid wages.



1                    CONSTANCE MANGAN

2    for a wealthy family, or a convention for General

3    Electric.  So I would do periodically jobs of that

4    nature.

5         Q.   Okay.

6         A.   But I didn't work a lot because my

7    father was receiving cancer treatment.  I was the

8    person who was taking him to all of his

9    appointments, so that was more important at that

10   time.

11        Q.   And then I believe you started working

12   at GEICO in April of 2004.  Does that sound right?

13        A.   That sounds exactly right.

14        Q.   And when you first started working at

15   GEICO, what was your title?

16        A.   Senior investigator.

17        Q.   And we'll get more into your experience

18   with GEICO soon, but when did you retire

19   specifically from GEICO?

20        A.   July 1st, 2020.

21        Q.   And why did you retire?

22        A.   I wasn't enjoying working any more.  It

23   was very stressful.

24        Q.   When you left in July of 2020, have you

25   worked since?



```
 1                     CONSTANCE MANGAN

 2        Q.    -- did your levels ever change?

 3        A.    No.

 4        Q.    So throughout your entire tenure you

 5   were a level sixty-five senior special

 6   investigator?

 7        A.    Level sixty-five senior investigator,

 8   special investigations unit.

 9        Q.    What were your duties and

10   responsibilities?

11        A.    To investigate fraud or suspected

12   fraud; to gather evidence of fraud; to interview

13   claimants; to review files; to conduct background

14   checks and other computer inquiries; to take

15   statements; to sometimes conduct our surveillance;

16   to do clinic inspections and clinic visits; to

17   visit pharmacies; to visit police precincts

18   regarding police reports; to conduct examinations

19   under oath; to prepare reports, and to submit

20   reports; to speak with other units within GEICO

21   such as the PIP unit, which is the personal injury

22   protection unit; or the theft unit; or the auto

23   damage, auto body unit.

24        Q.    Did you supervise anybody?

25        A.    No.  I'm bossy, but not the supervisor.
```



```
 1                    CONSTANCE MANGAN
 2   You could spend a great deal of time in the field,
 3   or you could spend a lot of time typing at your
 4   computer, so...
 5        Q.   So within your position did you send
 6   emails?
 7        A.   Yes.
 8        Q.   And you evaluated various claims?
 9        A.   I don't know if I would use the word
10   "evaluated," but we certainly reviewed claims,
11   gathered evidence in claims.  We didn't make claim
12   determinations.
13        Q.   But you would make the determination
14   whether there was fraud or not found?
15        A.   Correct.
16        Q.   I believe you said that gather police
17   reports, do interviews, gather statements, run
18   background checks, review files, conduct
19   surveillance...
20             For all those tasks would the case
21   dictate how much time you would allocate to those
22   tasks?
23        A.   I guess I would say that each case in
24   an investigation in my opinion is different, and
25   so every case could take you in a different
```



```
 1                    CONSTANCE MANGAN

 2          might say, "Come on in," and they show you

 3          their equipment, and you meet some of the

 4          doctors and the personnel.

 5                So you might in your mind say, well

 6          this will probably be about an hour or two

 7          hours, but you could also have a four- or

 8          five- or six-hour day.

 9    BY MS. ALBERTY:

10          Q.   Were -- were your hours varied?

11          A.   No.

12          Q.   What were your hours you worked?

13          A.   My hours were consistently beginning

14    between 7:00 a.m. and 9:00 a.m. -- So it varied

15    only in that very limited sense -- and then

16    finishing anywhere between say 3:00 to 5:00.

17                Those were the scheduled hours, not the

18    actual hours that I worked.

19          Q.   Were you -- strike that.

20                Who was your supervisor?  And again I

21    want to focus between the 2016 to 20/2010 (sic)

22    time frame.

23          A.   Okay, I'm going to go backwards,

24    because that would be easier.  Brian Portnoy was

25    the supervisor I had when I retired.  I don't know
```



1                      CONSTANCE MANGAN

2        A.    EUOs.

3        Q.    EUOs.

4        A.    Examination under oath.  Yeah, because

5   we love acronyms.  It's just one of those things.

6        Q.    Were you doing EUOs for doctors,

7   medical specialists, things like that as well?

8        A.    I did not.  Other people did within the

9   SIU, but I did not.

10       Q.    Okay.  Would you consider yourself a

11  subject matter expert in the field of medical

12  insurance investigations?

13           MS. COLE-CHU:  Objection to form.

14           THE WITNESS:  I would say that I became

15       very proficient at it.

16  BY MS. ALBERTY:

17       Q.    What about for auto insurance fraud?

18       A.    Yes, very proficient at it.

19       Q.    To your knowledge, do you know if other

20  senior security investigators had the same

21  workload as you for the medical fraud claims?

22       A.    Yes.

23       Q.    How do you know that?

24       A.    Well, I -- I spoke to other

25  investigators that were in the medical fraud team,



1                    CONSTANCE MANGAN

2    conducted for the year?

3         A.   Yes, actually it's required that you

4    review it, and I believe, if I'm correct, that we

5    had to sign it.

6         Q.   What would typically be included in

7    that performance evaluation?

8         A.   So, to the best of my recollection,

9    because it has been a while, that would be case

10   life, quality of your cases, the amount of

11   training that you had, the number of cases

12   assigned.

13             Those are the ones that come to mind.

14        Q.   Would it include the number of cases

15   closed in that year?

16        A.   I believe it could.

17        Q.   How many cases would you say you closed

18   a month?

19        A.   That changed frequently.  The goal

20   would be to try to close as many as possible, but

21   just it was not always possible.  And since it was

22   such a rolling caseload, it's hard for me to give

23   you an answer to that question, because I really

24   am not certain.

25        Q.   Would you be able to close one case a



```
 1                    CONSTANCE MANGAN
 2   month?
 3        A.   Well, hopefully, yes.  That would be
 4   great.
 5        Q.   Okay?
 6        A.   Yeah.
 7        Q.   Five cases, ten cases a month?
 8        A.   Potentially; depends.
 9        Q.   When you would effectively close a
10   case, what did that look like?
11             MS. COLE-CHU:  Objection to form.
12             THE WITNESS:  Yeah, I'm not sure I can
13        answer that.  I'm not sure what you mean.
14        What do you mean, "What did it look like?"
15   BY MS. ALBERTY:
16        Q.   Sure.  Meaning did you have to submit a
17   final report, who did it go to, were you making
18   determinations whether there was fraud, there
19   wasn't fraud?
20        A.   Okay, so I was making determinations as
21   far as whether or not I discovered any fraud as a
22   result of my investigation for sure, whether
23   billing was excessive or improper.
24             I had to submit a written report
25   through the case reporting system, and once you
```



1                          CONSTANCE MANGAN

2          Q.    Okay.  So we'll go back and look at

3    then Exhibit 2, G000039, where we were talking

4    about the Overtime Eligibility Policy.

5              Based off what we read and looked at

6    where it indicates that, "All nonexempt employees

7    are required to accurately record their hours work

8    and absences taken," you understood that this

9    policy did not allow for working off the clock?

10             MS. COLE-CHU:  Objection to form.

11             THE WITNESS:  Yeah, I would not say

12        that was my understanding.

13             I -- I would say that this is what the

14        policy says, but my understanding of it,

15        based on the practice, would be different

16        from that.

17             Although it does say that "You should

18        report any issues you had to your

19        supervisor," that is something I strictly

20        followed.

21    BY MS. ALBERTY:

22        Q.    Okay.

23        A.    Yeah.

24        Q.    As if applies to the remaining titles

25    that's mentioned in this policy -- so, "If you



1                           CONSTANCE MANGAN

2    would then indicate percentage wise for the

3    eligibility of your annual raise?

4        A.   I do not.

5        Q.   So we, too, really enjoy acronyms.  So

6    the cost of cost of living adjustment that you

7    were talking about, they're called COLAs.

8        A.   Right.

9        Q.   Do you know what specific factors were

10   applied for a COLA?

11       A.   I'm not sure about specific factors.  I

12   believe COLA was set -- I don't -- at a certain

13   rate, but I couldn't say that with complete

14   certainty.

15       Q.   Do you recall receiving a raise every

16   year that you were at GEICO from 2016 to 2020?

17       A.   To the best of my recollection, I

18   believe, yes.

19       Q.   Okay, I want to go back to the systems

20   with which you used to record your time.

21            How did you record your time?

22       A.   You would enter the hours worked for

23   your day and submit it to the supervisor.

24       Q.   I think you said that you recall

25   entering your time monthly, then weekly, then



```
 1                    CONSTANCE MANGAN

 2             THE WITNESS:  Yeah, I'm going to have

 3        to ask you to repeat that question again.

 4   BY MS. ALBERTY:

 5        Q.   Sure.

 6        A.   I got a little lost in there.

 7        Q.   That's okay.

 8             I think you said any time you would

 9   bring up the amount of time it would take for you

10   to do your job and exceed then the 38.75 hours,

11   that your supervisors would then bring up the

12   discussion of overtime?

13        A.   That's not correct.  If I testified to

14   that, then that's not correct.

15             It's -- we would constantly have

16   conversations about working hours in excess of the

17   7.75 per day.  There was a time when overtime was

18   offered, and there were times when we had

19   conversations about that offered overtime.

20        Q.   Okay, so GEICO offered overtime.  Did

21   you enter your overtime hours?

22             MS. COLE-CHU:  Objection to form.

23             THE WITNESS:  I can recall submitting

24        overtime hours on very few occasions.

25
```



```
 1                    CONSTANCE MANGAN
 2    BY MS. ALBERTY:
 3         Q.   When you submitted your overtime hours,
 4    were you paid for that overtime?
 5         A.   To the best of my recollection I was
 6    paid for the overtime I submitted, yes.
 7         Q.   Okay, number twelve of your
 8    declaration, which is going to be page three and
 9    four, states "The process for requesting overtime
10    approval was onerous and deterred me from
11    reporting overtime I worked."
12         A.   I see that.
13         Q.   In -- in what way do you mean that it
14    was "onerous"?
15         A.   To me it felt onerous due to the fact
16    that I had to contact my supervisor; I had to
17    request permission to submit for overtime; I had
18    to cite a specific case or cases that I would
19    require the overtime for, and then I had to
20    specify the number of hours I anticipated needing
21    to complete that task on that day that would
22    require overtime.
23              Now, if I underestimated, I was not
24    permitted to correct it.  So if I said, "I'm going
25    to need two more hours" because, I'm guessing, it
```



1                    CONSTANCE MANGAN

2          thing to that was onerous and -- and to -- to

3          me excessive.

4     BY MS. ALBERTY:

5          Q.   When you made the request, how would

6     you do it?

7                MS. COLE-CHU:  Objection to form.

8                THE WITNESS:  So the request for

9          overtime, to the best of my recollection, was

10         via email to my direct supervisor.

11    BY MS. ALBERTY:

12         Q.   When you made the request for overtime,

13    was it always approved?

14         A.   To the best of my recollection, I would

15    say yes, but I made, as I said, very few requests.

16    BY MS. ALBERTY:

17         Q.   Do you recall specifically who you made

18    the request through?  And what I mean by that is

19    not just the general supervisors, like a named

20    person.

21         A.   Well, the supervisors that I had, which

22    would have been Brian Portnoy, or Toni D'Agata, or

23    Dara Campbell, going back to Kevin Moynihan, but

24    that's again possibly before 2016, so.

25         Q.   So as far as the process of emailing



1                    CONSTANCE MANGAN

2    had already requested, I didn't feel confident

3    that it would be approved, and I also did not

4    really want to have to go through another process

5    of submitting a request for an approval and

6    specifying a case for another hour of overtime,

7    especially when my -- my supervisors were saying

8    we shouldn't be doing it.

9         Q.   What do you mean -- excuse me, what do

10   you mean that you felt your overtime requests were

11   discouraged?

12        A.   Because our -- as I have stated and I

13   would tell my supervisors, there is no way I can

14   complete my investigations, my reports, within the

15   time frame of 7.75 hours a day; that in order to

16   complete my work I had to work in excess of those

17   hours on a regular basis.

18             And the response that I received from

19   my supervisors -- and that would be all of the

20   supervisors that I have named so far -- was that

21   Don't do overtime.  Work 38.75; work 7.75."

22             My response would be, "But I have to,

23   because it affects my performance evaluation.  It

24   affects my case rating.  There's no way that I can

25   do -- finish these cases if I don't work more than



```
1                    CONSTANCE MANGAN
2     my normally scheduled hours."
3              And they would say, "We understand, but
4     there's nothing we can do about it."
5         Q.    But you had the ability, though, to
6     still request overtime?
7         A.    The problem to my understanding with
8     requesting overtime was that affected my ability
9     to -- not my ability, I apologize.  It affected my
10    qualification to be assigned more cases.  So,
11    while I was already feeling extremely
12    overwhelmed -- I can recall having this
13    conversation with Toni D'Agata especially, not on
14    a particular date, but I can remember having this
15    conversation with her, that -- and I -- I believe
16    Dara as well -- that if you submitted say in a
17    week that you worked fifty hours, that would then
18    trigger the assignment of more cases to you,
19    because you are now available on more hours.
20              So, I'm doing the overtime to complete
21    the cases I already have -- and I'm failing to do
22    that a lot of the time -- and now if I submit all
23    of my actual overtime hours, all of the hours that
24    I was working, say fifty hours, that would then
25    trigger the assignment of additional cases adding
```



1                    CONSTANCE MANGAN
2      to my caseload.  And the supervisors didn't want
3      us to do that.  They knew he had an unmanageable
4      and unreasonable caseload, and they constantly
5      told me and -- and everybody -- not everybody, but
6      most the people that I spoke with and worked with
7      that I knew and had conversations with, that we
8      were limited to a 7.75-hour day, in spite of the
9      fact that we were all complaining and all saying
10     that we're all working way past that.
11             There was -- just seemed to be no
12     avenue to satisfy that problem.
13        Q.   With regard to supervisors saying
14     "Don't do overtime" -- I think that's what the
15     phrase you had stated --
16        A.   Yeah.
17        Q.   Was that ever in any type of GEICO
18     policy?
19             MS. COLE-CHU:  Objection to form.
20             THE WITNESS:  My recollection of those
21         conversations were specifically telephone
22         conversations, in-person conversations,
23         predominantly.
24     BY MS. ALBERTY:
25        Q.   Do you ever recall seeing that in an



1                   CONSTANCE MANGAN

2        A.   I know he worked overtime.  I don't

3   remember if he ever told me that he was denied

4   overtime.

5        Q.   Do you know if Mike Sullivan submitted

6   for overtime and was denied?

7        A.   I do not know if he was denied.

8        Q.   Do you know if Charise Jones submitted

9   for overtime and was denied?

10       A.   I do not know if she was denied.

11       Q.   Do you know if Louis Pia submitted

12   overtime and was denied?

13       A.   I do not know if he was denied.

14       Q.   And do you know if John Moeser

15   submitted overtime and was denied?

16       A.   I do not know if he was denied.

17       Q.   Do you know if any of these people that

18   you commiserated with over the overtime ever went

19   to human resources?

20       A.   Not to my knowledge, but I don't know

21   for sure.

22       Q.   Okay.  Let's go to actually paragraph

23   ten.  It states, "GEICO set a regular schedule of

24   me starting anywhere between 7:00 to 9:00 a.m.

25   and ended between 3:00 to 5:00 p.m., but I



```
 1                       CONSTANCE MANGAN

 2   regularly worked more hours from late 2016 to

 3   approximately May of 2020, and I started working

 4   between 7:00 a.m. and 8:00 a.m. and worked until

 5   approximately 7:00 p.m.

 6              "I worked about fifty to sixty hours a

 7   week on average during this time period."

 8              On what do you base these estimates?

 9       A.   I based these estimates on the actual

10   time I spent working at my computer or reviewing

11   documents related to my cases.

12       Q.   Did you have any type of tracking

13   mechanism for your hours, such as that you did

14   manually, in a Word document, handwritten, so that

15   you would say, "I'd start my day today at 8:00 and

16   I actually ended at 7:00"?

17       A.   Well, we would submit our hours through

18   the time reporting system, which of course I can't

19   remember the name of.  But I also do know that

20   SICM is -- has I think they call it case

21   timestamps.  So your time spent in the case

22   reporting system is also documented, but you're

23   not always in the case system.

24              But certainly I believe if you're on

25   the computer, the supervisors had the ability to
```



CONSTANCE MANGAN                                   August 09, 2024
FISCHER V. GEICO                                               131

1                        CONSTANCE MANGAN

2     know when you're on your computer or not.

3          Q.    Are you assuming that, or do you have

4     knowledge?

5          A.    I'm sure they could.

6          Q.    Again, are you assuming that, or do you

7     have knowledge that a supervisor could go in and

8     see the time stamps of what you login and are on

9     your computer?

10         A.    My understanding is that they could,

11    yes.

12         Q.    How do you know that?

13         A.    From what we were told.  That they

14    could -- they would know when we were on our --

15    whether we were on our SICM or signed into our

16    computers.

17              There was some monitoring system on the

18    computer.  I can't think of the name of it.

19         Q.    Who told you that?

20         A.    Supervisors, management, other

21    investigators.

22         Q.    Right, and I'm trying to get to more

23    specificity on who.

24         A.    Oh, well, my supervisors, that they

25    would know when we were on the computer, they



```
 1                   CONSTANCE MANGAN

 2   would know when we were on SICM, that they were

 3   able to tell from their computer, if we were.

 4        Q.   You stated that you would enter your

 5   time every day, but in the same breath you're

 6   saying, "I didn't actually enter my time that

 7   exceeded 7.75."

 8            So did you have a time reporting system

 9   that you personally kept that said, "I worked this

10   day, these hours"?

11        A.   Oh, I see what you're asking, okay.

12   Like difficult a diary or something along those

13   lines?

14            (Ms. Alberty nods head in the

15   affirmative.)

16        A.   No.

17        Q.   So you wouldn't have recorded your time

18   anywhere other than in GEICO's timekeeping

19   program, right?

20        A.   For actual hours worked.

21            And sometimes -- I just though of this.

22   Sometimes I would be exchanging an email with a

23   supervisor at 8:00 o'clock at night.  So I would

24   have submitted my hours for the day of 7:00 to

25   4:00, and then still be having an email
```



1              CONSTANCE MANGAN

2    conversation with a supervisor past those hours.

3              So that was -- that was another way

4    that they would know that I was still working,

5    because they were still working.

6        Q.   And it's your testimony that you

7    weren't provided flex time, and you were supposed

8    to be working from that 7:00 a.m./9:00 a.m. to

9    3:00 p.m./9:00 -- 5:00 p.m., correct?

10       A.   Right, yes.

11       Q.   Is it fair to say that you can't

12   specifically itemize every week in which you

13   allegedly exceeded forty hours a week?

14             MS. COLE-CHU:  Objection to form.

15             THE WITNESS:  Just if you could clarify

16        what you mean by "itemize."

17   BY MS. ALBERTY:

18       Q.   Sure.  So say, "May 22nd through May

19   27th I worked fifty-five hours that week."

20       A.   That's difficult to do, a specific week

21   like that.

22             I know when I made -- when, you know,

23   these were signed in November.  I remember when I

24   made my declaration sometime last fall, we tried

25   to nail down a week, which was a little easier at



```
1                    CONSTANCE MANGAN
2   that time because it was a little further back
3   than today.  I know that at one point we -- we
4   settled on a week in September that I could more
5   specifically recall working the over time.  But I
6   don't have any document to reflect that, like a --
7   like you said, like a diary or some personal or
8   independent record.
9        Q.   Sure.  So as -- then back to the
10  question, which is the itemization of every week,
11  for fifty-two weeks, from 2016 to 2020, you can't
12  go itemization every week to what hours you worked
13  over the forty-hour work week, correct?
14            MS. COLE-CHU:  Objection to form.
15            THE WITNESS:  I -- well, I'm struggling
16       to make sure that I'm answering you
17       correctly, and honestly, and fully.
18            I don't have an -- independent of the
19       GEICO systems, I don't have any independent
20       records of specific itemized time or hours
21       worked.
22  BY MS. ALBERTY:
23       Q.   Okay.  So as to then, at least in
24  paragraph ten, where you're stating, "I worked
25  about fifty to sixty hours a week on average
```



```
 1                   CONSTANCE MANGAN

 2  A  F  T  E  R  N  O  O  N    S  E  S  S  I  O  N

 3              (Whereupon at 1:17 p.m. the videotaped

 4  deposition of Constance Mangan resumed, and she

 5  further testified as follows.)

 6              THE LEGAL VIDEO SPECIALIST:  We are

 7  back on the record.  The time is 1:17 p.m.  This

 8  is the beginning of the media labeled number four.

 9  BY MS. ALBERTY:

10      Q.   All right, so before we took a break we

11  were looking at your declaration, and specifically

12  we were looking at page three, number ten.

13              In regard to your statement that you

14  worked about fifty to sixty hours a week on

15  average during this time period, did you

16  specifically tell anyone that you were working

17  fifty to sixty hours a week and not putting in the

18  overtime hours?

19      A.   I definitely had that discussion with

20  other SIU investigators that I was working

21  approximately those many hours per week, and of

22  course I was complaining to my supervisors about

23  working excessive hours.  And I would say

24  sometimes, "I'm working 'till 8:00 o'clock at

25  night," or "I'm working 'till 9:00 o'clock at
```



```
 1                    CONSTANCE MANGAN

 2   night," "I'm working 'till 7:30 at night."

 3            So in essence, yes, we did have those

 4   conversations.

 5       Q.   So as to -- and specifically more "I'm

 6   working fifty to sixty hours a week on average,

 7   but I'm not putting in the overtime hours for then

 8   that" -- we'll say "ten to twenty OT."

 9            Did you tell anyone that?

10       A.   Well, everyone knew it.  We all -- we

11   all had the same conversation.  Nobody was putting

12   in for it.  Or very few people were putting in for

13   it.  Or people were putting in for it in different

14   amounts or degrees.  So it was sort of a known

15   thing.

16       Q.   So again my question is different,

17   which is did you tell anyone that "I'm working

18   fifty to sixty hours over, and I'm not putting in

19   the overtime"?

20       A.   Like during the course of our

21   conversations?

22       Q.   Yes.

23       A.   Is that what you're asking?  Yes,

24   absolutely.

25       Q.   Okay, and who did you tell?
```



1              CONSTANCE MANGAN

2         THE LEGAL VIDEO SPECIALIST:  We are now

3    going off the record.  The time is 4:00 p.m.

4    This is the end of the media labeled number

5    five, concluding this video recorded

6    deposition.

7         (Whereupon at 4:00 p.m. the videotaped

8    deposition of Constance Mangan concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              CONSTANCE MANGAN
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK     )
 4                         : Ss.
 5   COUNTY OF NEW YORK    )
 6              I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9              That CONSTANCE MANGAN, the witness
10   whose deposition is hereinbefore set forth, was
11   duly sworn by me and that such deposition is a
12   true record of the testimony given by the witness.
13              I further certify that I am not related
14   to any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto set
18   my hand this 14th day of August, 2024.
19
20              _____
21                 Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

