Exhibit 4

```
 1

 2          IN THE UNITED STATES DISTRICT COURT

 3          FOR THE EASTERN DISTRICT OF NEW YORK

 4  - - - - - - - - - - - - - - - - - )

 5  KEITH FISCHER, MICHAEL O'SULLIVAN,)

 6  JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

 7  BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

 8  CHARISE JONES, individually and   ) (GRB) (ARL)

 9  on behalf of all others similarly )

10  situated,                         )

11                   Plaintiffs,      )

12     - v -                          )

13  GOVERNMENT EMPLOYEES INSURANCE    )

14  COMPANY d/b/a GEICO,              )

15                   Defendant.       )

16  - - - - - - - - - - - - - - - - - )

17

18      VIDEOTAPED DEPOSITION OF THOMAS BARDEN

19

20

21

22

23  Reported by:

24  Kim M. Brantley

25  Job No: J11541508
```



1                        THOMAS BARDEN

2                   Thursday, August 8, 2024

3                   Time: 9:59 a.m.

4          Videotaped deposition of THOMAS BARDEN, held

5     at Duane Morris, LLP, 1540 Broadway, 14th Floor,

6     New York, New York, before Kim M. Brantley, Court

7     Reporter and Notary Public of the State of New

8     York.

9

10    APPEARANCES:

11    On behalf of the Plaintiffs:

12         OUTTEN & GOLDEN, LLP

13         1225 New York Avenue NW - Suite 1200B

14         Washington, DC, 20007

15         (202) 847-4400

16         Email: hcolechu@outtengolden.com

17              zdsouza@outtengolden.com

18         BY:  HANNAH COLE-CHU, ESQUIRE

19              ZARKA SHABIR DSOUZA, ESQUIRE

20

21

22

23

24

25



```
 1                    THOMAS BARDEN
 2   APPEARANCES CONTINUED:
 3   On behalf of the Defendant GEICO:
 4        DUANE MORRIS, LLP
 5        190 South LaSalle Street - Suite 3700
 6        Chicago, Illinois 60603
 7        (312) 499-0198
 8        Email: tealberty@duanemorris.com
 9   BY:  TIFFANY ALBERTY, ESQUIRE
10
11   Also On behalf of the Defendant GEICO:
12        DUANE MORRIS, LLP
13        1540 Broadway - 14th Floor
14        New York, New York 10036
15        (212) 471-1856
16        Email:  gsslotnick@duanemorris.com
17        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)
18
19   ALSO PRESENT:
20        SILVIO FACCHIN, Legal Video Specialist
21        Esquire Deposition Solutions
22
23
24
25
```



```
1                    THOMAS BARDEN

2              P R O C E E D I N G S

3              THE LEGAL VIDEO SPECIALIST:  This is

4    the media labeled number one in the video recorded

5    deposition of Thomas Barden in the matter of Keith

6    Fischer, et al., versus Government Employee

7    Insurance Company, doing business as GEICO.

8              This deposition is being taken in New

9    York City, New York, on August 8th, 2024.  My name

10   is Silvio Facchin.  I am a certified legal video

11   specialist; the court reporter is Kim Brantley,

12   and we're both representing Esquire Deposition

13   Solutions.

14             We are now going on the record.  The

15   time is 10:00 a.m.

16             Counsel will state their appearances

17   for the record.

18        MS. COLE-CHU:  For the plaintiffs,

19        Hannah Cole-Chu, from Outten & Golden, and

20        with me is Zarka DSouza from Outten & Golden

21        as well.

22        MS. ALBERTY:  And Tiffany Alberty, on

23        behalf of GEICO, along with Gregory Slotnick.

24        THE LEGAL VIDEO SPECIALIST:  Will the

25        court reporter please swear in the witness.
```



```
 1                    THOMAS BARDEN

 2                    THOMAS BARDEN

 3   called as a witness by Counsel for the Defendant,

 4   and, after having been first duly sworn by the

 5   Notary Public, was examined and testified as

 6   follows:

 7          EXAMINATION BY COUNSEL FOR DEFENDANT:

 8                  BY MS. ALBERTY:

 9        Q.   Can you please state your name and

10   spell it for the court reporter.

11        A.   It's Thomas Barden, T-h-o-m-a-s,

12   Barden, B-a-r-d-e-n.

13          MS. ALBERTY:  Let the record reflect

14       that this is the discovery deposition of Mr.

15       Thomas Barden taken pursuant to notice and by

16       agreement of the parties.  Today's deposition

17       will be taken in accordance with all

18       applicable rules.

19   BY MS. ALBERTY:

20        Q.   Mr. Barden, I know that I introduced

21   myself off the record.  I will just make another

22   introduction.  My name is Tiffany Alberty.  I

23   represent GEICO in this matter that's been filed.

24          Would you prefer me to call you Thomas,

25   Tom, Mr. Barden?
```



                        THOMAS BARDEN

1

2    Lafayette, New York, which is near Syracuse, New

3    York, and the end of my career I was assigned to

4    division headquarters in Albany.

5          Q.   And how did your employment with the

6    force end?

7          A.   How did it end?  I retired in December

8    of 2018.

9          Q.   Why did you retire?

10         A.   I had had enough.

11         Q.   Is there any reason, per se, that you

12   retired based off the county, any issues that were

13   going on, investigations?

14         A.   No.  Basically I had reached my

15   thirty-two year -- thirty-two-year career goal,

16   and I completed my service, and wanted to spend

17   more time with my family.

18         Q.   Okay.  From retirement from the force,

19   is that when you went in to GEICO and started

20   working for them?

21         A.   Approximately ten, eleven months later.

22   So I started in the end of September of 2019, so

23   however long that was.

24         Q.   Between that time period that you took

25   off the ten months, were you working?



                         THOMAS BARDEN

1

2   Crosier.

3        Q.   Okay.  And then do you know who Brian

4   spoke to at GEICO to get you in the door?

5        A.   I believe he spoke to his supervisor,

6   Chester Janik.

7        Q.   Do you remember interviewing with

8   Chester?

9        A.   Yes.

10       Q.   When you interviewed, do you remember

11  what position you interviewed for?

12       A.   It was for an investigator, field

13  investigator position.

14       Q.   Once you got hired, what was your

15  title?

16       A.   Senior field investigator.

17       Q.   When did your employment with GEICO

18  end?

19       A.   December 2022.

20       Q.   And why did it end?

21       A.   I basically made the decision to leave

22  because of the -- the stress that was involved,

23  the over work, the time that was involved that

24  was -- I was spending at work; kind of pleading of

25  my wife that saw what the stress was doing to me.



THOMAS BARDEN                                          August 08, 2024
Keith Fischer, et al. vs GEICO                                      25

```
1                    THOMAS BARDEN
2        Q.   When you resigned in December, were you
3    still within that Albany territory?
4        A.   Yes.
5        Q.   During your time with GEICO, did you
6    ever transition out of the Albany territory?
7        A.   No.
8        Q.   I believe in the complaint, in your
9    declaration you described yourself as a special
10   investigator.  Is that the same as the field
11   investigator position that we just spoke about?
12       A.   I believe field investigator is
13   encompassed within all special investigators.
14       Q.   Would there be other titles then that
15   you would anticipate or presume that are special
16   investigators along with your field investigator
17   position?
18            MS. COLE-CHU:  Objection.
19            THE WITNESS:  I would assume that there
20        are other titles that people were given.
21   BY MS. ALBERTY:
22       Q.   Do you know what those other titles
23   would have been?
24       A.   I'm not sure what they would have been.
25       Q.   Okay.  I believe you indicated a level
```



1                     THOMAS BARDEN

2    sixty-five special investigator.  What does that

3    mean?

4         A.   Basically the level I was assigned to.

5    I'm not sure what that level indicates.

6         Q.   Okay.  Were you ever any other level

7    while you were with GEICO?

8         A.   No.

9         Q.   As the -- as the field investigator,

10   what were your duties and responsibilities?

11        A.   We were --

12             MS. COLE-CHU:  Objection.  Sorry.

13             THE WITNESS:  We were assigned auto

14        fraud investigative cases.  So our job was to

15        investigate the fraud that was indicated.

16   BY MS. ALBERTY:

17        Q.   And that would have been within that

18   Albany territory that you told me about?

19        A.   Yes.

20        Q.   Did you supervise anyone?

21        A.   No.

22        Q.   Did anyone shadow you?

23        A.   No.

24        Q.   When you first started, did you shadow

25   anyone?



THOMAS BARDEN

2   Q.   Fair to say because you were a level
3   sixty-five, that's the only knowledge that you
4   have about that position is within that level
5   base, correct?
6            MS. COLE-CHU:  Objection.
7            THE WITNESS:  Yes.
8   BY MS. ALBERTY:
9   Q.   As a senior field investigator, what
10  were your hours?
11           MS. COLE-CHU:  Objection.
12           THE WITNESS:  Hours were basically
13       eight hours a day.
14  BY MS. ALBERTY:
15  Q.   Were they set times?
16  A.   When I was hired, I was told that our
17  hours were flexible so that we could adjust to
18  whatever is required during the day regarding
19  in-person interviews, scene canvasses, EUOs that
20  had to be done, things likes that, so that we
21  could adjust our schedule according to that.
22  Q.   Did you say EUOs?
23  A.   Examinations under oath.
24  Q.   Okay, thank you.
25  A.   Sorry.



```
 1                     THOMAS BARDEN
 2       Q.   No, that's okay.
 3       A.   Sorry.
 4       Q.   So in your position everything that you
 5  just outlined are some of the additional duties
 6  and responsibilities that you had in order to
 7  investigate auto fraud, correct?
 8       A.   Yes.
 9       Q.   Did your hours change from that flex
10  time throughout your employment with GEICO?
11            MS. COLE-CHU:  Objection.
12            THE WITNESS:  The hours were extended.
13  BY MS. ALBERTY:
14       Q.   Okay, and in what capacity?
15       A.   With increased caseload, it was -- it
16  demanded more hours to complete cases,
17  investigative steps.
18       Q.   Were you still allocated that flex time
19  we talked about?
20       A.   It was still -- it was basically up to
21  us when we got that work done, when we put in that
22  eight hours.
23       Q.   When you first started, who was your
24  supervisor?
25       A.   Chester Janik, Chet Janik.
```



```
 1                    THOMAS BARDEN

 2        Q.   Did -- did your supervisor change at

 3   any time during your employment?

 4        A.   No.

 5        Q.   Did you ever work with somebody by the

 6   name of Gerald -- Gerald Cassagne?  Did I butcher

 7   that last name?

 8        A.   If I can go back and qualify, Chet

 9   Janik retired about two weeks before I left the

10   company.  So if that was a transition into a new

11   supervisor, it may have happened over those two

12   weeks, but that was very minimal --

13        Q.   Okay.

14        A.   -- time, so.

15        Q.   So we'll say from ninety-five percent

16   of your employment --

17        A.   Yeah.

18        Q.   -- with GEICO --

19        A.   Even more so.

20        Q.   Chester --

21        A.   Yes.

22        Q.   -- was your supervisor?

23        A.   Yes.

24        Q.   Okay.  We'll circle back to the

25   original question, which was did you ever work
```



```
 1                      THOMAS BARDEN

 2              MS. COLE-CHU:  Objection.

 3              THE WITNESS:  No.

 4    BY MS. ALBERTY:

 5       Q.   Have you ever had a desk role at the

 6    Woodbury office?

 7              MS. COLE-CHU:  Objection.

 8              THE WITNESS:  No.

 9    BY MS. ALBERTY:

10       Q.   Did anyone tell you how to arrange your

11    flex time?

12       A.   No.

13       Q.   Were you free to complete your work at

14    any time that was convenient for you?

15              MS. COLE-CHU:  Objection.

16              THE WITNESS:  It wasn't out of

17          convenience.  It was more when the job

18          dictated when I needed to work.

19    BY MS. ALBERTY:

20       Q.   Aside from the auto fraud cases we

21    spoke about, did you have any other cases you

22    would work on?

23       A.   Occasionally we would be assigned

24    medical, like injury cases.

25       Q.   Almost like personal injury cases?
```



```
 1                    THOMAS BARDEN

 2      Q.   And once you would be assigned the

 3   case, what were your next steps then thereafter?

 4      A.   We would adopt the case and then start

 5   our investigation.

 6      Q.   I believe in your declaration you

 7   indicated that you would investigate insurance

 8   fraud, but it seems to me now that it's much

 9   narrow than that.  It was just auto insurance

10   fraud.

11           Is that correct?

12           MS. COLE-CHU:  Objection.

13           THE WITNESS:  Most of our cases were

14       auto damage.  On occasion we would be

15       assigned for auto injury.

16   BY MS. ALBERTY:

17      Q.   But you weren't involved, for example,

18   like in property insurance fraud, as in

19   homeowner's?

20      A.   Homeowners?  No.

21      Q.   Were you involved in any cases related

22   to arson or theft?

23      A.   There were arson auto cases, yes; auto

24   theft, yes.

25      Q.   For the auto fraud cases that you
```



1                    THOMAS BARDEN

2    investigated, how long did it take you to complete

3    your investigations?

4         A.    That depended on the complicated nature

5    of the claim.

6         Q.    Sure.  Could you give maybe a range?

7         A.    I really couldn't.  I mean, sometimes

8    it took hours; sometimes it took days; sometimes

9    it took weeks; depended on how complicated the

10   case was, what the claim was, how long it took us

11   to get information.

12              We requested police reports that

13   sometimes were not available.  Contacting

14   claimants was difficult at times.

15        Q.    Aside from gathering police reports,

16   contacting claimants, conducting witness

17   interviews, and going on scene, is there anything

18   else that you would do to investigate these auto

19   insurance fraud cases?

20        A.    We did background investigations on all

21   of the parties involved, social media

22   investigations, examinations under oath as I

23   mentioned before, scene canvasses, if I didn't

24   mention that, interviewing police agencies,

25   reviewing police accident reports and depositions,



1              THOMAS BARDEN

2   four hours in the field a day?

3        A.    It was hard to say.

4        Q.    After COVID, or when COVID started in

5   March of 2020, how much time did you spend in the

6   field?

7        A.    None.

8        Q.    All the way up until you left in

9   December of 2020, was there any time that you went

10  back to going into the field?

11             MS. COLE-CHU:  Objection.

12             THE WITNESS:  December of 2022.

13  BY MS. ALBERTY:

14       Q.    Sorry, that's what I meant, of 2022.  I

15  apologize.

16       A.    That's okay.

17             Yes, around November of 2021 we were

18  allowed to go back in the field for certain scene

19  canvasses, anything that didn't have contact with

20  people basically was the first step of returning

21  back to the field.

22       Q.    For the tasks that you mentioned --

23  which is background checks, gathering police

24  reports, contacting claimants, doing special media

25  investigations, examinations under oath, scene



```
1                    THOMAS BARDEN
2    canvassing -- for those tasks, did you have to do
3    that for every single one of your cases?
4         A.   I would say the majority of those, yes.
5              The claim or the case that we took
6    would dictate exactly what we needed to do, but
7    those were a lot of the tools or some of the tools
8    that we used during our investigation.
9              Each claim was different.  Each case
10   was different.
11        Q.   Was that up to you to make that
12   determination?
13             MS. COLE-CHU:  Objection.
14             THE WITNESS:  It was.
15   BY MS. ALBERTY:
16        Q.   When did you first get assigned to your
17   own cases outside of shadowing?
18        A.   January 20, 2020, so after my first
19   three months basically.
20        Q.   And how many claims did you handle per
21   week?
22             MS. COLE-CHU:  Objection.
23             THE WITNESS:  I got roughly eight cases
24        a week.
25   BY MS. ALBERTY:
```



1                    THOMAS BARDEN

2        Q.    Did that change or fluctuate?

3        A.    Yes.

4        Q.    Were some weeks busier than others?

5        A.    I mean, obviously there's different

6    claims coming at different times.  They did

7    fluctuate, but not by a whole lot.  That was

8    pretty much steady.

9        Q.    Was there any time of the year that it

10   tended to be more busy?

11       A.    I don't recall.  I recall some of the

12   team members I talked to had that opinion.  I

13   never really saw a big difference in caseload.

14       Q.    Were there other factors that made your

15   workload heavier at times?

16       A.    Weekends, holidays, obviously if things

17   happened over the weekend.

18            Mondays were always busier because

19   there were two days of, three days of events being

20   reported that piled up as opposed to a daily

21   basis.

22            If there was a three- or four-day

23   weekend, obviously things backed up.

24       Q.    When COVID hit in March of 2020, did

25   that make your workload lighter?



```
 1                        THOMAS BARDEN

 2              MS. COLE-CHU:  Objection.

 3              THE WITNESS:  I would say it was their

 4         expectation, yes.

 5    BY MS. ALBERTY:

 6         Q.   Was it your understanding that you

 7    needed to adequately record your hours?

 8         A.   Yes.

 9         Q.   If there was any issue regarding your

10    hours and pay, was it your understanding that you

11    could contact a supervisor, local HR, or corporate

12    HR?

13         A.   It was my understanding that I would

14    bring it to the attention of my supervisor.

15         Q.   Was HR an accessibility point for you

16    in your position?

17              MS. COLE-CHU:  Objection.

18              THE WITNESS:  As far as I knew, yes.

19    BY MS. ALBERTY:

20         Q.   I think you said you recalled getting

21    the employee handbook at orientation.

22              Do you recall ever getting subsequent

23    trainings for the policies and procedures of GEICO

24    as it would apply to your position?

25              MS. COLE-CHU:  Objection.
```



```
 1                    THOMAS BARDEN

 2

 3   BY MS. ALBERTY:

 4       Q.   Sure.  Did you understand that your

 5   managers were not allowed to tell you that you

 6   can't work off the clock?

 7            MS. COLE-CHU:  Objection.

 8            THE WITNESS:  I don't know what they

 9        were told.

10   BY MS. ALBERTY:

11       Q.   Did you ever go to your local human

12   resource manager regarding any complaints of not

13   receiving pay for your hours worked?

14       A.   No.

15       Q.   Did you ever go to corporate human

16   resources regarding any complaints or concerns in

17   which you felt that you weren't getting paid for

18   hours worked?

19       A.   No.

20       Q.   Did you understand that you were

21   required to report if anyone asked for you to work

22   off the clock?

23            MS. COLE-CHU:  Objection.

24            THE WITNESS:  So, say that again.  If I

25        was -- go ahead.
```



| 1 | THOMAS BARDEN |

2        "I was in training for the first few

3   months of my employment and did not have regular

4   cases assigned to me until January of 2020."

5        Did I read that right?

6   A.   Yes.

7   Q.   Okay.  Fair to say, and based off your

8   testimony, you had started then in September of

9   2019, correct?

10   A.   Yes.

11   Q.   And then, so this paragraph would

12   indicate that between September of 2019 through to

13   we'll say around January of 2020 you were paid for

14   all the time that you had worked, right?

15        MS. COLE-CHU:  Objection.

16        THE WITNESS:  Yes.

17   BY MS. ALBERTY:

18   Q.   And then in January, this is when you

19   were assigned regular cases.  Is that right?

20   A.   Right around that time period, yes.

21   Q.   Okay, so then on number eight it

22   states, "Starting in March of 2020, the COVID-19

23   pandemic halted field operations, so all of my

24   work was done remotely until approximately

25   November of 2021."



```
1                      THOMAS BARDEN

2        A.    Okay.

3        Q.    -- at that time, correct?

4        A.    Correct.

5        Q.    And you weren't meeting people in

6   person at that time, correct?

7        A.    Correct.

8        Q.    And you weren't doing interviews or

9   declarations under oath, correct?

10       A.    We were doing everything by phone

11  remotely.  We did the same work, we did it

12  remotely.

13       Q.    In your capacity as a field

14  investigator, did you have the ability to close

15  files?

16       A.    To close the cases?

17       Q.    Yes.

18       A.    Yes.

19       Q.    How frequent would you close cases?

20       A.    I tried to close cases every day when I

21  was -- whenever I was finished with them.

22       Q.    Did you need authority from any of your

23  supervisors or managers in order to close a case?

24       A.    They were reviewed, and if it was not

25  acceptable to close the case at that time, it
```



```
 1                    THOMAS BARDEN
 2   hours a day, five days a week, for that week --
 3        A.    Right.
 4        Q.    -- then to accumulate then to
 5   fifty-five to sixty hours per week.
 6              Is that right?
 7        A.    Correct.
 8        Q.    Did you specifically itemize your hours
 9   each week when you exceeded forty hours a week?
10              MS. COLE-CHU:  Objection.
11              THE WITNESS:  At the beginning when we
12          were allowed to put in overtime, I actually
13          submitted an overtime request for that time
14          period, up until the time period, the date we
15          were told we were no longer allowed to
16          request overtime.
17   BY MS. ALBERTY:
18        Q.    And that's that July or October time
19   frame you've previously stated --
20        A.    July or August.
21        Q.    August, my apologies.  So July or
22   August of 2020, correct?
23        A.    Correct.
24        Q.    Then during March of 2020, up and until
25   July or August of 2020, were you adequately
```



```
 1                    THOMAS BARDEN
 2   inputting your overtime hours?
 3           MS. COLE-CHU:  Objection.
 4           THE WITNESS:  From what I recall, yes.
 5   BY MS. ALBERTY:
 6       Q.   And were you getting paid for that
 7   overtime?
 8       A.   I did get paid overtime at that time.
 9       Q.   So during the time consideration of
10   March of 2020 to July, August of 2020, you were
11   itemizing your weeks in order to adequately
12   request your overtime hours, correct?
13           MS. COLE-CHU:  Objection.
14           THE WITNESS:  Yes.
15   BY MS. ALBERTY:
16       Q.   Then starting around July or August of
17   2020, is that when you stopped itemizing your
18   hours over forty?
19           MS. COLE-CHU:  Objection.
20           THE WITNESS:  That's when I stopped
21       requesting overtime, because I was told.
22   BY MS. ALBERTY:
23       Q.   Sure.  The question's a little
24   different, which is did you stop itemizing;
25   meaning you exceeded the time amount of forty
```



THOMAS BARDEN                                    August 08, 2024
Keith Fischer, et al. vs GEICO                              100

```
 1                     THOMAS BARDEN

 2   hours in July or August of 2020, and you stopped

 3   notating that information for your own personal

 4   records?

 5              MS. COLE-CHU:  Objection.

 6              THE WITNESS:  Yes.

 7   BY MS. ALBERTY:

 8       Q.   When you were inputting the time from

 9   March of 2020 up and until July or August of 2020

10   for your overtime, did you personally maintain

11   records regarding your overtime?

12              MS. COLE-CHU:  Objection.

13              THE WITNESS:  No.

14   BY MS. ALBERTY:

15       Q.   But you were plugging that information

16   into the timekeeping system and asking for

17   overtime through your supervisor, correct?

18       A.   Correct.

19       Q.   Okay.  So then it's fair to say that

20   from at least July of 2020, August 2020 up and

21   until December of '22 when you left, you were not

22   specifically itemizing your alleged exceeded

23   overtime per week, right?

24              MS. COLE-CHU:  Objection.

25              THE WITNESS:  Correct.
```



Case 2:23-cv-02848-SJB-ST    Document 138-8    Filed 10/10/25    Page 27 of 37 PageID
#: 5353
THOMAS BARDEN                                                August 08, 2024
Keith Fischer, et al. vs GEICO                                           101

1                        THOMAS BARDEN

2

3    BY MS. ALBERTY:

4        Q.    Fair to say then you're assuming that

5    from July or August of 2020 up and until December

6    of '22 that you exceeded your forty-hour work week

7    between fifteen to twenty hours, right?

8            MS. COLE-CHU:  Objection.

9            THE WITNESS:  I'm not assuming.  I know

10       I did.

11   BY MS. ALBERTY:

12       Q.    But you didn't itemize it?

13       A.    I did not write it down and itemize

14   every minute, no.

15       Q.    Did you tell anyone that you were

16   working approximately fifty-five to sixty hours a

17   week during that time, and by this time I'm

18   talking around the July time period?

19       A.    We had meetings with supervisors and

20   discussed the time that we were actually putting

21   into cases, and how much time we were spending

22   working off the clock, yes.

23       Q.    How -- it's hard, because we're working

24   in a few different time periods, right?

25            So, for -- let's start COVID 2020,



```
 1                     THOMAS BARDEN

 2        A.   Yes.

 3        Q.   Transitioning to number eleven on page

 4   three of the declaration," From May of 2020 to

 5   August of 2020 GEICO permitted me to submit

 6   overtime hours for approval but required me to

 7   document for reasons of overtime, case

 8   information, and specific tasks that I needed to

 9   do on each case."

10             How did you learn that you couldn't put

11   your overtime hours?

12             MS. COLE-CHU:   Objection.

13             THE WITNESS:   How did I learn that I

14        was not allowed to?

15   BY MS. ALBERTY:

16        Q.   No, that you could.

17        A.   I talked with my supervisor that

18   basically told me, "If you're working extra hours,

19   put in for it.  Document it."

20        Q.   Were there specific hard and fast lines

21   of what you needed to input for your overtime

22   hours?

23        A.   Like the reasons?

24        Q.   Yes.

25        A.   I don't know if there were certain
```



```
 1                    THOMAS BARDEN
 2    weren't provided that information.
 3            Is that something that you can provide
 4    over to your counsel?
 5            MS. COLE-CHU:  Objection.
 6            THE WITNESS:  I can -- yeah, I can look
 7        for them.  I don't know if I have those or
 8        not.  I erased a lot of that stuff out of my
 9        phone.
10    BY MS. ALBERTY:
11        Q.    Okay.
12        A.    Contacts.
13        Q.    If you could look into it --
14        A.    Mm-hmm.
15        Q.    -- we would appreciate that.
16            For any of the individuals that's
17    referenced in nineteen of your declaration, do you
18    have any of their personal email addresses or
19    physical addresses?
20        A.    No.
21        Q.    You could set that to the side.
22            During your employment with GEICO, you
23    were eligible for overtime, correct?
24            MS. COLE-CHU:  Objection.
25            THE WITNESS:  For a certain period of
```



```
1                    THOMAS BARDEN

2         time, yes.

3    BY MS. ALBERTY:

4         Q.   And you were paid for that certain

5    period of time --

6              MS. COLE-CHU:  Objection.

7    BY MS. ALBERTY:

8         Q.   -- for overtime, right?

9              MS. COLE-CHU:  Objection.

10             THE WITNESS:  Yes.

11   BY MS. ALBERTY:

12        Q.   Do you know if other senior field

13   security investigators were eligible for overtime?

14             MS. COLE-CHU:  Objection.

15             THE WITNESS:  I don't know.  I don't

16        know.

17   BY MS. ALBERTY:

18        Q.   Do you know if other senior field

19   security investigators were eligible for overtime

20   who were outside of your assigned outfit?

21             MS. COLE-CHU:  Objection.

22             THE WITNESS:  I don't know.

23   BY MS. ALBERTY:

24        Q.   Do you know whether SIU investigators

25   other than senior field security investigators
```



```
1                     THOMAS BARDEN

2    recollection GEICO generally evaluated me based on

3    how many hours it took me to complete a case task,

4    how often I made an entry in a case report, how

5    many days I took to close a case, how many cases I

6    completed within a month, and whether we were able

7    to document fraud in the case.

8              "These metrics put a lot of pressure on

9    me to work as much as needed to meet these goals

10   and deadlines."

11             What is your basis for believing that

12   the evaluations at GEICO were based on these

13   metrics?

14        A.   Because that's what we were told.

15             Basically there were -- sorry, ask the

16   question again.

17        Q.   Sure.

18        A.   So I just make sure I'm on the right

19   track.

20        Q.   That's okay.

21             What's your basis for believing that

22   the evaluations at GEICO were based on these

23   metrics that you laid out?

24        A.   Because we were told that.

25             I mean, it's -- it was -- that's the
```



```
 1              THOMAS BARDEN

 2   way they rated you on, not only how you performed

 3   your case, but your efficiency and how many cases

 4   you closed out, and all of this was factored into

 5   your performance evaluation.

 6        Q.   Who told you this?

 7        A.   Supervisors, we got through Ted Janik,

 8   through Bill Newport, that it was sent down

 9   through GEICO channels to us.

10        Q.   Was there anyone else as you sit here

11   today that you recall telling you this aside from

12   Chet and Bill?

13        A.   Not offhand, no.

14        Q.   Do you recall seeing a written policy

15   that described these metrics?

16        A.   I don't recall it.  I believe it was

17   provided to us email as to what was required by

18   us, the time periods, the -- kind of what was --

19   what was expected as far as how your performance

20   evaluation was going to be created by supervision,

21   so.

22        Q.   Do you remember if these metrics

23   changed?

24        A.   They changed several times.

25             I mean, there were points given at one
```



1                    THOMAS BARDEN

2    period, the August 3rd, 2020?

3         A.    No.

4         Q.    Okay.  If we go to the next page, page

5    forty-nine, which is fifteen -- sorry, paragraph

6    forty-nine, page fifteen.  Sorry, it's getting

7    late in the day.

8              "During this March 2020 to December '22

9    period Barden continued to report 38.75 hours per

10   week because GEICO's supervisors told him that he

11   was not allowed to report more without prior

12   supervisory approval.

13             "GEICO's supervisors did not approve

14   overtime except for a brief period starting

15   between approximately May to August of 2020 when

16   they offered to pay overtime to special

17   investigators who took on additional cases on top

18   of their already high workload.

19             "GEICO's records reflect that Barden

20   was paid 43.75 overtime hours between June and

21   July of 2020 over the course of twenty-five work

22   days.

23             "Save for the overtime reported and

24   paid out during the above periods, GEICO did not

25   pay plaintiff Barden for all the hours worked in



THOMAS BARDEN                                          August 08, 2024
Keith Fischer, et al. vs GEICO                                      227

```
1                   THOMAS BARDEN

2           So, yes, it would suffer in a way that

3      it's lower than it could have been.

4  BY MS. COLE-CHU:

5      Q.   And what were the consequences of that?

6      A.   The consequences were, one, I was

7  denied a raise at one time.  It's why I was told I

8  was denied a raise, because the performance

9  evaluation wasn't high enough at that time.  And I

10  believe it was -- it was part of -- part of the

11  reason that was used to start the coaching

12  remedial training, coaching, training.

13  BY MS. COLE-CHU:

14     Q.   And to confirm that these consequences

15  of having a -- let's call it less good performance

16  evaluation in fact happened to you?

17     A.   Yes.

18     Q.   Would you say that it was important

19  then to meet your performance metrics as best you

20  could?

21     A.   Yes.

22     Q.   Was it possible for you to meet GEICO's

23  performance metrics within a 38.75 hour work week?

24          MS. ALBERTY:  Objection.

25          THE WITNESS:  No.
```



```
 1                       THOMAS BARDEN

 2

 3   BY MS. COLE-CHU:

 4        Q.   As a result would you work more hours?

 5        A.   Yes.

 6        Q.   And you testified today that GEICO

 7   stated that it would not pay you for hours above

 8   38.75.

 9             Is that correct?

10        A.   Correct.

11        Q.   So, those hours that you worked above

12   38.75 were unpaid?

13        A.   Correct.

14        Q.   And would you say that you had to do

15   this in order to keep your job?

16             MS. ALBERTY:   Objection.

17             THE WITNESS:   Yes.

18   BY MS. COLE-CHU:

19        Q.   We've discussed this a little bit over

20   the course of the day, but I just want to walk

21   through your daily schedule one more time.

22             Approximately what time would you

23   typically log on to work in the morning?

24        A.   Usually around 6:00 a.m.

25        Q.   And then approximately what time --
```



1                      THOMAS BARDEN

2         Q.    But again in the three plus years you

3    worked at GEICO, you don't remember any time when

4    this denial of a raise occurred?

5         A.    Yeah, I'm not sure exactly what the

6    dates were.

7              MS. ALBERTY:  Okay, I don't have any

8         further questions.

9              THE COURT REPORTER:  Is there read and

10        sign in this?  Will he read and sign?

11             MS. COLE-CHU:  Yes, please.

12             THE LEGAL VIDEO SPECIALIST:  All right.

13        We are now going off the record.  The time is

14        4:16 p.m.  This is the end of the media

15        labeled number six concluding this video

16        deposition.

17             (Whereupon at 4:16 p.m. the deposition

18   of Thomas Barden concluded.)

19

20

21

22

23

24

25



1                      THOMAS BARDEN

2                  C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                          : Ss.

5    COUNTY OF NEW YORK    )

6            I, Kim M. Brantley, Shorthand

7    Reporter, and Notary Public within and for the

8    State of New York, do hereby certify:

9            That THOMAS BARDEN, the witness whose

10   deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true

12   record of the testimony given by the witness.

13           I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in

16   the outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto set

18   my hand this 11th day of August, 2024.

19

20   _____

21                  Kim M. Brantley

22

23

24   My Commission expires May 31, 2026.

25

