# Exhibit 5

```
                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF NEW YORK
        ------------------------------
KEITH FISCHER, MICHAEL
O'SULLIVAN, JOHN MOESER, LOUIS
PIA, THOMAS BARDEN, CONSTANCE
MANGAN, and CHARISE JONES,
Individually and on behalf of
All others similarly situated,

                    Plaintiffs,

        vs.          No. 2:23 Civ. 2848(GRB)(ARL)

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO,

                    Defendant.
        ------------------------------




        VIDEOTAPED DEPOSITION OF MICHAEL O'SULLIVAN

                    New York, New York

                 Monday, August 26, 2024






Reported by:
Yaffa Kaplan
JOB NO. 11574176
```



1

2                    August 26, 2024

3                    10:00 a.m.

4

5         Deposition of MICHAEL O'SULLIVAN,

6   held at the offices of Esquire Deposition

7   Solutions, 1225 Franklin Avenue, Garden

8   City, New York, pursuant to Replace, before

9   Yaffa Kaplan, a Notary Public of the State

10  of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S:
 3
 4        OUTTEN & GOLDEN LLP
 5        Attorneys for Plaintiffs
 6             685 Third Avenue, 25th Floor
 7             New York, New York 10017
 8        BY:   SABINE JEAN, ESQ.
 9
10        DUANE MORRIS LLP
11        Attorneys for Defendant
12             190 South LaSalle Street, Suite 3700
13             Chicago, Illinois 60603
14        BY:   TIFFANY E. ALBERTY, ESQ.
15
16   ALSO PRESENT:
17        JOSEPH BARLETTA - Videographer
18
19
20
21
22
23
24
25
```



1

2          IT IS HEREBY STIPULATED AND AGREED,

3     by and between counsel for the respective

4     parties hereto, that the filing, sealing and

5     certification of the within deposition shall

6     be and the same are hereby waived;

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the form

9     of the question, shall be reserved to the

10    time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be signed

13    before any Notary Public with the same force

14    and effect as if signed and sworn to before

15    the Court.

16

17

18

19

20

21

22

23

24

25



1

2          THE VIDEOGRAPHER:  We are on the record,

3     and the time now is approximately 10:00 a.m.

4     Today's date is August 26, 2024.

5          This is the video deposition of Michael

6     O'Sullivan in the matter of Keith Fischer et

7     al v. Government Employees Insurance Company.

8     Index number 2:203cv02848 (GRB)(ARL) in the

9     United States District Court, Eastern District

10    of New York.

11         My name is Joseph Barletta, legal

12    videographer with Shereck Video in association

13    with Esquire.  Today we are at the office of

14    Esquire Deposition Solutions located at

15    1225 Franklin, Avenue, Garden City, New York.

16         Will counsels please voice identify

17    yourselves and state whom you represent.

18         MS. JEAN:  Sabine Jean from Outten &

19    Golden, representing plaintiffs.

20         MS. ALBERTY:  Tiffany Alberty on behalf

21    of defendants with Duane Morris.

22         THE VIDEOGRAPHER:  Thank you.  The court

23    reporter is Yaffa Kaplan with Esquire.

24         Please swear in the witness.

25   M I C H A E L   O ' S U L L I V A N , called as a



```
 1                        M. O'Sullivan
 2   witness, having been duly sworn by a Notary Public,
 3   was examined and testified as follows:
 4   EXAMINATION BY
 5   MS. ALBERTY:
 6        Q.    What is your name and address?
 7        A.    Michael O'Sullivan, ███████████████,
 8   ████████████████████.
 9        Q.    Good morning, Mr. O'Sullivan.
10        A.    Good morning.
11        Q.    I know I previously introduced myself
12   off the record and then I also introduced myself
13   on, but my name is Tiffany Alberty.  I represent
14   GEICO in this matter.
15            Today I am going to be asking you a
16   series of questions about you, your background,
17   your time and experience at GEICO.
18            Have you ever been deposed before?
19        A.    No.
20        Q.    And then let the record reflect that
21   this deposition is taken pursuant to notice and
22   also agreement by the parties.
23            What I am going to do is I am just going
24   to go through some ground rules for us to cover at
25   the very beginning, so you familiarize yourself
```



1                          M. O'Sullivan

2          A.    My previous job, I was a detective in

3     the New York City Police Department.

4          Q.    How many times did you say you have

5     testified before in that type of forum?

6          A.    Hundreds.

7          Q.    And were those in criminal-related

8     matters?

9          A.    Yes.

10         Q.    Have you ever been retained as an

11    expert?

12         A.    No.

13         Q.    Did you ever have to provide any type of

14    testimony while you were employed with GEICO?

15         A.    I don't believe I did, no.

16         Q.    And then when did you leave the force?

17         A.    Left the PD in January of 2004.

18         Q.    Fair to say that since 2004, you haven't

19    been involved in any court proceedings, whether

20    trial or hearings?

21         A.    That would be correct.

22         Q.    Other than this lawsuit, have you been a

23    party to any other lawsuit?

24         A.    I was involved in a previous lawsuit,

25    similar to this one.



```
 1                        M. O'Sullivan

 2      Q.    Do you remember the name of that?

 3      A.    I believe it's going to be Calderon.

 4      Q.    And we will circle back to Calderon in

 5   just a second.

 6            So other than this matter, Calderon,

 7   have you been involved in any other lawsuits

 8   whether you were a plaintiff or a defendant?

 9      A.    Not that I recall.

10      Q.    How did you come to be involved in the

11   Calderon matter?

12      A.    I believe I got a text from another

13   investigator, stating that they were going to

14   contact an attorney about the -- the issue.

15      Q.    Do you remember who that person was?

16      A.    I don't recall who it was, no.

17      Q.    Do you remember if it was male or

18   female?

19      A.    I am going to say a male, but only

20   because I only worked with probably two other

21   females and I don't recall having conversations

22   with them.

23      Q.    In the Calderon matter, did you have to

24   provide any answers to discovery, similar to what

25   you have done in this matter?
```



                            M. O'Sullivan

1

2        A.    No.

3              MS. JEAN:  Objection.

4        A.    Sorry.

5        Q.    Were you deposed in the Calderon matter?

6              MS. JEAN:  Objection.

7        Q.    You can go ahead.

8        A.    No.

9        Q.    Were you involved in the Vetter v GEICO

10   matter?

11       A.    I don't recall, actually.

12             Now that you mention Vetter, I do recall

13   hearing about it, but I don't remember if I was

14   part of that.

15       Q.    For any other previous matters where you

16   were a party against GEICO, did you receive any

17   money as a result of those cases?

18             MS. JEAN:  Objection.

19       A.    Yes.

20       Q.    Do you recall how much?

21             MS. JEAN:  Objection.

22       A.    I believe it was to the tune of ███.

23       Q.    Do you know what it was for?

24             MS. JEAN:  Objection.

25       A.    It was compensation for unpaid overtime.



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                          13

```
 1                        M. O'Sullivan
 2        Q.    After your involvement in those
 3   matters -- strike that.
 4              When you were involved in those matters,
 5   were you still an employee of GEICO at the time?
 6        A.    Yes.
 7        Q.    After those matters resolved and you
 8   were provided compensation, did anything in your
 9   employment with GEICO change?
10        A.    As far as what?
11        Q.    Any type of titles, duties or
12   responsibilities?  Policies?
13              That you remember, anything like that?
14              MS. JEAN:  Objection.
15        A.    I believe after the lawsuit, GEICO
16   created a pay scale called premium pay.
17        Q.    Was there anything else that you
18   remember changing, or was it just the premium pay?
19              MS. JEAN:  Objection.
20        A.    Not that I recall at this time, no.
21        Q.    Have you ever filed any administrative
22   charge?
23        A.    Can you define that?
24              I don't know what you refer to as
25   administrative charge.
```



```
 1                      M. O'Sullivan
 2    Department and transitioning to GEICO and absent a
 3    two-week break, did you have any extended time off
 4    between those two positions?
 5         A.    I technically left the police department
 6    on a Friday, and started GEICO at the following
 7    Monday.  There was no time in between.
 8         Q.    And then when did you start working at
 9    GEICO?
10         A.    I was actually hired November of 2003.
11         Q.    Do you recall when you started?
12         A.    I think within like a week or two I
13    actually started.  Getting set up, as you know, my
14    home office and everything.
15         Q.    And when you applied with GEICO, what
16    position did you apply for?
17         A.    Field investigator.
18         Q.    And in what position then were you hired
19    for?
20         A.    I believe the title was senior security
21    investigator.
22         Q.    Do you recall how long your training
23    was?
24         A.    Back when I got hired, it was on-the-job
25    training.  I got coupled up with an investigator as
```



MICHAEL O'SULLIVAN                                      August 26, 2024
Keith Fischer, et al. vs GEICO                                       25

1                         M. O'Sullivan

2     they were going out to do interviews or fieldwork.

3          Q.    Do you recall how long you were working

4     with GEICO in training with other individuals

5     before you were assigned your own case load?

6          A.    I think within -- within a month, I was

7     assigned cases.

8          Q.    When you first started as a senior

9     investigator, did you work in a specific region?

10         A.    Yes.

11         Q.    What region was that?

12         A.    Region 2.

13         Q.    And territorially, what did Region 2

14    cover?

15         A.    I guess Long Island, five boroughs of

16    Manhattan, and up through the lower Upstate

17    counties.

18         Q.    Would there be a dividing line on where

19    you wouldn't go north of?

20         A.    Technically no, but I never seem to get

21    cases north of the Bronx.

22         Q.    How long were you employed with GEICO?

23               And if you can't know years, maybe what

24    year you ended up leaving.

25         A.    I left in '22, so I think 18 years.



```
 1                    M. O'Sullivan
 2      Q.    When you left in 2022, were you still
 3  working in Region 2?
 4      A.    Yes.
 5      Q.    At any time during the 18 years you were
 6  in GEICO, did you ever transition out of Region 2?
 7      A.    No.
 8      Q.    Did you ever work out of the State of
 9  New York?
10      A.    No.  Well, as far as an assignment?
11      Q.    Yes.
12      A.    Or I mean, doing interviews?
13            I would have to go to New Jersey for a
14  law firm, but it was always a New York case.
15      Q.    Did you ever handle any cases that would
16  have been -- excuse me -- been up north, in Buffalo
17  and Syracuse or Albany?
18      A.    No.
19      Q.    Did you resign or were you terminated
20  from GEICO?
21      A.    I retired.  Resigned.
22      Q.    Do you remember what month in 2022 you
23  retired?
24      A.    Effective May 1, '22, I believe the date
25  was.
```



                              M. O'Sullivan

1

2      Q.    After you retired, did you work at all?

3      A.    Yes.

4      Q.    What did you end up doing then after?

5      A.    I do security for the Department of

6    Justice.

7      Q.    And in what capacity?

8      A.    A district security officer.

9      Q.    Are you assigned to a specific location?

10     A.    Brooklyn -- basically the Eastern

11   District of New York.

12     Q.    And is that a full-time or part-time

13   position?

14     A.    No.  Per diem.

15     Q.    Per diem?

16     A.    Yes.

17     Q.    How many hours would you say you work?

18     A.    I can work one day a week, and then not

19   get called for three weeks.

20     Q.    Do you feel there is any consistency, or

21   is it really haphazard like that?

22     A.    It's -- I wouldn't say haphazard, but

23   it's not steady.

24     Q.    How long have you been working for the

25   DOJ?



```
 1                    M. O'Sullivan
 2      A.    I actually -- technically had the job
 3   for 14 years.
 4      Q.    Were you doing that intermittently while
 5   you were working for GEICO as well?
 6      A.    Yes, yes.
 7      Q.    I am so terrible at math.  So that would
 8   have been in -- what year did you start?
 9      A.    Roughly, I think it was in 2010.
10      Q.    Had it always been in that per diem
11   capacity?
12      A.    Yes.
13      Q.    Other than working security for DOJ
14   since you left GEICO in May of 2022, have you
15   worked any other jobs?
16      A.    No.
17      Q.    For background, I just want to get a
18   little more information regarding your senior
19   security investigator.
20            But as we go out through the deposition,
21   we will be focusing more on the 2016 forward until
22   your retirement time frame.
23            When you first started as a senior
24   security investigator, were you assigned a level?
25      A.    An employment level?
```



```
 1                    M. O'Sullivan

 2        Q.    Yes.

 3        A.    I believe I was 65.

 4        Q.    At any time from when you started, all

 5   the way until you retired in May of '22, did your

 6   level ever change?

 7        A.    No.

 8        Q.    Do you know what the other levels would

 9   have been?

10        A.    I believe a lead security -- senior

11   security lead investigator, is a level 66.

12        Q.    Do you know if there is any other

13   levels?  Like level 80 is so-and-so or level 30 is

14   so-and-so?

15        A.    Not that I know of, no.

16        Q.    What were your duties and

17   responsibilities as a senior security investigator?

18        A.    I was hired by GEICO to be on the

19   medical team.

20        Q.    What does that mean?

21        A.    I did medical fraud investigations, for

22   the most part.

23        Q.    Were you on the medical fraud team for

24   your entire tenure?

25        A.    Yes.  I say yes, but there was a short
```



                           M. O'Sullivan

2   investigator.

3        Q.    Do you recall if there was any

4   difference in title between being a senior field

5   security investigator or a senior outside security

6   investigator?

7        A.    I would believe that's the same title.

8        Q.    Throughout your tenure at GEICO, did you

9   ever supervise any employees?

10       A.    No.

11       Q.    Were there any requirements for your

12  position as a senior security investigator?

13       A.    Not that I recall.  Not that I know of,

14  I should say.

15       Q.    When you first started at GEICO, what

16  were your hours?

17       A.    Basically you worked seven hours, 7.75.

18  But it was an eight-and-a-half hour day.

19       Q.    Did you have specific hours where you

20  had to clock in, clock out?

21       A.    No.

22       Q.    So for that 7.75 in the day, can you

23  allocate the hours to whatever would work that day

24  for you?

25       A.    Yes.



1                          M. O'Sullivan

2        Q.    Was that considered flextime?

3        A.    Yes.

4        Q.    Did you have that flextime ability

5   throughout your entire tenure at GEICO?

6        A.    Yes.

7        Q.    So focusing merely on that role, the

8   2016 until your retirement time frame, who was your

9   supervisor?

10       A.    I had several supervisors.  In the '16

11  to '22 time frame, I believe I had Dara Campbell,

12  Toni D'Agata and Brian Portnoy.

13       Q.    Do you recall if all three of those

14  individuals were your supervisors at the same time?

15       A.    I'm sorry, if what?

16       Q.    Sure.  So with Dara Campbell, Toni

17  D'Agata and Brian Portnoy; were all three of those

18  individuals your supervisors at the same time?

19       A.    Oh, no.  No.  It's when they realign

20  teams, you would be shifted to a different

21  supervisor.

22       Q.    Do you know when that phase out and

23  transition would have occurred with the

24  supervisors?

25       A.    I don't recall.



```
 1                    M. O'Sullivan
 2    only five or six of us that I can recall.
 3         Q.    Do you remember their names?
 4         A.    Eric David.  Bradley Waltman.  Pat
 5    Ormberger.  Barbara Chapman.
 6               That's all I recall.  I think it's
 7    someone else, but I can't recall who it was.
 8         Q.    To your knowledge for your supervisors,
 9    Dara Campbell, Toni D'Agata and Brian Portnoy, do
10    you know if they supervised any other titles,
11    outside of the senior security investigator role
12    you had?
13         A.    You mean other-level investigators?
14         Q.    Anyone.
15         A.    I believe we worked with inside
16    investigators hand-in-hand, but I don't know who --
17    who was -- what supervisor they fell under.  So I
18    don't really know what their supervision was.
19         Q.    When you were assigned and worked for
20    your entire tenure under Region 2, what was your
21    home office like?
22         A.    As far as physically?
23         Q.    Or were you assigned -- what was that
24    setup like?
25         A.    I had an office set up in my basement.
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    35

```
 1                    M. O'Sullivan

 2    It was a roughly 8-by-8 setup with a desk.  A

 3    computer, my printer.  Book shelf.  File cabinets.

 4         Q.    For your home office.

 5               Did you go into a GEICO office as well?

 6         A.    I didn't actually have a physical office

 7    in GEICO, no.

 8         Q.    Were you assigned to any GEICO office?

 9         A.    Meaning as far as who to report to?

10         Q.    Yes.

11         A.    No.

12         Q.    Did you ever go into any GEICO office?

13         A.    Occasionally I would go into the office.

14         Q.    And what for?

15         A.    Supplies.

16               Stopping to discuss cases with the

17    inside investigators.

18               Trainings, meetings.

19         Q.    Because you were an in-the-field

20    investigator, is that different than somebody who

21    was an inside investigator?

22         A.    I would say yes.

23         Q.    Do you know what the inside investigator

24    did?

25         A.    I mean, inside investigators pretty much
```



```
 1                    M. O'Sullivan
 2   orchestrated the fraud investigations.
 3              And they would reach out, I would get an
 4   e-mail -- or basically an e-mail from an inside
 5   investigator asking me to schedule or assign myself
 6   cases.  To do interviews regarding specific
 7   facilities or doctors.
 8       Q.    Flipping back when we were talking about
 9   flextime and you being able to set your own
10   schedule for the 7.75 hours you worked in a day.
11              Did anyone ever tell you how to arrange
12   your flextime?
13       A.    No.
14       Q.    In 2016 to '22, did you ever handle any
15   underwriting fraud claims?
16       A.    I don't believe I did.
17       Q.    Did you handle any auto-body claims?
18       A.    No.
19       Q.    Did you handle any PIP claims?
20       A.    Yes.
21       Q.    How much would you say the PIP claims,
22   percentage-wise, allocated into your casework?
23       A.    I would say they were 100 percent of my
24   work.
25       Q.    What about for cat cases?
```



```
 1                    M. O'Sullivan
 2    interviews for people that are treating with
 3    that -- at that location.
 4    ████████████████████████████████
 5    ████████████████████████████████████
 6    ██████████████████████████████
 7    ████
 8              And then you had to fill out the
 9    adjudication, looking for a claim that still had
10    open features.  Meaning, the bodily injury claim
11    was still open, or the PIP claim was still open.
12              Otherwise to do the investigation, GEICO
13    couldn't take an impact on a case if we found
14    fraud.
15         Q.   ██████████████████████████
16    ███████████████████████████████████
17    ████████████████████████████████████
18    ███████████████████
19         A.   ██████████████████
20    ████████████████
21         Q.   Were you interviewing doctors, nurses,
22    medical professionals?
23         A.   On occasion I would be asked to schedule
24    an interview.  90 percent or 99 percent of the
25    time, the doctor would never consent to the
```



```
 1                      M. O'Sullivan
 2    interview.
 3         Q.    I am not surprised.
 4         A.    But you had to ask.
 5         Q.    So let's talk about for the med-fraud
 6    claims.  How long -- strike that.
 7              For the med-fraud claims, what is the
 8    range to -- how short to how long for those type of
 9    claims would it take to investigate?
10         A.    On a good case, they could be opened and
11    closed within a month.  On a case where you are
12    dealing with claimants that won't make themselves
13    available for interviews or attorneys who keep
14    rescheduling the interviews, then go on for five or
15    six months.
16         Q.    For PIP cases, what was that life span
17    of a case?
18         A.    Again, it could be a month, or you know,
19    I mean, there was always pressure to get the cases
20    closed.
21              But a lot of times, you know, when you
22    are dealing with attorneys, it -- just don't make
23    it easy.  So they reschedule you once or twice, I
24    guess, hoping that you go away.  But just have to
25    continue requesting the interviews.
```



```
 1                      M. O'Sullivan

 2    Bronx and I have a 10:00 appointment, 10:00

 3    interview scheduled, you have to be on the road at

 4    8:30.  The interview could be anywhere from

 5    45 minutes to an hour-and-a-half.  And then you

 6    have an hour-and-a-half coming back.

 7              If you are only doing one interview for

 8    the day.

 9              If you are doing a second interview,

10    then you have travel time to the second location.

11    And the second interview.  And there is still

12    travel time back.

13        Q.    Were you doing onsite visits at doctor's

14    offices?

15        A.    They would be called clinic inspections.

16        Q.    Yes?

17        A.    Yes.

18        Q.    Were you doing medical record review?

19        A.    Yes.

20        Q.    Were you doing medical billing review?

21        A.    Yes.

22        Q.    Between 2016 to '22, how many claims

23    would you say you handled per week?

24        A.    As far as being assigned?  Or touch

25    cases, cases I touched?
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    44

```
 1                    M. O'Sullivan
 2        Q.    Touching cases.
 3        A.    I mean, I would be assigned up to 20
 4   cases a month.  And you know, if I had to get to
 5   them, I don't know how many per week or per day,
 6   but how often I would get into them.
 7        Q.    For the assigned.  Let's just go with
 8   the 20 cases per month that you were getting
 9   assigned.
10            How many cases of those were you closing
11   a month?
12        A.    I don't recall what the closure was.  I
13   mean, you can close ten in one month and 20 in the
14   next.  It depends on how quick, you know, you are
15   getting interviews.  Again, it's out -- out of my
16   control.  It was out of my control.
17        Q.    Fair to say then it fluctuated on how
18   many cases you could close a month?
19        A.    Yes.
20        Q.    Would it fluctuate on how many cases
21   were assigned to you a month?
22        A.    Well, the case was self-assigned.  And
23   you know, I forget what the number was when I
24   retired, but you made it your best effort to assign
25   yourself the cases.
```



1                    M. O'Sullivan

2        Q.    When you say "self-assigned," walk me

3    through that process a little bit.

4        A.    So again, I would get an e-mail from an

5    inside investigator advising me what provider he or

6    she was looking into.  ███████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ██████

12           Towards the end, I don't recall

13   time-frame-wise, but I believe the medical

14   investigators were given access to case entry into

15   the SICM system.  So we bypassed having to reach

16   out to Fran to get cases assigned.

17       Q.    With the access to get into the system,

18   can you ultimately decline whether you took a case

19   or not?

20       A.    Define that a little bit.

21       Q.    I am just trying to understand.

22           You said it's self-assigned.  So in

23   theory, you are choosing which cases you can take

24   in the queue, and you can decline a case?

25       A.    Decline a case?  If I went to -- for a



                          M. O'Sullivan

1  claim number and if for some reason I didn't like

2  the case?

3      Q.    Yes.

4      A.    I could in theory, yes.  Actually, in

5  reality, I could pass over a certain case.

6      Q.    Were some weeks busier than others?

7      A.    Yes and no.  Some weeks you can have

8  eight interviews in your schedule, then have only

9  one or two go because the others were no shows and

10 had to be rescheduled.

11          But you still have to be at the location

12 to -- in case the claimant appeared.

13     Q.    From your experience, were there any

14 times of the year that happened to be busier?

15     A.    Not necessarily, no.

16     Q.    Were there any other factors that made

17 your workload heavier at times?

18     A.    Not necessarily.  I found the medical

19 was pretty steady.

20     Q.    Do you know if other senior security

21 investigators who worked on the med team had the

22 same workload as you?

23     A.    I believe we all had the same, yes.

24     Q.    How do you know that?



                          M. O'Sullivan

1

2        A.    I said I believed that we did.  I don't

3    know if that was the case.

4        Q.    Do you know if other senior security

5    investigators who worked on the auto side had the

6    same workload as the med team?

7        A.    I would hear them complaining about

8    getting slammed with cases when somebody was on

9    vacation or a guy was on vacation and cases would

10   just continuously come out.

11       Q.    And while I recognize that taking

12   coverage for vacation time is understandable, I am

13   specifically looking more for:  Do you know if the

14   auto team had the same amount of cases assigned to

15   the med team?

16             So I think you said you would typically

17   get 20 cases a month assigned on med.  Do you know

18   if auto was getting the same amount?

19       A.    I believe auto was getting more.

20       Q.    What is that basis of your opinion

21   from --

22       A.    First, on the medical team to

23   investigate and prepare for an interview, you have

24   to review the medical billing, what medical

25   documents are available in the system.  Sometimes



```
 1                        M. O'Sullivan
 2    when you are reviewing the billing you see a CPT
 3    code that you are not familiar with, I research the
 4    code.  So if I am doing the interview, I know what
 5    I am going to be asking about or basically, you
 6    know, training myself to be familiar with what, you
 7    know, they should be describing.
 8              So I think there is a lot more prep time
 9    for medical interview and medical investigation.
10         Q.   Do you know if anyone -- anybody on the
11    auto side was doing the same thing as you to prep
12    for interviews?  Such as looking at CPT or ICD
13    codes before interviews?
14         A.   I don't know what their practice was.
15         Q.   Did you ever speak to any -- anybody on
16    the auto side regarding their workload?
17         A.   I guess in conversation, yes, it would
18    be discussed.
19         Q.   Do you recall the substance of those
20    conversations?
21         A.   Yes.  How easy the medical guys have it.
22         Q.   Who told you that?
23         A.   George McManus always told me that.
24              However, whenever they ask for a
25    volunteer to work in medical, there were no hands
```



1                        M. O'Sullivan

2        Q.     Okay.  So we will try this again.

3               What's been placed in front of you has

4    been marked as Exhibit Number 2, this is G000028 to

5    G00042.

6               I want to focus your attention to

7    G00038.  And then towards the bottom of that page,

8    it should have in the caption, Overtime

9    Eligibility.  And then that's going to roll into

10   Page 39 of the actual policy itself.

11              Mr. O'Sullivan, does this look familiar

12   to you?

13       A.     I will be honest with you, it doesn't

14   look familiar to me.

15       Q.     Do you recall throughout your employment

16   with GEICO if you had any type of annual trainings

17   on different policies and revised policies?

18       A.     We did trainings.  I don't recall

19   contents, what it was for.

20       Q.     Do you recall receiving your employee

21   handbook when you first started at GEICO?

22       A.     I believe it was electronic, so yes.

23       Q.     From 2016 to 2022, were you an hourly

24   employee?

25       A.     I believe I was considered a salary



                              M. O'Sullivan

  2  employee.

  3       Q.    Were you nonexempt, so you were eligible

  4  for overtime?

  5       A.    I believe so.

  6       Q.    If you go to the middle of the Page 39,

  7  it starts with, All nonexempt associates.

  8            Do you see that there?

  9       A.    Yes.

 10       Q.    So, I am just going to read into the

 11  record.

 12            It states, "All nonexempt associates are

 13  required to accurately record their hours worked

 14  and absences taken."

 15            Would you agree that as a nonexempt

 16  associate eligible for overtime, that you were

 17  required to accurately record your hours worked?

 18            MS. JEAN:  Objection.

 19       A.    I'm sorry.  So repeat that question?

 20       Q.    Sure.  Would you agree as a nonexempt

 21  associate who was eligible for overtime, you were

 22  required to accurately record your hours worked?

 23       A.    Yes.

 24            MS. JEAN:  Objection.

 25       Q.    Then we will go to the following



```
 1                      M. O'Sullivan
 2   sentence that starts, "A nonexempt associate who
 3   feels he/she did not receive pay for all his or her
 4   hours worked, and an exempt or salaried nonexempt
 5   associate who feels his or her pay incorrectly
 6   reflects a deduction for an absence, should contact
 7   his/her supervisor, local human resource manager,
 8   or corporate human resources."
 9           Fair to say if you had any concerns
10   about pay issues, you could bring those complaints
11   to your supervisor, local or corporate HR?
12           MS. JEAN:  Objection.
13       A.   Yes.
14       Q.   As you sit here today, do you recall
15   receiving any training regarding this policy?
16       A.   I don't specifically recall training in
17   regards to this policy.
18       Q.   You can set that to the side for the
19   moment.
20           (O'Sullivan Exhibit 3, Excel
21       spreadsheet, Bates-stamped G004264, marked for
22       identification, as of this date.)
23       Q.   So what's been presented to you has been
24   marked as O'Sullivan Exhibit Number 3.  It is
25   G004264.
```



                         M. O'Sullivan

1

2    record completion date as well as the record grade

3    for pass.

4              Do you have any reason to disagree with

5    this history?

6              MS. JEAN:  Objection.

7         A.   No.

8         Q.   Throughout your tenure at GEICO, were

9    you always required to log your hours?

10        A.   As far as filing your time sheet?

11        Q.   Yes.

12        A.   Yes.

13        Q.   And what did that process look like in

14   2016 to 2022?

15        A.   You went through your time sheet and

16   entered your time -- hours worked.

17        Q.   Do you remember if there was a

18   timekeeping software that you would enter your time

19   into?

20        A.   I'm sorry, if there was what?

21        Q.   Do you remember if there was a

22   timekeeping software that you would enter your time

23   into?

24        A.   I believe there was, yes.

25        Q.   Do you remember the name of the



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                      58

```
 1                    M. O'Sullivan
 2   software?  Whether it was like Workday, Chronos?
 3        A.    Oh, Workday.  Yes, Workday.
 4        Q.    When you would log your hours, how would
 5   you do that?  Meaning; would you manually type in
 6   the number of hours for that week?
 7              For that day?  For that month?
 8        A.    I believe we would type in our hours
 9   worked per day.
10        Q.    Would you have to break down your hours
11   as in; I allocated this one hour to this interview?
12   Or, I allocated this hour to doing a case summary?
13        A.    No.
14        Q.    So there was no narrative per hours?
15              MS. JEAN:  Objection.
16        A.    No.
17        Q.    Looking back at Exhibit Number 2 for the
18   policy itself.  Did you understand this policy,
19   that you could not work off the clock?
20              MS. JEAN:  Objection.
21        A.    Do you want to repeat that question?
22        Q.    Sure.  Looking back at the policy, which
23   is on GE000039, did you understand that you could
24   not work off the clock because you had to log all
25   your hours worked?
```



```
 1                      M. O'Sullivan

 2              MS. JEAN:  Objection.

 3       A.    As far as -- I mean, I would do the work

 4   needed to finish a case.

 5       Q.    But for any of the work that you needed

 6   to do, you had to log those hours; correct?

 7              MS. JEAN:  Objection.

 8       A.    According to the manual, yes.

 9       Q.    Did you understand that managers and

10   supervisors were not allowed to tell you to work

11   off the clock?

12              MS. JEAN:  Objection.

13       A.    Yes.

14       Q.    Did any manager/supervisor tell you to

15   work off the clock?

16       A.    Not actually used the words, "work off

17   the clock."

18       Q.    What do you mean by that?

19       A.    It was pressure to get the cases done.

20   Get cases closed.  And that required additional

21   typing time.

22       Q.    But no manager explicitly said, work off

23   the clock?

24              MS. JEAN:  Objection.

25       A.    No.
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                      60

```
 1                     M. O'Sullivan
 2         Q.    With the pressure to get cases closed,
 3    did you ever report that to local or corporate HR?
 4         A.    No.
 5         Q.    Were you paid hourly -- or you said you
 6    believe you were salaried?
 7         A.    I believe I was salary employee, yes.
 8         Q.    Do you recall what your salary was?
 9         A.    I don't, actually.
10         Q.    That's okay.
11         A.    I think when I retired, I think it was
12    70,000 a year.
13         Q.    Did you make any type of bonuses or
14    commissions?
15         A.    Other than profit sharing, no.
16         Q.    Did you see raises while you were
17    employed at GEICO?
18         A.    Yes.
19         Q.    And how frequent would you receive
20    raises?
21         A.    It would get reviewed annually.
22         Q.    Was it the same month every year?
23         A.    I believe it was March.
24         Q.    And walk me through what the review
25    process looked like, from what you recall.
```



1                        M. O'Sullivan

2        Q.    Do you know if any of your raises were

3   set by a cost-of-living adjustment due to rising

4   prices in the county or the state?

5        A.    I don't know that.

6        Q.    Do you know if any of the raises that

7   you were provided were based upon tenure?

8        A.    I don't know that neither.

9        Q.    From 2006 to '22, was it your custom and

10  practice that you would enter your 7.75 hours every

11  day?

12       A.    Are you saying going into Workday every

13  day and --

14       Q.    Yes.

15       A.    I would do it on a Friday.

16       Q.    Was that then through the -- Monday

17  through Friday?

18       A.    Yes.

19       Q.    When you would go in to log your hours

20  on that Friday for the whole week, would you have

21  set, for example, your time in and time out?  Or

22  are you just putting the 7.75?

23       A.    Just the 7.75.

24       Q.    Was there any type of certification for

25  the accuracy of the time recorded?  Such as a



```
 1                      M. O'Sullivan
 2    pop-up box that said, I certified my hours?
 3         A.    To the best of my recollection, I
 4    believe there was.
 5                 (O'Sullivan Exhibit 4, Responses to
 6            interrogatories, marked for identification, as
 7            of this date.)
 8         Q.    So what's been presented to you and
 9    marked as Exhibit Number 4 is your responses to the
10    court's interrogatories, as well as your
11    declaration.  You are more than welcome to take a
12    quick look and review, and then we will discuss.
13                 And you just tell me whenever you are
14    ready.
15         A.    Okay.
16         Q.    Have you seen these documents before?
17         A.    I believe I did, yes.  Yes.
18         Q.    Did you help your counsel prepare these
19    documents?
20         A.    In what fashion?
21         Q.    In providing information.
22         A.    Yes.
23         Q.    I anticipate that it was your counsel
24    who would have drafted the documents for you; is
25    that correct?
```



```
 1                     M. O'Sullivan

 2   referencing to in paragraph number 5?

 3        A.    I don't know.

 4        Q.    As far as when you said management would

 5   have provided you this information, as to whom in

 6   management?  Do you know?

 7        A.    I don't know.

 8        Q.    Let's flip to Page Number 3 of your

 9   declaration under paragraph 8.

10             So it states, "I only entered 7.75

11   working hours per day, five days a week, regardless

12   of how many hours I actually worked.  I only

13   entered this amount of time because I understood,

14   based on conversations with my supervisor, that

15   GEICO would not authorize overtime pay, 'just for

16   typing.'  Meaning, writing my case reports as

17   required -- as required by my job."

18             Which supervisor are you referring to in

19   paragraph number 8?

20        A.    Brian Portnoy.

21        Q.    As to paragraph number 8 for our other

22   supervisors that I believe you testified to, Dara

23   Campbell and Toni D'Agata, do you recall them

24   saying anything to this degree?

25        A.    No.
```



```
 1                        M. O'Sullivan

 2              Your response says, in relevant parts,

 3     "That plaintiff further responds, that at least on

 4     one occasion he called his supervisor, Brian

 5     Portnoy, requesting overtime due to case write-ups

 6     he had to complete.  And his supervisor responded

 7     that he can't approve overtime just for typing."

 8              Is this the same conversation we were

 9     discussing in paragraph 8 of your declaration?

10          A.    Yes.

11          Q.    And again, you recall this was a phone

12     conversation, but you don't know when in time it

13     was?

14          A.    I don't recall the time frame.

15          Q.    Walk me through the overtime process as

16     you recall it to be.

17          A.    As far as what?  The policy, if we were

18     going to ask for overtime?

19          Q.    Yes.

20          A.    If we were going to have to do overtime,

21     you had to get supervisor approval.

22          Q.    Was this always the policy, at least

23     from 2016 to '22?

24          A.    I believe so, yes.

25          Q.    So during that time period, say you
```



```
1                    M. O'Sullivan

2    needed to work more time for your cases, you would

3    reach out either to, at that time; Dara Campbell,

4    Toni D'Agata or Brian Portnoy?

5         A.    Actually, really didn't reach out to

6    them for overtime.  We just -- because it didn't

7    seem like the company was going to pay overtime for

8    typing, so I just typed my cases as required or as

9    needed to get the cases submitted timely.

10        Q.    Did you ever request OT through those

11   supervisors?

12        A.    Did I ever request what?

13        Q.    Did you ever request overtime through

14   those supervisors?

15        A.    I don't recall with Campbell or D'Agata.

16   Like I said, the one time with Portnoy, it was; he

17   can't authorize overtime for typing.

18             It was asked once.  And once I realized

19   it wasn't going to happen, I just did my typing as

20   necessary.

21        Q.    Did you report that conversation that

22   you had with Brian Portnoy to anyone else?

23        A.    Not that I recall.

24        Q.    I apologize if I am repeating myself.

25             To your knowledge, do you recall ever
```



1                      M. O'Sullivan

2    requesting overtime outside of this one time period

3    where he said you -- you can't get overtime just

4    for typing?

5         A.    The only other time I recall getting

6    overtime and being authorized overtime was -- I

7    don't recall what year, but it was during the month

8    of December when GEICO was trying to clear up a

9    back load of social media cases, where they offered

10   overtime above and beyond to do cases.  Above and

11   beyond your regular scheduled cases.

12        Q.    When overtime was requested and then

13   subsequently approved, was that requested via

14   e-mail?

15             MS. JEAN:  Objection.

16        A.    I would say probably was, but I don't

17   recall specifically.

18        Q.    Do you recall ever -- excuse me --

19   making an OT request through the Workday portal?

20        A.    I never did.

21             Let me just -- I say I never did.  So

22   you are saying work -- overtime through the Workday

23   portal?  Submitting overtime or requesting

24   overtime?

25        Q.    Requesting overtime.



1                        M. O'Sullivan

2          A.    Okay, no.  I don't recall on that.

3          Q.    And then when you would submit for

4    overtime, to be paid overtime, that was done then

5    through the Workday portal; correct?

6          A.    I believe so.

7          Q.    As you sit here today, do you ever

8    recall Campbell or D'Agata ever deterring you from

9    entering in overtime?

10         A.    Again, I don't think I ever requested it

11   with Campbell or D'Agata, so I would say no.

12         Q.    Let's turn to interrogatory number 10.

13   That's going to be on Page 8, into Page 9.

14              So the interrogatory states, "Identify

15   each person who you contend had actual or

16   constructive knowledge that you worked unpaid

17   overtime hours as alleged in the complaint, and for

18   each, describe all the facts in support of your

19   contention that he or she had actual constructive

20   knowledge, and identify the dates and hours of the

21   unpaid overtime hours of which you contend such

22   person was aware."

23              That's a mouthful.

24              Your response, in relevant parts states,

25   "That plaintiff further responds that during phone



```
 1                    M. O'Sullivan
 2    receiving overtime pay, and for each person
 3    describe all the facts and information supporting
 4    your claim, and all the ways in which you gained
 5    such facts and information."
 6              Your response states, that at least in
 7    relevant part, aside from the objection, "That the
 8    individuals you saw, other special investigators
 9    who worked many overtime hours off the clock each
10    week without receiving overtime pay includes
11    individuals identified in paragraph 17 of your
12    declaration."
13              And then your response to interrogatory
14    number 10.
15              If we look at interrogatory number 10,
16    the only person that you referenced then is Dan
17    King.
18              As it regards Dan King, is your
19    knowledge based off just what he told you?
20        A.    Knowledge of what?
21        Q.    As it -- as it applies to the topic for
22    interrogatory number 12.
23              So overtime, that you saw other special
24    investigators who worked many overtime hours off
25    the clock each week without receiving pay, was that
```



```
 1                    M. O'Sullivan
 2   knowledge that you had personally because you
 3   watched him not work on the clock, or is that
 4   something he told you?
 5        A.    I would say that he was on -- on a
 6   computer, and Dan would call me with questions for
 7   different -- in different situations.
 8        Q.    When you say that you would see him on
 9   the computer, how did that happen?
10        A.    There was -- I forget -- forget what the
11   program was, but -- but it would list people I --
12   that were signed on with a green dot.  I forgot the
13   name.  I don't know if it's part of Outlook or --
14   or what system it was.
15        Q.    As indicated, if somebody was online and
16   you can see their green dot, how do you know that
17   he was not logging his hours?
18        A.    I wouldn't know that.
19        Q.    Did you ever review Dan King's entered
20   Workday hours?
21             MS. JEAN:  Objection.
22        A.    No.
23        Q.    So then aside from Dan King, going back
24   to Exhibit Number 4, looking at paragraph 17, this
25   is going to be the last page.
```



```
 1                      M. O'Sullivan
 2             And sorry, I am kind of looking at
 3      both -- both exhibits just based upon your answer.
 4             So then for 17, you state, "I worked
 5      with approximately four to other six other special
 6      investigators in my medical team; including Dan
 7      King, Pat Ormberger, Eric David and Brad Waltman."
 8             We already spoke about Dan King.
 9             As it applies to then Pat Ormberger, how
10      do you know he was working overtime hours off the
11      clock without receiving overtime pay?
12         A.    Well, Pat is a female.  It's short for
13      Patricia.
14         Q.    Sorry.
15         A.    Don't offend me.
16             I wouldn't know what hours she was
17      working.
18         Q.    Then transitioning to Eric David from
19      number 17.  How would you know that Eric David was
20      working many overtime hours off the clock each week
21      without receiving overtime pay?
22         A.    Multiple conversations.  When we meet up
23      at -- at deposition locations.
24         Q.    And as far as the knowledge that you
25      have that Eric David was working many overtime
```



MICHAEL O'SULLIVAN                                          August 26, 2024
Keith Fischer, et al. vs GEICO                                          80

```
 1                      M. O'Sullivan
 2   hours off the clock each week without receiving
 3   overtime pay, was that something he had told you?
 4   Or you had personal knowledge?
 5        A.    He had told me.
 6        Q.    Then for Brad Waltman.  How did you know
 7   he was working many overtime hours off the clock
 8   each week without receiving overtime pay?
 9        A.    I would receive -- well, Waltman -- I
10   didn't train him, but he -- I guess he shadowed me
11   when he first got hired.  And he would call me to
12   discuss different scenarios or situations.  And a
13   lot of times, it would be later -- late afternoon
14   or early evening, which would indicate he was
15   probably still working.
16        Q.    But do you know if him working in the
17   late afternoon was still on his flextime or if that
18   was overtime?
19        A.    I wouldn't know that.
20        Q.    Do you know if Dan King ever entered --
21   strike that.
22              Do you know if Dan King ever requested
23   overtime hours?
24              MS. JEAN:  Objection.
25        A.    I don't know if he ever did.
```



```
 1                   M. O'Sullivan
 2   phone call.
 3        Q.    To your knowledge, you don't recall
 4   Campbell or D'Agata telling you you needed to do
 5   this process when they would have been your
 6   supervisors?
 7        A.    I don't recall addressing it with them.
 8        Q.    For any of the time that you actually
 9   did enter your overtime hours, were you always paid
10   for those hours?
11        A.    Yes.
12        Q.    So looking back at 11, you go on to
13   state, "I recall some time after January 2020 I
14   asked my supervisor, Brian Portnoy, if GEICO would
15   approve overtime one week.  However, Brian told me
16   to just complete what work I could in the 38.75
17   hours.  I still ended up working overtime to
18   complete the work assigned to me, and did not
19   submit the hours I worked because GEICO did not
20   approve my overtime work."
21             Is this the same conversation that we
22   are talking about where Brian said that you
23   couldn't work OT for just typing?
24        A.    Yes.
25        Q.    To your knowledge, from what you recall,
```



```
 1                    M. O'Sullivan

 2   have still paid for it?

 3             MS. JEAN:  Objection.

 4        A.    He wouldn't have approved the Workday.

 5        Q.    Well, how do you know that you still

 6   wouldn't be paid though?

 7        A.    If I submitted and he wouldn't have

 8   approved it, he would have sent my Workday back or

 9   sent me an e-mail to reflect the hours.

10        Q.    But that had never happened, right?

11             MS. JEAN:  Objection.

12        A.    No.

13        Q.    Back to the declaration, Page 4,

14   number 12.

15             It states, "GEICO authorized me to work

16   overtime only if I agreed to take on additional

17   cases, such as a social media investigation.  I

18   remember GEICO offered me overtime pay to work on

19   social media cases one year in December because

20   GEICO wanted these cases completed by the end of

21   the year."

22             I believe from your previous testimony

23   you didn't recall what year this was; right?

24        A.    No, I don't.

25        Q.    Who at GEICO offered you overtime pay to
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    86

```
 1                    M. O'Sullivan
 2   work on the social media cases?
 3        A.    I would -- to my recollection, it was
 4   Portnoy.
 5        Q.    And when in time did that conversation
 6   take place?
 7        A.    What do you mean, when in time?  Like
 8   what time frame?
 9        Q.    Yes.
10        A.    I believe it was sometime in December
11   because it was towards the end of the year.
12        Q.    And do you remember where the
13   conversation took place?
14        A.    It was a phone conversation and I was in
15   my office.
16        Q.    Do you know if anyone else was on the
17   call with you and Brian?
18        A.    No.  I don't know if anyone was.
19        Q.    Did you offer to work on the social
20   media cases?
21        A.    I did.
22        Q.    And then because you accepted, do you
23   know how many overtime hours were needed when you
24   accepted?
25        A.    I believe the -- it was -- average was
```



```
 1                      M. O'Sullivan

 2       Q.    Did supervisors remind senior special

 3   investigators to flex your time accordingly?

 4            MS. JEAN:  Objection.

 5       A.    Were we reminded?  I don't know if we

 6   were reminded, but I mean, we did vary our schedule

 7   slightly.

 8       Q.    In your custom and practice, what were

 9   your hours?

10       A.    If it was a down day and just typing, I

11   would do -- start it like 8:30 and I usually finish

12   at dinner time, which is at 6:00, 6:30.

13            If it was a field day, sometimes my day

14   started at 7:30 because I would have to prepare for

15   my interviews.

16            Print out a worksheet, you know,

17   basically a series of questions I am going to use

18   for my interview.  Print out the billing so I know

19   what areas of the investigation I have to go into.

20            And check e-mails.  Make sure nothing

21   has been cancelled before I leave the office.

22            And then go to the field, do my

23   interviews, and then come back and start typing.

24       Q.    Would you ever work, say overnight?

25   Like a graveyard, 1:00, 2:00 in the morning?
```



1                      M. O'Sullivan

2    38.75, that then gives us an 8.75 to 11.25

3    difference per week.

4               There is -- is there any way to quantify

5    that substantively, outside of just your testimony?

6         A.    No.

7         Q.    As to the 8.75 to 11.25 hours per week

8    that you indicate you worked OT, you did not then

9    log those hours in the Workday system?

10        A.    That's correct.

11        Q.    Did you tell anyone that you were

12   working between 8.75 to 11.25 extra hours per week?

13        A.    Anybody?  As in?

14        Q.    Anybody.

15        A.    Anybody.  I mean, other than other

16   investigators, we would discuss working the extra

17   time.

18        Q.    Were those other investigators the ones

19   on your team?

20        A.    Yes.

21        Q.    Any other investigators?

22        A.    I mentioned McManus, and I believe

23   Fischer.

24        Q.    Did you ever tell your supervisor you

25   were working between 11 -- between 8 to 11 extra



```
 1                    M. O'Sullivan
 2   hours a week?
 3        A.    I don't know if I specifically told them
 4   I was doing the -- the overtime, other than that I
 5   was doing the typing to get the work -- to get the
 6   required cases submitted.
 7        Q.    Do you recall saying anything to HR?
 8        A.    No, I never went to HR.
 9        Q.    When you took -- in your leave in
10   January of '21, who took over your cases?  To your
11   knowledge?
12        A.    I don't -- I don't recall if they were
13   all reassigned or they were just, you know,
14   delayed.  I don't recall.
15             I don't think they were all reassigned.
16   I think some of them might have been just -- been
17   like interviews scheduled out to the month, to my
18   recollection.
19        Q.    When you spoke to other investigators
20   about working overtime, did you specifically tell
21   them the extra hours you were working, or just
22   broadly that you were working overtime?
23        A.    I believe it was just a broad statement
24   that, you know -- you know, we would meet at
25   deposition locations, and while we were waiting for
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                    96

```
 1                     M. O'Sullivan

 2   extended period of time.

 3        Q.   Do you recall, because of these

 4   limitations, you were closing out cases faster?

 5        A.    I want to say yes, but I am not

 6   100 percent sure.  I kind of -- I kind of remember

 7   we were -- we were processing the cases.

 8             And like I said, the ones where we

 9   couldn't get interviews or couldn't get through to

10   the attorneys, I think we were going to close them

11   out and open up new cases to try and keep the

12   investigations moving.

13        Q.   During COVID, did working from home

14   100 percent instead of working for the field give

15   you more flexibility in your investigation process?

16        A.    Flexibility in what sense?  Give me an

17   idea what you are looking at, as far as what.

18        Q.    I mean, you are not driving now, so you

19   may have more time to allocate doing reports or

20   whatever was necessary that you could do in a

21   remote capacity for all your cases.

22        A.    Yes, I believe that's fair to say.

23        Q.    During March of 2020, was it still your

24   older son and your wife who were residing with you?

25             MS. JEAN:  Objection.
```



```
 1                      M. O'Sullivan

 2       Q.    All right.  Took a quick lunch.

 3             I believe before we were taking a break

 4    we were discussing about COVID.

 5             Was there anything related to COVID, and

 6    we will say from March of 2020 up until the end of

 7    the year, into 2021, that that set of circumstances

 8    due to COVID, the lock downs, county, state,

 9    governor orders, that affected your ability to do

10    your job?

11             MS. JEAN:  Objection.

12       A.    Not necessarily, no.

13       Q.    Do you have knowledge as to whether any

14    other GEICO employee asked for approval to work

15    more than the 38.75 hours in a week?

16       A.    No.

17       Q.    All the individuals that you worked with

18    on your team, and the ones specifically that you

19    identified in paragraph 17, so that would have been

20    Daniel King, Pat Ormberger, Eric David and Brad

21    Waltman, were all those individuals assigned to

22    working the southern half, we will say, of

23    New York?  To your knowledge?

24       A.    To my knowledge, yes.

25       Q.    As far as anybody on the med team, was
```



MICHAEL O'SULLIVAN                                          August 26, 2024
Keith Fischer, et al. vs GEICO                                          99

```
 1                      M. O'Sullivan

 2    anybody assigned up north to Albany, Syracuse or

 3    Buffalo area?

 4          A.    I don't think on our team.  I think our

 5    team was all lower portion of the region.

 6          Q.    Do you have any knowledge whether any

 7    other employees were approved to work more than the

 8    38.75 hours in a week?

 9          A.    I have no knowledge to that.

10          Q.    So from 2016 to '22, you could have

11    asked for overtime by and through your supervisors;

12    correct?

13                MS. JEAN:  Objection.

14          A.    Yes.

15          Q.    Do you have any knowledge as to whether

16    any other senior security investigators were

17    eligible for overtime?

18          A.    No.

19          Q.    Do you know whether SIU investigators,

20    other than those who worked in the med team, were

21    eligible for overtime?

22          A.    I have no knowledge of that.

23          Q.    Do you know whether any other SIU

24    investigators who worked outside of the med team

25    were paid overtime?
```



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                                   105

```
 1                      M. O'Sullivan
 2    set by the software at --
 3          A.    No.
 4          Q.    Not Citrix?  What was the name of the
 5    software?
 6          A.    SICM.
 7          Q.    I keep mixing that up, I'm sorry.
 8
 9
10
11
12
13
14          A.
15
16
17
18
19
20          Q.    For the outline for your investigative
21    steps, was that you personally making the
22    determination of what needed to be done on that
23    file?
24          A.    Yes.
25          Q.    Did you record in any GEICO system the
```



```
 1                      M. O'Sullivan
 2        Q.    Do you recall if it was male or female?
 3        A.    May have been Charise Jones.  Might have
 4   been a female, Charise Jones.  I believe it was
 5   probably Jones.
 6        Q.    Then looking at 19 -- just kidding, 18.
 7              It states, "I also know that other
 8   special investigators worked many overtime hours
 9   off the clock each week without receiving overtime
10   pay."
11              As to other special investigators
12   reference in paragraph 18, who are you referring
13   to?
14        A.    It could be a variety of investigators.
15              You know, if we would be at a deposition
16   location, you know, just in conversation, guys
17   would be complaining about working extra hours to
18   get cases done.
19        Q.    As to the complaints for extra hours, do
20   you know if any of them asked for overtime hours
21   and they were denied them?
22        A.    I don't know that.
23        Q.    As to all these other special
24   investigators who worked overtime hours off the
25   clock without them receiving pay, do you know if
```



```
 1                    M. O'Sullivan
 2    good, average, fair or poor?
 3              MS. JEAN:  Objection.
 4         A.    Average.
 5         Q.    If you were to rate GEICO as an employer
 6    based on your experience there and other employers,
 7    was GEICO an excellent, good, average, fair or poor
 8    employer?
 9              MS. JEAN:  Objection.
10         A.    Depends on the time frame.  Used to be a
11    great job.  Towards the end, it got very difficult.
12         Q.    How was Brian Portnoy as your
13    supervisor?
14              MS. JEAN:  Objection.
15         A.    He was fair.
16         Q.    What about Ms. Campbell and Ms. D'Agata?
17              MS. JEAN:  Objection.
18         A.    They were all fair.
19         Q.    Did you feel like there was an open-door
20    policy with your supervisors where you would come
21    to them with any information?
22              MS. JEAN:  Objection.
23         A.    Absolutely.
24         Q.    When were you working at GEICO, between
25    2019 to your retirement, was the Calderon case
```



```
 1                        M. O'Sullivan

 2    report cards.  Would you receive them every month

 3    though?

 4         A.    They would be one per month.  But

 5    sometimes if they were delayed, you would get two

 6    back to back.  But they were for the reporting

 7    month.

 8         Q.    Earlier counsel for GEICO asked you

 9    about if you submitted accurate reports.

10               Do you recall that?

11               In which you replied yes.

12               Do you recall that testimony?

13         A.    Yes.

14         Q.    Did you submit all the time that you

15    worked, including overtime that you worked, for all

16    hours worked into Workday?

17               MS. ALBERTY:  Objection.

18         A.    No, I wouldn't report overtime hours.

19         Q.    Is a Workday report something that you

20    would submit for GEICO?

21         A.    Yes.

22         Q.    Is it accurate to say you would not

23    submit accurate Workday reports for GEICO?

24               MS. ALBERTY:  Objection to form.

25         A.    The Workday reports would be reflective
```



1                      M. O'Sullivan

2    of a 7.75 day.

3         Q.    They would reflect a 7.75 day, but in

4    reality, that would be an inaccurate report?

5         A.    That would be inaccurate, yes.

6         Q.    Sorry.  Would it be accurate or

7    inaccurate?

8         A.    Well, it would be accurate reporting,

9    but it wouldn't reflect the hours worked.

10        Q.    So would it then be an inaccurate

11   reflection of your time worked?

12        A.    Yes.

13        Q.    You also heard various titles within the

14   investigation units, more broadly special

15   investigators throughout today.

16             And I wanted to follow up and ask:  In

17   terms of the job duties of special investigators,

18   you said that the work would vary.

19             Do you recall that?

20        A.    Yes.

21        Q.    Were all special investigators -- and I

22   am using that term to mean people who were

23   investigators under the special investigation

24   unit -- would all special investigators investigate

25   suspected insurance fraud?



1                    M. O'Sullivan

2     coaching plan.

3          Any written policy described in

4     performance evaluation metrics and/or a number

5     scale.

6          Any documents involve describing

7     caseload metrics, including time frames for

8     case assignments.

9          Any documents describing productivity

10    metrics.

11         Any monthly report cards issued by your

12    supervisors for Michael O'Sullivan.

13         Any documents for metrics that would

14    require a coaching plan.

15         And any documents referencing

16    time-in-progress compliance or TIP compliance,

17    and any metrics associated with that.

18         MS. ALBERTY:  Okay.

19         THE VIDEOGRAPHER:  I am going to sign us

20    off.

21         This concludes the video deposition of

22    Michael O'Sullivan.  The time now is

23    approximately 3:21 p.m.

24         We are off the record.

25         (Time noted: 3:21 p.m.)



```
 1                     M. O'Sullivan

 2                 C E R T I F I C A T E

 3   STATE OF NEW YORK     )

 4                         : ss.

 5   COUNTY OF QUEENS      )

 6

 7          I, YAFFA KAPLAN, a Notary Public

 8      within and for the State of New York, do

 9      hereby certify:

10          That MICHAEL O'SULLIVAN, the witness

11      whose deposition is hereinbefore set forth,

12      was duly sworn by me and that such

13      deposition is a true record of the

14      testimony given by the witness.

15          I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I am

18      in no way interested in the outcome of this

19      matter.

20          IN WITNESS WHEREOF, I have hereunto

21      set my hand this 3rd day of September,

22      2024.

23

24                  YAFFA KAPLAN

25
```

