# Exhibit 17

Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 2 of 53 PageID #: 5458

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                              1

1

2        IN THE UNITED STATES DISTRICT COURT

3        FOR THE EASTERN DISTRICT OF NEW YORK

4    ---------------------------------------------X
     KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
5    LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,
     and CHARISE JONES, individually and on behalf
6    of all others similarly situated,

7                              Plaintiffs,

8      -against-                         Case No.
                                         2:23 Civ. 2848 (GRB) (ARL)
9

10   GOVERNMENT EMPLOYEES INSURANCE COMPANY
     d/b/a GEICO,
11

12                             Defendant.

13   ---------------------------------------------X

14                         August 13, 2024

15                         10:00 a.m.

16

17        EXAMINATION BEFORE TRIAL of LOUIS PIA,

18   a Plaintiff, taken by counsel for the

19   Defendants, pursuant to Order, held at Duane

20   Morris, L.L.P., 1540 Broadway, New York, before

21   Tiffanie Jones, a Notary Public for and within

22   the State of New York.

23

24

25



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 3 of 53 PageID #: 5459

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                              2

```
 1

 2    A P P E A R A N C E S :

 3

 4        OUTTEN & GOLDEN, L.L.P.

 5          Attorneys for the Plaintiffs

 6            685 Third Avenue, 25th Floor

 7            New York, New York 10017

 8

 9        BY:   MICHAEL J. SCIMONE, ESQUIRE

10              mscimone@outtengolden.com

11

12              ZARKA SHABIR DSOUZA, ESQUIRE

13              zdsouza@outtengolden.com

14

15

16

17        DUANE MORRIS, L.L.P.

18          Attorneys for the Defendant

19            1540 Broadway

20            New York, New York 10036

21

22        BY:   GREGORY SLOTNICK, ESQUIRE

23              GSSlotnick@duanemorris.com

24

25
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 4 of 53 PageID #: 5460

LOUIS PIA  Contains Highly Conf. Testimony                      August 13, 2024
Keith Fischer, et al. vs GEICO                                                3

1

2                    S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED by and

5    between the attorneys for the respective parties

6    herein, that filing, sealing and certification,

7    and the same are, hereby waived.

8

9        IT IS FURTHER STIPULATED AND AGREED that

10   all objections except as to the form of the

11   question shall be reserved to the time of the

12   trial.

13

14       IT IS FURTHER STIPULATED AND AGREED that

15   the within deposition may be signed and sworn to

16   by an officer authorized to administer an oath,

17   with the same force and effect as if signed and

18   sworn to before the Court.

19

20

21

22

23

24

25



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 5 of 53 PageID #: 5461

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                            4

```
 1                    PROCEEDINGS

 2        THE VIDEOGRAPHER:  Good morning.  We

 3   are on the record, and the time is

 4   approximately 10:00 a.m.  Today's date

 5   is August 13th, 2024.  This is Media 1

 6   of the video deposition of Louis Pia, in

 7   the matter of Keith Fischer, versus

 8   Government Employees Insurance Company.

 9   The Index Number is 2:23 Civ. 2848 (GRB)

10   (ARL).

11        My name is Ben Peretz, legal

12   videographer with Shereck Video, in

13   association with Esquire.  Today, we're

14   at the office of the Duane Morris,

15   L.L.P., located at 1540 Broadway, New

16   York City.

17        Would counsel please voice-identify

18   yourself, and state whom you represent.

19        MR. SLOTNICK:  Good morning.  My

20   name is Greg Slotnick, on behalf of

21   GEICO, from Duane Morris.

22        MR. SCIMONE:  Michael Scimone,

23   Outten & Golden, on behalf of

24   Plaintiffs.

25        MS. DSOUZA:  Zarka Shabir Dsouza,
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 6 of 53 PageID
#: 5462
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                              5

```
 1                      L. PIA

 2           Outten & Golden, also on behalf of

 3           Plaintiffs.

 4                THE VIDEOGRAPHER:  Thank you.

 5                The court reporter is Tiffanie Jones

 6           with Esquire.  And please swear in the

 7           witness.

 8                THE REPORTER:  All right.  Sir,

 9           please raise your right hand.

10                Do you solemnly swear or affirm that

11           the testimony you're about to give shall

12           be the truth, the whole truth, and

13           nothing but the truth?

14                THE WITNESS:  I do.

15                     L O U I S   P I A,

16        having first been duly sworn by a Notary

17        Public for and within the State of New

18        York, upon being examined, testified as

19        follows:

20                THE REPORTER:  Thank you, sir.

21

22    EXAMINATION BY

23    MR. SLOTNICK, ESQUIRE:

24        Q.  Good morning, Mr. Pia.

25        A.  Good morning.
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 7 of 53 PageID #: 5463

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                         6

```
1                          L. PIA
2        Q.  Could you please state and spell your
3    name for the record.
4        A.  Sure.  Louis Pia.  First name is L --
5    as in "Larry" -- o-u-i-s.  Last name is Pia, P
6    -- as in "Peter" -- i-a.
7        Q.  And could you please state your
8    current address.
9        A.  My current address is ████████████
10   ██████████████████████████████.
11       Q.  Have you ever been deposed before?
12       A.  Yes.
13       Q.  So I'm just going to go through sort
14   of a general guideline set of topics here.
15            So my name is Greg Slotnick, I
16   introduced myself to you off the record.  I'll
17   be taking your deposition today on behalf of
18   GEICO.  So I'll be asking you a series of
19   questions.  Your job is to provide truthful
20   testimony, to the best of your ability.  My
21   questions and your answers will be recorded by
22   a videographer, and a court reporter.
23            Do you understand?
24       A.  Yes.
25       Q.  Because the court reporter is
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 8 of 53 PageID #: 5464

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                           25

```
 1                    L. PIA
 2              MR. SCIMONE:  I'll object here, and
 3         just caution you not to disclose
 4         anything you discussed with Mr. Lewonka
 5         that reflects advice from your
 6         attorneys, or mental impressions of your
 7         attorneys; but you can answer the
 8         question with that instruction.  Go
 9         ahead.
10              THE WITNESS:  I -- I -- to the best
11         of my recollection, I just informed him
12         that the lawsuit was ongoing, similar to
13         a conversation I had with Dan King, when
14         he notified that the -- the lawsuit was
15         ongoing and notified me.
16    BY MR. SLOTNICK:
17         Q.  And to confirm, you said that you last
18    worked for GEICO in November of 2022; is that
19    correct?
20         A.  Correct.
21         Q.  Okay.  Have you ever gone by any other
22    name?
23         A.  Not that I know of.
24         Q.  Okay.  What's your date of birth?
25         A.  ███████████ .
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 9 of 53 PageID #: 5465

LOUIS PIA  Contains Highly Conf. Testimony                        August 13, 2024
Keith Fischer, et al. vs GEICO                                                 37

```
 1                        L. PIA

 2        Q.   Yes.

 3        A.   Yes.

 4        Q.   Did each region have its own office?

 5        A.   I know Region 2 had their own office.

 6   I don't know about the other offices.

 7        Q.   Where was the Region 2 office located?

 8        A.   It was in the GEICO building on

 9   Woodbury Road, Nassau County.

10        Q.   Which town is that in?

11        A.   Woodbury -- well, is it Woodbury or

12   Syosset?  Possibly one of the two.

13        Q.   Okay.  On Long Island?

14        A.   Yes.

15        Q.   And you describe yourself as an SIU

16   investigator in your first title; is that

17   correct?

18        A.   Yes.

19        Q.   What were your job responsibilities in

20   that role?

21        A.   I was assigned a -- a -- cases that --

22   at the time, upon initial employment, we were

23   assigned cases from claims examiners and --

24   where they suspected fraud was involved.

25        Q.   And what were your specific duties
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 10 of 53 PageID #: 5466

LOUIS PIA  Contains Highly Conf. Testimony                          August 13, 2024
Keith Fischer, et al. vs GEICO                                                      38

```
 1                         L. PIA

 2    with respect to investigating fraud?

 3         A.  We would do background, database

 4    searches on the individuals named in the -- in

 5    the claim.  We would retrieve police reports,

 6    interview witnesses, respond, canvas, locate

 7    the scene locations.  On occasion, inspect

 8    medical facilities, conduct Examinations Under

 9    Oath, take recorded statements from witnesses,

10    and other things I -- I don't recall right now.

11         Q.  And how did your responsibilities

12    change, if at all, when you became a lead

13    investigator?

14         A.  Well, the responsibilities there --

15    there's a -- there's a long gap in between,

16    from 2003 to 2017.  So in 14 years, my

17    responsibilities changed.  Number one is I got

18    substantial increase in -- in case load in

19    those 14 years.  And as a lead investigator at

20    certain points in time, I was asked to either

21    train, or have new investigators accompany me

22    either on Examination Under Oaths or recorded

23    interviews.

24              That being said, I did not -- or it

25    did not come with any supervisory powers.  I
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 11 of 53 PageID #: 5467

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                        43

```
1                         L. PIA

2    Al Brust was one, Steve Stemmler.  I -- I

3    believe Jeff Lewonka, Anthony DeStefano.  And

4    there could be others.  I just don't recall.

5         Q.  In your role as -- just to jump back.

6              As a -- an investigator, before you

7    were a lead investigator, were you working

8    remotely in the field?

9         A.  Yes.

10        Q.  Did you ever work based out of an

11   office?

12        A.  I had an home office.

13        Q.  Home office.

14             Did you ever work in GEICO's office?

15        A.  On -- on -- not on a steady basis, no.

16        Q.  Was that the case throughout your time

17   as investigator in the SIU?

18        A.  Yes, I was never assigned a desk in

19   the GEICO building.

20        Q.  Did you have a company car?

21        A.  Yes.

22        Q.  Was that the case throughout your

23   GEICO employment?

24        A.  Yes.

25        Q.  Did you ever supervise any other
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 12 of 53 PageID #: 5468

LOUIS PIA  Contains Highly Conf. Testimony                      August 13, 2024
Keith Fischer, et al. vs GEICO                                            47

```
 1                    L. PIA
 2   security investigator.
 3        A.   Lead security, I worked seven days a
 4   week.
 5        Q.   Seven days a week?
 6        A.   Yes.
 7        Q.   Okay.  Were you scheduled to work
 8   seven days a week?
 9        A.   When you say "scheduled", it's -- it's
10   kind of a convoluted question because it --
11   they didn't -- they didn't -- in order to
12   handle my case load, in order for me to not to
13   be penalized, I had to work over and above the
14   40 hour, or a 38.75-hour workweek in order for
15   me not to be penalized; and, therefore, not get
16   a raise or put on coaching or, you know,
17   possibly be terminated.
18        Q.   Were you scheduled to work 38.75 hours
19   per week?
20        A.   I would say yes.
21        Q.   Was that the case throughout your
22   GEICO employment?
23        A.   Well, that was the policy that GEICO
24   instituted, but that wasn't the practice.
25        Q.   I'm just asking about the policy.
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 13 of 53 PageID #: 5469

LOUIS PIA  Contains Highly Conf. Testimony                          August 13, 2024
Keith Fischer, et al. vs GEICO                                                    52

```
 1                       L. PIA

 2    with.  If you want to define it for me, and

 3    I'll -- I'll -- I'll let you know if I'm

 4    familiar with it.

 5        Q.  Was there ever a policy in place with

 6    respect to your employment, where you were able

 7    to work less hours on a given day, and make-up

 8    those hours later in the day or on another day

 9    in the same workweek?

10        A.  I -- I don't recall whether -- that

11    being policy, no.

12        Q.  When you were working, were you free

13    to complete your work at any time that it was

14    convenient for you during the work day, or did

15    you have set hours where you had to complete

16    your work?

17        A.  No, as I -- as I stated before -- and

18    maybe I could be a little bit more clear.  I

19    mean, I -- I was -- I was working -- I was

20    doing my case load at -- some nights, 9:00,

21    10:00, 11:00 o'clock at night.

22        Q.  When you were assigned specific cases,

23    were they all different types of cases, or were

24    their subsets of cases in -- in the SIU?

25        A.   What time period?
```



```
 1                          L. PIA
 2    and -- and inside because they were also
 3    getting cases was -- I mean, I'm -- I'm going
 4    to say it was at least ten different people
 5    that you could get a case from.
 6         Q.  Can you name some of those
 7    individuals, the inside investigators?
 8         A.  Marie Butler, Denise D'Avanzo, Dario
 9    Dimeo.  The intake people were fairly new --
10    they were fairly new.  There was -- there was
11    another female there.  She was a -- she was --
12    she was a nice girl.  I forget her name.  She
13    had -- she ended up being a -- a supervisor.
14    She became a supervisor, but she used to assign
15    cases.  And others that I -- I don't recall
16    their names at this time.
17         Q.  When you took Examinations Under Oath,
18    was that from specific locations?
19         A.  Yes.  Prior to COVID, we used to
20    respond out to different locations depending on
21    the borough in which it was being conducted.
22         Q.  Where were the locations -- strike
23    that.
24              Which boroughs did you conduct EUO's
25    in?
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 15 of 53 PageID #: 5471

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                                    61

```
 1                        L. PIA
 2        A.  I'm going to say I conducted an EUO in
 3   every borough, with the exception of Staten
 4   Island.  And I can't be quite sure.  I may have
 5   done one in Staten Island.
 6        Q.  Was there a specific EUO location
 7   within each borough?
 8        A.  Yes.
 9        Q.  Did you decide where to schedule your
10   EUO's?
11        A.  We were basically told to schedule the
12   location based on the closeness to the
13   individual that we're -- that we're going to
14   EUO, their residence.
15        Q.  And throughout this period, were you
16   living on Long Island?
17        A.  Yes.
18        Q.  How long did it take you to drive to
19   each EUO center approximately?
20        A.  Well, EUO's were only conducted on the
21   weekdays.  So therefore, you had the largest
22   volume of traffic on the weekdays.  The Bronx
23   and Brooklyn were, on average, the worst, the
24   longest travel time it took.  I did a lot of my
25   -- well, I would say predominantly, most of my
```



```
 1                      L. PIA

 2    cases in the Bronx and Brooklyn.  And I would

 3    leave my house at approximately 7:00 o'clock,

 4    and I wouldn't get to the Bronx -- which was

 5    right down the block from Yankee Stadium --

 6    until about 8:20, 8:30.  Now, you throw in a

 7    little rain and snow, and you can add on a half

 8    hour to 45 minutes to that.

 9           Brooklyn, same type -- same type of a

10    -- you know, length of time.  Rain on the BQE

11    just basically, you know, put everything to a

12    standstill.  It took a long time.

13       Q.  And how much time would you say that

14    you spent in the field on a given day?

15       A.  Well, let's take it -- let's take, for

16    example, the -- an EUO day, and -- and when you

17    went out on an EUO -- at least I, and I know a

18    lot of a -- the investigators.  There were

19    multiple EUO's.  You had to schedule more than

20    one EUO on a given day, or you just ran out of

21    time.

22           So if I went out with two or three

23    EUO's scheduled, I would leave my house at --

24    well, I would -- I would review or just peruse

25    the EUO's that I had at about 6:30 in the
```



```
 1                         L. PIA

 2   morning.  Get in the car, leave at about 7:00.

 3   Depending on -- just let's say, for instance, I

 4   arrive at the Bronx at about 8:30.  Now, the

 5   scheduling of the EUO's was quite difficult,

 6   also, because some of these people wouldn't

 7   show up.  So you had to give them 45 minutes

 8   waiting time.  If they did show up, I would say

 9   a normal EUO would take an hour, sometimes

10   longer.

11           So if you had several EUO's, you

12   couldn't schedule them at 9:00, 9:30 and 10:00

13   because if all three showed, you -- you know,

14   you had three different court reporters, and it

15   just wouldn't work.  So you had to do 9:00,

16   10:30, you know, maybe 12:00 noon.  And just --

17   let's say your last EUO didn't show at 12:00.

18   You had to remain there until 12:45.  Coming

19   back home, understandably, there was less

20   traffic, but it still took you about 40

21   minutes, you know, half hour to get home.

22           And then, when you got back to your

23   office, you were responsible to -- well, let me

24   -- let me stop there.  Your question was:  How

25   long did you spend in the field?  Is that
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 18 of 53 PageID
#: 5474
LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                           64

1                       L. PIA

2    correct.

3         Q.  Correct.

4         A.  Okay.  So I'm back home from -- from

5    7:00 to about 2:30.

6         Q.  And you said -- strike that.

7              How many days a week did you typically

8    schedule EUO's?

9         A.  I would say, myself, probably three to

10   four.

11        Q.  And what was the approximate rate of

12   no-shows for EUO's?

13        A.  No -- no-shows, you -- you -- again,

14   the rate, the percentage, you know, I -- I --

15   I'm not going to give you, but there was -- it

16   -- it was -- a large percentage of scheduled

17   EUO's were no shows, but there was work

18   involved in -- in the no-show appearance, also.

19        Q.  What work was involved in no-show

20   appearances?

21        A.  Well, you had to wait for 45 minutes,

22   and then you had to put a -- put a statement on

23   the record with the court reporter.  Then, you

24   had to contact the -- the legal -- GEICO's

25   legal to reschedule, unless it was a second



```
 1                        L. PIA
 2   and this was ongoing for years, even prior to
 3   2016.  We were asking for overtime to be
 4   incurred for the hours that we were working
 5   over and above 38.75, and we were told that --
 6   that GEICO doesn't approve and authorize
 7   overtime for the excess amount of time
 8   regarding the handling of cases.
 9          So when the case load got to be so
10   extreme, that we couldn't do our job within the
11   38.75, we basically -- well, I basically
12   continued to do the work while asking for
13   overtime, not being approved, but continued to
14   do the work in order to satisfy my case load,
15   and not have the cases turn red; and, you know,
16   be possibly recognized as needing coaching and
17   -- and, you know, possibly being, you know,
18   terminated.  I needed the job.
19      Q.  Okay.  I believe my question on that
20   one was:  Were there certain times of the year
21   that were busier than others?
22      A.  Yes.
23      Q.  Okay.  Which times of the year were
24   those?
25      A.  Well, co -- after COVID hit, I would
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 20 of 53 PageID #: 5476

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          78

```
 1                      L. PIA

 2      A.  Not that I recall, no.

 3      Q.  Were you ever disciplined in any

 4  capacity in any of your positions at GEICO?

 5      A.  No.

 6      Q.  And during your employment with GEICO,

 7  from 2016 forward, did you ever take any FMLA

 8  leave absence?

 9      A.  No.

10      Q.  Did you ever take any disability

11  leave?

12      A.  Disability, I -- I -- I don't know

13  exactly if it would encompass disability, but I

14  was in a -- a motor vehicle accident in a GEICO

15  car.  I was struck from the rear, and I think I

16  went sick maybe two days or three days.

17      Q.  Did you ever take any other extended

18  leaves of absence at GEICO?

19      A.  No.

20          (Defendant's Exhibit Number 2 was

21       marked for identification.)

22  BY MR. SLOTNICK:

23      Q.  Mr. Pia, I've handed you what's been

24  marked as Exhibit 2.  It is a document that

25  says:  Compensation Contents, the GEICO Human
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 21 of 53 PageID
#: 5477
LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                            79

```
 1                       L. PIA

 2    Resources Associate Handbook.

 3           Are you familiar with this document?

 4        A.  I -- I would say at -- at some point

 5    in time in my GEICO career, I may have perused

 6    the contents of -- of this document.

 7        Q.  Do you know if you received this

 8    employee handbook during your employment with

 9    GEICO?

10        A.  Yes.

11        Q.  So you turn to Page G000039 on the

12    bottom-right.  And if you look right about

13    where it says, "Hourly non-exempt associates",

14    there's a paragraph that starts with, "All

15    non-exempt associates".

16           Do you see that paragraph?

17        A.  Yes.

18        Q.  Okay.  It says:  "All non-exempt

19    associates are required to accurately record

20    their hours worked and absences taken.  All

21    exempt associates are required to accurately

22    record their absences taken.  A non-exempt

23    associate who feels he/she did not receive pay

24    for all his/her hours worked.  And an exempt or

25    salaried, non-exempt associate who feels
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 22 of 53 PageID
#: 5478
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                           80

```
1                      L. PIA

2    his/her pay incorrectly reflects a deduction

3    for an absence should contact his/her

4    supervisor, local Human Resources manager or

5    corporate Human Resources."

6          Did I read that correctly?

7      A.  I -- yeah, I was following along.  I

8    didn't see you -- any errors.

9      Q.  Do you -- strike that.

10         Did you get training on this policy?

11     A.  Training on the policy?

12     Q.  (Nodding affirmatively).

13     A.  I don't recall specifically any

14   training.

15     Q.  Were you required to follow this

16   policy as a GEICO employee?

17     A.  Policy, I -- I -- I would say that

18   policies are generally looked at to be

19   followed.  However, the practice in the

20   workplace sometimes differs greatly than the

21   policy that is mentioned in this handbook.

22         MR. SLOTNICK:  Could you read back

23      my question.

24         (The reporter complies with the

25      request.)
```



```
 1                      L. PIA

 2             THE WITNESS:  Yes.

 3             MR. SLOTNICK:  Let me introduce --

 4             MR. SCIMONE:  And just when the

 5        court reporter read backs the question,

 6        that's not the question.  You have to

 7        wait for the attorney to ask the

 8        question.

 9             THE WITNESS:  Sorry.

10             MR. SCIMONE:  Just wait until he

11        asks the question.  Don't answer.

12             THE WITNESS:  Am I done with this

13        one, or we're going to --

14             MR. SLOTNICK:  Yeah, you can set

15        that aside for now.

16             (Defendant's Exhibit Number 3 was

17        marked for identification.)

18   BY MR. SLOTNICK:

19        Q.  Mr. Pia, I've handed you what's been

20   marked as Exhibit 3.  This is a

21   training-history log.

22             Are you familiar with the trainings

23   that you completed as a GEICO employee?

24        A.  Yes.

25        Q.  How often did you take trainings at
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 24 of 53 PageID #: 5480

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                        82

1                          L. PIA

2    GEICO?

3         A.   I would say there were several times a

4    year that we were notified to go online and

5    take, you know, a training class.

6         Q.   And did you always follow those

7    prompts and take the trainings?

8         A.   Yes.

9         Q.   Okay.  Did you always complete the

10   trainings?

11        A.   Yes.

12        Q.   If you turn to -- and apologies, there

13   are no separate page numbers on this document,

14   but if you turn to the page that has the date

15   5/17/16 on the bottom row, in the middle.

16        A.   Got it.

17        Q.   Do you see on the left side, it says:

18   Louis Pia, Policies and Acknowledgements 2016?

19            Do you see that?

20        A.   2016, yes.  Second from the bottom?

21        Q.   Second from the bottom.

22        A.   Yep.

23        Q.   Do you see where it says "Completed"

24   in the middle?

25        A.   Yes.



```
 1                          L. PIA

 2        Q.  Do you see where it says "Pass"?

 3        A.  Yes.

 4        Q.  Do you have any reason to doubt that

 5   those -- that you accurately completed and

 6   passed this training?

 7        A.  No.

 8        Q.  If you turn to the next page, where

 9   the entry says 5/2/2017.

10        A.  One, two --

11        Q.  Towards the middle.

12        A.  Yeah.

13        Q.  On the left side, it says:  "2017

14   Policies and Acknowledgements."

15        A.  Yes.

16        Q.  Completed and passed?

17        A.  Yes.

18        Q.  Any reason to doubt that you completed

19   and passed that training?

20        A.  No.

21        Q.  The next one is on the next page,

22   second row down.  4/22/2018, do you see that?

23        A.  Yes.

24        Q.  On the left side, "2018 Policies and

25   Acknowledgements"?
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 26 of 53 PageID
#: 5482
LOUIS PIA  Contains Highly Conf. Testimony                          August 13, 2024
Keith Fischer, et al. vs GEICO                                                     84

1                        L. PIA

2        A.   Yes.

3        Q.   Completed and pass for that row?

4        A.   Yes.

5        Q.   Any reason to doubt that you completed

6    and passed that training?

7        A.   No.

8        Q.   And then, the -- on the same page, it

9    says 5/1/2019 towards the middle.

10            Do you see that entry?

11       A.   Yes.

12       Q.   The left side, it says:  "2019

13   Policies and Acknowledgements."  Completed and

14   Pass.

15            Do you see that?

16       A.   Yes.

17       Q.   Okay.  Any reason to doubt that you

18   completed and passed that training?

19       A.   No.

20       Q.   On the next page, it says May 1st,

21   2021 --

22       A.   Yeah.

23       Q.   -- towards the top.  Do you see that?

24       A.   Yep.

25       Q.   It's "2021 Policies and



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 27 of 53 PageID #: 5483

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                            85

```
 1                    L. PIA

 2   Acknowledgements?

 3       A.  Yes.

 4       Q.  "Completed", do you see that?

 5       A.  Yes.

 6       Q.  Any reason to doubt that you completed

 7   that training?

 8       A.  No.

 9       Q.  Do you know why there's no entry for a

10   pass of that training?

11       A.  I do not.

12       Q.  And then, on the same page, it says

13   5/30/2022 in the middle.  Do you see that?

14       A.  Yes.

15       Q.  On the left side, Policies and

16   Acknowledgements 2022, and it says completed

17   next to it.

18           Do you see that?

19       A.  Yes.

20       Q.  Any reason to doubt that you completed

21   that training?

22       A.  No.

23       Q.  Did you understand yourself to be a

24   non-exempt associate at GEICO?

25       A.  That always confused me, the
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 28 of 53 PageID #: 5484

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          86

```
 1                      L. PIA

 2    non-exempt and -- and -- and the other one that

 3    they -- they mentioned.  So I -- I don't know

 4    what I was.  It always confused me from --

 5    from the first time that I was hired, but it

 6    really didn't matter to me, you know, what --

 7    what I was classified as.

 8        Q.  Do you know what non-exempt means?

 9        A.  Well, non-exempt means that you're a

10    -- you know, something other than what their --

11    their -- the -- the regular, you know, group is

12    entitled to or -- or asked for.

13        Q.  And why do you say it didn't matter to

14    you if you were classified as non-exempt?

15        A.  Because I was still getting my

16    paycheck for -- for working at GEICO.  And the

17    overtime that we consistently asked for wasn't

18    getting approved, whether I was non-exempt or

19    -- or the other classification.

20        Q.  If you turn back to Exhibit 2.  And

21    you go back to Page G000039.

22        A.  Okay.

23        Q.  So from the language that I read

24    directly from this policy, did you understand

25    that working off the clock was not allowed at
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 29 of 53 PageID #: 5485

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                            87

```
 1                        L. PIA

 2   GEICO?

 3      A.  Again, what I understood as -- as what

 4   GEICO's policy was, and what the practice in

 5   the workplace was, was totally different.

 6      Q.  Okay.  I'm just asking if you

 7   understood what the policy was.

 8      A.  Based on the language that you just

 9   read to me earlier?

10      Q.  Yes.

11      A.  Yes.

12      Q.  Did you understand that you were

13   required to accurately record your hours worked

14   at GEICO?

15           MR. SCIMONE:  Objection.

16           THE WITNESS:  Yes.

17   BY MR. SLOTNICK:

18      Q.  Were you aware that you were required

19   to report any issues that you felt you had,

20   with respect to payment for all of your hours

21   worked to your supervisor, local Human

22   Resources manager or corporate Human Resources?

23      A.  I did.

24      Q.  Do you know what -- the difference

25   between local Human Resources and corporate
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 30 of 53 PageID
#: 5486

LOUIS PIA  Contains Highly Conf. Testimony                  August 13, 2024
Keith Fischer, et al. vs GEICO                                              93

```
 1                        L. PIA

 2   factors, though, that went into whether you got

 3   a raise or not?

 4        A.   Yes.

 5        Q.   Okay.  And what were those factors?

 6        A.   The way that you handled your

 7   investigations, and kept them up in a timely

 8   manner.

 9        Q.   Anything else?

10        A.   Not that I can recall right now.

11        Q.   Do you know if the raises were based

12   on your tenure with GEICO?

13        A.   I don't think so.

14        Q.   Other than the change from

15   investigator to lead investigator, were you at

16   -- at any point otherwise promoted at GEICO?

17        A.   No.

18        Q.   Did you apply for any other promotions

19   at GEICO?

20        A.   No.

21        Q.   And did you record your time worked at

22   GEICO?

23        A.   On a daily basis, you mean?

24        Q.   Yes, on a daily basis.

25        A.   Yes, I did.
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 31 of 53 PageID
#: 5487

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          94

```
1                      L. PIA

2      Q.  And how did you do that?

3      A.  I did it on a -- a computer system,

4  and it was -- it was -- you had to input

5  Monday, Tuesday, Wednesday, Thursday, Friday,

6  and you had to input 7.75 under each day that

7  you worked.  And Gerry Cassagne -- as well as

8  other supervisors, I believe -- in order to

9  keep up with their workload, they had -- I know

10  I can state -- state this specifically.  My

11  time -- my time payment on the -- on the

12  computer, I would submit by, like, Wednesday of

13  every week because we knew -- well, I knew that

14  I wasn't going to incur any overtime.  So

15  therefore, the -- the -- the -- the hours

16  weren't going to change.

17           So he would ask if -- if for some

18  reason I got preoccupied.  And Thursday came

19  around, and he would send an e-mail and say,

20  you know, time sheets.  And it was, you know,

21  assumable that you'd put in your time sheets

22  for 7.75 Monday to Friday, get them into Gerry

23  so he can get a heads up, you know, on what his

24  chores were regarding supervisory paperwork.

25  And so they were -- they were -- they were put
```



```
 1                         L. PIA
 2    in before the end of the workweek.
 3         Q.   Just so I understand you fully.
 4              So you're saying that you would submit
 5    time before the end of the week that included
 6    hours for days that you hadn't worked yet --
 7         A.   Correct.
 8         Q.   -- correct?
 9         A.   Yeah.  And if I knew I was going to
10    take off on a Saturday -- I mean, on a Friday
11    or whatever, I would then go there, and then
12    you'd have to -- there'd be a drop-down for,
13    like, vacation day or whatever the case may be.
14         Q.   Okay.  Do you recall what program you
15    used to submit that?
16         A.   No.
17         Q.   Do you know if that program changed at
18    all from 2016 forward?
19         A.   Until I retired?
20         Q.   Yeah.
21         A.   I don't believe it did.
22         Q.   Was the 7.75 per day pre-populated, or
23    did you have to physically enter that number
24    in?
25         A.   I -- I -- I'm pretty sure I -- I -- I
```



                        L. PIA

1

2       A.  I -- I -- I would venture to say that

3  -- that I -- I had telephone conversations with

4  Gerry regarding overtime, where he told me, you

5  know, it was not allowed.

6       Q.  Was anyone else present for those

7  phone calls?

8       A.  No.

9       Q.  And can you describe generally what

10 you mean by "catastrophe assignments"?

11      A.  Major hurricane or a -- a flooding.

12 Anything where a section of the country needed

13 additional work man-hours, what GEICO would do

14 is they would have -- they called it a CAT

15 team.  I wasn't a member of the CAT team, but I

16 think it was an acronym for catastrophe team or

17 whatever.  And they would respond to these

18 locations to assist, and get everything -- all

19 the claims up in order.  And that's what I

20 meant by catastrophe.

21      Q.  So the CAT team, as you say, was --

22 that was a specific sub-team?

23      A.  Not within GEICO.  The CAT team

24 encompassed claims examiners, management, theft

25 examiners.  You know, the whole -- the whole



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 34 of 53 PageID #: 5490

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          105

                              L. PIA

 1

 2   met, then there's -- there was going to be no

 3   change.

 4        Q.  When did he tell you that?

 5        A.  I don't know exactly, but during that

 6   time period, and even before.

 7        Q.  Was that on the phone?

 8        A.  Could have been on the phone, in

 9   person or both.

10        Q.  Did you take any notes of those

11   conversations?

12        A.  No.

13        Q.  Were those conversations reflected in

14   any e-mails that you recall?

15        A.  No.

16        Q.  If we could go back to Paragraph 8.

17   So it says:  "I recall my supervisor, Gerard

18   Cassagne, discussed with me the norms of

19   everyone working overtime off the clock to keep

20   up with GEICO's performance metrics.  And he

21   said that the only way the practice would stop

22   is if everyone collectively stopped working

23   after 7.75 hours per day, and allowed their

24   cases to go red.  Meaning the cases would

25   receive poor ratings.  Accordingly, I only



```
1                        L. PIA

2    entered 7.75 hours per day, 5 days a week,

3    regardless of how many hours I actually

4    worked."

5             Mr. Pia, is that the conversation that

6    you were just referring to in your testimony?

7         A.   In sum and substance, yes.

8         Q.   And when you say "go red", what

9    exactly does that mean?

10        A.   The system that we used on the

11   computer -- and again, I'm not an IT.  I'm like

12   a -- you know, a little bit behind the ball

13   with that, but the SICMS computer would have --

14   there would be a queue on the left side of the

15   screen, and that would be a list of all your

16   cases.  And if you didn't meet certain

17   requirements within a -- a -- a -- a case life,

18   then your -- your case would turn red.

19             So in essence, if -- if you, you know,

20   shutdown and say, hey, I'll get to that when I

21   get to that, and all of a sudden, either the

22   time period to update your case or the 30-day

23   case life came up, the case would turn red.

24   Then, the other case would turn red, and so on

25   and so forth.
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 36 of 53 PageID #: 5492

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                           107

```
1                            L. PIA

2         Q.  How could you prevent a case from

3    turning red?

4         A.  Working as many hours as it takes in a

5    day to -- to get your work done, even if it's

6    over and above 7.75.

7         Q.  Would taking -- strike that.

8              Would entering -- strike that.

9              You mentioned SICMS?

10        A.  Yeah, it's an acronym for special

11   investigation case management system or

12   something -- something to that effect.

13        Q.  Was that the case management software

14   that you used at GEICO?

15        A.  Yes, issued by home office.

16        Q.  And if you made an entry in SICMS in a

17   given case, would that prevent or take away a

18   red flag for that case?

19        A.  It depends on the entry.

20        Q.  What do you mean by that?

21        A.  Well, I mean, if -- if I just went in

22   the case and went, hi, and then exited out, you

23   know, the case would still -- you know, you

24   have to show some type of -- of constructive,

25   you know, data in the entry.
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 37 of 53 PageID #: 5493

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                             109

```
1                       L. PIA

2   red.

3       Q.  Did you ever intentionally allow any

4   cases to go red?

5       A.  No.

6       Q.  Would you receive poor ratings if you

7   let your cases go red?

8       A.  Yes.

9       Q.  Are you aware of any other

10  investigators who intentionally allowed their

11  cases to go red?

12      A.  Intentionally?

13      Q.  Yeah.

14      A.  Not that I know of, no.

15      Q.  If you look at Paragraph 9, which is

16  on the same page.  The second sentence reads:

17  "From approximately late 2016 to approximately

18  March 2020, I worked approximately ten hours

19  each day, Monday through Friday, and another

20  four to six hours on weekends to keep up with

21  my work.  I worked about 55 hours a week on

22  average."

23          What are you referring to when you say

24  "late 2016"?

25      A.  I -- I would say a period of time from
```



LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                        110

```
 1                         L. PIA
 2    the middle to the latter part of -- of 2016.
 3         Q.  Do you have a specific month that
 4    you're talking about?
 5         A.  I -- I don't.  I don't recall.
 6         Q.  And on what do you base these estimate
 7    hours worked?
 8         A.  Well, based on what I recall, my -- my
 9    workday being, and that the -- the hours that I
10    listed here, I would say, is a conservative
11    estimate.
12         Q.  They're based on your recollection of
13    what you remember your -- your hours worked
14    being?
15         A.  Yeah.
16         Q.  Did you record your time worked
17    anywhere, other than GEICO's timekeeping
18    program?
19         A.  During the time period of 2016 to '22,
20    no.  Prior to that, yes.
21         Q.  Where did you keep those documented
22    notes prior?
23         A.  During the Calg study time period, we
24    were required to itemize everything that we did
25    in a case.  So, for example, if I took out Case
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 39 of 53 PageID #: 5495

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                        111

```
 1                      L. PIA
 2   Number 123, and I called Mr. Slotnick, and it
 3   took ten minutes, I had to put down ten
 4   minutes.  And then, at the end of the case,
 5   when it was being typed up for submission, I
 6   would add up all the time.  And on the bottom,
 7   in the summary, I would say total case time, 27
 8   hours, 30 minutes.  And that stopped.  We were
 9   told to stop that at some point in time.  I
10   don't know exactly when, but that was during
11   that period that I documented my time.
12        Q.  How did that differ from the regular
13   practice of documenting time at GEICO?
14        A.  Practice, or policy?
15        Q.  Practice.
16        A.  Well, the practice was that you -- you
17   worked so your -- your cases didn't turn red.
18   You worked overtime and didn't -- and didn't
19   put in for it.  So there was no difference in
20   that, other than there was an additional
21   recording of the time during the Calg study, as
22   opposed to 2016 to 2022.  I didn't record any
23   place else my unpaid overtime.  The only -- the
24   only place that I recorded my time was in the
25   -- the -- the weekly-time computer thing.
```



LOUIS PIA  Contains Highly Conf. Testimony                 August 13, 2024
Keith Fischer, et al. vs GEICO                                        125

```
 1                      L. PIA
 2         On what do you base the approximately
 3   65 hours-a-week calculation?
 4         A.   What -- individually?  Like, how many
 5   during the week and -- and the weekends?  I was
 6   working seven days a week.  The case load
 7   jumped up dramatically.  And I recall during
 8   COVID, I -- I was conducting in -- in --
 9   approximately three of the four can -- three to
10   five recorded statements a day.  Okay.  And
11   then, you know, all the -- all the -- the --
12   the background work that we had to do on these
13   cases.
14         So, I mean, I -- I -- I recall during
15   COVID being, you know, at my computer, you
16   know, until dinner time and breaking for
17   dinner, and then going back at about 6:30,
18   7:00.  And then, working until, you know, the
19   -- the evening hours almost every single night.
20         Q.   Did you keep any documents or records
21   of those additional work hours?
22         A.   No.
23         Q.   Let's go to Paragraph 12 on the same
24   page.  It says:  "From March 2020 to November
25   2021, my regular hours worked were
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 41 of 53 PageID #: 5497

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                         126

```
 1                      L. PIA

 2    approximately 65 hours per week.  And from

 3    December 2021 to December 2022, my regular

 4    hours worked were approximately 55 to 60 hours

 5    per week."

 6            So on what are you basing those

 7    estimates of hours worked?

 8        A.  Well, from -- from COVID until, I

 9    guess, November '21 would be, like, sort of the

10    -- the going-back-out time after COVID, but,

11    you know, they would -- they were extensive

12    hours, in that the case load was a -- and there

13    was -- there was a month I was -- I was -- I

14    think I was assigned to over 70 cases, or

15    around 70 cases in one month.  So that, you

16    know, incorporated the approximately 65 hours a

17    week.

18            Once we went out, the case load -- to

19    the best of my regulate -- recollection --

20    diminished, but it wasn't like a God send, like

21    someone came in and said, hey, the -- listen,

22    these guys, you know, got to go down to a, you

23    know, respectable case load; but they did go

24    down a little bit.  And so I reduced the hours

25    that I worked from 65 -- approximately 65 to 55
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 42 of 53 PageID
#: 5498
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                           127

```
1                         L. PIA
2    to 60 hours per week.
3         Q.  Do you have any records of working
4    those additional hours?
5         A.  You mean less hours; right -- well --
6    well, additional hours, but less than the --
7    the -- the COVID?
8         Q.  Correct.
9         A.  No.
10        Q.  And during COVID -- so the period from
11   March 2020 on -- who was actually living in
12   your home with you?
13        A.  It was myself, my wife, and two of my
14   children.
15        Q.  If you look at Paragraph 12 on Page 4.
16            Again, did you tell anyone that from
17   March 2020 to November 2021, your regular work
18   hours were 65 hours per week?
19        A.  I don't know if I specifically told
20   them the amount of hours, but there -- there
21   were some vocal conversations between myself
22   and Gerry Cassagne regarding -- you know, I
23   mean -- I remember even saying to Gerry, I
24   don't care how good your -- an investigator you
25   are, 70 cases -- nobody can do 70 cases.  I was
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 43 of 53 PageID #: 5499

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                          128

```
 1                      L. PIA

 2    beside myself with that number for the monthly

 3    average.

 4           So, I mean, I -- I did repeatedly

 5    during that time voice my dissension to Gerry

 6    about, you know, the case load and -- and --

 7    and he was well aware that we were working over

 8    and above the 38.75.

 9       Q.  Did you ever make any written

10    complaints to Gerry about that?

11       A.  That -- that would be career suicide.

12    I -- no, I -- I didn't do that, no.

13       Q.  Did you ever go to HR with complaints

14    about those hours worked?

15       A.  Again, career suicide.

16       Q.  Did you call the ethics hotline about

17    those hours worked?

18       A.  During that time?

19       Q.  Yes.

20       A.  No.

21       Q.  Do you know if the ethics hotline was

22    anonymous?

23       A.  It was anonymous when I called back

24    when -- as I stated earlier in the testimony.

25       Q.  Do you know whether any GEICO
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 44 of 53 PageID #: 5500

LOUIS PIA  Contains Highly Conf. Testimony                         August 13, 2024
Keith Fischer, et al. vs GEICO                                               129

```
 1                          L. PIA

 2    investigators in the SIU asked for approval to

 3    work more than 38.75 hours per week, 2016

 4    forward?

 5        A.   Again, I'm a little confused at that

 6    question because I determined that question to

 7    be a yes, because of the meetings that we had,

 8    when overtime was brought up -- the issue of

 9    overtime.  And we're working above and beyond

10    the 38.75.

11        Q.   Right, but I'm -- I'm asking about

12    specifically.

13             Like, do you know of anyone who

14    actually asked to work more than 38.75?  Like,

15    any direct requests?

16        A.   I -- I don't.

17        Q.   Okay.  Were you ever approved to work

18    overtime at GEICO?

19        A.   Yes.

20        Q.   When were you approved to work

21    overtime?

22        A.   It was the -- the weirdest thing.  At

23    some point in time -- I don't know the time

24    period -- but they -- they asked if -- if

25    people wanted overtime to handle other people's
```



```
 1                      L. PIA
 2   cases, when you would take cases that either
 3   other people had, and you were assigned these
 4   cases.  And you would do the investigation, and
 5   then get either two hours or four hours,
 6   whatever, overtime, but never to, you know, try
 7   to get your workload down.
 8        Q.  Do you recall when you were approved
 9   to work overtime?
10        A.  The time period?
11        Q.  Yes.
12        A.  I -- I do not, no.
13        Q.  And you said that you were asked to
14   work on other people's cases?
15        A.  Well, that was the stipulation of --
16   for the -- for the overtime.  Why it was
17   determined or approved, I -- I don't know.
18   That would be a management decision, but that
19   -- that was a real -- the -- the specifications
20   was you couldn't -- you know, like, I couldn't
21   ask Gerry -- Gerry, I'm going to, you know,
22   work four hours tonight, and I'm just going to
23   take the four hours extra for my cases.  You
24   had to do other people's cases that were
25   assigned.
```



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 46 of 53 PageID #: 5502

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          131

                            L. PIA

1

2       Q.  Did anyone actually tell you that

3   specifically?

4       A.  When I was asked to do overtime, I

5   think I initially asked Gerry, is that for my

6   case load.

7       Q.  And what did he say?

8       A.  He said, no, we're going to assign you

9   cases to -- to -- to work on, and you'll get --

10  I don't know.  I -- I forget whether if it was

11  two hours or four hours overtime.

12      Q.  Approximately, how many times did that

13  happen?

14      A.  Several.  I -- I mean, I don't know

15  the exact amount.

16      Q.  And was that overtime that you asked

17  to work, or was it overtime that was assigned

18  to you by Gerry?

19      A.  No, they would -- they wouldn't -- he

20  didn't assign it and say, you got to do this.

21  You know, he would ask:  There's overtime

22  available, are you interested?  And if it was

23  -- if it was asked of me, more times than not,

24  I took it.

25      Q.  Did you ever decline to take the



LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          162

```
 1                      L. PIA
 2   career, if I had it 15 times maybe, it was a
 3   lot.
 4      Q.  And in Paragraph 17, where you're
 5   talking about your goals.  "If I failed to meet
 6   these goals, I could be subject to disciplinary
 7   action."
 8          Did you ever fail to meet the goals?
 9      A.  No.
10      Q.  Were you ever subjected to
11   disciplinary action?
12      A.  No.
13      Q.  And how do you know that your
14   supervisor -- strike that.
15          How do you know that each supervisor
16   was given a separate pool of money for raises
17   at the end of each year?
18      A.  And again, just let me just clarify
19   it.  When I say pool of money, it was either
20   percentages or mon -- percentage of monies that
21   he could award to people in his team, and I was
22   -- I was told that that was -- that was part of
23   the, you know, performance goals and -- and --
24   and your raise.  You were notified that you got
25   a raise by your supervisor.
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 48 of 53 PageID
#: 5504
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                        163

1                        L. PIA

2        Q.  And who told you that?

3        A.  Gerry Cassagne.

4        Q.  Did you know any investigators on

5   Gerry's team who did not get a raise each year?

6        A.  Yes.

7        Q.  Who were those investigators?

8        A.  There was a female that was -- I -- I

9   -- I don't -- I don't remember her name.  She

10  was fairly new.  She -- she came from auto

11  damage and she came into SIU, and -- but prior

12  to retiring, Gerry told me that he -- he fought

13  for her, he wanted to give her a raise, and

14  management said she didn't conform to the goals

15  and that she wasn't getting a raise.

16       Q.  You don't recall her name?

17       A.  No.  If I think of it during the

18  course of this proceeding, I'll let you know,

19  but I -- I -- I don't -- I don't think.

20       Q.  Did you always get a raise each year?

21       A.  Yes.

22       Q.  So in Paragraph 17, you also say:  "I

23  recall one special investigator, Stevie Banks,

24  was put on a coaching plan because he regularly

25  ended his workday around 4:30 p.m., instead of



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 49 of 53 PageID #: 5505

LOUIS PIA  Contains Highly Conf. Testimony                August 13, 2024
Keith Fischer, et al. vs GEICO                                        186

                          L. PIA

2  probably working over 70 hours a week, and

3  that's what I would call extensive.  And the

4  case load was extensive, also.

5      Q.  And were you receiving overtime pay

6  for any time period during the COVID era?

7      A.  I don't know if that overtime that we

8  spoke about earlier, where we were given

9  unrelated cases for overtime.  I don't know if

10  that incurred during the COVID time, but other

11  than that, I received no overtime pay for my

12  cases that were directly assigned to me.

13      Q.  And did you keep records of the hours

14  that you worked during that period, but did not

15  record in GEICO's system anywhere else?

16      A.  No.

17      Q.  The second sentence in Paragraph 39,

18  you say:  "In full workweeks, for example,

19  weeks in which Pia worked at least five days

20  without days lost due to holidays or other time

21  off, these assignments required him to work

22  approximately 55 hours per week."

23          So is it your testimony in your claim

24  that you worked approximately 55 hours per week

25  each week during the period from December 2016



LOUIS PIA  Contains Highly Conf. Testimony                 August 13, 2024
Keith Fischer, et al. vs GEICO                                          190

```
 1                        L. PIA

 2              How -- or strike that.

 3              Specifically, where are you getting

 4    that 65 hours-per-week number from?

 5         A.  Well, due to the increased case load,

 6    and the fact that I -- I -- I knew what I was

 7    approximately working prior to the increased

 8    case load.  And I recall on specific occasions

 9    working into the -- not the wee hours of the

10    morning, but, you know, the -- the middle hours

11    of the evening and -- and at times, getting up

12    on the weekends.  If I had something to do with

13    my kids, I would get up earlier than -- than

14    everyone else and type a couple of hours, come

15    back from what I did, you know, jump on the

16    computer.  There was no -- no day off.  I was

17    working the weekends, and I was working before

18    -- you know, pre-COVID, before going out and --

19    and during the -- the evening hours after

20    dinner.

21         Q.  Did you like your job at GEICO?

22         A.  There was a period of time that I --

23    that I loved my job at GEICO.  I love doing

24    investigation.

25         Q.  Do you have any records or
```



```
1                      L. PIA
2   documentation to show that you specifically
3   worked 65 hours per week in April 2020?
4        A.  Not -- I don't have any specific
5   hours, but I think that was the month that I
6   was assigned 70 cases.  So if you look at the
7   results of those 70 cases, and that no cases
8   turned red, as somebody with experience in
9   assigning and approving cases, if that
10  individual thought that those 70 cases could be
11  done within 38.75 times four, then they're
12  sadly mistaken.
13       Q.  So is the answer that you do not have
14  any specific records or documentation --
15       A.  No.
16       Q.  -- confirming those hours worked?
17           Paragraph 43, same page.  "Plaintiff
18  Pia recalls attending team meetings with other
19  special investigators and their supervisor.  At
20  these meetings, special investigators asked if
21  there would be any overtime pay available to
22  them because of the long hours they were
23  working, and unreasonable number of cases they
24  had, but GEICO denied their request to
25  authorize overtime pay."
```



Case 2:23-cv-02848-SJB-ST   Document 138-21   Filed 10/10/25   Page 52 of 53 PageID #: 5508

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                            226

1            L. PIA

2        MR. SLOTNICK:  Thank you.  All

3    right.

4        THE VIDEOGRAPHER:  This -- this

5    concludes the video deposition of Louis

6    Pia.  The time is approximately 15:24,

7    end of Media 7.  We are off the record.

8    Thank you, everyone.

9        THE REPORTER:  Mr. Scimone, would

10   you like to purchase a copy of this

11   transcript?

12       MR. SCIMONE:  Yeah.  We're going to

13   do a three-day.  Let's do three days.

14       THE REPORTER:  You want it in three

15   days.  Okay.  Thank you.

16       (Thereupon, the examination was

17   concluded at 3:24 p.m.)

18

19

20

21

22

23

24

25



Case 2:23-cv-02848-SJB-ST    Document 138-21    Filed 10/10/25    Page 53 of 53 PageID #: 5509

LOUIS PIA  Contains Highly Conf. Testimony                     August 13, 2024
Keith Fischer, et al. vs GEICO                                            227

```
1                           L. PIA

2                   C E R T I F I C A T E

3

4    STATE OF NEW YORK   )

5                               :SS

6    COUNTY OF NEW YORK  )

7

8        I, TIFFANIE JONES, a Notary Public within

9    and for the State of New York, do hereby

10   certify:

11       That the witness whose examination is

12   hereinbefore set forth was duly sworn and that

13   such an examination is a true record of the

14   testimony given by such a witness.

15       I further certify that I am not related to

16   any of these parties to this action by blood or

17   marriage, and that I am not in any way

18   interested in the outcome of this matter.

19       IN WITNESS WHEREOF, I have hereunto set my

20   hand this 13th day of August, 2024.

21

22

23

24   _____

25        TIFFANIE JONES
```

