# Exhibit 21

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK
     ------------------------------------X
3    KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
4    BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
5    of all others similarly situated,

6              Plaintiffs,

7                              Case No.:
                               2:23 Civ. 2848
8                              (GRB)(ARL)
          -against-
9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY d/b/a GEICO,

11             Defendants.
     ------------------------------------X
12

13

14
     DEPOSITION OF
15

16             DANIEL JOSEPH KING

17
          Tuesday, January 7th, 2025
18
          Garden City, Long Island, New York
19

20

21   Reported By:

22
     Marina Dubson
23

24   Job #: J12200285

25



DANIEL J. KING                                      January 07, 2025
Fischer v Government Employees Ins.                              2

1

2

3

4
                    DATE: January 7th, 2025
5
                    TIME: 10:00 a.m.
6

7

8          DEPOSITION of DANIEL JOSEPH KING, an

9   opt-in Plaintiff herein, taken by the

10  Defendant, pursuant to Federal Rules of

11  Civil Procedure, and Notice, held at

12  Esquire Deposition Solutions, 1225 Franklin

13  Avenue, Suite 325, Garden City, New York

14  11530, at the above-mentioned date and

15  time, before MARINA DUBSON, a Notary Public

16  of the State of New York.

17

18

19

20

21

22

23

24

25



1  APPEARANCES:

2

3  OUTTEN & GOLDEN, LLP
   Attorney for Plaintiffs
4  685 Third Avenue, 25th Floor,
   New York, New York 10017
5  (212) 245-1000
   BY: SABINE JEAN, ESQ.
6      Sjean@outtengolden.com

7      JARRON MCALLISTER, ESQ.
       Jmcallister@outtengolden.com

8

9

10 DUANE MORRIS, LLP
   Attorney for Defendant
11 1540 Broadway, 14th Floor,
   New York, New York 10036
12 (212)471-1856
   BY: GREG SLOTNICK, ESQ.
13 Gsslotnick@duanemorris.com

14

15
   Sam Shereck, Shereck Video, videographer
16 Sshereck1@gmail.com

17

18

19

20

21

22

23

24

25



1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25



1                D. King

2         THE REPORTER:  Please confirm

3    your orders?

4         MR. SLOTNICK: 5-day expedite

5    final.

6         MS. JEAN:  Copy, regular

7    turnaround.

8                XXXX

9         THE VIDEOGRAPHER:  We're on the

10   record.  The time is 10:10 a.m.

11   Today's date is Tuesday, January 7,

12   2025.  This is the video deposition

13   of Daniel King in the matter of

14   Fischer et al. v. Government

15   Employees Insurance Company d/b/a

16   GEICO, case number 23CIV2848 in the

17   United States District Court for the

18   Eastern District of New York.

19         My name is Sam Shereck, legal

20   videographer with Shereck Video in

21   association with Esquire.  Today, we

22   are at the offices of Esquire located

23   at 1225 Franklin Avenue, Garden City,

24   New York.  Will counsels please voice

25   identify yourselves and state who you



```
 1                        D. King

 2            represent?

 3                   MS. JEAN:  Good morning.  This

 4            is Sabine Jean for plaintiffs.  I'm

 5            Sabine Jean of Outten & Golden, and

 6            with me is my colleague,

 7            Jarron McAllister.

 8                   MR. SLOTNICK:  Good morning.

 9            My name is Greg Slotnick.  I am from

10            the law firm of Duane Morris, LLP,

11            representing defendant GEICO in this

12            case.

13                   THE VIDEOGRAPHER:  And the

14            court reporter is Marina Dubson with

15            Esquire.  Please swear in the

16            witness.

17                   (Whereupon, the witness was

18            sworn in by the Court Reporter.)

19     EXAMINATION

20     BY MR. SLOTNICK:

21            Q.    Good morning, Mr. King.

22            A.    Good morning.

23            Q.    Could you please state and

24     spell your name for the record?

25            A.    Sure.  Daniel King, K-I-N-G.
```



```
 1                    D. King
 2       Q.    And how long were you there
 3   for?
 4       A.    Six months.
 5       Q.    What was your next position?
 6       A.    I worked for a private security
 7   firm.
 8       Q.    What was the name of the firm?
 9       A.    Elite Security.
10       Q.    And what were your job
11   responsibilities there?
12       A.    Did corporate security for the
13   Golden Globes, Waldorf Astoria events, the
14   Plaza, stuff at -- I can't think of the
15   name of the place.  Right near Times
16   Square.  Now, it's changed so many times, I
17   forget.  It was a small venue there.  I
18   used to do a lot of different things for
19   ABC and CNN.
20       Q.    How long were you in that
21   position for?
22       A.    Up until I got hired for GEICO.
23       Q.    And when were you hired for
24   GEICO?
25       A.    August 2005.
```



```
1                          D. King
2         Q.    And what role were you hired
3    into at GEICO?
4         A.    As an investigator.
5         Q.    And was that the only role that
6    you held at GEICO?
7         A.    Yes.  I was first hired as a
8    medical fraud investigator, and then after
9    several years, I switched over to the
10   auto -- auto fraud investigator.
11        Q.    Did you switch over
12   voluntarily?
13        A.    No.
14        Q.    How did it come about that you
15   made that switch?
16        A.    They needed people.  Just -- it
17   was a management decision.
18        Q.    And just to jump back to -- you
19   said you started as a medical fraud
20   investigator?
21        A.    Yes.
22        Q.    Can you describe what your job
23   duties were in that role?
24        A.    Yeah, it was investigating
25   people who were in car accidents.  And then
```



DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
43

```
1                    D. King

2      after the accident, they were treating at

3      certain medical facilities that maybe

4      popped up as being unscrupulous.

5      ████████████████████████████████

6      ██████████████████████████████████

7      ████████████████████████████████████

8      ████████████████████████████  A lot of

9      EUOs were conducted.  Clinic inspections,

10     ████████████████████████████████████

11     ██████████████████████████

12     ████████████████████████████████████

13          Q.    And was that role located in

14     New York?

15          A.    Yes.

16          Q.    Was it a field-based role or a

17     desk-based role?

18          A.    It was field based.  Sorry.

19          Q.    Did you have a GEICO company

20     car?

21          A.    Yes, I did.

22          Q.    And how long were you in the

23     medical fraud investigator role for?

24          A.    About eight years, I would

25     think.  I am guessing.  Well, I -- I
```



```
 1                    D. King

 2   assume.

 3        Q.    So, from approximately 2005 to

 4   2013, somewhere in that range?

 5        A.    Yes.

 6        Q.    And you mentioned that you then

 7   worked as an auto fraud investigator?

 8        A.    Correct.

 9        Q.    And what were your job

10   responsibilities in that role?

11        A.    In that, it went from car theft

12   to hit-and-runs to, as well, what they call

13   jump-ins.  People who claim to be in a car

14   accident but were never in the car or bus

15   or something.  Motor vehicle, parking

16   losses, flood damage.

17        Q.    Okay.  And what years were you

18   in that role for?

19        A.    I was there from, I think you

20   had said 2013 till I left, since I retired.

21        Q.    And did GEICO have different

22   regions to which employees reported?

23        A.    Yes, but it changed at times.

24        Q.    Do you recall how it changed

25   over time?
```



```
 1                     D. King
 2        A.    Yes.
 3        Q.    And you had mentioned
 4   Rich Kilgen --
 5        A.    Yes.
 6        Q.    -- was a prior supervisor from
 7   approximately 2005 until -- what year was
 8   that?
 9        A.    Probably '5 till about 2010.
10        Q.    And who was your next
11   supervisor?
12        A.    I got bounced.  They shuffled
13   people around quickly for a little while.
14   It was Kevin Monahan.  Kevin Monahan.
15        Q.    And do you recall what years
16   Kevin Monahan was your supervisor?
17        A.    Only about a year or two.  2010
18   to 2012 roughly.
19        Q.    And during that time, did your
20   role change or it was simply your
21   supervisor that was changing?
22        A.    My role was the same at that
23   point.
24        Q.    And who became your supervisor
25   after Kevin?
```



```
 1                    D. King
 2        A.    Toni D'Agata.
 3        Q.    And how long was Toni D'Agata
 4   your supervisor for?
 5        A.    Let me try to do some math in
 6   my head real quick.  Probably like 2013
 7   to -- I mean, yeah, 2013 to about, I guess,
 8   2017.
 9        Q.    And again, did your role change
10   during that time, or it was just your
11   supervisor that changed?
12        A.    In the middle of that session
13   with Toni D'Agata, my role did change.
14        Q.    And how did it change?
15        A.    I went from doing medical cases
16   to doing auto fraud cases.
17        Q.    Do you recall when that change
18   occurred?
19        A.    No, I do not.
20        Q.    And you mentioned previously
21   that that was not a voluntary change; is
22   that correct?
23        A.    That is correct.
24        Q.    Do you recall why you were
25   placed on the auto fraud team?
```



```
 1                         D. King
 2         A.    Needs of the department.
 3         Q.    Is that something someone told
 4   you, or is that your understanding?
 5         A.    That's what I was told when I
 6   questioned.
 7         Q.    And who told you that?
 8         A.    Toni D'Agata.
 9         Q.    Did she say anything else or
10   was that all she said?
11         A.    I don't recall.
12         Q.    And Toni D'Agata was your
13   supervisor until 2017, correct?
14         A.    To the best of my knowledge,
15   yes.
16         Q.    And who was your subsequent
17   supervisor after Toni?
18         A.    Dara Campbell.
19         Q.    And how long was Dara Campbell
20   your supervisor for?
21         A.    Up until I retired.
22         Q.    So, from approximately 2017
23   till 2022?
24         A.    Yes.
25         Q.    Do you know if Dara Campbell
```



```
 1                    D. King
 2   of.
 3        Q.    And from the period of 2016
 4   until the end of your GEICO employment in
 5   2022, did you have a set schedule?
 6        A.    Yes.
 7        Q.    Do you recall what your set
 8   schedule was?
 9        A.    Monday through Friday, 8:00
10   a.m. to, I think it was like 4:30, I
11   believe.
12        Q.    Did that ever change during
13   that time?
14        A.    No.
15        Q.    Did you need to have that
16   schedule approved by your supervisor or is
17   it something that you set by yourself?
18        A.    That was something that we were
19   told, that that's our hours.
20        Q.    And that's something that
21   Dara Campbell told you?
22        A.    I think it was -- it was from
23   the -- from the upper echelons, the upper
24   bosses, like Mike DeGrocco.  I think that
25   was his name.  He was a manager.
```



 1                          D. King

 2          Q.    Did you ever work with anyone

 3    outside of the Woodbury office?

 4          A.    No.

 5          Q.    And how many approximately --

 6    at a given point in time from 2016 to 2022,

 7    approximately how many cases did you have

 8    at a time?

 9          A.    It was probably about a week --

10    I'm just trying -- I'm sorry -- just trying

11    to think.  It probably started out lower,

12    probably like 25 cases a month.  And as

13    time went on, later, it went up to -- it

14    was like close to 40 cases a month or more.

15          Q.    And how long did it take you to

16    investigate a typical case that you had?

17          A.    It depended.

18          Q.    What did it depend on?

19          A.    It depended on finding -- doing

20    background checks and finding the right

21    information, able to schedule interviews

22    with certain individuals that needed to be

23    spoken to, how long it would take to

24    schedule and complete an EUO.

25          Q.    Is there any other factors?



```
 1                        D. King
 2    time that you would wait before
 3    determining --
 4         A.    Yes.
 5         Q.    -- it was a no-show?
 6         A.    Yes.  I believe it was -- I
 7    don't know -- I don't recall the exact
 8    time, but it was under an hour.
 9         Q.    And while you were waiting for
10    the individual to show up for their EUO,
11    how did you spend that time waiting?
12         A.    Looking over other cases.  I
13    may have a conversation with the other
14    attorney, having a conversation with the
15    court reporter.
16         Q.    Did you bring your laptop with
17    you on those occasions?
18         A.    No, I did not.
19         Q.    And were you ever part of a
20    specialty team of investigators at GEICO?
21         A.    No, I was not.
22         Q.    Were there specialty teams
23    investigators at GEICO while you worked
24    there?
25         A.    I'm not sure if you would call
```



DANIEL J. KING                                                January 07, 2025
Fischer v Government Employees Ins.                                          83

```
 1                     D. King
 2   because I was going out sick, long-term
 3   sick.  So, I looked it up for that, too.
 4        Q.    If you could turn to the page
 5   that's marked G000039 on the bottom right.
 6        A.    Okay.
 7        Q.    And in the paragraph that
 8   starts, all nonexempt associates, right in
 9   the middle of the page, do you see that
10   paragraph?
11        A.    Yes.
12        Q.    And it says, all nonexempt
13   associates are required to accurately
14   record their hours worked and absences
15   taken.  All exempt associates are required
16   to accurately record their absences taken.
17   A nonexempt associate who feels he or she
18   did not receive pay for all his/her hours
19   worked and an exempt or salaried nonexempt
20   associate who feels his/her pay incorrectly
21   reflects a deduction for an absence should
22   contact his/her supervisor, local human
23   resources manager or corporate human
24   resources.
25            Did I read that paragraph
```



```
 1                        D. King
 2    correctly?
 3         A.    Yes, you did.
 4         Q.    Do you recall getting training
 5    on this policy?
 6         A.    No, I do not.
 7         Q.    Do you understand that this
 8    policy was applicable to your employment at
 9    GEICO?
10         A.    Yes.
11         Q.    Do you understand from this
12    policy GEICO required you to accurately
13    record all of your hours worked?
14         A.    From reading this, yes.
15         Q.    Okay.  And on the same page, if
16    you look under the -- the bold that says
17    hourly nonexempt associates.
18         A.    Yes.
19         Q.    It says, an hourly nonexempt
20    associate is paid overtime pay, time and
21    one half the hourly rate of pay for all
22    hours actually worked in excess of 40 in
23    the workweek.
24              Did I read it correctly?
25         A.    Yes, you did.
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                                    85

```
1                         D. King
2        Q.    Did you get training on this
3   policy?
4        A.    I may have gotten this when I
5   was first employed, yes.
6        Q.    Do you recall any subsequent
7   training after you were first hired there?
8        A.    No.
9        Q.    Did you understand this policy
10  to be applicable to your employment at
11  GEICO?
12       A.    I don't recall.
13       Q.    Do you understand from this
14  policy that GEICO's policy was to pay
15  overtime at time and a half of all hours
16  actually worked in excess of 40 in the
17  workweek?
18       A.    Yes.
19       Q.    Did you understand yourself to
20  be a nonexempt associate at GEICO?
21       A.    Yes.
22       Q.    And did you understand from
23  this policy that working off the clock was
24  not allowed at GEICO?
25             MS. JEAN:  Objection.
```



```
1                       D. King
2    you mean by that?
3         A.    Personal injury protection.
4         Q.    Are those -- strike that.
5               Is that a specific type of
6    case?
7         A.    Yes.
8         Q.    Were there specific
9    investigators who only investigated PIP
10   cases?
11        A.    No.  Not -- I am not 100
12   percent sure.
13        Q.    Did you ever have any PIP
14   cases?
15        A.    Yes.
16        Q.    And if we look back at the
17   policy, it talks about if a nonexempt
18   associates feels his/her pay incorrectly
19   reflects a deduction for an absence, or
20   feels he or she did not receive pay for all
21   his/her hours worked, they should contact
22   their supervisor, local human resources
23   manager or corporate human resources.
24              Did you ever make any such
25   contact with human resources regarding any
```



                           D. King

2   complaints at GEICO?

3        A.    No, I did not.

4        Q.    Did you ever make any

5   complaints to human resources or corporate

6   human resources at GEICO about anything

7   during your employment?

8        A.    The only time I dealt with

9   human resources is when I was going out

10   sick and when I was resigning.

11        Q.    And on those occasions, were

12   you contacting local human resources or

13   corporate human resources?

14        A.    Local.

15        Q.    Do you know what the difference

16   is between those two?

17        A.    I do not.

18        Q.    And when you say local, are you

19   referring to Woodbury?

20        A.    Correct.

21        Q.    Okay.  So, the Woodbury office

22   had its own human resources department?

23        A.    Yes, it did.

24        Q.    Do you know if each of GEICO's

25   offices had its own human resources



DANIEL J. KING                                              January 07, 2025
Fischer v Government Employees Ins.                                       97

```
 1                      D. King
 2        Q.    Do you recall whether your
 3   submitted time was always approved?
 4        A.    That I recall, yes.
 5        Q.    Did you have any issues with
 6   respect to time that you submitted that was
 7   not correctly paid?
 8        A.    Not that I recall.
 9        Q.    And do you recall the name of
10   the app that you used to submit your time?
11        A.    I don't.
12        Q.    Was it potentially called
13   Workday?
14        A.    Yes.
15        Q.    Do you remember if you used
16   Workday as the only app to submit your time
17   online or was there previously another
18   application?
19        A.    I don't recall.
20        Q.    Did you certify the accuracy of
21   the time that you recorded when you
22   submitted it?
23        A.    I don't understand what you
24   mean by that.
25        Q.    Were you required to confirm
```



```
 1                         D. King
 2      that the time entry you were submitting was
 3      accurate when --
 4           A.    I believe so.
 5           Q.    Did you always have to do that
 6      before you submitted your time?
 7           A.    Yes.
 8                 (Defendant's Exhibit 4,
 9            Declaration of Daniel King, was
10            marked for identification as of this
11            date by the Reporter.)
12      BY MR. SLOTNICK:
13           Q.    Mr. King, you've been handed
14      what's been marked Defendant's Exhibit 4.
15                 Have you seen this document
16      before?
17           A.    Yes.
18           Q.    And did you help prepare this
19      document?
20           A.    I'd have to look it over and
21      see if there's anything from me on this.
22           Q.    Yeah.  Please take a minute to
23      review it.  I should have said that at the
24      outset.
25           A.    Yes, I did.
```



```
 1                    D. King
 2         with me.
 3   BY MR. SLOTNICK:
 4         Q.    I am just asking if you recall
 5   off the top of your head.
 6         A.    I don't recall.
 7         Q.    Did anyone at GEICO tell you
 8   that you were being reclassified because of
 9   the Calderon and Vetter settlements?
10         A.    I don't recall.
11         Q.    So, what is the basis of your
12   claim for this statement in paragraph six,
13   that following the settlements, they
14   reclassified you from overtime exempt to
15   nonexempt?
16         A.    I didn't know if somebody was
17   jumping in.
18              That I am not entitled to
19   overtime.
20         Q.    And if you look at paragraph
21   eight on page two, same page.
22         A.    Uh-huh.
23         Q.    So, you say, I only entered
24   7.75 hours per day regardless of how many
25   hours I actually worked.  I did not enter
```



                        D. King
 1
 2    more hours into the timekeeping system as
 3    my supervisor said doing so would
 4    negatively affect my rating, giving me a
 5    poor evaluation and negatively affecting my
 6    potential for an annual pay increase?
 7          A.    Yes.
 8          Q.    And which supervisor are you
 9    referring to here?
10          A.    Dara Campbell.
11          Q.    And where did that conversation
12    take place?
13          A.    On the phone.
14          Q.    Do you remember when it took
15    place?
16          A.    No, I do not.
17          Q.    Did that conversation take
18    place one time or more than once?
19          A.    There may have been another
20    version of the same conversation.
21          Q.    And what do you mean by another
22    version?
23          A.    I requested to get transferred
24    to the -- back to the medical team.
25          Q.    And who did you request that



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                            116

```
 1                    D. King
 2    paid for that extra time after dinner,
 3    correct?
 4         A.    She didn't just say me.  She
 5    said they're not going to pay you guys
 6    after that, you know.  They're not going to
 7    pay more than 7.75.
 8         Q.    And what exactly did she say to
 9    you about that?
10         A.    I can't give you a quote.  I
11    can't.  I don't --
12         Q.    Was that one conversation or
13    was that a number of conversations about
14    that topic specifically?
15         A.    I've probably had several
16    conversations about that.  Not so much as
17    far as overtime, it was more about how many
18    hours working just to get the job done --
19              (Clarified by the Court
20          Reporter.)
21         A.    It would take to complete the
22    job, how many extra hours a day.
23         Q.    Did Dara Campbell ever
24    encourage you to work extra hours off the
25    clock?
```



DANIEL J. KING                                           January 07, 2025
Fischer v Government Employees Ins.                            117

```
 1                        D. King

 2        A.    No.

 3        Q.    Did she ever suggest you work

 4   extra hours off the clock?

 5        A.    Not to my recollection.

 6        Q.    And you had also mentioned

 7   Bill Newport, SIU manager, correct?

 8        A.    Correct.

 9        Q.    Can you describe what he told

10   you about working those extra hours?

11        A.    He never told me anything

12   specifically.  I didn't really have many

13   conversations with him.  I -- I don't think

14   I have ever had a one-on-one with him.

15        Q.    Have you ever met Bill Newport?

16        A.    Yes.

17        Q.    Did you meet him in person?

18        A.    Yes.

19        Q.    So, who was Bill Newport

20   talking to when you learned of this?

21        A.    The -- the supervisors.  I'm

22   sorry.  The supervisors.

23        Q.    So, this is -- strike that.

24              Are you saying that this is

25   something Dara said that Bill said?
```



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                         128

```
 1                    D. King
 2    couple of months at the beginning of COVID.
 3    I wasn't talking to anybody.  I was out
 4    three or four months.  Probably not until
 5    more after we started going on and doing --
 6    doing face-to-faces again.
 7         Q.    And do you recall the time
 8    period that you were out of work at GEICO?
 9         A.    I went out, had surgery in
10    February of 2020, and probably came back
11    about August of 2020, July or August of
12    2020.
13         Q.    Did you work for GEICO at all
14    during that time?
15         A.    No.
16         Q.    From March 2020 on, did you
17    ever submit more than 38.75 hours per week
18    into your timekeeping program?
19         A.    No.
20         Q.    Did you ever make a request for
21    overtime from your supervisor after
22    March 2020?
23         A.    No.
24         Q.    Were you ever asked
25    specifically to work overtime after
```



1                    D. King

2     March 2020?

3          A.    No.

4          Q.    Were you offered any available

5     overtime after March 2020?

6          A.    No.

7          Q.    And on those occasions -- I

8     don't want to misstate your testimony --

9     so, you talked about the social media

10    overtime offer?

11         A.    Yes.

12         Q.    And the Superstorm Sandy

13    overtime offer.

14               On both of those occasions, was

15    working overtime entirely voluntary?

16         A.    Yes.

17         Q.    Did you have to notify your

18    supervisor before you worked that overtime

19    in the social media cases?

20         A.    Yes, because they would have to

21    be assigned to you.

22         Q.    And apologies if you already

23    testified to this.

24               Was your supervisor at that

25    point Toni D'Agata or was that



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                          137

```
 1                   D. King
 2    show proof of when -- when my cases were
 3    submitted, at what time.
 4         Q.    When you say your calendar
 5    book, are those the documents that we
 6    talked about earlier that you produced in
 7    this case?
 8         A.    Yes.
 9         Q.    In paragraph 12 on the same
10    page at the bottom, it -- you say, GEICO
11    required me to seek approval from my
12    supervisor to submit any hours worked above
13    38.75?
14         A.    Correct.
15         Q.    Did a supervisor tell you that?
16         A.    Well, that's what you had to
17    do.  You had to submit your -- your
18    timesheet, and if there was anything over
19    that, you -- you know, technically, I guess
20    you were supposed to say if you were going
21    to get paid, but they were not paying you
22    for it.
23         Q.    Did you ever actually submit
24    over that amount, though?
25         A.    No.
```



DANIEL J. KING                                              January 07, 2025
Fischer v Government Employees Ins.                                      144

```
 1                      D. King

 2        A.    Yes.

 3        Q.    Did that ever fluctuate during

 4   that time period?

 5        A.    I'm sure at points, it did.

 6   Maybe I've gotten four.  But --

 7        Q.    And when you returned to work

 8   but before you were able to go back into

 9   the field, were you able to take breaks

10   during the day and make up that time later

11   in the day if you wanted to?

12        A.    I'm sorry.  Rephrase that.

13        Q.    Sure.  Were you able to --

14   strike that.

15             Did you still have your set

16   work schedule, like for 8:00 a.m. to 4:00

17   p.m.?

18        A.    To 4:30.

19        Q.    8 to 4:30?

20        A.    Yes.

21        Q.    And were those the hours that

22   you regularly worked when you were at home

23   or were -- did you have more flexibility in

24   terms of --

25        A.    No.  That was when we had -- at
```



```
 1                    D. King
 2   8:00, we were logged on to our computers.
 3       Q.    And was that a GEICO-issued
 4   computer?
 5       A.    Yes, it is.
 6       Q.    Did you tell anyone that GEICO
 7   increased your caseload significantly after
 8   March 2020?
 9       A.    I think I answered that.
10       Q.    What was your answer?
11       A.    Yes.
12       Q.    Do you know whether you were
13   eligible for overtime from 2016 to 2022?
14       A.    I was only eligible from that
15   time I had spoke to you about with the
16   social media cases.
17       Q.    But if you had worked over --
18   strike that.
19            If you worked over 40 hours,
20   wasn't GEICO's policy to pay you time and a
21   half for that time?
22            MS. JEAN:  Objection.
23            THE WITNESS:  What it says in
24        writing.  But what they actually did,
25        they didn't pay us.  And we were
```



DANIEL J. KING                                                January 07, 2025
Fischer v Government Employees Ins.                                        162

```
 1                      D. King

 2        A.    What do you mean by -- you mean

 3    talent-wise or --

 4        Q.    Different -- different teams of

 5    individual investigators investigating

 6    different types of cases.  What -- like you

 7    mentioned those two types.

 8              Were there other types of

 9    cases?

10        A.    Like I said, there was staged

11    loss.  You have that one?  You had the body

12    shop fraud.  It was some involving tow

13    companies.  Did I say theft?

14        Q.    Yes.

15        A.    Okay.  So, theft, body shop,

16    stage loss.  Basically about those three, I

17    think.  Three, maybe four.  The body -- the

18    tow one may be -- may have been tied in

19    with the body shops.

20        Q.    And did you work each of those

21    types of cases at any point in GEICO?

22        A.    I did staged loss.  None --

23    none of these on a regular basis.  They

24    would just become assigned to me.  Theft.

25    I -- I didn't do anything with the body
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                              163

```
 1                    D. King
 2   shop.
 3        Q.    Do you know if any of those
 4   types of cases were more common than others
 5   just in terms of frequency or volume?
 6        A.    I'm not sure.  I don't know.
 7        Q.    Do you know if any other
 8   investigators were able to use flex time as
 9   part of their weekly work schedule?
10        A.    I can only answer for myself.
11        Q.    So, is the answer no?
12        A.    Correct.  No.
13        Q.    Do you know if any other SIU
14   investigators in New York actually worked
15   overtime?
16        A.    Other than what I spoke
17   earlier, no, I don't know.
18        Q.    Did you ever personally see any
19   other SIU investigators performing their
20   work outside of the EUO meet-ups?
21        A.    Very rarely, when I did EDIs --
22   EDRs -- sorry -- electronic data recording.
23        Q.    What's an EDR?
24        A.    It's basically a little black
25   box in a vehicle.  It tells information,
```



D. King

2    Q.    Was there any discussion of
3  your workload in that ride-along?
4    A.    No. No.  Just -- really, he had
5  just started, so --
6    Q.    Do you recall when that was?
7    A.    No, I don't recall.  Before
8  COVID.
9    Q.    And that was the only
10  ride-along with Bill that you remember?
11    A.    That's the only one that I did
12  have, yes.
13    Q.    Was there any discussion of
14  your hours worked with Bill during that
15  ride-along?
16    A.    No.
17    Q.    Did you ever have ride-alongs
18  with any of your supervisors?
19    A.    In the earlier days.
20    Q.    But from 2016 to 2022, do you
21  remember having any?
22    A.    Maybe once or twice.
23    Q.    Do you remember if that was
24  with Dara Campbell?
25    A.    It might have been Dara or



DANIEL J. KING                                                    January 07, 2025
Fischer v Government Employees Ins.                                            191

1                         D. King

2          was marked for identification as of

3          this date by the Reporter.)

4    BY MR. SLOTNICK:

5          Q.    Mr. King, you've been marked

6    what's -- sorry -- handed what's been

7    marked Exhibit 7.

8                Have you seen this document

9    before?

10         A.    I don't recall.  It's an e-mail

11   from 2017 I had sent to Toni D'Agata.

12         Q.    Do you recall if Toni D'Agata

13   was your supervisor at this time?

14         A.    If it's going to her, either

15   that, either yes, she was, or -- or she was

16   filling in for another supervisor.

17         Q.    Do you remember why you sent

18   this e-mail to Toni D'Agata?

19         A.    It had to do with three cases.

20   They might have been social media cases,

21   but I -- just looking at those case

22   numbers, I have no idea.

23         Q.    Do you know if this was a

24   request for overtime to Toni D'Agata?

25         A.    It looks like it was, yes.



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                          192

```
 1                    D. King
 2       Q.    Do you know if you were paid
 3   overtime in response to this request?
 4       A.    If -- if this was authorized
 5   overtime sanctioned by GEICO, then yes, I
 6   was paid just like the other ones I was.
 7       Q.    So, your testimony is this
 8   would only be part of a designated overtime
 9   drive; is that correct?
10             MS. JEAN:  Objection.
11             You can answer.
12             THE WITNESS:  Yes.  Yeah.  If
13         it was, it wouldn't be us.  It
14         wouldn't be self-generated by me.
15   BY MR. SLOTNICK:
16       Q.    What do you mean by
17   self-generated?
18       A.    It's not something that I would
19   just take three of my cases here that you
20   have listed, work them an hour -- an extra
21   hour each and then submit it without
22   preauthorization.
23       Q.    Do you know what, if anything,
24   Toni did with respect to your request for
25   overtime in -- in this case?
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                              193

```
 1                      D. King

 2      A.    I don't recall.

 3            (Defendant's Exhibit 8, e-mail,

 4       was marked for identification as of

 5       this date by the Reporter.)

 6  BY MR. SLOTNICK:

 7      Q.    Mr. King, you've been handed

 8  what's been marked Defendant's Exhibit 8.

 9            Do you recognize this document?

10      A.    It's an e-mail that I sent to,

11  again, Toni D'Agata.  I assume she was my

12  supervisor at the time for four hours of

13  overtime.

14      Q.    And do you recall whether these

15  overtime hours were requested as part of a

16  designated pre-approved overtime drive?

17      A.    Due -- due to the time that

18  this has passed, seven years ago, I don't

19  recall.

20      Q.    And that's -- this e-mail is

21  reflected as having been sent on May 15,

22  2018, correct?

23      A.    '18 at 12:41 a.m.

24      Q.    Right.  And do you recall what,

25  if anything, Toni did with this e-mail
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                              194

```
 1                      D. King
 2    request for overtime?
 3          A.    I -- I can only make
 4    assumptions.
 5          Q.    Do you know if you received
 6    overtime pay in response to this e-mail?
 7          A.    I believe I did on these.
 8                (Defendant's Exhibit 9, e-mail,
 9           was marked for identification as of
10           this date by the Reporter.)
11    BY MR. SLOTNICK:
12          Q.    Mr. King, you've been handed
13    what's been marked Defendant's Exhibit 9
14    Bates stamped G011750 on the bottom right.
15                Have you seen this document
16    before?
17          A.    Yes.
18          Q.    Do you recall sending these
19    e-mails to Dara Campbell on December 30th
20    and December 31, 2019?
21          A.    I don't.  I don't recall.  I --
22    I'm sure I did.  This is, you know, my
23    e-mail and stuff, but I don't have any
24    recollection of when I did it.
25          Q.    And in the e-mail, you say, all
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                              195

```
 1                         D. King
 2    bust but ate up most of my day.
 3              Can you just describe what you
 4    mean by that sentence?
 5         A.    All these cases.  Okay.  So, I
 6    had all these Examinations Under Oath
 7    scheduled for that day.  And all these
 8    cases were supposed to be -- were supposed
 9    to be Examinations Under Oath.
10              A bust means you put on the
11    record that the people never showed up.
12    So, I had to wait around a certain amount
13    of time for each case with -- with the
14    court reporter.
15         Q.    Okay.  So -- sorry.
16         A.    So, I guess on this case,
17    she -- because I was there all day and she
18    told me I could put in four hours overtime,
19    so I -- because I spelled out.  I said, all
20    busts ate up most of my day.
21              In other words, a day that I
22    couldn't be catching up with cases that I
23    needed to catch up on.  So, I said I'm
24    going to take four hours overtime to try
25    and -- to try and catch up on the other
```



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                          196

```
1                          D. King
2    cases.  And the other cases were at the
3    top, the update.
4         Q.    And do you recall if this
5    e-mail was sent in the context of a social
6    media pre-approved overtime drive?
7         A.    I am assuming it wasn't.  This
8    was -- this was on New Year's Eve.  Looks
9    like I was having a good time that day.
10        Q.    Do you know whether you
11   received overtime pay in response to this
12   request for overtime that you sent?
13        A.    I would assume I -- I did, four
14   hours overtime.  So, it appears to me that
15   once every year and a half, I am getting
16   three or four hours overtime a year.
17        Q.    Did you have any other
18   conversation with Dara on -- before you
19   sent this e-mail about taking four hours of
20   overtime to try to catch up?
21        A.    I wouldn't have done it
22   unless she -- she offered it, which is very
23   rare.  I notice this is also prior to
24   COVID.  Actually, they're all prior to
25   COVID.
```



```
 1                    D. King
 2              (Defendant's Exhibit 10,
 3         e-mail, was marked for identification
 4          as of this date by the Reporter.)
 5   BY MR. SLOTNICK:
 6        Q.    Mr. King, you've been handed
 7   what's been marked as Defendant's
 8   Exhibit 10.  The Bates number is G011931.
 9              Do you recall sending this
10   e-mail on January 21, 2020 to
11   Dara Campbell?
12        A.    Do I recall sending it?  No.
13   Did I send it?  It looks like I did.
14        Q.    And when you mentioned two bust
15   statements again, is that referring to
16   no-shows for EUOs?
17        A.    Correct.
18        Q.    And when you talk about a train
19   delay, do you know what you're referring to
20   there?
21        A.    Yes.  The train was delayed.
22        Q.    Was that a train that you were
23   taking or was that a train that the witness
24   was taking?
25        A.    It was a train I was taking
```



```
 1                     D. King
 2   going into One Penn Plaza from Long Island.
 3        Q.    Were there some days that you
 4   took the train into the city instead of
 5   driving into the city?
 6        A.    If I was going into Penn Plaza,
 7   yes, I would take a train.
 8        Q.    And Penn Plaza is in Manhattan,
 9   correct?
10        A.    Correct.
11        Q.    Going back to your EUOs, did
12   you decide where you were taking EUOs
13   physically?
14        A.    Usually try to make it
15   convenient for the -- for the person that
16   we're conducting the EUO on.  Some people
17   don't do it that way.  I always try to make
18   it more convenient for them so that they
19   would show up.  So, I chose -- they must
20   live in maybe Manhattan or somewhere, so it
21   made it easy right there at -- at Penn
22   station.
23        Q.    And when you say have five
24   cases to close tonight pulse assigned two
25   cases yesterday --
```



1                          D. King

2          A.    Plus.    Sorry.    I spoke that

3    wrong.

4          Q.    And when you say have five

5    cases to close tonight pulse assigned two

6    cases yesterday, is pulse supposed to say

7    plus?

8          A.    Yes.

9          Q.    So, it's just a typo?

10         A.    Correct.

11         Q.    And you say, and today that we

12   need to be updated to meet TIP?

13         A.    Yes.

14         Q.    And you also talk about having

15   two EUOs on Wednesday.

16                BX I am assuming means Bronx;

17   is that correct?

18         A.    Correct.

19         Q.    Slash Jamaica, an EUO on Friday

20   in the Bronx.

21                Do you remember if you in fact

22   took those EUOs?

23         A.    I don't recall right now.

24         Q.    Have you ever seen the e-mail

25   on the top in which Dara Campbell forwards



1                          D. King

2    your e-mail to Bill Newport and says

3    requesting overtime for Dan King for

4    tonight, see below and thanks?

5          A.    No, never seen that.

6          Q.    Do you know whether you were

7    paid overtime on this occasion?

8          A.    I would assume I -- I would

9    assume I was.

10          Q.    Do you know if this overtime

11    was part of a preapproved social media

12    drive?

13          A.    I -- no.  This one definitely

14    wasn't.  He's -- spells it right out on

15    there.

16          Q.    Did you ever steal, take or

17    misappropriate any money, property or

18    confidential information from GEICO?

19               MS. JEAN:  Objection.

20               THE WITNESS:  Was there any to

21        have, to be had?  No, I did not.

22    BY MR. SLOTNICK:

23          Q.    Did you ever lie to anyone at

24    GEICO about anything?

25               MS. JEAN:  Objection.



```
 1              D. King
 2         (Request noted.)
 3         MS. JEAN land then a request
 4    for metrics -- any metrics regarding
 5    performance evaluations that were not
 6    already produced in this case.
 7         (Request noted.)
 8         MS. JEAN:  As well as any
 9    documents reflecting time
10    expectations for case investigation
11    tasks.  And we'll follow up with this
12    in writing as well.
13         (Request noted.)
14         MR. SLOTNICK:  Got it.
15         MS. JEAN:  Nothing further.
16         (Page break to accommodate
17    jurat.)
18
19
20
21
22
23
24
25
```



DANIEL J. KING                                            January 07, 2025
Fischer v Government Employees Ins.                              221

```
 1                    D. King

 2             THE VIDEOGRAPHER:  Okay.  We're

 3        off the record at 3:54, and that

 4        concludes the deposition.

 5                  (Whereupon, at 3:55 P.M., the

 6        Examination of this Witness was

 7        concluded.)

 8

 9

10                  _____

                           DANIEL KING

11

12   Subscribed and sworn to before me

13   this _____ day of _____ 20___.

14

     _____
15        NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25
```



DANIEL J. KING                                          January 07, 2025
Fischer v Government Employees Ins.                              224

```
 1                    D. King

 2              C E R T I F I C A T E

 3

 4   STATE OF NEW YORK       )
                             :
 5   COUNTY OF RICHMOND      )

 6

 7        I, MARINA DUBSON, a Notary Public for

 8   and within the State of New York, do hereby

 9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 7th day of January 2025.

21

22

23        _____
                  MARINA DUBSON
24

25
```

