# Exhibit 25

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF NEW YORK

3    KEITH FISCHER, MICHAEL        )
     O'SULLIVAN, JOHN MOESER, LOUIS )
4    PIA, THOMAS BARDEN, CONSTANCE )
     MANGAN, and CHARISE JONES,     )
5    individually and on behalf of all )
     others similarly situated,     )
6                                    )
                Plaintiffs,          )
7                                    ) No. 2:23-cv-2848
      -v-                            )
8                                    )
     GOVERNMENT EMPLOYEES INSURANCE  )
9    COMPANY d/b/a GEICO,            )
                                     )
10              Defendant.           )

11

12              Wednesday, January 15, 2025

13         Oral videoconference deposition of ALBERT

14   BRUST, held pursuant to Notice via Zoom with all

15   parties participating remotely, commencing at

16   9:00 a.m. Central Time, on the above date, before

17   Andrew R. Pitts, Certified Shorthand Reporter.

18

19

20

21

22

23   Andrew R. Pitts, CSR, RPR
     License No.:  084-4575
24   Esquire Deposition Solutions

25
```



```
 1   REMOTE APPEARANCES:

 2   On behalf of the Plaintiffs:

 3   OUTTEN & GOLDEN, LLP
     685 Third Avenue - 25th Floor
 4   New York, New York  10017
     (347) 390-2121
 5   Email: jmcallister@outtengolden.com
     BY:  JARRON D. McALLISTER, ESQUIRE

 6

 7   On behalf of the Defendant GEICO:

 8   DUANE MORRIS, LLP
     190 South LaSalle Street - Suite 3700
 9   Chicago, Illinois  60603-3433
     (312) 499-6779
10   Email:  gtsonis@duanemorris.com
     BY:  GREGORY TSONIS, ESQUIRE

11

12

13   ALSO PRESENT:

14       BRENT JORDAN, CLVS, Legal Videographer.

15

16

17

18

19

20

21

22

23

24

25
```



```
1                    I N D E X

2    ALBERT BRUST                         EXAMINATION

3        BY MR. TSONIS                     5, 286
         BY MR. McALLISTER                278
4

5                  E X H I B I T S

6    BRUST           DESCRIPTION              PAGE

7    Exhibit 1      Compensation Contents,     104
                    G000028-43
8

9    Exhibit 2      E-mails, G011080-81        148

10   Exhibit 3      E-mails, G011431-432       151

11   Exhibit 4      E-mails, G011598-599       155

12   Exhibit 5      E-mails, G017819-820       161

13   Exhibit 6      7/19/20 e-mail, G017819    163

14   Exhibit 7      E-mails, G012091-92        164

15   Exhibit 8      Performance appraisal,     206
                    G006735-745
16

17   Exhibit 9      Workday profile, G005126-163  218
                    (CONFIDENTIAL)
18

19   Exhibit 10     Associate of the Month     236
                    nomination, G015733-737
20

21   Exhibit 11     Opt-In Plaintiff Responses 244

22   Exhibit 12     Human Resource Associate   261
                    Handbook, G000191-235
23

24

25
```



```
 1              (Whereupon, the following proceedings were
 2          taken via videoconference.)
 3              THE VIDEOGRAPHER:  Okay.  We are now on the
 4      record.  The time is 9:02 a.m. Central Time on
 5      January 15th, 2025.  This begins the videoconference
 6      deposition of Albert Brust taken in the matter of
 7      Keith Fischer, et al., v. Government Employees
 8      Insurance Company, d/b/a Geico.  This case is filed in
 9      the United States District Court for the Eastern
10      District of New York, Case No. 2:23-CIV-2848.
11              My name is Brent Jordan.  I am the
12      certified legal videographer for the day.  The court
13      reporter is Andrew Pitts.  We are representing Esquire
14      Deposition Solutions.
15              Will Counsel present please identify
16      yourself and state whom you represent.
17              MR. McALLISTER:  Good morning.  I am Jarron
18      McAllister, and I am an attorney from Outten & Golden
19      and I am representing Mr. Brust today.
20              MR. TSONIS:  Gregory Tsonis with Duane
21      Morris, LLP, representing the Defendant Geico.
22              COURT REPORTER:  Okay.  Mr. Brust --
23              THE WITNESS:  Yeah, Al Brust.  I was an
24      employee of Geico.  I no longer am.
25              COURT REPORTER:  Great.  Okay.  Sir, please
```



1    raise your right hand to be sworn in.

2              (Whereupon, the witness was

3               administered an oath.)

4              COURT REPORTER:  Okay.  Thank you.  Sworn.

5    You may lower your hand.  I'll mute myself, and

6    Counsel you may proceed.

7              MR. McALLISTER:  Thank you.

8                    ALBERT BRUST,

9    called as a witness herein, having been first

10   administered an oath, was examined and testified

11   remotely via videoconference as follows:

12                    EXAMINATION

13   BY MR. TSONIS:

14        Q.    Good morning, Mr. Brust.

15        A.    Good morning.

16        Q.    As you probably heard, my name is Greg

17   Tsonis.  I'm an attorney that represents Geico in this

18   lawsuit.

19             Before you kick off, can you please just

20   state and spell your name for the record.

21        A.    It's Brust, B as in boy, R-U-S-T.

22        Q.    All right.  And your first name --

23        A.    First name is Albert, A-L-B-E-R-T.

24        Q.    Perfect.  And what's your current address?

25        A.    ███████████████████████████████████,



1    BY MR. TSONIS:

2        Q.    Okay.  Have you ever had a conversation

3    with anyone about joining the lawsuit?

4        A.    No.

5        Q.    Other than about the lawsuit, are there any

6    current or former Geico employees that you do keep in

7    contact with?

8        A.    Gerard Sardina, and I would say Maria Munoz

9    now, you know, in regard to, you know, using her as a

10   point of contact, you know, for me.

11       Q.    Sure.  And you said that's your --

12   connected with your work as a -- working within the

13   SIU unit of Plymouth Rock, right?

14       A.    That's -- that's correct.

15       Q.    Okay.  I think you said you started working

16   at Plymouth Rock, you believe, December 2nd, right?

17       A.    Yes.  Yes.

18       Q.    2024?

19       A.    Yes, correct.

20       Q.    All right.  When did you leave Geico?

21       A.    I believe it was May -- let's -- it was

22   February, I -- the -- early February.  I don't

23   remember the exact date.

24       Q.    Between February of '24 or approximately

25   February of '24 and when you started working for



```
 1   break -- I just -- I'm out of coffee -- before
 2   I launch into a new session, if that's okay.
 3              THE WITNESS:  Yeah.
 4              MR. McALLISTER:  Okay.  What time do you
 5   want to come back?
 6              MR. TSONIS:  11:00, that's fine with me,
 7   seven minutes.  Is that okay?
 8              MR. McALLISTER:  So it's going to be 11:05.
 9              MR. TSONIS:  Oh, sorry.  Well, I mean, five
10   to ten minutes.  I mean --
11              MR. McALLISTER:  Yeah.
12              MR. TSONIS:  -- I'll be back sooner than
13   that, but that's fine.
14              MR. McALLISTER:  Yeah, yeah.
15              THE VIDEOGRAPHER:  And we'll go off the
16   record at 9:54 a.m.
17              (Whereupon, a break was taken.)
18              THE VIDEOGRAPHER:  We are back on the
19   record at 10:06 a.m.
20   BY MR. TSONIS:
21        Q.    All right.  Mr. Brust, you understand that
22   you're still under oath?
23        A.    Yes.
24        Q.    Now, earlier, I think you referenced you
25   began to work for Geico in September of 2019?
```



```
 1          A.    Yes.
 2          Q.    What was your job title when you began
 3   working with Geico?
 4          A.    Senior field security investigator.
 5          Q.    Did that job title change at some point?
 6          A.    I don't believe so, no.
 7          Q.    Okay.  Did your job responsibilities
 8   generally change?
 9          A.    I mean, in the beginning, I handled, you
10   know, a variety of different types of fraud claims,
11   and then approximately about a year or two into
12   working with Geico, I was assigned -- I was
13   investigating thefts, thefts like vehicle thefts.  So
14   I was part of the theft team.
15          Q.    Okay.  And we'll -- we'll get to, I guess
16   the -- the breakout of how things were organized in
17   your office.
18                But I guess just from a general standpoint,
19   how would you describe your job security -- or your
20   job duties and responsibilities as a senior field
21   security investigator?
22          A.    I would be assigned cases that were
23   referred by another associate, whether it came from
24   claims or the auto damages adjuster, and we would
25   investigate what their concerns are.
```



1              And it could be a variety of, you know, the

2     damage to the car does not fit the facts of the loss,

3     or it could be something as simple as, you know, it

4     was a change in policy, you know, day before the claim

5     was filed, you know.  You know, and I would do

6     examination under oaths, and, you know, all this, all

7     my findings were typewritten into a case file folder

8     and submitted when completed.

9         Q.    Do you have an understanding as to whether

10    there's a difference between a senior field security

11    investigator and a field security investigator?

12        A.    I didn't -- I don't know if there's a

13    difference, so I'm not aware of that.

14        Q.    All right.  You were hired on as a senior

15    field security investigator; is that right?

16        A.    That's correct.

17        Q.    Okay.  Were there other field security

18    investigators that you worked with?

19        A.    I believe we all had the same title.

20        Q.    What geographic area did you have?

21        A.    I covered Nassau County, Suffolk County,

22    Long Island, and the five boroughs.  That would be it.

23    So --

24        Q.    Were there -- were there other individuals

25    with the same job title that had the same geographic



 1  the field anywhere between two to three days a week.

 2      Q.    Was there any kind of requirement that your

 3  supervisor gave you as far as which days or how

 4  frequently you had to be in the field?

 5      A.    It was no requirement as far as which day.

 6  That's something we would set up by -- you know, we

 7  would set up for -- and, you know, according to case

 8  management and what made sense or, you know, when, you

 9  know, if we were meeting somebody, their availability.

10          But there was no particular requirement as

11  to how many days a week you have to go out, but when

12  we were hired or when I was hired, I was told

13  you're -- "You're a field investigator and, you know,

14  we want you in the field.  We don't want to" -- you

15  know, "your investigations all to be conducted in your

16  house."

17      Q.    COVID was roughly, you know, sort of

18  February or March of 2020, right?

19      A.    Yes.

20      Q.    And you started in September of 2019?

21      A.    Yes.

22      Q.    Okay.  So there was about, you know, four

23  to five months there where I guess you were working

24  before the changes brought about by COVID took place,

25  right?



1        A.    Correct.

2        Q.    So let's talk about that initial time

3   period first.

4              So when you were hired on with Geico,

5   I guess, what -- what was the training process or the

6   onboarding process?

7        A.    We were going into Woodbury every day for,

8   I think, about two to three weeks, and then we were

9   going in maybe two to three times a week for, like,

10  another month or so where, you know, we would have

11  some training and then we would be assigned, you know,

12  which we would basically say, like, the simpler tasks,

13  like a social media search, you know, a background

14  search.

15             You know, it was kind -- we kind of like

16  had homework assignments, you know, reviewed claims,

17  go through, you know, Atlas file, see how they note

18  things in the file.  You know, then we -- we would

19  spend -- we'd go to Woodbury and spend time with the

20  claims representatives.  We'd sit with them as they

21  handled calls and, you know, basically the line of

22  questioning how the calls come in.

23             And then shortly after the training, we

24  were -- you know, our time in the office was basically

25  now one day a week, and we were given cases, but a lot



1   of those cases in the beginning were -- could be

2   handled at home.

3             There were some cases where I -- you know,

4   a scene canvass or I'd have to go do an EUO, whether

5   it was in, you know, Brooklyn or Queens or the Bronx,

6   you know, Garden City, or wherever it was scheduled.

7             And then really, you know, before, you

8   know, I really got, you know -- was able to hit the

9   ground running, that's when COVID started.  So that

10  was really the extent of, like -- like, my first

11  couple of months.  It was minimal field work.

12        Q.   That was going to be my next question.

13            How long does the training process take or

14  did the training process take?

15        A.   I mean -- I mean, it was over a three-month

16  period, I would say.  Like I said, we started in the

17  beginning having to go, like, every day, and then it

18  was three days a week and then two times, and then we

19  were just coming in one day a week.

20            You know, basically you come in, what kind

21  of questions you have.  Then maybe they'd have some

22  type of PowerPoint for us.  And, again, that lasted

23  for about, you know -- you know, couple months,

24  I guess, you know.  We were always being trained in

25  the beginning.  I mean, even during COVID, we would



1  still have -- we would set up meetings and having

2  training but that was through Zoom.  But yeah, that

3  was it.

4       Q.   When you referenced "we," were there other

5  people that were going through training at the same

6  time as you?

7       A.   Yes.  When I got hired, there were three

8  other investigators:  Roger Schartner, Ted Wendling,

9  and there was another one.  I can't remember his name.

10 He -- he only stayed for about a year.  I can't think

11 of his name right now.

12      Q.   And were those other individuals field

13 investigator, like, the same job title you had, or

14 something --

15      A.   They were -- they were all field

16 investigators, and then there was like -- there was an

17 overlap.  Approximately a month or two after we got

18 hired, I think they hired about another three more

19 investigators.

20      Q.   Who was the person or the people that were

21 doing the training?

22      A.   It was Bill Newport did training, Gerry

23 Cassagne, Toni D'Agata, Dara Campbell, then there was

24 Theresa Bishop.  She was a supervisor.  She wasn't a

25 supervisor -- I mean, yeah, she was.  She basic -- she



 1  became a supervisor, I guess, when I first got hired.

 2  She did training that day, and I remember that day.

 3  It had to do with, like, reviewing the claim file.

 4  And that's all I recall.  It's --

 5      Q.    Everyone you named, well, specifically

 6  Gerry, Toni, Dara, and Theresa Bishop were

 7  supervisors, right?

 8      A.    Correct.

 9      Q.    And Bill Newport, did you understand him to

10  be the manager of the SIU office in Woodbury?

11      A.    Yes.

12      Q.    Were there any investigators or trainers

13  apart from those individuals that you referenced that

14  did any training?

15      A.    I believe -- yes, I believe Keith Fischer

16  did a class or training session.

17      Q.    Do you recall what he -- his training

18  session was about?

19      A.    No.

20      Q.    Did you do any sort of ride-alongs or

21  things like that with another individual that might be

22  a field security investigator?

23      A.    Never did a ride-along, but I did spend --

24  it was one day with Keith Fischer and basically

25  shadowed him.  I went to his home and sat with him in



```
 1        Q.    All right.  And the time that you spent
 2   driving out in the field, was that considered work
 3   time that you were paid for?
 4        A.    Yes.
 5        Q.    All right.  When COVID restrictions came
 6   into place and Geico -- or, well, Geico instructed its
 7   field investigators that they were not permitted to go
 8   out in the field anymore, right?
 9        A.    Yes.
10        Q.    All right.  So the time that you would have
11   otherwise have spent driving when you were out in the
12   field, you no longer had to spend that time driving;
13   would that be accurate?
14        A.    Yes.
15        Q.    Okay.  That was work time that, I guess,
16   you were otherwise now -- had available to you to work
17   on other cases that you were assigned?
18        A.    Yes.
19        Q.    How were cases assigned to you?
20        A.    It was a rotation.  I'm trying to think how
21   it was assigned.  They -- I guess their intake, it
22   was -- I think Theresa Bishop might have been one of
23   the supervisors, but it would be a rotation, you know.
24   It would -- could be -- you know, it would be Al
25   Brust, Maria Munoz, Steve Stemmler, you know, to Keith
```



 1   BY THE WITNESS:

 2        A.    Yes.

 3   BY MR. TSONIS:

 4        Q.    Sorry, what was that?

 5        A.    Yes.

 6        Q.    Okay.  And if you were working from home,

 7   would you similarly have flexibility as to when you

 8   would start your day?

 9             MR. McALLISTER:  Objection.

10   BY THE WITNESS:

11        A.    There was flexibility, but you had to --

12   you always had to show a reason, you know.  You -- you

13   couldn't just sign in at 7:00 just because you felt

14   like it.

15   BY MR. TSONIS:

16        Q.    But did you have a scheduled start time?

17   For example, when, you know, in -- after the COVID

18   changes occurred and you were working from home, you

19   were working from home each day, right?

20        A.    Right.

21        Q.    Did you have a scheduled start time?

22        A.    I don't recall a scheduled start time.  The

23   general time was -- which was spoken was 8:00, but

24   again, if there were appointments or if you needed to

25   work, you thought you were going to have to work



ALBERT BRUST                                         January 15, 2025
KEITH FISCHER v GEICO                                           76

1    later, they would recommend that you would start

2    later.  If you needed to be somewhere early in the

3    morning, they were okay with you signing in at, like,

4    7:00.  So if I -- if I wanted to be in Staten Island,

5    I would have to start a little bit earlier just

6    because of the commute.

7        Q.    Right.  And if you started a little earlier

8    or you started a little later, you didn't need to,

9    like, get approval from your supervisor, right?

10       A.    No, you didn't have to get approval, but

11   you did -- you did make them aware if it was -- if

12   it -- if the start time -- I mean, I don't -- I never

13   started at 6:00, you know, but like I said, my -- my

14   start time was between 7:30 and 8:00, so I never had

15   to reach out and get approval because it was within,

16   you know, I guess, their normal expectancy of where

17   you should be as far as starting.

18       Q.    Right.  And using that example, I guess, if

19   you're schedule to start at 7:30, you could choose, if

20   you wanted to, to start at 7:45 that day, right?

21       A.    Right.  It's sometimes, yeah, you -- you

22   didn't have to start on the hour or the half hour.  It

23   could be an even unexpected start time where, you

24   know, I could be sipping a cup of coffee and the, you

25   know, phone rings, and it's somebody that I've been



 1 | trying to get in touch with, you know.  I'm going to
 2 | handle the call, and I'm going to sign in.
 3 |      Q.    Understood.  If you had something come up
 4 | in the middle of the day, like, for example, you know,
 5 | you had a doctor's appointment or you needed to pick
 6 | up your kids or something like that, could you, you
 7 | know, take an hour off and work an hour later than
 8 | what you would normally?
 9 |      A.    You would either have to put in for the
10 | time off, or if you didn't -- and this was only
11 | towards the end, and I forget what they called it, but
12 | it was only towards the end, maybe the, like, last
13 | year, where they basically -- because, like, with
14 | Workday, you could sign in and out, you know, and as
15 | long as at the end of the day, it added up to 7.75.
16 |           I mean, I don't know why you would have,
17 | but if I took, like, a two-hour lunch, I would have to
18 | work two hours later, you know.  So -- or if I had a
19 | doctor's appointment, they would say sign out, sign
20 | back in, you know.
21 |           You -- you just -- you would -- you would,
22 | you know, you would still get a -- you know, you would
23 | speak to your supervisor and make them aware because
24 | they would know, obviously, if you're away from the
25 | because it -- you know, it starts the clock when,



 1  beyond my 7.75 hours.

 2       Q.    Okay.  And --

 3       A.    And the weekends.

 4       Q.    I think you said before the change where

 5  you would log in and out, again, where you're just

 6  entering your time, 7.75 or whatever it is, into

 7  Workday -- right?  Are you with me so far?

 8       A.    Yes.

 9       Q.    During that time period, how frequently

10  would you work on your lunch?

11       A.    So the big change -- in the beginning, when

12  I first started, we were catching two to three cases.

13  It was manageable.  When COVID started and we were

14  grounded, they obviously said, as you pointed out

15  before, we're not in the field anymore.  So that field

16  time is available.  So now they bumped it up to five,

17  six cases a day, which, again, we weren't in the

18  field.

19            It was challenging because now you're --

20  there are a lot more balls in the air and it's -- you

21  know, it does get a little confusing sometimes as to

22  what case was that, what case was -- but manageable.

23            The problem was, or is, is when we went

24  back in the field, we never went back to two to three

25  cases; we stayed at the five, six cases a day.



1  anything," something to that, "let me speak to Bill."

2  And then he would get back to me and say, "There is no

3  overtime."

4        Q.    So when you would say -- or ask

5  Mr. Cassagne if overtime was available, what

6  specifically would Gerry Cassagne say to you?

7        A.    He would say, "Spoke to Bill and he said

8  there's a" -- he's -- he'll ask for it.  And, you

9  know, shortly after, we'd get the answer that no

10 overtime.

11       Q.    So when you would bring this concern to

12 Mr. Cassagne, you would only request overtime for the

13 work that you currently had?

14             MR. McALLISTER:  Objection.

15 BY THE WITNESS:

16       A.    I would request it, you know, especially

17 when I was falling behind.  I would say, "I need to

18 catch up.  Could I get overtime," you know, this day

19 or that day.  And he said, "The last I spoke to Bill,

20 there's no overtime."

21             And the other -- there were times, you

22 know, and it wasn't because I asked, again, it was

23 most likely it was because there was like a hurricane

24 or some type of flooding where we would get an e-mail

25 saying, you know, "Starting this date, you will be



1   getting flood claims from" -- you know, whatever,

2   whatever hurricane it is, and you -- "you can handle

3   this on overtime."

4            So we would do our regular work, and then

5   you volunteered.  So the overtime that we were getting

6   was not even to work on our own cases; it was to work

7   on these additional claims through catastrophe.

8        Q.    All right.  Is what you're referencing cat

9   pay?

10       A.    Correct.  Correct.

11       Q.    All right.  And setting cat pay aside, were

12  there periods of time where overtime was authorized

13  when you worked at SIU?

14       A.    Yes.

15       Q.    When was that?

16       A.    I don't remember, but I -- it didn't last

17  very long.  I'm going to say it lasted, you know,

18  maybe a month or two, and then maybe it popped up

19  again.  For whatever reason, they said, you know,

20  there's some overtime, but it was very rare.

21       Q.    Okay.  And we'll get to those periods of

22  time in a moment here, but when you would have these

23  conversations with Gerry Cassagne, would Gerry

24  Cassagne explore alternative ways to help you catch

25  up, for example, stop you from catching cases?



 1  what.

 2      Q.    All right.  Being that you were relatively

 3  new to Geico, it might be that Gerry Cassagne was

 4  advising ow ways that you could be more productive

 5  too, right?

 6           MR. McALLISTER:  Objection.

 7  BY THE WITNESS:

 8      A.    I wouldn't say he advised us.  He just --

 9  you know, he just said, "Do the best you can."  You

10  know, like, we knew what we had to do, and it had to

11  be done, you know.  It was all part of the metrics.

12  So there was no -- there was cutting corners.  You had

13  to handle, you know, the cases.

14           THE WITNESS:  I'm sorry, I -- could I just

15  let my dog out?

16           MR. TSONIS:  Okay.

17           THE WITNESS:  You know, I'm at home.

18  I apologize.  Okay.  I'm sorry.

19  BY MR. TSONIS:

20      Q.    Okay.  I believe earlier, you testified

21  that some investigators just, you know, worked faster

22  than others, right?

23           MR. McALLISTER:  Objection.

24  BY THE WITNESS:

25      A.    Yeah, everyone, every investigator has



1      Q.    Right.  So when you would have a

2    conversation with Gerry Cassagne regarding overtime,

3    you wouldn't tell Gerry Cassagne, "I'm working off the

4    clock"; is that right?

5            MR. McALLISTER:  Objection.

6    BY THE WITNESS:

7      A.    Gerry, he -- he -- I didn't have to tell

8    him.  He -- he knew when he signed up for my cases.

9    They're time stamped.  He would see a -- you know,

10   a report time stamped at 7:00 at night.  It's right

11   there.  It's right in the report.

12   BY MR. TSONIS:

13     Q.    Okay.  So -- but to go back to my question,

14   you didn't actually tell Gerry Cassagne at any point

15   that you were working off the clock?

16           MR. McALLISTER:  Objection.

17   BY THE WITNESS:

18     A.    Yes, he knew I was working off the clock.

19   BY MR. TSONIS:

20     Q.    I didn't ask if you believe he knew.  We'll

21   get to that.

22     A.    Oh.

23     Q.    I'm asking a different question.

24           Did you ever actually tell Gerry Cassagne

25   that you were working off the clock?



1           MR. TSONIS:  Your objection's noted,

2    although speaking objections are not permitted.  So

3    I'll ask the witness the question again.

4    BY MR. TSONIS:

5         Q.   What specifically did you say to Gerry

6    Cassagne during these conversations regarding

7    off-the-clock work?

8           MR. McALLISTER:  Objection.

9    BY THE WITNESS:

10        A.   I spoke to Gerry in sum and substance that

11   I need overtime, or I'm not going to be able to

12   satisfy the metrics.  I asked him on a regular basis,

13   and he said, "I've spoken to Bill, and Bill will try."

14   However, Bill, unless it was a cat case, it was very,

15   very rare, and I think I was only maybe on two

16   separate occasions where it may be less than a week or

17   two that we were able to use overtime specifically,

18   specifically for the cases that we were working.

19   BY MR. TSONIS:

20        Q.   So in those conversations with Gerry

21   Cassagne, you didn't actually tell him, "I'm working

22   off the clock."  You were asking about overtime; is

23   that accurate?

24        A.   No.

25          MR. McALLISTER:  Objection.



1   BY THE WITNESS:

2       A.    I did tell him I was working off the clock

3   because I told him that I will -- I have to do what

4   I have to do so I'm not, you know, in the bottom

5   quartile.  So I told -- he knew, he knew I worked

6   weekends, he knew I worked after hours.  He knew --

7   I would discuss with -- I'm a -- could I let my dog

8   out?

9           THE WITNESS:  I'm sorry.  I'm going to kill

10  this dog.  I apologize.  The dog is killing me.

11  You're killing me, dog.  Yeah, get out.  Thank you.

12  BY THE WITNESS:

13      A.    So, sorry, off the clock, I could --

14  I could specifically -- myself and Gerry are very big

15  hockey fans, and we both play hockey, but I would work

16  in between periods.  I told him I would do work.  He

17  knows hockey games generally start at 7:30 at night.

18  So indirectly and directly, he's aware that I was

19  working off the clock because in between periods, as

20  soon as the period would end, I would do as many

21  computer checks as I can.  So he knew that.  Again,

22  I --

23  BY MR. TSONIS:

24      Q.    How many -- how many conversations did you

25  have with Gerry Cassagne where you specifically told



1   him, "I'm working off the clock"?

2          MR. McALLISTER:  Objection.

3   BY THE WITNESS:

4      A.    I can't -- I can't put a number on that,

5   but it's many.  Over the course of four and a half

6   years, you know, again, it's many times, could be

7   50 to 100.  I don't know.  The conversation was a --

8   a constant, especially when, you know, the Monday

9   numbers would come out, and they would say, you know,

10  "Guys aren't meeting your, you know, metrics."

11         And I said, "Well, we're never going to

12  meet it in eight hours.  It's not happening.  We need

13  more hours to work."  So it was -- it was -- I was

14  very vocal when it came to that.

15         And, again, I take pride in what I do, and

16  I always try to do the right thing for the

17  policyholder.  So, you know, again, my supervisors

18  were aware and, you know, I did work, you know, off

19  the clock, but -- and they were aware of it.  Makes --

20  and I -- and I spoke to them numerous times over the

21  course of five years.  Specific dates, no, I didn't

22  keep record of it because I never expected to be

23  involved in a lawsuit.

24  BY MR. TSONIS:

25     Q.    But it's your testimony here today that



1    50 to 100 times, you talked to Gerry Cassagne and used

2    the words, "I'm working off the clock"?

3            MR. McALLISTER:  Objection.

4    BY THE WITNESS:

5        A.    I -- I never used that term ever, "I'm

6    working off the clock."  I would say, "I'm working on

7    my own time.  I'm tired of working on my own time."

8            Unless you're working on your own time

9    you're not getting this done.  You know, if somebody's

10   at the top of the ratings, everybody knows why they're

11   at the top of the ratings because you can go on the

12   computer at 10:00 at night and see the light's green.

13   Gerry knows that.  Everybody knows that.

14           Everybody knew everybody was working past

15   the time, but like I said, everyone did the best they

16   can, and we were just trying to do the right thing,

17   but absolutely I had conversations with Gerry numerous

18   times.  I wouldn't use off the clock; I had said, you

19   know, on my own time.  On my own time.  He would ask

20   me, "How was your weekend?"  And I would be like, "Oh,

21   it's great.  I worked five hours."  You know?  They

22   knew.

23   BY MR. TSONIS:

24       Q.    And those conversations with Gerry, were

25   some of those conversations ones where you didn't



1      A.    Again, for me to get the job done, and

2   again, your metrics, again, there's always the -- if

3   your metrics aren't to their standards, and again, if

4   they determine it's at the bottom quartile, there's

5   always that risk of getting laid off or not getting

6   raises.

7           So if other people -- and, again, it really

8   has nothing to do with what other people are doing,

9   you know.  I did it because I felt it was the right

10  thing to do.  Again, as far as me being an

11  investigator, you know, a retired detective, I took a

12  lot of pride in my investigations.  I didn't like to

13  do shoddy work, and I -- you know, I did what was

14  necessary.  And if I worked on my own time, and in the

15  police department, I mean, we had a cap on overtime,

16  you know.  You worked on your own time sometimes, you

17  know.  You did the job.

18     Q.    Do you have an understanding as to whether

19  overtime was ever approved for any investigator?

20          MR. McALLISTER:  Objection.

21  BY THE WITNESS:

22     A.    Overtime, I do recall overtime being

23  approved, and I was -- I was very happy.  I was -- you

24  know, I was like, "Finally," but it only lasted, like,

25  two weeks.  You know?  It came and went really fast.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
139

1   And then there was another time it started again, and

2   that, I think, lasted like maybe three days.  It was

3   even less and besides the cat overtime, but that was

4   for cat cases.  So now we were catching cat cases and

5   our regular cases, but the overtime was only for the

6   cat cases.

7   BY MR. TSONIS:

8       Q.    Right.  So let me distinguish for a second.

9             There was a period of time, I think you're

10  testifying, where overtime hours were pre-approved for

11  investigators to use?

12      A.    Yes.

13      Q.    For example, in or around June of 2020, was

14  there a period of time where every investigator was

15  authorized to use up to ten hours of overtime per

16  workweek?

17            MR. McALLISTER:  Objection.

18  BY THE WITNESS:

19      A.    I don't have anything to, you know, refresh

20  my recollection as to that.  You know, did -- you

21  know, you're referring to June, so I'm going to assume

22  that you have something that -- that -- in that time

23  frame, but I do recall we had, like, ten -- we could

24  do ten hours a week.  I do recall that.

25



1      Q.    All right.  Now, typically when you

2   worked -- or excuse me, when you keyed time for

3   vacation or sick time in Workday, that was time that

4   you didn't spend working, right?

5      A.    Correct.

6      Q.    So I guess, just to be clear, if you've

7   entered time as vacation time in worked Workday,

8   you're not contending that you took the day off, but

9   you're actually working during that time?

10          MR. McALLISTER:  Objection.

11   BY THE WITNESS:

12      A.    Yes.

13   BY MR. TSONIS:

14      Q.    Yes, that's correct?

15      A.    Yes.

16      Q.    Okay.  In this e-mail, you don't notify

17   Gerry Cassagne that you're -- you've been working off

18   the clock, right?

19          MR. McALLISTER:  Objection.

20   BY THE WITNESS:

21      A.    Which e-mail are we talked about, the first

22   one?

23   BY MR. TSONIS:

24      Q.    Exhibit 3, the one that we've been looking

25   at now.



1      Q.    All right.  So it looks like

2   Mr. Fitzsimmons here basically flexed hours that he

3   thought he would need to work on Sunday because he

4   wasn't sure if he would be able to work on Monday,

5   right?

6      A.    Yes.

7      Q.    Right.  And you similarly understood that

8   you had the authority to flex your schedule if needed?

9            MR. McALLISTER:  Objection.

10  BY THE WITNESS:

11     A.    Yes.

12  BY MR. TSONIS:

13     Q.    Okay.  Now earlier when you referenced

14  individuals working on the weekends, I guess to be

15  clear, you're gauging whether that work is happening

16  from just someone being logged in?

17            MR. McALLISTER:  Objection.

18  BY THE WITNESS:

19     A.    No.  In particular with Robert Fitzsimmons,

20  I may have spoken to him once.  I did not know him at

21  all.  So I don't know -- again, I don't -- he was not

22  there very long.  I think he got hired right after me,

23  and then I think he was gone within a couple months.

24            So I don't -- again, I can't, you know --

25  you know, I can't answer for him as far as how he



 1  BY MR. TSONIS:

 2      Q.    Yeah.  I mean, for example, I might show

 3  present right now, but if I walk away from my computer

 4  for ten minutes until it goes to away, it looks like

 5  I'm working to you, right?

 6      A.    Correct.

 7      Q.    Okay.  And similarly, when you see someone

 8  is logged in or online, you don't know whether they're

 9  actually working any extra hours rather than just

10  flexing their time, right?

11          MR. McALLISTER:  Objection.

12  BY THE WITNESS:

13      A.    If somebody's online, you're correct, in --

14  in that particular moment, could I say from sitting at

15  my desk whether they are working a day for a day or is

16  it if there are working on their own time or if

17  they're working on overtime?  No, I cannot tell.

18  I'm -- I know from conversation.

19          So if some -- if I was told by an

20  investigator, "I worked last night," I would say,

21  "Yeah, I saw you on the computer."  That's the only

22  time I would be able to confirm it.

23  BY MR. TSONIS:

24      Q.    Okay.  But even if an investigator told

25  you, "I worked last night," you wouldn't necessarily



 1   BY MR. TSONIS:

 2       Q.    Sure.  Did you get credit from a

 3   productivity standpoint on assists that you did?

 4       A.    No.

 5       Q.    Okay.  Typically, do you have an

 6   understanding at Geico as to what the ratings

 7   1 through 5 mean?  Like, at what point are you meeting

 8   expectations?

 9       A.    I think 3 and above.

10       Q.    Okay.  So if you're a 3 or a 4 or a 5, you

11   were either meeting or perhaps exceeding expectations?

12       A.    Yes.

13       Q.    All right.  Did you receive performance

14   reviews each year that you worked for Geico?

15       A.    Yes.

16       Q.    You started in September of 2019, so did

17   you receive a 2019 performance review?

18       A.    I don't recall.

19       Q.    Okay.  In either event, in 2020 and in

20   2021, 2022, you would have received a performance

21   review, right?

22       A.    Yes.

23       Q.    Did you receive merit increases as part of

24   your reviews?

25       A.    Yes.



1      Q.    Was that true every year that you worked

2   for Geico?

3      A.    I received merit ratings every year.

4      Q.    Do you have a recollection or an

5   understanding of what your performance ratings were in

6   the time that you worked for Geico?

7      A.    Are you asking do I recall the actual

8   rating number?

9      Q.    Yeah, I mean do you -- I understand how you

10  might not recall the exact rating number, but

11  typically speaking, did you fall in the 1, 2, 3, 4, or

12  5 range?

13     A.    I think -- I think generally I fell in the

14  area of, like, 4, 4.-something, 4.2, something in that

15  area.

16     Q.    Okay.

17     A.    And I don't think I was ever a 3.

18     Q.    Okay.  Working additional hours allows you

19  to -- would allow you to close cases faster, right?

20          MR. McALLISTER:  Objection.

21  BY THE WITNESS:

22     A.    It would allow me to close more cases.

23  BY MR. TSONIS:

24     Q.    Right.  So working additional hours would

25  allow you to increase productivity by closing more



```
 1   cases?

 2              MR. McALLISTER:  Objection.

 3   BY THE WITNESS:

 4        A.   Yes.

 5   BY MR. TSONIS:

 6        Q.   And working additional hours would allow

 7   you to reduce your average case life as well, right?

 8              MR. McALLISTER:  Objection.

 9   BY THE WITNESS:

10        A.   Yes.

11   BY MR. TSONIS:

12        Q.   Would you agree by working additional

13   hours, but not recording it in Workday, that you

14   benefit in the form of merit increases?

15              MR. McALLISTER:  Objection.

16   BY THE WITNESS:

17        A.   I benefitted in my metrics.  What they

18   decided to give me, that's -- you know, that's up to

19   them.

20   BY MR. TSONIS:

21        Q.   As a Geico associate, you wouldn't have

22   been eligible for a merit increase if you're rated a

23   1 or a 2, right?

24              MR. McALLISTER:  Objection.

25   BY THE WITNESS:
```



1    numbers, and this is what I did extra."  And I was
2    told that the extra stuff does help.
3    BY MR. TSONIS:
4         Q.    Okay.  And so, you know, there --
5    I understand your point there might be some, you know,
6    special projects or extra sort of work that you do
7    that might have a bearing on your performance rating;
8    is that what you're saying?
9         A.    Yes.
10        Q.    Okay.  But generally in the absence of
11   anything like that, your performance rating is based
12   off of the metrics that were identified at the
13   beginning of any year, right?
14              MR. McALLISTER:  Objection.
15   BY THE WITNESS:
16        A.    For the most part, yes.
17   BY MR. TSONIS:
18        Q.    Okay.  And by working additional hours and
19   not recording it in Workday, you would agree that you
20   made your metrics look better; is that --
21              MR. McALLISTER:  Objection.
22   BY THE WITNESS:
23        A.    My metrics were better, yes.
24   BY MR. TSONIS:
25        Q.    Okay.  I think you referenced earlier that



1   you understood that they were taking into account

2   those differences?

3                MR. McALLISTER:  Objection.

4   BY THE WITNESS:

5       A.   Yes.

6   BY MR. TSONIS:

7       Q.   All right.  Did you have any personal

8   involvement in -- like, aside from filling out a

9   self-performance review or evaluation, did you have

10  any involvement in assessing any other investigator's

11  performance?

12      A.   No.

13      Q.   Okay.  That was Gerry Cassagne, the other

14  supervisors, and Bill Newport?

15               MR. McALLISTER:  Objection.

16  BY THE WITNESS:

17      A.   Yes.

18  BY MR. TSONIS:

19      Q.   Okay.  And I guess by -- you agree that by

20  working additional hours and not recording them, not

21  only, I guess, were your metrics better in the

22  absolute sense, but you were making yourself look

23  better relative to other investigators, right?

24               MR. McALLISTER:  Objection.

25  BY THE WITNESS:



1      A.    Working the extra hours definitely helped

2   with me satisfying the metrics.

3   BY MR. TSONIS:

4      Q.    Right.  But I guess my question's slightly

5   different is that it also made you appear, I guess, if

6   you're ranking individuals and comparing you against

7   other investigators, by increasing your metrics, you

8   look better relative to the other investigators too,

9   right?

10           MR. McALLISTER:  Objection.

11   BY THE WITNESS:

12      A.    That I would have to say that I was -- it

13   wasn't just me working the extra hours.  So I think it

14   was an even -- it was a fair playing field because --

15   and, again, I under- -- I mean, they can, you know,

16   testify to that, but I was not the only one working

17   extra hours.

18   BY MR. TSONIS:

19      Q.    And we can agree if somebody else is

20   working only 38.75 hours a week, and you're working

21   several hours more than that in any given week, that

22   your metrics look better and not only, again, in the

23   absolute sense, but relative to that person, right?

24           MR. McALLISTER:  Objection.

25   BY THE WITNESS:



1    yourself to be an excellent investigator, and you

2    continue to improve with your quality goal?

3           A.    Yes.

4           Q.    All right.  And then he similarly continues

5    to say good things about your performance in terms of

6    you being an excellent investigator, using your law

7    enforcement background with -- to assist in your

8    investigations, having the utmost integrity, and

9    having proven yourself to be an asset to the unit?

10          A.    Yes.

11          Q.    All right.  At no point in here did you

12   indicate that you were working hours in excess of

13   38.75 but not logging them, right?

14          A.    No.

15          Q.    Sorry, I asked that poorly.  No, that's not

16   right, or no, you indicate --

17          A.    I did not ask that.

18          Q.    Okay.  And similarly, do you see any

19   comment from Mr. Cassagne acknowledging that you had

20   been working hours off the clock?

21          A.    No, there is no -- nothing by Mr. Cassagne.

22          Q.    Okay.  You can set this aside.

23                So if we looked at the remainder of your

24   performance reviews for your time at Geico, was there

25   ever a time that you indicated that you were working



1    additional hours off the clock?

2          MR. McALLISTER:  Objection.

3    BY THE WITNESS:

4        A.    No.

5    BY MR. TSONIS:

6        Q.    All right.  And similarly, if we looked at

7    every performance evaluation, would we see any

8    acknowledgement from any supervisor that you were

9    working hours off the clock?

10       A.    No.

11       Q.    I'm going to introduce another exhibit.

12   Let's see if I can drop it into the chat here.  This

13   one may take a minute to download, hopefully not, but

14   it's, I think, like 23 megabytes.  Let me know when

15   you've had a chance to download and look at it.  This

16   should be Exhibit 9.

17          (Whereupon, Brust Exhibit 9 was presented.)

18          THE WITNESS:  Okay.  It's open.

19          MR. TSONIS:  Okay.  And for the record,

20   this is a document that has the Bates label G005126 to

21   5163.

22   BY MR. TSONIS:

23       Q.    Now, Mr. Brust, have you ever seen this

24   document before?

25       A.    Not this particular one, no.



1    D'Agata, and then my last supervisor was Sarah
2    Greenman.
3          Q.    Okay.   And how long was Ms. Sarah Greenman
4    your supervisor?
5          A.    Maybe five months, approximately.
6          Q.    Okay.   Did you ever inform Ms. Greenman
7    that you were working off the clock and not recording
8    it in Workday?
9          A.    Yes.
10         Q.    And when did you do that?
11         A.    I don't have a particular date and time,
12   but we would have weekly one-on-one meetings, and on
13   occasion, I did mention it.
14         Q.    When you say on occasion, how frequently do
15   you mean?
16         A.    I was -- again, I'm approximating five
17   months.   I would say approximately five times.
18         Q.    And when you mentioned it to Ms. Greenman,
19   what specifically did you say?
20         A.    That, you know, I would ask for overtime,
21   you know, because I'm falling behind on my cases and,
22   you know, it's -- I'm not able to, you know, conduct a
23   proper investigation with, you know, just the, you
24   know, standard week.
25         Q.    And I just want to be clear.   You would get



1    on the phone with her or, you know, via Zoom, and you

2    would say, "I'm requesting overtime because of -- I'm

3    falling behind on my cases and because I can't do my

4    work in a standard work" --

5         A.    No, once a week, we would meet, and

6    I actually do recall one of the conversations where

7    she said, "Well, what could we do differently?  How

8    would -- what would help to move these cases along?"

9               And I said, "I need overtime."  And her

10   response was, "Well, that's not happening, so we need

11   to come up with something different."  And we

12   chuckled.

13        Q.    Okay.  So it's conversations like that that

14   you're encompassing?

15        A.    Yeah.  And, again, nothing major, again

16   beating a dead horse.  She's well aware of it.  It's

17   been discussed in, you know, team meetings.  You know,

18   she said she would do her best, you know.  She would

19   put that, you know, out there for consideration when

20   she spoke to managers, and I think she -- I think --

21   I forget his name.  It was Rene, it was like Rene

22   Cubas or something like that, she reported to him, but

23   once again, I know when they're hard, I didn't get any

24   overtime.

25        Q.    Would you ever make Bill Newport aware



1  that -- that you were working off the clock?

2       A.    No, I never spoke to Bill.  Everything --

3  I -- I would speak to, you know, the immediate

4  supervisor.  You know, I'm used to chain of command.

5  You don't -- you know, you don't go right to the

6  captain.  So I always spoke to Gerry or Toni or Sarah.

7       Q.    Okay.  So you never had any conversations

8  about working off the clock with anyone at the SIU

9  manager level?

10      A.    No.

11      Q.    Okay.  It says here your hire date was

12 September 16, 2019.  Is that right, to the best of

13 your recollection?

14      A.    Yes.

15      Q.    And your termination date with Geico was

16 February 2nd, 2024?

17      A.    Yes.

18      Q.    Why did you decide to leave in two

19 thousand -- in February of 2024?

20            MR. McALLISTER:  Objection.

21 BY THE WITNESS:

22      A.    It -- it was, you know, leading up to that

23 date, I was already dissatisfied with the treatment

24 and the culture and the rule by fear and, you know,

25 the metrics over objective, and every day's a failure.



1    doesn't include an unpaid meal period?

2              MR. McALLISTER:  Objection.

3    BY THE WITNESS:

4         A.   It does not include an unpaid meal period.

5    BY MR. TSONIS:

6         Q.   Okay.  And the total number of hours that

7    you were scheduled to work each week was 37.75?

8         A.   Yes.

9         Q.   Now, if you go to page -- or paragraph 8,

10   this declaration states, "From the start of my

11   employment with Geico through February of 2020, on top

12   of my recorded 7.75 hours a day, I regularly worked an

13   extra two hours a day, plus another five hours on

14   weekends, to keep up with my work.  I worked about

15   50 hours a week on average."

16             Do you see that?

17        A.   Yes.

18        Q.   Okay.  Now, as we've discussed earlier,

19   you're not claiming that during the time you spent

20   training that you were working more than 7.75 hours a

21   day?

22             MR. McALLISTER:  Objection.

23   BY THE WITNESS:

24        A.   That's correct.

25



```
 1   BY MR. TSONIS:
 2        Q.    All right.  So when you say from the start
 3   of your employment with Geico, that's not quite
 4   accurate because that would encompass this training
 5   time?
 6             MR. McALLISTER:  Objection.
 7   BY THE WITNESS:
 8        A.    That's correct, it's not completely
 9   accurate.
10   BY MR. TSONIS:
11        Q.    Okay.  You say in paragraph 9, starting in
12   March 2020, the COVID-19 pandemic halted field
13   operations, so all of your work was done remotely
14   until approximately November 2021; do you see that?
15        A.    Yes.
16        Q.    You state that, "Geico increased your case
17   load increased significantly after March 2020 and your
18   overtime hours increased substantially as a result"?
19        A.    Yeah, I see that.
20        Q.    Okay.  And here you write, "I was generally
21   working about 11 hours a day without a full lunch
22   break plus another five more hours on weekends.  And
23   on average during this time.  I was working about
24   60 hours a week."
25             You see that?
```



```
 1        A.    Yes.

 2        Q.    Okay.  Now, you note here during this time

 3   period a lunch break, without a full lunch break, but

 4   you don't note anything about a lunch break in

 5   paragraph 8, right?

 6        A.    Correct.

 7        Q.    So is it fair to assume that you were not

 8   working on your lunch break during the time period

 9   encompassed by paragraph 8?

10              MR. McALLISTER:  Objection.

11   BY THE WITNESS:

12        A.    Before Workday signing me out, I always

13   worked on my lunch.  So if this was pre, you know,

14   Workday signing in and out for lunch, which it was,

15   I worked on my lunch, again not all the time, but for

16   the most -- most of the time, I did work through

17   lunch.

18   BY MR. TSONIS:

19        Q.    Okay.  So you're accounting for that lunch

20   time in the -- in the time discussed in paragraph 8?

21        A.    Yes.

22        Q.    Okay.  Now, in paragraph 10, you write that

23   Geico returned to normal field operations in or around

24   November 21, but that your -- and that your overtime

25   decreased somewhat, but your case load still required
```



1   you to work overtime to keep up; is that right?

2        A.    Yes.

3        Q.    And then you estimate from November 21

4   through February 2023 that you were again working

5   about 50 hours a week on average?

6        A.    Yes.

7        Q.    Okay.  And then paragraph 11 sort of recaps

8   the information in the preceding paragraphs and then

9   states after that parentheses that you see in the

10  middle, it says, "In sum, for the periods described

11  above, my best estimate is that I am owed

12  approximately $137,743.59 in base wages."

13        You see that?

14        A.    Yes.

15        Q.    And that this amount -- the following

16  sentence says that that amount does not include

17  liquidated damages, which add another $137,734.53 in

18  damages?

19        A.    Yes.

20        Q.    And then it says it also doesn't include

21  amounts encompassing fees, costs, or interest?

22        A.    Correct.

23        Q.    So, I guess, is it accurate to say that as

24  part of your -- you joining this lawsuit, you are

25  seeking at least $275,000 from Geico?



 1  anything for the record?

 2          COURT REPORTER:  Just to confirm orders for

 3  the transcript.

 4          MR. TSONIS:  We'll do an electronic

 5  transcript only.

 6          THE VIDEOGRAPHER:  Okay.  Thank you.  This

 7  will conclude today's videoconference deposition of

 8  Albert Brust taken on January 15th, 2025, at 4:44 p.m.

 9  Central Time.

10          (Whereupon, the proceedings concluded.)

11           FURTHER DEPONENT SAITH NOT

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1   STATE OF ILLINOIS    )
                         ) SS:
2   COUNTY OF C O O K    )

3

4        I, ANDREW R. PITTS, C.S.R. within and for the

5   County of Cook and State of Illinois, do hereby

6   certify that heretofore, to wit, on Friday the 15th

7   day of January, 2025, personally appeared before me

8   via videoconference, ALBERT BRUST, in a cause now

9   pending and undetermined in the United States District

10  Court, For the Eastern District of New York, wherein

11  KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS

12  PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE

13  JONES, individually and on behalf of all others

14  similarly situated are the Plaintiffs, and GOVERNMENT

15  EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the

16  Defendant.

17       I further certify that the said witness was

18  first duly sworn to testify to the truth, the whole

19  truth and nothing but the truth in the cause

20  aforesaid; that the testimony then given by said

21  witness was reported stenographically by me in the

22  presence of the said witness remotely via

23  videoconference, and afterwards reduced to typewriting

24  by Computer-Aided Transcription, and the foregoing is

25  a true and correct transcript of the remote
```



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
300

```
 1   videoconference testimony so given by said witness as
 2   aforesaid.
 3        I further certify that the signature to the
 4   foregoing deposition was reserved by counsel for the
 5   Deponent.  I further certify that the taking of this
 6   deposition was pursuant to Notice, and that there were
 7   present via videoconference at the deposition the
 8   attorneys hereinbefore mentioned.
 9        I further certify that I am not counsel for nor
10   in any way related to the parties to this suit, nor am
11   I in any way interested in the outcome thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto set my
13   hand and affixed my seal this 22nd day of January,
14   2025.
15        Andrew R. Pitts
16   _____
17   ANDREW R. PITTS, CSR, RPR
18   CSR, COOK COUNTY, ILLINOIS
19
20
21
22
23
24
25
```

