Exhibit 35

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF NEW YORK

 3     KEITH FISCHER, MICHAEL           )
       O'SULLIVAN, JOHN MOESER, LOUIS   )
 4     PIA, THOMAS BARDEN, CONSTANCE    )
       MANGAN, and CHARISE JONES,       )
 5     individually and on behalf of all )
       others similarly situated,       )
 6                                       )
                Plaintiffs,              )
 7                                       ) No. 2:23-cv-2848
         -v-                             )
 8                                       )
       GOVERNMENT EMPLOYEES INSURANCE    )
 9     COMPANY d/b/a GEICO,              )
                                         )
10              Defendant.               )

11

12               Friday, January 10, 2025

13          Oral videoconference deposition of CRAIG

14   COSTANZO, held pursuant to Notice via Zoom with all

15   parties participating remotely, commencing at

16   10:00 a.m. Central Time, on the above date, before

17   Andrew R. Pitts, Certified Shorthand Reporter.

18

19

20

21

22

23

24   Andrew R. Pitts, CSR, RPR
     License No.:  084-4575
25   Esquire Deposition Solutions
```



```
 1   REMOTE APPEARANCES:

 2   On behalf of the Plaintiffs:

 3   OUTTEN & GOLDEN, LLP
     685 Third Avenue - 25th Floor
 4   New York, New York  10017
     (347) 390-2121
 5   Email: zdsouza@outtengolden.com
             sjean@outtengolden.com
 6   BY:  ZARKA SHABIR DSOUZA, ESQUIRE
          SABINE JEAN, ESQUIRE
 7

 8   On behalf of the Defendant GEICO:

 9   DUANE MORRIS, LLP
     190 South LaSalle Street - Suite 3700
10   Chicago, Illinois  60603-3433
     (312) 499-6779
11   Email:  gtsonis@duanemorris.com
     BY:  GREGORY TSONIS, ESQUIRE
12

13

14   ALSO PRESENT:

15      MEGAN SCZYGELSKI, Legal Videographer.

16

17

18

19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2   CRAIG COSTANZO                        EXAMINATION

 3       BY MR. TSONIS                          5

 4

 5                  E X H I B I T S

 6   COSTANZO        DESCRIPTION              PAGE

 7   Exhibit 1     Workday profile for Craig
                   Costanzo, G004533-4588     separate
 8                 (confidential)             transcript

 9

10   Exhibit 2     Geico HR Associate Handbook,  147
                   Compensation Contents,
11                 G000028-43

12   Exhibit 3     2017 Geico Performance Guide &  166
                   Appraisal for Craig Costanzo,
13                 G006638-6642

14   Exhibit 4     2019 Geico Performance          183
                   Appraisal for Craig Costanzo,
15                 G006591-6603

16   Exhibit 5     2020 Geico Performance          193
                   Appraisal for Craig Costanzo,
17                 G006581-6590

18   Exhibit 6     MAP 2 2021 (second half of      206
                   year) Performance Appraisal,
19                 Craig Costanzo, G006623-6626

20   Exhibit 7     MAP 2 2022 (second half of      223
                   year) Performance Appraisal,
21                 Craig Costanzo, G006621-6622

22   Exhibit 8     Answers to Interrogatories      229

23   Exhibit 9     Geico Human Resources           250
                   Associate Handbook,
24                 G000191-235

25
```



```
 1                    (Whereupon, the following proceedings were
 2                    taken via videoconference.)
 3                    THE VIDEOGRAPHER:  Good morning.  I am now
 4        started the recording, and we are now on the record.
 5        The time is 10:01 a.m. Central on Friday,
 6        January 10th, 2025.  This begins the videoconference
 7        deposition of Craig Costanzo taken in the matter of
 8        Keith Fischer, et al., versus Government Employees
 9        Insurance Company doing business as Geico filed in the
10        United States District Court for the Eastern District
11        of New York, Case No. 23-cv-2848.
12                    My name is Megan Sczygelski.  I'm your
13        remote videographer today.  The court reporter is
14        Andrew Pitts.  We are representing Esquire Deposition
15        Solutions.
16                    Will everyone present please identify
17        themselves and state who you represent, after which
18        the court reporter will swear in the witness.
19                    MS. DSOUZA:  Hi.  This is Zarka DSouza from
20        the law firm Outten & Golden on behalf of the
21        Plaintiffs.
22                    MR. TSONIS:  Gregory Tsonis on behalf of
23        Defendant Geico, from Duane Morris LLP.
24                    MS. JEAN:  Sabine Jean from Outten & Golden
25        on behalf of the Plaintiffs.
```



1              COURT REPORTER:  Okay.  Mr. Costanzo,

2     please raise your right hand to be sworn in.

3              (Whereupon, the witness was

4               administered an oath.)

5              COURT REPORTER:  Okay.  Great.  Sworn.  You

6     may lower your hand.  I will mute myself, and Counsel,

7     you may proceed.

8              MR. TSONIS:  Thank you.

9                   CRAIG COSTANZO,

10    called as a witness herein, having been first

11    administered an oath, was examined and testified

12    remotely via videoconference as follows:

13                   EXAMINATION

14    BY MR. TSONIS:

15        Q.    Good morning, Mr. Costanzo.  How are you?

16        A.    Good morning.  How are you?

17        Q.    I'm well, thank you.  My name is Greg

18    Tsonis, as you heard, and I'm a lawyer for Geico.

19    I will be the one that is taking your deposition

20    today.

21             Before we get started, just a couple of

22    foundational things, then I'll go over some basic

23    ground rules, but can you state and spell your name

24    for the record.

25        A.    My name is Craig Costanzo; C-R-A-I-G,



```
 1        Q.    Okay.  You started working for Geico in
 2   approximately 2014, right?
 3        A.    That's correct.
 4        Q.    All right.  And are you still employed by
 5   Geico?
 6        A.    I am.
 7        Q.    All right.  Was, to the best of your
 8   recollection, your performance evaluation something
 9   that was pretty recent, or was it something from a
10   while back?
11        A.    It was from a while back.
12        Q.    Okay.  Any other documents that you recall
13   reviewing besides the complaint, the e-mail, and
14   performance evaluation?
15        A.    It was a document regarding my responses to
16   certain questions, I guess.
17        Q.    Does the word interrogatory sound familiar?
18        A.    Yes.
19        Q.    Okay.  So you -- you re- -- you reviewed
20   your responses to some set of interrogatories?
21        A.    Some of it, correct.
22        Q.    Okay.  Fair enough.  Not every single
23   sentence or word, and not maybe every single question,
24   but some of them; is that right?
25        A.    Correct.
```



```
 1          Q.    Okay.  So --
 2          A.    Because they set the goal packages.
 3          Q.    When you began working for Geico, were you
 4    located out of -- well, strike that.
 5                When you began working for Geico, what was
 6    your job title?
 7          A.    Senior field investigator, I believe, or
 8    senior security investigator.
 9          Q.    So as a -- does the title, job title
10    outside security investigator sound familiar?
11          A.    Yes.
12          Q.    All right.  And is it your understanding
13    that an outside position within the context that we're
14    talking about refers to a field position?
15          A.    Correct.
16          Q.    All right.  And so you worked out in the
17    field, and you didn't on a day-to-day basis have to go
18    into the office to do your work, right.
19          A.    That's correct.
20          Q.    All right.  But in Geico's system, you were
21    assigned to a specific office, right?
22          A.    Yes.
23          Q.    Were you assigned out of the what was then
24    the Woodbury office?
25          A.    That was my understanding, yes.
```



1    A.    I think I answered to him until they put me

2  under Renee.

3    Q.    Do you know Renee's last name?

4    A.    It's my current manager, and I'm drawing a

5  blank on his last name.

6    Q.    That's okay.  And we'll -- this isn't a

7  memory test, but there are some documents that I think

8  will probably refresh your recollection --

9    A.    Yes.

10    Q.    -- help you.  So I'm not -- not trying to

11  get you to just wrack your brain for no reason.  I'm

12  just trying to get a certainly general sense of -- of

13  the timeline.

14        When you started in 2014, do you recall who

15  your supervisor was?

16    A.    Chet Janik.

17    Q.    All right.  And did Chet, Chet Janik,

18  continue being your supervisor until he retired?

19    A.    That's correct.

20    Q.    Do you recall approximately when Chet

21  retired?

22    A.    I don't want to guess.  I don't remember.

23  I'm -- '22, '23 something.  I don't -- I'm not --

24  I don't remember for sure.

25    Q.    Okay.  So in any event, I mean, going back



1    of 2020 that there was a period of time where they

2    authorized, and for example, ten hours of overtime for

3    any investigator that wanted it?

4         A.    I -- I do recall times where they were

5    authorizing it, yes.

6         Q.    Okay.  And that's, I guess, what I mean by

7    preauthorized over time is that they've communicated

8    that there were a certain number of hours available to

9    an investigator in any given workweek, okay?

10        A.    Okay.

11        Q.    So when that overtime was offered, did you

12   utilize it?

13        A.    I don't remember for sure, but I believe

14   so.  I believe I did some.  I mean, with the volume of

15   cases, I believe I did.

16        Q.    Okay.  Is it -- it's your recollection that

17   you used some, but not all of the hours?

18        A.    I think so.  I don't think I used all of

19   it, no.

20        Q.    Okay.  Setting aside those periods where

21   they communicated, you know, a pool of hours on a

22   weekly basis that are available for overtime, what was

23   the process by which you would, you know, make a

24   request to work overtime?

25        A.    If you saw the need and something was



```
 1   coming up, I would check with my supervisor and say,
 2   "This is what I think's going to happen, and I don't
 3   think I'm going to be done in time.  Am I okay to
 4   work?"
 5        Q.    So you had author -- or you would request
 6   to your supervisor you had -- strike that.
 7             So is it accurate to say you would
 8   identify, you know, the -- the business purpose for
 9   needing to work overtime with your cases and request a
10   certain amount of overtime?
11        A.    Yes.
12        Q.    Would you do that verbally or in writing?
13        A.    I remember it could have been both, I mean
14   one or the other.  If I happened to call, it might be
15   verbal, or otherwise I would send an e-mail.
16        Q.    How frequently would you make that kind of
17   a request to your supervisor?
18        A.    Well, again, it depends what the time frame
19   was.  It's hard to say.  You know, we reached a point
20   where we were, you know, told there was no more
21   overtime, so you wouldn't ask because people were even
22   told there isn't.
23        Q.    Okay.  What was the point, what was the
24   period of time approximately where you, you know, were
25   making those kinds of requests?
```



1    A.    I mean, I -- it's hard for me to say a

2  specific time frame.  I mean, it was prior to the

3  COVID.

4    Q.    An estimate?  What's your best estimate,

5  prior --

6    A.    I mean, it was prior to COVID, but it's

7  hard to -- it -- you know, it wasn't 2014.  I --

8  I don't know for sure.

9    Q.    All right.  So between 2016 and, you know,

10  February-March of 2020 for at least some of that time,

11  you were able to request, you know, overtime in this

12  way?

13    A.    Yes.

14    Q.    All right.  And would your supervisor

15  typically approve it?

16    A.    Yes.

17    Q.    Okay.  After he approved it, would you send

18  any sort of follow-up documentation?

19    A.    Not that I recall.  I mean, if it -- if

20  there was something different or a change from what we

21  talked about, I probably would have let him know.

22    Q.    Okay.  In 2016 time period, do you recall

23  the timekeeping sort of software that Geico used?

24    A.    I don't remember.  I know it wasn't

25  Workday.



1        Q.    Okay.   That was -- you're going to where

2   I was going.

3              There was ultimately a Geico transition to

4   Workday, right?

5        A.    Yes.   Yes.

6        Q.    But in both systems, you would enter your

7   hours worked on a daily basis?

8        A.    Yes.

9        Q.    All right.   In both systems, would your

10  timesheet go up to your supervisor for approval?

11       A.    Yes.

12       Q.    All right.   So if you worked overtime, you

13  knew that you were supposed to document that in the

14  either Workday or the other timekeeping system?

15       A.    Yes.

16       Q.    All right.   And when your supervisor

17  approved -- well, strike that.

18             You're supervisor would ultimately approve

19  your timesheet, right?

20       A.    Yes.

21       Q.    All right.   When your supervisor's

22  approving your timesheet, was it your understanding

23  that they were just doing the basic check of your

24  hours, matching up in any time off requests you, you

25  know, had requested were included?



```
 1         A.    I think so.
 2         Q.    Okay.  Your supervisor, I guess, doesn't
 3   know on a day-to-day basis what hours you're working,
 4   right?
 5         A.    Not unless we happen to -- I mean, that's
 6   probably correct.  Unless we talked about it, there
 7   was a -- we were able to start at different times for
 8   a period and then they kind of set it, set our start
 9   times.
10         Q.    Okay.  As a field investigator, though, you
11   would have the ability generally to flex your schedule
12   as needed?
13         MS. DSOUZA:  Objection.
14         You can answer, Craig.
15   BY THE WITNESS:
16         A.    To some extent.  See, it's -- it kind of
17   got difficult because, as they started implementing
18   these TIP times, they started -- you know, they kind
19   of locked you into a schedule because they were
20   sending you cases that you had to make TIPs relatively
21   quickly after you got the case.  So you were kind of
22   locked into a -- the schedule, not necessarily set,
23   but you had to kind of be there during the day time to
24   manage those TIPs.
25
```



```
 1   BY MR. TSONIS:
 2        Q.    What was the time period within which you
 3   had to do those activities, the TIP activities?
 4        A.    Well, some of it -- and, again, it changed
 5   so much, but at one point, it was like you're supposed
 6   to be doing something with it, like, in a couple of
 7   hours.  It -- it got very confusing because it was
 8   within a couple hours, but then they'd say it's an
 9   overall add all the numbers together kind of thing,
10   and then they'd average it out.  So it was kind of
11   confusing.
12        Q.    Okay.  And we'll talk more about that.
13             Did you ever notify your supervisor that
14   you were working overtime but not documenting it in
15   Geico's timekeeping system?
16        A.    I wouldn't say that I said it exactly like
17   that.  I -- I believe it was more of an "I have to
18   stay, I have to work past the times to try to meet
19   these requirements" and that I felt it was not
20   possible to meet these requirements once they started
21   giving us the huge volume of cases.  There was no way
22   to do it within the eight-hour day.
23        Q.    Okay.  But you never specifically told your
24   supervisor that you were working time periods but not
25   logging them in Geico's timekeeping system?
```



1     A.   I never specifically told him that I was

2   not logging time into the system, no, I didn't say

3   that, I don't believe.

4     Q.   Okay.  Similarly, you never told any SIU

5   manager that you were working but not entering certain

6   periods of time working into the company's timekeeping

7   system?

8     A.   I believe I made it clear that there was no

9   way to do this unless I put extra time in.  I didn't

10  specifically say I'm not putting it into the

11  timekeeping, but I believe I made it clear to them was

12  that the only way there was working was because we

13  were putting in extra time.

14    Q.   Who did you make that report to?

15    A.   Bill Newport.

16    Q.   When did you make that -- when did you have

17  that conversation?

18    A.   I mean, I couldn't tell you specifically

19  when.  I just felt that, you know, the message was

20  getting crossed that this isn't working.  You're

21  giving us way too many cases to have the expectation

22  that we're able to do this in eight hours, and the

23  only way we can get this done is to put extra time in.

24    Q.   Right, but none of your cases -- well,

25  strike that.



CRAIG COSTANZO  Non-Confidential                      January 10, 2025
KEITH FISCHER v GEICO                                                57

1   exhibit here.  I'm going to drop it in the chat for

2   you as well, Court Reporter and Zarka.

3              MS. DSOUZA:  Okay.  Thank you.

4              (Whereupon, proceedings were had which were

5               deemed confidential.)



1      A.    Yes, it was.

2      Q.    Okay.  Now, it shows you in terms of

3  location here, it says Buffalo, New York for field,

4  right?

5      A.    It does.

6      Q.    But you were actually, I think you said,

7  assigned out of the Woodbury office?

8      A.    That was my understanding, yes.

9      Q.    All right.  Did you have an understanding

10  that you worked in what was then known be as region 2

11  at Geico?

12      A.    Yes.

13      Q.    All right.  And did you understand that the

14  Buffalo office was region 3?

15      A.    I think so.  I'm not sure I remember which

16  region they were.

17      Q.    Okay.

18      A.    But yeah, they were a different region.

19  I thought they were 8, but I could be wrong.

20      Q.    You've got me second guessing myself too.

21  It might be that it's 8.

22            Okay.  But going back to this Manager

23  History, so it guess it shows, you know, Chester Janik

24  until November 18th of 2022 was your supervisor, or it

25  says --



1          A.    Yes.

2          Q.    -- manager here, but supervisor, right?

3          A.    Right.

4          Q.    And then after that, from, you know,

5    November 19th of 2022 to about June 30th of 2023, was

6    Dara Campbell your supervisor?

7          A.    Yes.

8          Q.    All right.  And then from July 1st of 2023

9    to March 18th of 2024, was Andrew Gelderman your

10   supervisor?

11         A.    That's correct.

12         Q.    All right.  And then currently, is Sarah

13   Greenman -- well, since March 19, 2024, to present, is

14   Sarah Greenman your supervisor?

15         A.    Yes.

16         Q.    Okay.  So you've had just those four

17   supervisors your entire career with Geico?

18         A.    Yes, that's correct.

19         Q.    And the majority of that, I think we've

20   said, and even prior to this 2016 date here, Chester

21   Janik was your supervisor from when you started?

22         A.    That's correct.

23         Q.    Okay.  Is this time frame of November, you

24   know, 2022 accurate to the best of your knowledge as

25   far as when the change happened between Chester Janik



 1    I think part of it started when they were trying to
 2    hold us for those, you know, TIPs within a couple
 3    hours kind of thing that kind of they didn't tell us
 4    that we couldn't adjust, but you really couldn't and
 5    still try to meet those.
 6            So, I mean, some of it was kind of just by
 7    circumstances you had to kind of work within these
 8    normal hours because they were going to send you
 9    cases, and you needed to get those TIPs in.
10        Q.    Right.  But I guess typically in 2017,
11    let's say, I mean, Chet Janik wasn't telling you, you
12    had to start your day at 7:30 in the morning, right?
13        A.    Correct.
14        Q.    I mean, you would kind of figure out, for
15    example, if you needed to go and do an examination
16    under oath or have multiple appointments in the city
17    and you wanted to beat traffic, you could decide to
18    just leave earlier that day and end your day earlier?
19        A.    Yes, that's true.
20        Q.    All right.  So I guess, you know, that's
21    what I mean in terms of the flexibility of when you
22    actually start your day and when you end it.  It was
23    far more flexible for you than, for example, a desk
24    investigator; is that accurate?
25        A.    I would think so, yes.



1   exact reason for why they were.  I was just told that

2   they were definitely higher rated.

3   BY MR. TSONIS:

4        Q.    Okay.

5        A.    I don't remember any conversations as to

6   why.  I don't -- I don't think I ever asked.

7        Q.    Pre-COVID, how much time in a given, you

8   know, day that you're out in the field do you spend

9   driving to and from various places, as opposed to

10  actually doing a scene canvas or an examination under

11  October or what have you?

12       A.    It's -- I mean, it's hard for me to say.

13  I can say prior to COVID, my area of coverage was

14  substantially different than what I do now.

15       Q.    How was it different?

16       A.    Well, I would cover from east of Rochester

17  to Herkimer area to the Canadian border to

18  Pennsylvania border.  Currently, I cover all of

19  upstate from -- from and sometimes including

20  Pennsylvania, northern Pennsylvania, and the entire

21  upstate New York.  So I'm driving from Albany to

22  Buffalo.  So the amount of drive time is substantially

23  more right now.

24       Q.    So the amount of drive time post-COVID once

25  in person things started happening more is more now



```
1          Q.    When was that, approximately?
2          A.    I don't know what the date was.  I'm sorry.
3    I just don't know.
4          Q.    Was it about -- was it in 2021?
5          A.    I believe so.  I think so.
6          Q.    Was it later in the year in 2021?
7          A.    I'm not sure.  I think you're right, but
8    I don't recall for sure.
9          Q.    I know I've heard from multiple people, and
10   obviously what I recall myself, but that New York was
11   one of the states that kind of locked down the
12   longest; is that fairly right?
13         A.    That's my understanding, yes.
14         Q.    Okay.
15         A.    Yeah.
16         Q.    So during the time post-COVID where you
17   weren't doing any field work, you didn't have any of
18   this drive time that you had to do anymore, right?
19         A.    That's correct.
20         Q.    So the, you know, hour and a half there,
21   hour and a half back is not something that you had in
22   your work day anymore?
23         A.    That's correct.
24         Q.    And the driving, like we said, from point A
25   to B to C, that didn't happen anymore either, right?
```



1   really.  Like I said, I kind of remember there was

2   like a theft group and a shop group, but I wasn't part

3   of any of the way they broke that up.  We -- upstate

4   just kind of we got whatever we got in the area, so it

5   was different.

6        Q.    Okay.  So because you were sort of in

7   upstate New York as -- as opposed to, for example, New

8   York City proper, you were handling all different

9   types of cases?

10       A.    Right.

11       Q.    All right.  Whereas some other

12  investigators that worked out of Woodbury, for

13  example, might only work primarily one specific type

14  of case if that was the team they were on?

15            MS. DSOUZA:  Objection.

16  BY THE WITNESS:

17       A.    I think so.

18  BY MR. TSONIS:

19       Q.    Okay.  Did you ever work, like, medical

20  investigations?

21       A.    Different aspects, yes.  I mean, we do

22  bodily injury, we do PIP investigations, but not

23  extensive medical.  But yeah, I mean, we would get the

24  bodily injury and the PIP type of investigations.

25       Q.    Okay.  Have you ever talked to any other



CRAIG COSTANZO  Confidential                                January 10, 2025
KEITH FISCHER v GEICO                                                    127

1    and Melville were not part of the same region, right?

2         A.    Correct.

3         Q.    To the best of your knowledge or

4    understanding, was there a different SIU manager for

5    Buffalo than there was for Woodbury?

6         A.    I think so.

7         Q.    Okay.  You didn't, for example, believe

8    that Bill Newport managed the Buffalo office; do you?

9         A.    I don't believe so, but I don't know for

10   sure.

11        Q.    Okay.

12        A.    I didn't think so.

13        Q.    Do you have any kind of understanding as to

14   the policy -- or the practices or procedures that

15   investigators assigned out of the Buffalo office

16   operate under?

17        A.    No, I don't.

18        Q.    All right.  Do you have any understanding

19   or knowledge about the case load that investigators

20   assigned to the Buffalo location had?

21        A.    No.

22        Q.    All right.  Do you have any understanding

23   as to whether or not investigators assigned to the

24   Buffalo office worked overtime?

25        A.    I don't know.



1    Q.    All right.  And do you have any

2  understanding as to whether or not investigators

3  assigned to the Buffalo office recorded any overtime

4  in Workday or the predecessor timekeeping system?

5    A.    I don't know.

6    Q.    All right.  And similarly, and last

7  question, you don't have any knowledge as to any

8  complaints by investigators that were assigned to the

9  Buffalo office regarding, you know, unpaid overtime?

10    A.    I'm not aware of that, no.

11    Q.    Okay.  The -- what we've been calling the

12  Woodbury office at some point also changed locations,

13  right, to what is now known as the Melville office?

14    A.    Yes.

15    Q.    Okay.  How frequently would you go into

16  either the Woodbury or the Melville office?

17    A.    I've never been to either.

18    Q.    You've never even stepped foot in the

19  office?

20    A.    No, I have not.

21    Q.    Okay.  Earlier, we referenced Workday.  Do

22  you -- at some point, was there a change where on your

23  phone you clock in and clock out?

24    A.    No.

25    Q.    Okay.  So you're not subject to any sort of



1   significantly changed by not being in the field

2   anymore, right?

3        A.    Right.

4        Q.    Right.  So the workload that you have,

5   I think you've testified repeatedly, you know, the

6   number of cases that you were assigned went up, right?

7        A.    Substantially, yes.

8        Q.    Okay.  And we also talked earlier about how

9   the types of cases that you would get changed as well,

10  right?

11       A.    Somewhat, yes.

12       Q.    All right.  So given those changes, why do

13  you believe that Chester Janik would know when you

14  say, "Hey, I can't do this work," you know, "my case

15  load is too high for me to get all this done," why

16  would Chester Janik take that to mean that you're

17  working additional hours and not logging them as

18  opposed to just trying to adjust to the changed case

19  load and case mix?

20       A.    Again, I -- we -- I think it was pretty

21  clear that we were saying we can't keep up with this

22  and get these deadlines done.  So I guess I'm kind of

23  thinking he would have understood that what we were

24  saying is this is causing us to work late.

25  I believe -- I don't know.  I believe that they knew.



1  I think it was pretty clear that we were working and

2  putting extra hours in.

3      Q.    Okay.  So you're -- but I understand your

4  belief, but you don't actually know whether Chet Janik

5  or others actually understood that you were working

6  additional hours, right?

7      A.    All I can -- what I -- what I think and

8  what I believe is all I know.  I don't -- I don't have

9  a -- anything else other than that's what I believe.

10      Q.    Okay.  So I just want to be clear.

11            I understand that you believe that -- that

12  you made yourself clear?

13      A.    Yes.

14      Q.    Is that right?  All right.

15            But you don't -- besides your belief, you

16  don't have any other evidence that they actually

17  understood that?

18            MS. DSOUZA:  Objection.

19  BY MR. TSONIS:

20      Q.    Like, for example, Chet Janik never said,

21  "I know you've been putting in the hours and not

22  getting paid for it," or anything like that?

23            MS. DSOUZA:  Objection.

24  BY THE WITNESS:

25      A.    I -- I don't remember a conversation with



CRAIG COSTANZO  Confidential                                    January 10, 2025
KEITH FISCHER v GEICO                                                        144

1  him specifically saying that.

2  BY MR. TSONIS:

3      Q.   But you don't remember him saying anything

4  like that in substance, though, right?

5      A.   I -- I don't remember him saying that.

6      Q.   Okay.  And similarly, you don't recall Bill

7  Newport ever acknowledging in any way that you or any

8  other investigator was working hours off the clock?

9      A.   I don't remember if there's a -- I don't

10 remember if there's an e-mail or anything that was

11 specific to that.  I don't.

12     Q.   In fact, the instructions that you had

13 received at some point from Bill Newport was that --

14 and your supervisor was that all hours had to --

15 worked had to be entered into Workday, right?

16     A.   Yes.

17     Q.   And you, I think, referenced earlier that

18 you even had copies of the associate handbook in your

19 home, right?

20     A.   Yes.

21     Q.   You understand that Geico's policy is that

22 associates are responsible for accurately recording

23 all hours worked?

24     A.   Yes.

25     Q.   All right.  And you understood that Geico's



```
 1              (Whereupon, the following proceedings were
 2              deemed not confidential.)
 3    BY MR. TSONIS:
 4        Q.    I'm going to show you what's going to be
 5    marked as Exhibit 2.  Let me share my screen again.
 6              (Whereupon, Costanzo Exhibit 2 was
 7              presented.)
 8    BY MR. TSONIS:
 9        Q.    You see this document, Mr. Costanzo?
10        A.    Yes.
11        Q.    All right.  What is this document?
12        A.    This is part of the handbook, I believe.
13    Yes.
14        Q.    Yeah, do you see down here, it says --
15        A.    Yeah, Human Resources Associate Handbook.
16        Q.    Yeah.  And this is a portion, not the
17    entire handbook, but the -- do you see on the bottom
18    right, it says Compensation Contents?
19        A.    Yes.
20        Q.    And do you see, again, here -- sorry to
21    jump back and forth -- on the left, there's a date
22    that say 11/17, slash 17?
23        A.    Yes.
24        Q.    Is it your understanding that this reflects
25    the compensation portion of the associate handbook
```



1          You understood that if you weren't paid for

2     all hours worked that you were able to contact

3     somebody?

4          A.    Yes.

5          Q.    All right.  And did you ever contact your

6     supervisor because you didn't receive pay for all the

7     hours that you worked in workweek?

8          A.    I did not.

9          Q.    Did you ever contact the local human

10    resources manager because you weren't -- did not

11    receive your pay for all hours worked in a workweek?

12         A.    I did not.

13         Q.    Did you ever contact corporate human

14    resources because you did not receive pay for all

15    hours worked in a workweek?

16         A.    I did not.

17         Q.    Did you ever attempt to contact either

18    supervisor, local human resources manager, or

19    corporate human resources?

20         A.    No, I did not.

21         Q.    Were you aware of who your local human

22    resources manager was?

23         A.    No, but it's -- I'm sure I could have

24    looked it up.

25         Q.    Thank you.  That was going to be my next



1  question.

2          And similarly, are you aware that Geico

3  maintains a Berkshire Hathaway ethics hotline?

4          A.    I am aware, yes.

5          Q.    All right.  And, you know, you never

6  contacted the Berkshire ethics -- strike that.

7          You never contacted the Berkshire Hathaway

8  ethics hotline to complain about not being paid for

9  all hours worked?

10         A.    I did not.

11         Q.    Okay.  Under the section here that deals

12  with hourly non-exempt associates, do you see it shows

13  in the parentheses afterwards that it includes certain

14  auto damage adjusters, and it says, "Field SIU

15  investigators in Alaska, California, New Mexico, and

16  Pennsylvania"?

17         A.    Yes.

18         Q.    All right.  So you didn't work in one of

19  those our states, right?

20         A.    I did not.

21         Q.    Okay.  So this would seem to apply to

22  you -- and, again, I understand you already testified

23  that you're not sure, but as it's written, it would

24  seem that it would apply to you, right?

25         A.    Yes.



1          A.    Yes.

2          Q.    All right.  So does that refresh your

3   memory of approximately when you became the lead

4   investigator?

5          A.    Yeah, I guess it would have been during

6   that period, yes.

7          Q.    Right.  So it seems like it's about August

8   of 2019?

9          A.    '19, yes.

10         Q.    And you write in your evaluation that,

11  "This is an area you'd like to improve in.  I missed

12  the goal in 5 of 6 months.  I did note that in most of

13  the months that the goal was not met, I had been

14  assigned more cases, 36, 37, 38, and 40.  I will work

15  to recognize when I have a heavier case load and

16  I will need to adjust and find ways to ensure that

17  this goal is met."

18              You see that?

19         A.    I do.

20         Q.    Okay.  So in this performance review,

21  I guess, you were stating that, you know, a higher

22  case load was, I guess, you know, part of the reason,

23  it seems like, why you had missed the goal in five or

24  six months?

25         A.    Yes.



1          Do supervisors approve a case that has a
2    final disposition?
3          A.    Not anymore.
4          Q.    At this time or prior to this time, did
5    they?
6          A.    For me, I would say no.  I was on
7    self-approval from -- I want to say before I was lead
8    investigator.  At some point, everybody else became
9    self-approved.  I don't know when that date happened.
10         Q.    Okay.  Well --
11         A.    At this time, probably not, but I'm not
12   sure.
13         Q.    Do you recall when you became
14   self-approval?
15         A.    I don't.
16         Q.    Was it -- go ahead.
17         A.    It wasn't long.  I -- it wasn't long.
18   I was still a field investigator when I became
19   self-approved, although --
20         Q.    And that was shortly after you began
21   working for Geico?
22         A.    I think so, yeah.  It wasn't long.
23         Q.    So when you closed a file, it wouldn't
24   generate, you know, like a, "This case needs the
25   closure or the disposition, needs to review and



1  approval by Chet Janik?

2       A.    Not once I was self-approval, no.

3       Q.    Okay.  And I think you said that was

4  probably -- that was prior to 2016?

5       A.    Yes, I think so.

6       Q.    Okay.  So we see, just to go back to this,

7  a 1 is, you know, 114.99 for Investigative Activities,

8  right?

9       A.    Yes.

10      Q.    All right.  And then File Quality, again

11 it's a percentage of sort of files that are

12 satisfactory of when you're doing the audits, and

13 100 percent is a 5, right?

14      A.    Yes.

15      Q.    And then closed cases/productivity, again

16 this is an average of monthly adjusted productivity

17 ratio, right?

18      A.    Yes.

19      Q.    Productivity is still weighted 40 percent

20 and still measured the same way in terms of an -- the

21 adjusted productivity ratio accounts for sort of

22 factoring process depending on the type of case?

23      A.    Yes.

24      Q.    All right.  And here, to be a 5 is

25 41 cases?



1    March 2020, I regularly worked about one extra hour

2    per day on top of my regularly scheduled 7.75 hours

3    per day.  As a result, I worked about 43 hours a

4    week."

5            Do you see that?

6        A.    I do.

7        Q.    Is that an accurate statement?

8        A.    It's -- it's an approximation, but I did

9    generally work approximately about an hour extra.

10       Q.    Okay.  Let me ask you something.  We looked

11   at your performance appraisals that talked about the

12   total cases assigned, right?

13       A.    Yes.

14       Q.    Okay.  And we saw between 2017 your

15   appraisal there and your appraisal in 2019 that there

16   was an increase in cases that you were assigned,

17   correct?

18       A.    Yes.

19       Q.    So is this number that you're talking

20   about, one hour per day, consistent across the entire

21   time period in 2016 to March 2020?

22       A.    I think so.  It's hard to say for sure, but

23   I -- I think so.  I think that's a fair representation

24   of it.  I mean --

25       Q.    Explain to me how the total number of cases



1   differs over a multi-year time period but you are

2   regularly always working one extra hour a day?

3       A.    Well, like I said, it's -- it's just sort

4   of what happened.  Are there days that I didn't?

5   Probably.  Are there days that I worked more than an

6   hour?  Probably.  But I think that's a fair

7   representation of what I was doing at the time.

8       Q.    Okay.  No one instructed you that you had

9   to work one extra hour per day, right?

10      A.    No, they did not.

11      Q.    Okay.  Chet Janik or any other supervisor

12  didn't instruct you that?

13      A.    Nobody instructed my to do that.

14      Q.    Neither Mike DeGrocco nor Bill Newport

15  instructed you?

16      A.    No, they did not.

17      Q.    Okay.  Do you agree that there was no real

18  way for your supervisor to know that you were working

19  one extra hour per day that you weren't including in

20  your timesheet?

21          MS. DSOUZA:  Objection.

22  BY THE WITNESS:

23      A.    I'm not sure how they would have known

24  that.

25



1   BY MR. TSONIS:

2       Q.    Right.   Earlier, I think you referenced

3   SICM time entries?

4       A.    Yes.

5       Q.    And you referenced general comments about,

6   you know, not being able to do the work?

7       A.    Yes.

8       Q.    Okay.   Certain activities you do as a field

9   investigator, you might be doing that work and not

10  actually being in SICM, right?

11      A.    That's correct.

12      Q.    So, for example, when you say you might

13  have worked an extra hour per day on top of your

14  regularly scheduled hours, it's possible that that

15  hour was spent commuting from the field back to your

16  house?

17          MS. DSOUZA:   Objection.

18  BY THE WITNESS:

19      A.    That's possible.

20          THE WITNESS:   Sorry.

21          MS. DSOUZA:   Go ahead.

22  BY THE WITNESS:

23      A.    Yes.   Yes, that -- that's possible.

24  BY MR. TSONIS:

25      Q.    Okay.   It's possible that that time was



1    scene canvas, it still takes time to review and then

2    look up the addresses, figure out who it is, make

3    phone calls to those business to see if they have

4    video.

5              It -- is it faster, or is it faster to go

6    knock from this door, walk to the next door, knock on

7    that door?  It -- it depends on each case.  It may be

8    faster, but it may not be.

9         Q.    But there are certain circumstances where

10   it could be faster certainly?

11        A.    It could be, yes.

12        Q.    Okay.

13             MS. DSOUZA:  Objection.  Sorry, Craig, just

14   give me a minute to object when -- before you answer.

15             THE WITNESS:  Okay.

16   BY MR. TSONIS:

17        Q.    Okay.  And then paragraph 13 here, it

18   references the return to normal field operations in

19   November '21, and you say, "My overtime hours

20   decreased somewhat as a result, but my case load has

21   still required me to work overtime.  I estimate that

22   since November '21, I work about 42 to 45 hours a week

23   on average because I have generally worked about one

24   to two extra hours a day."

25             Do you see that?



1    A.    Yes.

2    Q.    Is that an accurate statement?

3    A.    It was at the time, yes.

4    Q.    Is that an accurate statement now?

5    A.    I'm not doing that now.

6    Q.    When did you stop doing that?

7    A.    They -- they made it very clear.  There was

8  a point, and I can't tell you exactly when, that it

9  was at -- well, part of it is the way they started,

10  they changed -- we were being evaluated against each

11  other for hours worked, and so when they started

12  evaluating us based -- comparing us to everybody

13  else's based on the number of hours worked, it was

14  very clear:  You can't work extra hours, or you're

15  basically tainting the whole system.

16          So once, you know, they're -- they're

17  measuring us based on each other, I mean, for me to

18  work extra hours is really kind of fudging the system.

19  So I -- I -- you know, then it became pretty clear

20  that I don't want to be, like, cheating the system,

21  and I -- I didn't want to do that.

22    Q.    Wasn't it fudging the system though, prior

23  to what you're describing, ranking against other

24  investigators?

25    A.    I --



 1    that.  All right.  Let's go back to this exhibit, and

 2    I'll share my screen again.

 3    BY MR. TSONIS:

 4        Q.    Just it's -- all right.  This is the same

 5    document we were looking at after the table of

 6    contents, Mr. Costanzo.

 7              Do you see here the main section titled

 8    Your Employment?

 9        A.    Yes.

10        Q.    All right.  And do you see Classification

11    of Associates, the subsection, and then the further

12    subsection Non-Exempt Associates?

13        A.    Yes.

14        Q.    All right.  And particularly after

15    January 1st of 2020, you were paid a -- you were a

16    non-exempt associate for Geico, right?

17        A.    Okay.

18        Q.    All right.  And then it says, "Non-exempt

19    associates are never allowed to work," quote, "off the

20    clock," closed quote.  "Working off the clock violates

21    company policy and will result in disciplinary action

22    up to and including termination of employment."

23              Do you see that?

24        A.    Yep.

25        Q.    All right.  So you understood as of, at the



1  very least, this date that non-exempt associates and

2  you were never allowed to work off the clock?

3       A.   I see it now.

4       Q.   Okay.  Well, earlier, you reference that at

5  some point, they started ranking you against other --

6  other people, right?

7       A.   Yes.  Yes.

8       Q.   And I think you referenced -- and I don't

9  want to put words in your mouth, but did you stop your

10  off the clock work at that point in time?

11       A.   I did.

12       Q.   Okay.  So since that date, you have not

13  been working any hours that are not recorded in

14  Workday?

15       A.   Correct.

16       Q.   When, approximately, was that date?

17       A.   I don't know.  I don't know what the date

18  was.

19       Q.   Who was your supervisor at the time that

20  you stopped?

21       A.   I'm not sure.

22       Q.   Was it Dara Campbell?

23       A.   I don't know if it was Dara or if it was

24  Andrew.

25       Q.   It was one of those two individuals?



```
 1          A.    I believe so.

 2          Q.    But you don't know which one?

 3          A.    I don't.

 4          Q.    So it would have -- it would have, though,

 5    been some point in 2022 or 2023 then?

 6          A.    I believe so.

 7          Q.    Have you talked to any of the other people

 8    that are part of this lawsuit?

 9          A.    I have not.

10          Q.    Do you have an understanding as to who the

11    other individuals that have joined this lawsuit or

12    that have filed it are?

13          A.    I saw the -- some names on the one form.

14          Q.    Do you know any of those people, like Keith

15    Fischer?

16          A.    No, I don't know him, and I'm not aware --

17    I believe Mike Reed is, but other than that,

18    I don't --

19          Q.    Okay.

20          A.    Yeah, Maria maybe, I think, I heard was in

21    it.

22          Q.    Maria Munoz?

23          A.    Yes, but I don't --

24          Q.    Earlier --

25          A.    I don't know her very well.
```



1  And Ms. DSouza, would you like your client to read and

2  sign?

3              MS. DSOUZA:  Yes.

4              THE VIDEOGRAPHER:  Thank you.  This

5  concludes the videoconference deposition of Craig

6  Costanzo on -- sorry, on January 10th, 2025.  We are

7  going off the record at 4:12 p.m.

8              (Whereupon, the proceedings concluded.)

9              FURTHER DEPONENT SAITH NOT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   STATE OF ILLINOIS      )
                            ) SS:
 2   COUNTY OF C O O K      )

 3

 4         I, ANDREW R. PITTS, C.S.R. within and for the

 5   County of Cook and State of Illinois, do hereby

 6   certify that heretofore, to wit, on Friday the 10th

 7   day of January, 2025, personally appeared before me

 8   via videoconference, CRAIG COSTANZO, in a cause now

 9   pending and undetermined in the United States District

10   Court, For the Eastern District of New York, wherein

11   KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS

12   PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE

13   JONES, individually and on behalf of all others

14   similarly situated are the Plaintiffs, and GOVERNMENT

15   EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the

16   Defendant.

17         I further certify that the said witness was

18   first duly sworn to testify to the truth, the whole

19   truth and nothing but the truth in the cause

20   aforesaid; that the testimony then given by said

21   witness was reported stenographically by me in the

22   presence of the said witness remotely via

23   videoconference, and afterwards reduced to typewriting

24   by Computer-Aided Transcription, and the foregoing,

25   including the confidential excerpt, is a true and
```



1   correct transcript of the remote videoconference

2   testimony so given by said witness as aforesaid.

3        I further certify that the signature to the

4   foregoing deposition was reserved by counsel for the

5   Deponent.  I further certify that the taking of this

6   deposition was pursuant to Notice, and that there were

7   present via videoconference at the deposition the

8   attorneys hereinbefore mentioned.

9        I further certify that I am not counsel for nor

10  in any way related to the parties to this suit, nor am

11  I in any way interested in the outcome thereof.

12       IN TESTIMONY WHEREOF:  I have hereunto set my

13  hand and affixed my seal this 14th day of January,

14  2025.

15       _Andrew R. Pitts_

16  _____

17  ANDREW R. PITTS, CSR, RPR

18  CSR, COOK COUNTY, ILLINOIS

19

20

21

22

23

24

25

