Exhibit 40

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK
    ------------------------------------X
3   KEITH FISCHER, MICHAEL O'SULLIVAN,
    JOHN MOESER, LOUIS PIA, THOMAS
4   BARDEN, CONSTANCE MANGAN, and
    CHARISE JONES, individually and on behalf
5   of all others similarly situated,

6            Plaintiffs,

7                               Case No.:
                                2:23 Civ. 2848
8                               (GRB) (ARL)
         -against-
9
    GOVERNMENT EMPLOYEES INSURANCE
10  COMPANY D/B/A GEICO,

11           Defendants.
    ------------------------------------X
12

13
    DEPOSITION of MARGARET A. FISCHER
14

15
         December 19, 2024
16

17       New York, New York

18

19

20

21

22  Reported By:

23  Marina Dubson

24  Job #: J12144278

25



1

2

3                       DATE: December 19, 2024

                        TIME: 10:00 a.m.
4

5

6           DEPOSITION of MARGARET A. FISCHER, an

7    opt-in Plaintiff herein, taken by the

8    Defendant, pursuant to Federal Rules of

9    Civil Procedure, and Notice, held at the

10   Duane Morris LLP, 1540 Broadway, 14th

11   Floor, New York, New York 10036, at the

12   above-mentioned date and time, before

13   MARINA DUBSON, a Notary Public of the State

14   of New York.

15

16

17

18

19

20

21

22

23

24

25



MARGARET A. FISCHER                                December 19, 2024
FISCHER V. GEICO                                                  3

```
 1   APPEARANCES:

 2

 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6       Sjean@outtengolden.com

 7       ZARKA DSOUZA, ESQ.
         Zdesouza@outtengolden.com
 8

 9

10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG TSONIS, ESQ.
13   Gtsonis@duanemorris.com

14

15
     Gil Peretz, Shereck Video, videographer,
16

17

18

19

20

21

22

23

24

25
```



1        IT IS HEREBY STIPULATED AND AGREED,

2    by and between the attorneys for the

3    respective parties, as follows:

4

5    THAT all objections, except as to the form

6    of the questions, shall be reserved to the

7    time of the trial;

8

9    THAT the within examination may be signed

10   and sworn to before any Notary Public with

11   the same force and effect as if signed and

12   sworn to before the Court;

13

14   THAT filing of the original transcript of

15   the examination is waived.

16

17

18

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

1          M. A. Fischer

2          THE REPORTER:  Are you ordering

3   a copy of this transcript?

4          MS. JEAN:  Yes, copy.

5          MR. TSONIS:  Regular turnaround

6   final, no rough.

7                    XXXX

8          THE VIDEOGRAPHER:  Good

9   morning.  We are on the record, and

10  the time now is 10:12 a.m.

11         Today's date is December 19,

12  2024.

13         This is media one in the video

14  deposition of Ms. Margaret Fischer --

15  one second -- Margaret Fischer, in

16  the matter of Government Employee

17  Insurance Company -- I'm sorry.

18         In the matter of Keith Fischer

19  versus Government Employee Insurance

20  Company, index number 2:23 Civ. 2848

21  (GRB) (ARL).

22         My name is Gil Peretz.  I am

23  the legal videographer with Shereck

24  Video in association with Esquire.

25         Today we're at the offices of



1          M. A. Fischer

2    Duane Morris, LLC, located at 1540

3    Broadway on the 14th floor in New

4    York City, New York.

5          Would counsel please identify

6    yourself and state whom they

7    represent.

8          MS. DSOUZA:  This is Zarka

9    Dsouza from Outten & Golden on behalf

10   of plaintiffs.

11         Joining me today is my

12   colleague, Sabine Jean, also from

13   Outten & Golden, also representing

14   the plaintiffs.

15         MR. TSONIS:  Gregory Tsonis

16   from Duane Morris, LLC, on behalf of

17   defendant Geico.

18         THE VIDEOGRAPHER:  Thank you.

19         The court reporter with us

20   today is Marina Dubson with Esquire.

21         Will the court reporter please

22   swear in the witness.

23         (Whereupon, the witness was

24   sworn in by the Court Reporter.)

25                    XXXX



```
 1                       M. A. Fischer
 2   M A R G A R E T   A.   F I S C H E R,
 3            called as a witness, having been
 4            first duly sworn by a Notary Public
 5            of the State of New York, was
 6            examined and testified as follows:
 7   EXAMINATION
 8   BY MR. TSONIS:
 9        Q.    Good morning, Ms. Fischer.
10        A.    Good morning.
11        Q.    Can you please state and spell
12   your name for the record.
13        A.    It's Margaret, M-A-R-G-A-R-E-T,
14   Fischer, F-I-S-C-H-E-R.
15        Q.    All right.  And have you ever
16   gone by any other names?
17        A.    Peggy.
18        Q.    Peggy.  Any other last names?
19        A.    My maiden name is Meehan,
20   M-E-E-H-A-N.
21        Q.    And, Ms. Fischer, what's your
22   current address?
23        A.    ████████████████████████████,
24   ██████████.
25        Q.    So, my name -- as I introduced
```



1              M. A. Fischer

2    enter it weekly?

3         A.    I believe, if there was

4    something that required an entry for the

5    day, we would -- vacation or illness.

6         Q.    So, you would log in Workday

7    time that you were going to be off from

8    work?

9         A.    Yes.

10         Q.    Absences, vacation, that sort

11    of thing?

12         A.    Yes.

13         Q.    All right.  And you would also

14    log all the hours that you worked in

15    Workday?

16         A.    No.

17         Q.    You ultimately were the one

18    that were entering the time in Workday,

19    though, right?

20         A.    Correct.

21         Q.    All right.  And the time that

22    you entered in Workday you understood would

23    be the time that you would be paid for?

24         A.    Yes.

25         Q.    All right.  You understood that



```
 1                    M. A. Fischer
 2    Geico had a policy that you are required to
 3    accurately record all time worked in
 4    Workday?
 5         A.    Yes.
 6               MS. DSOUZA:  Objection.
 7    BY MR. TSONIS:
 8         Q.    You had been involved in two
 9    prior lawsuits that you alleged you weren't
10    paid for all time worked?
11         A.    Yes.
12         Q.    All right.  So, you were
13    certainly aware through those lawsuits that
14    Geico's policy was that employees should
15    enter into Workday all time that they
16    worked?
17               MS. DSOUZA:  Objection.
18         A.    Yes.
19    BY MR. TSONIS:
20         Q.    All right.  How many hours were
21    you scheduled per week?
22         A.    38.75.
23         Q.    And how many hours do you
24    contend that you worked per week that you
25    were not compensated for?
```



```
 1                    M. A. Fischer
 2   office, correct?
 3        A.    Yes.
 4        Q.    With the exception of a period
 5   of time post COVID where employees worked
 6   from home?
 7        A.    Yes.
 8        Q.    Okay.  When you transitioned
 9   back from working home to the office, were
10   you five days a week in the office?
11        A.    I did not return to the office.
12   I retired.
13        Q.    You retired.
14              And you never actually went
15   back to the office at that point?
16        A.    Correct.
17        Q.    Understood.  Prior to that
18   point -- well, strike that.
19              What was your job title at
20   Geico before you retired?
21        A.    Inside medical investigator.
22        Q.    Okay.  Did that job title
23   change at some point?  Were you something
24   else, and you became an inside medical
25   investigator?
```



                         M. A. Fischer

1

2        A.     It was a -- I believe the

3    titles did change.  It was just medical

4    investigator.

5        Q.     Were you ever something known

6    as, like, a major case investigator?

7        A.     Well, that's the same thing.

8    It was always a major case investigator.

9        Q.     Okay.  It was major case

10   because all the medical investigations

11   qualify as major case investigations; is

12   that right?

13            MS. DSOUZA:  Objection.

14       A.     No.

15   BY MR. TSONIS:

16       Q.     Back up for a second.

17            What's the difference, I guess,

18   between a field or desk investigator and a

19   medical -- inside medical investigator?

20       A.     I can answer what I did.  I

21   can't tell you what other people's jobs

22   included.  But my job, I investigated

23   medical providers and facilities.

24       Q.     Were there others that would

25   qualify as major case but didn't have the



1                        M. A. Fischer

2    job, claims that had already been paid,

3    right?

4         A.    Correct.

5         Q.    All right.  Other

6    investigators, like inside and outside

7    investigators, are typically investigating

8    pending claims, right?

9         A.    Yes.

10        Q.    How would cases get assigned to

11   you as an inside medical investigator?

12        A.    The supervisor would assign

13   them.

14        Q.    Who was your supervisor before

15   you retired?

16        A.    Kristen Slack.

17        Q.    Do you remember who the manager

18   was?

19        A.    Courtney Wolfe.

20        Q.    How long was Courtney Wolfe

21   your manager?

22        A.    I believe -- my best estimate

23   was that she started in 2018, I think.

24        Q.    Prior to Courtney Wolfe, who

25   was your manager?



```
1                    M. A. Fischer
2          A.    Bill Newport.
3          Q.    And when did Bill Newport start
4    being your manager?
5          A.    I don't remember.
6          Q.    Did he get to the Woodbury or
7    Melville office at around the same time as
8    Courtney?
9          A.    I don't understand.
10         Q.    So, was Courtney always located
11   in the Melville office?
12         A.    I believe so.
13         Q.    All right.  At some point, it
14   sounds like, if you started to -- reporting
15   to her in 2018, something changed, right?
16   Either she came to the office, or the
17   structure changed, right?
18         A.    She came from a different
19   department in Woodbury, yes.
20         Q.    Okay.  Do you remember who your
21   manager was before Bill Newport?
22         A.    I believe Mike DeGrocco.
23         Q.    To the best of your
24   recollection -- and I realize it was a long
25   time ago -- who was your supervisor in
```



                        M. A. Fischer

1

2   2016?

3       A.    2016, I believe Danielle

4   Perdomo.

5       Q.    And how long was she your

6   supervisor for?

7       A.    I couldn't say exactly, but I

8   would estimate around two years.

9       Q.    Who was your supervisor after

10  that?

11      A.    Kristin Slack.

12      Q.    Was there anyone in the middle?

13      A.    No.

14      Q.    Okay.

15      A.    Danielle had previously been my

16  supervisor once before also.  There was

17  somebody before Danielle.

18      Q.    Okay.  To the best of your

19  recollection, was Mike DeGrocco your

20  manager or the manager of the Woodbury

21  office in 2016?

22      A.    No.

23      Q.    Who was?

24      A.    I don't believe he was.  I

25  believe it was Bill Newport.  I'm not sure.



```
 1                 M. A. Fischer
 2                MS. DSOUZA:  I'd just like
 3         to -- Counsel, could you just wait
 4         for the witness to complete her
 5         answer before you ask the next
 6         question?
 7                MR. TSONIS:  Sure.
 8   BY MR. TSONIS:
 9         Q.    I think you said that you would
10   be assigned cases by your supervisor; is
11   that right?
12         A.    Correct.
13         Q.    Approximately how many cases
14   would you be assigned in a month?
15         A.    I believe four.
16         Q.    Four cases per month?
17         A.    I believe so.
18         Q.    All right.  And what kinds of
19   things would you have to do to investigate
20   those cases?
21         A.    I would have to run background
22   searches.  I would have to run data
23   searches, review billing, review public
24   records, review previous cases through our
25   case system.  I would assign clinic
```



MARGARET A. FISCHER                                    December 19, 2024
FISCHER V. GEICO                                                     68

```
 1              M. A. Fischer
 2   you retired, was it four cases per month?
 3        A.    No.
 4        Q.    What was it at that time?
 5        A.    At that time, I was working on
 6   a few cases because it was COVID.  The
 7   assignments had changed.
 8        Q.    When you say, "The assignments
 9   had changed," what do you mean?
10        A.    I wasn't receiving -- I wasn't
11   in the office.  We were working on cases
12   that we had had -- I was building evidence
13   for actions.
14        Q.    Can you explain in general
15   terms what you mean by "evidence for
16   actions"?
17        A.    Cases would -- once if -- when
18   they are completely investigated, if there
19   are reasons that they should be denied or
20   further looked into, they would go to the
21   legal -- our legal counsels.  They would be
22   flagged for that.  And then legal would ask
23   us for documents to support different
24   things that they needed all along the way.
25        Q.    Okay.  When did you retire from
```



                            M. A. Fischer

1

2    Geico?

3          A.     In September of 2020.

4          Q.     Is that when you announced it

5    or when it was effective?

6          A.     My last day of work was in

7    September of 2020, and my official date was

8    November 1st, I believe.

9          Q.     Okay.  Because I know we said

10   right when COVID hit you had taken a week

11   off, and then you had a Geico-issued

12   laptop, right?

13         A.     Correct.

14         Q.     So, for the remainder of that

15   time, you worked from home?

16         A.     Yes.

17         Q.     All right.  I think you said

18   you weren't being assigned cases at the

19   same rate during that time period because

20   you were obtaining evidence for other

21   investigations?

22                MS. DSOUZA:  Objection.

23         A.     I just think -- I don't -- I

24   can't remember exactly because it's been a

25   while.  I did not get new cases.  I was



1                    M. A. Fischer

2     very beginning, the actual declaration.

3          A.     Got it.

4          Q.     So, you see under the title

5     employment history and job duties, there's

6     paragraph 1?

7          A.     Yes.

8          Q.     And it says that you were

9     employed with Geico -- or by Geico

10    beginning in September 2001?

11         A.     Correct.

12         Q.     All right.  And you say:  I was

13    employed as a special investigator at Geico

14    from January 2010 to November 2020 when I

15    retired.

16         A.     Yes.

17         Q.     So, pause there for a second.

18                What -- when you first got

19    hired with Geico, what job were you hired

20    on for?

21         A.     I was hired part-time, and I

22    processed claim checks.

23         Q.     Okay.  So, you worked in the

24    claims department.

25                Or was it in service?



                          M. A. Fischer

1

2          A.    It was service.

3          Q.    How long did you work there?

4          A.    A few years.  Maybe four years,

5   four or five years.

6          Q.    Okay.  Before you -- so, strike

7   that.

8                Is it accurate that you

9   transferred into SIU in January of 2010?

10         A.    Yes, I did.

11         Q.    All right.  Between

12  September 2001 to January 2010, what jobs

13  did you have at Geico?

14         A.    I was a -- I processed the

15  claims checks for the cashier's department,

16  and then I went over to systems security.

17  I was -- I assigned associates access to

18  different programs in the Geico system.

19         Q.    How did you make your way over

20  to SIU?

21         A.    I was working part-time, and

22  SIU needed help, and my boss allowed me to

23  work in SIU.  I did, like, clerical work

24  there also.

25         Q.    Was that prior to January 2010?



```
 1                    M. A. Fischer
 2         Q.    Got it.  And then I think you
 3    said it was right around that 2016 or 2017
 4    time period where you sort of permanently
 5    were working in the office?
 6         A.    I believe so in that -- it
 7    seems that time period, yes.
 8         Q.    Okay.  From this entire time,
 9    January 2010 to November 2020, it sounds
10    like your formal job title may have
11    changed; is that right?
12         A.    Yes.
13         Q.    Did your job responsibilities
14    change?
15         A.    Yes, in that we were not
16    required to go into the field as often.
17         Q.    All right.  Aside from not
18    having to go out into the field one day a
19    week, did your job responsibilities change
20    in any other way?
21         A.    No.
22         Q.    Okay.  Did you ever work out
23    of -- well, strike that.
24              You're aware that there was
25    another office located in the State of New
```



```
 1            M. A. Fischer
 2  or things like that that you were talking
 3  about, where would you document those?
 4       A.   In SICM, in the reflected case.
 5       Q.   Okay.
 6       A.   Yes.
 7       Q.   I guess, do you have an
 8  understanding as to whether the way you
 9  documented cases in SICM differed or was
10  the same than other investigators, either
11  field or desk?
12            MS. DSOUZA:  Objection.
13       A.   I am not aware of how other
14  investigators document.
15  BY MR. TSONIS:
16       Q.   All right.  Would you enter
17  your, I guess, activities sort of in a
18  separate line in SICM?  Or did they all go
19  in the same entry and you would just update
20  it?
21       A.   It would be in a note, a
22  separate note for each activity.  There
23  could be many on one day, and there could
24  be one on a day.
25       Q.   There could be none on a day?
```



1                    M. A. Fischer

2        A.    Yes.

3        Q.    Okay.  Did you have some sort

4   of expectation or metric that required you

5   to log a certain number of activities each

6   day?

7        A.    Not a number of activities, but

8   we had a goal that we needed to be -- in

9   the case, we had metrics set up how many

10  days you needed to be in the case.

11       Q.    Are you talking about a case

12  going red if it was pending for too long?

13       A.    That's one of the things, yes.

14       Q.    And what are other ones?

15       A.    Well, every time when you get a

16  new case, you have parameters that you have

17  to cover within a certain amount of time.

18  And then you set up a diary, and then you

19  need to be in that case every 15 days, we

20  had to at that point.

21            So, you would set up a reminder

22  diary, and that would come up on your

23  calendar to remind you that, okay, it's

24  15 days.  You need to update this.

25            My cases would go on for a



```
1                    M. A. Fischer
2    period of time.  They weren't once-and-done
3    quick cases.
4         Q.    Sure.
5         A.    Yeah.
6         Q.    So, in terms of, you know, the
7    time it takes to close one of your cases
8    versus cases handled by either field or
9    desk investigators, your cases would take
10   substantially longer?
11        A.    Months.
12        Q.    There were some that even
13   lasted years?
14        A.    There could be, yeah.
15        Q.    Okay.  So, I guess, knowing
16   that you referenced having to update, you
17   know, a case every 15 days; is that right?
18        A.    Yes.
19        Q.    All right.  Besides that 15-day
20   requirement, was there any other, you know,
21   timeline you had to meet in terms of
22   entries you had to make in SICM?
23        A.    In the beginning of a case when
24   you opened it, there were -- there was
25   standards of things that needed to be
```



 1              M. A. Fischer

 2    saved on -- some initial steps you take

 3    with every case?

 4         A.    Yes.

 5         Q.    All right.  And then after

 6    that, is it accurate to say that it kind of

 7    depends on where the investigation takes

 8    you?

 9         A.    Yes.  And the supervisor can

10    also direct you, you know, you need to do

11    this; this needs to get done by the next

12    15 days, certain things that come up if

13    they find something.

14         Q.    Okay.  If you were doing an

15    investigative activity and 15 days later

16    you were still working on it, could you

17    satisfy that requirement by simply going

18    into SICM and saying still investigating

19    whatever that issue was?

20         A.    No.

21         Q.    Why not?

22         A.    Because you have to show a

23    substantial activity on that case to keep

24    that case moving.  You can't just have a

25    case sit.



                        M. A. Fischer

1

2        Q.    Right.  But if, I guess, the

3   substantial activity that you're working

4   on, you know, wasn't completed in 15 days,

5   what would happen?

6        A.    You would write what you had

7   completed.

8        Q.    Okay.  Prior to COVID, how many

9   new cases were you assigned typically in a

10  month?

11       A.    Well, we said four.

12       Q.    Okay.  So, you would have four

13  cases that you were assigned.  I think you

14  said it would take sometimes months to

15  close cases.

16       A.    Yeah.

17       Q.    How many cases would you

18  typically close in a given month?

19       A.    Every month would be different.

20  I would say on average, maybe three.

21       Q.    Okay.  You were a Geico

22  associate for a long time.  I'm sure you

23  know that there are certain metrics against

24  which associates are rated, right?

25       A.    Yes.



```
 1                 M. A. Fischer
 2        A.    Yes.
 3        Q.    All right.  And they assessed
 4   your files for, essentially, you know,
 5   doing the activities and documenting them
 6   the right way?
 7        A.    Correct.
 8        Q.    All right.  Besides that sort
 9   of, you know, metric, did you have other
10   specific metrics that you were held to?
11        A.    (No verbal response.)
12        Q.    For example, your performance
13   wasn't assessed against the number of days
14   it took to close a case, right?
15        A.    Not on our cases.
16        Q.    Not on major case?
17        A.    No.
18        Q.    Or inside medical?
19        A.    Right.
20        Q.    All right.  And similarly, you
21   weren't rated in terms of productivity on
22   how many cases you closed per month?
23        A.    No.
24        Q.    No, that's not right?  Or, no,
25   you weren't?
```



```
 1                  M. A. Fischer
 2       A.    No, we weren't.
 3       Q.    Okay.  Do you have an
 4  understanding as to whether field or desk
 5  investigators are assessed in how many
 6  cases they close per month?
 7            MS. DSOUZA:  Objection.
 8       A.    I do.
 9       Q.    All right.  And is your
10  understanding that that was a performance
11  metric that applied to them?
12       A.    Yes.
13       Q.    All right.  Similarly, do you
14  have an understanding as to whether field
15  and desk investigators had a metric called
16  time to close that they were assessed with?
17       A.    No.
18       Q.    You have no understanding that
19  field or desk investigators, in part, had a
20  metric monthly as to how many days their
21  cases were open?
22       A.    Yes.
23       Q.    All right.  You understood
24  that, for those investigators, you received
25  a better score if your cases were open less
```



```
 1                    M. A. Fischer
 2    time and a worse score if your cases were
 3    open for a significant amount of time?
 4         A.    Yes.
 5         Q.    All right.  And -- but that
 6    worked differently, we said, for inside
 7    medical, like yourself, investigators?
 8         A.    Correct.
 9         Q.    Would you receive performance
10    ratings each year?
11         A.    Yes.
12         Q.    All right.  Do you have a
13    general sense of where you shook out in
14    terms of your performance on a year-to-year
15    basis?
16         A.    I was always in the top four or
17    five percent.
18         Q.    Okay.  And just for clarity,
19    I'm sure you recall.  Do you have -- do you
20    understand that Geico rates all its
21    associates from a yearly review standpoint
22    on a one-to-five scale?
23         A.    Yes.
24         Q.    Do you agree that three, using
25    Geico's scale, is satisfactory?
```



```
 1                    M. A. Fischer
 2     in your performance reviews?
 3          A.    Not that I can recall.  It's
 4     been a while.
 5          Q.    Besides SICM what other
 6     systems, Geico systems, did you use on a
 7     regular basis?
 8          A.    Outlook for e-mail.  Workday
 9     for time management.  I had access to
10     billing.
11          Q.    When you say "billing," is that
12     the Atlas database?
13          A.    Yes.  And we had Background.
14     We had a background services that we ran.
15          Q.    That's fair.
16                So, there was a number of, I
17     guess, third-party providers, we'll call
18     them, that you could run different checks
19     on, right?
20          A.    Yes.
21          Q.    All right.  And you had
22     credentials and access and would use those
23     kinds of systems?
24          A.    Yes.
25          Q.    All right.  Did you have a
```



```
 1                    M. A. Fischer
 2   typical schedule that you worked?
 3        A.    Yes.  I worked 9:00 to 5:30 in
 4   the later years.
 5        Q.    When you say "the later years,"
 6   was that your schedule from 2016 to the
 7   time you retired?
 8        A.    Yes.
 9        Q.    You typically worked Monday
10   through Friday?
11        A.    Yes.
12        Q.    You received breaks during that
13   9:00 to 5:30 period?
14        A.    Yes.
15        Q.    And did you also receive a meal
16   period?
17        A.    It was unpaid.
18        Q.    That was going to be my next
19   question.
20        A.    Yes.
21        Q.    So, is it your understanding
22   you were compensated for a meal period --
23   or excuse me.  Strike that.
24             Is it your understanding you
25   were compensated for the break period, but
```



```
 1                 M. A. Fischer

 2        A.    As the day would come to an

 3   end, I would see what needed to still be

 4   accomplished in that day to fulfill my

 5   diary, and I would be catching up, making

 6   sure that everything was -- that I had to

 7   accomplish in that day was done.

 8        Q.    Okay.

 9        A.    To the best of my ability.

10        Q.    And, I guess, is that things

11   that are -- that you had to do to complete

12   a diary entry that day?

13        A.    Some of it was, yes.

14        Q.    Okay.  So, I guess, you know,

15   if it's due the next day or the day

16   after -- well, step back for a moment.

17             You said the diary sort of

18   entries were every 15 days you had to

19   submit, right?

20        A.    Right.

21        Q.    Is that 15 business days or 15

22   real-time days?

23        A.    I think it was 15 business

24   days.

25        Q.    Okay.  So, essentially, three
```



1                    M. A. Fischer

2    weeks, every three weeks you had to submit

3    a diary?

4          A.    Yes.

5          Q.    All right.  And I know you

6    mentioned that you would print out your

7    schedule on Friday so that you would know

8    what's happening for the following week,

9    right?

10         A.    Yes.

11         Q.    So, I guess, given the fact

12   that your timelines, you know, are three

13   weeks out, why was it necessary to work two

14   to two and a half hours a day overtime --

15   two to two and half hours per week in

16   excess of your scheduled hours?

17         A.    Because I wasn't just working

18   on those cases.  I also had other things

19   going on, phone calls.  Like I said, we had

20   new investigators, helping new

21   investigators, meetings, other things in

22   the day, e-mails that needed to be

23   addressed immediately, so everything pushes

24   everything down.

25         Q.    Sure.  I'm not suggesting that



```
 1                    M. A. Fischer
 2         Q.    So, she was a field supervisor,
 3    so she didn't work out of the office,
 4    correct?
 5         A.    Correct.
 6         Q.    All right.  So, Danielle
 7    Perdomo wouldn't know that you were working
 8    during your meal period?
 9         A.    Correct.
10         Q.    All right.  And Danielle
11    Perdomo wouldn't know that you were working
12    two to 2.5 hours in addition to your
13    scheduled hours each week?
14              MS. DSOUZA:  Objection.
15         A.    My -- I swiped in and out of
16    the building every day, which recorded my
17    time in and my time out.  My SICM also has
18    a date stamp on it and I'm sure my computer
19    when I shut it down at night.
20    BY MR. TSONIS:
21         Q.    So, let's take those back for a
22    second.
23              SICM has time and date stamps
24    for any activity that's entered, right?
25         A.    Every activity that's entered.
```



1                    M. A. Fischer

2         Q.    SICM doesn't have a timestamp

3    for when you open the application, to your

4    knowledge, right?

5         A.    Not to my knowledge, but I'm

6    assuming.  Everything does, right?

7         Q.    Okay.  Similarly, do you have

8    any reason to think that there's a

9    timestamp of when you closed out of the

10   SICM application?

11        A.    I believe that there was.

12        Q.    Did anyone ever talk to you

13   about, hey, I saw you closed SICM at this

14   time?

15        A.    No.

16        Q.    Anybody ever talk to you about,

17   I saw you open SICM at this time?

18        A.    No.

19        Q.    You said you swiped into the

20   building and swiped out of the building?

21        A.    Absolutely.

22        Q.    All right.  So, just to be

23   clear:  To leave the building, you didn't

24   just have to walk out.  You had to

25   literally swipe?



1                    M. A. Fischer

2    absolutely, they can check your time

3    swipes.

4         Q.    Do you recall who told you

5    that?

6         A.    No.

7         Q.    Do you recall when they told

8    you that?

9         A.    No.

10        Q.    Do you recall if it was an

11   e-mail or an oral conversation?

12        A.    No idea.

13        Q.    This understanding that you

14   had, was it that someone at Geico could

15   pull your swipes or that your supervisor

16   could pull your swipes?

17        A.    I believe that someone could

18   and the supervisor could request that.

19        Q.    Did your supervisor ever talk

20   to you about your swipes?

21        A.    No.

22        Q.    Did the manager ever talk to

23   you about your swipes?

24        A.    No.

25        Q.    Did anyone at Geico ever talk



```
1                    M. A. Fischer
2    to you about the time you swiped in or out
3    of the building?
4         A.    No.
5         Q.    You said Kristin Slack worked
6    out of the Woodbury office also?
7         A.    Yes.
8         Q.    Did she work out of there five
9    days a week?
10        A.    Yes.
11        Q.    Did she work the same hours as
12   you?
13        A.    No.
14        Q.    What hours did she work?
15        A.    I believe she worked 7:00 to
16   3:30, if I can remember.
17             MS. DSOUZA:  Just give me time
18         to object.
19             THE WITNESS:  Okay.  I'm sorry.
20             MS. DSOUZA:  No worries.
21   BY MR. TSONIS:
22        Q.    So, if Kristin Slack's usual
23   schedule had her leaving approximately two
24   hours before your normal end time, she
25   wouldn't know if you stayed late, right?
```



1              M. A. Fischer

2              MS. DSOUZA:  Objection.

3         A.    Well, my SICM reports would

4    have a date stamp on them after my time out

5    of -- after 5:30 at night if I was working

6    on a report.

7         Q.    Okay.  Let me -- we'll return

8    to that in a second.  Let me just ask a

9    specific question.

10              Kristin Slack wouldn't

11   physically be at the office to see if you

12   stayed late, right?

13        A.    Correct.

14        Q.    All right.  And I think I'm

15   understanding what you're saying is that

16   she could see the timestamp on something

17   that was submitted to her for approval?

18        A.    Yes.

19        Q.    All right.  Was the work that

20   you would stay late to do always something

21   that would be time stamped in SICM?

22        A.    No.

23        Q.    All right.  So, there are times

24   where she wouldn't be able to know?

25        A.    Correct.



1          M. A. Fischer

2     left the office, it was discussed that I

3     didn't have a place to work.  I didn't have

4     a computer.

5          Q.    Once you got a computer,

6     though, I guess you would agree that

7     various people have various, you know,

8     ability to set up a home office in their

9     houses?

10          MS. DSOUZA:  Objection.

11          A.    That has nothing to do with me.

12     BY MR. TSONIS:

13          Q.    Right.  I guess I'm just --

14     you're contending that your supervisor

15     would have known about your specific

16     situation and how you had to set up your

17     computers each day.

18          Am I wrong?

19          A.    No, but I'm assuming that I --

20     I fully believe that she knew that.

21          Q.    Do you have any reason to think

22     that she knew how long it took you to get

23     your setup?

24          A.    No.

25          Q.    Do you have any reason to think



1              M. A. Fischer

2   that your supervisor knew how long it took

3   you to break down your setup?

4        A.    No.

5        Q.    All right.  How much time would

6   you say it took you to set up your

7   workstation each day?

8        A.    I would say about 10 to

9   15 minutes.

10        Q.    Okay.  And similarly, how much

11   time would you say it took to tear it down?

12        A.    Same thing:  10 to 15 minutes.

13        Q.    Do you use -- do you use your

14   dining room table regularly?

15        A.    Yes.

16        Q.    And I was saying, some people

17   do; some people don't.  For example, some

18   people have a dining room they use only on

19   special occasions, and they eat and use a

20   kitchen table.

21              What's your home setup?

22        A.    We eat every meal at the dining

23   room table.  We don't have a kitchen table.

24        Q.    Do you have a different place

25   that you could have set up your



1                   M. A. Fischer

2        Q.    Okay.  Are you contending as

3   part of this lawsuit that your time setting

4   up and taking down your workstation is time

5   you should have been compensated by Geico?

6        A.    Yes.

7        Q.    Again, let's do some math.  If

8   you're claiming 10 to 15 minutes each day,

9   that's 20 to 30 minutes per day, right?

10       A.    Correct.

11       Q.    20 and 30 minutes per day times

12  five days a week is about 100 to 150

13  minutes, right?

14       A.    Correct.

15       Q.    Okay.  It's about an hour and

16  40 minutes to two and a half hours; is that

17  right?

18       A.    I didn't do the math.  Okay.

19       Q.    Well, 20 minutes times --

20  excuse me.  Fifteen minutes times two is

21  30 minutes a day at the high end, right?

22  Five days a week at 30 minutes a day is two

23  and a half hours, right?

24       A.    Correct.

25       Q.    Okay.  In this declaration



```
 1                M. A. Fischer
 2           MR. TSONIS:  Let's go off the
 3        record and take a break.
 4           THE VIDEOGRAPHER:  We are going
 5        off the record.  The time now is
 6        12:38 p.m.
 7           (Whereupon, a short break was
 8        taken at this time.)
 9           THE VIDEOGRAPHER:  We are back
10        on the record, and the time now is
11        1:34 p.m.
12      Q.    All right, Ms. Fischer.  We
13   were looking at Exhibit 1, your
14   declaration, before we went on lunch.
15           Can you turn to paragraph 9 of
16   your declaration.  So, from December 2016
17   to March 2020, it states that you said your
18   regular hours worked were approximately
19   41.5 to 42 hours per week; and from
20   March 2020 to September 2020, your regular
21   hours worked were approximately 40.75 hours
22   per week.  So, I'll stop there.
23           Is this accurate?
24      A.    Yes, to the best of my memory,
25   yes.
```



1                     M. A. Fischer

2          Q.     All right.  So, if you recall,

3    just prior to going on lunch, we were also

4    talking about the COVID timeframe, from

5    March 2020 until the time you retired,

6    right?

7          A.     Uh-huh.

8          Q.     And we were talking about the

9    time that you said you spent setting up and

10   taking down your work station each day?

11         A.     Correct.

12         Q.     Does this incorporate that

13   time?

14         A.     The 40.75, yes, and also other

15   overtime that I would be doing during that

16   time.

17         Q.     Okay.  So, I just want to be

18   clear because I thought you said the

19   opposite before we went to lunch and I just

20   want to make sure that we're right.

21                The 40.75 hours per week, if

22   you were scheduled for 38.75 hours, means

23   two hours additional each work week that

24   you're claiming, right?

25         A.     Yes.



```
 1                    M. A. Fischer
 2        Q.    All right.  Does that two hours
 3   include the 10 to 15 minutes setting up
 4   your workstation and the 10 to 15 minutes
 5   taking down your workstation each day?
 6        A.    Yes.
 7        Q.    Okay.  Whatever time remains,
 8   if I understand you correctly, you're
 9   saying would be other work that you did?
10        A.    Yes.
11        Q.    Now, you say in the rest of
12   that sentence:  And my last regular pay was
13   $41.95 per hour.
14             I'll pause there again.
15             Were you compensated on an
16   hourly rate the entire time you worked as
17   an investigator?
18        A.    Yes.
19        Q.    Was there ever a period of time
20   in which you were paid an hourly rate but
21   the way that your hourly rate was
22   calculated changed?
23        A.    I don't understand.
24        Q.    Sure.  So, was there a period
25   of time where you would not potentially get
```



```
1                   M. A. Fischer
2    continues:  An hourly nonexempt associate
3    must receive permission in advance to work
4    more than his or her regular work hours.
5               Did I read that right?
6         A.    Yes.
7         Q.    All right.  Did you understand
8    that you had to request permission in
9    advance to work more than your regular work
10   hours?
11        A.    Yes.
12        Q.    Okay.  The following sentence
13   says:  The associate's timesheet must show
14   the exact day, parentheses, S, the hours
15   are worked.  Job training that is required
16   or compulsory staff meetings before and
17   after regular work hours are considered
18   hours worked for purposes of overtime pay
19   for hourly nonexempt associates.
20               I'll pause there.
21               Did you understand your
22   timesheet had to show the exact days that
23   your hours were worked?
24        A.    Yes.
25        Q.    Okay.  Now, if we move up above
```



```
 1                    M. A. Fischer
 2    the header, do you see the last paragraph
 3    above the header that says, hourly
 4    nonexempt associates?  Begins with, all?
 5         A.    Yes.
 6         Q.    All right.  And that sentence
 7    says:  All nonexempt associates are
 8    required to accurately record their hours
 9    worked and absences taken.
10              Did I read that right?
11         A.    Yes.
12         Q.    All right.  Did you understand
13    as a nonexempt associate you were required
14    to accurately record your hours worked?
15              MS. DSOUZA:  Objection.
16         A.    Yes.
17    BY MR. TSONIS:
18         Q.    The next sentence deals with
19    exempt associates.
20              You were not an exempt
21    associate, right?
22         A.    Yes.
23         Q.    Sorry.
24              Is that correct?
25         A.    Yes.
```



```
 1                    M. A. Fischer
 2        Q.     Thank you.
 3               It then continues in the third
 4    sentence:  A nonexempt associate who feels
 5    he/she did not receive pay for all his/her
 6    hours worked and an exempt or salaried
 7    nonexempt associate who feels his/her pay
 8    incorrectly reflects a deduction for an
 9    absence should contact his or her
10    supervisor, local human resources manager,
11    or corporate human resources.
12               Did I read that right?
13        A.     Yes.
14        Q.     All right.  Did you understand
15    that, if you had -- if you felt you didn't
16    receive pay for all the hours that you
17    worked, that you could contact your
18    supervisor, local human resources manager,
19    or corporate human resources?
20        A.     Yes.
21        Q.     All right.  Did you also
22    understand as a Geico associate that Geico
23    maintains a Berkshire Hathaway ethics line?
24        A.     Yes.
25        Q.     What's the purpose of the
```



1                    M. A. Fischer

2    Berkshire Hathaway ethics line?

3        A.    I believe it was to report any

4    kind of problem that you had.

5        Q.    All right.  Would that include

6    a problem of not being compensated for all

7    time worked?

8        A.    It could be, yeah.

9        Q.    Okay.  Did you ever try to call

10   the Berkshire Hathaway line?

11       A.    No.

12       Q.    You would be able to call the

13   line if you wanted to, though, right?

14       A.    Correct.

15       Q.    Did you ever try to call

16   corporate human resources?

17       A.    No.

18       Q.    And I'll preface this.  I'm

19   talking about being compensated for time

20   that you're alleging that you worked.

21            Okay?

22            Did you ever try to contact

23   Geico corporate human resources?

24       A.    No.

25       Q.    Did you ever try to contact



```
 1                    M. A. Fischer

 2    Geico local human resources manager?

 3         A.    No.

 4         Q.    You had the ability to contact

 5    Geico's corporate human resources, right?

 6         A.    Yes.

 7         Q.    You had the ability to contact

 8    Geico's local human resources manager?

 9         A.    Yes.

10         Q.    It also says you could contact

11    your supervisor, correct?

12         A.    Yes.

13         Q.    Did you ever contact your

14    supervisor?

15         A.    We discussed overtime in

16    meetings just in passing, like, everybody

17    knew every -- you know, when we were

18    working.

19         Q.    Okay.  Let's be more specific

20    about that.

21               Which supervisor are you

22    talking about?

23         A.    I don't know.  Maybe Danielle.

24    I don't know.  But in general, when you

25    would have a group meeting, you know, it
```



1                     M. A. Fischer

2          A.     Every few months.

3          Q.     Okay.   During these meetings,

4     were there ever concerns about unpaid

5     overtime being raised?

6          A.     No.

7          Q.     No investigator you ever heard

8     raised a concern to a supervisor about

9     unpaid overtime?

10         A.     Not about unpaid overtime.

11         Q.     Am I understanding correctly

12    that some people raised concerns about

13    having to work overtime?

14         A.     That we did work overtime.

15         Q.     Okay.   What was the concern

16    that you raised or that others raised?

17         A.     There was a lot of work that

18    had to be done.   It takes time to keep

19    current.

20         Q.     Okay.   So, was the issue --

21    well, strike that.

22                Was it you that raised that

23    issue or others?

24         A.     Say it again.

25         Q.     Was it you that brought that up



```
 1                    M. A. Fischer

 2   and raised that issue?  Or was it others?

 3        A.    No.  It would just be as part

 4   of a discussion.

 5        Q.    So, there would be a discussion

 6   about workload generally is what I'm

 7   understanding?

 8        A.    Workload, yes.

 9        Q.    Okay.  So, you and other

10   investigators would have discussions with

11   the supervisor about your workload

12   generally?

13        A.    Yes.

14        Q.    Okay.  During the course of

15   those discussions, you didn't inform your

16   supervisor that you were working overtime

17   and not logging it into Workday; is that

18   correct?

19        A.    Correct.

20             MS. DSOUZA:  Objection.

21   BY MR. TSONIS:

22        Q.    And during those discussions,

23   your supervisor didn't instruct you to work

24   overtime and not log it into Workday,

25   correct?
```



```
 1                  M. A. Fischer
 2        A.    Correct.
 3        Q.    Did you ever raise -- strike
 4   that.
 5              Separate from the meetings, did
 6   you ever inform any of your supervisors
 7   that you were working hours beyond your
 8   scheduled hours but not entering them into
 9   Workday?
10        A.    Yes.
11        Q.    Who did you inform?
12        A.    Danielle Perdomo.
13        Q.    When did you inform Danielle
14   Perdomo?
15        A.    I don't know.  She was aware.
16        Q.    What's your best estimate as to
17   when?
18        A.    I don't have one.  I would send
19   an e-mail.  She would see the timestamp on
20   the e-mail.  She would know I'm still in
21   the office.
22        Q.    Okay.  Let me clarify.  I'm not
23   talking about if you believe she could
24   infer that you were working past your
25   scheduled start time.
```



1              M. A. Fischer

2              Does that make sense?

3       A.     No.

4       Q.     That doesn't make sense?

5       A.     No.  Say it again.

6       Q.     Sure.

7              So, I think what you just said

8    is she could, from an e-mail that you sent

9    to her, determine that that e-mail was sent

10   after your scheduled end time; is that

11   right?

12      A.     Yes.

13      Q.     All right.  And I understand

14   and you've testified about some of the

15   timestamp stuff earlier, right?

16      A.     Right.

17      Q.     Okay.  I guess my question is a

18   little different.

19             Did you actually ever inform

20   your supervisor, either orally or in

21   writing, that you were working additional

22   hours beyond your scheduled hours but not

23   logging it into Workday?

24      A.     No.

25      Q.     All right.  Did your supervisor



                              M. A. Fischer

1

2    ever instruct you, either orally or in

3    writing, that you needed to work hours

4    beyond what you were scheduled but not log

5    it into Workday?

6         A.    No.

7         Q.    Okay.  Now, going back to your

8    earlier point, you've stated that your

9    supervisor could see e-mails that were time

10   stamped beyond the end of your scheduled

11   shift; is that right?

12        A.    Correct.

13        Q.    All right.  Were those e-mails

14   like the diaries in SICM that we were

15   discussing?

16        A.    In addition to diaries in SICM,

17   there would be timestamps on e-mails that

18   would be sent during that time.

19        Q.    Okay.  So, I just want to make

20   sure that I have your testimony accurately.

21             At times, you would send

22   e-mails to your supervisor beyond the end

23   of your scheduled shift?

24        A.    Yes.

25        Q.    Okay.  Did you ever work longer



```
 1                    M. A. Fischer
 2    get back in.
 3         Q.    I didn't realize the Woodbury
 4    office was that large.
 5         A.    It's very large.  It was very
 6    large.
 7         Q.    I asked you a series of
 8    questions a short while ago, if you ever,
 9    you know, either orally or in any kind of
10    written correspondence, informed your
11    supervisor you were working beyond your
12    scheduled shift, right?
13         A.    Correct.
14         Q.    I'll ask you the same series of
15    questions about your manager.
16              Did you ever inform your
17    manager orally or in writing that you were
18    working beyond your scheduled shift-end
19    time?
20         A.    No.
21         Q.    Did you ever inform your
22    manager -- or excuse me.  Strike that.
23              Did your manager ever inform
24    you, either orally or in writing, that you
25    needed to work beyond the end of your
```



```
 1                    M. A. Fischer
 2    scheduled shift time and not record it in
 3    Workday?
 4         A.    No.
 5         Q.    Did you ever raise any
 6    complaints, either orally or in writing, to
 7    your manager about working additional hours
 8    than those scheduled but not being
 9    compensated for them?
10         A.    No.
11         Q.    Did your manager ever instruct
12    you to work more than the hours you were
13    scheduled but not log those hours in
14    Workday?
15         A.    No.
16         Q.    Thank you.
17               Would e-mails that you sent
18    after the end of your shift go to your
19    manager?
20         A.    Not unless she was CC'd on it.
21         Q.    Was it typical that she would
22    be CC'd on it?
23         A.    No.
24         Q.    Okay.  Besides timestamps on
25    e-mails, is there any other way that you
```



```
 1                    M. A. Fischer
 2    was my understanding that hours above 38.75
 3    to complete regular case work would rarely
 4    be approved.
 5              Do you see that?
 6         A.   Yes.
 7         Q.   All right.  Why was it your
 8    understanding that hours above 38.75 to
 9    complete regular case work would rarely be
10    approved?
11         A.   If -- to work overtime, you
12    would have to submit in advance a request
13    to work overtime on a specific case and
14    specifically what on that case you would
15    want to work during that time.
16         Q.   So, you had the ability to
17    request overtime in advance; is that right?
18         A.   On a specific case and
19    regarding a specific detail to that case.
20         Q.   Did you ever make that kind of
21    request?
22         A.   No.
23         Q.   Why not?
24         A.   Because it would have to be
25    done in advance and most of the time when I
```



MARGARET A. FISCHER                                    December 19, 2024
FISCHER V. GEICO                                                          191

1              M. A. Fischer

2     worked overtime, it was because the end of

3     my day was up and I had things I still

4     needed to accomplish in that day.

5          Q.    Okay.  Was there ever any

6     communications to how far in advance you

7     had to request it?

8          A.    No.  It would also take time to

9     write up the request and the specification.

10         Q.    I get the impression that you

11    had a pretty good relationship with your

12    supervisor?

13         A.    Yes.

14         Q.    Could you call her and say,

15    hey, can I have 30 minutes of overtime or

16    an hour, if you needed it?

17         A.    It was very rarely approved.

18         Q.    Why do you -- strike that.

19              If you never requested it, how

20    do you know that it wouldn't have been

21    approved for you?

22         A.    It has been the trend in Geico

23    that people just worked to get their work

24    done for the day.

25         Q.    Do you have an understanding of



```
 1                    M. A. Fischer
 2    what the process was for your husband,
 3    Keith Fischer, to request overtime?
 4         A.    No.
 5         Q.    Do you know who his supervisor
 6    was?
 7         A.    He was under Gerry Cassagne, I
 8    believe.
 9         Q.    He had Gerry Cassagne as a
10    supervisor for this entire time period of
11    2016 to when he retired also, right?
12         A.    I believe so.
13         Q.    He worked with Gerry Cassagne
14    back in NYPD also, right?
15         A.    Correct.
16         Q.    Okay.  You have no
17    understanding as to whether during 2016 or
18    2017 Keith Fischer could work overtime
19    hours as long as he just sent a follow-up
20    documentation e-mail to Gerry Cassagne?
21              MS. DSOUZA:  Objection.
22         A.    No.
23    BY MR. TSONIS:
24         Q.    Your husband never talked to
25    you about that?
```



1                    M. A. Fischer

2          A.    No.

3          Q.    Did you ever ask your husband

4     about, should I request overtime?

5          A.    No.

6          Q.    Why not?

7          A.    We didn't discuss things like

8     that.

9          Q.    Are you aware as part of this

10    lawsuit there have been documents produced

11    that show that Keith Fischer did, in fact,

12    work overtime in some weeks that was

13    approved?

14         A.    No.  I don't know what was

15    submitted on his behalf.

16         Q.    Well, I mean, a short while

17    ago, you testified, you know, it's the

18    trend in Geico that people just work their

19    38.7 -- they work more hours, but --

20         A.    Yes.

21         Q.    -- I guess, you know, I'm not

22    going to put a bunch of documents that

23    don't have your name in front of them -- or

24    on them in front of you.  But I'll

25    represent to you that there are documents



1              M. A. Fischer

2    from different investigators that get

3    overtime approved.  So, I'm curious why it

4    is that you didn't request it.

5              MS. DSOUZA:  Counselor, is

6         there a question?

7    BY MR. TSONIS:

8         Q.    Why is it that you didn't

9    request it?

10        A.    I didn't feel that it would be

11   approved.

12        Q.    Okay.  Do you have any other --

13   any understanding as to whether other major

14   case SIU investigators did request

15   overtime?

16        A.    I do not.

17        Q.    Did anyone ever communicate to

18   you that they had the same understanding

19   that overtime hours wouldn't be approved?

20              When I say "they," I'm talking

21   about SIU major case investigators.

22        A.    Yes.

23        Q.    Who?

24        A.    I don't know offhand.

25        Q.    Can you name anyone?



```
 1                    M. A. Fischer
 2        Q.    If you look at paragraph 3, the
 3   very last sentence, it says:  In an
 4   effort -- nevertheless, in an effort to
 5   minimize its labor costs, Geico prohibited
 6   special investigators from working overtime
 7   without prior permission and actively
 8   deterred special investigators from
 9   reporting overtime.
10             You see that?
11        A.    Yes.
12        Q.    All right.  Well, we talked
13   earlier about the policy of requesting or
14   approving your overtime, right?
15        A.    Correct.
16        Q.    All right.  Were you ever
17   actively deterred from reporting overtime?
18        A.    It was not encouraged.
19        Q.    I mean, that's, I guess, a
20   little different than what I asked.
21             Were you actively deterred from
22   reporting overtime?
23        A.    No.
24        Q.    Okay.  So, if we go to page 4
25   of this complaint -- have you read this
```



```
 1                  M. A. Fischer
 2              MR. TSONIS:  You are
 3          dangerously close to crossing the
 4          line now of coaching the witness.
 5          You're entitled to object --
 6              [Crosstalk.]
 7              MR. TSONIS:  I'm entitled to
 8          explore the witness's knowledge in an
 9          area when she may have knowledge
10          about another plaintiff in this case.
11          It's no different than if she was
12          close friends with somebody else and
13          I was asking about that.
14   BY MR. TSONIS:
15       Q.    I'll ask my question again, Ms.
16   Fischer.
17              Do you have an understanding as
18   to how your husband's caseload changed
19   during the time in or about March 2020?
20       A.    Yes.
21       Q.    Okay.  And what's your
22   understanding?
23       A.    That it increased.
24       Q.    Do you have an understanding as
25   to how much it increased?
```



```
 1                    M. A. Fischer
 2        A.    A lot.
 3        Q.    Okay.  As a major case
 4   investigator, we said that your caseload
 5   did not increase, right?
 6        A.    Correct.
 7        Q.    In fact, your caseload
 8   decreased because you weren't assigned new
 9   cases?
10        A.    Correct.
11        Q.    Okay.  If you continue on in
12   that paragraph, bottom of page 5 going onto
13   page 6, it says:  As a result, to keep up
14   with his escalating workload and Geico's
15   demanding performance metrics, Fischer
16   typically began working at approximately
17   6:00 a.m. and finished his work for the day
18   at approximately 11:00 p.m., accounting for
19   some gaps in his workday for meals and
20   other self-care from March 2020 through
21   April 2020 -- plaintiff Fischer worked
22   between approximately 60 and 75 hours per
23   week in most full workweeks, i.e., weeks
24   with no days lost to holidays or other time
25   off.
```



```
1                    M. A. Fischer
2         A.    Yes.
3         Q.    What was the earliest they
4    would start, to the best of your knowledge?
5         A.    I believe 7:00 a.m.
6         Q.    And how late would they be
7    scheduled, to the best of your knowledge?
8         A.    9:00.
9         Q.    How many major case
10   investigators would a supervisor have
11   reporting to them?
12        A.    At the end, we said there were
13   18, so nine.
14        Q.    Do you believe that each
15   supervisor could track the SICM entries or
16   e-mails received from nine investigators
17   and recall precisely the schedules that
18   those investigators worked to be able to
19   determine that they worked overtime?
20             MS. DSOUZA:  Objection.
21        A.    I believe that would be part of
22   their job as a supervisor.
23        Q.    Okay.  But ultimately, you
24   never raised a complaint that you were
25   working overtime and not paid for it,
```



 1                    M. A. Fischer

 2   right?

 3        A.    Correct.

 4             MR. TSONIS:  Okay.  No further

 5        questions.

 6             MS. DSOUZA:  No further

 7        questions.  On the record -- we're

 8        still on the record.

 9             We want to request some

10        documents that were referenced during

11        the deposition today.  We would like

12        to reiterate some of the requests.

13             We would like to ask for

14        e-mails to Ms. -- I forget her last

15        name.  Danielle Perdomo -- e-mails to

16        Ms. Danielle Perdomo that were sent

17        outside the scheduled hours of 9:30

18        to 5:30 by Ms. Fischer for the

19        relevant time period as well as the

20        same e-mails that might have been

21        sent to Ms. Kristin Slack.

22             (Request noted.)

23             MS. DSOUZA:  We would ask for

24        data about Ms. Fischer's swipe card

25        activity as well as SICM data that



1          M. A. Fischer

2     data regarding time entries as well

3     as other ways of keeping track of

4     time.

5          MS. DSOUZA:  But we will do, as

6     you pointed out, we will probably

7     follow up in writing and confer on

8     this.

9          MR. TSONIS:  Right.  I think

10    that's probably the most productive.

11    Thank you.

12         MS. DSOUZA:  Thank you.

13         (Page break to accommodate

14    jurat.)

15

16

17

18

19

20

21

22

23

24

25



```
 1                    M. A. Fischer

 2             THE VIDEOGRAPHER:  This

 3       concludes the video deposition of

 4       Ms. Margaret Fischer.  The time now

 5       is approximately 4:48 p.m.  We are

 6       off the record.  Thank you, everyone.

 7             (Whereupon, at 4:50 P.M., the

 8       Examination of this Witness was

 9       concluded.)

10

11

12             _____
                    MARGARET. A FISCHER

13

14  Subscribed and sworn to before me

15  this _____ day of _____ 20____.

16
    _____
17        NOTARY PUBLIC

18

19

20

21

22

23

24

25
```



1                     M. A. Fischer

2               C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :
5    COUNTY OF RICHMOND       )

6

7         I, MARINA DUBSON, a Notary Public for

8    and within the STATE OF NEW YORK, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 19th day of December 2024.

21

22

23   _____
                MARINA DUBSON

24

25

