# Exhibit 45

```
 1
 2           IN  THE  UNITED  STATES  DISTRICT  COURT
 3           FOR  THE  EASTERN  DISTRICT  OF  NEW  YORK
 4    - - - - - - - - - - - - - - - - - - )
 5    KEITH FISCHER, MICHAEL O'SULLIVAN,)
 6    JOHN MOESER, LOUIS PIA, THOMAS     ) Case No.:
 7    BARDEN, CONSTANCE MANGAN, and      ) 2:23 Civ. 2848
 8    CHARISE JONES, individually and    ) (GRB) (ARL)
 9    on behalf of all others similarly  )
10    situated,                          )
11                     Plaintiffs,       )
12       - v -                           )
13    GOVERNMENT EMPLOYEES INSURANCE      )
14    COMPANY d/b/a GEICO,                )
15                     Defendant.         )
16    - - - - - - - - - - - - - - - - - - )
17
18        REMOTE  VIDEOTAPED  DEPOSITION  OF  MICHAEL  GREY
19
20
21
22
23    Reported by:
24    Kim M. Brantley
25    Job No: J12254485
```



```
 1                    MICHAEL GREY

 2               Wednesday, January 22, 2025

 3                  Time: 10:02 a.m.

 4         Remote videotaped deposition of MICHAEL GREY,

 5    held via Zoom, before Kim M. Brantley, Court

 6    Reporter and Notary Public of the State of New

 7    York.

 8

 9    APPEARANCES:

10    On behalf of the Plaintiffs:

11         OUTTEN & GOLDEN, LLP

12         685 Third Avenue, 25th Floor

13         New York NY 10017

14         (202) 847-4400

15         Email: sjean@outtengolden.com

16         BY:   SABINE JEAN, ESQUIRE

17

18    On behalf of the Defendant GEICO:

19         DUANE MORRIS, LLP

20         190 South LaSalle Street - Suite 3700

21         Chicago, Illinois 60603

22         (312) 499-6779

23         Email: gtsonis@duanemorris.com

24    BY:  GREGORY TSONIS, ESQUIRE

25
```



```
 1                    MICHAEL GREY

 2   APPEARANCES CONTINUED:

 3   ALSO PRESENT:

 4        BRENT JORDAN, Legal Video Specialist

 5        Esquire Deposition Solutions

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1          MICHAEL GREY

2      P  R  O  C  E  E  D  I  N  G

3          THE LEGAL VIDEO SPECIALIST:  We are now

4   on the record.  The time is 10:02 Eastern

5   time on January 22nd, 2025.  This begins the

6   video conference deposition of Michael Grey,

7   taken in the matter of Keith Fischer, et al.,

8   v. Government Employees Insurance Company.

9   This case is filed in the United States

10  District Court, Eastern District of New York,

11  Case No. 223-civ-2848.

12         My name is Brent Jordan.  I'm your

13  remote videographer for today.  The court

14  reporter is Kim Brantley.  We are

15  representing Esquire Deposition Solutions.

16         Will counsel present please identify

17  yourself and state whom you represent.

18         MS. JEAN:  This is Sabine Jean from

19  Outten & Golden, representing plaintiffs and

20  opt-in plaintiffs.

21         MR. TSONIS:  Craig Tsonis, from Duane

22  Morris, LLP, representing defendant GEICO.

23

24

25



```
 1                     MICHAEL GREY
 2        Whereupon,
 3                     MICHAEL GREY
 4   called as a witness by counsel for Defendant, and
 5   after having been first duly sworn, was examined
 6   and testified as follows:
 7        EXAMINATION BY COUNSEL FOR DEFENDANT
 8                  BY MR. TSONIS:
 9        Q.   Good morning, Mr. Grey.
10        A.   Good morning.
11        Q.   Can you -- before we get started, can
12   you state and spell your name for the record.
13        A.   Michael, M-i-c-h-a-e-l, Grey, G-r-e-y.
14        Q.   What's your current address?
15        A.   ████████████████████████████,
16   ████████████████████████.
17        Q.   Okay.  Now my name is Craig Tsonis, and
18   as you may have heard, I'm an attorney for GEICO.
19   I will be taking your deposition today.
20             Have you ever been deposed before?
21        A.   No.
22        Q.   All right.  Well, I'll give you some
23   basic guidelines of how the day will go.
24             Obviously, today I will be asking you a
25   series of questions.  Your job is just to provide
```



```
 1                     MICHAEL GREY
 2             I've worked for GEICO since 2003.
 3        Q.   Okay.  Were those -- was the subject
 4   matter of your testimony generally about, you
 5   know, an investigation concerning fraud with an
 6   insurance claim?
 7        A.   Not always.
 8             I was also an adjustor, so it might
 9   have to do with confirming the damages in a
10   vehicle, where the damage was, what the damage
11   was, things of that nature.
12        Q.   But each of those matters concerned
13   some sort of insurance claim that had been filed?
14        A.   Correct.
15        Q.   Okay.  Aside from testimony you've
16   provided in connection with your employment, have
17   you ever been a party to a lawsuit, meaning have
18   you ever sued anyone or have you ever been sued?
19        A.   Yes.
20        Q.   When was that?
21        A.   With Progressive I was part of a class
22   action lawsuit for overtime in regards to
23   adjustors and payment, and I was also part of a
24   class action lawsuit for overtime with GEICO.
25        Q.   The class action lawsuit with GEICO
```



```
 1                    MICHAEL GREY
 2    York.
 3        Q.   Was the substance of your complaint
 4    that the GEICO special investigation unit was
 5    impermissibly rendering claims decisions or
 6    inputting claims decisions in violation of New
 7    York State Regulation?
 8             MS. JEAN:  Objection.
 9             THE WITNESS:  Not -- no, that was not
10        the core of, but that was going on as well.
11             There were multiple infractions being
12        committed by the special investigations unit.
13    BY MR. TSONIS:
14        Q.   Okay.  Do you have any knowledge as to
15    whether GEICO -- well, strike that.
16             Did you ever report your concerns to
17    members of management at GEICO?
18        A.   Many times.
19        Q.   Okay.  Do you have any knowledge as to
20    whether any -- GEICO conducted any investigation
21    as to whether its practices complied with New York
22    insurance regulations?
23        A.   Yes.
24             MS. JEAN:  Objection.
25
```



```
 1                      MICHAEL GREY
 2   had?
 3        A.   I think he's a -- he's considered a
 4   field, senior field investigator.
 5        Q.   Who was the other individual you
 6   referenced?  I think you said a couple of people
 7   would have gotten back you.
 8        A.   Oh, I reached out to Brian Crozier.
 9   He's a field representative out of Siracuse, New
10   York.  I was actually looking to see if he could
11   help me review an old email that went out, and he
12   responded that he didn't have it.  I called him --
13   maybe I sent him a text message, actually, and
14   I -- and he responded in text.
15        Q.   Which old email are you talking about?
16        A.   It was an old email that had shown
17   results for the last six months from January to
18   June, and, it would have shown that I had done
19   a -- a very good job, and yet GEICO terminated me
20   soon after saying that I didn't perform to the
21   minimum qualifications.
22        Q.   January to June of what time period?
23        A.   2024.
24        Q.   When were you terminated from GEICO?
25        A.   August of 2024.
```



MICHAEL GREY                                      January 22, 2025
FISCHER V. GEICO                                              52

```
1                     MICHAEL GREY

2          A.   Correct.

3          Q.   Okay.  What was your title when you

4     first came into SIU?

5          A.   I believe I was considered a senior

6     field investigator.

7          Q.   And that was in 2015?

8          A.   Correct.

9          Q.   At some point did your title change?

10         A.   Yes.  In December of 2023 I became a

11    desk investigator.  GEICO took away my car and my

12    phone and had me just working in front of a

13    computer all day rather than going in the field.

14         Q.   Got it.

15              When you say "desk investigator," I

16    guess was the job title like senior internal

17    security investigator?

18         A.   Possibly.  Sorry, I don't know.  I

19    just -- they termed us field and desk.

20              You might be right that that was the

21    title.  I never got a card or anything that showed

22    what my title is because it never went out on the

23    road.

24         Q.   Did the types of cases that you

25    investigated as a desk investigator differ from
```



```
 1                       MICHAEL GREY

 2        A.   Yes.

 3        Q.   All right.  After Chester Janik

 4   retired, was Toni D'Agata your supervisor?

 5        A.   Correct.

 6        Q.   And was she your supervisor from

 7   approximately mid November of 2022 through June of

 8   2023?

 9        A.   Correct.

10        Q.   All right.  And ultimately did Ms.

11   D'Agata retire, as well?

12        A.   I -- she didn't -- she retired, but she

13   did not retire, and that's why I was changed over.

14   She was still working on June 30th, 2023.

15        Q.   Okay.  So --

16        A.   She was still employed.

17        Q.   If you see the top line there, under

18   "Position" it says "Senior Internal Security

19   Investigator," right?  In the top right --

20        A.   Yes.

21        Q.   -- in the "Position" box.

22        A.   Yes, yes.

23        Q.   And it shows a start date of November

24   19th, 2022?

25        A.   Yes.
```



1                      MICHAEL GREY

2        Q.    So is that approximately when you

3    changed from a field -- senior field security

4    investigator to a senior internal security

5    investigator?

6        A.    No.

7        Q.    To the best of your knowledge?

8        A.    No, that's an incorrect date.

9        Q.    What's the date you believe?

10       A.    December of 2023.

11       Q.    Okay.  So you believe you worked as a

12   field security investigator for an additional

13   approximately thirteen months?

14       A.    Yes.

15       Q.    Okay.  Under "Manager" it shows "Andrew

16   Gelderman" as your supervisor from July 1st of '23

17   to August 13th of '24, right?

18       A.    Correct.

19       Q.    All right.  Is that approximately -- or

20   strike that.

21            To your knowledge is that accurate in

22   terms of the dates that Mr. Gelderman was your

23   supervisor?

24       A.    I believe so, yes.

25       Q.    All right.  When Toni D'Agata was your



```
1                      MICHAEL GREY
2    supervisor, were you, to your knowledge, working
3    as a field investigator?
4         A.   Yes.
5         Q.   Okay.  And once you transferred over
6    and Mr. Gelderman became your supervisor, you were
7    a desk investigator?
8         A.   No.
9         Q.   So Mr. Gelderman also supervised you
10   while you were working as a field investigator?
11        A.   Correct.
12        Q.   Okay.  Aside from these three
13   individuals, did you have any other supervisors?
14        A.   No.
15        Q.   Who was the SIU manager of region two
16   when you first joined SIU?
17        A.   Mike DeGrocco I think his name, Mike
18   DeGrocco.
19        Q.   And then at some point Mr. DeGrocco was
20   replaced by someone else?
21        A.   Correct.
22        Q.   Who replaced Mike DeGrocco?
23        A.   William Newport.
24        Q.   Okay.  And Bill Newport was the SIU
25   manager of the Woodbury office for several years?
```



```
 1                      MICHAEL GREY
 2   November 9th, I should say, 2019, to mid December
 3   of 2019?
 4        A.   Yes.
 5        Q.   All right.  And similarly was one leave
 6   approximately mid November of 2020 until early
 7   January of 2021?
 8        A.   I'm sorry, somehow I hit a button and I
 9   lost the page again.
10        Q.   Ah, it's the one ending in 4388, which
11   is --
12        A.   Okay, I'm back.
13        Q.   Yes.
14        A.   So the first one you mentioned was --
15   yes, 11/8/2019 through 12/15/2019?
16        Q.   Yeah.  That -- that was the first one,
17   and I -- I was asking did you -- do you recall you
18   took a leave of absence from approximately, you
19   know, November 21st, 2020 through, you know,
20   January 3rd of 2021?
21        A.   Yes.
22        Q.   Okay.  So one was about five weeks, and
23   one it looks like it was about six weeks, give or
24   take?
25        A.   Correct.
```



```
1                      MICHAEL GREY

2        Q.   All right.  And then there is a top

3   leave here, but it seems like it was only maybe a

4   day or so.

5        A.   Yes, that's -- and it -- just to

6   explain, it's the same leave of absence, but GEICO

7   had some sort of thing with Hartford for

8   short-term disability, and that's -- so, it was

9   just that one day.  Because the holiday obviously

10  is January 1st, and January 2nd I think is when we

11  returned, or we had the day off maybe for the

12  holiday.  Like that was a Monday, and then the 3rd

13  is -- was Tuesday, something to that effect.

14            So somehow there was a new process in

15  place in Hartford that took over at the beginning

16  of 2021.

17       Q.   Understand.  Thank you for the -- the

18  clarification there.

19            If we go to the box underneath -- third

20  box on this page, there's a heading, it says "Time

21  Off Requests."

22            Do you see that?

23       A.   Okay.

24       Q.   And then there is, you know, the left

25  most column is, you know, an absence request or --
```



```
 1                      MICHAEL GREY

 2        Q.   All right.  And he, in the bottom email

 3   here, sent January 11th, 2018, is sending this

 4   again to the -- the distribution list of his

 5   direct reports, including yourself?

 6        A.   Yes.

 7        Q.   All right.  And the email is titled

 8   "End-of-Month's Requirements."  Do you see that?

 9        A.   Correct.

10        Q.   All right.  Now, Mr. Janik informs

11   again you and others of various things to do for

12   the end of the month.

13             Would that be right?

14        A.   That's the title of the subject.

15        Q.   Okay.  Now if you look at the third

16   bullet point here, Mr. Janik again instructs that

17   Workday timesheets need to be submitted on Friday

18   of each week, right, for approval?

19        A.   That's what it says.

20        Q.   And then Mr. Janik writes, "If you've

21   entered any overtime hours, there should be a

22   listing in your Outlook calendar that lists the

23   SICM case and hours worked."

24             Do you see that?

25        A.   Yes.
```



```
1                        MICHAEL GREY
2        Q.   All right.  So Mr. Janik expected that
3    if you were working overtime that you would be
4    creating a log in your Outlook calendar of the
5    cases that you worked?
6        A.   It appears that way.
7        Q.   All right.  And similarly, Mr. Janik
8    wanted the Outlook calendar information to include
9    the number of overtime hours that you worked.
10            (Witness reviews document.)
11       A.   Can we -- can we make that bigger?
12       Q.   Sure.  Is that okay?
13       A.   So you're talking the bullet point
14   where it says, "Your Workday timesheet is to be
15   submitted on Friday of each week by 11:00 a.m.
16   for approval"?
17       Q.   Yes, that bullet point?
18       A.   My first comment would be that we had
19   to submit it by Thursday.  So that's incorrect.
20   We -- we had to get it to them ahead of the time.
21   So that's my first comment.
22            The second one is, "If you entered any
23   overtime hours there should be a listing in your
24   Outlook calendar that lists that SICM case and
25   hours worked"...
```



```
 1                   MICHAEL GREY

 2   pay per the guidelines."

 3           Do you see that?

 4      A.   Yes.

 5      Q.   And then Mr. Janik writes that, "If you

 6   are working beyond 7.75 hours in a day, you should

 7   be putting in for the overtime pay."  Right?

 8           So, Mr. Janik, in April of 2018, is

 9   instructing you that if you are working more than

10   7.75 hours in a day, that you should be entering

11   that time, right?

12      A.   Yes.

13      Q.   The next sentence Mr. Janik says that,

14   if you do work overtime on a case, that he, again,

15   wants you to update your Outlook calendar with the

16   amount of hours worked and the SICM case number,

17   right?

18      A.   Correct.

19      Q.   So, this is consistent with the -- the

20   prior exhibit that we looked at, Exhibit 3, in

21   which Mr. Janik is instructing the investigators

22   to enter in time and provide supporting

23   documentation?

24      A.   Yes.

25      Q.   All right.  Now, Mr. Janik then writes,
```



```
 1                    MICHAEL GREY

 2       Q.   Did you in fact log and work overtime

 3  and provide that documentation to Mr. Janik?

 4       A.   On occasion.

 5       Q.   Got it.

 6            MR. TSONIS:  Well, we've been going

 7       about an hour.  Why don't we take another

 8       break.

 9            MS. JEAN:  Sounds good.

10            THE WITNESS:  We'll go off the record

11       at 12:24 p.m.

12            (Recess taken.)

13            THE LEGAL VIDEO SPECIALIST:  We are

14       back on the record at 12:36 p.m.

15  BY MR. TSONIS:

16       Q.   All right, Mr. Grey, I'm -- you

17  recognize you're still under oath?

18       A.   Yes.

19       Q.   All right.  I have uploaded into the

20  chat what I'm marking as Exhibit 5.  I will share

21  my screen, as well.

22            (Email chain Bates stamped G012461 to

23       463 was marked Deposition Grey Exhibit 5, for

24       identification.)

25
```



```
1                        MICHAEL GREY

2    BY MR. TSONIS:

3         Q.   So from the -- the breakdown underneath

4    there, it looks like you worked four hours of

5    overtime on Monday, two hours of overtime on

6    Wednesday, two hours of overtime on Thursday, and

7    two hours of overtime on Friday?

8         A.   Correct.

9         Q.   All right.  So, approximately ten hours

10   of overtime on the social media --

11        A.   Yes.

12        Q.   -- project?

13             You write underneath that, "I have or

14   will note the SICM numbers in Outlook."

15             Do you see that?

16        A.   Yes.

17        Q.   And you write, "I will have closed five

18   social media cases, and then I will be complete

19   and out of the program"?

20        A.   Yes.

21        Q.   Does that indicate to you that after

22   this -- that -- this particular week's overtime

23   that you would no longer be working social media

24   cases as part of this sort of pre-approved

25   overtime program?
```



```
 1                        MICHAEL GREY

 2         A.    Luckily in Buffalo, that's really not

 3    that much of a concern.   Fortunately that's the

 4    beauty of Buffalo.

 5         Q.    I didn't mean to interrupt you.   I

 6    apologize.

 7         A.    That's -- go ahead.   Go ahead.

 8         Q.    I was going to say, I can see how that

 9    might be more of a concern if you worked in sort

10    of five boroughs, for example?

11         A.    Yeah, correct.

12         Q.    Okay.   If you needed to take a break in

13    the middle of your day with a doctor's appointment

14    or pick up your kids or something, did you have

15    the ability to, you know, take out an hour and

16    just tack it on either at the beginning or the end

17    of your shift?

18         A.    Yes.

19         Q.    And similarly, if, for example, you did

20    get caught up with traffic, or something

21    unexpected happened where you worked, you know, a

22    half hour or an hour longer on a Tuesday, could

23    you work a half hour, an hour less on Wednesday,

24    rather than work overtime that week?

25         A.    Possibly.   I -- I -- I rarely did that.
```



```
 1                     MICHAEL GREY

 2    I -- I don't know that that was anything that they

 3    would have accepted.  I can't say yes or no.

 4         Q.   I guess I'm asking, did you have the

 5    ability to flex your time sort of depending on

 6    what the demands were of your immediate cases?

 7         A.   I -- I was under the -- understanding

 8    that we did have the ability to flex time.  Under

 9    Chet that seemed to be the situation, and under

10    Toni and Andrew it became a -- much more of an

11    issue.

12         Q.   How is it much more of an issue?

13         A.   We had to -- later on we literally had

14    to note, you might call it punch in or punch out

15    through Workday on our phones, and in doing so I

16    was saying that that was part of our flex

17    scheduling, and I was being told that that wasn't

18    what flex scheduling meant.

19         Q.   So if I'm understanding right, when

20    GEICO changed to having you actually, you know,

21    log in and log out on the Workday app on your

22    phone, that you thought you could sort of shift

23    your hours as you needed to but that you weren't

24    actually permitted to?

25         A.   Correct.
```



MICHAEL GREY                                    January 22, 2025
FISCHER V. GEICO                                           125

```
 1                     MICHAEL GREY
 2      Q.   Okay.
 3           MR. TSONIS:  I'm going to drop in the
 4      chat what I'm marking as Exhibit 7.  For the
 5      record, Exhibit 7 is document Bates stamped
 6      G012498.
 7           (6/2/2020 email chain Bates stamped
 8      G012498 was marked Deposition Grey Exhibit 7,
 9      for identification.)
10  BY MR. TSONIS:
11      Q.   Do you see the document here, Mr. Grey?
12      A.   Yes.
13      Q.   All right, and this is from June 2nd of
14  2020?
15      A.   Yes.
16      Q.   Exhibit 7 is an email from yourself to
17  Chet Janik your supervisor?
18      A.   Yes, it is.
19      Q.   And the subject of the -- of your email
20  is overtime, right?
21      A.   Yes.
22      Q.   And in your email you wrote that you
23  worked some overtime and adjusted your daily
24  figure accordingly in Workday?
25      A.   Yes.
```



MICHAEL GREY

1

2    know, GEICO's history, also went over the benefit

3    packages that you had.  It was run by HR.

4         Q.   Were GEICO policies covered during that

5    training?

6         A.   I -- I would imagine.  I don't recall

7    exactly, but I'm sure that that was part of it.

8         Q.   Do you recall that GEICO policies were

9    contained in the document that I think most

10   associates know as the Associates Handbook?

11        A.   Yes.

12        Q.   Did you receive an Associates Handbook

13   when you started at GEICO?

14        A.   I don't know that I got a physical

15   handbook, but -- and I don't even know if there

16   was something online.  I'm not quite sure of what

17   I got.

18        Q.   But you were aware that those policies

19   existed in the Associate Handbook?

20        A.   I -- I don't know that I was aware of

21   them in 2003.  I certainly was aware of them in

22   future times because we had to go online and fill

23   out forms and things of that nature.

24        Q.   Right.  So I guess I'm less focused

25   about 2003 but more focused around the time period





1                      MICHAEL GREY

2    of, you know, the middle of 2016 'till the time

3    you ended your employment with GEICO, okay?

4         A.    Absolutely, I was aware of the handbook

5    and the policies and procedures.

6         Q.    Okay.

7              MR. TSONIS:  I'm going to mark what I'm

8         going to -- or introduce into the chat here

9         what I'm going to mark as Exhibit 8.  And

10        I'll share my screen again.

11             (Associates Handbook Bates stamped

12        G000028 through 43 was marked Deposition Grey

13        Exhibit 8, for identification.)

14   BY MR. TSONIS:

15        Q.    Now Exhibit 8 is -- Exhibit 8 is the

16   document bearing the Bates stamp G000028 through

17   43.

18             Does this document look familiar to

19   you, Mr. Grey?

20        A.    I'm not sure that I recall every page

21   of the document -- of the handbook, but it

22   certainly appears to be part of the handbook.

23        Q.    All right.  Do you see at the bottom

24   here, and I'll enlarge it, it says "Human

25   Resources Associate Handbook"?



1                    MICHAEL GREY

2        A.   I do.

3        Q.   All right.  Was it your understanding

4    that at some point you were classified as a

5    "salaried nonexempt associate"?

6        A.   I don't know what I was classified as.

7        Q.   Okay.  The second bullet point says,

8    "An hourly nonexempt associate is paid time and

9    one half his or her hourly rate of pay for all

10   hours actually worked in excess of forty in a work

11   week."

12            Do you see that?

13       A.   I do.

14       Q.   Do you have any understanding as to

15   whether you were classified as an hourly nonexempt

16   employee by GEICO at any point?

17       A.   I don't know.

18       Q.   Okay.  If we scroll down, I want to

19   talk about this box (indicating.)

20            So, do you see that it says, "All

21   nonexempt associates are required to accurately

22   record their hours worked and absences taken"?

23       A.   Yes.

24       Q.   All right.  So you understood that, as

25   a nonexempt associate, whether salaried or hourly



MICHAEL GREY                                        January 22, 2025
FISCHER V. GEICO                                                139

```
 1                    MICHAEL GREY
 2    nonexempt, that you were required to accurately
 3    record your hours worked?
 4         A.   Yes.
 5         Q.   And you understood that as a nonexempt
 6    associate you were required to accurately record
 7    any absences that you took?
 8         A.   I know that I had to put my time in and
 9    my absences in.  I don't know that I was a
10    nonexempt employee.  I don't -- I don't really
11    know what my title was, but I definitely knew that
12    I needed to accurately record my hours worked and
13    absences taken.
14         Q.   Okay.  Now it says here, starting with
15    this portion of the sentence, "A nonexempt
16    associate who feels he or she didn't receive pay
17    for all if his or her hours worked, and an exempt
18    or salaried nonexempt associate who feels his or
19    her pay incorrectly reflects a deduction for an
20    absence should contact his or her supervisor,
21    local human resources manager, or corporate human
22    resources."
23              You see that?
24         A.   Yes.
25         Q.   All right.  Did you ever contact your
```



MICHAEL GREY                                    January 22, 2025
FISCHER V. GEICO                                            140

```
1                    MICHAEL GREY
2   supervisor because you believed you did not
3   receive pay for all of the hours that you worked?
4        A.   I -- I would say no, that I never said
5   anything about pay that I didn't receive.
6        Q.   All right.  Did you ever contact your
7   local human resources manager because you believe
8   you didn't receive pay for all hours worked?
9        A.   No.
10       Q.   Did you ever contact corporate human
11  resources because you believed you did not receive
12  pay for all hours you worked?
13       A.   No.
14       Q.   Are you aware as a GEICO associate that
15  GEICO maintains the Berkshire Hathaway Ethics
16  Hotline?
17       A.   Yes.
18       Q.   Did you ever contact the Berkshire
19  Hathaway Ethics Hotline because you believed you
20  did not receive pay for all hours that you worked?
21       A.   No.
22       Q.   Was it part of GEICO's practice to have
23  associates review the policies and associate
24  handbook in some sort of regular interval?
25       A.   Yes.
```



MICHAEL GREY                                      January 22, 2025
FISCHER V. GEICO                                              150

```
 1                      MICHAEL GREY

 2   managers that oversaw you, right?

 3        A.   Yes.

 4        Q.   All right.  Now I want to talk a little

 5   bit about this section titled "My schedule in

 6   unpaid wages and overtime," starting with

 7   paragraphs six and seven.

 8             Now do you see it states, "As a

 9   nonexempt employee, GEICO required me to use a

10   web-based timekeeping program to submit my time on

11   a weekly basis"?

12        A.   Yes.

13        Q.   All right.  Is that web-based

14   timekeeping program Workday?

15        A.   Yes.

16        Q.   All right.  Paragraph seven states, "My

17   supervisors told me that I could only report up to

18   38.75 hours per week, or 7.75 hours a day, five

19   days a week in the timekeeping program.

20             "Accordingly, I only entered 7.75 hours

21   per day, five days a week, regardless of how many

22   hours I actually worked."

23             Did I read that right?

24        A.   Yes.

25        Q.   All right.  Is it your testimony here
```



```
 1                    MICHAEL GREY

 2   today that what you've written in paragraph seven

 3   is an accurate statement?

 4        A.   There was a -- a specific time frame

 5   during my employment where that fit.  I -- I don't

 6   know that it fits the entire timeframe that I was

 7   employed.

 8        Q.   Okay.  What time frame are you claiming

 9   that this statement applies to?

10        A.   Definitely a time frame during my

11   tenure with SIU.  I don't know the exact dates.

12        Q.   Well, you were with SIU from 2015 to

13   2024, correct?

14        A.   Correct.

15        Q.   So which time, which years are you

16   claiming that this statement applies to?

17        A.   I think that it varied.  It -- it may

18   have been at the beginning from 2015.  It might

19   have stopped at 2018 or 2017 and then started back

20   up again sometime afterwards.

21             I mean, it varied.

22        Q.   Right.  Well, you don't -- you don't

23   say "it varied," and you don't say "at times."

24             You say, "I only entered 7.75 hours per

25   day, five days a week, regardless of how many
```



```
 1                    MICHAEL GREY

 2   hours I actually worked," right?

 3        A.   Yes.

 4        Q.   Okay.  So it's your testimony then that

 5   at times you were not instructed that you could

 6   report only 38.75 hours per week?

 7        A.   What's the time frame on this document?

 8        Q.   It's your writing.  I mean, you didn't

 9   write a timeframe in this paragraph.  That's what

10   I'm trying to specify.

11        A.   What it shows that -- number five says

12   "since January 2020."

13        Q.   It says, "Since January of 2020, GEICO

14   classified you and other special investigators as

15   nonexempt employees who were eligible for overtime

16   pay at one-and-a-half -- and one-half times your

17   regular rate if you worked over forty hours per

18   week," yes.

19        A.   Right.  So I'm saying that after --

20   since January of 2020 I was told to put 7.75 hours

21   in.

22        Q.   All right.  Well, if we skip ahead here

23   to "Summary" paragraph in paragraph eleven, you

24   write, "From December 2016 to March 2020 my

25   regular hours worked were approximately 45 hours
```



```
 1                   MICHAEL GREY
 2   completely stopped inputting any extra hours or
 3   working any extra hours.
 4        Q.   Okay, just so I'm clear, after February
 5   of 2023, you are not claiming as part of this
 6   lawsuit that you worked time that you were not
 7   compensated for?
 8        A.   I would say -- I'd say that's fair,
 9   yes.
10        Q.   Okay.  Essentially the claims that
11   you're asserting as part of this lawsuit, and, you
12   know, through February of 2023, with regard to
13   unpaid overtime --
14        A.   I'd say that's fair.
15        Q.   Okay.  So, for those claims you write
16   in paragraph eleven of your declaration that your
17   best estimate of what you were owed is
18   approximately $78,683.36 in unpaid wages.
19             Do you see that?
20        A.   Yes.
21        Q.   And similarly, you later write that
22   this amount does not include liquidated damages,
23   which would add another $78,683.36 in damages.
24             Do you see that?
25        A.   Yes.
```



1                       MICHAEL GREY

2    response to complaints from my coworkers about

3    unpaid work, in April 2020 Mr. Janik emailed me

4    and the team to confirm that our team was not

5    approved for overtime but still needed to complete

6    all time workload requirements."

7              Do you see that?

8         A.   Yes.

9         Q.   All right.  Now, you'd agree that you

10   did not formally complain to your supervisors

11   about working overtime without pay?

12        A.   Correct.

13        Q.   I'm sorry, what was that?

14        A.   Correct.

15        Q.   Okay.  Now you referenced, "In response

16   to complaints from my coworkers about unpaid

17   work," what are you describing there?

18        A.   Jeff Mills complained to Chet about the

19   workload and how the workload was unreasonable,

20   yet they weren't allowing overtime.

21        Q.   Okay, who is Jeff Mills?

22        A.   He was the Rochester representative --

23   investigator.  He's left the company.

24        Q.   Were you present for that conversation

25   between Mr. Mills and Mr. Janik?



1                        MICHAEL GREY

2          Q.   Okay.   The fifth or fourth line here,

3     in 2019, it said "Willingly worked overtime when

4     workload dictated"?

5          A.   Yes.

6          Q.   Okay.   So you noted that you willingly

7     worked overtime when your workload dictated in

8     2019?

9          A.   I don't know that I was saying my

10    particular workload or that -- that was -- that I

11    willingly worked the social media cases.

12               Not everybody jumped in and did the

13    social media cases, but I willingly did that when

14    the workload for the entire department dictated.

15         Q.   Okay.   How would Mr. Janik's review of

16    your performance appraisal typically go?   Would he

17    walk through each -- each metric?

18         A.   I believe -- I think I knew pretty much

19    ahead of time what -- if you go back up where it

20    shows "Scorecard."   See scorecard rating, "4.3"?

21    He would send us a monthly update showing us what

22    we had done and what we were doing.

23               So pretty much at the end here was just

24    confirmation of the scorecards that he had

25    provided for us in a monthly.



```
 1                      MICHAEL GREY

 2   laws, right?

 3        A.   Oh, I'm sorry.  Say that again.

 4        Q.   As part of this lawsuit, you are

 5   alleging that GEICO failed to comply with federal

 6   and New York State wage and hour laws, right?

 7        A.   I believe so, yes.

 8        Q.   All right.  In none of your performance

 9   appraisals that we looked at do you ever address

10   or discuss allegedly unpaid over time?

11        A.   Correct.

12        Q.   Right?  And sitting here today, you

13   can't think of a single document in which you had

14   actually notified anyone in writing of overtime

15   that you claim to have worked but you were not

16   paid for.

17             Isn't that right?

18             MS. JEAN:  Objection.

19             THE WITNESS:  I think it was implied

20        with Chet.  I -- I didn't address it anymore

21        with anyone else after that for fear of

22        losing my job.

23   BY MR. TSONIS:

24        Q.   I think you mentioned -- so, to be

25   clear, you never mentioned to Toni D'Agata that
```



MICHAEL GREY                                      January 22, 2025
FISCHER V. GEICO                                               257

```
 1                        MICHAEL GREY

 2   you were working time off the clock but not being

 3   compensated -- compensated for it?

 4        A.   Yeah, I didn't -- I didn't have very

 5   much of a relationship with Toni and didn't

 6   discuss much with her at all, correct.

 7        Q.   Okay.  And did you ever discuss working

 8   off the clock with Mr. Gelderman and not being

 9   paid for it?

10        A.   I explained to Mr. Gelderman that I

11   would not take extra cases because that would -- I

12   was no longer going to pay -- I'm sorry, that I

13   was no longer going to work overtime and not get

14   paid.  That I definitely did speak to him about.

15        Q.   Isn't it true that Mr. Gelderman in

16   writing coached you that you were not permitted to

17   work off the clock?

18             MS. JEAN:  Objection.

19             THE WITNESS:  Mr. Gelderman, after

20        being my supervisor for several months,

21        explained to me that my interpretation was

22        flex time was incorrect.

23   BY MR. TSONIS:

24        Q.   Was your interpretation of flex time

25   that you could work time but not enter it into
```



```
 1                    MICHAEL GREY

 2           MR. TSONIS:  Now is probably a good

 3      time for a break.

 4           MS. JEAN:  Okay.

 5           THE LEGAL VIDEO SPECIALIST:  So we'll

 6      go off the record at 4:32 p.m.

 7           (Recess taken.)

 8           THE LEGAL VIDEO SPECIALIST:  We are

 9      back on the record at 4:43 p.m.

10   BY MR. TSONIS:

11      Q.   All right.  Mr. Grey, before we went on

12   break you were referencing -- we were looking at

13   an email from Mr. Gelderman, and I think you've

14   referenced your understanding of flex time.

15           Do you recall that?

16      A.   Yes.

17      Q.   What was your understanding of flex

18   time as a field investigator?

19      A.   That if we needed to take time to do

20   something personally, we could do that and just

21   make up -- make it up at some point during the

22   day.

23      Q.   Okay.  Ultimately, either as a field or

24   a desk investigator, you were the one figuring out

25   what you needed to complete in terms of tasks on a
```



```
 1                     MICHAEL GREY
 2   given day?
 3        A.   Yes.
 4        Q.   All right.  And you could figure out
 5   when you needed to start work on any given day?
 6        A.   Yes.
 7        Q.   And you similarly would figure out when
 8   you would end work on any given day?
 9        A.   Yes.
10        Q.   Once a case -- well, strike that.
11             As an investigator part of your job was
12   to determine which investigative activities would
13   drive the case to closure, right?
14        A.   Yes.
15        Q.   All right.  And once you have closed
16   the case, would you submit it for approval?
17        A.   Yes.
18        Q.   Who would approve your cases?
19        A.   The supervisors.
20        Q.   You would not approve your own cases?
21        A.   At some point that changed, very late.
22   It was almost like everyone's got approved, but I
23   still think that Andrew was reviewing them.
24             But what would happen -- and -- and I
25   can only go back to Chet, and Toni, as well -- we
```



```
 1                       MICHAEL GREY
 2   her -- I think she might have been the -- the
 3   supervisor of the intake desk.  I don't really
 4   know, though.  I don't want to misspeak.  She was
 5   some sort of a supervisor.  I don't know exactly
 6   of who.
 7        Q.   Sounds like, with the exception of
 8   maybe around this issue, you didn't really have
 9   interactions with April?
10        A.   Correct.  I didn't have a lot of
11   interactions with Gerry and Toni at this point.
12   And like I said, this was a specific meeting that
13   took place, and at that point -- so when was the
14   date of this email?  Can we go back and check?
15        Q.   Sure, it's November 5th of 2020.
16        A.   Yeah.  So this is six months into the
17   pandemic, and what we're doing, and how we're
18   handling cases.  And I'm just, you know -- and to
19   the point where, you know, I'm at -- I'm at stress
20   end.
21        Q.   Were the leave of absences that you
22   took related to stress?
23        A.   ██████████████████████████████
24   █████████████████████████████████████████
25   █████████████████████████████████████████████
```



```
1                        MICHAEL GREY

2     ████████████████████████████████████████████

3     ████████████████████████████████████████████

4     ████████████████████████████████████████████

5     ██████████████████████████████

6            The second time I took off I think was

7     at the end of 2021 where I did take another eight

8     weeks off.

9          Q.   Okay.

10         A.   Or six weeks, or something to that

11    effect.

12         Q.   Got it.  Okay.

13             When we look back at Exhibit 9, at your

14    declaration -- do you see that?

15         A.   Yes.

16         Q.   You know, even in the first paragraph

17    you write, "I -- I have been employed as a special

18    investigator at GEICO since 2015."

19             You see that?

20         A.   Yes.

21         Q.   And there is references to being a

22    special investigator kind of throughout here.

23             How do you define a "special

24    investigator"?

25         A.   Well the name of the unit is the
```



MICHAEL GREY                                           January 22, 2025
FISCHER V. GEICO                                                   287

```
 1                    MICHAEL GREY

 2         THE COURT REPORTER:  Okay.  Thank you.

 3         THE LEGAL VIDEO SPECIALIST:  Thank you.

 4    This will conclude today's video conference

 5    deposition of Michael Grey taken on January

 6    22nd, 2025 at 5:13 p.m. Eastern time.

 7         (Whereupon at 5:13 p.m. the videotaped

 8    deposition of Michael Grey concluded.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              MICHAEL GREY
 2          C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : Ss.
 5   COUNTY OF NEW YORK   )
 6           I, Kim M. Brantley, Shorthand
 7   Reporter, and Notary Public within and for the
 8   State of New York, do hereby certify:
 9           That MICHAEL GREY, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13           I further certify that I am not related
14   to any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17           IN WITNESS WHEREOF, I have hereunto set
18   my hand this 2nd day of February, 2025.
19
20                    Kim M. Brantley
21                    Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```

