## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY,<br><br>        Defendant. | Case No. 2:23-CV-02848 (SJB) (SLT) |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Eastern District of New York, Plaintiffs hereby respectfully submit this Response to Defendants Government Employees Insurance Company, (collectively, "GEICO" or "Defendant") Statement of Undisputed Facts and Supporting Evidence in support of its Motion for Summary Judgment on the claims of Named Plaintiffs Keith Fischer ("K. Fischer"), Michael O'Sullivan ("O'Sullivan"), John Moeser ("Moeser"), Louis Pia ("Pia"), Thomas Barden ("Barden"), Constance Mangan ("Mangan"), and Charise Jones ("Jones"); and Opt-In Plaintiffs Louis Caniglia, Jr. ("Caniglia, Jr."), Michael Grey ("Grey"), Daniel King ("King"), Margaret Fischer ("M. Fischer"), Craig Costanzo ("Costanzo"), Ted Wendling ("Wendling"), Maria Muñoz ("Muñoz") and Albert Brust ("Brust") (collectively, "Plaintiffs"):

## I.    The Parties

1.      GEICO is in the business of providing insurance and operates in the state of New York. (Docket Entry ("DE") No. 53, GEICO's Answer to Plaintiffs' Second Amended Collective and Class Action Complaint ("Answer"), ¶¶ 1, 106.)

**Plaintiffs' response: Undisputed.**

2.       Plaintiffs are current and former GEICO employees in GEICO's Special Investigations Unit ("SIU"). DE No. 53, Answer at ¶¶ 2, 9, 19, 28, 36, 44, 52, 59, 70.)

**Plaintiffs' response: Undisputed.**

## II.       GEICO's Timekeeping Policies

3.       The SIU is a unit within GEICO comprised of different types of investigators and other workers primarily devoted to investigating different kinds of insurance fraud. (Ex. 1, J. Fogarty 2024 Decl., ¶¶ 9-29.)

**Plaintiffs' response: Undisputed.**

4.       For each investigation, the SIU investigator determined what tasks (such as background checks, scene surveillance, document requests, witness interviews, examinations under oath ("EUOs"), or additional police reporting) were necessary, conducted those tasks, and determined when to close a case. (Ex. 2, K. Fischer Dep. 43:1-15; 47:14-23; 48:7-11; 63:5-7; Ex. 3, Mangan Dep. 35:13-16; 62:6-9; 71:17-72:8; Ex. 4, Barden Dep. 42:22-43:14; 80:13-21; Ex. 4, O'Sullivan Dep. 44:10-19.)

**Plaintiffs' response:  Undisputed but lacking context.  Investigators exercised limited discretion to determine which investigation tasks to complete within the contours of GEICO's uniform policies and procedures.  These procedures required investigators to complete specific tasks for each case.  *See, e.g.*, Ex. A, K. Fischer Tr. 38:2-47:23; 63:8-17; Ex. B, Moeser Tr. 55:9-15.  For example, GEICO's Ex. 16 shows that each "investigation of possible suspected insurance fraud shall include:**

1.       **A thorough investigation of the referral.**

2.       **Identification and interviews of potential witnesses who may provide information on the accuracy of the claim and /or application.**

3.       **Utilizing industry recognized databases as deemed necessary in conducting investigations.**

4.       **Preservation of documents and other evidence.**

     5.     **Writing a concise and complete summary of the investigation, including the investigators findings regarding the suspected insurance fraud and the basis for their findings."**

**GEICO's Ex. 16, SICM User's Manual at P00000881.**

     5.     GEICO associates are responsible for ensuring that all time worked is entered in GEICO's timekeeping system, including overtime. (Ex. 6, Emails (G012464-65); Ex. 7, Emails (G015179); Ex. 8, Emails (G012482); Ex. 9, GEICO 2017 HR Associate Handbook Excerpts (G000039); Ex. 10, GEICO 2023 HR Associate Handbook Excerpts (G000195-196); Ex. 4, Barden Dep. 107:17-19; Ex. 84, Newport Dep. 311:2-12; 312:3-19; 325:2-6; 334:18-335:7.)

     **Plaintiffs' response:  Disputed.  Although GEICO's written policies place the responsibility on Investigators for entering worktime into GEICO's timekeeping system, GEICO supervisors regularly instructed Plaintiffs *not* to record overtime hours unless authorized or approved by GEICO.  *See* Ex. A, K. Fischer Tr. 123:9-16; Ex. C, Jones Tr. 148:18-24, 162:5-11; Ex. D, Costanzo Tr.  46:16-47:8; 130:23-132:9; Ex. E, Reed Tr. 72:2-21.**

     6.     GEICO's timekeeping policies appear in its Employee Handbook. At all relevant times, the Handbook provided that GEICO associates must record all hours worked (Exs. 9, 10), and explicitly states that **"[n]on-exempt associates are never allowed to work 'off the clock.'"** (Ex. 10.) If any associate works off the clock "or believes [he or she is] being asked to work without reporting time or being properly compensated for time worked," the employee "**must** immediately contact Associate Relations." (*Id.* (emphasis added)).

     **Plaintiffs' response:  Undisputed in part, disputed in part.  While GEICO's Exhibit 9 (Employee Handbook dated November 2017) states that associates should record all hours worked, only GEICO's Exhibit 10 (Employee Handbook dated July 2023, issued after this case was filed in April 2023) mentions anything about "off the clock" work or discusses a reporting procedure.**

     7.     While a supervisor would "approve" an employee's timesheet, supervisor's review of timesheets is to ensure time has been entered for each day, and that any vacation, sick,

or holiday hours have been keyed appropriately to ensure proper compensation. (Ex. 84, Newport Dep. 324:8-19.)

**Plaintiffs' response: Undisputed.**

8.      With respect to their time entries, Plaintiffs would "just put it in Workday and they get paid." (Ex. 11, Emails (G012010); Ex. 12, Emails (G012903); Ex. 13, Emails (G011080); Ex. 14, Emails (G011859-61); Ex. 15, Emails (G011586), Ex. 82, Emails (G011540).)

**Plaintiffs' response: Undisputed in part, disputed in part. Although GEICO's Exhibit 11 includes the quoted text, the remainer of the exhibits do not include the quoted text. GEICO has not produced paystubs for all overtime hours it allegedly paid to Investigators, and discovery is not yet complete. Plaintiffs cannot confirm whether all Plaintiffs were paid fully for all time put in Workday. Plaintiffs were also routinely discouraged from reporting unapproved overtime in Workday. *See* RSOF ¶ 5.**

9.      Plaintiffs entered notes on their cases into the Special Investigations Case Management ("SICM") application, and while SICM entries are time-stamped, SICM entries do not show the amount of time it took to complete each case task. (Ex. 2, K. Fischer Dep. 91:22-25; Ex. 16, SICM Manual (P00000879-906 at 899).)

**Plaintiffs' response: Undisputed but lacking context. SICM shows the "time [Investigators] logged on," Ex. F, SICM Manual at P00000882, and work entries are "logged by the time and date created." *Id*. at P00000885.**

10.      SICM is not a timekeeping system.  (Ex. 2, K. Fischer Dep. 91:22-25; Ex. 16 (at 899.)

**Plaintiffs' response: Undisputed.**

11.      SIU "field" investigators worked outside of a GEICO office and worked "flex" schedules, whereby they could adjust shift start and end times and how many hours they worked each day. (Ex. 2, K. Fischer Dep. 36:18-37:19; Ex. 4, Barden Dep. 28:15-21; Ex. 3, Mangan Dep. 38:10-13; Ex. 17, Pia Dep. 52:12-21; Ex. 18, Portnoy Decl. ¶ 14; Ex. 19, Greenman Decl. ¶¶ 8, 10-12.)

**Plaintiffs' response:  Disputed.  Plaintiffs testified uniformly that "flex" time made no difference to total hours worked each day in light of their unmanageable workloads. For example, Charise Jones testified that while her supervisor April Neyland told her to try to flex her time if she worked late on any given day, she responded that "I still have my workload the next day," and Ms. Neyland simply told her, "there's no approved overtime." Ex. C, Jones Tr. 162:5-11.  Similarly, Thomas Barden testified that while he could have flexed his time, he "didn't" because he "didn't have time to do that."  Ex. G, Barden Tr. 82:4-9, 230:18-231:10.  Rather, Mr. Barden's hours were "flexible" in the sense that "the job dictated when I needed to work," and not "at any time that was convenient" for him. *Id.* 36:10-18.**

12.    Plaintiffs recorded the time that they worked in GEICO's timekeeping software via a computer; beginning in or around 2023, some investigators were able to record their time using a mobile application. (Ex. 17, Pia Dep. 93:21-95:7; Ex. 20, Muñoz Dep. 139:23-140:18.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  Undisputed that some Investigators used a mobile app, around 2023, while others used a computer to record their time.  Disputed to the extent GEICO claims that Investigators in fact "recorded the time that they worked," as Plaintiffs testified to not logging overtime hours at GEICO's instruction.  Ex. C, Jones Tr. 162:5-11; Ex. H, Muñoz Tr. 161:14-16; Ex. I, O'Sullivan Tr. 67:18-68:19; Ex. G, Barden Tr. 99:16-21.**

13.    Upon submission of their hours, GEICO associates, including Plaintiffs, certified that their time entries accurately reflected all of their hours worked, including overtime. (Ex. 21, King Dep. 97:20-98:7; Ex. 22, Caniglia, Jr. Dep. 91:14-92:20.)

**Plaintiffs' response: Undisputed that GEICO required Plaintiffs to certify their time regardless of hours worked.**

### III.    Facts Specific to Each Plaintiff

#### a.    Thomas Barden

14.    Barden worked for GEICO as a Level 65 senior field investigator in the SIU from September 2019 to December 2022.  He investigated auto injury and auto insurance fraud within the Albany, New York region.  (Ex. 4, Barden Dep. 20:18-23; 22:10-19; 25:8-13; 25:25-26:5; 28:12-21; 38:6-15.)

**Plaintiffs' response: Undisputed.**

15.    Chet Janik was Barden's supervisor for most of Barden's employment, and Gerard Cassagne was Barden's supervisor for Barden's last few weeks of his employment.  (*Id.* 23-30:12.)

**Plaintiffs' response: Undisputed**

16.    Barden worked "basically eight hours a day," but the "hours were flexible" in that he could determine which hours he worked each day. (*Id.* 28:12-21; 36:10-18.)

**Plaintiffs' response: Disputed.  It is not clear from the cited testimony whether Mr. Barden understood the question about "hours" to be "time worked" or "scheduled hours." Ex. G, Barden Tr. 28:12-21.  But Mr. Barden clarified in his declaration and elsewhere in his deposition that he worked three to four *additional* hours a day, five days a week, meaning 55-60 hours per week total.  *Id.* 97:15-98:7; Ex. J, Barden Resp. to Court Interrogatories at ¶¶ 8, 10.  Mr. Barden's hours were "flexible" in the sense that "the job dictated when I needed to work," and not "at any time that was convenient" for him.  Ex. G, Barden Tr. 36:10-18.  Although he could have flexed his time, he "didn't" because he "didn't have time to do that."  *Id.* 82:4-9, 230:18-231:10.**

17.    The time for Barden to complete investigations could range from hours to weeks because "[e]ach case was different." (*Id.* 38:25-39:11; 43:9-10; 44:4-8.)

**Plaintiffs' response: Undisputed.**

18.    Janik instructed Barden in 2020, "if you're working extra hours, put in for it. Document it," and specifically told his team "I don't[] want anyone working over their 7.75 hours, without putting in for overtime." (*Id.* 107:3-19; Ex. 8 G012483.)

**Plaintiffs' response: Undisputed, but lacking context. Although Mr. Janik did tell Mr. Barden this, the instruction was related to a short period of time in 2020 where GEICO permitted Mr. Barden to submit overtime hours. Ex. G, Barden Tr. 107:3-19.**

19.    Barden did not recall working overtime before March 2020, and he was paid for all overtime that he recorded from March 2020 through July 2020. (*Id.* 77:11-16; 98:24-99:8; 151:22-152:10; 196:19-22; Ex. 23, Barden Resp. to Court Interrogatories, Barden Decl. ¶ 11.)

**Plaintiffs' response: Undisputed.**

20.    Barden alleges that he worked 55 to 60 hours per week between August 2020 through December 2022, though he does not have any records confirming his hours beyond what he recorded in GEICO's timekeeping software. (Ex. 4, Barden Dep. 99:16-101:14.)

**Plaintiffs' response:  Undisputed.**

21.    Barden believed that the efficiency with which he closed cases factored into this performance evaluation such that not logging overtime hours would result in merit-based pay increases. (*Id.* 158:21-159:9; 227:14-228:5.)

**Plaintiffs' response: Undisputed but lacking context.  Mr. Barden had additional reasons to not log overtime.  Starting around July 2020, Mr. Barden stopped requesting overtime because GEICO told him he was not allowed to record it.  Ex. G, Barden Tr. 99:16-21.  He also did so to avoid negative consequences, as it was not possible to "to meet GEICO's performance metrics within a 38.75 hours work week."  *Id.*  226:19-227:25.**

22.    Barden recorded more than 40 hours in 7 workweeks between September 30, 2019 and December 9, 2022, which is 4.55% of all workweeks during that time and 5.15% of workweeks in which Barden worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 28-29.)

**Plaintiffs' response: Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

**b.  Albert Brust**

23.    Brust worked as a Senior Field Security Investigator from September 2019 through February 2024 where he handled a variety of fraud and theft claims for Nassau County,

Suffolk County, Long Island, and the five boroughs area of New York. (Ex. 25, Brust Dep. 48:24-49:14; 50:20-23; 33:20-23.)

      **Plaintiffs' response: Undisputed.**

24.     Brust alleges that he worked approximately 50-60 hours per week. (*Id.* 246:9-17; 247:11-248:1; 249:3-6; Ex. 26, Brust Resp. to Court Interrogatories, Brust. Decl. ¶¶ 8, 9.)

      **Plaintiffs' response: Undisputed.**

25.     Brust had "flextime" with which he could schedule his workday based on the needs of his cases, and there were no requirements as to how frequently he had to be in the field or when he needed to start his day. (Ex. 25, Brust Dep. 55:2-16; 75:21-76:17; 77:3-15; 167:7-11.) When working on a case, all activity in the files would be time stamped according to the time that it was completed. (*Id.* 126:1-11; 169:7-18.)

      **Plaintiffs' response: Undisputed.**

26.     Before COVID, Brust was getting assigned two to three cases a day and traveling often for investigations, but after COVID hit, Brust was receiving five to six cases a day but no longer spent time driving to investigate the different claims in person. (*Id.* 63:10-18; 91:11-18.)

      **Plaintiffs' response: Disputed in part. In or around November 2021, GEICO returned to normal field operations and Mr. Brust returned to driving in the field for his investigative work. Ex. K, Brust Tr. 248:22-249:2.**

27.     Throughout his GEICO career, Brust regularly requested, recorded, and was paid for overtime hours. (Ex. 25, Brust Dep. 114:11-14; 138:18-139:12; 154:6-12; Ex. 27, Brust Pay Records (G000504-508, G000577-584, G000586-587, G000589-591, G000593-594).)

      **Plaintiffs' response: Undisputed that Mr. Brust was paid for the overtime hours reflected in the cited documents but disputed as to the characterization that Mr. Brust requested overtime "regularly." Mr. Brust "spoke to [his supervisor] Gerry Cassagne and told him specifically that [he] was working off the clock[.]" Ex. K, Brust Tr. 127:17-20; 111:9-20 ("I would discuss with Gerry [Cassagne] that to get my work done, I'm**

**working past the eight hours, and could we get overtime. And he told me he will bring it up at the next meeting with Bill [Newport]. And then every meeting, it was the same answer, that he can't authorize the overtime").**

28.     Neither Brust's manager Bill Newport, nor any other SIU Manager ever told him not to record hours that he worked. (Ex. 26, Brust Dep. 223:7-10.) In fact, Brust was reminded by his manager Gerard Cassagne to put in his timesheet and "[d]on't forget to put in any overtime if worked." (Ex. 15, Emails (G011586).)

**Plaintiffs' response: Undisputed, but lacking context. Mr. Brust acknowledged that he never told anyone at the "manager level" that he was working off the clock because he is "used to chain of command," but he "always spoke to [his supervisors] Gerry or Toni or Sarah." Ex. K, Brust Tr. 222:25-223:10.**

29.     Similarly, Brust never told his supervisor that he was working hours that he did not record in GEICO's timekeeping system and, at one point, reported that he was "not able to, you know, conduct a proper investigation with, you know, just the, you know, standard week." (Ex. 25, Brust Dep. 129:20-24; 221:18-24.)

**Plaintiffs' response: Disputed. Mr. Brust explicitly raised concerns with his supervisor Mr. Gerard Cassagne several times throughout his tenure about the need to work extra hours to complete his tasks. Ex. K, Brust Tr. 111:9-20, 127:17-20, 128:6-10, 129:10-12, 130:2-6, 131;8-13, 132:6-7. He stated on "numerous occasions" that "if we don't work extra . . . I cannot satisfy these metrics." *Id.* 128:6-10. Mr. Brust told his supervisor Ms. Toni D'Agata during one-on-one meetings about his overtime hours worked, but she responded that she was not authorized to approve overtime. *Id*. 255:20-257:7. Mr. Brust also told his supervisor Ms. Sarah Greenman about the need to work additional hours to complete the work. *Id.* 221:6-222:12.**

30.     Brust had told his supervisor Cassagne that he would work while watching hockey games, but never stated to anyone that he was working off the clock. (*Id.* 130:13-22; 131:25- 132:13.)

**Plaintiffs' response: Disputed. Mr. Brust understood his conversations with Mr.**

Cassagne, about working during hockey games, to be statements about him working off-the-clock.  Specifically, Mr. Brust said that he "and Gerry are very big hockey fans, and we both play hockey, but I would work in between periods.  I told him I would do work.  He knows hockey games generally start at 7:30 at night.  So directly and indirectly, he's aware that I was working off the clock because in between periods, as soon as the period would end, I would do as many computer checks as I can."  Ex. K, Brust Tr. 130:14-21.

31.     Brust did not make any comments regarding his alleged unpaid off the clock work during his performance evaluations. (*Id.* 217:4-218:4; 218:6-10.)

**Plaintiffs' response: Undisputed.**

32.     Brust received several merit-based pay increases and attributes them to working off the clock: "working the extra hours definitely helped with me satisfying the metrics." (*Id.* 181:23- 182:3; 183:12-19; 185:18-23; 188:19-189:21, 217:11-13.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Undisputed to the extent that Mr. Brust earned merit increases each year during the relevant period, based on his personnel record.  *See* Ex. L, Brust Personnel Record at G005139-40.  Disputed to the extent that Mr. Brust "attributed" these merit increases to working off-the-clock.  During his deposition, Mr. Brust was asked the following question: "Would you agree by working additional hours, but not recording it in Workday, that you benefit in the form of merit increases?"  Ex. K, Brust Tr. 183:12-14.  Plaintiffs' counsel objected, and Mr. Brust simply responded: "I benefitted in my metrics.  What they decided to give me, that's – you know, that's up to them."  *Id.* 183:15-19.**

33.     Brust recorded more than 40 hours in 22 workweeks between September 16, 2019 and February 2, 2024, which is 9.95% of all workweeks during that time and 10.53% of workweeks in which Brust worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 24-25.)

**Plaintiffs' response: Undisputed**.

**c.  Louis Caniglia, Jr.**

34.     Louis Caniglia, Jr. worked in GEICO's SIU as a senior field security

investigator from 2015 to late 2023, based in the New York and Long Island area. (Ex. 22, Caniglia, Jr. Dep. 26:13-28:1; 55:8-18; 207:4-18.)

> **Plaintiffs' response: Undisputed.**

35.    Caniglia, Jr. primarily investigated theft cases and sometimes assisted on major case investigations, reporting over the years to different supervisors including Gerard Cassagne, Toni D'Agata, Richard Aniolowski and Theresa Bishop. (*Id.* 26:13-28:1; 205:13-207:18.)

> **Plaintiffs' response: Undisputed.**

36.    Caniglia, Jr. estimated that he worked 43 to 50 hours per week from 2016 through 2023. (Ex. 28, Caniglia, Jr. Resp. to Court Interrogatories, Caniglia, Jr. Decl. ¶ 13.)

> **Plaintiffs' response: Undisputed.**

37.    Caniglia, Jr. did not work a set work schedule and could use flex time, as his supervisors did not monitor or supervise his day-to-day case tasks. (Ex. 22, Caniglia, Jr. Dep. 194:5-19; 200:16-201:5; 264:22-266:7.)

> **Plaintiffs' response: Undisputed, but lacking context.  Mr. Caniglia, Jr. acknowledged some flexibility with his time, but not that it allowed him to avoid incurring overtime.  Ex. M, Caniglia, Jr. Tr. 194:5-19 ("I mean, yeah, it's flex timing, but still, it goes over the 38.75.").**

38.    Caniglia, Jr.'s case assignments fluctuated monthly, and he had the ability to decline or remove cases if he made the request to his supervisor. (*Id.* 209:9-19; 213:9-13.)

> **Plaintiffs' response: Disputed as to GEICO's characterization of the facts.  In rare circumstances, Mr. Caniglia Jr. asked to not receive new case assignments when his caseload was high to allow him to catch up on his caseload.  Ex. M, Caniglia, Jr. Tr. 212:22-213:13.**

39.    Caniglia, Jr. received annual training on GEICO's written policies requiring him to accurately record all time that he worked. (*Id.* 68:5-7; 69:20-24; 91:14-92:20.)

> **Plaintiffs' response: Undisputed.**

40.    Caniglia, Jr. understood based on supervisor directives that if he worked

overtime, he had to document it, including a November 25, 2016 email from his supervisor Gerard Cassagne to Caniglia, Jr. specifically stating "[i]f you work overtime, you must be able to document your time worked," and "**Bottom line**- continue to work the way you were working. If you determine that you need to work overtime on any specific day, you can work the overtime and you will get paid for it. You have to document your overtime hours and be able to verify why it was needed. Your supervisor will also be responsible to verify your overtime." (Ex. 29, G. Cassagne Dep. 180:16-181:4; 260:14-261:1; Ex. 30, Emails (P00000077).)

**Plaintiffs' response: Disputed in part. The excerpted section of Mr. Cassagne's deposition testimony refers to overtime for work at or around the time of an email Cassagne sent to his team on November 26, 2018 related to a pre-authorized overtime drive for social media cases; this deposition excerpt does not reflect Mr. Caniglia Jr.'s understanding of this email. Ex. N, Cassagne Tr. 180:4-181:4; Ex. O, November 26, 2018, Email from G. Cassagne to Investigators at G011553. Similarly, the cited email from Mr. Cassagne to his team does not reflect Mr. Caniglia Jr.'s understanding as to the overtime approval protocol and is from November 25, 2016.**

41.    On December 8, 2016, Cassagne told Caniglia, Jr. that if he was working overtime, he "must enter it" into his timesheet and that if he was "stuck working overtime" after the timesheets were submitted, to contact him immediately to correct the error. (Ex. 22, Caniglia, Jr. Dep. 53:10-53:22; 64:4-9; 96:5-8; 103:19-104:3; Ex. 31, Emails (G011548).)

**Plaintiffs' response: Undisputed.**

42.    Caniglia, Jr. admitted that he knew the process to request overtime, by contacting his supervisor, and identifying which case he needed overtime and why. (Ex. 22, Caniglia, Jr. Dep. 53:10-22; 64:4-9; 96:5-8; Ex. 84, Newport Dep. 240:18-241:20; Ex. 32, Caniglia, Jr. OT Emails (G011375-76; G011385; G011409; G011418; G011455-56; G011459; G011461; G011486; G011488-89; G011493; G011500-02; G011516; G011535; G011537; G011538-39; G011543-45; G011613; G011836; G013543); Ex. 29, Cassagne Dep. 180:16-181:4; 187:9-17; 260:14-261:1.)

**Plaintiffs' response: Undisputed.**

43.     Caniglia Jr. told his supervisors "I am requesting overtime", his supervisors approved his overtime requests, and Caniglia Jr. was paid for all overtime that he recorded. (Ex. 22, Caniglia, Jr. Dep. 112:1-116:5; 117:13-20; 126:1-132:20; 243:16-246:9; Ex. 33, Caniglia, Jr. Pay Records (G002230, G002234, G002241, G002243-46, G002306-10, G002379-89, G002391- 92, G002394-96, G008548-52);  Ex. 32, Caniglia, Jr. OT Emails (G011421-11423; G11375 (emailing "I am requesting overtime.")).)

**Plaintiffs' response: Undisputed**.

44.     None of Caniglia, Jr.'s supervisors told him to work off the clock (Ex. 22, Caniglia, Jr. Dep. 54:7-18) or that he could not receive overtime pay. (*Id.* 165:8-19.)

**Plaintiffs' response: Disputed.  Mr. Caniglia, Jr. sometimes requested pre-approval for overtime and his supervisor's response "would usually be, in sum and substance, a negative for payment, but didn't say don't work."  Ex. M, Caniglia, Jr. Tr. 53:10-54:3.**

45.     Sometime during his tenure, Caniglia, Jr. started to use the Workday application on his cell phone. (*Id.* 42:10-14; 51:1-14.)

**Plaintiffs' response: Undisputed.**

46.     Caniglia, Jr. never told his managers or Human Resources ("HR") that he was working time beyond what he recorded or that his pay did not reflect the hours that he worked. (*Id.* 78:18-79:20; 84:4-7; 167:1-8.)

**Plaintiffs' response: Disputed.  Mr. Caniglia, Jr. requested pre-approval for overtime on several occasions and told his supervisor that he would be working extra hours; his supervisor's response "would usually be, in sum and substance, a negative for payment, but didn't say don't work."  Ex. M, Caniglia Jr. Tr. 53:10-54:3. In addition, he contacted his supervisors when he felt he did not receive pay for all hours worked, *id.* 77:1-19, and "definitely expressed [his] overtime to [his] supervisors over the phone" and email. *Id.* 79:17-19, 77:1-83:11 (describing a series of conversations where he informed his supervisor that he worked overtime and "wasn't compensated for it").**

47.     Because Caniglia, Jr. handled a variety of cases, he admitted that the productivity metric was different per type of case and team assignment. (*Id.* 208:4-7.)

**Plaintiffs' response: Undisputed**.

48.     Caniglia, Jr. thought that closing cases in less time would positively impact his merit salary raise that he received every year. (*Id.* 242:14-243:6; 229:13-15.)

**Plaintiffs' response: Disputed**.  **The cited deposition testimony does not support GEICO's proposition.  In his deposition, Mr. Caniglia, Jr. agreed with GEICO's counsel's suggestion that a Special Investigator could close cases faster if they worked 48 hours per week than if they worked 38.75 hours per week, but this discussion was not related to merit-based salary increases.  Ex. M, Caniglia, Jr. Tr. 240:19-243:6.**

49.     Caniglia Jr. recorded more than 40 hours in 32 workweeks between April 17, 2017 and December 21, 2023, which is 9.97% of all workweeks during that time and 11.07% of workweeks in which Caniglia Jr. worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 20-21.)

**Plaintiffs' response: Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

### d.  Craig Costanzo

50.     Costanzo was a senior field security investigator with GEICO SIU from approximately 2014 to 2019 and has been a lead security investigator since approximately August 2019, at most times based in upstate New York. (Ex. 34, Costanzo Resp. to Court Interrogatories, Costanzo Decl. ¶¶ 1-2; Ex. 35, Costanzo Dep. 16:1-6; 20:3-8; 94:16-23; 107:6-10; 127:13-128:20; 186:2-9.)

**Plaintiffs' response: Undisputed.**

51.     Costanzo's supervisors were Chet Janik from approximately 2014 to 2022, Dara Campbell from November 2022 to June 30, 2023, Andrew Gelderman from July 1, 2023 to March 18, 2024, and Sarah Greenman from March 19, 2024 to present. (*Id.* 22:14-24; 74:20-75:22.)

**Plaintiffs' response: Undisputed.**

52.     Costanzo alleges that he worked approximately 43 hours per week before March 2020, approximately 48 hours per week but as much as 55 hours per week from March 2020 to November 2021, and approximately 42 to 45 hours from November 2021 to the present. (Ex. P, Costanzo Resp. to Court Interrogatories, Costanzo Decl. ¶¶ 10-13.)

**Plaintiffs' response: Undisputed.**

53.     Costanzo's estimates include approximately 3 hours of commuting per day during periods in which he worked in the field. (Ex. 35, Costanzo Dep. 101:16-23.)

**Plaintiffs' response: Disputed.  The cited testimony consists of GEICO's attorney stating that when GEICO stopped field investigations during the COVID pandemic, "you didn't have any of this drive time that you had to do anymore, right? . . . . So the, you know, hour and a half there, hour and a half back is not something you had in your work day anymore?" with which Mr. Costanzo agreed.  This leading question does not establish that Mr. Costanzo spent time "commuting," i.e. traveling from home to a worksite, as opposed to traveling from one worksite to another.  Nor did Mr. Constanzo offer three hours a day as an estimate of the time he spent driving to various locations to complete investigation tasks such as witness interviews and scene canvasses that were required for investigations, which varied considerably. Ex. D, Costanzo Tr. 88:5-16; 95:4-23,101:16-23.**

54.     Costanzo testified "[t]hat's possible" when directly asked if his alleged extra hour worked per day on top of his scheduled work hours was spent commuting from the field back to his home, and that no one instructed him to work an extra hour per day. (*Id.* 87:10-25; 232:25- 233:24; 234:8-23.)

**Plaintiffs' response: Disputed.  The question asked was, "Q: So, for example, when you say you might have worked an extra hour per day on top of your regularly scheduled hours, it's possible that that hour was spent commuting from the field back to your house? . . . A: That's possible."  This hypothetical—to which Plaintiffs' counsel objected —does not establish that Mr. Costanzo's alleged hours were uniformly spent driving home from investigation sites.**

55.     Costanzo's supervisor Chet Janik did typically approve Costanzo's overtime requests. (*Id.* 45:20-47:16.)

**Plaintiffs' response: Disputed. Overtime was approved for limited periods of time; it was not "typically" approved.  For example, Mr. Costanzo testified that, in the summer of 2020, overtime was authorized for Investigators working on social media cases. Ex. D, Costanzo Tr. 44:2-45:3.  Prior to COVID, Investigators had "reached a point where we were . . . told there was no more overtime, so you wouldn't ask because people were even told there isn't." *Id.* 46:16-47:8. Similarly, in 2023 and 2024, Mr. Costanzo testified that he was "advised that there was no overtime anymore" and "it was very clear that overtime was not authorized."  *Id.* 130:23-132:9.**

56.     Costanzo knew that GEICO policy required him to document all the time he worked into GEICO's timekeeping system and Costanzo admitted that "if [Costanzo] worked overtime, [he] knew that [he was] supposed to document that" in GEICO's timekeeping system. (*Id.* 48:12- 20.)

**Plaintiffs' response: Undisputed in Part; disputed in part.  Undisputed that Mr. Costanzo was aware of GEICO's policy.  Disputed to the extent GEICO alleges that Mr. Costanzo "knew" that all his overtime hours were supposed to be documented in GEICO's timekeeping system in practice.  Mr. Costanzo testified that overtime was approved only for limited periods of time. Ex. D, Costanzo Tr. 44:2-24. Beyond these time periods, Mr. Costanzo did not input his overtime in GEICO's timekeeping system because he was told that there was "no more overtime" and requests would not be approved.  *Id.* 46:16-47:8, 130:23-132:9.**

57.     Costanzo's supervisor did not know on a day-to-day basis what hours he was working. (*Id.* 49:2-9.)

**Plaintiffs' response: Disputed. Mr. Costanzo's supervisors knew that he was regularly working overtime hours.  Mr. Costanzo "made it clear" to his supervisors, and manager Bill Newport, that he was only able to stay on top of his caseload because he "put extra time in."  Ex. D, Costanzo Tr. 51:4-13.  He stated that he made it "clear to**

them…that the only way [this] was working was because we were putting extra time in."
*id.* at 50:13-22, 51:4-23 (complaining to his supervisor about "the huge volume of cases"
and how "there was no way to do it within the eight-hour work day").

58.    Costanzo never told his supervisor that he worked any time that he did not
record into GEICO's timekeeping software, and he was "not sure how they would have known
that" he was working any time that he did not record. (*Id.* 45:20-47; 50:12-51:3; 232:25-
233:24.)

**Plaintiffs' response: Undisputed in part; disputed in part. Undisputed that Mr.
Costanzo did not explicitly tell his supervisor that "that he worked any time that he did
not record into GEICO's timekeeping software." Disputed to the extent GEICO alleges
that Mr. Costanzo was "not sure" that his supervisor was aware that he worked unpaid
overtime. Mr. Costanzo testified that it was "clear" to his supervisor, Chet Janik and to
Manager Bill Newport, that he was only able to stay on top of his caseload because he
"put extra time in." Ex. D, Costanzo Tr. 51:4-13; 139:9:140:25 ("I think it was pretty
clear during the lockdown that we were all working extra hours."); 142:12-143:2 ("I
think it was pretty clear that we were saying we can't keep up with this and get these
deadlines done. So I guess I'm kind of thinking he would have understood that what we
were saying is this is causing us to work late . . . I believe they knew. I think it was pretty
clear that we were working and putting extra hours in.")**

59.    Costanzo had authority to change the status of his investigations to "closed" in
SICM without supervisor approval. (*Id.* 211:1-212:5.)

**Plaintiffs' response: Undisputed.**

60.    Costanzo stopped working off the clock at some point in 2022 or 2023. (*Id.*
243:17- 244:21; 252:18-254:6.)

**Plaintiffs' response: Undisputed.**

61.    Costanzo received overtime pay for overtime hours recorded in GEICO's
timekeeping system. (Ex. 36, Costanzo Pay Records (G001030-1031; G001034; G001036-
1039; G001045; G001047; G001050-1051; G001053-1054; G001057-1059; G001061-1068;

G001074; G001082; G001084-1085; G001087-1092; G001094; G001096-1098; G001100-1102; G001111- 1113; G001186; G001192; G008980; G008982-8983; G008985-8990; G008992; G008994-8995; G008998-9000; G009009-9011; G010102; G010104-5; G010107-12; G010114; G010116-18; G010120-22; G010131-33).)

> **Plaintiffs' response: Undisputed.**

62.    Costanzo believed that Janik and Newport knew that he was working more hours than he was entering into Workday because "they had access to that SICM to see when we're in and when we're out and that they would know we were doing work and doing entries after hours." (Ex. 34, Costanzo Dep. 142:12-144:24.)

> **Plaintiffs' response: Undisputed.**

63.    Costanzo never complained to GEICO's local HR, corporate HR, or any supervisor that he did not receive pay for all hours worked. (*Id.* 151:13-24; 152:5-10.)

> **Plaintiffs' response: Disputed.  *See* RSOF ¶ 62.**

64.    Costanzo recorded more than 40 hours in 59 workweeks between April 17, 2017 and September 6, 2024, which is 15.49% of all workweeks during that time and 17.05% of workweeks in which Costanzo worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 22-23.)

> **Plaintiffs' response: Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

### e.   Keith Fischer

65.    K. Fischer was employed as a Grade 65 GEICO SIU Investigator from 1999 to 2004 and as a Grade 66 GEICO SIU Lead Investigator from 2004 to 2020 based in New York City and Long Island. (DE No. 53, Answer at ¶ 9; Ex. 2, K. Fischer Dep. 25:17-25; 27:13-16; 28:12-19; 31:6-13.)

> **Plaintiffs' response: Undisputed.**

66.    From 2016 to 2020, K. Fischer primarily investigated theft cases, reported to supervisor Gerard ("Gerry") Cassagne, and did not work a set work schedule, but rather, he determined what tasks were needed for a given investigation and used flex time to complete them. As a Lead Investigator, he also trained incoming SIU investigators. (*Id.* 31:17-20; 33:2-

6; 33:18- 22; 34:9-11; 36:11-37:19; 43:12-15.)

**Plaintiffs' response: Undisputed.**

67.    K. Fischer spent different amounts of time on each case. For example, K. Fischer closed some cases the same day that he received them, and he closed some cases in a matter of months. (*Id.* 64:17-19, 23-25; 66:3-67:6; 73:7-13; 79:16-80:10; 125:24-126:6.)

**Plaintiffs' response: Undisputed.**

68.    K. Fischer received GEICO's written policies requiring him to record and enter all time worked accurately, received annual training on those timekeeping policies, and was paid for all time that he entered in GEICO's timekeeping system. (*Id.* 85:5-86:23; 107:9-20; 119:5-9.)

**Plaintiffs' response: Undisputed.**

69.    Neither K. Fischer's supervisor (Cassagne) nor his manager (Newport) told him to work without recording his time, meaning work "off the clock." (*Id.* 88:2-89:3; 99:4-11.) Cassagne allegedly told K. Fischer that how he completed his work was up to him and that "you have to do what you have to do to complete your work." (*Id.* 87:3-10; 88:2-18.)

**Plaintiffs' response: Disputed**. **Mr. Fischer testified at length that Mr. Cassagne was aware that Investigators regularly worked beyond 7.75 hours per day and did not record all hours worked.  In addition to the testimony GEICO cites, Mr. Fischer told Mr. Cassagne that he was working several hours of overtime on weekends. Ex. A, K. Fischer Tr. 122:17-123:4. In response, Mr. Cassagne told him that he "can't put in for overtime" because "we don't have pre-approval." *Id.* 123:9-16.  Mr. Cassagne also told him: "You can do your 7.75, and what you do after that you're on your own accord" and that "he couldn't stop [Investigators] from working overtime" to complete their cases. *Id.* 123:9-16; 99:10-18. Mr. Fischer also had conversations with other GEICO Supervisors, including Ms. Toni D'Agata and Ms. Dara Campbell, where he complained about the lack of overtime. *Id.* 91:2-10.**

70.    On November 25, 2016, Cassagne sent K. Fischer an email stating, "[i]f you work overtime, you must be able to document your time worked," and "**Bottom line**- continue

to work the way you were working. If you determine that you need to work overtime on any specific day, you can work the overtime and you will get paid for it. You have to document your overtime hours and be able to verify why it was needed. Your supervisor will also be responsible to verify your overtime." (*Id.* 241:4-12; Ex. 30, Email (P00000077).)

**Plaintiffs' response: Undisputed.**

71.    K. Fischer controlled how many hours he entered into GEICO's time keeping software, and he generally recorded working 7.75 hours per day, Monday through Friday. (Ex. 2, K. Fischer Dep. 106:15-23; 111:10-112:14.)

**Plaintiffs' response: Disputed. Mr. Fischer did not "control" the hours he entered into GEICO's timekeeping software. He was informed by Mr. Cassagne that time beyond 7.75 hours would not be approved without prior authorization, regardless of the actual hours he worked, and he could only put in the time that he was approved to work. Ex. A, K. Fischer Tr. 113:9-24, ("I could not put in for overtime without a good enough reason to substantiate the overtime, and it didn't matter if I drove eight hours for the day"), 123:9-16. ("Jerry would say to me, you can't put in for overtime. . .You can do your 7.75, and what you do after that you're on your own accord.")**

72.    GEICO paid K. Fischer for all time that he recorded in GEICO's timekeeping system. (*Id.* 106:15-23; 111:10-112:14.)

**Plaintiffs' response: Undisputed.**

73.    K. Fischer estimated that he worked 50 to 65 hours per week from 2016 through March 2020. (Ex. 37, K. Fischer Resp. to Court Interrogatories, K. Fischer Decl. ¶ 9.)

**Plaintiffs' response: Undisputed.**

74.    K. Fischer described the schedule of a day of work as follows: he left his house at 5:00 am, arrived at an interview location at 7:00 am, "sleep in your car" or reviewed the file until 9:00 am, conducted an interview until approximately 2:00 pm, and arrived home at 4:00 pm. According to K. Fischer, the day he described included 11 hours of work. (Ex. 2, K. Fischer Dep. 242:21-243:24.)

**Plaintiffs' response: Disputed. The cited testimony offers an example of how Mr.**

Fischer structured "some days" in which he traveled between Brooklyn and Levittown. Mr. Fischer's schedule and the nature of his day-to-day work varied throughout the month, and he did not travel to Brooklyn on all days. Ex. A, K. Fischer Tr. 234:23-235:5 ("I did this . . . to organize my month so that, if I knew I was going to Brooklyn on Tuesday, you know, I wouldn't have to go on Thursday. I would try and do three in Brooklyn."). Mr. Fischer also testified that on a day when he left his house at 5 AM, he might return from an EUO at around 3 PM and start "typing" his notes while working from home. *Id.* 37:3-10. He was also required to work on each new case the day it was received and often worked "3 or 4 hours" after 4 PM to complete his casework. *Id.* 73:21-74:9; 120:16-121:3.

75.     K. Fischer routinely included his commute toward his total hours worked. (Ex. 38, K. Fischer OT Emails (G011487 (6:45 am left my residence . . . 3 EUO's . . . from 10AM to 12PM; drove home/arrived 1:45PM); G011491 ("7:15AM left residence; 10:00AM-1:00PM conducted 3 EUO's; 1:00PM left [Brooklyn], 2:30PM arrived home"); G011492 (6:30AM to 7PM; Left my house at 7AM; I did a EUO . . . at 11AM")).) At least once, K. Fischer included a seven hour stretch of time that he spent "on and off typing cases…" (Ex. 38, K. Fischer OT Emails (G011498).)

Plaintiffs' response: Disputed. Mr. Fischer did not include his "commute" in his total hours worked. He included the time he spent driving to various locations to conduct examinations under oath ("EUOs") in his working hours, as instructed by his supervisor, Gerry Cassagne. Ex. Q, Email from G. Cassagne to K. Fischer at P00000077 ("your travel time to appointments is considered working hours."). As discussed in more detail in Plaintiffs' opposition, before the COVID-19 pandemic, Mr. Fischer could not have performed the required tasks assigned to him without driving to and from EUOs and witness interviews. Ex. A, K. Fischer Tr. 41:21-42:25; 32:6-32:18;72:3-72:22;128:19-24.

76.     K. Fischer understood how to request overtime because from 2016 to 2020, K. Fischer recorded and was paid for overtime, including on at least six occasions in 2017. (Ex.

39, K. Fischer Pay Records (G002123; G002125-2127; G002136-2137; G002144); Ex. 38, K. Fischer OT Emails (G011487; G011492; G011518; G011521; G011515; G011497; G011498; G011496; G011536); Ex. 2, K. Fischer Dep. 116:3-7; 152:8-11; Ex, 29, G. Cassagne, 180:16-181:4; 187:9-17; 189:5-10; 260:14-261:1.)

**Plaintiffs' response: Undisputed.**

77.      K. Fischer believed that if he recorded overtime, he would receive lower scores on his monthly "report card" and that he "needed the rating of 4 or 5 to get a better raise and better compensation through [his] profit share." (Ex. 2, K. Fischer Dep. 99:16-18.)

**Plaintiffs' response: Undisputed but lacking context; Mr. Fischer "believed" this because: "I was told that would be my rate, but because I asked for overtime, I would now be susceptible to getting more cases, because I had more time on the books, and my rating would go down." Ex. A, K. Fischer Tr. 94:11-25.**

78.      GEICO never capped the number of hours that K. Fischer could work on a given case. (*Id.* 189:8-190:21.)

**Plaintiffs' response: Undisputed in part; Disputed in part. Undisputed that GEICO did not "cap" the number of hours an Investigator could work on a given case. Disputed insofar as GEICO's "Productivity" metric and "Case Life" metric discouraged Investigators like Mr. Fischer from spending more time than was needed on a given case. Investigators' "Productivity" was calculated as a ratio that divided the number of cases an Investigator closed by the number of work hours reported for the month and "Case Life" measured how quickly they resolved cases. Ex R, SIU Case Investigations Instructions at G017297; Ex. S, SIU Core Metrics Report Card Excel at G007938 (Notes tab with formulas for metrics, including Average Case Life, calculated as: (Closed Date – Case Assigned Date)/ (Number of Closed Cases)).  Working on a case beyond a certain amount of time could directly and negatively impact Mr. Fischer's performance ratings. Ex. A, K. Fischer Tr. 182:9-22 ("The longer you went in a case, the more you were hurt, because the**

numbers, your 1, 2, 3, or 5, would decline."), 181:20-182:3 ("[L]et's say you put in for ten hours overtime a week, and you got paid for it. Well, now your caseload for that week, those ten cases, that should have been completed in 38.75, were now completed in 48.75, which reduced your productivity").

79.    K. Fischer never told Cassagne, Newport, or HR about any occasion in which he worked more hours than he recorded because, as he explained, "You don't report them. You just, you sit, and you take it. That's just the way we did things." (*Id.* 97:5-16; 98:20-25.)

**Plaintiffs' response: Disputed**. **The cited testimony was in response to a question about whether Mr. Fischer raised concerns with HR—the question acknowledged that Mr. Fischer did raise concerns with Gerry Cassagne and Bill Newport. Ex A, K. Fischer Tr. 97:5-8. Mr. Fischer told Mr. Cassagne that he was working beyond the 7.75 hours recorded in GEICO's timekeeping system.** *Id.* **121:4-124:21 ("I told my immediate supervisor Jerry Cassagne that I was doing over ten hours a week in overtime . . . I just said I am doing weekends . . . Jerry would say to me, you can't put in for overtime…Jerry and I had this conversation, if not weekly, biweekly.")  He also had conversations with other GEICO supervisors, Toni D'Agata and Dara Campbell, where he complained about the lack of overtime and that Mr. Newport was present for at least one of these conversations but refused to attend future meetings.** *Id.* **91:2-15.**

80.    K. Fischer does not know if any other investigators requested overtime, were denied overtime, or worked uncompensated overtime, did not personally see other investigators performing their work, did not look at the SIU claim files of any other investigators other than for training purposes, and he could not see what hours other investigators entered in GEICO's timekeeping system. (*Id.* 194:8-196:5.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Mr. Fischer did not personally see other Investigators performing their work, did not look at the SIU claim files of any other investigators other than for training purposes, and could not see what hours other investigators entered in GEICO's timekeeping system.  Disputed that Mr. Fischer did not know that other investigators requested overtime, were denied**

**overtime, or worked uncompensated overtime. Mr. Fischer knew that other Investigators emailed Mr. Cassagne about working unpaid overtime. Ex. A, K. Fischer Tr. 96:13-20 ("I know there's emails…and they came from all his investigators that we were doing overtime and we weren't getting paid for it." He also described quarterly meetings with Mr. Newport and Supervisors Ms. D'Agata, Ms. Campbell, and Mr. Cassagne, where other Investigators raised the issue of being denied overtime. *Id.* 156:20-157:9; 206:10-24.**

81.     K. Fischer generally recalled that coworkers informed him that they were working long hours and their caseload was difficult, but he did not relay the report to anyone else at GEICO or suggest that the reporting coworker inform a supervisor or HR. (*Id.* 206:2-207:18)

**Plaintiffs' response: Disputed**. **Mr. Fischer recalled an in-person meeting at Bill Newport's office where he told Mr. Newport about the long hours he and his coworkers were working. Ex. A, K. Fischer Tr. 93:13-22 ("We are working so many hours overtime to complete our cases in a timely fashion").**

82.     K. Fischer once asked Newport "…who's watching the store here? Do you know what we do? Is anybody telling you what we do? Do you read our reports? Do you read the things that we do? Do you look at our monthly reports? Do you look at our mileage reports? Do you look at our reports to Jerry [Cassagne]? Do you look at our report cards?" (*Id.* 89:13-92:8.)

**Plaintiffs' response: Undisputed.**

83.     K. Fischer never recorded the total amount of hours or overtime that he worked outside of GEICO's timekeeping system. (*Id.* 234:6-235:5.)

**Plaintiffs' response: Undisputed.**

84.     According to K. Fischer, SICM time-stamped entries do not show hours worked and he would type of case task summaries in Microsoft Word and submit them as SICM entries at a later time. (*Id.* 247:18-22; Ex. 81, C. O'Neil Interview Notes.)

**Plaintiffs' response: Undisputed. For additional context on time stamps in SICM,**

*see* **RSOF ¶ 9.**

85.    K. Fischer participated in prior litigation captioned as the Calderon and Vedder matters against GEICO alleging unpaid wages and received around $99,300 total as a result. (*Id.* 9:9-11:18.)

> **Plaintiffs' response: Undisputed**.

86.    K. Fischer recorded more than 40 hours in 6 workweeks between April 17, 2017 and August 27, 2020, which is 3.61% of all workweeks during that time and 4.26% of workweeks in which K. Fischer worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 32-33.)

> **Plaintiffs' response: Undisputed**.

**f.    Margaret Fischer**

87.    M. Fischer worked as a GEICO SIU investigator from approximately January 2010 to September 2020, and she retired in November 2020. Beginning in 2016, M. Fischer predominantly worked in GEICO's Long Island office as an inside medical major case investigator. (Ex. 40, M. Fischer Dep. 58:17-59:8; 82:4-83:10; 87:2-7; 68:25-69:8; Ex. 41, M. Fischer Resp. to Court Interrogatories, M. Fischer Dcl. ¶ 1.)

> **Plaintiffs' response: Undisputed.**

88.    M. Fischer's supervisors were Danielle Perdomo from approximately 2016 to 2018 and then Kristen Slack until she retired. (Ex. 40, M. Fischer Dep. 62:14-64:13; Ex. 41, M. Fischer Resp. to Court Interrogatories, M. Fischer Decl. ¶ 2.)

> **Plaintiffs' response: Undisputed.**

89.    M. Fischer generally worked a set schedule from 9:00 am to 5:30 pm. (Ex. 40, M. Fischer Dep. 104:25-105:17.), and alleges that she worked around 41.5 to 42 hours per week from December 2016 to March 2020 and around 40.75 hours per week from March 2020 to September 2020. (*Id.* 147:12-25.)

> **Plaintiffs' response: Undisputed.**

90.    M. Fischer's time estimates included each day approximately 10 to 15 minutes to set up her workstation at her dining room table and 10 to 15 minutes to take it down, which

she alleges was necessary to eat dinner at her table. (*Id.* 138:25-139:18; 142:5-23.) She did not inform her supervisor about the time spent organizing her workstation. (*Id.* 141:13-142:12; 144:2-24; 148:17-149:10.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Ms. Fischer did not inform her supervisor about the time spent organizing her workstation. Disputed to the extent that GEICO alleges that Ms. Fischer's time estimates, from 2016 to 2020, included *only* time spent setting up and taking down her workstation. From 2016 to 2020, Ms. Fischer worked at GEICO's Long Island office from 9:00 AM to 5:30 PM every day but often stayed in the office past 5:30 PM to complete required tasks such as submitting required diary entries, answering phone calls, assisting new investigators, and answering e-mails. Ex. T, M. Fischer Tr. 122:17-125:19; 57:21-58:12.  She also emailed with her supervisor Danielle Perdomo while working unpaid overtime after hours, giving GEICO knowledge of her unpaid overtime work.  *Id.* 265:5-22 ("Q.  Why do you believe she had actual knowledge [of your off-the-clock work]?  A.  Because I would e-mail her when I was in the office and she would answer me.").  During this time, she was required to "swipe" in and out of GEICO's offices.  *Id.* 129:15-19. Beginning in March 2020, Ms. Fischer worked remotely until her retirement. *Id.* 57:21-58:12. It is only during this time Ms. Fischer estimates that her workday included 10 to 15 minutes of set up and take down time for her workstation. *Id.* 138:25-139:18; 142:5-23.  Disputed as to GEICO's characterization that this was necessary "to eat dinner at her table"—setting up and taking down her workstation was necessary for Ms. Fischer to perform her principal job duties for GEICO.**

91.    M. Fischer's supervisor assigned her approximately four cases per month.  (*Id.* 65:9-17.) M. Fischer's caseload decreased upon the onset of COVID in March 2020 because she was not assigned new cases. (*Id.* 242:15-243:10.)

**Plaintiffs' response: Undisputed**.

92.    M. Fischer's cases were complex and could take months or even years to close. (*Id.* 94:6-14; Ex. 42, Sheppard Decl. ¶ 18.) She typically closed around three (3) cases per

month, though every month was different. (Ex. 40, M. Fischer Dep. 98:17-20.)

       **Plaintiffs' response: Undisputed**.

    93.    M. Fischer was required to request permission from her supervisor to work more than her regular work hours and her timesheet had to show the dates and number of hours that she worked, including any overtime. (*Id.* 34:13-35:5; 171:7-24; 172:6-16.)

       **Plaintiffs' response: Undisputed**.

    94.    M. Fischer rarely requested overtime because "[i]t has been the trend in [GEICO] that people just worked to get their work done for the day" and she "didn't feel that it would be approved." (*Id.* 190:16-192:4; 193:21-194:16.)

       **Plaintiffs' response: Disputed**.  **Ms. Fischer rarely requested overtime because same-day requests for overtime were "rarely approved" and "to work overtime, you would have to submit in advance a request to work overtime on a specific case and [state] specifically what on that case you would want to work during that time." Ex. T, M. Fischer Tr. 190:7-191:24. Ms. Fischer could not always predict when she needed to work overtime and understood that same-day requests would likely be denied.  *Id.*  Indeed, she frequently worked overtime "because the end of [her] day was up and [she] had things [she] still needed to accomplish in that day."  *Id.***

    95.    No supervisor or manager instructed M. Fischer not to report overtime, and GEICO paid her for all hours that she entered into GEICO's timekeeping system. (*Id.* 129:6-19; 182:7- 183:6; 186:7-187:15; 236:19-23; Ex. 43, M. Fischer Pay Records (G002657).)

       **Plaintiffs' response: Undisputed.**

    96.    M. Fischer did not enter case notes into SICM every day and was only required to create a "diary" log in SICM every 15 business days. (Ex. 40, M. Fischer Dep. 92:7-93:24; 94:15- 18; 97:5-98:7; 123:10-124:4.)

       **Plaintiffs' response: Undisputed.**

    97.    M. Fischer's performance evaluations depended on the quality of her investigations. (*Id.* 100:12-102:8; Ex. 44, Bishop Decl. ¶ 21.)

       **Plaintiffs' response: Undisputed in part; disputed in part. Undisputed that Ms.**

**Fischer's performance was evaluated in part based on the quality of her investigations. Disputed to the extent GEICO alleges that investigation "quality" was the *only* metric that impacted Ms. Fischer's performance ratings.  Ms. Fischer was also rated on other metrics such as the length of time it took her to close a case and the timeliness of her diary submissions.  Ex. T, M. Fischer Tr. 196:16-200:2; Ex. U, M. Fischer Resp. to Court Interrogatories, M. Fischer Decl. ¶ 11. Failure to meet these metrics could negatively impact Ms. Fischer's performance evaluations. *Id.***

98.    M. Fischer's performance was not evaluated for "Productivity," meaning the number of cases closed in a month, or "Case Life," meaning how long her investigations remained open. (Ex. 40, M. Fischer Dep. 100:12-102:8; Ex. 44, Bishop Decl. ¶ 21; Ex. 43, Sheppard Decl. ¶ 22.)

**Plaintiffs' response: Undisputed in part; disputed in part.  Undisputed that Ms. Fischer's performance was not evaluated for "Productivity."  Disputed that Ms. Fischer was not evaluated for the length of time "her investigations remained open."  After a case was "approved for closure," Ms. Fischer was rated on the length of time it took to close the case.  Ex. T, M. Fischer Tr. 196:16-197:10.**

99.    M. Fischer believes her supervisor tracked the number of hours that she worked through the time stamps on her case notes and e-mails, and her building swipe in and out times, though none of her supervisors told her or suggested that they did so. (Ex. 40, M. Fischer Dep. 130:2-18; 132:25-133:4; 134:7-25; 291:14-292:3.)

**Plaintiffs' response: Undisputed in part; disputed in part.  Undisputed that Ms. Fischer believes that supervisors could track the number of hours she worked through time stamps on her case notes and e-mails, as well as her building swipes.  Disputed that "none of her supervisors told her or suggested that they did so."  Ms. Fischer was "told that [GEICO] could. . .check [her] time swipes."  Ex. T, M. Fischer Tr. 131:24-132-3.**

100.    M. Fischer never complained to her supervisor, manager, or HR regarding her hours or her pay, nor does she recall coworkers making such complaints. (*Id.* 173:14-175:9; 179:3- 181:2.)

**Plaintiffs' response: Undisputed.**

101.    M. Fischer recorded more than 40 hours in 2 workweeks between April 17, 2017 and September 18, 2020, which is 1.14% of all workweeks during that time and 1.27% of workweeks in which Fischer worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 6-7.)

**Plaintiffs' response: Undisputed..**

**g.  Michael Grey**

102.    Grey worked as a senior field security investigator with GEICO SIU from 2003 to August 2024. He worked in the field or from home before 2016 until December 2023, when he transitioned to a 100% in-person desk investigator role. Grey worked out of Buffalo, New York and would cover the northern territory of New York. (Ex. 45, Grey Dep. 11:2; 37:24-25; 52:3-23.)

**Plaintiffs' response: Undisputed.**

103.    Grey reported at different times to Chat Janik, Toni D'Agata and Andrew Gelderman. (*Id.* 69:1-71:25; Ex. 46, Grey Resp. to Court Interrogatories, Grey Decl. ¶ 2; Ex. 47, Gelderman Decl. ¶ 9.)

**Plaintiffs' response: Undisputed.**

104.    During Grey's employment, he took two extended periods of time off due to medical issues in 2019 and 2021. (Ex. 45, Grey Dep. 87:22-88:16; 279:21-280:11.)

**Plaintiffs' response: Undisputed.**

105.    Grey did not work a set schedule and could use flex time, and asserts he worked approximately 45 to 50 hours per week. (*Id.* 110:1-4; 119:3-11; 123:12-18; 124:4-11; 125:11-25; 262:23-263:9; Ex. 46, Grey Resp. to Court Interrogatories, Grey Decl. ¶ 11.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Mr. Grey did not work a set schedule, worked approximately 45 to 50 hours per week, and could use flex time.  Disputed that Mr. Grey was able to "flex" his working hours throughout his tenure and in practice.  When working under the supervision of Toni D'Agata and Andrew Gelderman, Mr. Grey was required to "punch in or punch out through Workday" on his phone and did not think he was permitted to "flex" his work**

**hours.  Ex. V, M. Grey Tr. 124:7-25: 180:18-24.**

106.    Grey received GEICO's written policies requiring him to accurately record all time that he worked, and he received annual training on those policies. (*Id.* 134:12-135:5; 138:24- 139:13.)

**Plaintiffs' response: Undisputed.**

107.    On April 19, 2018, Grey's supervisor emailed his team stating, "you are aware that you are eligible for overtime pay, per the guidelines. If you are working beyond 7.75 hours in a day, you should be putting in for the overtime pay." (*Id.* 100:20-101:6; 106:5-18; Ex. 6.)

**Plaintiffs' response: Undisputed.**

108.    Grey requested overtime from his supervisor Chet Janik on multiple occasions. (Ex. 48, Grey OT Emails (G012453-54; G012457-58; G012461; G017971-72).) GEICO paid Grey for overtime that he properly recorded in the timekeeping system. (Ex. 45, Grey Dep. 110:1- 4; 119:3-11; 125:11-25; 213:2-14; Ex. 49, Grey Pay Records (G003189-97; G003200-3202; G003208; G003210; G003214; G003219-23; G004025-26; G004028-30; G004032-33; G004036; G004038; G008279-87; G008290-92; G008298-8300; G008304; G008309-13); Ex. 50, Grey's 2019 Annual Performance Appraisal (G006119-6129).)

**Plaintiffs' response: Undisputed.**

109.    When Gelderman supervised Grey, Gelderman told him, "to always enter all of [his] time worked so that [he] could be properly compensated for such time – including the occasions the required overtime hours worked over 40 in a given week." (Ex. 47, Gelderman Decl. ¶¶ 9, 18).

**Plaintiffs' response: Unisputed**.

110.    Grey became a desk investigator and did not work overtime after February 2023. (Ex. 45, Grey Dep. 181:4-9.)

**Plaintiffs' response: Undisputed**.

111.    Janik never told Grey to work off the clock.  (*Id.* 150:16-152:2; 273:5-9.)

**Plaintiffs' response: Disputed. Grey testified at length that his supervisor Janik was aware that the Investigators on his team were working off the clock and it was "understood**

that that's what [Investigators] had to do to get [their] job done." **Ex. V, M. Grey Tr. 95:20-25.  He had "dozens" of conversations with Janik about working unpaid overtime and Janik "knew that his entire team was putting in more hours than [their] scheduled hours."** *Id.* **95:3-20.  It was "well known" that Grey and other Investigators on his team were working unpaid overtime and Janik once stated in an email that "I know the math doesn't add up, but just get it done."** *Id.* **264:13-265:13.**

112.    Grey never contacted his supervisor, manager or HR to complain that he did not receive pay for all the hours he worked. (*Id.* 139:25-140:21; 192:9-12; 256:24-257:6.)

**Plaintiffs' response: Undisputed.**

113.    Grey recorded more than 40 hours in 39 workweeks between April 17, 2017 and August 1, 2024, which is 11.08% of all workweeks during that time and 12.23% of workweeks in which Grey worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 4-5.)

**Plaintiffs' response: Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

### h.  Charise Jones

114.    Jones has worked at GEICO since 1986. Jones worked in the SIU as a Level 65 investigator from approximately 2016 to 2022, as a SIU Trainer from mid-2022 to late-2023, and since late-2023 as an SIU Auditor. (Ex. 51, Jones Dep. 30:10-16; 60:19-25; 92:22-93:2; 93:13-94:7.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Ms. Jones worked as both an Investigator and as an SIU Trainer during the first six months "when . . . transitioning from investigator to trainer."  Ex. C, Jones Tr. 160:24-161:12; Ex. W, Jones Pay Records at G000898 to G000935.**

115.    From mid-2022 to late-2023, Jones worked as a SIU trainer, which was an exempt position for which she was paid on an annual salary. (*Id.* 89:19-90:8; 92:22-93:2; Ex. 1, Fogarty 2024 Decl. ¶ 8; Ex. 80, SIU Trainer Job Description).

**Plaintiffs' response: Undisputed in part, disputed in part.  The cited testimony states that Ms. Jones worked as an exempt SIU Trainer from 2023 to 2024.  GEICO's**

records show that she was classified as an exempt Trainer from March 26, 2022, to August 26, 2023. Ex. W, Jones Pay Records at G000898 to G000935.

116.    Jones alleges that she worked 51 to 58 hours per week between April 2017 and March 2022. (Ex. 52, Jones Resp. to Court Interrogatories, Jones Decl. ¶ 13.)

**Plaintiffs' response: Undisputed.**

117.    Jones once complained to her supervisor that she "wasn't able to finish up what I had" due to "so much windshield time," which is how she referred to her estimated four to six hours of commute time per day, and she described days where she "put[] in almost [her] entire day of [her] 7.75 in the car." (Ex. 51, Jones Dep. 122:21-123:4; 151:18-152:8; Ex. 52, Jones Decl. ¶ 8.)

**Plaintiffs' response: Undisputed in part, disputed in part.   Ms. Jones complained to her supervisors about "windshield time," Ex. C, Jones Tr. 122:7-123:4, but she never referred to this time as "commuting," and spent "hours and hours on the road" each day to complete her duties.  *Id.* 154:18-21.  Ms. Jones' driving time to some locations could take "a few hours" "per one way."  *Id.* 231:6-12.**

118.    Jones understood that GEICO policy required her to accurately record her hours worked but she "never report[ed] working more than 7.75 hours per day. (*Id.* 105:21-24; 108:19- 109:3; 160:12-14.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Undisputed that Ms. Jones did not regularly report working more than 7.75 hours per day.  Disputed that Ms. Jones understood that she was not allowed to report more than 7.75 hours per day because she had the "same conversation over and over" with her supervisor that "there is no approved overtime."  Ex. C, Jones Tr. 160:15-23.**

119.    SIU Manager Bill Newport, when discussing hiring needs, cautioned SIU associates not to work off the clock because doing so would "not be beneficial for the people that are only working the 38.75 [hours], because you'll have the numbers skewed." (*Id.* 172:6-173:9.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Undisputed that Ms.**

**Jones testified to the quoted text. But Ms. Jones did not testify that Bill Newport told anyone "not to work off the clock"; rather, he said that investigators should "do [their] job[s] in the amount of time that's allotted." Ex. C, Jones Tr. 172:10-22.**

120.  Jones closed investigations in between one hour and several weeks. (*Id.* 78:7-22.)

**Plaintiffs' response: Undisputed that it took Jones between one hour and several weeks to close her investigations**.

121.  Jones had flex time with which she could adjust her schedule as needed.  (*Id.* 76:7-15.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Although it is undisputed that Ms. Jones had flex time, she used it "not that often" because of her workload.  Ex. C, Jones Tr. 76:16-21.**

122.  April Neyland, Jones's supervisor, instructed Jones that if she worked late on one day, then she should use flex time to "try to take it off before the next pay period." (*Id.* 161:23- 162:11.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Although it is undisputed that April Neyland told her to try to flex her time if she worked late on a given day, Ms. Jones informed her supervisor that she could not because she "still [has her] workload the next day."  In response, Ms. Neyland told her "'there's no approved overtime.'"  Ex. C, Jones Tr. 162:5-11.**

123.  Neyland further instructed Jones that "if [she] was going to work over 38.75 hours per week [she] needed to speak with [Neyland] … and state why [she] needed to work additional hours." (Ex. 52, Jones Decl. ¶ 7.)

**Plaintiffs' response:  Undisputed.**

124.  Jones sometimes requested overtime hours that her supervisor "approved… no problem", and GEICO paid her for the overtime that she recorded. (Ex. 51, Jones Dep. 148:15-17;  149:10-14; Ex. 53, Jones Pay Records (G000767, G000792, G000799, G000801, G000806, G000810, G000823, G000827, G000829, G000832, G000837, G000848, G000849,

G000850, G000851, and G000896).)

**Plaintiffs' response: Undisputed in part, disputed in part. While Ms. Jones occasionally requested overtime, her supervisor "reprimanded [her] on putting it in, saying that there was nobody to approve it, and 'you can't just work the overtime.'" Ex. C, Jones Tr. 148:18-24**.

125.   Jones described the process for requesting overtime as a "hassle" and too "time consuming." (Ex. 51, Jones Dep. 148:18-149:14, 150:14-19.)

**Plaintiffs' response: Undisputed but lacking context. Ms. Jones described the process as "time consuming" because "in order for me to get approved for [overtime], I had to write down every single case that I worked, what I did, the time I did it, and why I needed to work that amount of hours overtime. And I – it was just time consuming. That took more time out of my day during my work." Ex. C, Jones Tr. 149:5-11.**

126.   Jones never reported working off the clock to a supervisor or to HR and postulates that timestamps on her entries in SICM notified GEICO of her hours. (*Id.* 153:12-22; 156:7-15, 190:13-25.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that SICM timestamps notified GEICO of the hours Ms. Jones worked. Disputed that Ms. Jones never complained to a supervisor. Ms. Jones complained to her supervisor, April Neyland, at least "four to five times." Ex. C, Jones Tr. 122:7-12. In response, Ms. Neyland suggested that Ms. Jones was the only Investigator who couldn't get her work done in 38.75 hours per week, but other investigators (Keith Fischer, John Moeser, and Anthony Geraci) later told Ms. Jones that "there was no way possible to finish all of what they were expecting us to finish within the time frame allotted" and that they were working off the clock as well. *Id.* 169:8-170:19. And while Ms. Jones never made "formal" complaints to HR, that is because she thought telling her supervisor was enough. *Id.* 152:9-18.**

127.   Newport at one point asked Jones's team "how [they] were doing, how the workflow was, if [they] needed anything," and Jones did not raise any concerns about pay or

working time. (*Id.* 72:20-73:15.)

**Plaintiffs' response: Undisputed that Ms. Jones did not raise any concerns in that meeting.**

128.    Jones recorded more than 40 hours in 21 workweeks between April 17, 2017 and March 25, 2022, which is 8.4% of all workweeks during that time and 9.77% of workweeks in which Jones worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 30-31.)

**Plaintiffs' response: Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

**i.   Daniel King**

129.    King worked as a senior field security investigator with GEICO SIU from approximately 2005 to May 2022. He was based out of the Woodbury area in New York and focused on auto fraud. (Ex. 21, King Dep. 41:20-44:20; 53:7-14; 57:2-4; 62:19-21; 162:20-163:2; Ex. 54, King Resp. to Court Interrogatories, King Decl. ¶ 1).

**Plaintiffs' response: Undisputed**.

130.    From 2016 until his resignation, King reported at different times to Toni D'Agata and Dara Campbell. (Ex. 21, King Dep. 49:24-50:13; 51:16-24; 171:17-22.)

**Plaintiffs' response: Undisputed**.

131.    King alleges that from 2016 to May 2022, he worked between 50 to 52 hours per week. (Ex. 54, King Decl. ¶ 11.)

**Plaintiffs' response: Undisputed**.

132.    King contends he did not have flex time and worked a set schedule of Monday through Friday, from approximately 8:00 am to 4:30 pm. (Ex. 21, King Dep. 144:15-145:2.)

**Plaintiffs' response: Undisputed**.

133.    King received and was annually trained on GEICO's written policies requiring him to accurately record and submit all his worktime. (*Id.* 83:7-84:10; 85:13-18; Ex. 55, King Training Records (G004268).)

**Plaintiffs' response: Undisputed**.

134.    King requested overtime from D'Agata. (Ex. 56, King OT Emails (G011213;

G011215).)

     **Plaintiffs' response: Undisputed**.

     135.    On December 30, 2019, King again followed GEICO's overtime request process by emailing his supervisor D'Agata indicating the cases he needed four hours of overtime on. (Ex. 56, King OT Emails (G011750).)

     **Plaintiffs' response: Undisputed**.

     136.    King requested overtime on several occasions. (Ex. 56, King OT Emails G011213; G011215; G011750.)

     **Plaintiffs' response: Undisputed.**

     137.    GEICO paid King for any overtime requested and recorded in GEICO's timekeeping system. (Ex. 21, King Dep. 191:23-200:15; Ex. 56, King OT Emails (G011868; G011931; G012063; G012158; G012227; G012235; G012240); Ex. 57, Pay Records (G010030- 35; G010038; G010048-51; G010064; G001203; G001205; G001207-1214; G001225-1226; G001228; G001230; G001233; G001235; G001242; G001249; G001265-1270; G001273; G001283-1286; G001299).)

     **Plaintiffs' response:  Undisputed.**

     138.    King alleges that Dara Campbell told him that he can "only ente[r] 7.75 hours per day regardless of how many hours worked," but could not recall when this conversation occurred, nor in what context. (Ex. 21, King Dep. 105:23-106:16.)

     **Plaintiffs' response: Undisputed in part; disputed in part.  Undisputed that Mr. King could not recall the exact time of the above-referenced conversation with Dara Campbell.  Disputed that Mr. King could not recall the "context" in which it took place. Mr. King testified that he spoke to Ms. Campbell on the phone, explained that he was "falling behind. . .[and] having trouble keeping up with all the steps."  In response, Ms. Campbell offered to "shut down" Mr. King for a "day or two to catch up" so that he would not be assigned new cases.  Ex. X, King Tr. 105:20-109:17. This conversation took place after Campbell added additional investigation steps to each Investigator's case.  *Id.* 73:25-76:3.**

139.    No supervisor ever instructed King to work off the clock. (*Id.* 116:23-117:5; 128:24-129:3; 137:9-25.)

**Plaintiffs' response: Disputed.  Mr. King's Supervisor, Dara Campbell, told him not to record the extra hours he worked on the Workday app because GEICO was not "paying [him] overtime."  Ex. X, King Tr. 113:20-114:4.  During his deposition, Mr. King recalled that on one occasion, when working past dinner time, Ms. Campbell told him "they're not going to pay you guys. . .they're not going to pay you more than 7.75."  *Id.* 115:24-116:18.**

140.    King was on FMLA leave from February 2020 to August 2020. (*Id.* 128:7-15; 142:15-23.)

**Plaintiffs' response: Undisputed in part, disputed in part.  GEICO's records state that King was on FMLA leave from approximately February 18, 2020 through May 26, 2020.  Ex. Y, King Personnel Record at G005556**.

141.    King never complained to a supervisor or to HR that he was not paid for all of the hours he worked until he alluded to same when he tendered his resignation in May 2022. (Ex. 21, King Dep. 90:24-91:10; Ex. 58, King Resignation (G005838).)

**Plaintiffs' response: Undisputed but lacks context – *see* response to RSOF ¶ 139**.

142.    King recorded more than 40 hours in 37 workweeks between April 17, 2017 and May 13, 2022, which is 15.61% of all workweeks during that time and 17.96% of workweeks in which King worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 14-15.)

**Plaintiffs' response: Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

### j.  Constance Mangan

143.    Mangan worked for GEICO as a Level 65 Senior Investigator from April 2004 until July 1, 2020. (Ex. 3, Mangan Dep. 25:11-20; 30:4-8.)

**Plaintiffs' response: Undisputed.**

144.    Mangan was trained on GEICO's employee handbook policies and understood that GEICO prohibited employees from working off the clock. (*Id.* 84:1-20.)

**Plaintiffs' response: Disputed.  Ms. Mangan testified to the opposite.  Ms. Mangan "*would not say* that was [her] understanding."  Ex. Z, Mangan Tr. 84:2-12 (emphasis added).  Although she knew what the paper policy stated, "based on practice, [the policy] would be different from that."  *Id.*  84:13-16.**

145.    Mangan alleges that she worked "around 50 to 60 hours a week on average" between late 2016 and May 2020. (*Id.* 129:22-130:11; Ex. 59, Mangan Resp. to Court Interrogatories, Mangan Decl. ¶ 10.)

**Plaintiffs' response: Undisputed.**

146.    Mangan's estimate is based "on a week in September that [she] could more specifically recall working the over time [sic]. But [she doesn't] have any document to reflect that…." (Ex. 3, Mangan Dep. 134:4-6; 133:23-134:8.)

**Plaintiffs' response: Disputed.  While Ms. Mangan admitted to not being able to "itemize" her OT hours, Ex. Z, Mangan Tr. 134:15-21, her estimate for working 50 to 60 hours a week is based on her recollection that she started at 7:00 a.m. or 8:00 a.m. each day and regularly worked past 7:00 p.m. (which was when Jeopardy aired and she realized she had been working late).  *Id.* 135:16-137:2.  She also recalls emailing her supervisor at 8:00 PM after submitting timesheets showing work from 7:00 PM to 4:00 PM.  *Id.* 137:14-17, 132:21-133:5.**

147.    Mangan recalls "sometimes" informing her supervisors that she was working until 7:30 pm, 8:00 pm, or 9:00 pm at night and claims unnamed supervisors at unspecified times told her "Don't do overtime. Work 38.75; work 7.75." (*Id.* 110:21-24; 147:24-148:2.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Undisputed that Ms. Mangan informed supervisors of her hours and that they told her to limit her hours.  Dispute GEICO's characterization that Ms. Mangan only "sometimes" informed them.  Ms. Mangan complained regularly about unpaid overtime.  Ms. Mangan's supervisors "constantly told [her] and . . . *most [of] the people that [she] spoke with* . . . that we were limited to a 7.75-hour day, in spite of the fact that *we were all complaining* and all saying that *we're all working way past that*."  Ex. Z, Mangan Tr. 111:20-112:10 (emphasis added).**

148.    Mangan knew how to request overtime because she submitted several requests for overtime, which were approved, and she admitted that when she did request the overtime, it was always approved. (*Id.* 105:20-24; 106:3-6; 108:12-15; Ex. 60, Mangan Pay Records (G00967); Ex. 61, Mangan OT Emails (G11615; G11617; G11639; G11645; G11666; G11667; G11679; G11683; G11685; G11741; G11746).)

**Plaintiffs' response: Undisputed in part, disputed in part.  Although Ms. Mangan requested overtime on "very few occasions," no pay records produced in discovery show any overtime pay.  Ex. Z, Mangan Tr. 105:24-25.**

149.    Mangan believes that her supervisors knew she was working more hours than what she recorded based on timestamps on her SICM entries and emails. (*Id.* 130:12-133:5.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  Undisputed that GEICO had knowledge of Ms. Mangan's overtime through SICM timestamps and emails.  Disputed that GEICO's knowledge was limited to evidence on those work systems.  Ms. Mangan also testified that "[t]here was some monitoring system on the computer" where GEICO could see if Investigators were in SICM or logged onto their computers and that her supervisors, managers, and other investigators told her about that system.  Ex. Z, Mangan Tr. 131:5-21.  She also testified: "I would tell my supervisors, there is no way I can complete my investigations, my reports, within the time frame of 7.75 hours a day; that in order to complete my work I had to work in excess of those hours on a regular basis.  And the response that I received from my supervisors…was that don't do overtime. Work 38.75; Work 7.75."  *Id.* 110:9-111:4.**

150.    Mangan sometimes declined to record overtime hours because she thought "it affects [her] performance evaluation" and to ensure that she met GEICO's performance metrics for employees in her position. (*Id.* 110:9-112:12.) Mangan cannot remember a specific date where a supervisor told her not to submit overtime. (*Id.* 109:11-14; 111:5-19.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Undisputed that Ms. Mangan could not recall "specific dates" and that performance was a motivating factor for her to not record overtime.  Disputed that "performance" was the only reason she**

39

**failed to report overtime hours. Ms. Mangan also did not record overtime because "overtime was discouraged . . . [and] my supervisors were saying we shouldn't be doing it." Ex. Z, Mangan Tr. 109:23-110:8. In addition, when Ms. Mangan told her supervisors there was "no way [she] can complete [her] investigations, [her] reports, within the time frame of 7.75 hours a day" her supervisors told her "Don't do overtime." *Id.* 110:9-21.**

151. Mangan received annual raises throughout her employment with GEICO. (*Id.* 93:15-18.)

**Plaintiffs' response: Undisputed.**

152. Mangan was an opt-in plaintiff in Vedder v. GEICO and received approximately $11,000 in a settlement in that matter for unpaid wages. (*Id.* 9:9-11:25; Ex. 59, Mangan Decl. ¶ 6.)

**Plaintiffs' response: Undisputed.**

153. Mangan recorded more than 40 hours in 2 workweeks between April 18, 2017 and May 29, 2020, which is 1.28% of all workweeks during that time and 1.43% of workweeks in which Mangan worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 12-13.)

Plaintiffs' response: **Undisputed.**

**k. John Moeser**

154. Moeser worked in the GEICO SIU as a senior field security investigator from October 2006 to April 2021, based in the New York City and Long Island region. From 2016 onward, Moeser focused on staged loss and theft cases, and his supervisors at different times were Rich Kilgin or April Neyland. (Ex. 62, Moeser Dep. 31:18-23; 35:18-25; 38:9-39:5; 44:4-11; 64:19-65:2.)

**Plaintiffs' response: Undisputed.**

155. Moeser alleges that he worked approximately 52.5 hours per week from December 2016 to March 2020 and approximately 55 hours per week from March 2020 to April 2021. (*Id.* 139:14-23; Ex. 63, Moeser Resp. to Court Interrogatories, Moeser Decl. ¶¶ 10-11.)

**Plaintiffs' response: Undisputed.**

156.    Moeser's case load fluctuated week to week and month to month, all cases required different tasks, and the time to complete cases "varied" from a few hours to a few months. (Ex. 62, Moeser Dep. 50:5-22; 54:24-55:20; 59:11-15; 67:10-19; 270:18-272:10.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Although the time to complete tasks and individual cases varied, Mr. Moeser did not testify that "all cases required different tasks," but discussed how different types of cases (e.g., underwriting, social media, etc.) may have *some* different tasks that take longer than others—such as if the case required site visits.  Ex. B, Moeser Tr. 55:9-15.  In addition, GEICO controlled caseload overall.  *Id.* 107:3-22 (discussing how supervisors told investigators they "can't control the amount of cases that [investigators] are being assigned, because a lot of this is coming from home office that wanted to increase the ratio of how many cases get assigned to SIU in a given week or time frame").**

157.    Moeser did not have specific hours he had to clock in and clock out but had the ability to work "flexible hours" and worked in the field as part of former Region 2 throughout his GEICO tenure. (*Id.* 34:25-35:14; 101:7-102:1.)

**Plaintiffs' response: Undisputed in part, disputed in part.  Although he could theoretically flex his time, Mr. Moeser would "normally" start around 8 AM. and would often work until 7:00 PM or 8:00 PM at night.  *Id.* 34:25-35:14; 101:21-102:9.**

158.    Beginning in approximately March 2020, Moeser had more time to complete his tasks because he was no longer working in the field. (*Id.* 153:10-18; 157:9-22.)

**Plaintiffs' response: Disputed.  Although Mr. Moeser had less "windshield time" because he could not travel during the COVID-19 pandemic and certain "in person" tasks were paused, he did not have "more time," to complete his tasks. In fact, Mr. Moeser had to take more EUOs to compensate for the lack of drive time.  *Id.* 153:10-18. In addition, he estimates he worked more overtime during the COVID-19 pandemic because GEICO increased his caseload.  Ex. AA, Moeser Resp. to Court Interrogatories, Moeser Decl. ¶ 10; Ex. B, Moeser Tr. 155:14-156:15.**

159.    Moeser did not enter case notes into SICM in real time, such that the time stamps on his SICM entries do not show which day or at what time the task was completed. (*Id.* 184:20- 185:19; 246:18-23.)

**Plaintiffs' response: Disputed.  While Mr. Moeser could put information into SICM after completing a task, he testified that "it would be time stamped for that time" because SICM contains both a time stamp for the entry and a time stamp for the task. Ex. B, Moeser Tr. 184:20-185:19.  Mr. Moeser also limited his backdated entries and regularly put SICM entries in toward the end of his workday such that the timestamps showed some evidence of work after regular business hours. *Id.* 246:18-247:13.**

160.    GEICO trained Moeser on its policy requiring employees to accurately record of all of the time that they worked, and Moeser understood that GEICO required him to log all of his hours. (*Id.* 83:8-14.)

**Plaintiffs' response: Disputed.  Mr. Moeser did not testify to being trained on recording hours.  *Id.* 83:8-16.  His supervisors April Neyland and Rich Kiligin (and possibly others) told him that entering more than 7.75 hours a day on his timesheet would negatively affect his performance ratings.  *Id.* 115:11-116:5.**

161.    Moeser knew that he could ask his supervisor to preapprove overtime by identifying which case he was working on and what tasks he needed to complete. (*Id.* 134:21-135:9; 198:14-17.)

**Plaintiffs' response: Disputed.  Although Mr. Moeser "could" ask his supervisor to preapprove overtime, he was discouraged from doing so for "office work," or the portion of his job done while sitting at a computer (and not in the field). *Id.* 135:10-136:2. The instances GEICO cites are rare exceptions when GEICO did permit overtime in 2017 and 2018. *Id.* 198:7-17.**

162.    Moeser frequently recorded overtime in GEICO's timekeeping system, and GEICO paid him overtime rates for any overtime hours recorded. (*Id.* 111:12-21; 115:3-5; 141:13-20; 138:2-5; 138:18-22; 198:14-17; 202:19-24; Ex. 64, Moeser Pay Records (G001790; G001811; G001871; G001873; G008736; G008738; G009858; G009860).)

**Plaintiffs' response:  Disputed.  Mr. Moeser did not "frequently" record overtime.  GEICO's own custodial records show Mr. Moeser only recorded overtime in 6 workweeks out of 182.  GEICO's Ex. 24, Fogarty Decl. ¶ 17.  And, GEICO has not produced paystubs showing overtime work for all these workweeks.**

163.    Moeser admits he knew that he could bring any concerns about pay issues to his supervisor, local, or corporate GEICO HR, but he never reported anything to HR. (*Id.* 95:10-19; 96:9-15.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  Although Mr. Moeser did not report his concerns specifically to GEICO HR, Mr. Moeser complained directly to Bill Newport that "I, along with everybody else that I knew of, were working more hours than what they were documenting."  Ex. B, Moeser Tr. 96:25-97:2.  By "everybody else" he meant "[e]verybody else within the SIU teams," including the "field investigators at the time that were making their concerns about getting more cases assigned to them . . . and working more hours than what they were documenting."  *Id.* 98:4-11.  He made this complaint to Mr. Newport in a "skip-level" meeting with other investigators.  *Id.* 98:18-99:10.**

164.    Moeser believed that if he recorded overtime, he would have lower performance ratings, which determined whether he was eligible for a raise, but the metrics were never the same, changed intermittently throughout the year and was not the only variable for a raise. (Ex. 63, Moeser Decl. ¶ 14; Ex. 62, Moeser Dep. 175:10-177:13.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  Undisputed that recording overtime would have lowered Mr. Moeser's performance metrics.  GEICO "generally evaluated [him] based on how many hours it took [him] to complete a case task, how often [he] made an entry in a case report, how many days [he] took to close a case, and how many cases [he] completed within a month."  Ex. AA, Moeser Response to Court Interrogatories, Moeser Decl. ¶ 14.  Mr. Moeser and others knew that recording overtime hours "would negatively reflect on your evaluation based on the hours that you were working in a given month compared to the cases that they were assigning you" and**

he and "several other[s]" complained "that [they were] working way past the time frame and not submitting them." **Ex. B, Moeser Tr. 105:8-15, 106:14-20 ("[i]f you submit overtime, you are gonna be docked" or "judged on more hours worked"; it would "negatively reflect on your rating"). Disputed that his metrics "were never the same," as Mr. Moeser's metrics changed only on a half-year or year basis. *Id.* 176:17-21.**

165.    Moeser participated in two prior litigations captioned as the Calderon and Vedder matters against GEICO alleging unpaid wages and received roughly $74,000 as a result. (*Id.* 12:4- 15:16.)

**Plaintiffs' response:  Undisputed.**

166.    Moeser recorded more than 40 hours in 6 workweeks between April 17, 2017 and April 30, 2021, which is 2.97% of all workweeks during that time and 3.30% of workweeks in which Moeser worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 16-17.)

**Plaintiffs' response: Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

**l.  Maria Muñoz**

167.    Muñoz has worked at GEICO in a variety of jobs since 1999, all based out of the Long Island GEICO location. (Ex. 20, Muñoz Dep. 45:10-16.)

**Plaintiffs' response: Undisputed.**

168.    In 2015, Muñoz started her job as a field investigator in the SIU where she investigated auto damage claims for "aspects of fraud" for Region 2, which handled New York state. (*Id.* 51:17-22; 52:22-8; 53:18-23.) For a brief period of time in 2020, Muñoz was assigned as a member of the specialized theft team. (*Id.* 64:13-25.)

**Plaintiffs' response: Undisputed.**

169.    Muñoz alleges that she worked approximately 46 to 48 hours per week from July 2016 through March 2020, 48 to 52 hours per week from March 2020 to November 2021, and 46 to 48 hours per week from November 2021 to present. (*Id.* 157:22-158:4; 171:14-23; Ex. 65, Muñoz Resp. to Court Interrogatories, Muñoz Decl. ¶ 10.)

**Plaintiffs' response: Undisputed.**

170.    During her time at GEICO, and on an annual basis, GEICO trained Muñoz to record all time that she worked, and she understood that GEICO required her to "record our time or input our time that was worked." (Ex. 20, Muñoz Dep. 119:20-120:6; 123:9-19.)

**Plaintiffs' response: Undisputed.**

171.    Muñoz's supervisors at different times were Dara Campbell, April Neyland, Gerard Cassagne, Toni D'Agata, Sarah Greenman, and her current supervisor Arineh Nazari, and her manager at different times were Mike DeGrocco, Bill Newport, and her current manager Rene Cubas. (*Id.* 52:15-21; 59:21-62:16; 144:18-145:6.)

**Plaintiffs' response: Undisputed.**

172.    Due to the remote nature of her job, Muñoz would "go literally weeks without talking to anyone," including without talking to any of her supervisors. (*Id.* 164:3-13.) Muñoz also had authority to close out her cases by herself without waiting for supervisor approval, so she worked primarily independently. (*Id.* 151:22-24; 154:13-15.)

**Plaintiffs' response: Disputed.  Ms. Muñoz did not always have the authority to close out or "submit" cases on her own and stated during her deposition that she gained this ability "somewhere in between Gerry and Tony as my supervisor.  I'm not sure of the year."  Ex. H, Muñoz Tr. 151:22-152:4.  Dispute the inference that Ms. Muñoz "worked primarily independently," which does not appear in the cited testimony and is not supported by the record.**

173.    Muñoz's volume of claims varied drastically: the summer months were the busiest by volume and the winter holidays were "not really that busy." (*Id.* 99:4-22.)

**Plaintiffs' response: Disputed**.  **Ms. Muñoz did not state that the volume of claims varied "drastically," but simply responded to counsel's question ("What times of the year were busiest?") and stated that "summer was always a busy time" and things were less busy "[u]sually around holidays."** *Id.* **99:8-16.  She only stated that work was "not really that busy" in "the week of" the "holidays."** *Id.* **99:4-22.**

174.    Muñoz's time spent working depended on "traffic." The sites that she investigated could be "well over anywhere between 60 to 120 miles one way." (*Id.* 55:10-13;

45

56:9-18; 92:3-17.)

      **Plaintiffs' response: Undisputed**.

     175.   While Muñoz was scheduled into a particular shift, she was able to take advantage of GEICO's flex time which she could use if she "needed to work at a not regularly scheduled time, [she] could back that time out at a later or earlier time." (*Id.* 57:13-17.) Muñoz had the ability to flex her time as long as it was within the same pay period but did not use flex time very often, and no one at GEICO told her how to arrange her flex time when she did use it. (*Id.* 58:12- 59:3; 68:22-69:5.)

      **Plaintiffs' response: Undisputed.**

     176.   None of Muñoz's supervisors instructed her to work off the clock. (Ex. 20, Muñoz Dep. 161:18-162:12). Muñoz asked her supervisor Nazari for overtime to complete her work but after being denied the overtime, Muñoz did not work the overtime hours when they were not approved. (*Id.* 136:19-24; 137:19-140:18; 143:15-144:10.) Rather, Muñoz input up to 39.99999 hours into Workday, all of which was paid, (*Id.* 178:10-179:5; 136:19-24), and she testified that if she is not getting paid, "I stop. Computer goes off. Phone's on the charger. I don't do anything after the hours. I don't pick up calls." (*Id.* 179:17-23; 199:7-16.)

      **Plaintiffs' response: Undisputed in part, disputed in part. Ms. Muñoz stated during her deposition that she works up until 39.99 hours "now . . . since we've had to check in and out," which began around 2023.  *Id.* 140:4-13, 178:17-23.  Ms. Muñoz worked approximately 48 to 52 hours per week from March 2020 to approximately November 2021 when caseloads went up during the COVID-19 pandemic and 46 to 48 hours per week before and after the pandemic until approximately 2023.  *Id.* 149:5-149:16, 168:20-169:9.**

     177.   Although Muñoz asked supervisor Gerard Cassagne about overtime and told him, "work can't get done, that we have too much work," Cassagne "never said that you can work overtime." (*Id.* 161:18-162:15.)

      **Plaintiffs' response: Undisputed in part, disputed in part.  Ms. Muñoz "remember[ed] having [a] conversation with [supervisor] Gerry [Cassagne] in regard to**

the work being too much," and "even cried to him at one point," but that he "never said you can work overtime." *Id.* 161:14-162:9.

178.    Muñoz received a merit-based pay increase based on her performance every year. (*Id.* 130:21-131:7.)

**Plaintiffs' response: Undisputed.**

179.    Muñoz recorded more than 40 hours in 33 workweeks between April 17, 2017 and September 9, 2024, which is 8.8% of all workweeks during that time and 10.15% of workweeks in which Muñoz worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 34-35.)

**Plaintiffs' response:  Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

### m.  Michael O'Sullivan

180.    O'Sullivan worked for GEICO from 2003 to 2022 as a senior field security investigator in the SIU where he focused on medical fraud investigations in the New York City and Long Island regions. (Ex. 5, O'Sullivan Dep. 24:8-10, 15-21; 25:8-25; 26:19-25; 29:16-22; 43:13-21.) Between 2016 and 2022, O'Sullivan reported at different times to SIU supervisors Dara Campbell, Toni D'Agata, and Brian Portnoy. (*Id.* 32:7-12.)

**Plaintiffs' response: Undisputed.**

181.    O'Sullivan alleges that he generally worked from 8:30 am to 6:00 pm, approximately 47.5 to 50 hours per week. (*Id.* 89:8-23; Ex. 66, O'Sullivan Resp. to Court Interrogatories, O'Sullivan Decl. ¶ 10.)

**Plaintiffs' response: Undisputed.**

182.    With the onset of the COVID-19 pandemic in approximately March 2020, O'Sullivan had more time to complete his tasks because he was no longer working in the field. (Ex. 5, O'Sullivan Dep. 96:13-22.)

**Plaintiffs' response:  Undisputed.**

183.    O'Sullivan determined what investigative steps were necessary to investigate each of his medical fraud claims. O'Sullivan closed varying numbers of cases per month, and he could decline taking additional cases as his schedule required. (*Id.* 41:7-15; 44:17-19; 45:22-

46:6; 105:20-24.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  Undisputed that Mr. O'Sullivan closed varying numbers of cases per month.  Disputed that Mr. O'Sullivan could decline cases "as his schedule required."  He never testified to this, only that he could "pass over a certain case."  Ex. I, O'Sullivan Tr. 45:21-46:6.  But GEICO never clarified which cases he could "pass over" or why.  In addition, Mr. Moeser was assigned 20 cases a month, and that number "was out of [his] control." *Id.* 44:3-16.  Also disputed that he had full control over "investigative steps," as he was required to follow a "plan of action that [he] filed in SICM, which would basically outline [his] investigative steps." *Id.* 105:14-19.**

184.    O'Sullivan had flextime and could adjust his schedule as needed. (*Id.* 31:15-32:6; 34:19-35:22; 36:8-13; 89:8-12.)

**Plaintiffs' response: Undisputed in part, disputed in part.  While Mr. O'Sullivan could "flex" his time, he did not.  He regularly worked 8:30 AM to 6:00 PM or 6:30 PM on "down day[s]" – those that were just "typing."  On field days, he'd start at 7:30 AM. and sometimes worked late on "typing." *Id.* 89:10-90:2.**

185.    GEICO trained O'Sullivan on its policy requiring employees to accurately record of all their time worked, and O'Sullivan understood that he was required to log all of the hours that he worked in GEICO's timekeeping system and that managers and supervisors were not allowed to and did not tell him to work off the clock. (*Id.* 53:15-19; 54:20-55:13; 57:8-12; 59:9- 25.)

**Plaintiffs' response:  Disputed.  While Mr. O'Sullivan's managers didn't use the words "off the clock," he felt "pressure to get the cases done" and "that required additional typing time" that he did not log. *Id.* 59:14-21.  Specifically, his manager, Brian Portnoy, told him over the phone that he could not put in for overtime "just for typing" his case reports. *Id.* 67:18-68:24.**

186.    On August 26, 2019, Portnoy reminded O'Sullivan to "please make sure you are keying any additional hours worked into workday. This is in reference to overtime." (Ex.

67, Emails (G019913)).

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Bryan Portnoy sent the quoted email. But, Mr. O'Sullivan also only recorded 7.75 hours per day because his supervisors, including Mr. Portnoy, told him he could not put in overtime "just for typing." Ex. BB, O'Sullivan Response to Court Interrogatories, O'Sullivan Decl. ¶¶ 8, 11; Ex. I, O'Sullivan Tr. 62:19-23.**

187.    No GEICO SIU supervisor or manager ever told O'Sullivan to work off the clock. (Ex. 5, O'Sullivan Dep. 59:14-60:4.)

**Plaintiffs' response: Disputed. While Mr. O'Sullivan's managers didn't use the words "off the clock," he felt "pressure to get the cases done" and "that required additional typing time" that he did not log. *Id.* 59:14-21. Specifically, his manager Brian Portnoy told him over the phone he could not put in for overtime "just for typing" his case reports. *Id.* 67:18-68:19.**

188.    O'Sullivan "absolutely" believed there was an open-door policy with his supervisors where he could come to them with any information or concerns and that he could bring concerns about pay issues to his supervisor or to GEICO's local or corporate HR representatives, but he never did. *Id.* (*Id.* 55:9-13; 60:2-4; 92:24-93:8; 157:19-23.)

**Plaintiffs' response: Undisputed in part, Disputed in part. Undisputed that there was an "open-door policy." Disputed that Mr. O'Sullivan did not bring pay issues to his supervisor's attention, as he asked his supervisor Brian Portnoy for overtime pay, who told him over the phone he could not put in overtime "just for typing" his case reports. *Id.* 67:18-68:19; 72:13-20.**

189.    On a weekly basis, O'Sullivan entered his hours into GEICO's timekeeping software and certified that his hours were correct. (*Id.* 57:8-58:9; 62:9-63:4; 175:8-176:12.)

**Plaintiffs' response: Undisputed**.

190.    O'Sullivan recorded overtime hours in GEICO's time keeping system on several occasions, and GEICO always paid O'Sullivan at the overtime rates for the hours that he recorded. (*Id.* 73:5-11; 83:8-11; 85:25-86:4; Ex. 68, O'Sullivan Pay Records (G009339;

G019960; G003296; G003299-3302; G003304-3305; G003307; G003310; G003318; G003355; G008217); Ex. 69, O'Sullivan OT Emails (G011669; G011673; G011680; G011684; G011686; G011688; G011697-11701; G011705-11712; G011721-11722; G011727; G011740).)

**Plaintiffs' response:  Undisputed**, **but GEICO has not presented sufficient payroll records to verify this statement.**

191.   O'Sullivan maintains that Portnoy once commented to him that GEICO would not authorize overtime pay "just for typing," so O'Sullivan never requested overtime thereafter based on his belief that approval for overtime pay "wasn't going to happen." (Ex. 5, O'Sullivan Dep. 67:8-25; 71:15-73:17.)

**Plaintiffs' response: Undisputed.**

192.   O'Sullivan believed that if he recorded overtime, he would have lower performance ratings, which determined whether he was eligible for a raise. (Ex. 66, O'Sullivan Resp. to Court Interrogatories, O'Sullivan Decl. ¶ 14.)

**Plaintiffs' response: Undisputed in part, disputed in part.   Undisputed that Mr. O'Sullivan believed recording overtime would reduce his performance ratings, because that is what GEICO supervisors told him.  *Id.* 112:20-24.  In addition, GEICO told him that if he worked additional hours, it would assign additional cases, increasing his workload.  *Id.* 112:2-11.**

193.   O'Sullivan has no knowledge as to whether any other GEICO employees asked for approval to work more than 38.75 hours in a week or whether any other GEICO employees were approved to work more than 38.75 hours in a week. (Ex. 5, O'Sullivan Dep. 77:13-80:19; 98:13- 16; 99:6-9; 128:6-22.)

**Plaintiffs' response: Undisputed in part, disputed in part.   Although Mr. O'Sullivan did not know if other employees "asked for approval" or "were approved" for overtime, he knew they were working overtime hours.  *Id.* 92:11-93:6.**

194.   O'Sullivan participated in the Calderon matter against GEICO alleging unpaid wages and received around $70,000 as a result. (*Id.* 10:22-13:6.)

**Plaintiffs' response:  Undisputed.**

195.    O'Sullivan recorded more than 40 hours in 13 workweeks between April 17, 2017 and April 22, 2022, which is 5.24% of all workweeks during that time and 5.80% of workweeks in which O'Sullivan worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 10-11.)

**Plaintiffs' response: Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

   **n. Louis Pia**

196.    Pia worked as an SIU Investigator from 2003 until 2017 and as Lead SIU Investigator from 2017 until November 2022 when he retired. (Ex. 17, Pia Dep. 37:15-38:17; 25:17-20.)

**Plaintiffs' response: Undisputed.**

197.    Pia alleges from late 2016 to approximately March 2020, he worked an average of 55 hours per week, from March 2020 to November 2021 he worked approximately 65 hours per week, and from December 2021 to December 2022 he worked approximately 55-60 hours per week. (*Id.* 109:15-110:2; Ex. 70, Pia Resp. to Court Interrogatories, Pia Decl. ¶ 9).

**Plaintiffs' response: Undisputed.**

198.    Pia's estimated number of hours worked is "based on what [he] can recall" because he has no records tracking his allegedly unpaid off-the-clock work. (Ex. 17, Pia Dep. 109:15- 111:25; 125:23-127:9; 186:13-16; 190:25-191:15.)

**Plaintiffs' response: Undisputed.**

199.    Pia used a company car to drive to different locations to investigate cases. Pia generally worked in the field between approximately 7:00 am until 2:30 pm. (*Id.* 43:10-24; 61:18- 64:5.)

**Plaintiffs' response: Undisputed.**

200.    Pia included the time spent driving in his time, explaining that for "most of my cases in the Bronx and Brooklyn," "I would leave my house at approximately 7:00 o'clock, and I wouldn't get to the Bronx -- which was right down the block from Yankee Stadium --

until about 8:20, 8:30. Now, you throw in a little rain and snow, and you can add on a half hour to 45 minutes to that." (*Id.* 60:17-64:5.)

**Plaintiffs' response: Disputed**. **The cited testimony offers examples of how Mr. Pia scheduled EUOs but does not establish that he included this time in his estimates of hours worked. The driving time Mr. Pia described was not his first activity of the day, as he typically spent 30 minutes reviewing case files before leaving his house. Ex. CC, Pia Tr. 62:22-63:2.**

201.    Pia at one point said to his supervisor Gerry Cassagne, "I don't care how good your -- an investigator you are, 70 cases -- nobody can do 70 cases," and suspects Cassagne "was well aware that [Pia was] working over and above the 38.75." (*Id.* 101:2-8; 110:8; 127:23-128:8.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Mr. Pia made the above-mentioned comment to Mr. Cassagne. Disputed to the extent GEICO alleges that this statement is the only example of Mr. Pia's complaints to his supervisor about his workload. Mr. Pia testified that Supervisors, including Mr. Cassagne, were aware of Investigators' increasing workloads, but frequently denied their requests for overtime. Ex. CC, Pia Tr. 86:15-20; 100:6-20; 101:2-5. For example, at monthly meetings, the topic of overtime was brought up and Investigators were told they "weren't getting overtime." *Id.* 70:4-71:19. During the COVID-19 pandemic, Investigators' caseloads increased dramatically, but when they requested overtime, Investigators "were told that…GEICO doesn't approve and authorize overtime for the excess amount of time" beyond 38.75 hours. *Id.* 67:22-68:18. Mr. Pia also recalled that he had phone conversations with his supervisor, Mr. Cassagne, "regarding overtime" where he was told that "it was not allowed." *Id.* 101:2-5.**

202.    Pia was trained on and understood GEICO's policy forbidding off-the-clock work. (*Id.* 78:23-85:22; 86:20-87:16.) This was reiterated by his supervisor, who instructed him "You also must put the hours into workday as overtime … The overtime is there to be USED. USE IT IF YOU NEED IT." (Ex. 72, Pia OT Emails (G011574-75; G011581-85).)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that Mr. Pia received training on GEICO's timekeeping policies. Disputed that GEICO's Exhibit 72 reflects GEICO's "policy forbidding off-the-clock work." Exhibit 72 indicates only that GEICO authorized a limited overtime campaign for the month of June 2020, where Investigators were allowed to work up to 10 hours of overtime. GEICO's Ex. 72, Pia Emails at G011584 to G011585. GEICO has not submitted records indicating that this campaign was extended beyond June 2020, in accordance with purported company "policy." Further, Mr. Pia testified that while GEICO's written policy did not allow off-the-clock work, "the practice in the workplace was totally [] different" requiring Mr. Pia to work "over and above the 40 hour, or a 38.75-hour workweek in order for [him] not to be penalized." Ex. CC, Pia Tr. 47:7-48:7; 86:23-87:5.**

203.    Pia recorded overtime hours numerous times, and GEICO paid him for all overtime hours that he recorded. (*Id.* 129:17-131:24; Ex. 71, Pia Pay Records (G002505; G002510; G002511; G002518; G002522; G002524; G002573; G002583; G002584; G002585; G002586; G002587); Ex. 72, Pia OT Emails (G011574-75; G011581-85).)

**Plaintiffs' response: Undisputed.**

204.    Pia sometimes did not record overtime because he believed it would improve his performance metrics and thereby avoid losing a potential raise, being placed on a performance plan, or being terminated. (Ex. 17, Pia Dep. 47:11-17; 68:9-18; 105:16-107:6.)

**Plaintiffs' response: Undisputed in part, disputed in part. Undisputed that the stated reasons were partial motivation for Mr. Pia not recording overtime. Disputed that they reflect all such reasons. Mr. Pia also did not record overtime because his Supervisor, Mr. Cassagne, discussed with him the "norms" of working overtime off-the-clock to meet GEICO's performance metrics. Ex. DD, Pia Resp. to Court Interrogatories, Pia Decl. ¶ 8; Ex. CC, Pia Tr. 105:16-107:6.**

205.    Pia did not make any written complaints about unpaid overtime hours worked to his supervisor, nor did he ever go to GEICO HR with complaints about unpaid overtime because he believed "that would be career suicide." (*Id.* 128:9-15.)

**Plaintiffs' response: Undisputed.**

206.    Pia received a raise every year. (*Id.* 162:15-163:21.)

**Plaintiffs' response: Undisputed.**

207.    Pia recorded more than 40 hours in 16 workweeks between April 17, 2017 and November 30, 2022, which is 5.71% of all workweeks during that time and 6.35% of workweeks in which Pia worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 8-9.)

**Plaintiffs' response:  Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

**o.  Michael Reed**

208.    Reed worked as a Senior Field Investigator in the SIU division from 2005 through 2023, covering seven counties in Western New York. (Ex. 73, Reed Dep. 27:7-22; 28:3-5; 30:21- 25). During that time, Reed regularly worked from 7:00 am to 3:30 pm. (*Id.* 38:24-39:20.)

**Plaintiffs' response: Undisputed**.

209.    Reed investigated a variety of claims including "theft, theft and fire of a vehicle, personal injury, date of loss, suspected jump-ins, hit and runs…", underwriting, and body shops. (*Id.* 41:8-13; 41:18-20; 42:7-10).

**Plaintiffs' response: Undisputed.**

210.    As an investigator in the field, Reed was responsible for driving to investigate his claims and drove "an hour and a half, an hour and forty-five minutes one way" depending on the weather and the time of year. (*Id.* 51:6-20).

**Plaintiffs' response: Undisputed.**

211.    GEICO paid Reed for all of his hours worked, and Reed never brought concerns to any supervisor regarding his pay. (*Id.* 63:19-64:15; 66:19-67:2).

**Plaintiffs' response:  Disputed.  GEICO did not pay Mr. Reed for many of his overtime hours because when he requested approval for this time from his Supervisor, Chet Janik, he was told "there was no overtime." Ex. E, Reed Tr. 71:2-21; 67:21-68:22.**

212.    Reed contends that Janik at some point told Reed that "there was no overtime,"

but no supervisors or managers within the SIU ever told Reed to work off the clock. (*Id.* 72:17-21; 83:20-25; 179:11-25.)

**Plaintiffs' response: Undisputed.**

213.    Reed's belief that GEICO did not permit overtime was "an assumption," and he testified that he never requested overtime because he believed "that was something that was not done." (*Id.* 67:3-7; 181:8-20; 188:2-5.)

**Plaintiffs' response: Disputed**. **In Mr. Reed's experience, lack of overtime was a "common complaint." Ex. E, Reed Tr. 70:18-71:11 ("With the amount of cases that we were receiving, and the amount of work that we're getting, it was just not feasible to do it in the amount of hours that we were working."), 72:8-73:3. Reed requested approval for overtime at various points but was told that "there was no overtime." *Id*. 71:2-21; 67:21-68:22. *See also id.* 70:12-17 ("Q. Do you recall any of your supervisors or managers telling you explicitly you cannot plug in and be entitled to overtime? A. . . . yeah.").**

214.    Reed alleges that he "worked" an extra two hours every day from 2016 until his resignation in 2023 based on "[t]he hours that [he] would be on the road traveling back and forth to statements," which could be as much as "between an hour and a half, an hour and forty-five minutes one way." Reed claims he never requested overtime, but collected overtime through 2017, until he stopped recording overtime hours. (*Id.* 51:6-20; 112:17-113:24; 119:4-9; 124:6-10; Ex. 74, Reed Pay Records (G003422, G003427, G004144-45, G004147, G008107-9, G008112-16, G008118-24, G008130-31).)

**Plaintiffs' response: Disputed. Mr. Reed testified that he regularly spent time "traveling back and forth to statements," and that after returning home, he spent *additional* time compiling "the information that [he] had from going out on the road," "summarizing the statements, getting all of that information into [his] Word document, [and] at the same time receiving more cases while [he] was out and having to get those cases . . . set up and into the SICM and into [his] other new Word documents." Ex. E, Reed Tr. 113:5-24.**

215.    During Reed's employment with GEICO, he received yearly pay increases that

were "based upon performance." (Ex. 73, Reed Dep. 103:12-104:5). Case life was "not something towards the end of my career that we were based – that we were scored on." (*Id.* 110:7-18).

**Plaintiffs' response: Undisputed in part, disputed in part. Case life was a relevant metric for Mr. Reed at the end of his tenure, even though it was no longer scored for him personally, because "the supervisor[s] and managers were graded upon [their] case life, therefore they were very adamant that you close your cases as quickly as you could and work your cases as quickly as they could." Ex. E, Reed Tr. 110:14-18.**

216.    Reed recorded more than 40 hours in no workweeks between April 17, 2017 and March 24, 2023. (Ex. 24, Fogarty 2025 Decl. ¶¶ 18-19.)

**Plaintiffs' response: Undisputed.**

**p. Ted Wendling**

217.    Wendling worked as a senior field security investigator with GEICO SIU from September 2019 to November 2023 in a remote capacity and assigned to GEICO's office in Nassau County, New York. (Ex. 75, Wendling Resp. to Court Interrogatories, Wendling Decl. ¶ 1; Ex. 76, Workday Profile (G004780-81).)

**Plaintiffs' response: Undisputed.**

218.    Wendling's immediate supervisors were Toni D'Agata from September 2019 through October 2023 and subsequently Sarah Greenman in November 2023. (Ex. 75, Wendling Resp. to Court Interrogatories, Wendling Decl. ¶ 2.)

**Plaintiffs' response: Undisputed**

219.    Before February 2023, Wendling submitted his timesheet on a weekly basis, and alleges that he worked approximately 57.625 hours per week, some of which was not recorded in GEICO's timekeeping system. (*Id.* ¶¶ 7-10.)

**Plaintiffs' response: Undisputed.**

220.    After February 2023, Wendling began punching in and out daily using Workday and worked approximately 38.75 hours a week. (*Id.* ¶¶ 7-9.)

**Plaintiffs' response: Undisputed.**

221.    Wendling "regularly performed work for GEICO that [he] did not report in the company's timekeeping system," but Wendling never complained about overtime to anyone at GEICO. (*Id.* ¶¶ 13-14.)

**Plaintiffs' response:  Undisputed in part, disputed in part.  While Mr. Wendling did not complain to his supervisor about overtime specifically, he complained about his workload and how it was difficult to manage.  Ex. EE, Wendling Response to Court Interrogatories, Wendling Decl. ¶ 12.  GEICO also told Mr. Wendling that hours above 38.75 each week will not be approved.  *Id.* ¶ 11.  GEICO's proposition that Mr. Wendling never complained "to anyone" is not supported by record evidence.**

222.    Wendling was subject to performance coaching by his supervisor D'Agata in or around May 2020, and D'Agata documented that "[Wendling] said he had a hard time keeping up this week – he had 3 telephone EUOs and received 4 cases a day is hard to manage. I explained if needed, and he works extra – put in for the time worked. I will review his case load as well." (Ex. 77, Wendling Performance Review (G016093-98).)

**Plaintiffs' response:  Undisputed that GEICO's Exhibit 77 (G016093-98) has been quoted accurately by GEICO.**

223.    GEICO paid Wendling for overtime hours he recorded in GEICO's timekeeping system. (Ex. 78, Wendling Pay Records (G003740-41; G003744; G003748; G003751).)

**Plaintiffs' response: Undisputed.**

224.    Wendling failed to appear for his noticed deposition despite GEICO noticing Wendling's deposition on three separate occasions. (Ex. 79, Wendling Dep. 7:5-9:4.)

**Plaintiffs' response: Undisputed.**

225.    Wendling recorded more than 40 hours in 6 workweeks between September 16, 2019 and November 20, 2023, which is 2.76% of all workweeks during that time and 3.02% of workweeks in which Wendling worked 4 days or more. (Ex. 24, Fogarty 2025 Decl. ¶¶ 26-27.)

**Plaintiffs' response: Undisputed, but GEICO has not presented sufficient payroll records to verify this statement.**

Dated:  September 12, 2025

Respectfully submitted,

By:  /s/ *Michael J. Scimone*
Michael J. Scimone
Sabine Jean
Jarron D. McAllister
Zarka Shabir DSouza
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2005
Email: mscimone@outtengolden.com
Email: sjean@outtengolden.com
Email: jmcallister@outtengolden.com
Email : zdsouza@outtengolden.com

Ryan C. Cowdin*
**OUTTEN & GOLDEN LLP**
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: rcowdin@outtengolden.com

Troy L. Kessler
Garrett Kaske
**KESSLER MATURA P.C.**
534 Broadhollow Road, Suite 275
Melville, NY 11747
Telephone: (631) 499-9100
Facsimile: (800) 451-0874
Email*:* tkessler@kesslermatura.com
Email: gkaske@kesslermatura.com

* Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Class and Collective*