# Exhibit A

**In the Matter Of:**

Keith Fischer, et al. vs GEICO

2:23 Civ. 2848 (GRB)(ARL)

---

# KEITH FISCHER

*August 28, 2024*

---

*Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

Page 29

1              Fischer
2  handling let's say cases up north?
3        A.   I did for about six months.  I was
4  under a different supervisor who was assigned up
5  there, and I had agreed to travel up there one or
6  two days a week and conduct cases up there.  They
7  were short on staff.
8        Q.   Do you remember when in time that
9  would have occurred?
10       A.   Probably after 2006, 2005, somewhere
11 in there maybe.
12       Q.   Okay.
13       A.   I believe Cheryl Darenthal was the
14 supervisor at the time.  So that might have been
15 2008, '09, '10, to the best of my recollection.
16       Q.   Okay.  Focusing on the claims in this
17 case, it's my understanding that it would have
18 started at the end of 2016 into then when you
19 retired.  Does that sound right to you?
20       A.   Could you repeat the question.
21       Q.   Sure.  As far as the claims and the
22 time period, because you've worked for GEICO for
23 so long, it's my understanding that the claims
24 would have occurred at the end of 2016 all the
25 way through to when you retired.  Does that sound

Page 30

1              Fischer
2  right?
3        A.   Yes.
4        Q.   So I will try my best to
5  differentiate if we're going back in time to when
6  you first started at GEICO, but really the focus
7  will be around that time consideration of 2016 up
8  until your retirement.  Okay?
9        A.   Okay.
10       Q.   So, for that specific time frame,
11 2016 until your retirement, fair to say that the
12 cases that you handled would have been in the
13 five boroughs, Suffolk and Nassau County?
14       A.   That's correct.
15       Q.   Did you handle any type of claims
16 outside of the State of New York between that
17 time frame?
18       A.   Yes, I did.  I was asked to go, I was
19 assigned to the catastrophe team, and I did
20 travel to Houston, Texas, and Denver, Colorado
21 twice I believe to handle hail claims in Denver
22 and flood claims in Houston, Texas.
23       Q.   Do you remember when in time that
24 would have been?
25       A.   That might have been just prior to

Page 31

1              Fischer
2  2016.  I'm not sure if I really had any
3  catastrophes after 2016, to the best of my
4  recollection.  There could have been, but from
5  what I remember it was prior to that.
6        Q.   So then let's circle back.  As an SIU
7  investigator, were you assigned to a specific
8  level?
9        A.   When I first started at GEICO, I was
10 a grade 65, and that was in 1999, and in 2004
11 five years later I was promoted to grade 66.  I
12 believe I was one of four investigators promoted
13 to that.
14       Q.   Okay, and tell me what's the
15 difference between a 65 and a 66, to your
16 recollection?
17       A.   66, in accordance with the regular
18 day-to-day investigations, I was also asked as a
19 66 to train all the new investigators that came
20 on board.  I was asked to do ride-alongs with
21 inside staff or counsel depending on the
22 supervisor's requests.  I was probably given
23 between four and six more cases a month being at
24 that level.  I had to take on more serious cases
25 to do things out of the ordinary that some people

Page 32

1              Fischer
2  wouldn't have to do.  It usually came at the
3  request of my supervisor Jerry Cassagne.
4        Q.   What were the duties and
5  responsibilities for a level 65?
6        A.   To handle cases given to us by the
7  inside staff, anything from bodily injuries to
8  theft claims to social media to visiting
9  attorneys with pictures and letters requesting
10 that they drop cases.  They were called operation
11 challenges.  Typing.  Every day doing
12 face-to-face interviews, coordinating with the
13 National Insurance Crime Bureau, police
14 personnel.  I also had a significant arson
15 contingent of investigators that I had to deal
16 with because I dealt with thefts and fires as far
17 as GEICO was concerned.  I have an arson
18 background.
19       Q.   With?
20       A.   The Levittown Fire Department.
21       Q.   With the duties that you just
22 outlined as a level 65, would a level 66 have to
23 take on those duties in conjunction then with the
24 training that you previously spoke about?
25       A.   Yes.



Page 33

1                    Fischer
2          Q.   You also stated as a 66 you would be
3   assigned four to six more cases a month, and
4   would that have been under the same scope of
5   cases that you just spoke about?
6          A.   Yes.
7          Q.   Which would have been social, auto,
8   operation challenges?
9          A.   I would like to clarify my answer.
10  As time went on, I thought we were back in the
11  early 2000's, as time went on, I became more of
12  the theft coordinator, but in addition to my
13  theft investigations, I also handled staged
14  accidents, caused accidents, social media.  Being
15  a 66, I was expected to handle bigger cases, more
16  pattern cases I guess you could say, rings,
17  things of that nature as a 66.
18         Q.   In 2016 until your retirement, what
19  percentage of theft cases would you say you were
20  handling?
21         A.   Probably 70 percent of my claims were
22  theft.
23         Q.   Then what percentage were you
24  handling staged accidents?
25         A.   About 20 percent.

Page 34

1                    Fischer
2          Q.   And then what about social media?
3          A.   Yeah.  That was maybe 5 percent, and
4   then we were given the other 5 percent was policy
5   claims.  Usually checking on people's vehicles
6   where they lived, rate evading, things like that.
7          Q.   In 2000, and I want to focus in 2016
8   were you assigned to a specific team?
9          A.   Yes.  I was assigned to my
10  supervisor, Jerry Cassagne.  I was assigned to
11  the theft team.
12         Q.   Who was comprised of that team at
13  that time?
14         A.   Myself, John Gillane, Vito, I've got
15  the wrong last name.  Vito, and what's her name?
16  Maria Munoz.
17         Q.   From 2016 onward until your
18  retirement, were you always assigned to Jerry's
19  team as the theft team?
20         A.   It did change.  To the best of my
21  recollection, I did primarily theft claims.
22  There were times that I was asked, if I can
23  expand my answer, as time went on, in the theft
24  team, there became times where the staged
25  accident team was cut off at a certain time.

Page 35

1                    Fischer
2          In other words, they would be given
3   only 20 cases, because they were what GEICO had
4   deemed level 1 cases, because there were usually
5   3 and 4 occupants in the car, which meant a
6   larger number of examinations under oath.
7          Usually about the 18th or 19th or
8   20th of the month, that particular team would
9   reach their maximum amount of cases that they
10  could receive, which was laid down or supplied to
11  us by supervisors, and, at that point, I would
12  take on staged accident losses, because those
13  particular five, six, seven investigators were
14  now cut off from staged accidents.
15         So, in addition to my theft claims, I
16  was also asked to do staged and caused losses.
17         Q.   Okay.  Was that something that only
18  uniquely applied to you, if you know?
19         A.   No.  There was a few of us.  Not just
20  myself.  I wasn't singled out, but a lot of us
21  had to take on additional work from other teams
22  even though we were assigned to the theft team.
23         Q.   For those who were on your theft
24  team, do you know, say, for example, if John,
25  Vito or Maria had to then take on staged

Page 36

1                    Fischer
2   accidents to assist with that department?
3          MS. DSOUZA:  Objection.
4          Q.   You can answer.
5          A.   Did they have to take those claims
6   on?
7          Q.   Yes.
8          A.   Is that what you're asking?
9          Q.   To your knowledge.
10         A.   Yes.
11         Q.   I think from your testimony, as I
12  understand it, you did not work in the office.
13  Is that right?
14         A.   That's right.
15         Q.   Did you ever have an inside role?
16         MS. DSOUZA:  Objection.
17         A.   No.
18         Q.   In your position from 2016 until your
19  retirement, did you have a set schedule, meaning
20  I worked Monday through Friday 9 to 5?
21         A.   No.
22         Q.   Did you have flex time?
23         A.   We were, I guess that's what it was
24  called.  Yes.  You could start and stop depending
25  on your schedule, depending on your examinations



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
37—40

Page 37

Fischer
1  under oath or your investigations.  If you had to
2  go out to Brooklyn, New York for an examination
3  under oath and you had to leave at 5 o'clock in
4  the morning to beat traffic to get there by 7 or
5  7:30, so obviously by the time you got home at
6  2 or 3 o'clock in the afternoon you would
7  actually start your typing at 2 or 3 o'clock in
8  the afternoon, but my day actually would start at
9  5 o'clock in the morning.
10      So, if that's what you mean, I wasn't
11  assigned to my computer at any given time.  No.
12      Q.  Did anyone ever tell you how to flex
13  your time, meaning you should be in the car from
14  5 to 7 and then do your examinations under oath
15  in the morning versus being able to do it at
16  night or at a convenient time for the person
17  you're interviewing?
18      A.  No.
19      Q.  As an SIU investigator, were you able
20  to make the determination of what each case
21  needed in order to investigate for that specific
22  theft-related incident?
23      A.  I was given procedures to follow as
24  to what was necessary to be completed and

Page 38

Fischer
1  conducted during each investigation.  I was given
2  a set of I guess you could say rules or
3  procedures to follow, how to conduct each type of
4  investigation, whether it be a caused accident or
5  a theft accident, and I had to meet those.  I had
6  to do those particular procedures in order to
7  receive a passing grade on my investigation.
8      Q.  What were those itemized procedures
9  to take the case, and we'll focus first on theft.
10      A.  On a theft case, upon receiving it,
11  you were asked to read the claim screens, the
12  policy, the notes from the claims examiner or the
13  theft examiner.
14      After doing that, they would then
15  call the theft examiner, and you had received, I
16  received a notice that I received the claim.  I
17  would open it up, and it would tell me a little
18  about the claim, the e-mail, as to why I got the
19  case.  So I had some idea.



20  At that point, I would call the theft

Page 39

Fischer
1  examiner, and I would confer with him or her
2  mostly.  Females, I believe nine of the ten were
3  females, and we would confer with that particular
4  theft case what her concerns were as far as the
5  fraud was.
6      Q.  Okay.  After the theft examiner would
7  articulate to you what her or his concerns were,
8  what procedures as set forth from what you were
9  saying did you have to conduct then thereafter?
10      A.  I would have to go into my
11  investigative steps.  I would have to



12  Each and every theft claim was
24  different, whether it was the car was stolen or

Page 40

Fischer
1  was the car involved in an accident and then
2  reported stolen, was there a fire, was there a
3  crime committed with it.  I would try to look up
4  Fox News, maybe Channel 2, Channel 7, to see if
5  there was any news on this particular claim that
6  reached that level, let's say, fire, maybe
7  someone was killed or someone was hurt, and then
8  I would usually after doing my background checks
9  I would start a basic report just that I had
10  received the case this date.  These are the
11  examiner's concerns, and these are the steps that
12  I'm going to take to identify if there is any
13  fraud.
14      Usually I will interview the insured.
15  I will conduct a recorded statement.  I will
16  conduct an examination under oath if needed.  I
17  will confer with law enforcement.  I will confer
18  with any other law enforcement,

19  and I would
20  usually do my report usually within the same day
21  depending on when I got it.



Page 41

1              Fischer
2          So it would be about two, two and a
3  half hours from the time I got it to the time
4  that I was satisfied that I had done my report,
5  my initial case report on the claim.
6          Q.  For each theft claim, did GEICO
7  require you to conduct a background check?
8          A.  Yes.
9          Q.  For each theft claim, did GEICO
10  require you to obtain a police report?
11          A.  Not in each case.  Depending on
12  the -- each claim was different.  So it depended
13  on whether the car was recovered right away,
14  whether the insured already had the report.  It
15  all depended on what -- by the time I received
16  the theft claim, it was usually a day or two or
17  three days, maybe four days old, so some of those
18  documents were already secured by the theft
19  examiner, so I didn't have to, but in most cases
20  I did have to secure that report.
21          Q.  For conducting research through news
22  channels, was that a required procedure by GEICO
23  for theft cases?
24          A.  Yes.
25          Q.  For procedures set forth for theft

Page 42

1              Fischer
2  cases, were you required to interview the
3  policyholder?
4          A.  Yes.
5          Q.  Were you required to take recorded
6  statements?
7          A.  Yes.
8          Q.  Were you required to conduct EUOs?
9          A.  Yes.
10          Q.  Were you required to talk to the
11  police or fire department?
12          A.  Yes.
13          Q.  Where was that list of procedures to
14  follow generated?
15          A.  It came from home office and
16  through -- given to, I believe it came out of
17  Chevy Chase.  The eight or nine regions of SIU
18  answered to a gentleman named Steve Ruzienbeck
19  and Michael College, so most of the -- who were
20  both prior Maryland state troopers.  They were
21  hired by GEICO, and we answered, our region, the
22  8 SIU regions or ten SIU regions answered to
23  those particular individuals.  They laid the
24  foundation and the procedures down to all SIU
25  investigators.

Page 43

1              Fischer
2          Q.  After you conducted then I believe
3  you stated your initial report, after looking at
4  the claim screen, getting the policy, reading the
5  notes, speaking to the theft examiner, getting
6  the background check, getting a police report,
7  researching the news, taking recorded statements,
8  interviews, EUOs, from there, did you make the
9  determination of what else you needed in order to
10  complete your investigation?
11          A.  Yes.
12          Q.  Did anybody tell you what steps you
13  needed to take after you conducted your initial
14  report?
15          A.  No.  Can I just clarify.  That's
16  limited to what -- those are just some of the
17  things that I was required to do.  I may have
18  left some out like ███████████████████████
19  ████████████████████████████████████████
20  ████████████████████████████████████████
21  ████████████████████████████████████████████
22  ████████████████████████████████████████████
23  █████████████████████████████████████████
24  ████████
25          We also touched base, I believe, I

Page 44

1              Fischer
2  don't know if I said it, but to reach out to
3  ████████████████████████████████████████
4  ████████████████████████████████████████
5  ███████████████  and there were several other
6  steps that I can't recall at this time.
7          Q.  For your theft cases, did you receive
8  referrals?
9          A.  Yes.
10          Q.  And who did you receive that from?
11          A.  It was an inside staff of about four
12  or five inside investigators that would forward
13  us our cases out to the 60 of us.  We received
14  our cases from an inside staff of four to five
15  investigators.
16          Q.  How would you receive your theft
17  assignments?
18          A.  I would receive notification.  It
19  would be a case number, SIU notification that I
20  received a new case.  I would have the number and
21  the insured's name and the claim number.
22          Q.  Was that through e-mail?
23          A.  Yes.
24          Q.  Going back then to staged loss, for
25  those claims that you assisted, am I



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
45–48

Page 45

1            Fischer
2  understanding correctly that there would be a
3  different SIU investigator who would do the
4  initial steps necessary to investigate that for
5  say the 20 days they had it up until when you had
6  received it?
7        MS. DSOUZA:  Objection.
8        A.  No, I'm sorry.  What I meant to
9  portray or say, let me clarify my answer.  At a
10  certain time of the month, those investigators,
11  as you know, when I started at GEICO, there were
12  3 million policies.  I believe when I left, there
13  were 19 million policies.
14        So obviously the number of claims
15  grew especially towards the last five or six
16  years, we were growing leaps and bounds as a
17  company.  So the claims were, the more insured
18  obviously you had, the more claims you had.
19  Those staged or caused loss team I'm going to say
20  there were approximately six.  Once they reached,
21  the supervisor set a goal, once they reached 20
22  cases for the month, they were to be cut off, and
23  they would not receive another case for the next
24  ten days.
25        As a result of them being cut off,

Page 46

1            Fischer
2  let's say the 20th, 21st, 22nd, now that left
3  five or six workdays, so that was six
4  investigators.  There would be about 50, 60
5  staged losses that they couldn't get to.  They
6  were given to us, and, when I got the staged or
7  caused loss, I had to do it right from inception
8  like it was a brand new claim just like it was a
9  theft.
10        Q.  Did you ever pick up any cases that
11  were already mid-investigation?
12        A.  I may have, but that was very, very
13  rare.  Maybe one out of every hundred.
14        Q.  For the staged loss cases that you
15  received, how did the initial -- strike that.
16  When you received your staged loss matters, what
17  procedures did you have to follow per GEICO
18  policy?
19        A.  Again, from inception, was review the
20  claim screen, review the policy, confer with the
21  examiner, usually the PIP examiner, and then from
22  there speak to her as to her concerns, and then I
23  would go back, and now I would have to run the
24  background checks on those individuals.
25        Most of the time, if it wasn't a

Page 47

1            Fischer
2  double-insured case, in other words, if car 1 and
3  car 2 weren't both from GEICO, I had to reach out
4  to the adverse carrier, Allstate, Farmers, State
5  Farm, Progressive, and talk to them as they were
6  the other vehicle and speak to their SIU as to
7  any concerns they may have with their vehicle, if
8  that was a concern.
9        I reviewed the police accident
10  report, and it was the same as a theft.  I would
11  then do my report, and I would go out to the
12  field and do my investigation and/or conduct
13  EUOs.
14        Q.  Similar to the theft claims, once you
15  did your initial review of what we just talked
16  about, the claim screens, policy, notes, you
17  spoke to the staged loss examiner, background
18  check, police reports, conducting interviews,
19  from there, did you also make the determination
20  of what you needed to conduct in order to then
21  render your final determination in a staged loss
22  claim?
23        A.  Yes.
24        Q.  Is it fair to say then for both the
25  theft and the staged loss matters that you were

Page 48

1            Fischer
2  handling that you did have to analyze and look
3  specifically to those claims to see what else
4  they needed in order for you to render your
5  determination?
6        A.  Yes.
7        Q.  For your final determination, was
8  that wholly your responsibility in saying yes, I
9  believe there's fraud, or no, I don't believe
10  there's fraud?
11        A.  Yes.
12        Q.  Did anyone ever tell you you needed
13  to change your opinion as to your ultimate
14  determination?
15        A.  No, not that I recall.
16        Q.  In 2016 up until your retirement in
17  2020, did you investigate arsons?
18        A.  I did receive a lot of the car fires,
19  car thefts.  Myself and John Gillane were given I
20  would say the majority of those because of our
21  arson background.
22        Q.  Within arson specifically, you said
23  there's a theft team.  Was there an arson team?
24        A.  No.
25        Q.  But there was a staged loss team,



Page 53
1      Fischer
2  to region 2.  I was given a few days to clean
3  them up and do some typing and stuff, but for the
4  most part I did have to carry some of them for a
5  few weeks or months.
6      Q.  I want to circle back to two other
7  areas.  One is were you ever assigned
8  underwriting fraud cases?
9      A.  Yes.
10     Q.  And would this have been in 2016
11 until your retirement?
12     A.  Yes.
13     Q.  How much would you say the
14 underwriting fraud component would have taken up
15 percentage-wise?
16     A.  About 5 percent, but if I can clarify
17 my answer, a lot of those were self-generated,
18 and I will tell you why, because being in the
19 industry for 25 years that I was, I had a lot of
20 contacts.  So I would receive a lot of calls from
21 adverse carriers and/or police personnel as to
22 identity theft, and I would deal with
23 underwriting, and I would give that to them, and
24 they would take it over, and I would do a few
25 minor things.  So those were the kind of cases

Page 54
1      Fischer
2  that I caught.
3      Q.  When you say self-generated, does
4  that mean you volunteered to take those cases?
5      A.  No.  Once I received information, it
6  was my responsibility to take a case for it,
7  because if there was an investigation that I had
8  to conduct on, I needed a case number to kind of
9  back myself up or to indemnify myself if you,
10 know, something happened.
11     Q.  For the procedures that we were
12 discussing between theft and staged, were there
13 specific itemized procedures that you needed to
14 follow for med fraud cases?
15     A.  Would you just repeat that.  I'm
16 sorry.
17     Q.  Sure.  So we spoke a little earlier
18 about the procedures you said you needed to
19 follow per GEICO standards for theft and staged
20 claims where we spoke about claim screens,
21 reading the policy, calling the theft examiner,
22 background check, things like that.
23     Was there procedures outlined for med
24 fraud cases, to your knowledge?
25     A.  Medical fraud?

Page 55
1      Fischer
2      Q.  Yes.
3      A.  Yes.
4      Q.  Okay, and with med fraud, what were
5  those procedures that GEICO laid out that you had
6  to follow in order to conduct your med fraud
7  claims?
8      A.  Just one example that I can think of
9  is ████████████████████████████████████
10 █████████████████████████████████████████
11 █████████████████████████████████████████
12 █████████████████████████████████████████
13 █████████████████████████████████████
14 ████████ whichever you want to say they
15 were, ████████████████████████
16 ██████████████████████████
17 So that I was given a procedure to
18 follow just on ████████████ on the medical fraud
19 part of it.  That side of it.
20     As far as medical fraud itself,
21 self-initiated cases, no, there weren't any
22 guidelines for those kinds of things, but there
23 was a procedure and a guideline for every single
24 case that we had.  We had booklets, and they
25 changed yearly if not monthly.

Page 56
1      Fischer
2      Q.  From your experience touching some of
3  these other cases outside of the primary
4  70 percent of the theft cases that you handled,
5  did those procedures change dependent upon what
6  type of case it was?
7      A.  Yes.
8      Q.  Were you assigned to auto body fraud
9  cases?
10     A.  Yes.
11     Q.  Is that wrapped up in theft, or is
12 that something completely different?
13     A.  You refreshed my memory.  That's a
14 whole another team, auto body theft.  Yes.
15     Q.  Okay.  Were you ever on the auto body
16 team?
17     A.  I may have been for a few months just
18 to get it off the ground.  To the best of my
19 recollection, I did a lot of the body shops.  I
20 did visit them for a short period of time.  The
21 ones that were of concern.  We would surveil
22 their particular body shops, do reports, look at
23 the damages, look at the estimates of repair,
24 things like that.
25     So, yes, I could have been a few

Page 57

1              Fischer
2  months.  It wasn't a long period, but, yes, I
3  was.
4       Q.  Do you remember if that would have
5  been in 2016 up to your retirement?
6       A.  I would like to say yes, but I can't
7  say for sure that this is in fact the truth.
8       Q.  As far as those types of cases, based
9  on your testimony, it would have just been for a
10  small short time period, right?
11       A.  As far as to the auto body team?
12       Q.  Yes.
13       A.  Yeah.  Um-hum.
14           Can I just clarify that answer.
15  Sometime back in maybe 2014 or '15, I was asked
16  to go to EDR school, event data recorder, EDR, OR
17  the black box.
18           I was sent out to Florida with a
19  group of maybe two or three or maybe four of us,
20  and I went to school.  I was asked by my
21  supervisors to go and take the EDR course, which
22  I did, and, as a result, I was given an EDR, and
23  there were several times a month where I was
24  asked maybe at 2 o'clock in the afternoon to ████
25  ████████████████████████████████████████

Page 58

1              Fischer
2  ████████████████████████████████████████
3  ████████████████████████████████████████
4  ████████████████████████████████████████
5  ████████████████████████████████
6           So I didn't get a lot of them, but
7  maybe three, four, five a month.  Sometimes less.
8  Sometimes none a month.  It depended on there
9  were about four or five of us, but I was
10  responsible for ████████████████████████████
11  ████████
12       Q.  Do you know if that was in 2016 until
13  your retirement?
14       A.  Yes, I believe so.
15       Q.  Do you know if there was an EDR team?
16       A.  Yes.
17       Q.  Who was comprised of that team, if
18  you remember?
19       A.  Kevin Dux, myself, I believe Charise
20  Jones, Paul Tellerman.  I'm trying to think of
21  who else I went to school with.  Richie Lenihan
22  might have been.  He was up in the Bronx team I
23  believe.  He was also one of them if I'm not
24  mistaken.  That's the best of my recollection.
25       Q.  For these, all these types of cases

Page 59

1              Fischer
2  that we've been talking about, the cat cases,
3  theft cases, rate evasion, your primary auto,
4  fraud, staged loss, when you were conducting your
5  investigations, were you able to multitask?
6       A.  Yes.
7       Q.  One thing I wanted to touch base.
8  You had stated that one of the procedures that
9  that you needed to speak to the examiner for each
10  of your cases.  What does an examiner do?
11       A.  Well, it's the file.  It's the claim
12  file owner.  It's either the PIP examiner or the
13  bodily injury or the theft examiner.  Examiners
14  are the people who are assigned to that division
15  inside GEICO, and they are handling the claim
16  from inception until its end, whether it be
17  payment or denial.
18       Q.  Okay.  When you pass off your
19  determination, whether fraud or not fraud, does
20  that go to the examiner to then follow up and
21  effectively close the case out?
22       A.  I was responsible to not only send my
23  report to the examiner, but I also had to call
24  the examiner and give her the reason, him or her,
25  I'm sorry, the reasons that or my findings as to

Page 60

1              Fischer
2  my investigation, and, just to clarify, that
3  could have been multiple examiners.  It could
4  have been the PIP.  It could have been the bodily
5  injury claim, and it could also be an AD
6  adjuster.  Whoever was assigned at the top of
7  that claims file on the claim screen I would have
8  to touch base with each and every one of those as
9  to my findings during my investigation and as
10  well as submit a report to them.  My entire
11  report, whether it be, you know, three pages or
12  20 pages.
13       Q.  How long or short were your typical
14  reports?
15       A.  Depending on the type of case, you
16  know, a staged accident and maybe a theft could
17  be anywhere from five pages up to, you know,
18  maybe ten pages, 12 pages.  Each claim was
19  different.  It depended on the extent of the
20  investigation.  You know, if someone was hurt or
21  someone was arrested, if someone, there was a
22  fire and someone was killed, those kind of things
23  were obviously, there's more to my report, but
24  the more detailed the investigation obviously the
25  bigger the report.



Page 61

1        Fischer
2        Q.   How long would it take for you to
3   investigate a theft case?
4        A.   I mean I can't put a time on it, but
5   I mean the simplest theft could be no less than
6   five hours and could go as far as 25 to 30 hours
7   depending on examinations under oath.  Just the
8   basic theft claim that was closed the first day,
9   whether I got the claim in the morning and by the
10  afternoon the car was recovered and the insured
11  just parked it on the other side of the mall and
12  just made a mistake on the door that he or she
13  went out, it would still take me at least four to
14  five to six hours just to do, open and close my
15  investigation.
16       Q.   What about for staged loss?  How long
17  would that take you on the short to long?
18       A.   Again, it all depends on the number
19  of passengers.  Some had two, some had five.
20  Some had six, sometimes you got a van full of
21  nine, so it depended, but on the short side, I
22  mean maybe, if you didn't have to conduct
23  examinations under oath, maybe ten hour, eight to
24  ten hours just on a background checks and things
25  like that.  On someone where we had to do

Page 62

1        Fischer
2   multiple EUOs sometimes you had five people and
3   you would do two in one day and maybe somebody
4   would cancel, and you had to give everyone, you
5   know, two opportunities to show.  You would have
6   some no-shows.  You would have some people who
7   would come in and conduct EUOs.  They wanted to
8   change boroughs.  They wanted to change dates.
9   So they could go as far as 30 some of them 25, 30
10  hours I guess you could say.  You know, sometimes
11  I had claims that were four or five months old
12  depending on the number of claimants.
13       Q.   For med fraud, how long on the short
14  and long end did those claims last?
15       A.   I mean medical fraud, as far as what
16  I handled, it was usually durable medical
17  equipment, billing by the medical provider,
18  things like that, licensing, things like that, I
19  mean on a basic, they all went to EUOs.  So it
20  depended again on the number of people that
21  showed or how many people was it a whole car
22  full?  Was it two people?  Was it one person?  If
23  it was one person, my EUOs to Brooklyn or Bronx
24  or Manhattan, it all depended on whether they
25  showed or not showed.  One person, maybe ten

Page 63

1        Fischer
2   hours.  If it was four or five, maybe 20 hours.
3   I mean to the best of my recollection.  It could
4   have gone more.
5        Q.   Can some cases require EUOs and some
6   don't?
7        A.   Yes.
8        Q.   What about recorded statements?
9        A.   ██████████████████████████████████
10  ████████████████████████████████████████████████
11  ████████████████████████████████████████████████
12  ████████████████████████████████████████████████
13  ████████████████████████████████████████████████
14  ████████████████████████████████████████████████
15  ████████████████████████████████████████████████
16  ████████████████████████████████████████████████
17  ████████████████████████████████████████████████
18       Q.   How long would it take to investigate
19  a social media claim?
20       A.   It could be as little as, again, the
21  number of claimants.  To the best of my
22  recollection, I mean, if I had one claimant,
23  three or four hours.  If I found something right
24  away, maybe two to three hours, but most of them
25  are three hours, four hours.  Multiple claimants,

Page 64

1        Fischer
2   maybe 10 max.
3        Q.   How long would it take to investigate
4   an auto body fraud case?
5        A.   Again, depending on the severity and
6   how many cars were involved, again, it was
7   usually enhanced damages that we were concerned
8   with at body shops.  It was the same types of
9   damage.  So to review multiple auto damage
10  adjusters' pictures and estimates of fraud, I
11  mean their estimates of damages, I'm sorry, if I
12  was given a particular body shop and there was
13  15 cars of concern, that could be a minimum of
14  ten hours.  If it was more cars, it could be 20
15  or 30 with also a lot of street time and a lot of
16  surveillance.
17       Q.   Did you ever have theft cases that
18  you can open and close the same day?
19       A.   Yes.
20       Q.   Did you have med fraud cases that you
21  could open and close the same day?
22       A.   Not to my recollection, no.
23       Q.   Did you have social media cases that
24  you could open and close the same day?
25       A.   Yes.



Page 65

1          Fischer
2     Q.  Did you have auto body cases that you
3  could open and close the same day?
4     A.  Not to my recollection.  No.
5     Q.  For rate evasion cases, could you
6  open and close those on the same day?
7     A.  Rare, but it could be done, yes.
8     Q.  How many hours or time did it take
9  you to investigate a rate evasion case?
10     A.  Depending on the location, I mean I
11  went to Staten Island, to the Bronx, Brooklyn.  I
12  was primarily assigned there.  Also Nassau and
13  Suffolk.  So, depending if I had to go to the
14  house, most of the time that was done on Sundays
15  or holidays or early in the morning.  It depended
16  on how many times I had to go to the house.  If I
17  knocked on the door, we had these things called
18  GEICO grams.  It was really a letter.  It was a
19  handwritten letter asking him to call me, the
20  insured.
21          So it depended.  It could be anywhere
22  from eight to ten hours all the way up to 15 or
23  20, dependent on how many times I had to visit
24  the residence and/or work or wherever they
25  worked, their residence.  I tried to identify the

Page 66

1  persons that were inside the residence.
2     Q.  For arson cases, how long did it take
3  you to investigate those types of claims?
4     A.  Those are more of my heavier cases.
5  So I mean those could go from a minimum of 15
6  hours all the way up to maybe 30, dependent on
7  from beginning to end and how much time I put
8  into them.  It depended on how many times I had
9  to go to the fire marshal's office.  How many
10  times I had to go to the New York City Police
11  Department, Nassau.
12          I also had a very big following out
13  in Suffolk County, and those were long drives.
14  So I could be, it all depended on the location,
15  which borough that it was in it depended on.
16          So I would say a minimum of, you
17  know, 15 to 20 hours all the way up to 30 or 40,
18  depending on the severity of the arson.  The
19  fire.  I shouldn't say arson.  The fire.  It
20  depended if it damaged the home.  Did it hurt
21  anybody?  Did it damage the car?  Did the police
22  have more to this?  You know, as time went on,
23  from 2016 to 2020, surveillance cameras became
24  more pronounced.  They were out in the street.

Page 67

1          Fischer
2  We had plate readers.  We had things that helped
3  us significantly.
4          So those are the kind of things.  It
5  was more work, but it was more work that helped
6  you identify what happened in the case.
7     Q.  I don't think we actually talked
8  about this.  Did you handle jump-in claims?
9     A.  Yes.
10     Q.  What are those?
11     A.  ████████████████████████████████
12  ██████████████████████████████████████████
13  ██████████████████████████████████████████
14  ██████████████████████████████████████████
15  ██████████████████████████████████
16  ██████████████████████████████████████████
17  ██████████████████████████████████████████
18  ██████████████████████████████████████████
19  ██████████████████████████████████████████
20  ██████████████████████████████████████
21  ██████████████████████████████████████████
22  ██████████████████████████████████████████
23  ██████████████████████████████████████████
24  ██████████████████████████████████████████
25  ██████████████████████████████████████

Page 68

1          Fischer
2  ████████████████████████████████████████
3  ████████████████████████████
4          So there were sometimes allegations
5  that there weren't as many people in that car at
6  the time of the accident to the time the police
7  showed up.
8     Q.  Do jump-ins fall under PIP cases?
9     A.  Yes.
10     Q.  And was there a PIP team, if you
11  know?
12     A.  PIP, no, it was kind of, it was all,
13  it wasn't exactly a PIP personal injury.  That
14  was more the inside investigators I guess you
15  could say.  Not that I recall.  To the best of my
16  recollection, there was not.
17     Q.  Okay, and then I think you said,
18  regarding PIP cases, that was about 5 percent of
19  what you would do out of the overall types of
20  matters.  So then the jump-ins would be 5 percent
21  within that PIP?
22     A.  That's correct.
23          THE VIDEOGRAPHER:  We are going off
24  the record at 11:32 a.m.
25          (Recess taken)



Page 69

1                          Fischer
2           THE VIDEOGRAPHER:  We are back on the
3      record at 11:46 a.m.
4    BY MS. ALBERTY:
5      Q.   Okay.  So, before we took a break, we
6    were talking about the different types of claims
7    that you would investigate.  For any of the
8    claims that you investigated for the five
9    boroughs, Suffolk and Nassau County, how far
10   would you drive, meaning mileage, max?
11     A.   An estimate, I mean I would do, to be
12   fair, I mean between 500 to 1200 miles a month.
13   I had to fill out a monthly mileage record.
14   Obviously during COVID there was no mileage, but
15   from '16 to '20, it depended on where my cases
16   were located, whether Staten Island, Brooklyn or
17   the Bronx or how many EUOs I did.
18          So I would say the minimum 4 to 500 a
19   month and some months a thousand to 1200 a month.
20     Q.   I apologize.  My question was not
21   great.  Regarding, how do I want to articulate
22   this, regarding how far you would drive, meaning
23   hours.  Clearly you're not driving 500 miles in
24   one day.
25     A.   No.

Page 70

1                          Fischer
2      Q.   So, in a day, what was, you know, the
3    time that you spent in the car obviously not
4    considering COVID times?
5      A.   Some days as many as five to six
6    hours and some days two hours.  It depended on
7    the number of EUOs that I had or where my cases
8    were located.  I lived pretty much centrally
9    located in Nassau.  So I was 30 miles from the
10   city, and I was 30 to 40 miles from Suffolk.
11     Q.   I think you said, for the claims that
12   you handled up north, you're just unsure when in
13   time that would have occurred.
14     A.   It was prior to this 2016.  I'm
15   almost positive.
16     Q.   Okay.  Prior to COVID, how many
17   claims would you handle a week in, again, sorry,
18   the 2016 to 2020 time frame?
19     A.   I'm going, approximately between 30
20   to 60 a month.  It depended on the year.  As time
21   went on and we lost investigators, obviously the
22   cases grew because there was less personnel.
23     Q.   And that 30 to 60 cases per month
24   range, did that fluctuate?
25     A.   Yes.

Page 71

1                          Fischer
2      Q.   Were some weeks busier than others?
3      A.   Yes.
4      Q.   Were there certain times of the year
5    that were busier than others?
6      A.   Not to my recollection.  Everything
7    was, there was no certain time of the year.
8    Busier?  I will say the summer was busy because
9    people were on vacation.  So, yes, that was quite
10   busy.  We handled up to 60 or 70 cases depending
11   on I think there was five to seven people were
12   allowed to go on vacation at any given time.  So
13   that meant that you had to take those 2 to 300
14   cases and divide them up.
15     Q.   If somebody went out, say, for
16   example, on short-term leave, say one week or was
17   out on a holiday, would you step in only for that
18   week to handle whatever was necessary for that
19   case, or would you then assume the entirety of
20   the case and work it from the very beginning to
21   the end?
22     A.   I would work it from the beginning to
23   the end.  It was now my case.  Are you talking
24   about if they had existing claims prior to going
25   on vacation?  Their cases?

Page 72

1                          Fischer
2      Q.   Yes.
3      A.   Yes, there would be times where we
4    would have to conduct examinations under oath or
5    go out and do some steps depending on who you
6    worked with.  In the theft team there was only
7    four or five of us.  So in SIU you were given two
8    or three days prior to your vacation to catch up
9    on your cases.  Then you would go away for a week
10   say, and then you would come back, and you were
11   given another day.
12          So there was about ten days there
13   that, not only did you have to do your 60 or 70
14   cases, but you had to go in and touch the cases
15   of other examiners or if they asked you to maybe
16   do some examinations under oath that were
17   scheduled, you would do it for them and/or maybe,
18   if you were out in Queens, you would do a canvass
19   or interview one of their insureds, because they
20   had to make entries into their case certain
21   dates.  We were given guidelines to touch our
22   cases so many days a month.
23     Q.   Do you know how many times you had to
24   touch a case a month if it was in theft?
25     A.   I had to touch it at least, to the



Page 73

1       Fischer
2   best of my recollection, four or five times a
3   month.  The 3rd day, the 8th day, I believe the
4   15th day, the 21st day and then closure usually
5   within I believe 28 days.  Something to that
6   effect.
7       Q.  Did you say you had to close the case
8   within 28 days?
9       A.  No, no, you could have a case open
10  for three or four months, but we were given a set
11  of guidelines that we had to not only make these
12  entries, but the quicker that we closed the claim
13  the better your rating.
14      Q.  For example, social media, was there
15  a requirement to touch the case a specific amount
16  of times per month?
17      A.  From 16 to 20 guidelines and
18  procedures changed numerous times.  Each year,
19  just to give you an example, a theft claim when I
20  first started, maybe let's say '14 or '15, you
21  had to touch a case within three days.  If we got
22  it on a Friday, you had to touch it on a Monday.
23  At the end, to give you a perspective on it, you
24  had to touch it the same day.  You had to touch
25  it within five hours.  So we lost that two days.

Page 74

1       Fischer
2       On a Friday before 3 o'clock if I got
3   let's say five cases during the day, I had to
4   touch them before 10 o'clock, 8 o'clock,
5   10 o'clock at night.  So I had to do something on
6   it to touch them to get into them and show that I
7   had gotten the case, that I knew about the case,
8   and I had spoken to somebody or done something on
9   the case.
10      Q.  And was this regarding social media
11  cases or theft cases?
12      A.  I'm sorry, I was using theft as an
13  example.  Social media, there was procedures that
14  you had to follow.  You had to touch it the day
15  that you got it.  In 2019, 2020, it could even
16  have been '18, you had to touch the case the day
17  you got it.  You were expected to close that
18  social media usually within three to five days I
19  would say, and sometimes you'd go longer, but
20  that's usually when you were required to complete
21  it and submit it.
22      Q.  For these guidelines that you stated
23  changed every year, was that set forth by GEICO?
24      A.  Yes.
25      Q.  How was that communicated to you?

Page 75

1       Fischer
2       A.  Through our supervisors and through
3   our quarterly meetings with management.  Our
4   manager, Mike DeGrocco or at the time 2016 to
5   '20, Bill Newport.
6       Q.  To your knowledge, would individual
7   teams only receive the guidelines for the types
8   of cases that they would see?
9       A.  I can't speak for anybody else.  I
10  can say, for me, I had a booklet of all of the
11  procedures.  They would come out regularly in
12  e-mails.  Usually in December they would come
13  out, and this is what's going to change for the
14  following year.  Sometimes it would come out
15  twice a year, sometimes three.  Depending on the
16  upper management, they would change the
17  procedures and rules as to what you had to do on
18  each particular case.
19      Q.  So, as it applies then to the theft
20  cases that you said you had to touch between four
21  to five times a month, that number in theory
22  would have changed per year based off your
23  testimony, is that right?
24      A.  That's correct.
25      Q.  Were there other factors that made

Page 76

1       Fischer
2   your workload heavier aside from what we talked
3   about where somebody was going out on leave or
4   holiday?
5       A.  As a grade 66, did you ask how many
6   more cases I would get?
7       Q.  No.  Were there other factors that
8   made your workload heavier at times outside of
9   what we talked about for people taking leave or
10  holiday?
11      A.  Yeah.  I was responsible as a grade
12  66 to train all the new hires.  I would spend
13  from three to six weeks with each one of them.
14  They would come to my house in the morning, and
15  they would leave 4 or 5 o'clock.  They would go
16  out and do EUOs with me.  I would train them how
17  to do EUOs.  You know, I would introduce them to
18  my contacts out in law enforcement and at NICB.
19      Weather was a big factor.  Come the
20  winter, sometimes EUOs got canceled because of
21  snow.  Things like that.  I'm sure there are many
22  other factors, but at this point those are the
23  ones that come to mind.
24      Q.  As a level 66, do you know who else
25  in region 2 who was assigned to let's say the



Page 81

Fischer

1
2  summonses or speed cameras, we would be
3  terminated, and that did happen to one
4  individual.  Actually two.  I shouldn't say that.
5  One.  The other one passed away.
6      Q.  During your employment with GEICO
7  from 2016 to '20, did you take any FMLA or
8  disability leave?
9      A.  From what year?  I'm sorry.
10     Q.  2016 to your retirement.
11     A.  Yes.  I took leave May 27th of 2020
12 to June 23rd.  I believe it was four weeks.  28
13 days.  I took Family Medical Leave Act for
14 stress.
15     Q.  And was your FMLA granted?
16     A.  Yes.
17     Q.  Was your FMLA respected?
18     A.  Yes.
19     Q.  Did you work with somebody in the HR
20 department to get your FMLA entered?
21     A.  Yes.
22     Q.  Do you remember who that person was?
23     A.  I don't know if it was Kiana Brown.
24 That name comes to mind.  I know she helped me
25 with my retirement.  I believe she also helped me

Page 82

Fischer

1
2  through my -- Jerry Cassagne, I gave everything
3  to my immediate supervisor Jerry Cassagne, who
4  then passed it on to human resources, and it was
5  approved.
6      Q.  Outside of this leave in May to June
7  2020, did you take any other extended leave
8  outside of protected leave or a sabbatical?
9      A.  From '16 to 2020?
10     Q.  Yes.
11     A.  No.
12        (Fischer Exhibit 2, Document Bates
13        stamped G000028 through 43, was so marked
14        for identification, as of this date.)
15     Q.  So what has been placed in front of
16 you has been marked as Exhibit 2.  Mr. Fischer,
17 if you just want to take a look at what the
18 document is, you don't have to read it
19 necessarily in totality for substance, because
20 I'm going to direct your attention to one page,
21 but just let me know whenever you're ready.
22     A.  Yeah.  This is the human resources
23 handbook.
24     Q.  Have you seen this document before?
25     A.  Yes.

Page 83

Fischer

1
2      Q.  Do you recall receiving this handbook
3  during your employment with GEICO?
4      A.  Yes, I believe so.
5      Q.  So let's look at page G000038.  So at
6  the bottom of the page it says "Overtime
7  Eligibility."  Actually it extends over to page
8  39.  So, if you want to flip there, that's where
9  the substance of the policy is.  The middle of
10 the page starts with "All non-exempt associates."
11 Do you see that paragraph?
12     A.  Which one?
13     Q.  It starts with "All non-exempt
14 associates."  Do you see that paragraph in the
15 middle?
16     A.  Oh.  All exempt.  All non-exempt?
17     Q.  Yes.
18     A.  Yes.
19     Q.  Okay.  It states, "All non-exempt
20 associates are required to accurately record
21 their hours worked and absences taken."
22        You were a non-exempt employee,
23 correct?
24     A.  Yes.
25     Q.  And so this part of the policy would

Page 84

Fischer

1
2  have applied to you, correct?
3      A.  Yes.
4      Q.  And you understood that as a
5  non-exempt employee, you're required to
6  accurately record your hours worked and then any
7  absences taken, right?
8      A.  Yes.
9      Q.  It goes on to state, it's actually
10 the third sentence in that paragraph, "A
11 non-exempt associate who feels he/she did not
12 receive pay for all his/her hours worked and an
13 exempt or salaried nonexempt associate who feels
14 his/her pay incorrectly reflects a deduction for
15 an absence should contact his/her supervisor,
16 local human resources manager or corporate human
17 resources."  Did I read that correctly?
18     A.  Yes.
19     Q.  Is it fair to say that as a
20 non-exempt employee, if you felt that there was
21 an issue regarding your pay for your hours
22 worked, that you should contact your supervisor,
23 local or corporate HR?
24     A.  Yes, which I did.
25        (Fischer Exhibit 3, Document Bates



Page 85

1            Fischer
2       stamped G004265 and attachment, was so
3       marked for identification, as of this
4       date.)
5       Q.   Mr. Fischer, what has been marked in
6   front of you is Exhibit 3.  It has been marked
7   G004265.  That's the top page.  The remaining
8   pages are actually a printout of an excel
9   spreadsheet.  That's why you see the topic lines,
10  and it is chronologic.
11      Do you recall intermittently
12  throughout your employment with GEICO being
13  trained on any revisions to GEICO's policies and
14  procedures as it applied to your position as a
15  lead security investigator local 66?
16      A.   To the best of my recollection, I
17  can't say for sure.  I mean I would have to look
18  this over.  The courses that I took.
19      Q.   As you're looking at the Learning
20  Record, which is the most left column?
21      A.   Yes.
22      Q.   And it identifies, for example, the
23  associate handbook, the recreational vehicle
24  training course, the code of conduct, time and
25  labor absence request, do these topics sound

Page 86

1            Fischer
2   familiar to you?
3       A.   Yes.  Absolutely.
4       Q.   As to your participation in the
5   learning courses where it then has a completion
6   status, a record date, and a record grade, do you
7   have any reason to dispute the specific dates,
8   the policies or your pass/fail rate regarding any
9   of the trainings you participated in for GEICO's
10  policies throughout your tenure?
11      A.   No.
12      Q.   Was it your understanding from 2016
13  and until your retirement that you were required
14  to follow the overtime policy as we discussed in
15  Exhibit 2?
16      A.   Just could you repeat that?
17      Q.   Sure.  Is it your understanding that
18  from 2016 until your retirement that you were
19  required to follow the overtime policy that we
20  looked at in Exhibit 2?
21      A.   In Exhibit 2.  Yes, but, if I can
22  clarify that this was the policy set by GEICO,
23  but the practice did not follow the policy.
24      Q.   Okay.
25      A.   Just something I just want to add.

Page 87

1            Fischer
2   That's all.
3       Q.   Is it fair to say, at least from the
4   policy that's set forth in front of you, that
5   working off the clock was not allowed by GEICO?
6       MS. DSOUZA:  Objection.
7       A.   There was no contention that it was
8   ever not allowed.  I mean I was told several
9   times by my immediate supervisor Jerry Cassagne
10  that what I did after hours was up to me.  They
11  never turned off our computers as they did
12  recently to the new investigators.
13      There was no lunches.  There was no
14  breaks.  What I did in my time, I was my own
15  person, my own man, and I did whatever I had to
16  do to make sure that I completed my cases
17  following the procedures that GEICO set forth in
18  each investigation.
19      Q.   But in looking at Exhibit 2, does it
20  indicate anywhere that you can work off the
21  clock?
22      A.   That I can work off the clock?  Does
23  it say here?  No, it does not.
24      MS. DSOUZA:  Objection.
25      A.   That you gave me.

Page 88

1            Fischer
2       Q.   You said that Jerry told you to the
3   effect that you could work off the clock.  Is
4   that your testimony?
5       MS. DSOUZA:  Objection.
6       A.   We were given -- I'll answer the
7   question.  As far as Jerry is concerned, Jerry
8   knew, if not weekly, at least biweekly, that I
9   was working overtime each and every day and
10  weekends to maintain my caseload.
11      Q.   Did Jerry ever tell you to work off
12  the clock?
13      MS. DSOUZA:  Objection.
14      A.   No.  Let's clarify.  Jerry did say to
15  me numerous times you have to do what you have to
16  do to complete your work, and that's the
17  understanding I had with Jerry for over 15 years
18  or 20 years that I worked for him.
19      Q.   But to the extent that he told you
20  you need to get what you need to get done off the
21  clock, did he say anything to that degree?
22      MS. DSOUZA:  Objection.
23      A.   Not in those exact words, but it was,
24  if you have to work overtime to get your caseload
25  to where it has to be so that it's not



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
89–92

Page 89

1           Fischer
2  unreasonable and not sustainable, that I could do
3  that without any repercussions from GEICO.
4       Q.   Did you have communication with Bill
5  Newport?
6       A.   Yes, once or twice a year, yes.
7       Q.   Did you ever report to Bill Newport
8  that you felt in theory that Jerry had said get
9  what you need to get done, and you took it as I
10  don't have to log my hours?
11       MS. DSOUZA:  Objection.
12       A.   Would you repeat that. I'm sorry.
13       Q.   Sure. Did you ever go to Bill
14  Newport with your concerns that it was your
15  interpretation of what Jerry said, which is you
16  got to get it done when you can get it done to
17  imply you should not log your hours?
18       MS. DSOUZA:  Objection.
19       A.   I did have a conversation with Bill
20  Newport at a meeting that didn't go very well
21  when I asked him in front of six or seven other
22  investigators, my exact words were who is
23  watching the store? Do you know what's going out
24  in the field, and do you know what we do each and
25  every day as your investigators?

Page 90

1           Fischer
2       And that was in the presence of at
3  least six or seven other investigators.
4       Q.   Did you say are you watching the
5  store?
6       A.   I said who is watching -- my exact
7  words were who's watching the store here? He is
8  the manager of the SIU. There were two managers.
9  I don't know the medical side. I forget her
10  name, but Bill was the property side, staged
11  loss. He was the medical and PIP team, auto
12  team. He was responsible for the nonmedical
13  investigators, and at a yearly meeting, which we
14  usually, sometimes it was semiannually, sometimes
15  it was annually, towards the end it became
16  annually, because the meetings got out of hand
17  and so disgruntled from the investigators that I
18  kind of led the meeting off by asking Bill, I
19  said, who's watching the store here? Do you know
20  what we do? Is anybody telling you what we do?
21  Do you read our reports? Do you read the things
22  that we do? Do you look at our monthly reports?
23  Do you look at our mileage reports? Do you look
24  at our reports to Jerry? Do you look at our
25  report cards?

Page 91

1           Fischer
2  We've brought numerous concerns to
3  Jerry and Toni D'Agata and Dara at quarterly
4  meetings, semiannual meetings, and they got less
5  as time went on because they didn't want to hear
6  our gripes I guess you could say, our complaints
7  about the overtime that we were doing, and it
8  just so happened that Bill was present in the
9  beginning, but towards the end he refused to
10  come.
11       Q.   When did this meeting occur?
12       A.   The last, I'm going to say '19, '20,
13  '21. They were very, very, not hostile. They
14  were very angry investigators that the amount of
15  work that we were doing to get through each week
16  and the stress and the unsustainable goals that
17  we were given and the caseload, and all we wanted
18  him was to reduce it, to review it for us. Bill,
19  please look at it and read what we do, just go
20  through one examiner, through one investigator,
21  and look at the steps that we have to do.
22       Everything is time-stamped at GEICO,
23  so they know when I'm working on a weekend. They
24  know when I'm working at night, what time. They
25  know my keystrokes. So they have that.

Page 92

1           Fischer
2  I said, please, just take one of us
3  and look at the amount of time that we are giving
4  you to meet your criteria that you've set in
5  front of every one of us, and we didn't want to
6  do -- I mean after a while we kind of backed off,
7  because it was, you know, it was falling on deaf
8  ears is really what it was doing.
9       Q.   For this specific meeting that you're
10  talking about where it was in front of six or
11  eight investigators where you were asking him
12  about the store, I'm just trying to again
13  delineate when in time this meeting was?
14       A.   I'm going to say 2020. I retired in
15  2020. I'm mixing up the years. I'm going to say
16  2019.
17       Q.   And who else was in attendance?
18       A.   It was a closed door meeting in his
19  office. John Gillane, George McMannus, Lou Pia.
20  Did I say Mark? Mark Giabalvo, George McMannus,
21  Lou Pia, Kevin. I forget Kevin's last name.
22  John Gillane. I believe Vito. I know at least
23  four of them were there. There was definitely
24  seven or eight, but those are the people that I
25  remember.

Page 93

1          Fischer
2      Q.   This was in person?
3      A.   It was in person in Bill Newport's
4   office.
5      Q.   What did he say in response to your
6   complaints?
7      A.   He was very frustrated at the comment
8   that I made, and he told me that he was the
9   manager and that he's in charge of the store I
10  guess was his response and that I shouldn't
11  question it, and I kind of backed off at that
12  point.
13     Q.   At that time, is that when you told
14  him that you were working overtime, but not
15  logging your hours?
16     MS. DSOUZA:  Objection.
17     A.   I know that it came up.  I know that
18  I said to him, we are working so many hours
19  overtime to complete our cases in a timely
20  fashion, and I got no response.  From that point
21  on, Bill and I never had the same relationship
22  because of what I said to him that day.
23     Q.   Okay, and I understand that you said
24  you told him you and the other gentlemen in the
25  room are working many hours of overtime, but in

Page 94

1          Fischer
2   the scope of not logging your overtime hours, was
3   that told to Bill?
4      A.   I just want to clarify.  The overtime
5   rate that GEICO would allow us was not time and a
6   half.  GEICO overtime to them was let's say I was
7   making, I'm not sure of the number, say $41 an
8   hour, $40 an hour.  Rather than pay me $60 an
9   hour, GEICO had offered to give me $18.62 for
10  each additional hour that I worked.
11     Now on top, if I took that overtime,
12  so let's say I put in for 15 hours overtime,
13  well, let's say ten hours for the week.  If I put
14  that in my thing, and I put that, we had to do
15  our time management every two weeks.  Usually on
16  a Wednesday or Thursday, Jerry would send a
17  message, please put your time in.  If I had to do
18  that overtime, so, if I worked let's say 20 or 25
19  hours a month or for the week or whatever it was,
20  say for the week, for the two weeks, say 40
21  hours, let's say 20 to 40 hours, I was told that
22  would be my rate, but because I asked for
23  overtime, I would now be susceptible to getting
24  more cases, because I had more time on the books,
25  and my rating would go down.

Page 95

1          Fischer
2      So your goal at GEICO was to be a 4
3   or a 5, but because you worked overtime, you
4   worked more hours.  So, if you got 30 cases for a
5   month, but you worked 150, if you worked 200
6   hours, your rating drastically fell because you
7   were given more time to complete those cases,
8   which should have taken you 38.75 a week you now,
9   say, I worked 50.  So, for an additional 12
10  hours, that would affect your rating and your
11  report card, and we received a report card every
12  month from Jerry Cassagne telling me, you know,
13  usually I was a 4 or 5, and probably towards the
14  end it was probably in the 3's.
15     Q.   Again, just circling back to that
16  meeting and speaking to Bill, did you tell him
17  that you were not logging your OT hours?
18     MS. DSOUZA:  Objection.
19     A.   I told Bill that -- my statement was
20  you're not watching the store.  I am doing a
21  ridiculous amount of overtime that I can't put in
22  for, because you're giving me a ludicrous hourly
23  rate, which is against the law, and you're
24  telling me it's only worth $18.  Why would I want
25  to do that overtime, plus I have to tell you why

Page 96

1          Fischer
2   I did that overtime.  Maybe I got into an
3   accident.  My car got hit or something, or I got
4   stuck in traffic.  I didn't put in for that
5   overtime, because it was expected.  It was the
6   practice of GEICO to -- you had to do that
7   overtime without being paid for it, and that's my
8   feeling.  That's the way I felt.  Of the 22 -- I
9   shouldn't say 22, but for the last 15 years of my
10  employment there that's the way I felt.
11     Q.   Who told you that that was the
12  practice of GEICO?
13     A.   My supervisor Jerry Cassagne numerous
14  times I had like two or three phone calls.  I
15  stood up for everybody else on my team, and
16  there's e-mails and I know there's e-mails, and
17  I'm sure that they may come across your desk at
18  some time, and they came from all his
19  investigators that we were doing overtime and we
20  weren't getting paid for it.
21     It was the practice of GEICO, and he
22  said you have -- I worked for Jerry in the police
23  department, and I also worked for Jerry at GEICO.
24  I worked for Jerry for over 30 years.  So I had a
25  very personal relationship with him.  So whatever



Page 97

1        Fischer
2    he said, you know, I had to follow, because not
3    only were we friends, but we were co-workers.  I
4    respected Jerry.
5        Q.  And circling back on the policy
6    itself and taking what you've testified to which
7    is you brought concerns to Jerry and to Bill, did
8    you ever take your concerns to local HR?
9        A.  No.  We didn't do things like that.
10   We just, whether it's my police background, my
11   law enforcement background, being, you know, a
12   fireman, you don't do that to your supervisors.
13   You don't report them.  You just, you sit, and
14   you take it.  That's just the way we did things.
15   That's the way I was taught.  That's the way I
16   was brought up.
17       Q.  Is it fair then to say you didn't go
18   to corporate HR either to report these issues?
19       A.  When I finally went out, when I
20   retired in 2020, Kiana Brown, I did it was like
21   an exit statement, and being that I was 22, I was
22   only 59 years old, I had planned on working
23   another four years, she asked me, do you have any
24   concerns, it was like an exit statement, my
25   indication was that we're working so much

Page 98

1        Fischer
2    overtime and there's so much stress on the job
3    that it is making me retire because I felt I was
4    going to get sick.  I retired four years early.
5    I wanted to work until I was 62 or 63.
6        Q.  Do you know if they opened any type
7    of investigation when you reported this to Kiana?
8        A.  I don't know what she took down.  She
9    asked me to give an exit statement which I did.
10   My feelings, I didn't have any grudges against
11   the company or the people I worked with.  My
12   grudges were the overtime and the amount of
13   stress and overtime that I had to work to get
14   through each and every work week 46 to 47 weeks a
15   year other than my vacation.
16       I know that I told Kiana Brown, you
17   know, that was my exit statement.  It was pretty
18   lengthy.  It was probably two or three minutes
19   long as to why I was leaving.
20       Q.  Why didn't you report -- strike that.
21   Do you agree that you were required to report to
22   HR during your tenure if your managers were
23   telling you to work overtime, but not log your
24   hours?
25       A.  Was I required?  It's in the policy.

Page 99

1        Fischer
2    It's written.  The policy says that.  The
3    practice at GEICO was not to do that.
4        Q.  And why was it your understanding
5    that it was the practice at GEICO for you not to
6    go to HR to report that it was your understanding
7    that Bill and Jerry were effectively telling you
8    to work off the clock?
9        MS. DSOUZA:  Objection.
10       A.  Let me clarify.  I don't want to say
11   that Bill told me to work off the clock.  He
12   turned his head to it.  He didn't have a lot to
13   say after that meeting, but Jerry told me, if not
14   weekly, biweekly, monthly, twice to three times a
15   month that I had to -- we couldn't stop us from
16   working overtime to complete our cases.  I needed
17   the rating of 4 or 5 to get a better raise and
18   better compensation through my profit share.
19       Bill on numerous occasions more than
20   five, less than ten, was told about the overtime
21   at open meetings, which probably held between 40
22   and 60 investigators.  He was present at those
23   meetings.  He heard what went on.  He heard it
24   from his immediate supervisors, Dara, Toni and
25   Jerry, that we were working an astronomical

Page 100

1        Fischer
2    amount of overtime to keep up with our caseload,
3    and there was nothing, there was no directives
4    ever sent down by Bill.  He never said, okay, I'm
5    going to shut the computers off at 4 o'clock so
6    you can't work.  I'm not going to shut your
7    computers off for an hour, which they do now.
8    About a year or two ago they did that.  They shut
9    the computers off so they could stop that.  They
10   never did that with us.
11       Q.  How do you know they shut the
12   computers off?
13       A.  Speaking to Maria at a retirement
14   party, I believe it was Jerry Cassagne's
15   retirement party, told us that, she told me
16   face to face that, after we left in 2021, GEICO
17   now makes you take your lunch.  You have to
18   document that.  You can't type during that 45
19   minutes.  You can't type during those two
20   15-minute breaks, and I don't want to say that
21   they turn the computer off, but they were
22   threatening that as of like say 4 or 5 o'clock,
23   depending on your work hours, they were thinking
24   about turning off the computers like other
25   companies had done.  Had they done it?  I don't



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
109–112

Page 109

1         Fischer
2      A.  No.
3      Q.  Do you know if GEICO used tenure as a
4  factor for raises?
5      A.  No.
6      Q.  Did you ever log your hours in the
7  case management software?
8      A.  No, not that I recall.
9      Q.  Do you remember the name of the case
10  management software?
11      A.  SCAM.  SIU Case Management.
12         (Fischer Exhibit 4, Plaintiff Keith
13         Fischer's Responses to the Court's
14         Interrogatories and Declaration of Keith
15         Fischer, was so marked for identification,
16         as of this date.)
17      Q.  What has been presented to you as
18  Exhibit 4 is actually two separate documents.
19  The first document is your answers to the Court's
20  interrogatories, and then the second part is your
21  declaration.  Have you seen these documents
22  before?
23      A.  Yes.
24      Q.  Are these the documents that you
25  reviewed in preparation for your deposition

Page 110

1         Fischer
2  today?
3      A.  Yes.
4      Q.  In regard to the substance of the
5  information in both the Court's interrogatories
6  and your declaration, did you prepare this
7  document in conjunction with your counsel?
8      A.  I didn't prepare it.  My attorneys
9  did.
10      Q.  Okay.  Did you help provide the
11  information to your counsel to assist in
12  preparing this document?
13      A.  Yes.
14      Q.  Alright.  So the last page on both
15  the declaration and the interrogatories should
16  have a signature line that appears to be an
17  electronic signature.
18      A.  Yes.
19      Q.  Both of them are executed on
20  November 6 of 2023.  Is this your electronic
21  signature?
22      A.  Yes.
23      Q.  Prior to signing, did you review this
24  document to ensure the accuracy of information?
25      A.  Yes, I did.

Page 111

1         Fischer
2      Q.  Let's go to number 7 for your
3  declaration, page 3.
4      A.  That starts the Vetter settlement?
5      Q.  Yes.  Number 7, the second sentence,
6  it says, "The timekeeping system auto-filled my
7  hours for each day to be 7.75."  Walk me through
8  that real quick.
9      A.  Just repeat that.  I'm sorry.
10      Q.  Sure.  I'm looking at the last
11  sentence of number 7, "The timekeeping system
12  auto-filled my hours each day to be 7.75."
13      A.  That's correct.  Yes.
14      Q.  So I guess walk me through that, so I
15  understand.  Obviously I don't have the software
16  in front of me,  so I don't know what it looks
17  like.
18      A.  As you click on, say, Monday through
19  Friday, as you clicked on the date, it would say
20  hours worked, and, as soon as you clicked on it,
21  it would say 7.75, and you could just touch each
22  day.  It was a rather quick process to fill in
23  the ten days and then submit it.
24      Q.  Okay.  Did you have the capacity,
25  even though, if the numbers auto-populated, so

Page 112

1         Fischer
2  7.75 auto-populates.  Did you have the capacity
3  to change that number?
4      A.  With the supervisor's approval, yes.
5      Q.  Okay.  So you could fluctuate that
6  time, meaning more time or less time.  It's not
7  required that, even though it auto-populates to
8  7.75, that it's locked into that number?
9      A.  Correct.  Yes.
10      Q.  With that filling process of the 7.75
11  and you would do that in two-week increments,
12  once you submitted for that time, did you always
13  get paid for that time?
14      A.  Yes.
15      Q.  Okay.  Transitioning to number 8, it
16  states, "Throughout my tenure, my supervisors
17  told me that I could only report up to 38.75
18  hours per week or 7.75 hours a day, five days a
19  week, in the timekeeping program."
20         Which supervisor told you that?
21      A.  My immediate supervisor, Jerry
22  Cassagne.
23      Q.  And when did this occur?
24      A.  Throughout my tenure.  Well, we'll
25  talk about 2016 through 2020.  Jerry would send a



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
113–116

Page 113

1          Fischer
2  notice, and we would send it back to him
3  requesting that time to be paid for.
4      Q.   Where did this conversation take
5  place?
6      A.   Which one?  I'm sorry.
7      Q.   So we're focusing on paragraph 8.
8      A.   Okay.
9      Q.   First sentence.  For the times that
10  he told you, you "could only report up to 38.75
11  hours per week or 7.75 hours a day," when did he
12  tell you that and how?
13      A.   Numerous conversations.  I don't know
14  how many I had.  It didn't have to do with the
15  7.75 reporting.  It was that I could not put in
16  for overtime without a good enough reason to
17  substantiate the overtime, and it didn't matter
18  if I drove eight hours for the day, because of an
19  accident on the Belt Parkway or it just took me
20  that long or my EUOs were extended, if I did ten
21  or 12-hour days, very rarely, could you, did I
22  ever put in for overtime?  I can't say I didn't,
23  but it wasn't a practice because we just were not
24  allowed to.
25      Q.   When you had these conversations with

Page 114

1          Fischer
2  Jerry, was this on the phone, via e-mail, text
3  message?
4      A.   Both phone and text.
5      Q.   Was this a company phone, or was this
6  your personal phone for text messaging?
7      A.   Probably -- it wasn't the company
8  phone.  I only used it for speaking to examiners.
9  It would probably be my personal phone.  It was
10  more in person than it was over the phone.
11      Q.   As to specificity on dates, meaning
12  on August 28, 2024, I recall talking to Jerry,
13  and Jerry told me this, can you tell me any
14  specific dates with which you recall that he told
15  you that you could only report up to 38.75 hours
16  in a week?
17      A.   Do I have specific dates?  No.  If
18  you showed me days of meetings and stuff, if you
19  would provide me with those, then I could tell
20  you.  Then tell you dates, they did come up at
21  meetings.  They did come up in team meetings,
22  things like that.
23      Q.   During meetings that you had with
24  your supervisors, did you ever take down
25  incorrect notes?

Page 115

1          Fischer
2      A.   Meetings with supervisors?  I never
3  did.  I can't speak for anybody else, but I never
4  took down notes.
5      Q.   Were you allowed to work Saturdays
6  and Sundays if you needed to?
7      A.   Absolutely.  Could I just clarify?
8  The reason I can only speak for myself that I did
9  is because you weren't getting cases submitted to
10  you, so you didn't have to work on those cases.
11  Those were your kind of free days to do your
12  cases without any background noise if you want to
13  say by receiving cases.  Things that I could get
14  done.  Traffic was less.  I could get from
15  Levittown to Brooklyn or Brooklyn to the Bronx at
16  4 o'clock in the morning, 5 o'clock, 6, 8 o'clock
17  without hitting any traffic.
18      Q.   Circling back to paragraph 8, it
19  said, "Except for emergencies (for example, going
20  to out of state catastrophes, going to court, or
21  when my car broke down), my supervisor would not
22  approve my requests to work overtime."  When did
23  you request overtime?
24      A.   Other than those other circumstances
25  that you said?

Page 116

1          Fischer
2      Q.   Yes.
3      A.   There might have been a few times
4  where I put in for -- I do remember putting in
5  for three hours once.  I do remember putting in
6  for five hours once, maybe once or twice a year.
7  It just wasn't worth the headache, and I forget
8  the circumstances.  It might have been, I know I
9  was rear-ended one day in my company car.  I
10  recovered some stolen cars where I had to stay
11  late at night.  I recovered them.  It took a long
12  time for the police to come.  I did a plate
13  reader search, and I found a car at 2 o'clock in
14  the morning.  I went out there and I sat until
15  the police came.  It was a very high-end car.  So
16  80 to $100,000.
17      I went out there, and I sat there and
18  waited for the police to arrive, and those are
19  the kind of things that just it was part of
20  your -- do I have proof of that?  I believe so,
21  but I can't swear to it that that was the case.
22      Q.   When you had a request for overtime,
23  what did that process look like?
24      A.   You would go in, and you would change
25  your -- I can speak through the catastrophes that



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
117—120

Page 117

1          Fischer
2   I went to.  I would plot in my days.  7 a.m. to
3   10 o'clock at night, 11 o'clock at night, and
4   they would self-generate 16 hours to 18 hours for
5   the day.  I do -- I can only remember twice where
6   I actually did it on my timesheet while working
7   in region 2 in the SIU.  Two or three times.  I
8   don't want to say.  It could have been more than
9   that, you know.  It wasn't less than that.
10      Q.   I think I'm losing you just a little
11  bit.  So are you saying there's two different
12  systems with which you put in your overtime
13  hours, one specifically only for cat cases and
14  one specifically only related to theft cases?
15      A.   Oh, no.  It's the same system.  I'm
16  sorry.
17      Q.   Okay, and for, when you would go in
18  and adjust your time, I think you had indicated
19  that you would adjust it to 16 hours if you
20  needed to.
21      A.   Let's say ten.  I know one day I put
22  in for 10.75, and I got 43 hours.  I got 41.75
23  instead of 38.75.  I put in for three hours and
24  ten minutes I think one day.
25      Q.   Okay, and, when that was submitted

Page 118

1          Fischer
2   through Workday when you closed out for the two
3   weeks in your custom and practice, then it was
4   approved, is that right?
5       A.   I had to pre-approve it with Jerry
6   who had to pre-approve it with Bill.
7       Q.   What did the pre-approval process
8   look like before you would go in and then adjust
9   the numbers in the Workday system?
10      A.   It would send Jerry an e-mail stating
11  that on August 28th, 2024 I went out to Brooklyn,
12  New York, where I secured a high-end vehicle,
13  waited for police to arrive at 2 o'clock in the
14  morning.  I waited until 5 o'clock.  I am
15  respectfully requesting overtime in the amount of
16  three hours.
17      Q.   And then you would send an e-mail.
18  Would you get correspondence back saying
19  approved?
20      A.   Yes.
21      Q.   Or denied?
22      A.   It would be back -- that one time I
23  got it back from Jerry that it was approved.
24      Q.   Did you ever, to your recollection,
25  receive any e-mail back after you requested

Page 119

1          Fischer
2   overtime with which somebody said denied?
3       A.   I never put in for any other
4   requests.  I can only speak for myself.
5       Q.   And as to then getting approved to
6   enter in your OT, which you did then enter in
7   your OT, were you paid for that overtime, to your
8   recollection?
9       A.   Yes.
10      Q.   Have you ever put in more than 7.75
11  hours for a day with which you didn't seek
12  pre-approval?
13      A.   Only during catastrophes.
14      Q.   What does that process look like?
15      A.   I answer to an SIU supervisor, Dale,
16  I forget his last name.  He was from that region
17  in Colorado and/or Houston.  He actually traveled
18  with me on both, and at that point he would say
19  that we worked a 12-hour day.  I'm going to give
20  you two hours travel in the morning.  I am going
21  to give you two three-hour reporting time at
22  night when you go back to your hotel room.
23      Q.   Okay, and so then you would just
24  enter your hours after you both agreed to
25  whatever that hour was in the Workday system, and

Page 120

1          Fischer
2   then would you get paid then that corrected
3   amount?
4       MS. DSOUZA:  Objection.
5       A.   To the best of my recollection, I did
6   go through the Workday system to put in my
7   overtime to the best of my -- I'm almost positive
8   it went through.  Did I get paid?  Yes.
9       Q.   Transitioning to number 9, it states,
10  "From 2016 to approximately March 2020, I worked
11  about ten to 12 hours a day Monday through Friday
12  and eight hours on many weekends.  I estimate
13  working a total of 50 to 65 hours a week on
14  average during this time period."
15          On what do you base these estimates?
16      A.   My caseload and the knowledge that I
17  did this each and every day.  My day started
18  early in the morning, and it went to late at
19  night.  I was fortunate enough that my wife was
20  an investigator and knew the pressures and the
21  stress at GEICO.  She worked there herself.  So
22  after dinner I would go back on the computer, and
23  I would, because now it was downtime.  I knew I
24  wasn't receiving cases after 4 or 5 o'clock, and
25  for that 3 or 4 hours I could type in peace and



Page 121

1              Fischer
2  not have my computer ring or send me another
3  case.
4      Q.  Did you record your time anywhere to
5  adequately reflect your testimony that you were
6  working ten to 12 hours a day exceeding the 7.75
7  hours a day that is typical in your position?
8      A.  No.
9      Q.  Why didn't you put that you were
10  working ten hours or 12 hours for a day in
11  Workday?
12      A.  First of all, what I did after hours
13  it was my conversations with Jerry Cassagne that
14  what I did on my own time was up to me, and he
15  was not going to approve or he and Bill Newport
16  would not approve any overtime over 38.75 other
17  than extenuating circumstances.  An example, you
18  know, going out to find a car or getting into an
19  accident, you know, having to go to the precinct
20  maybe, if one of these insured were arrested, you
21  know, something extenuating.
22      Q.  Did you ever try to put in the hours
23  that you actually worked into Workday without
24  pre-approval?
25      A.  No.

Page 122

1              Fischer
2      Q.  Do you know if anyone did?
3      A.  I can't speak for anybody else.  I
4  can't say.  No.
5      Q.  Did you specifically tell anyone that
6  you were working ten to 12 hours a day?
7      A.  Every day or every other day we
8  circulated e-mails at the end of the day to each
9  other.  Today I got five cases.  Well, I got six,
10  or I got four cases.  I got four staged accidents
11  today with 12 claimants.  How do they expect me
12  to keep up?  This went on every day.  I shouldn't
13  say every day.  At least two or three times a
14  week among a group of us investigators, and, you
15  know, they are all covered in this particular
16  lawsuit.
17      Q.  So I understand that the case
18  assignments is what you're talking about.  My
19  question is did you tell anyone you were working
20  ten to 12 hours a day?
21      A.  I told my immediate supervisor Jerry
22  Cassagne that I was doing over ten hours a week
23  in overtime.  I can't say that I -- I can't say
24  that I used the number 10 or 15 or 20, but I just
25  said that I am doing weekends, that I am doing

Page 123

1              Fischer
2  whatever I have to do to keep up with my
3  caseload, which was probably, you know, one of
4  the highest of all investigators being a 66.
5      Q.  Did he know that, when you said I'm
6  working over ten hours a week or whatever number
7  of hours a week in OT, that you weren't logging
8  your hours?
9      A.  Absolutely.  I mean Jerry would say
10  to me, you can't put in for overtime.  It doesn't
11  call for it.  We don't have pre-approval.  You're
12  not going to get it.  You can do your 7.75, and
13  what you do after that you're on your own accord.
14  You can't put in for it.  He's not going to
15  approve it, and Jerry and I had this
16  conversation, if not weekly, biweekly.
17      Q.  And this was on the phone?
18      A.  The phone and whenever I saw him in
19  person.  We had to do ride-alongs with Jerry four
20  times a year, at meetings, quarterly meetings
21  with quarterly, semiannual or annual meetings
22  with management.
23      Q.  Were any of these conversations by
24  e-mail at all or text?
25      A.  With Jerry?  Oh, absolutely.  I know

Page 124

1              Fischer
2  I sent him numerous e-mails.  I don't know if I
3  had any, or I supplied any to my attorneys.  I
4  think I did that, you know, that the workload was
5  out of control and my overtime was out of
6  control.  It was stressful, and I wasn't able to
7  sustain, you know.
8      Q.  I think -- I didn't mean to interrupt
9  you.
10      A.  Yeah.  It was unsustainable.  I
11  couldn't keep up, and I'm one I took a lot of
12  pride in my investigations.  I thought I did one
13  of the best jobs.  I was known for that being
14  there 22 years, and I gave my heart and soul, and
15  I just couldn't keep up, and that's not,
16  especially the last two or three years, I could
17  not keep up with my caseload, and I had to have
18  things done.  I didn't want to see them on my
19  screen, and that's just the way that I work.
20  It's just something I've done since the police
21  department.
22      Q.  I believe, from what you have stated
23  regarding how the cases fluctuated and that each
24  case had a different set of hours that needed to
25  be allocated, is it fair to say that a specific



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
125–128

Page 125

1              Fischer
2   number of cases doesn't necessarily equate
3   directly to a specific number of hours?
4        MS. DSOUZA:  Objection.
5        A.  It all comes down to the type of
6   case.  Again, I can only speak for myself.  Each
7   theft is completely different from, you know,
8   each case, dependent on the number of claimants,
9   the number of insured, how many witnesses he had,
10  how many EUOs, were they no-showed, or they
11  didn't show up, or sometimes they would no-show
12  for two, and they would ask for a third, and
13  legal would say okay, yeah, let's give them a
14  third.
15       So there was a lot of prolonged
16  investigations that sometimes you held a case
17  three or four months, and let's not forget that
18  you had to document that case every three, eight,
19  15, 21, 28 days.  If I have a case open three
20  months, I had to document it 15 times, you know.
21       Q.  Mr. Fischer, I need you to just focus
22  on the question that I'm asking.
23       A.  Okay.  I'm sorry.  Sure.
24       Q.  Okay.  Is it fair to say because you
25  stated that every case, you just said it,

Page 126

1              Fischer
2   required a different number of hours because all
3   the cases were different, so the number of cases
4   did not necessarily equate to a specific number
5   of hours?
6        A.  Yes.
7        MS. DSOUZA:  Objection.
8        Q.  Because you didn't log your
9   additional overtime hours, is it fair to say that
10  the number that you have indicated in paragraph
11  9, ten to 12 hours a day, estimating 50 to 65
12  hours a week, is an assumption?
13       MS. DSOUZA:  Objection.
14       A.  Each week was different.  There were
15  weeks that maybe I worked depending on whether I
16  took a day off or whether I had vacation coming
17  up, whether I had, you know, EUOs.  To me, the
18  best estimate, as far as I'm concerned is that I
19  was working ten to 12 hours every day five days a
20  week, and then I was doing an additional 4 to
21  eight hours on Saturdays and Sundays.
22       Q.  Then this would have been an
23  assumption, because you can't break down, for
24  example, March 5th, 2018, which would have been a
25  Monday to then March 11th, which is a Sunday,

Page 127

1              Fischer
2   2018, you would have worked 61 hours that week.
3   So fair it's an assumption for number 9?
4        MS. DSOUZA:  Objection.
5        A.  I didn't keep records on paper, but
6   in my mind I knew exactly what I had worked.  Is
7   it an assumption?  Yes, I guess I knew in my
8   head, canvassing my brain that I knew I worked
9   those hours, and I can say each and every week.
10  Sometimes it was more, but is it an assumption?
11  I don't feel it's an assumption.  I know for a
12  fact that those are the hours that I worked.
13       Q.  Can you tell me then using the
14  hypothetical I gave you, which is on March 5th,
15  2018, which is a Monday, to then March 11th,
16  Sunday, 2018, how many hours you worked that
17  week?
18       A.  No.
19       MS. DSOUZA:  Objection.
20       MS. ALBERTY:  So it's about 1:05.
21  Let's go off the record for a second.
22       THE VIDEOGRAPHER:  We are going off
23  the record at 1:05 p.m.
24       (Lunch recess:  1:05 p.m.)
25

Page 128

1              Fischer
2        Afternoon Session
3        1:49 p.m.
4        THE VIDEOGRAPHER:  We are back on the
5   record at 1:49 p.m.
6   K E I T H   F I S C H E R, having been previously
7   sworn, testified further as follows:
8   EXAMINATION (Continued)
9   BY MS. ALBERTY:
10       Q.  Okay.  So we took a quick break for
11  lunch.  Before we took a break, we were going
12  through your declaration.  I want to draw your
13  attention to paragraph 10, page 3.  You state,
14  "Starting in March of 2020, the COVID-19 pandemic
15  halted field operations, so all of my work was
16  done remotely until I retired in August 2020."
17       How did this differ from your work
18  prior to the pandemic?
19       A.  The amount of cases was extended
20  because we weren't doing field time.  We weren't
21  allowed to do face-to-face interviews.  We
22  weren't allowed to do EUOs, and we weren't
23  allowed to do canvasses and go out on the street.
24  I think my car sat for quite a few months.
25       Q.  Okay.  Were you conducting any EUOs



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
129–132

Page 129

1      Fischer
2  virtually?
3      A.  Yeah.  When did it start?  In March
4  of 2020?  So I might have had just a few left.  I
5  was gone by the time May came was my last week.
6  I took some sick time, and then I retired.  So I
7  wasn't around very long during COVID.
8      Q.  As far as the amount of driving,
9  which I believe you indicated took up a pretty
10  substantial amount of time because of traffic and
11  going through all the boroughs, was all that time
12  then allocated back to you to complete your
13  casework since you were no longer going out in
14  the scene?
15      A.  Yes.
16      Q.  Okay.  Then just so I know, you were
17  already working remotely before March of 2020 in
18  theory because you were working from home and not
19  going into the home office of GEICO, right?
20      A.  Yeah.  Was it March 19th I think
21  COVID started?  So we had stopped maybe a day or
22  two before, if my memory serves me right.  I mean
23  I always worked from home.  EUOs were still being
24  done, but not out in the field after that March
25  date.

Page 130

1      Fischer
2      Q.  Because of the COVID restrictions
3  that were going on in the state, in the county,
4  you were not allowed to take in-person interviews
5  at that time, right?
6      A.  Yes.
7      Q.  And then you weren't able to do scene
8  canvassing or showing up to any scenes at that
9  time?
10      A.  I could.  I did go out.  I could just
11  take pictures of the scene where the car was
12  stolen from, maybe some intersection where it was
13  recovered, but I couldn't speak to anybody in the
14  house, any insured face to face.  I still spoke
15  to police personnel.  You know, they weren't off.
16  Everything was masked up, but I did visit
17  precincts.  I had a lot more time to do that.
18      Q.  Were you able to take lunches at any
19  time?
20      A.  Again, it was only a short two months
21  for me with COVID.  What happened was I went from
22  40, 45 cases up to 70 to 75 my last two months,
23  and that's what kind of pushed me over the edge
24  when I went out sick.  So the caseload increased
25  to make up for what we weren't doing out in the

Page 131

1      Fischer
2  field.
3      Q.  Were you still taking breaks, though,
4  throughout the day?
5      A.  Breaks?  I mean was my overtime as
6  great the last during the month of May?  I can't
7  really recall.  I mean I can't say it was any
8  less.  Could I have done a little less overtime?
9  Absolutely.  I could have.  I don't remember.
10  But at that point things had kind of stopped, but
11  the caseload I was doing more typing.  I actually
12  caught up on a lot of old cases that I had open.
13  So that was good.  I kind of caught up.
14      Q.  At that time during COVID, who was
15  living in the home?
16      A.  Myself, my wife Peggy, and my two
17  children, Kaitlyn and Keith Jr.
18      Q.  Okay.  At that time at the early
19  stages of COVID, so March 2020, did anybody
20  acquire COVID?
21      MS. DSOUZA:  Objection.
22      A.  I didn't get it until '22.  I was
23  already retired.  About two and a half years
24  after it started, my first time I got it.  My
25  children are both nurses, and I don't think

Page 132

1      Fischer
2  either one of them got it even though they worked
3  with COVID.  My wife did get it, but I can't tell
4  you when it was.  It might have been in '21.  No.
5  It had to be after that because we were in
6  Florida.  So it had to be after November 30th,
7  2021.  She got it in '22 also.
8      Q.  Was it stressful having your kids
9  work in healthcare during this time?
10      A.  Absolutely.
11      Q.  Were they first responders, meaning
12  in the hospital setting, during COVID?
13      A.  Yes, they were both.  My son is in
14  the OR, and my daughter is a med-surge nurse, and
15  they worked opposite each other.  So my son would
16  come home at 7 or 8 o'clock in the morning, and
17  my daughter would come home at 7 or 8 o'clock at
18  night.  So we were constantly doing laundry and
19  things like that.
20      My wife also worked at home.  At that
21  point she was out of the office, and we were both
22  working in the same house.
23      Q.  Did you have separate areas where you
24  worked?
25      A.  Yes.



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
133–136

Page 133

1                    Fischer
2         Q.   Okay.  Transitioning back to
3    paragraph 10, it says, "GEICO assigned cases
4    using a point-based system."  Walk me through
5    what the point-based system was.
6         A.   To the best of my recollection, they
7    gave each type of case, staged accident was
8    highest.  Theft was probably just below that.  A
9    rate evasion was like a 1 or a 2, but then, you
10   know, at that point I was still in theft, and I
11   can't say that I did a lot of staged accidents.
12   I did mostly thefts.  Again at that point I was
13   doing 20 more cases a month.
14        Q.   When you say a point-based system and
15   that from your example the lowest would be rate
16   evasion to the highest, which was staged loss,
17   we'll go piece by piece.  What was the
18   point-based system for a rate evasion case?
19        A.   I don't remember the rating system,
20   how it was set up, but let's use 1 through 5, and
21   let's say that staged was like a 5.  5 out of 5.
22   Theft would be a 4 out of 5.  Jump-in would be a
23   3 out of 5.  Those are things you could kind of
24   do over the phone in, you know, kind of decrease
25   the level, but you still had to do interviews.

Page 134

1                    Fischer
2         I had to do a lot more recorded
3    statements now because I was home.  So, instead
4    of not doing them, you know, if I thought maybe
5    an EUO was more productive, I would do, you know,
6    a lot more recorded interviews.  So I could do
7    maybe 50 or 60, and, based on the evidence, write
8    them up, you know, and then I don't remember if I
9    was doing EUOs in April or May.  If I had my
10   calendar books in front of me, I could tell you.
11   I don't have them.
12        Q.   And I just want to make sure I
13   understand how this point-based system worked
14   from your understanding.  With how cases are
15   allocated where you said, for example, staged
16   loss would be 5 out of 5 --
17        A.   From hardest to easiest.
18        Q.   Okay.  How did that factor into your
19   work at all, if any?
20        A.   They were able to decipher what, not
21   what, but how many cases each investigator should
22   get.  So, again, it was a short period of time.
23   It's not something that I remember, but I know
24   that they downgraded a theft, because I didn't
25   have to do EUOs, and I didn't have to do

Page 135

1                    Fischer
2    face-to-faces.  So it could have been a 3.  I'm
3    pretty sure it was a 4, and at that rate I could
4    get 60 3-point cases being relatively in the
5    middle or maybe towards the higher end.  That's
6    the kind of system that they were working.
7         Q.   Okay.  So then, as I understand it
8    then, the point-based system you're talking about
9    went into effect when COVID occurred in March
10   2020?
11        A.   Yeah.  The rules were for about a
12   week it was suspended.  We didn't know what was
13   going on.  What we're going to do.  We were
14   waiting for, you know, policy to come out as to
15   what we could and couldn't do, and I know it
16   changed a few times.  We were doing EUOs over
17   Zoom, you know, that way.
18        Again, I don't have the calendar
19   book, so I can't tell you how many I did, but I
20   remember sitting out in my, come May, I was
21   outside a lot doing -- my wife would sit at the
22   kitchen table, and I would sit, we have a den in
23   the back room, and I would go outside if I had to
24   take a recorded statement out on my deck table,
25   so that we didn't -- she was taking statements.

Page 136

1                    Fischer
2    I was taking, so we didn't interrupt each other.
3         Q.   In regard to the point-based system
4    that went into effect in March of 2020 time
5    frame, as it applies to theft cases and how those
6    were rated, do you have any idea what the
7    percentage or matrix would have been from GEICO
8    now allocating that theft cases would be, for
9    example, a 3, and because of that, you were
10   auto-generated a hundred cases?
11        MS. DSOUZA:  Objection.
12        A.   The only thing that is clear to me
13   and I do remember is GEICO lowered I'll take a
14   theft case, for example.  A theft case has to
15   meet, there's 100 criteria for a theft.  Payments
16   are almost at the end.  Mileage is high.  Prior
17   accident, prior claims, things like, this is what
18   would bring a theft out into the field, and
19   usually GEICO decided to, because we weren't
20   going out in the field, what they did was they
21   made it two things for a theft.
22        So it was parked at the mall, and it
23   had high mileage.  I got it.  So what was
24   happening was at 7 o'clock in the morning I would
25   get my theft, and I would already be reaching out



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
137–140

Page 137

Fischer

1   to the insured going to the claim, and the claims
2   examiner or the theft examiner didn't even have
3   it yet.  So now we were both doing the work.  The
4   same work.  She was taking a statement.  I was
5   taking a statement.  He would tell me I just took
6   a statement.  Who did you take the statement
7   from?  You know because it's just.
8       So we were working the cases where we
9   used to wait three or four days, so a lot of
10  things were knocked out before we got them.
11      Now we were doing the work of a
12  claims examiner, and we were doing 20, 25 more
13  cases.  So I had to start from the real bottom.
14  I didn't even know, you know, what the claim was
15  about, because there was nothing in the claims
16  diary.
17      Q.  And I just want to make sure I
18  understand.  Are you stating now, because this
19  new point-based system that went into effect in
20  March 2020 that no claims examiners were assigned
21  to matters anymore?
22      MS. DSOUZA:  Objection.
23      A.  No.  They were, but my examples.
24  There's 100 factors in a theft and why we look at

Page 138

Fischer

1   it, and they used to be, let's say GEICO would
2   say there are seven things that have to happen
3   before it goes out into the field.
4       Well, now they dropped it to two
5   things.  So there's just two of those four
6   indicators would bring it to me, and what was
7   happening, I was getting it in the morning.
8   Let's say the theft happened at 4 o'clock in the
9   morning.  By 6:30 it was on my desk already and
10  the only contact was the insured that she called
11  in or he called saying that there was a theft.
12      So now I knew nothing.  I had to pick
13  up the phone, and a lot of times I didn't call
14  the examiner, because either they weren't in
15  until 9 o'clock and/or they were so busy they
16  didn't answer the phone, so, by the time
17  11 o'clock came, I haven't even spoke to the
18  insured, and I got the information that usually
19  the claims examiner would get.  Initial contact,
20  phone numbers, where they're residing, you know,
21  where it happened, how it happened.
22      So I had to take an in-depth initial
23  interview usually, you know, an hour or two, and
24  now I would go in, and I would put the claims

Page 139

Fischer

1   diary in.  I would add things and send it to that
2   examiner.  Look, I already talked to the insured,
3   and this is how the theft happened.  This is what
4   I'm going to do, or, you know what, maybe the car
5   was recovered.  You know.  You don't have to do
6   anything on your end.  I took care of it already.
7       So there was a lot more
8   responsibilities as far as the SIU investigators
9   were concerned, because now we were taking the
10  initial bottom of the case, which we knew nothing
11  about.  We used to be three days behind the theft
12  examiner.  Now we were starting at the same, and
13  that was one of our contentions to the supervisor
14  that we're doing an interview, and 30 minutes
15  later we're trying to call the examiner, and
16  she's already on the phone later with the same
17  insured taking the same statement.
18      So there was a lot of double work,
19  and that's what happened I remember for that last
20  two or three months.
21      Q.  With the rest of paragraph 10, you
22  state that "GEICO inaccurately assumed that
23  remote work could be completed in substantially
24  less time than in-person field work, so it

Page 140

Fischer

1   assigned remote cases fewer points."
2       A.  Um-hum.
3       Q.  I'm trying to understand again the
4   basis of my questions are going back to the
5   matrix system, which is the point-based system.
6   What were remote theft cases worth for points at
7   that time?
8       A.  I'm going to say a 3 or a 4.  They
9   could have been a 5, but I mean, as far as I
10  know, the staged accidents didn't increase.
11  Thefts did.  We got 20 to 25 of them in addition,
12  so a 3.
13      Q.  Again, Mr. Fischer, just try to focus
14  on the question that I'm asking.
15      A.  Sure.
16      Q.  Which is what then would remote cases
17  be allocated point-wise, based on this point
18  based-system you're saying?  Remote cases that
19  your statement says?
20      A.  Could you rephrase your question.
21  I'm just trying to see what you're getting at.
22      Q.  Sure.  So it says, "GEICO assigned
23  cases using a point-based system."
24      A.  Okay.



Page 141

1              Fischer
2      Q.   You're stating that GEICO assigned
3   remote cases with fewer points.  What was a
4   regular theft case worth?  What was a remote
5   theft case worth on this point-based system that
6   you're stating?
7      A.   They were worth the same as far as,
8   you know, I mean, if it was a high-level case, I
9   don't know if there was actually any, they graded
10  it at all.  It was just you were told you want to
11  catch more.
12     Q.   Okay, but as far as the point system
13  and the matrix for the point system, you can't
14  sit here today and tell me what that point system
15  was?
16     A.   No, I can't.
17     Q.   Why do you believe that GEICO assumed
18  remote work took less time than in-person field
19  work?
20     A.   Why it took more or less?
21     Q.   Less time than in-person field work.
22     A.   Oh, well, I didn't have to travel,
23  windshield time from Brooklyn to Queens, Brooklyn
24  to Manhattan.  I couldn't go out and do canvasses
25  of neighbors and things like that.  Things that I

Page 142

1              Fischer
2   would normally do.  Go out and check for, check
3   usually not the entire block, but five houses on
4   each side where the theft occurred and speak to
5   neighbors to see if cameras were present, see if
6   I could pick up something.
7      Q.   Do you agree that -- strike that.  Do
8   you believe that the remote work took less time
9   than in-person field work?
10     A.   The remote work took?  What was your
11  question?
12     Q.   Do you believe that the remote work
13  took less time than in-person field work?
14     A.   Each individual case might have
15  depended on what happened, but my caseload
16  increased.  It almost doubled, so I had more
17  cases where I was catching, you know, a normal
18  day would be three to four cases.  The day that I
19  got sick I got seven cases, and that's what, you
20  know, put me over the edge to show you relatively
21  what happened during that period.
22     Q.   Who was assigning you more cases at
23  that time?
24     A.   It came from the inside staff.
25     Q.   Was there anybody specifically

Page 143

1              Fischer
2   assigned to you saying I always worked with Mary.
3   Mary is the person who assigned me the cases.
4      A.   No, there were four or five inside
5   investigators that were deemed, that would get
6   the cases, look at the case, case calendar, and
7   decide who was up next and then give them out in
8   order.
9      Q.   Okay, going back to the declaration,
10  you state, "Because remote cases were given a
11  lesser point value, GEICO increased my caseload
12  significantly after March 2020."
13          I think we already fleshed this out,
14  but you stated that you don't know what the point
15  value matrix would have been for what cases were
16  worth, right?
17          MS. DSOUZA:  Objection.
18     A.   There wasn't a lot of -- I left GEICO
19  early on as the procedures were changing because
20  of COVID, so I can't, I don't recall those two
21  months during the COVID.  It started really kind
22  of, April things kind of changed, and for six
23  weeks, you know.
24          So my memory is not that good as
25  to -- I do know that the caseload increased

Page 144

1              Fischer
2   dramatically, but as far as, you know, the case
3   point system, no, I don't recall.  I kind of
4   forgot.
5      Q.   Okay.  Fair to say in this sentence
6   that you can't tell me what the lesser point
7   value for remote cases were worth at this time,
8   to your knowledge?
9      A.   No, I was told by supervision that,
10  because we weren't doing face-to-face interviews
11  anymore, that we could receive a greater number
12  of cases because we had cut out that other work.
13  So they did drop it.  They're saying that, I
14  don't recall.  It could have been -- it was a
15  level 1, but there was level 2, and there was
16  level I think 1, 2 and 7, if I remember right,
17  and thefts may have become a 2, they may have
18  stayed a 1, but, you know, I really can't say
19  that I recall at this time.
20     Q.   The next sentence says, "In and
21  around April 2020, I recall being assigned
22  approximately 70 cases in contrast to a monthly
23  average of 40 cases in 2018 and '19."
24     A.   That's correct.
25     Q.   So how do you know that you had 30



Page 145

1          Fischer
2  more cases assigned in April 2020?
3      A.   Because I had numerous conversations
4  with Jerry.  In fact, there might have been, I
5  don't know if there's an e-mail.  I thought there
6  was.  I can't be sure, but stating that I was
7  doing, I was getting four, three, four, maybe
8  five cases a day.  I was getting 20 cases a week,
9  and you couldn't keep up.  You know that six or
10  eight weeks was probably one of the worst times
11  that I spent at GEICO.  Talk about overtime.  It
12  was through the roof.  I couldn't even keep up.
13      Q.   Were the 70 cases that you had, how
14  many of those made up theft cases?
15      A.   All of them.  I'm pretty sure I did
16  100 percent theft at that time.
17      Q.   So you were no longer doing social
18  media cases in April of 2020?
19      A.   I don't think so, because thefts were
20  increasing, because people learned out on the
21  street that it was probably a good opportunity to
22  try and get rid of your car.  So I handled, as a
23  66, from I what recall, I handled all thefts at
24  that time.
25      Q.   Would that have been in 2020, or was

Page 146

1          Fischer
2  that beforehand, if you know?
3      A.   I was still doing EUOs on staged and
4  caused accidents into January or February, so it
5  had to be right in that time period between March
6  and May.
7      Q.   Transitioning to paragraph 12, you
8  state, "GEICO required me to seek approval from
9  my supervisor to submit any hours worked above
10  38.75.  It was well known that supervisors would
11  not approve overtime for special investigators
12  and that hours above 38.75 to complete regular
13  case work would not be approved."
14          Was there a policy requiring you to
15  seek approval from your supervisor to work more
16  than the 38.75 hours in a week?
17      A.   A requirement?  If I wanted to be
18  paid for overtime, I had to get the approval of
19  my supervisor.
20      Q.   Right, but my question was was there
21  a policy requiring you to do so?
22      A.   Yes.
23      Q.   And who do you recall receiving that
24  policy from?
25      A.   I would imagine Jerry Cassagne, if

Page 147

1          Fischer
2  not from Bill Newport.
3      Q.   But do you recall as you sit here
4  today?
5      A.   No.
6      Q.   To your knowledge, do you know if
7  your supervisor Jerry was not approving overtime
8  for any of the other employees on your team?
9          MS. DSOUZA:  Objection.
10      A.   Do I know?  Yes.  Speaking to other
11  investigators, none of the overtime, at least in
12  my group of my theft team and some of the other
13  staged accident guys, they were not approving
14  whether they worked for Toni or Dara or Jerry.
15  They were not approving.  The people I spoke to,
16  which is probably four or five, they were not
17  putting in for overtime or getting overtime
18  approved.
19      Q.   So that's twofold, which is are you
20  saying that the individuals you spoke with were
21  not entering their overtime hours and that was
22  not getting approved?
23      A.   They were not entering, and they were
24  not getting approved overtime.
25      Q.   Do you have direct knowledge, meaning

Page 148

1          Fischer
2  you saw them attempt to put in their overtime
3  hours, or you saw e-mails where they asked for
4  overtime, and they were denied overtime?
5      A.   Yes.
6      Q.   And who is that?
7      A.   e-mails from within our group.
8      Q.   Okay, and from whom?
9      A.   My particular group was Tony Geraci,
10  John Moeser.  I back that up.  John Moeser, he
11  had his own team.  He dealt with April.  Tony,
12  Mark, myself and George McMannus.
13      Q.   So you were on e-mails where Tony,
14  Mark and George were requesting overtime hours
15  from Jerry, and Jerry denied them?
16      A.   Myself and Tony worked for Jerry.
17  George and Mark worked for Toni D'Agata, I
18  believe, or actually Dara.  George worked for
19  Dara.  Mark worked for Toni, I believe.
20      Q.   Okay.  So I'm going to circle back,
21  which is were you cc'd then on this
22  correspondence in which Tony, Mark or George
23  e-mailed anyone of their supervisors?  So Jerry,
24  Dara or D'Agata asking for overtime hours and
25  they were denied overtime?



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
153–156

Page 153

1              Fischer
2      A.   Yes, they were.
3      Q.   And I believe from your testimony you
4  were indicating that it was capped at ten hours
5  per person?  Is that what you're saying?
6      MS. DSOUZA:  Objection.
7      A.   Each investigator was offered ten
8  hours a week for the months of July and August.
9      Q.   For 2020?
10     A.   That was the first time in 21 years
11  that that occurred.  Yes.
12     Q.   Prior to that, though, do you know if
13  individuals were eligible for overtime outside of
14  the ten hours that you're indicating from July
15  and August 2020?
16     A.   I don't know.
17     Q.   As far as the ten hours that were
18  allocated between July and August 2020 as you
19  described, do you recall seeing that in a
20  GEICO-related policy?
21     A.   Yes, it was an e-mail from Jerry
22  Cassagne out to his team that anyone who wanted
23  to work ten hours, it might have come from Bill
24  Newport, but it was given to us from Jerry.
25     Q.   If you had already put in your

Page 154

1              Fischer
2  retirement, how were you receiving communication
3  in July and August 2020?
4      A.   I worked till -- I had cases, even
5  though I left on May 27th when I went, I sought
6  medical attention, to when I came back in June, I
7  didn't make the determination until two days
8  before on June 21st.
9         Now, once I put my papers in to
10  retire, I still had to complete the cases that I
11  had over July, August and September.  I worked on
12  those cases that I still had open.
13     Q.   Okay.  So did you give them is it
14  then a four-month advance of your retirement
15  date?
16     A.   No.  It's the practice of GEICO that,
17  once you retire, you give them a date.  They pick
18  a date.  Let's say I'm going to go out
19  October 1st.  Well, they'll say, okay, August and
20  September you're not going to catch cases.
21  You're just going to do all your remaining EUOs,
22  all your remaining cases that you have open, any
23  court that you have to go to, you'll take care of
24  it, and you'll not catch any cases.
25         You might get some -- I shouldn't say

Page 155

1              Fischer
2  that.  We were given some social media, some
3  low-level cases to keep us busy, even though we
4  weren't catching cases, so maybe I would get two
5  social media a day, five days a week.
6         So that kind of stuff, but stuff that
7  I didn't have to go out to the field.  It would
8  only take me maybe three or four hours to do.
9      Q.   Do you know if other SIU
10  investigators who would have been level 65 were
11  eligible for overtime?
12     MS. DSOUZA:  Objection.
13     A.   To the best of my recollection,
14  everyone in the SIU outside investigator was
15  eligible for ten hours overtime.
16     Q.   But that's your understanding for
17  July and August of 2020, right?
18     A.   Oh, yes.
19     Q.   I'm talking about from 2016 to when
20  you retired.
21     MS. DSOUZA:  Objection.
22     A.   No, I don't know.
23     Q.   Do you know if senior field security
24  investigators were eligible for overtime between
25  2016 to 2020?

Page 156

1              Fischer
2      MS. DSOUZA:  Objection.
3      A.   Do I know if they were?
4      Q.   Eligible.
5      A.   I don't know.  No.
6      Q.   Do you know if senior field security
7  investigators were denied overtime in 2016 to
8  2020?
9      A.   Yes.
10     Q.   Okay, and how do you know that?
11     A.   Again, in my quarterly meetings with
12  Bill Newport and the three supervisors, Toni
13  D'Agata, Jerry Cassagne and Dara Campbell, that
14  was the topic.  Always the first topic of concern
15  at each meeting over those four years was the
16  overtime and the caseload.
17     Q.   But what about overtime?
18     A.   As far as?
19     MS. DSOUZA:  Objection.
20     Q.   The question was do you know if they
21  were denied overtime?  You're saying the
22  quarterly meetings you attended was about hours
23  and overtime, but the question was were they
24  denied overtime, specifically senior field
25  security investigators?



Page 157

Fischer

1
2      A.   Yes.  That also came up.
3      Q.   So how do you know that specific
4  senior security investigators were denied
5  overtime?
6      A.   Because that was one of the topics in
7  addition to the caseload and the amount of
8  workload was also the denial and the hourly rate
9  of the overtime.
10     Q.   Who reported during these quarterly
11 meetings that they were denied overtime that was
12 a senior field investigator?
13     A.   Mark Giabalvo, Lou Pia.  That's all I
14 can think of at this time.
15     Q.   And did they say how many hours of
16 overtime they were denied?
17     A.   No.
18     Q.   Did they indicate that they logged
19 their overtime hours and were not paid for it?
20     A.   I don't recall.
21     Q.   Do you know if they were ever paid
22 for overtime?
23         MS. DSOUZA:  Objection.
24     A.   No, I don't.
25     Q.   Do you know if senior internal

Page 158

Fischer

1
2  security investigators were eligible for
3  overtime?
4          MS. DSOUZA:  Objection.
5      A.   I don't know if there were any
6  internal, but no, I wouldn't know.  No, I'm
7  sorry.
8      Q.   Do you know if any senior internal
9  security investigators were denied overtime in
10 2016 to 2020?
11         MS. DSOUZA:  Objection.
12     A.   No, I don't know.
13     Q.   Do you know if senior internal
14 security investigators were paid overtime from
15 2016 to 2020?
16     A.   I don't know.
17     Q.   Do you know if claim security
18 investigators were eligible for overtime in 2016
19 to 2020?
20         MS. DSOUZA:  Objection.
21     A.   No.
22     Q.   Do you know if claim security
23 investigators were denied overtime from 2016 to
24 2020?
25     A.   No.

Page 159

Fischer

1
2      Q.   Do you know if claim security
3  investigators were paid overtime from 2016 to
4  2020?
5      A.   No.
6      Q.   For field major case SIU
7  investigators, do you know if they were eligible
8  for overtime from 2016 to 2020?
9          MS. DSOUZA:  Objection.
10     A.   Can you repeat that.
11     Q.   Sure.  For field major case SIU
12 investigators, do you know if they were eligible
13 for overtime from 2016 to 2020?
14         MS. DSOUZA:  Objection.
15     A.   I don't know.
16     Q.   Do you know if field major case SIU
17 investigators were denied overtime from 2016 to
18 2020?
19     A.   I can say that they were denied only
20 because of the meetings that I attended and then
21 speaking to them in our circle they were denied.
22     Q.   Who that you know had the title of
23 field major case SIU investigators were denied
24 overtime?
25     A.   Mark Giabalvo, Lou Pia, George

Page 160

Fischer

1
2  McMannus and probably even -- you're saying
3  senior, correct?
4      Q.   No.  Field major case SIU
5  investigators.
6      A.   And John Moeser, I believe.  The
7  other three I'm sure of.
8      Q.   And how do you know these four
9  individuals were denied overtime?
10     A.   Because that was my inner circle.
11 Those are people that I relied on.  Those are
12 people that I bounced things off of, and those
13 were the people that I had contact with each and
14 every day.
15     Q.   As far as GEICO denying them
16 overtime, other than what Mark, Louis, George and
17 John may have told you, how do you know GEICO
18 denied them overtime?
19     A.   In my conversations and in e-mails
20 among each other.  Mostly e-mails.
21     Q.   Were any GEICO supervisors on these
22 e-mails indicating you're denied overtime where
23 you're discussing Mark, Louis, George and John?
24     A.   There was one where I believe the
25 three supervisors were on the e-mail that we were



Page 177

1              Fischer
2        A.  My raise would be affected as would
3   be my profit-sharing the following year because I
4   wasn't getting the same raises as I had gotten
5   when I was rated a 4 or a 5.
6        Q.  So, say, for example, I'm trying to
7   just break it down in the most granular way so
8   that I understand it, which is, say, in January
9   you received your report card, you got a 3, but
10  then in July you received your report card and
11  you got a 5, and then in August you received your
12  report card and you got a 2.
13          With what your general end of year
14  score would be for your performance evaluation,
15  how did those numbers of each individual report
16  card get generated into the matrix of how it
17  would be applied in your overall percentage for
18  your performance evaluation?
19          MS. DSOUZA:  Objection.
20        A.  So over 12 months there would be, it
21  would be calculated and divided by 12, and then
22  you would be anywhere from 1, 2 were usually no
23  raises.  3 was a minor raise, and 4 and 5 were
24  raises.
25          So, towards the last two years, my

Page 178

1              Fischer
2   efficiency went down as far as the case, because
3   I had more cases.  I wasn't closing them as fast.
4   I had them longer.  They were open longer.
5        Q.  If you had a case that was open let's
6   say 45 days?
7        A.  Okay.
8        Q.  What then would be your percentage?
9          MS. DSOUZA:  Objection.
10        A.  I would fail the case if it wasn't in
11  the EUO.  If I hadn't conducted an examination,
12  anything that went over 25 days, 26 days, I would
13  be rated a 1 or a 2 for that.
14        Q.  Do you recall seeing this type of
15  granular breakdown in any type of policy from
16  GEICO?
17        A.  Yes.
18        Q.  Okay, and walk me through one
19  where --
20        A.  Each year in December I'm pretty sure
21  in January at our meetings we were given the new
22  procedures as far as case, quality, life, the
23  time, and these are the things that we would
24  print out in December, and you would keep it in a
25  file, so that you knew, and it would take you a

Page 179

1              Fischer
2   month or two to learn them, that you knew what
3   the new guidelines were.  They were always
4   changing, sometimes twice a year, sometimes once
5   a year.  So I knew that I had to touch a case
6   five times in 21 days now.  I had to close it
7   within 24 days if in fact it hadn't gone to EUO.
8          So I was under the gun to catch more
9   cases, but to also close them even faster than
10  the year before.
11        Q.  Were there cases that you would get
12  that were open that day, but you could also close
13  that day?
14        A.  Yes.
15        Q.  And, as far as what the metrics were
16  in order to evaluate your performance in a report
17  card and then for your end-of-year performance
18  evaluation, that was specifically determinative
19  of the types of cases since there was both a
20  general criteria and a specific criteria,
21  correct?
22          MS. DSOUZA:  Objection.
23        A.  Yes.
24        Q.  Did you ever provide report cards for
25  any of the individuals that you helped train?

Page 180

1              Fischer
2        A.  No.
3        Q.  Did you ever go back through your
4   report cards and your performance evaluations to
5   double-check the percentages that were getting
6   allocated for your end-of-the-year performance?
7        A.  No, I didn't have the time.
8        Q.  Were the report cards electronic or
9   hard copy?
10        A.  Electronic sent to me, me only by my
11  immediate supervisor Jerry Cassagne.
12        Q.  Was it generated through an e-mail or
13  through the software system that you guys used?
14        A.  The software system.
15        Q.  Was that Workday or SCAM?
16        A.  Yes, probably Workday.
17        Q.  Do you remember?
18        A.  I believe it was Workday.  Yes.
19        Q.  Do you remember what your typical
20  rating on your report card was?
21        A.  Always between 4 and 5.
22        Q.  Could they be point percentages?
23        A.  Yes, 4.1, 4.2.
24        Q.  Do you recall the lowest rating you
25  ever received?



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
181–184

Page 181

1                    Fischer
2        A.  3.1.
3        Q.  Did you ever review any of your
4    colleagues' report cards?
5        A.  No.
6        Q.  In paragraph 14, you state, "I
7    received more favorable ratings if I completed
8    more work within the 7.75 hours per day or the
9    38.75 hours per week."
10           How did GEICO quantify the amount of
11   work you completed for the purposes of the
12   ratings?
13       A.  As far as the 38.75, if you put in
14   for overtime, you were, I'm trying to think of
15   the word, you were, the ratings were elevated.
16           In other words, the more time you
17   were allowed, so, if you didn't complete it in
18   38.75 and let's say you put in for overtime,
19   again, this is not me, these are people that did.
20           So let's say you put in for ten hours
21   overtime a week, and you got paid for it.  Well,
22   now your caseload for that week, those ten cases,
23   that should have been completed in 38.75, were
24   now completed in 48.75, which reduced your
25   productivity and reduced -- you had more time to

Page 182

1                    Fischer
2    close a case than you did if you didn't take the
3    overtime is the best way I can explain it.
4        Q.  I guess I'm having trouble
5    understanding, which is the sentence in paragraph
6    15 says, "I received more favorable ratings if I
7    completed more work."
8        A.  Correct.
9        Q.  What's the more favorable rating to
10   the more work?  What does that ratio look like?
11       A.  In other words, everything was based
12   on a month's productivity.  So, if I closed, if I
13   got, let's say I got 40 cases, and I closed 45
14   because I had five left over from the other
15   month, that's a better rating than it is if I
16   closed 40 cases, and, if I closed it in a certain
17   amount of time within say seven days, it was
18   better than closing it in 14 days.  It was better
19   than closing it in 21 days.  There were levels.
20   The longer you went in a case, the more you were
21   hurt, because the numbers, your 1, 2, 3 or 5,
22   would decline.
23       Q.  Okay.  So was there a requirement to
24   close, say, for example, a theft case within a
25   specific amount of days?

Page 183

1                    Fischer
2        A.  Yes.
3        Q.  What was that?
4        A.  I'm going to say eight to 12 days.
5        Q.  Do you know that for a fact, or is
6    that an assumption?
7        A.  Assumption.
8        Q.  Do you recall ever seeing any type of
9    documents from GEICO that indicated you get this
10   amount of days to investigate your case, and then
11   you need to render a determination?
12       A.  I received paperwork as to what
13   rating I would get if I closed it per day, but
14   not the second part of your question.  I was made
15   well aware that I had to close a case -- I get a
16   better rating if I closed it faster and I met all
17   the other requirements in a case, and that was
18   the idea doing so much work in a week to try and
19   get the favorable rating of 5 rather than a
20   rating of 3.
21       Q.  Again, I'm trying to figure out the
22   changeability of you're saying things are going
23   to be closed faster, but you don't know what the
24   date, amount of time, would be allocated for a
25   case.

Page 184

1                    Fischer
2           So how many days difference or hours
3    difference would there be on a theft case for you
4    to get a 3 or a 5?
5           MS. DSOUZA:  Objection.
6        A.  If I closed my entire theft case
7    within I'm going to say seven to eight days, I
8    received a 5.  If I closed it within 12 to 15
9    days, I would get a 4.  If I got it after 18
10   days, it was a 3.  21, it was a 1, and anything
11   after 24 it was either a 1, or it failed.
12       Q.  And this type of breakdown, did you
13   see this in a GEICO policy?
14       A.  Yes.
15       Q.  And was this via e-mail?  Was this in
16   person?
17       A.  Every year in December and/or January
18   when we had our annual meeting with Bill or Mike
19   DeGrocco we would get the new case requirements
20   as to the following year.  So we got them in
21   December, and they would say starting January 1st
22   the following changes have been made to impacts
23   on your cases, and they are -- every year we got
24   them.  I believe I sent one into you.  You might
25   have it.  It's -- I know I got it back in the



Page 189

1    Fischer
2    and every day is on there as to EUOs, the day
3    that I conducted it, the day I requested it, the
4    day I conducted it, or the day I was present for
5    a no show was in there each and every day.
6        Q.   But do all cases need EUOs?
7        A.   No.
8        Q.   Going back to your declaration, and
9    I'm wrapping up, Counsel, where it is stated, "If
10   I reported working more hours, I understood that
11   would negatively affect my performance ratings,"
12   did somebody at GEICO tell you this?
13       MS. DSOUZA:  Objection.
14       A.   Yes.  It was Jerry Cassagne at our
15   meetings stated -- actually all three supervisors
16   would sit in front of the room and say, look,
17   you're going to work 38.75.  If you are going to
18   put in for overtime and you get paid for overtime
19   ten hours a week or five hours a week, whatever
20   it was, so at the end of the month you had 20 or
21   40 hours overtime, you were affected because you
22   had more time to complete cases where someone who
23   didn't take the overtime, I didn't have that, I
24   had to complete them within 38.75.  I had a
25   better rating.

Page 190

1        Q.       Fischer
2        Q.   Were you ever capped on the hours per
3    case?  So you got a brand new theft case.  Were
4    you capped on 30 hours per case?
5        A.   No.
6        Q.   Is that fair to say for any of your
7    cases?
8        A.   Yes.
9        Q.   Social media, PIP, cat, you were
10   never capped by the hours you can allocate to
11   that case?
12       A.   Correct.
13       Q.   And then you stated for the meetings
14   there were two other individuals there.  Who were
15   those people?  Your supervisors you said.
16       A.   As far as the overtime?  Is that what
17   you're talking about?
18       Q.   Going back to paragraph 14, yes, that
19   we just talked about.
20       A.   That was Jerry Cassagne, Toni D'Agata
21   and Dara Campbell.
22       THE VIDEOGRAPHER:  We are going off
23   the record at 3:09 p.m.
24       (Recess taken)
25       THE VIDEOGRAPHER:  We are back on the

Page 191

1        Q.       Fischer
2    record at 3:24 p.m.
3    BY MS. ALBERTY:
4        Q.   So, going back to the theft team from
5    2016 to 2020, who again was comprised of that
6    team with you?
7        A.   Myself, Maria Munoz, Tony Geraci and
8    Vito, I forget Vito's last name.  There was also
9    one other investigator, and I forget his name.
10       Q.   Were these four individuals all
11   working on the same types of claims as you?
12       A.   Yes.
13       Q.   You had testified that 70 percent of
14   your cases around that time would have been
15   theft-related more than the 30 percent of the
16   other matters that you would have handled, say,
17   social media, staged loss, do you know if, for
18   that 30 percent, those four individuals were also
19   handling those types of claims, or were they only
20   doing theft cases?
21       A.   No.  We would all handle relatively
22   the same amount of cases, different cases.
23       Q.   I think you had stated, though, that
24   for supervisors -- strike that.  I believe you
25   had testified before that for lead level 66

Page 192

1        Q.       Fischer
2    investigators that you would be assigned four to
3    six additional cases per month.  As far as those
4    four to six additional cases per month, were
5    those specifically related to theft, or were they
6    maybe made up of that other 30 percent of other?
7        A.   Toward the end, I got most of the
8    staged and caused losses that were overflow from
9    that unit.  I received I would say four out of my
10   six extra cases were staged/caused accidents
11   because of my level 66 and my 22 years, 21 years
12   at GEICO.
13       Q.   As far as the percentages, you talked
14   about your 70 percent theft, 30 percent other.
15   For the other four individuals on your team, do
16   you know what their breakdown percentages would
17   have been for the types of cases they would have
18   handled?
19       A.   I don't know, but I would believe
20   that we were all the same.  There didn't seem to
21   be any, other than me getting a few more cases,
22   we all relatively received a combination of cases
23   after our thefts to make up the other 30 percent.
24       Q.   Have we addressed all of the other
25   types of claims that other special investigators



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
193–196

Page 193

                    Fischer
2  within your region would have overseen?
3      A.  To the best of my recollection, I'm
4  just trying to think if there were any other
5  cases.  That's really all I can think of at this
6  time.  There were some other things we were asked
7  to do maybe off the cuff, but, other than that,
8  that was usually the 66's.  You know, many cases
9  that dealt with employees.  I myself and George
10  McMannus and Mark Giabalvo received them because
11  they were sensitive cases as far as, you know,
12  possible termination of the employee.  It
13  depended on what type of claim he put in.
14      Q.  As far as it applies to the other
15  teams, so staged loss team, do you know if they
16  only handled staged loss?
17      A.  No, but I can't say that they handled
18  just caused/staged.  I believe that that's all
19  they handled.  Yes.  That's what we were told.
20  Do I know for a fact?  No.
21      Q.  Do you know if med fraud only took on
22  med fraud cases?
23      A.  Again, I'm relatively sure, but I
24  don't know for sure.
25      Q.  I think you said for the various

Page 194

                    Fischer
2  types of claims, whether that's for theft, staged
3  loss, med fraud, rate evasions, those all would
4  have different duties that were required to
5  investigate the claims?
6      A.  There was different investigative
7  steps for each one of those.  Yes.
8      Q.  As it applies to the other teams, do
9  you know if they had flex time?
10      MS. DSOUZA:  Objection.
11      A.  I don't know.  I would think so.
12      Q.  And, as it applies to the other teams
13  as well as the folks on the inside, do you know
14  if they worked overtime?
15      MS. DSOUZA:  Objection.
16      A.  I don't know.
17      Q.  If they did work overtime, do you
18  know if they were ever paid for it?
19      A.  I don't know.
20      Q.  Did you personally see other special
21  investigators in your region doing their work?
22      A.  No, unless it was one of my cases,
23  unless I was going on vacation, and they did part
24  of my case, no, I wouldn't look at any of their
25  cases.

Page 195

                    Fischer
2      Q.  For any other special investigators
3  in your region, did you have access to their
4  claim files?
5      A.  Yes.
6      Q.  Did you review them in your custom
7  and practice?
8      A.  No.  The only time that I reviewed
9  other cases, you could go into someone else's
10  case and put their name in and put dates.  So, if
11  I wanted to look at six months worth of cases,
12  the only time I would do that was with the
13  blessing of Jerry Cassagne because of my
14  trainees.
15      At the beginning, when I would train
16  them and I would do reports, I would send them a
17  few of my cases to look at just to see how to
18  write the report.  So there were times where they
19  would send me their case, how they wrote it up,
20  and say is this good?  Did I miss something?
21  That's when I would review their cases.  Yes.
22      Q.  Outside of in more of that training
23  and shadowing component, were you looking at any
24  of the other SIU claim files?
25      A.  Other than the trainees, no.

Page 196

                    Fischer
2      Q.  Did you ever have access to any of
3  the special investigators' Workday to see what
4  they were logging for their hours?
5      A.  No.
6      Q.  For other special investigators in
7  your region, did you ever work together on the
8  same case?  Kind of like counsel is right now
9  they're working together on the same case.
10      A.  Yeah, if there was a pattern, I might
11  catch, let's say there's a string of thefts, or
12  it really took place, as far as I remember, I had
13  a body case where it was the same shop, and maybe
14  two of us went out to the field and we worked
15  together on it, but we would do one report.  We
16  wouldn't generate two reports.  It would be one
17  report.
18      Q.  Outside of the body style cases, do
19  you recall doing anything like that on theft,
20  arson, staged loss, PIP or jump-ins?
21      A.  No, not that I recall.
22      Q.  Did you ever work or communicate with
23  any special investigators outside of your region?
24      A.  Oh, yes.  Regularly.  We called it
25  assist cases.  We would get a case from region



Page 197

1      Fischer
2  say somebody was out in Colorado, and they had an
3  insured who maybe was here on vacation and had a
4  theft.  He would call me and say he needs an
5  assist to go out.  They have moved out to Long
6  Island, or they're going to be there for a month.
7  I would go out and get those maybe three or four
8  cases a month to assist other regions, and I
9  would actually go into their report and document
10  just my investigative steps into their case.
11      Q.  Do you know for those other special
12  investigators outside of your region if they did
13  the same type of work as you?
14      A.  I mean, in speaking to them, we
15  conferred about caseload and things like that.
16  Things that California had to do compared to New
17  York was completely different.  That's what I got
18  from the conversations, but on paper I never saw
19  anything that showed the difference.
20      Q.  In the example that you just gave,
21  California to New York, is that something based
22  on the various laws of the state that would
23  affect the insurance fraud process?
24      A.  Their claims, you know, we became
25  interested to see what, because of the caseload,

Page 198

1      Fischer
2  I do remember picking the brain of other
3  investigators just to see what they had to do.
4  Especially upstate the other team that worked for
5  Chad up in the Buffalo area.  I got to pick their
6  brain a lot, because I spoke to them quite often,
7  but there were times that you would speak to New
8  Jersey, Connecticut, you know, and are you
9  required to do these steps too, you know, and
10  most of the time it was pretty much the same in
11  most regions.
12        There were a few things that were
13  different, and they were set by the managers, but
14  that had to do, you know, if you get someplace
15  like Maine and you've got New York, it's
16  completely different.  We outnumbered them
17  probably ten to one.
18      Q.  Do you know what the other categories
19  of special investigators outside of your region
20  were?
21      A.  No.  Other than just region 2, I
22  really didn't get, if I met them in catastrophes
23  and things like that, some guys were assigned to
24  different teams like we were.  They may have had
25  different teams unlike New York, but that's

Page 199

1      Fischer
2  because that's before that was going on, hail.
3  They had a hail team.  You know, things like
4  that.
5      Q.  Do you know what type of claims each
6  category of special investigator outside of your
7  region worked on?
8      MS. DSOUZA:  Objection.
9      A.  Could you just repeat that.  I'm
10  sorry.
11      Q.  Sure.  Do you know what type of
12  claims that each special investigator outside of
13  your region worked on?
14      MS. DSOUZA:  Objection.
15      A.  No.
16      Q.  As far as outside your region, do you
17  have any knowledge whether those special
18  investigators had flex time?
19      A.  I couldn't tell you.  No.
20      Q.  For outside of your region do you
21  know if those special investigators worked
22  overtime?
23      MS. DSOUZA:  Objection.
24      A.  I don't know.
25      Q.  Would you know if they were subject

Page 200

1      Fischer
2  to the same performance metrics that we
3  previously talked about whether they were
4  specific or general performance metrics?
5      A.  Yes.  The metrics and in most states
6  at least the SIUs that I spoke to we did pretty
7  much follow the guidelines set forth by the
8  management as to what we spoke about earlier, the
9  time, the caseload, how quick, I mean how long
10  you had a case open, the amount of time, the
11  level of the case.
12      Q.  How do you know that the special
13  investigators outside of region 2 had the same
14  performance metrics?
15      A.  From what I understand, it was a
16  companywide policy.  It came from Chevy Chase,
17  which was home office for us.  That's where the
18  SIUs came out of, and that's where it came from.
19  So that was made by I would assume Mike College
20  and Ruzienbeck and whoever the VP of our region
21  was, they all got together, and it was the same
22  pretty much for everybody.  I know different
23  regions had different windshield time, because
24  they covered bigger areas than we did, but
25  everything else was pretty much the same.



Page 201

1           Fischer
2       Q.   Would you ever personally see special
3   investigators outside of your region doing their
4   work?
5       A.   Other than catastrophes, no.
6       Q.   Then fair to say for special
7   investigators outside of your region you would
8   not have access to their claim files or Workday
9   files?
10      A.   Not unless it was an assist.  No.
11      Q.   Okay.  Let's just look back at your
12  declaration, paragraph 22.  You state, "I worked
13  with approximately seven other special
14  investigators in my theft team, including Louis
15  Pia, Anthony Geraci, Maria Munoz and Al Brust."
16       Is that the other person you were
17  thinking of?
18      A.   Yes.  Just to clarify, Lou Pia was in
19  the staged loss team.  This might have been
20  mistakenly -- these are the people that were in
21  my team under the direction of supervisor Jerry
22  Cassagne.  Maria was in theft.  Al was in theft.
23  Tony, but Lou Pia wasn't in staged.  Vito.  That
24  should be Vito there instead of Lou Pia.
25      Q.   Okay.  So Vito, Anthony, Maria and Al

Page 202

1           Fischer
2   Brust were on your theft team?
3       A.   Yes.
4       Q.   And it says seven.
5       A.   There were replacements, so, in other
6   words, if somebody went on vacation, somebody was
7   designated to fill in for them.  We all had a
8   partner, so that, if like Jeff Lewonka did some
9   of my -- I was his partner on the phone.  He was
10  on vacation.  I would get his messages, and I
11  would handle his calls.
12       If I went on vacation, he might
13  handle some of my thefts rather than give the 20
14  or 30 open cases to an already existing theft
15  examiner.  Theft investigator.
16      Q.   So, as to that would be four.  Then
17  four individuals that you would work with and
18  then possibly three others, but more on a special
19  occasion if there needed to be coverage for
20  somebody who was out for whatever reason?
21      A.   Correct.  I think what I meant to say
22  there was I worked with seven other people.  I
23  was number 8 in the team that worked for Jerry
24  Cassagne.  I worked with four others on the theft
25  team.

Page 203

1           Fischer
2       Q.   As far as for typical schedules with
3   that flex time, is it your understanding that
4   Tony, Maria, Al and Vito had the same schedule as
5   you?
6       MS. DSOUZA:  Objection.
7       A.   Yes.
8       Q.   And for Tony, Vito, Maria and Al, to
9   your knowledge, did they all work in the field?
10      A.   Yes.
11      Q.   And then they would have all reported
12  to Jerry with you, correct?
13      A.   Yes.
14      Q.   Who were the other individuals who
15  would have reported to Jerry as well?
16      A.   Lou Pia would be one of the
17  additional.  Mark -- was it Mark?  Lou Pia, Vito.
18  There's another investigator.  I can't think of
19  his name.  He was also one of Jerry's.  It
20  changed depending if someone left the company or
21  new hires would come in.  Jeff Lewonka worked on
22  my team for a while.  I believe he was also there
23  in 2018, '19 and '20 he worked with me, but he
24  did staged caused, I believe.
25      Q.   So is it fair to say that Jerry

Page 204

1           Fischer
2   oversaw the theft team and then some individuals
3   who would have been on staged loss?
4       A.   Yes.  Sometimes it grew as far as
5   nine or ten investigators depending on how many
6   employees we had  we used to have five
7   supervisors.  Now we were down to three, and we
8   used to have 60 investigators.  We were down to
9   maybe 25, 30.
10      Q.   Under 23 you state, "I also know that
11  other special investigators worked many overtime
12  hours off the clock each week without receiving
13  overtime pay.  I know this because we had regular
14  team meetings and discussed the duties we
15  performed and the long hours we were working."
16       Have you addressed all the
17  individuals that you declare in paragraph 23?
18      A.   Have I?
19      Q.   Have we discussed all those
20  individuals today?
21      A.   I believe so.  Maybe the only one I
22  left out was Jeff Lewonka.  He took a lot of the
23  overtime when they opened it, but he was also, I
24  forgot that he was in my team, and he would call
25  me once or twice a week as his 66 and speak to



Page 205

Fischer

1
2  Jerry.  I know that for a fact because he
3  confided in me that he was also thinking about
4  leaving the company and going to Liberty Mutual.
5  He had an offer.  I kind of, you know, try to
6  walk, I guess talk him off the wall I guess you
7  could say.
8       Q.  As it applies to the meetings
9  identified in number 23, what type of meetings
10  are these?
11      A.  We had team meetings usually four
12  times a year with just the supervisors, just the
13  immediate supervisors, Dara, Toni and Jerry.  Our
14  three teams would meet usually at Woodbury.
15  Richie Kilgen, who was upstate in the Bronx, he
16  would have his own meeting.  They always didn't
17  bring them down here. The guys in Staten Island,
18  we had two investigators in Staten Island, Chris
19  Brogner and Doug Pfleging.  They always didn't
20  make it, so they would go up to the Bronx
21  meeting, but those were usually quarterly
22  meetings.  I also had ride-alongs with Jerry, and
23  then we had our annual or semiannual meeting with
24  the manager, either Bill Newport or Mike
25  DeGrocco.

Page 206

Fischer

1
2       Q.  When you say, "I also know that other
3  special investigators worked many overtime hours
4  off the clock each week without receiving pay,"
5  is this information based off what other special
6  investigators told you, or you have personal
7  knowledge as to observing that they worked
8  overtime and then failed to report their
9  overtime?
10      A.  This was the meetings, our meetings,
11  each one of our meetings, whether they were
12  quarterly or semiannual, it depended on
13  supervisor meetings or manager meetings, the
14  first topic of discussion, whether it be our
15  annual Christmas get-together or our other four
16  or five meetings with management or just -- that
17  was the first topic that came up was overtime and
18  the caseload every single meeting.  They were, we
19  would talk, if we had a two-hour meeting, I would
20  say the first half hour until the bosses shut it
21  down and said it's over, I'm not going to answer
22  any other questions, or we're not going to
23  discuss it.  It happened every single meeting for
24  probably ten years.
25      Q.  Well, again, the question was, as to

Page 207

Fischer

1
2  your personal knowledge, is that just based upon
3  what was told to you during these meetings?
4       A.  Yes.
5       Q.  Do you recall any employees
6  specifically saying the number of overtime hours
7  they were working without reporting them?
8       A.  No.
9       Q.  When you heard people say at these
10  meetings that they were working long hours and
11  their caseload was difficult and they were not
12  getting paid, did you report this to anyone in
13  corporate at GEICO?
14      A.  No.
15      Q.  Did you make any recommendation to
16  the other individuals that they should report it
17  to corporate?
18      A.  No.
19      Q.  On your declaration page 5, paragraph
20  17, it states, "I attended a Christmas luncheon
21  in or around 2018 where Richie Lenihan, another
22  special investigator, raised concerns to GEICO
23  manager Mike DeGrocco about our escalating
24  workload and the lack of authorized overtime
25  hours."

Page 208

Fischer

1
2       Who else was at the luncheon besides
3  you, Mike and Richie?
4       A.  The entire inside staff and the
5  entire outside staff.  I would say 60 people.
6       Q.  Was this just a private conversation
7  with the three of you during this luncheon, or
8  was --
9       A.  No, this was, I caught the tail end
10  of it.  I had just come out of the bathroom, and
11  Richie Lenihan, one of our Bronx investigators,
12  was going up and down, Mike DeGrocco, and some
13  things were said between the two parties.  It got
14  so bad that DeGrocco made some statements about
15  police officers and cops and things like that and
16  at the end of it he was concerned that he might
17  have to go to human resources for what he said at
18  the meeting, and he did not go there as a result
19  of conversations with the three immediate
20  supervisors as we told him that we wouldn't do
21  that.
22      Q.  So, as to the complaints about
23  escalating workload and lack of authorized
24  overtime hours, was this something discussed at
25  large so all 60 people could hear it, or was this



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
233—236

Page 233

1              Fischer
2  you have all of your monthly reports that you
3  provided to Jerry throughout your tenure?
4       A.  Did I ever?  I'm sorry.
5       Q.  Did you review your documents,
6  because it appears that you said you produced
7  maybe one, but do you have access to all of them?
8       A.  Oh, yeah.  I had to submit them to
9  him through e-mail.  I had to write it about
10  myself, and every November, actually December,
11  maybe the first week of January, I would have to
12  submit to Jerry, every one of us had to submit at
13  least on my team, and I know it happened at least
14  through region 2 you had to submit a yearly
15  report to your supervisor as to what you did.  I
16  attended 13 trainings.  You know, I took three
17  GEICO courses.  I went to two NICB meetings.  I
18  trained six new hires over six months.
19          I made so many arrests.  I mean it
20  was a very long narrative.  It was probably 25 to
21  30 lines and everything that I had done for the
22  year, and this is what helped.
23       Q.  Do you have access to those reports?
24       A.  I have one or two, maybe more.
25       Q.  Can you double-check your files and

Page 234

1              Fischer
2  tender anything over to your counsel?
3       A.  Absolutely.
4          MS. ALBERTY:  And I will follow up
5       with you.
6       Q.  I don't want to go through these line
7  by line.  That is not my intent here today.  More
8  so my question regarding these is anywhere in
9  your custom and practice of writing down daily
10  tasks whatever they may be, did you ever indicate
11  either the total amount of hours you worked that
12  day or the total amount of overtime with which
13  you exceeded the 7.75 hours that you typically
14  should have worked in SIU?
15       A.  No, I did not.
16       Q.  Fair to say that's not something you
17  would have done in your custom and practice?
18       A.  I didn't have any reason to, because
19  no one was asking for my overtime.  I didn't set
20  out back in 2010.  I did it so that I would make
21  my life easy when I did my yearly and monthly
22  reports.
23          The only reason that I did this and
24  obviously to organize my month so that, if I knew
25  I was going to Brooklyn on Tuesday, you know, I

Page 235

1              Fischer
2  wouldn't have to go on Thursday.  I would try and
3  do three in Brooklyn.  You know, it was more to
4  help me coordinate my weekly and daily activities
5  out on the street and help me with my reports.
6       Q.  Okay.  Can you flip to P41?
7       A.  Yes.
8       Q.  Sorry.  I probably should have also
9  indicated this specific number within the packet
10  of P41.  It has been a long day.  So, within the
11  packet of P41, can you flip to P57, please.  My
12  apologies.
13       A.  Page 57?
14       Q.  Yes.
15       A.  Okay.  Yes.  I see it now.  I'm
16  sorry.  Yes.  Okay.  I'm here.
17       Q.  Alright.  Looking at September 2017,
18  Sunday to Wednesday, the 3rd through the 6th,
19  there's numbers that are then circled.  So we
20  have a 7 without a circle dash 13 on the 3rd, and
21  then on the 4th it has a 13 in a circle.  On the
22  5th, it has 8 in a circle.  On the 6th, it has a
23  6 in a circle.  Do you have any idea what these
24  numbers reflect?
25       A.  Can I just see the page you're

Page 236

1              Fischer
2  indicating.  I seem to be on the wrong page.
3       Q.  Okay.
4       A.  The 3rd, 4th, 5th.  That was in
5  Houston.  That was my flood catastrophe that I
6  was out on.  Those were the 13 hours a day, eight
7  hours a day, six on a Wednesday.
8       Q.  Okay.
9       A.  Yeah, I went on, I'd have to look it
10  up, but I know I was there for two weeks.  So it
11  looks like I came home on the 12th, and I
12  probably went somewhere in the beginning I
13  believe I was there two to three weeks.  I don't
14  recall the amount of time, but that was Houston.
15  It says Texas home, return Texas.
16       Q.  Um-hum.  Okay.  Let's jump forward
17  then to P60.  Same packet.
18       A.  Okay.  Gotcha.
19       Q.  On the right-hand side of the page,
20  it looks like in parentheses there's a 9 under
21  Saturday the 7th, a 2 under the 14th, a 7 under
22  the 21st.  Do you have any idea what those
23  numbers equate back to?
24       A.  Yeah, if you look to the right, what
25  I would do is every month I would total up the



Page 241

1            Fischer
2  Jerry?
3      A.  Yes.
4      Q.  In this e-mail it specifically states
5  that starting November 2016 that "If you work
6  overtime, you must be able to document your time
7  worked."  Do you see that?
8      A.  Yes.
9      Q.  Was that your understanding that, if
10  you worked overtime, that you have to document
11  it?
12      A.  Yes.
13      Q.  It also indicates that your travel
14  time is considered working hours.  You would
15  agree with that?
16      A.  That my travel time is work-related?
17      Q.  Yes.
18      A.  Yes.
19      Q.  It also states, "If you determine
20  that you need to work overtime on any specific
21  day, you can work overtime and you will get paid
22  for it."
23      So you understood based off your
24  direct supervisor's explicit instructions that,
25  if you need to work overtime, you can work

Page 242

1            Fischer
2  overtime, and you will get paid for it, correct?
3      MS. DSOUZA:  Objection.
4      A.  Correct.
5      Q.  It also states that you have to
6  document your overtime hours and be able to
7  verify why it was needed, and you see that,
8  correct?
9      A.  Yes.
10      Q.  So you understood that your
11  responsibility was to document your overtime and
12  verify why you needed the overtime, correct?
13      MS. DSOUZA:  Objection.
14      A.  Yes.  This was the policy, but it was
15  not the practice of GEICO.
16      Q.  This is a direct e-mail, an explicit
17  e-mail from your supervisor Jerry in November
18  2016?
19      A.  Yes.
20      Q.  Did you ever respond to this e-mail?
21      A.  I don't recall, but I did try to
22  submit overtime, and I was turned down, and I
23  gave up after about two to three months.
24      Q.  But do you remember in time when you
25  requested overtime?

Page 243

1            Fischer
2      A.  It was shortly after this I believe
3  back at the start of January that I tried for
4  several times, but I was shot down only because
5  it didn't meet the criteria, or the allocation of
6  overtime wouldn't go to what I used it for.
7      So, although I had windshield hours
8  some days of going from Levittown, New York to
9  Brooklyn is 35 miles, and you leave at 5 in the
10  morning, and you get there at 7.  You sleep in
11  your car or you review your file until 9 until
12  when you walk down the block, you do that so you
13  don't have to fight traffic, or you're trying to
14  get there reasonably on time like today.
15      Instead of taking three or four
16  hours, I would do it in two hours by leaving at
17  5, review my case, you know, maybe take a nap
18  prior to walking down to the EUO and then going
19  down to the EUO, getting back in my car at
20  2 o'clock, driving home in another two hours of
21  traffic, I already spent 11 hours, and that was
22  not part of the overtime.  That did not fit the
23  criteria of putting in for overtime.  It had to
24  be -- windshield time didn't count.  Typing on
25  weekends didn't count.

Page 244

1            Fischer
2      Q.  This e-mail doesn't state anything
3  like that, though, correct?
4      A.  That's correct.  Can I clarify just
5  one thing.  What we were speaking about before,
6  if you read, it says premium pay.  That's what I
7  could not think of before when I said to you it
8  says it right there.
9      Overtime was paid at a premium pay,
10  not time and a half.  So that's what it was
11  called.  So that question that you asked, it's
12  premium pay.
13      Q.  And as then to what we talked about
14  before regarding "premium pay," you still don't
15  know what that rate would have been?
16      MS. DSOUZA:  Objection.
17      A.  I know that it was between $18 and
18  $19.  I remember as a grade 66 I believe it was
19  $19.62.  Somewhere in there.  I remember that
20  number, and for a 65 it was $18.17.  I was a
21  little bit more, being that I was a 66.
22      Q.  Are you making any other claim in
23  this lawsuit besides a claim that you didn't
24  receive proper overtime compensation?
25      A.  No.



1

2            C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 2nd day of September, 2024.

16

17   _____

18               JOSEPH R. DANYO

19           STATE OF NEW YORK

20           My Commission Expires 2/20/2027

21

22

23

24

25

