# Exhibit B

**In the Matter Of:**

Keith Fischer, et al. vs GEICO

2:23 Civ. 2848 (GRB)(ARL)

---

# JOHN E. MOESER

*August 02, 2024*

---

*Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

Page 33

1              J. Moeser
2      Q.    What region were you in?
3      A.    Region 2.
4      Q.    And was that the region you were in
5  throughout the duration with GEICO?
6      A.    Yes.
7      Q.    Now, you described yourself as a senior
8  field investigator; right?
9      A.    That's the title that they gave me,
10  yes.
11      Q.    What were your duties and
12  responsibilities as a senior field investigator?
13      A.    To investigate claims that had
14  suspicions for allegations of fraud.
15      Q.    Was there ever a time that the title
16  may have been a little different where maybe it
17  was senior outside security investigator instead
18  of senior field security investigator?
19      A.    It could have been, yes, because I was
20  a field investigator, so that's -- I believe what
21  you are saying is that that was considered outside
22  compared to the inside investigators, yeah.
23      Q.    Okay.  And so the requirements of the
24  position are the same, they are outside?
25          MR. SCIMONE:  Objection.

Page 34

1              J. Moeser
2      Q.    Between.  Sorry.  I am going to
3  rephrase that.
4          Senior field security investigator and
5  a senior outside security investigator would have
6  the same -- be the same role?
7      A.    I am not familiar with the first term
8  that you said, but if they were field
9  investigators, yes.
10      Q.    Okay.  And the first term is the senior
11  outside -- senior outside security investigator is
12  the one that you are not familiar with the term;
13  right?
14      A.    Not really, no.  No.
15      Q.    And the term that you are familiar with
16  is senior field security investigator; right?
17      A.    Yes.
18      Q.    Okay.  So you said you investigated
19  potential fraudulent activity; correct?
20      A.    Suspicion of fraudulent activity, yes.
21      Q.    What -- what were your hours?
22      A.    Well, that's -- I don't know how to
23  define that, because when I first started, my
24  hours were different than when I left.
25      Q.    What were your -- did you have a set

Page 35

1              J. Moeser
2  time that you would start your day?
3          MR. SCIMONE:  Objection.
4      A.    A set time?  I normally would start
5  around 8 a.m., but, you know, we also had what
6  they called flexible hours.
7      Q.    What does flexible hours mean?
8      A.    It means that you could start your day
9  at a different time or -- start your day at a
10  different time.
11      Q.    So if you start your day at a different
12  time, then do you end your day at a different
13  time?
14      A.    You would, yes.
15      Q.    Who was your supervisor?
16      A.    I had -- during my tenure there, I had
17  many supervisors, so...
18      Q.    Let's go with 2016 through 2021, do you
19  recall who your supervisor was during those years?
20      A.    I know my last supervisor was April
21  Neyland, but I also worked for Rich Kiligin.  I
22  don't know if he retired prior or after that time.
23      Q.    Okay.  So prior to April Neyland you
24  worked for Rich Kiligin; is that correct?
25      A.    Kiligin, yes.

Page 36

1              J. Moeser
2      Q.    Kiligin?
3      A.    Yeah.
4      Q.    And who was the manager?
5      A.    During 2016?
6      Q.    Yes.
7      A.    I don't know when Mike DeGrocco left,
8  but my last manager was Bill Newport.
9      Q.    And prior to Bill Newport, who was it?
10      A.    Mike DeGrocco.
11      Q.    Okay.  Did you ever work in an office
12  while you were at GEICO?
13      A.    You mean at the Woodbury office or --
14      Q.    Yes.
15      A.    No.  I mean, occasionally I went there
16  for meetings and different training sessions, but
17  I didn't have like a desk there.
18      Q.    Okay.  Did you ever have an inside role
19  as an investigator?
20      A.    No.
21      Q.    Did you ever have a desk role as an
22  investigator?
23      A.    Well, you mean as a desk investigator?
24      Q.    Correct.
25      A.    No.



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
53–56

Page 53

1           J. Moeser
2  database work on them, and basically we would just
3  drive to the location, make an observation,
4  document it, go back a second time, then the third
5  time actually try and speak to the people.
6      Q.   Did underwriting referrals ever require
7  Examinations Under Oath?
8      A.   No.  Not that I had.  Okay.
9      Q.   And then you mentioned social media
10  referrals.  What are those?
11      A.   Those were referrals that were sent in
12  by claims examiners to do social media checks on
13  individuals who were usually reporting injuries
14  that were not consistent -- how they felt it was
15  not consistent with the loss itself, and they
16  wanted us to do various, I guess, just ████████
17  ███████████████████████████████████████████████
18  ███████████████████████████████
19      Q.   The social media -- media referrals,
20  did they require you to have windshield time?
21      A.   No.
22      Q.   And about how long would it take you to
23  investigate a social media referral?
24      A.   That's, again, subjective, because when
25  we started getting these assigned to us, you know,

Page 54

1           J. Moeser
2  we were very unfamiliar with the usage of social
3  media, I'll be honest with you, I was anyway, and
4  management felt that you can complete these cases
5  within a few hours.  Well, that's not true.  Okay.
6  This could take you many hours to compute -- to
7  complete or conduct a thorough investigation on
8  individuals, especially if you had a common name,
9  you know.
10      Q.   What social media platforms would you
11  search on?
12      A.   Well, obviously at the time it was
13  ███████████████████████████████████████████████
14  ████████████████████████████  and I --
15  there was a few others that I was not familiar
16  with and -- but they suggested to use other
17  sources, but I wasn't familiar with them and...
18      Q.   And so as far as the social media
19  referrals, when did you start doing those?
20      A.   Probably a few years before I left.
21      Q.   Did you do social media referrals as
22  well as field work at the same time?
23      A.   Yes.
24      Q.   Did social media referrals take less
25  time to investigate than a staged loss referral?

Page 55

1           J. Moeser
2      A.   Generally speaking, yes.
3      Q.   And did they take -- did social media
4  referrals take less time than an enhanced damage
5  referral?
6      A.   Again, generally speaking, yes, yeah.
7      Q.   Did they take less time than an
8  underwriting referral?
9      A.   Well, the underwriting referral would
10  be spread out over several days, because you had
11  to make several different visits.  Social media
12  you may take part of today and go into tomorrow,
13  so obviously then it would be less time because
14  you had the case opened in underwriting longer
15  than social media.
16      Q.   From all the types of cases that you
17  investigated, which ones were closed quicker, do
18  you think?
19          MR. SCIMONE:  Objection.
20      A.   Maybe the social media cases.
21      Q.   You also mentioned theft cases; right?
22      A.   Uh-huh.
23      Q.   So what -- I know what a theft is, but
24  can you explain to me what a theft case is with
25  respect to these referrals that you were receiving

Page 56

1           J. Moeser
2  from GEICO?
3      A.   Well, a theft case would be where a
4  person reports their car stolen and it would be
5  assigned to a theft examiner and there would be
6  unexplained reasons of how the car got stolen, and
7  that would be from what the examiner was able to
8  obtain from the insured, if they were in
9  possession of both keys.  Well, modern cars is how
10  do you start the car when you have both keys.
11  Most of the time the theft case would come because
12  of those reasons or unexplained reasons of, you
13  know, where you parked the car on a particular
14  time and the car was stolen, may have been
15  recovered with damages, may have been recovered
16  with burn damage.  You know, why would somebody
17  steel a car just to burn it.  You know, there
18  is -- there is a financial gain to this, and but
19  in general that's what the referrals were sent in
20  for, basically this is the suspicion and see what
21  you can do as far as doing your database work and
22  interviews and see, you know, how they can explain
23  how this loss occurred.
24      Q.   What kind of database searches would
25  you do with respect to a theft case?



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
81–84

Page 81

J. Moeser

1    a non-exempt associate; right?
2    A.   Well, it depends on when you are
3    referring to.
4
5    Q.   When were you a non-exempt associate?
6    A.   I believe when I first started.
7    Q.   Okay.  And that would be through the
8    duration of your employment then?
9        MR. SCIMONE:  Objection.
10    A.   No.
11    Q.   So you are bringing -- what claims are
12    you bringing here today against GEICO?
13    A.   The claim for compensation for overtime
14    that I worked that I was not compensated for.
15    Q.   And in your Complaint you allege that
16    you are a non-exempt employee; right?
17    A.   Yes.
18    Q.   Okay.  So this sentence here that says
19    "all nonexempt associates are required to
20    accurately record their hours worked and absences
21    taken" would apply to you, would you understand
22    that?
23    A.   I was deemed a non-exempt employee,
24    yes.
25    Q.   Okay.  And then the next sentence says

Page 82

J. Moeser

1
2    "all exempt associates," so that does not apply to
3    you; right?  So we move on to the --
4    A.   Well, at one time I was considered an
5    exempt employee.
6    Q.   From -- but not at GEICO?
7    A.   Yes, at GEICO.
8    Q.   What period was that when you were
9    considered an exempt employee?
10    A.   I think they changed my status after
11    the results of the second lawsuit that came
12    through.  I don't know the exact date, but I know
13    we got changed from exempt to non-exempt.
14    Q.   And during the course of this since
15    2016, you were considered exempt?
16        MR. SCIMONE:  Objection.
17    A.   I think I was considered non-exempt.
18    Q.   Non-exempt.  Okay.  So from 2016 until
19    your last day at GEICO, you were a non-exempt
20    employee, is that what you believe to be correct?
21    A.   What I believe, yes.
22    Q.   Okay.  So the third sentence says:  A
23    nonexempt associate who feels he/she did not
24    receive pay for all his or her hours worked and an
25    exempt or salaried nonexempt associate who feels

Page 83

J. Moeser

1    his or her pay incorrectly reflects a deduction
2    for an absence should contact his or her
3    supervisor, local human resources manager or
4    corporate human resources.
5        Do you see that there?
6    A.   Yes.
7    Q.   And since you were a non-exempt
8    employee, you were eligible for overtime; right?
9    A.   Yes.
10    Q.   Now, you were required to accurately
11    record your hours; right?
12        MR. SCIMONE:  Objection.
13    A.   Yes.
14    Q.   Did you get training on this policy?
15    A.   Not that I can recall.
16        MS. CACERES-BONEAU:  This we are going
17    to mark as Exhibit 5.
18        (Moeser Exhibit 5, Document Produced
19        Natively, spreadsheet Bates stamped G004289,
20        marked for identification.)
21    Q.   Okay.  So this here is a training
22    history log.
23    A.   Uh-huh.
24    Q.   And flipping the first page -- one,
25

Page 84

J. Moeser

1
2    two, three, four.  So if we start on what is the
3    fourth page, so the first page is blank, then the
4    third page that has columns and rows, I am going
5    to be looking at that.
6    A.   What was that?  I'm sorry.
7    Q.   It will be the fourth page total from
8    the packet.
9    A.   Okay.  Fourth page.
10    Q.   And we see learning record as -- the
11    first column is the learning record and if we go
12    all the way down to -- it's going to be -- one,
13    two, three, four, five, six, seven, eight, nine --
14    the ninth row of the fourth page, it says "John
15    Moeser," it says "terminated," "SIU Investigative
16    Efforts E-Learning Course."  Do you see that?
17        MR. SCIMONE:  Objection.
18    A.   No, I don't see that.  Am I on the
19    right page?
20        MR. SCIMONE:  What's the date of the
21    line?
22    A.   Yeah, is there a date on it?  Maybe
23    that will help me.
24    Q.   It's February 17, 2016.
25    A.   February 17th?



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
93—96

Page 93

J. Moeser

2    A.    February 4th, 2020.  I mean, I'm sorry,
3  May 4th, 2020, correct?
4    Q.    Yes.
5    A.    Okay.
6    Q.    Do you recall the contents of that
7  training?
8    A.    No.  I could just assume it had
9  something to do with Workday.
10    Q.    Okay.
11    A.    Oh, my God, I failed it.
12    Q.    And then the next row is 2020
13  Policies & Acknowledgments training.  Do you see
14  that?
15    A.    Yes.
16    Q.    And do you recall the contents of that
17  training?
18    A.    No, not the -- no.
19    Q.    Okay.  The second to the last row says
20  SIU Knowledge Test 2020.  That was completed on
21  December 18, 2020.  Do you see that?
22    A.    Yes.
23    Q.    And do you recall that test?
24    A.    No.
25    Q.    And the last row there is the 2021

Page 94

J. Moeser

2  Policies & Acknowledgments training.  Do you
3  recall that training?
4    A.    Not the contents of it, no.
5    Q.    And it says that you completed it;
6  correct?
7    A.    Yes.  It doesn't say pass, though.
8    Q.    Now, based on the policy that we read
9  out of the handbook that we marked as Exhibit 4,
10  so we are back to this here, based on that policy,
11  do you understand that you were required to
12  accurately record your hours worked?
13        MR. SCIMONE:  Objection.
14    A.    Yes.
15    Q.    Did you understand that managers and
16  supervisors were not allowed to tell you to work
17  off the clock?
18        MR. SCIMONE:  Objection.
19    A.    Did I understand -- say that again,
20  please.  That managers and supervisors --
21    Q.    Did you understand that managers and
22  supervisors were not allowed to tell you to work
23  off the clock?
24    A.    They were not allowed to tell me that?
25  No.

Page 95

J. Moeser

2    Q.    Did you know that you were required to
3  report any off-the-clock work that you performed
4  to a supervisor?
5        MR. SCIMONE:  Objection.
6    A.    Was I required to report off-the-clock
7  work?
8    Q.    Yes.
9    A.    Well, yeah.  Yeah.
10    Q.    Did you understand that if you felt
11  that you were not being paid for all of your hours
12  worked, that you should contact your supervisor?
13        MR. SCIMONE:  Objection.
14    A.    Yes.
15    Q.    Did you understand that you could also
16  contact human resources if you -- if you felt you
17  did not receive all of the hours you worked?
18        MR. SCIMONE:  Objection.
19    A.    Yes.
20    Q.    Did you ever make such a report with
21  your supervisor?
22        MR. SCIMONE:  Objection.
23    A.    Regarding?
24    Q.    That you -- okay.  Did you ever make a
25  report with your supervisor that you did not

Page 96

J. Moeser

2  receive pay for all of the hours you worked?
3    A.    Yes.
4    Q.    Who was that supervisor?
5    A.    It would have been several of them.
6  There would have been April Neyland, Rich Kiligin,
7  my manager, Bill Newport, another supervisor Tony
8  Mazzotti.
9    Q.    Okay.  Let's go through -- and did you
10  ever report that you felt like you did not receive
11  pay for all of your hours worked to human
12  resources?
13    A.    After 2016?
14    Q.    Correct, yes.
15    A.    No.
16    Q.    Now, you mentioned April Neyland, Rich
17  Kiligin, Bill Newport and Tony Mazzotti as
18  individuals to whom you reported.  Were all of
19  these after -- 2016 or after?
20    A.    I don't know the time frame with Tony
21  Mazzotti, but I know the other three would have
22  been.
23    Q.    Let's start with Bill Newport.  What
24  did you report to Bill Newport?
25    A.    That I, along with everybody else that



Page 97

1           J. Moeser
2   I knew of, were working more hours than what they
3   were documenting.
4       Q.    Who are the "everybody else"?
5       A.    Everybody else within the SIU teams.
6       Q.    Can you be more specific about that?
7       A.    It was people who were attending
8   meetings who were field investigators at the time
9   that were making their concerns about getting more
10  cases assigned to them and not -- and working more
11  hours than what they were documenting.
12      Q.    Were -- when you discussed this with
13  Bill Newport, was this in a group setting or was
14  it one on one?
15      A.    It was what they called a skip-level
16  meeting and there were other investigators with
17  me.
18      Q.    What is -- what is a skip-level
19  meeting?
20      A.    It's a meeting directly with your
21  manager and you skip over the supervisor.  The
22  supervisor is not present.
23      Q.    How many people attend a skip-level
24  meeting?
25      A.    It could have been an individual, it

Page 98

1           J. Moeser
2   could be in a team.  At that particular time it
3   was members that were in the team that I was
4   working in.
5       Q.    What team was that?
6       A.    I don't remember which team that was.
7   That was -- could have been in the enhanced damage
8   team or the staged -- I don't recall what team I
9   was in.
10      Q.    So when you made this complaint to Bill
11  Newport, it was -- let me rephrase that.
12          So when you discussed this with Bill
13  Newport, it was at a skip meeting involving either
14  the staged loss referral team or the enhanced
15  damage referral team; is that right?
16      A.    Was I making a complaint about the team
17  or --
18      Q.    No.  When you -- when you discussed the
19  hours that you were working, was -- that was
20  during a skip-level meeting that involved either
21  the staged loss referral team or the enhanced
22  damage referral team; is that right?
23      A.    What do you mean by involved?  I was in
24  the team at the time, on one of those teams.
25      Q.    Okay.  So the skip-level meeting had

Page 99

1           J. Moeser
2   people outside of the team that you were involved
3   in as well?
4       MR. SCIMONE:  Objection.
5       A.    It could have been, yes.
6       Q.    So I guess to rephrase it, was it just
7   Bill Newport and the staged loss referral team in
8   the skip meeting?
9       A.    I don't recall.  I know there was
10  several other individuals in this meeting with me.
11  What teams they were in, I don't know.  They could
12  have been in the enhanced damage team or -- I
13  don't believe they were in the staged loss team,
14  but I could be wrong, but there was maybe two or
15  three other investigators in this meeting with me
16  and I don't know what team he -- what other teams
17  they were in.  I don't -- I don't know if they
18  were all under April's supervision, because not
19  only did she supervise people in the staged loss
20  team, but she supervised people in other teams, so
21  I don't -- I don't know what teams they were in.
22      Q.    How many people did April supervise?
23      A.    It varied.  I mean, it could have been
24  anywhere from eight to ten.  She -- you know,
25  during some certain periods she was also

Page 100

1           J. Moeser
2   supervising inside staff people, I believe, along
3   with field team people.
4       Q.    And do you recall the names of the
5   people that were in this meeting with Bill Newport
6   and you?
7       A.    No, I don't -- I believe one of them
8   may have been a Mike Lazos, but I don't recall the
9   other people.
10      Q.    Was it -- what did you tell Bill
11  Newport?
12      A.    I told him that not only myself, but it
13  seems to be that most people are working more
14  hours than what they are submitting, which is
15  reflected on their evaluations, and I felt it was
16  unfair that, you know, with the amount of work
17  that you were giving us that we were forced to
18  work more hours than what they are documenting,
19  and I told him that there is no secret to this, I
20  mean, you could very easily look this up, and I
21  told him, I said, just look at their case
22  reporting system.  Everything is time stamped.
23  And I said this is -- this is well-known amongst
24  everybody in meetings that we had, everybody
25  within the field.  So, you know, I felt that I was



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
101–104

Page 101

1                     J. Moeser
2   being fairly judged by the hours that I was
3   submitting and not being compensated for it, and I
4   felt that I had to work these hours in order to
5   keep -- meet standards with their evaluation
6   system.
7       Q.    Now, you worked a flex schedule; right?
8       A.    Yes.
9       Q.    So looking at a time stamp doesn't
10  accurately reflect the hours that you worked in a
11  day, though?
12          MR. SCIMONE:  Objection.
13      A.    Yes, it does.
14      Q.    But you were able to complete tasks
15  when you felt like it; right?
16          MR. SCIMONE:  Objection.
17      A.    What do you mean when I felt like it?
18      Q.    Because you had flexible time.  Were
19  you able to complete tasks at different times of
20  the day?
21      A.    I did complete tasks within different
22  times of the day, but that doesn't mean I took any
23  breaks during or I started later.  Even if I
24  started at 7:30 or 8:00 in the morning, there were
25  times that I worked until 7 or 8:00 at night

Page 102

1   continually.
2       Q.    Were there times that you started after
3   8 in the morning?
4       A.    Occasionally.  I don't recall
5   particular dates or anything, but there may have
6   been times that I started after 8.
7       Q.    Do you recall starting after 9?
8       A.    I don't recall that, no.
9       Q.    So you mentioned this meeting with Bill
10  Newport.  Was there any other time that you had a
11  discussion with Bill Newport about this issue?
12      A.    Personal with him?
13      Q.    Just with Bill Newport.  It could be in
14  another group or it could be personally.
15      A.    No, there --
16      Q.    My question is was there any other
17  discussion that you had with Bill Newport on a
18  separate occasion?
19      A.    Yes, both in a group and individual.
20      Q.    So tell me about the individual.
21      A.    Well, as Bill became our manager, he
22  wasn't familiar with what SIU investigators did,
23  this is what he expressed, and that he wanted to
24  do ride-alongs with field investigators to get a

Page 103

1                     J. Moeser
2   feel for what they do, and on some of those
3   ride-alongs that we did this subject would come up
4   as far as the amount of cases that we are being
5   assigned, the increase on them and the amount of
6   hours it takes to do these cases, which obviously
7   if you are giving me more work to do within a time
8   period, one of two things are gonna happen:  I'm
9   either gonna work more, or it's gonna reflect on
10  my quality of my investigation.
11      Q.    How many times did you have these --
12  this type of one-on-one conversation with Bill
13  Newport about this?
14      A.    I don't recall how many times.  I mean,
15  I think we did several ride-alongs together and I
16  don't know if we discussed this on every
17  ride-along, but I think I probably had, you know,
18  maybe four, maybe five ride-alongs with him, maybe
19  three, in that area.
20      Q.    And what was Bill Newport's response to
21  you?
22      A.    Not much.  They were gonna look into it
23  and basically changed the subject.
24      Q.    Did he tell you that you needed to
25  report all your hours you worked?

Page 104

1                     J. Moeser
2       A.    I don't remember in the individual
3   meetings, but it was -- I believe -- I don't know
4   if Bill mentioned that, but in group meetings that
5   was mentioned, and we were also told that it would
6   reflect negatively on our ratings because of the
7   amount of cases that they felt that you should
8   handle within a certain period of time -- within a
9   month's time.
10      Q.    But you were told in the meeting that
11  you needed to report your time accurately; right?
12          MR. SCIMONE:  Objection.
13      A.    I don't recall that, no.
14          MS. CACERES-BONEAU:  Can we read
15      back -- can we move back up the testimony
16      from a sentence before, the prior response to
17      the prior question.
18      Q.    So the prior question I asked was:  Did
19  he tell you that you needed to report all of your
20  hours worked?
21          And then your response was:  I don't
22  remember in the individual meetings, but it was --
23  I believe -- I don't know if Bill mentioned that,
24  but in group meetings that was mentioned.
25          So again, I said did he tell you that

JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024

105–108

Page 105

1           J. Moeser
2  you needed to report all of your hours worked, and
3  your response was:  I don't remember in the
4  individual meetings, but it was -- I believe -- I
5  don't know if Bill mentioned that, but in group
6  meetings.  So are you changing that testimony
7  then?
8      A.   No.  I mean, what was discussed in
9  group meetings was that it would negatively
10  reflect on your evaluation based on the hours that
11  you were working in a given month compared to the
12  cases that they were assigning you, and it was
13  voiced by not only myself, but several other
14  members in these meetings that we are working way
15  past the time frame and not submitting them.  Now,
16  at that point the meeting subject -- the meeting
17  changed and we got off that subject, so I don't
18  know if that's what -- there is a misunderstanding
19  here, but I don't ever, you know, remember that
20  conversation with him.
21      Q.   So you don't remember Bill Newport ever
22  telling you that you needed to accurately enter
23  your time?
24      A.   He may have, yes, but I don't remember
25  it, though.

Page 106

1           J. Moeser
2      Q.   Okay.  But you said something about it
3  negatively affecting your ratings.  What do you
4  mean by that?
5      A.   Meaning that from what -- how it was
6  explained to me is that you are based on the
7  amount of hours worked in a month, which was, I
8  believe, 155 hours.  Now, they felt that you
9  should be able to handle X amount of cases within
10  that time frame, and they never explained to us
11  how they came up with that ratio, however, when
12  you increased the cases over periods of time,
13  well, what was told to us is that if you submit
14  for overtime, you are gonna be docked -- well, not
15  docked, but you are gonna be judged on more hours
16  worked.  So for an example, if you put in for 20
17  hours of overtime in a given month, well, now you
18  are rated on 170 hours, 175 hours instead of 155
19  hours, which would negatively reflect on your
20  rating in that part of your rating, because you
21  are doing in their eyes the same amount of work in
22  more hours.
23      Q.   Do you know of anyone whose rating was
24  negatively affected that way?
25      A.   Oh, I don't -- I couldn't -- I don't --

Page 107

1           J. Moeser
2  no, I don't know.
3      Q.   So you mentioned Bill Newport.  You
4  mentioned there being -- you mentioned one
5  meeting, but you said there was more than --
6  sorry.  With respect to Bill Newport, you had
7  one-on-one conversations, but you also had how
8  many group meetings where you all discussed your
9  hours worked?
10      A.   I don't -- I don't know the number of
11  group meetings we had, but we would have periodic
12  training sessions, meetings, and the subject would
13  come up often and either would be non-addressed by
14  supervisors attending this meeting, or they would
15  just tell us that this is something that we are
16  looking into as far as the amount of cases that
17  you are getting, and basically other times we were
18  told they can't control the amount of cases that
19  we are being assigned, because a lot of this is
20  coming from home office that wanted to increase
21  the ratio of how many cases get assigned to SIU in
22  a given week or time frame.
23      Q.   And you mentioned Rich Kiligin.
24      A.   Kiligin, correct.
25      Q.   And was he one of your supervisors?

Page 108

1           J. Moeser
2      A.   For a time, yes.
3      Q.   Was he a supervisor from -- at any time
4  period between 2016 and your last day of
5  employment?
6      A.   Yes.
7      Q.   And when you -- what did you discuss
8  with Rich Kiligin?
9      A.   Other than standard training sessions
10  that he would hold, again, the amount of cases
11  that were being assigned, the increased amount of
12  cases being assigned, and that, you know, people
13  are working more hours than what they are
14  documenting.
15      Q.   When you say the number of cases that
16  were being assigned, you said that -- earlier you
17  represented that you had about 13 to 17 cases when
18  you left GEICO?
19      A.   That was in the staged loss team.
20      Q.   And what was Rich Kiligin's response?
21      A.   Not much.  Got off the subject very
22  quickly and basically said there is nothing he
23  could do and that, you know, I guess we would
24  discuss this at another time, and I felt that that
25  meant like at general meetings.



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
113—116

Page 113

1              J. Moeser
2   Moeser?
3       A.   Yes.
4       Q.   Okay.  And have you seen the Plaintiff
5   John Moeser's Responses to the Court's
6   Interrogatories?
7       A.   Yes.
8       Q.   Okay.  Did you -- let's look at the
9   first one that's Plaintiff John Moeser's Responses
10  to the Court's Interrogatories.  Did you prepare
11  this document?
12      A.   No.
13      Q.   Who prepared it?
14      A.   I believe somebody in my attorneys'
15  office.
16      Q.   If we look to the last page that is
17  page 7.
18      A.   Last page, 7.  Yes.
19      Q.   The top says it's a verification.  Do
20  you see that?
21      A.   Yes.
22      Q.   And I see there is a signature line.
23  Is that your signature?
24      A.   Yes.
25      Q.   How did you sign this document?

Page 114

1              J. Moeser
2       A.   What do you mean how do I sign it?
3       Q.   Did you use a pen, was it electronic,
4   how did you sign it?
5       A.   It was electronic.  I believe it was
6   with the mouse or something.
7       Q.   Okay.  Did you read this document
8   before you signed it?
9       A.   Yes.
10      Q.   Let's look at the Declaration that's
11  attached to it.  Did you prepare this Declaration?
12      A.   No.
13      Q.   If we move to page 5.
14      A.   Page 5, right.
15      Q.   And it has a signature there.  Is that
16  your signature?
17      A.   I believe, yeah.  I guess, yes.
18      Q.   Do you remember how you signed it?
19      A.   Again, it would have been done with the
20  mouse on the computer.
21      Q.   Did you read the declaration before you
22  signed it?
23      A.   Yes.
24      Q.   You mentioned entering your time into a
25  time keeping system named Workday; right?

Page 115

1              J. Moeser
2       A.   Yes.
3       Q.   Did you always get paid for that time
4   that you entered in Workday?
5       A.   Yes.
6       Q.   Let's look at the declaration.  There
7   is paragraph numbers on the left side.  And let's
8   move to paragraph number 8, which is -- starts on
9   the second page.
10      A.   Uh-huh.
11      Q.   If you read paragraph 8, it states:  "I
12  only entered 7.75 hours per day, regardless of how
13  many hours I actually worked.  I did not enter
14  more hours into the timekeeping system as my
15  supervisor said doing so would affect my rating,
16  giving me a poor evaluation and negatively
17  effecting my potential for an annual pay
18  increase."
19           What supervisors told you that?
20      A.   The supervisors that I mentioned
21  before.
22      Q.   So who were they?
23      A.   It would have been April Neyland, it
24  would have been Rich Kiligin, it would have been
25  Tony Mazzotti.  I guess I don't know if that was

Page 116

1              J. Moeser
2   prior to 2016, but it also could have been other
3   supervisors that were at general meetings that
4   basically said that the percentage could
5   negatively affect your rating.
6       Q.   Did you take any notes during those
7   conversations?
8       A.   During meetings?
9       Q.   Yes.
10      A.   No.
11      Q.   And you mentioned April Neyland as
12  another person.
13      A.   Well, that was my supervisor, April.
14      Q.   And when did you have conversation with
15  April Neyland about this?
16      A.   Particular dates?  I -- I wouldn't know
17  the particular dates, but there were times that we
18  had team meetings, there were times that I spoke
19  to her individually about it, and there were times
20  that she was present during general meetings.
21      Q.   And which super-- -- never mind.  I
22  retract that.
23           MS. CACERES-BONEAU:  Can you mark this
24  as Exhibit 7.
25           (Moeser Exhibit 7, Plaintiff John



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
117–120

Page 117

1          J. Moeser
2      Moeser's Responses and Objections to
3      Defendant's First Set of Interrogatories,
4      marked for identification.)
5      Q.    So this document is entitled Plaintiff
6  John Moeser's Responses and Objections to
7  Defendant's First Set of Interrogatories.  Do you
8  see that up top?
9      A.    Yes.
10      Q.    Have you seen this document before?
11      A.    Yes.
12      Q.    Did you prepare this document?
13      A.    No.
14      Q.    If we turn to page 19, which is the
15  second to the last page.
16      A.    Yes.
17      Q.    Do you see a verification page?
18      A.    Yes.
19      Q.    How did you sign this document?
20      A.    The same way I signed the other ones.
21  It would have been over the mouse of the computer.
22      Q.    Is there a special software that you
23  used to sign it?
24      A.    I don't know.
25      Q.    Did you read this document before you

Page 118

1          J. Moeser
2  signed it?
3      A.    Yes.
4      Q.    Let's look on page 4.  There is an
5  Interrogatory No. 3.
6      A.    Okay.
7      Q.    You can read that and your response
8  that continues on to page 5.
9      A.    Okay.
10      (Document review.)
11      Q.    Let me know when you finished.
12      (Document review.)
13      A.    Okay.
14      Q.    So I had asked you earlier if you took
15  notes during the meetings and you said no; right?
16      A.    I don't believe I did, no.  There would
17  be no reason for me to take notes.
18      Q.    How about during the face-to-face
19  interactions that you had with your supervisors,
20  did you take any notes of those meetings?
21      A.    I don't recall them taking notes.
22      Q.    Did you take any notes?
23      A.    I don't recall taking any notes, no.
24      Q.    Okay.  You mentioned here that you had
25  frequent phone conversations, "these

Page 119

1          J. Moeser
2  communications took place in frequent phone
3  conversations."  How frequent were they?
4      A.    I -- I couldn't put a time -- I mean an
5  amount on it.  Depending on which supervisor and
6  what case that I was working on, whatever other
7  issues that I needed to speak with a supervisor
8  about or what they needed to speak to me about, I
9  couldn't tell you on a weekly basis how many times
10  I spoke to supervisors.
11      Q.    But what do you mean by "these
12  communications" here, was it communications about
13  the case generally that happened frequently?
14      MR. SCIMONE:  Can you point out where
15      you are reading from?
16      MS. CACERES-BONEAU:  Yes.
17      MR. SCIMONE:  This is in Exhibit 7?
18      MS. CACERES-BONEAU:  Yes.
19      A.    Page 5 you are saying?
20      Q.    Yes, page 5.  So it's the second to the
21  last sentence and it says:  "These communications
22  took place in frequent phone conversations with 3
23  different supervisors."
24      A.    Uh-huh.
25      Q.    "SIU meetings with the entire unit,

Page 120

1          J. Moeser
2  team meetings, skip level meetings with Bill
3  Newport, and during face-to-face interactions with
4  supervisors."  It says:  "These communications
5  took place in frequent phone conversations."
6      What communications are they that you
7  are referring to when you say "these"?
8      A.    In this particular paragraph?  Probably
9  I was referring to conversations that I had about
10  the extended hours that I was working.
11      Q.    You mentioned frequent, but you are
12  unable to give me a number -- to attribute a
13  number to frequent; right?
14      A.    Well, that depends on how people
15  interpret frequent.  I mean, I don't want to give
16  you a wrong number.
17      Q.    How do you interpret it?
18      A.    I would say --
19      MR. SCIMONE:  Objection.
20      A.    -- more than five or six.
21      Q.    So did you have more than five or six
22  conversations with Bill Newport, April Neyland,
23  Rich Kiligin and Tony Mazzotti about the hours you
24  were working?
25      A.    Again, now you want to -- you are



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
133–136

Page 133

1           J. Moeser
2  additional cases that I got assigned that day when
3  I returned back to my home office.
4      Q.   So if you knew you were starting -- if
5  you knew you were going to have an Examination
6  Under Oath that ended at 5:00, then would you
7  start your day later?
8      A.   No.  No.
9           MR. SCIMONE:  I think this might be a
10      good time for a bathroom break.  We have been
11      going about a little over an hour and a half
12      since lunch.
13          MS. CACERES-BONEAU:  Okay.
14          MR. SCIMONE:  Is that okay?
15          MS. CACERES-BONEAU:  Yes, that's fine.
16          THE VIDEOGRAPHER:  The time right now
17      is 2:52 p.m. and we are off the record.
18          (Recess was taken from 2:52 to 3:06.)
19          THE VIDEOGRAPHER:  The time right now
20      is 3:06 p.m. and we are back on the record.
21  BY MS. CACERES-BONEAU:
22      Q.   Hi, Mr. Moeser.  I am looking back at
23  what we have marked as Exhibit 6, which is a
24  Declaration of John Moeser.  It's the last
25  document we were looking at, and we had left off

Page 134

1           J. Moeser
2  on page 4 and we had formerly been discussing
3  paragraph 12.  Now we are going to look at
4  paragraph 13.  You can let me know when you have
5  finished reading that paragraph.
6          (Document review.)
7      A.   Okay.
8      Q.   Okay.  So you reference an e-mail in
9  here.  When did that e-mail exchange take place?
10     A.   I don't know the date of it, but it
11  would have been after I had submitted for overtime
12  at one point.
13     Q.   And you mentioned a supervisor.  Which
14  supervisor was this e-mail exchange with?
15     A.   That would have been April Neyland.
16     Q.   Was anyone else copied on the e-mail
17  exchange?
18     A.   I don't believe so, no.  No.
19     Q.   When did you submit this report?
20     A.   Which report?  The overtime report?
21     Q.   Well, it says here:  "She instructed me
22  to submit a list of reasons for why these hours
23  should have been approved.  I completed the report
24  as requested, and my overtime hours approved, but
25  I was again discouraged from reporting them."

Page 135

1           J. Moeser
2      A.   The report that I am referring to there
3  is the -- I guess the e-mail that I sent her with
4  the list of cases that I was submitting the
5  overtime for.
6      Q.   And you state here your hours were
7  approved, your overtime -- sorry -- your overtime
8  hours were approved after submitting this report?
9      A.   Yes.
10     Q.   Why did you believe they were -- you
11  were discouraged from reporting them if your hours
12  were approved?
13     A.   Because that's what she told me after
14  when I had the phone conversation with her, that
15  you don't submit overtime for office work.
16     Q.   What is office work?
17     A.   Well, I think you are gonna need to ask
18  her that, because that's exactly what I asked, and
19  office work, from what I assumed, was just report
20  writing or doing database work or not exactly
21  going out into the field, and, you know, there was
22  times that -- and I believe -- I don't know if
23  this was the time that we were working after
24  COVID, so everything was in house, so to say, so I
25  didn't know what you meant by office work, you

Page 136

1           J. Moeser
2  know, or administrative work as I heard also.
3      Q.   You said this was after COVID and
4  everything was in house.  So when did you send --
5  when do you think this took place?
6      A.   I don't know if this particular time
7  took place after COVID, but again, when COVID
8  occurred and we were restricted into doing office
9  work, we were doing our EUOs over the telephone,
10  so is that considered office work or -- it was
11  never really explained as far as since there was
12  no travel time involved at that point, what do you
13  consider office work or administrative work
14  compared to when we were in the field.  Now, this
15  particular time, I don't know if this was during
16  COVID or before COVID.
17     Q.   Did you complain to anyone that you
18  felt discouraged from reporting overtime?
19     A.   Anyone as far as management or anyone
20  in general?
21     Q.   It can be anyone in general.
22     A.   Oh, yeah.  I mean, we talked about it
23  amongst ourselves a lot.
24     Q.   Who -- who is "we"?
25     A.   Well, again, I mean, there would have



Page 137

1              J. Moeser
2    been people who were named here and other people
3    who I might have run into that we were talking
4    about caseload and stuff, I might have seen them
5    at meetings or maybe talked to over the phone
6    with, and everybody was in agreement that, you
7    know, the caseload is heavy and that they are
8    working all these extra hours.
9        Q.   Do you remember specifically the names
10   of anyone you spoke with?
11       A.   I spoke to, well, okay, Mark Giambalvo,
12   I spoke to Tony Geraci about it, I know I spoke to
13   Louie Pia about it, I know I spoke to Keith
14   Fischer about it, I know I spoke to other fellows.
15   Charise Jones, I spoke to her about it, Scott
16   Brady I spoke to about it, Jeff Lewonka I spoke to
17   about it, George McManus I spoke to about it, and
18   there had -- there were others, but I just don't
19   recall -- oh, Michael O'Sullivan in meetings, Dan
20   King I spoke to about it.  I don't remember.
21   Connie I spoke to about -- Mangan I spoke to about
22   it.  I know there were others, but I just -- I
23   don't recall their names, but this was also
24   overheard in group meetings that other people
25   would express their concerns.

Page 138

1              J. Moeser
2        Q.   Did you receive -- the statement in
3    paragraph 13 says that your overtime was approved,
4    and my question is did you receive pay for that?
5        A.   Yes.
6        Q.   What other times did you request
7    overtime?
8        A.   I don't -- I don't recall.  I'm sure
9    they have my record somewhere that, you know, to
10   show on my -- my pay -- I didn't keep my pay
11   stubs, so I'm sure that they had a record of, you
12   know, over the last 2016 to 2021 what I got paid,
13   but I don't recall -- I can't remember the dates
14   that I submitted for overtime.
15       Q.   Every time that you submitted overtime
16   you were paid for it?
17       A.   They had to pay me, yes.
18       Q.   Was there ever a time that you said,
19   "hey, I need overtime" and you were refused
20   overtime?
21       A.   I wouldn't ask for overtime.  You know,
22   I know that that was brought up -- that subject
23   was brought up in a general meeting that we had
24   and I don't remember the date on that.  As far as
25   if they would grant universal -- now, what they

Page 139

1              J. Moeser
2    meant by universal I don't know, but if they would
3    grant overtime for all the investigators to work
4    on their cases, taking into account the increase
5    of caseload that we were getting, and that was
6    told to us by people -- supervisors running this
7    meeting that no, they weren't going to approve
8    that type of overtime.
9        Q.   Let's look at paragraph 9.  We are
10   going back.  Page 3.  You can take a look at that
11   one and let me know when you are done reading it.
12           (Document review.)
13       A.   Okay.
14       Q.   So it says here that you worked about
15   52.5 hours a week on average.  On what do you base
16   that estimate?
17       A.   It's an estimate that I came up with
18   that hours after 37-point -- after 38.75 hours
19   that I felt that I was working during that period,
20   but I think that was before COVID.  Oh, okay.
21   Yeah, the next paragraph.  Okay.  It's an estimate
22   of hours that I was working beyond my scheduled
23   time.
24       Q.   Did you record your time anywhere other
25   than Workday?

Page 140

1              J. Moeser
2        A.   No.
3        Q.   Do you have any kind of written
4    record --
5        A.   Well, hold on, because I don't know if
6    you are meaning when I would send an e-mail to my
7    supervisor listing the cases that I worked on that
8    day.
9        Q.   In that e-mail would you say -- would
10   you include your start time, your break and your
11   end time of day?
12       MR. SCIMONE:  Objection.
13       A.   Originally that's what they wanted, but
14   toward the latter part of my career they just
15   wanted -- she just wanted case numbers.
16       Q.   And so where would -- where would you
17   enter the hours that you worked?
18       A.   In Workday.
19       Q.   And did you take any written notes to
20   track your hours during the day?
21       A.   After 2016, no.  Prior to, yes.
22       Q.   What was the difference?
23       A.   We were told to track our hours at one
24   point.  That was -- I don't know the time frame,
25   but that was right after we had the first lawsuit



Page 149

1    J. Moeser
2  the telephone.  And but they didn't mind you going
3  verifying police reports.  So that was kind of
4  confusing.  It's like I can go into a police
5  station, but I can't go into a gas station.  I
6  mean, that doesn't make any sense.  But so we were
7  doing canvasses at the time looking for any kind
8  of surveillance equipment and to verify police
9  reports.
10    Q.    And this is after COVID -- or
11  actually this is --
12    A.    During COVID.
13    Q.    This is after February 2021?
14    A.    Right.  There came a time when they --
15  when they said that we could go out into the
16  field, you know, to do this type of work.
17    Q.    When you were not in the field during
18  COVID, what kind of work were you performing then?
19    A.    Same type of work.
20    Q.    How did you investigate the cases?
21    A.    The same way.  Other -- other than
22  doing in-person interviews or EUOs, we were doing
23  them over the telephone.
24    Q.    And you were not permitted to go do
25  scene canvasses though, or were you?

Page 150

1    J. Moeser
2    A.    Prior to February '21?
3    Q.    Yes.
4    A.    No, we were shut down.
5    Q.    So everything was -- everything was
6  from your home?
7    A.    Everything was shut down when they
8  closed the building in Woodbury and I -- I think
9  that was in March of -- whenever the pandemic
10  occurred.  I mean, it was like March of 2019.  I
11  don't -- I don't know the date, but they stopped
12  all functions at the building, we were shut down
13  as field investigators, and they came up with a
14  plan as far as how we were going to start
15  investigating cases from home, especially when
16  EUOs were involved, and it was kind of complicated
17  at first because there was a lot of errors being
18  made as far as scheduling, getting on the right
19  Webex meetings and stuff, there was a lot of
20  coordination involved, but everything was done at
21  home at that time or from home office.
22    Q.    So where was the EUO center at that you
23  would go have EUOs at when they were in person?
24    A.    In person?
25    Q.    Yes.

Page 151

1    J. Moeser
2    A.    Well, I did them in Queens, it would
3  have been either the Queens drive-in center off
4  Kissena Boulevard before they closed that.  Then I
5  would go to the EUO center which was on Sutphin
6  Boulevard across the street from the courthouse.
7  In Brooklyn it would have been the Queens -- I
8  mean, the Brooklyn drive-in on Coney Island Avenue
9  before they closed that, and then we did it at
10  Court Street in Brooklyn, and they were gonna give
11  us another location there, but they never did.  In
12  Manhattan it was usually I did them at One Penn
13  Plaza.  In the Bronx they had locations near
14  Yankee Stadium, which I didn't use.  I used the
15  location on East Tremont Avenue in -- in the
16  Bronx.  And where else?  Oh, in Nassau and Suffolk
17  County I used either our legal office in Melville
18  or the Suffolk location was on Veterans Highway in
19  Islandia.
20    Q.    How long would it take you to get to
21  the EUO center on East Tremont in the Bronx?
22    A.    Well, depending on the traffic and the
23  time that I had to schedule it for, I don't know
24  if you ever traveled the Cross Bronx, but it's
25  the worst parking lot in the world.  I mean, it

Page 152

1    J. Moeser
2  could -- I used to have to leave between two and
3  two and a half hours before.
4    Q.    I used to work in the south Bronx --
5    A.    Okay, so then you --
6    Q.    -- as a teacher before I became a
7  lawyer, so --
8    A.    You are familiar with that.
9    Q.    Yes.
10    A.    I mean, it's -- it's horrible.  And
11  they were doing construction on both bridges at
12  the time, they were taking down the toll booths,
13  so that made it really pleasant instead of working
14  on one and one, but, you know, I used to leave
15  myself at least two to two and a half hours to get
16  to that location.
17    Q.    In comparison to go to the Melville
18  location, how long did that take you?
19    A.    The Melville location, which was on
20  Broad Hollow, I would give myself at least an
21  hour, an hour and a half, because again, you don't
22  know the traffic on the Long Island Expressway
23  and, you know, you have to give yourself that time
24  because you don't want to be late, so you always
25  had to give yourself -- even if you sat there for



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
153–156

Page 153

1                J. Moeser
2  a half an hour, it's better than being late.
3        Q.   Were there any EUO locations that were
4  closer to you?
5        A.   The one in Islandia, that was the one
6  that was closest to me.
7        Q.   How far was that a drive?
8        A.   I would say anywhere with no traffic,
9  maybe 45 minutes, you know.
10       Q.   So when you were doing EUOs during
11  COVID when you were only working from home, you
12  had less windshield time, you had no windshield
13  time; right?
14       A.   There was no travel.
15       Q.   So your EUOs took less time when you
16  consider the travel time; is that right?
17       A.   Yeah, but you could schedule more EUOs
18  in one day than you could if you were traveling.
19       Q.   Did you have more EUOs when you worked
20  from home versus in -- in the field?
21       A.   Yeah, because I was in the staged loss
22  team at the time.
23       Q.   Prior to the beginning of COVID in
24  March 2020, were you not on the staged loss team?
25       A.   Say that again.  Prior to March --

Page 154

1                J. Moeser
2        Q.   2020, which was the start of COVID,
3  were you on the staged loss team?
4        A.   Yes.
5        Q.   So did the number of EUOs then change
6  between before COVID and after COVID when you were
7  on the same team?
8        A.   No.  Well, the numbers always changed
9  because you don't know how many people are
10  involved with the staged loss that you are gonna
11  conduct the EUO on.  You know, for example, if it
12  was a double-insured case, meaning both parties
13  are insured by GEICO, well, you had not only EUO
14  of the people that -- in this -- that you got the
15  referral on, but also in the other case, because
16  they were both insured by GEICO.  And I don't know
17  if you -- you were able to -- if this clarifies
18  it, you were able to schedule more EUOs from
19  remote than you were for travel -- when you were
20  traveling.  I mean, you could schedule -- you
21  know, there were times that I scheduled three,
22  mayor four EUOs for one day, you know, and you
23  would do two-hour intervals.  That's what they
24  wanted you to do.
25       Q.   What do you mean by "two-hour

Page 155

1                J. Moeser
2  intervals"?
3        A.   Well, they didn't want you to schedule
4  an EUO at 9:00, at 10:00, at 11:00.  They wanted
5  you to do it 9:00, 11:00, 9:30, 11:30, so there
6  was two-hour intervals.
7        Q.   Did you schedule more EUOs because you
8  had more time now that you weren't driving?
9        A.   Did I schedule more -- I was able to
10  schedule more EUOs because I wasn't driving to a
11  location, but they were the same or if not more
12  EUOs that I had to do depending on the case that I
13  was working on.
14       Q.   It says on paragraph 10 also that:
15  GEICO increased my caseload significantly after
16  2020.  My overtime hours increased as a result, to
17  about 55 hours a week on average.
18       A.   Right.
19       Q.   On what do you base that estimate?
20       A.   Because they gave me more cases to work
21  on when we were assigned remote -- or we were --
22  after COVID when we were assigned strictly to our
23  home base, they did increase our caseload.
24       Q.   How -- can you tell me what your
25  caseload was before COVID and then when -- during

Page 156

1                J. Moeser
2  COVID when you were working from home?
3        A.   Again, outside of the staged loss cases
4  that I was catching, which, like I said before,
5  averaged -- averaged maybe 15 cases a month, we
6  were also doing more social media cases during
7  that period.  There could have been cases that
8  they just needed database work done on.  I was
9  also getting cases from our inside staff who were
10  doing major case investigations for possible
11  pattern cases.  So the workload did increase.
12       Q.   Do you know how -- an estimate of how
13  many more cases you were receiving then?
14       A.   No, I couldn't tell you.  No, I
15  couldn't judge that.
16       Q.   Did you keep any record of this
17  additional time that you were spending during
18  COVID on cases?
19       A.   Did I keep a record of it?  You mean
20  like a separate outside record?
21       Q.   Uh-huh, outside of Workday.
22       A.   No, but, like I said, at that -- during
23  that time when I had to submit my caseload, I
24  don't -- no, I wasn't putting my -- well, when I
25  had to submit my cases at the end of the workday I



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
157–160

Page 157

J. Moeser

1
2  wasn't putting time frames in, but there were
3  times that I was submitting them well after 5:00
4  at night or 4:30, whatever the time was.
5       Q.    Did working from home instead of
6  working in the field give you more flexibility in
7  when you could investigate cases?
8       A.    Give me more flexibility of when -- no.
9       Q.    When you were working from home, you
10  were no longer required to canvass a scene; right?
11      A.    Until they reopened it around that time
12  frame that we said before, yeah.
13      Q.    You also weren't required to be
14  investigating cases in person; right?
15      A.    When COVID first shut us down, up until
16  that time frame, we did not do any field work.
17      Q.    So you weren't required to go meet any
18  people in person then; right?
19      A.    No.
20      Q.    And you could take breaks during the
21  day when you were at home?
22      A.    I guess I could, yeah.
23      Q.    Did you take breaks during the day?
24      A.    It depends on what you are classifying
25  as a break.  I mean, you know, a five-minute

Page 158

J. Moeser

1
2  walk-away, yeah.  An extended period of time, no.
3       Q.    Did you take time to watch the news
4  about COVID?
5       A.    During my workday?
6       Q.    Yes.
7       A.    I didn't have a TV in my location where
8  I worked.
9       Q.    Where did you work from home?
10      A.    At home.
11      Q.    Where, in what room?
12      A.    Oh, it was out of -- well, first it was
13  down in my basement, and then I moved up to one of
14  my spare bedrooms.
15      Q.    And you didn't have a TV in the
16  basement?
17      A.    No.
18      Q.    How about the spare bedroom?
19      A.    At that time I don't think I -- no, I
20  didn't.
21      Q.    Who lived in your house in March 2020
22  while you were working from home during that COVID
23  period?
24      A.    My wife.
25      Q.    Were you all worried about COVID?

Page 159

J. Moeser

1
2       A.    Yeah, I think everybody was.
3       Q.    Were more things going on at home
4  because of COVID?
5            MR. SCIMONE:  Objection.
6       A.    I -- I don't know what you mean as far
7  as "more things."
8       Q.    During the workday, were there other
9  things to do because of COVID?
10      A.    No.
11      Q.    Did you have anyone to care for because
12  they had COVID?
13      A.    No.
14      Q.    How did you cope with the stress of
15  COVID?
16           MR. SCIMONE:  Objection.
17      A.    I -- I don't know what you mean by the
18  stress of it.  I mean, the stress of COVID itself
19  or -- what are you referring to?
20      Q.    Well, we said we were all worried about
21  COVID; right?
22      A.    Who was worried about COVID?
23      Q.    I asked earlier if we were all -- if
24  you were worried about COVID and you said we all
25  were.

Page 160

J. Moeser

1
2       A.    Oh, yeah, well, in general, yeah.
3       Q.    So what kind of coping mechanisms did
4  you use so that you wouldn't be so worried?
5            MR. SCIMONE:  Objection.
6       A.    I -- I don't know how to answer that.
7  I don't know what you mean by how did I cope with
8  it.  I just -- I mean, we talked about it, me and
9  my wife, and obviously I talked to my kids about
10  it over the phone.  You know, when my son came
11  down with it, I talked to him.  When my daughter
12  came down with it, I talked to him.  When I came
13  down with it, they talked to me.  I mean, you
14  know, it's -- but I really didn't have too much
15  worry -- I mean, did we worry about it, yeah, but
16  I really didn't like upset my day about it.
17      Q.    Now, you mentioned your -- did you say
18  that your caseload increased during COVID,
19  increased while you were working from home during
20  COVID?
21      A.    Yes.
22      Q.    Earlier you mentioned there being more
23  cases during certain months, like summer, near the
24  December holiday.  Why were there -- do you know
25  why there were more referrals during COVID that



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
173–176

Page 173

1            J. Moeser
2     Q.   Now, we have also internal security
3   investigators.  Are you familiar with that title?
4     A.   I -- I guess they had to do some --
5   something with -- with our inside staff.
6     Q.   When you did a case assist, for
7   example, for the major investigators, major case
8   investigators, did you get any credit for that?
9     A.   I don't know -- I don't remember if
10  that went down as an assist case or -- I don't
11  know what you mean by credit, though.  I mean, you
12  know, would I -- would that be considered a case
13  for me?
14    Q.   Yes.
15    A.   Yeah, because -- but it may be under a
16  sister case or an assist case.  I don't want you
17  confuse you with that.  But that may be under an
18  assist case, but I would still have to do
19  my invest-- -- it would still count as a case to
20  me.
21    Q.   Okay.  And the title of internal
22  security investigators, do you know that to be
23  investigators that work from a desk versus field?
24    A.   I -- I believe they were desk
25  investigators.

Page 174

1            J. Moeser
2     Q.   Do you know what desk investigators
3   did?
4     A.   Keep it civil here.  I -- I don't know,
5   because I -- I really -- never really got involved
6   with them.  I was very rarely in the office even
7   when we were in the field, so I don't know what
8   they actually did.  I don't know if they were
9   working on medical cases, if they were working on
10  auto cases, if they were handling complaints that
11  came in -- not complaints, but requests that came
12  in from NICB members or the frauds department, New
13  York State Frauds Bureau.  I don't know what they
14  were doing, really.
15    Q.   Do you know if internal security
16  investigators were eligible for overtime?
17    A.   Again, like I'm just assuming that if
18  they were employed by GEICO, then --
19    Q.   Do you know if they were denied
20  overtime?
21    A.   I wouldn't know that.
22    Q.   Do you know if any of them were paid
23  overtime?
24    A.   I wouldn't know that.
25    Q.   Let's look back at -- back to the same

Page 175

1            J. Moeser
2   document, Declaration of John Moeser, that's
3   marked as Exhibit 6.  Now we are looking at
4   paragraph 14.
5     A.   Okay.
6     Q.   Let me know when you have finished
7   reviewing.
8         (Document review.)
9     A.   Okay.
10    Q.   Paragraph 14 you speak of some
11  performance metrics that you are required to meet
12  in order to remain in good standing.
13        Was there a written policy that
14  described these metrics?
15    A.   Was there a what policy?
16    Q.   A written policy.
17    A.   I remember seeing -- yes, I remember
18  seeing some written policies that were gone over
19  in group meetings.
20    Q.   Do you recall who communicated these
21  policies to you?
22    A.   It would have been one of the
23  supervisors that were attending the meeting, that
24  were holding the meeting.
25    Q.   And these are the supervisors -- can

Page 176

1            J. Moeser
2   you name them?
3     A.   Oh, boy.  Besides the three that I
4   named before, there could have been Gerry
5   Cassagne, Toni D'Agnati (phonetic), Dara Campbell.
6   What was her first name?  Danielle Pomodore
7   (phonetic).  I'm trying to think of who else.
8   I -- I can't remember anybody else, but they
9   were -- there were supervisors that I remember
10  associated with the field other than Danielle.
11  She was, I think, a supervisor from people on the
12  inside staff.
13    Q.   When did they tell you that these were
14  the performance metrics?
15    A.   Whenever they changed.
16    Q.   How often did they change?
17    A.   They changed several -- you know, on
18  either a half-year basis or a year basis.  I mean,
19  they were changing metrics all the time.  I mean,
20  I don't -- I can't tell you how many times in a
21  given six-month period or something.
22    Q.   Were there metrics in place in 2016?
23    A.   Yeah.  Yes.
24    Q.   Were there metrics in place from 2016
25  through your last day of employment at GEICO?



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
177–180

Page 177

1           J. Moeser
2      A.   Yes.
3      Q.   And you say in paragraph 14 that -- the
4  second sentence you state:  "These performance
5  metrics and ratings changed constantly, but to the
6  best of my recollection GEICO generally evaluated
7  me based on how many hours it took me to complete
8  a case task, how often I made an entry in a case
9  report, how many days I took to close a case, and
10 how many cases I completed within a month."
11          Were these the only metrics that were
12 used to evaluate your performance at GEICO?
13     A.   No.  There were others.
14     Q.   What were the others?
15     A.   There were the other -- the amount of
16 cases I'm being assigned, the quality of my case,
17 whether or not it was a face-to-face -- and what I
18 mean by face-to-face, in-person contact with
19 somebody, or whether -- and that would be
20 considered a level 1.  Level 2 would mean that you
21 didn't do any field work on the case.  That one
22 used to also go into your metrics.  Not -- not so
23 much the type of case that you had, but whether or
24 not you got an impact on the case, and that was
25 very difficult with staged loss cases, because you

Page 178

1           J. Moeser
2  may take an impact on it.  That doesn't mean it's
3  gonna impact the claim.
4           When I was in the property damage or
5  the enhanced damage team, metrics were also
6  applied as far as if I took an impact, in other
7  words, if I had a positive -- positive findings
8  for the claims examiners to make a determination
9  on or the auto damage adjuster, they would
10 consider that an impact, and there was a whole
11 category of what you can take positive impacts on.
12     Q.   You answered my next question, which
13 was going to be what is an impact, so I appreciate
14 it.
15     A.   It's -- it's -- they had a list of
16 everything -- you could take an impact for an
17 underwriting referral.  In other words, during the
18 course if I found out that you didn't live at this
19 certain location and I was submitted an
20 underwriting referral that I would submit to
21 underwriting through my -- I think it was my -- my
22 SICM system, my case reporting SICM.  I would
23 get -- sorry.  I would get a credit for that
24 impact and you were judged on that.  So, you know,
25 they made it almost like your goal is to get a lot

Page 179

1           J. Moeser
2  of impacts on a case, however, a lot of cases
3  never warranted impacts, and not that you would be
4  downgraded, but you wouldn't get a positive or a
5  higher rating on that case.
6      Q.   And when you have an impact, you
7  mentioned it was being able to help make a
8  determination on the fraud?
9      A.   No, it would be help to make a
10 determination on how the claims examiner or the
11 management wanted to handle -- make a decision as
12 far as the claim concerned.
13     Q.   And what would be an example where
14 there isn't an impact?
15     A.   If I didn't have any really what they
16 considered positive findings.  It could be -- I
17 would have to see the categories again that they
18 printed out that they had that I could tell you
19 what would be a neg- -- or no impact.  For
20 instance, if you were doing a case where you were
21 a newly insured person with GEICO and you had a
22 vehicle that was not new, a used vehicle, and you
23 would put that on your policy without collision
24 damage, and then two days before you put collision
25 on your car, two days before you had an accident

Page 180

1           J. Moeser
2  you put collision on your car, so obviously the
3  suspicion is that you added collision after you
4  had the accident.  So there could be a time when
5  you produced records to me that verified that.
6  You either had let's say a CARCO report done or
7  you had photos of the car or something to that
8  effect.  Well, then basically that wouldn't impact
9  the claim any, so I wouldn't take an impact on
10 that.  And then they had impacts, like I stated
11 before, where they let you do underwriting
12 referrals, but then they changed that, and it got
13 more complicated to take an impact for an
14 underwriting referral.  You had to make a
15 significant impact on an underwriting decision.
16 How would I know that?  I don't work in
17 underwriting.  So you would make the referral and
18 there was subcategories of it that you could or
19 could not take an impact on.  And it got kind of
20 complicated there, you know, in -- in the last few
21 years, and this was all dictated by people from
22 our home office and stuff like that.
23     Q.   When you say your home office --
24     A.   GEICO's home office.
25     Q.   Do you mean nationwide or do you mean



Page 181

1        J. Moeser
2  just Region 2?
3      A.  No, nationwide.
4      Q.  As far as you mentioned the impact, how
5  about were you -- did you have event data recorder
6  equipment?
7      A.  Not me, no.  Other investigators did.
8      Q.  Was file quality part of your
9  performance metrics?
10     A.  File quality?  Yes.
11     Q.  How about audit results?
12     A.  I believe so, yes.  Yeah.
13     Q.  What did they look for in an audit?
14     A.  Again, that changed.  There -- there
15  was a booklet that they gave you, and I remember
16  this, it had to be 7 or 8 pages big, of all the
17  downgrades that they would consider on an audit or
18  the positive that they would do on an audit, and
19  they could downgrade you for something as simple
20  as, you know, the wording that you used.  That's
21  how ridiculous it got.  I mean, you know, and it's
22  all semantics as far as, you know, you know, I
23  went there or I traveled there.  Well, what
24  difference does it make?  You went there.  But
25  they would downgrade you because you didn't use

Page 182

1        J. Moeser
2  the right wording.  You know, if you went to
3  interview somebody and, you know, you decided
4  later on that you didn't need to interview
5  somebody but you didn't document that properly,
6  they would downgrade you for that, or, you know,
7  if your investigation was, I guess, in their eyes
8  good, they would give you a rating on it.  I don't
9  know how they actually came up with that
10  calculation, but it was never really explained
11  thoroughly to not me or anybody else that I
12  remember asking the questions about that.
13     Q.  Did you -- were there specific time
14  limits on tasks that you had to complete?
15     A.  Yeah.
16     Q.  Can you give me some examples?
17     A.  Time limits would be case life.  There
18  was times that I -- yeah, I mean, my cases at that
19  time were judged on case life.  And I believe
20  right before I left, I don't know if it was a few
21  months before I left, they changed the system
22  again and they did away with the case life on a
23  case and they got -- and they actually got into a
24  whole other thing as far as how they evaluate
25  individuals, it was done on a semi-annual basis

Page 183

1        J. Moeser
2  instead of an annual basis, but I remember them
3  doing away with case life, but that was shortly
4  before I left.
5      Q.  Was there a record system where you
6  would enter every task that you completed for a
7  case?
8      A.  A record system?  Yeah.  That was
9  called the SICM system.
10     Q.  And did it record every task that you
11  did for every part of your investigation?
12     A.  Yes, every time I entered into it.
13  That was our case reporting system.
14     Q.  What would you enter into it?
15     A.  Basically everything I did, you know,
16  from the start, from the case assessment all the
17  way down to my closing summary.
18     Q.  Did you enter that contemporaneously as
19  you were -- as you were completing those tasks?
20     A.  Yes.
21     Q.  So when you would go for, say, a scene
22  canvass, you would immediately enter that note or
23  whatever it was that you -- how -- explain to me
24  how you would enter that scene canvass onto SICM.
25     A.  Well, I don't know what you mean by

Page 184

1        J. Moeser
2  immediately, because you couldn't do it while you
3  were in the field unless you sat there with your
4  laptop, which I don't know too many people are
5  gonna do that, but how I did it and other people
6  may have done it differently, but SICM, which was
7  the -- I think it was an acronym for the Special
8  Investigations Case Management system, you could
9  open up a field and actually type in what you were
10  doing there, but the print was so small and didn't
11  have a spell check and I decided not to do that,
12  so I would open up my own Word program and I would
13  keep that case running, and when I came back from
14  like your example from doing a canvass, I would
15  come back to my home office and type it into the
16  Word program and then copy and paste it into the
17  SICM, because you could alter -- not alter, but
18  you could edit a Word program a lot easier than in
19  SICM.
20     Q.  And did you enter that into SICM on the
21  same day or could you enter it on the next day?
22     A.  Yeah, you could enter it in the next
23  day, but it would be time stamped for that day.
24  So then -- one -- I'm glad you brought that --
25  another downgrade was that when they looked into



Page 185

1      J. Moeser
2  it, you know, initially before they changed a lot
3  of the downgrades and systems, I could enter
4  something in that I did two days ago and put
5  down -- what's today?  Today is Friday?  So if I
6  did something on Tuesday, I put it in on Friday,
7  you know, I didn't have to explain why it was
8  doing this, it was more or less common sense that
9  you would see, you know, the time and date that I
10  went to a location compared to when it says that I
11  put it in.  Well, one of the things that they
12  looked at was that I needed to write a whole line
13  that, you know, on this date I went to -- on
14  Tuesday I went there, but I'm putting this in on a
15  Friday.  Does it really help the case?  No.  Does
16  it hurt the case?  No.  But this is one of the
17  downgrades that they would do.  So you could enter
18  it in after you did the task, but it would be time
19  stamped for that time.
20      Q.   How long did it take for you to copy
21  what you put in your Word document to SICM, like,
22  if you were to -- because you said you typed
23  things into a Word program and then you would copy
24  that in to SICM.  How long did that take?
25      A.   Not long at all.  I mean, depending on

Page 186

1      J. Moeser
2  the amount of things that I was putting in SICM,
3  if it was one general thing, it wouldn't take, I
4  don't know, a couple of minutes, you know, to do
5  one thing and then you would copy and paste
6  something else, and they had different drop-downs
7  in SICM too if you were doing database work, you
8  know, because you would -- a lot of people, and I
9  didn't do that, would copy and paste the results
10  right into SICM.  Well, I didn't do that, because
11  it wasn't detailed.  So I would detail it in my
12  report and then put it in.
13      Q.   And did you on your Word -- this detail
14  that you are talking about, was this in the Word
15  document that you mentioned earlier or --
16      A.   Yes.
17      Q.   So that Word document, would you
18  prepare that after the scene canvass like before
19  you would get home, or was that something you
20  would do once you got home, put it into SICM?
21      A.   No, I would -- I would have to do it
22  when I returned.
23      Q.   Okay.
24      A.   I couldn't do it in the field.  I
25  didn't have my laptop, unless I was going to, you

Page 187

1      J. Moeser
2  know, someplace like an EUO center or something,
3  but I wouldn't take my laptop to do scene
4  canvasses in Brooklyn or something, no.
5      Q.   So when you would be in a scene
6  canvass, did you carry a notebook of some sort
7  where you would note?
8      A.   Oh, you mean to document what I did?
9      Q.   Yes.
10      A.   I -- a lot of times what I would do is
11  that I -- I would print out the cover sheet of the
12  referral.  A lot of people didn't do that.  I did.
13  And I would use just like a single piece of paper
14  and just write notes on it, and then when the case
15  was over with, I would destroy that.  They didn't
16  want you to keep records.
17      Q.   You referred -- let me look here.  In
18  the -- so in the Complaint there is a reference to
19  special investigators.  Do you know what titles
20  special investigators means or what titles
21  would -- what job titles would be encompassed
22  within the special investigators?
23      A.   It's my understanding that's what we
24  all were, special investigators.
25      Q.   So that's senior field investigators

Page 188

1      J. Moeser
2  and which other titles?
3      A.   I guess it was anybody who was assigned
4  to the SIU, Special Investigations Unit.
5      Q.   Do you know if you were all working the
6  same types of claims?  Actually, do you know if
7  you were all working the same types of referrals?
8      A.   No, we weren't.  Like I explained
9  before, we had different teams that would handle
10  different referrals.  But prior to being split up
11  in specialty teams, there was a time that we used
12  to handle all different referrals, everybody, you
13  know.
14      Q.   Do you know if internal security
15  investigators were permitted to flex their time?
16      A.   I wouldn't know that.
17      Q.   Do you know if field medical fraud
18  investigators were permitted to flex their time?
19      A.   If they were -- again, in their medical
20  team I know some of them that worked there and
21  they had the same status as I did, but I don't
22  know if there were other people in the medical,
23  because they came in later on when they split the
24  unit, and I really didn't know a lot of them.  I
25  don't know what their title was as far as inside



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
197–200

Page 197

1           J. Moeser
2  7.75 hours of work per day.
3      A.   What was put to writing, and I don't
4  recall the date, was that you could submit for
5  overtime -- you could not submit for overtime for
6  office work or administrative work.  Any other one
7  would have been through a phone conversation.
8      Q.   Did anyone ever tell you that overtime
9  would not be approved?
10      A.   Yeah, in a general meeting, and I think
11  I said this before, in one of our general meetings
12  when it was asked, you know, would you -- when
13  they meant "you," they meant management, permit us
14  to work overtime to catch up on -- or not to catch
15  up, but to handle the cases that we were being
16  assigned, and they said no, that that wouldn't be
17  a consideration.
18      Q.   So what did they tell you to do
19  instead?
20      A.   Didn't tell you anything.  Handle it.
21      Q.   Did they tell you to flex your time?
22      A.   Well, we all knew that we had flexible
23  time, but, you know, as far as flexing time, they
24  needed to explain what you meant by that.  Now, I
25  know what flexible time is, but like I said

Page 198

1           J. Moeser
2  before, when you are handling more work than you
3  normally should be or were before, how do you flex
4  your time, you know.  It's just common sense that
5  if you are giving me five more cases, how do I
6  flex my time to work around that.
7      Q.   It says in paragraph 32:  "On a handful
8  of occasions in 2017 and 2018 -- no more than 3
9  days in total, according to GEICO's records --
10  Moeser's supervisors made exceptions, and approved
11  overtime.  These approved overtime days were
12  scattered across workweeks, and total no more than
13  5.5 overtime hours."
14           Which supervisors made the decision to
15  approve overtime for you on these occasions?
16      A.   During that period it would have been
17  either April Neyland or Rich Kiligin.
18      Q.   And do you remember the circumstances
19  surrounding those overtime approvals?
20      A.   No.  Again, I don't know -- I remember
21  Rich -- having a conversation with Rich Kiligin
22  when I made the -- when I made the overtime that
23  he also expressed that it could reflect on your
24  evaluation, because as I explained before about
25  the amount of hours, you know, in ratio to the

Page 199

1           J. Moeser
2  amount of cases, and the same thing with April,
3  during one of these periods I believe might have
4  been when I was being supervised by April.
5      Q.   Do you remember why you were given
6  overtime or -- sorry -- do you remember why your
7  overtime was approved?
8      A.   If it was -- I would imagine I probably
9  had some field work done at that time.
10      Q.   Could you -- field work -- you were a
11  field investigator then, though, so --
12      A.   Well, if it was before the pandemic,
13  then it was -- I was doing work in the field, I
14  mean, I was doing EUOs in the field and handling
15  new cases or coming home to handle new cases and
16  do the write-ups, and I believe -- I don't know if
17  that was the time that I was submitting for
18  these over -- I don't know the dates that I
19  submitted for these overtimes, but, you know, or
20  what I was doing that particular day, but I can
21  only assume that that was what I was doing.
22      Q.   And why did you submit then but not --
23  submit a request for overtime then but not later?
24      A.   Because it was told that it would
25  negatively reflect on my evaluation and it would

Page 200

1           J. Moeser
2  be something that unless it was that type of
3  investigative steps taken, that they, and again I
4  don't know who "they" was, I would imagine GEICO
5  management, didn't want us submitting for overtime
6  for office work.  However, if I was doing EUOs,
7  then I ran into time where I had to come back
8  late, let's say, you know, if I ran into
9  windshield time and came back late and I had to do
10  something else and I stayed late, yeah, you know,
11  you could submit for overtime, however, you know,
12  it would affect what your evaluation would be.
13      Q.   And when you submitted the requests for
14  overtime in 2017 and 2018, at that time were you
15  told that it was going to negatively affect you?
16      A.   It was known to me, I knew that before
17  and after 2017.  This was something that was going
18  on for quite sometime, you know, five or six years
19  before this.
20      Q.   So why did you -- knowing that you
21  thought it would negatively affect you, why would
22  you still submit for overtime then in these three
23  instances and not others?
24      A.   Because it was a minimal amount of
25  time, you know.  It wasn't really gonna change my,



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
245–248

Page 245

J. Moeser
1
2     A.   Well, if you were gonna backdate your
3   cases, you needed to explain why you were doing
4   this or, from my recall, you would be downgraded,
5   yes.
6     Q.   Do you recall approximately when that
7   happened, that GEICO asked you to begin
8   documenting the reasons for backdating a case
9   entry?
10        MS. CACERES-BONEAU:  Objection.
11    A.   I can't recall.  It was going on for a
12   few years before I retired, I mean, before I left.
13   Again, I don't -- I don't recall the actual time
14   frame when it started.
15    Q.   Do you recall whether that was the case
16   before COVID?
17    A.   Oh, yeah.  Yeah.
18    Q.   And do you recall whether that was the
19   case in 2016?
20    A.   Again, it could have been, yeah.  Sure.
21   See, you have to understand, these guidelines, you
22   know, they just weren't set in stone, they were
23   changing constantly, and, you know, they were
24   adding things to them and it just seemed like, you
25   know, every time somebody came up with a new idea,

Page 246

J. Moeser
1
2   they threw it out there and said, "okay, let's
3   start doing it this way" and they didn't realize
4   that, well, it may seem small to you on one scale,
5   you know, but when you are doing this over a
6   period of many cases, it adds up, and, you know,
7   it's -- so when they increased it, they were
8   increasing different steps that they wanted you to
9   take that sounded redundant and sounded, you know,
10   not important, but they still wanted you to do it,
11   and if you didn't do it, well, then you were gonna
12   be downgraded on your audit.
13    Q.   And GEICO adopted that practice of
14   downgrading investigators for backdating cases,
15   did you -- did you backdate entries after that
16   time?
17    A.   Oh, sure, I had to, yeah.  Yeah.
18    Q.   Did you try to limit the extent to
19   which you backdated entries?
20    A.   I tried, yeah, but, you know, unless I
21   was gonna work until 11:00 at night every night, I
22   mean, I would have to put stuff off into the next
23   day.
24    Q.   Was it your practice, generally
25   speaking, to make at least some kind of entry in

Page 247

J. Moeser
1
2   SICM toward the end of your workday, meaning --
3   when I say "workday," I mean the last hours that
4   you were doing work for GEICO?
5     A.   There would be entries in there before
6   I stopped working, yes.
7     Q.   And so what -- let me ask a slightly
8   more precise question.
9        In that last hour or so of the day that
10   you were working, was it typical for you at that
11   time within that last hour to be making entries in
12   SICM?
13    A.   Yes.
14    Q.   I'd like you to take a look at
15   Exhibit 5.
16    A.   I don't know which 5 is.  Is this 5?
17    Q.   No.  It's the one that has -- the cover
18   page says this -- file produced natively.
19    A.   I'm sorry about this, guys.
20    Q.   No problem.
21    A.   This?
22    Q.   That's the one, yes.
23    A.   Okay.
24    Q.   Turn to the last page of the exhibit.
25    A.   Last page.  Okay.

Page 248

J. Moeser
1
2     Q.   So -- and if you want to refer to the
3   first page -- well, I guess it's the second page
4   after the cover as well, you can see the header to
5   these different columns.
6     A.   All right.
7     Q.   Do you see that?
8     A.   Uh-huh.
9     Q.   Okay.  So look at the column that says
10   "Record Completion Date" on that second page.
11    A.   Okay.
12    Q.   That's the column that has -- do you
13   see the date entries there?
14    A.   Correct.
15    Q.   Okay.  Now look on the last page of
16   Exhibit 5 in that column.
17    A.   Okay.
18    Q.   So there is -- do you see the date
19   entry there?
20    A.   You are talking about 4/26?
21    Q.   On the last page, the top date that --
22   yes, 4/26 I see is the last row of that last page.
23   Is that what you are looking at?
24    A.   Okay.  So you are talking about May
25   4th?



1

2                   C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                         ) ss.:

6    COUNTY OF NASSAU     )

7

8            I, KRISTIN KOCH, a Notary Public

9       within and for the State of New York, do

10      hereby certify:

11           That JOHN E. MOESER, the witness

12      whose deposition is hereinbefore set forth,

13      was duly sworn by me and that such

14      deposition is a true record of the

15      testimony given by such witness.

16           I further certify that I am not

17      related to any of the parties to this

18      action by blood or marriage; and that I am

19      in no way interested in the outcome of this

20      matter.

21           IN WITNESS WHEREOF, I have hereunto

22      set my hand this 8th day of August, 2024.

23

24      _____

25           KRISTIN KOCH, RPR, RMR, CRR

