# Exhibit E

**In the Matter Of:**

**KEITH FISCHER v GEICO**

2:23 Civ. 2848 (GRB) (ARL)

**MICHAEL REED**

*January 08, 2025*



800.211.DEPO (3376)
*EsquireSolutions.com*

Page 65

1  MICHAEL REED
2  Q. And how would you input your hours?
3  A. Friday -- Thursday or Friday we would
4  just -- basically it was a cut and paste for the
5  hours and submit it.
6  Q. And what do you mean by that?
7  A. It was an auto-fill. You would hit
8  auto-fill, and all of your days and your hours
9  would automatically fill, and that was how it was
10 submitted.
11 Q. Okay. And when it was auto-filled,
12 would that be hour stamped, meaning I worked --
13 again, I'm making an example -- 9:00 a.m. to 5:00?
14 A. No, it was just the number of hours.
15 Q. And do you remember what the auto-fill
16 number of hours would allocate in total?
17 A. Thirty-eight point seven five.
18 Q. Did you have the ability to not use
19 auto-fill and to actually plug and play different
20 numbers per day?
21 A. Yes.
22 Q. In your custom and practice, do you
23 ever do that?
24 A. I did not, no.
25 Q. And I think you said on Thursday or

Page 66

1  MICHAEL REED
2  Friday you would auto-fill the number of hours.
3  Would you then submit it on the day that you
4  auto-filled the hours?
5  A. Sometimes a supervisor would say that
6  they were going to be out of the office on a
7  Thursday or Friday, so you would submit that
8  either early or Thursday or Friday.
9  Q. To your knowledge, once you would
10 submit it to a supervisor, what would occur then
11 thereafter?
12 A. I -- I don't know what they did with it
13 past that point.
14 Q. Did anything ever get sent back to you
15 because it was inaccurate, incomplete, or there
16 was any problem just the processing for your
17 Workday auto-fill hours?
18 A. Not that I can recall.
19 Q. To your recollection, for the auto-fill
20 hours that you would plug into the Workday system
21 for your hours worked, were you always paid for
22 the hours that you input through Workday?
23 A. Was I always paid for those hours?
24 Q. Yes.
25 A. Yes. I was not paid for the hours that

Page 67

1  MICHAEL REED
2  I worked over that, though.
3  Q. For any hours that you worked over the
4  auto-fill amount within the Workday system, did
5  you ever input those hours into Workday?
6  A. I did not fill out for overtime because
7  that was something that was not done.
8  Q. And to your knowledge would it be a
9  violation of GEICO policy to not input hours that
10 you actually worked?
11 A. That I don't know. All I know is the
12 cases had to be done.
13 Q. Did any supervisor, lead, manager,
14 somebody with authority at GEICO ever come to you
15 say "I'm aware that you're working overtime, but
16 you're not inputting those hours into Workday to
17 be adequately paid"?
18 A. They ever came to us and said that.
19 Q. How frequent were you paid with GEICO?
20 A. I believe it was every two weeks.
21 Q. And I apologize if you already answered
22 this. As to any potential discrepancy for the
23 hours that you were not paid that you were
24 concerned based on your paycheck or your pay
25 record, did you ever raise that to human resources

Page 68

1  MICHAEL REED
2  or to a supervisor?
3  A. You're going to have to repeat that.
4  You kind of got me lost on that one.
5  Q. Sure. And I -- apologies. That was
6  confusing.
7     With regard to when you would receive
8  money in from GEICO for your work where you felt
9  that you were not being adequately paid for your
10 hours, did you ever go to any human resource
11 individual or your supervisor regarding being, for
12 example, shorted money on your paycheck or your
13 paystub?
14 A. Human resources, I never spoke with
15 human resources.
16    As -- as to what you describe as
17 "shorted," the 38.75 hours were there. There --
18 overtime or any hours that we worked was not up
19 for discussion for our supervisors. There was --
20 according to them there was no overtime. Even
21 though you worked the extra hours, or you put the
22 extra time into your cases, there was no overtime.
23 Q. And when was this first communicated to
24 you that overtime was not allowed?
25    Oh, sorry.



Page 69

1      MICHAEL REED
2   A. I'm sorry. I thought you were trying
3  to say -- go ahead. I'm sorry. Repeat the
4  question if you could. I thought somebody popped
5  in there.
6   Q. No, that's okay. With regard -- strike
7  that.
8      MS. ALBERTY: Can you read -- read back
9  that last question, Kim. I apologize.
10     THE COURT REPORTER: Yes. Give me one
11  minute, please.
12     "And when was this first communicated
13  to you that overtime was not allowed?"
14     THE WITNESS: I can't give you that,
15   but that was always implied, that just
16   overtime was not part of what we did.
17     Our job was to get the cases done and
18   make sure that the cases were submitted.
19  BY MS. ALBERTY:
20   Q. What do you mean by "it was implied"?
21   A. Just, we had to do our work. All of
22  our -- all of our evaluations were based upon our
23  work. Our report cards were based upon how many
24  cases we received and how many we closed. Certain
25  cases took longer than others. There was a lot of

Page 70

1      MICHAEL REED
2  work to be done, and it was all based -- your --
3  your compensation, your raises, everything was
4  based upon those report cards and that evaluation.
5      So you had to work your cases. If that
6  meant working past 38.75, or past 3:30 in the
7  afternoon, it was -- you did it, because that was
8  what -- what you did.
9      There was no -- if you were to call and
10  get overtime approved, the answer was no, but yet
11  that case had to be done. It had to be submitted.
12   Q. Do you recall any of your supervisors
13  or managers telling you explicitly you cannot plug
14  in and be entitled to overtime?
15   A. There -- there was, yeah. There was
16  questions of overtime, and the answer was there is
17  no overtime.
18   Q. And who had questions regarding
19  overtime, as you remember?
20   A. I know I did, and I know most of the
21  other investigators all felt the same way, but I
22  can't speak for them.
23   Q. When you say "other investigators," are
24  you talking about John and Mike, or some -- some
25  other ones?

Page 71

1      MICHAEL REED
2   A. I would say most all of the
3  investigators in the SIU unit, but once again, I
4  can't speak for them specifically.
5   Q. How do you know that mostly all the SIU
6  investigators had questions regarding overtime?
7   A. Whenever it was -- it was just a common
8  complaint. With the amount of cases that we were
9  receiving, and the amount of work that we're
10  getting, it was just not feasible to do it in the
11  amount of hours that we were working.
12   Q. So I want -- I want to focus in on --
13  on this area where we're not talking in a
14  hypothetical setting --
15   A. Okay.
16   Q. -- but a tangible form, which is, "I
17  was cc'd on this email," you know, "from X, Y, and
18  Z, and they had questions about OT;" or,
19  I remember being in some type of meeting where so
20  and so brought this up."
21     Do you have any type of substantial
22  information regarding your testimony that mostly
23  all SIU had questions related to OT, outside of
24  your own questions you had raised?
25   A. No, I do not.

Page 72

1      MICHAEL REED
2   Q. When you brought your questions
3  forward, do you recall who it was to?
4   A. My questions of overtime?
5   Q. Yes.
6   A. That would have been to Chet Janik, and
7  the answer once again, there was no overtime.
8   Q. Do you remember if we talked --
9   A. But that -- that was for -- I mean,
10  that -- it was not asked all the time. It was
11  just that -- that was the way it was. There was
12  no overtime.
13   Q. Do you recall if the conversations you
14  had with Chet were by email, on the phone, text
15  message, DM, direct message?
16   A. Mostly phone.
17   Q. And when you had questions regarding
18  overtime, what do you recall Chet explicitly
19  saying to you?
20   A. There was no -- "There was no
21  overtime."
22   Q. Do you have any knowledge whether any
23  other SIU investigators in New York -- so whether
24  that's downstate or up north -- actually received
25  and were -- was paid overtime?



Page 73

1     MICHAEL REED
2     A.  I have no knowledge of any other
3  investigators having any overtime.
4         MS. ALBERTY:  So I'm going to mark this
5     as Exhibit 3.
6  BY MS. ALBERTY:
7     Q.  Real quick, before we do that, Michael,
8  we've been going about an hour and a half --
9         MS. ALBERTY:  Sorry, Jared, if you were
10  wanting to take --
11        MR. MCALLISTER:  Yeah, I was going to
12    say, I think we should take a break at some
13    point soon, but maybe we cam do it after this
14    exhibit.
15        MS. ALBERTY:  Okay.
16 BY MS. ALBERTY:
17    Q.  Michael, are you okay to keep going for
18 another five to ten minutes, and then we'll take a
19 quick break?
20    A.  We go through this one, and then we'll
21 take a break.
22    Q.  Okay, all right, great.
23        MS. ALBERTY:  I appreciate everyone's
24 flexibility.
25

Page 74

1     MICHAEL REED
2     (Compensation Associate Handbook Table
3  of Contents, Bates stamped G000191 to G000235 was
4  marked Deposition Reed Exhibit 3, for
5  identification.)
6  BY MS. ALBERTY:
7     Q.  So, let's go ahead and share screen
8  again.
9         So what's before you is marked as
10 G000191 all the way down to G000235.  This is an
11 employment contents with, in part, an associate
12 handbook similar to what we saw before in Exhibit
13 Number 2.
14        I am going to zoom in if it allows me.
15 Is this an okay view --
16    A.  It's fine.  It's fine with me.
17    Q.  Okay, great.  Just as to this
18 employment contents, table of contents, does this
19 look familiar to you?
20    A.  I might have seen it.  I don't recall
21 when.
22    Q.  Okay.  I'm going to scroll down and go
23 to G000195.  So under "Classifications of
24 Associates," we have one that is "Nonexempt
25 Associates."

Page 75

1     MICHAEL REED
2     Do you recall, Michael, from 2016 to
3  2023 if you were considered a nonexempt associate?
4     A.  I can't -- honestly can't recall what I
5  was classified as.
6         MR. MCALLISTER:  Tiffany, I just want
7     to note that, as far as we understand this is
8     from July of 2023, and Mr. Reed left GEICO
9     in -- in or around April of 2023.  So I'm not
10    sure if this applied to him exactly.
11        MS. ALBERTY:  Okay.
12 BY MS. ALBERTY:
13    Q.  Do you recall, again, Mr. Reed, seeing
14 anything indicating a policy where it states that
15 nonexempt associates are never allowed to work,
16 quote, "off the clock"?
17    A.  Do I recall seeing that?  No.
18    Q.  Okay.  Do you recall anybody telling
19 you that?
20    A.  No.
21    Q.  I'll go ahead and stop sharing my
22 screen right now.
23        MS. ALBERTY:  What we'll is we'll go
24    ahead and take a break.  We're at 10:35, for
25    my time --

Page 76

1     MICHAEL REED
2     THE WITNESS:  How about 11:35?
3     THE LEGAL VIDEO SPECIALIST:  Do you
4     want to go off the record for this?
5     MS. ALBERTY:  Yeah.
6     THE LEGAL VIDEO SPECIALIST:  We're off
7     the video record, 11:34 a.m.
8     (Recess taken.)
9     THE LEGAL VIDEO SPECIALIST:  We are now
10    back on the video record, 11:42 a.m.
11 BY MS. ALBERTY:
12    Q.  Okay, great.  And before we took a
13 break we were talking about various policies and
14 trainings.  I want to focus back on Exhibit Number
15 2, so I'm going to share screen again.
16        Okay, so we're back looking at G000039.
17 Is this an okay view for you, Michael?
18    A.  Yeah, I'm good.
19    Q.  Okay.  So I want to focus on this
20 paragraph here where it starts with, "All
21 nonexempt associates are required to accurately
22 record their hours worked and absences taken.  All
23 exempt associates are required to accurately
24 record their absences taken."
25        Was it the expectation as an employee



Page 109

1   MICHAEL REED
2   upon the types of cases?
3       A.  Yes.  If you had a case that was going
4   through EUO, you wouldn't really need to touch
5   that as much, because the EUO is still pending.
6   That's already been scheduled and pending.
7       Q.  As to the time consideration and kind
8   of the scale that you're talking about, that to
9   your knowledge only applies to the types of cases
10  that you would have handled, right?
11      A.  That I would have handled, yes.  I
12  don't have any knowledge of the other cases, their
13  medical teams or any of those guys, what those --
14  what those time frames were.
15      Q.  For a rating of four, do you recall the
16  number of cases that needed to be worked or touch
17  point?
18      A.  I don't recall.
19      Q.  What about for a number three?
20      A.  Once again I -- I can't recall, and
21  once again I don't know if different teams or
22  different investigators had different goals.
23      Q.  As to the overall rating on that
24  one-to-five scale for the weekly report card,
25  monthly report card, and the end-of-year

Page 110

1   MICHAEL REED
2   evaluation, do you recall the number of cases you
3   needed to close in order to hit the specific types
4   of rating?
5       A.  I don't recall the number of cases to
6   be closed, no.
7       Q.  I believe you indicated case life?
8       A.  Yes.
9       Q.  In what capacity did case life have an
10  impact score into your overall end-of-year
11  evaluation?
12      A.  Case life was not something towards the
13  end of my career that we were based -- that we
14  were scored on.  However, the supervisor and the
15  managers were graded upon our case life, therefore
16  they were very adamant that you close your cases
17  as quickly as you could and work your cases as
18  quickly as they could.
19          Like I said, although that wasn't
20  something that was a goal of mine, it was a goal
21  of my supervisor and a goal of my manager,
22  therefore there was pressure to get that case life
23  down so that their evaluations and their case life
24  would be better.
25      Q.  How -- how do you know that?

Page 111

1   MICHAEL REED
2       A.  I was told that by my supervisor, Chet
3   Janik.
4       Q.  As to the, you know, the same matrix of
5   was the case life for you specifically, how that
6   would impact, for example, Chet's overall
7   end-of-year evaluation, do you have any idea what
8   that looked like in application?
9       A.  In his -- in his -- in his evaluation?
10      Q.  Yes.  So --
11      A.  I don't know -- I don't know what his
12  evaluation was, but they were something that they
13  were evaluated on, and it was a hot item for us to
14  get those cases closed if we could close them.
15          The more case closures for us, the more
16  case closures for them.  That helped out their
17  evaluation.  What numbers they got out of that I
18  couldn't tell you.
19      Q.  And when you -- when this was told to
20  you, was this over the phone, in person --
21      A.  Yeah, over the phone.
22      Q.  Do you remember when in time this was
23  told to you?
24      A.  I don't recall the date and time.  The
25  conversation was basically the fact that I was

Page 112

1   MICHAEL REED
2   being questioned about my case life, which I've
3   indicated is not part of my goals, to which the
4   answer was, "It was part of my goals," is what he
5   said.  "It's part of our goals, my goals, and
6   management goals.  That's why case life is
7   important."
8           Though I have no proof, I can't tell
9   you that, but I can tell you that conversation
10  occurred.
11      Q.  Going back to your declaration in
12  paragraph nine, you claim that you regularly
13  worked two hours a day to address case files you
14  received on the road, maintain the life of your
15  other cases, and to meet the guidelines set by
16  GEICO.
17          Is it your testimony that you worked an
18  extra two hours every day from 2016 to your
19  resignation?
20      A.  That would be a --
21          MR. MCALLISTER:  Objection.
22          You can answer.  Sorry.
23          THE WITNESS:  Oh, okay.  I was just
24      making sure.
25          That would be a fair number, yes.



Page 113

1  MICHAEL REED
2  BY MS. ALBERTY:
3   Q.  And what do you base these estimates
4  on?
5   A.  The hours that I would be on the road
6  traveling back and forth to statements, coming
7  back into the office, trying to compile the
8  information that I had from going out on the road,
9  which would be summarizing the statements, getting
10 all of that information into my Word document, at
11 the same time receiving more cases while I was out
12 and having to get those cases -- case life done,
13 and to get the -- excuse me, get the --
14  Q.  Sorry.
15  A.  Get the initial case -- we're good?
16     Okay, to get the initial cases set up
17 and into the SICM and into my other new Word
18 documents.
19     So, every time I was on the road for an
20 hour and a half, two hours, three hours, that
21 would end up at the end of the day with the cases
22 that I got while I was out.
23     Just because you're on the road, the
24 cases didn't stop.
25  Q.  Do you have any notes calendaring any

Page 114

1  MICHAEL REED
2  type of phone software that you used to support
3  your statement that you were working an additional
4  two hours every day?
5   A.  I do not have any documentation.
6   Q.  Is it fair to say that this is more of
7  a guess?
8   A.  I'd say it's more than a guess.
9     It would be the hours that I would work
10 on my statement, my verbal statement.
11  Q.  But a --
12    MR. MCALLISTER:  I would also just
13    object to that last line of questioning, but
14    keep going.
15 BY MS. ALBERTY:
16  Q.  As to those actual itemization of the
17 two hours per day, which in theory would be ten or
18 so hours I would say a week, or less than that,
19 you don't have anything to substantiate the actual
20 itemized breakdown of what that looked like per
21 day?
22  A.  I do not have any documentation, no.
23  Q.  How many cases did you receive while
24 you were on the road on average?
25  A.  Once again that varied upon the day.

Page 115

1  MICHAEL REED
2     You could be one case, two cases, three
3  cases.  It depended upon how many case were in
4  your cue for your geographical area.
5   Q.  In your declaration you referred to
6  guidelines set by GEICO.  What guidelines are you
7  referring to?
8   A.  For what guide -- for what guidelines?
9  I don't understand.
10  Q.  Sure.  Let me just pull this back up.
11  A.  Okay.
12  Q.  So we're still on nine, third to last
13 sentence.
14  A.  Okay.  The guidelines met by GEICO
15 would have been all the time frames that I had
16 spoke about earlier, that case life, cases had to
17 be set up within twenty-four hours, contact with
18 the examiner within twenty-four hours...
19     All of that had to be done whether you
20 were on the road or not.  So when you got back at
21 the end of the day, you still had to take those
22 cases and get those done within the twenty-four
23 hours.
24     That doesn't concern the fact that
25 possibly you're more than likely the next

Page 116

1  MICHAEL REED
2  morning -- you had work to do with those cases and
3  then go ahead head back out on the road again.
4   Q.  When regard to the time frames that we
5  spoke about earlier, would that have been from
6  2016 to 2023 --
7   A.  Yes.
8   Q.  -- or did the guidelines change at any
9  time?
10  A.  They changed but they're all basically
11 the same.  Twenty-four hours was most of the hits
12 on all of the information; twenty-four hours to
13 enter a statement; twenty-four hours to contact
14 the examiner; twenty-four hours to upload your
15 cases or to put in your plan of action.
16    They had very strict time frames on all
17 of the entries into SICM.  If you missed those
18 time frames, your case would fail.  And then you
19 failed your case, that obviously would bring your
20 rating down.
21  Q.  When you say twenty-four hours, is that
22 twenty-four hours from the -- from the hour you
23 received the case from intake?
24  A.  Yes.  There was no weekend.  And
25 actually weekends and holidays count for certain



C E R T I F I C A T E

STATE OF NEW YORK    )
                     : Ss.
COUNTY OF NEW YORK   )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL REED, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January, 2025.



_____
Kim M. Brantley

My Commission expires May 31, 2026.