# Exhibit G

**In the Matter Of:**

Keith Fischer, et al. vs GEICO

2:23 Civ. 2848 (GRB) (ARL)

# THOMAS BARDEN

*August 08, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

Page 25

1      THOMAS BARDEN
2  Q. When you resigned in December, were you
3  still within that Albany territory?
4  A. Yes.
5  Q. During your time with GEICO, did you
6  ever transition out of the Albany territory?
7  A. No.
8  Q. I believe in the complaint, in your
9  declaration you described yourself as a special
10 investigator. Is that the same as the field
11 investigator position that we just spoke about?
12 A. I believe field investigator is
13 encompassed within all special investigators.
14 Q. Would there be other titles then that
15 you would anticipate or presume that are special
16 investigators along with your field investigator
17 position?
18     MS. COLE-CHU: Objection.
19     THE WITNESS: I would assume that there
20     are other titles that people were given.
21 BY MS. ALBERTY:
22 Q. Do you know what those other titles
23 would have been?
24 A. I'm not sure what they would have been.
25 Q. Okay. I believe you indicated a level

Page 26

1      THOMAS BARDEN
2  sixty-five special investigator. What does that
3  mean?
4  A. Basically the level I was assigned to.
5  I'm not sure what that level indicates.
6  Q. Okay. Were you ever any other level
7  while you were with GEICO?
8  A. No.
9  Q. As the -- as the field investigator,
10 what were your duties and responsibilities?
11 A. We were --
12     MS. COLE-CHU: Objection. Sorry.
13     THE WITNESS: We were assigned auto
14     fraud investigative cases. So our job was to
15     investigate the fraud that was indicated.
16 BY MS. ALBERTY:
17 Q. And that would have been within that
18 Albany territory that you told me about?
19 A. Yes.
20 Q. Did you supervise anyone?
21 A. No.
22 Q. Did anyone shadow you?
23 A. No.
24 Q. When you first started, did you shadow
25 anyone?

Page 27

1      THOMAS BARDEN
2  A. Yes.
3  Q. And who was that?
4  A. Craig Costanzo.
5  Q. How long did that occur for?
6  A. Three to four months.
7  Q. So if my math serves me right, then
8  that would have been between September of 2019 to
9  about end of December of 2019 into January of 2020
10 that you would have shadowed Craig Costanza (sic)?
11 A. Yes.
12 Q. What were the requirements for your
13 position?
14     MS. COLE-CHU: Objection.
15     THE WITNESS: Requirements? As far as?
16 BY MS. ALBERTY:
17 Q. You know, if there was any type of
18 education requirements --
19 A. Oh.
20 Q. -- any experience requirements.
21 A. I'm not sure what their requirements
22 were.
23 Q. Do you know if there was a level
24 sixty-six field investigator role at GEICO?
25 A. I don't know.

Page 28

1      THOMAS BARDEN
2  Q. Fair to say because you were a level
3  sixty-five, that's the only knowledge that you
4  have about that position is within that level
5  base, correct?
6     MS. COLE-CHU: Objection.
7     THE WITNESS: Yes.
8  BY MS. ALBERTY:
9  Q. As a senior field investigator, what
10 were your hours?
11     MS. COLE-CHU: Objection.
12     THE WITNESS: Hours were basically
13     eight hours a day.
14 BY MS. ALBERTY:
15 Q. Were they set times?
16 A. When I was hired, I was told that our
17 hours were flexible so that we could adjust to
18 whatever is required during the day regarding
19 in-person interviews, scene canvasses, EUOs that
20 had to be done, things likes that, so that we
21 could adjust our schedule according to that.
22 Q. Did you say EUOs?
23 A. Examinations under oath.
24 Q. Okay, thank you.
25 A. Sorry.



Page 29

1  THOMAS BARDEN
2  Q. No, that's okay.
3  A. Sorry.
4  Q. So in your position everything that you
5  just outlined are some of the additional duties
6  and responsibilities that you had in order to
7  investigate auto fraud, correct?
8  A. Yes.
9  Q. Did your hours change from that flex
10 time throughout your employment with GEICO?
11     MS. COLE-CHU: Objection.
12     THE WITNESS: The hours were extended.
13 BY MS. ALBERTY:
14 Q. Okay, and in what capacity?
15 A. With increased caseload, it was -- it
16 demanded more hours to complete cases,
17 investigative steps.
18 Q. Were you still allocated that flex time
19 we talked about?
20 A. It was still -- it was basically up to
21 us when we got that work done, when we put in that
22 eight hours.
23 Q. When you first started, who was your
24 supervisor?
25 A. Chester Janik, Chet Janik.

Page 30

1  THOMAS BARDEN
2  Q. Did -- did your supervisor change at
3  any time during your employment?
4  A. No.
5  Q. Did you ever work with somebody by the
6  name of Gerald -- Gerald Cassagne? Did I butcher
7  that last name?
8  A. If I can go back and qualify, Chet
9  Janik retired about two weeks before I left the
10 company. So if that was a transition into a new
11 supervisor, it may have happened over those two
12 weeks, but that was very minimal --
13 Q. Okay.
14 A. -- time, so.
15 Q. So we'll say from ninety-five percent
16 of your employment --
17 A. Yeah.
18 Q. -- with GEICO --
19 A. Even more so.
20 Q. Chester --
21 A. Yes.
22 Q. -- was your supervisor?
23 A. Yes.
24 Q. Okay. We'll circle back to the
25 original question, which was did you ever work

Page 31

1  THOMAS BARDEN
2  with Gerald Cassange?
3  A. "Gerald" sounds familiar. I don't
4  recall.
5  Q. You had said that Brian Crosier --
6  A. Crosier.
7  Q. Thank you.
8  A. Mm-hmm.
9  Q. -- helped you get the position. Was he
10 over your supervisor?
11 A. No.
12 Q. Okay. For Chester's role as your
13 supervisors, do you know how many senior field
14 investigators he oversaw?
15 A. Eight or nine maybe. I'm not really
16 sure for the -- the exact number.
17 Q. Would that have been throughout your
18 tenure at GEICO that you recall?
19 A. Yes. They did have a couple that left
20 service within that time period that were never
21 replaced.
22 Q. Do you know if he managed any other
23 individuals with different titles than you?
24 A. No, I don't know.
25 Q. How frequent did you speak to him?

Page 32

1  THOMAS BARDEN
2  A. At the very least on a weekly basis.
3  Q. And what was the mode of communication?
4  A. It was usually a phone call, or also
5  emails obviously as far as, you know, task
6  assignments, information, things like that were
7  emails on a constant -- you know, consistent
8  basis.
9  Q. Did -- did GEICO utilize any
10 communication platforms for their investigators,
11 such as Teams, Slack, Jabber?
12 A. I don't recall any of that, no.
13 Q. Do you still talk to Chester today?
14 A. No.
15 Q. It seems that you had more of a
16 personal relationship with him prior to starting
17 at GEICO. Did that end when you ended your
18 employment at GEICO?
19     MS. COLE-CHU: Objection.
20     THE WITNESS: I never met Chet Janik
21     before I interviewed with him --
22 BY MS. ALBERTY:
23 Q. Okay.
24 A. -- for the job.
25 Q. Sorry, I apologize. I think I was



Page 33

1  THOMAS BARDEN
2  mixing him up with Brian.
3     A.  Okay.
4     Q.  Okay, so aside from your supervisor,
5  was there anybody else that would oversee you in
6  your capacity as a field investigator?
7        MS. COLE-CHU:  Objection.
8        THE WITNESS:  There was his supervisor.
9  BY MS. ALBERTY:
10    Q.  And what was his name --
11    A.  -- which would be a manager I guess is
12 his title, Bill Newkirk -- Bill -- sorry.  Bill
13 Newport, my apologies.  Bill Newkirk was my
14 college roommate, so, sorry.
15    Q.  Okay, Bill Newport.  And do you know
16 how many investigators Bill oversaw in his
17 capacity as a manager?
18    A.  I do not know.
19    Q.  How frequent would you communicate with
20 Bill?
21    A.  Seldom.
22    Q.  Could you maybe give me a
23 generalization?  Once a quarter? once a month?
24 once a year?
25    A.  Maybe a few times a year I would say.

Page 34

1  THOMAS BARDEN
2     Q.  And what was that mode of
3  communication?
4     A.  We did have two to three -- I would say
5  two or three FaceTime meetings, or Zoom meetings
6  as a team with Bill.  I did talk to him a couple
7  of occasions on the phone over certain -- a couple
8  of matters, but not very often.
9     Q.  Did you ever speak to Bill outside of
10 the work environment?
11    A.  No.
12    Q.  Did you have a mentor when you started
13 at GEICO?
14       MS. COLE-CHU:  Objection.
15       THE WITNESS:  I would say Craig
16    Costanzo, who was assigned to basically teach
17    me what the job was.
18 BY MS. ALBERTY:
19    Q.  And did you mentor anyone as you became
20 more senior in your position?
21    A.  No.
22    Q.  All right, when you started in
23 September of 2019 as a field security
24 investigator, did you work in an office?
25    A.  I worked out of an office in my home.

Page 35

1  THOMAS BARDEN
2     Q.  Was that a hundred percent?
3     A.  Yes.
4     Q.  Did you have an office assignment, say
5  for example, even though you worked from home, you
6  worked out of the New York City office, anything
7  like that?
8     A.  I was assigned to the Woodbury office,
9  I believe.
10    Q.  And how far was Woodbury from your
11 residence, whether that was Round Lake or Saratoga
12 Springs at the time?
13    A.  Four to five hours, probably.
14    Q.  Did you ever --
15    A.  Drive time.
16    Q.  Did you ever go to that office?
17    A.  I did.
18    Q.  When would you have gone to the office?
19    A.  I went down, I'm not sure when it was,
20 sometime within my first year of employment.
21    Q.  Well, is it fair to say it wasn't
22 frequent you would go to the Woodbury office?
23    A.  That was the only time I ever went.
24    Q.  Have you ever had an inside role in the
25 Woodbury office?

Page 36

1  THOMAS BARDEN
2        MS. COLE-CHU:  Objection.
3        THE WITNESS:  No.
4  BY MS. ALBERTY:
5     Q.  Have you ever had a desk role at the
6  Woodbury office?
7        MS. COLE-CHU:  Objection.
8        THE WITNESS:  No.
9  BY MS. ALBERTY:
10    Q.  Did anyone tell you how to arrange your
11 flex time?
12    A.  No.
13    Q.  Were you free to complete your work at
14 any time that was convenient for you?
15       MS. COLE-CHU:  Objection.
16       THE WITNESS:  It wasn't out of
17    convenience.  It was more when the job
18    dictated when I needed to work.
19 BY MS. ALBERTY:
20    Q.  Aside from the auto fraud cases we
21 spoke about, did you have any other cases you
22 would work on?
23    A.  Occasionally we would be assigned
24 medical, like injury cases.
25    Q.  Almost like personal injury cases?

Page 37

```
 1              THOMAS BARDEN
 2     A.  Like auto injury, yeah, personal injury
 3  cases, auto related.
 4     Q.  Who assigned the auto fraud cases to
 5  you?
 6     A.  All of our cases came from the same
 7  place, as far as I knew.
 8     Q.  Where did that come from?
 9     A.  From the Woodbury office I assumed.
10     Q.  And I apologize, my question wasn't
11  clear.
12         Was there any person that was directly
13  assigning you cases?
14     A.  I don't know that.  I assume there was.
15  I mean, they had to be generated from somewhere,
16  but I don't know who that was, and...
17     Q.  How would you get assigned to a new
18  case?
19     A.  We would receive them through our
20  reporting system, I think, if I remember right;
21  possibly email.  I'm trying to remember how we
22  actually received the assignments.
23         I believe there was an email and a --
24  and a case assigned in the reporting system that
25  we used.
```

Page 38

```
 1              THOMAS BARDEN
 2     Q.  And once you would be assigned the
 3  case, what were your next steps then thereafter?
 4     A.  We would adopt the case and then start
 5  our investigation.
 6     Q.  I believe in your declaration you
 7  indicated that you would investigate insurance
 8  fraud, but it seems to me now that it's much
 9  narrow than that.  It was just auto insurance
10  fraud.
11         Is that correct?
12         MS. COLE-CHU:  Objection.
13         THE WITNESS:  Most of our cases were
14     auto damage.  On occasion we would be
15     assigned for auto injury.
16  BY MS. ALBERTY:
17     Q.  But you weren't involved, for example,
18  like in property insurance fraud, as in
19  homeowner's?
20     A.  Homeowners?  No.
21     Q.  Were you involved in any cases related
22  to arson or theft?
23     A.  There were arson auto cases, yes; auto
24  theft, yes.
25     Q.  For the auto fraud cases that you
```

Page 39

```
 1              THOMAS BARDEN
 2  investigated, how long did it take you to complete
 3  your investigations?
 4     A.  That depended on the complicated nature
 5  of the claim.
 6     Q.  Sure.  Could you give maybe a range?
 7     A.  I really couldn't.  I mean, sometimes
 8  it took hours; sometimes it took days; sometimes
 9  it took weeks; depended on how complicated the
10  case was, what the claim was, how long it took us
11  to get information.
12         We requested police reports that
13  sometimes were not available.  Contacting
14  claimants was difficult at times.
15     Q.  Aside from gathering police reports,
16  contacting claimants, conducting witness
17  interviews, and going on scene, is there anything
18  else that you would do to investigate these auto
19  insurance fraud cases?
20     A.  We did
```



Page 40

```
 1              THOMAS BARDEN
```



```
 7     Q.  Were any of these things that you did
 8  in investigating the auto insurance fraud, was
 9  there a rollover from your previous experience as
10  being an officer?
11         MS. COLE-CHU:  Objection.
12         THE WITNESS:  Well, there was
13     definitely a familiarization with conducting
14     an investigation and doing -- conducting
15     interviews.
16  BY MS. ALBERTY:
17     Q.  Did you conduct investigations when you
18  were a police officer?
19     A.  Yes.
20     Q.  I know you testified that you would
21  cover a-hundred-plus-mile radius or range for your
22  territory of north in Albany.  Is that the same
23  amount of time that you would max drive to
24  investigate a claim?
25         MS. COLE-CHU:  Objection.
```



Page 81

1  THOMAS BARDEN
2  would be returned to us.
3  Q. Would there be recommendations for you
4  to do, for example, X, Y, and Z, in order then to
5  make the determination to close the case out?
6     MS. COLE-CHU: Objection.
7     THE WITNESS: Sometimes, yes.
8  BY MS. ALBERTY:
9  Q. Anything else as to why cases would get
10 kicked back to you after you believed that the
11 case should have been closed?
12    MS. COLE-CHU: Objection.
13    THE WITNESS: Any other reasons?
14 BY MS. ALBERTY:
15 Q. Yes.
16 A. Other than the supervisor's
17 determination?
18 Q. Yes.
19 A. I'm not sure. I -- I don't know. I'm
20 not sure.
21 Q. During this COVID period, could you
22 take breaks of thirty minutes throughout the day
23 that you couldn't make up that time later on since
24 you were on that flex time?
25    MS. COLE-CHU: Objection.

Page 82

1  THOMAS BARDEN
2     THE WITNESS: Rephrase that again.
3  BY MS. ALBERTY:
4  Q. Sure. Could you take breaks, say
5  thirty minutes throughout the day, and if you
6  needed to make up that time later on you could
7  have, since you were on flex time?
8  A. I suppose we could have. I didn't. I
9  didn't have time to do that.
10 Q. During March of 2020 who else was
11 living in your residence with you?
12 A. My wife.
13 Q. Were your two minor children at that
14 time residing with their mother?
15 A. Yes.
16 Q. And then your third child was not born
17 yet, correct?
18 A. Correct.
19 Q. Did the pandemic and COVID impact you
20 at all?
21    MS. COLE-CHU: Objection.
22    THE WITNESS: It impacted everyone.
23 Yes.
24 BY MS. ALBERTY:
25 Q. But you, specifically. I understand it

Page 83

1  THOMAS BARDEN
2  impacted everybody, but you specifically, did it
3  impact you?
4  A. In what way? What -- what specifically
5  what are you asking?
6  Q. So that's what I was going to ask you.
7  In what ways did it impact you?
8  A. It --
9     MS. COLE-CHU: Objection.
10    THE WITNESS: It impacted me that my
11    workload got so much greater. You know, not
12    being able to go to the grocery store, things
13    like that, yeah, it impacted everybody.
14 BY MS. ALBERTY:
15 Q. Were you diagnosed with COVID in that
16 first few-month period?
17    MS. COLE-CHU: Objection.
18    THE WITNESS: No.
19 BY MS. ALBERTY:
20 Q. Was your wife working from home at that
21 time, too?
22 A. No.
23 Q. Was she working at all? And I -- the
24 only reason why I say that is because she was a
25 fitness instructor.

Page 84

1  THOMAS BARDEN
2  A. She had previously been an owner of her
3  own business. The sale of that business took
4  place somewhere in there. I'm not sure when they
5  closed that out. So from her working at home, I
6  don't know when that was resolved.
7  Q. Did you assist in any capacity with the
8  sale of her business during that time?
9  A. No.
10 Q. Sorry, no?
11 A. No, sorry.
12 Q. That's okay.
13 A. No.
14 Q. It's one of those things, again, that
15 we talked about --
16 A. Yes.
17 Q. -- on the nonverbals.
18 A. Yes.
19 Q. To your recollection, were there any
20 local or state COVID restrictions that inhibited
21 you from going out, whether out in the field,
22 outside to locations where people would populate?
23 A. Yeah, from what I remember, yeah, they
24 restricted gatherings. I'm trying to think back
25 to that time period, yeah, that there was

Page 93

1    THOMAS BARDEN
2  significantly after March of 2020."
3       Do you have any idea how many cases
4  were being assigned to you a week once COVID
5  started?
6    A.  Like I said, it was we received
7  anywhere from eight to ten cases a day, every day
8  of the week, so, upwards of fifty cases a week.
9    Q.  But you don't recall the means and
10 mechanisms in which the cases were assigned to
11 you, right?
12   A.  No.
13   Q.  Is that correct?
14   A.  That's correct.
15   Q.  How many cases were you closing a day?
16   A.  I would close as many as I could, just
17 that the mere hours that it took just to adopt a
18 case did not give us a lot of time to actually
19 investigate a case.
20   Q.  Do you know if the new assignment of
21 cases ever provided to you during COVID was
22 because you were given less cases at the inception
23 of your employment after you were done shadowing
24 in January of 2020?
25       MS. COLE-CHU:  Objection.

Page 94

1    THOMAS BARDEN
2       THE WITNESS:  No.  Was not, did not
3    have anything to do with that.
4  BY MS. ALBERTY:
5    Q.  Why do you say that?
6    A.  Because everyone is about the same
7  caseload at that time period, and everyone got the
8  same increase after the pandemic, everyone on the
9  team.  We discussed it.
10   Q.  Tightening that up, when you say
11 everyone, you're talking about those people
12 indicated on your team, correct?
13   A.  Yes.
14   Q.  So, it's your testimony that everyone
15 assigned to your team was getting anywhere between
16 eight to ten additional cases per day once the
17 pandemic started?
18   A.  Yes.
19   Q.  And they told you this?
20   A.  Yes.
21   Q.  Did they tell you this when the
22 pandemic started, years later when the lawsuit
23 occurred?
24       MS. COLE-CHU:  Objection.
25       THE WITNESS:  This was discussed when

Page 95

1    THOMAS BARDEN
2  it actually occurred.  Once we started
3  receiving all these extra cases, we were
4  discussing it amongst ourselves that all of a
5  sudden -- the pandemic shutdown happened, all
6  of a sudden our caseload increased
7  dramatically.
8  BY MS. ALBERTY:
9    Q.  And I think you said that this
10 communication would have occurred over the phone
11 and via email?
12       MS. COLE-CHU:  Objection.
13       THE WITNESS:  Yes.
14 BY MS. ALBERTY:
15   Q.  So further in your declaration you
16 state that, "I recall being assigned approximately
17 five to seven new cases a day."
18       You're saying now you're -- you were
19 getting more cases than that.  Is that right?
20   A.  I'm using eight as a reference.  My
21 declaration five to seven is accurate.  I'm just
22 using that as a reference point.
23       If we got eight per week, then we got
24 eight per week.  If we got seven per week, we got
25 seven per -- you know, seven more.

Page 96

1    THOMAS BARDEN
2       We went -- we went -- the matrix went
3  from per week to per day.  That's basically what
4  I'm saying.
5    Q.  So you're saying there is a -- a range
6  of flexibility and fluctuation.  Is that right?
7       MS. COLE-CHU:  Objection.
8       THE WITNESS:  Flexibility and
9    fluctuation of what?
10 BY MS. ALBERTY:
11   Q.  Of cases.
12       I'm -- I'm just trying to -- to
13 understand.  You're -- as you sit here today,
14 you're saying eight to ten, but your declaration
15 says five to seven new cases.  So I'm trying to
16 understand how many new cases were you receiving
17 in 2020, because those are two -- those are all
18 different numbers.
19   A.  I see what you're saying.
20       My apologies.  I was using eight as
21 just a reference point.  So, my declaration is
22 accurate, five to seven cases per week.
23       My statement is that we went from five
24 to seven cases, per week, to five to seven cases
25 per day.



Page 97

1  THOMAS BARDEN
2  Yes, it fluctuated anywhere in that
3  time -- anywhere in between five cases to ten
4  cases. And five to seven is basically an
5  estimate, an average, to the best of my
6  recollection when I made this declaration.
7     Q.  How many overtime hours were you
8  working between January of 2020 then to March of
9  2020 when you transitioned to a hundred percent
10 remote work because of COVID?
11        MS. COLE-CHU:  Objection.
12        THE WITNESS:  I don't recall working
13    hardly any overtime during that time period.
14 BY MS. ALBERTY:
15    Q.  On what do you base the estimate
16 starting in March of 2020 when the pandemic
17 occurred that your overtime hours increased to
18 fifty-five to sixty hours per week per your
19 declaration under number eight?
20    A.  I'm sorry, what's the question?
21    Q.  Sure.  What do you base that estimate
22 on?
23    A.  Basically three to four hours a day for
24 five days' work.
25    Q.  So you're tacking on three to four

Page 98

1  THOMAS BARDEN
2  hours a day, five days a week, for that week --
3     A.  Right.
4     Q.  -- then to accumulate then to
5  fifty-five to sixty hours per week.
6        Is that right?
7     A.  Correct.
8     Q.  Did you specifically itemize your hours
9  each week when you exceeded forty hours a week?
10        MS. COLE-CHU:  Objection.
11        THE WITNESS:  At the beginning when we
12    were allowed to put in overtime, I actually
13    submitted an overtime request for that time
14    period, up until the time period, the date we
15    were told we were no longer allowed to
16    request overtime.
17 BY MS. ALBERTY:
18    Q.  And that's that July or October time
19 frame you've previously stated --
20    A.  July or August.
21    Q.  August, my apologies.  So July or
22 August of 2020, correct?
23    A.  Correct.
24    Q.  Then during March of 2020, up and until
25 July or August of 2020, were you adequately

Page 99

1  THOMAS BARDEN
2  inputting your overtime hours?
3        MS. COLE-CHU:  Objection.
4        THE WITNESS:  From what I recall, yes.
5  BY MS. ALBERTY:
6     Q.  And were you getting paid for that
7  overtime?
8     A.  I did get paid overtime at that time.
9     Q.  So during the time consideration of
10 March of 2020 to July, August of 2020, you were
11 itemizing your weeks in order to adequately
12 request your overtime hours, correct?
13        MS. COLE-CHU:  Objection.
14        THE WITNESS:  Yes.
15 BY MS. ALBERTY:
16    Q.  Then starting around July or August of
17 2020, is that when you stopped itemizing your
18 hours over forty?
19        MS. COLE-CHU:  Objection.
20        THE WITNESS:  That's when I stopped
21    requesting overtime, because I was told.
22 BY MS. ALBERTY:
23    Q.  Sure.  The question's a little
24 different, which is did you stop itemizing;
25 meaning you exceeded the time amount of forty

Page 100

1  THOMAS BARDEN
2  hours in July or August of 2020, and you stopped
3  notating that information for your own personal
4  records?
5        MS. COLE-CHU:  Objection.
6        THE WITNESS:  Yes.
7  BY MS. ALBERTY:
8     Q.  When you were inputting the time from
9  March of 2020 up and until July or August of 2020
10 for your overtime, did you personally maintain
11 records regarding your overtime?
12        MS. COLE-CHU:  Objection.
13        THE WITNESS:  No.
14 BY MS. ALBERTY:
15    Q.  But you were plugging that information
16 into the timekeeping system and asking for
17 overtime through your supervisor, correct?
18    A.  Correct.
19    Q.  Okay.  So then it's fair to say that
20 from at least July of 2020, August 2020 up and
21 until December of '22 when you left, you were not
22 specifically itemizing your alleged exceeded
23 overtime per week, right?
24        MS. COLE-CHU:  Objection.
25        THE WITNESS:  Correct.



Page 101

1    THOMAS BARDEN
2
3    BY MS. ALBERTY:
4    Q.  Fair to say then you're assuming that
5    from July or August of 2020 up and until December
6    of '22 that you exceeded your forty-hour work week
7    between fifteen to twenty hours, right?
8       MS. COLE-CHU:  Objection.
9       THE WITNESS:  I'm not assuming.  I know
10   I did.
11   BY MS. ALBERTY:
12   Q.  But you didn't itemize it?
13   A.  I did not write it down and itemize
14   every minute, no.
15   Q.  Did you tell anyone that you were
16   working approximately fifty-five to sixty hours a
17   week during that time, and by this time I'm
18   talking around the July time period?
19   A.  We had meetings with supervisors and
20   discussed the time that we were actually putting
21   into cases, and how much time we were spending
22   working off the clock, yes.
23   Q.  How -- it's hard, because we're working
24   in a few different time periods, right?
25      So, for -- let's start COVID 2020,

Page 102

1    THOMAS BARDEN
2    March --
3    A.  Mm-hmm.
4    Q.  How frequent were meetings occurring?
5    A.  I believe he -- meaning Mr. Janik --
6    tried to have a complete team meeting with
7    everyone quarterly.  So every two to three months,
8    he would travel, we would meet.  This is prior
9    to -- obviously prior to March.  After that it
10   would be either Zoom, or a conference call, or
11   things like that.  He would try to do it that way.
12   Q.  Sure, but still under that time
13   condition of quarterly, regardless of the forum?
14   A.  I -- I believe, from what I understand,
15   that was his schedule to do that.  That was his
16   requirement to do that, yes.
17   Q.  Do you recall any of these quarterly
18   meetings being in person?
19   A.  Not -- at that time, once we were
20   allowed to meet again, yes, then we had meetings
21   in person again.
22   Q.  Do you remember when that occurred in
23   time?
24   A.  I don't remember the dates.
25      They -- I remember traveling to

Page 103

1    THOMAS BARDEN
2    Syracuse, Weedsport, which is the other side of
3    Syracuse, having in-person meetings with Mr. Janik
4    and other team members at that time.
5    Q.  To the best of your recollection do you
6    remember if that happened in '21 or '22?
7    A.  I don't remember when we were opened
8    back up to do that.
9       Like I said, it went -- you know, the
10   opening of COVID went in steps, as everybody
11   knows.  We were allowed to go out on the road and
12   do scene canvasses, but not allowed to meet with
13   people.  Once we were allowed to meet with people
14   again, then we started having meetings again.
15   So -- and I'm not sure what that time frame is, to
16   be honest with you.
17   Q.  All right, transitioning to number
18   nine, you state, "GEICO returned to limited field
19   operations in or about the November 2021 time
20   frame."
21      What does that mean?  What does
22   "limited field operations" mean?
23   A.  Just -- just, like I just said, we were
24   allowed to do scene canvasses, you know, things
25   that didn't take interaction with public

Page 104

1    THOMAS BARDEN
2    basically.
3       We weren't -- we still weren't allowed
4    to do interviews in person with claimants, things
5    like that, but we were allowed to at least go on
6    the road and do scene canvasses.
7       I think we were allowed to go to
8    certain police agencies that were allowed --
9    allowing us to come there, pick up police reports,
10   and that depended on the areas, things like that,
11   so.
12   Q.  Did you ever go back to the one hundred
13   percent of being able to do your position like it
14   was in 2020, January 2020?
15   A.  It did expand as we went through.  We
16   were allowed to meet with -- with claimants and
17   interview them in person again.  So I am guessing,
18   yeah, probably.
19      I never went back to meeting them in
20   their homes.  I always met them at a remote
21   location, but -- and I think most everybody else
22   did that same thing.  But, yeah, it eventually got
23   back to where we were meeting people in person,
24   doing in-person interviews.
25      We never went back as far as when I



Page 105

1     THOMAS BARDEN
2  first there to doing examinations under oath in
3  person.  We did that all by -- by Zoom calls
4  entirely.
5     Q.  And presumably, based off what you've
6  been saying, were you driving then less in 2022,
7  for example, because you weren't doing in-person
8  under oath examinations, things like that?
9     A.  Not so much the -- the EUOs -- we call
10 them the examinations under oath -- but we were
11 still -- I was still traveling.  2022 I was still
12 traveling around doing in-person interviews, scene
13 canvases, and police agencies, and things like
14 that, so.
15         It was more back to what we were doing
16 before the pandemic hit.
17    Q.  Looking back at your declaration, so
18 under number ten you state that, "From March of
19 2020 to December of '22 my regular hours worked
20 were approximately fifty-five to sixty hours per
21 week.
22         "My last regular pay rate was $32.36
23 per hour.  During most of this time I entered only
24 38 hours -- point seventy-five hours in the
25 timekeeping system, and I was only paid then for

Page 106

1     THOMAS BARDEN
2  the 38.75 hours, identifying $1,253.95 per week."
3         On what do you base the estimate that
4  your regular working hours were then the
5  fifty-five to sixty per week?
6     MS. COLE-CHU:  Objection.
7     THE WITNESS:  What was the basis of my
8   conclusion in that?
9  BY MS. ALBERTY:
10    Q.  Yes.
11    A.  I was still working the same amount of
12 hours the entire time.
13    Q.  In your custom and practice, aside from
14 the timekeeping system that GEICO utilized for you
15 to input your hours, would you have input your
16 hours anywhere else in GEICO software?
17    A.  Not that I recall.
18    Q.  Why were you only entering the 38.75
19 hours in the timekeeping system during that time?
20    A.  Because that's the hours that I worked
21 minus the overtime, which I was not allowed to
22 submit per the directive back in July or August of
23 2020.
24    Q.  But you were submitting overtime hours
25 from March to then July or August of 2020?

Page 107

1     THOMAS BARDEN
2     A.  Yes.
3     Q.  Transitioning to number eleven on page
4  three of the declaration," From May of 2020 to
5  August of 2020 GEICO permitted me to submit
6  overtime hours for approval but required me to
7  document for reasons of overtime, case
8  information, and specific tasks that I needed to
9  do on each case."
10        How did you learn that you couldn't put
11 your overtime hours?
12    MS. COLE-CHU:  Objection.
13    THE WITNESS:  How did I learn that I
14  was not allowed to?
15 BY MS. ALBERTY:
16    Q.  No, that you could.
17    A.  I talked with my supervisor that
18 basically told me, "If you're working extra hours,
19 put in for it.  Document it."
20    Q.  Were there specific hard and fast lines
21 of what you needed to input for your overtime
22 hours?
23    A.  Like the reasons?
24    Q.  Yes.
25    A.  I don't know if there were certain

Page 108

1     THOMAS BARDEN
2  reasons.  I know that they did not want you to put
3  in overtime for doing like writing the report
4  itself, like sitting at your desk writing the
5  report.  It had to be some specific reason that
6  a -- some task that needed be -- needed to be
7  accomplished, other than that, even though that
8  was a majority of our workload.
9     Q.  Sure.  For the basis that you needed
10 the overtime hours, was that done over the phone
11 with your supervisor, or did that specifically
12 have to be written and submitted?
13    A.  I don't recall.
14    Q.  Okay.  So in remaining paragraph
15 eleven, page four, it states, "In May of 2020 my
16 supervisor informed me and other special
17 investigators that starting August of 2020 GEICO
18 would no longer permit us to request overtime and
19 that we could only work the 7.75 hours per day.
20        "However, GEICO did not reduce our
21 caseloads and I still had to work the same number
22 of hours to keep up with my cases.
23        "Accordingly, I entered 7.75 hours per
24 day, five days a week, regardless of how many
25 hours I actually worked."



Page 165

1       THOMAS BARDEN
2  accurately and correctly?
3       MS. COLE-CHU:  Objection.
4       THE WITNESS:  Yes.
5  BY MS. ALBERTY:
6    Q.  Do you know what would happen once you
7  had reported it, where it went then thereafter?
8    A.  It's -- far as I know it stayed within
9  that system.
10   Q.  Do you know if anybody would review it?
11   A.  Yes.
12   Q.  And who was that?
13   A.  Mr. Janik.
14   Q.  Anyone else, to your knowledge?
15      MS. COLE-CHU:  Objection.
16      THE WITNESS:  Not that I know of.
17 BY MS. ALBERTY:
18   Q.  Did you keep any separate personal
19 system that helped maintain your task list for
20 your cases, outside of the GEICO software we just
21 talked about?
22   A.  Not that I recall, no.
23   Q.  Other than this GEICO software, was
24 there any other records that you created in any
25 other capacities, so whether that was in Microsoft

Page 166

1       THOMAS BARDEN
2  Word, Power Point.
3       I don't know how software efficient you
4  are, but anything else that would keep records of
5  how much work you completed each day?
6    A.  Not that I recall, no.
7    Q.  And case reports, were those a part of
8  your job duties?
9    A.  Yes.
10   Q.  And these various task items such as
11 witness interviews, canvassing a scene, obtaining
12 a police report, were those a part of your duties
13 and responsibilities, insuring completing your
14 auto theft cases?
15   A.  Yes.
16   Q.  Do you know how long GEICO would give
17 you to investigate a case?
18      MS. COLE-CHU:  Objection.
19      THE WITNESS:  I'm not -- I don't
20   recall.
21 BY MS. ALBERTY:
22   Q.  Was one of the things in the
23 performance metrics for number twelve you indicate
24 it's "how many days I took to close out a case."
25      So as you sit here today, you don't

Page 167

1       THOMAS BARDEN
2  recall how many days GEICO would give you as a
3  field investigator to investigate a claim?
4    A.  Yeah, I don't recall at this point.
5  No.
6    Q.  Okay, let's turn to number thirteen.
7  It says, "GEICO's performance metrics and ratings
8  determined whether I was entitled to an annual
9  raise.
10      "If I failed to meet them they could
11 also lead to disciplinary action such as being put
12 on a coaching plan that will eventually lead to
13 termination."
14      What's your basis for believing that
15 disciplinary action at GEICO was based on the
16 performance metrics that you line itemized in
17 number twelve?
18      MS. COLE-CHU:  Objection.
19      THE WITNESS:  Well, because I was -- I
20   was contacted at one point by Mr. Janik who
21   told me that I didn't actually meet criteria
22   for a raise at that particular time during
23   the year, and it was due to my performance
24   evaluation.
25 BY MS. ALBERTY:

Page 168

1       THOMAS BARDEN
2    Q.  When you were ineligible for a raise,
3  did he, for example, specifically say, "Hey, on
4  the Smith matter I notice you didn't go out and
5  canvas the scene.  So because you didn't hit that
6  performance metric for that case, this is one of
7  the reasons why you're ineligible for a raise"?
8       MS. COLE-CHU:  Objection.
9  BY MS. ALBERTY:
10   Q.  Was it ever that specific?
11   A.  I don't believe it was conveyed in that
12 specific content.
13   Q.  Do you recall if there was any type of
14 written policy that stated that the metrics were
15 linked to discipline?
16   A.  Well, I know I got put on, excuse me,
17 on a coaching plan because of poor performance.  I
18 don't recall at this time if it was directly
19 related to a performance rating, or if it was just
20 simply an overall -- you know, like a specific
21 performance rating period is what I mean, or if it
22 was just kind of an ongoing supervisory notation
23 or they noticed happening.
24   Q.  When you were put on your coaching, was
25 it specifically itemized that, for example, you



Page 225

1  THOMAS BARDEN
2  number six.
3  EXAMINATION BY COUNSEL FOR PLAINTIFFS
4  BY MS. COLE-CHU:
5  Q. Thank you for being here today, Mr.
6  Barden. Before I ask you a couple questions, I am
7  going to just call for the production -- call for
8  the production of some of the documents. We can
9  follow up with this request in writing. But I
10 believe that a number of documents that were
11 referenced today that have not been produced in
12 discovery included the email that was discussed at
13 length regarding the no-overtime policy, an email
14 regarding special investigator metrics that Mr.
15 Barden was discussing when we were going through
16 paragraph twelve of his declaration. Mr. Barden
17 also referenced a termination memo, which we don't
18 believe has been produced in discovery. And
19 fourth an email that was discussed regarding GEICO
20 prohibiting special investigators to work prior to
21 7:30 a.m. And I wanted to note that for the
22 record.
23 MS. ALBERTY: We'll try our best, and
24 we'll confer after, too.
25 BY MS. COLE-CHU:

Page 226

1  THOMAS BARDEN
2  Q. Mr. Barden, you testified today about
3  performance metrics that GEICO required you to
4  meet throughout the day.
5  Do you recall giving that testimony?
6  A. Yes.
7  Q. You also testified that your
8  performance evaluation was determined, at least in
9  part, by whether you met these metrics.
10 Do you recall discussing that, as well?
11 A. Yes.
12 Q. And you stated I believe that your
13 performance evaluation would suffer if you didn't
14 meet GEICO's performance metrics.
15 Do you recall giving that testimony?
16 MS. ALBERTY: Objection.
17 THE WITNESS: Yes.
18 BY MS. COLE-CHU:
19 Q. Does that mean that if you didn't meet
20 GEICO's performance metrics, you would get a
21 negative performance review?
22 MS. ALBERTY: Objection.
23 THE WITNESS: It just means that the --
24 your performance rating wouldn't be as high
25 as if you had met that -- certain metrics.

Page 227

1  THOMAS BARDEN
2  So, yes, it would suffer in a way that
3  it's lower than it could have been.
4  BY MS. COLE-CHU:
5  Q. And what were the consequences of that?
6  A. The consequences were, one, I was
7  denied a raise at one time. It's why I was told I
8  was denied a raise, because the performance
9  evaluation wasn't high enough at that time. And I
10 believe it was -- it was part of -- part of the
11 reason that was used to start the coaching
12 remedial training, coaching, training.
13 BY MS. COLE-CHU:
14 Q. And to confirm that these consequences
15 of having a -- let's call it less good performance
16 evaluation in fact happened to you?
17 A. Yes.
18 Q. Would you say that it was important
19 then to meet your performance metrics as best you
20 could?
21 A. Yes.
22 Q. Was it possible for you to meet GEICO's
23 performance metrics within a 38.75 hour work week?
24 MS. ALBERTY: Objection.
25 THE WITNESS: No.

Page 228

1  THOMAS BARDEN
2
3  BY MS. COLE-CHU:
4  Q. As a result would you work more hours?
5  A. Yes.
6  Q. And you testified today that GEICO
7  stated that it would not pay you for hours above
8  38.75.
9  Is that correct?
10 A. Correct.
11 Q. So, those hours that you worked above
12 38.75 were unpaid?
13 A. Correct.
14 Q. And would you say that you had to do
15 this in order to keep your job?
16 MS. ALBERTY: Objection.
17 THE WITNESS: Yes.
18 BY MS. COLE-CHU:
19 Q. We've discussed this a little bit over
20 the course of the day, but I just want to walk
21 through your daily schedule one more time.
22 Approximately what time would you
23 typically log on to work in the morning?
24 A. Usually around 6:00 a.m.
25 Q. And then approximately what time --



**Page 229**

1  THOMAS BARDEN
2  understanding that days were different, weeks were
3  different, would you typically log off of work in
4  the evening?
5     A.  Usually around 5:00 p.m.
6     Q.  Did you work on the weekends?
7     A.  I would work Sunday evenings, yes.
8     Q.  Approximately how many hours?
9     A.  Usually three to four hours on a Sunday
10  evening.
11    Q.  So in a typical week day your testimony
12  is that you would work approximately --
13  approximately eleven hours.  Shall we say from
14  6:00 in the morning to 5:00 in the evening.
15       Is that roughly correct?
16    A.  There are many nights I went back to
17  work after 7:00 or 8:00 p.m. for a couple hours
18  also.
19    Q.  Earlier today you testified something
20  to the effect of you worked eight hours a day.
21       Was that in reference to the number of
22  hours GEICO permitted you to record?
23       MS. ALBERTY:  Objection.
24       THE WITNESS:  That was -- yeah, that
25    was like a typical eight-hour day, if I'm

**Page 230**

1  THOMAS BARDEN
2    remembering the conversation.  It referenced
3    a typical eight-hour day.  But, yes, that was
4    what they allowed me to submit for payment.
5  BY MS. COLE-CHU:
6    Q.  But in -- in your actual practice you
7  typically worked more than eight hours per day?
8    A.  Yes.
9    Q.  You also gave testimony today regarding
10  GEICO's flex time policy.  Do you recall --
11    A.  Yes.
12    Q.  -- discussing that?
13       And if I understand correctly, this
14  policy permitted you to record maybe four hours
15  early in the morning and then 3.75 hours late in
16  the day, and you in theory could mow your lawn in
17  the middle of the day.
18       Is that a fair rendition of what the
19  flex time policy was supposed to be?
20    A.  In theory, yeah, you could do that.
21    Q.  Did you ever actually flex your time in
22  this way?
23       MS. ALBERTY:  Objection, form.
24       THE WITNESS:  No, I don't recall doing
25    that, especially after the pandemic shutdown.

**Page 231**

1  THOMAS BARDEN
2  Basically we didn't -- I didn't -- I'll
3  testify for me -- I didn't have time to take
4  time off during the day.
5       If I were to take two, three hours off
6  in the middle of the day, at the end of that
7  time period I would have four or five cases
8  waiting for me to adopt.  And so, it would be
9  beneficial to me just to keep working
10  throughout the day.
11       MS. COLE-CHU:  That's all I have.
12       MS. ALBERTY:  I just have a few
13  follow-ups.
14    EXAMINATION BY COUNSEL FOR DEFENDANTS
15       BY MS. ALBERTY:
16    Q.  You had stated that you were denied a
17  raise.  Do you remember when that was in time?
18       MS. COLE-CHU:  Objection.
19       THE WITNESS:  I don't recall exactly
20    when that was.
21  BY MS. ALBERTY:
22    Q.  So as to it coinciding with the
23  coaching, fair to say you don't have any knowledge
24  that it coincided with the coaching?
25       MS. COLE-CHU:  Objection.

**Page 232**

1  THOMAS BARDEN
2       THE WITNESS:  Again, I don't -- I don't
3    recall when that all happened.
4  BY MS. ALBERTY:
5    Q.  Okay.  But you just recall being denied
6  an annual raise.  Is that correct?
7       MS. COLE-CHU:  Objection.
8       THE WITNESS:  I believe it was an
9    annual raise.  I -- I really don't.  I just
10    remember the phone call from my supervisor
11    saying, you know, "I'm sorry, it didn't quite
12    meet the criteria.  You're not getting a
13    raise this time around," so forth and so on.
14  BY MS. ALBERTY:
15    Q.  Okay, and who was that from?
16    A.  That was from Mr. Janik.
17    Q.  Do you -- strike that.
18       Did Mr. Janik mention anything in
19  regard to nonperformance-related variables that
20  impacted whether or not you would get a raise?
21    A.  Nonperformance variables?
22    Q.  Yes.
23    A.  Such as?
24    Q.  Anything else.  Inflation.
25    A.  No.



```
 1                      THOMAS BARDEN
 2                 C E R T I F I C A T E
 3    STATE OF NEW YORK    )
 4                         : Ss.
 5    COUNTY OF NEW YORK   )
 6              I, Kim M. Brantley, Shorthand
 7    Reporter, and Notary Public within and for the
 8    State of New York, do hereby certify:
 9              That THOMAS BARDEN, the witness whose
10    deposition is hereinbefore set forth, was duly
11    sworn by me and that such deposition is a true
12    record of the testimony given by the witness.
13              I further certify that I am not related
14    to any of the parties to this action by blood or
15    marriage, and that I am in no way interested in
16    the outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto set
18    my hand this 11th day of August, 2024.
19
20              _____
21              Kim M. Brantley
22
23
24    My Commission expires May 31, 2026.
25
```

