# Exhibit H

# In the Matter Of:

## FISCHER, et al. -against- GEICO

2:23 Civ. 2848 (GRB)(ARL)

# MARIA MUNOZ

*December 17, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

Page 97

1           M. Munoz
2  would say that there was somewhere between
3  25 to 40 field investigators handling the
4  same territory we're handling now.
5      Q.   Were they all reporting to the
6  same supervisor that you were?
7      A.   That one specific, no.
8      Q.   Do you know how many different
9  supervisors those 25 to 40 people reported
10 to?
11     A.   I -- when I started, I know
12 there was Dara Campbell, Tony D'Agata,
13 Gerry Cassagne.  There was another guy, I
14 think his name was Rich.  Not really sure.
15 I never reported to him.  And there were
16 others -- oh, Rich Killigan.  Killigan was
17 his last name.  And I would say anywhere
18 from my start, there was five to maybe
19 seven SIU supervisors.
20     Q.   Do you know approximately how
21 many people each of those supervisors
22 supervised?
23     A.   I'd say there was seven --
24 there could be seven to ten people on a
25 team possibly at any given time.

Page 98

1           M. Munoz
2      Q.   And were those individuals all
3  field investigators?
4      A.   I believe so, at that time.
5      Q.   And when you say at that time,
6  what time period are you referring to?
7      A.   From when I started SIU.
8      Q.   Up through what time
9  approximately?
10     A.   Until 2022, '23.
11     Q.   So, these teams stayed in place
12 through COVID; is that correct?
13     A.   Yes.
14     Q.   So, we were talking about how
15 many claims you would handle per week, and
16 you mentioned that it varied and it -- and
17 that it fluctuated; is that correct?
18     A.   Correct.
19     Q.   So, were some weeks busier than
20 other weeks?
21     A.   Yes.
22     Q.   What would that depend on?
23     A.   Volume of claims coming in.
24 Staffing issues could be a reason.
25     Q.   Anything else?

Page 99

1           M. Munoz
2      A.   That's the most I can think of
3  right now.
4      Q.   Were there certain times of the
5  year that were busier than other times of
6  the year?
7      A.   Yes.
8      Q.   What times of the year were
9  busiest?
10     A.   I would say the summer was
11 always a busy time.  To me, that would be
12 the busiest time.
13     Q.   So, summer would be the busiest
14 period?  What would be the less busy times
15 of a year?
16     A.   Usually around holidays.
17     Q.   Do you know why that would be
18 the case?
19     A.   Well, I know by claims volume.
20 So, let's say at the time of the holidays
21 or like the week of, it's not really that
22 busy.  But then once people would report
23 the claims after, because maybe I am
24 assuming they think that we were closed or
25 something, then it would get busier.

Page 100

1           M. Munoz
2           Or people in claims might have
3  been off, and now they come back, and now
4  they need to -- they send a referral to get
5  it assigned to SIU or something like that.
6      Q.   Is that the usual process of
7  how claims come into SIU, through the
8  claims department?
9      A.   Yes.  A claim -- well, the
10 usual process, yes.  So, claims may find
11 something and send a referral, and then
12 the referral -- referral comes through and
13 then it gets assigned.
14     Q.   How else do you receive claim
15 files in SIU?
16     A.   Sometimes I get phone calls
17 from police contacts, and they'll tell me
18 that I may want to look at this claim.
19 Sometimes -- I'm trying to think.  That's
20 pretty much -- oh, no.
21          There's a database, like a
22 system -- I don't know if I am using the
23 right word -- that they use also which kind
24 of gives the claim a score value in regard
25 to whether they think it should be assigned



Page 137

1  M. Munoz
2  Q. If we turn to paragraph six on
3  page 2 of your declaration, do you see in
4  bold in the middle of the page, it says my
5  schedule and unpaid wages and overtime?
6  A. Yes.
7  Q. And in paragraph six, you say,
8  my supervisor told me that I could only
9  report up to 38.75 hours per week or
10 7.75 hours a day, five days a week, in the
11 timekeeping program.  Accordingly, I only
12 entered 7.75 hours per day, five days a
13 week, regardless of how many hours I
14 actually worked.
15       Do you recall writing that into
16 your declaration?
17 A. I recall advising my attorneys
18 about that, yes.
19 Q. And when did your supervisor
20 tell you that?
21 A. That is prior to the
22 reorganization of SIU.  That is how it was.
23 You were just told you input 7.75 per day
24 regardless of your time, unless you flexed,
25 but then that would show accordingly.  So,

Page 138

1  M. Munoz
2  maybe I had a 9.75, but then it would be a
3  5.75 on another day.
4  Q. And which supervisor actually
5  told you that?
6  A. Well, they all -- they all told
7  us that, meaning Dara.  That's how I was
8  trained, under Dara.  April, Gerry and
9  Tony.  Currently, it's not like that.
10 Q. But when you say it was like
11 that -- so, let's focus on that time
12 period.
13       So, you say each of Dara,
14 April, Gerry and Tony all told you that
15 that was the policy in place?
16 A. I don't know -- I know it was
17 told from the beginning.  So, it would be
18 under Dara to April, because everybody
19 recorded time or asked you to submit it
20 differently.  There were different ways I
21 did it.
22       Some you would enter per day,
23 submit.  Some you would enter in the
24 beginning of the week, some you would enter
25 in the end of the week and then submit by

Page 139

1  M. Munoz
2  the end of the week.
3  Q. Can you describe the time
4  periods that were applicable to each of
5  those ways you just described entering
6  time?
7  A. 38.75 per week.
8  Q. Right.  But you mentioned
9  different methods of how you submitted
10 time.  You just said sometimes you would
11 put in daily amounts sometimes at the
12 front -- you would front load it.
13       What specifically was the
14 practice during each period of time in SIU?
15 A. Well, I don't remember how Dara
16 wanted it.  April, to the best of my
17 knowledge, wanted it daily.  And Gerry,
18 just get it done by the end of the week.  I
19 don't remember with Tony how it was either.
20 Q. Was that practice different
21 between your different supervisors?
22 A. Yes.
23 Q. And you said that that changed
24 at some point in time, the 7.75 hours per
25 day?

Page 140

1  M. Munoz
2  A. Yes.
3  Q. When did that change?
4  A. Somewhere around 2023 up to
5  present.
6  Q. And how has that changed?
7  A. Actually, May prior to -- it's
8  somewhere between '22 to '24.  I now --
9  currently, we have a -- we clock in and
10 clock out.  We never did that before.  So,
11 when I start work, I check in on Workday on
12 my phone.  Time clock starts.  So, it's
13 actually watching the time.
14       And then I have to clock out
15 for a meal, 45 minutes, clock back in, and
16 then we clock out at the end of the day.
17 We're not required to clock in and out for
18 our 15-minute breaks.
19 Q. And how many 15-minute breaks
20 do you take a day?
21 A. We're supposed to take two.
22 Q. And you do not clock out for
23 those, you're saying?
24 A. We don't have to.
25 Q. And can you describe for me in



Page 141

1  M. Munoz
2  detail the conversations that you had with
3  Dara when she told you you needed to input
4  38.75 hours only per workweek?
5     A.  I can't because I don't
6  remember it.
7     Q.  Can you describe those
8  conversations with April?
9     A.  I don't remember specific
10  conversations.
11     Q.  What about with Gerry?
12     A.  In regard to the inputting, the
13  7.75 per day, I don't remember an exact
14  conversation.
15     Q.  Do you recall any exact
16  conversations with Tony about that?
17     A.  No.
18     Q.  Were any of these conversations
19  in written form, either through text or
20  e-mail?
21     A.  Not that I can recall.
22     Q.  Were they over the phone?
23     A.  I don't remember how we would
24  have spoke about it.
25     Q.  Do you remember if anyone else

Page 142

1  M. Munoz
2  was there when you had these conversations?
3     A.  I don't recall.
4     Q.  Do you recall what your
5  response was when you received those
6  instructions from your supervisors?
7     A.  I just inputted the time as I
8  was told, which was 7.75 per day, 38.75,
9  right, for the week.
10     Q.  Did you challenge that
11  instruction in any way?
12     A.  Well, we voiced concerns,
13  meaning me and my co-workers, in regard to
14  that we weren't necessarily working those
15  hours.
16     Q.  When did you voice those
17  concerns?
18     A.  Team meetings sometimes we
19  would have with certain supervisors.
20  Sometimes we would have a meeting every few
21  months with the manager also where we all
22  got together, it would be brought up.  And
23  those -- yeah, those would be the times.
24     Q.  Were any of those
25  communications that you just talked about

Page 143

1  M. Munoz
2  in written form?
3     A.  I'm sure there's something in
4  writing.  Now, I have, at this point, put
5  in writing like I -- I asked for overtime,
6  at least a minimum of four times this year,
7  and I was told no.
8     Q.  Who did you ask for overtime
9  this year?
10     A.  Arineh Nazari.
11     Q.  Do you recall when you sent
12  those communications?
13     A.  Within approximately the last
14  six months.
15     Q.  Were you asking for the
16  authority to work future overtime in those
17  conversations?
18     A.  I was asking for either that
19  day or that week.
20     Q.  Do you recall why Arineh told
21  you that you cannot work that overtime?
22     A.  The first time, she told me it
23  was a taboo subject.  Second, third, maybe
24  it was just do the best you can, just get
25  it done.  And I believe -- I don't know,

Page 144

1  M. Munoz
2  because I didn't see the communication nor
3  hear it -- she asked management the last
4  time and was told that it wasn't, you know,
5  approved.  Just do the best -- like get it
6  done, get your work done.
7     Q.  So, after receiving her
8  responses, did you still go ahead and work
9  overtime?
10     A.  No.
11     Q.  And when you say management,
12  she reached out to management, who are you
13  talking about?
14     A.  I -- I -- it's an assumption
15  because I don't know.  But I -- I think she
16  would have asked Rene Cubas, who is my
17  manager.
18     Q.  And how long has Rene been your
19  manager for?
20     A.  Probably since '23 -- 2023.
21     Q.  So, your -- just to go back in
22  time a little bit, your original manager
23  when you first started at SIU was
24  Michael DeGrocco, correct?
25     A.  Correct.



Page 145

1    M. Munoz
2    Q.   Was there anyone in that role
3  between Michael DeGrocco and Bill Newport?
4    A.   No.  I believe it was
5  Mike DeGrocco, Bill Newport and then it
6  would become Rene in my tenure with SIU.
7    Q.   And I just want to go back.
8         So, you talked about voicing
9  concerns in team meetings with team
10 supervisors, correct?
11   A.   The supervisors would be
12 present, yes.
13   Q.   Do you recall any other details
14 about when those meetings took place or who
15 was there?
16   A.   Team meetings would be with
17 your section.  And my section, you know,
18 changed sometimes, so I -- I couldn't say
19 who exactly was there.  And then sometimes,
20 we would have full meetings with all of
21 SIU, supervisors and -- and management
22 present.
23   Q.   When you say your section, what
24 do you mean by that?
25   A.   So, a section would be who --

Page 146

1    M. Munoz
2  so if I reported to Gerry, it was whoever
3  was under Gerry.  That is my section.
4    Q.   Do you remember how many of the
5  full SIU meetings there were where these
6  complaints were raised?
7    A.   I don't remember the exact
8  number.  Maybe, on average, they held them
9  twice a year.
10   Q.   And can you describe the
11 substance of what concerns were being
12 talked about in these meetings?
13   A.   Well, they would start off in
14 regard to how we were doing, let's say, as
15 a department.  And then when it came time
16 to voice concerns or questions, certain
17 investigators would voice their concerns
18 and say that we had too much work, we
19 couldn't get it done and we needed more
20 time to complete it or more people to do
21 the job.
22   Q.   Which investigators are you
23 referring to?
24   A.   I don't -- one instance that
25 stands in my mind is a guy named

Page 147

1    M. Munoz
2  Mark Giambalvo.  He definitely was a
3  loudmouth, definitely voiced his opinion.
4    Q.   Do you recall what position
5  Mark worked in?
6    A.   Same as I, field investigator.
7    Q.   And do you remember the
8  substance of what he said?
9    A.   Not in totality, no.
10   Q.   Do you remember the gist of
11 what he said in these meetings?
12   A.   That we had too much work and
13 that it couldn't get done in the timeframe.
14   Q.   Do you recall what the response
15 was?
16   A.   Sometimes it was, okay, we'll
17 look into it, we'll see if we can hire
18 someone, do the best you can, we know you
19 guys are overworked.
20   Q.   And who were the individuals
21 who were actually giving these responses
22 in --
23   A.   It would be management such as
24 either Mike DeGrocco or Bill Newport.
25 These kind of things did not happen under

Page 148

1    M. Munoz
2  Rene.
3    Q.   When you say these kind of
4  things, what do you mean?
5    A.   Well, these kind of discussions
6  in regard to the workload.  I mean, I've
7  only met with Rene two times.  So, he
8  doesn't live in New York.
9    Q.   Do you know where he lives?
10   A.   Florida.
11   Q.   So, is it fair to say that you
12 no longer directly report to someone who is
13 in New York?
14        MS. JEAN:  Objection.
15        THE WITNESS:  My supervisor is
16    in New York, but my manager is in
17    Florida.
18 BY MR. SLOTNICK:
19   Q.   And this is in the current
20 organization of SIU?
21   A.   Correct.
22   Q.   If we look at paragraph seven
23 of Exhibit 5, it says, my regular schedule
24 for Geico is 7:00 a.m. to 3:30 p.m.  I also
25 work approximately 1.5 hours each day in



Page 149

1          M. Munoz
2   addition to that, including working through
3   meal breaks and after 3:30 p.m., and
4   another two hours occasionally on weekends
5   to keep up with my work.  I worked about 46
6   to 48 hours a week, on average.
7          What time period is this
8   paragraph in reference to?
9      A.   That would be anywhere from
10  when I started in SIU.  I wouldn't say
11  in -- within -- you know, the first couple
12  of months, I was getting my feet wet
13  until -- you know, learning the job.  They
14  did not give me maybe the same caseload for
15  a couple of weeks, months.  But this would
16  be up until approximately 2023.
17     Q.   And how often do you allege
18  that you worked through meal breaks, on
19  average, per workweek?
20     A.   On average?
21     Q.   Yeah.
22     A.   Minimum, four days in a
23  workweek -- sorry.
24     Q.   Go ahead.
25     A.   No.  I said in a workweek.

Page 150

1          M. Munoz
2   Sorry.
3      Q.   You say -- you say that you
4   occasionally work another two hours on
5   weekends to keep up with your work.
6          Can you give me details in
7   terms of what you mean by occasionally?
8      A.   So, I was not really much of a
9   weekend worker.  That's why it's
10  occasionally.  If needed, to catch up, then
11  I would do that.
12     Q.   And when you say if needed to
13  catch up, do you mean in terms of specific
14  cases with respect to time deadlines?  I'm
15  just trying to figure out why -- what you
16  mean by catching up with work.
17     A.   So, you are expected to get
18  things done within a certain timeframe.
19  And also, so the SICM program, you can see
20  25 cases, I believe it is, in your pending
21  at one time.  And if you went over that,
22  you're what we call scrolling.
23         If I was scrolling, I was
24  absolutely -- I don't want to say
25  absolutely.  I was more than likely

Page 151

1          M. Munoz
2   utilizing that time and working on the
3   weekends to catch myself up.  It's very
4   overwhelming when you're scrolling.
5      Q.   I mean, how often would --
6   would you be scrolling?
7      A.   That would happen -- since
8   2023, it doesn't happen really as often.
9   Prior to that, I -- I -- I mean, I can't
10  give an exact amount, but there were
11  multiple times, a lot of times within a
12  year, that I would be scrolling.
13     Q.   And so scrolling would be --
14  just trying to figure this out.  Scrolling
15  would mean cases from before the 25 most
16  recent pending ones that you had in your --
17     A.   So, they're all your open
18  cases.  So, any cases that I need to work
19  would be in that pending because once
20  they're closed, they're gone.  They leave
21  there.
22     Q.   Do you have the authority to
23  close cases by yourself?
24     A.   Currently, yes.
25     Q.   When did that practice start?

Page 152

1          M. Munoz
2      A.   I believe it was somewhere in
3   between Gerry and Tony as my supervisor.
4   I'm not sure of the year.
5      Q.   Do you have specific criteria
6   that have to be met in order to close out a
7   case by yourself?
8      A.   Well, yes, you're supposed to.
9   There are specific things you need to do.
10  But when you close it yourself, you just
11  submit.  So, it will close whether you did
12  them all or not.
13     Q.   And then your understanding
14  would be that that might be looked at by
15  the audit team --
16     A.   Correct.  Then -- right.
17  Before the audit team, your supervisors
18  used to approve your cases.  So, either a
19  supervisor might see it or the audit team.
20  So, you don't -- best practice, you don't
21  want to close it without doing everything
22  correctly.
23     Q.   So, before that policy changed
24  and you were allowed to close your own
25  cases, you either had audit or a supervisor



Page 153

1  M. Munoz
2  look at cases that you submitted for
3  closure?
4      A.   Correct.
5      Q.   Do you know if other
6  investigators had that same practice
7  applied to them, to their own cases?
8      A.   When -- yes.  Yes.
9      Q.   That would apply to all field
10 investigators in Region 2?
11     A.   So, the only time somebody
12 would be different, it would be expected
13 when I had -- when I -- when my cases were
14 being approved by a supervisor.  To my
15 knowledge, all the field investigators were
16 being approved by a supervisor.
17         I remember at some point lead
18 investigators used to be able to approve
19 their cases on their own, but I can't speak
20 of that because I wasn't a lead.  And then
21 when they took away the supervisors
22 approving it, we got this period of -- of
23 self-approval, and then you got random
24 audits, right.
25         So, you just -- that was before

Page 154

1  M. Munoz
2  the audit team came, so random supervisor
3  audits, let's say.  That was a short
4  period.  And then the audit team came, and
5  then we all had to do it that way.
6         Now, the only difference is
7  somebody may be on a warning or something
8  like that, and they may take your
9  self-approval away and say, hey, you know,
10 we want to just look at your cases before
11 we approve them.  So, they take people off
12 of self-approval.  I've heard of that.
13     Q.   Have you ever been taken off
14 self-approval?
15     A.   No.
16     Q.   And how do you know that lead
17 security investigators were able to close
18 their own cases before you had that
19 ability?
20     A.   It was just something I had
21 heard.  Scott Brady is a lead investigator,
22 and I remember him telling me that used to
23 be a practice, but I don't know from what
24 timeframe.
25     Q.   Did he give you any other

Page 155

1  M. Munoz
2  details on that ability and when it applied
3  to lead investigators?
4      A.   Self-approval?
5      Q.   Yes.
6      A.   No.  I just remember him saying
7  when asking like what do you do as being a
8  lead, and his job really wasn't so much
9  different as mine.  He said, oh, well, I am
10 supposed to be training.  I am supposed to
11 have self-approval.  I am -- you know, I am
12 supposed to get more cases.  But I don't
13 think he really was.
14     Q.   Why do you say that?
15     A.   Well, because we -- we speak.
16 So, I know -- I know like currently, we
17 just do the same exact job.  Now, sometimes
18 he's asked to help out on things and he's
19 very helpful, so he will help or answer
20 questions for people.  But it's not just
21 because he's a lead.  He's treated
22 basically the same as us at this point.
23     Q.   Did you ever speak with any
24 other lead security investigators about
25 their role compared to your own role?

Page 156

1  M. Munoz
2      A.   Not that I recall.
3      Q.   And if we look back at
4  paragraph seven of Exhibit 5 that we had
5  talked about in terms of your approximate
6  time that you were working through meal
7  breaks and occasionally on the weekends to
8  keep up with your work, you totaled an
9  average of 46 to 48 alleged hours worked
10 per week.
11         Where did you come up with
12 those estimations?
13     A.   So, my regularly scheduled
14 time, 7:00 to 3:30, prior to clock in and
15 clock out, I would, on average, pretty much
16 five days a week, but maybe let's say four
17 to five, sign on around 6:00 a.m., start my
18 day.
19         And on average, I would always
20 be off the computer after 4:30 -- after
21 3:30 -- I'm sorry -- where it be may be I
22 got a phone call, you know.  Police
23 schedules, I deal with a lot of police
24 officers, detectives, their schedules.
25 They work day and night tours.



Page 157

1  M. Munoz
2  So, if an officer called me
3  after hours and I needed to speak to them
4  in order to get my case done, I would speak
5  to them. Some insureds are not available
6  between my business hours, but I have to
7  speak to them. So, I would just leave my
8  computer on, locked. And if I needed to, I
9  would answer the calls.
10  Q.  Did you ever answer any of
11  those calls and tell the individual you
12  could talk to them the next day?
13  MS. JEAN: Objection.
14  THE WITNESS: There may have
15  been circumstances where I may have
16  done that.
17  BY MR. SLOTNICK:
18  Q.  If we look at paragraph ten of
19  your declaration, on page three at the
20  bottom, do you see that paragraph?
21  A.  Yes.
22  Q.  So, it starts, from July 2016
23  to March 2020, my regular hours were
24  approximately 46 to 48 hours per week.
25  And, again, did you just

Page 158

1  M. Munoz
2  describe to me what the basis of your
3  estimation for those hours are?
4  A.  Yes.
5  Q.  And during that time period
6  from July 2016 to March 2020, did you ever
7  record over 38.75 hours per week in your
8  timekeeping program?
9  MS. JEAN: Objection.
10  THE WITNESS: In regard to what
11  I submitted?
12  Q.  Yes.
13  A.  Did I ever? If there was
14  approved overtime.
15  Q.  Do you recall how often there
16  was approved overtime?
17  A.  I don't remember the exact
18  dates. Are we talking from July 2016 to
19  March 2020 at this point?
20  Q.  Yes.
21  A.  I can't remember how many
22  instances there were, but I will say that
23  there was at least one, maybe two.
24  Q.  And when you talk about
25  approved instances of overtime, are those

Page 159

1  M. Munoz
2  forward looking overtime or is that for
3  overtime during your current work period?
4  A.  So, I'm sorry. Forward looking
5  overtime?
6  Q.  Is that for future overtime, as
7  in there will be approved overtime, say, X
8  number of hours during this time period two
9  weeks in the future, or are we talking
10  about you would request overtime, it would
11  be approved and then you could work that
12  overtime, say, the next day?
13  A.  To my recollection, the only
14  time overtime was given was if the
15  workload -- well, let me go back like this.
16  I don't know if it was due to the workload.
17  For whatever specific reason, management
18  would say, okay, we're offering overtime,
19  let's say, to do social media cases. We
20  have an uptick in social media. Anybody
21  want overtime? You could do it.
22  But that's what you had to do.
23  You couldn't do your own work. You had to
24  just do it, and you had to record what you
25  did to prove what you were doing during the

Page 160

1  M. Munoz
2  overtime.
3  I -- and then if like a
4  catastrophe happened and that would be
5  something like a flood, a hurricane,
6  hailstorm, those instances which Geico
7  calls catastrophes -- or cat, we call it --
8  there, you didn't even have to -- whenever
9  working those, it was -- you were just
10  allowed to work and get that -- that work
11  done regardless of hours. And you inputted
12  the amount of hours you worked.
13  Q.  So, those would be for sort of
14  standalone overtime drives as opposed to
15  your daily caseload; is that --
16  A.  The cat work?
17  Q.  The cat work.
18  A.  Yes. Yes. It was not --
19  nothing related to your own work, only if
20  related to the catastrophe.
21  Q.  And from July 2016 to
22  March 2020, did you ever make a request for
23  daily overtime for your -- overtime related
24  to your own work to your supervisors?
25  MS. JEAN: Objection.



Page 161

1       M. Munoz
2       THE WITNESS: I don't recall a
3   specific instance, so I'm going to --
4   well, I don't want to say or no
5   because I don't recall actually
6   asking.
7  BY MR. SLOTNICK:
8       Q.   And from the same time period,
9  so July 2016 to March 2020, were you ever
10 asked by any Geico manager or supervisor to
11 work overtime?
12      A.   Well, let me actually go back
13 because I do remember, from your prior
14 question, I do remember having conversation
15 with Gerry in regard to the work being too
16 much. Did I use the words overtime? I am
17 not sure.
18           I know I said work can't get
19 done, that we have too much work, how are
20 we supposed to do this? And I would kind
21 of panic. I get a little anxiety driven.
22 So, I -- I just want to do well, like my
23 numbers mean a lot to me.
24           So, I remember feeling a little
25 bit of overwhelm -- overwhelmingness where

Page 162

1       M. Munoz
2  I wasn't going to get it done. I may have
3  actually even cried to him at one point,
4  saying to him that it was too much.
5           And he would just tell me,
6  don't worry about it, just keep doing what
7  you're doing, get the job done, you got
8  this, that kind of reassurance. But it was
9  never said that you can work overtime.
10      Q.   Did you actually ask him to
11 work overtime in that conversation?
12      A.   I don't --
13           MS. JEAN: Objection.
14           THE WITNESS: I -- I don't know
15   if the words came out in that sense.
16 BY MR. SLOTNICK:
17      Q.   When was that conversation?
18      A.   Well, it would have been -- I
19 don't remember the exact time. I just can
20 remember that instance, at least once, of
21 being really overwhelmed by it. I know
22 during COVID it was definitely brought up.
23           That could have been my
24 overwhelming issue. I don't remember in
25 regard to that day when I got really upset.

Page 163

1       M. Munoz
2  But I'd say with him, I probably discussed
3  how overwhelmed I felt and the amount of
4  work, at minimum, two times and maybe up to
5  five times.
6       Q.   Were any of those concerns sent
7  to Gerry in writing?
8       A.   I don't recall.
9       Q.   Were they in-person
10 discussions?
11      A.   No. They would be over the
12 phone.
13      Q.   How often did you actually meet
14 in person with your supervisors before
15 COVID, so from July 2016 to March 2020 in a
16 given workweek?
17      A.   In a workweek?
18      Q.   Yes.
19      A.   I mean, I -- you'd have to ask
20 me in months because we didn't see them.
21      Q.   You didn't see them physically,
22 but you would communicate with them?
23      A.   Yeah, either via e-mail or
24 phone. More -- mostly phone, because I
25 don't believe we had the videoconferencing

Page 164

1       M. Munoz
2  at that point.
3       Q.   And was that due to the field
4  or remote nature of your job? Is that why
5  you didn't see them all the time?
6       A.   Correct.
7       Q.   Do you remember how often you
8  would speak to them on the phone, your
9  supervisors?
10      A.   I mean, I could go literally
11 weeks without talking to anyone. Get your
12 job done and nobody really bothered you,
13 you know.
14      Q.   Okay. And when we talked about
15 the catastrophe pay and specific dedicated
16 overtime drives, did you always accept
17 those overtime hours that were offered to
18 you?
19      A.   To my knowledge, I always -- I
20 always worked overtime when offered.
21      Q.   And those were entirely
22 voluntary overtime hours, correct?
23      A.   Yes. I don't believe any of it
24 was mandatory. Especially -- I know the
25 cat -- oh, yeah, I know cat was not



Page 165

1  M. Munoz
2  mandatory in any way. And I don't believe
3  there was ever any mandatory overtime, no.
4     Q.   Do you know which groups of
5  investigators those hours were offered to?
6        MS. JEAN: Objection.
7        THE WITNESS: I don't recall
8     when it was just like generally
9     given. I think it just went out to
10    everyone and asked. With cat,
11    sometimes -- so, Geico's kind of
12    keeps changing the way they handle
13    cat cases.
14       So, years ago, I think if I
15    remember correctly, it was just like,
16    oh, we have these cat cases, you want
17    to do it, do it. Then at some point,
18    they asked for people to join like a
19    cat team. They've done that now, I
20    think, for a few years. I know in
21    2024 because I was on it, and that
22    was as a -- like a voluntary basis,
23    let's say.
24       So, the time came up when
25    Hurricane Milton and whatever just

Page 166

1  M. Munoz
2     happened in Tampa, and they said,
3     hey, you're next up on the list. Do
4     you want to go? And I said yep. And
5     then they sent me. So, that's how
6     that went.
7        Now, next year, they've already
8     asked -- they're doing a dedicated
9     cat team, which I applied for to be
10    on, and it will be, you know, certain
11    people that will do it. They -- you
12    know, other investigators won't --
13    you have to be on this team in order
14    to get it.
15  BY MR. SLOTNICK:
16     Q.   And the cat overtime, is that
17  an on-site overtime drive? So, in other
18  words, you will go to whatever location is
19  affected in --
20       [Crosstalk.]
21     A.   I would. I've done cat here in
22  New York where I am doing it from home. A
23  lot more desk work than you would think,
24  and you're not really in the field because
25  you're just going over these cases and

Page 167

1  M. Munoz
2  seeing, if needed, to go out. But like
3  when I went to Tampa, yeah, they just gave
4  me a whole bunch of cases. If I needed to
5  go out, I had a car and I just went and
6  looked at the cars.
7     Q.   Do you know if other
8  investigators that you worked with in your
9  section always took on these available
10 overtime hours like you did?
11    A.   I know one -- ones who did. I
12 don't know if everyone did.
13    Q.   Which ones do you know who did?
14    A.   Charise Jones would do it.
15 Kevin Dux did it with me at one point. And
16 that's the only two that I can say for sure
17 ever did any type of overtime work offered.
18    Q.   And did Charise and Kevin both
19 work in the same position that you did
20 during those times?
21    A.   Yes.
22    Q.   Does Charise Jones currently
23 work in the same position that you work in?
24    A.   No.
25    Q.   What's her current role?

Page 168

1  M. Munoz
2     A.   She's an auditor. I don't know
3  her official name.
4     Q.   Is she still working in SIU?
5     A.   Yes.
6     Q.   And is Kevin Dux a current
7  employee --
8     A.   Yes.
9     Q.   -- of Geico?
10    A.   Sorry. Sorry.
11    Q.   And is he still working as an
12 investigator?
13    A.   Yes.
14    Q.   Were you always paid for all of
15 the overtime that you worked in cat duty?
16       MS. JEAN: Objection.
17       THE WITNESS: I submitted the
18    hours I worked. And I was paid, yes.
19 BY MR. SLOTNICK:
20    Q.   So, in paragraph ten of your
21 declaration, you then say, from March 2020
22 to approximately November 2021, my regular
23 hours were approximately 48 to 52 hours per
24 week.
25       So, what is your basis for that



Page 169

1    M. Munoz
2  calculation?
3    A.   Well, our caseload went up
4  significantly during the start of COVID in
5  March 2020 when everything went on
6  lockdown.
7    Q.   And when you say our caseload,
8  who are you referring to?
9    A.   The investigators.
10   Q.   So, every investigator's
11  caseload went up in COVID?
12      MS. JEAN:  Objection.
13      THE WITNESS:  I'm going to
14    speak of my co-workers, the field
15    investigators.  I'm going to -- I
16    know theirs did, yes.
17  BY MR. SLOTNICK:
18   Q.   How do you know that theirs --
19  caseloads went up?
20   A.   Well, number one, I can access
21  everyone's pending and actually physically
22  see it.  Number two, I had discussions with
23  my co-workers in regard to it.
24   Q.   How often did you access other
25  investigator's pending caseloads?

Page 170

1    M. Munoz
2    A.   I wouldn't do it on a regular
3  basis.  Maybe once, twice, like every
4  month.
5    Q.   And why would you do that?
6    A.   Just to see like the received
7  compared to me, like just to see if we were
8  all on the same playing field.
9    Q.   Do you remember which
10  investigator's pendings you looked at?
11   A.   Specifically, no.
12   Q.   Would it be people in your
13  section?
14   A.   Yes.
15   Q.   Did you ever look at people in
16  other sections?
17   A.   Not to my knowledge.
18   Q.   Go off the record.
19      THE VIDEOGRAPHER:  We're going
20    off the record, and the time now is
21    2:27 p.m.
22      (Whereupon, a short break was
23    taken at this time.)
24      THE VIDEOGRAPHER:  We're back
25    on the record, and the time now is

Page 171

1    M. Munoz
2    2:41 p.m.
3  BY MR. SLOTNICK:
4    Q.   Ms. Munoz, we were speaking
5  about the time period between March 2020
6  and November 2021, right?
7    A.   Yes.
8    Q.   Okay.  Let -- so, these next
9  series of questions, that's the time period
10  I am going to be focusing on.
11   A.   March 2020, November '21.
12   Q.   Yes.  Yes.
13   A.   Okay.
14   Q.   So, in paragraph ten of the
15  declaration, Exhibit 5, you had said during
16  this time period from March 2020 to
17  approximately November 2021, my regular
18  hours were approximately 48 to 52 hours per
19  week.
20      And you had mentioned your
21  increasing caseload as being the reason for
22  that; is that correct?
23   A.   Correct.
24   Q.   Can you describe for me what
25  you mean by your increasing caseload during

Page 172

1    M. Munoz
2  that period?
3    A.   During that period, we just got
4  significantly more cases.
5    Q.   Do you have an example in terms
6  of how many more cases you were getting per
7  week?
8    A.   In regard to exact numbers, no.
9  I don't know the exact number.  I can say
10  with almost all certainty that the theft
11  team -- because I was part of that in March
12  of 2020 -- was getting the highest number
13  of cases for that time period.
14   Q.   Why was the theft team getting
15  more cases than other groups?
16   A.   Stolen cars were happening at a
17  tremendous rate during COVID.  So -- and a
18  lot of people weren't driving, so there
19  were less accidents, I would assume.  But I
20  know that car thefts went up significantly.
21   Q.   During that time period, were
22  you still going into the field to perform
23  your job duties?
24   A.   No.  At some point when there
25  was the lockdown, we were advised we could

Page 177

1      M. Munoz
2  I went to Tampa, it is inputted different
3  in the Workday system when you submit it.
4      Q.   And then also in paragraph ten,
5  you say from November 2021 to the present,
6  my regular hours worked are approximately
7  46 to 48 hours per week.
8          Is that accurate?
9      A.   To the best of my knowledge,
10  yes.
11      Q.   And what are those calculations
12  based on?
13      A.   Based on, again, you know, in
14  regard to my start time starting prior to
15  7:00, working through a meal, taking calls
16  and doing stuff on the computer after 3:30.
17  Occasional weekend.  But again, I wasn't
18  like a huge weekend worker.
19      Q.   Was your supervisor aware that
20  you were working before 7:00?
21      A.   I would say it.
22      Q.   What do you mean you would say
23  it?
24      A.   I signed on -- well, let's put
25  it this way, I know I have verbally said at

Page 178

1      M. Munoz
2  some point that I -- oh, I usually clock on
3  at 6:00, 6:30, to at least April and Gerry.
4  We're not talking about the -- that time
5  period you just said last, right?  We're
6  talking in general now?
7      Q.   General, yes.
8      A.   Yep.  But I don't -- I don't do
9  that anymore, so --
10      Q.   And when is the last time that
11  you did that?
12      A.   I don't remember the exact
13  time.  Well, it would be -- well, I
14  shouldn't say I don't ever do it, because
15  now if I do clock in at 6:00, then I am
16  done at 2:30.
17          I do have that ability to do
18  that, but I am not -- I will work up to
19  39.99 hours and I am fine.  Nobody says
20  anything to me because it's not considered
21  overtime.  So, that's how I work now, or
22  since we've had to check in and check
23  out -- clock out.
24      Q.   And do you submit for those
25  39.99 hours for payment?

Page 179

1      M. Munoz
2      A.   At minimum, it's 38.75.  At
3  maximum, it's 39.99999.  As long as it
4  doesn't go over 40.  So, I -- I am all in
5  between.
6      Q.   Are you still working your
7  general set schedule from 7:00 a.m. to
8  3:30?
9      A.   That is my general schedule.
10  But that's -- if you looked at my Workday
11  submissions the last few months, this whole
12  year, I have been working almost over eight
13  hours Monday through Thursday.  And then by
14  the time Friday comes, I only have like
15  whatever's left of the 38 to 39 hours and
16  then I have to clock off.
17          And then that's when I've asked
18  for, if needed, additional time to work.
19  Because I am willing to work, but they, you
20  know, don't want me to, so I stop.
21  Computer goes off.  Phone's on the charger.
22  I don't do anything after the hours.  I
23  don't pick up calls.
24      Q.   And those requests you just
25  mentioned, those were the requests you

Page 180

1      M. Munoz
2  testified to earlier to Arineh; is that
3  right?
4      A.   Correct.
5      Q.   And just to go back to -- you
6  said that you talked to April and Gerry
7  about starting before your scheduled 7:00
8  a.m. start time; is that right?
9      A.   I believe I had conversations
10  with both of them.  It would have came up
11  at some point.
12      Q.   Why do you say it would have
13  come up at some point?
14      A.   Because I was doing it every
15  day.  So, I know -- and they would have,
16  let's say, maybe seen an e-mail with the
17  time.  You -- when you clock in on SICM, it
18  tells you the date and time that you sign
19  on, so it's -- it's recorded whatever time
20  I did clock on, sign on.  Also, when you --
21  when you do something in SICM, it's
22  timestamped, so they could see when I was
23  working.
24      Q.   When you say, when you do
25  something, what do you mean?



                         M. Munoz

                    C E R T I F I C A T E


STATE OF NEW YORK       )
                        :
COUNTY OF RICHMOND      )


        I, MARINA DUBSON, a Notary Public for and within the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

        I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of December 2024.



                    _____
                            MARINA DUBSON