# Exhibit K

**In the Matter Of:**

KEITH FISCHER v GEICO

2:23-cv-2848

---

**ALBERT BRUST**

*January 15, 2025*

---



800.211.DEPO (3376)
EsquireSolutions.com

Page 53

1  had no reason to call them.
2         The only investigator that I ever spoke
3  with, you know, most frequently would be Maria Munoz
4  because she was also on the theft team, but in regard
5  to the other investigators, we handled different
6  cases.  So if I was to confer, I wouldn't confer with
7  any of them.
8         So to answer your question, I don't --
9  I don't know, you know, if there is a -- if it's an
10  equal or if there's a big discrepancy between the --
11  you know, the different units as far as how many EUOs
12  they conduct.
13     Q.    Okay.  I guess the -- the tactics that they
14  would take to investigate cases would differ between
15  the different types of cases; would that be right?
16         MR. McALLISTER:  Objection.
17  BY THE WITNESS:
18     A.    From experience, I would say that because
19  it is a different fraud -- you know, element of fraud,
20  it would be handled, you know, a little bit different,
21  but most of your criminal cases, you know, as -- you
22  know, basically are pretty consistent as far as you're
23  going to do your background checks, you're going to
24  do -- you interview your policyholder or claimant, any
25  witnesses, canvass for, you know, video and if need be

Page 54

1  an EUO.
2     Q.    Okay.  But, I guess, which of those tactics
3  are necessary or what follow-up is necessary for many
4  of those activities would be up to the individual
5  investigator to decide?
6     A.    Generally, yeah, it would be up to the
7  investigator.  We would schedule EUOs without -- we
8  didn't have to confer with a supervisor.  If we -- if
9  we needed -- you know, if we felt that an examination
10  under oath was necessary, we would, you know, request
11  it from our staff counsel.
12     Q.    Okay.  How frequently in that role did you
13  work, I guess, out in the field versus at home?  And
14  I recognize that that might have changed over time,
15  but what's your, I guess, basic description of the
16  time spent in the field versus working at home?
17     A.    Well, in the very beginning, because of
18  COVID, we were grounded.  So pretty much for my first
19  year, I didn't -- I didn't -- I don't even know how
20  long it was, but it was a long time.  It was months,
21  you know, that I didn't leave home.
22         Once the ban was lifted, we were limited to
23  the amount of time that we would go in the field, and
24  it was only for certain cases.  And once, you know,
25  everything got back to normal, I would say I was in

Page 55

1  the field anywhere between two to three days a week.
2     Q.    Was there any kind of requirement that your
3  supervisor gave you as far as which days or how
4  frequently you had to be in the field?
5     A.    It was no requirement as far as which day.
6  That's something we would set up by -- you know, we
7  would set up for -- and, you know, according to case
8  management and what made sense or, you know, when, you
9  know, if we were meeting somebody, their availability.
10         But there was no particular requirement as
11  to how many days a week you have to go out, but when
12  we were hired or when I was hired, I was told
13  you're -- "You're a field investigator and, you know,
14  we want you in the field.  We don't want to" -- you
15  know, "your investigations all to be conducted in your
16  house."
17     Q.    COVID was roughly, you know, sort of
18  February or March of 2020, right?
19     A.    Yes.
20     Q.    And you started in September of 2019?
21     A.    Yes.
22     Q.    Okay.  So there was about, you know, four
23  to five months there where I guess you were working
24  before the changes brought about by COVID took place,
25  right?

Page 56

1     A.    Correct.
2     Q.    So let's talk about that initial time
3  period first.
4         So when you were hired on with Geico,
5  I guess, what -- what was the training process or the
6  onboarding process?
7     A.    We were going into Woodbury every day for,
8  I think, about two to three weeks, and then we were
9  going in maybe two to three times a week for, like,
10  another month or so where, you know, we would have
11  some training and then we would be assigned, you know,
12  which we would basically say, like, the simpler tasks,
13  like a social media search, you know, a background
14  search.
15         You know, it was kind -- we kind of like
16  had homework assignments, you know, reviewed claims,
17  go through, you know, Atlas file, see how they note
18  things in the file.  You know, then we -- we would
19  spend -- we'd go to Woodbury and spend time with the
20  claims representatives.  We'd sit with them as they
21  handled calls and, you know, basically the line of
22  questioning how the calls come in.
23         And then shortly after the training, we
24  were -- you know, our time in the office was basically
25  now one day a week, and we were given cases, but a lot



Page 109

1  the last paragraph above that that starts, "All
2  non-exempt associates"; do you see that?
3      A.   Yeah, I see that.
4      Q.   Okay.  And the first sentence reads, "All
5  non-exempt associates are required to accurately
6  record their hours worked and absences taken."
7          Did I read that right?
8      A.   Yes.
9      Q.   All right.  Now, as a non-exempt associate,
10 you understood that you were required to accurately
11 record your hours worked?
12     A.   Yes.
13     Q.   All right.  And you, as a non-exempt
14 associate, you were also required to accurately record
15 any absences taken?
16     A.   Yes.
17     Q.   All right.  And the second sentence deals
18 with all exempt associates are required to accurately
19 record their absences taken"; do you see that?
20     A.   Yes.
21     Q.   Now, the following sentence after that
22 says, "A non-exempt associate who feels he/she did not
23 receive pay for all his/her hours worked, and an
24 exempt or salaried non-exempt associate who feels his
25 or her pay incorrectly reflects a deduction for an

Page 110

1  absence should contact his/her supervisor, local human
2  resources manager, or corporate human resources."
3          Do you see that?
4      A.   Yes.
5      Q.   All right.  Now, as a non-exempt associate,
6  did you ever contact your supervisor and explain that
7  you believed that you didn't receive pay for all the
8  hours that you worked?
9      A.   I have contacted -- no, so what's the --
10 can you repeat the question?
11     Q.   Yeah.  As a non-exempt associate, did you
12 ever contact your supervisor and inform him or her
13 that your pay did not reflect the hours that you
14 worked?
15     A.   I have.  If I worked past the -- you know,
16 the eight hours and I felt I was entitled, I would
17 ask, but I was told there is no overtime.
18     Q.   All right.  Mr. Brust, I'm -- I'm asking
19 you a very specific question.
20     A.   Right.
21     Q.   Did you ever contact your supervisor and
22 inform him or her that you didn't receive pay for all
23 of the hours you worked?
24     A.   Yes.
25     Q.   When did you contact your supervisor?

Page 111

1      A.   I don't -- I can't recall the specific
2  date, but I have discussed with my supervisor that
3  because of the workload, I'm working through lunch,
4  I'm working after hours, I'm working on the weekends.
5      Q.   Which supervisor or supervisors did you
6  make that report to?
7      A.   Gerry Cassagne, and towards the end of my
8  time with Geico, I was supervised by Toni D'Agata.
9      Q.   Let's focus on Mr. Cassagne for a second.
10         When did you inform Mr. Cassagne of what
11 you just testified to, that you were working
12 additional hours?
13     A.   Specific date and time, I'm not going to be
14 able to give you that, but it was, you know, over a
15 period of time where, you know, I would discuss with
16 Gerry that to get my work done, I'm working past the
17 eight hours, and could we get overtime.  And he told
18 me he will bring it up at the next meeting with Bill.
19 And then every meeting, it was the same answer, that
20 he can't authorize the overtime.
21     Q.   How many instances are you saying that you
22 informed Mr. Cassagne of that?
23     A.   I can't -- I mean, it was over a course of
24 years it was discussed .  It was -- it was a constant,
25 you know, constantly brought up, and again, Gerry

Page 112

1  would say, "Do the best you can."
2      Q.   Right.  I want to be clear, Mr. Brust.
3          When you're talking about conversations
4  with Jerry Cassagne --
5      A.   Right.
6      Q.   -- are you talking about general
7  discussions about workload?
8      A.   No, I'm talking about it -- I specifically
9  discussed overtime with Gerry Cassagne on numerous
10 occasions, and I don't particularly know -- you know,
11 I couldn't even tell you if it was -- you know, it
12 could have been two times in a month, it may not be
13 that month, it maybe could be two days in a row, three
14 days in a row.  It depends, you know, if the timing of
15 it is right or -- you know, or, you know, it's just it
16 was brought up on a -- I would say on a regular basis.
17     Q.   Okay.  So your testimony is that you would
18 have discussions with Gerry Cassagne on a regular
19 basis regarding the availability of overtime; is
20 that --
21     A.   Correct.
22     Q.   Okay.  And what would you say specifically
23 in those conversations with Mr. Cassagne?
24     A.   I would ask, "Are we allowed to put in for
25 overtime?"  And he, in return, would say, "Don't do



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
125–128

Page 125

1  because of a struggle or just their style.
2  BY MR. TSONIS:
3      Q.   All right.  I mean, is it common or
4  possible that new investigator, you know, might think,
5  okay, I have to do all these things on this case when
6  a supervisor may look at it and say, you know, "You
7  proved -- you had enough to close the case with a
8  progress disposition, you know, two days ago, or a day
9  ago," right?  That's possible?
10        MR. McALLISTER:  Objection.
11 BY THE WITNESS:
12     A.   It's -- I'm sure it's possible.
13 BY MR. TSONIS:
14     Q.   Sure.  So I guess when you were having
15 these conversations with Mr. Cassagne asking about
16 overtime, was part of the discussion with Gerry
17 Cassagne just whether -- how productive you were being
18 with your cases?
19     A.   He would ask, "How's it going?  Are you
20 struggling?  Are you okay?"
21        And it was never about the -- the -- the
22 investigation itself; it was just the -- the amount of
23 stuff that needed to be done.  It was just more --
24 it -- the -- the enemy was time, you know.  That
25 was -- you just didn't have the time.

Page 126

1      Q.   Right.  So when you would have a
2  conversation with Gerry Cassagne regarding overtime,
3  you wouldn't tell Gerry Cassagne, "I'm working off the
4  clock"; is that right?
5        MR. McALLISTER:  Objection.
6  BY THE WITNESS:
7      A.   Gerry, he -- he -- I didn't have to tell
8  him.  He -- he knew when he signed up for my cases.
9  They're time stamped.  He would see a -- you know,
10 a report time stamped at 7:00 at night.  It's right
11 there.  It's right in the report.
12 BY MR. TSONIS:
13     Q.   Okay.  So -- but to go back to my question,
14 you didn't actually tell Gerry Cassagne at any point
15 that you were working off the clock?
16        MR. McALLISTER:  Objection.
17 BY THE WITNESS:
18     A.   Yes, he knew I was working off the clock.
19 BY MR. TSONIS:
20     Q.   I didn't ask if you believe he knew.  We'll
21 get to that.
22     A.   Oh.
23     Q.   I'm asking a different question.
24        Did you ever actually tell Gerry Cassagne
25 that you were working off the clock?

Page 127

1        MR. McALLISTER:  Objection.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MR. TSONIS:
5      Q.   When did you tell Gerry Cassagne you were
6  working off the clock?
7      A.   Over a course of time, I -- you know,
8  throughout my time with Geico.
9      Q.   You're filing a lawsuit, you joined a
10 lawsuit here about -- with Geico, and I'll entitled to
11 your best testimony here today.
12     A.   Right.
13     Q.   So when specifically did you --
14     A.   So --
15     Q.   -- tell Gerry Cassagne that you were
16 working off the clock?
17     A.   When -- when I worked with Geico and
18 I spoke to Gerry Cassagne and told him specifically
19 I was working off the clock, told him I needed
20 overtime -- well, I was told I was denied overtime.
21 During that time, I was not thinking lawsuit.  I was
22 not preparing to litigate.
23        So I was not taking notes on, "Oh, Gerry
24 Cassagne said no today."  You know?  So I don't have
25 any records.  So nothing that really could refresh my

Page 128

1  recollection.  And, again, I worked with them for
2  almost five years, and it's been over a year since
3  I worked with them.
4        So it's -- again, it's throughout the five
5  years, you know, throughout, you know, my tenure with
6  Geico.  I don't have a specific date or time, but
7  I can tell you I do recall on numerous occasions
8  making a point or a stand as far as if we don't work
9  extra, we're -- you know, I cannot satisfy these
10 metrics.  I don't know -- I don't have, you know --
11 again, I wasn't preparing to be here, you know.
12     Q.   I understand the lawsuit wasn't -- didn't
13 exist then, but we are -- Geico is entitled to know
14 the specifics of what you said and when you said it
15 for what you're contending here today, okay?  Does
16 that make sense?
17     A.   Sure.  Of course.
18     Q.   So when you had conversations with Gerry
19 Cassagne, what specifically did you say regarding
20 off-the-clock work that you are claiming now?
21        MR. McALLISTER:  Objection.  I think --
22 Greg, I think Al has been explaining his experiences
23 with Gerry and his conversations, and he has answered
24 this question multiple ways.  I think maybe if we can
25 move past this question, that would be appreciated.



Page 129

1    MR. TSONIS:  Your objection's noted,
2   although speaking objections are not permitted.  So
3   I'll ask the witness the question again.
4   BY MR. TSONIS:
5       Q.    What specifically did you say to Gerry
6   Cassagne during these conversations regarding
7   off-the-clock work?
8       MR. McALLISTER:  Objection.
9   BY THE WITNESS:
10      A.    I spoke to Gerry in sum and substance that
11  I need overtime, or I'm not going to be able to
12  satisfy the metrics.  I asked him on a regular basis,
13  and he said, "I've spoken to Bill, and Bill will try."
14  However, Bill, unless it was a cat case, it was very,
15  very rare, and I think I was only maybe on two
16  separate occasions where it may be less than a week or
17  two that we were able to use overtime specifically,
18  specifically for the cases that we were working.
19  BY MR. TSONIS:
20      Q.    So in those conversations with Gerry
21  Cassagne, you didn't actually tell him, "I'm working
22  off the clock."  You were asking about overtime; is
23  that accurate?
24      A.    No.
25      MR. McALLISTER:  Objection.

Page 130

1   BY THE WITNESS:
2       A.    I did tell him I was working off the clock
3   because I told him that I will -- I have to do what
4   I have to do so I'm not, you know, in the bottom
5   quartile.  So I told -- he knew, he knew I worked
6   weekends, he knew I worked after hours.  He knew --
7   I would discuss with -- I'm a -- could I let my dog
8   out?
9       THE WITNESS:  I'm sorry.  I'm going to kill
10  this dog.  I apologize.  The dog is killing me.
11  You're killing me, dog.  Yeah, get out.  Thank you.
12  BY THE WITNESS:
13      A.    So, sorry, off the clock, I could --
14  I could specifically -- myself and Gerry are very big
15  hockey fans, and we both play hockey, but I would work
16  in between periods.  I told him I would do work.  He
17  knows hockey games generally start at 7:30 at night.
18  So indirectly and directly, he's aware that I was
19  working off the clock because in between periods, as
20  soon as the period would end, I would do as many
21  computer checks as I can.  So he knew that.  Again,
22  I --
23  BY MR. TSONIS:
24      Q.    How many -- how many conversations did you
25  have with Gerry Cassagne where you specifically told

Page 131

1   him, "I'm working off the clock"?
2       MR. McALLISTER:  Objection.
3   BY THE WITNESS:
4       A.    I can't -- I can't put a number on that,
5   but it's many.  Over the course of four and a half
6   years, you know, again, it's many times, could be
7   50 to 100.  I don't know.  The conversation was a --
8   a constant, especially when, you know, the Monday
9   numbers would come out, and they would say, you know,
10  "Guys aren't meeting your, you know, metrics."
11      And I said, "Well, we're never going to
12  meet it in eight hours.  It's not happening.  We need
13  more hours to work."  So it was -- it was -- I was
14  very vocal when it came to that.
15      And, again, I take pride in what I do, and
16  I always try to do the right thing for the
17  policyholder.  So, you know, again, my supervisors
18  were aware and, you know, I did work, you know, off
19  the clock, but -- and they were aware of it.  Makes --
20  and I -- and I spoke to them numerous times over the
21  course of five years.  Specific dates, no, I didn't
22  keep record of it because I never expected to be
23  involved in a lawsuit.
24  BY MR. TSONIS:
25      Q.    But it's your testimony here today that

Page 132

1   50 to 100 times, you talked to Gerry Cassagne and used
2   the words, "I'm working off the clock"?
3       MR. McALLISTER:  Objection.
4   BY THE WITNESS:
5       A.    I -- I never used that term ever, "I'm
6   working off the clock."  I would say, "I'm working on
7   my own time.  I'm tired of working on my own time."
8       Unless you're working on your own time
9   you're not getting this done.  You know, if somebody's
10  at the top of the ratings, everybody knows why they're
11  at the top of the ratings because you can go on the
12  computer at 10:00 at night and see the light's green.
13  Gerry knows that.  Everybody knows that.
14      Everybody knew everybody was working past
15  the time, but like I said, everyone did the best they
16  can, and we were just trying to do the right thing,
17  but absolutely I had conversations with Gerry numerous
18  times.  I wouldn't use off the clock; I had said, you
19  know, on my own time.  On my own time.  He would ask
20  me, "How was your weekend?"  And I would be like, "Oh,
21  it's great.  I worked five hours."  You know?  They
22  knew.
23  BY MR. TSONIS:
24      Q.    And those conversations with Gerry, were
25  some of those conversations ones where you didn't



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
133—136

Page 133

1  reference on my own time but really just talking about
2  workload generally?
3        MR. McALLISTER:  Objection.
4  BY THE WITNESS:
5     A.   I'm sorry, say that again?
6  BY MR. TSONIS:
7     Q.   Yeah, were some of those -- was every
8  single one of those conversations, did it include a
9  reference to your own time, as you said, or were some
10 of those conversations just about workload generally?
11       MR. McALLISTER:  Objection.
12 BY THE WITNESS:
13    A.   No, we -- it got to the point where, you
14 were, you know, I was beating a dead horse, like it
15 wasn't changing.  So every time I spoke to Gerry, you
16 know, I didn't complain about the workload.  I didn't
17 complain about overtime.  He -- he saw the cases.
18 He -- he -- he knew.  He would say, "Hey, I -- you
19 know, how are you doing?  You're falling behind."
20       "Well, I'm doing the best I can."
21       And he goes, "That's all you can do."
22       You know, and -- you know, again, he signs
23 off on our -- you know, if he comes in on Monday
24 morning, and there's ten reports in his -- his queue,
25 he knows we did it on the weekend.  You know, we

Page 134

1  didn't have to have that conversation.  Everything's
2  time stamped.
3        You know, and you can't -- and it got to
4  the point where, you know, he's the supervisor.  He
5  doesn't want to hear it.  You know?  He knows the
6  complaints.  After a while, it's like he knows.
7  BY MR. TSONIS:
8     Q.   So to be clear, when you would say things
9  like this to Gerry Cassagne, he never instructed you
10 to work off the clock?
11       MR. McALLISTER:  Objection.
12 BY THE WITNESS:
13    A.   No, he never told me to walk -- work off
14 the clock.  He said, "Do the best you can."
15 BY MR. TSONIS:
16    Q.   Okay.  So going back to the Geico policy we
17 were looking at, if I understand your -- your
18 testimony, you never told Gerry Cassagne specifically,
19 "My pay doesn't reflect all the hours that I worked";
20 is that accurate?
21       MR. McALLISTER:  Objection.
22 BY THE WITNESS:
23    A.   Yes.
24 BY MR. TSONIS:
25    Q.   Now, did you ever complain to your local

Page 135

1  human resources manager that your pay did not -- that
2  your pay --
3     A.   No.
4     Q.   -- did not reflect -- sorry, let me -- let
5  me rephrase my question.
6        Did you ever notify your local human
7  resources manager that you did not -- you felt you
8  didn't receive pay for all of the hours that you
9  actually worked?
10    A.   No.
11    Q.   As a Geico employee, you knew how to
12 contact your local human resources manager if you
13 needed to?
14    A.   I'm sure I could figure that out, yes.
15    Q.   Okay.  And similarly, you never informed
16 corporate human resources that you didn't receive pay
17 for all hours that you actually worked?
18       MR. McALLISTER:  Objection.
19 BY THE WITNESS:
20    A.   That's correct.
21 BY MR. TSONIS:
22    Q.   Okay.  And similarly, you were aware that
23 you -- of how you could contact corporate human
24 resources?
25       MR. McALLISTER:  Objection.

Page 136

1  BY THE WITNESS:
2     A.   Yes.
3  BY MR. TSONIS:
4     Q.   Are you aware that Geico maintained a
5  Berkshire Hathaway ethics hotline?
6     A.   That I'm not aware of.
7     Q.   Okay.  So your -- you just don't know one
8  way or the other if an ethics hotline --
9     A.   And it's not anything -- I've never even
10 heard of an ethics hotline, no.
11    Q.   Okay.  So we talked about Gerry Cassagne.
12 What -- when -- or strike that.
13       Did you ever notify Toni D'Agata that you
14 felt you did not receive pay for all the hours you
15 actually worked?
16    A.   I notified Toni D'Agata that, you know,
17 same as Gerry Cassagne, I requested it, I was told
18 overtime is not available, and, you know, throughout
19 our discussions over a period of time, I did make it
20 known that I was working on my own time.
21    Q.   How did you make it known you were working
22 on your own time?
23    A.   I told her.  I said I work about two hours
24 extra every day and I work about two hours on a
25 Saturday and two hours on a Sunday.



Page 137

1    Q.   When did you have that conversation with
2  Toni D'Agata?
3    A.   I don't have any record of that.  I don't
4  have specific dates, but, I mean, Toni was my
5  supervisor for maybe the last six months of my time
6  with Geico, so, you know -- or around that time, you
7  know, when I left Geico, towards the end, that --
8    Q.   How many times did you have that kind of
9  conversation with Toni D'Agata?
10    A.   I would -- it wasn't many with her.  Again,
11  it was just she wasn't a supervisor very long, but,
12  you know, I -- I do recall in the -- my initial
13  conversation and her taking, you know, over as my
14  supervisor, we discussed it, and I was -- and she was
15  well aware of our complaints.
16         And, again, I -- you know, I've dealt
17  with supers -- you know, I've had supervisors my
18  entire life.  Once they know, they don't want to hear
19  it over and over and over.  You know, it was known.
20         I did mention it, I would say, you know,
21  approximately about, you know, anywhere between five
22  to ten times in the six months that we just need
23  overtime.  We need overtime or work on your own time.
24    Q.   What do you mean by or work on your own
25  time?

Page 138

1    A.   Again, for me to get the job done, and
2  again, your metrics, again, there's always the -- if
3  your metrics aren't to their standards, and again, if
4  they determine it's at the bottom quartile, there's
5  always that risk of getting laid off or not getting
6  raises.
7         So if other people -- and, again, it really
8  has nothing to do with what other people are doing,
9  you know.  I did it because I felt it was the right
10  thing to do.  Again, as far as me being an
11  investigator, you know, a retired detective, I took a
12  lot of pride in my investigations.  I didn't like to
13  do shoddy work, and I -- you know, I did what was
14  necessary.  And if I worked on my own time, and in the
15  police department, I mean, we had a cap on overtime,
16  you know.  You worked on your own time sometimes, you
17  know.  You did the job.
18    Q.   Do you have an understanding as to whether
19  overtime was ever approved for any investigator?
20         MR. McALLISTER:  Objection.
21  BY THE WITNESS:
22    A.   Overtime, I do recall overtime being
23  approved, and I was -- I was very happy.  I was -- you
24  know, I was like, "Finally," but it only lasted, like,
25  two weeks.  You know?  It came and went really fast.

Page 139

1  And then there was another time it started again, and
2  that, I think, lasted like maybe three days.  It was
3  even less and besides the cat overtime, but that was
4  for cat cases.  So now we were catching cat cases and
5  our regular cases, but the overtime was only for the
6  cat cases.
7  BY MR. TSONIS:
8    Q.   Right.  So let me distinguish for a second.
9         There was a period of time, I think you're
10  testifying, where overtime hours were pre-approved for
11  investigators to use?
12    A.   Yes.
13    Q.   For example, in or around June of 2020, was
14  there a period of time where every investigator was
15  authorized to use up to ten hours of overtime per
16  workweek?
17         MR. McALLISTER:  Objection.
18  BY THE WITNESS:
19    A.   I don't have anything to, you know, refresh
20  my recollection as to that.  You know, did -- you
21  know, you're referring to June, so I'm going to assume
22  that you have something that -- that -- in that time
23  frame, but I do recall we had, like, ten -- we could
24  do ten hours a week.  I do recall that.
25

Page 140

1  BY MR. TSONIS:
2    Q.   All right.  Excuse me.  And similarly, do
3  you recall a period in July of 2020 where you -- it
4  was communicated that you could work up to ten hours
5  of overtime per workweek?
6         MR. McALLISTER:  Objection.
7  BY THE WITNESS:
8    A.   I do -- I do recall another time, if it was
9  July, I don't -- I don't recall what month it was, but
10  I do recall, I stated before you made those comments
11  before June, July, I do recall it was like two
12  separate times, you know, that we were all authorized,
13  but it was not very long.
14  BY MR. TSONIS:
15    Q.   Okay.  Prior to or setting aside that --
16  that preauthorized overtime, was it your understanding
17  that as an investigator, you could request overtime
18  and needed to have overtime approved before you could
19  work it?
20    A.   You were advised to ask your supervisor for
21  overtime before you did it.
22    Q.   Okay.  So you understood that the policy
23  was if you felt there was a business need for overtime
24  that you could request it from your supervisor?
25         MR. McALLISTER:  Objection.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
141–144

Page 141

1  BY THE WITNESS:
2      A.  That's correct.
3  BY MR. TSONIS:
4      Q.  Okay.  If you, for example, you know, got
5  stuck in traffic or had an EUO that ran long, and you
6  worked two extra hours on Monday, one option would be
7  cutting two hours from a different shift, right?
8      A.  That, that wasn't really exposed to until,
9  like, the end of my -- I didn't hear about that until,
10  like, maybe my last few months.  I forget what they
11  called it, but, like, you could if you worked, like
12  I said, an extra two hours, you could end -- on
13  Thursday, you could work two hours less on Friday.
14      But it wasn't about the -- you know, you
15  didn't -- you -- even if you did work an extra two
16  hours, you wouldn't want to work less than hours on a
17  Friday because you had too much work, you know.  It's
18  just -- it was all about time, you know.
19      It -- and, again, you know, have I worked
20  extra in -- no, I wouldn't take two hours less because
21  that actually hurts me in a way because I still have
22  work to do.
23      Q.  Right.  But you had an understanding, or is
24  your understanding of the concept that, you know, if
25  you work two hours more one day, you can cut two hours

Page 142

1  from a subsequent shift, like flexing your time?
2      A.  That's what it's called, flex time.  Yeah,
3  so flex time, I didn't become aware of that until
4  probably -- it was probably maybe -- maybe my last
5  year in Geico, and I was working two hours every --
6  extra every day, so that means I would have off every
7  Friday if I -- if I did that, you know?
8      So I didn't really pay attention to the
9  flex time.  It didn't -- it didn't work for me because
10  I'm working extra so I could do the work.  I'm not --
11  I wasn't working extra so I could take a day off.
12      Q.  Okay.  And going back to the conversation
13  with your supervisors, Toni D'Agata and Gerry
14  Cassagne, you never told them how many hours extra
15  you're working that you're claiming now, right?
16      MR. McALLISTER:  Objection.
17  BY THE WITNESS:
18      A.  I have told Gerry that I do about two hours
19  every day and on the weekends I would do about two
20  hours on Saturday, two hours on Friday.  You know, it
21  was between four to five hours on the weekend.  He
22  knew.  I definitely told him.
23  BY MR. TSONIS:
24      Q.  All right.  So you're claiming that you
25  told Gerry Cassagne specifically how much time you

Page 143

1  were working and not putting into Workday?
2      MR. McALLISTER:  Objection.
3  BY THE WITNESS:
4      A.  Yes.  Yes.
5  BY MR. TSONIS:
6      Q.  And was that time that you're just
7  referencing the amount of time that you spent
8  consistent throughout your time at Geico?
9      MR. McALLISTER:  Objection.
10  BY THE WITNESS:
11      A.  I will say that it was not every weekend,
12  but I would say most of my weekends were spent working
13  at some point.
14  BY MR. TSONIS:
15      Q.  Do you have an understanding of how much
16  time any other investigator spent working on any given
17  workweek?
18      MR. McALLISTER:  Objection.
19  BY THE WITNESS:
20      A.  I did not have a conversation where
21  I specifically spoke about time, but I was aware that
22  all investigators were at some point -- and, again,
23  not every weekend, but have worked on the -- on the
24  weekends.
25

Page 144

1  BY MR. TSONIS:
2      Q.  All right.  You're making pretty broad
3  statement that all investigators are working on the
4  weekend.
5      So who do you mean by all investigators?
6      A.  You know, I don't remember all of them, but
7  I -- like I said, did they work every day weekend?
8  But I know for a fact, and I know you're going to say
9  it's broad, but there wasn't too many of us, and we've
10  had the conversation many times that unless you work
11  on the weekends, you're not going to -- you're not
12  going to be able to keep up.
13      Again, I don't know how much they did, but
14  without a doubt -- and I know, like, it's, you know,
15  nobody -- when you're testifying, they don't like
16  absolutes, but they worked weekends.
17      Did they work as much as me or more or
18  less?  I don't -- I don't know.  I didn't keep track,
19  but it was a -- it was a complaint from all of us, and
20  I'd be surprised if an investigator said they never
21  worked on the weekend.
22      Q.  When you say all, who are you referencing?
23      A.  So I would say Maria Munoz, Ted Wendling,
24  Steve Stemmler, Keith Fischer.  Who else?  Kevin Dux.
25  Tiffany Cummings.  I'm trying to think of who else



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
181–184

Page 181

1  BY MR. TSONIS:
2      Q.   Sure.  Did you get credit from a
3  productivity standpoint on assists that you did?
4      A.   No.
5      Q.   Okay.  Typically, do you have an
6  understanding at Geico as to what the ratings
7  1 through 5 mean?  Like, at what point are you meeting
8  expectations?
9      A.   I think 3 and above.
10      Q.   Okay.  So if you're a 3 or a 4 or a 5, you
11  were either meeting or perhaps exceeding expectations?
12      A.   Yes.
13      Q.   All right.  Did you receive performance
14  reviews each year that you worked for Geico?
15      A.   Yes.
16      Q.   You started in September of 2019, so did
17  you receive a 2019 performance review?
18      A.   I don't recall.
19      Q.   Okay.  In either event, in 2020 and in
20  2021, 2022, you would have received a performance
21  review, right?
22      A.   Yes.
23      Q.   Did you receive merit increases as part of
24  your reviews?
25      A.   Yes.

Page 182

1      Q.   Was that true every year that you worked
2  for Geico?
3      A.   I received merit ratings every year.
4      Q.   Do you have a recollection or an
5  understanding of what your performance ratings were in
6  the time that you worked for Geico?
7      A.   Are you asking do I recall the actual
8  rating number?
9      Q.   Yeah, I mean do you -- I understand how you
10  might not recall the exact rating number, but
11  typically speaking, did you fall in the 1, 2, 3, 4, or
12  5 range?
13      A.   I think -- I think generally I fell in the
14  area of, like, 4, 4.-something, 4.2, something in that
15  area.
16      Q.   Okay.
17      A.   And I don't think I was ever a 3.
18      Q.   Okay.  Working additional hours allows you
19  to -- would allow you to close cases faster, right?
20          MR. McALLISTER:  Objection.
21  BY THE WITNESS:
22      A.   It would allow me to close more cases.
23  BY MR. TSONIS:
24      Q.   Right.  So working additional hours would
25  allow you to increase productivity by closing more

Page 183

1  cases?
2          MR. McALLISTER:  Objection.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. TSONIS:
6      Q.   And working additional hours would allow
7  you to reduce your average case life as well, right?
8          MR. McALLISTER:  Objection.
9  BY THE WITNESS:
10      A.   Yes.
11  BY MR. TSONIS:
12      Q.   Would you agree by working additional
13  hours, but not recording it in Workday, that you
14  benefit in the form of merit increases?
15          MR. McALLISTER:  Objection.
16  BY THE WITNESS:
17      A.   I benefitted in my metrics.  What they
18  decided to give me, that's -- you know, that's up to
19  them.
20  BY MR. TSONIS:
21      Q.   As a Geico associate, you wouldn't have
22  been eligible for a merit increase if you're rated a
23  1 or a 2, right?
24          MR. McALLISTER:  Objection.
25  BY THE WITNESS:

Page 184

1      A.   I don't know.  I don't know what -- I don't
2  know.
3  BY MR. TSONIS:
4      Q.   Okay.  But it's your understanding that by
5  being rated, you know, in the -- in the range of
6  4.-something that you were eligible for a merit
7  increase?
8      A.   The ratings that I received, I did get
9  merit increases.
10      Q.   Right.  And the number ratings that you
11  received and the merit increases that came with them
12  were based on your performance in the metrics in the
13  measurement -- that your performance was measured
14  against, right?
15          MR. McALLISTER:  Objection.
16  BY THE WITNESS:
17      A.   Yes, that and, like I said, and there
18  were -- there were additional assignments that -- you
19  know, that I was -- or that I handled that were
20  beyond, like, your typical case as re- -- you know,
21  referred from intake, kind of more like you could
22  label it almost like a major case that could be more
23  time-consuming, and, again, when you -- ratings came
24  around, you basically had to -- you know, you had to
25  sell yourself and say, you know, "Well, these were my



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
217—220

Page 217

1  yourself to be an excellent investigator, and you
2  continue to improve with your quality goal?
3      A.  Yes.
4      Q.  All right.  And then he similarly continues
5  to say good things about your performance in terms of
6  you being an excellent investigator, using your law
7  enforcement background with -- to assist in your
8  investigations, having the utmost integrity, and
9  having proven yourself to be an asset to the unit?
10     A.  Yes.
11     Q.  All right.  At no point in here did you
12  indicate that you were working hours in excess of
13  38.75 but not logging them, right?
14     A.  No.
15     Q.  Sorry, I asked that poorly.  No, that's not
16  right, or no, you indicate --
17     A.  I did not ask that.
18     Q.  Okay.  And similarly, do you see any
19  comment from Mr. Cassagne acknowledging that you had
20  been working hours off the clock?
21     A.  No, there is no -- nothing by Mr. Cassagne.
22     Q.  Okay.  You can set this aside.
23         So if we looked at the remainder of your
24  performance reviews for your time at Geico, was there
25  ever a time that you indicated that you were working

Page 218

1  additional hours off the clock?
2      MR. McALLISTER:  Objection.
3  BY THE WITNESS:
4      A.  No.
5  BY MR. TSONIS:
6      Q.  All right.  And similarly, if we looked at
7  every performance evaluation, would we see any
8  acknowledgement from any supervisor that you were
9  working hours off the clock?
10     A.  No.
11     Q.  I'm going to introduce another exhibit.
12  Let's see if I can drop it into the chat here.  This
13  one may take a minute to download, hopefully not, but
14  it's, I think, like 23 megabytes.  Let me know when
15  you've had a chance to download and look at it.  This
16  should be Exhibit 9.
17         (Whereupon, Brust Exhibit 9 was presented.)
18         THE WITNESS:  Okay.  It's open.
19         MR. TSONIS:  Okay.  And for the record,
20  this is a document that has the Bates label G005126 to
21  5163.
22  BY MR. TSONIS:
23     Q.  Now, Mr. Brust, have you ever seen this
24  document before?
25     A.  Not this particular one, no.

Page 219

1      Q.  Okay.  I don't suspect that you have, but
2  do you have an understanding that Geico maintains what
3  are known as Workday profiles for different
4  associates, for its associates?
5      A.  Yes.
6      Q.  And I'll represent to you that this is your
7  Workday profile at Geico's records, okay?
8      A.  Yes.
9      Q.  It's your name listed at the top, right,
10  under View Worker?
11     A.  Yes.
12     Q.  All right.  And we will not be looking at
13  all of the pages of this document and the information
14  therein, but just as a couple of key points, is that
15  your phone number listed at the top underneath your
16  picture?
17     A.  That would be the Geico, my Geico phone
18  number.
19     Q.  Okay.  And similarly, is that your Geico
20  e-mail address underneath that?
21     A.  Yes.
22     Q.  All right.
23     A.  Yes.
24     Q.  If you go to the second page ending in
25  5127.

Page 220

1      A.  Okay.
2      Q.  Now, it says under Location, just kind of
3  the fourth line down, it says New York Long Island?
4      A.  Yeah.
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  Because I know earlier you testified about
8  the Woodbury and the Melville office.
9         Have you ever been assigned to any other
10  office?
11     A.  No.
12     Q.  Okay.  So you were never, I guess to be
13  specific, assigned out of the Buffalo office, for
14  example?
15     A.  No.
16     Q.  All right.  While you were with Geico, did
17  you understand that at some point, Geico changed from
18  a sort of, you know, geographic region-based structure
19  to a more sort of vertically integrated structure?
20     A.  Yes.
21     Q.  Okay.  After that change, who did you
22  report to?
23     A.  So at that point, I believe when the change
24  occurred, it might have been Gerry Cassagne, but for a
25  really short time; he left, and then it was Toni



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
221–224

1  D'Agata, and then my last supervisor was Sarah
2  Greenman.
3      Q.   Okay.  And how long was Ms. Sarah Greenman
4  your supervisor?
5      A.   Maybe five months, approximately.
6      Q.   Okay.  Did you ever inform Ms. Greenman
7  that you were working off the clock and not recording
8  it in Workday?
9      A.   Yes.
10     Q.   And when did you do that?
11     A.   I don't have a particular date and time,
12  but we would have weekly one-on-one meetings, and on
13  occasion, I did mention it.
14     Q.   When you say on occasion, how frequently do
15  you mean?
16     A.   I was -- again, I'm approximating five
17  months.  I would say approximately five times.
18     Q.   And when you mentioned it to Ms. Greenman,
19  what specifically did you say?
20     A.   That, you know, I would ask for overtime,
21  you know, because I'm falling behind on my cases and,
22  you know, it's -- I'm not able to, you know, conduct a
23  proper investigation with, you know, just the, you
24  know, standard week.
25     Q.   And I just want to be clear.  You would get

1  on the phone with her or, you know, via Zoom, and you
2  would say, "I'm requesting overtime because of -- I'm
3  falling behind on my cases and because I can't do my
4  work in a standard work" --
5      A.   No, once a week, we would meet, and
6  I actually do recall one of the conversations where
7  she said, "Well, what could we do differently?  How
8  would -- what would help to move these cases along?"
9          And I said, "I need overtime."  And her
10  response was, "Well, that's not happening, so we need
11  to come up with something different."  And we
12  chuckled.
13     Q.   Okay.  So it's conversations like that that
14  you're encompassing?
15     A.   Yeah.  And, again, nothing major, again
16  beating a dead horse.  She's well aware of it.  It's
17  been discussed in, you know, team meetings.  You know,
18  she said she would do her best, you know.  She would
19  put that, you know, out there for consideration when
20  she spoke to managers, and I think she -- I think --
21  I forget his name.  It was Rene, it was like Rene
22  Cubas or something like that, she reported to him, but
23  once again, I know when they're hard, I didn't get any
24  overtime.
25     Q.   Would you ever make Bill Newport aware

1  that -- that you were working off the clock?
2      A.   No, I never spoke to Bill.  Everything --
3  I -- I would speak to, you know, the immediate
4  supervisor.  You know, I'm used to chain of command.
5  You don't -- you know, you don't go right to the
6  captain.  So I always spoke to Gerry or Toni or Sarah.
7      Q.   Okay.  So you never had any conversations
8  about working off the clock with anyone at the SIU
9  manager level?
10     A.   No.
11     Q.   Okay.  It says here your hire date was
12  September 16, 2019.  Is that right, to the best of
13  your recollection?
14     A.   Yes.
15     Q.   And your termination date with Geico was
16  February 2nd, 2024?
17     A.   Yes.
18     Q.   Why did you decide to leave in two
19  thousand -- in February of 2024?
20         MR. McALLISTER:  Objection.
21  BY THE WITNESS:
22     A.   It -- it was, you know, leading up to that
23  date, I was already dissatisfied with the treatment
24  and the culture and the rule by fear and, you know,
25  the metrics over objective, and every day's a failure.

1  You know, no matter what you did, they moved the goal
2  posts.  It felt like you couldn't really do anything
3  correct, right.
4          And then there came a point that they
5  wanted to make me an inside investigator.  And I said
6  that's not what I was hired to do.  I did not want to
7  sit behind my desk.  And I said, "If that's going to
8  happen, I'm going to resign."
9          Sarah, you know, wished that I would not
10  and that I would reconsider.  I told her I would think
11  about it over the weekend, because this conversation
12  I had with Sarah was on a Friday.  And I thought about
13  it, and on that Monday, I called her up at 8:00, and
14  I resigned.
15     Q.   Okay.  So ultimately they wanted to change
16  you from a field investigator to a desk investigator,
17  and that wasn't --
18     A.   Yes.
19     Q.   -- a change you wanted to make?
20     A.   And they were taking my company car.
21  I mean, that wasn't the reason, but I just didn't want
22  to be a desk investigator.
23     Q.   Okay.  If you go to the page that ends in
24  5128, should be the third page of the document.
25     A.   Okay.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
245—248

Page 245

1    A.   Myself.
2    Q.   Okay.  And do you recognize that on the
3  very last page of this document, you see that there's
4  a -- a date and a signature line?
5    A.   Yes.  Yes.
6    Q.   Is that your signature?
7    A.   Yes.
8    Q.   So you signed this document on or around
9  November 8th, 2023?
10   A.   Yes.
11   Q.   And you were declaring under penalty of
12  perjury that what you put in this declaration was true
13  and correct?
14   A.   Yes.
15   Q.   I want to direct your attention to
16  paragraph 8.
17   A.   Okay.
18   Q.   Well, actually, if you -- if you go back
19  just one paragraph to paragraph 7.
20   A.   Okay.
21   Q.   Is it accurate to say that throughout the
22  course of your employment with Geico that you were
23  scheduled and expected to work 7.75 hours per day?
24   A.   Yes.
25   Q.   All right.  And that's compensable time, it

Page 246

1  doesn't include an unpaid meal period?
2        MR. McALLISTER:  Objection.
3  BY THE WITNESS:
4    A.   It does not include an unpaid meal period.
5  BY MR. TSONIS:
6    Q.   Okay.  And the total number of hours that
7  you were scheduled to work each week was 37.75?
8    A.   Yes.
9    Q.   Now, if you go to page -- or paragraph 8,
10  this declaration states, "From the start of my
11  employment with Geico through February of 2020, on top
12  of my recorded 7.75 hours a day, I regularly worked an
13  extra two hours a day, plus another five hours on
14  weekends, to keep up with my work.  I worked about
15  50 hours a week on average."
16        Do you see that?
17   A.   Yes.
18   Q.   Okay.  Now, as we've discussed earlier,
19  you're not claiming that during the time you spent
20  training that you were working more than 7.75 hours a
21  day?
22        MR. McALLISTER:  Objection.
23  BY THE WITNESS:
24   A.   That's correct.
25

Page 247

1  BY MR. TSONIS:
2    Q.   All right.  So when you say from the start
3  of your employment with Geico, that's not quite
4  accurate because that would encompass this training
5  time?
6        MR. McALLISTER:  Objection.
7  BY THE WITNESS:
8    A.   That's correct, it's not completely
9  accurate.
10  BY MR. TSONIS:
11   Q.   Okay.  You say in paragraph 9, starting in
12  March 2020, the COVID-19 pandemic halted field
13  operations, so all of your work was done remotely
14  until approximately November 2021; do you see that?
15   A.   Yes.
16   Q.   You state that, "Geico increased your case
17  load increased significantly after March 2020 and your
18  overtime hours increased substantially as a result"?
19   A.   Yeah, I see that.
20   Q.   Okay.  And here you write, "I was generally
21  working about 11 hours a day without a full lunch
22  break plus another five more hours on weekends.  And
23  on average during this time.  I was working about
24  60 hours a week."
25        You see that?

Page 248

1    A.   Yes.
2    Q.   Okay.  Now, you note here during this time
3  period a lunch break, without a full lunch break, but
4  you don't note anything about a lunch break in
5  paragraph 8, right?
6    A.   Correct.
7    Q.   So is it fair to assume that you were not
8  working on your lunch break during the time period
9  encompassed by paragraph 8?
10        MR. McALLISTER:  Objection.
11  BY THE WITNESS:
12   A.   Before Workday signing me out, I always
13  worked on my lunch.  So if this was pre, you know,
14  Workday signing in and out for lunch, which it was,
15  I worked on my lunch, again not all the time, but for
16  the most -- most of the time, I did work through
17  lunch.
18  BY MR. TSONIS:
19   Q.   Okay.  So you're accounting for that lunch
20  time in the -- in the time discussed in paragraph 8?
21   A.   Yes.
22   Q.   Okay.  Now, in paragraph 10, you write that
23  Geico returned to normal field operations in or around
24  November 21, but that your -- and that your overtime
25  decreased somewhat, but your case load still required



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
249–252

Page 249

1  you to work overtime to keep up; is that right?
2      A.    Yes.
3      Q.    And then you estimate from November 21
4  through February 2023 that you were again working
5  about 50 hours a week on average?
6      A.    Yes.
7      Q.    Okay.  And then paragraph 11 sort of recaps
8  the information in the preceding paragraphs and then
9  states after that parentheses that you see in the
10  middle, it says, "In sum, for the periods described
11  above, my best estimate is that I am owed
12  approximately $137,743.59 in base wages."
13          You see that?
14      A.    Yes.
15      Q.    And that this amount -- the following
16  sentence says that that amount does not include
17  liquidated damages, which add another $137,734.53 in
18  damages?
19      A.    Yes.
20      Q.    And then it says it also doesn't include
21  amounts encompassing fees, costs, or interest?
22      A.    Correct.
23      Q.    So, I guess, is it accurate to say that as
24  part of your -- you joining this lawsuit, you are
25  seeking at least $275,000 from Geico?

Page 250

1          MR. McALLISTER:  Objection.
2  BY THE WITNESS:
3      A.    Yes.
4  BY MR. TSONIS:
5      Q.    That's what you believe that you should be
6  paid, $275,000?
7          MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9      A.    That, I did not do the math on this when
10  I conferred with counsel.  This is what was presented
11  to me, and again, that's why they're hired, you know.
12  That's -- you know -- you know, I retained them for
13  them to determine what I'm owed.
14  BY MR. TSONIS:
15      Q.    Does $275,000 exceed the wages that you've
16  earned for the time that you entered into Workday?
17          MR. McALLISTER:  Objection.
18  BY THE WITNESS:
19      A.    Again, that -- that's -- I mean, I would
20  think that's a -- you know, to be answered by counsel.
21  I mean, I don't know the value of, you know, in a
22  suit, you know, liquidated damages, how they even come
23  up with that number, but, you know, when I reviewed it
24  and discussed it with counsel, that was what they
25  were -- were they felt was a fair estimate.

Page 251

1  BY MR. TSONIS:
2      Q.    Right.  And I recognized you -- you've
3  testified you didn't do the math and you're not
4  familiar with the concept of liquidated damages.
5          I'm asking you as a party to this lawsuit,
6  you are suing Geico, do you feel like you are owed
7  $275,000 at least?
8          MR. McALLISTER:  Objection.
9  BY THE WITNESS:
10      A.    Yes.
11  BY MR. TSONIS:
12      Q.    Okay.  Will you direct your attention to
13  paragraph 12.
14      A.    Okay.
15      Q.    Do you see that it states that Geico
16  required you to seek approval from your supervisor to
17  submit any hours above 38.75?
18      A.    Yes.
19      Q.    And then it talks about Gerry Cassagne, and
20  you're -- you're saying that he reiterated to you that
21  hours above 38.75 would not be approved?
22      A.    Yes.
23      Q.    And then you write, "At various times, my
24  supervisor approved a limited amount of extra hours to
25  allow me to catch up on work.  This was limited to

Page 252

1  about an hour or two extra hours a week."
2          Do you see that?
3      A.    Yes.
4      Q.    All right.  But earlier, we looked at
5  periods of time in June and July where you could work
6  up to ten hours of overtime a week, right?
7      A.    Yes.
8      Q.    All right.  And, in fact, there was an
9  e-mail that said hey we have extra unused overtime if
10  you want to work even more than that?
11      A.    That's correct.
12      Q.    Okay.  So this statement is inaccurate?
13          MR. McALLISTER:  Objection.
14  BY THE WITNESS:
15      A.    No, it's accurate.  I just didn't recall
16  the other times.
17  BY MR. TSONIS:
18      Q.    Well, it says this was limited to about an
19  hour or two extra hours a week?
20      A.    Yes.
21      Q.    That's not accurate, though, right?
22          MR. McALLISTER:  Objection.
23  BY THE WITNESS:
24      A.    It's -- it's -- it was more than that, but
25  when I stated that, I didn't recall those, the --



Page 253

1  I think it was June-July, you know, e-mails.
2  BY MR. TSONIS:
3      Q.   Right.  I'm -- I guess knowing what we
4  discussed today, you would agree that this statement
5  is no longer accurate, to the best of your
6  recollection?
7          MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9      A.   I wouldn't say it's not accurate because we
10 were limited overtime, and it -- it was -- that's
11 accurate.  It was like an hour or two, but when the --
12 let's say the gates were open for the ten hours, there
13 wasn't, like, an official e-mail.
14         So, you know, there were times where Gerry
15 said, you know, "I could give you a couple hours a
16 week just to catch up."  So it wasn't like an official
17 e-mail.  So that's what I recall at that time when
18 I made that statement.
19 BY MR. TSONIS:
20     Q.   Okay.  So this statement is referencing
21 something other than the pre-approved overtime that
22 was offered in June and July of 2020?
23     A.   Right, but this was very limited.  This,
24 this didn't happen very often.
25     Q.   Okay.  How frequently was it that Gerry

Page 254

1  Cassagne would tell you that he could give you an
2  extra hour or two to catch up?
3      A.   Very limited.  I mean, it would -- it
4  wasn't even every month, you know, and if it was, it
5  wouldn't -- it wouldn't be more than probably five
6  hours to the month.  So, again, I don't recall, but it
7  was not often, you know.  It was not every month.
8          It could be I could go a couple months no
9  overtime, I could have two months in a row with this
10 amount of overtime, you know, I could go five months
11 without overtime.  So it was very sporadic, and it all
12 depended on, again, my case load if I was falling
13 behind.  So, again, I can't really answer, you know,
14 you know, exactly how many times.
15     Q.   Okay.  But there were some times where
16 Gerry Cassagne offered you extra hours in a workweek,
17 one or two extra hours?
18     A.   Yes.
19     Q.   Okay.  So if you skip down to paragraph 14,
20 do you see where it says, "In or around the end of
21 2021 and on a few occasions in 2022, I complained
22 verbally to my supervisor, Mr. Cassagne, during our
23 monthly team meetings.  I told him about the volume of
24 work we were being assigned and the number of unpaid
25 hours I and my colleagues were working as a result.

Page 255

1  His response to these complaints was that he was not
2  permitted to improve this overtime work."
3          Did I read that right?
4      A.   I -- what paragraph was that?
5      Q.   Paragraph 14.
6      A.   "In or around" -- yes, okay, and, "I told
7  him about the volume of work" -- right, and on certain
8  times, he did not authorize the overtime.
9      Q.   Okay.  But this paragraph describes the
10 discussions that you referenced earlier today that you
11 had with Mr. Cassagne?
12     A.   Yes.
13     Q.   Okay.  And so this paragraph is an accurate
14 summary of the discussions that you had with Gerry
15 Cassagne about working off the clock?
16         MR. McALLISTER:  Objection.
17 BY THE WITNESS:
18     A.   Yes.
19 BY MR. TSONIS:
20     Q.   Okay.  Paragraph 15 similarly says that
21 throughout your time working with Toni D'Agata, "She
22 held weekly one-on-one meetings with special
23 investigators."  And during these meetings, I verbally
24 expressed your dis- -- you verbally expressed your
25 displeasure of working overtime without pay and that

Page 256

1  Ms. D'Agata, though sympathetic to your concerns, told
2  you she was not authorized to approve you "overtime
3  that I was working," or you were working?
4      A.   That's accurate.
5      Q.   Okay.  Are these -- is this the discussions
6  you were referencing with Ms. D'Agata earlier?
7          MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9      A.   Yes.
10 BY MR. TSONIS:
11     Q.   Okay.  Apart from what's written here, did
12 you have any other discussions with Ms. D'Agata?
13         MR. McALLISTER:  Objection.
14 BY THE WITNESS:
15     A.   Regarding overtime?
16 BY MR. TSONIS:
17     Q.   Yes.
18     A.   It wasn't -- I didn't discuss it every
19 one-on-one meeting, but it was -- it was definitely
20 discussed on different occasions.
21     Q.   Okay.  So let me just clarify.
22         Did you ever have team meetings where
23 multiple investigators were present with Ms. D'Agata
24 where this came up?
25     A.   I don't recall that.



Page 257

1    Q.   Okay.  So the only communication which
2  you -- you're claiming to have raised this with
3  Ms. D'Agata were on one-on-one meetings with her?
4    A.   Yeah, I only recall one on one.  I do not
5  recall bringing this up on a team meeting.
6    Q.   Okay.  And do you see here there's no
7  mention of Ms. Greenman?
8    A.   Yes.
9    Q.   All right.  So earlier today, if
10  I understood your testimony correctly, you referenced
11  a conversation with Ms. Greenman; is that right?
12    A.   Yes.
13    Q.   Regarding overtime, I mean?
14    A.   Yes.
15    Q.   All right.  Here, though, you don't note
16  any conversation with Ms. Greenman?
17    A.   No.
18    Q.   Okay.  Did you approve your own cases, or
19  did Gerry Cassagne approve your cases?
20    A.   What do you mean, like approve?  Like, when
21  I was finished with the investigation, did he sign off
22  on it?
23    Q.   Yes.
24    A.   Oh, no.  Gerry Cassagne, I submitted them
25  for approval.

Page 258

1    Q.   And he would go in and review and approve
2  them?
3    A.   Yes.
4    Q.   Okay.  Were you aware that there were other
5  investigators that did not need Gerry Cassagne to
6  approve their cases?
7        MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9    A.   No.
10  BY MR. TSONIS:
11    Q.   Were you aware of any investigators who did
12  not require a supervisor to approve their cases?
13        MR. McALLISTER:  Objection.
14  BY THE WITNESS:
15    A.   When Gerry Cassagne was around, I would say
16  I'm not aware of that, but after Gerry Cassagne left,
17  there was self-approval where we did sign off on our
18  cases.
19  BY MR. TSONIS:
20    Q.   When did that self-approval process start?
21    A.   Right before Gerry left, or he might have
22  already left, but it was right around that time, and
23  it turned -- once -- once region 2 was taken away and
24  they restructured, it was around that time.
25    Q.   So Gerry Cassagne -- without pulling it up

Page 259

1  again, I'll represent to you that the date, that the
2  Managed To date for Gerry Cassagne with regard to
3  supervising you ends on April 26, 2023.
4        So what's your best estimate as to when
5  self-approval would have started?
6    A.   I think a more accurate reference would be
7  when region 2 was dismantled and we became -- the
8  oversight came from, I guess, corporate down in
9  Maryland, so whenever that change occurred.
10    Q.   Okay.
11    A.   And I don't -- I don't recall when it was.
12  It was -- it was -- the self-approval for me was maybe
13  approximately six, seven months.  It wasn't --
14  I didn't do it very long.
15    Q.   Okay.  When the Workday system that
16  required you to sort of, you know, check in and check
17  out on a daily basis using your phone was rolled out,
18  was there any training or anything that accompanied
19  that?
20    A.   I wouldn't call it training.  It was, you
21  know, a brief discussion on what was needed to be
22  done, and I think, again, most of it was
23  self-explanatory.
24    Q.   Did you, like, go into a Woodbury office or
25  a Melville office, or did you have like a Zoom session

Page 260

1  that walked through how you would do it?
2    A.   I don't recall that.
3    Q.   Was there any communication that came along
4  with that new system or new process?
5    A.   The only communication was during team
6  meeting that, you know, this is how it needs to be
7  done, and that's -- that's the only thing I really
8  recall.  I don't recall any type of pamphlet, manual,
9  or, you know, training video.
10        We were just basically told that we got to
11  enter our hours, and when we're off the clock, sign
12  out, and when we go back in, sign in, make sure at the
13  end of the day you do the e-mail if that was required,
14  and that was really it.
15    Q.   All right.  I'll drop one more document
16  into the chat here.  Actually, you know what,
17  I dropped it into the chat earlier by accident.  If
18  you scroll to the top, at the top of the chat, the
19  very first document that states Geico Associated
20  Handbook.
21    A.   It's -- I got it, yeah.
22    Q.   Yeah.  It's the one that, for the record,
23  this --
24        MR. TSONIS:  Court Reporter, what exhibit
25  are we on, or Jarrod, if you know?



1  STATE OF ILLINOIS    )
                         ) SS:
2  COUNTY OF C O O K    )

3

4          I, ANDREW R. PITTS, C.S.R. within and for the

5  County of Cook and State of Illinois, do hereby

6  certify that heretofore, to wit, on Friday the 15th

7  day of January, 2025, personally appeared before me

8  via videoconference, ALBERT BRUST, in a cause now

9  pending and undetermined in the United States District

10  Court, For the Eastern District of New York, wherein

11  KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS

12  PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE

13  JONES, individually and on behalf of all others

14  similarly situated are the Plaintiffs, and GOVERNMENT

15  EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the

16  Defendant.

17          I further certify that the said witness was

18  first duly sworn to testify to the truth, the whole

19  truth and nothing but the truth in the cause

20  aforesaid; that the testimony then given by said

21  witness was reported stenographically by me in the

22  presence of the said witness remotely via

23  videoconference, and afterwards reduced to typewriting

24  by Computer-Aided Transcription, and the foregoing is

25  a true and correct transcript of the remote



```
 1   videoconference testimony so given by said witness as
 2   aforesaid.
 3          I further certify that the signature to the
 4   foregoing deposition was reserved by counsel for the
 5   Deponent.  I further certify that the taking of this
 6   deposition was pursuant to Notice, and that there were
 7   present via videoconference at the deposition the
 8   attorneys hereinbefore mentioned.
 9          I further certify that I am not counsel for nor
10   in any way related to the parties to this suit, nor am
11   I in any way interested in the outcome thereof.
12          IN TESTIMONY WHEREOF:  I have hereunto set my
13   hand and affixed my seal this 22nd day of January,
14   2025.
15   Andrew R. Pitts
16   _____
17   ANDREW R. PITTS, CSR, RPR
18   CSR, COOK COUNTY, ILLINOIS
19
20
21
22
23
24
25
```

