# Exhibit M

Case 2:23-cv-02848-SJB-ST   Document 142-15   Filed 10/10/25   Page 1 of 14 PageID #: 7092

# In the Matter Of:

## KEITH FISCHER, et al. vs GEICO

2:23-Civ. 2848 (GRB)(ARL)

## LOUIS CANIGLIA, JR.

*January 17, 2025*



800.211.DEPO (3376)
EsquireSolutions.com

Page 49

1  BY THE WITNESS:
2  A. No.
3  BY MR. TSONIS:
4  Q. I'm just a little confused. I thought
5  that's what you said.
6  A. That's not what I said. I said that
7  there was a ruling, and GEICO changed it. Whether
8  GEICO did that, that's GEICO's decision if they did
9  it because of that or not.
10  Q. Right -- sorry. I didn't mean to
11  interrupt. I'm trying to get an understanding if
12  you have any basis for that other than what you've
13  read, for example, online or anything like that?
14  A. I don't understand the question.
15  Q. Right. So at some point a change was
16  made, but fair enough to say that you don't know
17  why GEICO made that change?
18  MR. McALLISTER: Objection.
19  BY THE WITNESS:
20  A. I can't attest to why GEICO made a
21  change or not.
22  BY MR. TSONIS:
23  Q. Okay. But at some point after that
24  change, is it your understanding that you were

Page 50

1  compensated at your hourly rate and eligible for
2  one and a half times that hourly rate if you worked
3  more than 40 hours?
4  A. Can you rephrase the question?
5  Q. I mean, you're asserting claims for
6  unpaid overtime as part of this lawsuit; right?
7  A. Yes.
8  Q. What was the compensation plan that
9  applied to you? When were you entitled to
10  overtime?
11  A. When we worked more than 7.75 hours a
12  day.
13  Q. So if you worked more than 7.75 hours in
14  any day, you think that wage should be paid at time
15  and a half?
16  A. Yes.
17  Q. Okay. And that's just your own personal
18  understanding of what you're owed?
19  A. No, it's -- yeah, yeah, yes. Okay.
20  Q. Okay. So when your compensation changed
21  from a premium time payment that you referenced
22  earlier to potentially time and a half, you were
23  still entering time in the Workday system; right?
24  A. Okay. Yes.

Page 51

1  Q. All right. And at some point, the
2  Workday system, your timekeeping system and
3  procedures changed; right?
4  A. Yes.
5  Q. All right. So at some point, GEICO
6  changed where you would actually sort of sign in
7  and sign out from your phone?
8  MR. McALLISTER: Objection.
9  BY THE WITNESS:
10  A. Yes.
11  BY MR. TSONIS:
12  Q. And that was using like a Workday
13  application on your phone?
14  A. Yes.
15  Q. All right. Do you have a recollection
16  as to when that change occurred?
17  A. No, I don't.
18  Q. That was the timekeeping process,
19  though, that you had to follow up until you left
20  GEICO; right?
21  A. Yes.
22  Q. Okay. And is it your testimony that
23  when that timekeeping process was in effect, that
24  you were not permitted to log any hours in excess

Page 52

1  of 7.75?
2  MR. McALLISTER: Objection.
3  BY THE WITNESS:
4  A. I can't -- I can't attest to that the
5  whole time, but generally speaking, yes.
6  BY MR. TSONIS:
7  Q. Okay. And why can't you, I guess,
8  attest to it the entire time? Were there --
9  A. Every day is different, Counsel.
10  Q. What do you mean by "every day is
11  different"?
12  A. You're asking me for exact -- I can't
13  give you exact information on that. I'm sorry. I
14  apologize, but I can't. I don't -- the question is
15  just not -- it's -- you're asking me to do specific
16  dates to recall. I can't do that. Every day is
17  different.
18  Sometimes -- to be honest with you,
19  sometimes I didn't put in my workday, and I had to
20  tell my supervisor the next day that, look, I have
21  to put in yesterday's day today. I mean, stuff
22  happens in life. It's a human -- it's -- we're
23  human. I mean, I can't say that every day I had to
24  put in 7.75 hours because that's not realistic.



Page 53

1  Q.  So I'm not asking about any specific
2  day.  I'm just asking were there times where you
3  worked more than 7.75 hours in a day, and that's --
4  A.  Yes.
5  Q.  -- and recorded more than 7.75 hours in
6  a day?
7  A.  Again, I -- yes.  I would have to say
8  yes.  I can't recall, though, the specific days,
9  but possibly, yes.
10  Q.  Okay.  When that would occur, what was
11  the process that you would follow?  Would you have
12  to, for example, notify anyone that you were going
13  to work more than 7.75 hours?
14  A.  Yeah, my supervisor.
15  Q.  Okay.  And how would you notify your
16  supervisor?
17  A.  E-mail.
18  Q.  What would you say in an e-mail to your
19  supervisor?
20  A.  I need some extra hours to work.  I'm --
21  you know, I'm going to be working extra hours.  Can
22  you approve overtime?
23  Q.  And what would your supervisor respond,
24  typically?

Page 54

1  A.  It would usually be, in sum and
2  substance, a negative for payment, but didn't say
3  don't work.
4  Q.  But they didn't say work the hours
5  anyway?
6  A.  They didn't say don't work.
7  Q.  Right.  I understand your testimony.
8  I'm just clarifying.  They didn't tell you to work
9  the hours anyway; right?
10  MR. McALLISTER:  Objection.
11  BY THE WITNESS:
12  A.  No, they didn't tell me to work and
13  you're not getting paid, no, they didn't say that.
14  BY MR. TSONIS:
15  Q.  Did any of your supervisors in your time
16  in SIU at GEICO ever instruct you to work off the
17  clock?
18  A.  No.
19  Q.  When you first joined SIU, were you --
20  after your training was completed, were you working
21  remotely from your home?
22  A.  Yes.
23  Q.  And did that, I guess, continue the
24  entire time that you worked for GEICO in SIU?

Page 55

1  A.  Yes.  Like I said before, I had --
2  they -- GEICO would set -- set us up -- well, or
3  me, with a home office.  So, yes, I was remote.  I
4  wasn't on location in the GEICO office.
5  Q.  Were there ever times that you did go
6  into the GEICO office?
7  A.  Yes.
8  Q.  All right.  Was that the Woodbury
9  office?
10  A.  Yes.
11  Q.  And then subsequently, the Woodbury
12  office moved and is also known as the Melville
13  office?
14  A.  Yes.
15  Q.  All right.  Aside from the
16  Woodbury/Melville office, were you ever assigned to
17  any other GEICO office?
18  A.  No.  I mean, I think there was a legal
19  office in Huntington Quad -- Quadrangle.  That's
20  where I think the attorneys were.  We had a few
21  meetings there.  But other than that, no.
22  Q.  You weren't assigned, for example, to
23  the Buffalo office at any point?
24  A.  No.  No.

Page 56

1  Q.  Okay.  So at all times when you worked
2  in SIU, were you a part of at least what was then
3  Region 2?
4  A.  That's correct, yes.
5  Q.  And at some point, was it your
6  understanding that GEICO, across like sort of
7  divisions, changed from the geographic-based region
8  structure to a totally different structure?
9  A.  Yes, they -- GEICO, yes, that they
10  rearranged things, yes.
11  Q.  Okay.  We talked about supervisors.
12  Initially, when you came into SIU, who was the
13  manager of the Woodbury office of Region 2 in SIU?
14  A.  For SIU, I believe, from what I recall,
15  it was Michael DeGrocco.
16  Q.  Do you recall when Mr. DeGrocco left?
17  A.  Left the company or -- or SIU?
18  Q.  Fair clarification.  When he stopped
19  being the Region 2 SIU manager.
20  A.  I don't recall the date.  I'm going to
21  say -- don't hold me to this, but I'm going to say
22  approximately 2020ish.
23  Q.  Okay.  After Mike DeGrocco, who was the
24  SIU manager for Region 2?



Page 73

1  don't recall entirely, but...
2     Q.   And that's okay if you don't know.  I
3  guess, you know, I was trying to get your
4  recollection of what the, I guess, you know, each
5  pay period was, each workweek.  Right?
6     A.   For me, it was biweekly, so that's what
7  I -- that was my understanding.  It was Monday
8  through -- I -- I -- when I really thought about
9  it, it was like Monday through Friday, but I -- but
10 then when I -- I remember recalling back to when I
11 looked at it, it would be, I think, Saturday for
12 some reason was included in the prior week.  So
13 this might be correct, yes.
14    Q.   Okay.
15    A.   The workweek from Saturday to Friday.
16    Q.   All right.  And if you look below the
17 sentence that we just looked at.
18    A.   Yep.
19    Q.   You see that there's a statement, it
20 says:  Associates are classified as exempt, hourly
21 nonexempt, or salaried nonexempt, in accordance
22 with the provisions of the Fair Labor Standards
23 Act, and then there's three bullet points?
24    A.   Yes, I see that.

Page 74

1     Q.   All right.  Now, the second bullet point
2  says:  An hourly nonexempt associate is paid time
3  and one-half his or her hourly rate of pay for all
4  hours actually worked in excess of 40 in a
5  workweek.
6         Do you see that?
7     A.   Yes.
8     Q.   All right.  And below that, the bullet
9  point says:  A salaried nonexempt associate is paid
10 a weekly salary and a premium payment for all hours
11 actually worked above 38.75 hours.
12        Do you see that?
13    A.   I see this, yes.
14    Q.   All right.  So earlier, do you recall we
15 were discussing kind of a salaried nonexempt versus
16 hourly nonexempt?
17    A.   I can recall -- yes, I can recall that,
18 yes.
19    Q.   All right.  Initially, when you worked
20 as a field investigator, were you a -- what's
21 defined here as a salaried nonexempt associate?
22    A.   Salaried nonexempt.  I believe that
23 was -- yes, I believe that was my designation.  I'm
24 going to say yes.

Page 75

1     Q.   Okay.  And at some point, that changed
2  and you became an hourly nonexempt associate?
3     A.   I believe -- I don't know if they
4  classified it as salary.  No, I believe that's
5  correct, yes.  Yes, I'm going to agree with you,
6  Counsel, yeah.
7     Q.   Okay.  But I think we said earlier, you
8  didn't recall exactly when that change happened;
9  right?
10    A.   No, I don't recall the exact date or
11 time frame.  I mean, I'm sure we can look at pay
12 stubs and stuff.  But, no, I don't recall.  Sorry.
13 I don't recall.
14    Q.   Okay.  So if you skip down, you know,
15 there's this big heading kind of two thirds of the
16 way down the page, Hourly Nonexempt Associates.  Do
17 you see that?
18    A.   Hourly Nonexempt Associates, including
19 auto damage adjusters and field SIU investigators.
20    Q.   Yes.  Do you see that?
21    A.   Yes.
22    Q.   I want to talk about the paragraph
23 that's right above that, the one that starts with
24 all nonexempt associates.  Do you see that?

Page 76

1     A.   Okay.  All nonexempt associates are
2  required -- is that --
3     Q.   Yes.
4     A.   Okay.
5     Q.   So that paragraph starts and says:  All
6  nonexempt associates are required to accurately
7  record their hours worked and absences taken.
8         Do you see that?
9     A.   Yes.
10    Q.   All right.  So GEICO's policy was that
11 all nonexempt associates were required to
12 accurately record their hours worked?
13    A.   That's what it says, yes.
14    Q.   Okay.  And if you skip the second
15 sentence that deals with exempt associates, the
16 third sentence says:  A nonexempt associate who
17 feels he or she did not receive pay for all of his
18 or her hours worked and an exempt or salaried
19 nonexempt associate who feels his or her pay
20 incorrectly reflects a deduction for an absence
21 should contact his or her supervisor, local human
22 resources manager, or corporate human resources.
23        Do you see that?
24    A.   Reading it with you, yes.



Page 77

1  Q.  Okay. Did you ever contact your
2  supervisor to report that you felt that you didn't
3  receive pay for all the hours you worked?
4  A.  Yes.
5  Q.  When did you do that?
6  A.  I really wish I could give you, like,
7  exact dates. I just -- I can't. I mean, it
8  happened -- it happened frequently, but I don't
9  know the exact dates.
10  Q.  When you say "it happened frequently,"
11  what is the "it" you're referring to?
12  A.  Requests for overtime payment.
13  Frequently, again, is not like every day, but it's
14  a culmination. So you're working -- you're working
15  the job and you're doing the work, and then after,
16  like, two weeks, you're putting ten hours a week in
17  overtime, like, then an e-mail like, look, I've
18  been working this, can I get some overtime kind of
19  thing, or a phone call, you know.
20  Q.  Okay. So just so I'm clear, the
21  conversations that you're talking about, are
22  they -- they're either via e-mail or over the
23  phone?
24  A.  I would say yes, that's correct, yes.

Page 78

1  Q.  Okay. And when you would have those
2  conversations, it sounds like part of that either
3  e-mail or conversation would be requesting
4  overtime?
5  A.  Yes.
6  Q.  All right. And those conversations,
7  though, didn't say I feel like my pay doesn't -- my
8  paycheck that I received doesn't reflect the hours
9  that I actually worked, right, as we were looking
10  at in the handbook?
11  A.  I don't --
12  MR. McALLISTER: Objection.
13  BY THE WITNESS:
14  A.  I don't know. Can you rephrase that,
15  Counsel? I think you're summarizing my statements
16  a little bit.
17  BY MR. TSONIS:
18  Q.  Right. I guess I'm trying to get
19  specifically as to an understanding as to what you
20  would say. You wouldn't say I worked, you know, 50
21  hours last week, and my paycheck does not reflect
22  that; right?
23  MR. McALLISTER: Objection.
24

Page 79

1  BY THE WITNESS:
2  A.  I don't -- if I can recall back to my
3  conversations with my supervisors, it's possible
4  that I -- I could have said something like that,
5  like I worked 20 hours overtime and my pay -- my
6  paycheck doesn't reflect that. It's possible.
7  BY MR. TSONIS:
8  Q.  But you don't recall --
9  A.  Yes.
10  Q.  You don't recall any conversation like
11  that?
12  A.  Do I recall any -- I just said that,
13  it's definitely possible that I said that to my
14  supervisors, and it fell on deaf ears.
15  Q.  So you're saying it's possible, but do
16  you recall any specific conversation like that?
17  A.  A specific date and time, no; but, yes,
18  I've definitely expressed my overtime to my
19  supervisors over the phone, and I wasn't
20  compensated for it.
21  Q.  Okay. So when you say --
22  A.  I don't know how far up that goes up the
23  line after the supervisor, if the manager or the
24  vice president or -- again, I can't attest to any

Page 80

1  of that, but I can only attest to what I told my
2  supervisor.
3  Q.  That's what I'm trying to figure out.
4  What are you claiming you specifically told your
5  supervisor?
6  A.  That I worked on cases over the 7.75
7  time period, and why is it not reflected in my
8  paycheck?
9  Q.  Did you use those precise words?
10  A.  It's possible, yeah, I might have used
11  those words, yes.
12  Q.  Okay. You're saying it's possible, I
13  guess. Do you have a recollection, or are you just
14  saying it's possible?
15  A.  I'm saying it's possible.
16  Q.  So you don't specifically recall what
17  words you might have used?
18  A.  It was a long time ago. No, I don't. I
19  don't have the conversation recorded. I'm not
20  trying to be difficult. I understand where
21  you're -- I get it. I just -- I can say that I've
22  asked for overtime during that time frame. I don't
23  know exactly what I said, though. I can't recall
24  exactly what I said.



Page 81

1  Q.  Okay.  So in those conversations, you'd
2  ask for overtime, but you don't recall specifically
3  what you said?
4  A.  No, I'd ask for overtime, and, again, I
5  don't recall exactly what I said because it was so
6  long ago.
7  Q.  Okay.  And which supervisors did you
8  have those conversations with?
9  A.  Gerry Cassagne, Toni D'Agata.
10  Q.  Any others?
11  A.  I might have had a conversation with
12  Theresa Bishop, but again, I don't know exactly the
13  time frame or what I said.
14  Q.  Okay.
15  A.  In terms of -- I know what I said, but I
16  don't -- I don't understand -- the best way to
17  answer the question is I don't exactly know what I
18  said at that particular time because it was so long
19  ago.  That's the best way I can put it.
20  Q.  Okay.  So Gerry Cassagne was your
21  supervisor throughout the time period of 2016 to
22  some point of 2021; is that right?
23  A.  I think that's right, yes.
24  Q.  All right.  Within that time period,

Page 82

1  that's a period -- that's a multi-year time period,
2  are there specific times within that multi-year
3  time period that you had these conversations with
4  Gerry Cassagne?
5  A.  I can't -- I can't again say the
6  specific times, but there were time periods that I
7  did have conversations with Gerry Cassagne, yes,
8  regarding overtime.
9  Q.  Were there some years where you didn't
10  have those conversations?
11  A.  Not that I recall.  I mean, I'm going to
12  say no to that.
13  Q.  And when you would have those
14  conversations with Gerry Cassagne, what would his
15  response be?
16  A.  Gerry's responses would be it's not --
17  overtime is not approved sometimes.  Again, it's
18  difficult to say every conversation.  Sometimes
19  overtime was approved, premium time was approved,
20  or you can't put in for overtime or you can't put
21  in for premium time.  So it's -- I understand where
22  your question is going, and I get it.  It's very
23  difficult to answer that question.  Can you be more
24  specific?

Page 83

1  Q.  Well, I guess, you're the one claiming
2  that you had conversations with Gerry Cassagne, so
3  I'm just trying to get your understanding and your
4  recollection of what his response would be.
5  A.  I mean, he was my supervisor for five
6  years.  I can't recall five years' worth of
7  conversations with the gentleman.  I mean, can you
8  recall five years of conversations with people?  I
9  mean, it's -- I'm -- again, I'm not trying to be
10  difficult.  I think I answered it the best I can,
11  so...
12  Q.  Okay.  I'm going to switch gears, but I
13  just want to close the loop on a couple of things.
14  Did you ever --
15  A.  Okay.
16  Q.  -- report to your -- as it says in the
17  associate handbook, you know, it identifies local
18  human resources manager and corporate human
19  resources.  Did you ever report to your local human
20  resources manager that your -- you didn't receive
21  pay for all the hours that you actually worked?
22  A.  I'm sorry.  Am I supposed to be
23  scrolling through something, like, to look --
24  Q.  No, you don't have to look at the

Page 84

1  document for reference.  I'm just asking you a
2  basic factual question.
3  A.  Okay.
4  Q.  Did you ever report to your local human
5  resources manager that you did not receive pay for
6  all the hours you actually worked?
7  A.  I'm going to say no.
8  Q.  All right.  Did you ever --
9  A.  Yes, no.  Sorry.
10  Q.  Did you ever report to corporate human
11  resources that you -- you did not receive pay for
12  all the hours you actually worked?
13  A.  I didn't even know we could do that, but
14  no.
15  Q.  Okay.  Were you aware that GEICO
16  maintains like a Berkshire Hathaway ethics hotline?
17  A.  Yes.
18  Q.  Did you ever report to the Berkshire
19  Hathaway ethics hotline that you did not receive
20  pay for all hours that you actually worked?
21  A.  I did not.
22  Q.  Okay.  So I'm going to drop another
23  exhibit into the chat here.  You should be getting
24  it now.  This is going to be marked as Exhibit 2,



Page 193

1  Michael DeGrocco, told us that we only work
2  38.75 -- that's it.
3      A.   Yes, I think DeGrocco is two Gs, but
4  yes.
5      Q.   Okay.  And spelling aside, I guess,
6  where did that meeting that you're referencing here
7  occur?
8      A.   That happened at the -- actually, I
9  remember this meeting -- at the GEICO office in
10  Wood -- Woodbury, New York, in Long Island.
11      Q.   When did this meeting take place, if you
12  recall?
13      A.   I don't remember the month.  I'm sorry.
14  I don't remember the month, but I can recall some
15  of the aspects of the meeting.
16      Q.   What do you recall about the meeting?
17      A.   I remember the investigators, it had to
18  be over 10 to 15 people in the room, plus
19  management, and the request for overtime was
20  verbally asked.  I don't remember his direct
21  response.  There could have been super -- there
22  were supervisors there, so I don't remember
23  Michael's exact response to it, but I do remember
24  saying that it's 38.75 hours and, like,

Page 194

1  basically -- I mean, and that was it, so...
2      Q.   So he communicated the expectation of
3  the workweek was 38.75 hours?
4      A.   I would say yes.  Yes.
5      Q.   As a field investigator, were you able
6  to flex your time?
7      A.   Flex my time.  Can you -- what do you
8  mean by flex time?
9      Q.   Is that a term that sounds familiar to
10  you?
11      A.   It is.  Do you mean like work the 38.75
12  hours a week in the time I want to work, like --
13  you know what I mean?  Like -- like, if I -- if I
14  work 15 hours on Monday, 8 hours on Tuesday, 4
15  hours on Wednesday, 10 hours on Thursday, 12 hours
16  on Friday, I mean, yeah, it's flex timing, but
17  still, it goes over the 38.75.  But, yeah, I would
18  say yes, I do have the opportunity to flex time,
19  yes.
20      Q.   Okay.  So I guess let's -- let's
21  clarify.  When you say flex time, are you
22  referencing your time, like how you work any
23  specific day, or are you talking about, hey, if I
24  work an extra hour one day, I can take away an hour

Page 195

1  from another day?
2      A.   No.  I mean, that's what flex time is,
3  but yeah.  Yeah, that's flex time.  So, yes, I'd
4  agree with that.
5      Q.   All right.  With both of those?  I mean,
6  I guess let's start with the first one.  On any
7  given day, did you have, like, a scheduled shift?
8      A.   What do you -- I'm sorry.  What do you
9  mean?  What do you mean?
10      Q.   Did Gerry Cassagne care when you started
11  work?
12      A.   No.
13      Q.   Did Toni?
14      A.   No.
15      Q.   They -- did you have the flexibility to
16  essentially start working whenever you either --
17      A.   Yes.
18      Q.   -- wanted to or whenever the business
19  need would dictate?
20      A.   Yes.
21      Q.   All right.  So and similarly, right, you
22  could choose if you had to drive far to, you know,
23  start really early and beat traffic, for example?
24      MR. McALLISTER:  Objection.

Page 196

1  BY THE WITNESS:
2      A.   Yeah, okay.  Yes.
3  BY MR. TSONIS:
4      Q.   Okay.  And did you also have the
5  flexibility, like, you know, for example, today,
6  right, your kids are coming home in the middle of
7  the school day.  If you needed to take an hour or
8  two off in the middle of the day, could you just
9  work an hour or two extra afterwards?
10      A.   I don't know.  I would still work the
11  7.75 -- like, it wasn't a straight -- like, I'm not
12  an assembly line worker or I'm on the assembly line
13  for 8 hours a day.  So I understand what you're
14  trying to say, but at the same time, I'm going to
15  say, yes, I could do that, yes.
16      Q.   Okay.  So I guess I'm just trying to
17  clarify.  Like, you were -- whether you were out in
18  the field or not, if you -- the expectation was
19  that you would work 7.75 hours that day; right?
20      A.   Yes.
21      Q.   And how you work, whether that's 4 hours
22  at one point and 3.75 hours at another point,
23  nobody would dictate, you know, the precise
24  schedule that you had to work on any day; right?



Page 197

1  A.  I would say that's fair to say, yes.
2  Q.  Okay. So that's, I guess, one kind of
3  flexibility we were talking about.  Another kind
4  would be, hey, if I, you know, got stuck in traffic
5  and I ended up working an hour later on Monday, did
6  you have the ability to work an hour less on
7  Tuesday to account for that hour?
8  A.  All right.  So I'm going to answer your
9  question, but I also want to get on the record
10 that, like, when you say travel, we're field
11 investigators.  So me going to some place is work.
12 When I leave, like, I'm doing -- I'll get a case.
13 I'll do database searches.  I'll make phone calls.
14 I'll call local police departments, do what I have
15 to do, and then I'll go out and try to get to the
16 location where I have to canvass or anything like
17 that.
18      So if I'm stuck in traffic, to me,
19 that's still work.  But I would say yes, if I
20 worked 24 hours on Monday, you know, I worked 24
21 hours for the week.  So I'll agree to that, yeah.
22 Q.  Right.  I wasn't trying to imply, if I
23 did, I apologize, wasn't trying to imply that drive
24 time or traffic, you know, wasn't compensable

Page 198

1  sometimes, just that if you work more than the 7.75
2  hours in a workday, that you could cut that time
3  out from a subsequent shift; right?
4      MR. McALLISTER:  Objection.
5  BY THE WITNESS:
6  A.  I've never -- I hate the word -- use the
7  word never, but I'm going to use it this time.  I
8  don't think I've ever cut my workday unless I took
9  like a PTO or a sick or something like that, so...
10 BY MR. TSONIS:
11 Q.  So when you would ask for overtime from
12 your supervisors, is it accurate to say that
13 sometimes they would recommend or suggest or seek
14 to understand whether you could flex your time
15 instead of incurring overtime?
16 A.  No, no, I understand what -- I
17 understand.  Yes.  So, for example, if I --
18 sometimes we were offered, instead of doing,
19 like -- say I wanted to work a Saturday, which was
20 considered in SI -- in the special investigations
21 unit, Saturday and Sunday were usually
22 traditionally like those are your off days.  If you
23 didn't, I guess, say want, I mean, that's a loaded
24 word, but again, want to work a Thursday, you could

Page 199

1  say, look, I'm not going to work Thursday, but I'll
2  work Saturday, and then that counts as the week
3  because you're still doing the 38.75.  Does that
4  make sense?  I don't know if I'm explaining it
5  right, but...
6  BY MR. TSONIS:
7  Q.  Okay.  I think what I'm talking about is
8  slightly different, though.  Let's say it's
9  Thursday or it's Friday, and you call up your
10 supervisor and you say, I think I've got -- you
11 know, I need three hours of overtime to -- or two
12 hours of overtime to, you know, catch up on my
13 pending or whatever the case is.  Is it accurate to
14 say that something the supervisor would have
15 suggested, instead of just approving overtime,
16 might have been, hey, so why does it need to happen
17 now?  What can you do?  Maybe you just work --
18 A.  To me?
19 Q.  Yeah.  So --
20 A.  No, I would say -- I mean, I'm not --
21 I'm not perfect, but I think I'm an efficient
22 employee where I manage my time properly.  So, no,
23 I don't think they -- they've never said that to
24 me.

Page 200

1  Q.  So I guess one of the tactics, it's your
2  understanding that a supervisor wouldn't think if
3  you're saying, hey, I worked two hours or I need to
4  work two hours, you know, overtime on Thursday,
5  that the supervisor wouldn't say, hey, can you cut
6  it out, work less two hours on Friday?
7      MR. McALLISTER:  Objection.
8  BY THE WITNESS:
9  A.  I mean, you showed me those exhibits
10 before where I put the documentation of overtime,
11 and if you -- if we do the math, it's more overtime
12 that I actually requested.  So I'm going to say
13 that, no, my supervisors never said that to me,
14 from my recollection.
15 BY MR. TSONIS:
16 Q.  Well, you, I guess -- as a field
17 investigator, if you're at 38.75 hours, I guess you
18 have the authority or the ability to stop working
19 on Friday and pick it up on Monday again; right?
20     MR. McALLISTER:  Objection.
21 BY THE WITNESS:
22 A.  Absolutely.  Why not?
23 BY MR. TSONIS:
24 Q.  Right.  So you could stop working at the



Page 209

1  personally thought it was a high caseload for me to
2  do my job and provide a good product for the
3  company, so I did my best, but I don't know.  I
4  don't know how everybody in, like, the staged and
5  caused accidents, I don't know their caseload
6  specifically.  I don't.
7      Q.   I'm just talking about your caseload
8  right now.  I guess I'll rephrase my question.
9           Was your caseload just consistent, the
10 number of cases you were assigned month to month,
11 or did it vary significantly?
12     A.   I mean, it varied.  I'm going to say it
13 varied.
14     Q.   Were there times that your caseload was
15 low?
16     MR. McALLISTER:  Objection.
17 BY THE WITNESS:
18     A.   I don't -- low?  Lower than other times,
19 I'd say yes.
20 BY MR. TSONIS:
21     Q.   Well, sure.  By default, one month might
22 be lower than the other, but were there times where
23 you would characterize your cases assigned as
24 pretty low?

Page 210

1      MR. McALLISTER:  Objection.
2  BY THE WITNESS:
3      A.   I'm going to say no.
4  BY MR. TSONIS:
5      Q.   Okay.  What was the process, if you
6  know, that you would get assigned cases?
7      A.   From my assumption, it was that if a
8  case would come in that had fraud indicators on it,
9  either a claims representative or somebody, a human
10 inside GEICO would generate a referral, or
11 depending on the time, I guess, AI was introduced,
12 so the AI computer would, then, I guess -- it's a
13 crazy concept to think about, but it's the world it
14 is, but they would pull red flag indicators and
15 then that would be assigned to SIU through
16 manage -- through dispatch, I believe it was.  I'm
17 sorry.  Not dispatch.  Through management to the
18 investigator.
19     Q.   Does the term "intake" sound familiar?
20     A.   Intake, yes.  I'm sorry.  I said
21 dispatch.  I apologize.
22     Q.   So once the case in the way that you're
23 talking about got to intake, do you have an
24 understanding of what intake does with it before it

Page 211

1  goes out to an investigator?
2      A.   I don't -- you want my assumption on it?
3      Q.   No, I just want to know if you have an
4  understanding.
5      A.   No.
6      Q.   Okay.  Do you have an understanding as
7  to how intake ultimately assigned cases to
8  investigators?
9      A.   No.
10     MR. McALLISTER:  Objection.
11 BY MR. TSONIS:
12     Q.   Do you have an understanding, like, what
13 your caseload was typically relative to like --
14          (WHEREUPON, there was a brief
15           interruption.)
16     THE WITNESS:  Hold on.  Sorry.  Can you give
17 me, like, two minutes?  I've just got to put him
18 away.
19     MR. McALLISTER:  Can you mute it, Lou?
20     THE WITNESS:  Yeah.  Hold on.  I'm sorry,
21 guys.  I'm going to put him away.  Hold on.  Hold
22 on.
23     THE COURT REPORTER:  Do we want to go off the
24 record?

Page 212

1      MR. McALLISTER:  Yeah, maybe when he gets
2  back.
3      MR. TSONIS:  Yeah, sure.
4      THE VIDEOGRAPHER:  Do you want to go off the
5  record now, or you want to wait until he gets back
6  to go off the record?
7      MR. McALLISTER:  Greg, what do you think?  I
8  think we're very, very, very close to lunch, so --
9      MR. TSONIS:  Yeah.  That's fine.  We can go
10 off the record.
11     THE VIDEOGRAPHER:  We'll go off the record at
12 1:57 p.m.
13          (WHEREUPON, a short break was
14           taken.)
15     THE VIDEOGRAPHER:  We are back on the record
16 at 2:52 p.m.
17 BY MR. TSONIS:
18     Q.   All right.  Mr. Caniglia, do you recall,
19 before we went on lunch, we were talking about the
20 assignment of cases?
21     A.   Yes.
22     Q.   All right.  Now, if your caseload was
23 high and you communicated that to your supervisor,
24 was one potential option to manage your workload



Page 213

1  closing you out from catching new cases?
2     A.   Yes, I believe my manager -- my
3  supervisor had that, yes --
4     Q.   Okay.
5     A.   -- option.
6     Q.   At times, is that something you would
7  request that your supervisor do?
8     A.   Sometimes I did request that, yes.
9     Q.   Okay.  And was the purpose of requesting
10 to be taken off sort of the ability to be assigned
11 new cases so that you can catch up on your existing
12 cases?
13    A.   Yes.
14    Q.   Okay.  Similarly, is another strategy
15 that could be used to manage your caseload at any
16 given time having your supervisor assign cases from
17 you to another investigator?
18       MR. McALLISTER:  Objection.
19 BY THE WITNESS:
20    A.   For assist purposes, yes, but not -- not
21 like give -- give another investigator my case.  So
22 I don't know how to answer that, Counsel.  I -- but
23 I'm going to say I guess yes.  Yes.
24

Page 214

1  BY MR. TSONIS:
2     Q.   Okay.  I'm sending you a document that
3  I'm going to mark as Exhibit 7.
4     A.   Okay.
5     Q.   Let me know when you download it and
6  have opened it.
7           (WHEREUPON, a certain document was
8            marked Caniglia Deposition Exhibit
9            No. 7, for identification, as of
10           January 17, 2025.)
11 BY THE WITNESS:
12    A.   Okay.
13 BY MR. TSONIS:
14    Q.   For the record, Exhibit 7 is a document
15 bearing Bates label G021472 to 473.
16    A.   I'm looking at -- it's dated April 6,
17 2020?
18    Q.   Yes.  So if you can scroll to the second
19 page.
20    A.   The second.  Okay.  Yes, I'm on it.
21    Q.   Like any e-mail thread, the initial
22 e-mail is sort of at the bottom and the more recent
23 ones are at the top; right?
24    A.   Yes.

Page 215

1     Q.   So you wrote to Gerry Cassagne on
2  April 3rd of 2020:  I know these times are tough on
3  all of us but I wanted to let you know that I was
4  assigned 11 cases this week.  Are the cases being
5  distributed evenly?  Please look into this.  Not
6  just between our team but other teams too.  Thanks.
7           You see that; right?
8     A.   I do, yes.
9     Q.   So in response, Gerry Cassagne sent you
10 back an e-mail, right, if you go to the first page?
11    A.   Okay.
12    Q.   And do you see he says he'll keep an eye
13 on it but a quick look shows, and he breaks down
14 sort of the case assignments of other
15 investigators?
16    A.   I see, yes.
17    Q.   All right.  And it looks like you and
18 your father were both assigned 11 cases for that
19 week?
20    A.   Plus the two to three social medias, so
21 yeah -- yes.
22    Q.   Okay.  And there were other
23 investigators that received anywhere between six
24 and ten cases?

Page 216

1     A.   According to the document, yes.
2     Q.   Right.  And then Mr. Cassagne says:
3  Keep an eye on it this week and let me know.  I
4  will give some away if you get swamped.
5           Do you see that?
6     A.   I do.
7     Q.   All right.  So one option that your
8  supervisor had in managing -- helping you manage
9  your workload was giving some of your cases to
10 another investigator if they -- if the assigned
11 cases were not evenly distributed?
12       MR. McALLISTER:  Objection.
13 BY THE WITNESS:
14    A.   I mean, based on what you're saying,
15 yeah, but, I mean, you saw that it wasn't evenly
16 distributed.  But yes.  Okay.  Yes.
17 BY MR. TSONIS:
18    Q.   Right.  And I guess you understood that,
19 for example, you know, people that worked on the
20 staged team, the shop guys, that's who's referenced
21 here; right?
22       MR. McALLISTER:  Objection.
23 BY THE WITNESS:
24    A.   Correct.  Yes.  I would see that, yes.



Page 237

1  with conversations with customers who are not
2  supposedly fraudulent customers, so there's other
3  aspects.  Again, there's a lot of variables that go
4  on here, but to your point, I'll agree with your
5  statement, yeah.  But I could only max out at 5,
6  so...
7  BY MR. TSONIS:
8     Q.   Right.  And I'm not suggesting that you
9  can get a rating higher than 5, just that it
10  allowed you to -- so I guess what I'm saying is
11  you're claiming you worked those hours, but you're
12  also saying you didn't --
13     A.   I did.  I'm not claiming.  I did.  So,
14  but --
15     Q.   I understand.  You're claiming that you
16  worked these hours, and if those numbers benefited
17  your metrics, then didn't you receive a benefit and
18  your metrics reflect in your performance review?
19        MR. McALLISTER:  Objection.
20  BY THE WITNESS:
21     A.   That's -- that's not correct.  Actually,
22  the way the core metrics at one point was set up is
23  the more you worked, the less benefit you received.
24

Page 238

1  BY MR. TSONIS:
2     Q.   But again --
3     A.   It's -- it's -- I -- I -- it's a crazy
4  concept, and I get it, but I'm just telling you
5  what it was.
6     Q.   I understand what the productivity was,
7  Mr. Caniglia, but what I'm trying to establish is
8  that if you're working hours but not logging them
9  anywhere, then it looks like you're working 38.75
10  hours to GEICO in its system when it's assessing
11  you via metrics; right?
12        MR. McALLISTER:  Objection.
13  BY THE WITNESS:
14     A.   What I logged into the system, Counsel,
15  I'll say what I logged into the system, yes.  Yes.
16  BY MR. TSONIS:
17     Q.   And one of the metrics that you were
18  assessed on was case life for a period of time;
19  right?
20     A.   Correct.
21     Q.   All right.  And, well, case life
22  changed, and it changed to time in process, to TIP;
23  right?
24     A.   Case life -- well, I -- can you rephrase

Page 239

1  the question?
2     Q.   Yeah.  Well, at one period of time you
3  were assessed at case life.  Eventually case life
4  went away and was replaced by TIP; right?
5     A.   There was always a TIP, but yeah.  Yeah,
6  I understand what you're saying, yes, there was --
7  it's like --
8     Q.   By working additional hours but not
9  documenting them into Workday, weren't you able to
10  ultimately close cases faster than you otherwise
11  would have?
12        MR. McALLISTER:  Objection.
13  BY THE WITNESS:
14     A.   I work cases to close.  I don't work --
15  I don't work -- look --
16  BY MR. TSONIS:
17     Q.   Let me give you an example.  If it's
18  going to take 15 hours to close a case, just a
19  hypothetical case, you wouldn't know that at the
20  outset, but it's going to take 15 hours to close
21  that case, wouldn't you be able to close that case
22  faster if you're working additional hours?
23        MR. McALLISTER:  Objection.
24

Page 240

1  BY THE WITNESS:
2     A.   Wouldn't I be able to work that case if
3  I'm working additional hours.  If I worked 15 hours
4  on one case, I should be paid seven hours of
5  overtime.
6  BY MR. TSONIS:
7     Q.   Mr. Caniglia, you're not -- you're not
8  listening to my question.  If every case --
9     A.   I am.
10     Q.   -- if every case ultimately takes a
11  certain number of investigative hours that you put
12  into it, by working more hours on a weekly basis,
13  aren't you able to close your cases faster?
14        MR. McALLISTER:  Objection.
15  BY THE WITNESS:
16     A.   That's -- no, that's not necessarily
17  true.
18  BY MR. TSONIS:
19     Q.   It's not true that you can close cases
20  faster if you're working 48 hours a week than you
21  are 38.75 hours a week?
22        MR. McALLISTER:  Objection.
23  BY THE WITNESS:
24     A.   It's -- okay.



Page 241

1  BY MR. TSONIS:
2    Q.   I mean, it's just a simple proposition.
3  If you're working more time, aren't you able to
4  close cases faster?
5    MR. McALLISTER:  Objection.
6  BY THE WITNESS:
7    A.   Okay.  So if a person goes to the gym
8  and they bench press a hundred pounds, and then a
9  week later they bench 125 pounds, are they doing
10  more work if they do less reps?  I mean, this is
11  the question you're asking me.  It doesn't make --
12  with all due respect, Counsel, I --
13  BY MR. TSONIS:
14    Q.   Well, I guess, let me clarify --
15    A.   What about --
16    Q.   Let me clarify using your analogy.  If
17  it's going to take a hundred hours in the gym to
18  increase your bench from 100 to 125 pounds and you
19  are allotted 38.75 hours to be in the gym in any
20  week, don't you get to a hundred hours faster if
21  you're working 48.75 hours in a week?
22    A.   Not necessarily, because --
23        (WHEREUPON, there was a brief
24         interruption.)

Page 242

1  BY THE WITNESS:
2    A.   Because you have to sleep, you have to
3  eat properly, and there are other variables that
4  consider -- that have to take into consideration.
5  BY MR. TSONIS:
6    Q.   Okay.  Setting those sleep and eating
7  variables aside, isn't it true, just from a
8  quantity of time standpoint, you get to a hundred
9  faster if you're working 48.75 than you are 38.75?
10    A.   I'm going to say I don't know.
11    THE WITNESS:  And, Jarron, that's what I'm
12  going to say.
13  BY MR. TSONIS:
14    Q.   But you won't admit that mathematically
15  you can get to that point faster by working more
16  hours?
17    A.   I -- I will admit that you could.
18    Q.   Okay.  But you won't admit that it's
19  possible you close cases faster --
20    A.   I just said that.
21    THE COURT REPORTER:  Hold on.  Sir, please let
22  him get the question out.
23  BY MR. TSONIS:
24    Q.   Then are you agreeing that it's possible

Page 243

1  that you closed cases faster because you claimed to
2  have worked more hours?
3    MR. McALLISTER:  Objection.
4  BY THE WITNESS:
5    A.   For the sake of keeping this interview
6  rolling, I will say yes.
7  BY MR. TSONIS:
8    Q.   Okay.  You can close out this exhibit.
9        I'm going to send you now what's being
10  marked as I believe it's Exhibit 9.
11    MR. McALLISTER:  Yes.
12        (WHEREUPON, a certain document was
13         marked Caniglia Deposition Exhibit
14         No. 9, for identification, as of
15         January 17, 2025.)
16  BY MR. TSONIS:
17    Q.   Let me know when you have it opened.
18    A.   It's titled as June 1, 2023?
19    Q.   Correct.  And for the record, Exhibit 9
20  is a document bearing Bates label G011375.
21        Do you see that this is an e-mail from
22  you to Toni D'Agata on June 1, '23?
23    A.   Yes.
24    Q.   All right.  And this is the time where

Page 244

1  Ms. D'Agata would have been your supervisor; right?
2    A.   Yes.
3    Q.   All right.  And you ultimately -- or the
4  subject here is overtime?
5    A.   Yes.
6    Q.   Okay.  And in the bottom e-mail, you
7  request essentially overtime because you had
8  multiple cases that you needed to work on?
9    A.   From what I'm reading, received three
10  cases Tuesday, three cases Wednesday, and two
11  today.  Counsel, yeah, I'd say yeah, that's what I
12  was asking, yes.
13    Q.   Okay.  And Ms. D'Agata asked, you know,
14  what do you need, an extra hour?  Right?
15    A.   Yes.  Yes.
16    Q.   And then you said, yeah, maybe I have
17  two left to do; right?
18    A.   Yeah.  Yes.
19    Q.   So you understood that if you needed
20  overtime, you could request it from Ms. D'Agata?
21    MR. McALLISTER:  Objection.
22  BY THE WITNESS:
23    A.   I -- yeah, of course I can ask.  Why
24  not?  Yeah.



Page 273

```
 1  STATE OF ILLINOIS    )
 2                       ) SS:
 3  COUNTY OF DUPAGE     )
 4          I, ALICE M. SCHWINGER, CSR No. 84-2913,
 5  a Certified Shorthand Reporter of the State of
 6  Illinois, do hereby certify:
 7          That previous to the commencement of the
 8  examination of the witness, the witness was duly
 9  sworn to testify the whole truth concerning the
10  matters herein;
11          That the foregoing deposition transcript
12  was reported stenographically by me, was thereafter
13  reduced to typewriting under my personal direction
14  and constitutes a true record of the testimony
15  given and the proceedings had;
16          That the said deposition was taken
17  before me at the time and place specified;
18          That I am not a relative or employee or
19  attorney or counsel, nor a relative or employee of
20  such attorney or counsel for any of the parties
21  hereto, nor interested directly or indirectly in
22  the outcome of this action.
23          IN WITNESS WHEREOF, I do hereunto set my
24  hand at Woodridge, Illinois, this 21st day of
```

Page 274

```
 1  January, A.D. 2025.
 2
 3
 4
 5
 6           Certified Shorthand Reporter
 7
 8
 9  ALICE M. SCHWINGER, CSR No. 84-2913
```

Page 275

```
 1              I N D E X
 2  EXAMINATION                              PAGE
 3  LOUIS CANIGLIA, JR.,
    EXAMINATION                                 4
 4  BY MR. TSONIS:
 5
 6          E X H I B I T S
 7
 8  Exhibit No. 1                             69
 9  Exhibit No. 2                             85
10  Exhibit No. 3                             98
11  Exhibit No. 4                            102
12  Exhibit No. 5                            104
13  Exhibit No. 6                            110
14  Exhibit No. 7                            214
15  Exhibit No. 8                            224
16  Exhibit No. 9                            243
17  Exhibit No. 10                           245
18  Exhibit No. 11                           246
19  Exhibit No. 12                           249
20  Exhibit No. 13                           253
```

Page 276

```
 1       DEPOSITION ERRATA SHEET
 2  Our Assignment No. J12275709
 3  Case Caption:  Fischer, et al
 4  vs.  Government Employees Insurance Company
 5     DECLARATION UNDER PENALTY OF PERJURY
 6      I declare under penalty of perjury
 7  that I have read the entire transcript of
 8  my deposition taken in the captioned matter
 9  or the same has been read to me, and
10  the same is true and accurate, save and
11  except for changes and/or corrections, if
12  any, as indicated by me on the deposition
13  errata sheet hereof, with the understanding
14  that I offer these changes as if still under
15  oath.
16      Signed on the _____ day of
17  _____, 2025.
18
19  _____
20        Louis Caniglia, Jr.
```

