# Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,
and CHARISE JONES, individually and on behalf of
all others similarly situated,

        Plaintiffs,

  -against-     Case No.:
          23-Civ-02848(GRB)(ARL)

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a
GEICO,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -x

       December 13, 2024
       9:31 a.m.

EXAMINATION BEFORE TRIAL of GERRY CASSAGNE, a
Non-Party Witness herein, taken by the
Plaintiffs, held via Zoom, pursuant to Subpoena,
taken before DANIELLE DEYOUNG, a Shorthand
Reporter and Notary Public in and for the State
of New York.

     MAGNA LEGAL SERVICES
      (866) 624-6221



Page 46

```
 1              G. CASSAGNE
 2   did not assign investigators cases; is
 3   that correct?
 4       A    That is correct.
 5       Q    How were your investigators
 6   assigned cases?
 7       A    Through an intake process.
 8       Q    Can you tell me about that
 9   intake process, please?
10       A    Referrals -- fraud referrals
11   would come into the SIU department.
12   There was a person assigned to that --
13   you know, I guess it was called a cue,
14   that would review those cases and then
15   assign them accordingly to whoever they
16   needed to be assigned to.
17       Q    What was the job title of a
18   person who was reviewing the cue and
19   assigning the cases?
20       A    I know their job was called
21   intake, but I believe they were SIU
22   inside investigators.
23       Q    If you could estimate, how
24   many people at any given point were doing
25   intake for SIU?
```

Page 47

```
 1              G. CASSAGNE
 2       A    It changed from one to two
 3   sometimes.
 4       Q    You said fraud referrals.
 5   Where were the fraud referrals coming
 6   from?
 7       A    The claims examiners and also
 8   automated fraud referral systems.
 9       Q    What is the automated fraud
10   referral system?
11       A    It's a computerized system
12   that I guess -- the claims are put into
13   the system and I guess the claim has to
14   hit a certain amount of parameters --
15   whatever word you want to use -- to
16   identify possible fraud into that claim
17   and then it would identify it as a
18   possible fraud claim and it would be
19   assigned to SIU.
20       Q    Who set those parameters, if
21   you know?
22       A    I do not know.
23       Q    Was that like a home office
24   level kind of thing?
25       A    I would believe so, but I do
```

Page 48

```
 1              G. CASSAGNE
 2   not know definitely.
 3       Q    Do you know if there's
 4   anything you or your manager could have
 5   done to adjust the parameters in that
 6   automation process so that you could get
 7   more or fewer cases?
 8       A    I could not.
 9       Q    And then you also mentioned
10   claims examiners would refer cases.  Were
11   --
12            So if I understand correctly
13   -- and please correct me -- those are
14   people who are reviewing claims --
15            MR. TSONIS:  You froze up,
16       Hannah, if you want to restart your
17       question.
18            MS. COLE-CHU:  That's for the
19       best, anyway.
20   BY MS. COLE-CHU:
21       Q    The claim examiners, Gerry,
22   were employees who were reviewing claims
23   and saw some sort of indicator of fraud
24   in the claim and then referred them to
25   SIU; is that correct?
```

Page 49

```
 1              G. CASSAGNE
 2       A    That is correct.
 3       Q    And you mentioned cases were
 4   assigned on a rotating basis?
 5       A    Yes.
 6       Q    Can you tell me a little bit
 7   more about that, how that worked?  Was it
 8   just cases came in through the process
 9   and they were dolled out as they came in
10   to investigators?
11       A    Yes.  An intake would have a
12   list of whatever investigators were
13   handling whatever specific case and then
14   they would assign them that way.
15       Q    If an investigator was really
16   busy or had a family emergency or
17   something like that, could you call the
18   intake person and say, can you not assign
19   this investigator any cases today?
20       A    Yes.
21       Q    Did you ever do that?
22       A    Yes, I did.
23       Q    Was that a regular practice of
24   yours?
25       A    Only when needed.
```



Page 50

```
 1              G. CASSAGNE
 2      Q    How often was it needed, in
 3  your recollection?
 4      A    After my review of what the
 5  investigator had or if the investigator
 6  needed an emergency, I would be on a
 7  case-by-case basis.
 8      Q    Was it a frequent occurrence?
 9         MR. TSONIS:  Objection to form.
10             You can answer.
11      A    No.
12      Q    If you were dealing with one
13  of these situations that we are
14  discussing now, otherwise the case
15  assignments -- strike that.
16             How often did you communicate
17  with your investigators that you
18  supervised?
19      A    Sometimes daily, sometimes
20  weekly, depending on the need.
21      Q    Did you regularly communicate
22  with investigators?
23      A    Yes.
24      Q    How did you communicate with
25  them?
```

Page 51

```
 1              G. CASSAGNE
 2      A    Either by phone or by --
 3  however I needed to.  Meetings.
 4      Q    How often did you have
 5  meetings?
 6      A    I tried to have weekly
 7  meetings or if not, then I would have
 8  them when necessary.
 9         MR. TSONIS:  Off the record.
10             (Whereupon, a recess took
11              place at 10:30 a.m. and
12              ended at 10:41 a.m.)
13  BY MS. COLE-CHU:
14      Q    Gerry, before the break we
15  were talking about meetings that you had
16  with your investigators, and I believe
17  you testified that you tried to have
18  meetings weekly.  Why was it important to
19  meet weekly with your investigators?
20      A    To update them on any new
21  procedures, update them on any new types
22  of cases that may be coming out, update
23  them on any type of new fraud trends that
24  we had, stuff like that.
25      Q    What does fraud trends mean?
```

Page 52

```
 1              G. CASSAGNE
 2      A    If we identified any type of
 3  new fraudulent type of case, you know, if
 4  the bad guys are doing something with
 5  staging accidents or doing something with
 6  body shop fraud or something like that.
 7  So we try to keep them updated on all
 8  type of fraud trends.
 9      Q    Would you say you had a good
10  relationship with your investigators?
11      A    I hope I did.
12      Q    Did you want your
13  investigators to feel comfortable
14  approaching you with questions?
15      A    Absolutely, yes.
16      Q    Did you want them to feel
17  comfortable approaching you with any
18  concerns that they had?
19      A    Yes.
20      Q    Did they approach you with
21  questions and concerns, you know, in the
22  course of their work?
23      A    I believe they did, yes.
24      Q    Would you consider the
25  investigators that you worked with to be
```

Page 53

```
 1              G. CASSAGNE
 2  hardworking?
 3      A    Yes.
 4      Q    And reliable?
 5      A    Yes.
 6      Q    Would you consider them
 7  trustworthy investigators?
 8      A    Yes.
 9         MS. COLE-CHU:  I am going to
10  introduce Exhibit 3.
11             (Whereupon, Exhibit 3 was
12              marked for
13              identification.)
14         MS. COLE-CHU:  Let me know when
15  you have it in front of you.  It's a
16  longer document; it's 30 pages.  So
17  take a look through it.  I am going
18  to direct you to a specific section,
19  but take your time going through it
20  and let me know when you've done
21  that.
22             I will note for the
23  record this is document Bates number
24  is G000161.  It's titled:  Employment
25  Contents.
```



Page 90

```
 1                G. CASSAGNE
 2       Q    Immediately underneath
 3   "Fraud," just to confirm, that refers to
 4   productivity?
 5       A    Yes.
 6       Q    And audits refer to the audits
 7   we've been discussing, three a month that
 8   you had to perform?
 9       A    Yes.
10       Q    And in this review, was your
11   investigators performance weighted in
12   your performance again like in prior
13   years?
14       A    Yes.
15       Q    So like in prior years, your
16   job performance was determined by your
17   investigators performance?
18       A    Yes.
19           MS. COLE-CHU:  Okay.
20               Next is Exhibit 7.  That
21       should be appearing in the chat.
22       This is G010623.
23               (Whereupon, Exhibit 7 was
24               marked for
25               identification.)
```

Page 91

```
 1                G. CASSAGNE
 2   BY MS. COLE-CHU:
 3       Q    Before you look at that,
 4   Gerry, I actually just have one question
 5   on the last document.  I didn't ask you
 6   this.
 7            Exhibit 6, the document we
 8   were just talking about, is that your
 9   2019 performance evaluation?
10       A    Yes.
11       Q    Okay.  Thank you.
12            Now go ahead and look at the
13   new document and let me know when you are
14   ready for me to ask you some questions
15   about it.
16       A    Got it.  Thank you.
17       Q    Again, this is Exhibit 7,
18   G010623.
19            Gerry, is this your 2020
20   performance appraisal?
21       A    Yes.
22       Q    Who completed this appraisal?
23       A    Bill Newport.
24       Q    I am going to ask you a few
25   questions about this paragraph on the
```

Page 92

```
 1                G. CASSAGNE
 2   first page.  Do you want a second to
 3   review it or are you ready for me to ask
 4   you some questions about it?
 5       A    Just give me a second to read
 6   it.
 7            (Perusing).
 8            Okay.
 9       Q    The first sentence reads:
10            "Gerry managed a diverse team
11   of field investigators that experienced
12   an increase in workload and a change in
13   how they complete their work."
14            Is it true, in your
15   experience, that in 2020 you experienced
16   an increase in workload?
17       A    I believe so, yes.
18       Q    And let me ask more
19   specifically.  Is it true that your
20   investigators experienced an increase in
21   workload in 2020?
22           MR. TSONIS:  Objection, form,
23       foundation.
24   BY MS. COLE-CHU:
25       Q    You can go ahead and answer,
```

Page 93

```
 1                G. CASSAGNE
 2   Gerry.
 3       A    Yes.
 4       Q    Can you tell me about that
 5   increase in workload, whatever you
 6   remember about it, when did it happen?
 7       A    I don't remember exactly.
 8   This is COVID time.
 9       Q    Yes.  COVID hit March 2020.
10       A    Right.  So this was COVID
11   time.  So they definitely had an increase
12   in caseload, but there were other factors
13   built into that where the field work was
14   taken away from them.  So there was no
15   field work being done.  So windshield
16   time was not included in that.
17       Q    Couple questions.  I believe
18   you said there was an increase in
19   workload around COVID.  What do you
20   attribute that to, if you know?  Why was
21   there an increase in workload around this
22   time?
23       A    I don't know specifically.  I
24   mean, it could be changing the volume of
25   claims coming in, there could have been a
```



Page 94

```
 1              G. CASSAGNE
 2    change in the automated system, there
 3    could have been a change in -- if we took
 4    on more social media cases.  I can't tell
 5    you specifically.
 6        Q    Is that because you ultimately
 7    don't have any control or say over the
 8    number of cases that are coming into SIU?
 9        A    I do not have control of that,
10    correct.
11        Q    So sitting here today, you
12    don't know why the cases increased?
13            MR. TSONIS:  Objection, asked and
14        answered.
15    BY MS. COLE-CHU:
16        Q    Or you don't specifically know
17    why?  I did hear you list some
18    possibilities, but it sounds like you're
19    testifying that you don't know exactly
20    why the cases increased.
21            MR. TSONIS:  Objection.
22               You can answer, if you
23        know.
24        A    Correct.
25        Q    This sentence also says that
```

Page 95

```
 1              G. CASSAGNE
 2    your investigators experienced change in
 3    how they complete their work.  Do you
 4    know what that's referring to?
 5        A    During COVID time, it was
 6    because they were not doing field work at
 7    that point.  So that's how that changed.
 8    Any other change, I don't know what we
 9    are talking about here.
10        Q    So how did no field work
11    change how they complete their work?
12        A    Normally we would go out and
13    scene canvases or meet claimants or
14    policyholders, take statements, go to
15    police departments, get copies of police
16    reports; we were unable to do that during
17    the COVID period.
18        Q    And how did that change their
19    work?
20        A    Everything had to be done by
21    phone, if they could, or -- it had to be
22    done by making phone calls and taking
23    recorded statements over the phone or --
24    there was no field work allowed during
25    that period.
```

Page 96

```
 1              G. CASSAGNE
 2        Q    How long did that period last,
 3    if you remember, the no field work
 4    period?
 5        A    I don't remember.  A month or
 6    -- I don't remember.  I don't want to
 7    lock it in.
 8        Q    It was a wild time, hard to
 9    remember.
10            Were the case assignments
11    adjusted to account for the fact that the
12    investigators were not traveling for
13    field work?
14        A    Yes.
15        Q    Is that one reason why there
16    was an increase in caseload?
17        A    Yes.
18        Q    How did that happen?  Did
19    someone -- I mean, do you know how that
20    mechanically happened, like who made the
21    decision to increase the number of cases?
22    Let's start there.
23        A    I got that from the manager.
24    I don't know where the manager got it
25    from, but based on the fact that there
```

Page 97

```
 1              G. CASSAGNE
 2    was no field work, they were assigned
 3    extra cases to investigate because there
 4    wasn't any field work driving windshield
 5    time that had to be done on these cases.
 6        Q    Do you know if that was a
 7    decision made by your manager, Bill
 8    Newport, or by the home office?
 9        A    I believe it was home office,
10    but -- because it affected the whole
11    company.
12        Q    Were the same types of cases
13    being assigned as before?  I mean, would
14    anything have changed about the types of
15    fraud cases that were coming in?
16        A    Yes.  Some of the cases
17    changed.  We started doing social media
18    checks, I believe, and then we were
19    getting some of the VELM cases -- which
20    were the computerized cases -- sent to us
21    also, that we had either not gotten in
22    the past or we got different ones in the
23    past.  So some of the case types changed
24    during that period, yes.
25        Q    I didn't hear you.  The second
```



Page 178

```
 1              G. CASSAGNE
 2       A    I do, yes.
 3       Q    What is this document?
 4       A    It's an e-mail from me to my
 5   investigators.
 6       Q    I will just note for the
 7   record that the subject is "Overtime for
 8   social media cases."
 9            The first sentence of the
10   e-mail reads:
11            "There are a large amount of
12   social media cases pending in SIU.
13   Currently, there are about 650 cases that
14   need to be handled."
15            Gerry, do you remember this
16   period, when there were a lot of social
17   media cases pending?
18       A    I do.
19       Q    Is it correct that in this
20   e-mail, you're communicating that SIU
21   management was authorizing overtime for
22   purposes of handling the social media
23   cases?
24       A    Yes.
25       Q    What do you recall about this
```

Page 179

```
 1              G. CASSAGNE
 2   period?
 3       A    Regarding?
 4       Q    What do you recall about this
 5   period regarding the large amount of
 6   social media cases?
 7       A    For whatever reason, I don't
 8   know the reason, that there were social
 9   media cases that came into the cue for
10   the region.  I don't know what generated
11   that, but there were these cases and they
12   were looking to get them handled.
13            So management came to us and
14   said -- with this procedure, saying your
15   guys could help out handling these cases,
16   this is how it will be handled.
17       Q    Do you recall if this was
18   specifically Region 2 social media cases
19   or if it was a national issue?
20       A    I think they were only Region
21   2.  I don't know.  I'm pretty sure they
22   were only Region 2.
23       Q    Did social media cases at this
24   time, if you remember, have that lower
25   weight associated with them for purposes
```

Page 180

```
 1              G. CASSAGNE
 2   of calculating productivity?
 3       A    Yes, they did.
 4       Q    It states here in this e-mail
 5   that the special project would last for
 6   one week.  Is it your recollection that
 7   that is how it panned out, that the
 8   program lasted for one week?
 9       A    I believe so, yes.  If that's
10   what I wrote, yes.  I don't remember if
11   it was extended, I don't remember.
12       Q    And it says here that field
13   investigators will be offered overtime to
14   handle the cases.  Is that correct?
15       A    Yes.
16       Q    Was overtime available before
17   this?
18       A    Overtime for the social media
19   cases?
20       Q    For anything.
21       A    If somebody worked overtime
22   because they got stuck on a case and they
23   contacted me and said I had to work an
24   hour past my 7.75, the procedure was they
25   would contact me, send me an e-mail
```

Page 181

```
 1              G. CASSAGNE
 2   saying why they had to do it and then I
 3   would tell them to put it on their
 4   timesheet so they got paid.
 5            MS. COLE-CHU:  Okay.
 6            Next exhibit, Exhibit 20,
 7       this is G011542.
 8            (Whereupon, Exhibit 20
 9            was marked for
10            identification.)
11   BY MS. COLE-CHU:
12       Q    Do you recognize this
13   document, Gerry?
14       A    I do.
15       Q    What is this document?
16       A    E-mail from me to my team, my
17   field investigators.
18       Q    Can you describe what the
19   e-mail says?
20       A    The investigators would have
21   to send me their weekly timesheets, then
22   I would have to approve it and get it in,
23   to make sure it got put into the -- so
24   they would get paid.
25            If I approved it on Friday in
```



Page 182

```
 1                G. CASSAGNE
 2   the afternoon and they ended up working
 3   extra time that night, they would have to
 4   send me a special note and then I would
 5   have to get that sent into HR and they
 6   would have to do a handwritten thing to
 7   change the timesheet.
 8            So it's just about making --
 9   if something came in after I approved
10   their timesheet, I would have to handle
11   it in a different manner.
12       Q    And it says in the e-mail that
13   you would have to physically go to HR in
14   Woodbury to get it changed on a
15   handwritten sheet; is that correct?
16       A    Right.
17       Q    And does that refer to
18   Woodbury, New York?
19       A    Right.
20       Q    How often did you go to
21   Woodbury, New York at this time in 2016?
22       A    I don't remember.  I mean, we
23   would go for meetings -- if Bill called a
24   meeting, I would go in, you know, not on
25   a regular basis, but I would go in.
```

Page 183

```
 1                G. CASSAGNE
 2   Training, meetings, if I had to meet
 3   somebody inside, if I had to speak to
 4   somebody else.
 5       Q    How far is Woodbury, New York
 6   from where you live?
 7       A    It's about 15 miles, maybe, 20
 8   miles.
 9       Q    Would it have been burdensome
10   on you to do this, to go in physically to
11   get the timesheet changed on a
12   handwritten sheet?
13       A    No.  I would just go in and
14   take care of it.
15            MS. COLE-CHU:  All right.
16            Exhibit 21 is G010294.
17            (Whereupon, Exhibit 21
18            was marked for
19            identification.)
20            MS. COLE-CHU:  Take a look Gerry
21       and let me know when you're ready.
22            THE WITNESS:  Okay.
23   BY MS. COLE-CHU:
24       Q    This is document Bates number
25   G010294.  It's titled:  AD and SIU
```

Page 184

```
 1                G. CASSAGNE
 2   Talking Points.
 3            Do you recognize this
 4   document, Gerry?
 5       A    I don't know if we actually
 6   were given this document or just given
 7   the information on it, but it's talking
 8   about how overtime was changed and how
 9   they paid it.
10       Q    Do you recall the change?
11       A    I think it was about -- if you
12   got changed to an exempt or nonexempt
13   employee, then you were -- or an hourly
14   rate, you would get paid time and a half
15   as compared to like a premium pay.  So
16   the hourly rate changed if you were
17   nonexempt or exempt, vice versa.
18       Q    And you remember when GEICO
19   made this change?
20       A    I do not remember exactly --
21   oh, I guess it says here, effective
22   January 20th.
23       Q    Do you know who drafted this
24   document?
25       A    I do not.
```

Page 185

```
 1                G. CASSAGNE
 2       Q    Do you remember who provided
 3   you with this document or the information
 4   in this document that you referenced?
 5       A    I would believe it would have
 6   to come from the manager, but I do not
 7   remember specifically.
 8       Q    Who would you say the audience
 9   of this document is?
10       A    Who the audience of this
11   document is?
12       Q    Yeah, who is this document
13   for?
14       A    Supervisors and managers, I
15   guess, to let their associates know the
16   change.
17       Q    In the first -- the top half
18   of the document, there's one black bullet
19   point that says:  "Expectations around
20   handling of overtime do not change."
21            Underneath that it says,
22   "Overtime must still be approved by
23   management."  Who is management in the
24   context of overtime approval here?
25            MR. TSONIS:  Objection, form,
```



Page 234

G. CASSAGNE

to work overtime and they went ahead and worked it, then that would become a disciplinary action situation, and then you would have to pay them for that work time that they did and then deal with the disciplinary action after that.
Q   What was the disciplinary action, if you know?
A   I don't know. I've never had to deal with it.
Q   Let's go back to Exhibit 23; that was the Lou Pia deposition transcript.
A   Okay. Go ahead.
Q   Are you familiar with Siccum?
A   Yes.
Q   Do supervisors use Siccum when managing caseload for investigators they supervise?
A   Siccum was the case management system reporting system.
Q   Did you use Siccum to -- when you were supervising your investigators?
A   Yes.

Page 235

G. CASSAGNE

Q   How did you use it when you were supervising your investigators?
A   You were able to review any case, that's where you did your approvals. You were able to see any of the case pendings. You were able to read any of the notes entered in any case. So anything regarding that case specifically, you were able to go in, read it, prove it, close it, review it.
Q   Does Siccum record the date and time that a case is assigned to an investigator?
A   I believe it does, yes.
Q   And is that the timestamp that's used to measure case life?
A   I believe when a case is assigned, that's when the time starts for case life, yes.
Q   We talked today about the system of assigning point values to cases. Do you recall that conversation?
A   Yes.
Q   It was some cases had higher

Page 236

G. CASSAGNE

point values than others?
A   Yes.
Q   Does Siccum regard the point values?
A   It's based on the level at closing. So if it was a -- like we said, it was a level one, you got one point for it. You got a level two because there was no field work -- I forgot -- it was a .75, and then the other cases, the computer check cases or social media were .375, I believe.
    Don't quote me on those numbers. I think that's the way it worked. So it was at the point when you closed the case, that's how they were recorded.
Q   If we were to go into Siccum, would we see what the levels were for the case at closing?
A   Yes.
Q   And then would we also see the point value associated with that level?
A   No. It just had the level --

Page 237

G. CASSAGNE

when it was assigned, it was given a level, but the supervisors and the investigator had the ability to change that level based on their closing, because it was assigned as a level one field and if they didn't do a field work on it, they could change that to a level two -- or it had to be changed to a level two. So the investigator could either do that or the supervisor could do that.
Q   Did those changes have to be justified?
A   No, just based on the investigation.
Q   Was checking that part of the audit to make sure any change was appropriate?
A   Yes. Case level was, I believe, part of one of the audit guidelines, and it was also part of our job to make sure that the right level closing was there, so they got the right amount responsible for that case, level one, two or three.



Page 281

```
 1                    G. CASSAGNE
 2                  C E R T I F I C A T E
 3
 4         I, DANIELLE DeYOUNG, a Shorthand Reporter
 5    and Notary Public of the State of New York, do
 6    hereby certify:
 7    That the WITNESS whose examination is
 8    hereinbefore set forth, was duly sworn, and
 9    that such examination is a true record of the
10    testimony given by such WITNESS.
11    I further certify that I am not related to any
12    of the parties to this action by blood or
13    marriage; and that I am in no way interested in
14    the outcome of this matter.
15
16
17
18
19         _____
                   Danielle DeYoung
20         DANIELLE DeYOUNG
21
22
23
24
25
```

