# Exhibit V

```
            IN THE UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF NEW YORK

 - - - - - - - - - - - - - - - - - - )
 KEITH FISCHER, MICHAEL O'SULLIVAN,  )
 JOHN MOESER, LOUIS PIA, THOMAS      ) Case No.:
 BARDEN, CONSTANCE MANGAN, and       ) 2:23 Civ. 2848
 CHARISE JONES, individually and     ) (GRB) (ARL)
 on behalf of all others similarly   )
 situated,                           )
                  Plaintiffs,        )
      - v -                          )
 GOVERNMENT EMPLOYEES INSURANCE      )
 COMPANY d/b/a GEICO,                )
                  Defendant.         )
 - - - - - - - - - - - - - - - - - - )


       REMOTE VIDEOTAPED DEPOSITION OF MICHAEL GREY




 Reported by:
 Kim M. Brantley
 Job No: J12254485
```



Page 93

1         MICHAEL GREY
2    A.   Yes.
3    Q.   All right. And setting aside I guess
4  the -- you know, where there's minus signs, those
5  are absence corrections that are noted, but the
6  absence requests are all the ones without minus
7  signs.
8         Do you see that?
9    A.   Well, let me double check.
10        (Witness reviews document.)
11   A.   Then that's what it appears.
12   Q.   All right. So I guess the time that
13 you requested off through the Workday system,
14 that's not time that you were working, right?
15   A.   That's not always the case.
16   Q.   What do you mean?
17   A.   I mean there was many situations where
18 I had -- that I requested vacation time, but I
19 would still be working because things needed to
20 get done.
21   Q.   So you would go into the Workday system
22 and request 7.75 hours of vacation for example,
23 right?
24   A.   Correct.
25   Q.   Okay. Your supervisor would approve

Page 94

1         MICHAEL GREY
2  that request?
3    A.   Correct.
4    Q.   So your supervisor would be under the
5  belief that you were not working, you were taking
6  7.75 five hours off?
7         MS. JEAN: Objection.
8         THE WITNESS: I don't know what they
9     believed.
10 BY MR. TSONIS:
11   Q.   But what you were submitting to your
12 supervisor was that you would not be working,
13 right?
14   A.   Yes.
15   Q.   Okay. And now you're contending that
16 you actually did work during some of this vacation
17 time?
18   A.   Yes, and with the knowledge that
19 supervisors acknowledged and understood that.
20   Q.   So be more specific when you say the --
21 the "knowledge and acknowledgment of the
22 supervisors." Who specifically?
23   A.   Chet Janik definitely knew; on more
24 than one occasion he said, "Hey, you're supposed
25 to be off." And I said, "I understand, but this

Page 95

1         MICHAEL GREY
2  needs to be done."
3    Q.   When specifically did you have that
4  conversations with Chet Janik?
5    A.   I don't know the exact times or dates,
6  but it happened on multiple situations.
7    Q.   So you can't provide any time of the
8  dates of when these conversations happened?
9    A.   No. I -- there was no reason for me
10 to.
11   Q.   Okay.
12   A.   I mean, there's hundreds of -- hundreds
13 of situations here. Do I know the exact date out
14 of hundreds? No.
15   Q.   So how many conversations are you
16 contending that you had with Chet Janik where you
17 told him that you were working during time that
18 you scheduled off?
19   A.   Dozens.
20   Q.   But you can't provide any specific --
21 specificity to when those conversations took
22 place?
23   A.   No. It -- it was pretty much
24 understood that that's what we had to do to get
25 our job done.

Page 96

1         MICHAEL GREY
2    Q.   And over what time period are you
3  contending that you had to work overtime to get
4  your job done?
5    A.   Probably ever since I was hired.
6    Q.   Did Chet Janik ever instruct you that
7  if you work overtime you're required to put those
8  hours into Workday?
9    A.   I don't recall.
10        MR. TSONIS: I'm putting in the chat
11    what I'm going to mark as Exhibit 2, and in
12    fact I'm going to share my screen.
13        (7/5/17 email chain Bates stamped
14    G012360 to 361 was marked Deposition Grey
15    Exhibit 2, for identification.)
16 BY MR. TSONIS:
17   Q.   Can you see my screen, Mr. Grey?
18   A.   No, I'm stuck on this other thing.
19 Hold on. Let me close this. Okay.
20   Q.   I'm showing you Exhibit 2, which bears
21 the Bates label G012360 to 361.
22        Do you see your name top of this email
23 chain, Mr. Grey?
24   A.   Yes.
25   Q.   And that's your email address, right?



Page 121

1  MICHAEL GREY
2  scheduled for 38.75 hours in a work week?
3  A. Yes.
4  Q. Is it your understanding that every
5  associate in GEICO is typically scheduled for
6  38.75 hours?
7  A. Yes.
8  Q. And the 38.75 in a week breaks down to
9  7.75 hours for five days in a work week?
10  A. Yes.
11  Q. Was your work week typically Monday
12  through Friday?
13  A. Yes.
14  Q. What hours would you typically work, or
15  did it change over time?
16  A. Sometimes it was 7:00 to 3:30;
17  sometimes it was 8:00 to 4:30; sometimes it was
18  fixed -- fixed to 2:30.
19  Q. One of my questions was going to be
20  pre-COVID, when you were out in the field, would
21  you adjust your start time I guess on various days
22  depending on whether you would or wouldn't be in
23  the field?
24  A. Yes.
25  Q. All right. And what would you

Page 122

1  MICHAEL GREY
2  typically take into account when figuring out when
3  you were going to start your day?
4  A. A perfect example would be the email
5  prior with Jeff Mills. Rochester is an hour and a
6  half away from my house, so in -- in order for me
7  to do things that I would need to do, I would get
8  up early, maybe go through emails, check
9  everything, see what new assignments that I had,
10  and then get on the road so I could get to
11  Rochester in a proper time frame.
12      So that -- those days might be I'm
13  starting at 6:00 o'clock. Starting at 6:00
14  o'clock, logging in, checking new cases that I
15  received, maybe doing things that I needed to do,
16  you know, for time and process, reviewing if
17  anybody called in, if I had any emails, you know,
18  maybe from claims about certain circumstances.
19      So instead of doing that at 8:00
20  o'clock, I might do that at 6:00 o'clock, knowing
21  that I needed to be on the road somewhere, you
22  know, to be in Rochester by 10:00.
23  Q. Would you also adjust your schedule,
24  for example, like avoid hitting, you know, morning
25  rush traffic or something like that?

Page 123

1  MICHAEL GREY
2  A. Luckily in Buffalo, that's really not
3  that much of a concern. Fortunately that's the
4  beauty of Buffalo.
5  Q. I didn't mean to interrupt you. I
6  apologize.
7  A. That's -- go ahead. Go ahead.
8  Q. I was going to say, I can see how that
9  might be more of a concern if you worked in sort
10  of five boroughs, for example?
11  A. Yeah, correct.
12  Q. Okay. If you needed to take a break in
13  the middle of your day with a doctor's appointment
14  or pick up your kids or something, did you have
15  the ability to, you know, take out an hour and
16  just tack it on either at the beginning or the end
17  of your shift?
18  A. Yes.
19  Q. And similarly, if, for example, you did
20  get caught up with traffic, or something
21  unexpected happened where you worked, you know, a
22  half hour or an hour longer on a Tuesday, could
23  you work a half hour, an hour less on Wednesday,
24  rather than work overtime that week?
25  A. Possibly. I -- I -- I rarely did that.

Page 124

1  MICHAEL GREY
2  I -- I don't know that that was anything that they
3  would have accepted. I can't say yes or no.
4  Q. I guess I'm asking, did you have the
5  ability to flex your time sort of depending on
6  what the demands were of your immediate cases?
7  A. I -- I was under the -- understanding
8  that we did have the ability to flex time. Under
9  Chet that seemed to be the situation, and under
10  Toni and Andrew it became a -- much more of an
11  issue.
12  Q. How is it much more of an issue?
13  A. We had to -- later on we literally had
14  to note, you might call it punch in or punch out
15  through Workday on our phones, and in doing so I
16  was saying that that was part of our flex
17  scheduling, and I was being told that that wasn't
18  what flex scheduling meant.
19  Q. So if I'm understanding right, when
20  GEICO changed to having you actually, you know,
21  log in and log out on the Workday app on your
22  phone, that you thought you could sort of shift
23  your hours as you needed to but that you weren't
24  actually permitted to?
25  A. Correct.



Page 125

1       MICHAEL GREY
2   Q.  Okay.
3       MR. TSONIS:  I'm going to drop in the
4   chat what I'm marking as Exhibit 7.  For the
5   record, Exhibit 7 is document Bates stamped
6   G012498.
7       (6/2/2020 email chain Bates stamped
8   G012498 was marked Deposition Grey Exhibit 7,
9   for identification.)
10  BY MR. TSONIS:
11  Q.  Do you see the document here, Mr. Grey?
12  A.  Yes.
13  Q.  All right, and this is from June 2nd of
14  2020?
15  A.  Yes.
16  Q.  Exhibit 7 is an email from yourself to
17  Chet Janik your supervisor?
18  A.  Yes, it is.
19  Q.  And the subject of the -- of your email
20  is overtime, right?
21  A.  Yes.
22  Q.  And in your email you wrote that you
23  worked some overtime and adjusted your daily
24  figure accordingly in Workday?
25  A.  Yes.

Page 126

1       MICHAEL GREY
2   Q.  All right.  So the second line you note
3   that you'll still put in daily in morning and then
4   adjust if/when needed.
5       Do you see that?
6   A.  Yes.
7   Q.  Is that a reference to you entering the
8   hours that you worked daily each morning?
9   A.  I -- I'm not positive, but I'm thinking
10  that it shows that I had to input it before I
11  worked for the day, kind of like what I was
12  mentioning in the earlier email -- email when you
13  said that we needed to get it in by 11:00 a.m. on
14  Friday.  Looks to me -- I'd be interested to know
15  what day of the week 6/2/2020 was before I answer
16  it.  I'm guessing that that's a Friday, or a
17  Thursday or something that we had to give all our
18  work.  So we had to punch in 7.75 hours before we
19  even worked it and sent it in to him, and then it
20  looks like I probably explained that I actually
21  worked overtime, so I needed to go back in and
22  change what I had already submitted, because we
23  needed to submit these things ahead of time.
24      So then I noted I don't know that
25  there's a perfect system for how we're supposed to

Page 127

1       MICHAEL GREY
2   do this because I don't know what we were supposed
3   to do.
4       So I had to put in -- for -- for my
5   best guess with this is that I put in that I
6   worked 7.75 hours on a Thursday and 7.75 hours on
7   a Friday and then had to go back in and change it
8   to show that I actually worked overtime.
9   Q.  Well, I just took a glance at the
10  calendar app on my phone, and I'll represent to
11  you that June 2nd, 2020 was a Tuesday.
12  A.  Okay, well, then maybe it was from the
13  week before or something.  I don't know.
14  Q.  Okay.  But you're sending this as 10:03
15  p.m., right?
16  A.  Yeah, that's when I'm sending it.  Yep.
17  Q.  All right.  And it -- you don't
18  believe that --
19  A.  Oh, so I must have put in -- you're
20  right.  I must have put in 7.75 for Tuesday.
21  Q.  Okay.  And then you worked overtime and
22  adjusted that figure?
23  A.  I must have.
24  Q.  Fine.  And then your time, Mr. Janik
25  (sic), that you'll still put in your time daily in

Page 128

1       MICHAEL GREY
2   the morning and then adjust it if and when it's
3   needed?
4   A.  Okay.  Now this is coming back to me.
5       We -- this is probably -- at some point
6   they changed it and told us to put in our -- put
7   in Workday before we even worked.  That's what was
8   going on here.
9       So in other words, on a Tuesday I had
10  to put in 7.75 hours before the day started and
11  punch it in so that they had approved, you know,
12  the Workday -- and it was in Workday.  So then, I
13  needed to -- I'll -- see, I'll still put in daily
14  in the morning.  That was meaning that -- that the
15  new system was, put it in daily, and put it in in
16  the morning, before we finished working.
17  Q.  And on a daily basis I guess if you
18  needed to adjust it, you could do so?
19  A.  I took -- I -- basically it looks like
20  we had never discussed that in this email, and
21  that I was making the assumption that we could.
22  Q.  Okay.
23  A.  It certainly -- it would appear, based
24  on had email, that I -- it had never been
25  addressed as to what we were supposed to do.

Page 177

1     MICHAEL GREY
2  out to be."
3     Q.  Okay.  Turning back to your declaration
4  that we looked at, you wrote, in paragraph nine,
5  that "Starting in March 2020 the COVID-19 pandemic
6  halted field operations.  All of my work was done
7  remotely until approximately November of 2021.
8        "GEICO increased my caseload
9  significantly after March of 2020.  My overtime
10 hours increased as a result to about 45 to 50
11 hours a week on average."
12       You see that?
13    A.  Yes.
14    Q.  Okay.  Is it your recollection that you
15 were working about forty-five to fifty hours a
16 week during this time period, in the summer of
17 2020?
18    A.  Certainly April.  I'd noted that it was
19 after March of 2020.  So I would say April, May
20 for sure.
21       I don't remember exactly how long it
22 went, but certainly when that was going on -- it
23 looks like in July they made changes to
24 accommodate us for what we had been putting up
25 with in April and May.

Page 178

1     MICHAEL GREY
2     Q.  In paragraph eleven you write, "From
3  about March 2020 through November 2021 my regular
4  hours worked were approximately 45 to 50 hour --
5  50 per week," right?
6     A.  Yes.
7     Q.  Is it your testimony that during that
8  entire time frame your regular hours were
9  approximately forty-five to fifty per week?
10    A.  Yes.
11    Q.  I want to re-share Exhibit 10 with you,
12 so if we scroll to June, beginning with June, do
13 you see from June, 1st 2020 through June 5th, 2020
14 the time that you entered into Workday totalled
15 43.25 hours?
16    A.  Yes.
17    Q.  And similarly, from June 8th, 2020
18 through June 12th, 2020 the time entered by you
19 for that work week totalled 41.75 hours?
20    A.  Yes.
21    Q.  From June 22nd, 2020 through June 26th,
22 2020 the time entered by you in Workday for that
23 work week totaled 42.25 hours?
24    A.  Yes.
25    Q.  And again, ignoring the -- the last

Page 179

1     MICHAEL GREY
2  week or the portion of the work week that ends in
3  June and begins in July, because of the July 3rd
4  holiday, focus on July 13th, 2020 through July
5  17th, 2020, the time entered by you for that work
6  week totalled 42.25 hours?
7     A.  Yes.
8     Q.  From July 20th, 2020 through July 24th,
9  2020 the time entered by you for that work week
10 totaled 40.75 hours?
11    A.  Yes.
12    Q.  I guess, despite the fact that Mr.
13 Janik said that up to ten hours of overtime were
14 approved, you never entered ten hours of overtime
15 in any work week in July, right?
16    A.  Correct.
17    Q.  And similarly, the program was in
18 effect in June 2020.  You never entered ten hours
19 of overtime in June of 2020 for any work week,
20 correct?
21    A.  Correct.
22    Q.  I want to share your declaration again.
23 I want to focus on a different portion -- or a
24 slightly different topic.
25       Do you see your declaration again, Mr.

Page 180

1     MICHAEL GREY
2  Grey?
3     A.  Yes.
4     Q.  All right.  Do you see here in
5  paragraph eleven it says -- well, before we get to
6  that point...
7        You write both in paragraph ten and
8  paragraph eleven that the time range that you were
9  working more than, you know -- that -- that your
10 regular hours included overtime that you weren't
11 compensated for, you see it goes from December
12 2016, and you sort of break out the periods, but
13 then that ends in February of 2023?
14    A.  Yes.
15    Q.  Right.  So what changed in February of
16 2023 such that you were no longer working overtime
17 and not being compensated?
18    A.  That was when the beginning of the
19 changes.  I was with Toni, and we had to -- I
20 think February of 2023 is when we were punching in
21 and out literally for lunch and everything with
22 that, and that's when also the flex scheduling
23 became confusing as to what was considered a flex
24 schedule.
25       So, approximately that time I just



Page 181

1     MICHAEL GREY
2  completely stopped inputting any extra hours or
3  working any extra hours.
4     Q.  Okay, just so I'm clear, after February
5  of 2023, you are not claiming as part of this
6  lawsuit that you worked time that you were not
7  compensated for?
8     A.  I would say -- I'd say that's fair,
9  yes.
10    Q.  Okay.  Essentially the claims that
11 you're asserting as part of this lawsuit, and, you
12 know, through February of 2023, with regard to
13 unpaid overtime --
14    A.  I'd say that's fair.
15    Q.  Okay.  So, for those claims you write
16 in paragraph eleven of your declaration that your
17 best estimate of what you were owed is
18 approximately $78,683.36 in unpaid wages.
19       Do you see that?
20    A.  Yes.
21    Q.  And similarly, you later write that
22 this amount does not include liquidated damages,
23 which would add another $78,683.36 in damages.
24       Do you see that?
25    A.  Yes.

Page 182

1     MICHAEL GREY
2     Q.  So, are you seeking in excess of
3  $157,000 in unpaid wages and liquidated damages as
4  part of this lawsuit?
5     A.  I believe that this number was
6  calculated through my attorney, but if that's what
7  it says, then that's the fair amount.
8     Q.  Understanding your testimony that you
9  personally did not perform the calculation, you
10 ultimately signed this document under penalty of
11 perjury, right?
12    A.  Yes.
13    Q.  So it is your assertion that you are
14 owed in excess of $157,000 in unpaid wages and
15 liquidated damages as part of this lawsuit?
16    A.  Yes.
17    Q.  In paragraph twelve you write that,
18 "GEICO has required me to seek approval from my
19 supervisor to submit any hours worked above
20 38.75."
21       Do you see that?
22    A.  Yes.
23    Q.  And you continue that, "GEICO's
24 managers and supervisor frequently reiterated to
25 me and other special investigators that hours

Page 183

1     MICHAEL GREY
2  above 38.75 to complete regular case work would
3  not be approved."
4       Do you see that?
5     A.  Yeah.
6     Q.  Again, we've seen multiple weeks where
7  you have been able to submit hours worked above
8  38.75 in a multiyear period, right?
9     A.  Yes.
10    Q.  Okay.  And Mr. Janik, for example,
11 didn't require approval to -- to do that
12 submission, he just wanted you to submit
13 documentation substantiating the overtime hours
14 worked?
15       MS. JEAN:  Objection.
16       THE WITNESS:  Yes.
17 BY MR. TSONIS:
18    Q.  I want to talk about paragraph
19 thirteen.  You write that "GEICO has instituted a
20 variety of performance metrics that you've been
21 required to meet to remain in good standing."
22       Do you see that?
23    A.  Yes.
24    Q.  Let's start during the 2016 time
25 period.  What were the performance metrics that

Page 184

1     MICHAEL GREY
2  GEICO required you to meet?
3     A.  I'd have to review the performance
4  evaluation.  They -- they changed so much that I
5  don't know each year what it was.
6     Q.  Fair that you wouldn't recall the --
7  the precise numbers, but I guess do you have a
8  general understanding of the categories that you
9  were being assessed on in your job?
10    A.  During my tenures in SIU, there was
11 productivity.  There was also auditing.  Those
12 were normally the two main ones.  On occasion they
13 added on investigative -- something about
14 investigative notes, something to that effect.  I
15 forget the term.  One year or two years that went
16 on.  Occasionally case life was a part of our --
17 our -- our metrics.  Included in the fact of the
18 auditing included changes from twenty-four hours
19 to four days to make contacts.
20       There was a wide range of different
21 metrics, and inside those metrics they changed
22 sometimes during the middle of the -- the year
23 that they changed.
24       Despite the fact that we had a program
25 in place in January, or February, or March, they



Page 261

1        MICHAEL GREY
2   A.  Yes.
3   Q.  And the -- the text he copies into his
4  email says, "GEICO's nonexempt associate
5  guidelines detailed in the Associate Handbook
6  provide that working for outside of normal working
7  hours by nonexempt associates requires prior --
8  prior approval from the manager or above," right?
9   A.  Yes.
10   Q.  All right.  And then he also writes,
11  "And that 'non-exempt associates are required to
12  record and accurately report all time spent on
13  GEICO business, regardless of the location work --
14  work is performed, or the device used,'" close
15  quotes.
16   A.  Yes.  And -- and I would just like to
17  repeat this is on July 31st, 2023.
18   Q.  Correct.  And you reply back,
19  "Understood.  I tried to put time in but I'm not
20  sure I was successful.  One hour," right?
21   A.  Yes.
22   Q.  So you were indicating that you worked
23  one additional hour that day?
24   A.  Yes.
25   Q.  Okay.

Page 262

1        MICHAEL GREY
2    MR. TSONIS:  Now is probably a good
3  time for a break.
4    MS. JEAN:  Okay.
5    THE LEGAL VIDEO SPECIALIST:  So we'll
6  go off the record at 4:32 p.m.
7    (Recess taken.)
8    THE LEGAL VIDEO SPECIALIST:  We are
9  back on the record at 4:43 p.m.
10  BY MR. TSONIS:
11   Q.  All right. Mr. Grey, before we went on
12  break you were referencing -- we were looking at
13  an email from Mr. Gelderman, and I think you've
14  referenced your understanding of flex time.
15    Do you recall that?
16   A.  Yes.
17   Q.  What was your understanding of flex
18  time as a field investigator?
19   A.  That if we needed to take time to do
20  something personally, we could do that and just
21  make up -- make it up at some point during the
22  day.
23   Q.  Okay.  Ultimately, either as a field or
24  a desk investigator, you were the one figuring out
25  what you needed to complete in terms of tasks on a

Page 263

1        MICHAEL GREY
2  given day?
3   A.  Yes.
4   Q.  All right.  And you could figure out
5  when you needed to start work on any given day?
6   A.  Yes.
7   Q.  And you similarly would figure out when
8  you would end work on any given day?
9   A.  Yes.
10   Q.  Once a case -- well, strike that.
11    As an investigator part of your job was
12  to determine which investigative activities would
13  drive the case to closure, right?
14   A.  Yes.
15   Q.  All right.  And once you have closed
16  the case, would you submit it for approval?
17   A.  Yes.
18   Q.  Who would approve your cases?
19   A.  The supervisors.
20   Q.  You would not approve your own cases?
21   A.  At some point that changed, very late.
22  It was almost like everyone's got approved, but I
23  still think that Andrew was reviewing them.
24    But what would happen -- and -- and I
25  can only go back to Chet, and Toni, as well -- we

Page 264

1        MICHAEL GREY
2  would submit them, and it would show that it was
3  submitted, and then I'd get an email saying that
4  the case was closed and approved.
5   Q.  Okay.  Aside from the conversations
6  with Chet Janik that you'd referenced, are you
7  claiming that Chet Janik knew that you were
8  working off the clock for any other reason?
9   A.  I don't know if I understand what
10  you're saying.  Say that again.
11   Q.  Sure.  That was probably poorly
12  phrased.
13    Other than the oral conversations that
14  you talked about with Chet Janik, is there any
15  other basis that you're claiming Chet Janik knew
16  or should have known that you were working off the
17  clock?
18   A.  I think Chet knew that his entire team
19  was putting in more hours than our scheduled
20  hours.
21   Q.  And what's your basis for saying that
22  you -- you believe that?
23   A.  Just on conversations with him.
24    We definitely got an email at one point
25  that -- where we raised concerns about -- and I



Page 265

1  MICHAEL GREY
2  don't want to misquote the email, but it had
3  something to do with "I know the math doesn't add
4  up, but just get it done."
5     Q.  Okay.  So, aside from your
6  conversations with Mr. Janik and the email you
7  just referenced, is there any other basis that
8  you're claiming Mr. Janik knew that you were
9  working off the clock?
10    A.  My answer to that would be that it was
11 well known.  It -- it didn't need to be discussed
12 or put in documentation.  It was pretty much a
13 foregone conclusion.
14    Q.  Right.  I understand your testimony,
15 Mr. Grey.  I guess I'm just trying to be specific.
16       You've referenced oral conversations
17 with Mr. Janik and an email that you just
18 referenced about "the math not adding up."
19       Is there any other basis that you're
20 claiming Chet Janik knew that you were working off
21 the clock?
22    A.  I would say we had several
23 conversations, not just one.
24    Q.  Was that --
25    A.  There wasn't -- there wasn't any

Page 266

1  MICHAEL GREY
2  specific one.  It would just be like...
3     Q.  Right.  I don't think I said a singular
4  conversation.  If I did, I apologize.
5       Other than the conversations you have
6  referenced and email that you referenced, is there
7  any other factual basis that you're claiming that
8  Chet Janik knew your were working off the clock?
9     A.  No.
10    Q.  Okay.  What is the factual basis for
11 claiming that Toni D'Agata knew that you were
12 working off the clock?
13    A.  I -- that I don't know.  I never had
14 very many conversations with Toni.  So I don't
15 know.
16    Q.  So you -- you'd agree it's possible she
17 didn't know I were working off the clock?
18       MS. JEAN:  Objection.
19       THE WITNESS:  It's possible, but I
20    think it's highly unlikely that any of the
21    supervisors had questions that we were
22    working more hours than what was assigned to
23    us.
24 BY MR. TSONIS:
25    Q.  Ultimately, as an investigator, I mean,

Page 267

1  MICHAEL GREY
2  you could have chosen to just work, actually work
3  38.75 hours in a week, right?
4     A.  If I did, I wouldn't have gotten the
5  4.3s, and the 3.6s, and -- et cetera, in order to
6  get the merit raises and keep my job.
7     Q.  Okay.  But we did see, for example,
8  that there was one performance rating where you
9  could have closed ten less cases a month and still
10 be meeting expectation, right?
11    A.  That would have rated me a three, not a
12 five.
13    Q.  Sure.  But you wouldn't have been not
14 meeting expectations in that circumstance, right?
15    A.  Yes, true.
16    Q.  Okay.
17    A.  I would have been -- I would have been
18 mediocre, not high.
19    Q.  Okay.  And as an investigator, you
20 have -- do you have any personal knowledge of any
21 other investigators' off-the-clock work?
22    A.  Anyone that was on Chet Janik's team,
23 I -- I've had conversations with and where we
24 would discuss how we were working overtime, yes.
25    Q.  Who did you have those conversations

Page 268

1  MICHAEL GREY
2  with?
3     A.  I know I had one at -- towards the end
4  with Craig Costanzo and Brian Crozier as they were
5  the only two still field investigators, and I was
6  a desk investigator, and they were handling the
7  field, and I had an email exchange with Brian, and
8  I'm like, "How are you guys possibly getting the
9  work done that they're asking you to do in the
10 time frame?"  And his response is, "We're not.
11 We're just putting in the numbers to show that we
12 only worked 38.75 hours."
13    Q.  It's your testimony that he put in an
14 email, "We're not.  We're only putting in the
15 hours showing we're working 38.75 hours"?
16    A.  He -- it was either in an email or a
17 text to me, yes.
18    Q.  Okay.
19    A.  But he -- he's like, you know
20 working -- I don't know if he said he was like
21 working through his lunch, or figuring out how to
22 do it, but that he was able to not get in trouble
23 for working overtime.
24    Q.  Are you claiming as part of this
25 lawsuit that the time that you spent working off



```
1                         MICHAEL GREY

2                     C E R T I F I C A T E

3      STATE OF NEW YORK     )

4                            : Ss.

5      COUNTY OF NEW YORK    )

6              I, Kim M. Brantley, Shorthand

7      Reporter, and Notary Public within and for the

8      State of New York, do hereby certify:

9              That MICHAEL GREY, the witness whose

10     deposition is hereinbefore set forth, was duly

11     sworn by me and that such deposition is a true

12     record of the testimony given by the witness.

13             I further certify that I am not related

14     to any of the parties to this action by blood or

15     marriage, and that I am in no way interested in

16     the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18     my hand this 2nd day of February, 2025.

19
                        
20                      _____

21                      Kim M. Brantley

22

23

24     My Commission expires May 31, 2026.

25
```