# Exhibit X

# In the Matter Of:

## Fischer v Government Employees Ins.

2:23 Civ. 2848 (GRB) (ARL)

## DANIEL J. KING

*January 07, 2025*



800.211.DEPO (3376)
EsquireSolutions.com

Page 69

1  D. King
2  drive to investigate your cases?
3      A.   All the way up to Westchester
4  and all the way south to Staten Island, and
5  all the way east to -- maybe went for about
6  -- Smithtown or Commack.
7      Q.   And how much time did you spend
8  in the field in a day when you would go
9  into the field?
10     A.   Every day was different.
11     Q.   And you mentioned earlier that
12 the number of claims that you handled per
13 week fluctuated; is that correct?
14     A.   No.  Over time, yes.  But then
15 it would be a continuous -- could be
16 several months and it's X amount per week,
17 five cases a day, 15 cases a week.
18     Q.   Were those set -- were they --
19 were they completely set by GEICO, or did
20 it depend on when you were assigned cases?
21 Like was it the same every single week for
22 a set period of time, or did it depend sort
23 of on the week?
24     A.   For the most part, it was set
25 by GEICO.  If -- during summer months or

Page 70

1  D. King
2  Christmas months when more people were off,
3  you would more than likely get more than
4  five cases a day.
5      Q.   So, certain times of the year
6  were busier than others?
7      A.   Yes.
8      Q.   And why -- why in the summer
9  and winter months when people were off
10 would it be busier?
11     A.   Manpower.
12     Q.   What do you mean by that?
13     A.   People are entitled to
14 vacation.  They would take off.  It was
15 known if people are off, you're going to be
16 catching more cases to cover the workload.
17     Q.   And then when you would take
18 vacation, did you have other investigators
19 cover for you?
20     A.   Yes.
21     Q.   Did you determine which
22 investigators you would ask to cover for
23 you?
24     A.   No.  That was determined by the
25 supervisor.

Page 71

1  D. King
2      Q.   Were there any other factors
3  that made your workload heavier at certain
4  times?
5      A.   Yes.
6      Q.   What were those factors?
7      A.   Factors would be when, you
8  know, more steps were requested.  If EUOs,
9  you have them scheduled, and the day
10 before, the attorney or something cancels,
11 and then you have to reschedule EUOs.  And
12 it has to be a certain -- can't do it like,
13 okay, we're going to do it tomorrow.  You
14 know, you have to give the attorney and the
15 claimant or insured enough time to show up
16 for the EUO.
17     Q.   Any other factors?
18     A.   If, depending on the
19 supervisor, if she was -- certain days,
20 they would send cases back to you because
21 they didn't like the way something was, I
22 guess, written.
23     Q.   When you say send back to
24 you --
25     A.   You would -- I'm sorry.  Go

Page 72

1  D. King
2  ahead.
3      Q.   Sorry.  When you say send back
4  to you, are you referring to cases you
5  submitted for closure that the supervisor
6  would then review and either approve or
7  send back for more work?
8      A.   Correct.
9      Q.   How did -- strike that.
10         Can you describe for me the
11 case closure process at GEICO?
12     A.   You have your steps that you
13 need to go through, and then you have to do
14 a closing report.  And you have to
15 determine whether, in your closing report,
16 whether there was going to be an impact on
17 the case.
18     Q.   Can you break down what an
19 impact means?
20     A.   Impact would be whether GEICO
21 was paying for the damage or -- or maybe
22 GEICO's not going to pay the full amount of
23 damage and that's another level of a
24 closing.  So, you would get some impact out
25 of that case.



Page 73

1       D. King
2       If you determine there's fraud,
3  even if not -- even if it's not 100 percent
4  fraud, but if you determine that there is
5  some fraud involved or possibility of
6  fraud, that would be an impact.
7       Or if you can deny the claim
8  completely for fraud or -- or if the car
9  said it was stolen and then it was found
10 with no damage, or the insured doesn't want
11 to put a claim in anymore, that's an
12 impact.  So, there's a lot of variables.
13      Q.   Did any of your supervisors
14 send cases back to you more often than
15 others?
16      A.   Yes.
17      Q.   Who sent them back to you more
18 often?
19      A.   Dara Campbell.
20      Q.   Do you know why that was?
21      A.   I have my own thoughts.  That's
22 all I am going to say.
23      Q.   And what are your thoughts
24 about that?
25      A.   There was a new person who was

Page 74

1       D. King
2  assigned to the team, and he decided to
3  do -- add certain -- add more steps that
4  necessarily weren't requested by management
5  or by the supervisor.  But then I felt she
6  took it upon herself to have everybody do
7  these extra steps that seemed to take a lot
8  more time, and they necessarily weren't
9  helping the case.  The outcome would still
10 be the same.
11      Q.   Who was that individual
12 investigator that you mentioned?
13      A.   Kevin Dux.
14      Q.   Do you recall when
15 Dara Campbell first started implementing
16 these additional steps?
17      A.   Not a lot longer after he was
18 assigned to our team.
19      Q.   Do you remember when he was
20 assigned to your team?
21      A.   No, I don't.
22      Q.   Did you ever make any
23 complaints about that to Dara?
24      A.   I just said I don't -- yes.
25 Okay.  Yes, I did.

Page 75

1       D. King
2       Q.   What complaints did you make?
3       A.   I just said I don't feel that
4  his steps and -- that he does necessarily I
5  need to do.  I've been doing this job, I
6  let her know, a long time, and I haven't
7  had any complaints before or -- I never had
8  as many cases sent back before until she
9  started sending me his cases to review and
10 do it like this.
11      Q.   And what was her response?
12      A.   Basically, well, this is the
13 way I want you to do it.
14      Q.   And when you say the way that
15 she wanted you to do it, did you have a set
16 list of criteria that needed to be met?
17 Like what specific steps did he add?
18      A.   She -- she wanted to change the
19 verbiage also of how I was doing my -- the
20 same way I had been doing these cases for
21 several years without an issue.
22      Q.   And what specifically do you
23 mean by change the verbiage?
24      A.   She wanted things written a
25 certain way.

Page 76

1       D. King
2       Q.   Did she explain why?
3       A.   She felt that his way was
4  better.
5       Q.   Did she tell you that?
6       A.   Yes.
7       Q.   In what context did she tell
8  you that?
9       A.   Over the phone.
10      Q.   Do you remember when that
11 conversation took place?
12      A.   Within about a year and a half
13 before I retired or quit, I should say.
14      Q.   Do you remember if it was
15 before or after the onset of COVID in March
16 2020?
17      A.   It was after.
18      Q.   And how did that change impact
19 your caseload?
20      A.   It took me longer to complete
21 my caseload.
22      Q.   Do you know if other
23 investigators had the same workload that
24 you did?
25      A.   Steve Stemmler did.



Page 77

D. King
1  
2  Q. How do you know that?  
3  A. We were on, what I explained to  
4  you before, like the everything team. So,  
5  I knew that we were catching the same  
6  amount of cases per week, per month.  
7  Q. Did you talk to Steve about  
8  that?  
9  A. Yes.  
10 Q. How often?  
11 A. While I was working there, once  
12 every one week or two.  
13 Q. How often did you talk to Steve  
14 in general on a weekly basis?  
15 A. Not often.  
16 Q. Were you both performing your  
17 own cases? Is that why?  
18 A. Yes.  
19 Q. Do you know about the workloads  
20 of any other investigators other than  
21 Steve?  
22 A. Yes.  
23 Q. Which investigators?  
24 A. Keith Fischer and Scott Brady,  
25 and George McManus.

Page 78

D. King
1  
2  Q. And who is Scott Brady?  
3  A. Another investigator who works  
4  for GEICO.  
5  Q. Was he on your team?  
6  A. Yes.  
7  Q. And how did you know about his  
8  workload?  
9  A. Sometimes you would run into  
10 the -- the other investigators while  
11 conducting EUOs. They were conducting  
12 their own.  
13 Q. How often would you run into  
14 Scott Brady?  
15 A. I can't tell you.  
16 Q. Did you see him on a weekly  
17 basis?  
18 A. No.  
19 Q. Monthly basis?  
20 A. Probably once a month,  
21 possibly.  
22 Q. Would you run into Scott, Keith  
23 or George in any other context other than  
24 seeing them at -- at the EUOs?  
25 A. Not during that time, no.

Page 79

D. King
1  
2  Q. And when you say during that  
3  time, what do you mean?  
4  A. During the last couple of years  
5  of my -- my time at GEICO.  
6  (Clarified by the Court  
7  Reporter.)  
8  A. When I was employed at GEICO.  
9  Q. Do you know if Scott Brady --  
10 strike that.  
11 What did Keith Fischer say  
12 about his workload?  
13 A. That it wasn't as -- it wasn't  
14 as much as mine.  
15 Q. Do you recall when he said that  
16 to you?  
17 A. No.  
18 Q. Any other details from that  
19 conversation?  
20 A. I -- it was either him or  
21 George who said, wow, you guys are getting  
22 killed, meaning Steve and I.  
23 Q. Do you recall any other details  
24 of your discussions about your workload  
25 with Keith or George or Scott?

Page 80

D. King
1  
2  A. George had told me that, again,  
3  he couldn't believe how many cases that we  
4  were catching or being assigned, if you  
5  want to --  
6  Q. Did he say how many cases he  
7  had at the time?  
8  A. He didn't say the number, but  
9  he -- he said his workload was not as heavy  
10 as ours.  
11 Q. Do you recall any other  
12 conversations with anyone other than Keith,  
13 Scott or George about workloads?  
14 A. No.  
15 Q. And did those conversations  
16 take place in person or over the phone?  
17 A. In person.  
18 Q. Do you know about the workloads  
19 of any other investigators other than the  
20 individuals we mentioned?  
21 A. No.  
22 (Defendant's Exhibit 2, GEICO  
23 employee handbook, was marked for  
24 identification as of this date by the  
25 Reporter.)

Page 101

1           D. King
2   being compensated for them.
3       Q.   Do you remember who told you
4   about that lawsuit?
5       A.   Specifically, no.
6       Q.   Do you remember the substance
7   of how you learned about that lawsuit?
8       A.   I believe that I ran into -- if
9   I remember correctly -- different
10  investigators at -- while doing an EUO,
11  most likely in Queens.  I started talking
12  to different GEICO employees.
13      Q.   Do you remember which employees
14  you talked to about it?
15      A.   Honestly, I don't.  On that
16  specific day, I don't.
17      Q.   Did you attempt to participate
18  as a plaintiff or opt-in plaintiff in that
19  lawsuit?
20      A.   There was two separate
21  different lawsuits prior to this one.  One
22  of them I was a member of, the other one I
23  wasn't.  I don't recall the names of each
24  one, so I'm not sure which one you're
25  referring to.

Page 102

1           D. King
2       Q.   So, earlier you testified that
3   you had participated in a lawsuit against
4   GEICO, correct?
5       A.   Correct.
6       Q.   Do you remember if it was the
7   Calderon or Vetter lawsuit?
8       A.   If you could tell me which one
9   was the first one and which one was the
10  second lawsuit that was submitted, then I
11  can tell you.
12      Q.   I'm just asking from your -- if
13  you recall.
14      A.   I don't recall.
15      Q.   Do you recall the substance of
16  the Vetter v. GEICO case?
17      A.   No, I don't.
18      Q.   Do you remember who told you
19  about that case?
20      A.   I believe it might have been
21  Mike O'Sullivan.
22      Q.   And what did he tell you about
23  the case?
24      A.   If this is the second one, he
25  said, did you ask me if I submitted to that

Page 103

1           D. King
2   lawsuit?  And I said, no, I did not.  And
3   his response, I remember clearly, was,
4   well, I think it's too late now.
5       Q.   Did you ask him what he meant
6   by that?
7       A.   No.  I knew that you had to --
8   there was a timeframe to submit if you
9   wanted to get in on the lawsuit, and I
10  didn't move fast enough.
11      Q.   And you said that was the
12  second lawsuit?
13      A.   I was asking you if that was
14  the second lawsuit.
15      Q.   Okay.  But I am asking from
16  your understanding.  So, you're -- you're
17  the deponent, so I just want to make sure I
18  understand what you recall about these
19  cases.
20           So, you mentioned a first and a
21  second lawsuit?
22      A.   Correct.
23      Q.   And is it your understanding
24  that the first lawsuit is the one that you
25  did participate in?

Page 104

1           D. King
2       A.   Yes.
3       Q.   And the second was the one that
4   you did not participate in?
5       A.   Correct.
6       Q.   But you don't know if -- if
7   either of those is Calderon or -- or
8   Vetter?
9       A.   Correct.
10      Q.   You mentioned here that
11  following the Calderon and Vetter
12  settlements, GEICO reclassified me and
13  other special investigators from overtime
14  exempt to nonexempt.
15           So, were you reclassified from
16  overtime exempt to nonexempt?
17      A.   I believe I was.
18      Q.   Did somebody tell you that?
19      A.   I don't know.  I really don't
20  recall.
21      Q.   Do you know the difference
22  between overtime exempt and nonexempt?
23           MS. JEAN:  Objection.
24           THE WITNESS:  I need a
25      refresher, if you want to share it

Page 105

1           D. King
2    with me.
3    BY MR. SLOTNICK:
4        Q.   I am just asking if you recall
5    off the top of your head.
6        A.   I don't recall.
7        Q.   Did anyone at GEICO tell you
8    that you were being reclassified because of
9    the Calderon and Vetter settlements?
10       A.   I don't recall.
11       Q.   So, what is the basis of your
12   claim for this statement in paragraph six,
13   that following the settlements, they
14   reclassified you from overtime exempt to
15   nonexempt?
16       A.   I didn't know if somebody was
17   jumping in.
18            That I am not entitled to
19   overtime.
20       Q.   And if you look at paragraph
21   eight on page two, same page.
22       A.   Uh-huh.
23       Q.   So, you say, I only entered
24   7.75 hours per day regardless of how many
25   hours I actually worked.  I did not enter

Page 106

1           D. King
2    more hours into the timekeeping system as
3    my supervisor said doing so would
4    negatively affect my rating, giving me a
5    poor evaluation and negatively affecting my
6    potential for an annual pay increase?
7        A.   Yes.
8        Q.   And which supervisor are you
9    referring to here?
10       A.   Dara Campbell.
11       Q.   And where did that conversation
12   take place?
13       A.   On the phone.
14       Q.   Do you remember when it took
15   place?
16       A.   No, I do not.
17       Q.   Did that conversation take
18   place one time or more than once?
19       A.   There may have been another
20   version of the same conversation.
21       Q.   And what do you mean by another
22   version?
23       A.   I requested to get transferred
24   to the -- back to the medical team.
25       Q.   And who did you request that

Page 107

1           D. King
2    to?
3        A.   Dara Campbell.
4        Q.   And what was her response?
5        A.   She said that the manager most
6    likely would not do it and it would look
7    bad for you and me, meaning her.
8        Q.   Do you remember when that took
9    place?
10       A.   Sometime after the first
11   conversation.
12       Q.   But did either of those
13   conversations include discussing entering
14   7.75 hours per day with Ms. Campbell?
15       A.   It's that -- no, not in those
16   words, but it's that I cannot complete the
17   tasks in that amount of time.
18       Q.   That's what you told
19   Ms. Campbell?
20       A.   Yes.  I said I am falling
21   behind, and I am having trouble keeping up
22   with all the steps you keep adding.
23       Q.   And was this after Ms. Campbell
24   had implemented Kevin Dux's additional
25   steps that you testified about earlier?

Page 108

1           D. King
2        A.   Yes.
3        Q.   And do you recall what exactly
4    Dara's response was to you when you brought
5    that up to her?
6        A.   Which part?  I don't
7    understand.
8        Q.   The problems completing all of
9    the tasks in your allotted hours.
10       A.   She said I could shut you down
11   for a day or two to catch up.
12       Q.   Did she say anything else?
13       A.   She said -- not that I recall.
14       Q.   Had she shut you down before?
15       A.   There are times they'll not
16   assign cases to you like two or three days
17   before.  Let's say, you're going on
18   vacation for two weeks, they will -- they
19   will not assign you cases because you won't
20   make your TIP then.
21       Q.   What does TIP mean?
22       A.   Time in progress, I believe.
23       Q.   And what did that measure
24   specifically?
25       A.   If you were assigned a case



Page 109

1          D. King
2   today, there were certain steps that you
3   had to take and have them submitted within
4   the 24 hours to make your TIP.
5       Q.   What specific steps are you
6   talking about?
7       A.   You had to do an opening
8   statement about the case, why you were
9   assigned, what you were assigned about.
10  You had to do background -- initial
11  background checks on all the people
12  involved.
13          And there was another -- there
14  was another like basic same step that you
15  had to put in, basically saying what --
16  what other further steps of investigations
17  you were going to do.
18      Q.   Do you know if that TIP
19  requirement was in place throughout 2016 to
20  2022?
21      A.   Yes.
22      Q.   It was?
23      A.   Yes.
24      Q.   And back to your discussion
25  with Dara, I guess the first discussion,

Page 110

1          D. King
2   was anyone else on that call?
3       A.   No.
4       Q.   Do you have any written records
5   of that discussion with Dara?
6       A.   No, I don't.
7       Q.   Do you have any written records
8   of that second discussion you had with
9   Dara?
10      A.   No, I don't.
11      Q.   Did you ever put in a formal
12  request to transfer off her team?
13      A.   No, I did not.
14      Q.   If you look at paragraph nine
15  on the next page, you say, on my regular --
16      A.   Oh, paragraph nine?
17      Q.   Yeah, paragraph nine, page
18  three at the very top.
19      A.   Got you.
20      Q.   You say, my regular schedule
21  for GEICO was 8:00 a.m. to 4:30 p.m. with a
22  half-hour lunch.  I often worked until
23  5:00 p.m., and then I continued working
24  after dinner each day for an additional two
25  hours.  I worked about 50 hours a week on

Page 111

1          D. King
2   average?
3       A.   Correct.
4       Q.   And what time period is that in
5   reference to?
6       A.   That is from, I guess, COVID,
7   when we were -- you know, after COVID, then
8   we went -- were back to full, you know,
9   going out and doing everything.  You know,
10  not just staying at home until I resigned.
11      Q.   And when you say back to full,
12  what do you mean by that?
13      A.   Well, before we were -- because
14  of COVID, we weren't allowed to go out and
15  do investigations.  Everything had to be
16  over the phone, everything had to be --
17  EUOs had to be done over the phone.
18      Q.   So, during COVID, you were not
19  allowed to work in the field; is that
20  correct?
21      A.   Correct.
22      Q.   And do you remember how long
23  that was the case for?
24      A.   A year maybe, or a year and a
25  half.  I -- I don't particularly recall.

Page 112

1          D. King
2       Q.   And how did the fact that you
3   could not go into the field impact your
4   workload during that time?
5       A.   Some of it, it -- it helped.
6   We weren't catching as many cases as we
7   were prior or after COVID.  People weren't
8   out driving, people, weren't, you know,
9   committing fraud, I guess, during that
10  time.
11      Q.   Okay.  So, was the volume of
12  cases lower during that time?
13      A.   I believe it was.
14          MS. JEAN:  Apologies.  For
15      clarification, when you say that
16      time, can you state the time, if
17      possible, please?
18  BY MR. SLOTNICK:
19      Q.   During the time period we were
20  just testifying about in terms of
21  March 2020 to when you were allowed to go
22  back out in the field, that's -- that's the
23  time period.
24          MS. JEAN:  Because I was
25      still -- thank you.



Page 113

1  D. King
2  BY MR. SLOTNICK:
3  Q. So, is it your allegation that
4  you worked an additional two hours after
5  dinner every single day?
6  A. At least, yes.
7  Q. And what is that estimate based
8  on?
9  A. Based on the time that I spent
10 at my desk, I would go down and have
11 dinner. My wife would get home around
12 5:00. We'd have dinner, and then I would
13 go up and work for another two, two and a
14 half hours, just trying to -- to take care
15 of my TIP.
16 Q. Would you record that time?
17 A. There's an unofficial recording
18 if you -- if GEICO really wants to look.
19 Q. What do you mean by that?
20 A. Well, when I submit my cases or
21 I submit my cases to be reviewed for TIP,
22 or e-mails when my bosses are responding to
23 me or talking to me which were after hours.
24 Q. But when I -- just to go back
25 to whether you submitted for that time, I

Page 114

1  D. King
2  mean on the Workday app, did you actually
3  put in for these additional hours you claim
4  to have worked?
5  A. No, because I was told not to.
6  Q. Who told you not to?
7  A. Dara Campbell. And it was said
8  that they're not paying you overtime.
9  Q. Who said that?
10 A. Dara said that. There was a
11 guy -- the guy, Bill, the manager.
12 Q. Bill was another SIU manager
13 that you had?
14 A. Yeah, Bill. I can't think of
15 his last name. Oh, Newport. Bill Newport.
16 Q. And back to Dara. So, when did
17 she tell you that specifically?
18 A. I don't exactly recall.
19 Q. Do you remember when she said
20 that to you?
21 A. I know it was in the evening on
22 a phone call, but I don't remember the date
23 or -- I mean, this is all way before any
24 lawsuit was put in. So --
25 Q. Do you have any written

Page 115

1  D. King
2  correspondence of that discussion with
3  Dara?
4  A. No, I do not.
5  Q. And what exactly did Dara say
6  to you on the phone in that call?
7  A. I can't quote exactly what she
8  said.
9  Q. The sum and substance?
10 A. Okay. So, we discussed a
11 couple of things. Which one are you
12 referring to?
13 Q. I just want to know sort of
14 what Dara told you on that phone call with
15 respect to not putting in for your time
16 worked as you are testifying to.
17 A. Okay. Because I spoke about --
18 I spoke to her about getting transferred.
19 That was one phone call.
20 Q. Right.
21 A. And then he was talking about
22 one when I was saying I had trouble keeping
23 up. Is that what you're talking about?
24 Q. You just testified with respect
25 to Dara telling you that you would not be

Page 116

1  D. King
2  paid for that extra time after dinner,
3  correct?
4  A. She didn't just say me. She
5  said they're not going to pay you guys
6  after that, you know. They're not going to
7  pay more than 7.75.
8  Q. And what exactly did she say to
9  you about that?
10 A. I can't give you a quote. I
11 can't. I don't --
12 Q. Was that one conversation or
13 was that a number of conversations about
14 that topic specifically?
15 A. I've probably had several
16 conversations about that. Not so much as
17 far as overtime, it was more about how many
18 hours working just to get the job done --
19   (Clarified by the Court
20   Reporter.)
21 A. It would take to complete the
22 job, how many extra hours a day.
23 Q. Did Dara Campbell ever
24 encourage you to work extra hours off the
25 clock?



Page 117

    D. King
1
2   A. No.
3   Q. Did she ever suggest you work
4   extra hours off the clock?
5   A. Not to my recollection.
6   Q. And you had also mentioned
7   Bill Newport, SIU manager, correct?
8   A. Correct.
9   Q. Can you describe what he told
10  you about working those extra hours?
11  A. He never told me anything
12  specifically. I didn't really have many
13  conversations with him. I -- I don't think
14  I have ever had a one-on-one with him.
15  Q. Have you ever met Bill Newport?
16  A. Yes.
17  Q. Did you meet him in person?
18  A. Yes.
19  Q. So, who was Bill Newport
20  talking to when you learned of this?
21  A. The -- the supervisors. I'm
22  sorry. The supervisors.
23  Q. So, this is -- strike that.
24      Are you saying that this is
25  something Dara said that Bill said?

Page 118

    D. King
1
2   A. Yes.
3   Q. Understood. So, did Bill ever
4   directly tell you that?
5   A. No.
6   Q. Or any -- have any discussions
7   with you about your hours worked?
8   A. No.
9   Q. And what's your basis for the
10  estimation that you worked 50 hours a week
11  on average in paragraph nine?
12  A. My basis, that I would work
13  from 8 to 5. After dinner, I would go back
14  up, log on to my computer again and spend
15  another two, two and a half hours
16  attempting to make my TIP.
17  Q. And are you testifying that you
18  did this every single day?
19  A. I would say yes, I did. Yes.
20  Q. During what time period?
21  A. During post-COVID until I left.
22  Q. Did you ever work additional
23  hours before COVID?
24  A. At times. At times. But not
25  to the extent that I was the last two years

Page 119

    D. King
1
2   or three years.
3   Q. What do you mean by at times,
4   like how often?
5   A. If for some reason I got stuck
6   in traffic from coming back from doing an
7   EUO, but I had to get this in, you know, by
8   tonight at midnight, I would work the hours
9   to get -- to get the report in.
10  Q. Did you ever make any requests
11  with respect to those additional hours for
12  overtime pay?
13  A. No.
14  Q. Why not?
15  A. Well, because it was known that
16  they were not paying us overtime. So, I'm
17  not sure why I would even -- why ask?
18  Q. Did you ever receive overtime
19  pay while you worked at GEICO?
20  A. I testified earlier that I did
21  when I was -- they had those extra cases,
22  the social media cases. Yes, I was paid
23  overtime.
24  Q. I think you testified to the
25  social media cases and the Superstorm Sandy

Page 120

    D. King
1
2   cases, correct?
3   A. I wasn't paid for Superstorm
4   Sandy. I -- you asked if anything was
5   available to anybody.
6   Q. Right. Other than the social
7   media cases though, did you ever put in a
8   request for overtime pay?
9   A. No.
10      MR. SLOTNICK: Off the record.
11      THE VIDEOGRAPHER: All right.
12   Off the record at 12:29.
13      (Whereupon, an off-the-record
14   discussion was held.)
15      (Whereupon, a short break was
16   taken at this time.)
17      THE VIDEOGRAPHER: Okay. Back
18   on the record at 1:26.
19  BY MR. SLOTNICK:
20  Q. Mr. King, before we broke, we
21  were reviewing your declaration?
22  A. Yes.
23  Q. So, if you could turn to
24  paragraph ten on page three in -- in
25  Exhibit 4.

```
 1                        D. King
 2                  C E R T I F I C A T E
 3
 4   STATE OF NEW YORK      )
                            :
 5   COUNTY OF RICHMOND     )
 6
 7         I, MARINA DUBSON, a Notary Public for
 8   and within the State of New York, do hereby
 9   certify:
10         That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14         I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19         IN WITNESS WHEREOF, I have hereunto
20   set my hand this 7th day of January 2025.
21
22
23              
                       MARINA DUBSON
24
25
```