# Exhibit Z

**In the Matter Of:**

**FISCHER V. GEICO**

2:23 Civ. 2848

**CONSTANCE MANGAN**

*August 09, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

Page 81

1         CONSTANCE MANGAN
2   Q.  Yeah.
3      (Witness reviews document.)
4   A.  Okay.
5   Q.  Okay.  On the left-hand side under
6 "Learning Record," there is various boxes in the
7 table for the different types of learning record.
8 So for example, at the first one it says "Cap
9 Awareness Training," then if you keep going down
10 you see, "Safeguarding Customer Privacy," "In This
11 Together Training," "Cap Awareness Training,"
12 "Diversity Training."
13      Do you recall any of these trainings
14 that you received?
15   A.  Well, reviewing this document
16 definitely helps my recollection that I had these
17 trainings.
18   Q.  Okay.
19   A.  So.
20   Q.  So --
21   A.  Yes.
22   Q.  Okay, so there's no reason to disagree
23 that you participated and completed these
24 trainings throughout your tenure with GEICO?
25   A.  I don't have any basis to dispute them.

Page 82

1         CONSTANCE MANGAN
2 I believe I may have done all of them.
3   Q.  I want to take a peak then at the dates
4 going to be April 28th, 2016.  Just let me know
5 whenever you get there.
6   A.  Okay.  April 28th, 2016 you said?  Is
7 that right?
8   Q.  Yep.
9   A.  Okay, yes.  I see it.
10   Q.  So that would have been a policy and
11 acknowledgment of 2016 that you would have
12 completed and passed.
13      Do you recall this training?
14   A.  I don't recall it specifically,
15 independently of this report, but looking at it, I
16 would agree that I completed it.
17   Q.  Okay.  And if we go to April 26th,
18 2018, it would be the very next page.  Again there
19 was a 2018 Policies and Acknowledgements that you
20 completed and passed.
21   A.  I see it.
22   Q.  And do you have any reason to disagree
23 that you weren't trained and completed and passed
24 this training module in April of 2018?
25   A.  I have no reason to dispute it.

Page 83

1         CONSTANCE MANGAN
2   Q.  Okay.  And if you flip to the next page
3 on June 19th, 2019, again we now have a revised
4 2019 Policies and Acknowledgment in which it
5 states that you completed and passed this training
6 module.
7      And do you have any reason to dispute
8 that you received and passed this training module?
9   A.  I'm sorry.  I see three trainings close
10 together, so -- okay, there is it is.  I see it.
11   Q.  Yeah.
12   A.  Okay.  Yeah, based on my review of this
13 record, I would say that I took and passed that
14 training.
15   Q.  Okay.
16   A.  Yep.
17   Q.  All right.  You could set Exhibit 3 to
18 the side.
19   A.  Okay.
20   Q.  I apologize.  I don't mean to confuse
21 anyone.
22   A.  No, that's fine.
23   Q.  Okay, if you want to pull back Exhibit
24 Number 2 in front of you.
25   A.  Okay.  Done.

Page 84

1         CONSTANCE MANGAN
2   Q.  Okay.  So we'll go back and look at
3 then Exhibit 2, G000039, where we were talking
4 about the Overtime Eligibility Policy.
5      Based off what we read and looked at
6 where it indicates that, "All nonexempt employees
7 are required to accurately record their hours work
8 and absences taken," you understood that this
9 policy did not allow for working off the clock?
10     MS. COLE-CHU:  Objection to form.
11     THE WITNESS:  Yeah, I would not say
12   that was my understanding.
13     I -- I would say that this is what the
14   policy says, but my understanding of it,
15   based on the practice, would be different
16   from that.
17     Although it does say that "You should
18   report any issues you had to your
19   supervisor," that is something I strictly
20   followed.
21 BY MS. ALBERTY:
22   Q.  Okay.
23   A.  Yeah.
24   Q.  As if applies to the remaining titles
25 that's mentioned in this policy -- so, "If you



Page 85

1  CONSTANCE MANGAN
2  feel that you didn't receive pay for all hours
3  worked to contact local human -- your local human
4  resources manager," did you contact anybody in HR
5  regarding any type of failure to pay?
6      A.  I did not contact human resources.
7      Q.  Okay.  And either a local or corporate
8  human resources, did you contact either one?
9      A.  I did not.
10     Q.  You stated you went to your supervisor
11  to tell them that you felt you were not getting
12  paid for all your hours worked.
13         Is that correct?
14     A.  Yes.
15     Q.  Who is that person?
16     A.  That would be all of the supervisors
17  that I named, so that would be Kevin Moynihan,
18  April Neyland, Dara Campbell, Toni D'Agata, and
19  Brian Portnoy, and our department manager, Bill
20  Newport.
21     Q.  Okay.  Were going to start with Kevin.
22  I believe you said that Kevin retired, as you
23  believe, before 2016.  So any complaints that you
24  had would have been before 2016, that you reported
25  to Kevin, correct?

Page 86

1  CONSTANCE MANGAN
2      A.  If my estimate of when he retired is
3  correct, then that would be correct.
4      Q.  Then we'll go down to April.  Do you
5  recall when you reported pay issues to April?
6      A.  I don't recall specific dates, but in
7  my communications with all of my supervisors
8  during my time at GEICO, there were conversations
9  about working in excess of my scheduled hours in
10  order to complete my cases in a timely manner.
11     Q.  But as to when you contacted your
12  individual supervisors, you can't tell me say for
13  example even the year that you would have made
14  that report?
15     A.  Well, what I'm saying is that it was a
16  constant conversation.
17         So, if you ask me to name a specific
18  day, I would not be able to do that, but this was
19  a constant conversation and a source of -- of an
20  issue, and so it was something that I constantly
21  brought to the attention of my supervisors.
22     Q.  In what mode of communication did you
23  bring your complaints?
24     A.  In person, on telephone calls, at --
25  possibly in emails as well.

Page 87

1  CONSTANCE MANGAN
2      Q.  For the in person, if you primarily
3  worked from home and -- or in the field, how were
4  you reporting your concerns in person?
5      A.  Oh, we had meetings with our
6  supervisors.  Sometimes our supervisors would -- I
7  believe I explained this with Brian Portnoy, but
8  sometimes our supervisors would meet us out at --
9  on our cases, meet us at a court reporting
10  facility where we were doing an examination under
11  oath, or I can remember meeting Dara Campbell in a
12  Starbucks once, just to have a meeting with her.
13         So we did meet with them in person.
14     Q.  Any of the email communication that you
15  had where you were raising your concerns, would
16  that have been done through your GEICO email or
17  your personal email?
18     A.  I did not use my personal email for any
19  GEICO matters.  So, any emails related to GEICO
20  business would have been on a GEICO computer.
21     Q.  Would you have sent any text messages
22  in your custom and practice?
23     A.  Oh, we never really texted.  It wasn't
24  something we used frequently.
25         Initially we had Motorola flip phones

Page 88

1  CONSTANCE MANGAN
2  for a very, very, very long time, then we had a --
3  I believe it was a Samsung Galaxy, but texting was
4  not something I recall doing often at all with
5  supervisors.
6      Q.  Was there any integrative software
7  platform that was utilized for GEICO during 2016
8  to 2020, such as Slack, Teams, Jabber, Cisco
9  Webex, if you know?
10     A.  I'm not sure.  I don't know.
11     Q.  As a nonexempt employee you were paid
12  hourly, correct?
13     A.  Well, we were paid weekly, but I had an
14  hourly rate, yes -- or biweekly I believe we were
15  paid.
16     Q.  Do you remember what your weekly --
17  strike that.
18         Do you remember what your yearly hourly
19  rate was from 2016 to 2020?
20     A.  My hourly rate I recall was
21  approximately $41 an hour.
22     Q.  Did you make any bonus or commissions?
23     A.  No, no.
24     Q.  Do you recall what the HRIS system was
25  in 2016 to 2020?  What I mean by that is the human



Page 101

```
1              CONSTANCE MANGAN
2    Let's take a peak at page --
3        A.  Sure.
4        Q.  -- three, and then number nine.
5        A.  Did you say number nine?
6        Q.  Yep.
7        A.  Oh, okay.  Thank you.
8        Q.  So number nine states, "My supervisor
9    told me I could work up to -- only up to 38.75
10   hours per week, even though I had frequent
11   conversations with my supervisors that it was not
12   possible to complete our work within these hours.
13        "Accordingly, I enter only 7.75 hours
14   per day, five days a week, regardless of how many
15   hours I actually worked."
16        As to the consistency in -- your
17   declaration that states "further conversations
18   with my supervisors," can you tell me at any time
19   when that occurred?
20       A.  I'm sorry, could you ask me that
21   question again?
22       Q.  Sure.  And I -- I'm looking at the
23   first sentence of declaration number nine where it
24   says "frequent conversations with my supervisors,"
25   where you were saying you couldn't complete your
```

Page 102

```
1              CONSTANCE MANGAN
2    work within these hours.
3        A.  Right.
4        Q.  Can you tell me when those
5    conversations occurred with your supervisors?
6        A.  Well, frequently we had those
7    conversations, and we had conversations outside of
8    actual official meetings.  We had conversations on
9    the phone, or conversations via email from time to
10   time.
11        So, frequent, I -- I can't really nail
12   that down I don't think to anything much more
13   specific than that.
14       Q.  And I believe from what you testified
15   to where the conversations took place would have
16   been in person, on the phone, or via email.
17       Is that right?
18       A.  Yes, that would be accurate.
19       Q.  When you had these conversations within
20   any mode of communication, was there anyone else
21   who would have been present to hear your
22   complaints, other than you and your supervisors?
23       A.  Well, for any non -- any conversation
24   not in person, it would be impossible for me to
25   answer that for anyone other than myself.
```

Page 103

```
1              CONSTANCE MANGAN
2        So for myself, I would say that I was
3    alone during those conversations.
4        Q.  Did you ever record any of these
5    conversations?
6        A.  No, I did not.
7        Q.  Under -- same page --
8        A.  Okay.
9        Q.  -- on number eleven, you state, "GEICO
10   required me to seek approval from my supervisor to
11   submit any hours worked above 38.75."
12       Which supervisor told you that?
13       A.  If I had to name a specific supervisor,
14   I can recall having that conversation with Brian
15   Portnoy, with Toni D'Agata, and I believe Dara
16   Campbell, I believe, to the best of my
17   recollection.
18       Q.  Do you recall when they had told you
19   this?
20       A.  Any time I brought up the amount of
21   hours I was actually working to complete my cases,
22   and we discussed the possibility of being paid
23   overtime for it.  So that would be when we would
24   have those conversations.  Not specific dates.  I
25   don't know.
```

Page 104

```
1              CONSTANCE MANGAN
2        Q.  Would this be consistent with -- strike
3    that.
4        Where did these conversations take
5    place?
6        A.  The -- the same as I previously
7    testified.  I believe -- I can't think of anything
8    outside of either a telephone call, or an email
9    conversation, or an in-person conversation.
10       Q.  Would it be true then it was just the
11   two of you having those conversations, nobody else
12   would be involved?
13       MS. COLE-CHU:  Objection to form.
14       THE WITNESS:  Yeah, I can only answer
15   again for myself, because I'm in my home on
16   my computer.
17       Whether or not my supervisor was alone
18   or in the presence of anybody else, I don't
19   know.  I couldn't answer that.
20   BY MS. ALBERTY:
21       Q.  So any time that you had complaints
22   that you had to exceed then the 38.75 hours in a
23   work week, Brian, Toni, Dara would then talk to
24   you about entering in overtime, correct?
25       MS. COLE-CHU:  Objection to form.
```



Page 105

1           CONSTANCE MANGAN
2     THE WITNESS: Yeah, I'm going to have
3  to ask you to repeat that question again.
4 BY MS. ALBERTY:
5    Q. Sure.
6    A. I got a little lost in there.
7    Q. That's okay.
8     I think you said any time you would
9 bring up the amount of time it would take for you
10 to do your job and exceed then the 38.75 hours,
11 that your supervisors would then bring up the
12 discussion of overtime?
13    A. That's not correct. If I testified to
14 that, then that's not correct.
15     It's -- we would constantly have
16 conversations about working hours in excess of the
17 7.75 per day. There was a time when overtime was
18 offered, and there were times when we had
19 conversations about that offered overtime.
20    Q. Okay, so GEICO offered overtime. Did
21 you enter your overtime hours?
22     MS. COLE-CHU: Objection to form.
23     THE WITNESS: I can recall submitting
24 overtime hours on very few occasions.
25

Page 106

1           CONSTANCE MANGAN
2 BY MS. ALBERTY:
3    Q. When you submitted your overtime hours,
4 were you paid for that overtime?
5    A. To the best of my recollection I was
6 paid for the overtime I submitted, yes.
7    Q. Okay, number twelve of your
8 declaration, which is going to be page three and
9 four, states "The process for requesting overtime
10 approval was onerous and deterred me from
11 reporting overtime I worked."
12    A. I see that.
13    Q. In -- in what way do you mean that it
14 was "onerous"?
15    A. To me it felt onerous due to the fact
16 that I had to contact my supervisor; I had to
17 request permission to submit for overtime; I had
18 to cite a specific case or cases that I would
19 require the overtime for, and then I had to
20 specify the number of hours I anticipated needing
21 to complete that task on that day that would
22 require overtime.
23     Now, if I underestimated, I was not
24 permitted to correct it. So if I said, "I'm going
25 to need two more hours" because, I'm guessing, it

Page 107

1           CONSTANCE MANGAN
2 could potentially be approved, and then I could
3 get two hours.
4     But the supervisors consistently told
5 us we only work 7.75 hours a day, we only work
6 38.75 hours a week, in spite of the fact that I
7 was working overtime on a regular basis every
8 week.
9    Q. Okay.
10    A. Okay.
11    Q. But you -- you were already in contact
12 with your supervisors. So contacting your
13 supervisors wasn't anything that was abnormal.
14 You were already doing that, right?
15     MS. COLE-CHU: Objection to form.
16     THE WITNESS: To me it's an additional
17 procedure that took time, and because I was
18 so crunched for time, and we were all so
19 pressed for time, it seemed like even the
20 smallest thing was just another layer,
21 another thing, another procedure that we had
22 to go through in order to get this process
23 done.
24     So, because of the circumstances I
25 already felt that I was in, to add another

Page 108

1           CONSTANCE MANGAN
2 thing to that was onerous and -- and to -- to
3 me excessive.
4 BY MS. ALBERTY:
5    Q. When you made the request, how would
6 you do it?
7     MS. COLE-CHU: Objection to form.
8     THE WITNESS: So the request for
9 overtime, to the best of my recollection, was
10 via email to my direct supervisor.
11 BY MS. ALBERTY:
12    Q. When you made the request for overtime,
13 was it always approved?
14    A. To the best of my recollection, I would
15 say yes, but I made, as I said, very few requests.
16 BY MS. ALBERTY:
17    Q. Do you recall specifically who you made
18 the request through? And what I mean by that is
19 not just the general supervisors, like a named
20 person.
21    A. Well, the supervisors that I had, which
22 would have been Brian Portnoy, or Toni D'Agata, or
23 Dara Campbell, going back to Kevin Moynihan, but
24 that's again possibly before 2016, so.
25    Q. So as far as the process of emailing



Page 109

1      CONSTANCE MANGAN
2  your supervisor saying to him, "I'm going to need
3  X amount of overtime hours for these cases this
4  week," that was something that you were doing
5  while you were under the supervision of Kevin as
6  well?
7      A.  We never submitted for overtime when I
8  worked for Kevin Moynihan.  I don't even recall
9  overtime being an option when I worked for Kevin
10 Moynihan.
11         The subject of ever submitting overtime
12 came up sometime later, but I don't know when.  I
13 could not even tell you a year, because I just
14 don't recall.
15     Q.  Did you ever have the time that you
16 underestimated the amount of overtime that you
17 needed and had to go back and ask for more time?
18     A.  I never went back to ask for more time,
19 but I would sometimes work more than what I had
20 submitted for.
21     Q.  Why wouldn't you go back and ask for
22 more time?
23     A.  My understanding was that overtime was
24 discouraged, and to go back and try to get an
25 additional hour approved on top of the two hours I

Page 110

1      CONSTANCE MANGAN
2  had already requested, I didn't feel confident
3  that it would be approved, and I also did not
4  really want to have to go through another process
5  of submitting a request for an approval and
6  specifying a case for another hour of overtime,
7  especially when my -- my supervisors were saying
8  we shouldn't be doing it.
9      Q.  What do you mean -- excuse me, what do
10 you mean that you felt your overtime requests were
11 discouraged?
12     A.  Because our -- as I have stated and I
13 would tell my supervisors, there is no way I can
14 complete my investigations, my reports, within the
15 time frame of 7.75 hours a day; that in order to
16 complete my work I had to work in excess of those
17 hours on a regular basis.
18         And the response that I received from
19 my supervisors -- and that would be all of the
20 supervisors that I have named so far -- was that
21 Don't do overtime.  Work 38.75; work 7.75."
22         My response would be, "But I have to,
23 because it affects my performance evaluation.  It
24 affects my case rating.  There's no way that I can
25 do -- finish these cases if I don't work more than

Page 111

1      CONSTANCE MANGAN
2  my normally scheduled hours."
3         And they would say, "We understand, but
4  there's nothing we can do about it."
5      Q.  But you had the ability, though, to
6  still request overtime?
7      A.  The problem to my understanding with
8  requesting overtime was that affected my ability
9  to -- not my ability, I apologize.  It affected my
10 qualification to be assigned more cases.  So,
11 while I was already feeling extremely
12 overwhelmed -- I can recall having this
13 conversation with Toni D'Agata especially, not on
14 a particular date, but I can remember having this
15 conversation with her, that -- and I -- I believe
16 Dara as well -- that if you submitted say in a
17 week that you worked fifty hours, that would then
18 trigger the assignment of more cases to you,
19 because you are now available on more hours.
20         So, I'm doing the overtime to complete
21 the cases I already have -- and I'm failing to do
22 that a lot of the time -- and now if I submit all
23 of my actual overtime hours, all of the hours that
24 I was working, say fifty hours, that would then
25 trigger the assignment of additional cases adding

Page 112

1      CONSTANCE MANGAN
2  to my caseload.  And the supervisors didn't want
3  us to do that.  They knew he had an unmanageable
4  and unreasonable caseload, and they constantly
5  told me and -- and everybody -- not everybody, but
6  most the people that I spoke with and worked with
7  that I knew and had conversations with, that we
8  were limited to a 7.75-hour day, in spite of the
9  fact that we were all complaining and all saying
10 that we're all working way past that.
11         There was -- just seemed to be no
12 avenue to satisfy that problem.
13     Q.  With regard to supervisors saying
14 "Don't do overtime" -- I think that's what the
15 phrase you had stated --
16     A.  Yeah.
17     Q.  Was that ever in any type of GEICO
18 policy?
19         MS. COLE-CHU:  Objection to form.
20         THE WITNESS:  My recollection of those
21 conversations were specifically telephone
22 conversations, in-person conversations,
23 predominantly.
24 BY MS. ALBERTY:
25     Q.  Do you ever recall seeing that in an



Page 113

1  CONSTANCE MANGAN
2  email?
3  A. I don't recall it independently. Is it
4  possible there ever was one? Maybe.
5  Q. In the testimony that you provided,
6  that if you submit more hours you would get more
7  cases --
8  A. Correct.
9  Q. -- that's your understanding of the
10 process, correct?
11 A. Based on information from my
12 supervisor.
13 Q. Who told you that?
14 A. I recall specifically Toni D'Agata
15 telling me that, and I believe also Dara Campbell
16 told me that.
17   Because I was torn between I submit the
18 actual hours I was actually working, and then
19 being buried in additional cases. And the
20 supervisor's answer to that is, "You do 38.75 a
21 week. If you put in for overtime, you're going to
22 get more cases."
23 Q. Do you know if that was a glitch in the
24 software?
25   MS. COLE-CHU: Objection to form.

Page 114

1  CONSTANCE MANGAN
2   THE WITNESS: As far as I understand
3   it, that is exactly the way the matrix was
4   designed.
5  BY MS. ALBERTY:
6  Q. Did you ever see that in any type of
7  policy or written format, that that was the
8  condition's precedent?
9  A. Not to my recollection.
10 Q. Going back to your declaration on page
11 three to four, it states, "First I needed to
12 accepted an email requesting -- request outline
13 the additional hours I needed to work on a
14 specific case for supervisor approval, and if
15 approved I could then put in the approved hours of
16 my time sheet and not the time actually spent on
17 my work."
18   What do you mean by "if approved I
19 could only put in the approved hours in my time
20 sheet and not the time I actually spent on my
21 work"?
22 A. So that is, if I were to estimate to my
23 supervisor that on this case number and for this
24 reason I'm going to need two-and-a-half hours of
25 overtime today, they would say, "Okay, you got it

Page 115

1  CONSTANCE MANGAN
2  it," if that was the case...
3   If I actually spent three hours on it,
4  or a little longer than that, I -- I -- that was
5  never an option, in my opinion, based on the
6  responses from my supervisors, to request that
7  additionally. It's like once it's in and the --
8  and the time is in, I don't know if there was any
9  system to correct that.
10 Q. Did you ever see any policy stating
11 that you could only submit your OT once and then,
12 what you testified to, you're locked out of the
13 system?
14 A. Not that I'm aware of.
15 Q. And I think you said you never went
16 back a second time to say, "Hey, I actually need
17 more time. I underestimated," correct?
18 A. I don't recall if I ever specifically
19 mentioned that I ended up working four hours
20 instead of two hours. I may have. But I don't
21 recall ever requesting that additional time for
22 compensation.
23 Q. But you could have, correct?
24 A. I don't believe I could. That's why I
25 didn't. I didn't believe that I could.

Page 116

1  CONSTANCE MANGAN
2  Q. But you never saw it in any type of
3  policy from the company saying you can't go back
4  and ask for more OT time, correct?
5  A. Well, you refer to "policy," and I
6  understand what you're saying, but I see it as the
7  practice of the company.
8   So what may or may not have been policy
9  or in writing, the practice that was in place,
10 that to me was what we were going by, the actual
11 practices that we -- we had to comply with.
12 Q. With these concerns you had, why
13 wouldn't you have brought that to human resources?
14 A. I do no faith in human resources to be
15 helpful to us in any way.
16 Q. And what's your basis of that opinion?
17 A. We had had a -- I not personally, but
18 another person in the office, or a couple of
19 people in the office had gone to human resources
20 in the past with complaints about a supervisor who
21 was consistently rude and inappropriate, and Paula
22 Tellerman in fact, who I believe I mentioned
23 earlier, was one of the people who had gone to
24 human resources for that -- a wonderful employee
25 with forty years of service -- and our feeling was



Page 129

1     CONSTANCE MANGAN
2  A.  I know he worked overtime.  I don't
3  remember if he ever told me that he was denied
4  overtime.
5     Q.  Do you know if Mike Sullivan submitted
6  for overtime and was denied?
7     A.  I do not know if he was denied.
8     Q.  Do you know if Charise Jones submitted
9  for overtime and was denied?
10    A.  I do not know if she was denied.
11    Q.  Do you know if Louis Pia submitted
12  overtime and was denied?
13    A.  I do not know if he was denied.
14    Q.  And do you know if John Moeser
15  submitted overtime and was denied?
16    A.  I do not know if he was denied.
17    Q.  Do you know if any of these people that
18  you commiserated with over the overtime ever went
19  to human resources?
20    A.  Not to my knowledge, but I don't know
21  for sure.
22    Q.  Okay.  Let's go to actually paragraph
23  ten.  It states, "GEICO set a regular schedule of
24  me starting anywhere between 7:00 to 9:00 a.m.
25  and ended between 3:00 to 5:00 p.m., but I

Page 130

1     CONSTANCE MANGAN
2  regularly worked more hours from late 2016 to
3  approximately May of 2020, and I started working
4  between 7:00 a.m. and 8:00 a.m. and worked until
5  approximately 7:00 p.m.
6     "I worked about fifty to sixty hours a
7  week on average during this time period."
8     On what do you base these estimates?
9     A.  I based these estimates on the actual
10  time I spent working at my computer or reviewing
11  documents related to my cases.
12    Q.  Did you have any type of tracking
13  mechanism for your hours, such as that you did
14  manually, in a Word document, handwritten, so that
15  you would say, "I'd start my day today at 8:00 and
16  I actually ended at 7:00"?
17    A.  Well, we would submit our hours through
18  the time reporting system, which of course I can't
19  remember the name of.  But I also do know that
20  SICM is -- has I think they call it case
21  timestamps.  So your time spent in the case
22  reporting system is also documented, but you're
23  not always in the case system.
24    But certainly I believe if you're on
25  the computer, the supervisors had the ability to

Page 131

1     CONSTANCE MANGAN
2  know when you're on your computer or not.
3     Q.  Are you assuming that, or do you have
4  knowledge?
5     A.  I'm sure they could.
6     Q.  Again, are you assuming that, or do you
7  have knowledge that a supervisor could go in and
8  see the time stamps of what you login and are on
9  your computer?
10    A.  My understanding is that they could,
11  yes.
12    Q.  How do you know that?
13    A.  From what we were told.  That they
14  could -- they would know when we were on our --
15  whether we were on our SICM or signed into our
16  computers.
17    There was some monitoring system on the
18  computer.  I can't think of the name of it.
19    Q.  Who told you that?
20    A.  Supervisors, management, other
21  investigators.
22    Q.  Right, and I'm trying to get to more
23  specificity on who.
24    A.  Oh, well, my supervisors, that they
25  would know when we were on the computer, they

Page 132

1     CONSTANCE MANGAN
2  would know when we were on SICM, that they were
3  able to tell from their computer, if we were.
4     Q.  You stated that you would enter your
5  time every day, but in the same breath you're
6  saying, "I didn't actually enter my time that
7  exceeded 7.75."
8     So did you have a time reporting system
9  that you personally kept that said, "I worked this
10  day, these hours"?
11    A.  Oh, I see what you're asking, okay.
12  Like difficult a diary or something along those
13  lines?
14    (Ms. Alberty nods head in the
15  affirmative.)
16    A.  No.
17    Q.  So you wouldn't have recorded your time
18  anywhere other than in GEICO's timekeeping
19  program, right?
20    A.  For actual hours worked.
21    And sometimes -- I just though of this.
22  Sometimes I would be exchanging an email with a
23  supervisor at 8:00 o'clock at night.  So I would
24  have submitted my hours for the day of 7:00 to
25  4:00, and then still be having an email



Page 133

1  CONSTANCE MANGAN
2  conversation with a supervisor past those hours.
3      So that was -- that was another way
4  that they would know that I was still working,
5  because they were still working.
6      Q.  And it's your testimony that you
7  weren't provided flex time, and you were supposed
8  to be working from that 7:00 a.m./9:00 a.m. to
9  3:00 p.m./9:00 -- 5:00 p.m., correct?
10     A.  Right, yes.
11     Q.  Is it fair to say that you can't
12 specifically itemize every week in which you
13 allegedly exceeded forty hours a week?
14     MS. COLE-CHU:  Objection to form.
15     THE WITNESS:  Just if you could clarify
16   what you mean by "itemize."
17 BY MS. ALBERTY:
18     Q.  Sure.  So say, "May 22nd through May
19 27th I worked fifty-five hours that week."
20     A.  That's difficult to do, a specific week
21 like that.
22     I know when I made -- when, you know,
23 these were signed in November.  I remember when I
24 made my declaration sometime last fall, we tried
25 to nail down a week, which was a little easier at

Page 134

1  CONSTANCE MANGAN
2  that time because it was a little further back
3  than today.  I know that at one point we -- we
4  settled on a week in September that I could more
5  specifically recall working the over time.  But I
6  don't have any document to reflect that, like a --
7  like you said, like a diary or some personal or
8  independent record.
9      Q.  Sure.  So as -- then back to the
10 question, which is the itemization of every week,
11 for fifty-two weeks, from 2016 to 2020, you can't
12 go itemization every week to what hours you worked
13 over the forty-hour work week, correct?
14     MS. COLE-CHU:  Objection to form.
15     THE WITNESS:  I -- well, I'm struggling
16   to make sure that I'm answering you
17   correctly, and honestly, and fully.
18     I don't have an -- independent of the
19   GEICO systems, I don't have any independent
20   records of specific itemized time or hours
21   worked.
22 BY MS. ALBERTY:
23     Q.  Okay.  So as to then, at least in
24 paragraph ten, where you're stating, "I worked
25 about fifty to sixty hours a week on average

Page 135

1  CONSTANCE MANGAN
2  during that time period," you're assuming that you
3  exceeded the forty-hour work week between ten to
4  twenty-five hour weekly difference, right?
5      A.  I'm sorry, say that one more time.
6      Q.  So in -- in paragraph ten --
7      A.  Right.
8      Q.  -- you state, "I worked about fifty to
9  sixty hours a week on average."
10     Because you didn't have any type of
11 itemization of every week you exceeded the forty
12 hours, you were then assuming that you exceeded
13 forty hours by then the ten to twenty-five hours,
14 correct?
15     MS. COLE-CHU:  Objection to form.
16     THE WITNESS:  That's not actually
17   correct.  And I can hopefully clarify that a
18   little bit, by saying that it also says here
19   that I "started on a more regular basis
20   between 2016 and 2020 between 7:00 and 8:00
21   a.m."
22     And the way that I would know how long
23   I had been working past what the end of my
24   day was, if I had, say, started at 7:00 -- is
25   that I'm a huge Jeopardy fan, and I know that

Page 136

1  CONSTANCE MANGAN
2  Jeopardy in New York comes on at 7:00
3  o'clock.  So my gauge of how much I was
4  working past the end of my scheduled tour
5  often depended on, did I catch Jeopardy, or
6  did I miss Jeopardy, was Jeopardy on.  That
7  was just something that I -- I used
8  personally as a gauge to kind of try and have
9  a feel for when I was working, because it was
10  easy to be sitting on that computer and look
11  up and realize it was 9:00 o'clock, or 9:30,
12  or 8:00 o'clock.
13     So, for me the beginning of when I
14  should at least try to think of wrapping up
15  and getting as much work done as possible was
16  around the Jeopardy mark of 7:00 o'clock.
17  That was when I would start to say, how much
18  more should I do? how much more can I do
19  without making mistakes, because now I'm
20  getting tired.
21     So that was sort of the way that I kept
22  track of it.  And that's obviously not
23  documented on a form, but that was the way
24  that I was able to really know where I was
25  in -- in relation to the number of hours that

Page 137

1  CONSTANCE MANGAN
2  I was working.
3  Q. And while I appreciate that, I -- I
4  believe, though, you're assuming, because you
5  can't provide tangible on week one of fifty-two
6  weeks, on week seven of fifty-two weeks I worked
7  forty-four, so it was four hours over, six hours
8  over?
9       You don't have -- again we're going to
10 go back down to the granular numbers. You don't
11 have the granular numbers of when you exceeded
12 overtime per week from 2016 to 2020, correct?
13      MS. COLE-CHU: Objection to form.
14      THE WITNESS: I would say that I have
15   my recollection of working again past 7:00
16   p.m. on a regular basis every week. I don't
17   have a piece of paper that says that.
18 BY MS. ALBERTY:
19 Q. Sure.
20 A. But I have that recollection that that
21 was the case.
22 Q. Okay.
23 A. And certainly there would be some
24 reflection in the SICM case system, which I'm sure
25 GEICO has all of the records for, that indicated

Page 138

1  CONSTANCE MANGAN
2  that I was on that system at least parts -- parts
3  of that time.
4  Q. Okay. So if we're going to go then
5  with your logic, November 4th, 2019 to November
6  8th of 2019, how many hours did you work overtime
7  that you did not account for?
8       MS. COLE-CHU: Objection to form.
9       THE WITNESS: I cannot state with a --
10   on a specific date, which I believe I've
11   already agreed to, but that I knew that every
12   week I was working every day extra hours to
13   complete my cases.
14      So, to say that between late 2016 to --
15   to May 2020, to say that I know that I was
16   working fifty to sixty hours on average per
17   week, I know that I was doing that.
18 BY MS. ALBERTY:
19 Q. But you're telling me you can't break
20 it down per week, right?
21 A. I cannot give you a specific date and
22 say that on May 16th I worked three-and-half
23 hours. I -- I don't think it's reasonable to even
24 ask me to be able to do that. I can't do that.
25 Q. Well, again, I'm trying to understand

Page 139

1  CONSTANCE MANGAN
2  then, because there is an assumption, that's why
3  you gave a range to begin with, right? Ten to
4  twenty-five hours, that's a fairly larger range.
5  It's not a one-hour range. It's -- that's a
6  fifteen-hour range -- or sorry, I apologize.
7       Fifty to sixty hours; that's a ten-hour
8  range.
9  A. Ten-hour range over the five days.
10 Q. Right.
11 A. Right. I don't think that's a big
12 range. I mean, that could be a --
13 Q. So --
14 A. In your interpretation. I don't think
15 that's a large range.
16 Q. So if you were required then to be in a
17 forty-hour work week, and you're doing sixty hours
18 say that week, and we go back to the week I just
19 provided, which is November 4th, 2019, which is a
20 Monday, to November 8th, 2019, which is a Friday,
21 you cannot tell me what hours you exceeded the
22 forty-hour week to quantify your assumption in
23 number ten of a fifty- to sixty-hour work week?
24      MS. COLE-CHU: Objection to form.
25

Page 140

1  CONSTANCE MANGAN
2  BY MS. ALBERTY:
3  Q. Correct?
4  A. Well, assuming that I wasn't on
5  vacation that week, which I have no independent
6  recollection of, if I was working, I was working
7  overtime. That's the only way I could really
8  state it.
9  Q. In 2020 did you ever get COVID?
10 A. No.
11 Q. Did you have limitations based upon
12 COVID restrictions in which you could not do your
13 job?
14 A. To some degree, yes.
15 Q. And in what way?
16 A. Field work, field visits.
17 Q. Okay, so in March up and until your
18 retirement in May of 2020 -- say we'll say for the
19 two months -- you were not able to conduct
20 in-field investigations, correct?
21 A. We were requested to do them, but then
22 we were told that it was not mandatory but
23 optional.
24      I opted not to go out and interact with
25 the public during that time period.



Page 181

1 CONSTANCE MANGAN
2 recall them doing medical fraud investigations?
3   A.   Not specifically.  But I believe
4 sometimes it would be a part of their
5 investigation.  It could happen.
6   Q.   All right, if it -- if it happened to
7 fall within a auto claim?
8   A.   Yes, that's true.
9       THE WITNESS:  Do you need the spelling
10    of Giambalvo?
11       THE COURT REPORTER:  Sure.
12       THE WITNESS:  Okay, that's not an easy
13    one to just figure out on your own.
14    G-i-a-m-b-a-l-v-o.  While I was thinking of
15    it, I'm sorry.
16 BY MS. ALBERTY:
17   Q.   You state, "I also know other special
18 investigator -- investigators worked many overtime
19 hours off the clock each week without receiving
20 overtime pay."
21       Who are the other special investigators
22 that you identify in number twenty-one that
23 haven't already been identified in number twenty?
24   A.   Well, we had a team in Staten Island,
25 and I know one guy's name was Doug, and I cannot

Page 182

1 CONSTANCE MANGAN
2 remember the other guy's name, and we would see
3 them at meetings where we had these discussions.
4       There were also -- Evan Teatum is a guy
5 I know worked upstate -- I forgot all about him
6 for a moment -- who I know whenever I saw him at a
7 meeting, we talked about what -- the hours we were
8 working and how many hours we were working.
9       There was another female
10 investigator -- who of course I can picture, but I
11 cannot think of her name; I apologize for that --
12 who also expressed between the amount of travel
13 that they did upstate, and then the caseload, that
14 she was constantly buried.
15       And we had a large meeting where we
16 were all together in the room, and we all had an
17 opportunity to speak to each other, and -- and we
18 discussed the same things.
19   Q.   All right.  I just want to break that
20 down a little bit.
21   A.   Okay.
22   Q.   On the large meeting, do you remember
23 when this occurred?
24   A.   The last large meeting that I can
25 remember was -- it was either 2018 or 2019, and

Page 183

1 CONSTANCE MANGAN
2 that's the most I can narrow it down, to the best
3 of my recollection, and that was a meeting that
4 was upstate investigators, Staten Island
5 investigators, the local metropolitan area
6 investigators, including Nassau and Suffolk
7 County, the five boroughs of the city, our
8 supervisors, inside staff, people from legal who
9 prepared our legal letters for us, our -- and our
10 manager also, Bill Newport, I know was there.
11   Q.   How many people do you think were in
12 this meeting?
13   A.   I'm not great at crowd estimation, but
14 I -- it would have to be at least forty people,
15 probably way more than forty people.
16   Q.   And who was leading the meeting?
17   A.   That meeting was being led by Bill
18 Newport, which I recall because he -- we never saw
19 him.
20   Q.   And during this meeting is this when
21 individuals or collectively people raised issues
22 of pay?
23       MS. COLE-CHU:  Objection to form.
24       THE WITNESS:  Collectively we raised
25    issues of unreasonable and unmanageable

Page 184

1 CONSTANCE MANGAN
2 caseloads, and specifically I remember Mark
3 Giambalvo speaking and he was a -- very well
4 spoken, Mark, and often he would sort of be a
5 spokesperson for us because he was so well
6 spoken.  He was very articulate.  And I can
7 remember at this particular meeting that Mark
8 Giambalvo was speaking to the caseload, and
9 how everybody was struggling, and that we
10 weren't able to manage it, and that we were
11 working past our scheduled hours.  And I
12 remember Bill Newport just shrugged his
13 shoulders and said, "I don't give a fuck."
14 BY MS. ALBERTY:
15   Q.   He said that explicitly?
16   A.   Explicitly, and it has stuck with me to
17 this day, because I was stung by it.  I -- I could
18 not believe that he would act in such an
19 unprofessional manner.  But it stunned the whole
20 room.  It just went quiet.
21   Q.   Was this in person?
22   A.   This was in person.  We were all there.
23 And he said in front of the whole entire room, "I
24 don't give a fuck."
25   Q.   Was that in regard to saying, "Still do



Page 185

CONSTANCE MANGAN

2 your hours but also indicate that you're doing
3 overtime?"
4     A.  Well that was in response to what Mark
5 was speaking about, which was that everybody is
6 buried in cases; nobody can manage their cases; we
7 can't get ahead; we can't get out from under.
8 We're working so many hours trying to get it done.
9 He just didn't care.
10    Q.  Did Bill tell you not to log your
11 overtime hours?
12    A.  Once he said, "I don't give a fuck,"
13 there was no more discussion about -- no
14 discussion.  Nobody then brought up cases after
15 that.
16    Q.  I understand --
17    A.  Okay.
18    Q.  -- but did he say that?  Did he say,
19 "Don't log your overtime hours?"
20    A.  In that meeting, did he say "Don't log
21 your overtime hours"?
22    Q.  Yes.
23    A.  I don't remember him saying that.
24    Q.  Do you know what the context was --
25 strike that.

Page 186

CONSTANCE MANGAN

2     Circling back to number twenty-one --
3     A.  Okay.
4     Q.  -- which are the individuals you
5 listed: The other people you believe that were in
6 Staten Island; there was a male and a female, you
7 can't remember their names; you remember Evan
8 Teatum.
9     A.  Mm-hmm.
10    Q.  Do you know if these individuals that
11 you're referencing as the "other special
12 investigators" for number twenty-one, if they did
13 medical fraud?
14    A.  I know the Staten Island team were not
15 in the medical fraud team, but as far as the
16 upstate investigators, I don't -- I don't have the
17 answer to that.  I don't know.
18    Q.  So the remaining individuals that you
19 listed, were all those people upstate SIUs, if you
20 know?
21    A.  Which people that I named?  Which ones?
22    Q.  So you said a male, a female, Evan
23 Teatum.
24    A.  Yes.  I remember Evan and -- it kills
25 me that I can't remember her name.

Page 187

CONSTANCE MANGAN

2     Did I say there was another male
3 upstate?
4     (Ms. Alberty nods in the affirmative.)
5     A.  Yeah, there probably was.  Oh, now I
6 lost track of the question.  I'm trying to
7 remember that person's name.  It's making me
8 crazy.
9     Q.  That's okay.  So those other
10 individuals --
11    A.  Yeah.
12    Q.  -- were they in medical fraud?
13    A.  I don't believe so, but I don't know
14 for -- for sure.
15        In fact I think they handled
16 everything, because they were upstate, and there
17 was a limited number of them.
18        So, I don't know if they were broken
19 into separate teams.  I don't know that answer.
20    Q.  So the separate teams and categories --
21 and I just want to make sure I understand --
22    A.  Okay.
23    Q.  -- is medical fraud, and we have auto,
24 but that's broken down even further to auto arson?
25    A.  Auto theft.

Page 188

CONSTANCE MANGAN

2     Q.  Auto theft.
3     A.  And staged accidents, or also caused
4 accidents.  That falls in the same or similar
5 categories.
6     Q.  Was there any other additional category
7 within auto?
8     A.  There might have been.  I don't
9 remember.  I'm not sure.
10    Q.  Were there any other big categories,
11 such as the -- the medical, auto, property,
12 homeowners?  Was there any other big groupings
13 where special investigators would be allocated?
14    A.  We only investigated automobile-related
15 fraud and injuries related to accidents, thefts of
16 course related to autos.
17        We did not investigate homeowner's
18 insurance or personal injury, slip-and-fall type
19 claims.  We didn't investigate those.
20    Q.  As it applies to medical fraud, did the
21 region determine the percentages for the types of
22 claims?
23        MS. COLE-CHU:  Objection to form.
24        THE WITNESS:  Yeah, I'm not sure what
25    that question is.




1           CONSTANCE MANGAN

2           C E R T I F I C A T E

3   STATE OF NEW YORK    )

4                        : Ss.

5   COUNTY OF NEW YORK   )

6           I, Kim M. Brantley, Shorthand

7   Reporter, and Notary Public within and for the

8   State of New York, do hereby certify:

9           That CONSTANCE MANGAN, the witness

10  whose deposition is hereinbefore set forth, was

11  duly sworn by me and that such deposition is a

12  true record of the testimony given by the witness.

13          I further certify that I am not related

14  to any of the parties to this action by blood or

15  marriage, and that I am in no way interested in

16  the outcome of this matter.

17          IN WITNESS WHEREOF, I have hereunto set

18  my hand this 14th day of August, 2024.

19

20  
    _____

21  Kim M. Brantley

22

23

24  My Commission expires May 31, 2026.

25