# Exhibit FF

Page 1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf of
all others similarly situated,

                              Plaintiffs, Docket No.
                                         23CIV.02848
                                         (GRB)(ARL)

      -against-

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a
GEICO,

                              Defendant.

----------------------------------------x

                        Zoom Deposition
                        New York
                        January 13, 2025
                        9:26 a.m.

                        CONFIDENTIAL

      Examination Before Trial of WILLIAM
NEWPORT, pursuant to Notice, before Deirdre
Plevritis, a Notary Public of the State of New
York.



## Page 50

```
 1                      50
 2       A    It would have been to prepare
 3   for the changes forthcoming.
 4       Q    So was this looking ahead to
 5   the reorganization that eventually
 6   happens in 2024?
 7       A    It would have been the
 8   reorganization and the changes in our
 9   business practice.  It would have
10   happened in 20 -- I want to say it was
11   2023, going into 2024.
12       Q    What were the changes in the
13   business practice that happened in or
14   about that time?
15       A    That is when we went from
16   saying region 2 and region 8, as you
17   referenced to put it in prospective where
18   it wasn't necessarily region 2 and region
19   8.  It would have been larger areas and
20   more encompassing.  That is when my
21   responsibilities shifted towards
22   analytics.  That was part of that
23   business change.
24       Q    Again, now, in the 2018 to
25   2023 timeframe, did you have regular,
```

## Page 51

```
 1                      51
 2   meaning, like, standing meetings with the
 3   supervisors who reported to you?
 4       A    It varied over time.  There
 5   were times that we would have formal
 6   meetings.  There were times I was always
 7   available for the supervisors, but over
 8   that time it was always an open door
 9   policy with the sups, supervisors.
10       Q    Did you work physically in
11   the Long Island office?
12       A    Yes, I did.
13       Q    Did your supervisors also
14   work in the Long Island office or did
15   that vary?
16       A    That varied.
17       Q    Approximately, how many
18   worked in the office?
19       A    It depended on the timeframe.
20   That number would have fluctuated even
21   during that '18 to '23 timeframe.
22       Q    Do you recall how many worked
23   outside the office?
24       A    That also, depending on that
25   five-year stretch would have changed.
```

## Page 52

```
 1                      52
 2       Q    Without breaking down between
 3   who was in the office and out of the
 4   office, can you -- do you recall what the
 5   general range was of the total number of
 6   supervisors between 2018 and 2023, low
 7   end and high end?
 8       A    So from '18 to '19, it would
 9   have been more while I had the medical
10   major case units before it went to
11   Courtney, so I will give you the answer
12   from say '19 to '23, I believe that is
13   most likely what you are looking for.
14       Q    Sure.
15       A    Probably somewhere between at
16   any given time seven to 12, would be my
17   best guess, maybe, a little lighter than
18   12, at most times lighter than 12, maybe,
19   seven to 10.  I am just trying to go
20   through all of the people that came
21   through.
22       Q    In 2019, approximately how
23   many supervisors went over to
24   Courtney Wolff's team?
25       A    I want to say three.  I don't
```

## Page 53

```
 1                      53
 2   recall the exact number off the top of my
 3   head.  Three people popped up.
 4       Q    What do you -- do you have an
 5   understanding of what this case is about?
 6       A    Yes, I do.
 7       Q    What is your understanding of
 8   what this case is about?
 9       A    The understanding, I guess
10   the contention is the unpaid overtime and
11   the workload, as I understand it.
12       Q    I note that is correct as far
13   as, I will represent and put a little bit
14   more color on it that this is -- the
15   allegations in this case are that
16   investigators working in New York worked
17   on unpaid time off the clock.
18            If I use the term "off the
19   clock," do you have a general
20   understanding of what I mean by that
21   term?
22       A    Sure.
23       Q    Okay.  When did you first
24   learn that this lawsuit was happening?
25       A    It was some time ago.  I
```



Page 154

```
                          154
 1
 2    we can come back at -- how long do
 3    you need?  1:30.  That's a little
 4    bit long.  Sorry.  1:15?
 5          MR. TSONIS:  Yeah, let's --
 6    1:15, 1:20, and then we will be
 7    back.
 8          THE VIDEOGRAPHER:  Off the
 9    record.  12:39.
10          (A recess was taken.)
11          THE VIDEOGRAPHER:  On the
12    record, 1:20.
13    EXAMINATION BY
14    MR. SCIMONE:
15       Q   Mr. Newport, welcome back
16    after lunch.  You understand that you are
17    still under oath?
18       A   Yes, sir.
19       Q   Did you discuss your
20    testimony with anyone during the lunch
21    break?
22       A   No, not directly, no.  I
23    spoke to Greg briefly, but not about the
24    testimony.  Nothing else.
25       Q   Okay.  Mr. Newport, are you
```

Page 155

```
                          155
 1
 2    familiar with the term "core metrics" as
 3    that term is used at GEICO?
 4       A   Yes, yes, I am.
 5       Q   Can you define how GEICO uses
 6    that term?
 7       A   Um, it would be like a group
 8    of metrics to calculate a rating for an
 9    associate or any position really, I mean
10    a GEICO associate in general, not
11    specific to SIU or a position.  Most
12    positions at some point or another had
13    core metrics.
14       Q   Is that a rating that is used
15    for performance management purposes?
16       A   Yes, it could be.
17       Q   Is that the way core metrics
18    are used at GEICO?
19       A   For performance management,
20    it was a way to -- I don't know what you
21    mean by "performance management."  It was
22    a way to evaluate associates' performance
23    compared to their peers or compared to a
24    goal package, so sure.
25       Q   That is what is meant by
```

Page 156

```
                          156
 1
 2    performance management.
 3       A   Okay.
 4       Q   Okay.  Did you have a role in
 5    deciding what the core metrics would be
 6    for investigators in your region?
 7       A   Yes, depending on the year it
 8    might have varied, but sure, setting the
 9    goals was part of it.
10       Q   And so can you describe what
11    your role would be?  Let me ask a
12    specific question because you mentioned,
13    I think you said a level.  I am not sure
14    if that was the terminology you used.
15          Was your decision about sort
16    of what the level would be for the goal
17    or was it more general than that?
18       A   Depending on the timeframe,
19    it varied.  So core metrics discussions
20    on any given year would start with some
21    guidance perhaps from claims home office
22    and then discussion on several variables,
23    and then you would create the metrics
24    from that there.  It would be somewhat of
25    a collaborative discussion mostly between
```

Page 157

```
                          157
 1
 2    the region, claims home office and, you
 3    know, my superiors, to determine what the
 4    right levels might be or the goals, in
 5    general.
 6       Q   And did, as the outcome of
 7    that process, were the same core metrics
 8    used across regions or different ones?
 9       A   It varied.  Even within
10    regions you had multiple sets of goals.
11    I am not familiar with what the other
12    regions would have instituted and how
13    many goal packages they would have had.
14       Q   I want to draw a distinction
15    here in the question I am asking between
16    sort of two different determinations.
17    One is what the metric would be.  So, for
18    example, we want to measure productivity
19    as to what the specific goal would be.
20          So, for example, we want
21    productivity to be at sort of this level
22    or above to be rated a five, as an
23    example.
24          So with that distinction, in
25    terms of selecting which core metrics to
```



Page 238

```
                         238
 1
 2    like a distribution list for SIU
 3    managers.  You would have been on that
 4    list in this time in 2020, correct?
 5         A    I should have been.  Sure.
 6         Q    And as you are reading this
 7    and as it is refreshing your
 8    recollection, it is correct to say that
 9    this reflected a change in how overtime
10    was paid to nonexempt employees?
11             MR. TSONIS:  Object to form.
12             You can answer.
13         A    Yeah, it appears that is what
14    is outlined in Shane's message.
15         Q    The method of payment
16    changed, correct?
17         A    I would have to -- let's see.
18    Yeah, it appears there was a change in
19    their compensation.
20         Q    And right about the middle of
21    Shane Wheelers communication it says:
22             "As before, the same rules
23    will apply to the use of overtime."
24             First bullet point:  "(Use of
25    overtime must be approved by management
```

Page 239

```
                         239
 1
 2    in parenthesis, not including minimal
 3    time needed to complete a task for a
 4    customer.)"  Closed paren.
 5             What was your understanding
 6    of the statement of use of overtime must
 7    be approved by management?
 8         A    The way that I would have
 9    understood it at that time is there is
10    not necessarily a pre-approved overtime.
11    If time was needed or you thought time
12    was needed, you would contact your
13    supervisor, have a discussion, maybe
14    pursue alternate solutions, like you
15    demonstrated earlier, maybe closing
16    someone.  That is how I would have
17    interpreted it.
18         Q    That discussion with the
19    manager that you are describing, am I
20    correct, your understanding is that the
21    process is that someone should be
22    speaking to a manager before they work
23    overtime?
24         A    Yes, for the most part,
25    except, you know, if they got caught in
```

Page 240

```
                         240
 1
 2    traffic coming home, maybe as an example,
 3    but in terms of if they needed or they
 4    felt there was an extenuating
 5    circumstance, they would organize with
 6    their supervisor or communicate with
 7    their supervisor.
 8         Q    And this note in parenthesis
 9    about minimal time needed to complete a
10    task for a customer, as I understand it,
11    investigators, most of the time at least
12    do not communicate directly with
13    customers; tell me if I wrong about that?
14         A    I don't know about most of
15    the time.  I mean part of their job is
16    actually communicating with the
17    customers.
18         Q    Okay.  So my question really
19    is how does this statement apply, if at
20    all, to the work done by investigators?
21    So in other words, there seems to be some
22    recognition there may be minimal time
23    where someone doesn't have time to get an
24    approval from a supervisor or doesn't
25    need to or something like that, are there
```

Page 241

```
                         241
 1
 2    categories like that for SIU?
 3         A    I would say something of the
 4    effect of if they got caught in traffic,
 5    perhaps, or you know, a recorded
 6    interview went wrong would be an example,
 7    perhaps.
 8         Q    The second bullet point is:
 9    "Overtime will be evaluated and approved
10    based on business needs."  So what is
11    your understanding of what that means?
12         A    It would be evaluating --
13    exactly how it reads.  It would be in
14    order to have pre-approved overtime,
15    probably have to have some information
16    and discuss it, and same for me as it
17    would be for an investigator before we
18    approved overtime, we would evaluate it
19    and discuss it with whoever needed to
20    approve it.
21             MR. SCIMONE:  We will mark it
22    as Exhibit 15, the document Bates
23    stamped 11859 through 11862.
24             (Document Bates stamped 11859
25    through 11862 referred to received
```

61 (Pages 238 to 241)



Page 254

```
                    254
 1
 2   to work outside of their normal hours."
 3          Do you have an understanding
 4   of what acceptable overtime means?
 5       A   I am just pulling back up.  I
 6   am not certain as it is written here what
 7   that definition would be.
 8       Q   Based on your experience as a
 9   manager, do you have an understanding of
10   what acceptable overtime means?
11          MR. TSONIS:  Object to form.
12          Foundation.
13          You can answer.
14       A   It would be an example of
15   some of the items we went over earlier.
16   If they -- if they called and they needed
17   a couple of hours, it would be reviewed
18   on a case-by-case basis.  We would look
19   for alternatives.  We would in some cases
20   approve it as needed if they were stuck
21   on a call.  Those would be on a
22   case-by-case basis in any opinion to be
23   defined as acceptable reasons.
24       Q   And you would approve it to
25   the extent that you had permission to
```

Page 255

```
                    255
 1
 2   approve that kind of overtime; is that
 3   fair to say?
 4       A   If it made sense, sure.  I
 5   don't remember the specific scenarios or
 6   associates, but yes, there was -- if it
 7   all lined up and that was the best course
 8   of action, they could do it.
 9       Q   Did you have unlimited
10   discretion to approve overtime?
11          MR. TSONIS:  Object to form.
12          You can answer.
13       A   In terms of unlimited
14   discretion, no, I don't believe that.  If
15   it was going to be almost like a regular,
16   a lot of work, you might consider it as a
17   pre-approved basis.  I would need to
18   review it and submit it or discuss it
19   with the appropriate parties at GEICO to
20   see if it would be acceptable.  On
21   one-off scenarios for a little bit here
22   and there, I had -- there were situations
23   that were within my control.
24       Q   Let me see if I understand
25   this correctly.  I think I do, but I want
```

Page 256

```
                    256
 1
 2   to make sure I am getting an accurate
 3   understanding of your testimony.
 4       A   Sure.
 5       Q   There were one-off
 6   situations.  You gave the example of
 7   someone being stuck on a call, for
 8   example, where you had discretion to
 9   approve that; correct so far?
10       A   That would -- chances are
11   that would be within my authority.  I
12   would -- chances are that was handled at
13   a supervisor level.  The cases that are
14   here and there, this happened, okay, you
15   know, no problem.
16       Q   But in general, putting aside
17   those one-off situations, the rule is
18   that people would need to ask for
19   pre-approval?  In other words,
20   investigators would need to ask for
21   pre-approval from a manager before
22   working overtime.  That was the general
23   rule, correct?
24          MR. TSONIS:  Object to form.
25       A   Yes, there should be a
```

Page 257

```
                    257
 1
 2   discussion with the supervisor to
 3   determine if the extra time was needed.
 4       Q   And whether or not the
 5   supervisor would approve it?
 6       A   Sure.
 7       Q   And that is the scenario
 8   where you say your discretion was not
 9   unlimited?
10          MR. TSONIS:  Object to form.
11          Misstates testimony.
12          You can answer.
13       A   Yeah, I would say if it was
14   happening on a regular pattern, or there
15   was a broader need for pre-approved
16   overtime for a group of people.  I
17   probably would need -- I would need
18   approval in terms of someone contacting
19   their supervisor saying they needed a
20   couple of hours.  I wouldn't say that was
21   unlimited, but if there was a pattern
22   that was consistently needed, we would
23   want to look at what other options are
24   there for this associate for us to work
25   with him.
```



```
                                    Page 258
 1                      258
 2       Q    A slightly different scenario
 3   now from the ones we have been talking
 4   about.  It is referenced here in Exhibit
 5   15.  It says:
 6            "Situations may arise when an
 7   associate continues to work extra time
 8   after you told them to discontinue,
 9   review these situations with HR."
10            So as I understand it, this
11   is a situation where someone has spoken
12   to their supervisor before working the
13   time and the supervisor said don't
14   continue working.  Maybe they tried to
15   come up with another way to help the
16   person to deal with the workload, but
17   this is a situation where they were told
18   not to continue.
19            Are we on the same page with
20   that scenario being described here?
21       A    Yes, the associate called.
22   The supervisor said no.
23       Q    It goes on, and this is the
24   red text.  It says:
25            "Remember unauthorized
```

```
                                    Page 259
 1                      259
 2   overtime is a disciplinary matter not a
 3   compensation issue.  If you told the
 4   associate not to work extra time, but the
 5   associate did not listen, you should pay
 6   the additional work time and begin the
 7   disciplinary process."
 8            Does that match with your
 9   understanding of what the policy would be
10   in a scenario such as this one?
11            MR. TSONIS:  Object to form.
12            Foundation, speculation.
13            You can answer.
14       A    It appears consistent with
15   the policy at the time or the policy, in
16   general, as you put it.
17       Q    And were these policies
18   communicated to investigators during your
19   time at SIU?
20            MR. TSONIS:  Object to form.
21       A    I don't recall how the
22   information was relayed directly to the
23   associate.  I don't recall how that
24   information made it to them from say,
25   from that email in April or Shane's
```

```
                                    Page 260
 1                      260
 2   email.
 3       Q    Do you know for certain
 4   whether or not the policy was
 5   communicated to them?
 6       A    I wouldn't -- I don't believe
 7   it is my place to speak to the training
 8   portion.  I don't recall how it would
 9   have been translated to them over the
10   course of my tenure there.
11       Q    There was training on it?
12       A    I don't know.  That is my
13   point, I don't know how it was
14   communicated.
15       Q    I haven't asked you how it
16   was communicated other than about the
17   training --
18       A    Oh.
19       Q    My only question is:  Do you
20   know were these policies communicated to
21   people?
22            MR. TSONIS:  Object to form.
23            Asked and answered.
24            You can answer.
25       A    I don't remember the
```

```
                                    Page 261
 1                      261
 2   mechanism in which they were communicated
 3   specifically.
 4       Q    Again, so please listen
 5   carefully to the question I am asking
 6   you.  I am not asking about the
 7   mechanism.  I am asking you, yes or no,
 8   were these policies communicated?  Do you
 9   know whether these policies were
10   communicated to investigators in your
11   unit?
12            MR. TSONIS:  Object to form.
13            Asked and answered,
14       foundation.
15            You can answer.
16       A    I believe that it was
17   communicated to them.  In terms of how, I
18   don't know.
19       Q    On what do you base that
20   belief?
21       A    Based on -- there was
22   information that was -- I don't want to
23   speculate.  We are speaking to a document
24   that I am not aware of, in general.
25   GEICO policies are explained to all
```



```
                                                    Page 341
 1                                              341
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK   )
 4                        ) ss.:
 5    COUNTY OF NASSAU    )
 6              I, Deirdre Plevritis, a
 7         Notary Public within and for the
 8         State of New York, do hereby certify:
 9              That WILLIAM NEWPORT, the
10         witness whose deposition is
11         hereinbefore set forth, was duly
12         sworn by me and that such
13         deposition is a true record of the
14         testimony given by such witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage; and that I
18         am in no way interested in the outcome
19         of this matter.
20              IN WITNESS WHEREOF, I have
21         hereunto set my hand this 16th day
22         of January, 2025.
23                   Deirdre Plevritis
                  ___Deirdre Plevritis_____
24                   DEIRDRE PLEVRITIS
25
```

