**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY,<br><br>     Defendant. | Case No. 2:23-CV-02848 (SJB) (SLT) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' LOCAL CIVIL RULE 56.1**
**STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Eastern District of New York, Defendant Government Employees Insurance Company ("GEICO" or "Defendant") hereby respectfully submits this Response to Plaintiffs' Rule 56.1 Statement of Additional Material Facts in support of GEICO's Motion for Summary Judgment (the "Motion") on the claims of Named Plaintiffs Keith Fischer ("K. Fischer"), Michael O'Sullivan ("O'Sullivan"), John Moeser ("Moeser"), Louis Pia ("Pia"), Thomas Barden ("Barden"), Constance Mangan ("Mangan"), and Charise Jones ("Jones"); and Opt-In Plaintiffs Louis Caniglia, Jr. ("Caniglia, Jr."), Michael Grey ("Grey"), Daniel King ("King"), Margaret Fischer ("M. Fischer"), Craig Costanzo ("Costanzo"), Ted Wendling ("Wendling"), Maria Munoz ("Munoz") and Albert Brust ("Brust") (collectively, "Plaintiffs"):

**INTRODUCTION**

As an initial matter, the Court should not consider Plaintiffs' Statement of Additional Facts ("SOAF") to the extent it violates Local Civil Rule 56.1. *See Butler v. Suffolk Cnty.*, No. 11-CV-2602

1

(JS) (ST), 2023 WL 5096218, at *19 (E.D.N.Y. Aug. 9, 2023) ("When moving for summary judgment, in addition to complying with Federal Rule of Civil Procedure 56, the parties must comply with Local Rule 56.1 of the United States District Courts of the Southern and Eastern Districts[.]").

First, Plaintiffs' SOAF repeatedly violates Local Civil Rule 56 by failing to cite evidence and/or misstating, overstating, or citing to non-supportive or inadmissible evidence. Second, Plaintiffs' SOAF contains, in various combinations, inadmissible hearsay, speculation, and improper argument. Third, Plaintiffs' SOAF contains several purported facts supported only by self-serving interrogatory responses and/or testimony, which are not based on personal knowledge. Fourth, Plaintiffs' SOAF contains purported "facts" that are immaterial and irrelevant to the issues presented by Defendant's Motion for Summary Judgment or their resolution.

Most of the purported "facts" offered by Plaintiffs are improper and should be disregarded. *See, e.g.*, Fed. R. Evid. 401, 602, and 802; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986) (explaining that "[f]actual disputes that are irrelevant or unnecessary" will not create a genuine dispute of material fact precluding summary judgment); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); *Morris v. Northrop Grumman Corp.,* 37 F. Supp. 2d 556, 568 (E.D.N.Y. 1999) ("Hearsay statements … which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based on personal knowledge, may be stricken" from a Rule 56.1 statement); *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal

knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence."); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (noting that a party cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial); *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 106 (S.D.N.Y. 2023) ("[A]llegations in Plaintiffs' Amended Complaint [] cannot constitute admissible evidence at the summary judgment stage.")

Plaintiffs' Response to Defendant's Statement of Undisputed Facts also includes nine individual responses to which Plaintiffs answer: "Undisputed but lacking context." *See* Response, ¶¶ 4, 9, 18, 21, 28, 37, 77, 125, 141. All nine responses should be deemed admitted because "purported denials or partial denials do not actually controvert the substance of the corresponding paragraphs in Defendant's 56.1 statement but instead purport to provide additional context," and "merely providing additional context does not properly controvert a fact asserted in a Rule 56.1 statement." *McDonald v. Williams-Sonoma, Inc.*, No. 22-CV-04164 (HG), 2024 U.S. Dist. LEXIS 165431, at *10-11 (E.D.N.Y. Sep. 13, 2024) (internal citation and quotation marks omitted).

Without waiving its objections to Plaintiffs' SOAF, Defendant responds as follows:[1]

1.  Until approximately February 2023, GEICO Special Investigators ("Investigators") worked on small teams with seven to ten other Investigators. Ex. FF, Newport Tr. 52:2-3; Ex. H, Muñoz Tr. 98:1-13, 139:8-140:18.

---

[1] All statements contained herein and in Defendant's Reply in Support of its Motion for Summary Judgment are set forth for the purpose of Defendant's Motion for Summary Judgment only, are not admissions by Defendant, and may not be used for any purpose other than Defendant's Motion for Summary Judgment, including, without limitation, any other proceeding in this lawsuit.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 1, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**The respective team size of SIU investigators[2] during an unspecified period is unrelated to, for example, Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness.  Plaintiffs' cited testimony also does not support Plaintiffs' statement.  Plaintiffs' citation to William ("Bill") Newport's testimony concerning "seven to 10" refers to the "general range … of the total number of supervisors between 2018 and 2023," in Bill's Region (Region 2) – not the number of investigators on a team.  Pls. Ex. FF, Newport Tr. 52:2-21.  Munoz testified to her belief that "there could be seven to ten people on a team possibly at any given time," which did not account for any "teams" of internal or other non-field SIU investigators.  Pls. Ex. H, Muñoz Tr., 97:20-98:4.**

2.      Until approximately July 2023, Investigators reported to SIU Supervisors, who reported to a single SIU Manager per office. Ex. GG, 30(b)(6) Tr. 82:24-83:3; Ex. HH November 21, 2023 Email from Rene Cubas to Team at G020144 (stating "reorganization began" around July 1, 2023).

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 2, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

---

[2] While Plaintiffs do not define "Special Investigators" and GEICO does not recognize any cognizable group of "Special Investigators," GEICO uses the term "investigators" or "special investigators" as this Court defined and discussed the term in its prior Order.  Docket Entry No. 91.

The supervisory structure of SIU investigators during an unspecified period is unrelated to, for example, Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness. SIU investigators reported to SIU supervisors, and the SIU reorganization began in or around mid-2023. SIU investigators reported to SIU supervisors, and the SIU reorganization began in or around mid-2023. SIU supervisors, however, did not report to a single SIU Manager in each office or Region. Def. Ex. 88, Newport Tr. 35:22-37:15; *see, e.g.,* Docket Entry ("DE") No. 98-119, Courtney Wolfe Declaration ¶¶ 3-11 (confirming that between 2019 and 2023, C. Wolfe was responsible for supervising medical major case investigators in both Region 2 and Region 8); *see also* DE No. 98-120, B. Newport Declaration ¶¶ 3-11; 16 (confirming that beginning in or around 2019, "all SIU major case medical investigator positions…no longer fell within my purview; New York SIU investigators working major medical cases worked under Courtney Wolfe's purview.").

Subject to the foregoing, Defendant admits that investigators report to a supervisor within SIU, but denies the remainder of Plaintiffs' SOAF No. 2.

3.      Investigators regularly speak with their Supervisors about their cases and workloads during team meetings and one-on-one calls. *See* Ex. N, Cassagne Tr. 50:16-51:8; Ex. K, Brust Tr. 254:21-256:4.

GEICO's Response: Defendant denies Plaintiffs' SOAF No. 3, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

The alleged frequency of discussions concerning cases and workloads between SIU

investigators and their respective SIU supervisors during an unspecified period is unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness.   The frequency of communication between SIU investigators varies, and certain Plaintiffs did not "regularly speak" with their supervisors about cases and workloads.  SIU Supervisor Cassagne testified that he communicated with investigators he supervised "sometimes daily, sometimes weekly, depending on the need."  Pls. Ex. N., Cassagne Tr. 50:16-51:8.  Some investigators went "literally weeks without talking to anyone," including their supervisor.  Def. Ex. 20, Munoz Tr. 164:7-13.

4.     Investigators' primary job duties are to investigate cases of suspected insurance fraud.  In doing so, they must review case files; run background checks; examine billing reports; drive to medical facilities, accident scenes, and/or theft sites; gather evidence; interview witnesses and law enforcement; confirm police reports; canvass and surveil scenes; conduct examinations under oath; and write and submit reports about their findings.  *See* Ex. II, Senior Field Security Investigator Job Description at G006749; Ex. JJ, Lead Security Investigator Job Description at G006754; Ex. KK, Internal Major Case SIU Investigator Job Description at G006756; Ex. LL, Senior Internal Security Investigator Job Description at G007697; Ex. MM, Major Case SIU Investigator Job Description at G007700; Ex. NN, Internal Security Investigator Job Description at G007705; Ex. OO, Field Major Case SIU Investigator Job Description at G007709; Ex. PP, Claims Security Investigator Job Description at G007711).

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 4, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Different SIU investigators' respective primary job duties during an unspecified period are unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness.  Further not all SIU investigators perform or performed all the job duties that Plaintiffs claim they "must" perform.  *See, e.g.*, Def. Ex. 89, 30(b)(6) Tr. 71:11-22 (stating, "Every investigation is like a snowflake.  There are no two alike," and confirming that whether senior field security investigators go into the field to conduct investigations depends on "[w]hat they determine has to be done.  It's up to them.");  *Id*. at 141:19-142:3 (desk/inside investigators could ask field investigators for assistance with field work on a case-by-case basis); *Id*. at 91:1-25 (confirming that a major case is "a more complex case than an investigation of an individual claim" that may, for example, involve "multiple claims").  As another example, Margaret Fischer – an internal major case SIU investigator – did not perform examinations under oath, nor are examinations under oath listed among the required job duties in the Internal Major Case SIU Investigator job description.  Pls. Ex. KK, Internal Major Case SIU Investigator Job Description at G006756; Def. Ex. 90, M. Fischer Tr. 117:7-16.**

**Subject to the foregoing, Defendant admits that one primary duty of SIU investigators is to investigate cases of suspected insurance fraud but denies the remainder of Plaintiffs' SOAF No. 4.**

5.      Investigators' primary duties and the prescribed procedures for them are outlined in GEICO's SIU Operations Manuals.  Ex. QQ, 2017 SIU Operations Manual at G010748-92.

**GEICO's Response:  Defendant denies Plaintiffs' SOAF No. 5, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp.**

**2d at 314.**

Identification of where SIU investigators' respective primary duties and procedures are or were located during an unspecified period is unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness. GEICO's SIU Operations Manual includes information relevant to SIU generally and to certain resources, processes, and procedures used within SIU. Pls. Ex. QQ. It does not outline investigators' "primary duties." (*Id.*) Moreover, some of the sections are inapplicable to certain types of investigators. For example, field investigator-related general information in the SIU Operations Manual is inapplicable to desk/inside investigators. *See, e.g.*, Pls. Ex. QQ, 2017 SIU Operations Manual at G010770.

6.      GEICO requires that requests for overtime pay receive prior management approval. *See* Ex. RR, November 2017 HR Handbook at G000041 ¶ 5; Ex. SS, May 2023 HR Handbook at G000054.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 6, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Plaintiffs' Ex. RR is stamped G000034 and does not address requests for overtime, thus does not support Plaintiffs' SOAF No. 6. Plaintiffs' Ex. SS provides, "[a] nonexempt associate must receive permission in advance to work more than their regular work hours …. *Nevertheless, all overtime hours will be paid.* (*Id.* (emphasis added).) Accordingly, many Plaintiffs could, and regularly did, record overtime hours in workweeks where they did not receive "prior management approval" for the specific requested overtime and for which they**

were paid overtime wages.  Def. Ex. 85, Compilation of Time Records; *see also* Plaintiffs'
Responses to Defendant's Statement of Undisputed Facts Nos. 19, 22, 27, 33, 49, 61, 64, 72, 76,
86, 101, 108, 113, 124, 128, 137, 142, 153, 166, 179, 190, 195, 203, 207, 216, 223, 225.  GEICO
empowered SIU supervisors to approve overtime work in their discretion based on "business
need" and individual SIU supervisor practices concerning such overtime varied greatly.  *See*,
*e.g.*, Def. Ex. 89, 30(b)(6) Dep. Tr. 257:13-258:4; Def. Ex. 88, Newport Tr. 241:9-20; Def. Ex.
91, Cassagne Tr. 186:23-187:8 ("If you need to do something regarding your case . . . that was
a business need which was – needed to be done within the guidelines of the company, then it
would be approved").  For example, Jerry Cassagne allowed employees to work overtime as
needed and to report to him by email <u>after</u> the individual worked overtime, providing details
of what cases and activities required overtime and the amount of overtime worked.  (Def. Ex.
38, K. Fischer Emails – emailing after working the overtime the same or next day.)  Other
supervisors, like Chet Janik, similarly allowed his team of investigators to work overtime and
then inform him afterward, requiring only that they add the case number(s) requiring
overtime and total overtime hours worked to their shared calendars. (*Id. generally*, Def. Ex.
41, Def. Ex. 92, Group Emails.)

       7.     GEICO's policies required Investigators to "discuss[] [overtime requests] with
[their] supervisor to determine if the extra time was needed," during which the supervisor may
approve or deny the request. Ex. FF, Newport Tr. 257:2-3; 239:5-17; *see also, e.g.*, Ex. K, Brust Tr.
140:20-21.

      **GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No.
7, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the
issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74;**

*Epstein*, 210 F. Supp. 2d at 314.

GEICO admits that the language quoted in Plaintiffs' SOAF No. 7 appears in Bill Newport's deposition testimony.  Ex. FF, Newport Tr. 257:2-3.  GEICO denies the remainder of Plaintiffs' SOAF No. 7 because SIU investigators admitted to following their supervisors' policies regarding overtime, which varied.  (*Compare* Ex. 32, K. Fischer OT Emails (permitting employees to work overtime and requiring only an email recap after-the-fact) *with* Ex. 42, G011379 (requiring preapproval of overtime); *see also* Response to Plaintiffs' SOAF No. 6.

8.    During the relevant period, neither the SIU Supervisors nor the former Region 2 Manager, Bill Newport, had unlimited discretion to approve overtime.  *See* Ex. FF, Newport Tr. 255:9-23; Ex. TT, July 8, 2020 Email from Manager Bill Newport to Supervisors at G013561.

GEICO's Response:  Defendant denies Plaintiffs' SOAF No. 8, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

SIU Managers and SIU Supervisors testified that they could approve any overtime that there was a business need for, thus did have "unlimited discretion" to determine the business need, but could not authorize unlimited pre-approved overtime, meaning overtime for future workweeks in advance.  *See*, *e.g.*, Def. Ex. 88, Newport Tr. 254:8-23 (explaining his understanding of what "acceptable overtime" means as times where if investigators "called and they needed a couple of hours, it would be reviewed on a case-by-case basis.  We would look for alternatives.  We would in some cases approve it as needed if they were stuck on a call. Those would be on a case-by-case basis in any opinion to be defined as acceptable reasons.");

10

*see also* **Def. Ex. 91, Cassagne Tr. 186:16-188:7 ("Overtime was available if the investigator explained to me why he needed to do it on that specific case, it would be approved" and confirming that although he did not have the ability to pre-approve overtime for future workweeks, "[he] was able to tell [his] investigators that if you are working on a case and you run over your time and you deem it necessary, you would just have to send [him] the reason why and [he] would approve it, based on the investigator's information he sent to me on that specific case.").**

9.      GEICO tightly regulated overtime, and only "pre-authorized" its use for special circumstances, like catastrophe projects, that fell outside Investigators' regular caseload. *See* Ex. UU, November 2017 Associate Handbook at G000040; Ex. TT, July 8, 2020 Email from Manager Bill Newport to Supervisors at G013561; Ex. A, K. Fischer Tr. 119:10-22.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 9, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO did not "tightly regulate" overtime, as exemplified by Plaintiffs' regular recording, and GEICO's regular payment, of overtime compensation to Plaintiffs for all recorded overtime hours worked.  For example, Costanzo and King recorded overtime in 59 and 37 workweeks during the relevant time period, 300.25 and 213.75 overtime hours, respectively.  (SOF ¶¶ 64, 113.)  Grey recorded overtime in 39 workweeks, Caniglia Jr. in 32 workweeks, Brust in 22 workweeks, Jones in 21 workweeks, Pia in 16 workweeks, and O'Sullivan in 13 workweeks.  *See* Def. Ex. 24; Def. Ex. 83, Cassagne June 1, 2020 email (generally stating: "The overtime is there to be USED. USE IT IF YOU NEED IT," without**

any restrictions on use of the available overtime).  Plaintiffs' citation to GEICO's November 2017 Associate Handbook's section on "Catastrophe Pay" does not support their statement because catastrophe pay is separate and distinct from regular overtime pay and concerns special circumstances such as hurricanes.  Pls. Ex. UU, November 2017 Associate Handbook at G000040.  Bill Newport's July 8, 2020 email (Pls. Ex. TT, G013561), subject line, "OT Extended through July" reflects approval for "10 hours/week per investigator through the end of July."  It references the June and July 2020 time period in which overtime was preapproved for future workweeks, does not address the multi-year period in which Plaintiffs regularly recorded overtime for their "regular caseload," and does not support Plaintiffs' contention that GEICO "tightly regulated overtime" or that the referenced preapproved overtime had to be used for "special circumstances … that fell outside Investigators' regular caseload."  *Id.*; *see also* **Def. Ex. 85, Hoagland OT Approval.  Even though GEICO consistently offered and approved overtime during June and July 2020, many Plaintiffs did not request, log or report overtime.  Def. Ex. 86, Plaintiffs' Pay Records; Def. Ex. 87, Munoz Pay Records.**

10.     For example, on November 25, 2016, Supervisor Gerard Cassagne sent Mr. Fischer an email stating, "Bottom line- continue to work the way you were working.  If you determine that you need to work overtime on any specific day, you can work the overtime and you will get paid for it.  You have to document your overtime hours and be able to verify why it was needed.  Your supervisor will also be responsible to verify your overtime." Ex. Q, November 25, 2016 Email from Supervisor Gerard Cassagne to Keith Fischer at P00000077. However, after Mr. Fischer received this email, he "did try to submit overtime, and [] was turned down, and [he] gave up after about two to three months." Ex. A, K. Fischer Tr. 242:20-23.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No.**

10, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

GEICO admits that Exhibit Q contains the language quoted in Plaintiffs' Statement of Fact No. 10. Pls. Ex. Q, November 25, 2016 Email from Supervisor Gerard Cassagne to Keith Fischer at P00000077. GEICO denies that K. Fischer "did try to submit overtime, and [] was turned down, and [he] gave up after about two to three months" because it is disproven by GEICO's objective records. For example in 2017, the time period encompassing the "two to three months" in which K. Fischer's overtime requests were "turned down" and he allegedly "gave up" submitting overtime, he recorded and was paid for overtime on at least six occasions. Plaintiffs' Response to Defendant's Statement of Undisputed Facts No. 76 ("Undisputed"); Def. Ex. 38, K. Fischer OT Requests; Def. Ex. 39, K. Fischer Time Records; *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020) (collecting cases and noting that "[i]n the face of contemporaneous evidence ... [Plaintiff's] self-serving comments from her deposition after the filing of this lawsuit cannot create an issue of fact....").

Subject to the foregoing, Defendant admits that Exhibit Q contains the quoted language, but denies the remainder of Plaintiffs' SOAF No. 10.

11.    In 2018, SIU Manager Bill Newport submitted an "OT approval form" to GEICO Vice President Rick Hoagland, who authorized a one-week overtime "campaign" allowing Investigators to work an additional ten hours for one week to resolve an unexpected excess of cases – but on the "conditions" that the time spent would be rigorously tracked, and the effects of the work documented, with continued approval contingent on the results. Ex. VV, November 23, 2018 Email from Rick Hoagland to Newport at G010848; Ex. O, November 26, 2018 Email from Cassagne to

Investigators at G011553.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 11, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO admits that Rick Hoagland emailed Bill Newport on November 23, 2018 regarding specific overtime that investigators could work in addition to their regular work to address a backlog of social media investigations, but denies Plaintiffs' characterization of its contents.  Rick Hoagland authorized Bill Newport to "offer the OT initially for 5 days to allow us to track the productivity and effectiveness of these reviews."  He continued, "[b]ased on the findings, we can decide to continue [the] OT campaign."  Pls. Ex. VV, November 23, 2018 Email from Hoagland to Newport, subject line "RE: OT for Social Media" at G010848. GEICO denies that any work time in connection with Plaintiffs' SOAF No. 11 was "rigorously" tracked as improper argument and unsubstantiated by the cited record evidence.  *Epstein*, 210 F. Supp. 2d at 314 (rejecting "argumentative" statements).**

12.     In June 2020, SIU Manager Bill Newport received approval to run another overtime "campaign," during which Investigators were pre-authorized to work additional hours, similar to the campaign that occurred in 2018.  Ex. WW, June 2020 Cassagne Emails to Supervisors and Investigators at G011584-85.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 12, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

The June 2020 overtime approval was not "similar to the campaign that occurred in 2018" as Plaintiffs allege.  On June 1, 2020, Cassagne emailed the investigators that he supervised, "Investigators will have the ability to use 10 hours a week overtime to work on cases during the month of June … The overtime is there to be USED.  USE IT IF YOU NEED IT."  On June 2, 2020, Cassagne sent a follow up email, "If you do overtime on a specific day, I need an email explaining what cases you worked on … REMEMBER – you can take 10 Hours per week for the month of June.  Use it or lose it."  Pls. Ex. WW, June 2020 Cassagne Emails to Supervisors and Investigators at G011584-85 (emphasis in original).  The overtime was available for investigators to work their normal caseload if needed.  *Id.*  Critically, none of the Plaintiffs subject to GEICO's Motion recorded 10 hours of overtime per week during June 2020 despite GEICO's explicit pre-approval of same.  *See* Def. Ex. 85, Compilation of Time Records.

Subject to the foregoing, Defendant admits that Newport received approval to allow investigators to work up to 10 hours of pre-authorized overtime per week in June and July 2020, but denies the remainder of Plaintiffs' SOAF No. 12.

13.    GEICO applied performance metrics to Investigators, who were scored on a 1-5 scale. Investigators who were rated less than a 3.0 were ineligible for an annual salary increase and put on a performance improvement plan.  *See* Ex. UU, November 2017 Associate Handbook – Employment Contents at G000172; Ex. XX, July 2023 Associate Handbook at G000210; Ex. YY, Reed 2017 Performance Appraisal at G006014-18; Ex. UU, November 2017 Associate Handbook – Employment Contents at G000170; Ex. XX, July 2023 Associate Handbook at G000210; Ex. G, Barden Tr. 167:19-24.

GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF

No. 13, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

SIU investigators' respective performance metrics during an unspecified period is unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness. Further, SIU investigators who were rated less than a 3.0 were placed on a performance improvement plan "if warranted," and not automatically. Pls. Ex. UU, November 2017 Associate Handbook – Employment Contents at G000172. Furthermore, SIU investigators' respective annual performance ratings varied and were adjusted to account for a number of factors including, *inter alia*, a given SIU investigator's participation in "[s]pecial projects, school, continuing education like insurance studies, volunteer work, charity work, helping other people." Def. Ex. 89, 30(b)(6) Tr. 194:15-19. Defendant therefore denies the remainder of Plaintiffs' SOAF No. 13.

Subject to the foregoing, Defendant admits that performance metrics were applied to investigators and that it used a 1-5 scale for SIU investigator performance evaluations, but denies the remainder of Plaintiffs' SOAF No. 13.

14.     One key metric, (Adjusted) Productivity, was calculated as a ratio that divided the number of cases an Investigator closed by the number of work hours reported for the month, and GEICO Supervisors emphasized to Investigators that reporting additional work hours could negatively impact their ratings. *See* Ex. R, SIU Case Investigations Instructions at G017297; Ex. B, Moeser Tr. 104:5-8; 106:2-22.

GEICO's Response: Defendant denies Plaintiffs' SOAF No. 14, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the

outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

The calculation of the "Adjusted Productivity" performance metric during an unspecified period is unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness. *See, e.g.*, *Chandok*, 632 F.3d at 812. GEICO disputes the categorization of the "Adjusted Productivity" measure as a "key" metric. The formula for "Adjusted Productivity" is: "(number of closed cases for productivity * Tenure (or implied tenure factor) * Weight (or implied Adjusted factor) / Total hours worked) * 155". (Pls. Ex. R, SIU Case Investigations Instructions at G017297.) Plaintiffs' contention that "GEICO Supervisors emphasized to Investigators that reporting additional work hours could negatively impact their ratings" is unsupported by the record. Plaintiffs cite only one individual's testimony, and Plaintiff Moeser testified only that "it was explained to me is that you are based on the amount of hours worked in a month," but he could not say who explained the metrics to him, and he could not provide a single example of an SIU investigator whose rating was negatively impacted based on Adjusted Productivity ratio. (Pls. Ex. B, Moeser Tr. 106:2-107:2.) Further, reporting overtime may increase an individual's Adjusted Productivity metric. Assuming hypothetically a four-week month, with 38.75 hours worked in each week, and 30 cases closed, with no tenure or weighting adjustments, a "ratio that divides the number of cases an Investigator closed by the number of work hours reported for the month" is 30 divided by 155, which equals a ratio of .193. (Pls. Ex. R.) If two hours are added to one workweek and that worktime allows for one more case to be closed, the ratio becomes 31 divided by 157 which equals .197. (*Id.*)

15.     Working more overtime hours lowered an Investigator's Productivity score. Ex ZZ,

March 21, 2018 Email from Supervisor Dara Campbell to Constance Mangan at G011670 ("Looks like you worked a lot of overtime which is lowering the overall [adjusted productivity] number."); Ex. A, K. Fischer Tr. 94:11-25; Ex. AAA, SIU Case Investigations Dictionary at G010919-20.

**GEICO's Response:  Defendant denies Plaintiffs' SOAF No. 15, which mischaracterizes the record, is unsupported by record evidence, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO's productivity metric was inversely proportional to the total hours worked. (Pls. Ex. R, SIU Case Investigations Instructions at G017297.)  However, increasing the hours worked allows an investigator to also increase the "number of closed cases," thus usage of overtime can increase an individual's Adjusted Productivity metric. (Responses to Plaintiffs' SOAF No. 13 and 14.)  For example, assuming hypothetically a four-week month, with 38.75 hours worked in each week, and 30 cases closed, with no tenure or weighting adjustments, a ratio that divides the number of cases an Investigator closed by the number of work hours reported for the month is 30 divided by 155, which equals a ratio of .193.  (Pls. Ex. R.)  If two hours are added to one workweek and that worktime allows for one more case to be closed, the ratio becomes 31 divided by 157 which equals .197.  (*Id.*)  Further, major case investigators like Plaintiff M. Fischer were not assessed on any productivity metric, including Adjusted Productivity.  (Def. Ex. 90, M. Fischer Dep. 65:13-16, 94:6-18, 123:17-24, 137:18-138:7; 243:3-10.)**

16.     To score File Quality, GEICO randomly audited cases and assigned a quality score based on various factors, while other metrics, such as Case Life, measured how quickly Investigators resolved cases.  *See* Ex. BBB, Costanzo 2021 Performance Appraisal at G006624; Ex. D Jones Tr.

96:4-13; Ex. B Moeser Tr. 181:13-182:12; Ex. S, SIU Core Metrics Report Card Excel at G007938; Ex. AAA, SIU Case Investigations Dictionary at G0109120-21.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 16, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**The calculation of "File Quality" scores during an unspecified period is unrelated to Plaintiffs' failure to record alleged overtime, GEICO's alleged knowledge of overtime hours worked, or the issue of willfulness.  *See, e.g.*, *Chandok*, 632 F.3d at 812 (2d Cir. 2011).  "Case Life" is "the number of days elapsed between the loss reported date to case closed date."  Pls. Ex. AAA, SIU Case Investigations Dictionary at G0109120-21; *see also* Pls. Ex. S, SIU Core Metrics Report Card Excel at G007938 (defining different variations of "case life").  Cases that required Examinations Under Oath are excluded from "Case Life" calculations. *See id*.  "Case Life" does not appear on Costanzo's 2021 performance appraisal.  Pls. Ex. BBB, Costanzo 2021 Performance Appraisal at G006624.  File quality appears on Costanzo's 2021 performance appraisal, but none of the cited materials support the allegation that GEICO "randomly audited cases and assigned a quality score."  Further, Plaintiffs' citation to the definition of "Case Life" is solely applicable to the period in which the specific version of the SIU Case Investigations Dictionary cited by Plaintiffs (Pls. Ex. AAA) was in effect.  GEICO's calculations of various case metrics have changed over time and have not remained static from 2017 to present. *See, e.g.*, Def. Ex. 89, Newport Tr. 100:13-24 (confirming, with respect to the "productivity" metric, for example, that "[o]ver the years productivity was gauged[,]  [t]here were different ways to measure productivity.  I don't remember where we were in 2020 or**

2019.").

Subject to the foregoing, Defendant admits that Quality and Case Life were metrics that were used at GEICO to assess investigators' performance at times, but denies the remainder of Plaintiffs' SOAF No. 16.

17.     GEICO forwarded "report cards" to Investigators every month showing their ratings and ranked Investigators against each other.  Ex. CCC, October 20, 2021 Email from Supervisor Chester Janik to Michael Grey at G012429-30; Ex. UU, November 2017 Associate Handbook – Employment Contents at G000170; Ex. FF, Newport Tr. 155:21-23).

GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 17, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

For purposes of performance appraisals, GEICO ranks employees against other associates in their department and in the same job titles.  (Pls. Ex. UU, November 2017 Associate Handbook – Employment Contents at G000170.)  Some SIU supervisors circulated a monthly "score card" to their investigators, but this practice varied by SIU supervisor and period.  Def. Ex. 89, 30(b)(6) Tr. 211:15-213:10.

18.     Investigators' caseloads rose steadily over the years, with caseloads increasing after March 2020.  Ex. N, Cassagne Tr. 93:10-12.

GEICO's Response: Defendant denies Plaintiffs' SOAF No. 18, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

**Case volume varied by individual, and some increases in case volume for field investigators during the COVID-19 time period resulted from, as Gerard Cassagne testified "…other factors built into that where the field work was taken away from them. So there was no field work being done. So windshield time was not included in that." Pls. Ex. N, Cassagne Tr. 93:12-16. Furthermore, Margaret Fischer – a major case investigator – confirmed that her caseload decreased upon the onset of COVID in March 2020. Def. Ex. 90, M. Fischer Tr. 242:15-243:10. Daniel King testified that during COVID, investigators "weren't catching as many cases as we were prior to or after COVID. People weren't out driving; people weren't committing fraud during that time." Def. Ex. 93, King Tr. 111:18-112:13 (quotation cleaned up).**

19.    Investigators discussed their increasing caseloads in team meetings and during one-on-one phone calls with their supervisors. Ex. CC, Pia Tr. 220:13-16; Ex. D, Costanzo Tr. 50:13-22, 51:4-23; Ex. A, K. Fischer Tr. 156:20-157:9, 206:10-24; Ex. DDD, Supervisor D'Agata Coaching Log for Ted Wendling at G016093-98.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 19, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO admits that supervisors generally discussed ongoing cases with the investigators they supervised, but the frequency in which supervisors spoke to investigators about their cases varied by case, supervisor and investigator. *See, e.g.*, Pls. Ex. N., Cassagne Tr. 50:16-51:8, 93:12-16; Pls. Ex. D, Costanzo Tr. 51:4-23. For example, major case investigators like M. Fischer were required to log investigative activities in a diary entry every**

**15 business days.  Def. Ex. 90, M. Fischer, 93:15-94:3.  Defendant denies the remainder of Plaintiffs' SOAF No. 19.**

20.    Thomas Barden testified to working 55 to 60 hours per week.  He "had meetings with supervisors and discussed the time that [Investigators] were actually putting into cases, and how much time [they] were spending working off the clock."  Ex. G, Barden Tr. 101:13-22. Starting around July 2020, Mr. Barden stopped requesting overtime because GEICO told him he was not allowed to record it.  *Id.* 99:16-21.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 20, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Barden testified to working 55 to 60 hours per week but only from July or August 2020 to December 2022.  Pls. Ex. G, Barden Tr. 101:4-25.  As to the period from January to March 2020, Barden testified, "I don't recall working hardly any overtime during that time period." *Id*. at 97:7-13.  Barden also testified that from March 2020 through July or August 2020, he accurately logged his overtime, and GEICO paid him for the overtime he recorded.  *Id.* at 98:8-99:8.  Barden failed to provide any testimony regarding who allegedly told him he was not allowed to record overtime, even though his direct supervisor Janik explicitly told him to log his overtime.  *See id.*; Def. Ex. 8 ("if you're working extra hours, put in for it. Document it," and specifically told his team "I don't[] want anyone working over their 7.75 hours, without putting in for overtime.).  *See generally,* Def. Ex. 24, ¶ 38.**

**Subject to the foregoing, Defendant admits that Barden testified to working overtime in certain time periods, but denies the remainder of Plaintiffs' SOAF No. 20.**

21.    GEICO assigns cases through its database SICM ("Special Investigation Case Management"), where Investigators submit casework. Ex. GG, 30(b)(6) Tr. 188:15-17.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 21, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO admits that it assigned some cases through the SICM system but other cases are assigned via email.  Pls. Ex. GG, 30(b)(6) Tr. 259:15-21; 260:12-261:10 (confirming that "some cases are not assigned through SICM").  GEICO admits that investigators ultimately log investigative activities in SICM.**

22.    SICM records the date and time when a Special Investigator is assigned a new case. Ex. N, Cassagne Tr. 235:12-15.

**GEICO's Response:  Defendant admits in part and denies in part Plaintiffs' SOAF No. 22, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**SICM records the date and time when an SIU investigator is assigned a new case if the case was assigned through SICM.  GEICO also refers to its Response to Plaintiffs' SOAF No. 21.**

23.    Special Investigators "mark down every task that they take" in SICM, and these entries are timestamped. Ex. GG, 30(b)(6) Tr. 262:20-24.

**GEICO's Response:  Defendant admits in part and denies in part Plaintiffs' SOAF No. 23, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of**

the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

SIU investigators log summaries of tasks that they undertake in SICM, but do not log every aspect of every investigative activity (particularly those that did not uncover relevant information) and SICM does not keep track of the number of tasks within a given case, the hours worked on any given task, or when the work that resulted in a SICM entry was actually completed or how long it took.  Pls. Ex. GG, 30(b)(6) Tr. 262:20-24; 263:22-24; 267:11-18; Def. Ex. 81 (O'Neil notes of conversation with investigators); GEICO Statement Of Material Facts ("SOMF") Nos. 9, 84, 96, 159.  Keith Fischer opined that 75% of work happens outside of SICM.  Def. Ex. 81.

24.    After an investigation, when Investigators "close out" of a case, SICM timestamps this action.  Ex. GG, 30(b)(6) Tr. 267:15-18.

**GEICO's Response:  Admitted.**

25.    After Investigators complete their work, SICM tracks their activity metrics, including Productivity, Case Life, and File Quality.  Ex. GG, 30(b)(6) Tr. 197:2-6, 197:21-198:5, 198:10-12; Ex. N, Cassagne Tr. 235:16-20.

**GEICO's Response:  Defendant admits in part and denies in part Plaintiffs' SOAF No. 25, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**While certain metrics derive data from the SICM database, other databases, such as Guardian, are also used to track metrics.  Pls. Ex. GG, 30(b)(6) Tr. 197:2-6; 197:21-198:5. GEICO refers to its Response to Plaintiffs' SOAF Nos. 13, 16, 23 and reasserts that not all SIU**

**investigators were scored on all activity metrics, including Productivity and Case Life.**

26.     GEICO considered travel time to investigation-related appointments to be work time. *See* Pls. Ex. Q, November 25, 2016 Email from Supervisor Gerard Cassagne to Keith Fischer at P00000077 (stating "your travel time to appointments is considered working hours").

**GEICO's Response:  Defendant denies Plaintiffs' SOAF No. 26, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO's policy is that "travel time does not include typical commuting time to work and likewise does not include commuting time from home to an event."  Def. Ex. 94, November 2017 HR Handbook Travel Time Policy at G000042.   Further, "travel time that is considered work time" begins "when the associate reaches his/her first field appointment.  Travel time that is considered work time will end at the conclusion of work at the site of the last appointment."  *Id.* at G000040-41.  Plaintiffs' email from Cassagne to K. Fischer encompasses travel time between multiple appointments, and does not address travel from appointments to an individual's home.  *See* Pls. Ex. Q and *also* Def. Ex. 38.**

27.     Investigators working in the field also considered their travel time to be work time. *See, e.g.*, Ex. M, Caniglia, Jr. Tr. 197:2-17 ("I also want to get on the record that, like, when you say travel, *we're field investigators.  So me going to some place is work.*  When I leave, like, I'm doing -- I'll get a case.  I'll do database searches.  I'll make phone calls.  I'll call local police departments, do what I have to do, and then I'll go out and try to get to the location where I have to canvass or anything like that.  *So if I'm stuck in traffic, to me, that's still work.*" (emphasis added)); Ex. K, Brust Tr. 55:10-16 ("You're a field investigator, and . . . we want you in the field.  We don't want . . . your

investigations all to be conducted in your house.").

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 27, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.** *See*, *e.g.*, *Holtz*, **258 F.3d at 74;** *Epstein*, **210 F. Supp. 2d at 314. An employee's belief of what is or is not compensable time is irrelevant to whether the time is legally compensable under federal or state law.**

**GEICO admits that Caniglia, Jr. and Brust testified that they considered their travel time to be work time. GEICO denies that Plaintiffs' belief about their work time makes it so. Def. Ex. 94, November 2017 HR Handbook Travel Time Policy at G000040-42 ("travel time that is considered work time" begins "when the associate reaches his/her first field appointment. Travel time that is considered work time will end at the conclusion of work at the site of the last appointment."). Further, K. Fischer stated that his naps in the field were "work time." Def. Ex. 2, K. Fischer Dep. 242:21-243:24.**

28.    Investigators who conducted field work spent many hours driving to investigation related appointments within their prescribed territories. For example, in the second half of 2022, Craig Costanzo's territory increased to include Rochester, New York – an "hour and a half to two hours away." Ex. D, Costanzo Tr. 225:8-13. He estimates that he travelled "6,877 miles" within his territory during this timeframe. *Id.* 19-23. Charise Jones spent "hours and hours on the road" each day to complete her duties, as her territory included cases that could be up to a few hours "one way." Ex. C, Jones Tr. 154:18-21, 231:6-12.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 28, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.** *See*, *e.g.*, *Holtz*, **258 F.3d at**

74; *Epstein*, 210 F. Supp. 2d at 314.

GEICO admits that field investigators regularly drove varying distances to investigations. *E.g.* Def. Ex. 95 Munoz Tr. 91:22-92:19 (Munoz would drive one block or up to 120 miles). GEICO denies that Plaintiffs performed field work or "spent many hours driving to investigation related appointments" immediately following the COVID-19 pandemic in March 2020 and many months thereafter. (Ex. N, Cassagne Tr. 93:12-16.)

29.    GEICO Supervisors often received requests for overtime late in the evening. *See, e.g.*, Ex. EEE, November 30, 2016 Email from Keith Fischer to Gerard Cassagne at G011492; Ex. FFF, June 3, 2020 Email from Albert Brust to Gerard Cassagne at G012079; Ex. GGG, December 15, 2016 Email from Louis Caniglia, Jr. to Gerard Cassagne at G011493.

GEICO's Response: Defendant denies Plaintiffs' SOAF No. 29, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.

GEICO supervisors received requests for overtime at various times of the day. *See* Def. Ex. 48 (G017971, overtime request made at 11:24 AM on August 1, 2023; G012461, overtime request made at 1:50 PM on August 25, 2018; G012457, overtime request made at 1:07 PM on December 6, 2018); Def. Ex. 56 (G011931, overtime request made at 4:56 PM on January 21, 2020; G012158, overtime request made at 7:59 AM on June 3, 2020); Def. Ex. 61 (G011615, overtime request made at 5:32 PM on August 15, 2017).

To the extent Plaintiffs characterize "requests for overtime" as occurring "late in the evening" based on the documents' identified timestamps, GEICO disputes and denies Plaintiffs' characterization. For example, K. Fischer's November 30, 2016 email to Cassagne

was not a "request[] for overtime late in the evening," but rather a response to Cassagne's earlier email asking K. Fischer and other SIU investigators to "[p]lease advise if you have any overtime so far this week."  Pls. Ex. EEE, November 30, 2016 Email from K. Fischer to Gerard Cassagne at G011492.  K. Fischer's email confirms that he was "[s]topping now at 7PM."  (*Id.*)  Pursuant to the Parties' Stipulation Concerning Production of Electronically Stored Information (*see* DE No. 61 and June 5, 2024 Court Order approving same), timestamps on emails such as this are listed as Coordinated Universal Time (UTC).  As such, K. Fischer actually sent his November 30, 2016 email to Cassagne (Pls. Ex. EEE) with an apparent sent time of "11:55:34 PM" at approximately 6:55 pm EST.  Similarly, the June 3, 2020 email from Albert Brust to Cassagne at G012079 (Pls. Ex. FFF) confirmed overtime already worked, rather than a proactive request to work overtime.  Caniglia, Jr. similarly emailed Cassagne requesting 2 hours of overtime apparently on December 15, 2016, at 1:43 AM (UTC), but that means he actually sent the email at 8:43 PM EST the prior day.

30.     Plaintiffs complained to their supervisors about their workload multiple times and on multiple occasions.  For example, Plaintiff Mangan described a Christmas luncheon involving the entire office in or around 2018:

> The last large meeting that I can remember was – it was either 2018 or 2019 . . . and that was a meeting that was upstate investigators, Staten Island investigators, the local metropolitan area investigators, including Nassau and Suffolk County, the five boroughs of the city, our supervisors, inside staff, people from legal who prepared our legal letters for us, our – and our manager also, Bill Newport, I know was there. . . .
>
> I – it would have to be at least forty people........ That meeting was being led by Bill Newport, which I recall because he – we never saw him......... Collectively we raised issues of unreasonable and unmanageable caseloads, and specifically I remember Mark Giambalvo speaking and he was a – very well spoken, Mark, and often he would sort of be a spokesperson for us because he was so well spoken.  He was very articulate.  And I can remember at this particular meeting that Mark Giambalvo was speaking to the caseload, and how everybody was

struggling, and that we weren't able to manage it, and that we were working past our scheduled hours. And I remember Bill Newport just shrugged his shoulders and said, "I don't give a fuck."

Q. He said that explicitly?

A. Explicitly, and it has stuck with me to this day, because I was stung by it. I – I could not believe that he would act in such an unprofessional manner. But it stunned the whole room. It just went quiet.

Ex. Z, Mangan Tr. 182:24-184:20.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 30, which mischaracterizes the record, contains hearsay testimony that is inadmissible, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Plaintiffs' SOAF No. 30 fails to conform to Local Civil Rule 56.1(b)'s requirement for a "short and concise statement" because it is more than 20 lines of quoted deposition testimony. *See* Local Civil Rule 56.1(b). Further, the testimony presented describes an alleged single complaint in or around 2018 or 2019, and not "complaints… multiple times and on multiple occasions."**

**The testimony contained in Plaintiffs' SOAF No. 30 also constitutes inadmissible hearsay. Mangan recounts out-of-court statements by Mark Giambalvo and Bill Newport for their truth – *i.e.*, that Newport (and by implication, GEICO) did not "give a fuck" about alleged work past "scheduled hours." Pls. Ex. Z, 184:2-185:23. But Plaintiffs fail to establish any hearsay exception for the quoted statements, rendering them inadmissible evidence that cannot be considered at summary judgment. See *Morris,* 37 F. Supp. 2d at 568 ("Hearsay statements … which cannot be categorized as a hearsay exception" may be stricken from a Rule 56.1 statement); *Epstein*, 210 F. Supp. 2d at 314 (explaining that "inadmissible hearsay"**

is not proper evidence); *Burlington Coat Factory Warehouse Corp.* 769 F.2d at 924 (explaining that party submitting inadmissible hearsay in opposing a motion for summary judgment must show evidence will be available at trial).

Finally, no other Plaintiff or record evidence substantiates Mangan's self-serving allegations. To the contrary, several Plaintiffs admit they never made any explicit complaints that they worked more hours than they recorded into GEICO's timekeeping software. GEICO refers to its SOMF Nos. 70, 82, 100, 147, 177, 205. *See also* Pls. Exs. K, M. Generalized complaints about "workload," or that "everyone" was "struggling" do not establish that the Plaintiffs at issue in GEICO's motion were part of this meeting, are encompassed within the generalized alleged complaint, or that any individual had knowledge that Plaintiffs worked off-the-clock or overtime in any particular workweek. Additionally, vague comments like Costanzo stating, "I have to work past the times to try to meet these requirements" (Def. Ex. 35, 50:13-51:3) and K. Fischer stating, "that [he was] doing weekends" (Pls. Ex. A. 122:17-123:4) similarly do not establish actual knowledge. *See also* Pls. Ex. V, 94:4-9. Last, workload status is not indicative of any alleged overtime hours as some investigators workload status varied for multiple reasons. Def. Ex. 97, Moeser Emails (G021475).

31.    Similarly, in Craig Costanzo's experience, it was "pretty clear" that Investigators could not "keep up with this [workload] and get the[] deadlines done." Ex. D, Costanzo Tr. 142:12-143:2. Costanzo recalled telling his supervisor, Chet Janik, that he had "to stay . . . [and] work past the times to try to meet [GEICO's] requirements." *Id.* 50:12-22. He also recalled a conversation with Bill Newport where he told Newport that GEICO was giving Investigators "way too many cases to have the expectation that [they would be] able to do this in eight hours." *Id.* 51:8-23.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 31, which mischaracterizes the record and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.** *See*, *e.g.*, *Holtz*, **258 F.3d at 74;** *Epstein*, **210 F. Supp. 2d at 314.**

**Costanzo's cited testimony does not address that he was "work[ing] past the times" but not recording such time. The record demonstrates that during the relevant time period, Costanzo recorded and was paid for over 300 hours of overtime, which he recorded in 59 workweeks. Def. Ex. 24, ¶ 22. Further, Costanzo testified that he did not remember Janik admitting that Janik actually knew or understood that investigators were working more time than they recorded. Pls. Ex. D Costanzo Tr. 142:12-144:5 ("what I think and what I believe is all I know – I don't have anything else other that that's what I believe.). GEICO also refers to its SOMF Nos. 55, 56, 61.**

32.     As a Major Case Investigator, Plaintiff Margaret Fischer worked primarily from the office or her home and used her computer to run background checks, database reviews, public record searches, and to verify licenses. Ex. T, M. Fischer Tr. 58:17-59:8, 87:2-7, 94:19- 96:16.

**GEICO's Response:  Admitted.**

33.     Plaintiffs submitted 27 declarations in support of their Renewed Motion for Class Certification (*see* Docket Entries ("DE") 56-1 to -27), from the following Plaintiffs and Opt-in Plaintiffs: (1) Thomas Barden; (2) Scott Brady; (3) Albert Brust; (4) Louis Caniglia, Jr.; (5)  Louis Caniglia, Sr.; (6) Craig Costanzo; (7) Vito DiNiso; (8) Keith Fischer; (9) Margaret Fischer; (10) Anthony Geraci; (11) Mark Giambalvo; (12) John Gillen; (13) Michael Grey; (14) Charise Jones; (15) Daniel King; (16) Constance Mangan; (17) George McManus; (18) John Moeser; (19) Maria Muñoz; (20) Joseph Neenan; (21) Michael O'Sullivan; (22) Louis Pia; (23) Michael Reed; (24) Evan

Teatum; (25) Ted Wendling; (26) Danielle Ennis; and (27) Mark Sowell. All of these declarations described unpaid overtime. DE 56-1 to 56-27.

**GEICO's Response: Defendant admits in part and denies in part Plaintiffs' SOAF No. 33, which violates this Court's instructions, Plaintiffs' counsel's prior representations, and is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**GEICO admits that Plaintiffs submitted 27 declarations in connection with this matter. Plaintiffs' SOAF No. 33 fails to conform to Local Civil Rule 56.1(b)'s requirement for a "short[] and concise statement" because it merely describes the fact that Plaintiffs previously filed declarations, and the docket speaks for itself. *See* Local Civil Rule 56.1(b). Plaintiffs' summary description of the declarations content is similarly not a statement of an undisputed material fact. *See id.* Moreover, on July 1, 2025, the Court explicitly stated to Plaintiffs' counsel that it was not permitted to use the declarations of opt-in Plaintiffs who GEICO did not have the opportunity to depose, expressly stating that doing so "doesn't work" as sufficient evidence to oppose summary judgment because "defendants haven't yet had the ability to test" Plaintiffs' evidence. (Def. Ex. 96, Transcript of July 1, 2025, Status Conference 19:14-20:14; *id*. at 19:19-25 (the Court explaining to Plaintiffs' counsel that it "didn't want to come to a situation where the defendants have briefed summary judgment and then you are opposing and saying, oh, by the way, all of GEICO has knowledge. Look at these declarations by people, oh, by the way, bracket, those people have not been deposed yet. That doesn't work.")) Plaintiffs "understood" the Court's instructions and acknowledged the parameters set forth by the Court, yet now impermissibly attempt to rely on evidence Plaintiffs confirmed they would not use as GEICO was not permitted to depose nine of the Plaintiffs – Anthony Geraci,**

**Louis Caniglia, Sr., Evan Teatum, Joseph Neenan, Mark Giambalvo, George McManus, Scott Brady, Vito DiNiso, and Joseph Costanza.  (*Id.*)  Thus, Plaintiffs' use of declarations from any opt-in Plaintiff that GEICO was not entitled to depose, as evidence in opposition of summary judgment is not appropriate and was expressly prohibited in the Court's July 1 instructions. Moreover, these self-serving declaration does not provide evidence relevant to the claims of the Plaintiffs that are subject to GEICO's Motion for Summary Judgment.[3]**

34.     Scott Brady worked an average of 49 hours a week before March 2020, 71 hours per week from March 2020 through December 2021, and 60 hours per week in 2022.  DE 56-2, Brady Decl. ¶ 12.  Despite working overtime, he only entered – and was only paid for – 7.75 hours per day, Monday through Friday.  *Id.* ¶ 8.  From his conversations with his supervisors, he understood that GEICO only paid overtime for special situations where GEICO had "additional work to offer me," but "did not authorize overtime if I needed to work on my regular caseload." *Id.* ¶¶ 8, 13.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 34, which violates this Court's explicit instructions, Plaintiffs' counsel's prior representations, and which is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion.  *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Plaintiffs' SOAF No. 34 fails to conform to the short and concise nature of statements as required by the Local Civil Rules.  *See* Local Civil Rule 56.1(b).  Moreover, on July 1, 2025, the Court explicitly stated to Plaintiffs' counsel that it was not permitted to use the declarations of opt-in Plaintiffs who GEICO did not have the opportunity to depose, expressly stating that**

---

[3] GEICO's Motion and Memorandum in Support of its Motion for Summary Judgment is directed to Named Plaintiffs:  Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan, and Charise Jones; and Opt-In Plaintiffs Louis Caniglia, Jr., Michael Grey, Daniel King, Margaret Fischer, Craig Costanzo, Ted Wendling, Maria Munoz and Albert Brust.

doing so "doesn't work" as sufficient evidence to oppose summary judgment because "defendants haven't yet had the ability to test" Plaintiffs' evidence. (Def. Ex. 96, Transcript of July 1, 2025, Status Conference 19:14-20:14 (the Court explaining to Plaintiffs' counsel that it "didn't want to come to a situation where the defendants have briefed summary judgment and then you are opposing and saying, oh, by the way, all of GEICO has knowledge. Look at these declarations by people, oh, by the way, bracket, those people have not been deposed yet. That doesn't work.")) Plaintiffs "understood" the Court's instructions and acknowledged the parameters set forth by the Court, yet now impermissibly attempt to rely on evidence Plaintiffs confirmed they would not use as GEICO was not permitted to depose Brady. (*Id.*) Thus, Plaintiffs' use of a declaration from Brady, an opt-in Plaintiff that GEICO was not entitled to depose, as evidence in opposition of summary judgment is not appropriate and was expressly prohibited in the Court's July 1 instructions. Even if Plaintiffs were entitled to use Brady's declaration, which they are not and their attempt to do so is contrary to their prior representations, his self-serving declaration does not provide evidence relevant to the claims of the Plaintiffs that are subject to GEICO's Motion for Summary Judgment.

To the extent the Court considers Brady's declaration as part of GEICO's motion, which would be unfairly prejudicial to Defendant, GEICO states that Brady worked overtime, submitted for overtime compensation, and was paid overtime wages. Def. Ex. 1, J. Fogarty 2024 Decl., ¶31.

35.        Vito DiNiso worked an average of 44 to 46 hours per week between November 2016 and May 2023. DE 56-7, DiNiso Decl. ¶ 10. His supervisor Dara Campbell "frequently reiterated" to him "and other Special Investigators that hours above 38.75 to complete regular case work would not be approved." *Id.* ¶ 11. DiNiso regularly complained to his supervisor about the lack of overtime

pay and increasing caseload, *id.* ¶ 13, and on November 8, 2022, asked her directly by email: "Is GEICO authorizing overtime to work the excess of cases being assigned?" Ms. Campbell responded, "No there has been no mention of overtime." Ex. HHH, November 8, 2022 Email from Supervisor Dara Campbell to Vito DiNisio at P00000065-68. As a result, DiNiso only entered 7.75 hours a day, five days a week, into GEICO's timekeeping system, regardless of his actual hours worked. DE 56-7, DiNiso Decl. ¶ 6.

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 35, which violates this Court's explicit instructions, Plaintiffs' counsel's prior representations, and which is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Plaintiffs' SOAF No. 35 fails to conform to the short and concise nature of statements as required by the Local Civil Rules. *See* Local Civil Rule 56.1(b). Moreover, on July 1, 2025, the Court explicitly stated to Plaintiffs' counsel that it was not permitted to use the declarations of opt-in Plaintiffs who GEICO did not have the opportunity to depose, expressly stating that doing so "doesn't work" as sufficient evidence to oppose summary judgment because "defendants haven't yet had the ability to test" Plaintiffs' evidence. (Def. Ex. 96, Transcript of July 1, 2025, Status Conference 19:14-20:14 (the Court explaining to Plaintiffs' counsel that it "didn't want to come to a situation where the defendants have briefed summary judgment and then you are opposing and saying, oh, by the way, all of GEICO has knowledge. Look at these declarations by people, oh, by the way, bracket, those people have not been deposed yet. That doesn't work.")) Plaintiffs "understood" the Court's instructions and acknowledged the parameters set forth by the Court, yet now impermissibly attempt to rely on evidence Plaintiffs confirmed they would not use as GEICO was not permitted to depose DiNiso. (*Id.*) Thus,**

**Plaintiffs' use of a declaration from DiNiso, an opt-in Plaintiff that GEICO was not entitled to depose, as evidence in opposition of summary judgment is not appropriate and was expressly prohibited in the Court's July 1 instructions. Even if Plaintiffs were entitled to use DiNiso's declaration, which they are not and their attempt to do so is contrary to their prior representations, his self-serving declaration does not provide evidence relevant to the claims of the Plaintiffs that are subject to GEICO's Motion for Summary Judgment.**

**To the extent the Court considers DiNiso's declaration as part of GEICO's motion, which would be unfairly prejudicial to Defendant, GEICO states that DiNiso worked overtime, submitted for overtime compensation, and was paid overtime wages. Def. Ex. 1, J. Fogarty 2024 Decl., ¶31.**

36.     Anthony Geraci worked an average of 42 to 45 hours per week from December 2016 to March 2020, and 45 to 50 hours per week from March 2020 to November 2020. DE 56-10, Geraci Decl. ¶ 9. Because Geraci's supervisor told him that overtime needed to be requested and preapproved, and that requesting overtime would negatively impact his productivity ratings, he only entered 7.75 hours per day into GEICO's timekeeping system. *Id.* ¶ 6. In Spring 2018, Geraci attended a skip-level meeting with Bill Newport, Michael DeGrocco, and other Special Investigators where investigators raised complaints about caseloads and overtime hours. *Id.* ¶ 12. While the managers acknowledged their complaints, GEICO did not adjust their caseloads. *Id.*

**GEICO's Response: Defendant denies Plaintiffs' SOAF No. 36, which violates this Court's explicit instructions, Plaintiffs' counsel's prior representations, and which is immaterial to and irrelevant to the outcome of the issues presented by Defendant's summary judgment motion. *See*, *e.g.*, *Holtz*, 258 F.3d at 74; *Epstein*, 210 F. Supp. 2d at 314.**

**Plaintiffs' SOAF No. 36 fails to conform to the short and concise nature of statements**

as required by the Local Civil Rules.  *See* Local Civil Rule 56.1(b).  Moreover, on July 1, 2025, the Court explicitly stated to Plaintiffs' counsel that it was not permitted to use the declarations of opt-in Plaintiffs who GEICO did not have the opportunity to depose, expressly stating that doing so "doesn't work" as sufficient evidence to oppose summary judgment because "defendants haven't yet had the ability to test" Plaintiffs' evidence.  (Def. Ex. 96, Transcript of July 1, 2025, Status Conference 19:14-20:1 (the Court explaining to Plaintiffs' counsel that it "didn't want to come to a situation where the defendants have briefed summary judgment and then you are opposing and saying, oh, by the way, all of GEICO has knowledge. Look at these declarations by people, oh, by the way, bracket, those people have not been deposed yet. That doesn't work."))  Plaintiffs "understood" the Court's instructions and acknowledged the parameters set forth by the Court, yet now impermissibly attempt to rely on evidence Plaintiffs confirmed they would not use as GEICO was not permitted to depose Geraci.  (*Id.*)  Thus, Plaintiffs' use of a declaration by Geraci, an opt-in Plaintiff that GEICO was not entitled to depose, as evidence in opposition of summary judgment is not appropriate and was expressly prohibited in the Court's July 1 instructions.  Even if Plaintiffs were entitled to use Geraci's declaration, which they are not and their attempt to do so is contrary to their prior representations, his self-serving declaration does not provide evidence relevant to the claims of the Plaintiffs that are subject to GEICO's Motion for Summary Judgment.