# EXHIBIT 89

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____
                                     )
KEITH FISCHER, MICHAEL               )
O'SULLIVAN, JOHN MOESER, LOUIS       )
PIA, THOMAS BARDEN, CONSTANCE        )
MANGAN, and CHARISE JONES,           )
individually and on behalf of        )
all others similarly situated,       )
                                     )  Case No.
            Plaintiffs,              )  23-Civ-02848(GRB)(ARL)
                                     )
       v.                            )
                                     )
GOVERNMENT EMPLOYEES INSURANCE       )
COMPANY d/b/a GEICO,                 )
                                     )
            Defendant.               )
_____)

VIDEOTAPED 30(b)(6) DEPOSITION of DEFENDANT,
GOVERNMENT EMPLOYEES INSURANCE COMPANY, by
JENNIFER FOGARTY

Friday, October 25, 2024
9:30 a.m.

Held at Outten & Golden LLP
685 New York Avenue, 25th Floor
New York, NY 10017

Reported stenographically by
JOSHUA B. EDWARDS, RDR, CRR, CRC
Notary Public of the State of New York
Registration No. 01ED0000628
Job No. 1212113



```
                                                          Page 2

 1                    A P P E A R A N C E S
 2
     On behalf of the Plaintiffs:
 3
         OUTTEN & GOLDEN LLP
 4       685 Third Avenue, 25th Floor
         New York, NY 10017
 5       212-245-1000
 6       BY:  SABINE JEAN, ESQ.
               MICHAEL SCIMONE, ESQ.
 7             sjean@outtengolden.com
               mscimone@outtengolden.com
 8
 9
     On behalf of the Defendant:
10
         DUANE MORRIS LLP
11       190 South LaSalle Street, Suite 3700
         Chicago, IL 60603
12       312-499-6711
13       BY:  JENNIFER RILEY, ESQ.
               jariley@duanemorris.com
14
15
     ALSO PRESENT:
16
         JEREMY KOVACS, Legal Videographer
17
                        *       *       *
18
19
20
21
22
23
24
25
```



Page 3

1              IT IS HEREBY STIPULATED AND AGREED, by and

2    between the attorneys for the respective parties

3    herein, that filing and sealing be and the same are

4    hereby waived.

5              IT IS FURTHER STIPULATED AND AGREED that

6    all objections, except as to the form of the question,

7    shall be preserved to the time of trial.

8              IT IS FURTHER STIPULATED AND AGREED that

9    the within deposition may be signed and sworn to before

10   any officer authorized to administer an oath, with the

11   same force and effect as if signed and sworn to before

12   the officer before whom the within deposition was

13   taken.

14                    *         *         *

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1              (Fogarty Exhibit 1, Second Amended Notice of
 2         Deposition, was marked for identification.)
 3              THE VIDEOGRAPHER:  Good morning.  We are now
 4         on the record.  This begins Videotape Number 1
 5         in the deposition of Jennifer Fogarty in the
 6         matter of Keith Fischer, et al., versus
 7         Government Employees Insurance Company, d/b/a
 8         GEICO.
 9              Today is Friday, October 25, 2024, and the
10         time is 9:40 a.m.  This deposition is being
11         taken at Outten & Golden LLP, 685 Third Avenue,
12         25th floor, New York, New York 10017 at the
13         request of Outten & Golden.
14              The videographer is Jeremy Kovacs at Magna
15         Legal Services, and the court reporter is Joshua
16         Edwards of Magna Legal Services.
17              Will counsel and parties present state their
18         appearances and whom they represent.
19              MS. JEAN:  Good morning.  This is Sabine Jean
20         from Outten & Golden, for plaintiffs.
21              MR. SCIMONE:  Michael Scimone with Outten &
22         Golden, for plaintiffs.
23              MS. RILEY:  Jennifer Riley of Duane Morris,
24         for defendant, GEICO.
25              THE VIDEOGRAPHER:  Will the court reporter
```



Page 5

1           please swear in the witness.

2                (Witness sworn in.)

3    JENNIFER FOGARTY, called as a witness, having been

4    first duly sworn by Joshua B. Edwards, a Notary Public

5    of the State of New York, Registration No. 01ED0000628,

6    was examined and testified as follows:

7    EXAMINATION BY

8    MS. JEAN:

9        Q.    Good morning.  My name is Sabine Jean.  And

10   as I just mentioned, I'm an attorney here at Outten &

11   Golden, and I represent plaintiffs.

12                With me is my colleague Michael Scimone, who

13   is also here from Outten & Golden, representing

14   plaintiffs in this matter.

15                Can you please state and spell your name for

16   the record.

17       A.    Jennifer Fogarty, J-E-N-N-I-F-E-R

18   F-O-G-A-R-T-Y.

19       Q.    Thank you.

20                Do you understand that you are under oath and

21   that you have sworn to tell the truth here today?

22       A.    Yes.

23       Q.    So even though there's no judge or jury here,

24   your testimony has the same force and effect as if you

25   were testifying in court.  Do you understand that?



Page 71

1      A.      SIU supervisor.

2      Q.      Would the SIU supervisor offer any guidance

3  on what needs to be done to conduct an investigation?

4      A.      It depends.

5      Q.      What does it depend on?

6      A.      Whether the person -- the level of experience

7  of the investigator.

8      Q.      Is there anything else that it depends on?

9      A.      There could be -- the supervisor's job is to

10  coach.  There could be other reasons.

11      Q.      How would an SIU supervisor help an

12  investigator determine what needs to be done for an

13  investigation?

14      A.      It would depend on the case.  I couldn't

15  speak to anything specifically.  Every investigation is

16  like a snowflake.  There are no two alike.

17      Q.      Do all senior field security investigators go

18  into the field to conduct investigations?

19      A.      It depends.

20      Q.      On what?

21      A.      What they determine has to be done.  It's up

22  to them.

23      Q.      Are you aware of circumstances where a senior

24  field security investigator determined that the

25  investigation does not require going into the field?



Page 91

1       Q.      Do major case SIU investigators work in the

2    field or do field work as we discussed earlier?

3       A.      No.

4       Q.      Where do they work?

5       A.      From home office or home depending on the

6    time period.

7       Q.      For the time period of 2016 to 2020, where

8    did they work?

9       A.      Prior to the pandemic?

10       Q.      Correct.

11       A.      In regional offices across the country.

12       Q.      Did they start working remotely after the

13    pandemic?

14       A.      Yes.

15       Q.      What job title do major case SIU

16    investigators report to?

17       A.      SIU supervisor.

18       Q.      And who do SIU supervisors report to?

19       A.      Usually an SIU manager.

20       Q.      What is a major case?

21       A.      It is a more complex case than an

22    investigation of an individual claim.

23       Q.      What would make something a more complex

24    case?

25       A.      Involving multiple claims is one way.



Page 141

1    A.    At this time it was a process that they were

2    piloting in only one region.

3    Q.    Was that Region 8?

4    A.    Yes.

5    Q.    But what is "assist"?  What does that mean?

6    A.    Means that -- it means that region 8 was

7    double-counting cases in most cases.  Because every

8    time somebody got it in a desk, they would then assign

9    a duplicate case to somebody in the field to do one

10   task for them to make it look like they were working

11   more cases than they were.

12   Q.    Is the term "assist" still used in present

13   day --

14   A.    Yes.

15   Q.    -- by SIU?

16         Does the practice of assist still exist?

17   A.    In a different way, yes.

18   Q.    What is that way?

19   A.    If somebody works at the desk in a desk role

20   and they are investigating and they need something done

21   in the field because they cannot resolve the case, then

22   they will ask for an assist from somebody who is in the

23   field near where whatever it is they need exists.  So

24   if they need a police report, they will assign a case

25   to a field investigator to go get them that police



Page 142

1    report.

2        Q.    Do you know how often that happens?

3        A.    No.  It's case-by-case basis.

4        Q.    If you continue on that line it says, "Back

5    out names from managers for those doing special

6    projects (special)."  What are special projects?

7        A.    Could be anything.  It's a special project.

8        Q.    Can you give me examples?

9        A.    An example is the manager that used to be in

10   the Arizona office had a special project where he had

11   his investigators working on presentations for an

12   industry fraud group.

13       Q.    How often do special projects come up?

14       A.    Depends on what year you are talking about,

15   what office, what manager, what team.  It could happen

16   at any time, multiple at the same time.  It's a term

17   for anything out of what their normal job duty is.

18       Q.    Can you give me another example than the

19   example you gave to me, but relating to Region 2 and

20   investigators?

21       A.    I wouldn't know what special projects

22   Region 2 assigned.

23       Q.    Do special projects still exist today?

24       A.    They could, yeah.

25       Q.    Do investigators in New York do special



Page 194

1      Q.    Oh.

2      A.    And I don't remember.  We talked about this

3  earlier.

4      Q.    Supervisor?

5      A.    What the heck does it stand for?

6  Performance-something, supervisor performance review,

7  something like that.

8      Q.    Are supervisor performance review or SPR

9  guidelines used to conduct performance reviews for

10  investigators?

11      A.    It's 40 percent of their core metric rating,

12  and then their core metric rating is a portion of one

13  item out of many that are reviewed to establish their

14  end-of-year rating.

15      Q.    What are the other items that are used to

16  establish the end-of-year rating?

17      A.    Special projects, school, continuing

18  education like insurance studies, volunteer work,

19  charity work, helping other people.

20      Q.    When you say "school" earlier, you said

21  "degree."  Is that the same thing?

22      A.    Mm-hmm.

23      Q.    Does that mean if an investigator obtained a

24  degree during the course of the year for the annual

25  performance review, they would be assessed on attaining



Page 211

1      A.     No.

2      Q.     Do you know where these ratings come from?

3      A.     No.

4      Q.     Do you know who would know?

5      A.     Likely Vito whose report card it is.

6      Q.     Do you know who Vito Diniso is?

7      A.     No.

8      Q.     Do you know who the owner of these monthly

9   spreadsheets are?

10     A.     No.

11     Q.     Would it be an SIU supervisor?

12            MS. RILEY:  Object to form.  Subject to that,

13       you may answer.

14     A.     I have no idea.

15     Q.     Who is responsible for giving investigators

16   monthly report cards?

17     A.     Their supervisor.

18     Q.     Does a supervisor keep track of monthly

19   scorecards in the ordinary course of business?

20     A.     I don't know what you mean by "keep track

21   of."

22     Q.     For example, we are looking at an Excel

23   spreadsheet.  Is it common for supervisors to use Excel

24   spreadsheets to keep track of monthly scorecards?

25     A.     They could.  It depends on the supervisor.



Page 212

1    It's up to them.

2        Q.    In what circumstance would you see a monthly

3    scorecard?

4        A.    When the supervisor decided to create one

5    that looks like this that breaks down the different

6    parts of their activities.  Every supervisor does it

7    different.  All they have to do is make sure that their

8    associates knows how they are doing monthly, and they

9    coach them.

10        Q.    When did you see a scorecard?

11        A.    I see them on and off.  It depends on what's

12    going on.  I haven't seen one in a while.

13        Q.    Do you recall the last time you saw a

14    scorecard?

15        A.    No, because I don't create them for my team.

16        Q.    Do supervisors share scorecards with you for

17    investigators?

18        A.    No.

19        Q.    Do you know if monthly scorecards feed into

20    annual performance assessments or appraisals?  Excuse

21    me.

22        A.    This scorecard should represent their goals

23    for the packet in a given year, which is one piece of

24    their overall assessment.

25        Q.    Do you know if supervisors use the monthly



Page 213

1    scorecards for performance appraisals?

2        A.    I don't know what you mean by "use

3    scorecards."  The investigators' results are the

4    investigators' results.  That's what's rolled up at the

5    end of the year, and that's one factor in their

6    assessment.  Weather the supervisor creates a

7    spreadsheet or not is irrelevant.  The results are

8    still their results.  Supervisor just needs to

9    communicate the results to the investigator.  How they

10   do that is up to them.

11       Q.    Are supervisors required to communicate

12   results for monthly scorecards to investigators?

13       A.    They are supposed to go over the

14   investigator's results monthly.

15       Q.    You can close the laptop.

16       A.    Am I going to need it again?

17       Q.    Yes.  You can just put it in front.  We are

18   going back to paper now.

19            MS. JEAN:  This document is marked as

20        Exhibit 11.

21            (Fogarty Exhibit 11, e-mail from Chester

22        Janik to Craig Costanzo on Tuesday, January 4,

23        2022, subject, title "December scorecard

24        numbers," was marked for identification.)

25   BY MS. JEAN:



Page 257

1    seen this document before?

2        A.    Yes.

3        Q.    In what context have you seen this document?

4        A.    It would have been sent out from HR when the

5    change was being made to notify us.

6        Q.    If you go under the title of "FAQ," the third

7    bullet point, "Will management discontinue scheduling

8    overtime?"  Do you see that?

9        A.    Yes.

10        Q.    It states, "Overtime has always been

11    available based on business need."  What is "business

12    need"?

13        A.    It means if you need to have somebody work

14    overtime based on the needs of the business so that you

15    can get the work done.

16        Q.    Who determines business needs?

17        A.    Depends on who it's for or what it's relating

18    to.

19        Q.    Who determines business need for

20    investigators in New York as it relates to overtime?

21        A.    It would have depended on who the manager was

22    at the time.

23        Q.    Would the manager determine if there's a

24    business need that requires overtime?

25        A.    If an investigator or supervisor says that



Page 258

1  overtime is needed, then the manager and supervisor

2  would go over it and they would find the -- they would

3  look to see if there was somebody else that could help

4  and if not they could look to approve overtime.

5      Q.    How much discretion do supervisors have in

6  authorizing overtime?

7      A.    It would be different based on the office and

8  the time period and whoever their boss was and how

9  comfortable they were with their decision-making.

10     Q.    Do supervisors have discretions in

11  determining whether or not to authorize overtime?

12     A.    It depends on the office and the time period

13  and how comfortable their boss was with allowing them

14  to make those decisions on their own.

15     Q.    Do you know if supervisors who reported to

16  Bill Newport in New York in 2016 to present have

17  discretion in authorizing overtime?

18     A.    No, I don't know.

19     Q.    Do you know if GEICO has any guidance or

20  training on how to authorize overtime?

21     A.    I don't know.

22     Q.    Do you know if managers receive any training

23  on authorizing overtime?

24     A.    No.

25     Q.    Do you know if managers receive any training



Page 272

```
 1   are timestamped once they are entered; is that correct?
 2        A.    Yes.
 3              MS. JEAN:  I think we have completed our
 4        questions for today.  Thank you very much for
 5        your time.
 6              MS. RILEY:  I don't have any questions at
 7        this time.  We will review and sign.
 8              THE VIDEOGRAPHER:  This concludes today's
 9        deposition by Jennifer Fogarty.  The time is
10        6:47 p.m.
11              (Deposition of JENNIFER FOGARTY concluded at
12        6:47 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 275

```
 1              W I T N E S S    D E C L A R A T I O N

 2

 3              I, JENNIFER FOGARTY, do hereby certify

 4    that having been duly sworn to tell the truth, I

 5    gave the above testimony.

 6              I FURTHER CERTIFY that I have read the

 7    foregoing pages, and that the same is a correct

 8    transcription of the answers given by me to the

 9    questions therein propounded, except for the

10    corrections or changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13                        _____
                          JENNIFER FOGARTY

14

15

16    Subscribed and sworn to before me this

17    _____ day of _____, 2024.

18

19    _____
      Notary Public

20

21

22

23

24

25
```



Page 276

```
 1              R E P O R T E R    C E R T I F I C A T E

 2

 3

 4          I, JOSHUA B. EDWARDS, a Notary Public for and

 5     within the State of New York, do hereby certify:

 6          That JENNIFER FOGARTY, whose examination is

 7     hereinbefore set forth, was duly sworn, and that

 8     such examination is a true record of the testimony

 9     given by that witness.

10          I further certify that I am not related to any

11     of the parties to this action by blood or by

12     marriage and that I am in no way interested in the

13     outcome of this matter.

14          IN WITNESS WHEREOF, I have hereunto set my hand

15     this 27th day of October 2024.

16

17

18          Joshua B. Edwards_____
            JOSHUA B. EDWARDS

19          Registered Diplomate Reporter
            Certified Realtime Reporter

20          Certified Realtime Captioner
            Notary Public of the State of NY

21          Registration No. 01ED0000628

22

23

24

25
```

