# Exhibit 20

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ------------------------------------X
 3   KEITH FISCHER, MICHAEL O'SULLIVAN,
     JOHN MOESER, LOUIS PIA, THOMAS
 4   BARDEN, CONSTANCE MANGAN, and
     CHARISE JONES, individually and on behalf
 5   of all others similarly situated,

 6             Plaintiffs,

 7                              Case No.:
                                2:23 Civ. 2848
 8                              (GRB)(ARL)
          -against-
 9
     GOVERNMENT EMPLOYEES INSURANCE
10   COMPANY d/b/a GEICO,

11             Defendants.
     ------------------------------------X
12

13

14   DEPOSITION OF

15

16             MARIA MUNOZ

17

18             Tuesday, December 17th, 2024

18             New York, New York

19

20

21   Reported By:

22

     Marina Dubson
23

24   Job #: J12144279

25
```



```
 1
 2
 3
 4
                    DATE: December 17th, 2024
 5
                    TIME: 10:00 a.m.
 6
 7
 8          DEPOSITION of MARIA MUNOZ, an opt-in
 9   Plaintiff herein, taken by the Defendant,
10   pursuant to Federal Rules of Civil
11   Procedure, and Notice, held at Duane
12   Morris, LLP, 1540 Broadway, 14th Floor,
13   New York, New York 10036, at the
14   above-mentioned date and time, before
15   MARINA DUBSON, a Notary Public of the State
16   of New York.
17
18
19
20
21
22
23
24
25
```



```
 1   APPEARANCES:

 2

 3   OUTTEN & GOLDEN, LLP
     Attorney for Plaintiffs
 4   685 Third Avenue, 25th Floor,
     New York, New York 10017
 5   (212) 245-1000
     BY: SABINE JEAN, ESQ.
 6       Sjean@outtengolden.com

 7       JARRON MCALLISTER, ESQ.
         Jmcallister@outtengolden.com
 8

 9

10   DUANE MORRIS, LLP
     Attorney for Defendant
11   1540 Broadway, 14th Floor,
     New York, New York 10036
12   (212)471-1856
     BY: GREG SLOTNICK, ESQ.
13   Gsslotnick@duanemorris.com

14

15   Gil Peretz, Shereck Video, videographer
16

17

18

19

20

21

22

23

24

25
```



1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25



```
 1              M. Munoz
 2        THE REPORTER:  Please confirm
 3   your orders?
 4        MR. SLOTNICK:  Rough draft and
 5   5-day expedite final.
 6        MS. JEAN:  Copy, regular
 7   turnaround.
 8              XXXX
 9        THE VIDEOGRAPHER:  Good
10   morning.  We're on the record, and
11   the time now is 10:07 a.m.  Today's
12   date is December 17, 2024.
13        This is media one in the video
14   deposition of Ms. Maria Munoz in the
15   matter of Keith Fischer versus
16   Government Employee Insurance
17   Company.
18        The index number is 2:23 Civ.
19   2848(GRB) (ARL).
20        My name is Gil Peretz.  I am
21   the legal videographer with Shereck
22   Video in association with Esquire.
23        Today, we're at the office of
24   Duane Morris LLP located at 1540
25   Broadway on the 14th floor in New
```



```
 1              M. Munoz
 2    York City.
 3         Would counsel please identify
 4    themselves and state whom they
 5    represent?
 6         MS. JEAN:  Good morning.  This
 7    is Sabine Jean from Outten & Golden
 8    on behalf of plaintiffs and opt-in
 9    plaintiffs.  Along with me is my
10    colleague, Jarron McAllister, also
11    from Outten & Golden.
12         MR. SLOTNICK:  Good morning.
13    My name is Greg Slotnick.  I am an
14    attorney with Duane Morris, LLP,
15    representing the defendant, Geico, in
16    this case.
17         THE VIDEOGRAPHER:  Thank you.
18    The court reporter with us today is
19    Marina Douglas [sic] with Esquire --
20         (Clarified by the Court
21    Reporter.)
22         THE VIDEOGRAPHER:  Dubson, my
23    apology, with Esquire.
24         Would the court reporter please
25    swear in the witness?
```



```
 1                     M. Munoz
 2              (Whereupon, the witness was
 3          sworn in by the Court Reporter.)
 4
 5    M A R I A   M U N O Z,
 6          after having first been duly sworn by
 7          a Notary Public of the State of New
 8          York, was examined and testified as
 9          follows:
10    EXAMINATION
11    BY MR. SLOTNICK:
12          Q.    Good morning, Ms. Munoz.
13          A.    Good morning.
14          Q.    Could you please state and
15    spell your name for the record?
16          A.    Maria Munoz, M-A-R-I-A,
17    M-U-N-O-Z.
18          Q.    And what is your current
19    address?
20          A.    ███████████████████████,
21    ████████████████████████.
22          Q.    Thank you, Ms. Munoz.  And
23    before we get started, I introduced myself,
24    I am going to introduce myself again for
25    the record.  So, my name is Greg Slotnick.
```



```
 1                    M. Munoz
 2   scenes and some other random duties, but
 3   basically stuff that could not be done via
 4   the desk.
 5        Q.    And what was your next position
 6   with Geico?
 7        A.    From there, I went into the
 8   PIP, personal injury protection, also known
 9   as no-fault.
10        Q.    And have all these positions
11   worked been based on Long Island?
12        A.    Office building, based on Long
13   Island.  When I was a field liability rep,
14   my territory was majority in Queens,
15   New York, but I could have gone to the
16   other boroughs or Long Island anywhere.
17        Q.    Were you always working within
18   New York or did you go into other states as
19   well?
20        A.    When?
21        Q.    As a field liability rep.
22        A.    To the best of my knowledge, I
23   only did New York.  There could be a
24   possibility I went into New Jersey or
25   Connecticut.
```



```
 1                      M. Munoz
 2   York, what general geographic area do you
 3   mean?
 4        A.    I remember Buffalo, Rochester,
 5   that area.
 6        Q.    Do you recall if you generally
 7   took the company car up there or did you go
 8   by some other method?
 9        A.    No, they flew me.
10        Q.    Did you still have a company
11   car at that time?
12        A.    No.
13        Q.    So, for the office-based roles,
14   you no longer had a company car; is that
15   right?
16        A.    Correct.
17        Q.    And after the CU position, what
18   role did you work in at Geico?
19        A.    I got the job in SIU.
20        Q.    And I believe you said earlier
21   that that was in 2015; is that right?
22        A.    Correct.
23        Q.    And when you say the job, could
24   you give me details of what the actual
25   title was when you first started in SIU?
```



1                    M. Munoz

2        A.    A field investigator.

3        Q.    Did you apply for that role?

4        A.    Yes.

5        Q.    Do you prefer working in the

6    field to working at a desk?

7              MS. JEAN:  Objection.

8              THE WITNESS:  Yes.

9    BY MR. SLOTNICK:

10       Q.    And why is that?

11             MS. JEAN:  Objection.

12             THE WITNESS:  I like something

13        different every day.

14   BY MR. SLOTNICK:

15       Q.    And who was your supervisor

16   when you first joined the SIU?

17       A.    Dara Campbell, I believe.

18   Dara, D-A-R-A.

19       Q.    And who was your manager at the

20   time?

21       A.    That would be Michael DeGrocco.

22       Q.    And what did the field

23   investigator SIU role generally entail in

24   terms of your job duties?

25       A.    I would be assigned cases, and



```
 1                      M. Munoz

 2    I was to investigate them for aspects of

 3    fraud.

 4         Q.    And what type of cases were you

 5    assigned at the time?

 6         A.    Would have been auto damage,

 7    like something with the vehicles, or it

 8    could have been injury cases.

 9         Q.    Do you recall how the SIU was

10    organized at that time?

11         A.    In what regard?

12         Q.    Were there regions in the SIU

13    at the time?

14         A.    Well, there was regions within

15    the company.

16         Q.    So, companywide regions?

17         A.    Correct.

18         Q.    Do you recall what region you

19    were in?

20         A.    Region 2.

21         Q.    And what geographic area did

22    Region 2 encompass?

23         A.    New York.

24         Q.    Anywhere else?

25         A.    We might have also handled
```



```
 1                   M. Munoz

 2    were others.  I just don't remember what

 3    they were.

 4         Q.    And what do you mean by

 5    background?

 6         A.    Well, I meant the background of

 7    your education.  So, I had a criminal

 8    justice degree, so I know that checked off

 9    a box for me.

10         Q.    And do you recall what your

11    scheduled weekly work hours were when you

12    first started?

13         A.    It was 38.75 hours per week.

14         Q.    And you said that your

15    supervisor was Dara Campbell; is that

16    right?

17         A.    Correct.

18         Q.    And in your role as a field

19    investigator in SIU, did you ever work in

20    an office?

21         A.    At any point?

22         Q.    Yes.

23         A.    Yes.

24         Q.    How often did you work in the

25    office?
```



1                    M. Munoz

2       A.    Not often.

3       Q.    Could you approximate what you

4  mean by that?

5       A.    I would only be in the office

6  if I was called for a meeting or if there

7  was some kind of function going off -- on

8  in the office.

9       Q.    Is it correct that your

10  day-to-day would be in the field?

11       A.    Field or at home, yes.

12       Q.    What percentage of the time

13  would you approximate you were in the field

14  versus working at home?

15       A.    It varies.

16       Q.    What is the variation based on?

17       A.    The caseload, what type of case

18  I got, the traffic.

19       Q.    Did you ever have a desk-based

20  investigator role in SIU?

21       A.    Not primarily, no.

22       Q.    Do those exist in SIU?

23       A.    Yes.

24       Q.    And did you have a set schedule

25  when you started working in SIU?



```
 1                    M. Munoz
 2        A.    Yes.
 3        Q.    What was your set schedule?
 4        A.    It would have been either 8:00
 5   to 4:30, but then I know at some point I
 6   changed it to 7:00 to 3:30.
 7        Q.    And to change it, did you have
 8   to request approval from your supervisor?
 9        A.    I don't remember.
10        Q.    Do you know what flex time is
11   at Geico?
12        A.    Yes.
13        Q.    And what is flex time?
14        A.    The way that it was told to me
15   is if you needed to work at a not regularly
16   scheduled time, you could back that time
17   out at a later or earlier time.
18        Q.    So, when you say back that time
19   out, what -- what do you mean by that?
20        A.    So, if I worked an additional
21   two hours one day, then I was expected to
22   back that time out the next day or by the
23   end of the pay week.
24        Q.    And would that be in order to
25   add up to the 38.75 per week?
```



```
 1                      M. Munoz
 2        A.    Correct.
 3        Q.    Did you have to seek approval
 4   to back the time out or change the time in
 5   subsequent days?
 6        A.    I don't know if it was
 7   necessarily approval.  It was -- but I
 8   always advised if I was going to do it.
 9        Q.    You would give advance notice
10   of that?
11        A.    Correct.
12        Q.    Do you recall approximately how
13   many times you used flex time?
14        A.    In my career at Geico or in
15   SIU?
16        Q.    In SIU.
17        A.    From like start to today?
18        Q.    I guess how often would you use
19   it approximately?
20        A.    Not very often.
21        Q.    Was it ever denied when you
22   requested it?
23        A.    Not to my knowledge.  The only
24   time it would have been is if it was to do
25   with the pay weeks because you had to do it
```



```
 1                    M. Munoz

 2    within a certain timeframe of the pay

 3    weeks.

 4         Q.    And what do you mean by pay

 5    weeks?

 6         A.    So, we're paid every two weeks.

 7    And I forget how it goes or -- so you work

 8    two weeks, then you get paid.  So, it just

 9    needs to fall within that two-week span of

10    the paycheck.

11         Q.    Do you recall when you first

12    learned about that flex time policy?

13         A.    I believe that was -- I don't

14    recall the exact time, no.

15         Q.    Was it fairly -- strike that.

16              Do you recall if you learned

17    about that when you were hired into SIU?

18         A.    No.

19         Q.    So, it was sometime after that?

20         A.    Correct.

21         Q.    Do you remember who explained

22    that policy to you?

23         A.    I believe it was April Neyland.

24         Q.    And who is April Neyland?

25         A.    She was a SIU supervisor, or
```



```
 1                    M. Munoz
 2   is.
 3        Q.    Was she ever your SIU
 4   supervisor?
 5        A.    Yes.
 6        Q.    Was that directly after your
 7   SIU supervisor was Dara Campbell?
 8        A.    I believe so, yes.
 9        Q.    And just to confirm timeframes,
10   do you recall how long Dara Campbell was
11   your supervisor for?
12        A.    I don't.
13        Q.    Do you remember when
14   April Neyland became your supervisor?
15        A.    Not the exact time, no.
16        Q.    When April became your
17   supervisor, were you still working in the
18   same role that you had previously worked
19   in?
20        A.    Yes.
21        Q.    Do you know why there was a
22   supervisor change?
23        A.    I don't know the exact reason.
24        Q.    Do you know any reason behind
25   that?
```



```
 1                        M. Munoz
 2          A.    It just probably had to do with
 3     organization of the department.
 4          Q.    Do you remember if
 5     Dara Campbell was your supervisor for a
 6     matter of years or a matter of months?
 7          A.    It would be months, not years.
 8          Q.    And you said April Neyland was
 9     a -- was or is a supervisor, correct?
10          A.    Correct.
11          Q.    And how long was she your
12     supervisor for?
13          A.    A few years.  I don't know how
14     long.
15          Q.    Longer than Dara was your
16     supervisor?
17          A.    Correct.
18          Q.    And who is your supervisor
19     after April, if -- if it changed?
20          A.    I believe after April, it was
21     Gerard Cassagne.
22          Q.    And that's the same individual
23     we spoke about a little earlier?
24          A.    Correct.
25          Q.    Gerard goes by Gerry as well?
```



```
 1                        M. Munoz

 2        A.    Yes, G-E-R-R-Y.

 3        Q.    And did you have any other

 4   supervisors after Gerry Cassagne?

 5        A.    Yes, Tony D'Agata.

 6        Q.    Could you spell that?

 7        A.    D-'-A-G-A-T-A.

 8        Q.    Did you have any other

 9   supervisors after Tony D'Agata?

10        A.    Yes.  Sarah Greenman, I

11   believe, was my next one after Tony.

12   S-A-R-A-H Greenman.

13        Q.    And did you have any

14   supervisors after Sarah Greenman?

15        A.    That would be then my current,

16   Arineh Nazari.

17        Q.    Do you recall when

18   Gerry Cassagne became your supervisor?

19        A.    Not the exact time, no.

20        Q.    Do you remember how long he was

21   your supervisor for?

22        A.    Him -- I don't know the exact

23   time that he was my supervisor.

24        Q.    Do you think it was a matter of

25   months or a matter of years?
```



```
 1                    M. Munoz
 2        A.    It was sometime, I believe, in
 3   2023.  So, she became my supervisor -- 2023
 4   or 2024.
 5        Q.    Okay.  Fairly recently?
 6        A.    Correct.
 7        Q.    In the time that you've worked
 8   in SIU, has your job changed in any way?
 9        A.    In regard to my
10   responsibilities or --
11        Q.    In regard to your job title.
12        A.    Title?  No.
13        Q.    What about with respect to your
14   job responsibilities?
15        A.    When I --
16   responsibilities-wise, I have not changed.
17   There was one point where I was on what's
18   called the theft team, T-H-E-F-T.  So, I
19   only specialized in stolen vehicles, but
20   that was just for a small period of time.
21        Q.    Do you recall when you were a
22   member of the theft team?
23        A.    I know it was in 2020.  I just
24   don't remember when it started and when it
25   exactly ended.
```



```
 1                    M. Munoz

 2        A.    No.  He was my -- my -- my

 3   manager at that time.

 4        Q.    Do you know who managed Bill at

 5   the time?

 6        A.    I don't know exactly.

 7              MR. SLOTNICK:  Go off the

 8   record.

 9              THE VIDEOGRAPHER:  We're going

10         off the record, and the time now is

11         11:15 a.m.

12              (Whereupon, a short break was

13         taken at this time.)

14              THE VIDEOGRAPHER:  We're back

15         on the record, and the time now is

16         11:28 a.m.

17   BY MR. SLOTNICK:

18        Q.    Ms. Munoz, earlier, we were

19   talking about a policy called flex time.

20              Do you recall that?

21        A.    Yes.

22        Q.    And did anyone at Geico tell

23   you how to arrange your flex time when you

24   did use it?

25        A.    Not exactly.  So, maybe it
```



```
 1                      M. Munoz
 2     would have been told, okay, if you do that
 3     on Saturday, you have to make up the time
 4     within a time period to make it for the
 5     workweek, if that makes sense.
 6          Q.    And that's within the same
 7     workweek or pay period practice that we
 8     talked about earlier?
 9          A.    Correct.
10          Q.    Do you remember if any of your
11     supervisors actually told you that, that
12     that was the policy?
13          A.    Again, the one that I remember
14     speaking about it at some point was
15     April Neyland.  Yeah.  Sorry.
16          Q.    Do you remember how many times
17     you spoke with April about flex time?
18          A.    No.
19          Q.    Did April allow flex time?
20          A.    Yes.
21          Q.    Did you ever request flex time
22     with any of your other supervisors that
23     we've talked about?
24          A.    Possibly.
25          Q.    Do you recall if they also
```



```
 1                     M. Munoz
 2        A.    Based on the location.
 3        Q.    What is the farthest you've
 4   ever driven to investigate a claim?
 5        A.    In my tenure of SIU?
 6        Q.    Yeah.
 7        A.    Mileage or hours?
 8        Q.    Either one.
 9        A.    Because it makes a difference.
10   So, I've gone -- I mean, I've gone up to
11   well over anywhere between 60 to 120 miles
12   one way, I would say.
13        Q.    And what's the shortest
14   distance you've driven for a claim
15   investigation?
16        A.    I had one down the block from
17   my home.
18        Q.    So, it varies drastically?
19        A.    Yes.
20        Q.    Is there any pattern or
21   practice to how far you're driving for a
22   given claim?
23        A.    No.
24        Q.    It's just based on the scene of
25   where the accident takes place or where --
```



```
 1                      M. Munoz
 2         A.    That's the most I can think of
 3    right now.
 4         Q.    Were there certain times of the
 5    year that were busier than other times of
 6    the year?
 7         A.    Yes.
 8         Q.    What times of the year were
 9    busiest?
10         A.    I would say the summer was
11    always a busy time.  To me, that would be
12    the busiest time.
13         Q.    So, summer would be the busiest
14    period?  What would be the less busy times
15    of a year?
16         A.    Usually around holidays.
17         Q.    Do you know why that would be
18    the case?
19         A.    Well, I know by claims volume.
20    So, let's say at the time of the holidays
21    or like the week of, it's not really that
22    busy.  But then once people would report
23    the claims after, because maybe I am
24    assuming they think that we were closed or
25    something, then it would get busier.
```



```
 1                        M. Munoz

 2              (Clarified by the Court

 3          Reporter.)

 4      Q.    The paragraph that says, all

 5   nonexempt associates are required to

 6   accurately record their hours worked and

 7   absences taken.  All exempt associates are

 8   required to accurately record their

 9   absences taken.

10              A nonexempt associate who feels

11   he/she did not receive pay for all of

12   his/her hours worked, an exempt or salaried

13   nonexempt associate who feels his/her pay

14   incorrectly reflects a deduction for an

15   absence should contact his/her supervisor,

16   local human resources manager or corporate

17   human resources.

18              Did I read that accurately?

19      A.    Yes.

20      Q.    Do you recall getting training

21   on this policy?

22      A.    Yes.

23      Q.    What do you recall about

24   receiving training on the policy?

25      A.    Just to record our time or
```



```
 1                    M. Munoz
 2   input our time that was worked.
 3        Q.    Did you understand this policy
 4   to be applicable to your employment at
 5   Geico?
 6        A.    Yes.
 7        Q.    Did you understand from this
 8   policy that Geico required you to
 9   accurately record all of your hours worked?
10        A.    Based on what it says.
11        Q.    Is that a yes?
12        A.    Yes.
13        Q.    It's on the same page
14   underneath the section that says hourly
15   nonexempt associates, there's a paragraph
16   that starts, an hourly nonexempt associate.
17            Do you see that?
18        A.    Well, there's two paragraphs
19   there that start that.
20        Q.    The first one.
21        A.    Okay.
22        Q.    So, it says, an hourly
23   nonexempt associate is paid overtime pay,
24   time and one half the hourly rate of pay,
25   for all hours actually worked in excess of
```



                        M. Munoz

1

2          A.    When we have to do like a

3    course, let's say, every year saying that

4    we reviewed it.  Maybe in the beginning

5    when I first started SIU, they may have

6    given it to me in this form actually, now

7    that I remember, but I don't remember

8    actually looking at it in this form.

9          Q.    You said when you take a course

10   for a yearly review.

11                What -- what do you mean by

12   that?

13         A.    Not a review.  Like we have to

14   acknowledge yearly like policies and

15   acknowledgements, or maybe go over the

16   handbook.

17         Q.    And you do that on a yearly

18   basis at Geico?

19         A.    I believe it's yearly.

20         Q.    So, if we turn to the page that

21   is marked G000195 on the bottom right-hand

22   corner, do you see the language that starts

23   in bold, nonexempt associates are never

24   allowed to work off the clock?

25         A.    Yes.



```
 1                    M. Munoz

 2  SIU?

 3        A.    I believe so.

 4        Q.    And at what rate of pay have

 5  you been paid in SIU?

 6              MS. JEAN:  Objection.

 7              THE WITNESS:  I really don't

 8         even know what my hourly rate is

 9         right now.  Yeah.  I don't know.

10  BY MR. SLOTNICK:

11        Q.    Does it change frequently?

12        A.    Not frequently.  It could

13  change yearly.  At some points throughout

14  my career, it could change multiple times

15  in the year.  So, I -- I don't know what I

16  make.

17        Q.    Do you know what those changes

18  were based on?

19        A.    Based on your performance.

20  Sometimes cost of living.  That's random.

21        Q.    So, when you say your

22  performance, are those merit-based changes?

23        A.    Most of them are, yes.

24        Q.    And did you ever not receive a

25  merits-based increase you were eligible
```



```
 1                      M. Munoz

 2    for?

 3              MS. JEAN:  Objection.

 4              THE WITNESS:  I can't recall in

 5         all the years that I've been there if

 6         there ever was a time that I did not.

 7         I don't recall.

 8    BY MR. SLOTNICK:

 9         Q.    Do you know whether Geico

10    employees working in other SIU investigator

11    roles are paid hourly rates of pay?

12              MS. JEAN:  Objection.

13              THE WITNESS:  I don't know.

14    BY MR. SLOTNICK:

15         Q.    And do you currently have to

16    record the time that you actually work at

17    Geico?

18         A.    Currently, yes.

19         Q.    Have you always had to record

20    that?

21         A.    Record my actual work or just

22    record work?

23         Q.    Record your work.

24         A.    Yes, I've always had to record

25    it.
```



```
 1                      M. Munoz
 2        Q.    If you turn to page 7 and it's
 3   a page that's titled verification, is that
 4   your signature on the page?
 5        A.    Electronically, it looks, yes.
 6        Q.    So, you e-signed this document?
 7        A.    Yes.
 8        Q.    And did you read it before you
 9   signed it?
10        A.    Yes.
11        Q.    And then if you turn to the
12   last page of Exhibit 5 with page number 4
13   on the bottom, is that also your electronic
14   signature?
15        A.    Yes.
16        Q.    Did you read this document
17   before you signed it?
18        A.    Yes.
19        Q.    Did you always get paid for the
20   amount of time that you submitted to
21   Geico's timekeeping for pay purposes?
22             MS. JEAN:  Objection.
23             THE WITNESS:  The time
24        submitted, yes.
25   BY MR. SLOTNICK:
```



```
 1                    M. Munoz
 2       Q.     If we turn to paragraph six on
 3   page 2 of your declaration, do you see in
 4   bold in the middle of the page, it says my
 5   schedule and unpaid wages and overtime?
 6       A.     Yes.
 7       Q.     And in paragraph six, you say,
 8   my supervisor told me that I could only
 9   report up to 38.75 hours per week or
10   7.75 hours a day, five days a week, in the
11   timekeeping program.  Accordingly, I only
12   entered 7.75 hours per day, five days a
13   week, regardless of how many hours I
14   actually worked.
15            Do you recall writing that into
16   your declaration?
17       A.     I recall advising my attorneys
18   about that, yes.
19       Q.     And when did your supervisor
20   tell you that?
21       A.     That is prior to the
22   reorganization of SIU.  That is how it was.
23   You were just told you input 7.75 per day
24   regardless of your time, unless you flexed,
25   but then that would show accordingly.  So,
```



```
 1                      M. Munoz
 2   maybe I had a 9.75, but then it would be a
 3   5.75 on another day.
 4        Q.    And which supervisor actually
 5   told you that?
 6        A.    Well, they all -- they all told
 7   us that, meaning Dara.  That's how I was
 8   trained, under Dara.  April, Gerry and
 9   Tony.  Currently, it's not like that.
10        Q.    But when you say it was like
11   that -- so, let's focus on that time
12   period.
13             So, you say each of Dara,
14   April, Gerry and Tony all told you that
15   that was the policy in place?
16        A.    I don't know -- I know it was
17   told from the beginning.  So, it would be
18   under Dara to April, because everybody
19   recorded time or asked you to submit it
20   differently.  There were different ways I
21   did it.
22             Some you would enter per day,
23   submit.  Some you would enter in the
24   beginning of the week, some you would enter
25   in the end of the week and then submit by
```



                        M. Munoz

1

2      the end of the week.

3          Q.    Can you describe the time

4      periods that were applicable to each of

5      those ways you just described entering

6      time?

7          A.    38.75 per week.

8          Q.    Right.  But you mentioned

9      different methods of how you submitted

10     time.  You just said sometimes you would

11     put in daily amounts sometimes at the

12     front -- you would front load it.

13              What specifically was the

14     practice during each period of time in SIU?

15         A.    Well, I don't remember how Dara

16     wanted it.  April, to the best of my

17     knowledge, wanted it daily.  And Gerry,

18     just get it done by the end of the week.  I

19     don't remember with Tony how it was either.

20         Q.    Was that practice different

21     between your different supervisors?

22         A.    Yes.

23         Q.    And you said that that changed

24     at some point in time, the 7.75 hours per

25     day?



```
1                      M. Munoz

2        A.    Yes.

3        Q.    When did that change?

4        A.    Somewhere around 2023 up to

5    present.

6        Q.    And how has that changed?

7        A.    Actually, May prior to -- it's

8    somewhere between '22 to '24.  I now --

9    currently, we have a -- we clock in and

10   clock out.  We never did that before.  So,

11   when I start work, I check in on Workday on

12   my phone.  Time clock starts.  So, it's

13   actually watching the time.

14            And then I have to clock out

15   for a meal, 45 minutes, clock back in, and

16   then we clock out at the end of the day.

17   We're not required to clock in and out for

18   our 15-minute breaks.

19       Q.    And how many 15-minute breaks

20   do you take a day?

21       A.    We're supposed to take two.

22       Q.    And you do not clock out for

23   those, you're saying?

24       A.    We don't have to.

25       Q.    And can you describe for me in
```



```
 1                    M. Munoz
 2   in written form?
 3        A.    I'm sure there's something in
 4   writing.  Now, I have, at this point, put
 5   in writing like I -- I asked for overtime,
 6   at least a minimum of four times this year,
 7   and I was told no.
 8        Q.    Who did you ask for overtime
 9   this year?
10        A.    Arineh Nazari.
11        Q.    Do you recall when you sent
12   those communications?
13        A.    Within approximately the last
14   six months.
15        Q.    Were you asking for the
16   authority to work future overtime in those
17   conversations?
18        A.    I was asking for either that
19   day or that week.
20        Q.    Do you recall why Arineh told
21   you that you cannot work that overtime?
22        A.    The first time, she told me it
23   was a taboo subject.  Second, third, maybe
24   it was just do the best you can, just get
25   it done.  And I believe -- I don't know,
```



```
 1                  M. Munoz

 2   because I didn't see the communication nor

 3   hear it -- she asked management the last

 4   time and was told that it wasn't, you know,

 5   approved.  Just do the best -- like get it

 6   done, get your work done.

 7        Q.   So, after receiving her

 8   responses, did you still go ahead and work

 9   overtime?

10        A.   No.

11        Q.   And when you say management,

12   she reached out to management, who are you

13   talking about?

14        A.   I -- I -- it's an assumption

15   because I don't know.  But I -- I think she

16   would have asked Rene Cubas, who is my

17   manager.

18        Q.   And how long has Rene been your

19   manager for?

20        A.   Probably since '23 -- 2023.

21        Q.   So, your -- just to go back in

22   time a little bit, your original manager

23   when you first started at SIU was

24   Michael DeGrocco, correct?

25        A.   Correct.
```



1                      M. Munoz

2          Q.    Was there anyone in that role

3   between Michael DeGrocco and Bill Newport?

4          A.    No.  I believe it was

5   Mike DeGrocco, Bill Newport and then it

6   would become Rene in my tenure with SIU.

7          Q.    And I just want to go back.

8                So, you talked about voicing

9   concerns in team meetings with team

10  supervisors, correct?

11         A.    The supervisors would be

12  present, yes.

13         Q.    Do you recall any other details

14  about when those meetings took place or who

15  was there?

16         A.    Team meetings would be with

17  your section.  And my section, you know,

18  changed sometimes, so I -- I couldn't say

19  who exactly was there.  And then sometimes,

20  we would have full meetings with all of

21  SIU, supervisors and -- and management

22  present.

23         Q.    When you say your section, what

24  do you mean by that?

25         A.    So, a section would be who --



1                         M. Munoz

2    utilizing that time and working on the

3    weekends to catch myself up.  It's very

4    overwhelming when you're scrolling.

5        Q.    I mean, how often would --

6    would you be scrolling?

7        A.    That would happen -- since

8    2023, it doesn't happen really as often.

9    Prior to that, I -- I -- I mean, I can't

10   give an exact amount, but there were

11   multiple times, a lot of times within a

12   year, that I would be scrolling.

13       Q.    And so scrolling would be --

14   just trying to figure this out.  Scrolling

15   would mean cases from before the 25 most

16   recent pending ones that you had in your --

17       A.    So, they're all your open

18   cases.  So, any cases that I need to work

19   would be in that pending because once

20   they're closed, they're gone.  They leave

21   there.

22       Q.    Do you have the authority to

23   close cases by yourself?

24       A.    Currently, yes.

25       Q.    When did that practice start?



```
 1                        M. Munoz
 2     the audit team came, so random supervisor
 3     audits, let's say.  That was a short
 4     period.  And then the audit team came, and
 5     then we all had to do it that way.
 6                Now, the only difference is
 7     somebody may be on a warning or something
 8     like that, and they may take your
 9     self-approval away and say, hey, you know,
10     we want to just look at your cases before
11     we approve them.  So, they take people off
12     of self-approval.  I've heard of that.
13          Q.    Have you ever been taken off
14     self-approval?
15          A.    No.
16          Q.    And how do you know that lead
17     security investigators were able to close
18     their own cases before you had that
19     ability?
20          A.    It was just something I had
21     heard.  Scott Brady is a lead investigator,
22     and I remember him telling me that used to
23     be a practice, but I don't know from what
24     timeframe.
25          Q.    Did he give you any other
```



```
 1                    M. Munoz

 2           So, if an officer called me

 3   after hours and I needed to speak to them

 4   in order to get my case done, I would speak

 5   to them.  Some insureds are not available

 6   between my business hours, but I have to

 7   speak to them.  So, I would just leave my

 8   computer on, locked.  And if I needed to, I

 9   would answer the calls.

10       Q.    Did you ever answer any of

11   those calls and tell the individual you

12   could talk to them the next day?

13               MS. JEAN:  Objection.

14               THE WITNESS:  There may have

15           been circumstances where I may have

16           done that.

17   BY MR. SLOTNICK:

18       Q.    If we look at paragraph ten of

19   your declaration, on page three at the

20   bottom, do you see that paragraph?

21       A.    Yes.

22       Q.    So, it starts, from July 2016

23   to March 2020, my regular hours were

24   approximately 46 to 48 hours per week.

25               And, again, did you just
```



```
 1                        M. Munoz

 2   describe to me what the basis of your

 3   estimation for those hours are?

 4        A.    Yes.

 5        Q.    And during that time period

 6   from July 2016 to March 2020, did you ever

 7   record over 38.75 hours per week in your

 8   timekeeping program?

 9              MS. JEAN:  Objection.

10              THE WITNESS:  In regard to what

11        I submitted?

12        Q.    Yes.

13        A.    Did I ever?  If there was

14   approved overtime.

15        Q.    Do you recall how often there

16   was approved overtime?

17        A.    I don't remember the exact

18   dates.  Are we talking from July 2016 to

19   March 2020 at this point?

20        Q.    Yes.

21        A.    I can't remember how many

22   instances there were, but I will say that

23   there was at least one, maybe two.

24        Q.    And when you talk about

25   approved instances of overtime, are those
```



```
 1                    M. Munoz
 2              THE WITNESS:  I don't recall a
 3          specific instance, so I'm going to --
 4          well, I don't want to say or no
 5          because I don't recall actually
 6          asking.
 7   BY MR. SLOTNICK:
 8        Q.    And from the same time period,
 9   so July 2016 to March 2020, were you ever
10   asked by any Geico manager or supervisor to
11   work overtime?
12        A.    Well, let me actually go back
13   because I do remember, from your prior
14   question, I do remember having conversation
15   with Gerry in regard to the work being too
16   much.  Did I use the words overtime?  I am
17   not sure.
18              I know I said work can't get
19   done, that we have too much work, how are
20   we supposed to do this?  And I would kind
21   of panic.  I get a little anxiety driven.
22   So, I -- I just want to do well, like my
23   numbers mean a lot to me.
24              So, I remember feeling a little
25   bit of overwhelm -- overwhelmingness where
```



```
 1                    M. Munoz
 2   I wasn't going to get it done.  I may have
 3   actually even cried to him at one point,
 4   saying to him that it was too much.
 5              And he would just tell me,
 6   don't worry about it, just keep doing what
 7   you're doing, get the job done, you got
 8   this, that kind of reassurance.  But it was
 9   never said that you can work overtime.
10       Q.    Did you actually ask him to
11   work overtime in that conversation?
12       A.    I don't --
13              MS. JEAN:  Objection.
14              THE WITNESS:  I -- I don't know
15        if the words came out in that sense.
16   BY MR. SLOTNICK:
17       Q.    When was that conversation?
18       A.    Well, it would have been -- I
19   don't remember the exact time.  I just can
20   remember that instance, at least once, of
21   being really overwhelmed by it.  I know
22   during COVID it was definitely brought up.
23              That could have been my
24   overwhelming issue.  I don't remember in
25   regard to that day when I got really upset.
```



```
 1                    M. Munoz
 2   at that point.
 3        Q.    And was that due to the field
 4   or remote nature of your job?  Is that why
 5   you didn't see them all the time?
 6        A.    Correct.
 7        Q.    Do you remember how often you
 8   would speak to them on the phone, your
 9   supervisors?
10        A.    I mean, I could go literally
11   weeks without talking to anyone.  Get your
12   job done and nobody really bothered you,
13   you know.
14        Q.    Okay.  And when we talked about
15   the catastrophe pay and specific dedicated
16   overtime drives, did you always accept
17   those overtime hours that were offered to
18   you?
19        A.    To my knowledge, I always -- I
20   always worked overtime when offered.
21        Q.    And those were entirely
22   voluntary overtime hours, correct?
23        A.    Yes.  I don't believe any of it
24   was mandatory.  Especially -- I know the
25   cat -- oh, yeah, I know cat was not
```



1                    M. Munoz

2          2:41 p.m.

3    BY MR. SLOTNICK:

4          Q.    Ms. Munoz, we were speaking

5    about the time period between March 2020

6    and November 2021, right?

7          A.    Yes.

8          Q.    Okay.  Let -- so, these next

9    series of questions, that's the time period

10   I am going to be focusing on.

11         A.    March 2020, November '21.

12         Q.    Yes.  Yes.

13         A.    Okay.

14         Q.    So, in paragraph ten of the

15   declaration, Exhibit 5, you had said during

16   this time period from March 2020 to

17   approximately November 2021, my regular

18   hours were approximately 48 to 52 hours per

19   week.

20              And you had mentioned your

21   increasing caseload as being the reason for

22   that; is that correct?

23         A.    Correct.

24         Q.    Can you describe for me what

25   you mean by your increasing caseload during



```
 1                      M. Munoz
 2    some point that I -- oh, I usually clock on
 3    at 6:00, 6:30, to at least April and Gerry.
 4    We're not talking about the -- that time
 5    period you just said last, right?  We're
 6    talking in general now?
 7          Q.    General, yes.
 8          A.    Yep.  But I don't -- I don't do
 9    that anymore, so --
10          Q.    And when is the last time that
11    you did that?
12          A.    I don't remember the exact
13    time.  Well, it would be -- well, I
14    shouldn't say I don't ever do it, because
15    now if I do clock in at 6:00, then I am
16    done at 2:30.
17                I do have that ability to do
18    that, but I am not -- I will work up to
19    39.99 hours and I am fine.  Nobody says
20    anything to me because it's not considered
21    overtime.  So, that's how I work now, or
22    since we've had to check in and check
23    out -- clock out.
24          Q.    And do you submit for those
25    39.99 hours for payment?
```



```
 1                    M. Munoz

 2         A.    At minimum, it's 38.75.  At

 3   maximum, it's 39.99999.  As long as it

 4   doesn't go over 40.  So, I -- I am all in

 5   between.

 6         Q.    Are you still working your

 7   general set schedule from 7:00 a.m. to

 8   3:30?

 9         A.    That is my general schedule.

10   But that's -- if you looked at my Workday

11   submissions the last few months, this whole

12   year, I have been working almost over eight

13   hours Monday through Thursday.  And then by

14   the time Friday comes, I only have like

15   whatever's left of the 38 to 39 hours and

16   then I have to clock off.

17              And then that's when I've asked

18   for, if needed, additional time to work.

19   Because I am willing to work, but they, you

20   know, don't want me to, so I stop.

21   Computer goes off.  Phone's on the charger.

22   I don't do anything after the hours.  I

23   don't pick up calls.

24         Q.    And those requests you just

25   mentioned, those were the requests you
```



```
 1                      M. Munoz

 2          A.    Most of the complaints were in

 3     regard to the workload but then would lead

 4     to hours worked, because in order to get

 5     the work done, you just had to work more

 6     than what was expected of you.

 7          Q.    Do you currently feel that in

 8     order to get the work done, you have to

 9     work more than what's expected of you?

10          A.    Well, currently, I don't.  So,

11     my case life might be a little higher

12     than -- I mean, I think I am about average

13     right now.  But currently, no.  It feels, I

14     mean, a little different.  It's just they

15     still don't have it all together.  They're

16     trying.

17          Q.    Did any manager or supervisor

18     at Geico ever directly tell you that you

19     should work off the clock?

20          A.    No.  I -- I don't believe so.

21          Q.    Did any manager or supervisor

22     at Geico ever directly tell you you should

23     not accurately record all of your hours

24     worked?

25          A.    I don't recall.
```



1              M. Munoz

2        could put that in writing, we'll

3        address it.

4              MS. JEAN:  Yes, we will.

5              MR. SLOTNICK:  Nothing further.

6              THE VIDEOGRAPHER:  This

7        concludes the video deposition of

8        Ms. Maria Munoz.  The time is

9        approximately 5:06 p.m.  We're off

10       the record.  Thank you very much,

11       everyone.

12              (Whereupon, at 5:10 P.M., the

13       Examination of this Witness was

14       concluded.)

15

16

17              _____
                       MARIA MUNOZ

18

19   Subscribed and sworn to before me

20   this _____ day of _____ 20____.

21

22   _____
          NOTARY PUBLIC

23

24

25



1                    M. Munoz

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :
5    COUNTY OF RICHMOND       )

6

7         I, MARINA DUBSON, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 17th day of December 2024.

21

22

23   _____
               MARINA DUBSON

24

25

