Exhibit 40

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK
    ------------------------------------X
3   KEITH FISCHER, MICHAEL O'SULLIVAN,
    JOHN MOESER, LOUIS PIA, THOMAS
4   BARDEN, CONSTANCE MANGAN, and
    CHARISE JONES, individually and on behalf
5   of all others similarly situated,

6         Plaintiffs,

7                  Case No.:
                   2:23 Civ. 2848
8                  (GRB) (ARL)
      -against-
9

10  GOVERNMENT EMPLOYEES INSURANCE
    COMPANY D/B/A GEICO,

11         Defendants.
    ------------------------------------X
12

13  DEPOSITION of MARGARET A. FISCHER

14

15       December 19, 2024

16

17       New York, New York

18

19

20

21

22  Reported By:

23  Marina Dubson

24  Job #: J12144278

25



1

2

                    DATE: December 19, 2024
3
                    TIME: 10:00 a.m.
4

5

6          DEPOSITION of MARGARET A. FISCHER, an

7    opt-in Plaintiff herein, taken by the

8    Defendant, pursuant to Federal Rules of

9    Civil Procedure, and Notice, held at the

10   Duane Morris LLP, 1540 Broadway, 14th

11   Floor, New York, New York 10036, at the

12   above-mentioned date and time, before

13   MARINA DUBSON, a Notary Public of the State

14   of New York.

15

16

17

18

19

20

21

22

23

24

25



MARGARET A. FISCHER                                December 19, 2024
FISCHER V. GEICO                                                      3

1  | APPEARANCES:

2  |

3  | OUTTEN & GOLDEN, LLP
   | Attorney for Plaintiffs
4  | 685 Third Avenue, 25th Floor,
   | New York, New York 10017
5  | (212) 245-1000
   | BY: SABINE JEAN, ESQ.
6  |     Sjean@outtengolden.com

7  |     ZARKA DSOUZA, ESQ.
   |     Zdesouza@outtengolden.com

8  |

9  |

10 | DUANE MORRIS, LLP
   | Attorney for Defendant
11 | 1540 Broadway, 14th Floor,
   | New York, New York 10036
12 | (212)471-1856
   | BY: GREG TSONIS, ESQ.
13 | Gtsonis@duanemorris.com

14 |

15 |
   | Gil Peretz, Shereck Video, videographer,
16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |



1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25



1          M. A. Fischer

2          THE REPORTER:  Are you ordering

3     a copy of this transcript?

4          MS. JEAN:  Yes, copy.

5          MR. TSONIS:  Regular turnaround

6     final, no rough.

7                    XXXX

8          THE VIDEOGRAPHER:  Good

9     morning.  We are on the record, and

10    the time now is 10:12 a.m.

11         Today's date is December 19,

12    2024.

13         This is media one in the video

14    deposition of Ms. Margaret Fischer --

15    one second -- Margaret Fischer, in

16    the matter of Government Employee

17    Insurance Company -- I'm sorry.

18         In the matter of Keith Fischer

19    versus Government Employee Insurance

20    Company, index number 2:23 Civ. 2848

21    (GRB) (ARL).

22         My name is Gil Peretz.  I am

23    the legal videographer with Shereck

24    Video in association with Esquire.

25         Today we're at the offices of



1          M. A. Fischer

2    Duane Morris, LLC, located at 1540

3    Broadway on the 14th floor in New

4    York City, New York.

5          Would counsel please identify

6    yourself and state whom they

7    represent.

8          MS. DSOUZA:  This is Zarka

9    Dsouza from Outten & Golden on behalf

10   of plaintiffs.

11         Joining me today is my

12   colleague, Sabine Jean, also from

13   Outten & Golden, also representing

14   the plaintiffs.

15         MR. TSONIS:  Gregory Tsonis

16   from Duane Morris, LLC, on behalf of

17   defendant Geico.

18         THE VIDEOGRAPHER:  Thank you.

19         The court reporter with us

20   today is Marina Dubson with Esquire.

21         Will the court reporter please

22   swear in the witness.

23         (Whereupon, the witness was

24   sworn in by the Court Reporter.)

25                XXXX



```
 1                    M. A. Fischer
 2   M A R G A R E T   A.   F I S C H E R,
 3          called as a witness, having been
 4          first duly sworn by a Notary Public
 5          of the State of New York, was
 6          examined and testified as follows:
 7   EXAMINATION
 8   BY MR. TSONIS:
 9        Q.    Good morning, Ms. Fischer.
10        A.    Good morning.
11        Q.    Can you please state and spell
12   your name for the record.
13        A.    It's Margaret, M-A-R-G-A-R-E-T,
14   Fischer, F-I-S-C-H-E-R.
15        Q.    All right.  And have you ever
16   gone by any other names?
17        A.    Peggy.
18        Q.    Peggy.  Any other last names?
19        A.    My maiden name is Meehan,
20   M-E-E-H-A-N.
21        Q.    And, Ms. Fischer, what's your
22   current address?
23        A.    ████████████████████████████,
24   ████████.
25        Q.    So, my name -- as I introduced
```



```
 1                    M. A. Fischer
 2    enter it weekly?
 3         A.    I believe, if there was
 4    something that required an entry for the
 5    day, we would -- vacation or illness.
 6         Q.    So, you would log in Workday
 7    time that you were going to be off from
 8    work?
 9         A.    Yes.
10         Q.    Absences, vacation, that sort
11    of thing?
12         A.    Yes.
13         Q.    All right.  And you would also
14    log all the hours that you worked in
15    Workday?
16         A.    No.
17         Q.    You ultimately were the one
18    that were entering the time in Workday,
19    though, right?
20         A.    Correct.
21         Q.    All right.  And the time that
22    you entered in Workday you understood would
23    be the time that you would be paid for?
24         A.    Yes.
25         Q.    All right.  You understood that
```



1              M. A. Fischer

2    Geico had a policy that you are required to

3    accurately record all time worked in

4    Workday?

5         A.    Yes.

6              MS. DSOUZA:  Objection.

7    BY MR. TSONIS:

8         Q.    You had been involved in two

9    prior lawsuits that you alleged you weren't

10   paid for all time worked?

11        A.    Yes.

12        Q.    All right.  So, you were

13   certainly aware through those lawsuits that

14   Geico's policy was that employees should

15   enter into Workday all time that they

16   worked?

17             MS. DSOUZA:  Objection.

18        A.    Yes.

19   BY MR. TSONIS:

20        Q.    All right.  How many hours were

21   you scheduled per week?

22        A.    38.75.

23        Q.    And how many hours do you

24   contend that you worked per week that you

25   were not compensated for?



```
 1                     M. A. Fischer
 2   office, correct?
 3         A.    Yes.
 4         Q.    With the exception of a period
 5   of time post COVID where employees worked
 6   from home?
 7         A.    Yes.
 8         Q.    Okay.  When you transitioned
 9   back from working home to the office, were
10   you five days a week in the office?
11         A.    I did not return to the office.
12   I retired.
13         Q.    You retired.
14               And you never actually went
15   back to the office at that point?
16         A.    Correct.
17         Q.    Understood.  Prior to that
18   point -- well, strike that.
19               What was your job title at
20   Geico before you retired?
21         A.    Inside medical investigator.
22         Q.    Okay.  Did that job title
23   change at some point?  Were you something
24   else, and you became an inside medical
25   investigator?
```



```
 1                    M. A. Fischer
 2          A.    It was a -- I believe the
 3     titles did change.  It was just medical
 4     investigator.
 5          Q.    Were you ever something known
 6     as, like, a major case investigator?
 7          A.    Well, that's the same thing.
 8     It was always a major case investigator.
 9          Q.    Okay.  It was major case
10     because all the medical investigations
11     qualify as major case investigations; is
12     that right?
13              MS. DSOUZA:  Objection.
14          A.    No.
15     BY MR. TSONIS:
16          Q.    Back up for a second.
17              What's the difference, I guess,
18     between a field or desk investigator and a
19     medical -- inside medical investigator?
20          A.    I can answer what I did.  I
21     can't tell you what other people's jobs
22     included.  But my job, I investigated
23     medical providers and facilities.
24          Q.    Were there others that would
25     qualify as major case but didn't have the
```



```
 1                   M. A. Fischer
 2    job, claims that had already been paid,
 3    right?
 4         A.    Correct.
 5         Q.    All right.  Other
 6    investigators, like inside and outside
 7    investigators, are typically investigating
 8    pending claims, right?
 9         A.    Yes.
10         Q.    How would cases get assigned to
11    you as an inside medical investigator?
12         A.    The supervisor would assign
13    them.
14         Q.    Who was your supervisor before
15    you retired?
16         A.    Kristen Slack.
17         Q.    Do you remember who the manager
18    was?
19         A.    Courtney Wolfe.
20         Q.    How long was Courtney Wolfe
21    your manager?
22         A.    I believe -- my best estimate
23    was that she started in 2018, I think.
24         Q.    Prior to Courtney Wolfe, who
25    was your manager?
```



```
 1                        M. A. Fischer
 2          A.    Bill Newport.
 3          Q.    And when did Bill Newport start
 4    being your manager?
 5          A.    I don't remember.
 6          Q.    Did he get to the Woodbury or
 7    Melville office at around the same time as
 8    Courtney?
 9          A.    I don't understand.
10          Q.    So, was Courtney always located
11    in the Melville office?
12          A.    I believe so.
13          Q.    All right.  At some point, it
14    sounds like, if you started to -- reporting
15    to her in 2018, something changed, right?
16    Either she came to the office, or the
17    structure changed, right?
18          A.    She came from a different
19    department in Woodbury, yes.
20          Q.    Okay.  Do you remember who your
21    manager was before Bill Newport?
22          A.    I believe Mike DeGrocco.
23          Q.    To the best of your
24    recollection -- and I realize it was a long
25    time ago -- who was your supervisor in
```



```
 1                    M. A. Fischer

 2   2016?

 3        A.    2016, I believe Danielle

 4   Perdomo.

 5        Q.    And how long was she your

 6   supervisor for?

 7        A.    I couldn't say exactly, but I

 8   would estimate around two years.

 9        Q.    Who was your supervisor after

10   that?

11        A.    Kristin Slack.

12        Q.    Was there anyone in the middle?

13        A.    No.

14        Q.    Okay.

15        A.    Danielle had previously been my

16   supervisor once before also.  There was

17   somebody before Danielle.

18        Q.    Okay.  To the best of your

19   recollection, was Mike DeGrocco your

20   manager or the manager of the Woodbury

21   office in 2016?

22        A.    No.

23        Q.    Who was?

24        A.    I don't believe he was.  I

25   believe it was Bill Newport.  I'm not sure.
```



```
 1              M. A. Fischer
 2              MS. DSOUZA:  I'd just like
 3         to -- Counsel, could you just wait
 4         for the witness to complete her
 5         answer before you ask the next
 6         question?
 7              MR. TSONIS:  Sure.
 8    BY MR. TSONIS:
 9         Q.    I think you said that you would
10    be assigned cases by your supervisor; is
11    that right?
12         A.    Correct.
13         Q.    Approximately how many cases
14    would you be assigned in a month?
15         A.    I believe four.
16         Q.    Four cases per month?
17         A.    I believe so.
18         Q.    All right.  And what kinds of
19    things would you have to do to investigate
20    those cases?
21         A.    I would have to run background
22    searches.  I would have to run data
23    searches, review billing, review public
24    records, review previous cases through our
25    case system.  I would assign clinic
```



```
 1              M. A. Fischer
 2   you retired, was it four cases per month?
 3        A.    No.
 4        Q.    What was it at that time?
 5        A.    At that time, I was working on
 6   a few cases because it was COVID.  The
 7   assignments had changed.
 8        Q.    When you say, "The assignments
 9   had changed," what do you mean?
10        A.    I wasn't receiving -- I wasn't
11   in the office.  We were working on cases
12   that we had had -- I was building evidence
13   for actions.
14        Q.    Can you explain in general
15   terms what you mean by "evidence for
16   actions"?
17        A.    Cases would -- once if -- when
18   they are completely investigated, if there
19   are reasons that they should be denied or
20   further looked into, they would go to the
21   legal -- our legal counsels.  They would be
22   flagged for that.  And then legal would ask
23   us for documents to support different
24   things that they needed all along the way.
25        Q.    Okay.  When did you retire from
```



```
 1                    M. A. Fischer
 2    Geico?
 3          A.    In September of 2020.
 4          Q.    Is that when you announced it
 5    or when it was effective?
 6          A.    My last day of work was in
 7    September of 2020, and my official date was
 8    November 1st, I believe.
 9          Q.    Okay.  Because I know we said
10    right when COVID hit you had taken a week
11    off, and then you had a Geico-issued
12    laptop, right?
13          A.    Correct.
14          Q.    So, for the remainder of that
15    time, you worked from home?
16          A.    Yes.
17          Q.    All right.  I think you said
18    you weren't being assigned cases at the
19    same rate during that time period because
20    you were obtaining evidence for other
21    investigations?
22                MS. DSOUZA:  Objection.
23          A.    I just think -- I don't -- I
24    can't remember exactly because it's been a
25    while.  I did not get new cases.  I was
```



```
 1                    M. A. Fischer
 2   very beginning, the actual declaration.
 3        A.    Got it.
 4        Q.    So, you see under the title
 5   employment history and job duties, there's
 6   paragraph 1?
 7        A.    Yes.
 8        Q.    And it says that you were
 9   employed with Geico -- or by Geico
10   beginning in September 2001?
11        A.    Correct.
12        Q.    All right.  And you say:  I was
13   employed as a special investigator at Geico
14   from January 2010 to November 2020 when I
15   retired.
16        A.    Yes.
17        Q.    So, pause there for a second.
18              What -- when you first got
19   hired with Geico, what job were you hired
20   on for?
21        A.    I was hired part-time, and I
22   processed claim checks.
23        Q.    Okay.  So, you worked in the
24   claims department.
25              Or was it in service?
```



```
 1                    M. A. Fischer
 2         A.    It was service.
 3         Q.    How long did you work there?
 4         A.    A few years.  Maybe four years,
 5    four or five years.
 6         Q.    Okay.  Before you -- so, strike
 7    that.
 8              Is it accurate that you
 9    transferred into SIU in January of 2010?
10         A.    Yes, I did.
11         Q.    All right.  Between
12    September 2001 to January 2010, what jobs
13    did you have at Geico?
14         A.    I was a -- I processed the
15    claims checks for the cashier's department,
16    and then I went over to systems security.
17    I was -- I assigned associates access to
18    different programs in the Geico system.
19         Q.    How did you make your way over
20    to SIU?
21         A.    I was working part-time, and
22    SIU needed help, and my boss allowed me to
23    work in SIU.  I did, like, clerical work
24    there also.
25         Q.    Was that prior to January 2010?
```



```
 1                    M. A. Fischer
 2        Q.    Got it.  And then I think you
 3    said it was right around that 2016 or 2017
 4    time period where you sort of permanently
 5    were working in the office?
 6        A.    I believe so in that -- it
 7    seems that time period, yes.
 8        Q.    Okay.  From this entire time,
 9    January 2010 to November 2020, it sounds
10    like your formal job title may have
11    changed; is that right?
12        A.    Yes.
13        Q.    Did your job responsibilities
14    change?
15        A.    Yes, in that we were not
16    required to go into the field as often.
17        Q.    All right.  Aside from not
18    having to go out into the field one day a
19    week, did your job responsibilities change
20    in any other way?
21        A.    No.
22        Q.    Okay.  Did you ever work out
23    of -- well, strike that.
24              You're aware that there was
25    another office located in the State of New
```



```
 1              M. A. Fischer
 2   or things like that that you were talking
 3   about, where would you document those?
 4        A.    In SICM, in the reflected case.
 5        Q.    Okay.
 6        A.    Yes.
 7        Q.    I guess, do you have an
 8   understanding as to whether the way you
 9   documented cases in SICM differed or was
10   the same than other investigators, either
11   field or desk?
12              MS. DSOUZA:  Objection.
13        A.    I am not aware of how other
14   investigators document.
15   BY MR. TSONIS:
16        Q.    All right.  Would you enter
17   your, I guess, activities sort of in a
18   separate line in SICM?  Or did they all go
19   in the same entry and you would just update
20   it?
21        A.    It would be in a note, a
22   separate note for each activity.  There
23   could be many on one day, and there could
24   be one on a day.
25        Q.    There could be none on a day?
```



1                         M. A. Fischer

2          A.     Yes.

3          Q.     Okay.  Did you have some sort

4     of expectation or metric that required you

5     to log a certain number of activities each

6     day?

7          A.     Not a number of activities, but

8     we had a goal that we needed to be -- in

9     the case, we had metrics set up how many

10    days you needed to be in the case.

11         Q.     Are you talking about a case

12    going red if it was pending for too long?

13         A.     That's one of the things, yes.

14         Q.     And what are other ones?

15         A.     Well, every time when you get a

16    new case, you have parameters that you have

17    to cover within a certain amount of time.

18    And then you set up a diary, and then you

19    need to be in that case every 15 days, we

20    had to at that point.

21                So, you would set up a reminder

22    diary, and that would come up on your

23    calendar to remind you that, okay, it's

24    15 days.  You need to update this.

25                My cases would go on for a



```
 1                     M. A. Fischer
 2    period of time.  They weren't once-and-done
 3    quick cases.
 4         Q.    Sure.
 5         A.    Yeah.
 6         Q.    So, in terms of, you know, the
 7    time it takes to close one of your cases
 8    versus cases handled by either field or
 9    desk investigators, your cases would take
10    substantially longer?
11         A.    Months.
12         Q.    There were some that even
13    lasted years?
14         A.    There could be, yeah.
15         Q.    Okay.  So, I guess, knowing
16    that you referenced having to update, you
17    know, a case every 15 days; is that right?
18         A.    Yes.
19         Q.    All right.  Besides that 15-day
20    requirement, was there any other, you know,
21    timeline you had to meet in terms of
22    entries you had to make in SICM?
23         A.    In the beginning of a case when
24    you opened it, there were -- there was
25    standards of things that needed to be
```



```
 1                    M. A. Fischer
 2   saved on -- some initial steps you take
 3   with every case?
 4         A.    Yes.
 5         Q.    All right.  And then after
 6   that, is it accurate to say that it kind of
 7   depends on where the investigation takes
 8   you?
 9         A.    Yes.  And the supervisor can
10   also direct you, you know, you need to do
11   this; this needs to get done by the next
12   15 days, certain things that come up if
13   they find something.
14         Q.    Okay.  If you were doing an
15   investigative activity and 15 days later
16   you were still working on it, could you
17   satisfy that requirement by simply going
18   into SICM and saying still investigating
19   whatever that issue was?
20         A.    No.
21         Q.    Why not?
22         A.    Because you have to show a
23   substantial activity on that case to keep
24   that case moving.  You can't just have a
25   case sit.
```



1                    M. A. Fischer

2          Q.    Right.  But if, I guess, the

3    substantial activity that you're working

4    on, you know, wasn't completed in 15 days,

5    what would happen?

6          A.    You would write what you had

7    completed.

8          Q.    Okay.  Prior to COVID, how many

9    new cases were you assigned typically in a

10   month?

11         A.    Well, we said four.

12         Q.    Okay.  So, you would have four

13   cases that you were assigned.  I think you

14   said it would take sometimes months to

15   close cases.

16         A.    Yeah.

17         Q.    How many cases would you

18   typically close in a given month?

19         A.    Every month would be different.

20   I would say on average, maybe three.

21         Q.    Okay.  You were a Geico

22   associate for a long time.  I'm sure you

23   know that there are certain metrics against

24   which associates are rated, right?

25         A.    Yes.



1                    M. A. Fischer

2         A.    Yes.

3         Q.    All right.  And they assessed

4   your files for, essentially, you know,

5   doing the activities and documenting them

6   the right way?

7         A.    Correct.

8         Q.    All right.  Besides that sort

9   of, you know, metric, did you have other

10  specific metrics that you were held to?

11        A.    (No verbal response.)

12        Q.    For example, your performance

13  wasn't assessed against the number of days

14  it took to close a case, right?

15        A.    Not on our cases.

16        Q.    Not on major case?

17        A.    No.

18        Q.    Or inside medical?

19        A.    Right.

20        Q.    All right.  And similarly, you

21  weren't rated in terms of productivity on

22  how many cases you closed per month?

23        A.    No.

24        Q.    No, that's not right?  Or, no,

25  you weren't?



```
 1                    M. A. Fischer

 2        A.    No, we weren't.

 3        Q.    Okay.  Do you have an

 4   understanding as to whether field or desk

 5   investigators are assessed in how many

 6   cases they close per month?

 7              MS. DSOUZA:  Objection.

 8        A.    I do.

 9        Q.    All right.  And is your

10   understanding that that was a performance

11   metric that applied to them?

12        A.    Yes.

13        Q.    All right.  Similarly, do you

14   have an understanding as to whether field

15   and desk investigators had a metric called

16   time to close that they were assessed with?

17        A.    No.

18        Q.    You have no understanding that

19   field or desk investigators, in part, had a

20   metric monthly as to how many days their

21   cases were open?

22        A.    Yes.

23        Q.    All right.  You understood

24   that, for those investigators, you received

25   a better score if your cases were open less
```



```
 1              M. A. Fischer
 2   time and a worse score if your cases were
 3   open for a significant amount of time?
 4        A.    Yes.
 5        Q.    All right.  And -- but that
 6   worked differently, we said, for inside
 7   medical, like yourself, investigators?
 8        A.    Correct.
 9        Q.    Would you receive performance
10   ratings each year?
11        A.    Yes.
12        Q.    All right.  Do you have a
13   general sense of where you shook out in
14   terms of your performance on a year-to-year
15   basis?
16        A.    I was always in the top four or
17   five percent.
18        Q.    Okay.  And just for clarity,
19   I'm sure you recall.  Do you have -- do you
20   understand that Geico rates all its
21   associates from a yearly review standpoint
22   on a one-to-five scale?
23        A.    Yes.
24        Q.    Do you agree that three, using
25   Geico's scale, is satisfactory?
```



```
 1              M. A. Fischer
 2  in your performance reviews?
 3       A.    Not that I can recall.  It's
 4  been a while.
 5       Q.    Besides SICM what other
 6  systems, Geico systems, did you use on a
 7  regular basis?
 8       A.    Outlook for e-mail.  Workday
 9  for time management.  I had access to
10  billing.
11       Q.    When you say "billing," is that
12  the Atlas database?
13       A.    Yes.  And we had Background.
14  We had a background services that we ran.
15       Q.    That's fair.
16              So, there was a number of, I
17  guess, third-party providers, we'll call
18  them, that you could run different checks
19  on, right?
20       A.    Yes.
21       Q.    All right.  And you had
22  credentials and access and would use those
23  kinds of systems?
24       A.    Yes.
25       Q.    All right.  Did you have a
```



1                 M. A. Fischer

2    typical schedule that you worked?

3         A.    Yes.  I worked 9:00 to 5:30 in

4    the later years.

5         Q.    When you say "the later years,"

6    was that your schedule from 2016 to the

7    time you retired?

8         A.    Yes.

9         Q.    You typically worked Monday

10   through Friday?

11        A.    Yes.

12        Q.    You received breaks during that

13   9:00 to 5:30 period?

14        A.    Yes.

15        Q.    And did you also receive a meal

16   period?

17        A.    It was unpaid.

18        Q.    That was going to be my next

19   question.

20        A.    Yes.

21        Q.    So, is it your understanding

22   you were compensated for a meal period --

23   or excuse me.  Strike that.

24             Is it your understanding you

25   were compensated for the break period, but



1              M. A. Fischer

2         A.    As the day would come to an

3    end, I would see what needed to still be

4    accomplished in that day to fulfill my

5    diary, and I would be catching up, making

6    sure that everything was -- that I had to

7    accomplish in that day was done.

8         Q.    Okay.

9         A.    To the best of my ability.

10        Q.    And, I guess, is that things

11   that are -- that you had to do to complete

12   a diary entry that day?

13        A.    Some of it was, yes.

14        Q.    Okay.  So, I guess, you know,

15   if it's due the next day or the day

16   after -- well, step back for a moment.

17             You said the diary sort of

18   entries were every 15 days you had to

19   submit, right?

20        A.    Right.

21        Q.    Is that 15 business days or 15

22   real-time days?

23        A.    I think it was 15 business

24   days.

25        Q.    Okay.  So, essentially, three



```
 1              M. A. Fischer
 2  weeks, every three weeks you had to submit
 3  a diary?
 4       A.    Yes.
 5       Q.    All right.  And I know you
 6  mentioned that you would print out your
 7  schedule on Friday so that you would know
 8  what's happening for the following week,
 9  right?
10       A.    Yes.
11       Q.    So, I guess, given the fact
12  that your timelines, you know, are three
13  weeks out, why was it necessary to work two
14  to two and a half hours a day overtime --
15  two to two and half hours per week in
16  excess of your scheduled hours?
17       A.    Because I wasn't just working
18  on those cases.  I also had other things
19  going on, phone calls.  Like I said, we had
20  new investigators, helping new
21  investigators, meetings, other things in
22  the day, e-mails that needed to be
23  addressed immediately, so everything pushes
24  everything down.
25       Q.    Sure.  I'm not suggesting that
```



```
 1                    M. A. Fischer
 2        Q.    So, she was a field supervisor,
 3   so she didn't work out of the office,
 4   correct?
 5        A.    Correct.
 6        Q.    All right.  So, Danielle
 7   Perdomo wouldn't know that you were working
 8   during your meal period?
 9        A.    Correct.
10        Q.    All right.  And Danielle
11   Perdomo wouldn't know that you were working
12   two to 2.5 hours in addition to your
13   scheduled hours each week?
14             MS. DSOUZA:  Objection.
15        A.    My -- I swiped in and out of
16   the building every day, which recorded my
17   time in and my time out.  My SICM also has
18   a date stamp on it and I'm sure my computer
19   when I shut it down at night.
20   BY MR. TSONIS:
21        Q.    So, let's take those back for a
22   second.
23             SICM has time and date stamps
24   for any activity that's entered, right?
25        A.    Every activity that's entered.
```



```
 1                    M. A. Fischer

 2         Q.    SICM doesn't have a timestamp

 3    for when you open the application, to your

 4    knowledge, right?

 5         A.    Not to my knowledge, but I'm

 6    assuming.  Everything does, right?

 7         Q.    Okay.  Similarly, do you have

 8    any reason to think that there's a

 9    timestamp of when you closed out of the

10    SICM application?

11         A.    I believe that there was.

12         Q.    Did anyone ever talk to you

13    about, hey, I saw you closed SICM at this

14    time?

15         A.    No.

16         Q.    Anybody ever talk to you about,

17    I saw you open SICM at this time?

18         A.    No.

19         Q.    You said you swiped into the

20    building and swiped out of the building?

21         A.    Absolutely.

22         Q.    All right.  So, just to be

23    clear:  To leave the building, you didn't

24    just have to walk out.  You had to

25    literally swipe?
```



```
 1                M. A. Fischer
 2   absolutely, they can check your time
 3   swipes.
 4        Q.    Do you recall who told you
 5   that?
 6        A.    No.
 7        Q.    Do you recall when they told
 8   you that?
 9        A.    No.
10        Q.    Do you recall if it was an
11   e-mail or an oral conversation?
12        A.    No idea.
13        Q.    This understanding that you
14   had, was it that someone at Geico could
15   pull your swipes or that your supervisor
16   could pull your swipes?
17        A.    I believe that someone could
18   and the supervisor could request that.
19        Q.    Did your supervisor ever talk
20   to you about your swipes?
21        A.    No.
22        Q.    Did the manager ever talk to
23   you about your swipes?
24        A.    No.
25        Q.    Did anyone at Geico ever talk
```



```
 1                 M. A. Fischer
 2    to you about the time you swiped in or out
 3    of the building?
 4         A.    No.
 5         Q.    You said Kristin Slack worked
 6    out of the Woodbury office also?
 7         A.    Yes.
 8         Q.    Did she work out of there five
 9    days a week?
10         A.    Yes.
11         Q.    Did she work the same hours as
12    you?
13         A.    No.
14         Q.    What hours did she work?
15         A.    I believe she worked 7:00 to
16    3:30, if I can remember.
17              MS. DSOUZA:  Just give me time
18         to object.
19              THE WITNESS:  Okay.  I'm sorry.
20              MS. DSOUZA:  No worries.
21    BY MR. TSONIS:
22         Q.    So, if Kristin Slack's usual
23    schedule had her leaving approximately two
24    hours before your normal end time, she
25    wouldn't know if you stayed late, right?
```



1              M. A. Fischer

2          MS. DSOUZA:  Objection.

3      A.    Well, my SICM reports would

4  have a date stamp on them after my time out

5  of -- after 5:30 at night if I was working

6  on a report.

7      Q.    Okay.  Let me -- we'll return

8  to that in a second.  Let me just ask a

9  specific question.

10          Kristin Slack wouldn't

11  physically be at the office to see if you

12  stayed late, right?

13      A.    Correct.

14      Q.    All right.  And I think I'm

15  understanding what you're saying is that

16  she could see the timestamp on something

17  that was submitted to her for approval?

18      A.    Yes.

19      Q.    All right.  Was the work that

20  you would stay late to do always something

21  that would be time stamped in SICM?

22      A.    No.

23      Q.    All right.  So, there are times

24  where she wouldn't be able to know?

25      A.    Correct.



```
 1                  M. A. Fischer
 2    left the office, it was discussed that I
 3    didn't have a place to work.  I didn't have
 4    a computer.
 5         Q.    Once you got a computer,
 6    though, I guess you would agree that
 7    various people have various, you know,
 8    ability to set up a home office in their
 9    houses?
10              MS. DSOUZA:  Objection.
11         A.    That has nothing to do with me.
12    BY MR. TSONIS:
13         Q.    Right.  I guess I'm just --
14    you're contending that your supervisor
15    would have known about your specific
16    situation and how you had to set up your
17    computers each day.
18              Am I wrong?
19         A.    No, but I'm assuming that I --
20    I fully believe that she knew that.
21         Q.    Do you have any reason to think
22    that she knew how long it took you to get
23    your setup?
24         A.    No.
25         Q.    Do you have any reason to think
```



```
 1              M. A. Fischer
 2   that your supervisor knew how long it took
 3   you to break down your setup?
 4        A.   No.
 5        Q.   All right.  How much time would
 6   you say it took you to set up your
 7   workstation each day?
 8        A.   I would say about 10 to
 9   15 minutes.
10        Q.   Okay.  And similarly, how much
11   time would you say it took to tear it down?
12        A.   Same thing:  10 to 15 minutes.
13        Q.   Do you use -- do you use your
14   dining room table regularly?
15        A.   Yes.
16        Q.   And I was saying, some people
17   do; some people don't.  For example, some
18   people have a dining room they use only on
19   special occasions, and they eat and use a
20   kitchen table.
21              What's your home setup?
22        A.   We eat every meal at the dining
23   room table.  We don't have a kitchen table.
24        Q.   Do you have a different place
25   that you could have set up your
```



1                    M. A. Fischer

2         Q.    Okay.  Are you contending as

3    part of this lawsuit that your time setting

4    up and taking down your workstation is time

5    you should have been compensated by Geico?

6         A.    Yes.

7         Q.    Again, let's do some math.  If

8    you're claiming 10 to 15 minutes each day,

9    that's 20 to 30 minutes per day, right?

10        A.    Correct.

11        Q.    20 and 30 minutes per day times

12   five days a week is about 100 to 150

13   minutes, right?

14        A.    Correct.

15        Q.    Okay.  It's about an hour and

16   40 minutes to two and a half hours; is that

17   right?

18        A.    I didn't do the math.  Okay.

19        Q.    Well, 20 minutes times --

20   excuse me.  Fifteen minutes times two is

21   30 minutes a day at the high end, right?

22   Five days a week at 30 minutes a day is two

23   and a half hours, right?

24        A.    Correct.

25        Q.    Okay.  In this declaration



```
 1                M. A. Fischer
 2           MR. TSONIS:  Let's go off the
 3        record and take a break.
 4           THE VIDEOGRAPHER:  We are going
 5        off the record.  The time now is
 6        12:38 p.m.
 7           (Whereupon, a short break was
 8        taken at this time.)
 9           THE VIDEOGRAPHER:  We are back
10        on the record, and the time now is
11        1:34 p.m.
12      Q.    All right, Ms. Fischer.  We
13   were looking at Exhibit 1, your
14   declaration, before we went on lunch.
15           Can you turn to paragraph 9 of
16   your declaration.  So, from December 2016
17   to March 2020, it states that you said your
18   regular hours worked were approximately
19   41.5 to 42 hours per week; and from
20   March 2020 to September 2020, your regular
21   hours worked were approximately 40.75 hours
22   per week.  So, I'll stop there.
23           Is this accurate?
24      A.    Yes, to the best of my memory,
25   yes.
```



1                    M. A. Fischer

2        Q.    All right.  So, if you recall,

3    just prior to going on lunch, we were also

4    talking about the COVID timeframe, from

5    March 2020 until the time you retired,

6    right?

7        A.    Uh-huh.

8        Q.    And we were talking about the

9    time that you said you spent setting up and

10   taking down your work station each day?

11       A.    Correct.

12       Q.    Does this incorporate that

13   time?

14       A.    The 40.75, yes, and also other

15   overtime that I would be doing during that

16   time.

17       Q.    Okay.  So, I just want to be

18   clear because I thought you said the

19   opposite before we went to lunch and I just

20   want to make sure that we're right.

21             The 40.75 hours per week, if

22   you were scheduled for 38.75 hours, means

23   two hours additional each work week that

24   you're claiming, right?

25       A.    Yes.



```
 1                    M. A. Fischer
 2        Q.    All right.  Does that two hours
 3   include the 10 to 15 minutes setting up
 4   your workstation and the 10 to 15 minutes
 5   taking down your workstation each day?
 6        A.    Yes.
 7        Q.    Okay.  Whatever time remains,
 8   if I understand you correctly, you're
 9   saying would be other work that you did?
10        A.    Yes.
11        Q.    Now, you say in the rest of
12   that sentence:  And my last regular pay was
13   $41.95 per hour.
14              I'll pause there again.
15              Were you compensated on an
16   hourly rate the entire time you worked as
17   an investigator?
18        A.    Yes.
19        Q.    Was there ever a period of time
20   in which you were paid an hourly rate but
21   the way that your hourly rate was
22   calculated changed?
23        A.    I don't understand.
24        Q.    Sure.  So, was there a period
25   of time where you would not potentially get
```



1                       M. A. Fischer

2    continues:  An hourly nonexempt associate

3    must receive permission in advance to work

4    more than his or her regular work hours.

5               Did I read that right?

6         A.    Yes.

7         Q.    All right.  Did you understand

8    that you had to request permission in

9    advance to work more than your regular work

10   hours?

11        A.    Yes.

12        Q.    Okay.  The following sentence

13   says:  The associate's timesheet must show

14   the exact day, parentheses, S, the hours

15   are worked.  Job training that is required

16   or compulsory staff meetings before and

17   after regular work hours are considered

18   hours worked for purposes of overtime pay

19   for hourly nonexempt associates.

20               I'll pause there.

21               Did you understand your

22   timesheet had to show the exact days that

23   your hours were worked?

24        A.    Yes.

25        Q.    Okay.  Now, if we move up above



```
1                   M. A. Fischer
2    the header, do you see the last paragraph
3    above the header that says, hourly
4    nonexempt associates?  Begins with, all?
5         A.   Yes.
6         Q.   All right.  And that sentence
7    says:  All nonexempt associates are
8    required to accurately record their hours
9    worked and absences taken.
10             Did I read that right?
11        A.   Yes.
12        Q.   All right.  Did you understand
13   as a nonexempt associate you were required
14   to accurately record your hours worked?
15             MS. DSOUZA:  Objection.
16        A.   Yes.
17   BY MR. TSONIS:
18        Q.   The next sentence deals with
19   exempt associates.
20             You were not an exempt
21   associate, right?
22        A.   Yes.
23        Q.   Sorry.
24             Is that correct?
25        A.   Yes.
```



```
 1                    M. A. Fischer

 2       Q.     Thank you.

 3              It then continues in the third

 4    sentence:  A nonexempt associate who feels

 5    he/she did not receive pay for all his/her

 6    hours worked and an exempt or salaried

 7    nonexempt associate who feels his/her pay

 8    incorrectly reflects a deduction for an

 9    absence should contact his or her

10    supervisor, local human resources manager,

11    or corporate human resources.

12              Did I read that right?

13       A.     Yes.

14       Q.     All right.  Did you understand

15    that, if you had -- if you felt you didn't

16    receive pay for all the hours that you

17    worked, that you could contact your

18    supervisor, local human resources manager,

19    or corporate human resources?

20       A.     Yes.

21       Q.     All right.  Did you also

22    understand as a Geico associate that Geico

23    maintains a Berkshire Hathaway ethics line?

24       A.     Yes.

25       Q.     What's the purpose of the
```



1                    M. A. Fischer

2    Berkshire Hathaway ethics line?

3         A.    I believe it was to report any

4    kind of problem that you had.

5         Q.    All right.  Would that include

6    a problem of not being compensated for all

7    time worked?

8         A.    It could be, yeah.

9         Q.    Okay.  Did you ever try to call

10   the Berkshire Hathaway line?

11        A.    No.

12        Q.    You would be able to call the

13   line if you wanted to, though, right?

14        A.    Correct.

15        Q.    Did you ever try to call

16   corporate human resources?

17        A.    No.

18        Q.    And I'll preface this.  I'm

19   talking about being compensated for time

20   that you're alleging that you worked.

21             Okay?

22             Did you ever try to contact

23   Geico corporate human resources?

24        A.    No.

25        Q.    Did you ever try to contact



```
 1                   M. A. Fischer
 2   Geico local human resources manager?
 3        A.    No.
 4        Q.    You had the ability to contact
 5   Geico's corporate human resources, right?
 6        A.    Yes.
 7        Q.    You had the ability to contact
 8   Geico's local human resources manager?
 9        A.    Yes.
10        Q.    It also says you could contact
11   your supervisor, correct?
12        A.    Yes.
13        Q.    Did you ever contact your
14   supervisor?
15        A.    We discussed overtime in
16   meetings just in passing, like, everybody
17   knew every -- you know, when we were
18   working.
19        Q.    Okay.  Let's be more specific
20   about that.
21              Which supervisor are you
22   talking about?
23        A.    I don't know.  Maybe Danielle.
24   I don't know.  But in general, when you
25   would have a group meeting, you know, it
```



1                    M. A. Fischer

2        A.    Every few months.

3        Q.    Okay.  During these meetings,

4    were there ever concerns about unpaid

5    overtime being raised?

6        A.    No.

7        Q.    No investigator you ever heard

8    raised a concern to a supervisor about

9    unpaid overtime?

10       A.    Not about unpaid overtime.

11       Q.    Am I understanding correctly

12   that some people raised concerns about

13   having to work overtime?

14       A.    That we did work overtime.

15       Q.    Okay.  What was the concern

16   that you raised or that others raised?

17       A.    There was a lot of work that

18   had to be done.  It takes time to keep

19   current.

20       Q.    Okay.  So, was the issue --

21   well, strike that.

22             Was it you that raised that

23   issue or others?

24       A.    Say it again.

25       Q.    Was it you that brought that up



```
 1                    M. A. Fischer
 2   and raised that issue?  Or was it others?
 3        A.    No.  It would just be as part
 4   of a discussion.
 5        Q.    So, there would be a discussion
 6   about workload generally is what I'm
 7   understanding?
 8        A.    Workload, yes.
 9        Q.    Okay.  So, you and other
10   investigators would have discussions with
11   the supervisor about your workload
12   generally?
13        A.    Yes.
14        Q.    Okay.  During the course of
15   those discussions, you didn't inform your
16   supervisor that you were working overtime
17   and not logging it into Workday; is that
18   correct?
19        A.    Correct.
20              MS. DSOUZA:  Objection.
21   BY MR. TSONIS:
22        Q.    And during those discussions,
23   your supervisor didn't instruct you to work
24   overtime and not log it into Workday,
25   correct?
```



1                    M. A. Fischer

2        A.    Correct.

3        Q.    Did you ever raise -- strike

4    that.

5              Separate from the meetings, did

6    you ever inform any of your supervisors

7    that you were working hours beyond your

8    scheduled hours but not entering them into

9    Workday?

10       A.    Yes.

11       Q.    Who did you inform?

12       A.    Danielle Perdomo.

13       Q.    When did you inform Danielle

14   Perdomo?

15       A.    I don't know.  She was aware.

16       Q.    What's your best estimate as to

17   when?

18       A.    I don't have one.  I would send

19   an e-mail.  She would see the timestamp on

20   the e-mail.  She would know I'm still in

21   the office.

22       Q.    Okay.  Let me clarify.  I'm not

23   talking about if you believe she could

24   infer that you were working past your

25   scheduled start time.



```
 1              M. A. Fischer
 2          Does that make sense?
 3     A.   No.
 4     Q.   That doesn't make sense?
 5     A.   No.  Say it again.
 6     Q.   Sure.
 7          So, I think what you just said
 8   is she could, from an e-mail that you sent
 9   to her, determine that that e-mail was sent
10   after your scheduled end time; is that
11   right?
12     A.   Yes.
13     Q.   All right.  And I understand
14   and you've testified about some of the
15   timestamp stuff earlier, right?
16     A.   Right.
17     Q.   Okay.  I guess my question is a
18   little different.
19          Did you actually ever inform
20   your supervisor, either orally or in
21   writing, that you were working additional
22   hours beyond your scheduled hours but not
23   logging it into Workday?
24     A.   No.
25     Q.   All right.  Did your supervisor
```



1                  M. A. Fischer

2    ever instruct you, either orally or in

3    writing, that you needed to work hours

4    beyond what you were scheduled but not log

5    it into Workday?

6         A.    No.

7         Q.    Okay.  Now, going back to your

8    earlier point, you've stated that your

9    supervisor could see e-mails that were time

10   stamped beyond the end of your scheduled

11   shift; is that right?

12        A.    Correct.

13        Q.    All right.  Were those e-mails

14   like the diaries in SICM that we were

15   discussing?

16        A.    In addition to diaries in SICM,

17   there would be timestamps on e-mails that

18   would be sent during that time.

19        Q.    Okay.  So, I just want to make

20   sure that I have your testimony accurately.

21             At times, you would send

22   e-mails to your supervisor beyond the end

23   of your scheduled shift?

24        A.    Yes.

25        Q.    Okay.  Did you ever work longer



```
 1                  M. A. Fischer
 2   get back in.
 3        Q.    I didn't realize the Woodbury
 4   office was that large.
 5        A.    It's very large.  It was very
 6   large.
 7        Q.    I asked you a series of
 8   questions a short while ago, if you ever,
 9   you know, either orally or in any kind of
10   written correspondence, informed your
11   supervisor you were working beyond your
12   scheduled shift, right?
13        A.    Correct.
14        Q.    I'll ask you the same series of
15   questions about your manager.
16             Did you ever inform your
17   manager orally or in writing that you were
18   working beyond your scheduled shift-end
19   time?
20        A.    No.
21        Q.    Did you ever inform your
22   manager -- or excuse me.  Strike that.
23             Did your manager ever inform
24   you, either orally or in writing, that you
25   needed to work beyond the end of your
```



1                    M. A. Fischer
2    scheduled shift time and not record it in
3    Workday?
4         A.    No.
5         Q.    Did you ever raise any
6    complaints, either orally or in writing, to
7    your manager about working additional hours
8    than those scheduled but not being
9    compensated for them?
10        A.    No.
11        Q.    Did your manager ever instruct
12   you to work more than the hours you were
13   scheduled but not log those hours in
14   Workday?
15        A.    No.
16        Q.    Thank you.
17              Would e-mails that you sent
18   after the end of your shift go to your
19   manager?
20        A.    Not unless she was CC'd on it.
21        Q.    Was it typical that she would
22   be CC'd on it?
23        A.    No.
24        Q.    Okay.  Besides timestamps on
25   e-mails, is there any other way that you



1                    M. A. Fischer

2    was my understanding that hours above 38.75

3    to complete regular case work would rarely

4    be approved.

5                    Do you see that?

6         A.    Yes.

7         Q.    All right.  Why was it your

8    understanding that hours above 38.75 to

9    complete regular case work would rarely be

10   approved?

11        A.    If -- to work overtime, you

12   would have to submit in advance a request

13   to work overtime on a specific case and

14   specifically what on that case you would

15   want to work during that time.

16        Q.    So, you had the ability to

17   request overtime in advance; is that right?

18        A.    On a specific case and

19   regarding a specific detail to that case.

20        Q.    Did you ever make that kind of

21   request?

22        A.    No.

23        Q.    Why not?

24        A.    Because it would have to be

25   done in advance and most of the time when I



1              M. A. Fischer

2    worked overtime, it was because the end of

3    my day was up and I had things I still

4    needed to accomplish in that day.

5         Q.    Okay.  Was there ever any

6    communications to how far in advance you

7    had to request it?

8         A.    No.  It would also take time to

9    write up the request and the specification.

10        Q.    I get the impression that you

11   had a pretty good relationship with your

12   supervisor?

13        A.    Yes.

14        Q.    Could you call her and say,

15   hey, can I have 30 minutes of overtime or

16   an hour, if you needed it?

17        A.    It was very rarely approved.

18        Q.    Why do you -- strike that.

19             If you never requested it, how

20   do you know that it wouldn't have been

21   approved for you?

22        A.    It has been the trend in Geico

23   that people just worked to get their work

24   done for the day.

25        Q.    Do you have an understanding of



```
 1                   M. A. Fischer
 2   what the process was for your husband,
 3   Keith Fischer, to request overtime?
 4        A.    No.
 5        Q.    Do you know who his supervisor
 6   was?
 7        A.    He was under Gerry Cassagne, I
 8   believe.
 9        Q.    He had Gerry Cassagne as a
10   supervisor for this entire time period of
11   2016 to when he retired also, right?
12        A.    I believe so.
13        Q.    He worked with Gerry Cassagne
14   back in NYPD also, right?
15        A.    Correct.
16        Q.    Okay.  You have no
17   understanding as to whether during 2016 or
18   2017 Keith Fischer could work overtime
19   hours as long as he just sent a follow-up
20   documentation e-mail to Gerry Cassagne?
21             MS. DSOUZA:  Objection.
22        A.    No.
23   BY MR. TSONIS:
24        Q.    Your husband never talked to
25   you about that?
```



```
 1                    M. A. Fischer
 2        A.    No.
 3        Q.    Did you ever ask your husband
 4   about, should I request overtime?
 5        A.    No.
 6        Q.    Why not?
 7        A.    We didn't discuss things like
 8   that.
 9        Q.    Are you aware as part of this
10   lawsuit there have been documents produced
11   that show that Keith Fischer did, in fact,
12   work overtime in some weeks that was
13   approved?
14        A.    No.  I don't know what was
15   submitted on his behalf.
16        Q.    Well, I mean, a short while
17   ago, you testified, you know, it's the
18   trend in Geico that people just work their
19   38.7 -- they work more hours, but --
20        A.    Yes.
21        Q.    -- I guess, you know, I'm not
22   going to put a bunch of documents that
23   don't have your name in front of them -- or
24   on them in front of you.  But I'll
25   represent to you that there are documents
```



1                    M. A. Fischer

2    from different investigators that get

3    overtime approved.  So, I'm curious why it

4    is that you didn't request it.

5                    MS. DSOUZA:  Counselor, is

6            there a question?

7    BY MR. TSONIS:

8        Q.    Why is it that you didn't

9    request it?

10       A.    I didn't feel that it would be

11   approved.

12       Q.    Okay.  Do you have any other --

13   any understanding as to whether other major

14   case SIU investigators did request

15   overtime?

16       A.    I do not.

17       Q.    Did anyone ever communicate to

18   you that they had the same understanding

19   that overtime hours wouldn't be approved?

20            When I say "they," I'm talking

21   about SIU major case investigators.

22       A.    Yes.

23       Q.    Who?

24       A.    I don't know offhand.

25       Q.    Can you name anyone?



```
 1                    M. A. Fischer
 2         Q.    If you look at paragraph 3, the
 3    very last sentence, it says:  In an
 4    effort -- nevertheless, in an effort to
 5    minimize its labor costs, Geico prohibited
 6    special investigators from working overtime
 7    without prior permission and actively
 8    deterred special investigators from
 9    reporting overtime.
10              You see that?
11         A.    Yes.
12         Q.    All right.  Well, we talked
13    earlier about the policy of requesting or
14    approving your overtime, right?
15         A.    Correct.
16         Q.    All right.  Were you ever
17    actively deterred from reporting overtime?
18         A.    It was not encouraged.
19         Q.    I mean, that's, I guess, a
20    little different than what I asked.
21              Were you actively deterred from
22    reporting overtime?
23         A.    No.
24         Q.    Okay.  So, if we go to page 4
25    of this complaint -- have you read this
```



```
 1              M. A. Fischer
 2              MR. TSONIS:  You are
 3         dangerously close to crossing the
 4         line now of coaching the witness.
 5         You're entitled to object --
 6              [Crosstalk.]
 7              MR. TSONIS:  I'm entitled to
 8         explore the witness's knowledge in an
 9         area when she may have knowledge
10         about another plaintiff in this case.
11         It's no different than if she was
12         close friends with somebody else and
13         I was asking about that.
14    BY MR. TSONIS:
15         Q.   I'll ask my question again, Ms.
16    Fischer.
17              Do you have an understanding as
18    to how your husband's caseload changed
19    during the time in or about March 2020?
20         A.   Yes.
21         Q.   Okay.  And what's your
22    understanding?
23         A.   That it increased.
24         Q.   Do you have an understanding as
25    to how much it increased?
```



                        M. A. Fischer

1

2        A.    A lot.

3        Q.    Okay.  As a major case

4   investigator, we said that your caseload

5   did not increase, right?

6        A.    Correct.

7        Q.    In fact, your caseload

8   decreased because you weren't assigned new

9   cases?

10        A.    Correct.

11        Q.    Okay.  If you continue on in

12   that paragraph, bottom of page 5 going onto

13   page 6, it says:  As a result, to keep up

14   with his escalating workload and Geico's

15   demanding performance metrics, Fischer

16   typically began working at approximately

17   6:00 a.m. and finished his work for the day

18   at approximately 11:00 p.m., accounting for

19   some gaps in his workday for meals and

20   other self-care from March 2020 through

21   April 2020 -- plaintiff Fischer worked

22   between approximately 60 and 75 hours per

23   week in most full workweeks, i.e., weeks

24   with no days lost to holidays or other time

25   off.



1                    M. A. Fischer

2         A.    Yes.

3         Q.    What was the earliest they

4    would start, to the best of your knowledge?

5         A.    I believe 7:00 a.m.

6         Q.    And how late would they be

7    scheduled, to the best of your knowledge?

8         A.    9:00.

9         Q.    How many major case

10   investigators would a supervisor have

11   reporting to them?

12        A.    At the end, we said there were

13   18, so nine.

14        Q.    Do you believe that each

15   supervisor could track the SICM entries or

16   e-mails received from nine investigators

17   and recall precisely the schedules that

18   those investigators worked to be able to

19   determine that they worked overtime?

20             MS. DSOUZA:  Objection.

21        A.    I believe that would be part of

22   their job as a supervisor.

23        Q.    Okay.  But ultimately, you

24   never raised a complaint that you were

25   working overtime and not paid for it,



```
 1                    M. A. Fischer

 2    right?

 3         A.    Correct.

 4              MR. TSONIS:  Okay.  No further

 5         questions.

 6              MS. DSOUZA:  No further

 7         questions.  On the record -- we're

 8         still on the record.

 9              We want to request some

10         documents that were referenced during

11         the deposition today.  We would like

12         to reiterate some of the requests.

13              We would like to ask for

14         e-mails to Ms. -- I forget her last

15         name.  Danielle Perdomo -- e-mails to

16         Ms. Danielle Perdomo that were sent

17         outside the scheduled hours of 9:30

18         to 5:30 by Ms. Fischer for the

19         relevant time period as well as the

20         same e-mails that might have been

21         sent to Ms. Kristin Slack.

22              (Request noted.)

23              MS. DSOUZA:  We would ask for

24         data about Ms. Fischer's swipe card

25         activity as well as SICM data that
```



```
 1          M. A. Fischer
 2   data regarding time entries as well
 3   as other ways of keeping track of
 4   time.
 5          MS. DSOUZA:  But we will do, as
 6   you pointed out, we will probably
 7   follow up in writing and confer on
 8   this.
 9          MR. TSONIS:  Right.  I think
10   that's probably the most productive.
11   Thank you.
12          MS. DSOUZA:  Thank you.
13          (Page break to accommodate
14   jurat.)
15
16
17
18
19
20
21
22
23
24
25
```



1          M. A. Fischer

2          THE VIDEOGRAPHER:  This

3     concludes the video deposition of

4     Ms. Margaret Fischer.  The time now

5     is approximately 4:48 p.m.  We are

6     off the record.  Thank you, everyone.

7          (Whereupon, at 4:50 P.M., the

8     Examination of this Witness was

9     concluded.)

10

11

12     _____
            MARGARET. A FISCHER

13

14   Subscribed and sworn to before me

15   this _____ day of _____ 20____.

16

17   _____
         NOTARY PUBLIC

18

19

20

21

22

23

24

25



1            M. A. Fischer

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :
5    COUNTY OF RICHMOND       )

6

7        I, MARINA DUBSON, a Notary Public for

8    and within the STATE OF NEW YORK, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 19th day of December 2024.

21

22

23   _____
              MARINA DUBSON

24

25

