Exhibit 51

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE EASTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - )

5  KEITH FISCHER, MICHAEL O'SULLIVAN,)

6  JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

7  BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

8  CHARISE JONES, individually and   ) (GRB) (ARL)

9  on behalf of all others similarly )

10  situated,                         )

11                    Plaintiffs,     )

12     - v -                          )

13  GOVERNMENT EMPLOYEES INSURANCE    )

14  COMPANY d/b/a GEICO,              )

15                    Defendant.      )

16  - - - - - - - - - - - - - - - - - )

17

18      VIDEOTAPED DEPOSITION OF CHARISE JONES

19

20

21

22

23  Reported by:

24  Kim M. Brantley

25  Job No: J11541510



1                    CHARISE JONES

2          P R O C E E D I N G S

3          THE LEGAL VIDEO SPECIALIST:  This is

4     the media labeled number one in the video

5     recorded deposition of Charise Jones in the

6     matter of Keith Fischer, et al. versus

7     Government Employee Insurance Company, doing

8     business as GEICO.

9          This deposition is being taken in New

10    York City, New York on August 12, 2024.  My

11    name is Silvio Facchin, I am a certified

12    legal video specialist; the court reporter is

13    Kim Brantley, and we're both representing

14    Esquire Deposition Solutions.

15         We are now going on the record.  The

16    time is 9:53 a.m.

17         Counsel will state their appearances

18    for the record.

19         MR. SLOTNICK:  Good morning.  Greg

20    Slotnick of Dwayne Morris for defendant

21    GEICO.

22         MS. JEAN:  Sabine Jean, Otten & Golden,

23    for plaintiff -- for named plaintiff Charise

24    Jones.

25         THE LEGAL VIDEO SPECIALIST:  Will the



1                    CHARISE JONES

2        court reporter please swear in the witness.

3   Whereupon,

4                    CHARISE JONES

5   called as a witness by counsel for Defendant, and

6   after having been first duly sworn, was examined

7   and testified as follows:

8        EXAMINATION BY COUNSEL FOR DEFENDANT

9                 BY MR. SLOTNICK:

10       Q.   Good morning, Ms. Jones.

11       A.   Hi.

12       Q.   Can you please state and spell your

13   name for the record.

14       A.   Charise, C-h-a-r-i-s-e, Jones,

15   J-o-n-e-s.

16       Q.   Thank you.  And what is your current

17   address?

18       A.   ██████████████████████████████████,

19   ██████████████████████.

20       Q.   Have you been deposed before?

21       A.   Yes.

22       Q.   So you probably know some of what I'm

23   about to say.  So again my name is Greg Slotnick.

24   I'll be taking your deposition today.  I'll be

25   asking you a series of questions.  Your job is to



```
 1                     CHARISE JONES

 2         Q.   When was that?

 3         A.   I don't know the dates.

 4         Q.   If you can give me an --

 5         A.   Maybe the last time I waitressed maybe

 6   five years ago.

 7         Q.   And is there a reason that you stopped

 8   waitressing?

 9         A.   It was a lot, you know, on the body.

10         Q.   Okay.  And if we could go back to your

11   GEICO employment, what year did you start working

12   for GEICO?

13         A.   1986.

14         Q.   And do you recall what your first job

15   title was?

16         A.   Transcriptionist.

17         Q.   And what did that job entail?

18         A.   Typing up all the letters that people

19   were sending out, examiners were sending out.

20         Q.   And what exactly -- strike that.

21              Who were examiners?

22         A.   The claims examiners in various

23   departments would call in, record their letters

24   that they wanted to be sent out, it would go into

25   a big vat, and then all of us would sit around
```



1                      CHARISE JONES

2          A.    Someone that would like take over let's

3     say if the supervisor is out, or the supervisor

4     wasn't unavailable, or if they had questions, or

5     they would take on more work or do something extra

6     where they would get compensated for that.

7          Q.    Do you know how the levels were

8     assigned?

9          A.    I don't know how they were assigned.

10    It's just whoever applied for them.

11         Q.    Were they posted as separate job,

12    like -- strike that.

13              Could you see if a particular job

14    posting was at a particular level?

15         A.    Yes.

16         Q.    And which levels have you worked in in

17    SIU?

18         A.    In SIU, sixty-five and sixty-six.

19         Q.    Do you recall when you were a level

20    sixty-five, what time frame?

21         A.    I was a sixty-five up until 2023.

22         Q.    And what happened in 2023?

23         A.    I applied for an SIU trainer's job.

24         Q.    And was that a level sixty-six job?

25         A.    Yes.



                    CHARISE JONES

1
2    when the office was open again, he would see me;
3    he would say "Hello," ask how things were going.
4    But on a regular basis, not so much.
5        Q.    And when you say "meetings," what type
6    of meetings are you referring to?
7        A.    Before COVID we had our regular staff
8    meeting with everybody, that we would go into a
9    meeting room, and we would all be there, and then
10   we would have just like skip-level meetings if we
11   had anything we wanted to talk about having to do
12   with our supervisor.
13       Q.    Did you in fact have skip-level
14   meetings with Bill?
15       A.    One.
16       Q.    Do you recall when that was?
17       A.    No.
18       Q.    Approximately?
19       A.    I do not.
20       Q.    Do you recall any of the substance of
21   that meeting?
22       A.    Basically asking us again, you know,
23   how we were doing, how the workflow was, if we
24   needed anything.
25       Q.    Who is "we" that you're referring to?



CHARISE JONES

1

2      A.   The section.

3      Q.   And what do you mean by "the section"?

4      A.   Each supervisor had their section.

5   Like you had asked about April's section, who she

6   had.  So those people would meet with him, other

7   supervisors' section would meet with him, all

8   separately.

9      Q.   Okay.  And did the meeting include both

10  people who worked inside and people who worked in

11  the field?

12     A.   Yes.

13     Q.   And do you recall if you said anything

14  during that meeting?

15     A.   I did not.

16     Q.   Do you recall if anyone else said

17  anything during that meeting?

18     A.   Yes.

19     Q.   What do you recall?

20     A.   Asking specifically about when we

21  closed a case, how -- how -- where -- where -- how

22  our numbers are figured out, like the time frame.

23          Because our cases had to be closed at a

24  specific time, and it was asked if the case was

25  closed, does it go by when we close it, or when



```
 1                    CHARISE JONES

 2   hours for a specific reason, you needed to let

 3   somebody know.

 4        Q.   Have you heard of the term "flex time"

 5   at GEICO?

 6        A.   Yes.

 7        Q.   What does that mean?

 8        A.   Meaning if you -- like during the

 9   afternoon, if you needed to take time off, make it

10   up at the end of the day, or on a different day,

11   or, you know, make sure it's within your specific

12   time that you're supposed to work.

13        Q.   And what time are you supposed to work?

14        A.   You were supposed to work 7.75 hours a

15   day.

16        Q.   Okay.  Did you utilize flex time at all

17   in your role?

18        A.   On occasion.

19        Q.   Approximately how often?

20        A.   Really not that often.  I couldn't

21   even -- maybe two, three times a month.

22        Q.   Is that because you were able to work

23   during your normal workday, or for some other

24   reason?

25        A.   Just for some other reason.
```



```
 1                    CHARISE JONES
 2   that just receiving them?
 3        A.   Correct.
 4        Q.   I just want to make sure I get the
 5   lingo.
 6        A.   Yes.
 7        Q.   Okay.  And how long did it take you
 8   generally to investigate one of your claims?
 9        A.   That's a loaded question, because it
10   really depended on the type of a claim came in.
11   There's just so many different claims that come
12   in, and it depended on what it was.
13        Q.   Okay.  Could you give me like a range
14   in terms of how long it could take to close a case
15   that you have?
16        A.   You could have one where it was, you
17   know, assigned to you mistakenly, and it was --
18   you know, they used the wrong claim number, and it
19   wasn't the right claim number, and you can close
20   that within, I don't know, an -- an hour.  And
21   then you have some that could go on for days and
22   weeks, depending on if you had EUOs scheduled.
23        Q.   Did you work major cases?
24        A.   Yes.
25        Q.   And when did you work major cases?
```



| | |
|---|---|
| 1 | CHARISE JONES |
| 2 | MR. SLOTNICK:  We've been going for |
| 3 | about an hour and a half.  Is now a good time |
| 4 | for a break? |
| 5 | THE WITNESS:  A bathroom break would be |
| 6 | great. |
| 7 | MR. SLOTNICK:  Okay.  Can we go off the |
| 8 | record, please. |
| 9 | THE LEGAL VIDEO SPECIALIST:  We are now |
| 10 | going off the record.  The time is 11:29 a.m. |
| 11 | (Recess taken.) |
| 12 | THE LEGAL VIDEO SPECIALIST:  We are |
| 13 | back on the record.  The time is 11:36 a.m. |
| 14 | This is the beginning of the media labeled |
| 15 | number two. |
| 16 | BY MR. SLOTNICK: |
| 17 | Q.  Ms. Jones, did you work in -- strike |
| 18 | that. |
| 19 | I believe after you worked as a field |
| 20 | investigator you mentioned that you worked as a |
| 21 | trainer. |
| 22 | Is that correct? |
| 23 | A.  Correct. |
| 24 | Q.  And again do you recall when that |
| 25 | employment position started? |



```
 1                    CHARISE JONES

 2        A.   I believe it -- I work -- I was

 3   accepted for that position in 2023.  I don't know

 4   if it was like mid -- I think it was like midyear,

 5   but I had the role of investigator still and

 6   trainer for about six months to finish my caseload

 7   and to still assist where need be in the

 8   investigative part.

 9        Q.   So you were working both as an

10   investigator and as a trainer at the same time?

11        A.   Correct.

12        Q.   And when you applied for that role, do

13   you recall whether you interviewed for it?

14        A.   Yes.

15        Q.   Who did you interview with?

16        A.   April Neyland, and there was another

17   person on with her.  I forget who the other person

18   was.  I forget who the other person was.

19        Q.   Was there a second round of interviews,

20   or just the one interview?

21        A.   There was a first interview and then

22   you had to present something.  You had to pick to

23   present something in order to like teach somebody

24   something.

25        Q.   And how is the trainer role different
```



```
 1                   CHARISE JONES
 2   longer.  It was just one company under one
 3   umbrella.
 4        Q.   Do you recall when that change was
 5   first implemented?
 6        A.   It was January of this -- well, it
 7   happened at the end of 2023, but like January of
 8   2024 is when they changed -- like they -- there
 9   was no longer trainers.
10        Q.   At all in the SIU?
11        A.   At all.  At all across the country now,
12   because now again it was SIU across the country.
13        Q.   And previously, when you were a
14   trainer, was that just for your region?
15        A.   It was just for my region, and I was
16   the first trainer ever in my region.  They didn't
17   have one.  Other regions did, but we didn't.
18        Q.   Do you know why region two didn't have
19   a trainer before?
20        A.   I don't know why they didn't have one,
21   no.
22        Q.   Okay, so you worked as a trainer from
23   mid-2023 to approximately January 2024.
24             Is that correct?
25        A.   My dates might be off, but, yeah, it
```



```
 1                      CHARISE JONES
 2   was just a brief time.
 3        Q.   And then what happened to your job
 4   position at that time?
 5        A.   They asked me if I preferred auditor or
 6   trainer, and I basically said whatever would keep
 7   my job, and they just said that everyone was going
 8   to be auditors, that there -- there was no need
 9   for trainers any more.  They were doing like --
10   almost like self-training like.  They were just
11   going to implement like, you know, a way to
12   self-teach yourself.
13        Q.   And so when you say "auditor," is that
14   your current job role?
15        A.   Correct.
16        Q.   And when did you start working in that
17   role?
18        A.   We were told we were auditors I think
19   like the end of 2023, but we started, you know,
20   actually auditing in this -- beginning of this
21   year.
22        Q.   And when you say "auditing," what do
23   you mean?
24        A.   Now I -- all the investigators that do
25   a case, when they go ahead and conduct their cases
```



CHARISE JONES

2  and they close it, I go in and I look at their

3  case and make sure that they completed everything

4  the way they should have.

5      Q.   So the auditor role is different than

6  investigator, correct?

7      A.   Correct.

8      Q.   And when you were -- to back -- strike

9  that.

10         To go back to when you were a trainer,

11  did you have any supervisory responsibilities in

12  that role?

13     A.   No.

14     Q.   When you worked as a trainer, did you

15  participate in providing information for

16  performance evaluations to any other employees?

17     A.   To any other employees?  No.

18     Q.   And in your role as an auditor, do you

19  have any supervisory responsibilities?

20     A.   No.

21     Q.   Have you ever in this role?

22     A.   No.

23     Q.   Have you provided any information for

24  performance evaluations for other SIU employees in

25  your role as an auditor?



1                        CHARISE JONES

2    feels his/her pay incorrectly reflects a deduction

3    for an absence should contact his/her supervisor,

4    local human resources manager, or corporate

5    resources" -- or sorry, "corporate human

6    resources.

7            Did I read that correctly?

8        A.   Yes.

9        Q.   And were you a nonexempt employee from

10   at least 2017 through March 2022?

11       A.   Yes.

12       Q.   Do you know what "nonexempt" means?

13       A.   Exempt versus nonexempt is one is

14   salaried and one is hourly.

15       Q.   And as a nonexempt associate, would you

16   agree that you were required to follow this policy

17   of GEICO?

18            MS. JEAN:  Objection.

19            THE WITNESS:  Yes.

20   BY MR. SLOTNICK:

21       Q.   And was it your understanding that you

22   were required to accurately record your hours

23   worked while working at GEICO?

24       A.   Yes.

25       Q.   And that if you had any issues



```
 1                      CHARISE JONES
 2        Q.   Do you recall whether your position was
 3   eligible for overtime?
 4        A.   I was under the impression it was.
 5        Q.   Why were you under the impression it
 6   was?
 7        A.   If I'm working, and I'm putting in the
 8   hours, I should be paid for it.  And based on what
 9   I'm reading and what they're saying is, if I'm
10   working, then I should be paid for it.
11        Q.   Do you know if you were eligible for
12   overtime in your trainer role?
13        A.   Yes, I was -- I mean, again I was under
14   the same impression that if I'm working, anything
15   over my time, or if it bled into more time, yes.
16        Q.   Do you know if you're eligible for
17   overtime in your current role as an auditor?
18        A.   Yes, I am.
19        Q.   So you were required to accurately
20   record your hours worked as an investigator.
21             Is that correct?
22        A.   Correct.
23        Q.   And did GEICO policy require you to
24   accurately record your hours worked as a trainer?
25        A.   Yes.
```



CHARISE JONES                                        August 12, 2024
FISCHER V. GEICO                                                 109

```
 1                     CHARISE JONES

 2       Q.   And as an auditor?

 3       A.   Yes.

 4            (Training history log was marked

 5       Deposition Jones Exhibit 3, for

 6       identification.)

 7  BY MR. SLOTNICK:

 8       Q.   Ms. Jones, have you seen what's in

 9  front of you and has been marked as Exhibit 3 with

10  Bates number G004285?

11       A.   I have not seen it, no.

12       Q.   Are you familiar with the trainings

13  that you completed throughout your employment at

14  GEICO?

15       A.   Yes.

16       Q.   And taking a look through this

17  document, does it refresh your recollection with

18  respect to trainings that you completed while

19  working at GEICO?

20       A.   Yes, it is.

21       Q.   Do you believe that this is an accurate

22  listing of your trainings completed at GEICO?

23            MS. JEAN:  Objection.

24            THE WITNESS:  I would say -- I mean,

25       without checking to see if I actually -- you
```



                        CHARISE JONES

1
2   online after, you know, like late hours, while I
3   was working.
4        Q.   And you said that you made a complaint
5   to April Neyland.  Is that right?
6        A.   Correct.
7        Q.   How many times did you complain to her
8   about off-the-clock work?
9        A.   A handful of times.
10       Q.   Could you approximate what you mean by
11  "a handful"?
12       A.   Maybe four to five times.
13       Q.   And do you recall when you made those
14  complaints to her?
15       A.   It was over the course of, you know,
16  her -- me being reporting to her.  So it was over
17  the course of a year or so, two years, you know,
18  depending on -- I don't know the time frame, but
19  it was, you know, whenever it came up, she was the
20  one I would discuss it with.
21       Q.   When you say whenever "it" came up,
22  what are you referring to?
23       A.   Whenever I had the -- wherever --
24  whenever I had to do the overtime, or when it was
25  coming towards the end of the week, and I wasn't



```
1                     CHARISE JONES

2     able to finish up what I had, or the day -- you

3     know, I was just -- so much windshield time, and I

4     just couldn't finish my work.

5          Q.   And when you say you couldn't finish

6     your work, what do you mean by that?

7          A.   Again we had like certain time frames

8     to finish it, certain time frames that things had

9     to be submitted by, and knowing that my shift was

10    over based on the number of hours I've already

11    worked, I knew that this report had to be in by

12    the end of that day, and I would just have to do

13    it, otherwise it would, you know, be held against

14    me for not doing it.

15         Q.   And your testimony is that that

16    happened on four to five occasions?

17         A.   Talking to her about the overtime?

18         Q.   Correct.

19         A.   Yes.

20         Q.   And from April 2017 to the present,

21    have you been paid hourly?

22         A.   I believe it changed at some point.  I

23    just don't know when.

24         Q.   Do you recall how it changed?

25         A.   I don't know how it changed.
```



                        CHARISE JONES

 1

 2     Q.   And when you submit -- strike that.

 3          When did you submit the report that

 4   you're referring to here?

 5     A.   She wanted it submitted the next day

 6   for the manager to approve it.

 7     Q.   And who was the manager?

 8     A.   Bill Newport.

 9     Q.   How did you submit it?

10     A.   I sent an email.

11     Q.   Who did you send the email to?

12     A.   Her, April.

13     Q.   Was anyone copied on that email?

14     A.   No.

15     Q.   And were your overtime hours for that

16   week approved?

17     A.   Yes.

18     Q.   So why did you -- why do you believe

19   that that dissuaded you from future requests to be

20   paid above 38.75 hours per work week?

21     A.   Because it -- the way it was -- the way

22   she reprimanded me on putting it in, saying that

23   there was nobody to approve it, and "You can't

24   just work the overtime," and she wanted to know

25   why I didn't ask somebody, and I proceeded to let



```
 1                        CHARISE JONES
 2    her know that nobody was there.  All the
 3    supervisors were out for the day.  The manager was
 4    out.  And I said, "I worked it, so I put it in."
 5               And then she told me that in order for
 6    me to get approved for it, I had to write down
 7    every single case that I worked, what I did, the
 8    time I did it, and why I needed to work that
 9    amount of hours overtime.
10               And I -- it was just time consuming.
11    That took more time out of my day during my work,
12    of which she made it a big deal to do it, and then
13    after it was approved, it was like no big deal.
14    "Okay, it's approved.  No problem."
15         Q.   And you submitted only 1.5 five
16    hours --
17         A.   Mm-hmm.
18         Q.   Is that correct?
19         A.   Correct.  And that's what persuaded me,
20    because at that point I was just like, just forget
21    the time, then.  Don't pay me for that 1.5 if
22    you're going to make me go through hoops for it.
23         Q.   But did you -- strike that.
24               Is it your testimony that you actually
25    worked more than 1.5 hours that week?
```



```
 1                    CHARISE JONES

 2      A.   Yes.

 3      Q.   So why didn't you include the rest of

 4   that time in the request?

 5      A.   Because it was persuaded -- it was the

 6   way she was making me feel.  I just didn't want to

 7   put in any other time.

 8           And when I did submit what I did, you

 9   can obviously see that it was more than the 1.5.

10   I only put in the 1.5, but she can definitely see

11   by the documentation that I put on there what I

12   did, where I went, and why I needed the time that

13   it was more than that.

14      Q.   But you didn't submit for the time you

15   actually worked, correct?

16      A.   No, because I knew it was going to be a

17   hassle just for -- just the amount that I put in

18   was already a hassle, that I wasn't going to go

19   any -- going to put in anything further.

20      Q.   Did April tell you not to put in for

21   the additional time?

22      A.   She didn't want me to put in for the

23   original time, never mind the additional time,

24   because she said it wasn't approved.

25      Q.   But when you were told to submit this
```



CHARISE JONES                                      August 12, 2024
FISCHER V. GEICO                                                151

```
 1              CHARISE JONES
 2   report to April, did she tell you not to submit it
 3   for all of your time worked?
 4       A.   No, because I already submitted my
 5   Workday time, so it was only her to approve the
 6   amount that I've already submitted.
 7           So she said that I had to write up this
 8   report to just justify what I already put in.
 9       Q.   Okay, and the original amount that you
10   had already put in, that only included the 1.5
11   hours?
12       A.   Correct.
13       Q.   And do you recall if you received pay
14   at time and a half for those hours you submitted?
15       A.   No, it was up -- it was still within
16   the forty hours.  So I was still getting straight
17   time.
18       Q.   And what other times did you ask to
19   work overtime hours?
20       A.   When -- again when my workload was
21   building up and I had a lot of cases, I would say,
22   "Is there any overtime available?"  It was always
23   "No.  If we have any, we'll let everybody know.
24   We'll put an email out."
25           I'm like, well, you know, when I would
```




```
 1                   CHARISE JONES
 2   go to Brooklyn, or all the windshield time that
 3   took up hours, or there was an accident, or there
 4   was traffic, and you're putting in almost your
 5   entire day of your 7.75 in the car, and then
 6   coming home and having to write up a report, you
 7   know, it was just told, "Listen, take it off
 8   another day," or "Work around it."
 9        Q.   Did you ever make any formal complaints
10   about this unpaid time?
11             MS. JEAN:  Objection.
12             THE WITNESS:  No.
13   BY MR. SLOTNICK:
14        Q.   Why not?
15        A.   I thought, you know, what I was doing,
16   telling my supervisor, and, you know, justifying
17   it where it went to the manager, I thought it
18   would be enough.
19        Q.   If you go back to paragraph eight on
20   page three, do you see that?
21        A.   Yes, eight.
22        Q.   It says, "As a special investigator,
23   starting from 2016 to my promotion to trainer in
24   approximately March 2022 I started work between
25   7:00 a.m. and 7:30 a.m. and ended my day between
```



1                    CHARISE JONES

2       5:00 p.m. and 6:00 p.m. about two to three times

3       per week, and until 7:00 p.m. about two to three

4       times per week.

5                    "GEICO did not provide me with a

6       regularly scheduled work period.  I also recall

7       that after March 2020 when the COVID-19 pandemic

8       started I also occasionally worked as late as 8:00

9       p.m.  When I took a lunch break, which is about

10      once a week, it took me no more than fifteen

11      minutes.

12                   "I estimate as -- that as a special

13      investigator I worked approximately fifty-one to

14      fifty-eight hours a week on average."

15               Did you record your time anywhere other

16      than in GEICO's timekeeping programs?

17          A.   No.

18          Q.   Did you keep any records of time that

19      you worked but did not record in GEICO's

20      timekeeping programs?

21          A.   Just my entries that were put in,

22      they're time stamped, so, I mean, it's -- it

23      wasn't like I was hiding it or saying I wasn't

24      working the hours because it was time stamped in

25      their system that they could see when I entered my



1                      CHARISE JONES

2        A.   No.

3        Q.   Did you tell anyone that there were

4   no -- that the breaks were no more than fifteen

5   minutes?

6        A.   No.

7        Q.   So if you would turn to paragraph

8   fifteen on page four, it says "From April 2017 to

9   March 2022 my regular hours were to approximately

10  fifty-one to fifty-eight hours per week, and my

11  regular pay was 48.86 per hour."

12            Did you tell anyone that you were

13  working approximately fifty-one to fifty-eight

14  hours per week?

15       A.   No.

16       Q.   If you look back -- I'm sort of jumping

17  around a little bit -- to paragraph eleven, on the

18  same page.

19       A.   Okay.

20       Q.   It says, "Prior to my promotion to

21  trainer, GEICO authorized me to work overtime only

22  if I agreed to take on additional cases, worked on

23  special projects, such as social media,

24  investigation or flooding storm cases, or if

25  special investigators were understaffed and there



CHARISE JONES                                          August 12, 2024
FISCHER V. GEICO                                                   160

CHARISE JONES

2        Which is the supervisor that you're

3   referring to here?

4        A.   April Neyland.

5        Q.   And how do you communicate your hours

6   to your supervisor?

7        A.   If I take off, if I take off a sick

8   time or a personal day, or if I take hours, I send

9   her an email saying, "I'm taking off tomorrow," or

10  "I'm taking off two hours of personal" through an

11  email.

12       Q.   Do you tell your supervisor when you

13  work more than the 7.75 hours per day?

14       A.   I would never report that.

15       Q.   When you work more hours than the 7.75

16  hours per day, or 38.75 hours per week, does

17  anything prevent you from telling your supervisor

18  about those hours worked?

19       A.   Again, whenever I stressed about

20  working the overtime, or telling her that I needed

21  to work overtime, it was just, you know, the

22  same -- same conversation over and over, like

23  there is no approved overtime.

24       Q.   But does anything prevent you from

25  telling your supervisor that you're working those



CHARISE JONES                                              August 12, 2024
FISCHER V. GEICO                                                       161

```
 1                      CHARISE JONES

 2   hours?

 3        A.   I told her, like especially when I was

 4   transitioning from investigator to trainer, that I

 5   was working many, many hours of overtime, because

 6   I was still doing my outside field work and still

 7   doing a trainer's job that I was learning.

 8            So I -- you know, I did stress to her

 9   and say, "Listen, I'm working two specific jobs.

10   I'm out on the road.  I'm trying to get training

11   done.  Is there any way that I can get overtime?"

12            "No."

13        Q.   How many times did that conversation

14   take place?

15        A.   That happened -- again that was a

16   six-month period of the two times I was doing it,

17   and I would say maybe four times, five times.

18        Q.   And how did those conversations take

19   place?

20        A.   Through phone conversations, mostly.

21        Q.   Do you have any documentation

22   reflecting those conversations?

23        A.   I had a work phone, so I would call

24   her.  If I was on -- on the road, I would call her

25   from a work phone, and tell her, "Hey, listen.
```



```
 1                    CHARISE JONES
 2    I'm not getting home 'till 5:00 o'clock.  You
 3    know, is there any way that I can put in
 4    overtime?"
 5              And, you know, she would say, "Listen,
 6    if you can't" -- "Try to just take it off before
 7    the next pay period.  You know, sign on late
 8    tomorrow, or sign in, you know -- sign out early,"
 9    and I'm like, but I'm still -- I still have my
10    workload the next day.  And she was like, you
11    know, "There's no approved overtime."
12         Q.   Okay, are there any documented notes
13    from those conversations?
14         A.   I personally don't have any documented
15    notes; only, like I said, the phone logs, which I
16    don't have that cellphone any longer.
17         Q.   When you say the phone logs, though,
18    are you talking about text messages?
19         A.   No --
20         Q.   -- that you sent?
21         A.   I'm just saying you -- you would see
22    that I called her, and it would be at, you know,
23    4:00 or 5:00 o'clock at night, or, you know,
24    whenever I was on the road.
25         Q.   Did you ever call her at 4:00 or 5:00
```



                          CHARISE JONES

1

2      Q.   But the other employees that you listed

3   did not report to April, correct?

4      A.   No, not during the time I reported to

5   her.

6      Q.   Okay.  Did you otherwise have any

7   conversations to verify their allegations that

8   they were working off the clock?

9      A.   Not -- not specifically.

10          Again, just like when we had our

11  general main meetings where we would go to

12  Melville, it would be brought up that, you know,

13  when -- you know, is it -- are we able to do any

14  overtime, when is overtime coming back.  And it

15  was told, you know, you have to, you know, do your

16  job in the amount of time that's allotted, and if

17  anybody's working overtime, it's just going to,

18  you know, not be beneficial for the people that

19  are only working the 38.75, because you'll have

20  the number skewed.

21     Q.   Who said that specifically?

22     A.   Bill Newport.

23     Q.   What did he mean by "the numbers

24  skewed"?

25     A.   Because they were -- they were getting



                          CHARISE JONES

1

2    their work done, but they're not putting in the

3    overtime.

4             And if, you know, they needed to hire

5    more people, then they wouldn't know who they

6    should hire because we're all getting the work

7    done, but we're not getting paid for it.

8         Q.   Did he say that specifically?

9         A.   Yes.

10        Q.   And who was in that meeting?

11        A.   It was everybody.  The whole SIU was in

12   it.

13            Not everyone could attend based on

14   geographical location.  Like some people lived too

15   far.  But I don't know specifically who was there.

16   It was just -- it was everybody that could attend

17   attended.

18        Q.   Do you recall when that meeting took

19   place?

20        A.   We had -- those meetings were maybe

21   twice a year or three times a year.  We would have

22   them on holidays, or just like to go over

23   something, or if there was a lot of change that

24   happened.

25        Q.   Were there any questions asked during



CHARISE JONES

1

2  going -- going over and above our regular work

3  hours, and we needed to put in overtime, and they

4  said that it's -- you would have to get it

5  approved before you put it in, and you cannot do

6  anything after your -- the 77.5 (sic) for the two

7  weeks unless it's approved beforehand.  You can't

8  just arbitrarily put the time in.

9       Q.   Did you ever just put the time in?

10      A.   Yes.  The one time I did, I had a wrath

11 to pay for it.  I had to write out a whole week's

12 worth of stuff for the 1.5 hours.

13      Q.   Other than that one occasion, did you

14 ever just submit the time you say you were

15 actually working?

16      A.   No.

17      Q.   Did you ever communicate by text

18 message with any of these individuals with respect

19 to your overtime hours that you say you were

20 working?

21      A.   No.

22      Q.   Did you ever send emails to any of

23 these people discussing the overtime hours you

24 were working?

25      A.   No.



1

2

3

4

5                    CHARISE JONES

6

7        MS. JEAN:  She will read and sign the

8

9   transcript.  And on the record we do request

10

11  a one-day transcript.

12

13        THE LEGAL VIDEO SPECIALIST:  We are now

14

15  going off the record.  The time is 4:27 p.m.

16

17  This is the end of media number five

18

19  concluding this video recorded deposition.

20

21        (Whereupon at 4:27 p.m. the videotaped

22

23  deposition of Charise Jones concluded.)



```
 1                       CHARISE JONES

 2                  C E R T I F I C A T E

 3    STATE OF NEW YORK    )

 4                         :  Ss.

 5    COUNTY OF NEW YORK   )

 6             I, Kim M. Brantley, Shorthand

 7    Reporter, and Notary Public within and for the

 8    State of New York, do hereby certify:

 9             That CHARISE JONES, the witness whose

10    deposition is hereinbefore set forth, was duly

11    sworn by me and that such deposition is a true

12    record of the testimony given by the witness.

13             I further certify that I am not related

14    Toni of the parties to this action by blood or

15    marriage, and that I am in no way interested in

16    the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18    my hand this 13th day of August, 2024.

19
                        Kim M. Brantley
20                      _____

21                        Kim M. Brantley

22

23

24    My Commission expires May 31, 2026.

25
```

