Exhibit 62

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3            FOR THE EASTERN DISTRICT OF NEW YORK

 4

 5   KEITH FISCHER, MICHAEL O'SULLIVAN, )
     JOHN MOESER, LOUIS PIA, THOMAS     )
 6   BARDEN, CONSTANCE MANGAN, and      )
     CHARISE JONES, individually and on )
 7   behalf of all others similarly     )
     situated,                          )
 8                                      )
                   Plaintiffs,          ) Case No.
 9                                      ) 2:23 Civ. 2848
              vs.                       ) (GRB)(ARL)
10                                      )
     GOVERNMENT EMPLOYEES INSURANCE     )
11   COMPANY d/b/a GEICO,               )
                                        )
12                 Defendant.           )
     -----------------------------------)

13

14

15

16         * CONTAINS CONFIDENTIAL PORTIONS *

17

18      VIDEOTAPED DEPOSITION OF JOHN E. MOESER

19               Garden City, New York

20               Friday, August 2, 2024

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. J11541506
```



1

2

3

4                    August 2, 2024

5                    11:04 a.m.

6

7

8            Videotaped Deposition of JOHN E.

9    MOESER, held at the offices of Esquire

10   Deposition Solutions, 1225 Franklin Avenue,

11   Garden City, New York, before Kristin Koch, a

12   Registered Professional Reporter, Registered

13   Merit Reporter, Certified Realtime Reporter

14   and Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S:
 3
 4        OUTTEN & GOLDEN LLP
 5        Attorneys for Plaintiffs
 6             685 Third Avenue
 7             New York, New York 10017
 8        BY:   MICHAEL J. SCIMONE, ESQ.
 9             SABINE JEAN, ESQ.
10
11
12        DUANE MORRIS LLP
13        Attorneys for Defendant
14             1540 Broadway
15             New York, New York 10036
16        BY:   MARIA CACERES-BONEAU, ESQ.
17             GREGORY SLOTNICK, ESQ.
18             - and -
19             190 South LaSalle Street
20             Chicago, Illinois 60603
21        BY:   TIFFANY E. ALBERTY, ESQ. (Via Zoom)
22
23   ALSO PRESENT:
24   JONATHAN JUAREZ, Videographer
25   SAMANTHA JACOBSON, GEICO (Via Zoom)
```



```
 1                    J. Moeser

 2          THE VIDEOGRAPHER:  We are now on the

 3   record.  My name is Jonathan Juarez.  I am a

 4   legal videographer for Esquire.

 5          Today's date is August 2nd, 2024, and

 6   the time is 11:04 a.m.  This deposition is

 7   taking place at 1225 Franklin Avenue,

 8   Garden City, New York, in the matter of

 9   Keith Fischer versus Government Employees

10   Insurance Company.  The deponent is John

11   Moeser.

12          Counsel, please, identify yourselves

13   for the record.

14          MS. CACERES-BONEAU:  Maria

15   Caceres-Boneau on behalf of GEICO.

16          MR. SLOTNICK:  Greg Slotnick on behalf

17   of GEICO as well.

18          MR. SCIMONE:  Michael Scimone with

19   Outten & Golden on behalf of plaintiffs.

20          MS. JEAN:  Sabine Jean, Outten &

21   Golden, on behalf of plaintiffs.

22          THE VIDEOGRAPHER:  The court reporter

23   is Kristin Koch and will now swear in the

24   witness.

25                    *     *     *
```



```
 1                    J. Moeser
 2    J O H N   E.   M O E S E R,
 3          called as a witness, having been duly sworn
 4          by a Notary Public, was examined and
 5          testified as follows:
 6    EXAMINATION BY
 7    MS. CACERES-BONEAU:
 8          Q.    Could you state and spell your name for
 9    the record.
10          A.    John Moeser, M-O-E-S-E-R.
11          Q.    And what is your current address?
12          A.    █████████████████████████████.
13          Q.    My name is Maria Caceres-Boneau and I
14    will be taking your deposition today.  I will be
15    asking a series of questions and what you will do
16    today is provide truthful responses to the
17    questions.  My questions and your answers will be
18    recorded by the court reporter and obviously by
19    the videographer as well.  Because the court
20    reporter is recording us, it's important that we
21    answer verbally and rather than with uh-huhs and
22    uh-uhs, like yes, no, verbally.  Do you understand
23    that?
24          A.    Yes.
25          Q.    Great.  Also, because the court
```



```
 1                    J. Moeser
 2   one and the one we are sitting here for today?
 3        A.    Yes.
 4        Q.    Okay.  And were you a plaintiff or
 5   defendant?
 6        A.    Plaintiff.
 7        Q.    Was it one lawsuit or more than one?
 8        A.    More than one.
 9        Q.    How many?
10        A.    Two.
11        Q.    Okay.  And who were the other parties?
12   Well, let's go with the first lawsuit, since there
13   were two.  So you were a plaintiff and then who
14   was a defendant?
15        A.    GEICO.
16        Q.    And do you recall what court that was
17   in?
18        A.    No.
19        Q.    Do you recall when it was filed, that
20   case?
21        A.    No.
22        Q.    Do you know what the outcome of the
23   case was?
24        A.    Yes.  They found in favor of the class
25   action suit.
```



```
 1                      J. Moeser
 2        Q.    Okay.  And was this case the Calderon
 3   or Calderon versus GEICO case?
 4        A.    That was the first one.
 5        Q.    Okay.  And then -- so that case you
 6   were the plaintiff, and then I see that there
 7   is -- you said there was a second case; correct?
 8        A.    Yes.
 9        Q.    And is that the case Vetter versus
10   GEICO?
11        A.    Yes.
12        Q.    How did you become -- and were you a --
13   you were a plaintiff in that case as well; right?
14        A.    Yes.
15        Q.    How did you become involved in the
16   Calderon case, the first one?
17        A.    I contacted the law firm that was --
18   that had the case and spoke to people there and
19   decided to join the lawsuit.
20        Q.    And how -- and the same question for
21   the Vetter versus GEICO case?
22        A.    It was the same law firm, so I
23   contacted them again, and after speaking to people
24   there, I signed an agreement at that time.
25        Q.    Did you receive any money as a result
```



```
1                       J. Moeser
2    of either of those cases?
3         A.    Yes.
4              (Moeser Exhibit 1, letter dated
5         November 17, 2016, Bates stamped P00000502,
6         marked for identification.)
7         Q.    So Mr. Moeser, I just handed you a
8    letter that's addressed to you dated November 17,
9    2016, from Nichols Kaster, Attorneys At Law,
10   relating to the Calderon versus GEICO Insurance
11   Company lawsuit.
12             Have you seen this letter before?
13        A.    Yes.
14        Q.    This letter shows that you received a
15   total of ████████ as part of your settlement
16   with Calderon versus GEICO.  Is that accurate, to
17   the best of your recollection?
18        A.    Yes.
19             MS. CACERES-BONEAU:  I am going to mark
20        that as Exhibit 1, Moeser Exhibit 1, and the
21        next one will be Moeser Exhibit 2.
22             (Moeser Exhibit 2, letter dated March
23        12, 2018, Bates stamped P00000416 through
24        P00000420, marked for identification.)
25        Q.    So Mr. Moeser, what you have now is
```



```
 1                        J. Moeser

 2    going to be Moeser Exhibit 2.  This is another

 3    letter.  This is dated March 12, 2018, to you with

 4    respect to Vetter versus GEICO, and it says

 5    McDonagh versus GEICO, from the law firm of

 6    Nichols Kaster, and following that there is a

 7    January 10th, 2018, correspondence or letter that

 8    says "Settlement Information Enclosed," which was

 9    also addressed to you with respect to the same

10    cases.  In it it says there is a pre-tax total

11    settlement amount of ██████████████████████

12    ████████████████████████.  Do you see that?

13         A.    Yes.

14         Q.    Are those accurate -- is that an

15    accurate figure, to the best of your recollection?

16         A.    Yes.

17         Q.    So we have spoken about these two

18    lawsuits.  Are those the only two where you were a

19    plaintiff then?

20         A.    Yes.

21         Q.    And then have you ever filed an

22    administrative charge or claim against another

23    person or entity?

24         A.    No.

25         Q.    So now you have told me every type of
```



```
 1                        J. Moeser

 2   there?

 3        A.    It was about a month before I got the

 4   job with GEICO, which was in October 2003, so it

 5   would have been either August or September.

 6        Q.    Okay.  And then you mentioned you

 7   started working at GEICO in October 2003; is that

 8   right?

 9        A.    No.  Two thousand -- I'm sorry.  Did I

10   say -- it's 2006 I started with GEICO.

11        Q.    Okay.  2006.  So then Safeco, you were

12   with Safeco from approximately 2003 through August

13   of 2006?

14        A.    I worked for Safeco for about two

15   years.  I don't know the exact time when I

16   started, but I know I worked with him for around

17   two years.

18        Q.    Okay.  And then you started at GEICO

19   October of 2006?

20        A.    I believe it was October 3rd, yeah.

21        Q.    Okay.  And then your last day with

22   GEICO was what?

23        A.    April 30th, 2021.

24        Q.    Are you currently employed?

25        A.    No.
```



```
 1                    J. Moeser
 2      Q.    Between.  Sorry.  I am going to
 3   rephrase that.
 4            Senior field security investigator and
 5   a senior outside security investigator would have
 6   the same -- be the same role?
 7      A.    I am not familiar with the first term
 8   that you said, but if they were field
 9   investigators, yes.
10      Q.    Okay.  And the first term is the senior
11   outside -- senior outside security investigator is
12   the one that you are not familiar with the term;
13   right?
14      A.    Not really, no.  No.
15      Q.    And the term that you are familiar with
16   is senior field security investigator; right?
17      A.    Yes.
18      Q.    Okay.  So you said you investigated
19   potential fraudulent activity; correct?
20      A.    Suspicion of fraudulent activity, yes.
21      Q.    What -- what were your hours?
22      A.    Well, that's -- I don't know how to
23   define that, because when I first started, my
24   hours were different than when I left.
25      Q.    What were your -- did you have a set
```



JOHN E. MOESER  Confidential                                    August 02, 2024
Keith Fischer, et al. vs GEICO                                                35

```
1                    J. Moeser

2    time that you would start your day?

3              MR. SCIMONE:  Objection.

4         A.   A set time?  I normally would start

5    around 8 a.m., but, you know, we also had what

6    they called flexible hours.

7         Q.   What does flexible hours mean?

8         A.   It means that you could start your day

9    at a different time or -- start your day at a

10   different time.

11        Q.   So if you start your day at a different

12   time, then do you end your day at a different

13   time?

14        A.   You would, yes.

15        Q.   Who was your supervisor?

16        A.   I had -- during my tenure there, I had

17   many supervisors, so...

18        Q.   Let's go with 2016 through 2021, do you

19   recall who your supervisor was during those years?

20        A.   I know my last supervisor was April

21   Neyland, but I also worked for Rich Kiligin.  I

22   don't know if he retired prior or after that time.

23        Q.   Okay.  So prior to April Neyland you

24   worked for Rich Kiligin; is that correct?

25        A.   Kiligin, yes.
```



```
 1                    J. Moeser
 2   convenient for you?
 3        A.    No.
 4        Q.    Were you assigned to specific types of
 5   claims to investigate?
 6        A.    That changed over the years, so I don't
 7   know what year you are -- what year gap that you
 8   are referring to.
 9        Q.    I am talking about 2016 through 2021
10   until your last day there, and we can take it --
11   if it changed, we can talk beginning however is
12   more convenient for you as you recall the types of
13   claims you investigated.
14        A.    It would be staged loss claims,
15   enhanced damage claims, underwriting claims or,
16   I'm sorry, underwriting referrals, because there
17   was no claim for underwriting.  Underwriting
18   referrals.  There could be social media referrals.
19   I don't know -- see, and that's -- I don't know
20   when I started these -- when they broke us up into
21   specialty teams, if I was doing theft cases at
22   that time prior to -- or around 2016.
23        Q.    Was theft cases a specialty team?
24        A.    They later made it a specialty team.
25        Q.    Okay.  When you say "later," were you
```



```
 1                    J. Moeser
 2   there when they made it a specialty team?
 3        A.    Yes.
 4        Q.    And you were working for GEICO then?
 5        A.    Yes.
 6        Q.    And that was during the period between
 7   2016 and your last day of employment?
 8        A.    That I was working theft cases or --
 9        Q.    Yes, theft cases.
10        A.    Like I said, I don't remember when I
11   stopped working theft cases when they made the
12   specialty teams, but I know I had handled them.
13   It could have been prior to 2016.
14        Q.    Okay.  Did you handle insurance fraud
15   cases?
16        A.    Well, yes.
17        Q.    And did you handle any arsons?
18        A.    Are we -- again, are we referring to
19   2016 on?
20        Q.    Yes.  Always, yes.  Now for these
21   questions, yes.
22        A.    Any specific arson cases?
23        Q.    Yes.  Did you handle any arsons?
24        A.    Again, I don't know when I stopped,
25   because the arson cases would fall under the theft
```



```
 1                    J. Moeser
 2   conduct it?
 3        A.    I don't recall.
 4        Q.    And then you also mentioned -- for the
 5   staged loss referrals, how far did you drive to
 6   investigate the claims?
 7        A.    Again, it depends on the location.  If
 8   it was Brooklyn or Queens, Nassau, Suffolk County,
 9   they had a team or investigators that would do,
10   you know, the upstate area, but most of mine were
11   in the five boroughs or Long Island.
12        Q.    Okay.  And when -- okay.  So it's fair
13   to say that it varied how far you would drive to
14   investigate claims; right?
15        A.    Yes.
16        Q.    How much time did you spend in the
17   field in a day?
18              MR. SCIMONE:  Objection.
19        A.    Again, that depends on where I'm going.
20   You know, there was a period there that we are
21   discussing that when the pandemic occurred, we
22   weren't doing field work, but if you are talking
23   windshield time, it depends on where I was going.
24        Q.    Did you try to investigate claims that
25   were close in location so that you would have less
```



```
 1                      J. Moeser
 2    the damages get there then.
 3         Q.    Okay.  Understood.  Thank you.  That
 4    was -- thank you.
 5               How long did it take you to investigate
 6    these enhanced damage referrals?
 7         A.    There is no time frame on it.  I
 8    couldn't tell you like it would take X amount of
 9    hours.  It varied.
10         Q.    And were staged loss referrals more
11    time -- take more time -- sorry.
12               Did staged loss referrals take more
13    time to investigate than enhanced damage
14    referrals?
15         A.    They were more complex, so on an
16    average they would, yes.
17         Q.    For the enhanced damage referrals, did
18    you also drive to the five boroughs and Long
19    Island?
20         A.    Yes.
21         Q.    And did your windshield time also vary?
22         A.    Yes.
23         Q.    You also mentioned underwriting
24    referrals.  What are those?
25         A.    Those would come from the underwriting
```



```
 1                        J. Moeser
 2   we were very unfamiliar with the usage of social
 3   media, I'll be honest with you, I was anyway, and
 4   management felt that you can complete these cases
 5   within a few hours.  Well, that's not true.  Okay.
 6   This could take you many hours to compute -- to
 7   complete or conduct a thorough investigation on
 8   individuals, especially if you had a common name,
 9   you know.
10        Q.    What social media platforms would you
11   search on?
12        A.    Well, obviously at the time it was
13   █████████████████████████████████████████████
14   ████████████████████████████████████, and I --
15   there was a few others that I was not familiar
16   with and -- but they suggested to use other
17   sources, but I wasn't familiar with them and...
18        Q.    And so as far as the social media
19   referrals, when did you start doing those?
20        A.    Probably a few years before I left.
21        Q.    Did you do social media referrals as
22   well as field work at the same time?
23        A.    Yes.
24        Q.    Did social media referrals take less
25   time to investigate than a staged loss referral?
```



```
 1                        J. Moeser
 2        A.    Generally speaking, yes.
 3        Q.    And did they take -- did social media
 4   referrals take less time than an enhanced damage
 5   referral?
 6        A.    Again, generally speaking, yes, yeah.
 7        Q.    Did they take less time than an
 8   underwriting referral?
 9        A.    Well, the underwriting referral would
10   be spread out over several days, because you had
11   to make several different visits.  Social media
12   you may take part of today and go into tomorrow,
13   so obviously then it would be less time because
14   you had the case opened in underwriting longer
15   than social media.
16        Q.    From all the types of cases that you
17   investigated, which ones were closed quicker, do
18   you think?
19              MR. SCIMONE:  Objection.
20        A.    Maybe the social media cases.
21        Q.    You also mentioned theft cases; right?
22        A.    Uh-huh.
23        Q.    So what -- I know what a theft is, but
24   can you explain to me what a theft case is with
25   respect to these referrals that you were receiving
```



```
 1                        J. Moeser

 2        A.    Yes.

 3        Q.    And for theft cases, were they also

 4   scattered between the five boroughs and Long

 5   Island when you would investigate them?

 6        A.    Yes.

 7        Q.    Were they outside of that area when you

 8   would investigate them?

 9        A.    Not that I could think, no, not that I

10   could think of.

11        Q.    How long does it take to investigate a

12   theft case?

13        A.    I think I answered that, but it depends

14   on the theft case itself.  Some of them are more

15   complex than others.

16        Q.    What's a -- like what would be a more

17   complex one?

18        A.    It's hard to say.  The circumstances of

19   the claim.  You know, as your investigation goes

20   on, you may have more questions, you know, as far

21   as what you are looking for, so it could take a

22   while to do.  An example of -- I don't know what

23   you would consider an easy case, because there are

24   no easy cases, but it would be a theft claim where

25   let's just -- a mother would or an insured would
```



```
 1                    J. Moeser
 2    team.  There was also a staged loss referrals team
 3    that was separate; is that right?
 4         A.   Yes.  First it was the enhanced damage
 5    team, and then later on they decided to form a
 6    staged loss team.
 7         Q.   Okay.  And when they formed the staged
 8    loss team, there was still an enhanced damage team
 9    that was separate?
10         A.   Yes.
11         Q.   Okay.  Was there an underwriting
12    referrals team?
13         A.   No.
14         Q.   Was there a social media referrals
15    team?
16         A.   There were inside investigators who --
17    I don't know how many were handling social media
18    cases.
19         Q.   Was there a theft referrals or theft --
20    sorry.  Was there a theft cases team?
21         A.   Yes.
22         Q.   And when you were on a team, the only
23    team that you were on was the enhanced damage
24    referrals team?
25         A.   No.  I was also on the staged loss
```



```
 1                      J. Moeser

 2   team.

 3        Q.    Okay.  Your time on the enhanced damage

 4   referral team and the staged loss referral team,

 5   did they overlap?

 6        A.    I don't believe so.  I don't recall.

 7   No, I think I went from -- again, I would have to

 8   know when I started -- when I was assigned to the

 9   staged loss team, but I may have had cases left

10   over from the enhanced damage team that I carried

11   over and I would be working on both at that time.

12        Q.    Okay.  And the last -- when you left

13   GEICO, you were working on which team was it?

14        A.    The staged loss team.

15        Q.    Okay.  And do you know how many people

16   were on that team?

17        A.    I believe it was maybe -- could have

18   been six or seven of us.

19        Q.    Do you recall the names of those

20   people?

21        A.    I know Charise Jones was.  I think

22   there was a Jeff Lewonka was on it.  An Anthony

23   DeStefano.  There was Mark Giambalvo, but he had

24   left prior to me.  I think George McManus may have

25   been involved with it.  And there were various
```



```
 1                        J. Moeser
 2        Q.    Okay.  And downstate would include what
 3   region?
 4        A.    The five boroughs, Long Island.  Yeah,
 5   the five boroughs and Long Island.
 6        Q.    Okay.
 7        A.    Maybe Yonkers.  I don't know if that's
 8   a separate county.  I don't know.  It could have
 9   been parts of Yonkers.
10        Q.    Okay.  How many claims did you handle
11   per week?
12        A.    Again, it depends on the schedule, it
13   depends on the amount of claims being submitted to
14   GEICO.  There was no given, okay, you are gonna
15   get two or three cases a week.  It could be a
16   number of cases.
17        Q.    So then it's your testimony that it
18   would fluctuate then; right?
19        A.    Yes.
20             MR. SCIMONE:  Objection.
21        Q.    So were some weeks busier than other
22   weeks?
23        A.    They could be, yeah.  Yes.
24        Q.    Were there times of the year that it
25   was busier than other times of the year?
```



```
 1                        J. Moeser

 2    his or her pay incorrectly reflects a deduction

 3    for an absence should contact his or her

 4    supervisor, local human resources manager or

 5    corporate human resources.

 6            Do you see that there?

 7       A.   Yes.

 8       Q.   And since you were a non-exempt

 9    employee, you were eligible for overtime; right?

10       A.   Yes.

11       Q.   Now, you were required to accurately

12    record your hours; right?

13            MR. SCIMONE:  Objection.

14       A.   Yes.

15       Q.   Did you get training on this policy?

16       A.   Not that I can recall.

17            MS. CACERES-BONEAU:  This we are going

18        to mark as Exhibit 5.

19            (Moeser Exhibit 5, Document Produced

20        Natively, spreadsheet Bates stamped G004289,

21        marked for identification.)

22       Q.   Okay.  So this here is a training

23    history log.

24       A.   Uh-huh.

25       Q.   And flipping the first page -- one,
```



```
1                      J. Moeser
2        Q.    Did you know that you were required to
3    report any off-the-clock work that you performed
4    to a supervisor?
5              MR. SCIMONE:  Objection.
6        A.    Was I required to report off-the-clock
7    work?
8        Q.    Yes.
9        A.    Well, yeah.  Yeah.
10       Q.    Did you understand that if you felt
11   that you were not being paid for all of your hours
12   worked, that you should contact your supervisor?
13             MR. SCIMONE:  Objection.
14       A.    Yes.
15       Q.    Did you understand that you could also
16   contact human resources if you -- if you felt you
17   did not receive all of the hours you worked?
18             MR. SCIMONE:  Objection.
19       A.    Yes.
20       Q.    Did you ever make such a report with
21   your supervisor?
22             MR. SCIMONE:  Objection.
23       A.    Regarding?
24       Q.    That you -- okay.  Did you ever make a
25   report with your supervisor that you did not
```



```
1                        J. Moeser

2    receive pay for all of the hours you worked?

3         A.    Yes.

4         Q.    Who was that supervisor?

5         A.    It would have been several of them.

6    There would have been April Neyland, Rich Kiligin,

7    my manager, Bill Newport, another supervisor Tony

8    Mazzotti.

9         Q.    Okay.  Let's go through -- and did you

10   ever report that you felt like you did not receive

11   pay for all of your hours worked to human

12   resources?

13        A.    After 2016?

14        Q.    Correct, yes.

15        A.    No.

16        Q.    Now, you mentioned April Neyland, Rich

17   Kiligin, Bill Newport and Tony Mazzotti as

18   individuals to whom you reported.  Were all of

19   these after -- 2016 or after?

20        A.    I don't know the time frame with Tony

21   Mazzotti, but I know the other three would have

22   been.

23        Q.    Let's start with Bill Newport.  What

24   did you report to Bill Newport?

25        A.    That I, along with everybody else that
```



```
 1                     J. Moeser
 2   being fairly judged by the hours that I was
 3   submitting and not being compensated for it, and I
 4   felt that I had to work these hours in order to
 5   keep -- meet standards with their evaluation
 6   system.
 7        Q.    Now, you worked a flex schedule; right?
 8        A.    Yes.
 9        Q.    So looking at a time stamp doesn't
10   accurately reflect the hours that you worked in a
11   day, though?
12              MR. SCIMONE:  Objection.
13        A.    Yes, it does.
14        Q.    But you were able to complete tasks
15   when you felt like it; right?
16              MR. SCIMONE:  Objection.
17        A.    What do you mean when I felt like it?
18        Q.    Because you had flexible time.  Were
19   you able to complete tasks at different times of
20   the day?
21        A.    I did complete tasks within different
22   times of the day, but that doesn't mean I took any
23   breaks during or I started later.  Even if I
24   started at 7:30 or 8:00 in the morning, there were
25   times that I worked until 7 or 8:00 at night
```



```
 1                         J. Moeser

 2   continually.

 3        Q.    Were there times that you started after

 4   8 in the morning?

 5        A.    Occasionally.  I don't recall

 6   particular dates or anything, but there may have

 7   been times that I started after 8.

 8        Q.    Do you recall starting after 9?

 9        A.    I don't recall that, no.  No.

10        Q.    So you mentioned this meeting with Bill

11   Newport.  Was there any other time that you had a

12   discussion with Bill Newport about this issue?

13        A.    Personal with him?

14        Q.    Just with Bill Newport.  It could be in

15   another group or it could be personally.

16        A.    No, there --

17        Q.    My question is was there any other

18   discussion that you had with Bill Newport on a

19   separate occasion?

20        A.    Yes, both in a group and individual.

21        Q.    So tell me about the individual.

22        A.    Well, as Bill became our manager, he

23   wasn't familiar with what SIU investigators did,

24   this is what he expressed, and that he wanted to

25   do ride-alongs with field investigators to get a
```



```
 1                         J. Moeser
 2   was?
 3        A.    From what period?
 4        Q.    Any time between 2016 and the last day
 5   of your employment.
 6        A.    On an hourly scale or --
 7        Q.    Yes, your hourly rate of pay, what was
 8   that?
 9        A.    I was somewhere over $40 an hour.
10        Q.    Did you record your time worked?
11        A.    Did I record it?
12        Q.    Yes.  Did you document your time
13   worked?
14        A.    In Workday.
15        Q.    When you entered your time in Workday,
16   were you required to certify the accuracy of it?
17        A.    I don't recall.  I know I submitted it.
18   I don't know if there was a box that you checked
19   off on it.  I'm not -- I don't recall.
20        Q.    How would you submit it?
21        A.    You hit the submit button.
22              MS. CACERES-BONEAU:  Let me mark this
23        as Exhibit 6.
24              (Moeser Exhibit 6, Plaintiff John
25        Moeser's Responses to the Court's
```



```
 1                          J. Moeser

 2        A.    Yes.

 3        Q.    Did you always get paid for that time

 4   that you entered in Workday?

 5        A.    Yes.

 6        Q.    Let's look at the declaration.  There

 7   is paragraph numbers on the left side.  And let's

 8   move to paragraph number 8, which is -- starts on

 9   the second page.

10        A.    Uh-huh.

11        Q.    If you read paragraph 8, it states:  "I

12   only entered 7.75 hours per day, regardless of how

13   many hours I actually worked.  I did not enter

14   more hours into the timekeeping system as my

15   supervisor said doing so would affect my rating,

16   giving me a poor evaluation and negatively

17   effecting my potential for an annual pay

18   increase."

19              What supervisors told you that?

20        A.    The supervisors that I mentioned

21   before.

22        Q.    So who were they?

23        A.    It would have been April Neyland, it

24   would have been Rich Kiligin, it would have been

25   Tony Mazzotti.  I guess I don't know if that was
```



```
 1                      J. Moeser

 2   on page 4 and we had formerly been discussing

 3   paragraph 12.  Now we are going to look at

 4   paragraph 13.  You can let me know when you have

 5   finished reading that paragraph.

 6              (Document review.)

 7        A.    Okay.

 8        Q.    Okay.  So you reference an e-mail in

 9   here.  When did that e-mail exchange take place?

10        A.    I don't know the date of it, but it

11   would have been after I had submitted for overtime

12   at one point.

13        Q.    And you mentioned a supervisor.  Which

14   supervisor was this e-mail exchange with?

15        A.    That would have been April Neyland.

16        Q.    Was anyone else copied on the e-mail

17   exchange?

18        A.    I don't believe so, no.  No.

19        Q.    When did you submit this report?

20        A.    Which report?  The overtime report?

21        Q.    Well, it says here:  "She instructed me

22   to submit a list of reasons for why these hours

23   should have been approved.  I completed the report

24   as requested, and my overtime hours approved, but

25   I was again discouraged from reporting them."
```



```
 1                      J. Moeser
 2          A.    The report that I am referring to there
 3    is the -- I guess the e-mail that I sent her with
 4    the list of cases that I was submitting the
 5    overtime for.
 6          Q.    And you state here your hours were
 7    approved, your overtime -- sorry -- your overtime
 8    hours were approved after submitting this report?
 9          A.    Yes.
10          Q.    Why did you believe they were -- you
11    were discouraged from reporting them if your hours
12    were approved?
13          A.    Because that's what she told me after
14    when I had the phone conversation with her, that
15    you don't submit overtime for office work.
16          Q.    What is office work?
17          A.    Well, I think you are gonna need to ask
18    her that, because that's exactly what I asked, and
19    office work, from what I assumed, was just report
20    writing or doing database work or not exactly
21    going out into the field, and, you know, there was
22    times that -- and I believe -- I don't know if
23    this was the time that we were working after
24    COVID, so everything was in house, so to say, so I
25    didn't know what you meant by office work, you
```



1                        J. Moeser

2       Q.    Did you receive -- the statement in

3   paragraph 13 says that your overtime was approved,

4   and my question is did you receive pay for that?

5       A.    Yes.

6       Q.    What other times did you request

7   overtime?

8       A.    I don't -- I don't recall.  I'm sure

9   they have my record somewhere that, you know, to

10  show on my -- my pay -- I didn't keep my pay

11  stubs, so I'm sure that they had a record of, you

12  know, over the last 2016 to 2021 what I got paid,

13  but I don't recall -- I can't remember the dates

14  that I submitted for overtime.

15      Q.    Every time that you submitted overtime

16  you were paid for it?

17      A.    They had to pay me, yes.

18      Q.    Was there ever a time that you said,

19  "hey, I need overtime" and you were refused

20  overtime?

21      A.     I wouldn't ask for overtime.  You know,

22  I know that that was brought up -- that subject

23  was brought up in a general meeting that we had

24  and I don't remember the date on that.  As far as

25  if they would grant universal -- now, what they



```
 1                        J. Moeser
 2    meant by universal I don't know, but if they would
 3    grant overtime for all the investigators to work
 4    on their cases, taking into account the increase
 5    of caseload that we were getting, and that was
 6    told to us by people -- supervisors running this
 7    meeting that no, they weren't going to approve
 8    that type of overtime.
 9         Q.    Let's look at paragraph 9.  We are
10    going back.  Page 3.  You can take a look at that
11    one and let me know when you are done reading it.
12              (Document review.)
13         A.    Okay.
14         Q.    So it says here that you worked about
15    52.5 hours a week on average.  On what do you base
16    that estimate?
17         A.    It's an estimate that I came up with
18    that hours after 37-point -- after 38.75 hours
19    that I felt that I was working during that period,
20    but I think that was before COVID.  Oh, okay.
21    Yeah, the next paragraph.  Okay.  It's an estimate
22    of hours that I was working beyond my scheduled
23    time.
24         Q.    Did you record your time anywhere other
25    than Workday?
```



```
 1                        J. Moeser
 2    or it might have been during the first lawsuit,
 3    the Calderon lawsuit, and before the Vetter
 4    lawsuit, that they wanted us to track our hours to
 5    try and get a summary of how many hours it took to
 6    work on a case, and that project lasted maybe six
 7    months, a few months, and then they stopped it.
 8         Q.    And --
 9         A.    My opinion is, which I don't know if
10    it's worth anything, but they stopped it because
11    they realized how many hours we were working on
12    each particular case.
13         Q.    Did you -- when you enter your time on
14    Workday, do you put your start time and your end
15    time, or how do you enter your time?
16         A.    No.  No.  I think it's just the hours.
17    It had like Monday through Friday or Saturday,
18    Sunday, but Monday through Friday, and you could
19    hit default and it would just come up the 7.75, or
20    you entered in the numbers.
21         Q.    Did you tell anyone that you were
22    working about 52.5 hours a week on average?
23              MR. SCIMONE:  Objection.
24         A.    I may have mentioned it to people that
25    I was working in excess of, you know -- sometimes
```



```
 1                        J. Moeser
 2    a half an hour, it's better than being late.
 3         Q.    Were there any EUO locations that were
 4    closer to you?
 5         A.    The one in Islandia, that was the one
 6    that was closest to me.
 7         Q.    How far was that a drive?
 8         A.    I would say anywhere with no traffic,
 9    maybe 45 minutes, you know.
10         Q.    So when you were doing EUOs during
11    COVID when you were only working from home, you
12    had less windshield time, you had no windshield
13    time; right?
14         A.    There was no travel.
15         Q.    So your EUOs took less time when you
16    consider the travel time; is that right?
17         A.    Yeah, but you could schedule more EUOs
18    in one day than you could if you were traveling.
19         Q.    Did you have more EUOs when you worked
20    from home versus in -- in the field?
21         A.    Yeah, because I was in the staged loss
22    team at the time.
23         Q.    Prior to the beginning of COVID in
24    March 2020, were you not on the staged loss team?
25         A.    Say that again.  Prior to March --
```



```
 1                        J. Moeser
 2   wasn't putting time frames in, but there were
 3   times that I was submitting them well after 5:00
 4   at night or 4:30, whatever the time was.
 5        Q.    Did working from home instead of
 6   working in the field give you more flexibility in
 7   when you could investigate cases?
 8        A.    Give me more flexibility of when -- no.
 9        Q.    When you were working from home, you
10   were no longer required to canvass a scene; right?
11        A.    Until they reopened it around that time
12   frame that we said before, yeah.
13        Q.    You also weren't required to be
14   investigating cases in person; right?
15        A.    When COVID first shut us down, up until
16   that time frame, we did not do any field work.
17        Q.    So you weren't required to go meet any
18   people in person then; right?
19        A.    No.
20        Q.    And you could take breaks during the
21   day when you were at home?
22        A.    I guess I could, yeah.
23        Q.    Did you take breaks during the day?
24        A.    It depends on what you are classifying
25   as a break.  I mean, you know, a five-minute
```



```
1                        J. Moeser

2    document, Declaration of John Moeser, that's

3    marked as Exhibit 6.  Now we are looking at

4    paragraph 14.

5         A.    Okay.

6         Q.    Let me know when you have finished

7    reviewing.

8              (Document review.)

9         A.    Okay.

10        Q.    Paragraph 14 you speak of some

11   performance metrics that you are required to meet

12   in order to remain in good standing.

13              Was there a written policy that

14   described these metrics?

15        A.    Was there a what policy?

16        Q.    A written policy.

17        A.    I remember seeing -- yes, I remember

18   seeing some written policies that were gone over

19   in group meetings.

20        Q.    Do you recall who communicated these

21   policies to you?

22        A.    It would have been one of the

23   supervisors that were attending the meeting, that

24   were holding the meeting.

25        Q.    And these are the supervisors -- can
```



```
 1                    J. Moeser

 2   you name them?

 3        A.    Oh, boy.  Besides the three that I

 4   named before, there could have been Gerry

 5   Cassagne, Toni D'Agnati (phonetic), Dara Campbell.

 6   What was her first name?  Danielle Pomodore

 7   (phonetic).  I'm trying to think of who else.

 8   I -- I can't remember anybody else, but they

 9   were -- there were supervisors that I remember

10   associated with the field other than Danielle.

11   She was, I think, a supervisor from people on the

12   inside staff.

13        Q.    When did they tell you that these were

14   the performance metrics?

15        A.    Whenever they changed.

16        Q.    How often did they change?

17        A.    They changed several -- you know, on

18   either a half-year basis or a year basis.  I mean,

19   they were changing metrics all the time.  I mean,

20   I don't -- I can't tell you how many times in a

21   given six-month period or something.

22        Q.    Were there metrics in place in 2016?

23        A.    Yeah.  Yes.

24        Q.    Were there metrics in place from 2016

25   through your last day of employment at GEICO?
```



```
 1                         J. Moeser

 2         A.     Yes.

 3         Q.     And you say in paragraph 14 that -- the

 4    second sentence you state:  "These performance

 5    metrics and ratings changed constantly, but to the

 6    best of my recollection GEICO generally evaluated

 7    me based on how many hours it took me to complete

 8    a case task, how often I made an entry in a case

 9    report, how many days I took to close a case, and

10    how many cases I completed within a month."

11              Were these the only metrics that were

12    used to evaluate your performance at GEICO?

13         A.     No.  There were others.

14         Q.     What were the others?

15         A.     There were the other -- the amount of

16    cases I'm being assigned, the quality of my case,

17    whether or not it was a face-to-face -- and what I

18    mean by face-to-face, in-person contact with

19    somebody, or whether -- and that would be

20    considered a level 1.  Level 2 would mean that you

21    didn't do any field work on the case.  That one

22    used to also go into your metrics.  Not -- not so

23    much the type of case that you had, but whether or

24    not you got an impact on the case, and that was

25    very difficult with staged loss cases, because you
```



```
 1                         J. Moeser
 2   immediately, because you couldn't do it while you
 3   were in the field unless you sat there with your
 4   laptop, which I don't know too many people are
 5   gonna do that, but how I did it and other people
 6   may have done it differently, but SICM, which was
 7   the -- I think it was an acronym for the Special
 8   Investigations Case Management system, you could
 9   open up a field and actually type in what you were
10   doing there, but the print was so small and didn't
11   have a spell check and I decided not to do that,
12   so I would open up my own Word program and I would
13   keep that case running, and when I came back from
14   like your example from doing a canvass, I would
15   come back to my home office and type it into the
16   Word program and then copy and paste it into the
17   SICM, because you could alter -- not alter, but
18   you could edit a Word program a lot easier than in
19   SICM.
20        Q.    And did you enter that into SICM on the
21   same day or could you enter it on the next day?
22        A.    Yeah, you could enter it in the next
23   day, but it would be time stamped for that day.
24   So then -- one -- I'm glad you brought that --
25   another downgrade was that when they looked into
```



```
 1                       J. Moeser
 2   it, you know, initially before they changed a lot
 3   of the downgrades and systems, I could enter
 4   something in that I did two days ago and put
 5   down -- what's today?  Today is Friday?  So if I
 6   did something on Tuesday, I put it in on Friday,
 7   you know, I didn't have to explain why it was
 8   doing this, it was more or less common sense that
 9   you would see, you know, the time and date that I
10   went to a location compared to when it says that I
11   put it in.  Well, one of the things that they
12   looked at was that I needed to write a whole line
13   that, you know, on this date I went to -- on
14   Tuesday I went there, but I'm putting this in on a
15   Friday.  Does it really help the case?  No.  Does
16   it hurt the case?  No.  But this is one of the
17   downgrades that they would do.  So you could enter
18   it in after you did the task, but it would be time
19   stamped for that time.
20        Q.    How long did it take for you to copy
21   what you put in your Word document to SICM, like,
22   if you were to -- because you said you typed
23   things into a Word program and then you would copy
24   that in to SICM.  How long did that take?
25        A.    Not long at all.  I mean, depending on
```



```
 1                    J. Moeser
 2   before, when you are handling more work than you
 3   normally should be or were before, how do you flex
 4   your time, you know.  It's just common sense that
 5   if you are giving me five more cases, how do I
 6   flex my time to work around that.
 7        Q.    It says in paragraph 32:  "On a handful
 8   of occasions in 2017 and 2018 -- no more than 3
 9   days in total, according to GEICO's records --
10   Moeser's supervisors made exceptions, and approved
11   overtime.  These approved overtime days were
12   scattered across workweeks, and total no more than
13   5.5 overtime hours."
14             Which supervisors made the decision to
15   approve overtime for you on these occasions?
16        A.    During that period it would have been
17   either April Neyland or Rich Kiligin.
18        Q.    And do you remember the circumstances
19   surrounding those overtime approvals?
20        A.    No.  Again, I don't know -- I remember
21   Rich -- having a conversation with Rich Kiligin
22   when I made the -- when I made the overtime that
23   he also expressed that it could reflect on your
24   evaluation, because as I explained before about
25   the amount of hours, you know, in ratio to the
```



```
1                        J. Moeser

2        Q.    Paragraph 34.  It's going to be the

3   third line.  The sentence begins:  "GEICO

4   supervisors did not approve overtime, except for a

5   brief period starting between approximately May

6   and August of 2020, when they offered to pay

7   overtime to Special Investigators who took on

8   additional cases, on top of their already-high

9   workload.  GEICO's records reflect that Moeser was

10  paid for 16.75 overtime hours between June and

11  July 2020, over the course of 13 workdays."  Do

12  you see that?

13       A.    Uh-huh, yes.

14       Q.    Which supervisors made the decision to

15  approve overtime for you on these occasions?

16       A.    This would have came from my manager at

17  that time, from Bill Newport, filtered down to all

18  the other supervisors.

19       Q.    Did you volunteer to take on additional

20  cases between approximately May and August of

21  2020?

22       A.    When it first started, I believe I took

23  on some, but I just -- it became unbearable at

24  that time and stopped doing it.

25       Q.    Why did you take on new cases?
```



JOHN E. MOESER  Confidential                        August 02, 2024
Keith Fischer, et al. vs GEICO                                   246

```
1              J. Moeser

2  they threw it out there and said, "okay, let's

3  start doing it this way" and they didn't realize

4  that, well, it may seem small to you on one scale,

5  you know, but when you are doing this over a

6  period of many cases, it adds up, and, you know,

7  it's -- so when they increased it, they were

8  increasing different steps that they wanted you to

9  take that sounded redundant and sounded, you know,

10 not important, but they still wanted you to do it,

11 and if you didn't do it, well, then you were gonna

12 be downgraded on your audit.

13      Q.    And GEICO adopted that practice of

14 downgrading investigators for backdating cases,

15 did you -- did you backdate entries after that

16 time?

17      A.    Oh, sure, I had to, yeah.  Yeah.

18      Q.    Did you try to limit the extent to

19 which you backdated entries?

20      A.    I tried, yeah, but, you know, unless I

21 was gonna work until 11:00 at night every night, I

22 mean, I would have to put stuff off into the next

23 day.

24      Q.    Was it your practice, generally

25 speaking, to make at least some kind of entry in
```



```
 1                       J. Moeser
 2    coming in, I could catch five of these a month.
 3    Now -- a week.  Now, how they tried to work this
 4    was that when I was going on vacation, the
 5    agreement was -- the agreement -- what they would
 6    tell us to do is that they weren't gonna assign us
 7    cases, new cases, field cases or cases that I
 8    would normally, get three days before I went on
 9    vacation, but they would still assign you social
10    media cases because, like I said before, in their
11    eyes they felt that these should only take you an
12    hour to do when in reality it's gonna take a lot
13    more than an hour to do a thorough job on it.  So
14    that would increase at that particular time when I
15    was -- the week before I was going on vacation.
16         Q.    How -- sorry.  Did I interrupt?
17         A.    No.  Go ahead.
18         Q.    How many -- how much time would it take
19    you to close a social media case?
20         A.    It would take me several hours.  It
21    could take somebody else less than that, but it
22    would take me several hours, and it could take
23    other people longer.
24         Q.    Do you have an estimate of the number
25    of hours when you say "several"?
```



```
 1                         J. Moeser

 2         A.    I would say I would spend an estimate

 3    of four to five hours on -- on one of those cases.

 4         Q.    How many hours would you spend on a

 5    staged loss case?

 6         A.    Oh, God, it could be literally weeks,

 7    months on one of those cases.  I couldn't give you

 8    a time frame.  I mean, I never really tried to

 9    calculate it, but it's a lot of hours involved,

10    because, you know, there was travel time involved,

11    there was EUO -- I couldn't really put -- I mean,

12    probably over 40 hours on those cases.

13         Q.    And how about for the enhanced damage

14    referrals, how many hours would you spend on

15    those?

16         A.    Again, there is no set time on them.

17    It depends on the case and what was entailed with

18    it.  To do database work, depending on how

19    complex it got, because you don't know what you

20    are gonna find once you start doing database work

21    and it can continue on to something else, it

22    could take you several hours to a half a day to

23    do, you know, the proper database work.

24    Scheduling interviews, well, again, you are

25    waiting on people to contact you back or, you
```



```
 1                    J. Moeser

 2   know, if they went through an EUO, you were

 3   waiting for a response from our legal department

 4   to send out the letters in time, and then actual

 5   doing the EUO, on an average it would take me, you

 6   know, an hour and a half to do.  Then writing the

 7   reports, conferring with AD personnel.  It

 8   could -- you know, I would say anywhere from, you

 9   know, 20 to 25 hours if you start really adding up

10   all the times and stuff.

11        Q.    And how about underwriting referrals,

12   do you have an estimate of how many hours?

13        A.    However long it took you when we were

14   doing them, you know, however long it took you to

15   get from point A to point B, number one, do a

16   drive-by, which was pretty easy, just drive by

17   seeing what cars are there and making documents as

18   far as the vehicles that you saw, and then doing

19   that at various times on different dates, and then

20   actually knocking on somebody's door and seeing if

21   they are home, and again, you may have to contact

22   them at another time.  That could take, depending

23   on where you were driving to, I don't know, 12, 15

24   hours to do one of those cases.

25        Q.    Could it take less if you were driving
```



```
 1                        J. Moeser
 2          produced in the case.
 3                 MS. CACERES-BONEAU:  Okay.
 4                 THE VIDEOGRAPHER:  The time right now
 5          is 6:35 p.m. and we are off the record.
 6                 (Time noted:  6:35 p.m.)
 7
 8
 9                 ----------------------
10                 JOHN E. MOESER
11
12
13   Subscribed and sworn to before me
14   this        day of               2024.
15
16   ---------------------------------------
17
18
19
20
21
22
23
24
25
```



1

2                       C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                         ) ss.:

6    COUNTY OF NASSAU     )

7

8            I, KRISTIN KOCH, a Notary Public

9        within and for the State of New York, do

10       hereby certify:

11           That JOHN E. MOESER, the witness

12       whose deposition is hereinbefore set forth,

13       was duly sworn by me and that such

14       deposition is a true record of the

15       testimony given by such witness.

16           I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage; and that I am

19       in no way interested in the outcome of this

20       matter.

21           IN WITNESS WHEREOF, I have hereunto

22       set my hand this 8th day of August, 2024.

23

24       _____

25           KRISTIN KOCH, RPR, RMR, CRR

