Exhibit 73

MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
1

```
 1

 2         IN THE UNITED STATES DISTRICT COURT

 3         FOR THE EASTERN DISTRICT OF NEW YORK

 4  - - - - - - - - - - - - - - - - - )

 5  KEITH FISCHER, MICHAEL O'SULLIVAN,)

 6  JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

 7  BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

 8  CHARISE JONES, individually and   ) (GRB) (ARL)

 9  on behalf of all others similarly )

10  situated,                         )

11                    Plaintiffs,     )

12     - v -                          )

13  GOVERNMENT EMPLOYEES INSURANCE    )

14  COMPANY d/b/a GEICO,              )

15                    Defendant.      )

16  - - - - - - - - - - - - - - - - - )

17

18      REMOTE VIDEOTAPED DEPOSITION OF MICHAEL REED

19

20

21

22

23  Reported by:

24  Kim M. Brantley

25  Job No: J12200420
```



```
 1                    MICHAEL REED

 2                 Wednesday, January 8, 2025

 3

 4        Remote videotaped deposition of MICHAEL REED,

 5   held via Zoom, before Kim M. Brantley, Court

 6   Reporter and Notary Public of the State of New

 7   York.

 8

 9   APPEARANCES:

10   On behalf of the Plaintiffs:

11        OUTTEN & GOLDEN, LLP

12        685 Third Avenue - 25th Floor

13        New York, NY, 10017

14        (212) 245-1000

15        Email: jmcallister@outtengolden.com

16               sjean@outtengolden.com

17        BY:  JARRON D. MCALLISTER, ESQUIRE

18             SABINE JEAN, ESQUIRE

19

20

21

22

23

24

25
```



```
 1                         MICHAEL REED

 2    APPEARANCES CONTINUED:

 3    On behalf of the Defendant GEICO:

 4         DUANE MORRIS, LLP

 5         190 South LaSalle Street - Suite 3700

 6         Chicago, Illinois 60603

 7         (312) 499-0198

 8         Email: tealberty@duanemorris.com

 9    BY:  TIFFANY ALBERTY, ESQUIRE

10

11    ALSO PRESENT:

12         ROBERT PACHECO, Legal Video Specialist

13         Esquire Deposition Solutions

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                      MICHAEL REED
 2             P  R  O  C  E  E  D  I  N  G  S
 3              THE LEGAL VIDEO SPECIALIST:  We are now
 4    on the video record.  Today's date is January the
 5    8th, 2025.  The time is 10:03 a.m., Eastern
 6    Standard Time.  This begins the videoconference
 7    deposition of Mr. Michael Reed in the matter of --
 8    in the matter of Keith Fischer, et al., Plaintiff,
 9    vs. Government Employees Insurance Company, doing
10    business as GEICO, Defendant, to be heard in the
11    United States District Court for the Eastern
12    District of New York, case number 2232848.
13              My name is Robert Pacheco.  I am the
14    remote videographer.  Your court reporter today is
15    going to be Miss Kim Brantley, both representing
16    Esquire Deposition Solutions.
17              Would counsel please introduce
18    yourselves and your affiliation, and the witness
19    will be sworn in.
20              MR. MCALLISTER:  Good morning.  My name
21         is Jarron McAllister.  I'm an attorney at
22         Outten & Golden, and I'm here with my
23         colleague, Sabine Jean.
24              MS. ALBERTY:  And Tiffany Alberty on
25         behalf of the defendant, GEICO.
```



```
 1                        MICHAEL REED
 2   Whereupon,
 3                        MICHAEL REED
 4   called as a witness by counsel for Defendant, and
 5   after having been first duly sworn, was examined
 6   and testified as follows:
 7             EXAMINATION BY COUNSEL FOR DEFENDANT:
 8                   BY MS. ALBERTY:
 9        Q.    Mr. Reed, can you please state and
10   spell your name for the court reporter.
11        A.    Sure.  First name is Michael,
12   M-i-c-h-a-e-l, with a middle initial of N, and the
13   last name is Reed, R-e-e-d.
14             MS. ALBERTY:  Let the record reflect
15        that this is the discovery deposition of Mr.
16        Michael N. Reed, taken pursuant to notice and
17        by agreement of the parties.  Today's
18        deposition will be taken in accordance with
19        all applicable rules.
20   BY MR. ALBERTY:
21        Q.    Mr. Reed, I know that we went through
22   you some preliminary things where you had seen me,
23   but my name is Tiffany Alberty.  I represent the
24   defendants GEICO in this matter.  Today I'm going
25   to be taking your deposition and asking you a
```



```
 1                  MICHAEL REED
 2    "nontraditional" I'm talking Uber Eats, any type
 3    of side gigs, side hustle, anything like that.
 4         A.   I do not do any of those jobs, and I a
 5    not working anywhere either off the books or off
 6    the record.
 7         Q.   Okay.  When you started in 2005, all
 8    the way up and until 2023, what were the titles
 9    that you held at GEICO?
10         A.   I was a senior security investigator,
11    or an a SIU investigator would be the common term.
12    That was the only position that I held.
13         Q.   Okay, so for -- and I'm forward now.
14              So that entire time from 2005 to 2023
15    you always had the same title, which was senior
16    security investigator, correct?
17         A.   Correct.  That's correct.
18         Q.   From 2005 to 2023, was there a specific
19    geographic region that you were assigned to?
20         A.   Yes.  I worked western New York, which
21    would be the Buffalo area.  I covered seven
22    western -- seven counties out of western New York.
23              To give you geographical, I guess
24    easier would be from Lake Ontario to the
25    Pennsylvania border, from Lake Erie and Buffalo as
```



```
 1                        MICHAEL REED
 2    far east as Rochester and Fairfield.
 3         Q.   Was that considered, to your
 4    recollection, region two?
 5         A.   That is through region two, yes.
 6         Q.   The allegations in this case have
 7    stemmed from 2016 to present, and because of your
 8    long tenure with GEICO a lot of my questions are
 9    going to be more geared towards that time frame.
10              With regard to your matters that you
11    handled from 2016 until your retirement, were
12    those always within New York State?
13         A.   There were times where I was required
14    to go to Canada, and there were times where I was
15    required to go to Pennsylvania, but those claims
16    were based out of New York.
17         Q.   All right.  Aside from region two, did
18    you work with any other region?
19         A.   No, I did not.
20         Q.   Ultimately when your employment ended
21    around March or April of 2023, what was the reason
22    why you left GEICO?
23         A.   I left GEICO because of the -- the work
24    conditions, the stress of the job.  ████████
25    █████████████████████████████████████████████
```



1                    MICHAEL REED

2    GEICO, was everything approved?

3          A.   Yes.

4          Q.   Were you assigned to a specific person

5    to assist you with your FMLA processing?

6          A.   It was through the human resources with

7    GEICO.  I don't recall the name of the human

8    resource person that I spoke with.

9          Q.   Okay.  And there were no issues

10   whatsoever with your FMLA processing and granting.

11          Is that right?

12          A.   Not at all, not at all.

13          MR. MCALLISTER:  Objection.

14   BY MS. ALBERTY:

15          Q.   While you were with GEICO -- and let's

16   say the entirety, 2005 to 2023 -- did you ever

17   hold the title senior payment recovery examiner?

18          A.   No.

19          Q.   With your title specifically you

20   indicated you were a senior security investigator.

21          Do you know about if that was a senior

22   outside security investigator, or a senior field

23   security investigator?

24          A.   The exact title I don't know.  I was a

25   field investigator, though.



                        MICHAEL REED

1

2        A.    I started out working for a gentleman

3    by the name of Anthony or Tony Mazziotti.  He was

4    my direct supervisor; then I worked or Chester or

5    Chet Janik, and when I left the company I was

6    working for Toni D'Agata.

7        Q.    And from 2016 to 2023, who was your

8    manager?

9        A.    There was a Michael DeGrocco and a

10   William Newport were the last two managers that I

11   had.  Prior to that it might have been Sharyl

12   Derenthal, but once again I don't recall the

13   exact -- I know the last two.

14       Q.    Did you ever work in the office?

15       A.    No, I did not.

16       Q.    And did you ever have an inside role,

17   or were you predominantly in the field?

18       A.    It was all field.

19       Q.    So it's fair to say you did not have a

20   desk role?

21       A.    No, I did not.  I -- I'm all the way

22   over in Buffalo.  In region two, I was -- I was

23   down in Long Island.

24       Q.    Did you have flex time?

25       A.    They called it "flex time," yes.



1                    MICHAEL REED

2        Q.   Okay.  And what, to your recollection,

3    what did that mean?

4        A.   That meant that you could flex your

5    hours if needed, however that flex was never --

6    never applicable to what we did.

7        Q.   What do you mean by that?

8        A.   It means that at 7:00 a.m., I was

9    receiving cases right off the bat at 7:00 o'clock

10   or prior to 7:00 a.m.  In those cases I had to get

11   up, get on the computer, and get working on all of

12   those cases.  There was no flexibility on their

13   end.  The cases continued to come in all day.

14            So I still had to work 7:00 a.m. to

15   3:00 p.m., 3:30, but yet continue to work

16   afterwards to catch up on all the cases that I

17   received during the day.

18       Q.   Did anyone tell you how to arrange your

19   flex time?

20       A.   No.

21       Q.   Were you -- strike that.

22            Did you have the flexibility to work

23   before 7:00 a.m.?

24       A.   Did I have the flexibility?

25       Q.   Yes.



MICHAEL REED                                        January 08, 2025
KEITH FISCHER v GEICO                                              41

```
 1                    MICHAEL REED

 2       Q.   And would all of your new cases that

 3   would come in come via email?

 4       A.   Yes.  Occasionally, if I got a call

 5   from law enforcement in regards to a concern that

 6   they had, I would open my own case and have intake

 7   reassign the case back to me.

 8       Q.   What types of claims did you

 9   investigate?

10       A.   Theft, theft and fire of a vehicle,

11   personal injury, date of loss, suspected jump-ins,

12   hit and run; just about every claim that would

13   come through GEICO.

14       Q.   Would this be both hit and runs for

15   vehicle and bicycle?

16       A.   Hit and run, pedestrian, bicycle, yes,

17   property damage.

18       Q.   Were you ever tasked with investigating

19   underwriting fraud?

20       A.   ███████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████████████████

24   ██████████████████████████████████████████

25   ████████████████████████████████████████
```





1                       MICHAEL REED

2    ███████████████████████████████████████████

3    ███████████████████████████████████████████

4         Q.    Okay.  Would you investigate staged

5    theft?

6         A.    Yes.

7         Q.    Would you investigate body shop theft?

8         A.    Body shop theft?  No.

9              We did inspect body shops, but no theft

10   of -- theft of body shops.  Theft of services.

11        Q.    Okay.  Did you investigate social media

12   claims?

13        A.    We did do social media, yes.

14        Q.    And what about rate evasion?

15        A.    Rate evasion was -- yeah, there was

16   cases where we would go and see whether or not a

17   person was living at an address in regards to what

18   was on their policy.  Yes, we did do rate evasion.

19        Q.    Again, the focus is between that 2016

20   to '23 time frame.  So I just want to make sure

21   we're in that world.

22        A.    Yeah.  This was from the day I started

23   until the day I resigned.  It was all that type of

24   case.

25        Q.    I think with regard, though, to social



MICHAEL REED

1          MICHAEL REED

2      Q.   Prior to 2020 -- and when I talk about

3  2020 I'm specifically focusing more on COVID, the

4  restrictions that were put in place either by

5  state or county -- but prior to that, so we'll say

6  2016 to the very beginning of 2020, how much time

7  would you say you spent in the field?

8      A.   Hours or percent?

9      Q.   Either/or.

10     A.   Okay.  I mean, it -- it's -- it's very

11  hard to say.

12          I mean, there would be a case -- if I

13  had a case in Buffalo or locally, there would be

14  less travel time, but if I had a case in the

15  southern tier -- which would be towards Jamestown,

16  Salamanca, Wellsville, or east to Utica,

17  Rochester -- travel time would be anywhere between

18  an hour and a half, an hour and forty-five minutes

19  one way, and that would also depend upon the

20  weather and the time of the year.

21          So, the -- the travel time in the field

22  would be, you know, variable depending upon where

23  I was going and what the weather was, what the

24  time of the year was.

25     Q.   Did you always go out in the field



```
 1                      MICHAEL REED
 2             So, Michael, if you want to take a read
 3    real quick and -- for the "Salaried Nonexempt
 4    Associates," and the just let me know whenever
 5    you're ready, and if I need to zoom in, I can.
 6             (Witness reviews document.)
 7        A.   Okay.
 8        Q.   Do you recall receiving any type of
 9    training on salaried nonexempt associates?
10        A.   No, I don't recall.
11        Q.   Okay.  Do you recall if you had any
12    questions or issues regarding pay that you can go
13    to either your supervisor or human resources with
14    questions?
15        A.   Do I recall?  No, I don't recall that,
16    but...
17        Q.   In your --
18        A.   I don't recall it.
19        Q.   In your practice do you remember ever
20    going to human resources or a supervisor with any
21    concerns regarding your pay?
22        A.   Not human resource, no.  In the
23    supervisors there was no discussion of overtime.
24        Q.   When you would receive your paycheck
25    and your pay records, did you ever review that for
```



```
 1                   MICHAEL REED
 2   the accuracy of your hours?
 3        A.   Yes.
 4        Q.   And did you ever notice any discrepancy
 5   within the pay amount that you had received?
 6        A.   No.
 7        Q.   With regard to the section where it
 8   says, "A salaried nonexempt associate is
 9   encouraged to contact a supervisor with any
10   questions," do you recall ever going to your
11   supervisor asking questions on how any type of
12   premium pay for the fluctuating work week method
13   was applied to your position?
14        A.   I don't recall going to my supervisor
15   for that, no.
16        Q.   Do you understand that GEICO paid
17   overtime for time and a half for all hours
18   actually worked above a forty-hour work week?
19        A.   They may have paid it, but we did not
20   receive it.
21        Q.   To your knowledge, was it your
22   responsibility as a senior security investigator
23   to input your hours worked?
24        A.   I would input my hours that was through
25   Workday, yes.
```



```
 1                      MICHAEL REED
 2    Friday you would auto-fill the number of hours.
 3    Would you then submit it on the day that you
 4    auto-filled the hours?
 5         A.   Sometimes a supervisor would say that
 6    they were going to be out of the office on a
 7    Thursday or Friday, so you would submit that
 8    either early or Thursday or Friday.
 9         Q.   To your knowledge, once you would
10    submit it to a supervisor, what would occur then
11    thereafter?
12         A.   I -- I don't know what they did with it
13    past that point.
14         Q.   Did anything ever get sent back to you
15    because it was inaccurate, incomplete, or there
16    was any problem just the processing for your
17    Workday auto-fill hours?
18         A.   Not that I can recall.
19         Q.   To your recollection, for the auto-fill
20    hours that you would plug into the Workday system
21    for your hours worked, were you always paid for
22    the hours that you input through Workday?
23         A.   Was I always paid for those hours?
24         Q.   Yes.
25         A.   Yes.  I was not paid for the hours that
```



```
 1                    MICHAEL REED
 2   I worked over that, though.
 3        Q.   For any hours that you worked over the
 4   auto-fill amount within the Workday system, did
 5   you ever input those hours into Workday?
 6        A.   I did not fill out for overtime because
 7   that was something that was not done.
 8        Q.   And to your knowledge would it be a
 9   violation of GEICO policy to not input hours that
10   you actually worked?
11        A.   That I don't know.  All I know is the
12   cases had to be done.
13        Q.   Did any supervisor, lead, manager,
14   somebody with authority at GEICO ever come to you
15   say "I'm aware that you're working overtime, but
16   you're not inputting those hours into Workday to
17   be adequately paid"?
18        A.   They ever came to us and said that.
19        Q.   How frequent were you paid with GEICO?
20        A.   I believe it was every two weeks.
21        Q.   And I apologize if you already answered
22   this.  As to any potential discrepancy for the
23   hours that you were not paid that you were
24   concerned based on your paycheck or your pay
25   record, did you ever raise that to human resources
```



1                    MICHAEL REED

2        Q.   When you brought your questions

3   forward, do you recall who it was to?

4        A.   My questions of overtime?

5        Q.   Yes.

6        A.   That would have been to Chet Janik, and

7   the answer once again, there was no overtime.

8        Q.   Do you remember if we talked --

9        A.   But that -- that was for -- I mean,

10  that -- it was not asked all the time.  It was

11  just that -- that was the way it was.  There was

12  no overtime.

13       Q.   Do you recall if the conversations you

14  had with Chet were by email, on the phone, text

15  message, DM, direct message?

16       A.   Mostly phone.

17       Q.   And when you had questions regarding

18  overtime, what do you recall Chet explicitly

19  saying to you?

20       A.   There was no -- "There was no

21  overtime."

22       Q.   Do you have any knowledge whether any

23  other SIU investigators in New York -- so whether

24  that's downstate or up north -- actually received

25  and were -- was paid overtime?



1              MICHAEL REED

2    for various policies that related back to 2006.

3              We have records here, and I'll go

4    through it with you just to read it into the

5    record, but, for example, the associate handbook

6    and policy as it's applicable to the claims here,

7    so that would start in 2016.  So, on page five we

8    have a "Michael Reed Policies and Acknowledgement,

9    2016 Historical Tracker" that would have been been

10   (sic) seen, completed, and passed on May 26th of

11   2016.

12             With regard to this historical tracking

13   log, the dates with which you reviewed the

14   policies, completed, and passed, do you have any

15   reason to dispute the accuracy of the historical

16   tracking log for your trainings while you were

17   with GEICO?

18       A.   From what I'm looking at, I can't

19   dispute that, no.

20       Q.   Did you understand that you were

21   required to report to anyone within GEICO if any

22   managers or your supervisors were telling you to

23   work off the clock?

24       A.   They were not telling us to work off

25   the clock.



```
 1                     MICHAEL REED

 2   something along those lines.

 3             Mostly I was a four or a five.

 4        Q.   Do you have any knowledge that if

 5   people were inputting overtime that exceeded the

 6   38.75 hours what their specific ratings would have

 7   been?

 8        A.   I have no knowledge of that.

 9        Q.   From 2016 to 2023, did you receive pay

10   increases?

11        A.   Yes.

12        Q.   And did you receive -- how frequently

13   did you receive them?

14        A.   Yearly.

15        Q.   And do you remember what the basis for

16   the yearly paid increases would have been?

17        A.   Basis by the evaluation at the end of

18   the year or the monetary?

19        Q.   The basis meaning whether it was

20   performance driven, if it was cost-of-living

21   adjustment, anything to that degree.

22        A.   The evaluation was based upon

23   performance.  I had no control over the cost of

24   living if there was a cost-of-living increase in

25   there.
```



```
1                    MICHAEL REED

2        Q.   To your knowledge did you receive a

3   yearly pay increase for performance from 2016 to

4   2023?

5        A.   Yes, I did.

6        Q.   Do you recall what the percentage

7   increases would have been for each fluctuating

8   year?

9        A.   Offhand, I can't tell you the exact

10  numbers, no.

11       Q.   So that I understand, so you still were

12  receiving raises even though you were on paper

13  only working 38.75 hours a week, correct?

14       A.   Correct.

15       Q.   In paragraph eight it states in theory

16  that if you have more hours it would negatively

17  affect your rate for a pay increase.

18            What does that algorithm look like,

19  that if say, for example, you put in fifty-five

20  hours per week, how that would impact the

21  percentage with which you would receive a pay

22  increase?

23       A.   I can't tell you what the algorithm

24  would have been with regard to that.

25            We did not put overtime in there
```



```
 1                    MICHAEL REED
 2    evaluation, do you recall the number of cases you
 3    needed to close in order to hit the specific types
 4    of rating?
 5         A.   I don't recall the number of cases to
 6    be closed, no.
 7         Q.   I believe you indicated case life?
 8         A.   Yes.
 9         Q.   In what capacity did case life have an
10    impact score into your overall end-of-year
11    evaluation?
12         A.   Case life was not something towards the
13    end of my career that we were based -- that we
14    were scored on.  However, the supervisor and the
15    managers were graded upon our case life, therefore
16    they were very adamant that you close your cases
17    as quickly as you could and work your cases as
18    quickly as they could.
19              Like I said, although that wasn't
20    something that was a goal of mine, it was a goal
21    of my supervisor and a goal of my manager,
22    therefore there was pressure to get that case life
23    down so that their evaluations and their case life
24    would be better.
25         Q.   How -- how do you know that?
```



```
 1                      MICHAEL REED

 2   being questioned about my case life, which I've

 3   indicated is not part of my goals, to which the

 4   answer was, "It was part of my goals," is what he

 5   said.  "It's part of our goals, my goals, and

 6   management goals.  That's why case life is

 7   important."

 8           Though I have no proof, I can't tell

 9   you that, but I can tell you that conversation

10   occurred.

11       Q.  Going back to your declaration in

12   paragraph nine, you claim that you regularly

13   worked two hours a day to address case files you

14   received on the road, maintain the life of your

15   other cases, and to meet the guidelines set by

16   GEICO.

17           Is it your testimony that you worked an

18   extra two hours every day from 2016 to your

19   resignation?

20       A.  That would be a --

21           MR. MCALLISTER:  Objection.

22           You can answer.  Sorry.

23           THE WITNESS:  Oh, okay.  I was just

24       making sure.

25           That would be a fair number, yes.
```



1                    MICHAEL REED

2    BY MS. ALBERTY:

3         Q.    And what do you base these estimates

4    on?

5         A.    The hours that I would be on the road

6    traveling back and forth to statements, coming

7    back into the office, trying to compile the

8    information that I had from going out on the road,

9    which would be summarizing the statements, getting

10   all of that information into my Word document, at

11   the same time receiving more cases while I was out

12   and having to get those cases -- case life done,

13   and to get the -- excuse me, get the --

14        Q.    Sorry.

15        A.    Get the initial case -- we're good?

16             Okay, to get the initial cases set up

17   and into the SICM and into my other new Word

18   documents.

19             So, every time I was on the road for an

20   hour and a half, two hours, three hours, that

21   would end up at the end of the day with the cases

22   that I got while I was out.

23             Just because you're on the road, the

24   cases didn't stop.

25        Q.    Do you have any notes calendaring any



MICHAEL REED                                           January 08, 2025
KEITH FISCHER v GEICO                                              119

```
 1                    MICHAEL REED
 2            Is that fair?
 3       A.    That's -- that's fair to say, yes.
 4       Q.    Okay.  All right, going back to number
 5   nine, and I just want to confirm, you never
 6   requested overtime for the hours that exceeded the
 7   38.75 from 2016 until your retirement?
 8       A.    I did not request any overtime.  I did
 9   not.
10       Q.    And so then your hours then would have
11   been underreported from 2016 'till your
12   retirement?
13       A.    Yes, they would have been
14   underreported.
15       Q.    Do you have any idea how many cases you
16   were handling per week per year?
17       A.    How many per week per year?  I couldn't
18   tell you that number.  Honestly, to give you an
19   honest number, I could not tell you that.
20       Q.    Let's go to paragraph ten.  It states,
21   "Starting in March 2020, COVID-19 pandemic halted
22   field operations.  All my work was done remotely
23   until approximately November 2021.
24            "Prior to the pandemic my caseload was
25   approximately between twenty to twenty-five cases
```



1                        MICHAEL REED

2    hours a week -- that was not being input into

3    Workday.  Only the 38.75 hours was being input

4    during that time period?

5         A.    That's correct.

6         Q.    And did you ever request the OT for

7    your hours that exceeded the 38.75 as indicated in

8    paragraph ten to quantify the 57.5 hours a week on

9    average?

10        A.    I did not request the overtime, no.

11        Q.    So paragraph ten doesn't have a cutoff

12   period to your retirement.  So I'm trying to

13   understand that is it -- what were your hours then

14   from November 2021 to then that March -- actually

15   until your FMLA in the --

16        A.    FMLA was only -- the FMLA was only

17   maybe one or two days a month.  It was not a

18   specific length of time.

19             The FMLA was in fact where I could

20   not -- when they he told me I had -- I had capped

21   out at my ten sick days for the year, I couldn't

22   take any more sick days.

23             So it would only be maybe one day a

24   month or two days a month.  That was it.  It was

25   not an extended period of time.



                         MICHAEL REED

2   then?

3        A.   Yeah.  The manager was Mike DeGrocco,

4   and after him was Bill Newport, or William

5   Newport.

6        Q.   Okay.  Do you remember when Mike

7   DeGrocco phased out and Bill Newport became your

8   manager?

9        A.   I could not give you that date.  I

10  can't recall.

11       Q.   Do you recall Mike DeGrocco ever saying

12  to you and your team to not input your overtime?

13       A.   For Mr. DeGrocco, no.

14       Q.   Do you recall Bill Newport ever telling

15  you and your team to not input your overtime?

16       A.   Directly, no.

17       Q.   What do you mean by directly versus

18  presumptively indirectly?

19       A.   Presumptively through Mr. Janik, who

20  was my supervisor, that that's where that was

21  coming from.

22       Q.   Okay.  But as to direct communication

23  from Bill Newport, he never indicated to you or

24  your team to not log overtime?

25       A.   No, he did not directly.



```
 1                      MICHAEL REED

 2         Q.   When you say that you know they knew,

 3    is that an assumption?

 4         A.   It's an assumption, but -- I'll leave

 5    it at that.

 6         Q.   Did you ever lie to anyone at GEICO

 7    about anything with regarding your wages, time,

 8    case reports?

 9              MR. MCALLISTER:  Objection.

10              THE WITNESS:  I never lied about

11         anything at GEICO.

12    BY MS. ALBERTY:

13         Q.   Did you ever provide false or

14    incomplete information in filling out any company

15    forms, papers, or reports?

16         A.   No, I --

17              MR. MCALLISTER:  Objection.

18              THE WITNESS:  No, I did not.

19              MS. ALBERTY:  Sorry, I just want to

20         make sure Kim got that on the record.

21              THE COURT REPORTER:  Yes, yes, I heard

22         him.

23              MS. ALBERTY:  Okay, thank you.

24              Counsel, it just blurred out on my end,

25         so, but I saw your face.
```



```
 1                  MICHAEL REED

 2          THE COURT REPORTER:  This is Kim, the

 3   reporter --

 4          MS. ALBERTY:  And would you just follow

 5   up -- oh sorry, Kim.

 6          If you could just follow up via email,

 7   that'd be great.

 8          And thank you again, Mr. Reed.  We're

 9   all finished for the day.

10          MR. MCALLISTER:  Thank you.

11          THE COURT REPORTER:  I need -- I need

12   to know the order for Mr. McAllister.  Do

13   you -- would you like to order the

14   transcript, Mr. McAllister?

15          MR. MCALLISTER:  Yes, ma'am.

16          THE COURT REPORTER:  Okay.

17          MR. MCALLISTER:  What is the time frame

18   for --

19          THE COURT REPORTER:  So it's ten -- ten

20   business days.

21          MR. MCALLISTER:  Okay, great.  Ten

22   business days is great.

23          THE COURT REPORTER:  All right, thank

24   you.

25          THE LEGAL VIDEO SPECIALIST:  This
```



```
 1               MICHAEL REED

 2   concludes today's videotaped deposition.  The

 3   time is 2:57 p.m.  Going off the record now.

 4        (Whereupon at 2:57 p.m. the videotaped

 5   deposition of Michael Reed concluded.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1

2              C E R T I F I C A T E

3   STATE OF NEW YORK    )

4                        : Ss.

5   COUNTY OF NEW YORK   )

6          I, Kim M. Brantley, Shorthand

7   Reporter, and Notary Public within and for the

8   State of New York, do hereby certify:

9          That MICHAEL REED, the witness whose

10  deposition is hereinbefore set forth, was duly

11  sworn by me and that such deposition is a true

12  record of the testimony given by the witness.

13         I further certify that I am not related

14  to any of the parties to this action by blood or

15  marriage, and that I am in no way interested in

16  the outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set

18  my hand this 20th day of January, 2025.

19              *Kim M. Brantley*

20  _____

21             Kim M. Brantley

22

23

24  My Commission expires May 31, 2026.

25

