# Exhibit C

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - )
KEITH FISCHER, MICHAEL O'SULLIVAN,   )
JOHN MOESER, LOUIS PIA, THOMAS       ) Case No.:
BARDEN, CONSTANCE MANGAN, and        ) 2:23 Civ. 2848
CHARISE JONES, individually and      ) (GRB) (ARL)
on behalf of all others similarly    )
situated,                            )
              Plaintiffs,            )
     - v -                           )
GOVERNMENT EMPLOYEES INSURANCE       )
COMPANY d/b/a GEICO,                 )
              Defendant.             )
- - - - - - - - - - - - - - - - - - )


        VIDEOTAPED DEPOSITION OF CHARISE JONES




Reported by:
Kim M. Brantley
Job No: J11541510
```



Page 41

1  CHARISE JONES
2  the system?
3     A.  Yes, I did.
4     Q.  Did you have to interview for that
5  role?
6     A.  Yes, I did.
7     Q.  Do you recall those interviews?
8     A.  Somewhat.
9     Q.  Do you know who you spoke with in
10 seeking that role?
11    A.  The supervisor and the manager.
12    Q.  And Ms. Katz was the supervisor,
13 correct?
14    A.  Correct.
15    Q.  Who was the manager?
16    A.  Tom Sullivan.
17    Q.  Do you know if Tom is still with GEICO?
18    A.  He passed away.
19    Q.  And how long did you work in that role
20 for?
21    A.  A good four years, four or five years.
22    Q.  What was your next job with GEICO?
23    A.  I then went to a no-fault field
24 representative.
25    Q.  What do you mean by "no-fault"?

Page 42

1  CHARISE JONES
2     A.  It was on the -- another side.  It
3  wasn't in the special investigations unit.  It was
4  in the claims department, and it was to go out and
5  get -- get stuff in the field that the examiners
6  could not get or could not obtain, whether it was
7  a police report, or if someone couldn't fill out a
8  form, or something of that nature.
9     Q.  And that was not in the SIU you said,
10 correct?
11    A.  No.
12    Q.  What is the claims department?
13    A.  It handled claims.
14    Q.  How is that different from the SIU?
15    A.  Claims and SIU are totally different
16 departments where claims goes out and get
17 information from the forms and information from --
18 that they need for the claim at hand, whereas the
19 special investigations unit is really trying to
20 look for any fraud detection.
21    Q.  Why did you move from the SIU to the
22 claims department?
23    A.  It was a new position that they were
24 trying to field up, and it came with a company
25 car, and it was again a lateral move, but it had

Page 43

1  CHARISE JONES
2  more potential of being out on the road and
3  totally different from what I was doing.
4     Q.  Did you want to be out on the road?
5     A.  Yeah.
6     Q.  Why?
7     A.  I just wanted to try it and see if I
8  liked it.
9     Q.  Did you like it?
10    A.  Yeah.
11    Q.  What did you like about it?
12    A.  I liked the variety of actually going
13 out and seeing the person face to face, and be
14 able to talk to them, and actually feel like I was
15 making more of a difference, helping more, because
16 I was getting information for those claims
17 examiners that they couldn't handle and helping
18 them close their files or cases quicker, because
19 they couldn't obtain the information.
20        So, I liked it.
21    Q.  Do you recall how long you worked in
22 that position for?
23    A.  I did that for about five, six years.
24    Q.  And when you were driving in that
25 position, did you have a specific geographic area

Page 44

1  CHARISE JONES
2  that you were responsible for?
3     A.  Anything within the three to
4  three-and-a-half-hour driving.
5     Q.  Do you know if that was official GEICO
6  policy, or was that a practice?
7     A.  It was just a practice.
8     Q.  And were you only working in New York
9  State, or were you traveling to other states?
10    A.  Only in New York -- I'm lying.  There
11 may be a time that we went to Connecticut,
12 depending on how far it was.  But mainly New York.
13    Q.  Were most of the driving assignments on
14 Long Island?
15    A.  No.  They would vary.  Brooklyn, Bronx,
16 the five boroughs, Staten Island; again, anything
17 within three-and-a-half hours.
18    Q.  And what type of interactions did you
19 have in the field in that role?
20    A.  Again it was police departments, going
21 picking up police reports.  If a person that had
22 an accident couldn't fill out forms, or they
23 needed help with filling it out, or getting a
24 statement from somebody, or having something
25 notarized, I would do that.



Page 45

 1    CHARISE JONES
 2    Q.  What types of claims were you working
 3  on in that role?
 4    A.  Auto claims.
 5    Q.  And that is different than the medical
 6  claims that you were working on previously,
 7  correct?
 8    A.  Well, the auto encompassed any injuries
 9  as well.  So it was just anything having to do
10  with auto, whether they were injured or not.
11    Q.  Okay.  And what was your next position
12  with GEICO?
13    A.  After that I worked in -- they did away
14  with that job.  They actually closed it or removed
15  it.  They didn't -- I don't know what they called
16  it, but they stopped that job, and then I went
17  inside and worked in -- I don't know the name of
18  the department.  It was also in claims.  It was --
19  I don't recall the name of the job it was, but I
20  went from outside to inside.
21    Q.  In the claims department itself?
22    A.  Yes.
23    Q.  Do you know why they got rid of that
24  job?
25    A.  They were cutting down on the cars and

Page 46

 1    CHARISE JONES
 2  just trying to -- you know, I don't know their
 3  actual reasoning for doing it, but they did.
 4    Q.  And so then you began working inside
 5  you said?
 6    A.  Correct.
 7    Q.  And that is similar to the previous
 8  roles where you were working out of the New York
 9  office.
10        Is that right?
11    A.  Correct.
12    Q.  This was still in the claims
13  department?
14    A.  Correct.
15    Q.  How long did you work in that position
16  for?
17    A.  That wasn't that long, and that was
18  another department that they closed down.
19    Q.  The department inside the claims
20  department?
21    A.  Yes.  It was -- it was separate, but I
22  just don't know the name of it, and they closed
23  down that department all together.
24    Q.  And what happened to your employment at
25  that point?

Page 47

 1    CHARISE JONES
 2    A.  Then I went to claims.  It was called
 3  hybrid where I handled PIP and liability claims.
 4    Q.  What does "PIP" mean?
 5    A.  Personal injury protection.
 6    Q.  What is personal injury protection?
 7    A.  That's the no-fault part of it,
 8  medical, when they had an injury.
 9    Q.  Is that a New York-specific procedure?
10    A.  Yes.
11    Q.  And how long were you in that role for?
12    A.  That I was in for maybe two years.
13    Q.  Do you recall what years you worked in
14  that role?
15    A.  I do not.
16    Q.  Do you know if it was within the last
17  ten years that you were in that role?
18    A.  No.  No, it was ten years -- it was
19  more than ten years.
20    Q.  More than ten years ago?
21    A.  Yeah.
22    Q.  Okay.  And what was the next position
23  you worked in at GEICO?
24    A.  Then I went back to SIU.
25    Q.  Did you apply to go back to SIU?

Page 48

 1    CHARISE JONES
 2    A.  Yes.
 3    Q.  And what position did you work in when
 4  you went back to SIU?
 5    A.  That was a desk job, and it was solely
 6  medical again.
 7    Q.  Were you working out of the Woodbury
 8  office?
 9    A.  Yes.
10    Q.  When you say "solely medical," what do
11  you mean?
12    A.  It didn't have to do with any damages
13  on cars.  It had to do with just injuries.
14    Q.  Who was your supervisor in that role?
15    A.  April Neyland.
16    Q.  Was this the first time you worked with
17  April Neyland?
18    A.  No.
19    Q.  When had you worked with her
20  previously?
21    A.  When -- when I was in the PIP, personal
22  injury protection, and the liability, she was also
23  my supervisor there.
24        And I apologize, when I went to SIU,
25  the supervisor there was not April, because she



Page 73

1　　　　CHARISE JONES
2　A.　The section.
3　Q.　And what do you mean by "the section"?
4　A.　Each supervisor had their section.
5　Like you had asked about April's section, who she
6　had.  So those people would meet with him, other
7　supervisors' section would meet with him, all
8　separately.
9　Q.　Okay.  And did the meeting include both
10　people who worked inside and people who worked in
11　the field?
12　A.　Yes.
13　Q.　And do you recall if you said anything
14　during that meeting?
15　A.　I did not.
16　Q.　Do you recall if anyone else said
17　anything during that meeting?
18　A.　Yes.
19　Q.　What do you recall?
20　A.　Asking specifically about when we
21　closed a case, how -- how -- where -- where -- how
22　our numbers are figured out, like the time frame.
23　　　　Because our cases had to be closed at a
24　specific time, and it was asked if the case was
25　closed, does it go by when we close it, or when

Page 74

1　　　　CHARISE JONES
2　the supervisor actually closes it.
3　Q.　Who asked that, if you recall?
4　A.　Maria Munoz.
5　Q.　And do you recall Bill's response?
6　A.　He said that it should be from the time
7　that the -- the manager -- or the supervisor
8　closes it.
9　Q.　Do you know what difference that would
10　make?
11　A.　Yes, because we could close it on a
12　Friday, and if the supervisor did not close it
13　'till Monday, Tuesday, or Wednesday, now that time
14　frame is locked in based on that Wednesday, or
15　whatever date it's closed.  So that's an extra
16　four days that's tacked on to our numbers.
17　Q.　Okay.  And just to confirm, did you
18　ever have an inside role at the SIU that you
19　worked as an investigator in?
20　A.　Yes.
21　Q.　When was that?
22　A.　That was when I did the intake before I
23　went to the -- those other departments, and then
24　when I went back to SIU I was -- I did the
25　medical, and that was, you know -- then I applied

Page 75

1　　　　CHARISE JONES
2　for the outside field.
3　　　　So I had two -- two specific inside
4　desk jobs.
5　Q.　And just to confirm, because I know we
6　talked about a lot of different roles that you've
7　had at GEICO, so I just want to make sure the time
8　frames are correct.
9　A.　Mm-hmm.  Okay.
10　Q.　Those two inside roles were pre 2015.
11　Is that right?
12　A.　Yes.  Yes.
13　Q.　And when you referred to the ability to
14　start your day when you wanted to, that April --
15　as long as April signed off on that, is that -- is
16　that called "flex time," do you know?
17　A.　That's not -- I'm not flexing my time.
18　I'm just starting my day at -- at a specific time.
19　Q.　Did you ever have a set work schedule
20　in the SIU?
21　A.　Not -- you know, as long as it
22　encompassed, you know, staying on during your time
23　that you were available.
24　　　　If you weren't going to be on the
25　computer for, you know, hours -- two or three

Page 76

1　　　　CHARISE JONES
2　hours for a specific reason, you needed to let
3　somebody know.
4　Q.　Have you heard of the term "flex time"
5　at GEICO?
6　A.　Yes.
7　Q.　What does that mean?
8　A.　Meaning if you -- like during the
9　afternoon, if you needed to take time off, make it
10　up at the end of the day, or on a different day,
11　or, you know, make sure it's within your specific
12　time that you're supposed to work.
13　Q.　And what time are you supposed to work?
14　A.　You were supposed to work 7.75 hours a
15　day.
16　Q.　Okay.  Did you utilize flex time at all
17　in your role?
18　A.　On occasion.
19　Q.　Approximately how often?
20　A.　Really not that often.  I couldn't
21　even -- maybe two, three times a month.
22　Q.　Is that because you were able to work
23　during your normal workday, or for some other
24　reason?
25　A.　Just for some other reason.



Page 77

1     CHARISE JONES
2   Q.  Do you know if other people that April
3 supervised used flex time more often than you did?
4   A.  I have no knowledge to that.
5   Q.  Do you know if flex time is a
6 supervisor-by-supervisor policy, or if it's a
7 general SIU policy?
8   A.  It's a supervisor by supervisor.
9   Q.  Do you know of supervisors who did not
10 allow their investigators to use flex time?
11   A.  No, I do not.
12   Q.  And you mentioned that you were working
13 both auto and medical type of claims.
14     Is that right?
15   A.  Correct.
16   Q.  Do you recall how those would be
17 assigned to you?
18   A.  Again they would be like a queue.
19 Somebody would assign them based on, you know, how
20 the next person would be up, or if there was
21 somebody, you know, not catching cases, because
22 they were going to be off, or they were out sick,
23 or for whatever reason.  So they'd just assign
24 them.
25   Q.  And when you say "catching cases," is

Page 78

1     CHARISE JONES
2 that just receiving them?
3   A.  Correct.
4   Q.  I just want to make sure I get the
5 lingo.
6   A.  Yes.
7   Q.  Okay.  And how long did it take you
8 generally to investigate one of your claims?
9   A.  That's a loaded question, because it
10 really depended on the type of a claim came in.
11 There's just so many different claims that come
12 in, and it depended on what it was.
13   Q.  Okay.  Could you give me like a range
14 in terms of how long it could take to close a case
15 that you have?
16   A.  You could have one where it was, you
17 know, assigned to you mistakenly, and it was --
18 you know, they used the wrong claim number, and it
19 wasn't the right claim number, and you can close
20 that within, I don't know, an -- an hour.  And
21 then you have some that could go on for days and
22 weeks, depending on if you had EUOs scheduled.
23   Q.  Did you work major cases?
24   A.  Yes.
25   Q.  And when did you work major cases?

Page 79

1     CHARISE JONES
2   A.  I worked major cases more when I was a
3 desk person.  When I did the medical, that was
4 considered major case.
5   Q.  Did you work any major cases in your
6 field position?
7   A.  No.
8   Q.  Do you know if major cases are worked
9 separately, as in individuals only worked major
10 cases?
11   A.  Yes.
12   Q.  Has that always been the case at GEICO?
13   A.  Yes.
14   Q.  Sorry, I keep using "case".
15     What steps did you usually take to
16 investigate a given case when it came in to you?
17   A.  Well, we had guidelines to follow, like
18 certain time frames where things had to be done.
19 So we would do backgrounds on them, do 

Page 80

1     CHARISE JONES
2
3
4     I mean, that's just like the standard
5 procedures.
6   Q.  Approximately how long did a social
7 media check take?
8   A.  Again, another loaded question,
9 depending on if we can -- you know, if it wasn't a
10 John Smith, that you couldn't find them, then it
11 was quick.  Because you're never going to find
12 somebody with, you know, that -- a common name, or
13 if someone that didn't have a common name where it
14 something came up, you know, you could down a
15 rabbit whole and find a whole bunch of things.
16   Q.  So it varied drastically?
17   A.  Yes.
18   Q.  And my intention is not to ask you
19 loaded questions.  I'm trying -- just trying to
20 get a sense of like how each of the steps worked.
21   A.  I got it.  Understood.
22   Q.  And when you did go into the field on
23 one of your three days, how much of the day was
24 spent in the field, or was it the entire day?
25   A.  It was a lot of the day.  I would say



Page 93

CHARISE JONES

was just a brief time.

Q. And then what happened to your job position at that time?

A. They asked me if I preferred auditor or trainer, and I basically said whatever would keep my job, and they just said that everyone was going to be auditors, that there -- there was no need for trainers any more. They were doing like -- almost like self-training like. They were just going to implement like, you know, a way to self-teach yourself.

Q. And so when you say "auditor," is that your current job role?

A. Correct.

Q. And when did you start working in that role?

A. We were told we were auditors I think like the end of 2023, but we started, you know, actually auditing in this -- beginning of this year.

Q. And when you say "auditing," what do you mean?

A. Now I -- all the investigators that do a case, when they go ahead and conduct their cases

Page 94

CHARISE JONES

and they close it, I go in and I look at their case and make sure that they completed everything the way they should have.

Q. So the auditor role is different than investigator, correct?

A. Correct.

Q. And when you were -- to back -- strike that.

To go back to when you were a trainer, did you have any supervisory responsibilities in that role?

A. No.

Q. When you worked as a trainer, did you participate in providing information for performance evaluations to any other employees?

A. To any other employees? No.

Q. And in your role as an auditor, do you have any supervisory responsibilities?

A. No.

Q. Have you ever in this role?

A. No.

Q. Have you provided any information for performance evaluations for other SIU employees in your role as an auditor?

Page 95

CHARISE JONES

A. If they -- if -- if the audit came back negatively, and they -- because it's a scoring -- if it's scoring, that information is used for performance, but not my me. It's whoever the supervisor is.

Q. And when you say "scoring," could you describe what you mean by that?

A. You start off at a hundred percent, and then there's categories for, you know, everything that we look into as far as what they did, and then each category has a scoring on it.

Depending on what they, you know, miss, or they missed, you know, they could -- it'd go from a hundred down to, you know, whatever the point system was.

Q. Do you know what the point system is?

A. Yes. It's like certain categories are, you know, fifteen percent, then you have categories that are ten percent, you know, five percent -- not percent, points, I'm sorry, fifteen points, ten points -- ten points, three points, one point, depending on where it fell.

Q. Can you give me some examples of these categories?

Page 96

CHARISE JONES

A. Investigative quality is fifteen points...

If they did not upload the evidence properly, whether we couldn't open it or we couldn't view it, that would be three points...

If they took a recorded interview, and they didn't use the proper opening and closing, that's seven points...

You know, they have to upload their report to the case management. They have to upload it to the claims department, so they could view it. That's one point, if they don't do it.

Q. In your positions at GEICO, were you ever disciplined in any capacity?

A. I'm sure I was. I just don't recall, like what specific -- I mean, nothing to the point where it was something I would remember.

Q. Do you know if there was any written disciplinary record at any point for your employment?

A. Currently I'm on a coaching plan.

Q. What does that entail?

A. They -- my percentage is ninety-six percent -- ninety-six point something, and I'm off



Page 97

1  CHARISE JONES
2  by a point.
3      So because I'm not at that ninety-six
4  point seven percent, they put me on a plan that I
5  have to work to get to that point.
6      Q.  Can you just give me a general
7  description of what you mean by "ninety-six
8  percent"?
9      A.  Currently there's eight auditors.
10 Prior to that there was six auditors.  So within
11 the six auditors, it ranged from ninety-eight to
12 ninety-six percent.  So there is -- being that
13 there was only a couple of us, the margins were
14 very tight, and they said that ninety-seven --
15 96.7 percent was what the average should be, and I
16 was at 96.4.
17     So because I wasn't at the right
18 percentage, they put me on this coaching plan.
19     Q.  Who is your current supervisor?
20     A.  Douglas Koontz, K-o-o-n-t-z.
21     Q.  And how long has he been your
22 supervisor for?
23     A.  About five -- four or five months.
24     Q.  Who was your supervisor before Douglas?
25     A.  Sarah Greenman, G-r-e-e-n-m-a-n.

Page 98

1  CHARISE JONES
2      Q.  And how long was Sarah your supervisor
3  for?
4      A.  About three or four months; not that
5  long.
6      Q.  Was she -- was -- strike that.
7      Was Sarah your first supervisor as an
8  auditor?
9      A.  When I first got the auditor's
10 position, there was no supervisor.  It was just
11 reporting directly to the manager.
12     Q.  Who was the manager?
13     A.  Gerry Marlon, M-a-r-l-o-n.
14     Q.  And so after the period of time when
15 there was no supervisor in the auditor role for
16 you, was Sarah your first supervisor in that role?
17     A.  Yes.
18     Q.  So you reported to Sarah and Douglas as
19 an auditor?
20     A.  Correct.
21     Q.  Okay.  And just to confirm, is Douglas
22 your current supervisor?
23     A.  Yes.
24     Q.  And then as a trainer, who were your
25 supervisors?

Page 99

1  CHARISE JONES
2      A.  Just April Neyland, and then -- Sarah
3  Greenman was the one who approached me and said
4  which would I prefer, auditor or trainer.
5      Q.  Did you prefer your job as a trainer to
6  your job as an investigator?
7      A.  Yes.
8      Q.  Why is that?
9      A.  Wait, you said did I prefer trainer?
10 Yes.  The answer is yes, I wanted to be a trainer.
11     Q.  Yes.
12     A.  Because the -- it wasn't as stressful
13 as far as meeting all the expectations of an
14 investigator.
15     Q.  When you say "expectations of an
16 investigator," what do you mean?
17     A.  All the things that comes along with
18 your investigation: Time frames, how many cases,
19 your performance.
20     It was just -- you know, it was just a
21 lot to make sure you maintained, where as a
22 trainer I kind of could, you know -- it was easier
23 for me to make my own schedule as a trainer on who
24 I was going to, you know, talk to, send out
25 invites for, you know, specific training.

Page 100

1  CHARISE JONES
2      It was just a lot -- a lot less stress.
3      Q.  Did you speak with any other trainers
4  before you took the position?
5      A.  No.
6      Q.  During your employment with GEICO from
7  2017 to present, did you take any FMLA or
8  disability leave?
9      A.  Yes.
10     Q.  And when was that?
11     A.  I don't know the time, but it was two
12 specific times.
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17     Q.  And when you say short period of time,
18 is that a number of days?  weeks?
19     A.  Yeah -- it wasn't -- no more than a
20 week.
21     Q.  Do you recall when those leaves took
22 place?
23     A.  One I know is around 2018, and the
24 other one I don't recall.
25     Q.  Which one was in 2018?



Page 121

1  CHARISE JONES
2  work done in the amount of time they're giving us.
3    Q.  Which other coworkers are you referring
4  to?
5    A.  Other ones when I would be at
6  examinations under oath at other places.
7        So depending on who was there, it could
8  have been, you know, Keith Fischer, Scott Brady.
9  Other people I talked to knowing that they were on
10 when I was on late would be Jeff Lewonka.
11       That's I can recall off the top of my
12 head.
13   Q.  Who is Jeff Lewonka?
14   A.  He was another coworker.
15   Q.  And what position did he work in?
16   A.  Same thing as the investigator.
17   Q.  Do you recall when you had those
18 discussions with Keith Fischer, Scott Brady, and
19 Jeff Lewonka?
20   A.  Just over the course of working as an
21 investigator.
22   Q.  How often did you have those
23 conversations?
24   A.  You know, whenever I would meet up with
25 them, see them at other places, and if I saw them

Page 122

1  CHARISE JONES
2  online after, you know, like late hours, while I
3  was working.
4    Q.  And you said that you made a complaint
5  to April Neyland.  Is that right?
6    A.  Correct.
7    Q.  How many times did you complain to her
8  about off-the-clock work?
9    A.  A handful of times.
10   Q.  Could you approximate what you mean by
11 "a handful"?
12   A.  Maybe four to five times.
13   Q.  And do you recall when you made those
14 complaints to her?
15   A.  It was over the course of, you know,
16 her -- me being reporting to her.  So it was over
17 the course of a year or so, two years, you know,
18 depending on -- I don't know the time frame, but
19 it was, you know, whenever it came up, she was the
20 one I would discuss it with.
21   Q.  When you say whenever "it" came up,
22 what are you referring to?
23   A.  Whenever I had the -- wherever --
24 whenever I had to do the overtime, or when it was
25 coming towards the end of the week, and I wasn't

Page 123

1  CHARISE JONES
2  able to finish up what I had, or the day -- you
3  know, I was just -- so much windshield time, and I
4  just couldn't finish my work.
5    Q.  And when you say you couldn't finish
6  your work, what do you mean by that?
7    A.  Again we had like certain time frames
8  to finish it, certain time frames that things had
9  to be submitted by, and knowing that my shift was
10 over based on the number of hours I've already
11 worked, I knew that this report had to be in by
12 the end of that day, and I would just have to do
13 it, otherwise it would, you know, be held against
14 me for not doing it.
15   Q.  And your testimony is that that
16 happened on four to five occasions?
17   A.  Talking to her about the overtime?
18   Q.  Correct.
19   A.  Yes.
20   Q.  And from April 2017 to the present,
21 have you been paid hourly?
22   A.  I believe it changed at some point.  I
23 just don't know when.
24   Q.  Do you recall how it changed?
25   A.  I don't know how it changed.

Page 124

1  CHARISE JONES
2    Q.  Do you recall when it changed
3  approximately?
4    A.  I do not.
5    Q.  But you do understand the difference
6  between hourly and salary?
7    A.  Yes.
8    Q.  What's your understanding of that
9  difference?
10   A.  You're -- you're paid hourly, meaning
11 each hour you work you're paid, or you're just
12 paid a flat fee of -- you know your grade is a
13 sixty-five, you make X amount, and that's what
14 your pay is, no matter how much you work.
15   Q.  Do you recall your rates of pay?
16   A.  Oh, no.  I do not.
17   Q.  Did your rates of pay generally
18 increase throughout your employment?
19   A.  Yes.
20   Q.  Did you ever make a -- a bonus or
21 commission?
22   A.  I don't know.  I mean, I had
23 profit-sharing, so I don't know if that's called a
24 bonus or a commission.  It was my own money.
25   Q.  Okay, and what do you mean by profit



Page 145

CHARISE JONES

Q. Do you know whether any investigators outside of region two were ever approved to work more than 38.75 hours in a week?
A. I have no knowledge of that.
Q. Do you know if any investigators outside of New York were ever approved to work 38.75 hours per week?
A. I don't know that.
Q. So in the second sentence of paragraph nine where it says, "My supervisor frequently reiterated to me and other special investigators there was no approved overtime for completing regular case work, and that if it was offered GEICO would let the special investigators know," where did that conversation take place?
A. That, again, same means would either be phone or Webex, meeting her.
Q. And when you say "frequently," how frequently are you talking about?
A. I don't know how frequent. I really don't.
Q. And those conversations would have been by phone or Webex you said?
A. Correct.

Page 146

CHARISE JONES

Q. Was anyone else in those conversations?
A. Sometimes when we had section meetings it would come up, and it would be everyone in her section.
Q. Who was in her section?
A. Jeff Lewonka, myself, Anthony DeStefano, Jessica Sheppard, Mario Demaeo -- it's D-e-m-a-e-o -- Marie Butler. And I don't remember the other ones at the time.
Q. And what do you mean by "regular case work"?
A. Meaning if it wasn't something specific that they needed the overtime for, like a special project.
Q. Like what type of job responsibilities would you say constitutes regular case work?
A. The everyday cases that we got that were submitted to us on a daily basis.
Q. So those would be part of your general responsibilities as an investigator?
A. Correct.
Q. So in paragraph ten, on the same page, where it says, "In approximately February or March 2022, prior to my promotion to being a trainer, I

Page 147

CHARISE JONES

attempted to submit time for approximately 1.5 hours that I worked above 38.75 hours in the week, even though I'd actually worked more hours.
"After my supervisor reviewed the request, she asked me who approved the overtime and then required me to spend a significant amount of time writing a report to justify the additional pay from my regular caseload.
"I had to detail at length in this report the cases I worked on during the pay period and what tasks I completed.
"Writing this took me at least two hours, and it dissuaded me from submitting further requests to be paid for hours above 38.75 per work week."
Do you recall that instance?
A. Yes.
Q. And where did that conversation take place?
A. That was I believe through Webex.
Q. Was it just you and April the call?
A. Yes.
Q. To one else was present?
A. No.

Page 148

CHARISE JONES

Q. And when you submit -- strike that.
When did you submit the report that you're referring to here?
A. She wanted it submitted the next day for the manager to approve it.
Q. And who was the manager?
A. Bill Newport.
Q. How did you submit it?
A. I sent an email.
Q. Who did you send the email to?
A. Her, April.
Q. Was anyone copied on that email?
A. No.
Q. And were your overtime hours for that week approved?
A. Yes.
Q. So why did you -- why do you believe that that dissuaded you from future requests to be paid above 38.75 hours per work week?
A. Because it -- the way it was -- the way she reprimanded me on putting it in, saying that there was nobody to approve it, and "You can't just work the overtime," and she wanted to know why I didn't ask somebody, and I proceeded to let



800.211.DEPO (3376)
EsquireSolutions.com

Page 149

1  CHARISE JONES
2  her know that nobody was there. All the
3  supervisors were out for the day. The manager was
4  out. And I said, "I worked it, so I put it in."
5       And then she told me that in order for
6  me to get approved for it, I had to write down
7  every single case that I worked, what I did, the
8  time I did it, and why I needed to work that
9  amount of hours overtime.
10      And I -- it was just time consuming.
11 That took more time out of my day during my work,
12 of which she made it a big deal to do it, and then
13 after it was approved, it was like no big deal.
14 "Okay, it's approved. No problem."
15    Q.  And you submitted only 1.5 five
16 hours --
17    A.  Mm-hmm.
18    Q.  Is that correct?
19    A.  Correct. And that's what persuaded me,
20 because at that point I was just like, just forget
21 the time, then. Don't pay me for that 1.5 if
22 you're going to make me go through hoops for it.
23    Q.  But did you -- strike that.
24      Is it your testimony that you actually
25 worked more than 1.5 hours that week?

Page 150

1  CHARISE JONES
2    A.  Yes.
3    Q.  So why didn't you include the rest of
4  that time in the request?
5    A.  Because it was persuaded -- it was the
6  way she was making me feel. I just didn't want to
7  put in any other time.
8       And when I did submit what I did, you
9  can obviously see that it was more than the 1.5.
10 I only put in the 1.5, but she can definitely see
11 by the documentation that I put on there what I
12 did, where I went, and why I needed the time that
13 it was more than that.
14    Q.  But you didn't submit for the time you
15 actually worked, correct?
16    A.  No, because I knew it was going to be a
17 hassle just for -- just the amount that I put in
18 was already a hassle, that I wasn't going to go
19 any -- going to put in anything further.
20    Q.  Did April tell you not to put in for
21 the additional time?
22    A.  She didn't want me to put in for the
23 original time, never mind the additional time,
24 because she said it wasn't approved.
25    Q.  But when you were told to submit this

Page 151

1  CHARISE JONES
2  report to April, did she tell you not to submit it
3  for all of your time worked?
4    A.  No, because I already submitted my
5  Workday time, so it was only her to approve the
6  amount that I've already submitted.
7       So she said that I had to write up this
8  report to just justify what I already put in.
9    Q.  Okay, and the original amount that you
10 had already put in, that only included the 1.5
11 hours?
12    A.  Correct.
13    Q.  And do you recall if you received pay
14 at time and a half for those hours you submitted?
15    A.  No, it was up -- it was still within
16 the forty hours. So I was still getting straight
17 time.
18    Q.  And what other times did you ask to
19 work overtime hours?
20    A.  When -- again when my workload was
21 building up and I had a lot of cases, I would say,
22 "Is there any overtime available?" It was always
23 "No. If we have any, we'll let everybody know.
24 We'll put an email out."
25      I'm like, well, you know, when I would

Page 152

1  CHARISE JONES
2  go to Brooklyn, or all the windshield time that
3  took up hours, or there was an accident, or there
4  was traffic, and you're putting in almost your
5  entire day of your 7.75 in the car, and then
6  coming home and having to write up a report, you
7  know, it was just told, "Listen, take it off
8  another day," or "Work around it."
9    Q.  Did you ever make any formal complaints
10 about this unpaid time?
11      MS. JEAN: Objection.
12      THE WITNESS: No.
13 BY MR. SLOTNICK:
14    Q.  Why not?
15    A.  I thought, you know, what I was doing,
16 telling my supervisor, and, you know, justifying
17 it where it went to the manager, I thought it
18 would be enough.
19    Q.  If you go back to paragraph eight on
20 page three, do you see that?
21    A.  Yes, eight.
22    Q.  It says, "As a special investigator,
23 starting from 2016 to my promotion to trainer in
24 approximately March 2022 I started work between
25 7:00 a.m. and 7:30 a.m. and ended my day between



Page 153

1      CHARISE JONES
2   5:00 p.m. and 6:00 p.m. about two to three times
3   per week, and until 7:00 p.m. about two to three
4   times per week.
5        "GEICO did not provide me with a
6   regularly scheduled work period.  I also recall
7   that after March 2020 when the COVID-19 pandemic
8   started I also occasionally worked as late as 8:00
9   p.m.  When I took a lunch break, which is about
10  once a week, it took me no more than fifteen
11  minutes.
12       "I estimate as -- that as a special
13  investigator I worked approximately fifty-one to
14  fifty-eight hours a week on average."
15       Did you record your time anywhere other
16  than in GEICO's timekeeping programs?
17    A.  No.
18    Q.  Did you keep any records of time that
19  you worked but did not record in GEICO's
20  timekeeping programs?
21    A.  Just my entries that were put in,
22  they're time stamped, so, I mean, it's -- it
23  wasn't like I was hiding it or saying I wasn't
24  working the hours because it was time stamped in
25  their system that they could see when I entered my

Page 154

1      CHARISE JONES
2   time.  My investigations they could see when I
3   entered a specific note.
4    Q.  Was the time stamp the time that you
5   pressed submit on the note?
6    A.  Correct.  When I entered a specific
7   entry, it would have the time stamp on it.
8    Q.  And was that the case throughout your
9   time as an SIU investigator?
10   A.  With the time stamp?
11   Q.  Yes.
12   A.  Yes, it was always on there.
13   Q.  And on what do you base the estimates
14  that you worked approximately fifty-one to
15  fifty-eight hours a week on average in paragraph
16  eight?
17   A.  I just base it on overall.
18       Again, you know, each day you're
19  driving, and you're spending hours and hours on
20  the road, you know.  It left minimal time to do
21  the paperwork and documenting your files.
22   Q.  Did you tell anyone that you
23  occasionally worked as late as 8:00 p.m.?
24   A.  I didn't tell anyone specific.  I
25  just -- other people saw that I was on that late.

Page 155

1      CHARISE JONES
2    Q.  How do you know they saw?
3    A.  Again, that Webex, you could see
4   everyone that's on.  They're green, or if they're
5   away, they'll say that they're inactive.
6        And, you know, when I was working the
7   later hours, I would Webex other people, be like,
8   "Why are you sill on?"  People would be like,
9   "Well, why are you still on," and we would just,
10  you know, commiserate.
11   Q.  When you say "other people," who are
12  you referring to?
13   A.  Scott Brady and Jeff Lewonka was the
14  main people that would be talking to.
15   Q.  And how often was this communication
16  happening?
17   A.  That happened a couple times a week.
18   Q.  Was there anyone else that you spoke
19  with that night?
20   A.  No.
21   Q.  Did you tell anyone that you took a
22  lunch break only about once a week or that --
23  strike that.
24       Did you tell anyone that you took a
25  lunch break only about once a week?

Page 156

1      CHARISE JONES
2    A.  No.
3    Q.  Did you tell anyone that there were
4   no -- that the breaks were no more than fifteen
5   minutes?
6    A.  No.
7    Q.  So if you would turn to paragraph
8   fifteen on page four, it says "From April 2017 to
9   March 2022 my regular hours were to approximately
10  fifty-one to fifty-eight hours per week, and my
11  regular pay was 48.86 per hour."
12       Did you tell anyone that you were
13  working approximately fifty-one to fifty-eight
14  hours per week?
15   A.  No.
16   Q.  If you look back -- I'm sort of jumping
17  around a little bit -- to paragraph eleven, on the
18  same page.
19   A.  Okay.
20   Q.  It says, "Prior to my promotion to
21  trainer, GEICO authorized me to work overtime only
22  if I agreed to take on additional cases, worked on
23  special projects, such as social media,
24  investigation or flooding storm cases, or if
25  special investigators were understaffed and there



Page 157

1     CHARISE JONES
2  were many cases to work on.
3       "These cases that were eligible for
4  overtime pay were additional cases on top of my
5  existing caseload, even though I was already
6  working overtime off the clock."
7       Who at GEICO told you that you could
8  only work overtime if you agreed to take on
9  additional cases and work on special projects?
10     A.  April Neyland.
11     Q.  Did anyone else at GEICO tell you that?
12     A.  Not that I could recall.
13     Q.  And when did that conversation take
14  place?
15     A.  That was any -- well, an email would go
16  out on anybody that was interested in overtime,
17  and then whoever applied for the overtime, there
18  was like just a general meeting on those people
19  that agreed to take on those extra cases, and it
20  was told to them at that point.  All of us were
21  told.
22     Q.  But the -- the allegation itself -- so
23  when you're saying that GEICO authorized you only
24  to work overtime if you agreed to take on
25  additional cases or work on special projects, when

Page 158

1     CHARISE JONES
2  did that specific direction -- when was that
3  communicated to you?
4     A.  I don't recall when it was communicated
5  to me.  Before that meeting, no, I don't recall.
6     Q.  Do you recall if anyone else was -- was
7  there when it was communicated to you?
8     A.  Like I said, the people that agreed to
9  do the special projects, or agreed to take on the
10  extra cases, they were all on like the Webex call,
11  and it was told to them that, you know, "You're
12  only to work on these cases.  You're not allowed
13  to, you know, touch your other cases.  You're only
14  allowed to work the cases that you have agreed to
15  help with."
16     Q.  Did you agree to take on those types of
17  additional cases?
18     A.  Yes.
19     Q.  Okay, and when was that?
20     A.  It would depend on like, the storms,
21  like I said if there were storms, you would get
22  those -- they were called catastrophic case, they
23  called them "cat cases".  The social media was a
24  more -- they were clearing them out at the end of
25  the year, and they needed people to do them at the

Page 159

1     CHARISE JONES
2  end of the year.
3       So, you know, whenever something
4  specific came up, I always volunteered, because I
5  knew I was going to at least get paid those
6  overtime hours.
7     Q.  Do you recall approximately how many
8  times you volunteered?
9     A.  Every time they put them out there.
10      And again, whenever these cat cases
11  came along, it's whenever the flooding, you know,
12  it could have been in Texas, could have been in
13  Florida, whenever there was a storm, whenever we
14  had more claims than normal, if there was a
15  snowstorm, a hail form, they would ask for
16  volunteers.  I volunteered every single time.
17     Q.  And were you approved for overtime pay
18  for working on those cases?
19     A.  Yes.
20     Q.  If you look at paragraph twelve, same
21  page, it says, "As a trainer and auditor I do not
22  log my hours and instead my supervisor inputs my
23  hours for me and approves them, which are still
24  7.75 hours per day, 38.75 hours per week, even
25  though I occasionally work more hours."

Page 160

1     CHARISE JONES
2       Which is the supervisor that you're
3  referring to here?
4     A.  April Neyland.
5     Q.  And how do you communicate your hours
6  to your supervisor?
7     A.  If I take off, if I take off a sick
8  time or a personal day, or if I take hours, I send
9  her an email saying, "I'm taking off tomorrow," or
10  "I'm taking off two hours of personal" through an
11  email.
12     Q.  Do you tell your supervisor when you
13  work more than the 7.75 hours per day?
14     A.  I would never report that.
15     Q.  When you work more hours than the 7.75
16  hours per day, or 38.75 hours per week, does
17  anything prevent you from telling your supervisor
18  about those hours worked?
19     A.  Again, whenever I stressed about
20  working the overtime, or telling her that I needed
21  to work overtime, it was just, you know, the
22  same -- same conversation over and over, like
23  there is no approved overtime.
24     Q.  But does anything prevent you from
25  telling your supervisor that you're working those



Page 161

1      CHARISE JONES
2  hours?
3      A.  I told her, like especially when I was
4  transitioning from investigator to trainer, that I
5  was working many, many hours of overtime, because
6  I was still doing my outside field work and still
7  doing a trainer's job that I was learning.
8          So I -- you know, I did stress to her
9  and say, "Listen, I'm working two specific jobs.
10  I'm out on the road.  I'm trying to get training
11  done.  Is there any way that I can get overtime?"
12          "No."
13      Q.  How many times did that conversation
14  take place?
15      A.  That happened -- again that was a
16  six-month period of the two times I was doing it,
17  and I would say maybe four times, five times.
18      Q.  And how did those conversations take
19  place?
20      A.  Through phone conversations, mostly.
21      Q.  Do you have any documentation
22  reflecting those conversations?
23      A.  I had a work phone, so I would call
24  her.  If I was on -- on the road, I would call her
25  from a work phone, and tell her, "Hey, listen.

Page 162

1      CHARISE JONES
2  I'm not getting home 'till 5:00 o'clock.  You
3  know, is there any way that I can put in
4  overtime?"
5          And, you know, she would say, "Listen,
6  if you can't" -- "Try to just take it off before
7  the next pay period.  You know, sign on late
8  tomorrow, or sign in, you know -- sign out early,"
9  and I'm like, but I'm still -- I still have my
10  workload the next day.  And she was like, you
11  know, "There's no approved overtime."
12      Q.  Okay, are there any documented notes
13  from those conversations?
14      A.  I personally don't have any documented
15  notes; only, like I said, the phone logs, which I
16  don't have that cellphone any longer.
17      Q.  When you say the phone logs, though,
18  are you talking about text messages?
19      A.  No --
20      Q.  -- that you sent?
21      A.  I'm just saying you -- you would see
22  that I called her, and it would be at, you know,
23  4:00 or 5:00 o'clock at night, or, you know,
24  whenever I was on the road.
25      Q.  Did you ever call her at 4:00 or 5:00

Page 163

1      CHARISE JONES
2  o'clock at night as part of your regular case
3  work?
4      A.  No.
5      Q.  Never?
6      A.  I wouldn't say never.
7      Q.  So once in a while perhaps?
8      A.  Yeah, if I was stuck in traffic or
9  knew, you know, that I was going to get home late,
10  I would -- might say, "Listen, I don't know if
11  you're looking for me, but I'm still on the road."
12          You know, even though I have my laptop,
13  it's not -- I can't, you know, access it while I'm
14  driving.  So, you know, "I just want to let you
15  know, I'm not going to be home 'till later."
16          MR. SLOTNICK:  It might be a good time
17      to take a quick break, if that's okay.
18          MS. JEAN:  Yeah.
19          THE LEGAL VIDEO SPECIALIST:  We're now
20
21      going off the record.  The time is 1:02 p.m.
22
23          (Whereupon at 1:02 p.m. a luncheon
24
25      recess was taken.)

Page 164

1      CHARISE JONES
2  A F T E R N O O N   S E S S I O N
3          (Whereupon at 1:36 p.m. the videotaped
4  deposition of Charise Jones resumed, and she
5  further testified as follows.)
6          THE LEGAL VIDEO SPECIALIST:  We're back
7  on the record.  The time is 1:36 p.m.  This is the
8  beginning of the media labeled number three.
9  BY MR. SLOTNICK:
10      Q.  Okay, Ms. Jones, before the break we
11  were reviewing some of the interrogatories,
12  responses that you had put together in your
13  declaration.  So I just wanted to direct your
14  attention back to paragraph seventeen of that
15  document.  It's on page six...
16          And it says, "My supervisor was aware
17  that I and other special investigators worked
18  overtime.  My supervisor was able to view when
19  special investigators submitted their reports,
20  sometimes at 8:00 or 9:00 p.m., because she had to
21  review and approve these reports, and various
22  entries in the report are time stamped."
23          Does your supervisor that you're
24  referring to in that paragraph, is that also April
25  Neyland?

Page 165

1        CHARISE JONES
2    A.  Correct.
3    Q.  And is it your assertion that April was
4  aware that you and others were working overtime
5  based on the fact that she may receive reports at
6  times like 8:00 p.m. or 9:00 p.m.?
7    A.  Yes.
8    Q.  Was there a specific time by which you
9  were required to submit those reports to your
10 supervisor?
11   A.  Not time as far as a specific like 8:00
12 o'clock in the morning or whatever, just a
13 twenty-four-hour -- when you closed a report, it
14 had to be submitted within twenty-four hours of
15 you finishing your report.
16   Q.  Was that April's policy, or was that --
17   A.  No.
18   Q.  -- GEICO's general policy?
19   A.  Sorry.  It was just the general policy
20 that, when something was completed, you had
21 twenty-four hours to close it and upload it to the
22 claims, to let claims know that you finished it,
23 that you finished your investigation.
24   Q.  Would that report when you submitted it
25 go straight to claims, or did that go to April

Page 166

1        CHARISE JONES
2  first?
3    A.  One report was automatically you
4  uploaded to claims, so that you did that first,
5  and then you submitted it to -- me being, I would
6  send it to April, but other people would send it
7  to their respective supervisor.
8    Q.  So that was a supervisor by supervisor
9  report that you would submit?
10      MS. JEAN:  Objection.
11      MR. SLOTNICK:  Let me rephrase that.
12 BY MR. SLOTNICK:
13   Q.  You would submit your reports to April
14 and other -- other investigators would submit
15 their reports to other -- to their individual
16 supervisors.
17      Is that correct?
18   A.  Correct.
19      Just to clarify, unless my supervisor
20 was off, then she would say, you know, so and so
21 is the covering supervisor while I'm out for the
22 week.
23   Q.  How often did that happen?
24   A.  Whenever she took off, like again
25 extended time, like a week or so.

Page 167

1        CHARISE JONES
2    Q.  Do you have any other reason to believe
3  that your supervisor would be aware of unreported
4  overtime hours worked?
5    A.  Other than what I noted?  No.
6    Q.  And you testified earlier that you had
7  no set working schedule, correct?
8    A.  I wouldn't say set.
9        I mean, I always started between 7:00
10 and 7:30, so that to me is set.  I barely deviated
11 that from time frame.
12   Q.  Right, but that's -- time frame was
13 dictated by you, correct?
14   A.  Correct.
15   Q.  So because you had no set regular
16 working hours, weren't you permitted to perform
17 your work at any time during the day that you
18 wanted to?
19      MS. JEAN:  Objection.
20      THE WITNESS:  I -- I scheduled my day
21   how I wanted to schedule my day, meaning
22   going out, typing my reports.
23      I wasn't permitted to work before 7:00
24   o'clock, but I -- currently I'm working at
25   6:00 a.m. I start, but as an investigator you

Page 168

1        CHARISE JONES
2  weren't allowed to start before 7:00.
3  BY MR. SLOTNICK:
4    Q.  Who told you that?
5    A.  It was the supervisor/manager said we
6  have nobody as an investigator working before
7  7:00.
8    Q.  Did you say the manager told you that?
9    A.  The manager just said we have no --
10 "Currently we have no investigators working before
11 seven."
12   Q.  Who was the manager that said that?
13   A.  Bill Newport.
14   Q.  Were you able to submit those reports
15 at any time you wanted to?
16   A.  It's kind of hard to say whenever.
17      As long as it's within the time frame
18 that it was, you know, projected on us, then, yes,
19 we can submit it when we wanted to, but we did
20 have certain time -- you know, stringents (sic) on
21 those when they had to be submitted.
22   Q.  Did you always submit those reports as
23 soon as you completed them?
24   A.  Within the twenty-four hours I did.
25   Q.  And then if you look at paragraph



Page 169

1   CHARISE JONES
2   eighteen on the same page, page six, you say, "I
3   recall in the summer 2016 that I asked my
4   supervisor how I could get all my work done in
5   only 38.75 hours per week and informed her that I
6   needed to work overtime hours in order to keep up
7   with my caseload.
8       "My supervisor's response was that
9   other special investigators were able to complete
10  the work within the set hours, but I learned
11  from speaking with the other special investigators
12  that we were also working overtime off the clock."
13      Was that also a conversation you had
14  with April?
15      A.  Yes.
16      Q.  Was that conversation with April an
17  in-person conversation?
18      A.  It could have been at her desk, because
19  we were going in the office at that point.  I
20  don't recall a hundred percent, but prior to COVID
21  we would go into the office, and I would have
22  conversations with her at her desk.
23      Q.  Do you recall if anyone else was part
24  of that conversation?
25      A.  No, nobody was.

Page 170

1   CHARISE JONES
2       Q.  Who are the other special investigators
3   you're referring to in that paragraph?
4       A.  I don't recall at that time, 2016, who
5   specifically I was referring to, just in general
6   that again, based on talking to other
7   investigators at other sites that we would run
8   into on another, we all stressed the same thing
9   that there was no way possible to finish all of
10  what they were expecting us to finish within the
11  time frame allotted.
12      Q.  But did they specifically say to you
13  that they were working off the clock?
14      A.  A lot of -- yes, I did have specific
15  investigators saying that they were working off
16  the clock.
17      Q.  And who were those investigators?
18      A.  Keith Fischer, John Moeser, Tony
19  Geraci.  I'm trying to think who else was there.
20      That's the only ones I could recall off
21  the top of my head.
22      Q.  What specifically did they say to you
23  about working off the clock?
24      A.  They would say there's no way that we
25  could, you know, finish all these cases expected

Page 171

1   CHARISE JONES
2   when we're sitting at these EUOs for hours waiting
3   for somebody to show up, waiting for an
4   interpreter, waiting for a court stenographer,
5   waiting for something; that -- and then by the
6   time you get home, it's hours later that, you
7   know, that'd have to, you know, finish up their
8   work, and it's after hours.
9       Q.  Did they say how many hours they were
10  working off the clock per week?
11      A.  No, nothing specific, just that they
12  couldn't finish their work within that time.
13      Q.  Do you know whether they made any
14  complaints to their supervisors about these
15  issues?
16      A.  That I don't know.
17      Q.  Do you know who their supervisors were?
18      A.  I don't know specifically who reported
19  to whom.  I know the supervisors, but I don't know
20  who reported to who.
21      Q.  Do you know whether they all reported
22  to April at that time?
23      A.  The only one that I know of reported to
24  April was John Moeser, the other ones I don't
25  recall.

Page 172

1   CHARISE JONES
2       Q.  But the other employees that you listed
3   did not report to April, correct?
4       A.  No, not during the time I reported to
5   her.
6       Q.  Okay.  Did you otherwise have any
7   conversations to verify their allegations that
8   they were working off the clock?
9       A.  Not -- not specifically.
10      Again, just like when we had our
11  general main meetings where we would go to
12  Melville, it would be brought up that, you know,
13  when -- you know, is it -- are we able to do any
14  overtime, when is overtime coming back.  And it
15  was told, you know, you have to, you know, do your
16  job in the amount of time that's allotted, and if
17  anybody's working overtime, it's just going to,
18  you know, not be beneficial for the people that
19  are only working the 38.75, because you'll have
20  the number skewed.
21      Q.  Who said that specifically?
22      A.  Bill Newport.
23      Q.  What did he mean by "the numbers
24  skewed"?
25      A.  Because they were -- they were getting



Page 173

1    CHARISE JONES
2  their work done, but they're not putting in the
3  overtime.
4         And if, you know, they needed to hire
5  more people, then they wouldn't know who they
6  should hire because we're all getting the work
7  done, but we're not getting paid for it.
8      Q.  Did he say that specifically?
9      A.  Yes.
10     Q.  And who was in that meeting?
11     A.  It was everybody.  The whole SIU was in
12  it.
13        Not everyone could attend based on
14  geographical location.  Like some people lived too
15  far.  But I don't know specifically who was there.
16  It was just -- it was everybody that could attend
17  attended.
18     Q.  Do you recall when that meeting took
19  place?
20     A.  We had -- those meetings were maybe
21  twice a year or three times a year.  We would have
22  them on holidays, or just like to go over
23  something, or if there was a lot of change that
24  happened.
25     Q.  Were there any questions asked during

Page 174

1    CHARISE JONES
2  that meeting after Bill made those statements?
3      A.  Well, questions were asked just about
4  general that was going on at the time, like, you
5  know, anything that they had concerns about, again
6  hiring anybody, you know, to help with the
7  workload, what -- what are we doing about the
8  cars?  Are we getting newer cars.  You know,
9  whatever it may be at that time.  Nothing --
10  nothing -- nothing reoccurring other than, you
11  know, how are we going to get the work done.
12     Q.  Do you know if they did hire other
13  individuals to help with the workload?
14     A.  Only if we lost people, or people
15  retired, or they would replace people, but
16  nothing -- there weren't new hires.
17     Q.  Did you ever check the workloads of any
18  of the other investigators that you mentioned
19  having told you that you worked -- they worked out
20  of the clock?
21     A.  Check -- how?  Check how?  I mean, I
22  don't know what you mean by "check".
23     Q.  Are you able to check on another
24  investigator's workload at a given point in time?
25     A.  I could see what they have in there

Page 175

1    CHARISE JONES
2  pending, but I don't know what they, you know,
3  have completed.
4      Q.  Did you in fact check what was in their
5  pending?
6      A.  I would -- if I had need to check, to
7  check, but not on a regular basis.
8      Q.  What types of needs would arise where
9  you needed to check?
10     A.  If something had to be transferred
11  maybe to somebody else, or if it was -- the case
12  was already worked by an investigator, and if I
13  wanted it to go back to that investigator, I would
14  just see how many cases they had on whether or not
15  it should go back to that investigator, or if I
16  should just keep it because they already had too
17  many cases.
18     Q.  Okay.  Did you make that decision on
19  your own?
20     A.  No, I would tell my supervisor and say,
21  you know, "So and so has X amount of cases; it
22  seems like they worked this, you know, whenever
23  they worked it; I think I should just keep it at
24  this point, because there's enough for the other
25  person that has it."

Page 176

1    CHARISE JONES
2      Q.  Did any of those cases ever go back to
3  the original investigator?
4      A.  If -- if there -- if it was, you know,
5  not enough -- if there weren't a lot of cases, or
6  if it was an involved case, and didn't want to
7  start fresh from the beginning, the other
8  investigator really knew the backgrounds of it, so
9  we kind of gave it to them.
10     Q.  Were you able -- strike that.
11        When you were working as an
12  investigator, were you able to look up the hours
13  that other investigators were working?
14     A.  No.
15     Q.  And how often would you say that you
16  looked up the workloads of the other
17  investigators?
18     A.  Workloads, maybe once -- again, it
19  would only be when the -- it would -- the
20  opportunity needed, but maybe once a month, if
21  that.
22        (Answers to Interrogatories were marked
23        Deposition Jones Exhibit 6, for
24
25        identification.)



Page 229

1    CHARISE JONES
2    A.  Yeah.
3    Q.  Do you have any records or
4  documentation that show that from March 2020 to
5  March 2022 Jones worked between approximately
6  fifty-one to fifty-eight hours per week in those
7  full work weeks?
8    A.  Oh, I'm sorry.  You asked a question?
9  Are you -- I thought you were reading.
10   Q.  Oh, sorry.
11   A.  I'm sorry.
12      MR. SLOTNICK:  Could you read that
13   back.
14      THE COURT REPORTER:  "Do you have any
15   records or documentation that show that from
16   March 2020 to March 2022 Jones worked between
17   approximately fifty-one and fifty-eight hours
18   per week in those four work weeks?"
19      THE WITNESS:  No, I do not, sorry.
20      MR. SLOTNICK:  And just to confirm, kit
21   was not "just those four work weeks."  It was
22   "most full work weeks."
23   BY MR. SLOTNICK:
24   Q.  So, just to confirm, if you do not have
25  any records or documentation to support this

Page 230

1    CHARISE JONES
2  specific allegation, on what are you basing those
3  estimates?
4    A.  Based on the work that I completed in
5  that SICM -- that -- that case log that I have
6  where I was -- I could see the case that -- the
7  caseload that I was being given on a daily basis
8  increased dramatically, and I wasn't going out.
9  Prior to that, I was going out and had face,
10  windshield time in the car, and that was just --
11  that was the reasoning for so much time spent, you
12  know, working extra hours, whereas now they were
13  giving us more caseloads because now we're at
14  home, so they said now we could do more.
15   Q.  Were -- were they incorrect when they
16  assumed that you could do more by not having
17  windshield time?
18   A.  Yes.
19   Q.  How were they incorrect?
20   A.  Because the cases still maintained the
21  same type of investigation where we still had to
22  run the database searches, we still had to run the
23  social medias, we still had to do a full
24  investigation, we still had to conduct those EUOs
25  and statements via Zoom call that still other than

Page 231

1    CHARISE JONES
2  driving to a location, still took time.
3    Q.  But you no longer had to drive to
4  locations, correct?
5    A.  Correct.
6    Q.  And you testified earlier that when you
7  were driving to locations, that would take a few
8  hours per day.
9        Is that accurate?
10   A.  Correct.
11   Q.  I'm sorry, a few hours per way?
12   A.  Per one way, correct.
13   Q.  And when you say -- strike that.
14      Other than what you've previously
15  mentioned, do you have any other records or
16  documentation supporting this specific
17  recollection that you worked fifty-one to
18  fifty-eight hours per week in July 2020?
19   A.  No.
20   Q.  Will you look at paragraph sixty-five,
21  the bottom of page eighteen: "During this March
22  2020 to March 2022 period, Jones continued to
23  report 38.75 hours per week because GEICO's
24  supervisors told her that she was not allowed to
25  report more without prior supervisory approval."

Page 232

1    CHARISE JONES
2      Which supervisor are you referring to
3  there?
4    A.  April Neyland.
5    Q.  And have you already testified as to
6  the meetings where she told you that?
7    A.  Yes.
8    Q.  Were there any other meetings where she
9  told you that you haven't already told me about?
10   A.  No.
11   Q.  And do you recall the dates of when she
12  told you that?
13   A.  No, I do not.
14   Q.  Do you have any written documentation
15  supporting this allegation?
16   A.  No.
17   Q.  And if you continue to look at
18  paragraph sixty-five, it says, "GEICO's
19  supervisors did not approve overtime during this
20  time except for a brief period when they offered
21  to pay overtime to special investigators who took
22  on additional cases on top of their already high
23  workload.
24      "GEICO'S records reflect that Jones was
25  paid for 56.25 overtime hours between June and



```
1                   CHARISE JONES
2              C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                         : Ss.
5    COUNTY OF NEW YORK   )
6              I, Kim M. Brantley, Shorthand
7    Reporter, and Notary Public within and for the
8    State of New York, do hereby certify:
9              That CHARISE JONES, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13             I further certify that I am not related
14   Toni of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17             IN WITNESS WHEREOF, I have hereunto set
18   my hand this 13th day of August, 2024.
19
                        
20                      _____
21                      Kim M. Brantley
22
23
24   My Commission expires May 31, 2026.
25
```