# Exhibit D

# In the Matter Of:

## KEITH FISCHER v GEICO

2:23-cv-2848

## CRAIG COSTANZO

*January 10, 2025*

*Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

Page 41

1  we're talking about, when it was too much or when it
2  was okay or -- I'm not sure what -- what you're
3  asking.
4      Q.   I mean, that's a fair distinction.
5          So were there times where your
6  conversations with your supervisor would say, "Yeah,
7  you know, my -- my case load is fine, it's not too
8  much right now"?
9      A.   Absolutely.
10     Q.   Okay.  And were there other times where you
11 would communicate to your supervisor that the case
12 load was low?
13     A.   Sure.  I mean, there were -- it wasn't
14 often, but yeah, which --
15     Q.   Okay.
16     A.   I think -- I think we had, you know, it's a
17 slow start to the week or something like that maybe.
18     Q.   Sure.  And then there were, if I'm
19 understanding right, times where you tell your
20 supervisor that your case load was high?
21     A.   Yes.
22     Q.   All right.  And when you would have those
23 discussions about high case load, what would you tell
24 your supervisor?
25     A.   Depending on the circumstances, you know,

Page 42

1  it may be that I'm just concerned that I'm not going
2  to be able to meet the requirements.
3      Q.   By meet the requirements, are you talking
4  about like --
5      A.   Where --
6      Q.   -- you need to close your case within the
7  time that, you know, Geico says you should?
8      A.   That might be part of it, but even just
9  making the TIPs, you know, you got to stop working
10 cases so that you can make the TIPs, then you've got
11 to get all the entries in, in the correct amount of
12 time frame for the different searches.
13         So it's, you know, once you -- if you get
14 overloaded at a period, then it's kind of hard to meet
15 those requirements, and then by doing the stopping
16 everything else to meet those requirements, now, like
17 you said, you're not getting the case closed very
18 quickly.
19     Q.   Okay.  So going back, I guess, to what your
20 discussion or -- I'm imaging that you don't have to
21 recap what you just told me with your supervisor every
22 conversation, right?
23     A.   No.  No.
24     Q.   Okay.  So what would you tell your
25 supervisor if you were talking about high case load

Page 43

1  specifically?
2          MS. DSOUZA:  Objection.
3          You can answer.
4  BY THE WITNESS:
5      A.   I would generally, if -- if all of a sudden
6  you get, you know, your -- a whole bunch of cases in a
7  very short period of time, it -- "I'm having some
8  trouble here, just wanted to let you know that I'm not
9  sure I can meet the requirements."
10 BY MR. TSONIS:
11     Q.   Accurate to say that you'd be sort of
12 flagging for them that it might have an impact on your
13 metrics for that month?
14     A.   I guess in a round about way, yeah, it --
15 I guess that's kind of where I was going, but it was
16 also you just -- you want to get the work done.  You
17 don't want to make customers wait.  So you're also
18 kind of going, "Hey, this is going to be tough getting
19 this done in a timely manner."
20     Q.   Okay.  Did you ever communicate to your
21 supervise that you intended to work overtime to get
22 the work done?
23     A.   Well, at different periods of time there
24 was questions about that, yes.
25     Q.   During these conversations -- or strike

Page 44

1  that.
2          There were periods of time where, I guess,
3  overtime had been authorized to be used by
4  investigators, right?
5      A.   Yeah.  Yes.
6      Q.   Okay.  During those time periods when it
7  would have been authorized, you didn't have to get
8  approval from your supervisor to work overtime?
9      A.   You had to make them aware if you were
10 going to be working.  It -- it was generally
11 authorized, but you -- you were supposed to advise
12 them, if you could, ahead of time to under -- so they
13 could understand why -- why you needed to.
14     Q.   Okay.  So there were times where super- --
15 where overtime excuse me, was authorized, but it
16 wasn't mandated.  It was available if you wanted to
17 use it?
18     A.   There was a period where they had social
19 media searches.  I felt, I would say, during that
20 period, there were sort of some mandatory, they needed
21 those done, so some of that was mandatory to -- to
22 kind of do some of them to help out and get that done,
23 but other than that, I -- I don't recall any mandatory
24 overtime.
25     Q.   Okay.  I guess, do you recall in the summer



Page 45

1  of 2020 that there was a period of time where they
2  authorized, and for example, ten hours of overtime for
3  any investigator that wanted it?
4      A.   I -- I do recall times where they were
5  authorizing it, yes.
6      Q.   Okay.  And that's, I guess, what I mean by
7  preauthorized over time is that they've communicated
8  that there were a certain number of hours available to
9  an investigator in any given workweek, okay?
10     A.   Okay.
11     Q.   So when that overtime was offered, did you
12  utilize it?
13     A.   I don't remember for sure, but I believe
14  so.  I believe I did some.  I mean, with the volume of
15  cases, I believe I did.
16     Q.   Okay.  Is it -- it's your recollection that
17  you used some, but not all of the hours?
18     A.   I think so.  I don't think I used all of
19  it, no.
20     Q.   Okay.  Setting aside those periods where
21  they communicated, you know, a pool of hours on a
22  weekly basis that are available for overtime, what was
23  the process by which you would, you know, make a
24  request to work overtime?
25     A.   If you saw the need and something was

Page 46

1  coming up, I would check with my supervisor and say,
2  "This is what I think's going to happen, and I don't
3  think I'm going to be done in time.  Am I okay to
4  work?"
5      Q.   So you had author -- or you would request
6  to your supervisor you had -- strike that.
7          So is it accurate to say you would
8  identify, you know, the -- the business purpose for
9  needing to work overtime with your cases and request a
10  certain amount of overtime?
11     A.   Yes.
12     Q.   Would you do that verbally or in writing?
13     A.   I remember it could have been both, I mean
14  one or the other.  If I happened to call, it might be
15  verbal, or otherwise I would send an e-mail.
16     Q.   How frequently would you make that kind of
17  a request to your supervisor?
18     A.   Well, again, it depends what the time frame
19  was.  It's hard to say.  You know, we reached a point
20  where we were, you know, told there was no more
21  overtime, so you wouldn't ask because people were even
22  told there isn't.
23     Q.   Okay.  What was the point, what was the
24  period of time approximately where you, you know, were
25  making those kinds of requests?

Page 47

1      A.   I mean, I -- it's hard for me to say a
2  specific time frame.  I mean, it was prior to the
3  COVID.
4      Q.   An estimate?  What's your best estimate,
5  prior --
6      A.   I mean, it was prior to COVID, but it's
7  hard to -- it -- you know, it wasn't 2014.  I --
8  I don't know for sure.
9      Q.   All right.  So between 2016 and, you know,
10  February-March of 2020 for at least some of that time,
11  you were able to request, you know, overtime in this
12  way?
13     A.   Yes.
14     Q.   All right.  And would your supervisor
15  typically approve it?
16     A.   Yes.
17     Q.   Okay.  After he approved it, would you send
18  any sort of follow-up documentation?
19     A.   Not that I recall.  I mean, if it -- if
20  there was something different or a change from what we
21  talked about, I probably would have let him know.
22     Q.   Okay.  In 2016 time period, do you recall
23  the timekeeping sort of software that Geico used?
24     A.   I don't remember.  I know it wasn't
25  Workday.

Page 48

1      Q.   Okay.  That was -- you're going to where
2  I was going.
3          There was ultimately a Geico transition to
4  Workday, right?
5      A.   Yes.  Yes.
6      Q.   But in both systems, you would enter your
7  hours worked on a daily basis?
8      A.   Yes.
9      Q.   All right.  In both systems, would your
10  timesheet go up to your supervisor for approval?
11     A.   Yes.
12     Q.   All right.  So if you worked overtime, you
13  knew that you were supposed to document that in the
14  either Workday or the other timekeeping system?
15     A.   Yes.
16     Q.   All right.  And when your supervisor
17  approved -- well, strike that.
18         You're supervisor would ultimately approve
19  your timesheet, right?
20     A.   Yes.
21     Q.   All right.  When your supervisor's
22  approving your timesheet, was it your understanding
23  that they were just doing the basic check of your
24  hours, matching up in any time off requests you, you
25  know, had requested were included?



Page 49

1   A.  I think so.
2   Q.  Okay.  Your supervisor, I guess, doesn't
3   know on a day-to-day basis what hours you're working,
4   right?
5   A.  Not unless we happen to -- I mean, that's
6   probably correct.  Unless we talked about it, there
7   was a -- we were able to start at different times for
8   a period and then they kind of set it, set our start
9   times.
10  Q.  Okay.  As a field investigator, though, you
11  would have the ability generally to flex your schedule
12  as needed?
13      MS. DSOUZA:  Objection.
14      You can answer, Craig.
15  BY THE WITNESS:
16  A.  To some extent.  See, it's -- it kind of
17  got difficult because, as they started implementing
18  these TIP times, they started -- you know, they kind
19  of locked you into a schedule because they were
20  sending you cases that you had to make TIPs relatively
21  quickly after you got the case.  So you were kind of
22  locked into a -- the schedule, not necessarily set,
23  but you had to kind of be there during the day time to
24  manage those TIPs.
25

Page 50

1   BY MR. TSONIS:
2   Q.  What was the time period within which you
3   had to do those activities, the TIP activities?
4   A.  Well, some of it -- and, again, it changed
5   so much, but at one point, it was like you're supposed
6   to be doing something with it, like, in a couple of
7   hours.  It -- it got very confusing because it was
8   within a couple hours, but then they'd say it's an
9   overall add all the numbers together kind of thing,
10  and then they'd average it out.  So it was kind of
11  confusing.
12  Q.  Okay.  And we'll talk more about that.
13      Did you ever notify your supervisor that
14  you were working overtime but not documenting it in
15  Geico's timekeeping system?
16  A.  I wouldn't say that I said it exactly like
17  that.  I -- I believe it was more of an "I have to
18  stay, I have to work past the times to try to meet
19  these requirements" and that I felt it was not
20  possible to meet these requirements once they started
21  giving us the huge volume of cases.  There was no way
22  to do it within the eight-hour day.
23  Q.  Okay.  But you never specifically told your
24  supervisor that you were working time periods but not
25  logging them in Geico's timekeeping system?

Page 51

1   A.  I never specifically told him that I was
2   not logging time into the system, no, I didn't say
3   that, I don't believe.
4   Q.  Okay.  Similarly, you never told any SIU
5   manager that you were working but not entering certain
6   periods of time working into the company's timekeeping
7   system?
8   A.  I believe I made it clear that there was no
9   way to do this unless I put extra time in.  I didn't
10  specifically say I'm not putting it into the
11  timekeeping, but I believe I made it clear to them was
12  that the only way there was working was because we
13  were putting in extra time.
14  Q.  Who did you make that report to?
15  A.  Bill Newport.
16  Q.  When did you make that -- when did you have
17  that conversation?
18  A.  I mean, I couldn't tell you specifically
19  when.  I just felt that, you know, the message was
20  getting crossed that this isn't working.  You're
21  giving us way too many cases to have the expectation
22  that we're able to do this in eight hours, and the
23  only way we can get this done is to put extra time in.
24  Q.  Right, but none of your cases -- well,
25  strike that.

Page 52

1       In terms of investigative activities,
2   there's only a very small number of things that have
3   to happen, you know, shortly after a case is assigned,
4   right?
5       MS. DSOUZA:  Objection.
6       You can answer.
7   BY THE WITNESS:
8   A.  It's -- well, there's -- there's time
9   quickly, and then there's number of days to get
10  certain things entered.  And, again, back at that --
11  during some of that same time frame in the COVID area
12  there, this was, you know, activities, and they were
13  grading us on activities.
14      And we had discussions, "Well, then don't
15  do -- if you can't get it done, then don't do all the
16  activities on every case."  And we were saying -- I
17  said to them, "Well, if I don't do the activities, I
18  get downgraded."  So I'm doing activities that don't
19  need to be done, taking up time that I don't have, to
20  try to meet the requirements to get the -- you know,
21  so I don't downgraded.
22  BY MR. TSONIS:
23  Q.  Right?
24  A.  So, I mean --
25  Q.  But the activities were measured on a



Page 62

1  seen this document before?
2      A.   No, I don't believe so.
3      Q.   Okay.
4           MS. DSOUZA:  Well, could you just zoom in a
5  little bit?
6           MR. TSONIS:  Oh, yeah, sure.
7  BY MR. TSONIS:
8      Q.   And this, this is a multipage document.
9  It's about 56 pages long, but I'll just -- I'll call
10 your attention to the top here, the logo for Workday.
11          Do you understand that as part of -- you
12 know, as a Geico associate that there is what's known
13 as a Workday profile that's maintained on you?
14     A.   We.
15     Q.   All right.  And that Workday profile would
16 contain things like when you started with Geico, who
17 your supervisors were, and other sort of, you know,
18 job-related information?
19     A.   Okay.
20     Q.   All right.  I'll represent to you that this
21 is your Workday profile as of August 23rd, 2024.
22     A.   Okay.
23     Q.   Okay?  So this might not contain certain
24 data, obviously, that might have happened after that
25 points, but it should contain, you know, almost

Page 63

1  everything up to that point.
2           So, now, do you see your name up at the top
3  here?
4      A.   Yes.
5      Q.   All right.  And as I mentioned, this is
6  your Workday profile.
7           Is your job current job title lead security
8  investigator?
9      A.   It is.
10     Q.   All right.  And is your -- if you look here
11 at the -- at the first page, which is -- bears a Bates
12 label of G004553, do you see that it shows your hire
13 date with Geico as August 4th, 2014?
14     A.   That's correct.
15     Q.   All right.  So you've been with Geico for a
16 little over ten years now?
17     A.   Yes.
18     Q.   Okay.  Now, it shows you your location here
19 as the New York Buffalo office; do you see that?
20     A.   I do.
21     Q.   Are you keyed out of the Buffalo, the New
22 York Buffalo office now or assigned to that office?
23     A.   I have no idea where I'm assigned to.
24     Q.   Okay.  Is it your understanding essentially
25 that you are -- you know, work out of your home in the

Page 64

1  field and that your supervisor, I think you said, is
2  based out of Boston?
3      A.   Actually my current one is out of
4  Pennsylvania.
5      Q.   Okay.  Got it.  So there's a lot of
6  information in here, and we are not certainly going to
7  cover all of it, but I just want to -- I think this
8  will help orient us in terms of some key basic
9  information.
10          So you have a Geico e-mail address, it
11 looks like, ███████████████████
12     A.   That's correct.
13     Q.   All right.  Do you have a personal e-mail
14 address too?
15     A.   Yes, I do.
16     Q.   Okay.  What's your personal e-mail address?
17     A.   ███████████████
18     Q.   How long have you had that e-mail address?
19     A.   A long time, since I started with Verizon
20 when they started Fios, so several years.
21          MS. DSOUZA:  Mr. Tsonis, can I just ask
22 that, like, the witness' personal e-mail address be
23 marked as confidential?
24          MR. TSONIS:  That's fine.  And we can mark
25 this entire exhibit confidential if you're worried

Page 65

1  about, you know, other sensitive information not
2  being, you know, potentially publicly available.
3      I have no issue with that.
4           MS. DSOUZA:  Sounds good.  Thank you.
5  BY MR. TSONIS:
6      Q.   Do you ever use your personal e-mail
7  address for, like, work-related reasons?
8      A.   No.
9      Q.   You don't send anything to any, you know,
10 maybe not Geico customers, but other law enforcement
11 agencies or other, you know, things that you might
12 interact with?
13     A.   The only thing possibly would be my -- with
14 an attorney regarding this, but no.
15     Q.   Okay.  Have you ever been to the Buffalo
16 office?
17     A.   I have.
18     Q.   This phone number that's listed down here
19 is a mobile number; do you see that?
20     A.   Yes.
21     Q.   Is this a Geico-issued cell phone?
22     A.   It is.
23     Q.   Is that the same Geico or, like,
24 Geico-issued phone number that you've had as a -- the
25 entire time you've worked for Geico?



Page 86

1  had something to do, you know, a doctor's appointment
2  that would take you like an hour in the middle of the
3  day.  I guess it was possible for you to just take
4  that hour and allocate it somewhere else, either on
5  the front or the back end of your shift, right, and
6  not take time off?
7      A.   I believe that would be authorized, yeah.
8      Q.   Okay.  I mean, being out in the field,
9  I guess, you had some flexibility in terms of what
10 your actual hours that you would work would be?
11     A.   I --
12          MS. DSOUZA:  Objection.
13 BY THE WITNESS:
14     A.   It -- it would depend, but -- excuse me --
15 yeah, I mean, it -- it's not a simple answer.  I would
16 think that, yes, you could adjust for an hour here or
17 an hour there under certain circumstances.
18 BY MR. TSONIS:
19     Q.   So I think you referenced earlier that at
20 some point, they started trying to provide some more
21 structure around your actual start and end time; is
22 that accurate?
23     A.   Yes.
24     Q.   Was that much more recently?
25     A.   I can't say for sure when that was.  It --

Page 87

1  I think part of it started when they were trying to
2  hold us for those, you know, TIPs within a couple
3  hours kind of thing that kind of they didn't tell us
4  that we couldn't adjust, but you really couldn't and
5  still try to meet those.
6           So, I mean, some of it was kind of just by
7  circumstances you had to kind of work within these
8  normal hours because they were going to send you
9  cases, and you needed to get those TIPs in.
10     Q.   Right.  But I guess typically in 2017,
11 let's say, I mean, Chet Janik wasn't telling you, you
12 had to start your day at 7:30 in the morning, right?
13     A.   Correct.
14     Q.   I mean, you would kind of figure out, for
15 example, if you needed to go and do an examination
16 under oath or have multiple appointments in the city
17 and you wanted to beat traffic, you could decide to
18 just leave earlier that day and end your day earlier?
19     A.   Yes, that's true.
20     Q.   All right.  So I guess, you know, that's
21 what I mean in terms of the flexibility of when you
22 actually start your day and when you end it.  It was
23 far more flexible for you than, for example, a desk
24 investigator; is that accurate?
25     A.   I would think so, yes.

Page 88

1      Q.   Okay.  We didn't talk about the distinction
2  between field and desk, but in your words, what's the
3  distinction between the job title that you held and,
4  for example, an inside security investigator?
5      A.   Well, when I -- when I first started, it
6  was, you know, we were trying to do every case with
7  face to face interviews or, you know, in person scene
8  canvasses and so forth.  Over time, they've kind of
9  changed it by assigning us cases that we can't
10 actually go in the field for.
11          So some of the stuff that we get, we
12 just -- you know, they're giving me cases in other
13 states and -- and stuff that I just can't possibly go
14 into the field, whereas the desk investigators never
15 go into the field.
16     Q.   Okay.  Do you have an understanding as to
17 when you started getting the types of cases that don't
18 require you to be out in the field?
19     A.   I mean, there would be the occasional ones
20 back under Chet because sometimes it's just the nature
21 of the assignment.  The insureds may claim they --
22 they live in our area when, in fact, they don't.  So
23 as you get into it, you'll have a false address in
24 Syracuse, for example, and turns out they actually
25 live in New York City.

Page 89

1           So there was the occasional case that was
2  assigned for us to do field work, but once you went to
3  try to do it, you really couldn't because there was
4  nobody here, so, I mean, some of that, but then as
5  time went on, they just started giving us more and
6  more cases that were just out of our area.
7      Q.   Well, it's a possible, right, that a case
8  that they believe, you know, likely will require field
9  work might not actually require field work?
10     A.   Yes.
11     Q.   Okay.  And that happens at times too,
12 right?
13     A.   Yes.
14     Q.   And then things like social media
15 investigations, those don't require field work, right?
16     A.   That's correct.
17     Q.   All right.  When we talked about
18 productivity earlier, we talked about kind of the
19 number of cases closed, right?
20     A.   Yes.
21     Q.   All right.  And the number of cases you
22 closed, is it your understanding that that kind of
23 translate into a weighted score?
24     A.   Yes.
25     Q.   And the weighted score reflects essentially



Page 94

1 exact reason for why they were.  I was just told that
2 they were definitely higher rated.
3 BY MR. TSONIS:
4     Q.   Okay.
5     A.   I don't remember any conversations as to
6 why.  I don't -- I don't think I ever asked.
7     Q.   Pre-COVID, how much time in a given, you
8 know, day that you're out in the field do you spend
9 driving to and from various places, as opposed to
10 actually doing a scene canvas or an examination under
11 October or what have you?
12     A.   It's -- I mean, it's hard for me to say.
13 I can say prior to COVID, my area of coverage was
14 substantially different than what I do now.
15     Q.   How was it different?
16     A.   Well, I would cover from east of Rochester
17 to Herkimer area to the Canadian border to
18 Pennsylvania border.  Currently, I cover all of
19 upstate from -- from and sometimes including
20 Pennsylvania, northern Pennsylvania, and the entire
21 upstate New York.  So I'm driving from Albany to
22 Buffalo.  So the amount of drive time is substantially
23 more right now.
24     Q.   So the amount of drive time post-COVID once
25 in person things started happening more is more now

Page 95

1 than it used to be pre-COVID?
2     A.   Yeah, because there was -- we went from
3 seven investigators to two.
4     Q.   Okay.  Pre-COVID, I guess, when you're out
5 in the field not working from home that day, how much
6 of your, you know, average day would be spent,
7 I guess, driving in the car from A to B to C versus
8 actually doing the things that you're driving there
9 for?
10     A.   I don't know how I determine that because,
11 you know, you're -- you're always trying to do
12 multiple things when you're out.  So if I'm, you know,
13 going to Watertown, and hopefully I have more than one
14 case, you know, so it's a long drive to the area but
15 then a shorter drive between them, different whether
16 even it's just an interview and then you do a canvass
17 of a scene or -- you know, so it's really hard to
18 determine.  Depends on where you're going.
19         If I'm in Syracuse, it's a short drive to
20 the location, not much different, you know, than the
21 interview time, but if I'm driving to, you know,
22 Herkimer, it takes longer to drive there than it does
23 to do the interview.  So it really varies.
24     Q.   Okay.  Pre-COVID, to get from -- you know,
25 you lived in the same address the entire time?

Page 96

1     A.   I did.
2     Q.   To get from your home to, you know, the
3 farthest area that you cover, how long is the drive
4 one way?
5     A.   I mean, generally, back then, the rule was
6 you didn't drive more than, like, an hour and a half
7 to two hours.  So an hour and a half would be kind of
8 the target, but sometimes if there was a reason, you'd
9 go maybe two hours, and others --
10     Q.   And if one was more than two hours away, it
11 should be somebody else that lives closer to that?
12     A.   Yes.
13     Q.   Okay.  So if it is an hour and a half
14 though, an hour and a half there, an hour and a half
15 back, that's three hours in the car, right?
16     A.   Correct.
17     Q.   Okay.
18     A.   Minimum, because you're -- like I said, you
19 try to have additional stuff.  So you may have to
20 drive between different locations in that particular
21 area, but --
22     Q.   That's fair.  So typically when you were
23 outs in the field, it sounds like you would try to
24 ensure that your day would be as productive as
25 possible by scheduling multiple things --

Page 97

1     A.   Yeah.
2     Q.   -- that are geographically approximate, you
3 know, to happen at the -- on the same day?
4     A.   Yes.
5     Q.   Okay.  And to your point, the, you know,
6 three hours, let's say hour and a half there, hour and
7 a half back, doesn't include going from, you know,
8 once you get to point A, going to point B or to point
9 C or D and so on, right?
10     A.   Right.
11     Q.   Okay.  So it sounds like when you are out
12 in the field that it -- without being able to quantify
13 it, it would still be a substantial portion of the
14 workday that you would spend driving in the car,
15 right?
16     A.   Yes.
17     Q.   Okay.  Post-COVID, Geico stopped allowing
18 field investigators to do various activities in
19 person, right?
20     A.   Yes, during the COVID thing, yeah, they --
21 they shut us down completely.
22     Q.   Okay.  And so by, like, shutting down
23 completely, for example, like, you know, they weren't
24 allowing examinations under oath to proceed in person
25 anymore, right?



Page 98

1   A.   That's correct.
2   Q.   No more in-person scene canvasses?
3   A.   Correct.
4   Q.   No going to police departments to pick up
5   various reports?
6   A.   That's correct.
7   Q.   All right.  No in-person witness
8   interviews?
9   A.   Correct.
10  Q.   All right.  Were there other activities
11  that I didn't mention that they wouldn't allow you to
12  do in person?
13  A.   There was a period of time we weren't able
14  to do anything.  I -- my car got parked.  It --
15  I didn't drive my car for a period of time.
16  Q.   Sure.  And so during that time period, you
17  would just exclusively work from your home, right?
18  A.   That's correct.
19  Q.   Do you have an understanding of what that
20  period of time was where you couldn't do anything out
21  in the field?
22  A.   I don't know the exact dates.
23  Q.   Sure.  Best --
24  A.   I'm sure that --
25  Q.   Best rough estimate.

Page 99

1   A.   I'm not sure.  I mean, I'm sure it's
2   documented somewhere because, like I said, I took the
3   car right off the road, and I had to report in what
4   the mileage was when I parked it and when I took it
5   back out, but I -- I don't know those dates.
6   Q.   That stop happened shortly after COVID,
7   right, hit?
8   A.   Yeah, it was pretty quick after once
9   they -- they told us there was no field activity at
10  all.
11  Q.   Is it accurate to say that there was a
12  period of time after the sort of total cessation where
13  some things were permitted in person --
14  A.   Yes.
15  Q.   -- and some things weren't?
16  A.   Yes.
17  Q.   All right.  During that period, what kind
18  of things could you do out in the field versus not do
19  in the field?
20  A.   You could do scene canvasses as long as you
21  didn't talk to people.  You could do photographing as
22  long as you didn't communicate with people face to
23  face.  So there were a few things you could do.
24  Q.   For example, examinations under oath,
25  initially those couldn't happen in person, right?

Page 100

1   A.   That's correct.
2   Q.   And they really couldn't happen at all
3   because there was no process for them to happen
4   virtually, right?
5   A.   That started up pretty quick when we were
6   doing the virtual.
7   Q.   Sure.  It was a short time where you,
8   I guess, couldn't do a -- couldn't do it until that
9   was up and running?
10  A.   Yeah, I'm sure that's true.
11  Q.   Okay.
12  A.   I don't know.  I'm not sure how long that
13  was though.  I don't think it was very long.
14  Q.   But there was a period of time where you
15  were exclusively doing virtual EUOs?
16  A.   Yes.
17  Q.   All right.  And then at some point, you are
18  now able to do them in person, but also able to do
19  them virtually?
20  A.   Yes.
21  Q.   Okay.  Is it accurate to say that at some
22  point, the operations within SIU at least, you know,
23  your -- as you understood them sort of were back to --
24  to what they were pre-COVID?
25  A.   Yes.

Page 101

1   Q.   When was that, approximately?
2   A.   I don't know what the date was.  I'm sorry.
3   I just don't know.
4   Q.   Was it about -- was it in 2021?
5   A.   I believe so.  I think so.
6   Q.   Was it later in the year in 2021?
7   A.   I'm not sure.  I think you're right, but
8   I don't recall for sure.
9   Q.   I know I've heard from multiple people, and
10  obviously what I recall myself, but that New York was
11  one of the states that kind of locked down the
12  longest; is that fairly right?
13  A.   That's my understanding, yes.
14  Q.   Okay.
15  A.   Yeah.
16  Q.   So during the time post-COVID where you
17  weren't doing any field work, you didn't have any of
18  this drive time that you had to do anymore, right?
19  A.   That's correct.
20  Q.   So the, you know, hour and a half there,
21  hour and a half back is not something that you had in
22  your work day anymore?
23  A.   That's correct.
24  Q.   And the driving, like we said, from point A
25  to B to C, that didn't happen anymore either, right?



Page 102
1   A.   That's correct.
2   Q.   All right.  Now, if I understand your prior
3   testimony correctly, it's that post-COVID your case
4   load increased; is that right?
5   A.   It was during the COVID time, yes.
6   Q.   All right.  With the increase in your case
7   load, however, you also didn't have this drive time we
8   said, right?
9   A.   That's correct.
10  Q.   All right.  So, I guess, wouldn't you have
11  expected that your workload would increase to some
12  degree to account for time that was no longer spent,
13  being spent driving?
14  A.   I guess.  I'm -- I guess it could, yeah.
15  I mean, I don't -- see, I'm not familiar with what
16  prior to COVID the desk, field desk difference in case
17  load was.  I don't know.  I would expect it to go up?
18  Okay, I guess I could expect it to go up a little,
19  yes.
20  Q.   Okay.  So I think you just said prior to
21  the COVID time frame, you don't really know what the
22  case volume was of desk investigators?
23  A.   Correct.
24  Q.   All right.  So your knowledge is pretty
25  much exclusively regarding your own case load,

Page 103
1   obviously, right?
2   A.   That's correct.
3   Q.   Do you have an understanding of the case
4   load of other field investigators that reported to
5   Chet Janik?
6   A.   I would have to say I just kind of assumed
7   we were all in the same general numbers.  I don't --
8   I don't think that was the kind of stuff that was
9   provided back then.
10  Q.   Okay.  So you were -- you didn't get a
11  report that showed, you know, another investigator had
12  X number of cases that month, right?
13  A.   Not back then, no.
14  Q.   Okay.  And similarly, I'm guessing you had
15  no knowledge of what other field investigators that
16  worked for other supervisors were getting assigned?
17  A.   That's correct.
18  Q.   All right.  Do you -- you didn't have any
19  knowledge as to what the, you know, overtime approval
20  or authorization process of those other supervisors
21  would be?
22  A.   No, I didn't know.
23  Q.   Okay.  And you don't know today, right?
24  A.   That's correct.
25  Q.   All right.  Similarly, supervisors that had

Page 104
1   desk investigators, you don't have any knowledge of
2   the policies or practices that they had in place
3   regarding, you know, overtime, right?
4   A.   No, I don't really know what -- I wasn't
5   really given information about the other groups.
6   Q.   Okay.  But you didn't, like, regularly talk
7   to, you know, all kinds of desk investigators, for
8   example, right?
9   A.   No, I -- not about case loads and stuff,
10  no.
11  Q.   Okay.  There were investigators -- well,
12  I'll strike that.
13       Does the term major case, is that a term
14  you're familiar with?
15  A.   Yes.
16  Q.   All right.  And what is the major case
17  team?
18  A.   If they -- again, I -- I've never been in a
19  major case team.  I am not exactly sure how they work,
20  but I know that they kind of focus on groups, I think,
21  or certain types of activities, fraud activities, but
22  I'm not real familiar with the -- the major case.
23  Q.   All right.  Is it accurate to say, like, a
24  major case investigator focuses less on a particular
25  claim and more on fraud at the entity level?

Page 105
1   A.   That's my understanding, yes.
2   Q.   Okay.  Major case investigators, did you
3   ever assist a major case investigator by doing field
4   work, for example, on a case?
5   A.   I have.
6   Q.   Okay.  And what kinds of major case
7   investigations have you helped with?
8   A.   Well, I've been sent to do scene canvasses,
9   look for different vehicles, I think, at different
10  locations.  I just recall a couple times being sent to
11  locations to see if it was actually residences or when
12  it turns out they were actually businesses and that
13  type of thing.
14  Q.   Okay.
15  A.   I think --
16  Q.   Did you ever talk routinely with -- oh,
17  I didn't mean to cuts off.  I apologize.
18  A.   No, I think I was scheduled to do an
19  examination under oath in person for a major crime
20  case, but the party never showed, so --
21  Q.   All right.  Did you ever talk regularly
22  with any major case investigators?
23  A.   Not regularly, no.
24  Q.   All right.  Do you have an understanding of
25  the number of cases assigned to a major case



Page 126

1  A.  No, I don't.
2  Q.  Okay. I think earlier you also referenced
3  that you've been to the Buffalo office, right?
4  A.  I -- I have, yes.
5  Q.  How many times have you been there?
6  A.  I went for my initial training, I went
7  there for a diversity training and recently went there
8  for a lunch.
9  Q.  Okay. The manager of the Buffalo office
10  was different than the manager for the Woodbury
11  office, right?
12  A.  I don't know that they do it, the manager,
13  by office. I -- I honestly don't know. I guess it
14  makes sense.
15  Q.  Yeah.
16  A.  I guess it makes sense that there is, but
17  I don't know.
18  Q.  And -- and that's fair. And I don't want
19  you to speculate, as I've said, but just so we orient
20  ourselves, are you familiar that at some point, Geico
21  shifted generally from a geographic region based
22  structure to a more, you know, vertical integration
23  structure?
24  A.  Yes.
25  Q.  All right. Prior to that change, Buffalo

Page 127

1  and Melville were not part of the same region, right?
2  A.  Correct.
3  Q.  To the best of your knowledge or
4  understanding, was there a different SIU manager for
5  Buffalo than there was for Woodbury?
6  A.  I think so.
7  Q.  Okay. You didn't, for example, believe
8  that Bill Newport managed the Buffalo office; do you?
9  A.  I don't believe so, but I don't know for
10  sure.
11  Q.  Okay.
12  A.  I didn't think so.
13  Q.  Do you have any kind of understanding as to
14  the policy -- or the practices or procedures that
15  investigators assigned out of the Buffalo office
16  operate under?
17  A.  No, I don't.
18  Q.  All right. Do you have any understanding
19  or knowledge about the case load that investigators
20  assigned to the Buffalo location had?
21  A.  No.
22  Q.  All right. Do you have any understanding
23  as to whether or not investigators assigned to the
24  Buffalo office worked overtime?
25  A.  I don't know.

Page 128

1  Q.  All right. And do you have any
2  understanding as to whether or not investigators
3  assigned to the Buffalo office recorded any overtime
4  in Workday or the predecessor timekeeping system?
5  A.  I don't know.
6  Q.  All right. And similarly, and last
7  question, you don't have any knowledge as to any
8  complaints by investigators that were assigned to the
9  Buffalo office regarding, you know, unpaid overtime?
10  A.  I'm not aware of that, no.
11  Q.  Okay. The -- what we've been calling the
12  Woodbury office at some point also changed locations,
13  right, to what is now known as the Melville office?
14  A.  Yes.
15  Q.  Okay. How frequently would you go into
16  either the Woodbury or the Melville office?
17  A.  I've never been to either.
18  Q.  You've never even stepped foot in the
19  office?
20  A.  No, I have not.
21  Q.  Okay. Earlier, we referenced Workday. Do
22  you -- at some point, was there a change where on your
23  phone you clock in and clock out?
24  A.  No.
25  Q.  Okay. So you're not subject to any sort of

Page 129

1  process whereby you have to, like, start your shift
2  via an app on your phone?
3  A.  That's correct, I'm not -- I don't do that.
4  Q.  All right. You just enter the number of
5  hours worked in Workday?
6  A.  Correct.
7  Q.  Okay. Earlier when we looked at your
8  supervisors -- and if I need to, I could put this back
9  up again, but I think I can do it without that once I
10  get to the right page. Give me a moment.
11  I apologize. I will share this screen. Hold on.
12    All right. We're still looking here at
13  Exhibit 1, Mr. Costanzo. I'm going to point you, if
14  I can find it, as I said to the list of supervisors
15  that we looked at earlier. Well, give me -- give me
16  just one second. I apologize. There we go. All
17  right. I'll share my screen.
18    So we looked earlier at this Exhibit 1, and
19  we talked about Mr. Janik. I just want to go through
20  the rest of the supervisors here.
21    So from November of 2022 to June 30th of
22  2023, your supervisor, you said, was Dara Campbell,
23  right?
24  A.  Correct.
25  Q.  Did you ever complain to Dara Campbell



Page 130

1  about the workload of cases?
2   A.   I don't remember complaining to her about
3  it.  That was a -- during one of the times when they
4  were allowing for overtime, so when there was
5  excessive stuff, we just had to get her approval, but
6  we were able to do some overtime to accommodate the
7  extra work.
8   Q.   Okay.  So during the time period that you
9  worked for -- your supervisor was Dara Campbell and
10  you were able to request overtime if it was needed,
11  your understanding was that it would be approved?
12   A.   Yes.
13   Q.   Okay.  You're not contending that Dara
14  Campbell knew that you were working hours but not
15  logging it into Workday; are you?
16   A.   No, I'm not.
17   Q.   Okay.  Andrew Gelderman, it shows, was your
18  supervisor from Jan- -- July 1st of 2023 to March 18th
19  of 2024, right?
20   A.   Yes.
21   Q.   Did you ever complain to Andrew Gelderman
22  about the workload that you were assigned?
23   A.   I believe we had discussed because during
24  that time frame is when I was advised that there was
25  no overtime anymore.  I don't know if I'd say

Page 131

1  complained about it, but it -- under Andrew, it was
2  very clear that overtime was not authorized.  So there
3  was really no point in discussing it.
4   Q.   Okay.  And when you say overtime wasn't
5  authorized, meaning that generally that there wouldn't
6  be an expectation that you would have to work more
7  than 38.75 hours?
8   A.   When asked about if we needed to do stuff
9  after hours to -- to keep up, I was told that overtime
10  was not authorized.
11   Q.   Okay.  How many times were you told that?
12   A.   I only remember one time.  It wasn't like a
13  regular conversation, and I -- I only remember one
14  time asking and being told that.
15   Q.   Okay.  And in the one time you asked,
16  generally was it just, "Hey, just in general terms, if
17  we need to work additional hours," or was it specific,
18  one specific day that you were requesting to work
19  additional hours?
20   A.   I think it was in general.  It wasn't
21  specific to one case; it was general question, we have
22  stuff that we can't get done, and we had been able to
23  have overtime, and that's -- I think it was general
24  conversation.
25   Q.   Okay.  Was that -- what was your

Page 132

1  understanding as to, you know, why overtime wouldn't
2  be approved when you worked for Mr. Gelderman?
3   A.   My understanding was that that came from
4  management that there was no overtime to be approved.
5   Q.   Okay.  Is that what Mr. Gelderman said?
6   A.   I don't remember if he said that
7  specifically, but that was just what I recall was --
8  that was my understanding from the conversation was
9  management had said there's no need for overtime.
10   Q.   As a field investigator essentially, did
11  different supervisors have different levels of whether
12  they would approve overtime or not?
13   A.   I'm -- I'm not sure what you mean,
14  different levels.
15   Q.   Sure.  So Dara Campbell was a supervisor
16  that had field investigators before you reported to
17  her, right?
18   A.   Yes.
19   Q.   Right.  Similarly, Jerry ^cast /SAPB, is
20  that someone you're familiar with?
21   A.   Yes.
22   Q.   He was also a supervisor that oversaw
23  various field investigators?
24   A.   Yes.
25   Q.   Tony ^de/TKPWAT at that, is she someone

Page 133

1  else you're familiar with?
2   A.   Yes.
3   Q.   She was someone that oversaw field
4  investigators?
5   A.   Yes.
6   Q.   All right.  Is it your understanding that
7  different supervisors had different discretion as to
8  whether they would approve overtime for investigators?
9   A.   No, that's not my understanding, no.
10   Q.   All right.  So it was your understanding
11  that every supervisor was sort of told by management
12  whether or not overtime would be approved?
13   A.   That's my understanding, yes.
14   Q.   All right.  Was it your understanding that
15  if there was a business reason for an overtime request
16  that you were prevented from asking for it?
17   A.   They -- yes, I mean, it became a point at
18  different times when we were told, "There's no
19  overtime.  Figure it out."  So, you know, at other
20  times it was, "Well, you'll have to adjust your
21  schedule to make it work," but that didn't really take
22  into account the volume.
23       I mean, early on in my career, it was kind
24  of if -- if you end up staying late, leave early.
25  That was, you know, sort of the way it was handled.



Page 138

1  A.  Yes.
2  Q.  But if you logged into the SICM system and
3  didn't actually do any activity, how would Chet Janik
4  know?
5  A.  Well, that, that I don't know.  I don't
6  know if you can.  I would assume you could generate
7  login and logout, but -- but that probably would be
8  something that they would have to request.
9      But I think when they looked at the cases,
10 you would see the time in and time out for date stamps
11 of when you're doing entries.  But yeah, if you didn't
12 do any entries, I guess that would have to be a
13 specific request for some sort of a search of the
14 database, but maybe not --
15 Q.  Okay.
16 A.  Not the -- you know, that would -- that may
17 not be something that they would get generated unless
18 they ask for it, but as they're looking at the cases,
19 you would see the time/date stamps for when everything
20 was getting done.
21 Q.  So aside from SICM time stamp entries, or
22 activities that you enter into SICM, are there any
23 other bases on which you're stating that Chet Janik or
24 others should have known that you were working
25 additional hours but not recording them in Workday?

Page 139

1  A.  It would be them, you know, when we're
2  saying we can't do it unless we work extra hours, it's
3  not specific saying, "I'm doing it"; it's, "You know
4  we can't get this done unless we work extra hours."
5      And I think when they looked and realized
6  we were getting it done, I think they -- they had a
7  pretty good idea that we were all working extra hours
8  to get our -- get our work in on time.
9  Q.  So if you tell Chet Janik, "I can't get my
10 work done without working, you know, extra hours," and
11 Chet Janik tells you, "Adjust your schedule as
12 needed," and ultimately the work does get done, why
13 would that indicate that you worked hours that you
14 didn't record?
15 A.  Well, again, I guess you got to look at the
16 time frames.  They're different time frames.  If
17 you're talking about, you know, '16 to '18 or '19, the
18 beginning, I could see him not necessarily being
19 overly concerned, but when you're talking about during
20 this, this COVID mess with all these just added,
21 added, added cases, we were pretty clear that, "This
22 isn't working.  We can't get this done."
23     So, I mean, it depends what time frame
24 you're talking about.  If you're talking, like I said,
25 '16, '17, '18, with the -- the plan to schedule adjust

Page 140

1  or whatever, that's fine.  He may not have picked up
2  on it.  But I think it was pretty clear during the
3  lockdown that we were all working extra hours.
4  Q.  So when you say it was clear, how did you
5  inform him of the -- the conversations or the -- the
6  substance of what you're just talking about?
7  A.  Well, during our team meetings, I mean,
8  I think we were all kind of going, "Hey, this isn't
9  working."  And -- and I know I specifically had said
10 it when Bill Newport was around, going, "This isn't
11 working.  This is too much."
12 Q.  And those team meetings were virtual?
13 A.  Yes.
14 Q.  And I think you're referencing that Bill
15 Newport joined at least one of these team meetings?
16 A.  Some of them, yes.
17 Q.  Okay.  And so you would say, "This isn't
18 working.  That" --
19 A.  Yeah, "There's too -- there's too much work
20 to get done in the allotted time."
21 Q.  And what was Bill Newport's response?
22 A.  He disagreed.  He said that it's fine and
23 to just make it work.  He -- he made it very clear he
24 didn't think that this was excessive, and he thought
25 this was something that we should all be able to do.

Page 141

1  Q.  You never informed Bill Newport that you
2  were working additional hours but not recording them
3  into Workday?
4  A.  I never specifically told him that.
5  Q.  Okay.
6  A.  I think I inferred that we we're all
7  working extra hours to try to keep up, but I never
8  specifically said, "I'm working and not putting it
9  into Workday."  I never said that.
10 Q.  Okay.  This COVID time frame is when we
11 talked about, obviously, significant changes with
12 field investigators not being out in the field, right?
13 A.  Yes.  Yes.
14 Q.  Okay.  What -- what's your basis for
15 claiming that either Chester Janik or Bill Newport had
16 an understanding of what your day-to-day workload
17 looked like when you weren't doing field work anymore?
18 A.  I'm sorry, I don't understand what you're
19 saying.
20 Q.  Sure.  So if -- pre-COVID, you were out in
21 the field and the activities that you were doing were
22 the ones that a field investigator would typically do,
23 right?
24 A.  Yes.
25 Q.  COVID hits.  Field investigators get



Page 142

1  significantly changed by not being in the field
2  anymore, right?
3     A.   Right.
4     Q.   Right.  So the workload that you have,
5  I think you've testified repeatedly, you know, the
6  number of cases that you were assigned went up, right?
7     A.   Substantially, yes.
8     Q.   Okay.  And we also talked earlier about how
9  the types of cases that you would get changed as well,
10 right?
11    A.   Somewhat, yes.
12    Q.   All right.  So given those changes, why do
13 you believe that Chester Janik would know when you
14 say, "Hey, I can't do this work," you know, "my case
15 load is too high for me to get all this done," why
16 would Chester Janik take that to mean that you're
17 working additional hours and not logging them as
18 opposed to just trying to adjust to the changed case
19 load and case mix?
20    A.   Again, I -- we -- I think it was pretty
21 clear that we were saying we can't keep up with this
22 and get these deadlines done.  So I guess I'm kind of
23 thinking he would have understood that what we were
24 saying is this is causing us to work late.
25 I believe -- I don't know.  I believe that they knew.

Page 143

1  I think it was pretty clear that we were working and
2  putting extra hours in.
3     Q.   Okay.  So you're -- but I understand your
4  belief, but you don't actually know whether Chet Janik
5  or others actually understood that you were working
6  additional hours, right?
7     A.   All I can -- what I -- what I think and
8  what I believe is all I know.  I don't -- I don't have
9  a -- anything else other than that's what I believe.
10    Q.   Okay.  So I just want to be clear.
11        I understand that you believe that -- that
12 you made yourself clear?
13    A.   Yes.
14    Q.   Is that right?  All right.
15        But you don't -- besides your belief, you
16 don't have any other evidence that they actually
17 understood that?
18        MS. DSOUZA:  Objection.
19 BY MR. TSONIS:
20    Q.   Like, for example, Chet Janik never said,
21 "I know you've been putting in the hours and not
22 getting paid for it," or anything like that?
23        MS. DSOUZA:  Objection.
24 BY THE WITNESS:
25    A.   I -- I don't remember a conversation with

Page 144

1  him specifically saying that.
2  BY MR. TSONIS:
3     Q.   But you don't remember him saying anything
4  like that in substance, though, right?
5     A.   I -- I don't remember him saying that.
6     Q.   Okay.  And similarly, you don't recall Bill
7  Newport ever acknowledging in any way that you or any
8  other investigator was working hours off the clock?
9     A.   I don't remember if there's a -- I don't
10 remember if there's an e-mail or anything that was
11 specific to that.  I don't.
12    Q.   In fact, the instructions that you had
13 received at some point from Bill Newport was that --
14 and your supervisor was that all hours had to --
15 worked had to be entered into Workday, right?
16    A.   Yes.
17    Q.   And you, I think, referenced earlier that
18 you even had copies of the associate handbook in your
19 home, right?
20    A.   Yes.
21    Q.   You understand that Geico's policy is that
22 associates are responsible for accurately recording
23 all hours worked?
24    A.   Yes.
25    Q.   All right.  And you understood that Geico's

Page 145

1  policy is that associates are not permitted to work
2  off the clock?
3     A.   I would say now I have been told that, but
4  prior to that, I don't recall them ever saying that,
5  but yeah, in the last -- I think after they started
6  with the -- the phone time stamp, you know, when you
7  come in, come out that the other investigators are
8  doing, they made it very clear that we are not allowed
9  to work any extra hours.
10       Before that, I don't recall them ever
11 saying that, just -- but yes, it does say that you're
12 supposed to enter hours worked, but I don't recall
13 them ever saying that we couldn't do work.
14       You know, sometimes you would get a phone
15 call after hours from someone that you were really
16 trying to get ahold of and hadn't been able to, so you
17 would pick up the phone, then you would do the
18 interview or whatever.  I didn't ever take it that
19 I wasn't allowed to answer the phone under those
20 circumstances until now.  They seem to make it pretty
21 clear that they don't want us to do that.  So Geico
22 has kind of changed, I think, what that perspective
23 was.
24    Q.   To use your example now when that situation
25 had happened in the past, and let's say you spent



Page 222

1  reviewing, you know, not all your cases, but if there
2  was something that's been pending a while, I'm sure
3  they would be questioning us going, "Why?"  So it was
4  a little more now.  It's a little more, you know,
5  one-on-one going through the case load with us.
6     Q.   Okay.  That's more of a present -- or, you
7  know, near past to present thing than it was
8  historically something with Chet Janik?
9     A.   Yes.
10     Q.   Okay.  Typically, I mean, for other people
11  that aren't a lead security investigator, without your
12  experience, do you know whether Chet Janik, like, what
13  his discussions would look like with people in their
14  cases in SICM?
15          MS DSOUZA:  Objection.
16  BY THE WITNESS:
17     A.   Yeah, I can't say what he would talk to
18  them if I wasn't around.  I'm -- I'm not sure what was
19  said.
20  BY MR. TSONIS:
21     Q.   Okay.  And given that you were
22  self-approval, would you ever have these conversations
23  with Chet about looking in your SICM at what was going
24  on?
25     A.   Yeah, I mean, there were times we would be

Page 223

1  reviewing where we're at with certain things,
2  absolutely.
3     Q.   How -- how frequently would that happen?
4     A.   It varied.  I mean, it varied.  Certainly
5  if I contacted him and said, "Hey, I'm kind of getting
6  buried here," you know, we might review a couple of
7  them to see if there was a quicker way to get rid of
8  them.  Other times, it's just, you know, he would be
9  checking in with you, and he might talk about if I had
10  a question on a particular case or whatever, we'd go
11  over it.
12     Q.   Okay.  Was that, I guess, more the
13  exception or the rule that you would talk about it,
14  like, cases like that?
15     A.   It was only when needed, you know, only if
16  I had, you know, some need or there was a particular
17  thing that maybe he picked up on that he was
18  questioning, but it was only an on-need basis.
19     Q.   I'll show you what I'm going to mark as
20  Exhibit 7.
21          (Whereupon, Costanzo Exhibit 7 was
22           presented.)
23  BY MR. TSONIS:
24     Q.   Do you see the document I'm showing you,
25  Mr. Costanzo?

Page 224

1     A.   Yes.
2     Q.   All right.  And do you recognize this as
3  your performance appraisal for the second half of
4  2022?
5     A.   Yes.
6     Q.   Now, this one is done by Dara Campbell,
7  right?
8     A.   Yes.
9     Q.   All right.  Ms. Campbell --
10          MR. TSONIS:  And for the record, excuse me,
11  the -- the document is the one Bates labelled G006621
12  to 6622.
13  BY MR. TSONIS:
14     Q.   But Ms. Campbell writes under her comments
15  that she's only had you for -- on her team for the
16  month of December and that you're a lead investigator,
17  you know, you're very good at what you do.  You see
18  that, right?  It's the first three sentences?
19     A.   Yes.
20     Q.   And then the fourth sentence says, "Craig
21  was on self-approval, which meant he did not have a
22  supervisor reviewing his cases prior closure."
23          Is that accurate?
24     A.   Yes.
25     Q.   All right.  And it says, "This means no

Page 225

1  second set of eyes to make sure everything is done
2  accurately," right?
3     A.   Yes.
4     Q.   And that despite that, you know, you had
5  perfect audits, which I think Ms. Campbell
6  characterizes as "incredible," right?
7     A.   Yes.
8     Q.   All right.  So when we look at -- and,
9  again, this is the second half of 2022.  If we look at
10  the -- the associate evaluation here, we see that your
11  area expanded, you said, to include Rochester, New
12  York, an hour and a half to two hours away?
13     A.   Yes.
14     Q.   All right.  And then you write your
15  productivity score, according to you, is a 48.27 and
16  that you had 202 cases assigned in this time period,
17  right?
18     A.   Yes.
19     Q.   All right.  And then there's obviously
20  other, you know, sub-metrics that you wrote, similar
21  to other assessments.  And then you write 6,877 miles
22  traveled?
23     A.   Yes.
24     Q.   Okay.  So if we look at the six-month
25  period, it says 202 total cases assigned, right?



Page 226

1   And you can assume my math here, but 202
2   divided by 6 shows -- why I can't -- oh, is 33.66,
3   right?
4       A.   Okay.
5       Q.   So if we looked at times, right,
6   particularly during the -- the summer of COVID and the
7   rest of maybe 2020 where that number was higher than
8   it was in the first February -- or
9   January-February-March of that year, right?
10      A.   Yes.
11      Q.   Okay.  So would you agree that the number
12  of cases assigned to you as a field investigator has
13  decreased since COVID?
14      A.   Yes.
15      Q.   Okay.
16      A.   I would agree with that.
17      Q.   Right.  And now you said you're back to
18  doing field work, right --
19      A.   Yes.
20      Q.   -- versus being off the field?
21           Would you agree that now, there are still
22  some things that you do virtually that pre-COVID would
23  have been done in person?
24      A.   The exams under oath are still mostly
25  virtual, yes.

Page 227

1       Q.   Okay.  So of these 202, where it says five
2   examin- -- examinations under oath, those five
3   examinations would have been virtual ones, likely?
4       A.   Yes, most likely.
5       Q.   Okay.  Okay.  When we look at the metrics
6   here now, the Goals, excuse me, it shows productivity
7   at 70 percent and quality at 30 percent, right?
8       A.   Yes.
9       Q.   So the time and process metric and the
10  investigative activities metrics that we saw in 2021
11  in your performance appraisal are no longer metrics
12  against which you are assessed, right?
13      A.   Yes.
14      Q.   All right.  So at least as of 2022, your
15  performance is being assessed solely on, you know,
16  compliance, audit compliance and making sure that
17  you're entering things and completing things the
18  correct way, right?
19      A.   Yes.
20      Q.   And then 70 percent on just the number of
21  cases that you close on an adjusted basis?
22      A.   Yes.
23      Q.   All right.  So similar to what we saw in
24  prior year, there -- there's no incentive in terms of
25  closing a case by a certain number of days now?

Page 228

1       A.   Correct.
2       Q.   Okay.  So in a year like 2022 here where
3   your sole metric is productivity -- ignore quality for
4   a moment.  I understand what the metric is, but I just
5   want to talk about productivity for a minute.
6            If it is the beginning of the month, and
7   you're coming up on your 7.75 hours on that given day,
8   you would agree with me that you could essentially
9   stop working for that day and then pick it up the next
10  morning, right?
11           MS. DSOUZA:  Objection.
12  BY MR. TSONIS:
13      Q.   You could answer.
14      A.   I mean, in general, yes, you could, but
15  you're not going to get the work done, but yes.
16      Q.   Well --
17      A.   But you could do that.
18      Q.   From a performance metric standpoint, you
19  know, you're not engaged on a shift to shift or even a
20  week to week basis, right?
21      A.   Yes.
22      Q.   So I guess in terms of any given work day
23  or at the end of any workweek even, you're not, by the
24  metrics you're assessed against, going to be dinged on
25  how long those cases have been open?

Page 229

1       A.   Based on the metrics, yes, you're correct.
2       Q.   Okay.  Well, we can put this aside.  Just
3   one moment.  I'll show you what I'm going to mark as
4   Exhibit 8.
5            (Whereupon, Costanzo Exhibit 8 was
6            presented.)
7            MR. TSONIS:  Sorry, I thought I -- give me
8   one moment.
9   BY MR. TSONIS:
10      Q.   Okay.  Do you see the document I'm showing
11  you now, Mr. Costanzo?
12      A.   I do.
13      Q.   All right.  Do you recognize this document?
14      A.   Yes.
15      Q.   Is this the document or one of the
16  documents that you reviewed in preparation for today's
17  deposition?
18      A.   Yes.
19      Q.   All right.  And there are interrogatory
20  answers here where you see -- interrogatories are
21  essentially just questions posed by Geico, okay?
22      A.   Okay.
23      Q.   And do you see that the answer to some is,
24  "See attached declaration of Craig Costanzo"?
25      A.   Yes.



Page 230

1  Q.  All right.  Now, I want to take you to that
2  declaration, which is attached.  Do you see that on
3  the eighth page of the PDF is a Declaration of Craig
4  Costanzo?
5  A.  Yes.
6  Q.  All right.  Have you seen this part before?
7  A.  Yes.
8  Q.  Did you participate in drafting this
9  document?
10  A.  Yes.
11  Q.  Ultimately, you signed this document,
12  right?
13  A.  Yes.
14  Q.  All right.  So this talks about your
15  employment with Geico at least through the date when
16  you wrote this declaration, right, or this declaration
17  was written, I should say?
18  A.  Yes.
19  Q.  All right.  You write in paragraph 5,
20  "Since January of 2020, Geico classified me and other
21  special investigators as non-exempt employees who were
22  eligible for overtime pay at one and one half times my
23  regular rate if I worked over 40 hours per week."
24      You see that?
25  A.  Yes.

Page 231

1  Q.  And it says, "My current regular rate of
2  pay is 49.74 per hour"?
3  A.  Yes, that's what it says.
4  Q.  All right.  Prior to that point, were you
5  compensated differently?  I know we talked about this
6  later, but does this refresh your recollection as to
7  whether or not your compensation, the basis on which
8  you were compensated, was different before January of
9  2020?
10  A.  I -- I don't know the dates.  I know there
11  were changes that were made, yes.
12  Q.  Okay.
13  A.  I couldn't tell you the dates, but yes.
14  Q.  In paragraph 7, you write, "My supervisor
15  Chet Janik told me that I could only report up to
16  38.75 hours per week or 7.75 hours a day five days a
17  week in the timekeeping program."  Do you --
18  A.  Yes, that's what we were supposed to put.
19  Yes.
20  Q.  Aside from the conversations with Mr. Janik
21  that we've already discussed today, are there any
22  other discussions with Mr. Janik that you have not
23  told me about?
24  A.  Not that I can remember.
25  Q.  Okay.  You write in paragraph 10, "Prior to

Page 232

1  March 2020, I regularly worked about one extra hour
2  per day on top of my regularly scheduled 7.75 hours
3  per day.  As a result, I worked about 43 hours a
4  week."
5      Do you see that?
6  A.  I do.
7  Q.  Is that an accurate statement?
8  A.  It's -- it's an approximation, but I did
9  generally work approximately about an hour extra.
10  Q.  Okay.  Let me ask you something.  We looked
11  at your performance appraisals that talked about the
12  total cases assigned, right?
13  A.  Yes.
14  Q.  Okay.  And we saw between 2017 your
15  appraisal there and your appraisal in 2019 that there
16  was an increase in cases that you were assigned,
17  correct?
18  A.  Yes.
19  Q.  So is this number that you're talking
20  about, one hour per day, consistent across the entire
21  time period in 2016 to March 2020?
22  A.  I think so.  It's hard to say for sure, but
23  I -- I think so.  I think that's a fair representation
24  of it.  I mean --
25  Q.  Explain to me how the total number of cases

Page 233

1  differs over a multi-year time period but you are
2  regularly always working one extra hour a day?
3  A.  Well, like I said, it's -- it's just sort
4  of what happened.  Are there days that I didn't?
5  Probably.  Are there days that I worked more than an
6  hour?  Probably.  But I think that's a fair
7  representation of what I was doing at the time.
8  Q.  Okay.  No one instructed you that you had
9  to work one extra hour per day, right?
10  A.  No, they did not.
11  Q.  Okay.  Chet Janik or any other supervisor
12  didn't instruct you that?
13  A.  Nobody instructed my to do that.
14  Q.  Neither Mike DeGrocco nor Bill Newport
15  instructed you?
16  A.  No, they did not.
17  Q.  Okay.  Do you agree that there was no real
18  way for your supervisor to know that you were working
19  one extra hour per day that you weren't including in
20  your timesheet?
21      MS. DSOUZA:  Objection.
22  BY THE WITNESS:
23  A.  I'm not sure how they would have known
24  that.
25



Page 234

1  BY MR. TSONIS:
2    Q.   Right.  Earlier, I think you referenced
3  SICM time entries?
4    A.   Yes.
5    Q.   And you referenced general comments about,
6  you know, not being able to do the work?
7    A.   Yes.
8    Q.   Okay.  Certain activities you do as a field
9  investigator, you might be doing that work and not
10 actually being in SICM, right?
11   A.   That's correct.
12   Q.   So, for example, when you say you might
13 have worked an extra hour per day on top of your
14 regularly scheduled hours, it's possible that that
15 hour was spent commuting from the field back to your
16 house?
17         MS. DSOUZA:  Objection.
18 BY THE WITNESS:
19   A.   That's possible.
20         THE WITNESS:  Sorry.
21         MS. DSOUZA:  Go ahead.
22 BY THE WITNESS:
23   A.   Yes.  Yes, that -- that's possible.
24 BY MR. TSONIS:
25   Q.   Okay.  It's possible that that time was

Page 235

1  spent, you know, talking to a policyholder?
2         MS. DSOUZA:  Objection.
3  BY THE WITNESS:
4    A.   It's possible.
5  BY MR. TSONIS:
6    Q.   All right.  And nothing prevented you from
7  talking to a policyholder, for example, and then
8  logging that event the following day in SICM, right?
9    A.   Correct.
10   Q.   So it says in paragraph 11 on -- well,
11 strike that actually.
12        And you said -- you said earlier that Chet
13 Janik would not review and approve your closed cases,
14 right?
15   A.   Correct.
16   Q.   All right.  So he wasn't looking at the
17 time stamps because he wasn't approving your cases?
18        MS. DSOUZA:  Objection.
19 BY MR. TSONIS:
20   Q.   Right?
21   A.   I -- I -- he wasn't required to approve
22 them, so, I mean, he wasn't looking at every case
23 I had, no, that's correct.
24   Q.   Okay.  And similarly, the SIU manager,
25 whether it was Mike DeGrocco or Bill Newport, wasn't

Page 236

1  approving your cases?
2    A.   That's correct.
3    Q.   And to your knowledge, they weren't going
4  into SICM and looking at your cases with any kind of
5  regularity?
6    A.   I'm not aware of that.
7    Q.   Okay.
8    A.   I'm not aware that they were, no.
9    Q.   In paragraph 11, it says, "Starting in
10 March 2020, COVID-19 halted field operations," so all
11 of your work was done remotely until approximately
12 November of 2021.
13        Do you see that?
14   A.   Yes.
15   Q.   Does that refresh your recollection as to
16 when Geico sort of reestablished normal operations?
17   A.   Yes.
18   Q.   Okay.  You say at that -- "At the time, my
19 official schedule was from 7:00 a.m. to 3:30 p.m."
20        Do you see that?
21   A.   Yes.
22   Q.   Are you referencing the time period from
23 March 2020 to November '21?
24   A.   Yes.
25   Q.   Okay.  You say, "During this period,

Page 237

1  however, I worked two hours extra per work day.  As a
2  result, I was regularly working at least 48 hours a
3  week."
4    A.   Yes.
5    Q.   You -- is that an accurate statement?
6    A.   I believe it is.
7    Q.   During this time period, in the summer of
8  2020, do you recall that there was at least one month
9  where overtime for investigators was preauthorized and
10 approved up to ten hours?
11   A.   I don't remember the exact dates, but yes,
12 we did talk about that, that there was a period of
13 time that there was overtime authorized.
14   Q.   And the reason for the preauthorization of
15 overtime was because there was, as Geico recognized,
16 an increase in the number of cases assigned?
17   A.   I -- I don't know why they authorized it.
18   Q.   Was that ever communicated to you why it
19 was authorized?
20   A.   I don't remember it ever being told to us.
21   Q.   But you knew that there were, during these
22 specific periods, overtime hours available to you to
23 use?
24        MS. DSOUZA:  Objection.
25 BY THE WITNESS:



```
 1   correct transcript of the remote videoconference
 2   testimony so given by said witness as aforesaid.
 3           I further certify that the signature to the
 4   foregoing deposition was reserved by counsel for the
 5   Deponent.  I further certify that the taking of this
 6   deposition was pursuant to Notice, and that there were
 7   present via videoconference at the deposition the
 8   attorneys hereinbefore mentioned.
 9           I further certify that I am not counsel for nor
10   in any way related to the parties to this suit, nor am
11   I in any way interested in the outcome thereof.
12           IN TESTIMONY WHEREOF:  I have hereunto set my
13   hand and affixed my seal this 14th day of January,
14   2025.
15
     
16   _____
17   ANDREW R. PITTS, CSR, RPR
18   CSR, COOK COUNTY, ILLINOIS
19
20
21
22
23
24
25
```