# Exhibit I

**In the Matter Of:**

Keith Fischer, et al. vs GEICO

2:23 Civ. 2848(GRB)(ARL)

**MICHAEL O'SULLIVAN**

*August 26, 2024*



800.211.DEPO (3376)
*EsquireSolutions.com*

MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
41–44

Page 41

1          M. O'Sullivan
2  interview.
3      Q.    I am not surprised.
4      A.    But you had to ask.
5      Q.    So let's talk about for the med-fraud
6  claims.  How long -- strike that.
7          For the med-fraud claims, what is the
8  range to -- how short to how long for those type of
9  claims would it take to investigate?
10      A.    On a good case, they could be opened and
11  closed within a month.  On a case where you are
12  dealing with claimants that won't make themselves
13  available for interviews or attorneys who keep
14  rescheduling the interviews, then go on for five or
15  six months.
16      Q.    For PIP cases, what was that life span
17  of a case?
18      A.    Again, it could be a month, or you know,
19  I mean, there was always pressure to get the cases
20  closed.
21          But a lot of times, you know, when you
22  are dealing with attorneys, it -- just don't make
23  it easy.  So they reschedule you once or twice, I
24  guess, hoping that you go away.  But just have to
25  continue requesting the interviews.

Page 42

1          M. O'Sullivan
2      Q.    What about for jump-in claims?  How long
3  would those take?
4      A.    Again, the jump-ins, if I recall
5  correctly, were part of the PIP where you were
6  trying to verify their details of the accident.  So
7  it would be the same, you know, basically the same
8  time frame.
9      Q.    How far did you drive to investigate
10  your claims?
11      A.    Again, it's -- it depends on where the
12  attorney's office is.
13          I mean, I have gone to locations in
14  New Jersey.  And out east into Suffolk County,
15  which I guess would be 40, 50 miles.
16          I don't know.  About 40, 50, you know.
17  I guess the furthest I would go out would be
18  40 miles.
19      Q.    I recognized that you worked during
20  COVID, so I don't want to necessarily focus on that
21  time frame or -- what was the standard practice
22  prior to, how much time would you say you spent in
23  the field?
24      A.    It depends on the schedule for the day.
25          For example, if you were going to the

Page 43

1          M. O'Sullivan
2  Bronx and I have a 10:00 appointment, 10:00
3  interview scheduled, you have to be on the road at
4  8:30.  The interview could be anywhere from
5  45 minutes to an hour-and-a-half.  And then you
6  have an hour-and-a-half coming back.
7          If you are only doing one interview for
8  the day.
9          If you are doing a second interview,
10  then you have travel time to the second location.
11  And the second interview.  And there is still
12  travel time back.
13      Q.    Were you doing onsite visits at doctor's
14  offices?
15      A.    They would be called clinic inspections.
16      Q.    Yes?
17      A.    Yes.
18      Q.    Were you doing medical record review?
19      A.    Yes.
20      Q.    Were you doing medical billing review?
21      A.    Yes.
22      Q.    Between 2016 to '22, how many claims
23  would you say you handled per week?
24      A.    As far as being assigned?  Or touch
25  cases, cases I touched?

Page 44

1          M. O'Sullivan
2      Q.    Touching cases.
3      A.    I mean, I would be assigned up to 20
4  cases a month.  And you know, if I had to get to
5  them, I don't know how many per week or per day,
6  but how often I would get into them.
7      Q.    For the assigned.  Let's just go with
8  the 20 cases per month that you were getting
9  assigned.
10          How many cases of those were you closing
11  a month?
12      A.    I don't recall what the closure was.  I
13  mean, you can close ten in one month and 20 in the
14  next.  It depends on how quick, you know, you are
15  getting interviews.  Again, it's out -- out of my
16  control.  It was out of my control.
17      Q.    Fair to say then it fluctuated on how
18  many cases you could close a month?
19      A.    Yes.
20      Q.    Would it fluctuate on how many cases
21  were assigned to you a month?
22      A.    Well, the case was self-assigned.  And
23  you know, I forget what the number was when I
24  retired, but you made it your best effort to assign
25  yourself the cases.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
45–48

Page 45

1          M. O'Sullivan
2     Q.    When you say "self-assigned," walk me
3   through that process a little bit.
4     A.    So again, I would get an e-mail from an
5   inside investigator ████████████████████████
6   ████████████████████████████████████████████
7   ████████████████████████████████████████████
8   ████████████████████████████████████████████
9   ████████████████████████████████████████████
10  ████████████████████████████████████████████
11  ████
12         Towards the end, I don't recall
13   time-frame-wise, but I believe the medical
14   investigators were given access to case entry into
15   the SICM system.  So we bypassed having to reach
16   out to Fran to get cases assigned.
17     Q.    With the access to get into the system,
18   can you ultimately decline whether you took a case
19   or not?
20     A.    Define that a little bit.
21     Q.    I am just trying to understand.
22         You said it's self-assigned.  So in
23   theory, you are choosing which cases you can take
24   in the queue, and you can decline a case?
25     A.    Decline a case?  If I went to -- for a

Page 46

1          M. O'Sullivan
2   claim number and if for some reason I didn't like
3   the case?
4     Q.    Yes.
5     A.    I could in theory, yes.  Actually, in
6   reality, I could pass over a certain case.
7     Q.    Were some weeks busier than others?
8     A.    Yes and no.  Some weeks you can have
9   eight interviews in your schedule, then have only
10   one or two go because the others were no shows and
11   had to be rescheduled.
12         But you still have to be at the location
13   to -- in case the claimant appeared.
14     Q.    From your experience, were there any
15   times of the year that happened to be busier?
16     A.    Not necessarily, no.
17     Q.    Were there any other factors that made
18   your workload heavier at times?
19     A.    Not necessarily.  I found the medical
20   was pretty steady.
21     Q.    Do you know if other senior security
22   investigators who worked on the med team had the
23   same workload as you?
24     A.    I believe we all had the same, yes.
25     Q.    How do you know that?

Page 47

1          M. O'Sullivan
2     A.    I said I believed that we did.  I don't
3   know if that was the case.
4     Q.    Do you know if other senior security
5   investigators who worked on the auto side had the
6   same workload as the med team?
7     A.    I would hear them complaining about
8   getting slammed with cases when somebody was on
9   vacation or a guy was on vacation and cases would
10   just continuously come out.
11     Q.    And while I recognize that taking
12   coverage for vacation time is understandable, I am
13   specifically looking more for:  Do you know if the
14   auto team had the same amount of cases assigned to
15   the med team?
16         So I think you said you would typically
17   get 20 cases a month assigned on med.  Do you know
18   if auto was getting the same amount?
19     A.    I believe auto was getting more.
20     Q.    What is that basis of your opinion
21   from --
22     A.    First, on the medical team to
23   investigate and prepare for an interview, you have
24   to review the medical billing, what medical
25   documents are available in the system.  Sometimes

Page 48

1          M. O'Sullivan
2   when you are reviewing the billing you see a CPT
3   code that you are not familiar with, I research the
4   code.  So if I am doing the interview, I know what
5   I am going to be asking about or basically, you
6   know, training myself to be familiar with what, you
7   know, they should be describing.
8         So I think there is a lot more prep time
9   for medical interview and medical investigation.
10     Q.    Do you know if anyone -- anybody on the
11   auto side was doing the same thing as you to prep
12   for interviews?  Such as looking at CPT or ICD
13   codes before interviews?
14     A.    I don't know what their practice was.
15     Q.    Did you ever speak to any -- anybody on
16   the auto side regarding their workload?
17     A.    I guess in conversation, yes, it would
18   be discussed.
19     Q.    Do you recall the substance of those
20   conversations?
21     A.    Yes.  How easy the medical guys have it.
22     Q.    Who told you that?
23     A.    George McManus always told me that.
24         However, whenever they ask for a
25   volunteer to work in medical, there were no hands



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
57–60

Page 57

1          M. O'Sullivan
2   record completion date as well as the record grade
3   for pass.
4          Do you have any reason to disagree with
5   this history?
6          MS. JEAN:  Objection.
7    A.   No.
8    Q.   Throughout your tenure at GEICO, were
9   you always required to log your hours?
10   A.   As far as filing your time sheet?
11   Q.   Yes.
12   A.   Yes.
13   Q.   And what did that process look like in
14  2016 to 2022?
15   A.   You went through your time sheet and
16  entered your time -- hours worked.
17   Q.   Do you remember if there was a
18  timekeeping software that you would enter your time
19  into?
20   A.   I'm sorry, if there was what?
21   Q.   Do you remember if there was a
22  timekeeping software that you would enter your time
23  into?
24   A.   I believe there was, yes.
25   Q.   Do you remember the name of the

Page 58

1          M. O'Sullivan
2   software?  Whether it was like Workday, Chronos?
3    A.   Oh, Workday.  Yes, Workday.
4    Q.   When you would log your hours, how would
5   you do that?  Meaning; would you manually type in
6   the number of hours for that week?
7          For that day?  For that month?
8    A.   I believe we would type in our hours
9   worked per day.
10   Q.   Would you have to break down your hours
11  as in; I allocated this one hour to this interview?
12  Or, I allocated this hour to doing a case summary?
13   A.   No.
14   Q.   So there was no narrative per hours?
15          MS. JEAN:  Objection.
16   A.   No.
17   Q.   Looking back at Exhibit Number 2 for the
18  policy itself.  Did you understand this policy,
19  that you could not work off the clock?
20          MS. JEAN:  Objection.
21   A.   Do you want to repeat that question?
22   Q.   Sure.  Looking back at the policy, which
23  is on GE000039, did you understand that you could
24  not work off the clock because you had to log all
25  your hours worked?

Page 59

1          M. O'Sullivan
2          MS. JEAN:  Objection.
3    A.   As far as -- I mean, I would do the work
4   needed to finish a case.
5    Q.   But for any of the work that you needed
6   to do, you had to log those hours; correct?
7          MS. JEAN:  Objection.
8    A.   According to the manual, yes.
9    Q.   Did you understand that managers and
10  supervisors were not allowed to tell you to work
11  off the clock?
12          MS. JEAN:  Objection.
13   A.   Yes.
14   Q.   Did any manager/supervisor tell you to
15  work off the clock?
16   A.   Not actually used the words, "work off
17  the clock."
18   Q.   What do you mean by that?
19   A.   It was pressure to get the cases done.
20  Get cases closed.  And that required additional
21  typing time.
22   Q.   But no manager explicitly said, work off
23  the clock?
24          MS. JEAN:  Objection.
25   A.   No.

Page 60

1          M. O'Sullivan
2    Q.   With the pressure to get cases closed,
3   did you ever report that to local or corporate HR?
4    A.   No.
5    Q.   Were you paid hourly -- or you said you
6   believe you were salaried?
7    A.   I believe I was salary employee, yes.
8    Q.   Do you recall what your salary was?
9    A.   I don't, actually.
10   Q.   That's okay.
11   A.   I think when I retired, I think it was
12  70,000 a year.
13   Q.   Did you make any type of bonuses or
14  commissions?
15   A.   Other than profit sharing, no.
16   Q.   Did you see raises while you were
17  employed at GEICO?
18   A.   Yes.
19   Q.   And how frequent would you receive
20  raises?
21   A.   It would get reviewed annually.
22   Q.   Was it the same month every year?
23   A.   I believe it was March.
24   Q.   And walk me through what the review
25  process looked like, from what you recall.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
61–64

Page 61

1        M. O'Sullivan
2    A.    I guess you do an annual review with
3  your supervisor and they recommend a raise
4  percentage.
5    Q.    Do you know what the raise percentage
6  limit or amount would be?  Such as 2 percent to
7  10 percent, the --
8    A.    I don't.  I don't know what the raise
9  range was.
10    Q.    Do you know what the eligibility
11  standards were to receive a raise?
12    A.    I don't know.
13    Q.    Do you know what the conditions
14  precedent would be to receive a raise?
15    A.    Not that I -- no, I don't recall.  No.
16    Q.    Do you recall receiving a raise every
17  year from 2016 to '22?
18    A.    I believe there is a year that I did not
19  receive a raise, but I believe every year I did
20  with the exception of one year.  But I don't -- I
21  don't recall the time frame when that happened.
22    Q.    Do you know if any of the raises that
23  you received would have been set by a
24  cost-of-living adjustment due to inflation?
25    A.    I don't know that.

Page 62

1        M. O'Sullivan
2    Q.    Do you know if any of your raises were
3  set by a cost-of-living adjustment due to rising
4  prices in the county or the state?
5    A.    I don't know that.
6    Q.    Do you know if any of the raises that
7  you were provided were based upon tenure?
8    A.    I don't know that neither.
9    Q.    From 2006 to '22, was it your custom and
10  practice that you would enter your 7.75 hours every
11  day?
12    A.    Are you saying going into Workday every
13  day and --
14    Q.    Yes.
15    A.    I would do it on a Friday.
16    Q.    Was that then through the -- Monday
17  through Friday?
18    A.    Yes.
19    Q.    When you would go in to log your hours
20  on that Friday for the whole week, would you have
21  set, for example, your time in and time out?  Or
22  are you just putting the 7.75?
23    A.    Just the 7.75.
24    Q.    Was there any type of certification for
25  the accuracy of the time recorded?  Such as a

Page 63

1        M. O'Sullivan
2  pop-up box that said, I certified my hours?
3    A.    To the best of my recollection, I
4  believe there was.
5        (O'Sullivan Exhibit 4, Responses to
6    interrogatories, marked for identification, as
7    of this date.)
8    Q.    So what's been presented to you and
9  marked as Exhibit Number 4 is your responses to the
10  court's interrogatories, as well as your
11  declaration.  You are more than welcome to take a
12  quick look and review, and then we will discuss.
13        And you just tell me whenever you are
14  ready.
15    A.    Okay.
16    Q.    Have you seen these documents before?
17    A.    I believe I did, yes.  Yes.
18    Q.    Did you help your counsel prepare these
19  documents?
20    A.    In what fashion?
21    Q.    In providing information.
22    A.    Yes.
23    Q.    I anticipate that it was your counsel
24  who would have drafted the documents for you; is
25  that correct?

Page 64

1        M. O'Sullivan
2    A.    Yes.
3    Q.    And that you would have then reviewed it
4  and signed it if it was correct?
5    A.    Yes.
6    Q.    So for the interrogatories on Page 7,
7  there is a verification page.  And then on Page 5
8  of your declaration, there is also a signature as
9  well.
10        Both of them say Michael O'Sullivan,
11  both dated November 8 of 2023.
12        It appears to me that this is an
13  electronic signature; is that right?
14    A.    Yes.
15    Q.    Again, in your custom and practice, you
16  would have read everything of substance before you
17  electronically send the documents?
18    A.    I reviewed it, yes.
19    Q.    Circling back to when you would enter
20  the 7.75 per day on Friday for that week.
21        Would you get paid then for that 7.75
22  you entered every day?
23    A.    Yes.
24    Q.    So let's look at the declaration.  We
25  will go to paragraph 5.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
65–68

Page 65

1          M. O'Sullivan
2       So it states, "Since" -- sorry, I will
3   wait 'till you get there.
4       It states, "Since January 2020, GEICO
5   classified me and other special investigators as
6   nonexempt employees who were eligible for overtime
7   pay at one-and-one-half times my regular rate if I
8   worked over 40 hours a week."
9       Do you recall what the one-and-one-half
10  times rate would have been at that time?
11     A.   No.
12     Q.   "That said, prior to January 2020, GEICO
13  classified me and other special investigators as
14  nonexempt employees eligible for overtime pay, but
15  they used a different method of payment.  My
16  understanding of this payment method called
17  'premium pay' was that it was less than my regular
18  rate."
19       What was the premium pay amount, if you
20  know?
21     A.   No.
22     Q.   Where was that -- this -- where does
23  this information come from?
24       Meaning, the change and the payment
25  method type now called premium pay?

Page 66

1          M. O'Sullivan
2     A.   I guess it came from management.  I
3   don't --
4     Q.   Do you know as you sit here today,
5   though?  Like, who told you any of this
6   information?
7     A.   No.  I don't recall actually who
8   furnished me with that information.
9     Q.   And I am just trying to understand to do
10  a reflection, which is the premium pay versus the
11  one-and-one-half times regular rate.
12       Do you have any idea what that
13  dollar-amount difference would have been?
14     A.   I recall the premium pay was actually
15  less than regular pay.  It wasn't even
16  straight-time pay.  It was less than regular pay.
17     Q.   But do you remember what that amount
18  was?
19     A.   No, I don't.
20     Q.   Was the premium rate ever indicated on
21  your pay slips?
22     A.   I don't -- I don't know.  I don't recall
23  how it was indicated on the pay stub.
24     Q.   Do you recall seeing any type of written
25  policy regarding the premium pay that you are

Page 67

1          M. O'Sullivan
2   referencing to in paragraph number 5?
3     A.   I don't know.
4     Q.   As far as when you said management would
5   have provided you this information, as to whom in
6   management?  Do you know?
7     A.   I don't know.
8     Q.   Let's flip to Page Number 3 of your
9   declaration under paragraph 8.
10       So it states, "I only entered 7.75
11  working hours per day, five days a week, regardless
12  of how many hours I actually worked.  I only
13  entered this amount of time because I understood,
14  based on conversations with my supervisor, that
15  GEICO would not authorize overtime pay, 'just for
16  typing.'  Meaning, writing my case reports as
17  required -- as required by my job."
18       Which supervisor are you referring to in
19  paragraph number 8?
20     A.   Brian Portnoy.
21     Q.   As to paragraph number 8 for our other
22  supervisors that I believe you testified to, Dara
23  Campbell and Toni D'Agata, do you recall them
24  saying anything to this degree?
25     A.   No.

Page 68

1          M. O'Sullivan
2     Q.   When did the conversation with Brian
3   Portnoy take place about, "just for typing"?
4     A.   I don't recall a time frame.
5     Q.   Do you remember if this was over the
6   phone, via text, e-mail?
7     A.   I believe it was over the phone.
8     Q.   To your knowledge, was anyone else
9   present for this conversation?
10     A.   No.
11     Q.   Did you have any custom and practice
12  that you would record any conversations with
13  supervisors or other employees of GEICO?
14     A.   No.
15     Q.   Was this a one-time occurrence?
16     A.   Basically, yes.
17     Q.   Was there anything else substantively
18  from this conversation that you recall outside of
19  the specifically, just for typing?
20     A.   No.
21     Q.   Was the reference for just for typing
22  only allocated to the case reports that you would
23  do?
24     A.   Yes.
25     Q.   And I just want to make sure we are



MICHAEL O'SULLIVAN                                            August 26, 2024
Keith Fischer, et al. vs GEICO                                        69–72

Page 69
1         M. O'Sullivan
2   talking about the same thing for case reports.
3         Were those the same things where you
4   made a determination of fraud or not fraud?
5      A.    Basically summarize the investigation,
6   yes.
7      Q.    Would some case summaries be short?
8      A.    Most of them were in detail, if the
9   interview went forward.  The only ones that would
10  be shorter is if the interview never went forward
11  and deemed the claimant noncooperative.
12     Q.    In a range, so I have an idea, how many
13  pages would your case summaries fluctuate?  1 to
14  50?  10?
15     A.    1 to 4, 1 to 5.
16        (O'Sullivan Exhibit 5, Answers to
17     interrogatories, marked for identification, as
18     of this date.)
19     Q.    So what's been placed in front of you
20  has been marked as Exhibit Number 5.  This is a
21  different set of answers to interrogatories which
22  GEICO propounded upon you.
23        Feel free to take a look and then just
24  let me know when you are ready.  And similar to the
25  declaration, we will look at things specifically,

Page 70
1         M. O'Sullivan
2   but just to familiarize yourself with the document.
3      A.    Okay.
4      Q.    Have you seen this before?
5      A.    Yes.
6      Q.    All right.  And I think similar to
7   Exhibit Number 4, go to the last page, Page 17.
8   There is a verification page where it looks like
9   there is an electronic signature that's dated for
10  July 29, 2024.
11        Is that your electronic signature?
12     A.    Yes.
13     Q.    And similar to your custom and practice
14  before, would you review the responses to the
15  interrogatories to ensure the correctness before
16  you signed the verification page?
17     A.    I did review them, yes.
18     Q.    Let's look at interrogatory number 3.
19  That's going to be on Page 4, and then the
20  responses on 4 and 5.
21        The interrogatory states, "Describe in
22  detail any oral or written policies or procedures
23  that you contend dictated the day-to-day activities
24  that you performed during your employment with
25  GEICO during the relevant period."

Page 71
1         M. O'Sullivan
2         Your response says, in relevant parts,
3   "That plaintiff further responds, that at least on
4   one occasion he called his supervisor, Brian
5   Portnoy, requesting overtime due to case write-ups
6   he had to complete.  And his supervisor responded
7   that he can't approve overtime just for typing."
8         Is this the same conversation we were
9   discussing in paragraph 8 of your declaration?
10     A.    Yes.
11     Q.    And again, you recall this was a phone
12  conversation, but you don't know when in time it
13  was?
14     A.    I don't recall the time frame.
15     Q.    Walk me through the overtime process as
16  you recall it to be.
17     A.    As far as what?  The policy, if we were
18  going to ask for overtime?
19     Q.    Yes.
20     A.    If we were going to have to do overtime,
21  you had to get supervisor approval.
22     Q.    Was this always the policy, at least
23  from 2016 to '22?
24     A.    I believe so, yes.
25     Q.    So during that time period, say you

Page 72
1         M. O'Sullivan
2   needed to work more time for your cases, you would
3   reach out either to, at that time; Dara Campbell,
4   Toni D'Agata or Brian Portnoy?
5      A.    Actually, really didn't reach out to
6   them for overtime.  We just -- because it didn't
7   seem like the company was going to pay overtime for
8   typing, so I just typed my cases as required or as
9   needed to get the cases submitted timely.
10     Q.    Did you ever request OT through those
11  supervisors?
12     A.    Did I ever request what?
13     Q.    Did you ever request overtime through
14  those supervisors?
15     A.    I don't recall with Campbell or D'Agata.
16  Like I said, the one time with Portnoy, it was; he
17  can't authorize overtime for typing.
18        It was asked once.  And once I realized
19  it wasn't going to happen, I just did my typing as
20  necessary.
21     Q.    Did you report that conversation that
22  you had with Brian Portnoy to anyone else?
23     A.    Not that I recall.
24     Q.    I apologize if I am repeating myself.
25        To your knowledge, do you recall ever


ESQUIRE
DEPOSITION SOLUTIONS

Page 85

1            M. O'Sullivan
2  have still paid for it?
3        MS. JEAN:  Objection.
4     A.   He wouldn't have approved the Workday.
5     Q.   Well, how do you know that you still
6  wouldn't be paid though?
7     A.   If I submitted and he wouldn't have
8  approved it, he would have sent my Workday back or
9  sent me an e-mail to reflect the hours.
10    Q.   But that had never happened, right?
11       MS. JEAN:  Objection.
12    A.   No.
13    Q.   Back to the declaration, Page 4,
14  number 12.
15       It states, "GEICO authorized me to work
16  overtime only if I agreed to take on additional
17  cases, such as a social media investigation.  I
18  remember GEICO offered me overtime pay to work on
19  social media cases one year in December because
20  GEICO wanted these cases completed by the end of
21  the year."
22       I believe from your previous testimony
23  you didn't recall what year this was; right?
24    A.   No, I don't.
25    Q.   Who at GEICO offered you overtime pay to

Page 86

1            M. O'Sullivan
2  work on the social media cases?
3     A.   I would -- to my recollection, it was
4  Portnoy.
5     Q.   And when in time did that conversation
6  take place?
7     A.   What do you mean, when in time?  Like
8  what time frame?
9     Q.   Yes.
10    A.   I believe it was sometime in December
11  because it was towards the end of the year.
12    Q.   And do you remember where the
13  conversation took place?
14    A.   It was a phone conversation and I was in
15  my office.
16    Q.   Do you know if anyone else was on the
17  call with you and Brian?
18    A.   No.  I don't know if anyone was.
19    Q.   Did you offer to work on the social
20  media cases?
21    A.   I did.
22    Q.   And then because you accepted, do you
23  know how many overtime hours were needed when you
24  accepted?
25    A.   I believe the -- it was -- average was

Page 87

1            M. O'Sullivan
2  one hour of overtime per social media case.
3     Q.   And then when you were actually in
4  application of taking on the social media cases,
5  was it one hour?
6     A.   Roughly it was, yes.
7     Q.   How many social media cases did you then
8  pick up in December?
9     A.   I don't recall how many in total, but
10  maybe five or seven.
11    Q.   And you voluntarily picked these cases
12  up; right?
13    A.   Yes.
14    Q.   And then did you receive overtime --
15  strike that.
16       Did you receive time-and-a-half pay for
17  the overtime hours that you picked up on the social
18  media cases?
19    A.   Yes.
20    Q.   Did this occur only in December, or did
21  it then extend past December that you worked on
22  additional social media cases?
23    A.   To my recollection, it was only in
24  December.
25    Q.   Were you still running your med cases at

Page 88

1            M. O'Sullivan
2  the same time?
3     A.   Yes.
4     Q.   Was there ever any offer, for example,
5  for you to pick up auto theft cases or auto arson
6  cases, similar to the situation you just told me
7  about with the social media cases?
8     A.   I don't recall being offered that.
9     Q.   Do you know if anyone else was offered
10  this same type of overtime to social media cases?
11    A.   I believe it went out as a general
12  message to all investigators.
13    Q.   When you were speaking to your
14  colleagues, do you remember any of them saying, Oh,
15  yes, I am going to pick up those additional social
16  media cases?
17    A.   I don't recall any of them actually
18  saying they were.
19    Q.   What other times did you ask to work
20  overtime, other than the social media and the
21  conversation with Portnoy where he had said you
22  don't get OT for typing?
23    A.   What other times did I ask?
24    Q.   Yes.
25    A.   That was the only time that I asked.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
89–92

Page 89

1          M. O'Sullivan
2      Q.    Did supervisors remind senior special
3    investigators to flex your time accordingly?
4          MS. JEAN:  Objection.
5      A.    Were we reminded?  I don't know if we
6    were reminded, but I mean, we did vary our schedule
7    slightly.
8      Q.    In your custom and practice, what were
9    your hours?
10     A.    If it was a down day and just typing, I
11   would do -- start it like 8:30 and I usually finish
12   at dinner time, which is at 6:00, 6:30.
13         If it was a field day, sometimes my day
14   started at 7:30 because I would have to prepare for
15   my interviews.
16         Print out a worksheet, you know,
17   basically a series of questions I am going to use
18   for my interview.  Print out the billing so I know
19   what areas of the investigation I have to go into.
20         And check e-mails.  Make sure nothing
21   has been cancelled before I leave the office.
22         And then go to the field, do my
23   interviews, and then come back and start typing.
24     Q.    Would you ever work, say overnight?
25   Like a graveyard, 1:00, 2:00 in the morning?

Page 90

1          M. O'Sullivan
2      A.    I have worked late in the past, yes.
3      Q.    So turning to paragraph 9, which is
4    going to be on Page 3 of your declaration, Exhibit
5    Number 4.
6          You stated, "I worked about 47.5 to
7    50 hours a week on average."
8          On what do you base these estimates?
9      A.    I based them on the time frame it
10   would -- from the point I would go down into the
11   office until the time I would leave.
12         And on days that I was going in the
13   field, what time I signed onto the computer to
14   start doing my printouts, to the time I shut my
15   computer down at night.
16     Q.    When you would work in the basement in
17   your home office, did you do other stuff in that
18   area on your computer?
19     A.    Such as?
20     Q.    Just regular social media.  Watching
21   videos on YouTube?  Video gaming?
22         You name it.
23     A.    Actually, I don't think we had access to
24   that on our computers, to my recollection.  I don't
25   recall -- definitely not gaming.

Page 91

1          M. O'Sullivan
2          But to my recollection, GEICO had a lot
3    of filters that didn't let you use social media
4    platforms.
5      Q.    For your home office, and I understand
6    the fire walls and some other issues with company
7    platforms and accessibility to other websites such
8    as YouTube, did you have your own personal computer
9    set up, actually, with your GEICO computer?
10     A.    I would use an iPad to assist with my
11   social media cases.
12     Q.    Other than Workday, did you record your
13   time anywhere else?
14     A.    No.
15     Q.    And I want to make sure I flesh this
16   out.
17         As far as entering it in an Excel
18   spread- -- spreadsheet, logging it on the calendar,
19   any other software mechanisms that you would have
20   used in order to quantify the additional time that
21   paragraph 9 says of the 47.5 to 50 hours a week?
22     A.    No.
23     Q.    So based then upon Number 9 for the 47.5
24   to 50 hours a week on average versus what you were
25   supposed to -- and what you did log, which was the

Page 92

1          M. O'Sullivan
2    38.75, that then gives us an 8.75 to 11.25
3    difference per week.
4          There is -- is there any way to quantify
5    that substantively, outside of just your testimony?
6      A.    No.
7      Q.    As to the 8.75 to 11.25 hours per week
8    that you indicate you worked OT, you did not then
9    log those hours in the Workday system?
10     A.    That's correct.
11     Q.    Did you tell anyone that you were
12   working between 8.75 to 11.25 extra hours per week?
13     A.    Anybody?  As in?
14     Q.    Anybody.
15     A.    Anybody.  I mean, other than other
16   investigators, we would discuss working the extra
17   time.
18     Q.    Were those other investigators the ones
19   on your team?
20     A.    Yes.
21     Q.    Any other investigators?
22     A.    I mentioned McManus, and I believe
23   Fischer.
24     Q.    Did you ever tell your supervisor you
25   were working between 11 -- between 8 to 11 extra



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
93–96

Page 93

1          M. O'Sullivan
2    hours a week?
3        A.    I don't know if I specifically told them
4    I was doing the -- the overtime, other than that I
5    was doing the typing to get the work -- to get the
6    required cases submitted.
7        Q.    Do you recall saying anything to HR?
8        A.    No, I never went to HR.
9        Q.    When you took -- in your leave in
10    January of '21, who took over your cases?  To your
11    knowledge?
12        A.    I don't -- I don't recall if they were
13    all reassigned or they were just, you know,
14    delayed.  I don't recall.
15            I don't think they were all reassigned.
16    I think some of them might have been just -- been
17    like interviews scheduled out to the month, to my
18    recollection.
19        Q.    When you spoke to other investigators
20    about working overtime, did you specifically tell
21    them the extra hours you were working, or just
22    broadly that you were working overtime?
23        A.    I believe it was just a broad statement
24    that, you know -- you know, we would meet at
25    deposition locations, and while we were waiting for

Page 94

1          M. O'Sullivan
2    our claimants to show up, we would have
3    conversations.  And just in a broad conversation
4    would be, you know, When I get home I got to type
5    this up.
6            And you know, sometimes you are not
7    leaving until 2:00, 3:00.  Which is going to put
8    you into traffic, you are not getting home until
9    5:00, and now you are going to be typing for two to
10    three hours.
11        Q.    What was their response when you would
12    tell them that?
13        A.    They would pretty much say the same
14    thing.  Like, Yes, same here.
15        Q.    Did any of them ever tell you they
16    reported it to HR?
17        A.    No.
18        Q.    So transitioning then to March of 2020.
19    I think we all have a very unique experience of
20    March of 2020, but when I focus on that, I am
21    talking about COVID and when everything started to
22    close down.
23        A.    Was it 2020 was COVID?
24            Okay.  My surgery might have been 2020,
25    not '21.  Just to -- I always thought it was '21.

Page 95

1          M. O'Sullivan
2    Because I actually had surgery, like, I think weeks
3    before COVID, which like, right in under the -- so.
4        Q.    Okay.  All right, no problem.
5            Starting in March of 2020, and if you
6    just came back from leave, were you performing all
7    of your work remotely because of the pandemic?
8        A.    Yes.
9        Q.    So fair to say you weren't going out in
10    the field to do in-person investigations or on-site
11    visits to clinics?
12        A.    For the most part, yes.
13        Q.    You were conducting investigations over
14    the phone then because you couldn't go in person?
15        A.    We were doing phone -- I was doing phone
16    interviews when possible.
17            When I say when possible, because at
18    some point, you know, I couldn't get through to
19    attorney's offices.  You know, being -- everything
20    shut down, so it was a struggle to get the
21    interview -- interviews in.
22            Some of the cases, if I recall
23    correctly, we made one or two attempts to contact
24    the claimant directly, and then we closed them out
25    just so they weren't going to be lingering for an

Page 96

1          M. O'Sullivan
2    extended period of time.
3        Q.    Do you recall, because of these
4    limitations, you were closing out cases faster?
5        A.    I want to say yes, but I am not
6    100 percent sure.  I kind of -- I kind of remember
7    we were -- we were processing the cases.
8            And like I said, the ones where we
9    couldn't get interviews or couldn't get through to
10    the attorneys, I think we were going to close them
11    out and open up new cases to try and keep the
12    investigations moving.
13        Q.    During COVID, did working from home
14    100 percent instead of working for the field give
15    you more flexibility in your investigation process?
16        A.    Flexibility in what sense?  Give me an
17    idea what you are looking at, as far as what.
18        Q.    I mean, you are not driving now, so you
19    may have more time to allocate doing reports or
20    whatever was necessary that you could do in a
21    remote capacity for all your cases.
22        A.    Yes, I believe that's fair to say.
23        Q.    During March of 2020, was it still your
24    older son and your wife who were residing with you?
25        MS. JEAN:  Objection.


ESQUIRE
DEPOSITION SOLUTIONS

MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
101–104

Page 101
1            M. O'Sullivan
2    A.   No, I don't know that.
3    Q.   Do you know if internal major case SIU
4  investigators were eligible for overtime?
5    A.   Not to my knowledge.
6    Q.   And do you know if internal major case
7  SIU investigators were denied overtime?
8    A.   No.
9    Q.   Do you know if internal major case SIU
10  investigators were paid overtime?
11    A.   No.
12    Q.   Do you know if internal security
13  investigators were eligible for overtime?
14    A.   Not to my knowledge.
15    Q.   Do you know if internal security
16  investigators were denied overtime?
17    A.   Not to my knowledge.
18    Q.   Do you know if they were paid overtime?
19    A.   I don't know if anyone was paid overtime
20  in -- in SIU.  I have no knowledge of it.  No
21  recollection of it, I should say.  I don't recall
22  anyone saying that they were paid overtime.
23    Q.   I want to flip back to Exhibit 4 of your
24  declaration.  I believe it's paragraph 13.
25  Paragraph 13, so that is going to be on Page 4.

Page 102
1            M. O'Sullivan
2    So paragraph 13 says --
3    A.   On what we are -- we are doing?
4    Q.   Sorry.  This is going to be on your
5  declaration, so that's going to be Exhibit 4.
6    Yes, it's in that packet, but it's the
7  declaration.
8    A.   What paragraph?
9    MS. ALBERTY:  Can you see it?
10    MS. JEAN:  He is there.
11    MS. ALBERTY:  Paragraph 13 --
12    MS. JEAN:  On Page 4.
13    A.   Okay.
14    Q.   Perfect.  So paragraph 13 also states,
15  "That GEICO had a variety of performance metrics
16  that I was required to meet to remain in good
17  standing.  To the best of my recollection, GEICO
18  generally evaluated me based on how often I made an
19  entry in a case report, how many days I took to
20  close a case, and how many cases I completed within
21  the month.  These metrics put a lot of pressure on
22  me to work as much as needed to meet these goals
23  and deadlines."
24    My question for you is:  What is your
25  basis for believing that GEICO's evaluations were

Page 103
1            M. O'Sullivan
2  based off these metrics?
3    A.   I guess performance evaluations.
4    Q.   Do you know that for certain?
5    A.   No.
6    Q.   In paragraph 13, you state "These
7  metrics put a lot of pressure on me."
8    As to the metrics that you are talking
9  about, is it only the three that are identified in
10  paragraph 13?  Which is, "How often I made an entry
11  in a case report, how many days I took to close a
12  case, and how many cases I completed within a
13  month."
14    A.   I don't recall.
15    Yes, I should say:  I don't know how
16  many metrics there were.
17    Q.   Do you recall if the metrics would
18  change every year?
19    A.   I don't know what their flexibility was.
20    Q.   Do you recall seeing any type of written
21  policy that described these metrics?
22    A.   I don't recall seeing anything.
23    Q.   Do you recall your supervisors or
24  managers telling you what the metrics were?
25    A.   I don't recall, no.

Page 104
1            M. O'Sullivan
2    Q.   Do you remember if someone at GEICO
3  communicated to you what the metrics were?
4    A.   I kind of remember the metrics being
5  discussed at some point, but I don't recall with
6  who.  You know, just in a conversation; the metrics
7  are what's used to conduct valuations.
8    Q.   Do you have any idea when GEICO started
9  to implement performance metrics as it applies to
10  your employment?
11    A.   I believe every year they used the
12  metrics to do performance evaluations.
13    Q.   But again, as to the -- almost like the
14  itemization of the performance metrics, you are not
15  sure what those were?
16    A.   No, I don't know.
17    Q.   Were there specific time limits on the
18  tasks that you had to complete on each med case?
19    A.   Not really, because it was all at the --
20  based on how quick you can get an interview.  If
21  you didn't get an interview, they had to go to
22  examinations under oath.  And if you had to go for
23  an EUO, automatically pushed it to a 30-day window
24  before you even got an EUO.
25    Q.   Was that something that was outlined or



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
105–108

Page 105

1          M. O'Sullivan
2   set by the software at --
3      A.   No.
4      Q.   Not Citrix?  What was the name of the
5   software?
6      A.   SICM.
7      Q.   I keep mixing that up, I'm sorry.
8          In the SICM system when you would look
9   at your case, say for example, it would be Smith
10  versus Smith.  You would look at the case.
11         Would it tell you what tasks you needed
12  to do, with any type of, you know, check-off list
13  that you completed those tasks?
14     A.   We did have a -- I believe it was plan
15  of action that we filed in the SICM, which would
16  basically outline our investigative steps to take
17  in the -- it -- in the case.  But they were not
18  check-offs or -- it was more just, you know, during
19  the case, I will do the following steps.
20     Q.   For the outline for your investigative
21  steps, was that you personally making the
22  determination of what needed to be done on that
23  file?
24     A.   Yes.
25     Q.   Did you record in any GEICO system the

Page 106

1          M. O'Sullivan
2   tasks that you completed in each given case?
3      A.   You would make entries into SICM for
4   various tasks, and the interviews and investigative
5   steps you took, yes.
6      Q.   Did that have a narrative component to
7   it?
8      A.   Yes.
9      Q.   Other than this process in SICM for your
10  investigative steps and your narrative, did you
11  keep any other records of the work you completed
12  each day on your files?
13     A.   I would use a blotter on a desk, but
14  that was -- you know, I didn't -- it wasn't
15  maintained.  It's been discarded.
16     Q.   When you would receive your performance
17  valuations, was that on a percentage or a number
18  scale?
19     A.   I believe a number scale.
20     Q.   Do you remember what the range was?
21     A.   I remember from two to four; three being
22  the average.
23     Q.   In delineating metrics for the overall
24  performance evaluation, as to what number gets
25  identified to what metric and how that factors into

Page 107

1          M. O'Sullivan
2   the performance evaluation, could you provide me
3   any insight?
4      A.   No.
5      Q.   Okay.  Transitioning down to the next
6   number, which is 14.
7          It states, "My best understanding of
8   GEICO's performance metrics was that they were tied
9   to the number of hours I reported.  I received more
10  favorable ratings related to my productivity
11  metrics if I completed more work within the 7.75
12  hours per day or the 38.75 hours per week.  If I
13  reported working more hours, that would
14  negatively" -- I think that's a typo, sorry.
15  "Negatively my performance ratings."
16     A.   I would say that should say, "negatively
17  affect my performance rating."
18     Q.   Okay, thank you.
19         So breaking that down.  What's your
20  basis for believing that the evaluations at GEICO
21  were tied to the number of hours you reported?
22     A.   Because if you reported additional hours
23  for every eight hours reported, GEICO's requirement
24  would be one more -- an additional case.
25     Q.   Again, I am telling you, me and math are

Page 108

1          M. O'Sullivan
2   not best friends.  We haven't been for years.
3          So if we add eight hours to your weekly
4   rate of 38.75, and so then you are working 46.75
5   hours in that week, then you would get one case
6   assigned to you additionally per week; correct?
7          MS. JEAN:  Objection.  I did not follow
8      that.  If you understand it, you can answer.
9      A.   So as was explained to me when this
10  premium time came into effect; if we recorded
11  premium time for every eight hours that you
12  recorded, the matrix would require you to do an
13  additional case to meet standards.
14         So in -- so for argument's sake or
15  discussion purposes:  If I did 32 hours of
16  overtime, it would make my requirement for four
17  more cases for the month.  So my -- so instead of
18  requiring 20 cases, the matrix would require me
19  24 cases.
20     Q.   Let's break that down.  Who told you
21  that?
22     A.   That, I don't recall.  It was definitely
23  a supervisor that explained that to us.  Me -- I
24  guess explained it to me.
25         As it was explained to me, that's how

Page 109
1          M. O'Sullivan
2  that would -- that would affect our performance
3  evaluation if we put in for -- and this is -- I am
4  only referring back to premium time, when we did
5  premium time.
6          Because my argument was if I put in for
7  premium time, which was less than a regular rate of
8  pay, I am doing additional cases for less than
9  regular pay.  So that's why I didn't put in for
10  much premium time.
11      Q.    So this -- this matrix, that would
12  attach an additional case to your case load if you
13  exceeded eight hours a week past the 38.75 in that
14  week?
15      A.    Again, this is how I believed it was
16  explained to me.  It could be explained totally
17  different by someone else, but that's how I
18  understood it.
19      Q.    Do you recall if you saw that in any
20  type of written policy?  E-mail?  That type of
21  format from GEICO?
22      A.    No.
23      Q.    And you don't remember who specifically
24  told you how that matrix worked?
25      A.    That was a supervisor, but I don't

Page 110
1          M. O'Sullivan
2  recall which one.
3      Q.    You said that that, to your
4  understanding, occurred during premium time.  So
5  that, we will say matrix update, would have started
6  then in January of 2020; is that correct?
7      A.    I don't -- honestly I can't recall time
8  frames.  I am terrible with time frames, so I don't
9  know.
10      Q.    Do you remember at least in time in
11  before COVID, if that matrix was in place?
12      A.    I believe it was.
13      Q.    And as far as the matrix, is it your
14  understanding that that was something that the
15  software would automatically trigger?
16          So once you are doing your OT in
17  Workday, that would then automatically trigger an
18  additional case assignment to you in Citrix?
19          MS. JEAN:  Objection.
20      Q.    Sorry, SICM.
21      A.    SICM.  But no, I don't think it would
22  trigger an additional case to us.  It would just --
23  how would I explain it.
24          It basically -- the calculations were if
25  you reported any kind of premium time -- because I

Page 111
1          M. O'Sullivan
2  am referring to premium time now -- that at the end
3  of the month, if you did an eight-hour premium
4  time, you would be required to have an additional
5  case for productivity.
6      Q.    I am just trying to follow then what you
7  just said.  Which is -- it appeared that it was
8  done on a monthly scale?
9      A.    The calculation at the end of the month,
10  yes.
11      Q.    So by your declaration then, if you were
12  working the 47.5 to 50 hours a week, is it fair to
13  say that you were not then getting assigned one
14  additional case per that additional time where
15  you -- because you were not logging your OT?
16          MS. JEAN:  Objection.
17      A.    I need you to rephrase that question.  I
18  didn't --
19      Q.    Sure, and I am not trying to confuse
20  you.
21          All right.  The standard is 38.75 in one
22  week.  But if you input more time and do eight
23  hours, that would be 46.75 hours for that week.
24          Your declaration states that in your
25  opinion, you were working 47.5 to 50 hours a week,

Page 112
1          M. O'Sullivan
2  but you weren't logging your OT.  If you were
3  logging your overtime, you would have then been
4  assigned, in your theory, one additional case per
5  week.
6          Is that what you are saying?
7      A.    I wouldn't have been assigned the
8  additional case; I would have been required in
9  order to meet standards.
10          And again, that's how I believed it
11  would be explained to me.
12      Q.    How is it required if it's not assigned?
13      A.    I don't know.  I mean, basically it was
14  calculations in this matrix as to whether they are
15  paying you for, I guess it's 40.
16          What do you say, 46.75?  The computer
17  says, all right.
18          So based on that time submission, you
19  know, should be an additional case in there.
20      Q.    When the supervisor was explaining this
21  matrix process to you, did they state that if you
22  reported more hours, that that would affect your
23  performance rating negatively?
24      A.    Yes.
25      Q.    But you don't recall who told you



MICHAEL O'SULLIVAN                                    August 26, 2024
Keith Fischer, et al. vs GEICO                        113–116

Page 113

1          M. O'Sullivan
2  that -- this?  And when in time; right?
3      A.    Right.  I don't recall time frame, no.
4      Q.    So then what would the rating scale be
5  if you worked for more than 38.75?
6      A.    You wouldn't have the additional case
7  requirement, so you would meet standards or exceed
8  standards.
9      Q.    Going back to the two to four and the
10  performance evaluation you were stating.
11         If you only worked the 38.75, do you
12  know if that would equate to the two to four number
13  in your performance evaluation?
14      A.    I believe it would, yes.
15      Q.    Then what, to your knowledge, would it
16  be then?
17      A.    What?  My performance evaluation?
18      Q.    Yes, if it was the 38.75.
19      A.    Probably would be three.  Meets
20  standards.
21      Q.    Do you know that for a fact or is that
22  an assumption?
23      A.    That's an assumption.
24      Q.    Okay.  What if the rating then -- strike
25  that.

Page 114

1          M. O'Sullivan
2         What if your hours then increased, for
3  example, to 40 hours?  So only -- only 1.25 hours
4  more a week, then what would your rating be then?
5         MS. JEAN:  Objection.
6      A.    Again, I -- I was under the belief that
7  every eight hours, the matrix would require you to
8  do an additional case to meet standards.  So 1.25,
9  I don't know if it would affect my rating.
10      Q.    So if we then jump up and say an 8.  So
11  we go 46.75 in the week, what would your rating
12  then be?
13         MS. JEAN:  Objection.
14      A.    I don't know what the rating would be.
15      Q.    As far as the favorability ratings, how
16  would that be allocated?
17         Meaning; was that adjusted by week, by
18  month?  By a quarter?  Biannual or annual?
19      A.    I don't know how it was.  I mean, we
20  used to get report cards once a month to give you
21  an idea where your rating was, and then it would
22  all, I guess, reflect down annually for the annual
23  performance evaluation.
24      Q.    Did the report cards breakdown the
25  matrix that we just talked about?

Page 115

1          M. O'Sullivan
2      A.    The report card did break down cases,
3  cases closed, interviews conducted, and impact
4  ratio.
5      Q.    What do you mean, impact ratio?
6      A.    Impact ratio is a term, I guess, in the
7  industry.  If your interview identifies fraud, that
8  would impact the way the examiners handle cases; if
9  they could deny claims or refer to arbitration to
10  negotiate down the bills.
11      Q.    Who was filling out all these report
12  cards?
13      A.    The supervisors.
14      Q.    Do you know if they were generating this
15  information based off SICM reporting?
16      A.    I would believe it would be off of SICM,
17  yes.  Yes.
18      Q.    In December of the year we don't know
19  when you worked OT and picked up those additional
20  social media cases, in theory, you were reporting
21  more hours; correct?
22      A.    Yes.
23      Q.    Did that negatively affect your
24  performance rating?
25      A.    Not that I know of.

Page 116

1          M. O'Sullivan
2      Q.    Going back to number 14, second half.
3         States, "When GEICO paid me at the
4  'premium pay rate' for overtime hours, this
5  especially deterred me from entering the hours I
6  worked.  This is because more hours entered would
7  increase my productivity requirement, so decrease
8  my ratings, all while I was paid a low pay rate for
9  that overtime."
10         I am going to get to the question.  Just
11  a second.
12         So as to the premium pay.  Again, you
13  don't remember in time when this went into effect;
14  correct?
15      A.    That's correct.
16      Q.    As to the premium pay rate, you don't
17  know what dollar amount that would have been;
18  correct?
19      A.    That's correct, I don't recall.
20      Q.    Do you recall seeing any written policy
21  that described the premium rate as it was
22  applicable to that time period?
23      A.    I don't recall.  I am assuming there had
24  to be an e-mail or something to the effect, but I
25  don't recall how it came out.



```
 1                    M. O'Sullivan

 2              C E R T I F I C A T E

 3    STATE OF NEW YORK     )

 4                          : ss.

 5    COUNTY OF QUEENS      )

 6

 7         I, YAFFA KAPLAN, a Notary Public

 8    within and for the State of New York, do

 9    hereby certify:

10         That MICHAEL O'SULLIVAN, the witness

11    whose deposition is hereinbefore set forth,

12    was duly sworn by me and that such

13    deposition is a true record of the

14    testimony given by the witness.

15         I further certify that I am not

16    related to any of the parties to this

17    action by blood or marriage, and that I am

18    in no way interested in the outcome of this

19    matter.

20         IN WITNESS WHEREOF, I have hereunto

21    set my hand this 3rd day of September,

22    2024.

23

24                  YAFFA KAPLAN

25
```

