# Exhibit T

**In the Matter Of:**

FISCHER V. GEICO

2:23 Civ. 2848 (GRB) (ARL)

---

**MARGARET A. FISCHER**

*December 19, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

Page 53

1       M. A. Fischer
2   your understanding that everything you had
3   on your old phone is now on your new phone?
4       A.   Yes.
5       MS. DSOUZA:  I'd just like to
6   state and mark witness's phone number
7   as confidential.
8       THE WITNESS:  Please.  And my
9   e-mail also.
10      MS. DSOUZA:  Yes.
11      MR. TSONIS:  No objections to
12   that.  Not looking to publicize it.
13   If there's other parts of the record
14   as we go forward today that you guys
15   feel are appropriately marked
16   confidential, we can note it on the
17   record, and everyone will be on the
18   same page.  That's fine.
19   BY MR. TSONIS:
20      Q.   Did you have a Geico-issued
21   cellphone when you worked for Geico?
22      A.   No.
23      Q.   Did you use your personal
24   cellphone for work purposes then?
25      A.   No.

Page 54

1       M. A. Fischer
2       Q.   You never once used your
3   cellphone instead of a landline at the
4   office?
5       MS. DSOUZA:  Objection.
6       A.   Not for work purposes.
7   BY MR. TSONIS:
8       Q.   Okay.  What would you do if you
9   had to take a photo of something for work
10   purposes?
11      A.   Then we would use the phone.
12      Q.   Okay.  And then you would send
13   it via text message, for example?
14      A.   No.  We would download it to
15   the -- to the system.  It was -- I haven't
16   done it in many, many, many years.
17      Q.   Did you have your Geico e-mail
18   on your cellphone?
19      A.   No.
20      Q.   I guess, if you take a picture
21   on your phone and you need to upload it to
22   the system, how does it get from your phone
23   to the system?
24      A.   I couldn't tell you.
25      Q.   Would you e-mail it?

Page 55

1       M. A. Fischer
2       A.   No.
3       Q.   Would you text it?
4       A.   No.
5       Q.   So, I guess, what's your
6   explanation for how it gets from your phone
7   to the computer?
8       MS. DSOUZA:  Objection.
9       A.   I don't know.  It was a really
10   long time ago.
11   BY MR. TSONIS:
12      Q.   I understand.  Is it possible
13   that you would e-mail it in those
14   circumstances?
15      A.   No.
16      MS. DSOUZA:  Objection.
17   BY MR. TSONIS:
18      Q.   But you can't identify how it
19   would have gotten from your phone to a
20   computer system?
21      MS. DSOUZA:  Objection.
22      A.   Correct.
23      Q.   Okay.  Do you use -- I know I
24   mentioned the texts.  Just to be clear,
25   there are other applications that do the

Page 56

1       M. A. Fischer
2   same thing as text messaging, like
3   WhatsApp, for example.
4       Do you use any of those
5   applications to text or message with
6   current or former Geico employees?
7       A.   No.
8       Q.   Okay.  I referenced a short
9   while ago that there were interrogatories
10   that were issued by both the court and
11   Geico in this case, right?
12      A.   Yes.
13      Q.   Do you understand that Geico
14   also issued what's called requests for
15   production, meaning requesting relevant
16   documents that you might have?
17      A.   Yes.
18      Q.   All right.  What did you do to
19   search for relevant documents?
20      A.   I looked through where I keep
21   paperwork in my home.  But like I said, I'm
22   retired, so -- and I worked in the office,
23   so I did not have documents in my home, and
24   I went through my phone.
25      Q.   And what did you go through



Page 57

1          M. A. Fischer
2   your phone looking for?
3      A.   Anything relative to overtime.
4      Q.   And, I guess, is that the
5   criteria that you were using as far as
6   something that you might need to provide if
7   it was relevant or relative to overtime?
8          MS. DSOUZA:  Objection.
9      A.   Yes.
10  BY MR. TSONIS:
11     Q.   Okay.  Besides your phone and
12  your, you know, physical files in your
13  home, any other places that you searched?
14     A.   No.
15     Q.   Did you find any documents that
16  you provided to counsel?
17     A.   No.
18     Q.   Did you ever have, I guess,
19  paper files in your home?
20     A.   No.
21     Q.   All right.  Now, we haven't
22  gotten to your specific jobs you held at
23  Geico, but you worked in SIU, right?
24     A.   Yes.
25     Q.   And you said you worked in the

Page 58

1          M. A. Fischer
2   office, correct?
3      A.   Yes.
4      Q.   With the exception of a period
5   of time post COVID where employees worked
6   from home?
7      A.   Yes.
8      Q.   Okay.  When you transitioned
9   back from working home to the office, were
10  you five days a week in the office?
11     A.   I did not return to the office.
12  I retired.
13     Q.   You retired.
14         And you never actually went
15  back to the office at that point?
16     A.   Correct.
17     Q.   Understood.  Prior to that
18  point -- well, strike that.
19         What was your job title at
20  Geico before you retired?
21     A.   Inside medical investigator.
22     Q.   Okay.  Did that job title
23  change at some point?  Were you something
24  else, and you became an inside medical
25  investigator?

Page 59

1          M. A. Fischer
2      A.   It was a -- I believe the
3   titles did change.  It was just medical
4   investigator.
5      Q.   Were you ever something known
6   as, like, a major case investigator?
7      A.   Well, that's the same thing.
8   It was always a major case investigator.
9      Q.   Okay.  It was major case
10  because all the medical investigations
11  qualify as major case investigations; is
12  that right?
13         MS. DSOUZA:  Objection.
14     A.   No.
15  BY MR. TSONIS:
16     Q.   Back up for a second.
17         What's the difference, I guess,
18  between a field or desk investigator and a
19  medical -- inside medical investigator?
20     A.   I can answer what I did.  I
21  can't tell you what other people's jobs
22  included.  But my job, I investigated
23  medical providers and facilities.
24     Q.   Were there others that would
25  qualify as major case but didn't have the

Page 60

1          M. A. Fischer
2   specific job title of -- strike that.  I
3   misspoke.
4          Is it fair to characterize
5   major case as a sort of subgroup within
6   SIU?
7      A.   Rephrase that.
8      Q.   I'll ask a general question.
9          How -- what was the
10  organizational structure of the Melville or
11  Woodbury SIU office?
12     A.   It was -- when I left, there
13  were two -- it was divided into two
14  managements.  It was medical team -- there
15  was medical and there was other.
16         There were outside
17  investigators.  There were inside
18  investigators.  People did social media
19  searches.  People did small investigations,
20  nothing -- and then we had medical
21  investigations, major medical
22  investigations.
23     Q.   Were there other major
24  investigations that weren't medical?
25     A.   I'm not--



Page 65

1          M. A. Fischer
2          MS. DSOUZA:  I'd just like
3    to -- Counsel, could you just wait
4    for the witness to complete her
5    answer before you ask the next
6    question?
7          MR. TSONIS:  Sure.
8    BY MR. TSONIS:
9          Q.    I think you said that you would
10   be assigned cases by your supervisor; is
11   that right?
12         A.    Correct.
13         Q.    Approximately how many cases
14   would you be assigned in a month?
15         A.    I believe four.
16         Q.    Four cases per month?
17         A.    I believe so.
18         Q.    All right.  And what kinds of
19   things would you have to do to investigate
20   those cases?
21         A.    I would have to run background
22   searches.  I would have to run data
23   searches, review billing, review public
24   records, review previous cases through our
25   case system.  I would assign clinic

Page 66

1          M. A. Fischer
2    inspections and claimants' statements out
3    to the field.
4          Q.    So, if field work was needed,
5    you would assign that to a field
6    investigator?
7          A.    I would assign the case to a
8    spreadsheet, and the field investigator
9    would get it from that.
10         Q.    Were there specific field
11   investigators that did, like, medical
12   investigations?
13         A.    Yes.
14         Q.    Okay.  Did those people report
15   to Kristin Slack?
16         MS. DSOUZA:  Objection.
17         A.    No.
18   BY MR. TSONIS:
19         Q.    Did the people that you would
20   assign -- or the people that would
21   ultimately do that field work for your
22   cases, do you know if they would only
23   investigate medical claims?  Or is that
24   just part of what they would otherwise
25   normally investigate, individual claims?

Page 67

1          M. A. Fischer
2          MS. DSOUZA:  Objection.
3          A.    Say that again, please.
4    BY MR. TSONIS:
5          Q.    So, you referenced earlier that
6    typically field investigators are
7    investigating individual claims, right?
8          A.    Yes.
9          Q.    All right.  Are those field
10   investigators the ones that would do the
11   activities -- the field activities you
12   needed for your investigations?  Or are
13   there other field investigators that
14   specifically focused only on medical
15   investigations?
16         A.    There are medical and field
17   investigators.
18         Q.    Okay.  Was this four cases a
19   month approximately that you were assigned
20   consistent throughout your time as an
21   inside medical investigator?
22         A.    No.  It had changed.  Up
23   through the course of years, things were
24   always changing.
25         Q.    When you -- at the time that

Page 68

1          M. A. Fischer
2    you retired, was it four cases per month?
3          A.    No.
4          Q.    What was it at that time?
5          A.    At that time, I was working on
6    a few cases because it was COVID.  The
7    assignments had changed.
8          Q.    When you say, "The assignments
9    had changed," what do you mean?
10         A.    I wasn't receiving -- I wasn't
11   in the office.  We were working on cases
12   that we had had -- I was building evidence
13   for actions.
14         Q.    Can you explain in general
15   terms what you mean by "evidence for
16   actions"?
17         A.    Cases would -- once if -- when
18   they are completely investigated, if there
19   are reasons that they should be denied or
20   further looked into, they would go to the
21   legal -- our legal counsels.  They would be
22   flagged for that.  And then legal would ask
23   us for documents to support different
24   things that they needed all along the way.
25         Q.    Okay.  When did you retire from



Page 69

1         M. A. Fischer
2    Geico?
3         A.   In September of 2020.
4         Q.   Is that when you announced it
5    or when it was effective?
6         A.   My last day of work was in
7    September of 2020, and my official date was
8    November 1st, I believe.
9         Q.   Okay.  Because I know we said
10   right when COVID hit you had taken a week
11   off, and then you had a Geico-issued
12   laptop, right?
13        A.   Correct.
14        Q.   So, for the remainder of that
15   time, you worked from home?
16        A.   Yes.
17        Q.   All right.  I think you said
18   you weren't being assigned cases at the
19   same rate during that time period because
20   you were obtaining evidence for other
21   investigations?
22        MS. DSOUZA:  Objection.
23        A.   I just think -- I don't -- I
24   can't remember exactly because it's been a
25   while.  I did not get new cases.  I was

Page 70

1         M. A. Fischer
2    working on the things that I had to wrap
3    up.
4         Q.   All right.  Sounds like what
5    you were specifically working on changed a
6    little bit during this time; is that fair?
7         A.   Yes.
8         Q.   All right.  It sounds like --
9    well, what you were working on changed a
10   little bit, but I guess the total amount of
11   workload didn't really change, right?
12        A.   No.
13        Q.   No, that's not right?  Or, no,
14   it didn't change?
15        A.   No, the workload did not
16   change.
17        Q.   Okay.  Prior to COVID -- you
18   said at the end it had changed.  What
19   timeframe is approximately this four cases
20   a month that you were being assigned?
21        I'll clarify even a little
22   further.  I'm not really -- unless I ask
23   you otherwise, I'm not really looking to
24   hear about anything that happened prior to
25   2016.  I know you worked for Geico for a

Page 71

1         M. A. Fischer
2    long time, so I'm not asking about the
3    early 2000s or the mid 2000s.  Really, the
4    starting point for the questions --
5         A.   Probably in that timeframe.
6         Q.   So, 2016 up until COVID?
7         A.   The work assignment -- the way
8    work was assigned changed.  It varied
9    through the course of time.
10        Q.   How did it change -- how did --
11   strike that.
12        How did the process by which
13   you were assigned work change over that
14   period of time?
15        A.   Management would decide how --
16   what was being done, what goals and things
17   were set up.
18        Q.   You said your supervisor would
19   assign you the cases?
20        A.   Yes.
21        Q.   Was it always the case that you
22   were assigned cases by your supervisor?
23        A.   No.  Sometimes we developed our
24   own cases.
25        Q.   So, some cases you just would

Page 72

1         M. A. Fischer
2    identify from reviewing records?
3         A.   Yes, and other people maybe
4    pointing out to us that something was --
5    you know, another -- maybe a PIP examiner
6    noticed something, yeah.
7         Q.   That was going to be my next
8    question.
9         Would you ever get referred
10   cases from, like, the claims department,
11   for example?
12        A.   Yes.
13        Q.   Do you have an understanding
14   outside of major case as to how assignments
15   were given to investigators?
16        A.   No.
17        Q.   I'll be more specific.
18        Do you have any familiarity
19   with the process that you've probably heard
20   of called intake?
21        A.   Yes.
22        Q.   How does the intake process --
23   or how did the intake process in the
24   Woodbury or Melville office work?
25        A.   I couldn't tell you.



Page 81

1             M. A. Fischer
2  Fischer.
3       A.   Yes.
4       Q.   Have you seen this declaration
5  before?
6       A.   Yes.
7       Q.   And if you flip to the very
8  last page just for a moment, do you see a
9  signature there?
10      A.   Yes.
11      Q.   All right.  Is that your
12 signature?
13      A.   Yes, it is.
14      Q.   All right.  So, you -- did you
15 electronically sign it?
16      A.   Yes.
17      Q.   All right.  Did you read and
18 review it before you signed it?
19      A.   Yes.
20      Q.   All right.  Is everything in
21 this declaration truthful and accurate, to
22 the best of your knowledge?
23      A.   To the best of my knowledge.
24      Q.   All right.  Let's flip back to
25 the cover page of the declaration.  Not the

Page 82

1             M. A. Fischer
2  very beginning, the actual declaration.
3       A.   Got it.
4       Q.   So, you see under the title
5  employment history and job duties, there's
6  paragraph 1?
7       A.   Yes.
8       Q.   And it says that you were
9  employed with Geico -- or by Geico
10 beginning in September 2001?
11      A.   Correct.
12      Q.   All right.  And you say:  I was
13 employed as a special investigator at Geico
14 from January 2010 to November 2020 when I
15 retired.
16      A.   Yes.
17      Q.   So, pause there for a second.
18         What -- when you first got
19 hired with Geico, what job were you hired
20 on for?
21      A.   I was hired part-time, and I
22 processed claim checks.
23      Q.   Okay.  So, you worked in the
24 claims department.
25         Or was it in service?

Page 83

1             M. A. Fischer
2       A.   It was service.
3       Q.   How long did you work there?
4       A.   A few years.  Maybe four years,
5  four or five years.
6       Q.   Okay.  Before you -- so, strike
7  that.
8         Is it accurate that you
9  transferred into SIU in January of 2010?
10      A.   Yes, I did.
11      Q.   All right.  Between
12 September 2001 to January 2010, what jobs
13 did you have at Geico?
14      A.   I was a -- I processed the
15 claims checks for the cashier's department,
16 and then I went over to systems security.
17 I was -- I assigned associates access to
18 different programs in the Geico system.
19      Q.   How did you make your way over
20 to SIU?
21      A.   I was working part-time, and
22 SIU needed help, and my boss allowed me to
23 work in SIU.  I did, like, clerical work
24 there also.
25      Q.   Was that prior to January 2010?

Page 84

1             M. A. Fischer
2  Or was it --
3       A.   Yes, prior.
4       Q.   Okay.  Got it.
5         And then?
6       A.   And then I interviewed and
7  became an SIU investigator.
8       Q.   Okay.  Your husband already
9  worked as an SIU -- or in SIU as an
10 investigator at that point, right?
11      A.   Correct.
12      Q.   All right.  What was your job
13 title, if you can remember, when you first
14 joined SIU?
15      A.   It was special investigator.  I
16 think it was just special investigator.
17      Q.   All right.  I guess, were you,
18 like, a desk investigator or a field
19 investigator?
20      A.   That was when we were in and
21 out.  We did clinic inspections and
22 investigations.
23      Q.   Okay.  So, even at that time,
24 you were doing some of the medical
25 investigations?



Page 85

1         M. A. Fischer
2       A.    I started doing medical -- I
3   was always doing medical investigations.
4       Q.    Oh, okay.
5       A.    Yes.
6       Q.    Would you ever do, I guess,
7   some of the more traditional investigations
8   of individual claims or no?
9       A.    No.
10      Q.    No?  So, from day one you were
11  doing medical investigations?
12      A.    Yes.
13      Q.    Okay.  What did you do before
14  you started working at Geico?  Like, did
15  you have a background in this sort of
16  investigative work?
17      A.    I have a bachelor's degree in
18  criminal justice from St. John's
19  University.
20      Q.    Okay.
21      A.    I worked for Hertz Rent-a-Car
22  in the security administrative position.  I
23  worked for another leasing company for a
24  few years doing billing.  And then I was
25  home for a number of years with my

Page 86

1         M. A. Fischer
2   children.
3       Q.    Got it.  Okay.
4             I was just curious if you
5   had -- I know it sounds like there's a fair
6   amount of former law enforcement that work
7   in the special investigations unit.
8       A.    Yes.
9       Q.    Your husband included, right?
10      A.    Yes, sir.
11      Q.    Yeah.  The third sentence here
12  says you worked from Geico's Woodbury, now
13  Melville, office in Nassau County,
14  New York, and in the field until about
15  March 2020 when you worked remotely in your
16  home, right?
17      A.    Yes.
18      Q.    Now, we talked a little bit
19  about how you would occasionally go out
20  into the field.
21             Does this refer to that?
22      A.    In the beginning, we were out
23  in the field maybe once a week, more often;
24  and then as it changed -- the job changed
25  over the years how things were done.

Page 87

1         M. A. Fischer
2       Q.    Got it.  And then I think you
3   said it was right around that 2016 or 2017
4   time period where you sort of permanently
5   were working in the office?
6       A.    I believe so in that -- it
7   seems that time period, yes.
8       Q.    Okay.  From this entire time,
9   January 2010 to November 2020, it sounds
10  like your formal job title may have
11  changed; is that right?
12      A.    Yes.
13      Q.    Did your job responsibilities
14  change?
15      A.    Yes, in that we were not
16  required to go into the field as often.
17      Q.    All right.  Aside from not
18  having to go out into the field one day a
19  week, did your job responsibilities change
20  in any other way?
21      A.    No.
22      Q.    Okay.  Did you ever work out
23  of -- well, strike that.
24             You're aware that there was
25  another office located in the State of New

Page 88

1         M. A. Fischer
2   York?
3       A.    Yes.
4       Q.    All right.  And where was that?
5       A.    Buffalo.
6       Q.    All right.  Did you ever work
7   out of the Buffalo office?
8       A.    No.
9       Q.    You seem very happy about that.
10      A.    Yes.
11      Q.    Why is that?
12      A.    It's very cold in Buffalo.
13  It's a lot of snow.  It was very far away.
14      Q.    Did you ever interact with
15  investigators that worked out of the
16  Buffalo office?
17      A.    No.
18      Q.    Okay.  Do you have
19  understanding of, like, what kind of work
20  the Buffalo office did, the SIU department
21  in the Buffalo office?
22      A.    Not -- it's -- I would assume
23  it was the same that we did, but I'm not --
24  I'm not -- I don't know exactly what
25  they --



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
93–96

Page 93

1           M. A. Fischer
2      A.    Yes.
3      Q.    Okay.  Did you have some sort
4   of expectation or metric that required you
5   to log a certain number of activities each
6   day?
7      A.    Not a number of activities, but
8   we had a goal that we needed to be -- in
9   the case, we had metrics set up how many
10  days you needed to be in the case.
11     Q.    Are you talking about a case
12  going red if it was pending for too long?
13     A.    That's one of the things, yes.
14     Q.    And what are other ones?
15     A.    Well, every time when you get a
16  new case, you have parameters that you have
17  to cover within a certain amount of time.
18  And then you set up a diary, and then you
19  need to be in that case every 15 days, we
20  had to at that point.
21          So, you would set up a reminder
22  diary, and that would come up on your
23  calendar to remind you that, okay, it's
24  15 days.  You need to update this.
25          My cases would go on for a

Page 94

1           M. A. Fischer
2   period of time.  They weren't once-and-done
3   quick cases.
4      Q.    Sure.
5      A.    Yeah.
6      Q.    So, in terms of, you know, the
7   time it takes to close one of your cases
8   versus cases handled by either field or
9   desk investigators, your cases would take
10  substantially longer?
11     A.    Months.
12     Q.    There were some that even
13  lasted years?
14     A.    There could be, yeah.
15     Q.    Okay.  So, I guess, knowing
16  that you referenced having to update, you
17  know, a case every 15 days; is that right?
18     A.    Yes.
19     Q.    All right.  Besides that 15-day
20  requirement, was there any other, you know,
21  timeline you had to meet in terms of
22  entries you had to make in SICM?
23     A.    In the beginning of a case when
24  you opened it, there were -- there was
25  standards of things that needed to be

Page 95

1           M. A. Fischer
2   accomplished within a certain timeframe.
3      Q.    What things needed to be
4   accomplished within certain timeframes?
5      A.    Background runs, public record
6   searches, database reviews, different
7   things like that.
8      Q.    What were the timelines
9   typically that you had to do those things?
10     A.    To the best that I can
11  remember -- it's been a while -- and we had
12  a -- when a case was assigned that day, we
13  had to be in there.  We had to open it.  We
14  had to acknowledge that we received it.
15  Then within a certain amount of days after
16  that, we had to do the initial review of
17  the case.  And then from there on, I
18  couldn't give you the exact parameters
19  anymore.
20     Q.    Okay.  So, after you're
21  initially assigned a case, is it about
22  right that, you know, within the first five
23  days, you have to do some sort of initial
24  review and assessment?
25     A.    The first day that you get that

Page 96

1           M. A. Fischer
2   case, you have to do an initial case
3   assessment.
4      Q.    Okay.  And then shortly
5   thereafter, I think you said you have to do
6   something else?
7      A.    Yes.
8      Q.    What is the something else?
9      A.    I believe that back then we had
10  to do background searches and -- you know,
11  to verify public documents.
12
13
14
15
16
17
18
19
20
21
22
23     Q.    So, if I'm understanding right,
24  when you first get assigned a case, it
25  sounds like there's some initial timelines



Page 97

1        M. A. Fischer
2   saved on -- some initial steps you take
3   with every case?
4        A.   Yes.
5        Q.   All right.  And then after
6   that, is it accurate to say that it kind of
7   depends on where the investigation takes
8   you?
9        A.   Yes.  And the supervisor can
10  also direct you, you know, you need to do
11  this; this needs to get done by the next
12  15 days, certain things that come up if
13  they find something.
14       Q.   Okay.  If you were doing an
15  investigative activity and 15 days later
16  you were still working on it, could you
17  satisfy that requirement by simply going
18  into SICM and saying still investigating
19  whatever that issue was?
20       A.   No.
21       Q.   Why not?
22       A.   Because you have to show a
23  substantial activity on that case to keep
24  that case moving.  You can't just have a
25  case sit.

Page 98

1        M. A. Fischer
2        Q.   Right.  But if, I guess, the
3   substantial activity that you're working
4   on, you know, wasn't completed in 15 days,
5   what would happen?
6        A.   You would write what you had
7   completed.
8        Q.   Okay.  Prior to COVID, how many
9   new cases were you assigned typically in a
10  month?
11       A.   Well, we said four.
12       Q.   Okay.  So, you would have four
13  cases that you were assigned.  I think you
14  said it would take sometimes months to
15  close cases.
16       A.   Yeah.
17       Q.   How many cases would you
18  typically close in a given month?
19       A.   Every month would be different.
20  I would say on average, maybe three.
21       Q.   Okay.  You were a Geico
22  associate for a long time.  I'm sure you
23  know that there are certain metrics against
24  which associates are rated, right?
25       A.   Yes.

Page 99

1        M. A. Fischer
2        Q.   For the purposes of their
3   performance review?
4        A.   Yes.
5        Q.   And what are those metrics?
6        A.   They are audits, the -- our
7   cases were audited by other supervisors,
8   how -- your timeline and your cases, your
9   diary, if everything was up to date, you
10  know, your performance, if, you know, you
11  were there, you weren't there, things like
12  that.
13       Q.   All right.  Is the audit metric
14  that you're referring to what Geico calls
15  quality?
16       A.   I'm sorry?
17       Q.   Is the -- is the metric that
18  you're referring to regarding having to do
19  documentation correctly, what Geico refers
20  to as a quality metric?
21       A.   I'm not sure.  I've never heard
22  that, I don't think.
23       Q.   Okay.  But you referenced
24  audits being done by other supervisors of
25  your files?

Page 100

1        M. A. Fischer
2        A.   Yes.
3        Q.   All right.  And they assessed
4   your files for, essentially, you know,
5   doing the activities and documenting them
6   the right way?
7        A.   Correct.
8        Q.   All right.  Besides that sort
9   of, you know, metric, did you have other
10  specific metrics that you were held to?
11       A.   (No verbal response.)
12       Q.   For example, your performance
13  wasn't assessed against the number of days
14  it took to close a case, right?
15       A.   Not on our cases.
16       Q.   Not on major case?
17       A.   No.
18       Q.   Or inside medical?
19       A.   Right.
20       Q.   All right.  And similarly, you
21  weren't rated in terms of productivity on
22  how many cases you closed per month?
23       A.   No.
24       Q.   No, that's not right?  Or, no,
25  you weren't?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
121–124

Page 121

1          M. A. Fischer
2     Q.   Okay.  In terms of follow-up
3   action from Geico legal -- strike that.
4          How many of your cases would
5   you say typically get referred to Geico
6   legal?
7     A.   High percentage.
8     Q.   A high percentage?  Like,
9   90 percent?
10    A.   I'm not aware.  I'm not sure
11  what the exact percentage would be.
12    Q.   All right.  It sounds like it's
13  most of the cases, though?
14    A.   A lot of cases.
15    Q.   Okay.  The ones that don't end
16  up getting referred to Geico legal,
17  typically why is that?
18    A.   There are different reasons.
19  The provider would have stopped billing.
20  They -- what else would be -- we didn't
21  find any kind of proof that there was any
22  impropriety done so we would close it.  Or
23  they stopped billing for certain things
24  that we were looking at them for.  They
25  changed their patterns.

Page 122

1          M. A. Fischer
2     Q.   Okay.  Were you always -- since
3   2016, were you paid on an hourly basis when
4   you worked for Geico?
5     A.   Yes.
6     Q.   All right.  Were you paid time
7   and a half for all hours you worked over
8   40?
9     A.   I didn't receive any overtime
10  pay, I don't believe.
11    Q.   I guess, was it your
12  understanding, if you know, that you would
13  have received overtime pay at a time and a
14  half had you worked over 40 hours and
15  entered it into Workday?
16    A.   Yes.
17    Q.   All right.  If you flip to the
18  next page, page 2 of your declaration, in
19  paragraph 7 you say:  My regular schedule
20  for Geico was 9:00 a.m. to 5:30 p.m.  I
21  also worked approximately two to 2.5 hours
22  each week in addition to that.
23         So, I'll pause there.
24         What was the work that you were
25  doing for those two to 2.5 hours?

Page 123

1          M. A. Fischer
2     A.   As the day would come to an
3   end, I would see what needed to still be
4   accomplished in that day to fulfill my
5   diary, and I would be catching up, making
6   sure that everything was -- that I had to
7   accomplish in that day was done.
8     Q.   Okay.
9     A.   To the best of my ability.
10    Q.   And, I guess, is that things
11  that are -- that you had to do to complete
12  a diary entry that day?
13    A.   Some of it was, yes.
14    Q.   Okay.  So, I guess, you know,
15  if it's due the next day or the day
16  after -- well, step back for a moment.
17         You said the diary sort of
18  entries were every 15 days you had to
19  submit, right?
20    A.   Right.
21    Q.   Is that 15 business days or 15
22  real-time days?
23    A.   I think it was 15 business
24  days.
25    Q.   Okay.  So, essentially, three

Page 124

1          M. A. Fischer
2   weeks, every three weeks you had to submit
3   a diary?
4     A.   Yes.
5     Q.   All right.  And I know you
6   mentioned that you would print out your
7   schedule on Friday so that you would know
8   what's happening for the following week,
9   right?
10    A.   Yes.
11    Q.   So, I guess, given the fact
12  that your timelines, you know, are three
13  weeks out, why was it necessary to work two
14  to two and a half hours a day overtime --
15  two to two and half hours per week in
16  excess of your scheduled hours?
17    A.   Because I wasn't just working
18  on those cases.  I also had other things
19  going on, phone calls.  Like I said, we had
20  new investigators, helping new
21  investigators, meetings, other things in
22  the day, e-mails that needed to be
23  addressed immediately, so everything pushes
24  everything down.
25    Q.   Sure.  I'm not suggesting that



Page 125

1          M. A. Fischer
2   you weren't getting phone calls or e-mails.
3   Of course, I understand what you're saying.
4          I guess my question is:  If the
5   diary wasn't due that day, you would have
6   been able to complete that work the
7   following day, right?
8      A.   But that isn't why I was there.
9   I was completing the diary that was due
10  that day.
11     Q.   So, every single week you had
12  two to 2.5 hours in addition that week to
13  complete a diary that was due on one
14  particular day?
15     A.   Not just the diaries, any of my
16  work for the day.
17         MS. DSOUZA:  Just for the court
18  reporter, just wait for counsel to
19         finish the question.
20         THE WITNESS:  Yes.
21  BY MR. TSONIS:
22     Q.   Sure.  So, if I'm understanding
23  correctly, you kind of had a plan for the
24  work that you were going to do in any given
25  day?

Page 126

1          M. A. Fischer
2      A.   Yes.
3      Q.   All right.  Some of that work
4   would have -- for example, a diary might
5   have had a due date for that day, right?
6      A.   Correct.
7      Q.   All right.  Some of that work
8   might not have a due date for that day,
9   right?
10     A.   Correct.
11     Q.   All right.  So, if it was work
12  that didn't have a due date for that day,
13  it's work you could have, I guess, picked
14  up the following morning if you wanted to?
15     A.   Possibly, yes.
16     Q.   Okay.  And we said the diary --
17  on an ongoing case, you would have only had
18  to list what you did from the previous
19  diary?
20     A.   Yes, but let me explain
21  something also.  I could have between high
22  20s and low 30s in my case count, so I
23  could have four cases that needed to be
24  updated in a day, three cases, five cases
25  depending on how the dates fell down.  It

Page 127

1          M. A. Fischer
2   wasn't just one case popping up on Monday
3   that had to be fixed.  There might have
4   been four cases that I had to get into and
5   touch that day or three cases, so...
6      Q.   Was that pending caseload that
7   you were just talking about -- was that
8   pending caseload you just referenced
9   consistent throughout your time at Geico
10  from 2016 to the time you retired?
11     A.   20 to 30 cases?
12     Q.   If that's what you're
13  referencing, yeah.
14     A.   Yeah.
15     Q.   Okay.  You also referenced that
16  at least one day per week you worked
17  through your meal break, in this
18  declaration?
19     A.   Yes.
20     Q.   Why one day per week?
21     A.   That's just on average.
22     Q.   I guess, what would make you
23  work through a meal break one day but not
24  on another day?
25     A.   Something needed to get done.

Page 128

1          M. A. Fischer
2      Q.   You were the one determining
3   something needed to get done?
4      A.   Yes.
5      Q.   It wasn't your supervisor
6   instructing you, work through your meal
7   period?
8      A.   Absolutely not.
9      Q.   Okay.  Did your supervisor know
10  that you were working in your meal period?
11     A.   I don't know.
12     Q.   Do you have any reason to think
13  that she did?
14     A.   Well, the inside ones, yeah.  I
15  mean, you're there.
16     Q.   So, if I'm understanding
17  correctly, your supervisor was located in
18  the same office that you worked out of?
19     A.   It would be Kristin Slack, yes.
20     Q.   Prior to Kristin Slack?
21     A.   Danielle was the field
22  supervisor that I reported to.
23     Q.   So, she didn't work out of the
24  office?
25     A.   She was a field.



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
129–132

Page 129

1           M. A. Fischer
2     Q.    So, she was a field supervisor,
3  so she didn't work out of the office,
4  correct?
5     A.    Correct.
6     Q.    All right.  So, Danielle
7  Perdomo wouldn't know that you were working
8  during your meal period?
9     A.    Correct.
10     Q.    All right.  And Danielle
11  Perdomo wouldn't know that you were working
12  two to 2.5 hours in addition to your
13  scheduled hours each week?
14           MS. DSOUZA:  Objection.
15     A.    My -- I swiped in and out of
16  the building every day, which recorded my
17  time in and my time out.  My SICM also has
18  a date stamp on it and I'm sure my computer
19  when I shut it down at night.
20  BY MR. TSONIS:
21     Q.    So, let's take those back for a
22  second.
23           SICM has time and date stamps
24  for any activity that's entered, right?
25     A.    Every activity that's entered.

Page 130

1           M. A. Fischer
2     Q.    SICM doesn't have a timestamp
3  for when you open the application, to your
4  knowledge, right?
5     A.    Not to my knowledge, but I'm
6  assuming.  Everything does, right?
7     Q.    Okay.  Similarly, do you have
8  any reason to think that there's a
9  timestamp of when you closed out of the
10  SICM application?
11     A.    I believe that there was.
12     Q.    Did anyone ever talk to you
13  about, hey, I saw you closed SICM at this
14  time?
15     A.    No.
16     Q.    Anybody ever talk to you about,
17  I saw you open SICM at this time?
18     A.    No.
19     Q.    You said you swiped into the
20  building and swiped out of the building?
21     A.    Absolutely.
22     Q.    All right.  So, just to be
23  clear:  To leave the building, you didn't
24  just have to walk out.  You had to
25  literally swipe?

Page 131

1           M. A. Fischer
2     A.    Correct.
3     Q.    Okay.  Any reason to think that
4  your supervisor could see your time-in and
5  time-out swipes?
6     A.    Yes.
7     Q.    What is that?  What's the
8  reason?
9     A.    We were told that they can run
10  our swipes to see if we were late, how --
11  you know, as far as, you know, you're late
12  to work, that's a problem, right?  So, they
13  can see when you're there and when you're
14  leaving.
15     Q.    Okay.  When you say "we were
16  told," what are you referencing?
17     A.    It's just common knowledge that
18  they can check your SICMs -- not your
19  SICMs -- your time swipes.
20     Q.    I guess I'm just trying to
21  understand if there's a specific
22  conversation you're referencing or you just
23  assume they could check your swipes.
24     A.    At some point in my employment,
25  I was told that they could -- that,

Page 132

1           M. A. Fischer
2  absolutely, they can check your time
3  swipes.
4     Q.    Do you recall who told you
5  that?
6     A.    No.
7     Q.    Do you recall when they told
8  you that?
9     A.    No.
10     Q.    Do you recall if it was an
11  e-mail or an oral conversation?
12     A.    No idea.
13     Q.    This understanding that you
14  had, was it that someone at Geico could
15  pull your swipes or that your supervisor
16  could pull your swipes?
17     A.    I believe that someone could
18  and the supervisor could request that.
19     Q.    Did your supervisor ever talk
20  to you about your swipes?
21     A.    No.
22     Q.    Did the manager ever talk to
23  you about your swipes?
24     A.    No.
25     Q.    Did anyone at Geico ever talk



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
133–136

Page 133

1          M. A. Fischer
2    to you about the time you swiped in or out
3    of the building?
4        A.   No.
5        Q.   You said Kristin Slack worked
6    out of the Woodbury office also?
7        A.   Yes.
8        Q.   Did she work out of there five
9    days a week?
10       A.   Yes.
11       Q.   Did she work the same hours as
12   you?
13       A.   No.
14       Q.   What hours did she work?
15       A.   I believe she worked 7:00 to
16   3:30, if I can remember.
17           MS. DSOUZA:   Just give me time
18   to object.
19           THE WITNESS:   Okay.  I'm sorry.
20           MS. DSOUZA:   No worries.
21   BY MR. TSONIS:
22       Q.   So, if Kristin Slack's usual
23   schedule had her leaving approximately two
24   hours before your normal end time, she
25   wouldn't know if you stayed late, right?

Page 134

1          M. A. Fischer
2           MS. DSOUZA:   Objection.
3        A.   Well, my SICM reports would
4    have a date stamp on them after my time out
5    of -- after 5:30 at night if I was working
6    on a report.
7        Q.   Okay.  Let me -- we'll return
8    to that in a second.  Let me just ask a
9    specific question.
10           Kristin Slack wouldn't
11   physically be at the office to see if you
12   stayed late, right?
13       A.   Correct.
14       Q.   All right.  And I think I'm
15   understanding what you're saying is that
16   she could see the timestamp on something
17   that was submitted to her for approval?
18       A.   Yes.
19       Q.   All right.  Was the work that
20   you would stay late to do always something
21   that would be time stamped in SICM?
22       A.   No.
23       Q.   All right.  So, there are times
24   where she wouldn't be able to know?
25       A.   Correct.

Page 135

1          M. A. Fischer
2        Q.   Did Kristin Slack ever tell
3    you, you know, you need to precisely work
4    your schedule and not deviate from it?
5        A.   No.
6        Q.   All right.  So, I guess it's
7    fair to say if she saw a timestamp for
8    6:00 p.m., that it would be possible you
9    came in a half hour later and stayed a half
10   hour later?
11       A.   I would have said something to
12   her.
13       Q.   Okay.  But did she know you
14   would have said something to her?
15       A.   Yes.
16       Q.   Okay.  Did she request it?  Or
17   would you have done it?
18       A.   I would have done it because I
19   wouldn't have been late to the office in
20   the morning.
21       Q.   Okay.  Your declaration here
22   says that you worked about 41.5 to 42 hours
23   a week on average.
24           Do you see that?
25       A.   Yes.

Page 136

1          M. A. Fischer
2        Q.   Just so I'm clear with the
3    math:  Your schedule was for 38.75, right?
4        A.   Yes.
5        Q.   You say here in the second
6    sentence that you worked approximately two
7    to two and a half hours each week in
8    addition to that, right?
9        A.   Approximately.
10       Q.   All right.  Doing the math,
11   again, not great at it, but that puts me at
12   approximately 40.75 to 41.25 hours.
13           So, are you claiming that the
14   meal period that you worked through one day
15   a week is in addition to the two and two
16   and a half hours?  Or is it encompassed by
17   the two or two and a half hours?
18       A.   I believe it's in -- added into
19   that.  It's on average.
20       Q.   I'll phrase my question pretty
21   simply.
22           What was the total amount of
23   time you're claiming that you worked but
24   weren't paid for in a week?
25       A.   Additionally, two to two and a

MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
137–140

Page 137

M. A. Fischer

1  half hours a week.
3      Q.   Okay.  And that includes the
4  meal period?
5      A.   Yes.
6      Q.   All right.  So, we say in
7  paragraph eight is when, essentially, COVID
8  started, right?
9      A.   Yes.
10     Q.   And you write here in the
11  second full sentence:  I was specifically
12  assigned to work on cases of medical fraud,
13  and Geico kept my caseload steady.  So,
14  during this period, my overtime hours
15  slightly decreased.
16         Let me pause there for a
17  second.
18         You were always assigned to
19  work on cases of medical fraud during this
20  time period, right?
21     A.   Correct.
22     Q.   The 2016 to retirement time
23  period?
24         And you're saying Geico kept
25  your caseload steady, right?

Page 138

M. A. Fischer

2      A.   To the COVID time and then they
3  stopped.  We weren't getting new cases.
4      Q.   So, when you say, Geico kept my
5  caseload steady, is what you mean, I was
6  not being assigned new cases?
7      A.   Correct.
8      Q.   Okay.  So, without any new
9  cases being assigned, you were still
10  working overtime, you're saying?
11     A.   Yes.
12     Q.   And that was just from the
13  existing caseload you had?
14     A.   That was also because every day
15  I had to be on at 9:00 a.m.  I had to build
16  my station every morning.  I had to set up
17  my computers, my monitors, my -- get
18  everything set online, ready to go.  I had
19  to be -- 9:00 o'clock, I had to be up and
20  running every morning, so that was time
21  before.  And at the end of my shift, I had
22  to break everything down and -- and also I
23  was working on stuff.  There was stuff I
24  would work extra on.
25     Q.   So, if I'm understanding

Page 139

M. A. Fischer

1  correctly, you're saying you came in early
3  so that you could power on your machine and
4  get set up to begin work at 9:00 a.m.?
5      A.   I had to -- I worked on my
6  dining room table.  I didn't have any --
7      Q.   You're talking about the COVID
8  time period?
9      A.   Yes.  I did not have a
10  workstation.  So, every day, I would have
11  to set everything up; and at the end of --
12  at 5:30, I had to take everything down.  I
13  had to be on from nine o'clock to 5:30.
14     Q.   When you say you didn't have a
15  workstation, I guess, what do you mean?
16  Why did you have to put it all up and take
17  it all down?
18     A.   It was my dining room table.
19  It was COVID.
20     Q.   Okay.  You would agree, though,
21  that no one at Geico knew what your at-home
22  setup looked like?
23         MS. DSOUZA:  Objection.
24     A.   I have no idea who would know.
25  BY MR. TSONIS:

Page 140

M. A. Fischer

2      Q.   Do you have any reason to think
3  that your supervisor, for example, knew how
4  you were setting up or taking -- do you
5  have any reason to think that your
6  supervisor knew that you were setting up
7  and taking down your setup on your dining
8  room table?
9      A.   Yes.
10     Q.   Why do you think that?
11     A.   Because when we were first
12  assigned to work from home, we were told we
13  had to be on at nine o'clock and we had to
14  shut down at 5:30.  And I'm sure that I
15  had -- she was aware that I was working in
16  my dining room.
17     Q.   That's my question, I guess.
18         Why do you think your
19  supervisor was aware about your specific
20  home setup?
21     A.   Because I'm sure that we had
22  that conversation.
23     Q.   Do you remember having it?
24     A.   Not specifically, but I'm sure
25  she -- I didn't have an office.  Before I



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
141–144

Page 141

1    M. A. Fischer
2  left the office, it was discussed that I
3  didn't have a place to work.  I didn't have
4  a computer.
5    Q.    Once you got a computer,
6  though, I guess you would agree that
7  various people have various, you know,
8  ability to set up a home office in their
9  houses?
10    MS. DSOUZA:  Objection.
11    A.    That has nothing to do with me.
12  BY MR. TSONIS:
13    Q.    Right.  I guess I'm just --
14  you're contending that your supervisor
15  would have known about your specific
16  situation and how you had to set up your
17  computers each day.
18    Am I wrong?
19    A.    No, but I'm assuming that I --
20  I fully believe that she knew that.
21    Q.    Do you have any reason to think
22  that she knew how long it took you to get
23  your setup?
24    A.    No.
25    Q.    Do you have any reason to think

Page 142

1    M. A. Fischer
2  that your supervisor knew how long it took
3  you to break down your setup?
4    A.    No.
5    Q.    All right.  How much time would
6  you say it took you to set up your
7  workstation each day?
8    A.    I would say about 10 to
9  15 minutes.
10    Q.    Okay.  And similarly, how much
11  time would you say it took to tear it down?
12    A.    Same thing:  10 to 15 minutes.
13    Q.    Do you use -- do you use your
14  dining room table regularly?
15    A.    Yes.
16    Q.    And I was saying, some people
17  do; some people don't.  For example, some
18  people have a dining room they use only on
19  special occasions, and they eat and use a
20  kitchen table.
21    What's your home setup?
22    A.    We eat every meal at the dining
23  room table.  We don't have a kitchen table.
24    Q.    Do you have a different place
25  that you could have set up your

Page 143

1    M. A. Fischer
2  workstation?
3    A.    No.
4    Q.    Do you have an extra bedroom in
5  your home?
6    A.    No, I do not.
7    Q.    Do you have a home?
8    A.    Yes.
9    Q.    All right.  How many bedrooms?
10    A.    Four bedrooms.
11    Q.    I believe you said earlier that
12  your children are near or over 30 years
13  old?
14    A.    Yes.
15    Q.    Do they still live at home with
16  you?
17    A.    One does now.  One just moved
18  out.
19    Q.    In March of 2020, how many of
20  your children lived with you?
21    A.    Two and my nephew.
22    Q.    Okay.  Do you have another
23  common area, like a basement, that could
24  have been a home office?
25    A.    No.

Page 144

1    M. A. Fischer
2    Q.    Okay.  Are you contending as
3  part of this lawsuit that your time setting
4  up and taking down your workstation is time
5  you should have been compensated by Geico?
6    A.    Yes.
7    Q.    Again, let's do some math.  If
8  you're claiming 10 to 15 minutes each day,
9  that's 20 to 30 minutes per day, right?
10    A.    Correct.
11    Q.    20 and 30 minutes per day times
12  five days a week is about 100 to 150
13  minutes, right?
14    A.    Correct.
15    Q.    Okay.  It's about an hour and
16  40 minutes to two and a half hours; is that
17  right?
18    A.    I didn't do the math.  Okay.
19    Q.    Well, 20 minutes times --
20  excuse me.  Fifteen minutes times two is
21  30 minutes a day at the high end, right?
22  Five days a week at 30 minutes a day is two
23  and a half hours, right?
24    A.    Correct.
25    Q.    Okay.  In this declaration



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
145–148

Page 145

1    M. A. Fischer
2    paragraph 7, the section entitled My
3    Schedule and Unpaid Wages and Overtime, you
4    say that you worked two to two and a half
5    hours each week, right?
6        A.    Correct.
7        Q.    Is this time putting up/taking
8    down your workstation the time that you're
9    referencing here?
10        MS. DSOUZA:  Objection.
11        A.    No.
12    BY MR. TSONIS:
13        Q.    So, in addition to this two to
14    two and a half hours, you're now contending
15    that you should be compensated for an
16    additional hour 40 minutes to two and a
17    half hours each week?
18        MS. DSOUZA:  Objection.
19        A.    During COVID.
20        Q.    For the COVID period?
21        A.    Right.
22        Q.    You're not the only party
23    plaintiff in this lawsuit, right?
24        A.    Correct.
25        Q.    All right.  Did your husband

Page 146

1        M. A. Fischer
2    have to set up and take down a workstation
3    during this time?
4        A.    No.  My husband works from
5    home.  He has a workstation.
6        Q.    He was a field investigator,
7    right?
8        A.    Correct.
9        Q.    So, he always worked from home
10    even pre-COVID?
11        A.    Correct.
12        Q.    Okay.  Setting your husband
13    aside for a second.
14        Do you have an understanding as
15    to whether any other plaintiffs in this
16    lawsuit are alleging that they should be
17    compensated for time setting up and taking
18    down their work stations?
19        MS. DSOUZA:  Objection.
20        A.    I have no idea.
21    BY MR. TSONIS:
22        Q.    It's possible that you're the
23    only one that is alleging that?
24        A.    I have no idea.
25        Q.    Okay.

Page 147

1        M. A. Fischer
2        MR. TSONIS:  Let's go off the
3    record and take a break.
4        THE VIDEOGRAPHER:  We are going
5    off the record.  The time now is
6    12:38 p.m.
7        (Whereupon, a short break was
8    taken at this time.)
9        THE VIDEOGRAPHER:  We are back
10    on the record, and the time now is
11    1:34 p.m.
12        Q.    All right, Ms. Fischer.  We
13    were looking at Exhibit 1, your
14    declaration, before we went on lunch.
15        Can you turn to paragraph 9 of
16    your declaration.  So, from December 2016
17    to March 2020, it states that you said your
18    regular hours worked were approximately
19    41.5 to 42 hours per week; and from
20    March 2020 to September 2020, your regular
21    hours worked were approximately 40.75 hours
22    per week.  So, I'll stop there.
23        Is this accurate?
24        A.    Yes, to the best of my memory,
25    yes.

Page 148

1        M. A. Fischer
2        Q.    All right.  So, if you recall,
3    just prior to going on lunch, we were also
4    talking about the COVID timeframe, from
5    March 2020 until the time you retired,
6    right?
7        A.    Uh-huh.
8        Q.    And we were talking about the
9    time that you said you spent setting up and
10    taking down your work station each day?
11        A.    Correct.
12        Q.    Does this incorporate that
13    time?
14        A.    The 40.75, yes, and also other
15    overtime that I would be doing during that
16    time.
17        Q.    Okay.  So, I just want to be
18    clear because I thought you said the
19    opposite before we went to lunch and I just
20    want to make sure that we're right.
21        The 40.75 hours per week, if
22    you were scheduled for 38.75 hours, means
23    two hours additional each work week that
24    you're claiming, right?
25        A.    Yes.



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
189—192

Page 189

1          M. A. Fischer
2   or because you were chatting with somebody?
3      A.   No, but they could ask.
4      Q.   Okay.  Similarly, if -- well,
5   strike that.
6          Did you ever start work early
7   that you're claiming is uncompensated time?
8      A.   No.
9      Q.   Okay.  So, it's purely at the
10  end of your shift?
11     A.   At the end.
12     Q.   Okay.  You can put that policy
13  to the side.
14          I want to turn for a second
15  back to Exhibit 1, if you don't mind.  The
16  last paragraph in your declaration -- it's
17  actually the last page of Exhibit 1,
18  paragraph 12.
19          Actually, let's go back to page
20  3 -- I apologize -- to paragraph 10.  So,
21  the first sentence says:  Geico required me
22  to seek approval from my supervisor to
23  submit any hours worked above 38.75, right?
24     A.   Yes.
25     Q.   The second sentence says:  It

Page 190

1          M. A. Fischer
2   was my understanding that hours above 38.75
3   to complete regular case work would rarely
4   be approved.
5          Do you see that?
6      A.   Yes.
7      Q.   All right.  Why was it your
8   understanding that hours above 38.75 to
9   complete regular case work would rarely be
10  approved?
11     A.   If -- to work overtime, you
12  would have to submit in advance a request
13  to work overtime on a specific case and
14  specifically what on that case you would
15  want to work during that time.
16     Q.   So, you had the ability to
17  request overtime in advance; is that right?
18     A.   On a specific case and
19  regarding a specific detail to that case.
20     Q.   Did you ever make that kind of
21  request?
22     A.   No.
23     Q.   Why not?
24     A.   Because it would have to be
25  done in advance and most of the time when I

Page 191

1          M. A. Fischer
2   worked overtime, it was because the end of
3   my day was up and I had things I still
4   needed to accomplish in that day.
5      Q.   Okay.  Was there ever any
6   communications to how far in advance you
7   had to request it?
8      A.   No.  It would also take time to
9   write up the request and the specification.
10     Q.   I get the impression that you
11  had a pretty good relationship with your
12  supervisor?
13     A.   Yes.
14     Q.   Could you call her and say,
15  hey, can I have 30 minutes of overtime or
16  an hour, if you needed it?
17     A.   It was very rarely approved.
18     Q.   Why do you -- strike that.
19          If you never requested it, how
20  do you know that it wouldn't have been
21  approved for you?
22     A.   It has been the trend in Geico
23  that people just worked to get their work
24  done for the day.
25     Q.   Do you have an understanding of

Page 192

1          M. A. Fischer
2   what the process was for your husband,
3   Keith Fischer, to request overtime?
4      A.   No.
5      Q.   Do you know who his supervisor
6   was?
7      A.   He was under Gerry Cassagne, I
8   believe.
9      Q.   He had Gerry Cassagne as a
10  supervisor for this entire time period of
11  2016 to when he retired also, right?
12     A.   I believe so.
13     Q.   He worked with Gerry Cassagne
14  back in NYPD also, right?
15     A.   Correct.
16     Q.   Okay.  You have no
17  understanding as to whether during 2016 or
18  2017 Keith Fischer could work overtime
19  hours as long as he just sent a follow-up
20  documentation e-mail to Gerry Cassagne?
21          MS. DSOUZA:  Objection.
22     A.   No.
23  BY MR. TSONIS:
24     Q.   Your husband never talked to
25  you about that?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
193–196

Page 193

1           M. A. Fischer
2     A.    No.
3     Q.    Did you ever ask your husband
4  about, should I request overtime?
5     A.    No.
6     Q.    Why not?
7     A.    We didn't discuss things like
8  that.
9     Q.    Are you aware as part of this
10  lawsuit there have been documents produced
11  that show that Keith Fischer did, in fact,
12  work overtime in some weeks that was
13  approved?
14    A.    No.  I don't know what was
15  submitted on his behalf.
16    Q.    Well, I mean, a short while
17  ago, you testified, you know, it's the
18  trend in Geico that people just work their
19  38.7 -- they work more hours, but --
20    A.    Yes.
21    Q.    -- I guess, you know, I'm not
22  going to put a bunch of documents that
23  don't have your name in front of them -- or
24  on them in front of you.  But I'll
25  represent to you that there are documents

Page 194

1           M. A. Fischer
2  from different investigators that get
3  overtime approved.  So, I'm curious why it
4  is that you didn't request it.
5           MS. DSOUZA:  Counselor, is
6      there a question?
7  BY MR. TSONIS:
8     Q.    Why is it that you didn't
9  request it?
10    A.    I didn't feel that it would be
11  approved.
12    Q.    Okay.  Do you have any other --
13  any understanding as to whether other major
14  case SIU investigators did request
15  overtime?
16    A.    I do not.
17    Q.    Did anyone ever communicate to
18  you that they had the same understanding
19  that overtime hours wouldn't be approved?
20           When I say "they," I'm talking
21  about SIU major case investigators.
22    A.    Yes.
23    Q.    Who?
24    A.    I don't know offhand.
25    Q.    Can you name anyone?

Page 195

1           M. A. Fischer
2     A.    No.
3     Q.    Your declaration here
4  continues, the last sentence of paragraph
5  10:  Accordingly, I did not record all of
6  my hours worked during my tenure, and I was
7  not paid for hours including overtime hours
8  that I worked off the clock.
9           Besides the reasons we've
10  already discussed, is there any other
11  reasons you didn't record all of your hours
12  worked during your time at Geico?
13    A.    No.
14    Q.    Paragraph 11 you say:  Geico
15  also had a variety of performance metrics
16  that I was required to meet to remain in
17  good standing.  These performance metrics
18  and ratings changed constantly, but to the
19  best of my recollection, Geico generally
20  evaluated me based on how many hours it
21  took me to complete a case task, how often
22  I made an entry in a case report, how many
23  days I took to close a case, and how many
24  cases I completed within a month.
25           Do you see that?

Page 196

1           M. A. Fischer
2     A.    Yes.
3     Q.    All right.  Earlier, do you
4  recall that we talked about the metrics
5  that your performance reviews were based
6  on?
7     A.    Yes.
8     Q.    All right.  And you have an
9  understanding that other investigators were
10  rated on a productivity metric?
11    A.    Yes.
12    Q.    And that productivity metric
13  concerned how many cases were closed in a
14  month?
15    A.    Yes.
16    Q.    You, however, were not rated on
17  how many cases you completed in a month?
18    A.    I was rated on if a case was
19  ready to be closed, if I did it or not in a
20  timely manner.
21    Q.    When you say "in a timely
22  manner," what do you mean?
23    A.    That it just didn't -- if it
24  was -- if it needed to be closed, it needed
25  to be closed right away.  As soon as it was



MARGARET A. FISCHER                                    December 19, 2024
FISCHER V. GEICO                                                      197–200

Page 197

1        M. A. Fischer
2  approved for closure, it needed to be
3  closed.  If it sat there for weeks, it
4  wouldn't be a good thing.
5        Q.    There was no objective number,
6  though, that constituted, for example, you
7  know, a rating of five on your performance
8  review for that metric?
9        A.    For that metric, no, I don't
10  believe so.
11        Q.    Got it.
12        There wasn't a metric, an
13  objective metric, that constituted a one
14  through five for performance review
15  purposes, right?
16        A.    On that -- on case closure?
17        Q.    Yes.
18        A.    I don't remember.
19        Q.    We talked about the prior entry
20  where it says, how many days I took to
21  close a month -- or I'm sorry -- how many
22  days I took to close a case.
23        Do you see that?
24        A.    Yes.
25        Q.    Is that a metric generally

Page 198

1        M. A. Fischer
2  referred to in SIU as case life?
3        A.    Yes.
4        Q.    You were not rated on case life
5  for purposes of your performance review,
6  right?
7        A.    It would be with -- relative to
8  the case.
9        Q.    Right.  But there were no
10  objective metrics against which you were
11  rated for purposes of your performance
12  review?
13        MS. DSOUZA:  Objection.
14        A.    Say it again.
15  BY MR. TSONIS:
16        Q.    Yeah, there wasn't an objective
17  number; a case that is opened this many
18  days is a five, this many days is a four,
19  three, and so on, correct?
20        A.    Not for a major case, no.
21        Q.    Okay.
22        A.    For other kinds of cases that
23  we handled, yes.
24        Q.    Okay.  You write here, the
25  first portion, you write:  Geico generally

Page 199

1        M. A. Fischer
2  evaluated me on how many hours it took me
3  to complete a case task.
4        How were you generally
5  evaluated on hours it took to complete a
6  case task?
7        A.    It would be in the SICM.  It
8  would be what I accomplished.
9        Q.    Okay.  Is this the 15-day
10  diary --
11        A.    Yes.
12        Q.    -- that we talked about?
13        A.    Yes.
14        Q.    All right.  Fair to say getting
15  your diary entries completed on time was
16  something that was part of your job but not
17  a specific metric on your performance
18  reviews?
19        A.    No.
20        Q.    No what?
21        A.    It was -- making those diary
22  entries was extremely important.
23        Q.    Was the timeliness of those
24  entries part of the audits that would be
25  done?

Page 200

1        M. A. Fischer
2        A.    Yes.
3        Q.    Okay.  So, it was part of the
4  quality score that was in your performance
5  review?
6        A.    I don't know.
7        Q.    Okay.
8        MR. TSONIS:  You can go off the
9  record.
10        THE VIDEOGRAPHER:  We are going
11  off the record.  The time now is 2:30
12  p.m.
13        (Whereupon, a short break was
14  taken at this time.)
15        (Defendant's Exhibit 4, Excel
16  spreadsheet, was marked for
17  identification as of this date by the
18  Reporter.)
19        THE VIDEOGRAPHER:  We are back
20  on the record, and the time now is
21  2:45 p.m.
22  BY MR. TSONIS:
23        Q.    Ms. Fischer, I'm going to show
24  you a document that I marked as Exhibit 4.
25  It's a document that is an Excel



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
201–204

Page 201

1      M. A. Fischer
2  spreadsheet that you'll see in a moment why
3  it doesn't lend itself to printing, so I'm
4  going to give you a computer.
5      MR. TSONIS:  Counsel, I just
6      e-mailed it to you.  For the record,
7      it's a document produced with the
8      Bates label G011963.
9  BY MR. TSONIS:
10     Q.   Here you go, Ms. Fischer.  And
11  I'll give you -- and I'll make it easier --
12     MS. DSOUZA:  If you have
13     trouble navigating --
14  BY MR. TSONIS:
15     Q.   Yeah, take your time.  We'll
16  help you get through it here.
17         So, are you able to read the
18  document that we've pulled up, Ms. Fischer?
19     A.   I can see it, yes.  It's up
20  here, yeah.
21     Q.   All right.  And if you scroll
22  over to the right in the Excel spreadsheet,
23  it's kind of columns AV, AW, AX, that area.
24  This is why this document doesn't really
25  lend itself to printing.  It's really wide.

Page 202

1      M. A. Fischer
2      MS. DSOUZA:  Can I help the
3      witness?
4      MR. TSONIS:  Yeah.
5      THE WITNESS:  Thank you.
6      MS. DSOUZA:  Which row did you
7      say, Counselor?
8      MR. TSONIS:  We're not -- just
9      the very top but if you scroll to the
10     right on that spreadsheet quite a
11     bit.
12     MS. DSOUZA:  Yeah.
13  BY MR. TSONIS:
14     Q.   All right.  Do you see now in
15  row 1, it's got investigator FCC Region 2?
16     MS. DSOUZA:  We don't really
17     see it in row 1.
18     THE WITNESS:  A1, it says.
19     MS. DSOUZA:  It's centered.
20     Yes.  FCC, yeah.  We see it -- yeah.
21     Q.   Okay, Ms. Fischer.
22         Do you see now it says
23  investigator FCC Region 2?
24     A.   Yes.
25     Q.   All right.  And you were in

Page 203

1      M. A. Fischer
2  Region 2, right?
3      A.   Correct.
4      Q.   Have you seen this kind of
5  report before?
6      A.   No.
7      Q.   All right.  You see it says SIU
8  case investigations in the next row down?
9      A.   Yes.
10     Q.   All right.  And then below
11  that, it says -- it's got a date range.  It
12  says January 1st, 2020, through
13  December 28th, 2020?
14     A.   Correct.
15     Q.   All right.  Was this kind of
16  reporting anything you ever saw?
17     A.   No.
18     Q.   All right.  Now, if you scroll
19  all the way back again to the left to the
20  column A, do you see that column A has --
21  on row 13, a heading that says current
22  supervisor?
23     A.   Correct.
24     Q.   All right.  And then column B
25  next to all those supervisors has

Page 204

1      M. A. Fischer
2  investigator name?
3      A.   Yes.
4      Q.   All right.  Now, if you go to
5  row 27, do you see it shows Kristin Slack
6  under supervisor and it shows your name
7  under investigator name?
8      A.   Yes.
9      Q.   All right.  Do you see under
10  new assigned cases?
11     A.   Yes.
12     Q.   It's got three under your name?
13     A.   Yes.
14     Q.   All right.  And then it says
15  closed cases, 19?
16     A.   Correct.
17     Q.   All right.  Do you have an
18  understanding as to when this report would
19  have been generated?
20     A.   No.
21     Q.   All right.  Does 19 closed
22  cases in the course of a year seem low?
23     A.   What was the year?
24     Q.   Well, this said December --
25  January through December of 2020, which is



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
261–264

Page 261

1      M. A. Fischer
2  response, there's several sentences of,
3  essentially, objections.
4          But then you see the last full
5  sentence that starts:  Without waving these
6  objections?
7      A.   Uh-huh.
8      Q.   It says:  Plaintiff directs
9  defendant to plaintiff's declaration
10  including paragraph 2 and further
11  identifies Danielle Perdomo, Bill Newport,
12  Courtney Wolfe, and Keith Fischer.
13      A.   Yes.
14      Q.   Okay.  So, what are the facts
15  on which you are claiming that Danielle
16  Perdomo had actual or constructive
17  knowledge that you worked unpaid overtime?
18      A.   My -- my swipes, my e-mail
19  times, my SICM times.
20      Q.   Okay.  So, you've identified
21  those three categories before, right?
22      A.   Yes.
23      Q.   Are you contending all three of
24  those categories pertain to Danielle
25  Perdomo?

Page 262

1          M. A. Fischer
2      A.   Yes.
3      Q.   All right.  Are you claiming
4  that all three of those categories pertain
5  to Bill Newport?
6      A.   They should, yes.
7      Q.   Okay.  Are there any other
8  categories that pertain to Bill Newport
9  that you did not describe?
10      A.   Not that I'm aware of.
11      Q.   Are you contending that those
12  three categories or those three facts
13  pertain to Courtney Wolfe?
14      A.   Yes, they should.
15      Q.   Are there any others that you
16  contend apply to Courtney Wolfe?
17      A.   Not that I'm aware of.
18      Q.   All right.  And you also
19  identified your husband, Keith Fischer,
20  here?
21      A.   Yeah.
22      Q.   What's the basis for claiming
23  that your husband had actual or
24  constructive knowledge that you worked
25  unpaid overtime hours?

Page 263

1          M. A. Fischer
2      A.   My -- the hours that I came
3  home and he knew I wasn't getting paid for
4  it.
5      Q.   How did he know you weren't
6  getting paid for it?
7      A.   I spoke to him about it.
8      Q.   You told your husband that you
9  were working but not logging in hours in
10  the Workday?
11      A.   Absolutely.
12      Q.   And what did your husband say?
13      A.   I don't remember.  It's the way
14  it was.
15      Q.   Did he tell you he was doing
16  the same thing?
17      A.   Yes.
18      Q.   What did you say to him?
19      A.   It's -- it was the culture.
20  It's what was done.
21      Q.   Did you guys ever bring up
22  possibly actually raising the issue to his
23  supervisor's attention?
24      A.   He did.
25      Q.   Well, we talked about him

Page 264

1          M. A. Fischer
2  raising the issue of workload.
3          But do you have any knowledge
4  of Keith Fischer reporting to his
5  supervisor that he was working overtime
6  hours but not entering them into Workday?
7      A.   I'm unsure.
8      Q.   Okay.  If I'm understanding
9  correctly, the swipes in and out of the
10  building, the e-mails that you sent, and
11  the SICM timestamps, are you claiming that
12  Bill Newport, for example, actually knew
13  you were working overtime or that he could
14  have known?
15      A.   I'm claiming that he should
16  have known.
17      Q.   Okay.  But you don't know that
18  he actually had knowledge?
19      A.   No.  No, I do not know that he
20  actually had knowledge.
21      Q.   All right.  And similarly with
22  Courtney Wolfe, you don't know that she
23  actually had knowledge of any alleged
24  overtime that you stated that you worked
25  and weren't paid for?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
265–268

Page 265

1          M. A. Fischer
2          MS. DSOUZA:  Objection.
3      A.   Correct.
4   BY MR. TSONIS:
5      Q.   All right.  And same question
6   similarly with Danielle Perdomo:  You're
7   not claiming she had actual knowledge that
8   you were working unpaid overtime hours?
9      A.   Yes, she did.
10     Q.   Why do you believe she had
11  actual knowledge?
12     A.   Because I would e-mail her when
13  I was in the office and she would answer
14  me.
15     Q.   So, besides the fact that the
16  e-mails that you would send were after the
17  end of your scheduled shift, is there any
18  other reason you're contending she had
19  actual knowledge?
20     A.   I would be sending in e-mails
21  during the time I was working overtime
22  having an issue or a question.
23     Q.   Okay.  Just so I'm clear:  I
24  think you stated you were working, you
25  know, two to two and a half hours a week?

Page 266

1          M. A. Fischer
2      A.   Yes.
3      Q.   Is that two to two and a half
4   hours evenly distributed throughout the
5   week?
6      A.   No.
7      Q.   When would it typically happen?
8      A.   It depended on every day.
9   Every day was different.
10     Q.   Okay.  If your scheduled shift
11  was -- strike that.
12         Your shift was typically slated
13  to end at 5:30 p.m.?
14     A.   Correct.
15     Q.   Okay.  Is it fair to assume
16  that you weren't e-mailing Danielle Perdomo
17  at 11:00 o'clock at night?
18     A.   Correct.
19     Q.   Okay.  The times you were
20  e-mailing her would have been relatively
21  close to your scheduled end time?
22     A.   Yes, and sometimes later.
23     Q.   Okay.  But most of the time
24  relatively close?
25     A.   Possibly, yeah.

Page 267

1          M. A. Fischer
2      Q.   Okay.  The Interrogatory Number
3   7, this asks you -- and I won't read the
4   entire interrogatory word for word, but to
5   identify the individuals that you believe
6   have knowledge or information relating to
7   your claims or the facts underlying your
8   claims.  Okay?  And it asked you to
9   identify what knowledge you believe that
10  person has.
11         So, again, if you go to the
12  response and skip over the first sentence
13  of objections, it states that:  Plaintiff
14  directs defendant to plaintiff's
15  declaration including paragraph 2 and
16  further identifies the same individuals,
17  Danielle Perdomo, Bill Newport, Courtney
18  Wolfe, and Keith Fischer.
19         All right.  Is there anything
20  that we haven't talked about today with
21  respect to Danielle Perdomo that you
22  believe she knows regarding your claims or
23  the facts underlying your claims?
24     A.   No.
25     Q.   Is there anything that we

Page 268

1          M. A. Fischer
2   haven't talked about today that you believe
3   Bill Newport knows regarding your claims or
4   the facts underlying your claims?
5      A.   No.
6      Q.   Is there anything that we
7   haven't talked about today that you believe
8   Courtney Wolfe knows about your claims or
9   the facts underlying your claims?
10     A.   No.
11     Q.   Is there anything that we
12  haven't talked about today that you believe
13  Keith Fischer knows about your claims or
14  the facts underlying your claims?
15     A.   No.
16     Q.   Did you suffer any physical or
17  emotional sort of ailments as a result of
18  working for Geico?
19     A.   No.
20     Q.   Are you claiming emotional
21  distress damages or anything, you know,
22  pain and suffering, anything like that as
23  part of this lawsuit?
24     A.   No.
25     Q.   Okay.  Questions I just asked



1                      M. A. Fischer

2              C E R T I F I C A T E

3

4   STATE OF NEW YORK        )
                             :
5   COUNTY OF RICHMOND       )

6

7        I, MARINA DUBSON, a Notary Public for

8   and within the STATE OF NEW YORK, do hereby

9   certify:

10       That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19       IN WITNESS WHEREOF, I have hereunto

20  set my hand this 19th day of December 2024.

21

22

23  _____
                MARINA DUBSON

24

25

