UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES,
*Individually and on behalf of all others similarly
situated*,

                        Plaintiffs,

      v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,
*doing business as GEICO*
                      Defendant.
--------------------------------------------------------X

**MEMORANDUM
AND ORDER**
23-CV-2848-SJB-SIL

**BULSARA, United States District Judge:**

      Plaintiffs Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas

Barden, Constance Mangan, and Charise Jones, (collectively "Plaintiffs"), seek class

action certification for their claims against Government Employees Insurance Company

("GEICO") for failing to pay overtime wages in violation of the New York Labor Law

("NYLL").  (Second Am. Compl. dated Feb. 23, 2024 ("SAC"), Dkt. No. 52; Pls.' Mem. in

Supp. of Mot. to Certify Class ("Pls.' Mot.") dated Mar. 12, 2025, Dkt. No. 98-1).  GEICO

opposes certification and simultaneously seeks to exclude Plaintiffs' expert on damages,

(Def.'s Mem. in Supp. of *Daubert* Mot. ("Def.'s *Daubert* Mot.") dated July 23, 2025, Dkt.

No. 128-1), and to seal exhibits relevant to their papers, (Def.'s Mem. in Supp. of Mot. to

Seal ("Def.'s Mot. to Seal") dated Aug. 27, 2025, Dkt. No. 130-1).  For the reasons that

follow, Plaintiffs' motion for class certification is denied, GEICO's motion to seal is

granted in part and denied in part, and GEICO's motion to exclude expert testimony is granted.

FACTUAL BACKGROUND

Plaintiffs and the Class Members are current and former non-exempt employees of GEICO in the Special Investigations Unit ("SIU").  (SAC ¶ 2).  As Special Investigators, Plaintiffs were tasked with investigating claims of suspected insurance fraud.[1]  (*Id.* ¶ 107).  This work includes, among other things, investigating and evaluating information to determine credibility, taking statements, coordinating with criminal investigatory authorities, and locating witnesses.  (*See, e.g.*, Lead Security Investigator Job Description, attached to Pls.' Mot. as Ex. 16, Dkt. No. 97-6 at G6754).  Most Investigators worked remotely, either from their homes or in the field, from April 17, 2017, to the present (the alleged Class Period).  (SAC ¶ 107; Pls.' Mot. at 2).

Plaintiffs worked for the Melville, New York office, which was part of GEICO's New York "Region 2" until 2023.  (*See* Fogarty Decl., attached to Def.'s Opp'n to Pls.'

_____

[1] Plaintiffs define "Special Investigator" as "an overarching job title that GEICO applied to Plaintiffs and other employees with substantively similar job duties."  (SAC ¶ 2 n.2; Pls.' Mot. at 1 n.1).  The term "refer[s] to employees in the following positions (and similarly situated job titles, however variously titled) who performed similar investigative work and were subject to the same overtime practices: Senior Field Security Investigator, Lead Security Investigator, Major Case SIU Investigator, Field Medical Fraud Investigator, Field Major Case SIU Investigator, Senior Outside Security Investigator, Internal Major Case SIU Investigator, Senior Internal Security Investigator, Internal Security Investigator, and Claims Security Investigator."  (Pls.' Mot at 1 n.1).  GEICO disputes that any single cohesive group exists, (Def.'s Mem. in Opp'n to Pls.' Mot. dated May 12, 2025 ("Def.'s Opp'n"), Dkt. No. 98-66 at 3 n.1), and asserts that different Investigator roles require different duties, (*id.* at 3) (*e.g.*, "Outside" investigators work in the field, while "inside" investigators work exclusively from their computers.).

Second Mot. to Certify FLSA Collective Action as Ex. 1, Dkt. No. 62-37 ¶¶ 13–15; *e.g.*, Dep. of Albert Brust ("Brust Dep."), attached to Pls.' Mot. as Ex. 1, Dkt. No. 98-3 at 149:21-22; Decl. of Keith Fischer ("K. Fischer Decl."), attached to Decl. of Michael J. Scimone in Supp. of Pls.' Second Mot. to Certify FLSA Collective Action ("Scimone Decl.") as Ex. H, Dkt. No. 56-8 ¶ 1). Region 2's SI Unit had at least 100 Investigators in 2020. (*See* Overview of SIU Case Investigations, attached to Pls.' Mot. as Ex. 61, Dkt. No. 98-63). Most Investigators work in small teams and report to SIU Supervisors, who report to an SIU Manager. (*See* Dep. of Jennifer Fogarty ("Fogarty Dep."), attached to Pls.' Mot. as Ex. 11, Dkt. No. 98-13 at 82:24–83:3 (discussing reporting structure); Dep. of William Newport ("Newport Dep."), attached to Pls.' Mot. as Ex. 12, Dkt. No. 97-3 at 52:2-3 (Manager describing teams of about 7–12 Investigators)).

GEICO policy only permitted Investigators to report 7.75 hours of work each day, or 38.75 hours each week. (*See* Employee Handbook, attached to Def.'s Opp'n as Ex. 20, Dkt. No. 97-48 at G195–96). GEICO's timekeeping policies require them to record all hours worked and they are "never allowed to work 'off the clock.'" (*Id.*). Because doing so "violates Company policy," it could lead to disciplinary action, including termination of employment. (*Id.*). And managers and supervisors are not permitted to "require, encourage or suggest that a non-exempt associate work off the clock." (*Id.*). A non-exempt associate who feels they did not receive pay for all hours worked is required to "immediately contact their supervisor, local HR management or Corporate Human Resources." (2023 HR Handbook, attached to Pls.' Mot. as Ex. 30, Dkt. No. 97-16 at G54) The Handbook contained a mixed message: while working

overtime without permission could lead to disciplinary action, including termination, "all overtime hours will be paid." (*Id.*).

As noted, GEICO required all requests for overtime pay receive prior management approval, (*see id.*; Nov. 2017 HR Handbook, attached to Pls.' Mot. as Ex. 31, Dkt. No. 97-17 at G41 ¶ 5), and decisions are to be made "based on business need," (AD & SIU Talking Points, attached to Pls.' Mot. as Ex. 32, Dkt. No. 97-18; *see also* Dep. of Gerard Cassagne ("Cassagne Dep."), attached to Pls.' Mot. as Ex. 13, Dkt. No 98-15 at 186:23–187:8 (describing business need as anything that "need[s] to be done within the guidelines of the company")). Many Supervisors did, in fact, require prior approval of overtime, which Plaintiffs allege was impractical, (*e.g.*, Dep. of Constance Mangan ("Mangan Dep."), attached to Pls.' Mot. as Ex. 23, Dkt. No. 98-25 at 106:15-22 (testifying that she had to request anticipated overtime preemptively)), while others required Investigators to seek approval after working overtime, with variations in method and detail for making such submissions. (*See, e.g.*, Cassagne Dep. at 198:7–199:2 ("I did not have the ability to preapprove overtime ahead of time."); Supervisor OT Emails, attached to Def.'s Opp'n as Ex. 41, Dkt. No. 97-59 at G12001 (supervisor requesting overtime summary at the end of the week)).

GEICO evaluates the Investigators' work performance based on certain "core metrics." (Newport Dep. at 155:1-24). All metrics rate Investigators on a 1–5 scale. (Nov. 2017 Associate Handbook, attached to Pls.' Mot as Ex. 42, Dkt. No. 97-24 at G172). Key metrics include "Productivity" which is calculated as a ratio that divides the number of cases an Investigator closed by the number of work hours reported. (*See* SIU

Case Investigations Instructions, attached to Pls.' Mot. as Ex. 50, Dkt. No. 97-26 at G17297). Investigators who are rated less than a 3.0 on any goal may be ineligible for an annual salary increase and placed on a performance improvement plan. (*See* Nov. 2017 Associate Handbook at G170–72).

GEICO assigned "an ever-increasing workload," (SAC ¶ 3), with a dramatic increase after March 2020, (*see* Dep. of Louis Pia ("Pia Dep."), attached to Pls.' Mot. as Ex. 10, Dkt. No. 98-12 at 69:16-19; Cassagne Dep. at 93:10-12). GEICO assumed that remote work could be completed in substantially less time than in-person work, so it assigned Investigators more cases. (*E.g.*, K. Fischer Decl. ¶ 10 (detailing that in April 2020 he was assigned approximately 70 cases in contrast to a monthly average of 40 cases in 2018–19)). It became routine for Investigators to underreport work hours— entering 38.75 hours on their timesheets even when they worked overtime. (*See, e.g.*, Decl. of Scott Brady, attached to Scimone Decl. as Ex. B, Dkt. No. 56-2 ¶ 8 ("I only entered 7.75 hours per day, five days a week [ ] regardless of how many hours I actually worked. My understanding from conversations with my supervisors was that GEICO did not authorize overtime if I needed to work on my regular caseload. GEICO authorized overtime only if it had additional cases to assign me."); Decl. of Craig Costanzo ("Costanzo Decl."), attached to Scimone Decl. as Ex. F, Dkt. No. 56-6 ¶ 9; Decl. of Margaret Fischer, attached to Scimone Decl. as Ex. I, Dkt. No. 56-9 ¶ 6 ("I only entered working 7.75 hours per day . . . regardless of how many hours I actually worked."); Decl. of Charise Jones ("Jones Decl."), attached to Scimone Decl. as Ex. N., Dkt. No. 56-14 ¶ 7 (same)). That being said, Investigators admitted that no Supervisor

or Manager ever instructed them to work "off the clock."  (*E.g.*, Dep. of Louis Caniglia Jr. ("Caniglia Dep."), attached to Def.'s Opp'n as Ex. 11, Dkt. No. 97-40 at 54:4-18).

Investigators regularly underreported their work hours because of the strict controls GEICO exercised over overtime hours, (*e.g.*, Mangan Dep. at 109:23–110:3 ("overtime was discouraged . . . I didn't feel confident that it would be approved"); *id.* at 111:15-19 (noting that requesting overtime led to being assigned more cases)); because Supervisors told them not to report overtime for certain kinds of work, (*e.g.*, Dep. of John Moeser ("Moeser Dep."), attached to Pls.' Mot. as Ex. 8, Dkt. No. 98-10 at 131:15–132:16 (["Supervisor Neyland] said that you are not supposed to report overtime for that type of [administrative case] work.")); and because their performance metrics penalized them for reporting more hours, (*e.g.*, Caniglia Dep., attached to Pls.' Mot. as Ex. 60, Dkt. No. 98-62 at 235:23–236:16 ("[I]f I put more work in . . . it could be negatively impacted on my core metrics.")).

Plaintiff Keith Fischer alleges he worked about 10–12 hours on weekdays and 8 hours on many weekends, about 50–65 hours a week from 2016 to March 2020.  (K. Fischer Decl. ¶ 9).  He worked as a Special Investigator for GEICO from May 1999 to December 2020, reporting to Supervisor Gerard Cassagne.  (*Id.* ¶¶ 1–2).  His workload increased, as did his overtime hours from March through April 2020, to about 60–75 hours per week.  (*Id.* ¶ 10).  He alleges that his supervisor "knew, if not weekly, at least biweekly, that [he] was working overtime each and every day and weekends to maintain [his] caseload" and he was told "do what you have to do to complete your work."  (Dep. of Keith Fischer ("K. Fischer Dep."), attached to Def.'s Opp'n as Ex. 3,

Dkt. No. 97-32 at 88:7-18).  He alleges that in about April of 2019 he raised complaints directly to SIU Manager Bill Newport over heavy caseloads, but his complaints were not addressed.  (K. Fischer Decl. ¶ 18).

Plaintiff Michael O'Sullivan was employed as an Investigator from November 2003 to April 2022, working remotely throughout his tenure, but assigned to the Melville office.  (Decl. of Michael O'Sullivan ("O'Sullivan Decl."), attached to Scimone Decl. as Ex. U, Dkt. No. 56-21 ¶ 1).  He reported to Supervisor Brian Portnoy, but also to Toni D'Agata, Dara Campbell, Richard Kilgin, and Nora Leeds.  (*Id.* ¶ 2).  O'Sullivan alleges to have worked approximately 47.5 to 50 hours per week from December 2016 to April 2022.  (*Id.* ¶ 10).  In January 2020, he asked Portnoy if GEICO would approve his overtime for the week and was told just to complete the work he could in 38.75 hours, so he did not submit the overtime hours worked "because GEICO did not approve [his] overtime work."  (*Id.* ¶ 11).  He admits to not having reached out to Supervisors Campbell or D'Agata for overtime approval.  (Dep. of Michael O'Sullivan ("O'Sullivan Dep."), attached to Pls.' Mot. as Ex. 24, Dkt. No. 98-26 at 72:5-17).

Plaintiff John Moeser worked as an Investigator from October 2006 to April 2021, reporting to Supervisor April Neyland.  (Decl. of John Moeser ("Moeser Decl."), attached to Scimone Decl. as Ex. R, Dkt. No. 56-18 ¶¶ 1–2).  Moeser alleges to have worked about 52.5 hours per week from December 2016 to March 2020, and about 55 hours per week from March 2020 to April 2021.  (*Id.* ¶ 11).  He alleges to have reported to Newport that "most people are working more hours than what they are submitting" and that he "felt that [he] had to work these hours in order to . . . meet standards with

their evaluation system." (Moeser Dep. at 100:12–101:6). He was told by Neyland not to "submit overtime for office work." (*Id*. at 135:10-15).

Plaintiff Louis Pia was employed as an Investigator from September 2003 to November 2022, working remotely but assigned to the Melville office. (Decl. of Louis Pia ("Pia Decl."), attached to Scimone Decl. as Ex. V, Dkt. No. 56-22 ¶ 1). Pia reported to Supervisor Gerard Cassagne. (*Id.* ¶ 2). Pia alleges he worked about 55 hours a week on average from late 2016 to March 2020, increasing to about 65 hours a week from March 2020 to November 2021, and back down to 55–60 hours from December 2021 to December 2022. (*Id.* ¶ 12). He alleges he and coworkers requested overtime and were told "no." (Pia Dep. at 70:4-12).

Plaintiff Thomas Barden was employed as an Investigator at GEICO from September 2019 to December 2022, working remotely but assigned to the Melville office. (Decl. of Thomas Barden, attached to Scimone Decl. as Ex. A, Dkt. No. 56-1 ¶ 1). He reported to Supervisor Chester Janik. (*Id.* ¶ 2). He alleges that after March 2020, his caseload increased significantly, with him receiving about 5–7 cases per day as opposed to 5–7 per week prior to the pandemic. (*Id.* ¶ 8). From March 2020 to December 2022, he alleges he regularly worked about 55–60 hours per week, but he only entered and was only paid for 38.75 hours. (*Id.* ¶ 10). That being said, he was told by a supervisor: "If you're working extra hours, put in for it. Document it." (Dep. of Thomas Barden ("Barden Dep."), attached to Def.'s Opp'n as Ex. 7, Dkt. No. 97-36 at 107:17-19).

Plaintiff Constance Mangan was employed as an Investigator from April 2004 to July 2020, reporting most recently to Supervisor Brian Portnoy, but previously reported

to April Neyland, Toni D'Agata, Dara Campbell, and Kevin Moynihan.  (Decl. of Constance Mangan, attached to Scimone Decl. as Ex. P, Dkt. No. 56-16 ¶¶ 1–2).  Mangan alleges to have worked about 50–60 hours a week on average between late 2016 and May 2020, (*id.* ¶ 10), despite understanding that overtime was "discouraged" and finding the process of requesting overtime "onerous."  (Mangan Dep. at 106:15-25, 109:23-24, 110:7-8 ("[M]y supervisors were saying we shouldn't be doing it.")).  She also recounts that Supervisors D'Agata and Campbell told her that "putting in overtime hours would be detrimental to [her]."  (*Id.* at 150:20-22).  She admits to having submitted overtime on "very few occasions" for which she was paid.  (*Id.* at 105:20–106:6).

Plaintiff Charise Jones is currently employed as an Investigator as part of the Melville office and has been employed by GEICO since 1987.  (Jones Decl. ¶ 1).  She reports to Supervisor April Neyland.  (*Id.* ¶ 2).  From April 2017 to March 2020, she worked approximately 51–58 hours per week, but "[d]uring nearly all of this time . . . entered only 38.75 hours in the timekeeping system[.]"  (*Id.* ¶ 13).  Jones found the process for requesting overtime "time consuming" and was dissuaded from seeking overtime after an occasion where Neyland reprimanded her for working overtime without prior approval.  (Dep. of Charise Jones ("Jones Dep."), attached to Def.'s Opp'n as Ex. 1, Dkt. No. 97-30 at 148:11–149:22).  Even if she knew her shift was over, and something had to be completed, "[she] would just have to do it, otherwise it would . . . be held against [her]."  (Jones Dep., attached to Pls.' Mot. as Ex. 6, Dkt. No. 98-8 at 123:5-14).

PROCEDURAL HISTORY

Plaintiffs commenced this action on April 17, 2023.  (Compl., Dkt. No. 1).  On October 6, 2023, Plaintiffs filed an amended complaint adding an additional named plaintiff, Ashley Alvarez, and allegations of violations of California law.  (Am. Compl., Dkt. No. 28 ¶¶ 41, 84–104).  On November 17, 2023, Plaintiffs moved for conditional certification of the proposed FLSA Collective Action, (Notice of Mot. to Certify FLSA Collective Action, Dkt. No. 36), which the Court denied without prejudice and with leave to renew after resolution of a then-pending motion to dismiss, (Order dated Dec. 12, 2023, Dkt. No. 43 at 3).  Plaintiffs subsequently filed a Second Amended Complaint revising the scope of the class to New York Investigators[2] and defining the FLSA Collective as: "All current and former non-exempt classified employees of GEICO who worked as Special Investigators (including comparable roles with different titles) in New York during the time period from three years prior to the filing of the complaint until resolution of this action."  (SAC ¶ 78).  On June 5, 2024, Plaintiffs renewed their motion to certify the FLSA Collective Action, (Pls.' Second Mot. to Certify FLSA Collective Action, Dkt. No. 62), which Magistrate Judge Tiscione later granted, (Mem. &

---

[2] The Amended Complaint withdrew Plaintiff Alvarez's claims, removing her as a named plaintiff, as well as the claims of opt-in plaintiffs not residing in New York. (*See* Joint Stipulation dated Feb. 8, 2024, Dkt. No. 49 at 2).

Order dated Mar. 31, 2025, Dkt. No. 91).[3]  On June 11, 2025, Plaintiffs moved to certify a class.  (Pls.' Mot.).  Plaintiffs seek to certify a class of "current and former Investigators in Region 2 from April 17, 2017 . . . who worked more than 40 hours per workweek but were not paid for all hours."[4]  (*Id.* at 15).  In other words, they seek certification of a NYLL overtime class of Region 2 investigators from April 17, 2017 forward.[5]

---

[3] Some courts in this District weigh a grant of FLSA collective action in favor of certifying a class.  *See, e.g.*, *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202–03 (S.D.N.Y. 2006) ("[W]here a collective action under the FLSA that is based on the same set of facts has been approved, there is an inclination to grant class certification of state labor law claims.").  But the Second Circuit has not yet adopted such a standard.  Here, there have been about 50 plaintiffs who joined the case during the opt-in period, for a total of about 57 employees.  (*See, e.g.*, Notice of Consent to Join, Dkt. No. 137).

[4] GEICO argues that Plaintiffs' proposed class—including only those "who worked more than 40 hours per workweek but were not paid for all hours"—constitutes an impermissible fail-safe class.  (Def.'s Opp'n at 9).  "A fail-safe class requires a court to decide the merits of individual class members' claims to determine class membership." *Nypl v. JP Morgan Chase & Co.*, No. 15-CV-9300, 2022 WL 819771, at *9 (S.D.N.Y. Mar. 18, 2022).  The Court does not reach this argument, because the class cannot be certified for other reasons.

[5] A class period defined "to the present" is problematic for a number of reasons, including "that the record will necessarily lack evidence that the requirements of Rule 23 are met with regard to the portion of the class period that stretches beyond the close of discovery."  *Rodriguez v. It's Just Lunch Int'l*, No. 07-CV-9227, 2018 WL 3733944, at *6 (S.D.N.Y. Aug. 6, 2018); *see also Hart v. Rick's NY Cabaret Int'l, Inc.*, No. 09-CV-3043, 2013 WL 11272536, at *5 (S.D.N.Y. Nov. 18, 2013) ("But an open-ended end-date is untenable. It fails to take account of the possibility that material facts might change.  And it denies the parties, after the close of fact discovery, a practical vehicle for exploring whether there have been material factual changes.  Lack of clarity as to the end date of the class period also has the potential to confuse putative class members as to whether their interests will, or will not, be represented in the pending lawsuit.") (collecting cases); *Chow v. Shorefront Operating LLC*, No. 19-CV-3541, 2025 WL 2306593, at *3 (E.D.N.Y. Aug. 11, 2025).  Although the Court could exercise its authority pursuant to Fed. R. Civ. P. 23(c)(1)(C) to modify the class definition and close the class period on a specific date, the Court sees no need to do so since certification is being denied.

<u>DISCUSSION</u>

## I.    Motion for Class Certification

Under the NYLL, employers are required to pay an overtime rate of one and one-half times the employee's "regular rate" of pay.  N.Y. Comp. Codes, R. & Regs. tit. 12, § 142-2.2.  To recover overtime under the NYLL, a plaintiff must show that he "performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 363 (S.D.N.Y. 2014) (quotation omitted).  Plaintiffs seek certification of a NYLL class of Investigators who were not paid overtime.

### A.    Standing

Relying on *Denney v. Deutsche Bank AG,* for the proposition that "no class may be certified that contains members lacking Article III standing," 443 F.3d 253, 264 (2d Cir. 2006), GEICO first argues that Plaintiffs cannot certify the proposed class because it "indisputably encompasses individuals who did not suffer injury[.]"  (Def.'s Mem. in Opp'n to Pls.' Mot. dated May 12, 2025 ("Def.'s Opp'n"), Dkt. No. 98-66 at 8).  In support, GEICO points to the declarations of six Investigators—who would be class members—but who aver they did not work off the clock.  (*Id.* at 9).  The argument is frivolous: the Court of Appeals has clarified that no such requirement exists and disavowed the vitality of *Denney* that GEICO advances.

In *Hyland v. Navient Co.*, the Court of Appeals explained that *Denney* was decided before the Supreme Court clarified the requirement for standing in class actions.  48 F.4th 110, 118 n.1 (2d Cir. 2022) (cautioning against overreliance of single-sentence in

*Denney*) (citing *Frank v. Gaos*, 586 U.S. 485 (2019)).  And *Denney* itself does not stand for the proposition that GEICO advances: "[o]nce it is ascertained that there is a named plaintiff with the requisite standing, [ ] there is no requirement that the members of the class also proffer such evidence."  *Id.* (quoting *Denney*, 443 F.3d at 263–64).  "Standing is satisfied so long as at least one named plaintiff can demonstrate the requisite injury. . . . Class actions are no exception to this long-standing rule."  *Id.* at 117–18 (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 766 (2019)).

### B.  Rule 23(a)

Class certification is governed by Federal Rule of Civil Procedure 23.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs seeking class certification under Rule 23 must satisfy each of the conditions in Rule 23(a).  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  "The party seeking 'class certification must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met."  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (quoting *Dukes*, 564 U.S. at 350).  "Rigorous analysis" means that:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the

merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re Initial Pub. Offering Sec. Litig*, 471 F.3d at 41.

Plaintiffs seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Fed. R. Civ. P. 23(a)). These requirements are referred to as numerosity, commonality, typicality, and adequacy. In addition, Rule 23(a) has been found to contain an implicit requirement of "ascertainability." *In re Petrobras Secs.*, 862 F.3d 250, 269 (2d Cir. 2017) ("The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."). The Court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met," *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d at 41, by a preponderance of the evidence.[6]

---

[6] GEICO's *Daubert* motion, (Def.'s *Daubert* Mot.), filed after completion of the class certification briefing, contains additional exhibits and arguments as to Rule 23 elements. Given that the Court is deciding these motions simultaneously and the absence of any objection the Court has considered the entirety of the record, including exhibits submitted by both sides with the *Daubert* motion, in evaluating the propriety of class certification. Neither party objected to the citation of the collective action certification exhibits in connection with the class certification briefing, so the Court has considered those documents as well.

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

### i.    Numerosity

Rule 23(a)(1) requires that the prospective class be so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Impracticable does not mean impossible."). In the Second Circuit, numerosity is generally presumed when the putative class has 40 or more members. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021). Here, Plaintiffs contend, with no opposition from GEICO, that according to GEICO's records Region 2's SI Unit had at least 100 Investigators in 2020. (*See* Overview of SIU Case Investigations at G011963). As such, the numerosity requirement is satisfied.[7]

### ii.    Commonality and Typicality

The commonality and typicality requirements "tend to merge" with each other because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class

---

[7] Defendants similarly do not contest the ascertainability of the putative class and the Court finds this implied requirement satisfied as it uses "objective criteria," *i.e.* specific dates, a specific employer/region, and specific enough job descriptions, "that establish a membership with definite boundaries." *See In re Petrobras Secs.*, 862 F.3d at 269.

members will be fairly and adequately represented in their absence." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

Commonality exists if plaintiffs' claims share a common question of law or fact. Fed. R. Civ. P. 23(a)(2). This requires the "plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of the Sw.*, 457 U.S. at 157), not "merely that they have all suffered a violation of the same provision of law," *id.* (noting that the language of Rule 23(a)(2) is "easy to misread, since any competently crafted class complaint literally raises common questions" (quotations and alteration omitted)). That is,

> [i]t asks not simply whether there are questions of law or fact common to the class, but whether a class action is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." . . . [T]here must be "a common contention . . . of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 162 (S.D.N.Y. 2014) (alterations in original) (quoting *Dukes*, 564 U.S. at 350). Ultimately, in deciding whether commonality exists, "the question becomes whether dissimilarities between the claims may impede a common resolution." 7A Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1763.1 (4th ed. 2025).

As for typicality, this

> Requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.

*Robidoux*, 987 F.2d at 936–37 (citations omitted); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 376–77 (2d Cir. 1997).

In the context of wage-and-hour cases, courts "require movants to either show proof of an express company policy that violates wage and hour laws, or proof from which a court can infer that the defendant operated under a *de facto* policy to deny class members the wages to which they were entitled." *Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 269 (E.D.N.Y. 2016); *e.g.*, *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015) ("[T]he common contention to be proved is whether Duane Reade misclassified its employees as exempt from New York's overtime requirements. . . . [T]he district court relied on evidence showing that (i) Duane Reade uniformly classifies all ASMs as exempt without an individualized determination of each ASM's job responsibilities, and (ii) Duane Reade ASMs carry out their duties pursuant to a uniform policy, uniform training, and uniform procedures across all stores."). Here, Plaintiffs argue that the common factual circumstances under which the GEICO Investigators worked, including the stated policy generally prohibiting overtime, combined with performance metrics, created a *de facto* policy that required and led Investigators to work off-the-clock. (Pls.' Mot. at 17–18). And they contend that that policy was measured and put in place by one common set of *de facto* practices: all Investigators "experienced GEICO's practices of restricting overtime, were all subject to the same overtime approval process and performance metrics, and their escalating workload was controlled by a handful of Supervisors reporting to a single Manager who was incentivized to increase it." (*Id.* at 17). Plaintiffs frame the common questions at issue as: whether GEICO failed to (i) "pay

17

Investigators in Region 2 for all hours worked," and (ii) "accurately record all hours worked by Investigators"; and (iii) "whether GEICO knew, or should have known, that Investigators were working off the clock."  (*Id.*).

GEICO argues that Plaintiffs have failed to provide any significant proof that a *de facto* policy or practice of failing to pay for all hours worked, contrary to the established employee handbook policy, was in fact in place.  (Def.'s Opp'n at 10–11).  Plaintiffs must present "enough evidence to confidently suggest a uniform, or nearly uniform, practice occurring," *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (2d Cir. 2015), and they have done so.  Plaintiffs' testimony demonstrates a common factual thread among Investigators: an understanding that they were expected to complete their work, even if it meant working beyond the hours allocated, and that they were not permitted to log those hours if they did.  And that understanding was driven by a common GEICO policy regarding overtime.

*First*, there is sufficient evidence that Plaintiffs and other class members worked overtime.  Plaintiffs present deposition testimony of 15 Investigators (and declarations

from 10 additional employees)[8] who allege that they worked beyond the 38.75 hours and did not log them.  (*E.g.*, Brust Dep. at 111:1-4, 16-17 ("I have discussed with my supervisor . . . because of the workload, I'm working through lunch, I'm working after hours, I'm working on the weekends. . . . I'm working past the eight hours."); Barden Dep., attached to Pls.' Mot as Ex. 26, Dkt. No. 98-28 at 101:1-14 (confirming that he worked 55 to 60 hours per week between August 2020 through December 2022); Dep. of Daniel King ("King Dep."), attached to Pls.' Mot. as Ex. 7, Dkt. No. 98-9 at 110:20–111:10 (confirming that he worked about 50 hours a week on average during COVID)).[9]

*Second*, the Investigators testified that they worked overtime and did not log it because they were pressured not to do so by GEICO's policies and case overload.  For

---

[8] The declarations, while providing some specifics as to each Investigators' circumstances and claims, contain nearly identical phrases and paragraphs, suggesting a cookie-cutter approach in their preparation.  For example, all declarations contain a sentence that reads: "As a result of the competing pressures that GEICO placed on me to do more work, meet demanding performance metrics, and limit my work schedule to non-overtime hours, I regularly performed work for GEICO that I did not report in the company's timekeeping system."  (Decl. of Albert Brust, attached to Scimone Decl. as Ex. C, Dkt. No. 56-3 ¶ 16; *see also* Pia Decl. ¶ 20; Decl. of Maria Munoz, attached to Scimone Decl. as Ex. S, Dkt. No. 56-19 ¶ 15; O'Sullivan Decl. ¶ 16).  Or a slight variation of this statement.  Although the declarations are less persuasive as a result, they are bolstered by the subsequent testimony of the declarants.

[9] GEICO argues that no *de facto* practice existed because there were Investigators that accurately reported all work time, including any overtime, and did not feel pressured to do otherwise.  (Def.'s Opp'n at 15–16 (citing to the testimony of six Investigators)).  But such examples do not undermine commonality.  *See, e.g., Pichardo v. Carmine's Broadway Feast Inc.*, No. 15-CV-3312, 2016 WL 5338551, at *4 (S.D.N.Y. Sep. 23, 2016) ("To the extent Defendants argue that they will prove to the jury's satisfaction that no illegal policy existed for any Plaintiff, their ability to proffer such evidence [declarations by individuals who did not work overtime or feel pressured to do so] only reinforces the Report's conclusion that the class's claims may be resolved by generalized proof.") (adopting report and recommendation).

example, Plaintiff Mangan, when asked why she felt that requesting overtime was

discouraged said:

> I would tell my supervisors, there is no way I can complete my
> investigations, my reports, within the time frame of 7.75 hours a day; that
> in order to complete my work I had to work in excess of those hours on a
> regular basis.  And the response that I received from my supervisors—and
> that would be all of the supervisors that I have named so far—was that
> ["]Don't do overtime.  Work 38.75; work 7.75."  My response would be "But
> I have to, because it affects my performance evaluation.  It affects my case
> rating.  There's no way that I can do—finish these cases if I don't work more
> than my normally scheduled hours."  And they would say "We understand,
> but there's nothing we can do about it."

(Mangan Dep. at 110:12–111:4).  Several Investigators testified that they did not log their

off-the-clock work because they understood that overtime was not available.  (*E.g.*, King

Dep. at 119:10-17 (when asked why he did not request overtime for the hours he claims

to have worked off-the-clock, he stated "because it was known that they were not

paying us overtime.  So, I'm not sure why I would even—why ask?")).  Yet, despite the

ban on working overtime without permission, evidence suggests that Investigators

believed that GEICO expected them to get the work done, even if it meant working off-

the-clock.  (*E.g.*, Dep. of Michael Reed ("Reed Dep."), attached to Pls.' Mot. as Ex. 25,

Dkt. No. 98-27 at 105:3-7 ("[I]t was frowned upon to put any overtime in.  So we just

continued to work and do the hours, and do the cases that needed to be done, and the

hours that they needed to be done."); Jones Dep., attached to Pls.' Mot. at 123:9-14

("[K]nowing that my shift was over based on the number of hours I've already worked,

I knew that this report had to be in by the end of that day, and I would just have to do

it, otherwise it would, you know, be held against me for not doing it."); Dep. of Craig

Costanzo ("Costanzo Dep."), attached to Pls.' Mot. as Ex. 2, Dkt. No. 98-4 at 50:17-19,

51:22-23 ("I have to stay, I have to work past the times to try to meet these requirements. . . . [T]he only way we can get this done is to put extra time in."); Moeser Dep. at 100:16–101:6 ("[W]ith the amount of work that you were giving us that we were forced to work more hours than what they are documenting . . . I felt that I had to work these hours in order to keep—meet the standards with their evaluation system.")). There is also evidence that Investigators understood that working off-the-clock was the expectation, even if they knew that the official company policy was the opposite.  (*E.g.*, Reed Dep. at 77:11-17 ("There is an expectation [to follow the policies in the handbook], but the reality is you still have to get your work done.  So.  With the amount of work that was coming in, that was not feasible.  We had to work the hours because the case life, the overload, and the log, and the amount of cases.")).

The Court finds that this evidence indicates that Investigators were working off-the-clock and not being paid overtime; and therefore, there is sufficient evidence of a common issue of fact as to whether such a *de facto* policy existed that is subject to common proof.  *See Perez v. Isabella Geriatric Ctr., Inc.*, No. 13-CV-7453, 2016 WL 5719802, at *2 (S.D.N.Y. Sep. 30, 2016) (finding commonality where plaintiffs' claims ultimately rested on the contention that defendant's policies, together with a policy of assigning more work than could be completed within the regularly scheduled shifts, "had the effect of causing the class to perform uncompensated work") (adopting report and recommendation).  "Courts considering similar claims of unlawful payment

policies routinely certify classes based on evidence of a common policy." *Pichardo*, 2016 WL 5338551, at *3 (collecting cases).[10]

GEICO emphasizes every distinction possible in arguing against commonality including differences between the amounts of overtime recorded, the practices supervisors used to approve overtime, and the specific performance metrics applicable to the class members. (Def.'s Opp'n at 10–23). Variations among the class members, such as the nature of their work or the types of cases they investigate, do not undermine commonality. *See Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 343 (S.D.N.Y. 2004) (finding commonality met even where "there are some differences among employees" such as "responsibilities, hours worked, and salaries" as long as "[a]ll potential class members are alleged to have been harmed by a common practice"). Such arguments are suited for analyzing predominance, or GEICO's ultimate liability and damages as to each class member. But commonality "does not require that all questions of law or fact

---

[10] GEICO relies on *Ruiz v. Citibank* to contend Plaintiffs have failed to present sufficient evidence of a *de facto* policy. (Def.'s Opp'n at 14). In *Ruiz*, the court found that anecdotal evidence that "certain branch managers applied improper pressure" and "certain personal bankers felt pressured to work off the clock" was deficient "in both scale and uniformity" to show commonality. 93 F. Supp. 3d at 291–92. However, in *Ruiz*, there were 31 named plaintiffs, declarants, and sample opt-ins representing "roughly one account for every 76 of the roughly 2,346 putative class members" (about 1.3%), failing to establish uniformity of experience. *Id.* at 292; *see also Ni v. HSBC Bank USA, N.A.*, No. 23-CV-0309, 2025 WL 1474735, at *9 (S.D.N.Y. Jan. 23, 2025) (finding no commonality where plaintiffs relied on anecdotal evidence from 24 bankers who constituted 2.5% of the proposed class). Here, Plaintiffs proffered testimony from 25 of approximately 100 Class Members—roughly 25% of the Class. (*See* Pls.' Mot. at 2 n.3). Therefore, due to the more compact nature of this case, the evidence of roughly 25% of the proposed class is far more compelling and therefore sufficient to demonstrate commonality. *Cf. Dukes*, 564 U.S. at 358 n.9 (discussing the persuasiveness of anecdotal evidence based on comparisons to the size of a potential class).

raised in the litigation be common[;] indeed, even a single question of law or fact common to the members of the class will satisfy the . . . requirement." *Houser v. Pritzker*, 28 F. Supp. 3d 222, 242 (S.D.N.Y. 2014) (quoting *Dukes*, 564 U.S. at 368–69 (Ginsburg, J., concurring in part and dissenting in part)); *e.g.*, *Diaz v. N.Y. Paving Inc.*, No. 18-CV-4910, 2023 WL 3853308, at *3 (S.D.N.Y. May 31, 2023) ("All potential class members are invested in proving that NY Paving had a de facto policy of requiring workers to report to a central location and complete various tasks before officially 'clocking-in.' Proof of this policy will undoubtedly require the marshalling of common facts.").

For similar reasons that commonality is present, the Court also finds the typicality requirement satisfied. The Plaintiffs' claims arise from the same events as the proposed class's claims: GEICO's *de facto* policy in Region 2 inducing off-the-clock work. (*E.g.*, Moeser Dep. at 100:12-25, 104:1-9; *supra* pp. 18–21). Plaintiffs "allege[] that the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented," *Robidoux*, 987 F.2d at 936–37, namely the essentially forced overtime work—because of the evaluation policies and need to complete assignments—that was not compensated. *See Zivkovic v. Laura Christy LLC*, 329 F.R.D.

61, 71 (S.D.N.Y. 2018) ("[T]ypicality, like commonality, has been found where plaintiff's claims arise from the same unlawful practices or legal theories.").[11]

### iii.    Adequacy

To satisfy Rule 23(a)(4), the class representative must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  That is, a class representative must "possess the same interest and suffer the same injury as the class members."  *Amchem Prods.*, *Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).  The adequacy requirement examines whether the class members have interests that are "antagonistic to one another."  *In re Drexel Burnham Lambert Grp.*, *Inc.* 960 F.2d 285, 290–91 (2d Cir. 1992) (quotations omitted).

Here, Plaintiffs' interests are aligned with the Class because they allege injury from the same policies and practices and seek similar relief—unpaid wages for time

---

[11] GEICO argues that Plaintiffs lack personal knowledge of whether other Investigators requested overtime, worked uncompensated overtime, or were denied overtime.  (Def.'s Mot. at 30).  But several Plaintiffs testified that they knew that other Investigators were similarly working off the clock because of the policies, even if they did not know exactly how many hours or when.  (*E.g.*, O'Sullivan Dep., attached to Def.'s Opp'n as Ex. 10, Dkt. No. 97-39 at 128:16-18 ("[I]n conversation, guys would be complaining about working extra hours to get cases done."); Moeser Dep. at 96:25–97:3 (reported to Bill Newport "[t]hat I, along with everybody else that I knew of, were working more hours than what they were documenting")).  In any event, the Court sees no reason why such a finding would undermine typicality where Plaintiffs' claims "arise[ ] from the same course of events," *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022), namely the working of overtime to complete necessary work, even if under different supervisors.  *Id.* ("Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members."); *e.g.*, *Espinoza v. 953 Assocs. LLC,* 280 F.R.D. 113, 127–28 (S.D.N.Y. 2011) (finding typicality satisfied where "the minimum wage and overtime claims alleged by Plaintiffs are similar to those of the class members and arise from the same allegedly unlawful practices and policies").

worked off-the-clock.  Plaintiffs have also undertaken steps to fulfill their obligations as class representatives such as by participating in extensive discovery.  (*See* Decl. of Michael J. Scimone in Supp. of Pls.' Mot., Dkt. No. 98-2 ¶¶ 10–11).  With no opposition from GEICO, the Court finds this element satisfied.

C.      **Rule 23(b)(3)**

Plaintiffs seeking to certify a class under Rule 23(b)(3) must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These requirements are referred to as the predominance and superiority requirements.  The Court finds that the proposed Class does not satisfy predominance.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  "Even if Rule 23(a)'s commonality requirement may be satisfied by that shared experience, the predominance criterion is far more demanding."  *Id.* at 623–24.

"A court examining predominance must assess (1) 'the elements of the claims and defenses to be litigated,' (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief,' and (3) 'whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues.'"  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir.

2015)).  Designed to test the proposed class's cohesiveness, the predominance inquiry "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  While individualized damages determinations alone cannot preclude certification under Rule 23(b)(3), it is a factor to "consider in deciding whether issues susceptible to generalized proof outweigh individual issues."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408–09 (2d Cir. 2015) (quotations omitted).

Here, Plaintiffs argue that that common questions predominate over individual questions and that damages can be proven on a common basis.  (Pls.' Mot. at 22).  But Plaintiffs' own evidence shows that the purported *de facto* policy will present discrete questions as to liability that will need to be decided based on individualized facts and employment circumstances.

The fatal issue with Plaintiffs' proposed class is the lack of coherence about when class members worked overtime and for how long, and the fact that Plaintiffs worked for different supervisors.[12]  These factual differences go beyond damages and affect liability, and even if each of the 100 plaintiffs demonstrates an entitlement to overtime compensation, it would only be after individualized inquiries about the employee's

---

[12] GEICO contends that there was no "Single Manager" to whom all Investigators reported during the Class Period.  (Def.'s Opp'n at 5–6).  GEICO points to evidence such as a Declaration from SIU Manager Newport who states that he worked alongside another Manager, Courtney Wolfe, to oversee the Investigators in NY.  (Decl. of William Newport ("Newport Decl."), attached to Def.'s Opp'n as Ex. 53, Dkt. No. 98-120 ¶¶ 10–11).  If this is true, it would create additional individualized issues, because Investigators' claims would vary based on managers.

peculiar circumstances.  This case presents parallels to another NYLL case where individual off-the-clock issues defeated predominance.

In *Onate v. AHRC Health Care, Inc.*, plaintiffs sought to certify a class of employees claiming unpaid wages, alleging that they were required to work off-the-clock based on an unofficial company practice.  No. 20-CV-8292, 2023 WL 8648167, at *1–*2 (S.D.N.Y. Dec. 14, 2023).  The court declined to certify the proposed class because plaintiffs' own evidence demonstrated that the alleged policy would "present predominantly individualized questions that will need to be decided based on individualized facts."  *Id.* at *9.  The record failed to show "a uniform, companywide policy": many plaintiffs were not subject to an off-the-clock requirement at all, with about half stating they did not perform off-the-clock work.  *Id.*  Of those who did, their "experiences also varied."  *Id.*  Some were explicitly instructed to work off-the-clock, while others were not, but did so anyway—suggesting that their experiences "depended heavily on individual managers."  *Id.*  The court also found significant variance for damages: for example, one plaintiff claimed 10–15 minutes of off-the-clock work 3–4 days per week, while another claimed 90 minutes.  *Id.*  Given the failure to show a uniform companywide policy, the fact that individuals who were subjected to the policy were harmed to different degrees, and the failure to demonstrate that liability or damages could be shown by class-wide proof, the court declined to certify the class as to the off-the-clock policy.  *Id.* at *9–*10; *see also Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. 2013) (finding no predominance where "each class

member would have to come forward and establish how many hours he or she worked and how much he or she was paid."). Similar deficiencies exist here.

First, many investigators cannot specify the periods they did work off-the-clock and how much time they worked. For example, Plaintiff Costanzo stated that "from November 2021 to November 2023" he "worked about 42 to 45 hours a week." (Costanzo Decl. ¶ 14). But in his deposition, he said he stopped working overtime at some point in 2022 or 2023 and could not identify exactly when. (Costanzo Dep., attached to Def.'s Opp'n as Ex. 12, Dkt. No. 97-41 at 253:8–254:6). Plaintiff Grey alleged that in nearly all workweeks between 2016 and 2023, he recorded and was paid for only 38.75 hours, despite working more, (Grey Decl., attached to Scimone Decl. as Ex. M, Dkt. No. 56-13 ¶ 11), but in his deposition acknowledged numerous instances when he recorded and was paid for working overtime in 2019, (Dep. of Michael Grey ("Grey Dep."), attached to Def.'s Opp'n as Ex. 18, Dkt. No. 97-47 at 167:3–169:3). Plaintiff Caniglia stated that he entered "7.75 hours per day, five days a week, regardless of how many hours [he] actually worked," while claiming to actually work about 50 hours a week on average between March 2020 to November 2021, (Decl. of Louis Caniglia Jr., attached to Scimone Decl. as Ex. D, Dkt. No. 56-4 ¶¶ 7, 13), yet time-keeping records show that he received 17.5 hours of overtime pay between June 6, 2020 to June 19, 2020. (Fogarty Decl., attached to Def.'s Opp'n to Pls.' Second Mot. to Certify FLSA Collective Action as Ex. 1, Dkt. No. 63-7 ¶ 31). Plaintiff Keith Fischer similarly alleged to have only entered 7.75 hours per day, regardless of hours worked, (K. Fischer Decl. ¶ 8), but timekeeping records show that he requested to work overtime and recorded overtime

28

on at least five occasions in 2017.  (Fischer OT emails, attached to Def.'s Opp'n as Ex. 32,

Dkt. No. 97-50).

Additionally, even if Investigators may have generally understood that they

could not log overtime, there is significant variation in Investigators' experiences

raising the issue of overtime with supervisors, the responses they received, and the

extent to which they even logged or requested overtime—all of which affects the extent

to which GEICO's policies caused each Investigator to work overtime without

compensation.  (But not the existence of a policy, which is why commonality exists.)

While some Investigators testified to raising the fact they worked overtime work to

their supervisors, (*e.g.*, Brust Dep. at 110:11-17 ("If I worked past the—you know, the

eight hours and I felt I was entitled, I would ask, but was told there is no overtime.")),

others admit to never doing so, (*see* Costanzo Dep., attached to Pls.' Mot. at 50:13–51:3

(when asked if he ever notified a supervisor that he was working overtime and not

documenting it, responded "I never specifically told him that I was not logging time

into the [timekeeping] system, no")), and others varied in whether they would seek

permission to work additional time, (*e.g.*, O'Sullivan Dep., attached to Pls.' Mot. at 72:5-

9 ("[A]ctually, really didn't reach out to them for overtime.")).  Some even varied in the

supervisors to whom they raised their off-the-clock work, because several reported to

more than one supervisor during the relevant period.  (*E.g.*, Costanzo Dep., attached to

Pls.' Mot. at 165:1-6 (explaining that the process for requesting overtime varied with

each supervisor); Grey Dep., attached to Pls.' Mot as Ex. 5, Dkt. No. 98-7 at 255:4-9 ("I

made comments to Chet [Janik], numerous comments to Chet.  I—I stopped with

Andrew [Gelderman].")).  When Investigators did raise the possibility or need to work overtime, some were told not to log it, (*e.g.*, Moeser Dep. at 135:10-15 (testifying that when he submitted overtime hours he was told by his supervisor "you don't submit overtime for office work")), while others were instructed to log it, (*e.g.*, Barden Dep., attached to Def.'s Opp'n at 107:17-19 (testifying that his supervisor told him "[i]f you're working extra hours, put in for it.  Document it")).

Several Investigators also admit that there were times when they were granted permission to work overtime, (*e.g.*, Brust Dep. at 254:15-18 (testifying that there were times where his supervisor would offer him extra hours in a workweek)), or were instructed to log hours they worked off-the-clock, (*e.g.*, Grey Dep., attached to Pls.' Mot. at 259:4–260:23 (discussing an email from his supervisor where he was told that he should "make any adjustments needed to reflect the hours worked")).

Given these variations, GEICO's liability as to each Investigator's alleged uncompensated work will turn on individualized issues.  The individual variation exists in several forms: (1) sometimes overtime was approved, and therefore, compensated, (*e.g.*, Mangan Dep. at 105:20–106:6 (recalling requesting overtime on some occasions for which she was paid)); (2) sometimes overtime was not approved but still worked, (*e.g.*, Jones Dep., attached to Pls.' Reply as Ex. 3, Dkt. No. 137 at 147:9–148:22) (recalling a time she requested overtime that had not been pre-approved but she worked anyway and was reprimanded for doing so)); and (3) sometimes overtime was not approved and not worked, (*e.g.*, Dep. of Maria Munoz, attached to Pls.' Mot. as Ex. 9, Dkt. No. 98-11 at 143:8–144:10 (recalling at least four occasions in 2024 where she

requested overtime and was denied and proceeded to not work overtime)).  In each of these scenarios, there is added variation because regardless of approval, if overtime was worked, sometimes it was logged (and presumably compensated) and other times it was not.  And some supervisors required requesting overtime approval before working extra, some after.  *See supra* p. 4.  Such substantial variation demonstrates that class certification is an improper mechanism to determine GEICO's liability as to each Investigator's claim.  Generalized proof cannot be used to determine liability.  *See Fernandez v. Wells Fargo Bank, N.A.*, No. 12-CV-7193, 2013 WL 4540521, at *14 (S.D.N.Y. Aug. 28, 2013) (finding no predominance where determination of liability turned on "highly individualized, employee-by-employee analysis of what they were told by management and how any time-recording practices were applied"); *cf. Gregory v. Stewart's Shops Corp.*, No. 14-CV-0033, 2016 WL 8290648, at *16 (N.D.N.Y. July 8, 2016) ("[L]iability on the claims involving alleged off-the-clock work would necessarily be determined, not on the basis of payroll or other objective records, but through testimony about deviations from [defendant's] express time keeping polices on a store-by-store basis.").

These individualized issues are compounded by Plaintiffs' failure to demonstrate a reliable method for measuring class-wide damages.  *Fernandez*, 2013 WL 4540521, at *15 (finding that plaintiffs had not presented a "meaningful approach to gauging damages on a class-wide basis" given "qualified and vague statements concerning when [plaintiffs] were denied overtime pay and when they were not").

In *Comcast Corp. v. Behrend*, the Supreme Court held that to satisfy predominance, class action plaintiffs must "establish[ ] that damages are capable of measurement on a classwide basis." 569 U.S. 27, 34 (2013). Although a damages model itself is not necessary to establish predominance, nor are additional individualized inquiries over damages fatal to predominance, *see Roach*, 778 F.3d at 405, Plaintiffs need to demonstrate that damages are amenable to class-wide determination. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) ("In *Comcast*, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis."); *Roach*, 778 F.3d at 408 ("*Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues[.]").

Plaintiffs rely exclusively on their proposed damages expert to show that damages are capable of class-wide determination, (Pls.' Reply in Further Supp. of Pls.' Mot. dated June 11, 2025, Dkt. No. 98-133 at 9–11)—a model developed by Dr. Catherine O'Neil. (Decl. of Catherine O'Neil ("O'Neil Decl."), attached to Pls.' Mot. as Ex. 62, Dkt. No. 98-64 ¶¶ 3–5). Dr. O'Neil describes a model to measure lost wages by assigning an amount of time to each type of case-related activity (through a regression analysis of the Plaintiffs' self-reported hours compared to case-related activities tracked in the GEICO

SICM database[13]), and then applying the assigned time-per-activity amounts to the case-related activity data for each Investigator to determine "actual" time worked by each. (O'Neil Decl. ¶¶ 5–9). O'Neil contends that she would then subtract a putative class member's reported hours from the hours derived from the regression model to determine the unreported and uncompensated hours for each month. (Id. ¶ 12).

But, as explained further below, the proposed model has several methodological flaws and, therefore, fails to show that damages are capable of measurement on a class-wide basis. Because the model flunks *Daubert*, and no other damages model is presented, this is another reason Plaintiffs' class cannot be certified.[14]

---

[13] GEICO's Special Investigation Case Management ("SICM") system is used by GEICO management to assign cases, (Fogarty Dep. at 188:15-17), and by Investigators to enter notes and track updates on cases, including case closure, (*id.* at 262:20-24, 264:11-12).

[14] Plaintiffs contend that the *Daubert* inquiry is premature at this stage. (Pls.' Opp'n to Def.'s *Daubert* Mot. dated Aug. 13, 2025 ("Pls.' *Daubert* Opp'n"), Dkt. No. 128-15 at 1). "Although neither the Supreme Court nor the Second Circuit has definitively held that a *Daubert* inquiry is necessary to evaluate expert opinions offered in support of class certification, the heavy weight of authority militat[es] towards a *Daubert* inquiry at class certification." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021) (quotation omitted). And here, without an expert, Plaintiffs have no viable damages theory that can satisfy the predominance inquiry—they have no class-wide mechanism to determine unpaid overtime. To not engage in a *Daubert* inquiry would permit Plaintiffs to use their expert as a sword, but shield her from any critical inquiry. That is not a permissible means by which to litigate certification. *E.g., City of Philadelphia v. Bank of Am. Corp.*, No. 19-CV-1608, 2023 WL 6160534, at *3 (S.D.N.Y. Sep. 21, 2023) ("District courts in this Circuit regularly subject expert testimony at the class certification stage to *Daubert*, but they limit the inquiry at that stage to whether or not the expert reports are admissible to establish the requirements of Rule 23." (quotation omitted)), *aff'd sub nom. City of Philadelphia v. Banc of Am. Secs. LLC*, No. 24-297, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) (affirming the district court's application of a "*Daubert* analysis *to the extent that* Defendants seek to exclude testimony relevant to the pending class certification motion"), *petition for cert. filed*, No. 25-639 (U.S. Dec. 3, 2025).

Under Federal Rule of Evidence 702 and *Daubert*, the proponent of expert testimony must show that the "that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22-CV-983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005)).[15]

Plaintiffs have failed to show that O'Neil's opinion "is the product of reliable principles and methods." Fed. R. Evid. 702(c). Rule 702's focus is "the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579. 594–95 (1993). Unsupported assertions "made without explanation or elaboration that would allow a fact finder to follow his reasoning and come to the same conclusion" are inadmissible expert opinions. *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 650 (S.D.N.Y. 2014). That is, an expert who reaches a conclusion but provides no explanation for it gives the Court no insight into the basis

---

[15] Plaintiffs cite to *In re Vale S.A. Securities Litigation* to argue a plaintiff need not present a fully developed damages model for class certification. (Pls.' *Daubert* Opp'n at 2 (citing No. 19-CV-0526, 2022 WL 122593, at *18 (E.D.N.Y. Jan. 11, 2022)). But *In re Vale*, and similar cases, stand for the simple proposition that final calculations are unnecessary at this stage. However, not even a limited *Daubert* inquiry allows for thought experiments, future models, and undefined assumptions. Nor would it permit a model that has yet to be built in any form, tested in any way, or applied to any claim of any class member. None of the cases Plaintiffs cite contemplate a damages exercise at class certification using an inchoate model. There is nothing to indicate that damages are reliably measured by a model that has not been constructed yet.

for her opinion or the means used to reach it.  And in addition, if expert testimony is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," then it must be excluded.  *Nachimovsky v. Nike, Inc.*, No. 22-866, 2023 WL 4504461, at *1 (2d Cir. July 13, 2023) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)).

Here, O'Neil contends that she can create a linear regression model to estimate the time Investigators spent performing certain activities.  (O'Neil Decl. ¶ 9).  But this model is nothing more, as she concedes, than a "thought experiment," (Dep. of Catherine O'Neil ("O'Neil Dep."), attached to Def.'s *Daubert* Mot. as Ex. D, Dkt. No. 128-7 at 15:3).  She has neither built the model nor applied it to the data available.  (*See* O'Neil Decl. ¶¶ 3–5; O'Neil Dep. at 15:13-14, 16:12-15 (conceding that she "ha[s] not taken any steps to actually created th[e] model, based on data that's available")).  Nor has she ever previously used a similar model to estimate the time spent performing activities.  (O'Neil Dep. at 80:17–81:4).  Plaintiffs argue that O'Neil properly reviewed and relied on the evidence that was available to her to better understand the data: a report from the SICM database, testimony of a former SIU Manager, and interviews with three Investigators who used SICM.  (Pls.' Opp'n to Def.'s *Daubert* Mot. dated Aug. 13, 2025 ("Pls.' *Daubert* Opp'n"), Dkt. No. 128-15 at 6 (citing O'Neil Decl. ¶ 3)).  They argue that relying on this information, she concluded that the model could be built and applying the model to the available data would have been "pointless" or "overkill."  (*Id.* at 7).  But, as GEICO points out, O'Neil had access to seven months' worth of SICM data

for 34 Plaintiffs and putative class members and Plaintiffs' testimony as to their estimated hours. (Def.'s *Daubert* Mot. at 11–12 (citing SICM Report Spreadsheet, attached to Def.'s *Daubert* Mot. as Ex. F); *see also* O'Neil Dep. at 60:13–61:4 (admitting that she could "get a good estimate of the average amount of hours that the plaintiffs worked per week in the baseline time period" by using no more than 20 Plaintiffs' testimony)). By limiting her model to a "thought experiment" and failing to show the applicability of this model to even a subset of available data, the very data O'Neil contends she would use to build her model, O'Neil's report has failed to show that her opinion is rooted in actual facts or data to properly assess class-wide damages; it amounts to a kind of "trust the expert" methodology. But such "ipse dixit" cannot satisfy *Daubert*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Contrary to Plaintiffs' presentation, this is not a kind of "plug and play" expert analysis, where simple math—here a basic linear regression model—is the core of the model. The inputs into that model, including the allocation of time for a task, are based on a series of assumptions, which O'Neil has not tested or explored in any meaningful way, even if it was not necessary to build the final complete version of her model.

For example, O'Neil assumes that certain Investigator tasks will take a standard amount of time. O'Neil engages in a kind of reverse engineering to determine this: using Plaintiffs' estimated total hours worked to "establish an estimate of time costs of various specific kinds of work done by Special Investigators." (O'Neil Decl. ¶¶ 7–9).

Using the resulting calculation, she contends she would be able to "figure out the
difference between how much [Plaintiffs] actually worked and how much they stated
they worked on their time sheets." (O'Neil Dep. at 41:3-20). In doing so, she relies on
her own assumptions about the length of tasks and Plaintiffs' testimony, instead of for
example, her understanding of commonly accepted metrics to determine the reasonable
length of time it takes to complete a task. O'Neil has no known expertise or experience
in doing the kind of investigations conducted by these kinds of employees, making
merely accepting Plaintiffs' accounts or her own uncredentialed assumptions
problematic. (*See generally* O'Neil's CV, attached to O'Neil Decl., Dkt. No. 98-64 at 7–9;
*e.g.*, O'Neil Dep. at 137:17–138:16 (acknowledging limited understanding of different
kinds of investigator positions)). *See EEOC v. Bloomberg L.P.*, No. 07-CV-8383, 2010 WL
3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Relying solely on the information fed to [the
expert] by the [plaintiff] without independently verifying whether the information is
representative undermines the reliability of his analysis.").

And as previously discussed, there are significant inconsistencies in Plaintiffs'
allegations and recollections of their overtime worked. There are other variations as
well. For example, Plaintiff Mangan confirmed in her deposition that the length of tasks
changed throughout the years, but she could not specify when those changes occurred.
(Mangan Dep. at 170:21–171:13; *see also* Barden Dep., attached to Def.'s Opp'n at 38:25–
39:11 (explaining that auto fraud cases sometimes took "hours," "days," or "weeks,"
depending on the nature of the case); K. Fischer Dep. at 61:2-19 (admitting that he "can't
put a time on" time to close a theft or staged loss case)). O'Neil's own notes from her

37

pre-declaration interview with three Plaintiffs demonstrate this variability.  Plaintiff

Reed informed O'Neil that "because [he] was ex-PD, [he] could get 15 police reports in

2min in a single trip" and would then stretch this out to more entries on SICM, "saying

[he] made a few trips."  (Interview of GEICO Investigators, attached to Def.'s *Daubert*

Mot. as Ex. E, Dkt. No. 128-8 at P1669).

Contending that differences would "even out," (*e.g.*, Decl. of Catherine O'Neil in

Supp. of Pls.' Reply ("O'Neil Reply Decl."), attached to Pls.' Reply in Supp. of Mot. to

Certify Class as Ex. 8, Dkt. No. 98-142 ¶ 5), and any under- or over-compensation would

"come out in the wash," (O'Neil Dep. at 132:17–133:13), without providing any basis for

that assumption is guesswork, not expert analysis.  O'Neil does not even give a single

example, for a single Investigator, on how their tasks can be converted to overtime

hours.[16]  And, without accounting for or explaining how inconsistencies between

---

[16] Unlike in *In re Vale* where at issue was an established model used by other
courts in securities fraud actions, 2022 WL 122593, at *19, here, Plaintiffs fail to show
that such a "linear regression" has been approved by other courts to calculate overtime
hours.  (*See* Pls.' *Daubert* Opp'n at 9 (citing *In re Keurig Green Mountain Single-Serve
Coffee Antitrust Litig.*, No. 14-CV-2542, 2025 WL 354671, at *16–*19 (S.D.N.Y. Jan. 30,
2025) (finding a regression model reliable to model anticompetitive behavior); *Chen-
Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950, 2022 WL 814074, at *9 (S.D.N.Y. Mar. 17,
2022) (admitting expert opinion based on regression analyses that looked at the way
policies affected compensation by gender in a sex discrimination case)).

employees would be resolved, makes the analysis unreliable (or at least significantly deficient).[17]

Thus, the Court finds Dr. O'Neil's opinion unreliable for determining whether Plaintiffs have satisfied the requirements of Rule 23.

Therefore, the abundance of individualized questions as to liability, combined with a lack of a *Daubert*-proof class-wide damages theory, defeat a finding of predominance, and as such class certification here is improper. "Where individualized questions permeate the litigation, those 'fatal dissimiliarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" *In re Petrobras Secs.*, 862 F.3d at 270 (alteration in original) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)); *see, e.g., Reid v. A-Plus Care HHC Inc.*, No. 23-CV-1163, 2025 WL 1703066, at *5, *8–*9 (S.D.N.Y. June 18, 2025) (denying certification of a NYLL class where Rule 23(a) requirements had been met but Plaintiff had not satisfied the predominance requirement of Rule 23(b)(3)) (adopting report and recommendation). The motion to certify a class is denied.

## II.    Motion to Seal

GEICO also requests to seal several filings from their motion to exclude the testimony of Dr. O'Neil. (Def.'s Mot. to Seal). Specifically, GEICO seeks to seal: (1)

---

[17] Plaintiffs contend that O'Neil addressed how her model would adjust for bias by using "objective data" in her Reply Declaration. (Pls.' *Daubert* Opp'n at 8). But in the paragraph cited, O'Neil simply asserts that she is not concerned "with the potential for 'biased' hours estimates" because of the reliability of GEICO's own data tracking tasks. (O'Neil Reply Decl. ¶ 14). It does not offer any additional objective means for resolving inconsistencies.

excerpts of deposition transcript testimony of Named and Opt-in Plaintiffs (Exhibits G, H, I, K); (2) a document containing data on GEICO's SICM system (Exhibit F); and (3) excerpts of testimony from Plaintiff Keith Fischer (Exhibit J).  (*Id.* at 2).  The motion is granted in part and denied in part.

> In deciding whether to seal or unseal filed materials, a court properly conducts a three-step inquiry: First, the court determines whether the record at issue is a judicial document—a document to which the presumption of public access attaches. Second, if the record sought is determined to be a judicial document, the court proceeds to determine the weight of the presumption of access to that document. Third, the court must identify all of the factors that legitimately counsel against disclosure of the judicial document and balance those factors against the weight properly accorded the presumption of access.

*Giuffre v. Maxwell*, 146 F.4th 165, 175 (2d Cir. 2025) (quoting *Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 69 (2d Cir. 2023)).

The materials at issue are judicial documents, since they were "filed on a federal court's docket in the ordinary course of litigation" and are "relevant to the performance of the judicial function and useful in the judicial process."  *Id.* at 176 (quotation omitted).  "Filings related to *Daubert* motions and class certification motions are subject to a strong presumption of access under the common law and the First Amendment." *Ndugga v. Bloomberg L.P.*, No. 20-CV-7464, 2025 WL 2302089, at *1 (S.D.N.Y. Aug. 11, 2025).  In light of the strong presumption of access, sealing "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim."  *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)).

The Court grants the sealing of Exhibits G, H, I, and K to the extent they contain sensitive personal and confidential information relating to each respective Plaintiff.  The excerpts contain medical information as well as personal residence addresses and are thus appropriate for sealing.  *See Thor Equities, LLC v. Factory Mut. Ins. Co.,* No. 20-CV-3380, 2023 WL 6382684, at *1 (S.D.N.Y. Sep. 29, 2023) (allowing plaintiff to file sealed exhibits that relate to "personal, confidential, [and] sensitive medical information" and that have "minimal relevance to the Court's decision" on pending motions).

As to the SICM exhibit and Fischer's testimony, the request is denied.  GEICO asserts that these documents contain "confidential and proprietary information." (Def.'s Mot. to Seal at 4).  While "the protection of sensitive, confidential, or proprietary business information is a countervailing interest that can militate in favor of sealing . . . conclusory statements that documents contain confidential business information are insufficient to justify sealing."  *Thor Equities*, 2023 WL 6382684, at *1 (quotations and citations omitted).  GEICO argues that publicly filing the SICM report would harm it in the markets it competes in and reveal business secrets, including the methods it uses to determine the existence of fraud.  (Def.'s Mot. to Seal at 5).  As to Fischer's transcript, they contend that the redactions would protect non-public "sources, methods, and tactics used within SIU to investigate potentially fraudulent insurance claims."  (*Id.* at 6).  But GEICO does so in a wholly conclusory fashion, failing to show that some harm would befall it if the information were released.  *See Vinci Brands LLC v. Coach Services, Inc.*, No. 23-CV-5138, 2023 WL 6289969, at *2 (S.D.N.Y. Sep. 27, 2023) (rejecting claim of confidentiality where "the parties d[id] not explain how public access . . . would 'cause

competitive harm'"); *In re Parmalat Secs. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) ("The party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test."). Such conclusory arguments are insufficient to merit the extensive sealing that GEICO seeks. The request to seal these exhibits is denied. To the extent that these documents were previously sealed, (*e.g.*, K. Fischer Dep., Dkt. No. 97-32), those docket entries are also to be unsealed.[18] GEICO is

---

[18] The same rational for unsealing the exhibits attached to the *Daubert* motion applies in equal force to the exhibits attached to the parties' class certification briefing previously sealed. In requesting that the exhibits be sealed, the parties offered no more than a cursory explanation: the documents were designated "confidential" pursuant to the Protective Order in this matter with no explanation as to how they meet the standard in *Lugosch*. (Letter Mot. for Leave to Electronically File under Seal dated June 11, 2025, Dkt. No. 97); *see also Renois v. WVMF Funding, LLC*, No. 20-CV-9281, 2025 WL 863714, at *1 (S.D.N.Y. Mar. 19, 2025) ("A designation of a document as confidential under a protective order, by itself, is not sufficient to permanently seal a document."). Further, the exhibits fail to comply with the sealing requirements; the parties did not file redacted versions of sealed documents for public view, instead filing a page that read "Confidential Information – Subject to Motion to Seal." (*E.g.*, Dkt. No. 98-71 (in place of a 44-page deposition of Plaintiff Pia)). There is no reason either to redact portions of a legal brief where citations are redacted. Such filings do not comply with the requirement that sealing be "narrowly tailored." *See Brown*, 929 F.3d at 47; *see also* Judge Bulsara Individual Practices (Civil) § III(G). As such, the class certification exhibits filed under seal in docket number 97 are ordered unsealed. The parties have plainly misapprehended and/or abused the sealing process and are cautioned against doing so again.

instructed to file the SICM Report, Exhibit F, on the docket.[19]

CONCLUSION

For the reasons explained above, Plaintiffs' motion for class certification is denied.  GEICO's motion to exclude O'Neil's testimony is granted and its motion to seal is granted in part and denied in part.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:  February 20, 2026
      Central Islip, New York

---

[19] Both sides seem intent on filing as many motions—and opposing them reflexively—as possible.  For instance, it is not obvious what the benefit of certifying a NYLL class here would achieve.  Almost 60% of the *class is already in the case* by virtue of opting into the FLSA collective.  And by opting-in, they are deemed to be a party and to have asserted not just a FLSA claim, but a NYLL claim as well.  *See Lubas v. JLS Grp., Inc.*, No. 18-CV-6611, 2024 WL 3492985, at *10 (E.D.N.Y. July 1, 2024) ("[A]n opt-in plaintiff is deemed to have asserted not just a FLSA claim, but all related wage claims, even if asserted under state law.").