**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY,<br><br>            Defendant. | Case No. 2:23-CV-02848<br><br>District Judge Sanket J. Bulsara<br><br>Magistrate Judge Steven I. Locke |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS <u>MOTION TO DECERTIFY THE COLLECTIVE ACTION</u>

Gerald L. Maatman, Jr.
Jennifer A. Riley
Gregory Tsonis
**DUANE MORRIS LLP**
190 S. LaSalle Street, Suite 3700
Chicago, IL  60603
Telephone: (312) 499-6700
Fax: (312) 499-6701
gmaatman@duanemorris.com
jariley@duanemorris.com
gtsonis@duanemorris.com

Gregory S. Slotnick
**DUANE MORRIS LLP**
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, New York 10017
Telephone: (212) 471-1856
Fax: (212) 202-5384
gsslotnick@duanemorris.com

*Attorneys for Defendant Government*
*Employees Insurance Company*

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 3

  A.  PROCEDURAL BACKGROUND........................................................... 3

  B.  FACTUAL BACKGROUND.................................................................... 4

    1.  GEICO's Organizational Structure Changed Over Time .......................... 4

    2.  Plaintiffs' Changing Estimates of Alleged Off-The-Clock Work Vary Drastically ........................................................................ 5

    3.  GEICO Evaluated Plaintiffs' Performance Using Varying Criteria Reflecting Different Jobs ........................................................ 7

    4.  Plaintiffs Did Not Uniformly Experience "Ever-Increasing" Workloads ........................................................................ 9

    5.  GEICO Required Plaintiffs To Record Overtime, And Each Supervisor's Practices Varied Substantially ............................................. 10

    6.  Plaintiffs Allege They Failed To Record Overtime For Varying Reasons ........................................................................ 11

    7.  Plaintiffs Assert Distinct and Disparate Bases of Knowledge of Alleged Overtime ........................................................................ 12

III.  LEGAL STANDARD........................................................................................ 13

IV.  ARGUMENT..................................................................................................... 14

  A.  Plaintiffs Have Not Proven And Cannot Prove Any Similarity Regarding A Factual Or Legal Issue Material To The Disposition Of Their FLSA Claims ........................................................................ 14

    1.  Plaintiffs Cannot Show That A Common De Facto Policy Prohibited Them From Recording Overtime Hours ................................. 15

    2.  Dissimilarities In Plaintiffs' Work Activities, And The Compensability Of Such Activities, Precludes A Finding Of Substantial Similarity........................................................................ 22

    3.  Plaintiffs Cannot Show A Common Basis For Establishing GEICO's Knowledge Of Any Overtime Worked .................................... 24

  B.  In The Absence of Decertification, the Collective Action Would Include Opt-In Plaintiffs That Lack Viable FLSA Claims ............................. 27

    1.  The FLSA Claims of Opt-In Plaintiffs Gotterbarn and McEvoy are Time-Barred........................................................................ 27

i

2.      Certain Opt-In Plaintiffs Cannot Assert Viable FLSA Claims
Because They Admitted They Did Not Work Overtime .......................... 28

V.      CONCLUSION................................................................................................... 30

## TABLE OF AUTHORITIES

**Federal Cases**

*A.P. Moller-Maersk A/S v. Ocean Express Miami*, 648 F. Supp. 2d 490 (S.D.N.Y. 2009)...........29

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946).........................................................14

*Blakes v. Illinois Bell Tel. Co.*, 2013 WL 6662831 (N.D. Ill. 2013) ...................................... 19-20

*Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344 (W.D.N.Y. 2011) ........................................... 20-21

*Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256 (N.D. Ala. 2012)...................................15, 21

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339 (N.D. Ill. 2012) ........................25

*Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)..................................... 15-17, 19

*Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P. Concrete Co.*, 145 F.4th 204 (2d Cir. 2025) ...................................................................................................29

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008)..............................................23

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313 (E.D.N.Y. 2014) ........................................................................................................................................19

*Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. 2009).................................20

*Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959 (5th Cir. 2016) ....................................26

*Finnigan v. Metro. Transportation Auth.*, 2025 WL 963998 (E.D.N.Y. 2025)............................22

*Gomez v. Mi Cocina Ltd.*, 2017 WL 3334106 (N.D. Tex. 2017) ..................................................29

*Grochowski v. Phoenix ConsDep.*, 318 F.3d 80 (2d Cir. 2003) ...................................................14

*Herrera v. Comme Des Garcons, Ltd.*, 84 F.4th 110 (2d Cir. 2023).......................................27, 30

*Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014)............................................18

*Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516 (2d Cir. 1998).............................................24

*Kavanagh v. Grand Union Co.*, 192 F.3d 269 (2d Cir. 1999) ......................................................23

*Kuebel v. Black & Decker Inc.*, 643 F.3d 352 (2d Cir. 2011)........................................................14

*Lockhart v. D&S Residential Servs., LP*, 2020 WL 4717910 (W.D. Tenn. 2020) .......................26

*MacEachern v. Quicken Loans, Inc*, 2016 WL 5118380 (E.D. Mich. 2016) ................................26

*Meadows v. NCR Corp.*, 2020 WL 1042042 (N.D. Ill. 2020) ................................................ 20-21

*Mebane v. GKN Driveline N. Am., Inc.*, 2023 WL 3435007 (M.D.N.C. 2023)......................22, 27

*Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003) ................................22

*Oldershaw v. DaVita HealthCare Partners, Inc.*, 2019 WL 427650 (D. Colo. 2019) ..................16

*Phillips v. County of Riverside*, 2022 WL 2162822 (C.D. Cal. 2022)........................................16

*Pittmon v. CACI Int'l, Inc.*, 2023 WL 8168834 (C.D. Cal. 2023) ..................................... 16, 18-20

*Reinig v. RBS Citizens, N.A.*, 2023 WL 5497106 (W.D. Pa. 2023)................................................17

*Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295 (N.D. Ga. 2014)........................27

*Roy v. FedEx Ground Package Systems, Inc.*, 2024 WL 1346999 (D. Mass. 2024).....................16

*Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020) ................................................13

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) ............................23

*Stevens v. HMSHost Corp.*, 2012 WL 13098466 (E.D.N.Y. 2012)................................................15

*Taylor v. White Oak Pastures, Inc.*, 454 F. Supp. 3d 1317 (M.D. Ga. 2020)................................27

*Tracy v. NVR*, Inc., 293 F.R.D. 395, 398 (W.D.N.Y. 2013)..................................................13, 22

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ................................................................23

*Vecchio v. Quest Diagnostics Inc.*, 2020 WL 5604080 (S.D.N.Y. 2020)......................... 13, 22-23

*Viriri v. White Plains Hosp. Med.*, 320 F.R.D. 344 (S.D.N.Y. 2017) ..........................................28

*White v. Baptist Mem'l Health Care Corp.*, 2011 WL 1883959 (W.D. Tenn. 2011)....................17

*Zhang v. Ichiban Grp., LLC*, 2023 WL 6122847 (N.D.N.Y. 2023) ..............................................13

*Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011)................................*Passim*

**Federal Statutes**

29 U.S.C. § 207(a)(1).....................................................................................................................14

29 U.S.C. § 216(b) .........................................................................................................................13

29 U.S.C. § 254(a)(1).....................................................................................................................23

**Regulations**

29 C.F.R. § 785.12 ................................................................................................24

29 C.F.R. § 785.35 ................................................................................................23

## I.    INTRODUCTION

This Court conditionally certified a collective action based solely on Plaintiffs' allegations that GEICO maintained a *de facto* common policy to deprive them of overtime compensation.  (DE 91.)  After months of discovery, including depositions of multiple Plaintiffs, the evidence has not revealed any uniform policy or practice that applied across the 45 current opt-in Plaintiffs and, as this Court recently found, Plaintiffs' claims instead "present discrete questions as to liability that will need to be decided based on individualized facts and employment circumstances."  (DE 162 at 26.)  Indeed, the factual and legal bases for Plaintiffs' claims depend on varying circumstances, subject to different defenses, and must be adjudicated through distinct proof.  As a result, Plaintiffs cannot meet their burden of showing that representative treatment is appropriate, the opt-in Plaintiffs' claims cannot be resolved on a representative basis, and decertification is thus appropriate for several reasons.

*First*, Plaintiffs cannot meet their burden of demonstrating that GEICO maintained a uniform common policy that prevented them from recording overtime hours.  The evidence indisputably shows the opposite:  GEICO maintained a written policy forbidding off-the-clock work, supervisors and managers frequently reinforced that policy, and opt-in Plaintiffs concede that they knew about and regularly followed that policy, including by regularly recording overtime without negative consequences.  Although Plaintiffs allege that common metrics incentivized them to violate GEICO's policy, GEICO assessed Plaintiffs' performance in varied ways and, for some Plaintiffs, utilized no such metrics.  As a result, Plaintiffs cannot show that GEICO maintained any common policy, *de facto* or otherwise, that prevented Plaintiffs from recording their hours worked.

*Second*, Plaintiffs cannot show that they worked more than 40 compensable hours in a workweek without overtime compensation, as they must, on a representative basis relying on common evidence. Plaintiffs worked in different positions and locations and spent their alleged work hours on different tasks, including non-compensable activities such as commuting, constructing or deconstructing an at-home workstation, and even napping. Therefore, to answer the threshold question as to whether any particular Plaintiff worked more than 40 compensable hours in a workweek, the Court must consider individualized evidence and resolve individualized questions of fact and law.

*Third*, with respect to the second material element of their claim, *i.e.*, whether GEICO knew or should have known about alleged unrecorded overtime, Plaintiffs face a similarly insurmountable obstacle. Some Plaintiffs allege that they told supervisors that they worked unrecorded hours, which raises distinct fact questions about who allegedly said what to whom; other opt-in Plaintiffs claim only opaque comments about workload; and still other Plaintiffs concede that they never informed supervisors or even actively took steps to *prevent* GEICO from learning of alleged off-the-clock work altogether. Some opt-in Plaintiffs contend (erroneously) that timestamps on investigative notes should have imparted knowledge on GEICO, but other opt-in Plaintiffs worked "flex" schedules and/or did not contemporaneously enter any such investigatory notes.

*Fourth*, certain opt-in Plaintiffs unquestionably have no viable FLSA claims. Due to either the statute of limitations or the failure to timely respond to written discovery, at least 20 Plaintiffs (38% of the collective action) cannot be similarly situated.

Because Plaintiffs cannot show that their claims turn on the same, or even similar inquiries, and the material evidence varies person-to-person, Plaintiffs cannot meet their burden of

demonstrating that the Court can resolve their claims on a representative basis and decertification is appropriate.

## II.    BACKGROUND

### A.    PROCEDURAL BACKGROUND

Plaintiffs Keith Fischer ("K. Fischer"), O'Sullivan, Moeser, Pia, Barden, Mangan, and Jones (the "named Plaintiffs") are current and former non-exempt employees in GEICO's Special Investigations Unit ("SIU"), which investigates potential insurance fraud.  (DE 52 ¶ 2.)  Plaintiffs sued GEICO under the FLSA for allegedly unpaid overtime on behalf of themselves and a proposed collective action of:

> All current and former non-exempt classified employees of GEICO who worked as Special Investigators (including comparable roles with different titles) in New York during the time period from three years prior to the filing of the complaint (DE No. 1) until resolution of this action.

(DE 52 ¶ 78.)  GEICO does not use the term "Special Investigators," but Plaintiffs contend that it encompasses "all such employees who performed similar investigative work and were subject to the same overtime practices," including those who worked in job titles "Special Investigator Trainers, SIU Investigators, Security Investigators, Senior Outside Security Investigators, Outside Field Investigators, Medical Investigators, Medical Fraud Investigators, Inside Medical Investigators, and Lead Investigators."  (DE 57 at 1 n.2.)

Plaintiffs subsequently sought to conditionally certify a collective action for purposes of sending notice to those "Special Investigators."  (*See* DE 54.)  Specifically, Plaintiffs contended that they and the Special Investigators "share a common experience and legal claim:  after GEICO reclassified them, it willfully continued to deny them overtime pay by systematically overloading them with work while prohibiting or deterring them from recording more than 38.75 hours per week."  (DE 57 at 2.)

Relying on Plaintiffs' declarations, this Court granted conditional certification.  (DE 91.) The Court determined that Plaintiffs "satisf[ied] their minimal burden" and made "the modest factual showing" that the proposed FLSA collective action members "were subject to [GEICO's] common policy or plan of deterring the reporting of all hours worked" by pointing to their declarations alleging that they were subject to common compensation and timekeeping practices that resulted in unpaid, off-the-clock work.  (*Id.* at 7.)

After notice issued, 30 additional individuals filed consent to join forms, though 8 withdrew their consents after GEICO issued discovery requests.  With Court permission, GEICO deposed 19 of the 45 remaining opt-in Plaintiffs during Phase I and Phase II discovery.

On February 20, 2026, the Court denied Plaintiffs' Motion to Certify a Class of New York investigators for purposes of pursuing Plaintiffs' "off-the-clock" claims under the NYLL.  (DE 162.)  In that ruling, the Court found a "lack of coherence about when class members worked overtime and for how long, and the fact that Plaintiffs worked for different supervisors."  (*Id.* at 26.)  The Court also determined that "many investigators cannot specify the periods they did work off-the-clock and how much time they worked" and highlighted the "significant variation in [Plaintiffs'] experiences raising the issue of overtime with supervisors, the responses they received, and the extent to which they even logged or requested overtime."  (*Id.* at 28-29.)  The Court concluded that, "[g]iven these variations, GEICO's liability as to each Investigator's alleged uncompensated work will turn on individualized issues."  (*Id.* at 30.)

**B.    FACTUAL BACKGROUND**

1.    GEICO's Organizational Structure Changed Over Time

Prior to 2023, GEICO was organized in a regional structure with at least 10 separate Regions run separately by different Regional Vice Presidents.  (Ex. 1, Fogarty Decl. ¶¶ 5, 14; Ex. 2, Newport Decl. ¶ 5.)  Region 2, overseen by Manager William Newport, was headquartered in

4

Long Island, New York, and Region 8, overseen by Manager Patricia Woupio, was headquartered in Buffalo, New York. (Ex. 2, Newport Decl. ¶ 5; Ex. 3, Slack Decl. ¶ 6; Ex. 4, Greenman Decl. ¶¶ 3-5.) Manager Courtney Wolfe oversaw the Major Case divisions of both Regions 2 and 8. (Ex. 5, Wolfe Decl. ¶ 8; Ex. 3, Slack Decl. ¶ 7.)

GEICO disbanded the regional structure in mid-2023 as part of a reorganization. Thereafter, investigators in former Regions 2 and 8 reported to supervisors throughout the country, and those supervisors reported to Managers Rene Cubas, Jim Hammonds, or Courtney Wolfe. (Ex. 6, Cruz 123:6-22; Ex. 7, Cubas 26:5-21; Ex. 4, Greenman Decl. ¶ 5.) Depending on when and where they worked, Plaintiffs reported to myriad supervisors working under five different Managers during the relevant period.

2.    Plaintiffs' Changing Estimates of Alleged Off-The-Clock Work Vary Drastically

Multiple Plaintiffs recorded and were paid for various amounts of overtime from 2020 to present. (Ex. 8, Thompson Decl. ¶¶ 11, 14, Fig. 1; Ex. 1, Fogarty Decl. ¶ 31; DE 97-52 to DE 97-58, (Brust, Jones, King, Teatum, Pia, Wending, and Grey Pay Excerpts.) For example, Plaintiffs Caniglia, Sr. and Krattinger recorded overtime in over 45% and nearly 19% of complete workweeks of five days, respectively. (*Id.* ¶¶ 11, 14.) Approximately half of the Plaintiffs recorded overtime in various workweeks during the relevant time period, with several more recording greater than 38.75 hours (but less than 40) in workweeks. (*Id.* ¶ 11, Fig. 1; Ex. 1, Fogarty Decl. ¶ 31.)

Plaintiffs' allegations regarding alleged off-the-clock work have shifted significantly. Several Plaintiffs drastically changed their assertions from the declarations on which the Court relied in granting conditional certification in verified interrogatory answers and/or deposition testimony. Despite swearing to particular numbers of "overtime" hours each workweek

5

throughout their employment, for example, several Plaintiffs admitted that they did not work "off the clock" during substantial periods of time and/or testified that they worked many fewer "off-the-clock" hours than previously claimed:

| Plaintiff | Declaration/Written Discovery Allegation | Revised Deposition Testimony |
|---|---|---|
| Michael Gray | 6.25-11.25 hours of overtime each complete workweek throughout employment. (DE 56-13, Grey Decl. ¶ 11.) | Ceased off-the-clock work in January 2023. (Ex. 9, Grey 180:15-181:9.) |
| Maria Munoz | 7.25-13.25 hours of overtime each complete workweek throughout employment. (DE 56-19, Munoz Decl. ¶ 11.) | Ceased off-the-clock work when clock-in/clock-out timekeeping started, in January 2023. (Ex. 10, Munoz 177:4-179:23.) |
| Craig Costanzo | 4.25-16.25 hours of overtime each complete workweek throughout employment. (DE 56-6, Costanzo Decl. ¶ 11.) | Ceased off-the-clock work in 2022 or 2023 after he saw a report that compared his performance to others. (Ex. 11, Costanzo 253:4-254:6.) |
| Steven Stemmler | 13.75-16.75 hours of overtime each complete workweek throughout employment. (Ex. 12, Stemmler Interrogatory Resp. No. 11.) | Ceased off-the-clock work in 2024. (Ex. 13, Stemmler 13:11-14:3.) |
| Patria Ohrnberger | Up to 4.25 hours of overtime each complete workweek throughout employment. (Ex. 14, Ohrnberger Interrogatory Resp. No. 11.) | Began off-the-clock work in 2020; prior to 2020, recorded and paid for all hours. (Ex. 15, Ohrnberger 90:10-91:14, 212:8-14, 248:13-249:14.) |
| Karen Gotterbarn | 8.75 hours of overtime each complete workweek throughout employment. (Ex. 16, Gotterbarn Interrogatory Resp. No. 11.) | Began off-the-clock work in 2020; prior to 2020, recorded and paid for all hours. (Ex.17, Gotterbarn 76:8-77:9.) |
| John Diblosi | 4 hours of overtime each complete workweek throughout employment, including 2 hours commuting. (Ex. 18, Diblosi Interrogatory Resp. No. 11.) | No overtime during training. Worked 1-3 hours off-the-clock per workweek, starting in early 2023 (Ex. 19, Diblosi 44:8-19, 45:4-22.) |
| Michael Manzolillo | 9 hours of overtime each complete workweek throughout employment. (Ex. 20, Manzolillo Interrogatory Resp. No 11.) | No overtime during training or shortly thereafter, and then off-the-clock work totaled estimated 5-10 hours per workweek. (Ex. 21, Manzolillo 15:17-22, 42:19-22.) |

6

| Cris Cruz | 1 to 2 hours of "unpaid overtime" per month.  (Ex. 22, Cruz Interrogatory Resp. No. 11.) | Did not work overtime as a desk investigator in 2019 because his workload provided "free time."  No off-the-clock work as a major case investigator until mid-2023, and then only through meal periods for a total of 1-2 hours off-the-clock per month.  (Ex. 6, Cruz 65:17-23, 70:6-18, 83:7-12.) |
| Lindsay Buzak | 5 hours of overtime each complete workweek throughout employment. (Ex. 23, Buzak Interrogatory Resp. No. 11.) | No off-the-clock work until late 2020 after receiving a desktop computer from GEICO, "not every single week," and did so only to "catch up" for various reasons, including a slow laptop.  (Ex. 24, Buzak 56:4-58:4.) |

Contrary to their declaration testimony or interrogatory responses asserting off-the-clock work "throughout [their] employment," at least four Plaintiffs (Gray, Munoz, Costanzo, and Stemmler) ceased alleged off-the-clock work for varying reasons years ago; four others (Gotterbarn, Ohrnberger, Buzak, and Cruz) conceded that alleged off-the-clock work began years after beginning employment; two others (Manzolillo, Diblosi) identified time periods in which they admittedly did not work off the clock; and multiple individuals changed the quantity of "off-the-clock" work alleged.  (Diblosi, Manzolillo, Cruz.)

3. GEICO Evaluated Plaintiffs' Performance Using Varying Criteria Reflecting Different Jobs

GEICO reviewed Plaintiffs' performance based on myriad factors.  Prior to 2023, Region 2 assigned many investigators to specialized teams with productivity targets that depended on the type of investigations they conducted (*e.g.*, medical fraud, staged losses, auto body, etc.) and the anticipated duration.  (Ex. 25, K. Fischer 32:4-18, 78:15-20, 175:2-25; Ex. 10, Munoz 64:7-25; Ex. 26, Mangan 213:20-23; Ex. 27, M. Fischer 58:19-59:14, 65:13-66:3; Ex. 28, Pia 52:22-54:19, 138:24-139:18; Ex. 29, Barden 36:20-24; Ex. 30, Reed 40:5-16.)  For some investigators, GEICO utilized an Adjusted Productivity metric, among other criteria, that compared the number of cases closed to the number of hours worked in a month.  (DE 142-20 at G017292.)  Such metric benefited

investigators by accounting for paid time off, rather than assessing performance based on full weeks, months, or years.  (Ex. 19, Diblosi 36:25-37:20; Ex. 31, Baker 40:6-23; Ex. 32, Hirsch 53:15-23.)

GEICO rated other investigators based "on different metrics."  (Ex. 5, Wolfe Decl. ¶ 18; Ex. 3, Slack Decl. ¶ 12.)  For Major Case investigators like M. Fischer, Cruz, or Ohrnberger, for example, GEICO did not measure "how many days they took to close a case[] and how many cases they completed within a month," as named Plaintiffs contend.  (DE 52 ¶ 4.)  Rather, GEICO assessed only the quality of their investigations and the accompanying documentation.  (Ex. 27, M. Fischer 100:12-102:8; Ex. 33, Bishop Decl. ¶ 21; Ex. 6, Cruz 96:3-98:20, 116:14-117:19; Ex. 15, Ohrnberger 112: 9-114:9.)  Major cases "could be open six, seven, eight months," so using Adjusted Productivity would have made little sense.  (Ex. 6, Cruz 45:23-46:2.)

For yet other opt-in Plaintiffs, GEICO did not use any metrics at all.  SIU Trainers such as Stephens and Jones, a position included in Plaintiffs' defined collective, "train[ed] new Special Investigators" and "audit[ed] their files," thus did not have such productivity metrics.  (DE 56-14 ¶¶ 4, 12, 14; Ex. 34, Jones 89:17-23.)  Stephens worked as an SIU Trainer until August 2023, and Jones worked as an SIU Trainer from mid-2023 to January 2024.  (Ex. 34, Jones 92:22-93:2; Ex. 35, Stephens Workday Profile Excerpt.)  Opt-in Plaintiffs like Cruz who participated in the Management Development Program did not have such metrics because they spent their time doing trainings and supervising other investigators, at times helping those investigators with *their* cases and metrics.  (Ex. 6, Cruz 31:8-33:12, 40:14-41:4.)    Plaintiffs' awareness of and motivation to meet their respective metrics also varied, because "there were employees who were okay . . . at a 3" out of 5 rating and some did not even know what the metrics or rating scale was utilized.  (Ex. 24, Buzak 108:23-109:14; Ex. 32, Hirsch at 55:9-56:8)

8

Depending on their roles, different Plaintiffs assert differing activities constituting alleged uncompensated work.  Field Investigators like K. Fischer worked at various remote locations and included the time spent commuting to or from his home and worksites (plus time spent napping if he arrived early) in claimed hours worked each workweek, as do Costanzo, Jones, Pia, and Reed. (Ex. 25, K. Fischer 242:24-243:25; Ex. 11, Costanzo 87:10-25, 101:16-23, 232:25-233:24, 234:8-23 (3 hours per day); Ex. 34, Jones 122:21-123:4, 151:18-152:8 (4-6 hours per day); Ex. 36, Jones Resp. to Court Interrogatories, Jones Decl. ¶ 8; Ex. 28, Pia 60:17-64:5, 109:15-110:2 (3-4 hours per day); Ex. 30, Reed 51:2-24; 112:17-113:24, 119:4-9, 124:6-10 (3-4 hours per day).)  M. Fischer, by contrast, worked from home and included the 20 to 30 minutes that she spent setting up and taking down her workstation in her dining room each day in off-the-clock work estimates.  (Ex. 27, M. Fischer 138:25-139:19, 142:5-23, 144:2-24, 148:17-149:10.)

4.    Plaintiffs Did Not Uniformly Experience "Ever-Increasing" Workloads

In granting conditional certification, the Court credited Plaintiffs' allegations that GEICO "assigned the Special Investigators 'an ever-increasing workload,' knowing it would require them to work 'substantially more than 40 hours a week to complete.'"  (DE 91 at 3.)

Discovery, however, has shown that Plaintiffs' workloads varied substantially depending on myriad factors such as time period, job title, and individual productivity.  Plaintiffs' workloads varied drastically, with many experiencing no increase in their workloads over time.  (Ex. 8, Thompson Decl. ¶¶ 21-40.)  Others admitted that their workloads remained essentially constant throughout their employment with GEICO.  (Ex. 32, Hirsch 49:13-18; Ex. 24, Buzak 48:9-15.) Major Case investigators, by contrast, had a drastically different case assignment system, and their workloads did not bear any correlation to the number of cases to which other types of investigators were assigned.  (Ex. 8, Thompson Decl. ¶¶ 21-40, Fig. Nos. 7-14.)

9

5.      GEICO Required Plaintiffs To Record Overtime, And Each Supervisor's Practices Varied Substantially

GEICO strictly required employees to record all hours they worked.  Per GEICO's employee handbook, "**[n]on-exempt associates are never allowed to work 'off the clock.'**" (Ex. 37, G000195-196 (emphasis in original).)  GEICO accordingly trained SIU investigators to record their time into a timekeeping software and then to verify their entries.  (Ex. 38, King 97:20-98:7; Ex. 39, Caniglia, Jr. 91:14-92:20.)  GEICO paid Plaintiffs for all time, *including overtime*, that they entered in the timekeeping system.  (Ex. 40.)  Supervisors reinforced GEICO's written policy with supervisees.  (Exs. 41 to 49; Ex. 50, Gelderman Decl. ¶ 18.)

Supervisors instituted different processes for authorizing investigators to work overtime.  Some supervisors required employees to seek preapproval from them in advance of working any overtime hours.  (*See* Ex. 26, Mangan 106:15-22.)  Other supervisors, including Jerry Cassagne, "did not have the ability to preapprove overtime" in advance (Ex. 51, Cassagne 197-24-199:2.), while yet others, like Theresa Bishop, did and simply informed their SIU manager as a "courtesy" if circumstances required an investigator to work overtime.  (Ex. 52, Bishop 98:6-101:10.)

Supervisors also disciplined investigators for off-the-clock work discovered.  For example, when Gelderman learned that Plaintiff Grey worked off the clock, Gelderman ensured Grey was paid for that time and reinforced GEICO's prohibition on off-the-clock work.  (Ex. 53.)  Similarly, when Supervisor Sarah Greenman discovered that Investigator Joe Abrams worked off the clock, she discussed the issue in a meeting and then had a "direct conversation" in which she "explain[ed] to him that he is not permitted to conduct GEICO business while off the clock, and that he must list all of his hours."  (Ex. 54, Greenman 289:18-291:2.)  Buzak's testimony and contemporaneous text messages demonstrate that she was "caught" working after hours and was forbidden from

10

doing so again, after which she took steps intentionally to hide that work from GEICO. (Ex. 24, Buzak 66:2-69:8; Ex 55.)

Plaintiffs understood GEICO's policies because they recorded overtime hours. (Ex. 1, Fogarty Decl. ¶¶ 8-13, 16-17, 28-33.) Cruz confirmed that "if you worked the time beyond 38.75 hours, you obviously are still supposed to report it in Workday," and reporting additional time "[was]n't anything that was prohibited or disincentivized" within his department. (Ex. 6, Cruz 79:11-81:9.) Baker confirmed that approval was not required to record more than 38.75 hours, and no one instructed him not to not to do so. (Ex. 31, Baker 49:20-50:2; 63:18-21.) Diblosi likewise testified that no one at GEICO ever instructed him not to record time worked. (Ex. 19, Diblosi 52:15-18.)

### 6.    Plaintiffs Allege They Failed To Record Overtime For Varying Reasons

Despite GEICO's clear timekeeping requirements, Plaintiffs maintain that they did not record all time purportedly worked for various, independent reasons. Barden, Brust, Caniglia, Jr., Mangan, O'Sullivan, and Pia admitted they intentionally declined to report overtime because they thought that appearing to close more cases in less time would inflate their performance metrics and yield greater compensation. (Ex. 29, Barden 157:17-159:9, 227:14-228:5; Ex. 56, Brust 181:23-182:4, 183:12-19, 185:18-23, 188:19-189:21, 216:13-217:17; Ex. 39, Caniglia, Jr., 242:14-243:6, 229:13-15; Ex. 26, Mangan 110:9-112:12; Ex. 57, O'Sullivan Resp. to Court Interrogatories, O'Sullivan Decl. ¶ 14; Ex. 28, Pia 47:7-17, 67:18-68:18, 105:16-107:6.) Other opt-in Plaintiffs, like Diblosi and Ohrnberger, simply never thought to record more than 38.75 hours. (Ex. 19, Diblosi 52:10-25; Ex. 15, Ohrnberger 228:25-229:7.) Jones believed the process for requesting and recording overtime was too "time consuming." (Ex. 34, Jones 148:18-149:14, 150:14-19), while Reed and others idiosyncratically believed overtime "was something that was not done" and

11

did not record it because they "didn't feel that [overtime] would be approved." (Ex. 30, Reed 67:3-7, 181:8-20, 186:13-188:5; Ex. 27, M. Fischer 190:16-192:4, 193:21-194:16; Ex. 25, K. Fischer 97:5-16, 98:20-25.)

> 7.    Plaintiffs Assert Distinct and Disparate Bases of Knowledge of Alleged Overtime

Plaintiffs advance two theories for why GEICO supposedly should have known that they worked more hours than they recorded. First, although some Plaintiffs maintain that they notified GEICO of off-the-clock work, many Plaintiffs, including Brust, Caniglia, Jr., Costanzo, Grey, and Reed, admitted the opposite – *i.e.*, they never informed GEICO of any off-the-clock work. (Ex. 56, Brust 129:20-24; Ex. 39, Caniglia, Jr. 78:18-79:20, 84:4-7, 166:21-167:8; Ex. 11, Costanzo 45:20-47:13, 50:12-51:3, 232:25-233:24; Ex. 9, Grey 139:25-140:21, 192:9-12, 256:24-257:6; Ex. 30, Reed 63:19-64:15, 66:19-67:2.)

Second, another set of Plaintiffs believes that GEICO knew (or could have known) they worked unrecorded hours based on time stamps generated by emails or Special Investigations Case Management ("SICM") entries. (Ex. 27, M. Fischer 129:10-131:19; Ex. 32, Hirsch 100:2-25; Ex. 13, Stemmler 65:7-66:8; Ex. 56, Brust 85:19-86:5, 243:9-23; Ex. 17, Gotterbarn 96:14-22.) But SIU investigators' practices with regard to SICM varied greatly, with some contemporaneously entering investigation notes (Ex. 25, K. Fischer 91:22-25), others entering notes after the fact (Ex. 58, Moeser 184:20-185:19; 246:18-23), and Plaintiffs like M. Fischer sometimes entering documentation into SICM only every 15 days. (Ex. 27, M. Fischer 92:7-93:24, 94:15-18, 97:5-98:7, 123:10-124:4.).

Further, many Plaintiffs, especially Field Investigators, could "flex" their schedules. Those Plaintiffs could adjust their hours each day to fit their needs and "could work four hours one day and twelve hours another to make up for the difference in time" within the workweek. (Ex. 19,

12

Diblosi 64:2-9; *see* Ex. 25, K. Fischer 36:18-37:19; Ex. 29, Barden 28:15-21; Ex. 26, Mangan 38:10-13; Ex. 6, Cruz 88:7-22; Ex. 24, Buzak 86:21-87:9; Ex. 31, Baker 52:21-53:12; Ex. 59, Portnoy Decl. ¶ 14; Ex. 4, Greenman Decl. ¶¶ 8, 10-12.)  Various Plaintiffs also had authority to "self-approve" the closing of their cases and cannot say that a supervisor ever reviewed their investigative notes.  (Ex. 29, Barden 80:13-18; Ex. 10, Munoz 151:22-24; Ex. 31, Baker 59:14-17; Ex. 24, Buzak 149:12-17.)

Yet other opt-in Plaintiffs concede GEICO neither knew nor could have known about alleged off-the-clock work.  Cruz's off-the-clock work, for example, consisted of attending meetings during his meal periods, which he admitted his supervisors could not have known about. (Ex. 6, Cruz 72:15-73:13.)  Buzak admitted that she would "avoid engaging in work that would create a timestamp" so that "[her] off-the-clock work wouldn't be discovered" by her supervisor. (Ex. 24, Buzak 81:21-83:4.)

## III.    LEGAL STANDARD

In a representative action under the FLSA, plaintiffs may sue on behalf of other employees only if they are "similarly situated" and the Court concludes it can manage the case appropriately. 29 U.S.C. § 216(b).  To establish that they are "similarly situated," the named plaintiffs must demonstrate that they and the opt-in plaintiffs "share a similar issue of law or fact material to the disposition of their FLSA claim." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020); *see Vecchio v. Quest Diagnostics Inc.*, 2020 WL 5604080, at *10 (S.D.N.Y. 2020) (describing plaintiffs' burden).  Whereas the standard is "lenient" at the conditional certification phase (step one), it is "more stringent" on a motion to decertify a collective action after discovery (step two). *Zhang v. Ichiban Grp., LLC*, 2023 WL 6122847, at *9 (N.D.N.Y. 2023) (quoting *Tracy v. NVR*, Inc., 293 F.R.D. 395, 398 (W.D.N.Y. 2013)).  "If the record reveals that the opt-in

plaintiffs are not [similarly situated], then the Court may decertify the collective and dismiss the opt-in plaintiffs' claims without prejudice." (DE 91 at 8.)

## IV.    ARGUMENT

The Court should decertify the collective action.  To succeed on claims for allegedly unpaid overtime under the FLSA, employees must show that (1) they performed more than 40 hours of compensable work in a workweek without proper compensation; (2) the employer had actual or constructive knowledge of such overtime work.  *See* 29 U.S.C. § 207(a)(1); *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).  Plaintiffs cannot show that they are similarly situated to the opt-in Plaintiffs with respect to either element.  Plaintiffs' claims do not turn on any uniform *de facto* policy but, rather, depend on individual circumstances.  Whether and when any Plaintiff worked "off the clock," whether such hours qualified for overtime compensation, and why such individual failed to record the hours vary from person to person and cannot be resolved on a representative basis.  Whether and who any individual Plaintiff informed that he or she worked "off the clock," what he or she told GEICO, and what GEICO knew or should have known likewise varies and turns on proof specific to each Plaintiff.  The evidence specific to any one Plaintiff is not applicable to or representative of material numbers of other Plaintiffs.  As a result, this suit cannot be managed appropriately on a collective basis.

### A.    Plaintiffs Have Not Proven And Cannot Prove Any Similarity Regarding A Factual Or Legal Issue Material To The Disposition Of Their FLSA Claims

The named Plaintiffs cannot meet their burden to show that they and opt-in Plaintiffs are similarly situated with respect to their claims for unpaid overtime.  Employees suing for overtime compensation "ha[ve] the burden of proving that the employer did not compensate [them] for completed work."  *Grochowski v. Phoenix ConsDep.*, 318 F.3d 80, 87 (2d Cir. 2003) (citing *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946)).  Here, the named and opt-in

Plaintiffs assert disparate factual and legal bases for their claims, rendering collective treatment improper.

1.    Plaintiffs Cannot Show That A Common *De Facto* Policy Prohibited Them From Recording Overtime Hours

Plaintiffs cannot show that they were subjected to some uniform, unwritten policy to deny compensation for overtime hours that spanned multiple regions, managers, and years.  In granting conditional certification, this Court observed that complaint allegations and declaration testimony "provide an adequate factual basis" that Plaintiffs and the proposed collective "were subject to Defendant's common policy or plan of deterring the reporting of all hours worked, and failing to pay for such hours worked."  (DE 91 at 20.)  The evidence adduced during discovery, however, confirms that Plaintiffs followed no such common policy or plan.

To maintain a collective action, plaintiffs bear the burden of showing they were subject to some *de facto* policy that required them to work overtime without compensation.  "[A] *de facto* policy is demonstrated through a showing of the illegal application of a common legal policy." *Stevens v. HMSHost Corp.*, 2012 WL 13098466, at *2 (E.D.N.Y. 2012).  The illegality must be "inherent" to the process. *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1271-72 (N.D. Ala. 2012) (decertifying FLSA collective action because "other factors" beyond compensation structure affected whether off-the-clock work occurred).  Moreover, "substantial evidence" must demonstrate the *de facto*, top-down policy. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1118-21 (9th Cir. 2018).

*Campbell* is instructive.  In *Campbell*, the plaintiffs alleged the employer "follow[ed] an unwritten policy that dissuades, and as a practical matter prevents, accurate time reporting."  903 F.3d at 1102.  After conditional certification and completing discovery, the defendant moved for decertification, which the district court granted and the Ninth Circuit affirmed for three primary

15

reasons.  First, the employer maintained "a written, FLSA-compliant policy" that prohibited off-the-clock work, required employees to accurately report all overtime, and warned of discipline for non-compliance.  *Id*.  Second, the plaintiffs' evidence of a policy included "a mass of individual declarations, mostly containing rote recitations of hours worked and bare assertions of a certain Department 'culture'" promulgated by "immediate supervisors at discrete worksites."  *Id.* at 1120.  The plaintiffs provided no evidence of top-down "directives, incentives, conversations, emails, or actions (such as denials of promotions) by Department leadership that could have communicated to local supervisors, implicitly or otherwise, a uniform policy against reporting small amounts of overtime."  *Id.*  Third, the plaintiffs themselves requested overtime, showing that there was no policy against doing so.  *See id.* at 1121.  Because the plaintiffs had not shown a *de facto* policy prohibiting overtime, the Ninth Circuit affirmed decertification.  *Id.*

Since *Campbell*, courts routinely decertify collective actions based on similar anecdotal evidence of an alleged *de facto* policy, finding such evidence insufficient to proceed on a representative basis.  *See, e.g.*, *Pittmon v. CACI Int'l, Inc.*, 2023 WL 8168834, at *10 (C.D. Cal. 2023) (concluding that evidence some plaintiffs underreported hours "reflects an individualized determination regarding whether the employee was pressured to underreport hours based on the individual employee's experience with their supervisor"); *Oldershaw v. DaVita HealthCare Partners, Inc.*, 2019 WL 427650, at *7 (D. Colo. 2019) (finding plaintiffs' evidence "focuses solely on the individual experiences of the Plaintiffs themselves, [and] fails to illustrate any single, cohesive corporate policy that applied similarly to all of them."); *Phillips v. County of Riverside*, 2022 WL 2162822, at *4 (C.D. Cal. 2022) (granting decertification because plaintiffs "fail[ed] to establish a department-wide policy" to deny overtime); *Roy v. FedEx Ground Package Systems,*

*Inc.*, 2024 WL 1346999, at *8-9 (D. Mass. 2024) (decertifying collective because plaintiffs failed to demonstrate a common policy or practice).

Similar to *Campbell* and its progeny, Plaintiffs' evidence here is insufficient. First, as in *Campbell*, GEICO expressly required Plaintiffs to record their hours worked and prohibited off-the-clock work. (Ex. 37.) GEICO trained Plaintiffs on the policy and required them to reacknowledge the policy annually, and Plaintiffs admits that GEICO required recording of all hours worked. (Ex. 62, RFA Compilation.) Thus, GEICO maintained a written, FLSA-compliant policy that prohibited off-the-clock work.

Second, Plaintiffs provide no evidence of a top-down policy of requiring investigators to work overtime without compensation. Such a "policy-to-violate-the-policy" requires demonstrating a "common or uniform practice [] to not follow its formal, written policy." *White v. Baptist Mem'l Health Care Corp.*, 2011 WL 1883959, at *9 (W.D. Tenn. 2011). Courts recognize that "vague suppositions that managers did not want anyone to record overtime" will not suffice to establish a common employer practice. *Reinig v. RBS Citizens, N.A.*, 2023 WL 5497106, at *4 (W.D. Pa. 2023) (decertifying collective action where plaintiffs did not carry burden to show opt ins were all subjected to common employer practice of discouraging reporting of overtime).

As an initial matter, Plaintiffs cannot demonstrate that SIU Managers Woupio, Wolfe, Cubas, and Hammond restricted Plaintiffs from recording overtime hours in any manner, as the declarations submitted to the Court for purposes of conditional certification concerned only Bill Newport, the former Region 2 SIU Manager, or supervisors reporting to him. Further, no evidence demonstrates that Newport prohibited the submission of overtime hours contrary to GEICO's written policy. While one declarant claims Newport uttered "I don't give a fuck" in response to a

17

complaint about workload, tellingly, no Plaintiff has substantiated Newport's alleged comment or otherwise demonstrated that a manager prohibited him or her from recording overtime.

Instead, Plaintiffs' evidence is supervisor-centric, varied, and cannot establish a "policy to violate the policy."  For example, Plaintiffs Mangan, O'Sullivan, and Reed allege that their supervisors instructed them "[d]on't do overtime," that overtime was unavailable "just for typing," and that "there was no overtime."  (Ex. 26, Mangan 147:24-148:2; Ex. 60, O'Sullivan 67:8-25, 71:15-73:17; Ex. 30, Reed 72:17-21, 83:20-25, 179:11-25.)  That evidence, however, suggests merely that they should not *work* overtime hours and, in any event, does not evince a company- or region-wide policy or directive but, rather, bears on the "individual employee's experience with their supervisor," which is insufficient.  *Pittmon*, 2023 WL 8168834, at *10.

Further, the evidence shows that supervisors *did not* uniformly dissuade Plaintiffs from recording overtime.  Supervisor Chet Janik instructed Grey, "[i]f you are working beyond 7.75 hours in a day, you should be putting in for the overtime pay" (Ex. 61; Ex. 9, Grey 100:20-101:6, 106:5-18), and told Barden, "if you're working extra hours, put in for it.  Document it."  (Ex. 29, Barden 107:3-19; Ex. 48)  Supervisor Jerry Cassagne instructed Brust, "don't forget to put in any overtime if worked" (Ex. 44), and told Caniglia, Jr., "[i]f you plan on working overtime . . . you must enter it into this timesheet . . . . [Y]ou can work the overtime and you will get paid for it." (Ex. 41.)  Supervisor Toni D'Agata directed Wendling to "put in for the time worked.  (Ex. 49.) Supervisor Brian Portnoy instructed his team, including Mangan and O'Sullivan, "[a]s a reminder please make sure you are keying any additional hours worked into workday.  This is in reference to overtime."  (Ex. 47.)  The different comments regarding overtime reflect "a hodgepodge" of instructions that, as courts recognize, is not sufficient representative evidence.  *Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22, 55 (W.D.N.Y. 2014).   Under these circumstances, "a

18

determination of the merits is not susceptible to generalized proof but will require individualized inquiries regarding . . . the conduct of individual managers and employees." *Id.*

Third, many Plaintiffs recorded and received compensation for overtime during the relevant period. The fact that employees received overtime compensation "strongly suggest[s]" that the employer honored properly recorded overtime, such that a court "cannot conclude that [the employer] had any uniform business practice across its many locations that intended to prevent employees from receiving compensation for all of the time that they worked." *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 325 (E.D.N.Y. 2014) (quoting *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 467 (S.D.N.Y. 2011)); *see Campbell*, 903 F.3d at 1121 (granting motion for decertification because "[i]t is undisputed" that plaintiffs submitted overtime requests). Here, many Plaintiffs recorded overtime hours, and Plaintiffs admit that GEICO properly paid them for such hours. (Ex. 8, Thompson Decl. ¶¶ 11, 14, Fig. 1 and 3; Ex. 62, RFA Compilation.)

As the evidence establishes that GEICO lacked any policy prohibiting or discouraging Plaintiffs from recording overtime hours worked, assessing why Plaintiffs did not record alleged overtime hours would require a per-instance, per-plaintiff analysis unfit for a resolution on a collective basis.

Contrary to Plaintiffs' theory, the use of performance metrics does not substitute for evidence of a uniform policy against recording overtime. *See Blakes v. Illinois Bell Tel. Co.*, 2013 WL 6662831 (N.D. Ill. 2013); *Pittmon*, 2023 WL 8168834, at *10. In *Blakes*, for instance, an employer tracked its employees' efficiency metrics. *See id.* at *12. Employees sued for unpaid overtime arguing that the tracking incentivized them to hide their time to appear more efficient. *Id*. The court decertified the matter to the extent the plaintiffs' collective action was based on

19

efficiency pressures. *See id.* at *21. It determined that employees could decide for themselves whether to work off the clock based on their other performance statistics and their personal risk tolerances, such that "there [was] no way to determine on a collective basis whether and how often [the employees] hid their time." *Id.* at *12. Likewise, in *Pittmon*, employees argued that unrealistic performance metrics "pressure[d]" them into not recording overtime. *See* 2023 WL 8168834, at *10. The court decertified the collective action because the plaintiffs' theory required "an individualized determination regarding whether the employee was pressured to underreport hours." *Id.*

Other courts similarly have recognized that "the potential and indirect results" of facially lawful productivity metrics or incentive programs do not give rise to an unlawful common policy. *See Meadows v. NCR Corp.*, 2020 WL 1042042 at *6 (N.D. Ill. 2020) ("Encouraging efficiency during working hours is not the same thing as encouraging unpaid overtime work, and a policy that does the former does not bind together as victims the people subject to that policy."); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (declining to certify collective action "in the absence of some evidence that the employer intended, compelled or condoned unlawful consequences" of incentive program); *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *3 (S.D.N.Y. 2009) (same where plaintiff alleged that legal reward policies to maximize sales and minimize overtime "incentivized" FLSA violations).

Here, as in *Blakes* and *Pittmon*, GEICO's performance metrics do not establish a policy against recording overtime. That metrics like Adjusted Productivity "might incentivize employees to work off-the-clock in an effort to maximize their score," is insufficient to demonstrate a common FLSA-violating practice. *Meadows*, 2020 WL 1042042 at *6. Indeed, some Plaintiffs admitted they allegedly failed to record overtime hours because they wanted to artificially improve their

20

performance metrics while others "were okay" simply meeting expectations. (*See supra* at 8-12.) The "potential and indirect results" of having performance metrics are inherently individualized such that they do not support proceeding as a collective action. *Brickey*, 272 F.R.D. at 348.

In any event, as discussed above, GEICO did not even use the alleged performance metrics to assess several Plaintiffs. (*See supra* at 7-9.) And other Plaintiffs do not point to performance metrics as the supposed reason that they allegedly failed to record their overtime hours. (*See supra* at 8.) Whereas some Plaintiffs did not record overtime to enhance their performance metrics, others differed; Jones testified that she did not record overtime because she found the process too "time consuming" and Reed failed to record overtime hours because he "didn't feel that [overtime] would be approved." (*See supra* at 11-12.) Moreover, Plaintiffs – including Betro, Connell, and Mill – effectively admitted that they did not work unrecorded overtime (Ex. 63, Maatman Decl. ¶¶ 4-6), while others – including Munoz, Costanzo, Buzak, Diblosi, and Stemmler – conceded the same for at least a portion of the relevant time period. (*See supra* at 6-7.) Thus, there is nothing "inherent" to GEICO's metrics that led to working "off the clock." *See Briggins*, 882 F. Supp. 2d at 1271-72.

In sum, performance metrics cannot satisfy Plaintiffs' burden to prove an unlawful common policy to prohibit submission of overtime hours. GEICO did not assess many Plaintiffs based on productivity metrics, let alone uniform metrics, and several Plaintiffs concede that they allegedly failed to record overtime for different reasons. Metrics, therefore, cannot establish a common top-down policy. *See Meadows* 2020 WL 1042042 at \*6 (decertifying FLSA collective action because individuals' reasons for working off-the-clock varied considerably).

2.     Dissimilarities In Plaintiffs' Work Activities, And The Compensability Of Such Activities, Precludes A Finding Of Substantial Similarity

Resolving the overtime claims that Plaintiffs assert requires individualized factual and legal inquiries.  "It would defy logic to certify Plaintiffs as a part of this collective if they ultimately will not be able to recover any wages under the FLSA as a matter of law."  *Finnigan v. Metro. Transportation Auth.*, 2025 WL 963998, at *14 (E.D.N.Y. 2025).  Thus, employees seeking to proceed on a representative basis must show they performed more than 40 hours of compensable work in a given workweek without compensation.  *See id.*

Members of a collective action are not similarly situated when their overtime claims are based on disparate activities.  *See Vecchio*, 2020 WL 5604080, at *13.  In *Vecchio*, for instance, the plaintiff alleged that her employer required her and other collective action members "to work many hours off-the-clock…through a combination of official policies…and individual communications from management to not record time spent."  *Id.* at *11.  The court, however, found that the collective action members were not similarly situated because they "varied widely" with respect to how long they worked on different tasks such that "[i]t would be impossible for the Court or a jury to decide in one fell swoop" if each plaintiff worked overtime and how much.  *Id.* at *13.

Other courts similarly have recognized that, where alleged off-the-clock work involves disparate tasks, such claims are not amenable to representative proof.  *See Tracy*, 293 F.R.D. at 399 (decertifying collective action because "[t]he record demonstrates a wide variety of employment practices and time management requirements among the individual plaintiffs, which would require dozens of mini-trials"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (decertifying because merits of claim "will turn upon evidence relating to [plaintiff's] day-to-day tasks"); *Mebane v. GKN Driveline N. Am., Inc.*, 2023 WL 3435007, at *4

22

(M.D.N.C. 2023) ("Because the record does not contain representative proof that employees were all engaged in compensable activities, the employees would need individualized, not representative, evidence to prove their case.").

Here, as the Court found with respect to Plaintiffs' NYLL claims, a "fatal issue … is the lack of coherence about when class members worked overtime and for how long, and the fact that Plaintiffs worked for different supervisors." (Order at 26.)[1] All named Plaintiffs recorded and were paid for overtime in various workweek. (Ex. 1, Fogarty Decl. ¶¶ 8-13, 16-17, 28-33.) Several Plaintiffs subject to discovery admitted that they stopped working overtime altogether at various times, did not begin allegedly working overtime for varying periods, and did not work overtime during discrete periods. (*See supra* at 5-7.)   Plaintiffs thus cannot show they are similarly situated with respect to whether they recorded overtime.

Moreover, the work that Plaintiffs allegedly performed involves different tasks and, therefore, requires separate inquiries as to the compensability of those tasks.  As in *Vecchio*, the tasks and time for which Plaintiffs seek to recover overtime "var[y] widely," and the extent to which such work is compensable "will necessarily vary widely according to the particular situation of each individual plaintiff." *Zivali*, 784 F. Supp. 2d at 468.  The Portal-to-Portal Act, 29 U.S.C. § 254(a)(1), for example, makes clear that time spent commuting is not compensable.  *See* 29 C.F.R. § 785.35; *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 273 (2d Cir. 1999).  Yet, Keith

---

[1] Plaintiffs' NYLL claims turn on individualized evidence, as the Court already found, negating any procedural advantages of proceeding on a representative basis for purposes of the FLSA claims. The FLSA's collective action mechanism "'applies only to wage claims brought under the substantive provisions of the FLSA' and does not apply to 'wage claims generally.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 247 (2d Cir. 2011) (quoting *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 162 (S.D.N.Y. 2008)).  Thus, "each employee" still "would have … to introduce [evidence] to prove the hours he or she worked," and their claims would be subject to "individual defenses." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016).

Fischer claims 4-6 uncompensated hours per day (20-30 hours per week) for time he spent commuting to and from investigation sites and napping (while his total claim is for 10-25 hours of overtime per week).  (*See supra* at 9; Ex. 64, K. Fischer Resp. to Court Interrogatories, K. Fischer Decl. ¶ 9.)  Reed, Pia, Jones, and Costanzo likewise contend they worked more than 40 hours per week by including commute time, while M. Fischer, conversely, seeks pay for time spent setting up and taking down her at-home workstation.  (*See supra* at 9.)

Indeed, as this Court already determined, "even if" plaintiffs could "demonstrate[] an entitlement to overtime compensation, it would only be after individualized inquiries about the employee's peculiar circumstances."  (DE 162 at 26-27.)

> 3. <u>Plaintiffs Cannot Show A Common Basis For Establishing GEICO's Knowledge Of Any Overtime Worked</u>

Plaintiffs similarly cannot meet their burden of proving a common material issue of fact or law with respect to GEICO's knowledge of any uncompensated overtime.  FLSA liability exists only "[i]f the employer knows or has reason to believe that the work is being performed."  29 C.F.R. § 785.12.  That is because "an employer cannot suffer or permit an employee to perform services about which the employer knows nothing."  *Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 524 (2d Cir. 1998).

Proceeding on a collective basis is unwarranted where the employer's knowledge of each plaintiff's alleged overtime "varies widely."  *Zivali*, 784 F. Supp. 2d at 468.  In *Zivali*, employees sued for unpaid overtime under the FLSA, and the court conditionally certified the collective action.  *Id.* at 459.  After discovery, the court decertified the collective action because the "plaintiffs' off-duty claims involve[d] highly individualized situations."  *Id.* at 464.  Regarding the employer's alleged knowledge of the employees' off-the-clock work, at least one plaintiff asserted that

knowledge of off-the-clock work was "implied," while another was "not sure" if the manager knew, and a third testified that the manager "could not have known." *Id.* at 468 n.34.

Here, like in *Zivali*, Plaintiffs advance various arguments regarding GEICO's purported knowledge, each of which turns on individualized factual and legal inquiries. As an initial matter, many Plaintiffs including Brust, Caniglia, Jr., Costanzo, Grey, and Reed admit that they never notified GEICO that they worked more time than they recorded. (*See supra* at 12.) Plaintiff M. Fischer confirmed that she never informed her supervisor of her alleged off-the-clock work, and relies exclusively on a theory of constructive knowledge (Ex. 27, M. Fischer 186:14-20), as do Plaintiffs Buzak, Cruz, and Stemmler. (Ex. 24, Buzak 63:14-20; Ex. 6 Cruz 73:2-4; Ex. 13, Stemmler 119:14-20.) Such Plaintiffs are not similarly situated to those claiming they informed GEICO supervisors of off-the-clock work because the basis of proving knowledge differs markedly.

Other Plaintiffs allege vague statements about their workloads imparted on GEICO the requisite knowledge that they worked without recording certain hours. "Evidence representative of the specific experiences of the Plaintiffs will be necessary to establish the Defendant['s] constructive knowledge." *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 353 (N.D. Ill. 2012) (decertifying collective action because proving knowledge "require[d] a fact-specific inquiry based on the specific working conditions each Plaintiff encountered"). Such statements include Keith Fischer's allegedly asking a manager "who's watching the store here?" (Ex. 25, K. Fischer 89:13-92:8), Mangan's reporting that she "sometimes" worked until 8:00 p.m. (Ex. 26, Mangan 132:21-133:2), Munoz's complaining that "we have too much work" (Ex. 10, Munoz 161: 8-162:15), and Pia's opining that "nobody can do 70 cases" (Ex. 28, Pia 127:16-128:11). These statements raise factual questions unique to each person about what was said,

25

when, to whom, and what response was received, and they raise legal questions about whether any specific statements put GEICO on notice of unpaid overtime.

Finally, some Plaintiffs suggest that time stamps in GEICO's case management software and emails put GEICO on notice that they worked more hours than they recorded (*e.g.*. SAC ¶ 68), but their different roles and working hours preclude any uniform analysis. "In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *Zivali*, 784 F. Supp. 2d at 468; *see Lockhart v. D&S Residential Servs., LP*, 2020 WL 4717910, at *10 (W.D. Tenn. 2020) (concluding that proof of actual or constructive knowledge "require[d] different and distinct evidence").

Individual employment circumstances preclude any collective-wide determination as to constructive knowledge. Employers are not "private detective[s]" that need to piece together employees' hours from systems not meant for timekeeping. *See MacEachern v. Quicken Loans, Inc*, 2016 WL 5118380, at *10 (E.D. Mich. 2016); *see Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 965 (5th Cir. 2016) (holding that "computer usage reports" did not impute knowledge of overtime to employer). GEICO field investigators worked flexible schedules allowing them to decide which hours to work each day. (*See supra* at 12-13.) Thus, a timestamp may indicate that work took place at the recorded time, but not how much work took place beforehand, whether it was recorded, or whether it resulted from flex schedules. (Ex. 13, Stemmler 45:13-17; DE 141-24, O'Neil Notes.) Further, SICM notes cannot determine total time worked – Margaret Fischer sometimes went 15 days without entering a SICM case note, Moeser did not enter notes in real time, and Reed admitted to falsifying SICM notes. (DE 162 at 38; *see supra* at 12.) Brust's entries would not reflect that he was watching a hockey game in between them rather

26

than working.  (Ex. 56, Brust 129:20-130:22; 131:25-132:13.)  Accordingly, timestamps cannot establish uniform knowledge of alleged off-the-clock work and, accordingly, the data does not provide a common means for proving constructive knowledge.

**B.    In The Absence of Decertification, the Collective Action Would Include Opt-In Plaintiffs That Lack Viable FLSA Claims**

Plaintiffs' conditionally certified collective action includes opt-in Plaintiffs who cannot assert viable FLSA claims, necessitating decertification.  It is difficult to "envision a more pertinent disparate factual setting, for purposes of the similarly situated inquiry, among a group of Plaintiffs than the fact that some members of the group do not actually have a viable claim in the action at issue." *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014); *Mebane*, 2023 WL 3435007 at *6 (granting decertification because it was "unclear whether individual employees actually suffered a net loss or net gain from the rounding policy.").  The evidence conclusively establishes that at least 20 individuals, or 38% of the collective action members, lack any FLSA claim for unpaid overtime and, consequently, cannot be "similarly situated" to the named Plaintiffs.

1.    The FLSA Claims of Opt-In Plaintiffs Gotterbarn and McEvoy are Time-Barred

Plaintiffs Gotterbarn and McEvoy have no viable FLSA claims because they did not work for GEICO during the relevant time period.  Individuals who cannot assert viable FLSA claims are per se dissimilar from other members of a collective action. *See Taylor v. White Oak Pastures, Inc.*, 454 F. Supp. 3d 1317, 1334 (M.D. Ga. 2020).  If a collective action includes individuals who cannot assert viable claims, such  individuals cannot be similarly situated to others, and a court must decertify. *Rindfleisch*, 22 F. Supp. 3d at 1303.

To recover damages under the FLSA, an individual must prove that he or she worked more than 40 hours in a workweek during the statute of limitations period. *See, e.g., Herrera v. Comme*

27

*Des Garcons, Ltd.*, 84 F.4th 110, 115 (2d Cir. 2023) (holding the FLSA requires plaintiffs to sufficiently allege "40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours"). For an opt-in plaintiff, "the statute of limitations continues to run . . . until the date the individual files a consent to join the lawsuit." *Viriri v. White Plains Hosp. Med.*, 320 F.R.D. 344, 349 (S.D.N.Y. 2017).

Here, Plaintiffs Gotterbarn and McEvoy filed consent to join forms on July 21 and July 29, 2025, respectively. (DE 109, 115.) Even accounting for tolling[2] and the FLSA's maximum three-year lookback period, Plaintiffs' claims extend no farther than February 11, 2021 (Gotterbarn) and February 19, 2021 (McEvoy). Gotterbarn's employment with GEICO ceased on January 1, 2021 (Ex. 17, Gotterbarn 14:5-7), and McEvoy worked only three days, totaling 23.25 recorded hours, during his potential lookback period, and alleges only 10 hours of off-the-clock work per workweek. (Ex. 65, McEvoy Time Block Data; Ex. 66, McEvoy Interrog. Resp. No. 11.) Neither can assert viable FLSA claims, precluding a finding that they are similarly situated.

2.      Certain Opt-In Plaintiffs Cannot Assert Viable FLSA Claims Because They Admitted They Did Not Work Overtime

Other members of the collective action lack viable FLSA claims because they failed to timely respond to GEICO's written discovery.

Federal Rule of Civil Procedure 36 unequivocally states: "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Consistent with Rule 36's unambiguous language, courts recognize that the failure to timely

---

[2] The magistrate judge previously stated that "the statute of limitations will be tolled as of October 23, 2023," and would remain tolled through the pendency of Plaintiffs' conditional certification motion. (DE 43 at 3.) Between October 23, 2023, and March 31, 2025, the date the motion was decided (DE 91), 525 days elapsed.

respond is deemed to constitute an admission. *See, e.g., Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P. Concrete Co.*, 145 F.4th 204 (2d Cir. 2025) (deeming matters admitted based on "Defendants' failure timely to respond."); *A.P. Moller-Maersk A/S v. Ocean Express Miami*, 648 F. Supp. 2d 490, 492 n.2 (S.D.N.Y. 2009) (holding that a request to admit was "deemed admitted in default of a response").

*Gomez v. Mi Cocina Ltd.*, 2017 WL 3334106 (N.D. Tex. 2017), is instructive. There, Defendants served "uniform discovery requests, including requests for admission, on sixty-two (62) Opt-In Plaintiffs." *Id*. at \*2. Nineteen opt-ins "provided timely answers," ten "never responded," and thirty-three "served late answers." *Id*. Thus, the court concluded, "[b]y operation of law, forty-three (43) of the sixty-two (62) Opt-In Plaintiffs were, therefore, deemed to have admitted all items in Defendants' requests for admission." *Id*. The 43 opt-in plaintiffs' effective admissions "conclusively established" material facts that doomed those individuals' claims, requiring decertification. *Id*. at \*4.

Here, GEICO issued timely Requests for Admission to Phase II opt-in Plaintiffs, including that each "[a]dmit that, during the Relevant Time Period, you did not work more than forty (40) hours for Defendant during any workweek." (Ex. 63, Maatman Decl. ¶ 4; Ex. 62, RFA No. 5.) Defendants also requested that each admit they did not work overtime and were paid for all time reported. (*Id*. RFA Nos. 1, 3, 14.) Plaintiffs Betro, Connell, and Mills never responded to GEICO's Requests, and Plaintiffs Baker, Connell, Cruz, DeMeo, Diblosi, Dux, Gotterbarn, Hirsch, Krattinger, McEvoy, Mills, Ohrnberger, Sarlo, Stemmler, Stephens, and Trentowski did not respond within 30 days, or obtain GEICO's consent or court permission excusing their failure to respond, rendering their responses untimely. (Ex. 63, Maatman Decl. ¶¶ 4-5, 9-24.) Accordingly, each is deemed to have admitted that he or she did not work more than 40 hours in any workweek.

*See Gomez*, 2017 WL 3334106, at \*2; *Ocean Express Miami*, 648 F. Supp. 2d at 494; *Herrera*, 84 F.4th at 115.

As these Plaintiffs have no viable FLSA claims, they are not similarly situated to members of the collective action.

## V.    CONCLUSION

For the foregoing reasons, GEICO respectfully requests that this Court decertify the collective action.


DATED:  **March 6, 2026**                  Respectfully submitted,

GOVERNMENT EMPLOYEES INSURANCE COMPANY


By: */s/ Gerald L. Maatman, Jr.*
        One of Its Attorneys

Gerald L. Maatman, Jr.
Jennifer A. Riley
Gregory Tsonis
DUANE MORRIS LLP
190 S. LaSalle Street, Suite 3700
Chicago, IL  60603
Telephone: (312) 499-6700
Fax:  (312) 499-6701
gmaatman@duanemorris.com
jariley@duanemorris.com
gtsonis@duanemorris.com

Gregory S. Slotnick
gsslotnick@duanemorris.com
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, New York 10017
Telephone: (212) 471-1856
Fax:  (212) 202-5384

*Attorneys for Defendant Government Employees Insurance Company*

30

## **CERTIFICATE OF SERVICE**

I, Gerald L. Maatman, Jr., hereby certify that on March 6, 2026, I caused a true and correct copy of the foregoing to be served on counsel of record via email in compliance with applicable Federal and Local Rules.

/s/ Gerald L. Maatman, Jr.

Gerald L. Maatman, Jr.