# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN and
CHARISE JONES, individually and
on behalf of all others similarly
situated,

        Plaintiffs,

            Case No.:  23 Civ. 2848 (GRB)(ARL)

v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination of:

        Cristobal Cruz

Location:        Regus Business Center
                 300 International Drive, Suite 100
                 Buffalo, New York 14221

Date:            January 9, 2026

Time:            1:30 p.m.

Reported By:  MARY ELIZABETH PHILLIPS

                Alliance Court Reporting, Inc.

                109 South Union Street, Suite 400

                Rochester, New York 14607



A P P E A R A N C E S

Appearing on Behalf of Plaintiffs:

Jarron McAllister, Esq.

     Outten & Golden LLP

     685 3rd Avenue, 25th Floor

     New York, New York  10017

     jmcallister@outtengolden.com


Appearing on Behalf of Defendant:

Gregory Tsonis, Esq.

     Duane Morris LLP

     190 South LaSalle Street, Suite 3700

     Chicago, Illinois  60603

     GTsonis@duanemorris.com


                    *      *      *



S T I P U L A T I O N S

FRIDAY, JANUARY 9, 2026;

(Proceedings in the above-titled matter commencing at 1:40 p.m.)

\*      \*      \*

IT IS HEREBY STIPULATED by and between the attorneys for the respective parties that this deposition may be taken by the Defendant at this time pursuant to notice;

IT IS FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until the time of the trial;

IT IS FURTHER STIPULATED, that pursuant to Federal Rules of Civil Procedure 30(e)(1) the witness requests to review the transcript and make any corrections to same before any Notary Public;

IT IS FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time



CRISTOBAL CRUZ - BY MR. TSONIS

of trial or any hearing in this cause, a certified transcript of the deposition may be used as though it were the original;

IT IS FURTHER STIPULATED, that the attorneys for the parties are individually responsible for their certified transcript charge, including any expedite or other related production charges;

AND IT IS FURTHER STIPULATED, that the Notary Public, Mary Elizabeth Phillips, may administer the oath to the witness.

*     *     *

CRISTOBAL CRUZ,

called herein as a witness, first being sworn, testified as follows:

EXAMINATION BY MR. TSONIS:

Q.    Good afternoon, Mr. Cruz.

A.    Good afternoon.

Q.    My name is Greg Tsonis.  I'm an attorney for GEICO and I'll be taking your deposition today.  Okay?

A.    Yup.

Q.    Have you ever been deposed before?

A.    No.



CRISTOBAL CRUZ - BY MR. TSONIS

Q.    So they worked non-major case?

A.    Correct.  They were desk investigators.

Q.    Okay.  Did they work in the property damage claims?

A.    Yes.

Q.    All right.  What did supervising Ms. Gilmore and Mr. Thornton entail?

A.    That entailed going over their files, holding meetings with them to make sure they didn't have any concerns.  Or if they needed help, I would give them guidance.  That would also entail monitoring their metrics to make sure they were meeting goals.

Q.    Were you approving their time sheets?

A.    No.  I stand corrected.  I can't recall.  I may have.

Q.    Okay.

A.    I do recall looking at times sheets. I think I did approve them because I did have access to the Workday for them.

Q.    So in Workday they were keyed I guess as reporting to you?

A.    Correct.



CRISTOBAL CRUZ - BY MR. TSONIS

Q.    Okay.  What would you do when you were approving their time sheets?  What process would you go through to review them?

A.    Just making sure that their hours were entered and then approve it from there.

Q.    Did you understand that that was your role as a supervisor to just review that they entered hours?

A.    Yes.

Q.    You weren't doing any follow-up to ensure that the hours they entered, you know, accurately reflected the hours that they worked?

A.    No, that was not a trained aspect.

Q.    Okay.  Did Jasmine Gilmore or Josh Thornton ever express concerns to you that they couldn't complete their workload in a normal 38.75-hour work week?

A.    I don't recall.

Q.    If they had expressed those concerns, what would you have done?

A.    I would have addressed it with them to see what I could do to help.

Q.    What kinds of things could you do to help?



CRISTOBAL CRUZ - BY MR. TSONIS

A.    Make phone calls, run databases.

Q.    When you say "make phone calls, run databases," what do you mean?

A.    Calling out to customers to get statements or request documents or running databases such as background checks or ISO checks, vehicle registrations.

Q.    So if I'm understanding right, you would have taken some of the workload off of their plate and done it yourself?

A.    Correct.

Q.    What other tools does a supervisor have to alleviate an investigator's workload if it spikes in a period of time?

A.    I don't have any other tools other than what I just stated.

Q.    Could a supervisor reach out to the intake team and ask that they be cut off from assignments?

MR. MCALLISTER:  Objection.

You can answer.

THE WITNESS:  I'm sorry?

MR. MCALLISTER:  You can answer.

A.    I have never heard of a supervisor



CRISTOBAL CRUZ - BY MR. TSONIS

A.    It was.

Q.    And similarly, how to effectively supervise others within GEICO's policies and requirements for people in management and supervisory authority?

A.    Correct.

Q.    Okay.  Besides supervising two individuals and doing the training classes, were there any other responsibilities that you had as part of the Management Development Program?

A.    Not in the management development, no.

Q.    At the time that you were in the Management Development Program, were you also still working major cases?

A.    Yes.

Q.    Okay.  So you were simultaneously working as a major case investigator and in the Management Development Program?

A.    Correct.

Q.    Okay.  What percentage of your work week was spent working in the Management Development Program as opposed to as your traditional major case investigator?



CRISTOBAL CRUZ - BY MR. TSONIS

A.    I would probably estimate it would be about 75 percent management development, 25 percent major case.

Q.    Were there other people in the Management Development Program in Region 8?

A.    There was at least one other that I recall.

Q.    Who else was there?

A.    Amanda Bontempi.

Q.    Who is Amanda -- Bontempi you said?

A.    Bontempi.  She's just another investigator.

Q.    Was she a major case investigator?

A.    Yes.

Q.    A desk investigator?

A.    She was previously, yes.

Q.    Okay.  Did she similarly have two individuals that reported to her?

A.    Yes.

Q.    Do you recall who those individuals were?

A.    I don't.

Q.    Did Amanda also report to Sarah Greenman?



CRISTOBAL CRUZ - BY MR. TSONIS

Q.   3 under that scale was meeting expectations?

A.   Correct.

Q.   4 and 5 were sort of exceeding expectations; right?

A.   Correct.

Q.   And a 2 or a 1 was not meeting expectations?

A.   Correct.

Q.   But you don't recall any metrics that you were held to?

A.   I don't recall.  They changed so many times, I don't have them straight.  I don't remember.

Q.   As a major case investigator in 2020, you were not gauged on how quickly you had to close a case?

A.   I don't think so, no.

Q.   How many cases would you typically be assigned in a month at that time, 2020?

A.   I don't recall.

Q.   How long would a major case take to investigate?

A.   They could be open six, seven, eight



CRISTOBAL CRUZ - BY MR. TSONIS

months.

Q.    So it's conceivable -- well, strike that.

If you were actively working a major case, would you receive another case?

A.    Yes.

Q.    How many active cases would you have at once?

A.    It could vary.  And the reason it would vary is because we would have the major case that would start the big picture.  As you're investigating that, you're getting the individual cases as well that may be tied to that.

For example, if it's a body shop, your major case is the shop.  Now you've got ten new vehicles going into this very shop for repairs. That's ten new claims, possibly ten new cases.

At that time, we did not work those cases directly.  They'd be assigned out to other investigators and they would report back to us.  But we would then have to take that information and add that into the main case.  So while the major case may be one file, it may have 20, 30, 40 additional cases linked with it.



CRISTOBAL CRUZ
FISCHER V. GEICO

CRISTOBAL CRUZ - BY MR. TSONIS

Q.    Prior to COVID, those were done in person; right?

A.    Correct.

Q.    Post-COVID they were done virtually?

A.    Correct.

Q.    As a major case investigator, did you ever do an in-person EUO?

A.    No.

Q.    We started today talking about this lawsuit.  And you referenced kind of working through your lunch.  You understand that this lawsuit is about kind of off-the-clock work that individuals claimed that they worked for GEICO but were not compensated for; right?

A.    Yes.

Q.    How much time on average are you claiming that you worked off the clock that you weren't compensated for?

A.    I'm saying it was at least one to two hours per month based on just knowledge of meetings.  It could be higher, but I can only say one to two for sure.

Q.    All right.  And you referenced working through lunch.  Is that one to two hours per



CRISTOBAL CRUZ - BY MR. TSONIS

reorganization, that kind of nationalized major case, were there such meetings that took place during your meal period?

A.   No.

Q.   All right.  So your claims here really start in 2023?

A.   Correct, after the reorganization.

Q.   Right.  And the reorganization, probably more like the middle of 2023; right?

A.   Sounds about right.

Q.   Okay.  So from at some point in 2023 to the end of your employment in 2025 is when you're claiming --

A.   Correct.

Q.   -- that you worked, you know, on average one to two hours off the clock per month?

A.   Correct.

Q.   Okay.  Were those one to two hours distributed across several work weeks in the month?

A.   I mean, it would be a random day somewhere, yeah.

Q.   I guess I'm just trying to figure out is it like, you know, there was this one meeting that happened monthly that would always conflict



CRISTOBAL CRUZ - BY MR. TSONIS

Q.   So you decided that you would do the meeting at the same time as your meal period?

A.   I may eat while in the meeting working, yes.

Q.   Okay.

A.   Because there may be an examination under oath that I've done first thing in the morning.  Then I got to get in the meeting.  Then you got to get everything documented and still work the new cases.

So you're trying to stretch that out. You skip lunch to do your meeting and you still got to be within your timelines of the other work.

Q.   Okay.  When you are working through these meal periods as you're alleging, are those times that you would be at home or in the office?

A.   It would be at home and it has been in the office.

Q.   What percentage of the time would you say occurred while you were working at home versus working at the office?

A.   I mean, because I was only in the office two days a week, I would say probably two-thirds of it was at home.



CRISTOBAL CRUZ - BY MR. TSONIS

Q.    Did you ever inform your supervisors that you were working through your meal period?

A.    Absolutely not.

Q.    Did your supervisors ever know that you were working through your meal period?

A.    No.

Q.    They had no way of knowing that; right?

A.    No.

Q.    Particularly if you're doing it while you're working from home.

A.    Correct.

Q.    Did your supervisors expect that you would not work through your meal period?

A.    I would assume they would expect me not to be working.

Q.    You understand that GEICO has policies applicable to all associates; right?

A.    Yes.

Q.    And it maintained those policies in the Associate Handbook?

A.    Yes.

Q.    You were given a copy of that Associate Handbook when you started working at



CRISTOBAL CRUZ - BY MR. TSONIS

A.    Yes.

Q.    And is that your understanding that essentially all associates are assigned to 38.75 hours?

A.    That's my understanding.

Q.    I guess it's not specific to SIU, the 38.75 work week.

A.    Correct.  Every position that I've held was 38.75 hours.

Q.    Were there times in which you needed to work in excess of 38.75 hours and you would request to work more than 38.75 hours?

A.    Yes.

Q.    All right.  Let me back up for a second.  If you needed to work more than 38.75 hours, did you always need to ask a supervisor for approval?

A.    If it was going to be an expectation that you wanted to work like, for example, an hour or more, yes.  If it was I'm stuck on a phone call and I went over 18 minutes, no.

Q.    Okay.  So if you're scheduled I guess to work 38.75 hours and you end up working 15 minutes more and you work 39 hours in a work



CRISTOBAL CRUZ                                     January 09, 2026
FISCHER V. GEICO                                                 80

            CRISTOBAL CRUZ - BY MR. TSONIS

week, that's not a problem?

        A.    No.

        Q.    That's not something that you would
need to ask a supervisor for approval?

        A.    No.

        Q.    And if I'm understanding correctly
what you said, is it an hour or more than an hour
that needed approval?

        A.    There was no set time frame where
they would say if you need X number of hours, you
need approval.  It was you need to stop working when
your shift is over.  But again, if you're on a phone
call and you're wrapping it up, wrap it up.  Put
that time in.

        Q.    So if you worked the time beyond
38.75 hours, you obviously are still supposed to
report it in Workday.

        A.    Correct, but it cannot be habitual
where you're working an extra half-hour every single
day.

        Q.    Right.  I guess the expectation was
that you should be able to complete your work in a
normal 38.75-hour work week, but there are
circumstances, like you said, maybe a phone call



CRISTOBAL CRUZ
FISCHER V. GEICO

January 09, 2026
81

CRISTOBAL CRUZ - BY MR. TSONIS

running long, that might require you to work a little beyond that.

A.   Correct.

Q.   And that isn't anything that was prohibited or disincentivized --

A.   Correct.

Q.   -- from recording; right?

A.   Right.

Q.   Were there times where you did, in fact, request approval to work -- in advance to work more than 38.75 hours in a work week?

A.   No.

Q.   Were there ever times that you recorded working more than 40 hours in a work week when you worked for GEICO?

A.   Yes.

Q.   What were those circumstances?

A.   Being stuck on a phone call. Something that went overtime that you couldn't just abruptly end.

Q.   And I'll clarify.  Are you familiar with when I say "catastrophe pay" what that means? Or "cat pay"?

A.   I am not familiar with cat pay, no.



CRISTOBAL CRUZ - BY MR. TSONIS

A.    Yes.

Q.    There was no need to work off the clock?

A.    Correct.  I found it reasonable to work and get work done.

Q.    And similarly, as a non-major case desk investigator in 2019, you were able to complete your workload without working off the clock; right?

A.    Correct.  The workload was much lower at that point in time and there was actually some free time at that time as well.

Q.    Okay.  Do you have an understanding as to whether other desk investigators were able to similarly complete their workload at that time?

A.    Around 2019?

Q.    Yeah.

A.    Yes.

Q.    All right.  Prior to 2023?

A.    Yes.

Q.    It's your impression that the workload was manageable, could be completed by desk investigators outside of major case before the reorganization in 2023?

A.    Yes.



CRISTOBAL CRUZ - BY MR. TSONIS

A.   No.   Everybody was pretty reasonable with if you're going over, you went over.  There were times also where it would be if you went over, you would have to flex that time and take it off of a different day.

Q.   Let's talk about flextime.  What is flextime?

A.   Flextime is if you work an extra ten minutes on Monday, by Friday you have to leave an extra ten minutes early so that you're still sticking within the 38.75.

Q.   So if you have an examination under oath that runs an hour long, when we're talking about flextime, the expectation would be within that same work week, that you reduce one of your remaining shifts by an hour --

A.   Correct.

Q.   -- so that you would sort of still maintain your approximately 38.75-hour scheduled work week.

A.   Correct.

Q.   Did you have to get approval in advance from your supervisor to flex your time?

A.   Yes.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CRISTOBAL CRUZ - BY MR. TSONIS

appraisals.

Q. So the first year that you were a major case desk investigator, there were no metrics on which that job title was being assessed?

A. Correct.

Q. Your performance appraisal was essentially freeform I guess, what you felt you accomplished that year and what your supervisor felt you accomplished?

A. It was basically freeform, and then whatever the goals were that they had created and ran the numbers for at that point for the performance appraisal.

Q. Okay. You're saying after your first year that changed?

A. Correct.

Q. Do you recall how it changed?

A. I don't because it changed a couple times. What the metrics were for each time they changed, I don't remember what they were.

Q. Generally speaking, what were the metrics that were instituted?

A. Quality, case closure.

Q. When you say "case closure," are you



CRISTOBAL CRUZ - BY MR. TSONIS

talking about that ratio of the number of cases assigned versus closed?

A.   Correct.  Those are the only two I recall offhand.

Q.   We talked earlier how major cases could span up to many months; right?

A.   Right.

Q.   Were the metrics that you're referring to looked at on a monthly basis or on a longer time frame?

A.   It was monthly.

Q.   Looked at monthly I guess, but were you -- well, take that back.

How would you learn what your metrics were for any given month?  Is that a report that you could pull or is that something your supervisor would provide to you?

A.   Supervisors would provide it.  But eventually, they gave us a link where we would actually access everything in real time.

Q.   Okay.  Do you know when you got access to that real-time link?

A.   I don't recall the time frame.  It was after the restructure.



CRISTOBAL CRUZ - BY MR. TSONIS

Q.   After -- sort of at some point at least in 2023 or after?

A.   Correct.

Q.   Prior to that point, you're saying your supervisor would provide you whatever the results were?

A.   Correct.

Q.   I guess in your first year, there were no real results; right?

A.   Right.

Q.   And then after that, there was a quality metric, for example, that would just be the results of your audits?

A.   Correct.

Q.   All right.  When those metrics were in place or when they were first instituted, were they something that was like a 1 through 5 rating scale or were they separately structured?

A.   It was 1 through 5.

Q.   Okay.  If you're working -- well, we talked about, you know, you might have, beginning in 2020, two to four active cases that you're working on; right?

A.   Right.



CRISTOBAL CRUZ - BY MR. TSONIS

A.    No.

Q.    In other words, you have no idea what the conditions, the business conditions were that might have factored into a decision of whether or not to keep or eliminate the positions of certain individuals?

A.    No.

Q.    You can turn to the next page.  I want to look at paragraph 4.  Take a second to read that to yourself as well.

A.    Okay.

Q.    I want to focus on the second sentence that begins "Among other factors."  So as a major case investigator, you were not ever measured on how many hours it took you to complete a case task; right?

A.    No.

Q.    No, that's not right, or no --

A.    No, I was not measured.

Q.    You were not measured by -- or I'll just reframe it neutrally.  Were you measured by how often you made an entry in a case report?

A.    Not to my knowledge, no.

Q.    Were you measured by how many days it



CRISTOBAL CRUZ - BY MR. TSONIS

took you to close a case as a major case investigator?

A.    It was not a metric, no.

Q.    And were you measured on how many cases you completed within a month?

A.    Just the case closure.

Q.    That ratio we referenced earlier?

A.    Correct.

Q.    But that was not, if you look at the next sentence, tied to completing it within 38.75 hours per week; right?

A.    For those that had the metric, I would say the expectation was for it to be completed in that time.

Q.    Right.  But the case closure metric we talked about doesn't have an hours component; right?

A.    Correct.

Q.    All right.  So purely a metric of measuring raw results.  Cases assigned, cases closed, correct?

A.    Right.

Q.    So it's not tied to if you work more hours, your metric will negatively suffer; right?



CRISTOBAL CRUZ - BY MR. TSONIS

encompassed; right?

A.    Correct.  It was no longer regional boundaries.  We would handle any state that needed work.

Q.    Do you have an understanding on how roughly SIU was organized post-reorganization in terms of geography?  You've been talking I guess about west coast and east coast.  Was it split that way?

A.    No.  To my knowledge, there were teams throughout the country.  Their supervisor could be anywhere as well.  Their manager could be anywhere.  But we didn't necessarily handle specific states.  The casework just got assigned out.  So I no longer just handled the New England region.  I would be working on a lot of Florida stuff, New York, California.

Q.    I see.  So post-reorganization, your investigations could essentially be geographically located anywhere in the country?

A.    Correct.

Q.    Did you have to be like certified for certain states in order to get investigations in those states or no?



CRISTOBAL CRUZ - BY MR. TSONIS

and the recorded statements, those were the most time-consuming things that nobody wants to do for somebody else and supervisors didn't have time for either.

MR. MCALLISTER:  Okay.  No further questions.

MR. TSONIS:  Just one follow-up.

RE-EXAMINATION BY MR. TSONIS:

Q.  You said people would complain about having too much to do.  In none of those team meetings did people say we're working off the clock, we're working time and not putting it into Workday.

A.  No.

Q.  Sorry.  I phrased that poorly.  No, they didn't say that or no, that's not correct?

A.  Nobody ever said that.

MR. TSONIS:  Okay.  No further questions.

(TIME:  5:32 p.m.)

*      *      *



C E R T I F I C A T I O N

STATE OF NEW YORK:
COUNTY OF MONROE:

I, MARY ELIZABETH PHILLIPS, do hereby certify that the foregoing testimony was duly sworn to; that I reported in machine shorthand the foregoing pages of the above-styled cause, and that they were produced by computer-aided transcription (CAT) under my personal supervision and constitute a true and accurate record of the testimony in this proceeding;

I further certify that the witness requests to review the transcript;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the City of Rochester, County of Monroe, State of New York.



MARY ELIZABETH PHILLIPS,
Freelance Court Reporter and
Notary Public No. 01PH0029368
in and for Monroe County, New York

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com