# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,<br><br>Defendant. | Case No. 2:23-CV-02848 (SJB) (SIL) |

## DECLARATION OF MATTHEW R. THOMPSON

I, Matthew R. Thompson, based on my personal knowledge and pursuant to 28 U.S.C. § 1746, declare as follows:

1.  At the request of counsel for Government Employees Insurance Company d/b/a GEICO ("GEICO"), I was asked to review timekeeping and special investigator case management ("SICM") data, along with job history data, declarations, deposition testimony, and case filings, for the named and opt-in plaintiffs, in order to describe and compare the plaintiffs' observable data in order to assess the level of variability in outcomes across plaintiffs and compare plaintiffs' data against certain claims made in this litigation. The following sections outline my background and qualifications and present my opinions and my assessment and analysis of the data provided to me.

2.  I am a labor economist and statistician, and the Vice President and Practice Leader of the Labor and Employment group at Charles River Associates ("CRA"), a global consulting firm whose services include performing economic and statistical analyses in connection with litigation and other consulting matters. My education includes a Ph.D. in Economics from the University of North Carolina at Chapel Hill.

3.  I have nearly 30 years' experience analyzing large volumes of workforce data and have provided expert witness testimony in federal and state cases. I am experienced in the statistical analysis of employment practices, employment outcomes, and the computation of economic loss estimates in employment matters, including federal and state wage and hour claims. In that capacity, I routinely work with company-specific human resources information systems ("HRIS"), timekeeping, work activity, and employer payroll data. Using these types of data, I am regularly retained to examine whether the underlying data support allegations raised in Equal Employment Opportunity (EEOC, Title VII and ADA) matters, Office of Federal Contract Compliance Program (OFCCP) investigations, Fair Labor Standards Act (FLSA) and state wage and hour litigation matters, as well as estimate potential economic losses.

4.    A copy of my current CV and recent testimony is attached to this declaration as Exhibit A. My billing rate is $825 per hour and the staff working with me on this declaration bill between $300 and $715 per hour. This declaration is based on the information available to me as of March 6, 2026. Should additional information become available it may be necessary to supplement or amend this declaration. At trial I may rely upon documents that have been produced or testimony that has been given in this matter. In addition, I may prepare demonstrative exhibits for use in trial.

5.    In preparing this declaration, I relied upon the documents and data attached in Exhibit B.

6.    It is my understanding that the plaintiffs in this case are alleging unpaid overtime wages. The data that I was provided fall into four categories: time recorded in the timekeeping data also reflecting time paid; SICM data reflecting monthly performance in various categories for each plaintiff; Workday profiles containing job history information, including positions held; and declarations and responses to interrogatories reporting the alleged off-the-clock hours individual plaintiffs claim to have worked during the relevant period.

7.    Based on my analysis, as set forth below, it is my opinion that the time recorded by plaintiffs, the alleged off-the-clock hours claimed by plaintiffs, and SICM data show substantial variation across individuals, across time periods, and across job titles of the collective action members. This level of variability is inconsistent with plaintiffs' allegations that they were subject to uniform policies or practices regarding their ability to record hours worked, as well as their level of case assignments over time. Accordingly, due to the considerable variation and non-homogeneous work experiences demonstrated by the data, it is my opinion that understanding a particular plaintiff's experience would require individualized review to determine whether any individual is representative of any other.

## Jobs held by named and opt-in plaintiffs

8.    Table 1 below shows the number of person-months in which opt-in and named plaintiffs held relevant jobs during the default statute of limitations period, which I understand to be up to three years prior to the filing of the complaint for FLSA claims. The limitations period for certain named plaintiffs is April 17, 2020, forward and for the opt-ins it is assumed to be three-years prior to the individual's opt-in date and, for anyone that filed a consent to join form after March 21, 2025, 525 days to adjust for a potentially applicable tolling period, providing a common period of comparison. There are 12 unique relevant job titles that at least one plaintiff held at some point during the relevant period. Named plaintiffs held three of these job titles over this period. These jobs differ in multiple ways, including location (*e.g.,* field), specialty (*e.g.,* medical), and case complexity (*e.g.*, major cases), and presumably have different work requirements.

9.    Furthermore, a review of the timekeeping data shows that the timekeeping system changed in January 2023, leading to substantive changes in the way hours were recorded for payment. After January 2023, certain plaintiffs began recording actual time-punches, while before January 2023, all plaintiffs were generally recording hours worked. Because this change correlates to changes in the amount and patterns in time recorded by plaintiffs, I compared jobs held before and after January 1, 2023. Prior to the change in timekeeping practices, about 39% of the person-months worked by opt-ins were in job titles that were never held by a named plaintiff. After the change, this increases to almost 99% of the person-months.

**Table 1: Jobs held before and after new timekeeping period**

| | Named Plaintiffs | | | | Opt-in Plaintiffs | | | |
| | Before 2023 | | 2023 and After | | Before 2023 | | 2023 and After | |
| Job | Number of Person Months | Percent of Person Months | Number of Person Months | Percent of Person Months | Number of Person Months | Percent of Person Months | Number of Person Months | Percent of Person Months |
|---|---|---|---|---|---|---|---|---|
| Senior Field Security Investigator | 94 | 66.7% | 0 | 0.0% | 441 | 50.1% | 256 | 41.2% |
| Lead Security Investigator | 38 | 26.8% | 0 | 0.0% | 104 | 11.8% | 73 | 11.7% |
| SIU Trainer | 9 | 6.5% | 8 | 100.0% | 23 | 2.6% | 8 | 1.2% |
| Field Major Case SIU Investigator | 0 | 0.0% | 0 | 0.0% | 49 | 5.6% | 38 | 6.1% |
| Field Medical Fraud Investigator | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 | 0.3% |
| Internal Major Case SIU Investigator | 0 | 0.0% | 0 | 0.0% | 84 | 9.5% | 116 | 18.6% |
| Internal Security Investigator | 0 | 0.0% | 0 | 0.0% | 44 | 5.0% | 9 | 1.5% |
| MDP I SIU I - S | 0 | 0.0% | 0 | 0.0% | 12 | 1.3% | 0 | 0.0% |
| MDP I SIU II - S | 0 | 0.0% | 0 | 0.0% | 8 | 0.9% | 1 | 0.2% |
| MDP I SIU III - S | 0 | 0.0% | 0 | 0.0% | 9 | 1.0% | 1 | 0.2% |
| Major Case SIU Investigator | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 | 0.3% |
| Senior Internal Security Investigator | 0 | 0.0% | 0 | 0.0% | 108 | 12.3% | 115 | 18.5% |
| **Number of Plaintiffs** | **7** | | **1** | | **43** | | **32** | |

## Cross-plaintiff variation in hours recorded

10.    Plaintiffs allege that they are or were generally only permitted to record 7.75 hours per day worked and 38.75 hours per week worked pursuant to a consistently applied policy, outside of individual requests on a one-off basis to work overtime. (Complaint, ¶108) Figure 1 displays, for each plaintiff, the distribution of *complete* workweeks (*i.e.,* weeks in which all days show recorded work) falling into four categories: fewer than 38.75 hours of work recorded (dark blue), exactly 38.75 hours of work recorded (light blue), between 38.75 and 40 hours of work recorded (light orange), and over 40 hours of work recorded (dark orange). Each bar represents one plaintiff. The figure shows substantial variation across the individuals: some plaintiffs (*e.g.*, Evan Teatum) never recorded below 38.75 hours in a complete workweek, while others recorded fewer than 38.75 hours in as many as 92% of their complete workweeks (Theresa Sarlo), as reflected in the height of the dark blue bars. One plaintiff (John McEvoy), represented by the missing bar at the far left of the figure, worked no complete workweeks during his relevant period. To the extent plaintiffs allege they were unable to record more than 38.75 hours of work per week, it is unclear why individuals alleging to have worked off-the-clock would have recorded fewer than 38.75 hours of work. This pattern indicates substantial variation across plaintiffs in the percentage of weeks in which they reported less than 38.75 hours but alleged that they worked off-the-clock.

11.    The dark orange bars in Figure 1 further show wide differences in the frequency with which plaintiffs recorded more than 40 hours in a complete workweek. Some plaintiffs (*e.g.,* Mark Giambalvo or Gene Connell) never recorded overtime in a complete workweek, while others recorded overtime in up to 45% of their complete workweeks (Louis Caniglia, Sr.). If plaintiffs were uniformly unable to record or be paid for overtime, this variation would not exist. Instead, this variation demonstrates that plaintiffs differed substantially in the percentage of weeks in which they were actually able to, and did, record and receive pay for overtime hours.

**Figure 1: Distribution of weekly hours recorded in complete workweeks, by plaintiff**



**Figure 2: Distribution of weeks with at least one full day of leave, by plaintiff**



12.    While Figure 1 focuses on complete workweeks, Figure 2 shows the percentage of workweeks that were "incomplete." In other words, the weeks in which plaintiffs did not record work in all days (*i.e.,* at least one full day consisted solely of leave, holiday, vacation, sick time, *etc.*). Plaintiffs are shown in the same order as in Figure 1. Incomplete workweeks range from 12% (*e.g.,* Louis Pia) to 100% (John McEvoy) of overall weeks in the timekeeping data. Assuming a 38.75-hour workweek and a normal schedule of five 7.75-hour days, a plaintiff would have to allege over nine hours of unrecorded work time in that workweek in order to exceed 40 hours of work and be eligible for overtime. Thus, a plaintiff who worked all days in only a quarter of their workweeks is far less likely to have the same scope of unpaid overtime claims than a plaintiff who worked all days in 88% of their workweeks.

13.    Figure 3 shows that this variation in recorded hours worked persists even within plaintiffs with the same job title. The figure mirrors Figure 1 but compares plaintiffs within the four largest job-title groups. For example, among Senior Field Security Investigators, the dark blue bars show that some plaintiffs (*e.g.*, Anthony Geraci) never recorded fewer than 38.75 hours in a complete workweek, while others recorded fewer than 38.75 hours in up to 50% of their complete workweeks (Constance Mangan). Similarly, among Internal Major Case SIU Investigators, one plaintiff (Dario DeMeo) recorded fewer than 38.75 hours in 11% of complete workweeks, while another (Theresa Sarlo) did so in in 92% of complete workweeks.

14.    The dark orange bars in Figure 3 show similar variation in overtime within job titles. For example, Senior Internal Security Investigators range from never recording over 40 hours in complete workweeks (*e.g.,* Jeffrey Lewonka) to recording overtime in nearly 19% of their complete workweeks (Joseph Krattinger).

**Figure 3: Distribution of weekly hours recorded in complete workweeks, by job title and plaintiff**



**Figure 4: Weekly hours worked by plaintiff Theresa Sarlo**



**Figure 5: Weekly hours worked by plaintiff Patricia Ohrnberger**



15.     These substantial differences in recorded hours worked and paid demonstrate that plaintiffs did not experience uniform rules, circumstances, or time-recording practices during the class period. Even among plaintiffs who frequently recorded fewer than 38.75 hours of work in a complete workweek, the patterns differ markedly. Figure 4 illustrates the weekly hours worked by plaintiff Theresa Sarlo. Each bar represents a week worked, with height indicating worked hours recorded. The blue bars represent weeks with fewer than 5 days worked and the green bars represent weeks with at least 5 days worked. The dotted line marks 38.75 hours.

16.     The data show that although Ms. Sarlo worked 5 days in most weeks, she rarely recorded the full 38.75 hours. Yet in her interrogatory responses she states: "Plaintiff further responds that from approximately 2018 to the present, they have generally worked a total of 42 hours per week in complete workweeks that they worked for GEICO while they worked as a Desk Investigator." (Response to Interrogatory #11). If Ms. Sarlo was in fact working 42 hours per complete workweek, it is not clear why she recorded fewer than 38.75 hours of work in those weeks. If she instead defines "complete workweeks" as only those weeks where she recorded 38.75 hours of work, then she had very few such weeks. (13 of her 229 workweeks, or 6%, reflected exactly 38.75 hours of work, and none reflected over 38.75 hours of work.) Either interpretation conflicts with her recorded time and underscores the individualized nature of her experience.

17.     Plaintiff Patricia Ohrnberger's records further illustrate lack of uniformity of experience across plaintiffs. Figure 5 shows her weekly recorded hours. Like Ms. Sarlo, Ms. Ohrnberger worked at least 5 days in most weeks and recorded fewer than 38.75 worked hours in many of them. Unlike Ms. Sarlo, she also recorded more than 38.75 worked hours in a number of weeks, particularly through 2023. In her interrogatory responses, she states: "Plaintiff responds that they generally worked a total of 43 hours per week in complete workweeks that they worked for GEICO between 2017 and 2023." (Response to Interrogatory #11). Again, if she consistently worked 43 hours per week, it is unclear why she would fail to record the full 38.75 in so many weeks. Her pattern, sometimes recording up to 40 hours of work while still recording fewer than 38.75 hours of work in many other weeks, differs from Ms. Sarlo's and further confirms that plaintiffs' work and recording practices were not uniform.

## Plaintiffs' alleged off-the-clock hours vary substantially

18.     Off-the-clock allegations are inherently difficult to quantify in FLSA matters, particularly where the type and amount of alleged unpaid work differ substantially across individuals and are subject to various potential sources of error inherent to self-reported data (*e.g.*, recall bias). In discovery, most plaintiffs responded to interrogatories by providing a range of weekly off-the-clock hours they claim to have worked, generally stating that these applied to "complete workweeks." Many plaintiffs also reported multiple ranges for different time periods. Figure 6 summarizes these responses by showing each plaintiff's minimum, maximum, and median alleged weekly off-the-clock hours during their relevant period. Each bar represents one plaintiff. The blue dot reflects the plaintiff's median alleged off-the-clock hours (or a daily-weighted average of medians, when multiple ranges were provided). The orange bars show the spread between each plaintiff's minimum and maximum hours alleged. The black dotted line marks the average of all plaintiffs' median alleged off-the-clock hours (9.4 hours), and the red lines indicate one standard deviation above and below that average (3.4 to 15.3 hours).

19.  The figure demonstrates substantial variation in the weekly off-the-clock time plaintiffs claim to have worked. Median allegations range from 0.63 hours per week (Cristobal Cruz) to 23.19 hours per week (Louis Pia). Many plaintiffs report periods in which they claim no off-the-clock time at all (*e.g.*, Patricia Ohrnberger), while the highest maximum allegation is 36.25 hours per week (Keith Fischer). Both the individual medians and ranges vary substantially around the overall average of 9.4 hours: eight plaintiffs report less than 3.4 hours (more than one standard deviation below the average), and ten plaintiffs report more than 15.2 hours (more than one standard deviation above the average). This degree of variation indicates that plaintiffs' alleged off-the-clock experiences were not uniform, even by their own accounts.

20.  Because the plaintiffs reported alleged off-the-clock work estimates on a weekly basis while the SICM data were reported monthly, monthly projections of off-the-clock hours were constructed for each plaintiff to enable comparison. Weekly off-the-clock hours were first converted to a daily equivalent by dividing by five, based on a five-day workweek assumption. This daily value was then multiplied by the number of days in each month on which the plaintiff recorded work, producing a projected total of off-the-clock hours for that month. Under this approach, each workday in a given month is treated as representing one-fifth of the plaintiff's alleged weekly off-the-clock hours.

**Figure 6: Weekly off-the-clock hours alleged, by plaintiff**



**SICM data shows substantial variation in work performed**

21.    Plaintiffs allege that they are required to satisfy numerous performance metrics to remain in good standing, and that these metrics "could only be satisfied by working substantial overtime hours." They assert that their evaluations were based, among other factors, on "how many hours it took them to complete a case task, how often they made an entry in a case report, how many days they took to close a case, and how many cases they completed within a month." (Complaint, ¶ 4) Plaintiffs also allege that they uniformly were subject to an "ever-increasing workload" over time and that "GEICO determines Special Investigators' caseloads and regularly assigns more cases each week. (Complaint, ¶ 3, 110) My review of several SICM data metrics, including cases closed and new cases assigned, shows that even among plaintiffs with the same job titles, there is substantial variation in individual experiences. This variation appears both month-to-month for the same plaintiff and across plaintiffs working in the same position. This is consistent with my understanding that there is no "typical" case and that no two investigations are alike or require the same amount of investigative effort or time. Plaintiff Keith Fischer, for example, testified that investigations can meaningfully differ in complexity and time necessary to conduct an investigation.  (Fischer deposition, 61:2-67:6.)  Jennifer Fogarty also testified to this in her deposition:

> Q. How would an SIU supervisor help an investigator determine what needs to be done for an investigation?
>
> A. It would depend on the case. I couldn't speak to anything specifically. Every investigation is like a snowflake. There are no two alike. (Fogarty deposition, 71:11-16)

22.    Consistent with Ms. Fogarty's and others' testimony, the SICM data show considerable variation both within individuals and across individuals who held the same job during the same period. As I explained in my May 12, 2025, declaration, the SICM data are not well-suited to testing differences across individuals or within job titles. Although the measures are numeric, they do not capture any of the qualitative differences in cases or activities. The data record only the number of times something occurred in the month (*e.g.*, the number of cases closed or activities performed) but they provide no information on the relative attributes of an investigation (*e.g.*, the complexity of the investigation or the length of time it takes that investigator or even an average investigator to complete). Given these limitations, variation across individuals is entirely expected.

23.    Figure 7 shows wide variation both within and across plaintiffs in the recorded monthly cases closed. Average cases closed (the blue dots) range from 0.6 per month (Eugene Connell) to 53.3 per month (Angela Gresham). The range of cases closed across plaintiffs is large, with many plaintiffs having months in which they close no cases at all, and the maximum number of cases closed in a single month being 99 (Matthew McNally). The orange bars around each plaintiff's average cases closed represent 95% confidence intervals around their average. Statisticians conclude that when individual confidence intervals do not overlap, the two estimated means are different. Only eight plaintiffs have 95% confidence intervals that include the overall average of 28.5. This suggests that the other 41 plaintiffs close an average number of cases per month that is different than the overall average. Further, the individual averages vary substantially around the overall average. This level of variation indicates two things: first, that the measure of cases closed is unlikely to be capturing the same type of information across individuals; and second, plaintiffs' experiences are not homogeneous such that understanding a particular plaintiff's experience would require an individualized review. Figure 8 leads to similar conclusions regarding new cases assigned.

**Figure 7: Average monthly cases closed, by plaintiff**



**Figure 8: Average monthly new cases assigned, by plaintiff**



24.     Figure 9 illustrates the monthly hours recorded (black line, left axis), projected monthly hours alleged, including off-the-clock time (orange line, left axis), new cases assigned (red bars, right axis), and cases closed (blue bars, right axis) for plaintiffs Kenneth Baker (top panel) and Vito DiNiso (bottom panel), both were Senior Field Security Investigators during the relevant period. Their patterns differ markedly. Mr. Baker typically closed between 10 and 20 cases per month (blue bars) and was typically assigned between 5 and 20 new cases (red bars). By contrast, Mr. DiNiso typically closed between 20 and 60 cases per month, two to three times as many as Mr. Baker, and was typically assigned between 20 and 65 new cases per month, more than triple Mr. Baker's typical monthly assignments.

25.     Despite these substantial differences in caseload, Mr. Baker and Mr. DiNiso recorded similar numbers of hours worked per month during the same period, generally ranging from about 120 to 175 hours (black line). They also allege similar amounts of off-the-clock time, with midpoint values of 6.22 hours per week and 6.25 hours per week, respectively. The orange line in each graphic represents the monthly equivalent of these midpoint estimates. As a result, their total recorded plus alleged hours are also similar. The similarity in hours worked and alleged off-the-clock time, despite their large differences in the number of cases closed and assigned, suggests either that the plaintiffs had substantially different levels of efficiency or that they were handling substantially different types of cases, even while holding the same job title. The lack of a parallel trend among cases closed, cases assigned, and hours worked is reflected in the figure's irregular and non-corresponding patterns.

26.     Examining each plaintiff's data individually reveals no consistent pattern that would allow identification of a "representative" month. For example, between May 2020 and October 2021, Mr. DiNiso recorded similar hours worked each month, yet the number of cases he closed and was assigned in these months is nearly double the cases closed and assigned between November 2021 and April 2023. His projected off-the-clock hours also remain relatively constant across months with very different case volumes. This lack of a parallel trend among cases closed, cases assigned, and hours worked suggests that understanding what work was required, and whether any off-the-clock work occurred, would require individualized review of the underlying case activity.

27.     Similar issues appear in Mr. Baker's data. Between March 2022 to December 2022, Mr. Baker consistently closed and was assigned approximately 15 cases per month, yet his recorded monthly hours worked varied substantially, ranging from approximately 120 to 180 hours. The limited fluctuation in case closure and assignment does not correspond to the variation in hours recorded. Determining whether, and to what extent, Mr. Baker performed off-the-clock work would require an individualized assessment and would likely yield a different conclusion than an assessment of Mr. DiNiso's work, even for the same periods of time.

28.     The fluctuation in case activity does not appear to follow any common or time-specific pattern across these individuals. For example, between September 2021 and January 2022, Mr. DiNiso experienced a rapid decline in the number of cases he closed, while over this same period Mr. Baker showed a gradual increase in his monthly case closures. After this period, the trends reversed: Mr. DiNiso's closed cases increased, whereas Mr. Baker's declined. These opposing patterns are inconsistent with any uniform practice of assigning more cases during particular periods of time or an overall increase in case assignments throughout the relevant time period.

**Figure 9: Monthly hours and productivity for Senior Field Security Investigators Kenneth Baker and Vito DiNiso**





**Figure 10: Monthly hours and productivity for Lead Security Investigators Scott Brady and Jeffrey Lewonka**





29.    Figure 10 presents similar information—monthly hours recorded (black line, left axis), additional alleged off-the-clock hours (orange line, left axis), new cases assigned (red bars, right axis), and cases closed (blue bars, right axis)—for two different plaintiffs, Scott Brady (top panel) and Jeffrey Lewonka (bottom panel), both of whom worked as Lead Security Investigators during the relevant period. Their patterns differ markedly, but in different ways than the prior two plaintiffs described in Figure 9. Mr. Brady typically closed about 37 cases per month and was assigned roughly 36 new cases. By contrast, Mr. Lewonka typically closed about 14 cases per month (less than half as many as Mr. Brady) and was typically assigned about 13 new cases per month, roughly one-third of Mr. Brady's typical monthly assignments.

30.    Despite Mr. Brady handling a substantially higher number of cases than Mr. Lewonka, their recorded hours worked per month show the opposite pattern. Mr. Brady averaged approximately 144 hours per month, while Mr. Lewonka averaged approximately 149 hours per month. This relationship remains similar when adding their alleged off-the-clock hours: Mr. Brady's projected total (recorded plus alleged off-the-clock) is approximately 221 per month, compared to approximately 223 hours for Mr. Lewonka. The fact that Mr. Brady reports fewer total hours while handling far more cases, and Mr. Lewonka reports more hours while handling far fewer cases, again suggests either substantial differences in efficiency or that they were performing substantially different types of cases despite holding the same job title. The lack of a parallel trend among cases closed, cases assigned, and hours worked is once again evident in the figure's irregular and noncorresponding patterns.

31.    The orange lines representing each plaintiff's projected monthly off-the-clock hours also demonstrate opposite time-trends. Mr. Brady's alleged off-the-clock projections are higher earlier in the period (April 2020 through December 2022) and lower thereafter (including providing no indication of off-the-clock work after December 2022), while Mr. Lewonka's projections are lower in the earlier period (March 2021 through August 2022) and higher in the later period (October 2022 through November 2023). These divergent patterns indicate that even the timing of alleged off-the-clock work is not consistent across plaintiffs. Given these differences, the experience of one plaintiff would not be representative of the other, even within the same job title and during overlapping time periods.

32.    The lack of common experiences persists even in positions not held by any of the named plaintiffs during the relevant period. Figure 11 presents monthly hours worked and case productivity measures for plaintiffs Dario DeMeo and Theresa Sarlo, both of whom held the Internal Major Case SIU Investigator position from April 2020 through August 2025 (the end of the available data). The data indicate that Mr. DeMeo and Ms. Sarlo have markedly different experiences in this role, and neither appears representative of the other.

33.    As with the prior pairwise comparisons, Mr. DeMeo and Ms. Sarlo show distinctly different productivity patterns and monthly hours worked. Mr. DeMeo exhibits substantially greater variability in his recorded monthly hours and consistently handles more cases, both assigned and closed, than Ms. Sarlo. By contrast, Ms. Sarlo shows relatively little month-to-month variation in hours and has notably fewer cases assigned and closed, including several months in which she was assigned no new cases, closed no cases, or both. Moreover, while Ms. Sarlo's caseload remains relatively low throughout the period, Mr. DeMeo's caseload fluctuates widely, with higher cases assignment and closure at the beginning and end of the period and lower levels in between. These differences suggest that the two plaintiffs were likely handling different types of cases, and therefore likely had different working experiences, making an individualized review necessary to assess any potential off-the-clock claims.

**Figure 11: Monthly hours and productivity for Internal Major Case SIU Investigators Dario DeMeo and Theresa Sarlo**





**Figure 12: Monthly hours and productivity for Senior Internal Security Investigators Lindsey Marie Volk and Albert Brust**





34.    Figure 12 presents monthly hours worked and case-productivity metrics for plaintiffs Lindsey Marie Volk and Albert Brust, both of whom held the Senior Internal Security role from February 2021 through February 2024. The data show minimal commonality between the two plaintiffs, indicating neither is representative of the other. Ms. Volk consistently is assigned and closes more cases per month than Mr. Brust, yet she reports fewer off-the-clock hours. Although neither plaintiff specified whether off-the-clock work continued beyond 2023, their higher monthly hours and case assignments align with the periods in which they allege having performed off-the-clock work.

35.    These pairwise comparisons become even more pronounced when viewed across positions. For example, although Mr. DeMeo's case volume is higher than Ms. Sarlo's, it remains lower than that of plaintiffs such as Mr. Brady or Mr. DiNiso. Similarly, the variability in recorded and off-the-clock differs substantially across plaintiffs. The combination of these differences—job, role, hours recorded, off-the-clock hours alleged, cases assigned, and cases closed—reflects a level of variability in the work that is incompatible with any assumption of representative or uniform experiences.

36.    The comparisons above were provided as illustrative examples to highlight the substantial differences between plaintiffs who held similar positions during the same period and to demonstrate that there are no representative plaintiffs or representative time periods. These differences are not limited to the sample plaintiffs discussed earlier. Reviewing the SICM data for all plaintiffs with both timekeeping and SICM records confirms that the plaintiffs did not have uniform experiences with respect to key measurements of productivity, hours recorded, or off-the-clock hours claimed. Figures 13 and 14 include the full set of plaintiffs for whom both data sources are available. These figures present hours and SICM measures at a more aggregated level, smoothing some of the month-to-month variation described above. Even with this smoothing, however, considerable variation remains. In these figures, the blue bars represent each plaintiff's average monthly work hours as reported in the timekeeping data, ranging from fewer than 30 hours (John McEvoy, a plaintiff who worked only one week during the relevant period) to almost 150 hours (*e.g.,* Kenneth Baker or John Diblosi). The orange bars stacked on top of the blue bars represent each plaintiff's average additional projected monthly off-the-clock hours, which range from 0 hours (*e.g.*, Geoffrey Mills, Gene Connell) to almost 85 hours (Louis Pia)  Superimposed on these bars as a black line are each plaintiff's median monthly cases closed (Figure 13) or median monthly new cases assigned (Figure 14).

37.    Two points are immediately apparent in Figure 13. First, the number of cases closed varies dramatically across plaintiffs: median monthly closures range from zero to more than 54. A plaintiff who typically closes no cases in a month is plainly not performing the same type of work as a plaintiff who typically closes 54. Second, these differences cannot be explained by variation in time worked. The blue bars and the cases closed show no correlation—plaintiffs with similar average monthly hours often close vastly different numbers of cases, and plaintiffs with very different hours sometimes close similar numbers of cases. These disparities strongly suggest fundamental individualized differences in the volume of work performed, which may be described by factors such as differences in type of work performed or individual levels of efficiency.

38.    In the bottom panel of Figure 13, which presents only the four illustrative plaintiffs selected for this example, the addition of monthly off-the-clock hours does not explain the variation in the median number of monthly cases closed. Michael Reed and Angela Gresham both have relatively high median monthly cases closed, 49 and 54, respectively. Yet Mr. Reed has a high projected monthly alleged off-the-clock time (about 67.6 hours), while Ms. Gresham's is considerably lower (about 10.9 hours). Similarly, Tracy McCarthy and Cris Cruz both have relatively low median monthly cases closed, 6 and 7 respectively, but Ms. McCarthy has relatively high projected monthly alleged off-the-clock time (about 49.9 hours) while Mr. Cruz's is considerably lower (about 5.5 hours).

**Figure 13: Average monthly hours recorded, off-the-clock hours alleged, and median cases closed, by plaintiff**





39.    Figure 14 shows a similar pattern for new cases assigned per month. Again, the number of new cases assigned varies widely across plaintiffs, with median values ranging from zero to 54 per month. As with cases closed, these differences are not attributable to differences in hours worked, either with or without projected off-the-clock hours. Plaintiffs with similar monthly hours receive very different numbers of new assignments. The lack of correlation between hours worked and cases assigned reinforces that plaintiffs are unlikely to be performing comparable work.

40.    Taken together, the SICM, timekeeping, and self-reported off-the-clock time data demonstrate that plaintiffs' experiences were highly individualized across many relevant dimensions—hours recorded, off-the-clock hours alleged, cases closed, and new cases assigned. These measures vary widely not only across job titles, but also among plaintiffs within the same job title and even within the same time period. The absence of any consistent relationship between hours worked and case activity, combined with the substantial differences in workload and alleged off-the-clock time, indicates that plaintiffs did not share common productivity patterns and is inconsistent with Plaintiffs' allegations of uniform policies regarding the ability to record time worked and the number of case assignments. Any assessment of potential off-the-clock work and ability to meet performance metrics that incorporate case closures would therefore require individualized inquiry into each plaintiff's specific assignments, case types, and work practices, and any evidence from one plaintiff would not necessarily provide any insight into the individualized experience of other plaintiffs during the relevant time period.

**Figure 14: Average monthly hours recorded, off-the-clock hours alleged, and median new cases assigned, by plaintiff**



Pursuant to 29 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6, 2026                                  Matthew R. Thompson

**Exhibit A**



# Matthew R. Thompson
Vice President

PhD, Economics
University of North Carolina at
Chapel Hill

BA, Economics
Central College

Matthew Thompson, Vice President, is Practice Leader of CRA's Labor and Employment practice. Dr. Thompson specializes in empirical research, applying statistical techniques to the analysis of various issues including firm level employment decisions, government contracting programs, and the impact of proposed regulatory and legislative changes. In these endeavors Dr. Thompson assists clients with the collection, analysis, and production of various electronic and hard copy data sources. He also provides economic loss estimates for single plaintiff and class action cases and assists clients with the development of processes that proactively monitor employment decisions. Dr. Thompson works with attorneys and human resource professionals in analyzing issues concerning Title VII, Age Discrimination in Employment Act (ADEA), Fair Labor Standards Act (FLSA), and Office of Federal Contract Compliance Programs (OFCCP) audits. He has provided expert witness testimony in state and federal cases. In addition to his sole authored work, Dr. Thompson has teamed with leading academic researchers to provide in-depth policy related research. Dr. Thompson has presented employment discrimination issues to attorneys and human resource professionals at seminars on the use of statistics in employment litigation, and has been an invited speaker at North Shore Labor Counsel, New England Legal Foundation, Atlanta Bar Association, Jacksonville Industry Liaison Group, Big Bend SHRM, Professional Liability Underwriting Society, and Jacksonville SHRM events.

## Professional history

| | |
|---|---|
| 2007–Present | *Vice President*, Charles River Associates |
| 1997–2007 | *Principal/Research Economist,* ERS Group |
| | Define and develop economic and statistical analyses of employment practices, such as compensation, promotion and termination, tailored to specific client needs and data requirements. Facilitate the identification, collection and organization of the data required for the analysis of the employment issue being examined. Create proactive methods for analyzing and reviewing proposed employment actions. Estimate potential economic losses associated with employment discrimination claims, wage and hour violations, and personal injury and wrongful death for individuals or classes of individuals. Lead a team of employees including PhD economists, programmers and research assistants. |
| 2003–2005 | *Adjunct Professor,* College of Social Science, Florida State University |
| 1994–1997 | *Instructor,* Department of Economics, University of North Carolina at Chapel Hill |

Charles River Associates

| 1994–1997 | *Research Assistant,* Department of Economics and Carolina Population Center, University of North Carolina at Chapel Hill |
|---|---|
| | Assisted in the estimation and statistical analysis of various projects using Census, National Medical Expenditure Survey (NMES), and Industry datasets. |

## Publications and research papers

"Understanding Employment Data Used for EEO Disparity Analyses." *Adverse Impact Analysis: Understanding Data, Statistics, and Risk*, Morris, Scott and Eric Dunleavy (Editors), Routledge Taylor & Francis Group, New York and London (2017).

"The Effect of Living Wage Laws on Low-wage Workers and Low-income Families: What do we know now?" With David Neumark and Leslie Koyle. *IZA Journal of Labor Policy*, 1:11 (2012).

"Estimating the Economic Impacts of Living Wage Mandates Using Ex Ante Simulations, Longitudinal Estimates, and New Public and Administrative Data: Evidence for New York City." With David Neumark, Francesco Brindisi, Leslie Koyle, and Clayton Reck. NBER Working Paper Series (Working Paper 18055), May 2012.

"The Economic Impacts on New York City of the Proposed Living Wage Mandate." With Marsha Courchane, David Neumark, Timothy Riddiough, and Anthony Yezer. New York City Economic Development Corporation, 2011.

"Report on Gainful Employment." With Jonathan Guryan. Career College Association, April 2, 2010.

"Compensation Strategies in the Era of the Lilly Ledbetter Fair Pay Act." With David Lamoreaux. *Newsletter of the American Health Lawyers Association*, May 2009.

"The Lilly Ledbetter Fair Pay Act and Compensation Strategies." With David Lamoreaux. *Profiles in Diversity Journal*, March/April 2009.

"Companies Need to Take Heed of New Fair Pay Act." With Kenneth Bello and Jennifer Belli, Bello Black & Welsh LLP and David Lamoreaux, Charles River Associates. *New England In-house*, March 2009.

"Public Housing: A Hard Habit to Break?  The Participation and Labor Supply Decisions of Public Housing Participants." PhD Dissertation, Department of Economics, University of North Carolina at Chapel Hill, 1997.

## Presentations and professional meetings

"Reading the Tea Leaves – Trends in Compensation Related Issues," Panelist, North Shore Labor Counsel Meeting, Deerfield, IL, November 13, 2019.

"Lifecycle of a Pay Equity Audit," Moderator, First Chair Equal Pay Summit, Chicago, IL, October 22, 2019.

"Immigration and EEO-Affirmative Action Developments," Panelist, NYU Labor and Employment Law, 71st Annual Conference on Labor, New York, NY, June 8, 2018.

Charles River Associates

"Pay Equity, Immigration and "Reverse Preemption" Developments," Panelist, NYU Labor and Employment Law, 71st Annual Conference on Labor, New York, NY, June 7, 2018.

"Recent Developments in Pay Equity and Practical Considerations in Self-Analysis," NELI Briefing with Felicia Davis, March 2018.

"Analyzing the Outcome of Your Compensation Philosophy", Invited Speaker, 2017 HR Tallahassee Conference and Expo, Tallahassee, FL, June 14, 2017.

"Who Knew Compensation Could Be So Complicated?" Panelist, PLUS Management & PL Symposium, Chicago, IL, April 5, 2017.

"How to Enhance Your Diversity & Inclusion Efforts through the Use of Metrics." Invited Speaker, Jacksonville SHRM, Jacksonville, FL, March 30, 2017.

"Developments Affecting Employers: Gender Wage Gap and 401(k)/403(b) Litigation." Moderator, CRA New York Seminar Series, New York, NY, February 7, 2017.

"How to Enhance Your Diversity & Inclusion Efforts through the Use of Metrics." Invited Speaker, Big Bend SHRM, Tallahassee, FL, October 12, 2016.

"Statistical Analysis in Employment Selection Matters." Invited Speaker, North Shore Labor Counsel Meeting, Deerfield, IL, May 20, 2015.

"Managing Employment Litigation in a Volatile Economy." Invited Speaker, New England Legal Foundation Board Meeting, Boston, MA, June 2, 2010.

"EEO-1 Revisions and Information Technology Challenges." Invited Speaker, Jacksonville Industry Liaison Group, Jacksonville, FL, May 15, 2006.

"The Role of an Economist in Litigation." Invited Speaker, Florida State University Master's of Economics Seminar, Tallahassee, FL, February 23, 2006.

"Use, Misuse and Abuse of Experts and Their Testimony." Invited Speaker, Atlanta Bar Association Continuing Legal Education, Atlanta, GA, March 19, 2004.

"Commonly Used Statistical Techniques." ERS Group's seminar on Employment Discrimination: Economic and Statistical Evidence. Spring 2002, Fall 2003, and Fall 2004.

"Advanced Statistical Techniques: Compensation Analysis." ERS Group's seminar on Employment Discrimination: Economic and Statistical Evidence. Fall 2002.

## Professional memberships

- American Economic Association

- American Bar Association

## Litigation related reports and declarations

*Denise Lemke v. Jenner & Block LLP;* No. 24 CV 4075, United States District Court, Northern District of Illinois (Eastern Division).

Charles River Associates

*Tamika Simmons, and Precious Cisneros, et al. v. Loma Linda University Shared Services;* No. CIVDS 2009499, Superior Court of the State of California, County of San Bernardino, San Bernardino District.

*Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan, and Charise Jones, et al. v. Government Employees Insurance Company d/b/a GEICO;* No.2:23-CV-02848 (SJB)(SLT), United States District Court, Eastern District of New York.

*Robert Dixon and Kelly Porreca, et al. v. Greater Delaware Valley Society of Transplant Surgeons d/b/a Gift of Life Donor Program;* October Term 2020, Case No. 001532, Philadelphia County Court of Common Pleas, Commerce Court.

*Rebecca Cartee-Haring and Dawn Marinello v. Central Bucks School District;* Nos. 2:20-cv-01995-MMB and 2:21-cv-05587-MMV, United States District Court, Eastern District of Pennsylvania.

*Cecil Thomas et al. v. TXX Services, Inc. et al. (Cushi Cunningham – Cushi's World);* No. 2:13-cv-2789, United States District Court, Eastern District of New York.

*Kerryann Cook v. McGivney, Kluger, Clark & Intoccia, P.C., and Charles M. McGivney, Jr.;* No.01-20-0015-4494, American Arbitration Association.

*Jared Le Feuvre v. Enterprise Rent-A-Car Canada Company;* CV-20-00647858-00CP, Ontario Superior Court of Justice.

*Penelope Pajak, v. Wal-Mart Stores East, L.P., a Foreign Limited Partnership;* No.: 6:19-cv-1144-ORL-40DCI, United States District Court, Middle District of Florida, Orlando Division.

*Terrence McCollum, v. Utz Quality Foods, LLC;* No.: 1:19-cv-587, United States District Court, Middle District of North Carolina, Greensboro Division.

*Aaron Essner, v. Howmedica Osteonics Corp. (d/b/a Stryker Corporation) and Colleen Riley;* No.: BER-L-3805-18, Superior Court of New Jersey, Bergen County-Law Division.

## Oral testimony

Trial testimony in *Thato Rankiritlane, et al. v. Love and Caring Homecare Agency LLC and Charlotte Y. Darko;* No. X07-HHD-CV-23-6174375-S, Superior Court Judicial District of Hartford at Harford.

Trial testimony in *Tamika Simmons, and Precious Cisneros, et al. v. Loma Linda University Shared Services;* No. CIVDS 2009499, Superior Court of the State of California, County of San Bernardino, San Bernardino District.

Deposition testimony in *Tamika Simmons, and Precious Cisneros, et al. v. Loma Linda University Shared Services;* No. CIVDS 2009499, Superior Court of the State of California, County of San Bernardino, San Bernardino District.

Arbitration testimony in *Kerryann Cook v. McGivney, Kluger, Clark & Intoccia, P.C., and Charles M. McGivney, Jr.;* No.01-20-0015-4494, American Arbitration Association.

Deposition testimony in *Kennedy Donohue, et al. v. AMN Services, LLC;* No.: 37-201400012605-CU-OE-CTL, Superior Court of California, County of San Diego.

Charles River Associates

Cross Examination testimony in Jared Le Feuvre v. Enterprise Rent-A-Car Canada Company; CV-20-00647858-00CP, Ontario Superior Court of Justice.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-289815, 289816, 289817, 290060, and 290145, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 31-RC-289988, Proceedings before the National Labor Relations Board, Region 19, Los Angeles, California.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 04-RC-289708, 289746, 290056, and 290064, Proceedings before the National Labor Relations Board, Region 04, Philadelphia, Pennsylvania.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-289455, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-289458, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 13-RC-288995, Proceedings before the National Labor Relations Board, Region 13, Chicago, Illinois.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 13-RC-288328, Proceedings before the National Labor Relations Board, Region 13, Chicago, Illinois.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 28-RC-289033, Proceedings before the National Labor Relations Board, Region 28, Phoenix, Arizona.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-288594, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 19-RC-287954, Proceedings before the National Labor Relations Board, Region 19, Seattle, Washington.

Hearing testimony in *Starbucks Corporation, Employer and Workers United, Petitioner;* Case No. 03-RC-285929, Proceedings before the National Labor Relations Board, Region 3, Buffalo, New York.

Deposition testimony in *Penelope Pajak, v. Wal-Mart Stores East, L.P., a Foreign Limited Partnership;* No.: 6:19-cv-1144-ORL-40DCI, United States District Court, Middle District of Florida,

Exhibit B

Exhibit B

**Materials Relied Upon:**

- Second Amended Collective and Class Action Complaint in the matter of *Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan, and Charise Jones, individually and on behalf of all others similarly situated, Plaintiffs, v. Government Employees Insurance Company d/b/a GEICO, Defendant*;

- Declaration of Matthew R. Thompson in the matter of *Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan, and Charise Jones, individually and on behalf of all others similarly situated, Plaintiffs, v. Government Employees Insurance Company d/b/a GEICO, Defendant*, dated May 12, 2025;

- Deposition transcript of Jennifer Fogarty dated October 25, 2024;

- Deposition transcript of Keith Fisher dated August 28, 2024;

- 2023.07.27 SICM Data Dictionary, Bates Nos. G010914 – G010922;

- Time records for opt-in plaintiffs:
  - Amanda Kreps Time.xlsx
  - Amanda Smith Time.xlsx
  - Angela Arthurs Time.xlsx
  - Angela Gresham Time.xlsx
  - Arlena Cranston Time.xlsx
  - Brian Trentowski Time.xlsx
  - Brittany Jecklin Time.xlsx
  - Christopher Hirsch Time.xlsx
  - Cris Cruz Time.xlsx
  - Dario Demeo Time.xlsx
  - Eric Stephens Time.xlsx
  - Frank Dovi Time.xlsx
  - G004003_Confidential.xlsx
  - G004148_Confidential.xlsx
  - G004150_Confidential.xlsx
  - G004151_Confidential - Joseph Costanza.xlsx
  - G005975 - Scott Brady.xlsx
  - G006169 - Michael Grey.xlsx
  - G006235 - Maria Munoz.xlsx
  - G006316 - Caniglia, Jr..xlsx
  - G006412 - Joseph Costanza.xlsx
  - G006580 - Craig Costanzo.xlsx
  - G006719 - Al Brust.xlsx
  - G007713_Confidential.xlsx
  - G008036_Confidential - Thomas Barden (leave).xlsx
  - G008190_Confidential - Michael O'Sullivan (leave).xlsx
  - G008647_Confidential - Keith Fischer (leave).xlsx
  - G008704_Confidential - John Moeser (leave).xlsx
  - G009061 - Constance Mangan (leave).xlsx
  - G009228_Confidential - Michael Reed (leave).xlsx
  - G009399_Confidential - Michael Grey (leave).xlsx
  - G009553_Confidential - Mark Giambalvo (leave).xlsx
  - G009594_Confidential - Margaret Fischer (leave).xlsx
  - G009638_Confidential - Caniglia, jr. (leave).xlsx
  - G009639_Confidential - Caniglia, sr. (leave).xlsx

- G009814_Confidential - Joseph Neenan (leave).xlsx
- G009883_Confidential - John Gillen (leave).xlsx
- G009898_Confidential - George McManus (leave).xlsx
- G010017_Confidential - Daniel King (leave).xlsx
- G010100_Confidential - Craig Costanzo (leave).xlsx
- G010219_Confidential - Anthony Geraci (leave).xlsx
- Gene Connell Time.xlsx
- Geoffrey Mills Time.xlsx
- Jason Snair Time.xlsx
- Jeffrey Lewanika Time.xlsx
- John Diblosi Time.xlsx
- John McEvoy Time.xlsx
- Joseph Krattinger Time.xlsx
- Karen Gotterbarn Time.xlsx
- Kenneth Baker Time.xlsx
- Kevin Dux Time.xlsx
- Lindsay Buzak Time.xlsx
- Lindsay Volk Time.xlsx
- Lynette Stone Time.xlsx
- Marie Butler Time.xlsx
- Mary Ann Betro Time.xlsx
- Matthew McNally Time.xlsx
- Michael Manzolillo Time.xlsx
- Nicholas Solazzo Time.xlsx
- Patricia Ohrnberger Time.xlsx
- Sheena Faublas Time.xlsx
- Stephen Stemmler Time.xlsx
- Theresa Sarlo Time.xlsx
- Tracy McCarthy Time.xlsx
- ELG_-_Time_Off_Details (22).xlsx
- ELG_-_Time_Off_Details (23).xlsx
- ELG_-_Time_Off_Details (24).xlsx
- ELG_-_Time_Off_Details (25).xlsx
- ELG_-_Time_Off_Details (27).xlsx
- ELG_-_Time_Off_Details (28).xlsx
- ELG_-_Time_Off_Details details (29).xlsx
- ELG_-_Time_Off_Details (30).xlsx
- ELG_-_Time_Off_Details (33).xlsx
- ELG_-_Time_Off_Details (34).xlsx
- ELG_-_Time_Off_Details (35).xlsx
- ELG_-_Time_Off_Details (37).xlsx
- ELG_-_Time_Off_Details (38).xlsx
- ELG_-_Time_Off_Details (39).xlsx
- ELG_-_Time_Off_Details (40).xlsx
- ELG_-_Time_Off_Details (41).xlsx
- ELG_-_Time_Off_Details (42).xlsx
- ELG_-_Time_Off_Details (44).xlsx
- ELG_-_Time_Off_Details - Amanda Kreps.xlsx.xlsx
- ELG_-_Time_Off_Details - Amanda Smith.xlsx.xlsx
- ELG_-_Time_Off_Details - Angela Arthurs.xlsx.xlsx
- ELG_-_Time_Off_Details - Angela Gresham.xlsx.xlsx
- ELG_-_Time_Off_Details - Arlana Cranston.xlsx.xlsx
- ELG_-_Time_Off_Details - Brian Trentowski.xlsx.xlsx
- ELG_-_Time_Off_Details - Brittany Jecklin.xlsx.xlsx
- ELG_-_Time_Off_Details - Christopher Hirsch.xlsx.xlsx
- ELG_-_Time_Off_Details - Cris Cruz.xlsx.xlsx

- ELG_-_Time_Off_Details - Dario Demeo.xlsx.xlsx
- ELG_-_Time_Off_Details - Eric Stephens.xlsx.xlsx
- ELG_-_Time_Off_Details - Frank Dovi.xlsx.xlsx
- ELG_-_Time_Off_Details - Gene Connell.xlsx.xlsx
- ELG_-_Time_Off_Details - Geoffrey Mills.xlsx.xlsx
- ELG_-_Time_Off_Details - Jason Snair.xlsx.xlsx
- ELG_-_Time_Off_Details - Jeffery Lewonka.xlsx.xlsx
- ELG_-_Time_Off_Details – John Diblosi.xlsx.xlsx
- ELG_-_Time_Off_Details - John McEvoy.xlsx.xlsx
- ELG_-_Time_Off_Details - Joseph Krattinger.xlsx.xlsx
- ELG_-_Time_Off_Details - Karen Gotterbarn.xlsx.xlsx
- ELG_-_Time_Off_Details - Kenneth Baker.xlsx.xlsx
- ELG_-_Time_Off_Details - Kevin Dux.xlsx.xlsx
- ELG_-_Time_Off_Details - Lindsay Buzak.xlsx.xlsx
- ELG_-_Time_Off_Details - Lindsay Volk.xlsx.xlsx
- ELG_-_Time_Off_Details - Lynnette Stone.xlsx.xlsx
- ELG_-_Time_Off_Details - Marie Butler.xlsx.xlsx
- ELG_-_Time_Off_Details - Mary Ann Betro.xlsx.xlsx
- ELG_-_Time_Off_Details - Matthew McNally.xlsx.xlsx
- ELG_-_Time_Off_Details - Michael manzolillo.xlsx.xlsx
- ELG_-_Time_Off_Details - Nicholas Solazzo.xlsx.xlsx
- ELG_-_Time_Off_Details - Patricia Ohrnberger.xlsx.xlsx
- ELG_-_Time_Off_Details - Sheena Faublas.xlsx.xlsx
- ELG_-_Time_Off_Details - Stephen Stemmler.xlsx.xlsx
- ELG_-_Time_Off_Details - Theresa sSrlo.xlsx.xlsx
- ELG_-_Time_Off_Details – Tracy Mccarthy.xlsx.xlsx

- SICM Data:
  - January - June 2023 Set One.xls
  - January - June 2023 Set Three.xls
  - January - June 2023 Set Two.xls
  - 11.23.2020 - 4.13.2023 Set One.xls
  - 11.23.2020 - 4.13.2023 Tet Three.xls
  - 11.23.2020 - 4.13.2023 Set Two.xls
  - July 2023+ Set One.xls
  - July 2023+ Set Three.xls
  - July 2023+ set Two.xls
  - SIU_Case_Investigation Craig Costanzo 1-17-12-22.xlsx
  - SIU_Case_Investigation Craig Costanzo 1-23-6-23.xlsx
  - SIU_Case_Investigation Craig Costaza 7-23-6-25.xlsx
  - SIU_Case_Investigation Gerrd Cassagne  1-20-12-20 sup, inv, mth.xlsx
  - SIU_Case_Investigation Peg Fischer- Keith- Fischer - Louis Pia   1-17-12-22.xlsx
  - SIU_Case_Investigation All Investigators 1-20-12-20 by month inv.xlsx

- Plaintiffs' Court-Ordered Responses:
  - 2023-11-08 C. Jones R&Os to Courts 1st Set of ROGs w. Attachment [Exec.pdf;
  - 2025-12-08 Opt-In Pltf P. Ohrnberger ROs to Defs 1st Set of ROGs [Exe.pdf;
  - 2025-12-12 Opt-In Pltf K. Gotterbarn R&Os to Defs 1st Set of ROGs [Ex.pdf;
  - 2025-11-28 Opt-In Pltf J. Snair R&Os to Defs 1st Set of ROGs [Execute.pdf;
  - 2025-12-02 Opt-In Pltf T. Sarlo ROs to Defs 1st Set of ROGs [Executed].pdf;
  - 2023-11-07 G. McManus R&Os to Courts 1st Set of ROGs w. Attachments [E.pdf;
  - 2023-11-06 K. Fischer R&Os to Courts 1st Set of ROGs w. Attachment [Ex.pdf;
  - 2023-11-08 M. Munoz R&Os to Courts 1st Set of ROGs w. Attachment [Exec.pdf;
  - 2023-11-08 L. Caniglia, Jr. R&Os to Courts 1st Set of ROGs w. Attachme.pdf;
  - 2023-11-08 M. Fischer R&Os to Courts 1st Set of ROGs w. Attachments [E.pdf;
  - 2023-11-09 A. Geraci R&Os to Courts 1st Set of ROGs w. Attachment [Exe.pdf;

- o 2023-11-07 J. Neenan R&Os to Courts 1st Set of ROGs w. Attachment [Exe.pdf;
- o 2023-11-06 M. Giambalvo R&Os to Courts 1st Set of ROGs w. Attachment [.pdf;
- o 2025-11-26 Opt-In Pltf J. Lewonka R&Os to Defs 1st Set of ROGs [Execu.pdf;
- o 2023-11-07 M. Grey R&Os to Courts 1st Set of ROGs w. Attachments [Exec.pdf;
- o 2023-11-06 L. Pia R&Os to Courts 1st Set of ROGs w. Attachment [Execut.pdf;
- o 2023-11-08 M. O'Sullivan R&Os to Courts 1st Set of ROGs w. Attachment .pdf;
- o 2023-11-06 C. Mangan R&Os to Courts 1st Set of ROGs w. Attachment [Exe.pdf;
- o 2025-11-27 Opt-In Pltf T. McCarthy R&Os to Defs 1st Set of ROGs [Exec.pdf;
- o 2025-12-05 Opt-In Pltf J. Krattinger R&Os to Defs 1st Set of ROGs [Ex.pdf;
- o 2023-11-09 S. Brady R&Os to Courts 1st Set of ROGs w. Attachment [Exec.pdf;
- o 2025-12-15 Opt-In Pltf B. Trentowski R&Os to Defs 1st Set of ROGs [Ex.pdf;
- o 2023-11-06 D. King R&Os to Courts 1st Set of ROGs w. Attachment [Execu.pdf;
- o 2023-11-09 J. Moeser R&Os to Courts 1st Set of ROGs w. Attachment [Exe.pdf
- o 2023-11-07 M. Reed R&Os to Courts 1st Set of ROGs w. Attachment [Execu.pdf;
- o 2023-11-08 E. Teatum R&Os to Courts 1st Set of ROGs w. Attachments [Ex.pdf;
- o 2025-11-26 Opt-In Pltf A. Cranstion R&Os to Defs 1st Set of ROGs [Exe.pdf ;
- o 2025-12-01 Opt-In Pltf S. Faublas R&Os to Defs 1st Set of ROGs [Execu.pdf;
- o 2023-11-07 V. DiNiso R&Os to Courts 1st Set of ROGs w. Attachments [Ex.pdf;
- o 2025-12-15 Opt-In Pltf J. McEvoy ROs to Defs 1st Set of ROGs [Execute.pdf;
- o 2025-11-26 Opt-In Pltf L. Volk R&Os to Defs 1st Set of ROGs [Executed].pdf;
- o 2025-11-26 Opt-In Pltf L. Volk R&Os to Defs 1st Set of ROGs [Executed].pdf;
- o 2025-12-05 Opt-In Pltf E. Stephens R&Os to Defs 1st Set of ROGs [Exec.pdf;
- o 2025-12-01 Opt-In Pltf D. DeMeo R&Os to Defs 1st Set of ROGs [Execute.pdf;
- o 2025-12-02 Opt-In Pltf A. Smith R&Os to Defs 1st Set of ROGs [Execute.pdf;
- o 2025-12-03 Opt-In Pltf C. Cruz R&Os to Defs 1st Set of ROGs [Executed].pdf;
- o 2025-11-26 Opt-In Pltf M. McNally R&Os to Defs 1st Set of ROGs [Execu.pdf;
- o 2025-12-01 Opt-In Pltf L. Marie Buzak R&Os to Defs 1st Set of ROGs [E.pdf;
- o 2023-11-08 C. Costanzo R&Os to Courts 1st Set of ROGs w. Attachment [E.pdf;
- o 2025-11-26 Opt-In Pltf A. Gresham R&Os to Defs 1st Set of ROGs [Execu.pdf;
- o 2025-12-22 Opt-In Pltf S. Stemmler R&Os to Defs 1st Set of ROGs [Exec.pdf;
- o 2025-12-02 Opt-In Pltf K. Dux R&Os to Defs 1st Set of ROGs [Executed].pdf;
- o 2023-11-08 A. Brust R&Os to Courts 1st Set of ROGs w. Attachment [Exec.pdf;
- o 2023-11-09 T. Wendling R&Os to Courts 1st Set of ROGs w. Attachment [E.pdf;
- o 2024-08-14 Opt-In Pltf Joseph Costanzo R&O's to Def's 1st ROGs [Exec.pdf;
- o 2023-11-06 T. Barden R&Os to Courts 1st Set of ROGs w. Attachment [Exe.pdf;
- o Fischer v. GEICO - ROGs ROs K. Baker 2026-01-02 17-03-15.pdf;
- o 2025-11-26 Opt-In Pltf M. Manzolillo R&Os to Defs 1st Set of ROGs [Ex.pdf;
- o 2025-12-09 Opt-In Pltf J. Diblosi R&Os to Defs 1st Set of ROGs [Execu.pdf; and
- o 2026-01-23 Opt-In Pltf C. Hirsch R&Os to Defs 1st Set of ROGs [Executed].pdf.

- Plaintiff Consent Forms:
    - o [00006] 2023.04.20 CONSENT to become party in a collective action. by Keith Fischer (Kaske, Garrett) (Entered_.pdf;
    - o [00109.00001] 2025.07.21 Exhibit A - Consent to Join Form.pdf;
    - o [00113.00001] 2025.07.28 Exhibit A - Consent to Join.pdf;
    - o [00118.00001] 2025.08.05 Exhibit A - Consent to Join Form.pdf;
    - o [00137.00001] 2025.09.19 Exhibit A - Consent to Join Form.pdf;
    - o [00125.00001] 2025.08.15 Exhibit A - Consent to Join Forms.pdf;
    - o [00108.00001] 2025.07.18 Exhibit A - Consent to Join Form.pdf;
    - o [00114.00001] 2025.07.28 Exhibit A - Consent to Join Forms.pdf;
    - o [00019.00001] 2023.06.13 Exhibit A.pdf;
    - o [00110.00001] 2025.07.22 Exhibit A - Consent to Join Form.pdf;
    - o [00110.00001] 2025.07.22 Exhibit A - Consent to Join Form.pdf ;
    - o [00127.00001] 2025.08.27 Exhibit A - Consent to Join.pdf;
    - o [00123.00001] 2025.08.12 Exhibit A - Consent to Join Forms.pdf;

- [00006] 2023.04.20 CONSENT to become party in a collective action. by Keith Fischer (Kaske, Garrett) (Entered_.pdf;
- [00106.00001] 2025.07.15 Exhibit A - Consent to Join Forms.pdf;
- [00109.00001] 2025.07.21 Exhibit A - Consent to Join Form.pdf;
- [00106.00001] 2025.07.15 Exhibit A - Consent to Join Forms.pdf;
- [00115.00001] 2025.07.29 Exhibit A - Consent to Join.pdf;
- [00035.00001] 2023.11.17 Exhibit A - Consent to Join.pdf;
- [00119.00001] 2025.08.07 Exhibit A - Consent to Join Forms.pdf;
- [00113.00001] 2025.07.28 Exhibit A - Consent to Join.pdf;
- [00115.00001] 2025.07.29 Exhibit A - Consent to Join.pdf;
- [00122.00001] 2025.08.11 Exhibit A - Consent to Join Forms.pdf;
- [00107.00001] 2025.07.16 Exhibit A - Consent to Join Form.pdf;
- [00114.00001] 2025.07.28 Exhibit A - Consent to Join Forms.pdf
- [00122.00001] 2025.08.11 Exhibit A - Consent to Join Forms.pdf;
- [00119.00001] 2025.08.07 Exhibit A - Consent to Join Forms.pdf;
- [00126.00001] 2025.08.15 Exhibit A - Consent to Join.pdf;
- [00020.00001] 2023.06.23 Exhibit A - Consent to Join.pdf;
- [00135] 2025.09.09 NOTICE by Ashley Alvarez, Thomas Barden, Keith Fischer, Charise Jones.pdf;
- [00112.00001] 2025.07.24 Exhibit A - Consent to Join.pdf;
- [00016.00001] 2023.05.18 Exhibit A - Consent to Join.pdf;
- [00109] 2025.07.21 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00113] 2025.07.28 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00118] 2025.08.05 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00137] 2025.09.19 NOTICE by Ashley Alvarez, Thomas Barden, Keith Fischer, Charise Jones, Constance.pdf;
- [00125] 2025.08.15 NOTICE by Keith Fischer of Consent to Join Forms.pdf;
- [00108] 2025.07.18 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00114] 2025.07.28 NOTICE by Ashley Alvarez Consent to Join Form.pdf;
- [00019] 2023.06.13 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00110] 2025.07.22 NOTICE by Keith Fischer of Consent to Join Form.pdf;
- [00127] 2025.08.27 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance.pdf;
- [00123] 2025.08.12 NOTICE by Keith Fischer Notice of Consent to Join.pdf;
- [00106] 2025.07.15 CONSENT to become party in a collective action. by Thomas Barden, Keith Fischer, Charise Jones,.pdf;
- [00115] 2025.07.29 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00035] 2023.11.17 CONSENT to become party in a collective action.pdf;
- [00119] 2025.08.07 NOTICE by Keith Fischer Notice of Consent to Join.pdf;
- [00122] 2025.08.11 NOTICE by Keith Fischer Notice of Consent to Join.pdf;
- [00107] 2025.07.16 CONSENT to become party in a collective action.pdf;
- [00126] 2025.08.15 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance.pdf;
- [00020] 2023.06.23 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
- [00135] 2025.09.09 NOTICE by Ashley Alvarez, Thomas Barden, Keith Fischer, Charise Jones.pdf;
- [00112] 2025.07.24 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf; and

- o [00016] 2023.05.18 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf

- Plaintiff Withdrawal Notices:
  - o [00150] 2025.11.24 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
  - o [00152] 2025.12.04 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
  - o [00153] 2025.12.05 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
  - o [00154] 2025.12.11 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
  - o [00155] 2025.12.11 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf;
  - o [00156] 2025.12.15 NOTICE by Thomas Barden, Joseph DiBenedetto, Keith Fischer, Charise Jones, Constance Mangan, John.pdf;
  - o [00160] 2026.02.03 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf; and
  - o [00161] 2026.02.03 NOTICE by Thomas Barden, Keith Fischer, Charise Jones, Constance Mangan, John Moeser, Michael.pdf.

- Plaintiff Workday Histories:
  - o Al Brust, Bates Nos. G005126 – 005163;
  - o Angela_Gresham_(Terminated)-193236.pdf.pdf
  - o Anthony Geraci, Bates Nos. G005582-G005614
  - o Arlana_Cranston_(Terminated).pdf.pdf
  - o Brian_Trentowski_(Terminated)-123140.pdf.pdf
  - o Charise Jones, Bates Nos G004589-G004649
  - o Christopher_HIRSCH_(Terminated)-259626.pdf.pdf
  - o Constance Mangan, Bates Nos. G005336-G005366
  - o Craig Costanzo, Bates Nos. G004533-G004588
  - o Cris_Cruz_(Terminated)-165181.pdf.pdf
  - o Daniel King, Bates Nos.  G005539-G005581
  - o Dario_DeMeo-160400.pdf.pdf
  - o Eric_Stephens-158556.pdf.pdf
  - o Evan Teatum, Bates Nos. G005079-G005124
  - o Gene_Connell_(Retired)-78957.pdf.pdf
  - o Geoffrey_Mills_(On_Leave)-143111.pdf.pdf
  - o George McManus, Bates Nos. G005506-G005538
  - o Jason_Snair_(Terminated)-72771.pdf.pdf
  - o Jeffrey_Lewonka_(Terminated)-110505.pdf.pdf
  - o John_Diblosi_(Terminated)-248322.pdf.pdf
  - o John_McEvoy_(Retired)-143437.pdf.pdf
  - o John Moeser, Bates Nos. G005309-G005335
  - o Joseph Costanza, Bates Nos. G004485-G004532
  - o Joseph_Krattinger-122207.pdf.pdf
  - o Keith Fischer, Bates Nos. G005278-G005308
  - o Kenneth_Baker_(Terminated)-231262.pdf.pdf
  - o Kevin_Dux-222858.pdf.pdf
  - o Lindsay_Buzak_(Terminated)-173798.pdf.pdf
  - o Lindsay_Volk_(Terminated)-152073.pdf.pdf
  - o Louis Cangilia, Sr., Bates Nos. G005401-G005437
  - o Louis Caniglia. Jr., Bates Nos. G004959-G005009
  - o Louis Pia, Bates Nos. G005242-G005277
  - o Margaret Fischer, Bates Nos. G005775-G005811

- o  Maria Munoz, Bates Nos. G004422-G004484
- o  Mark Glambalvo, Bates Nos. G005367-G005400
- o  Mary_Ann_Betro_(Retired)-54383.pdf.pdf
- o  Matthew_Mcnally_(Terminated)-170273.pdf.pdf
- o  Michael Grey, Bates Nos. G004360-G004421
- o  Michael Manzolillo_(Terminated)-241541.pdf.pdf
- o  Michael O'Sullivan, Bates Nos. G005209-G005241
- o  Michael Reed, Bates Nos. G004875-G004916
- o  Patricia_Ohrnberger-60009.pdf.pdf
- o  Scott Brady, Bates Nos. G004307-G004359
- o  Sheena_Faublas_(Terminated)-130395.pdf.pdf
- o  Stephen_Stemmler-219760.pdf.pdf
- o  Ted Wendling, Bates Nos. G004780-G004817
- o  Theresa_Sarlo-75616.pdf.pdf
- o  Thomas Barden, Bates Nos. G005171-G005208
- o  Tracy_McCarthy-121454.pdf.pdf
- o  Vito Diniso, Bates Nos.G004700-G004742