# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL            )
O'SULLIVAN, JOHN MOESER, LOUIS    )
PIA, THOMAS BARDEN, CONSTANCE     )
MANGAN, and CHARISE JONES,        )
individually and on behalf of all )
others similarly situated,        )
                                  )
            Plaintiffs,           )
                                  ) No. 2:23-cv-2848
  -v-                             )
                                  )
GOVERNMENT EMPLOYEES INSURANCE    )
COMPANY d/b/a GEICO,              )
                                  )
            Defendant.            )

Friday, January 10, 2025

Oral videoconference deposition of CRAIG

COSTANZO, held pursuant to Notice via Zoom with all

parties participating remotely, commencing at

10:00 a.m. Central Time, on the above date, before

Andrew R. Pitts, Certified Shorthand Reporter.

Andrew R. Pitts, CSR, RPR
License No.:  084-4575
Esquire Deposition Solutions



800.211.DEPO (3376)
EsquireSolutions.com

REMOTE APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP
685 Third Avenue - 25th Floor
New York, New York  10017
(347) 390-2121
Email: zdsouza@outtengolden.com
        sjean@outtengolden.com
BY:  ZARKA SHABIR DSOUZA, ESQUIRE
     SABINE JEAN, ESQUIRE


On behalf of the Defendant GEICO:

DUANE MORRIS, LLP
190 South LaSalle Street - Suite 3700
Chicago, Illinois  60603-3433
(312) 499-6779
Email:  gtsonis@duanemorris.com
BY:  GREGORY TSONIS, ESQUIRE



ALSO PRESENT:

    MEGAN SCZYGELSKI, Legal Videographer.



                          I N D E X

CRAIG COSTANZO                              EXAMINATION

     BY MR. TSONIS                               5


                        E X H I B I T S

COSTANZO          DESCRIPTION                    PAGE

Exhibit 1    Workday profile for Craig
             Costanzo, G004533-4588          separate
             (confidential)                  transcript


Exhibit 2    Geico HR Associate Handbook,    147
             Compensation Contents,
             G000028-43

Exhibit 3    2017 Geico Performance Guide &  166
             Appraisal for Craig Costanzo,
             G006638-6642

Exhibit 4    2019 Geico Performance          183
             Appraisal for Craig Costanzo,
             G006591-6603

Exhibit 5    2020 Geico Performance          193
             Appraisal for Craig Costanzo,
             G006581-6590

Exhibit 6    MAP 2 2021 (second half of      206
             year) Performance Appraisal,
             Craig Costanzo, G006623-6626

Exhibit 7    MAP 2 2022 (second half of      223
             year) Performance Appraisal,
             Craig Costanzo, G006621-6622

Exhibit 8    Answers to Interrogatories      229

Exhibit 9    Geico Human Resources           250
             Associate Handbook,
             G000191-235



(Whereupon, the following proceedings were taken via videoconference.)

THE VIDEOGRAPHER:  Good morning.  I am now started the recording, and we are now on the record.  The time is 10:01 a.m. Central on Friday, January 10th, 2025.  This begins the videoconference deposition of Craig Costanzo taken in the matter of Keith Fischer, et al., versus Government Employees Insurance Company doing business as Geico filed in the United States District Court for the Eastern District of New York, Case No. 23-cv-2848.

My name is Megan Sczygelski.  I'm your remote videographer today.  The court reporter is Andrew Pitts.  We are representing Esquire Deposition Solutions.

Will everyone present please identify themselves and state who you represent, after which the court reporter will swear in the witness.

MS. DSOUZA:  Hi.  This is Zarka DSouza from the law firm Outten & Golden on behalf of the Plaintiffs.

MR. TSONIS:  Gregory Tsonis on behalf of Defendant Geico, from Duane Morris LLP.

MS. JEAN:  Sabine Jean from Outten & Golden on behalf of the Plaintiffs.



COURT REPORTER:  Okay.  Mr. Costanzo, please raise your right hand to be sworn in.

(Whereupon, the witness was

administered an oath.)

COURT REPORTER:  Okay.  Great.  Sworn.  You may lower your hand.  I will mute myself, and Counsel, you may proceed.

MR. TSONIS:  Thank you.

CRAIG COSTANZO, called as a witness herein, having been first administered an oath, was examined and testified remotely via videoconference as follows:

EXAMINATION

BY MR. TSONIS:

Q.    Good morning, Mr. Costanzo.  How are you?

A.    Good morning.  How are you?

Q.    I'm well, thank you.  My name is Greg Tsonis, as you heard, and I'm a lawyer for Geico. I will be the one that is taking your deposition today.

Before we get started, just a couple of foundational things, then I'll go over some basic ground rules, but can you state and spell your name for the record.

A.    My name is Craig Costanzo; C-R-A-I-G,



of 2020 that there was a period of time where they authorized, and for example, ten hours of overtime for any investigator that wanted it?

A.    I -- I do recall times where they were authorizing it, yes.

Q.    Okay.  And that's, I guess, what I mean by preauthorized over time is that they've communicated that there were a certain number of hours available to an investigator in any given workweek, okay?

A.    Okay.

Q.    So when that overtime was offered, did you utilize it?

A.    I don't remember for sure, but I believe so.  I believe I did some.  I mean, with the volume of cases, I believe I did.

Q.    Okay.  Is it -- it's your recollection that you used some, but not all of the hours?

A.    I think so.  I don't think I used all of it, no.

Q.    Okay.  Setting aside those periods where they communicated, you know, a pool of hours on a weekly basis that are available for overtime, what was the process by which you would, you know, make a request to work overtime?

A.    If you saw the need and something was



coming up, I would check with my supervisor and say, "This is what I think's going to happen, and I don't think I'm going to be done in time.  Am I okay to work?"

Q.    So you had author -- or you would request to your supervisor you had -- strike that.

So is it accurate to say you would identify, you know, the -- the business purpose for needing to work overtime with your cases and request a certain amount of overtime?

A.    Yes.

Q.    Would you do that verbally or in writing?

A.    I remember it could have been both, I mean one or the other.  If I happened to call, it might be verbal, or otherwise I would send an e-mail.

Q.    How frequently would you make that kind of a request to your supervisor?

A.    Well, again, it depends what the time frame was.  It's hard to say.  You know, we reached a point where we were, you know, told there was no more overtime, so you wouldn't ask because people were even told there isn't.

Q.    Okay.  What was the point, what was the period of time approximately where you, you know, were making those kinds of requests?



A.    I mean, I -- it's hard for me to say a specific time frame.  I mean, it was prior to the COVID.

Q.    An estimate?  What's your best estimate, prior --

A.    I mean, it was prior to COVID, but it's hard to -- it -- you know, it wasn't 2014.  I -- I don't know for sure.

Q.    All right.  So between 2016 and, you know, February-March of 2020 for at least some of that time, you were able to request, you know, overtime in this way?

A.    Yes.

Q.    All right.  And would your supervisor typically approve it?

A.    Yes.

Q.    Okay.  After he approved it, would you send any sort of follow-up documentation?

A.    Not that I recall.  I mean, if it -- if there was something different or a change from what we talked about, I probably would have let him know.

Q.    Okay.  In 2016 time period, do you recall the timekeeping sort of software that Geico used?

A.    I don't remember.  I know it wasn't Workday.



BY MR. TSONIS:

Q.    What was the time period within which you had to do those activities, the TIP activities?

A.    Well, some of it -- and, again, it changed so much, but at one point, it was like you're supposed to be doing something with it, like, in a couple of hours.  It -- it got very confusing because it was within a couple hours, but then they'd say it's an overall add all the numbers together kind of thing, and then they'd average it out.  So it was kind of confusing.

Q.    Okay.  And we'll talk more about that.

Did you ever notify your supervisor that you were working overtime but not documenting it in Geico's timekeeping system?

A.    I wouldn't say that I said it exactly like that.  I -- I believe it was more of an "I have to stay, I have to work past the times to try to meet these requirements" and that I felt it was not possible to meet these requirements once they started giving us the huge volume of cases.  There was no way to do it within the eight-hour day.

Q.    Okay.  But you never specifically told your supervisor that you were working time periods but not logging them in Geico's timekeeping system?

ESQUIRE
DEPOSITION SOLUTIONS

A.    I never specifically told him that I was not logging time into the system, no, I didn't say that, I don't believe.

Q.    Okay.  Similarly, you never told any SIU manager that you were working but not entering certain periods of time working into the company's timekeeping system?

A.    I believe I made it clear that there was no way to do this unless I put extra time in.  I didn't specifically say I'm not putting it into the timekeeping, but I believe I made it clear to them was that the only way there was working was because we were putting in extra time.

Q.    Who did you make that report to?

A.    Bill Newport.

Q.    When did you make that -- when did you have that conversation?

A.    I mean, I couldn't tell you specifically when.  I just felt that, you know, the message was getting crossed that this isn't working.  You're giving us way too many cases to have the expectation that we're able to do this in eight hours, and the only way we can get this done is to put extra time in.

Q.    Right, but none of your cases -- well, strike that.



I think part of it started when they were trying to hold us for those, you know, TIPs within a couple hours kind of thing that kind of they didn't tell us that we couldn't adjust, but you really couldn't and still try to meet those.

So, I mean, some of it was kind of just by circumstances you had to kind of work within these normal hours because they were going to send you cases, and you needed to get those TIPs in.

Q.    Right.  But I guess typically in 2017, let's say, I mean, Chet Janik wasn't telling you, you had to start your day at 7:30 in the morning, right?

A.    Correct.

Q.    I mean, you would kind of figure out, for example, if you needed to go and do an examination under oath or have multiple appointments in the city and you wanted to beat traffic, you could decide to just leave earlier that day and end your day earlier?

A.    Yes, that's true.

Q.    All right.  So I guess, you know, that's what I mean in terms of the flexibility of when you actually start your day and when you end it.  It was far more flexible for you than, for example, a desk investigator; is that accurate?

A.    I would think so, yes.



Q.    When was that, approximately?

A.    I don't know what the date was.  I'm sorry.
I just don't know.

Q.    Was it about -- was it in 2021?

A.    I believe so.  I think so.

Q.    Was it later in the year in 2021?

A.    I'm not sure.  I think you're right, but
I don't recall for sure.

Q.    I know I've heard from multiple people, and
obviously what I recall myself, but that New York was
one of the states that kind of locked down the
longest; is that fairly right?

A.    That's my understanding, yes.

Q.    Okay.

A.    Yeah.

Q.    So during the time post-COVID where you
weren't doing any field work, you didn't have any of
this drive time that you had to do anymore, right?

A.    That's correct.

Q.    So the, you know, hour and a half there,
hour and a half back is not something that you had in
your work day anymore?

A.    That's correct.

Q.    And the driving, like we said, from point A
to B to C, that didn't happen anymore either, right?



March 2020, I regularly worked about one extra hour per day on top of my regularly scheduled 7.75 hours per day.  As a result, I worked about 43 hours a week."

Do you see that?

A.    I do.

Q.    Is that an accurate statement?

A.    It's -- it's an approximation, but I did generally work approximately about an hour extra.

Q.    Okay.  Let me ask you something.  We looked at your performance appraisals that talked about the total cases assigned, right?

A.    Yes.

Q.    Okay.  And we saw between 2017 your appraisal there and your appraisal in 2019 that there was an increase in cases that you were assigned, correct?

A.    Yes.

Q.    So is this number that you're talking about, one hour per day, consistent across the entire time period in 2016 to March 2020?

A.    I think so.  It's hard to say for sure, but I -- I think so.  I think that's a fair representation of it.  I mean --

Q.    Explain to me how the total number of cases



differs over a multi-year time period but you are regularly always working one extra hour a day?

A.    Well, like I said, it's -- it's just sort of what happened.  Are there days that I didn't?  Probably.  Are there days that I worked more than an hour?  Probably.  But I think that's a fair representation of what I was doing at the time.

Q.    Okay.  No one instructed you that you had to work one extra hour per day, right?

A.    No, they did not.

Q.    Okay.  Chet Janik or any other supervisor didn't instruct you that?

A.    Nobody instructed my to do that.

Q.    Neither Mike DeGrocco nor Bill Newport instructed you?

A.    No, they did not.

Q.    Okay.  Do you agree that there was no real way for your supervisor to know that you were working one extra hour per day that you weren't including in your timesheet?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.    I'm not sure how they would have known that.



CRAIG COSTANZO  Non-Confidential                                        January 10, 2025
KEITH FISCHER v GEICO                                                                234

BY MR. TSONIS:

     Q.    Right.  Earlier, I think you referenced

SICM time entries?

     A.    Yes.

     Q.    And you referenced general comments about,

you know, not being able to do the work?

     A.    Yes.

     Q.    Okay.  Certain activities you do as a field

investigator, you might be doing that work and not

actually being in SICM, right?

     A.    That's correct.

     Q.    So, for example, when you say you might

have worked an extra hour per day on top of your

regularly scheduled hours, it's possible that that

hour was spent commuting from the field back to your

house?

          MS. DSOUZA:  Objection.

BY THE WITNESS:

     A.    That's possible.

          THE WITNESS:  Sorry.

          MS. DSOUZA:  Go ahead.

BY THE WITNESS:

     A.    Yes.  Yes, that -- that's possible.

BY MR. TSONIS:

     Q.    Okay.  It's possible that that time was



very least, this date that non-exempt associates and you were never allowed to work off the clock?

A.    I see it now.

Q.    Okay.  Well, earlier, you reference that at some point, they started ranking you against other -- other people, right?

A.    Yes.  Yes.

Q.    And I think you referenced -- and I don't want to put words in your mouth, but did you stop your off the clock work at that point in time?

A.    I did.

Q.    Okay.  So since that date, you have not been working any hours that are not recorded in Workday?

A.    Correct.

Q.    When, approximately, was that date?

A.    I don't know.  I don't know what the date was.

Q.    Who was your supervisor at the time that you stopped?

A.    I'm not sure.

Q.    Was it Dara Campbell?

A.    I don't know if it was Dara or if it was Andrew.

Q.    It was one of those two individuals?



A.    I believe so.

Q.    But you don't know which one?

A.    I don't.

Q.    So it would have -- it would have, though, been some point in 2022 or 2023 then?

A.    I believe so.

Q.    Have you talked to any of the other people that are part of this lawsuit?

A.    I have not.

Q.    Do you have an understanding as to who the other individuals that have joined this lawsuit or that have filed it are?

A.    I saw the -- some names on the one form.

Q.    Do you know any of those people, like Keith Fischer?

A.    No, I don't know him, and I'm not aware -- I believe Mike Reed is, but other than that, I don't --

Q.    Okay.

A.    Yeah, Maria maybe, I think, I heard was in it.

Q.    Maria Munoz?

A.    Yes, but I don't --

Q.    Earlier --

A.    I don't know her very well.



And Ms. DSouza, would you like your client to read and sign?

MS. DSOUZA:  Yes.

THE VIDEOGRAPHER:  Thank you.  This concludes the videoconference deposition of Craig Costanzo on -- sorry, on January 10th, 2025.  We are going off the record at 4:12 p.m.

(Whereupon, the proceedings concluded.)

FURTHER DEPONENT SAITH NOT



CRAIG COSTANZO  Non-Confidential                                      January 10, 2025
KEITH FISCHER v GEICO                                                              261

STATE OF ILLINOIS       )
                        ) SS:
COUNTY OF C O O K        )


          I, ANDREW R. PITTS, C.S.R. within and for the
County of Cook and State of Illinois, do hereby
certify that heretofore, to wit, on Friday the 10th
day of January, 2025, personally appeared before me
via videoconference, CRAIG COSTANZO, in a cause now
pending and undetermined in the United States District
Court, For the Eastern District of New York, wherein
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS
PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE
JONES, individually and on behalf of all others
similarly situated are the Plaintiffs, and GOVERNMENT
EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the
Defendant.

          I further certify that the said witness was
first duly sworn to testify to the truth, the whole
truth and nothing but the truth in the cause
aforesaid; that the testimony then given by said
witness was reported stenographically by me in the
presence of the said witness remotely via
videoconference, and afterwards reduced to typewriting
by Computer-Aided Transcription, and the foregoing,
including the confidential excerpt, is a true and



correct transcript of the remote videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the Deponent.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 14th day of January, 2025.

_Andrew R. Pitts_

_____

ANDREW R. PITTS, CSR, RPR

CSR, COOK COUNTY, ILLINOIS

