# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL            )
O'SULLIVAN, JOHN MOESER,          )
LOUIS PIA, THOMAS BARDEN,         )
CONSTANCE MANGAN, and             )
CHARISE JONES, individually       )
and on behalf of all others       )
similarly situated,               )
                                  )
              Plaintiffs,         )No.2:23-CV-
                                  )02848
        vs.                       )
                                  )
GOVERNMENT EMPLOYEES              )
INSURANCE COMPANY d/b/a           )
GEICO,                            )
                                  )
              Defendants.         )
------------------------------

REMOTE VIDEOTAPED DEPOSITION OF

PATRICIA OHRNBERGER

Tuesday, December 9, 2025

Reported by:

LISA M. MURACO, RPR, CCR-NJ

JOB NO. J13784891



Case 2:23-cv-02848-SJB-SIL     Document 173-18     Filed 04/24/26     Page 3 of 18 PageID #: 11548

Tuesday, December 9, 2025

10:00 a.m.


REMOTE Deposition of PATRICIA OHRNBERGER, held VIA ZOOM, before LISA M. MURACO, a Registered Professional Reporter, CR-NJ, a Notary Public of the State of New York, New Jersey, Florida, and Massachusetts.



A P P E A R A N C E S:

(REMOTE)


        OUTTEN & GOLDEN LLP

        Attorneys for Plaintiff

                1 California St

                Fl 12

                San Francisco, CA 94111-5414

        BY:    KAELYN MAHAR, ESQ.

               JANE BALKOSKI, ESQ.




        DUANE MORRIS LLP

        Attorneys for Defendant

                190 South LaSalle Street, Suite 3700

                Chicago, Illinois 60603-3433

        BY:    GREGORY TSONIS, ESQ.



IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -



P. OHRNBERGER

P A T R I C I A   O H R N B E R G E R,

called as a witness, having been duly sworn

by a Notary Public, was examined and

testified as follows:

EXAMINATION BY

MS. TSONIS:

Q.    All right.

Good morning, Ms. Ohrnberger.

Am I saying that right?    10:00

A.    You are.

Q.    All right.  Well, thank you for joining us.

My name is Greg Tsonis.  I'm an attorney for Geico in this matter, and I will    10:00 be taking your deposition today.

A.    Okay.

Q.    Can you please state and spell your name, just for the record.

A.    Patricia, P-A-T-R-I-C-I-A.    10:00 Ohrnberger, O-H-R-N-B-E-R-G-E-R.

Q.    All right.

Where do you currently live?

A.    I live in West Babylon.

Q.    And where is that?  What state?    10:01


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

P. OHRNBERGER

Q.    And how did it change?

A.    I don't really work overtime at all off the clock.  I don't work off the clock anymore.

Q.    So since you became a desk investigator, you ceased working off the clock?

A.    I did, yes.

Q.    All right.

Now, in the time period where you were receiving premium pay, which we said extends through 2019, right?

A.    Yes.

Q.    We will or can look at your time entries.  But I'll represent to you that there's multiple instances in those workweeks and that time period where you recorded more than 40 hours.

Would you agree?  Is that your recollection?

A.    Yes.

Q.    If you recorded more than 40 hours in workweeks, are you alleging during that time period where you were receiving premium pay, that there was an additional work that you did

11:52

11:52

11:52

11:53

11:53



P. OHRNBERGER

that you did not report in Workday or the timekeeping system?

A.    I don't recall.  I would -- I believe anything that was premium pay during that time frame, I think those were the hours that I worked over.                          11:53

Q.    So what you're saying is during the time that you were receiving premium pay, you believe that the hours that you recorded in Workday or the timekeeping system accurately reflect the hours that you actually spent working?                          11:53

A.    Yes, I believe so.

Q.    Okay.                          11:53

Now, have you ever worked -- well, strike that.

Did you have an understanding before Geico reorganized away from a regional structure that you worked in a certain region at Geico?                          11:54

A.    Yes.

Q.    What region was that?

A.    Two.

Q.    Did you ever work in any other                          11:54



P. OHRNBERGER

Is that accurate?

A.    I --

(Multiple speakers.)

MS. MAHAR:  Objection.

You can answer.

A.    I believe so.

Q.    Okay.

Because other major case investigators, for example, Peggy Fischer, have said that they were not rated on anything other than quality?

MS. MAHAR:  Objection.

You can answer.

BY MR. TSONIS:

Q.    So I'm trying to understand why your recollection is that you were rated on something like the time a case was open.

Does that make sense?

A.    Yeah, it does make sense.

Honestly, I don't remember if it was just quality or if there was something more to it.  I don't recall.  Let's leave it at that.

To clarify what I said, there's been a lot of changes.  I've worked for SIU for a



P. OHRNBERGER

long time.  So forgive me.  It may have just as well been quality.  I don't know.

Q.    When we say quality, what's your understanding of the quality metric?    12:37

A.    So working the case to fruition. Getting the case to a point where it's either going to go for an examination under oath or for -- for, you know, whether the case doesn't have any merit.  And then closing the case if    12:37 it doesn't.

Q.    From a quality standpoint, is it your understanding that certain files were reviewed to ensure that various investigative steps that were appropriate were taken?    12:37

A.    Correct.

Q.    And is part of the audit process also ensuring that those steps are documented in the way that's required by Geico?

A.    Yes.    12:37

Q.    All right.

And your audit is essentially scored and, you know, gain or lose points depending on whether you did or didn't do something according to certain criteria?    12:38



Case 2:23-cv-02848-SJB-SIL   Document 173-18   Filed 04/24/26   Page 11 of 18
PageID #: 11556

PATRICIA OHRNBERGER
KEITH FISCHER vs GEICO

December 09, 2025
114

P. OHRNBERGER

A.    Yes.

Q.    All right.

And so, the audit process essentially scores the quality of the investigation and the documentation and gives you a result, right, like your percentage of points that you got?

A.    Yes.

Q.    Okay.

From 2017 to the middle of 2023, you were never rated on a productivity metric that measured how many cases you closed in a given month, right?

MS. MAHAR:  Objection.

You can answer.

A.    For the hybrids, we -- we did have certain things that we had to have done in a certain time frame.  I don't know that, like, if we had social media cases, those had to be turned over in a certain amount of time.  So in that regard, yes, I think that was -- that was a time thing, that we had to have that completed.

Q.    Social media cases, though, were not



P. OHRNBERGER

Q.    All right.

Are you aware of any time that you actually recorded in Workday that you were not properly compensated for?                    03:05

A.    Repeat the question.

Q.    Yeah.

Are you aware of any hours that you actually recorded in Workday, but that Geico didn't pay you correctly?                    03:06

A.    Not to my knowledge.

Q.    To your knowledge, everything you put into Workday you got paid for correctly?

A.    Yes, I believe so.

Q.    All right.                                        03:06

If you skip to page 101.

A.    Okay.

Q.    And this is, just to keep us oriented, the document or the page Bates stamped ending in 389.                    03:06

A.    101.  Okay.

Q.    All right.

Do you see now at this point, Geico's pay statements reflect the different types of hours for each workweek, not just the    03:06



P. OHRNBERGER

your supervisor to work overtime and they said no?

A.    Well, let me rephrase.  So if you needed overtime and you contacted them, and if I was to contact them, they would likely advise me no.  There may have been incidences when that happened.  So yes, you know, they -- they weren't able to give overtime.

Q.    I just want to be clear.  Are you saying that because you expected that they would tell you no, that you wouldn't call or make the request?

A.    On some occasions, yes.  And on other occasions, I may have put it out there, you know, hey, can I -- you know, can I use overtime.

But the written rule was that there was no overtime.

Q.    All right.

I want to talk about that for a second, because I want your best recollection here.

A.    Sure.

Q.    Are you talking hypothetically or do

03:26

03:27

03:27

03:27

03:27



P. OHRNBERGER

recall a certain instance where you asked for overtime and you told them no?

A.   I can't recall an actual incident where I requested it.  And to the best of my knowledge, I'm -- I feel like I had.  But I can't -- I just can't remember.

Q.   Okay.

And then you referenced in the second part there, the written rule was that there was no overtime.

What do you mean by the written rule?

A.   Because we were -- we just -- when our -- when my supervisor spoke to us in meetings and so forth, they said, you know, look, there's -- they're not approving overtime.

There was approved overtime at certain points because of special projects. But for regular workload, they were not offering overtime.

Q.   So if I'm understanding correctly, your supervisors informed you that the expectation was that you would be able to



P. OHRNBERGER

You can answer.

A.    So there was -- no, I honestly don't understand what you're asking me to say here.

Q.    I guess my point is, you justified earlier that during the time period that you received premium pay, you were recording all the hours that you worked because there was no requirement, there was no cap on the number of hours you could record, right?

A.    That is -- that -- to the best of my knowledge, yes, that's correct.

Q.    Okay.

So then you switch over to an hourly rate in which you are potentially able to be paid time and a half for any hours worked over 40, right?

A.    Right.  In 2020.

Q.    Okay.

During that changeover, there was communication from Geico that said you are going to be paid now differently than what you had been paid in the past, right?

A.    Right.

Q.    All right.



03:50
03:50
03:51
03:51
03:51

P. OHRNBERGER

That communication from Geico didn't state that overtime is not permitted.  It stated that if you need to work overtime, you should have that approved by a supervisor in advance, right?

A.    Yes.

Q.    Okay.

And it was at that time that you started, as you alleged, working hours that you didn't write down in Workday, and that you're now saying you should be compensated for, right?

A.    Right.

Q.    Okay.

That wasn't because, I guess, a direction that you received from Geico to not record your hours worked, right?

MS. MAHAR:  Objection.

You can answer.

A.    Could you repeat the question.  I'm sorry.

Q.    Yeah.

That didn't begin because Geico instructed you not to start recording your

03:51

03:51

03:51

03:52

03:52



P. OHRNBERGER

major case investigators that reported to a

supervisor that reported to Courtney Wolfe.

Is that accurate?

A.     Yes.                                                04:16

Q.     Okay.

MR. TSONIS:  All right.  I have no

further questions.

MS. MAHAR:  No further questions

from us.                                                  04:16

(Time Noted:  4:16 p.m.)

----------------------

PATRICIA OHRNBERGER

Subscribed and sworn to before me

this         day of              2025.

-------------------------------------------



C E R T I F I C A T E

STATE OF NEW YORK     )

                      ) ss.:

COUNTY OF NEW YORK    )

I, LISA M. MURACO, a Notary Public within and for the State of New York, do hereby certify:

That PATRICIA OHRNBERGER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of December, 2025.

_____

LISA M. MURACO

