# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN,

JOHN MOESER, LOUIS PIA, THOMAS

BARDEN, CONSTANCE MANGAN, and

CHARISE JONES, individually and on behalf of

all others similarly situated,

                    Plaintiffs,

V.                    Case No. 2:23-CV-02848

GOVERNMENT EMPLOYEES INSURANCE

COMPANY d/b/a GEICO,

                    Defendant.

------------------------------------------------X


 REMOTE VIDEOTELECONFERENCED DEPOSITION OF:

                LINDSAY M. BUZAK

            Tuesday, January 27, 2026


Reported by:
Aydil M. Torres, CSR
JOB NO. J14143883



January 27, 2026

4:59 p.m.


Remote VTC deposition of LINDSAY M. BUZAK, pursuant to Notice, before Aydil M. Torres, a Notary Public of the State of New York.



A P P E A R A N C E S:


   OUTTEN & GOLDEN, LLP

   Attorneys for Plaintiffs

      685 Third Avenue, 25th Floor

      New York, New York 10017

   BY: JARRON D. MCALLISTER, ESQ.




   DUANE MORRIS, LLP

   Attorneys for Defendants

      190 South LaSalle Street, Suite 3700

      Chicago, Illinois 60603

   BY:  GREGORY TSONIS, ESQ.



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification and the same are hereby waived and that the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.



THE REPORTER:  My name is Aydil M. Torres, a New York State notary public and certified shorthand reporter.

This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.

The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

L I N D S A Y   M.   B U Z A K,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

THE REPORTER:  Will you please state and spell your full name for the record.

THE WITNESS:  L-I-N-D-S-A-Y, Marie, M-A-R-I-E, Buzak, B-U-Z-A-K.

THE REPORTER:  Will you



Lindsay M. Buzak

were there some days that you would not get cases?

A.    There were probably days where I didn't get them, and then maybe the next day, I would get, like, five.  But I don't think I would get more than, like, five a day.  So it could be anywhere between zero and five.

Q.    So the average is two to three, I guess, a day?  Would it be accurate to say you got about 10 to 15 cases per week?

A.    Yeah.

Q.    Was that caseload consistent throughout your time as a desk investigator?

A.    I would say so, yes.

Q.    All right.  In other words, there wasn't a drastic increase of case assignments for any one specific time period, that you can recall?

A.    Not that I can recall.

Q.    You mentioned going on a "PIP."
What's a "PIP"?

A.    Personal -- I forget what the "I" stands for.  It's -- it was, essentially, like, being watched because I was in trouble



Lindsay M. Buzak

that you worked, off the clock, each week?

A.    About five hours a week.

Q.    So five hours a week, off the clock, that you worked each week, and didn't record in the Workday timekeeping system?

A.    Yeah, give or take, maybe two, but closer to five, I would say, my best guess.

Q.    Between three and five hours a week?

A.    Yeah.

Q.    All right.  Are you contending that you worked that three to five hours a week, on average, off the clock, while you worked on the Social Media Team?

A.    No.

Q.    Are you contending that you worked three to five hours, off the clock, each week, when you first began working as a desk investigator?

A.    Not when -- at -- when I was a desk investigator, yes.  But not -- not immediately when I was a desk investigator. Because I still wasn't sure what I was doing.

Q.    So when did you first begin



Lindsay M. Buzak

working, off the clock, to the best of your recollection?

A.    Best of my recollection, it would also be end of 2020.  Most likely, it would have been once I got the desktop computer, because with my laptop, I wouldn't have been able to.  I could barely work during the day. I wouldn't have been doing extra work because it wasn't working.  So whenever I got the desktop.  So I worked overtime to, you know, try to catch up.

Q.    When you say, "try to catch up," are you talking about trying to catch up from falling behind due to, you know, your laptop and the other issues?

A.    Correct.

Q.    Okay.  When did your employment with Geico end?

A.    September 2021.

Q.    So, essentially, if I am understanding correctly, correct me if I am wrong, you're asserting that, approximately, the end of 2020, through September of 2021, you were working three to five hours, off the



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
58

Lindsay M. Buzak

clock, each week?

A.    Yes, but probably not every single week.

Q.    Okay.  So we will look, but there were periods of time -- I think there's a period of time where you were on short-therm disability, right?

A.    Correct.

Q.    During that period of time, you performed no work for Geico, right?

A.    Correct.

Q.    So you're not contending that you worked off the clock during that period of time?

A.    Correct, I did not.

Q.    Okay.  Now, similarly, and we will see some records, there are multiple workweeks in which you put in, you know, various hours of sick time, for example, right?

A.    Okay, yes.

Q.    Were there workweeks where you entered in sick times that you are contending that you also worked off the clock?



Lindsay M. Buzak

contending that you worked off the clock?

A.    Correct.

Q.    It's only shifts in which you were working from home?

A.    Correct.

Q.    Okay.  Your supervisors never knew that you were working time and not recording it in your Workday, correct?

MR. MCALLISTER:  Objection.

You can answer.

THE WITNESS:  I am not sure.

BY MR. TSONIS:

Q.    You never informed your supervisors that you were working, but not recording certain time in the Workday, right?

A.    No.

Q.    "No," that's not right or "no," you didn't inform them?

A.    No, I did not inform them.

Q.    Okay.  Do you have any facts on which you claim that either Eric or Kelly, your two supervisors, knew that you were working off the clock?

A.    No.  The only thing that is -- that



Lindsay M. Buzak

Why do you believe that Kelly knew that you did not document that time on Workday, at some point?

A.   I guess, I don't know if -- whether or not she knows if I documented it or not. But...

Q.   So I apologize.  I didn't mean to cut you off.

A.   No, that's okay.  I am just going off an old text message that I found of me telling a friend that I -- that she caught me, like, working overtime.  I don't know exactly what she -- what she would have known or didn't know.

Q.   So we said that the normal scheduled workday results in, kind of, an entry of 7.75 hours of a workday, right?

A.   Yeah.

Q.   There are various times in which you recorded more than 7.75 hours in a workday, right?

A.   Possibly, yeah.

Q.   We can look at the time record, if you want.  Would it surprise --



Lindsay M. Buzak

A.   Then, yes.

Q.   Would it surprise you if you recorded 9.75 hours in Workday, regularly?

A.   "Regularly"?  That probably would surprise me.  But I am sure I did do more than 7.75 sometimes, yes.

Q.   Is it possible that Kelly discovered that you were working, you know, later into an evening, after the end of your scheduled shift, only?

A.   As being paid for it, like being as, like, being clocked in?

I'm sorry, I don't think I understand the question.

Q.   Right.  Did Kelly ever instruct you not to enter -- with respect to this one incident you are talking about, did Kelly ever instruct you not to enter the time in Workday?

A.   No.

Q.   You understood, as a Geico associate, that Geico maintains a timekeeping policy that requires all associates to accurately enter all hours worked, right?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Lindsay M. Buzak

A.    Yes.

Q.    Okay.  Geico's policy -- timekeeping policies forbids associates from working off the clock, right?

A.    Yes.

Q.    And you were aware of those policies while working at SIU?

A.    Yes.

Q.    In fact, as a Geico associate, you would have received copies of those policies in the form of Geico's Associate Handbook, right?

A.    Yes.

Q.    At the time you were hired by Geico, in fact, you had to acknowledge that you read and understood the policies and procedures contained in the associate handbook, while you were reviewing the Geico policies?

A.    Yes.

Q.    In fact, as part of Geico's normal practices, it requires associates to certify, on an annual basis, that they had read and understood and acknowledged Geico's policies



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
69

                    Lindsay M. Buzak

in timekeeping, correct?

        A.    Yes.   I believe so.

        Q.    And you, in fact, did acknowledge,

annually, that you read, understood, and

would comply with Geico's policies, including

its timekeeping policies?

        A.    I am sure I did, yeah.

                    THE REPORTER:   Can we take a

        short break?

                    MR. TSONIS:   Sure.

                    (Whereupon, a recess was

        taken at this time.)

                    MR. TSONIS:   Before we

        begin, again, I guess on the

        record, Jarron, do you know if the

        text messages that the deponent has

        been referencing have been produced

        to Defendants?

                    MR. MCALLISTER:   We have

        produced some text messages, I know

        that, but I don't recall exact

        which ones.   But I can check, after

        the deposition, or in between other

        breaks, and let you know.



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
81

Lindsay M. Buzak

When would you -- when are you alleging that you worked off the clock?

A.    At the end of my scheduled shift.

Q.    Okay.  When you would work weeks in which you are alleging you worked off the clock, would that off-the-clock work be concentrated in one day, or would you do it multiple days a week?

A.    It varied, but, like, maybe once or twice a week, I would work late, past, you know, my scheduled time.

Q.    So, typically, I guess, it might be, you know, one or two shifts a week in which you were working, you know, one or two, or maybe three hours?

A.    Yes.

Q.    Sorry.  After the end of your scheduled shift?

A.    Correct.

Q.    Okay.  What kind of activities would you be doing during that time period, when you are alleging that you were working off the clock?

A.    I don't remember, exactly, what I



Lindsay M. Buzak

was doing, but prepping for the next day.  I believe we had, like, an Excel spreadsheet for tracking.  So organizing that.  I tried to stay away from things with a timestamp.  So I would stay away from e-mails and maybe would run background checks.  Prep -- getting things prepared to do recorded interviews for, you know, the next day, but I wouldn't, you know, call anybody.  That's the best I can remember.

Q.   When you say, "try to avoid things with timestamps," am I correct in saying you would avoid engaging in work that would create a timestamp record of you actually working?

A.   Correct.

Q.   So sending an e-mail, for example, creates a timestamp?

A.   Correct.

Q.   Making an entry into SCI-COM, creates a timestamp?

A.   I believe it did.  I assume it probably did, yeah.

Q.   So you would try to avoid doing



Lindsay M. Buzak

those types of things so your off-the-clock work wouldn't be discovered, right?

A.    Yes.

Q.    Okay.  And if I am understanding correctly, one of the things you would do is, prepare for a recorded interview the following day?

A.    Yes.

Q.    And is that preparation, kind of, like, looking through the claim file, familiarizing yourself with the facts of the case?

A.    Yes.

Q.    You mentioned an Excel spreadsheet that would be used for tracking; what is that?

A.    I think -- I don't remember completely.  I think that there was maybe, like, an -- and I could be wrong, but I think that there was, like, a share point document that you could, you know, track what claims were assigned to who.  I only just remembered about it while we were talking, so I don't -- I think that's how we, you know, tracked



Lindsay M. Buzak

can, sort of, perform your work, in the manner that you performed your work, right?

Including direction regarding varying or flexing your time.

Do you see that?

A.    Yeah, yes.  On page 5, right?

Q.    Yes.

A.    Yes.  Sorry.  Yes.

Q.    That's okay.  And then your response -- and if you go to the top of the page 6 --

A.    Yes.

Q.    -- do you see that -- the sentence there, the last sentence says, "Plaintiff recalls receiving instructions about working a set schedule each week and instructions about getting pre-approval to flex work time"?  Do you see that?

A.    Yes.

Q.    So when we -- so when you use "flex," in this context, what does "flexing" your time mean?

A.    So if I started late, for example, if I was an hour late to work, then I would



Lindsay M. Buzak

make it up at the end of the day, work an extra hour.  Or if I had a doctor's appointment one day, and I was going to be, you know, four hours late, I could then make it up, maybe two hours that day, two hours another day, as long as it was, I believe, within the, like, pay period.  We can make up missed time.

Q.   And when you wanted to flex your time, let's say for personal reasons, like you were saying, is that something that you had the ability to do on your own?

A.   I would need -- I could do it, but I would get approval for it first.  I believe.

Q.   All right, I guess that was my question.  Did you need to have that approved in advance, or was it just something that you could notify your supervisor and let them know?

A.   From what I remember, I would need to notify Kelly, or Eric, ahead of time, to get approval before doing it.  I couldn't just, like, show up late and not notify



Case 2:23-cv-02848-SJB-SIL    Document 173-27    Filed 04/24/26    Page 21 of 24
PageID #: 11700

LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
108

Lindsay M. Buzak

A.    I believe so, yeah.

Q.    And in Geico's rating scale, is "3" a "satisfactory score"?

A.    I guess so.  I mean, the goals always 5 or 4.  Three would be "you need improvement."

Q.    I guess under Geico's rating scale, is a rating of 3, "meets expectations"?

A.    I think so, yes.

Q.    Okay.  To your point, a "4" or "5" is "exceeding expectations"?

A.    Yeah, the goal was always 5s.

Q.    When you say, "the goal was always 5s," what do you mean?

A.    It was -- in order to, you know, get promoted or move to different positions, the higher your rating was, the better.  So your -- our goal was always to get as close to 5 as possible, so that we had the opportunity to -- to move around or get promoted.

Q.    But you would agree, there are some people that worked for Geico, that may have no interest in being promoted from their



Lindsay M. Buzak

current position?

A.   Yes.

Q.   Right.   So if a desk investigator's happy doing what they are doing, they might very well not be looking to be a 5, for promotion purposes, right?

MR. MCALLISTER:   Objection, but you can answer.

THE WITNESS:   Yes, I am sure there were employees -- there were employees who were okay not getting promoted and they would have been okay at a 3.

BY MR. TSONIS:

Q.   Okay.   And your -- to be eligible for merit increases, you would need to be rated, at least, a 3, in Geico's system, right?

A.   I think so.   To the best of my recollection, yes.

Q.   Do you have a recollection as to what your ratings were, while you worked for SIU?

A.   I do not.



Case 2:23-cv-02848-SJB-SIL    Document 173-27    Filed 04/24/26    Page 23 of 24
PageID #: 11702

Lindsay M. Buzak

MR. MCALLISTER:  I don't have any further questions.

But with respect to the text messages, if Geico could point us to which discovery requests they think that those text messages might be responsive to, we can produce -- we can get back to you on whether or not we think they are responsive and then produce.

MR. TSONIS:  Okay.  That works.

Thank you, Ms. Buzak.

THE WITNESS:  Thank you.

-oOo-

(Whereupon, the examination of LINDSAY M. BUZAK was adjourned at 8:26 p.m.)


LINDSAY M. BUZAK


Subscribed and sworn to before me this     day of             , 2026.


NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK      )
                                        : ss.
COUNTY OF NEW YORK     )

I, AYDIL M. TORRES, a Notary Public within and for the State of New York, do hereby certify:

That LINDSAY M. BUZAK, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of January, 2026.



AYDIL M. TORRES