# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------x

KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, Individually and on
behalf of all others similarly
situated,

                         Plaintiffs,

        -against-                      Case No.
                                       2:23 Civ. 2848
GOVERNMENT EMPLOYEES INSURANCE         (GRB)(ARL)
COMPANY d/b/a GEICO,

                         Defendant.

---------------------------------------x

                    August 28, 2024
                    10:06 a.m.


***This Transcript Contains a Confidential Section***


        Videotaped Deposition of KEITH FISCHER,

taken by Defendant, pursuant to Notice and Agreement,

held at 1540 Broadway, New York, New York, before

Joseph R. Danyo, a Shorthand Reporter and Notary

Public within and for the State of New York.



A P P E A R A N C E S :

       OUTTEN & GOLDEN LLP
       Attorneys for Plaintiffs
            1225 New York Avenue, N.W.
            Suite 1200B
            Washington, D.C. 20005

       By:   ZARKA SHABIR DSOUZA, ESQ.
             HANNAH COLE-CHU, ESQ.


       DUANE MORRIS LLP
       Attorneys for Defendant
            190 South LaSalle Street
            Suite 3700
            Chicago, Illinois 60603

       By:   TIFFANY ALBERTY, ESQ.



Also Present:

       ADRIENNE CHEMMEL, Videographer

                  ~oOo~



Fischer

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  The time is 10:06 a.m. on August 28, 2024.  This begins the video deposition of Keith Fischer taken in the matter of Keith Fischer versus Government Employees Insurance Company filed in the United States District Court for the Eastern District of New York, the case number of which is 2:23 Civ. 2848(GRB)(ARL).

My name is Adrienne Chemmel.  I am your videographer today.  The court reporter is Joe Danyo.  We are representing Esquire Deposition Solutions.

Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in.

MS. DSOUZA:  Zarka Shabir Dsouza from Outten & Golden for the Plaintiffs.

MS. ALBERTY:  Tiffany Alberty of Duane Morris on behalf of the Defendant GEICO.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness, and



KEITH FISCHER  Confidential                              August 28, 2024
Keith Fischer, et al. vs GEICO                                        4

                        Fischer

then, Counsel, you may proceed.

K E I T H    F I S C H E R, having been first
duly sworn by Joseph R. Danyo, a Notary Public,
was called as a witness and testified as follows:       10:08
EXAMINATION BY MS. ALBERTY:

        Q.   Can you please state and spell your
first and last name.

        A.   Keith, K-e-i-t-h, Fischer,
F-i-s-c-h-e-r.                                           10:08

            MS. ALBERTY:  Let the record reflect
        that this is the discovery deposition of
        Mr. Keith Fischer taken pursuant to notice
        and by agreement of the parties.  Today's
        deposition will be taken in accordance          10:08
        with all applicable rules.

        Q.   Mr. Fischer, I know I introduced
myself off the record, and I just stated my name
for the record, but I'm Tiffany Alberty.  I'm
counsel for GEICO, the Defendant in this case.          10:08

            I'm going to be asking you a series
of questions about your background, your
experience at GEICO.  Before we get started, have
you been deposed before?

        A.   Deposed, I mean as far as grand jury,      10:09



Fischer

wouldn't have to do.  It usually came at the request of my supervisor Jerry Cassagne.

Q.   What were the duties and responsibilities for a level 65?

10:43

A.   To handle cases given to us by the inside staff, anything from bodily injuries to theft claims to social media to visiting attorneys with pictures and letters requesting that they drop cases.  They were called operation

10:44

challenges.  Typing.  Every day doing face-to-face interviews, coordinating with the National Insurance Crime Bureau, police personnel.  I also had a significant arson contingent of investigators that I had to deal

10:44

with because I dealt with thefts and fires as far as GEICO was concerned.  I have an arson background.

Q.   With?

A.   The Levittown Fire Department.

10:44

Q.   With the duties that you just outlined as a level 65, would a level 66 have to take on those duties in conjunction then with the training that you previously spoke about?

A.   Yes.

10:45



                    Fischer

accidents to assist with that department?

          MS. DSOUZA:  Objection.

     Q.    You can answer.

     A.    Did they have to take those claims
on?                                                      10:50

     Q.    Yes.

     A.    Is that what you're asking?

     Q.    To your knowledge.

     A.    Yes.                                          10:50

     Q.    I think from your testimony, as I
understand it, you did not work in the office.
Is that right?

     A.    That's right.

     Q.    Did you ever have an inside role?            10:50

          MS. DSOUZA:  Objection.

     A.    No.

     Q.    In your position from 2016 until your
retirement, did you have a set schedule, meaning
I worked Monday through Friday 9 to 5?                   10:50

     A.    No.

     Q.    Did you have flex time?

     A.    We were, I guess that's what it was
called.  Yes.  You could start and stop depending
on your schedule, depending on your examinations        10:50



Fischer

under oath or your investigations.  If you had to go out to Brooklyn, New York for an examination under oath and you had to leave at 5 o'clock in the morning to beat traffic to get there by 7 or 7:30, so obviously by the time you got home at 2 or 3 o'clock in the afternoon you would actually start your typing at 2 or 3 o'clock in the afternoon, but my day actually would start at 5 o'clock in the morning.

So, if that's what you mean, I wasn't assigned to my computer at any given time.  No.

Q.   Did anyone ever tell you how to flex your time, meaning you should be in the car from 5 to 7 and then do your examinations under oath in the morning versus being able to do it at night or at a convenient time for the person you're interviewing?

A.   No.

Q.   As an SIU investigator, were you able to make the determination of what each case needed in order to investigate for that specific theft-related incident?

A.   I was given procedures to follow as to what was necessary to be completed and

10:51
10:51
10:51
10:51
10:52



Fischer

A.   George McMannus was also in the staged/caused loss the last two or three years. So his caseload stopped at 20.  I mean it could have gone to 30, but for the most part they were cut off.

Q.   I apologize if you stated this before.  I just can't recall.  When cases were provided to you for individuals who went out on leave and we'll say a short leave, not a full FMLA 3 months or vacation, when they would return from either leave or vacation, would those cases that you oversaw go back to those individuals?

A.   Yes.

Q.   The cases that you handled versus the ones that George and Mark handled would have differed because you were assigned to theft and they were assigned to staged loss.  Is that right?

A.   Yes.  Can I just clarify that I said 20, and it could have been 24 or 26.  I don't remember the exact number, because I wasn't in the team, but it was somewhere in the 20s as far as the number of cases prior to them being cut off.



                         Fischer

unreasonable and not sustainable, that I could do that without any repercussions from GEICO.

Q.   Did you have communication with Bill Newport?                                            12:16

A.   Yes, once or twice a year, yes.

Q.   Did you ever report to Bill Newport that you felt in theory that Jerry had said get what you need to get done, and you took it as I don't have to log my hours?                             12:16

MS. DSOUZA:  Objection.

A.   Would you repeat that.  I'm sorry.

Q.   Sure.  Did you ever go to Bill Newport with your concerns that it was your interpretation of what Jerry said, which is you      12:16
got to get it done when you can get it done to imply you should not log your hours?

MS. DSOUZA:  Objection.

A.   I did have a conversation with Bill Newport at a meeting that didn't go very well          12:17
when I asked him in front of six or seven other investigators, my exact words were who is watching the store?  Do you know what's going out in the field, and do you know what we do each and every day as your investigators?                          12:17



Fischer

And that was in the presence of at least six or seven other investigators.

Q.   Did you say are you watching the store?

12:17

A.   I said who is watching -- my exact words were who's watching the store here?  He is the manager of the SIU.  There were two managers. I don't know the medical side.  I forget her name, but Bill was the property side, staged 12:17 loss.  He was the medical and PIP team, auto team.  He was responsible for the nonmedical investigators, and at a yearly meeting, which we usually, sometimes it was semiannually, sometimes it was annually, towards the end it became 12:18 annually, because the meetings got out of hand and so disgruntled from the investigators that I kind of led the meeting off by asking Bill, I said, who's watching the store here?  Do you know what we do?  Is anybody telling you what we do? 12:18 Do you read our reports?  Do you read the things that we do?  Do you look at our monthly reports? Do you look at our mileage reports?  Do you look at our reports to Jerry?  Do you look at our report cards? 12:18



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                              91

Fischer

We've brought numerous concerns to Jerry and Toni D'Agata and Dara at quarterly meetings, semiannual meetings, and they got less as time went on because they didn't want to hear our gripes I guess you could say, our complaints about the overtime that we were doing, and it just so happened that Bill was present in the beginning, but towards the end he refused to come.

Q.    When did this meeting occur?

A.    The last, I'm going to say '19, '20, '21.  They were very, very, not hostile.  They were very angry investigators that the amount of work that we were doing to get through each week and the stress and the unsustainable goals that we were given and the caseload, and all we wanted him was to reduce it, to review it for us.  Bill, please look at it and read what we do, just go through one examiner, through one investigator, and look at the steps that we have to do.

Everything is time-stamped at GEICO, so they know when I'm working on a weekend.  They know when I'm working at night, what time.  They know my keystrokes.  So they have that.



Fischer

I said, please, just take one of us and look at the amount of time that we are giving you to meet your criteria that you've set in front of every one of us, and we didn't want to do -- I mean after a while we kind of backed off, because it was, you know, it was falling on deaf ears is really what it was doing.

Q.    For this specific meeting that you're talking about where it was in front of six or eight investigators where you were asking him about the store, I'm just trying to again delineate when in time this meeting was?

A.    I'm going to say 2020.  I retired in 2020.  I'm mixing up the years.  I'm going to say 2019.

Q.    And who else was in attendance?

A.    It was a closed door meeting in his office.  John Gillane, George McMannus, Lou Pia. Did I say Mark?  Mark Giabalvo, George McMannus, Lou Pia, Kevin.  I forget Kevin's last name. John Gillane.  I believe Vito.  I know at least four of them were there.  There was definitely seven or eight, but those are the people that I remember.



Fischer

he said, you know, I had to follow, because not only were we friends, but we were co-workers.  I respected Jerry.

Q.   And circling back on the policy itself and taking what you've testified to which is you brought concerns to Jerry and to Bill, did you ever take your concerns to local HR?

A.   No.  We didn't do things like that. We just, whether it's my police background, my law enforcement background, being, you know, a fireman, you don't do that to your supervisors. You don't report them.  You just, you sit, and you take it.  That's just the way we did things. That's the way I was taught.  That's the way I was brought up.

Q.   Is it fair then to say you didn't go to corporate HR either to report these issues?

A.   When I finally went out, when I retired in 2020, Kiana Brown, I did it was like an exit statement, and being that I was 22, I was only 59 years old, I had planned on working another four years, she asked me, do you have any concerns, it was like an exit statement, my indication was that we're working so much


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Fischer

overtime and there's so much stress on the job that it is making me retire because I felt I was going to get sick.  I retired four years early. I wanted to work until I was 62 or 63.

Q.    Do you know if they opened any type of investigation when you reported this to Kiana?

A.    I don't know what she took down.  She asked me to give an exit statement which I did. My feelings, I didn't have any grudges against the company or the people I worked with.  My grudges were the overtime and the amount of stress and overtime that I had to work to get through each and every work week 46 to 47 weeks a year other than my vacation.

I know that I told Kiana Brown, you know, that was my exit statement.  It was pretty lengthy.  It was probably two or three minutes long as to why I was leaving.

Q.    Why didn't you report -- strike that. Do you agree that you were required to report to HR during your tenure if your managers were telling you to work overtime, but not log your hours?

A.    Was I required?  It's in the policy.



Fischer

So theft then would have its own specific metrics?

A.   Yes.

Q.   Did staged loss have its own specific metrics?                                                    02:49

A.   Yes.

Q.   Did med fraud have its own specific criteria?

A.   I don't remember.                           02:49

Q.   Did body shop have its own specific criteria?

A.   I don't know if the body case existed in 2020.  That was kind of phased out.

Q.   Do you know if PIP had its own              02:49 special criteria along with jump-in claims, because you said it falls under the same?

A.   Yeah.  Those were rated different too.

Q.   Do you know if arson had different          02:50 metrics?

A.   That was all handled under theft.

Q.   Do you know if social media had its own criteria?

A.   I don't believe so.                         02:50



Fischer

overtime, and you will get paid for it, correct?

MS. DSOUZA:  Objection.

A.    Correct.

Q.    It also states that you have to document your overtime hours and be able to verify why it was needed, and you see that, correct?                                          04:34

A.    Yes.

Q.    So you understood that your responsibility was to document your overtime and verify why you needed the overtime, correct?                                          04:35

MS. DSOUZA:  Objection.

A.    Yes.  This was the policy, but it was not the practice of GEICO.                                          04:35

Q.    This is a direct e-mail, an explicit e-mail from your supervisor Jerry in November 2016?

A.    Yes.

Q.    Did you ever respond to this e-mail?                                          04:35

A.    I don't recall, but I did try to submit overtime, and I was turned down, and I gave up after about two to three months.

Q.    But do you remember in time when you requested overtime?                                          04:35



Fischer

A.    It was shortly after this I believe back at the start of January that I tried for several times, but I was shot down only because it didn't meet the criteria, or the allocation of overtime wouldn't go to what I used it for.

So, although I had windshield hours some days of going from Levittown, New York to Brooklyn is 35 miles, and you leave at 5 in the morning, and you get there at 7.  You sleep in your car or you review your file until 9 until when you walk down the block, you do that so you don't have to fight traffic, or you're trying to get there reasonably on time like today.

Instead of taking three or four hours, I would do it in two hours by leaving at 5, review my case, you know, maybe take a nap prior to walking down to the EUO and then going down to the EUO, getting back in my car at 2 o'clock, driving home in another two hours of traffic, I already spent 11 hours, and that was not part of the overtime.  That did not fit the criteria of putting in for overtime.  It had to be -- windshield time didn't count.  Typing on weekends didn't count.

04:36

04:36

04:36

04:36

04:37



                         Fischer

          MS. ALBERTY:  Objection.

     A.   Yes.

          MS. DSOUZA:  I think that is it.

          MS. ALBERTY:  I don't have any                           05:33

     further questions.  Thank you.

          MS. DSOUZA:  Thank you.

          THE VIDEOGRAPHER:  This marks the end

     of the deposition.  We are going off the

     record at 5:33 p.m.                                           05:34

          (Time noted:  5:33 p.m.)

                                   _____

     Subscribed and sworn to

     before me this____day of_____, 2024.

     _____



C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of September, 2024.

_____
JOSEPH R. DANYO

STATE OF NEW YORK

My Commission Expires 2/20/2027

