# EXHIBIT 26

Case 2:23-cv-02848-SJB-SIL    Document 173-29    Filed 04/24/26    Page 2 of 18 PageID #: 11725

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS       ) Case No.:

BARDEN, CONSTANCE MANGAN, and        ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                                )

                    Plaintiffs,          )

    - v -                                )

GOVERNMENT EMPLOYEES INSURANCE     )

COMPANY d/b/a GEICO,                     )

                    Defendant.          )

- - - - - - - - - - - - - - - - - - - )

VIDEOTAPED DEPOSITION OF CONSTANCE MANGAN

Reported by:

Kim M. Brantley

Job No: J11541509



CONSTANCE MANGAN

Thursday, August 9, 2024

Time: 9:35 a.m.

Videotaped deposition of CONSTANCE MANGAN, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.


APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

1225 New York Avenue NW - Suite 1200B

Washington, DC, 20007

(202) 847-4400

Email: hcolechu@outtengolden.com

BY:  HANNAH COLE-CHU, ESQUIRE



CONSTANCE MANGAN

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

        DUANE MORRIS, LLP

        190 South LaSalle Street - Suite 3700

        Chicago, Illinois 60603

        (312) 499-0198

        Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE


Also On behalf of the Defendant GEICO:

        DUANE MORRIS, LLP

        1540 Broadway - 14th Floor

        New York, New York 10036

        (212) 471-1856

        Email:  gsslotnick@duanemorris.com

        BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)


ALSO PRESENT:

        SILVIO FACCHIN, Legal Video Specialist

        Esquire Deposition Solutions



CONSTANCE MANGAN

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  This is the media labeled number one in the video recorded deposition of Constance Mangan in the matter of Keith Fischer, et al., versus Government Employee Insurance Company, doing business as GEICO.

This deposition is being taken in New York City, New York, on August 9th, 2024.  My name is Silvio Facchin.  I am a certified legal video specialist; the court reporter is Kim Brantley, and we are both representing Esquire Deposition Solutions.

We are now going on the record.  The time is 9:35 a.m.

Counsel will state their appearances for the record.

MS. COLE-CHU:  Hannah Cole-Chu for the plaintiffs and the witness, Connie Mangan.

MS. ALBERTY:  Tiffany Alberty and Gregory Slotnick on behalf of the defendants, GEICO.

THE LEGAL VIDEO SPECIALIST:  And will the court reporter please swear in the witness.



CONSTANCE MANGAN

Whereupon,

CONSTANCE MANGAN

called as a witness by counsel for Defendant, and after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. ALBERTY:

Q.    Can you please state your name and spell it for the court reporter?

A.    Sure.  Constance Mangan, C-o-n-s-t-a-n-c-e, last name Mangan, M-a-n-g-a-n.

MS. ALBERTY:  Let the record reflect that this is the discovery deposition of Constance Mangan taken pursuant to notice and by agreement of the parties.  Today's deposition will be taken in accordance with all applicable rules.

Excuse me.  It's an early morning.

THE WITNESS:  That's a tough one.

BY MS. ALBERTY:

Q.    I know I previously introduced myself on the record and then before we began, but my name's Tiffany Alberty.  I'm counsel for GEICO. Today I'm going to be asking you a series of questions about your experience at GEICO.



CONSTANCE MANGAN

might say, "Come on in," and they show you their equipment, and you meet some of the doctors and the personnel.

So you might in your mind say, well this will probably be about an hour or two hours, but you could also have a four- or five- or six-hour day.

BY MS. ALBERTY:

Q.   Were -- were your hours varied?

A.   No.

Q.   What were your hours you worked?

A.   My hours were consistently beginning between 7:00 a.m. and 9:00 a.m. -- So it varied only in that very limited sense -- and then finishing anywhere between say 3:00 to 5:00.

Those were the scheduled hours, not the actual hours that I worked.

Q.   Were you -- strike that.

Who was your supervisor?  And again I want to focus between the 2016 to 20/2010 (sic) time frame.

A.   Okay, I'm going to go backwards, because that would be easier.  Brian Portnoy was the supervisor I had when I retired.  I don't know



CONSTANCE MANGAN

BY MS. ALBERTY:

Q.    When you submitted your overtime hours, were you paid for that overtime?

A.    To the best of my recollection I was paid for the overtime I submitted, yes.

Q.    Okay, number twelve of your declaration, which is going to be page three and four, states "The process for requesting overtime approval was onerous and deterred me from reporting overtime I worked."

A.    I see that.

Q.    In -- in what way do you mean that it was "onerous"?

A.    To me it felt onerous due to the fact that I had to contact my supervisor; I had to request permission to submit for overtime; I had to cite a specific case or cases that I would require the overtime for, and then I had to specify the number of hours I anticipated needing to complete that task on that day that would require overtime.

Now, if I underestimated, I was not permitted to correct it.  So if I said, "I'm going to need two more hours" because, I'm guessing, it



CONSTANCE MANGAN

had already requested, I didn't feel confident that it would be approved, and I also did not really want to have to go through another process of submitting a request for an approval and specifying a case for another hour of overtime, especially when my -- my supervisors were saying we shouldn't be doing it.

Q.   What do you mean -- excuse me, what do you mean that you felt your overtime requests were discouraged?

A.   Because our -- as I have stated and I would tell my supervisors, there is no way I can complete my investigations, my reports, within the time frame of 7.75 hours a day; that in order to complete my work I had to work in excess of those hours on a regular basis.

And the response that I received from my supervisors -- and that would be all of the supervisors that I have named so far -- was that Don't do overtime.  Work 38.75; work 7.75."

My response would be, "But I have to, because it affects my performance evaluation.  It affects my case rating.  There's no way that I can do -- finish these cases if I don't work more than



                        CONSTANCE MANGAN

my normally scheduled hours."

            And they would say, "We understand, but
there's nothing we can do about it."

      Q.    But you had the ability, though, to
still request overtime?

      A.    The problem to my understanding with
requesting overtime was that affected my ability
to -- not my ability, I apologize.  It affected my
qualification to be assigned more cases.  So,
while I was already feeling extremely
overwhelmed -- I can recall having this
conversation with Toni D'Agata especially, not on
a particular date, but I can remember having this
conversation with her, that -- and I -- I believe
Dara as well -- that if you submitted say in a
week that you worked fifty hours, that would then
trigger the assignment of more cases to you,
because you are now available on more hours.

            So, I'm doing the overtime to complete
the cases I already have -- and I'm failing to do
that a lot of the time -- and now if I submit all
of my actual overtime hours, all of the hours that
I was working, say fifty hours, that would then
trigger the assignment of additional cases adding



CONSTANCE MANGAN

to my caseload.  And the supervisors didn't want us to do that.  They knew he had an unmanageable and unreasonable caseload, and they constantly told me and -- and everybody -- not everybody, but most the people that I spoke with and worked with that I knew and had conversations with, that we were limited to a 7.75-hour day, in spite of the fact that we were all complaining and all saying that we're all working way past that.

There was -- just seemed to be no avenue to satisfy that problem.

Q.   With regard to supervisors saying "Don't do overtime" -- I think that's what the phrase you had stated --

A.   Yeah.

Q.   Was that ever in any type of GEICO policy?

MS. COLE-CHU:  Objection to form.

THE WITNESS:  My recollection of those conversations were specifically telephone conversations, in-person conversations, predominantly.

BY MS. ALBERTY:

Q.   Do you ever recall seeing that in an



CONSTANCE MANGAN

would know when we were on SICM, that they were able to tell from their computer, if we were.

Q.   You stated that you would enter your time every day, but in the same breath you're saying, "I didn't actually enter my time that exceeded 7.75."

So did you have a time reporting system that you personally kept that said, "I worked this day, these hours"?

A.   Oh, I see what you're asking, okay. Like difficult a diary or something along those lines?

(Ms. Alberty nods head in the affirmative.)

A.   No.

Q.   So you wouldn't have recorded your time anywhere other than in GEICO's timekeeping program, right?

A.   For actual hours worked.

And sometimes -- I just though of this. Sometimes I would be exchanging an email with a supervisor at 8:00 o'clock at night.  So I would have submitted my hours for the day of 7:00 to 4:00, and then still be having an email



                    CONSTANCE MANGAN

conversation with a supervisor past those hours.

        So that was -- that was another way

that they would know that I was still working,

because they were still working.

        Q.    And it's your testimony that you

weren't provided flex time, and you were supposed

to be working from that 7:00 a.m./9:00 a.m. to

3:00 p.m./9:00 -- 5:00 p.m., correct?

        A.    Right, yes.

        Q.    Is it fair to say that you can't

specifically itemize every week in which you

allegedly exceeded forty hours a week?

            MS. COLE-CHU:  Objection to form.

            THE WITNESS:  Just if you could clarify

    what you mean by "itemize."

BY MS. ALBERTY:

        Q.    Sure.  So say, "May 22nd through May

27th I worked fifty-five hours that week."

        A.    That's difficult to do, a specific week

like that.

        I know when I made -- when, you know,

these were signed in November.  I remember when I

made my declaration sometime last fall, we tried

to nail down a week, which was a little easier at



CONSTANCE MANGAN

A F T E R N O O N    S E S S I O N

(Whereupon at 1:17 p.m. the videotaped deposition of Constance Mangan resumed, and she further testified as follows.)

THE LEGAL VIDEO SPECIALIST:  We are back on the record.  The time is 1:17 p.m.  This is the beginning of the media labeled number four.

BY MS. ALBERTY:

Q.   All right, so before we took a break we were looking at your declaration, and specifically we were looking at page three, number ten.

In regard to your statement that you worked about fifty to sixty hours a week on average during this time period, did you specifically tell anyone that you were working fifty to sixty hours a week and not putting in the overtime hours?

A.   I definitely had that discussion with other SIU investigators that I was working approximately those many hours per week, and of course I was complaining to my supervisors about working excessive hours.  And I would say sometimes, "I'm working 'till 8:00 o'clock at night," or "I'm working 'till 9:00 o'clock at



800.211.DEPO (3376)
EsquireSolutions.com

CONSTANCE MANGAN

night," "I'm working 'till 7:30 at night."

So in essence, yes, we did have those conversations.

Q.   So as to -- and specifically more "I'm working fifty to sixty hours a week on average, but I'm not putting in the overtime hours for then that" -- we'll say "ten to twenty OT."

Did you tell anyone that?

A.   Well, everyone knew it.  We all -- we all had the same conversation.  Nobody was putting in for it.  Or very few people were putting in for it.  Or people were putting in for it in different amounts or degrees.  So it was sort of a known thing.

Q.   So again my question is different, which is did you tell anyone that "I'm working fifty to sixty hours over, and I'm not putting in the overtime"?

A.   Like during the course of our conversations?

Q.   Yes.

A.   Is that what you're asking?  Yes, absolutely.

Q.   Okay, and who did you tell?



CONSTANCE MANGAN

records of my schedule.

BY MS. ALBERTY:

Q.   To paragraph fifty-five, from December of 2016 to March 2020 GEICO assigned Mangan work that required her to spend extensive but highly variable hours both at home and in the field to investigate cases assigned to her.

"In full work weeks, i.e. weeks in which Mangan worked at least five days without loss to a holiday or other time off, these assignments required her to work, approximately fifty to sixty hours per week.

"Specifically Plaintiff Mangan recalls working between approximately between forty-five and fifty hours in the week of September 23rd, 2019."

I believe we fleshed this out.  I just want to double check.

The type of work that you did during December of 2016 to March of 2020 were med fraud claims, right?

A.   That is right.

Q.   How if at all did that differ -- strike that.



CONSTANCE MANGAN

THE LEGAL VIDEO SPECIALIST:  We are now going off the record.  The time is 4:00 p.m. This is the end of the media labeled number five, concluding this video recorded deposition.

(Whereupon at 4:00 p.m. the videotaped deposition of Constance Mangan concluded.)



CONSTANCE MANGAN

C E R T I F I C A T E

STATE OF NEW YORK      )

                        : Ss.

COUNTY OF NEW YORK    )

                I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

                That CONSTANCE MANGAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

                I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

                IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of August, 2024.

*Kim M. Brantley*
_____

Kim M. Brantley

My Commission expires May 31, 2026.

