# EXHIBIT 27

Case 2:23-cv-02848-SJB-SIL    Document 173-30    Filed 04/24/26    Page 2 of 38 PageID #: 11743

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,

       Plaintiffs,

                            Case No.:
                            2:23 Civ. 2848
                            (GRB) (ARL)

       -against-

GOVERNMENT EMPLOYEES INSURANCE COMPANY D/B/A GEICO,

       Defendants.

----------------------------------------X


DEPOSITION of MARGARET A. FISCHER


     December 19, 2024


     New York, New York


Reported By:

Marina Dubson

Job #: J12144278


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

DATE: December 19, 2024

TIME: 10:00 a.m.

DEPOSITION of MARGARET A. FISCHER, an opt-in Plaintiff herein, taken by the Defendant, pursuant to Federal Rules of Civil Procedure, and Notice, held at the Duane Morris LLP, 1540 Broadway, 14th Floor, New York, New York 10036, at the above-mentioned date and time, before MARINA DUBSON, a Notary Public of the State of New York.



APPEARANCES:


OUTTEN & GOLDEN, LLP
Attorney for Plaintiffs
685 Third Avenue, 25th Floor,
New York, New York 10017
(212) 245-1000
BY: SABINE JEAN, ESQ.
    Sjean@outtengolden.com

    ZARKA DSOUZA, ESQ.
    Zdesouza@outtengolden.com



DUANE MORRIS, LLP
Attorney for Defendant
1540 Broadway, 14th Floor,
New York, New York 10036
(212)471-1856
BY: GREG TSONIS, ESQ.
Gtsonis@duanemorris.com



Gil Peretz, Shereck Video, videographer,



IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties, as follows:

THAT all objections, except as to the form of the questions, shall be reserved to the time of the trial;

THAT the within examination may be signed and sworn to before any Notary Public with the same force and effect as if signed and sworn to before the Court;

THAT filing of the original transcript of the examination is waived.



800.211.DEPO (3376)
EsquireSolutions.com

M. A. Fischer

THE REPORTER:  Are you ordering a copy of this transcript?

MS. JEAN:  Yes, copy.

MR. TSONIS:  Regular turnaround final, no rough.

XXXX

THE VIDEOGRAPHER:  Good morning.  We are on the record, and the time now is 10:12 a.m.

Today's date is December 19, 2024.

This is media one in the video deposition of Ms. Margaret Fischer -- one second -- Margaret Fischer, in the matter of Government Employee Insurance Company -- I'm sorry.

In the matter of Keith Fischer versus Government Employee Insurance Company, index number 2:23 Civ. 2848 (GRB) (ARL).

My name is Gil Peretz.  I am the legal videographer with Shereck Video in association with Esquire.

Today we're at the offices of



M. A. Fischer

Duane Morris, LLC, located at 1540 Broadway on the 14th floor in New York City, New York.

Would counsel please identify yourself and state whom they represent.

MS. DSOUZA:  This is Zarka Dsouza from Outten & Golden on behalf of plaintiffs.

Joining me today is my colleague, Sabine Jean, also from Outten & Golden, also representing the plaintiffs.

MR. TSONIS:  Gregory Tsonis from Duane Morris, LLC, on behalf of defendant Geico.

THE VIDEOGRAPHER:  Thank you.

The court reporter with us today is Marina Dubson with Esquire.

Will the court reporter please swear in the witness.

(Whereupon, the witness was sworn in by the Court Reporter.)

XXXX



M. A. Fischer

office, correct?

A.    Yes.

Q.    With the exception of a period of time post COVID where employees worked from home?

A.    Yes.

Q.    Okay.  When you transitioned back from working home to the office, were you five days a week in the office?

A.    I did not return to the office. I retired.

Q.    You retired.

And you never actually went back to the office at that point?

A.    Correct.

Q.    Understood.  Prior to that point -- well, strike that.

What was your job title at Geico before you retired?

A.    Inside medical investigator.

Q.    Okay.  Did that job title change at some point?  Were you something else, and you became an inside medical investigator?



                    M. A. Fischer

        A.    It was a -- I believe the
titles did change.  It was just medical
investigator.

        Q.    Were you ever something known
as, like, a major case investigator?

        A.    Well, that's the same thing.
It was always a major case investigator.

        Q.    Okay.  It was major case
because all the medical investigations
qualify as major case investigations; is
that right?

            MS. DSOUZA:  Objection.

        A.    No.
BY MR. TSONIS:

        Q.    Back up for a second.

            What's the difference, I guess,
between a field or desk investigator and a
medical -- inside medical investigator?

        A.    I can answer what I did.  I
can't tell you what other people's jobs
included.  But my job, I investigated
medical providers and facilities.

        Q.    Were there others that would
qualify as major case but didn't have the



M. A. Fischer

MS. DSOUZA:  I'd just like to -- Counsel, could you just wait for the witness to complete her answer before you ask the next question?

MR. TSONIS:  Sure.

BY MR. TSONIS:

Q.    I think you said that you would be assigned cases by your supervisor; is that right?

A.    Correct.

Q.    Approximately how many cases would you be assigned in a month?

A.    I believe four.

Q.    Four cases per month?

A.    I believe so.

Q.    All right.  And what kinds of things would you have to do to investigate those cases?

A.    I would have to run background searches.  I would have to run data searches, review billing, review public records, review previous cases through our case system.  I would assign clinic



                    M. A. Fischer

inspections and claimants' statements out

to the field.

        Q.    So, if field work was needed,

you would assign that to a field

investigator?

        A.    I would assign the case to a

spreadsheet, and the field investigator

would get it from that.

        Q.    Were there specific field

investigators that did, like, medical

investigations?

        A.    Yes.

        Q.    Okay.  Did those people report

to Kristin Slack?

            MS. DSOUZA:  Objection.

        A.    No.

BY MR. TSONIS:

        Q.    Did the people that you would

assign -- or the people that would

ultimately do that field work for your

cases, do you know if they would only

investigate medical claims?  Or is that

just part of what they would otherwise

normally investigate, individual claims?



M. A. Fischer

or things like that that you were talking about, where would you document those?

A.    In SICM, in the reflected case.

Q.    Okay.

A.    Yes.

Q.    I guess, do you have an understanding as to whether the way you documented cases in SICM differed or was the same than other investigators, either field or desk?

MS. DSOUZA:  Objection.

A.    I am not aware of how other investigators document.

BY MR. TSONIS:

Q.    All right.  Would you enter your, I guess, activities sort of in a separate line in SICM?  Or did they all go in the same entry and you would just update it?

A.    It would be in a note, a separate note for each activity.  There could be many on one day, and there could be one on a day.

Q.    There could be none on a day?



M. A. Fischer

A.    Yes.

Q.    Okay.  Did you have some sort of expectation or metric that required you to log a certain number of activities each day?

A.    Not a number of activities, but we had a goal that we needed to be -- in the case, we had metrics set up how many days you needed to be in the case.

Q.    Are you talking about a case going red if it was pending for too long?

A.    That's one of the things, yes.

Q.    And what are other ones?

A.    Well, every time when you get a new case, you have parameters that you have to cover within a certain amount of time. And then you set up a diary, and then you need to be in that case every 15 days, we had to at that point.

So, you would set up a reminder diary, and that would come up on your calendar to remind you that, okay, it's 15 days.  You need to update this.

My cases would go on for a



M. A. Fischer

period of time.  They weren't once-and-done quick cases.

Q.    Sure.

A.    Yeah.

Q.    So, in terms of, you know, the time it takes to close one of your cases versus cases handled by either field or desk investigators, your cases would take substantially longer?

A.    Months.

Q.    There were some that even lasted years?

A.    There could be, yeah.

Q.    Okay.  So, I guess, knowing that you referenced having to update, you know, a case every 15 days; is that right?

A.    Yes.

Q.    All right.  Besides that 15-day requirement, was there any other, you know, timeline you had to meet in terms of entries you had to make in SICM?

A.    In the beginning of a case when you opened it, there were -- there was standards of things that needed to be



M. A. Fischer

saved on -- some initial steps you take with every case?

A.    Yes.

Q.    All right.  And then after that, is it accurate to say that it kind of depends on where the investigation takes you?

A.    Yes.  And the supervisor can also direct you, you know, you need to do this; this needs to get done by the next 15 days, certain things that come up if they find something.

Q.    Okay.  If you were doing an investigative activity and 15 days later you were still working on it, could you satisfy that requirement by simply going into SICM and saying still investigating whatever that issue was?

A.    No.

Q.    Why not?

A.    Because you have to show a substantial activity on that case to keep that case moving.  You can't just have a case sit.



M. A. Fischer

Q.    Right.  But if, I guess, the substantial activity that you're working on, you know, wasn't completed in 15 days, what would happen?

A.    You would write what you had completed.

Q.    Okay.  Prior to COVID, how many new cases were you assigned typically in a month?

A.    Well, we said four.

Q.    Okay.  So, you would have four cases that you were assigned.  I think you said it would take sometimes months to close cases.

A.    Yeah.

Q.    How many cases would you typically close in a given month?

A.    Every month would be different.  I would say on average, maybe three.

Q.    Okay.  You were a Geico associate for a long time.  I'm sure you know that there are certain metrics against which associates are rated, right?

A.    Yes.



M. A. Fischer

A.    Yes.

Q.    All right.  And they assessed your files for, essentially, you know, doing the activities and documenting them the right way?

A.    Correct.

Q.    All right.  Besides that sort of, you know, metric, did you have other specific metrics that you were held to?

A.    (No verbal response.)

Q.    For example, your performance wasn't assessed against the number of days it took to close a case, right?

A.    Not on our cases.

Q.    Not on major case?

A.    No.

Q.    Or inside medical?

A.    Right.

Q.    All right.  And similarly, you weren't rated in terms of productivity on how many cases you closed per month?

A.    No.

Q.    No, that's not right?  Or, no, you weren't?



M. A. Fischer

A.    No, we weren't.

Q.    Okay.  Do you have an understanding as to whether field or desk investigators are assessed in how many cases they close per month?

MS. DSOUZA:  Objection.

A.    I do.

Q.    All right.  And is your understanding that that was a performance metric that applied to them?

A.    Yes.

Q.    All right.  Similarly, do you have an understanding as to whether field and desk investigators had a metric called time to close that they were assessed with?

A.    No.

Q.    You have no understanding that field or desk investigators, in part, had a metric monthly as to how many days their cases were open?

A.    Yes.

Q.    All right.  You understood that, for those investigators, you received a better score if your cases were open less



M. A. Fischer

time and a worse score if your cases were open for a significant amount of time?

A.    Yes.

Q.    All right.  And -- but that worked differently, we said, for inside medical, like yourself, investigators?

A.    Correct.

Q.    Would you receive performance ratings each year?

A.    Yes.

Q.    All right.  Do you have a general sense of where you shook out in terms of your performance on a year-to-year basis?

A.    I was always in the top four or five percent.

Q.    Okay.  And just for clarity, I'm sure you recall.  Do you have -- do you understand that Geico rates all its associates from a yearly review standpoint on a one-to-five scale?

A.    Yes.

Q.    Do you agree that three, using Geico's scale, is satisfactory?



M. A. Fischer

A.    As the day would come to an end, I would see what needed to still be accomplished in that day to fulfill my diary, and I would be catching up, making sure that everything was -- that I had to accomplish in that day was done.

Q.    Okay.

A.    To the best of my ability.

Q.    And, I guess, is that things that are -- that you had to do to complete a diary entry that day?

A.    Some of it was, yes.

Q.    Okay.  So, I guess, you know, if it's due the next day or the day after -- well, step back for a moment.

You said the diary sort of entries were every 15 days you had to submit, right?

A.    Right.

Q.    Is that 15 business days or 15 real-time days?

A.    I think it was 15 business days.

Q.    Okay.  So, essentially, three



M. A. Fischer

weeks, every three weeks you had to submit a diary?

A.    Yes.

Q.    All right.  And I know you mentioned that you would print out your schedule on Friday so that you would know what's happening for the following week, right?

A.    Yes.

Q.    So, I guess, given the fact that your timelines, you know, are three weeks out, why was it necessary to work two to two and a half hours a day overtime -- two to two and half hours per week in excess of your scheduled hours?

A.    Because I wasn't just working on those cases.  I also had other things going on, phone calls.  Like I said, we had new investigators, helping new investigators, meetings, other things in the day, e-mails that needed to be addressed immediately, so everything pushes everything down.

Q.    Sure.  I'm not suggesting that



M. A. Fischer

Q.    So, she was a field supervisor, so she didn't work out of the office, correct?

A.    Correct.

Q.    All right.  So, Danielle Perdomo wouldn't know that you were working during your meal period?

A.    Correct.

Q.    All right.  And Danielle Perdomo wouldn't know that you were working two to 2.5 hours in addition to your scheduled hours each week?

MS. DSOUZA:  Objection.

A.    My -- I swiped in and out of the building every day, which recorded my time in and my time out.  My SICM also has a date stamp on it and I'm sure my computer when I shut it down at night.

BY MR. TSONIS:

Q.    So, let's take those back for a second.

SICM has time and date stamps for any activity that's entered, right?

A.    Every activity that's entered.



M. A. Fischer

Q.    SICM doesn't have a timestamp for when you open the application, to your knowledge, right?

A.    Not to my knowledge, but I'm assuming.  Everything does, right?

Q.    Okay.  Similarly, do you have any reason to think that there's a timestamp of when you closed out of the SICM application?

A.    I believe that there was.

Q.    Did anyone ever talk to you about, hey, I saw you closed SICM at this time?

A.    No.

Q.    Anybody ever talk to you about, I saw you open SICM at this time?

A.    No.

Q.    You said you swiped into the building and swiped out of the building?

A.    Absolutely.

Q.    All right.  So, just to be clear:  To leave the building, you didn't just have to walk out.  You had to literally swipe?



M. A. Fischer

A.    Correct.

Q.    Okay.  Any reason to think that your supervisor could see your time-in and time-out swipes?

A.    Yes.

Q.    What is that?  What's the reason?

A.    We were told that they can run our swipes to see if we were late, how -- you know, as far as, you know, you're late to work, that's a problem, right?  So, they can see when you're there and when you're leaving.

Q.    Okay.  When you say "we were told," what are you referencing?

A.    It's just common knowledge that they can check your SICMs -- not your SICMs -- your time swipes.

Q.    I guess I'm just trying to understand if there's a specific conversation you're referencing or you just assume they could check your swipes.

A.    At some point in my employment, I was told that they could -- that,



800.211.DEPO (3376)
EsquireSolutions.com

M. A. Fischer

A.    To the COVID time and then they stopped.  We weren't getting new cases.

Q.    So, when you say, Geico kept my caseload steady, is what you mean, I was not being assigned new cases?

A.    Correct.

Q.    Okay.  So, without any new cases being assigned, you were still working overtime, you're saying?

A.    Yes.

Q.    And that was just from the existing caseload you had?

A.    That was also because every day I had to be on at 9:00 a.m.  I had to build my station every morning.  I had to set up my computers, my monitors, my -- get everything set online, ready to go.  I had to be -- 9:00 o'clock, I had to be up and running every morning, so that was time before.  And at the end of my shift, I had to break everything down and -- and also I was working on stuff.  There was stuff I would work extra on.

Q.    So, if I'm understanding



M. A. Fischer

correctly, you're saying you came in early so that you could power on your machine and get set up to begin work at 9:00 a.m.?

A.    I had to -- I worked on my dining room table.  I didn't have any --

Q.    You're talking about the COVID time period?

A.    Yes.  I did not have a workstation.  So, every day, I would have to set everything up; and at the end of -- at 5:30, I had to take everything down.  I had to be on from nine o'clock to 5:30.

Q.    When you say you didn't have a workstation, I guess, what do you mean? Why did you have to put it all up and take it all down?

A.    It was my dining room table. It was COVID.

Q.    Okay.  You would agree, though, that no one at Geico knew what your at-home setup looked like?

MS. DSOUZA:  Objection.

A.    I have no idea who would know.

BY MR. TSONIS:



800.211.DEPO (3376)
EsquireSolutions.com

M. A. Fischer

that your supervisor knew how long it took you to break down your setup?

A.    No.

Q.    All right.  How much time would you say it took you to set up your workstation each day?

A.    I would say about 10 to 15 minutes.

Q.    Okay.  And similarly, how much time would you say it took to tear it down?

A.    Same thing:  10 to 15 minutes.

Q.    Do you use -- do you use your dining room table regularly?

A.    Yes.

Q.    And I was saying, some people do; some people don't.  For example, some people have a dining room they use only on special occasions, and they eat and use a kitchen table.

What's your home setup?

A.    We eat every meal at the dining room table.  We don't have a kitchen table.

Q.    Do you have a different place that you could have set up your



M. A. Fischer

Q.    Okay.  Are you contending as part of this lawsuit that your time setting up and taking down your workstation is time you should have been compensated by Geico?

A.    Yes.

Q.    Again, let's do some math.  If you're claiming 10 to 15 minutes each day, that's 20 to 30 minutes per day, right?

A.    Correct.

Q.    20 and 30 minutes per day times five days a week is about 100 to 150 minutes, right?

A.    Correct.

Q.    Okay.  It's about an hour and 40 minutes to two and a half hours; is that right?

A.    I didn't do the math.  Okay.

Q.    Well, 20 minutes times -- excuse me.  Fifteen minutes times two is 30 minutes a day at the high end, right? Five days a week at 30 minutes a day is two and a half hours, right?

A.    Correct.

Q.    Okay.  In this declaration



M. A. Fischer

Q.    All right.  So, if you recall, just prior to going on lunch, we were also talking about the COVID timeframe, from March 2020 until the time you retired, right?

A.    Uh-huh.

Q.    And we were talking about the time that you said you spent setting up and taking down your work station each day?

A.    Correct.

Q.    Does this incorporate that time?

A.    The 40.75, yes, and also other overtime that I would be doing during that time.

Q.    Okay.  So, I just want to be clear because I thought you said the opposite before we went to lunch and I just want to make sure that we're right.

The 40.75 hours per week, if you were scheduled for 38.75 hours, means two hours additional each work week that you're claiming, right?

A.    Yes.



M. A. Fischer

Q.    All right.  Does that two hours include the 10 to 15 minutes setting up your workstation and the 10 to 15 minutes taking down your workstation each day?

A.    Yes.

Q.    Okay.  Whatever time remains, if I understand you correctly, you're saying would be other work that you did?

A.    Yes.

Q.    Now, you say in the rest of that sentence:  And my last regular pay was $41.95 per hour.

I'll pause there again.

Were you compensated on an hourly rate the entire time you worked as an investigator?

A.    Yes.

Q.    Was there ever a period of time in which you were paid an hourly rate but the way that your hourly rate was calculated changed?

A.    I don't understand.

Q.    Sure.  So, was there a period of time where you would not potentially get



                    M. A. Fischer

get back in.

        Q.    I didn't realize the Woodbury
office was that large.

        A.    It's very large.  It was very
large.

        Q.    I asked you a series of
questions a short while ago, if you ever,
you know, either orally or in any kind of
written correspondence, informed your
supervisor you were working beyond your
scheduled shift, right?

        A.    Correct.

        Q.    I'll ask you the same series of
questions about your manager.

              Did you ever inform your
manager orally or in writing that you were
working beyond your scheduled shift-end
time?

        A.    No.

        Q.    Did you ever inform your
manager -- or excuse me.  Strike that.

              Did your manager ever inform
you, either orally or in writing, that you
needed to work beyond the end of your



M. A. Fischer

was my understanding that hours above 38.75 to complete regular case work would rarely be approved.

Do you see that?

A.    Yes.

Q.    All right.  Why was it your understanding that hours above 38.75 to complete regular case work would rarely be approved?

A.    If -- to work overtime, you would have to submit in advance a request to work overtime on a specific case and specifically what on that case you would want to work during that time.

Q.    So, you had the ability to request overtime in advance; is that right?

A.    On a specific case and regarding a specific detail to that case.

Q.    Did you ever make that kind of request?

A.    No.

Q.    Why not?

A.    Because it would have to be done in advance and most of the time when I



M. A. Fischer

worked overtime, it was because the end of my day was up and I had things I still needed to accomplish in that day.

Q.    Okay.  Was there ever any communications to how far in advance you had to request it?

A.    No.  It would also take time to write up the request and the specification.

Q.    I get the impression that you had a pretty good relationship with your supervisor?

A.    Yes.

Q.    Could you call her and say, hey, can I have 30 minutes of overtime or an hour, if you needed it?

A.    It was very rarely approved.

Q.    Why do you -- strike that.

If you never requested it, how do you know that it wouldn't have been approved for you?

A.    It has been the trend in Geico that people just worked to get their work done for the day.

Q.    Do you have an understanding of



800.211.DEPO (3376)
EsquireSolutions.com

M. A. Fischer

what the process was for your husband, Keith Fischer, to request overtime?

A.    No.

Q.    Do you know who his supervisor was?

A.    He was under Gerry Cassagne, I believe.

Q.    He had Gerry Cassagne as a supervisor for this entire time period of 2016 to when he retired also, right?

A.    I believe so.

Q.    He worked with Gerry Cassagne back in NYPD also, right?

A.    Correct.

Q.    Okay.  You have no understanding as to whether during 2016 or 2017 Keith Fischer could work overtime hours as long as he just sent a follow-up documentation e-mail to Gerry Cassagne?

MS. DSOUZA:  Objection.

A.    No.

BY MR. TSONIS:

Q.    Your husband never talked to you about that?



M. A. Fischer

A.    No.

Q.    Did you ever ask your husband about, should I request overtime?

A.    No.

Q.    Why not?

A.    We didn't discuss things like that.

Q.    Are you aware as part of this lawsuit there have been documents produced that show that Keith Fischer did, in fact, work overtime in some weeks that was approved?

A.    No.  I don't know what was submitted on his behalf.

Q.    Well, I mean, a short while ago, you testified, you know, it's the trend in Geico that people just work their 38.7 -- they work more hours, but --

A.    Yes.

Q.    -- I guess, you know, I'm not going to put a bunch of documents that don't have your name in front of them -- or on them in front of you.  But I'll represent to you that there are documents



M. A. Fischer

from different investigators that get overtime approved.  So, I'm curious why it is that you didn't request it.

MS. DSOUZA:  Counselor, is there a question?

BY MR. TSONIS:

Q.    Why is it that you didn't request it?

A.    I didn't feel that it would be approved.

Q.    Okay.  Do you have any other -- any understanding as to whether other major case SIU investigators did request overtime?

A.    I do not.

Q.    Did anyone ever communicate to you that they had the same understanding that overtime hours wouldn't be approved?

When I say "they," I'm talking about SIU major case investigators.

A.    Yes.

Q.    Who?

A.    I don't know offhand.

Q.    Can you name anyone?



M. A. Fischer

THE VIDEOGRAPHER:  This concludes the video deposition of Ms. Margaret Fischer.  The time now is approximately 4:48 p.m.  We are off the record.  Thank you, everyone.

(Whereupon, at 4:50 P.M., the Examination of this Witness was concluded.)

_____
MARGARET. A FISCHER

Subscribed and sworn to before me this _____ day of _____ 20____.

_____
NOTARY PUBLIC



M. A. Fischer

C E R T I F I C A T E

STATE OF NEW YORK       )
                       :
COUNTY OF RICHMOND      )

I, MARINA DUBSON, a Notary Public for and within the STATE OF NEW YORK, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of December 2024.

_____
                MARINA DUBSON

