# EXHIBIT 28

Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 2 of 28 PageID #: 11781

LOUIS PIA  Contains Highly Conf. Testimony                     August 13, 2024
Keith Fischer, et al. vs GEICO                                               1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,
LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,
and CHARISE JONES, individually and on behalf
of all others similarly situated,

                        Plaintiffs,

    -against-                              Case No.
                                      2:23 Civ. 2848 (GRB) (ARL)


GOVERNMENT EMPLOYEES INSURANCE COMPANY
d/b/a GEICO,

                        Defendant.

--------------------------------------------------------X

                        August 13, 2024

                        10:00 a.m.


    EXAMINATION BEFORE TRIAL of LOUIS PIA,

a Plaintiff, taken by counsel for the

Defendants, pursuant to Order, held at Duane

Morris, L.L.P., 1540 Broadway, New York, before

Tiffanie Jones, a Notary Public for and within

the State of New York.



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

A P P E A R A N C E S:


    OUTTEN & GOLDEN, L.L.P.

        Attorneys for the Plaintiffs

            685 Third Avenue, 25th Floor

            New York, New York 10017


        BY:   MICHAEL J. SCIMONE, ESQUIRE

                mscimone@outtengolden.com


                ZARKA SHABIR DSOUZA, ESQUIRE

                zdsouza@outtengolden.com


    DUANE MORRIS, L.L.P.

        Attorneys for the Defendant

            1540 Broadway

            New York, New York 10036


        BY:   GREGORY SLOTNICK, ESQUIRE

                GSSlotnick@duanemorris.com



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
4

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  We are on the record, and the time is approximately 10:00 a.m.  Today's date is August 13th, 2024.  This is Media 1 of the video deposition of Louis Pia, in the matter of Keith Fischer, versus Government Employees Insurance Company. The Index Number is 2:23 Civ. 2848 (GRB) (ARL).

My name is Ben Peretz, legal videographer with Shereck Video, in association with Esquire.  Today, we're at the office of the Duane Morris, L.L.P., located at 1540 Broadway, New York City.

Would counsel please voice-identify yourself, and state whom you represent.

MR. SLOTNICK:  Good morning.  My name is Greg Slotnick, on behalf of GEICO, from Duane Morris.

MR. SCIMONE:  Michael Scimone, Outten & Golden, on behalf of Plaintiffs.

MS. DSOUZA:  Zarka Shabir Dsouza,



Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 6 of 28 PageID #: 11785

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                              5

                        L. PIA

        Outten & Golden, also on behalf of

        Plaintiffs.

                THE VIDEOGRAPHER:  Thank you.

                The court reporter is Tiffanie Jones

        with Esquire.  And please swear in the

        witness.

                THE REPORTER:  All right.  Sir,

        please raise your right hand.

                Do you solemnly swear or affirm that

        the testimony you're about to give shall

        be the truth, the whole truth, and

        nothing but the truth?

                THE WITNESS:  I do.

                    L O U I S   P I A,

        having first been duly sworn by a Notary

        Public for and within the State of New

        York, upon being examined, testified as

        follows:

                THE REPORTER:  Thank you, sir.


        EXAMINATION BY

        MR. SLOTNICK, ESQUIRE:

            Q.  Good morning, Mr. Pia.

            A.  Good morning.



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
47

L. PIA

security investigator.

A.  Lead security, I worked seven days a week.

Q.  Seven days a week?

A.  Yes.

Q.  Okay.  Were you scheduled to work seven days a week?

A.  When you say "scheduled", it's -- it's kind of a convoluted question because it -- they didn't -- they didn't -- in order to handle my case load, in order for me to not to be penalized, I had to work over and above the 40 hour, or a 38.75-hour workweek in order for me not to be penalized; and, therefore, not get a raise or put on coaching or, you know, possibly be terminated.

Q.  Were you scheduled to work 38.75 hours per week?

A.  I would say yes.

Q.  Was that the case throughout your GEICO employment?

A.  Well, that was the policy that GEICO instituted, but that wasn't the practice.

Q.  I'm just asking about the policy.



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
52

L. PIA

with.  If you want to define it for me, and I'll -- I'll -- I'll let you know if I'm familiar with it.

Q.  Was there ever a policy in place with respect to your employment, where you were able to work less hours on a given day, and make-up those hours later in the day or on another day in the same workweek?

A.  I -- I don't recall whether -- that being policy, no.

Q.  When you were working, were you free to complete your work at any time that it was convenient for you during the work day, or did you have set hours where you had to complete your work?

A.  No, as I -- as I stated before -- and maybe I could be a little bit more clear.  I mean, I -- I was -- I was working -- I was doing my case load at -- some nights, 9:00, 10:00, 11:00 o'clock at night.

Q.  When you were assigned specific cases, were they all different types of cases, or were their subsets of cases in -- in the SIU?

A.  What time period?



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
53

L. PIA

Q.   2016 to 2022.

A.   Now, in 2016, I don't know if they -- for lack of a better term -- call, like, segregated teams to specified units.  So if -- if they didn't do that in 2016, then I handled an -- an assortment of cases.  I handled the theft cases, I handled no-fault cases, I handled jump-ins, bodily-injury cases, underwriting cases.

Now, during that period -- sometime during the period of 2016 to -- what did you say?  2020?

Q.   '22.

A.   '22?

Q.   Yeah.

A.   The structure of the unit went to -- different teams were involved and -- and I was -- I was involved in the -- in the auto shop, the body-shop team.  So I mainly dealt with the -- either staged accidents or enhanced damage on cars, you know, organized rings that set up accidents.  So -- so from that period on, that's all I dealt with.

Q.   Was that by choice, or was that



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
54

L. PIA

assigned to you?

A.  Well, I think the -- I don't know if it was by choice.  The management, I would assume, had to agree and -- and okay the fact that the -- the unit was going to be divided in this way.  And I was -- I -- I don't know if I was specifically asked or -- or said, you know, Lou, you're going to be in the auto shop -- body team and...

Q.  Were there other investigators on the auto-body team, as well?

A.  Yes.

Q.  Who were those individuals?

A.  I know Lewonka was one, Scott Brady was one.  I know Lewonka, he left and went to the no-fault team a short time thereafter, but maybe Al Brust was on the team.  And I'm sure there were others I -- I don't recall.

Q.  Did those cases -- strike that.

How were those cases different than some of the other types of cases that you said you previously worked on?

A.  Different in what respect?  Like, as far as how I investigate them?



L. PIA

and -- and inside because they were also getting cases was -- I mean, I'm -- I'm going to say it was at least ten different people that you could get a case from.

Q.  Can you name some of those individuals, the inside investigators?

A.  Marie Butler, Denise D'Avanzo, Dario Dimeo.  The intake people were fairly new -- they were fairly new.  There was -- there was another female there.  She was a -- she was -- she was a nice girl.  I forget her name.  She had -- she ended up being a -- a supervisor.  She became a supervisor, but she used to assign cases.  And others that I -- I don't recall their names at this time.

Q.  When you took Examinations Under Oath, was that from specific locations?

A.  Yes.  Prior to COVID, we used to respond out to different locations depending on the borough in which it was being conducted.

Q.  Where were the locations -- strike that.

Which boroughs did you conduct EUO's in?



L. PIA

A.  I'm going to say I conducted an EUO in every borough, with the exception of Staten Island.  And I can't be quite sure.  I may have done one in Staten Island.

Q.  Was there a specific EUO location within each borough?

A.  Yes.

Q.  Did you decide where to schedule your EUO's?

A.  We were basically told to schedule the location based on the closeness to the individual that we're -- that we're going to EUO, their residence.

Q.  And throughout this period, were you living on Long Island?

A.  Yes.

Q.  How long did it take you to drive to each EUO center approximately?

A.  Well, EUO's were only conducted on the weekdays.  So therefore, you had the largest volume of traffic on the weekdays.  The Bronx and Brooklyn were, on average, the worst, the longest travel time it took.  I did a lot of my -- well, I would say predominantly, most of my



Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 13 of 28
PageID #: 11792

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                         62

L. PIA

cases in the Bronx and Brooklyn.  And I would leave my house at approximately 7:00 o'clock, and I wouldn't get to the Bronx -- which was right down the block from Yankee Stadium -- until about 8:20, 8:30.  Now, you throw in a little rain and snow, and you can add on a half hour to 45 minutes to that.

Brooklyn, same type -- same type of a -- you know, length of time.  Rain on the BQE just basically, you know, put everything to a standstill.  It took a long time.

Q.  And how much time would you say that you spent in the field on a given day?

A.  Well, let's take it -- let's take, for example, the -- an EUO day, and -- and when you went out on an EUO -- at least I, and I know a lot of a -- the investigators.  There were multiple EUO's.  You had to schedule more than one EUO on a given day, or you just ran out of time.

So if I went out with two or three EUO's scheduled, I would leave my house at -- well, I would -- I would review or just peruse the EUO's that I had at about 6:30 in the



Case 2:23-cv-02848-SJB-SIL   Document 173-31   Filed 04/24/26   Page 14 of 28
PageID #: 11793

LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          63

L. PIA

morning.  Get in the car, leave at about 7:00.
Depending on -- just let's say, for instance, I
arrive at the Bronx at about 8:30.  Now, the
scheduling of the EUO's was quite difficult,
also, because some of these people wouldn't
show up.  So you had to give them 45 minutes
waiting time.  If they did show up, I would say
a normal EUO would take an hour, sometimes
longer.

So if you had several EUO's, you
couldn't schedule them at 9:00, 9:30 and 10:00
because if all three showed, you -- you know,
you had three different court reporters, and it
just wouldn't work.  So you had to do 9:00,
10:30, you know, maybe 12:00 noon.  And just --
let's say your last EUO didn't show at 12:00.
You had to remain there until 12:45.  Coming
back home, understandably, there was less
traffic, but it still took you about 40
minutes, you know, half hour to get home.

And then, when you got back to your
office, you were responsible to -- well, let me
-- let me stop there.  Your question was:  How
long did you spend in the field?  Is that



L. PIA

correct.

Q.   Correct.

A.   Okay.  So I'm back home from -- from 7:00 to about 2:30.

Q.   And you said -- strike that.

How many days a week did you typically schedule EUO's?

A.   I would say, myself, probably three to four.

Q.   And what was the approximate rate of no-shows for EUO's?

A.   No -- no-shows, you -- you -- again, the rate, the percentage, you know, I -- I -- I'm not going to give you, but there was -- it -- it was -- a large percentage of scheduled EUO's were no shows, but there was work involved in -- in the no-show appearance, also.

Q.   What work was involved in no-show appearances?

A.   Well, you had to wait for 45 minutes, and then you had to put a -- put a statement on the record with the court reporter.  Then, you had to contact the -- the legal -- GEICO's legal to reschedule, unless it was a second



L. PIA

and I still had a 10:00 or 11:00 -- an EUO, then I still had to remain at the facility for my other two EUO's.

Q.  How many claims did you typically handle in a week from 2016 to -- forward?

A.  Yeah, yeah.  No, I got that.  And at -- in 2016, I would say that to the best of my recollection, I was doing a minimum of 30 claim -- you said a week?

Q.  Yeah, per week.

A.  I -- I would say eight to ten.

Q.  Did that fluctuate over time?

A.  Yes.

Q.  Were some weeks busier than other weeks?

A.  Extremely, yeah.

Q.  Were there certain times of the year that were busier than other times?

A.  In that time period?

Q.  Yeah.

A.  Well, once COVID hit, the case load went up drastically and -- now, during the course of this time period, when the case load was continually rising, okay, we were asking --



L. PIA

and this was ongoing for years, even prior to 2016.  We were asking for overtime to be incurred for the hours that we were working over and above 38.75, and we were told that -- that GEICO doesn't approve and authorize overtime for the excess amount of time regarding the handling of cases.

So when the case load got to be so extreme, that we couldn't do our job within the 38.75, we basically -- well, I basically continued to do the work while asking for overtime, not being approved, but continued to do the work in order to satisfy my case load, and not have the cases turn red; and, you know, be possibly recognized as needing coaching and -- and, you know, possibly being, you know, terminated.  I needed the job.

Q.  Okay.  I believe my question on that one was:  Were there certain times of the year that were busier than others?

A.  Yes.

Q.  Okay.  Which times of the year were those?

A.  Well, co -- after COVID hit, I would



L. PIA

met, then there's -- there was going to be no change.

Q.   When did he tell you that?

A.   I don't know exactly, but during that time period, and even before.

Q.   Was that on the phone?

A.   Could have been on the phone, in person or both.

Q.   Did you take any notes of those conversations?

A.   No.

Q.   Were those conversations reflected in any e-mails that you recall?

A.   No.

Q.   If we could go back to Paragraph 8. So it says:  "I recall my supervisor, Gerard Cassagne, discussed with me the norms of everyone working overtime off the clock to keep up with GEICO's performance metrics.  And he said that the only way the practice would stop is if everyone collectively stopped working after 7.75 hours per day, and allowed their cases to go red.  Meaning the cases would receive poor ratings.  Accordingly, I only



                        L. PIA

entered 7.75 hours per day, 5 days a week,

regardless of how many hours I actually

worked."

        Mr. Pia, is that the conversation that

you were just referring to in your testimony?

        A.  In sum and substance, yes.

        Q.  And when you say "go red", what

exactly does that mean?

        A.  The system that we used on the

computer -- and again, I'm not an IT.  I'm like

a -- you know, a little bit behind the ball

with that, but the SICMS computer would have --

there would be a queue on the left side of the

screen, and that would be a list of all your

cases.  And if you didn't meet certain

requirements within a -- a -- a -- a case life,

then your -- your case would turn red.

        So in essence, if -- if you, you know,

shutdown and say, hey, I'll get to that when I

get to that, and all of a sudden, either the

time period to update your case or the 30-day

case life came up, the case would turn red.

Then, the other case would turn red, and so on

and so forth.



Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 20 of 28
PageID #: 11799
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                          107

L. PIA

Q.  How could you prevent a case from turning red?

A.  Working as many hours as it takes in a day to -- to get your work done, even if it's over and above 7.75.

Q.  Would taking -- strike that.

Would entering -- strike that.

You mentioned SICMS?

A.  Yeah, it's an acronym for special investigation case management system or something -- something to that effect.

Q.  Was that the case management software that you used at GEICO?

A.  Yes, issued by home office.

Q.  And if you made an entry in SICMS in a given case, would that prevent or take away a red flag for that case?

A.  It depends on the entry.

Q.  What do you mean by that?

A.  Well, I mean, if -- if I just went in the case and went, hi, and then exited out, you know, the case would still -- you know, you have to show some type of -- of constructive, you know, data in the entry.



Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 21 of 28
PageID #: 11800
LOUIS PIA  Contains Highly Conf. Testimony                    August 13, 2024
Keith Fischer, et al. vs GEICO                                            109

L. PIA

red.

Q.  Did you ever intentionally allow any cases to go red?

A.  No.

Q.  Would you receive poor ratings if you let your cases go red?

A.  Yes.

Q.  Are you aware of any other investigators who intentionally allowed their cases to go red?

A.  Intentionally?

Q.  Yeah.

A.  Not that I know of, no.

Q.  If you look at Paragraph 9, which is on the same page.  The second sentence reads: "From approximately late 2016 to approximately March 2020, I worked approximately ten hours each day, Monday through Friday, and another four to six hours on weekends to keep up with my work.  I worked about 55 hours a week on average."

What are you referring to when you say "late 2016"?

A.  I -- I would say a period of time from



L. PIA

the middle to the latter part of -- of 2016.

Q.  Do you have a specific month that you're talking about?

A.  I -- I don't.  I don't recall.

Q.  And on what do you base these estimate hours worked?

A.  Well, based on what I recall, my -- my workday being, and that the -- the hours that I listed here, I would say, is a conservative estimate.

Q.  They're based on your recollection of what you remember your -- your hours worked being?

A.  Yeah.

Q.  Did you record your time worked anywhere, other than GEICO's timekeeping program?

A.  During the time period of 2016 to '22, no.  Prior to that, yes.

Q.  Where did you keep those documented notes prior?

A.  During the Calg study time period, we were required to itemize everything that we did in a case.  So, for example, if I took out Case



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024

127

L. PIA

to 60 hours per week.

Q.  Do you have any records of working those additional hours?

A.  You mean less hours; right -- well -- well, additional hours, but less than the -- the -- the COVID?

Q.  Correct.

A.  No.

Q.  And during COVID -- so the period from March 2020 on -- who was actually living in your home with you?

A.  It was myself, my wife, and two of my children.

Q.  If you look at Paragraph 12 on Page 4.

Again, did you tell anyone that from March 2020 to November 2021, your regular work hours were 65 hours per week?

A.  I don't know if I specifically told them the amount of hours, but there -- there were some vocal conversations between myself and Gerry Cassagne regarding -- you know, I mean -- I remember even saying to Gerry, I don't care how good your -- an investigator you are, 70 cases -- nobody can do 70 cases.  I was



L. PIA

beside myself with that number for the monthly average.

So, I mean, I -- I did repeatedly during that time voice my dissension to Gerry about, you know, the case load and -- and -- and he was well aware that we were working over and above the 38.75.

Q.  Did you ever make any written complaints to Gerry about that?

A.  That -- that would be career suicide. I -- no, I -- I didn't do that, no.

Q.  Did you ever go to HR with complaints about those hours worked?

A.  Again, career suicide.

Q.  Did you call the ethics hotline about those hours worked?

A.  During that time?

Q.  Yes.

A.  No.

Q.  Do you know if the ethics hotline was anonymous?

A.  It was anonymous when I called back when -- as I stated earlier in the testimony.

Q.  Do you know whether any GEICO



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
138

L. PIA

SIU platform, in order to receive a case, had to be referred by someone.  As I testified earlier, from either the claims examiners or the inside analyst or whatever.

So social media, if I -- for example, I had direct knowledge with a social media case.  I had a case, and it was an individual that had a high-end vehicle, a McLaren, which was valued at like 400,000, $500,000.  And they're normally a race car, so I -- I wanted to see if my policyholder, who is alleging that he -- it incurred damage on a regular roadway, had any, like, Facebook or Instagram photos of him racing like at a racetrack.  Therefore, if I could prove that, he would be acting in a reckless matter and -- and I -- I could get, you know, a -- a savings on the case.  So I inquired with one of the social media investigators to assist me, and he did some work.  So I actually referred that part of the case to him, and then he gave me, you know, some information on that.

Q.  Okay.  Thank you for that.  I'm trying to figure out how -- how the different cases



L. PIA

work, the different types of cases, the referrals --

A.   Yeah.  Yeah.

Q.   -- where they come into play.

You said social media investigator; right?

A.   There was -- there was one individual, Paul -- I forget his last name -- who specifically did social media cases.  Now I, as well, got social media cases referred to me, you know, as a -- as a -- a general assignment. If they were overloaded, you know, if -- if they came in and -- and -- and then there --- there were too many cases for the individuals that were normally assigned them, that would -- it would overflow to us, and we would get assigned them, also.

Q.   Were social media cases their own cases, or was that always a component of a general investigation?

A.   That, I couldn't tell you.  I mean, normally social media was utilized in, like, accident cases, where individuals were either no-fault or bodily injury, where they were



L. PIA

MR. SLOTNICK:  Thank you.  All right.

THE VIDEOGRAPHER:  This -- this concludes the video deposition of Louis Pia.  The time is approximately 15:24, end of Media 7.  We are off the record. Thank you, everyone.

THE REPORTER:  Mr. Scimone, would you like to purchase a copy of this transcript?

MR. SCIMONE:  Yeah.  We're going to do a three-day.  Let's do three days.

THE REPORTER:  You want it in three days.  Okay.  Thank you.

(Thereupon, the examination was concluded at 3:24 p.m.)



Case 2:23-cv-02848-SJB-SIL    Document 173-31    Filed 04/24/26    Page 28 of 28
PageID #: 11807
LOUIS PIA  Contains Highly Conf. Testimony                     August 13, 2024
Keith Fischer, et al. vs GEICO                                              227

L. PIA

C E R T I F I C A T E


STATE OF NEW YORK    )

                        :SS

COUNTY OF NEW YORK  )


     I, TIFFANIE JONES, a Notary Public within and for the State of New York, do hereby certify:

     That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

     I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2024.



TIFFANIE JONES