# EXHIBIT 30

Case 2:23-cv-02848-SJB-SIL     Document 173-33     Filed 04/24/26     Page 2 of 25 PageID #: 11826

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS     ) Case No.:

BARDEN, CONSTANCE MANGAN, and      ) 2:23 Civ. 2848

CHARISE JONES, individually and    ) (GRB) (ARL)

on behalf of all others similarly )

situated,                          )

                 Plaintiffs,        )

   - v -                        )

GOVERNMENT EMPLOYEES INSURANCE     )

COMPANY d/b/a GEICO,               )

                 Defendant.         )

- - - - - - - - - - - - - - - - - - - )

REMOTE VIDEOTAPED DEPOSITION OF MICHAEL REED

Reported by:

Kim M. Brantley

Job No: J12200420



MICHAEL REED

Wednesday, January 8, 2025


Remote videotaped deposition of MICHAEL REED, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.


APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

685 Third Avenue - 25th Floor

New York, NY, 10017

(212) 245-1000

Email: jmcallister@outtengolden.com

sjean@outtengolden.com

BY:  JARRON D. MCALLISTER, ESQUIRE

SABINE JEAN, ESQUIRE



MICHAEL REED

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE


ALSO PRESENT:

    ROBERT PACHECO, Legal Video Specialist

    Esquire Deposition Solutions



MICHAEL REED

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  We are now on the video record.  Today's date is January the 8th, 2025.  The time is 10:03 a.m., Eastern Standard Time.  This begins the videoconference deposition of Mr. Michael Reed in the matter of -- in the matter of Keith Fischer, et al., Plaintiff, vs. Government Employees Insurance Company, doing business as GEICO, Defendant, to be heard in the United States District Court for the Eastern District of New York, case number 2232848.

My name is Robert Pacheco.  I am the remote videographer.  Your court reporter today is going to be Miss Kim Brantley, both representing Esquire Deposition Solutions.

Would counsel please introduce yourselves and your affiliation, and the witness will be sworn in.

MR. MCALLISTER:  Good morning.  My name is Jarron McAllister.  I'm an attorney at Outten & Golden, and I'm here with my colleague, Sabine Jean.

MS. ALBERTY:  And Tiffany Alberty on behalf of the defendant, GEICO.



MICHAEL REED

Whereupon,

MICHAEL REED

called as a witness by counsel for Defendant, and after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT:

BY MS. ALBERTY:

Q.   Mr. Reed, can you please state and spell your name for the court reporter.

A.   Sure.  First name is Michael, M-i-c-h-a-e-l, with a middle initial of N, and the last name is Reed, R-e-e-d.

MS. ALBERTY:  Let the record reflect that this is the discovery deposition of Mr. Michael N. Reed, taken pursuant to notice and by agreement of the parties.  Today's deposition will be taken in accordance with all applicable rules.

BY MR. ALBERTY:

Q.   Mr. Reed, I know that we went through you some preliminary things where you had seen me, but my name is Tiffany Alberty.  I represent the defendants GEICO in this matter.  Today I'm going to be taking your deposition and asking you a



MICHAEL REED

A.    7:00 a.m. was what they considered my start time, but if needed to do extra case work, I would work before 7:00 a.m., yes.

Q.    From 2016 to 2023 were you assigned to a specific I want to say type of claim or team to investigate claims?

A.    No, I was not.  No, I was not.

Q.    And what I mean by "team," do you understand that there were various types of teams within the New York region that others were involved in?  Excuse me.

A.    Yes, I know there were teams, but being one of only two field investigators, often the area that I was at I was handling all types of claims.  I was not part of any team.

Q.    Who was the other person that was working with you in the field at that time?

A.    Mike Grey was out here also.

Q.    For the intake where you would receive cases, was there a specific intake person that was assigned to you?

A.    No.  There was just intake for region two, and you would receive a case for whoever was working the intake desk that day.



MICHAEL REED

Q.    Prior to 2020 -- and when I talk about 2020 I'm specifically focusing more on COVID, the restrictions that were put in place either by state or county -- but prior to that, so we'll say 2016 to the very beginning of 2020, how much time would you say you spent in the field?

A.    Hours or percent?

Q.    Either/or.

A.    Okay.  I mean, it -- it's -- it's very hard to say.

I mean, there would be a case -- if I had a case in Buffalo or locally, there would be less travel time, but if I had a case in the southern tier -- which would be towards Jamestown, Salamanca, Wellsville, or east to Utica, Rochester -- travel time would be anywhere between an hour and a half, an hour and forty-five minutes one way, and that would also depend upon the weather and the time of the year.

So, the -- the travel time in the field would be, you know, variable depending upon where I was going and what the weather was, what the time of the year was.

Q.    Did you always go out in the field



MICHAEL REED

So, Michael, if you want to take a read real quick and -- for the "Salaried Nonexempt Associates," and the just let me know whenever you're ready, and if I need to zoom in, I can.

(Witness reviews document.)

A.    Okay.

Q.    Do you recall receiving any type of training on salaried nonexempt associates?

A.    No, I don't recall.

Q.    Okay.  Do you recall if you had any questions or issues regarding pay that you can go to either your supervisor or human resources with questions?

A.    Do I recall?  No, I don't recall that, but...

Q.    In your --

A.    I don't recall it.

Q.    In your practice do you remember ever going to human resources or a supervisor with any concerns regarding your pay?

A.    Not human resource, no.  In the supervisors there was no discussion of overtime.

Q.    When you would receive your paycheck and your pay records, did you ever review that for



MICHAEL REED

the accuracy of your hours?

A.    Yes.

Q.    And did you ever notice any discrepancy within the pay amount that you had received?

A.    No.

Q.    With regard to the section where it says, "A salaried nonexempt associate is encouraged to contact a supervisor with any questions," do you recall ever going to your supervisor asking questions on how any type of premium pay for the fluctuating work week method was applied to your position?

A.    I don't recall going to my supervisor for that, no.

Q.    Do you understand that GEICO paid overtime for time and a half for all hours actually worked above a forty-hour work week?

A.    They may have paid it, but we did not receive it.

Q.    To your knowledge, was it your responsibility as a senior security investigator to input your hours worked?

A.    I would input my hours that was through Workday, yes.



MICHAEL REED

Friday you would auto-fill the number of hours. Would you then submit it on the day that you auto-filled the hours?

A.    Sometimes a supervisor would say that they were going to be out of the office on a Thursday or Friday, so you would submit that either early or Thursday or Friday.

Q.    To your knowledge, once you would submit it to a supervisor, what would occur then thereafter?

A.    I -- I don't know what they did with it past that point.

Q.    Did anything ever get sent back to you because it was inaccurate, incomplete, or there was any problem just the processing for your Workday auto-fill hours?

A.    Not that I can recall.

Q.    To your recollection, for the auto-fill hours that you would plug into the Workday system for your hours worked, were you always paid for the hours that you input through Workday?

A.    Was I always paid for those hours?

Q.    Yes.

A.    Yes.  I was not paid for the hours that



MICHAEL REED
KEITH FISCHER v GEICO

                    MICHAEL REED

I worked over that, though.

Q.   For any hours that you worked over the auto-fill amount within the Workday system, did you ever input those hours into Workday?

A.   I did not fill out for overtime because that was something that was not done.

Q.   And to your knowledge would it be a violation of GEICO policy to not input hours that you actually worked?

A.   That I don't know.  All I know is the cases had to be done.

Q.   Did any supervisor, lead, manager, somebody with authority at GEICO ever come to you say "I'm aware that you're working overtime, but you're not inputting those hours into Workday to be adequately paid"?

A.   They ever came to us and said that.

Q.   How frequent were you paid with GEICO?

A.   I believe it was every two weeks.

Q.   And I apologize if you already answered this.  As to any potential discrepancy for the hours that you were not paid that you were concerned based on your paycheck or your pay record, did you ever raise that to human resources



MICHAEL REED                                                January 08, 2025
KEITH FISCHER v GEICO                                                     72

MICHAEL REED

Q.   When you brought your questions forward, do you recall who it was to?

A.   My questions of overtime?

Q.   Yes.

A.   That would have been to Chet Janik, and the answer once again, there was no overtime.

Q.   Do you remember if we talked --

A.   But that -- that was for -- I mean, that -- it was not asked all the time.  It was just that -- that was the way it was.  There was no overtime.

Q.   Do you recall if the conversations you had with Chet were by email, on the phone, text message, DM, direct message?

A.   Mostly phone.

Q.   And when you had questions regarding overtime, what do you recall Chet explicitly saying to you?

A.   There was no -- "There was no overtime."

Q.   Do you have any knowledge whether any other SIU investigators in New York -- so whether that's downstate or up north -- actually received and were -- was paid overtime?



MICHAEL REED

for various policies that related back to 2006.

We have records here, and I'll go through it with you just to read it into the record, but, for example, the associate handbook and policy as it's applicable to the claims here, so that would start in 2016.  So, on page five we have a "Michael Reed Policies and Acknowledgement, 2016 Historical Tracker" that would have been been (sic) seen, completed, and passed on May 26th of 2016.

With regard to this historical tracking log, the dates with which you reviewed the policies, completed, and passed, do you have any reason to dispute the accuracy of the historical tracking log for your trainings while you were with GEICO?

A.   From what I'm looking at, I can't dispute that, no.

Q.   Did you understand that you were required to report to anyone within GEICO if any managers or your supervisors were telling you to work off the clock?

A.   They were not telling us to work off the clock.



MICHAEL REED

being questioned about my case life, which I've indicated is not part of my goals, to which the answer was, "It was part of my goals," is what he said.  "It's part of our goals, my goals, and management goals.  That's why case life is important."

Though I have no proof, I can't tell you that, but I can tell you that conversation occurred.

Q.   Going back to your declaration in paragraph nine, you claim that you regularly worked two hours a day to address case files you received on the road, maintain the life of your other cases, and to meet the guidelines set by GEICO.

Is it your testimony that you worked an extra two hours every day from 2016 to your resignation?

A.   That would be a --

MR. MCALLISTER:  Objection.

You can answer.  Sorry.

THE WITNESS:  Oh, okay.  I was just making sure.

That would be a fair number, yes.



January 08, 2025
                                                                            113

                          MICHAEL REED

BY MS. ALBERTY:

        Q.    And what do you base these estimates on?

        A.    The hours that I would be on the road traveling back and forth to statements, coming back into the office, trying to compile the information that I had from going out on the road, which would be summarizing the statements, getting all of that information into my Word document, at the same time receiving more cases while I was out and having to get those cases -- case life done, and to get the -- excuse me, get the --

        Q.    Sorry.

        A.    Get the initial case -- we're good?

              Okay, to get the initial cases set up and into the SICM and into my other new Word documents.

              So, every time I was on the road for an hour and a half, two hours, three hours, that would end up at the end of the day with the cases that I got while I was out.

              Just because you're on the road, the cases didn't stop.

        Q.    Do you have any notes calendaring any



800.211.DEPO (3376)
EsquireSolutions.com

MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
119

                    MICHAEL REED

          Is that fair?

     A.   That's -- that's fair to say, yes.

     Q.   Okay.  All right, going back to number nine, and I just want to confirm, you never requested overtime for the hours that exceeded the 38.75 from 2016 until your retirement?

     A.   I did not request any overtime.  I did not.

     Q.   And so then your hours then would have been underreported from 2016 'till your retirement?

     A.   Yes, they would have been underreported.

     Q.   Do you have any idea how many cases you were handling per week per year?

     A.   How many per week per year?  I couldn't tell you that number.  Honestly, to give you an honest number, I could not tell you that.

     Q.   Let's go to paragraph ten.  It states, "Starting in March 2020, COVID-19 pandemic halted field operations.  All my work was done remotely until approximately November 2021.

          "Prior to the pandemic my caseload was approximately between twenty to twenty-five cases



MICHAEL REED

hours a week -- that was not being input into Workday.  Only the 38.75 hours was being input during that time period?

A.    That's correct.

Q.    And did you ever request the OT for your hours that exceeded the 38.75 as indicated in paragraph ten to quantify the 57.5 hours a week on average?

A.    I did not request the overtime, no.

Q.    So paragraph ten doesn't have a cutoff period to your retirement.  So I'm trying to understand that is it -- what were your hours then from November 2021 to then that March -- actually until your FMLA in the --

A.    FMLA was only -- the FMLA was only maybe one or two days a month.  It was not a specific length of time.

The FMLA was in fact where I could not -- when they he told me I had -- I had capped out at my ten sick days for the year, I couldn't take any more sick days.

So it would only be maybe one day a month or two days a month.  That was it.  It was not an extended period of time.



MICHAEL REED

then?

A.    Yeah.  The manager was Mike DeGrocco, and after him was Bill Newport, or William Newport.

Q.    Okay.  Do you remember when Mike DeGrocco phased out and Bill Newport became your manager?

A.    I could not give you that date.  I can't recall.

Q.    Do you recall Mike DeGrocco ever saying to you and your team to not input your overtime?

A.    For Mr. DeGrocco, no.

Q.    Do you recall Bill Newport ever telling you and your team to not input your overtime?

A.    Directly, no.

Q.    What do you mean by directly versus presumptively indirectly?

A.    Presumptively through Mr. Janik, who was my supervisor, that that's where that was coming from.

Q.    Okay.  But as to direct communication from Bill Newport, he never indicated to you or your team to not log overtime?

A.    No, he did not directly.



MICHAEL REED

MR. MCALLISTER:  Objection.

You can answer.

THE WITNESS:  I -- the -- the answer was from management, no; from my direct supervisor there was no overtime.

BY MS. ALBERTY:

Q.   But did Mr. Janik ever tell you to not input your overtime?

A.   Directly, no, but yes there was, that there was no overtime.  That was the answer.  If you asked about overtime, the answer is there is no overtime.

That was directly, that was implied, whichever way you want to put it, but over the years there was no overtime, and you were told there was no overtime.

I have no documentation.  I can't tell you specifically when that was said, but there was no overtime.

Q.   And was it Chet who ultimately approved your CAT overtime?

A.   Ultimately approving it?  I imagine it would have gone to the manager, whoever that was at the time.

MICHAEL REED

A.    Also probably less than five minutes.

Q.    Did he ask you why you were retiring?

A.    He asked me if everything was okay and if about there was anything either medical or that I was leaving.  I said "No, I'm medically fine. I'm healthy."  And he said "Okay," that was it, and "Have a nice life."

Q.    When you spoke to Bill then, did you make any complaints regarding lack of overtime payments?

A.    No.

Q.    And why at that time, either when you spoke to Toni or when you spoke to Bill, did you not raise your complaints that you're raising today?

MR. MCALLISTER:  Objection.

THE WITNESS:  It would have -- it -- it -- it's just useless to speak to him about what had been going on for years.  And I can't -- of course you're going to say that it's my knowledge.  I don't have the knowledge.  But he was aware of all the overtime.  He was aware of all the hours we were working.  He was aware of all the cases



MICHAEL REED

he was assigning to us.

It was a game between management of all the regions as to who could do the most cases and who could get the most work.  It was all about the numbers.

So for all those years he had no concern about any of my overtime.  He had no concern about anything.  I didn't speak to him two or three years at a time, and then all of a sudden I'm going to bring this up the day I'm leaving?  Why -- why would I waste my time?  It hadn't been addressed for two to three years.

And he knew all of our concerns.  He knew it.  They all knew it.  But it was all a numbers game for them to be top dog, have the most cases, get the most cases done, and they did that on the backs of all the SIU supervisors -- or excuse me, all the SIU investigators that were working for him out in the field.  And there was never appreciation or any goodwill from them.  So why would I bring it up at the last minute?

BY MS. ALBERTY:



MICHAEL REED

Q.    When you say that you know they knew, is that an assumption?

A.    It's an assumption, but -- I'll leave it at that.

Q.    Did you ever lie to anyone at GEICO about anything with regarding your wages, time, case reports?

MR. MCALLISTER:  Objection.

THE WITNESS:  I never lied about anything at GEICO.

BY MS. ALBERTY:

Q.    Did you ever provide false or incomplete information in filling out any company forms, papers, or reports?

A.    No, I --

MR. MCALLISTER:  Objection.

THE WITNESS:  No, I did not.

MS. ALBERTY:  Sorry, I just want to make sure Kim got that on the record.

THE COURT REPORTER:  Yes, yes, I heard him.

MS. ALBERTY:  Okay, thank you.

Counsel, it just blurred out on my end, so, but I saw your face.



MICHAEL REED concludes today's videotaped deposition.  The time is 2:57 p.m.  Going off the record now.

(Whereupon at 2:57 p.m. the videotaped deposition of Michael Reed concluded.)



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
202

C E R T I F I C A T E

STATE OF NEW YORK      )

                       : Ss.

COUNTY OF NEW YORK     )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL REED, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January, 2025.



_____

Kim M. Brantley

My Commission expires May 31, 2026.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com