# EXHIBIT 32

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN and CHARISE JONES individually And on behalf of all others similarly situated,

Plaintiffs,

- against -

CASE NO.
2:23 Civ. 02848
(GRB) (ARL)

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,

Defendant.

---------------------------------------------------X

Zoom Videoconference
Remote

DATE: January 30, 2026
TIME: 10:12 a.m.

DEPOSITION OF CHRISTOPHER HIRSCH, a Plaintiff witness herein, taken by the Defendant, pursuant to Article 31 of the Civil Practice Law & Rules of Testimony, held at the above-mentioned time and place before SUSAN CONNORS, a Stenographic Reporter and Notary Public of the State of New York.

A P P E A R A N C E S

OUTTEN & GOLDEN, LLP
Attorneys for Plaintiffs
685 Third Avenue - 25th Floor
New York, New York 10017
BY: JARRON D. McALLISTER, ESQ.
(212) 245-1000
jmcallister@outtengoldberg.com

DUANE MORRIS, LLP
Attorneys for Defendant
190 South LaSalle Street - Suite 3700
Chicago, Illinois 60603
BY: GREGORY TSONIS, ESQ.
(312) 499-6779
gtsonis@duanemorris.com

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Christopher Hirsch | Mr. Tsonis | 9 |

DEFENDANT'S EXHIBIT

| | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | E-mail from Bradley Waltman | 34 |
| Ex. 2 | Workday Document | 68 |
| Ex. 3 | Pay Stub | 79 |
| Ex. 4 | Plaintiff's responses to Interrogatories | 94 |
| Ex. 5 | E-mail from Courtney Wolfe | 131 |
| Ex. 6 | Workday Document | 135 |

REQUESTS FOR PRODUCTION

| | DESCRIPTION | PAGE |
|---|---|---|
| 1. | Preserve correspondence with Mike Manzolillo, John Cataldi and Chris Ward | 153/158 |
| 2. | Search for GEICO Severance agreement | 158 |

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that signing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination(s) may be subscribed and sworn to before any Notary Public with the same force and effect as though subscribed and sworn to before this Court.

COURT REPORTER: Will Counsel please stipulate on the record that in lieu of formally being in the presence of the witness, and swearing him in, the reporter will instead remotely swear in the witness, and that Counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that he is, in fact, Christopher Hirsch, will counsel stipulate to that.

MR. McALLISTER: Yes.

MR. TSONIS: Yes, that's fine.

COURT REPORTER: Mr. Christopher Hirsch, please raise your right hand.

C H R I S T O P H E R H I R S C H, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE WITNESS: Yes, I do.

COURT REPORTER: Please state your full name and address for the record.

THE WITNESS: Christopher Todd Hirsch, 3 Forest Avenue, Lake Grove, New York 11755.

COURT REPORTER: Thank you.

Counsel, you may proceed.

MR. TSONIS: Good morning, Mr. Hirsch.

THE WITNESS: Good morning.

Q. How long were you in training?

A. I believe it was two weeks. I could be wrong. I'm not a hundred percent sure. I don't recall exactly.

Q. Okay. And after the two-week period, was there any period of like shadowing, or anything like that, with other investigators?

A. Yes. For a week or two I believe I would shadow other investigators along with doing my work. I would hop on and watch them do an EUO and see how they do their questioning.

Q. The workload or the -- strike that.

The cases or investigations that were assigned to you, are you contending that it was the same amount of cases and investigations you had to work after your training concluded as it was right before your employment with GEICO ended?

A. Yes.

Q. So from day one out of training you were expected to schedule 15 EUOs per week?

A. I don't recall exactly how many my first two weeks. It might have been a little bit less than -- you know, it might have been eight to 10.

Q. Okay. What about there were times, work weeks, in which you took, you know, either sick or

A. Correct.
Q. When you say the requirement was to submit them within 24 hours, where did that requirement come from?
A. That's what I was told from my supervisor.
Q. Okay. Did you have any other reason for believing that it was 24 hours that you had to submit your documentation?
A. I believe I was also told that by other investigators.
Q. Okay. How was your performance assessed as an investigator?
A. To the best of my knowledge, it was assessed as good.
Q. Okay. Were there any criteria, specific criteria that applied to you, objective metrics, for example, in assessing your performance as an investigator?
A. Yes.
Q. What were those metrics?
A. Cases opened, cases closed. Completed EUOs. Completed inspections. That's to the best of my knowledge.
Q. So when you say cases opened, cases closed, are you referring to two metrics or one metric that is

let everyone know where they were at.

Q. Okay. But he wasn't, I guess, communicating to you like specifically on a weekly basis let's say, hey, here's how you did last week?

A. I don't recall.

Q. He wasn't sending you your individual metrics each on a monthly basis.

A. I don't remember if I did or did not.

Q. Okay. I guess if I understand your testimony correctly though, you're claiming that Mr. Waltman just told you, here's the note, the expectation of how many EUOs or clinic inspections that have to happen, right?

A. Yes.

Q. And that was your basis for kind of believing that that was the number that you needed to hit.

A. Correct.

Q. It wasn't like the metrics, for example, you saw, that you were not meeting a certain metric and that you needed to improve that metric.

A. Correct.

Q. Okay. Did you even know, I guess, what the rating scale was for these various metrics?

I'm sorry.

A. No, I did not.
Q. Okay. So you didn't know kind of what was meeting or not meeting expectations.
A. No.
Q. You didn't know, I guess, how much weight any individual metric carried in terms of your overall performance assessment.
A. No, I do not.
Q. Okay. Did you know generally at any point in your GEICO career how you faired in any of these metrics?
A. I -- my -- I remember meeting with Brad after, I don't know, I think it was every six months I think we would have like an individual meeting, and he would tell you how you are doing. And I was always told I was doing, you know, fine, above average.
Q. Got it. So when he would have these discussions with you, would he cover any specific metrics, or tell you, hey, you are doing fine, you are doing great, above average?
A. He was looking at a screen, I couldn't see what he was looking at, but, you know, he would tell me, you know, you met all the metrics, or you exceeded them. That's what I recall.
Q. Okay. And did those metrics, to the best

A. Yes.

Q. Aside from what's written down here, do you have any other basis for claiming that Bradley Waltman knew that you were working unpaid overtime?

A. Yes.

Q. What else?

A. While I was logged on after work hours, sometimes Bradley Waltman would also be on and he would message me through Teams or call me -- I'm sorry, through Webex, or call me through Webex. He would also know that I was working when I was inputting the files into the case management system, because they're timestamped.

Q. Any other reasons why you contend Bradley Waltman had actual knowledge of your working unpaid overtime?

A. Just what I stated earlier.

Q. Okay. What is your basis for claiming that Courtney Wolfe had actual knowledge that you worked unpaid overtime?

A. Courtney Wolfe also has access to Webex. So she would be able to see when you were working. Key strokes. She would also be able to see when these documents were uploaded into the GEICO case management system, because they were timestamped.

insure they don't get deleted.

THE WITNESS: Sure.

Q. Aside from the individuals that we've already talked about, do you know of any other current or former GEICO employees that have joined this lawsuit?

A. I do not.

MR. TSONIS: Okay. That's all the questions that I have.

MR. McALLISTER: Okay.

Maybe we can take five minutes to see if there are any additional questions I may have for Mr. Hirsch.

MR. TSONIS: That's fine.

(Time noted: 1:48 p.m.)

(WHEREUPON, A RECESS WAS TAKEN)

(Time noted: 1:55 p.m.)

MR. McALLISTER: No further questions from me.

(Time noted: 1:55 p.m.)

C E R T I F I C A T I O N

I, SUSAN CONNORS, a Shorthand Reporter and notary public within and for the State of New York, do hereby certify:

THAT Christopher Hirsch, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of February, 2026.



______________________
Susan Connors