# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                    Plaintiffs,    )

    - v -                          )

GOVERNMENT EMPLOYEES INSURANCE     )

COMPANY d/b/a GEICO,               )

                    Defendant.     )

- - - - - - - - - - - - - - - - - - - )


VIDEOTAPED DEPOSITION OF CHARISE JONES


Reported by:

Kim M. Brantley

Job No: J11541510



800.211.DEPO (3376)
*EsquireSolutions.com*

CHARISE JONES

Monday, August 12, 2024

Time:  9:53 a.m.

Videotaped deposition of CHARISE JONES, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

1225 New York Avenue NW - Suite 1200B

Washington, DC, 20007

(202) 847-4400

Email: sjean@outtengolden.com

BY:  SABINE JEAN, ESQUIRE



CHARISE JONES

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    1540 Broadway - 14th Floor

    New York, New York 10036

    (312) 499-0198 (Ms. Alberty)

    Email:  gsslotnick@duanemorris.com

    BY:  GREGORY SLOTNICK, ESQUIRE


Also on behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE

      (Appearing via Zoom)


ALSO PRESENT:

    SILVIO FACCHIN, Legal Video Specialist

    Esquire Deposition Solutions



CHARISE JONES

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  This is the media labeled number one in the video recorded deposition of Charise Jones in the matter of Keith Fischer, et al. versus Government Employee Insurance Company, doing business as GEICO.

This deposition is being taken in New York City, New York on August 12, 2024.  My name is Silvio Facchin, I am a certified legal video specialist; the court reporter is Kim Brantley, and we're both representing Esquire Deposition Solutions.

We are now going on the record.  The time is 9:53 a.m.

Counsel will state their appearances for the record.

MR. SLOTNICK:  Good morning.  Greg Slotnick of Dwayne Morris for defendant GEICO.

MS. JEAN:  Sabine Jean, Otten & Golden, for plaintiff -- for named plaintiff Charise Jones.

THE LEGAL VIDEO SPECIALIST:  Will the



                        CHARISE JONES

    court reporter please swear in the witness.

Whereupon,

                        CHARISE JONES

called as a witness by counsel for Defendant, and

after having been first duly sworn, was examined

and testified as follows:

        EXAMINATION BY COUNSEL FOR DEFENDANT

                BY MR. SLOTNICK:

    Q.   Good morning, Ms. Jones.

    A.   Hi.

    Q.   Can you please state and spell your

name for the record.

    A.   Charise, C-h-a-r-i-s-e, Jones,

J-o-n-e-s.

    Q.   Thank you.  And what is your current

address?

    A.   5567 Redleaf Rose Drive, Myrtle Beach,

South Carolina, 29579.

    Q.   Have you been deposed before?

    A.   Yes.

    Q.   So you probably know some of what I'm

about to say.  So again my name is Greg Slotnick.

I'll be taking your deposition today.  I'll be

asking you a series of questions.  Your job is to



CHARISE JONES

MR. SLOTNICK:  We've been going for about an hour and a half.  Is now a good time for a break?

THE WITNESS:  A bathroom break would be great.

MR. SLOTNICK:  Okay.  Can we go off the record, please.

THE LEGAL VIDEO SPECIALIST:  We are now going off the record.  The time is 11:29 a.m.

(Recess taken.)

THE LEGAL VIDEO SPECIALIST:  We are back on the record.  The time is 11:36 a.m. This is the beginning of the media labeled number two.

BY MR. SLOTNICK:

Q.    Ms. Jones, did you work in -- strike that.

I believe after you worked as a field investigator you mentioned that you worked as a trainer.

Is that correct?

A.    Correct.

Q.    And again do you recall when that employment position started?



CHARISE JONES
FISCHER V. GEICO

CHARISE JONES

longer.  It was just one company under one umbrella.

Q.   Do you recall when that change was first implemented?

A.   It was January of this -- well, it happened at the end of 2023, but like January of 2024 is when they changed -- like they -- there was no longer trainers.

Q.   At all in the SIU?

A.   At all.  At all across the country now, because now again it was SIU across the country.

Q.   And previously, when you were a trainer, was that just for your region?

A.   It was just for my region, and I was the first trainer ever in my region.  They didn't have one.  Other regions did, but we didn't.

Q.   Do you know why region two didn't have a trainer before?

A.   I don't know why they didn't have one, no.

Q.   Okay, so you worked as a trainer from mid-2023 to approximately January 2024.

Is that correct?

A.   My dates might be off, but, yeah, it



CHARISE JONES

was just a brief time.

Q. And then what happened to your job position at that time?

A. They asked me if I preferred auditor or trainer, and I basically said whatever would keep my job, and they just said that everyone was going to be auditors, that there -- there was no need for trainers any more. They were doing like -- almost like self-training like. They were just going to implement like, you know, a way to self-teach yourself.

Q. And so when you say "auditor," is that your current job role?

A. Correct.

Q. And when did you start working in that role?

A. We were told we were auditors I think like the end of 2023, but we started, you know, actually auditing in this -- beginning of this year.

Q. And when you say "auditing," what do you mean?

A. Now I -- all the investigators that do a case, when they go ahead and conduct their cases



CHARISE JONES

online after, you know, like late hours, while I was working.

Q.   And you said that you made a complaint to April Neyland.  Is that right?

A.   Correct.

Q.   How many times did you complain to her about off-the-clock work?

A.   A handful of times.

Q.   Could you approximate what you mean by "a handful"?

A.   Maybe four to five times.

Q.   And do you recall when you made those complaints to her?

A.   It was over the course of, you know, her -- me being reporting to her.  So it was over the course of a year or so, two years, you know, depending on -- I don't know the time frame, but it was, you know, whenever it came up, she was the one I would discuss it with.

Q.   When you say whenever "it" came up, what are you referring to?

A.   Whenever I had the -- wherever -- whenever I had to do the overtime, or when it was coming towards the end of the week, and I wasn't



CHARISE JONES

able to finish up what I had, or the day -- you know, I was just -- so much windshield time, and I just couldn't finish my work.

Q.   And when you say you couldn't finish your work, what do you mean by that?

A.   Again we had like certain time frames to finish it, certain time frames that things had to be submitted by, and knowing that my shift was over based on the number of hours I've already worked, I knew that this report had to be in by the end of that day, and I would just have to do it, otherwise it would, you know, be held against me for not doing it.

Q.   And your testimony is that that happened on four to five occasions?

A.   Talking to her about the overtime?

Q.   Correct.

A.   Yes.

Q.   And from April 2017 to the present, have you been paid hourly?

A.   I believe it changed at some point.  I just don't know when.

Q.   Do you recall how it changed?

A.   I don't know how it changed.



CHARISE JONES

Q.   And when you submit -- strike that.

When did you submit the report that you're referring to here?

A.   She wanted it submitted the next day for the manager to approve it.

Q.   And who was the manager?

A.   Bill Newport.

Q.   How did you submit it?

A.   I sent an email.

Q.   Who did you send the email to?

A.   Her, April.

Q.   Was anyone copied on that email?

A.   No.

Q.   And were your overtime hours for that week approved?

A.   Yes.

Q.   So why did you -- why do you believe that that dissuaded you from future requests to be paid above 38.75 hours per work week?

A.   Because it -- the way it was -- the way she reprimanded me on putting it in, saying that there was nobody to approve it, and "You can't just work the overtime," and she wanted to know why I didn't ask somebody, and I proceeded to let



CHARISE JONES                                      August 12, 2024
FISCHER V. GEICO                                                149

                    CHARISE JONES

her know that nobody was there.  All the
supervisors were out for the day.  The manager was
out.  And I said, "I worked it, so I put it in."

          And then she told me that in order for
me to get approved for it, I had to write down
every single case that I worked, what I did, the
time I did it, and why I needed to work that
amount of hours overtime.

          And I -- it was just time consuming.
That took more time out of my day during my work,
of which she made it a big deal to do it, and then
after it was approved, it was like no big deal.
"Okay, it's approved.  No problem."

     Q.   And you submitted only 1.5 five
hours --

     A.   Mm-hmm.

     Q.   Is that correct?

     A.   Correct.  And that's what persuaded me,
because at that point I was just like, just forget
the time, then.  Don't pay me for that 1.5 if
you're going to make me go through hoops for it.

     Q.   But did you -- strike that.

          Is it your testimony that you actually
worked more than 1.5 hours that week?



CHARISE JONES

A.    Yes.

Q.    So why didn't you include the rest of that time in the request?

A.    Because it was persuaded -- it was the way she was making me feel.  I just didn't want to put in any other time.

And when I did submit what I did, you can obviously see that it was more than the 1.5. I only put in the 1.5, but she can definitely see by the documentation that I put on there what I did, where I went, and why I needed the time that it was more than that.

Q.    But you didn't submit for the time you actually worked, correct?

A.    No, because I knew it was going to be a hassle just for -- just the amount that I put in was already a hassle, that I wasn't going to go any -- going to put in anything further.

Q.    Did April tell you not to put in for the additional time?

A.    She didn't want me to put in for the original time, never mind the additional time, because she said it wasn't approved.

Q.    But when you were told to submit this



CHARISE JONES

report to April, did she tell you not to submit it for all of your time worked?

A.    No, because I already submitted my Workday time, so it was only her to approve the amount that I've already submitted.

So she said that I had to write up this report to just justify what I already put in.

Q.    Okay, and the original amount that you had already put in, that only included the 1.5 hours?

A.    Correct.

Q.    And do you recall if you received pay at time and a half for those hours you submitted?

A.    No, it was up -- it was still within the forty hours.  So I was still getting straight time.

Q.    And what other times did you ask to work overtime hours?

A.    When -- again when my workload was building up and I had a lot of cases, I would say, "Is there any overtime available?"  It was always "No.  If we have any, we'll let everybody know. We'll put an email out."

I'm like, well, you know, when I would



CHARISE JONES

go to Brooklyn, or all the windshield time that took up hours, or there was an accident, or there was traffic, and you're putting in almost your entire day of your 7.75 in the car, and then coming home and having to write up a report, you know, it was just told, "Listen, take it off another day," or "Work around it."

Q.   Did you ever make any formal complaints about this unpaid time?

MS. JEAN:  Objection.

THE WITNESS:  No.

BY MR. SLOTNICK:

Q.   Why not?

A.   I thought, you know, what I was doing, telling my supervisor, and, you know, justifying it where it went to the manager, I thought it would be enough.

Q.   If you go back to paragraph eight on page three, do you see that?

A.   Yes, eight.

Q.   It says, "As a special investigator, starting from 2016 to my promotion to trainer in approximately March 2022 I started work between 7:00 a.m. and 7:30 a.m. and ended my day between



CHARISE JONES

     MS. JEAN:  She will read and sign the

transcript.  And on the record we do request

a one-day transcript.

     THE LEGAL VIDEO SPECIALIST:  We are now

going off the record.  The time is 4:27 p.m.

This is the end of media number five

concluding this video recorded deposition.

     (Whereupon at 4:27 p.m. the videotaped

deposition of Charise Jones concluded.)



CHARISE JONES

C E R T I F I C A T E

STATE OF NEW YORK      )

                       : Ss.

COUNTY OF NEW YORK     )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That CHARISE JONES, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related Toni of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2024.

*Kim M. Brantley*
_____

Kim M. Brantley

My Commission expires May 31, 2026.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com