# EXHIBIT 56

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL            )
O'SULLIVAN, JOHN MOESER, LOUIS    )
PIA, THOMAS BARDEN, CONSTANCE     )
MANGAN, and CHARISE JONES,        )
individually and on behalf of all )
others similarly situated,        )
                                  )
            Plaintiffs,           )
                                  ) No. 2:23-cv-2848
   -v-                            )
                                  )
GOVERNMENT EMPLOYEES INSURANCE     )
COMPANY d/b/a GEICO,              )
                                  )
            Defendant.            )

Wednesday, January 15, 2025

Oral videoconference deposition of ALBERT BRUST, held pursuant to Notice via Zoom with all parties participating remotely, commencing at 9:00 a.m. Central Time, on the above date, before Andrew R. Pitts, Certified Shorthand Reporter.

Andrew R. Pitts, CSR, RPR
License No.:  084-4575
Esquire Deposition Solutions



REMOTE APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP
685 Third Avenue - 25th Floor
New York, New York  10017
(347) 390-2121
Email: jmcallister@outtengolden.com
BY:  JARRON D. McALLISTER, ESQUIRE


On behalf of the Defendant GEICO:

DUANE MORRIS, LLP
190 South LaSalle Street - Suite 3700
Chicago, Illinois  60603-3433
(312) 499-6779
Email:  gtsonis@duanemorris.com
BY:  GREGORY TSONIS, ESQUIRE



ALSO PRESENT:

    BRENT JORDAN, CLVS, Legal Videographer.



ALBERT BRUST                                    January 15, 2025
KEITH FISCHER v GEICO                                          3

                          I N D E X

ALBERT BRUST                                    EXAMINATION

        BY MR. TSONIS                           5, 286
        BY MR. McALLISTER                  278


                        E X H I B I T S

  BRUST              DESCRIPTION                        PAGE

  Exhibit 1      Compensation Contents,            104
                 G000028-43


  Exhibit 2      E-mails, G011080-81               148

  Exhibit 3      E-mails, G011431-432              151

  Exhibit 4      E-mails, G011598-599              155

  Exhibit 5      E-mails, G017819-820              161

  Exhibit 6      7/19/20 e-mail, G017819           163

  Exhibit 7      E-mails, G012091-92               164

  Exhibit 8      Performance appraisal,            206
                 G006735-745


  Exhibit 9      Workday profile, G005126-163      218
                 (CONFIDENTIAL)


  Exhibit 10     Associate of the Month            236
                 nomination, G015733-737


  Exhibit 11     Opt-In Plaintiff Responses        244

  Exhibit 12     Human Resource Associate          261
                 Handbook, G000191-235



800.211.DEPO (3376)
EsquireSolutions.com

(Whereupon, the following proceedings were taken via videoconference.)

THE VIDEOGRAPHER:  Okay.  We are now on the record.  The time is 9:02 a.m. Central Time on January 15th, 2025.  This begins the videoconference deposition of Albert Brust taken in the matter of Keith Fischer, et al., v. Government Employees Insurance Company, d/b/a Geico.  This case is filed in the United States District Court for the Eastern District of New York, Case No. 2:23-CIV-2848.

My name is Brent Jordan.  I am the certified legal videographer for the day.  The court reporter is Andrew Pitts.  We are representing Esquire Deposition Solutions.

Will Counsel present please identify yourself and state whom you represent.

MR. McALLISTER:  Good morning.  I am Jarron McAllister, and I am an attorney from Outten & Golden and I am representing Mr. Brust today.

MR. TSONIS:  Gregory Tsonis with Duane Morris, LLP, representing the Defendant Geico.

COURT REPORTER:  Okay.  Mr. Brust --

THE WITNESS:  Yeah, Al Brust.  I was an employee of Geico.  I no longer am.

COURT REPORTER:  Great.  Okay.  Sir, please



raise your right hand to be sworn in.

(Whereupon, the witness was

administered an oath.)

COURT REPORTER:  Okay.  Thank you.  Sworn.
You may lower your hand.  I'll mute myself, and
Counsel you may proceed.

MR. McALLISTER:  Thank you.

ALBERT BRUST,

called as a witness herein, having been first
administered an oath, was examined and testified
remotely via videoconference as follows:

EXAMINATION

BY MR. TSONIS:

Q.    Good morning, Mr. Brust.

A.    Good morning.

Q.    As you probably heard, my name is Greg
Tsonis.  I'm an attorney that represents Geico in this
lawsuit.

Before you kick off, can you please just
state and spell your name for the record.

A.    It's Brust, B as in boy, R-U-S-T.

Q.    All right.  And your first name --

A.    First name is Albert, A-L-B-E-R-T.

Q.    Perfect.  And what's your current address?

A.    62 Brandy Avenue, Holbrook, New York,



you know, they could see when you're working, when you -- if you send them the case.  It's time stamped, you know.  And I'm not sure how they figured it out, but they were like, "You can't be working on your lunch time," you know.  I don't know if I answered your question.

Q.    So how long of a meal period did you get?

A.    Oh, I don't re- -- what did we get? I think like 45 minutes.  I don't think it was a full hour.  I don't remember, but I think it was approximately 45 minutes.

Q.    And that was not paid time?

A.    Not paid time.

Q.    Okay.  So when you would work on your lunch, you would be doing that work either out in the field or in your home?

A.    Yeah, if I was in the field and then I had lunch, I would sign out.

Q.    Right.  But if you sign out of Workday, and you continue actually working, I guess, you would agree that no one at Geico would know that you were actually working, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    They could find out.  I don't know if they



were monitoring it and they just -- they know when we log into systems.  They know when they log out.  They know when we, you know, sign into SICM.  They know when we generate a report.  It's time stamped.  So, again, I don't know if they were looking into that.

I didn't work often enough where I thought, like -- you know, it wasn't a normal practice, so I wasn't really concerned about myself, you know, if I had to work an extra minute or start, you know, if ten minutes before my lunch was up and somebody called, I would answer the phone, you know.  There were -- they were pretty -- like, again, they did not want us working on our -- our lunch.

Q.    Okay.  And prior to the change in timekeeping that you talked about, so talking about the period where you would just enter in your hours worked either on a daily or weekly basis -- does that make sense?

A.    I'm sorry, say that again?

Q.    Yeah.  I want to talk to you about the time period where you would enter in your time to Workday the time or hours worked on a daily basis rather than the time that you would actually be logged in and out of Workday.

A.    Right.  Okay.



MR. TSONIS:  Your objection's noted, although speaking objections are not permitted.  So I'll ask the witness the question again.

BY MR. TSONIS:

Q.    What specifically did you say to Gerry Cassagne during these conversations regarding off-the-clock work?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    I spoke to Gerry in sum and substance that I need overtime, or I'm not going to be able to satisfy the metrics.  I asked him on a regular basis, and he said, "I've spoken to Bill, and Bill will try." However, Bill, unless it was a cat case, it was very, very rare, and I think I was only maybe on two separate occasions where it may be less than a week or two that we were able to use overtime specifically, specifically for the cases that we were working.

BY MR. TSONIS:

Q.    So in those conversations with Gerry Cassagne, you didn't actually tell him, "I'm working off the clock."  You were asking about overtime; is that accurate?

A.    No.

MR. McALLISTER:  Objection.



BY THE WITNESS:

A.    I did tell him I was working off the clock because I told him that I will -- I have to do what I have to do so I'm not, you know, in the bottom quartile.  So I told -- he knew, he knew I worked weekends, he knew I worked after hours.  He knew -- I would discuss with -- I'm a -- could I let my dog out?

THE WITNESS:  I'm sorry.  I'm going to kill this dog.  I apologize.  The dog is killing me.  You're killing me, dog.  Yeah, get out.  Thank you.

BY THE WITNESS:

A.    So, sorry, off the clock, I could -- I could specifically -- myself and Gerry are very big hockey fans, and we both play hockey, but I would work in between periods.  I told him I would do work.  He knows hockey games generally start at 7:30 at night.  So indirectly and directly, he's aware that I was working off the clock because in between periods, as soon as the period would end, I would do as many computer checks as I can.  So he knew that.  Again, I --

BY MR. TSONIS:

Q.    How many -- how many conversations did you have with Gerry Cassagne where you specifically told



him, "I'm working off the clock"?

MR. McALLISTER: Objection.

BY THE WITNESS:

A.    I can't -- I can't put a number on that, but it's many.  Over the course of four and a half years, you know, again, it's many times, could be 50 to 100.  I don't know.  The conversation was a -- a constant, especially when, you know, the Monday numbers would come out, and they would say, you know, "Guys aren't meeting your, you know, metrics."

And I said, "Well, we're never going to meet it in eight hours.  It's not happening.  We need more hours to work."  So it was -- it was -- I was very vocal when it came to that.

And, again, I take pride in what I do, and I always try to do the right thing for the policyholder.  So, you know, again, my supervisors were aware and, you know, I did work, you know, off the clock, but -- and they were aware of it.  Makes -- and I -- and I spoke to them numerous times over the course of five years.  Specific dates, no, I didn't keep record of it because I never expected to be involved in a lawsuit.

BY MR. TSONIS:

Q.    But it's your testimony here today that



ALBERT BRUST                                          January 15, 2025
KEITH FISCHER v GEICO                                             132

50 to 100 times, you talked to Gerry Cassagne and used the words, "I'm working off the clock"?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    I -- I never used that term ever, "I'm working off the clock."  I would say, "I'm working on my own time.  I'm tired of working on my own time."

Unless you're working on your own time you're not getting this done.  You know, if somebody's at the top of the ratings, everybody knows why they're at the top of the ratings because you can go on the computer at 10:00 at night and see the light's green. Gerry knows that.  Everybody knows that.

Everybody knew everybody was working past the time, but like I said, everyone did the best they can, and we were just trying to do the right thing, but absolutely I had conversations with Gerry numerous times.  I wouldn't use off the clock; I had said, you know, on my own time.  On my own time.  He would ask me, "How was your weekend?"  And I would be like, "Oh, it's great.  I worked five hours."  You know?  They knew.

BY MR. TSONIS:

Q.    And those conversations with Gerry, were some of those conversations ones where you didn't



BY MR. TSONIS:

Q.    Sure.  Did you get credit from a productivity standpoint on assists that you did?

A.    No.

Q.    Okay.  Typically, do you have an understanding at Geico as to what the ratings 1 through 5 mean?  Like, at what point are you meeting expectations?

A.    I think 3 and above.

Q.    Okay.  So if you're a 3 or a 4 or a 5, you were either meeting or perhaps exceeding expectations?

A.    Yes.

Q.    All right.  Did you receive performance reviews each year that you worked for Geico?

A.    Yes.

Q.    You started in September of 2019, so did you receive a 2019 performance review?

A.    I don't recall.

Q.    Okay.  In either event, in 2020 and in 2021, 2022, you would have received a performance review, right?

A.    Yes.

Q.    Did you receive merit increases as part of your reviews?

A.    Yes.



Q.    Was that true every year that you worked for Geico?

A.    I received merit ratings every year.

Q.    Do you have a recollection or an understanding of what your performance ratings were in the time that you worked for Geico?

A.    Are you asking do I recall the actual rating number?

Q.    Yeah, I mean do you -- I understand how you might not recall the exact rating number, but typically speaking, did you fall in the 1, 2, 3, 4, or 5 range?

A.    I think -- I think generally I fell in the area of, like, 4, 4.-something, 4.2, something in that area.

Q.    Okay.

A.    And I don't think I was ever a 3.

Q.    Okay.  Working additional hours allows you to -- would allow you to close cases faster, right?

        MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    It would allow me to close more cases.

BY MR. TSONIS:

Q.    Right.  So working additional hours would allow you to increase productivity by closing more



cases?

          MR. McALLISTER:  Objection.

BY THE WITNESS:

    A.    Yes.

BY MR. TSONIS:

    Q.    And working additional hours would allow you to reduce your average case life as well, right?

          MR. McALLISTER:  Objection.

BY THE WITNESS:

    A.    Yes.

BY MR. TSONIS:

    Q.    Would you agree by working additional hours, but not recording it in Workday, that you benefit in the form of merit increases?

          MR. McALLISTER:  Objection.

BY THE WITNESS:

    A.    I benefitted in my metrics.  What they decided to give me, that's -- you know, that's up to them.

BY MR. TSONIS:

    Q.    As a Geico associate, you wouldn't have been eligible for a merit increase if you're rated a 1 or a 2, right?

          MR. McALLISTER:  Objection.

BY THE WITNESS:



numbers, and this is what I did extra."  And I was told that the extra stuff does help.

BY MR. TSONIS:

Q.    Okay.  And so, you know, there -- I understand your point there might be some, you know, special projects or extra sort of work that you do that might have a bearing on your performance rating; is that what you're saying?

A.    Yes.

Q.    Okay.  But generally in the absence of anything like that, your performance rating is based off of the metrics that were identified at the beginning of any year, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    For the most part, yes.

BY MR. TSONIS:

Q.    Okay.  And by working additional hours and not recording it in Workday, you would agree that you made your metrics look better; is that --

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    My metrics were better, yes.

BY MR. TSONIS:

Q.    Okay.  I think you referenced earlier that



you understood that they were taking into account those differences?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    Yes.

BY MR. TSONIS:

Q.    All right.  Did you have any personal involvement in -- like, aside from filling out a self-performance review or evaluation, did you have any involvement in assessing any other investigator's performance?

A.    No.

Q.    Okay.  That was Gerry Cassagne, the other supervisors, and Bill Newport?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    Yes.

BY MR. TSONIS:

Q.    Okay.  And I guess by -- you agree that by working additional hours and not recording them, not only, I guess, were your metrics better in the absolute sense, but you were making yourself look better relative to other investigators, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:



A.    Working the extra hours definitely helped with me satisfying the metrics.

BY MR. TSONIS:

Q.    Right.  But I guess my question's slightly different is that it also made you appear, I guess, if you're ranking individuals and comparing you against other investigators, by increasing your metrics, you look better relative to the other investigators too, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    That I would have to say that I was -- it wasn't just me working the extra hours.  So I think it was an even -- it was a fair playing field because -- and, again, I under- -- I mean, they can, you know, testify to that, but I was not the only one working extra hours.

BY MR. TSONIS:

Q.    And we can agree if somebody else is working only 38.75 hours a week, and you're working several hours more than that in any given week, that your metrics look better and not only, again, in the absolute sense, but relative to that person, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:



BY MR. TSONIS:

Q.    Do you have any reason to think that that number is wrong, that you didn't achieve a 4.3 in 2020 --

MR. McALLISTER:  Objection.

BY MR. TSONIS:

Q.    -- from the quality performance rating?

A.    That's what I received, so yeah.  So I got a -- I got a 4.3.

Q.    All right.  And then if you skip forward three more pages and the page that ends in 6743.

A.    Yes.

Q.    There's a -- there's nothing in the Manager Evaluation section, but there's a comment from -- that you would have entered into this, right?

A.    Yes.

Q.    And this is describing, I guess, some additional or -- or specific things that you would have done throughout the course of the year?

A.    Yes.

Q.    All right.  And then if you go to the very last page, this is the overall comments given by Gerry Cassagne, right?

A.    Yes.

Q.    And Mr. Cassagne says that you've proven



yourself to be an excellent investigator, and you continue to improve with your quality goal?

A.    Yes.

Q.    All right.  And then he similarly continues to say good things about your performance in terms of you being an excellent investigator, using your law enforcement background with -- to assist in your investigations, having the utmost integrity, and having proven yourself to be an asset to the unit?

A.    Yes.

Q.    All right.  At no point in here did you indicate that you were working hours in excess of 38.75 but not logging them, right?

A.    No.

Q.    Sorry, I asked that poorly.  No, that's not right, or no, you indicate --

A.    I did not ask that.

Q.    Okay.  And similarly, do you see any comment from Mr. Cassagne acknowledging that you had been working hours off the clock?

A.    No, there is no -- nothing by Mr. Cassagne.

Q.    Okay.  You can set this aside.

So if we looked at the remainder of your performance reviews for your time at Geico, was there ever a time that you indicated that you were working



MR. TSONIS:  Take ten minutes.

MR. McALLISTER:  Yeah.

THE VIDEOGRAPHER:  We'll go -- we'll go off the record at 3:11 p.m.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER:  Okay.  We are back on the record at 3:23 p.m.

BY MR. TSONIS:

Q.    So, Mr. Brust, we talked about conversations that we've had with your supervisors regarding, you know, workload and things of that nature, right?

A.    Yes.

Q.    And I think you also mentioned at one point that SICM entries are time stamped and that the times that you were making those entries could be observed by your supervisors?

A.    Yes.

Q.    Aside from verbal conversations and SICM time entries, is there any other basis on which you are claiming that your supervisors would have or should have known that you were working off the clock?

A.    No.

Q.    Okay.  Now, I'm going to introduce what I'm going to mark as Exhibit 11.  Let me know when you've



anything for the record?

COURT REPORTER:  Just to confirm orders for the transcript.

MR. TSONIS:  We'll do an electronic transcript only.

THE VIDEOGRAPHER:  Okay.  Thank you.  This will conclude today's videoconference deposition of Albert Brust taken on January 15th, 2025, at 4:44 p.m. Central Time.

(Whereupon, the proceedings concluded.)

FURTHER DEPONENT SAITH NOT



Case 2:23-cv-02848-SJB-SIL    Document 173-59    Filed 04/24/26    Page 23 of 24
PageID #: 12054

ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025

299

STATE OF ILLINOIS        )
                         ) SS:
COUNTY OF C O O K        )

        I, ANDREW R. PITTS, C.S.R. within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on Friday the 15th day of January, 2025, personally appeared before me via videoconference, ALBERT BRUST, in a cause now pending and undetermined in the United States District Court, For the Eastern District of New York, wherein KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated are the Plaintiffs, and GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the Defendant.

        I further certify that the said witness was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness remotely via videoconference, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the remote



videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the Deponent.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 22nd day of January, 2025.

*Andrew R. Pitts*

ANDREW R. PITTS, CSR, RPR

CSR, COOK COUNTY, ILLINOIS

