# Exhibit A

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN and CHARISE JONES, individually and on behalf of all others similarly situated,

       Plaintiffs,

         Case No.:  23 Civ. 2848 (GRB)(ARL)

v.

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination of:
        Cristobal Cruz

Location:     Regus Business Center
          300 International Drive, Suite 100
          Buffalo, New York 14221

Date:         January 9, 2026

Time:         1:30 p.m.

Reported By:  MARY ELIZABETH PHILLIPS
          Alliance Court Reporting, Inc.
          109 South Union Street, Suite 400
          Rochester, New York 14607

## Page 2

A P P E A R A N C E S

Appearing on Behalf of Plaintiffs:

Jarron McAllister, Esq.
   Outten & Golden LLP
   685 3rd Avenue, 25th Floor
   New York, New York  10017
   jmcallister@outtengolden.com

Appearing on Behalf of Defendant:

Gregory Tsonis, Esq.
   Duane Morris LLP
   190 South LaSalle Street, Suite 3700
   Chicago, Illinois  60603
   GTsonis@duanemorris.com

      *    *    *

## Page 3

S T I P U L A T I O N S

FRIDAY, JANUARY 9, 2026;

   (Proceedings in the above-titled matter commencing at 1:40 p.m.)

      *   *   *

   IT IS HEREBY STIPULATED by and between the attorneys for the respective parties that this deposition may be taken by the Defendant at this time pursuant to notice;

   IT IS FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until the time of the trial;

   IT IS FURTHER STIPULATED, that pursuant to Federal Rules of Civil Procedure 30(e)(1) the witness requests to review the transcript and make any corrections to same before any Notary Public;

   IT IS FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time

## Page 4

CRISTOBAL CRUZ - BY MR. TSONIS

of trial or any hearing in this cause, a certified transcript of the deposition may be used as though it were the original;

   IT IS FURTHER STIPULATED, that the attorneys for the parties are individually responsible for their certified transcript charge, including any expedite or other related production charges;

   AND IT IS FURTHER STIPULATED, that the Notary Public, Mary Elizabeth Phillips, may administer the oath to the witness.

      *   *   *

CRISTOBAL CRUZ, called herein as a witness, first being sworn, testified as follows:

EXAMINATION BY MR. TSONIS:

Q.   Good afternoon, Mr. Cruz.

A.   Good afternoon.

Q.   My name is Greg Tsonis.  I'm an attorney for GEICO and I'll be taking your deposition today.  Okay?

A.   Yup.

Q.   Have you ever been deposed before?

A.   No.



CRISTOBAL CRUZ
FISCHER V. GEICO

January 09, 2026
5–8

Page 5

CRISTOBAL CRUZ - BY MR. TSONIS

Q. All right. I'll go over some ground rules that I think will help today go a little smoother.

So today is a deposition, which you'll be asked a series of questions. And your only real responsibility is to provide truthful and accurate answers. Does that make sense?

A. Yes.

Q. I'll be asking the questions today and the court reporter will be writing down everything that we say. Okay?

A. Yes.

Q. Because the court reporter is making a written record of everything we say, a couple of things to mention. First, please verbalize all your responses. Things like uh-huh, uh-uh, nods and shakes of the head don't really translate well on the written page. Does that make sense?

A. Understood.

Q. The other thing that I assure you will make our court reporter very happy is please wait for me to finish asking my question before you start to answer. And likewise, I'll wait until you finish your answer before I ask the next question.

Page 6

CRISTOBAL CRUZ - BY MR. TSONIS

Okay?

A. Understood.

Q. All right. Your attorney here today may object to questions as we go through this process. Those objections are for the record only. You must answer each of the questions unless your attorney instructs you not to answer. Does that make sense?

A. Understood.

Q. Now, at times today I may ask a question that doesn't make sense or that I don't state particularly clearly. If you don't understand my question for any reason, please feel free to ask me to rephrase or repeat my question. Okay?

A. Understood.

Q. Can we agree if you do answer the question though, that you understood the question?

A. Yes.

Q. All right. Is there any reason why you wouldn't be able to give truthful or accurate testimony today?

A. No.

Q. We'll be talking about events potentially that happened several years ago, so it's

Page 7

CRISTOBAL CRUZ - BY MR. TSONIS

okay if your recollection has faded over time. We're entitled to your best testimony though. So if you have a partial recollection, I'd ask that you provide the recollection that you do have. Okay?

A. Understood.

Q. But I don't want you to guess or speculate. Does that make sense?

A. Yes, it does.

Q. All right. Last thing is if you need a break at any time for any reason, please just let me know and we can go on break. The only thing I will ask is if there's a question pending, that you answer the question before we go on break. Okay?

A. Understood.

Q. All right. Can you just state and spell your name for the record?

A. Cristobal Cruz. C-R-I-S-T-O-B-A-L, Cruz, C-R-U-Z.

Q. Where do you currently reside?

A. Do you want full address?

Q. Yes.

A. The address is 211 Conant Drive, C-O-N-A-N-T, Tonawanda, New York 14223.

Q. How long have you resided there?

Page 8

CRISTOBAL CRUZ - BY MR. TSONIS

A. Seven months.

Q. Prior to that, where did you reside?

A. The address was 92 Rosemont, R-O-S-E-M-O-N-T, Drive, Amherst, New York 14226.

Q. And how long did you reside there?

A. Approximately seven years.

Q. You're familiar -- are you familiar with the lawsuit that we're here to discuss today?

A. Yes.

Q. All right. What's your understanding of what this lawsuit that we're here to talk about today is about?

A. My understanding is I received a letter acknowledging or noting that the lawsuit was for people that were working overtime unpaid to keep up with workloads.

Q. Okay. When did you receive notice about that?

A. I don't recall a specific time. It had to be May or June after I had resided at 211 Conant Drive.

Q. Was it after your employment at GEICO had ended?

A. Yes.



CRISTOBAL CRUZ
FISCHER V. GEICO

Page 9

CRISTOBAL CRUZ - BY MR. TSONIS

Q.   Okay.  Why did you ultimately decide to opt into this lawsuit?

A.   I had worked through several lunch breaks through the years just to keep up with the workload.  I know others had complained about working overtime, over hours beyond the 4:30 p.m.  So at this point in time, I thought get my word out there as well that workload is a concern.  It kept gradually increasing.  So I wanted to make sure that I gave my testimony as well that it is a thing.

Q.   Okay.  And we'll get to, you know, the particulars of kind of what facts you have that may be relevant to the case.

Prior to joining this lawsuit, had you talked to any -- or let me step back for a second and rephrase that.

Prior to filing the form that led to you formally joining this lawsuit, had you spoken with any other current or former GEICO associates about whether or not you should join?

A.   No.

Q.   When was the first time you learned about the lawsuit?

A.   When I received the letter.

Page 10

CRISTOBAL CRUZ - BY MR. TSONIS

Q.   All right.  So prior to receiving the court-authorized letter that was sent out, you hadn't heard that this lawsuit had been filed prior to that?

A.   That's correct.

Q.   Since you opted into this litigation, have you spoken with any current or former GEICO associates?

A.   No.

Q.   You were employed --

A.   I want to stand corrected on that.  I have spoken with them, not about necessarily work.  I do have a coworker I have spoken with, to be clear.  Because we were friends, we did take a welding class together.  So directly, yes, I have spoken with people.  Topics are a little bit different.

Q.   I understand.

Are you aware of any other individuals that have joined this lawsuit?

A.   I am not.

Q.   So you don't know the identities of any other people?

A.   I don't.

Page 11

CRISTOBAL CRUZ - BY MR. TSONIS

Q.   All right.  Let's switch gears a little bit.  What did you do to prepare for your deposition today?  And I want to be clear at the outset, I'm not asking about the substance of your conversation with your legal counsel.  I'm just asking what generally you did to prepare.

A.   The only preparation I had was speaking with Jarron.

Q.   How many conversations did you have with Jarron?

A.   Two.

Q.   When was the first conversation?

A.   It had to be in December when the first date was scheduled.  I don't recall the date.

Q.   Okay.  And when was the second conversation?

A.   Yesterday, January 8th.

Q.   Let's start with yesterday's conversation.  Was that in person?  Over the phone?

A.   It was through a Microsoft Teams meeting.  Virtual.

Q.   Approximately, how long was that conversation?

A.   I want to say approximately an hour.

Page 12

CRISTOBAL CRUZ - BY MR. TSONIS

Q.   Did you review any documents as part of that conversation?

A.   Yes.

Q.   Were there other individuals that were present for that conversation?

A.   No.

Q.   Did those documents that you reviewed kind of refresh your recollection as to the relevant facts?

A.   Yes.

Q.   What documents did you review?

A.   It was my opt-in for the suit and just a spreadsheet of my time.  And a pay stub.

Q.   So your opt-in consent form that you filed, the consent to join form?

A.   Yes.

Q.   And I think you said a spreadsheet of your time?

A.   Correct.

Q.   Meaning a spreadsheet that identified the number of hours that you entered into Workday?

A.   Correct.

Q.   And then you said your pay stubs?

A.   We looked at one pay stub.

CRISTOBAL CRUZ
FISCHER V. GEICO

January 09, 2026
21–24

Page 21

CRISTOBAL CRUZ - BY MR. TSONIS

York or claims that occurred outside of New York?

A. Majority, yes. We did also handle New York as part of Region 2 as well.

Q. When you say as part of Region 2, what do you mean?

A. Region 2 handled New York, but there was overflow that would come to us in Region 8.

Q. Okay. Was that overflow within major case or non-major case?

A. That was non-major case.

Q. Okay. So I want to make sure I understand you right. So Region 2 -- well, I'll confirm. Was Region 2 located in what used to be known as the Woodbury office, which later moved to Melville?

A. That's correct.

Q. What geographic area did you understand Region 2 to cover?

A. All of New York State.

Q. Okay. So if there was high volume or Region 2 needed assistance in terms of managing caseload or for any other reason, one potential thing that would happen is that Region 8 would step in to provide additional resources?

Page 22

CRISTOBAL CRUZ - BY MR. TSONIS

A. Correct.

Q. And when I say "provide additional resources," I guess investigators that were assigned to work in Region 8 would take on cases that concerned claims that occurred in the State of New York.

A. Correct.

Q. Okay. And I think you said that was for non-major cases; right?

A. Correct. New York had their own major case that handled New York stuff primarily.

Q. Okay. Was that New York major case team different than the major case team that you were a part of?

A. Yes. They were under different management.

Q. Okay. Let's talk for a second about the management of the major case team. So at the time you transferred into the beginning of 2020, do you recall who your supervisor was?

A. Mike McConnell.

Q. How long was --

A. I'm sorry. Can you repeat that question?

Page 23

CRISTOBAL CRUZ - BY MR. TSONIS

Q. Yeah. At the time you transferred into major case.

A. Into major case?

Q. Yeah.

A. Yes, still Mike McConnell.

Q. Okay. How long was Mike McConnell your supervisor for?

A. For major case?

Q. Yes.

A. I don't recall the time frame.

Q. Okay. Do you recall who Mike McConnell's supervisor was?

A. Patricia Woupio.

Q. Is Patricia Woupio the Region 8 SIU manager?

A. Yes.

Q. So did Patricia Woupio to your understanding oversee both major case and non-major case SIU that was Region 8?

A. Correct.

Q. Okay. Are you familiar with Courtney Wolfe?

A. I am not.

Q. You're not familiar with who she is

Page 24

CRISTOBAL CRUZ - BY MR. TSONIS

or you didn't work indirectly under her?

A. I heard the name. I don't know who she is. I did not work under her.

Q. After Mike McConnell, who was your next supervisor?

A. Andrew Gelderman.

Q. Do you recall when Mr. Gelderman became your supervisor?

A. I don't recall.

Q. What's your best estimate?

A. How long he was my supervisor?

Q. When he took over as your supervisor.

A. It was right after Mike. I don't know how long Mike was my supervisor to know when Andrew took over. We changed supervisors several times.

Q. That's okay. This isn't meant to be a quiz. I don't want you to guess. There's something that will make this process a little easier. I'm going to introduce an exhibit.

(The following exhibit was marked for identification: Number EXH 1.)

Q. Have you ever seen this type of document before, Mr. Cruz?



Page 65

CRISTOBAL CRUZ - BY MR. TSONIS

Q.   Prior to COVID, those were done in person; right?

A.   Correct.

Q.   Post-COVID they were done virtually?

A.   Correct.

Q.   As a major case investigator, did you ever do an in-person EUO?

A.   No.

Q.   We started today talking about this lawsuit.  And you referenced kind of working through your lunch.  You understand that this lawsuit is about kind of off-the-clock work that individuals claimed that they worked for GEICO but were not compensated for; right?

A.   Yes.

Q.   How much time on average are you claiming that you worked off the clock that you weren't compensated for?

A.   I'm saying it was at least one to two hours per month based on just knowledge of meetings.  It could be higher, but I can only say one to two for sure.

Q.   All right.  And you referenced working through lunch.  Is that one to two hours per

Page 66

CRISTOBAL CRUZ - BY MR. TSONIS

month a summation of times where you worked through meetings and were not provided your sort of off-the-clock meal period?

A.   Yes.

Q.   In other words, besides working through meal periods, are you also claiming that there's another bucket of off-the-clock work that you weren't paid for?

A.   Just breaks.  I would never work past my scheduled 8 to 4:30 shift.

Q.   So when 4:30 hit, you were done at 4:30?

A.   I was done.

Q.   Pre-COVID as a desk investigator, you didn't have a laptop; right?

A.   Correct.

Q.   So you couldn't even work from home really if you wanted to.

A.   Correct.  There were no work from home.

Q.   Post-COVID, everyone was working from home, so you got issued a GEICO laptop?

A.   Yes.

Q.   And had the ability to connect

Page 67

CRISTOBAL CRUZ - BY MR. TSONIS

remotely to GEICO's systems after that?

A.   Yes.

Q.   So the one to two hours per month we said is exclusively working through meal periods?

A.   Yes.  At minimum one to two.

Q.   When you say "at minimum," what's the maximum that it would be?

A.   Maybe five.

Q.   Okay.  You're aware though you provided interrogatory responses to GEICO --

A.   Yes.

Q.   -- right?  And in those interrogatory responses, you signed them and verified them as accurate; right?

A.   Yes.

Q.   Do you have an understanding as to whether those interrogatory responses say at least one to two and up to five hours or whether they --

A.   It does not say up to five.  It's one to two.

Q.   Let's wait for our court reporter's sake.

So it says one to two hours per month?

Page 68

CRISTOBAL CRUZ - BY MR. TSONIS

A.   Yes.

Q.   Are you revising that response today to say one to two hours per month and potentially up to five?

A.   No.

Q.   And it's an average of one to two, but you're saying there are times where it could have been five?

A.   Yes.

Q.   And there's similarly times where it could have been zero in a given month?

A.   Possibly.

Q.   Okay.  How long was your meal period, your allotted meal period?

A.   45 minutes for lunch.

Q.   You worked 8 to 4:30 you said; right?

A.   Correct.

Q.   Was that true throughout the entirety of your time at SIU?

A.   No.

Q.   Was that true throughout the entirety of your time in major case?

A.   No.  I did do a shift change 7 to 3:30.



CRISTOBAL CRUZ
FISCHER V. GEICO

Page 69

CRISTOBAL CRUZ - BY MR. TSONIS

Q. When was that?

A. That happened -- I was reporting to Nichole Matthew at that time. And it happened -- it would have been September 2023. I think, yeah, I was reporting to Nichole. But that doesn't seem to match up with these dates.

Q. I'll represent to you that in GEICO's systems, you have to be keyed as managed by someone. But if someone was out on a vacation or something that doesn't result in a Workday change, that might not be reflected in any manager history section.

A. Okay.

Q. Okay?

A. I know it was the September before I quit, and that was June of '25.

Q. Okay. So to the best of your recollection, September of 2024 you think you made a schedule change to 7 to 3:30?

A. Yes.

Q. Okay. You said meetings would sometimes be scheduled after the reorganization that conflicted with your meal period.

A. Yes.

Q. All right. Prior to the 2023

Page 70

CRISTOBAL CRUZ - BY MR. TSONIS

reorganization, that kind of nationalized major case, were there such meetings that took place during your meal period?

A. No.

Q. All right. So your claims here really start in 2023?

A. Correct, after the reorganization.

Q. Right. And the reorganization, probably more like the middle of 2023; right?

A. Sounds about right.

Q. Okay. So from at some point in 2023 to the end of your employment in 2025 is when you're claiming --

A. Correct.

Q. -- that you worked, you know, on average one to two hours off the clock per month?

A. Correct.

Q. Okay. Were those one to two hours distributed across several work weeks in the month?

A. I mean, it would be a random day somewhere, yeah.

Q. I guess I'm just trying to figure out is it like, you know, there was this one meeting that happened monthly that would always conflict

Page 71

CRISTOBAL CRUZ - BY MR. TSONIS

with my meal period and that would happen? Or was it many work weeks it would be zero and then it might be three meal periods in one work week? Was it more evenly distributed through the course of a month?

A. It would be, like you said, there would be one specific meeting that would be that day. Or it would be another day where I'm busy playing catch-up and I just worked through.

Q. Okay. So you had the ability though to still take your meal period at a different time; right?

A. If I was to keep up with my work, no, because again, you're starting your day -- and it comes down to the schedule too. You may be returning your voicemails. You may be taking recorded statements which could take an hour.

You may also be doing an EUO that same day, which could take an hour and a half to two hours, while having meetings, while returning phone calls, while working new files that you got because they got to be touched within 24 hours. There's a lot that goes into each thing that you're balancing out through each day.

Page 72

CRISTOBAL CRUZ - BY MR. TSONIS

Q. So you decided that you would do the meeting at the same time as your meal period?

A. I may eat while in the meeting working, yes.

Q. Okay.

A. Because there may be an examination under oath that I've done first thing in the morning. Then I got to get in the meeting. Then you got to get everything documented and still work the new cases.

So you're trying to stretch that out. You skip lunch to do your meeting and you still got to be within your timelines of the other work.

Q. Okay. When you are working through these meal periods as you're alleging, are those times that you would be at home or in the office?

A. It would be at home and it has been in the office.

Q. What percentage of the time would you say occurred while you were working at home versus working at the office?

A. I mean, because I was only in the office two days a week, I would say probably two-thirds of it was at home.



Page 85

CRISTOBAL CRUZ - BY MR. TSONIS

A.  Correct.

Q.  And it could -- well, field investigators were working from their homes for a period of time; right?

A.  Correct.

Q.  What I mean by "working from their homes," is it your understanding that people that were classified as field investigators did not work in a GEICO office?

A.  That's correct.  To my knowledge they did not report to any offices.

Q.  So, for example, in Region 8, if the geographic territory that you're covering is the northeast, the field investigators that work in Region 8 are people that would be located in those geographic areas.

A.  Correct.  They would be in their respective states.

Q.  Okay.  They might be working from home or they might be out in the field, but they're not working in a GEICO office.

A.  Correct.

Q.  Was New Jersey part of Region 8?

A.  Yes.

Page 86

CRISTOBAL CRUZ - BY MR. TSONIS

Q.  Was New Jersey part of Region 8 I guess as a state or just like partially, like normal New Jersey, for example?

A.  New Jersey was included as a state.

Q.  Did the non-major case investigators report up through a supervisor to Patricia Woupio also?

A.  Yes.

Q.  Do you have a recollection of when Patricia Woupio stopped being the Region 8 SIU manager?

A.  It was in 2023, the first round of layoffs, I believe.

Q.  Who ultimately did you report up to after that change?

A.  I believe right after Patricia, that's when I went to -- I blanked on his name.  I can picture his face.  Jim Hammonds.

Q.  And how long did you report up indirectly to Jim Hammonds?

A.  Up until I left.

Q.  So essentially, there were two SIU managers during your time at SIU that you reported to through a supervisor, first Patricia Woupio and

Page 87

CRISTOBAL CRUZ - BY MR. TSONIS

then Jim Hammonds.

A.  Correct.

Q.  The practice we were talking about earlier where hey, if you need to wrap up some activity, a phone call runs long, something like that, how did you come to understand that that was the practice that you should follow?

A.  It was discussed in team meetings.

Q.  Who would be present in those team meetings?

A.  It varied on whichever team I was on. The team members and the supervisor.

Q.  So it would be generally the other investigators that reported to that supervisor and the supervisor?

A.  Correct.

Q.  Would they be like department-wide meetings that included the manager or no?

A.  No, typically just the immediate team.

Q.  Okay.  Did different supervisors that you reported to over time have different expectations around how you should request working additional time like that?

Page 88

CRISTOBAL CRUZ - BY MR. TSONIS

A.  No.  Everybody was pretty reasonable with if you're going over, you went over.  There were times also where it would be if you went over, you would have to flex that time and take it off of a different day.

Q.  Let's talk about flextime.  What is flextime?

A.  Flextime is if you work an extra ten minutes on Monday, by Friday you have to leave an extra ten minutes early so that you're still sticking within the 38.75.

Q.  So if you have an examination under oath that runs an hour long, when we're talking about flextime, the expectation would be within that same work week, that you reduce one of your remaining shifts by an hour --

A.  Correct.

Q.  -- so that you would sort of still maintain your approximately 38.75-hour scheduled work week.

A.  Correct.

Q.  Did you have to get approval in advance from your supervisor to flex your time?

A.  Yes.


ESQUIRE
DEPOSITION SOLUTIONS

Page 117

CRISTOBAL CRUZ - BY MR. TSONIS

took you to close a case as a major case investigator?

A. It was not a metric, no.

Q. And were you measured on how many cases you completed within a month?

A. Just the case closure.

Q. That ratio we referenced earlier?

A. Correct.

Q. But that was not, if you look at the next sentence, tied to completing it within 38.75 hours per week; right?

A. For those that had the metric, I would say the expectation was for it to be completed in that time.

Q. Right. But the case closure metric we talked about doesn't have an hours component; right?

A. Correct.

Q. All right. So purely a metric of measuring raw results. Cases assigned, cases closed, correct?

A. Right.

Q. So it's not tied to if you work more hours, your metric will negatively suffer; right?

Page 118

CRISTOBAL CRUZ - BY MR. TSONIS

A. I don't know because I'm not sure on the formula.

Q. Okay. But to your understanding, it wasn't tied to hours?

A. I don't believe it was tied to hours.

Q. Okay. Were you ever subject to any disciplinary action during your employment with GEICO?

A. No.

Q. Were you ever subject to any informal disciplinary action like a coaching?

A. Coaching, yes.

Q. What kinds of coachings did you receive?

A. Are we speaking specifically to SIU again or at any time?

Q. SIU. I'll clarify. If I want to ask about the time you were a claims representative, I will specify. But generally speaking, we're talking about SIU. And I'm trying to clarify major case versus non-major case. But yes, within your time in SIU, were you ever subject to disciplinary action?

A. I don't recall any disciplinary action in SIU.

Page 119

CRISTOBAL CRUZ - BY MR. TSONIS

Q. And you talked about coaching. What kind of coaching would you receive while you were in SIU?

A. The coaching would have been more so on recorded interviews, responding to -- you know, asking the proper questions for follow-up.

Q. So it would be whether you probed correctly or whether you asked the right follow-up questions in response to what the insured was saying?

A. Correct.

Q. All right. You were never disciplined, reprimanded or otherwise coached for entering an excess of 38.75 hours?

A. No.

Q. Did you ever complain to a supervisor that you were working through your meal periods?

A. No.

Q. Did you ever complain to human resources that you had to work through meal periods?

A. No.

Q. Did you ever complain to a member of management that you had to work through meal periods?

Page 120

CRISTOBAL CRUZ - BY MR. TSONIS

A. No.

Q. Did you ever complain to your supervisors about workload?

A. I did not, no.

Q. Are you aware of others who complained to their supervisors about workload?

A. Absolutely. Many teammates would complain.

Q. When you say "many teammates," do you know what individuals you're referring to?

A. I don't remember the individuals. It would have been people that were on my teams throughout the SIU over the last couple years.

Q. All right. So again, you're referencing the time period from July 2023 through the end of your employment?

A. Correct.

Q. And you said "people that were on my teams." So it would have been people that reported to the same supervisor as you?

A. That's correct.

Q. Let's flesh that out for a second. Do you have any other knowledge about individuals that worked in SIU that contended that they worked



CRISTOBAL CRUZ
FISCHER V. GEICO

January 09, 2026
121–124

Page 121

CRISTOBAL CRUZ - BY MR. TSONIS

off the clock that did not report to the same supervisor as you?

A.   No.

MR. MCALLISTER:  Objection.

Q.   Do you have any understanding or any knowledge of an investigator that worked in what was formerly known as Region 2 and whether they worked off the clock or had high workloads?

MR. MCALLISTER:  Objection.

You can answer.

A.   No.

Q.   You don't have to go back to the actual document, but let's say on a team that you worked with with Mike Mitchell, Michael Mitchell, who were the peers that you worked with?

A.   I worked with Amanda Bontempi and Ryan Maurer specifically.  There were a couple other people, but they were outside of the Buffalo area and I don't recall who they were.

Q.   What about when you reported to Nichole Matthew, who were your peers that you worked with?

A.   Amanda was my local peer.  And then there were people in other states.  I don't recall

Page 122

CRISTOBAL CRUZ - BY MR. TSONIS

who they were.

Q.   So when you're saying you heard things from your peers, are you talking about Amanda and Ryan Maurer or are you talking about these other individuals in other states?

A.   The other teammates in the other states.  They would monopolize team calls to complain about the workloads.

Q.   And those were individuals that worked as field investigators?

A.   No.  We were all on the desk.

Q.   I see.  So these are -- strike that.  These team calls, I think you were saying if I recall correctly, they nationalized major case; right?

A.   Correct.

Q.   So these would be desk investigators that worked throughout the country?

A.   Correct.  Most of us were on the east coast on the team, but we were in the different states.

Q.   I see.  And once post-reorganization, the east coast didn't just mean the northeast like Buffalo -- Region 8 I should say historically

Page 123

CRISTOBAL CRUZ - BY MR. TSONIS

encompassed; right?

A.   Correct.  It was no longer regional boundaries.  We would handle any state that needed work.

Q.   Do you have an understanding on how roughly SIU was organized post-reorganization in terms of geography?  You've been talking I guess about west coast and east coast.  Was it split that way?

A.   No.  To my knowledge, there were teams throughout the country.  Their supervisor could be anywhere as well.  Their manager could be anywhere.  But we didn't necessarily handle specific states.  The casework just got assigned out.  So I no longer just handled the New England region.  I would be working on a lot of Florida stuff, New York, California.

Q.   I see.  So post-reorganization, your investigations could essentially be geographically located anywhere in the country?

A.   Correct.

Q.   Did you have to be like certified for certain states in order to get investigations in those states or no?

Page 124

CRISTOBAL CRUZ - BY MR. TSONIS

A.   No.

Q.   Okay.  And I think you're saying that you would have these team calls that encompassed major case desk investigators or non-major case as well?

A.   If it was the entire SIU department, it could be everybody.  But specifically, if we're talking about people complaining about workloads, that's specific to the major case team.

Q.   All right.  And those major case calls, do you have an understanding of how many people would be a part of those calls?

A.   If it was just my team, it would be eight of us I think or so, some ballpark in there.  I don't know how many people were on the team.

Q.   All right.  And those people you said would be located in a variety of states?

A.   Correct.

Q.   All right.  Aside from people complaining about workload, are there any other conversations that you have personal knowledge about high workloads, people that allegedly required them to work off the clock?

A.   Those conversations were specific to



Page 193

CRISTOBAL CRUZ - BY MR. MCALLISTER

A.   Essentially, anytime we had team meetings, the first complaint, why I would not say anything myself, is it would just drag meetings out and we didn't have time for that.  People just straight up saying, "When are we going to get less cases?  There's too much to do."  Verbally expressed at every single meeting.

Q.   How often did you have those meetings?

A.   Meetings were -- I can't remember if they were monthly or weekly.  I don't recall if they were monthly or weekly.

Q.   Okay.  And in response or did your supervisors from 2023 to the time that you left, did your supervisors have any responses to those complaints?

A.   No.  They would acknowledge them because it was a known fact that it was a high case assignment and workload.  And it was just more we just have to kind of work through it and we could work as a team and do things.  But everybody was so backed up, we weren't really getting help from each other.

And as far as examinations under oath

Page 194

CRISTOBAL CRUZ - BY MR. TSONIS

and the recorded statements, those were the most time-consuming things that nobody wants to do for somebody else and supervisors didn't have time for either.

MR. MCALLISTER:  Okay.  No further questions.

MR. TSONIS:  Just one follow-up.

RE-EXAMINATION BY MR. TSONIS:

Q.   You said people would complain about having too much to do.  In none of those team meetings did people say we're working off the clock, we're working time and not putting it into Workday.

A.   No.

Q.   Sorry.  I phrased that poorly.  No, they didn't say that or no, that's not correct?

A.   Nobody ever said that.

MR. TSONIS:  Okay.  No further questions.

(TIME:  5:32 p.m.)

*   *   *

Page 195

W I T N E S S

| Name | Examination by | Page |
| --- | --- | --- |
| Cristobal Cruz | Mr. Tsonis | 4-192 |
| "    " | Mr. McAllister | 192-194 |
| "    " | Mr. Tsonis | 194-194 |

*   *   *

Page 196

E X H I B I T S

| Exhibit | Description | Marked | ID'ed |
| --- | --- | --- | --- |
| EXH 1 | Workday profile of Cristobal Cruz | 24 | 24 |
| EXH 2 | Second Amended Collective and Class Action Complaint | 111 | 111 |
| EXH 3 | Spreadsheet of hours worked | 141 | 141 |
| EXH 4 | Email chain, top email to C. Cruz, P. Woupio, A. Gelderman, J. Matrale, R. Aniolowski from M. McConnell dated 6/17/21 | 149 | 149 |
| EXH 5 | Email chain, top email to M. McConnell, S. Gray, C. Cruz, A. Bontempi, R. Peou from P. Woupio dated 7/15/21 | 157 | 157 |
| EXH 6 | Email to J. Karl from C. Cruz dated 7/27/22 | 180 | 180 |
| EXH 7 | Email to C. Cruz, R. Hauck, K. Vesci from P. Woupio dated 1/17/23 | 183 | 183 |

(Exhibits retained by the Court Reporter to be returned to Mr. Tsonis)

*   *   *

EXHIBITS PREVIOUSLY MARKED

| Exhibit | Description | Page |
| --- | --- | --- |
| EXH | | |

(No Previously Marked Exhibits Presented)


ESQUIRE
DEPOSITION SOLUTIONS

CRISTOBAL CRUZ
FISCHER V. GEICO

January 09, 2026
197–200

Page 197

D O C U M E N T   R E Q U E S T S

Request                                              Page
---------------------------------------------------------

(No Documents Requested)

*     *     *

C E R T I F I E D   Q U E S T I O N S

Question                                             Page
---------------------------------------------------------

(No Certified Questions)

*     *     *

Page 199

E R R A T A   S H E E T
Witness: Cristobal Cruz
Deposition Date:   January 9, 2026

| Pg # | Line # | Change | Clarification |
|------|--------|--------|---------------|
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |

Page 198

A C K N O W L E D G M E N T

I, Cristobal Cruz, declare, swear and aver that I have read my testimony contained herein and that my answers are true and correct, with any exceptions noted on the errata sheet, under penalty of perjury.

_____
Cristobal Cruz

I certify that this transcript was signed in my presence by Cristobal Cruz on the _____ day of _____, 2026.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office of Rochester, New York on this _____ day of _____, 2026.

_____
Notary Public

_____
My Commission Expires:

Page 200

C E R T I F I C A T I O N

STATE OF NEW YORK:
COUNTY OF MONROE:

I, MARY ELIZABETH PHILLIPS, do hereby certify that the foregoing testimony was duly sworn to; that I reported in machine shorthand the foregoing pages of the above-styled cause, and that they were produced by computer-aided transcription (CAT) under my personal supervision and constitute a true and accurate record of the testimony in this proceeding;

I further certify that the witness requests to review the transcript;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the City of Rochester, County of Monroe, State of New York.

*Mary Elizabeth Phillips*

MARY ELIZABETH PHILLIPS,
Freelance Court Reporter and
Notary Public No. 01PH0029368
in and for Monroe County, New York

