# Exhibit C

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

----------------------------x

ASHLEY ALVAREZ and MARK         :

SOWELL, individually and on :

behalf of all others            :

similarly situated,             :

         Plaintiffs,             :

v.                              :   CASE NO.

GOVERNMENT EMPLOYEES            :   1:24-cv-00722 (GLR)

INSURANCE COMPANY, d/b/a        :

GEICO,                          :

         Defendants.             :

----------------------------x

***SOME PORTIONS OF THIS TRANSCRIPT ARE IDENTIFIED

   AS CONFIDENTIAL AND WERE SEPARATELY BOUND***

   Videotaped Zoom Deposition of SCOTT GOSS

       Thursday, March 26, 2026

          9:39 a.m.

BEFORE: Cassandra E. Ellis,

CA-CSR #14448, CA-CCG, HI-CSR, WA-CCR,

RMR, RDR, CRR, Realtime Systems Administrator

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 14

long were those sessions?

A.   The first session, I don't recall, it was shorter, maybe -- maybe two hours, and then the next session was maybe three and a half hours.

Q.   Did you review any documents in those meetings?

MS. RILEY:  You can answer yes or no.

A.   Yes.

Q.   And did any of the documents that you reviewed refresh your recollection of your time at Geico?

MS. RILEY:  You can answer yes or no.

A.   No.

Q.   They didn't refresh your recollection?

A.   I was pretty aware of all of them. They weren't anything new.

MS. RILEY:  Okay.  Just yes or no.

MR. SCIMONE:  Okay.

MS. RILEY:  That's okay.

BY MR. SCIMONE:

Q.   You can give -- I'll ask that you

Page 15

give the most complete answer that you can, so I appreciate the answer that you gave.  Thank you.

All right.  Other than meeting with counsel, did you talk with anyone else at Geico to prepare today?

A.   No.

Q.   And have you been asked to search for any documents related to this litigation?

A.   No.

Q.   And did you voluntarily provide any documents to -- in connection with the litigation?

A.   No.

Q.   Have you discussed this deposition with anyone else, besides your counsel or Geico's counsel?

A.   No.

Q.   All right.  When did you first learn about this lawsuit?

A.   I had a vague understanding, generalization, that there was a lawsuit, I don't know, two years ago, year and a half ago? It's been a little while, but I wasn't informed directly, it was more hearsay understanding.

Q.   Do you remember who you heard about

Page 16

it from?

A.   I do not.

Q.   So two -- you said two or one and a half years ago, are we talking about roughly 2024?

A.   It could be.

Q.   What's your understandings of the allegations in this lawsuit?

A.   Broadly, I was told that there is a concern that people weren't paid for overtime.

Q.   Do you have any understanding of sort of the particulars of that and what -- what the plaintiffs are alleging?

A.   No.

Q.   Is it part of your understanding that the allegations include that investigators worked off the clock because they felt pressured by Geico's performance metrics?

A.   Yeah, and generally just that they weren't paid for overtime hours.

Q.   What's your educational background?

A.   I have a -- I have a bachelor's of science degree in criminal justice.  I have a business administration degree with -- in strategic management.  And I have a graduate

Page 17

certificate in government management.

Q.   Is the business administration degree a master's degree?

A.   No.

Q.   Roughly the equivalent --

A.   BA.  BA.

Q.   Understood.

Do you have any other formal training or professional certification?

A.   I was ACTAR certified as an accident reconstructionist, 750 credit hours of collegiate level work at Northwestern, Texas A&M, and the University of North Florida.  At the time there was no degree program, I'm not sure if there is now or not.  I was kind of on the front end of that movement of accident reconstructionist, but I was ACTAR certified.

I was then also certified as a fire and explosive experts by the National Fire Academy, that would be it, other than some just general certification stuff that goes along with insurance, fraud claims, law specialist.

Q.   Understood.

And I -- I think you said before, but how long have you worked for Geico?

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 18

A.   Since December of 1999.

Q.   And what's your current position?

A.   I'm a senior manager over our investigative operations.

Q.   And is that generally referred to as SIU, the -- the Special Investigations Unit?

A.   Yes.

Q.   And you're the senior manager over that unit, as a whole?

A.   Not the whole SIU, no.

Q.   What parts of it fall under your purview?

A.   I am responsible, currently, for our risk assessment team, which is our referral and triage team.  I'm responsible for the staged accident unit.  I'm responsible for all of our desk investigative teams and all of our field investigative teams.

Q.   And what are the parts of SIU that do not fall under your management umbrella?

A.   New York, New Jersey medical, Florida medical and non-medical major case, commercial investigations, marine investigations, and major case commercial investigations.

Page 19

I don't think I've forgotten anything, but that -- generally, that's it.

Q.   Where are you physically located?

A.   I'm in northern Georgia.

Q.   And who do you report to within Geico?

A.   I report to Brian Armstrong.

Q.   What's his title?

A.   Director SIU.

Q.   And do you have direct reports?

A.   I think, yes, let me think about how many.  I've got 12 direct reports.

Q.   I won't ask you to name them one by one, but can you give an overview of what roles they -- they fill?

A.   Yes.  I have four direct report managers who oversee the desk and field teams.  I have two investigative supervisors who oversee the staged accident teams.  I have three desk supervisors who encompass our weekend team, that direct report to me.  And I have two risk associate supervisors who -- who handle our triage.

Q.   And how would you describe your major responsibilities as a -- as a high

Page 20

overview, outlook overview?

A.   Responsible for all the day-to-day operations as they relate to single claim auto investigations, and I'm responsible for all referral triage and all automation of referrals.

Q.   How long have you been in your current role?

A.   I don't remember the exact date that I was officially promoted, but I took over this role in May of '23.  There was a period of time where I did it without title, I want to say that was June or July, but I don't remember the exact month.

Q.   June or July of 2023?

A.   Yes.

Q.   What was your position before that?

A.   I was an SIU regional manager.

Q.   What region were you responsible for?

A.   Region 3, Southeast.

Q.   How long were you in the regional manager position?

A.   13 years.

Q.   What was your position before that?

A.   I was an SIU field supervisor.

Page 21

Q.   For how long?

A.   Roughly, nine years.

Q.   Have we accounted now for your full time at Geico or was there another position before that?

A.   I started and had a brief time, maybe 18 months, as a field investigator before I was promoted.

Q.   Where did you work prior to Geico?

A.   I worked for the City of Decatur, Georgia, police department.

Q.   How long were you -- were you in the police department?

A.   Total law enforcement was just under 10 years, it was like nine and a half years.

Q.   Okay.  Let's talk, broadly, about SIU.

What role does SIU play, if any, in Geico's profitability as a company?

A.   Our role is, simply put, high level, to detect and defeat and defer fraud from our book of business, that translates into investigating and helping the claims department stop paying claims that we don't owe from a

Page 58

a defense against those issues that we were dealing with.

Q. So what were the analytics that you were referring to here?

A. Specifically there were -- there were dozens and dozens of pulls, at this particular time. So I mean to speak to just one singular one or giving you all of them, I don't recall all of them.

Q. Let's move to the next slide. Well, first, there's a transition slide. Things we are doing well, with a thumbs up; do you see that?

A. Yes.

Q. Okay. So now the next slide, we have a table with some data points. Is this showing a year-over-year comparison from 2021 to 2022 of these data points?

A. It is, in the context that it's 2021, 5/23, versus 2022 through 5/23. So it would be the same date range on both sides, it's not a year-end date on the top.

Q. You're referring to this little note at the bottom, MIP through 5/23/22?

Page 59

A. Yes.

Q. All right. Are -- are these the kinds of analytics that you would have been asking the managers to look at as part of -- just to go back to your phrasing here?

A. The answer to your question is --

Q. Hold on, hold on, if you'll let me finish the question: These are the analytics you would have asked managers to look at as part of focusing on the macro picture?

A. No.

Q. Okay. So then what analytics were you asking managers to focus on?

A. As I previously stated, there were analytical reporting that was given to them based on their assigned areas. I can give you one example that's very vivid to my memory: We had a bodily injury problem in the Atlanta metropolitan area, so we would have a BI run daily that had certain characteristics that we pulled out of the claims system from our FNOLs, and then we would review those cases for potential action if -- if it was, in fact, true that there was fraud flags. That's the analytics I'm talking about to the

Page 60

managers. They reviewed those reports.

Q. So what was your purpose in including these metrics in this presentation?

A. I was telling the team what was going well.

Q. Do these metrics relate to the context we saw at the beginning, where you were talking about Geico's market share, profitability and growth?

A. One has nothing to do with the other.

Q. This has nothing to do with Geico's profitability, the metrics we're looking at here?

A. In a very minute, indirect way. But the comparison here is an operational comparison over a period of time from one year to the next, just to gauge how we're doing.

Q. Let's break this down a little bit. The first three metrics here, the first three columns, new assigned cases, closed cases, and closure ratio, those relate to the volume of cases received and closed; is that -- am I understanding that right?

Page 61

A. New assigned -- new assigned is received, closed is what's closed by the investigators, and the ratio is the ratio between the two.

Q. The next column says: FPA, what is that?

A. It's a measurement of what we believe fraud of payment avoidance that we've sent to the company.

Q. Is this a percentage, then, where we see 56 point -- I'm sorry, that's millions -- 56,433,026 in 2021, is that -- what does that number represent, is that dollars?

A. It represents dollars, yes.

Q. So does that mean that's the number of payments that Geico didn't have to pay out as a result of your region's activities?

A. That's the measurement, yes.

Q. You characterized your unit's impact on Geico's profitability as -- just looking back here -- minute? To me, $56,000,000 doesn't seem minute. Is that how you would view that number?

MS. RILEY: Object to form, mischaracterizes testimony.

Page 62

A.   In the context of loss payments, in the 11 to 12 billion dollars range, at this time it's pretty minute.

Q.   All right.  But fair to say that between 2021 and 2022 there's an increase in the amount of money that SIU saved Geico in your region?

MS. RILEY:  Object to form.

A.   What it says on the chart, yes.

Q.   All right.  So we -- now moving to the right, here, we see old PROD and then a couple of columns over weighted PROD.

Can you explain the difference between those two measures?

A.   So old PROD would have been, as we discussed earlier, number of closed cases based on their -- based on their closing level, which would have given them a points or a weight, you know, divided by the number of hours.

Weighted PROD we did away for a period of time with the over hours, and we just had a points system, and this was the weighted point system.  You got so many points for a social media case, so many for a -- a policy case, so many for a full investigation.

Page 63

And the more complex the investigation the more points you got, the less complex the fewer points you got, in general

Q.   So as that's measured here, we have in 2022, 19,875, so -- and that's a number of points assigned to cases; is that measured over a period of time?

A.   From 1/1 to 5/23/22.

Q.   So that's over -- a little over a five-month period?

A.   Correct.

Q.   And when that measure weighted PROD was taken for the year, was that looked at over the course of the entire year?

A.   I have no doubt that we measured it.

Q.   Yeah, I think I'm asking just how it's measured, so weighted PROD, at this time, was being measured as a number of points over the course of the year?

A.   I apologize, I misunderstood.

Yes, that was the 2022 way that the corporate had given us the goal package, yes.

Q.   And you said for a time you moved to measuring it that way.  When did that time

Page 64

period end?

A.   I can't speak to exactly.  I want to say it lasted one year, it may have been two.  It was a short period of time.

Q.   Okay.  And then, after that, did Geico go back to measuring PROD in the old way, number of cases over hours?

A.   That's correct.

Q.   And to the right of that, we have case life, and so we have five in 2021 and then that rises to 5.1 in 2022.

My question is just what the number represents, is that a number of days, number of hours or something else?

A.   It's a number of days it takes, on average, for a case to close.

Q.   And then, to the right of that, we have disposition ratio and effectiveness.

Am I understanding this right, that those are percentages of the number of cases in which SIU was able to save Geico money by identifying fraud?

A.   I guess, from a high level, yes.  They're measuring two different things but, in general, yes, those are -- those are cases that

Page 65

we -- we had the ability to take some savings on or believe we gave them enough to save on.

Q.   Okay.  So these are the things the unit was doing well.  Now let's move to slide 16.

So here we have areas for improvement.  And then, following that, we have a number of slides.  I'm not going to go through them in detail, but these appear to show -- I'll just briefly go over them so you can see what we're talking about.

Am I understanding right that these are showing what the goals were for these various metrics?

A.   That's not correct.

Q.   All right.  So what is it, then?  What are we looking at?  Why are these areas here as areas for improvement?

A.   So at Geico we have a way that we measure things where we create 25 percent range groups.  We have the first quartile, second, third, and fourth quartile.

Effectively, if you're in the first quartile, you're from the 75th percentile to 100; second is 50th percentile to 75; third

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 90

reached this point, you know, that was time to adopt this.

Q.   Do you know who created this presentation about the new feature?

A.   I don't know who created the presentation.

Q.   Was it you, can you say that?

A.   It was not me.

Q.   Do you know where it -- did you -- well, are you familiar with the presentation?

A.   I'm familiar to the extent that I cite in this meeting, yes.

Q.   All right.  So you were part of the audience who had this presented to you, then?

A.   Yes.  And then I repeated it to my supervisors.

Q.   I see.  So you both received a presentation -- presentation, and then you also used this slide deck to give a presentation?

A.   Or to pass the information along, same difference, yes.

Q.   Okay.  Let's move down to slide six, which is Bates numbered 10739.  And so we have the heading here:  Why is this changing.  So I take it this is listing the reasons Geico

Page 91

is using this new feature; is that your understanding?

A.   That's what it says, yes.

Q.   All right.  And if you look at the fourth item down, one of the reasons listed is:  We have endured multiple legal challenges to our exempt/nonexempt time policies.

Are you familiar with what that's referring to?

MS. RILEY:  Object to the form, lacks foundation.

A.   Not directly.  I was not personally involved in -- in any of those.

Q.   I take it you were indirectly aware?

A.   I was indirectly aware of a previous challenge to the exempt/not exempt status in SIU.  And then I was also aware, just very generally, that there were several challenges similar in our auto damage department.

And auto damage was the ones -- was the group who was leading this.

Q.   When you say they were the group who was leading this, what's the "this" you're

Page 92

referring to?

A.   This -- this slide deck, this training.

Q.   Okay.  So this was being presented by someone in the auto damage component of Geico?

A.   That's correct.

Q.   And is that the -- the -- is that part of the adjuster function in the company?

A.   Yeah, auto damages are field appraisers who go and look at cars and/or physical damage of any type and do estimates.

Q.   And you were aware of those chall- -- legal challenges involving auto damage adjusters in -- at this time in December of 2022?

A.   Again, generally speak, yes, I had no details on it.

Q.   Okay.  And the last bullet here or last item says:  This places the responsibility on the associate to report the correct time and for management to approve it daily.

Do you understand "this" to be referring to the new feature?

A.   I understand this to be referring

Page 93

to the application they were using, yes.

Q.   Move to the next slide.

All right.  So this is listing pros and cons of the new feature, yes?

A.   That's what it appears.

Q.   Okay.  I'm going to draw your attention to -- on the con-side, the second box down, it says:  Not sure if a con, more respond -- more responsibility on you to report accurate time.

Do you understand "more responsibility on you" to refer to the employee whose time is being entered?

MS. RILEY:  Object to form, lacks foundation.

A.   Yes, I -- I would make the assumption that that is the end user.

Q.   Do you have an understanding of why it says:  Not sure if a con?

MS. RILEY:  Object to form, lacks foundation.

A.   Because prior to the check-in/check-out app they still had to report their time, and they still were responsible for their time, only on a timesheet on the computer.

Page 102

yes, that's when they would start their time clock or their check-in.

Q. Moving to the next slide, now.

Okay. Trying to get as much of it in the frame as I can while keeping the text large enough to read.

A. No, you're doing good. You're doing good.

Q. Thank you. Thank you.

Okay. So I want to draw your attention now to the bottom box here. There's a reference in here to flexible scheduling; do you see that?

A. Yes.

Q. Is that sometimes referred to as flex time?

A. That's what we commonly call it, yes.

Q. Can you explain what that is, briefly?

A. Again, we -- we allow our investigators to work for the most -- particularly the field, to work whatever schedule that -- that they need to, to accomplish the task in their day.

Page 103

And many of them may need to work early into the evening, because that's when people are off work and they can get interviews, et cetera.

So we allow them, if they need to, to take some hours in the middle of the day and flex their time in the afternoon.

If on -- I'm making a hypothetical -- on a Monday they work nine hours, they can make that, you know, overage of our normal 7.75 up later in the week by taking some hours off. And we give them pretty free rein to manage their schedules in that manner.

If somebody has, for example, a program at their child's school or they need to take a child to the doctor they can flex those hours in and out.

A good example of that is just this week I had an associate even in our office setting who we allowed to flex her morning hours so that she could attend some doctor's appointments without using leave time, and then she just made the hours up before the week was over.

Q. Okay. So now looking at this box

Page 104

in Exhibit 4, is this an accurate description of the flex time policy?

MS. RILEY: Object to form.

A. Not for SIU, probably for AD.

Q. Does this accurately describe how that policy works in SIU?

A. No.

Q. What are the differences?

A. We don't need a manager's approval. Again, we give them approval outright. We function a little differently than AD in the sense that we don't have to be in body shops during the time body shops are open.

And much of what we need to do occurs after normal business hours, sometimes. So we -- we -- we allow the flexibility for them to flex their time, utilize their own schedules so that they can get the work they need to do done.

Q. Is there any sort of approval needed for someone to flex their time at SIU?

A. Not officially, I do know some supervisors want to be at least let -- you know, be heads up that they're doing it, but in general, no.

Page 105

Q. But what about the part that says flexible scheduling can only be used up to a 40-hour work week, is that part accurate as to SIU?

A. I would say that we do ask them to -- to keep their check-in/check-outs at 40 or below, yes.

Q. So what you just described is that about how it works at SIU, is that true throughout the time from 2020 to the present?

MS. RILEY: Object form.

A. I can't --

MS. RILEY: Objection.

A. I can't speak to the other 11 regions for the time that we weren't verticalized, but for myself in Region 3, and myself now vertically, yes, that's how it's been handled. How was it handled in other regions? I can't speak to that.

Q. So from the time period from 2023 to present, during which you've been the senior manager of SIU, what you just described has been true for SIU, as a whole?

A. For the investigative division, yes.

Page 106

Q.   And I should have asked this earlier.

Just going back to that previous slide, where we were talking about when investigators should start and end their time, has there been a change, any change to those guidelines throughout the time, from 2020 to the present, that you're aware of?

MS. RILEY:  Object to form, lacks foundation.

A.   **There's -- there's been no change.**

Q.   Okay.  Now I'm going to move to slide 11.

Okay.  So this is a slide describing management expectations, yes?

A.   **That's what it appears.**

Q.   Okay.  Now, I'm going to draw your attention to the third box down, which says:  If overtime is worked repeatedly without management approval/consent performance coaching must take place.  Approval should be given in advance to work overtime that exceeds eight hours.

Is that an accurate description of Geico policy as to SIU?

MS. RILEY:  Object to form, calls

Page 107

for speculation.

A.   **The answer is yes.**

Q.   And has -- is that an accurate description of the policies at SIU from the time -- has there been any change in that from 2020 to the present?

MS. RILEY:  Object to form, lacks foundation.

A.   **No.**

Q.   All right.  So it's been true from 2020 to the present, that overtime approval is supposed to be given in advance?

MS. RILEY:  Object to form, lacks foundation.

A.   **That's correct.**

Q.   So the supervisor allowed someone to work overtime and only get approval after the fact that would not be consistent with Geico's policy; is that fair to say?

MS. RILEY:  Object to form, lacks foundation.

A.   **That's correct.  However, we would pay the hours and we would -- we would have a conversation about it.  We give them the work that we expect them to do in the 38.75 hour**

Page 108

**week.**

**So if we're working overtime or need overtime we just need to have a discussion about why.**

Q.   All right.  So if someone works overtime, and asks for approval after the fact, is that the performance coaching that's referred to in this box, that conversation you referred to?

A.   **That's more of an AD conversation. I would probably have a conversation with the supervisor for approving it.**

**Just for -- just for context, this -- this is, like I said, most of this is AD, it's not really us.  We just sort of tag along.**

Q.   But you were just giving answers as to SIU, that's what I was asking about.

A.   **Yes, I was giving answers as to SIU.  I just -- this document is AD is on that image.**

Q.   I understand.  But you did also give this presentation to your unit, afterwards, you said; correct?

A.   **Yes.**

Page 109

MR. SCIMONE:  Okay.  We are now uploading Exhibit 5.

I have to click a lot of buttons to get this up, so bear with me.  There we go.

All right.  Exhibit 5 is Bates stamped 10553.

(Exhibit No. 5 was marked for identification.)

BY MR. SCIMONE:

Q.   Okay.  Do you recognize this exhibit?

A.   **It appears to be an e-mail sent from someone else, on my behalf, from Rene Cubas.**

Q.   Who is Rene Cubas, in the context of Geico?

A.   **Rene is a manager that reports to me that handles the southeastern United States.**

Q.   Okay.  I'm just drawing your attention now to the earlier e-mail in the chain, was this from -- this part of the e-mail from you, not sent on your behalf, but actually sent by you?

A.   **Yes.**

Q.   And I'm going to draw your

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 118

people.

Are these people in the "to" line here managers within SIU?

A.   Yes.

Q.   And I'll just scroll down so you can see the text, but in sum, are you laying out steps for implementing a coaching process for the people that Ms. Dwigun had identified?

A.   **May I see that bottom area, if you don't mind?**

Q.   Absolutely.

A.   **Okay.  I'm sorry, if you asked me a question can you repeat the question?**

Q.   Yes.  Am I summarizing correctly to say that you are laying out the steps in a coaching process for those low performers that Ms. Dwigun had identified?

A.   **That's what it appears, yes.**

Q.   And this was the sort of next step that you talked about before, right, that you're trying to get them -- coach them up to the level where they're no longer underperforming?

MS. RILEY:  Object to form, lacks foundation.

A.   **That's correct.**

Page 119

Q.   And if -- without improvement, fair to say that they're in jeopardy of losing their job?

MS. RILEY:  Object to form, lacks foundation.

A.   **There was potential, yes, this could rise to that level.**

Q.   And drawing your attention here under -- just above this table, where you say "last," right here, the supervisors are also expected to comply with this coaching process; am I understanding that right?

A.   **No, that -- that last is that they're -- they're required to comply with the documentation process.  We have an application that we coach within, and sometimes it's not -- or at least at this time it was not as widely used as we were trying to still bring the regions into a synchronized standard.**

Q.   Okay.  So this would be -- sorry, go ahead.

A.   **I apologize.  I was just going to qualify my answer in that the supervisors were -- I'm basically asking them to use the tools to document this.**

Page 120

Q.   That's their responsibility?

A.   **Correct.**

Q.   You expect them to do that?

A.   **Yes.**

Q.   That's part of their job?

A.   **Yes.**

Q.   So my next question is whether this was a -- a regular process.  And I -- by this, what I mean is not just the -- the coaching plan, but beginning with the part where Ms. Dwigun identified people who were in this bottom 10 percent to get them onto coaching plans, was that a regular process within SIU?

MS. RILEY:  Object to form, lacks foundation.

A.   **This was not an SIU process.  This was a company-wide process for all operational units, and it began in January of 2024.**

Q.   So it applied within SIU, as well, from January '24 on?

A.   **Yes.**

Q.   And so that process was that employee relations would identify the bottom 10 percent and then initiate that process in getting them onto coaching plans?

Page 121

MS. RILEY:  Object to form.

A.   **At least explanation as to why we didn't think they need a coaching plan.  I mean, there is times where there was an understanding, because of individual circumstances, that they would recover without additional coaching.**

Q.   Okay.  But the process was employee relations identifies the bottom 10 percent and then sends them to you to then pass along to the managers to identify people who should be placed on coaching plans?

MS. RILEY:  Object to form, mischaracterizes.

A.   **In effect, yes.**

Q.   And then, as we go back to your e-mail, these two tables are the ones -- are showing the people who are in that bottom 10 percent in terms of the performance metrics listed on the table?

A.   **That's correct.**

Q.   And those metrics are productivity, file quality, and average case life; am I identifying the right things?

A.   **That's correct.**

Q.   With this process that's been

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 122

initiated in 2024 what's the frequency with which employee relations does the process by identifying the bottom decile?

MS. RILEY: Object to form, lacks foundation.

A. Every six months.

MS. D'SOUZA: I think the exhibit might have gone away.

MR. SCIMONE: Yes, I took it down.

MS. D'SOUZA: Oh, okay. Sorry.

MR. SCIMONE: I'm moving now to the next one, just taking a minute to get it up.

So Exhibit 7 is Bates numbered 9980.

Okay. I'm going to zoom in here a bit.

(Exhibit No. 7 was marked for identification.)

BY MR. SCIMONE:

Q. Okay. Do you recognize Exhibit 7, Mr. Goss?

A. Looks like an e-mail someone sent on my behalf, yes.

Q. And this is in July of 2024.

My question is: Is this a

Page 123

continuation of the process we were just discussing in reference to Exhibit 6?

A. Yes.

Q. Okay. So this is now people in the bottom 10 percent, some number of them have been placed on coaching plans, and this is now SIU tracking the results of that; is that a fair summary?

MS. RILEY: Form.

A. This is human relations tracking and following up on the results, but yes.

Q. So was this sent on your behalf by human relations?

A. No, but the request came from them to us to put this together. I assume that there is a string of e-mails, and I suspect that the very bottom we're being asked for a memo on all of this stuff.

Q. All right. Let me scroll down and see if that's correct. So it is a very long chain, but --

A. This appears to be, from my perspective, us working together to put together all the different areas' memos.

Q. Okay. All right.

Page 124

So now going back up to the last e-mail in time. All right.

So in summary, after some period of coaching, some people have improved, some people are still working at it, and some you believe can no longer be coached to an acceptable level?

A. Yes.

Q. And so some of those people, the ones who couldn't be coached to an acceptable level, were either fired or in this e-mail you were saying that they would be fired; am I getting the context correctly?

MS. RILEY: Lacks foundation.

A. I'm sorry, I missed the last part. You said they would be fired or what?

Q. Yeah, so let me just point out what I'm looking at here.

So -- these have Nydi- -- Nydia, the last person here, you write: We'll be recommending term, that means you were making the recommendation that she be fired; is that right?

A. No, this -- this recommendation in this e-mail is about our -- our PIU team, which is separate from SIU, and this is Jen Fogarty's

Page 125

message, it got forwarded, I guess, under my name, somehow. I don't know why.

Q. I see. So this was Jen Fogarty recommending that Nydia be fired?

A. That's correct.

Q. Is that similar, though, to how the process would work for investigators in SIU?

MS. RILEY: Object to form, lacks foundation.

A. Yes, it's -- it's all operational areas in -- in S -- in Geico.

Q. And where you note here for Carrol, that her results are still not good, you say: I don't know if we would term due to FML or -- maybe this is Jen Fogarty, saying: I don't know if we would term due to FML, do you understand FML to refer to family medical leave?

MS. RILEY: Object to form, lacks foundation.

A. I do, but these are not my words.

Q. Do you know whether the decision was ultimately made to fire Carrol?

A. I don't. I -- I don't have anything to do with PIU.

MR. SCIMONE: Okay. Exhibit 8 is

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 126

Bates stamped 10018.

(Exhibit No. 8 was marked for identification.)

BY MR. SCIMONE:

Q. Okay. Do you recognize Exhibit 8?

A. It appears to be an outline of what Neill Haggett, a supervisor of mine, is going to do, from a coaching standpoint, with an associate Heath Little.

Q. Okay. And I'm going to just scroll back, because actually my questions are about what precedes that.

So he's responding to an e-mail from you, dated June 11, 2024; do you see that?

A. All right. Go ahead.

Q. All right. So I take it you just skimmed through the document. I was going to ask you to take a look, but this is your e-mail to Neill, Ben Stewart and Eduardo Lopez and Jessica Lopez, on June 11th, 2024; do you see where we are?

A. (Nodding.)

Q. Okay. Do you need me to scroll down so you can read the rest of it?

A. You can. I -- I'm pretty sure I

Page 127

know what this is, but let's make -- let's make sure so that I don't give you the wrong answer.

Q. Sure.

A. Can I see what comes before that, is there anything before that e-mail?

Q. Yeah, no, nothing before that.

A. Okay. I'm pretty sure I know what this is about, but go ahead, you can ask your questions.

Q. Yeah, so my first question is just: Is this a slightly different process from the one we were just looking at, involving the bottom 10 percent?

A. I would characterize this as an early pivot by our leadership team. Angela that I'm referring to there is a -- the executive leader over all of operations for Geico.

And initially, when this particular procedure came out, we were not looking back to the end of '23. They made a decision to look back and see where those folks were at that time.

So that added those extra people to my list that I needed to get some understanding of what kind of coaching that we've done, that

Page 128

kind of thing, just to report up.

Q. What's Angela's last name?

A. Reilenia.

Q. Sorry, could you spell that?

A. R-e-i-l-e-n-i-a, I think. Spelling is not my strong suit, so if I got it wrong I'm sorry.

Q. No worries.

Okay. So here what you're looking at is people who are in the fourth quartile, and, in fact, have been, you know, in more than once; am I understanding that right?

MS. RILEY: Mischaracterizes the document.

A. It appears that I'm looking at people who are in the fourth quartile that had ended 2023 in the fourth quartile and now they're still in the fourth quartile in the middle of '24.

Q. Is this fourth quartile for a particular metric or is that an overall quartile?

A. That would be a combination of the three metrics.

Q. And are those the three metrics we

Page 129

saw earlier, productivity, quality and case life?

A. That's correct.

Q. All right. Is this also part of a coaching process?

A. That's correct.

Q. And is this also a regular process, meaning that from time to time the management team would be looking at people who would stay in the fourth quartile from one year to the next?

MS. RILEY: Form.

A. I -- I would characterize this as I did before, this happened every six months. Again, this was the first time we had went through this, so there was some sausage making going on as to what they wanted to look at and wanted to see.

And that has been tweaked a couple of times over the past, I don't know, two years or so.

Q. Okay. And understanding, of course, that there is a coaching process that happens first, you say here that if we can't get them to perform better it might be better to

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 193

listening to it.

Q.   So Lee was the director of the department where this issue that Jim Hammonds refers to would have arisen?

A.   Yes.

Q.   Do you remember what you did here, the substance of what you did here, from Lee, at that time?

A.   I don't.  I don't remember.

Q.   Did you get any information from anyone in management about claims by TCRs being resolved or -- as part of that?

A.   No, that's not within my scope.

Q.   Did you later learn anything else about TCR claims?

A.   Again, that wouldn't be something that would have been shared with me, other than high level, super high level overview at a staff meeting, and a reminder on this overtime issue.

Q.   Yeah, let me take a step back now, because we have talked about a couple of instances involving claims of unpaid overtime.

There was -- we talked earlier about an auto damage adjuster suit.  There's this reference to TCR1 OT, and then Jim mentions

Page 194

this issue involving the customer service representatives, in each case it seems that you didn't get a lot of information about what was happening; is that fair?

A.   That's correct.

MS. RILEY:  Object to form.

BY MR. SCIMONE:

Q.   And is that typical, you know, in your experience with Geico that you have not -- you, although you may have heard, you know, something from time to time, at a high level, about these overtime issues, you were never really fully briefed on what happened or why; is that accurate?

A.   That's accurate.

Q.   Did any of that change when you moved into your current role, as director of SIU, did you get any new information about issues like that?

A.   I'm at the senior manager level, so, no, that's usually reserved for the director or senior director level.

Q.   I apologize, I keep confusing the job titles.

But when you moved into your role

Page 195

as senior manager, thank you, where you're overseeing the field of investigators, you didn't get any further briefing on past wage and hour issues that had been raised?

A.   No.

MR. SCIMONE:  All right.  Exhibit 19 Is Bates stamped 11613.

(Exhibit No. 19 was marked for identification.)

BY MR. SCIMONE:

Q.   I'll just scroll down a bit, so you can see the overall context of this.  And I'm scrolling a little bit quickly, just so you can see the pattern of who's writing and who's responding, but I can go more slowly, if you'd like.  My questions will mostly be about this top document, but -- my question for you is if you recognize it?

A.   I believe what I'm look at is being an e-mail -- an e-mail string that began with McElvain, and then I responded.  I don't recall, specifically, the conversation, but I do recognize it as an e-mail.

Q.   All right.  And this is dated December 1st, 2021, so this is at the time when

Page 196

you were the regional manager of Region 3; correct?

A.   Correct.

Q.   And Ryan McElvain, at that time, was the director of SIU?

A.   Yes.

Q.   Earlier, when we were talking about Brian Armstrong, you mentioned some difference in their roles, although the title was the same.

I think you said Brian Armstrong was operational director.

What was the difference in Ryan McElvain's role when he was the director?

A.   So I'll start with -- with McElvain, in prior years, before, McElvain and the directors that came before him, Douglas Shiring or Steven Rutzebeck, that goes back about 15 or 18 years those are what we call CHO directors or claims home office directors.

They were directors with a very small staff, four or five people, and they basically created policy and -- and then they sent that out to the regions.

The regions, on the other hand, operated as independent companies, and it was

Page 197

like having 10 to 12, depending on what timeframe we're talking about, separate laboratories trying to find the best practices to do in all areas.

So McElvain and before was more of a policy-setting role, and I did not report to him. I had a dash line, we had to listen to what they said, but ultimately if my assistant vice president in the region decided it wasn't in our local interest to follow whatever guidance they were giving us, we could do so.

There's certain things we followed pretty regularly, but certain decisions we didn't follow.

Now, fast forward to today as a verticalized unit I have an actual operational director that I report to, I no longer report to the officer in the region and the regions don't exist anymore.

So he has direct say over what I do or don't do and then I have to get approval from him on certain things before I can do them, where McElvain I did not.

Q. Do you recall earlier today we were talking about a change that happened in 2022 as

Page 198

to how PROD was calculated, where hours were taken out of the equation?

A. Yes.

Q. You testified in connection with that, that the way PROD was calculated was not something you had control over, that that was something that was dictated by a different entity within Geico; was that claims home office?

A. That's correct.

Q. That's one of the things you didn't have control of in your region?

MS. RILEY: Object to form.

A. I didn't have control over the way they set the reporting. So the leverage that home office would have over us is they controlled the reporting.

So in the end, if you didn't follow what they wanted to you to do from a goal or metrical standpoint as far as measurement of associates, you would not have the support that they put into place from a reporting standpoint.

So yes, we would -- we would, for the most part, have to follow those things.

Q. All right. And this e-mail here is

Page 199

also about how productivity is calculated; is that right?

A. That -- that e-mail is, as I recall, I was trying to get myself in the conversation, and I never did get in the conversation, and that was my suggestion in writing.

Q. Can you summarize the suggestion that you were making?

A. Out of weight, certain activities that are being done. Ryan had an idea that we needed to weight activities. And the initial conversation about it I was trying to get in that conversation, and I was not able to -- to get into that group that was discussing or working on this, so I gave him what I believed the breakdown of the points should be based on the activities, the large scale activities that we measure in the system.

Ultimately, they reprogrammed some of the reporting, and my suggestion here was let's don't reprogram the reporting. Let's use what we have today, and they ultimately didn't go that way.

Q. Now, was the objective of your

Page 200

suggestion to try to measure the productivity of investigators more accurately?

A. My -- my suggestion was, from my perspective, this was a better way to do it, and it wasn't as complicated, albeit I do think, looking at it now, in retrospect, it is kind of complicated.

But from an explanation standpoint to an associate, so that they understand, you know, what's expected of them, I felt like the plan they were discussing was so different that we were going to have some concerns and -- and that was my take on it, this was just a suggestion to try to keep things more simple.

Q. Was your suggestion a better way to do it because it measured productivity more accurately?

MS. RILEY: Object to form, asked and answered?

A. If I'm honest with you, I don't really recall what the plan was we landed on, so I can't say whether the plan was better or worse. It was very short-lived, I think it was one year, maybe two.

Q. Sorry. So I'm not asking about

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 213

Q.   And your way of being part of that conversation was to make this proposal that we now see at the top of Exhibit 19?

A.   I wouldn't characterize it as a proposal but, yes, that I expressed my idea, after, it looks like, a phone consideration between Ryan and I when I understood more the direction he was going.

Q.   Okay.  So now drawing your attention back down to this section here, you say:  The last thing I think we need to take some time and consider is what is the right PROD.  This is an excellent time to reset, since the entire applecart is changing.

What did you mean by the entire applecart is changing?

A.   I mean, their ideas to go from a case count to an activities count.  And if we're going to -- if we're going to turn everything over, now is the time you look under the hood and make sure we're doing everything correctly.

Q.   And correctly, here, meaning you want to make it more accurate to the work being done?

MS. RILEY:  Object, form, asked and

Page 214

answered.

A.   Not necessarily, it's always about whether we're measuring something the right way, and thinking about it the right way, and applying the right times to it, this is a constant throughout my career, we have constantly, year-over-year, reassessed our data to make sure that we are getting the cleanest, best way to look at something.

Q.   Mr. Goss, I just want to draw you back to the last thing we went through, it seems we need to go through it again.

I thought that we agreed that putting whatever the proposal itself was, the goal was to have -- to come up with a way to measure PROD that would more accurately reflect the work.  Is that true or is it not, that that was the objective that was --

MS. RILEY:  Object.

BY MR. SCIMONE:

Q.   -- that this conversation was driving towards?

A.   So that was the objective for the below e-mail, right?  And then he asked me to speak to him at noon, and there was a phone

Page 215

conversation, it looks like I got a different idea of what his plan was, so after I determined that this was where we were headed, I put together my ideas.

I also found out, I do recall this, that I wasn't going to be part of a this conversation.  So I put what I wanted to do into writing to try to make myself part of the conversation.

Q.   Right.  Well, let's look at what you were -- what you said about this idea.

After you write:  I'm not sure either of us believe 69 PROD is productive and 30 something may be underproductive, you go on to write:  I am concerned about the hidden overtime piece and looming new AB suit; what is that referring to?

A.   I don't remember specifically, but I remember there being a concern with AD, at one point in time, that they had a -- some sort of a -- some sort of an overtime suit which led to the whole check-in/check-out thing.

Q.   Yeah, we talked about that in the context of that Workday presentation; right?

A.   Correct.

Page 216

Q.   That's the same auto damage test receipt that we were talking about?

A.   Yeah, I don't have specifics on it, I just -- in general.

Q.   You were aware that that was happening, it seems, in December of 2021?

A.   In the context of our auto damage, yes.

Q.   And what do you mean:  I am concerned at the hidden overtime piece?

A.   Well, that was what the lawsuit was with AD was, is there was a concern that they were working non-documented hours.

Q.   What's the relationship between what you called the hidden overtime piece and PROD?

A.   I'm not sure I understand your question.

Q.   Why did you say:  I am concerned at the hidden overtime piece in the context of this conversation about how productivity is measured?

A.   Because I want to set the right rate so that we -- we -- we are giving it the right amount of work so that we're not overworking people.

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 217

Q. How did the measurement of PROD relate to hidden overtime?

MS. RILEY: Object to form of the question.

A. Okay. It --

MS. RILEY: Foundation.

A. If we -- if we look at the first sentence, I'm saying that we should get to the right PROD, right? What is the right number for 38.75 hours.

And then below, I'm just generally saying I'm concerned about the overtime piece if we don't get to the right PROD.

Q. Why were you concerned about the overtime piece?

A. In the context of the -- that there was a looming suit with auto damage, and we had been reminded of this.

Q. What about the context of the looming auto damage suit made you think that how PROD was measure wood affect overtime?

MS. RILEY: Object to the form of the question.

A. Because all areas are measured with widget overtime, so...

Page 218

Q. I'm sorry, what's widget overtime?

A. Widget, activity overtime, in our damage it would be closed claim, in SIU it's closed case.

Q. I see. So you're saying that's how productivity was measured, in general, across the company?

A. In all of operations, yes.

Q. So did you have an understanding that the overtime lawsuit and auto damage had something to do with how they were measuring PROD?

MS. RILEY: Object to the form of the question, misstates testimony.

A. Not how they're measuring PROD, per se, no.

Q. Well, then, why did you -- why did you bring this up in the context of the conversation about productivity? You say that productivity is measured the same way in SIU as it is in other parts of the company, including auto damage.

So I'm trying to figure out what the connection is here between PROD and overtime, in your mind?

Page 219

A. I'm trying to answer it as simply as I can for you, but I'm trying to set the right number of PROD, and we had this big gap between 69 and 30.

I don't know what the -- what that number should be, because we're counting one for one across all regions.

So my point was I don't want to get involved in what's going on over here in AD. I'm trying to make sure we set the right PROD as we change things, and I want to make sure we're doing the math behind it, essentially.

Q. So what does hidden overtime mean? I'm asking about the word hidden, there. Why -- why did you refer to it as hidden overtime?

A. I don't recall.

Q. You don't recall?

You don't know why you used that word?

A. I just said, I don't recall.

MR. SCIMONE: Let's mark this as Exhibit 20.

(Exhibit No. 20 was marked for identification.)

///

Page 220

BY MR. SCIMONE:

Q. All right. Mr. Goss, I've introduced Exhibit 20, it's a legal pleading, it's a collective and class-action complaint, it's been filed in the District Court For the Eastern District of New York and it's Rieske v. Geico; do you see this?

A. I see it.

Q. Have you ever seen this document before or one like it with this caption?

A. No.

Q. Have you ever heard of Rieske v. Geico, I don't know if I'm pronouncing it correctly, but have you heard of a lawsuit by that name?

A. No.

Q. All right. So I want to draw your attention here to a few things, this was filed in July 22nd, 2021, so roughly five months before the e-mail we were just looking at.

And in the introduction here it says that the plaintiff is bringing this lawsuit on behalf of other people who are similarly situated. And the second paragraph he goes onto say that those people who suffer damages as a

Page 225

A.    Correct.

Q.    Isn't that what I asked you earlier, and you said, no?  How is that different?

A.    I don't remember.

MS. RILEY:  Object to form.

A.    I don't remember you asking me that earlier.

Q.    I had asked:  Were you aiming to figure out what the correct workload would be or rather what would be a reasonable workload for a 38.75 hour week?

A.    That -- I don't recall that question.

Q.    Okay.  Well, now you're testifying that you wanted to ensure that you were assigning the amount of work that would not exceed a 38.75 hour week; is that your testimony?

A.    That's --

MS. RILEY:  Object to form.

A.    That's the exercise with the idea that I'm sharing, yes.

Q.    And you wanted people to do that without hiding overtime that they were working,

Page 226

I take it?

MS. RILEY:  Object to form, misstates testimony.

A.    It -- it's company policy to -- to log the hours that you work.  I -- I have routinely reminded the associates that we will pay for any hours at work, and they're expected to log any hours that's worked.

So anybody that is quote, unquote, working off the clock or not reporting their hours are in violation with not only company policy but an integrity violation.

So, I mean, that, in and of itself, it should not be a consideration.

Q.    Well, you were concerned at this time that people were working off the clock, I take it, is that what hidden overtime means?

MS. RILEY:  Object to form, asked and answered, argumentative.

A.    Again, that was about the concern of the overtime piece with the AD lawsuit.

Q.    And so were you concerned about AD or were you concerned about SIU?

A.    I was concerned about us falling into a similar situation if we did not choose

Page 227

the right amount of work.

Q.    All right.  So in sum, then, you were concerned that if you didn't have the right level of PROD there could be a similar overtime problem in SIU?

MS. RILEY:  Form, misstates testimony.

A.    Correct, I would -- I would not want to over-assign people work.  My goal, as a manager, is to assign the right amount of work and be productive and efficient and to work for efficiencies to gain, you know, more opportunities.

But it's never about just over-assigning people, that -- that doesn't work with investigations, unfortunately.

Q.    Because if you over-assigned people work there was concern that they might feel pressured to work off the clock; is that a fair way to say it?

MS. RILEY:  Object to form, misstates testimony.

A.    I -- I -- I would say that my concern would be an investigation, because they're -- they're not fully -- in that they

Page 228

don't fully have a procedure that you have to follow, like check a whole bunch of boxes, right?

So my concern would be that if you give them too much work what you're going to get is very little investigation back.  So there -- there's a balance that you have to strike when you're managing a team like this where they have the ability to work their case.  They have enough time to work their case.

Q.    But you didn't write in this e-mail that you were worried about getting very little investigation, you wrote that you were concerned about hidden overtime.

And so isn't it a more reasonable reading of this to say that you were concerned that if you use the wrong measurement PROD people would be pressured, would feel pressured, investigators would feel pressured to work off the clock?

MS. RILEY:  Object to form, asked and answered, misstates testimony.

A.    Again, I'm trying to seek the right amount of PROD in what appears to be a new system or way of measuring it, and I was

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 229

concerned about not only AD's lawsuits, but also concerned about workload issues with AOS. I didn't want people to be making complaints about workload.

Q. Because, as you say in the next sentence, people were -- there were repeated workload AOS issues, in other words, the associate survey was showing repeated workload concerns; is that right?

A. Yes. Yes.

Q. And you were concerned about that; fair?

MS. RILEY: Object to form.

A. As a manager, I'm always concerned what we get back in the AOS. And I always try to resolve them, just as what we looked at earlier that was my plan to try to resolve those pieces.

Q. And you were concerned that there might be similar problems with overtime and SIU similar as to what had happened in auto damage?

MS. RILEY: Object to form, asked and answered.

A. Again, I was concerned about the AD suit and our reminders about overtime, that's

Page 230

all.

Q. You were concerned because you didn't want the same thing to happen in SIU; right?

MS. RILEY: Object to form, asked and answered.

A. I did not want to have an overtime issue with our teams because we had given them too much work.

Q. And your ideas about how to measure PROD were not implemented?

A. As I recall, no.

Q. And you did not end up being part of the conversation about how to measure PROD?

A. As I recall, no.

Q. Did you explain in your phone conversation with Ryan McElvain all of these concerns that you lay out in the e-mail?

A. As I recall, that conversation was more about where his direction was, and me understanding that, which led to me following up with the e-mail.

Q. Did you discuss with him your concerns about the workload issues and the AOS surveys?

Page 231

A. I don't know, this was several years ago, sir, I don't -- I don't remember the very specifics of it, other than I know we discussed what his path was.

Q. Do you recall whether you discussed the concerns about overtime with him?

A. I don't recall.

Q. Did you ever learn whether Geico had taken any actions to avoid the kinds of concerns about overtime that we just discussed in SIU, specifically?

MS. RILEY: Object to form.

A. I'm not sure that I understand what you're asking me, so let's clarify just a little bit. You say that -- did Geico take any actions to do what?

Q. To avoid the concerns that people would work off the clock if they had too much work assigned to them?

MS. RILEY: Object, form, misstates testimony.

A. So I personally have repeatedly reminded the teams that we pay for all hours, to document time, as required by the handbook. They signed the handbook and go through a

Page 232

handbook class, annually, to ensure that they understand what the corporate policy is, and I've also told all the supervisors to ensure that they -- that they pay the overtime if it's posted.

So, I mean, I have taken those actions. I can't speak for Geico, beyond that, that's what I'm aware of.

Q. Anything else, besides what you just said, any other steps --

MS. RILEY: Object to form.

BY MR. SCIMONE:

Q. -- that led to your concern?

A. Not that I can recall, no.

Q. And since you moved into your senior manager role, overseeing all the desk and field investigators in Geico, were you aware of any other steps that have been taken to avoid the problem of people working off the clock?

MS. RILEY: Object to form.

A. Just we have regular reminders that they're required to -- to update their time.

Q. Have you made any changes to how productivity is measured for that reason of avoiding overtime, has -- has there been a

Page 233

change for that reason?

A.    No.

Q.    I want to go back, briefly, now, to Exhibit 2.  This is, again, the June and July town hall from 2022.  I'm going back to a slide we spoke about earlier.

All right.  This is slide 22.  You may remember this, we talked about -- you wrote here:  Time is no longer a factor, and we discussed how that refers to the fact that for that year they changed PROD so that hours were not part of it, it was just the number of cases closed in a year; do you remember that testimony?

A.    It wasn't cases, it was the number of points accumulated in the year, but yes.

Q.    Thank you.  And you had written underneath that managers and supervisors are danged if we do and if we don't.  And we had an exchange about whether there were some people who were upset about hours being part of productivity.

And now that we've spoken about this concern you raised in 2021, about how productivity was measured, and whether it was

Page 234

assigning the right amount of work to people, does any of that refresh your recollection as to why managers and supervisors were danged if they did include hours or danged if they don't?

MS. RILEY:  Answer.

A.    It doesn't change anything, this -- this wasn't a -- this wasn't a number of cases issued, this was a how the system worked issue, it was very hard to understand.

Q.    So your testimony is this doesn't have anything to do with the concern about hours driving off the clockwork?

A.    No.

Q.    It's, no, it's not your testimony, or, no, it doesn't have anything to do with that?

A.    No, it doesn't have anything to do with that.

Q.    Geico went back to using hours in the productivity network after 2022?

A.    I don't remember exactly what year, but we did go back to it, yes.

Q.    And you had that -- this exchange with Ryan McElvain in 2021, Geico has continued to use productivity as a metric in recent years,

Page 235

correct, in 2024 and 2025?

A.    Yes.

Q.    And that metric still includes hours in the denominator?

A.    That's correct.

Q.    Do you know who made the decision to go back to using hours in the denominator?

A.    I don't.  I don't remember if that was -- if Ryan was still involved with SIU or at that time -- I know that our goals now, and since, I know since '23 our goals come directly from HR.

So I don't -- I don't know if Ryan changed that the year before that or if it -- if it got changed when we got under sort of the umbrella of the corporate goal structure, I'm not sure.

Q.    So in the time since 2023, the decision to use productivity and to measure it the way that it's measured has come from HR?

A.    There -- so maybe -- maybe -- maybe I need to preface that a little bit.  There is a committee of directors that -- that aren't involved with HR, that develop these, but yes, it is a consistent across the board each -- to

Page 236

each line unit has some form that is very similar so that everyone can be measured in a similar way.

Q.    Do you sit on that committee?  I'm sorry, can you just repeat?  I didn't hear an answer.

A.    I'm sorry, I said no.

Q.    Do you know who does sit on that committee?

A.    For SIU it's Brian Armstrong.

Q.    How long has that committee been in existence?

A.    I'm not sure.  I would say since '23, but I'm not really sure.  Again, I'm not involved with it.

Q.    And I -- I'm sorry, I know that I have asked this before, but Brian Armstrong began in his role when?

A.    Middle of 2024, sometime, May or June of 2024.

Q.    So who -- who preceded him on that committee for SIU?

A.    I don't think we had a representative.  We went through a period of time where we had some leadership changes, as we

Page 237

were getting ready to verticalize it, so I think initially we didn't have anybody on it.

Q.   All right.  So during that time, when you had nobody on that committee, was that committee still setting the goal packages for SIU?

A.   At -- at a high level, yes.  I mean we were -- we were told you have to have a PROD and you have to have this, but there was less discussion over how that was said and how it was going to be publicly displayed to associates, et cetera.

Q.   And before the committee, the PROD metric was -- the way that that was calculated was determined by a claims home office?

A.   That's correct.

Q.   Does that committee have a name?

A.   If it does, I'm not aware of it.

Q.   How do you refer to it?

A.   I call to the goals committee, but I don't think that's an official name.

Q.   All right.  But when you say that other people understand what you're talking about?

A.   The only person I have conversation

Page 238

with this about is with Brian, as I get information from him.

Q.   Have you ever had any conversations with Brian about that productivity metric and why it -- well, let me be a little narrower than that, it's a very broad question.

Have you ever had any conversations with Brian about why that committee continues to use productivity as one of those metrics?

A.   No.

MR. SCIMONE:  All right.  Let's take a break here.  We can make this a -- let's actually take a little bit of a longer break.  Let's make this one 15 minutes, if that's okay.

THE VIDEOGRAPHER:  All right.  I'm sorry, I didn't hear you, Ms. Riley, did you say it was okay?

THE WITNESS:  I think I turned my mic off on her.  Go ahead.

MS. RILEY:  That's fine.

THE VIDEOGRAPHER:  All right.

We're now off the record.

The time is 3:45 p.m. eastern time.

(Recess.)

THE VIDEOGRAPHER:  We are now on

Page 239

the record.

The time is 4:00 p.m. eastern time.

BY MR. SCIMONE:

Q.   All right.  Mr. Goss, we're back after a break.

Anything about your previous testimony that you'd like to clarify or amend?

A.   No.

Q.   I'm sorry?

A.   I said "no."

MR. SCIMONE:  Okay.  All right.

I'm going to introduce Exhibit 21, which is Bates stamped 10715.  Let me try to enlarge the text a little here.

All right.  Good.

(Exhibit No. 21 was marked for identification.)

BY MR. SCIMONE:

Q.   Do you recognize Exhibit 21.

A.   Generally speaking, yes.

Q.   What is it?

A.   It looks like a copy of our strategic plan.

Q.   And this is for the year 2023?

A.   This would be claims home office's

Page 240

plan for 2023.

Q.   Okay.  So can you tell me a little bit about how this document got drafted?

A.   I don't know, because I wouldn't have been involved with this document.

Q.   Did you receive it in or around either late 2022 or the beginning of 2023?

A.   This document, it may have been posted on, like, a share site, but this document was for the planning team, which is a group of executives when they visited the home office, this was -- this would be outside of my scope.

Q.   Who are the executives who are part of that planning team?

A.   It -- it varied from time to time.

Q.   Do you know who the SIU representatives, if any, were?

A.   Oh, there was never an SIU representative on that group.

Q.   So claims -- is it your understanding that claims home office created this document?

A.   I believe so, that's their logo.

Q.   And you -- you've mentioned this might have been posted on a share site.  What's

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 257

productivity.

Q.   And does that reporting include the hours worked by associates?

A.   It's part of the equation, but it's not shown in the reporting, it's -- you just get the end number.

Q.   If a manager had an associate whose productivity looked off, would they be able to dig a little bit deeper to see whether that was related to the number of points or related to the number of hours?

A.   So I'm going to answer your question two ways, and I'm not trying to be coy, I just want to be clear.

In prior years, yes.  Reporting has changed in the last, I don't know, three or four years, no

Q.   Well, I'm not asking so much about reporting, but could they look this information up, did they have access to it?  I'm not talking about, necessarily, whether it was pushed to them but whether they had the ability to investigate it?

A.   In that, I'm sorry, but that's what I'm answering.  They had -- they had reporting,

Page 258

they could see that, a couple years ago, that went away.  Now they can't see the hours anymore without -- I don't know how they would do it, to be honest with you.  If there is a report in Workday I'm unaware of it.

Q.   When did they stop being able to access that information?

A.   We moved from a -- an IBM enterprise database type scenario to a different reporting system, that's in Snowflake, and that data all got changed and the reporting systems got changed.

Q.   When did that change happen?

A.   It didn't happen all at once, but it happened throughout 2023 and early '24.

Q.   You said earlier that -- and Ms. Riley asked you if pre-approval was only required if it was foreseeable, and your answer was yes.

If a -- an investigator is repeatedly asking a supervisor to approve overtime, after the fact, is that something that, under Geico's policy, should lead to a coaching conversation?

A.   It would certainly have a

Page 259

conversation at least with the supervisor to figure out why that is happening, because my example, in my mind, would be that someone has something run over at the end of their day and they get caught and need to work a couple extra hours, we want to give them that flexibility.

However, if that happens a whole bunch of times, then we need to talk about better planning your week, et cetera.  There -- there -- there's -- there's pieces that we can try to help them with.

MR. SCIMONE:  Okay.  Thank you.

MS. RILEY:  All right.  We will read and sign, please.

MR. SCIMONE:  All right.  Off record, then.

THE VIDEOGRAPHER:  Cassandra, did you have -- you wanted to get your orders or do you want me to go first.

THE REPORTER:  I can go first.

Mr. Scimone, when do you need your transcript?

MR. SCIMONE:  I think we would like a rough, and I think also an expedited turnaround.

Page 260

THE REPORTER:  What day?

MR. SCIMONE:  Let's see, today's Thursday, would you be able to get it to us by the end of the week?

THE REPORTER:  That would be tomorrow?

MR. SCIMONE:  Yeah.

THE REPORTER:  Yes, we can do that.

And Ms. Riley, when do you need your transcript.

MS. RILEY:  If you don't mind sending me the rough, that would be great.  And I'll follow up with you on the order.

THE REPORTER:  All right.  That sounds good.

THE VIDEOGRAPHER:  And then, Mr. Scimone, for video we have standard video.  Did you want that synced?

MR. SCIMONE:  Yes, please.

THE VIDEOGRAPHER:  Okay.  And then, Ms. Riley, would you like a copy of the video?

MS. RILEY:  I don't need a video right now for our order.  Thank you.

THE VIDEOGRAPHER:  Okay.  This concludes the deposition of Scott Goss for

SCOTT GOSS
MARCH 26, 2026

JOB NO. 2486474

Page 261

Ashley Alvarez, et al., versus Government Employees Insurance Company doing business as Geico.

We are now off the record.

The time is 4:34 p.m. eastern time.

(Signature having not been waived, the deposition of SCOTT GOSS was concluded at 4:34 p.m. eastern time.)

ACKNOWLEDGMENT OF DEPONENT

I, SCOTT GOSS, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____          _____
        (DATE)                         (SIGNATURE)

Page 262

REPORTER'S CERTIFICATION ORAL DEPOSITION OF SCOTT GOSS
March 26, 2026

I, Cassandra E. Ellis, Certified Shorthand Reporter hereby certify to the following: That the witness, SCOTT GOSS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:

___X___ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript.

If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 27TH day of March 2026.

_Cassandra F. Ellis, CSR_
_____
CASSANDRA E. ELLIS, CA CSR; HI CSR; WA CCR RMR, RDR, CRR

Page 263

E R R A T A    S H E E T

IN RE:  ASHLEY ALVAREZ and MARK SOWELL, individually and on behalf of all others similarly situated, v. GOVERNMENT EMPLOYEES INSURANCE COMPANY, d/b/a GEICO

RETURN BY: _____

PAGE    LINE    CORRECTION AND REASON

____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____

_____   _____
    (DATE)                (SIGNATURE)

Page 264

E R R A T A    S H E E T    C O N T I N U E D

IN RE:  ASHLEY ALVAREZ and MARK SOWELL, individually and on behalf of all others similarly situated, v. GOVERNMENT EMPLOYEES INSURANCE COMPANY, d/b/a GEICO

RETURN BY: _____

PAGE    LINE    CORRECTION AND REASON

____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____
____   ____    _____

_____   _____
    (DATE)                (SIGNATURE