# Exhibit D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL         ) Case No. 23 Civ. 02848
O'SULLIVAN, JOHN MOESER,       ) (SJB)(SLT)
LOUIS PIA, THOMAS BARDEN,      )
CONSTANCE MANGAN, and CHARISE)
JONES, individually and on    )
behalf of all others          )
similarly situated,           )
                              )
                 Plaintiffs, )
                              )
v.                            )
                              )
GOVERNMENT EMPLOYEES          )
INSURANCE COMPANY, d/b/a      )
GEICO,                        )
                              )
                 Defendant.  )
_____)

REMOTE VIDEO-RECORDED DEPOSITION OF SARAH GREENMAN

Date:                   Thursday, October 16, 2025

Time:                   10:06 a.m. Eastern

Location:               Steno Connect Videoconference

Stenographer:           Amy E. Simmons,

                        RDR, CRR, CRC, CSR

Page 166

following up for information, something along those lines.

But what it does is it raises awareness for the customer that someone else from GEICO is going to contact them. Okay?

You can imagine from a customer perspective it can get confusing. I've already talked to this person when I reported the claim. I talked to a medical adjuster. I talked to a liability adjuster. I talked to my auto damage adjuster. Now I have to talk to you.

So we're trying to set the stage in that situation to ideally garner cooperation from our customer and be able to collect the facts that we need to collect.

Now, when you start your contact attempts with the customer sooner in your case, then you can work through that process and procedure a little bit quicker.

So you could infer that it could help progress and maybe reduce your case life because I'm running my background searches and I'm setting up my case. I'm sending that email to the customer.

There is certainly an opportunity where

Page 167

the customer could send you the on-scene police report that resolves all of your concerns and you don't have to talk to them on the phone.

So it pushes the case along by collecting information, if you don't have the time to make a particular phone call to that individual right up front.

Q. I see.

So this is a strategy, then, to be efficient in terms of case life; is that fair to say?

A. Yep. And it's not something you can use in every case, which is why I would say it's a case life tip.

Q. Sure.

A. You might be able to, you know, maybe take half a day off of this case or that case, which you will see in your overall results, then, impacted by it.

MR. SCIMONE: Okay. We're going to mark as Exhibit 11 a document Bates-stamped G14980 through 982.

(Deposition Exhibit No. 11 was marked.)

Q. (BY MR. SCIMONE) Okay. Do you recognize Exhibit 11?

Page 168

A. I do.

Q. And what do you recognize it to be?

A. It is email communication with my then-manager, Rene Cubas.

Q. And if we scroll down a bit further to the earlier email in time, this begins with an email from Rene to a group of people that includes you.

Just looking at the other names here, are these other SIU supervisors?

A. Yes.

Q. Or were they at the time?

A. Yes, that would be correct.

Q. Were these supervisors who reported to Rene?

A. Yes. To the best of my memory, they would have.

Q. So the first sentence in the email is, "As part of your prep for our MAAG meeting," M-A-A-G.

What is a MAAG meeting?

A. Month at a Glance.

Q. What were those meetings? What was the subject matter of those meetings?

A. On a high level, we will generally come

Page 169

together as a leadership team. That can be all members -- all managers. In my current function, Scott Goss generally leads those meetings. And then our direct managers are in there.

We will talk about results for investigators. And we will talk about, you know, maybe where their struggles are, how we are currently supporting them.

And it's, you know, kind of a good check-in to, one, make sure a supervisor's on point with individuals who need support, and, two, make sure that management is in the loop.

And, you know, it then gives them an opportunity to identify if a supervisor may be missing something, to come together to provide the best support we can.

Q. Okay. So, generally speaking, you're reviewing data in these meetings and discussing how to supervise based on that?

A. Yeah. How to support them, how to help drive their results.

Q. Just in general, when you say, "results," I mean, you're referring generally to, you know, the kinds of data that's being measured in, like, the results that you emailed around on a monthly

Page 170

basis, for example; is that fair to say?

A.    They tend to be very similar, yes.

Q.    Okay.  And there's a table here with what looks like some data in Rene's email.

What data does this chart show?

A.    Are you speaking in regards to time frame for the data?

Q.    No.  I'm just asking kind of what the data is, what information it's telling us.

A.    So the data that's showing there can be critical performance metrics, like productivity and case life.

It would also show our impact ratio, which is kind of -- you know, what's our level of, for lack of a better term, success in identifying or securing evidence of fraud.

Q.    And on the two columns all the way to the right, we have Impact and -- can't quite see the word, it's a little cut off -- Prod.

Is that -- do you understand that to be productivity or an abbreviation of productivity?

A.    Yes, I do believe so based on the verbiage in the email.  It says, "Check the associates here showing fourth quartile for productivity."

Page 171

Q.    Yeah.  Okay.

So that gets to my next question, then, which is, the numbers here seem to be 1, 2, 3, or 4 and are color-coded accordingly.

So what is that showing us?

A.    I'm only inferring from the body of the email because we're not looking at the original document.  This would be just a -- kind of a snip of certain investigators.

They could be only the ones on the report that Rene had reporting to him.  I can't --

Q.    It's showing us what quartile they fall under for each of these categories, right?

A.    That would be my interpretation based on context of that email.  He specifically states it for productivity but doesn't for impact.  So that's why I'm inferring it's the same for impact.

Q.    I mean, was this data that you saw kind of regularly at these monthly meetings?

A.    Not necessarily.  And I only say that because we didn't always have the Month at a Glance at the supervisor level.  Sometimes it could be at the manager level only.

So it's not something I could tell you for certain that I saw every month regularly.

Page 172

Q.    But it's familiar to you, right?  Is that fair to say?

A.    Yes.

Q.    Okay.  Like, you're not surprised -- you're not guessing that this is a quartile.

You're sort of basing that on some experience of having seen similar data; is that fair to say?

A.    That would be fair to say, yes.

Q.    Okay.  All right.  So just so we understand, is fourth quartile the highest or the lowest?

A.    In this situation, it would be the lowest.

Q.    Okay.  So Rene writes, "Check the associates here showing fourth quartile for productivity.  Check the why to it.  It could be their hours worked, parentheses, early vacation, et cetera.  So compare hours first.  That will help."

How does hours worked relate to these data points?

A.    Productivity is calculated by the cases closed and their individual weights for the types of cases they're closing divided by their hours

Page 173

worked.

And then you would kind of average it out by multiplying it by 155, the average working hours in a month.

That was the formula we were using in this time frame.

Q.    How does early vacation relate to that?

A.    I don't know what Rene's intent was by checking for early vacation, to be honest, because lesser hours worked can lead to having less cases.  That could be a factor.

In his specific line of questioning for the associates that reported to me here, my answer was very simple.  These are both associates that have resigned.

So I did no further investigation or follow-up in checking on this data.

Q.    Right.  Just focusing, again, though, on that sort of question, let me see if I'm understanding right.

If people were on vacation, they would not be getting so many cases, and so that might change the productivity numbers?

A.    Correct.  When associates are not in the office, they do not receive cases.

SARAH GREENMAN
OCTOBER 16, 2025

JOB NO. 2016452

Page 174

Q.   Okay.  Was that always the case throughout your time at GEICO?

A.   I want to say yes because there were times where cases would come to me and then I would distribute them to the investigators.  And if they weren't there on a particular day, I wasn't assigning them that case day.

Then we eventually, even at the regional level, transitioned to direct assignments to the investigators.

And we used to have to report, and still do today, when associates are out of the office because they would not receive cases in that window.

That's typically for a full day out of the office.  So if somebody was taking an hour or two for a doctor's appointment or something like that, they could still receive cases.  But if you had a full day off, you should not get cases that day.

MR. SCIMONE:  Okay.  We'll mark as Exhibit 12 a document Bates-stamped G17531 through 532.

(Deposition Exhibit No. 12 was marked.)

Q.   (BY MR. SCIMONE)  Okay.  Do you -- well,

Page 175

let me scroll a little bit so you can see the rest of the document.

Do you recognize this document?

A.   Yes, I do.  It's an email to my investigative unit from April 8th of 2024.

Q.   And the subject line here is 4/08 Meeting Minutes.

Similar to the earlier document we saw, is this a set of minutes that you circulated after a team meeting?

A.   That is correct.

Q.   Okay.  Looking at the names here, this looks like a different team; is that right?

A.   Yes.  I would say middle of March of 2024, I transitioned from the previous group of investigators, which were largely located in the Long Island/New York City area, to this team that you see below, which represents some Pennsylvania, New Jersey, and New York investigators.

All five of those associates still currently report to me, and there are three additional.

Q.   All right.  But in spite of that change, you continued your practice of sending meeting minutes?

Page 176

A.   Yes.

Q.   And including the data that you -- that we see here in the chart?

A.   That's correct.

Q.   All right.  So looking here at the first bullet point, what's a ten-day pending report?

A.   That would be an interim report that we're supplying to the claims team when we are conducting an investigation that takes ten days or more.

We're, essentially, providing them a ten-day update.  Through our case management system, we would print a PDF report of the activities taken place thus far.

Q.   So is that, then, sent out every ten days?

A.   No.  It is only the first ten days.

You can see actually the initial process if you look at, I believe, the fifth bullet point, "A pending report should be uploaded for all pending cases not referred to EUO every ten days."

So that must have been the standard at that time.

But I would tell you the number of cases that do proceed past ten days, on average, are

Page 177

very, very slim.  So it would be rare currently to have that.

And I don't believe my investigators are updating them every ten days.  It's ten-day pending report and typically, by then, it's either moving into EUO or moving to closure.

MR. SCIMONE:  Okay.  Exhibit 13 will be a document Bates-stamped G15041 through 042.

(Deposition Exhibit No. 13 was marked.)

Q.   (BY MR. SCIMONE)  Okay.  Do you recognize by format what Exhibit 13 is?

A.   Yes, I do.  It's an email exchange with one of my peers.

Q.   That's Andrew Gelderman?

A.   That's correct.

Q.   And this was dated April 8th, 2024?

A.   Correct.

Q.   All right.  So I'm going to scroll down so you can see the earliest email in time.  I'm trying to move slowly so you can kind of take this all in.

And then scrolling up to take in the rest of that email.

So the To line in Andrew's original email here is to a distribution group.

Page 218

between 38.75 hours and 40 hours as overtime?

A. Correct. Outside of their regularly scheduled hours.

Q. Okay. There are different definitions of overtime. There's a legal definition and it's a little bit different, so I just want to make sure we're using consistent terminology here.

A. Okay.

Q. So the question I had asked was whether investigators need to request approval for overtime. I'm not sure I quite got the answer there.

So what is the answer?

A. And by "overtime" that definition, you mean, is over 40 hours?

Q. No. I want to use your definition here.

A. Okay.

Q. Just for consistency's sake.

Were they required to request approval for what you've described as overtime for that gap up to 40 hours?

A. My process in handling that for a desk investigator or someone pre in the regional structure, prior to the re-org, would be different than my process today with my field investigators,

Page 219

because their operation in how they conduct their business is slightly different.

If you specifically were saying, I have X tasks that I need to get done and I need a few hours to do that, that is kind of an interpreted request for additional hours or overtime, so to speak, beyond the 37.5.

So that would be something, yes, I would want to have their discussion with. And, again, that's focusing on my regional investigators prior to the reorganization.

Today, the investigators operating reporting to me are field investigators. Some days can go longer than their 7.75. Some days may go shorter. They should balance out at 38.75.

If they happen to go over incidentally because of a specific scenario, that is okay. They will log that. They will be compensated for it. There is no request process for that.

Q. Okay. I want to just ask you to focus very carefully and narrowly on the question I'm asking. We're getting a little bit outside of that, which is fine. I just have to go back and sort of break down the bits of this.

So let's talk about the time

Page 220

pre-reorganization first.

A. Okay.

Q. Was the answer yes or no for did they have to request authorization to work between 38.75 and 40 hours?

A. Yes, they would have to have a discussion with me.

Q. Okay. If they worked more than 40 hours -- again, this is pre-reorganization -- if they worked more than 40 hours, did they have to ask you for approval?

A. Yes. That would be above the 38.75, so the same answer would apply.

Q. In your declaration, you write that when they ask for overtime between one to two hours a week, you would approve overtime requests without the need for SIU manager approval.

Was there a point at which you did have to ask for SIU manager approval?

A. I don't know that it was required so much as my personal practice. If somebody was going to need that, I would have a discussion with my manager to make sure that they were in agreement that offering them that overtime request was going to be of benefit for the particular tasks.

Page 221

Q. Do you know whether you were required to ask a manager for approval of more than two hours of overtime as a matter of GEICO policy?

A. No, I do not.

Q. Are you familiar with GEICO's policy for overtime approval?

A. I'm not aware of there being any specific policy in place. There could be context in our handbook regarding overtime.

Again, it was personal practice and based on the relationship I developed with my managers.

Q. Let me be sure I understand here.

Is it your testimony under oath today that you're not aware of whether there was a policy about requesting overtime approval? Again, we're talking about before the reorganization.

MR. TSONIS: Object to form; argumentative.

You can answer.

THE WITNESS: No, I have not seen a policy of that nature.

Q. (BY MR. SCIMONE) So you're not familiar with GEICO having a policy that investigators had to ask for supervisor approval for overtime?

MR. TSONIS: Object to form.

SARAH GREENMAN
OCTOBER 16, 2025

JOB NO. 2016452

Page 222

Q. (BY MR. SCIMONE)  I just want to be very sure that that's your testimony.

A. I am not aware of a policy that stated that.  That was my personal practice.

Q. Why did you write in your declaration -- or why did you agree to the statement in your declaration that you would approve overtime requests without the need for SIU manager approval?  Why use that word "need"?

A. Because small amounts of time were entrusted upon us to kind of manage that, I suppose.

I mean, the majority of the time I was still alerting my manager to the fact that maybe they were going to work a little bit more than normal based on a discussion I had.

But I didn't necessarily need their authority to say, you need an extra 30 minutes to wrap up something.  Proceed.  I could grant that to them.

Q. Did you have an understanding that if someone needed a significantly more -- greater amount of overtime, more than two hours, that it would be a good idea for you to reach out to a manager?

Page 223

MR. TSONIS:  Object to form.

You can answer.

THE WITNESS:  Yes, that's my style.  I like to keep my manager informed of the performance of myself and my team.

Q. (BY MR. SCIMONE)  The question was whether you understood it would be a good idea.

A. Yes.

Q. What led you to that understanding?

A. The -- it's -- again, it's just my leadership style.  And through discussions of just operational items with my manager, I preferred to keep them informed of what was happening in my team than not informed.

Q. So this was entirely just your style and your preference and, you know, how you kind of felt you should operate as a supervisor?

A. Yes, sir.

Q. It wasn't based on any GEICO policy?

A. That is correct.

MR. TSONIS:  Object to form.

You can answer.

Q. (BY MR. SCIMONE)  It wasn't based on any training you received about overtime?

A. No.

Page 224

Q. That wasn't based on any conversations with any managers or any other person in a position of authority at GEICO?

MR. TSONIS:  Object to form.

You can answer.

THE WITNESS:  No.

Q. (BY MR. SCIMONE)  That's your testimony sitting here today?

A. That is correct.  That is my personal preference and the way I operated as a supervisor.

Q. Did you ever ask a manager to approve overtime at any point in your role as a supervisor?

A. Yes, I have.

Q. How many times or how often did you make requests like that for approval from a manager?

A. I don't recall a specific number, but it is -- it was few and far between.  And as previously stated, it was all pre-reorganization.

Q. Was the -- so your best recollection is that it was few and far between.

Is that because it wasn't very common for a supervisor -- sorry, for investigators to ask for overtime approval?

MR. TSONIS:  Object to form.

Page 225

Q. (BY MR. SCIMONE)  Or rather, as opposed to, for example, them asking for it but you not escalating that to a manager, for whatever reason?

MR. TSONIS:  Same objection.

You can answer.

THE WITNESS:  If you're -- can you restate your question?

Q. (BY MR. SCIMONE)  Yeah.  You said it was few and far between, and I'm trying to figure out if that is because you didn't get very many requests for it or because you opted not to raise that with a manager, for whatever reason.

A. It would be because there wasn't a great need for it during that time frame.  I may get a request for it.  There were some times I may have offered it to an investigator based on a singular discussion.

Q. Were there, in fact, times that you offered overtime to an investigator based on a singular discussion?

A. I can think of a couple of occasions where that may have happened.

Q. Please describe them.

A. So it would be a situation where I'm in a one-on-one coaching conversation with an associate

SARAH GREENMAN
OCTOBER 16, 2025

JOB NO. 2016452

Page 306

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL    ) Case No. 23 Civ. 02848
O'SULLIVAN, JOHN MOESER,   ) (SJB)(SLT)
LOUIS PIA, THOMAS BARDEN,  )
CONSTANCE MANGAN, and CHARISE)
JONES, individually and on  )
behalf of all others       )
similarly situated,         )
                            )
              Plaintiffs,  )
                            )
v.                          )
                            )
GOVERNMENT EMPLOYEES        )
INSURANCE COMPANY, d/b/a    )
GEICO,                      )
                            )
              Defendant.   )
_____)

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
SARAH GREENMAN
OCTOBER 16, 2025

I, Amy E. Simmons, Certified Shorthand Reporter in and for the states of California, Idaho, Oregon, Washington, Utah, and Tennessee, hereby certify to the following:

That the witness, SARAH GREENMAN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

Page 307

I further certify that pursuant to FRCP Rule (30(e)(1) that the signature of the deponent:

_____X_____ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefore;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this 28th day of June, 2025.

*Amy E. Simmons*
_____
AMY E. SIMMONS
ID CSR No. 685
CA CSR No. 14553
WA CSR No. 22012915
OR CSR No. 22-009
UT CSR No. 14223843-7801
TN CSR No. 1127
RDR, CRR, CRC,
and Notary Public
Steno - NV Firm No. 108F
315 W. 9th Street, Suite 807
Los Angeles, CA 90015

Page 308

ERRATA SHEET
CHANGES IN TESTIMONY
KEITH FISCHER v GOVERNMENT EMPLOYEES INSURANCE
Sarah Greenman
October 16, 2025

Page  Line  From                  To

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

SIGNATURE:_____DATE:_____
            Sarah Greenman

Docusign Envelope ID: 5722B934-51C6-496B-96F4-76C7014564D4

Job No. 2016452

Date: October 16, 2025

Witness Name: Sarah Greenman

Case: KEITH FISCHER v GOVERNMENT EMPLOYEES INSURANCE

DECLARATION UNDER PENALTY OF PERJURY

 I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

   Signed on the 4_____ day of December_____, 20 25_____ .

DocuSigned by:

Sarah Greenman
49D65B821D694D0...

_____       _____

Signature  Sarah Greenman

PAGE 1 OF 3

Docusign Envelope ID: 5722B934-51C6-496B-96F4-76C7014564D4

SARAH GREENMAN
OCTOBER 16, 2025

JOB NO. 2016452

DEPOSITION ERRATA SHEET

Page No. __47__ Line No. __21-22__

Change: "From October of 2014 until I joined training and quality..."

Reason for change: Correcting transcription error

Page No. __48__ Line No. __16__

Change: "I also had clerical function employees reporting to me..."

Reason for change: Correcting transcription error

Page No. __96__ Line No. __17-18__

Change: "Again, that would be speaking to how they were evaluated in their regions..."

Reason for change: Correcting transcription error

Page No. __100__ Line No. __6-8__

Change: "The desire to have a more standard distribution is a decision that's made above me."

Reason for change: Correcting transcription error

Page No. __105__ Line No. __8__

Change: deleted repeated word "in"

Reason for change: Correcting transcription error

Page No. __119__ Line No. __12__

Change: add comma in between "car" and "meeting"

Reason for change: comma adds clarification

Page No. __128__ Line No. __17__

Change: "he was a tenured investigator and perceived as fully trained."

Reason for change: Clarification

PAGE 2 OF 3

STENO.COM
(888) 707-8366

Page 309

Docusign Envelope ID: 5722B934-51C6-496B-96F4-76C7014564D4

SARAH GREENMAN                                                JOB NO. 2016452
OCTOBER 16, 2025

```
                    DEPOSITION ERRATA SHEET

Page No. __182__    Line No. __5__

Change: __replace "is" with "are"__

Reason for change: __Correcting transcription error__

Page No. __183__    Line No. __6__

Change: __replace "your" with "their"__

Reason for change: __Correcting transcription error__

Page No. __186__    Line No. __20__

Change: __add an "s" to "investigator"__

Reason for change: __Correcting transcription error__

Page No. __188__    Line No. __24-25__

Change: __"So with Brian and Craig being field investigators, we need..."__

Reason for change: __Correcting transcription error__

Page No. __215__    Line No. __16-17__

Change: __"the rest of my team are field investigators that are required..."__

Reason for change: __Correcting transcription error__

Page No. __219__    Line No. __9__

Change: __"...yes, I would want to have that discussion with them."__

Reason for change: __Correcting transcription error__

            Signed on the _4_ day of

_December_____, 20 _25_____ .
```

DocuSigned by:

Sarah Greenman

49D65B821D694D0...

_____    _____

   Signature  Sarah Greenman

                    PAGE 3 OF 3

Docusign Envelope ID: 5722B934-51C6-496B-96F4-76C7014564D4

SARAH GREENMAN
OCTOBER 16, 2025

JOB NO. 2016452

DEPOSITION ERRATA SHEET

Page No. __219__ Line No. __12-13__

Change: __delete the word "operating"__

Reason for change: __Correcting transcription error__

Page No. __250__ Line No. __8__

Change: __replace "asking" with "saying"__

Reason for change: __Correcting transcription error__

Page No. __257__ Line No. __10-13__

Change: __"...it's something that is a preference the company..."__

Reason for change: __Correcting transcription error__

Page No. __265__ Line No. __3-4__

Change: __"...it's good to reinforce that our associates..."__

Reason for change: __Correcting transcription error__

Page No. __265__ Line No. __25__

Change: __delete the "s" in "thinks"__

Reason for change: __Correcting transcription error__

Page No. __242__ Line No. __3-4__

Change: __"...potential examples of when it happens and is foreseeable."__

Reason for change: __Correcting transcription error__

Signed on the __4__ day of

__December__ , 20 __25__ .

DocuSigned by:

*Sarah Greenman*

49D65B821D694D0...

_____      _____

Signature  Sarah Greenman

PAGE 3 OF 3