# Exhibit F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,

LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and

CHARISE JONES, individually and on behalf of

all others similarly situated,

                    PLAINTIFFS,

          vs                        Index No.

                                    23-cv-02848

GOVERNMENT EMPLOYEES INSURANCE COMPANY

d/b/a GEICO,

                    DEFENDANT.

-----------------------------------------------X


                REMOTE DEPOSITION

                      of

              RENÉ CUBAS, JR.

                Miami, Florida

          Friday, November 21, 2025


Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

JOB NO. 2146385

Page 106

RENE CUBAS, JR.

you?"

That's a pretty fun way of saying, hello; is that a standard greeting for you?

A.   Yes.

Q.   Got it.  When you say "Gang" are you referring to your supervisor team mostly or do you use that sort of generically to talk to people at work?

A.   The supervisors, although I know gang has a negative connotation, but just this group of people.

Q.   Got it.  Right.  But you wouldn't, for instance, e-mail the big manager group and say, "Gang, how are you," and that sort of thing?

A.   I'm a marine, so I am pretty smart with the chain of command.  So as I go up, I get pretty formal.

Q.   Oh, I didn't realize you are a marine.

When did you serve?

A.   '83 to '89.

Q.   '83 to '89.  Thank you for your service.

Page 107

RENE CUBAS, JR.

A.   Appreciate it.

Q.   Where did you serve?

A.   Beautiful Camp Lejeune, so one of the those toxic water cancer guys.  And I did a year in Guantanamo, Cuba; not a fun place.

Q.   Yeah, I imagine not.

All right.  So going down to -- after the greeting, "As part of your prep for our MAAG meeting."

What does "MAAG" stand for?

A.   Monthly At a Glance.

Q.   Got it.  What is this meeting?

A.   So it is a -- we have a meeting monthly; we actually have two.  One is the supervisors present their numbers, and then another is where I present the overall numbers for the team.

Q.   Got it.  Are there different attendees at these two meetings?

A.   Yes.

Q.   All right.  So who are the supervisors presenting this information to?

A.   The other managers and Scott.

Q.   Okay.  And just because I'm curious,

Page 108

RENE CUBAS, JR.

so all of your supervisors will present, or is there -- I don't know, a chosen couple who will present to Scott and the other managers?

A.   There's -- when I say "present" is they're there.  And if they are asked any questions by Scott, there is not really a formal presentation, it's kind of a misnomer.

Q.   Oh, okay.  I understand.

So once a month there will be a meeting with you and your supervisors and all the other managers and Scott, and they are available to answer questions.

Are you the one presenting numbers for your group?

A.   Not necessarily.  We just put the slide up and Scott kind of asks questions about it.  The other managers may chime in.  It's not so much a formal presentation.

Q.   I see.  It's not like every month you are doing a stand up presentation on metrics?

A.   Yeah, it would take too long, it's a big team.

Q.   Yeah, makes sense.  So what's the

Page 109

RENE CUBAS, JR.

purpose of doing that with the supervisors and then again without the supervisors?

A.   Honestly, getting them ready for succession to the manager level, kind of exposing them to senior management.

Q.   Got it.  Is there a particular rhythm as far as the supervisor versus the non-supervisor MAAG meetings; like, is it the 1st of the month is the supervisors, and the 15th is the one without the supervisors, or something like that?

A.   That's a good question.  It has been normally the managers go first, and then we go supervisors.

Sometimes they flip-flop it.

Lately, they have been flip-flopping it and managers have been going first.

Q.   Got it.  So in advance of the MAAG meeting, do you always send out an e-mail like this to your team to talk about numbers?

A.   I normally try to prepare them, yes.

Q.   So in the second sentence of your e-mail, I guess it's the third sentence, "Check the associates here showing fourth quartile for

RENE CUBAS, JR.
NOVEMBER 21, 2025

JOB NO. 2146385

Page 110

RENE CUBAS, JR.

productivity."

What is fourth quartile productivity?

A.    So the team sometimes gets quartiled.  At this time we were quartiling the teams: Quarters, first, second, third, fourth quartile.

Q.    You know, on the slides we looked at awhile ago, I think on Exhibit 2, for the number scale of 1, 2, 3, 4 is quartiling, did those two things happen at the same time or did the quartiling replace the 1, 2, 3, 4, 5 scale?

A.    No, there is no replacement.  It's just something to review.

So the fourth quartile doesn't mean a lot, because we have very tight variances.  So you might be in the fourth quartile and rating.  What you are talking about is 1 through 5, and that's a rating.

So the fourth quartile is something for us to get an overview of where people stand.

But we have very, very tight variances as you can kind of look here when you

Page 111

RENE CUBAS, JR.

look at the Productivity ratio.  So it's just something for us to view and kind of get an idea on.

Q.    Got it.  Yeah.  So you ask them to "check the why to it," for the fourth quartile productivity.

So why is it important to flag these fourth quartile investigators?

A.    There could be reasons that their Productivity was low.  So, you know, people have personal concerns.  You know, people have family issues.  People take vacations.  And, you know, we try to give them a break to get caught up on work.

There is always variables to it.

We wanted to make sure that maybe it wasn't a lack of referrals on our side; sometimes we just didn't give them enough work, sometimes the system is infallible, so that is what I mean to tell me the why, so we can fix it.

Q.    Is this a big list?  Like, is this a lot of investigators to be in the fourth quartile, or is this a pretty standard amount

Page 112

RENE CUBAS, JR.

for, you know, like, a given month?

A.    So I don't know what number of investigators we have at this time, but it is a big list of investigators.  So it's not huge, you have to -- you have to extrapolate this number out nationwide.

So if you think about 25 percent of all the investigators in the nation, that's not a big number.

It doesn't mean anything.

You see Chaston Williams and Christophe Coradin; they are here fourth quartile.  Since then they have been promoted to supervisors.

So again they are just investigators that have extenuating circumstances that come up on this list.

Q.    I see.  How big is this list relative to your total team, how many investigators are working underneath you?  I'm sure there is some fluctuations, but just from a whole --

A.    Yeah.  Yeah.  So again, fourth quartile PROD is nationwide, not just my team.

Page 113

RENE CUBAS, JR.

So at any given time 75 to -- 70 to 85 investigators, somewhere in that range.

Q.    Got it.  So for the "check the why to it," do you have to justify this at the MAAG meeting or explain this at the MAAG meeting?

A.    So we want to coach them.  And if somebody asked me a question as to why somebody's here, we want to coach them.

So the "why to" is just to explain what the concern is and have a plan of action going forward, maybe it's -- whatever that may be.

Q.    Right.  So would Scott Goss say, René, tell me what's happened to Tiffany Cummings; you know, would it get that granular at the MAAG meetings?

A.    It could.

Q.    Okay.  Or would Scott be asking more broadly:  Have you taken a look at your fourth quartile associates or investigators?

A.    So this is a great example of Tiffany Cummings.  So somebody like her -- I mean she jumps out, right, 11.24 [sic], I wouldn't really wait at a manager level for him

RENE CUBAS, JR.
NOVEMBER 21, 2025

JOB NO. 2146385

Page 114

RENE CUBAS, JR.

to say anything. I would explain to him that she is actually on this chart because she was struggling switching roles. And in order to help her and coach her and kind of give her some guidance, I took her off receipt to let her get her pending down; thus, that Productivity ratio is based on me, it's nothing that she did or didn't do wrong.

So that is something that I can explain to Scott. That's on me, I'm trying to give her the coaching she needs and the training that she needs to kind of move forward. She is struggling a little bit to get into the role.

She came from another department; auto damage.

Q. I see. So you took her off the assignment list, if you will?

A. Yes.

Q. So she could catch up and close some more cases?

A. Correct, yes. So once I got to talk to her and see that she was struggling a little bit, that's not something that is her fault.

Page 115

RENE CUBAS, JR.

That is something that I decided to do to help her. So I would talk to Scott quickly on that, because you see 11.64 [sic] you ask what's going on there.

Q. Yeah. So -- I mean -- so obviously the number jumps out from being, you know, less than a lot of the other numbers in the column. But what is a good productivity ratio, like, what's the number you are looking for in this column?

MS. RILEY: Form.

THE WITNESS: So there is no number, counselor. The investigators are looked at with their peers, so that ratio will be versus their peers.

There will always be a fourth quartile, and we're okay with a fourth quartile, if the Productivity -- if the variances are tight.

So there is no number, per se, that I would look at, if the variances are tight, if that makes sense.

BY MR. COWDIN:

Q. Yeah, I think that does.

Page 116

RENE CUBAS, JR.

And so correct me if I'm wrong. So the expectation is for investigators to all be productive, right, and you want everyone to be productive and be similarly productive. And so the quartiling -- having the fourth quartile isn't bad, it's just necessary, right, because you have this large group of investigators, and some quarter of them will be on the bottom, and so you guys want to keep track of who is on the bottom to see -- to do what you can to calibrate and get everyone at the same level?

MS. RILEY: Object to form. Compound.

MR. COWDIN: That was a long question, I was just trying to summarize the best I could.

BY MR. COWDIN:

Q. Is that basically right?

MS. RILEY: Object to form.

THE WITNESS: That's basically. The CO once told me, I asked him a question, you've been at GEICO a long time. I said, Mr. Nicely, as a new manager, when would you consider me successful? And he said

Page 117

RENE CUBAS, JR.

something to me that stuck with me. He said, "René, if you can get your variances to ten percent," if you think about it, it's almost impossible, if you have the bottom and top within ten percent of themselves, so that's what we're looking at here.

We are not looking at Productivity as a negative, as far as PROD fourth quartile. We're just trying to see the variances in the fourth quartile.

Like, for instance, you see Tiffany. There is a reason that Tiffany is at 11 [sic], I can explain that. That's something that I did to her, so yes.

BY MR. COWDIN:

Q. Right. Right. Right. Okay. Got it.

And then you mentioned it could be their hours worked, early vacation.

So explain how the hours worked compared to PROD?

A. Depending on how long your vacation is going to be -- and depending on the

Page 118

RENE CUBAS, JR.

depending, right, every situation is different.

If you need time to close your cases, we will kind of cut you off heading into your vacation.

The last thing we want you to do is to stress over the workload before you go on vacation.

That all varies. There is variables there, and it depends on pending. If you have one pending a week before your vacation, then obviously we're probably going to give you more cases.

So that may impact, sometimes, the productivity ratio.

Q. Okay. And so sorry, just to -- so say hypothetically you have an investigator that works for a month and they take, I don't know, one week off, the final week of the month off.

How does that impact the productivity ratio here?

A. So again, depending on their pending, we may have cut them off three days before they leave, two days, four days; it all

Page 119

RENE CUBAS, JR.

depends on their pending.

The reason that I need to know that is that on a month-to-month basis -- I don't like looking at a number like this; you look at it, slippage is what it is. But on a month-to-month basis, it doesn't tell me anything. The law of averages, aggregate numbers, everybody takes vacation, so it always comes out in the wash equal.

So if I see something -- again, like I said, Chaston and Chris, you know they are supervisors now, if I see them here, they may have taken a vacation, which impacted their ability to take cases that month.

Q. I see. So their Productivity would go down by default, because they can't close this many cases in a month, as someone who has been working for the whole month?

A. So not necessarily, because it's hours worked.

What I'm discussing is Productivity of hours while they're here and not receiving cases in preparation for their vacation.

It's different.

Page 120

RENE CUBAS, JR.

Q. Oh, okay. Maybe I'm misunderstanding that a little bit.

A. Yes.

Q. Can you try to explain it again?

A. No problem. So if you work two weeks, and that's your hours worked; obviously, the Productivity of your -- is going to be based on only two weeks of hours versus four.

Does that make sense?

Q. Yes, that makes sense.

A. Okay. So if we cut you off before, the only thing that may hurt you, it's not your vacation, it's not vacation, vacation doesn't hurt you at all, it's the time that you are there trying to prepare for vacation.

Does that make sense, that may impact the number.

Q. Yes, that makes a lot more sense to me. So in the two to three days before the vacation --

A. Correct.

Q. You can't keep getting more case assignments, because then you wouldn't have time to complete them before you go on

Page 121

RENE CUBAS, JR.

vacation, and then Case Life would go up and a lot of problems would happen.

So you cut them off. They are working for the three to four days, but their Productivity might drop, because they're not going to get the assignments, like, leading up to their vacation?

A. Correct.

Q. You hesitated there for a second.

A. No, I just wanted to make sure, but you hit all the salient points.

Q. Okay. All right. I think that makes sense to me.

All right. Just real quick, I see a couple of other categories here that we haven't talked about before.

I see an "Impact Ratio" column. Could you just explain the Impact Ratio to me; I'm not sure we talked about that before?

A. Yes, sir. Impact Ratio is -- I believe we're using features, so I'm going to roll with that assumption and hope that I'm right.

We measure the features worked, and

Page 138

RENE CUBAS, JR.

wait when you return for it to be Wednesday and you say, hey, I haven't gotten any work.

The irony of this is he's trying to help his team to make sure that they, number one, keep a beat of stay efficient, because if he does it, you know, they could not see anything in the system, it will just start assigning on Monday. But the system is round robin, you may come back Monday and not get cases until Wednesday.

So Andrew would know, he has the ability, if needed to, to move cases within his unit.

Q. And you say that -- sorry, you say the system is round robin. My understanding of it is that it's just going through the list one-by-one and assigning people, and then it goes back to the top of the list. When it gets to the end of the list, is that what round robin means, or do you have a different understanding than that?

A. It's zip-code based.

Q. Okay. So connect the zip code, means round robin, or how do those two concepts

Page 139

RENE CUBAS, JR.

relate to each other?

A. So we're going to try to get the field investigators in the field that do assignments in cars, their work, because obviously we want to make sure that they maximizing their abilities in the field.

So round robin meaning in Miami, you may have five investigators, and I will not give the first investigator five; I will go, 1, 2, 3, 4, 5, and then the next round in Miami it will go 2, 3, 4, 5, like that. That's what I mean by round robin.

Q. Okay. And then the final sentence in that paragraph says, "If we are not seeing enough cases, then do not be surprised if I try getting you files from outside your normal areas."

What does he mean by that?

A. So I'm assuming he's talking to his field team; meaning, if you don't get enough field assignments, then I'll send you desk cases.

Desk cases could be work from anywhere.

Page 140

RENE CUBAS, JR.

Q. Got it. And then to the next paragraph that starts with "Impact Ratio." Andrew seems very excited about this in the e-mail. He says, "Our impact ratio looks great so far. I pulled our team's results in comparison with other teams for the month of November. We rank as the ninth best team in the country regarding Feature Impact Ratio."

Is that the line we were talking about earlier in the MAAG meetings where teams can be -- well, actually, this might be a little different.

How does he know that, like, his team is the ninth best in the country?

MS. RILEY: Objection. Calls for speculation.

THE WITNESS: So this particular system can be drilled down by manager or by supervisor or by investigator.

So if he drilled it down by supervisor, and he's pretty savvy with Excel, so if he used the pivot table and went supervisor ratio, he would just count. The Excel spreadsheet would be tell him

Page 141

RENE CUBAS, JR.

that you are the ninth best team, if you sort it from largest to smallest.

BY MR. COWDIN:

Q. Oh, I see. He could do that with Impact Ratio.

Could he do that with the other metrics?

A. He could, yes.

Q. Got it. And ninth best sounds pretty good to me, but how many -- do you know how many teams there are in the country?

A. Counselor, I don't, it fluctuates. Suffice it to say, that's pretty good. Hundred, mid-hundreds; it depends, it fluctuates.

Q. Got it. And then do you ever look at your teams and see, like, where they rank nationally?

A. I don't, counselor.

Q. No. Okay. You seem to understand how you could go about doing that though?

A. Yes.

Q. Okay. How long have you been able to go through the sorting process?

Page 142

RENE CUBAS, JR.

A.    That system was in place in 2012, when I was promoted.  So up until we changed the new system, which it's been fairly recently, you could do it.

Q.    Got it.  And again, is this -- does that system have a name?

A.    The system we're using now?

Q.    No, the system that --

A.    This system?

Q.    This system, yeah.

A.    Did he source it?  No, he didn't source it.  I'm going to say for the record, making an assumption, this is MIP.

He didn't source it.

Q.    What do you mean by "source it"?

A.    Well, he would normally put the link and say, this is source "MIP, November."

Q.    Oh, I see.

A.    Yes, sir.

MR. COWDIN:  Okay.  Got it.  All right.  Thank you.

And we can close Exhibit 6.  I'm going to drop into the chat Exhibit 7.  Let me know when you've received that and

Page 143

RENE CUBAS, JR.

opened it and reviewed it?

(Whereupon, Cubas Exhibit 7, Greenman E-mail Dated 4/8/24, Bates Stamped G015041 to '042, 2-Pages was marked for identification.)

(Brief pause.)

THE WITNESS:  Okay.

BY MR. COWDIN:

Q.    All right.  So just scroll on the first page, midway down there is, again, an e-mail from Andrew Gelderman to R8 Andrew Gelderman Section.

And you are copied on this e-mail too, correct?

A.    Speaking of the Monday, April 8th e-mail?

Q.    Yes.

A.    Yes, I am.

Q.    Okay.  And this is -- the subject of this e-mail is "April MTD."

Do you know what MTD stands for?

A.    I'm going to say Month-to-Date.

Q.    Got it.  Okay.  And again, you just reminded me, the date is April 8th.

Page 144

RENE CUBAS, JR.

So is this -- this is, as Andrew says here at the beginning of the e-mail, is this results from the beginning of April?

A.    Yes.

Q.    Got it.  Does Andrew normally copy you on these e-mails?

A.    If I remember, he likes to copy me, yes.

Q.    Do you instruct your team to copy you on these sorts of e-mails?

A.    I do not.

Q.    All right.  So scrolling down it, the first table here that is split between G015041 and G015042, the table similar to the one we looked at previously.

I don't think we need to go through any of the columns, as long as you can confirm that these columns look like the ones we were just talking about with the prior Andrew Gelderman e-mail, which was Exhibit 6?

A.    Yes, I concur.

Q.    Okay.  All right.  Actually, there is one field that seems a little different, and that is the "Weighted Productivity" field.  I'm

Page 145

RENE CUBAS, JR.

not sure if anything that we looked at previously had Weighted Productivity as a measure.

So I just wanted to see, what is Weighted Productivity?

A.    It's a good question, counselor.  I can't recall what that metric means.

Q.    Is it possible that the word "Weighted" doesn't actually add anything; it just measured productivity, he's just labeling it in a more fancy way or is it a different thing?

A.    Quite possibly.  It could be fancy terms and put a zero to just change it.

Q.    All right.  Got it.  And scroll down to the next two tables on G015042.  I see two tables here.

One says, "Field Investigator Quartiles" and one says, "Desk Investigator Quartiles."

Could you help me understand each of quartiles here.  So starting with "Quartile Rank"?

A.    So it looks like he took averages

Page 194

RENE CUBAS, JR.

MR. COWDIN: Sorry, I didn't hear you.

MS. RILEY: I'm a little sniffly, so I'll try to speak up a little more.

MR. COWDIN: Thank you. We're getting close to the end, but thank you.

Mr. Cubas, go ahead.

THE WITNESS: Sure. We want to get the information as quickly as possible to claims.

BY MR. COWDIN:

Q. Okay. Elaborate on that a little more; why are you trying to get the information as quickly as possible to claims?

A. So the claims department a lot of times has time-in-process goals to keep cases open. And if we don't get them the information in a timely manner, they may have to make a payment. So the quicker we get them the information, the quicker they can mitigate a claim either way.

Q. Got it. So why does Airneh need your permission to have Maria do this?

A. She wants to bring it -- it's a

Page 195

RENE CUBAS, JR.

Saturday. She could have done it on her own. But Airneh is a new supervisor to the SIU, so she's just being prudent, making sure that I approved.

Q. Got it. And it looks like, scrolling up in the e-mail, on Friday, May 31st, you approve it; is that right?

A. Yes.

Q. And why did you approve the request?

A. There is no negative to approving it. It gets her case closed quicker. Helps her with her case, it gets the information to claims quicker. Rather than waiting until next Thursday; if she's willing to do it on a Saturday, there is no reason not to do it.

Q. Got it. Do you generally or always approve flex time requests?

A. If it's for a reason like this, the insured is only give an investigator a specific timeframe, yes.

Q. What's the significance of the specific timeframe?

A. That there is no choice; the insured says I can only meet you at 7:30 or 8:00 at

Page 196

RENE CUBAS, JR.

night, because I work or I can only meet you Saturday morning, then that's what they need to get the case done, I'll approve that 100 percent of the time.

Q. Well, it looks like in the original e-mail the insured is available this upcoming Saturday or next Thursday.

A. Correct. So it goes back to the message of getting the information as quickly as possible to claims, and assisting the investigator with their Case Life, so they don't have to keep it opened another, what's that, five extra days.

Q. Is that a significant amount of time for Case Life?

MS. RILEY: Object to form.

THE WITNESS: Five days extra when you're already ten, it's pretty significant.

Q. Yeah. Just help me get my bearing a little bit on that.

So what would be the goal then for Case Life?

MS. RILEY: Object to form.

Page 197

RENE CUBAS, JR.

THE WITNESS: So it's not so much the goal, it's that they need to be as competitive as possible.

So this particular insured -- remember law of averages, an investigator like Maria will work 330 or 350-some odd cases, so one case like this isn't going to sink her.

But if I can help her not to keep the case opened five days and she's willing to flex the time and work on a Saturday, this is a win/win, I'm going to approve that every time.

BY MR. COWDIN:

Q. And what's the competitive aspect that you mentioned?

A. The investigators compete against each other for Case Life, they are ranked against each other.

Q. Got it. So scrolling up to the first page on the document, so G020175, there's two e-mails. I'll start with the one on from Maria, Saturday, June 1st to Airneh and you.

She says, "Hi, EDR was completed.

Page 198

RENE CUBAS, JR.

No events found, which is a win for us. Closed the file. But wow, that was over four hours in the car. It actually took me over the GW Bridge into New Jersey to get there. So much traffic on this beautiful Saturday. Signing off now to lay out by the pool. Hope you have a great weekend."

Q. All right. Were you surprised by the amount of time it took her?

A. I had no context to where she was going.

Q. Okay. So four hours to do a task like this, is that normal?

A. It's five a major metropolitan area, I don't know if it's normal or not. I had no idea where she was going.

Q. Yeah. A question about just, like, the workweek. Does the workweek start on Saturday?

A. Workweek, no, Monday.

Q. Oh, it's Monday. So it goes Monday to Sunday?

A. The workweek is Monday to Friday.

Q. Right. So, I mean, obviously,

Page 199

RENE CUBAS, JR.

right, the core days that somebody works is Monday through Friday, but I'm asking for purposes of, like, a one-week calculation, does the workweek, for payment purposes, start on the Monday through Sunday, or does is it go Sunday to Saturday, or does it go Saturday to Friday?

A. Counselor, you lost me on that one; I don't understand your question.

Q. I'm not sure I can clarify it any more. If you don't understand, I guess you don't. I can move on.

Okay. Well, you learned through this e-mail that Maria took four hours of her Saturday to go do this investigative task.

Did you follow-up with Airneh -- did I say that right?

A. Yeah. Airneh, um-huh.

Q. Did you follow-up with Airneh to ensure that Maria flexed her time later in the week?

A. No.

Q. Why not?

A. It's Airneh's responsibility and

Page 200

RENE CUBAS, JR.

Maria's to work it out; she has authority to flex it.

Q. Is it Airneh's responsibility to ensure that Maria is being paid for all of her time worked?

A. I don't understand the question. You asked me about flexing time, and I'm telling you that Maria told her the hours, and Airneh and her work out the schedule.

I don't need to micromanage her and call her and ask her did she do it.

Q. Well, the reason I'm asking the questions, just to be candid with you, four hours is a lot of time. And so it's not obvious to me that an investigator who works full time can take four hours off during the workweek, Monday to Friday, just because she took four hours on a Saturday to do something.

So my question to you is: Does that raise any concerns such that you would want to ensure that, you know, Maria wasn't working off-the-clock?

A. So I'll answer you -- when you say four hours is an in-ordinary amount of time,

Page 201

RENE CUBAS, JR.

you mean in order for her to flex four hours, is that the concern, or four hours to complete the assignment?

Q. It's actually a little bit of both, I think, because four hours is, just generally, a long amount of time, right, that's half of a normal workday, right.

So the assignment seems, like, a considerable assignment. It would take over half the day or exactly half the day for her to complete it.

So what I'm wondering is if it's normal for an investigator to take a whole half-day off for flex purposes?

A. Sure. You don't have to flex it in one day. She can take an hour one day everyday, start an hour later, she can take two hours one day and two hours another, that's up to her.

Q. So that's something that you do not take responsibility for?

A. My responsibility is to approve it, and then they need to work it out. I don't need to call to make sure that she did it. She

RENE CUBAS, JR.
NOVEMBER 21, 2025

JOB NO. 2146385

Page 206

RENE CUBAS, JR.

Q.    For Case Life, for example?

A.    Yeah, we're -- so just to give you an example, my team right now is 3.14 days for Case Life, probably the best it's ever been.

So there is nobody on my team that remotely -- I don't think there is one thing in the country, so...

Q.    Well, maybe I should rephrase.

What is -- or maybe I should ask a follow-up question.  Like, at what score is an investigator in trouble or concerned about retaining their job?

MS. RILEY:  Object to form.

THE WITNESS:  So if an investigator is performing at a specific rate, so there is no real score; because again, they are ranked against each other.  So if the entire country is running eight days, you've got to understand, I can't give you an exact number.  It's not like a number, it's what they're doing together as a team.

BY MR. COWDIN:

Q.    Right.  Okay.  So they see themselves in comparison to other

Page 207

RENE CUBAS, JR.

investigators, and they are pushing themselves to be better, close cases faster, have better Productivity, because if they don't do that, then they don't know where they are going to fall in terms of their final score or their quartiles?

A.    I wouldn't say that.  The first part of your statement is correct, they push themselves, right; everyone's nature is they want to be good at their job.  But they push themselves to want to be at the top of whatever ranking list they have, right, at the top of the investigators, so that is what they're pushing themselves for.

Q.    So I feel like what you are saying is they're pushing themselves to be ones, but they could be happy at threes.  What's the incentive for them to be at one, why isn't everyone a three, if that's the case that three and one is the same?

MS. RILEY:  Object to the form.

THE WITNESS:  No, that's not what I'm saying.  What I am saying is workload-wise, they can do it in 38.7.

Page 208

RENE CUBAS, JR.

The problem -- if I've ever heard complaints about the workload, it's about them trying to be a five, that they can't be a five in a specific workload.

BY MR. COWDIN:

Q.    So you haven't heard investigators complain that, you know, the requirement to touch cases in a particular timeframe is too burdensome, or the requirement to close so many cases in a particular timeframe is too burdensome.

I won't go on, actually, it is a compound question, I look forward to Jennifer's objection.

But, you know, start with Case Life -- I mean, I'm sorry, start with the five-day touch rule or whatever touch rule you have, I think there might be multiple.

You haven't heard investigators complain, hey, it's burdensome on me, because I have to handle all of my existing cases, and then I have to touch the new cases that are coming in the door within a certain period of time?

Page 209

RENE CUBAS, JR.

MS. RILEY:  Object to form.  Compound.

THE WITNESS:  So, counselor, in my 20 years of management, I've heard investigators complain about volume.  From the whole time that I've been in SIU management, they are always complaining.

BY MR. COWDIN:

Q.    Got it.  Have the metrics gone up over time?

A.    Metrics -- which one?

Q.    I know there are a few, but I am sort of saying overall.  So, for instance, the number of cases assigned, we'll start with that?

A.    So the answer is yes.  Because we've leveraged technology, their efficiency gains allowed us to increase some of the Productivity for the field investigators.

For instance, when I started I didn't have a laptop.  I had to go back home and do my reports.  These guys have laptops and they have the ability to dictate to their phone.  So we leveraged technology.

Page 210

RENE CUBAS, JR.

Q.   So in general then, there's been an increase in caseload, and you're saying that the reason is that technology allows them to be more efficient?

A.   Increase and decrease -- sorry.

MS. RILEY:  That's okay.  Go ahead.

THE WITNESS:  Increase and degrees. So we've increased, and we recently decreased.  It's always an ongoing study in fluctuations.

BY MR. COWDIN:

Q.   When did you decrease?

A.   They are decreased now from what they did during COVID.

Q.   When did they start decreasing?

A.   It's a year-over-year thing.

Q.   You mentioned you have the biggest field group.  What are -- like, where are they sitting now in their monthly targets for assignments?

A.   Eight a week.

Q.   Eight a week.  How does that compare to, say, I don't know, last year, is it an annual thing?

Page 211

RENE CUBAS, JR.

A.   It is an annual thing.  We might have been at ten, and then fluctuate to eight. We try to find a spot that's as efficient as possible.  Remember, it is one of the times that we use impact.  It doesn't do us any good to hypothetically give them 20 cases, and they impact 20 percent, right.  We want them to be efficient.

It's something that we are constantly monitoring.

Q.   Yeah.  Okay.  That's Case Life. What about Productivity?

A.   What about it, sorry?

Q.   Sorry.  That was obvious to me, but probably not to you.

Have you heard investigators complaining about Productivity as a metric?

A.   So, yeah.  My original answer was to actually Productivity.  In my whole career, I will say, because Ms. Mary made me raise my hand, the investigators have complained the whole time I've been in management.  That's just the nature of the beast.

Q.   What's the gist of their complaint?

Page 212

RENE CUBAS, JR.

A.   It's always that it's a lot of work.

Q.   Got it.  I think we talked before about Quality.  And did you say Quality is no longer a metric?

A.   It's no longer a metric.

Q.   Go ahead.

A.   At least -- I'm sorry, were you finished, counselor?

Q.   Yeah, I was.  Sorry.  I was interrupting you.  Go ahead.

A.   Quality is no longer a metric at the supervisor level; it is a metric at the investigator level.

Q.   Oh, okay.

A.   Yes, sir.

Q.   I see.  And is Quality a metric on the manager level?

A.   So as crazy as it may seem, because it's December, I'm not sure.  We haven't really finalized my goals.  And I know it's 2025 and I know that sounds insane, but I'm not sure if they will give me a departmental goal for that year.

It's a data thing.  It's a data

Page 213

RENE CUBAS, JR.

thing.  We're struggling with the vertical moving data.  It's a lot of data to move.

Q.   Got it.  Got it.  And so just going back to the metrics that investigators have, a number of cases, number of cases assigned per week; that's always been a metric since, you know, throughout your time at GEICO?

I'm sorry, I said metric, I didn't mean that.  I meant the target, the target for case assignments.  I know it changes year-over-year, but has it always been -- has there always been a target for desk and field investigators to be assigned a certain number of cases per week?

A.   We always try to make sure that we're efficient, so we always try to make sure that we have some type of minimal target for them to hit, to make sure that the units are moving efficiently.

Q.   Got it.

A.   So the answer is, yes, to answer your question.

Q.   Got it.  Okay.  Thank you.

And then this is kind of a random

RENE CUBAS, JR.
NOVEMBER 21, 2025

JOB NO. 2146385

Page 218

RENE CUBAS, JR.

Q.    And when you talked a minute ago about people complaining about work or complaining that they have a lot of work, are those -- strike that.

When people complained that they have a lot of work to do, did anyone ever tell you that they were working without writing down the time?

A.    No.

Q.    And when people complained about having a lot of work to do, did anyone ever tell you that they were working without getting paid for the work?

A.    No.

MS. RILEY:  That's all I had.

MR. COWDIN:  All right.

MS. RILEY:  We will review and sign.

(Proceedings concluded.)

(Time:  4:34 p.m.)

(Total Time on the record:  4 hours, 49 minutes.)

- oOo -

Page 219

(Time Noted:  4:34 p.m.)

--------------------

RENÉ CUBAS

Subscribed and sworn to before me this_____day of _____2025.

-------------------------------------

Page 220

C E R T I F I C A T E

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF ONONDAGA  )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That RENÉ CUBAS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of December, 2025.

*Mary Agnes Drury*

Mary Agnes Drury

Page 221

INDEX

WITNESS/EXAMINATIONS

PAGE

RENÉ CUBAS, JR.

EXAMINATION BY MR. COWDIN          7

EXAMINATION BY MS. RILEY          216

CUBAS EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Shiring E-mail Dated 12/20/19, Bates Stamped G010836, 1-Page | 35 |
| Exhibit 2 | Special Investigations Unit Core Metrics, 2020 Proposal, Bates Stamped G010831 to '835, 5-Pages | 37 |
| Exhibit 3 | Greenman E-mail Dated 5/8/24, Bates Stamped G017517 to '519, 3-Pages | 62 |
| Exhibit 4 | Goss E-mail Dated 7/30/24, Bates Stamped G017638 to '640, 3-Pages | 74 |
| Exhibit 5 | Greenman E-mail Dated | 104 |

Docusign Envelope ID: 6CC91E84-CA3E-4E62-A481-A66BB9DC1664

RENE CUBAS, JR.
NOVEMBER 21, 2025

JOB NO. 2146385

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:        Fischer vs GEICO
Dep. Date:        November 21, 2025
Deponent:         RENÉ CUBAS

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| | | See Exhibit A | | |

SUBSCRIBED AND SWORN BEFORE ME

THIS 21 DAY OF jan 2025.

_____

(Notary Public)  MY COMMISSION EXPIRES:_____

RENÉ CUBAS

Docusign Envelope ID: 6CC91E84-CA3E-4E62-A481-A66BB9DC1664

*Keith Fischer v. Government Employees Insurance Co.*
Rene Cubas, November 21, 2025
ERRATA EXHIBIT A

| Transcript Line | Current Text | Proposed Text | Reason for Change |
|---|---|---|---|
| 19:25 | Merritt | Meritt | Typo |
| 21:11 | Merritt | Meritt | Typo |
| 23:19 | the to ensure | to ensure | Typo |
| 28:5 | to be handled | to handle | Clarification |
| 31:4-5 | …off-the-clock after-hours, that's how I view it. | off-the-clock after-hours, that's how I view it, someone working beyond their scheduled hours for that day. | Clarification |
| 46:7 | classes | glasses | Typo |
| 46:8 | So assume | So I assume | Typo |
| 59:23 | taking | talking | Typo |
| 60:19 | Do not | I do not | Typo |
| 64:17 | drive time, field | drive time in field cases. | Clarification |
| 96:15 | look at Case Log | looks at case log | Typo |
| 118:9 | is variables | are variables | Typo |
| 118:11 | one pending | one case pending | Clarification |
| 125:23 | conversation | conversations | Typo |
| 138:6 | of stay | to stay | Typo |
| 139:6-7 | they maximizing | they are maximizing | Typo |
| 140:25 | would be tell | would tell | Typo |
| 146:3 | me in | be in | Typo |
| 150:2 | become an | becomes an | Typo |
| 156:19 | At all | Not at all | Clarification |
| 158:18 | the | to | Typo |
| 172:15 | new time with the | new timekeeping | Clarification |

1

Docusign Envelope ID: 6CC91E84-CA3E-4E62-A481-A66BB9DC1664

*Keith Fischer v. Government Employees Insurance Co.*
Rene Cubas, November 21, 2025
ERRATA EXHIBIT A

| Transcript Line | Current Text | Proposed Text | Reason for Change |
|---|---|---|---|
| 179:2 | if are | if you are | Typo |
| 187:19 | have | had | Typo |
| 198:15 | five | for | Typo |
| 210:8 | degrees | decrease | Typo |
| 215:24 | tae | take | Typo |