# Exhibit L

CHARISE JONES
FISCHER V. GEICO

August 12, 2024
1–4

Page 1

CHARISE JONES

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                  Plaintiffs,     )

       - v -                      )

GOVERNMENT EMPLOYEES INSURANCE    )

COMPANY d/b/a GEICO,              )

                  Defendant.      )

- - - - - - - - - - - - - - - - - )

VIDEOTAPED DEPOSITION OF CHARISE JONES

Reported by:

Kim M. Brantley

Job No: J11541510

Page 2

CHARISE JONES

Monday, August 12, 2024

Time:  9:53 a.m.

Videotaped deposition of CHARISE JONES, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

1225 New York Avenue NW - Suite 1200B

Washington, DC, 20007

(202) 847-4400

Email: sjean@outtengolden.com

BY:  SABINE JEAN, ESQUIRE

Page 3

CHARISE JONES

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

DUANE MORRIS, LLP

1540 Broadway - 14th Floor

New York, New York 10036

(312) 499-0198 (Ms. Alberty)

Email:  gsslotnick@duanemorris.com

BY:  GREGORY SLOTNICK, ESQUIRE

Also on behalf of the Defendant GEICO:

DUANE MORRIS, LLP

190 South LaSalle Street - Suite 3700

Chicago, Illinois 60603

(312) 499-0198

Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE

    (Appearing via Zoom)

ALSO PRESENT:

SILVIO FACCHIN, Legal Video Specialist

Esquire Deposition Solutions

Page 4

CHARISE JONES

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  This is the media labeled number one in the video recorded deposition of Charise Jones in the matter of Keith Fischer, et al. versus Government Employee Insurance Company, doing business as GEICO.

This deposition is being taken in New York City, New York on August 12, 2024.  My name is Silvio Facchin, I am a certified legal video specialist; the court reporter is Kim Brantley, and we're both representing Esquire Deposition Solutions.

We are now going on the record.  The time is 9:53 a.m.

Counsel will state their appearances for the record.

MR. SLOTNICK:  Good morning.  Greg Slotnick of Dwayne Morris for defendant GEICO.

MS. JEAN:  Sabine Jean, Otten & Golden, for plaintiff -- for named plaintiff Charise Jones.

THE LEGAL VIDEO SPECIALIST:  Will the



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
121–124

Page 121

CHARISE JONES

work done in the amount of time they're giving us.

Q.   Which other coworkers are you referring to?

A.   Other ones when I would be at examinations under oath at other places.

So depending on who was there, it could have been, you know, Keith Fischer, Scott Brady. Other people I talked to knowing that they were on when I was on late would be Jeff Lewonka.

That's I can recall off the top of my head.

Q.   Who is Jeff Lewonka?

A.   He was another coworker.

Q.   And what position did he work in?

A.   Same thing as the investigator.

Q.   Do you recall when you had those discussions with Keith Fischer, Scott Brady, and Jeff Lewonka?

A.   Just over the course of working as an investigator.

Q.   How often did you have those conversations?

A.   You know, whenever I would meet up with them, see them at other places, and if I saw them

Page 122

CHARISE JONES

online after, you know, like late hours, while I was working.

Q.   And you said that you made a complaint to April Neyland.  Is that right?

A.   Correct.

Q.   How many times did you complain to her about off-the-clock work?

A.   A handful of times.

Q.   Could you approximate what you mean by "a handful"?

A.   Maybe four to five times.

Q.   And do you recall when you made those complaints to her?

A.   It was over the course of, you know, her -- me being reporting to her.  So it was over the course of a year or so, two years, you know, depending on -- I don't know the time frame, but it was, you know, whenever it came up, she was the one I would discuss it with.

Q.   When you say whenever "it" came up, what are you referring to?

A.   Whenever I had the -- wherever -- whenever I had to do the overtime, or when it was coming towards the end of the week, and I wasn't

Page 123

CHARISE JONES

able to finish up what I had, or the day -- you know, I was just -- so much windshield time, and I just couldn't finish my work.

Q.   And when you say you couldn't finish your work, what do you mean by that?

A.   Again we had like certain time frames to finish it, certain time frames that things had to be submitted by, and knowing that my shift was over based on the number of hours I've already worked, I knew that this report had to be in by the end of that day, and I would just have to do it, otherwise it would, you know, be held against me for not doing it.

Q.   And your testimony is that that happened on four to five occasions?

A.   Talking to her about the overtime?

Q.   Correct.

A.   Yes.

Q.   And from April 2017 to the present, have you been paid hourly?

A.   I believe it changed at some point.  I just don't know when.

Q.   Do you recall how it changed?

A.   I don't know how it changed.

Page 124

CHARISE JONES

Q.   Do you recall when it changed approximately?

A.   I do not.

Q.   But you do understand the difference between hourly and salary?

A.   Yes.

Q.   What's your understanding of that difference?

A.   You're -- you're paid hourly, meaning each hour you work you're paid, or you're just paid a flat fee of -- you know your grade is a sixty-five, you make X amount, and that's what your pay is, no matter how much you work.

Q.   Do you recall your rates of pay?

A.   Oh, no.  I do not.

Q.   Did your rates of pay generally increase throughout your employment?

A.   Yes.

Q.   Did you ever make a -- a bonus or commission?

A.   I don't know.  I mean, I had profit-sharing, so I don't know if that's called a bonus or a commission.  It was my own money.

Q.   Okay, and what do you mean by profit



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
149–152

Page 149

CHARISE JONES

her know that nobody was there. All the supervisors were out for the day. The manager was out. And I said, "I worked it, so I put it in."

And then she told me that in order for me to get approved for it, I had to write down every single case that I worked, what I did, the time I did it, and why I needed to work that amount of hours overtime.

And I -- it was just time consuming. That took more time out of my day during my work, of which she made it a big deal to do it, and then after it was approved, it was like no big deal. "Okay, it's approved. No problem."

Q. And you submitted only 1.5 five hours --

A. Mm-hmm.

Q. Is that correct?

A. Correct. And that's what persuaded me, because at that point I was just like, just forget the time, then. Don't pay me for that 1.5 if you're going to make me go through hoops for it.

Q. But did you -- strike that.

Is it your testimony that you actually worked more than 1.5 hours that week?

Page 150

CHARISE JONES

A. Yes.

Q. So why didn't you include the rest of that time in the request?

A. Because it was persuaded -- it was the way she was making me feel. I just didn't want to put in any other time.

And when I did submit what I did, you can obviously see that it was more than the 1.5. I only put in the 1.5, but she can definitely see by the documentation that I put on there what I did, where I went, and why I needed the time that it was more than that.

Q. But you didn't submit for the time you actually worked, correct?

A. No, because I knew it was going to be a hassle just for -- just the amount that I put in was already a hassle, that I wasn't going to go any -- going to put in anything further.

Q. Did April tell you not to put in for the additional time?

A. She didn't want me to put in for the original time, never mind the additional time, because she said it wasn't approved.

Q. But when you were told to submit this

Page 151

CHARISE JONES

report to April, did she tell you not to submit it for all of your time worked?

A. No, because I already submitted my Workday time, so it was only her to approve the amount that I've already submitted.

So she said that I had to write up this report to just justify what I already put in.

Q. Okay, and the original amount that you had already put in, that only included the 1.5 hours?

A. Correct.

Q. And do you recall if you received pay at time and a half for those hours you submitted?

A. No, it was up -- it was still within the forty hours. So I was still getting straight time.

Q. And what other times did you ask to work overtime hours?

A. When -- again when my workload was building up and I had a lot of cases, I would say, "Is there any overtime available?" It was always "No. If we have any, we'll let everybody know. We'll put an email out."

I'm like, well, you know, when I would

Page 152

CHARISE JONES

go to Brooklyn, or all the windshield time that took up hours, or there was an accident, or there was traffic, and you're putting in almost your entire day of your 7.75 in the car, and then coming home and having to write up a report, you know, it was just told, "Listen, take it off another day," or "Work around it."

Q. Did you ever make any formal complaints about this unpaid time?

MS. JEAN: Objection.

THE WITNESS: No.

BY MR. SLOTNICK:

Q. Why not?

A. I thought, you know, what I was doing, telling my supervisor, and, you know, justifying it where it went to the manager, I thought it would be enough.

Q. If you go back to paragraph eight on page three, do you see that?

A. Yes, eight.

Q. It says, "As a special investigator, starting from 2016 to my promotion to trainer in approximately March 2022 I started work between 7:00 a.m. and 7:30 a.m. and ended my day between



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
153–156

Page 153

CHARISE JONES

5:00 p.m. and 6:00 p.m. about two to three times per week, and until 7:00 p.m. about two to three times per week.

"GEICO did not provide me with a regularly scheduled work period. I also recall that after March 2020 when the COVID-19 pandemic started I also occasionally worked as late as 8:00 p.m. When I took a lunch break, which is about once a week, it took me no more than fifteen minutes.

"I estimate as -- that as a special investigator I worked approximately fifty-one to fifty-eight hours a week on average."

Q. Did you record your time anywhere other than in GEICO's timekeeping programs?

A. No.

Q. Did you keep any records of time that you worked but did not record in GEICO's timekeeping programs?

A. Just my entries that were put in, they're time stamped, so, I mean, it's -- it wasn't like I was hiding it or saying I wasn't working the hours because it was time stamped in their system that they could see when I entered my

Page 154

CHARISE JONES

time. My investigations they could see when I entered a specific note.

Q. Was the time stamp the time that you pressed submit on the note?

A. Correct. When I entered a specific entry, it would have the time stamp on it.

Q. And was that the case throughout your time as an SIU investigator?

A. With the time stamp?

Q. Yes.

A. Yes, it was always on there.

Q. And on what do you base the estimates that you worked approximately fifty-one to fifty-eight hours a week on average in paragraph eight?

A. I just base it on overall.

Again, you know, each day you're driving, and you're spending hours and hours on the road, you know. It left minimal time to do the paperwork and documenting your files.

Q. Did you tell anyone that you occasionally worked as late as 8:00 p.m.?

A. I didn't tell anyone specific. I just -- other people saw that I was on that late.

Page 155

CHARISE JONES

Q. How do you know they saw?

A. Again, that Webex, you could see everyone that's on. They're green, or if they're away, they'll say that they're inactive.

And, you know, when I was working the later hours, I would Webex other people, be like, "Why are you sill on?" People would be like, "Well, why are you still on," and we would just, you know, commiserate.

Q. When you say "other people," who are you referring to?

A. Scott Brady and Jeff Lewonka was the main people that would be talking to.

Q. And how often was this communication happening?

A. That happened a couple times a week.

Q. Was there anyone else that you spoke with that night?

A. No.

Q. Did you tell anyone that you took a lunch break only about once a week or that -- strike that.

Did you tell anyone that you took a lunch break only about once a week?

Page 156

CHARISE JONES

A. No.

Q. Did you tell anyone that there were no -- that the breaks were no more than fifteen minutes?

A. No.

Q. So if you would turn to paragraph fifteen on page four, it says "From April 2017 to March 2022 my regular hours were to approximately fifty-one to fifty-eight hours per week, and my regular pay was 48.86 per hour."

Did you tell anyone that you were working approximately fifty-one to fifty-eight hours per week?

A. No.

Q. If you look back -- I'm sort of jumping around a little bit -- to paragraph eleven, on the same page.

A. Okay.

Q. It says, "Prior to my promotion to trainer, GEICO authorized me to work overtime only if I agreed to take on additional cases, worked on special projects, such as social media, investigation or flooding storm cases, or if special investigators were understaffed and there



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
157–160

Page 157

CHARISE JONES

were many cases to work on.

"These cases that were eligible for overtime pay were additional cases on top of my existing caseload, even though I was already working overtime off the clock."

Who at GEICO told you that you could only work overtime if you agreed to take on additional cases and work on special projects?

A.  April Neyland.

Q.  Did anyone else at GEICO tell you that?

A.  Not that I could recall.

Q.  And when did that conversation take place?

A.  That was any -- well, an email would go out on anybody that was interested in overtime, and then whoever applied for the overtime, there was like just a general meeting on those people that agreed to take on those extra cases, and it was told to them at that point.  All of us were told.

Q.  But the -- the allegation itself -- so when you're saying that GEICO authorized you only to work overtime if you agreed to take on additional cases or work on special projects, when

Page 158

CHARISE JONES

did that specific direction -- when was that communicated to you?

A.  I don't recall when it was communicated to me.  Before that meeting, no, I don't recall.

Q.  Do you recall if anyone else was -- was there when it was communicated to you?

A.  Like I said, the people that agreed to do the special projects, or agreed to take on the extra cases, they were all on like the Webex call, and it was told to them that, you know, "You're only to work on these cases.  You're not allowed to, you know, touch your other cases.  You're only allowed to work the cases that you have agreed to help with."

Q.  Did you agree to take on those types of additional cases?

A.  Yes.

Q.  Okay, and when was that?

A.  It would depend on like, the storms, like I said if there were storms, you would get those -- they were called catastrophic case, they called them "cat cases".  The social media was a more -- they were clearing them out at the end of the year, and they needed people to do them at the

Page 159

CHARISE JONES

end of the year.

So, you know, whenever something specific came up, I always volunteered, because I knew I was going to at least get paid those overtime hours.

Q.  Do you recall approximately how many times you volunteered?

A.  Every time they put them out there.

And again, whenever these cat cases came along, it's whenever the flooding, you know, it could have been in Texas, could have been in Florida, whenever there was a storm, whenever we had more claims than normal, if there was a snowstorm, a hail form, they would ask for volunteers.  I volunteered every single time.

Q.  And were you approved for overtime pay for working on those cases?

A.  Yes.

Q.  If you look at paragraph twelve, same page, it says, "As a trainer and auditor I do not log my hours and instead my supervisor inputs my hours for me and approves them, which are still 7.75 hours per day, 38.75 hours per week, even though I occasionally work more hours."

Page 160

CHARISE JONES

Which is the supervisor that you're referring to here?

A.  April Neyland.

Q.  And how do you communicate your hours to your supervisor?

A.  If I take off, if I take off a sick time or a personal day, or if I take hours, I send her an email saying, "I'm taking off tomorrow," or "I'm taking off two hours of personal" through an email.

Q.  Do you tell your supervisor when you work more than the 7.75 hours per day?

A.  I would never report that.

Q.  When you work more hours than the 7.75 hours per day, or 38.75 hours per week, does anything prevent you from telling your supervisor about those hours worked?

A.  Again, whenever I stressed about working the overtime, or telling her that I needed to work overtime, it was just, you know, the same -- same conversation over and over, like there is no approved overtime.

Q.  But does anything prevent you from telling your supervisor that you're working those



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
161–164

Page 161

CHARISE JONES

hours?

A. I told her, like especially when I was transitioning from investigator to trainer, that I was working many, many hours of overtime, because I was still doing my outside field work and still doing a trainer's job that I was learning.

So I -- you know, I did stress to her and say, "Listen, I'm working two specific jobs. I'm out on the road. I'm trying to get training done. Is there any way that I can get overtime?"

"No."

Q. How many times did that conversation take place?

A. That happened -- again that was a six-month period of the two times I was doing it, and I would say maybe four times, five times.

Q. And how did those conversations take place?

A. Through phone conversations, mostly.

Q. Do you have any documentation reflecting those conversations?

A. I had a work phone, so I would call her. If I was on -- on the road, I would call her from a work phone, and tell her, "Hey, listen.

Page 162

CHARISE JONES

I'm not getting home 'till 5:00 o'clock. You know, is there any way that I can put in overtime?"

And, you know, she would say, "Listen, if you can't" -- "Try to just take it off before the next pay period. You know, sign on late tomorrow, or sign in, you know -- sign out early," and I'm like, but I'm still -- I still have my workload the next day. And she was like, you know, "There's no approved overtime."

Q. Okay, are there any documented notes from those conversations?

A. I personally don't have any documented notes; only, like I said, the phone logs, which I don't have that cellphone any longer.

Q. When you say the phone logs, though, are you talking about text messages?

A. No --

Q. -- that you sent?

A. I'm just saying you -- you would see that I called her, and it would be at, you know, 4:00 or 5:00 o'clock at night, or, you know, whenever I was on the road.

Q. Did you ever call her at 4:00 or 5:00

Page 163

CHARISE JONES

o'clock at night as part of your regular case work?

A. No.

Q. Never?

A. I wouldn't say never.

Q. So once in a while perhaps?

A. Yeah, if I was stuck in traffic or knew, you know, that I was going to get home late, I would -- might say, "Listen, I don't know if you're looking for me, but I'm still on the road."

You know, even though I have my laptop, it's not -- I can't, you know, access it while I'm driving. So, you know, "I just want to let you know, I'm not going to be home 'till later."

MR. SLOTNICK: It might be a good time to take a quick break, if that's okay.

MS. JEAN: Yeah.

THE LEGAL VIDEO SPECIALIST: We're now going off the record. The time is 1:02 p.m.

(Whereupon at 1:02 p.m. a luncheon recess was taken.)

Page 164

CHARISE JONES

A F T E R N O O N   S E S S I O N

(Whereupon at 1:36 p.m. the videotaped deposition of Charise Jones resumed, and she further testified as follows.)

THE LEGAL VIDEO SPECIALIST: We're back on the record. The time is 1:36 p.m. This is the beginning of the media labeled number three.

BY MR. SLOTNICK:

Q. Okay, Ms. Jones, before the break we were reviewing some of the interrogatories, responses that you had put together in your declaration. So I just wanted to direct your attention back to paragraph seventeen of that document. It's on page six...

And it says, "My supervisor was aware that I and other special investigators worked overtime. My supervisor was able to view when special investigators submitted their reports, sometimes at 8:00 or 9:00 p.m., because she had to review and approve these reports, and various entries in the report are time stamped."

Does your supervisor that you're referring to in that paragraph, is that also April Neyland?



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
165–168

Page 165

CHARISE JONES

A.   Correct.

Q.   And is it your assertion that April was aware that you and others were working overtime based on the fact that she may receive reports at times like 8:00 p.m. or 9:00 p.m.?

A.   Yes.

Q.   Was there a specific time by which you were required to submit those reports to your supervisor?

A.   Not time as far as a specific like 8:00 o'clock in the morning or whatever, just a twenty-four-hour -- when you closed a report, it had to be submitted within twenty-four hours of you finishing your report.

Q.   Was that April's policy, or was that --

A.   No.

Q.   -- GEICO's general policy?

A.   Sorry.  It was just the general policy that, when something was completed, you had twenty-four hours to close it and upload it to the claims, to let claims know that you finished it, that you finished your investigation.

Q.   Would that report when you submitted it go straight to claims, or did that go to April

Page 166

CHARISE JONES

first?

A.   One report was automatically you uploaded to claims, so that you did that first, and then you submitted it to -- me being, I would send it to April, but other people would send it to their respective supervisor.

Q.   So that was a supervisor by supervisor report that you would submit?

MS. JEAN:  Objection.

MR. SLOTNICK:  Let me rephrase that.

BY MR. SLOTNICK:

Q.   You would submit your reports to April and other -- other investigators would submit their reports to other -- to their individual supervisors.

Is that correct?

A.   Correct.

Just to clarify, unless my supervisor was off, then she would say, you know, so and so is the covering supervisor while I'm out for the week.

Q.   How often did that happen?

A.   Whenever she took off, like again extended time, like a week or so.

Page 167

CHARISE JONES

Q.   Do you have any other reason to believe that your supervisor would be aware of unreported overtime hours worked?

A.   Other than what I noted?  No.

Q.   And you testified earlier that you had no set working schedule, correct?

A.   I wouldn't say set.

I mean, I always started between 7:00 and 7:30, so that to me is set.  I barely deviated that from time frame.

Q.   Right, but that's -- time frame was dictated by you, correct?

A.   Correct.

Q.   So because you had no set regular working hours, weren't you permitted to perform your work at any time during the day that you wanted to?

MS. JEAN:  Objection.

THE WITNESS:  I -- I scheduled my day how I wanted to schedule my day, meaning going out, typing my reports.

I wasn't permitted to work before 7:00 o'clock, but I -- currently I'm working at 6:00 a.m. I start, but as an investigator you

Page 168

CHARISE JONES

weren't allowed to start before 7:00.

BY MR. SLOTNICK:

Q.   Who told you that?

A.   It was the supervisor/manager said we have nobody as an investigator working before 7:00.

Q.   Did you say the manager told you that?

A.   The manager just said we have no -- "Currently we have no investigators working before seven."

Q.   Who was the manager that said that?

A.   Bill Newport.

Q.   Were you able to submit those reports at any time you wanted to?

A.   It's kind of hard to say whenever.

As long as it's within the time frame that it was, you know, projected on us, then, yes, we can submit it when we wanted to, but we did have certain time -- you know, stringents (sic) on those when they had to be submitted.

Q.   Did you always submit those reports as soon as you completed them?

A.   Within the twenty-four hours I did.

Q.   And then if you look at paragraph



CHARISE JONES
FISCHER V. GEICO

Page 169

CHARISE JONES

eighteen on the same page, page six, you say, "I recall in the summer 2016 that I asked my supervisor how I could get all my work done in only 38.75 hours per week and informed her that I needed to work overtime hours in order to keep up with my caseload.

"My supervisor's response was that other special investigators were able to complete the work within the set hours, but I learned from speaking with the other special investigators that we were also working overtime off the clock."

Was that also a conversation you had with April?

A. Yes.

Q. Was that conversation with April an in-person conversation?

A. It could have been at her desk, because we were going in the office at that point. I don't recall a hundred percent, but prior to COVID we would go into the office, and I would have conversations with her at her desk.

Q. Do you recall if anyone else was part of that conversation?

A. No, nobody was.

Page 170

CHARISE JONES

Q. Who are the other special investigators you're referring to in that paragraph?

A. I don't recall at that time, 2016, who specifically I was referring to, just in general that again, based on talking to other investigators at other sites that we would run into on another, we all stressed the same thing that there was no way possible to finish all of what they were expecting us to finish within the time frame allotted.

Q. But did they specifically say to you that they were working off the clock?

A. A lot of -- yes, I did have specific investigators saying that they were working off the clock.

Q. And who were those investigators?

A. Keith Fischer, John Moeser, Tony Geraci. I'm trying to think who else was there.

That's the only ones I could recall off the top of my head.

Q. What specifically did they say to you about working off the clock?

A. They would say there's no way that we could, you know, finish all these cases expected

Page 171

CHARISE JONES

when we're sitting at these EUOs for hours waiting for somebody to show up, waiting for an interpreter, waiting for a court stenographer, waiting for something; that -- and then by the time you get home, it's hours later that, you know, that'd have to, you know, finish up their work, and it's after hours.

Q. Did they say how many hours they were working off the clock per week?

A. No, nothing specific, just that they couldn't finish their work within that time.

Q. Do you know whether they made any complaints to their supervisors about these issues?

A. That I don't know.

Q. Do you know who their supervisors were?

A. I don't know specifically who reported to whom. I know the supervisors, but I don't know who reported to who.

Q. Do you know whether they all reported to April at that time?

A. The only one that I know of reported to April was John Moeser, the other ones I don't recall.

Page 172

CHARISE JONES

Q. But the other employees that you listed did not report to April, correct?

A. No, not during the time I reported to her.

Q. Okay. Did you otherwise have any conversations to verify their allegations that they were working off the clock?

A. Not -- not specifically.

Again, just like when we had our general main meetings where we would go to Melville, it would be brought up that, you know, when -- you know, is it -- are we able to do any overtime, when is overtime coming back. And it was told, you know, you have to, you know, do your job in the amount of time that's allotted, and if anybody's working overtime, it's just going to, you know, not be beneficial for the people that are only working the 38.75, because you'll have the number skewed.

Q. Who said that specifically?

A. Bill Newport.

Q. What did he mean by "the numbers skewed"?

A. Because they were -- they were getting



CHARISE JONES
FISCHER V. GEICO

August 12, 2024
297–300

Page 297

CHARISE JONES

I N D E X

DEPOSITION OF CHARISE JONES

EXAMINATION BY:                          PAGE:

   Mr. Slotnick                        5, 292

   Ms. Jean                               275

INDEX OF DEPOSITION EXHIBITS:

JONES EXHIBITS:                          PAGE:

Jones Exhibit 1. Notice of Deposition      11

Jones Exhibit 2. Employee handbook        101

Jones Exhibit 3. Training history log     109

Jones Exhibit 4. Employment Contents

From the GEICO Human Resources Associate

Handbook                                  115

Jones Exhibit 5. Charise Jones Declaration  134

Jones Exhibit 6. Answers to Interrogatories 176

Jones Exhibit 7. Second Amended Collective

and Class Action Complaint                 224

   (Exhibits attached to original transcript.

Page 298

CHARISE JONES
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer, et al. vs. GEICO
Dep. Date: August 12, 2024
Deponent: Charise Jones

CORRECTIONS:
Pg.  Ln.  Now Reads  Should Read  Reason

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2024

_____
(Notary Public)

MY COMMISSION EXPIRES: _____

Page 299

CHARISE JONES
ACKNOWLEDGEMENT OF WITNESS

   I, CHARISE JONES, do hereby acknowledge
that I have read and examined the foregoing
testimony, and the same is a true, correct and
complete transcription of the testimony given by
me, and any corrections appear on the attached
Errata sheet signed by me.

_____  _____
  (DATE)            (SIGNATURE)

Page 300

CHARISE JONES
C E R T I F I C A T E

STATE OF NEW YORK    )

          : Ss.

COUNTY OF NEW YORK   )

   I, Kim M. Brantley, Shorthand
Reporter, and Notary Public within and for the
State of New York, do hereby certify:

   That CHARISE JONES, the witness whose
deposition is hereinbefore set forth, was duly
sworn by me and that such deposition is a true
record of the testimony given by the witness.

   I further certify that I am not related
Toni of the parties to this action by blood or
marriage, and that I am in no way interested in
the outcome of this matter.

   IN WITNESS WHEREOF, I have hereunto set
my hand this 13th day of August, 2024.

*Kim M. Brantley*

   Kim M. Brantley

My Commission expires May 31, 2026.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com