# Exhibit M

## Page 1

CONSTANCE MANGAN

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                Plaintiffs,       )

    - v -                         )

GOVERNMENT EMPLOYEES INSURANCE    )

COMPANY d/b/a GEICO,              )

                Defendant.        )

- - - - - - - - - - - - - - - - - )

VIDEOTAPED DEPOSITION OF CONSTANCE MANGAN

Reported by:

Kim M. Brantley

Job No: J11541509

## Page 2

CONSTANCE MANGAN

Thursday, August 9, 2024

Time: 9:35 a.m.

Videotaped deposition of CONSTANCE MANGAN, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

    OUTTEN & GOLDEN, LLP

    1225 New York Avenue NW - Suite 1200B

    Washington, DC, 20007

    (202) 847-4400

    Email: hcolechu@outtengolden.com

    BY:  HANNAH COLE-CHU, ESQUIRE

## Page 3

CONSTANCE MANGAN

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE

Also On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    1540 Broadway - 14th Floor

    New York, New York 10036

    (212) 471-1856

    Email:  gsslotnick@duanemorris.com

    BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)

ALSO PRESENT:

    SILVIO FACCHIN, Legal Video Specialist

    Esquire Deposition Solutions

## Page 4

CONSTANCE MANGAN

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  This is the media labeled number one in the video recorded deposition of Constance Mangan in the matter of Keith Fischer, et al., versus Government Employee Insurance Company, doing business as GEICO.

This deposition is being taken in New York City, New York, on August 9th, 2024.  My name is Silvio Facchin.  I am a certified legal video specialist; the court reporter is Kim Brantley, and we are both representing Esquire Deposition Solutions.

We are now going on the record.  The time is 9:35 a.m.

Counsel will state their appearances for the record.

MS. COLE-CHU:  Hannah Cole-Chu for the plaintiffs and the witness, Connie Mangan.

MS. ALBERTY:  Tiffany Alberty and Gregory Slotnick on behalf of the defendants, GEICO.

THE LEGAL VIDEO SPECIALIST:  And will the court reporter please swear in the witness.



Page 61

CONSTANCE MANGAN

workload heavier at times?

A. Well, the case reporting system is repetitive, redundant. So preparing a report, inputting a report, submitting a report is time consuming, for sure; the inability to get an attorney to commit to a date for an examination under oath can be very challenging; reviewing medical billing is very tedious, and you really have to pay attention, and you have to know what you're reading, and that -- often I would have to look things up. We had some training, but really, to get an understanding of every medical code, to actually watch a video of somebody getting an electrical stimulation applied, or a nerve test done, this was -- these were things that you had to do, so that when you went in to ask a person questions, you knew what it was that you needed to ask them.

So there was a lot of preparation involved with investigations, and also with examinations under oath specifically for medical cases for me, that was a lot of preparing.

Q. Were you doing what they called EOUs for short?

Page 62

CONSTANCE MANGAN

A. EUOs.

Q. EUOs.

A. Examination under oath. Yeah, because we love acronyms. It's just one of those things.

Q. Were you doing EUOs for doctors, medical specialists, things like that as well?

A. I did not. Other people did within the SIU, but I did not.

Q. Okay. Would you consider yourself a subject matter expert in the field of medical insurance investigations?

MS. COLE-CHU: Objection to form.

THE WITNESS: I would say that I became very proficient at it.

BY MS. ALBERTY:

Q. What about for auto insurance fraud?

A. Yes, very proficient at it.

Q. To your knowledge, do you know if other senior security investigators had the same workload as you for the medical fraud claims?

A. Yes.

Q. How do you know that?

A. Well, I -- I spoke to other investigators that were in the medical fraud team,

Page 63

CONSTANCE MANGAN

like Dave Jones, like Eric David, like Michael O'Sullivan, I think Danny King for a while was assigned to medical fraud.

So in our conversations either on the phone or through emails, or even at an examination under oath was where we ran into each other all the time, because we were constantly at a court reporting facility for examinations under oath, sometimes three days a week, sometimes four days a week. I always would run into the other guys I worked with. And I know that guys like Toni Geraci and Keith Fischer, especially when they were doing auto theft, had maybe even more cases than I did assigned.

Q. Right. So, again, because you had two different hats, and for the focus of the time consideration of 2016 forward, I really just want to hone in then on the medical side because that's what you were doing during that time.

A. Okay.

Q. Other than the one-offers that you said where somebody might say, "Hey, I need help on this one nuanced issue on a fraud auto-related claim" -- because your -- your primary ninety --

Page 64

CONSTANCE MANGAN

we'll say ninety-five percent was medical, right?

A. I think that be would fair. I don't really like percentages too much, because -- but I would say that the majority of it, the bulk of my assignments were medical fraud investigations.

Q. Okay. And -- and just a little bit by what you've told me, medical fraud investigations are different in the overall process versus doing an auto investigation, correct?

A. I would not say that, no. I believe all the basics are essentially the same, is that you still have to acknowledge the receipt of a case, make the proper notifications, make your entries, do background checks, review medical billing -- on a staged accident, they had to review medical billing -- look through the claim file, review the case file, review paperwork, review documents, do a surveillance, visit a clinic, visit somebody's house...

So their responsibilities where essentially -- they're essentially the same. The cases themselves may be different as far as the nature of the claim, whether it's somebody's reporting their car stolen, or somebody's



Page 109

CONSTANCE MANGAN

your supervisor saying to him, "I'm going to need X amount of overtime hours for these cases this week," that was something that you were doing while you were under the supervision of Kevin as well?

A. We never submitted for overtime when I worked for Kevin Moynihan. I don't even recall overtime being an option when I worked for Kevin Moynihan.

The subject of ever submitting overtime came up sometime later, but I don't know when. I could not even tell you a year, because I just don't recall.

Q. Did you ever have the time that you underestimated the amount of overtime that you needed and had to go back and ask for more time?

A. I never went back to ask for more time, but I would sometimes work more than what I had submitted for.

Q. Why wouldn't you go back and ask for more time?

A. My understanding was that overtime was discouraged, and to go back and try to get an additional hour approved on top of the two hours I

Page 110

CONSTANCE MANGAN

had already requested, I didn't feel confident that it would be approved, and I also did not really want to have to go through another process of submitting a request for an approval and specifying a case for another hour of overtime, especially when my -- my supervisors were saying we shouldn't be doing it.

Q. What do you mean -- excuse me, what do you mean that you felt your overtime requests were discouraged?

A. Because our -- as I have stated and I would tell my supervisors, there is no way I can complete my investigations, my reports, within the time frame of 7.75 hours a day; that in order to complete my work I had to work in excess of those hours on a regular basis.

And the response that I received from my supervisors -- and that would be all of the supervisors that I have named so far -- was that Don't do overtime. Work 38.75; work 7.75."

My response would be, "But I have to, because it affects my performance evaluation. It affects my case rating. There's no way that I can do -- finish these cases if I don't work more than

Page 111

CONSTANCE MANGAN

my normally scheduled hours."

And they would say, "We understand, but there's nothing we can do about it."

Q. But you had the ability, though, to still request overtime?

A. The problem to my understanding with requesting overtime was that affected my ability to -- not my ability, I apologize. It affected my qualification to be assigned more cases. So, while I was already feeling extremely overwhelmed -- I can recall having this conversation with Toni D'Agata especially, not on a particular date, but I can remember having this conversation with her, that -- and I -- I believe Dara as well -- that if you submitted say in a week that you worked fifty hours, that would then trigger the assignment of more cases to you, because you are now available on more hours.

So, I'm doing the overtime to complete the cases I already have -- and I'm failing to do that a lot of the time -- and now if I submit all of my actual overtime hours, all of the hours that I was working, say fifty hours, that would then trigger the assignment of additional cases adding

Page 112

CONSTANCE MANGAN

to my caseload. And the supervisors didn't want us to do that. They knew he had an unmanageable and unreasonable caseload, and they constantly told me and -- and everybody -- not everybody, but most the people that I spoke with and worked with that I knew and had conversations with, that we were limited to a 7.75-hour day, in spite of the fact that we were all complaining and all saying that we're all working way past that.

There was -- just seemed to be no avenue to satisfy that problem.

Q. With regard to supervisors saying "Don't do overtime" -- I think that's what the phrase you had stated --

A. Yeah.

Q. Was that ever in any type of GEICO policy?

MS. COLE-CHU: Objection to form.

THE WITNESS: My recollection of those conversations were specifically telephone conversations, in-person conversations, predominantly.

BY MS. ALBERTY:

Q. Do you ever recall seeing that in an



CONSTANCE MANGAN
FISCHER V. GEICO

August 09, 2024
113–116

Page 113

CONSTANCE MANGAN

email?

A.   I don't recall it independently.  Is it possible there ever was one?  Maybe.

Q.   In the testimony that you provided, that if you submit more hours you would get more cases --

A.   Correct.

Q.   -- that's your understanding of the process, correct?

A.   Based on information from my supervisor.

Q.   Who told you that?

A.   I recall specifically Toni D'Agata telling me that, and I believe also Dara Campbell told me that.

Because I was torn between I submit the actual hours I was actually working, and then being buried in additional cases.  And the supervisor's answer to that is, "You do 38.75 a week.  If you put in for overtime, you're going to get more cases."

Q.   Do you know if that was a glitch in the software?

MS. COLE-CHU:  Objection to form.

Page 114

CONSTANCE MANGAN

THE WITNESS:  As far as I understand it, that is exactly the way the matrix was designed.

BY MS. ALBERTY:

Q.   Did you ever see that in any type of policy or written format, that that was the condition's precedent?

A.   Not to my recollection.

Q.   Going back to your declaration on page three to four, it states, "First I needed to accepted an email requesting -- request outline the additional hours I needed to work on a specific case for supervisor approval, and if approved I could then put in the approved hours of my time sheet and not the time actually spent on my work."

What do you mean by "if approved I could only put in the approved hours in my time sheet and not the time I actually spent on my work"?

A.   So that is, if I were to estimate to my supervisor that on this case number and for this reason I'm going to need two-and-a-half hours of overtime today, they would say, "Okay, you got it

Page 115

CONSTANCE MANGAN

it," if that was the case...

If I actually spent three hours on it, or a little longer than that, I -- I -- that was never an option, in my opinion, based on the responses from my supervisors, to request that additionally.  It's like once it's in and the -- and the time is in, I don't know if there was any system to correct that.

Q.   Did you ever see any policy stating that you could only submit your OT once and then, what you testified to, you're locked out of the system?

A.   Not that I'm aware of.

Q.   And I think you said you never went back a second time to say, "Hey, I actually need more time.  I underestimated," correct?

A.   I don't recall if I ever specifically mentioned that I ended up working four hours instead of two hours.  I may have.  But I don't recall ever requesting that additional time for compensation.

Q.   But you could have, correct?

A.   I don't believe I could.  That's why I didn't.  I didn't believe that I could.

Page 116

CONSTANCE MANGAN

Q.   But you never saw it in any type of policy from the company saying you can't go back and ask for more OT time, correct?

A.   Well, you refer to "policy," and I understand what you're saying, but I see it as the practice of the company.

So what may or may not have been policy or in writing, the practice that was in place, that to me was what we were going by, the actual practices that we -- we had to comply with.

Q.   With these concerns you had, why wouldn't you have brought that to human resources?

A.   I do no faith in human resources to be helpful to us in any way.

Q.   And what's your basis of that opinion?

A.   We had had a -- I not personally, but another person in the office, or a couple of people in the office had gone to human resources in the past with complaints about a supervisor who was consistently rude and inappropriate, and Paula Tellerman in fact, who I believe I mentioned earlier, was one of the people who had gone to human resources for that -- a wonderful employee with forty years of service -- and our feeling was



Page 125

CONSTANCE MANGAN

It is possible that I had seen something regarding this ratio of cases worked to hours. It's possible.

Q. But do you remember as you sit here today?

A. Like an independent recollection of a specific form? I -- just could not answer that question truthfully if I said yes for sure. I just don't remember exactly.

Q. As a senior special investigator, were you ever involved in making the determination of those ratios of cases to hours worked that we talked about?

A. Did I personally have any --

Q. Yes.

A. No.

Q. Do you --

A. Not that I know of.

Q. Do you know who was?

A. I don't. I just assume it's company policy.

Q. But I think you said, "I'm assuming it's company policy."

A. Right.

Page 126

CONSTANCE MANGAN

Q. You don't know if it is or not?

A. I mean, that would probably be a good approximation, that it's company policy.

I don't believe my supervisors were making up matrices, but I couldn't cite a specific policy, if that's the question.

Q. For the times that you requested OT, were approved for overtime, do you recall how many new cases then you got assigned because you got approved overtime?

A. I don't.

Q. I just want to make sure I'm fleshing this out.

A. Okay.

Q. Did you ever report to anyone your concerns about being deterred from submitting overtime hours that we haven't yet talked about?

A. So, just to be clear, you're talking outside of my supervisors, and management, and other people that I worked with, like other SIU investigators or inside staff? Is that --

Q. I don't think we talked about inside staff or SIU investigators.

A. Well, we talked about those things on a

Page 127

CONSTANCE MANGAN

regular basis.

Q. Okay, do you remember who you spoke to about that?

A. Oh, I could probably name a lot of people. It seemed to be the subject of the conversation on a constant basis every time we ran into each other at an -- an examination under oath, or if we spoke on the phone.

But in order to name a few people specifically, I could say Tony Geraci, George McManus, Mark Giambalvo, Mike O'Sullivan, Danny King, Charise Jones, Dave Jones, Eric David, Lou Pia, John Moeser.

Oh, I mean, just -- just running out of names in my head, but, yeah, a lot of the other people that I worked with. And every time we would see each other, we all had the same complaints.

Q. Do you know if all these people are plaintiffs in this lawsuit?

A. I know some of them are. I don't know if all of them are.

Q. And have you spoken to them since joining the lawsuit?

Page 128

CONSTANCE MANGAN

A. We haven't been in touch, no.

Sometimes when you retire you stay in touch with people, and sometimes you don't. An occasional like, "Oh, let's get together some day and see each other," but that would be the extent of it.

Q. In regard to Tony, do you know if Tony ever submitted overtime and was denied?

A. You're saying Tony Geraci or Toni D'Agata?

Q. Sorry, Geraci.

A. Well, there's so many -- I don't know that he submitted for specifically, but I know it was the same issue, that we were not to put in for overtime; that we were to record our hours as 38.75 per week, 7.75 a day.

Q. So --

A. Whether he was specifically denied anything at any point, that I'm not certain of.

Q. Do you know if George McManus had submitted overtime and was denied?

A. I do not know independently if he was or not.

Q. Did he tell you?



Page 137

CONSTANCE MANGAN

I was working.

Q. And while I appreciate that, I -- I believe, though, you're assuming, because you can't provide tangible on week one of fifty-two weeks, on week seven of fifty-two weeks I worked forty-four, so it was four hours over, six hours over?

You don't have -- again we're going to go back down to the granular numbers. You don't have the granular numbers of when you exceeded overtime per week from 2016 to 2020, correct?

MS. COLE-CHU: Objection to form.

THE WITNESS: I would say that I have my recollection of working again past 7:00 p.m. on a regular basis every week. I don't have a piece of paper that says that.

BY MS. ALBERTY:

Q. Sure.

A. But I have that recollection that that was the case.

Q. Okay.

A. And certainly there would be some reflection in the SICM case system, which I'm sure GEICO has all of the records for, that indicated

Page 138

CONSTANCE MANGAN

that I was on that system at least parts -- parts of that time.

Q. Okay. So if we're going to go then with your logic, November 4th, 2019 to November 8th of 2019, how many hours did you work overtime that you did not account for?

MS. COLE-CHU: Objection to form.

THE WITNESS: I cannot state with a -- on a specific date, which I believe I've already agreed to, but that I knew that every week I was working every day extra hours to complete my cases.

So, to say that between late 2016 to -- to May 2020, to say that I know that I was working fifty to sixty hours on average per week, I know that I was doing that.

BY MS. ALBERTY:

Q. But you're telling me you can't break it down per week, right?

A. I cannot give you a specific date and say that on May 16th I worked three-and-half hours. I -- I don't think it's reasonable to even ask me to be able to do that. I can't do that.

Q. Well, again, I'm trying to understand

Page 139

CONSTANCE MANGAN

then, because there is an assumption, that's why you gave a range to begin with, right? Ten to twenty-five hours, that's a fairly larger range. It's not a one-hour range. It's -- that's a fifteen-hour range -- or sorry, I apologize.

Fifty to sixty hours; that's a ten-hour range.

A. Ten-hour range over the five days.

Q. Right.

A. Right. I don't think that's a big range. I mean, that could be a --

Q. So --

A. In your interpretation. I don't think that's a large range.

Q. So if you were required then to be in a forty-hour work week, and you're doing sixty hours say that week, and we go back to the week I just provided, which is November 4th, 2019, which is a Monday, to November 8th, 2019, which is a Friday, you cannot tell me what hours you exceeded the forty-hour week to quantify your assumption in number ten of a fifty- to sixty-hour work week?

MS. COLE-CHU: Objection to form.

Page 140

CONSTANCE MANGAN

BY MS. ALBERTY:

Q. Correct?

A. Well, assuming that I wasn't on vacation that week, which I have no independent recollection of, if I was working, I was working overtime. That's the only way I could really state it.

Q. In 2020 did you ever get COVID?

A. No.

Q. Did you have limitations based upon COVID restrictions in which you could not do your job?

A. To some degree, yes.

Q. And in what way?

A. Field work, field visits.

Q. Okay, so in March up and until your retirement in May of 2020 -- say we'll say for the two months -- you were not able to conduct in-field investigations, correct?

A. We were requested to do them, but then we were told that it was not mandatory but optional.

I opted not to go out and interact with the public during that time period.

CONSTANCE MANGAN
FISCHER V. GEICO

Page 149

CONSTANCE MANGAN

A.   Specifically that's harder to answer, but I know that I had discussions like that with Tony Geraci, and with Dave Jones, George McManus, Mark Giambalvo.

I mean, if I have to specifically name a person or persons, I know for sure I would have -- I -- not would have.  I know for sure I had conversations with them about working extra hours every week and not submitting overtime for it.

Q.   Do you remember what their response was?

A.   They were doing the same thing.

Q.   Was that their response?

A.   Yeah, there was head nodding and, "Yes, that's -- we're all doing that."  Or "I worked until 10:00 o'clock the other night," or "I turned my computer on on the weekend."

It was -- that was the kind of response that a we were sharing.

Q.   With management did you ever tell them that you were working fifty to sixty hours a week and that you weren't putting in your overtime for those hours?

Page 150

CONSTANCE MANGAN

A.   You mean to Bill Newport specifically?

Q.   To your supervisors.

A.   My supervisors?  Absolutely.  They knew how many hours I was working.  I told them I was working overtime every day, yeah.

Q.   And you told them that --

A.   And they knew I wasn't putting in overtime, because they would have had to approve it.

Q.   Right, so when you told them that you weren't putting in for overtime, but you were working the fifty to sixty hours over --

A.   Right.

Q.   -- what would they say?

A.   They would say, "We know, but there's nothing we can do about it."

Q.   Did they encourage you to put in your overtime hours?

A.   Well, it was specifically Toni D'Agata and Dara who pointed out to me that putting in overtime hours would be detrimental to me.

So that's certainly a discouragement to me, and also it seemed to be the same answer was "Do 38.75 per week, 7.75 per day."

Page 151

CONSTANCE MANGAN

Q.   Did they say specifically that it would be "detrimental" if you put in those hours, even though you were working those hours?

A.   Is the question whether or not they used the word "detrimental" in a conversation?

(Ms. Alberty nods head in the affirmative.)

A.   I don't remember if they did or not.

Q.   Did you tell Bill Newport that you were working fifty to sixty hours a week, that you were not logging your overtime hours?

A.   I don't recall ever having a conversation like that with them.

Q.   Did you tell anyone in HR?

A.   I did not speak to HR, no.

Q.   Was there any -- was there anyone that worked over Bill that you would speak with?

A.   No.

Q.   Did you ever put in writing -- whether to the SIUs, to the supervisors, to Bill -- that you were working fifty to sixty hours a week on average?

A.   Not to my recollection.

Q.   As to what weeks or how much overtime

Page 152

CONSTANCE MANGAN

was requested by your other SIUs, you were not involved in approving any overtime hours for your colleagues, correct?

A.   That's correct.

Q.   Did anyone -- strike that.

Did any of the SIUs come to you and tell you more on a number amount, similar to what you state in your declaration of fifty to sixty hours?

Did any of your SIUs tell you, "Hey, I'm working seventy hours typically in a week"?

MS. COLE-CHU:  Objection to form.

THE WITNESS:  To the best of my recollection I can recall some people saying they worked longer than I was working, which I -- I found upsetting.  I'm not sure exactly who.  Maybe Lou Pia, but I -- I -- I believe that's the case.  I would not say a hundred percent for sure.

BY MS. ALBERTY:

Q.   Would that have been in person? on the phone? email?

A.   When I saw Lou Pia, it was always in person.  I don't know that we spoke on the phone

CONSTANCE MANGAN
FISCHER V. GEICO

August 09, 2024
153–156

Page 153

CONSTANCE MANGAN

much at all.

Q.  Do you know whether any employees outside of the Woodbury office were approved to work more than the 38.75 hours in a week?

A.  If they were approved to work?  I don't know.

Q.  Do you know if Lou was approved for any overtime hours?

A.  I don't know what hours he was approved for.

Q.  So were you eligible for overtime?

MS. COLE-CHU:  Objection.

THE WITNESS:  Overtime had been offered at one point, but in a -- to my understanding in a very limited capacity.

BY MS. ALBERTY:

Q.  And I apologize if you previously testified to this...

Do you know when in time overtime was allowed and approved?

A.  Yeah, that a good question.  I wouldn't be able to answer that.  I'm not sure.

Q.  Do you know whether other senior security investigators were eligible for overtime?

Page 154

CONSTANCE MANGAN

MS. COLE-CHU:  Objection.

BY MS. ALBERTY:

Q.  Between that -- sorry, between that 2016 to 2020 time frame?

MS. COLE-CHU:  Objection to form.

THE WITNESS:  My understanding from my conversations with the other SIU investigators is we were all subject to the same circumstances.  We all had the same issue, complaints, and problems regarding the hours we were working over our scheduled tours.

BY MS. ALBERTY:

Q.  Specifically the question is for eligibility, though.  Do you know if other senior security investigators were eligible for overtime?

MS. COLE-CHU:  Objection.

THE WITNESS:  Yeah, I'm not sure how I would make that determination, who's eligible or not eligible.  I would only know what they told me about the fact and what was actually happening.

BY MS. ALBERTY:

Q.  What about senior field security

Page 155

CONSTANCE MANGAN

investigators outside of Long Island and the boroughs.  Do you know if they were eligible for overtime?

A.  Well, again I don't know the specifics of their eligibility, but I know many of them were also working hours in excess of their scheduled 7.75 per day.

Q.  Do you know whether SIU investigators other than field security investigators were eligible for overtime?

MS. COLE-CHU:  Objection.

THE WITNESS:  I don't know their eligibility status.

BY MS. ALBERTY:

Q.  Do you know if they were paid for overtime?

A.  I don't know what they were paid for or not paid for, but I know they were working a lot.

Q.  Do you know if lead security investigators were eligible for overtime?

MS. COLE-CHU:  Objection.

THE WITNESS:  I don't know their eligibility status, but I know Keith Fischer was a lead, and he had expressed to me that

Page 156

CONSTANCE MANGAN

he also was working hours in excess of his 7.75 every day, and that we were not putting in for overtime.

BY MS. ALBERTY:

Q.  Do you know if Keith Fischer was denied overtime?

A.  I don't know.

Q.  Do you know if lead security investigators were denied overtime?

A.  Not to my recollection.  I don't know.

Q.  Do you know if lead security investigators were paid overtime?

A.  I don't know.

Q.  Do you know if claim security investigators were paid overtime?

A.  I'm not sure what you mean by "claim security investigators."  I mean, that title, I don't know that title.

Q.  Do you know if that was a title for any employee at GEICO during 2016 to 2020?

A.  It's not a title that sounds familiar to me.  "Claims security investigator"?

(Ms. Alberty nods head in the affirmative.)



Page 181

CONSTANCE MANGAN

recall them doing medical fraud investigations?

A.  Not specifically.  But I believe sometimes it would be a part of their investigation.  It could happen.

Q.  All right, if it -- if it happened to fall within a auto claim?

A.  Yes, that's true.

THE WITNESS:  Do you need the spelling of Giambalvo?

THE COURT REPORTER:  Sure.

THE WITNESS:  Okay, that's not an easy one to just figure out on your own. G-i-a-m-b-a-l-v-o.  While I was thinking of it, I'm sorry.

BY MS. ALBERTY:

Q.  You state, "I also know other special investigator -- investigators worked many overtime hours off the clock each week without receiving overtime pay."

Who are the other special investigators that you identify in number twenty-one that haven't already been identified in number twenty?

A.  Well, we had a team in Staten Island, and I know one guy's name was Doug, and I cannot

Page 182

CONSTANCE MANGAN

remember the other guy's name, and we would see them at meetings where we had these discussions.

There were also -- Evan Teatum is a guy I know worked upstate -- I forgot all about him for a moment -- who I know whenever I saw him at a meeting, we talked about what -- the hours we were working and how many hours we were working.

There was another female investigator -- who of course I can picture, but I cannot think of her name; I apologize for that -- who also expressed between the amount of travel that they did upstate, and then the caseload, that she was constantly buried.

And we had a large meeting where we were all together in the room, and we all had an opportunity to speak to each other, and -- and we discussed the same things.

Q.  All right.  I just want to break that down a little bit.

A.  Okay.

Q.  On the large meeting, do you remember when this occurred?

A.  The last large meeting that I can remember was -- it was either 2018 or 2019, and

Page 183

CONSTANCE MANGAN

that's the most I can narrow it down, to the best of my recollection, and that was a meeting that was upstate investigators, Staten Island investigators, the local metropolitan area investigators, including Nassau and Suffolk County, the five boroughs of the city, our supervisors, inside staff, people from legal who prepared our legal letters for us, our -- and our manager also, Bill Newport, I know was there.

Q.  How many people do you think were in this meeting?

A.  I'm not great at crowd estimation, but I -- it would have to be at least forty people, probably way more than forty people.

Q.  And who was leading the meeting?

A.  That meeting was being led by Bill Newport, which I recall because he -- we never saw him.

Q.  And during this meeting is this when individuals or collectively people raised issues of pay?

MS. COLE-CHU:  Objection to form.

THE WITNESS:  Collectively we raised issues of unreasonable and unmanageable

Page 184

CONSTANCE MANGAN

caseloads, and specifically I remember Mark Giambalvo speaking and he was a -- very well spoken, Mark, and often he would sort of be a spokesperson for us because he was so well spoken.  He was very articulate.  And I can remember at this particular meeting that Mark Giambalvo was speaking to the caseload, and how everybody was struggling, and that we weren't able to manage it, and that we were working past our scheduled hours.  And I remember Bill Newport just shrugged his shoulders and said, "I don't give a fuck."

BY MS. ALBERTY:

Q.  He said that explicitly?

A.  Explicitly, and it has stuck with me to this day, because I was stung by it.  I -- I could not believe that he would act in such an unprofessional manner.  But it stunned the whole room.  It just went quiet.

Q.  Was this in person?

A.  This was in person.  We were all there. And he said in front of the whole entire room, "I don't give a fuck."

Q.  Was that in regard to saying, "Still do



Page 185

CONSTANCE MANGAN

your hours but also indicate that you're doing overtime?"

A.   Well that was in response to what Mark was speaking about, which was that everybody is buried in cases; nobody can manage their cases; we can't get ahead; we can't get out from under. We're working so many hours trying to get it done. He just didn't care.

Q.   Did Bill tell you not to log your overtime hours?

A.   Once he said, "I don't give a fuck," there was no more discussion about -- no discussion.  Nobody then brought up cases after that.

Q.   I understand --

A.   Okay.

Q.   -- but did he say that?  Did he say, "Don't log your overtime hours?"

A.   In that meeting, did he say "Don't log your overtime hours"?

Q.   Yes.

A.   I don't remember him saying that.

Q.   Do you know what the context was -- strike that.

Page 186

CONSTANCE MANGAN

Circling back to number twenty-one --

A.   Okay.

Q.   -- which are the individuals you listed: The other people you believe that were in Staten Island; there was a male and a female, you can't remember their names; you remember Evan Teatum.

A.   Mm-hmm.

Q.   Do you know if these individuals that you're referencing as the "other special investigators" for number twenty-one, if they did medical fraud?

A.   I know the Staten Island team were not in the medical fraud team, but as far as the upstate investigators, I don't -- I don't have the answer to that.  I don't know.

Q.   So the remaining individuals that you listed, were all those people upstate SIUs, if you know?

A.   Which people that I named?  Which ones?

Q.   So you said a male, a female, Evan Teatum.

A.   Yes.  I remember Evan and -- it kills me that I can't remember her name.

Page 187

CONSTANCE MANGAN

Did I say there was another male upstate?

(Ms. Alberty nods in the affirmative.)

A.   Yeah, there probably was.  Oh, now I lost track of the question.  I'm trying to remember that person's name.  It's making me crazy.

Q.   That's okay.  So those other individuals --

A.   Yeah.

Q.   -- were they in medical fraud?

A.   I don't believe so, but I don't know for -- for sure.

In fact I think they handled everything, because they were upstate, and there was a limited number of them.

So, I don't know if they were broken into separate teams.  I don't know that answer.

Q.   So the separate teams and categories -- and I just want to make sure I understand --

A.   Okay.

Q.   -- is medical fraud, and we have auto, but that's broken down even further to auto arson?

A.   Auto theft.

Page 188

CONSTANCE MANGAN

Q.   Auto theft.

A.   And staged accidents, or also caused accidents.  That falls in the same or similar categories.

Q.   Was there any other additional category within auto?

A.   There might have been.  I don't remember.  I'm not sure.

Q.   Were there any other big categories, such as the -- the medical, auto, property, homeowners?  Was there any other big groupings where special investigators would be allocated?

A.   We only investigated automobile-related fraud and injuries related to accidents, thefts of course related to autos.

We did not investigate homeowner's insurance or personal injury, slip-and-fall type claims.  We didn't investigate those.

Q.   As it applies to medical fraud, did the region determine the percentages for the types of claims?

MS. COLE-CHU:  Objection to form.

THE WITNESS:  Yeah, I'm not sure what that question is.



Page 285

CONSTANCE MANGAN

I N D E X

DEPOSITION OF CONSTANCE MANGAN

EXAMINATION BY:                              PAGE:

    Ms. Alberty                           5, 282

    Ms. Cole-Chu                            275

INDEX OF DEPOSITION EXHIBITS:

MANGAN EXHIBITS:                             PAGE:

Mangan Exhibit 1. Notice of Deposition    12

Mangan Exhibit 2. GEICO's Associate

Handbook                                    76

Mangan Exhibit 3. Training history log    79

Mangan Exhibit 4. Interrogatories and

declaration                                 96

Mangan Exhibit 5. Answers to

Interrogatories                            207

Mangan Exhibit 6. Second Amended

Collective and Class Action Complaint     207

    (Exhibits attached to original transcript.)

Page 286

CONSTANCE MANGAN
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer, et al. vs. GEICO
Dep. Date: August 9, 2024
Deponent:  Constance Mangan

CORRECTIONS:
Pg.  Ln.  Now Reads   Should Read   Reason

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2024
_____
   (Notary Public)

MY COMMISSION EXPIRES: _____

Page 287

CONSTANCE MANGAN

ACKNOWLEDGEMENT OF WITNESS

    I, CONSTANCE MANGAN, do hereby acknowledge

that I have read and examined the foregoing

testimony, and the same is a true, correct and

complete transcription of the testimony given by

me, and any corrections appear on the attached

Errata sheet signed by me.

_____  _____

   (DATE)              (SIGNATURE)

Page 288

CONSTANCE MANGAN

C E R T I F I C A T E

STATE OF NEW YORK    )

                : Ss.

COUNTY OF NEW YORK   )

    I, Kim M. Brantley, Shorthand

Reporter, and Notary Public within and for the

State of New York, do hereby certify:

    That CONSTANCE MANGAN, the witness

whose deposition is hereinbefore set forth, was

duly sworn by me and that such deposition is a

true record of the testimony given by the witness.

    I further certify that I am not related

to any of the parties to this action by blood or

marriage, and that I am in no way interested in

the outcome of this matter.

    IN WITNESS WHEREOF, I have hereunto set

my hand this 14th day of August, 2024.

*Kim M. Brantley*

Kim M. Brantley

My Commission expires May 31, 2026.



**Deposition Transcript Errata Sheet**

Case Name: *K. Fischer, et al., v. Government Employees Insurance Company d/b/a GEICO*,
Case No. 2:23 Civ. 2848
Witness: Constance Mangan
Deposition Date: 08/09/2024

| Page and Line | Change | Reason |
|---|---|---|
| 116:14 | I do > I had | Incorrect transcription |
| 141:7 | clinic > a clinic | Incorrect transcription |
| 166:4 | Like a notification Tuesday, a claims examiner > Like a notification to a claims examiner | Incorrect transcription |
| 184:17 | stung > stunned | Incorrect spelling |
| 194:7 | do > did | Incorrect transcription |
| 199:22 | would be > wouldn't be | Incorrect spelling |
| 228:22 | it you people > it's two people | Incorrect spelling |
| 240:14-15 | Is he named on everything > ? | Looks incorrect |

Date:  09/11/2024

_____
Constance Mangan