# Exhibit N

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL O'SULLIVAN, )
JOHN MOESER, LOUIS PIA, THOMAS    )
BARDEN, CONSTANCE MANGAN, and     )
CHARISE JONES, individually and on )
behalf of all others similarly    )
situated,                         )
                                  )
              Plaintiffs,         ) Case No.
                                  ) 2:23 Civ. 2848
         vs.                      ) (GRB)(ARL)
                                  )
GOVERNMENT EMPLOYEES INSURANCE     )
COMPANY d/b/a GEICO,              )
                                  )
              Defendant.          )
----------------------------------)

* CONTAINS CONFIDENTIAL PORTIONS *

VIDEOTAPED DEPOSITION OF JOHN E. MOESER
Garden City, New York
Friday, August 2, 2024

Reported by:
KRISTIN KOCH, RPR, RMR, CRR
JOB NO. J11541506

**Page 2**

August 2, 2024

11:04 a.m.

Videotaped Deposition of JOHN E. MOESER, held at the offices of Esquire Deposition Solutions, 1225 Franklin Avenue, Garden City, New York, before Kristin Koch, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

**Page 3**

A P P E A R A N C E S:

OUTTEN & GOLDEN LLP
Attorneys for Plaintiffs
685 Third Avenue
New York, New York 10017
BY:   MICHAEL J. SCIMONE, ESQ.
SABINE JEAN, ESQ.


DUANE MORRIS LLP
Attorneys for Defendant
1540 Broadway
New York, New York 10036
BY:   MARIA CACERES-BONEAU, ESQ.
GREGORY SLOTNICK, ESQ.
- and -
190 South LaSalle Street
Chicago, Illinois 60603
BY:   TIFFANY E. ALBERTY, ESQ. (Via Zoom)

ALSO PRESENT:
JONATHAN JUAREZ, Videographer
SAMANTHA JACOBSON, GEICO (Via Zoom)

**Page 4**

J. Moeser

THE VIDEOGRAPHER:  We are now on the record.  My name is Jonathan Juarez.  I am a legal videographer for Esquire.

Today's date is August 2nd, 2024, and the time is 11:04 a.m.  This deposition is taking place at 1225 Franklin Avenue, Garden City, New York, in the matter of Keith Fischer versus Government Employees Insurance Company.  The deponent is John Moeser.

Counsel, please, identify yourselves for the record.

MS. CACERES-BONEAU:  Maria Caceres-Boneau on behalf of GEICO.

MR. SLOTNICK:  Greg Slotnick on behalf of GEICO as well.

MR. SCIMONE:  Michael Scimone with Outten & Golden on behalf of plaintiffs.

MS. JEAN:  Sabine Jean, Outten & Golden, on behalf of plaintiffs.

THE VIDEOGRAPHER:  The court reporter is Kristin Koch and will now swear in the witness.

*   *   *



Page 69

J. Moeser

year.

Q.    Were there other factors that would make your workload heavier sometimes?

A.    As far as what?

Q.    Well, we mentioned the season; right?

A.    Uh-huh.

Q.    This time of year.  Is there anything -- were there any other factors that would create an uptick in claims?

A.    Well, I just need to clarify.  When you say "claims" or referrals?  Because I don't know anything about the claims being reported.  I know about -- I don't know about all referrals being sent over SIU, but there were increases in our caseload, if that's what you mean, yes.

Q.    Yes.  Thank you.  I appreciate the clarification.

So were there any other factors that would increase the number of referrals that you would receive?

A.    Yes.

Q.    What other factors?

A.    It would have been management's decision to increase our caseload.

Page 70

J. Moeser

Q.    Did other senior field security investigators have the same caseload as you?

MR. SCIMONE:  Objection.

A.    I wouldn't know that, but for the most part, people in the theft team or the enhanced damage team or outside those, because there is other referrals coming in that are not related to theft, enhanced damages.  It could have been, you know, first reporting of claims or anything within a certain time frame.  They may have gotten more claims referred to them than I was -- or more cases referred to them than I was getting.

Q.    How do you know that?

A.    It was generally known.  I mean, you know, when you have meetings and people would talk during meetings and they would say "I am getting this amount of cases" or "I am getting that amount of cases."

Q.    And who did you speak with about their workload?

A.    Anybody who wanted to voice their concerns at different meetings.  I mean, it was -- it was also, you know, guidelines that came out through management as far as, you know, this is

Page 71

J. Moeser

what you are gonna handle, that's what you are gonna -- see, when I -- for an example, when I first started with the enhanced damage team, it was we are gonna give you 20 referrals a month, and then it went to 20-something, then it went to 25, and then it went -- it just kept escalating, and that was true for people in other teams too.

Q.    And you said that was in -- which team was that where you first received 20 and then it kept increasing?

A.    Well, that was just an example I used.  I mean, that was in -- when I was in this -- the enhanced damage team, but, you know, I was also not just getting more enhanced damage claims -- referrals.  It would have been an increase in referrals overall.

Q.    So at the same time as being on the enhanced damage team, you would receive some referrals that were outside -- that were not enhanced damage referrals; is that right?

A.    Yes.

Q.    But the majority of the cases that you worked on when you were on that team were enhanced damage referrals; right?

Page 72

J. Moeser

A.    The majority of them, yes.

Q.    And you said that about -- it started off with you working about 20 of those case -- referrals a month; right?

A.    I -- I believe that might have been the number that they used when we first started the team.

Q.    And do you remember the time period when you worked on that team?

A.    No.  Like I said before, I don't know if it overlapped into 2016 prior to me getting on the staged loss team.  I don't know the time frame.

Q.    And you mentioned speaking with other people about their caseloads.  Do you remember the names of the people that you spoke with?

A.    I don't remember, no.  I mean, it was anybody who was -- people who were working, you know, assigned to the field units that were attending these meetings.

Q.    You mentioned having a caseload of -- so you mentioned your caseload was increasing, right, from 20 it went up a little bit more -- let me rephrase that.



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
73–76

Page 73

J. Moeser

You mentioned it started at 20.  Do you recall what it went up to after that?

A.    I'm just -- I'm sorry.  I am gonna move this, because I keep stepping on it and I don't want to knock it off.  Okay.  What was that?

Q.    So you mentioned that you started off with 20 cases in that team, but it changed.  Can you explain to me how it changed?

A.    They gave me more cases.

Q.    Do you recall how many more?

A.    No, because there was no set number.  They would just increase them.  They didn't like tell you, okay, now we are gonna give you 22, now we are gonna give you twenty -- no, it just increased.

Q.    And when you left GEICO, how many cases were you investigating a month?

A.    On the staged loss team, it could have been anywhere from, I would say, 13 to 17.

Q.    Were you -- when you left GEICO, were you working out in the field or were you working -- or were you working inside because of COVID during -- when you left GEICO?

MR. SCIMONE:  Objection.

Page 74

J. Moeser

A.    I was doing both when I left GEICO.  They opened it up prior to me leaving that you could do certain things in the field.

Q.    Did investigator -- did individuals working in other SIU investigator positions have the same work -- caseload as you?

A.    No.

Q.    How do you know that?

A.    Again, there was lists that went out as far as they are gonna investigate -- this was a list from management that they are gonna investigate X amount of cases and, again, it just didn't -- meeting up with different investigators at different locations and meetings and stuff, they would tell you how much -- how many cases they were being assigned, how many cases they had to handle this month.

Q.    Do you recall how they differed?  Rephrase that.

Do you recall how the caseloads differed between your caseload and their caseload?

A.    What do you mean by -- the amount?

Q.    Uh-huh, yes.

A.    Oh, it could be -- I don't know the

Page 75

J. Moeser

figures, but some people were saying that they were catching well over 50, 60 cases a month.

MR. SCIMONE:  We have been going for about an hour and a half.  Can we take a break?

MS. CACERES-BONEAU:  Yeah, sure.  It's a good time.

THE VIDEOGRAPHER:  The time right now is 12:35 p.m. and we are off the record.

(Lunch recess was taken from 12:35 to 1:25.)

THE VIDEOGRAPHER:  The time right now is 1:25 p.m. and we are back on the record.

CONTINUED EXAMINATION BY
MS. CACERES-BONEAU:

Q.    Thank you.  So when you were employed at GEICO, did you receive any employee handbooks?

A.    I believe when I first started, yes.

Q.    And do you recall whether the employee handbook had any discussions about your compensation?

A.    You mean as far as my salary was concerned?

Q.    Anything related to how your

Page 76

J. Moeser

compensation would be determined.

A.    I don't know if it did or not.

Q.    Did it have anything related to recording your hours worked?

A.    I don't know if the handbook had it, no.

Q.    So you said you received a handbook when you were hired.  Did you receive a handbook every year after that?

A.    A handbook?  No.

Q.    Did you receive any company policies related to documenting your hours worked?

A.    There may have been some e-mails that were given out or maybe during a meeting or something, but I don't recall them.

Q.    Did you have any -- let me rephrase this.

Did you have an annual policies and acknowledgment training?

A.    Yes.  Well, no, it wasn't training.  It was the form that you gave out -- well, I guess it was training, because you had to review certain things online or -- and you would sign off on it, yeah.



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
93–96

Page 93

J. Moeser

A.   February 4th, 2020.  I mean, I'm sorry, May 4th, 2020, correct?

Q.   Yes.

A.   Okay.

Q.   Do you recall the contents of that training?

A.   No.  I could just assume it had something to do with Workday.

Q.   Okay.

A.   Oh, my God, I failed it.

Q.   And then the next row is 2020 Policies & Acknowledgments training.  Do you see that?

A.   Yes.

Q.   And do you recall the contents of that training?

A.   No, not the -- no.

Q.   Okay.  The second to the last row says SIU Knowledge Test 2020.  That was completed on December 18, 2020.  Do you see that?

A.   Yes.

Q.   And do you recall that test?

A.   No.

Q.   And the last row there is the 2021

Page 94

J. Moeser

Policies & Acknowledgments training.  Do you recall that training?

A.   Not the contents of it, no.

Q.   And it says that you completed it; correct?

A.   Yes.  It doesn't say pass, though.

Q.   Now, based on the policy that we read out of the handbook that was marked as Exhibit 4, so we are back to this here, based on that policy, do you understand that you were required to accurately record your hours worked?

MR. SCIMONE:  Objection.

A.   Yes.

Q.   Did you understand that managers and supervisors were not allowed to tell you to work off the clock?

MR. SCIMONE:  Objection.

A.   Did I understand -- say that again, please.  That managers and supervisors --

Q.   Did you understand that managers and supervisors were not allowed to tell you to work off the clock?

A.   They were not allowed to tell me that?  No.

Page 95

J. Moeser

Q.   Did you know that you were required to report any off-the-clock work that you performed to a supervisor?

MR. SCIMONE:  Objection.

A.   Was I required to report off-the-clock work?

Q.   Yes.

A.   Well, yeah.  Yeah.

Q.   Did you understand that if you felt that you were not being paid for all of your hours worked, that you should contact your supervisor?

MR. SCIMONE:  Objection.

A.   Yes.

Q.   Did you understand that you could also contact human resources if you -- if you felt you did not receive all of the hours you worked?

MR. SCIMONE:  Objection.

A.   Yes.

Q.   Did you ever make such a report with your supervisor?

MR. SCIMONE:  Objection.

A.   Regarding?

Q.   That you -- okay.  Did you ever make a report with your supervisor that you did not

Page 96

J. Moeser

receive pay for all of the hours you worked?

A.   Yes.

Q.   Who was that supervisor?

A.   It would have been several of them.  There would have been April Neyland, Rich Kiligin, my manager, Bill Newport, another supervisor Tony Mazzotti.

Q.   Okay.  Let's go through -- and did you ever report that you felt like you did not receive pay for all of your hours worked to human resources?

A.   After 2016?

Q.   Correct, yes.

A.   No.

Q.   Now, you mentioned April Neyland, Rich Kiligin, Bill Newport and Tony Mazzotti as individuals to whom you reported.  Were all of these after -- 2016 or after?

A.   I don't know the time frame with Tony Mazzotti, but I know the other three would have been.

Q.   Let's start with Bill Newport.  What did you report to Bill Newport?

A.   That I, along with everybody else that



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

Page 97

J. Moeser

I knew of, were working more hours than what they were documenting.

Q.  Who are the "everybody else"?

A.  Everybody else within the SIU teams.

Q.  Can you be more specific about that?

A.  It was people who were attending meetings who were field investigators at the time that were making their concerns about getting more cases assigned to them and not -- and working more hours than what they were documenting.

Q.  Were -- when you discussed this with Bill Newport, was this in a group setting or was it one on one?

A.  It was what they called a skip-level meeting and there were other investigators with me.

Q.  What is -- what is a skip-level meeting?

A.  It's a meeting directly with your manager and you skip over the supervisor.  The supervisor is not present.

Q.  How many people attend a skip-level meeting?

A.  It could have been an individual, it

Page 98

J. Moeser

could be in a team.  At that particular time it was members that were in the team that I was working in.

Q.  What team was that?

A.  I don't remember which team that was. That was -- could have been in the enhanced damage team or the staged -- I don't recall what team I was in.

Q.  So when you made this complaint to Bill Newport, it was -- let me rephrase that.

So when you discussed this with Bill Newport, it was at a skip meeting involving either the staged loss referral team or the enhanced damage referral team; is that right?

A.  Was I making a complaint about the team or --

Q.  No.  When you -- when you discussed the hours that you were working, was -- that was during a skip-level meeting that involved either the staged loss referral team or the enhanced damage referral team; is that right?

A.  What do you mean by involved?  I was in the team at the time, on one of those teams.

Q.  Okay.  So the skip-level meeting had

Page 99

J. Moeser

people outside of the team that you were involved in as well?

MR. SCIMONE:  Objection.

A.  It could have been, yes.

Q.  So I guess to rephrase it, was it just Bill Newport and the staged loss referral team in the skip meeting?

A.  I don't recall.  I know there was several other individuals in this meeting with me. What teams they were in, I don't know.  They could have been in the enhanced damage team or -- I don't believe they were in the staged loss team, but I could be wrong, but there was maybe two or three other investigators in this meeting with me and I don't know what team he -- what other teams they were in.  I don't -- I don't know if they were all under April's supervision, because not only did she supervise people in the staged loss team, but she supervised people in other teams, so I don't -- I don't know what teams they were in.

Q.  How many people did April supervise?

A.  It varied.  I mean, it could have been anywhere from eight to ten.  She -- you know, during some certain periods she was also

Page 100

J. Moeser

supervising inside staff people, I believe, along with field team people.

Q.  And do you recall the names of the people that were in this meeting with Bill Newport and you?

A.  No, I don't -- I believe one of them may have been a Mike Lazos, but I don't recall the other people.

Q.  Was it -- what did you tell Bill Newport?

A.  I told him that not only myself, but it seems to be that most people are working more hours than what they are submitting, which is reflected on their evaluations, and I felt it was unfair that, you know, with the amount of work that you were giving us that we were forced to work more hours than what they are documenting, and I told him that there is no secret to this, I mean, you could very easily look this up, and I told him, I said, just look at their case reporting system.  Everything is time stamped. And I said this is -- this is well-known amongst everybody in meetings that we had, everybody within the field.  So, you know, I felt that I was



Page 101

J. Moeser

being fairly judged by the hours that I was submitting and not being compensated for it, and I felt that I had to work these hours in order to keep -- meet standards with their evaluation system.

Q. Now, you worked a flex schedule; right?

A. Yes.

Q. So looking at a time stamp doesn't accurately reflect the hours that you worked in a day, though?

MR. SCIMONE: Objection.

A. Yes, it does.

Q. But you were able to complete tasks when you felt like it; right?

MR. SCIMONE: Objection.

A. What do you mean when I felt like it?

Q. Because you had flexible time. Were you able to complete tasks at different times of the day?

A. I did complete tasks within different times of the day, but that doesn't mean I took any breaks during or I started later. Even if I started at 7:30 or 8:00 in the morning, there were times that I worked until 7 or 8:00 at night

Page 102

J. Moeser

continually.

Q. Were there times that you started after 8 in the morning?

A. Occasionally. I don't recall particular dates or anything, but there may have been times that I started after 8.

Q. Do you recall starting after 9?

A. I don't recall that, no. No.

Q. So you mentioned this meeting with Bill Newport. Was there any other time that you had a discussion with Bill Newport about this issue?

A. Personal with him?

Q. Just with Bill Newport. It could be in another group or it could be personally.

A. No, there --

Q. My question is was there any other discussion that you had with Bill Newport on a separate occasion?

A. Yes, both in a group and individual.

Q. So tell me about the individual.

A. Well, as Bill became our manager, he wasn't familiar with what SIU investigators did, this is what he expressed, and that he wanted to do ride-alongs with field investigators to get a

Page 103

J. Moeser

feel for what they do, and on some of those ride-alongs that we did this subject would come up as far as the amount of cases that we are being assigned, the increase on them and the amount of hours it takes to do these cases, which obviously if you are giving me more work to do within a time period, one of two things are gonna happen: I'm either gonna work more, or it's gonna reflect on my quality of my investigation.

Q. How many times did you have these -- this type of one-on-one conversation with Bill Newport about this?

A. I don't recall how many times. I mean, I think we did several ride-alongs together and I don't know if we discussed this on every ride-along, but I think I probably had, you know, maybe four, maybe five ride-alongs with him, maybe three, in that area.

Q. And what was Bill Newport's response to you?

A. Not much. They were gonna look into it and basically changed the subject.

Q. Did he tell you that you needed to report all your hours you worked?

Page 104

J. Moeser

A. I don't remember in the individual meetings, but it was -- I believe -- I don't know if Bill mentioned that, but in group meetings that was mentioned, and we were also told that it would reflect negatively on our ratings because of the amount of cases that they felt that you should handle within a certain period of time -- within a month's time.

Q. But you were told in the meeting that you needed to report your time accurately; right?

MR. SCIMONE: Objection.

A. I don't recall that, no.

MS. CACERES-BONEAU: Can we read back -- can we move back up the testimony from a sentence before, the prior response to the prior question.

Q. So the prior question I asked was: Did he tell you that you needed to report all of your hours worked.

And then your response was: I don't remember in the individual meetings, but it was -- I believe -- I don't know if Bill mentioned that, but in group meetings that was mentioned.

So again, I said did he tell you that



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
105–108

Page 105

J. Moeser

you needed to report all of your hours worked, and your response was:  I don't remember in the individual meetings, but it was -- I believe -- I don't know if Bill mentioned that, but in group meetings.  So are you changing that testimony then?

A.  No.  I mean, what was discussed in group meetings was that it would negatively reflect on your evaluation based on the hours that you were working in a given month compared to the cases that they were assigning you, and it was voiced by not only myself, but several other members in these meetings that we are working way past the time frame and not submitting them.  Now, at that point the meeting subject -- the meeting changed and we got off that subject, so I don't know if that's what -- there is a misunderstanding here, but I don't ever, you know, remember that conversation with him.

Q.  So you don't remember Bill Newport ever telling you that you needed to accurately enter your time?

A.  He may have, yes, but I don't remember it, though.

Page 106

J. Moeser

Q.  Okay.  But you said something about it negatively affecting your ratings.  What do you mean by that?

A.  Meaning that from what -- how it was explained to me is that you are based on the amount of hours worked in a month, which was, I believe, 155 hours.  Now, they felt that you should be able to handle X amount of cases within that time frame, and they never explained to us how they came up with that ratio, however, when you increased the cases over periods of time, well, what was told to us is that if you submit for overtime, you are gonna be docked -- well, not docked, but you are gonna be judged on more hours worked.  So for an example, if you put in for 20 hours of overtime in a given month, well, now you are rated on 170 hours, 175 hours instead of 155 hours, which would negatively reflect on your rating in that part of your rating, because you are doing in their eyes the same amount of work in more hours.

Q.  Do you know of anyone whose rating was negatively affected that way?

A.  Oh, I don't -- I couldn't -- I don't --

Page 107

J. Moeser

no, I don't know.

Q.  So you mentioned Bill Newport.  You mentioned there being -- you mentioned one meeting, but you said there was more than -- sorry.  With respect to Bill Newport, you had one-on-one conversations, but you also had how many group meetings where you all discussed your hours worked?

A.  I don't -- I don't know the number of group meetings we had, but we would have periodic training sessions, meetings, and the subject would come up often and either would be non-addressed by supervisors attending this meeting, or they would just tell us that this is something that we are looking into as far as the amount of cases that you are getting, and basically other times we were told they can't control the amount of cases that we are being assigned, because a lot of this is coming from home office that wanted to increase the ratio of how many cases get assigned to SIU in a given week or time frame.

Q.  And you mentioned Rich Kiligin.

A.  Kiligin, correct.

Q.  And was he one of your supervisors?

Page 108

J. Moeser

A.  For a time, yes.

Q.  Was he a supervisor from -- at any time period between 2016 and your last day of employment?

A.  Yes.

Q.  And when you -- what did you discuss with Rich Kiligin?

A.  Other than standard training sessions that he would hold, again, the amount of cases that were being assigned, the increased amount of cases being assigned, and that, you know, people are working more hours than what they are documenting.

Q.  When you say the number of cases that were being assigned, you said that -- earlier you represented that you had about 13 to 17 cases when you left GEICO?

A.  That was in the staged loss team.

Q.  And what was Rich Kiligin's response?

A.  Not much.  Got off the subject very quickly and basically said there is nothing he could do and that, you know, I guess we would discuss this at another time, and I felt that that meant like at general meetings.



Page 109

J. Moeser

Q.   Did you ever speak with human resources?

A.   After 2016?

Q.   Correct, yes.

A.   No.

Q.   How many times do you think you had this conversation with Rich Kiligin?

A.   Depended on how many meetings he held in the Bronx or in the Melville office.  The subject came up quite often.

Q.   How many meetings did you have with general -- how many times did you meet with Bill Newport for skip-level meetings?

A.   I believe he only had the one with me or with -- the one that I was involved in.

Q.   Okay.  And how often did you meet with Rich Kiligin?

A.   I don't -- I guess Rich -- I don't know the figure, but he would do periodic meetings with us, I don't know if it was every quarter or every three months or -- but we would meet up in the area up in the Bronx, and then also he would come to general meetings where we would -- he would then break up into teams and talk to his team at

Page 110

J. Moeser

that time.

Q.   And your conversations with Rich Kiligin were in a group setting when you discussed your hours worked?

A.   Yes.  Well, it could also be over the telephone where I discussed this with him too, because I did have phone conversations with him throughout my time with him.

Q.   And did you have this discussion about your hours worked with him on the telephone?

A.   Yes.

Q.   How many times?

A.   I couldn't tell you.  I -- I would speak with Rich frequently and it might -- it would be over cases that I had or different things that were coming up, maybe meetings that were being set or -- but, you know, I can't give you a time frame or figure or how many times I spoke to Rich Kiligin.  I mean, he was my supervisor.  I spoke to him frequently.

Q.   Now, were you paid hourly?

A.   Yes, when I -- I think when I became a non-exempt employee I got paid hourly.

Q.   Do you remember what your rate of pay

Page 111

J. Moeser

was?

A.   From what period?

Q.   Any time between 2016 and the last day of your employment.

A.   On an hourly scale or --

Q.   Yes, your hourly rate of pay, what was that?

A.   I was somewhere over $40 an hour.

Q.   Did you record your time worked?

A.   Did I record it?

Q.   Yes.  Did you document your time worked?

A.   In Workday.

Q.   When you entered your time in Workday, were you required to certify the accuracy of it?

A.   I don't recall.  I know I submitted it. I don't know if there was a box that you checked off on it.  I'm not -- I don't recall.

Q.   How would you submit it?

A.   You hit the submit button.

MS. CACERES-BONEAU:  Let me mark this as Exhibit 6.

(Moeser Exhibit 6, Plaintiff John Moeser's Responses to the Court's

Page 112

J. Moeser

Interrogatories and Declaration of John Moeser, marked for identification.)

Q.   Have you seen this document before?

A.   Yes.

Q.   So this is Plaintiff John Moeser's Responses to the Court's Interrogatories.

A.   Well, there is two sets of forms here. Which -- are they both the same?  No, they are not.  Okay.

Q.   So if we look at -- if we look at the first page of the Plaintiff John Moeser's Responses to the Court's Interrogatories, you will see Interrogatory No. 1, a heading, then Response to Interrogatory No. 2.  Do you see that?

A.   Yes.

Q.   And the response says:  "See attached Declaration of John Moeser."  Do you see that?

A.   Yes.

Q.   So the second document that you see that's together with this is that Declaration of John Moeser is what it states.  Do you see that?

A.   Declaration, yes.

Q.   Okay.  So let's look -- have you seen this document before, the Declaration of John



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
133–136

Page 133

J. Moeser

additional cases that I got assigned that day when I returned back to my home office.

Q.   So if you knew you were starting -- if you knew you were going to have an Examination Under Oath that ended at 5:00, then would you start your day later?

A.   No.  No.

MR. SCIMONE:  I think this might be a good time for a bathroom break.  We have been going about a little over an hour and a half since lunch.

MS. CACERES-BONEAU:  Okay.

MR. SCIMONE:  Is that okay?

MS. CACERES-BONEAU:  Yes, that's fine.

THE VIDEOGRAPHER:  The time right now is 2:52 p.m. and we are off the record.

(Recess was taken from 2:52 to 3:06.)

THE VIDEOGRAPHER:  The time right now is 3:06 p.m. and we are back on the record.

BY MS. CACERES-BONEAU:

Q.   Hi, Mr. Moeser.  I am looking back at what we have marked as Exhibit 6, which is a Declaration of John Moeser.  It's the last document we were looking at, and we had left off

Page 134

J. Moeser

on page 4 and we had formerly been discussing paragraph 12.  Now we are going to look at paragraph 13.  You can let me know when you have finished reading that paragraph.

(Document review.)

A.   Okay.

Q.   Okay.  So you reference an e-mail in here.  When did that e-mail exchange take place?

A.   I don't know the date of it, but it would have been after I had submitted for overtime at one point.

Q.   And you mentioned a supervisor.  Which supervisor was this e-mail exchange with?

A.   That would have been April Neyland.

Q.   Was anyone else copied on the e-mail exchange?

A.   I don't believe so, no.  No.

Q.   When did you submit this report?

A.   Which report?  The overtime report?

Q.   Well, it says here: "She instructed me to submit a list of reasons for why these hours should have been approved.  I completed the report as requested, and my overtime hours approved, but I was again discouraged from reporting them."

Page 135

J. Moeser

A.   The report that I am referring to there is the -- I guess the e-mail that I sent her with the list of cases that I was submitting the overtime for.

Q.   And you state here your hours were approved, your overtime -- sorry -- your overtime hours were approved after submitting this report?

A.   Yes.

Q.   Why did you believe they were -- you were discouraged from reporting them if your hours were approved?

A.   Because that's what she told me after when I had the phone conversation with her, that you don't submit overtime for office work.

Q.   What is office work?

A.   Well, I think you are gonna need to ask her that, because that's exactly what I asked, and office work, from what I assumed, was just report writing or doing database work or not exactly going out into the field, and, you know, there was times that -- and I believe -- I don't know if this was the time that we were working after COVID, so everything was in house, so to say, so I didn't know what you meant by office work, you

Page 136

J. Moeser

know, or administrative work as I heard also.

Q.   You said this was after COVID and everything was in house.  So when did you send -- when do you think this took place?

A.   I don't know if this particular time took place after COVID, but again, when COVID occurred and we were restricted into doing office work, we were doing our EUOs over the telephone, so is that considered office work or -- it was never really explained as far as since there was no travel time involved at that point, what do you consider office work or administrative work compared to when we were in the field.  Now, this particular time, I don't know if this was during COVID or before COVID.

Q.   Did you complain to anyone that you felt discouraged from reporting overtime?

A.   Anyone as far as management or anyone in general?

Q.   It can be anyone in general.

A.   Oh, yeah.  I mean, we talked about it amongst ourselves a lot.

Q.   Who -- who is "we"?

A.   Well, again, I mean, there would have



JOHN E. MOESER  Confidential
Keith Fischer, et al. vs GEICO

August 02, 2024
137–140

Page 137

J. Moeser
been people who were named here and other people who I might have run into that we were talking about caseload and stuff, I might have seen them at meetings or maybe talked to over the phone with, and everybody was in agreement that, you know, the caseload is heavy and that they are working all these extra hours.

Q.  Do you remember specifically the names of anyone you spoke with?

A.  I spoke to, well, okay, Mark Giambalvo, I spoke to Tony Geraci about it, I know I spoke to Louie Pia about it, I know I spoke to Keith Fischer about it, I know I spoke to other fellows. Charise Jones, I spoke to her about it, Scott Brady I spoke to about it, Jeff Lewonka I spoke to about it, George McManus I spoke to about it, and there had -- there were others, but I just don't recall -- oh, Michael O'Sullivan in meetings, Dan King I spoke to about it.  I don't remember. Connie I spoke to about -- Mangan I spoke to about it.  I know there were others, but I just -- I don't recall their names, but this was also overheard in group meetings that other people would express their concerns.

Page 138

J. Moeser
Q.  Did you receive -- the statement in paragraph 13 says that your overtime was approved, and my question is did you receive pay for that?

A.  Yes.

Q.  What other times did you request overtime?

A.  I don't -- I don't recall.  I'm sure they have my record somewhere that, you know, to show on my -- my pay -- I didn't keep my pay stubs, so I'm sure that they had a record of, you know, over the last 2016 to 2021 what I got paid, but I don't recall -- I can't remember the dates that I submitted for overtime.

Q.  Every time that you submitted overtime you were paid for it?

A.  They had to pay me, yes.

Q.  Was there ever a time that you said, "hey, I need overtime" and you were refused overtime?

A.  I wouldn't ask for overtime.  You know, I know that that was brought up -- that subject was brought up in a general meeting that we had and I don't remember the date on that.  As far as if they would grant universal -- now, what they

Page 139

J. Moeser
meant by universal I don't know, but if they would grant overtime for all the investigators to work on their cases, taking into account the increase of caseload that we were getting, and that was told to us by people -- supervisors running this meeting that no, they weren't going to approve that type of overtime.

Q.  Let's look at paragraph 9.  We are going back.  Page 3.  You can take a look at that one and let me know when you are done reading it.

(Document review.)

A.  Okay.

Q.  So it says here that you worked about 52.5 hours a week on average.  On what do you base that estimate?

A.  It's an estimate that I came up with that hours after 37-point -- after 38.75 hours that I felt that I was working during that period, but I think that was before COVID.  Oh, okay. Yeah, the next paragraph.  Okay.  It's an estimate of hours that I was working beyond my scheduled time.

Q.  Did you record your time anywhere other than Workday?

Page 140

J. Moeser
A.  No.

Q.  Do you have any kind of written record --

A.  Well, hold on, because I don't know if you are meaning when I would send an e-mail to my supervisor listing the cases that I worked on that day.

Q.  In that e-mail would you say -- would you include your start time, your break and your end time of day?

MR. SCIMONE:  Objection.

A.  Originally that's what they wanted, but toward the latter part of my career they just wanted -- she just wanted case numbers.

Q.  And so where would -- where would you enter the hours that you worked?

A.  In Workday.

Q.  And did you take any written notes to track your hours during the day?

A.  After 2016, no.  Prior to, yes.

Q.  What was the difference?

A.  We were told to track our hours at one point.  That was -- I don't know the time frame, but that was right after we had the first lawsuit



Page 277

J. Moeser produced in the case.

MS. CACERES-BONEAU:  Okay.

THE VIDEOGRAPHER:  The time right now is 6:35 p.m. and we are off the record.

(Time noted:  6:35 p.m.)

--------------------

JOHN E. MOESER

Subscribed and sworn to before me this      day of            2024.

------------------------------------

Page 278

C E R T I F I C A T E

STATE OF NEW YORK    )

) ss.:

COUNTY OF NASSAU    )

I, KRISTIN KOCH, a Notary Public within and for the State of New York, do hereby certify:

That JOHN E. MOESER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of August, 2024.



KRISTIN KOCH, RPR, RMR, CRR

Page 279

--------------------I N D E X--------------------

WITNESS              EXAMINATION BY          PAGE

JOHN E. MOESER   MS. CACERES-BONEAU  5, 258, 274
                 MR. SCIMONE              236, 273

--------------------EXHIBITS--------------------

MOESER                            PAGE LINE

Exhibit 1
Letter dated November 17, 2016, Bates
stamped P00000502.....................14    4

Exhibit 2
Letter dated March 12, 2018, Bates
stamped P00000416 through P00000420....14   22

Exhibit 3
Revised Amended Notice of Deposition
of John Moeser........................16    8

Exhibit 4
Human Resources Associate Handbook,
Bates stamped G000028 through G000043..79   8

Exhibit 5
Document Produced Natively,
spreadsheet Bates stamped G004289......83   19

Exhibit 6
Plaintiff John Moeser's Responses to
the Court's Interrogatories and
Declaration of John Moeser............111   24

Exhibit 7
Plaintiff John Moeser's Responses and
Objections to Defendant's First Set
of Interrogatories....................116   25

Page 280

--------------------EXHIBITS--------------------

MOESER                            PAGE LINE

Exhibit 8
Second Amended Collective and Class
Action Complaint......................195   14

--------------------REQUESTS--------------------

Page 276   Videos of the policy review and
           acknowledgment trainings

           Calendar entries reflecting skip-level
           meetings
           Any records that Bill Newport may have
           made of skip-level meetings at which
           the topics of hours and workload were
           discussed

           Documents and policies reflecting
           performance metrics including a seven-
           to eight-page booklet of audits and
           what kinds of things would result in
           negative audit ratings

           With respect to Exhibit 5, the
           underlying documents or data giving
           rise to these time stamp entries

Page 281

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:  Fischer, et al. v. GEICO

Dep. Date:  August 2, 2024

Deponent:   John E. Moeser

                CORRECTIONS:

Pg. Ln.  Now Reads        Should Read      Reason

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____

___ ___  _____    _____    _____


                    _____
                    Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____, 2024.


_____

(Notary Public)  MY COMMISSION EXPIRES:_____

