# Exhibit O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-----------------------------------x
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, Individually and on
behalf of all others similarly
situated,

                    Plaintiffs,

          -against-              Case No.
                                 2:23 Civ. 2848
GOVERNMENT EMPLOYEES INSURANCE        (GRB)(ARL)
COMPANY d/b/a GEICO,
                    Defendant.
-----------------------------------x
                    August 28, 2024
                    10:06 a.m.

***This Transcript Contains a Confidential Section***

        Videotaped Deposition of KEITH FISCHER,
taken by Defendant, pursuant to Notice and Agreement,
held at 1540 Broadway, New York, New York, before
Joseph R. Danyo, a Shorthand Reporter and Notary
Public within and for the State of New York.

Page 2

A P P E A R A N C E S :

     OUTTEN & GOLDEN LLP
     Attorneys for Plaintiffs
        1225 New York Avenue, N.W.
        Suite 1200B
        Washington, D.C. 20005
     By:   ZARKA SHABIR DSOUZA, ESQ.
           HANNAH COLE-CHU, ESQ.


     DUANE MORRIS LLP
     Attorneys for Defendant
        190 South LaSalle Street
        Suite 3700
        Chicago, Illinois 60603

     By:   TIFFANY ALBERTY, ESQ.


Also Present:
     ADRIENNE CHEMMEL, Videographer
                ~oOo~

Page 3

Fischer

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  The time is 10:06 a.m. on August 28, 2024.  This begins the video deposition of Keith Fischer taken in the matter of Keith Fischer versus Government Employees Insurance Company filed in the United States District Court for the Eastern District of New York, the case number of which is 2:23 Civ. 2848(GRB)(ARL).

My name is Adrienne Chemmel.  I am your videographer today.  The court reporter is Joe Danyo.  We are representing Esquire Deposition Solutions.

Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in.

MS. DSOUZA:  Zarka Shabir Dsouza from Outten & Golden for the Plaintiffs.

MS. ALBERTY:  Tiffany Alberty of Duane Morris on behalf of the Defendant GEICO.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness, and

Page 4

Fischer

then, Counsel, you may proceed.

K E I T H   F I S C H E R, having been first duly sworn by Joseph R. Danyo, a Notary Public, was called as a witness and testified as follows:

EXAMINATION BY MS. ALBERTY:

Q.  Can you please state and spell your first and last name.

A.  Keith, K-e-i-t-h, Fischer, F-i-s-c-h-e-r.

MS. ALBERTY:  Let the record reflect that this is the discovery deposition of Mr. Keith Fischer taken pursuant to notice and by agreement of the parties.  Today's deposition will be taken in accordance with all applicable rules.

Q.  Mr. Fischer, I know I introduced myself off the record, and I just stated my name for the record, but I'm Tiffany Alberty.  I'm counsel for GEICO, the Defendant in this case.

I'm going to be asking you a series of questions about your background, your experience at GEICO.  Before we get started, have you been deposed before?

A.  Deposed, I mean as far as grand jury,



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

Page 69

Fischer

THE VIDEOGRAPHER:  We are back on the record at 11:46 a.m.

BY MS. ALBERTY:

Q.  Okay.  So, before we took a break, we were talking about the different types of claims that you would investigate.  For any of the claims that you investigated for the five boroughs, Suffolk and Nassau County, how far would you drive, meaning mileage, max?

A.  An estimate, I mean I would do, to be fair, I mean between 500 to 1200 miles a month.  I had to fill out a monthly mileage record.  Obviously during COVID there was no mileage, but from '16 to '20, it depended on where my cases were located, whether Staten Island, Brooklyn or the Bronx or how many EUOs I did.

So I would say the minimum 4 to 500 a month and some months a thousand to 1200 a month.

Q.  I apologize.  My question was not great.  Regarding, how do I want to articulate this, regarding how far you would drive, meaning hours.  Clearly you're not driving 500 miles in one day.

A.  No.

Page 70

Fischer

Q.  So, in a day, what was, you know, the time that you spent in the car obviously not considering COVID times?

A.  Some days as many as five to six hours and some days two hours.  It depended on the number of EUOs that I had or where my cases were located.  I lived pretty much centrally located in Nassau.  So I was 30 miles from the city, and I was 30 to 40 miles from Suffolk.

Q.  I think you said, for the claims that you handled up north, you're just unsure when in time that would have occurred?

A.  It was prior to this 2016.  I'm almost positive.

Q.  Okay.  Prior to COVID, how many claims would you handle a week in, again, sorry, the 2016 to 2020 time frame?

A.  I'm going, approximately between 30 to 60 a month.  It depended on the year.  As time went on and we lost investigators, obviously the cases grew because there was less personnel.

Q.  And that 30 to 60 cases per month range, did that fluctuate?

A.  Yes.

Page 71

Fischer

Q.  Were some weeks busier than others?

A.  Yes.

Q.  Were there certain times of the year that were busier than others?

A.  Not to my recollection.  Everything was, there was no certain time of the year.  Busier?  I will say the summer was busy because people were on vacation.  So, yes, that was quite busy.  We handled up to 60 or 70 cases depending on I think there was five to seven people were allowed to go on vacation at any given time.  So that meant that you had to take those 2 to 300 cases and divide them up.

Q.  If somebody went out, say, for example, on short-term leave, say one week or was out on a holiday, would you step in only for that week to handle whatever was necessary for that case, or would you then assume the entirety of the case and work it from the very beginning to the end?

A.  I would work it from the beginning to the end.  It was now my case.  Are you talking about if they had existing claims prior to going on vacation?  Their cases?

Page 72

Fischer

Q.  Yes.

A.  Yes, there would be times where we would have to conduct examinations under oath or go out and do some steps depending on who you worked with.  In the theft team there was only four or five of us.  So in SIU you were given two or three days prior to your vacation to catch up on your cases.  Then you would go away for a week say, and then you would come back, and you were given another day.

So there was about ten days there that, not only did you have to do your 60 or 70 cases, but you had to go in and touch the cases of other examiners or if they asked you to maybe do some examinations under oath that were scheduled, you would do it for them and/or maybe, if you were out in Queens, you would do a canvass or interview one of their insureds, because they had to make entries into their case certain dates.  We were given guidelines to touch our cases so many days a month.

Q.  Do you know how many times you had to touch a case a month if it was in theft?

A.  I had to touch it at least, to the



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

Page 73

Fischer

best of my recollection, four or five times a month.  The 3rd day, the 8th day, I believe the 15th day, the 21st day and then closure usually within I believe 28 days.  Something to that effect.

Q.   Did you say you had to close the case within 28 days?

A.   No, no, you could have a case open for three or four months, but we were given a set of guidelines that we had to not only make these entries, but the quicker that we closed the claim the better your rating.

Q.   For example, social media, was there a requirement to touch the case a specific amount of times per month?

A.   From 16 to 20 guidelines and procedures changed numerous times.  Each year, just to give you an example, a theft claim when I first started, maybe let's say '14 or '15, you had to touch a case within three days.  If we got it on a Friday, you had to touch it on a Monday.  At the end, to give you a perspective on it, you had to touch it the same day.  You had to touch it within five hours.  So we lost that two days.

Page 74

Fischer

On a Friday before 3 o'clock if I got let's say five cases during the day, I had to touch them before 10 o'clock, 8 o'clock, 10 o'clock at night.  So I had to do something on it to touch them to get into them and show that I had gotten the case, that I knew about the case, and I had spoken to somebody or done something on the case.

Q.   And was this regarding social media cases or theft cases?

A.   I'm sorry, I was using theft as an example.  Social media, there was procedures that you had to follow.  You had to touch it the day that you got it.  In 2019, 2020, it could even have been '18, you had to touch the case the day you got it.  You were expected to close that social media usually within three to five days I would say, and sometimes you'd go longer, but that's usually when you were required to complete it and submit it.

Q.   For these guidelines that you stated changed every year, was that set forth by GEICO?

A.   Yes.

Q.   How was that communicated to you?

Page 75

Fischer

A.   Through our supervisors and through our quarterly meetings with management.  Our manager, Mike DeGrocco or at the time 2016 to '20, Bill Newport.

Q.   To your knowledge, would individual teams only receive the guidelines for the types of cases that they would see?

A.   I can't speak for anybody else.  I can say, for me, I had a booklet of all of the procedures.  They would come out regularly in e-mails.  Usually in December they would come out, and this is what's going to change for the following year.  Sometimes it would come out twice a year, sometimes three.  Depending on the upper management, they would change the procedures and rules as to what you had to do on each particular case.

Q.   So, as it applies then to the theft cases that you said you had to touch between four to five times a month, that number in theory would have changed per year based off your testimony, is that right?

A.   That's correct.

Q.   Were there other factors that made

Page 76

Fischer

your workload heavier aside from what we talked about where somebody was going out on leave or holiday?

A.   As a grade 66, did you ask how many more cases I would get?

Q.   No.  Were there other factors that made your workload heavier at times outside of what we talked about for people taking leave or holiday?

A.   Yeah.  I was responsible as a grade 66 to train all the new hires.  I would spend from three to six weeks with each one of them.  They would come to my house in the morning, and they would leave 4 or 5 o'clock.  They would go out and do EUOs with me.  I would train them how to do EUOs.  You know, I would introduce them to my contacts out in law enforcement and at NICB.

Weather was a big factor.  Come the winter, sometimes EUOs got canceled because of snow.  Things like that.  I'm sure there are many other factors, but at this point those are the ones that come to mind.

Q.   As a level 66, do you know who else in region 2 who was assigned to let's say the



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                          85–88

Page 85

Fischer

stamped G004265 and attachment, was so marked for identification, as of this date.)

Q.   Mr. Fischer, what has been marked in front of you is Exhibit 3.  It has been marked G004265.  That's the top page.  The remaining pages are actually a printout of an excel spreadsheet.  That's why you see the topic lines, and it is chronologic.

Do you recall intermittently throughout your employment with GEICO being trained on any revisions to GEICO's policies and procedures as it applied to your position as a lead security investigator local 66?

A.   To the best of my recollection, I can't say for sure.  I mean I would have to look this over.  The courses that I took.

Q.   As you're looking at the Learning Record, which is the most left column?

A.   Yes.

Q.   And it identifies, for example, the associate handbook, the recreational vehicle training course, the code of conduct, time and labor absence request, do these topics sound

Page 86

Fischer

familiar to you?

A.  Yes.  Absolutely.

Q.   As to your participation in the learning courses where it then has a completion status, a record date, and a record grade, do you have any reason to dispute the specific dates, the policies or your pass/fail rate regarding any of the trainings you participated in for GEICO's policies throughout your tenure?

A.  No.

Q.   Was it your understanding from 2016 and until your retirement that you were required to follow the overtime policy as we discussed in Exhibit 2?

A.  Just could you repeat that?

Q.   Sure.  Is it your understanding that from 2016 until your retirement that you were required to follow the overtime policy that we looked at in Exhibit 2?

A.  In Exhibit 2.  Yes, but, if I can clarify that this was the policy set by GEICO, but the practice did not follow the policy.

Q.  Okay.

A.  Just something I just want to add.

Page 87

Fischer

That's all.

Q.  Is it fair to say, at least from the policy that's set forth in front of you, that working off the clock was not allowed by GEICO?

MS. DSOUZA:  Objection.

A.  There was no contention that it was ever not allowed.  I mean I was told several times by my immediate supervisor Jerry Cassagne that what I did after hours was up to me.  They never turned off our computers as they did recently to the new investigators.

There was no lunches.  There was no breaks.  What I did in my time, I was my own person, my own man, and I did whatever I had to do to make sure that I completed my cases following the procedures that GEICO set forth in each investigation.

Q.  But in looking at Exhibit 2, does it indicate anywhere that you can work off the clock?

A.  That I can work off the clock?  Does it say here?  No, it does not.

MS. DSOUZA:  Objection.

A.  That you gave me.

Page 88

Fischer

Q.  You said that Jerry told you to the effect that you could work off the clock.  Is that your testimony?

MS. DSOUZA:  Objection.

A.  We were given -- I'll answer the question.  As far as Jerry is concerned, Jerry knew, if not weekly, at least biweekly, that I was working overtime each and every day and weekends to maintain my caseload.

Q.  Did Jerry ever tell you to work off the clock?

MS. DSOUZA:  Objection.

A.  No.  Let's clarify.  Jerry did say to me numerous times you have to do what you have to do to complete your work, and that's the understanding I had with Jerry for over 15 years or 20 years that I worked for him.

Q.  But to the extent that he told you you need to get what you need to get done off the clock, did he say anything to that degree?

MS. DSOUZA:  Objection.

A.  Not in those exact words, but it was, if you have to work overtime to get your caseload to where it has to be so that it's not



Page 89

Fischer

unreasonable and not sustainable, that I could do that without any repercussions from GEICO.

Q.   Did you have communication with Bill Newport?

A.   Yes, once or twice a year, yes.

Q.   Did you ever report to Bill Newport that you felt in theory that Jerry had said get what you need to get done, and you took it as I don't have to log my hours?

MS. DSOUZA:  Objection.

A.   Would you repeat that.  I'm sorry.

Q.   Sure.  Did you ever go to Bill Newport with your concerns that it was your interpretation of what Jerry said, which is you got to get it done when you can get it done to imply you should not log your hours?

MS. DSOUZA:  Objection.

A.   I did have a conversation with Bill Newport at a meeting that didn't go very well when I asked him in front of six or seven other investigators, my exact words were who is watching the store?  Do you know what's going out in the field, and do you know what we do each and every day as your investigators?

Page 90

Fischer

And that was in the presence of at least six or seven other investigators.

Q.   Did you say are you watching the store?

A.   I said who is watching -- my exact words were who's watching the store here?  He is the manager of the SIU.  There were two managers.  I don't know the medical side.  I forget her name, but Bill was the property side, staged loss.  He was the medical and PIP team, auto team.  He was responsible for the nonmedical investigators, and at a yearly meeting, which we usually, sometimes it was semiannually, sometimes it was annually, towards the end it became annually, because the meetings got out of hand and so disgruntled from the investigators that I kind of led the meeting off by asking Bill, I said, who's watching the store here?  Do you know what we do?  Is anybody telling you what we do?  Do you read our reports?  Do you read the things that we do?  Do you look at our monthly reports?  Do you look at our mileage reports?  Do you look at our reports to Jerry?  Do you look at our report cards?

Page 91

Fischer

We've brought numerous concerns to Jerry and Toni D'Agata and Dara at quarterly meetings, semiannual meetings, and they got less as time went on because they didn't want to hear our gripes I guess you could say, our complaints about the overtime that we were doing, and it just so happened that Bill was present in the beginning, but towards the end he refused to come.

Q.   When did this meeting occur?

A.   The last, I'm going to say '19, '20, '21.  They were very, very, not hostile.  They were very angry investigators that the amount of work that we were doing to get through each week and the stress and the unsustainable goals that we were given and the caseload, and all we wanted him was to reduce it, to review it for us.  Bill, please look at it and read what we do, just go through one examiner, through one investigator, and look at the steps that we have to do.

Everything is time-stamped at GEICO, so they know when I'm working on a weekend.  They know when I'm working at night, what time.  They know my keystrokes.  So they have that.

Page 92

Fischer

I said, please, just take one of us and look at the amount of time that we are giving you to meet your criteria that you've set in front of every one of us, and we didn't want to do -- I mean after a while we kind of backed off, because it was, you know, it was falling on deaf ears is really what it was doing.

Q.   For this specific meeting that you're talking about where it was in front of six or eight investigators where you were asking him about the store, I'm just trying to again delineate when in time this meeting was?

A.   I'm going to say 2020.  I retired in 2020.  I'm mixing up the years.  I'm going to say 2019.

Q.   And who else was in attendance?

A.   It was a closed door meeting in his office.  John Gillane, George McMannus, Lou Pia.  Did I say Mark?  Mark Giabalvo, George McMannus, Lou Pia, Kevin.  I forget Kevin's last name.  John Gillane.  I believe Vito.  I know at least four of them were there.  There was definitely seven or eight, but those are the people that I remember.



Page 93

Fischer

Q.  This was in person?

A.  It was in person in Bill Newport's office.

Q.  What did he say in response to your complaints?

A.  He was very frustrated at the comment that I made, and he told me that he was the manager and that he's in charge of the store I guess was his response and that I shouldn't question it, and I kind of backed off at that point.

Q.  At that time, is that when you told him that you were working overtime, but not logging your hours?

MS. DSOUZA:  Objection.

A.  I know that it came up.  I know that I said to him, we are working so many hours overtime to complete our cases in a timely fashion, and I got no response.  From that point on, Bill and I never had the same relationship because of what I said to him that day.

Q.  Okay, and I understand that you said you told him you and the other gentlemen in the room are working many hours of overtime, but in

Page 94

Fischer

the scope of not logging your overtime hours, was that told to Bill?

A.  I just want to clarify.  The overtime rate that GEICO would allow us was not time and a half.  GEICO overtime to them was let's say I was making, I'm not sure of the number, say $41 an hour, $40 an hour.  Rather than pay me $60 an hour, GEICO had offered to give me $18.62 for each additional hour that I worked.

Now on top, if I took that overtime, so let's say I put in for 15 hours overtime, well, let's say ten hours for the week.  If I put that in my thing, and I put that, we had to do our time management every two weeks.  Usually on a Wednesday or Thursday, Jerry would send a message, please put your time in.  If I had to do that overtime, so, if I worked let's say 20 or 25 hours a month or for the week or whatever it was, say for the week, for the two weeks, say 40 hours, let's say 20 to 40 hours, I was told that would be my rate, but because I asked for overtime, I would now be susceptible to getting more cases, because I had more time on the books, and my rating would go down.

Page 95

Fischer

So your goal at GEICO was to be a 4 or a 5, but because you worked overtime, you worked more hours.  So, if you got 30 cases for a month, but you worked 150, if you worked 200 hours, your rating drastically fell because you were given more time to complete those cases, which should have taken you 38.75 a week you now, say, I worked 50.  So, for an additional 12 hours, that would affect your rating and your report card, and we received a report card every month from Jerry Cassagne telling me, you know, usually I was a 4 or 5, and probably towards the end it was probably in the 3's.

Q.  Again, just circling back to that meeting and speaking to Bill, did you tell him that you were not logging your OT hours?

MS. DSOUZA:  Objection.

A.  I told Bill that -- my statement was you're not watching the store.  I am doing a ridiculous amount of overtime that I can't put in for, because you're giving me a ludicrous hourly rate, which is against the law, and you're telling me it's only worth $18.  Why would I want to do that overtime, plus I have to tell you why

Page 96

Fischer

I did that overtime.  Maybe I got into an accident.  My car got hit or something, or I got stuck in traffic.  I didn't put in for that overtime, because it was expected.  It was the practice of GEICO to -- you had to do that overtime without being paid for it, and that's my feeling.  That's the way I felt.  Of the 22 -- I shouldn't say 22, but for the last 15 years of my employment there that's the way I felt.

Q.  Who told you that that was the practice of GEICO?

A.  My supervisor Jerry Cassagne numerous times I had like two or three phone calls.  I stood up for everybody else on my team, and there's e-mails and I know there's e-mails, and I'm sure that they may come across your desk at some time, and they came from all his investigators that we were doing overtime and we weren't getting paid for it.

It was the practice of GEICO, and he said you have -- I worked for Jerry in the police department, and I also worked for Jerry at GEICO.  I worked for Jerry for over 30 years.  So I had a very personal relationship with him.  So whatever



Page 117

Fischer

I went to.  I would plot in my days.  7 a.m. to 10 o'clock at night, 11 o'clock at night, and they would self-generate 16 hours to 18 hours for the day.  I do -- I can only remember twice where I actually did it on my timesheet while working in region 2 in the SIU.  Two or three times.  I don't want to say.  It could have been more than that, you know.  It wasn't less than that.

Q.   I think I'm losing you just a little bit.  So are you saying there's two different systems with which you put in your overtime hours, one specifically only for cat cases and one specifically only related to theft cases?

A.   Oh, no.  It's the same system.  I'm sorry.

Q.   Okay, and for, when you would go in and adjust your time, I think you had indicated that you would adjust it to 16 hours if you needed to.

A.   Let's say ten.  I know one day I put in for 10.75, and I got 43 hours.  I got 41.75 instead of 38.75.  I put in for three hours and ten minutes I think one day.

Q.   Okay, and, when that was submitted

Page 118

Fischer

through Workday when you closed out for the two weeks in your custom and practice, then it was approved, is that right?

A.   I had to pre-approve it with Jerry who had to pre-approve it with Bill.

Q.   What did the pre-approval process look like before you would go in and then adjust the numbers in the Workday system?

A.   It would send Jerry an e-mail stating that on August 28th, 2024 I went out to Brooklyn, New York, where I secured a high-end vehicle, waited for police to arrive at 2 o'clock in the morning.  I waited until 5 o'clock.  I am respectfully requesting overtime in the amount of three hours.

Q.   And then you would send an e-mail.  Would you get correspondence back saying approved?

A.   Yes.

Q.   Or denied?

A.   It would be back -- that one time I got it back from Jerry that it was approved.

Q.   Did you ever, to your recollection, receive any e-mail back after you requested

Page 119

Fischer

overtime with which somebody said denied?

A.   I never put in for any other requests.  I can only speak for myself.

Q.   And as to then getting approved to enter in your OT, which you did then enter in your OT, were you paid for that overtime, to your recollection?

A.   Yes.

Q.   Have you ever put in more than 7.75 hours for a day with which you didn't seek pre-approval?

A.   Only during catastrophes.

Q.   What does that process look like?

A.   I answer to an SIU supervisor, Dale, I forget his last name.  He was from that region in Colorado and/or Houston.  He actually traveled with me on both, and at that point he would say that we worked a 12-hour day.  I'm going to give you two hours travel in the morning.  I am going to give you two to three-hour reporting time at night when you go back to your hotel room.

Q.   Okay, and so then you would just enter your hours after you both agreed to whatever that hour was in the Workday system, and

Page 120

Fischer

then would you get paid then that corrected amount?

MS. DSOUZA:  Objection.

A.   To the best of my recollection, I did go through the Workday system to put in my overtime to the best of my -- I'm almost positive it went through.  Did I get paid?  Yes.

Q.   Transitioning to number 9, it states, "From 2016 to approximately March 2020, I worked about ten to 12 hours a day Monday through Friday and eight hours on many weekends.  I estimate working a total of 50 to 65 hours a week on average during this time period."

On what do you base these estimates?

A.   My caseload and the knowledge that I did this each and every day.  My day started early in the morning, and it went to late at night.  I was fortunate enough that my wife was an investigator and knew the pressures and the stress at GEICO.  She worked there herself.  So after dinner I would go back on the computer, and I would, because now it was downtime.  I knew I wasn't receiving cases after 4 or 5 o'clock, and for that 3 or 4 hours I could type in peace and



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
121–124

Page 121

Fischer

not have my computer ring or send me another case.

Q.  Did you record your time anywhere to adequately reflect your testimony that you were working ten to 12 hours a day exceeding the 7.75 hours a day that is typical in your position?

A.  No.

Q.  Why didn't you put that you were working ten hours or 12 hours for a day in Workday?

A.  First of all, what I did after hours it was my conversations with Jerry Cassagne that what I did on my own time was up to me, and he was not going to approve or he and Bill Newport would not approve any overtime over 38.75 other than extenuating circumstances.  An example, you know, going out to find a car or getting into an accident, you know, having to go to the precinct maybe, if one of these insured were arrested, you know, something extenuating.

Q.  Did you ever try to put in the hours that you actually worked into Workday without pre-approval?

A.  No.

Page 122

Fischer

Q.  Do you know if anyone did?

A.  I can't speak for anybody else.  I can't say.  No.

Q.  Did you specifically tell anyone that you were working ten to 12 hours a day?

A.  Every day or every other day we circulated e-mails at the end of the day to each other.  Today I got five cases.  Well, I got six, or I got four cases.  I got four staged accidents today with 12 claimants.  How do they expect me to keep up?  This went on every day.  I shouldn't say every day.  At least two or three times a week among a group of us investigators, and, you know, they are all covered in this particular lawsuit.

Q.  So I understand that the case assignments is what you're talking about.  My question is did you tell anyone you were working ten to 12 hours a day?

A.  I told my immediate supervisor Jerry Cassagne that I was doing over ten hours a week in overtime.  I can't say that I -- I can't say that I used the number 10 or 15 or 20, but I just said that I am doing weekends, that I am doing

Page 123

Fischer

whatever I have to do to keep up with my caseload, which was probably, you know, one of the highest of all investigators being a 66.

Q.  Did he know that, when you said I'm working over ten hours a week or whatever number of hours a week in OT, that you weren't logging your hours?

A.  Absolutely.  I mean Jerry would say to me, you can't put in for overtime.  It doesn't call for it.  We don't have pre-approval.  You're not going to get it.  You can do your 7.75, and what you do after that you're on your own accord.  You can't put in for it.  He's not going to approve it, and Jerry and I had this conversation, if not weekly, biweekly.

Q.  And this was on the phone?

A.  The phone and whenever I saw him in person.  We had to do ride-alongs with Jerry four times a year, at meetings, quarterly meetings with quarterly, semiannual or annual meetings with management.

Q.  Were any of these conversations by e-mail at all or text?

A.  With Jerry?  Oh, absolutely.  I know

Page 124

Fischer

I sent him numerous e-mails.  I don't know if I had any, or I supplied any to my attorneys.  I think I did that, you know, that the workload was out of control and my overtime was out of control.  It was stressful, and I wasn't able to sustain, you know.

Q.  I think -- I didn't mean to interrupt you.

A.  Yeah.  It was unsustainable.  I couldn't keep up, and I'm one I took a lot of pride in my investigations.  I thought I did one of the best jobs.  I was known for that being there 22 years, and I gave my heart and soul, and I just couldn't keep up, and that's not, especially the last two or three years, I could not keep up with my caseload, and I had to have things done.  I didn't want to see them on my screen, and that's just the way that I work.  It's just something I've done since the police department.

Q.  I believe, from what you have stated regarding how the cases fluctuated and that each case had a different set of hours that needed to be allocated, is it fair to say that a specific



Page 129

Fischer

virtually?

A.  Yeah.  When did it start?  In March of 2020?  So I might have had just a few left.  I was gone by the time May came was my last week.  I took some sick time, and then I retired.  So I wasn't around very long during COVID.

Q.  As far as the amount of driving, which I believe you indicated took up a pretty substantial amount of time because of traffic and going through all the boroughs, was all that time then allocated back to you to complete your casework since you were no longer going out in the scene?

A.  Yes.

Q.  Okay.  Then just so I know, you were already working remotely before March of 2020 in theory because you were working from home and not going into the home office of GEICO, right?

A.  Yeah.  Was it March 19th I think COVID started?  So we had stopped maybe a day or two before, if my memory serves me right.  I mean I always worked from home.  EUOs were still being done, but not out in the field after that March date.

Page 130

Fischer

Q.  Because of the COVID restrictions that were going on in the state, in the county, you were not allowed to take in-person interviews at that time, right?

A.  Yes.

Q.  And then you weren't able to do scene canvassing or showing up to any scenes at that time?

A.  I could.  I did go out.  I could just take pictures of the scene where the car was stolen from, maybe some intersection where it was recovered, but I couldn't speak to anybody in the house, any insured face to face.  I still spoke to police personnel.  You know, they weren't off.  Everything was masked up, but I did visit precincts.  I had a lot more time to do that.

Q.  Were you able to take lunches at any time?

A.  Again, it was only a short two months for me with COVID.  What happened was I went from 40, 45 cases up to 70 to 75 my last two months, and that's what kind of pushed me over the edge when I went out sick.  So the caseload increased to make up for what we weren't doing out in the

Page 131

Fischer

field.

Q.  Were you still taking breaks, though, throughout the day?

A.  Breaks?  I mean was my overtime as great the last during the month of May?  I can't really recall.  I mean I can't say it was any less.  Could I have done a little less overtime?  Absolutely.  I could have.  I don't remember.  But at that point things had kind of stopped, but the caseload I was doing more typing.  I actually caught up on a lot of old cases that I had open.  So that was good.  I kind of caught up.

Q.  At that time during COVID, who was living in the home?

A.  Myself, my wife Peggy, and my two children, Kaitlyn and Keith Jr.

Q.  Okay.  At that time at the early stages of COVID, so March 2020, did anybody acquire COVID?

MS. DSOUZA:  Objection.

A.  I didn't get it until '22.  I was already retired.  About two and a half years after it started, my first time I got it.  My children are both nurses, and I don't think

Page 132

Fischer

either one of them got it even though they worked with COVID.  My wife did get it, but I can't tell you when it was.  It might have been in '21.  No.  It had to be after that because we were in Florida.  So it had to be after November 30th, 2021.  She got it in '22 also.

Q.  Was it stressful having your kids work in healthcare during this time?

A.  Absolutely.

Q.  Were they first responders, meaning in the hospital setting, during COVID?

A.  Yes, they were both.  My son is in the OR, and my daughter is a med-surge nurse, and they worked opposite each other.  So my son would come home at 7 or 8 o'clock in the morning, and my daughter would come home at 7 or 8 o'clock at night.  So we were constantly doing laundry and things like that.

My wife also worked at home.  At that point she was out of the office, and we were both working in the same house.

Q.  Did you have separate areas where you worked?

A.  Yes.



Page 145

Fischer

more cases assigned in April 2020?

A.   Because I had numerous conversations with Jerry.  In fact, there might have been, I don't know if there's an e-mail.  I thought there was.  I can't be sure, but stating that I was doing, I was getting four, three, four, maybe five cases a day.  I was getting 20 cases a week, and you couldn't keep up.  You know that six or eight weeks was probably one of the worst times that I spent at GEICO.  Talk about overtime.  It was through the roof.  I couldn't even keep up.

Q.   Were the 70 cases that you had, how many of those made up theft cases?

A.   All of them.  I'm pretty sure I did 100 percent theft at that time.

Q.   So you were no longer doing social media cases in April of 2020?

A.   I don't think so, because thefts were increasing, because people learned out on the street that it was probably a good opportunity to try and get rid of your car.  So I handled, as a 66, from I what recall, I handled all thefts at that time.

Q.   Would that have been in 2020, or was

Page 146

Fischer

that beforehand, if you know?

A.   I was still doing EUOs on staged and caused accidents into January or February, so it had to be right in that time period between March and May.

Q.   Transitioning to paragraph 12, you state, "GEICO required me to seek approval from my supervisor to submit any hours worked above 38.75.  It was well known that supervisors would not approve overtime for special investigators and that hours above 38.75 to complete regular case work would not be approved."

Was there a policy requiring you to seek approval from your supervisor to work more than the 38.75 hours in a week?

A.   A requirement?  If I wanted to be paid for overtime, I had to get the approval of my supervisor.

Q.   Right, but my question was was there a policy requiring you to do so?

A.   Yes.

Q.   And who do you recall receiving that policy from?

A.   I would imagine Jerry Cassagne, if

Page 147

Fischer

not from Bill Newport.

Q.   But do you recall as you sit here today?

A.   No.

Q.   To your knowledge, do you know if your supervisor Jerry was not approving overtime for any of the other employees on your team?

MS. DSOUZA:  Objection.

A.   Do I know?  Yes.  Speaking to other investigators, none of the overtime, at least in my group of my theft team and some of the other staged accident guys, they were not approving whether they worked for Toni or Dara or Jerry.  They were not approving.  The people I spoke to, which is probably four or five, they were not putting in for overtime or getting overtime approved.

Q.   So that's twofold, which is are you saying that the individuals you spoke with were not entering their overtime hours and that was not getting approved?

A.   They were not entering, and they were not getting approved overtime.

Q.   Do you have direct knowledge, meaning

Page 148

Fischer

you saw them attempt to put in their overtime hours, or you saw e-mails where they asked for overtime, and they were denied overtime?

A.   Yes.

Q.   And who is that?

A.   e-mails from within our group.

Q.   Okay, and from whom?

A.   My particular group was Tony Geraci, John Moeser.  I back that up.  John Moeser, he had his own team.  He dealt with April.  Tony, Mark, myself and George McMannus.

Q.   So you were on e-mails where Tony, Mark and George were requesting overtime hours from Jerry, and Jerry denied them?

A.   Myself and Tony worked for Jerry.  George and Mark worked for Toni D'Agata, I believe, or actually Dara.  George worked for Dara.  Mark worked for Toni, I believe.

Q.   Okay.  So I'm going to circle back, which is were you cc'd then on this correspondence in which Tony, Mark or George e-mailed anyone of their supervisors?  So Jerry, Dara or D'Agata asking for overtime hours and they were denied overtime?



KEITH FISCHER  Confidential                                    August 28, 2024
Keith Fischer, et al. vs GEICO                                          149–152

Page 149

Fischer

A.  No.  There were no supervisors on any of those e-mails.  It was all among our group just the four of us.

Q.  So then how do you know where you have direct knowledge that the supervisors were not approving your colleagues' overtime hours?

A.  Because of the conversations that I had with them weekly is anyone getting, is anyone putting in for overtime.  In fact, right after that happened in July and August they opened up overtime for us, ten hours a week, and that's when it started to get approved.  It was not approved prior to that.

Q.  But as far as direct knowledge where you saw that they were --

A.  No.

Q.  -- declining overtime, the information that you have then is just based off what they told you, correct?

A.  Yes.

Q.  Do you have any knowledge as to any employees who were working up north who requested to work more than 38.75 hours in a week?

MS. DSOUZA:  Objection.

Page 150

Fischer

A.  No.

Q.  I'm looking at paragraph 11 of your declaration, and, based off your testimony, I'm just trying to remember.  So is it fair to say that you stopped working end of May of 2020 due to health conditions, and you returned back at the end of June?

A.  I think I retired two days -- I put my papers in to retire two days before I returned on June 21st.

Q.  Okay.  From April of 2020 up until May 27 of 2020, what were your hours?

A.  To the best of my recollection, I was doing from 7 in the morning.  I would try to go on before the cases would come out and try and catch up on some work, and I was working until, you know, with maybe a dinner break, 9, 10, sometimes 11 o'clock.  You know, it increased during that two-month period.

Q.  What I'm trying to understand is I'm looking at paragraph 11.  You have December 2016 to March of 2020.  Then you indicate March 2020 to April 2020.  From April 2020 until May 27, 2020, when you left on leave, that period of time

Page 151

Fischer

is missing.  It doesn't indicate what your hours were where the other at least in paragraph 11 indicate.  So I'm asking which is what were your hours per week?

A.  Oh, I'm sorry.  I was doing another 10, I would say at least another ten, 12 to 15 hours of week because of the increase of my caseload.

Q.  As you sit here today, though, are you assuming that number, because you have yet to produce any documentation to evidence those hours at least in the part of time that's missing in paragraph 11.

MS. DSOUZA:  Objection.

A.  All I can say is I wish GEICO could produce the documents that show my time entry.  I don't have them.  I discarded my caseload, my case diary, which showed every case I ever caught from 1999 to 2020.  I threw them out about a year after I left, unaware that this lawsuit was going to take place.  So I threw them out, and, if I had them here today, I could tell you that how many hours on it, what the increase was.  I remember going through where I used to go through

Page 152

Fischer

two cards a month with 20 on each side.  I was now going through three and three and a half cards.

Q.  Did you get rid of those documents before or after you joined the lawsuit?

A.  That was way before.

Q.  You were eligible for overtime, right?

MS. DSOUZA:  Objection.

A.  Yes.

Q.  Do you know if other lead security investigators were eligible for overtime?

MS. DSOUZA:  Objection.

A.  To the best of my recollection, everyone in July and August of 2020, because I was still there until November, everyone was offered ten hours a week, and, if someone else didn't take it, then you could take that person's ten hours, if that's what it came to to keep up with the increase in the caseload.

Q.  Okay.  So the question was do you know whether other lead security investigators were eligible for overtime?

MS. DSOUZA:  Objection.



Page 153

Fischer

A.  Yes, they were.

Q.  And I believe from your testimony you were indicating that it was capped at ten hours per person?  Is that what you're saying?

MS. DSOUZA:  Objection.

A.  Each investigator was offered ten hours a week for the months of July and August.

Q.  For 2020?

A.  That was the first time in 21 years that that occurred.  Yes.

Q.  Prior to that, though, do you know if individuals were eligible for overtime outside of the ten hours that you're indicating from July and August 2020?

A.  I don't know.

Q.  As far as the ten hours that were allocated between July and August 2020 as you described, do you recall seeing that in a GEICO-related policy?

A.  Yes, it was an e-mail from Jerry Cassagne out to his team that anyone who wanted to work ten hours, it might have come from Bill Newport, but it was given to us from Jerry.

Q.  If you had already put in your

Page 154

Fischer

retirement, how were you receiving communication in July and August 2020?

A.  I worked till -- I had cases, even though I left on May 27th when I went, I sought medical attention, to when I came back in June, I didn't make the determination until two days before on June 21st.

Now, once I put my papers in to retire, I still had to complete the cases that I had over July, August and September.  I worked on those cases that I still had open.

Q.  Okay.  So did you give them is it then a four-month advance of your retirement date?

A.  No.  It's the practice of GEICO that, once you retire, you give them a date.  They pick a date.  Let's say I'm going to go out October 1st.  Well, they'll say, okay, August and September you're not going to catch cases.  You're just going to do all your remaining EUOs, all your remaining cases that you have open, any court that you have to go to, you'll take care of it, and you'll not catch any cases.

You might get some -- I shouldn't say

Page 155

Fischer

that.  We were given some social media, some low-level cases to keep us busy, even though we weren't catching cases, so maybe I would get two social media a day, five days a week.

So that kind of stuff, but stuff that I didn't have to go out to the field.  It would only take me maybe three or four hours to do.

Q.  Do you know if other SIU investigators who would have been level 65 were eligible for overtime?

MS. DSOUZA:  Objection.

A.  To the best of my recollection, everyone in the SIU outside investigator was eligible for ten hours overtime.

Q.  But that's your understanding for July and August of 2020, right?

A.  Oh, yes.

Q.  I'm talking about from 2016 to when you retired.

MS. DSOUZA:  Objection.

A.  No, I don't know.

Q.  Do you know if senior field security investigators were eligible for overtime between 2016 to 2020?

Page 156

Fischer

MS. DSOUZA:  Objection.

A.  Do I know if they were?

Q.  Eligible.

A.  I don't know.  No.

Q.  Do you know if senior field security investigators were denied overtime in 2016 to 2020?

A.  Yes.

Q.  Okay, and how do you know that?

A.  Again, in my quarterly meetings with Bill Newport and the three supervisors, Toni D'Agata, Jerry Cassagne and Dara Campbell, that was the topic.  Always the first topic of concern at each meeting over those four years was the overtime and the caseload.

Q.  But what about overtime?

A.  As far as?

MS. DSOUZA:  Objection.

Q.  The question was do you know if they were denied overtime?  You're saying the quarterly meetings you attended was about hours and overtime, but the question was were they denied overtime, specifically senior field security investigators?



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
273–276

## Page 273

Fischer

MS. ALBERTY:  Objection.

A.  Yes.

MS. DSOUZA:  I think that is it.

MS. ALBERTY:  I don't have any further questions.  Thank you.

MS. DSOUZA:  Thank you.

THE VIDEOGRAPHER:  This marks the end of the deposition.  We are going off the record at 5:33 p.m.

(Time noted:  5:33 p.m.)

_____

Subscribed and sworn to before me this____day of_____, 2024.

_____

## Page 274

C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of September, 2024.

_____
JOSEPH R. DANYO

STATE OF NEW YORK

My Commission Expires 2/20/2027

## Page 275

I N D E X

| Witness | Examination by | Page |
|---|---|---|
| KEITH FISCHER | Ms. Alberty | 4 |
| | Ms. Dsouza | 269 |

E X H I B I T S

| Fischer | | Page |
|---|---|---|
| Exhibit 1 | Revised Notice of Deposition of Keith Fischer | 12 |
| Exhibit 2 | Document Bates stamped G000028 through 43 | 82 |
| Exhibit 3 | Document Bates stamped G004265 and attachment | 84 |
| Exhibit 4 | Plaintiff Keith Fischer's Responses to the Court's Interrogatories and Declaration of Keith Fischer | 109 |
| Exhibit 5 | Second Amended Collective and Class Action Complaint | 219 |
| Exhibit 6 | Document Bates stamped P00000490 through 494 | 222 |
| Exhibit 7 | Document Bates stamped 00000078 through 064 | 230 |
| Exhibit 8 | Document Bates stamped P00000077 | 240 |
| Exhibit 9 | Plaintiff Keith Fischer's Responses and Objections to Defendant's First Set of Interrogatories | 260 |

~oOo~

## Page 276

DEPOSITION ERRATA SHEET

Our Assignment No. 11658332

Case Caption: Keith Fischer v GEICO

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____day of_____ 2024.

_____
KEITH FISCHER

Subscribed and sworn to on the_____day of _____, 2024 before me.

_____

Notary Public in and for the State of New York.



KEITH FISCHER  Confidential
Keith Fischer, et al. vs GEICO

August 28, 2024
277–278

Page 277

DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

SIGNATURE:_____ DATE:_____

KEITH FISCHER

Page 278

DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

SIGNATURE:_____ DATE:_____

KEITH FISCHER



**Deposition Transcript Errata Sheet**

Case Name: *K. Fischer, et al., v. Government Employees Insurance Company d/b/a GEICO.*,
Case No. 2:23 Civ. 2848
Witness: Keith Fischer
Deposition Date: August 28, 2024

| Page and Line | Change | Reason |
|---|---|---|
| 22:17-18 | St. Thomas > St. Dominick's | Correct spelling |
| 48:19 | John Gillane > John Gillen | Correct spelling |
| 51:23 | We did 3 to 400 > We did 300 to 400 | Correct transcription |
| 71:13 | those 2 to 300 > those 200 to 300 | Correct transcription |
| 109:11 | SCAM. > SICM | Correct transcription |
| 180:15 | Was that Workday or SCAM? > Was that Workday or SICM | Correct transcription |
| 188:22 | Outside of the SCAM system, > Outside of the SICM system, | Correct transcription |

Date:  10/03/2024

Keith Fischer