# Exhibit P

Case 2:23-cv-02848-SJB-SIL     Document 174-19     Filed 04/24/26     Page 2 of 12 PageID #: 12750

LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
1–4

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER,

LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN,

and CHARISE JONES, individually and on behalf

of all others similarly situated,

             Plaintiffs,

-against-            Case No.

                2:23 Civ. 2848 (GRB) (ARL)

GOVERNMENT EMPLOYEES INSURANCE COMPANY

d/b/a GEICO,

             Defendant.

-----------------------------------------------X

           August 13, 2024

           10:00 a.m.

    EXAMINATION BEFORE TRIAL of LOUIS PIA,
a Plaintiff, taken by counsel for the
Defendants, pursuant to Order, held at Duane
Morris, L.L.P., 1540 Broadway, New York, before
Tiffanie Jones, a Notary Public for and within
the State of New York.

## Page 2

A P P E A R A N C E S :

    OUTTEN & GOLDEN, L.L.P.

      Attorneys for the Plaintiffs

        685 Third Avenue, 25th Floor

        New York, New York 10017

    BY:   MICHAEL J. SCIMONE, ESQUIRE

        mscimone@outtengolden.com

        ZARKA SHABIR DSOUZA, ESQUIRE

        zdsouza@outtengolden.com

    DUANE MORRIS, L.L.P.

      Attorneys for the Defendant

        1540 Broadway

        New York, New York 10036

    BY:   GREGORY SLOTNICK, ESQUIRE

        GSSlotnick@duanemorris.com

## Page 3

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties
herein, that filing, sealing and certification,
and the same are, hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that
all objections except as to the form of the
question shall be reserved to the time of the
trial.

    IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed and sworn to
by an officer authorized to administer an oath,
with the same force and effect as if signed and
sworn to before the Court.

## Page 4

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  We are on the record, and the time is approximately 10:00 a.m.  Today's date is August 13th, 2024.  This is Media 1 of the video deposition of Louis Pia, in the matter of Keith Fischer, versus Government Employees Insurance Company.  The Index Number is 2:23 Civ. 2848 (GRB) (ARL).

My name is Ben Peretz, legal videographer with Shereck Video, in association with Esquire.  Today, we're at the office of the Duane Morris, L.L.P., located at 1540 Broadway, New York City.

Would counsel please voice-identify yourself, and state whom you represent.

MR. SLOTNICK:  Good morning.  My name is Greg Slotnick, on behalf of GEICO, from Duane Morris.

MR. SCIMONE:  Michael Scimone, Outten & Golden, on behalf of Plaintiffs.

MS. DSOUZA:  Zarka Shabir Dsouza,



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
65–68

Page 65

L. PIA

no-show, and then you would -- you know, you -- when you formulated your report, you would document the two no-shows.  And -- and then, if -- you know, if -- if it was a first no-show, then you have to give dates to the legal people, and then they would reach out to the -- to the subject and see what dates are available.  And, you know, it wasn't like a no-show was -- was a breeze.  It still encompassed a lot of work.

Q.  Did you bring your laptop with you into the field?

A.  No.

Q.  Do you know if other investigators did?

A.  I would say yes.

Q.  Is there a reason that you didn't?

A.  And when -- I didn't bring it as a -- as a -- as the norm.  I was working up in the Bronx and -- I mean, I -- I can attest that there were items that were stolen from vehicles parked outside, or in the parking garage, and also from the location where we conducted the EUO's, also.  So for safety reasons, I didn't

Page 66

L. PIA

bring it.  And also, I was -- I was preoccupied with the job I was doing there.

Q.  How would you spend the time waiting for the individuals, if they were late to an EUO?

A.  I would be in the room with the court reporter.

Q.  Were there also adjournments of EUO's?

A.  When you say "adjournments", do you mean the individual showed, and for whatever reason, we didn't go through with the EUO?

Q.  Either that, or when you were already on location, you would find out that the person wasn't coming, or needed to request an adjournment to another date.

Did that ever happen?

A.  Yes, but it depends on the -- when that -- that occurred.  Like, if the EUO was at 9:00, and the -- the -- the -- the -- the associate in -- in the law office for GEICO got a call at 10:00 that they wanted to reschedule, then, they would possibly still make that a no-show.  And whether it was an adjournment or a no-show, if a -- if that was at 9:00 o'clock

Page 67

L. PIA

and I still had a 10:00 or 11:00 -- an EUO, then I still had to remain at the facility for my other two EUO's.

Q.  How many claims did you typically handle in a week from 2016 to -- forward?

A.  Yeah, yeah.  No, I got that.  And at -- in 2016, I would say that to the best of my recollection, I was doing a minimum of 30 claim -- you said a week?

Q.  Yeah, per week.

A.  I -- I would say eight to ten.

Q.  Did that fluctuate over time?

A.  Yes.

Q.  Were some weeks busier than other weeks?

A.  Extremely, yeah.

Q.  Were there certain times of the year that were busier than other times?

A.  In that time period?

Q.  Yeah.

A.  Well, once COVID hit, the case load went up drastically and -- now, during the course of this time period, when the case load was continually rising, okay, we were asking --

Page 68

L. PIA

and this was ongoing for years, even prior to 2016.  We were asking for overtime to be incurred for the hours that we were working over and above 38.75, and we were told that -- that GEICO doesn't approve and authorize overtime for the excess amount of time regarding the handling of cases.

So when the case load got to be so extreme, that we couldn't do our job within the 38.75, we basically -- well, I basically continued to do the work while asking for overtime, not being approved, but continued to do the work in order to satisfy my case load, and not have the cases turn red; and, you know, be possibly recognized as needing coaching and -- and, you know, possibly being, you know, terminated.  I needed the job.

Q.  Okay.  I believe my question on that one was:  Were there certain times of the year that were busier than others?

A.  Yes.

Q.  Okay.  Which times of the year were those?

A.  Well, co -- after COVID hit, I would



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
69–72

Page 69

L. PIA

say that would be the -- the busiest time regarding case load.

Q. Before COVID hit, was there --

A. So -- I'm sorry.

Q. Before COVID hit, were there certain times of the year that were busier than others?

A. Yeah. I mean, like -- like you asked me before, certain weeks and certain months fluctuated. We used -- I used to keep a track, as far as how many cases we got per month. So even before COVID and before 2016, some months, you got 30 cases; other months, you may have gotten 34. You know, we -- I used to call other investigators and say, you know, how many cases did you get, you know, this month? But then when COVID hit, that's when the case load went, you know, total -- totally, you know, out of control.

Q. When you say you called "other investigators", who did you call?

A. I think I may have called Lewonka.

Q. Anyone else?

A. He was actually, you know, in my team. I don't -- I don't recall. I'm sure I did, but

Page 70

L. PIA

I don't recall specifically the names of the other associates.

Q. And earlier, you testified that you used to ask for overtime for work above 38.75 hours; correct?

A. Yes.

Q. Okay. And I believe you used the phrase "we". You were told -- you said, "We were told no."

Is that correct?

A. Yes.

Q. Who is "we" that you're referring to there?

A. Myself and other coworkers.

Q. Which coworkers?

A. Well, when I say "we", I did, you know, converse with -- with other associates. And also present at monthly meetings, where the topic was brought up that, you know, other coworkers were -- were present, where we were told that we weren't getting overtime.

Q. Which other associates are you referring to specifically?

A. Again, I -- I -- I can't name everyone

Page 71

L. PIA

that was at the meetings, but I remember there was -- Mark Giambalvo was there, Keith Fischer, John Moeser, Lewonka, myself. There was Richie Lenihan. He was pretty vocal at the meetings, he's -- he's deceased now, but there was a -- Connie Mangan maybe was -- was present.

These monthly meetings that -- that were scheduled, I believe all were requested to attend, unless you had other business -- you know, other GEICO business that you weren't able to attend. So there were a lot of associates or coworkers at these meetings, and the topic of overtime was always brought up.

Q. Okay. It was brought up by these individuals that you mentioned?

A. Yeah, and other individuals that I don't specifically remember their name. The case load and -- and overtime.

Q. Were the monthly meetings in person?

A. The monthly meetings were in person. And then, I think, during COVID, they had some type of Zoom meetings.

Q. Were they your entire team, or the entire -- the entire region, if you recall?

Page 72

L. PIA

A. The entire region, I don't -- meaning the SI -- the whole entire region to SIU unit?

Q. Yeah. What was the scope of the invitees to these monthly meetings?

A. What do you mean by "scope"?

Q. So who was generally invited to these meetings, if you know?

A. I don't know who -- who was invited to the meetings because I didn't do the invitations; but unless you had other business, which could be like an EUO scheduled or something like that, the invitation to the meetings -- now this is pre-COVID, okay -- was to everyone, I believe, in the unit.

Q. Everyone in the SIU, are you saying?

A. In the SIU unit, I believe, yes.

Q. Was that only in Region 2, or was that beyond Region 2?

A. I don't know what other regions did, and I would -- I don't -- I could -- I could say I -- I was never in a meeting in SIU unit, other than Region 2. Like, I never attended a -- a -- a SIU Region 5 meeting.

MR. SLOTNICK: We can go off the



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
105–108

Page 105

L. PIA

met, then there's -- there was going to be no change.

Q. When did he tell you that?

A. I don't know exactly, but during that time period, and even before.

Q. Was that on the phone?

A. Could have been on the phone, in person or both.

Q. Did you take any notes of those conversations?

A. No.

Q. Were those conversations reflected in any e-mails that you recall?

A. No.

Q. If we could go back to Paragraph 8. So it says: "I recall my supervisor, Gerard Cassagne, discussed with me the norms of everyone working overtime off the clock to keep up with GEICO's performance metrics. And he said that the only way the practice would stop is if everyone collectively stopped working after 7.75 hours per day, and allowed their cases to go red. Meaning the cases would receive poor ratings. Accordingly, I only

Page 106

L. PIA

entered 7.75 hours per day, 5 days a week, regardless of how many hours I actually worked."

Mr. Pia, is that the conversation that you were just referring to in your testimony?

A. In sum and substance, yes.

Q. And when you say "go red", what exactly does that mean?

A. The system that we used on the computer -- and again, I'm not an IT. I'm like a -- you know, a little bit behind the ball with that, but the SICMS computer would have -- there would be a queue on the left side of the screen, and that would be a list of all your cases. And if you didn't meet certain requirements within a -- a -- a -- a case life, then your -- your case would turn red.

So in essence, if -- if you, you know, shutdown and say, hey, I'll get to that when I get to that, and all of a sudden, either the time period to update your case or the 30-day case life came up, the case would turn red. Then, the other case would turn red, and so on and so forth.

Page 107

L. PIA

Q. How could you prevent a case from turning red?

A. Working as many hours as it takes in a day to -- to get your work done, even if it's over and above 7.75.

Q. Would taking -- strike that.

Would entering -- strike that.

You mentioned SICMS?

A. Yeah, it's an acronym for special investigation case management system or something -- something to that effect.

Q. Was that the case management software that you used at GEICO?

A. Yes, issued by home office.

Q. And if you made an entry in SICMS in a given case, would that prevent or take away a red flag for that case?

A. It depends on the entry.

Q. What do you mean by that?

A. Well, I mean, if -- if I just went in the case and went, hi, and then exited out, you know, the case would still -- you know, you have to show some type of -- of constructive, you know, data in the entry.

Page 108

L. PIA

Q. Was the construct of a case being red -- was that something that somebody could go in and review, and take the -- like, take the red flag away from the case, or is it an automatic thing, where, hey, the -- it -- the red flag would pop up based on a certain number of days the case had been dormant?

A. To the best of my knowledge, if a case turned red, it could not be taken away.

Q. Could not be taken away?

A. Correct, that's to the best -- the best of my knowledge.

Q. Do you know if there were other colors of flags for cases?

A. Yes. As a case was nearing red, it would turn yellow.

Q. When you say "nearing red", what do you mean by that?

A. Like, for example, if -- if the case life was 30 days, within a certain -- maybe a week's time, that case would turn yellow. So it would be a warning to the investigator like, okay, Case Number 12345, I got a week, you know, to -- to get up on that before it turned



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
109–112

Page 109

L. PIA

red.

Q. Did you ever intentionally allow any cases to go red?

A. No.

Q. Would you receive poor ratings if you let your cases go red?

A. Yes.

Q. Are you aware of any other investigators who intentionally allowed their cases to go red?

A. Intentionally?

Q. Yeah.

A. Not that I know of, no.

Q. If you look at Paragraph 9, which is on the same page. The second sentence reads: "From approximately late 2016 to approximately March 2020, I worked approximately ten hours each day, Monday through Friday, and another four to six hours on weekends to keep up with my work. I worked about 55 hours a week on average."

What are you referring to when you say "late 2016"?

A. I -- I would say a period of time from

Page 110

L. PIA

the middle to the latter part of -- of 2016.

Q. Do you have a specific month that you're talking about?

A. I -- I don't. I don't recall.

Q. And on what do you base these estimate hours worked?

A. Well, based on what I recall, my -- my workday being, and that the -- the hours that I listed here, I would say, is a conservative estimate.

Q. They're based on your recollection of what you remember your -- your hours worked being?

A. Yeah.

Q. Did you record your time worked anywhere, other than GEICO's timekeeping program?

A. During the time period of 2016 to '22, no. Prior to that, yes.

Q. Where did you keep those documented notes prior?

A. During the Calg study time period, we were required to itemize everything that we did in a case. So, for example, if I took out Case

Page 111

L. PIA

Number 123, and I called Mr. Slotnick, and it took ten minutes, I had to put down ten minutes. And then, at the end of the case, when it was being typed up for submission, I would add up all the time. And on the bottom, in the summary, I would say total case time, 27 hours, 30 minutes. And that stopped. We were told to stop that at some point in time. I don't know exactly when, but that was during that period that I documented my time.

Q. How did that differ from the regular practice of documenting time at GEICO?

A. Practice, or policy?

Q. Practice.

A. Well, the practice was that you -- you worked so your -- your cases didn't turn red. You worked overtime and didn't -- and didn't put in for it. So there was no difference in that, other than there was an additional recording of the time during the Calg study, as opposed to 2016 to 2022. I didn't record any place else my unpaid overtime. The only -- the only place that I recorded my time was in the -- the -- the weekly-time computer thing.

Page 112

L. PIA

Q. Okay. And during the 2016 to 20 -- March 2020 time period, did you ever work less than 40 hours in a workweek?

A. With -- without taking time off -- and I don't believe I took, like, half a day or anything with my vacation time. But without taking time off, no, I didn't work. There wasn't one day that I worked less than -- than 7.75.

Q. But you can't specifically itemize each of those days, where you worked over 7.75 hours in a day; correct?

A. Itemize?

Q. Yes.

A. No.

Q. Did you tell anyone that you were working about 55 hours a week on average during that time period?

A. Specifically?

Q. Yes.

A. I don't recall specifically telling an individual, or individuals that I worked 55 hours a week during that time.

Q. Did you tell anyone that you were



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
125–128

Page 125

L. PIA

On what do you base the approximately 65 hours-a-week calculation?

A. What -- individually?  Like, how many during the week and -- and the weekends?  I was working seven days a week.  The case load jumped up dramatically.  And I recall during COVID, I -- I was conducting in -- in -- approximately three of the four can -- three to five recorded statements a day.  Okay.  And then, you know, all the -- all the -- the -- the background work that we had to do on these cases.

So, I mean, I -- I -- I recall during COVID being, you know, at my computer, you know, until dinner time and breaking for dinner, and then going back at about 6:30, 7:00.  And then, working until, you know, the -- the evening hours almost every single night.

Q. Did you keep any documents or records of those additional work hours?

A. No.

Q. Let's go to Paragraph 12 on the same page.  It says:  "From March 2020 to November 2021, my regular hours worked were

Page 126

L. PIA

approximately 65 hours per week.  And from December 2021 to December 2022, my regular hours worked were approximately 55 to 60 hours per week."

So on what are you basing those estimates of hours worked?

A. Well, from -- from COVID until, I guess, November '21 would be, like, sort of the -- the going-back-out time after COVID, but, you know, they would -- they were extensive hours, in that the case load was a -- and there was -- there was a month I was -- I was -- I think I was assigned to over 70 cases, or around 70 cases in one month.  So that, you know, incorporated the approximately 65 hours a week.

Once we went out, the case load -- to the best of my regulate -- recollection -- diminished, but it wasn't like a God send, like someone came in and said, hey, the -- listen, these guys, you know, got to go down to a, you know, respectable case load; but they did go down a little bit.  And so I reduced the hours that I worked from 65 -- approximately 65 to 55

Page 127

L. PIA

to 60 hours per week.

Q. Do you have any records of working those additional hours?

A. You mean less hours; right -- well -- well, additional hours, but less than the -- the -- the COVID?

Q. Correct.

A. No.

Q. And during COVID -- so the period from March 2020 on -- who was actually living in your home with you?

A. It was myself, my wife, and two of my children.

Q. If you look at Paragraph 12 on Page 4.

Again, did you tell anyone that from March 2020 to November 2021, your regular work hours were 65 hours per week?

A. I don't know if I specifically told them the amount of hours, but there -- there were some vocal conversations between myself and Gerry Cassagne regarding -- you know, I mean -- I remember even saying to Gerry, I don't care how good your -- an investigator you are, 70 cases -- nobody can do 70 cases.  I was

Page 128

L. PIA

beside myself with that number for the monthly average.

So, I mean, I -- I did repeatedly during that time voice my dissension to Gerry about, you know, the case load and -- and -- and he was well aware that we were working over and above the 38.75.

Q. Did you ever make any written complaints to Gerry about that?

A. That -- that would be career suicide.  I -- no, I -- I didn't do that, no.

Q. Did you ever go to HR with complaints about those hours worked?

A. Again, career suicide.

Q. Did you call the ethics hotline about those hours worked?

A. During that time?

Q. Yes.

A. No.

Q. Do you know if the ethics hotline was anonymous?

A. It was anonymous when I called back when -- as I stated earlier in the testimony.

Q. Do you know whether any GEICO

ESQUIRE
DEPOSITION SOLUTIONS

LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
129–132

Page 129

L. PIA

investigators in the SIU asked for approval to work more than 38.75 hours per week, 2016 forward?

A. Again, I'm a little confused at that question because I determined that question to be a yes, because of the meetings that we had, when overtime was brought up -- the issue of overtime. And we're working above and beyond the 38.75.

Q. Right, but I'm -- I'm asking about specifically.

Like, do you know of anyone who actually asked to work more than 38.75? Like, any direct requests?

A. I -- I don't.

Q. Okay. Were you ever approved to work overtime at GEICO?

A. Yes.

Q. When were you approved to work overtime?

A. It was the -- the weirdest thing. At some point in time -- I don't know the time period -- but they -- they asked if -- if people wanted overtime to handle other people's

Page 130

L. PIA

cases, when you would take cases that either other people had, and you were assigned these cases. And you would do the investigation, and then get either two hours or four hours, whatever, overtime, but never to, you know, try to get your workload down.

Q. Do you recall when you were approved to work overtime?

A. The time period?

Q. Yes.

A. I -- I do not, no.

Q. And you said that you were asked to work on other people's cases?

A. Well, that was the stipulation of -- for the -- for the overtime. Why it was determined or approved, I -- I don't know. That would be a management decision, but that -- that was a real -- the -- the specifications was you couldn't -- you know, like, I couldn't ask Gerry -- Gerry, I'm going to, you know, work four hours tonight, and I'm just going to take the four hours extra for my cases. You had to do other people's cases that were assigned.

Page 131

L. PIA

Q. Did anyone actually tell you that specifically?

A. When I was asked to do overtime, I think I initially asked Gerry, is that for my case load.

Q. And what did he say?

A. He said, no, we're going to assign you cases to -- to -- to work on, and you'll get -- I don't know. I -- I forget whether if it was two hours or four hours overtime.

Q. Approximately, how many times did that happen?

A. Several. I -- I mean, I don't know the exact amount.

Q. And was that overtime that you asked to work, or was it overtime that was assigned to you by Gerry?

A. No, they would -- they wouldn't -- he didn't assign it and say, you got to do this. You know, he would ask: There's overtime available, are you interested? And if it was -- if it was asked of me, more times than not, I took it.

Q. Did you ever decline to take the

Page 132

L. PIA

available overtime?

A. I -- I may have. I don't recall.

Q. Were you eligible to work and receive overtime pay from 2016 forward?

A. Can you repeat that.

Q. Were you eligible to work and receive overtime pay from 2016 forward?

A. Policy-wise, yes. Practice-wise in the -- in a work environment, no.

Q. You -- do you know what I mean by "eligible"?

A. I'm available to -- to get overtime if -- if available; correct?

Q. Right.

A. Okay.

Q. Do you know whether other security investigators were eligible for overtime during that period?

A. I would assume that applied to everyone, not -- not just myself.

Q. When you say "everyone", who are you referring to?

A. Everyone that was employed by GEICO. According to the policy, you were eligible for



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
185–188

Page 185

L. PIA

A.  Yeah, prob -- for sure or -- or for certainty, I could say the first three years of my employment.

Q.  And what years were those?

A.  2000 -- conservatively, 2003 to 2006.

Q.  Is it your testimony that you've never worked only 7.75 hours in a day, from 2016 through the end of your employment?

A.  Not that I can recall.  I -- for certainty, I -- I can't say for sure, but it's -- it's highly questionable that I could -- I could have worked a day, 7.75 during that time period, and not penalize myself in -- in such a way where the following day, I was, you know, overburdened, you know, with work.  It just encompassed overtime every day.

Q.  Okay.  And what do you mean by the term "extensive"?

A.  Well, ex -- extensive is -- could be -- 38.75 is your normal workday.  So 50 hours could be extensive, if that was all of it, but now after -- or during COVID, it was raised to 65 and -- and that was a conservative est -- because there's some -- some weeks, I was

Page 186

L. PIA

probably working over 70 hours a week, and that's what I would call extensive.  And the case load was extensive, also.

Q.  And were you receiving overtime pay for any time period during the COVID era?

A.  I don't know if that overtime that we spoke about earlier, where we were given unrelated cases for overtime.  I don't know if that incurred during the COVID time, but other than that, I received no overtime pay for my cases that were directly assigned to me.

Q.  And did you keep records of the hours that you worked during that period, but did not record in GEICO's system anywhere else?

A.  No.

Q.  The second sentence in Paragraph 39, you say:  "In full workweeks, for example, weeks in which Pia worked at least five days without days lost due to holidays or other time off, these assignments required him to work approximately 55 hours per week."

So is it your testimony in your claim that you worked approximately 55 hours per week each week during the period from December 2016

Page 187

L. PIA

to March 2020?

MR. SCIMONE:  Objection.

THE WITNESS:  Again, yes, but stipulating -- like, if I had a day off -- and again, the hours that I gave, as far as the overtime, is a conservative estimate.  Personally, I think they're a little bit higher, but let's go with the number 55.  If I took a day off, or if I had three-days vacation, then, of course not, I didn't -- I didn't work the 55 hours.  But on a given week, with no time off, 55 hours is a minimum at best.

BY MR. SLOTNICK:

Q.  And that's based on your estimations, as you sit here today; correct?

A.  Yes, you stated that in the beginning of our proceeding that to estimate when -- so that the -- that's an estimate of mine.

Q.  Perfect.  You're following directions.  I appreciate it.

A.  Thank you.  Thank you.

Q.  Paragraph 40, it says:  "On a handful of occasions in 2017, 2018, and early 2020, no

Page 188

L. PIA

more than ten days in total, according to GEICO's records, Pia's supervisors made exceptions and approved overtime.  These approved overtime days were scattered across workweeks, and totaled no more than 19.5 overtime hours."

So which supervisors made those exceptions?

A.  Again, the overtime, I rem -- I remember doing it.  It was unrelated to my case load.  The supervisors -- I can't say Gerry gave me all of it.  There could have been a time that, you know, Dara called me or sent me an e-mail, or put out an e-mail that said anybody want overtime?  So I can't, with certainty, say that it was all of the supervisors or just one, but the -- that overtime that was incurred was gotten from supervisor approval, but it was unrelated cases, not of my own.

Q.  And which of GEICO's records are you referring to in this paragraph?

A.  Where does it say record?

Q.  On the second line --



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
189–192

Page 189

L. PIA

A. Of?

Q. -- of Paragraph 40.

A. Forty. "10 days in total, according to GEICO's records." Honestly, I don't recall why records is there, unless -- maybe the overtime records that GEICO has.

Q. So Paragraph 41 of the complaint alleges that beginning -- at the beginning of the COVID-19 pandemic, which you say reached a peak your -- it says your workload steadily increased over the course of your employment; reached the peak in or about March 2020, at the start of the COVID19 pandemic. During this time, Pia was required to work primarily from home.

And it goes on to say that: "Accounting for some gaps in his workday for meals, and other self-care from March 2020 to April 2021, Pia worked approximately 65 hours per week in most full workweeks -- i.e., weeks with no days lost to holidays or other time off. Specifically, Plaintiff Pia recalls working approximately 65 hours per week in April 2020."

Page 190

L. PIA

How -- or strike that.

Specifically, where are you getting that 65 hours-per-week number from?

A. Well, due to the increased case load, and the fact that I -- I -- I knew what I was approximately working prior to the increased case load. And I recall on specific occasions working into the -- not the wee hours of the morning, but, you know, the -- the middle hours of the evening and -- and at times, getting up on the weekends. If I had something to do with my kids, I would get up earlier than -- than everyone else and type a couple of hours, come back from what I did, you know, jump on the computer. There was no -- no day off. I was working the weekends, and I was working before -- you know, pre-COVID, before going out and -- and during the -- the evening hours after dinner.

Q. Did you like your job at GEICO?

A. There was a period of time that I -- that I loved my job at GEICO. I love doing investigation.

Q. Do you have any records or

Page 191

L. PIA

documentation to show that you specifically worked 65 hours per week in April 2020?

A. Not -- I don't have any specific hours, but I think that was the month that I was assigned 70 cases. So if you look at the results of those 70 cases, and that no cases turned red, as somebody with experience in assigning and approving cases, if that individual thought that those 70 cases could be done within 38.75 times four, then they're sadly mistaken.

Q. So is the answer that you do not have any specific records or documentation --

A. No.

Q. -- confirming those hours worked?

Paragraph 43, same page. "Plaintiff Pia recalls attending team meetings with other special investigators and their supervisor. At these meetings, special investigators asked if there would be any overtime pay available to them because of the long hours they were working, and unreasonable number of cases they had, but GEICO denied their request to authorize overtime pay."

Page 192

L. PIA

So are these the meetings that we've been discussing today during your testimony?

A. Yes.

Q. Do you recall what the general purpose of the meetings was?

A. Again, you would have to ask the supervisors, but it was -- it was kind of a recap of everything that went on from the prior meeting. When they were -- when they were held pretty routinely, like every month, it was any new business. You know, and then the floor was open for questions and that went -- that's when it was, you know, strictly pertaining to the case load and -- and any overtime involved that we weren't getting paid for.

Q. Did you ever put your requests to authorize overtime pay in writing to anyone at GEICO?

A. No.

Q. Did you ever steal, take or misappropriate any money, property or confluent -- confidential information from GEICO?

A. No.

Q. Did you ever lie to anyone at GEICO



LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
225–228

Page 225

L. PIA

Q.  You testified as to meetings that John Pham attended, where unpaid-time issues were raised.  Is that accurate?

A.  Yes.

Q.  Okay.  Do you recall when those meetings were?

A.  They were -- the exact years, I do not know, but it was pre-COVID.

Q.  And you also testified with respect to Gerry Cassagne providing you information with respect to the home office meetings; is that correct?

A.  Yes.

Q.  And all of your testimony with respect to the home office meetings, is that all through information that you learned through speaking with Gerry?

A.  Yeah, Bill Newport was another attendee, and I never heard anything from him regarding that.

MR. SLOTNICK:  I have nothing further.

MR. SCIMONE:  Neither do I.  Thank you.

Page 226

L. PIA

MR. SLOTNICK:  Thank you.  All right.

THE VIDEOGRAPHER:  This -- this concludes the video deposition of Louis Pia.  The time is approximately 15:24, end of Media 7.  We are off the record.  Thank you, everyone.

THE REPORTER:  Mr. Scimone, would you like to purchase a copy of this transcript?

MR. SCIMONE:  Yeah.  We're going to do a three-day.  Let's do three days.

THE REPORTER:  You want it in three days.  Okay.  Thank you.

(Thereupon, the examination was concluded at 3:24 p.m.)

Page 227

L. PIA

C E R T I F I C A T E

STATE OF NEW YORK    )

                     :SS

COUNTY OF NEW YORK   )

I, TIFFANIE JONES, a Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2024.



TIFFANIE JONES

Page 228

L. PIA

INDEX

EXAMINATION OF LOUIS PIA

EXAMINATION BY                          PAGE

Mr. Slotnick                           5-216

Mr. Scimone                          217-222

FURTHER EXAMINATION BY

Mr. Slotnick                         223-225

LOUIS PIA  Contains Highly Conf. Testimony
Keith Fischer, et al. vs GEICO

August 13, 2024
229–232

Page 229

                    L. PIA


                    EXHIBITS

            MARKED FOR IDENTIFICATION

             (Exhibits Attached.)


DEFENDANT'S EXHIBITS                    PAGE

Ex. 1 - Notice of Deposition of Louis Pia      15

Ex. 2 - Compensation Contents, the GEICO Human

        Resources Associate Handbook         78

Ex. 3 - Training History Log                 81

Ex. 4 - Plaintiff Louis Pia's Responses to the

        Court's Interrogatories             96

Ex. 5 - Plaintiff Louis Pia's Responses and

        Objections to Defendant's First Set of

        Interrogatories                    179

Ex. 6 - Second Amended Collective and Class

        Action Complaint                   182

Page 230

                    L. PIA

        DESIGNATED **HIGHLY-CONFIDENTIAL**

           PORTION OF THE TRANSCRIPT


1.  Testimony Starting On Page 10, Line 12 and

    going to to Page 14, Line 4.

Page 231

                    L. PIA

        A C K N O W L E D G M E N T



    STATE OF NEW YORK   )

                       :SS

    COUNTY OF NEW YORK  )


        I, LOUIS PIA, hereby certify that I have

    read the transcript of my testimony taken under

    oath on August 13, 2024; that the transcript is

    a true, complete and correct record of what was

    asked, answered and said during this proceeding,

    and that the answers on the record as given by

    me are true and correct.



             ------------------------

                    LOUIS PIA



    Signed and subscribed to

    before me this _____ day

    of _____, 2024


    _____

        Notary Public

Page 232

                    L. PIA
ERRATA SHEET FOR THE TRANSCRIPT OF:
Witness Name:  LOUIS PIA
Examination Date:  August 13, 2024


Pg.   Ln. Now Reads   Should Read  Reason
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____
___   ___ _____ _____ _____


_____

Signature of Deponent

Subscribed and sworn to before me
this _____ day of _____, 2024
_____
(Notary Public)

