# Exhibit Q

## Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------

KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, Individually and on behalf of All others similarly situated,

Plaintiffs,

vs.        No. 2:23 Civ. 2848(GRB)(ARL)

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,

Defendant.

------------------------------

VIDEOTAPED DEPOSITION OF MICHAEL O'SULLIVAN
New York, New York
Monday, August 26, 2024

Reported by:
Yaffa Kaplan
JOB NO. 11574176

## Page 2

August 26, 2024

10:00 a.m.

Deposition of MICHAEL O'SULLIVAN, held at the offices of Esquire Deposition Solutions, 1225 Franklin Avenue, Garden City, New York, pursuant to Replace, before Yaffa Kaplan, a Notary Public of the State of New York.

## Page 3

A P P E A R A N C E S :

OUTTEN & GOLDEN LLP
Attorneys for Plaintiffs
685 Third Avenue, 25th Floor
New York, New York 10017
BY:    SABINE JEAN, ESQ.

DUANE MORRIS LLP
Attorneys for Defendant
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603
BY:    TIFFANY E. ALBERTY, ESQ.

ALSO PRESENT:
JOSEPH BARLETTA - Videographer

## Page 4

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
37–40

Page 37

M. O'Sullivan

A.   No.

Q.   Did you handle any rate-evasion cases from 2016 to '22?

A.   When I discussed the time frame where we kind of did a little bit of both, I don't recall what -- what time frame that -- that was, so I -- I could have, but I tend to think that was before that time.

Q.   Did you handle any arson-related cases from 2016 to '22, to -- to your knowledge?

A.   Not that I recall.

Q.   And then what about any type of theft cases?

A.   Again, we had that short period of time, but I don't recall doing theft cases in that time frame.

Q.   I saw a reference to something called a jump-in claim.
     Do you know what that is?

A.   Yes.

Q.   What is that?

A.   That is basically a person that will claim to have been in a car at the time of an accident.

Page 38

M. O'Sullivan

Q.   Did you handle any types of those claims in that 2016 to '22 time frame?

A.   I believe I probably had some of those cases.

Q.   Was that during that blend period, or something completely different?

A.   I would say some time in that blend period or under the PIP, because that falls under the PIP, the jump-ins.

Q.   Did you handle any social media fraud cases?

A.   Yes.

Q.   So when would you get assigned a specific type of claim -- let's go social media, who would you -- assign you the social media claims?

A.   It would be assigned from -- sometimes a supervisor would assign it to you, or there was an assignment person at GEICO that would put the cases in.

Q.   I am just going to break that apart a little bit.
     For the supervisors that would assign you cases, would a supervisor only assign you

Page 39

M. O'Sullivan

specific types of cases?  Such as; that supervisor only handled medicals or only social media cases?

A.   I kind of remember the supervisors handing, you know, assigning the social media cases.  But I could be mistaken.  For some reason I thought they came from the supervisor.
     And then the other cases would be assigned by -- like I said, the desk that -- I don't even know what the desk, the assignment, would be called.
     It was -- I don't remember the person's last name.  Fran was the person that assigned them.

Q.   Would it be a blend of different types of cases?  Or would Fran say, for example, I will only give you med cases?

A.   Oh, as far as my cases went, we would get some assigned.  And then later in my career, the medical team pretty much had to assign ourself cases.

Q.   I guess -- in what way?

A.   So for an example, basically the job -- what would happen was I would get an e-mail from an inside investigator and I would be told:  I am working on ABC Medical.  I need ten claimant

Page 40

M. O'Sullivan

interviews for people that are treating with that -- at that location.
     So I would use the tax identification number of the medical provider and search out claim numbers of GEICO claimants that were treating there.
     And then you had to fill out the adjudication, looking for a claim that still had open features.  Meaning, the bodily injury claim was still open, or the PIP claim was still open.
     Otherwise to do the investigation, GEICO couldn't take an impact on a case if we found fraud.

Q.   When you are investigating the med-fraud claims, are you specifically looking at any of the doctors, facilities, or their medical personnel who is, for example, over billing?

A.   Basically both.  You know, facility-to-doctor, yes.

Q.   Were you interviewing doctors, nurses, medical professionals?

A.   On occasion I would be asked to schedule an interview.  90 percent or 99 percent of the time, the doctor would never consent to the



Page 41

M. O'Sullivan

interview.

Q.   I am not surprised.

A.   But you had to ask.

Q.   So let's talk about for the med-fraud claims.  How long -- strike that.

For the med-fraud claims, what is the range to -- how short to how long for those type of claims would it take to investigate?

A.   On a good case, they could be opened and closed within a month.  On a case where you are dealing with claimants that won't make themselves available for interviews or attorneys who keep rescheduling the interviews, then go on for five or six months.

Q.   For PIP cases, what was that life span of a case?

A.   Again, it could be a month, or you know, I mean, there was always pressure to get the cases closed.

But a lot of times, you know, when you are dealing with attorneys, it -- just don't make it easy.  So they reschedule you once or twice, I guess, hoping that you go away.  But just have to continue requesting the interviews.

Page 42

M. O'Sullivan

Q.   What about for jump-in claims?  How long would those take?

A.   Again, the jump-ins, if I recall correctly, were part of the PIP where you were trying to verify their details of the accident.  So it would be the same, you know, basically the same time frame.

Q.   How far did you drive to investigate your claims?

A.   Again, it's -- it depends on where the attorney's office is.

I mean, I have gone to locations in New Jersey.  And out east into Suffolk County, which I guess would be 40, 50 miles.

I don't know.  About 40, 50, you know. I guess the furthest I would go out would be 40 miles.

Q.   I recognized that you worked during COVID, so I don't want to necessarily focus on that time frame or -- what was the standard practice prior to, how much time would you say you spent in the field?

A.   It depends on the schedule for the day.

For example, if you were going to the

Page 43

M. O'Sullivan

Bronx and I have a 10:00 appointment, 10:00 interview scheduled, you have to be on the road at 8:30.  The interview could be anywhere from 45 minutes to an hour-and-a-half.  And then you have an hour-and-a-half coming back.

If you are only doing one interview for the day.

If you are doing a second interview, then you have travel time to the second location.  And the second interview.  And there is still travel time back.

Q.   Were you doing onsite visits at doctor's offices?

A.   They would be called clinic inspections.

Q.   Yes?

A.   Yes.

Q.   Were you doing medical record review?

A.   Yes.

Q.   Were you doing medical billing review?

A.   Yes.

Q.   Between 2016 to '22, how many claims would you say you handled per week?

A.   As far as being assigned?  Or touch cases, cases I touched?

Page 44

M. O'Sullivan

Q.   Touching cases.

A.   I mean, I would be assigned up to 20 cases a month.  And you know, if I had to get to them, I don't know how many per week or per day, but how often I would get into them.

Q.   For the assigned.  Let's just go with the 20 cases per month that you were getting assigned.

How many cases of those were you closing a month?

A.   I don't recall what the closure was.  I mean, you can close ten in one month and 20 in the next.  It depends on how quick, you know, you are getting interviews.  Again, it's out -- out of my control.  It was out of my control.

Q.   Fair to say then it fluctuated on how many cases you could close a month?

A.   Yes.

Q.   Would it fluctuate on how many cases were assigned to you a month?

A.   Well, the case was self-assigned.  And you know, I forget what the number was when I retired, but you made it your best effort to assign yourself the cases.



Page 45

M. O'Sullivan

Q. When you say "self-assigned," walk me through that process a little bit.

A. So again, I would get an e-mail from an inside investigator advising me what provider he or she was looking into. I would do the TIN run and search out cases. And when I found a case that was suitable for an interview -- early on, I would have to send a request in to Fran to submit it to the SICM database in order for it be generated as a case.

Towards the end, I don't recall time-frame-wise, but I believe the medical investigators were given access to case entry into the SICM system. So we bypassed having to reach out to Fran to get cases assigned.

Q. With the access to get into the system, can you ultimately decline whether you took a case or not?

A. Define that a little bit.

Q. I am just trying to understand.

You said it's self-assigned. So in theory, you are choosing which cases you can take in the queue, and you can decline a case?

A. Decline a case? If I went to -- for a

Page 46

M. O'Sullivan

claim number and if for some reason I didn't like the case?

Q. Yes.

A. I could in theory, yes. Actually, in reality, I could pass over a certain case.

Q. Were some weeks busier than others?

A. Yes and no. Some weeks you can have eight interviews in your schedule, then have only one or two go because the others were no shows and had to be rescheduled.

But you still have to be at the location to -- in case the claimant appeared.

Q. From your experience, were there any times of the year that happened to be busier?

A. Not necessarily, no.

Q. Were there any other factors that made your workload heavier at times?

A. Not necessarily. I found the medical was pretty steady.

Q. Do you know if other senior security investigators who worked on the med team had the same workload as you?

A. I believe we all had the same, yes.

Q. How do you know that?

Page 47

M. O'Sullivan

A. I said I believed that we did. I don't know if that was the case.

Q. Do you know if other senior security investigators who worked on the auto side had the same workload as the med team?

A. I would hear them complaining about getting slammed with cases when somebody was on vacation or a guy was on vacation and cases would just continuously come out.

Q. And while I recognize that taking coverage for vacation time is understandable, I am specifically looking more for: Do you know if the auto team had the same amount of cases assigned to the med team?

So I think you said you would typically get 20 cases a month assigned on med. Do you know if auto was getting the same amount?

A. I believe auto was getting more.

Q. What is that basis of your opinion from --

A. First, on the medical team to investigate and prepare for an interview, you have to review the medical billing, what medical documents are available in the system. Sometimes

Page 48

M. O'Sullivan

when you are reviewing the billing you see a CPT code that you are not familiar with, I research the code. So if I am doing the interview, I know what I am going to be asking about or basically, you know, training myself to be familiar with what, you know, they should be describing.

So I think there is a lot more prep time for medical interview and medical investigation.

Q. Do you know if anyone -- anybody on the auto side was doing the same thing as you to prep for interviews? Such as looking at CPT or ICD codes before interviews?

A. I don't know what their practice was.

Q. Did you ever speak to any -- anybody on the auto side regarding their workload?

A. I guess in conversation, yes, it would be discussed.

Q. Do you recall the substance of those conversations?

A. Yes. How easy the medical guys have it.

Q. Who told you that?

A. George McManus always told me that.

However, whenever they ask for a volunteer to work in medical, there were no hands



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
49–52

Page 49

M. O'Sullivan
raised. So it couldn't have been that easy.

Q. Did you ever have access to anybody on the auto-side's case lists?

A. I mean, to see how many cases were assigned? I would have, yes.

Q. Did you ever look at that in your custom and practice?

A. Yes.

Q. And whose case loads were you looking at?

A. Actually because he used to harass me; McManus.

Q. Do you recall, as you sit here today, how many cases he typically would have assigned?

A. No, I don't recall how many -- it would fluctuate though. It would be a lot, and then it would be -- the list would go down.

Q. Why were you looking at his case load?

A. Because he complained how much he had to do.

Q. Did you ever think that he was full of it?

MS. JEAN: Objection.

A. He is just an old man that whines.

Page 50

M. O'Sullivan
Q. During your employment from the 2016 to May of '22 time frame, did you ever take any FMLA or disability leave?

A. Yes.

Q. When was that in time?

A. I believe it was January of 2001, I was out for three or four weeks, I believe.

Q. I think you said 2001. Do you mean 2021?

A. Yes, I'm sorry.

Q. That's okay. Okay. So January 2021, you believe you were out for three or four weeks. For a medical condition?

A. Yes, I had surgery.

Q. What type of surgery did you have?

A. Gallbladder.

Q. Did you go through the FMLA process?

A. Yes, I did.

Q. Was that granted to you?

A. Yes.

Q. Was it also respected?

Meaning, did anybody from GEICO reach out to you about work, workloads, during that time from your protected leave?

Page 51

M. O'Sullivan
MS. JEAN: Objection.

A. No. No.

Q. So aside from the January '21, roughly a month that you took off, any other time that you took leave?

A. No.

Q. Did you take any sabbaticals or leave outside of a protected status?

A. No.

MS. ALBERTY: So I believe we have been going for about an hour. Is that okay if we just take a short restroom break?

MS. JEAN: Yes.

THE VIDEOGRAPHER: Off the record at 11:05.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record at 11:16.

Q. So what's been placed in front of you has been marked as O'Sullivan Exhibit 2. This is the GEICO Associate handbook.

It is a little dense and we are not going to look at the whole thing in totality.

If you would like to just quickly glance

Page 52

M. O'Sullivan
at it for substance, you are more than welcome to. And then just let me know when you are ready and we will turn to a specific page.

A. Okay, I am ready.

Q. So if you could turn to the bottom of -- the right corner has G, and then a bunch of different digits. If you can go to G00038.

MS. JEAN: It starts with G00191.

MS. ALBERTY: Sorry, one second. We will go off the record.

THE VIDEOGRAPHER: Off the record at 11:18.

(Discussion off the record.)

THE VIDEOGRAPHER: Back on the record at 11:25.

MS. ALBERTY: Okay. So I recognize that we marked the wrong document and that's my error. So we are going to -- I will withdraw the Exhibit 2 and remark Exhibit Number 2 as G000028 through to G000043.

(O'Sullivan Exhibit 2, GEICO Associate Handbook, Bates-stamped G000028 through G000043, marked for identification, as of this date.)



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
57–60

Page 57

M. O'Sullivan

record completion date as well as the record grade for pass.

Q. Do you have any reason to disagree with this history?

MS. JEAN: Objection.

A. No.

Q. Throughout your tenure at GEICO, were you always required to log your hours?

A. As far as filing your time sheet?

Q. Yes.

A. Yes.

Q. And what did that process look like in 2016 to 2022?

A. You went through your time sheet and entered your time -- hours worked.

Q. Do you remember if there was a timekeeping software that you would enter your time into?

A. I'm sorry, if there was what?

Q. Do you remember if there was a timekeeping software that you would enter your time into?

A. I believe there was, yes.

Q. Do you remember the name of the

Page 58

M. O'Sullivan

software? Whether it was like Workday, Chronos?

A. Oh, Workday. Yes, Workday.

Q. When you would log your hours, how would you do that? Meaning; would you manually type in the number of hours for that week?

For that day? For that month?

A. I believe we would type in our hours worked per day.

Q. Would you have to break down your hours as in; I allocated this one hour to this interview? Or, I allocated this hour to doing a case summary?

A. No.

Q. So there was no narrative per hours?

MS. JEAN: Objection.

A. No.

Q. Looking back at Exhibit Number 2 for the policy itself. Did you understand this policy, that you could not work off the clock?

MS. JEAN: Objection.

A. Do you want to repeat that question?

Q. Sure. Looking back at the policy, which is on GE000039, did you understand that you could not work off the clock because you had to log all your hours worked?

Page 59

M. O'Sullivan

MS. JEAN: Objection.

A. As far as -- I mean, I would do the work needed to finish a case.

Q. But for any of the work that you needed to do, you had to log those hours; correct?

MS. JEAN: Objection.

A. According to the manual, yes.

Q. Did you understand that managers and supervisors were not allowed to tell you to work off the clock?

MS. JEAN: Objection.

A. Yes.

Q. Did any manager/supervisor tell you to work off the clock?

A. Not actually used the words, "work off the clock."

Q. What do you mean by that?

A. It was pressure to get the cases done. Get cases closed. And that required additional typing time.

Q. But no manager explicitly said, work off the clock?

MS. JEAN: Objection.

A. No.

Page 60

M. O'Sullivan

Q. With the pressure to get cases closed, did you ever report that to local or corporate HR?

A. No.

Q. Were you paid hourly -- or you said you believe you were salaried?

A. I believe I was salary employee, yes.

Q. Do you recall what your salary was?

A. I don't, actually.

Q. That's okay.

A. I think when I retired, I think it was 70,000 a year.

Q. Did you make any type of bonuses or commissions?

A. Other than profit sharing, no.

Q. Did you see raises while you were employed at GEICO?

A. Yes.

Q. And how frequent would you receive raises?

A. It would get reviewed annually.

Q. Was it the same month every year?

A. I believe it was March.

Q. And walk me through what the review process looked like, from what you recall.



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
65–68

Page 65

M. O'Sullivan

So it states, "Since" -- sorry, I will wait 'till you get there.

It states, "Since January 2020, GEICO classified me and other special investigators as nonexempt employees who were eligible for overtime pay at one-and-one-half times my regular rate if I worked over 40 hours a week."

Do you recall what the one-and-one-half times rate would have been at that time?

A.   No.

Q.   "That said, prior to January 2020, GEICO classified me and other special investigators as nonexempt employees eligible for overtime pay, but they used a different method of payment.  My understanding of this payment method called 'premium pay' was that it was less than my regular rate."

What was the premium pay amount, if you know?

A.   No.

Q.   Where was that -- this -- where does this information come from?

Meaning, the change and the payment method type now called premium pay?

Page 66

M. O'Sullivan

A.   I guess it came from management.  I don't --

Q.   Do you know as you sit here today, though?  Like, who told you any of this information?

A.   No.  I don't recall actually who furnished me with that information.

Q.   And I am just trying to understand to do a reflection, which is the premium pay versus the one-and-one-half times regular rate.

Do you have any idea what that dollar-amount difference would have been?

A.   I recall the premium pay was actually less than regular pay.  It wasn't even straight-time pay.  It was less than regular pay.

Q.   But do you remember what that amount was?

A.   No, I don't.

Q.   Was the premium rate ever indicated on your pay slips?

A.   I don't -- I don't know.  I don't recall how it was indicated on the pay stub.

Q.   Do you recall seeing any type of written policy regarding the premium pay that you are

Page 67

M. O'Sullivan

referencing to in paragraph number 5?

A.   I don't know.

Q.   As far as when you said management would have provided you this information, as to whom in management?  Do you know?

A.   I don't know.

Q.   Let's flip to Page Number 3 of your declaration under paragraph 8.

So it states, "I only entered 7.75 working hours per day, five days a week, regardless of how many hours I actually worked.  I only entered this amount of time because I understood, based on conversations with my supervisor, that GEICO would not authorize overtime pay, 'just for typing.'  Meaning, writing my case reports as required -- as required by my job."

Which supervisor are you referring to in paragraph number 8?

A.   Brian Portnoy.

Q.   As to paragraph number 8 for our other supervisors that I believe you testified to, Dara Campbell and Toni D'Agata, do you recall them saying anything to this degree?

A.   No.

Page 68

M. O'Sullivan

Q.   When did the conversation with Brian Portnoy take place about, "just for typing"?

A.   I don't recall a time frame.

Q.   Do you remember if this was over the phone, via text, e-mail?

A.   I believe it was over the phone.

Q.   To your knowledge, was anyone else present for this conversation?

A.   No.

Q.   Did you have any custom and practice that you would record any conversations with supervisors or other employees of GEICO?

A.   No.

Q.   Was this a one-time occurrence?

A.   Basically, yes.

Q.   Was there anything else substantively from this conversation that you recall outside of the specifically, just for typing?

A.   No.

Q.   Was the reference for just for typing only allocated to the case reports that you would do?

A.   Yes.

Q.   And I just want to make sure we are



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
73–76

Page 73

M. O'Sullivan

requesting overtime outside of this one time period where he said you -- you can't get overtime just for typing?

A.    The only other time I recall getting overtime and being authorized overtime was -- I don't recall what year, but it was during the month of December when GEICO was trying to clear up a back load of social media cases, where they offered overtime above and beyond to do cases.  Above and beyond your regular scheduled cases.

Q.    When overtime was requested and then subsequently approved, was that requested via e-mail?

MS. JEAN:  Objection.

A.    I would say probably was, but I don't recall specifically.

Q.    Do you recall ever -- excuse me -- making an OT request through the Workday portal?

A.    I never did.

Let me just -- I say I never did.  So you are saying work -- overtime through the Workday portal?  Submitting overtime or requesting overtime?

Q.    Requesting overtime.

Page 74

M. O'Sullivan

A.    Okay, no.  I don't recall on that.

Q.    And then when you would submit for overtime, to be paid overtime, that was done then through the Workday portal; correct?

A.    I believe so.

Q.    As you sit here today, do you ever recall Campbell or D'Agata ever deterring you from entering in overtime?

A.    Again, I don't think I ever requested it with Campbell or D'Agata, so I would say no.

Q.    Let's turn to interrogatory number 10.  That's going to be on Page 8, into Page 9.

So the interrogatory states, "Identify each person who you contend had actual or constructive knowledge that you worked unpaid overtime hours as alleged in the complaint, and for each, describe all the facts in support of your contention that he or she had actual constructive knowledge, and identify the dates and hours of the unpaid overtime hours of which you contend such person was aware."

That's a mouthful.

Your response, in relevant parts states, "That plaintiff further responds that during phone

Page 75

M. O'Sullivan

conversations with special investigator Daniel King, plaintiff routinely discussed working overtime to finish a case while both of them were still at their computers at approximately 7:00 to 7:30 p.m."

Do you recall when in time this would have been?  And what I mean by time, not the actual time-date, but the date.

A.    That happened frequently where I -- I get a call from him or he would call me to discuss a case, and we would still be in the office.

Q.    But do you remember, as you sit here today, this happened in March of 2021?  In September of 2019?  Or anything like that?

A.    No, I can't give a specific date.

Q.    When you say frequently, I think that could be interpreted by people in different scopes.

How -- how many times would that be, frequently, as you indicated?

A.    Could be once, twice a week.

Q.    Did you ever work weekends?

A.    I tried not to.  However, on a rainy Saturday, I would go down to the office and do some typing to catch up.

Page 76

M. O'Sullivan

Q.    Would you say that was more on the rare side?

A.    It was on the rarer side to work a Saturday, yes.

Q.    And then Sunday?

A.    Probably not.

Q.    When you had these frequent conversations with Dan, was this over the phone verbally?  By text?  By Zoom or FaceTime?

A.    Usually a phone call.

Q.    Did you happen to take any notes during these conversations?

A.    No.

Q.    Do you recall, as in reference to number 10, what case you were working on when you had this conversation?

A.    As in a specific case?

Q.    Yes.

A.    No.

Q.    Same Page 9.  We are going to look at interrogatory number 12.  It goes to Page 9 and 10.

The question states, "Identify the other special investigators whom you claim worked many overtime hours off the clock each week without



MICHAEL O'SULLIVAN
Keith Fischer, et al. vs GEICO

August 26, 2024
77–80

Page 77

M. O'Sullivan

receiving overtime pay, and for each person describe all the facts and information supporting your claim, and all the ways in which you gained such facts and information."

Your response states, that at least in relevant part, aside from the objection, "That the individuals you saw, other special investigators who worked many overtime hours off the clock each week without receiving overtime pay includes individuals identified in paragraph 17 of your declaration."

And then your response to interrogatory number 10.

If we look at interrogatory number 10, the only person that you referenced then is Dan King.

As it regards Dan King, is your knowledge based off just what he told you?

A.   Knowledge of what?

Q.   As it -- as it applies to the topic for interrogatory number 12.

So overtime, that you saw other special investigators who worked many overtime hours off the clock each week without receiving pay, was that

Page 78

M. O'Sullivan

knowledge that you had personally because you watched him not work on the clock, or is that something he told you?

A.   I would say that he was on -- on a computer, and Dan would call me with questions for different -- in different situations.

Q.   When you say that you would see him on the computer, how did that happen?

A.   There was -- I forget -- forget what the program was, but -- but it would list people I -- that were signed on with a green dot.  I forgot the name.  I don't know if it's part of Outlook or -- or what system it was.

Q.   As indicated, if somebody was online and you can see their green dot, how do you know that he was not logging his hours?

A.   I wouldn't know that.

Q.   Did you ever review Dan King's entered Workday hours?

MS. JEAN:  Objection.

A.   No.

Q.   So then aside from Dan King, going back to Exhibit Number 4, looking at paragraph 17, this is going to be the last page.

Page 79

M. O'Sullivan

And sorry, I am kind of looking at both -- both exhibits just based upon your answer.

So then for 17, you state, "I worked with approximately four to other six other special investigators in my medical team; including Dan King, Pat Ormberger, Eric David and Brad Waltman."

We already spoke about Dan King.

As it applies to then Pat Ormberger, how do you know he was working overtime hours off the clock without receiving overtime pay?

A.   Well, Pat is a female.  It's short for Patricia.

Q.   Sorry.

A.   Don't offend me.

I wouldn't know what hours she was working.

Q.   Then transitioning to Eric David from number 17.  How would you know that Eric David was working many overtime hours off the clock each week without receiving overtime pay?

A.   Multiple conversations.  When we meet up at -- at deposition locations.

Q.   And as far as the knowledge that you have that Eric David was working many overtime

Page 80

M. O'Sullivan

hours off the clock each week without receiving overtime pay, was that something he had told you?  Or you had personal knowledge?

A.   He had told me.

Q.   Then for Brad Waltman.  How did you know he was working many overtime hours off the clock each week without receiving overtime pay?

A.   I would receive -- well, Waltman -- I didn't train him, but he -- I guess he shadowed me when he first got hired.  And he would call me to discuss different scenarios or situations.  And a lot of times, it would be later -- late afternoon or early evening, which would indicate he was probably still working.

Q.   But do you know if him working in the late afternoon was still on his flextime or if that was overtime?

A.   I wouldn't know that.

Q.   Do you know if Dan King ever entered -- strike that.

Do you know if Dan King ever requested overtime hours?

MS. JEAN:  Objection.

A.   I don't know if he ever did.



Page 89

M. O'Sullivan

Q.    Did supervisors remind senior special investigators to flex your time accordingly?

MS. JEAN:  Objection.

A.    Were we reminded?  I don't know if we were reminded, but I mean, we did vary our schedule slightly.

Q.    In your custom and practice, what were your hours?

A.    If it was a down day and just typing, I would do -- start it like 8:30 and I usually finish at dinner time, which is at 6:00, 6:30.

If it was a field day, sometimes my day started at 7:30 because I would have to prepare for my interviews.

Print out a worksheet, you know, basically a series of questions I am going to use for my interview.  Print out the billing so I know what areas of the investigation I have to go into.

And check e-mails.  Make sure nothing has been cancelled before I leave the office.

And then go to the field, do my interviews, and then come back and start typing.

Q.    Would you ever work, say overnight?  Like a graveyard, 1:00, 2:00 in the morning?

Page 90

M. O'Sullivan

A.    I have worked late in the past, yes.

Q.    So turning to paragraph 9, which is going to be on Page 3 of your declaration, Exhibit Number 4.

You stated, "I worked about 47.5 to 50 hours a week on average."

On what do you base these estimates?

A.    I based them on the time frame it would -- from the point I would go down into the office until the time I would leave.

And on days that I was going in the field, what time I signed onto the computer to start doing my printouts, to the time I shut my computer down at night.

Q.    When you would work in the basement in your home office, did you do other stuff in that area on your computer?

A.    Such as?

Q.    Just regular social media.  Watching videos on YouTube?  Video gaming?

You name it.

A.    Actually, I don't think we had access to that on our computers, to my recollection.  I don't recall -- definitely not gaming.

Page 91

M. O'Sullivan

But to my recollection, GEICO had a lot of filters that didn't let you use social media platforms.

Q.    For your home office, and I understand the fire walls and some other issues with company platforms and accessibility to other websites such as YouTube, did you have your own personal computer set up, actually, with your GEICO computer?

A.    I would use an iPad to assist with my social media cases.

Q.    Other than Workday, did you record your time anywhere else?

A.    No.

Q.    And I want to make sure I flesh this out.

As far as entering it in an Excel spread- -- spreadsheet, logging it on the calendar, any other software mechanisms that you would have used in order to quantify the additional time that paragraph 9 says of the 47.5 to 50 hours a week?

A.    No.

Q.    So based then upon Number 9 for the 47.5 to 50 hours a week on average versus what you were supposed to -- and what you did log, which was the

Page 92

M. O'Sullivan

38.75, that then gives us an 8.75 to 11.25 difference per week.

There is -- is there any way to quantify that substantively, outside of just your testimony?

A.    No.

Q.    As to the 8.75 to 11.25 hours per week that you indicate you worked OT, you did not then log those hours in the Workday system?

A.    That's correct.

Q.    Did you tell anyone that you were working between 8.75 to 11.25 extra hours per week?

A.    Anybody?  As in?

Q.    Anybody.

A.    Anybody.  I mean, other than other investigators, we would discuss working the extra time.

Q.    Were those other investigators the ones on your team?

A.    Yes.

Q.    Any other investigators?

A.    I mentioned McManus, and I believe Fischer.

Q.    Did you ever tell your supervisor you were working between 11 -- between 8 to 11 extra



Page 177

M. O'Sullivan

MS. ALBERTY:  Objection.

A.   Yes.

MS. JEAN:  Those are all my questions.

MS. ALBERTY:  Just a quick follow up.

EXAMINATION BY

MS. ALBERTY:

Q.   On the monthly report card, was your manager ever issuing those?

A.   No, it was done by my immediate supervisor.

MS. ALBERTY:  Okay.  I don't have any other questions.

RQ    MS. JEAN:  I have a few things I want to state on the record in terms of follow up, and we will follow up in writing as well.

We would like to request documents regarding underlying training documents from Exhibit 3.

Documents listing and/or describing performance metrics and eligibility standards and conditions to receive annual raises.

Documents regarding performance evaluations of plaintiff Michael O'Sullivan with any metrics listed, including any

Page 178

M. O'Sullivan

coaching plan.

Any written policy described in performance evaluation metrics and/or a number scale.

Any documents involve describing caseload metrics, including time frames for case assignments.

Any documents describing productivity metrics.

Any monthly report cards issued by your supervisors for Michael O'Sullivan.

Any documents for metrics that would require a coaching plan.

And any documents referencing time-in-progress compliance or TIP compliance, and any metrics associated with that.

MS. ALBERTY:  Okay.

THE VIDEOGRAPHER:  I am going to sign us off.

This concludes the video deposition of Michael O'Sullivan.  The time now is approximately 3:21 p.m.

We are off the record.

(Time noted: 3:21 p.m.)

Page 179

M. O'Sullivan

_____.

MICHAEL O'SULLIVAN

Subscribed and sworn to before me this ___ day of _____, 2024.

_____

Page 180

M. O'Sullivan

C E R T I F I C A T E

STATE OF NEW YORK    )

                     : ss.

COUNTY OF QUEENS     )

I, YAFFA KAPLAN, a Notary Public within and for the State of New York, do hereby certify:

That MICHAEL O'SULLIVAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of September, 2024.

YAFFA KAPLAN

Page 181

----------------- I N D E X ---------------

WITNESS                    EXAMINATION BY        PAGE

Michael O'Sullivan                          6, 177

---------- INFORMATION REQUESTS ----------

DIRECTIONS:

RULINGS:

TO BE FURNISHED:

REQUESTS: 177

MOTIONS:

---------------- EXHIBITS -----------------

O'SULLIVAN                              FOR ID.

Exhibit 1  Notice of deposition              14

Exhibit 2  GEICO Associate Handbook,
           Bates-stamped G000028 through
           G000043                           52

Exhibit 3  Excel spreadsheet, Bates-stamped
           G004264                           55

Exhibit 4  Responses to interrogatories      63

Exhibit 5  Answers to interrogatories        69

Exhibit 6  Second amended collective and
           Class action complaint           136

Page 182

DEPOSITION ERRATA SHEET

Our Assignment No. J11574176

CASE NAME: Fischer vs. GEICO

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, same and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____

        MICHAEL O'SULLIVAN

Subscribed and sworn to on the _____ day of _____, 2024 before me,

_____

Notary Public,

in and for the State of _____

Page 183

DEPOSITION ERRATA SHEET

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

        MICHAEL O'SULLIVAN

Page 184

DEPOSITION ERRATA SHEET

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

Page No.____Line No.___Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

        MICHAEL O'SULLIVAN

