# Exhibit R

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                    Plaintiffs,   )

    - v -                         )

GOVERNMENT EMPLOYEES INSURANCE    )

COMPANY d/b/a GEICO,              )

                    Defendant.    )

- - - - - - - - - - - - - - - - - - )

VIDEOTAPED DEPOSITION OF THOMAS BARDEN

Reported by:

Kim M. Brantley

Job No: J11541508

Page 2

THOMAS BARDEN

Thursday, August 8, 2024

Time: 9:59 a.m.

Videotaped deposition of THOMAS BARDEN, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

    OUTTEN & GOLDEN, LLP

    1225 New York Avenue NW - Suite 1200B

    Washington, DC, 20007

    (202) 847-4400

    Email: hcolechu@outtengolden.com

          zdsouza@outtengolden.com

    BY:  HANNAH COLE-CHU, ESQUIRE

         ZARKA SHABIR DSOUZA, ESQUIRE

Page 3

THOMAS BARDEN

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE

Also On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    1540 Broadway - 14th Floor

    New York, New York 10036

    (212) 471-1856

    Email:  gsslotnick@duanemorris.com

    BY:  GREGORY SLOTNICK, ESQUIRE (Via Zoom)

ALSO PRESENT:

    SILVIO FACCHIN, Legal Video Specialist

    Esquire Deposition Solutions

Page 4

THOMAS BARDEN

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  This is the media labeled number one in the video recorded deposition of Thomas Barden in the matter of Keith Fischer, et al., versus Government Employee Insurance Company, doing business as GEICO.

This deposition is being taken in New York City, New York, on August 8th, 2024.  My name is Silvio Facchin.  I am a certified legal video specialist; the court reporter is Kim Brantley, and we're both representing Esquire Deposition Solutions.

We are now going on the record.  The time is 10:00 a.m.

Counsel will state their appearances for the record.

MS. COLE-CHU:  For the plaintiffs, Hannah Cole-Chu, from Outten & Golden, and with me is Zarka DSouza from Outten & Golden as well.

MS. ALBERTY:  And Tiffany Alberty, on behalf of GEICO, along with Gregory Slotnick.

THE LEGAL VIDEO SPECIALIST:  Will the court reporter please swear in the witness.



Case 2:23-cv-02848-SJB-SIL   Document 174-21   Filed 04/24/26   Page 3 of 11 PageID #: 12776

Page 41

THOMAS BARDEN

THE WITNESS:  It really dictated the importance of either the interview or the scene canvas or whatever required us to drive that far.

I'm sure -- I think -- I think my supervisor, Mr. Janik, stated one time don't -- basically limit it to an hour drive, I think something like that, if possible, unless it was extremely important that we see that scene or interview that person in person.  That's an hour one way.

BY MS. ALBERTY:

Q.  Okay.  Prior to COVID -- and I'm going to kind of pinpoint COVID as March of 2020, how much time did you spend in the field?

MS. COLE-CHU:  Objection.

THE WITNESS:  We -- I regularly went out and did interviews with claimants in person, scene canvasses, picked up police reports at police stations, things like that.

So it was a regular basis.  Usually I would say every day.

BY MS. ALBERTY:

Q.  Would you say you would spend more than

Page 42

THOMAS BARDEN

four hours in the field a day?

A.  It was hard to say.

Q.  After COVID, or when COVID started in March of 2020, how much time did you spend in the field?

A.  None.

Q.  All the way up until you left in December of 2020, was there any time that you went back to going into the field?

MS. COLE-CHU:  Objection.

THE WITNESS:  December of 2022.

BY MS. ALBERTY:

Q.  Sorry, that's what I meant, of 2022.  I apologize.

A.  That's okay.

Yes, around November of 2021 we were allowed to go back in the field for certain scene canvasses, anything that didn't have contact with people basically was the first step of returning back to the field.

Q.  For the tasks that you mentioned -- which is background checks, gathering police reports, contacting claimants, doing special media investigations, examinations under oath, scene

Page 43

THOMAS BARDEN

canvassing -- for those tasks, did you have to do that for every single one of your cases?

A.  I would say the majority of those, yes.

The claim or the case that we took would dictate exactly what we needed to do, but those were a lot of the tools or some of the tools that we used during our investigation.

Each claim was different.  Each case was different.

Q.  Was that up to you to make that determination?

MS. COLE-CHU:  Objection.

THE WITNESS:  It was.

BY MS. ALBERTY:

Q.  When did you first get assigned to your own cases outside of shadowing?

A.  January 20, 2020, so after my first three months basically.

Q.  And how many claims did you handle per week?

MS. COLE-CHU:  Objection.

THE WITNESS:  I got roughly eight cases a week.

BY MS. ALBERTY:

Page 44

THOMAS BARDEN

Q.  Did that change or fluctuate?

A.  Yes.

Q.  Were some weeks busier than others?

A.  I mean, obviously there's different claims coming at different times.  They did fluctuate, but not by a whole lot.  That was pretty much steady.

Q.  Was there any time of the year that it tended to be more busy?

A.  I don't recall.  I recall some of the team members I talked to had that opinion.  I never really saw a big difference in caseload.

Q.  Were there other factors that made your workload heavier at times?

A.  Weekends, holidays, obviously if things happened over the weekend.

Mondays were always busier because there were two days of, three days of events being reported that piled up as opposed to a daily basis.

If there was a three- or four-day weekend, obviously things backed up.

Q.  When COVID hit in March of 2020, did that make your workload lighter?

Page 45

THOMAS BARDEN

A.  No.

Q.  Did it stay the same as far as the eight cases per week?

A.  No.

Q.  How do you think COVID changed your caseload?

MS. COLE-CHU:  Objection.

THE WITNESS:  We, shortly after that shutdown period, almost immediately we went from eight cases a week to roughly eight cases a day.

BY MS. ALBERTY:

Q.  Do you know if you're -- strike that.

Do you know if other senior field security investigators had the same workload as you?

A.  As far as I knew, yes.

Q.  And how do you know this?

A.  Because we talked.

Q.  Okay, and I anticipate that it's based upon your specific location in Albany.

Is that right?

MS. COLE-CHU:  Objection.

THE WITNESS:  My caseload was, yes.

Page 46

THOMAS BARDEN

BY MS. ALBERTY:

Q.  Who did you speak to about your and their workload?

A.  Other team members.

Q.  Who were those people?

A.  Craig Costanzo, Brian Crosier.

Q.  Sorry?

A.  Brian Crosier.

Q.  Thank you.

A.  Same guy, Mike Reed, Mike Grey, John McCarthy, Chester Janik, our supervisor.

Q.  Did they all tell you that shortly after the lockdown situation for COVID they were obtaining eight cases a day?

A.  Yes.

Q.  And how did you speak to them?

A.  Phone usually, in person, after we were allowed to meet again in person, which was after, obviously after the COVID lockdown, when we were actually allowed to meet as a group again, we discussed it.

Q.  So this would have been months later, right?

Page 47

THOMAS BARDEN

A.  Yes.

Q.  Did you use text at all?

A.  Text, email.

Q.  Was that through your GEICO email or your personal?

A.  GEICO.

Q.  For all these individuals that you just listed, did they handle different types of cases than you?

MS. COLE-CHU:  Objection.

THE WITNESS:  As far as I knew, we all got the same types of cases.

BY MS. ALBERTY:

Q.  Do you know how any of the cases would have differed amongst the senior field security investigators?

MS. COLE-CHU:  Objection.

THE WITNESS:  I'm sorry, the types of cases?

BY MS. ALBERTY:

Q.  Yes.

A.  How they would differ?

Q.  Yes.

A.  They -- as far as I knew they were all,

Page 48

THOMAS BARDEN

you know, basically the same types of cases.  We all got all different types of cases.  The claims were all different across the state, so.

And during that time period, just to back up when you asked whether it was just within my jurisdiction in the Albany area, after COVID we also did start getting cases from other places in the state.

So, in other words, I would get cases from Syracuse, Buffalo, downstate, kind of all over the place, rather than before that time period it was very regionalized.

So I got my cases in Albany.  The Syracuse guys would get their Syracuse cases.  After COVID we got them from all over the place.

Q.  When after COVID?

A.  Immediately following that.  So from there -- from there on, from after the COVID shutdown until the end of my employment, I would get cases from all over the state.

Q.  Do you know if when you started in January until March that your territory would be expanding because you would be more senior?

MS. COLE-CHU:  Objection.



THOMAS BARDEN
Keith Fischer, et al. vs GEICO

Page 69

THOMAS BARDEN

BY MS. ALBERTY:

Q.   Sure.  Did you understand that your managers were not allowed to tell you that you can't work off the clock?

MS. COLE-CHU:  Objection.

THE WITNESS:  I don't know what they were told.

BY MS. ALBERTY:

Q.   Did you ever go to your local human resource manager regarding any complaints of not receiving pay for your hours worked?

A.   No.

Q.   Did you ever go to corporate human resources regarding any complaints or concerns in which you felt that you weren't getting paid for hours worked?

A.   No.

Q.   Did you understand that you were required to report if anyone asked for you to work off the clock?

MS. COLE-CHU:  Objection.

THE WITNESS:  So, say that again.  If I was -- go ahead.

Page 70

THOMAS BARDEN

BY MS. ALBERTY:

Q.   If you were directed to work off the clock, did you know you had to report that to HR?

MS. COLE-CHU:  Objection.

THE WITNESS:  No.

BY MS. ALBERTY:

Q.   Did you go to your supervisor to complain or raise any concerns that you were not receiving pay for all your hours worked?

A.   Yes, I did.

Q.   And who was that to?

A.   Chester Janik.

Q.   Was he the only one?

A.   It was discussed with Bill Newport also.

Q.   He was present when you were making bill concerns?

MS. COLE-CHU:  Objection.

THE WITNESS:  It was over the Zoom meetings on several occasions.

BY MS. ALBERTY:

Q.   So I'm going to back up just a little bit.

Page 71

THOMAS BARDEN

You were paid hourly, right?

A.   Correct.

Q.   Okay.  Do you remember what your rates of pay were for the years worked?

A.   I don't recall what they were.  They're -- I know they're in the complaint.

Q.   Okay.  Do you remember the last amount that you were receiving before you left in '22?

MS. COLE-CHU:  Objection.

THE WITNESS:  I don't recall offhand, no.

BY MS. ALBERTY:

Q.   Talk to me about how you would record your time.

A.   Honestly, I do not recall how we did that.  I really -- I don't want to make a statement that's untrue, so I really don't recall how we did that, how we recorded every week.

Q.   Okay.  Do you know if it was every week, every -- every day, every hour?

A.   I -- I really don't recall.  I believe it was on a weekly basis.

Q.   Were you eligible for any bonuses or commissions?

Page 72

THOMAS BARDEN

A.   Not as far as hours.  Not as far as I know, no.

Q.   Did you receive raises while you were employed with GEICO?

A.   Yes.

Q.   And do you remember what those raises were?

A.   The amounts, or just --

Q.   The amounts.

A.   I don't recall what the amount -- the amounts were, no.

Q.   Do you remember how frequent?

A.   I recall just one specific that was an across-the-board raise that they gave to everyone.  We were told it was based -- based upon salaries.  Other companies were paying their investigators.  They kind of brought us back up -- brought us back up to status equal to other companies.

Q.   Do you remember receiving a raise every year you were employed with GEICO?

A.   I don't recall, to be honest.

Q.   I just want to make sure I understand.  From what you remember from the one



THOMAS BARDEN
Keith Fischer, et al. vs GEICO

August 08, 2024
93–96

Page 93

THOMAS BARDEN

significantly after March of 2020."

Q.  Do you have any idea how many cases were being assigned to you a week once COVID started?

A.  Like I said, it was we received anywhere from eight to ten cases a day, every day of the week, so, upwards of fifty cases a week.

Q.  But you don't recall the means and mechanisms in which the cases were assigned to you, right?

A.  No.

Q.  Is that correct?

A.  That's correct.

Q.  How many cases were you closing a day?

A.  I would close as many as I could, just that the mere hours that it took just to adopt a case did not give us a lot of time to actually investigate a case.

Q.  Do you know if the new assignment of cases ever provided to you during COVID was because you were given less cases at the inception of your employment after you were done shadowing in January of 2020?

MS. COLE-CHU:  Objection.

Page 94

THOMAS BARDEN

THE WITNESS:  No.  Was not, did not have anything to do with that.

BY MS. ALBERTY:

Q.  Why do you say that?

A.  Because everyone is about the same caseload at that time period, and everyone got the same increase after the pandemic, everyone on the team.  We discussed it.

Q.  Tightening that up, when you say everyone, you're talking about those people indicated on your team, correct?

A.  Yes.

Q.  So, it's your testimony that everyone assigned to your team was getting anywhere between eight to ten additional cases per day once the pandemic started?

A.  Yes.

Q.  And they told you this?

A.  Yes.

Q.  Did they tell you this when the pandemic started, years later when the lawsuit occurred?

MS. COLE-CHU:  Objection.

THE WITNESS:  This was discussed when

Page 95

THOMAS BARDEN

it actually occurred.  Once we started receiving all these extra cases, we were discussing it amongst ourselves that all of a sudden -- the pandemic shutdown happened, all of a sudden our caseload increased dramatically.

BY MS. ALBERTY:

Q.  And I think you said that this communication would have occurred over the phone and via email?

MS. COLE-CHU:  Objection.

THE WITNESS:  Yes.

BY MS. ALBERTY:

Q.  So further in your declaration you state that, "I recall being assigned approximately five to seven new cases a day."

You're saying now you're -- you were getting more cases than that.  Is that right?

A.  I'm using eight as a reference.  My declaration five to seven is accurate.  I'm just using that as a reference point.

If we got eight per week, then we got eight per week.  If we got seven per week, we got seven per -- you know, seven more.

Page 96

THOMAS BARDEN

We went -- we went -- the matrix went from per week to per day.  That's basically what I'm saying.

Q.  So you're saying there is a -- a range of flexibility and fluctuation.  Is that right?

MS. COLE-CHU:  Objection.

THE WITNESS:  Flexibility and fluctuation of what?

BY MS. ALBERTY:

Q.  Of cases.

I'm -- I'm just trying to -- to understand.  You're -- as you sit here today, you're saying eight to ten, but your declaration says five to seven new cases.  So I'm trying to understand how many new cases were you receiving in 2020, because those are two -- those are all different numbers.

A.  I see what you're saying.

My apologies.  I was using eight as just a reference point.  So, my declaration is accurate, five to seven cases per week.

My statement is that we went from five to seven cases, per week, to five to seven cases per day.

THOMAS BARDEN
Keith Fischer, et al. vs GEICO

Page 97

THOMAS BARDEN

Yes, it fluctuated anywhere in that time -- anywhere in between five cases to ten cases. And five to seven is basically an estimate, an average, to the best of my recollection when I made this declaration.

Q. How many overtime hours were you working between January of 2020 then to March of 2020 when you transitioned to a hundred percent remote work because of COVID?

MS. COLE-CHU: Objection.

THE WITNESS: I don't recall working hardly any overtime during that time period.

BY MS. ALBERTY:

Q. On what do you base the estimate starting in March of 2020 when the pandemic occurred that your overtime hours increased to fifty-five to sixty hours per week per your declaration under number eight?

A. I'm sorry, what's the question?

Q. Sure. What do you base that estimate on?

A. Basically three to four hours a day for five days' work.

Q. So you're tacking on three to four

Page 98

THOMAS BARDEN

hours a day, five days a week, for that week --

A. Right.

Q. -- then to accumulate then to fifty-five to sixty hours per week.

Is that right?

A. Correct.

Q. Did you specifically itemize your hours each week when you exceeded forty hours a week?

MS. COLE-CHU: Objection.

THE WITNESS: At the beginning when we were allowed to put in overtime, I actually submitted an overtime request for that time period, up until the time period, the date we were told we were no longer allowed to request overtime.

BY MS. ALBERTY:

Q. And that's that July or October time frame you've previously stated --

A. July or August.

Q. August, my apologies. So July or August of 2020, correct?

A. Correct.

Q. Then during March of 2020, up and until July or August of 2020, were you adequately

Page 99

THOMAS BARDEN

inputting your overtime hours?

MS. COLE-CHU: Objection.

THE WITNESS: From what I recall, yes.

BY MS. ALBERTY:

Q. And were you getting paid for that overtime?

A. I did get paid overtime at that time.

Q. So during the time consideration of March of 2020 to July, August of 2020, you were itemizing your weeks in order to adequately request your overtime hours, correct?

MS. COLE-CHU: Objection.

THE WITNESS: Yes.

BY MS. ALBERTY:

Q. Then starting around July or August of 2020, is that when you stopped itemizing your hours over forty?

MS. COLE-CHU: Objection.

THE WITNESS: That's when I stopped requesting overtime, because I was told.

BY MS. ALBERTY:

Q. Sure. The question's a little different, which is did you stop itemizing; meaning you exceeded the time amount of forty

Page 100

THOMAS BARDEN

hours in July or August of 2020, and you stopped notating that information for your own personal records?

MS. COLE-CHU: Objection.

THE WITNESS: Yes.

BY MS. ALBERTY:

Q. When you were inputting the time from March of 2020 up and until July or August of 2020 for your overtime, did you personally maintain records regarding your overtime?

MS. COLE-CHU: Objection.

THE WITNESS: No.

BY MS. ALBERTY:

Q. But you were plugging that information into the timekeeping system and asking for overtime through your supervisor, correct?

A. Correct.

Q. Okay. So then it's fair to say that from at least July of 2020, August 2020 up and until December of '22 when you left, you were not specifically itemizing your alleged exceeded overtime per week, right?

MS. COLE-CHU: Objection.

THE WITNESS: Correct.



THOMAS BARDEN
Keith Fischer, et al. vs GEICO

Page 101

THOMAS BARDEN

BY MS. ALBERTY:

Q.   Fair to say then you're assuming that from July or August of 2020 up and until December of '22 that you exceeded your forty-hour work week between fifteen to twenty hours, right?

MS. COLE-CHU:  Objection.

THE WITNESS:  I'm not assuming.  I know I did.

BY MS. ALBERTY:

Q.   But you didn't itemize it?

A.   I did not write it down and itemize every minute, no.

Q.   Did you tell anyone that you were working approximately fifty-five to sixty hours a week during that time, and by this time I'm talking around the July time period?

A.   We had meetings with supervisors and discussed the time that we were actually putting into cases, and how much time we were spending working off the clock, yes.

Q.   How -- it's hard, because we're working in a few different time periods, right?

So, for -- let's start COVID 2020,

Page 102

THOMAS BARDEN

March --

A.   Mm-hmm.

Q.   How frequent were meetings occurring?

A.   I believe he -- meaning Mr. Janik -- tried to have a complete team meeting with everyone quarterly.  So every two to three months, he would travel, we would meet.  This is prior to -- obviously prior to March.  After that it would be either Zoom, or a conference call, or things like that.  He would try to do it that way.

Q.   Sure, but still under that time condition of quarterly, regardless of the forum?

A.   I -- I believe, from what I understand, that was his schedule to do that.  That was his requirement to do that, yes.

Q.   Do you recall any of these quarterly meetings being in person?

A.   Not -- at that time, once we were allowed to meet again, yes, then we had meetings in person again.

Q.   Do you remember when that occurred in time?

A.   I don't remember the dates.

They -- I remember traveling to

Page 103

THOMAS BARDEN

Syracuse, Weedsport, which is the other side of Syracuse, having in-person meetings with Mr. Janik and other team members at that time.

Q.   To the best of your recollection do you remember if that happened in '21 or '22?

A.   I don't remember when we were opened back up to do that.

Like I said, it went -- you know, the opening of COVID went in steps, as everybody knows.  We were allowed to go out on the road and do scene canvasses, but not allowed to meet with people.  Once we were allowed to meet with people again, then we started having meetings again.  So -- and I'm not sure what that time frame is, to be honest with you.

Q.   All right, transitioning to number nine, you state, "GEICO returned to limited field operations in or about the November 2021 time frame."

What does that mean?  What does "limited field operations" mean?

A.   Just -- just, like I just said, we were allowed to do scene canvasses, you know, things that didn't take interaction with public

Page 104

THOMAS BARDEN

basically.

We weren't -- we still weren't allowed to do interviews in person with claimants, things like that, but we were allowed to at least go on the road and do scene canvasses.

I think we were allowed to go to certain police agencies that were allowed -- allowing us to come there, pick up police reports, and that depended on the areas, things like that, so.

Q.   Did you ever go back to the one hundred percent of being able to do your position like it was in 2020, January 2020?

A.   It did expand as we went through.  We were allowed to meet with -- with claimants and interview them in person again.  So I am guessing, yeah, probably.

I never went back to meeting them in their homes.  I always met them at a remote location, but -- and I think most everybody else did that same thing.  But, yeah, it eventually got back to where we were meeting people in person, doing in-person interviews.

We never went back as far as when I



THOMAS BARDEN
Keith Fischer, et al. vs GEICO

August 08, 2024
105–108

Page 105

THOMAS BARDEN

first there to doing examinations under oath in person. We did that all by -- by Zoom calls entirely.

Q. And presumably, based off what you've been saying, were you driving then less in 2022, for example, because you weren't doing in-person under oath examinations, things like that?

A. Not so much the -- the EUOs -- we call them the examinations under oath -- but we were still -- I was still traveling. 2022 I was still traveling around doing in-person interviews, scene canvases, and police agencies, and things like that, so.

It was more back to what we were doing before the pandemic hit.

Q. Looking back at your declaration, so under number ten you state that, "From March of 2020 to December of '22 my regular hours worked were approximately fifty-five to sixty hours per week.

"My last regular pay rate was $32.36 per hour. During most of this time I entered only 38 hours -- point seventy-five hours in the timekeeping system, and I was only paid then for

Page 106

THOMAS BARDEN

the 38.75 hours, identifying $1,253.95 per week."

On what do you base the estimate that your regular working hours were then the fifty-five to sixty per week?

MS. COLE-CHU: Objection.

THE WITNESS: What was the basis of my conclusion in that?

BY MS. ALBERTY:

Q. Yes.

A. I was still working the same amount of hours the entire time.

Q. In your custom and practice, aside from the timekeeping system that GEICO utilized for you to input your hours, would you have input your hours anywhere else in GEICO software?

A. Not that I recall.

Q. Why were you only entering the 38.75 hours in the timekeeping system during that time?

A. Because that's the hours that I worked minus the overtime, which I was not allowed to submit per the directive back in July or August of 2020.

Q. But you were submitting overtime hours from March to then July or August of 2020?

Page 107

THOMAS BARDEN

A. Yes.

Q. Transitioning to number eleven on page three of the declaration," From May of 2020 to August of 2020 GEICO permitted me to submit overtime hours for approval but required me to document for reasons of overtime, case information, and specific tasks that I needed to do on each case."

How did you learn that you couldn't put your overtime hours?

MS. COLE-CHU: Objection.

THE WITNESS: How did I learn that I was not allowed to?

BY MS. ALBERTY:

Q. No, that you could.

A. I talked with my supervisor that basically told me, "If you're working extra hours, put in for it. Document it."

Q. Were there specific hard and fast lines of what you needed to input for your overtime hours?

A. Like the reasons?

Q. Yes.

A. I don't know if there were certain

Page 108

THOMAS BARDEN

reasons. I know that they did not want you to put in overtime for doing like writing the report itself, like sitting at your desk writing the report. It had to be some specific reason that a -- some task that needed be -- needed to be accomplished, other than that, even though that was a majority of our workload.

Q. Sure. For the basis that you needed the overtime hours, was that done over the phone with your supervisor, or did that specifically have to be written and submitted?

A. I don't recall.

Q. Okay. So in remaining paragraph eleven, page four, it states, "In May of 2020 my supervisor informed me and other special investigators that starting August of 2020 GEICO would no longer permit us to request overtime and that we could only work the 7.75 hours per day.

"However, GEICO did not reduce our caseloads and I still had to work the same number of hours to keep up with my cases.

"Accordingly, I entered 7.75 hours per day, five days a week, regardless of how many hours I actually worked."



800.211.DEPO (3376)
EsquireSolutions.com

THOMAS BARDEN                                                    August 08, 2024
Keith Fischer, et al. vs GEICO                                        233–236

**Page 233**

THOMAS BARDEN

Q.  But again in the three plus years you worked at GEICO, you don't remember any time when this denial of a raise occurred?

A.  Yeah, I'm not sure exactly what the dates were.

MS. ALBERTY:  Okay, I don't have any further questions.

THE COURT REPORTER:  Is there read and sign in this?  Will he read and sign?

MS. COLE-CHU:  Yes, please.

THE LEGAL VIDEO SPECIALIST:  All right. We are now going off the record.  The time is 4:16 p.m.  This is the end of the media labeled number six concluding this video deposition.

(Whereupon at 4:16 p.m. the deposition of Thomas Barden concluded.)

**Page 234**

THOMAS BARDEN

I N D E X

DEPOSITION OF THOMAS BARDEN

EXAMINATION BY:                                    PAGE:

Ms. Alberty                                        5, 231

Ms. Cole-Chu                                       225

INDEX OF DEPOSITION EXHIBITS:

BARDEN EXHIBITS:                                    PAGE:

Barden Exhibit 1. Notice of Deposition    12

Barden Exhibit 2. Employee handbook       59

Barden Exhibit 3. Training history log    63

Barden Exhibit 4. Interrogatories and declaration                                 74

Barden Exhibit 5. Answers to Interrogatories                                125

Barden Exhibit 6. Second Amended Collective and Class Action Complaint    191

(Exhibits attached to original transcript.)

**Page 235**

THOMAS BARDEN
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer, et al. vs. GEICO
Dep. Date: August 8, 2024
Deponent:  Thomas Barden

CORRECTIONS:
Pg.  Ln.  Now Reads   Should Read   Reason
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2024
_____
(Notary Public)

MY COMMISSION EXPIRES: _____

**Page 236**

THOMAS BARDEN

ACKNOWLEDGEMENT OF WITNESS

I, THOMAS BARDEN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____
(DATE)                (SIGNATURE)



Page 237

                        THOMAS BARDEN
                   C E R T I F I C A T E
STATE OF NEW YORK    )
                     : Ss.
COUNTY OF NEW YORK   )

          I, Kim M. Brantley, Shorthand
Reporter, and Notary Public within and for the
State of New York, do hereby certify:

          That THOMAS BARDEN, the witness whose
deposition is hereinbefore set forth, was duly
sworn by me and that such deposition is a true
record of the testimony given by the witness.

          I further certify that I am not related
to any of the parties to this action by blood or
marriage, and that I am in no way interested in
the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set
my hand this 11th day of August, 2024.

          _____
                    Kim M. Brantley


My Commission expires May 31, 2026.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com