# Exhibit S

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL          )
O'SULLIVAN, JOHN MOESER, LOUIS  )
PIA, THOMAS BARDEN, CONSTANCE   )
MANGAN, and CHARISE JONES,      )
individually and on behalf of all )
others similarly situated,      )
                                )
          Plaintiffs,           )
                                ) No. 2:23-cv-2848
   -v-                          )
                                )
GOVERNMENT EMPLOYEES INSURANCE  )
COMPANY d/b/a GEICO,            )
                                )
          Defendant.            )

Wednesday, January 15, 2025

Oral videoconference deposition of ALBERT BRUST, held pursuant to Notice via Zoom with all parties participating remotely, commencing at 9:00 a.m. Central Time, on the above date, before Andrew R. Pitts, Certified Shorthand Reporter.

Andrew R. Pitts, CSR, RPR
License No.:  084-4575
Esquire Deposition Solutions

## Page 2

REMOTE APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP
685 Third Avenue - 25th Floor
New York, New York  10017
(347) 390-2121
Email: jmcallister@outtengolden.com
BY:   JARRON D. McALLISTER, ESQUIRE

On behalf of the Defendant GEICO:

DUANE MORRIS, LLP
190 South LaSalle Street - Suite 3700
Chicago, Illinois  60603-3433
(312) 499-6779
Email:  gtsonis@duanemorris.com
BY:   GREGORY TSONIS, ESQUIRE

ALSO PRESENT:

BRENT JORDAN, CLVS, Legal Videographer.

## Page 3

I N D E X

ALBERT BRUST                              EXAMINATION
    BY MR. TSONIS                          5, 286
    BY MR. McALLISTER                      278

E X H I B I T S

BRUST          DESCRIPTION                PAGE

Exhibit 1    Compensation Contents,       104
             G000028-43

Exhibit 2    E-mails, G011080-81          148
Exhibit 3    E-mails, G011431-432         151
Exhibit 4    E-mails, G011598-599         155
Exhibit 5    E-mails, G017819-820         161
Exhibit 6    7/19/20 e-mail, G017819      163
Exhibit 7    E-mails, G012091-92          164
Exhibit 8    Performance appraisal,       206
             G006735-745

Exhibit 9    Workday profile, G005126-163  218
             (CONFIDENTIAL)

Exhibit 10   Associate of the Month       236
             nomination, G015733-737

Exhibit 11   Opt-In Plaintiff Responses   244
Exhibit 12   Human Resource Associate     261
             Handbook, G000191-235

## Page 4

(Whereupon, the following proceedings were taken via videoconference.)

THE VIDEOGRAPHER:  Okay.  We are now on the record.  The time is 9:02 a.m. Central Time on January 15th, 2025.  This begins the videoconference deposition of Albert Brust taken in the matter of Keith Fischer, et al., v. Government Employees Insurance Company, d/b/a Geico.  This case is filed in the United States District Court for the Eastern District of New York, Case No. 2:23-CIV-2848.

My name is Brent Jordan.  I am the certified legal videographer for the day.  The court reporter is Andrew Pitts.  We are representing Esquire Deposition Solutions.

Will Counsel present please identify yourself and state whom you represent.

MR. McALLISTER:  Good morning.  I am Jarron McAllister, and I am an attorney from Outten & Golden and I am representing Mr. Brust today.

MR. TSONIS:  Gregory Tsonis with Duane Morris, LLP, representing the Defendant Geico.

COURT REPORTER:  Okay.  Mr. Brust --

THE WITNESS:  Yeah, Al Brust.  I was an employee of Geico.  I no longer am.

COURT REPORTER:  Great.  Okay.  Sir, please



ALBERT BRUST
KEITH FISCHER v GEICO

Page 81

Q.   Okay.  With respect to that process, I think you referenced prior to that change that you would often work through lunch?

A.   Yeah, I would sit at my desk and eat.

Q.   Would you sit at your desk and eat while working or just sit at your desk and eat?

A.   Sit, I would eat while working.

Q.   Okay.  And after that change, you then had to log out of Workday and then log back in at the end of your meal period?

A.   Yes.

Q.   All right.  Are you -- well, were you working during the time period that you were logged out of Workday?

A.   We were not -- we were not supposed to.

Q.   Right.  I guess I'm asking a slightly different question.

Are you contending that you were actually working during the period that you logged yourself out of Workday each day?

A.   No -- well, I'll just say when we -- when the signing in and out started, we were told, "When you sign out for lunch, do not work."

Q.   Well, again, did you -- so knowing that that was a -- you were instructed not to work on your

Page 82

lunch period, did you actually work on your lunch period?

A.   You tried not to, but again, you know, when you have, you know, you know, a policyholder that you've been trying to get ahold of, and then they finally call you back and you're on your lunch, it's not easy to just sit there and watch the phone ring. So there were times I would pick up the phone and sign back in and then sign back out.

Q.   Right.  I guess I'm asking -- I appreciate that, you know, saying that you signed back in for the time period that you contacted the policyholder and then signed back out to finish your meal period; is that what you're saying?

A.   Yes.

Q.   Right.  So aside from those scenarios, I guess, where the time records that Geico has shown you as signed out for lunch during a given work day, did you work during that time that you logged yourself off of Workday?

A.   I would say that I have done work during my lunch time, and there were times I did not.  So I don't -- I don't know how often I worked, but sometimes it was just unavoidable.

Q.   Well, when you say unavoidable, I guess you

Page 83

could have logged yourself back into Workday, right?

A.   True, but it's not always -- you know, it was a system too that I've never had to do that before, and I would forget.  And if I would get a phone call, my intention would be to, you know, log out and then log back in, but sometimes I would forget.

You know, it's -- it's -- the case -- it was -- it was a lot to handle.  It was, you know, phone calls, e-mails, and, you know, with the workload, you know, it was always a race against the clock, and you did your best.

But to answer your question, I did not always -- there were times that when I was signed out, I did work.  I will say it wasn't like I was -- like, in my normal course of work, it may have been just finishing up typing a report and then I would go get my sandwich, or -- or as I'm finishing up my lunch, I may look up a number or two just so when I sign back in, I can hit the ground running, you know.

So it wasn't sign out for lunch and I'm going to keep working with total disregard for what they were saying because we were told that it's going to be a problem if they see us working during the lunch.  But sometimes it just wasn't -- as far as case

Page 84

management and doing the right thing for the policyholder, you know, you -- they would call four or five times in a row, and I know if I'm -- if I'm the -- you know, if I have a policy with Geico, I would -- I would hope somebody would answer my phone call.

So it was kind of just trying, like, to do the right thing for the policyholder, but again, it wasn't like the norm.  I didn't always work through lunch.

Q.   Okay.  And no supervisor or anyone at Geico instructed you, "Hey, you have to take that policyholder call and work on your lunch"?

A.   No, I was never instructed.  Our -- our -- we voiced our concerns on how it kind of happens, and they would say, "We understand, but you're going to get yourself in trouble."

And, again, to the best -- I would -- I would say most of the time I was signed on, I didn't -- didn't work during lunch.  It was most of the time, I did not, but all -- I didn't do it all the time.

Again, it's been a while, I don't recall, but especially towards the end, it was -- got a little -- I was definitely not working because the --



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
85–88

Page 85

you know, they could see when you're working, when you -- if you send them the case. It's time stamped, you know. And I'm not sure how they figured it out, but they were like, "You can't be working on your lunch time," you know. I don't know if I answered your question.

Q. So how long of a meal period did you get?

A. Oh, I don't re- -- what did we get? I think like 45 minutes. I don't think it was a full hour. I don't remember, but I think it was approximately 45 minutes.

Q. And that was not paid time?

A. Not paid time.

Q. Okay. So when you would work on your lunch, you would be doing that work either out in the field or in your home?

A. Yeah, if I was in the field and then I had lunch, I would sign out.

Q. Right. But if you sign out of Workday, and you continue actually working, I guess, you would agree that no one at Geico would know that you were actually working, right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. They could find out. I don't know if they

Page 86

were monitoring it and they just -- they know when we log into systems. They know when they log out. They know when we, you know, sign into SICM. They know when we generate a report. It's time stamped. So, again, I don't know if they were looking into that.

I didn't work often enough where I thought, like -- you know, it wasn't a normal practice, so I wasn't really concerned about myself, you know, if I had to work an extra minute or start, you know, if ten minutes before my lunch was up and somebody called, I would answer the phone, you know. There were -- they were pretty -- like, again, they did not want us working on our -- our lunch.

Q. Okay. And prior to the change in timekeeping that you talked about, so talking about the period where you would just enter in your hours worked either on a daily or weekly basis -- does that make sense?

A. I'm sorry, say that again?

Q. Yeah. I want to talk to you about the time period where you would enter in your time to Workday the time or hours worked on a daily basis rather than the time that you would actually be logged in and out of Workday.

A. Right. Okay.

Page 87

Q. All right. During that time period, you similarly were working either in your home or out in the field aside from training, right?

A. Yes.

Q. All right. And during those time periods, you would agree that if you were working on your lunch that there was no way for a supervisor or anyone at Geico to know that you were actually working on your lunch, right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. The only way they would know is if they asked me because -- you know, when did I take lunch, because it wasn't recorded, but nobody's ever asked me, "When did you take lunch, and did you work?"

But back then, it wasn't an issue. We -- everybody worked -- if I was in the field and I had an hour ride home, I had no problem eating my food in the car and I'd come home and work.

And -- and I just didn't understand with Geico because when they did this, it actually hurt them because it took 45 minutes away from people that were willing to work because they were trying to, again, personal pride, do the right thing, you know, satisfy the metrics.

Page 88

So the -- the thing that was -- you know, I could be in the field for four hours, but because I'm on the phone, I didn't have time for a meal, but when I got home, now I got to take a meal.

So I was in the field for four hours driving, and now I have to take a meal. So now it's like five hours of my day is gone. It's just like -- and I would have been more than happy to -- again, coming from where I came from, again, the police department, meal was a privilege. You ate when you can, you worked, and you got the job done.

And, you know, I voiced my opinion. I was like, "This is -- this is not the right way to do it," because, you know, it just -- it just took an hour away from us. You know, we -- and they were strict. So it made it more difficult for me. I know that.

BY MR. TSONIS:

Q. Right. So, I guess, going back to my question though, Geico expected you to take a 45-minute unpaid meal period each day?

A. Yes.

Q. All right. And Geico expected that during that meal period that you would not be performing work?

A. Yes.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
109–112

Page 109

the last paragraph above that that starts, "All non-exempt associates"; do you see that?

A. Yeah, I see that.

Q. Okay. And the first sentence reads, "All non-exempt associates are required to accurately record their hours worked and absences taken."

Did I read that right?

A. Yes.

Q. All right. Now, as a non-exempt associate, you understood that you were required to accurately record your hours worked?

A. Yes.

Q. All right. And you, as a non-exempt associate, you were also required to accurately record any absences taken?

A. Yes.

Q. All right. And the second sentence deals with all exempt associates are required to accurately record their absences taken"; do you see that?

A. Yes.

Q. Now, the following sentence after that says, "A non-exempt associate who feels he/she did not receive pay for all his/her hours worked, and an exempt or salaried non-exempt associate who feels his or her pay incorrectly reflects a deduction for an

Page 110

absence should contact his/her supervisor, local human resources manager, or corporate human resources."

Do you see that?

A. Yes.

Q. All right. Now, as a non-exempt associate, did you ever contact your supervisor and explain that you believed that you didn't receive pay for all the hours that you worked?

A. I have contacted -- no, so what's the -- can you repeat the question?

Q. Yeah. As a non-exempt associate, did you ever contact your supervisor and inform him or her that your pay did not reflect the hours that you worked?

A. I have. If I worked past the -- you know, the eight hours and I felt I was entitled, I would ask, but I was told there is no overtime.

Q. All right. Mr. Brust, I'm -- I'm asking you a very specific question.

A. Right.

Q. Did you ever contact your supervisor and inform him or her that you didn't receive pay for all of the hours you worked?

A. Yes.

Q. When did you contact your supervisor?

Page 111

A. I don't -- I can't recall the specific date, but I have discussed with my supervisor that because of the workload, I'm working through lunch, I'm working after hours, I'm working on the weekends.

Q. Which supervisor or supervisors did you make that report to?

A. Gerry Cassagne, and towards the end of my time with Geico, I was supervised by Toni D'Agata.

Q. Let's focus on Mr. Cassagne for a second.

When did you inform Mr. Cassagne of what you just testified to, that you were working additional hours?

A. Specific date and time, I'm not going to be able to give you that, but it was, you know, over a period of time where, you know, I would discuss with Gerry that to get my work done, I'm working past the eight hours, and could we get overtime. And he told me he will bring it up at the next meeting with Bill. And then every meeting, it was the same answer, that he can't authorize the overtime.

Q. How many instances are you saying that you informed Mr. Cassagne of that?

A. I can't -- I mean, it was over a course of years it was discussed . It was -- it was a constant, you know, constantly brought up, and again, Gerry

Page 112

would say, "Do the best you can."

Q. Right. I want to be clear, Mr. Brust.

When you're talking about conversations with Jerry Cassagne --

A. Right.

Q. -- are you talking about general discussions about workload?

A. No, I'm talking about it -- I specifically discussed overtime with Gerry Cassagne on numerous occasions, and I don't particularly know -- you know, I couldn't even tell you if it was -- you know, it could have been two times in a month, it may not be that month, it maybe could be two days in a row, three days in a row. It depends, you know, if the timing of it is right or -- you know, or, you know, it's just it was brought up on a -- I would say on a regular basis.

Q. Okay. So your testimony is that you would have discussions with Gerry Cassagne on a regular basis regarding the availability of overtime; is that --

A. Correct.

Q. Okay. And what would you say specifically in those conversations with Mr. Cassagne?

A. I would ask, "Are we allowed to put in for overtime?" And he, in return, would say, "Don't do



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
125–128

Page 125

because of a struggle or just their style.

BY MR. TSONIS:

Q.   All right.  I mean, is it common or possible that new investigator, you know, might think, okay, I have to do all these things on this case when a supervisor may look at it and say, you know, "You proved -- you had enough to close the case with a progress disposition, you know, two days ago, or a day ago," right?  That's possible?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   It's -- I'm sure it's possible.

BY MR. TSONIS:

Q.   Sure.  So I guess when you were having these conversations with Mr. Cassagne asking about overtime, was part of the discussion with Gerry Cassagne just whether -- how productive you were being with your cases?

A.   He would ask, "How's it going?  Are you struggling?  Are you okay?"

And it was never about the -- the -- the investigation itself; it was just the -- the amount of stuff that needed to be done.  It was just more -- it -- the -- the enemy was time, you know.  That was -- you just didn't have the time.

Page 126

Q.   Right.  So when you would have a conversation with Gerry Cassagne regarding overtime, you wouldn't tell Gerry Cassagne, "I'm working off the clock"; is that right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Gerry, he -- he -- I didn't have to tell him.  He -- he knew when he signed up for my cases.  They're time stamped.  He would see a -- you know, a report time stamped at 7:00 at night.  It's right there.  It's right in the report.

BY MR. TSONIS:

Q.   Okay.  So -- but to go back to my question, you didn't actually tell Gerry Cassagne at any point that you were working off the clock?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yes, he knew I was working off the clock.

BY MR. TSONIS:

Q.   I didn't ask if you believe he knew.  We'll get to that.

A.   Oh.

Q.   I'm asking a different question.

Did you ever actually tell Gerry Cassagne that you were working off the clock?

Page 127

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yes.

BY MR. TSONIS:

Q.   When did you tell Gerry Cassagne you were working off the clock?

A.   Over a course of time, I -- you know, throughout my time with Geico.

Q.   You're filing a lawsuit, you joined a lawsuit here about -- with Geico, and I'll entitled to your best testimony here today.

A.   Right.

Q.   So when specifically did you --

A.   So --

Q.   -- tell Gerry Cassagne that you were working off the clock?

A.   When -- when I worked with Geico and I spoke to Gerry Cassagne and told him specifically I was working off the clock, told him I needed overtime -- well, I was told I was denied overtime.  During that time, I was not thinking lawsuit.  I was not preparing to litigate.

So I was not taking notes on, "Oh, Gerry Cassagne said no today."  You know?  So I don't have any records.  So nothing that really could refresh my

Page 128

recollection.  And, again, I worked with them for almost five years, and it's been over a year since I worked with them.

So it's -- again, it's throughout the five years, you know, throughout, you know, my tenure with Geico.  I don't have a specific date or time, but I can tell you I do recall on numerous occasions making a point or a stand as far as if we don't work extra, we're -- you know, I cannot satisfy these metrics.  I don't know -- I don't have, you know -- again, I wasn't preparing to be here, you know.

Q.   I understand the lawsuit wasn't -- didn't exist then, but we are -- Geico is entitled to know the specifics of what you said and when you said it for what you're contending here today, okay?  Does that make sense?

A.   Sure.  Of course.

Q.   So when you had conversations with Gerry Cassagne, what specifically did you say regarding off-the-clock work that you are claiming now?

MR. McALLISTER:  Objection.  I think -- Greg, I think Al has been explaining his experiences with Gerry and his conversations, and he has answered this question multiple ways.  I think maybe if we can move past this question, that would be appreciated.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
129–132

Page 129

MR. TSONIS: Your objection's noted, although speaking objections are not permitted. So I'll ask the witness the question again.

BY MR. TSONIS:

Q. What specifically did you say to Gerry Cassagne during these conversations regarding off-the-clock work?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I spoke to Gerry in sum and substance that I need overtime, or I'm not going to be able to satisfy the metrics. I asked him on a regular basis, and he said, "I've spoken to Bill, and Bill will try." However, Bill, unless it was a cat case, it was very, very rare, and I think I was only maybe on two separate occasions where it may be less than a week or two that we were able to use overtime specifically, specifically for the cases that we were working.

BY MR. TSONIS:

Q. So in those conversations with Gerry Cassagne, you didn't actually tell him, "I'm working off the clock." You were asking about overtime; is that accurate?

A. No.

MR. McALLISTER: Objection.

Page 130

BY THE WITNESS:

A. I did tell him I was working off the clock because I told him that I will -- I have to do what I have to do so I'm not, you know, in the bottom quartile. So I told -- he knew, he knew I worked weekends, he knew I worked after hours. He knew -- I would discuss with -- I'm a -- could I let my dog out?

THE WITNESS: I'm sorry. I'm going to kill this dog. I apologize. The dog is killing me. You're killing me, dog. Yeah, get out. Thank you.

BY THE WITNESS:

A. So, sorry, off the clock, I could -- I could specifically -- myself and Gerry are very big hockey fans, and we both play hockey, but I would work in between periods. I told him I would do work. He knows hockey games generally start at 7:30 at night. So indirectly and directly, he's aware that I was working off the clock because in between periods, as soon as the period would end, I would do as many computer checks as I can. So he knew that. Again, I --

BY MR. TSONIS:

Q. How many -- how many conversations did you have with Gerry Cassagne where you specifically told

Page 131

him, "I'm working off the clock"?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I can't -- I can't put a number on that, but it's many. Over the course of four and a half years, you know, again, it's many times, could be 50 to 100. I don't know. The conversation was a -- a constant, especially when, you know, the Monday numbers would come out, and they would say, you know, "Guys aren't meeting your, you know, metrics."

And I said, "Well, we're never going to meet it in eight hours. It's not happening. We need more hours to work." So it was -- it was -- I was very vocal when it came to that.

And, again, I take pride in what I do, and I always try to do the right thing for the policyholder. So, you know, again, my supervisors were aware and, you know, I did work, you know, off the clock, but -- and they were aware of it. Makes -- and I -- and I spoke to them numerous times over the course of five years. Specific dates, no, I didn't keep record of it because I never expected to be involved in a lawsuit.

BY MR. TSONIS:

Q. But it's your testimony here today that

Page 132

50 to 100 times, you talked to Gerry Cassagne and used the words, "I'm working off the clock"?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I -- I never used that term ever, "I'm working off the clock." I would say, "I'm working on my own time. I'm tired of working on my own time."

Unless you're working on your own time you're not getting this done. You know, if somebody's at the top of the ratings, everybody knows why they're at the top of the ratings because you can go on the computer at 10:00 at night and see the light's green. Gerry knows that. Everybody knows that.

Everybody knew everybody was working past the time, but like I said, everyone did the best they can, and we were just trying to do the right thing, but absolutely I had conversations with Gerry numerous times. I wouldn't use off the clock; I had said, you know, on my own time. On my own time. He would ask me, "How was your weekend?" And I would be like, "Oh, it's great. I worked five hours." You know? They knew.

BY MR. TSONIS:

Q. And those conversations with Gerry, were some of those conversations ones where you didn't



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
133–136

Page 133

reference on my own time but really just talking about workload generally?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I'm sorry, say that again?

BY MR. TSONIS:

Q. Yeah, were some of those -- was every single one of those conversations, did it include a reference to your own time, as you said, or were some of those conversations just about workload generally?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. No, we -- it got to the point where, you were, you know, I was beating a dead horse, like it wasn't changing. So every time I spoke to Gerry, you know, I didn't complain about the workload. I didn't complain about overtime. He -- he saw the cases. He -- he -- he knew. He would say, "Hey, I -- you know, how are you doing? You're falling behind."

"Well, I'm doing the best I can."

And he goes, "That's all you can do."

You know, and -- you know, again, he signs off on our -- you know, if he comes in on Monday morning, and there's ten reports in his -- his queue, he knows we did it on the weekend. You know, we

Page 134

didn't have to have that conversation. Everything's time stamped.

You know, and you can't -- and it got to the point where, you know, he's the supervisor. He doesn't want to hear it. You know? He knows the complaints. After a while, it's like he knows.

BY MR. TSONIS:

Q. So to be clear, when you would say things like this to Gerry Cassagne, he never instructed you to work off the clock?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. No, he never told me to walk -- work off the clock. He said, "Do the best you can."

BY MR. TSONIS:

Q. Okay. So going back to the Geico policy we were looking at, if I understand your -- your testimony, you never told Gerry Cassagne specifically, "My pay doesn't reflect all the hours that I worked"; is that accurate?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Yes.

BY MR. TSONIS:

Q. Now, did you ever complain to your local

Page 135

human resources manager that your pay did not -- that your pay --

A. No.

Q. -- did not reflect -- sorry, let me -- let me rephrase my question.

Did you ever notify your local human resources manager that you did not -- you felt you didn't receive pay for all of the hours that you actually worked?

A. No.

Q. As a Geico employee, you knew how to contact your local human resources manager if you needed to?

A. I'm sure I could figure that out, yes.

Q. Okay. And similarly, you never informed corporate human resources that you didn't receive pay for all hours that you actually worked?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. That's correct.

BY MR. TSONIS:

Q. Okay. And similarly, you were aware that you -- of how you could contact corporate human resources?

MR. McALLISTER: Objection.

Page 136

BY THE WITNESS:

A. Yes.

BY MR. TSONIS:

Q. Are you aware that Geico maintained a Berkshire Hathaway ethics hotline?

A. That I'm not aware of.

Q. Okay. So your -- you just don't know one way or the other if an ethics hotline --

A. And it's not anything -- I've never even heard of an ethics hotline, no.

Q. Okay. So we talked about Gerry Cassagne. What -- when -- or strike that.

Did you ever notify Toni D'Agata that you felt you did not receive pay for all the hours you actually worked?

A. I notified Toni D'Agata that, you know, same as Gerry Cassagne, I requested it, I was told overtime is not available, and, you know, throughout our discussions over a period of time, I did make it known that I was working on my own time.

Q. How did you make it known you were working on your own time?

A. I told her. I said I work about two hours extra every day and I work about two hours on a Saturday and two hours on a Sunday.



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
137–140

Page 137

Q. When did you have that conversation with Toni D'Agata?

A. I don't have any record of that. I don't have specific dates, but, I mean, Toni was my supervisor for maybe the last six months of my time with Geico, so, you know -- or around that time, you know, when I left Geico, towards the end, that --

Q. How many times did you have that kind of conversation with Toni D'Agata?

A. I would -- it wasn't many with her. Again, it was just she wasn't a supervisor very long, but, you know, I -- I do recall in the -- my initial conversation and her taking, you know, over as my supervisor, we discussed it, and I was -- and she was well aware of our complaints.

And, again, I -- you know, I've dealt with supers -- you know, I've had supervisors my entire life. Once they know, they don't want to hear it over and over and over. You know, it was known.

I did mention it, I would say, you know, approximately about, you know, anywhere between five to ten times in the six months that we just need overtime. We need overtime or work on your own time.

Q. What do you mean by or work on your own time?

Page 138

A. Again, for me to get the job done, and again, your metrics, again, there's always the -- if your metrics aren't to their standards, and again, if they determine it's at the bottom quartile, there's always that risk of getting laid off or not getting raises.

So if other people -- and, again, it really has nothing to do with what other people are doing, you know. I did it because I felt it was the right thing to do. Again, as far as me being an investigator, you know, a retired detective, I took a lot of pride in my investigations. I didn't like to do shoddy work, and I -- you know, I did what was necessary. And if I worked on my own time, and in the police department, I mean, we had a cap on overtime, you know. You worked on your own time sometimes, you know. You did the job.

Q. Do you have an understanding as to whether overtime was ever approved for any investigator?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Overtime, I do recall overtime being approved, and I was -- I was very happy. I was -- you know, I was like, "Finally," but it only lasted, like, two weeks. You know? It came and went really fast.

Page 139

And then there was another time it started again, and that, I think, lasted like maybe three days. It was even less and besides the cat overtime, but that was for cat cases. So now we were catching cat cases and our regular cases, but the overtime was only for the cat cases.

BY MR. TSONIS:

Q. Right. So let me distinguish for a second. There was a period of time, I think you're testifying, where overtime hours were pre-approved for investigators to use?

A. Yes.

Q. For example, in or around June of 2020, was there a period of time where every investigator was authorized to use up to ten hours of overtime per workweek?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I don't have anything to, you know, refresh my recollection as to that. You know, did -- you know, you're referring to June, so I'm going to assume that you have something that -- that -- in that time frame, but I do recall we had, like, ten -- we could do ten hours a week. I do recall that.

Page 140

BY MR. TSONIS:

Q. All right. Excuse me. And similarly, do you recall a period in July of 2020 where you -- it was communicated that you could work up to ten hours of overtime per workweek?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I do -- I do recall another time, if it was July, I don't -- I don't recall what month it was, but I do recall, I stated before you made those comments before June, July, I do recall it was like two separate times, you know, that we were all authorized, but it was not very long.

BY MR. TSONIS:

Q. Okay. Prior to or setting aside that -- that preauthorized overtime, was it your understanding that as an investigator, you could request overtime and needed to have overtime approved before you could work it?

A. You were advised to ask your supervisor for overtime before you did it.

Q. Okay. So you understood that the policy was if you felt there was a business need for overtime that you could request it from your supervisor?

MR. McALLISTER: Objection.



Page 141

BY THE WITNESS:

A.   That's correct.

BY MR. TSONIS:

Q.   Okay.  If you, for example, you know, got stuck in traffic or had an EUO that ran long, and you worked two extra hours on Monday, one option would be cutting two hours from a different shift, right?

A.   That, that wasn't really exposed to until, like, the end of my -- I didn't hear about that until, like, maybe my last few months.  I forget what they called it, but, like, you could if you worked, like I said, an extra two hours, you could end -- on Thursday, you could work two hours less on Friday.

But it wasn't about the -- you know, you didn't -- you -- even if you did work an extra two hours, you wouldn't want to work less than hours on a Friday because you had too much work, you know.  It's just -- it was all about time, you know.

It -- and, again, you know, have I worked extra in -- no, I wouldn't take two hours less because that actually hurts me in a way because I still have work to do.

Q.   Right.  But you had an understanding, or is your understanding of the concept that, you know, if you work two hours more one day, you can cut two hours

Page 142

from a subsequent shift, like flexing your time?

A.   That's what it's called, flex time.  Yeah, so flex time, I didn't become aware of that until probably -- it was probably maybe -- maybe my last year in Geico, and I was working two hours every -- extra every day, so that means I would have off every Friday if I -- if I did that, you know?

So I didn't really pay attention to the flex time.  It didn't -- it didn't work for me because I'm working extra so I could do the work.  I'm not -- I wasn't working extra so I could take a day off.

Q.   Okay.  And going back to the conversation with your supervisors, Toni D'Agata and Gerry Cassagne, you never told them how many hours extra you're working that you're claiming now, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   I have told Gerry that I do about two hours every day and on the weekends I would do about two hours on Saturday, two hours on Friday.  You know, it was between four to five hours on the weekend.  He knew.  I definitely told him.

BY MR. TSONIS:

Q.   All right.  So you're claiming that you told Gerry Cassagne specifically how much time you

Page 143

were working and not putting into Workday?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yes.  Yes.

BY MR. TSONIS:

Q.   And was that time that you're just referencing the amount of time that you spent consistent throughout your time at Geico?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   I will say that it was not every weekend, but I would say most of my weekends were spent working at some point.

BY MR. TSONIS:

Q.   Do you have an understanding of how much time any other investigator spent working on any given workweek?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   I did not have a conversation where I specifically spoke about time, but I was aware that all investigators were at some point -- and, again, not every weekend, but have worked on the -- on the weekends.

Page 144

BY MR. TSONIS:

Q.   All right.  You're making pretty broad statement that all investigators are working on the weekend.

So who do you mean by all investigators?

A.   You know, I don't remember all of them, but I -- like I said, did they work every day weekend?  But I know for a fact, and I know you're going to say it's broad, but there wasn't too many of us, and we've had the conversation many times that unless you work on the weekends, you're not going to -- you're not going to be able to keep up.

Again, I don't know how much they did, but without a doubt -- and I know, like, it's, you know, nobody -- when you're testifying, they don't like absolutes, but they worked weekends.

Did they work as much as me or more or less?  I don't -- I don't know.  I didn't keep track, but it was a -- it was a complaint from all of us, and I'd be surprised if an investigator said they never worked on the weekend.

Q.   When you say all, who are you referencing?

A.   So I would say Maria Munoz, Ted Wendling, Steve Stemmler, Keith Fischer.  Who else?  Kevin Dux.  Tiffany Cummings.  I'm trying to think of who else



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
145–148

Page 145

worked there.  I guess I don't remember the rest of the investigators.  I'm sorry.

Q.  So it's your testimony that every single one of those individuals informed you that they were working on the weekend and the number of -- and the amount of time they spent working?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  The people I just mentioned, at some point we did have conversation that we -- we were working weekends, and it's ridiculous, without -- definitely.  I mean, I know, again, the absolutes, but I recall having conversations with -- in groups, individually, each individually.  You know, and it became a joke.  "What did you do this weekend?"  Geico.  What else?"  You know, "What else do I do?  Geico."  You know?

BY MR. TSONIS:

Q.  Do you have any personal knowledge of conversations those individuals had with their supervisors?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  No.

BY MR. TSONIS:

Q.  Okay.  So you have no personal knowledge of

Page 146

any conversation that those investigators had with their supervisors at any given time?

MR. McALLISTER:  Objection.

BY MR. TSONIS:

Q.  Is that correct?

A.  I don't have -- you know, I -- I guess I'd have to even say yeah because we've been in meetings where it's been brought up.  So, you know, individually, I don't know what they say, you know, on their one-on-one meetings, but I've been in meetings in Melville where that was the hot topic.  So, again, I don't recall who was present that day, who was absent that day, but it wasn't just one meeting.

So can I say everybody?  No, but we've had meetings, and, you know, the majority of us were always present.  So, again, I can't recall, but that was the hot topic at the meetings.

I don't know if there's records of meetings.  I don't know if -- you know, if they kept -- you know, if the -- notes from meetings, you know, I have no idea, but it was some of those meetings were pretty heated, you know.  So --

BY MR. TSONIS:

Q.  The individuals that you're referencing, are those all field investigators?

Page 147

A.  Yes.

Q.  Do you have any personal knowledge as to the hours worked by desk investigators?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  I -- I didn't know any of them personally.

BY MR. TSONIS:

Q.  Do you have any personal knowledge regarding the hours worked by investigators that worked major case?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  No.

BY MR. TSONIS:

Q.  Are all the investigators that you named on the theft specialty team?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  No.

BY MR. TSONIS:

Q.  Which ones aren't?

A.  Maria Munoz.

Q.  What team did she work on?

A.  The theft team.  We were the only two, I think we were the only two theft investigators.

Page 148

MR. TSONIS:  Okay.  Why don't we go to lunch.

MR. McALLISTER:  Sure.

THE WITNESS:  Okay.

MR. TSONIS:  Do you want to come back at --

THE VIDEOGRAPHER:  Okay.  We'll go off the record at 12:12 p.m.

(Whereupon, a luncheon break was taken.)

THE VIDEOGRAPHER:  We're back on the record at 1:07 p.m.

BY MR. TSONIS:

Q.  All right.  Mr. Brust, do you realize your still under oath?

A.  Yes, I'm aware.

Q.  Okay.  I'm going to drop in the chat here what I'm going to introduce as Exhibit 2.

(Whereupon, Brust Exhibit 2 was presented.)

BY MR. TSONIS:

Q.  If you can download it and open it.

A.  Okay.

Q.  In the bottom right-hand corner, you should see a stamp, which --

A.  Yeah, well, I opened it up, and it appears to be an e-mail.

MR. TSONIS:  Okay.  And for the record, it



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
245–248

Page 245

A.   Myself.

Q.   Okay.  And do you recognize that on the very last page of this document, you see that there's a -- a date and a signature line?

A.   Yes.  Yes.

Q.   Is that your signature?

A.   Yes.

Q.   So you signed this document on or around November 8th, 2023?

A.   Yes.

Q.   And you were declaring under penalty of perjury that what you put in this declaration was true and correct?

A.   Yes.

Q.   I want to direct your attention to paragraph 8.

A.   Okay.

Q.   Well, actually, if you -- if you go back just one paragraph to paragraph 7.

A.   Okay.

Q.   Is it accurate to say that throughout the course of your employment with Geico that you were scheduled and expected to work 7.75 hours per day?

A.   Yes.

Q.   All right.  And that's compensable time, it

Page 246

doesn't include an unpaid meal period?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   It does not include an unpaid meal period.

BY MR. TSONIS:

Q.   Okay.  And the total number of hours that you were scheduled to work each week was 37.75?

A.   Yes.

Q.   Now, if you go to page -- or paragraph 8, this declaration states, "From the start of my employment with Geico through February of 2020, on top of my recorded 7.75 hours a day, I regularly worked an extra two hours a day, plus another five hours on weekends, to keep up with my work.  I worked about 50 hours a week on average."

Do you see that?

A.   Yes.

Q.   Okay.  Now, as we've discussed earlier, you're not claiming that during the time you spent training that you were working more than 7.75 hours a day?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   That's correct.

Page 247

BY MR. TSONIS:

Q.   All right.  So when you say from the start of your employment with Geico, that's not quite accurate because that would encompass this training time?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   That's correct, it's not completely accurate.

BY MR. TSONIS:

Q.   Okay.  You say in paragraph 9, starting in March 2020, the COVID-19 pandemic halted field operations, so all of your work was done remotely until approximately November 2021; do you see that?

A.   Yes.

Q.   You state that, "Geico increased your case load increased significantly after March 2020 and your overtime hours increased substantially as a result"?

A.   Yeah, I see that.

Q.   Okay.  And here you write, "I was generally working about 11 hours a day without a full lunch break plus another five more hours on weekends.  And on average during this time.  I was working about 60 hours a week."

You see that?

Page 248

A.   Yes.

Q.   Okay.  Now, you note here during this time period a lunch break, without a full lunch break, but you don't note anything about a lunch break in paragraph 8, right?

A.   Correct.

Q.   So is it fair to assume that you were not working on your lunch break during the time period encompassed by paragraph 8?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Before Workday signing me out, I always worked on my lunch.  So if this was pre, you know, Workday signing in and out for lunch, which it was, I worked on my lunch, again not all the time, but for the most -- most of the time, I did work through lunch.

BY MR. TSONIS:

Q.   Okay.  So you're accounting for that lunch time in the -- in the time discussed in paragraph 8?

A.   Yes.

Q.   Okay.  Now, in paragraph 10, you write that Geico returned to normal field operations in or around November 21, but that your -- and that your overtime decreased somewhat, but your case load still required



ALBERT BRUST
KEITH FISCHER v GEICO

January 15, 2025
249–252

Page 249

you to work overtime to keep up; is that right?

A.  Yes.

Q.  And then you estimate from November 21 through February 2023 that you were again working about 50 hours a week on average?

A.  Yes.

Q.  Okay.  And then paragraph 11 sort of recaps the information in the preceding paragraphs and then states after that parentheses that you see in the middle, it says, "In sum, for the periods described above, my best estimate is that I am owed approximately $137,743.59 in base wages."

You see that?

A.  Yes.

Q.  And that this amount -- the following sentence says that that amount does not include liquidated damages, which add another $137,734.53 in damages?

A.  Yes.

Q.  And then it says it also doesn't include amounts encompassing fees, costs, or interest?

A.  Correct.

Q.  So, I guess, is it accurate to say that as part of your -- you joining this lawsuit, you are seeking at least $275,000 from Geico?

Page 250

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  Yes.

BY MR. TSONIS:

Q.  That's what you believe that you should be paid, $275,000?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  That, I did not do the math on this when I conferred with counsel.  This is what was presented to me, and again, that's why they're hired, you know.  That's -- you know -- you know, I retained them for them to determine what I'm owed.

BY MR. TSONIS:

Q.  Does $275,000 exceed the wages that you've earned for the time that you entered into Workday?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  Again, that -- that's -- I mean, I would think that's a -- you know, to be answered by counsel.  I mean, I don't know the value of, you know, in a suit, you know, liquidated damages, how they even come up with that number, but, you know, when I reviewed it and discussed it with counsel, that was what they were -- were they felt was a fair estimate.

Page 251

BY MR. TSONIS:

Q.  Right.  And I recognized you -- you've testified you didn't do the math and you're not familiar with the concept of liquidated damages.

I'm asking you as a party to this lawsuit, you are suing Geico, do you feel like you are owed $275,000 at least?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  Yes.

BY MR. TSONIS:

Q.  Okay.  Will you direct your attention to paragraph 12.

A.  Okay.

Q.  Do you see that it states that Geico required you to seek approval from your supervisor to submit any hours above 38.75?

A.  Yes.

Q.  And then it talks about Gerry Cassagne, and you're -- you're saying that he reiterated to you that hours above 38.75 would not be approved?

A.  Yes.

Q.  And then you write, "At various times, my supervisor approved a limited amount of extra hours to allow me to catch up on work.  This was limited to

Page 252

about an hour or two extra hours a week."

Do you see that?

A.  Yes.

Q.  All right.  But earlier, we looked at periods of time in June and July where you could work up to ten hours of overtime a week, right?

A.  Yes.

Q.  All right.  And, in fact, there was an e-mail that said hey we have extra unused overtime if you want to work even more than that?

A.  That's correct.

Q.  Okay.  So this statement is inaccurate?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  No, it's accurate.  I just didn't recall the other times.

BY MR. TSONIS:

Q.  Well, it says this was limited to about an hour or two extra hours a week?

A.  Yes.

Q.  That's not accurate, though, right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  It's -- it's -- it was more than that, but when I stated that, I didn't recall those, the --



Page 293

lives in the -- or a potential driver that lives in the household that hasn't been disclosed?

A.   Yes, that would be a licensed driver that's not on the policy.

Q.   All right.  Typically, are those some of the quickest investigations that can be closed?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yes.

BY MR. TSONIS:

Q.   Okay.  Similarly, change in policy, are those types of cases that are very often closed very quickly?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Not always, because if there's a change in policy and the policyholder files a claim, and that date of loss is on or about, you know, that date, obviously, and if it's after, we have to, you know, try to determine the facts of loss, and that could require, you know, a scene canvass, you know, interviews, you know, license plate checks on the vehicle, you know.  So it -- sometimes it takes a little bit more leg work.

Page 294

BY MR. TSONIS:

Q.   Okay.  Well, recognizing that in some cases it might become more complicated, in your experience typically, are those pretty quick investigations to close?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   They're on the quicker side, but like I said, it'll -- sometimes it looks cut and dry and it -- sometimes it could take weeks.

MR. TSONIS:  Okay.  I have no further questions.

THE WITNESS:  Okay.  Thank you.

MR. McALLISTER:  Nothing in direct.

THE VIDEOGRAPHER:  Just quickly before we conclude the record, Mr. McAllister, did you want to order a copy of the video?

MR. McALLISTER:  Yes, please.

THE VIDEOGRAPHER:  Would you like that synced with the transcript or just a separate video?

MR. McALLISTER:  I think synced with the transcript.  That sounds --

THE VIDEOGRAPHER:  That's the most common.

MR. McALLISTER:  Yeah.

THE VIDEOGRAPHER:  Mr. Pitts, did you need

Page 295

anything for the record?

COURT REPORTER:  Just to confirm orders for the transcript.

MR. TSONIS:  We'll do an electronic transcript only.

THE VIDEOGRAPHER:  Okay.  Thank you.  This will conclude today's videoconference deposition of Albert Brust taken on January 15th, 2025, at 4:44 p.m. Central Time.

(Whereupon, the proceedings concluded.)

FURTHER DEPONENT SAITH NOT

Page 296

DEPOSITION ERRATA SHEET
Our Assignment No. J12254483
Case Caption: KEITH FISCHER, et al., vs. GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____ 20___.

_____
ALBERT BRUST

Subscribed and sworn to on the ____ day of _____ 20 ____ before me.

_____
Notary Public, in and for the State of _____.

Page 297

DEPOSITION ERRATA PAGE

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

             ALBERT BRUST

Page 298

DEPOSITION ERRATA PAGE

Page No._____ Line No. _____ Change to:_____

_____

Reason for change: _____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No. _____ Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

             ALBERT BRUST

Page 299

STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K     )

I, ANDREW R. PITTS, C.S.R. within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on Friday the 15th day of January, 2025, personally appeared before me via videoconference, ALBERT BRUST, in a cause now pending and undetermined in the United States District Court, For the Eastern District of New York, wherein KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated are the Plaintiffs, and GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the Defendant.

I further certify that the said witness was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness remotely via videoconference, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the remote

Page 300

videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the Deponent. I further certify that the taking of this deposition was pursuant to Notice, and that there were present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my seal this 22nd day of January, 2025.

*Andrew R. Pitts*
_____
ANDREW R. PITTS, CSR, RPR
CSR, COOK COUNTY, ILLINOIS