# Exhibit T

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL          )
O'SULLIVAN, JOHN MOESER, LOUIS  )
PIA, THOMAS BARDEN, CONSTANCE   )
MANGAN, and CHARISE JONES,      )
individually and on behalf of all )
others similarly situated,      )
                                )
          Plaintiffs,           )
                                ) No. 2:23-cv-2848
   -v-                          )
                                )
GOVERNMENT EMPLOYEES INSURANCE  )
COMPANY d/b/a GEICO,            )
                                )
          Defendant.            )

          Friday, January 10, 2025

Oral videoconference deposition of CRAIG COSTANZO, held pursuant to Notice via Zoom with all parties participating remotely, commencing at 10:00 a.m. Central Time, on the above date, before Andrew R. Pitts, Certified Shorthand Reporter.

Andrew R. Pitts, CSR, RPR
License No.:  084-4575
Esquire Deposition Solutions

Page 2

REMOTE APPEARANCES:
On behalf of the Plaintiffs:
OUTTEN & GOLDEN, LLP
685 Third Avenue - 25th Floor
New York, New York  10017
(347) 390-2121
Email: zdsouza@outtengolden.com
       sjean@outtengolden.com
BY:  ZARKA SHABIR DSOUZA, ESQUIRE
     SABINE JEAN, ESQUIRE

On behalf of the Defendant GEICO:
DUANE MORRIS, LLP
190 South LaSalle Street - Suite 3700
Chicago, Illinois  60603-3433
(312) 499-6779
Email:  gtsonis@duanemorris.com
BY:  GREGORY TSONIS, ESQUIRE

ALSO PRESENT:
   MEGAN SCZYGELSKI, Legal Videographer.

Page 3

                I N D E X
CRAIG COSTANZO                          EXAMINATION
   BY MR. TSONIS                            5

               E X H I B I T S
COSTANZO      DESCRIPTION                   PAGE
Exhibit 1     Workday profile for Craig
              Costanzo, G004533-4588        separate
              (confidential)                transcript

Exhibit 2     Geico HR Associate Handbook,  147
              Compensation Contents,
              G000028-43
Exhibit 3     2017 Geico Performance Guide & 166
              Appraisal for Craig Costanzo,
              G006638-6642
Exhibit 4     2019 Geico Performance        183
              Appraisal for Craig Costanzo,
              G006591-6603
Exhibit 5     2020 Geico Performance        193
              Appraisal for Craig Costanzo,
              G006581-6590
Exhibit 6     MAP 2 2021 (second half of    206
              year) Performance Appraisal,
              Craig Costanzo, G006623-6626
Exhibit 7     MAP 2 2022 (second half of    223
              year) Performance Appraisal,
              Craig Costanzo, G006621-6622
Exhibit 8     Answers to Interrogatories    229
Exhibit 9     Geico Human Resources         250
              Associate Handbook,
              G000191-235

Page 4

(Whereupon, the following proceedings were taken via videoconference.)

THE VIDEOGRAPHER:  Good morning.  I am now started the recording, and we are now on the record.  The time is 10:01 a.m. Central on Friday, January 10th, 2025.  This begins the videoconference deposition of Craig Costanzo taken in the matter of Keith Fischer, et al., versus Government Employees Insurance Company doing business as Geico filed in the United States District Court for the Eastern District of New York, Case No. 23-cv-2848.

My name is Megan Sczygelski.  I'm your remote videographer today.  The court reporter is Andrew Pitts.  We are representing Esquire Deposition Solutions.

Will everyone present please identify themselves and state who you represent, after which the court reporter will swear in the witness.

MS. DSOUZA:  Hi.  This is Zarka DSouza from the law firm Outten & Golden on behalf of the Plaintiffs.

MR. TSONIS:  Gregory Tsonis on behalf of Defendant Geico, from Duane Morris LLP.

MS. JEAN:  Sabine Jean from Outten & Golden on behalf of the Plaintiffs.



Page 17

Q.   Okay.  Any other types of documents that you reviewed that you recall?

A.   I believe a brief look at the employee handbook.

Q.   The Geico associate handbook?

A.   Yes.

Q.   All right.  Which portion of the Geico associate handbook do you recall reviewing?

A.   With regards to HR and report -- making certain reports.

Q.   How to report things to human resources?

A.   Yes.

Q.   Okay.  Any other portions of the handbook?

A.   I don't remember any other.

Q.   All right.  Any other types of documents that you recall reviewing?

A.   I don't remember any others.

Q.   Okay.  As part of this lawsuit, did you ever produce documents that you have to your lawyers?

A.   Yes, I did.

Q.   Okay.  And what types of documents did you produce?

A.   Performance appraisals, some memos, I believe the handbooks.  I just packaged up everything I had.

Page 18

Q.   Got it.  And were those documents stored, like, in a file cabinet or a file folder or somewhere specific in your home?

A.   My desk basically.

Q.   Got it.  So you have like a Geico file on your desk?

A.   It -- basically my desk is my Geico office.

Q.   Fair enough.  Okay.

A.   It was -- it was drawers on my desk and --

Q.   Okay.  Aside from the documents that you have provided to your lawyers, do you have other documents that are relevant to this case?

A.   No, I don't believe I do.

Q.   Okay.  What do you understand this case to be about?

A.   It's regarding a period of time when Geico was requiring us to do excessive amounts of work that couldn't possibly be done during the typical eight-hour day and that it was forcing us to have to work additional hours.

Q.   What period of time was that?

A.   I would say there's occasionally some, you know, starting probably, I don't know, two or three or four years once I started working here, but my primary concern was -- started during the COVID period when it

Page 19

just -- everything changed.

Q.   Okay.  And, you know, COVID I understand in a lot of ways is sort of a delineating line.  So let's -- let's talk about that.

I guess, pre-COVID, I think you said you started in 2014, right?

A.   Correct.

Q.   And now I think you said, you know, two or three or four years after you started is when -- I don't want to put words in your mouth, but when, you know, you started to experience some of this increase in case load?

A.   Correct.

Q.   Okay.  And I guess from that time period to COVID, what is, I guess, the -- the essence of -- of your claims here in this lawsuit?

A.   Well, when I was hired, they explained what the case load would be and that they had based it on studies, how much work could reasonably be done, and then they just started increasing it seemed like every year additional case load with no explanation on how we were supposed to get it accomplished.

Q.   Okay.  When you say they, who are you referring to?

A.   I would say SIU management.

Page 20

Q.   Okay.  So --

A.   Because they set the goal packages.

Q.   When you began working for Geico, were you located out of -- well, strike that.

When you began working for Geico, what was your job title?

A.   Senior field investigator, I believe, or senior security investigator.

Q.   So as a -- does the title, job title outside security investigator sound familiar?

A.   Yes.

Q.   All right.  And is it your understanding that an outside position within the context that we're talking about refers to a field position?

A.   Correct.

Q.   All right.  And so you worked out in the field, and you didn't on a day-to-day basis have to go into the office to do your work, right.

A.   That's correct.

Q.   All right.  But in Geico's system, you were assigned to a specific office, right?

A.   Yes.

Q.   Were you assigned out of the what was then the Woodbury office?

A.   That was my understanding, yes.



CRAIG COSTANZO  Non-Confidential
KEITH FISCHER v GEICO

January 10, 2025
230–233

Page 230

Q. All right. Now, I want to take you to that declaration, which is attached. Do you see that on the eighth page of the PDF is a Declaration of Craig Costanzo?

A. Yes.

Q. All right. Have you seen this part before?

A. Yes.

Q. Did you participate in drafting this document?

A. Yes.

Q. Ultimately, you signed this document, right?

A. Yes.

Q. All right. So this talks about your employment with Geico at least through the date when you wrote this declaration, right, or this declaration was written, I should say?

A. Yes.

Q. All right. You write in paragraph 5, "Since January of 2020, Geico classified me and other special investigators as non-exempt employees who were eligible for overtime pay at one and one half times my regular rate if I worked over 40 hours per week." You see that?

A. Yes.

Page 231

Q. And it says, "My current regular rate of pay is 49.74 per hour"?

A. Yes, that's what it says.

Q. All right. Prior to that point, were you compensated differently? I know we talked about this later, but does this refresh your recollection as to whether or not your compensation, the basis on which you were compensated, was different before January of 2020?

A. I -- I don't know the dates. I know there were changes that were made, yes.

Q. Okay.

A. I couldn't tell you the dates, but yes.

Q. In paragraph 7, you write, "My supervisor Chet Janik told me that I could only report up to 38.75 hours per week or 7.75 hours a day five days a week in the timekeeping program." Do you --

A. Yes, that's what we were supposed to put. Yes.

Q. Aside from the conversations with Mr. Janik that we've already discussed today, are there any other discussions with Mr. Janik that you have not told me about?

A. Not that I can remember.

Q. Okay. You write in paragraph 10, "Prior to

Page 232

March 2020, I regularly worked about one extra hour per day on top of my regularly scheduled 7.75 hours per day. As a result, I worked about 43 hours a week." Do you see that?

A. I do.

Q. Is that an accurate statement?

A. It's -- it's an approximation, but I did generally work approximately about an hour extra.

Q. Okay. Let me ask you something. We looked at your performance appraisals that talked about the total cases assigned, right?

A. Yes.

Q. Okay. And we saw between 2017 your appraisal there and your appraisal in 2019 that there was an increase in cases that you were assigned, correct?

A. Yes.

Q. So is this number that you're talking about, one hour per day, consistent across the entire time period in 2016 to March 2020?

A. I think so. It's hard to say for sure, but I -- I think so. I think that's a fair representation of it. I mean --

Q. Explain to me how the total number of cases

Page 233

differs over a multi-year time period but you are regularly always working one extra hour a day?

A. Well, like I said, it's -- it's just sort of what happened. Are there days that I didn't? Probably. Are there days that I worked more than an hour? Probably. But I think that's a fair representation of what I was doing at the time.

Q. Okay. No one instructed you that you had to work one extra hour per day, right?

A. No, they did not.

Q. Okay. Chet Janik or any other supervisor didn't instruct you that?

A. Nobody instructed my to do that.

Q. Neither Mike DeGrocco nor Bill Newport instructed you?

A. No, they did not.

Q. Okay. Do you agree that there was no real way for your supervisor to know that you were working one extra hour per day that you weren't including in your timesheet?

MS. DSOUZA: Objection.

BY THE WITNESS:

A. I'm not sure how they would have known that.



Page 234

BY MR. TSONIS:

Q.   Right.  Earlier, I think you referenced SICM time entries?

A.   Yes.

Q.   And you referenced general comments about, you know, not being able to do the work?

A.   Yes.

Q.   Okay.  Certain activities you do as a field investigator, you might be doing that work and not actually being in SICM, right?

A.   That's correct.

Q.   So, for example, when you say you might have worked an extra hour per day on top of your regularly scheduled hours, it's possible that that hour was spent commuting from the field back to your house?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.   That's possible.

THE WITNESS:  Sorry.

MS. DSOUZA:  Go ahead.

BY THE WITNESS:

A.   Yes.  Yes, that -- that's possible.

BY MR. TSONIS:

Q.   Okay.  It's possible that that time was

Page 235

spent, you know, talking to a policyholder?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.   It's possible.

BY MR. TSONIS:

Q.   All right.  And nothing prevented you from talking to a policyholder, for example, and then logging that event the following day in SICM, right?

A.   Correct.

Q.   So it says in paragraph 11 on -- well, strike that actually.

And you said -- you said earlier that Chet Janik would not review and approve your closed cases, right?

A.   Correct.

Q.   All right.  So he wasn't looking at the time stamps because he wasn't approving your cases?

MS. DSOUZA:  Objection.

BY MR. TSONIS:

Q.   Right?

A.   I -- I -- he wasn't required to approve them, so, I mean, he wasn't looking at every case I had, no, that's correct.

Q.   Okay.  And similarly, the SIU manager, whether it was Mike DeGrocco or Bill Newport, wasn't

Page 236

approving your cases?

A.   That's correct.

Q.   And to your knowledge, they weren't going into SICM and looking at your cases with any kind of regularity?

A.   I'm not aware of that.

Q.   Okay.

A.   I'm not aware that they were, no.

Q.   In paragraph 11, it says, "Starting in March 2020, COVID-19 halted field operations," so all of your work was done remotely until approximately November of 2021.

Do you see that?

A.   Yes.

Q.   Does that refresh your recollection as to when Geico sort of reestablished normal operations?

A.   Yes.

Q.   Okay.  You say at that -- "At the time, my official schedule was from 7:00 a.m. to 3:30 p.m."

Do you see that?

A.   Yes.

Q.   Are you referencing the time period from March 2020 to November '21?

A.   Yes.

Q.   Okay.  You say, "During this period,

Page 237

however, I worked two hours extra per work day.  As a result, I was regularly working at least 48 hours a week."

A.   Yes.

Q.   You -- is that an accurate statement?

A.   I believe it is.

Q.   During this time period, in the summer of 2020, do you recall that there was at least one month where overtime for investigators was preauthorized and approved up to ten hours?

A.   I don't remember the exact dates, but yes, we did talk about that, that there was a period of time that there was overtime authorized.

Q.   And the reason for the preauthorization of overtime was because there was, as Geico recognized, an increase in the number of cases assigned?

A.   I -- I don't know why they authorized it.

Q.   Was that ever communicated to you why it was authorized?

A.   I don't remember it ever being told to us.

Q.   But you knew that there were, during these specific periods, overtime hours available to you to use?

MS. DSOUZA:  Objection.

BY THE WITNESS:



Page 238

A.   I -- I don't remember what the period was that they authorized it.  I just don't.

BY MR. TSONIS:

Q.   Okay.  But when that period -- during that period when it was authorized, that would have been communicated via e-mail to you and others by Mr. Janik?

A.   Yes, and when there was overtime authorized, if I worked it, I would have put in for it.

Q.   Okay.  And during that period where it was authorized, you would agree with me that if you were working two hours extra per work day that you would have entered that into your time records?

A.   I would agree with that, yes.

Q.   Okay.  So to the extent your time records for the time period do not show an additional two hours per work day, you didn't work two hours after per work day, right?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.   I -- I would have thought that I would have put in for it had it been work during that period.

BY MR. TSONIS:

Q.   Okay.  Is there a reason why you wouldn't

Page 239

have put in for it, put it into the Workday system if you would have been paid for it?

A.   No.

Q.   You write, "In addition, there were many nights where I would work up to eight hours after the end of my scheduled shift putting in reports and submitting my work on the system.  On these evenings, I was working until 10:00 or 11:00 p.m.  As a result, in these weeks, I worked about 55 hours per week."

Do you see that?

A.   Yes.

Q.   How many such weeks would you say you worked about 55 hours per week?

A.   I don't -- I don't know.  There was just -- during that period, there were times that it was just crazy.  I -- I can't say for sure when or how often, but there were nights that we were -- I was there until 10:00, 11:00 at night.

Q.   And I understand your testimony.  I just -- Geico is entitled, I guess, when you write this to find out how many workweeks you're claiming you worked 55 hours per week.

A.   I know.  I understand that.  I -- I did not keep records.  I just didn't.

Q.   What's your best estimate?

Page 240

A.   I just don't know.

Q.   You can't quantify in any way how many of the workweeks between March 20th and November 21 you worked approximately 55 hours per week?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.   No, I really -- I can't say for sure how many.

BY MR. TSONIS:

Q.   I'm not asking you for say for sure.  I'm asking for a general estimation.

A.   I just -- I -- I can't.  I don't know.

Q.   You write in paragraph 12, "Geico assigned cases using a point-based system.  Geico inaccurately assumed that remote work could be completed in substantially less time than in-person field work, so it assigned remote cases fewer points.  Because remote cases were given a lesser point value, Geico increased my case load significantly after March 2020."

Do you see that?

A.   I do.

Q.   All right.  You -- we previously talked about your windshield time, right?

A.   Yes.

Q.   And you would agree during this time

Page 241

period, because you were not working in the field, you did not have any time traveling in your vehicle?

A.   That's correct.

Q.   And that time ordinarily if you were in the field would be hours typically, right?

A.   Yes.

Q.   Okay.  So in substance -- well, strike that.

Do you believe that Geico was incorrect in assuming that time that would otherwise be spent in a vehicle could be spent working cases remotely now?

A.   I'm sorry, can you say that again?

Q.   Yeah.  Do you think Geico was wrong in assuming that because you weren't spending time in a car, that that time could otherwise be spent working on cases in your home?

A.   No, I mean, I guess that assumption is okay.  I just -- I'm not -- I guess I just have a different opinion that cases that are desk cases still take a long time to work.  You know, a case is a case.

But I understand the drive time is an issue, but to work a case still takes the amount of time to work a case, but I -- I sort of see what you're saying that the -- you know, not driving does provide for some more time during the day, but it



Page 242

still takes the amount of time it takes to -- sometimes it's easier to get people when you drive, so the amount of time it takes you to drive to the house versus trying to call them multiple times because you can't get them to answer the phone kind of -- the difference between a field case and a desk case, sometimes it's not different and sometimes it's not better to be a -- you know, faster to be a desk case.

Sometimes when you can show up at somebody's house, you catch them a lot faster than it is when you're chasing them trying to call them and call them and text them and call them.  So, I mean, the length, how long it takes you to close a case, isn't necessarily faster if it's a desk case.

Q.    Right, not necessarily.  I understand your point.  But it is very possible that if it's going to take multiple investigative -- investigative activities that take time in the field that that kind of case can be closed more quickly if it doesn't require field work?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.    I -- I guess I don't totally agree.  I see what you're saying, but if I'm going to do an in-person scene canvas, or I'm going to do a virtual

Page 243

scene canvas, it still takes time to review and then look up the addresses, figure out who it is, make phone calls to those business to see if they have video.

It -- is it faster, or is it faster to go knock from this door, walk to the next door, knock on that door?  It -- it depends on each case.  It may be faster, but it may not be.

Q.    But there are certain circumstances where it could be faster certainly?

A.    It could be, yes.

Q.    Okay.

MS. DSOUZA:  Objection.  Sorry, Craig, just give me a minute to object when -- before you answer.

THE WITNESS:  Okay.

BY MR. TSONIS:

Q.    Okay.  And then paragraph 13 here, it references the return to normal field operations in November '21, and you say, "My overtime hours decreased somewhat as a result, but my case load has still required me to work overtime.  I estimate that since November '21, I work about 42 to 45 hours a week on average because I have generally worked about one to two extra hours a day."

Do you see that?

Page 244

A.    Yes.

Q.    Is that an accurate statement?

A.    It was at the time, yes.

Q.    Is that an accurate statement now?

A.    I'm not doing that now.

Q.    When did you stop doing that?

A.    They -- they made it very clear.  There was a point, and I can't tell you exactly when, that it was at -- well, part of it is the way they started, they changed -- we were being evaluated against each other for hours worked, and so when they started evaluating us based -- comparing us to everybody else's based on the number of hours worked, it was very clear:  You can't work extra hours, or you're basically tainting the whole system.

So once, you know, they're -- they're measuring us based on each other, I mean, for me to work extra hours is really kind of fudging the system. So I -- I -- you know, then it became pretty clear that I don't want to be, like, cheating the system, and I -- I didn't want to do that.

Q.    Wasn't it fudging the system though, prior to what you're describing, ranking against other investigators?

A.    I --

Page 245

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.    I don't -- I don't -- I don't see what you mean.

BY MR. TSONIS:

Q.    Sure.  So your metrics, according to what you're claiming today in your deposition testimony and in this declaration, reflected a number of hours that you were not entering into Workday; is that correct?

A.    Yes.

Q.    All right.  So when you and your metrics, even if you weren't ranked against other investigators, Chet Janik or Bill Newport or anybody in management is looking at what you are accomplishing in, according to Workday, 38.75 hours, right?

A.    Yes.

Q.    So when your metrics are really high and you're scoring a 5 or a 4 or somewhere between a 4 and a 5 in productivity or case life, doesn't that indicate in management and SIU that you are capable of doing the job in the hours that are being entered?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.    Well, it wasn't -- I never looked at it that way because it was the cases and getting them



CRAIG COSTANZO  Non-Confidential
KEITH FISCHER v GEICO

January 10, 2025
258–261

Page 258

DEPOSITION ERRATA SHEET

Our Assignment No. J12220998

Case Caption: KEITH FISCHER, et al., vs. GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition, including the confidential excerpt, taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____ 20___.

_____
CRAIG COSTANZO

Subscribed and sworn to on the ____ day of _____ 20 ____ before me.

_____
Notary Public, in and for the State of
_____.

Page 259

DEPOSITION ERRATA PAGE

Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
CRAIG COSTANZO

Page 260

DEPOSITION ERRATA PAGE

Page No.____ Line No. _____ Change to:_____
_____
Reason for change: _____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
Page No.____ Line No. _____ Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
CRAIG COSTANZO

Page 261

STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )

I, ANDREW R. PITTS, C.S.R. within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on Friday the 10th day of January, 2025, personally appeared before me via videoconference, CRAIG COSTANZO, in a cause now pending and undetermined in the United States District Court, For the Eastern District of New York, wherein KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated are the Plaintiffs, and GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the Defendant.

I further certify that the said witness was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness remotely via videoconference, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing, including the confidential excerpt, is a true and



800.211.DEPO (3376)
EsquireSolutions.com

Page 262

correct transcript of the remote videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the Deponent.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 14th day of January, 2025.

*Andrew R. Pitts*

ANDREW R. PITTS, CSR, RPR

CSR, COOK COUNTY, ILLINOIS



Page 58

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL            )
O'SULLIVAN, JOHN MOESER, LOUIS    )
PIA, THOMAS BARDEN, CONSTANCE     )
MANGAN, and CHARISE JONES,        )
individually and on behalf of all )
others similarly situated,        )
                                  )
          Plaintiffs,             )
                                  ) No. 2:23-cv-2848
    -v-                           )
                                  )
GOVERNMENT EMPLOYEES INSURANCE    )
COMPANY d/b/a GEICO,              )
                                  )
          Defendant.              )

CONFIDENTIAL EXCERPT OF

THE REMOTE DEPOSITION OF CRAIG COSTANZO

taken on January 10, 2025

Chicago, Illinois.

Andrew R. Pitts, CSR, RPR
License No.:  084-4575
Esquire Deposition Solutions

Page 59

REMOTE APPEARANCES:
On behalf of the Plaintiffs:
OUTTEN & GOLDEN, LLP
685 Third Avenue - 25th Floor
New York, New York  10017
(347) 390-2121
Email: zdsouza@outtengolden.com
       sjean@outtengolden.com
BY:  ZARKA SHABIR DSOUZA, ESQUIRE
     SABINE JEAN, ESQUIRE

On behalf of the Defendant GEICO:
DUANE MORRIS, LLP
190 South LaSalle Street - Suite 3700
Chicago, Illinois  60603-3433
(312) 499-6779
Email:  gtsonis@duanemorris.com
BY:  GREGORY TSONIS, ESQUIRE

ALSO PRESENT:
  MEGAN SCZYGELSKI, Legal Videographer.

Page 60

I N D E X

CRAIG COSTANZO                         EXAMINATION

BY MR. TSONIS (continued)          61

E X H I B I T S

COSTANZO      DESCRIPTION            PAGE

Exhibit 1     Workday profile for Craig     61
              Costanzo, G004533-4588

Page 61

(Whereupon, the following proceedings were taken via videoconference.)

(Whereupon, the following excerpted proceedings were deemed confidential.)

(Whereupon, Costanzo Exhibit 1 was presented.)

MR. TSONIS:  It is 35 megs, so it might take a second to load up.

CRAIG COSTANZO, called as a witness herein, having been first administered an oath and having testified, was examined and testified further remotely via videoconference as follows:

EXAMINATION (continued)

BY MR. TSONIS:

Q.  Mr. Costanzo, I'm going to you pull it up on the screen so you can see which portions that I'm talking about.  If it's easier for you, you can also download it, whatever you prefer, but I'll -- I'll share my screen here so that you can see it.

A.  Okay.

Q.  All right.  Do you see this document now, Mr. Costanzo?

A.  I do.

Q.  Okay.  And I take it you've probably never



CRAIG COSTANZO  Confidential
KEITH FISCHER v GEICO

January 10, 2025
134–137

Page 134

Then during the -- the COVID time, it was, "There's no overtime, you should be able to get it all done in the amount of time that we're giving you.  So there's no overtime, there is no business need, you can't have it."

During Dara, that changed and said, "Yes, if there's a business need."  You just have to justify it and provide the -- the records of why, and you could get it, but obviously, you know, they wanted to make sure that it was needed.  And then when I went to Andrew, it was, "There's no longer any overtime."

Q.  Okay.  So just so I make sure that I'm clear.

Pre-COVID, if there was a business need for overtime, you could request it, and it might be approved if there was a legitimate business need?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.  I don't -- early on under Chet Janik, it was really a schedule adjust kind of thing.  It was if there's time that you got to work late, then make it up, you know.  Give yourself time off another day.  There was a period in there, I just -- I don't remember for sure if there was time when they actually would allow us to do overtime.  I just don't remember.

Page 135

BY MR. TSONIS:

Q.  Okay.  But the workload increase or the case assignment -- strike that.

The case assignment that you're contending led to, you know, needing to work additional hours didn't happen until post-COVID?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.  It started increasing prior to the COVID stuff, but it really became majorly a problem after COVID started.

BY MR. TSONIS:

Q.  Okay.  So when it started increasing, when you say that, what time period do you mean?

A.  They just -- it seemed like the case load kicked in.  I mean, they just started giving us more cases.  I mean, it wasn't -- it was a little bit before the COVID stuff because they started using that different system, the Velm (phonetic), and that seemed to -- they had seemed to be able to crank that up to get us more cases whenever they wanted to.

So I think once that stuff started coming in, it was -- and, again, they would send you some really bad cases, and then if, like, you rejected, they'd send you more, but yet you still had to spend

Page 136

time on them.  So, like, they -- it was like they weren't going to count them if you rejected them, but you still spent time on them.

Q.  Okay.  So is it accurate to say that this -- this ramp-up that you're talking about started in -- I think you said a little before COVID in 2019?

A.  I think it was around there, 2019.

Q.  Okay.  With Chet Janik, I think you said, pre-COVID, you know, he would encourage you, it sounds like, to adjust your schedule as needed?

A.  Yes.

Q.  So if you needed to work early for some reason, he would encourage you to basically, you know, make up that time by shortening your shift on a different day?

A.  Yes.

Q.  Okay.  Chet Janik never instructed you to work off the clock and not record it?

A.  No, he did not.

Q.  All right.  And you never told Chet Janik that you were working but not entering hours into Workday?

A.  That -- I didn't specifically say it like that, no.  I mean, as time was going on with this, it was, "There's no way we can do this without working

Page 137

extra hours."  I didn't specifically say, "I'm doing it and then not putting it in the clock."  I didn't -- didn't specifically say that.

Q.  What are the bases on which you are claiming that Chet Janik knew that you were working more hours than what you were entering into Workday?

A.  I believe that Chet Janik and I believe Bill Newport, I mean, they know, they had access to that SICM to see when we're in and when we're out and that they would know we were doing work and doing entries after hours.

Q.  So when you say they could access SICM and see when you were in and when you were out, you're not contending that there's some report that generates that shows when you first logged into the system and when you logged out?

A.  I'm pretty sure they can generate that.

Q.  What makes you think they can generate that?

A.  Because it's a database.  They should be able to -- to do that.  They would be able to see. I mean, every entry is time/date stamped.

Q.  That was going to be my next question.

You understand that various entries that you make into SICM are time stamped, right?



CRAIG COSTANZO  Confidential
KEITH FISCHER v GEICO

January 10, 2025
138–141

Page 138

A.    Yes.

Q.    But if you logged into the SICM system and didn't actually do any activity, how would Chet Janik know?

A.    Well, that, that I don't know.  I don't know if you can.  I would assume you could generate login and logout, but -- but that probably would be something that they would have to request.

But I think when they looked at the cases, you would see the time in and time out for date stamps of when you're doing entries.  But yeah, if you didn't do any entries, I guess that would have to be a specific request for some sort of a search of the database, but maybe not --

Q.    Okay.

A.    Not the -- you know, that would -- that may not be something that they would get generated unless they ask for it, but as they're looking at the cases, you would see the time/date stamps for when everything was getting done.

Q.    So aside from SICM time stamp entries, or activities that you enter into SICM, are there any other bases on which you're stating that Chet Janik or others should have known that you were working additional hours but not recording them in Workday?

Page 139

A.    It would be them, you know, when we're saying we can't do it unless we work extra hours, it's not specific saying, "I'm doing it"; it's, "You know we can't get this done unless we work extra hours."

And I think when they looked and realized we were getting it done, I think they -- they had a pretty good idea that we were all working extra hours to get our -- get our work in on time.

Q.    So if you tell Chet Janik, "I can't get my work done without working, you know, extra hours," and Chet Janik tells you, "Adjust your schedule as needed," and ultimately the work does get done, why would that indicate that you worked hours that you didn't record?

A.    Well, again, I guess you got to look at the time frames.  They're different time frames.  If you're talking about, you know, '16 to '18 or '19, the beginning, I could see him not necessarily being overly concerned, but when you're talking about during this, this COVID mess with all these just added, added, added cases, we were pretty clear that, "This isn't working.  We can't get this done."

So, I mean, it depends what time frame you're talking about.  If you're talking, like I said, '16, '17, '18, with the -- the plan to schedule adjust

Page 140

or whatever, that's fine.  He may not have picked up on it.  But I think it was pretty clear during the lockdown that we were all working extra hours.

Q.    So when you say it was clear, how did you inform him of the -- the conversations or the -- the substance of what you're just talking about?

A.    Well, during our team meetings, I mean, I think we were all kind of going, "Hey, this isn't working."  And -- and I know I specifically had said it when Bill Newport was around, going, "This isn't working.  This is too much."

Q.    And those team meetings were virtual?

A.    Yes.

Q.    And I think you're referencing that Bill Newport joined at least one of these team meetings?

A.    Some of them, yes.

Q.    Okay.  And so you would say, "This isn't working.  That" --

A.    Yeah, "There's too -- there's too much work to get done in the allotted time."

Q.    And what was Bill Newport's response?

A.    He disagreed.  He said that it's fine and to just make it work.  He -- he made it very clear he didn't think that this was excessive, and he thought this was something that we should all be able to do.

Page 141

Q.    You never informed Bill Newport that you were working additional hours but not recording them into Workday?

A.    I never specifically told him that.

Q.    Okay.

A.    I think I inferred that we we're all working extra hours to try to keep up, but I never specifically said, "I'm working and not putting it into Workday."  I never said that.

Q.    Okay.  This COVID time frame is when we talked about, obviously, significant changes with field investigators not being out in the field, right?

A.    Yes.  Yes.

Q.    Okay.  What -- what's your basis for claiming that either Chester Janik or Bill Newport had an understanding of what your day-to-day workload looked like when you weren't doing field work anymore?

A.    I'm sorry, I don't understand what you're saying.

Q.    Sure.  So if -- pre-COVID, you were out in the field and the activities that you were doing were the ones that a field investigator would typically do, right?

A.    Yes.

Q.    COVID hits.  Field investigators get



Page 146

15 minutes talking to a policyholder when they finally called you back, nothing prevented you from adjusting the next day's work by reducing it by 15 minutes, right?

A.    Correct.

Q.    Okay.  But it's not your testimony here today that Geico's policy has ever permitted you to work off the clock and not be paid for it?

MS. DSOUZA:  Objection.

BY THE WITNESS:

A.    I'm going to say what I said before. I think things did change.  It's kind of a -- like I said, I understand it says you're supposed to put it on the clock, but I also understand that there were times when we didn't, you know.  So no, I didn't think it was forbidden, but now I do.  I think it changed.

(Whereupon, proceedings were had which were not deemed confidential.)

Page 147

DEPOSITION ERRATA SHEET

Our Assignment No. J12220998

Case Caption: KEITH FISCHER, et al., vs. GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition, including the confidential excerpt, taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____ 20___.

_____
CRAIG COSTANZO

Subscribed and sworn to on the ____ day of _____ 20 ____ before me.

_____
Notary Public, in and for the State of
_____.

Page 148

DEPOSITION ERRATA PAGE

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

CRAIG COSTANZO

Page 149

DEPOSITION ERRATA PAGE

Page No.____ Line No. _____ Change to:_____

_____

Reason for change: _____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

Page No.____ Line No. _____ Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

CRAIG COSTANZO



Page 150

STATE OF ILLINOIS    )

                     ) SS:

COUNTY OF C O O K    )

I, ANDREW R. PITTS, C.S.R. within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on Friday the 10th day of January, 2025, personally appeared before me via videoconference, CRAIG COSTANZO, in a cause now pending and undetermined in the United States District Court, For the Eastern District of New York, wherein KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated are the Plaintiffs, and GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO is the Defendant.

I further certify that the said witness was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness remotely via videoconference, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing, including the confidential excerpt, is a true and

Page 151

correct transcript of the remote videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the Deponent.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 14th day of January, 2025.

Andrew R. Pitts
_____
ANDREW R. PITTS, CSR, RPR
CSR, COOK COUNTY, ILLINOIS


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com