# Exhibit U

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
1–4

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf
of all others similarly situated,

        Plaintiffs,

                Case No.:
                2:23 Civ. 2848
                (GRB)(ARL)
    -against-

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO,
        Defendants.
------------------------------------X

DEPOSITION OF

      DANIEL JOSEPH KING

    Tuesday, January 7th, 2025

    Garden City, Long Island, New York

Reported By:

Marina Dubson

Job #: J12200285

## Page 2

DATE: January 7th, 2025

TIME: 10:00 a.m.

DEPOSITION of DANIEL JOSEPH KING, an opt-in Plaintiff herein, taken by the Defendant, pursuant to Federal Rules of Civil Procedure, and Notice, held at Esquire Deposition Solutions, 1225 Franklin Avenue, Suite 325, Garden City, New York 11530, at the above-mentioned date and time, before MARINA DUBSON, a Notary Public of the State of New York.

## Page 3

APPEARANCES:

OUTTEN & GOLDEN, LLP
Attorney for Plaintiffs
685 Third Avenue, 25th Floor,
New York, New York 10017
(212) 245-1000
BY: SABINE JEAN, ESQ.
    Sjean@outtengolden.com
    JARRON MCALLISTER, ESQ.
    Jmcallister@outtengolden.com

DUANE MORRIS, LLP
Attorney for Defendant
1540 Broadway, 14th Floor,
New York, New York 10036
(212)471-1856
BY: GREG SLOTNICK, ESQ.
Gsslotnick@duanemorris.com

Sam Shereck, Shereck Video, videographer
Sshereck1@gmail.com

## Page 4

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties, as follows:

THAT all objections, except as to the form of the questions, shall be reserved to the time of the trial;

THAT the within examination may be signed and sworn to before any Notary Public with the same force and effect as if signed and sworn to before the Court;

THAT filing of the original transcript of the examination is waived.



DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
73–76

Page 73

D. King

If you determine there's fraud, even if not -- even if it's not 100 percent fraud, but if you determine that there is some fraud involved or possibility of fraud, that would be an impact.

Or if you can deny the claim completely for fraud or -- or if the car said it was stolen and then it was found with no damage, or the insured doesn't want to put a claim in anymore, that's an impact. So, there's a lot of variables.

Q. Did any of your supervisors send cases back to you more often than others?

A. Yes.

Q. Who sent them back to you more often?

A. Dara Campbell.

Q. Do you know why that was?

A. I have my own thoughts. That's all I am going to say.

Q. And what are your thoughts about that?

A. There was a new person who was

Page 74

D. King

assigned to the team, and he decided to do -- add certain -- add more steps that necessarily weren't requested by management or by the supervisor. But then I felt she took it upon herself to have everybody do these extra steps that seemed to take a lot more time, and they necessarily weren't helping the case. The outcome would still be the same.

Q. Who was that individual investigator that you mentioned?

A. Kevin Dux.

Q. Do you recall when Dara Campbell first started implementing these additional steps?

A. Not a lot longer after he was assigned to our team.

Q. Do you remember when he was assigned to your team?

A. No, I don't.

Q. Did you ever make any complaints about that to Dara?

A. I just said I don't -- yes. Okay. Yes, I did.

Page 75

D. King

Q. What complaints did you make?

A. I just said I don't feel that his steps and -- that he does necessarily I need to do. I've been doing this job, I let her know, a long time, and I haven't had any complaints before or -- I never had as many cases sent back before until she started sending me his cases to review and do it like this.

Q. And what was her response?

A. Basically, well, this is the way I want you to do it.

Q. And when you say the way that she wanted you to do it, did you have a set list of criteria that needed to be met? Like what specific steps did he add?

A. She -- she wanted to change the verbiage also of how I was doing my -- the same way I had been doing these cases for several years without an issue.

Q. And what specifically do you mean by change the verbiage?

A. She wanted things written a certain way.

Page 76

D. King

Q. Did she explain why?

A. She felt that his way was better.

Q. Did she tell you that?

A. Yes.

Q. In what context did she tell you that?

A. Over the phone.

Q. Do you remember when that conversation took place?

A. Within about a year and a half before I retired or quit, I should say.

Q. Do you remember if it was before or after the onset of COVID in March 2020?

A. It was after.

Q. And how did that change impact your caseload?

A. It took me longer to complete my caseload.

Q. Do you know if other investigators had the same workload that you did?

A. Steve Stemmler did.

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
77–80

Page 77

D. King

Q. How do you know that?

A. We were on, what I explained to you before, like the everything team. So, I knew that we were catching the same amount of cases per week, per month.

Q. Did you talk to Steve about that?

A. Yes.

Q. How often?

A. While I was working there, once every one week or two.

Q. How often did you talk to Steve in general on a weekly basis?

A. Not often.

Q. Were you both performing your own cases? Is that why?

A. Yes.

Q. Do you know about the workloads of any other investigators other than Steve?

A. Yes.

Q. Which investigators?

A. Keith Fischer and Scott Brady, and George McManus.

Page 78

D. King

Q. And who is Scott Brady?

A. Another investigator who works for GEICO.

Q. Was he on your team?

A. Yes.

Q. And how did you know about his workload?

A. Sometimes you would run into the -- the other investigators while conducting EUOs. They were conducting their own.

Q. How often would you run into Scott Brady?

A. I can't tell you.

Q. Did you see him on a weekly basis?

A. No.

Q. Monthly basis?

A. Probably once a month, possibly.

Q. Would you run into Scott, Keith or George in any other context other than seeing them at -- at the EUOs?

A. Not during that time, no.

Page 79

D. King

Q. And when you say during that time, what do you mean?

A. During the last couple of years of my -- my time at GEICO.

(Clarified by the Court Reporter.)

A. When I was employed at GEICO.

Q. Do you know if Scott Brady -- strike that.

What did Keith Fischer say about his workload?

A. That it wasn't as -- it wasn't as much as mine.

Q. Do you recall when he said that to you?

A. No.

Q. Any other details from that conversation?

A. I -- it was either him or George who said, wow, you guys are getting killed, meaning Steve and I.

Q. Do you recall any other details of your discussions about your workload with Keith or George or Scott?

Page 80

D. King

A. George had told me that, again, he couldn't believe how many cases that we were catching or being assigned, if you want to --

Q. Did he say how many cases he had at the time?

A. He didn't say the number, but he -- he said his workload was not as heavy as ours.

Q. Do you recall any other conversations with anyone other than Keith, Scott or George about workloads?

A. No.

Q. And did those conversations take place in person or over the phone?

A. In person.

Q. Do you know about the workloads of any other investigators other than the individuals we mentioned?

A. No.

(Defendant's Exhibit 2, GEICO employee handbook, was marked for identification as of this date by the Reporter.)

Page 109

D. King

today, there were certain steps that you had to take and have them submitted within the 24 hours to make your TIP.

Q. What specific steps are you talking about?

A. You had to do an opening statement about the case, why you were assigned, what you were assigned about. You had to do background -- initial background checks on all the people involved.

And there was another -- there was another like basic same step that you had to put in, basically saying what -- what other further steps of investigations you were going to do.

Q. Do you know if that TIP requirement was in place throughout 2016 to 2022?

A. Yes.

Q. It was?

A. Yes.

Q. And back to your discussion with Dara, I guess the first discussion,

Page 110

D. King

was anyone else on that call?

A. No.

Q. Do you have any written records of that discussion with Dara?

A. No, I don't.

Q. Do you have any written records of that second discussion you had with Dara?

A. No, I don't.

Q. Did you ever put in a formal request to transfer off her team?

A. No, I did not.

Q. If you look at paragraph nine on the next page, you say, on my regular --

A. Oh, paragraph nine?

Q. Yeah, paragraph nine, page three at the very top.

A. Got you.

Q. You say, my regular schedule for GEICO was 8:00 a.m. to 4:30 p.m. with a half-hour lunch. I often worked until 5:00 p.m., and then I continued working after dinner each day for an additional two hours. I worked about 50 hours a week on

Page 111

D. King

average?

A. Correct.

Q. And what time period is that in reference to?

A. That is from, I guess, COVID, when we were -- you know, after COVID, then we went -- were back to full, you know, going out and doing everything. You know, not just staying at home until I resigned.

Q. And when you say back to full, what do you mean by that?

A. Well, before we were -- because of COVID, we weren't allowed to go out and do investigations. Everything had to be over the phone, everything had to be -- EUOs had to be done over the phone.

Q. So, during COVID, you were not allowed to work in the field; is that correct?

A. Correct.

Q. And do you remember how long that was the case for?

A. A year maybe, or a year and a half. I -- I don't particularly recall.

Page 112

D. King

Q. And how did the fact that you could not go into the field impact your workload during that time?

A. Some of it, it -- it helped. We weren't catching as many cases as we were prior or after COVID. People weren't out driving, people, weren't, you know, committing fraud, I guess, during that time.

Q. Okay. So, was the volume of cases lower during that time?

A. I believe it was.

MS. JEAN: Apologies. For clarification, when you say that time, can you state the time, if possible, please?

BY MR. SLOTNICK:

Q. During the time period we were just testifying about in terms of March 2020 to when you were allowed to go back out in the field, that's -- that's the time period.

MS. JEAN: Because I was still -- thank you.

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
113–116

Page 113

D. King

BY MR. SLOTNICK:

Q.   So, is it your allegation that you worked an additional two hours after dinner every single day?

A.   At least, yes.

Q.   And what is that estimate based on?

A.   Based on the time that I spent at my desk, I would go down and have dinner.  My wife would get home around 5:00.  We'd have dinner, and then I would go up and work for another two, two and a half hours, just trying to -- to take care of my TIP.

Q.   Would you record that time?

A.   There's an unofficial recording if you -- if GEICO really wants to look.

Q.   What do you mean by that?

A.   Well, when I submit my cases or I submit my cases to be reviewed for TIP, or e-mails when my bosses are responding to me or talking to me which were after hours.

Q.   But when I -- just to go back to whether you submitted for that time, I

Page 114

D. King

mean on the Workday app, did you actually put in for these additional hours you claim to have worked?

A.   No, because I was told not to.

Q.   Who told you not to?

A.   Dara Campbell.  And it was said that they're not paying you overtime.

Q.   Who said that?

A.   Dara said that.  There was a guy -- the guy, Bill, the manager.

Q.   Bill was another SIU manager that you had?

A.   Yeah, Bill.  I can't think of his last name.  Oh, Newport.  Bill Newport.

Q.   And back to Dara.  So, when did she tell you that specifically?

A.   I don't exactly recall.

Q.   Do you remember when she said that to you?

A.   I know it was in the evening on a phone call, but I don't remember the date or -- I mean, this is all way before any lawsuit was put in.  So --

Q.   Do you have any written

Page 115

D. King

correspondence of that discussion with Dara?

A.   No, I do not.

Q.   And what exactly did Dara say to you on the phone in that call?

A.   I can't quote exactly what she said.

Q.   The sum and substance?

A.   Okay.  So, we discussed a couple of things.  Which one are you referring to?

Q.   I just want to know sort of what Dara told you on that phone call with respect to not putting in for your time worked as you are testifying to.

A.   Okay.  Because I spoke about -- I spoke to her about getting transferred.  That was one phone call.

Q.   Right.

A.   And then he was talking about one when I was saying I had trouble keeping up.  Is that what you're talking about?

Q.   You just testified with respect to Dara telling you that you would not be

Page 116

D. King

paid for that extra time after dinner, correct?

A.   She didn't just say me.  She said they're not going to pay you guys after that, you know.  They're not going to pay more than 7.75.

Q.   And what exactly did she say to you about that?

A.   I can't give you a quote.  I can't.  I don't --

Q.   Was that one conversation or was that a number of conversations about that topic specifically?

A.   I've probably had several conversations about that.  Not so much as far as overtime, it was more about how many hours working just to get the job done --

        (Clarified by the Court Reporter.)

A.   It would take to complete the job, how many extra hours a day.

Q.   Did Dara Campbell ever encourage you to work extra hours off the clock?



DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
117–120

Page 117

D. King

A.   No.

Q.   Did she ever suggest you work extra hours off the clock?

A.   Not to my recollection.

Q.   And you had also mentioned Bill Newport, SIU manager, correct?

A.   Correct.

Q.   Can you describe what he told you about working those extra hours?

A.   He never told me anything specifically.  I didn't really have many conversations with him.  I -- I don't think I have ever had a one-on-one with him.

Q.   Have you ever met Bill Newport?

A.   Yes.

Q.   Did you meet him in person?

A.   Yes.

Q.   So, who was Bill Newport talking to when you learned of this?

A.   The -- the supervisors.  I'm sorry.  The supervisors.

Q.   So, this is -- strike that.
Are you saying that this is something Dara said that Bill said?

Page 118

D. King

A.   Yes.

Q.   Understood.  So, did Bill ever directly tell you that?

A.   No.

Q.   Or any -- have any discussions with you about your hours worked?

A.   No.

Q.   And what's your basis for the estimation that you worked 50 hours a week on average in paragraph nine?

A.   My basis, that I would work from 8 to 5.  After dinner, I would go back up, log on to my computer again and spend another two, two and a half hours attempting to make my TIP.

Q.   And are you testifying that you did this every single day?

A.   I would say yes, I did.  Yes.

Q.   During what time period?

A.   During post-COVID until I left.

Q.   Did you ever work additional hours before COVID?

A.   At times.  At times.  But not to the extent that I was the last two years

Page 119

D. King

or three years.

Q.   What do you mean by at times, like how often?

A.   If for some reason I got stuck in traffic from coming back from doing an EUO, but I had to get this in, you know, by tonight at midnight, I would work the hours to get -- to get the report in.

Q.   Did you ever make any requests with respect to those additional hours for overtime pay?

A.   No.

Q.   Why not?

A.   Well, because it was known that they were not paying us overtime.  So, I'm not sure why I would even -- why ask?

Q.   Did you ever receive overtime pay while you worked at GEICO?

A.   I testified earlier that I did when I was -- they had those extra cases, the social media cases.  Yes, I was paid overtime.

Q.   I think you testified to the social media cases and the Superstorm Sandy

Page 120

D. King

cases, correct?

A.   I wasn't paid for Superstorm Sandy.  I -- you asked if anything was available to anybody.

Q.   Right.  Other than the social media cases though, did you ever put in a request for overtime pay?

A.   No.

MR. SLOTNICK:  Off the record.

THE VIDEOGRAPHER:  All right.  Off the record at 12:29.

(Whereupon, an off-the-record discussion was held.)

(Whereupon, a short break was taken at this time.)

THE VIDEOGRAPHER:  Okay.  Back on the record at 1:26.

BY MR. SLOTNICK:

Q.   Mr. King, before we broke, we were reviewing your declaration?

A.   Yes.

Q.   So, if you could turn to paragraph ten on page three in -- in Exhibit 4.

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
137–140

Page 137

D. King

show proof of when -- when my cases were submitted, at what time.

Q.    When you say your calendar book, are those the documents that we talked about earlier that you produced in this case?

A.    Yes.

Q.    In paragraph 12 on the same page at the bottom, it -- you say, GEICO required me to seek approval from my supervisor to submit any hours worked above 38.75?

A.    Correct.

Q.    Did a supervisor tell you that?

A.    Well, that's what you had to do.  You had to submit your -- your timesheet, and if there was anything over that, you -- you know, technically, I guess you were supposed to say if you were going to get paid, but they were not paying you for it.

Q.    Did you ever actually submit over that amount, though?

A.    No.

Page 138

D. King

Q.    So, how do you know that they were not paying you for it?

A.    Well, just what my supervisor told me.

Q.    And those were the conversations with --

A.    Dara Campbell.

Q.    -- Dara Campbell that you testified to earlier?

A.    Yeah.

Q.    And for those discussions with Dara, was anyone else present or it was just a one-on-one conversation?

A.    It was a one-on-one on the telephone.

Q.    You continue, in the same paragraph, it says, Dara Campbell, my supervisor, frequently reiterated to me and other special investigators that hours above 38.75 to complete regular case work would not be approved?

A.    Correct.

Q.    What other special investigators are you referring to in that

Page 139

D. King

paragraph?

A.    Just regular investigators.

Q.    Can you identify who you're talking about by name?

A.    Well, anybody who was an investigator that was working for Dara Campbell at that time.

Q.    Were you present for those discussions?

A.    No.

Q.    And what do you mean by frequently reiterated?

A.    When I would complain about that, that I'm having trouble keeping up with the work --

(Clarified by the Court Reporter.)

A.    When I would speak to her about me having trouble keeping up with my caseload and saying that, you know, there's not enough hours in the day for me, and basically had said I am going to get divorced soon because my wife was complaining I'm never around even though I

Page 140

D. King

work from home.

She basically said we're all -- she did say, but I can't quote, we're all in the same boat and you got to do the best you can.

Q.    Did she say anything else on that front?

A.    Not that I recall.

Q.    Do you know if any other investigators complained to Dara Campbell about not being able to keep up with the workload like you did?

A.    Honestly, I don't know.

Q.    Did working from home during the time period you couldn't go into the field after March 2020, did that give you any more flexibility in terms of how and when you could investigate your cases?

A.    No.  It -- it kind of hindered it because we couldn't go out.

Q.    Were you still required to go into the field and take pictures and scene canvass?

A.    Not in the beginning, no.



DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
141–144

Page 141

D. King

Q.   Do you remember when you were first able to go do that again?

A.   Well, I think it might have started -- like I said, I didn't go back till probably August.  So, maybe in the -- and again, I don't know for sure, but I am thinking maybe in the fall at some point.

Q.   And would that be 2020?

A.   2020, I believe.

Q.   During that time period, do you know of any investigators working in the field in New York?

A.   I have no idea.

Q.   And when you -- you said you missed about four months of work; is that right?

A.   Four or five months, yes.  Four or five months.

Q.   Do you know what happened to your pending cases during that time period right before you left?

MS. JEAN:  Objection.

THE WITNESS:  I know that before I went out sick, because this

Page 142

D. King

was a planned procedure, that I had caught up on a lot of my cases.  I wasn't catching.  I wasn't being assigned cases for probably the -- the week before I went out.

And during that time, I caught up on a lot of my cases, closed out what I could or, you know, did as much work as I could prior to going out sick.  So, they were reassigned to other investigators.  And how they handled them, I don't know.

BY MR. SLOTNICK:

Q.   And just to confirm, do you remember when you first went out on leave?  Was it March 2020?

A.   Yeah, because I had the surgery in -- end of February, week -- week before everything was shut down.  So, it might have been -- it was definitely in February, I had the surgery.

Q.   And then transitioning back to when you returned to GEICO, do you recall how you received new cases when you first

Page 143

D. King

returned?  Was it back in the normal swing of things?

A.   Back in the normal --

Q.   Were you given 65 cases at once or how did that work?

A.   No.

Q.   Was there a ramp up period?

A.   Usually, I would get probably five or six cases a day, five days a week.

Q.   And that was when you returned, or that was prior to your going out on leave?

A.   I can't recall prior, but I know afterwards when I went back because I was a little bit in shock with the caseload.

Q.   And how long was the time period when you received five to six cases a day?

A.   It was after the week when I first started, back whenever that was.

Q.   And you -- you received five to six cases a day from the time you returned until you left GEICO?

Page 144

D. King

A.   Yes.

Q.   Did that ever fluctuate during that time period?

A.   I'm sure at points, it did.  Maybe I've gotten four.  But --

Q.   And when you returned to work but before you were able to go back into the field, were you able to take breaks during the day and make up that time later in the day if you wanted to?

A.   I'm sorry.  Rephrase that.

Q.   Sure.  Were you able to -- strike that.

Did you still have your set work schedule, like for 8:00 a.m. to 4:00 p.m.?

A.   To 4:30.

Q.   8 to 4:30?

A.   Yes.

Q.   And were those the hours that you regularly worked when you were at home or were -- did you have more flexibility in terms of --

A.   No.  That was when we had -- at



DANIEL J. KING                                    January 07, 2025
Fischer v Government Employees Ins.                        145–148

Page 145

D. King

8:00, we were logged on to our computers.

Q.    And was that a GEICO-issued computer?

A.    Yes, it is.

Q.    Did you tell anyone that GEICO increased your caseload significantly after March 2020?

A.    I think I answered that.

Q.    What was your answer?

A.    Yes.

Q.    Do you know whether you were eligible for overtime from 2016 to 2022?

A.    I was only eligible from that time I had spoke to you about with the social media cases.

Q.    But if you had worked over -- strike that.

If you worked over 40 hours, wasn't GEICO's policy to pay you time and a half for that time?

MS. JEAN:  Objection.

THE WITNESS:  What it says in writing.  But what they actually did, they didn't pay us.  And we were

Page 146

D. King

discouraged from putting it in in writing.

BY MR. SLOTNICK:

Q.    How were you discouraged from putting it in?

A.    Like in any other business, there's unwritten rules.  And one, it was like you're going to make it worse for everybody else.  They're not going to pay you.  My boss was -- she was literally frightened by Bill Newport.  And I guess he -- she felt he was always on her tail. She didn't want any added attention to her or her team.

Q.    Can you specify what you mean, discouraged from entering more than 40 hours in a week?

A.    I don't believe -- no, let me rephrase that -- other than I know for a fact she's saying that they're not going to pay you that, just do the best you can, you know, try harder.  That's about the extent of it.

Q.    But she never actually told you

Page 147

D. King

not to enter more than 40 hours a week, correct?

MS. JEAN:  Objection.

THE WITNESS:  I can't answer that.

BY MR. SLOTNICK:

Q.    Do you not recall or did she --

A.    I don't recall.

Q.    Okay.  Do you know if senior field security investigators in Buffalo were eligible for overtime?

A.    I have no idea.

Q.    Did you ever work with anyone in Buffalo?

A.    No.

Q.    Did you ever go to the Buffalo office?

A.    No.

Q.    Was Buffalo part of your region at GEICO?

A.    They had their own region.  I think at one point they were and then they switched it, but I can't -- I can't swear to any of that.

Page 148

D. King

Q.    Do you know if SIU investigators in other regions and other states were eligible for overtime?

A.    I don't know.

Q.    Do you know if any SIU investigators in other regions and other states were paid overtime?

A.    Again, I -- I don't know.  I only really know -- only know what I can about Woodbury.  I don't know about the other regions.

Q.    If you look at paragraph 13 on page four, see you say, GEICO had a variety of performance metrics that I was required to meet to -- to remain in good standing.

A.    Yes.

Q.    These performance metrics and ratings changed constantly, but to the best of my recollection, GEICO generally evaluated me based on how many hours it took me to complete a case task, how often I made an entry in a case report, how many days I took to close a case and how many cases I completed within a month.  These



Page 149

D. King

metrics put a lot of pressure on me to work as much as needed to meet these goals and deadlines.

A. Correct.

Q. Was there a written policy anywhere that described those metrics?

A. I believe there is about how many -- you know, they must be somewhere. I don't have it. I don't have a copy of it, but I know there was some written that X amount of days to get TIPed on, you had to -- you had to be back in your case.

Like if you had a case, I had a case, like 50 cases -- I'd have to go back every so many days -- I forget -- it was like every three, four days, go back in and make an entry. So, you would have to go through all those cases just to put a note in, not including all the other steps you have to do on your cases.

Q. Do you know who that policy applied to?

A. I think it applied to every investigator, I believe. It wasn't

Page 150

D. King

specifically to me.

Q. And do you know who at GEICO communicated those metrics to you?

A. I believe it was -- it either came from Bill Newport or it came to -- from our immediate supervisor.

Q. Do you remember when GEICO started using those performance metrics?

A. I don't. It's -- things have -- you know, changed during the years that I was there. Metrics changed, timeframes, so I can't recall.

Q. And did you ever attend any meetings with Bill Newport?

A. Yeah. Once in a while, yes.

Q. In what context did you attend meetings? Were they all like staff meetings?

A. Staff meetings.

Q. And did Bill ever talk about hours during those meetings?

A. I don't recall. He was pretty much a gentleman who was like, this is the way it is, I'll listen -- I'll spend all

Page 151

D. King

day, listen to you guys all complain, but it's not changing.

Q. Who was complaining in those meetings?

A. There was people -- guys that that don't work there anymore -- guy named John Gillan [phonetic], he -- he left there before me. Some guys on some of the other teams that I am not familiar with.

Q. Do you recall what John Gillan complained about to Bill Newport?

A. That -- too many cases, too many steps and not enough hours, yeah.

Q. Did Bill Newport ever tell anyone, in response to the complaints, not to put in for all their hours worked?

A. No. Oh, I should say I don't know. I'll say I didn't know.

Q. In terms of the performance metrics that we were just talking about --

A. Yes.

Q. -- were there any other metrics that are not included in paragraph 13?

A. I don't recall at this time.

Page 152

D. King

Q. Do you know if audit results were part of the performance metrics?

A. Yes. They were, I believe, I should say. Scratch that. I believe they were. I'm not positive.

Q. And what were -- what did audits consist of, audits of your case files?

A. I'm just trying to go by memory on this. Time going back, making notifications in your case, the mandatory time, how long a case stayed open, should have been closed, notifications. It could be like whether somebody should have been interviewed and they weren't on the case.

Q. Was that a decision that you made unilaterally in terms of who to interview for your cases, or was that something that was directed to you?

A. It could be both.

Q. What do you mean it could be both?

A. A supervisor may review -- be reviewing a case and makes a suggestion

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
177–180

Page 177

D. King

running shopping and everything. I was basically working that whole time, except for 20 minutes here or there.

BY MR. SLOTNICK:

Q. Did you have rest breaks or other breaks during each workday?

A. I may have. If I had to get up and go to the bathroom, I went to the bathroom. If the doorbell rang, if I was home, I open the doorbell [sic]. But, I mean, I always went back to work.

Q. Did you sign out for those breaks?

A. No. There was no -- we didn't have to sign out for those.

Q. Okay. Were there any breaks that you did have to sign out for?

A. No.

Q. Did you take a lunch break every day?

A. Sometimes I did. I ate at my desk a lot of times.

Q. Do you recall if you signed out

Page 178

D. King

for those breaks?

A. No, because most times, I was still working while I was eating.

Q. So, you did not sign out for meal breaks?

MS. JEAN: Objection.

THE WITNESS: No.

BY MR. SLOTNICK:

Q. If you look at interrogatory number four on page five, it says, describe each job title that you held during the relative period, including start and end dates of each title held. And for each job title, describe each job duty that you performed.

And in the second paragraph, plaintiff states during the relevant period, he recalls working for GEICO as a senior fraud investigator in SIU from approximately 2016 to May 2022 in GEICO's Woodbury, now Melville, office.

Do you see that testimony?

A. Yes.

Q. And was senior fraud

Page 179

D. King

investigator your official title at GEICO?

A. There was two forms. I don't know if -- honestly, I don't recall. I was either fraud investigator, it said on my business card senior fraud investigator, but then there was one that got paid more money than I did. And that was based on merit.

Q. What do you mean one got paid more than you?

A. The senior one was making more money than a regular investigator. I don't know if the one that says senior fraud is the above title or -- like Keith Fischer. All right. So, he was like a senior one. He was making more money than me. George McManus, same thing. Michael O'Sullivan, no. Steve Stemmler, at the time, no.

Q. So, you said Keith Fischer and George McManus were in roles that were making more money than you?

A. Same job, more money.

Q. Was it the same job title that

Page 180

D. King

you had?

A. That's what I don't recall, if theirs is senior fraud --

(Clarified by the Court Reporter.)

A. I don't recall exactly what their title was.

Q. And you said Michael O'Sullivan and Steve Stemmler --

A. At the time.

Q. Let me finish my question.

A. Sorry.

Q. No. You're okay.

At the time, Mike O'Sullivan and Steve Stemmler were in the same role as you --

A. Yes.

Q. -- is that correct?

A. Yes.

Q. Do you recall what their official job title was?

A. No. Let me see if I have a card.

MS. JEAN: You're not allowed

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
181–184

Page 181

D. King
to have any documents in front of the attorney.
THE WITNESS:  Sorry.
BY MR. SLOTNICK:
Q.   If -- if we look at interrogatory number six on page six, so this interrogatory asks you to identify each person who you contend had actual or constructive knowledge that you worked unpaid overtime hours as alleged in the complaint.
And then if you look down at your response, you identify Michael O'Sullivan, Keith Fischer, Steve Stemmler, Dara Campbell and George McManus.
Do you see that?
A.   Yep.
Q.   And so my question is, as to Michael O'Sullivan, can you describe all the knowledge that he has about your overtime allegations?
A.   He knows that we would both complain to each other back and forth

Page 182

D. King
discussing the amount of hours we were working.  I would see him on the computer, I could see sometimes when somebody's on.  And then I call him, we'd complain.  Keith Fischer, I see him or George.
Q.   Just -- just wanted to -- to follow up on that.
So, when you say Michael O'Sullivan, you complained to each other, how often did you complain to each other?
A.   Once a week or more.
Q.   Do you remember like the substance of your actual discussions with Michael O'Sullivan about your complaints?
A.   I would say I can't -- you know, something to the effect that I can't believe I got another five cases today, I'm still backed up on the five I caught yesterday, things of that nature.
Q.   And at the time, did Michael also report to Dara Campbell?
A.   No.
Q.   Who did Michael report to?

Page 183

D. King
A.   I don't know.  He was -- like I said, he got switched to -- they broke up -- made fraud -- the fraud investigators, they made them a separate unit.
Q.   And with respect to Keith Fischer, what knowledge does Keith Fischer know about your overtime allegations?
A.   Just saying -- you know, in talking to him, probably running into him at EUOs and whatnot, just saying, you know, I can't believe how many cases we're getting.  I am having trouble keeping up.  I am working all these hours.  And, you know, basically they would -- him and George would say the same thing.
Q.   Did you discuss how many actual hours that you were working with Keith Fischer?
A.   I don't recall.
Q.   Did you discuss the number of hours you were working with Michael O'Sullivan?

Page 184

D. King
A.   I don't recall.
Q.   Do you know if Michael O'Sullivan ever complained, other than talking to you, about his workload?
A.   I really don't know because I -- I didn't know his supervisors.
Q.   Do you know if Keith Fischer ever complained to anyone else other than you about his workload and hours?
A.   I can't answer.  I don't know.
Q.   What about Steve Stemmler?  What information does Steve Stemmler have about your overtime allegations?
A.   I would -- he knows -- he was catching the same amount of cases and working the same amount as I was.
Q.   Did you complain to Steve Stemmler about your cases and your hours?
A.   If I saw him in passing and we started BSing, yes.
Q.   Do you remember how often you would have those conversations with Steve?
A.   Once every couple of weeks



DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
221–224

Page 221

D. King

THE VIDEOGRAPHER:  Okay.  We're off the record at 3:54, and that concludes the deposition.

(Whereupon, at 3:55 P.M., the Examination of this Witness was concluded.)

_____
DANIEL KING

Subscribed and sworn to before me this _____ day of _____ 20___.

_____
NOTARY PUBLIC

Page 222

D. King

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | the complaint | 18 |
| Exhibit 2 | GEICO employee handbook | 80 |
| Exhibit 3 | training log | 92 |
| Exhibit 4 | Declaration of Daniel King | 98 |
| Exhibit 5 | interrogatories | 173 |
| Exhibit 6 | second amended collective and class action complaint | 189 |
| Exhibit 7 | e-mail | 190 |
| Exhibit 8 | e-mail | 193 |
| Exhibit 9 | e-mail | 194 |
| Exhibit 10 | e-mail | 197 |

(*Exhibits attached to transcript.)

(Cont'd next page.)

Page 223

D. King

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. SLOTNICK | 6 |
| MS. JEAN | 212 |

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| 1. Request for SICM entries | 219 |
| 2. Request for metrics | 220 |
| 3. Request for expectations for case investigation tasks | 220 |

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 224

D. King

C E R T I F I C A T E

STATE OF NEW YORK     )
                       :
COUNTY OF RICHMOND    )

I, MARINA DUBSON, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of January 2025.

_____
MARINA DUBSON

DANIEL J. KING
Fischer v Government Employees Ins.

January 07, 2025
225

Page 225

```
                    ERRATA SHEET
WITNESS NAME: DANIEL KING
PAGE  LINE (s)        CHANGE      REASON
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____
____|_____|  _____| _____


--------------------
DANIEL KING

SUBSCRIBED AND SWORN BEFORE ME
THIS ____ DAY OF _____, 20__.
_____ _____
(NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

