# Exhibit V

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL        )
O'SULLIVAN, JOHN MOESER,       )
LOUIS PIA, THOMAS BARDEN,      )
CONSTANCE MANGAN, and          )
CHARISE JONES,                 )
individually and on behalf     )
of all others similarly        )
situated,                      )
                               )
          Plaintiffs,          )   Case No:
                               )   2:23-Civ. 2848
     -vs-                       )   (GRB)(ARL)
                               )
GOVERNMENT EMPLOYEES           )
INSURANCE COMPANY d/b/a        )
GEICO,                         )
                               )
          Defendant.           )

The videotaped videoconference deposition of LOUIS CANIGLIA, JR., called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken remotely before ALICE M. SCHWINGER, CSR NO. 84-2913, a Certified Shorthand Reporter of the State of Illinois, on the 17th day of January, A.D. 2025, commencing at 10:00 a.m. Central Standard Time.

**Page 2**

APPEARANCES:

    OUTTEN & GOLDEN, LLP,

    (685 Third Avenue, 25th Floor,

    New York, New York 212/245-1000,

    516/788-7159), by:

    MR. JARRON D. McALLISTER,

        appeared on behalf of the Plaintiffs;


    DUANE MORRIS LLP,

    (190 South LaSalle Street, Suite 3700,

    Chicago, Illinois 60603,

    312/499-6700), by:

    MR. GREGORY TSONIS,

        appeared on behalf of the Defendant;

REPORTED BY:  ALICE M. SCHWINGER, CSR
              CSR No. 84-2913.

**Page 3**

THE VIDEOGRAPHER:  We are now on the record. The time is 10:00 a.m. Central Time on January 17, 2025.  This begins the videoconference deposition of Louis Caniglia, Jr., taken in the matter of Keith Fischer, et al., v. Government Employees Insurance Company.  This case is filed in the United States District Court, Eastern District of New York, Case No. 2:23 CIV 2848.

My name is Brent Jordan.  I'm your remote videographer today.  The court reporter is Alice Schwinger.  We are representing Esquire Deposition Solutions.

Will counsel present please identify yourself and state whom you represent.

MR. McALLISTER:  Jarron McAllister for plaintiffs from Outten and Golden representing Mr. Caniglia in this deposition today.

MR. TSONIS:  Greg Tsonis from Duane Morris, LLP, representing defendant GEICO.

THE COURT REPORTER:  My name is Alice Schwinger, Illinois Certified Shorthand Reporter. This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely

**Page 4**

pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

(WHEREUPON, the witness was duly sworn.)

LOUIS CANIGLIA, JR., called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TSONIS:

Q.   Good morning, Mr. Caniglia.

A.   Hello.

Q.   Can you please state and spell your name for the record?

A.   Yeah, my name is Louis Caniglia.  That's L-o-u-i-s, last name is Caniglia, C-a-n-i-g-l-i-a.

Q.   All right.  What's your current address?

A.   10 Berry Court, Congers, that's C-o-n-g-e-r-s, New York 10920.

Q.   Thank you.  And, Mr. Caniglia, as I said, my name is Greg Tsonis.  I'm a lawyer for GEICO, and I'll be taking your deposition today.

Have you ever been deposed before?

A.   No.



Page 49

BY THE WITNESS:

A. No.

BY MR. TSONIS:

Q. I'm just a little confused. I thought that's what you said.

A. That's not what I said. I said that there was a ruling, and GEICO changed it. Whether GEICO did that, that's GEICO's decision if they did it because of that or not.

Q. Right -- sorry. I didn't mean to interrupt. I'm trying to get an understanding if you have any basis for that other than what you've read, for example, online or anything like that?

A. I don't understand the question.

Q. Right. So at some point a change was made, but fair enough to say that you don't know why GEICO made that change?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I can't attest to why GEICO made a change or not.

BY MR. TSONIS:

Q. Okay. But at some point after that change, is it your understanding that you were

Page 50

compensated at your hourly rate and eligible for one and a half times that hourly rate if you worked more than 40 hours?

A. Can you rephrase the question?

Q. I mean, you're asserting claims for unpaid overtime as part of this lawsuit; right?

A. Yes.

Q. What was the compensation plan that applied to you? When were you entitled to overtime?

A. When we worked more than 7.75 hours a day.

Q. So if you worked more than 7.75 hours in any day, you think that wage should be paid at time and a half?

A. Yes.

Q. Okay. And that's just your own personal understanding of what you're owed?

A. No, it's -- yeah, yeah, yes. Okay.

Q. Okay. So when your compensation changed from a premium time payment that you referenced earlier to potentially time and a half, you were still entering time in the Workday system; right?

A. Okay. Yes.

Page 51

Q. All right. And at some point, the Workday system, your timekeeping system and procedures changed; right?

A. Yes.

Q. All right. So at some point, GEICO changed where you would actually sort of sign in and sign out from your phone?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Yes.

BY MR. TSONIS:

Q. And that was using like a Workday application on your phone?

A. Yes.

Q. All right. Do you have a recollection as to when that change occurred?

A. No, I don't.

Q. That was the timekeeping process, though, that you had to follow up until you left GEICO; right?

A. Yes.

Q. Okay. And is it your testimony that when that timekeeping process was in effect, that you were not permitted to log any hours in excess

Page 52

of 7.75?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I can't -- I can't attest to that the whole time, but generally speaking, yes.

BY MR. TSONIS:

Q. Okay. And why can't you, I guess, attest to it the entire time? Were there --

A. Every day is different, Counsel.

Q. What do you mean by "every day is different"?

A. You're asking me for exact -- I can't give you exact information on that. I'm sorry. I apologize, but I can't. I don't -- the question is just not -- it's -- you're asking me to do specific dates to recall. I can't do that. Every day is different.

Sometimes -- to be honest with you, sometimes I didn't put in my workday, and I had to tell my supervisor the next day that, look, I have to put in yesterday's day today. I mean, stuff happens in life. It's a human -- it's -- we're human. I mean, I can't say that every day I had to put in 7.75 hours because that's not realistic.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
53–56

Page 53

Q.    So I'm not asking about any specific day.  I'm just asking were there times where you worked more than 7.75 hours in a day, and that's --

A.    Yes.

Q.    -- and recorded more than 7.75 hours in a day?

A.    Again, I -- yes.  I would have to say yes.  I can't recall, though, the specific days, but possibly, yes.

Q.    Okay.  When that would occur, what was the process that you would follow?  Would you have to, for example, notify anyone that you were going to work more than 7.75 hours?

A.    Yeah, my supervisor.

Q.    Okay.  And how would you notify your supervisor?

A.    E-mail.

Q.    What would you say in an e-mail to your supervisor?

A.    I need some extra hours to work.  I'm -- you know, I'm going to be working extra hours.  Can you approve overtime?

Q.    And what would your supervisor respond, typically?

Page 54

A.    It would usually be, in sum and substance, a negative for payment, but didn't say don't work.

Q.    But they didn't say work the hours anyway?

A.    They didn't say don't work.

Q.    Right.  I understand your testimony.  I'm just clarifying.  They didn't tell you to work the hours anyway; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.    No, they didn't tell me to work and you're not getting paid, no, they didn't say that.

BY MR. TSONIS:

Q.    Did any of your supervisors in your time in SIU at GEICO ever instruct you to work off the clock?

A.    No.

Q.    When you first joined SIU, were you -- after your training was completed, were you working remotely from your home?

A.    Yes.

Q.    And did that, I guess, continue the entire time that you worked for GEICO in SIU?

Page 55

A.    Yes.  Like I said before, I had -- they -- GEICO would set -- set us up -- well, or me, with a home office.  So, yes, I was remote.  I wasn't on location in the GEICO office.

Q.    Were there ever times that you did go into the GEICO office?

A.    Yes.

Q.    All right.  Was that the Woodbury office?

A.    Yes.

Q.    And then subsequently, the Woodbury office moved and is also known as the Melville office?

A.    Yes.

Q.    All right.  Aside from the Woodbury/Melville office, were you ever assigned to any other GEICO office?

A.    No.  I mean, I think there was a legal office in Huntington Quad -- Quadrangle.  That's where I think the attorneys were.  We had a few meetings there.  But other than that, no.

Q.    You weren't assigned, for example, to the Buffalo office at any point?

A.    No.  No.

Page 56

Q.    Okay.  So at all times when you worked in SIU, were you a part of at least what was then Region 2?

A.    That's correct, yes.

Q.    And at some point, was it your understanding that GEICO, across like sort of divisions, changed from the geographic-based region structure to a totally different structure?

A.    Yes, they -- GEICO, yes, that they rearranged things, yes.

Q.    Okay.  We talked about supervisors.  Initially, when you came into SIU, who was the manager of the Woodbury office of Region 2 in SIU?

A.    For SIU, I believe, from what I recall, it was Michael DeGrocco.

Q.    Do you recall when Mr. DeGrocco left?

A.    Left the company or -- or SIU?

Q.    Fair clarification.  When he stopped being the Region 2 SIU manager.

A.    I don't recall the date.  I'm going to say -- don't hold me to this, but I'm going to say approximately 2020ish.

Q.    Okay.  After Mike DeGrocco, who was the SIU manager for Region 2?



LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
149–152

Page 149

pretty far drive one way in New York.

A.   It is.  I agree with you.

Q.   Okay.  Once COVID hit, though, and you weren't in the field, you know, that time you -- there's no longer any time in the car; right?

A.   For a brief period, I believe it was like for the -- yeah, for a brief period of time, yes, I'd agree with that, yeah.

Q.   Was it a brief period of time?  I mean, in your declaration, you write that normal field operations didn't come back until November of 2021.

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yeah.  Yes.

BY MR. TSONIS:

Q.   All right.  So from about March 2020 to November 2021, you were -- well, for a period of time, you were definitely not in the field at all; right?

A.   I wouldn't say at all.  I mean, during that particular time period, I might have went out, like you said prior, to do canvasses and things like that, maybe pick up the police reports; but for the most part, the job in general changed to

Page 150

primarily a working-at-home job, in terms of they didn't -- like, again, GEICO probably didn't want you to go out and get sick.  At that particular time, it was very -- it was uncertain.  People were dying.  It was all over the news.  So I can understand GEICO's position on that.

So I'd say for that yearish, give or take, field operations, normal field operations were not the same prior to the pandemic.

Q.   Right.  And I guess I'm just saying immediately after COVID, you know, the amount of time in the field was like zero percent; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   In the beginning, I would say -- I mean, from what I can recall, I could be wrong again, but no, I don't recall being in the field that much during the pandemic, in the initial part of the pandemic.  Again, pandemic, I don't know the dates of when it officially lasted, but definitely the beginning part, no.

BY MR. TSONIS:

Q.   Okay.  And so you write in your declaration here that -- in the next sentence in

Page 151

paragraph 10 that GEICO increased your caseload significantly after March 2020; right?

A.   Yes.

Q.   And you write that your overtime hours increased as a result to about 50 hours a week on average?

A.   That's what I wrote, yes.

Q.   Okay.  So I guess part of the increase in your caseload was the result of basically eliminating the windshield time as a field investigator; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   That could be an explanation of why, yes.

BY MR. TSONIS:

Q.   All right.  Well, I guess, if you remove, you know, one to four hours of a day that you would have otherwise been in the field, that's time you could otherwise spend working on cases; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Counsel, I mean, I'm going -- I'm going

Page 152

to agree with you because I understand it's a logical explanation of what you're saying, but I don't -- I don't know if I can agree with it entirely because there's so many other variables in life that happen.  But okay.  Yeah, I think that's GEICO's position on what they thought.

BY MR. TSONIS:

Q.   Right.  Well, I guess just as a -- like a practical matter, pre-COVID, there was -- we don't have to --

A.   Yep.

Q.   -- a number, but there was X amount of number of hours that you spent in a car, right, and once COVID stopped operations, that X number of hours were no longer spent in a car; right?

A.   Yes.  I understand your logic, yes.

Q.   Okay.  After -- you write in paragraph 11, after the return to normal field operations in about November 2021, that your overtime hours decreased somewhat as a result?

A.   Yes.

Q.   You see that?  All right.  But you write that your caseload still required you to work overtime to keep up with your workload and that you



Page 153

estimate that you were back to sort of 48 hours a week on average?

A. Yes. I see it.

Q. Okay. You write in paragraph 12: Since about February of 2023, GEICO has required me to clock in and out. Unfortunately, to keep up with my work, I must still perform about five hours of work off the clock most weeks.

Do you see that?

A. Yes.

Q. All right. So, again, that February '23 is sort of a reference to when GEICO changed its process and had you logging in and out of Workday on a daily basis from your phone?

A. I think so, yeah. I guess that's about right.

Q. Okay. So if you skip ahead to paragraph 13.

A. Okay.

Q. It sort of summarizes the hours worked in the previous period, but I want to call your attention actually to page 4 of the declaration. It's page 11 of the PDF.

A. Okay.

Page 154

Q. So you write in the first full sentence of the first line where it says "In sum."

Do you see that?

A. I'm on page 11 of the PDF.

Q. Yes. It's after the parenthetical. It's the sentence starting "In sum."

A. I don't see this. Hold on.

Q. It's on the very first line, but it's part way through the sentence.

A. In sum.

Q. It's page 4 of the declaration.

A. I see it. I see GEICO's overtime practices -- the pay practices --

Q. Yes. The very first line of text at the top, do you see, it's --

A. Okay.

Q. -- continuing a sentence, and then there's a period and then it says "In sum"?

A. I'm sorry. I'm -- yes, I see this now. Okay.

Q. All right. So it says: In sum, for the periods described above, my best estimate is that I am owed approximately $120,001.42 in unpaid wages.

Do you see that?

Page 155

A. Yes. Yes.

Q. Is it your best -- is it your contention that, as part of this lawsuit, you're owed approximately $120,000 in unpaid wages?

A. Yes.

Q. All right. And you say after this sort of -- the next sentence says, this is your best recollection, but after that, there's a sentence that says: This amount does not include liquidated damages, which would add another $120,001.42 in damages.

Do you see that?

A. I see this, yes.

Q. Okay. So you're claiming as part of this lawsuit that you're owed at least $240,000 from GEICO?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Based on this statement, yes.

BY MR. TSONIS:

Q. That's what you're seeking to recover, not counting attorneys' fees or costs, pre-judgment interest and post-judgment interest?

MR. McALLISTER: Objection.

Page 156

BY THE WITNESS:

A. I believe this is punitive damages, so yeah, I'm going to say yes.

BY MR. TSONIS:

Q. Okay. Well, it says liquidated damages, but you use the word punitive. What's your understanding, or why do you use the word punitive?

A. Because that's my definition of what this is, in my opinion, $120,000 liquidated damages, and its synonym is punitive damages; right? That's my reading of it.

Q. Okay. So you're seeking $120,000 in unpaid wages and punitive damages to punish GEICO in the amount of $120,000 at least?

A. GEICO --

MR. McALLISTER: Objection.

THE COURT REPORTER: I'm sorry. There was a -- there was -- I think there was an objection and --

MR. McALLISTER: Yes, ma'am.

THE COURT REPORTER: Okay. Thank you.

What's your answer, sir? Because none of it came through.

THE WITNESS: Are you -- are you speaking to



Page 165

Q. -- which manager are you referring to or managers?

A. Again, I can't -- the statement, I see it now, but the manager at the particular time was Bill Newport, I believe, during that 2023 period. So --

Q. Let me ask --

A. -- again, Bill Newport never said to me directly that I can't receive overtime, so I don't --

Q. Okay. Did Rene Cubas ever tell you that you couldn't receive overtime?

A. Directly, no.

Q. Did Mike DeGrocco ever tell you you could not receive overtime?

A. No.

Q. Okay. Did any of those three managers ever instruct you to work off the clock?

A. To work off the clock, no, no.

Q. Okay. None of those managers would know if you were working off the clock; right?

A. I don't know that. I don't know. I'm assuming there's ways to check if you're on the computer and stuff or not, but I don't -- I don't

Page 166

know. I can't answer that question in a -- in a yes or no. I can't.

Q. Okay. So I know you talked about conversations with your supervisors. Setting aside conversations with your supervisors, are there any other ways in which you're claiming that your supervisors knew that you were working but not recording your time in Workday?

A. That's a good question. I don't -- I don't know if -- I'm going to say no to that question.

Q. So those conversations essentially are the basis for your claim, that your supervisors, you know, that -- to use the paragraph 14 language, that GEICO failed to record your hours worked and you weren't paid for time?

MR. McALLISTER: Objection.

BY MR. TSONIS:

Q. Well, strike that because I think I asked it poorly. I'll ask it again. Those conversations with your supervisors, that's the basis for you claiming that your supervisors were aware that you were working hours that you weren't compensated for?

Page 167

A. My complaint is that I was working and I wasn't compensated for my time that I worked for GEICO all of the time, in terms of the entirety of my overtime working. I'm going to say no to your question because I can't attest to if they knew anything or not. So, again, my complaint is unpaid overtime. It's just -- it's a simple complaint, so...

Q. Okay. So that's fair. So your complaint is unpaid overtime, but you don't know if any of the supervisors were aware of any of the hours that you were working but not getting paid for?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. They were aware of it because I -- I -- you -- you showed me e-mails before of -- of me telling them. You only have a brief period of time, though, from 2017 to 2018, I believe, but, you know, there was other years that -- and days that there's no documentation for that, and there could have been con -- there were phone conversations and things like that, so...

Page 168

BY MR. TSONIS:

Q. Right. I guess, listen to the question precisely, right, because we said for those e-mails, you were paid for those hours; right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I -- I can say that I requested those hours for me, and if you can look at the outline of those -- of those e-mails, I requested two hours when I was -- I literally worked six hours overtime, sometimes, or four hours overtime, and I'm only requesting an hour or two hours. So, I mean, it's -- again, the complaint is I'm not being -- I was -- we -- I was not paid for the time that I worked for the company of GEICO and protected their assets and did what I had to do to protect insurance fraud, people trying to get money that they didn't deserve, and that's what it was, so...

BY MR. TSONIS:

Q. Right. Mr. Caniglia, I guess, just listen to where I'm trying to -- the question --

A. I can't give you yes-or-no questions all the time, Counsel. You're trying to box me in



LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
169–172

Page 169

stuff, I feel.

MR. McALLISTER: You want to just -- sorry to talk over you, Greg, and talk over you, Lou, but just -- I know it is -- I know you want to, like, answer other questions and kind of, like, talk a bit more, but if Greg is asking you a specific question, or trying to ask you a specific question, it would be good to just kind of answer that question. And if there are follow-up questions, then he'll ask them. Yeah.

MR. TSONIS: Thank you, Jarron.

BY MR. TSONIS:

Q. My question is generally, right, you're claiming that there were hours that you worked above and beyond 38.75 in a workweek; right?

A. Yes.

Q. Some of those hours, like those that we saw in the e-mails that I showed you in Exhibit 6, some of those hours above 38.75, you were compensated for; right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I believe so, yeah. Again, I don't have my pay stub in front of me, but yes. Okay.

Page 170

BY MR. TSONIS:

Q. And that's fair. I didn't ask you -- you know, we haven't looked at a document to verify that it's actually on your paycheck. I guess, you know, more precisely, given that you're requesting it to your supervisor, you have no reason to think you weren't compensated for those; right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Okay. Yeah, I'd agree with that. Okay.

BY MR. TSONIS:

Q. And I understand that your claim in this lawsuit is that there are other hours that you worked in excess of 38.75 that you weren't compensated for; right?

A. Yes.

Q. Okay. Now, when I asked you before the basis for saying that your supervisors knew that you were working those hours that you didn't get compensated for, I said, right, your basis for claiming that they were aware of that is these conversations that you had with Gerry Cassagne and Toni D'Agata and potentially Theresa Bishop; right?

A. Yeah.

Page 171

Q. Okay.

A. Yes.

Q. And there's no other basis that you're claiming that they were aware of those hours aside from your conversations; right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. Greg, you really -- you're hitting me with these questions. I got to respond to like -- I mean, they can look at what I was doing on the computer and stuff, but I'm going to say no to that question.

BY MR. TSONIS:

Q. Okay. For the managers, do you have any basis --

A. Okay.

Q. -- that Mike DeGrocco or Bill Newport or Rene Cubas knew of any hours that you're claiming that you worked but you weren't paid for?

A. I'm going to say they -- I -- I don't know. I don't know.

Q. Okay. So I understand your answer of I don't know, but just to clarify, I guess, there's -- you don't know one way or the other, you

Page 172

can't say if they knew?

A. You want me to say what I believe? I believe they -- the managers --

Q. No, I didn't ask -- I didn't ask your belief. I just asked --

A. Okay.

Q. -- if you're -- if you're -- if -- if you're claiming that they knew that you were working those hours that were not documented in Workday?

MR. McALLISTER: Objection.

BY MR. TSONIS:

Q. Those --

A. Was it --

Q. -- specific three individuals?

THE WITNESS: It's okay. I get the question.

BY THE WITNESS:

A. To be more specific, I mean, I would submit case files. I would document my SICM -- it's S-I-C-M -- file in GEICO. There were date and time stamps of me working different hours. Sometimes you'd work a paper folder, or, like, you know, you're looking at stuff, police reports, et cetera, et cetera, going over EUO notes, interview



LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
201–204

Page 201

38.75 hours and then start up again Monday morning, for example?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yeah.

BY MR. TSONIS:

Q.   Okay.  When you -- is there a difference in how you document, like, a social media case versus a field investigation?

A.   Again, I've been out of GEICO for a year, but from what I can recall, a social media investigation requires a plan of action, and then a detailed social media investigation, if we can gain access to even -- the information we're looking at, but, yeah, every case is different.  So it's a yes.

Q.   You use the phrase here, like in paragraph 17, for example, you know, my fellow Special Investigators.  Who do you mean?

A.   I'm sorry.  Greg, I'm sorry, where was that?

Q.   So in your declaration, the last page, paragraph 17, and that's just one example, but there's -- you use the phrase, you know, my fellow, but you use the phrase "Special Investigators."

Page 202

What do you mean by special investigators?

A.   Special investigators.  I will clarify that, that I would say that senior outside security investigators related to this unpaid hours it takes to complete our work.  So I would say people that might have experienced the same thing that I did.

Q.   Okay.  So, I guess, are you talking about other senior security field investigators?

A.   Yes.  Yes.

Q.   Okay.  Are you talking about, I guess, you know, like, senior inside or desk investigators?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Again, I -- again, other individuals who have experienced -- who had my job title that I did with GEICO that experienced the same things that I did.  I just used the word fellow, meaning like I can relate to them.  So I can't attest for inside or outside, but if some people do feel that -- or did do work and not compensated for it, I would say that -- I would say my fellow special investigators, so...

Page 203

BY MR. TSONIS:

Q.   I'm less concerned about fellow and unpaid hours and more just around the term "special investigator."  So, like, you were a senior field security investigator; right?

A.   Senior outside field security investigator, I believe it was, yes.

Q.   Okay.  That job title does something totally different than what like a desk investigator does; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Yes.  Okay.  In terms of -- yes, like, they're not going -- they don't have to physically go face to face and, like, interview people and things like that.  Usually the desk is different, yes.

BY MR. TSONIS:

Q.   Okay.  And like field -- your job title is field investigator.  That's totally different than what like major case investigators do; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Most of -- I don't know if -- yeah.  I'm

Page 204

trying to give you an understanding of like -- believe it or not, like, the major case investigators predominantly would ask us to go in the field and do things of that nature, like interviews for, you know, PIP EUOs or --

(WHEREUPON, there was a brief interruption.)

THE WITNESS:  PI, personal injury, PIP.  So sorry.  Thank you for correcting me.

BY THE WITNESS:

A.   In that nature, it's difficult to say, Counsel, if -- the difference, but, yeah, there's a difference.

BY MR. TSONIS:

Q.   So you're investigating, for example, you know, pending claims that are made by a policyholder; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Can you say that again?  I'm sorry.

BY MR. TSONIS:

Q.   Yeah.  You -- you, as -- in your job, would investigate pending claims, right, made by a policyholder that have not been paid out yet?



Page 229

Q. Do you see there's a Pay Change History here?

A. I do.

Q. Sort of in the middle. All right. And do you see it sort of shows by year merit compensation changes that happened?

A. Yes.

Q. So from approximately, you know, 2017 where your total sort of base pay, it looks like, was 66,800, as of January 28th of 2023, that it increased to $90,171, approximately?

A. I see this, yes.

Q. All right. And it looks like you received a merit increase every single year?

A. Yes.

Q. Now, if you go to the page ending in 4988.

A. Is that -- in the PDF, Counsel, which one?

Q. Yeah, page 30.

A. Okay. Okay.

Q. All right. You see the bottom box here that says Time Off Requests?

A. Yes.

Page 230

Q. If you scroll -- and I don't want to go through every single line certainly, but you see there's like vacation, floating holidays, sick, caretime, different categories for time off?

A. Yes.

Q. All right. And very often it's like a full day. If it's 7.75 hours, it's a full day off that was requested?

A. Yes.

Q. All right. So in these times that are kind of indicated here, again, I recall you may not have a specific recollection of any specific day off, but generally speaking, when you put in and request it and it was approved, this is time that you weren't working; right?

MR. McALLISTER: Objection.

BY THE WITNESS:

A. I would say that's correct. If I put in time off for vacation, caretime, or something, I wasn't working. I can't say that I never popped on the computer, but I'll agree with that, yeah. No, that was -- I did my personal stuff, my life, if I put in for, you know, time off.

Page 231

BY MR. TSONIS:

Q. Okay. And then if we go to the last page I want to look at is the one ending in 5006, which is page 48 of the PDF.

A. 48. Okay. I see this.

Q. All right. Now, you see you had sort of performance reviews here that are listed at the bottom?

A. Yes.

Q. All right. And starting with, I guess, the year 2016, you would have been in SIU; right?

A. Yes, that's correct.

Q. All right. And from 2016 all the way through, it looks like, the first half of 2022, you received a rating of 4 or greater; right?

A. I believe so. I mean, that's my interpretation of what happened, yes.

Q. Do you recall getting a rating of less than 4 any of those years?

A. Never. And I'm going to use the word never. Never.

Q. Okay. And, you know, the fact that you didn't finish the year 2023, I suspect you didn't actually receive or get, you know, any sort of

Page 232

performance review for the year 2023; right?

A. Can I just say, I'm just curious, why does it say terminated? I wasn't terminated.

Q. I'll represent to you that it means any kind of termination, voluntary or involuntary. It just means you terminated your employment with GEICO.

A. Okay.

Q. It doesn't mean fired, if that's what you're worried about.

A. No, I'm not worried. I'm just saying it's an interesting way that it's described.

Q. Okay. But in any of these years or these performance reviews, the lowest it looks like you received while you were in SIU was like a 3.7; right?

A. From my recollection, I mean, I was always above a 3, so if that's my lowest, I don't know. I'd have to look at the ratings, but yeah, that's okay. Yeah, 3.7, maybe, yeah.

Q. Okay. And I guess you'd agree generally that, you know, working additional hours, as a general matter, helped you increase the core metrics that you were rated on?



LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
233–236

Page 233

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  I would disagree with that.

BY MR. TSONIS:

Q.  You don't think working additional hours helped improve your metrics?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  I think that working the core metric hours or working extra hours decreased my core metric performance because if you do the math in terms of hours worked versus cases closed, if you increase the hours worked, it will decrease your productivity.  So I was trying to be more product -- I was, like, honestly trying to be more productive, but it just didn't work out.

And I also wanted to keep the investigation process as transparent.  And in a way, I know investigations take a long time, sometimes, but other times when you get something across your desk and it's someone's insurance claim, which they have a contract with GEICO, it was like, okay, there's not really fraud here.  It came across.  I don't know how it came across.

Page 234

Again, I can't attest to how it did, but I'm not -- I'm not going to waste somebody's time or -- you know, if there's no fraud there, I'm not going to investigate it as thoroughly as I would if I do find fraud indicators early.  I don't know.  That --

BY MR. TSONIS:

Q.  Well, let me go back to what you said in the beginning, though.  You said --

A.  Sure.

Q.  -- you disagree because working -- because you're rated from a productivity standpoint on how many hours you're also spending to close those cases.  Is that -- did I misstate your testimony?

A.  How many hours am I working.  So what I said was that if I -- if you -- if you closed five -- let me just try to -- if you close five -- just say you hypothetically get five cases in a week and you work 48 hours to close those five cases, and then next week you get five case and it only takes you 37.75, the first week that I said, you would be rated less no matter what just because of the number, it took you longer to work those

Page 235

cases.

Q.  Okay.  So using your analogy --

A.  Sure.

Q.  -- that would only be true if you were actually entering the additional time into Workday; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  No.

BY MR. TSONIS:

Q.  How would the productivity metric that's assessed take into account time that you claim you worked but didn't enter into the company's timekeeping software?

A.  That's a great question.  I mean, I think that's a question for GEICO management to --

Q.  Well, do you have any basis for thinking that it was accounted for in your productivity metrics?

A.  It was.  It was negatively accounted for in terms of I was less productive for doing more work.

Q.  How was it negatively productive -- negatively affecting your productivity when those

Page 236

hours weren't documented anywhere, according to you?

A.  Because in the core metrics, at the end of the year, if I took more time than 38.75 hours to complete -- we'll use -- I'll use an example of five cases.  If I could work five cases in 38.75 and then the next week I got ten cases, I could only put 38.75 hours in.  So if I did ten cases in 38.7 hours, if I put more work in, which I did, I could be negatively impacted on my core metrics.

Q.  If you were to put in ten additional hours and you log those in the system, is what you're saying that your productivity number would be negatively affected because you are taking 48.75 hours to close those cases now?

A.  Yes, that's correct, Counsel.

Q.  Okay.  Now, I guess what I'm saying is if you don't enter those hours and in GEICO's system it looks like you're only working 38.75 hours to close, don't you get the benefit of the increased productivity number?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.  Maxed out at 5, and then have to deal



LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

January 17, 2025
265–268

Page 265

no.

Q.   Well, was your supervisor ever in your home with you?

A.   Was my supervisor ever in my home with me, no.

Q.   Okay.  So if you're working on your lunch, your supervisor wouldn't know that?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   I don't -- I don't know.

BY MR. TSONIS:

Q.   Your supervisor didn't require you to take lunch at a certain time; right?

A.   No, we didn't have a lunch period.

Q.   Okay.  So given that you could take lunch whenever you want and your supervisor wasn't with you, your supervisor wouldn't know what time you're on lunch; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   That's -- no.  That's -- he -- he or she could know if I was on lunch at sometimes.

BY MR. TSONIS:

Q.   Unless you told them, they wouldn't know

Page 266

that you were on lunch; right?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   Well, obvious -- yes, obviously.  I mean, how would they know I'm on lunch unless they had a camera in my house or something like that, yeah.

BY MR. TSONIS:

Q.   Did you ever tell any supervisor "I'm working on my lunch"?

A.   Yes.

Q.   When?

A.   I don't recall.

Q.   Who did you tell that to?

A.   Gerry Cassagne, Toni D'Agata.

Q.   Okay.  Your declaration references the time that you spent working overtime, allegedly, while you were working for GEICO; right?

A.   It's not allegedly.  It's what it is, but yes.

Q.   Okay.  Your declaration, do you recall, references time that you claim to have spent working prior to and after your normal scheduled shift?

Page 267

A.   Normal -- again, a normal scheduled shift, it's not an 8:00 to 5:00 job.  It's a different type of job, so...

Q.   Right.  So does your declaration reference working in a meal period at all?

A.   It may.

Q.   Go ahead and pull it up.

A.   Pull what up?

Q.   Exhibit 2.

A.   Okay.  Is this the one, Louis Terminated?

Q.   No, it's the one that starts 2023-11-08.

A.   2023.  Can you resend that to me, please?

Q.   It's the second document that was sent to you, if you scroll to the top.

A.   The second document I have, it says Louis Caniglia Terminated, which is not accurate, but that's neither here nor there.

Q.   I'll share my screen.  This is Exhibit 2.

A.   Thank you.

Q.   Okay.  So do you see here you write: Prior to March 2020, I worked about two hours of

Page 268

extra work per day, including when I logged in to do work before 8:00 and continued working after 4:30.  Once or twice a month, I worked on Sundays.  In total, I was working 48 hours a week.

You don't say anything about meal periods there; right?

A.   That statement has nothing to do with -- no meal periods, yes.

Q.   Okay.  And, in fact, you don't reference meal periods anywhere in your declaration; right?

A.   I would have to review it, but no.

Q.   Okay.  So are you claiming now that you're owed compensation for meal periods that you spent working?

MR. McALLISTER:  Objection.

BY THE WITNESS:

A.   I am claiming that I worked through my meal periods.

BY MR. TSONIS:

Q.   Are you claiming --

A.   I wasn't compensated for that time.

Q.   What specifically did you say to Gerry Cassagne about your meal periods?

A.   I don't recall.



Page 273

STATE OF ILLINOIS    )

                     )  SS:

COUNTY OF DUPAGE     )

I, ALICE M. SCHWINGER, CSR No. 84-2913, a Certified Shorthand Reporter of the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Woodridge, Illinois, this 21st day of

Page 274

January, A.D. 2025.

_Alice M. Schwinger_

Certified Shorthand Reporter

ALICE M. SCHWINGER, CSR No. 84-2913

Page 275

                I N D E X

EXAMINATION                              PAGE

LOUIS CANIGLIA, JR.,

EXAMINATION                                4

BY MR. TSONIS:

               E X H I B I T S

| Exhibit No. 1 | 69 |
| Exhibit No. 2 | 85 |
| Exhibit No. 3 | 98 |
| Exhibit No. 4 | 102 |
| Exhibit No. 5 | 104 |
| Exhibit No. 6 | 110 |
| Exhibit No. 7 | 214 |
| Exhibit No. 8 | 224 |
| Exhibit No. 9 | 243 |
| Exhibit No. 10 | 245 |
| Exhibit No. 11 | 246 |
| Exhibit No. 12 | 249 |
| Exhibit No. 13 | 253 |

Page 276

DEPOSITION ERRATA SHEET

Our Assignment No. J12275709

Case Caption:  Fischer, et al

vs.  Government Employees Insurance Company

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the deposition errata sheet hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2025.

_____

Louis Caniglia, Jr.

LOUIS CANIGLIA, JR.
KEITH FISCHER, et al. vs GEICO

Page 277

```
                  DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
        Louis Caniglia, Jr.
```

Page 278

```
                  DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
        Louis Caniglia, Jr.
```

