# Exhibit W

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN MOESER, LOUIS PIA, THOMAS BARDEN, CONSTANCE MANGAN, and CHARISE JONES, individually and on behalf of all others similarly situated,

       Plaintiffs,

                   Case No.:
                   2:23 Civ. 2848
                   (GRB)(ARL)
   -against-

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,

       Defendants.
-----------------------------------X

DEPOSITION OF

       MARIA MUNOZ

       Tuesday, December 17th, 2024

       New York, New York

Reported By:

Marina Dubson

Job #: J12144279

## Page 2

       DATE: December 17th, 2024

       TIME: 10:00 a.m.

     DEPOSITION of MARIA MUNOZ, an opt-in Plaintiff herein, taken by the Defendant, pursuant to Federal Rules of Civil Procedure, and Notice, held at Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York 10036, at the above-mentioned date and time, before MARINA DUBSON, a Notary Public of the State of New York.

## Page 3

APPEARANCES:

OUTTEN & GOLDEN, LLP
Attorney for Plaintiffs
685 Third Avenue, 25th Floor,
New York, New York 10017
(212) 245-1000
BY: SABINE JEAN, ESQ.
   Sjean@outtengolden.com
   JARRON MCALLISTER, ESQ.
   Jmcallister@outtengolden.com

DUANE MORRIS, LLP
Attorney for Defendant
1540 Broadway, 14th Floor,
New York, New York 10036
(212)471-1856
BY: GREG SLOTNICK, ESQ.
Gsslotnick@duanemorris.com

Gil Peretz, Shereck Video, videographer

## Page 4

    IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties, as follows:

THAT all objections, except as to the form of the questions, shall be reserved to the time of the trial;

THAT the within examination may be signed and sworn to before any Notary Public with the same force and effect as if signed and sworn to before the Court;

THAT filing of the original transcript of the examination is waived.


ESQUIRE
DEPOSITION SOLUTIONS

Page 101

M. Munoz

or not.

So, then the risk team gets that, they look at it. They decide that's called like a -- that might also be like a proactive referral. We also have analysts, but I have never done that job, so I don't know how they do it. But the analysts may say, hey, you should look at this claim.

Q. When you get a call from a police officer who says, hey, you might want to look at this claim, do you then formally open a case? Or how does that work?

A. So, usually, I will tell my -- well, yeah, what I do is I tell my supervisor I got a call from a police contact. He thinks this is a -- or she -- thinks this is, you know, not good, I give my reasonings.

And then where like I usually will CC the claims supervisor to let them know, and then claims can send the referral. And if they don't do it, then my supervisor will say, hey, all right, let's

Page 102

M. Munoz

get this -- I don't assign it, but it gets assigned to me.

Q. Do you have the ability to assign cases?

A. I mean, at some point, we did. Do I have the ability? Yes. But we don't do it now.

Q. Did you previously?

A. At some point, I remember that we were doing -- like were sending referrals.

Q. You personally?

A. I mean, I -- I definitely have done it at some point, but it wasn't like a usual always practice. But if I needed to, I could get a case assigned to me.

Q. Do you know if other investigators did that as well?

A. I can't speak for them. I don't know.

Q. Were there any other factors that we haven't talked about that made your workload heavier at certain times?

MS. JEAN: Objection.

Page 103

M. Munoz

THE WITNESS: Any other factors? I mean, I'm sure there may be some I missed, but I can't think off the top of my head.

BY MR. SLOTNICK:

Q. Did other field security investigators have the same workload that you did?

A. From time of start to now?

Q. From 2015. So, when you started in the SIU until the change in the organization in 2022 to 2023, as you said.

A. On average, we should have had the same amount of cases or somewhere near.

Q. When you say should have, do you know for a fact that other investigators had the same workload or near the same workload as you?

A. Yeah. I don't want to say 100 percent the number, that we all got the same exact cases, but close to or near, yes. I know that we were all pretty much in the same boat.

Q. And how do you know that?

Page 104

M. Munoz

A. Well, we would see each other at that point during -- while going for Examinations Under Oath.

Q. And who in particular did you see and talk about your workload with?

A. Well, definitely Charise Jones, Keith Fischer, Tony Geraci, Mike Giambalvo, Scott Brady. There may be others. I just can't remember.

Q. And what did they generally say about their workloads during these conversations?

A. I mean, everybody was complaining that it was too much work, couldn't get the work done.

Q. What do you mean couldn't get the work done?

A. So, you're expected to get the work done in 7.75 hours a day. But at that time, we were going for these Examinations Under Oath in person. You could be there for multiple hours. And the caseload just kept coming. It didn't matter, you know, what your schedule was. You just had --

Page 105

M. Munoz

you know, the work just kept coming and coming.

Q. How many days a week were you taking EUOs during that period?

A. During that period, it fluctuated definitely. On average, I would have at least one, but I could have as many as four or five, let's say, in a week. And it could be more. But --

Q. And when you say one or four or five, are you talking about EUOs themselves or days that you would conduct EUOs?

A. EUOs themselves. And at that point, they were conducted in person, so I had to go to locations to do them.

Q. So, you would take between, on average, one to four to five EUOs per week; is that right?

A. At -- at some points, I might have.

Q. Did it vary throughout your time in SIU?

A. Yes.

Q. Were there some weeks where you

Page 106

M. Munoz

took zero EUOs?

A. I don't recall a day -- a week of zero.

Q. Where did you generally take the EUOs?

A. They could have been in Queens on Sutphin Boulevard in Jamaica, Court Street in Brooklyn, Penn Plaza for Manhattan. The Bronx one was across from Yankee Stadium. I don't remember the street.

There was a Islandia one for the island. Sometimes -- rarely -- they could be at the attorney's office if it was to accommodate the person I was doing the EUO for, but the usual were the first places that I stated.

Q. And did you determine by yourself where each EUO would take place?

A. Yes.

Q. So, you were responsible for scheduling them?

A. Sending out the letter, do you mean?

Page 107

M. Munoz

Q. Yes.

A. No.

Q. Okay. If you could explain the process of how you set up EUOs just in general.

A. When it's determined that I am going to do an EUO, at this point, I send an e-mail. If it's a no-fault or injury case, in that sense, I send an e-mail with all the information.

I decide on time, place, documents I'll need or that I request of the person. And that gets sent to our legal department, and the paralegals will send out the letter to the parties. And that's pretty much it there.

Q. Do you determine if an EUO is necessary in a given case?

A. Sometimes.

Q. How else would it be determined that it's necessary?

A. Sometimes it's requested from somebody in liability or no-fault. Maybe the -- we used to call them the RLA, the

Page 108

M. Munoz

regional liability administrator, may say an -- an EUO is needed. But predominantly, it was the SIU investigator making the decision. But it did also come from other places.

Q. What would you use to -- in order to make the decision that an EUO is necessary?

A. There would need to be some kind of discrepancies in my investigation in regard to what they reported and what I found. If, let's say, another example would be if I request something from somebody such as cell phone records or a document or to do something and they don't comply, that might be a reason why I will do an EUO.

If they're just totally not answering my phone calls or e-mails or letters, but I need to get some kind of information from them, I will request an EUO.

Q. Were EUOs -- strike that.

Did you generally take EUOs for



MARIA MUNOZ
FISCHER, et al. -against- GEICO

December 17, 2024
145–148

Page 145

M. Munoz

Q.   Was there anyone in that role between Michael DeGrocco and Bill Newport?

A.   No.  I believe it was Mike DeGrocco, Bill Newport and then it would become Rene in my tenure with SIU.

Q.   And I just want to go back.  So, you talked about voicing concerns in team meetings with team supervisors, correct?

A.   The supervisors would be present, yes.

Q.   Do you recall any other details about when those meetings took place or who was there?

A.   Team meetings would be with your section.  And my section, you know, changed sometimes, so I -- I couldn't say who exactly was there.  And then sometimes, we would have full meetings with all of SIU, supervisors and -- and management present.

Q.   When you say your section, what do you mean by that?

A.   So, a section would be who --

Page 146

M. Munoz

so if I reported to Gerry, it was whoever was under Gerry.  That is my section.

Q.   Do you remember how many of the full SIU meetings there were where these complaints were raised?

A.   I don't remember the exact number.  Maybe, on average, they held them twice a year.

Q.   And can you describe the substance of what concerns were being talked about in these meetings?

A.   Well, they would start off in regard to how we were doing, let's say, as a department.  And then when it came time to voice concerns or questions, certain investigators would voice their concerns and say that we had too much work, we couldn't get it done and we needed more time to complete it or more people to do the job.

Q.   Which investigators are you referring to?

A.   I don't -- one instance that stands in my mind is a guy named

Page 147

M. Munoz

Mark Giambalvo.  He definitely was a loudmouth, definitely voiced his opinion.

Q.   Do you recall what position Mark worked in?

A.   Same as I, field investigator.

Q.   And do you remember the substance of what he said?

A.   Not in totality, no.

Q.   Do you remember the gist of what he said in these meetings?

A.   That we had too much work and that it couldn't get done in the timeframe.

Q.   Do you recall what the response was?

A.   Sometimes it was, okay, we'll look into it, we'll see if we can hire someone, do the best you can, we know you guys are overworked.

Q.   And who were the individuals who were actually giving these responses in --

A.   It would be management such as either Mike DeGrocco or Bill Newport.  These kind of things did not happen under

Page 148

M. Munoz

Rene.

Q.   When you say these kind of things, what do you mean?

A.   Well, these kind of discussions in regard to the workload.  I mean, I've only met with Rene two times.  So, he doesn't live in New York.

Q.   Do you know where he lives?

A.   Florida.

Q.   So, is it fair to say that you no longer directly report to someone who is in New York?

MS. JEAN:  Objection.

THE WITNESS:  My supervisor is in New York, but my manager is in Florida.

BY MR. SLOTNICK:

Q.   And this is in the current organization of SIU?

A.   Correct.

Q.   If we look at paragraph seven of Exhibit 5, it says, my regular schedule for Geico is 7:00 a.m. to 3:30 p.m.  I also work approximately 1.5 hours each day in



Page 149

M. Munoz

addition to that, including working through meal breaks and after 3:30 p.m., and another two hours occasionally on weekends to keep up with my work. I worked about 46 to 48 hours a week, on average.

What time period is this paragraph in reference to?

A. That would be anywhere from when I started in SIU. I wouldn't say in -- within -- you know, the first couple of months, I was getting my feet wet until -- you know, learning the job. They did not give me maybe the same caseload for a couple of weeks, months. But this would be up until approximately 2023.

Q. And how often do you allege that you worked through meal breaks, on average, per workweek?

A. On average?

Q. Yeah.

A. Minimum, four days in a workweek -- sorry.

Q. Go ahead.

A. No. I said in a workweek.

Page 150

M. Munoz

Sorry.

Q. You say -- you say that you occasionally work another two hours on weekends to keep up with your work.

Can you give me details in terms of what you mean by occasionally?

A. So, I was not really much of a weekend worker. That's why it's occasionally. If needed, to catch up, then I would do that.

Q. And when you say if needed to catch up, do you mean in terms of specific cases with respect to time deadlines? I'm just trying to figure out why -- what you mean by catching up with work.

A. So, you are expected to get things done within a certain timeframe. And also, so the SICM program, you can see 25 cases, I believe it is, in your pending at one time. And if you went over that, you're what we call scrolling.

If I was scrolling, I was absolutely -- I don't want to say absolutely. I was more than likely

Page 151

M. Munoz

utilizing that time and working on the weekends to catch myself up. It's very overwhelming when you're scrolling.

Q. I mean, how often would -- would you be scrolling?

A. That would happen -- since 2023, it doesn't happen really as often. Prior to that, I -- I -- I mean, I can't give an exact amount, but there were multiple times, a lot of times within a year, that I would be scrolling.

Q. And so scrolling would be -- just trying to figure this out. Scrolling would mean cases from before the 25 most recent pending ones that you had in your --

A. So, they're all your open cases. So, any cases that I need to work would be in that pending because once they're closed, they're gone. They leave there.

Q. Do you have the authority to close cases by yourself?

A. Currently, yes.

Q. When did that practice start?

Page 152

M. Munoz

A. I believe it was somewhere in between Gerry and Tony as my supervisor. I'm not sure of the year.

Q. Do you have specific criteria that have to be met in order to close out a case by yourself?

A. Well, yes, you're supposed to. There are specific things you need to do. But when you close it yourself, you just submit. So, it will close whether you did them all or not.

Q. And then your understanding would be that that might be looked at by the audit team --

A. Correct. Then -- right. Before the audit team, your supervisors used to approve your cases. So, either a supervisor might see it or the audit team. So, you don't -- best practice, you don't want to close it without doing everything correctly.

Q. So, before that policy changed and you were allowed to close your own cases, you either had audit or a supervisor



MARIA MUNOZ
FISCHER, et al. -against- GEICO

December 17, 2024
157–160

Page 157

M. Munoz

So, if an officer called me after hours and I needed to speak to them in order to get my case done, I would speak to them. Some insureds are not available between my business hours, but I have to speak to them. So, I would just leave my computer on, locked. And if I needed to, I would answer the calls.

Q. Did you ever answer any of those calls and tell the individual you could talk to them the next day?

MS. JEAN: Objection.

THE WITNESS: There may have been circumstances where I may have done that.

BY MR. SLOTNICK:

Q. If we look at paragraph ten of your declaration, on page three at the bottom, do you see that paragraph?

A. Yes.

Q. So, it starts, from July 2016 to March 2020, my regular hours were approximately 46 to 48 hours per week. And, again, did you just

Page 158

M. Munoz

describe to me what the basis of your estimation for those hours are?

A. Yes.

Q. And during that time period from July 2016 to March 2020, did you ever record over 38.75 hours per week in your timekeeping program?

MS. JEAN: Objection.

THE WITNESS: In regard to what I submitted?

Q. Yes.

A. Did I ever? If there was approved overtime.

Q. Do you recall how often there was approved overtime?

A. I don't remember the exact dates. Are we talking from July 2016 to March 2020 at this point?

Q. Yes.

A. I can't remember how many instances there were, but I will say that there was at least one, maybe two.

Q. And when you talk about approved instances of overtime, are those

Page 159

M. Munoz

forward looking overtime or is that for overtime during your current work period?

A. So, I'm sorry. Forward looking overtime?

Q. Is that for future overtime, as in there will be approved overtime, say, X number of hours during this time period two weeks in the future, or are we talking about you would request overtime, it would be approved and then you could work that overtime, say, the next day?

A. To my recollection, the only time overtime was given was if the workload -- well, let me go back like this. I don't know if it was due to the workload. For whatever specific reason, management would say, okay, we're offering overtime, let's say, to do social media cases. We have an uptick in social media. Anybody want overtime? You could do it.

But that's what you had to do. You couldn't do your own work. You had to just do it, and you had to record what you did to prove what you were doing during the

Page 160

M. Munoz

overtime.

I -- and then if like a catastrophe happened and that would be something like a flood, a hurricane, hailstorm, those instances which Geico calls catastrophes -- or cat, we call it -- there, you didn't even have to -- whenever working those, it was -- you were just allowed to work and get that -- that work done regardless of hours. And you inputted the amount of hours you worked.

Q. So, those would be for sort of standalone overtime drives as opposed to your daily caseload; is that --

A. The cat work?

Q. The cat work.

A. Yes. Yes. It was not -- nothing related to your own work, only if related to the catastrophe.

Q. And from July 2016 to March 2020, did you ever make a request for daily overtime for your -- overtime related to your own work to your supervisors?

MS. JEAN: Objection.

Page 161

M. Munoz

THE WITNESS: I don't recall a specific instance, so I'm going to -- well, I don't want to say or no because I don't recall actually asking.

BY MR. SLOTNICK:

Q. And from the same time period, so July 2016 to March 2020, were you ever asked by any Geico manager or supervisor to work overtime?

A. Well, let me actually go back because I do remember, from your prior question, I do remember having conversation with Gerry in regard to the work being too much. Did I use the words overtime? I am not sure.

I know I said work can't get done, that we have too much work, how are we supposed to do this? And I would kind of panic. I get a little anxiety driven. So, I -- I just want to do well, like my numbers mean a lot to me.

So, I remember feeling a little bit of overwhelm -- overwhelmingness where

Page 162

M. Munoz

I wasn't going to get it done. I may have actually even cried to him at one point, saying to him that it was too much.

And he would just tell me, don't worry about it, just keep doing what you're doing, get the job done, you got this, that kind of reassurance. But it was never said that you can work overtime.

Q. Did you actually ask him to work overtime in that conversation?

A. I don't --

MS. JEAN: Objection.

THE WITNESS: I -- I don't know if the words came out in that sense.

BY MR. SLOTNICK:

Q. When was that conversation?

A. Well, it would have been -- I don't remember the exact time. I just can remember that instance, at least once, of being really overwhelmed by it. I know during COVID it was definitely brought up. That could have been my overwhelming issue. I don't remember in regard to that day when I got really upset.

Page 163

M. Munoz

But I'd say with him, I probably discussed how overwhelmed I felt and the amount of work, at minimum, two times and maybe up to five times.

Q. Were any of those concerns sent to Gerry in writing?

A. I don't recall.

Q. Were they in-person discussions?

A. No. They would be over the phone.

Q. How often did you actually meet in person with your supervisors before COVID, so from July 2016 to March 2020 in a given workweek?

A. In a workweek?

Q. Yes.

A. I mean, I -- you'd have to ask me in months because we didn't see them.

Q. You didn't see them physically, but you would communicate with them?

A. Yeah, either via e-mail or phone. More -- mostly phone, because I don't believe we had the videoconferencing

Page 164

M. Munoz

at that point.

Q. And was that due to the field or remote nature of your job? Is that why you didn't see them all the time?

A. Correct.

Q. Do you remember how often you would speak to them on the phone, your supervisors?

A. I mean, I could go literally weeks without talking to anyone. Get your job done and nobody really bothered you, you know.

Q. Okay. And when we talked about the catastrophe pay and specific dedicated overtime drives, did you always accept those overtime hours that were offered to you?

A. To my knowledge, I always -- I always worked overtime when offered.

Q. And those were entirely voluntary overtime hours, correct?

A. Yes. I don't believe any of it was mandatory. Especially -- I know the cat -- oh, yeah, I know cat was not



Page 165

M. Munoz

mandatory in any way. And I don't believe there was ever any mandatory overtime, no.

Q. Do you know which groups of investigators those hours were offered to?

MS. JEAN: Objection.

THE WITNESS: I don't recall when it was just like generally given. I think it just went out to everyone and asked. With cat, sometimes -- so, Geico's kind of keeps changing the way they handle cat cases.

So, years ago, I think if I remember correctly, it was just like, oh, we have these cat cases, you want to do it, do it. Then at some point, they asked for people to join like a cat team. They've done that now, I think, for a few years. I know in 2024 because I was on it, and that was as a -- like a voluntary basis, let's say.

So, the time came up when Hurricane Milton and whatever just

Page 166

M. Munoz

happened in Tampa, and they said, hey, you're next up on the list. Do you want to go? And I said yep. And then they sent me. So, that's how that went.

Now, next year, they've already asked -- they're doing a dedicated cat team, which I applied for to be on, and it will be, you know, certain people that will do it. They -- you know, other investigators won't -- you have to be on this team in order to get it.

BY MR. SLOTNICK:

Q. And the cat overtime, is that an on-site overtime drive? So, in other words, you will go to whatever location is affected in --

[Crosstalk.]

A. I would. I've done cat here in New York where I am doing it from home. A lot more desk work than you would think, and you're not really in the field because you're just going over these cases and

Page 167

M. Munoz

seeing, if needed, to go out. But like when I went to Tampa, yeah, they just gave me a whole bunch of cases. If I needed to go out, I had a car and I just went and looked at the cars.

Q. Do you know if other investigators that you worked with in your section always took on these available overtime hours like you did?

A. I know one -- ones who did. I don't know if everyone did.

Q. Which ones do you know who did?

A. Charise Jones would do it. Kevin Dux did it with me at one point. And that's the only two that I can say for sure ever did any type of overtime work offered.

Q. And did Charise and Kevin both work in the same position that you did during those times?

A. Yes.

Q. Does Charise Jones currently work in the same position that you work in?

A. No.

Q. What's her current role?

Page 168

M. Munoz

A. She's an auditor. I don't know her official name.

Q. Is she still working in SIU?

A. Yes.

Q. And is Kevin Dux a current employee --

A. Yes.

Q. -- of Geico?

A. Sorry. Sorry.

Q. And is he still working as an investigator?

A. Yes.

Q. Were you always paid for all of the overtime that you worked in cat duty?

MS. JEAN: Objection.

THE WITNESS: I submitted the hours I worked. And I was paid, yes.

BY MR. SLOTNICK:

Q. So, in paragraph ten of your declaration, you then say, from March 2020 to approximately November 2021, my regular hours were approximately 48 to 52 hours per week.

So, what is your basis for that



MARIA MUNOZ                                          December 17, 2024
FISCHER, et al. -against- GEICO                          169–172

Page 169

M. Munoz calculation?

A.    Well, our caseload went up significantly during the start of COVID in March 2020 when everything went on lockdown.

Q.    And when you say our caseload, who are you referring to?

A.    The investigators.

Q.    So, every investigator's caseload went up in COVID?

MS. JEAN:  Objection.

THE WITNESS:  I'm going to speak of my co-workers, the field investigators.  I'm going to -- I know theirs did, yes.

BY MR. SLOTNICK:

Q.    How do you know that theirs -- caseloads went up?

A.    Well, number one, I can access everyone's pending and actually physically see it.  Number two, I had discussions with my co-workers in regard to it.

Q.    How often did you access other investigator's pending caseloads?

Page 170

M. Munoz

A.    I wouldn't do it on a regular basis.  Maybe once, twice, like every month.

Q.    And why would you do that?

A.    Just to see like the received compared to me, like just to see if we were all on the same playing field.

Q.    Do you remember which investigator's pendings you looked at?

A.    Specifically, no.

Q.    Would it be people in your section?

A.    Yes.

Q.    Did you ever look at people in other sections?

A.    Not to my knowledge.

Q.    Go off the record.

THE VIDEOGRAPHER:  We're going off the record, and the time now is 2:27 p.m.

(Whereupon, a short break was taken at this time.)

THE VIDEOGRAPHER:  We're back on the record, and the time now is

Page 171

M. Munoz

2:41 p.m.

BY MR. SLOTNICK:

Q.    Ms. Munoz, we were speaking about the time period between March 2020 and November 2021, right?

A.    Yes.

Q.    Okay.  Let -- so, these next series of questions, that's the time period I am going to be focusing on.

A.    March 2020, November '21.

Q.    Yes.  Yes.

A.    Okay.

Q.    So, in paragraph ten of the declaration, Exhibit 5, you had said during this time period from March 2020 to approximately November 2021, my regular hours were approximately 48 to 52 hours per week.

And you had mentioned your increasing caseload as being the reason for that; is that correct?

A.    Correct.

Q.    Can you describe for me what you mean by your increasing caseload during

Page 172

M. Munoz that period?

A.    During that period, we just got significantly more cases.

Q.    Do you have an example in terms of how many more cases you were getting per week?

A.    In regard to exact numbers, no. I don't know the exact number.  I can say with almost all certainty that the theft team -- because I was part of that in March of 2020 -- was getting the highest number of cases for that time period.

Q.    Why was the theft team getting more cases than other groups?

A.    Stolen cars were happening at a tremendous rate during COVID.  So -- and a lot of people weren't driving, so there were less accidents, I would assume.  But I know that car thefts went up significantly.

Q.    During that time period, were you still going into the field to perform your job duties?

A.    No.  At some point when there was the lockdown, we were advised we could

Page 173

M. Munoz

not go in the field for work.

Q.    Do you recall when the time period was that you were in this lockdown?

A.    I don't remember the exact date, but I will say that it was sometime in March of 2020.  And to the best of my knowledge, it was -- I know it was summer when we were released back to the field.

But I can't say with all certainty it was summer of 2020 or summer of 2021.  I want to say it was 2021, but I'm not 100 percent sure.  But summer resonates in my head as the time when we were told we could go back in the field.

Q.    And when you say we, who are you referring to?

A.    The field investigators.

Q.    And that would be field investigators in New York?

A.    For New York, yes.

Q.    During that time period from March 2020 to November 2021, as you say, did you ever record over 38.75 hours per week in your timekeeping program?

Page 174

M. Munoz

MS. JEAN:  Objection.

THE WITNESS:  Submitted?  Did I ever?  There was a period that they offered overtime, so I would say yes.  At some point, I could have.

BY MR. SLOTNICK:

Q.    When did they offer overtime?

A.    I don't remember the exact timeframe.

Q.    Do you remember how long it was offered for?

A.    I don't.  But -- no, I don't.

Q.    And was that offered --

(Clarified by the Court Reporter.)

Q.    During the period that you were offered overtime, was that in relation to a cat drive or other overtime drive, or was that with respect to your own casework?

A.    No.  It was never in respect usually to just your own casework.  There was always something extra that you had to do in order to get it, to the best of my knowledge.

Page 175

M. Munoz

Q.    Do you know who approved that overtime availability?

A.    It would have been somebody above our supervisors.  I don't know which exact person.

Q.    Did supervisors have the ability to approve overtime in this -- in this way that you describe in terms of an ability to offer available overtime for you to work?

A.    When overtime -- when overtime was offered, the normal route was hearing it from your supervisor.  In regard to who gave that approval or told them it was okay or who made the decision, I don't know.

Q.    Do you know if other investigators' supervisors were ever offering overtime to their own investigative team?

MS. JEAN:  Objection.

THE WITNESS:  I don't know of anybody having overtime when it wasn't offered to all.

BY MR. SLOTNICK:

Page 176

M. Munoz

Q.    And did you accept any of the offered overtime from March 2020 to November 2021?

A.    I believe I did, yes.

Q.    And did you input that time worked into your timekeeping program?

A.    For whatever hours I worked, yes.

Q.    Do you know if it was coded the same way as your regular work hours?

A.    I believe it was, but I'm not 100 percent sure.  I am just getting a little confused because when you do cat overtime and cat work, it's different, the way you code it.  But at that period, I believe it was just you put your hours in, because anything over 40 would just be considered overtime, so --

Q.    So, for cat hours, they had a different time designation.  Is that what your testimony is?

A.    Yes.  Not through my whole tenure in SIU doing cat, but I know when I did Ida and just recently Tampa -- and when



MARIA MUNOZ

FISCHER, et al. -against- GEICO

December 17, 2024

177–180

Page 177

M. Munoz

I went to Tampa, it is inputted different in the Workday system when you submit it.

Q.   And then also in paragraph ten, you say from November 2021 to the present, my regular hours worked are approximately 46 to 48 hours per week.

Is that accurate?

A.   To the best of my knowledge, yes.

Q.   And what are those calculations based on?

A.   Based on, again, you know, in regard to my start time starting prior to 7:00, working through a meal, taking calls and doing stuff on the computer after 3:30. Occasional weekend.  But again, I wasn't like a huge weekend worker.

Q.   Was your supervisor aware that you were working before 7:00?

A.   I would say it.

Q.   What do you mean you would say it?

A.   I signed on -- well, let's put it this way, I know I have verbally said at

Page 178

M. Munoz

some point that I -- oh, I usually clock on at 6:00, 6:30, to at least April and Gerry. We're not talking about the -- that time period you just said last, right?  We're talking in general now?

Q.   General, yes.

A.   Yep.  But I don't -- I don't do that anymore, so --

Q.   And when is the last time that you did that?

A.   I don't remember the exact time.  Well, it would be -- well, I shouldn't say I don't ever do it, because now if I do clock in at 6:00, then I am done at 2:30.

I do have that ability to do that, but I am not -- I will work up to 39.99 hours and I am fine.  Nobody says anything to me because it's not considered overtime.  So, that's how I work now, or since we've had to check in and check out -- clock out.

Q.   And do you submit for those 39.99 hours for payment?

Page 179

M. Munoz

A.   At minimum, it's 38.75.  At maximum, it's 39.99999.  As long as it doesn't go over 40.  So, I -- I am all in between.

Q.   Are you still working your general set schedule from 7:00 a.m. to 3:30?

A.   That is my general schedule. But that's -- if you looked at my Workday submissions the last few months, this whole year, I have been working almost over eight hours Monday through Thursday.  And then by the time Friday comes, I only have like whatever's left of the 38 to 39 hours and then I have to clock off.

And then that's when I've asked for, if needed, additional time to work. Because I am willing to work, but they, you know, don't want me to, so I stop. Computer goes off.  Phone's on the charger. I don't do anything after the hours.  I don't pick up calls.

Q.   And those requests you just mentioned, those were the requests you

Page 180

M. Munoz

testified to earlier to Arineh; is that right?

A.   Correct.

Q.   And just to go back to -- you said that you talked to April and Gerry about starting before your scheduled 7:00 a.m. start time; is that right?

A.   I believe I had conversations with both of them.  It would have came up at some point.

Q.   Why do you say it would have come up at some point?

A.   Because I was doing it every day.  So, I know -- and they would have, let's say, maybe seen an e-mail with the time.  You -- when you clock in on SICM, it tells you the date and time that you sign on, so it's -- it's recorded whatever time I did clock on, sign on.  Also, when you -- when you do something in SICM, it's timestamped, so they could see when I was working.

Q.   When you say, when you do something, what do you mean?



MARIA MUNOZ
FISCHER, et al. -against- GEICO

December 17, 2024
197–200

Page 197

M. Munoz

Q. Did you voice those specific concerns to any of your other supervisors other than Gerry -- or I guess you didn't talk to April about it?

A. Definitely -- I know Tony had a short period, definitely felt more of a -- that she understood that we were busy and had a lot of work. Dara, too. I can specifically remember one time.

I was driving from Long Island City. I just recovered a motorcycle, and I got stuck there late. And I was panicking because I said it's going to take me forever to get home right now.

And for some reason, I was reporting to Dara. I think Gerry was out or some -- yeah. I said, what am I supposed to be? I -- we were clocking in and out at that point.

And -- and she said to me that one specific time, no, no, no, you don't clock -- wait till you get -- I'm like, I'm just going to clock out. Sorry.

(Clarified by the Court

Page 198

M. Munoz

Reporter.)

A. You stay on the clock. I said, yeah, but when I -- when I get home, I gotta still put like something in. I mean, we did have 24 hours at that point to be able to put it in, so I necessarily -- but like I -- I know -- I remember I had to do something.

And she -- she just told me to stay on. That's like one instance I can remember of being like, go ahead, just stay on. There was a like a small stint of time -- I can't remember when -- when that was okay, but I -- it was very short-lived.

Q. Do you remember when that was?

A. It would be after 2020, after 2021. I want to say -- I don't recall exactly when. I just know after that -- 2021.

Q. And these complaints and concerns you were voicing to supervisors, were they with respect to your workload or were they with respect to your hours actually worked?

Page 199

M. Munoz

A. Most of the complaints were in regard to the workload but then would lead to hours worked, because in order to get the work done, you just had to work more than what was expected of you.

Q. Do you currently feel that in order to get the work done, you have to work more than what's expected of you?

A. Well, currently, I don't. So, my case life might be a little higher than -- I mean, I think I am about average right now. But currently, no. It feels, I mean, a little different. It's just they still don't have it all together. They're trying.

Q. Did any manager or supervisor at Geico ever directly tell you that you should work off the clock?

A. No. I -- I don't believe so.

Q. Did any manager or supervisor at Geico ever directly tell you you should not accurately record all of your hours worked?

A. I don't recall.

Page 200

M. Munoz

Q. If you look at paragraph eight, so flipping back a page -- two pages, the -- the bottom page number is page 2. You say, starting in March 2020, the COVID-19 pandemic halted field operations. So, all of my work was done remotely until approximately November 2021.

Prior to COVID, were you performing any work outside of the field or your home?

A. Prior to COVID -- say that again.

Q. Before -- strike that.

How did the COVID-19 pandemic impact your actual performance of your job duties?

A. Well, I wasn't able to go in the field, which would limit some things I was able to do such as, like I stated earlier, in the beginning of the pandemic, I was on the theft team.

So, to handle a theft case, sometimes, you know, I would need to speak to the police to ask them about the report.



MARIA MUNOZ
FISCHER, et al. -against- GEICO

December 17, 2024
277–280

Page 277

M. Munoz

MR. SLOTNICK:  I have nothing further.  Thank you.

MS. JEAN:  I do have one last list of documents I would like to request on the record.  We would like to request any scorecards received by Ms. Munoz for the period that scorecards were in use.

To the extent there are any documents relating to this dashboard that is used daily on Power BI or related website or internal system, if there are any guidance documents or any documents that relate to that.

Any calendar invitations for meetings including team meetings within SIU hosted by either supervisors or managers during the relevant period that includes a list of attendees, any notes taken from the meeting, as well as any skip level meetings.  I don't know if I said that -- including skip level meetings and team meetings.

Page 278

M. Munoz

Reiterating our requests -- I know it's tied up in the ESI negotiations -- regarding SICM event data relating to inputting notes on cases, as well as time records that relate to when an investigator starts and ends their day within SICM.

The 2024 e-mails from Rene Cubas and Scott Goss regarding the policy for requesting overtime.  Any documents reflecting case life calculations and any changes to case life calculations that took place during the relevant time period and/or when case life was in effect in terms of a -- of a performance metric.

Any documents reflecting goals that are in Workday or on e-mails that include performance metrics that special investigators are evaluated on.  And that is all.

(Request noted.)

MR. SLOTNICK:  Counsel, if you

Page 279

M. Munoz

could put that in writing, we'll address it.

MS. JEAN:  Yes, we will.

MR. SLOTNICK:  Nothing further.

THE VIDEOGRAPHER:  This concludes the video deposition of Ms. Maria Munoz.  The time is approximately 5:06 p.m.  We're off the record.  Thank you very much, everyone.

(Whereupon, at 5:10 P.M., the Examination of this Witness was concluded.)

_____
MARIA MUNOZ

Subscribed and sworn to before me this \_\_\_\_\_ day of _____ 20\_\_\_.

_____
NOTARY PUBLIC

Page 280

M. Munoz

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Ex 1 | deposition notice | 14 |
| Ex 2 | compensation handbook | 117 |
| Ex 3 | human resources associate handbook | 122 |
| Ex 4 | transcript of courses | 127 |
| Ex 5 | responses to interrogatories | 135 |
| Ex 6 | responses and objections to first set of interrogatories | 238 |
| Ex 7 | Summons and Complaint | 251 |

(Exhibits attached to transcript.)

(Cont'd next page.)



MARIA MUNOZ
FISCHER, et al. -against- GEICO

December 17, 2024
281–283

Page 281

M. Munoz

I N D E X

EXAMINATION BY                        PAGE

MR. SLOTNICK                          7, 275

MS. JEAN                              265


  INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS          PAGE

BY MR. SLOTNICK:

1. Request for witness's notes        217

2. Request for text messages          265

BY MS. JEAN:

3. Request for documents              277-78



     QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 282

M. Munoz

C E R T I F I C A T E

STATE OF NEW YORK      )

                       :

COUNTY OF RICHMOND     )


     I, MARINA DUBSON, a Notary Public for

and within the State of New York, do hereby

certify:

     That the witness whose examination is

hereinbefore set forth was duly sworn and

that such examination is a true record of

the testimony given by that witness.

     I further certify that I am not

related to any of the parties to this

action by blood or by marriage and that I

am in no way interested in the outcome of

this matter.

     IN WITNESS WHEREOF, I have hereunto

set my hand this 17th day of December 2024.



                    _Marina Dubson_
                    MARINA DUBSON

Page 283

ERRATA SHEET

WITNESS NAME: MARIA MUNOZ

PAGE   LINE (s)        CHANGE        REASON

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____

____|_____|  _____|  _____


--------------------

MARIA MUNOZ


SUBSCRIBED AND SWORN BEFORE ME

THIS _____ DAY OF _____, 20__.

_____  _____

(NOTARY PUBLIC)    MY COMMISSION EXPIRES: