# Exhibit X

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

Plaintiffs,       )

- v -                      )

GOVERNMENT EMPLOYEES INSURANCE     )

COMPANY d/b/a GEICO,               )

Defendant.       )

- - - - - - - - - - - - - - - - - )

REMOTE VIDEOTAPED DEPOSITION OF MICHAEL GREY

Reported by:

Kim M. Brantley

Job No: J12254485

## Page 2

MICHAEL GREY

Wednesday, January 22, 2025

Time: 10:02 a.m.

Remote videotaped deposition of MICHAEL GREY, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

685 Third Avenue, 25th Floor

New York NY 10017

(202) 847-4400

Email: sjean@outtengolden.com

BY:   SABINE JEAN, ESQUIRE

On behalf of the Defendant GEICO:

DUANE MORRIS, LLP

190 South LaSalle Street - Suite 3700

Chicago, Illinois 60603

(312) 499-6779

Email: gtsonis@duanemorris.com

BY:  GREGORY TSONIS, ESQUIRE

## Page 3

MICHAEL GREY

APPEARANCES CONTINUED:

ALSO PRESENT:

BRENT JORDAN, Legal Video Specialist

Esquire Deposition Solutions

## Page 4

MICHAEL GREY

P R O C E E D I N G

THE LEGAL VIDEO SPECIALIST:  We are now on the record.  The time is 10:02 Eastern time on January 22nd, 2025.  This begins the video conference deposition of Michael Grey, taken in the matter of Keith Fischer, et al., v. Government Employees Insurance Company. This case is filed in the United States District Court, Eastern District of New York, Case No. 223-civ-2848.

My name is Brent Jordan.  I'm your remote videographer for today.  The court reporter is Kim Brantley.  We are representing Esquire Deposition Solutions.

Will counsel present please identify yourself and state whom you represent.

MS. JEAN:  This is Sabine Jean from Outten & Golden, representing plaintiffs and opt-in plaintiffs.

MR. TSONIS:  Craig Tsonis, from Duane Morris, LLP, representing defendant GEICO.



MICHAEL GREY
FISCHER V. GEICO

January 22, 2025
93–96

Page 93

MICHAEL GREY

A.  Yes.

Q.  All right.  And setting aside I guess the -- you know, where there's minus signs, those are absence corrections that are noted, but the absence requests are all the ones without minus signs.

Do you see that?

A.  Well, let me double check.

(Witness reviews document.)

A.  Then that's what it appears.

Q.  All right.  So I guess the time that you requested off through the Workday system, that's not time that you were working, right?

A.  That's not always the case.

Q.  What do you mean?

A.  I mean there was many situations where I had -- that I requested vacation time, but I would still be working because things needed to get done.

Q.  So you would go into the Workday system and request 7.75 hours of vacation for example, right?

A.  Correct.

Q.  Okay.  Your supervisor would approve

Page 94

MICHAEL GREY

that request?

A.  Correct.

Q.  So your supervisor would be under the belief that you were not working, you were taking 7.75 five hours off?

MS. JEAN:  Objection.

THE WITNESS:  I don't know what they believed.

BY MR. TSONIS:

Q.  But what you were submitting to your supervisor was that you would not be working, right?

A.  Yes.

Q.  Okay.  And now you're contending that you actually did work during some of this vacation time?

A.  Yes, and with the knowledge that supervisors acknowledged and understood that.

Q.  So be more specific when you say the -- the "knowledge and acknowledgment of the supervisors."  Who specifically?

A.  Chet Janik definitely knew; on more than one occasion he said, "Hey, you're supposed to be off."  And I said, "I understand, but this

Page 95

MICHAEL GREY

needs to be done."

Q.  When specifically did you have that conversations with Chet Janik?

A.  I don't know the exact times or dates, but it happened on multiple situations.

Q.  So you can't provide any time of the dates of when these conversations happened?

A.  No.  I -- there was no reason for me to.

Q.  Okay.

A.  I mean, there's hundreds of -- hundreds of situations here.  Do I know the exact date out of hundreds?  No.

Q.  So how many conversations are you contending that you had with Chet Janik where you told him that you were working during time that you scheduled off?

A.  Dozens.

Q.  But you can't provide any specific -- specificity to when those conversations took place?

A.  No.  It -- it was pretty much understood that that's what we had to do to get our job done.

Page 96

MICHAEL GREY

Q.  And over what time period are you contending that you had to work overtime to get your job done?

A.  Probably ever since I was hired.

Q.  Did Chet Janik ever instruct you that if you work overtime you're required to put those hours into Workday?

A.  I don't recall.

MR. TSONIS:  I'm putting in the chat what I'm going to mark as Exhibit 2, and in fact I'm going to share my screen.

(7/5/17 email chain Bates stamped G012360 to 361 was marked Deposition Grey Exhibit 2, for identification.)

BY MR. TSONIS:

Q.  Can you see my screen, Mr. Grey?

A.  No, I'm stuck on this other thing.  Hold on.  Let me close this.  Okay.

Q.  I'm showing you Exhibit 2, which bears the Bates label G012360 to 361.

Do you see your name top of this email chain, Mr. Grey?

A.  Yes.

Q.  And that's your email address, right?


ESQUIRE
DEPOSITION SOLUTIONS

Page 177

MICHAEL GREY

out to be."

Q. Okay. Turning back to your declaration that we looked at, you wrote, in paragraph nine, that "Starting in March 2020 the COVID-19 pandemic halted field operations. All of my work was done remotely until approximately November of 2021.

"GEICO increased my caseload significantly after March of 2020. My overtime hours increased as a result to about 45 to 50 hours a week on average."

You see that?

A. Yes.

Q. Okay. Is it your recollection that you were working about forty-five to fifty hours a week during this time period, in the summer of 2020?

A. Certainly April. I'd noted that it was after March of 2020. So I would say April, May for sure.

I don't remember exactly how long it went, but certainly when that was going on -- it looks like in July they made changes to accommodate us for what we had been putting up with in April and May.

Page 178

MICHAEL GREY

Q. In paragraph eleven you write, "From about March 2020 through November 2021 my regular hours worked were approximately 45 to 50 hour -- 50 per week," right?

A. Yes.

Q. Is it your testimony that during that entire time frame your regular hours were approximately forty-five to fifty per week?

A. Yes.

Q. I want to re-share Exhibit 10 with you, so if we scroll to June, beginning with June, do you see from June, 1st 2020 through June 5th, 2020 the time that you entered into Workday totaled 43.25 hours?

A. Yes.

Q. And similarly, from June 8th, 2020 through June 12th, 2020 the time entered by you for that work week totaled 41.75 hours?

A. Yes.

Q. From June 22nd, 2020 through June 26th, 2020 the time entered by you in Workday for that work week totaled 42.25 hours?

A. Yes.

Q. And again, ignoring the -- the last

Page 179

MICHAEL GREY

week or the portion of the work week that ends in June and begins in July, because of the July 3rd holiday, focus on July 13th, 2020 through July 17th, 2020, the time entered by you for that work week totalled 42.25 hours?

A. Yes.

Q. From July 20th, 2020 through July 24th, 2020 the time entered by you for that work week totaled 40.75 hours?

A. Yes.

Q. I guess, despite the fact that Mr. Janik said that up to ten hours of overtime were approved, you never entered ten hours of overtime in any work week in July, right?

A. Correct.

Q. And similarly, the program was in effect in June 2020. You never entered ten hours of overtime in June of 2020 for any work week, correct?

A. Correct.

Q. I want to share your declaration again. I want to focus on a different portion -- or a slightly different topic.

Do you see your declaration again, Mr.

Page 180

MICHAEL GREY

Grey?

A. Yes.

Q. All right. Do you see here in paragraph eleven it says -- well, before we get to that point...

You write both in paragraph ten and paragraph eleven that the time range that you were working more than, you know -- that -- that your regular hours included overtime that you weren't compensated for, you see it goes from December 2016, and you sort of break out the periods, but then that ends in February of 2023?

A. Yes.

Q. Right. So what changed in February of 2023 such that you were no longer working overtime and not being compensated?

A. That was when the beginning of the changes. I was with Toni, and we had to -- I think February of 2023 is when we were punching in and out literally for lunch and everything with that, and that's when also the flex scheduling became confusing as to what was considered a flex schedule.

So, approximately that time I just



Page 193

MICHAEL GREY

A.  It was in like a weekly -- it was like in a -- either a weekly or some sort of a team meeting, Webex meeting that we were all a part.

Q.  Okay.  So I guess do you specifically recall this conversation between Mr. Mills and Mr. Janik?

A.  Hundred percent.

Q.  Okay.  And what did Mr. Janik -- here you reference an email.  You see that?

A.  Yes.

Q.  What did Mr. Janik respond to Mr. Mills during that Webex?

A.  He said that there was no overtime.

And at some point -- and it may not be that he responded to us in an email in April of 2020; I don't know when he sent the email -- but it continued on specifically with social media.  Social media was added on at some point.  I think it was much later than 2020.  It was added on as mandatory on every claim, and additional complaints were raised stating that, if we had to spend two hours alone on social media, how were we supposed to get the rest of our work done?

Q.  Okay.  Anything else you recall about

Page 194

MICHAEL GREY

the conversation between Mr. Mills and Mr. Janik?

A.  Only that everybody on the call agreed that the workload was unreasonable, and that maybe Chet was going to go back to the manager to verify if in fact we could get overtime, and then he reported it back to us that we didn't.

It looks like though in June or July they changed that and -- and offered it to us, based on some of the emails you've refreshed my memory with.

Q.  So, in response to changes in workload, it looks like, at least for a period of time, the region two SIU was -- investigators were able to work overtime?

A.  That would -- I'm -- I'm -- I'm basing that off the emails that you provided from June saying that overtime was extended in July.

So I'm -- I am guessing sometime in June, based off these things, I'm presuming sometime in June, based off those emails, that that's when they finally allowed it.

But it -- my testimony is that in April when it was first addressed, because it was March that we shut down, that in April of 2020 we were

Page 195

MICHAEL GREY

old no, even though it -- it -- it was a legitimate concern.

Q.  Do you have any knowledge as to the ability of region two to bring on, to hire new investigators?

A.  To "hire" new investigators?

Q.  Yeah.

A.  I don't know.

Q.  I guess to be more specific, do you have an understanding of whether or not management in region two SIU was trying or ultimately did bring on additional investigators during 2020?

A.  I'm not aware of that.

Q.  I'm sorry.  You were muffled.

A.  I'm not aware of that.  No one was added on in -- in my area.

We had -- I would say on Chet's team we had seven investigators.

Are you saying after the pandemic?  Or at what point are you saying?

I'm sorry.  Let me clarify -- let me make sure I know the time frame that you're saying.

Q.  Yeah, I am saying after the pandemic,

Page 196

MICHAEL GREY

at any point in 2020.

A.  I don't recall anyone else being added on our team.

Q.  Okay.  I guess you'd agree, though, that bringing on additional investigators would be a way to alleviate workload concerns that might have been raised?

MS. JEAN:  Objection.

THE WITNESS:  Lowering the amount of cases would lower the workload.

BY MR. TSONIS:

Q.  Right, if there's more people available to distribute cases to, that's one way to lower the number of cases --

A.  Sure.

Q.  -- that are assigned?

MS. JEAN:  Objection.

THE WITNESS:  I -- I guess.  That would be one way.

BY MR. TSONIS:

Q.  Okay.

MR. TSONIS:  Why don't we take a break.

MS. JEAN:  That's good.

THE LEGAL VIDEO SPECIALIST:  We'll go



MICHAEL GREY
FISCHER V. GEICO

January 22, 2025
233–236

Page 233

MICHAEL GREY

vacation, and 15.5 hours of" -- what's --

A.   "Floating holiday" that looks to be.

Q.   -- "floating holiday, totaling 110 hours during the first six months of 2022"?

A.   Yes.

Q.   And it says, "This time off will affect his productivity results"?

A.   Yeah, I -- I think you only were counted for productivity based on the hours that you worked.

Q.   So, I guess --

A.   If you go back up to 1, "ATJ Productivity," that's showing adjustor productivity -- adjusted productivity.

Q.   Was it your understanding I guess that if you took vacation time, or care time, or floating holidays, let's say if you worked -- you know, if you took time off during the time period it would be harder to make your productivity goals because you weren't assigned as many cases?

MS. JEAN:  Objection.

THE WITNESS:  No, almost the opposite.

Basically you -- you needed to take time off in order for the productivity to be

Page 234

MICHAEL GREY

adjusted to show, you know, that you could pass these goals.

Because if you went back two years ago when it talked about the number of cases that you needed, in 2022 that number probably increased by twenty percent.

BY MR. TSONIS:

Q.   I guess I'm not understanding why taking 110.5 hours in the first six months of 2022, how that would make it more difficult for you to achieve your productivity numbers then.

A.   It wouldn't.  It -- it helped me achieve my numbers.  The numbers were only based on the hours worked.

Q.   So you're saying, because you took time off, your productivity numbers were higher than they otherwise would have been if you worked?

A.   Well, what I'm saying is they had to note how many hours -- so in other words, if they took, whatever, 7.75 -- 38.75 times twenty-six weeks, and then calculated the -- my productivity, it would have been less than the 42.0...

But what they did is they calculated it, the twenty-six weeks and the number of hours,

Page 235

MICHAEL GREY

and then subtracted 110.5 hours.

So that my -- that's the -- that's how they came up with the figures.

Q.   When you would take vacation -- I think we saw in one of the exhibits earlier, it seemed like the practice was that you would not be assigned cases while you were on vacation, right?

A.   Correct.

Q.   Okay.  So if you were on vacation, for example if you took a week of vacation in a month, that's one week of time which you were not being assigned new cases?

A.   Correct.

Q.   If you were not being assigned to new cases, you have less potential cases to close during that month, right?

A.   Yes.

Q.   All right.  So, if you have less potential cases to close, and productivity is a metric tracking closed cases, then taking time off could potentially lower your productivity, right?

A.   Yes, but we were getting overwhelmed with cases, so it didn't matter.

So the time off actually -- if I --

Page 236

MICHAEL GREY

if -- if that 110 hours hadn't come off, the -- my productivity rating would have been, I don't know, thirty-five instead of forty-two or something. I'm speculating, but, yes, that's what the productivity number would have been.

But they took 110 hours off of whatever a six-month total is.  I guess we could figure it out: 38.75X26 is that many hours, and they didn't base it on that, they based it on the actual hours you worked.

Q.   I understand I think what -- what you're saying, but just so I'm clear, using your analogy, if you worked that extra 110 hours, you also were -- your -- your productivity metric would also get adjusted by the number of cases you could actually close in that 110 hours, right?

A.   I guess.  That's not how it works, but I guess.  That's how you're interpreting it.

I'm explaining -- you've asked me, and I've explained it.

Q.   Okay.  Well, you mentioned earlier you were -- I think you said "we" were getting, you know, the work -- you referenced "we" in terms of workload.



Page 261

MICHAEL GREY

A. Yes.

Q. And the -- the text he copies into his email says, "GEICO's nonexempt associate guidelines detailed in the Associate Handbook provide that working for outside of normal working hours by nonexempt associates requires prior -- prior approval from the manager or above," right?

A. Yes.

Q. All right. And then he also writes, "And that 'non-exempt associates are required to record and accurately report all time spent on GEICO business, regardless of the location work -- work is performed, or the device used,'" close quotes.

A. Yes. And -- and I would just like to repeat this is on July 31st, 2023.

Q. Correct. And you reply back, "Understood. I tried to put time in but I'm not sure I was successful. One hour," right?

A. Yes.

Q. So you were indicating that you worked one additional hour that day?

A. Yes.

Q. Okay.

Page 262

MICHAEL GREY

MR. TSONIS: Now is probably a good time for a break.

MS. JEAN: Okay.

THE LEGAL VIDEO SPECIALIST: So we'll go off the record at 4:32 p.m.

(Recess taken.)

THE LEGAL VIDEO SPECIALIST: We are back on the record at 4:43 p.m.

BY MR. TSONIS:

Q. All right. Mr. Grey, before we went on break you were referencing -- we were looking at an email from Mr. Gelderman, and I think you've referenced your understanding of flex time.

Do you recall that?

A. Yes.

Q. What was your understanding of flex time as a field investigator?

A. That if we needed to take time to do something personally, we could do that and just make up -- make it up at some point during the day.

Q. Okay. Ultimately, either as a field or a desk investigator, you were the one figuring out what you needed to complete in terms of tasks on a

Page 263

MICHAEL GREY

given day?

A. Yes.

Q. All right. And you could figure out when you needed to start work on any given day?

A. Yes.

Q. And you similarly would figure out when you would end work on any given day?

A. Yes.

Q. Once a case -- well, strike that.

As an investigator part of your job was to determine which investigative activities would drive the case to closure, right?

A. Yes.

Q. All right. And once you have closed the case, would you submit it for approval?

A. Yes.

Q. Who would approve your cases?

A. The supervisors.

Q. You would not approve your own cases?

A. At some point that changed, very late. It was almost like everyone's got approved, but I still think that Andrew was reviewing them.

But what would happen -- and -- and I can only go back to Chet, and Toni, as well -- we

Page 264

MICHAEL GREY

would submit them, and it would show that it was submitted, and then I'd get an email saying that the case was closed and approved.

Q. Okay. Aside from the conversations with Chet Janik that you'd referenced, are you claiming that Chet Janik knew that you were working off the clock for any other reason?

A. I don't know if I understand what you're saying. Say that again.

Q. Sure. That was probably poorly phrased.

Other than the oral conversations that you talked about with Chet Janik, is there any other basis that you're claiming Chet Janik knew or should have known that you were working off the clock?

A. I think Chet knew that his entire team was putting in more hours than our scheduled hours.

Q. And what's your basis for saying that you -- you believe that?

A. Just on conversations with him.

We definitely got an email at one point that -- where we raised concerns about -- and I



MICHAEL GREY
FISCHER V. GEICO

January 22, 2025
265–268

Page 265

MICHAEL GREY

don't want to misquote the email, but it had something to do with "I know the math doesn't add up, but just get it done."

Q. Okay. So, aside from your conversations with Mr. Janik and the email you just referenced, is there any other basis that you're claiming Mr. Janik knew that you were working off the clock?

A. My answer to that would be that it was well known. It -- it didn't need to be discussed or put in documentation. It was pretty much a foregone conclusion.

Q. Right. I understand your testimony, Mr. Grey. I guess I'm just trying to be specific.

You've referenced oral conversations with Mr. Janik and an email that you just referenced about "the math not adding up."

Is there any other basis that you're claiming Chet Janik knew that you were working off the clock?

A. I would say we had several conversations, not just one.

Q. Was that --

A. There wasn't -- there wasn't any

Page 266

MICHAEL GREY

specific one. It would just be like...

Q. Right. I don't think I said a singular conversation. If I did, I apologize.

Other than the conversations you have referenced and email that you referenced, is there any other factual basis that you're claiming that Chet Janik knew your were working off the clock?

A. No.

Q. Okay. What is the factual basis for claiming that Toni D'Agata knew that you were working off the clock?

A. I -- that I don't know. I never had very many conversations with Toni. So I don't know.

Q. So you -- you'd agree it's possible she didn't know I were working off the clock?

MS. JEAN: Objection.

THE WITNESS: It's possible, but I think it's highly unlikely that any of the supervisors had questions that we were working more hours than what was assigned to us.

BY MR. TSONIS:

Q. Ultimately, as an investigator, I mean,

Page 267

MICHAEL GREY

you could have chosen to just work, actually work 38.75 hours in a week, right?

A. If I did, I wouldn't have gotten the 4.3s, and the 3.6s, and -- et cetera, in order to get the merit raises and keep my job.

Q. Okay. But we did see, for example, that there was one performance rating where you could have closed ten less cases a month and still be meeting expectation, right?

A. That would have rated me a three, not a five.

Q. Sure. But you wouldn't have been not meeting expectations in that circumstance, right?

A. Yes, true.

Q. Okay.

A. I would have been -- I would have been mediocre, not high.

Q. Okay. And as an investigator, you have -- do you have any personal knowledge of any other investigators' off-the-clock work?

A. Anyone that was on Chet Janik's team, I -- I've had conversations with and where we would discuss how we were working overtime, yes.

Q. Who did you have those conversations

Page 268

MICHAEL GREY

with?

A. I know I had one at -- towards the end with Craig Costanzo and Brian Crozier as they were the only two still field investigators, and I was a desk investigator, and they were handling the field, and I had an email exchange with Brian, and I'm like, "How are you guys possibly getting the work done that they're asking you to do in the time frame?" And his response is, "We're not. We're just putting in the numbers to show that we only worked 38.75 hours."

Q. It's your testimony that he put in an email, "We're not. We're only putting in the hours showing we're working 38.75 hours"?

A. He -- it was either in an email or a text to me, yes.

Q. Okay.

A. But he -- he's like, you know working -- I don't know if he said he was like working through his lunch, or figuring out how to do it, but that he was able to not get in trouble for working overtime.

Q. Are you claiming as part of this lawsuit that the time that you spent working off



MICHAEL GREY
FISCHER V. GEICO

Page 269

MICHAEL GREY

the clock and weren't compensated for was in part your meal periods?

A.   Yes.

Q.   So you're claiming that you worked in your meal periods but weren't paid for it?

A.   It -- it was common knowledge that many times we worked through lunch.

Q.   Right.  But if you worked through lunch because you chose to work through lunch, right?

MS. JEAN:  Objection.

THE WITNESS:  I guess in terms to do it, but it was in order to get the work done that I needed to get done.

BY MR. TSONIS:

Q.   Right.  You were working either in your home or out in the field for every single one of those shifts, right?

A.   That might been at a EUO where I was doing four of them in a day, which started at 10:00 and went through 'till three o'clock, where there was no time to take a lunch.

Q.   How many times in your career would you estimate you did four EUOs in a day?

A.   I would -- I would say not -- not a

Page 270

MICHAEL GREY

lot.

Q.   Less than five?

A.   Ooo, I don't know about that.

Q.   Less than ten?

A.   Less than ten.  Four in a day?  Two or three was common.

Q.   Okay.  But I guess all of the shifts, like I said, that you would have worked would have either taken place in your home or out in the field, right?

A.   Yes.

Q.   All right.  So, Chet Janik, for example, wouldn't know for any specific shift if you were eating or you were doing work during your meal period?

A.   Correct.

Q.   Similarly, Toni D'Agata wouldn't know for any particular lunch whether you were working or not working and eating lunch?

A.   Correct.

Q.   Okay.  When you say it's "common knowledge," what's your basis for claiming common knowledge?

A.   In discussions during non-work periods

Page 271

MICHAEL GREY

that I would have had with Chet.

Q.   I mean, were you telling Chet Janik, "I'm working on my meal periods"?

A.   Chet Janik understood that we didn't always take lunch.  He knew that.

Q.   So, I guess to be clear, he never specifically said it, but you believe that he understood that?

A.   I became personal friends with Chet Janik, so, you know, similar to where I said, you know, I wouldn't work overtimes on Friday, which was a tongue-in-cheek comment, I was able to joke and discuss with Chet, "But of course, I'm always taking lunch," when it was obviously known that we weren't always taking lunch.

Q.   How would you rate Chet Janik as a supervisor?

MS. JEAN:  Objection.

THE WITNESS:  I would say Chet is a twelve out of ten.

BY MR. TSONIS:

Q.   You understand as part of this lawsuit you are claiming that Chet Janik is responsible for you not being paid for time that you spent

Page 272

MICHAEL GREY

working, right?

MS. JEAN:  Objection.

THE WITNESS:  No, I'm -- no, I'm -- Chet was doing what he was told to do from people above him.  He was just trying to keep his job.

BY MR. TSONIS:

Q.   But you're claiming that your supervisors, including Chet Janik -- we saw in your declaration, you're claiming that he instructed you to enter in 38.75 no matter what you actually worked.

Isn't that your claim?

A.   For the most past of the time frame that he was my supervisor, yes.

Q.   Okay.  So you're claiming that Chet Janik was purposely instructing you not to get paid for time that you should have been paid working.

Isn't that right?

MS. JEAN:  Objection.

THE WITNESS:  No.  What I'm saying is that Chet Janik told us we needed to put in 38.75 hours, and we needed to do what we

Page 289

MICHAEL GREY

INDEX OF DEPOSITION EXHIBITS CONTINUED:

GREY EXHIBITS:                                    PAGE:

Grey Exhibit 9. Opt-in Plaintiff Michael
Grey's Responses to the Court's
Interrogatories                          147

Grey Exhibit 10. Excel spreadsheet Bates
stamped G008277                          155

Grey Exhibit 11. 7/8/2020 email chain
Bates stamped G012499                    174

Grey Exhibit 12. Email chain Bates
stamped G012453 to 454                   197

Grey Exhibit 13. 2019 Performance
Appraisal Bates stamped G006119 to 129   202

Grey Exhibit 14. 2020 Performance
Appraisal                               216

Grey Exhibit 15. July to December 2021
Performance Appraisal Bates stamped
G006147 to 149                          223

Grey Exhibit 16. 2022 January to June
Performance Appraisal Bates stamped
G006150 to 151                          231

Grey Exhibit 17. July to December 2022
Performance Appraisal Bates stamped
G006145 to 146                          238

Page 290

MICHAEL GREY

INDEX OF DEPOSITION EXHIBITS CONTINUED:

GREY EXHIBITS:                                    PAGE:

Grey Exhibit 18. 2023 Performance
Appraisal Bates stamped G006143 to 144   244

Grey Exhibit 19. Email chain Bates
stamped G17971 to 972                    258

Grey Exhibit 20. Email chain Bates
stamped G01583 to 838                    273

(Exhibits attached to original transcript.)

Page 291

MICHAEL GREY
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer, et al vs. GEICO
Dep. Date: January 22, 2025
Deponent:  Michael Grey

CORRECTIONS:

Pg.   Ln.   Now Reads      Should Read     Reason
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____
___   ___   _____     _____      _____

                    _____
                    Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2025
_____
    (Notary Public)

MY COMMISSION EXPIRES: _____

Page 292

MICHAEL GREY

ACKNOWLEDGEMENT OF WITNESS

    I, MICHAEL GREY, do hereby acknowledge
that I have read and examined the foregoing
testimony, and the same is a true, correct and
complete transcription of the testimony given by
me, and any corrections appear on the attached
Errata sheet signed by me.

_____  _____
    (DATE)              (SIGNATURE)



Page 293

MICHAEL GREY

C E R T I F I C A T E

STATE OF NEW YORK    )

: Ss.

COUNTY OF NEW YORK   )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL GREY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of February, 2025.

*Kim M. Brantley*
_____
Kim M. Brantley

My Commission expires May 31, 2026.

