# Exhibit Y

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

Plaintiffs,         )

- v -                        )

GOVERNMENT EMPLOYEES INSURANCE     )

COMPANY d/b/a GEICO,              )

Defendant.        )

- - - - - - - - - - - - - - - - - )


REMOTE VIDEOTAPED DEPOSITION OF MICHAEL REED


Reported by:

Kim M. Brantley

Job No: J12200420

## Page 2

MICHAEL REED

Wednesday, January 8, 2025

Remote videotaped deposition of MICHAEL REED, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

OUTTEN & GOLDEN, LLP

685 Third Avenue - 25th Floor

New York, NY, 10017

(212) 245-1000

Email: jmcallister@outtengolden.com

sjean@outtengolden.com

BY:   JARRON D. MCALLISTER, ESQUIRE

SABINE JEAN, ESQUIRE

## Page 3

MICHAEL REED

APPEARANCES CONTINUED:

On behalf of the Defendant GEICO:

DUANE MORRIS, LLP

190 South LaSalle Street - Suite 3700

Chicago, Illinois 60603

(312) 499-0198

Email: tealberty@duanemorris.com

BY:   TIFFANY ALBERTY, ESQUIRE

ALSO PRESENT:

ROBERT PACHECO, Legal Video Specialist

Esquire Deposition Solutions

## Page 4

MICHAEL REED

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST:  We are now on the video record.  Today's date is January the 8th, 2025.  The time is 10:03 a.m., Eastern Standard Time.  This begins the videoconference deposition of Mr. Michael Reed in the matter of -- in the matter of Keith Fischer, et al., Plaintiff, vs. Government Employees Insurance Company, doing business as GEICO, Defendant, to be heard in the United States District Court for the Eastern District of New York, case number 2232848.

My name is Robert Pacheco.  I am the remote videographer.  Your court reporter today is going to be Miss Kim Brantley, both representing Esquire Deposition Solutions.

Would counsel please introduce yourselves and your affiliation, and the witness will be sworn in.

MR. MCALLISTER:  Good morning.  My name is Jarron McAllister.  I'm an attorney at Outten & Golden, and I'm here with my colleague, Sabine Jean.

MS. ALBERTY:  And Tiffany Alberty on behalf of the defendant, GEICO.



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
69–72

Page 69

MICHAEL REED

A.  I'm sorry.  I thought you were trying to say -- go ahead.  I'm sorry.  Repeat the question if you could.  I thought somebody popped in there.

Q.  No, that's okay.  With regard -- strike that.

MS. ALBERTY:  Can you read -- read back that last question, Kim.  I apologize.

THE COURT REPORTER:  Yes.  Give me one minute, please.

"And when was this first communicated to you that overtime was not allowed?"

THE WITNESS:  I can't give you that, but that was always implied, that just overtime was not part of what we did.

Our job was to get the cases done and make sure that the cases were submitted.

BY MS. ALBERTY:

Q.  What do you mean by "it was implied"?

A.  Just, we had to do our work.  All of our -- all of our evaluations were based upon our work.  Our report cards were based upon how many cases we received and how many we closed.  Certain cases took longer than others.  There was a lot of

Page 70

MICHAEL REED

work to be done, and it was all based -- your -- your compensation, your raises, everything was based upon those report cards and that evaluation.

So you had to work your cases.  If that meant working past 38.75, or past 3:30 in the afternoon, it was -- you did it, because that was what -- what you did.

There was no -- if you were to call and get overtime approved, the answer was no, but yet that case had to be done.  It had to be submitted.

Q.  Do you recall any of your supervisors or managers telling you explicitly you cannot plug in and be entitled to overtime?

A.  There -- there was, yeah.  There was questions of overtime, and the answer was there is no overtime.

Q.  And who had questions regarding overtime, as you remember?

A.  I know I did, and I know most of the other investigators all felt the same way, but I can't speak for them.

Q.  When you say "other investigators," are you talking about John and Mike, or some -- some other ones?

Page 71

MICHAEL REED

A.  I would say most all of the investigators in the SIU unit, but once again, I can't speak for them specifically.

Q.  How do you know that mostly all the SIU investigators had questions regarding overtime?

A.  Whenever it was -- it was just a common complaint.  With the amount of cases that we were receiving, and the amount of work that we're getting, it was just not feasible to do it in the amount of hours that we were working.

Q.  So I want -- I want to focus in on -- on this area where we're not talking in a hypothetical setting --

A.  Okay.

Q.  -- but a tangible form, which is, "I was cc'd on this email," you know, "from X, Y, and Z, and they had questions about OT;" or, I remember being in some type of meeting where so and so brought this up."

Do you have any type of substantial information regarding your testimony that mostly all SIU had questions related to OT, outside of your own questions you had raised?

A.  No, I do not.

Page 72

MICHAEL REED

Q.  When you brought your questions forward, do you recall who it was to?

A.  My questions of overtime?

Q.  Yes.

A.  That would have been to Chet Janik, and the answer once again, there was no overtime.

Q.  Do you remember if we talked --

A.  But that -- that was for -- I mean, that -- it was not asked all the time.  It was just that -- that was the way it was.  There was no overtime.

Q.  Do you recall if the conversations you had with Chet were by email, on the phone, text message, DM, direct message?

A.  Mostly phone.

Q.  And when you had questions regarding overtime, what do you recall Chet explicitly saying to you?

A.  There was no -- "There was no overtime."

Q.  Do you have any knowledge whether any other SIU investigators in New York -- so whether that's downstate or up north -- actually received and were -- was paid overtime?



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
93–96

Page 93

MICHAEL REED

A.   According to that, yes.

Q.   Okay.  And do you know if you were -- if you were paid the $46.27 per hour from that January 2020 up until your retirement?

A.   Again, I can't recall what my hourly rate was.

Q.   Do you recall in January 2020 when you were classified as nonexempt if there was a policy that went out and you looked at it?

A.   I can't recall.

Q.   So looking at then -- I'm going to just zoom in for myself -- number seven, it says, "As a nonexempt employee GEICO required me to use a web-based timekeeping program, Workday, to submit my time on a weekly basis."

From 2016 to your retirement, did you always use Workday?

A.   No, it was not always Workday.  Before that there was another system that I can't recall the name of it.

Q.   For the previous system that you used prior to Workday, did it have an auto-fill mechanism --

A.   Yes, it did.

Page 94

MICHAEL REED

Q.   -- for your time --

A.   Yes, it did.

Q.   Okay.  And did you implement that auto-fill for the previous timekeeping system?

A.   I used the auto-fill for the previous auto -- previous system, yes, but I don't recall if Workday had an auto-fill or not.  So I -- that I can't answer.

Q.   In either one of the systems -- so the one that you can't remember prior to Workday and then also Workday -- any of the hours that you input into either one of the systems, is it your testimony that you were paid for those hours?

A.   For the 38.75.

Q.   In both of the software timekeeping systems?

A.   Yes.

Q.   Okay, so paragraph eight, it states, "I only entered 7.75 hours per day regardless of how many hours I actually worked.

"I did not enter more hours into the timekeeping system as my supervisor said doing so would effect my rating, giving me a poor evaluation and negatively affecting my potential

Page 95

MICHAEL REED

for an annual pay increase."

With regard to the supervisor that's referenced in paragraph eight, who is that person?

A.   That would have been Chet Janik.

Q.   Did any other supervisor tell you this, or was it only Chester?

A.   I did not work for Toni D'Agata that long, so it just it would have been Chet.

Q.   Okay.  And do you recall in time when this was communicated to you?

A.   I do not recall.

Q.   And was this the conversation that you and I had prior, which is that the communication between you and Chet typically took place over the phone?

A.   Yes.

Q.   When you had these phone conversations with Chet, was it just the two of you?

A.   Yes.

Q.   From 2016 up and until your termination -- excuse me.  Strike that.

From 2016 up and until your retirement, were you ever put on any type of performance plan?

A.   No, I was not.

Page 96

MICHAEL REED

Q.   Do you know what the tiering process would be for GEICO for their performance improvement plans?

A.   I do not know what the tiering for the performance plans were.

Q.   Were you ever involved in giving out performance improvement plans to your colleagues, to other people in the SIU?

A.   No.

Q.   Okay.  In paragraph eight you claim that more hours would impact your rating.

Walk me through the rating system that you were referring to in paragraph eight.

A.   Your rating system was you would get a -- a -- they called it a report card on a weekly basis, and then a monthly basis, and that was all -- all those numbers were put into your end-of-the-year evaluation, as you -- whether a one, two, three, four, or five, and that was all based upon the number of cases you worked, the number of cases you closed, and the case life on those cases.

Q.   Okay.  I'm going to take that in pieces.



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
109–112

Page 109

MICHAEL REED

upon the types of cases?

A. Yes. If you had a case that was going through EUO, you wouldn't really need to touch that as much, because the EUO is still pending. That's already been scheduled and pending.

Q. As to the time consideration and kind of the scale that you're talking about, that to your knowledge only applies to the types of cases that you would have handled, right?

A. That I would have handled, yes. I don't have any knowledge of the other cases, their medical teams or any of those guys, what those -- what those time frames were.

Q. For a rating of four, do you recall the number of cases that needed to be worked or touch point?

A. I don't recall.

Q. What about for a number three?

A. Once again I -- I can't recall, and once again I don't know if different teams or different investigators had different goals.

Q. As to the overall rating on that one-to-five scale for the weekly report card, monthly report card, and the end-of-year

Page 110

MICHAEL REED

evaluation, do you recall the number of cases you needed to close in order to hit the specific types of rating?

A. I don't recall the number of cases to be closed, no.

Q. I believe you indicated case life?

A. Yes.

Q. In what capacity did case life have an impact score into your overall end-of-year evaluation?

A. Case life was not something towards the end of my career that we were based -- that we were scored on. However, the supervisor and the managers were graded upon our case life, therefore they were very adamant that you close your cases as quickly as you could and work your cases as quickly as they could.

Like I said, although that wasn't something that was a goal of mine, it was a goal of my supervisor and a goal of my manager, therefore there was pressure to get that case life down so that their evaluations and their case life would be better.

Q. How -- how do you know that?

Page 111

MICHAEL REED

A. I was told that by my supervisor, Chet Janik.

Q. As to the, you know, the same matrix of was the case life for you specifically, how that would impact, for example, Chet's overall end-of-year evaluation, do you have any idea what that looked like in application?

A. In his -- in his -- in his evaluation?

Q. Yes. So --

A. I don't know -- I don't know what his evaluation was, but they were something that they were evaluated on, and it was a hot item for us to get those cases closed if we could close them.

The more case closures for us, the more case closures for them. That helped out their evaluation. What numbers they got out of that I couldn't tell you.

Q. And when you -- when this was told to you, was this over the phone, in person --

A. Yeah, over the phone.

Q. Do you remember when in time this was told to you?

A. I don't recall the date and time. The conversation was basically the fact that I was

Page 112

MICHAEL REED

being questioned about my case life, which I've indicated is not part of my goals, to which the answer was, "It was part of my goals," is what he said. "It's part of our goals, my goals, and management goals. That's why case life is important."

Though I have no proof, I can't tell you that, but I can tell you that conversation occurred.

Q. Going back to your declaration in paragraph nine, you claim that you regularly worked two hours a day to address case files you received on the road, maintain the life of your other cases, and to meet the guidelines set by GEICO.

Is it your testimony that you worked an extra two hours every day from 2016 to your resignation?

A. That would be a --

MR. MCALLISTER: Objection. You can answer. Sorry.

THE WITNESS: Oh, okay. I was just making sure.

That would be a fair number, yes.



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
125–128

Page 125

MICHAEL REED

Q.   And as to the one days or two days a month for your FMLA, do you remember when in time it started?

A.   I don't have offhand, but I -- I would have -- I'm -- I'm going to just say probably after the 1st of the year in 2023, probably January, February.

It wasn't a long time, and that's why I just said then, then I decided to leave.

Q.   So then looking at paragraph ten, because there's no information after November of 2021, what were your hours starting November of 2021 up and until you took your FMLA?

A.   Once again, the FMLA was only one or two days a month.

Q.   Right.

A.   I was not out an extended period of time.

Q.   Right, so, again --

A.   Okay.  I'm just saying, I -- I don't want you to think that I was gone for the month of January, the month of February for FMLA.  It was just -- just to take, if I needed, one or two extra sick -- one or two sick days a month, and

Page 126

MICHAEL REED

they were capped at one or two.  That was it.

MR. MCALLISTER:  Michael, I just want to say, just let Tiffany finish asking her question.

THE WITNESS:  Okay, I'm sorry.  I'm sorry.

MR. MCALLISTER:  No worries, but just wanted to remind you.

THE WITNESS:  Okay.

BY MS. ALBERTY:

Q.   That's okay.

Yeah, so I understand that.  And so I just -- I understand you weren't out on an extended, say for example, full FMLA three-month scope, and that it was more intermittent FMLA...

But as to that time consideration, November of 2021, up and until you took that FMLA we'll say January of 2023, what were your hours then at that time?

A.   They were the 7:00 to 3:30 with additional hours after 3:30 or prior to 7:00 to keep my -- my case life and to keep my case -- my cases current.

So probably two hours each day to

Page 127

MICHAEL REED

continue to keep that work and to keep that five on my rating.

Q.   Okay, so then --

A.   I -- I just wanted to make sure that we -- we understood I wasn't like gone.

Q.   Understood.  So, then from the November of 2021 up and until let's say around January of 2023, as reflecting in paragraph nine or ten, were you working about 52.5 hours on average or 57.5 hours on average?

A.   I would say probably fifty-two to fifty-seven, depending upon the amount of cases that I received for the day or for the week.

Q.   And similar to the time consideration of March of 2020 to November of 2021, to quantify the 57.5 hours a week on average that you worked that would have been above the 38.75 that you reported, did you have any additional notes, documents, software that you used in order to quantify that additional amount of time that you didn't input into Workday?

A.   No, I do not.

Q.   As to then November of 2021, we'll say up and until then January of 2023, do you have any

Page 128

MICHAEL REED

type of documentation, notes, or software that you used then to adequately quantify the claims that you worked roughly about 52.5 hours to 57.5 hours, depending on your caseload, to support your statement?

A.   I do not have any documentation.

Q.   Fair to say based off paragraph ten and what you had provided as to your testimony for your hours that you worked on average -- that would have been between the 52.5 to 57.5 hours a week -- that you were underreporting your hours and were only reporting the 38.75 during that time period?

A.   That's correct.

MR. MCALLISTER:  Objection.

BY MS. ALBERTY:

Q.   With regard to anything -- anything that you worked above 38.75 that you logged but to evidence the 52.5 to the 57.5 hours that's in paragraph nine and ten, have you gone back to any of your pay records or your lead report that was produced in this case to then itemize and break down any discrepancies that may have occurred based off the additional vacation or FMLA that you



MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
185–188

Page 185

MICHAEL REED

A. I emailed Toni D'Agata to let him -- let her know that I would be leaving the company. I then, after I spoke to her very briefly -- she called me. I then emailed Bill or William Newport to let him know the date and time that I would be leaving the company. He called me shortly after that, and that was the last communication I had with him.

Q. When you had the initial conversation with Toni, what do you recall was discussed?

A. That I was putting in my notice and leaving the company.

Q. And did she ask you why?

A. Not really.

Q. Did you at that time make any complaints to Toni about lack of overtime payments?

A. No.

Q. Do you recall how long that conversation was?

A. Probably less than five minutes.

Q. And then after emailing Bill and then speaking to Bill on the phone, do you recall how long that conversation was?

Page 186

MICHAEL REED

A. Also probably less than five minutes.

Q. Did he ask you why you were retiring?

A. He asked me if everything was okay and if about there was anything either medical or that I was leaving. I said "No, I'm medically fine. I'm healthy." And he said "Okay," that was it, and "Have a nice life."

Q. When you spoke to Bill then, did you make any complaints regarding lack of overtime payments?

A. No.

Q. And why at that time, either when you spoke to Toni or when you spoke to Bill, did you not raise your complaints that you're raising today?

MR. MCALLISTER: Objection.

THE WITNESS: It would have -- it -- it -- it's just useless to speak to him about what had been going on for years. And I can't -- of course you're going to say that it's my knowledge. I don't have the knowledge. But he was aware of all the overtime. He was aware of all the hours we were working. He was aware of all the cases

Page 187

MICHAEL REED

he was assigning to us.

It was a game between management of all the regions as to who could do the most cases and who could get the most work. It was all about the numbers.

So for all those years he had no concern about any of my overtime. He had no concern about anything. I didn't speak to him two or three years at a time, and then all of a sudden I'm going to bring this up the day I'm leaving? Why -- why would I waste my time? It hadn't been addressed for two to three years.

And he knew all of our concerns. He knew it. They all knew it. But it was all a numbers game for them to be top dog, have the most cases, get the most cases done, and they did that on the backs of all the SIU supervisors -- or excuse me, all the SIU investigators that were working for him out in the field. And there was never appreciation or any goodwill from them. So why would I bring it up at the last minute?

BY MS. ALBERTY:

Page 188

MICHAEL REED

Q. When you say that you know they knew, is that an assumption?

A. It's an assumption, but -- I'll leave it at that.

Q. Did you ever lie to anyone at GEICO about anything with regarding your wages, time, case reports?

MR. MCALLISTER: Objection.

THE WITNESS: I never lied about anything at GEICO.

BY MS. ALBERTY:

Q. Did you ever provide false or incomplete information in filling out any company forms, papers, or reports?

A. No, I --

MR. MCALLISTER: Objection.

THE WITNESS: No, I did not.

MS. ALBERTY: Sorry, I just want to make sure Kim got that on the record.

THE COURT REPORTER: Yes, yes, I heard him.

MS. ALBERTY: Okay, thank you.

Counsel, it just blurred out on my end, so, but I saw your face.

MICHAEL REED
KEITH FISCHER v GEICO

January 08, 2025
197–200

Page 197

MICHAEL REED

THE COURT REPORTER: This is Kim, the reporter --

MS. ALBERTY: And would you just follow up -- oh sorry, Kim.

If you could just follow up via email, that'd be great.

And thank you again, Mr. Reed. We're all finished for the day.

MR. MCALLISTER: Thank you.

THE COURT REPORTER: I need -- I need to know the order for Mr. McAllister. Do you -- would you like to order the transcript, Mr. McAllister?

MR. MCALLISTER: Yes, ma'am.

THE COURT REPORTER: Okay.

MR. MCALLISTER: What is the time frame for --

THE COURT REPORTER: So it's ten -- ten business days.

MR. MCALLISTER: Okay, great. Ten business days is great.

THE COURT REPORTER: All right, thank you.

THE LEGAL VIDEO SPECIALIST: This

Page 198

MICHAEL REED
concludes today's videotaped deposition. The time is 2:57 p.m. Going off the record now.

(Whereupon at 2:57 p.m. the videotaped deposition of Michael Reed concluded.)

Page 199

MICHAEL REED

I N D E X

DEPOSITION OF MICHAEL REED

EXAMINATION BY:                                    PAGE:

Ms. Alberty                                         5


INDEX OF DEPOSITION EXHIBITS:

DEPOSITION REED EXHIBITS:                          PAGE:

Reed Exhibit 1. Notice of Deposition        16

Reed Exhibit 2. Compensation Associate

Handbook Bates stamped G000028 to G000043   61

Reed Exhibit 3. Compensation Associate

Handbook Table of Contents Bates stamped

G000191 to G000235                          74

Reed Exhibit 4. Training History Log

Bates stamped 380                           82

Reed Exhibit 5. Opt-In Responses to the

Court's Interrogatories                     87

Reed Exhibit 6. Answers to Interrogatories  172

Reed Exhibit 7. Second Amended Collective

and Class Action Complaint                  183

(Exhibits attached to original transcript.)

Page 200

MICHAEL REED
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer, et al. vs. GEICO
Dep. Date: January 8, 2025
Deponent: Michael Reed

CORRECTIONS:
Pg.   Ln.   Now Reads    Should Read    Reason

_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____
_____ _____ _____ _____ _____

                    _____
                    Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2025
_____
    (Notary Public)

MY COMMISSION EXPIRES: _____



Page 201

MICHAEL REED

ACKNOWLEDGEMENT OF WITNESS

I, MICHAEL REED, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____   _____
(DATE)              (SIGNATURE)

Page 202

C E R T I F I C A T E

STATE OF NEW YORK    )

             : Ss.

COUNTY OF NEW YORK   )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL REED, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January, 2025.

*Kim M. Brantley*

Kim M. Brantley

My Commission expires May 31, 2026.

