# Exhibit Z

**Page 1**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
KEITH FISCHER, MICHAEL O'SULLIVAN, JOHN
MOESER, LOUIS PIA, THOMAS BARDEN,
CONSTANCE MANGAN, and CHARISE JONES,
individually and on behalf of all others
similarly situated,

                 Plaintiffs,

      v.         Case No. 2:23-CV-02848

GOVERNMENT EMPLOYEES INSURANCE COMPANY
d/b/a GEICO,

                 Defendant.
----------------------------------------x

                Remote proceeding
                January 16, 2026
                10:30 a.m.

    VIDEOCONFERENCE DEPOSITION of Opt-In Plaintiff, KENNETH BAKER, before Michele Moskowitz, a Shorthand Reporter and Notary Public of the State of New York.

**Page 2**

         A P P E A R A N C E S

(VIA ZOOM)

OUTTEN & GOLDEN

Attorneys for Plaintiffs

    One California Street, 12th Floor

    San Francisco, California 94111

BY:  JANE BALKOSKI, ESQ.

    KAELYN MAHAR, ESQ.

    jbalkoski@outtengolden.com


DUANE MORRIS LLP

Attorneys for Defendant

    190 South LaSalle Street, Suite 3700

    Chicago, Illinois 60603

BY:  GREGORY TSONIS, ESQ.

    gtsonis@duanemorris.com

**Page 3**

       I N D E X
WITNESS      EXAMINATION BY     PAGE
KENNETH BAKER    MR. TSONIS     4, 152
             MS. BALKOSKI     150

------------------ EXHIBITS --------------------

DEFENDANT'S    DESCRIPTION      PAGE

Exhibit A     Plaintiff's Responses    71
            and Objections to
            Defendant's First Set of
            Interrogatories
Exhibit B     Document Bates labeled    85
            G023294 - G023304

Exhibit C     Excel document      93

Exhibit D     Training record     107

Exhibit E     Workday profile     123

Exhibit F     Second Amended      145
            Collective and Class
            Action Complaint

**Page 4**

        K. Baker

    K E N N E T H  B A K E R, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. TSONIS:

    Q.   Please state your name for the record.

    A.   Kenneth Baker.

    Q.   What is your current address?

    A.   31 Violet Avenue, Mineola, New York.

    Q.   Good morning, Mr. Baker.

    A.   Good morning, sir.

    Q.   My name is Greg Tsonis.  I'm an attorney for GEICO and I'll be taking your deposition here.

    A.   Mineola, New York; 31 Violet Avenue.

    Q.   Is that the address that you identified on the record?

    A.   Correct.

    Q.   Is that where you're currently located for this deposition?

    A.   Yes.

    Q.   Have you ever been deposed before?

    A.   Yes.

    Q.   When was the last time you were deposed?



KENNETH BAKER
FISCHER vs GEICO

January 16, 2026
13–16

Page 13

K. Baker

Q. I completely understand you're not a lawyer, so you may not know the formal titles of documents, but besides the documents that you've already described, were there any other documents that you reviewed?

A. I believe I reviewed a time record, my time record.

Q. Any other documents?

A. Not that I recall.

Q. Any pay-related documents?

A. That was the time sheets. Not pay per se, the time sheets.

Q. Okay. Understood.

So you said you had three conversations that occurred and the most recent conversation that occurred yesterday. Prior to yesterday's conversation, when was the last conversation that you had with counsel to prepare for your deposition?

A. No other conversation preparing for the deposition other than back-and-forth e-mails, but the previous conversation was to give the answers that were on that -- one of the documents that I reviewed, so to get my information about what I recall about my time at GEICO.

Page 14

K. Baker

Q. While you were employed by GEICO, you worked from home, right?

A. Initially when I started, I was in the field. It was just prior to COVID. And then when COVID hit, then I was working from home.

Q. As part of your work from home, I suspect you had GEICO-related documents that you maintained at your home?

A. What type of documents?

Q. Any type of documents. Whether they're electronic, paper files, did you have any kind of documents that you kept at your home related to your employment with GEICO?

A. Yes.

Q. Have you searched those documents for potentially relevant documents in connection with this lawsuit?

A. I don't really have any more documents left. So any documents that were on computer were returned, any GEICO equipment was returned upon my termination, and any subsequent documents, such as, you know, the policy book or anything like that were destroyed immediately upon termination.

Q. What about handwritten notes from your

Page 15

K. Baker

time working with GEICO, did you keep any handwritten notes?

A. Any handwritten notes that I had in regards to examination under oaths were shredded upon completion of each case.

Q. Did you ever use, like, a personal cell phone or personal e-mail in connection with work?

A. No.

Q. Never texted anybody from a personal cell phone?

A. No. Because I didn't -- I didn't have anyone's number in my personal phone. It was strictly in the GEICO phone.

Q. Have you talked with anyone else that you understand to be a part of this lawsuit?

A. No.

Q. Do you recall that you filed a form to formally join as a party to this lawsuit?

A. I believe that was one of the documents that we had spoken about earlier, yes.

Q. Did you consult with anyone before you executed that form?

A. Outside of Jane or Kaelyn?

Q. Well, I guess just first did you consult,

Page 16

K. Baker

I guess, with anyone? And that's either a yes-or-no question.

A. Yes. I spoke with Jane and Kaelyn. That would be it. No one outside of those two people.

Q. Okay. So I guess my question was, to confirm, did you speak with any current or former GEICO employees about whether or not you should submit that form?

A. No, I did not.

Q. Since submitting that form, have you spoken with any current or former GEICO employees regarding the claims being asserted in this lawsuit?

A. No, I have not.

Q. Have you spoken to any current or former GEICO employees in any way, unrelated potentially to the lawsuit, since you filed that consent to join form?

A. No, I have not.

Q. What about since your employment with GEICO ended?

A. I'm trying to think if I did speak with anybody. I don't believe I have. I don't recall if I did.

Q. What do you understand this lawsuit to be



Page 17

K. Baker

about?

A.    I believe it pertains to overtime and not being paid for time that was worked over the 38.75 hours that we were required to work each week -- or each month.  Each week.

Q.    Okay.  And are you asserting that you worked hours in excess of 38.75 that you did not record in GEICO's timekeeping system?

A.    Yes.

Q.    How many hours are you contending that you worked that you did not document in GEICO's timekeeping system per week?

A.    Probably an additional five to seven hours per week average, as an estimate.

Q.    Did that number vary over time?

A.    I'm not sure that I understand the -- your question.

Q.    Yeah, I can clarify.

So you said five to seven hours on average.  Was there a time period in which you worked for GEICO where it was less than that?

A.    Potentially, yes.

Q.    When was that?

A.    I can't give you a specific date or

Page 18

K. Baker

anything.

Q.    So you said the duration of your employment with GEICO was January of 2020 to October 2023, right?

A.    Correct.

Q.    Are you contending that you worked five to seven hours each week that you didn't document in GEICO's timekeeping system from January 2020 to October of 2023?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.    As an estimate, yes.

Q.    Okay.  So your very first week of employment at GEICO you worked five to seven hours that you didn't document in the timekeeping system; is that correct?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.    I honestly wouldn't be able to answer that or tell you that.  I don't know what weeks I potentially worked more or less.  There were some weeks I probably worked more than the estimate that I'm giving.  There were some weeks I might have worked less than the estimate that I'm giving.  I'm

Page 19

K. Baker

estimating approximately each week.

Q.    When you were first hired on with GEICO, you were hired on as a senior field security investigator, correct?

A.    Yes.

Q.    And you had an onboarding process that you went through?

A.    Yes.

Q.    What was that onboarding process?

A.    We went to the Woodbury office, basically put on computers to learn all the different systems.  I believe it was -- I'm not going to say how long.  I believe it was two weeks.  It might have been longer.  Actually I think it might have been longer than that.  And then it was going out with other investigators to sit with them and learn with them.

Q.    Sounds like there was an initial phase of training where you learned GEICO's systems and the practices by which you were supposed to perform your job duties?

A.    Correct.

Q.    And how long would you estimate that that training process lasted?

A.    I just said I -- I don't recall, but I

Page 20

K. Baker

believe I was in the office for two weeks and then there was field work with other investigators after that.

Q.    How long was that phase where you were doing field work with other investigators?

A.    I don't recall.

Q.    What's your best recollection?

A.    Probably another two weeks, potentially longer.  Again, it was a long time ago.  I do not recall how long the orientation was.

Q.    Did that training process, I guess, end naturally or did it end as a result of COVID-19 pandemic?

A.    No.  It ended naturally.  And you mean -- naturally by just it was sort of over and then it went into regular job duties, that's what I mean by that.

Q.    Okay.  I guess that's what I'm trying to confirm.

Given how close in proximity to COVID you were hired, I guess I'm asking if COVID had any impact on your onboarding and training.

A.    No.

Q.    As part of your onboarding and training,



Page 61

K. Baker

Q.   Is it accurate, to the best of your recollection, to say he was your supervisor until approximately the middle of January 2022?

A.   That could be, yes.

Q.   Who was your supervisor after Mr. Portnoy?

A.   Bradley Waltman.

Q.   Bradley Waltman?

A.   Yes.

Q.   Was Mr. Waltman your supervisor throughout the remainder of the duration of your employment with GEICO?

A.   Yes.

Q.   Did your job duties change across any of these different supervisors?

A.   That's kind of vague.  Like, it -- my specific job responsibilities, no.  The parameters of it, yes.

Q.   What do you mean by the parameters?  I guess how did it change from supervisor to supervisor?

A.   It was more -- basically going back to the performance metrics, so there was more expected of you as it went along.

Page 62

K. Baker

Q.   So I guess is it correct to say that your testimony is that the performance metrics that you were required to meet got higher in terms of the thresholds over time?

A.   Correct.

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   Correct.

Q.   The policies, though, requiring you to accurately record all hours worked didn't change over time, right?

A.   Not that I know, no.

Q.   Right.  And there was no change in terms of the expectations communicated to you, the number of hours you should be working before that change to the mobile timekeeping system using your phone or after, right?

A.   Can you re -- just say that question again.

Q.   Yeah.  With the change to the sign-in/ sign-out process, there wasn't any change to -- communicated to you regarding the expectations of the number of hours you should be working, right?

A.   No.

Page 63

K. Baker

Q.   No, that's not right, or no, there was nothing communicated?

A.   No, there was nothing communicated.

Q.   The expectation regarding, you know, the hours you should be working was the same throughout your employment with GEICO?

A.   Yes.

Q.   Your ability to record more than 38.75 hours if you wanted was the same through your employment with GEICO?

A.   Yes.

Q.   Did Danielle Perdomo and Brian Portnoy and Bradley Waltman differ with respect to flex time and expectations around using flex time?

A.   I don't recall if they differed.  I don't know.

Q.   Okay.  Did any of those supervisors, you know, require you, I guess, to get approval from them before you recorded more than 38.75 hours?

A.   No.

Q.   Did any of those supervisors -- well, strike that.

You'd agree that none of those supervisors had knowledge that you were working

Page 64

K. Baker

hours that you were not recording in GEICO's timekeeping system, correct?

MS. BALKOSKI:  Objection.  You can answer.

A.   No.

Q.   Why is that incorrect?

A.   Because there were times that they would know that I would be working extra time.

Q.   Which times are those?

A.   I can't give you a specific date or time.

Q.   What's your basis for saying that they would know that you were working extra time?

A.   Because I've had conversations with them in regards to such stuff.

Q.   Well, let's be specific.

First, which individuals are you talking about as between Ms. Perdomo, Mr. Portnoy, and Mr. Waltman?

A.   All three.

Q.   All right.  So you're contending you had conversations with all three.  Let's start with Ms. Perdomo.

When did you have a conversation with Ms. Perdomo that you're referencing?



Page 65

K. Baker

A.   I can't give you a specific date or time.

Q.   Give me an approximate date or time.

A.   I wouldn't even be able to give you an approximate date or time.

Q.   So you worked with Ms. Perdomo from February 2020 through October of 2021.  When in that time frame do you believe you had a conversation with Ms. Perdomo about working off the clock?

MS. BALKOSKI:  Objection, asked and answered.

Q.   You can answer.

A.   Yeah, I don't know.  I don't recall.

Q.   So you can't identify any time period, even a remotely approximate range, within that time period when this alleged conversation occurred?

MS. BALKOSKI:  Objection, asked and answered again.  You can answer, Ken.

A.   That would be correct.

Q.   All right.  How many conversations are you contending you had with Ms. Perdomo on this topic?

A.   Again, I don't recall how many times.

Q.   Okay.  What's your best approximation of how many such conversations you had?

Page 66

K. Baker

A.   I'm not going to give you an estimate because I don't know.  Depends on the week.  I don't know.

Q.   So you can't give me an approximate of how many such conversations you had?

MS. BALKOSKI:  Objection.

A.   No.

Q.   Is it more than five?

A.   Again, I'm not going to give you an estimate.  I don't know.

Q.   More than ten?

A.   I don't know.

Q.   More than 20?

MS. BALKOSKI:  Objection.  You've asked this question several times.

MR. TSONIS:  Jane, the speaking objections and coaching the witness is enough.  You're fine to say objection and let the witness answer.

A.   I don't know.

Q.   Were those conversations in person, over the phone, via messaging app, or via e-mail or some other method?

A.   Could be a combination of all three.

Page 67

K. Baker

Well, not in person.  But all three: text, e-mail, phone.  Yeah.  Text, e-mail, or phone.

Q.   Okay.  And when you would have these alleged conversations with Ms. Perdomo, what specifically would you say to her?

A.   Again, I don't recall a specific conversation.

Q.   Mr. Baker, in all fairness, you're claiming you had a conversation in which you contend your supervisor had knowledge you were working off the clock, GEICO's entitled to know what the factual basis is for that allegation.  So what are you contending that you communicated to your supervisor?

A.   I might have -- again, this is a paraphrasing.  We'll say -- so it might have been something to the effect, I had a really busy week having prepared for my EUOs, I'm probably going to jump on Sunday to finish them or prepare for my EUOs for the next week, something to that effect.

Q.   Okay.  Are you contending that the five to seven hours you're claiming that you worked off the clock always occurred on Sundays?

MS. BALKOSKI:  Objection.

A.   That's not what I said.  No.

Page 68

K. Baker

Q.   Did you ever inform your supervisor that you were working off the clock in any way other than working on Sundays?

A.   Potentially, yes.

Q.   But you can't recall a specific conversation?

A.   No.

Q.   So what would the substance of the conversation be that you're contending would inform your supervisor that you were working off the clock during the week?

A.   Again, basically the same substance that I just said.  It would be referencing if I had a busy week, I'm going to stay on and do some work.

Q.   And is that the same substance of conversations that you contend you had with Mr. Portnoy?

A.   Correct.

Q.   Is that the same substance of the conversations you contend you had with Mr. Waltman?

A.   Correct.

Q.   Did you ever have any such conversations with any other supervisory or management individual at GEICO?



Page 69

K. Baker

A.   I don't know.

Q.   You don't know or no?

A.   I don't know.

Q.   Who was the SIU manager that your supervisors reported to?

A.   Courtney -- I don't remember -- Wolfe? Was it Wolfe?

MR. TSONIS:  Courtney Wolfe, W-O-L-F-E, for the court reporter.

Q.   Did you ever have a conversation with Courtney Wolfe where you informed her you were working off the clock?

A.   No.  I rarely had any conversation with her.

Q.   Did you ever have a conversation with any member of human resources at GEICO where you informed them that you were working but not recording certain time?

A.   No.

Q.   Was there with Ms. Perdomo, Mr. Waltman, or Mr. Portnoy any conversation that differed in substance from what you already testified to?

A.   I'm not sure that I can answer that.  Can you rephrase that?

Page 70

K. Baker

Q.   Sure.

So you testified that you might have had a conversation where you said you had a busy week, didn't get to prepare for EUOs, and you might jump on on Sunday, and you testified that you might have had a conversation where you said you had a busy week and you might stay on to finish some work.

Are there any other types of conversations that you had with your supervisors that you're contending informed them that you were working off the clock?

A.   Potentially, but I can't tell you what those conversations were.

Q.   I'm going to introduce a document into evidence.  I'll copy and paste it into the chat.  Do you know how to access the chat, Mr. Baker?

A.   Yup.  Did you put it in already?

Q.   No.  Sorry.  Technical issue on my end. It's not letting me paste it.  I'll do this slightly different.  Give me one second.  Now the document is in the chat.  I'm going to mark this as Exhibit 1 to your deposition, Mr. Baker.

(Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories were

Page 71

K. Baker

marked Defendant's Exhibit A for identification, as of this date.)

Q.   Let me know when you have it open.

A.   Okay.

Q.   So do you recognize this document?

A.   Let me just take a look through it just to make sure.

Q.   Sure.

A.   Yes.  I believe this is one of the documents I reviewed.

Q.   If you skip to the very last page titled "Verification," let me know when you're there.

A.   Okay.

Q.   All right.  Do you see that the verification here has a signature on it?

A.   Yes.

Q.   Is that your signature?

A.   Yes.

Q.   Did you sign this document?

A.   Yes.

Q.   Did you understand by signing this document that you are verifying under penalty of perjury that the information within was true and correct to the best of your knowledge?

Page 72

K. Baker

A.   Yes.

Q.   So we will not go through all of this document, but I want you to skip to page 7.

A.   Okay.

Q.   So this interrogatory is a question that GEICO essentially asked you to answer and asked for you to identify each person that you believe had actual or constructive knowledge that you worked unpaid overtime, and for each person describe the facts that support your contention; do you see that?

A.   Okay.

Q.   So if you skip to the next page -- we don't have to go through all these objections, but I want to draw your attention -- are you on page 8?

A.   Yes.

Q.   Do you see the first full paragraph on page 8?  In kind of the middle of the paragraph there's a sentence that says, "Plaintiff further identifies the following individuals as having knowledge that plaintiff worked off the clock."

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   And do you see that it identifies



Page 73

K. Baker

Danielle Perdomo and Bradley Waltman?

A.   Yes.

Q.   So it does not identify Brian Portnoy in this response, right?

A.   Correct.  Because I couldn't remember his name.

Q.   Okay.  So you're contending that this answer isn't accurate in that Mr. Portnoy should also be included on this list?

A.   Yes.

MS. BALKOSKI:  Objection.

Q.   So it says -- you could have written here a supervisor whose name you can't recall, right?

A.   I could have at the time.  I did not remember that transition time.

Q.   Okay.  So here you write, "On several occasions plaintiff sent work-related e-mails to Perdomo and outside of his regular working hours"; do you see that?

A.   Yes.

Q.   All right.  So are you contending that Ms. Perdomo, Mr. Waltman, and perhaps Mr. Portnoy knew that you were working but not recording hours because you were e-mailing them outside of regular

Page 74

K. Baker

working hours?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   Yes.

Q.   Okay.  But if you sent, let's say, an e-mail to Danielle Perdomo at 7:00, it's also possible you could be flexing your time that day, right?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   Yes.

Q.   It says, "Plaintiff also told Perdomo and Waltman in meetings that he had worked or planned to work additional unpaid hours"; do you see that?

A.   Yes.

Q.   Describe to me the facts underlying that statement in your interrogatory response.

A.   I believe I answered that with the questions you asked earlier.  So I would have conversations -- potentially conversations with them about my work week and what was going on and that I needed to do additional work to catch up.

Q.   Okay.  So let me unpack this for a minute.

Page 75

K. Baker

This says "in meetings."  I want to focus on that phrase for a second.  Is the phrase "in meetings" in this interrogatory response something like a team meeting in which many people were present or like a one-on-one meeting you had over the phone with your supervisor?

A.   It could potentially be both.  A meeting is -- meeting could be on the phone, it could be in person.

Q.   Mr. Baker, I'm asking -- specifically you're claiming that certain conversations you had with these individuals informed them that you worked or planned to work additional unpaid hours, and I'm asking you -- let's start with Ms. Perdomo -- what meeting are you referencing that you said a comment that provided that knowledge?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   So a meeting could be just a phone conversation.  That's a meeting.

Q.   Okay.  So to be clear, you never made these statements in the context of like a team meeting in front of other individuals?

MS. BALKOSKI:  Objection.  You can

Page 76

K. Baker

answer, Ken.

A.   Again, I don't recall.  I can't give you specifics.

Q.   Do you have any reason to think you had the type of conversations you're describing publicly in front of others?

A.   I don't know.

Q.   Again, Mr. Baker, I'm entitled to your best testimony here and your best recollection.  Do you have any reason to think why you would have in a team meeting with other investigators been talking to your supervisor about your workload in one particular week?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   I -- so in a team meeting we would discuss individuals' work weeks.  It's not a -- it wasn't a secret.  It wasn't something we couldn't talk about, what their work week was like or what they had going on.

Q.   But you don't recall ever having a specific conversation like this in any specific team meeting?

A.   I don't recall, no.



Page 77

K. Baker

Q.   Do you think it's more likely that it happened in a phone call or in a team meeting?

A.   Again, I'm not going to answer that because it could be both.  I don't know.

Q.   So all you can provide is the general testimony that it happened sometimes, some way, with someone, but you don't know anything more than that?

A.   To generalize it, yes.

Q.   Okay.  So when this says "had worked or planned to work additional unpaid hours," I want to unpack that.

What you've talked about and testified to is that your workload would require you to work on a future Sunday or work later in a particular day, both instances in the future, right?

MS. BALKOSKI:  Objection.

A.   Correct.

Q.   Okay.  This says -- references comments that you had worked additional unpaid hours.  Can you recall any conversation in which you informed one of your supervisors that you had already worked unpaid hours?

A.   I cannot give you a specific, no.

Q.   In fact, you would not have told your

Page 78

K. Baker

supervisor, hey, I worked certain hours, but I did not record them in GEICO's timekeeping system, right?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   Not in those words, no.

Q.   Right.  The words would have been what you already testified to, right?

MS. BALKOSKI:  Objection.

A.   Potentially, yes.

Q.   Okay.  Aside from what we've already testified to, are there any other types of conversations you had with your supervisors that relate to this interrogatory response?

A.   Again, I don't recall.

Q.   Okay.  I'd like you to skip down to page 13 of the document.  Page 12, we'll start there.

A.   Okay.

Q.   This interrogatory asked you to identify or to describe the instances in which you worked overtime without authorization or approval and identify the number of hours that you worked, et cetera; do you see that?

A.   Yes.

Page 79

K. Baker

Q.   All right.  And when you scroll to the next page, do you see the paragraph that starts "in light of these objections"?

A.   Okay.

Q.   It says, "Plaintiff responds they generally worked a total of 44 to 46 hours per week in complete work weeks that they worked for GEICO"; do you see that?

A.   Yes.

Q.   All right.  Now, here you say this time estimate in response to complete work weeks, right?

A.   Okay.

Q.   Do you mean work weeks of 38.75 hours or work weeks in which you worked five days?

A.   I guess it -- yes.  So the weeks work in 38.75.  It was sort of a generalized response for 38.75 hours a week.

Q.   In work weeks that were less than complete, what was the estimate of hours that you worked in total?

A.   It's being read the wrong way.  So it's -- every week was 38.75.  Whether I took a day off, it was still 38.75 hours a week.  So it was the estimate of what I worked past those hours.

Page 80

K. Baker

Q.   It also says, "Out of those hours, approximately zero hours per week were typically spent either driving from home from your first appointment or from the last appointment back home," right?

A.   Yes.

Q.   But you did spend time driving to, for example, clinic inspections, right?

A.   Correct.

Q.   How long, approximately, would it take you to drive out to a clinic typically?

A.   That varied with every clinic, depending on where it was.

Q.   Sure.

But what's your estimate of the average?  How long did it take you on average to drive out to your first appointment?

A.   So in regards to this, it was never -- I never started in my car and drove.  I always started work at home to prep for it and then I would drive to my medical -- the clinic inspection.

Q.   Okay.  I appreciate that.  I guess I asked a different question, though.

How long would it take you to drive from



Page 137

K. Baker

on a Tuesday in SICM, it doesn't mean that that activity actually took place at that time or shortly before, it could have happened the prior week, right?

A.    Yes.

Q.    Part of the documentation in SICM involves, like, what investigative steps were taken or what was learned in an EUO, things like that, right?

A.    Yes.

Q.    If you are doing, like, a -- documenting something in SICM, the duration of the activity isn't something that you have to log in SICM, right?

A.    I do not recall.

Q.    Okay.  Was there any software that you used regularly as part of your job?

A.    We had the background software.  I don't -- I think we might have used Intelius.  I don't remember what -- background software, there was the software to look at the medical billing, and I'm sure there was some other software.  I don't recall off the top of my head.

Q.    Do you recall what the software to look at the medical billing was called?

Page 138

K. Baker

A.    I do not recall what it was called.

Q.    Was that literally what would allow you to sort of pull up a provider, look at the bills that you were issued, actually see copies of bills, things like that?

A.    Yes.

Q.    Is that the software for which you would, like, mine your cases?

A.    Part of it, yes.

Q.    What was the other part?

A.    The claims itself.

Q.    Like the claims database, Atlas?

A.    Yes.

Q.    Investigators that didn't work major medical cases, would they have any reason to go on that medical software, the billing software?

MS. BALKOSKI:  Objection.  You can answer.

A.    I don't know.

Q.    Okay.  Do you have any understanding of how frequently your supervisors would go into SICM to review your cases?

A.    No.

Q.    Did they usually inform you if they did

Page 139

K. Baker

or only inform you if there was some kind of issue?

A.    I'm not really sure.

Q.    Okay.  Did your workload remain relatively consistent over the time that you were employed as a major medical field investigator?

A.    No.

Q.    How did it change?

A.    It increased as time went along.

Q.    How much did it increase, I guess?  Do you have a recollection?

A.    I do not recall specific numbers or anything like that, but it definitely increased.  There was more expected.

Q.    Do you have a recollection as to if there was a particular time in which it changed significantly, like a beginning of a certain year?

A.    No.

Q.    So it was just a continuous increase over time?

A.    Yeah.  I guess the metrics changed as time went on, but I can't tell you specifically when.

Q.    So if the metrics changed since time went on and your testimony is that workload increased

Page 140

K. Baker

over time, then why is your estimate of off-the-clock work consistent over time?

A.    Because I was getting more -- I was increasing my workload, but exactly like you pointed out, I was also more proficient at what I did as opposed to when I first came on, and I was having less cases.  So as I got more proficient at what I did, my caseload was able to increase, but -- in order to be able to get those ratings.

Q.    It's your testimony that the change in metrics that GEICO communicated and applied to you and your position precisely matched your increase in proficiency over time; is that right?

MS. BALKOSKI:  Objection.  Ken, you can answer.

A.    That's not what I said.  I just said that I became more proficient at doing what I did.

Q.    Right.  But your change in proficiency and the change in metrics, according to you, results in a consistent estimate of off-the-clock work that you're alleging overtime the entirety of your time at GEICO, right?

MS. BALKOSKI:  Objection.  You can answer, Ken.



KENNETH BAKER                                    January 16, 2026
FISCHER vs GEICO                                        141–144

Page 141

K. Baker

A.   I don't know how to answer that.  It's not -- it had nothing to do with the amount of overtime.  It had to do with just specifically the number of cases that we were pulling and working on and the fact that I became more proficient at doing that.  It had nothing to do with the overtime end of it.

Q.   Okay.  But you don't know -- you can't quantify in any way the number of cases that you were supposed to generate or work at the start of your career versus the end; is that right?

A.   I definitely don't remember the beginning.  Towards the end it was somewhere in the 20s.

Q.   When you say somewhere in the 20s, what do you mean?

A.   Closing a certain -- somewhere in the 20s, you had to close that amount in order to be, I guess, proficient, be in the 3 category.

Q.   And that includes both conducting EUOs and doing clinic inspections?

A.   Yes.

Q.   So towards the end, I guess, of your employment with GEICO, you're saying the requirement

Page 142

K. Baker

was 20-something cases closed per month?

A.   I believe so.  I'm not 100 percent sure.

Q.   Do you have any knowledge as to any other individual -- any other field investigator's alleged off-the-clock work?

A.   No.

Q.   You have no personal knowledge that any other investigator did or did not work off the clock; is that right?

A.   Yes, I do not know.

Q.   No other investigator communicated to you that they had worked off the clock, right?

MS. BALKOSKI:  Objection.  You can answer, Ken.

A.   Not that I recall, no.

Q.   Do you recall that GEICO underwent a reorganization that was ultimately implemented in 2023 that changed from what was previously a regional structure to a more vertical integration?

A.   I don't know what you call it, but yes, there was some sort of a restructuring.

Q.   Prior to that restructuring that you recall, do you have an understanding of which region you were a part of?

Page 143

K. Baker

A.   New York.

Q.   Does the term Region 2 sound familiar to you, or you don't know which you were a part of?

A.   No, now that you said it, yes, Region 2.

Q.   All right.  Do you have any understanding of the workloads that any other investigator had in Region 2 during the time of your employment?

A.   Not really, no.

Q.   Not really or no?

A.   No.

Q.   Okay.  Similarly, do you have any personal knowledge as to the job responsibilities or workload of any investigator outside of Region 2?

A.   No.

Q.   You mentioned earlier that for a time the geographic location that you were responsible for extended almost out to Buffalo; do you recall that?

A.   That was a separate region.  Yes, I do recall that.

Q.   What do you recall regarding the change in the geographic area for which you were responsible for?

A.   I just know when that happened, we started -- I started doing cases from Pennsylvania,

Page 144

K. Baker

started doing cases from Washington State.  It varied.  It extended out much further.

Q.   Got it.

During COVID -- well, let me back up.

How long have you lived at your current address?

A.   20 -- 2003.

Q.   During COVID did you ever relocate to a different address and work from there?

A.   No.

Q.   You worked basically -- when we say work from home, you were literally working from your home?

A.   Yes.

Q.   As part of your allegations in this lawsuit, you're not claiming that GEICO didn't accurately pay you for hours that you actually recorded in the Workday timekeeping system, right?

A.   Correct.

Q.   I'm going to introduce another exhibit. I just dropped it in the chat.  Let me know when you have it open.

(Second Amended Collective and Class Action Complaint was marked Defendant's Exhibit



Page 157

C E R T I F I C A T I O N

STATE OF NEW YORK   )
                    )
COUNTY OF NEW YORK )

     I, MICHELE MOSKOWITZ, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

     That KENNETH BAKER, the witness whose examination is hereinbefore set forth, was duly sworn/affirmed by me and that this transcript of such examination is a true record of the testimony given by such witness.

     I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of February, 2026.

*Michele Moskowitz*

MICHELE MOSKOWITZ

Page 158

***ERRATA SHEET***

NAME OF CASE:  FISCHER, ET AL. v. GOVERNMENT EMPLOYEES INSURANCE COMPANY D/B/A GEICO

DATE OF DEPOSITION:  JANUARY 16, 2026

NAME OF WITNESS:  KENNETH BAKER

PAGE  LINE    FROM      TO        REASON

____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____
____|_____|_____|_____|_____

                    _____

Subscribed and sworn/affirmed before me this ____ day of _____, 2026.

_____      _____
Notary Public       My Commission Expires

