# Exhibit AA

STEPHEN STEMMLER
KEITH FISCHER vs GEICO

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                Plaintiffs,       )

    - v -                         )

GOVERNMENT EMPLOYEES INSURANCE    )

COMPANY d/b/a GEICO,              )

                Defendant.        )

- - - - - - - - - - - - - - - - - )


    REMOTE DEPOSITION OF STEPHEN STEMMLER


Reported by:

Kim M. Brantley

Job No: J14079449

Page 2

STEPHEN STEMMLER

Thursday, January 15, 2026

Time: 10:03 a.m.

Remote deposition of STEPHEN STEMMLER, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

    OUTTEN & GOLDEN, LLP

    685 Third Avenue, 25th Floor

    New York, NY, 10017

    (212) 245-1000

    Email: jmcallister@outtengolden.com

    BY:  JARRON D. MCALLISTER, ESQUIRE


On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: tealberty@duanemorris.com

BY:  TIFFANY ALBERTY, ESQUIRE

Page 3

STEPHEN STEMMLER

P R O C E E D I N G S

STEPHEN STEMMLER

called as a witness by Counsel for the Defendant, and, after having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MS. ALBERTY:

Q.  Can you please state your full name for the record.

A.  Stephen, that's with a Ph, middle initial P, last name is Stemmler, S-t-e-m-m-l-e-r.

Q.  Thank you.  Can you please state your full address for the record.

A.  394 Harrison Avenue.  That's in Massapequa, M-a-s-s-a-p-e-q-u-a, New York, 11758.

Q.  Nice to meet you, Mr. Stemmler.  My name is Tiffany Alberty.  I'm counsel for GEICO, and I introduced myself off the record.

MS. ALBERTY:  This is the discovery deposition of Mr. Stephen Stemmler taken pursuant to notice and by agreement of the parties.

Today's deposition will be taken in accordance with all applicable rules.

Page 4

STEPHEN STEMMLER

BY MS. ALBERTY:

Q.  Mr. Stemmler, have you given a deposition before?

A.  I have.

Q.  When was the last time you gave a deposition?

A.  I don't know; probably in the '80s.

Q.  Okay, that's really long ago.

A.  Probably before you were even born.

Q.  All right, so it's been some time.

But I knew that when you were off the record you indicated that you were familiar at least in part from your experience in doing depositions.

What I will do is I'll just kind of go over some ground rules.  It's just so that you and I work on the same plane moving forward.  And I'm sure that your counsel, Jarron, has gone over some of these ground rules with you.

If at any time during the process you have any questions, of course feel free to ask.

Obviously we're on a remote application today.  What Zoom typically ends up doing is that you'll see a glowing green screen around my face.



Page 9

STEPHEN STEMMLER

Q.   Was it your specific disability insurance policy?

A.   The client -- no, no, not mine.  I worked for Met Life at the time, yeah.

Q.   Understood.

Is this the first lawsuit that you've ever been a part of as either a plaintiff or a defendant?

A.   That I testified to, yes.

Q.   Not testified to, just in general, either you've been a plaintiff or a defendant in a lawsuit?

A.   I might have been a defendant, but they never -- they never went to fruition.  It was either, you know, tossed out or something like that.

Q.   For this case did you opt into the lawsuit?

A.   I opted in, yes.

Q.   Do you know what it means when you opted into the lawsuit?

A.   What it means?

Q.   Yep.

A.   I opted in to be a part of this

Page 10

STEPHEN STEMMLER

lawsuit.

Q.   Do you recall when you opted in?

A.   Not too long ago; maybe a few months ago.

Q.   Why did you opt in?

A.   Well, because I knew about the lawsuit.  The reason I didn't go into the lawsuit is because I felt there was going to be retribution because I was like a new employee, but then I changed my mind.

Q.   How did you find out about the lawsuit before you opted into it?

A.   Just through other coworkers.

Q.   Anybody with specificity tell you about it?

A.   No.  Pretty much everybody was talking about it.

Q.   Can you provide me any names?

A.   Names, I guess most would be Tony Geraci.

Q.   Did you work with Tony in your department?

A.   He was in SIU with us.

Q.   What did Tony tell you?

Page 11

STEPHEN STEMMLER

A.   That there was a lawsuit going on, you know, due to the, you know, the extra hours that we were all working and not getting compensated for.

Q.   Did he tell you at all how much he was expecting to get out of the lawsuit?

A.   No.

Q.   And then I think you indicated that you thought retribution was going to come.

What do you mean by that?

A.   I just felt like, you know, GEICO would be privy to the information and then just say, "Oh, this guy is going to sue us.  Let's get rid of him."

Q.   Has that occurred at all since you opted into the lawsuit?

A.   No, it hasn't.

Q.   Since opting into the lawsuit, what claims are you asserting?

A.   That I worked a hell of a lot more hours than I got paid for.

Q.   Okay, so walk me through that, that you worked more hours than you were paid for.  In what way?

Page 12

STEPHEN STEMMLER

A.   Exactly how it sounds.  You know, you get paid for, whatever, eight hours a day, and I was working more than eight hours a day.

Q.   In your custom and practice, how many hours a day were you typically working?

A.   Well, how many hours was I supposed to work, or how many hours was I working?

Q.   How many hours were you working a day?

A.   I guess I probably averaged at least two hours every day.

Q.   Sorry, I guess when you're saying that you worked at least two hours a day, are you saying that's all you worked was two hours a day?

A.   No, I'm sorry, two hours extra a day, you know, past my allotted time.

Q.   So how many hours in total a day would you say that you were working?

A.   Well, on average at least ten hours.

Q.   How many days a week were you working?

A.   I was working five days a week.

Q.   For the ten hours a day you were working, were you logging your ten hours a day?

A.   No.

Q.   For the ten hours a day you were



STEPHEN STEMMLER
KEITH FISCHER vs GEICO

January 15, 2026
13–16

Page 13

STEPHEN STEMMLER

working, five days a week, is that during the totality that you've been employed with GEICO?

A.   Up until they switched to the signing in on the phones, which I guess was 2024.

Q.   Sorry, what did you say?  I didn't hear that?

A.   I was working ten hours a day up until they switched to -- we had to sign in, log in our phone, our hours, which I think was in 2024.

Q.   So there was a sign-in application that changed over you believe in 2024, and from that time forward then -- again, I believe based off your testimony -- then you were no longer working the ten hours a day.

Is that correct?

A.   Yes.

Q.   So from then the 2024 logging in through the phone, what were your hours a day you were consistently working based off your custom and practice?

A.   Say that again.

Q.   Sure.  Once that transition happened where you were logging in through your phone in 2024, what were your hours you were typically

Page 14

STEPHEN STEMMLER

working?

A.   7:30 to 4:00.

Q.   Was that still five days a week?

A.   Yes.

Q.   How many hours a day would that typically be?

A.   It's 775.  However, due to the amount of cases they were assigning us on say like a Monday, which was typically around seven cases in one day, we would be able to work extra hours, but we wouldn't get paid for it.

So it would be like, let's say I did, you know, one or two hours extra on Monday, one or two hours extra on Tuesday, then that would come off on Friday, then most of the lime our day would end at say 11:00 a.m. or 12:00 p.m., so around that time.

Q.   So then -- again, not trying to put words in your mouth -- is it from 2024 you're saying that your hours were lax, so you could work more hours or less hours on a specific day than to shovel out a specific amount of hours per week?

A.   Yeah, it was still thirty-eight hours a week, no matter how you look at it.  They weren't

Page 15

STEPHEN STEMMLER

paying any overtime.

So, you know, if you did twenty-four hours on Monday, you know, whatever was left, that's how it worked.

Q.   Okay.  Within let's say since that changeover, 2024 onward -- so we're in 2026 now -- do you still work for GEICO today?

A.   Yes.

Q.   So 2024 -- and we're in 2026 now -- have you worked any overtime since that changeover?

A.   No.

Q.   Since the changeover in 2024, are you utilizing primarily the phone application to log your hours?

A.   Yes.

Q.   And is that through Workday?

A.   Yes, it is.

Q.   Prior to 2024 did you have the phone application as an option?

A.   No -- oh, let me correct that.

I guess it could have been on the phone.  I didn't have -- we didn't have to sign in like that, so I just had it on my laptop, Workday.

Page 16

STEPHEN STEMMLER

Q.   So you had the option, but in your custom and practice you just normally did it through your laptop prior to 2024?

A.   Yes.

Q.   Let's backtrack real quick.

When did you start working for GEICO?

A.   In 2006.

Q.   What was your title when you worked and started with GEICO in 2006?

A.   I was a senior investigator, but I think it's senior security investigator.

Q.   Since 2006 -- we're really jogging some memories here, because we're going twenty years now --

A.   Yeah.

Q.   -- have you had the same title since 2006?

A.   Yes, I have.

Q.   And have you worked in the same department since 2006?

A.   Oh, hold on, hold on.  I'm sorry.  I'm sorry.

The question was when did I start working at GEICO?



STEPHEN STEMMLER
KEITH FISCHER vs GEICO

January 15, 2026
77–80

Page 77

STEPHEN STEMMLER

A.  Probably since 2018.

Q.  Have you ever let, for example, HR know that you've been doing that?

A.  No.

Q.  So then I guess let's backtrack. Minus the lunch for the meal periods that we were just talking about --

A.  Mm-hmm.

Q.  -- talking more on accurately reporting hours, have you always accurately recorded your absences taken?

A.  My absences?  Yes.

Q.  So I guess to the degree of this policy here where it says that you're required to accurately record there your hours worked and absences taken, in your custom and practice you have always accurately recorded your absences taken. Is that true?

A.  Yes.

Q.  So to the condition of that portion of the policy, you have followed that portion of the policy?

A.  Yes.

Page 78

STEPHEN STEMMLER

Q.  But as to the portion of accurately reporting your hours worked, you have not followed that portion of the policy. Is that fair?

A.  Say it again.

Q.  As to the portion of accurately reporting your hours worked, you have not followed that portion of the policy. Is that fair?

A.  Regarding a lunch?

Q.  Regarding any of your hours worked for this portion here, accurately recording your hours worked?

A.  Accurately recording?  I guess it's not accurately recording if you can't add your overtime -- the amount of hours that you're working.

Q.  Sorry, one more time.

A.  It's not accurately recording your absence -- I'm trying to -- how do I word this? It's like they're telling us to put 775, but I'm working more than that and not taking lunch.

Q.  So again you're not then accurately

Page 79

STEPHEN STEMMLER

recording your hours worked. Is that fair?

A.  Not accurately recording absences -- yeah, I guess that's fair.

Q.  Did any of your managers or supervisors ever tell you to work off the clock?

A.  No.

Q.  Did anyone in HR ever tell you to work off the clock?

A.  No.

Q.  Was it your understanding that if somebody told you to work off the clock that you would report it?

A.  Say it again.

Q.  If anyone told you that you needed to work off the clock that you should report it?

A.  No.  If you didn't work off the clock you would -- it would affect your rating.

Q.  Right, but if somebody's telling you to work off the clock, that you should report that, is that fair?

MR. MCALLISTER:  Objection.

BY MS. ALBERTY:

Q.  Sorry, go ahead, Steve.

Page 80

STEPHEN STEMMLER

A.  I think it was reported to the supervisors on several occasions, and it was always denied.  And then after a few times you knew what the answer was, so you stopped asking. You stopped asking.

Q.  So my question is different, which is if a supervisor or a manager told you, "You have to work off the clock," did you know that you should report that?

A.  Yeah, no supervisor told me I have to work off the clock.

Q.  Did you ever go to human resources regarding the issues you had with Toni or Dara in working overtime but not clocking overtime?

A.  No.

Q.  Do you know who Dara or Toni's supervisor was?

A.  Bill Newport.

Q.  Did you ever go to Bill with any issues?

A.  No, I did not.  It was chain of command.

Q.  For incoming SIU investigators, did you help shadow or train those people?



Page 81

STEPHEN STEMMLER

A. No.

MS. ALBERTY: Off the record.

(Discussion off the record.)

BY MS. ALBERTY:

Q. So being with GEICO since 2018, we just looked at the employee handbook and the pay policies...

Do you recall being retrained on various GEICO policies throughout your tenure with them?

A. Retrained on various policies?

Q. Yeah.

A. Yeah, they're always doing something. So I would say probably, yes.

Q. And in this case we produced, for example, some training records that you've had where you had to attend or take trainings, for example, their antidiscrimination policies, or their pay policies, or their new implementation policies...

Do you have any reason to dispute that you attended those trainings and passed those trainings throughout 2018 to present?

A. Yeah, yeah, that's true.

Page 82

STEPHEN STEMMLER

Q. Since being employed with GEICO, have you always been paid on an hourly basis?

A. Yes.

Q. Do you recall ever being converted from nonexempt salary to nonexempt hourly in and around 2020?

A. I have no idea.

Q. Were you ever made aware of any other lawsuit that had gone on between GEICO and SIU investigators in 2018?

A. I heard there was a previous lawsuit. I don't know too much about it, other than it's pretty much the same thing.

Q. Were you involved in that previous lawsuit?

A. No.

Q. What did you hear about it, if anything?

A. Just that they filed a lawsuit for, you know, the working extra hours.

Q. Do you know if any of those individuals were a part of the previous lawsuit or a part of this lawsuit as well?

A. Did I know people?

Page 83

STEPHEN STEMMLER

Q. Yes.

A. Yeah, yeah, I know them.

Q. Like who?

A. Geraci; I think it was a lot of the older guys; maybe Pia, Louie Pia; Keith Fischer. I can't think of anybody else.

I think most of those guys have already retired already, or all of them are retired.

Q. Do you still speak to any of those people?

A. I see them like once in a blue moon.

Q. In what capacity?

A. Just at, you know, like a social gathering.

Q. Do they ever talk about this case?

A. No, not really.

Q. I'm going to share my screen with you real quick.

A. Mm-hmm.

MS. ALBERTY: This should be marked as Exhibit Number 3.

(6/24/2020 email exchange Bates stamped G011587 to 588 was marked Deposition Stemmler Exhibit 3, for identification.)

Page 84

STEPHEN STEMMLER

BY MS. ALBERTY:

Q. Okay. I'm going to zoom out, and then we'll zoom back in.

So what's in front of you is marked as Exhibit 3. This is G011587 to 588. It's a two-page email.

Steve, you're not cc'd on this, so your email is not on here. I'm going to zoom a hundred percent -- I'll go to one twenty-five.

Is that good?

A. That's fine, yeah.

Q. Then I'm going to scroll to the bottom real quick. Just the way that the email is printed chronologically, it starts at the bottom and works its way up.

So down towards the bottom it has an email starting from Dara Campbell on June 24th. It says, "Overtime help for Steve," and then I believe these are case numbers.

A. Mm-hmm.

Q. It was sent over to Gerry. And then if I scroll up a little more, I believe it's talking about you because the caption or the subject says



Page 129

STEPHEN STEMMLER

just, for foreshadowing, maybe about another thirty to forty minutes, so I feel like maybe a ten-minute break.

(Recess taken.)

BY MS. ALBERTY:

Q. So I ask you to take a look at Exhibit Number 4, which was the pay slips, during the time periods of 2020 and at least 2023 where you were paid for overtime, that would have been the time periods that either Toni or Dara were your supervisors.

Is that right?

A. Right.

Q. Okay. So they would have had approved then your overtime, correct?

A. Right.

Q. Do you recall -- and again, I don't want to know about anything with you and your counsel -- but do you recall assisting your attorney in providing answers to what's called "interrogatories," written questions that we gave over to you?

A. Yes.

Q. In one of the answers that you had

Page 130

STEPHEN STEMMLER

provided you had stated that you had made some complaints to Toni and Dara about working off the clock on various occasions by phone, email, in a Teams meeting, and that your requests for OT were not approved by your manager, Bill Newport.

My question is, how do you know that it was not approved by Bill Newport?

A. Because I think Dara and Toni would always say that, you know, "It's not me".

I think they kind of just relayed to us that, you know, she would gladly give us overtime, but she was always being shot down by Bill.

Q. So to your recollection you don't recall, for example, Bill Newport ever telling you, "Yeah, no. You can't get overtime."

Is that fair?

A. No. Bill rarely spoke to us, I mean, once in a while, but not -- you know, he wouldn't call me direct or anything like that.

Q. After coming back the first time on FMLA leave, and I know you're on it now --

A. Yes.

Q. After the first time going out and coming back, was there, for example, like a

Page 131

STEPHEN STEMMLER

ramp-up period where it was kind of a slow ease into getting back into your duties and responsibilities?

A. No, it's you're back -- I know when I go back -- I know when I go back in February it's an EUO.

Q. For example, do they drop a bunch of cases, or is it a phased approach?

What does it look like?

A. No, just you come in -- I mean, the way it is now, you come in on Monday, and you get eight cases; seven, eight cases.

Q. Got it. And I'm guessing in your understanding, is that the expectation when you come back in February?

A. Yes.

Q. Have there ever been any times where you reported to your supervisors that you didn't want to take any more cases?

A. Yes. Again I think I stated earlier that if I felt overloaded or overwhelmed -- and for me it takes a lot for me to say that as a man -- that you just couldn't do it anymore. I mean, we're just getting flustered.

Page 132

STEPHEN STEMMLER

You know, like again I was getting -- it's not a major case, but I was getting a full case of, you know, medical claims while people were getting just some medical cases and doing assists. I'm getting a full -- I was basically -- I felt like I was getting double the work from anybody else.

Q. Got it.

And so at the times that you asked for no further cases, would there be mechanisms put in place by your supervisors to help implement, such as the one we looked at with Lou Pia?

A. Yeah, that's like rare, I think, but, yeah, she would say, "Okay, I'm just going to close" -- they used the words, "I close you," meaning close the gate for receiving cases, and that would usually be like a day or two, you know; usually no more than that.

Q. During the time --

A. Just to kind of catch your breath a little bit.

Q. Got it.

During your tenure have you ever transitioned from full-time to part-time status?


ESQUIRE
DEPOSITION SOLUTIONS

Page 153

STEPHEN STEMMLER

C E R T I F I C A T E

STATE OF NEW YORK    )

: Ss.

COUNTY OF NEW YORK   )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That STEPHEN STEMMLER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of February, 2026.

*Kim M. Brantley*
_____

Kim M. Brantley

My Commission expires May 31, 2026.


ESQUIRE
DEPOSITION SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*