# Exhibit BB

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------X

KEITH FISCHER, MICHAEL O'SULLIVAN,

JOHN MOESER, LOUIS PIA, THOMAS

BARDEN, CONSTANCE MANGAN, and

CHARISE JONES, individually and on behalf of

all others similarly situated,

              Plaintiffs,

V.            Case No. 2:23-CV-02848

GOVERNMENT EMPLOYEES INSURANCE

COMPANY d/b/a GEICO,

              Defendant.

-------------------------------------------X

REMOTE VIDEOTELECONFERENCED DEPOSITION OF:

LINDSAY M. BUZAK

Tuesday, January 27, 2026

Reported by:

Aydil M. Torres, CSR

JOB NO. J14143883

**Page 2**

January 27, 2026

4:59 p.m.

Remote VTC deposition of

LINDSAY M. BUZAK, pursuant to

Notice, before Aydil M. Torres, a

Notary Public of the State of

New York.

**Page 3**

A P P E A R A N C E S :

OUTTEN & GOLDEN, LLP

Attorneys for Plaintiffs

685 Third Avenue, 25th Floor

New York, New York 10017

BY: JARRON D. MCALLISTER, ESQ.

DUANE MORRIS, LLP

Attorneys for Defendants

190 South LaSalle Street, Suite 3700

Chicago, Illinois 60603

BY: GREGORY TSONIS, ESQ.

**Page 4**

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification and the same are hereby waived and that the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
53–56

Page 53

Lindsay M. Buzak

Eric, was still on the Social Media Team, except for you?

A.   Exactly.

Q.   All right.  And the lack of a supervisor that had, you know, a team of desk investigators to guide you, if I understand correctly, would have effected, you know, your ability to perform your role as a desk investigator?

A.   Correct.  I don't think he was ever a desk investigator, from the best of my knowledge, because he was a new supervisor to the SIU team, with the Social Media Team.  So he -- we were, kind of, the blind leading the blind.

Q.   So your supervisors lacking, kind of, experience and expertise in a desk investigator role, would also have been a fact that effected your ability to perform your role as a desk investigator?

A.   Absolutely, yes.

Q.   You mentioned -- we talked a bit earlier about the training period being somewhat abbreviated, probably different than

Page 54

Lindsay M. Buzak

what the normal training process would have been.

A.   Yes.

Q.   And I think, if I am understanding your testimony right, the lack of, kind of, structure, training, that you didn't feel was appropriate, contributed to, sort of, your performance issues?

A.   Yes.

Q.   And then, lastly, you mentioned that your computer was just, you know, technologically very slow, and had an impact on how quickly you could complete your work.

A.   Yes.

Q.   It had an impact -- negatively impacted, I think you said, caused you to fall behind?

A.   Correct.

Q.   Did those computer problems ever get rectified?

A.   It did, eventually.  Geico did provide me with a desktop computer that I went and picked up and brought home, and that fixed it.

Page 55

Lindsay M. Buzak

Q.   Do you recall when that was?

A.   I don't.  I remember it was a winter because it was snowing.  But beyond that, I don't remember.

Q.   So if the COVID pandemic began in March, in the winter, it's fair to say it might have been a year after the COVID pandemic started?

A.   I would guess -- I would say it was most likely that, you know, end of -- end of 2020 -- I -- I think it would probably have been 2020 -- I am not sure.  I don't remember exactly when, but I would say, 2020.

Q.   Approximately, to the best of your recollection, the end of 2020?

A.   Yeah.

Q.   Got it.

So as part of this case, by joining this case, you are asserting that you worked hours that you did not record in Geico's timekeeping system, that you think you should be paid for; is that right?

A.   Correct.

Q.   How many hours are you contending

Page 56

Lindsay M. Buzak

that you worked, off the clock, each week?

A.   About five hours a week.

Q.   So five hours a week, off the clock, that you worked each week, and didn't record in the Workday timekeeping system?

A.   Yeah, give or take, maybe two, but closer to five, I would say, my best guess.

Q.   Between three and five hours a week?

A.   Yeah.

Q.   All right.  Are you contending that you worked that three to five hours a week, on average, off the clock, while you worked on the Social Media Team?

A.   No.

Q.   Are you contending that you worked three to five hours, off the clock, each week, when you first began working as a desk investigator?

A.   Not when -- at -- when I was a desk investigator, yes.  But not -- not immediately when I was a desk investigator. Because I still wasn't sure what I was doing.

Q.   So when did you first begin



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026

57–60

Page 57

Lindsay M. Buzak

working, off the clock, to the best of your recollection?

A.   Best of my recollection, it would also be end of 2020.  Most likely, it would have been once I got the desktop computer, because with my laptop, I wouldn't have been able to.  I could barely work during the day.  I wouldn't have been doing extra work because it wasn't working.  So whenever I got the desktop.  So I worked overtime to, you know, try to catch up.

Q.   When you say, "try to catch up," are you talking about trying to catch up from falling behind due to, you know, your laptop and the other issues?

A.   Correct.

Q.   Okay.  When did your employment with Geico end?

A.   September 2021.

Q.   So, essentially, if I am understanding correctly, correct me if I am wrong, you're asserting that, approximately, the end of 2020, through September of 2021, you were working three to five hours, off the

Page 58

Lindsay M. Buzak

clock, each week?

A.   Yes, but probably not every single week.

Q.   Okay.  So we will look, but there were periods of time -- I think there's a period of time where you were on short-therm disability, right?

A.   Correct.

Q.   During that period of time, you performed no work for Geico, right?

A.   Correct.

Q.   So you're not contending that you worked off the clock during that period of time?

A.   Correct, I did not.

Q.   Okay.  Now, similarly, and we will see some records, there are multiple workweeks in which you put in, you know, various hours of sick time, for example, right?

A.   Okay, yes.

Q.   Were there workweeks where you entered in sick times that you are contending that you also worked off the clock?

Page 59

Lindsay M. Buzak

A.   Possibly.  I don't remember, exactly, if I did or didn't.

Q.   As a normal -- as a Geico associate, I guess for -- even before you went into SIU, the normal schedule workweek for a Geico associate is 38.75 hours, right?

A.   Right.

Q.   All right.  Your supervisors never told you that you couldn't enter in 38.75 hours, right?

A.   What do you mean?

Q.   Your supervisors allowed you to enter in 38.75 hours of work each week, right?

A.   Yes.

Q.   So if your supervisors allowed you to enter 38.75 hours each week, but you're entering in, let's say, ten hours of sick time in a workweek, you are not working off the clock in that workweek as well, right?

A.   I mean, I don't remember what I -- if -- you know, what days I worked off the clock, but -- no, I wouldn't because I would -- if I was working outside of those hours, I

Page 60

Lindsay M. Buzak

would try to flex my time to -- so I would use less time.

Q.   Right.  I guess that was my point.  You would have only put, in my example, five hours of sick time, and record the five hours that you are contending that you worked off the clock, right?

A.   Yes, that would be correct.

Q.   Okay.  So I guess going back to my question, if you recorded sick time in excess of five hours in a workweek, that's not a workweek in which you are contending you worked off the clock?

A.   Correct.

Q.   Okay.  So similarly, there are workweeks, I guess, in which you took vacation time, right?

A.   Probably.

Q.   All right.  And workweeks in which you took vacation time, are you contending that you worked off the clock?

A.   Probably not, no.

Q.   Okay.  So it sounds like it's the workweeks in which you worked, you know,



LINDSAY M. BUZAK
FISCHER V. GEICO

January 27, 2026
61–64

Page 61

Lindsay M. Buzak

38.75 hours or very close to 38.75 hours, that are potentially workweeks in which you worked off the clock?

A. Yes.

Q. Okay. Now, what would determine whether or not you would work off the clock in any of those given workweeks?

A. How -- if I fell behind, if I felt pressure to catch up, if I felt like I needed to get more work done, so I wouldn't, you know, get in trouble for being behind. And it would only be when I was working from home.

Q. Just so I am clear, if you were working in the office, you weren't working off the clock?

A. Correct.

Q. Correct. So any of the times in which you were --

MR. TSONIS: Strike that.

Q. Did you have a scheduled shift when you worked in the office?

A. Yes.

Q. What was your scheduled shift?

Page 62

Lindsay M. Buzak

A. I don't remember, exactly, what it was, but it would be -- my start time would be somewhere between eight and nine, and my end time would be probably between five and six.

Q. Was your typical scheduled shift eight to four-thirty?

A. It could have been.

Q. All right. But your schedule -- your typical scheduled shift would have been for eight-and-a-half hours, right?

A. Correct.

Q. And that eight-and-a-half hours includes forty-five-minute unpaid meal period?

A. Either thirty or forty-five-minutes, unpaid, I think.

Q. Ordinarily, would you record a shift of 7.75 hours in the workday, if you worked your normal scheduled shift?

That sound correct?

A. Yes.

Q. So if you were working your scheduled shift in the office, you're not

Page 63

Lindsay M. Buzak

contending that you worked off the clock?

A. Correct.

Q. It's only shifts in which you were working from home?

A. Correct.

Q. Okay. Your supervisors never knew that you were working time and not recording it in your Workday, correct?

MR. MCALLISTER: Objection.

You can answer.

THE WITNESS: I am not sure.

BY MR. TSONIS:

Q. You never informed your supervisors that you were working, but not recording certain time in the Workday, right?

A. No.

Q. "No," that's not right or "no," you didn't inform them?

A. No, I did not inform them.

Q. Okay. Do you have any facts on which you claim that either Eric or Kelly, your two supervisors, knew that you were working off the clock?

A. No. The only thing that is -- that

Page 64

Lindsay M. Buzak

I can think of, is I have a text message where I am telling a friend that Kelly found out, or that -- my supervisor was Kelly at the time. That I worked overtime, and that I -- I can't -- that I am -- I have to avoid doing it, in the future, but I don't have any, you know, direct messages or record of me actually talking to Kelly, and I don't remember how she found out.

Q. So when you say, "she found out" that you worked overtime, what do you mean?

A. That she -- that I -- I don't remember the exact situation. In just finding the text message, kind of, jogged my memory that it even happened, and that's all I said, was, like, my supervisor found out, I can't do it again. So she, like, discovered that I was working, you know, unpaid overtime.

Q. When you say she "discovered" that you were "working unpaid overtime," what -- what did she "discover"?

A. I don't remember how she figured it out, if it was, like, like, a text message

Page 65

Lindsay M. Buzak

that was sent after-hours or there's maybe a document note in the system. I don't remember how she found out, how she realized that I had done that.

Q. So did you have a conversation with your supervisor?

A. I would have had a conversation, I am sure, through Teams, like video call.

Q. Okay. And what did Kelly tell you?

A. I don't remember.

Q. So you're alleging that your supervisor knew that you were working, quote, "unpaid overtime," unquote, but you don't know what she discovered, how she discovered it, or what she said to you?

A. Correct.

MR. MCALLISTER: Objection.

BY MR. TSONIS:

Q. Okay. So what is -- if you don't remember any of those things, what is the factual basis for claiming that she knew you were working unpaid overtime?

A. Can you rephrase the question?

Q. Sure.

Page 66

Lindsay M. Buzak

Why do you believe that Kelly knew that you did not document that time on Workday, at some point?

A. I guess, I don't know if -- whether or not she knows if I documented it or not. But...

Q. So I apologize. I didn't mean to cut you off.

A. No, that's okay. I am just going off an old text message that I found of me telling a friend that I -- that she caught me, like, working overtime. I don't know exactly what she -- what she would have known or didn't know.

Q. So we said that the normal scheduled workday results in, kind of, an entry of 7.75 hours of a workday, right?

A. Yeah.

Q. There are various times in which you recorded more than 7.75 hours in a workday, right?

A. Possibly, yeah.

Q. We can look at the time record, if you want. Would it surprise --

Page 67

Lindsay M. Buzak

A. Then, yes.

Q. Would it surprise you if you recorded 9.75 hours in Workday, regularly?

A. "Regularly"? That probably would surprise me. But I am sure I did do more than 7.75 sometimes, yes.

Q. Is it possible that Kelly discovered that you were working, you know, later into an evening, after the end of your scheduled shift, only?

A. As being paid for it, like being as, like, being clocked in?

I'm sorry, I don't think I understand the question.

Q. Right. Did Kelly ever instruct you not to enter -- with respect to this one incident you are talking about, did Kelly ever instruct you not to enter the time in Workday?

A. No.

Q. You understood, as a Geico associate, that Geico maintains a timekeeping policy that requires all associates to accurately enter all hours worked, right?

Page 68

Lindsay M. Buzak

A. Yes.

Q. Okay. Geico's policy -- timekeeping policies forbids associates from working off the clock, right?

A. Yes.

Q. And you were aware of those policies while working at SIU?

A. Yes.

Q. In fact, as a Geico associate, you would have received copies of those policies in the form of Geico's Associate Handbook, right?

A. Yes.

Q. At the time you were hired by Geico, in fact, you had to acknowledge that you read and understood the policies and procedures contained in the associate handbook, while you were reviewing the Geico policies?

A. Yes.

Q. In fact, as part of Geico's normal practices, it requires associates to certify, on an annual basis, that they had read and understood and acknowledged Geico's policies



Page 69

Lindsay M. Buzak

in timekeeping, correct?

A.   Yes.  I believe so.

Q.   And you, in fact, did acknowledge, annually, that you read, understood, and would comply with Geico's policies, including its timekeeping policies?

A.   I am sure I did, yeah.

THE REPORTER:  Can we take a short break?

MR. TSONIS:  Sure.

(Whereupon, a recess was taken at this time.)

MR. TSONIS:  Before we begin, again, I guess on the record, Jarron, do you know if the text messages that the deponent has been referencing have been produced to Defendants?

MR. MCALLISTER:  We have produced some text messages, I know that, but I don't recall exact which ones.  But I can check, after the deposition, or in between other breaks, and let you know.

Page 70

Lindsay M. Buzak

MR. TSONIS:  Okay.

MR. MCALLISTER:  I know that we produced some.

MR. TSONIS:  In the interest of full disclosure, I have someone on my team trying to identify as well.  If you know the approximate date when that was produced, that would be helpful too.  I want to confirm what was produced and make sure we have everything, but I guess we can deal with that at the next break too.

MR. MCALLISTER:  Yeah.

MR. TSONIS:  Okay.  I am going to drop another document in the chat here.  All right, it should be there now.

BY MR. TSONIS:

Q.   Let me know when you have downloaded it and opened it.

A.   It's open.

Q.   Okay.  Do you recognize this document?

Page 71

Lindsay M. Buzak

A.   Yes.

Q.   What is this document?

A.   I don't know what it's called.

Q.   You're not a lawyer.  I don't expect the formal name, but I guess, does this appear to you to be the answers -- the responses you provided to the questions that Geico asked of you in this matter?

A.   Yes.

Q.   Earlier, in preparation for your deposition, you testified that you reviewed your responses to Geico's questions.

Is this the document that you reviewed?

A.   I think so, yeah.  Yes.

Q.   And if you skip to the very last page, page 15 of 15 --

A.   Uh-huh.

Q.   -- do you see that the page title is "verification" here?

A.   Yes.

Q.   And is that your signature, electronic signature?

A.   Yes.

Page 72

Lindsay M. Buzak

Q.   And it's dated "December 1st, 2025," right?

A.   Correct.

Q.   Did you provide your responses and sign this on or about December 1st, 2025?

A.   Yes, I think we did the questions, maybe the day before.

Q.   And did you understand that by signing this document, you were declaring, under penalty of perjury, that your responses to Geico's interrogatories, the questions that it asked of you, were true, to the best of your knowledge?

A.   Yes.

Q.   If you can first skip to page 12 of the document.  Do you see at the top it says, "interrogatory number 11"?

A.   Yes.

Q.   And it asks you -- and I don't have to read it word for word but -- to "describe all the instances during the relevant period in which you worked overtime, without prior approval and authorization," right?

A.   Yes.



## Page 161

---------------- I N D E X ----------------

WITNESS          EXAMINATION BY          PAGE

LINDSAY M. BUZAK

              MR. TSONIS          6

---------------- EXHIBITS ------------------

DEFENDANT'S                          FOR ID.

EXHIBIT 1      Email G023557-558    premarked

EXHIBIT 2      Responses           premarked

EXHIBIT 3      Workday Profile     premarked
               G023588-23634

EXHIBIT 4      Excel G023576       premarked

EXHIBIT 5      Texts               premarked

EXHIBIT 6      E-mail G023560-561 premarked

        (Exhibits retained by reporter.)

-------------------------------------------

## Page 162

          C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )

     I, AYDIL M. TORRES, a Notary Public within and for the State of New York, do hereby certify:

     That LINDSAY M. BUZAK, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

     I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of January, 2026.

          *Aydil M. Torres*

          AYDIL M. TORRES

## Page 163

          DEPOSITION ERRATA SHEET

Our Assignment No. J14143883

Case Caption:  KEITH FISCHER vs. GOVERNMENT EMPLOYEES INSURANCE COMPANY, ET AL.

    DECLARATION UNDER PENALTY OF PERJURY

     I declare under penalty of perjury That I have read the entire transcript of My Deposition taken in the captioned matter Or the same has been read to me, and The same is true and accurate, save and Except for changes and/or corrections, if Any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding That I offer these changes as if still under Oath.

_____

          LINDSAY M. BUZAK

Subscribed and sworn to on the _____ day of _____, 20_____ before me,

_____

Notary Public,

In and for the State of _____

## Page 164

          DEPOSITION ERRATA SHEET

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

SIGNATURE:_____DATE:_____

          LINDSAY M. BUZAK

