# Exhibit CC

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL O'SULLIVAN, )
JOHN MOESER, LOUIS PIA, THOMAS      )
BARDEN, CONSTANCE MANGAN, and       )
CHARISE JONES, individually and on  )
behalf of all others similarly      )
situated,                           )
                                    )
             Plaintiffs,            ) Case No.
                                    ) 2:23 Civ. 2848
        vs.                         ) (GRB)(ARL)
                                    )
GOVERNMENT EMPLOYEES INSURANCE       )
COMPANY d/b/a GEICO,                 )
                                    )
             Defendant.             )
----------------------------------)

REMOTE DEPOSITION OF JOHN VINCENT DIBLOSI
East Islip, New York
Thursday, January 8, 2026

Reported by:
KRISTIN KOCH, RPR, RMR, CRR
JOB NO. J13981783

## Page 2

January 8, 2026

10:01 a.m. EST

Deposition of JOHN VINCENT DIBLOSI, held remotely before Kristin Koch, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Electronic and Traditional Notary Public of the State of New York.

## Page 3

A P P E A R A N C E S:  (Via Zoom)

        OUTTEN & GOLDEN LLP
        Attorneys for Plaintiffs
            685 Third Avenue
            New York, New York 10017
        BY:   ZARKA SHABIR DSOUZA, ESQ.

        DUANE MORRIS LLP
        Attorneys for Defendant
            190 South LaSalle Street
            Chicago, Illinois 60603
        BY:   GREGORY TSONIS, ESQ.

## Page 4

J. Diblosi

JOHN VINCENT DIBLOSI, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. TSONIS:

Q.   Mr. Diblosi, could you just state and spell your name for the record.

A.   Sure.  My name is John Diblosi.  First name J-O-H-N, last name D-I-B-L-O-S-I.

Q.   And where do you currently reside?

A.   4903 Thomas Drive, East Islip, New York 11730.

Q.   How long have you resided at that address?

A.   Four and a half years.

Q.   Prior to that, where did you reside?

A.   I was in 3902 Southwest 22nd Street in Fort Lauderdale, Florida.

Q.   I see.  So about when did you move from Florida to New York?

A.   In May of 2021.

Q.   Ah, okay.

A.   Yeah.



Page 41

J. Diblosi

when you, to the best of your recollection, started to struggle with meeting certain performance metrics?

A. Yes.

Q. Okay. And do you recall what the cause of that, I guess, issue with meeting performance metrics at that time was?

A. Yeah. It was, you know, we -- we were instructed to do the work within the workweek and I just didn't have enough time to complete the -- the job assignments and meet the metrics and the goals of the organization.

MR. TSONIS: I am going to drop in the chat here what I am going to mark as Exhibit 1.

(Diblosi Exhibit 1, Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories to Opt-In Plaintiff John Diblosi, marked for identification.)

Q. Let me know, Mr. Diblosi, if you are able to open the document.

A. Okay. I don't see anything yet, just so you know.

Q. It should be there. So if you hit the

Page 42

J. Diblosi

chat button at the bottom --

A. Hold on one sec. Okay.

Q. Do you see now it shows a PDF file?

A. Yeah. Let me just bring it up.

Q. So first click should download it, second click --

A. Yes, okay. Okay, I am looking at it now.

Q. You can take a second to just briefly look over, familiarize yourself with the document. I won't ask you about every -- every bit of every page.

(Document review.)

A. Okay.

Q. Have you seen this document before?

A. Yes.

Q. What is this document?

A. Is this the Complaint, the initial Complaint, or my -- my statement?

Q. Yeah, so this is -- I recognize you are not a lawyer and that's okay. This is what's known as interrogatory responses.

A. Okay.

Q. So I'll represent to you that as part

Page 43

J. Diblosi

of the lawsuit, GEICO has issued what I guess we can just informally call certain questions to people that are part of this lawsuit and ask them to provide responses to those questions, and these are your answers to those questions. Does that make sense?

A. Yes.

Q. So if you flip to the very last page of this, do you see that this is -- is that your signature?

A. Yes.

Q. And this is dated December 9th of 2025; right?

A. Correct.

Q. Do you recall executing this document?

A. Yes.

Q. Did you review all of the answers in here before you signed this document?

A. Yes.

Q. And did you understand that you are signing this document under the penalty of perjury?

A. Yes.

Q. I'd like you to turn up to -- well,

Page 44

J. Diblosi

before we actually go there, I think we established earlier that as part of joining this lawsuit you are contending that you worked certain hours for which you were not compensated by GEICO; right?

A. Yes.

Q. What is the amount of hours that you are claiming that you worked but that you were not compensated by GEICO?

A. I believe when I was working for GEICO I worked an average of, I would say, two to four hours extra time a week or every other week. It wasn't every week. It was -- it was about on average two to four every two weeks.

Q. Okay. So two to four hours a pay period, so roughly one to two hours a workweek?

A. Yeah, or sometimes it would extend longer, maybe I would say one to three a workweek.

Q. Okay. What were the circumstances that would cause you to work that additional time?

A. Writing the reports for the EUOs or for the inspections.

Q. Okay. So was there any other circumstances that would require you to work



Page 45

J. Diblosi

additional time?

A.   No.

Q.   So I think we said there was an initial four-month training period, approximately four-month training period; right?

A.   Correct.

Q.   Is it your contention that you were working off the clock during that training period?

A.   No.

Q.   So the first four months or approximately four to five months of your employment, you are not contending you worked off the clock and weren't compensated by GEICO; right?

A.   Correct.

Q.   So when did you first start working off the clock?

A.   I would say it started approximately after the first year, so I was with GEICO, so the beginning of 2023.  When the metrics were starting to be increased, I started to -- needed to work on my own time to keep up with the expectations.

Q.   Okay.  So it was an increase in metrics roughly in the beginning of 2023 that you are contending caused you to have to work some

Page 46

J. Diblosi

additional time?

A.   Correct, or if -- if -- well, it wasn't just that.  It also depended on if the -- a lot of the interviews sometimes the client would not show up and sometimes they would, and there would be some weeks where all the clients would show up for the interviews, therefore, I would get backlogged with reports, so it was when the metrics were raised it made it more difficult, but also when the metrics were initially at five or six, there were a couple of weeks that all the clients showed up for the EUOs and I had inspections to complete and I was backed up with reports.

Q.   I see.  Did you have a certain geographic area that you were responsible for?

A.   We covered all of New York City, I guess, and Long Island, and the -- Westchester County, but I never went up to Westchester.  It was always Long Island or predominantly New York City, the five boroughs.

Q.   I think your camera isn't working anymore.

A.   Okay.

Q.   There we go.

Page 47

J. Diblosi

A.   Okay.  I was scrolling the document.

Q.   It's okay.  You worked with -- strike that.

There were other field medical investigators with whom you worked; is that right?

A.   We mainly worked independently.  There were on occasion assistance with another field investigator, but it wasn't -- mostly I was independent.

Q.   I guess I am not suggesting that you were working with other investigators all the time, but I will reframe my question so it's more accurate.

You had a supervisor that you reported to; right?

A.   Yes.

Q.   Was that supervisor for much of the time Brian Portnoy?

A.   Correct, yes.

Q.   Did other field medical investigators report to Brian Portnoy?

A.   Yes.

Q.   Did those field medical investigators have a different geographic area than you or did

Page 48

J. Diblosi

they overlap with your geographic area?

A.   We overlapped.

Q.   Okay.  So if you were, I guess, in one of the weeks that you are saying where all of your EUOs show up and all of them happen to go that week and that results in a number of reports needing to be written, what things could you do to alleviate that workload?

A.   To alleviate?  There was really nothing I could do to alleviate that workload.  It was my responsibility to complete the work within the time frame that was expected for me to complete the work.

Q.   Did you ever reach out to your supervisor and ask if certain steps could be taken to alleviate your workload given the spike in activity in one particular workweek?

A.   No.

Q.   So for example, you could ask that in lieu of one to two clinic inspections that week, that another field medical investigator take those inspections?

A.   No.  Never did that.

Q.   Okay.  What time period was Brian



Page 49

J. Diblosi

Portnoy your supervisor for, to the best of your recollection?

A.   I don't recall exactly, but he was my supervisor up until I would say maybe springtime of 2023, and I think --

Q.   Who was --

A.   Go ahead.

Q.   I apologize.  I was going to ask who was your supervisor after Mr. Portnoy?

A.   Dara Campbell.

Q.   How long was Ms. Campbell your supervisor for?

A.   If I -- I don't know exactly.  I would say five, six months.

Q.   Was she the supervisor all the way through the end of your employment?

A.   Yes.

Q.   Did you ever inform Ms. Campbell that you were working off the clock?

A.   No.

Q.   Did you ever inform Ms. Campbell that you were not accurately recording all hours worked in Workday?

MS. DSOUZA:  Objection.

Page 50

J. Diblosi

A.   No.

Q.   Did Ms. Campbell -- is it your opinion that Ms. Campbell knew that you were working off the clock?

A.   No.

Q.   So she had no idea you were working off the clock; right?

A.   No.

Q.   No, that's not right, or no, she had no idea?

A.   No, she had no idea.

Q.   Okay.  What about Brian Portnoy, did you ever inform Brian Portnoy that you were working off the clock?

A.   I did not inform him I was working off the clock when I was doing the report writings, but I did inform Brian at one point, I remember it was a Friday on Father's Day weekend, that I was doing a field inspection and it took me over three hours to get home and I informed him it took me a long time to get home from the inspections that were being conducted in Brooklyn.  He was with me on the inspection earlier in the day, but then he left and I had another inspection to do, and then

Page 51

J. Diblosi

it took me a while to get home past my expected work hours, to get home from that inspection, and I did mention that to him.  That was the only time I ever mentioned working the hours above and beyond the workweek.

Q.   Okay.  So you never informed -- aside from that one instance where you informed Mr. Portnoy that it took you longer than you anticipated to get back home from an inspection, was there any other conversation you had with Mr. Portnoy that informed him that you were working off the clock?

A.   No.

Q.   All right.  Mr. Portnoy never instructed you to work off the clock; correct?

A.   Correct.

Q.   No GEICO supervisor, including Brian Portnoy and Dara Campbell, informed you or instructed you to not record your hours in Workday?

A.   Instructed me not to record them?  No, they never -- well -- I'm sorry.  Could I try to answer this correctly?  I think this is what you mean.  We were never -- we were told not to --

Page 52

J. Diblosi

that we should keep all our work hours within the 38.75 workweek, that we should not work beyond those hours.  So we weren't instructed that -- that we -- we were never instructed to work beyond 38.75.  We were told to keep our work within those -- within that time frame.

Q.   Let's be precise, I guess.

A.   Yes.

Q.   Were you told that it was GEICO's expectation that you would be able to complete your work in a normal 38.75-hour workweek?

A.   I -- that was what was expected of us, yes.

Q.   No one ever told you that it was not permitted to ever record hours more than 38.75; right?

A.   Correct.

Q.   All right.  Did you ever request to record more than 38.75 hours in a workweek?

A.   No.

Q.   You could have, though; right?

A.   I -- I guess we could.  Would -- would it have been authorized?  I don't know.  Because we were instructed not to work beyond the 38.75.



Page 53

J. Diblosi

Q.   You were told that the expectation was that the work could be done in 38.75 hours, but I guess there are some workweeks, like you indicated earlier, where maybe every EUO shows up where typically a certain percentage no-shows; right?

A.   Correct.

Q.   That leads to a greater-than-expected workload in one workweek, you would agree that's possible; right?

A.   Yes.

Q.   In that situation it's possible, in fact, you could have asked your supervisor and said, hey, explained the situation and said could I work an additional one, two, three hours this week to meet my deadlines and whatnot; right?

MS. DSOUZA:  Objection.

A.   Technically I guess I could have requested, but we did not.  It was under the understanding that we had to complete the work within the 38.75 workweek.

Q.   Well, I guess -- you say "we."  When you say the expectation was "we," who are you referring to?

A.   The team, the medical team.

Page 54

J. Diblosi

Q.   The other medical investigators that you worked with?

A.   Yes.

Q.   Do you have any personal knowledge of the hours that those field medical investigators actually recorded in Workday?

A.   I do not.

Q.   Would it surprise you if any of those field medical investigators did record more than 38.75 hours in Workday?

A.   It wouldn't surprise me, but it also -- I mean, I don't know what they do.  I was never told or nobody ever said to me what hours they were putting in for, so no, I mean, to each his own.  I didn't ask anybody what they were doing.

Q.   I guess, Mr. Diblosi, help me understand.  If it's not surprising to you that someone else might have recorded more than 38.75 hours in Workday that worked on the same team, why wouldn't you be able to ask to record more than 38.75 hours in a workweek?

MS. DSOUZA:  Objection.

A.   Let me rephrase that.  I'm sorry.  Go ahead.

Page 55

J. Diblosi

MS. DSOUZA:  Objection.

You can answer.

A.   Okay.  It was under the understanding that -- or not the understanding, but I -- not that -- I would be surprised, let me rephrase that, I would be surprised, because the field medical group, nobody admitted to working beyond the 38.75 hours, but it was understood and we knew through conversation of co-workers that we were working beyond the 38.75 to keep up with the productivity expectations, but nobody said or told anybody else how many hours they were actually putting in for if they were putting in for beyond the 38.75.  So I would be surprised if one of the other investigators on my team did put in for work beyond the 38.75, because nobody ever mentioned that within the group, but we knew we were all compensating on our own time to make up for the productivity expectations.

Q.   When you say that you have knowledge of what other investigators were working, what is the source of that knowledge, these conversations that you referenced?

A.   The conversations were generally spoken

Page 56

J. Diblosi

amongst meetings of the investigators where guys -- other team members were mentioning the difficulty with keeping up with the pace and how -- how GEICO expected us to meet these -- these goals, these productivity goals, in the amount of time that they were requesting it without working overtime, but there was no -- nothing specifically documented and I do not recall anything that was specifically said to that fact that they worked a particular certain amount of hours.  I just know what I worked personally to keep up with the pace.

Q.   So if I am understanding correctly, the conversations that you are referencing are conversations that you had with other field medical investigators like yourself in meetings or otherwise where people complained about their workload or the metrics that they were required to meet; is that right?

A.   Correct, yes.

Q.   During these conversations, did any of those other investigators actually tell you that they were working off the clock?

A.   No.



Page 57

J. Diblosi

Q.   All right.  And similarly, did you ever tell any of these investigators that you were working off the clock?

A.   No.

Q.   Who -- strike that.

We talked about your supervisor.  Do you know who the SIU manager was?

A.   The name -- I forget the name, Brian's supervisor, but I don't know it off the top of my head.  It was a female, I know that.

Q.   Was her name Courtney Wolfe?

A.   Yes, Courtney Wolfe, that was it.

Q.   Did you ever have any interactions with Courtney Wolfe?

A.   No, except when she called me to tell me I was laid off.

Q.   Understood.  So you never really communicated with Courtney Wolfe prior to that time?

A.   No.

Q.   Did you have an understanding that GEICO -- at the time that you were employed by GEICO that it was organized in kind of a regional structure?

Page 58

J. Diblosi

A.   I'm sorry.  Say that again.

Q.   Yeah.  Did you have an understanding at the time that you worked for GEICO that GEICO was organized in like a regional structure?

A.   Yes.

Q.   What region were you a part of?

A.   I believe the northeast, from what I recall.

Q.   When you say --

A.   Go ahead.

Q.   So the regions were typically numbered.  Do you have a recollection --

A.   I don't recall which number we were.  I think we were number one, I think.  I'm not sure.  I don't recall.

Q.   Was it, I guess, Region 2 or Region 8, do either of those ring a bell?

A.   Honestly, I don't recall.  If anything, it would be Region 2.

Q.   Okay.  Did you ever interact with any other SIU manager, for example, do you know Bill Newport?

A.   No.

Q.   Okay.  So if you can go to Exhibit 1

Page 59

J. Diblosi

here, the PDF document that I had you open.

A.   Okay.

Q.   And if you can go to page 13, Interrogatory No. 11.  Do you see that?

A.   Let me just get up to it real quick.

Q.   Sure.

A.   Okay.  I'm on page 13.  Okay.  Here we go.

Q.   Okay.  Do you see where it says "Interrogatory No. 11"?

A.   Yep.

Q.   And it says:  Describe all instances in the relevant period in which you worked overtime without prior approval or authorization, including, and there is a number of things we don't need to talk about, but essentially Interrogatory No. 11 asks you to describe the time during the relevant period which you worked overtime without being compensated.  Okay?

A.   Yes.

Q.   Does that make sense?

A.   Yes.

Q.   And if you go to the portion that says "Response," if you skip over that first paragraph,

Page 60

J. Diblosi

which is mostly objections, do you see there is -- the next paragraph starts:  "In light of these objections," do you see that?

A.   Yep.  Yep.

Q.   It says:  Plaintiff responds that they generally worked a total of 44 hours per week in complete workweeks that they worked for GEICO.  Out of those 44 hours, approximately 2 hours per week were typically spent either driving from home to the first appointment as the first task, or the last appointment to Plaintiff's home.  Do you see that?

A.   Yeah.

Q.   All right.  So this response isn't quite accurate as we described, right, because you are not contending that you worked off the clock every workweek of your employment with GEICO; right?

A.   Correct.

Q.   Okay.  And we also talked about your estimate of the time that you spent working off the clock and it's not 44 hours per week; right?

A.   That it's --

MS. DSOUZA:  Objection.



## Page 157

C E R T I F I C A T E

STATE OF NEW YORK    )

                     ) ss.:

COUNTY OF NASSAU     )

I, KRISTIN KOCH, a Notary Public within and for the State of New York, do hereby certify:

That JOHN VINCENT DIBLOSI, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of January, 2026.

-------------------------------

KRISTIN KOCH, RPR, RMR, CRR

## Page 158

--------------------I N D E X--------------------

WITNESS                    EXAMINATION BY      PAGE

JOHN VINCENT DIBLOSI    MR. TSONIS      4, 154
                       MS. DSOUZA         143

--------------------EXHIBITS--------------------

DIBLOSI                              PAGE LINE

Exhibit 1
Plaintiffs' Responses and Objections
to Defendant's First Set of
Interrogatories to Opt-In Plaintiff
John Diblosi.........................41    17

Exhibit 2
GEICO pay statements, Bates stamped
G022760 through G022815...............85    7

Exhibit 3
Workday profile, Bates stamped
G023151 through G023186...............92    25

Exhibit 4
Second Amended Collective and Class
Action Complaint......................122    23

## Page 159

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:  Fischer, et al. v. GEICO

Dep. Date:  January 8, 2026

Deponent:   John Vincent Diblosi

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS_____DAY OF_____, 2026.

_____

(Notary Public)  MY COMMISSION EXPIRES:_____

