# Exhibit DD

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS BARDEN,
CONSTANCE MANGAN and CHARISE JONES individually
And on behalf of all others similarly situated,

                    Plaintiffs,

    - against -
                            CASE NO.
                            2:23 Civ. 02848
                            (GRB) (ARL)
GOVERNMENT EMPLOYEES INSURANCE COMPANY
d/b/a GEICO,

                    Defendant.
-----------------------------------------------------X
        Zoom Videoconference
        Remote

        DATE:  January 30, 2026
        TIME:  10:12 a.m.

    DEPOSITION OF CHRISTOPHER HIRSCH, a Plaintiff witness herein, taken by the Defendant, pursuant to Article 31 of the Civil Practice Law & Rules of Testimony, held at the above-mentioned time and place before SUSAN CONNORS, a Stenographic Reporter and Notary Public of the State of New York.

**Page 2**

            A P P E A R A N C E S

OUTTEN & GOLDEN, LLP
Attorneys for Plaintiffs
685 Third Avenue - 25th Floor
New York, New York 10017
BY:  JARRON D. McALLISTER, ESQ.
(212) 245-1000
jmcallister@outtengoldberg.com

DUANE MORRIS, LLP
Attorneys for Defendant
190 South LaSalle Street - Suite 3700
Chicago, Illinois 60603
BY:  GREGORY TSONIS, ESQ.
(312) 499-6779
gtsonis@duanemorris.com

**Page 3**

                INDEX

WITNESS              EXAMINATION BY          PAGE
Christopher Hirsch   Mr. Tsonis              9

            DEFENDANT'S EXHIBIT
    DESCRIPTION                          PAGE
Ex. 1  E-mail from Bradley Waltman           34
Ex. 2  Workday Document                      68
Ex. 3  Pay Stub                              79
Ex. 4  Plaintiff's responses to Interrogatories   94
Ex. 5  E-mail from Courtney Wolfe            131
Ex. 6  Workday Document                      135

        REQUESTS FOR PRODUCTION
    DESCRIPTION                          PAGE
1.    Preserve correspondence with         153/158
      Mike Manzolillo, John Cataldi
      and Chris Ward
2.    Search for GEICO Severance agreement   158

**Page 4**

            STIPULATIONS

    IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that signing, sealing and certification be and the same are hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

    IT IS FURTHER STIPULATED AND AGREED that the within examination(s) may be subscribed and sworn to before any Notary Public with the same force and effect as though subscribed and sworn to before this Court.



Page 45

continue working for 30 more minutes, would you agree?

A.   No, I would not.

Q.   So you think if you have an EUO that is 10 minutes away from being wrapped up and you are at the scheduled end time, that it is more efficient to end the EUO and try to get the claimant back on an EUO the following day or on another day, rather than work 10 minutes later and conclude it?

A.   That's incorrect, because the EUO wouldn't end, I would just have to clock out on my phone and continue with the EUO.

Q.   Why couldn't you remain logged in on your phone?

A.   Because we were told to not go over the 38.75 per week.

Q.   Right.  But in that example that we are talking about, you could clock out 10 minutes late, let's say that day, and then just start 10 minutes later the next day, right?

A.   That's not how -- that's not how I understood it.

Q.   Okay.  Well, did you ever ask if that was permissible?

A.   No.

Q.   Did anyone ever tell you that you weren't

Page 46

permitted to do that?

A.   Start 10 minutes later the next day?

Q.   Sure.  That if a business reason existed for you to work beyond your scheduled end time, it would be fine to do so, but that you should cut that same amount of time from another shift in the same work week.

A.   No, that was never explained to me or told to me.

Q.   Okay.  So I guess you are saying no one ever told it to you.  And I'm asking a slightly different question.

Did anyone, your supervisor or manager, ever tell you that you were not permitted to do that?

A.   No.

Q.   Do you have an understanding as to whether other investigators at SIU had the capability to do that?

A.   I do not.

Q.   As a field investigator, you would ultimately set the start times for your EUOs, right?

A.   Yes.

Q.   And you would determine which clinics you were going to go to and in what order?

A.   Yes.

Page 47

Q.   All right.  Because one of the considerations on your field inspection days, you are trying to avoid traffic.

A.   Yes.

Q.   All right.  So if where you are expected to go that day, if that makes sense to leave a half hour earlier to save yourself time in traffic, right?

A.   Yes.

Q.   Did you have the flexibility to do so?

A.   When I -- I'm sorry, I'm not understanding that question.

I would -- I would usually clock in whatever time, you know, 7:00 a.m., and that's when I started.  7:00 -- I clock in at 7:00 a.m., I would get in the car and I would drive to the location.

Q.   Okay.  So you clock in first; is that right?

A.   Yes, as soon as I start my scheduled tour, let's say Friday after -- Friday morning, 7:00 a.m., and I had two clinic inspections in Brooklyn, I would clock in at 7:00 a.m., and I would go outside to the car, and then I would start driving.

Q.   What geographic area did you cover as a field investigator?

A.   It was Long Island and the Metro New York

Page 48

area, the five Boroughs.

Q.   Approximately on your field inspection days, once you get in your car, how long would it take you before you get to your first clinic?

A.   The -- in my experience, the majority of my clinic inspections were usually in Brooklyn or Manhattan, so two hours, two hours and 15 minutes generally to Brooklyn or Manhattan, depending on traffic.

Q.   And that's -- is that the same amount of time that you would have to spend driving back?

A.   Generally, yes.

Q.   Okay.  Going back to your claim, you know, off the clock work, on average, how much time are you contending that you worked off the clock each week?

A.   I would say between 12 to 15 hours.

Q.   Is that estimate consistent throughout the entire course of your employment with GEICO?

A.   Yes.

Q.   So from the first week you started when you were in training, you were working 12 to 15 hours off the clock?

A.   I'm sorry, I will change that to while I was in training, no, I would not say I was doing overtime during training for that two weeks.



CHRISTOPHER HIRSCH
FISCHER V. GEICO

Page 49

Q.  How long were you in training?

A.  I believe it was two weeks.  I could be wrong.  I'm not a hundred percent sure.  I don't recall exactly.

Q.  Okay.  And after the two-week period, was there any period of like shadowing, or anything like that, with other investigators?

A.  Yes.  For a week or two I believe I would shadow other investigators along with doing my work.  I would hop on and watch them do an EUO and see how they do their questioning.

Q.  The workload or the -- strike that.

The cases or investigations that were assigned to you, are you contending that it was the same amount of cases and investigations you had to work after your training concluded as it was right before your employment with GEICO ended?

A.  Yes.

Q.  So from day one out of training you were expected to schedule 15 EUOs per week?

A.  I don't recall exactly how many my first two weeks.  It might have been a little bit less than -- you know, it might have been eight to 10.

Q.  Okay.  What about there were times, work weeks, in which you took, you know, either sick or

Page 50

vacation time, right?

A.  Yes.

Q.  Are you contending that you worked 12 to 15 hours off the clock on those weeks?

A.  No.

Q.  Are you contending you worked any off the clock work during those workweeks?

A.  If I take the whole week off.  Did I take one day off?  Did I take the whole week off?  I don't know.

Q.  If you took the whole week off, I imagine you are not claiming that you worked off the clock that week, right?

A.  I imagine, yes.  I would agree with that.

Q.  If you took one day off during that work week, are you contending you worked off the clock?

A.  If I took one day off, the other four days I would contend I worked off the clock.

Q.  Okay.  How much time during a four-week work week -- excuse me, strike that.

How much time in a four-day work week where you took one day of vacation, are you contending you worked off the clock on those types of week?

A.  I would say probably seven to eight hours then.

Page 51

Q.  Okay.  And if you took two days off in a work week?

A.  Probably close to five or six hours.  You know, this is all guesstimates.

Q.  Sure.  I'm asking for your best estimate.

A.  Yes, my best testimony would be if I took two days off and I worked three days, it would somewhere be most likely in the range -- it would be two hours a night mostly is what it was.

Q.  So tell me more.  I guess the circumstances under which you would work under -- off the clock, like when you would do it, what would you be doing, etc.?

A.  So generally I'm just going to give you, to the best recollection, my usual day.

I start my tour.  Right away I would start working on the EUO that I had scheduled first.  I would have my, you know, background checks, all that done.  Any information I needed for the claimant.

I'd have my medical billing, spread sheet up, and I would be organizing the spread sheet by provider and dates of treatment from most recent to not most recent.

I'd have my line of questioning, because the questions obviously change depending on the

Page 52

scenario, what kind of accident, treatment.

Then I would do my EUO.  I would say a 10:00 o'clock EUO, hopefully it ends in a timely fashion, 11:30.  Then I would immediately start typing that EUO up.  And then I would have, let's say, an hour and a half for that.

And then I would start my next EUO.

Continue that protocol until the afternoon.

And then in the afternoon, after my second or third EUO, I would have to clock out.  And usually I wasn't done typing the EUO, so I would have to continue typing up the report for the EUO and get those reports -- they'd have to be, I think, within 24 hours into the system.  I'd have to upload those reports into the case system.

And then usually I would start prepping on my own time for the next day.

Q.  So the documentation for the EUO wasn't due until the next business day.

A.  We had 24 hours to get the reports into the case management system.

Q.  Okay.  So under, I guess, the timelines that you are testifying to, once -- the EUOs that you did in one day, there was no requirement to complete and submit the reports that day, right?



Page 97

inaccurate, right, that you didn't generally flex your time because you couldn't -- because you didn't have free time.

MR. McALLISTER: Objection.

A. That's not flex time.

Q. Working longer in one shift and working less in another isn't flex time to you?

A. Flex time was explained to me that if you needed to start your tour later, you were able to change your tour. Instead of starting at 7:30, you start at, you know, 10:00 o'clock, because you had a prior engagement. Or, you know, starting in the afternoon because you had something during the day, and you would work from 3:00 to 10:00 p.m. That's how I understand flex time.

Q. Okay. So if I'm understanding correctly, you don't consider the ability for work-related reasons to change the start time of your shift to be flex time?

A. No, that's not how I understand it.

Q. Okay. And you don't understand if you worked beyond 7.75 hours in one workday, but then worked less time in another workday that same week, that that is part of what would be considered a flex time; is that right?

Page 98

A. No, I don't agree with that, no.

Q. Okay. So your individual understanding of flex time, I guess, is only if you have a non work reason to kind of change the shift that you working on that day.

A. Correct, that's how I understood it.

MR. TSONIS: Okay. If you can turn to Page 7.

THE WITNESS: Okay.

Q. Do you see there is an Interrogatory Number 5, and it says: Identify each person who you believe had actual or constructive knowledge that you worked unpaid overtime and, for each person, describe the facts that support that contention.

A. I'm sorry, Page 7.

Q. Yeah.

A. Identify each person -- okay.

Q. So do you see that this question posed by GEICO says -- asks you to identify each person that you believe had actual or constructive knowledge that you worked unpaid overtime, and for each person that you identified to describe all facts that support that contention?

A. Yes.

Q. Okay. And, once again, we can skip over

Page 99

the first paragraph here, which is all objections.

Do you see the second paragraph that's on Page 8?

A. Yes.

Q. All right. Now I'd like to kind of start a little less than halfway, do you see the sentence that says "plaintiff further identifies the following individuals as having knowledge that plaintiff worked off the clock"?

A. Yes.

Q. And it says "plaintiff's supervisor, Bradley Waltman, and plaintiff's manager, Courtney Wolfe".

A. Yes.

Q. Okay. So as to Mr. Waltman, you write that plaintiff recalls discussing the investigators' excessive workload at team meetings with Mr. Waltman and being told to figure it out. Plaintiff also recalls informing Mr. Waltman that some of his investigator tasks, including examinations under oath, could not always be completed within the 7.75 workday. Mr. Waltman did not ask plaintiff to put in overtime for these hours. Instead, plaintiff was regularly told overtime was not available. Did I read that right?

Page 100

A. Yes.

Q. Aside from what's written down here, do you have any other basis for claiming that Bradley Waltman knew that you were working unpaid overtime?

A. Yes.

Q. What else?

A. While I was logged on after work hours, sometimes Bradley Waltman would also be on and he would message me through Teams or call me -- I'm sorry, through Webex, or call me through Webex. He would also know that I was working when I was inputting the files into the case management system, because they're timestamped.

Q. Any other reasons why you contend Bradley Waltman had actual knowledge of your working unpaid overtime?

A. Just what I stated earlier.

Q. Okay. What is your basis for claiming that Courtney Wolfe had actual knowledge that you worked unpaid overtime?

A. Courtney Wolfe also has access to Webex. So she would be able to see when you were working. Key strokes. She would also be able to see when these documents were uploaded into the GEICO case management system, because they were timestamped.



Page 101

Q.  So am I correctly understanding that the basis for claiming Courtney Wolfe had actual knowledge that you worked unpaid overtime was her capability to be on Webex and see you online, and the capability to see case entry times or activity timestamps in SICM.

A.  Yes.

MR. TSONIS:  And, Court Reporter, that's SICM.

THE WITNESS:  Thank you.  I forgot the name of the system.  Thank you.

MR. TSONIS:  That's okay.

Q.  Do you have any knowledge that Courtney Wolfe actually went on Webex and saw times that you were online?

A.  I don't have any evidence.

Q.  Did Courtney Wolfe ever message you on Webex in the evenings?

A.  Yes, yes.

Q.  During evening hours?

A.  I don't recall if they were evening hours.

Q.  Okay.  What were the circumstances under which Courtney Wolfe Webexed you?

A.  Well, for one, she messaged me the day that they were laying everyone off.  I think she Webexed me at 6:45 in the morning, I believe.

Page 102

Q.  Apart from that instance, were there other times where she Webexed messaged you?

A.  I don't recall for sure.

Q.  Would you agree with me that Courtney Wolfe did not have any sort of regular habit of messaging you on Webex in the evening hours?

A.  Yes, I would agree with that.

Q.  In fact, it's very likely that she never messaged you on Webex in the evening hours.

A.  Evening hours -- hours, correct.

Q.  Okay.  Do you have any facts supporting your contention that Courtney Wolfe -- well, strike that.

Do you have any knowledge or any basis to claim that Courtney Wolfe actually ever looked at your case files?

A.  Yes, she would have to.  After they were in SICM, they would have to get approved by your supervisor, and then they would have to be approved by Courtney.  That was my understanding.

Q.  So you believe that every case that you submitted, every EUO that you closed in SICM needed both Bradley Waltman and Courtney Wolfe's approval.

A.  Yes.

Q.  What is the basis for your belief that

Page 103

Courtney Wolfe needed to approve cases?

A.  Because she was the overall director or supervisor of this unit.

Q.  For sure.  But just because she's the manager of that unit, doesn't mean that she needs to approve each case in SICM, right?

A.  Oh, I don't know.  I can't answer that.

Q.  Well, you're claiming that she has knowledge of your off the clock work because she would approve the cases, that's what you testified to a moment ago.

A.  Yes.

Q.  You believed that, but you don't actually have any knowledge that Courtney Wolfe approves cases; is that accurate?

A.  That's accurate.

Q.  Okay.  So if Courtney Wolfe doesn't approve SICM cases, then your basis for claiming she had actual knowledge of off-the-clock work wouldn't be accurate, right?

A.  I don't know.  Like I said, that's what you're saying.

Q.  Well, no, respectfully, sir, I'm asking you, you have named the SIU manager that has actual knowledge, not could, you claim she has it; do you

Page 104

understand that?

A.  Correct.

Q.  Do you want to correct this to say that she could have knowledge?

A.  Okay, she could have knowledge.

Q.  Because earlier in the portion I skipped over, there is reference here to constructive knowledge, right?

Do you understand the difference between constructive and actual knowledge?

A.  Yes.

Q.  Okay.  What's the difference between constructive and actual knowledge as you used it in your interrogatory response?

A.  I understand what you are saying.  Please go ahead.

Q.  Okay.  So let's -- just to be clear, and we can move forward, you are not -- you don't have any facts to actually claim that Courtney Wolfe had actual knowledge that you worked off the clock; is that accurate?

A.  Correct.

Q.  What you are claiming is that Courtney Wolfe may have had the ability to identify your off-the-clock work?



Page 105

A. Yes, that would be -- yes, that would be correct.

Q. But you don't have any facts that Courtney Wolfe actually did the things that you are contending could have provided constructive knowledge; is that right?

A. Correct. I'm simply saying that she could have knowledge by looking at my cases and the timestamps when those cases and the documents were uploaded. That's what I'm saying.

Q. Okay. But as we said, you don't actually have any basis to say that she actually did look at any of your case files or timestamps or times things were uploaded, right?

A. That I don't know if she did for sure, I don't.

Q. So let's talk about Mr. Waltman then.

A. Yes.

Q. You testified, or you wrote here that you recall discussing excessive workload at team meetings with Mr. Waltman, okay.

A. Yes.

Q. How many team meetings do you recall discussing excessive workload with Mr. Waltman?

A. Three or four team meetings possibly, to

Page 106

the best of my recollection.

Q. Were those three to four team meetings spread roughly evenly through the course of your employment, were they clustered over a period of time?

A. I can't say for sure.

Q. Did Mr. Waltman have a practice of holding team meetings with any regularity?

A. They were usually every three or four weeks. You know, sometimes it's monthly. If there was another issue that came up, you know, maybe it was on a weekly basis, depending on if something came up, just to touch base with the team on something. But generally we had a team meeting at least monthly.

Q. Okay. And so when, to the best of your recollection, was the first team meeting in which you recall discussing excessive workload?

A. I can't say for sure.

Q. Can you give me your best estimation?

A. No, I can't give you a best recollection. I just know we discussed it multiple times.

Q. And what was the substance of the discussion that you recall?

A. The amount of EUOs that we were scheduling and the time constraints.

Q. When you say "the time constraints", what

Page 107

do you mean?

A. That it was hard to do the amount of EUOs with all the other work that was required with the EUOs. And we had discussed that another team that we had spoken to, the investigators on another team were not doing the same amount of EUOs as we were, they were doing less.

Q. Do you have a recollection of how many EUOs those other investigators on that different team were doing?

A. I don't recall the exact number, but it was less than we were doing.

Q. Was this other team of investigators, did they report to a different supervisor?

A. They did.

Q. Was this team of investigators also field medical investigators?

A. I -- I don't know for sure. I don't recall. I'm sorry, yes, they were. I apologize, yes.

Q. Okay. So I guess, would it be accurate to say that this discussion you are talking about was that you believe Mr. Waltman was requiring you and the others that were field investigators that reported to him to do more EUOs than another supervisor was requiring of his or her field medical investigators?

Page 108

A. Yes.

Q. Okay. What was Mr. Waltman's response to the discussion that you just testified to?

A. He really didn't have an answer. He just said, you know, these are the numbers that we were given. I don't -- you know, I don't recall exactly what he said, but he said he can't speak on why the other team is doing the number they are doing.

Q. Was the substance of the discussion the same in each meeting, meaning -- I guess I will rephrase my question.

Did you bring up the same issue of another supervisor requiring less EUOs each time, or was it a different concerns that were raised?

A. No, they were different each time.

Q. Okay. So this was the concern in one meeting, I guess, that you're asserting here in your response.

What about another meeting with Mr. Waltman that you are referencing here?

A. They weren't always about the amount of, you know, work we were doing. Sometimes they were just something new in the company that he wanted to let us know about or something. You know -- you know, logging in and clocking in and clocking out



CHRISTOPHER HIRSCH
FISCHER V. GEICO

Page 157

report to Courtney Wolfe, to your knowledge?

A. Directly -- directly, no, but she was -- you know, as we stated earlier, she was my overall supervisor.

Q. Right. And it shows you in this profile reporting to her for two days.

A. Yes.

Q. And Jonathan Tortora was your manager here for a few more days after that, and then it goes to Courtney Wolfe through December 18, 2023, okay.

A. Okay. Sure.

Q. So I guess I will -- the point that I'm going to, is would you agree with me that you actually stopped doing work as a Field Medical Investigator on, you know, October 18th or October 19, 2023?

A. Yes, that's correct.

Q. All right. So even though your employment in GEICO's records show that it was ended December 18, 2023, you didn't actually perform work for that roughly 60 day period.

A. Correct.

Q. You are not claiming you worked off the clock during that 60-day period.

A. No, sir.

Q. Okay. So I know you referenced you

Page 158

received pay for a couple -- a period of time. Did you have to sign like a severance agreement, something like that?

A. Yes, there was a severance agreement e-mailed to me in the weeks following my employment ending, or a week, possibly. I don't recall exactly. Which I signed through a Docusign type situation and sent it back.

Q. Did you retain a record -- a copy of that severance agreement?

A. I don't recall. I don't remember finding anything when I looked, but I can look again.

MR. TSONIS: Okay. Yeah, I mean, we would ask and we have asked, I guess, for relevant documents.

THE WITNESS: I'm pretty sure I would think GEICO would definitely have through the Workday. They would have a copy of that definitely.

MR. TSONIS: All right. I would similarly ask, I know we talked about the conversations around the time that you joined the lawsuit, or conversations that you had with Mike Manzolillo or others after your employment ended with GEICO, text messages or e-mails, or like written records of communications that you have, I would ask that you preserve those too and

Page 159

insure they don't get deleted.

THE WITNESS: Sure.

Q. Aside from the individuals that we've already talked about, do you know of any other current or former GEICO employees that have joined this lawsuit?

A. I do not.

MR. TSONIS: Okay. That's all the questions that I have.

MR. McALLISTER: Okay.

Maybe we can take five minutes to see if there are any additional questions I may have for Mr. Hirsch.

MR. TSONIS: That's fine.

(Time noted: 1:48 p.m.)

(WHEREUPON, A RECESS WAS TAKEN)

(Time noted: 1:55 p.m.)

MR. McALLISTER: No further questions from me.

(Time noted: 1:55 p.m.)

Page 160

C E R T I F I C A T I O N

I, SUSAN CONNORS, a Shorthand Reporter and notary public within and for the State of New York, do hereby certify:

THAT Christopher Hirsch, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of February, 2026.

_____
Susan Connors

ESQUIRE
DEPOSITION SOLUTIONS