# Exhibit EE

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )

KEITH FISCHER, MICHAEL O'SULLIVAN,)

JOHN MOESER, LOUIS PIA, THOMAS    ) Case No.:

BARDEN, CONSTANCE MANGAN, and     ) 2:23 Civ. 2848

CHARISE JONES, individually and   ) (GRB) (ARL)

on behalf of all others similarly )

situated,                         )

                 Plaintiffs,      )

   - v -                          )

GOVERNMENT EMPLOYEES INSURANCE    )

COMPANY d/b/a GEICO,              )

                 Defendant.       )

- - - - - - - - - - - - - - - - - )

REMOTE DEPOSITION OF MICHAEL MANZOLILLO

Reported by:

Kim M. Brantley

Job No: J14237881

**Page 2**

MICHAEL MANZOLILLO

Wednesday, February 4, 2026

Time: 10:03 a.m.

Remote deposition of MICHAEL MANZOLILLO, held via Zoom, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

On behalf of the Plaintiffs:

    OUTTEN & GOLDEN, LLP

    1225 New York Avenue NW - Suite 1200B

    Washington, DC, 20007

    (202) 847-4400

    Email: dsouza@outtengolden.com

    BY: ZARKA D'SOUZA, ESQUIRE

On behalf of the Defendant GEICO:

    DUANE MORRIS, LLP

    190 South LaSalle Street - Suite 3700

    Chicago, Illinois 60603

    (312) 499-0198

    Email: gtsonis@duanemorris.com

BY:   GREG TSONIS, ESQUIRE

**Page 3**

MICHAEL MANZOLILLO

P R O C E E D I N G S

Whereupon,

    MICHAEL MANZOLILLO

called as a witness by counsel for Defendant, and after having been first duly sworn, was examined and testified as follows:

    EXAMINATION BY COUNSEL FOR DEFENDANT

        BY MR. TSONIS:

    Q.  Good morning, Mr. -- Manzolillo?

    A.  Yes, fine.

    Q.  Did I say that correctly?

    A.  Yes, you did.

    Q.  All right, excellent.

        Well, my name is Gregory Tsonis.  I'm an attorney with the law firm Duane Morris, and we represent GEICO in this case.

        Do you understand?

    A.  Sure.

    Q.  All right.  Do you understand that you are being deposed here today under oath and that your testimony is the same as if you were testifying in a court of law?

    A.  Yes.

    Q.  Have you ever been deposed before?

**Page 4**

MICHAEL MANZOLILLO

    A.  Yes.

    Q.  How long ago was that?

    A.  I guess when I was active in the police department, over the past twenty-five years, numerous times I did.  Probably the last time was probably about seven or eight years ago.

    Q.  Well, as a refresher, just as this spans at least some period of time, I'll go over the ground rules first.

        The purpose of the deposition today is to ask you questions, and your responsibility is only to provide truthful and accurate testimony.

        Do you understand?

    A.  Yes.

    Q.  All right.  Now as we go through that process, your counsel here may object to some of my questions.  Those objections are only for the record.  You must answer each of my questions unless your counsel instructs you not to answer.

        Does that make sense?

    A.  Yes.

    Q.  We have a court reporter here today that is going to be taking down a transcript, a written record of everything that we say.  So two



MICHAEL MANZOLILLO
FISCHER V. GEICO

February 04, 2026
13–16

Page 13

MICHAEL MANZOLILLO

compensation?

A. Well, it's really one thing: The hours worked, unpaid hours worked. That's what it came down to.

Q. When you say "hours paid unworked," approximately how many hours are you claiming that you worked that you which you were not paid?

A. For unpaid hours worked.

It varied between an hour to two a day, sometimes longer.

From the beginning -- I don't remember what year I started. I think I started in May of '21, I believe, but from there on I got progressively more and more work and more and more hours.

MS. D'SOUZA: Sorry to interrupt, but like I want to quickly make a note that if you could give me a couple seconds to object in between your answer, that would be great, because it just helps me to get the objection out and helps the court reporter as well.

BY MR. TSONIS:

Q. So you mentioned that you believe your employment about GEICO began in May of 2021.

Page 14

MICHAEL MANZOLILLO

Do you recall when your employment with GEICO ended?

A. Well, I think the official -- I think we got laid off in the end of October of '23, but then we had a severance package that paid us through I believe January of '24, I believe.

I'm not sure if it's specific. We got a vacation check I think and things like that.

Q. Okay, but the actual in terms of performing work in your job for GEICO, that ceased in kind of being late in October of 2023?

A. Yes. We didn't have access to any computers or anything anymore.

Q. I guess just to be clear for the record, you're not claiming that you're owed compensation for after you were informed that your employment was ending, right?

A. Oh, no, no.

Q. Okay. So I think you said one to two hours a day, but it varied. On average, what would you say you're contending you worked off the clock?

A. I would say an hour and a half if you went on average every day, but there was some days

Page 15

MICHAEL MANZOLILLO

where it was three or four hours because of the extra work that we had to put in.

But on average I would say an hour and a half to two hours, somewhere around there.

Q. There were days where you didn't work any time, though, off the clock, right?

A. Yes.

Q. So you were scheduled to work five days a week?

A. That's correct, yes.

Q. All right. So I guess if we're doing the math, one-and-a-half times five is on average about seven-and-a-half hours a week off the clock. Is that right?

A. That sounds about right, yes.

Q. And I know you said about one to two hours. So it sounds like it would be between five hours and ten hours of off-the-clock work?

A. Per week?

Q. Per week, correct?

A. Yes.

Q. In work weeks in which you took vacation time, or sick time, or was otherwise off for one or more of your scheduled days, are you

Page 16

MICHAEL MANZOLILLO

contending that you worked off the clock in those weeks, as well?

A. Not on vacation time if I was away, no. But there was days I worked -- I logged on -- I logged on weekends for the prep for the next Monday's EUOs and stuff like that, especially as the work load got more.

Q. Okay, so if you had vacation time in a given work week, that's not a work week in which you're contending you worked off the clock?

A. That's correct.

Q. Okay. What was your job title when you worked for GEICO?

A. I was an SIU medical senior fraud investigator.

Q. What generally were your responsibilities as a senior field medical investigator?

A. So we were given cases, and then we had to investigate and look for fraud inside the body of the bill that was sent in by the medical providers, and then we had to schedule examinations under oath for the clients or the claimants to try and see what medical procedures



MICHAEL MANZOLILLO
FISCHER V. GEICO

February 04, 2026
45–48

Page 45

MICHAEL MANZOLILLO

BY MR. TSONIS:

Q. Excuse me, go ahead.

A. No, as I said, where it started it was probably triple to what it was when it started to when I was laid off.

Q. You agree that at the end of your employment with GEICO you were more proficient and faster at doing your job than right after you finished training?

A. Yeah, I would say that's fair to say. Yes.

Q. You have attained, I guess, certain experiences, certain skills that allow you to maybe conduct EUOs more efficiently?

A. Yes, but keep in mind that they constantly changed what they wanted added into the EUOs and constantly changed the -- like there was a point when -- I can't give specifics when; I don't have a specific timeline -- that the cases had to be submitted for review first before you could get them back, before you could submit them to be closed off on.

So I would have to submit the cases to Brad -- well, first in training, and then for the

Page 46

MICHAEL MANZOLILLO

first few weeks you had to submit the cases to Danielle, just to make sure everything was good. But then as time went on, for whatever reason, I remember they said that cases had to be submitted to him before -- you had to submit to him, he'd review them and send them back to us before we could actually submit them for final signoff. I don't remember exactly when that was, but it was more time consuming. Because if something wasn't in there that he felt should have been in there, you'd get it back. So then the case would take longer. You'd have to fix things and then put it back. I can't give an exact date when that started, but that's one of the things, too. Because they were constantly changing things. So as soon as we got them --

I mean, Brad's thing in the meeting was, "The goalpost keeps moving back. Guys, I'm sorry. It keeps moving back". You know, "It's not coming from me. You got to do this now. You got to do that now. You got to do this now," so.

Q. When you were onboarded with GEICO, you understood that GEICO had certain policies that it maintained that applies to all associates that

Page 47

MICHAEL MANZOLILLO

worked at GEICO, right?

A. Yes, I believe there was a handbook that they gave us, too.

Q. You understand that one of the policies in the handbook was a timekeeping policy that requires all associates to record accurately all time worked?

A. That's correct.

Q. And you understood that the same policy actually forbids off-the-clock work by any associate, right?

MS. D'SOUZA: Objection.

THE WITNESS: That was explained to us, yes.

BY MR. TSONIS:

Q. All right. And the handbook also states that if you feel like you've not been paid for all the work that you've performed that you're instructed to reach out to your supervisor, human resources, or a member of management, right?

A. If it said that, I'll take your word for it, but I can't really remember exactly what the handbook said.

Q. Do you have any reason to disagree that

Page 48

MICHAEL MANZOLILLO

I guess GEICO's policy stated if you don't think you've been paid for all hours worked that you should reach out and raise that issue with human resources or management?

A. I would take your word for it that it says that, yes.

Q. Did you ever raise the issue of you alleging you worked off the clock but not being paid for it to your a supervisor?

A. Yes.

Q. When did you do that?

A. I can't give it -- again, it was brought up in the weekly meetings almost on a weekly basis; not from me, from other people in the meetings. It was just -- I can't say specifically who, but it was always, generally speaking, how are we all supposed to get this work done in -- I forget what the number is, thirty-eight, whatever it is, in a forty-hour work week? It's impossible. And it was just like "Well, you guys can't put in for overtime. You can't incur overtime".

And the work got more and more. It was brought up more and more, and they said, "You



Page 49

MICHAEL MANZOLILLO

can't put in for overtime".

And if you're caught working past hours, then, you know, you would be subject to -- I guess HR, whatever, they would send a complaint to HR, something like that.

Q.   So your testimony is that other individuals, not yourself, would raise concerns about workload to the supervisor?

A.   I raised concerns myself as well.  But other people did as well, it wasn't just me.

Q.   Okay, that they would raise concerns about the amount of workload that was expected to be completed in the normal work week?

MS. D'SOUZA:  Objection.

You can answer.

THE WITNESS:  Yes.

BY MR. TSONIS:

Q.   All right and, if I understood your testimony correctly, you said that the supervisor would communicate that there was no overtime available?

A.   That's correct.

Q.   What specifically was said by the supervisor?

Page 50

MICHAEL MANZOLILLO

A.   Listen, I can't say specifically what exactly his specific words were, but the subject was brought up numerous times.  I don't remember the exact wording that was used, but it was, "You don't to get put on the shit list," and once you get a complaint or something like that, you're in HR, it's like, "You got to stay out of HR's way.  Don't make complaints.  Don't complaint, and don't put in for overtime on your own, because you're going to be on the" -- I didn't mean to say "shit list"; like the bad boy list, so.

Q.   So I understand what you just testified to your understanding, but I'm asking what specifically was actually said by the supervisor.

A.   "There is no overtime.  This unit does not get overtime".

Q.   So is it your testimony that the exact words that he used were, "There is no overtime.  This unit does not get overtime"; or that --

A.   The exact words I can't say.  I can't say exact words, but it was said that numerous times there was no overtime, we cannot get overtime, and, "Don't work off the clock or you're going to be subject to an HR complaint".

Page 51

MICHAEL MANZOLILLO

Q.   Right, so your supervisor was instructing you and others expressly that you were not to work off the clock, right?

MS. D'SOUZA:  Objection.

THE WITNESS:  Right.

BY MR. TSONIS:

Q.   Sorry, what was that?

A.   That's correct.

Q.   And this reminder that you were forbidden from working off the clock was issued on multiple occasions, right?

MS. D'SOUZA:  Objection.

THE WITNESS:  I don't know about multiple occasions.  There's no overtime; that's what I can remember was said.

BY MR. TSONIS:

Q.   Okay, but on at least one of these occasions, and potentially more, your supervisor instructed you and others that you were not permitted to work out of the clock or you would be subject to discipline per GEICO's policies, right?

MS. D'SOUZA:  Objection.

THE WITNESS:  Well, I don't know if it was -- I can't say specifically how it was

Page 52

MICHAEL MANZOLILLO

said.  What I do know is they said, "There is no overtime".  That's what I remember, we cannot get overtime; "There is no overtime".

BY MR. TSONIS:

Q.   But it's fair to say that your supervisor was communicating to you and others that the expectation was that you would complete the workload in the normal 38.75 hours scheduled work week?

A.   That was the expectation, correct.

Q.   Did you ever record overtime when you worked for GEICO?

A.   "Record," like what do you -- like in an email to the supervisor?

Q.   No.  How would you document the time that you worked while you were working for GEICO?

A.   I didn't document the time that I worked.  I just did it.

Q.   You had no system for actually recording the hours that you worked?

A.   No.  Other -- like normal work hours?

Q.   Yes.

A.   Yes.  Yes, we had to log on on a certain time and log off.



Page 61

MICHAEL MANZOLILLO

BY MR. TSONIS:

Q. Do you have it open Mr. Manzolillo?

A. No, I don't. The chat box went away. It's not at the bottom. That's the problem.

Q. I'll tell you what. I'll share my screen.

This is the document being marked as Exhibit 2, Mr. Manzolillo. Have you seen this document before?

A. I only see you right now. Okay, I have it now.

Q. Do you have it open independently, or you can see the screen I'm sharing?

A. I have it open. I see you controlling.

Q. So I can take it away?

A. No, now it went away.

Q. I'll share it again.

All right, can you see it again now?

A. Okay, I see it.

Q. All right, do you see this document titled "Plaintiffs' Responses and Objections to Defendants' First Set of Interrogatories To Opt-In Plaintiff Michael Manzolillo"?

A. Yes.

Page 62

MICHAEL MANZOLILLO

Q. Have you seen this document before?

A. Yes.

Q. About if we flip here to the last page, do you see this page called "Verification"?

A. Yes.

Q. And this is dated November 26, 2025?

A. Yes.

Q. Did you provide the electronic signature on this verification?

A. Yes, I did.

Q. Did you understand that in providing information in these interrogatories you were providing testimony that you were certifying was true and accurate under penalty of perjury?

A. Yes.

Q. So I want to look at interrogatory number five here for a minute on page seven. And this asks you, "GEICO asked you to identify each person who you believe had actual or constructive knowledge that you worked unpaid overtime hours, and for each person describe all facts in support of your contention," okay?

A. Okay.

Q. Now skipping over this first paragraph,

Page 63

MICHAEL MANZOLILLO

because this is a bunch of objections. It doesn't provide any substance. If we move on to the next page, I'd like to focus on the sentence that starts here. It says, "Plaintiff further identifies the following individuals as having actual knowledge that plaintiff worked off the clock: Bradley Waltman".

A. Yes.

Q. Do you see that?

A. Yes.

Q. So let's pause there for a second. You didn't name Danielle Perdomo on this interrogatory, right?

A. Yes.

Q. And you didn't name Brian Portnoy as part of this interrogatory response either, right?

A. No.

Q. So you're not contending that either of those two individuals had actual knowledge that you worked unpaid overtime, right?

A. That's fair to say, yes.

Q. The only person that you're contending had knowledge that you were working off the clock is Bradley Waltman?

Page 64

MICHAEL MANZOLILLO

MS. D'SOUZA: Objection.

THE WITNESS: That's correct.

MS. D'SOUZA: You can answer.

THE WITNESS: That's correct.

BY MR. TSONIS:

Q. And you write here that "In 2021 plaintiff participated in a team meeting with his supervisor, Mr. Waltman, and other team members.

"Someone else on plaintiff's SIU team told Mr. Waltman that member of the team were working off the clock and asked how they could get paid for that additional work.

"Mr. Waltman responded that overtime was not available to their team, SIU Medical".

So pause there for a second. Is that the substance of the conversation that you were alleging just a short while ago?

A. That's correct, yes.

Q. Here you write that this is a team meeting that occurred in 2021, right?

A. That's correct, yes.

Q. Okay. So, is it accurate to say that the contention that the issue was raised by others to Mr. Waltman that people were allegedly working



MICHAEL MANZOLILLO
FISCHER V. GEICO

February 04, 2026
65–68

Page 65

MICHAEL MANZOLILLO

off the clock and Mr. Waltman's supposed response that overtime was not available occurred in a single meeting in 2021?

MS. D'SOUZA: Objection.

THE WITNESS: Can you rephrase it again. You lost me there.

BY MR. TSONIS:

Q. You wrote here that in a single meeting in 2021 that the issue of off-the-clock work and the issue of the availability of overtime was discussed between other members of the SIU medical team and Mr. Waltman on a call you were on, right?

A. It happened on a call, yes.

Q. Is it accurate to say that it was one call in 2021 as you write here that that issue arose?

MS. D'SOUZA: Objection.

THE WITNESS: No, that's not accurate.

BY MR. TSONIS:

Q. So now you're changing your interrogatory response to claim that it was more than one call?

MS. D'SOUZA: Objection.

THE WITNESS: No. It was way more than

Page 66

MICHAEL MANZOLILLO

one call, yes.

BY MR. TSONIS:

Q. I see. Did something between November 26th and 2025 to now refresh your recollection as to the calls that you had with Bradley Waltman?

A. As far as what, the team meeting calls?

Q. Well, the information that you provided here under penalty of perjury says that in a team meeting in 2021 this issue was raised, and now you're contending, once again, under oath, that it was now many meetings. So I'm trying to find out which one is the accurate story.

MS. D'SOUZA: Objection.

THE WITNESS: It's many meetings. That's the accurate.

BY MR. TSONIS:

Q. So the interrogatory response you provided is inaccurate in that respect. Is that what you're saying now?

MS. D'SOUZA: Objection.

THE WITNESS: I would say that it was construed wrong, but it happened on many

Page 67

MICHAEL MANZOLILLO

meetings. I let whoever interviewed me know that.

BY MR. TSONIS:

Q. Well, you right further here that you recollect the issue of unpaid off-the-clock work also came up in at least one additional Zoom meeting, but you don't recall who other than Mr. Waltman was on the call. So here you site to two total calls where the issue of unpaid off-the-clock work as you write here arose, right?

A. That appears to be correct, yes, what's written.

Q. So is it your testimony -- I understand what you said about workload and the ability to, you know, complete workload in a normal scheduled work week... Is it accurate to say that that issue arose repeatedly, but actual unpaid, off-the-clock work only arose in two work weeks?

MS. D'SOUZA: Objection.

THE WITNESS: No, that's not accurate.

BY MR. TSONIS:

Q. Okay, so you are contending now,

Page 68

MICHAEL MANZOLILLO

contrary to what was written here, that the issue arose repeatedly on those Zoom or telephone calls?

MS. D'SOUZA: Objection.

THE WITNESS: That's correct.

BY MR. TSONIS:

Q. Is it your testimony here that on every one of those calls individuals were saying -- using the phrase "unpaid off-the-clock work"?

A. Everyone on which calls?

Q. The call that you are asserting that these issues arose?

A. Oh, I can't say it came up on every call, but it came up numerous times. I can't give a specific number.

Q. Okay, so it's possible that in a number of these calls the issue of workload generally was what was being discussed and not specifically off-the-clock work?

MS. D'SOUZA: Objection.

THE WITNESS: No, both were discussed.

BY MR. TSONIS:

Q. Every time; that's your testimony?

A. No, not every time. I said numerous calls, not every single time.



Page 181

MICHAEL MANZOLILLO

ACKNOWLEDGEMENT OF WITNESS

I, MICHAEL MANZOLILLO, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____
   (DATE)              (SIGNATURE)

Page 182

MICHAEL MANZOLILLO
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Keith Fischer vs. GEICO
Dep. Date: February 4, 2026
Deponent:  Michael Manzolillo

CORRECTIONS:
Pg.  Ln.  Now Reads   Should Read   Reason

                                        _____
                                        Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____, 2026
_____
    (Notary Public)

MY COMMISSION EXPIRES:

Page 183

MICHAEL MANZOLILLO

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : Ss.
COUNTY OF NEW YORK   )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL MANZOLILLO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of February, 2026.

*Kim M. Brantley*
_____
     Kim M. Brantley

My Commission expires May 31, 2026.

