# Exhibit FF

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf
of all others similarly situated,
        Plaintiffs,
                        Case No.:
                        2:23 Civ. 2848
                        (GRB) (ARL)
        -against-

GOVERNMENT EMPLOYEES INSURANCE
COMPANY D/B/A GEICO,
        Defendants.
------------------------------------X


DEPOSITION of MARGARET A. FISCHER


        December 19, 2024

        New York, New York




Reported By:
Marina Dubson
Job #: J12144278

Page 2

                DATE: December 19, 2024

                TIME: 10:00 a.m.


        DEPOSITION of MARGARET A. FISCHER, an
opt-in Plaintiff herein, taken by the
Defendant, pursuant to Federal Rules of
Civil Procedure, and Notice, held at the
Duane Morris LLP, 1540 Broadway, 14th
Floor, New York, New York 10036, at the
above-mentioned date and time, before
MARINA DUBSON, a Notary Public of the State
of New York.

Page 3

APPEARANCES:

OUTTEN & GOLDEN, LLP
Attorney for Plaintiffs
685 Third Avenue, 25th Floor,
New York, New York 10017
(212) 245-1000
BY: SABINE JEAN, ESQ.
    Sjean@outtengolden.com
    ZARKA DSOUZA, ESQ.
    Zdesouza@outtengolden.com


DUANE MORRIS, LLP
Attorney for Defendant
1540 Broadway, 14th Floor,
New York, New York 10036
(212)471-1856
BY: GREG TSONIS, ESQ.
Gtsonis@duanemorris.com



Gil Peretz, Shereck Video, videographer,

Page 4

        IT IS HEREBY STIPULATED AND AGREED,
by and between the attorneys for the
respective parties, as follows:

THAT all objections, except as to the form
of the questions, shall be reserved to the
time of the trial;

THAT the within examination may be signed
and sworn to before any Notary Public with
the same force and effect as if signed and
sworn to before the Court;

THAT filing of the original transcript of
the examination is waived.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
33–36

Page 33

M. A. Fischer

Q.   All right.  How would you enter your time worked?

A.   Into an online system.

Q.   Is that online system an application or a program called Workday?

A.   Yes.

Q.   All right.  And it may not have been per the duration of your employment, right?

A.   Correct.

Q.   But let's say from 2016 to the present, you used Workday to log your hours?

A.   I believe so.

Q.   All right.  Walk me through the process of how you entered in your hours.

A.   It's manually entering the hours each day worked.

Q.   Would you enter it daily or at the end of a week?

A.   I can't remember.

Q.   Do you have an understanding as to whether, like, you were supposed to enter it daily or you were supposed to

Page 34

M. A. Fischer

enter it weekly?

A.   I believe, if there was something that required an entry for the day, we would -- vacation or illness.

Q.   So, you would log in Workday time that you were going to be off from work?

A.   Yes.

Q.   Absences, vacation, that sort of thing?

A.   Yes.

Q.   All right.  And you would also log all the hours that you worked in Workday?

A.   No.

Q.   You ultimately were the one that were entering the time in Workday, though, right?

A.   Correct.

Q.   All right.  And the time that you entered in Workday you understood would be the time that you would be paid for?

A.   Yes.

Q.   All right.  You understood that

Page 35

M. A. Fischer

Geico had a policy that you are required to accurately record all time worked in Workday?

A.   Yes.

MS. DSOUZA:  Objection.

BY MR. TSONIS:

Q.   You had been involved in two prior lawsuits that you alleged you weren't paid for all time worked?

A.   Yes.

Q.   All right.  So, you were certainly aware through those lawsuits that Geico's policy was that employees should enter into Workday all time that they worked?

MS. DSOUZA:  Objection.

A.   Yes.

BY MR. TSONIS:

Q.   All right.  How many hours were you scheduled per week?

A.   38.75.

Q.   And how many hours do you contend that you worked per week that you were not compensated for?

Page 36

M. A. Fischer

A.   Between two and two and a half hours a week.

Q.   Each week?

A.   Many weeks.  Not every week.  It varied.

Q.   Which weeks would you work that two to two and a half hours as opposed to weeks that you wouldn't?

A.   Most weeks I would work two to two and a half hours.  Some more hours.

Q.   Okay.  Was there something particular that would be going on in those weeks that you worked the two or two and a half hours?

A.   It would be my daily work that I had to accomplish.

Q.   Okay.  What did you do to prepare for this deposition today?  And I don't want to know about the substance of any conversations you had with counsel.  Just generally.

A.   I spoke with counsel.

Q.   How many times did you speak with counsel?



Page 37

M. A. Fischer

A. Once.

Q. When did that conversation occur?

A. Yesterday.

Q. How long did that conversation take?

A. Two hours.

Q. Was it in person? On the phone? Virtual?

A. It was Zoom.

Q. Via Zoom?

A. Uh-huh.

Q. Who was present for that Zoom meeting?

A. Myself, Zarka Dsouza, and Sabine Jean, my attorneys.

Q. Did you review any documents during that Zoom session?

A. Yes.

Q. Did those documents kind of refresh your recollection as to the relevant facts and events that were -- that are relevant to this lawsuit?

A. Yes.

Page 38

M. A. Fischer

Q. What documents did you review?

A. The complaint and the request for -- I can't remember how you say it -- interrogatories?

Q. Are you aware that there's more than one set of interrogatories that you answered in this case?

A. Yes.

Q. Okay. There was one set issued by Geico and one set issued by the court, right?

A. Correct.

Q. Did you review both of those sets of interrogatories?

A. I believe so.

Q. Okay. Any other documents you reviewed besides the complaint and the interrogatories?

A. Yes.

Q. What other documents?

A. One referring to Geico's policies.

Q. When you say "one referring to Geico's policies," was it a policy

Page 39

M. A. Fischer

handbook?

A. Yes.

Q. Was it the Geico Associate Handbook?

A. It might have been, yes.

Q. Okay. Did you review certain portions of that handbook?

A. Yes.

Q. Which portions?

A. Regarding the recording of overtime hours.

Q. Any other portions?

A. No.

Q. Besides the complaint, the interrogatories, and the associate handbook policies, what other documents did you review?

A. I think that was it.

Q. No e-mail communications, anything like that?

A. No.

Q. No metrics or, you know, documents indicating, you know, how you were performing on some sort of interval,

Page 40

M. A. Fischer

you know, whether that was monthly or yearly?

A. No.

Q. No e-mail communications -- or strike that.

No deposition testimony from any other person in this case?

A. No.

Q. Did you take any notes during this meeting or no?

A. Yes.

Q. What were you taking notes on?

MS. DSOUZA: Objection.

A. Just general notes just regarding what to expect today, the location, who would be here, the documents that we reviewed. Just, basically, that's it.

BY MR. TSONIS:

Q. Okay. With respect to the complaint and your interrogatory responses and the handbook, how did those documents refresh your recollection?

A. They were just shown to me that



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
121–124

Page 121

M. A. Fischer

Q.   Okay.  In terms of follow-up action from Geico legal -- strike that.

How many of your cases would you say typically get referred to Geico legal?

A.   High percentage.

Q.   A high percentage?  Like, 90 percent?

A.   I'm not aware.  I'm not sure what the exact percentage would be.

Q.   All right.  It sounds like it's most of the cases, though?

A.   A lot of cases.

Q.   Okay.  The ones that don't end up getting referred to Geico legal, typically why is that?

A.   There are different reasons.  The provider would have stopped billing.  They -- what else would be -- we didn't find any kind of proof that there was any impropriety done so we would close it.  Or they stopped billing for certain things that we were looking at them for.  They changed their patterns.

Page 122

M. A. Fischer

Q.   Okay.  Were you always -- since 2016, were you paid on an hourly basis when you worked for Geico?

A.   Yes.

Q.   All right.  Were you paid time and a half for all hours you worked over 40?

A.   I didn't receive any overtime pay, I don't believe.

Q.   I guess, was it your understanding, if you know, that you would have received overtime pay at a time and a half had you worked over 40 hours and entered it into Workday?

A.   Yes.

Q.   All right.  If you flip to the next page, page 2 of your declaration, in paragraph 7 you say:  My regular schedule for Geico was 9:00 a.m. to 5:30 p.m.  I also worked approximately two to 2.5 hours each week in addition to that.

So, I'll pause there.

What was the work that you were doing for those two to 2.5 hours?

Page 123

M. A. Fischer

A.   As the day would come to an end, I would see what needed to still be accomplished in that day to fulfill my diary, and I would be catching up, making sure that everything was -- that I had to accomplish in that day was done.

Q.   Okay.

A.   To the best of my ability.

Q.   And, I guess, is that things that are -- that you had to do to complete a diary entry that day?

A.   Some of it was, yes.

Q.   Okay.  So, I guess, you know, if it's due the next day or the day after -- well, step back for a moment.

You said the diary sort of entries were every 15 days you had to submit, right?

A.   Right.

Q.   Is that 15 business days or 15 real-time days?

A.   I think it was 15 business days.

Q.   Okay.  So, essentially, three

Page 124

M. A. Fischer

weeks, every three weeks you had to submit a diary?

A.   Yes.

Q.   All right.  And I know you mentioned that you would print out your schedule on Friday so that you would know what's happening for the following week, right?

A.   Yes.

Q.   So, I guess, given the fact that your timelines, you know, are three weeks out, why was it necessary to work two to two and a half hours a day overtime -- two to two and half hours per week in excess of your scheduled hours?

A.   Because I wasn't just working on those cases.  I also had other things going on, phone calls.  Like I said, we had new investigators, helping new investigators, meetings, other things in the day, e-mails that needed to be addressed immediately, so everything pushes everything down.

Q.   Sure.  I'm not suggesting that



Page 125

M. A. Fischer

you weren't getting phone calls or e-mails. Of course, I understand what you're saying.

I guess my question is: If the diary wasn't due that day, you would have been able to complete that work the following day, right?

A. But that isn't why I was there. I was completing the diary that was due that day.

Q. So, every single week you had two to 2.5 hours in addition that week to complete a diary that was due on one particular day?

A. Not just the diaries, any of my work for the day.

MS. DSOUZA: Just for the court reporter, just wait for counsel to finish the question.

THE WITNESS: Yes.

BY MR. TSONIS:

Q. Sure. So, if I'm understanding correctly, you kind of had a plan for the work that you were going to do in any given day?

Page 126

M. A. Fischer

A. Yes.

Q. All right. Some of that work would have -- for example, a diary might have had a due date for that day, right?

A. Correct.

Q. All right. Some of that work might not have a due date for that day, right?

A. Correct.

Q. All right. So, if it was work that didn't have a due date for that day, it's work you could have, I guess, picked up the following morning if you wanted to?

A. Possibly, yes.

Q. Okay. And we said the diary -- on an ongoing case, you would have only had to list what you did from the previous diary?

A. Yes, but let me explain something also. I could have between high 20s and low 30s in my case count, so I could have four cases that needed to be updated in a day, three cases, five cases depending on how the dates fell down. It

Page 127

M. A. Fischer

wasn't just one case popping up on Monday that had to be fixed. There might have been four cases that I had to get into and touch that day or three cases, so...

Q. Was that pending caseload that you were just talking about -- was that pending caseload you just referenced consistent throughout your time at Geico from 2016 to the time you retired?

A. 20 to 30 cases?

Q. If that's what you're referencing, yeah.

A. Yeah.

Q. Okay. You also referenced that at least one day per week you worked through your meal break, in this declaration?

A. Yes.

Q. Why one day per week?

A. That's just on average.

Q. I guess, what would make you work through a meal break one day but not on another day?

A. Something needed to get done.

Page 128

M. A. Fischer

Q. You were the one determining something needed to get done?

A. Yes.

Q. It wasn't your supervisor instructing you, work through your meal period?

A. Absolutely not.

Q. Okay. Did your supervisor know that you were working in your meal period?

A. I don't know.

Q. Do you have any reason to think that she did?

A. Well, the inside ones, yeah. I mean, you're there.

Q. So, if I'm understanding correctly, your supervisor was located in the same office that you worked out of?

A. It would be Kristin Slack, yes.

Q. Prior to Kristin Slack?

A. Danielle was the field supervisor that I reported to.

Q. So, she didn't work out of the office?

A. She was a field.

Page 129

M. A. Fischer

Q. So, she was a field supervisor, so she didn't work out of the office, correct?

A. Correct.

Q. All right. So, Danielle Perdomo wouldn't know that you were working during your meal period?

A. Correct.

Q. All right. And Danielle Perdomo wouldn't know that you were working two to 2.5 hours in addition to your scheduled hours each week?

MS. DSOUZA: Objection.

A. My -- I swiped in and out of the building every day, which recorded my time in and my time out. My SICM also has a date stamp on it and I'm sure my computer when I shut it down at night.

BY MR. TSONIS:

Q. So, let's take those back for a second.

SICM has time and date stamps for any activity that's entered, right?

A. Every activity that's entered.

Page 130

M. A. Fischer

Q. SICM doesn't have a timestamp for when you open the application, to your knowledge, right?

A. Not to my knowledge, but I'm assuming. Everything does, right?

Q. Okay. Similarly, do you have any reason to think that there's a timestamp of when you closed out of the SICM application?

A. I believe that there was.

Q. Did anyone ever talk to you about, hey, I saw you closed SICM at this time?

A. No.

Q. Anybody ever talk to you about, I saw you open SICM at this time?

A. No.

Q. You said you swiped into the building and swiped out of the building?

A. Absolutely.

Q. All right. So, just to be clear: To leave the building, you didn't just have to walk out. You had to literally swipe?

Page 131

M. A. Fischer

A. Correct.

Q. Okay. Any reason to think that your supervisor could see your time-in and time-out swipes?

A. Yes.

Q. What is that? What's the reason?

A. We were told that they can run our swipes to see if we were late, how -- you know, as far as, you know, you're late to work, that's a problem, right? So, they can see when you're there and when you're leaving.

Q. Okay. When you say "we were told," what are you referencing?

A. It's just common knowledge that they can check your SICMs -- not your SICMs -- your time swipes.

Q. I guess I'm just trying to understand if there's a specific conversation you're referencing or you just assume they could check your swipes.

A. At some point in my employment, I was told that they could -- that,

Page 132

M. A. Fischer

absolutely, they can check your time swipes.

Q. Do you recall who told you that?

A. No.

Q. Do you recall when they told you that?

A. No.

Q. Do you recall if it was an e-mail or an oral conversation?

A. No idea.

Q. This understanding that you had, was it that someone at Geico could pull your swipes or that your supervisor could pull your swipes?

A. I believe that someone could and the supervisor could request that.

Q. Did your supervisor ever talk to you about your swipes?

A. No.

Q. Did the manager ever talk to you about your swipes?

A. No.

Q. Did anyone at Geico ever talk



Page 173

M. A. Fischer

Q.   Thank you.

It then continues in the third sentence:  A nonexempt associate who feels he/she did not receive pay for all his/her hours worked and an exempt or salaried nonexempt associate who feels his/her pay incorrectly reflects a deduction for an absence should contact his or her supervisor, local human resources manager, or corporate human resources.

Did I read that right?

A.   Yes.

Q.   All right.  Did you understand that, if you had -- if you felt you didn't receive pay for all the hours that you worked, that you could contact your supervisor, local human resources manager, or corporate human resources?

A.   Yes.

Q.   All right.  Did you also understand as a Geico associate that Geico maintains a Berkshire Hathaway ethics line?

A.   Yes.

Q.   What's the purpose of the

Page 174

M. A. Fischer

Berkshire Hathaway ethics line?

A.   I believe it was to report any kind of problem that you had.

Q.   All right.  Would that include a problem of not being compensated for all time worked?

A.   It could be, yeah.

Q.   Okay.  Did you ever try to call the Berkshire Hathaway line?

A.   No.

Q.   You would be able to call the line if you wanted to, though, right?

A.   Correct.

Q.   Did you ever try to call corporate human resources?

A.   No.

Q.   And I'll preface this.  I'm talking about being compensated for time that you're alleging that you worked.

Okay?

Did you ever try to contact Geico corporate human resources?

A.   No.

Q.   Did you ever try to contact

Page 175

M. A. Fischer

Geico local human resources manager?

A.   No.

Q.   You had the ability to contact Geico's corporate human resources, right?

A.   Yes.

Q.   You had the ability to contact Geico's local human resources manager?

A.   Yes.

Q.   It also says you could contact your supervisor, correct?

A.   Yes.

Q.   Did you ever contact your supervisor?

A.   We discussed overtime in meetings just in passing, like, everybody knew every -- you know, when we were working.

Q.   Okay.  Let's be more specific about that.

Which supervisor are you talking about?

A.   I don't know.  Maybe Danielle. I don't know.  But in general, when you would have a group meeting, you know, it

Page 176

M. A. Fischer

would -- you know, people were working more.  There was a lot of work to be done.

Q.   Would you participate in meetings only with major case or with other job titles within SIU?

A.   Mainly with major case.

Q.   How many meetings would you have?

A.   Maybe one a month.

Q.   Was everybody present in those meetings, meaning field, major case, and inside major case?

A.   No, just my unit.

Q.   Did everybody in your unit -- well, strike that.

I think you said earlier, at a certain point they hired 12 new people, and there was a total of about 18?

A.   Yes.

Q.   Did those 18 people report to the same supervisor?

A.   Two supervisors.

Q.   Who was the other supervisor?

A.   Katherine -- what's



Page 189

M. A. Fischer

or because you were chatting with somebody?

A.   No, but they could ask.

Q.   Okay.  Similarly, if -- well, strike that.

Did you ever start work early that you're claiming is uncompensated time?

A.   No.

Q.   Okay.  So, it's purely at the end of your shift?

A.   At the end.

Q.   Okay.  You can put that policy to the side.

I want to turn for a second back to Exhibit 1, if you don't mind.  The last paragraph in your declaration -- it's actually the last page of Exhibit 1, paragraph 12.

Actually, let's go back to page 3 -- I apologize -- to paragraph 10.  So, the first sentence says:  Geico required me to seek approval from my supervisor to submit any hours worked above 38.75, right?

A.   Yes.

Q.   The second sentence says:  It

Page 190

M. A. Fischer

was my understanding that hours above 38.75 to complete regular case work would rarely be approved.

Do you see that?

A.   Yes.

Q.   All right.  Why was it your understanding that hours above 38.75 to complete regular case work would rarely be approved?

A.   If -- to work overtime, you would have to submit in advance a request to work overtime on a specific case and specifically what on that case you would want to work during that time.

Q.   So, you had the ability to request overtime in advance; is that right?

A.   On a specific case and regarding a specific detail to that case.

Q.   Did you ever make that kind of request?

A.   No.

Q.   Why not?

A.   Because it would have to be done in advance and most of the time when I

Page 191

M. A. Fischer

worked overtime, it was because the end of my day was up and I had things I still needed to accomplish in that day.

Q.   Okay.  Was there ever any communications to how far in advance you had to request it?

A.   No.  It would also take time to write up the request and the specification.

Q.   I get the impression that you had a pretty good relationship with your supervisor?

A.   Yes.

Q.   Could you call her and say, hey, can I have 30 minutes of overtime or an hour, if you needed it?

A.   It was very rarely approved.

Q.   Why do you -- strike that.

If you never requested it, how do you know that it wouldn't have been approved for you?

A.   It has been the trend in Geico that people just worked to get their work done for the day.

Q.   Do you have an understanding of

Page 192

M. A. Fischer

what the process was for your husband, Keith Fischer, to request overtime?

A.   No.

Q.   Do you know who his supervisor was?

A.   He was under Gerry Cassagne, I believe.

Q.   He had Gerry Cassagne as a supervisor for this entire time period of 2016 to when he retired also, right?

A.   I believe so.

Q.   He worked with Gerry Cassagne back in NYPD also, right?

A.   Correct.

Q.   Okay.  You have no understanding as to whether during 2016 or 2017 Keith Fischer could work overtime hours as long as he just sent a follow-up documentation e-mail to Gerry Cassagne?

MS. DSOUZA:  Objection.

A.   No.

BY MR. TSONIS:

Q.   Your husband never talked to you about that?



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
193–196

Page 193

M. A. Fischer

A.   No.

Q.   Did you ever ask your husband about, should I request overtime?

A.   No.

Q.   Why not?

A.   We didn't discuss things like that.

Q.   Are you aware as part of this lawsuit there have been documents produced that show that Keith Fischer did, in fact, work overtime in some weeks that was approved?

A.   No.  I don't know what was submitted on his behalf.

Q.   Well, I mean, a short while ago, you testified, you know, it's the trend in Geico that people just work their 38.7 -- they work more hours, but --

A.   Yes.

Q.   -- I guess, you know, I'm not going to put a bunch of documents that don't have your name in front of them -- or on them in front of you.  But I'll represent to you that there are documents

Page 194

M. A. Fischer

from different investigators that get overtime approved.  So, I'm curious why it is that you didn't request it.

MS. DSOUZA:  Counselor, is there a question?

BY MR. TSONIS:

Q.   Why is it that you didn't request it?

A.   I didn't feel that it would be approved.

Q.   Okay.  Do you have any other -- any understanding as to whether other major case SIU investigators did request overtime?

A.   I do not.

Q.   Did anyone ever communicate to you that they had the same understanding that overtime hours wouldn't be approved?

When I say "they," I'm talking about SIU major case investigators.

A.   Yes.

Q.   Who?

A.   I don't know offhand.

Q.   Can you name anyone?

Page 195

M. A. Fischer

A.   No.

Q.   Your declaration here continues, the last sentence of paragraph 10:  Accordingly, I did not record all of my hours worked during my tenure, and I was not paid for hours including overtime hours that I worked off the clock.

Besides the reasons we've already discussed, is there any other reasons you didn't record all of your hours worked during your time at Geico?

A.   No.

Q.   Paragraph 11 you say:  Geico also had a variety of performance metrics that I was required to meet to remain in good standing.  These performance metrics and ratings changed constantly, but to the best of my recollection, Geico generally evaluated me based on how many hours it took me to complete a case task, how often I made an entry in a case report, how many days I took to close a case, and how many cases I completed within a month.

Do you see that?

Page 196

M. A. Fischer

A.   Yes.

Q.   All right.  Earlier, do you recall that we talked about the metrics that your performance reviews were based on?

A.   Yes.

Q.   All right.  And you have an understanding that other investigators were rated on a productivity metric?

A.   Yes.

Q.   And that productivity metric concerned how many cases were closed in a month?

A.   Yes.

Q.   You, however, were not rated on how many cases you completed in a month?

A.   I was rated on if a case was ready to be closed, if I did it or not in a timely manner.

Q.   When you say "in a timely manner," what do you mean?

A.   That it just didn't -- if it was -- if it needed to be closed, it needed to be closed right away.  As soon as it was

MARGARET A. FISCHER
FISCHER V. GEICO

Page 241

M. A. Fischer

the witness being asked to testify on her husband's workload?

MR. TSONIS:  I just asked her if she had any understanding as to whether her husband's workload had changed.

MS. DSOUZA:  I know.  But the witness can testify on her own work.  Why on her husband's work?

MR. TSONIS:  Why not?

MS. DSOUZA:  She can testify to her own experience, not the experience of the --

MR. TSONIS:  You're coaching the witness?  That's not proper.  She is also, in addition to being a plaintiff in this case, somebody that may have knowledge that is relevant and material to the case of Keith Fischer.  And I'm entitled to explore that --

MS. DSOUZA:  But she would be speculating on what happened with Keith Fischer.

Page 242

M. A. Fischer

MR. TSONIS:  You are dangerously close to crossing the line now of coaching the witness.  You're entitled to object --

[Crosstalk.]

MR. TSONIS:  I'm entitled to explore the witness's knowledge in an area when she may have knowledge about another plaintiff in this case.  It's no different than if she was close friends with somebody else and I was asking about that.

BY MR. TSONIS:

Q.    I'll ask my question again, Ms. Fischer.

Do you have an understanding as to how your husband's caseload changed during the time in or about March 2020?

A.    Yes.

Q.    Okay.  And what's your understanding?

A.    That it increased.

Q.    Do you have an understanding as to how much it increased?

Page 243

M. A. Fischer

A.    A lot.

Q.    Okay.  As a major case investigator, we said that your caseload did not increase, right?

A.    Correct.

Q.    In fact, your caseload decreased because you weren't assigned new cases?

A.    Correct.

Q.    Okay.  If you continue on in that paragraph, bottom of page 5 going onto page 6, it says:  As a result, to keep up with his escalating workload and Geico's demanding performance metrics, Fischer typically began working at approximately 6:00 a.m. and finished his work for the day at approximately 11:00 p.m., accounting for some gaps in his workday for meals and other self-care from March 2020 through April 2020 -- plaintiff Fischer worked between approximately 60 and 75 hours per week in most full workweeks, i.e., weeks with no days lost to holidays or other time off.

Page 244

M. A. Fischer

Do you see that?

A.    Yes.

Q.    All right.  Do you have any independent recollection as to your husband's work schedule during the March and April 2020 time period?

A.    No, but -- not exactly, but he had a tremendous amount of a workload, yes.

Q.    Okay.  Do you know specifically when he would start or stop work during that time?  Do you recall?

A.    I can't recall.

Q.    Okay.  Do you have any recollection as to, you know, how often or how frequently he took, like, meal breaks or ate dinner, things like that?

A.    I can't recall.

Q.    Okay.  Earlier, you testified that, you know, you would eat dinner at the dining room table every night, right?

A.    We would eat at -- that is our place of eating, yes.

Q.    Okay.  I guess, during this time period, was this still, like, a



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
261–264

Page 261

M. A. Fischer

response, there's several sentences of, essentially, objections.

But then you see the last full sentence that starts: Without waving these objections?

A. Uh-huh.

Q. It says: Plaintiff directs defendant to plaintiff's declaration including paragraph 2 and further identifies Danielle Perdomo, Bill Newport, Courtney Wolfe, and Keith Fischer.

A. Yes.

Q. Okay. So, what are the facts on which you are claiming that Danielle Perdomo had actual or constructive knowledge that you worked unpaid overtime?

A. My -- my swipes, my e-mail times, my SICM times.

Q. Okay. So, you've identified those three categories before, right?

A. Yes.

Q. Are you contending all three of those categories pertain to Danielle Perdomo?

Page 262

M. A. Fischer

A. Yes.

Q. All right. Are you claiming that all three of those categories pertain to Bill Newport?

A. They should, yes.

Q. Okay. Are there any other categories that pertain to Bill Newport that you did not describe?

A. Not that I'm aware of.

Q. Are you contending that those three categories or those three facts pertain to Courtney Wolfe?

A. Yes, they should.

Q. Are there any others that you contend apply to Courtney Wolfe?

A. Not that I'm aware of.

Q. All right. And you also identified your husband, Keith Fischer, here?

A. Yeah.

Q. What's the basis for claiming that your husband had actual or constructive knowledge that you worked unpaid overtime hours?

Page 263

M. A. Fischer

A. My -- the hours that I came home and he knew I wasn't getting paid for it.

Q. How did he know you weren't getting paid for it?

A. I spoke to him about it.

Q. You told your husband that you were working but not logging in hours in the Workday?

A. Absolutely.

Q. And what did your husband say?

A. I don't remember. It's the way it was.

Q. Did he tell you he was doing the same thing?

A. Yes.

Q. What did you say to him?

A. It's -- it was the culture. It's what was done.

Q. Did you guys ever bring up possibly actually raising the issue to his supervisor's attention?

A. He did.

Q. Well, we talked about him

Page 264

M. A. Fischer

raising the issue of workload.

But do you have any knowledge of Keith Fischer reporting to his supervisor that he was working overtime hours but not entering them into Workday?

A. I'm unsure.

Q. Okay. If I'm understanding correctly, the swipes in and out of the building, the e-mails that you sent, and the SICM timestamps, are you claiming that Bill Newport, for example, actually knew you were working overtime or that he could have known?

A. I'm claiming that he should have known.

Q. Okay. But you don't know that he actually had knowledge?

A. No. No, I do not know that he actually had knowledge.

Q. All right. And similarly with Courtney Wolfe, you don't know that she actually had knowledge of any alleged overtime that you stated that you worked and weren't paid for?



Page 265

M. A. Fischer

MS. DSOUZA: Objection.

A. Correct.

BY MR. TSONIS:

Q. All right. And same question similarly with Danielle Perdomo: You're not claiming she had actual knowledge that you were working unpaid overtime hours?

A. Yes, she did.

Q. Why do you believe she had actual knowledge?

A. Because I would e-mail her when I was in the office and she would answer me.

Q. So, besides the fact that the e-mails that you would send were after the end of your scheduled shift, is there any other reason you're contending she had actual knowledge?

A. I would be sending in e-mails during the time I was working overtime having an issue or a question.

Q. Okay. Just so I'm clear: I think you stated you were working, you know, two to two and a half hours a week?

Page 266

M. A. Fischer

A. Yes.

Q. Is that two to two and a half hours evenly distributed throughout the week?

A. No.

Q. When would it typically happen?

A. It depended on every day. Every day was different.

Q. Okay. If your scheduled shift was -- strike that. Your shift was typically slated to end at 5:30 p.m.?

A. Correct.

Q. Okay. Is it fair to assume that you weren't e-mailing Danielle Perdomo at 11:00 o'clock at night?

A. Correct.

Q. Okay. The times you were e-mailing her would have been relatively close to your scheduled end time?

A. Yes, and sometimes later.

Q. Okay. But most of the time relatively close?

A. Possibly, yeah.

Page 267

M. A. Fischer

Q. Okay. The Interrogatory Number 7, this asks you -- and I won't read the entire interrogatory word for word, but to identify the individuals that you believe have knowledge or information relating to your claims or the facts underlying your claims. Okay? And it asked you to identify what knowledge you believe that person has.

So, again, if you go to the response and skip over the first sentence of objections, it states that: Plaintiff directs defendant to plaintiff's declaration including paragraph 2 and further identifies the same individuals, Danielle Perdomo, Bill Newport, Courtney Wolfe, and Keith Fischer.

All right. Is there anything that we haven't talked about today with respect to Danielle Perdomo that you believe she knows regarding your claims or the facts underlying your claims?

A. No.

Q. Is there anything that we

Page 268

M. A. Fischer

haven't talked about today that you believe Bill Newport knows regarding your claims or the facts underlying your claims?

A. No.

Q. Is there anything that we haven't talked about today that you believe Courtney Wolfe knows about your claims or the facts underlying your claims?

A. No.

Q. Is there anything that we haven't talked about today that you believe Keith Fischer knows about your claims or the facts underlying your claims?

A. No.

Q. Did you suffer any physical or emotional sort of ailments as a result of working for Geico?

A. No.

Q. Are you claiming emotional distress damages or anything, you know, pain and suffering, anything like that as part of this lawsuit?

A. No.

Q. Okay. Questions I just asked



MARGARET A. FISCHER
FISCHER V. GEICO

December 19, 2024
281–284

Page 281

M. A. Fischer

Woodbury office at some point beyond -- we've talked a bit today about field and desk investigators, right?

A. Yes.

Q. Do you have an understanding as to the specific teams that were set up for field and desk investigators?

A. There were always teams, and teams changed constantly.

Q. Okay. So, for example, the teams that I'm referring to was like there was a stage team, coverage team, theft team.

Do those sound familiar?

A. For the other side. They weren't major -- they weren't medical.

Q. Okay. What teams existed in major case?

A. It was just -- everyone was medical, and the outside guys were outside medical. That's just the way it was divided up.

Q. Okay. Were there any other specialized teams like auto or theft or

Page 282

M. A. Fischer

anything like that?

A. Not in medical, no.

Q. Not in major case?

A. Not in medical, no.

Q. Okay. Is it possible there were those teams in major case, you just weren't involved with them?

A. Not in the medical part of it, no.

Q. Okay. All right.

MR. TSONIS: I have no further questions.

THE VIDEOGRAPHER: We are going off the record. The time now is 4:29 p.m.

(Whereupon, a short break was taken at this time.)

THE VIDEOGRAPHER: We are back on the record, and the time now is 4:37 p.m.

XXXX

EXAMINATION

BY MS. DSOUZA:

Q. Hi, Peggy. I know it's been a

Page 283

M. A. Fischer

really long day and we've asked you a lot of questions. I'm going to ask you a few more questions, so bear with me. It's going to be short.

A. Okay.

Q. So, earlier today, we talked a little bit about how you had a Geico-issued phone and computer; is that right?

A. Correct.

Q. And earlier today, you mentioned that sometimes you took pictures on your personal phone and e-mailed them or used them for your case investigations that you did for Geico.

MR. TSONIS: Objection. Form. Leading.

A. Many, many years ago.

BY MS. DSOUZA:

Q. Okay. How -- how did you get the photos from your phone to the computer?

A. I don't remember.

Q. Okay. Do you remember -- do you recall using a cord, maybe, to, like, connect your phone to the computer?

Page 284

M. A. Fischer

A. I don't remember.

Q. Okay. We also talked a fair bit about your hours today; is that right?

A. Correct.

Q. All right. We talked about your break period as well as your meal period; is that right?

A. Yes.

Q. While you were at Geico, did you have to swipe in and out of the building?

A. When I came in and when I left the building, yes.

Q. Did you ever have to swipe in and out while you went for lunch?

A. If I left the building.

Q. Okay. Was it often that you left the building to go for lunch?

A. No. Very infrequently.

Q. Okay. You -- earlier today, you testified that you worked in the office with your supervisor, Kristin Slack; is that right?

A. Yes.



Page 285

M. A. Fischer

MR. TSONIS:  Objection.  Form. Leading.

BY MS. DSOUZA:

Q.   And did Ms. -- strike that.

Did you work frequently with Ms. Slack in the office?

A.   Yes.

Q.   Okay.  Did you ever have lunch with Ms. Slack in the office?

A.   No.

Q.   Okay.  Do you know if she might have seen you have -- take your lunch break while you were at Geico?

MR. TSONIS:  Objection.  Form.

A.   Yeah.  She might have, yes.

BY MS. DSOUZA:

Q.   Okay.  Do you know if she may have seen you work through lunch?

A.   Yes.

Q.   I'm going to -- can I draw your attention to Exhibit 2?

This was marked earlier today. It is your Workday profile.

A.   Yes.

Page 286

M. A. Fischer

Q.   Can I just turn to page -- that has the Bates number G005787.

A.   Yes.

Q.   So, on this page, do you see a table at the top of the page that has the positions that you held in various years?

A.   Yes.

Q.   And it shows that you started working at Geico in 2001; is that right?

A.   Correct.

Q.   During -- when you started working at Geico, was your position inside medical fraud investigator?

A.   No.

Q.   Okay.  Do you know why it might have said here that -- it says here it might be medical fraud investigator?

A.   No.

Q.   What was your position during that time?

A.   Well, I started -- I worked as a claims check processor.

Q.   And what did that job entail?

A.   I printed out the insurance

Page 287

M. A. Fischer

claims checks and processed them through the mail.

Q.   Okay.  You mentioned that you processed claims and mailed them out; is that right?

A.   The checks.  The physical checks.

Q.   Yes.  I apologize.

A.   And that was part-time.

Q.   Okay.  And was that different from your -- what work you did as an inside medical fraud investigator?

A.   Yes, very.

MS. DSOUZA:  Okay.  That's all from us.  Thank you.

THE WITNESS:  Thank you.

MR. TSONIS:  I have a few more questions for you, Ms. Fischer.

XXXX

CONTINUED EXAMINATION

BY MR. TSONIS:

Q.   If you can stick around that page that you were on?

Do you recall, when we looked

Page 288

M. A. Fischer

at your performance appraisal from 2017 earlier today, that you noted that you had learned Workday?

A.   Yes.

Q.   Is it your understanding or your recollection that it was around 2017 when Geico migrated to the Workday program?

A.   I believe that's what we saw.

Q.   These entries from 2001, if you look all the way to the right, do you see under the column entry date, there are entries from May and June of 2017?

A.   Yes.

Q.   All right.  Does it appear possible to you that your position may not be accurately reflected because of the transition to Workday during this time?

A.   Maybe.

Q.   Okay.  We can close this.

Your counsel asked you a short while ago about whether you would leave the building for lunch.

Do you recall that?

A.   Yes.



Page 297

M. A. Fischer

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 1 | interrogatories | 79 |
| 2 | Workday profile | 153 |
| 3 | human resources associate handbook | 167 |
| 4 | Excel spreadsheet | 200 |
| 5 | 2017 self-appraisal | 213 |
| 6 | Excel spreadsheet | 227 |
| 7 | the operative complaint | 233 |
| 8 | interrogatories | 258 |
| 9 | e-mail chain | 270 |

(*Exhibits attached to transcript.)

(Cont'd next page.)

Page 298

M. A. Fischer

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. TSONIS | 7, 287 |
| MS. DSOUZA | 282 |

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| BY MR. TSONIS: | |
| 1. Request to preserve notes | 42 |
| 2. Request for notes | 43 |
| BY MS. DSOUZA: | |
| 3. Request for e-mails | 292 |
| 4. Request for swipe card activity as well as SICM data | 293 |
| 5. Request for yearly goals | 293 |

QUESTIONS MARKED FOR RULINGS
PAGE LINE QUESTION
(None)

Page 299

M. A. Fischer

C E R T I F I C A T E

STATE OF NEW YORK      )
                                             :
COUNTY OF RICHMOND     )

I, MARINA DUBSON, a Notary Public for and within the STATE OF NEW YORK, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of December 2024.

_____
MARINA DUBSON

Page 300

ERRATA SHEET
WITNESS NAME: MARGARET. A FISCHER

PAGE  LINE (s)      CHANGE      REASON
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____
____|_____|  _____|_____

---------------------
MARGARET. A FISCHER

SUBSCRIBED AND SWORN BEFORE ME
THIS _____ DAY OF _____, 20___.
_____ _____
(NOTARY PUBLIC)    MY COMMISSION EXPIRES:

