# Exhibit GG

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------
KEITH FISCHER, MICHAEL O'SULLIVAN,
JOHN MOESER, LOUIS PIA, THOMAS
BARDEN, CONSTANCE MANGAN, and
CHARISE JONES, individually and on behalf
of all others similarly situated,

          Plaintiffs,

                  Case No.
  -against-          2:23-CV-02848

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO,
            Defendant.
--------------------------------------

     DEPOSITION OF JASON SNAIR, Opt-In Plaintiff herein, taken by Defendant, pursuant to Notice, at the offices of Regus, 80 Orville Drive, Suite 100, Bohemia, New York 11716, on Tuesday, February 17, 2026, at 10:05 a.m., before Patricia Guarino, a Shorthand Reporter and notary public, within and for the State of New York.

**Page 2**

A P P E A R A N C E S :
OUTTEN & GOLDEN, LLP
     Attorneys for Plaintiffs
685 Third Avenue, 25th floor
New York, New York 10017

BY:  ZARKA SHABIR D'SOUZA, ESQ.
    (212) 245-1000
    zdsouza@outtengolden.com

DUANE MORRIS
     Attorneys for Defendant
190 South Lasalle Street, Suite 3700
Chicago, Illinois 60603
BY:  TIFFANY ALBERTY, ESQ.
    (312) 499-6779
    tealberty@duanemorris.com

         * * *

**Page 3**

     IT IS HEREBY STIPULATED AND AGREED that all objections, except as to the form of the questions, shall be reserved to the time of the trial;

     IT IS FURTHER STIPULATED AND AGREED that the within examination may be subscribed and sworn to before any notary public with the same force and effect as though subscribed and sworn to before this court.

**Page 4**

    Whereupon,
        JASON SNAIR,
after having been first duly sworn, was examined and testified as follows:

    COURT REPORTER:   Please state your name for the record.

    THE WITNESS:  Jason Snair.

    COURT REPORTER:  What is your address?

    THE WITNESS: 1571 Roosevelt Avenue, Bohemia, New York 11716.

EXAMINATION BY MS. ALBERTY:

    Q.  Let the record reflect that this is the discovery deposition of Mr. Jason Snair pursuant to notice and by agreement of the parties.  Today's deposition is going to go well.

    Jason, I know I introduced myself off the record.  On the record, my name is Tiffany Alberty.  I'm counsel for Geico.

    I'm going to be asking you a series of questions about your time at GEICO and some of claims that have been asserted today.

    Have you ever given a deposition before?

    A.  No.



Page 9

J. Snair

GEICO.

Q.   Has anyone ever filed suit against you?

A.   No.

Q.   Do you recall when you opted in to this lawsuit?

We're in 2026.

A.   So 2025.

Q.   How did you going become involved in the lawsuit?

A.   I believe I got a mailing about it.  I believe.

Q.   Physical mail or e-mail?

A.   I don't remember, to be honest.  I don't know how I got it.

Q.   Was that -- again, I don't know want to know the substance of the communication, but was that communication from counsel that's with you today?

A.   I believe her firm.  I believe so.

Q.   Did anybody that you worked with at GEICO ask you to opt in to the case?

A.   No.

Q.   Do you still speak to anybody that used to work with at GEICO?

Page 10

J. Snair

A.   Yes.

Q.   Who do you speak with?

A.   Specifically from this department or anyone at Geico?  I was at GEICO for 28 years.

Q.   Specifically within the SIU department.

A.   I played golf periodically with someone names Dan Kurto.  And social media with Courtney Wolfe.  That's basically -- I think that's it.

Q.   Have you spoken to either one of them regarding this lawsuit?

A.   No.

Q.   Have you been involved in any conversations with either current we'll say named plaintiffs or Opt-In plaintiffs or prospective plaintiffs about this case?

A.   No.

Q.   When you opted in to the lawsuit did you have a chance to review the complaint?

A.   I don't think I read it fully.  I think I saw the gist of it, like what it was about and decide to opt in.

Q.   And what is your understanding of the lawsuit?

A.   The complaint is that GEICO was not

Page 11

J. Snair

paying overtime for hours worked by SIU associates, employees.

Q.   Do you know if that includes any lunch or meal break periods?

A.   Can you rephrase that?

Q.   Failing to pay overtime for any hours worked, do you know if that also encompasses for lunch breaks or meal periods?

A.   That's what I assumed, that it includes working through lunches and not getting paid for it.

MS. ALBERTY:   We'll mark this as Exhibit 1.

(Defendant's Exhibit 1 so marked for identification.)

Q.   What's in front of you is marked as Exhibit Number 1.  This is a copy of the class action lawsuit that was filed and it's an amended complaint.  So it's going to be the most recent one that was filed in February of 2024.

I'm not going to ask you to read this or anything like that.  It's a lot of pages and some legalese.  But at the very top of the page there is something called a case caption where it has the plaintiffs' name and then it has the defendant's

Page 12

J. Snair

name, who I represent, GEICO.  But as to any of the plaintiffs here -- so that's going to be Keith Fischer, Michael O'Sullivan, John Moeser, Louis Pia, Thomas Barden, Constance Mangan or Charise Jones.  Do you know any of those individuals?

A.   I know the name Charise Jones, but I don't know any of them.

Q.   Did you work with Charise?

A.   No.

Q.   Is there anything in particular that jogs your memory about her or why that looks familiar to you?

A.   I just know she was there for a long time and I've seen the name because I also was there a long time so I know who she is, but I didn't have any interaction with her.

Q.   For the overtime that you believe that you worked but were not paid for what time consideration as far as how long you've been with GEICO is that encompassing for your opt-in?

MS. D'SOUZA:   Objection.

You can answer.

A.   I was only in the SIU department for about a year-and-a-half.



Page 13

J. Snair

Q.   And so are your claims only one within the SIU department?

A.   Yes.

Q.   Are you making any overtime claims related to, I believe you were a PIP supervisor?

A.   No.

Q.   How many hours per week are you claiming that you worked but were not paid for the overtime?

A.   About five.

Q.   So for the overtime that you're claiming that you were not paid, is that based upon a 40 hour week?

A.   37.75 hour week.

Q.   And I'm not trying to confuse you on numbers.  I know we're going to talk about numbers today.

So it's my understanding from answers to discovery that you provided in this case that you would work 7.75 hours each day, totaling 38.75 hours in a week?

A.   Yes.  That was our normal workweek.  38.75.  I might have said that wrong.  38.75.

Q.   Okay.  Of the 38.75 about five hours

Page 14

J. Snair

per week in addition would be on top of the 38.75 hours, correct?

A.   Yes.

Q.   In the scope from your experience if you were working under the 38.75 hours in a week not hitting full-time status, would you then not be working the additional five hours per week of overtime?

MS. D'SOUZA:   Objection.

THE WITNESS:   Do I answer that now?

MS. D'SOUZA:  Yes.

A.   I guess it depends on the week and if I was off.  The days that I worked, you know, the full 7.75, there were times that I would also work additional hours on those days.

Q.   So it sounds like your daily hour intake of the 7.75 would wax and wane; is that fair?  Would it fluctuate?  It sounds like it from your testimony.

A.   Would what fluctuate?  My 38.75 hours?

Q.   For the 7.75 in a day.

A.   Yes.

Q.   There have been previous lawsuits against GEICO related to different departments

Page 15

J. Snair

throughout your tenure.  Had you ever been a part of any other lawsuit against GEICO?

A.   No.

Q.   I believe from the records that we produced in this case that your employment was about 26 years.  So 1995 to 2022.

A.   Correct.

Q.   I'm not going make you talk about all 26 years, I promise.

Throughout the deposition I might expand upon the timeframe, but for the most part we are going to be talking about the time that you were in SIU.  Okay?

A.   Okay.

Q.   Actually before we get started, what did you do to prepare for your deposition today?

A.   I spoke to our attorney yesterday just to go over the format and how the process goes because I've never done one of these before.

Q.   Did you review any documents in preparation for your deposition today?

A.   No.  I briefly looked over this, but it was a while ago.

(Referring to Exhibit 1.)

Page 16

J. Snair

Q.   Are you currently working now?

A.   Yes.

Q.   In what industry are you in?

A.   Worker's Comp billing I guess.

Q.   Are you working for the State?

A.   No.

Q.   In what capacity are you in Worker's Comp?

A.   I'm a business analyst for Medrisk.  M-E-D-R-I-S-K, one word.

Should I embellish on that?

Q.   Yes, you can keep going.

A.   They're a vendor that insurance companies use to process medical billing or nurse reviews and claim handling.

Q.   Did you have a gap between your employment from when your employment ended with GEICO around September of '22 to then when you rolled into Medrisk?

A.   Maybe a week.

Q.   How did your employment end with GEICO?

A.   I resigned.

Q.   Why did you resign?

A.   Because I found a new job.



JASON SNAIR
FISCHER V. GEICO

February 17, 2026
57–60

Page 57

J. Snair

A.  I don't know.

Q.  Do you recall having a lesser work load?

A.  I know I didn't get assigned cases to me while I was out full time.

Q.  And then what about when you came back and you were only working part time?

A.  I know I got cases.  I don't know if it was abbreviated or not .

Q.  Do you recall receiving raises when you worked in SIU?

A.  I don't think I did.

Q.  With the auto population that we talked about, was that being utilized as well when you were in PIP?

A.  For the Workday?

Q.  Yes.

A.  Yes.

Q.  When you worked in PIP did you approve overtime requests?

A.  When I was a supervisor?

Q.  Yes.

A.  Yes.

Q.  When you transitioned into SIU do you

Page 58

J. Snair

recall the Workday process changing from a desktop or a laptop to a phone application?

A.  I didn't have it on my phone.

Q.  Do you recall if the policy had changed that you actually had to clock in at the time that you worked and clock out at the time you left?

A.  No.

Q.  No, you don't recall or no, you didn't do that in applications?

A.  We didn't do that in applications.

Q.  Do you know if any of your colleagues did that?

A.  I have no idea.

Q.  Were you provided a company car?

A.  No.

Q.  What about a company cell phone?

A.  No.

Q.  Do you recall having to clock in and out for your lunch breaks?

A.  We did not -- I did not.

Q.  Did you always get paid for the time you entered into Workday?

A.  Yes.

Q.  Do you recall what the process was to

Page 59

J. Snair

request overtime?

A.  There was no process.

Q.  What do you mean by that?

A.  We were told we weren't eligible.  We weren't allowed to have overtime.

Q.  Who told you you were ineligible?

A.  Doreen.

Q.  Do you recall when that would have occurred?

A.  Throughout my course of SIU.  I don't have specific date or time that it happened.

Q.  Do you remember if this was a phone call, if it was an e-mail?

A.  It was on a meeting, like a team meeting.

Q.  Do you have any knowledge whether any of your colleagues were actually working and clocking overtime?

A.  I know people were working additional hours.

Q.  For the additional hours that they were working do you know if they got approval for overtime?

A.  I don't know.

Page 60

J. Snair

Q.  In your time in SIU did you ever request overtime?

A.  Yes.

Q.  In what set of circumstances?

A.  In a team meeting when Doreen was talking about the timeframe to complete a case I had said that if we had overtime approved we could probably get them done quicker.

Q.  And what would she say?

A.  "You guys don't get overtime."

Q.  Do you know for example the other internal investigators on the separate teams, such as with Katherine, if they were approved overtime?

A.  To my knowledge nobody was approved overtime.

Q.  Would you be surprised to hear that they were?

A.  Yes.

Q.  Did you ever put more than 7.75 hours in a work day into overtime?

A.  No.

Q.  Did you ever input less than 7.75 hours into Workday?

A.  No.



JASON SNAIR
FISCHER V. GEICO

Page 61

J. Snair

Q. Do you recall working less than the 38.75 hours in a workweek outside of the partial FMLA that we talked about?

A. I mean, I'm sure I took vacation time or sick time, but it always equalled the 7.75 because I had accruals.

Q. For any of the hours that you worked below the 38.75 were you ever punished for that?

A. No.

Q. I'm going to do a few exhibits.

MS. ALBERTY: Let's do this as 4.

(Defendant's Exhibit 4 so marked for identification.)

Q. What's in front of you is marked as Exhibit 4. This is G023759 to 60.

This is an e-mail regarding CAT duty. Does this look familiar to you at all?

A. It doesn't look familiar it me, but I see I got the e-mail.

Q. It states in the e-mail, "Good afternoon. I understand you all are assisting with the aftermath of Ida, and we appreciate it."

Does this jog your memory at all?

A. Vaguely. I don't know if I did this

Page 62

J. Snair

though. I assumed if I was offered overtime -- I don't recall doing this, but I'm not sure if I did or not.

(Defendant's Exhibit 5 so marked for identification.)

Q. What's in front of you is marked as Exhibit 5. This is G023766. This is a one-page e-mail.

Do you recall ever reporting to Brian Portnoy.

A. No. But he was in charge of the CAT program, this CAT overtime.

Q. So it appears that based on this e-mail you would have requested to work CAT and to work overtime Saturday and Sunday on the weekend and then maybe more if allowed and Monday too if offered.

Does that look correct to you?

A. Yes.

Q. So with regard to CAT were you -- based off your recollection -- doing CAT in conjunction with your regular activities in Major Medical?

A. Yes. This was like in addition to like after my set hours of regular work.

Q. So this was voluntary, correct?

Page 63

J. Snair

A. Yes.

Q. And during the time that you would have been in CAT is that when Brian Portnoy would have supervised you?

A. Yes. I believe he would be -- I think he was the one that was in charge of whatever project this was. I don't recall what we actually did, but evidently I volunteered for it.

Q. Do you recall how long he did CAT for in conjunction with your regular scheduled activities?

A. I don't. I believe it was just this time frame, but I could be wrong. But I believe it was just short-term.

(Defendant's Exhibit 6 so marked for identification.)

Q. What's in front of you is marked as Exhibit 6. Top page is G023932.

It states that the document was produced in its native form. I'll just explain to you what that means. The document would have been produced in an Excel spreadsheet. So that's why you're seeing a bunch of lines of code in a table format. It goes back to July of 2017 and it has the

Page 64

J. Snair

report that was ran until '25, just based off internal systems.

Have you ever seen this before?

A. This actual document?

Q. Yes.

A. No.

Q. This is just going to be a generalized report of the time that you took off for sick or vacation or FMLA or holiday.

Do you remember at all coding for any care time?

A. I mean I'm sure I have throughout. I'm sure I did.

Q. And then do you recall requesting time for bereavement?

A. I'm sure somebody died -- yeah. I don't know who died.

Q. That's fine. Do you recall during the COVID period that you ended up getting COVID?

A. Yes.

Q. I understand that you haven't seen this format before but just the way that some of this time has been allocated, do you have any reason to dispute that this is an accurate representation of



JASON SNAIR
FISCHER V. GEICO

February 17, 2026
65–68

Page 65

J. Snair

time off that you would have taken?

A. No.

Q. I believe in your Answers to Interrogatories -- those would have been the written questions that were sent to you from us that you probably worked with your counsel on. Does that sound familiar to you?

A. That I did interrogatories?

Q. Yes.

A. Yes.

Q. Again, I don't want to know about any conversations that you had with your attorney, but I believe in your Answers to Interrogatories you had stated that you would work 42.5 hours in a work week above the 38.75 hours in a work week.

Does that sound correct to you?

A. Yes.

Q. For what time period did you work 42.5 hours per week in SIU?

A. Probably once my training was over in SIU. So two months after I started there, give or take.

Q. And then until when?

A. Most likely till I left.

Page 66

J. Snair

Q. Did you ever receive any overtime pay for the additional hours that you're claiming the 42.5?

A. No, unless I got paid for this CAT time which I don't know if I actually -- I don't recall. I don't recall if I actually did that or not. But other than that CAT time, then no.

Q. In your experience in Internal Major Medical were there weeks that you were able to complete your workload within the normal 38.75 hours in a workweek?

A. Yes.

Q. Was there anything specifically that you needed to do that required overtime?

A. Just my normal work. Nothing specific. Just my normal case assignments.

Q. And would that wax and wane depending on whatever the case specifically needed?

A. Yes.

Q. When you took either paid or unpaid overtime, vacation, COVID leave, sick pay or FMLA, would you have also worked overtime?

A. Not if I wasn't logged in working, no.

Q. I think we talked about this earlier.

Page 67

J. Snair

I just want to flesh it out. When you took bereavement do you recall if you would catch cases?

A. Again, I know they closed us if we were out a certain amount of time, but I don't know what the parameters were.

(Defendant's Exhibit 7 so marked for identification.)

Q. What's in front of you has been marked as Exhibit 7. This is G023777 all the way to G023929.

For clarity, Jason, if we go to G023875 that is going to be when you transitioned into Major Medical. Actually it's going to be the page before.

Do these look familiar to you at all?

A. I mean, I've seen my pay stubs, so yes.

Q. So at the top of the page -- we'll just stay on 23875 -- it has your Name, Department, Location, Job Title.

Does that all look consistent to you?

A. Yes.

Q. Let's start with the first page that we're still on, the 23875. This is going to be pay period October 24, 2020 to November 6, 2020.

In the Earnings box it has the

Page 68

J. Snair

Description, the Dates, Hours, the Rate, the Amount and then it has a Year to Date at the very end.

A. Yes.

Q. In, for example, this pay period here we have a Regular Pay with the hours that you would have worked from week one of this pay period. So that's October 24, 2020 to October 30, 2020 you would have been working 35.75 hours.

Do you see that?

A. I don't see that.

Q. So right here. So we're looking at -- (Indicating.)

A. Yes.

Q. In the Earnings.

A. I see.

Q. And then the following week would have been October 31, 2020 to November 6, 2020. And the hours worked would have been 26.75.

Do you see that?

A. Yes.

Q. So in this specific pay period you would have not ever worked a full 40 hour workweek, which at GEICO would have been the 38.75 hours, correct?



JASON SNAIR
FISCHER V. GEICO

Page 73

J. Snair

your actual hours worked ever cleared anywhere near the 38.75 that was required to get at least in part to an overtime status.

MS. D'SOUZA: Objection.

A. All I know is on days that I worked I always accounted for my 7.75 using my regular pay hours plus my accruals. And I do know there were circumstances where I either started late, worked through lunch or stayed late and worked additional hours that aren't accounted for on this Workday time card.

Q. Would there be any place that would accurately reflect your hours worked in comparison to the sick time, the personal time and the vacation time that you had then put in and coded for?

MS. D'SOUZA: Objection.

A. No.

Q. Do you know why -- again, you can flip through a few of these pages, but we have you utilizing sick time almost ever pay period. Do you have any recollection as to in 2020 or 2021 -- we're not going to talk about FMLA. We're just talking about sick time, why you were using so much sick time.

Page 74

J. Snair

MS. D'SOUZA: I would like to instruct the witness you do not need to give personal and medical history if you're not comfortable with it.

A. I don't know what I was going through, why I was using the sick time.

Q. As we sit here today -- and again, we can keep flipping through some of these pages. So for example, I'm on G023886, which was a pay period March 13, 2021. We have 7.75 --

A. I'm sorry, which one? What day? What number?

Q. 23886.

So we have sick pay here for 7.75.

Any reason to dispute that you were taking intermittent sick time, regularly utilizing your vacation time, taking personal leave throughout at least the time that you were in SIU?

A. No, I'm not disputing that.

Q. And with these hour allocations there are plenty of weeks where you were not even working the 38.75 in the regular pay without it being fluctuated based off sick, personal leave, vacation time, or bereavement. Fair?

Page 75

J. Snair

MS. D'SOUZA: Objection.

A. That's seems fair, yes.

Q. Let's go to 23899.

Are you there?

A. Yes.

Q. I think earlier we were looking at CAT time. And so in that Earnings box that we've been talking about in this pay period September 11, 2021 to September 24, 2021 there were four hours that were allocated into CAT pay?

A. Yes.

Q. And so fair to say while you might not even remember working CAT, you were paid for CAT time at one point five times. So that would have been overtime you were receiving; is that correct?

A. Yes.

Q. Do you recall if GEICO had a policy that you would have to exhaust your paid sick time before you can start accruing FMLA?

A. No. I don't think you accrued FMLA.

Q. And I don't mean to confuse you at all. What I'm saying is do you know if you had to exhaust any sick time that you had before you can trigger FMLA and take FMLA pay?

Page 76

J. Snair

A. No, I don't think that was the case. I don't believe that was the case.

Q. I think based on your testimony -- if we go to G023914 we have a pay period that --

A. I'm sorry. Where? G...

Q. 23914.

A. Okay.

Q. We're in a pay period from March 12, 2022 -- and actually it's going to go through to the rest of your pay history. But I believe this is when FMLA started getting triggered. And do you see that in the Earnings on this page?

A. Yes.

Q. And then if we look at the next page of 23915 we also have the bank of the FMLA sick and paid sick time, and that continues on if we keep going through the remainder.

So I think based off of your testimony then any time that this sick period in a batch of FMLA, your custom and practice you would not be working overtime because you were not working. Is that fair?

A. That's fair.

Q. I probably should have asked you this



JASON SNAIR
FISCHER V. GEICO

February 17, 2026
77–80

Page 77

J. Snair

before, and I mean no ill will behind this question.

When you had your concussion did that impact at all like your short-term memory or long-term memory?

A. No.

MS. D'SOUZA:   Objection.

You can answer.

A. No.

Q.   Do you know if your colleagues had to get overtime approved in advance?

A. I'm not aware of them getting overtime approved.

Q. Do you know if they could just work overtime without approval?

A. I don't know.

Q. Are you contending that your workload required substantially more than 40 hours a week to complete?

A. More than 40 hours, yes.

(Discussion held off the record.)

(Time noted:   12:11 p.m.)

(Recess.)

(Time noted:   12:20 p.m.)

Q. I think we've been talking about some

Page 78

J. Snair

overtime.  Did Courtney Wolfe ever tell you that overtime was not allowed?

A. No.

Q. I think based off your testimony, has that always been Doreen during the times that you were on Webex or Teams or some type of virtual platforms that she would tell you that overtime was not allowed for the department?

A. Yes.

Q. Did you ever document or log the hours that you contend that you have worked off the clock?

A. No.

(Defendant's Exhibit 8 so marked for identification.)

Q. What is in front of you have is marked as Exhibit 8.  These are the Answers to Interrogatories we were briefly discussing earlier. Do these look familiar to you?

A. Yes.

Q. If you go to the last page of Exhibit 8 it's going to have a verification page and it has your -- it looks like electronic signature on November 28, 2025.  Does that look correct to you?

A. Yes.

Page 79

J. Snair

Q. Again, I don't want to know about any communication you had with your counsel, but with providing the answers to these interrogatories would you have worked with your attorney to have them in a written format as we see today?

A. I just responded to the questions. Someone put them in a written format.

Q. Let's go to interrogatory number 5 real quick.  It starts on page 6 and then goes into page 7, into page 8.

So the question says, "Identify each person you believe had actual or constructive knowledge that you worked unpaid overtime hours," and then -- et cetera.

If we go to the last paragraph on page 7 you state, "Plaintiff responds that all GEICO supervisory employees with knowledge of the particulars of Plaintiff's employment had at least constructive knowledge that Plaintiff worked off the clock."

When you're indicating "constructive knowledge" are you specifically talking about Doreen?

A. Yes.

Page 80

J. Snair

Q. If we go to page 8 it's going to have the remainder of the answer.  And second into the third sentence it states, "Plaintiff recalls raising the issue of off-the-clock work to Bogoff" -- to Doreen -- "his supervisor, in at least one team-wide meeting that occurred over WebX."

With regard to this specific recollection do you recall when in time that would have been?

A. I don't.

Q. When you state "raising the issue of off-the-clock work" what do you specifically recall stating to her?

A. That we were working extra hours either through lunch, staying late, logging on early to make sure we could get the stuff done quickly and timely.

Q. Who was on -- it says "team-wide meeting."  Is that the eight to ten people we were talking about earlier?

A. Yes.

Q. Was Courtney in that meeting too?

A. No.

Q. Did anybody else raise complaints as to



Case 2:23-cv-02848-SJB-SIL    Document 174-36    Filed 04/24/26    Page 10 of 12
PageID #: 12955

JASON SNAIR
FISCHER V. GEICO

February 17, 2026
81–84

Page 81

J. Snair

extra hours to get work done quickly?

A. Yes.

Q. Who do you recall?

A. There was someone named Theresa. There was someone named Lilly, and there was someone named Navin, N-A-V-I-N.

Q. At this time did you tell Doreen that you were working 42.5 hours that week but you were only logging the 38.75 hours?

A. I don't think I used specific numbers. I said that I was working -- signing on early and working through part of my lunch, so...

Q. Did she tell you to not work through your lunch?

A. No.

Q. Did she tell you to flex your time?

A. No.

Q. With regard to your claims I believe it would have been 3.75 hours that you're claiming you would have worked off the clock per week. Did you ever report to Doreen that you were working 3.75 hours a week off the clock?

MS. D'SOUZA: Objection.

Page 82

J. Snair

A. No, I did not.

Q. Did you ever tell Courtney that you were working 3.75 hours off the clock per week?

A. No.

Q. Did you ever report that to Human Resources?

A. No.

Q. Is there somebody over Courtney that you would have communicated with?

A. No.

Q. Do you know if any of the other Internal Major Medical Case Investigators were also picking up extra shifts through CAT?

A. I believe others were, yes.

Q. When you stated that you would be working 3.75 hours of overtime per week off the clock is that inclusive of CAT?

A. CAT was a one-time occurrence and it wasn't related to my job.

Q. I apologize. I don't know if you answered the question.

Is the off-the-clock work that you're claiming encompassed in CAT?

A. No.

Page 83

J. Snair

Q. During your employment did you have performance metrics in Internal Medical Major Case?

A. They were metrics, yes.

Q. Do you recall what they were?

A. I believe it was solely audits -- audit based.

Q. Do you know what the factors would have been in your audits?

A. There was like a checklist of parameters that needed to be done within the life of a major case.

Q. Do you know who would be doing the audit?

A. The supervisors did them.

Q. When you were out on FMLA do you know if your performance metrics changed to accommodate for your leave?

A. I don't believe I was audited when I was out.

Q. In Major Case was case life a factor?

A. That was the talk, that they were measuring the turn around time to complete a case and that that was going to be a metric moving forward.

Page 84

J. Snair

Q. Do you remember when?

A. No.

Q. Do you know if during your time in Major Medical if case life was not a factor?

A. I don't recall if they were measuring that while I was there.

Q. Do you know if productivity was measured while you were there?

A. I believe that was tracked, yes.

Q. When you would complete your data analytics for billing would you include the amount of time it took you to get through those analytics?

A. No.

Q. During your employment with GEICO do you recall having either biannual or annual reviews?

A. SIU or my whole life?

Q. SIU.

A. There was definitely annual reviews, and I'm not 100 percent sure if we had mid-year reviews as well.

Q. And during your employment did you ever have any disciplinary actions?

A. No.

Q. So in this case we produced your



Case 2:23-cv-02848-SJB-SIL    Document 174-36    Filed 04/24/26    Page 11 of 12
PageID #: 12956

JASON SNAIR
FISCHER V. GEICO

February 17, 2026
97–100

## Page 97

            I N D E X
WITNESS        EXAMINATION BY            PAGE
J. Snair      MS. ALBERTY                 4

DEFENDANT'S
EXHIBITS                                 PAGE
Ex. 1    Copy of the class action        11
         lawsuit filed in
         February of 2024
Ex. 2    Document G011963                 37
Ex. 3    Document regarding               46
         Compensation Contents
         Bates G000028 to G000043
Ex. 4    Bates G023759 to 60             61
         E-mail regarding CAT duty

Ex. 5    E-mail, 9/3/21                  62
         Bates G023766
Ex. 6    Documents                       63
         Starts with Bates G023932
         Generalized report of time
         off for sick or vacation or
         FMLA or holiday
Ex. 7    Documents                       67
         Bates G023777 to G023929

Ex. 8    Answers to Interrogatories      78

## Page 98

            C E R T I F I C A T I O N

        I, PATRICIA GUARINO, a Shorthand Reporter and notary public, within and for the State of New York, do hereby certify:

        That JASON SNAIR, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that this transcript of said testimony is a true record of the testimony given by said witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of February, 2026.

                    PATRICIA GUARINO

## Page 99

DEPOSITION ERRATA SHEET

Our Assignment No.:  J14307392
Case Caption:  Keith Fischer vs. Government Employees Insurance Company

    DECLARATION UNDER PENALTY OF PERJURY
I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

    _____
    Jason Snair
Subscribed and sworn to on the ____ day of _____, 20 ____ before me.
_____
Notary Public,
in and for the State of _____.

## Page 100

DEPOSITION ERRATA SHEET
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____
Page No.____Line No.____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____DATE:_____
    Jason Snair



Page 101

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

        Jason Snair

