# Exhibit HH

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL         )
O'SULLIVAN, JOHN MOESER,        )
LOUIS PIA, THOMAS BARDEN,       )
CONSTANCE MANGAN, and          )
CHARISE JONES, individually    )
and on behalf of all others    )
similarly situated,            )
                               )
              Plaintiffs,      )No.2:23-CV-
                               )02848
        vs.                    )
                               )
GOVERNMENT EMPLOYEES           )
INSURANCE COMPANY d/b/a        )
GEICO,                         )
                               )
              Defendants.      )
----------------------------

REMOTE VIDEOTAPED DEPOSITION OF
PATRICIA OHRNBERGER
Tuesday, December 9, 2025

Reported by:
LISA M. MURACO, RPR, CCR-NJ
JOB NO. J13784891

**Page 2**

Tuesday, December 9, 2025
10:00 a.m.

REMOTE Deposition of PATRICIA
OHRNBERGER, held VIA ZOOM, before LISA M.
MURACO, a Registered Professional Reporter,
CR-NJ, a Notary Public of the State of New
York, New Jersey, Florida, and
Massachusetts.

**Page 3**

A P P E A R A N C E S:

(REMOTE)

    OUTTEN & GOLDEN LLP
    Attorneys for Plaintiff
        1 California St
        Fl 12
        San Francisco, CA 94111-5414
    BY:   KAELYN MAHAR, ESQ.
          JANE BALKOSKI, ESQ.


    DUANE MORRIS LLP
    Attorneys for Defendant
        190 South LaSalle Street, Suite 3700
        Chicago, Illinois 60603-3433
    BY:   GREGORY TSONIS, ESQ.

**Page 4**

IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing and
sealing be and the same are hereby waived.
IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.
IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized
to administer an oath, with the same
force and effect as if signed and sworn
to before the Court.

- oOo -



Page 17

P. OHRNBERGER

A.   I don't remember.

Q.   To the best of your recollection, were you being paid a salary at that time?

MS. MAHAR:  Objection.

You can answer.

THE WITNESS:  Okay.

A.   Well, if you mean a salary, meaning that I was getting paid for working, yes, I received a salary.

Q.   Okay.

And you referenced, I think, an earlier lawsuit that you were also a part of, right?

A.   Right.

Q.   What was the substance of the claims in that lawsuit?

A.   I think it was the same.  It was based on overtime.

Q.   Did you -- I think you said you received a settlement payment as a result of that lawsuit?

A.   Yes.

Q.   And you thought it was between -- not necessarily that one, but one of your

Page 18

P. OHRNBERGER

settlement payments, I think you said, was between $20- and $30,000, you believe?

A.   Something of that amount.

I -- again, I don't -- I don't remember the amounts.  I didn't think we were going to discuss it, so I didn't look all that up.

Q.   That's all right.

Aside from those two lawsuits, have you ever been a party to a lawsuit?

A.   No.

Q.   Now, this is the third lawsuit that you are a part of against Geico, right?

A.   Right.

Q.   What's your understanding of the claims in this lawsuit?

A.   The overtime -- well, based on the workload that we're -- that is expected of the investigators, they're -- we've been -- it's difficult to do the metrics to -- based on the time frame that they're asking us to get work accomplished in.  It's -- in most cases was very difficult to do all of that in 38.75 hours.

Page 19

P. OHRNBERGER

So based on the fact that you couldn't do it in 38.75 hours, you had to work overtime in order to meet the requirements.

Q.   I see.

When did you first gain that understanding that because of the metrics you couldn't complete in 38.75, you had to work overtime?

A.   They -- because of the time frames that certain items that are -- were on our list of things to do during our workday, it -- there were certain cases that had to be handled within a certain time frame.

So if you couldn't finish it in a time frame, a lot of time you didn't have a choice but to work over so that you wouldn't end up not completing the task on time.

Q.   I guess I'm asking a slightly different question.

A.   Okay.

Q.   When did you first gain an understanding of what you're describing as your claims here?

Was it before the lawsuit was filed

Page 20

P. OHRNBERGER

or after the lawsuit was filed?

A.   Well, it's always been an issue.  So I would say before the lawsuit was filed.

Q.   I see.

Have you ever seen the lawsuit that was filed in this case?

A.   I did.  I didn't read through it --

Q.   Okay.

A.   -- completely.

Q.   Did you read part of it?

A.   I skimmed it.

Q.   When did you skim it?

A.   Probably when it first came to my attention that I -- I -- huh?

Q.   And when was that?

A.   I'm sorry.  That was, I don't know, maybe a year or two ago.

Q.   Did you have any input or did you provide any input to the counsel that filed that lawsuit?

A.   Well, if you're talking about the interrogatories, yes.

Q.   That's not what I'm walking about.  I appreciate the clarification.


ESQUIRE
DEPOSITION SOLUTIONS

Page 53

P. OHRNBERGER

Q. Ms. Ohrnberger, just a couple more follow-up questions on this Department of Labor complaint.

Did you work with any counsel in connection with the filing of that complaint with the Department of Labor?

A. I didn't.

Q. Did you file it on your own?

A. Yes.

Q. Did you receive any assistance from someone who was not a lawyer?

A. No.

Q. How did you decide to file a charge with the New York Department of Labor?

A. Because I -- I was -- thought that it was -- the premium pay was wrong, so I felt that it was necessary to at least try to file it. I don't know.

For whatever reason, at that point in time, I decided to do it.

Q. Yeah.

I guess that's partly what I was getting at is, I think you said the premium pay ended, you know, at the end of 2019.

Page 54

P. OHRNBERGER

So at the beginning of 2020, you were being compensated differently, right?

A. Correct.

Q. But I think you said -- and I don't have the document, so I can't tell you the date precisely -- but to the best of your recollection, it was 2020, 2021, that you filed this charge with the New York Department of Labor, right?

A. I believe so, yes.

Q. Okay.

So why after that period of time, I guess, did you file a charge or a complaint?

A. Because -- I believe I already said this. Because there was an e-mail that came out after, in 2019, that the policy had changed and they were no longer doing premium pay. And I just felt like there must have been a reason why they stopped doing premium pay. And that I thought maybe it was because it was wrong.

Q. Was there anything that gave you the impression that it was wrong other than the fact that it changed?

A. I just -- just reading over the

Page 55

P. OHRNBERGER

labor laws, it didn't seem -- it didn't seem like it was accurately -- Geico was accurately paying for those hours.

Q. What did the compensation change to after 2019, beginning in 2020?

A. It was anything over -- I think -- I guess it would be over 40 hours was time and a half.

Q. How many hours were you scheduled to work in any normal workweek?

A. 38.75.

Q. Okay.

Has that been consistent throughout your time at Geico?

A. Yes.

Q. Is it your understanding that essentially all associates at Geico are scheduled for 38.75-hour workweek?

A. To the best of my knowledge.

Q. Okay.

I think earlier you referenced that you didn't believe you were permitted to work overtime; is that right?

A. What time frame are you talking

Page 56

P. OHRNBERGER

about?

Q. Sure.

In 2020, to the present day?

A. Right. You had to have approval for overtime.

Q. Okay.

So if you wanted to work overtime or thought you needed to work overtime, what would the process look like, as you understand it?

A. You would have to request from your supervisor if you could work overtime.

Q. And once you requested it from your supervisor, what would happen then?

A. Generally speaking, it would be no, unless there was special projects that were to be accomplished. So there were time frames where it was approved, but it was for certain projects that had come to light at any given time.

Q. Okay.

And what kinds of special projects are you referencing?

A. For me, it was mostly social media cases.





Page 57

P. OHRNBERGER

Q. Well, if there was an influx of social media cases, there might be a need to approve overtime for you or potentially other investigators?

A. Correct.

Q. All right.

So I guess if there were a specific business need, your supervisor had the authority to approve overtime?

A. Yes, to the best of my recollection. Yes.

Q. Okay.

Did you ever -- again, let's stick with the 2020 to present day time frame.

Did you ever request overtime hours from your supervisor that was not related to a special project?

A. I had intimated that I couldn't get some of my work done within the 38.75 hours. I didn't -- I wouldn't say I requested. I would advise that it was going to be difficult to get what needed to be accomplished for that period -- for in 38.75 hours.

Q. Which supervisor did you intimate

Page 58

P. OHRNBERGER

that to?

A. Well, Danielle Perdomo and Bradley Waltman.

Q. You said Bradley Walton?

A. Waltman, W-A-L-T-M-A-N.

Q. When was Bradley Waltman your supervisor?

A. I believe from the end of 2022, I don't recall which month, to October of 2023. -- well, actually, sorry. September of 2023.

THE COURT REPORTER: I'm sorry. Just real fast, are you marking that first document for the record? I don't want it to be forgotten.

MR. TSONIS: Yes, I'll mark it as Exhibit 1. That's fine.

(Ohrnberger Exhibit 1, Plaintiff's Responses and Objection to Defendant's First Set of Requests for Production of Documents to Opt-in Plaintiff Patricia Ohrnberger, marked for identification.)

BY MR. TSONIS:

Q. And when was Danielle Perdomo your supervisor?

Page 59

P. OHRNBERGER

A. I believe 2014 to -- at some point in 2022, she had left the company.

Q. Did you have any supervisors between Danielle Perdomo and Bradley Waltman?

A. There were occasions where there was interim supervisors, I think. But they weren't my supervisors, if you will. They -- it was -- I can it was the time frame between Danielle leaving and Bradley taking over as supervisor, I think there was maybe a few weeks that another supervisor -- I would report to another supervisor for a brief period of time.

Q. Someone was temporarily covering?

A. Yes.

Q. Okay.

Do you recall who the temp supervisors that were covering were, or supervisor, if there was only one?

A. I want to say I believe it was Doreen Wolgoth. I think that's who it was.

Q. And since September of 2023, who has been your supervisor?

A. Doreen.

Q. So Doreen was kind of an interim

Page 60

P. OHRNBERGER

supervisor, but also is currently your supervisor; is that right?

A. Yes.

Q. Okay.

And I think you said, you intimated that you wouldn't be able to complete your workload within 38.75 hours to Danielle Perdomo and Bradley Waltman; is that right?

A. Yes.

Q. You did not intimate that to Doreen?

A. No.

Q. Okay.

Sorry. I phrased that poorly.

You did not intimate that to Doreen; is that correct?

A. During which time frame?

Q. September 2023 to present?

A. There's a -- no, I'm trying to think. When I came in to Doreen, I also became a desk investigator. So she basically said, you will only work 38.75 hours. And I said okay.

Q. So you never intimated to Doreen that you weren't going to be able to get your



PATRICIA OHRNBERGER
KEITH FISCHER vs GEICO

December 09, 2025
61–64

Page 61

P. OHRNBERGER

work done in 38.75; is that right?

A.   Not that I remember, no.

Q.   Sorry.

Again, just from a phrasing standpoint, is it correct that you never intimated to Doreen that you couldn't get your work done in the 38.75 hours?

A.   I don't recall ever having that conversation with her.

Q.   All right.

How many times did you intimate that to Danielle Perdomo?

A.   Often.

Q.   How often?

A.   You know, if we had team meetings, or if we had one-on-ones.  Sometimes Danielle would come out in the field with me and I would tell her that, you know, it's hard to get everything done in certain -- you know, in this period of time, this time frame.

Q.   Danielle Perdomo was your supervisor for many years.  I think what we're focusing on right now is the time period from 2020 to present, okay?

Page 62

P. OHRNBERGER

A.   Okay.

Q.   What position did you hold beginning, you know, 2020?

A.   So I was considered a hybrid.  It's a hybrid investigator.  So I dealt with major medical cases.

Q.   When you say hybrid, what do you mean?

A.   So it was field and inside.

Q.   Can you break that down for me a little more, the field versus inside part.

A.   Sure.  So inside was the major medical cases, so cases that were provider cases.  So we would get assigned a major case for a provider or several providers and we -- and as a hybrid, I would do the examination under oath of the claimants and the insureds.

And I would also do the clinic inspections and the scene canvasses and any other fieldwork that needed to be done for those cases.

Q.   I recognize it's only a brief period of time -- well, strike that.

When did you start in this hybrid

Page 63

P. OHRNBERGER

role as a field-end inside investigator?

A.   That was 2014.

Q.   At some point, did you switch into major case?

A.   Well, it's considered major case, but hybrid.  And then, yes, major case investigator, I guess, is now from September 2023, until the present.

Q.   Was your job title a field major case SIU investigator from like 2018?

A.   They changed the -- they had changed the -- the description.  Not the description, but what we were called, if you will, a couple of times.

So yes, it may have been.

Q.   Okay.

But you worked in major case investigating medical cases, essentially, from 2014 to the present?

A.   Well, I still do major case, but I'm not in the field anymore.

Q.   I see.

So that hybrid role -- I apologize if I already asked.  When did the hybrid role

Page 64

P. OHRNBERGER

end?

A.   September of 2023.  I think I -- I think we wrapped our cases around September -- the end of September 2023.

Q.   So from 2014 to September of 2023, you were in a hybrid role, where you worked part of the time in the field and part of the time as an inside investigator, right?

A.   Yes.

Q.   PreCOVID, were you going into the then Woodbury office?

A.   I wouldn't start in the office.  I would start at home.

Q.   Right.

I guess, as a hybrid, inform me how it worked.

Was it certain days you would be at the desk in the office and certain days you would be out in the field, or would it just depend on what was going on in your cases?

A.   So our desk was at home.  We would occasionally go into the office.  But there was no set rule that we started at the Woodbury office.  If that makes sense.  So we started at



PATRICIA OHRNBERGER
KEITH FISCHER vs GEICO

December 09, 2025
85–88

Page 85

P. OHRNBERGER

phone.

Q.   Okay.

And by the beginning of 2023, you had to, on your phone and the Workday application, sort of start your shift, punch out for lunch, punch back in for lunch, and then end your shift, right?

A.   Correct.

Q.   And you would do that, I guess -- strike that.

You followed that timekeeping policy in your role up until you transitioned to desk investigator; is that right?

A.   Yes.

Q.   And once you became a desk investigator, did you go back to entering in your hours worked each day, as you had in the past?

A.   Yes.

Q.   And that's the process that you follow even still today?

A.   Yes.

Q.   Okay.

How many hours -- well, let me back

Page 86

P. OHRNBERGER

up for a second.

You're alleging as part of this lawsuit that you worked time that you didn't write down in Workday and that you should be paid for; is that right?

A.   Yes.

Q.   How much time are you claiming that you did not write down in Workday on a weekly basis?

A.   On an average weekly basis, probably anywhere from one to three and a half hours.

Q.   Did that one to three and a half change at all -- let me put it a different way.

Was it one to three and a half from 2017 to the present day?

A.   Possibly.  It's likely, yes.

Q.   So I guess, you know, we talked about your role change, the timekeeping system change, the ability to do fieldwork change. There were number of changes during this time. Did the amount of time you're claiming you worked off the clock vary by time period?

A.   Did it vary?  I mean, there were

Page 87

P. OHRNBERGER

occasions when I didn't work overtime during a week.  But I -- you know, that was probably because I was on vacation.

Q.   Okay.

So any week that you had vacation time or holiday time taken or sick time is not a week that you're claiming you worked off the clock?

A.   Not that I recall, no.

Q.   Sorry --

(Multiple speakers.)

A.   And I'm talking about like a week of vacation.  I'm talking about, like, if I took a week-long vacation, then obviously I'm not working overtime.

Q.   That's a fair clarification.

So if you took a full week of vacation, you're not contending you otherwise worked during that week, right?

A.   Right.

Q.   And if you took a day or two of vacation, are you claiming that you worked hours off the clock that week?

A.   I may have in some cases.  Maybe not

Page 88

P. OHRNBERGER

as many as I would on a week where I didn't have vacation time.  But sure.

Q.   And then in other workweeks, you're claiming that you worked -- if you worked, you know, five days, for example, that you're claiming you worked additional time that you didn't record in Geico's systems?

A.   Correct.

Q.   And how -- I guess, did the amount of time you're claiming that you worked off the clock vary between 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024, and 2025, right?

Like, was it level and constant during that time period or was there a time period where there was only one hour a week and another time period where it was maybe two hours a week?

You know, that's what I'm trying to understand.

MS. MAHAR:  Objection.

You can answer.

A.   I wish I could tell you and split it up and tell you if there was a difference from year to year.  But I -- I don't think I could



PATRICIA OHRNBERGER
KEITH FISCHER vs GEICO

December 09, 2025
265–268

Page 265

P. OHRNBERGER

A.   I -- they didn't work medical provider cases, but they did the EUOs and the clinic inspections.

Q.   Right.

Well, they might not do a clinic inspection if, for example, it's a body shop that's a -- right?

A.   Well, that would be on the auto side.

Q.   Right.  That's what I mean.

There's major case investigators that work the auto, not the medical side, right?

A.   Oh, I see what you're saying.  Yes.

Q.   Okay.

And those individuals didn't report up to Courtney Wolfe, right?

A.   No, they -- I think they were -- I don't know when Bill came in.  But when Bill came in, they reported to him.

Q.   Okay.

So you had some major case investigators that reported to a supervisor who reported to Bill Newport, and you had other

Page 266

P. OHRNBERGER

major case investigators that reported to a supervisor that reported to Courtney Wolfe.  Is that accurate?

A.   Yes.

Q.   Okay.

MR. TSONIS:  All right.  I have no further questions.

MS. MAHAR:  No further questions from us.

(Time Noted:  4:16 p.m.)


--------------------

PATRICIA OHRNBERGER

Subscribed and sworn to before me this        day of           2025.

--------------------------------------

Page 267

C E R T I F I C A T E

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK    )

I, LISA M. MURACO, a Notary Public within and for the State of New York, do hereby certify:

That PATRICIA OHRNBERGER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of December, 2025.

--------------------------
LISA M. MURACO

Page 268

I N D E X

WITNESS                                    PAGE
PATRICIA OHRNBERGER
MR. TSONIS                                 5
                                           260


E X H I B I T S

DESCRIPTION                                PAGE
Ohrnberger Exhibit 1, Plaintiff's          58
Responses and Objection to Defendant's
First Set of Requests for Production of
Documents to Opt-in Plaintiff Patricia
Ohrnberger

Ohrnberger Exhibit 2, Bates Number         99
G022582 to 659, Workday Profile

Ohrnberger Exhibit 3, E-mail               149

Ohrnberger Exhibit 4, Timesheet            154

Ohrnberger Exhibit 5, Bates Number         184
G022740, E-mail



Page 269

    I N D E X   O F   E X H I B I T S(Cont'd.)
DESCRIPTION                              PAGE
Ohrnberger Exhibit 6, Bates Number       205
G022289 to G 022513, Pay Stubs


Ohrnberger Exhibit 7, Interrogatories     222


            INFORMATION REQUESTED
                Page      Line

                 44        22
                 50        17

       QUESTIONS INSTRUCTED NOT TO ANSWER
                Page      Line
                245        12

Page 270

        ERRATA SHEET FOR THE TRANSCRIPT OF:
    Case Name: FISCHER, et al. V GOVERNMENT
    EMPLOYEES
    Dep. Date:     TUESDAY, DECEMBER 9, 2025
    Deponent:      PATRICIA OHRNBERGER

            CORRECTIONS:

    Pg. Ln.  Now Reads      Should Read     Reason
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____
    ___ ___  _____   _____   _____

                        _____
                        Signature of Deponent
    SUBSCRIBED AND SWORN BEFORE ME
    THIS____DAY OF_____, 2025.

    _____
    (Notary Public)  MY COMMISSION EXPIRES:_____



800.211.DEPO (3376)
EsquireSolutions.com