# Exhibit II

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

KEITH FISCHER, MICHAEL        )
O'SULLIVAN, JOHN MOESER,       )
LOUIS PIA, THOMAS BARDEN,      )
CONSTANCE MANGAN, and          )
CHARISE JONES, individually    )
and on behalf of all others    )
similarly situated,            )
                               )
                Plaintiffs,    )No.2:23-CV-
                               )02848
            vs.                )
                               )
GOVERNMENT EMPLOYEES           )
INSURANCE COMPANY d/b/a        )
GEICO,                         )
                               )
                Defendants.    )
----------------------------

REMOTE VIDEOTAPED DEPOSITION OF
KAREN GOTTERBARN
Monday, December 15, 2025

Reported by:
LISA M. MURACO, RPR, CCR-NJ
JOB NO. J13928128

Page 2

Monday, December 15, 2025
10:45 a.m.

REMOTE Deposition of KAREN
GOTTERBARN, held VIA ZOOM, before LISA M.
MURACO, a Registered Professional Reporter,
CR-NJ, a Notary Public of the State of New
York, New Jersey, Florida, and
Massachusetts.

Page 3

A P P E A R A N C E S:

(REMOTE)

    OUTTEN & GOLDEN LLP
    Attorneys for Plaintiff
        685 Third Avenue
        25th Floor
        New York, NY 10017
    BY:   JARRON McALLISTER, ESQ.

    DUANE MORRIS LLP
    Attorneys for Defendant
        190 South LaSalle Street, Suite 3700
        Chicago, Illinois 60603
    BY:   GREGORY TSONIS, ESQ.

Page 4

        IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing and
sealing be and the same are hereby waived.
        IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.
        IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized
to administer an oath, with the same
force and effect as if signed and sworn
to before the Court.

                - oOo -



KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

December 15, 2025
89–92

Page 89

K. GOTTERBARN

Q.   Do you have any understanding as to whether other individuals recorded more than 40 hours in a workweek?

MR. McALLISTER:  Objection.

A.   I --

MR. McALLISTER:  You can answer.

A.   I do not.

Q.   For example, do you have any understanding as to whether Patricia Ohrnberger or Tracy McCarthy or Barbara Ann Chapman had the ability to record more than 40 hours in a workweek?

MR. McALLISTER:  Objection.

You can answer.

A.   I do not.

Q.   You are contending that you worked, however, in excess of 40 hours in certain workweeks and weren't compensated for that time; is that right?

A.   Over 40 hours?  Is that the question you're asking?

Q.   Yeah.

You're claiming you worked more than what you recorded down on your timesheets,

Page 90

K. GOTTERBARN

correct?

A.   Correct.

Q.   Right.

From this time period beginning in January of 2020, to the end of your employment, how many hours are you alleging that you worked each week that you didn't record?

A.   On an average, ten hours.

Q.   Did that time period -- excuse me.  Strike that.

Did that -- those ten hours that you're alleging vary over time?

A.   Yes.

Q.   I'll frame it a little bit differently.

In this time period, this year that we're talking about, or just over a year, was there a time period in which it was less than ten hours and a time period in which it was more than ten hours?

MR. McALLISTER:  Objection.

You can answer.

A.   At the least, it was ten hours.  That is at the low end.

Page 91

K. GOTTERBARN

Q.   And what would it be on the high end?

A.   18.

Q.   How frequently was it 18 as opposed to 10?

A.   I'm sorry.  I can't give you an accurate estimate.

Q.   But you never recorded any of those hours in Geico's timekeeping system; is that right?

A.   That is correct.

MR. McALLISTER:  Objection.

BY MR. TSONIS:

Q.   You submitted your timesheets on a weekly basis for approval; is that right?

A.   I thought it was every other week.  But I'm not sure.

Q.   Okay.

A.   Because the pay periods were every two weeks.  That's why I may be mistaken.

Q.   Would you submit the time, the amount of time that you worked on each day on a daily basis or would you do it at the end of the week?

Page 92

K. GOTTERBARN

A.   I would put it in the system, but you didn't have to submit it daily.  You could update without submission.

Q.   I appreciate the clarity.

So you would enter it into Workday, but you wouldn't be submitting a timesheet for approval at that time.

Would that be right?

A.   It's the way the Geico system worked.  If you submit it every day, it means the supervisor has to approve every day and then send it back.  So it was established that we should only submit when it was due.

Q.   I see.

So you would only submit it either at the end -- potentially at the end of the pay period, but maybe on a weekly basis?

A.   I'm not sure if it was weekly or biweekly.

Q.   Okay.

It sounds like, to the best of your recollection, you think it was biweekly, by pay period?

A.   Yes.



KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

Page 93

K. GOTTERBARN

Q. Okay.

So once you submitted it, was it your understanding that then it would go to Danielle Perdomo for approval?

A. Yes, it went directly to her.

Q. And do you have an understanding of what Danielle Perdomo would be looking at on your timesheet?

A. Yes.

Q. What would she be looking at?

A. To make sure that our time, including regular time, holiday pay, vacation pay, maybe medical, you know, that would go into like your sick, she would make sure that it was all accurate.

Q. All right.

So your supervisor would look over your timesheet to ensure that if you took time off or had vacation or something like that, that you'd accurately recorded it?

A. Yes.

Q. Danielle Perdomo wouldn't actually reach out to you, though, and say, hey, did you work 38.75 hours this workweek?

Page 94

K. GOTTERBARN

A. No.

Q. Okay.

So your supervisor, except through your submission of your timekeeping records on a biweekly basis, wouldn't know how many hours you actually worked, right?

MR. McALLISTER: Objection.

You can answer.

A. According to the timesheet, no, she would not know.

Q. Okay.

And she wouldn't, I guess, in any workweek know precisely how many hours that you worked, right?

A. That needs further explanation. There were other ways that she could know that we worked over our time.

Q. I see.

In what ways are you referring to?

A. Phone calls, e-mails, SICM entries would be three examples.

Q. I see.

Did you have a scheduled start time when you worked as a field investigator?

Page 95

K. GOTTERBARN

A. Not really.

Q. You had the ability to set your own schedule, actually, right?

A. Correct.

Q. Okay.

Similarly, if you -- or I guess, relatedly, if you wanted to start later in the pay, you would end later in the day, right, to work your shift?

A. Correct.

Q. Okay.

And if you wanted to start far earlier, let's say, beat traffic or something like that, you could start earlier and end earlier?

A. Correct.

Q. All right.

So you listed three ways that you're contending your supervisor would know when you were working.

I think you said phone calls, e-mails, and SICM entries; is that right?

A. Correct.

Q. Let's start with phone calls.

Page 96

K. GOTTERBARN

What do you mean by phone calls?

A. If I'm calling her, she can see that it's after the regular workday.

Q. I see --

A. -- basic 7.75 that she would think or know that we were working.

Q. Okay.

And is that, I guess, the same basis for why you're saying e-mails are --

(Multiple speakers.)

A. Timestamps, yes.

Q. I see.

So timestamps on e-mails would indicate if you were working past the close of normal business hours?

A. They might, yes.

Q. Well, is that the basis for you claiming that your supervisor could have knowledge that you were working, but not recording it?

A. Yes.

Q. And you referenced SICM.

What do you mean by that?

A. Putting entries into the system.

KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

Page 97

K. GOTTERBARN

Putting entries in.  They are also timestamped.

Q.   Okay.

Are you aware -- well, strike that.

Who would decide whether a case gets closed in SICM?

A.   My supervisor.

Q.   So if you created an assist for an EUO and you conducted that EUO and you documented it, you needed your supervisor to approve that case closure?

A.   Yes, sir.

Q.   Did your -- did that ever change throughout your time with Geico?

A.   Before the timing of this suit, at one time, it was way back, we were on self-approval briefly.

Q.   But you weren't on self-approval?

A.   In probably about 2012 for a short period of time.  But beyond that, no.

Q.   Okay.

Do you have an understanding as to whether any other field major case investigators had the ability to approve their own cases?

Page 98

K. GOTTERBARN

MR. McALLISTER:  Objection.

A.   No, I don't.

Q.   I see.

So besides phone calls, the timestamps in e-mails, and the timestamps in SICM entries, do you have any other basis for alleging that your supervisor would be aware of time that you worked off the clock but didn't record in Geico's timekeeping system?

A.   No, I do not.

Q.   Okay.

Did you ever inform your supervisor that you were working off the clock?

A.   She knew.

Q.   Again, Ms. Gotterbarn, I'd appreciate if you answer my actual question.

A.   Oh, I'm sorry.

Q.   Did you ever inform Danielle Perdomo that you were working off the clock?

A.   I'm sorry.  I misunderstood your question.

Did I ever inform her, yes.

Q.   When did you inform her?

A.   I don't have exact dates.  But she

Page 99

K. GOTTERBARN

would know if I was working at 5 o'clock in the morning or 9 o'clock at night, she would know.  I would tell her I worked extra.

Q.   I guess I want to get specific here.

A.   All right.

Q.   Do you recall a conversation with Danielle Perdomo or more than one conversation?

A.   I would have to say more than one.

Q.   How many conversations, to the best of your recollection?

A.   I have no recollection of the number or -- (inaudible.)

Q.   Is it --

(Multiple speakers.)

A.   Excuse me.

Q.   Bless you.

A.   Thanks.

Q.   Is it three conversations?

A.   I couldn't tell you.

Q.   All right.

Ms. Gotterbarn, I appreciate that we're talking about things that happened several years ago now.

But again, I'm entitled to your best

Page 100

K. GOTTERBARN

recollection.  If you're claiming you had a conversation with your supervisor about working off the clock, we're entitled as much detail as you can recall.

Does that make sense?

A.   It does.  But this is four years ago.

Q.   I understand.  And I appreciate you can't give me --

A.   I --

(Multiple speakers.)

Q.   -- a specific date or time.  And I'm not asking you for a specific date and time.

I'm just asking how many times you're alleging that you had such a conversation with Danielle Perdomo?

A.   I cannot give you a number.

Q.   Just give me a range then.

A.   It would be guess.

Q.   I don't want you to guess.  I want your best recollection.

A.   I can't recall.  If I could recall, I would tell you.  I cannot recall.

I'm keeping it open-ended so that if

KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

December 15, 2025
101–104

Page 101

K. GOTTERBARN

I do recall in the course of our conversation, I will ask you to come back to it.

Is that fair?

Q. Well, if you have some recollection, I guess it would be fair for you to say what that is. You can always clarify your testimony down the road if you recall something else through the course of today's deposition.

But if you have a recollection now, I'd ask that you do give it.

A. I just can't pinpoint an estimate.

I would say more than once. That, I can attest to with certainty. More than once.

I'm trying to think. Maybe five times.

Q. Okay.

Five at the most? Somewhere between one and five or two and five?

MR. McALLISTER: Objection.

BY MR. TSONIS:

Q. You can answer.

A. I can answer. Thank you.

It's a foggy recollection. It could be five.

Page 102

K. GOTTERBARN

Q. Okay.

And when you would have these conversations with Danielle Perdomo, were they all over the phone?

A. Yes.

Q. And when you had these conversations with Danielle Perdomo, is it your testimony that you would say something along the lines of, I worked extra?

MR. McALLISTER: Objection.

You can answer it.

A. Yes.

Q. Okay.

Did Danielle Perdomo ever respond to your comment?

A. I don't recall.

Q. Okay.

Aside from the conversation or conversations with Danielle Perdomo we've just been discussing, did you ever in any other way inform your supervisor that you were working off the clock and not recording that time in Geico's timekeeping system?

A. No.

Page 103

K. GOTTERBARN

Q. Did you ever record any -- strike that.

Did you ever notify any SIU manager that you were working off the clock and not recording that time in Geico's timekeeping system?

A. No.

Q. Did you ever put a --

A. Oops. You're breaking up.

Q. Can you hear me okay?

A. There, better. Thank you. For a second, I couldn't hear you.

Q. That's okay.

Did you ever notify anyone in human resources that you were working off the clock and not recording that time in Geico's timekeeping system?

A. No.

Q. Did you ever inform anyone else at Geico that you were working off the clock and not recording that time in Geico's timekeeping system?

A. Not to the best of my recollection.

Q. Okay.

Page 104

K. GOTTERBARN

What is the reason that you're contending you needed to work off the clock?

A. The workloads were big. The cases were involved and they needed that time to resolve them. And for me to keep up with the five-day requirement to be in my cases.

Q. When you say keep up with the five-day requirement, I guess, the requirement that you're referencing is that you had to make some sort of update indicating that you were moving the case forward toward completion.

Would that be fair?

A. Yes, it would.

Q. All right.

And in some cases, that update could simply be, hey, continuing to wait to schedule an EUO, for example, right?

A. No.

Q. Why not?

A. Because that doesn't do anything to really move the case forward. I would write a little more detail than that. You know, like I'm waiting for this EUO. It has been rescheduled for -- you know, I'd have to give



KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

December 15, 2025
105–108

Page 105

K. GOTTERBARN

more specifics. That's what I'm trying to get at. Like date, time, why it was rescheduled.

You can't just put in it's just rescheduled. You know, I'm just waiting for an EUO. It would be incomplete.

Q. Okay.

But this timeline that you're talking about, you know, this note, for example, you're saying about updating on the scheduling of an EUO, that's a note that might take, you know, a couple of minutes to put into SICM, right?

MR. McALLISTER: Objection.

You can answer it.

A. It would depend. I would have to go back, open the case, read through my notes. It would be more than a couple of minutes.

Q. How long would that type of note take?

A. It would depend because I had to back it up with fact. Which was I scheduled it for this date. I received perhaps a call from an attorney, which had been previously noted. Or the person I went to the EUO and they did

Page 106

K. GOTTERBARN

not show up. Because when you were attend and they don't show up, you have to wait an hour.

So I would put whatever note pertained to that specific EUO. It wouldn't be just a couple of minutes.

Q. Sure.

In that circumstance, though, you had a laptop issued to you, as a Geico employee, right?

A. Correct.

Q. You could be waiting in the EUO for the, you know, no show and complete your SICM entry while you were waiting, right?

A. I could.

Q. Okay.

A. But it didn't always happen that way.

Q. Right.

So the requirement that you have to be in SICM and provide some sort of update once a week, that was a requirement relating to audit guidelines, right?

A. Correct.

Q. All right.

Page 107

K. GOTTERBARN

Is that something that's referred to as, like, time and process or is that different?

A. I don't recall.

Q. Okay.

But the audit guidelines or the audit process, looked at, I guess, the documentation of your cases as a whole.

Would that be right?

MR. McALLISTER: Objection.

You can answer.

A. That -- that would be part of it.

Q. Well, I guess, the audit process looks at all aspects of case handling, right?

A. Correct.

Q. It includes things like whether the right investigative steps were taken, right?

A. Correct.

Q. It includes things like whether communication with the internal, you know, the adjuster or whoever was investigating outside or handling the claim outside of SIU, right?

A. Yes.

Q. It includes whether certain things

Page 108

K. GOTTERBARN

were done, like background checks and the like, right?

A. Yes.

Q. The timing piece is only one portion of the audit criteria, right?

A. Yes.

Q. Okay.

So besides the audit criteria, was there any other timing or any other way in which it was communicated to you that you had to be in your case files at some sort of -- within some sort of time frame?

A. I'm sorry. I thought we went over this before. And I don't recall.

Could you phrase it another way.

Q. That's okay.

So in part, I guess, the time that you're alleging that you worked but didn't record was because you wanted to be thorough in your case updates.

Would that be fair?

A. That would be very fair.

Q. All right.

Would it be accurate to say that



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 233

K. GOTTERBARN

Q.    Okay.

It seems like there's at least some group of people that, like yourself, transitioned from nonSIU roles into SIU, right?

A.    Correct.

Q.    Okay.

But there's other people that, I guess, don't have that relevant Geico experience and might need more time in training to learn Geico's systems and Geico, you know, ways of doing things, I guess, right?

A.    (No audible response.)

Q.    Sorry.  It cut out.

A.    Correct.

Q.    Okay.

A.    Better?

Q.    Yes.  Thank you.

A.    Can you pause one second.  I want to turn the heat up.  I'm freezing.

Q.    No, that's fine.

A.    Okay.  I'm back.

MR. TSONIS:  I think that's all my questions.

THE WITNESS:  Okay.  Thank you.

Page 234

K. GOTTERBARN

MR. McALLISTER:  Maybe give us like five or so minutes, just to double-check to see if I have any redirect questions.

MR. TSONIS:  That's fine.

MR. McALLISTER:  Come back at 3:30 or 2:30 Central.

MR. TSONIS:  All right.  That works.  Thank you.

(Recess is taken.)

MR. McALLISTER:  I have no further questions.

THE WITNESS:  Oh.

MR. TSONIS:  Okay.

(Time Noted:  3:25 p.m.)

---------------------

KAREN GOTTERBARN

Subscribed and sworn to before me this      day of            2025.

--------------------------------------

Page 235

C E R T I F I C A T E

STATE OF NEW YORK    )

                     ) ss.:

COUNTY OF NEW YORK   )

I, LISA M. MURACO, a Notary Public within and for the State of New York, do hereby certify:

That KAREN GOTTERBARN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of December, 2025.

LISA M. MURACO

Page 236

I N D E X

WITNESS                                PAGE
KAREN GOTTERBARN
MR. TSONIS                               5

E X H I B I T S

DESCRIPTION                            PAGE
Gotternbarn Exhibit 1, Bates Number      71
G022190 to G02288, Geico Pay Stub

Gotterbarn Exhibit 2, E-mail            110

Gotterbarn Exhibit 3, E-mail Exchange   124

Gotterbarn Exhibit 4, Bates Number      140
G000028 to G000043, 11/17 Human
Resources Associate Handbook

Gotterbarn Exhibit 5, Bates Number      147
G002514, Excel and Native Document
Student Learning Transcript

Gotterbarn Exhibit 6, Plaintiff's       153
Responses and Objections to Plaintiff's
First Set of Interrogatories to Opt-In
Plaintiff Karen Gotterbarn



KAREN GOTTERBARN
KEITH FISCHER, et al. vs GEICO

December 15, 2025
237–238

Page 237

I N D E X   O F   E X H I B I T S(Cont'd.)

DESCRIPTION                                    PAGE

Gotterbarn Exhibit 7, Second Amended           162
Collective and Class Action Complaint

Gotterbarn Exhibit 8, Workday Report           175

Gotterbarn Exhibit 9, E-mail                   201

Page 238

     ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: FISCHER v GOVERNMENT EMPLOYEES

Dep. Date:     MONDAY, DECEMBER 15, 2025

Deponent:     KAREN GOTTERBARN

          CORRECTIONS:

Pg. Ln.  Now Reads        Should Read     Reason

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____


                    _____
                    Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____, 2025.


_____

(Notary Public)  MY COMMISSION EXPIRES:_____

